Lee Gelernt*
Judy Rabinovitz*
Omar C. Jadwat*
Anand Balakrishnan*
Celso Perez**(SBN 304924)
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*ojadwat@aclu.org*
*abalakrishnan@aclu.org*
*cperez@aclu.org*

Jennifer Chang Newell (SBN 233033)
Cody Wofsy (SBN 294179)
Julie Veroff** (SBN 310161)
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-0770
F: (415) 395-0950
*jnewell@aclu.org*
*cwofsy@aclu.org*
*jveroff@aclu.org*

*Attorneys for Plaintiffs* (Additional counsel listed on following page)

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| East Bay Sanctuary Covenant; Al Otro Lado; Innovation Law Lab; and Central American Resource Center in Los Angeles,<br><br>*Plaintiffs*,<br><br>v.<br><br>Donald J. Trump, President of the United States, in his official capacity; Matthew G. Whitaker, Acting Attorney General, in his official capacity; U.S. Department of Justice; James McHenry, Director of the Executive Office for Immigration Review, in his official capacity; the Executive Office for Immigration Review; Kirstjen M. Nielsen, Secretary of Homeland Security, in her official capacity; U.S. Department of Homeland Security; Lee Francis Cissna, Director of the U.S. Citizenship and Immigration Services, in his official capacity; U.S. Citizenship and Immigration Services; Kevin K. McAleenan, Commissioner of U.S. Customs and Border Protection, in his official capacity; U.S. Customs and Border Protection; Ronald D. Vitiello, Acting Director of Immigration and Customs Enforcement, in his official capacity; Immigration and Customs Enforcement,<br><br>*Defendants*. | Case No.:<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**IMMIGRATION ACTION** |

Melissa Crow*
SOUTHERN POVERTY LAW CENTER
1666 Connecticut Avenue NW, Suite 100
Washington, D.C. 20009
T: (202) 355-4471
F: (404) 221-5857
*melissa.crow@splcenter.org*

Mary Bauer*
SOUTHERN POVERTY LAW CENTER
1000 Preston Avenue
Charlottesville, VA  22903
T:  (470) 606-9307
F:  (404) 221-5857
*mary.bauer@splcenter.org*

Baher Azmy*
Angelo Guisado*
Ghita Schwarz*
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Telephone: (212) 614-6464
Facsimile: (212) 614-6499
bazmy@ccrjustice.org
aguisado@ccrjustice.org
gschwarz@ccrjustice.org

Christine P. Sun (SBN 218701)
Vasudha Talla (SBN 316219)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
T: (415) 621-2493
F: (415) 255-8437
*csun@aclunc.org*
*vtalla@aclunc.org*

*Attorneys for Plaintiffs*

*Pro hac vice application forthcoming*
**Application for admission forthcoming*

## INTRODUCTION

1. As part of our nation's commitment to the protection of people fleeing persecution, federal law specifically guarantees that "[a]ny alien who is physically present in the United States or who arrives in the United States," at a designated port of entry or not, is entitled to apply for asylum. 8 U.S.C. § 1158(a)(1). Consistent with its international obligations, Congress was specific and clear: Entering without inspection is not a basis to categorically deny asylum to refugees.

2. Despite this clear congressional command, on November 8, 2018, the Acting Attorney General and Secretary of Homeland Security promulgated an interim final rule ("rule") providing that all persons subject to a presidential proclamation concerning the southern border issued pursuant to Immigration and Nationality Act ("INA") § 212(f), 8 U.S.C. § 1182(f), or INA § 215(a)(1), 8 U.S.C. § 1185(a)(1), are ineligible for asylum. The next day, the President signed a Proclamation entitled "Presidential Proclamation Addressing Mass Migration Through the Southern Border of the United States" that suspends the entry of all persons entering without inspection at the southern border.

3. Together, the rule and Proclamation bar people from obtaining asylum if they enter the United States somewhere along the southern border other than a designated port of arrival—in direct violation of Congress's clear command that manner of entry cannot constitute a categorical asylum bar. In addition, the Acting Attorney General and Secretary of Homeland Security promulgated the rule without the required procedural steps and without good cause for immediately putting the rule into effect.

