Lee Gelernt*
Judy Rabinovitz*
Omar C. Jadwat*
Anand Balakrishnan*
Celso Perez**(SBN 304924)
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*ojadwat@aclu.org*
*abalakrishnan@aclu.org*
*cperez@aclu.org*

Jennifer Chang Newell (SBN 233033)
Cody Wofsy (SBN 294179)
Julie Veroff** (SBN 310161)
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-0770
F: (415) 395-0950
*jnewell@aclu.org*
*cwofsy@aclu.org*
*jveroff@aclu.org*

*Attorneys for Plaintiffs* (Additional counsel listed on following page)

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| East Bay Sanctuary Covenant; Al Otro Lado; Innovation Law Lab; and Central American Resource Center in Los Angeles, | Case No.: 18-cv-06810 |
| *Plaintiffs,* | |
| v. | **PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER** |
| Donald J. Trump, President of the United States, in his official capacity; Matthew G. Whitaker, Acting Attorney General, in his official capacity; U.S. Department of Justice; James McHenry, Director of the Executive Office for Immigration Review, in his official capacity; the Executive Office for Immigration Review; Kirstjen M. Nielsen, Secretary of Homeland Security, in her official capacity; U.S. Department of Homeland Security; Lee Francis Cissna, Director of the U.S. Citizenship and Immigration Services, in his official capacity; U.S. Citizenship and Immigration Services; Kevin K. McAleenan, Commissioner of U.S. Customs and Border Protection, in his official capacity; U.S. Customs and Border Protection; Ronald D. Vitiello, Acting Director of Immigration and Customs Enforcement, in his official capacity; Immigration and Customs Enforcement, | **IMMIGRATION ACTION** |
| *Defendants.* | |

Melissa Crow*
SOUTHERN POVERTY LAW CENTER
1666 Connecticut Avenue NW, Suite 100
Washington, D.C. 20009
T: (202) 355-4471
F: (404) 221-5857
*melissa.crow@splcenter.org*

Mary Bauer*
SOUTHERN POVERTY LAW CENTER
1000 Preston Avenue
Charlottesville, VA  22903
T:  (470) 606-9307
F:  (404) 221-5857
*mary.bauer@splcenter.org*

Baher Azmy*
Angelo Guisado*
Ghita Schwarz*
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Telephone: (212) 614-6464
Facsimile: (212) 614-6499
bazmy@ccrjustice.org
aguisado@ccrjustice.org
gschwarz@ccrjustice.org

Christine P. Sun (SBN 218701)
Vasudha Talla (SBN 316219)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
T: (415) 621-2493
F: (415) 255-8437
*csun@aclunc.org*
*vtalla@aclunc.org*

*Attorneys for Plaintiffs*

*Pro hac vice application forthcoming
**Application for admission forthcoming

MEMORANDUM IN SUPPORT OF TEMPORARY RESTRAINING ORDER
Case No. 3:18-cv-06810

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

BACKGROUND ................................................................................................... 3

LEGAL STANDARD............................................................................................ 5

ARGUMENT ........................................................................................................ 5

    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ...................... 5

I.    The Interim Final Rule Violates The Procedural Requirements of The APA. ............................................................................................... 5

    A.    The Attorney General Failed to Engage in Notice and Comment Rulemaking. ................................................................ 6

    B.    The Attorney General Also Violated The APA's Required 30-day Grace Period................................................. 11

II.    The *Per Se* Denial Of Asylum To All Noncitizens Who Enter Without Inspection Violates the INA and Is Contrary To Law. ........................... 12

    A.    The Regulation Violates The INA. ......................................... 12

    B.    The President Likewise Lacks Authority To Deny Asylum To All Who Enter Without Inspection. .................................... 165

    THE REMAINING FACTORS TIP DECIDELY IN FAVOR OF GRANTING A TRO AND PRSERVING THE STATUS QUO ........................................ 18

CONCLUSION..................................................................................................... 21

# TABLE OF AUTHORITIES

**Cases**

*Action on Smoking & Health v. Civil Aeronautics Bd.*,
713 F.2d 795 (D.C. Cir. 1983)................................................................. 7

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) .......................................................... 5, 20

*Am. Fed. of Gov't Emps. v. Block*,
655 F.2d 1153 (D.C. Cir. 1981).......................................................... 7,18

*Buschmann v. Schweiker*,
676 F.2d 352 (9th Cir. 1982) ................................................................. 7

*California v. Health & Human Servs.*,
281 F. Supp. 3d 806 (N.D. Cal. 2017). ................................................ 18

*Circuit City Stores, Inc. v. Adams*,
532 U.S. 105 (2001)............................................................................. 15

*Council of S. Mountains, Inc. v. Donovan*,
653 F.2d 573 (D.C. Cir. 1981) ............................................................... 7

*Cresote Council v. Johnson*,
555 F.Supp.2d 36 (D.D.C. 2008) .......................................................... 20

*Doe v. Trump*,
288 F. Supp. 3d 1045 (W.D. Wash. 2017)............................................ 11

*El Rescate Legal Servs., Inc. v. Exec. Office of Immigration Review*,
959 F.2d 742 (9th Cir. 1991) ............................................................... 19

*Indep. Guard Ass'n of Nevada, Local No. 1 v. O'Leary on Behalf of U.S. Dep't of Energy*,
57 F.3d 766 (9th Cir. 1995) ................................................................. 11

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*,
407 F.3d 1250 (D.C. Cir. 2005).............................................................. 6

*Jean v. Nelson*,
711 F.2d 1455 (11th Cir. 1983) ........................................................... 11

*Jifry v. FAA*,
370 F.3d 1174 (D.C. Cir. 2004) ............................................................. 7

*Mack Trucks, Inc. v. EPA*,
682 F.3d 87 (D.C. Cir. 2012)................................................................. 8

*Matter of Pula*,
19 I&N Dec. 467 (BIA 1987) ................................................................ 13

*N. Mariana Islands v. U.S.*,
686 F. Supp. 2d 7 (D.D.C. 2009) ......................................................... 18

*Nat'l Council of La Raza v. Cegavske*,
800 F.3d 1032 (9th Cir. 2015) ............................................................. 19

*New Jersey v. EPA*,
626 F.2d 1038 (D.C. Cir.1980)....................................................... 18, 20

*Ngou v. Schweiker*,
535 F. Supp. 1214 (D.D.C. 1982) ........................................................ 12

*Nken v. Holder*,
556 U.S. 418 (2009)............................................................................. 20

*Olmstead v. L.C. ex rel. Zimring*,
527 U.S. 581 (1999)............................................................................. 15

*Orantes-Hernandez v. Thornburgh*,
919 F.2d 549 (9th Cir. 1990) ....................................................... 3, 4,13

*Paulsen v. Daniels*,
413 F.3d 999 (9th Cir. 2005) ................................................................. 6

*Prows v. Dep't of Justice*,
938 F.2d 274 (D.C. Cir. 1991) ............................................................. 12

*Reno-Sparks Indian Colony v. EPA*,
336 F.3d 899 (9th Cir. 2003) ................................................................. 7

