## DECLARATION OF ERIKA PINHEIRO

I, Erika Pinheiro, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I would testify competently and truthfully to these matters.

2. I am a U.S. licensed attorney practicing in the areas of immigration law and international human rights. I am barred by the State of California and am over the age of 18.

3. I have over sixteen years of experience in the immigration arena, including representation of over 100 detained clients in removal proceedings. From 2011 to 2015, I administered Department of Justice-funded legal access programs for immigrant adults and children detained in prisons, jails, and shelters, as well as legal orientation programs for unaccompanied children following their release from government custody. Previously, I managed one of the largest free legal programs in California for DACA recipients, overseeing the completion of thousands of applications, as well as managed representation programs for unaccompanied children. I regularly provide technical assistance to numerous Los Angeles County agencies and train Federal Public Defender offices on the intersection between criminal and immigration law. In 2017, I was a New America California Fellow, and my organization, Al Otro Lado, has received numerous awards and commendations, including the 2018 Courageous Luminaries Award from the National Immigration Law Center, the YWCA Pasadena 2018 Racial Justice Award, and a 2017 commendation from Los Angeles County Supervisor Hilda Solis.

4. Since 2017, I have served as the Director of Litigation and Policy at Al Otro Lado, a non-profit, binational legal services organization incorporated in California. Al Otro

Lado serves indigent deportees, migrants, refugees and their families, principally in Los Angeles, California, and Tijuana, Mexico. Al Otro Lado's mission is to provide screening, advocacy, and legal representation for individuals in asylum and other immigration proceedings, to seek redress for civil rights violations, and to assist deportees, refugees, and other indigent immigrants with legal and social service needs.

5. Through its Border Rights Project, Al Otro Lado hosts legal orientation workshops in migrant shelters in Tijuana, Mexico, and provides representation to detained asylum seekers in Southern California. As part of this representation, our staff accompany some asylum seekers who wish to present themselves to Customs and Border Protection (CBP) officers at the San Ysidro Port of Entry and represent them at their credible/reasonable fear interviews before asylum officers with U.S. Citizenship and Immigration Services (USCIS). To expand our capacity, Al Otro Lado frequently recruits and trains pro bono attorneys to assist with legal orientation workshops in Tijuana migrant shelters, border accompaniment, and credible/reasonable fear representation. We also work with asylum seekers and other community advocates to document human rights violations by both U.S. and Mexican immigration authorities against asylum seekers.

6. Al Otro Lado routinely provides representation or other assistance to asylum seekers who have entered the United States without inspection (EWI). On average, Al Otro Lado and our volunteer attorneys provide representation to about 75 individuals per year in their credible fear or reasonable fear interviews, and handle about 50 cases per year involving EWI asylum seekers in removal proceedings. Through our shelter clinics, we help an additional 1,000 people per year prepare for their credible fear interviews.

7.  Pursuant to the Trump Administration's "Zero Tolerance" and "Operation Streamline" policies, large numbers of migrants entering the United States without inspection are criminally prosecuted. If asylum seekers enter without inspection near San Diego, they are usually detained at the Otay Mesa Detention Facility and represented by federal public defenders in their criminal proceedings. Once their criminal proceedings are over, the federal public defenders often refer these asylum seekers to Al Otro Lado for representation in their bond and/or removal proceedings.

8.  Generally, when asylum seekers who entered without inspection are referred to Al Otro Lado, our attorneys represent them in their bond proceedings. Almost all these clients are released on bond. If an individual remains in the Los Angeles area following release, our Los Angeles office continues to represent him or her before the Los Angeles immigration court. If the client moves to another jurisdiction, Al Otro Lado connects the client with local pro bono counsel or a local nonprofit.

**Harms Caused by the New Policies**

9.  If individuals who enter without inspection are ineligible for asylum, Al Otro Lado would have to completely revamp its representation strategy, comprehensively overhaul the materials we use to train pro bono attorneys, and reevaluate the eligibility of each of our clients for immigration relief. In addition, we would have to expend resources to brief eligibility issues, resulting in additional hearings and time spent on each case.

