**DECLARATION OF STEPHEN W. MANNING, EXECUTIVE DIRECTOR,
INNOVATION LAW LAB**

I, Stephen W. Manning, declare as follows:

1.      I am an attorney licensed to practice in the State of Oregon and am a member in good standing of the bars of the United States District Court for the District of Oregon, the United States Court of Appeals for the Ninth Circuit, and the Supreme Court of the United States.  I am a member of the American Immigration Lawyers Association ("AILA"), a former member of the Board of Governors of AILA, and a former Chair of the Oregon Chapter of AILA. I am over 18 and have personal knowledge of the facts described herein.

2.      I am the Executive Director of the Innovation Law Lab ("the Law Lab"), a nonprofit in Oregon that I founded to improve the legal rights of immigrants and refugees in the United States. In my role at the Law Lab, I led the organizing of the Artesia Pro Bono Project in 2014 and the Dilley Pro Bono Project in 2015, which are detention-based projects that provided universal representation to detained families in rapid removal proceedings. I designed the model for the Southeast Immigrant Freedom Initiative, an initiative of the Southern Poverty Law Center in collaboration with the Law Lab, to provide representation to adult noncitizens detained at immigration facilities in the Southeastern United States in 2017. I designed and direct the pro bono representation project called the Centers of Excellence, which provide support to noncitizens and their pro bono attorneys including legal, technical, and strategic assistance in the preparation and presentation of claims. Through the Centers of Excellence, I direct representation projects in Georgia, Kansas, Missouri, North Carolina, and Oregon, with expansion underway to Texas, New Mexico, and California. In Oregon, under my direction, approximately 125 pro bono lawyers have been trained on asylum and removal defense. These are lawyers from large, medium, and small firms, solo practices, and in-house counsel. I

designed and directed a program called BorderX that uses technology and collaboration tools to provide support to legal service providers at immigrant detention centers. I designed BorderX so that remote attorneys and advocates—that is, attorneys and advocates who are unable to physically enter a detention center because of its remoteness—can participate by telephone and through cloud-software to scale representation efficiently.

3.      The Artesia Pro Bono Project provided representation to more than 700 women and children who were detained at the Artesia Family Residential Center in Artesia, New Mexico, including representation during the credible and reasonable fear screenings, applications for release, and merits adjudication on immigration relief. The Artesia Pro Bono Project lasted six months and ended when the detention center in Artesia was closed in December 2014.

4.      The Dilley Pro Bono Project, which continues to operate at the South Texas Family Residential Center, has been representing noncitizen asylum seekers during proceedings since its inception in 2015.  A related project operates at the Karnes Family Residential Center; together, both projects have represented over 100,000 individuals since their launch.

5.      As part of designing and scaling representation projects at detention centers, I have relied on data acquired during the different representation phases of immigration proceedings to make estimates about when and how long attorneys and other legal workers must spend interviewing, conferring, and consulting with clients. My estimates form the basis of the representational models, which have proven to be very successful when measured by client outcomes, with most individuals prevailing in seeking relief.

6.      In 2015, I was awarded the AILA Founder Award as a person who had the most substantial impact on the field of immigration law or policy in relation to the Artesia Pro Bono Project and the Dilley Pro Bono Project. In 2017, I was named the most innovative lawyer in

North America by *Financial Times* for my work in creating these immigrant and refugee representation detention-based projects.

7.      Innovation Law Lab's work is centered on providing representation to asylum seekers.  Recently, we mobilized around the civil detention of 123 asylum-seeking immigrant men at the Federal Correctional Institution Sheridan, Oregon ("FCI Sheridan").  The Law Lab provided pro bono legal representation to every man in the Sheridan cohort who requested our representation. In collaboration with almost 200 legal advocates and community members, the Law Lab represented 80 men from 11 different countries.  Every individual represented by the Law Lab was found to have a credible fear of persecution or torture; leading to, for most, the conclusion of expedited removal proceedings, the initiation of immigration judge § 240 proceedings, and eligibility for release from detention.  All but three of our 80 clients were released from FCI Sheridan on bond or parole.  Merits representation of two clients who remain detained is ongoing, and we also represent men whose cases remain before the Portland Immigration Court.

