1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**EXHIBIT A**

The Honorable Jon S. Tigar

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| East Bay Sanctuary Covenant; Al Otro Lado; Innovation Law Lab; and Central American Resource Center in Los Angeles,<br><br>               *Plaintiffs,*<br><br>    v.<br><br>Donald J. Trump, President of the United States, in his official capacity; Matthew G. Whitaker, Acting Attorney General, in his official capacity; U.S. Department of Justice; James McHenry, Director of the Executive Office for Immigration Review, in his official capacity; the Executive Office for Immigration Review; Kirstjen M. Nielsen, Secretary of Homeland Security, in her official capacity; U.S. Department of Homeland Security; Lee Francis Cissna, Director of the U.S. Citizenship and Immigration Services, in his official capacity; U.S. Citizenship and Immigration Services; Kevin K. McAleenan, Commissioner of U.S. Customs and Border Protection, in his official capacity; U.S. Customs and Border Protection; Ronald D. Vitiello, Acting Director of Immigration and Customs Enforcement, in his official capacity; Immigration and Customs Enforcement,<br><br>               *Defendants.* | Case No.  3:18-cv-06810<br><br>**BRIEF OF AMICUS CURIAE FOR THE STATE OF WASHINGTON, COMMONWEALTH OF MASSACHUSETTS, STATE OF NEW YORK, AND STATE OF CALIFORNIA** |

## I.   INTRODUCTION AND INTEREST OF AMICI CURIAE

The States of Washington, Massachusetts, New York, and California (the States) respectfully submit this brief as amici curiae to address the need for emergency relief suspending the Acting Attorney General and Secretary of Homeland Security's Interim Final Rule: "Aliens Subject to a Bar on Entry under Certain Presidential Proclamations; Procedures for Protection Claims" (the Rule).[1]

This is not the sort of rare circumstance that can excuse the Government's failure to follow the APA's foundational procedural requirements. If the States had been afforded an opportunity to comment on the effects of barring asylum claims for those who enter at the country's southern border, they would have advised of the significant and deleterious impact of the Rule.  Under an appropriate rulemaking process, the agencies would have been required to consider how the Rule would further incentivize Customs and Border Protection (CBP) to turn asylum seekers away at points of entry (a practice known as "metering"), exacerbate unnecessary human suffering at our country's doorstep, and cause asylum seekers with meritorious claims prolonged harm resulting from being needlessly forced to wait at the border while their claims are processed.  The agencies' failure to utilize the standard APA process denied the States the right to submit their comments before the Rule – which enacts sweeping policy changes on an issue of national significance – went into effect.

The States have a strong interest in ensuring that federal agencies comply with the APA and refrain from engaging in arbitrary and capricious decision-making, and that their public policies in favor of open government, transparency, and the Rule of Law are vindicated.  Further,

---

[1] *Available at* https://www.regulations.gov/document?D=EOIR_FRDOC_0001-0039.

the States invest their own resources to provide education, health care, and other services to immigrant families – like all families that reside in our States – and will have a significant role in assisting immigrants and their relatives in the United States who will suffer the trauma and uncertainty that the Rule imposes. The States support the issuance of temporary relief to preserve the status quo and prevent widespread harm while the validity of the agency action is adjudicated, and such relief would clearly serve the public interest.

## II.     ARGUMENT

### A.     The Agencies Evaded Notice and Comment and Waiting Period Requirements, Denying States the Opportunity to Provide Input.

The agencies' failure to engage in notice and comment rulemaking as required by the APA deprived the States of their right to participate in the rulemaking process. "The notice and comment requirements are designed to ensure public participation in rulemaking." *Paulsen v. Daniels*, 413 F.3d 999, 1004 (9th Cir. 2005) (ellipses and brackets removed). Public participation ensures that "agency regulations are tested via exposure to diverse public comment"; that the process is "fair[] to affected parties"; and that affected parties have "an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review." *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005). "It is antithetical to the structure and purpose of the APA for an agency to implement a rule first, then seek comment later." *United States v. Valverde*, 628 F.3d 1159, 1164 (9th Cir. 2010) (quoting *Paulsen*, 413 F.3d at 1004). These procedural requirements are so fundamental that if an agency improperly fails to follow them, its regulation must be invalidated. 5 U.S.C. § 706(2)(D) (courts "shall . . . hold unlawful and set aside" agency action taken "without observance of procedure required by law").

