JOSEPH H. HUNT
*Assistant Attorney General*
SCOTT G. STEWART
*Deputy Assistant Attorney General*
AUGUST E. FLENTJE
*Special Counsel*
WILLIAM C. PEACHEY
*Director*
EREZ REUVENI
*Assistant Director*
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 307-4293
Email: Erez.R.Reuveni@usdoj.gov
PATRICK GLEN
*Senior Litigation Counsel*
JOSEPH DARROW
FRANCESCA GENOVA
CHRISTINA GREER
*Trial Attorneys*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| East Bay Sanctuary Covenant, *et al.*, ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 1:18-cv-06810-JST |
| ) | |
| Donald J. Trump, President of the United ) States, *et al.*, ) | |
| ) | |
| Defendants. ) | |

# TABLE OF CONTENTS

**Introduction**.................................................................................................................1

**Legal and Procedural Background** ........................................................................3

**Argument** ....................................................................................................................8

**I.      Plaintiffs' Claims Are Not Justiciable.** ......................................................8

    A.      Plaintiffs Have Not Suffered an Injury in Fact and thus Lack Article III Standing. ........................................................................................................8

    B.      Plaintiffs' Claims Fall Outside the Statutory Zone of Interests.............................10

**II.     The Rule Satisfies The APA's Procedural Requirements.** .............................11

**III.    The Rule and Proclamation Are Consistent with the INA** ...........................17

    A.      The Rule Is Consistent with the INA. ...................................................17

    B.      The Proclamation Is a Valid Use of the President's Authority.............................22

**IV.    The Other Stay Factors Foreclose Issuing a TRO** ........................................23

**V.      Any Interim Relief Must Be Sharply Limited.** ..............................................24

**Conclusion** ..................................................................................................................25

**CERTIFICATE OF SERVICE** .............................................................................26

# TABLE OF AUTHORITIES

## CASE LAW

*Adams v. Vance*,
570 F.2d 950 (D.C. Cir. 1978) ................................................................................... 24

*Am. Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States*,
751 F.2d 1239 (Fed. Cir. 1985) ............................................................................ 15, 16

*Am. Immigration Lawyers Ass'n v. Reno*,
199 F.3d 1352 (D.C. Cir. 2000) ............................................................................ 11, 25

*Ass'n for Retarded Citizens of Dallas v. Dallas Cty. Mental Health & Mental Retardation Ctr. Bd. of Trustees*,
19 F.3d 241 (5th Cir. 1994) ....................................................................................... 8

*California Hosp. Ass'n v. Maxwell-Jolly*,
2011 WL 464008 (E.D. Cal. Feb. 4, 2011) .............................................................. 25

*Capital Legal Found. v. Commodity Credit Corp.*,
711 F.2d 253 (D.C. Cir. 1983) ................................................................................. 11

*Caribbean Marine Servs. Co. v. Baldrige*,
844 F.2d 668 (9th Cir. 1988) ................................................................................... 24

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ................................................................................................... 9

*Clarke v. Secs. Indus. Ass'n*,
479 U.S. 388 (1987) ................................................................................................. 10

*Fed'n for Am. Immigration Reform, Inc. v. Reno*,
93 F.3d 897 (D.C. Cir. 1996) ................................................................................... 10

*Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ................................................................................................... 8

*Gill v. Whitford*,
138 S. Ct. 1916 (2018) ............................................................................................. 25

*Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70*,
415 U.S. 423 (1974) ................................................................................................. 25

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) ................................................................................................... 9

*Hawaii Helicopter Operators Ass'n v. FAA,*
  51 F.3d 212 (9th Cir. 1995) ............................................................... 12

*Immigrant Assistance Project of Los Angeles Cty. v. INS,*
  306 F.3d 842 (9th Cir. 2002) ............................................................. 10

*Immigrant Rights Project v. USCIS,*
  325 F.R.D. 671 (W.D. Wash. 2016) ................................................... 11

*INS v. Aguirre-Aguirre,*
  526 U.S. 415 (1999) ........................................................................... 19

*INS v. Cardoza-Fonseca,*
  480 U.S. 421 (1987) ........................................................................... 22

*INS v. Legalization Assistance Project of L.A. Cty.,*
  510 U.S. 1301 (1993) .................................................................. 10, 11

*Kleindienst v. Mandel,*
  408 U.S. 753 (1972) ............................................................................. 3

*Komarenko v. INS,*
  35 F.3d 432 (9th Cir. 1994) ............................................................... 21

*L.A. Haven Hospice, Inc. v. Sebelius,*
  638 F.3d 644 (9th Cir. 2011) ............................................................. 26

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League,*
  634 F.2d 1197 (9th Cir. 1980) ........................................................... 25

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest,*
  624 F.3d 1083 (9th Cir. 2010) ........................................................... 10

*Landon v. Plasencia,*
  459 U.S. 21 (1982) ............................................................................. 24

*Lopez v. Davis,*
  531 U.S. 230 (2001) ........................................................................... 20

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ............................................................................. 8

*Madsen v. Women's Health Ctr., Inc.,*
  512 U.S. 753 (1994) ........................................................................... 25

*Mendoza v. Perez*,
    754 F.3d 1002 (D.C. Cir. 2014) ........................................................................ 11

*Mobil Oil Corp. v. Dep't of Energy*,
    728 F.2d 1477 (TECA 1983) ........................................................................... 12

*Nat'l Taxpayers Union, Inc. v. United States*,
    68 F.3d 1428 (D.C. Cir. 1995) ........................................................................... 8

*Nijjar v. Holder*,
    689 F.3d 1077 (9th Cir. 2012) .......................................................................... 22

*R-S-C- v. Sessions*,
    869 F.3d 1176 (10th Cir. 2017) ........................................................................ 19

*Rajah v. Mukasey*,
    544 F.3d 427 (2d Cir. 2008) ............................................................................. 17

*Raoof v. Sullivan*,
    315 F. Supp. 3d 34 (D.D.C. 2018) .................................................................... 15

*Sale v. Haitian Centers Council, Inc.*,
    509 U.S. 155 (1993) ......................................................................................... 24

*Smith v. Pac. Properties & Dev. Corp.*,
    358 F.3d 1097 (9th Cir. 2004) ............................................................................ 8

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ....................................................................................... 9

*Summers v. Earth Island Institute*,
    555 U.S. 488 (2009) ........................................................................................... 9

*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018) ........................................................................ 1, 19, 23, 25

*United States ex rel. Knauff v. Shaughnessy*,
    338 U.S. 537 (1950) ........................................................................................... 3

*United States v. Valverde*,
    628 F.3d 1159 (9th Cir. 2010) ..................................................................... 12, 14

*Univ. of Tex. v. Camenisch*,
    451 U.S. 390 (1981) ......................................................................................... 25

*Yang v. INS*,
  79 F.3d 932 (9th Cir. 1996) ........................................................................... 20

*Zepeda v. INS*,
  753 F.2d 719 (9th Cir. 1983) ................................................................... 15, 17

## ADMINISTRATIVE DECISIONS

*Matter of Pula*,
  19 I. & N. Dec. 467 (BIA 1987) ................................................................. 20

