# DECLARATION OF LEAH JAHAN CHAVLA OF
# THE WOMEN'S REFUGEE COMMISSION

I, Leah Jahan Chavla, hereby declare as follows:

1. I am a Policy Advisor within the Migrant Rights and Justice (MRJ) Program of the Women's Refugee Commission (WRC), where I have worked on research and policy advocacy since October 2016. For three years prior to joining the WRC, I worked as a junior and senior attorney within the Rapporteurships on the Rights of Migrants and on Human Rights Defenders, respectively, at the Inter-American Commission on Human Rights (IACHR). I am admitted to practice law in New York. I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2. The WRC is a non-profit organization that advocates for the rights of women, children, and youth fleeing violence and persecution. The WRC is based in New York, New York; the MRJ Program is based in Washington, D.C.

3. The WRC was founded in 1989, originally as a program within the International Rescue Committee, after having identified a dearth of programming to protect women and girls displaced by humanitarian crises around the world. It subsequently evolved into an independent entity. WRC's mission is to improve the lives and protect the rights of women, children, and youth displaced by conflict and crisis.

4. The WRC is a leading expert on the needs of refugee women and children, and the policies and programs that can protect and empower them. The WRC regularly consults displaced women, children, and youth, and works with the community-based organizations that are usually the first responders in any humanitarian crisis. It then raises those needs with policy makers and implementers, including local and national governments, the United Nations, and

other international non-governmental organizations that drive humanitarian policy and practice.

5. The MRJ program focuses on the right to seek asylum in the United States. It strives to ensure that refugees, including women and children, are provided with humane reception in transit and in the United States, given access to legal protection, and protected from exposure to gender discrimination or gender-based violence. The MRJ program regularly consults with diverse stakeholders, including affected migrants and refugees; community-based, national, and international organizations; policymakers, including Members of Congress and their staff; and federal government officials from several departments and agencies that work on immigration-related issues and conduct oversight.

6. Since 1996, the MRJ team has made numerous visits to the southwest border region, including along Mexico's northern border, as well as to immigration detention centers for adult women and families and to shelters housing unaccompanied children throughout the country. Based on the information that we collect on these visits and our legal and policy analysis of the issues, we advocate for improvements through various methods, including meetings with government officials and service providers, and by documenting our findings through fact sheets, reports, backgrounders, and other materials. We make recommendations to address identified or observed gaps or ways in which we believe the corresponding department or agency could improve its compliance with the relevant standards. We use these materials in our advocacy work to inform the perspectives and decisions of policymakers.

7. The MRJ's recent publications include a fact sheet explaining why Mexico does not qualify as a safe third country. The main reasons are summarized below. A copy of the fact sheet is attached as Exhibit A.

8. While Mexico has made commitments to strengthen its capacity to

provide asylum to Central Americans, particularly those coming from the Northern Triangle countries of El Salvador, Guatemala, and Honduras, it has yet to make demonstrable progress in screening individuals for protection needs and ceasing to return families and children to danger. Significant barriers prevent migrants, including children, from accessing the right to seek and enjoy asylum in Mexico.

9. Many migrants are arbitrarily detained in poor conditions in processing facilities upon apprehension. In these facilities, migrants lack access to legal counsel and opportunities to have their cases heard. Child migrants are being systematically detained, which violates their basic human rights.

10. Adult and child migrants in need of international protection are not routinely informed about their rights or screened for international protection concerns as is required by Mexican law. This is especially concerning as persons have only thirty business days upon entering Mexican territory to file an asylum application. Further, Mexico's Commission for Refugee Assistance ("COMAR") is understaffed, under resourced, and limited geographically, as it has only three offices – in Tapachula (Chiapas), Acayucan (Veracruz), and Mexico City. Although I understand that COMAR now has 40 agents (rather than 15 as of June 2015, as specified in our fact sheet), this capacity is woefully inadequate to deal with the continuing increase in asylum applications in recent years. According to COMAR's statistics, 14,544 persons requested asylum in Mexico from January 1, 2018 to August 31, 2018.

