1. I, René Cutlip-Mason, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

2. I am the Chief of Programs of The Tahirih Justice Center, a nonprofit and non-partisan organization whose mission is to protect courageous immigrant women and girls who refuse to be victims of violence. From January 2015 through May 2017, I was Counsel to the Director at the Department of Justice, Executive Office for Immigration Review (EOIR); and from June 2017 – December 2017 I was Associate General Counsel in the Office of General Counsel at EOIR.

3. In my positions at EOIR I regularly worked with and reviewed EOIR data. This includes data on the number of in absentia orders of removal issued by immigration judges each year, and in particular on the in absentia rates published by EOIR in its Statistics Yearbooks.

4. While not professionally trained in statistics, I am familiar with the methodology that EOIR uses to calculate what it calls "the in absentia rate." In my professional opinion this "rate" does not accurately reflect the number of individuals who do not appear at an immigration court hearing. Because the interim final rule entitled "Aliens Subject to a Bar on Entry under Certain Presidential Proclamations; Procedures for Protection Claims" relies on EOIR's methodology, it misstates the flight risk for individuals who are apprehended after crossing the U.S.-Mexico border between ports of entry.

5. When a respondent fails to appear for removal proceedings after receiving written notice, the presiding immigration judge may order that the respondent be "removed in absentia." 8 U.S.C. § 1229a(b)(5)(A). A respondent ordered removed in absentia may move to reopen his or her case (rescinding the "in absentia" order of removal) within 180 days if the failure to appear was due to

"exceptional circumstances," or, if the respondent did not receive proper notice of the hearing, at any time. 8 U.S.C. § 1229a(b)(5)(C).

6. In its yearly Statistics Yearbooks, EOIR publishes an "in absentia rate." Importantly, the in absentia "rate" EOIR publishes is not a substitute for an attendance rate, and does not represent the rate at which individuals fail to appear in court.

### How EOIR Calculates "In Absentia Rates"

7. EOIR calculates its in absentia rate by dividing the number of individuals ordered removed in absentia in any given fiscal year by the number of "initial case completions" in any given fiscal year. *See* EOIR, Statistics Yearbook Fiscal Year 2017, at 33 (2018) (defining in absentia rate as "the proportion of all [immigration judge] decisions at the [initial case completion] where the removal order is issued *in absentia*").

8. EOIR defines an "initial case completion" as the "first dispositive decision rendered by an immigration judge." This could be a decision made by an immigration judge that resolves the case, whether it be a decision granting relief from removal, an order of removal, or a decision granting a motion to terminate the case. *See id.* at 7.

9. Thus, in Fiscal Year 2017, there were 41,384 in absentia orders of removal which, when divided by 149,436 initial case completions, produces an in absentia rate of 28%. *Id.* at 34.

### The Many Methodological Flaws of EOIR's "In Absentia Rates"

10. EOIR's methodology fails to establish an accurate rate of applicants failing to appear for at least three reasons. First, EOIR does not consider a grant of administrative closure to be an "initial case completion." *Id.* Administrative closure has long been a docket management tool in which a case is indefinitely

removed from the docket. Under the Obama administration, administrative closure was used as a primary method of prosecutorial discretion. From Fiscal Year 2013 to Fiscal Year 2016, over 160,000 cases were administratively closed. *Id.* at 15. Because EOIR does not consider administrative closure to be an "initial case completion," these cases are entirely excluded from the calculation of "in absentia" rates. This significantly distorts the "in absentia" rate. For example, in 2016, there were 32,755 "in absentia" orders, 128,145 initial case completions, and 53,736 administrative closures. Using EOIR's method of calculation, the "in absentia rate" was 26%. If administrative closures were considered as initial case completions, the "in absentia rate" would have been only 18%.

11. Second, EOIR does not consider whether an order of removal in absentia was subsequently rescinded when calculating the "in absentia rate." Even when a respondent successfully reopens her removal proceedings, EOIR still includes the respondent in its calculation of the in absentia rate. The Transactional Records Access Clearinghouse, an organization which publishes monthly statistics relating to immigration court proceedings, has criticized this methodological decision as "quite inappropriate." *See* TRAC Immigration, What Happens When Individuals Are Released on Bond in Immigration Court Proceedings, n7 (2016), *available at* http://trac.syr.edu/immigration/reports/438/. According to TRAC, reclassifying individuals who successfully reopened proceedings following a removal order in absentia "significantly impacts and reduces [EOIR's] calculated rates."

12. Third, EOIR's use of "initial case completions" as a denominator has artificially increased its in absentia rate as the immigration court backlog has risen over the past decade. Individuals who appear for scheduled removal hearings but are then asked to return for a later hearing are not considered in EOIR's calculation of the in absentia rate. As more and more people are scheduled to appear in court,

the raw number of people ordered removed in absentia will rise even if the percentage of people failing to appear remains the same. If the raw number of case completions does not rise at the same time, EOIR's in absentia rate will artificially increase.