4. Plaintiffs seek a declaration that these actions violate the INA and the Administrative Procedure Act ("APA"), and an order enjoining the Proclamation and the rule.

1
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## JURISDICTION AND VENUE

5. This case arises under the APA, 5 U.S.C. § 701, *et seq.* and the INA, 8 U.S.C. § 1101, *et seq.* This Court has subject matter jurisdiction under 28 U.S.C. § 1331.

6. Venue is proper under 28 U.S.C. § 1391(e)(1) because the defendants are agencies of the United States and officers of the United States acting in their official capacity and 1) at least one plaintiff resides in this district; and/or 2) a substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

7. Plaintiff East Bay Sanctuary Covenant ("ESBC") is a nonprofit organization incorporated in California. ESBC's main office is in Berkeley, California.

8. ESBC was founded in 1982 to assist refugees fleeing the civil wars and violence in El Salvador and Guatemala. ESBC's mission is to offer sanctuary, support, community organizing assistance, advocacy, and legal services to people escaping political persecution, terror, war, intolerance, exploitation, and other violence. In particular, one of ESBC's critical missions is to assist individuals fleeing persecution in applying for asylum and other humanitarian relief in the United States. EBSC also trains and mentors law students and attorneys to help clients apply for asylum.

9. Plaintiff Al Otro Lado is a nonprofit, nonpartisan organization established in 2014 and incorporated in California.

10. Al Otro Lado is a legal services organization that serves indigent deportees, migrants, refugees, and their families, and operates primarily in Los Angeles, California, and Tijuana, Mexico. Al Otro Lado's mission is to coordinate and provide screening, advocacy, and legal representation for individuals in asylum and other immigration proceedings; to seek redress for civil rights violations; and to provide assistance with other legal and social service needs.

11. Plaintiff Innovation Law Lab is a nonprofit organization that has projects in multiple states.

12. Innovation Law Lab seeks to advance the legal rights of immigrants and refugees in the United States, with a focus on providing representation to asylum seekers.

13. Plaintiff Central American Resource Center ("CARECEN") is a nonprofit organization incorporated in California.

14. CARECEN's mission is to empower Central Americans and all immigrants by defending human and civil rights, working for social and economic justice and promoting cultural diversity. CARECEN offers low-cost immigration legal services, community education programs, and advocacy and organizing to achieve fair and more inclusive immigration, education, and labor laws and policies in Los Angeles.

15. Defendant Donald Trump is the President of the United States. He is sued in his official capacity. In that capacity, he issued the Proclamation challenged in this suit.

16. Defendant Matthew G. Whitaker is the Acting Attorney General of the United States. He is sued in his official capacity. In that capacity, he issued the interim final rule challenged in this suit. The Attorney General is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103 and is empowered to grant asylum or other relief.

17. Defendant U.S. Department of Justice ("DOJ") is a cabinet-level department of the United States federal government.

18. Defendant James McHenry is the Director of the Executive Office for Immigration Review ("EOIR"). He is sued in his official capacity.

19. Defendant EOIR is the sub-agency of DOJ that, through its immigration judges, conducts limited review of negative credible fear determinations.

20. Defendant Kirstjen M. Nielsen is the Secretary of Homeland Security. She is sued in her official capacity. In that capacity, she issued the interim final rule challenged in this suit. She

3
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

directs each of the component agencies within the Department of Homeland Security. In her official capacity, Defendant Nielsen is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103, and is empowered to grant asylum or other relief.

21.     Defendant U.S. Department of Homeland Security ("DHS") is a cabinet-level department of the United States federal government. Its components include U.S. Citizenship and Immigration Services ("USCIS"), Customs and Border Protection ("CBP"), and Immigration and Customs Enforcement ("ICE").