*Saravia for A.H. v. Sessions,*
   905 F.3d 1137 (9th Cir. 2018) ............................................................................ 5
*Sorenson Commc'ns Inc. v. FCC,*
   755 F.3d 702 (D.C. Cir. 2014) ........................................................................ 7, 8
*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.,*
   240 F.3d 832 (9th Cir. 2001) ............................................................................ 5
*Sugar Cane Growers Cooperative of Fla. v. Veneman,*
   289 F.3d 89 (D.C. Cir. 2002) ......................................................................... 18
*SurvJustice Inc. v. DeVos,*
   No. 18-CV-00535-JSC, 2018 WL 4770741 (N.D. Cal. Oct. 1, 2018)....................... 19
*Trump v. Hawaii,*
   138 S. Ct. 2392 (2018) .......................................................................... 2, 17,18
*United States v. Larionoff,*
   431 U.S. 864 (1977).......................................................................................12
*United States v. Valverde,*
   628 F.3d 1159 (9th Cir. 2010) .................................................................. 6, 7, 8, 9
*Util. Air Reg. Group v. EPA,*
   134 S. Ct. 2427 (2014) .................................................................................. 16
*Wis. Gas Co. v. Fed. Energy Regulatory Comm'n,*
   758 F.2d 669 (D.C. Cir. 1985) ........................................................................ 18
*Yassini v. Crosland,*
   618 F.2d 1356 (9th Cir. 1980) ........................................................................ 11
*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952) ...................................................................................... 17


**Statutes**

5 U.S.C. § 553 ...................................................................................................... 6
5 U.S.C. § 553(b) .............................................................................................. 5, 11
5 U.S.C. § 553(b)(B) .......................................................................................... 6, 7
5 U.S.C. § 553(c). .......................................................................................... 5,6,11
5 U.S.C. § 553(d) ........................................................................................... 6, 11
5 U.S.C. § 553(a)(1)............................................................................................ 10
8 U.S.C. § 1101(a)(42).......................................................................................... 17
8 U.S.C. § 1101(a)(42)(A) ....................................................................................... 3
8 U.S.C. § 1158.................................................................................................... 1
8 U.S.C. § 1158(a)(1) .................................................................................... passim
8 U.S.C. § 1158(b)(1)(A)......................................................................................... 3
8 U.S.C. § 1158(b)(2)(C) .............................................................................. 4, 14, 16
8 U.S.C. § 1182(f)......................................................................................... passim
8 U.S.C. § 1185(a) ................................................................................................ 4
8 U.S.C. § 1225(b)(1)(B) ......................................................................................... 3
8 U.S.C. § 1229a .................................................................................................. 3
8 U.S.C. § 1231(b)(3) ............................................................................................ 4
8 U.S.C. § 1325 .................................................................................................... 9


**Other Authorities**

Aliens Subject to a Bar on Entry under Certain Presidential Proclamations; Procedures for Protection
   Claims," *available at* https://www.regulations.gov/document?D=EOIR_FRDOC_0001-0039 ...... 4
Nick Miroff & Missy Ryan, "Army assessment of migrant caravans undermines Trump's rhetoric,"
   Washington Post (Nov. 2, 2018), https://wapo.st/2JC2m4p ........................................... 10
Presidential Proclamation Addressing Mass Migration Through the Southern Border of the United
   States," *available at* https://www.whitehouse.gov/presidential-actions/presidential-proclamation-
   addressing-mass-migration-southern-border-united-states/ ............................................. 4

iii

S.Doc. No. 248, 79th Cong., 2d Sess. 199 (1946) ................................................................ 11

UN Ad Hoc Committee on Refugees and Stateless Persons, Memorandum by the Secretary-General,
    UN Doc. E/AC.32/2, Ch. XI, Art. 24. Para. 2 (Jan. 3, 1950) ...................................................... 13

U.S. Customs and Border Protection, Southwest Border Migration FY2018,
    https://www.cbp.gov/newsroom/stats/sw-border-migration (last accessed Nov. 9, 2018)............... 9

U.S. Customs and Border Protection, Southwest Border Sectors,
    https://www.cbp.gov/sites/default/files/assets/documents/2017-
    Dec/BP%20Southwest%20Border%20Sector%20Apps%20FY1960%20-%20FY2017.pdf (last
    accessed Nov. 9, 2018) .......................................................................................................... 9

U.S. Customs and Border Protection, United States Border Patrol Southwest Family Unit Subject
    and Unaccompanied Alien Children Apprehensions Fiscal Year 2016, Statement by Secretary
    Johnson on Southwest Border Security (Oct. 18, 2016),
    https://www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children/fy-2016 ......... 10

**Regulations**

8 C.F.R. § 208.2(b) ........................................................................................................................ 3

8 C.F.R. § 208.9 ............................................................................................................................. 3

8 C.F.R. § 208.2(a) ........................................................................................................................ 3

8 C.F.R. § 208.18 ........................................................................................................................... 3

MEMORANDUM IN SUPPORT OF TEMPORARY RESTRAINING ORDER
Case No. 3:18-cv-06810

## INTRODUCTION

On November 9, 2018, the government published an emergency regulation, followed immediately by a Proclamation invoking Section 212(f) of the Immigration and Nationality Act (8 U.S.C. § 1182(f)), which together categorically bar asylum for individuals who enter the United States along the southern border between ports of entry, regardless of how much danger those individuals face if returned to their home countries.  The interim rule was issued without the "notice and comment" procedures or the 30-day waiting period that are required by the Administrative Procedure Act ("APA") to ensure that agency action is transparent, fair, and accountable.  Because "good cause" did not exist to disregard these bedrock procedural requirements, the regulation violates the APA.  For this reason alone, a Temporary Restraining Order ("TRO") is necessary to preserve the status quo.

More fundamentally, a *per se* ban on asylum at the southern border based solely on the fact that an individual did not enter and assert his or her fear of persecution at a port of entry is patently unlawful under the Immigration and Nationality Act ("INA").  Consistent with its international obligations, Congress has specifically and unambiguously addressed this issue and made clear in the INA that asylum is available regardless of "whether or not" an individual entered "at a designated port of arrival."  8 U.S.C. § 1158.  Neither the Attorney General (through a regulation), nor the President (through a § 212(f) Proclamation), has the power to override that explicit and longstanding congressional directive.

Indeed, the Acting Attorney General and Secretary of Homeland Security no doubt recognize that they cannot issue a regulation that is in square conflict with the express terms of the statute under which they are acting.  That is presumably why the President issued a Proclamation in conjunction with the regulation.  But the President's 212(f) proclamation power likewise cannot override a congressionally mandated statutory directive.  Notably, in defending the President's § 212(f) travel ban, the government went out of its way to explain that the travel ban did *not* conflict

1

with a specific statutory command.  The Supreme Court agreed with the government that the travel ban did not conflict with a specific statutory provision and, significantly, stated: "We may assume that § 1182(f) does not allow the President to expressly override particular provisions of the INA." *Trump v. Hawaii*, 138 S. Ct. 2392, 2411 (2018).  Yet that is precisely what the President seeks to do here.