10. The new rule and Presidential proclamation would also place individuals who entered without inspection in "withholding-only" proceedings, rendering them ineligible for bond for at least six months. The question of whether they are eligible thereafter is the subject of ongoing litigation and would need to be briefed accordingly, requiring additional resources to

litigate bond hearings. Many more of Al Otro Lado's clients would remain detained throughout their removal cases, which would proceed on a much faster timetable than if they were not detained. To effectively serve this population, Al Otro Lado would have to devote virtually all its resources to representation of individuals in removal proceedings.

11. In addition, the rule and proclamation would jeopardize some of Al Otro Lado's most critical funding streams. Currently, the California Department of Social Services (CDSS) gives us funding at a fixed per-case rate to represent individuals in bond proceedings. As noted above, the rule and proclamation would make individuals who entered without inspection ineligible for bond for at least six months, thus alleviating the need for bond proceedings in cases that conclude during that time. We also receive a fixed per-case rate to represent migrants in their removal cases, but this funding is limited to a small number of cases. Even now, the funding received per full removal case ($5,000 for released, $6,500 for detained) does not cover the true cost of a complex asylum case that requires extensive briefing, expert testimony, and multiple hearings to litigate eligibility issues. The rule and proclamation would make such cases even more challenging and labor-intensive.

12. The vast majority of our asylum-seeking clients who entered without inspection have immediate family members in their countries of origin with whom they hope to reunify once they gain lawful status. Stripping these individuals of the ability to qualify for asylum would also eliminate their ability to petition for their immediate family members, even if they ultimately win Withholding of Removal or protection under the Convention Against Torture. In many cases, the spouses and children left behind in the country of origin also face persecution, and our clients are anxious to win asylum so that they can remove their family members from dangerous situations. Given our clients' goals, Al Otro Lado would have no choice but to

vigorously litigate issues of asylum eligibility for any client who entered without inspection and would otherwise be eligible for asylum.

13. Most of Al Otro Lado's asylum clients are families traveling with minor children. Should they become ineligible for asylum, spouses and minor children could no longer be counted as derivatives in a single application. Al Otro Lado would be forced to prepare separate cases for each family member, exponentially increasing the number of hours required to prepare a family's case.

14. If the government had provided an opportunity for notice and comment before promulgating the new rule, Al Otro Lado would have submitted comments regarding why the rule violates the Immigration and Nationality Act. Al Otro Lado also would have offered comments and evidence to show that the government's proffered reasons for promulgating the rule—namely, to channel asylum seekers to ports of entry—reflect an incorrect understanding of asylum seekers' motives for crossing the U.S.-Mexico border between ports of entry, and that the government's reference to an excessive volume of asylum seekers and unlawful entrants is factually incorrect when compared with historical norms.

**Asylum Seekers Traveling to the Southern Border**

15. Individuals who arrive at the southern border seeking protection in the United States through the asylum process are fleeing some of the most dangerous countries in the world.

16. Although asylum seekers come to the southern border from all over the world, the vast majority come from El Salvador, Guatemala, and Honduras, an area often referred to as Central America's "Northern Triangle." A 2015 UNHCR report described those countries as

having "epidemic levels of violence."[1] Their murder rates register as among the highest in the world.[2] The degree of violence suffered by people in the Northern Triangle has been compared to that experienced in war zones.[3]

17. Those who leave often are running from life-or-death situations, leaving everything behind to make a dangerous journey. In particular, violence against women by criminal armed groups has escalated dramatically, and home governments have been unable or unwilling to provide effective protection.[4]

18. Asylum seekers fleeing their home countries in Central America face an arduous journey to the United States, involving a high risk of violence, including sexual assault, along the way.[5] In 2015 and 2016, 68% of migrants from the Northern Triangle region experienced violence, including sexual assault, on their journeys through Central America and Mexico.[6]

---

[1] UNHCR, *Women on the Run: First-Hand Accounts of Refugees Fleeing El Salvador, Guatemala, Honduras, and Mexico*, (October 26, 2015), http://www.unhcr.org/en-us/publications/operations/5630f24c6/women-run.html ("*Women on the Run*").