8.      Because of the Law Lab's organizational focus on asylum seekers, the new asylum rule and Presidential proclamation will require us to divert our limited resources significantly. Though most of our programmatic work serves immigrants without eligibility restrictions based on case type, the vast majority of the people we serve in Georgia, Kansas, Missouri, North Carolina, Oregon, Texas, New Mexico, and California are asylum seekers.  In Georgia and Oregon, we conduct pro se asylum workshops to assist asylum seekers in removal proceedings with application preparation and filing.  The new rule and proclamation purport to make a meaningful percentage of the asylum seekers we serve entirely ineligible for asylum because of their manner of entry into the country.     Implementation of the new rule and

proclamation would require us to entirely rework the advice and guidance we provide in our pro se workshops and respond to a flood of inquiries and community uncertainty from the immigrant communities we serve regarding the attempt to change asylum law.

9.       Through the Centers of Excellence, the Law Lab also places and mentors pro bono cases across the country.  The Executive Order and new rule make a significant percentage of our pro bono cases a great deal more complicated and will require us to reevaluate relief eligibility in all of the cases that we screen and mentor.  This will require, for each pro bono case, significant legal research and multiple strategy meetings with pro bono counsel. Additionally, if clients represented are only eligible for withholding of removal or Convention Against Torture relief, which have a higher standard of proof than asylum and are more time-consuming cases to handle, the Centers of Excellence may begin to lose more cases.  We would then be forced to shift a significant portion of our resources towards mentoring pro bono attorneys on complicated appeals before the Board of Immigration Appeals and the circuit courts.

10.      Our Border X program will also suffer immediate and dramatic impacts from the new rule and proclamation.  Border X builds better systems for advocates working in immigrant detention centers, and, as a part of its mission, coordinates effective release strategies for noncitizens in detention.  Since the program's launch in October 2017, 100% of the noncitizens served have been asylum seekers.  Border X's release strategy is, in many ways, dependent on a noncitizen's asylum eligibility, as release becomes possible only after passing a credible fear interview, which moves the asylum seeker out of expedited removal proceedings and into immigration judge § 240 or withholding proceedings.  The government's attempt to decimate asylum eligibility will immediately create a population of detained noncitizens who are not only

3

ineligible for release but also in danger of immediate removal.  Pivoting to determine advocacy strategies for this group will take a significant amount of resources, and will divert our attention from the noncitizen population that remains eligible for asylum under the Executive Order and new rule and who will still remain in desperate need of Border X's support.

11.     Thousands of individuals rely on Law Lab's systems.  The new rule and proclamation will require Law Lab to deploy expensive and limited engineering resources to recode its software to create new analytical modeling.  Law Lab publishes materials for pro bono attorneys and asylum applicants, including printed guides, worksheets, training videos, self-help videos, and other resources that are used around the country.  The new rule and proclamation will require Law Lab to substantially revise this material and create new learning engagements and materials.  This endeavor would represent such a substantial burden that it could cause Law Lab to cease most of its pro bono activities.

12.     Finally, Law Lab's work creating accountability within the immigration system will be significantly hindered due to the impact of the new rule and proclamation.  We are currently engaged in research and policy advocacy around improving due process and access to justice in the asylum process and removal proceedings.  Given the centrality of the asylum process to our organizational work and mission, the new rule and proclamation will force us to turn our attention from the many pressing issues we are currently investigating towards mitigating the effects of these new policies on our existing programs and clients.

13.     In sum, every single one of the Law Lab's existing programs will be significantly affected, irrevocably damaged, and immediately diverted by the new rule and proclamation.

14.     If the government had provided an opportunity for notice and comment before promulgating the new asylum rule, Law Lab would have submitted comments explaining why

the rule is illegal, and debunking the government's proffered reasons for promulgating the rule. Based on the thousands of client interviews that Law Lab has conducted, many asylum seekers are unfamiliar with the U.S. border and do not even understand the concept of a port of entry.

I hereby declare under the penalty of perjury pursuant to the laws of the United States that the above is true and correct to the best of my knowledge.

EXECUTED this 9th day of November, 2018.

Stephen W. Manning, OSB #013373