The agencies insist that this unilateral action is supported by "good cause," and that giving the States and the public an opportunity to comment on drastic changes to federal immigration policy would be "impracticable" and "contrary to the public interest." *See* Interim Final Rule at 65 (citing 5 U.S.C. § 553(b)(B)). They also purport to make the rule effective immediately, dispensing with the 30-day waiting period required by 5 U.S.C. 553(d), arguing that "immediate implementation of this rule is essential to avoid creating an incentive for aliens to seek to cross the border." 83 Fed. Reg. 55950. The Rule was issued without notice, in the absence of any emergency such as an imminent threat of a terrorist attack, an accident or natural disaster that imperils human life, or even a fiscal emergency. *See* Motion for TRO at 7–8. Thus, the government fails to overcome the "high bar" to invoke the good cause exception. *Valverde*, 628 F.3d at 1164.

"The good cause exception is essentially an emergency procedure." *Id.* at 1165 (quoting *Buschmann v. Schweiker*, 676 F.2d 352, 357 (9th Cir. 1982)). Failing to follow notice and comment procedures may be excused "only in those narrow circumstances" in which taking the time to comply with the APA's procedural requirements "would do real harm." *Id.* at 1164–65. "[T]he good cause exception … authorizes departure from the APA's requirements only when compliance would interfere with the agency's ability to carry out its mission." *Cal-Almond, Inc. v. U.S. Dep't of Agric.*, 14 F.3d 429, 441 (9th Cir. 1993). It is to be "sparingly used in order to promote public input into agency rulemaking," *Serv. Emps. Int'l Union, Local 102 v. County of San Diego*, 60 F.3d 1346, 1353 (9th Cir. 1994), lest it "carve the heart out of the statute." *Action on Smoking and Health v. CAB*, 713 F.2d 795, 800 (D.C. Cir 1983).

The government also invokes the "foreign affairs" exception to the APA's procedural requirements, 5 U.S.C. § 553(a)(1). 83 Fed. Reg. 55950.  However, the Ninth Circuit rejected this exception's application to the kind of regulation at issue here, holding that: "The foreign affairs exception would become distended if applied to [DHS] actions generally, even though immigration matters typically implicate foreign affairs. For the exception to apply, the public rulemaking provisions should provoke definitely undesirable international consequences." *Yassini v. Crosland*, 618 F.2d 1356, 1363 n.4 (9th Cir. 1980) (internal citations omitted). Although foreign relations are briefly discussed in the Rule, *see* 83 Fed. Reg. 55950, the government's focus is on the United States' internal interests, not international relations.

The States' interests in governmental transparency are furthered by the opportunity to comment on proposed federal rulemaking.  Moreover, as sovereigns responsible for the health, safety, and welfare of millions of people within their respective borders, the States have unique interests and perspectives to contribute on issues of national importance and widespread impact, particularly when such policies will cause prospective residents of our States unnecessary, substantial, and enduring harm.  If the States had been provided with an opportunity to comment on the Rule before it was promulgated, they would have raised these issues before the Rule took effect.[2] The agencies would have been required to consider those comments in crafting the final regulation, *see* 5 U.S.C. § 553(c), and may have made changes to the proposed rule in response, as agencies often do. The record developed through the notice and comment process in turn

---

[2] For example, since March 2016, Washington State has offered more than 45 comment letters on anticipated or proposed actions by the Administration to delay, repeal or adopt federal regulations. Massachusetts has submitted dozens of comment letters on proposed regulatory changes, New York offered 45 comment letters, and California has submitted 59 comment letters since February 2017.

would have aided the Court in its review of the action. *United Mine Workers*, 407 F.3d at 1259. That is the way the process is supposed to work.

**B.     The Interim Final Rule Will Exacerbate Inhumane Border Conditions.**

Granting the temporary restraining order could prevent needless harm.  On the other side of the ledger, the federal government can assert little to no legally cognizable harm from entry of the injunction. "[T]he government[] . . . cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns."[3] The balance of equities tips in favor of a TRO here.

In addition to obvious legal infirmities detailed in the Motion, the Rule raises several key practical and humanitarian concerns. Because the Rule requires people fleeing violence to present requests for asylum only at official U.S. ports of entry, it will increase pressure on border officers to turn away people who try to present themselves—a process known as "metering." Increasing metering will only exacerbate the inhumane border conditions migrants experience.

Even if metering does not occur, the Rule will increase asylum seekers' wait times at the border while their claims are being processed. During these long waits, children will not be educated and families will not receive the basic health services that they would receive if they were to be released to live in the States.

**1.     Increasing Pressure on Ports of Entry Will Increase Metering.**

Along the southern border, CBP regularly prevents asylum seekers from requesting protection at official U.S. ports of entry by turning away individuals before they can reach the

---

[3] *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (citing *Zepeda v. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983)). *See also NAACP v. Trump*, 2018 U.S. Dist. LEXIS 139663, at *15 (D.D.C. Aug. 17, 2018) (finding lack of injury to federal government from order "simply correct[ing] the improper exercise of [DHS] authority" in case relating to rescission of Deferred Action for Childhood Arrivals ["DACA"]).

entry point. This is not an isolated practice, but a widespread policy intended to deter asylum seekers from accessing ports of entry at the U.S.–Mexico border, a policy that the federal government has repeatedly acknowledged over the past year.