## STATUTES

5 U.S.C. § 553(a)(1) ............................................................... 2, 12, 15, 17

5 U.S.C. § 553(b) ................................................................................... 7

5 U.S.C. § 553(b)(B) ........................................................................ 2, 12

5 U.S.C. § 553(c) ................................................................................... 7

5 U.S.C. § 553(d) ................................................................................... 7

5 U.S.C. § 553(d)(3) ........................................................................ 2, 12

5 U.S.C. § 702 ..................................................................................... 10

5 U.S.C. § 706 ....................................................................................... 7

8 U.S.C. § 1158 ................................................................................ 3, 4

8 U.S.C. § 1158(a) ............................................................................ 21

8 U.S.C. § 1158(a)(1) ........................................................... 2, 3, 7, 18, 21

8 U.S.C. § 1158(a)(2)(A) ................................................................. 18

8 U.S.C. § 1158(a)(2)(B) ................................................................. 18

8 U.S.C. § 1158(a)(2)(C) ................................................................. 18

8 U.S.C. § 1158(b)(C) ..................................................................... 18

8 U.S.C. § 1158(b)(1)(A) .................................................... 2, 3, 19, 21

8 U.S.C. § 1158(b)(1)(B) ........................................................................................... 3

8 U.S.C. § 1158(b)(2) ................................................................................................ 3

8 U.S.C. § 1158(b)(2)(A)(i) ...................................................................................... 19

8 U.S.C. § 1158(b)(2)(A)(ii) ............................................................................... 19, 22

8 U.S.C. § 1158(b)(2)(A)(iii) .................................................................................... 19

8 U.S.C. § 1158(b)(2)(A)(iv) .............................................................................. 19, 22

8 U.S.C. § 1158(b)(2)(A)(v) ..................................................................................... 19

8 U.S.C. § 1158(b)(2)(A)(vi) .................................................................................... 19

8 U.S.C. § 1158(b)(2)(C) ................................................................... 2, 3, 5, 18, 22

8 U.S.C. § 1158(d)(5)(b) ............................................................................................ 5

8 U.S.C. § 1182(f) ................................................................................. 3, 4, 5, 23

8 U.S.C. § 1185(a) ............................................................................................ 3, 4, 5

8 U.S.C. § 1185(a)(1) ............................................................................................... 23

8 U.S.C. § 1225(b) ........................................................................................... 3, 4, 7

8 U.S.C. § 1225(b)(1)(A)(i) ........................................................................................ 4

8 U.S.C. § 1225(b)(1)(A)(iii)(I) .............................................................................. 13,

8 U.S.C. § 1225(b)(1)(B) ............................................................................................ 4

8 U.S.C. § 1225(b)(1)(B)(ii) ....................................................................................... 4

8 U.S.C. § 1225(b)(1)(B)(iii)(I) .................................................................................. 4

8 U.S.C. § 1225(b)(1)(B)(iii)(III) ............................................................................... 4

8 U.S.C. § 1225(b)(1)(C) ............................................................................................ 4

8 U.S.C. § 1225(b)(2)(A) ............................................................................................ 4

8 U.S.C. § 1229a ........................................................................................................ 4

8 U.S.C. § 1252(a) ............................................................................................ 11

8 U.S.C. § 1252(a)(2)(A)(iii) ........................................................................... 11

8 U.S.C. § 1252(a)(5) ...................................................................................... 25

8 U.S.C. § 1252(b)(9) ...................................................................................... 25

8 U.S.C. § 1252(d) ........................................................................................... 25

8 U.S.C. § 1252(e)(1) ....................................................................................... 11

8 U.S.C. § 1252(e)(2) ....................................................................................... 25

8 U.S.C. § 1252(e)(3) ....................................................................................... 25

8 U.S.C. § 1325 .................................................................................................. 3

8 U.S.C. § 1326 .................................................................................................. 3

## REGULATIONS

8 C.F.R. § 208.13(f) ........................................................................................... 4

8 C.F.R. § 208.30(e)(5) ................................................................................... 4, 5

8 C.F.R. § 208.31 ............................................................................................... 4

8 C.F.R. § 1208.16(b) ........................................................................................ 3

8 C.F.R. § 1208.16(c) ........................................................................................ 3

## FEDERAL REGISTER

81 Fed. Reg. 14948 .......................................................................................... 15

83 Fed. Reg. 55934 ........................................................................................ 4, 6

83 Fed. Reg. 55934-38 ...................................................................................... 5

83 Fed. Reg. 55937-38 ...................................................................................... 3

83 Fed. Reg. 55949 ............................................................................................ 13, 17. 24

83 Fed. Reg. 55949-50 ........................................................................................... 5, 12

**MISCELLANEOUS**

*Presidential Proclamation Addressing Mass Migration Through the Southern Border of the*
*United States § 1* (Proclamation) (Last visited Nov. 9, 2018),
https://www.whitehouse.gov/presidential-actions/presidential-proclamation-addressing-mass-
migration-southern-border-united-states/ ...................................................................... 5

United States Border Patrol, Southwest Border Deaths By Fiscal Year ...................................... 13

Missing Migrants, Tracking Deaths Along Migratory Routes, Deaths of Migrants Recorded in
US-Mexico Border in 2018 ........................................................................................ 13

**Introduction**

The President, relying on his "broad discretion to suspend the entry of aliens into the United States" through proclamation, *Trump v. Hawaii*, 138 S. Ct. 2392, 2408 (2018), determined that entry must be temporarily suspended for the large number of aliens transiting Mexico who, rather than properly presenting themselves at a port of entry, violate our criminal law and endanger themselves, any children accompanying them, and U.S. law enforcement officers by crossing illegally into the country. The President has sought to halt this dangerous and illegal practice and regain control of the border. In turn, the Attorney General and Secretary of Homeland Security, exercising their broad and express statutory authority, determined that those who enter the country in contravention of such a presidential proclamation will not be eligible for the discretionary benefit of asylum. Such aliens can still establish eligibility for withholding of removal or protection under the regulations implementing the Convention Against Torture—ensuing that aliens will not be sent back to countries where they are more likely than not to face persecution or torture. These actions together discourage illegal entry by those who might evade detection or if caught misuse the asylum process to obtain release into the country, channel aliens to ports of entry so asylum claims may be processed efficiently, encourage aliens to apply for asylum in Mexico or other countries they enter before reaching the United States, and facilitate ongoing negotiations with Mexico and other countries on preventing unlawful mass migration to the United States.

Plaintiffs ask this Court to issue immediate nationwide relief halting these initiatives because they disagree with the Executive Branch's judgment about how best to secure our southern border. This Court should deny Plaintiffs' extraordinary request.

To start, Plaintiffs lack standing. Plaintiffs are advocacy groups who claim injury based on the need to adapt to a new policy and speculation about its effect on funding. That view of injury would confer standing whenever the law changed, converting the courts from a Branch that decides cases and controversies to an oversight board reviewing any shift in the law. Further, Plaintiffs' predictions about how funding streams might change are far too speculative to support standing. Even if Plaintiffs could demonstrate Article III standing, the asserted injuries of these organizations fall well outside the zone of interests of our nation's immigration laws.

Plaintiffs fare no better on the merits.  They argue that the new asylum-ineligibility rule violates the Administrative Procedure Act's (APA's) notice-and-comment and effective date requirements.  But those requirements do not apply when, as here, they would harm important national interests.  *See* 5 U.S.C. § 553(b)(B), (d)(3).  Nor are notice and comment required when agencies are implementing a measure linked intimately with foreign affairs – here, ongoing negotiations between the United States, Mexico, and Northern Triangle countries to address cross-border travel and asylum.  *See id.* § 553(a)(1).  Plaintiffs also argue that the rule, as applied to the proclamation, conflicts with the Immigration and Nationality Act's (INA's) provision allowing most aliens, including those who enter unlawfully, to apply for asylum.  But though the INA allows unlawful entrants *to apply* for asylum, 8 U.S.C. § 1158(a)(1), it confers broad discretion on the Attorney General and Secretary as to whether *to grant* asylum, *id.* § 1158(b)(1)(A), including broad authority to adopt categorical "limitations and conditions" on asylum eligibility, *id.* § 1158(b)(2)(C).  Indeed, Plaintiffs agree that the Executive may create categorical rules barring asylum eligibility and may deny individual aliens asylum based on their unlawful entry.  TRO Br. 13 n.6, 14.  Their only objection is that the rule here categorically renders aliens who violate the proclamation ineligible for asylum.  But the statute makes clear that the agencies may exercise discretion over granting asylum through categorical rules, rather than individualized determinations.  Plaintiffs' objection is particularly misplaced given that the rule does not turn on an alien's unlawful entry per se, but rather on his decision to enter at a particular place and time in violation of a presidential proclamation aimed at addressing a particular urgent situation at the southern border and foreign policy needs.  Plaintiffs' challenge to the President's action—which falls well within his broad authority—simply mischaracterizes the proclamation itself.

Finally, Plaintiffs cannot demonstrate that the balance of harms warrants drastic and immediate injunctive relief to hedge against the risk that these organizations may need to adapt to new rules.  The rule and proclamation aim to save lives by discouraging asylum seekers from making dangerous, unlawful border crossings.  And the Executive has a paramount sovereign interest in maintaining the integrity of the United States' borders, in enforcing the immigration laws, and in ensuring that immigration cases can be adjudicated swiftly.

**Legal and Procedural Background**

Legal Background.  The President has broad constitutional power to exclude aliens.  *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950).  Congress has, in turn, recognized the need for the President to regulate the flow of aliens into the United States, and has empowered the President to suspend or limit the entry of aliens when doing so is in the national interest and to impose regulations on the entry and departure of aliens.  8 U.S.C. §§ 1182(f), 1185(a).