11. As illustrated in our fact sheet, these factors are reflected in the low number of asylum applications in contrast with the high number of apprehended migrants and despite numerous studies showing an increase in flows of asylum seekers from the Northern Triangle countries, due to high levels of violence and crime. Further, there is a low rate of success on asylum applications in Mexico.

12. Migrants often lack sufficient protections while in Mexico. In

transiting through the country to arrive at the U.S.-Mexico border, they suffer violence and other abuses at the hands of organized crime and corrupt migration authorities. Further, there is a lack of accountability for crimes against migrants.

13. In addition to migrants from other countries, certain Mexican nationals face higher risks of having their human rights violated. The include human rights defenders and journalists, particularly women and indigenous persons; LGBTI persons; children and adolescents, particularly those being recruited for organized criminal groups; and internally-displaced persons. Mexican women continue to remain more likely than men to experience sexual crimes or be victims of human trafficking.

EXECUTED this 16th day of November, 2018.

_____
Leah Jahan Chavla

# Exhibit A



# Safe Third Countries for Asylum-Seekers
## Why Mexico Does Not Qualify as a Safe Third Country

It has been argued that refugees or asylum-seekers passing through Mexico to request asylum in the United States should be denied entry to the U.S. based on the availability of protection in Mexico as a signatory to the 1951 Convention on the Status of Refugees ("1951 Convention" or "Refugee Convention"). In some cases, this is referred to a "safe third country" option. The term "safe third country" applies to countries determined as being non-refugee-producing or as being places where refugees can receive asylum without any danger.[1] Following this concept, asylum-seekers/refugees may be denied entry or returned to countries where they have, or could have, sought asylum and where their safety would not be jeopardized. Despite important steps taken by Mexico in recent years to strengthen its asylum system, the system is still squarely within the development phase and has extremely limited resources and capacity (it currently processes a small fraction of the asylum applications received by the U.S.). **Mexico is clearly not a safe, or in many cases viable, alternative for many refugees and vulnerable migrants seeking international protection.**

**Part I. "Safe third country" concept in international refugee law**

The right to seek asylum is well-established in international law, under the 1948 Universal Declaration of Human Rights and the binding 1951 Convention on the Status of Refugees. The latter establishes who qualifies as a refugee, the rights of persons recognized as refugees or granted asylum, and the obligations of States towards these persons. The U.S. acceded to the 1967 Protocol Relating to the Status of Refugees, which modified the 1951 Convention by removing the temporal and geographic limits (originally it was restricted to those persons who fled, within Europe, prior to January 1, 1951).

The position of the UNHCR – the UN entity in charge of supervising the application of the 1951 and 1967 instruments – is that "burden-sharing" arrangements allowing for readmission and determination of status elsewhere, such as the safe third country principle, are reasonable, provided they always ensure protection of refugees first and foremost.[2] This means that refugees, asylum-seekers, and other persons forcibly displaced from their homes must be safe in the third country from being removed to their home country (the *non-refoulement* principle), and that they must have access to basic social services in this third country, such as healthcare, education, and employment.

There are numerous ways this "safe third country" concept could be implemented, some of which are legal and some not.

---

[1] Not to be confused with the 'first country of asylum' principle, which is used to justify the decision to return an asylum-seeker to another country where s/he has already been granted protection.
[2] UNHCR, Background Note on the Safe Country Concept and Refugee Status, EC/SCP/68, July 26, 1991.



**Part II. Origin of the "safe third country" concept in U.S. immigration law**

One way this concept could be implemented is through a bar on certain asylum applications. The Illegal Immigration Reform and Responsibility Act (IIRIRA) of 1996 amended section 208 (a)(2)(A) of the Immigration and Naturalization Act (INA) to bar asylum to those aliens who can be returned to a "safe-third country."