13. This is exactly what has happened over the past decade. In 2008, there were roughly 186,000 cases pending at the end of year. By the end of 2017, there were over 650,000 pending cases, a 250% increase. As the raw number of people placed in removal proceedings grew, so too did the number of people ordered removed in absentia, although at a significantly lower rate. In 2008, there were 29,854 people ordered removed in absentia, compared to 41,384 removed in absentia in 2017, an increase of only 39%.

14. During the same time period, "initial case completions" fell significantly, both as a result of the increased numbers of administrative closures (which, as noted above, are not considered by EOIR to be case completions) and because the increase in time-consuming asylum applications appears to have lowered adjudicative capacity.



Table 1: As Initial Case Completions Stagnate, EOIR's "In Absentia Rate Rises" Along With Administrative Closures and Court Backlogs

| | FY 2008 | FY 2009 | FY 2010 | FY 2011 | FY 2012 | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017 |
|---|---|---|---|---|---|---|---|---|---|---|
| Cases in Backlog | 186108 | 223809 | 262622 | 297848 | 326255 | 356060 | 430062 | 459973 | 521329 | 656067 |
| Initial Case Completions | 229488 | 232424 | 223528 | 220255 | 187270 | 136761 | 124238 | 127350 | 128145 | 149436 |
| Administrative Closures | 8413 | 7888 | 8941 | 6348 | 18043 | 32545 | 34422 | 46214 | 53736 | 32394 |
| "In Absentia" Removals | 29854 | 25336 | 26827 | 24031 | 20691 | 18747 | 23440 | 35166 | 32755 | 41384 |
| EOIR's "In Absentia Rate" | 13.0% | 10.9% | 12.0% | 10.9% | 11.0% | 13.7% | 18.9% | 27.6% | 25.6% | 27.7% |

15. As Table 1 demonstrates, over the past five years the numerator in EOIR's "in absentia" calculation has risen primarily as a result of the total case volume, while the denominator of initial case completions has fallen. This has led to the appearance of rising "in absentia" rates despite the complete lack of actual evidence that respondents are failing to appear at higher rates. While no single factor can explain the rise of EOIR's in absentia rates, taken together it is clear that these rates do not accurately reflect the actual rates at which applicants fail to appear..

### The Interim Final Rule Relies on EOIR's Misguided Methodology

16. The IFR relies on EOIR's methodology to calculate in absentia rates for individuals who were placed in immigration court proceedings. In doing so, DHS and EOIR fundamentally misrepresent the actual rate at which asylum seekers fail to appear in court, making it appear substantially higher than it actually is.

17. For example, on page 51 of the interim final rule, the IFR relies on EOIR data, *see* IFR footnote 10, to claim that in FY 2018, "about 38%" of noncitizens from Northern Triangle countries who passed credible fear interviews were ordered removed in absentia. The government's misunderstanding of this data is made clear when, in the very next sentence, the agency declares that when "put differently," its data indicates that "over a third" of nationals from Northern Triangle countries "who claimed a fear of persecution … did not appear at section 240 proceedings."

18. In reality, the data referenced in the IFR shows only that there were 7,919 orders of removal in absentia in FY 2018 for individuals from Northern

Triangle countries who passed credible fear interviews, *see* IFR footnote 10, and that in FY 2018, immigration judges produced 20,784 "initial case completions" involving individuals from Northern Triangle countries, *see* IFR at 51. Contrary to government's argument, this information *does not* reflect the percentage of individuals who failed to appear for a scheduled removal hearing.

19. The data included in the IFR does not account for the number of individuals whose cases were administratively closed in the same time period. This artificially increases the in absentia rate presented in the IFR.

20. The data included in the IFR also does not account for individuals who were ordered removed in absentia and who successfully reopened their cases. This also artificially increases the "in absentia rate" presented in the IFR.

21. In addition, the data included in the IFR does not account for individuals who appeared for a scheduled removal hearing and whose cases did not result in a completion. As the government admits, in FY 2018 there were at least 47,507 individuals from Northern Triangle nations who passed credible fear interviews and were placed in removal proceedings, *see* IFR at 52, yet only 7,919 were ordered removed in absentia that year, only 16.7% of total cases, *see* IFR footnote 10.

22. By relying on EOIR's "initial case completion" methodology, the IFR's statistics falsely paint the picture of asylum-seekers frequently absconding from court proceedings. As shown above, these statistics simply do not reflect what the government claims that they do.

EXECUTED this 16 day of November, 2018.

Rená Cutlip-Mason