22.     Defendant Lee Francis Cissna is the Director of USCIS. He is sued in his official capacity.

23.     Defendant USCIS is the sub-agency of DHS that, through its asylum officers, conducts interviews of individuals who apply for asylum.

24.     Defendant Kevin K. McAleenan is the Commissioner of CBP. He is sued in his official capacity.

25.     Defendant CBP is the sub-agency of DHS that is responsible for the initial processing and detention of noncitizens who are apprehended near the U.S. border.

26.     Defendant Ronald D. Vitiello is the Acting Director of ICE. He is sued in his official capacity.

27.     Defendant ICE is the sub-agency of DHS that is responsible for carrying out removal orders and overseeing immigration detention.

## BACKGROUND

**Obligations to Asylum Seekers Under Domestic and International Law**

28.     Federal law provides several forms of protection for individuals fleeing persecution and torture. These forms of protection include asylum, 8 U.S.C. § 1158; withholding of removal, 8 U.S.C. § 1231(b)(3); and protection under the Convention Against Torture, *see* Foreign Affairs

4
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231); 8 C.F.R. § 208.18.

29. The modern asylum system was established by the Refugee Act of 1980, Pub. L. 96-212, 94 Stat. 102, which was incorporated into the INA. The Act reflects "one of the oldest themes in America's history—welcoming homeless refugees to our shores," and "gives statutory meaning to our national commitment to human rights and humanitarian concerns." Sen. Rep. No. 256, 96th Cong., 1st Sess. 1 (1979), *reprinted in* U.S. Code Cong. and Admin. News 141, 141.

30. In crafting the statutory provisions governing asylum, Congress took care to ensure that noncitizens within our country or at the border would be able to apply for asylum, regardless of their manner of arrival at or entry within our borders. 8 U.S.C. § 1158(a)(1) specifically provides that

> "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title."

31. Accordingly, the Board of Immigration Appeals has long held that "an alien's manner of entry or attempted entry . . . should not be considered in such a way that the practical effect is to deny [asylum] relief in virtually all cases." *Matter of Pula*, 19 I&N Dec. 467, 474 (BIA 1987).

32. The statutory provisions governing asylum, including 8 U.S.C. § 1158(a)(1), represent an effort by Congress to bring the United States into compliance with its international obligations under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees.

33. Asylum affords protection to individuals who have a "well-founded fear of persecution" on account of any one of five protected grounds: race, religion, nationality, political opinion, or membership in a particular social group. 8 U.S.C. § 1158(b)(1)(A); 8 U.S.C. § 1101(a)(42)(A). Withholding of removal also offers protection to individuals targeted on account

of one of the five grounds, but it requires an applicant to show that such persecution is more likely than not—a higher standard of proof than that needed for asylum.

34. Asylum is also associated with certain benefits that are critical to the noncitizen's safety and ability to successfully transition to a life free from persecution. *See* 8 U.S.C. §§ 1159(b) (ability to adjust to the status of a lawful permanent resident); 1427 (ability to become a United States citizen after being lawfully admitted for permanent residence). Critically, the spouse and children of a person granted asylum are likewise eligible for asylum. 8 U.S.C. § 1158(b)(3). These benefits are not available with certain other forms of relief from removal, like withholding of removal.

35. There are three principal ways for an individual to seek asylum:

36. First, where a noncitizen is not in any kind of removal proceedings, his or her application is "affirmative." *See* 8 C.F.R. §§208.2(a), 208.9. He or she files an application with USCIS, and has an interview with an asylum officer.

37. Second, a noncitizen in ordinary removal proceedings, *see* 8 U.S.C. § 1229a, may apply for asylum as a form of relief from removal, 8 C.F.R. § 208.2(b). These applications are referred to as "defensive" asylum applications.

38. Third, Congress established an alternative process, "expedited removal," applicable to certain noncitizens who are arriving at ports of entry or apprehended after entering without inspection. *See* 8 U.S.C. § 1225(b)(1); *see also Designating Aliens for Expedited Removal*, 69 Fed. Reg. 48,877 (Aug. 11, 2004) (expedited removal applicable to those who entered without inspection and are apprehended within 14 days of entry and 100 miles of the border).