The stakes in this case are high.  The availability of asylum is often all that stands between an individual and severe persecution or death.  The Administration's refrain that some individuals do not ultimately file for asylum, or will not ultimately prevail on their claims, misses the point.  Congress has made clear that there must be a *process* to determine who is a legitimate asylum seeker and that eligibility to seek asylum cannot turn on "whether or not" one enters at a port of entry, 8 U.S.C. § 1158(a)(1) – a fact that has no bearing on the degree of danger one would face if sent back to his or her home country.

Moreover, the stakes in this case are enormous not only because it involves the fundamental humanitarian protections of asylum, but also because it implicates foundational separation of powers concerns.  This is not a case where the President is filling a void left open by Congress or operating within the interstices of broad congressional policy.  It is just the opposite.   Here, the President and Attorney General are trying to override Congress and settled law.  If the courts allow the President to take this step here,  he could not only override statutory asylum law, but disregard the entirety of our congressional immigration scheme – a scheme that reflects Congress's considered judgment about how to balance the nation's ideals and competing policy priorities.

For the past four decades, asylum has been available regardless of where one entered the country.  A TRO is warranted to preserve that status quo.  In the absence of immediate judicial intervention, families in serious danger, including children, could be imminently removed and effectively delivered back to their persecutors without ever having had the chance even to apply for asylum.  Plaintiffs also will be deprived of their critical procedural right to submit comments

2

regarding the illegality of the rule and the flawed factual premises underlying the government's

proffered reasons for promulgating it.

## BACKGROUND

### A.  Statutory Background

Federal law provides for asylum, which is a form of protection available to individuals who

fear persecution in their home countries.  The asylum laws reflect Congress's intent to bring the

United States into compliance with its international obligations under the 1967 United Nations

Protocol Relating to the Status of Refugees.  *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 551

(9th Cir. 1990).  Asylum law affords protection to individuals who have a "well-founded fear of

persecution" on account of any one of five protected grounds: race, religion, nationality, political

opinion, or membership in a particular social group.  8 U.S.C. § 1158(b)(1)(A); 8 U.S.C.

§ 1101(a)(42)(A).  A ten percent chance of harm is sufficient to establish a well-founded fear.

*Orantes-Hernandez*, 919 F.2d at 553 n.9.

There are three principal ways for an individual to seek asylum.  First, where a noncitizen is

not in any kind of removal proceedings, his or her application is considered to be an "affirmative"

filing.  *See* 8 C.F.R. §§ 208.2(a), 208.9.  Second, a noncitizen in ordinary removal proceedings, *see* 8

U.S.C. § 1229a, may submit a "defensive" application for asylum as a form of relief from removal, 8

C.F.R. § 208.2(b).  Third, as part of the expedited removal system—an alternative summary removal

system currently applicable to certain individuals at or within 100 miles of the border—a noncitizen

who expresses a fear of return to his or her home country is entitled to a "credible fear" screening

interview.  8 U.S.C. § 1225(b)(1)(B).  If the screening officer finds a "significant possibility" that the

individual "could establish eligibility for asylum," he or she is placed in ordinary removal

proceedings and given an opportunity to apply for asylum.  *Id*.

Critically, and consistent with our international law obligations, Congress made clear that

manner of entry is irrelevant to asylum availability.  Section 1158(a)(1) provides that "[a]ny alien

*who is physically present in the United States* or who arrives in the United States (*whether or not at*

3

*a designated port of arrival* and including an alien who is brought to the United States after having

been interdicted in international or United States waters), irrespective of such alien's status, may

apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title."

8 U.S.C. § 1158(a)(1) (emphasis added).

### B.  The Interim Final Rule and § 212(f) Proclamation

Through a combination of an Interim Final Rule and a § 212(f) Proclamation, the

government has sought to squarely overturn Congress's clear directive that asylum cannot be

categorically denied based on unlawful entry.

On November 8, 2018, the Acting Attorney General and Secretary of Homeland Security

issued an Interim Final Rule.  *See* "Aliens Subject to a Bar on Entry under Certain Presidential

Proclamations; Procedures for Protection Claims," *available at*

https://www.regulations.gov/document?D=EOIR_FRDOC_0001-0039.  Invoking the power to

"establish additional limitations and conditions, consistent with [§ 1158], under which an alien shall

be ineligible for asylum," 8 U.S.C. § 1158(b)(2)(C), Defendants established a new bar to asylum.

Under the rule, any individual whose entry is prohibited by a proclamation or order of the President

concerning the southern border, issued pursuant to INA § 212(f) or INA § 215(a)(1), 8 U.S.C.

§ 1185(a), is now barred from asylum.[1]

The next day, the President signed a Proclamation, invoking INA § 212(f) and INA § 215(a).

*See* "Presidential Proclamation Addressing Mass Migration Through the Southern Border of the

United States," *available at* https://www.whitehouse.gov/presidential-actions/presidential-

---

[1] The interim rule permits those who enter between ports to apply for a form of relief called "Withholding of Removal." *See* 8 U.S.C. § 1231(b)(3).  But to qualify for withholding of removal, the applicant must satisfy a standard of proof far higher than for asylum.  Rather than the well-founded fear governing asylum, an applicant for withholding must show that it is "more likely than not" that he or she will suffer persecution.  It is therefore not a substitute for the asylum relief authorized by statute.  *Orantes-Hernandez*, 919 F.2d at 553 n.9  The interim rule also permits individuals barred from asylum to apply for relief under the Convention Against Torture ("CAT").  Convention Against Torture, *see* Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231); 8 C.F.R. § 208.18.  But, unlike asylum, a CAT applicant must show he or she will likely be tortured by (or with the acquiescence of) the home government.

proclamation-addressing-mass-migration-southern-border-united-states/.  The Proclamation

suspends the entry of noncitizens entering at the southern border between ports of entry. Together,

the Interim Final Rule and Proclamation categorically bar asylum for every individual who enters

without inspection at the southern border.

## LEGAL STANDARD

On a motion for a TRO, the plaintiff "must establish that he is likely to succeed on the merits,

that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of

equities tips in his favor, and that an injunction is in the public interest."  *Saravia for A.H. v.*

*Sessions*, 905 F.3d 1137, 1142 (9th Cir. 2018); *see Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,

240 F.3d 832, 839 n.7 (9th Cir. 2001) (standard for a TRO or Preliminary Injunction is "substantially

identical").  A TRO may issue where "serious questions going to the merits [are] raised and the

balance of hardships tips sharply in [plaintiff's] favor."  *All. for the Wild Rockies v. Cottrell*, 632

F.3d 1127, 1131 (9th Cir. 2011).

## ARGUMENT

## PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

Plaintiffs move for a TRO on two grounds, either one of which is sufficient to warrant

preserving the status quo.  First, the government lacked any sufficient justification to disregard the

procedural requirements of the APA.  *See* Section I.  Second, the government's categorical denial of

asylum to those who enter between ports on the U.S.-Mexico border violates the INA, and thus is

contrary to law and ultra vires under the APA's substantive standards.  *See* Section II.