[2] The Wall Street Journal, "Why Are People Fleeing Central America? A New Breed of Gangs is Taking Over," (Nov. 2, 2018) ("With the highest homicide rate of all countries in the world, El Salvador is a nation held hostage."); NBC News, "Amid political unrest, violence in Honduras, TPS holders in U.S. worry about their fate," (Feb. 22, 2018), https://www.nbcnews.com/news/latino/amid-political-unrest-violence-honduras-tps-holders-u-s-worry-n850241 ("Honduras is among the countries with the world's highest rates of murder, violence and corruption").

[3] Médecins Sans Frontières (Doctors Without Borders), *Forced to Flee Central America's Northern Triangle: A Neglected Humanitarian Crisis*, (May 2017), https://www.msf.org/sites/msf.org/files/msf_forced-to-flee-central-americasnorthern-triangle_e.pdf ("*Forced to Flee*").

[4] *See, e.g.*, *Women on the Run* at 16, 23.

[5] *Forced to Flee* at 11; *Women on the Run* at 43-45.

[6] *Forced to Flee* at 11.

19. Although those traveling by land cross through Mexico before reaching the United States, for many, remaining in Mexico is not an option. Rates of violence in Mexico have been increasingly as of late; 2017 was the deadliest year on record.[7]

20. Refugees in Mexico are at risk of kidnapping, disappearance, trafficking, and sexual assault, among other harms.[8] Lesbian, gay, bisexual, and transgender persons, as well as people with indigenous heritage, regularly have been subjected to persecution in Mexico.[9]

21. In my experience, a significant proportion of migrants coming to the southern border have credible claims to asylum.

22. According to the United Nations High Commissioner for Refugees, in fiscal year 2015, 82 percent of the women from El Salvador, Guatemala, Honduras, and Mexico who were subject to a credible fear screening by an asylum officer were found to have a significant possibility of establishing eligibility for asylum or protection under the Convention Against Torture.[10]

23. Between fiscal years 2014 and 2016, 8,848 people from El Salvador, Guatemala, and Honduras were granted asylum affirmatively, and 3,502 people from those countries were granted asylum defensively.[11]

---

[7] Human Rights First, *Mexico: Still Not Safe for Migrants and Refugees* (Mar. 2018), https://www.humanrightsfirst.org/sites/default/files/Mexico_Not_Safe.pdf (*"Mexico: Still Not Safe"*).

[8] *Id.*, at 1.

[9] The San Diego Union Tribune, "Should asylum seekers heading to the U.S. stay in Mexico?" (May 21, 2018), http://www.sandiegouniontribune.com/news/immigration/sd-me-safe-country-20180518-story.html.

[10] *Women on the Run* at 2, n.2 .

[11] U.S. Department of Homeland Security, Table 17. Individuals Granted Asylum Affirmatively By Region and Country of Nationality: Fiscal Years 2014 to 2016, https://www.dhs.gov/immigration-statistics/yearbook/2016/table17; U.S. Department of Homeland Security, Table 19. Individuals Granted Asylum Defensively By Region and Country

24. In Al Otro Lado's experience, many people seeking refuge in the United States are prevented from presenting at a port of entry and instead must enter elsewhere along the southern border.

25. Al Otro Lado, as well as numerous nongovernmental organizations and news outlets, have documented thousands of cases in which CBP officials have arbitrarily denied and/or unreasonably delayed access to the asylum process to individuals seeking asylum by presenting themselves at ports of entry along the U.S.-Mexico border.[12]

26. When Al Otro Lado conducts initial screenings of asylum seekers who entered without inspection, we find that many were unaware that they could present themselves at a Port of Entry to seek asylum; others are unfamiliar with the concept of a Port of Entry and only know that they must enter U.S. territory to seek asylum. Many refugees lack significant formal education, and are unaware that there are designated locations for crossing into the United States. Even those who know that there exist designated ports of arrival have no idea where they are or how to find them. Others become lost in the remote terrain of the border area, and do not even realize they have crossed into U.S. territory until they are apprehended by U.S. Border Patrol officers. Most individuals who enter without inspection with the intention of seeking asylum do not attempt to evade U.S. Border Patrol; instead, many approach border officials and ask for

---

of Nationality: Fiscal Years 2014 to 2016, https://www.dhs.gov/immigration-statistics/yearbook/2016/table19 (last accessed Nov. 8, 2018).