In June 2018, the DHS Office of Inspector General (OIG) conducted unannounced site visits to CBP and ICE facilities along the southern border.[4] OIG's report, issued in late September, confirmed that "CBP was regulating the flow of asylum-seekers at ports of entry through 'metering[.]'" *Id*. at 5.  OIG described the process: "When metering, CBP officers stand at the international line out in the middle of the footbridges" and turn asylum-seekers away before they can cross onto U.S. soil, claiming that there is no space available. *Id.* at 6. CBP instructs officers to "inform individuals that the port is currently at capacity and that they will be permitted to enter once there is sufficient space and resources to process them." *Id.* at 6.

In recent years, CBP has increasingly utilized metering tactics. In April and May 2018, officials at the San Ysidro port of entry near San Diego, California denied entry to a large group of asylum seekers and forced them to wait outside the U.S. gate for days, enduring cold, rain, ants, and lice.[5] CBP justified the denial of entry based on a lack of processing capacity, despite the fact that the agency had been anticipating the arrival of these 240 asylum seekers for weeks and regularly manages the daily crossing of 20,000 people at this port of entry. *Id*. Individuals seeking to cross were told by CBP that the US did not accept asylum claims at the border, or that they needed to obtain appointments from Mexican officials before they could proceed. *Id.*

---

[4] OFFICE OF INSPECTOR GENERAL, SPECIAL REVIEW – INITIAL OBSERVATIONS REGARDING FAMILY SEPARATION ISSUES UNDER THE ZERO TOLERANCE POLICY (Sept. 27, 2018) at 1, available at https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-84-Sep18.pdf.

[5] JASON BOYD AND GREG CHEN, AMERICAN IMMIGRATION LAWYERS ASSOCIATION POLICY BRIEF: NEW BARRIERS AT THE BORDER IMPEDED DUE PROCESS AND ACCESS TO ASYLUM (June 1, 2018) at 3. Available at https://www.aila.org/File/DownloadEmbeddedFile/76208.

Legal representatives who accompanied immigrants wishing to present themselves to CBP officers at ports of entry from 2017 to present have witnessed dozens of people—mostly asylum seekers—being turned away repeatedly. Human Rights First documented over a hundred instances where CBP refused to grant individuals and families access at numerous ports of entry. BOYD AND CHEN, AMERICAN IMMIGRATION LAWYERS ASSOCIATION POLICY BRIEF at 3. Most of these were families fleeing violence in their home country. *Id.*

There is no doubt that metering has and continues to be a policy at ports of entry on the southern border. The OIG noted that CBP "has utilized [metering] at least as far back as 2016 to regulate the flow of individuals at ports of entry." OIG, INITIAL OBSERVATIONS REGARDING FAMILY SEPARATION at 5-6. In May 2018, DHS Secretary Kirstjen Nielsen publicly admitted that it was DHS policy to meter migrants at the U.S.-Mexico border: "We are 'metering', which means that if we don't have the resources to let them [asylum-seekers] in on a particular day, they are going to have to come back." AMNESTY INTERNATIONAL REPORT, USA: 'YOU DON'T HAVE ANY RIGHTS HERE' (2018) at 11.[6] Commissioner Kevin McAleenan confirmed a few weeks ago that CBP is preparing to "expand" metering, stating

> that if the Border Patrol sees a significant increase in asylum seekers, it will expand metering to other border crossings — effectively blocking immigrants from entering. He said the agency already faced a "significant backlog" of asylum seekers in Tijuana and delays at three to four other crossings daily.[7]

Unsurprisingly, metering puts enormous pressure on migrants to enter illegally, as persons fleeing violence are faced with indefinite waits at ports of entry. As OIG found, "DHS regulated the number of asylum-seekers entering the country through ports of entry at the same

---

[6] *Available at* https://www.amnesty.org/download/Documents/AMR5191012018ENGLISH.PDF.
[7] http://www.latimes.com/nation/la-na-border-patrol-commissioner-20181026-story.html

time it encouraged asylum-seekers to come to ports." OIG, INITIAL OBSERVATIONS REGARDING FAMILY SEPARATION at 1. OIG suggested that "limiting the volume of asylum-seekers entering at ports of entry leads some aliens who would otherwise seek legal entry into the United States to cross the border illegally." *Id.* at 7. Indeed, interviews with a Border Patrol supervisor and migrants confirmed that there is "an increase in illegal entries when aliens are metered at ports of entry." *Id.* at 7.