Under 8 U.S.C. § 1158, "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . . ), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, [8 U.S.C. § 1225(b)]."  8 U.S.C. § 1158(a)(1).  Separate and apart from the provisions governing who may apply, a grant of asylum is discretionary: it "may [be] grant[ed] to an alien who has applied," *id.* § 1158(b)(1)(A), if the alien satisfies certain standards and is not subject to an eligibility bar, *see id.* § 1158(b)(1)(B), (2).  As part of that discretion, "[t]he Attorney General may by regulation establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum."  *Id.* § 1158(b)(2)(C).  The Attorney General has exercised his authority to exclude categories of aliens from being eligible to receive asylum several times since the asylum statute was first enacted in 1980.  *See* Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations, 83 Fed. Reg. 55934, 55937-38 (Nov. 9, 2018).  Besides the discretionary authority to grant asylum, the United States has a mandatory duty to provide two forms of protection from removal: withholding of removal (available when an alien faces a clear probability of persecution if returned to a particular country) and protection under the Convention Against Torture (CAT) (available when an alien faces a clear probability of torture if returned).  *See id.* § 1231(b)(3)(A) (withholding); 8 C.F.R. § 1208.16(b) (same); *id.* § 1208.16(c) (CAT).

An alien abroad has no right to enter the United States.  *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972).  It is a crime for an alien to enter the United States without presenting for inspection at a port of entry.  *See* 8 U.S.C. §§ 1325, 1326.  Expedited removal procedures— streamlined procedures for promptly reviewing aliens' claims and removing certain aliens—apply generally to aliens who arrive at a port of entry without valid travel documents who are

DEFENDANTS' OPPOSITION TO MOTION
FOR TEMPORARY RESTRAINING ORDER
*East Bay Sanctuary v. Trump*,
Case No. 1:18-cv-06810-JST

3

apprehended shortly after illegally crossing the border. *Id.* § 1225(b). Aliens in expedited removal proceedings shall be "removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under [8 U.S.C. § 1158] or a fear of persecution." *Id.* § 1225(b)(1)(A)(i). Such aliens are referred for a credible-fear interview and must demonstrate a "credible fear"—a "significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum under [§ 1158]." *Id.* § 1225(b)(1)(B). Regulations also provide for asylum officers to consider such a request under the standard for withholding or CAT protection. *See* 8 C.F.R. § 208.30(e)(3)-(4). If the officer determines that the alien does not have a credible fear and an immigration judge (IJ) concurs with that determination, then the alien is removed from the United States without further review of the asylum claim. 8 U.S.C. §§ 1225(b)(1)(B)(iii)(I), (III), (b)(1)(C); *id.* § 1252(a)(2)(A)(iii), (e)(2). If the officer or the IJ determines that the alien has a credible fear, then the alien is placed in ordinary removal proceedings under 8 U.S.C. § 1229a. 8 U.S.C. § 1225(b)(1)(B)(ii), (b)(2)(A).

Other procedures have been used in other contexts to address screening for withholding or CAT. This "reasonable fear" screening is similar to the credible-fear process, but with a standard suitable for withholding or CAT claims. *See* 83 Fed. Reg. at 55942; 8 C.F.R. § 208.31.

Joint Rule/Presidential Proclamation. On November 9, 2018, the Attorney General and Secretary issued a joint interim final rule rendering ineligible for asylum aliens who enter the United States in contravention of a presidential proclamation that, under 8 U.S.C. §§ 1182(f) and 1185(a), limits or suspends the entry of aliens into the United States through the southern border with Mexico. 83 Fed. Reg. 55934; 8 C.F.R. § 208.13(f). To impose that bar, the Attorney General and Secretary invoked their statutory authority to establish "additional limitations . . . under which an alien shall be ineligible for asylum" (8 U.S.C. § 1158(b)(2)(C), and to impose "limitations on the consideration of an application for asylum" (*id.* § 1158(d)(5)(B)). *See* 83 Fed. Reg. at 55934-38. Specifically, the rule explains that an "alien whose entry is suspended or limited by a proclamation is one whom the President has determined should not enter the United States" and "[s]uch an alien would have engaged in actions that undermine a particularized determination in a

proclamation that the President judged as being required by the national interest." 83 Fed. Reg. at 55934. That determination reflects "sensitive determinations regarding foreign relations and national security that Congress has entrusted to the President," and "[a]liens who contravene such a measure have not merely violated the immigration laws, but have also undercut the efficacy of a measure adopted by the President based upon his determination of the national interest in matters that could have significant implications for the foreign affairs of the United States." *Id.* The rule provides that aliens who lack a credible fear due to the proclamation-based eligibility bar may still proceed to full immigration proceedings if they establish a reasonable fear of persecution or torture. *Id.* at 55952-53 (8 C.F.R. § 208.30(e)(5)). That process considers claims for withholding or CAT using the existing reasonable-fear standard, with review of a negative determination by an immigration judge. *Id.* at 55952-53. The rule was issued as an interim final rule, effective immediately during the comment period under the good-cause and foreign-affairs exceptions to the notice-and-comment and effective-date requirements of the APA. *See id.* at 55949-50.

Later that same day, the President issued a proclamation under 8 U.S.C. §§ 1182(f) and 1185(a) that "suspend[s]s and limit[s]" "[t]he entry of any alien into the United States across the international boundary between the United States and Mexico," except for at a port of entry. *See Presidential Proclamation Addressing Mass Migration Through the Southern Border of the United States* § 1 (Proclamation) (Nov. 9, 2018), https://www.whitehouse.gov/presidential-actions/presidential-proclamation-addressing-mass-migration-southern-border-united-states/. The proclamation will last for 90 days after November 9 or until a safe third country agreement with Mexico takes effect, whichever is earlier. *Id.* §§ 2(a), (b). The proclamation does not limit any alien "from being considered" for withholding of removal or CAT protection. *Id.* § 2(c).

Together, the proclamation and rule address the "continuing and threatened mass migration of aliens with no basis for admission into the United States through our southern border" and the need "to maintain the effectiveness of the asylum system for legitimate asylum seekers." *Id.* (preamble). The President observed that "approximately 2,000 inadmissible aliens have entered each day at our southern border" in recent weeks, and that a "substantial number of aliens primarily from Central America . . . are traveling in large, organized groups through Mexico and reportedly

DEFENDANTS' OPPOSITION TO MOTION
FOR TEMPORARY RESTRAINING ORDER
*East Bay Sanctuary v. Trump,*
Case No. 1:18-cv-06810-JST

5

intend to enter the United States unlawfully or without proper documentation." *Id.* The proclamation explains that the "entry of large numbers of aliens into the United States unlawfully between ports of entry on the southern border is contrary to the national interest" and that such "[u]nlawful entry puts lives of both law enforcement and aliens at risk." *Id.* The rule likewise identifies an "urgent situation at the southern border" where there "has been a significant increase in the number and percentage of aliens who seek admission or unlawfully enter . . . and then assert an intent to apply for asylum." 83 Fed. Reg. at 55944-45 (noting a 2000% increase in credible-fear referrals since FY 2008, and that 61% of aliens from Northern Triangle countries assert a fear).

Further, a substantial number of aliens "do not pursue their claims" once released into the United States, add to significant backlogs in the immigration court system, or "fail to appear for . . . proceedings." *Id.* (26% of the 791,821 immigration case backlog due to this process, and 31% of case completions in FY 2018 were due to alien not showing up to proceedings, and in most an asylum application was never filed). And the large majority of such claims ultimately lack merit. *Id.* at 55946 (of 34,158 case completions in FY18 that began with a credible fear removal, 71% resulted in a removal order, and asylum granted in only 17%). The statistics relating to nationals of Northern Triangle countries highlight this problem. *Id.* (of those establishing credible fear whose cases were resolved in FY 2018, only 54% sought asylum; only 9% received asylum; and 38% did not appear in proceedings). The rule thus explains that discretion to grant asylum will not be exercised for those who violate such a proclamation, to "channel inadmissible aliens to ports of entry, where such aliens could seek to enter and would be processed in an orderly and controlled manner" and would not be able to either avoid detection or abuse the asylum process. *Id.* at 55935.

<u>This Lawsuit.</u> On November 9, 2018, before the suspension of entry became operative on November 10 or had been applied to anyone, Plaintiffs—four organizations that provide legal and social services to immigrants and refugees—filed this suit against the President and Executive Branch agencies and officials. Plaintiffs allege that the rule and proclamation together unlawfully "bar people from obtaining asylum if they enter the United States somewhere along the southern border other than a designated port of arrival." Compl. ¶ 3. Plaintiffs allege that they must "divert

DEFENDANTS' OPPOSITION TO MOTION
FOR TEMPORARY RESTRAINING ORDER
*East Bay Sanctuary v. Trump,*
Case No. 1:18-cv-06810-JST

6

organizational resources to, among other things, understand[] the new policy" and "train . . . staff," *id.* ¶ 84, and that the rule and proclamation could mean fewer cases and fewer "funding streams" (*id.* ¶¶ 87, 97) or more cases and fewer "funding streams" (*id.* ¶¶ 90-91).