In order to invoke this bar, however, the INA requires the U.S. to have a "bilateral or multilateral agreement" in place with the third country.[3]

The U.S. only has one safe third country agreement in place, with Canada, which entered force in 2004. One important exception embedded in the U.S.-Canada agreement regards family reunification. Family unity is a fundamental principle of international law and is enshrined not only in the Refugee Convention but also in several other international legal instruments, such as the Universal Declaration of Human Rights, the International Covenant on Civil and Political Rights, the Convention on the Rights of the Child, the American Declaration on the Rights and Duties of Man, and the American Convention on Human Rights, among others.

The U.S.-Canada agreement provides that an asylum-seeker with a family member in the destination country, who is either in lawful immigration status or is 18 years or older and has an asylum application pending, will be allowed to enter that country (whether it be the U.S. or Canada) to join this relative. The range of eligible family members under the agreement includes spouses, sons, daughters, parents, legal guardians, siblings, grandparents, grandchildren, aunts, uncles, nieces, and nephews.[4]

The U.S. does not currently have a formal agreement with Mexico but may choose to pursue one. If they do, it is essential to remember that:

- Mexico is not a safe option for many migrants.
- Family ties and reunification are a major factor driving current migrant and refugee flows. Many child migrants, particularly unaccompanied children, are traveling through Mexico to reach the United States, where other family members are located. Including an exception for family reunification in any such agreement would be essential to protecting children's rights and the right to family life.
- Mexico's asylum system is still evolving and a large increase in the already overburdened asylum system is likely to cause further instability and delay or prevent the consolidation of an effective protection system.

---

[3] Section 608 of IIRIRA amended the INA as follows:
> INA §208 (a)(2)(A) SAFE THIRD COUNTRY.-Paragraph (1) [stating that any alien physically present in the United States or who arrives in the United States, irrespective of status, may apply for asylum in accordance with the provisions of § 208] shall not apply to an alien if the Attorney General determines that the alien may be removed, pursuant to a bilateral or multilateral agreement, to a country (other than the country of the alien's nationality or, in the case of an alien having no nationality, the country of the alien's last habitual residence) in which the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection, unless the Attorney General finds that it is in the public interest for the alien to receive asylum in the United States.

[4] U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services (USCIS), Press Release: United States and Canada Implement Safe Third Country Agreement on Asylum (Dec. 29, 2004), p. 2.



**Part III. Mexico is not a safe third country**

    **A. Mexico is not safe for most migrants, particularly vulnerable ones**

While Mexico has made commitments to strengthen its capacity to provide asylum to Central Americans, particularly those coming from the Northern Triangle countries of El Salvador, Guatemala, and Honduras, it has yet to make demonstrable progress in screening individuals for protection needs and ceasing to return families and children to danger. Significant barriers prevent migrants, including children, from accessing the right to seek and enjoy asylum in Mexico:

- Many migrants are arbitrarily detained in poor conditions in processing facilities upon apprehension. In these facilities, migrants lack access to legal counsel and opportunities to have their cases heard. Child migrants are being systematically detained, which violates their basic human rights. Between 2014 and 2015, the number of detained unaccompanied children migrants in Mexico doubled, from 10,943 to 20,368.[5]  Particularly for children, the length and conditions of detention deter them from seeking asylum.[6]

- Adult and child migrants in need of international protection are not routinely informed about their rights or screened for international protection concerns as is required by Mexican law.[7] This is especially concerning as persons only have thirty business days upon entering Mexican territory to file an asylum application. Further, Mexico's Commission for Refugee Assistance (or COMAR, by its initials in Spanish) is understaffed, having only 15 agents as of June 2015, to conduct asylum interviews throughout the entire country;[8] under resourced,[9] in comparison to the large increase in asylum applications over the past few years[10]; and limited geographically, as it only has three offices - Tapachula (Chiapas), Acayucan (Veracuz), and Mexico City.[11] These factors are reflected in the low number of asylum applications in contrast with the high number of apprehended migrants and despite numerous studies showing an increase in flows of asylum-seekers from the Northern Triangle countries, due to high levels of violence and crime.[12] Further, there is a low rate of success on asylum applications in Mexico, as illustrated by the charts below.