39. As part of the expedited removal system, a noncitizen who expresses a fear of return to his or her home country is entitled to a "credible fear" screening interview. 8 U.S.C. § 1225(b)(1)(B). If the screening officer finds a "significant possibility" that the individual "could

establish eligibility for asylum," he or she is placed in regular removal proceedings and given an opportunity to apply for asylum. *Id.*

**The New Proclamation and Interim Final Rule**

40. On November 8, 2018, Defendant Whitaker, in his role as Acting Attorney General, and Defendant Nielsen, in her role as Secretary of Homeland Security, promulgated an interim final rule pursuant to 8 U.S.C. § 1158(b)(2)(C), a provision of the INA that gives the Attorney General the power to "by regulation establish additional limitations and conditions, consistent with [§ 1158], under which an alien shall be ineligible for asylum," and 8 U.S.C. § 1158(d)(5)(B), a provision of the INA that gives the Attorney General the power to "provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with this chapter."

41. The rule renders ineligible for asylum noncitizens whose entry is prohibited by a proclamation or order of the President issued pursuant to INA § 212(f), 8 U.S.C. § 1182(f), or INA § 215(a)(1), 8 U.S.C. § 1185(a)(1), that concerns the southern border.

42. The APA generally requires a period of public notice and comment on proposed regulations, to ensure that agency actions are transparent, lawful, and appropriately vetted. Nevertheless, the Defendants claimed "good cause" to bypass the notice-and-comment procedures normally required for a rulemaking pursuant to 5 U.S.C. § 553(b)(B), and the 30-day waiting period that is required even where notice and comment are not, 5 U.S.C. § 553(d). They also invoked the "foreign affairs" exception to those procedures. 5 U.S.C. § 553(a)(1).

43. The next day, November 9, 2018, President Trump issued a Proclamation entitled "Presidential Proclamation Addressing Mass Migration Through the Southern Border of the United States." The Proclamation was issued pursuant to 8 U.S.C. §§ 1182(f) and 1185(a), and suspends the entry of persons entering without inspection along the southern border.

44. Together, these actions render ineligible for asylum any noncitizen who enters the United States without inspection at the southern border. Plaintiffs are harmed by these actions, which undermine their missions and cause them to divert resources.

**Asylum Seekers at the Southern Border**

*Dire Conditions in Central America Have Prompted Many to Seek Refuge Elsewhere*

45. Individuals who arrive at the southern border seeking protection in the United States through the asylum process are fleeing some of the most dangerous countries in the world.

46. Although asylum seekers come to the southern border from all over the world, many come from El Salvador, Guatemala, and Honduras, countries known as the "Northern Triangle." According to a recent report from the United Nations High Commissioner for Refugees, these countries are experiencing epidemic levels of violence. Human rights groups have compared the levels of violence in this region to those typically seen in war zones.

47. Those who leave often are running from life-or-death situations, leaving everything behind to make a dangerous journey. In particular, violence against women by criminal armed groups has escalated dramatically in Central America, and those governments have been unable or unwilling to provide effective protection.

48. Asylum seekers fleeing their home countries in Central America face an arduous journey to the United States, involving a high risk of violence, including sexual assault, along the way.

49. Although those traveling by land cross through Mexico before reaching the United States, for many, remaining in Mexico is not an option. Rates of violence in Mexico have been increasing as of late; 2017 was the deadliest year on record, with more than 23,000 murder investigations opened.

50. Refugees in Mexico are at risk of kidnapping, disappearance, trafficking, and sexual assault, among other harms. Lesbian, gay, bisexual, and transgender persons, as well as people with indigenous heritage, regularly have been subject to persecution in Mexico.

51. Many of the migrants coming to the southern border have legitimate claims to asylum.

52. According to the United Nations High Commissioner for Refugees, in fiscal year 2015, 82 percent of the women from El Salvador, Guatemala, Honduras, and Mexico who were subject to a credible fear screening by an asylum officer were found to have a significant possibility of establishing eligibility for asylum or protection under the Convention Against Torture.