### I.        The Interim Final Rule Violates The Procedural Requirements of The APA.

The new regulation violates the APA's procedural requirements in two respects.  First, the

Department of Justice issued the rule without providing notice and opportunity for comment, a

bedrock requirement that ensures the public's involvement in the formulation of governmental

policy.  5 U.S.C. §§ 553(b), (c).  Second, and alternatively, the rule takes immediate effect,

5

without the 30-day notice period required by law, in violation of 5 U.S.C. § 553(d).  Contrary to the government's assertion, there is no good cause for the regulation to go into immediate effect, nor does this case fall within the narrow foreign affairs exception.

**A.  The Attorney General Failed to Engage in Notice and Comment Rulemaking.**

The APA requires federal agencies to publish in the Federal Register a general notice of proposed rulemaking prior to the promulgation of any regulation, to allow "interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments with or without opportunity for oral presentation."  *Id*. § 553(c).  Comments must be considered and addressed in the notice of final rulemaking: "[a]fter consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose."  *Id*.

The notice requirements of § 553 "are designed (1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review."  *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005).  "It is antithetical to the structure and purpose of the APA for an agency to implement a rule first, and then seek comment later."  *United States v. Valverde*, 628 F.3d 1159, 1164 (9th Cir. 2010) (quoting *Paulsen v. Daniels,* 413 F.3d 999, 1005 (9th Cir. 2005)).

There is no dispute that the Acting Attorney General and Secretary of Homeland Security failed to comply with these requirements.  Instead, in the Federal Register Notice, Defendants offer a cursory assertion of "good cause" to bypass notice and comment pursuant to 5 U.S.C. § 553(b)(B).  There is no good cause to skip the normal notice and comment requirement.  The government also improperly seeks to fit this rule into what is only a narrow exception for foreign affairs.

Section 553(b)(B) of Title 5 provides an exception to the notice and comment requirements

6

"when the agency for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest."  "[T]he agency's decision not to follow the APA's notice and comment procedure" is reviewed *de novo*.  *Reno-Sparks Indian Colony v. EPA*, 336 F.3d 899, 910 n.11 (9th Cir. 2003).

A reviewing court is to "examine closely" the agency's explanation as outlined in the rule. *Council of S. Mountains, Inc. v. Donovan*, 653 F.2d 573, 580 (D.C. Cir. 1981).  Because notice and comment is the default procedure, "the onus is on the [agency] to establish that notice and comment" should not be given.  *Action on Smoking & Health v. Civil Aeronautics Bd.*, 713 F.2d 795, 801 n.6 (D.C. Cir. 1983).  Successfully invoking the good cause exception requires the agency to "overcome a high bar," as "the good cause exception should be 'narrowly construed and only reluctantly countenanced.'"  *Valverde*, 628 F.3d at 1164 (quoting *Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004)).  "[T]he good cause exception is essentially an emergency procedure," *id*. at 1165 (quoting *Buschmann v. Schweiker*, 676 F.2d 352, 357 (9th Cir. 1982)), and so "should be limited to emergency situations," *Am. Fed. of Gov't Emps. v. Block*, 655 F.2d 1153, 1156 (D.C. Cir. 1981).

Defendants have asserted that they have good cause because providing notice and comment would be "impracticable" and "contrary to the public interest."  *See* Interim Final Rule at 65 (citing 5 U.S.C. § 553(b)(B)).  Specifically, they assert that permitting notice and comment to proceed in the normal course would create "an incentive for aliens to seek to cross the border" during those periods. Interim Final Rule at 65-67.  That argument is unfounded and insufficient to establish good cause.

The impracticability prong of the good cause exception is only satisfied "where delay would imminently threaten life or physical property."  *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 706 (D.C. Cir. 2014); *see also Jifry*, 370 F.3d at 1179 (upholding good cause assertion where rule was "necessary to prevent a possible imminent hazard to aircraft, persons, and property within the United States" based on "the threat of further terrorist acts involving aircraft in the aftermath of September 11, 2001"); *Council of the S. Mountains, Inc.*, 653 F.2d at 581 (good cause shown where rule was

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

one of "life-saving importance" involving miners in a mine explosion); *Sorenson*, 755 F.3d at 706-07 (rejecting an agency's assertion of a fiscal emergency because it would be short up to $159 million as sufficient to bypass notice and comment).  That is certainly not the case here.  There is nothing in the Interim Rule that suggests that the publication of a proposed rule with notice and an opportunity to comment would imminently threaten life or physical property.

And the public interest prong "is met only in the rare circumstance when ordinary procedures – generally presumed to serve the public interest – would in fact harm that interest." *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 95 (D.C. Cir. 2012).   That is likewise not the case here.

Defendants fail to proffer any credible imminent threat or conceivable exigent circumstances. Instead of demonstrating an actual threat of immediate harm to life, physical property, or the public interest, Defendants have pointed only to "conclusory speculative" concerns, *Valverde*, 628 F.3d at 1164, which, on their own terms, suggest only a broad, long-term policy goal of deterring migration, rather than an emergency need.  Defendants surmise that preserving the status quo asylum system – which has been in effect for decades – while allowing the ordinary publication process to unfold *might* create an incentive for individuals to enter without inspection while the rulemaking procedures are ongoing.  But it is highly doubtful that this technical legal change will influence any asylum seeker's decisions about when and how to seek protection in this country.  Indeed, in reality, many asylum seekers do not even know what or where ports of entry are – much less the niceties of the APA's procedural requirements.  *See* Declaration of Erika Pinheiro, Director of Litigation and Policy, Al Otro Lado (Nov. 9, 2018), at ¶ 26; Declaration of Stephen W. Manning, Executive Director, Innovation Law Lab (Nov. 9, 2018), at ¶ 14.  And even if an asylum seeker were to become aware of the notice and comment period, any possible incentive to arrive and enter more quickly than he or she otherwise would have is outweighed by the preexisting incentives in the INA that *discourage* entering between ports of entry, including criminal penalties associated with entering without inspection and the administration's "zero tolerance" policy mandating criminal prosecution

8

of illegal entrants.  *See* 8 U.S.C. § 1325.  Furthermore, even if an asylum seeker wanted to hasten his or her entry into the United States because of a pending change to the asylum regime and was set on entering between ports of entry, Defendants offer no reason to think an asylum seeker reasonably could do so, particularly given the length of the journey – Central America and the U.S.-Mexico border are thousands of miles apart – and the resource constraints facing many asylum seekers.  The unsubstantiated specter of a migration "surge" during the pre-promulgation notice and comment period, or the period before the effective date, thus is highly suspect and insufficient to justify abandonment of the typical rulemaking procedures.

The Ninth Circuit rejected a similarly flimsy rationale in *Valverde*.  There, the Attorney General implemented a rule penalizing the violation of certain sex offender registration requirements.  The Court explained that in light of the existing legal structure, the Attorney General's invocation of public safety could not establish good cause: "[T]he existence of stringent . . . criminal sanctions on the books at the time the [interim] regulation was promulgated obviated the case for an emergency."  628 F.3d at 1168 (second alteration in original, internal quotation marks omitted).  As here, "[t]he Attorney General provided no reason why, in view of the existing statutory regime . . . , it was necessary for the interim rule to be made effective immediately, without providing any opportunity for notice and comment."  *Id.* (calling it "difficult to see what substantial public safety interest was served").