[12] Amnesty Int'l, *USA: 'You Don't Have Any Rights Here'* (Oct. 11, 2018), https://www.amnesty.org/download/Documents/AMR5191012018ENGLISH.PDF ("While there are no official statistics on how many people CBP has illegally turned away without processing their asylum requests, Amnesty International has received numerous secondary reports from NGOs indicating that CBP has forced thousands of asylum-seekers to wait in Mexico – including families with children, mostly from Central America."); *see generally* First Amended Complaint 28-, *Al Otro Lado v. Nielsen*, No. 17-cv-2366 (S.D. Cal. *filed* Oct. 12, 2018) (recounting other evidence in the possession of Al Otro Lado).

protection, or wait near the border fence to be apprehended by Border Patrol. Most claim fear of return as soon as they are encountered by U.S. officials.

27. In other cases, asylum applicants are forced to enter the United States without inspection by criminal groups, who typically refuse to take migrants to ports of entry. Instead, they drop migrants near the border, with no idea where they are or where the nearest port of entry may be, thus forcing them to enter without inspection.

28. Others are held for ransom by criminal groups near the border; some are kidnapped when they attempt to cross without paying the criminal groups that ostensibly "control" the border area. I have personally spoken with asylum seekers who were kidnapped, raped, or beaten by criminal groups operating on or near the border. In at least two cases, asylum applicants were forced to watch as members of criminal groups raped and killed other migrants. In one case, cartel members freed an asylum-seeking father and daughter from captivity and ordered them at gunpoint to cross the border without inspection.

29. Asylum seekers presenting at ports of entry are turned back by U.S. officals through a number of tactics, including threats, intimidation, and coercion; physical force; physical obstruction; and deliberate misinformation. This may force asylum seekers to attempt to enter without inspection.

30. Noncitizens seeking asylum who present at a port of entry also may have to wait several days or even weeks to present their claims to an immigration officer. Al Otro Lado is aware of multiple instances in which Border Patrol agents have coordinated with Mexican immigration authorities and other third parties to implement a "metering," or waitlist, system that creates unreasonable and life-threatening delays in processing asylum seekers; instructed asylum seekers to wait in pre-inspection areas or at a shelter until there is adequate space at the port of

entry; or simply asserted to asylum seekers that they cannot be processed because the port of entry is "full" or "at capacity."

31.     Asylum seekers waiting in Tijuana must add their names to a first-come, first-serve list that is administered by another asylum seeker. Only asylum seekers whose names are on the list are able to present themselves at the Port of Entry, but not all migrants have access to the list. I have personally witnessed the list administrator refuse to add the names of black migrants to the list. Al Otro Lado staff has also witnessed the list administrator refuse to add unaccompanied children. Asylum seekers who are not able to access the list could be compelled to enter the United States without inspection, depending on their circumstances.

32.     Asylum seekers who wish to present at the San Ysidro Port of Entry are currently waiting an average of four to six weeks in Tijuana due to an alleged lack of CBP capacity. Asylum seekers waiting in Tijuana shelters are subject to threats and intimidation by criminal groups who seek to coerce them into paying fees to cross without inspection. Over the past few weeks, Al Otro Lado has spoken with several families who were pressured and threatened by members of criminal groups to cross without inspection. Members of criminal groups have infiltrated the migrant shelters and prey on the most vulnerable, including families traveling with small children.

33.     I am also aware of significant delays at other ports of entry along the Southern Border. For instance, earlier this summer, only six asylum seekers were processed each day at

the port of entry in Nogales, despite a backlog of more than 100 people waiting in Mexico to apply, and even though the port is capable of holding 47 people at a time.[13]

34.  Similarly, at the port of entry in Brownsville, Texas, there were reports that officials were processing between zero and three people per day.[14]

35.  Outside observers have indicated that this slowdown is not the result of an actual lack of capacity to process asylum seekers. The Department of Homeland Security Office of Inspector General has noted that, while CBP justifies "metering" by citing a lack of capacity to process asylum seekers, "the OIG team did not observe severe overcrowding at the ports of entry it visited."[15] Human rights researchers visiting seven POEs in Texas in June 2018 reported that "[t]he processing rooms visible in the ports of entry . . . appeared to be largely empty."[16]

36.  These delays in processing asylum seekers can be life-threatening, as individuals are often vulnerable to violence and exploitation while they wait to be processed.