### 2. Metering Exacerbates Inhumane Border Conditions.

Media reports show how families, some with small children, have been forced to sleep on the ground outside ports of entry for weeks as they waited for CBP to allow them to present themselves:

> Families from El Salvador, Guatemala and Honduras huddle together on the ground near packages of donated diapers and cans of baby formula. Some have endured this limbo for nearly two weeks, sleeping on the ground at night and trying to stay cool during the day as temperatures in this outpost in the Sonoran Desert surpass 100 degrees.[8]

Other reports describe the unofficial bureaucracy that grew out of CBP border refusals at the San Ysidro Port of Entry, where "metered" migrants live for weeks as they wait for CBP to allow them to seek asylum.[9] Asylum seekers are left to camp out near the U.S.–Mexico border for "up to a month in more than two dozen temporary shelters in Tijuana."

Metering increases the wait at ports of entry for asylum seekers, many of whom are women with children. Faced with days of additional delay at the border, and fearful of losing their place in line, asylum seekers will be exposed to harsh weather conditions, lack of stable

---

[8] https://www.nytimes.com/2018/06/12/us/asylum-seekers-mexico-border.html
[9] http://www.latimes.com/local/california/la-me-asylum-seekers-notebook-holds-key-to-entry-20180705-story.html

shelter, and inadequate facilities.[10]  Just this week, freezing temperatures forced hundreds of waiting migrants outside an El Paso port of entry to seek other shelter.[11] Vulnerable adults and children are exposed to greatly increased risks of crime, exploitation, and unsanitary conditions as they languish at the border.[12]

During these periods, children do not go to school and families do not receive basic health and social services that the States would otherwise provide. For these people, whatever trauma caused them to flee their home country will only be compounded. Ultimately, the States will bear the costs of the Rule, as asylum seekers who are accepted will settle in our jurisdictions having unnecessarily experienced more trauma due to the Rule.  For example, in FY 2017, almost 15,000 accompanied children (those arriving with their families) received positive credible fear determinations and were released from federal custody, many in the amicus States.  *See* 83 Fed. Reg. 45486, 45519 (Sept. 7, 2018). The prospective application of this illegal Rule will certainly affect future State residents.

### III.   CONCLUSION

The States support the issuance of temporary relief to preserve the status quo and prevent widespread harm while the validity of the agency action is being adjudicated, and they urge the Court to grant Plaintiffs' Motion.

---

[10] *See* https://www.nytimes.com/2018/06/12/us/asylum-seekers-mexico-border.html (describing father and toddler forced to sleep "on cardboard pizza boxes in a squalid entryway to a bathroom at the border crossing" as they wait for CBP to accept their asylum claim).
[11] *See* https://www.upi.com/Top_News/World-News/2018/11/13/Cold-weather-drives-migrants-camped-at-border-bridge-into-shelter/2751542145667/
[12] *See* http://cmsny.org/publications/heyman-slack-asylum-poe/

DATED this _____ day of November, 2018.

ROBERT W. FERGUSON
Washington State Attorney General

_____
MEGAN D. LIN, SNB # 298267
COLLEEN M. MELODY, WSBA #42275
Civil Rights Division Chief
LAURA K. CLINTON, WSBA #29846
KRISTIN BENESKI, WSBA #45478
Assistant Attorneys General
Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
Tel: (206) 464-5342
MeganL@atg.wa.gov
ColleenM1@atg.wa.gov
LauraC5@atg.wa.gov
KristinB1@atg.wa.gov
Attorneys for the State of Washington


MAURA HEALEY
Attorney General for Massachusetts


_____
GENEVIEVE C. NADEAU
Chief, Civil Rights Division
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
Tel:  (617) 727-2200
Genevieve.Nadeau@state.ma.us
Attorneys for the Commonwealth of Massachusetts

BARBARA D. UNDERWOOD
Attorney General of New York

LOURDES ROSADO, Civil Rights Bureau Chief
ANISHA DASGUPTA, Deputy Solicitor General
Civil Rights Bureau
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
(212) 416-8252
lourdes.rosado@ag.ny.gov
anisha.dasgupta@ag.ny.gov
Attorneys for the State of New York


XAVIER BECERRA
Attorney General of California

JAMES F. ZAHRADKA II
Deputy Attorney General
MICHAEL L. NEWMAN
Senior Assistant Attorney General
Civil Rights Enforcement Section
California Department of Justice
1515 Clay Street, Suite 2000
Oakland, CA 94612
Tel: (510) 879-1247
James.Zahradka@doj.ca.gov
Attorneys for the State of California