Plaintiffs bring two claims.  First, they claim that the rule violates the APA because it was improperly issued without notice and an opportunity to comment and was published less than 30 days before its effective date.  Compl. ¶¶ 108-10; *see* 5 U.S.C. § 553(b), (c), (d).  Second, they claim that the rule and proclamation conflict with the asylum statute—in particular, its provision that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . . ), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, [8 U.S.C. § 1225(b)]," 8 U.S.C. § 1158(a)(1)—and so are contrary to law under the APA.  Compl. ¶¶ 101-06; *see* 5 U.S.C. § 706.

The same day they filed suit, Plaintiffs moved for a temporary restraining order preventing the rule and proclamation from taking effect.  *See* TRO Br. 5-17.  Plaintiffs argue that such relief is necessary because they are irreparably harmed by their inability to comment on the proposed rule and by the need to divert resources to provide training on the new rules and their potential loss of income that might come from preparing asylum applications.  *Id.* at 18-20.

## Argument

## I.    Plaintiffs' Claims Are Not Justiciable.

### A.    Plaintiffs Have Not Suffered an Injury in Fact and thus Lack Article III Standing.

Article III standing is a jurisdictional requirement, and a party invoking federal jurisdiction has the burden of establishing it.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  To satisfy Article III, "a plaintiff must show (1) it has suffered an 'injury in fact'[;] . . . (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative that the injury will be redressed by a favorable decision."  *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).  Where, as here, an organization sues on its own behalf, it must establish standing in the same manner as an individual.  *Smith v. Pac. Properties & Dev. Corp.*, 358 F.3d 1097 (9th Cir. 2004).  Plaintiffs have not done so.

**1.**   Plaintiffs allege that they will be injured by the rule and proclamation either because

they will need to divert resources to assist the asylum seekers they represent, or because their funding will be reduced. *See* Compl. ¶¶ 78-99. But even if true, these allegations would not establish a harm concrete to any legally or judicially cognizable interests of the Plaintiffs.

The effects the rule and proclamation will have on Plaintiffs' operations are wholly uncertain. Plaintiffs are "nonprofit organizations that provide assistance to asylum seekers," Compl. ¶ 78, but neither the rule nor proclamation prevents them from assisting those who seek asylum. Plaintiffs say that they must adapt to the new requirements by taking the time to understand changes in the law, *see* TRO Br. 19, "revamp[ing] representation strateg[ies]," Compl. ¶ 89, and devoting "more hours per case to pursue complex non-asylum relief," TRO Br. 19-20. But if such "injuries" could confer standing, then any legal services or advocacy organization could sue in federal court whenever there is a change in the law, simply by alleging that organization must get up to speed on the impact of the change. Such impacts on legal representation do not satisfy Article III. *See, e.g.*, *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995) ("The mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization."); *Ass'n for Retarded Citizens of Dallas v. Dallas Cty. Mental Health & Mental Retardation Ctr. Bd. of Trustees*, 19 F.3d 241, 244 (5th Cir. 1994) (same).

Several Plaintiffs allege that they will suffer financial harm, but these funding concerns are speculative and self-inflicted. *Cf. Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (no standing where plaintiffs' costly measures to avoid government surveillance they believed reasonably likely were "self-inflicted"). EBSC claims that it will lose funding because the bulk of the affirmative asylum cases that it handles are for individuals who enter the country without inspection, and its funding for this program is partly based on the number of cases it handles per year. Compl. ¶¶ 81-82. Similarly, CARECEN claims that it will be harmed financially because, when representing individuals who enter between ports of entry, it will need to spend more time per case to "assist them in applying for withholding and CAT." *Id.* ¶ 98. Likewise, Al Otro Lado allegedly "must now prepare separate cases for each family member," increasing the amount of time required to prepare a family's case. *Id.* ¶ 91. But Plaintiffs have no judicially cognizable

basis to challenge a change in the law simply because it may affect future clients and then may in turn derivatively affect Plaintiffs' own decisions about how to allocate their own resources.

Finally, Plaintiffs claim that they have been harmed simply because they "were denied the opportunity to comment" on the rule. But "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).

**2.** Organizations may have standing in some situations where their core activities are impaired, as recognized in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). But *Havens* arose under a private right of action under the Fair Housing Act, not the generalized procedural challenges under the APA that Plaintiffs pursue here. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016) ("Congress may 'elevat[e] to the status of legally cognizable injuries concrete, de facto injuries that were previously inadequate in law.'"). Congress's intention to allow private enforcement of statutory prohibitions against discriminatory housing practices thus drove the Court's standing analysis. *See Havens*, 455 U.S. at 373-74. And even in the fair housing context, an organization alleging standing under *Havens* must establish "that it would have suffered some other injury if it had not diverted resources to counteracting the problem," because otherwise the diversion of resources is a purely self-inflicted injury. *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010). Here, however, the INA confers ono "legally cognizable interests," *Spokeo*, 136 S. Ct. at 1549, on advocacy organizations, and no Plaintiff has alleged that it is being forced to divert resources to avoid some other cognizable injury to itself.

**B. Plaintiffs' Claims Fall Outside the Statutory Zone of Interests.**

Plaintiffs also cannot bring suit because the INA precludes this suit and their claims are outside the zone of interests of the statutes they invoke. The APA does not "allow suit by every person suffering injury in fact." *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 395 (1987). Rather, the APA provides a cause of action only to one "adversely affected or aggrieved by agency action within the meaning of a relevant statute," 5 U.S.C. § 702. To be "aggrieved," "the interest sought to be protected" must "be arguably within the zone of interests to be protected or regulated by the

statute . . . in question," *Clarke*, 479 U.S. at 396 (modifications omitted).  Plaintiffs invoke no such interest here.

Nothing in the INA and its asylum provisions even arguably suggests that the statute protects the interests of "nonprofit organizations that provide assistance to asylum seekers." Compl. ¶ 78.  The asylum provisions neither regulate Plaintiffs' conduct nor create any benefits for which these organizations themselves might be eligible.  And courts have routinely concluded that immigration statutes are directed at aliens, not the organizations advocating for them.  When confronted with a similar challenge brought by "organizations that provide legal help to immigrants," Justice O'Connor concluded that the Immigration Reform and Control Act "was clearly meant to protect the interests of undocumented aliens, not the interests of [such] organizations," and the fact that a "regulation may affect the way an organization allocates its resources . . . does not give standing to an entity which is not within the zone of interests the statute meant to protect." *INS v. Legalization Assistance Project of L.A. Cty.*, 510 U.S. 1301, 1305 (1993) (O'Connor, J., in chambers).  The Ninth Circuit and other courts have thus held that immigrant advocacy organizations are outside the immigration statutes' zone of interests.  *See, e.g.*, *Immigrant Assistance Project of Los Angeles Cty. v. INS*, 306 F.3d 842, 867 (9th Cir. 2002); *Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 900-04 (D.C. Cir. 1996).

That reasoning fully applies here.  Plaintiffs are not applying for asylum; they seek to help others do so.  Nothing in the "the relevant provisions [can] be fairly read to implicate Organizational Plaintiffs' interest in the efficient use of resources." *Nw. Immigrant Rights Project v. USCIS*, 325 F.R.D. 671, 688 (W.D. Wash. 2016).  Because Plaintiffs are simply bystanders to the statutory scheme, the (alleged) effects on their resources are outside the statutory zone of interests.  *See Legalization Assistance Project*, 510 U.S. at 1305 ("The fact that the INS regulation may affect the way an organization allocates its resources . . . does not give standing to an entity which is not within the zone of interests the statute meant to protect.").[1]

---

[1] The INA itself confirms that such organizations are *not* within the zone of interests.  An alien's challenge to an asylum determination must occur in individual removal proceedings, and others may not bring suit on their behalf.  8 U.S.C. § 1252(a); *see Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 351 (1984).  And as to the impact of these changes on expedited removal,

1    The procedural nature of some of Plaintiffs' APA claims makes no difference.  A plaintiff

2    asserting a violation of the APA's notice-and-comment requirements must show that the underlying

3    concrete Article III injury comes within the zone of interests protected by the underlying

4    substantive statute upon which the claim is based—here, the INA.  *See Mendoza v. Perez*, 754 F.3d

5    1002, 1016 (D.C. Cir. 2014); *Capital Legal Found. v. Commodity Credit Corp.*, 711 F.2d 253, 260

6    (D.C. Cir. 1983).  Plaintiffs have not done so.