---

[5] José Antonio Román, "Se duplicó la detención de menores centroamericanos no acompañados" [*Detention of unaccompanied children from Central America doubled*], La Jornada, Oct. 25, 2016.

[6] Georgetown Law Human Rights Institute (HRI), The Cost of Stemming the Tide: How Immigration Enforcement practices in Southern Mexico Limit Migrant Children's Access to International Protection (Apr. 2015), p. 25.

[7] Amnesty International, Overlooked, Under-Protected: Mexico's Deadly Refoulement of Central Americans Seeking Asylum (Jan. 2018), p. 12 (in a survey of 297 migrants who passed through an immigration detention center in Mexico, 75% were not informed of their right to seek asylum in Mexico); HRI, The Cost of Stemming the Tide, p. 25, 48-50 (concerning child migrants) ; IACHR, Human Rights Situation of Migrants and Other Persons in the Context of Human Mobility in Mexico (2014), para 534 (concerning adult migrants).

[8] Manu Ureate, México recibe 67% más solicitudes de refugio, pero sólo tiene 15 oficiales para atender 2 mil casos [*Mexico receives 67% more requests for asylum, but only has 15 agents to deal with 2,000 cases*], Animal Político, June 19, 2015.

[9] Ximena Suarez Enriquez, Jose Knippen, Maureen Meyer, A Trail of Impunity: Thousands of Migrants in Transit Face Abuses amid Mexico's Crackdown, WOLA (Oct. 20, 2016).

[10] COMAR currently has a backlog of thousands of cases; according to a press release by Mexico's National Human Rights Commission (CNDH), as of February 2018, close to 60% of asylum applications filed in 2017 have not been processed yet. The CNDH made an urgent appeal to Mexico's national government to act "in the face of a possible collapse of Mexico's refugee protection system" ["ante el posible colapso del sistema de protección de refugiados en México"].

[11] COMAR, ¿Dónde está COMAR? [*Where is the COMAR located?*] (last accessed on May 17, 2018).

[12] *See* Latin American Working Group (LAWG), Central American Families & Children Arriving at U.S.-Mexico Border Demonstrate Need for Urgent Protection Mechanisms, Oct. 19, 2016. *See also*, UNHCR, Children on the Run, Apr. 2014, p. 6 (finding that of the 404 unaccompanied and separated children, ages 12-17, from Mexico, El Salvador, Guatemala, and Honduras that UNHCR interviewed, 58% raised potential international protection needs. The sample size was designed to be representative of other similarly-situated children from these four countries); UNHCR, Arrancados de Raíz [Uprooted], 2014 (finding that of 200 migrant children from El Salvador, Guatemala, and Honduras who were interviewed in Mexico, 48.6% had cited violence as a principal factor in leaving their homes).



**Adult Migrants in Mexico: Apprehensions, Asylum Applications, and Grants of Asylum, 2013-2017**[13]

| Year | Total apprehensions | Asylum applicants (applicants from Northern Triangle, NT) | Granted protection* (#NT) |
|---|---|---|---|
| 2013 | 76,668 | 1,296 (887) | 313 (242) |
| 2014 | 104,053 | 2,137 (1,769) | 536 (477) |
| 2015 | 159,627 | 3,424 (3,138) | 1,102 (1,015) |
| 2016 | 146,102 | 8,796 (8,059) | 3,205 (2,808) |
| 2017 | 77,197 | 14,596 (8,656) | 1,907 (958) |
| Total | 563,647 | 30,249 (22,509) | 7,063 (5,500) |