53. Between fiscal years 2014 and 2016, 8,848 people from El Salvador, Guatemala, and Honduras were granted asylum affirmatively, and 3,502 people from those countries were granted asylum defensively.

*Seeking Refuge at a Port of Entry is Difficult to Impossible for Many People*

54. Many people seeking refuge in the United States cannot reasonably present at a port of entry and instead must enter elsewhere along the southern border. This is so for a variety of reasons.

55. Many refugees lack significant formal education, and are unaware that there are designated locations for crossing into the United States.

56. Even those refugees who know that designated ports of arrival exist often have no idea where they are or how to find them.

57. Ports of entry are also difficult to access even for those who know how to find them.

58. Even when noncitizens seeking access to the U.S. asylum process present themselves at official ports of entry along the southern border, U.S. government officials often deny them access to U.S. ports of entry and turn them away, thus forcing asylum seekers to attempt unauthorized crossings at the border.

9
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

59. Plaintiff Al Otro Lado, as well as other nongovernmental organizations and news outlets, has documented numerous cases in which CBP officials have arbitrarily denied and/or unreasonably delayed access to the asylum process to individuals seeking asylum by presenting themselves at ports of entry along the U.S.-Mexico border.

60. Asylum seekers presenting at ports of entry are turned back by CBP through a number of tactics, including threats, intimidation, and coercion; physical force; physical obstruction; and deliberate misinformation.

61. Noncitizens seeking asylum who present at a port of entry also may have to wait several days or even weeks to present their claims to an immigration officer.

62. Asylum seekers who wish to present at the San Ysidro Port of Entry are currently waiting an average of four to six weeks in Tijuana due to an alleged lack of CBP capacity to process asylum seekers.

63. Asylum processing has dramatically slowed down at ports of entry in recent months.

64. For instance, earlier this summer, only six asylum seekers were processed each day at the port of entry in Nogales, despite a backlog of more than 100 people waiting in Mexico to apply, and even though the port is capable of holding 47 people at a time.

65. Similarly, at the port of entry in Brownsville, Texas, there were reports that officials were processing between zero and three people per day.

66. These delays in processing asylum seekers can be life-threatening, as individuals are often vulnerable to violence and exploitation while they wait to be processed.

67. The region of Mexico near the border with the United States is a particularly violent area with limited law enforcement capacity.

68. Asylum seekers turned back from a port of entry have been raped, beaten, and kidnapped and held for ransom by cartel members waiting outside.

69. Even shelters outside ports of entry are not always safe, as cartels often infiltrate them.

70. Asylum seekers who need to reach safety as quickly as possible thus often feel compelled to enter the United States along the border, outside of a port of entry, in order to escape their persecutors and the violence on Mexico's side of the border.

*Overall Migration at the Southern Border is Down*

71. In general, migration at the southern border is far lower than it was in recent years.

72. The number of migrants apprehended by Border Patrol officials at the U.S.-Mexico border in 2017 is the lowest annual number since 1972.

73. In fiscal year 2018, CBP processed 1.25 million fewer people arriving at the southern border than in fiscal year 2000.

74. Despite the drop in processing, CBP's budget is twice what it was in 2000. Whereas the Border Patrol's budget in 2000 was $1.055 billion, its budget in 2016 was $3.801 billion.

75. CBP's staffing has also increased. The number of Border Patrol agents at the southwest border is almost double the number in 2000, from 8,580 agents in fiscal year 2000, when the number of apprehensions was four times higher than it is now, to 16,605 agents in fiscal year 2017.

76. Each officer is thus apprehending and processing far fewer individuals than in years past. In 2017, the average U.S. Border Patrol agent apprehended only 18 migrants along the U.S.-Mexico border all year, or one every 20 days.

77. Those asylum seekers who are apprehended upon their arrival and then released into the United States after passing their credible fear interviews overwhelmingly show up for their immigration court hearings. According to data from the Department of Justice, in fiscal year 2017, 89% of asylum seekers appeared for their hearings.