Nor does the volume of asylum seekers establish good cause.  According to U.S. Customs and Border Protection's ("CBP") own statistics, migration at the southern border is far lower today than in recent decades.[2]  The number of migrants apprehended by Border Patrol officials at the U.S.-Mexico border each month in fiscal year 2018 is a fraction of the number apprehended each month

---

[2] U.S. Customs and Border Protection, Southwest Border Migration FY2018, https://www.cbp.gov/newsroom/stats/sw-border-migration (last accessed Nov. 9, 2018); U.S. Customs and Border Protection, Southwest Border Sectors, https://www.cbp.gov/sites/default/files/assets/documents/2017-Dec/BP%20Southwest%20Border%20Sector%20Apps%20FY1960%20-%20FY2017.pdf (last accessed Nov. 9, 2018); *see also* Isacson Decl. ¶ 3.

in fiscal year 2000.  *See* Declaration of Adam Isacson, Director for Defense Oversight, Washington Office on Latin America (Nov. 9, 2018), at ¶¶ 3-4.  Even as migration numbers have dropped, CBP's resources have increased, and CBP now has *twice* the budget and number of officials it did in 2000.  *See id.* ¶¶ 6-7.  In 2017, the average Border Patrol agent apprehended only eighteen migrants along the southern border all year long, or one every twenty days.  *Id.* ¶ 3.

Within the context of this low migration volume, the United States saw an increase in Central American families and unaccompanied minors coming to the southern border in 2014 and 2016.[3]  The current influx of Central Americans seeking refuge thus is not new.  Individuals apprehended at the southern border during those previous influxes were provided an opportunity to apply for asylum,[4] and Defendants point to no consequences that threatened public safety or the public interest, nor have they identified any reason to expect that a different result will obtain today.  Because DHS and USCIS have been able to handle similar, if not larger, numbers in past years without a change in longstanding asylum law, there is no reason to believe that such a change now is so urgent that the agencies can justifiably bypass the requisite notice-and-comment procedures.[5]

Defendants' contention that these procedural requirements do not apply because "this rule involves a 'foreign affairs function of the United States,'" Interim Final Rule at 6 (quoting 5 U.S.C. 553(a)(1)), is similarly flawed.  They can offer only vague and insubstantial connections to foreign

---

[3] U.S. Customs and Border Protection, United States Border Patrol Southwest Family Unit Subject and Unaccompanied Alien Children Apprehensions Fiscal Year 2016, Statement by Secretary Johnson on Southwest Border Security (Oct. 18, 2016), https://www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children/fy-2016.

[4] *Id.* ("We are determined to treat migrants in a humane manner.  At the same time, we must enforce our immigration laws, consistent with our enforcement priorities.  This has included, and will continue to include, providing individuals with an opportunity to assert claims for asylum and other forms of humanitarian relief.").

[5] The agencies' invocation of the migrant caravan currently traveling to the United States also does not constitute good cause.  As a factual matter, DHS' claims as to the number of migrants likely to reach the U.S. border are erroneous.  According to military planning documents, only "about 20 percent of the roughly 7,000 migrants traveling through Mexico are likely to complete the journey."  Nick Miroff & Missy Ryan, "Army assessment of migrant caravans undermines Trump's rhetoric," Washington Post (Nov. 2, 2018), https://wapo.st/2JC2m4p (discussing U.S Army North, JFLCC Threat Working Group PowerPoint Presentation 10, https://bit.ly/2AKgXId ("Historical Analysis – Assessed Trend: ~20% of individuals will make entire journey")).  Furthermore, the caravan likely will not reach the United States for several more weeks.  *See* Isacson Decl. ¶ 9.  And there is no reason to assume, as the Government does, that members of the caravan will seek to enter between ports of entry.  The practices of past caravans indicate that many who make it to the U.S.-Mexico border will seek asylum at a port of entry.  *Id.* ¶ 10.

1   policy, but that is insufficient to satisfy their high burden.

2       Like the other exceptions to notice and comment rulemaking, "Congress intended [this]

3   exception to have a narrow scope." *Indep. Guard Ass'n of Nevada, Local No. 1 v. O'Leary on*

4   *Behalf of U.S. Dep't of Energy*, 57 F.3d 766, 769 (9th Cir. 1995), *opinion amended on denial of*

5   *reh'g*, 69 F.3d 1038 (9th Cir. 1995) (addressing the "military function" prong of the same provision

6   of the APA.  Indeed, "the Report of the Senate Judiciary Committee emphasized that 'the

7   exceptions apply only to the extent that the excepted subjects are *directly* involved.'"  *Id.* (quoting

8   S.Doc. No. 248, 79th Cong., 2d Sess. 199 (1946)) (internal quotation marks omitted).

9

10      Accordingly, "for the exception to apply, the public rulemaking provisions should provoke

11  definitely undesirable international consequences." *Doe v. Trump*, 288 F. Supp. 3d 1045, 1075

12  (W.D. Wash. 2017) (quoting *Yassini v. Crosland*, 618 F.2d 1356, 1360 n.4 (9th Cir. 1980) (alteration

13  omitted).  There are no relevant undesirable circumstances here.  The government states that it is in

14  related negotiations with Mexico and Central American countries.  Interim Final Rule at 69.  But that

15  does not mean *notice and comment procedures* will cause problems for foreign policy.  On the

16  contrary, no "undesirable international consequences . . . would result if rulemaking were

17  employed."  *Jean v. Nelson*, 711 F.2d 1455, 1477–78 (11th Cir. 1983), *dismissed in relevant part as*

18  *moot,* 727 F.2d 957 (11th Cir. 1984) (en banc), *aff'd,* 472 U.S. 846 (1985).  In the absence of such

19  "definitely undesirable international consequences," the exception is inapplicable.  *Doe*, 288 F.

20  Supp. 3d at 1075.

21

22      In sum, because it was promulgated in violation of the notice and comment requirements of 5

23  U.S.C. § 553(b) and (c), the rule should be stayed pending a final ruling on the merits.

24  **B.  The Attorney General Also Violated The APA's Required 30-day Grace Period.**

25      Even if notice and comment were not required, the rule would still violate 5 U.S.C. §

26  553(d)'s separate requirement that a rule be published "no less than 30 days before its effective date,

27  except . . . (3) as otherwise provided by the agency for good cause found and published with the

28
                                              11

rule."  This requirement "protects those who are affected by agency action taken during the 30–day waiting period without disturbing later action that is not the product of the violation."  *Prows v. Dep't of Justice*, 938 F.2d 274, 276 (D.C. Cir. 1991).  For the same reasons stated above, the agency cannot show good cause why the 30-day waiting period should not apply to the rule, or that the foreign affairs exception applies.  If the Court reaches this alternate ground for relief, the proper remedy is to stay the rule for the necessary 30 days.  *Ngou v. Schweiker*, 535 F. Supp. 1214, 1216 (D.D.C. 1982).