37.  Asylum seekers who suffer persecution in Mexico are, at times, unable to wait several weeks to present themselves at a Port of Entry and must seek to enter the United States by other means. In one case, a transgender asylum seeker had suffered horrendous persecution at the hands of state actors and non-state actors in Mexico. She jumped over the border fence on

---

[13] Washington Office on Latin America, *"Come Back Later:" Challenges for Asylum Seekers Waiting at Ports of Entry* (Aug. 2, 2018), https://www.wola.org/analysis/come-back-later-challenges-asylum-seekers-waiting-ports-entry/.

[14] The Guardian, *On a bridge between borders, asylum seekers linger in painful limbo* (Oct. 16, 2018), https://www.theguardian.com/us-news/2018/oct/16/zero-tolerance-asylum-seekers-limbo-gateway-international-bridge.

[15] Dep't of Homeland Sec., Office of the Inspector General, *Special Review – Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy* ("OIG Report"), No. OIG-18-84 at 5-6 (Sept. 27, 2018), available at www.oig.dhs.gov.

[16] Human Rights First, *Zero-Tolerance Criminal Prosecutions: Punishing Asylum Seekers and Separating Families* (July 18, 2018), https://www.humanrightsfirst.org/resource/zero-tolerance-criminalprosecutions-punishing-asylum-seekers-and-separating-families.

Imperial Beach, a heavily patrolled area, and asked for protection as soon as she encountered a Border Patrol officer. Unfortunately, the Border Patrol officer forced her to jump back over the wall into Mexico rather than process her in accordance with the law. This is one of many examples of asylum seekers who are forced to enter the United States without inspection due to an extreme threat of persecution in Mexico.

38. The region of Mexico near the border with the United States is a particularly violent area with limited law enforcement capacity.[17] Tijuana, in particular, is experiencing record-levels of violence; 2017 saw the highest annual number of homicides ever recorded,[18] with a murder rate higher than many Central American cities from which asylum seekers are fleeing.[19]

39. Asylum seekers turned back from a port of entry have been kidnapped and held for ransom by cartel members waiting outside.[20]

40. Even shelters outside ports of entry are not always safe, as cartels often infiltrate them.[21]

---

[17] U.S. Dep't of State, *Mexico Travel Advisory* (Aug. 22, 2018), https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/mexico-travel-advisory.html.

[18] San Diego Union Tribune, *Control for street drug trade pushes Tijuana to grisly new record: 1,744 homicides* (Jan. 14, 2018), http://www.sandiegouniontribune.com/news/border-baja-california/sd-me-homicides-tijuana-20180102-story.html.

[19] In 2017, Tijuana was the 5th most dangerous city in the world. Business Insider, *These were the 50 most violent cities in the world in 2017* (March 6, 2018), https://www.businessinsider.com/most-violent-cities-in-the-world-2018-3.

[20] Human Rights First, *Crossing the Line: U.S. Border Agents Illegally Reject Asylum Seekers*, (May 2017), https://www.humanrightsfirst.org/sites/default/files/hrf-crossing-the-line-report.pdf.

[21] *Id.*, at 17.

41.     Asylum seekers who need to reach safety as quickly as possible thus often feel compelled to enter the United States along the border, outside of a port of entry, in order to escape their persecutors and the violence on Mexico's side of the border.

42.     Individuals fleeing persecution often choose to travel together for safety reasons. Traveling alone can put a migrant at risk of violence and exploitation. By joining together, vulnerable individuals can gain some measure of protection.

I hereby declare under the penalty of perjury pursuant to the laws of the United States that the above is true and correct to the best of my knowledge.

*Erika Pinheiro*
Erika Pinheiro
EXECUTED this 9th day of November 2018