7    **II.    The Rule Satisfies the APA's Procedural Requirements.**

8    On the merits, Plaintiffs contend that the rule violates the APA's procedural requirements

9    because it was issued without notice and an opportunity for comment (TRO Br. 5-11) and was

10   published less than 30 days before its effective date (*id.* at 11-12).  But the APA also provides

11   exceptions to its general notice-and-comment and publication requirements when either "the

12   agency for good cause finds . . . that notice and public procedure thereon are impracticable,

13   unnecessary, or contrary to the public interest," 5 U.S.C. § 553(b)(B), (d)(3), or the rule "involve[s]

14   . . . [a] foreign affairs function of the United States," *id.* § 553(a)(1).  The rule here fits within both

15   exceptions and is consistent with similar interim rules affecting the border.  As the agencies

16   explained, there is good cause to implement the rule here immediately to avoid a rush to make

17   dangerous border crossings before the rule goes into effect.  *See* 83 Fed. Reg. at 55949-50.  And

18   the rule independently warrants immediate issuance because it involves foreign affairs as a critical

19   component of ongoing negotiations with Mexico and Central American countries over border

20   security and Mexico's shared responsibility to secure the integrity of its borders and take action to

21   resettle refugees fleeing Central America.  *Id.* at 55950.

22   Good Cause.  The good-cause exception applies when "the very announcement of a

23   proposed rule itself can be expected to precipitate activity by affected parties that would harm the

24   public welfare."  *Mobil Oil Corp. v. Dep't of Energy*, 728 F.2d 1477, 1492 (TECA 1983).

25   Significant public-safety harms provide good cause to make rule changes without pre-

26   promulgation notice and comment.  *Hawaii Helicopter Operators Ass'n v. FAA*, 51 F.3d 212, 214

27   ─────────────────────

28   § 1252(e)(3) creates the exclusive review scheme for such challenges and precludes organizational
     challenges, *see infra* Part V.

(9th Cir. 1995) (delay may increase "threat[s] to public safety").  For instance, the Ninth Circuit has found this standard met where "in the three years prior to the issuance of [an] air safety regulation, Hawaii had experienced 20 air tour accidents resulting in 24 fatalities."  *United States v. Valverde*, 628 F.3d 1159, 1165 (9th Cir. 2010).  This standard is satisfied here.

The Departments recognized that pre-promulgation notice and comment or a delayed effective date "would result in serious damage to important interests" by encouraging a surge to enter the United States between ports of entry before the rule took effect and that each of those crossings risks the safety of aliens and Border Patrol agents.  *See* 83 Fed. Reg. 55949-50. As the preamble to the rule explained, 396,579 aliens were apprehended in FY 2018 entering unlawfully between ports of entry, over 1,000 a day, 83 Fed. Reg. at 55948.  There are now "thousands of aliens traveling in groups . . . expected to attempt entry at the southern border in the coming weeks" including "large, organized groups [transiting] through Mexico," *id*. at 55950.  Hundreds die each year making the dangerous border crossing.  *See id*.[2] These crossings—which require at large apprehensions—also "endanger[] . . . [Customs and Border Protection (CBP)] agents who seek to apprehend them."  *Id*. at 55935.  The Departments therefore concluded that immediate implementation is warranted because it will prevent a "rush" at the border before the rule goes into effect, steer the large groups of aliens en route to ports of entry, and avoid an *increase* in the already high number of aliens making the dangerous border crossing to beat the effective date of the rule.  *Id*. at 55950.  As the preamble explains, "[c]reating an incentive for members of those groups to attempt to enter the United States unlawfully before this rule took effect would make more dangerous their already perilous journeys, and would further strain CBP's apprehension operations."  *Id.*

This is consistent with Ninth Circuit law—which found good cause based on a much lower level of safety risk in *Hawaii Helicopter*.  It is also consistent with prior changes to entry policies. As with prior border-policy changes, there is good cause to prevent "foreign nationals from

---

[2] https://www.cbp.gov/sites/default/files/assets/documents/2017-Dec/BP%20Southwest%20Border%20Sector%20Deaths%20FY1998%20-%20FY2017.pdf (294 deaths in FY2017); *see also* https://missingmigrants.iom.int/region/americas?region=1422 (345 deaths thus far in 2018).

undertaking dangerous border crossings, and thereby prevent the needless deaths and crimes associated with human trafficking and alien smuggling operations.'" *Id.* at 55950 (quoting 69 Fed. Reg. at 48878); *see id.* (citing prior uses of good-cause exception to address border-entry rules). This is also consistent with Congress's provision regarding changes to those subject to expedited removal, where modifications are permitted "at any time." 8 U.S.C. § 1225(b)(1)(A)(iii)(I). Avoiding a surge of illegal border crossings where already hundreds die each year and over a thousand are apprehended each day satisfies the good-cause exception.

Plaintiffs' contrary arguments are meritless. First, Plaintiffs contend that there is no "immediate harm to life . . . or the public interest." TRO Br. 8. But, as discussed, and consistent with many rules regarding entry at the border, delaying the rule's effective date would harm life and public safety given the incentive to surge across the border before the rule takes effect. Second, Plaintiffs contend that there is no need for immediate implementation given that there are already "criminal penalties associated with entering without inspection" that will deter illegal conduct. *Id.* But this ignores the surge problem and the evidence that many thousands make the dangerous crossing each year (and hundreds die) despite the penalties. Third, Plaintiffs contend that CBP has sufficient agents or officers to arrest aliens illegally crossing the border, making immediate implementation unnecessary. TRO Br. 10. That ignores the significant number of illegal border crossers who evade capture, 83 Fed. Reg. at 55941, and also overlooks the good cause in preventing ongoing, dangerous criminal behavior in the first place. CBP "dedicates enormous resources to attempting to apprehend aliens who cross the southern border," which comprised 396,579 aliens in fiscal year 2018; these crossings are "often . . . in remote locations"; and they require "over 16,000 CBP officers" to "patrol[] hundreds of thousands of square miles of territory." *Id.* at 55948. Reducing this burden of dangerous activity that all agree is illegal (TRO Br. 8)—rather than increasing it during a comment period—is good cause not to delay. A notice-and-comment period that enables aliens to continue entering the country contrary to a presidential proclamation, criminal law, and public safety is not the type of pause for inquiry needed to "ensure fairness to affected parties." *Int'l Union, United Mine Workers of Am. v. MSHA*, 407 F.3d 1250, 1259 (D.C. Cir. 2005).

Plaintiffs invoke *Valverde* (TRO Br. 9), but that case involved whether regulations retroactively applying a sex-offender registration statute to convictions prior to its enactment met the good-cause exception. *See* 628 F.3d at 1167 (regulations "did not have the immediate effect of compelling any additional sex offenders to register" but allowed prosecution of sex offenders already violating registration laws). That had nothing to do with the border and involved a retrospective situation quite different from the prospective one here, where ordinary notice of proposed rulemaking would encourage those regulated to endanger themselves and violate criminal law during the comment period.

Foreign Affairs. The APA's procedural requirements also do not apply here because the rule "involve[s]" a "foreign affairs function of the United States." 5 U.S.C. § 553(a)(1). The foreign-affairs exception covers agency actions "linked intimately with the Government's overall political agenda concerning relations with another country." *Am. Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States*, 751 F.2d 1239, 1249 (Fed. Cir. 1985). As the Ninth Circuit has explained, "[a] rule of law that would inhibit the flexibility of the political branches [in matters of foreign affairs] should be adopted with only the greatest caution." *Yassini v. Crosland*, 618 F.2d 1356, 1361 (9th Cir. 1980).

The Departments properly invoked this exception. First, as the Departments explained, "[t]he flow of aliens across the southern border, unlawfully or without appropriate travel documents, directly implicates the foreign policy interests of the United States." 83 Fed. Reg. at 55950. This same foreign affairs rationale has repeatedly justified rules, like this one, that address the movement of individuals between nations. *See, e.g.*, 81 Fed. Reg. 14948, 14952 (Mar. 21, 2016) (invoking foreign-affairs exception in rule addressing flights to Cuba); 82 Fed. Reg. at 4904-05 (the exception applies "to travel and migration between the two countries"); *see also Raoof v. Sullivan*, 315 F. Supp. 3d 34, 43-44 (D.D.C. 2018) (rule imposing two-year foreign residence requirement prior to visa issuance "certainly relates to the foreign affairs and diplomatic duties" of the Executive Branch). Here, the rule and proclamation "necessarily implicate our relations with Mexico and the President's foreign policy, including sensitive and ongoing negotiations with Mexico about how to manage our shared border." 83 Fed. Reg. at 55950. The proclamation—by

DEFENDANTS' OPPOSITION TO MOTION
FOR TEMPORARY RESTRAINING ORDER
*East Bay Sanctuary v. Trump*,
Case No. 1:18-cv-06810-JST

14

suspending entry at the southern border except at ports of entry—directly relates to that shared challenge at the border, and the rule—by "establish[ing] a mandatory bar to asylum eligibility resting squarely" on the proclamation—"confirms the direct relationship between the President's foreign policy decisions in this area and the rule." *Id*.