*Figure in chart encompasses grants of asylum and complementary protection.*

**Child Migrants in Mexico: Apprehensions, Asylum Applications, and Grants of Asylum, 2013-2016**[14]

| Year | Total apprehensions of children | Child applicants for asylum (applicants from the Northern Triangle, NT) | Children granted protection* (#NT) |
|---|---|---|---|
| 2013 | 9,630 | 63 (55) | 18 (15) |
| 2014 | 23,096 | 78 (75) | 22 (22) |
| 2015 | 38,514 | 142 (139) | 44 (44) |
| 2016 | 40,114 | 242 (229) | 102 (102) |
| 2017 | 18,300 | 259 (236) | 36 (31) |
| Total | 129,654 | 784 (734) | 222 (214) |

*Figure in chart encompasses grants of asylum and complementary protection.*

---

[13] Mexican Commission for the Assistance of Refugees (COMAR), Statistics 2013 to 2016 (last accessed on May 17, 2018). For apprehension numbers, please consult: National Institute on Migration of Mexico (INM), Annual Statistics Bulletins (last accessed on May 17, 2018).
[14] *Id.*



- Mexican authorities, with U.S. support, have been steadily ramping up deportations of all irregular migrants, including children, from the Northern Triangle countries with little regard for due process, which increases the potential for *refoulement*.[15]

**Deportations from Mexico, 2013-2016**[16]

| Year | Total persons deported | Deported migrants from Northern Triangle (% of total deportations) | Total children deported | Deported children from Northern Triangle (% of total children deported) |
|---|---|---|---|---|
| 2013 | 80,902 | 77,896 (96%) | 8,577 | 8,401 (98%) |
| 2014 | 107,814 | 104,269 (97%) | 18,169 | 17,921 (99%) |
| 2015 | 181,163 | 175,136 (97%) | 36,921 | 36,497 (99%) |
| 2016 | 159,872 | 149,540 (94%) | 38,555 | 37,759 (98%) |
| 2017 | 80,353 | 75,677 (94%) | 16,162 | 15,821 (98%) |
| Total | 610,104 | 582,518 (95%) | 118,384 | 116,399 (98%) |

- Migrants often lack sufficient protections while in Mexico: in transiting through the country to arrive at the U.S.-Mexico border, they suffer violence and other abuses at the hands of organized crime and corrupt migration authorities.[17] Further, there is a lack of justice for crimes against migrants, which allows for crimes to remain in impunity and only serves to foster their repetition: between 2014 and 2016, "of the 5,284 crimes against migrants reported in Chiapas, Oaxaca, Tabasco, Sonora, Coahuila, and at the federal level, there is evidence of only 49 sentences, leaving 99 percent of the cases in impunity."[18]

- Attention may be called to Mexico's issuance of "passes" to certain migrants. If referring to the "oficios de salida" [exit passes], it is important to know that these only allow for a person in an irregular migratory situation to transit Mexico for the duration of the pass (approximately 20 days). Further, they are not uniformly granted to all migrants by Mexico's National Institute on Migration (INM or INAMI), nor do they confer any special protection to the holder or grant him or her a stable or renewable immigration status in Mexico.

**B.  Mexico is not safe for certain Mexicans**

- In addition to migrants from other countries, certain Mexican nationals face higher risks of having their human rights violated. These include human rights defenders and journalists, particularly women and indigenous persons; LGBTI persons; children and adolescents, particularly those being recruited for organized criminal groups; and internally-displaced persons. Mexican women continue to remain more likely than men to experience sexual crimes or be the victim of human trafficking.[19]