11
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**Harms to Plaintiffs**

78. Plaintiffs are nonprofit organizations that provide assistance to asylum seekers, including those who have entered between ports of entry and seek asylum affirmatively before the USCIS. The new rule and Proclamation cause each Plaintiff significant harm.

79. Plaintiff East Bay Sanctuary Covenant provides legal and social services to immigrants and refugees within the jurisdiction of the San Francisco Asylum Office, including applicants in California, Washington, and Oregon. It offers clients legal assistance in applying for affirmative asylum; provides social services; and helps train professionals to assist immigrant and refugee communities.

80. EBSC's affirmative asylum program is a key part of the organization's mission, and accounts for nearly half of its organizational budget. Since 1992, ESBC has filed nearly 5,000 affirmative asylum cases. Over 97 percent of those cases have been granted.

81. An estimated 80 percent of the clients in ESBC's affirmative asylum program entered between ports of entry. Most of those clients fled persecution in Central America and Mexico. ESBC currently has around 35 clients who entered without inspection and expect to file for affirmative asylum in the upcoming months.

82. Funding for ESBC's affirmative asylum program is based in part on the number of cases ESBC handles per year, and the number of clients ESBC anticipates serving.

83. The new rule and Proclamation seriously frustrate ESBC's mission and cause it to divert organizational resources.

84. As a result of the new policy, ESBC will have to divert significant resources to, among other things, understanding the new policy and its impact on the communities ESBC serves, and educating and advising its staff, clients, and prospective clients accordingly. To properly counsel new prospective clients who seek its affirmative asylum services going forward, ESBC will need to invest resources in training multiple intake staff not only to screen for asylum eligibility

based on the new rule, but to conduct detailed screenings for alternative forms of relief to facilitate referrals or other forms of assistance as appropriate.

85. Under the new policy, ESBC will no longer be able to train law students to handle affirmative asylum cases, or would have to substantially reduce its training program, which frustrates its mission of helping to train legal professionals to assist individuals fleeing violence and persecution.

86. The new policy also directly frustrates EBSC's mission of providing assistance and support to individuals fleeing persecution and violence.

87. The new policy jeopardizes ESBC's funding streams. If ESBC is no longer able to handle affirmative asylum cases for individuals who enter without inspection, it will face a marked decrease in its budget and will have to significantly cut its program and staff, or dramatically overhaul its program to provide types of assistance is it not currently equipped or trained to provide.

88. Plaintiff Al Otro Lado routinely provides representation or other assistance to asylum seekers who have entered the United States between ports of entry.

89. With the new policy, Defendants have frustrated Al Otro Lado's mission and have forced Al Otro Lado to divert significant resources away from its other programs. Because individuals who enter without inspection at the southern border are now categorically ineligible for asylum under the rule and Proclamation, Al Otro Lado has to revamp its representation strategy, overhaul the materials it uses to train pro bono attorneys, and evaluate the eligibility of each of its clients for other types of immigration relief. It also has to expend resources to brief eligibility issues, resulting in additional hearings and time spent on each case.

90. The new policy also jeopardizes some of Al Otro Lado's most critical funding streams.

91. Most of Al Otro Lado's asylum clients are families traveling with minor children. Because they will be ineligible for asylum under the new policy, spouses and minor children can no

13

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

longer be counted as derivatives in a single application.  Al Otro Lado must now prepare separate cases for each family member, exponentially increasing the number of hours required to prepare a family's case.

92.     Plaintiff Innovation Law Lab, among other services, has established "Centers of Excellence," which provide support to noncitizens and their pro bono attorneys including legal, technical, and strategic assistance in the preparation and presentation of claims.  These projects are established in Georgia, Kansas, Missouri, North Carolina, and Oregon.