II.     **The *Per Se* Denial Of Asylum To All Noncitizens Who Enter Without Inspection Violates the INA and Is Contrary To Law.**

    **A.  The Regulation Violates The INA.**

    1.   The regulation categorically denying asylum to all noncitizens who entered without inspection at the southern border is flatly contrary to the INA, because Congress explicitly requires that asylum be available to individuals who enter without inspection.  The INA speaks with unmistakable clarity to the precise question at issue in this case: whether individuals who enter without inspection are nonetheless eligible for asylum.  Section 1158(a)(1) provides that

> "[a]ny alien *who is physically present in the United States* or who arrives in the United States (*whether or not at a designated port of arrival* and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title."

8 U.S.C. § 1158(a)(1) (emphasis added).  This language is specific and precise.  An individual who has already entered without inspection is "physically present in the United States."  *Id*.  Likewise, an individual who is apprehended at the border but not at a port of entry—i.e. who is in the process of entering without inspection—is "arriv[ing] in the United States . . . not at a designated port of arrival."  *Id*.  Thus, barring a person from asylum solely because he or she entered without inspection is at odds with the statutory mandate and must be invalidated as contrary to law.  *See United States v. Larionoff*, 431 U.S. 864, 873 (1977) (stating that "in order to be valid," regulations "must be

consistent with the statute under which they are promulgated"). [6]

Congress's decision not to ban asylum based on one's manner of entry makes sense: the manner of entry bears no relation to how much danger one faces.  Congress's decision is also consistent with the international law obligations of the United States regarding refugees.  *See* Declaration of Professor Guy Goodwin-Gill (Nov. 9, 2018) (noting, as one of the world's leading refugee and asylum authorities, that the U.S. government's recent decision to enact a *per se* ban on asylum for individuals who enter between ports at the U.S.-Mexico border violates international law, including the 1951 United Nations Convention Relating to the Status of Refugees). [7]

The government attempts to wave away the significance of § 1158(a)(1) by asserting that the new regulation only governs *eligibility* for asylum, whereas § 1158(a)(1) is concerned with the ability to *apply* for asylum.  *See* Interim Final Rule at 30.  But accepting that argument would gut Congress's command in § 1158(a)(1) of any force.  The ability to apply for asylum has to be a meaningful one, involving some chance of actually receiving asylum.  A categorical bar on the

---

[6] Not surprisingly in light of the language of the statute, the Board of Immigration Appeals (BIA) has also made clear that the Attorney General cannot categorically deny asylum simply because an applicant entered between ports.  Rather, the BIA has noted that individuals who enter between ports are eligible to apply for asylum and that the manner of entry becomes relevant, if at all, only at the end of the process when deciding whether the applicant should be denied asylum as a matter of discretion.  Notably, though, the BIA has made clear that even at the discretionary end of the process, the manner of entry may not become a back-door means of routinely denying asylum, thereby undercutting Congress's decision to ensure that the applicant's manner of entry did not render him *per se* ineligible for asylum.  In *Matter of Pula*, 19 I&N Dec. 467 (BIA 1987), for instance, the BIA held that while "an alien's manner of entry or attempted entry is a proper and relevant discretionary factor to consider in adjudication asylum applications, . . . *it should not be considered in such a way that the practical effect is to deny relief in virtually all cases.*"  *Id.* at 474 (emphasis added).  And, the BIA added, a well-founded fear of persecution "should generally outweigh all but the most egregious of adverse factors."  A *categorical rule* denying asylum in all cases of entry without inspection, then, runs counter to the longstanding rule that manner of entry cannot be dispositive in all cases.

[7] The United States has acceded to the international 1967 Protocol Relating to the Status of Refugees and is bound by it.  *Orantes-Hernandez*, 919 F.2d at 551.  By acceding to the Protocol, the United States agreed to comply with the 1951 Refugee Convention.  *Id.*  The Convention's prohibition on penalties reflects a recognition of the reality of being a refugee – a person who is, by definition, fleeing persecution.  *See* UN Ad Hoc Committee on Refugees and Stateless Persons, Memorandum by the Secretary-General, UN Doc. E/AC.32/2, Ch. XI, Art. 24. Para. 2 (Jan. 3, 1950) ("A refugee whose departure from his country of origin is usually a flight, is rarely in a position to comply with the requirements for legal entry . . . into the country of refuge.").  For this reason, the UNHCR's Introductory Note to the Convention describes the prohibition on penalizing a refugee for her manner of entry as one of the Convention's "fundamental principles."  *See* Introductory Note (UNHCR) (2010) at 3, UN Convention Relating to the Status of Refugees.  Prohibiting a person from applying for asylum merely because she entered at a place other than a port of entry is a penalty inconsistent with Article 33(1).

MEMORANDUM IN SUPPORT OF TEMPORARY RESTRAINING ORDER
Case No. 3:18-cv-06810

ability to obtain asylum merely because of a refugee's manner of entry leaves no such chance, and operates the same way as a ban on applying for asylum, thus rendering § 1158(a)(1) an empty vessel.

2.  The federal register notice accompanying the regulation argues that the Attorney General could lawfully enact the regulation because the asylum statute allows him to "establish additional limitations and conditions, consistent with [§ 1158], under which an alien shall be ineligible for asylum." 8 U.S.C. § 1158(b)(2)(C).   The Attorney General's power is phrased in terms of imposing *additional* conditions and limitations on a person's eligibility for asylum because the statute already sets out six exceptions to eligibility.  Critically, the statute then makes clear that the Attorney General does not have unfettered discretion to craft whatever additional limitations and conditions he believes appropriate, but may only impose additional limitations and conditions that are "consistent with this section."  8 U.S.C. § 1158(b)(2)(C).

A *per se* ban on asylum for all those who enter between ports at the U.S.-Mexico border is not consistent with the nature of the six limitations already contained in the statute:

> (i) the alien ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion;

> (ii) the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States;

> (iii) there are serious reasons for believing that the alien has committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States;

> (iv) there are reasonable grounds for regarding the alien as a danger to the security of the United States;

> (v) the alien is described in subclause (I), (II), (III), (IV), or (VI) of section 1182(a)(3)(B)(i) of this title or section 1227(a)(4)(B) of this title (relating to terrorist activity), unless, in the case only of an alien described in subclause (IV) of section 1182(a)(3)(B)(i) of this title, the Attorney General determines, in the Attorney General's discretion, that there are not reasonable grounds for regarding the alien as a danger to the security of the United States; or

> (vi) the alien was firmly resettled in another country prior to arriving in the United States.

14

The clear upshot of these enumerated bars is that Congress sought to deny asylum only to dangerous individuals and persecutors, as well as those who no longer needed a safe haven.  In light of § 1158(a)(1), Congress did not believe that the mere fact that an individual entered between ports made her a danger or threat to the United States.  Indeed, there are numerous reasons why asylum applicants cross between ports.  *See* Pinheiro Decl. ¶¶ 26-41 (discussing such reasons, including lack of information, safety concerns, and practices by U.S. Border Patrol agents denying access to ports of entry).