Second, the rule and proclamation directly relate to our ongoing negotiations with Mexico over our shared obligations to consider asylum claims from Northern Triangle countries, and with the Northern Triangle countries to address their obligations to control the flow of their nationals. As the Departments explained, "the vast majority of aliens who enter illegally today come from the Northern Triangle countries." *Id*. "Channeling those aliens to ports of entry would encourage these aliens to first avail themselves of offers of asylum from Mexico"—an important foreign policy objective of the President. *Id*.; *see* Proclamation (preamble). The proclamation and rule work together to limit a problematic method of avoiding scrutiny of their claims by either country: first transiting Mexico and "reject[ing] opportunities to apply for asylum and benefits in Mexico" and then "[c]rossing the border to avoid detection" and inquiry into the viability of a claim for relief in the United States. Proclamation (preamble). Importantly, "the United States and Mexico have been engaged in ongoing discussions of a safe-third-country agreement"—an agreement like the one the United States has with Canada whereby aliens normally must seek asylum in the first country they enter, rather than transiting one country to seek asylum in another. 83 Fed. Reg. at 55950. By limiting illegal entries, and requiring orderly processing, the proclamation and rule will help "develop a process to provide this influx with the opportunity to seek protection at the safest and earliest point of transit possible" and "establish compliance and enforcement mechanisms for those who seek to enter the United States illegally, including for those who do not avail themselves of earlier offers of protection." *Id*.; *see* Proclamation (preamble) ("suspension will facilitate ongoing negotiations with Mexico and other countries regarding appropriate cooperative arrangements to prevent unlawful mass migration to the United States through the southern border"). In sum, the rule "will strengthen the ability of the United States to address the crisis at the southern border and therefore facilitate the likelihood of success in future negotiations." *Id*. Indeed, the proclamation's suspension will expire as soon as a safe third country agreement is

reached that permits the removal of aliens to Mexico in accordance with the INA.  Proclamation § 1.

These interlocking goals—gaining Mexico's assistance in securing our border and negotiating with countries to take more responsibility for asylum seekers who first arrive in their territory—are all "linked intimately with the Government's overall political agenda concerning relations with another country."  *Am. Ass'n of Exporters*, 751 F.2d at 1249.  The choice of the Executive Branch here—to require aliens seeking asylum to undergo orderly processing at ports of entry while safely in Mexico where they could also request asylum—is a "[d]ecision[] involving the relationships between the United States and its alien visitors" that "implicate[s] our relations with foreign powers" and "implement[s] the President's foreign policy."  *Yassini*, 618 F.2d at 1361.  Indeed, this is a more straightforward case than *Yassini*, which involved Iranians *already in the United States* who were required to leave.  *Id.*  This case involves only aliens crossing an international border entering the country in violation of law from an international partner with whom we are negotiating.  The policy here comfortably "f[a]lls within the foreign affairs function and good cause exceptions to the notice and comment requirements of the APA."  *Id.*

Plaintiffs contend that the rule does not show that "public rulemaking . . . should provoke definitely undesirable international consequences."  TRO Br. 11.  The statute requires no such showing.  The exception applies when a rule "involve[s]" a "foreign affairs function of the United States"— without regard to harm.  5 U.S.C. § 553(a)(1); *see Rajah v. Mukasey, 544 F.3d 427, 437* (2d Cir. 2008) (there is "no requirement" that agency state a finding of undesirable international consequences, particularly "when the consequences are seemingly as evident" as they are in this case).  Even were a showing of harm required, it is present: the Executive Branch must act quickly to address this foreign-affairs function that is threatened by requiring ordinary notice-and-comment rulemaking because large numbers of aliens are transiting through Mexico *right now* and Mexico's prompt help in addressing the situation is needed immediately.  *See* Proclamation (preamble) ("immediate action" required to address mass migration through Mexico that has "precipitated a crisis"); 83 Fed. Reg. at 55949; *Yassini*, 618 F.2d at 1360 ("prompt response" required to embassy takeover).

**III.     The Rule and Proclamation Are Consistent with the INA.**

Plaintiffs argue that the rule and proclamation violate the INA by denying eligibility for asylum to certain unlawful entrants.  TRO Br. 12-17.  But the rule and proclamation fall within the Executive's authority to regulate the entry of aliens and grant or deny asylum.

**A.  The Rule Is Consistent with the INA.**

The rule rendering any alien who contravenes the proclamation ineligible for asylum comports with the INA.  Section 1158(b)(1) makes a grant of asylum a matter of the Executive's discretion, and § 1158(b)(2)(C) authorizes the agency heads to "establish *additional* limitations and conditions . . . under which an alien shall be ineligible for asylum" on top of the six statutory bars on asylum eligibility set forth in § 1158(b)(2)(A).  8 U.S.C § 1158(b)(2)(C) (emphasis added).  To be sure, that broad delegation of authority requires that regulatory asylum-eligibility bars be "consistent with" § 1158.  *Id.* § 1158(b)(2)(C).  But that describes the rule here:  Nothing in § 1158 confers *a right* to asylum for aliens who enter in violation of a specific presidential proclamation governing a specific border for a specific time in response to a specific crisis, and thus the rule is "consistent with" the broad discretion conferred by that section to impose an asylum-eligibility bar tailored to these circumstances.

Against this straightforward analysis, Plaintiffs contend (TRO Br. 12) that the rule conflicts with § 1158(a), which provides that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . . ), irrespective of such alien's status, may apply for asylum in accordance with this section."  8 U.S.C. § 1158(a)(1).  But the instruction that aliens "may apply" for asylum regardless of whether they entered at a port of arrival does not "require," as Plaintiffs maintain, that "asylum be available" to those individuals.  TRO Br. 12.  Rather, § 1158 carefully distinguishes between an alien's *ability to apply* for asylum and the Executive's *authority to deny* asylum on grounds of ineligibility or otherwise, imposing different sets of requirements for each stage of the process.

Section 1158(a), which governs asylum applications, bars an alien from even applying for asylum unless: (1) he "demonstrates by clear and convincing evidence that the application has been filed within 1 year after" his arrival, 8 U.S.C. § 1158(a)(2)(B); (2) he has not "previously

applied for asylum and had such application denied," *id.* § 1158(a)(2)(C); and (3) the Attorney General has not "determine[d] that the alien may be removed" under a Safe Third Country Agreement, *id.* § 1158(a)(2)(A). An alien must clear these hurdles before his eligibility for asylum may even be considered, but if he does so he "may apply for asylum" under § 1158(a)(1) "whether or not" he arrived "at a designated port of arrival." But even if § 1158(a) does not bar an alien from applying for asylum, he still may be categorically ineligible for asylum under six statutory eligibility bars, *id.* § 1158(b)(2)(A), or any "additional limitations" the agency heads may impose, *id.* § 1158(b)(2)(C). And even if an alien does not fall within one of these statutory or regulatory eligibility bars, the ultimate "decision whether asylum should be granted to an eligible alien is committed to the Attorney General's discretion." *INS v. Aguirre-Aguirre*, 526 U.S. 415, 420 (1999). Under § 1158, the Attorney General "*may* grant asylum to an alien who has applied for asylum" in accordance with the relevant "requirements and procedures" if he "determines that such an alien is a refugee" under the INA. 8 U.S.C. § 1158(b)(1)(A) (emphasis added). Section 1158 imposes no express constraints on the Executive's discretion *to deny* asylum to an applicant, and thus the asylum bar imposed by the rule here is not in any way inconsistent with § 1158. To the contrary, § 1158 primarily limits the Executive's discretion *to grant* asylum, by imposing six statutory eligibility bars, each of which renders an alien categorically ineligible for this relief regardless of his ability to apply for asylum.[3]

It therefore is not the case that "[t]he ability to apply for asylum has to be a meaningful one, involving some chance of actually receiving asylum," or that "Congress explicitly requires that asylum be available to individuals who enter without inspection." TRO Br. 12-13. Indeed, the Tenth Circuit recently rejected a similar theory that "the Attorney General could not impose any limitations on asylum eligibility because any regulation that 'limits' eligibility necessarily undermines the statutory guarantee that 'any alien . . . irrespective of such alien's status' may apply for asylum." *R-S-C v. Sessions*, 869 F.3d 1176, 1187 n.9 (10th Cir. 2017). Such a construction of

---

[3] Those bars apply if the alien (1) engaged in certain forms of "persecution" before arriving, (2) was convicted of a "particularly serious crime," including any "aggravated felony," (3) "committed a serious nonpolitical crime outside the United States prior to arrival," (4) poses "a danger to the security of the United States," (5) falls within certain categories relating to "terrorist activity," or (6) "has firmly resettled in another country prior to arriv[al]," 8 U.S.C. § 1158(b)(2).

the term "consistent" in § 1158(b)(2)(C) would render that section's delegation "meaningless, disabling the Attorney General from adopting further limitations while the statute clearly empowers him to do so." *Id.*; *cf. Hawaii*, 138 S. Ct. at 2411 (rejecting argument that § 1152(a)(1)(A)'s prohibition on nationality discrimination in *issuance of immigrant visas* constrained President's separate authority to *suspend entry* under § 1182(f)).