---

[15] HRI, The Cost of Stemming the Tide, p. 14-15, 18; *see also*, Adam Isacson, Maureen Meyer, and Hannah Smith, Increased Enforcement at Mexico's Southern Border, WOLA (Nov. 2015) (presenting findings on research into the impacts of Mexico's *Plan Frontera Sur*).
[16] INM, Annual Statistics Bulletins (last accessed on Oct. 28, 2016).
[17] Ximena Suárez, Andrés Díaz, José Knippen, and Maureen Meyer, Access to Justice for Migrants in Mexico: A Right that Exists Only on the Books, WOLA (July 2017); Latin American Working Group (LAWG), Central American Families & Children Arriving at U.S.-Mexico Border Demonstrate Need for Urgent Protection Mechanisms, Oct. 19, 2016; Ximena Suarez Enriquez, Jose Knippen, Maureen Meyer, A Trail of Impunity: Thousands of Migrants in Transit Face Abuses amid Mexico's Crackdown, WOLA (Oct. 20, 2016).
[18] Access to Justice for Migrants in Mexico: A Right that Exists Only on the Books, WOLA (July 2017), p. 4; see also, Ximena Suarez Enriquez, Jose Knippen, Maureen Meyer, A Trail of Impunity: Thousands of Migrants in Transit Face Abuses amid Mexico's Crackdown, WOLA (Oct. 20, 2016).
[19] *See, e.g.*, Inter-American Commission on Human Rights, Human Rights Situation in Mexico, OEA/Ser.L/V/II., Dec. 31, 2015, p. 112-135.



**Part IV. Implementation of a safe third country-like provision with Mexico**

In lieu of a binational agreement[20], we may see the U.S. implement a safe third country-like approach in the following ways:

- Turning persons seeking international protection back at Ports of Entry along the U.S. southern border with Mexico with no explanation, telling them there is no space and to return later, or having them go through Mexican officials to get an appointment for a future date to come back to the Port;
- Returning persons to Mexico after placing them into removal proceedings, pursuant to INA section 240[21];
- Placing persons seeking international protection into expedited removal, returning them to Mexico, and conducting credible fear interviews in Mexico[22];
- Denying a credible fear interview based on the argument that the person (if not a Mexican citizen) could have sought protection in Mexico; or
- Denying asylum based on this same argument.

The extent to which each of these is legal varies and may depend on details of implementation.  Some may require legislation but much of this could be implemented administratively.

Additionally, proposed legislation, such as section 12 of HR 391 (proposed by Rep. Jason Chaffetz, R-Utah, in the 114th Congress and 115th Congress), has called for modifying the INA to eliminate the requirement of a safe third country (bilateral) agreement altogether. This bill was introduced in the House of Representatives in January 2017. The practical effect of such a change would be to bar persons from submitting asylum applications in the U.S. if they can be removed to another country where their life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion and where the person would have access to a full and fair procedure for determining a claim to asylum or equivalent protection. However, the U.S. has no guarantees that an asylum-seeker's claim will be addressed in that third country.

Further, as the law currently stands, the Attorney General may decide to waive the safe third country exception, if s/he finds that it is in the public interest for the asylum-seeker to receive asylum in the United States. Section 12 of HR 391 would replace the Attorney General with the Secretary of Homeland Security, which suggests that a decision to bar an asylum application would not be subject to a hearing before an immigration judge, as is currently the process; thus, the asylum-seeker would potentially have no means to challenge this decision.

**For more information, please contact:**

Leah Chavla, Policy Advisor, Women's Refugee Commission: leahc@wrcommission.org - tel: 202-750-8598

---

[20] Although it appears the U.S. and Mexico are or have been in discussions around such an agreement, *see* Ted Hesson, "U.S., Mexican officials to discuss asylum pact," Politico (May 16, 2018).

[21] Section 235(b)(2)(C) of the INA provides the following: Treatment of aliens arriving from contiguous territory.-In the case of an alien described in subparagraph (A) [referring to an alien who is not clearly and beyond a doubt entitled to be admitted] who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 240."  As of May 2018 and according to the Office of Information and Regulatory Affairs of the Office of Management and Budget, the Department of Homeland Security is engaging in regulatory rulemaking on this provision. *See* the "Return to Territory" entry in the Unified Agenda [last accessed on May 17, 2018].

[22] INA Section 235 (b)(1)(B)(i) establishes that "an asylum officer shall conduct [credible fear of persecution] interviews of aliens . . . either at a port of entry *or at such other place designated by the Attorney General* (emphasis added)."