93.     The new policy will require Innovation Law Lab to significantly divert its limited resources.  The vast majority of people Innovation Law Lab serves are asylum seekers.  The new policy will, among other things, require Innovation Law Lab to entirely rework the advice and guidance it provides in pro se workshops, and respond to a flood of inquiries and uncertainty from the immigrant communities Innovation Law Lab serves regarding the attempt to change asylum law.  It will also require Innovation Law Lab to evaluate eligibility for other types of relief in all of the cases that it screens and mentors.

94.     The changes created by the new asylum rule will have a substantial impact on the Innovation Law Lab.  For example, the Law Lab will have to deploy expensive and limited engineering resources to recode its software to create new analytical modeling to account for the new rule.  The Innovation Law Lab publishes materials for pro bono attorneys and asylum applicants, including printed guides, worksheets, training videos, self-help videos, and other resources that are used around the country.  The new asylum rule will require the Innovation Law Lab to substantially revise this material and create new learning engagements and materials on the asylum rule.

95.     Thousands of individuals rely on the Innovation Law Lab's systems; the new asylum rule will require the organization to divert its limited resources away from other projects and priorities.  For example, Innovation Law Lab will have to divert its attention away from the

noncitizen population who remain eligible for asylum under the new policy and who will remain in desperate need of Innovation Law Lab's services. Innovation Law Lab will also have to divert its limited resources away from developing additional, new technologies to support and improve the rights of immigrants.

96. Plaintiff CARECEN provides immigration legal services to clients throughout Southern California. These services include affirmative and defensive representation for asylum seekers. CARECEN also educates immigrants through citizenship classes, trainings to develop organizing and advocacy skills, and workshops to facilitate the integration of immigrants into their communities. CARECEN also helps to organize immigrant communities to advocate on behalf of their rights on specific policy items.

97. Funding for CARECEN's asylum cases is based in part on the number of cases it handles per year, and the number it anticipates serving. The rule and Proclamation will seriously harm CARECEN in multiple respects, and frustrate CARECEN's mission and divert organizational resources.

98. For example, CARECEN's mission as it relates to affirmative asylum applicants will be frustrated because the organization will be unable to assist asylum seekers who entered between ports of entry because they will no longer be eligible for asylum. CARECEN's representation of individuals who enter between ports of entry and seek asylum while in removal proceedings also will be compromised, and CARECEN will be forced to assist them in applying for withholding and CAT. The additional staff time required to handle such cases because of the more stringent standards for withholding and CAT will require diverting resources from other critical areas of work.

99. CARECEN will also have to divert resources to training staff and educating prospective clients about the effects of the new policy.

100. Plaintiffs have also been harmed because they were denied the opportunity to comment. If Defendants had provided an opportunity for notice and comment before the rule,

15
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs could have informed Defendants of their serious objections to the rule, and they may have convinced Defendants to adopt a different approach.

## FIRST CLAIM FOR RELIEF

### (Violation of Immigration and Nationality Act and Administrative Procedure Act)

101. All of the foregoing allegations are repeated and realleged as if fully set forth herein.

102. The Immigration and Nationality Act provides, with certain exceptions not relevant here, that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title."  8 U.S.C. § 1158(a)(1).

103. The Administrative Procedure Act, 5 U.S.C. § 706, provides that a Court "shall hold unlawful and set aside agency action, findings, and conclusions found to be – (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

104. The Proclamation and the rule are contrary to law, including 8 U.S.C. § 1158(a)(1).

105. The President's power to suspend or restrict entry pursuant to INA § 212(f) does not encompass the ability to limit the forms of relief available to noncitizens once they have entered the country, nor does his power pursuant to INA § 215(a)(1).

106. The rule exceeds the authority delegated to the Attorney General by Congress in 8 U.S.C §§ 1158(b)(2)(C) and (d)(5)(B).  The Attorney General lacks the authority to issue asylum bars as broad as the President's § 212(f) entry suspension authority permits.