Under ordinary principles of statutory construction, the Attorney General's residual authority to promulgate additional conditions or limitations on asylum eligibility must be construed narrowly.  *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001) ("residual clause" is limited by "the enumerated categories . . . which are recited just before it").  By requiring that any new limitations be "consistent" with § 1158 as a whole, Congress authorized only limitations that fit within the overall statutory scheme, including the six enumerated grounds of ineligibility.  *See, e.g.*, *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 606 n.16 (1999) (plurality) (rejecting ADA standard that went beyond that articulated in Rehab Act regulations because Congress had directed the ADA regulations be "consistent" with the Rehab Act regulations).

In short, even if there were any doubt about whether the regulation is consistent with the type of exceptions set out in the statute, Congress eliminated that doubt by expressly stating that one is eligible for asylum "whether or not" they entered at a port of entry.  Whatever additional exceptions to asylum eligibility the Attorney General may impose, he certainly cannot make entry between ports a *per se* ground of ineligibility.[8]

---

[8] Perhaps out of appreciation for the narrow scope of Congress's grant in § 1158(b)(2)(C), no Attorney General has ever promulgated a regulation pursuant to his or her § 1158(b)(2)(C) authority as sweeping as the one here, or with the power to so fully undermine the asylum statute.  Indeed, the Interim Final Rule points to only *one* regulatory exercise of § 1158(b)(2)(C).  *See* Interim Final Rule at 19.  This marked departure from past practice is a development that in itself

15

### B.  The President Likewise Lacks Authority To Deny Asylum To All Who Enter Without Inspection.

The President also lacks authority to categorically ban asylum for all those who enter between ports on the US.-Mexico border, for two reasons.  First, the President's 212(f) power applies only to suspending or restricting "entry."  It does not allow the President to impose conditions on those who have already entered.  Second, even if the President's 212(f) power did permit him to impose conditions on those who already entered, it does not permit him to contravene Congress's specific command that individuals who enter without inspection may apply for asylum.

1. Section 212(f) gives the President the power to "suspend the *entry*" of noncitizens and impose "restrictions" on their "*entry*."  8 U.S.C. § 1182(f).  It does not refer to immigration proceedings once an individual has entered the country, nor does it reference the complex, reticulated scheme Congress has put in place to govern what relief is available, and to whom, in such post-entry proceedings.  By a reading of its plain text, section 212(f) does not grant the President any authority to dictate what forms of relief are available to a person who has *already entered*.  Indeed, if 212(f) provided that power, the President could recreate the entire immigration system – including, as here, by restructuring what forms of relief are available once an individual has *already* entered.

2.  Even if Section 212(f) did authorize regulation of events after entry (which it does not), it certainly cannot authorize the direct repudiation of a congressional command.  The implications of allowing such a blatant repudiation of Congress are extreme.  The President could literally rewrite the immigration laws.  He could decree, for example, that henceforth only certain of the five protected asylum grounds will be acceptable bases for asylum.  *See* 8 U.S.C. § 1101(a)(42) (providing for asylum based on a well-founded fear of persecution on account of "race, religion,

---

signals the need for caution, especially where there has been no notice and comment or a 30-day grace period, as required by the APA.  *Cf. Util. Air Reg. Group v. EPA*, 134 S. Ct. 2427, 2444 (2014) (When an agency claims to discover "an unheralded power" lying dormant "in a long-extant statute," courts "typically greet its announcement with a measure of skepticism.").

nationality, membership in a particular social group, or political opinion"). Or he could unilaterally heighten the standards for all forms of relief from removal, effectively writing the statutes Congress enacted out of existence.

That cannot be. As Justice Jackson explained nearly 70 years ago: "When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring). "Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system." *Id*. at 638.

The government has cited the Supreme Court's travel ban decision in *Hawaii* for support in enacting the asylum § 212(f) Proclamation. But the Court's *Hawaii* decision actually undermines the Proclamation here. In *Hawaii*, the Court found that the plaintiffs in that case could not "point to any contradiction with another provision of the INA." 138 S. Ct. at 2412. It was careful to acknowledge that in another case, where a plaintiff could identify a direct conflict between the President's proclamation and a statute, Congress's lawmaking authority would prevail. *See id*. at 2412 ("[T]his is not a situation where 'Congress has stepped into the space and solved the exact problem.'"); *id*. at 2411 ("We may assume that § 1182(f) does not allow the President to expressly override particular provisions of the INA."). This case represents just the situation *Hawaii* hypothesized, where the President is seeking to eviscerate a statute directly on point. Where, as here, Congress has spoken directly to the issue in a statute, the President has no authority to disregard that statute.

## THE REMAINING FACTORS TIP DECIDELY IN FAVOR OF GRANTING A TRO AND PRSERVING THE STATUS QUO

Plaintiffs are experiencing irreparable harm because they are being "depriv[ed] of a procedural protection to which [they are] entitled" under the APA.  *Sugar Cane Growers Cooperative of Fla. v. Veneman*, 289 F.3d 89, 94–95 (D.C. Cir. 2002).  If relief were unavailable under such circumstances, "section 553 would be a dead letter." *Id.* at 95.  And unless the new rule is stayed, Plaintiffs' injuries cannot be cured by ultimate success on the merits in this case.  *See Wis. Gas Co. v. Fed. Energy Regulatory Comm'n,* 758 F.2d 669, 674 (D.C. Cir. 1985).  Section 553 "is designed to ensure that affected parties have an opportunity to participate in and influence agency decision making at an early stage, when the agency is more likely to give real consideration to alternative ideas." *New Jersey v. EPA*, 626 F.2d 1038, 1049 (D.C. Cir.1980) (citation and internal quotation marks omitted).  "[P]ermitting the submission of views after the effective date of a regulation is no substitute for the right of interested persons to make their views known to the agency in time to influence the rulemaking process in a meaningful way." *Block,* 655 F.2d at 1158.  Indeed, if the rule is allowed to go into effect for any real period, the agencies are "far less likely to be receptive to comments." *N. Mariana Islands v. U.S.*, 686 F. Supp. 2d 7, 18 (D.D.C. 2009).  "Every day the [rules] stand is another day Defendants may enforce regulations likely promulgated in violation of the APA's notice and comment provision, without Plaintiffs' advance input." *California v. Health & Human Servs.*, 281 F. Supp. 3d 806, 829–30 (N.D. Cal. 2017).

Had Defendants provided an opportunity for notice and comment before putting the rule into effect, Plaintiffs would have had the opportunity to inform Defendants of their serious concerns.  *See* Complaint ¶ 100; Pinheiro Decl. ¶ 14; Declaration of Michael Smith, Refugee Rights Program Director, East Bay Sanctuary Covenant (Nov. 9, 2018), at ¶ 20; Declaration of Daniel Sharp, Legal Director, Central American Resource Center, Los Angeles (Nov. 9, 2014), at ¶ 14.