Plaintiffs therefore contend that "barring a person from asylum *solely because* he or she entered without inspection is at odds with the statutory mandate." TRO Br. 12 (emphasis added). The statute contains no such mandate. The fact that § 1158(a) allows an alien to *apply* for asylum regardless of his manner of entry does not mean that this consideration can have no bearing on his *eligibility* for asylum under § 1158(b) or on the ultimate discretionary determination whether to grant asylum even if the alien is eligible. Indeed, Plaintiffs acknowledge that the Attorney General has, for decades, "denied asylum as a matter of discretion" based on the alien's "manner of entry." TRO Br. 13 n.6 (discussing *Matter of Pula*, 19 I. & N. Dec. 467 (BIA 1987)); *see also Yang v. INS*, 79 F.3d 932, 936-39 (9th Cir. 1996) (citing *Pula* with approval and explaining that it is an "instrument[] of delegated discretion").

Plaintiffs' position thus reduces to the theory that "while 'an alien's manner of entry or attempted entry is a proper and relevant discretionary factor to consider in adjudication asylum applications,'" the government "cannot categorically deny asylum simply because an applicant entered between ports." TRO Br. 13 n.6 (quoting *Pula*, 19 I & N. Dec. at 474). But *Pula*, the only authority that Plaintiffs invoke for this assertion, did not rely on the current version of § 1158(a) in drawing a distinction between individualized decisionmaking and categorical rules, since that provision would not be enacted until nine years later. Instead, all that *Pula* reveals is that the Board of Immigration Appeals has treated illegal entry as a discretionary consideration in the context of individualized asylum adjudications. But nothing in § 1158 forbids the Executive from changing the weight afforded to this factor in exercising its discretionary judgment whether to grant asylum—here, by adopting a categorical eligibility bar—particularly given the public-safety and foreign-policy problems posed by this specific subset of illegal entrants. In fact, under *Pula*, consideration of illegal entry will at least sometimes tip the scales against asylum—yet Plaintiffs

1   can provide no explanation how that result is "consistent" with § 1158(a) but the rule here is not.

2   The simple fact that is that § 1158(a)'s rules governing *an alien's right to apply for asylum* simply

3   do not speak to § 1158(b)'s rules governing *the Executive's discretion to deny asylum*, whether

4   through adopting categorical eligibility bars or through relying on particular considerations in

5   individualized asylum adjudications.  *See Lopez v. Davis*, 531 U.S. 230, 244 (2001) (rejecting

6   claim that agency "must not make categorical exclusions, but may rely only on case-by-case

7   assessments").

8          Indeed, the Ninth Circuit has already recognized that the asylum statute is a "broad

9   delegation of power" that permits creation of regulatory categorical bars to eligibility, and thus has

10  rejected the claim that "Congress intended there to be no categories of aliens for whom asylum

11  would be completely unavailable," because "Congress did not expressly declare such an intent in

12  8 U.S.C. § 1158(a)."  *Komarenko v. INS*, 35 F.3d 432, 436 (9th Cir. 1994).  Rather, "[t]he statute

13  merely states that 'the alien may be granted asylum in the discretion of the Attorney General,'" *id.*

14  (quoting 8 U.S.C. § 1158(a)(1) (1993)), and thus nothing in the statute "preclude[s] the Attorney

15  General from exercising this discretion by promulgating reasonable regulations applicable to . . .

16  undesirable classes of aliens."  *Id.*   Although the statute has since been amended, the same

17  discretionary features relevant here remain undiminished.  *See* 8 U.S.C. § 1158(a)(1), (b)(1)(A).

18         Moreover, Plaintiffs' fears that recognizing the Executive's broad authority over asylum

19  will render § 1158(a)(1) "an empty vessel" (TRO Br. 14) are particularly unwarranted here.  The

20  rule will "not preclude an alien physically present in the United States from being granted asylum

21  if the alien arrives in the United States through any border other than the southern land border with

22  Mexico or at any time other than during the pendency of a proclamation suspending or limiting

23  entry."  83 Fed. Reg. at 55941.  The only category of aliens who are ineligible are those who are

24  "subject" to a proclamation concerning the southern border and "nonetheless enter[] the United

25  States after [that] proclamation [went] into effect," and have necessarily "engaged in actions that

26  undermine a particularized determination in a proclamation that the President judged as being

27  required by the national interest."  *Id.* at 55940.  The President's proclamation is a response to a

28  particular and "immediate" "crisis"; it is "tailor[ed] . . . to channel" particular aliens "to ports of

entry" to ensure that any entry will occur in "an orderly and controlled manner"; and it is a "foreign affairs" measure to "facilitate ongoing negotiations with Mexico and other countries regarding appropriate cooperative arrangements to prevent unlawful mass migration to the United States through the southern border." Proclamation (preamble). Nothing in § 1158 bars the adoption of an asylum-ineligibility rule that turns on the contravention of this proclamation. After all, "[a]liens who contravene such a measure have not merely violated the immigration laws, but have also undercut the efficacy of a measure adopted by the President based upon his determination of the national interest in matters that could have significant implications for the foreign affairs of the United States." 83 Fed. Reg. at 55940.

For similar reasons, Plaintiffs misfire in asserting that § 1158(b)(2)(C)'s delegation "must be construed narrowly" and track "the nature of the six" statutory eligibility bars. TRO Br. 14-15. Those provisions *explicitly prohibit* the Executive from *granting* asylum in certain circumstances. It would turn them on their head to construe them as *implicitly restricting* the Executive from *denying* eligibility for asylum in other circumstances. In fact, the Attorney General or Secretary may alter the scope of some of these statutory eligibility bars through regulations "designat[ing] . . . offenses that will be considered a crime" for purposes of the "particularly serious crime" and "serious nonpolitical crime" bars. 8 U.S.C. § 1158(b)(2)(B)(ii). Nothing in § 1158 restricts the Attorney General's express power to establish "additional limitations" on asylum (*id.* § 1158(b)(2)(C)) "only to dangerous individuals and persecutors, as well as those who no longer needed a safe haven." TRO Br. 15. For example, as the Ninth Circuit has observed, "[f]raud in the application is not mentioned explicitly, but is one of the 'additional limitations under which an alien shall be ineligible for asylum' that the Attorney General is authorized to establish by regulation," *Nijjar v. Holder*, 689 F.3d 1077, 1082 (9th Cir. 2012) (ellipsis omitted), and that offense has nothing to do with "dangerous individuals," "persecutors," or aliens "who no longer needed a safe haven." TRO Br. 15. In any event, the rule—which rests on public-safety and foreign-relations concerns—*is* "consistent with the nature of the six limitations" set forth in the

statute (TRO Br. 14), which, *inter alia*, aim to protect "the security of the United States."  8 U.S.C. § 1158(b)(2)(A)(iv).[4]

### B.  The Proclamation Is a Valid Exercise of the President's Authority

Plaintiffs also attack the proclamation on the ground that the President "lacks authority to categorically ban asylum for all those who enter between ports on the U[.]S.-Mexico border." TRO Br. 16; *see id.* at 16-17.  Plaintiffs argue that the INA "does not allow the President to impose conditions on those who have already entered" and "does not permit him to contravene Congress's specific command that individuals who enter without inspection may apply for asylum." *Id.* at 16.

These arguments mischaracterize what the proclamation does.  *The proclamation* does not deny anyone asylum, but simply *suspends entry* for aliens between ports of entry at the southern border for a temporary period. *See* Proclamation §§ 1, 2.  To be sure, *the rule* imposes an eligibility bar to asylum for those who violate the proclamation's entry suspension—but, as already explained, the INA authorizes the agency heads to establish that bar, and it was both lawful and reasonable to impose such a bar on aliens who violate a presidential entry suspension.  *See supra* Part III.  Section 1182(f) concerns restrictions on entry—a matter over which the President has broad authority—whereas § 1158(a) and (b) go to the separate issue of which aliens are eligible to apply for or receive asylum, which is a matter that the proclamation does not affect but the rule lawfully does.  *See Hawaii*, 138 S. Ct. at 2411.