## SECOND CLAIM FOR RELIEF

### (Violation of Administrative Procedure Act)

107. All of the foregoing allegations are repeated and realleged as if fully set forth herein.

108. The APA requires notice and opportunity for comment prior to the promulgation of regulations. 5 U.S.C. §§ 553(b), (c). The Acting Attorney General and Secretary of Homeland Security failed to provide notice and an opportunity to comment in a timely manner.

109. The APA requires that a regulation be published "no less than 30 days before its effective date." 5 U.S.C. § 553(d). The Acting Attorney General and Secretary of Homeland Security failed to publish the regulation 30 days before its effective date.

110. The Acting Attorney General and Secretary of Homeland Security have not articulated reasons sufficient to shown good cause why these requirements are inapplicable, nor is the foreign affairs exception applicable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray for the following relief:

a. A declaration pursuant to 28 U.S.C. § 2201 that the Proclamation and interim final rule are unlawful and invalid;

b. A preliminary and permanent injunction enjoining Defendants, their officials, agents, employees, assigns, and all persons acting in concert or participating with them from implementing or enforcing the Proclamation or interim final rule;

c. An order awarding Plaintiffs costs of suit, and reasonable attorneys' fees and expenses pursuant to any applicable law;

d. Such other and further relief as the Court deems equitable, just, and proper.

| | |
|---|---|
| Dated: November 9, 2018 | Respectfully submitted, |
| Lee Gelernt*<br>Judy Rabinovitz*<br>Omar Jadwat*<br>Anand Balakrishnan*<br>Celso Perez** (SBN 304924)<br>AMERICAN CIVIL LIBERTIES UNION FOUNDATION<br>IMMIGRANTS' RIGHTS PROJECT<br>125 Broad St., 18th Floor<br>New York, NY 10004<br>T:  (212) 549-2660<br>F:  (212) 549-2654<br>*lgelernt@aclu.org*<br>*jrabinovitz@aclu.org*<br>*ojadwat@aclu.org*<br>*abalakrishnan@aclu.org*<br>*cperez@aclu.org*<br><br>Melissa Crow*<br>SOUTHERN POVERTY LAW CENTER<br>1666 Connecticut Avenue NW, Suite 100<br>Washington, D.C. 20009<br>T: (202) 355-4471<br>F: (404) 221-5857<br>*melissa.crow@splcenter.org*<br><br>Mary Bauer*<br>SOUTHERN POVERTY LAW CENTER<br>1000 Preston Avenue<br>Charlottesville, VA  22903<br>T:  (470) 606-9307<br>F:  (404) 221-5857<br>*mary.bauer@splcenter.org*<br><br>*Attorneys for Plaintiffs*<br><br>*Pro hac vice application forthcoming<br>**Application for admission forthcoming | /s/Jennifer Chang Newell<br>Jennifer Chang Newell (SBN 233033)<br>Cody Wofsy (SBN 294179)<br>Julie Veroff** (SBN 310161)<br>AMERICAN CIVIL LIBERTIES UNION FOUNDATION<br>IMMIGRANTS' RIGHTS PROJECT<br>39 Drumm Street<br>San Francisco, CA 94111<br>T:  (415) 343-1198<br>F:  (415) 395-0950<br>*jnewell@aclu.org*<br>*cwofsy@aclu.org*<br>*jveroff@aclu.org*<br><br>Christine P. Sun (SBN 218701)<br>Vasudha Talla (SBN 316219)<br>AMERICAN CIVIL LIBERTIES UNION OF NORTHERN CALIFORNIA, INC.<br>39 Drumm Street<br>San Francisco, CA 94111<br>T: (415) 621-2493<br>F: (415) 255-8437<br>*csun@aclu.org*<br>*vtalla@aclu.org*<br><br>Baher Azmy*<br>Angelo Guisado*<br>Ghita Schwarz*<br>CENTER FOR CONSTITUTIONAL RIGHTS<br>666 Broadway, 7th Floor<br>New York, NY 10012<br>Telephone: (212) 614-6464<br>Facsimile: (212) 614-6499<br>bazmy@ccrjustice.org<br>aguisado@ccrjustice.org<br>gschwarz@ccrjustice.org |