Moreover, the new policy makes far-reaching changes that will harm Plaintiffs.  Plaintiffs are

18

threatened with the immediate prospect of dramatically diverting their resources to account for the blanket ineligibility for asylum of so much of their clientele.  *See* Complaint ¶¶ 83-86, 88-89, 91, 93-95, 98-99; Pinheiro Decl. ¶¶ 9-10, 12-13; Smith Decl. ¶¶ 14-15, 17-19; Sharp Decl. ¶¶ 10-11, 13; Manning Decl. ¶¶ 8-12.  For example, Plaintiff Innovation Law Lab has created a nationwide system of training and mentoring pro bono counsel in asylum proceedings.  Manning Decl. ¶ 11.  The new policy precluding certain individuals from applying for asylum would force Innovation Lab to reallocate considerable resources to understanding the new regulatory landscape, and to handling complicated appeals before the Board of Immigration Appeals and the circuit courts.  *Id.* ¶ 12.  *See also* Sharp Decl. ¶ 13 (similar); *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040 (9th Cir. 2015) (holding plaintiff demonstrated injury where organization would not have diverted resources to voter registration drives but for state's actions); *SurvJustice Inc. v. DeVos*, No. 18-CV-00535-JSC, 2018 WL 4770741, at *8 (N.D. Cal. Oct. 1, 2018) (finding plaintiff suffered injury where "challenged policy required it to divert resources it 'otherwise would spend in other ways'") (citing *El Rescate Legal Servs., Inc. v. Exec. Office of Immigration Review*, 959 F.2d 742, 748 (9th Cir. 1991)).

In addition, several of the Plaintiff organizations face an extraordinary loss of funding tied to asylum applications, threatening their very existence.  *See* Complaint ¶¶ 80-82, 87, 90, 97; Pinheiro Decl. ¶ 11; Smith Decl. ¶¶ 16; Sharp Decl. ¶¶ 7, 12; Manning Decl. ¶ 11.  For instance, Plaintiff East Bay Sanctuary Covenant ("ESBC") mainly serves clients who entered without inspection in filing affirmative asylum applications.  Smith Decl. ¶ 9.  The organization receives funding from the State of California to partially defray costs for many of the applications it files.  *Id.* ¶ 16.  In 2017 alone, the organization received approximately $304,000 for filing 152 affirmative asylum applications for individuals who entered without inspection.  *Id.*  The new policy would imminent harm Plaintiff ESBC by jeopardizing a significant portion of its budget.  *See also* Sharp Decl. ¶ 12 (explaining how the new policy would financially strain Plaintiff CARECEN by forcing attorneys to devote more

hours per case to pursue complex non-asylum relief, while receiving a flat per-case reimbursement rate from the State of California); Pinheira Decl. ¶¶ 11-12 (explaining how Plaintiff Al Otro Lado would have to prepare additional applications for family members, incurring greater financial costs).

In contrast, the government cannot point to any real harm that would result from the requested TRO.  With regard to the procedural violations, the government can begin a new rulemaking process, this time following the mandatory procedures.  As explained above, the current rule is not made in response to an emergency, and a delay will not harm the public interest.

Moreover, in cases against the government, the government's interest and public interest factors "merge."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  As explained above, there is no urgent need to have the new asylum ban in effect immediately.  But if the ban is in effect, hundreds or thousands of vulnerable asylum seekers will be summarily denied asylum and could therefore be deported pursuant to a rule that violates the clear terms of the statue Congress enacted.  "Of course there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm."  *Id.* at 436.

Finally, the public interest is served when administrative agencies comply with their obligations under the APA.  *See New Jersey*, 626 F.2d at 1045 ("It is now a commonplace that notice-and-comment rule-making is a primary method of assuring that an agency's decisions will be informed and responsive."); *Cresote Council v. Johnson*, 555 F.Supp.2d 36, 40 (D.D.C. 2008) (explaining that there is a "general public interest in open and accountable agency decision-making").  Thus, "the balance of hardships tips sharply in [Plaintiffs'] favor."  *All. for the Wild Rockies*, 632 F.3d at 1131.

1

**CONCLUSION**

2

For the foregoing reasons, Plaintiffs' motion for a TRO should be granted.

3

Dated: November 9, 2018                                        Respectfully submitted,

4

Lee Gelernt*                                                   /s/Jennifer Chang Newell
Judy Rabinovitz*                                               Jennifer Chang Newell (SBN 233033)

5

Omar Jadwat*                                                   Cody Wofsy (SBN 294179)
Anand Balakrishnan*                                            Julie Veroff** (SBN 310161)

6

Celso Perez** (SBN 304924)                                     AMERICAN CIVIL LIBERTIES UNION
AMERICAN CIVIL LIBERTIES UNION                                 FOUNDATION

7

FOUNDATION                                                     IMMIGRANTS' RIGHTS PROJECT
IMMIGRANTS' RIGHTS PROJECT                                     39 Drumm Street

8

125 Broad St., 18th Floor                                      San Francisco, CA 94111
New York, NY 10004                                             T:  (415) 343-1198

9

T:  (212) 549-2660                                             F:  (415) 395-0950
F:  (212) 549-2654                                             *jnewell@aclu.org*

10

*lgelernt@aclu.org*                                            *cwofsy@aclu.org*
*jrabinovitz@aclu.org*                                         *jveroff@aclu.org*

11

*ojadwat@aclu.org*
*abalakrishnan@aclu.org*

12

*cperez@aclu.org*                                              Christine P. Sun (SBN 218701)
                                                               Vasudha Talla (SBN 316219)

13

Melissa Crow*                                                  AMERICAN CIVIL LIBERTIES UNION OF
SOUTHERN POVERTY LAW CENTER                                    NORTHERN CALIFORNIA, INC.

14

1666 Connecticut Avenue NW, Suite 100                          39 Drumm Street
Washington, D.C. 20009                                         San Francisco, CA 94111

15

T: (202) 355-4471                                              T: (415) 621-2493
F: (404) 221-5857                                              F: (415) 255-8437

16

*melissa.crow@splcenter.org*                                   *csun@aclu.org*
                                                               *vtalla@aclu.org*

17

Mary Bauer*
SOUTHERN POVERTY LAW CENTER                                    Baher Azmy*

18

1000 Preston Avenue                                            Angelo Guisado*
Charlottesville, VA  22903                                     Ghita Schwarz*

19

T:  (470) 606-9307                                             CENTER FOR CONSTITUTIONAL RIGHTS
F:  (404) 221-5857                                             666 Broadway, 7th Floor

20

*mary.bauer@splcenter.org*                                     New York, NY 10012
                                                               Telephone: (212) 614-6464

21

*Attorneys for Plaintiffs*                                     Facsimile: (212) 614-6499
                                                               bazmy@ccrjustice.org

22

*Pro hac vice application forthcoming*                         aguisado@ccrjustice.org
**Application for admission forthcoming*                       gschwarz@ccrjustice.org

23

24

25

26

27

28

MEMORANDUM IN SUPPORT OF TEMPORARY RESTRAINING ORDER
Case No. 3:18-cv-06810