That suspension—which rests on the President's authority under § 1185(a)(1) and § 1182(f)—is plainly lawful.  *See* Proclamation § 2.  The President may suspend or restrict the entry of any "aliens or of any class of aliens" if he determines such entry "would be detrimental to the interests of the United States," "for such period as he shall deem necessary," 8 U.S.C. § 1182(f), and adopt "reasonable rules, regulations, and orders" governing the "entry" or "depart[ure]" of aliens, "subject to such limitations and exceptions as [he] may prescribe," *id.* §

---

[4] Plaintiffs are wrong that the rule "violates international law, including the 1951 United Nations Convention Relating to the Status of Refugees."  TRO Br. 13.  That theory does not account for the fully discretionary nature of asylum, or *Pula* and its approval.  Instead, the mandatory part of our nonrefoulement obligation under the Convention is withholding of removal, which the rule and proclamation do not alter.  *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 440 (1987); 83 Fed. Reg. at 55939 (explaining why asylum-eligibility bars are consistent with U.S. treaty obligations).

1185(a).  The President found it in the national interest to suspend entry of these aliens and provided a detailed explanation for that finding.  Proclamation (preamble).  Consistent with this explanation, the proclamation imposes limited measures to ameliorate the crisis along the southern border by suspending entry for 90 days (or until a safe third country agreement) and only for those aliens who attempt to enter the country unlawfully.  Proclamation §§ 1, 2.  Such limitation on entry is consistent with the President's authority under § 1182(f) and § 1185(a)(1), which permits the President to entirely block a class of aliens from entering, even if the entry of such aliens is already illegal.  *See Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 187 (1993) ("§ 1182(f) . . . grants the President ample power to establish a naval blockade that would simply deny illegal Haitian migrants the ability to disembark on our shores.").

## IV.    The Other Stay Factors Foreclose Issuing a TRO

The other stay factors support denying a TRO.  A TRO would irreparably harm the United States and the public.  It is always in the public interest to protect the country's borders and enforce its immigration laws.  *See Landon v. Plasencia*, 459 U.S. 21, 34 (1982).  Here, the Executive Branch has identified a crisis at the southern border—of thousands of aliens entering our country in a dangerous manner in violation of our criminal law and overburdening or misusing the asylum screening process—and has taken targeted measures to address that crisis promptly.  *See* Proclamation (preamble) ("396,579 aliens were apprehended entering the United States unlawfully in FY 2018").  The public interest is served by encouraging aliens to follow U.S. law at the border rather than flagrantly violating U.S. law hundreds of thousands of times a year.

Against this, Plaintiffs fail to show any "immediate threatened injury."  *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).  The rule and proclamation do not prevent any individual alien from seeking asylum.  Applicants merely must do so at a port of entry to allow orderly processing.  And those who violate the policy lose only a discretionary benefit to which they are never entitled—they remain eligible for mandatory protections from removal.  *See* 83 Fed. Reg. at 55949.  More importantly, the Court should not even make that type of inquiry: Plaintiffs are organizations and the *only* harms they allege are speculations about their funding and the need to plan for the new rules.  *See, e.g.*, Compl. ¶ 84.  Even if credited, those administrative

1   inconveniences do not outweigh the harm that would be imposed by "injunctive relief [that] deeply

2   intrudes into the core concerns of the executive branch" and prevents it from addressing a serious

3   crisis to public safety and foreign affairs. *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978).

4   Even these mild alleged harms ring hollow. Expending resources is not irreparable injury.

5   TRO Br. 19-20. Plaintiffs cite cases holding that similar expenditures may be sufficient in some

6   circumstances to establish *standing*, but Plaintiffs provide no case holding that such expenditures

7   establish the type of irreparable harm that would warrant enjoining prior to final judgment the

8   actions of Executive Branch to secure the border, let alone where the magnitude of the alleged

9   harms is uncertain. TRO Br. 19. Indeed, "[m]ere injuries, however substantial, in terms of money,

10  time and energy necessarily expended . . . are not enough." *L.A. Mem'l Coliseum Comm'n v. Nat'l*

11  *Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980).

## V.   Any Interim Relief Must Be Sharply Limited.

13  Even if Plaintiffs were entitled to any relief, it would have to be strictly limited.

14  First, to the extent that Plaintiffs could be deemed to challenge any aspect of the rule and

15  proclamation as applied to expedited removals, the Court lacks authority to issue any such relief

16  and the suit is premature. Any such challenge is governed by the exclusive venue and remedy

17  provisions of 8 U.S.C. § 1252(e)(3), which were designed to ensure that, given Congress's plenary

18  authority to limit entry at the border, the expedited removal system can operate without

19  intervention outside of this limited review scheme. *See id.* ("[j]udicial review of determinations

20  under section 1225(b) of this title and its implementation is available in an action instituted in the

21  United States District Court for the District of Columbia"). The D.C. Circuit, which has exclusive

22  appellate jurisdiction over such suits, has made clear that § 1252(e)(3), which also bars class-action

23  challenges, contemplates lawsuits "by, and only by, aliens against whom the new procedures

24  ha[ve] been applied." *Am. Immigration Lawyers Ass'n v. Reno*, 199 F.3d 1352, 1359 (D.C. Cir.

25  2000). Such a suit is also premature. Plaintiffs filed suit *before* the rule and proclamation were

26  applied to any person who entered unlawfully and had received an order of removal, expedited or

27  otherwise. Their suit is premature as to aliens in expedited removal proceedings, *see id.* at 1360,

28  or full removal proceedings, *see* 8 U.S.C. § 1252(a)(5), (b)(9), (d) (alien must exhaust

administrative remedies). So this Court cannot issue any order on the rule and proclamation to the extent that they apply to anyone in expedited removal.

Second, a TRO "should be restricted to" "preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing and no longer." *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423, 439 (1974). Relief must be "as narrow as possible to prevent the irreparable injury" of Plaintiffs—and only Plaintiffs. *California Hosp. Ass'n v. Maxwell-Jolly*, 2011 WL 464008, *1 (E.D. Cal. Feb. 4, 2011).

Third, Article III and equitable principles require that relief be no broader than necessary to redress the Plaintiffs' injuries. Under Article III, "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018). And the rule in equity is that injunctions "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). Here, any relief must be tailored to remedying Plaintiffs' particular alleged resource-allocation harms, *see L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011), especially at this stage, where the purpose of any TRO or injunction is to "preserve the relative positions of the parties until a trial," *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Indeed, nationwide injunctions "did not emerge until a century and a half after the founding," and they "take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Hawaii*, 138 S. Ct. at 2425 (Thomas, J., concurring); *see also Zepeda v. INS*, 753 F.2d 719, 727, 730 n.1 (9th Cir. 1983) (holding that "the injunction must be limited to apply only to the individual plaintiffs unless the district judge certifies a class of plaintiffs" because "[plaintiffs] are not entitled to relief for people whom they do not represent. If this elementary principle were not true, there would be no need for class actions.").

## CONCLUSION

For these reasons, the Court should deny the motion for a TRO.

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

SCOTT G. STEWART
Deputy Assistant Attorney General

AUGUST E. FLENTJE
Special Counsel

WILLIAM C. PEACHEY
Director

By: */s/ Erez Reuveni*
EREZ REUVENI
Assistant Director
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 307-4293
Email: Erez.R.Reuveni@usdoj.gov

PATRICK GLEN
Senior Litigation Counsel

JOSEPH DARROW
FRANCESCA GENOVA
CHRISTINA GREER
Trial Attorneys

Dated: November 15, 2018                      *Attorneys for Defendants*

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 15, 2018, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of for the Northern District of California by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

By: */s/ Erez Reuveni*
      EREZ REUVENI
      Assistant Director
      United States Department of Justice
      Civil Division

JOSEPH H. HUNT
*Assistant Attorney General*
SCOTT G. STEWART
*Deputy Assistant Attorney General*
AUGUST E. FLENTJE
*Special Counsel*
WILLIAM C. PEACHEY
*Director*
EREZ REUVENI
*Assistant Director*
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 307-4293
Email: Erez.R.Reuveni@usdoj.gov
PATRICK GLEN
*Senior Litigation Counsel*
JOSEPH DARROW
FRANCESCA GENOVA
CHRISTINA GREER
*Trial Attorneys*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| East Bay Sanctuary Covenant, *et al.*, ) <br><br> Plaintiffs, ) <br><br><br> v. ) <br><br> Donald J. Trump, President of the United States, *et al.*, ) <br><br> Defendants. ) | [PROPOSED] ORDER DENYING MOTION FOR TEMPORARY RESTRAINING ORDER <br><br> Civil Action No. 1:18-cv-06810-JST |

Before the Court is the Plaintiffs motion for temporary restraining order. Having reviewed the briefs of the parties, and having heard argument on November 19, 2018, IT IS HEREBY ORDERED that the motion is DENIED.

Issued this _____ day of _____, 2018.

_____
United States District Judge

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

[PROPOSED ]ORDER DENYING MOTION
FOR TEMPORARY RESTRAINING ORDER
*East Bay Sanctuary v. Trump*,
Case No. 1:18-cv-06810-JST

1