1
2
3
4                       UNITED STATES DISTRICT COURT

5                      NORTHERN DISTRICT OF CALIFORNIA

6

7    EAST BAY SANCTUARY COVENANT,            Case No. 18-cv-06810-JST
     et al.,
8                                            **ORDER GRANTING TEMPORARY**
                   Plaintiffs,               **RESTRAINING ORDER; ORDER TO**
9                                            **SHOW CAUSE RE PRELIMINARY**
            v.                               **INJUNCTION**
10
     DONALD J. TRUMP, et al.,                Re: ECF No. 8
11
                   Defendants.
12

13          The Immigration and Naturalization Act ("INA") "deals with one of the oldest and most

14   important themes in our Nation's history: welcoming homeless refugees to our shores," and it

15   "give[s] statutory meaning to our national commitment to human rights and humanitarian

16   concerns."  125 Cong. Rec. 23231-32 (Sept. 6, 1979).  As part of that commitment, Congress has

17   clearly commanded in the INA that any alien who arrives in the United States, irrespective of that

18   alien's status, may apply for asylum – "whether or not at a designated port of arrival."  8 U.S.C.

19   § 1158(a)(1).

20          Notwithstanding this clear command, the President has issued a proclamation, and the

21   Attorney General and the Department of Homeland Security have promulgated a rule, that allow

22   asylum to be granted only to those who cross at a designated port of entry and deny asylum to

23   those who enter at any other location along the southern border of the United States.  Plaintiff

24   legal and social service organizations, Plaintiffs East Bay Sanctuary Covenant, Al Otro Lado,

25   Innovation Law Lab, and Central American Resource Center of Los Angeles (collectively, the

26   "Immigration Organizations"), now ask the Court to stop the rule from going into effect.  ECF No.

27   8.  The Court will grant the motion.

28          The rule barring asylum for immigrants who enter the country outside a port of entry

*United States District Court
Northern District of California*

irreconcilably conflicts with the INA and the expressed intent of Congress.  Whatever the scope of the President's authority, he may not rewrite the immigration laws to impose a condition that Congress has expressly forbidden.  Defendants' claims that the rule can somehow be harmonized with the INA are not persuasive.

Also, Plaintiffs and the immigrants they represent will suffer irreparable injury if the rule goes into effect pending resolution of this case.  Asylum seekers will be put at increased risk of violence and other harms at the border, and many will be deprived of meritorious asylum claims.  The government offers nothing in support of the new rule that outweighs the need to avoid these harms.

The Court addresses the parties' various arguments, and explores the Court's reasons for granting Plaintiffs' motion, more fully below.

## I.     BACKGROUND

### A.     Asylum Framework

Asylum is a protection granted to foreign nationals already in the United States or at the border who meet the international law definition of a "refugee."  Congress has currently extended the ability to apply for asylum to the following non-citizens:

> Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title.

8 U.S.C. § 1158(a)(1).  Congress has also created exceptions for aliens who (1) may be removed to a safe third country, (2) did not apply within one year of arriving in the United States, or (3) have previously been denied asylum, absent a material change in circumstances or extraordinary circumstances preventing the alien from filing a timely application.  *Id.* § 1158(a)(2).

To obtain asylum status, applicants must clear three hurdles.  First, applicants must establish that they qualify as refugees who have left their country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion," *id.* § 1101(a)(42)(A), and that their status in one of

United States District Court
Northern District of California

2

those groups "was or will be at least one central reason" for the persecution, *id.* § 1158(b)(1)(A); *see also id.* § 1158(b)(1)(B).

Second, Congress has established a series of statutory bars to eligibility for asylum, such as an applicant's role in persecuting members of protected groups or "reasonable grounds for regarding the alien as a danger to the security of the United States." *Id.* § 1158(b)(2)(A). In addition, Congress authorized the Attorney General to "by regulation establish additional limitations and conditions, consistent with [8 U.S.C. § 1158], under which an alien shall be ineligible for asylum under [*id.* § 1158(b)(1)]." *Id.* § 1158(b)(2)(C). If "the evidence indicates" that one of these statutory or regulatory bars applies, the applicant bears the burden of proving that it does not. 8 C.F.R. § 1240.8(d).

Finally, even if an applicant satisfies those two requirements, the decision to grant asylum relief is ultimately left to the Attorney General's discretion, *see I.N.S. v. Aguirre-Aguirre*, 526 U.S. 415, 420 (1999); *Delgado v. Holder*, 648 F.3d 1095, 1101 (9th Cir. 2011), subject to the court of appeals' review for whether the Attorney General's decision was "manifestly contrary to the law and an abuse of discretion," 8 U.S.C. § 1252(b)(4)(D).

If an alien is granted asylum status, the Attorney General must refrain from removing the alien and must grant the alien authorization to work in the United States. *Id.* § 1158(c)(1)(A)-(B). The alien's spouse and children may also "be granted the same status as the alien if accompanying, or following to join, such alien." *Id.* § 1158(b)(3)(A). Asylum status also provides a path to citizenship.[1] Still, asylum is not irrevocable. The Attorney General may terminate an alien's asylum status based on changed circumstances, a subsequent determination that a statutory bar applies, or under various other conditions. *Id.* § 1158(c)(2).

In addition to asylum, two other forms of relief from removal are generally available under U.S. immigration law. With some exceptions,[2] an alien is entitled to withholding of removal if

---

[1] After one year, asylum refugees may apply for adjustment of status to lawful permanent residents, provided they meet certain conditions. *See id.* § 1159(b)-(c). Lawful permanent residents may apply for citizenship after five years of continuous residence. *Id.* § 1427(a).

[2] An alien is not eligible for withholding of removal if

"the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1231(b)(3)(A). However, "[t]he bar for withholding of removal is higher; an applicant must demonstrate that it is more likely than not that he would be subject to persecution on one of the [protected] grounds." *Ling Huang v. Holder*, 744 F.3d 1149, 1152 (9th Cir. 2014).

An alien may also seek protection under the Convention Against Torture ("CAT"), which requires the alien to prove that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal," 8 C.F.R. § 1208.16(c)(2), and that the torture would be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity," *id.* § 1208.18(a)(1). Though these latter two forms of relief require the applicant to meet a higher bar, they are mandatory rather than discretionary. *See Nuru v. Gonzales*, 404 F.3d 1207, 1216 (9th Cir. 2005).

### B.     Challenged Actions

On November 9, 2018, the federal government took two actions that are the subject of this dispute.

First, the Department of Justice ("DOJ") and Department of Homeland Security ("DHS") published a joint interim final rule, entitled "Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims" (the "Rule"). 83 Fed. Reg. 55,934 (Nov. 9, 2018) (to be codified at 8 C.F.R. pts. 208, 1003, 1208). The Rule adds an "[a]dditional

---

(i) the alien ordered, incited, assisted, or otherwise participated in the persecution of an individual because of the individual's race, religion, nationality, membership in a particular social group, or political opinion;
(ii) the alien, having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States;
(iii) there are serious reasons to believe that the alien committed a serious nonpolitical crime outside the United States before the alien arrived in the United States; or
(iv) there are reasonable grounds to believe that the alien is a danger to the security of the United States.

8 U.S.C. § 1231(b)(3)(B).

limitation on eligibility for asylum" that applies to "applications filed after November 9, 2018."

*Id.* at 55,952.  Under the Rule, an alien is categorically ineligible for asylum "if the alien is subject

to a presidential proclamation or other presidential order suspending or limiting the entry of aliens

along the southern border with Mexico that is issued pursuant to subsection 212(f) or 215(a)(1) of

the Act on or after November 9, 2018 and the alien enters the United States after the effective date

of the proclamation or order contrary to the terms of the proclamation or order." *Id.* (to be

codified at 8 C.F.R. §§ 208.13(c)(3), 1208.13(c)(3)).[3]

The Rule also amends the regulations governing credible fear determinations in expedited

removal proceedings.  "Although DHS has generally not applied existing mandatory bars to

asylum in credible-fear determinations,"[4] the Rule's bar applies in such proceedings.  83 Fed. Reg.

at 55,947.  Accordingly, for an alien subject to the new bar, "the asylum officer shall enter a

negative credible fear determination with respect to the alien's application for asylum." *Id.* (to be

codified at 8 C.F.R. § 208.30(e)(5)).  The asylum officer will then proceed to evaluate the alien's

claim for withholding of removal or protection under CAT by assessing whether the alien has

demonstrated a "reasonable fear of persecution or torture." *Id.*  If the asylum officer finds that this

standard is not met, the alien will be removed unless an immigration judge determines upon

review that (1) the alien is not actually subject to the categorical bar, i.e. did not enter in violation

of a presidential proclamation or order or (2) the alien satisfies the reasonable fear standard. *See*

*id.* (to be codified at 8 C.F.R. § 1208.30(g)(1)).

In promulgating the Rule, the agencies claimed exemption from the Administrative

Procedure Act's ("APA") notice-and-comment requirements. *See* 5 U.S.C. § 553(b)-(d).  In so

doing, they invoked § 553(a)(1)'s "military or foreign affairs function" exemption and

§ 553(b)(B)'s "good cause" exemption.  83 Fed. Reg. at 55,949-51.  They also invoked

---

[3] This categorical bar does not apply only if the Presidential proclamation or order contains an explicit exception to the bar.  *See* 83 Fed. Reg. at 55,952 (to be codified at 8 C.F.R. §§ 208.13(c)(3), 1208.13(c)(3)) ("This limitation on eligibility does not apply if the proclamation or order expressly provides that it does not affect eligibility for asylum, or expressly provides for a waiver or exception that makes the suspension or limitation inapplicable to the alien.").

[4] Under the current regulations, DHS places aliens subject to mandatory bars in full removal proceedings.  8 C.F.R. § 208.30(e)(5).

§ 553(d)(3)'s "good cause" waiver of the thirty-day grace period that is usually required before a newly promulgated rule goes into effect. *Id.* at 55,949-50. The Court discusses the proffered reasons for both the Rule and the waiver of § 553 requirements as relevant below.

Second, the President of the United States issued a presidential proclamation, entitled "Presidential Proclamation Addressing Mass Migration Through the Southern Border of the United States" (the "Proclamation").[5] Asserting the President's authority under the Immigration and Nationality Act, 8 U.S.C. §§ 1182(f), 1185(a), the Proclamation suspended "[t]he entry of any alien into the United States across the international boundary between the United States and Mexico" for ninety days. Proclamation § 1.[6] The Proclamation applies only to aliens who enter after its issuance, *id.* § 2(a), and expressly exempts "any alien who enters the United States at a port of entry and properly presents for inspection," *id.* § 2(b).

The combined effect of the Rule and the Proclamation is that any alien who enters the United States across the southern border at least over the next ninety days, except at a designated port of entry, is categorically ineligible to be granted asylum.

**C.      Procedural History**

That same day, the Immigration Organizations filed this lawsuit against Defendants,[7] ECF

---

[5] *See* Whitehouse.gov, *Presidential Proclamation Addressing Mass Migration Through the Southern Border of the United States*, (November 9, 2018), available at https://www.whitehouse.gov/presidential-actions/presidential-proclamation-addressing-mass-migration-southern-border-united-states/.

[6] The Proclamation expires earlier if the United States reaches "an agreement [that] permits the United States to remove aliens to Mexico in compliance with the terms of section 208(a)(2)(A) of the INA (8 U.S.C. [§] 1158(a)(2)(A))." Proclamation § 1. It may also extend for a longer period of time, however. The Proclamation requires the "Secretary of State, the Attorney General, and the Secretary of Homeland Security [to] jointly submit to the President . . . a recommendation on whether an extension or renewal of the suspension or limitation on entry in section 1 of this proclamation is in the interests of the United States." Proclamation § 2(d).

[7] Defendants are President Donald Trump, DOJ, Acting Attorney General Matthew Whitaker, the Executive Office for Immigration Review ("EOIR"), EOIR Director James McHenry, DHS, Secretary of Homeland Security Kirstjen Nielsen, U.S. Citizenship and Immigration Services ("USCIS"), USCIS Director Lee Cissna, Customs and Border Protection ("CBP"), CBP Commissioner Kevin McAleenan, Immigration and Customs Enforcement ("ICE"), and Acting ICE Director Ronald Vitiello. Compl. ¶¶ 13-27. Individual Defendants are sued in their official capacities.

United States District Court
Northern District of California

No. 1 ("Compl."), and immediately moved for a TRO, ECF No. 8.  The Organizations allege two claims: (1) a claim under 5 U.S.C. § 706(2), that the Rule is an invalid regulation because it is inconsistent with 8 U.S.C. § 1158, Compl. ¶¶ 101-106; and (2) a claim that Defendants violated the APA's notice-and-comment provisions, *see* 5 U.S.C. § 553, Compl. ¶¶ 107-110.

The case was assigned to the undersigned on November 13, 2018, and the Court set a hearing on the TRO for November 19, 2018.  ECF Nos. 9, 11.  Defendants filed their opposition on November 15, 2018, ECF No. 27, and the Immigration Organizations filed a reply on November 16, 2018, ECF No. 35.[8]  The Court also permitted the states of Washington, Massachusetts, New York, and California (the "States") to file an amicus brief in support of the TRO.  ECF No. 20.[9]  The Court likewise permitted the Immigration Reform Law Institute ("IRLI") to file an amicus brief in opposition.  ECF No. 37.

## II.   JURISDICTION

The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331.

## III.   THRESHHOLD CHALLENGES

### A.   Article III Standing

The Court addresses as a threshold matter the Immigration Organizations' standing to bring this lawsuit.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101-02 (1998).

#### 1.   Legal Standard

Article III standing requires that a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be

---

[8] The Immigration Organizations included declarations and other evidence with, and made a third party standing argument in, their reply that they did not submit with their opening brief.  Because Defendants neither objected to this material nor requested an opportunity to respond to it, the Court has considered the Immigration Organizations' reply brief in full.  *See Cincinnati Ins. Co. v. Harry Johnson Plumbing & Excavating Co.*, No. 4:16-CV-5090-LRS, 2017 WL 5639944, at *1 (E.D. Wash. Oct. 23, 2017) (affirming consideration of new evidence on reply when an opposing party did not object); *see also Quillar v. CDCR*, No. 2:04-CV-01203-KJM, 2012 WL 4210492, at *3 n.2 (E.D. Cal. Sept. 19, 2012) ("Plaintiff has not responded to Anderson's second declaration or moved to strike it despite having ample time."), *aff'd sub nom. Quillar v. Hill*, 582 F. App'x 736 (9th Cir. 2014).

[9] After the Court granted the motion for leave to file an amicus brief, the States failed to re-file the brief as a separate docket entry pursuant to the Court's order.  At the hearing, the Court deemed the brief filed without objection.

United States District Court
Northern District of California

redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). *Lujan*, 504 U.S. at 560).

Because "[t]he party invoking federal jurisdiction bears the burden of establishing these elements," they are "an indispensable part of the plaintiff's case." *Lujan*, 504 U.S. at 561. Accordingly, "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561. A TRO requires a "clear showing of each element of standing." *Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013). "At this very preliminary stage of the litigation, [the Immigration Organizations] may rely on the allegations in their Complaint and whatever other evidence they submitted in support of their TRO motion to meet their burden." *Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir.), *reconsideration en banc denied,* 853 F.3d 933 (9th Cir. 2017), and *reconsideration en banc denied,* 858 F.3d 1168 (9th Cir. 2017), and *cert. denied sub nom. Golden v. Washington*, 138 S. Ct. 448 (2017).[10]

Where, as here, an organization seeks to sue on its own behalf, rather than in a representative capacity, the Court "conduct[s] the same [standing] inquiry as in the case of an individual." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982); *see also* ECF No. 35 at 8 (relying on direct harm to Immigration Organizations); Compl. ¶¶ 78-100 (same).

### 2.    Discussion

Defendants argue that the Immigration Organizations lack a cognizable Article III injury. ECF No. 27 at 17-18. The Immigration Organizations respond that the Rule causes them injury because it impairs their funding, frustrates their missions, and forces them to divert resources to address the Rule's impacts. ECF No. 35 at 8-10.

---

[10] Where a party fails to establish standing to seek affirmative preliminary relief, such as a preliminary injunction, that failure "requires denial of the motion for preliminary injunction, not dismissal of the case." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015).

United States District Court
Northern District of California

These asserted injuries are the types of injuries alleged in *Havens*, 455 U.S. at 379. *Havens* involved the challenge by an equal-housing organization called HOME under the Fair Housing Act, 42 U.S.C. § 3604, to a realtor's "racial steering" practices, i.e., providing false information to prospective renters based on race. *Id.* at 366, 388. HOME alleged, on its own behalf, that the realtor's practices had "frustrated its efforts to assist equal access to housing through counseling and other referral services" and that the organization had been forced to respond by "devot[ing] significant resources to identify and counteract the defendant's [sic] racially discriminatory steering practices." *Id.* at 379 (alteration in original) (citation omitted). The Supreme Court agreed that if the alleged violations had "perceptibly impaired HOME's ability to provide counseling and referral services for low-and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact." *Id.* Further, the *Havens* Court explained, "[s]uch concrete and demonstrable injury to the organization's activities – with the consequent drain on the organization's resources – constitutes far more than simply a setback to the organization's abstract social interests." *Id.*

Following *Havens*, the Ninth Circuit has held that an organization may establish injury on its own behalf where "a challenged statute or policy frustrates the organization's goals and requires the organization 'to expend resources in representing clients they otherwise would spend in other ways.'" *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943 (9th Cir. 2011) (en banc) (quoting *El Rescate Legal Servs., Inc. v. Exec. Office of Immigration Review*, 959 F.2d 742, 748 (9th Cir. 1991)). But it has warned that "an organization cannot, of course, manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit." *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 903 (9th Cir. 2002) (citation omitted).

As a threshold matter, Defendants' arguments that *Havens* and its progeny apply with less force here are not persuasive. To the extent Defendants and IRLI suggest that these cases are limited to the FHA context, numerous Ninth Circuit cases demonstrate otherwise. *See, e.g.*, *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1035 (9th Cir. 2015) (lawsuit for violations of National Voter Registration Act); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1018 (9th Cir.

1    2013) (preemption challenge to state law restricting transportation of illegal aliens); *City of*

2    *Redondo Beach*, 657 F.3d at 940 (First Amendment challenge to city ordinance).  Nor is *Havens*'s

3    rule confined to cases where Congress confers a special "legally cognizable interest," such as

4    truthful information, upon the organization.  ECF No. 27 at 18; *see also* ECF No. 37 at 7.  In *Valle*

5    *de Sol*, for instance, plaintiffs argued that the state law was preempted by federal immigration law.

6    732 F.3d at 1012.  There was no suggestion that the Supremacy Clause or the immigration statutes

7    gave plaintiffs a right to operate aid programs.  *Cf. id.* at 1018.

8            As IRLI notes, some individual appellate judges have criticized certain applications of the

9    *Havens* test as impermissibly diluting the standing inquiry.  *See* ECF No. 37 at 6 (citing *People for*

10   *the Ethical Treatment of Animals v. U.S. Dep't of Agric.* ("*PETA*"), 797 F.3d 1087, 1099 (D.C.

11   Cir. 2015) (Millett, J., dubitante); *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 632 F. App'x

12   905, 908 (9th Cir. 2015) (Chhabria, J., concurring)); *see also Fair Hous. Council of San Fernando*

13   *Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1224 (9th Cir. 2012) (Ikuta, J., dissenting).  As an

14   initial matter, the Court is "bound to follow binding Ninth Circuit precedent unless the U.S.

15   Supreme Court or the Ninth Circuit en banc reverses course," *Siegal v. Gamble*, No. 13-CV-

16   03570-RS, 2016 WL 1085787, at *9 n.2 (N.D. Cal. Mar. 21, 2016); *see also Miller v. Gammie*,

17   335 F.3d 889, 893 (9th Cir. 2003) (en banc), so it cannot rest its ruling on expressions of doubt or

18   disagreement by individual panel members.  Regardless, the Court concludes the concerns raised

19   by those judges are not present here.

20           Primarily, those judges have expressed concern that the application of *Havens* "has drifted

21   away from the requirement that an organization actually suffer an injury."  *Fair Hous. Council*,

22   666 F.3d at 1225 (Ikuta, J., dissenting); *see also PETA*, 797 F.3d at 1101 (Millet, J., dubitante)

23   (explaining that the defendant agency had not "torn down, undone, devalued or otherwise

24   countermanded the organization's own activities," but rather had failed "to facilitate or subsidize

25   through governmental enforcement the organization's vindication of its own interests").  Judge

26   Ikuta, for instance, criticized prior cases finding that "an organization with a social interest in

27   advancing enforcement of a law was injured when the organization spent money enforcing that

28   law," reasoning that this was in fact the mission of the organization.  *Fair Hous. Council*, 666 F.3d

United States District Court
Northern District of California

10

at 1226.  Nonetheless, Judge Ikuta agreed that the Ninth Circuit has "correctly recognized that organizations have standing to sue on their own behalf when a defendant's actions impair the organization's ability to function as an organization," such as by impairing its "interest in recruiting members, obtaining funding, or collecting dues."  *Id.* at 1224-25.  In her view, *Havens* represented an equally cognizable form of impairment, where an organization's "purpose is to provide a specified type of service and a defendant's actions hinder the organization from providing that core service."  *Id.* at 1225.

The Court distills two warnings from these critiques.  First, there are doubts whether the frustration of an organization's mission is a concrete harm unless "a defendant's actions impair the organization's ability to function as an organization" by inhibiting the organization's acquisition of resources – such as members or funding – or by "hinder[ing] the organization from providing [its] core service."  *Id.* at 1225; *see also Animal Legal Defense Fund*, 632 F. App'x at 909 (Chabria, J., concurring) (suggesting that Ninth Circuit precedent should be read "to require the organization to show that it was 'forced' to divert resources to avoid or counteract an *injury to its own ability to function*" (emphasis added) (quoting *City of Redondo Beach*, 657 F.3d at 943)).  Second, there are similar concerns that the organization's diversion of resources must be to efforts that are outside of the organization's "core" services, rather than redirecting from one core organizational priority to another.  *Fair Hous. Council*, 666 F.3d at 1225.

Here, the Immigration Organizations have demonstrated the requisite organizational injury.  First, their mission has been frustrated in numerous cognizable ways.  The record reveals that the government has an established policy of limiting the number of people who may present asylum claims at ports of entry – called "metering" – and that this policy currently results in lengthy delays, some eclipsing six weeks.  *See, e.g.*, ECF No. 8-4 ¶¶ 32-34; ECF No. 19-1 at 6-10; No. 35-3 at 17-28; ECF No. 35-4 ¶¶ 5-9; ECF No. 35-5 ¶¶ 5-7.  Under this practice, border officials at official ports of entry turn away asylum seekers and other migrants and force them to return at a later date.  ECF No. 35-3 at 17 (quoting DHS Secretary Kirstjen Nielsen).  The record further establishes that unaccompanied children seeking asylum, who are among the Immigration Organizations' clients, are entirely barred from presenting their claims at a port of entry.  *See* ECF

No. 35-8 ¶¶ 4, 10, 13.  Because of the Rule, the Organizations' clients with potentially meritorious asylum claims are significantly delayed or wholly unable to pursue those claims, which are the Organizations' core service.  The inability of an organization's constituency to gain access to or participate in the organization's core services is a well-recognized impairment of an organization's ability to function.  The en banc Ninth Circuit recognized such an injury to day-laborer organizing entities in *City of Redondo Beach*, where a local ordinance prohibiting public solicitation of employment prevented day laborers from making their availability known and discouraged potential employers from hiring them.  657 F.3d at 943.

Moreover, the Immigration Organizations' funding is directly tied to their ability to pursue affirmative asylum claims on a per-case basis.  *See* ECF No. 8-3 ¶ 7; ECF No. 8-4 ¶ 11; ECF No. 8-7 ¶¶ 15-16.  The Rule's impairment of the Organizations' ability to pursue asylum cases therefore impairs their functioning by jeopardizing their funding, an independently sufficient injury.  *See Constr. Indus. Ass'n of Sonoma Cty. v. City of Petaluma*, 522 F.2d 897, 903 (9th Cir. 1975) (holding that a construction association suffered cognizable injury from a "restriction on building" where its members "contribute[d] dues to the Association in a sum proportionate to the amount of business the builders d[id] in the area").

Second, the Immigration Organizations have been forced to respond by diverting resources to efforts that exceed the scope of their core services.  Plaintiff Al Otro Lado, for instance, has expended significant staff resources to accompany its minor clients full-time in order to safeguard them from various dangers in border towns.  ECF No. 35-8 ¶¶ 14-16; *see also* ECF No. 8-4 ¶¶ 38-40; ECF No. 35-3 ¶ 5.  This is sufficient to satisfy *Havens*.  *See City of Redondo Beach*, 657 F.3d at 943 (finding sufficient diversion of "time and resources spent in assisting day laborers during their arrests and meeting with workers about the status of the ordinance would have otherwise been expended toward [the organization's] core organizing activities").[11]  Moreover, to the extent

---

[11] Because the Court concludes that the expenditure of resources on non-legal services to protect clients is sufficiently outside of Al Otro Lado's core services, it need not reach the question whether the reallocation of resources from asylum claims to other forms of immigration relief or retraining its personnel falls outside of the Immigration Organizations' core services.  *But see Valle de Sol*, 732 F.3d at 1018 (relying on diversion of "staff and resources to educating [organization's] members about the [challenged] law").

that the Immigration Organizations will simply have fewer resources because of a loss of funding, an additional showing of diversion is unnecessary.  *See City of Petaluma*, 522 F.2d at 903.

Defendants' remaining standing argument appears to be that Plaintiffs' harms are "self-inflicted" or "speculative."  ECF No. 27 at 17.  As to the self-inflicted point, *Havens* and similar cases recognize that the diversion of resources to avoid injury to the organization's interests is not truly voluntary for the purposes of injury.  Further, *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), does not support Defendants' position.  There, the Supreme Court rejected as inadequate for Article III plaintiffs' "highly speculative fear" that the government would (1) ever seek to intercept communications from plaintiffs' foreign clients, (2) do so based on the type of surveillance challenged; (3) have its request authorized by a court; (4) successfully obtain communications; and (5) obtain specific communications that involved plaintiffs.  *Id.* at 410. Because this fear of intercepted communications was too speculative, plaintiffs' use of resources to take precautions against that surveillance was likewise not cognizable.  *Id.* at 416 ("In other words, respondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending.").  Here, the Immigration Organizations' fears have already materialized because, as described above, their function is currently impaired by the Rule.  Moreover, given the demonstrated obstacles to pursuing asylum cases under the current regime, the Court also finds that the Immigration Organizations' loss of per-case funding is certainly impending.

Accordingly, the Court concludes that the Immigration Organizations have made a clear showing of a cognizable injury.  Though not challenged by Defendants, the Court further finds that these injuries are fairly traceable to the Rule and likely to be redressed by the relief sought.

**B.    Third-Party Standing**

The Immigration Organizations further argue that they have third-party standing to assert the legal rights of their clients "who are seeking to enter the country to apply for asylum but are being blocked by the new asylum ban."  ECF No. 35 at 13.

**1.    Legal Standard**

The default rule is that "a litigant must assert his or her own legal rights and interests, and

cannot rest a claim to relief on the legal rights or interests of third parties." *Powers v. Ohio*, 499 U.S. 400, 410 (1991). In order to depart from that rule and assert a third party's right: (1) "[t]he litigant must have suffered an 'injury in fact'"; (2) "the litigant must have a close relationship to the third party"; and (3) "there must exist some hindrance to the third party's ability to protect his or her own interests." *Id.* at 410-11 (citation omitted).

## 2.     Discussion

The Court concludes that the Immigration Organizations have third-party standing to assert their clients' interests.

First, as discussed above, the Organizations have adequately demonstrated an injury in fact.

Second, the Organizations' attorney-client relationship is "one of special consequence," which the Supreme Court has recognized as sufficient to support third-party standing. *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 n.3 (1989); *see also U.S. Dep't of Labor v. Triplett*, 494 U.S. 715, 720 (1990) ("A restriction upon the fees a lawyer may charge that deprives the lawyer's prospective client of a due process right to obtain legal representation falls squarely within this principle."). Moreover, the Organizations rely on an "existing attorney-client relationship," rather than a "hypothetical" one with "as yet unascertained" clients. *Kowalski v. Tesmer*, 543 U.S. 125, 131 (2004).

Finally, the Court has little difficulty finding a "genuine obstacle" to the Organizations' clients asserting their own rights. *See Singleton v. Wulff*, 428 U.S. 106, 116 (1976) ("If there is some genuine obstacle to such assertion, however, the third party's absence from court loses its tendency to suggest that his right is not truly at stake, or truly important to him, and the party who is in court becomes by default the right's best available proponent."). As discussed above, the record is replete with reports of the government preventing asylum-seekers from presenting themselves at ports of entry to begin the asylum process, including DHS Secretary Nielsen's own statement confirming that this is the government's official practice. *See, e.g.*, ECF No. 35-3 at 17-28. In addition to these delays, Plaintiff Al Otro Lado submitted a declaration stating that its unaccompanied minor clients are categorically barred from applying at ports of entry. ECF No.

United States District Court
Northern District of California

¶¶ 4-5, 10.  Nor do the Organizations' clients have other avenues for review.  At the hearing, the Organizations asserted, and Defendants did not dispute, that asylum seekers whose applications were denied on the basis of the Rule would be unable to litigate the lawfulness of the Rule in their immigration proceedings or otherwise.[12]

*Powers* explains that a court must consider whether third parties will be able to vindicate their rights "[a]s a practical matter."  499 U.S. at 414.  *Powers* involved a facially available remedy, as a juror excluded for racial reasons *could* bring such a suit but would often lack the incentive to do so or overcome certain difficulties of proof.  *Id.*  Where, as here, the practical difficulties involve the ability, rather than incentive to assert rights, the obstacle is even greater. Moreover, the Court must consider the time-sensitive nature of the claims.  *See Singleton*, 428 U.S. at 117.  Asylum seekers' claims naturally carry with them some urgency, which is only compounded by the dangerous conditions in border towns.  *See* ECF No. 35-8 ¶¶ 14-15.  If the Immigration Organizations are not permitted to raise their clients' rights, their clients may never have the chance to do so.  *See* ECF No. 8-4 ¶¶ 38-39 (noting record-high murder rate in border town and past instances where "[a]sylum seekers turned back from a port of entry have been kidnapped and held for ransom by cartel members waiting outside").

The Court therefore concludes that the Immigration Organizations have standing to assert their clients' rights.

### C.     Statutory Standing/Zone of Interests

Defendants also argue that Immigration Organizations do not come within the "zone of interests" of the statutes on which their claims are based.  ECF No. 27 at 18-20.

### 1.     Legal Standard

The zone-of-interests test requires a court "to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014).  A court "presume[s] that a statute ordinarily provides a cause of action 'only to plaintiffs

---

[12] The Court reaches no independent conclusion on this point but accepts the parties' assertion for purposes of this motion.

whose interests fall within the zone of interests protected by the law invoked.'" *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1302 (2017) (quoting *Lexmark*, 572 U.S. at 129).

Here, the Immigration Organizations allege claims under the APA.  *See* Compl. ¶¶ 101, 106, 108-109.  The APA provides a cause of action to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute."  5 U.S.C. § 702.  The relevant zone of interests is not that of the APA itself, but the underlying statute.  *See Havasupai Tribe v. Provencio*, 906 F.3d 1155, 1166 (9th Cir. 2018).

 "[I]n the APA context, . . . the test is not 'especially demanding.'"  *Lexmark*, 572 U.S. at 130 (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012)).  Rather, the Supreme Court has "conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff," and has explained that it "forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that' Congress authorized that plaintiff to sue."  *Id.* (quoting *Match-E-Be-Nash-She-Wish Band*, 567 U.S. at 225)).  But "what comes within the zone of interests of a statute for purposes of obtaining judicial review of administrative action under the 'generous review provisions' of the APA may not do so for other purposes."  *Bennett v. Spear*, 520 U.S. 154, 163 (1997) (citation omitted).  The Court must answer this question "not by reference to the overall purpose of the Act in question," but by interpreting "the statutory provision whose violation forms the legal basis for [the] complaint."  *Id.* at 175-76 (emphasis and citation omitted).

### 2.     Discussion

Litigants with third-party standing may satisfy the zone-of-interests inquiry by reference to the third parties' rights.  *See FAIC Secs., Inc. v. United States*, 768 F.2d 352, 357-58 (D.C. Cir. 1985) (Scalia, J.).

Because the Immigration Organizations are asserting the rights of their clients as potential asylum seekers, they easily satisfy the APA's lenient zone-of-interests inquiry.  *See Match-E-Be-Nash-She-Wish Band*, 567 U.S. at 225; *Patel v. U.S. Citizenship & Immigration Servs.*, 732 F.3d 633, 636 (6th Cir. 2013) ("Given that § 1153(b)(3) expressly provides for issuance of employment

United States District Court
Northern District of California

visas directly to qualified aliens, it is arguable, to say the least, that a qualified alien who wants an employment visa is within that provision's zone of interests."); *Doe v. Trump*, 288 F. Supp. 3d 1045, 1068 (W.D. Wash. 2017) (finding that because "[m]aking provisions for the resettlement and absorption of refugees into the United States is the core mission of" plaintiff social service organizations, those "organizations' interests in effectuating refugee resettlement and absorption falls within the zone of interest protected by the INA and the Refugee Act of 1980").

## IV.    MOTION FOR TEMPORARY RESTRAINING ORDER

### A.    Legal Standard

The Court applies a familiar four-factor test on both a motion for a temporary restraining order and a motion for a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n. 7 (9th Cir. 2001). A plaintiff seeking either remedy "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)). Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

To grant preliminary injunctive relief, a court must find that "a certain threshold showing [has been] made on each factor." *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011) (per curiam). Assuming that this threshold has been met, "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

### B.    Likelihood of Success on the Merits

As an initial matter, the parties agree that the Proclamation does not render any alien ineligible for asylum. ECF No. 27 at 31; ECF No. 35 at 18. On that understanding, the Immigration Organizations have clarified that they do not challenge the Proclamation as exceeding

17

United States District Court
Northern District of California

the President's authority under 8 U.S.C. § 1182(f).  ECF No. 35 at 18-19.  This case therefore does not present the question whether 8 U.S.C. § 1182(f) authorizes the President to directly limit asylum eligibility by proclamation.

### 1.    Validity of the Rule

The Immigration Organizations' claim that the Rule is inconsistent with the statute presents a straightforward question of statutory interpretation.[13]  Does Congress's grant of rulemaking authority in 8 U.S.C. § 1158(b)(2)(C) permit the Attorney General to adopt a categorical bar to asylum *eligibility* based on a characteristic that Congress specified does not impact an alien's ability to *apply* for asylum?

### a.    Legal Standard

Where a plaintiff alleges that, as a result of an erroneous legal interpretation, the agency's action was "not in accordance with the law," 5 U.S.C. § 706(2)(A), or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), courts apply the framework for review first established in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  *See Nw. Envtl. Advocates v. U.S. E.P.A.*, 537 F.3d 1006, 1014 (9th Cir. 2008).

Under *Chevron*, the Court considers "whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter." *Campos-Hernandez v. Sessions*, 889 F.3d 564, 568 (9th Cir. 2018) (quoting *Chevron*, 467 U.S. at 842).  In other words, the Court asks "whether, 'applying the normal tools of statutory construction,' the statute is ambiguous." *Sung Kil Jang v. Lynch*, 812 F.3d 1187, 1190 (9th Cir. 2015) (quoting *INS v. St. Cyr*, 533 U.S. 289, 321 n.4 (2001)).  Second, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Campos-Hernandez*, 889 F.3d at 568 (quoting *Chevron*, 467 U.S. at 843).[14]

---

[13] At the hearing, the parties agreed that resolution of this question is entirely separate from the validity or sufficiency of the justifications for the Rule.

[14] The *Chevron* framework applies here because (1) "it appears that Congress delegated authority to the agency generally to make rules carrying the force of law," and (2) "the agency interpretation claiming deference was promulgated in the exercise of that authority." *Marmolejo-Campos v. Holder*, 558 F.3d 903, 908 (9th Cir. 2009) (en banc) (quoting *United States v. Mead Corp.*, 533

### b.     Discussion

"The first and most important canon of statutory construction is the presumption 'that a legislature says in a statute what it means and means in a statute what it says there.'" *In re Pangang Grp. Co., LTD.*, 901 F.3d 1046, 1056 (9th Cir. 2018) (quoting *Conn. Nat. Bank v. Germain*, 503 U.S. 249, 253 (1992)).  A court "must read the words in their context and with a view to their place in the overall statutory scheme." *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015) (citation omitted).

In 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009-546, which "abolished the distinction between exclusion and deportation procedures and created a uniform proceeding known as 'removal.'" *Vartelas v. Holder*, 566 U.S. 257, 262 (2012).  "Congress made 'admission' the key word, and defined admission to mean 'the lawful entry of the alien into the United States after inspection and authorization by an immigration officer.'" *Id.* (quoting 8 U.S.C. § 1101(a)(13)(A)).  As part of IIRIRA, Congress provided that "[a]n alien present in the United States without being admitted or paroled, or who *arrives in the United States at any time or place other than as designated by the Attorney General*, is inadmissible." 8 U.S.C. § 1182(6)(A)(i) (emphasis added).  Aliens who enter illegally are therefore inadmissible under IIRIRA. *See id.*

However, separately from the question of admissibility, Congress has clearly commanded that immigrants be eligible for asylum regardless of where they enter.  Prior to IIRIRA, asylum was potentially available to "an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status." 8 U.S.C. § 1158(a) (1980).  In IIRIRA, Congress amended § 1158(a) to provide that "[a]ny alien who is physically present in the United States or who arrives in the United States (*whether or not at a designated port of arrival* and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance" with § 1158 and § 1225(b).  8 U.S.C. § 1158(a) (emphasis added).[15]  In short, Congress's amendment to

---

U.S. 218, 226-27 (2001)).  The Court notes, however, that Defendants do not claim that the Rule is entitled to *Chevron* deference.

[15] Congress also amended 8 U.S.C. § 1225(a)(1) in substantially the same manner, providing that

§ 1158(a) specifically captured within its scope all aliens who violated § 1182(6)(A)(i).  Congress provided that this violation would render those aliens inadmissible but would have no effect on their ability to apply for asylum.

Congress's determination that place of entry not be disqualifying to an application for asylum is consistent with the treaty obligations underlying § 1158's asylum provisions.  Congress enacted the Refugee Act of 1980, including 8 U.S.C. § 1158, "to bring United States refugee law into conformance with the 1967 United Nations Protocol Relating to the Status of Refugees, 19 U.S.T. 6223, T.I.A.S. No. 6577, to which the United States acceded in 1968."  *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 436-37 (1987).  "The Protocol incorporates the substantive provisions of Articles 2 through 34 of the United Nations Convention Relating to the Status of Refugees (the Convention), July 5, 1951, 189 U.N.T.S. 150."  *Delgado v. Holder*, 648 F.3d 1095, 1100 (9th Cir. 2011) (en banc).  Because the Protocol is not "self-executing," it "does not have the force of law in American courts."  *Khan v. Holder*, 584 F.3d 773, 783 (9th Cir. 2009).  Nonetheless, it provides "a useful guide in determining congressional intent in enacting the Refugee Act."  *Id.* (citation omitted); *see also Cardoza-Fonseca*, 480 U.S. at 436-37.

Of particular relevance here, Article 31 of the Protocol provides:

> The Contracting States shall not impose penalties, *on account of their illegal entry or presence*, on refugees who, coming directly from a territory where their life or freedom was threatened in the sense of [A]rticle 1, enter or are present in their territory without authorization, provided they present themselves without delay to the authorities and show good cause for their illegal entry or presence.

19 U.S.T. at 6275 (emphasis added).

Considering the text and structure of the statute, as well as the interpretive guide of the U.N. Protocol, reveals Congress's unambiguous intent.  The failure to comply with entry requirements such as arriving at a designated port of entry should bear little, if any, weight in the asylum process.  The Rule reaches the opposite result by adopting a categorical bar based solely

---

"[a]n alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters) shall be deemed for purposes of this chapter an applicant for admission."  Inadmissible aliens are generally placed in full removal proceedings.  *See* §§ 1225(b)(2)(A), 1229.

United States District Court
Northern District of California

on the failure to comply with entry requirements.

Defendants maintain that the Rule is nonetheless "consistent with" the statute. § 1158(b)(2)(C).  First, Defendants contend that even if Congress unambiguously stated that manner of entry has no effect on an alien's ability to *apply* for asylum, it can be the *sole* factor by which the alien is *rendered ineligible*.  ECF No. 27 at 26-27.  The argument strains credulity.  To say that one may *apply* for something that one has no right to *receive* is to render the right to apply a dead letter.  There simply is no reasonable way to harmonize the two.

Clearly, the Attorney General may deny eligibility to aliens authorized to apply under § 1158(a)(1), whether through categorical limitations adopted pursuant to § 1158(b)(2)(C) or by the exercise of discretion in individual cases.[16]  But Congress's judgment that manner of entry should have no impact on ability to apply necessarily implies some judgment that manner of entry should not be the basis for a categorical bar that would render § 1158(a)(1)'s terms largely meaningless.  Basic separation of powers principles dictate that an agency may not promulgate a rule or regulation that renders Congress's words a nullity.  *Mohasco Corp. v. Silver*, 447 U.S. 807, 825 (1980) ("As we have held on prior occasions, [an agency's] 'interpretation' of the statute cannot supersede the language chosen by Congress.").

Next, Defendants argue that because the agency is permitted to give manner of entry *some* weight, *see Matter of Pula*, 19 I & N. Dec. at 474, then Defendants could give it *conclusive* weight.  ECF No. 27 at 28-29.  As with Defendants' prior argument, this one fails because it runs headlong into the contrary language of the statute.  And Defendants' reliance on *Lopez v. Davis*, 531 U.S. 230 (2001), is misplaced.  Though *Lopez* approved the Bureau of Prisons' categorical

---

[16] For this reason, many of Defendants' arguments are based on strawmen.  The Immigration Organizations do not argue that the Attorney General cannot adopt *any* limits that render ineligible aliens who are authorized to apply for asylum.  *Cf.* ECF No. 27 at 27-28.  Nor do the Immigration Organizations argue that the statute prohibits the Attorney General from adopting categorical bars that do not conflict with § 1158(a)'s text and Congress's underlying judgment.  *See* ECF No. 35 at 19.  Therefore, it is immaterial that the Attorney General has previously adopted a categorical bar on fraud in the application.  *See* ECF No. 27 at 30 (citing *Nijjar v. Holder*, 689 F.3d 1077, 1082 (9th Cir. 2012)).  It is difficult, moreover, to see much conflict with the statute posed by a limitation that permits termination of asylum if "[t]here is a showing of fraud in the alien's application such that he or she was not eligible for asylum at the time it was granted," 8 C.F.R. § 208.24(a)(1), which simply reinforces the eligibility criteria that are already in place.

United States District Court
Northern District of California

rule denying early release to certain prisoners, *id.* at 243-44, the rule in "*Lopez* applies only when Congress has not spoken to the precise issue and the statute contains a gap." *Toor v. Lynch*, 789 F.3d 1055, 1064 (9th Cir. 2015) (citation omitted).  Congress has done so here.

Not only does the Rule flout the explicit language of the statute, it also represents an extreme departure from prior practice.  The BIA had previously held that the "manner of entry or attempted entry is a proper and relevant discretionary factor to consider," but that "it should not be considered in such a way that the practical effect is to deny relief in virtually all cases."  *Matter of Pula*, 19 I. & N. Dec. 467, 473 (BIA 1987).  Numerous Circuits have approved of *Matter of Pula* and have further emphasized that illegal entry deserves little weight in the asylum inquiry.  *See, e.g.*, *Hussam F. v. Sessions*, 897 F.3d 707, 718 (6th Cir. 2018) ("Here, Petitioner certainly should have been more forthcoming with immigration officials.  But under *Pula*, the Board's analysis may not begin and end with his failure to follow proper immigration procedures."); *Zuh v. Mukasey*, 547 F.3d 504, 511 n.4 (4th Cir. 2008); *Huang v. I.N.S.*, 436 F.3d 89, 100 (2d Cir. 2006) ("As with peripheral embellishments, if illegal manner of flight and entry were enough independently to support a denial of asylum, we can readily take notice, from the facts in numerous asylum cases that come before us, that virtually no persecuted refugee would obtain asylum.  It follows that Wu's manner of entry, on the facts in this record, could not bear the weight given to it by the IJ.").  In particular, the Ninth Circuit has repeatedly observed that in exercising discretion to grant asylum, the agency should take into account that bona fide asylum seekers may feel compelled to violate immigration laws "to gain entry to a safe haven," and "that deception 'does not detract from but supports [a] claim of fear of persecution.'"  *Mamouzian v. Ashcroft*, 390 F.3d 1129, 1138 (9th Cir. 2004) (quoting *Akinmade v. I.N.S.*, 196 F.3d 951, 955 (9th Cir. 1999)); *Gulla v. Gonzales*, 498 F.3d 911, 917 (9th Cir. 2007) (same).  True, consideration of this admittedly unweighty factor, in conjunction with other factors, might lead to denial of asylum in an individual case.  But that does not make Congress's command in § 1158(a) ambiguous.

Finally, Defendants suggest that, even if the manner of entry deserves little weight as a general matter, violation of a Presidential proclamation is of particularly grave consequence and is therefore distinct from an "ordinary" entry violation.  The asserted distinction is not supported by

United States District Court
Northern District of California

evidence or authority.  And if what Defendants intend to say is that the President by proclamation can override Congress's clearly expressed legislative intent, simply because a statute conflicts with the President's policy goals, the Court rejects that argument also.  No court has ever held that § 1182(f) "allow[s] the President to expressly override particular provisions of the INA."  *Trump v. Hawaii*, 138 S. Ct. 2392, 2411 (2018).

Furthermore, the Court observes that the Rule itself actually gives the President the ability to issue even more restrictive proclamations that would then be given conclusive weight in the asylum context.  At the moment, aliens may enter and apply for asylum only because the current Proclamation expressly says so.  *See* Proclamation § 2(b).  By simply incorporating by reference any future proclamations, the Rule gives the President plenary authority to halt asylum claims entirely along the southern border, subject only to the requirements of § 1182(f).

There is little reason to think Congress intended this result.  Congress located the President's authority to suspend entry in § 1182, which governs admissibility, not asylum.  To the extent that Congress delegated authority to limit asylum eligibility, it conferred that authority on the Attorney General, who, unlike the President, is subject to the procedural requirements of the APA.  *See Franklin v. Massachusetts*, 505 U.S. 788, 800 (1992).  When Congress wanted to delegate authority directly to the President in immigration matters, it did so.  *See, e.g.*, 8 U.S.C. § 1182(f); *cf. Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 173 (1993) ("The reference to the Attorney General in the statutory text [of 8 U.S.C. § 1253(h)(1) (1988)] is significant not only because that term cannot be reasonably construed to describe either the President or the Coast Guard, but also because it suggests that it applies only to the Attorney General's normal responsibilities in the INA.").  Here, it did not.  "In such circumstances, the President may still give directions to executive agencies, and he can usually fire a recalcitrant agency head.  But he cannot take away the agency's statutory authority or exercise it himself."  *Main St. Legal Servs., Inc. v. Nat'l Sec. Council*, 811 F.3d 542, 558 (2d Cir. 2016).  This too, is unambiguously foreclosed by the statute.

Accordingly, for the foregoing reasons, the Court concludes that the Immigration Organizations are likely to succeed on the merits of their 5 U.S.C. § 706(2) claim.

### 2.   Notice-and-Comment Requirements

Because the Immigration Organizations are likely to succeed on the merits of their claim that the Rule is invalid, the Court need not reach their notice-and-comment claim in order to grant relief.  Nonetheless, mindful of the preliminary stage of the proceedings, the Court analyzes this additional basis for standing.

### a.   Legal Standard

The APA requires agencies to publish notice of proposed rules in the Federal Register and then allow "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation."  5 U.S.C. § 553(c).  "The essential purpose of according [§] 553 notice and comment opportunities is to reintroduce public participation and fairness to affected parties after governmental authority has been delegated to unrepresentative agencies."  *Batterton v. Marshall*, 648 F.2d 694, 703 (D.C. Cir. 1980).  Accordingly, agencies may not treat § 553 as an empty formality.  Rather, "[a]n agency must consider and respond to significant comments received during the period for public comment."  *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015).  It is therefore "antithetical to the structure and purpose of the APA for an agency to implement a rule first, and then seek comment later."  *United States v. Valverde*, 628 F.3d 1159, 1164 (9th Cir. 2010) (citation omitted).

These purposes apply with particular force in important cases.  As Judge Posner has stated, "[t]he greater the public interest in a rule, the greater reason to allow the public to participate in its formation."  *Hoctor v. U.S. Dep't of Agric.*, 82 F.3d 165, 171 (7th Cir. 1996).[17]

Nonetheless, the APA contains some limited exceptions to the notice-and-comment requirements.  As relevant here, § 553 does not apply "to the extent that there is involved – a . . .

---

[17] Indeed, the Congressional Research Service has explained that "[a]lthough the APA sets the minimum degree of public participation the agency must permit, [matters] of great importance, or those where the public submission of facts will be either useful to the agency or a protection to the public, should naturally be accorded more elaborate public procedures."  Vanessa K. Burrows & Todd Garvey, Cong. Research Serv., R41546, A Brief Overview of Rulemaking and Judicial Review 1 (2011) (internal quotation marks and citation omitted).

United States District Court
Northern District of California

foreign affairs function of the United States."  5 U.S.C. § 553(a)(1).  In addition, an agency need not comply with notice and comment when it "for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest."  *Id.* § 553(b)(B).

Section 553(d) also provides that a promulgated final rule shall not go into effect for at least thirty days.  Independently of this good-cause exception to notice and comment, an agency may also waive this grace period "for good cause found and published with the rule."  *Id.* § 553(d)(3).

An agency's legal conclusions regarding whether § 553 notice-and-comment procedures are required are not entitled to deference.  *Reno-Sparks Indian Colony v. E.P.A.*, 336 F.3d 899, 909 n.11 (9th Cir. 2003); *see also Sorenson Commc'ns Inc. v. F.C.C.*, 755 F.3d 702, 706 (D.C. Cir. 2014) ("[O]ur review of the agency's legal conclusion of good cause is de novo.").

### b.    Foreign Affairs

The Rule invokes the foreign affairs exception, stating that "Presidential proclamations . . . at the southern border necessarily implicate our relations with Mexico, including sensitive and ongoing negotiations with Mexico about how to manage our shared border."  83 Fed. Reg. at 55,950.  Accordingly, the Rule explains, the then-anticipated proclamation "would be inextricably related to any negotiations over a safe-third-country agreement . . . , or other similar arrangements," and the Rule would be "an integral part of ongoing negotiations with Mexico and Northern Triangle countries over how to address the influx of tens of thousands of migrants."  *Id.*

The Court cannot accept the Rule's first assumption that a relationship to Presidential proclamations regarding immigration "*necessarily* implicate[s]" the foreign affairs exception.  *Id.* (emphasis added).  In *Yassini v. Crosland*, the Ninth Circuit cautioned that "[t]he foreign affairs exception would become distended if applied to [an immigration enforcement agency's] actions generally, even though immigration matters typically implicate foreign affairs."  618 F.2d 1356, 1360 n.4 (9th Cir. 1980) (per curiam).  Accordingly, the Ninth Circuit stated that in those cases, "[f]or the exception to apply, the public rulemaking provisions should provoke definitely undesirable international consequences."  *Id.*  Other Circuits have likewise warned that the foreign

affairs exception cannot be given too much breadth in the immigration context. *See City of New York v. Permanent Mission of India to United Nations*, 618 F.3d 172, 202 (2d Cir. 2010) ("While immigration matters typically implicate foreign affairs at least to some extent, it would be problematic if incidental foreign affairs effects eliminated public participation in this entire area of administrative law." (internal quotation marks and citation omitted)); *Jean v. Nelson*, 711 F.2d 1455, 1478 (11th Cir. 1983) ("Not every request for international cooperation seriously may be called 'foreign policy.'"), *dismissed in relevant part as moot*, 727 F.2d 957, 984 (11th Cir. 1984) (en banc). As the Second Circuit observed, "[t]his approach accords with Congress's admonition in the legislative history of the APA not to interpret the phrase ' "foreign affairs function" . . . loosely . . . to mean any function extending beyond the borders of the United States.'" *City of New York*, 618 F.3d at 202 (quoting S. Rep. No. 79-752, at 13 (1945)). Therefore, that the Rule addresses entry and asylum does not, standing alone, immunize it from notice and comment. *Cf. Doe v. Trump*, 288 F. Supp. 3d 1045, 1075 (W.D. Wash. 2017) (observing that "8 C.F.R. part 207, the regulations implementing the Refugee Act of 1980, and subsequent amendments . . . were subject to notice and comment before they were codified" (citing Aliens and Nationality; Refugee and Asylum Procedures, 46 Fed. Reg. 45,116 (Sept. 10, 1981)).

The Rule also states that it represents "an integral part of ongoing negotiations" with Mexico and the Northern Trainable countries regarding migrants. 83 Fed. Reg. at 55,950. Defendants assert that the foreign affairs exception therefore applies because the Rule is "linked intimately with the Government's overall political agenda concerning relations with another country." ECF No. 27 at 25 (quoting *Am. Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States*, 751 F.2d 1239, 1249 (Fed. Cir. 1985)); *see also Yassini*, 618 F.2d at 1360 (analyzing whether the agency official was "in effect announcing his own foreign policy, or merely implementing the expressed foreign policy of the President"). The Court accepts for the purposes of argument that the Rule was part of the President's larger coordinated effort in the realm of immigration.

But the Court must also consider the counterfactual, namely, whether "definitely undesirable international consequences" would result from following rulemaking procedures.

*Yassini*, 618 F.2d at 1360 n.4.[18]  Defendants rely on *Rajah v. Mukasey*, where the Second Circuit found obvious undesirable consequences that would result from rulemaking regarding the agency's designation of specific groups of aliens as required to register under a post-September 11th data collection program.  544 F.3d 427, 437 (2d Cir. 2008).  Publicly debating why certain nations' citizens posed a greater threat risked compromising sensitive intelligence, impairing relationships with those countries, and unduly slowing the response to potential terrorist attacks.  *Id.*  However, Defendants do not explain how information that would be revealed through the rulemaking process would harm foreign policy interests.

Instead, Defendants' argument reduces to the need for speed and flexibility in the President's ongoing negotiations with Mexico and other countries.  *See* ECF No. 27 at 25 (explaining that harm would result "because large numbers of aliens are transiting through Mexico *right now* and Mexico's prompt help in addressing the situation is needed immediately").  Defendants do not say in their opposition, and were unable to explain at the hearing, how eliminating notice and comment would assist the United States in its negotiations.  And it cannot be the case that simply stating that something will have an effect makes that effect likely or even possible, particularly where there is no apparent logical connection between dispensing with notice and comment and achieving a foreign affairs goal.  Pending further information produced in the administrative record, the Court concludes that at this preliminary stage, there are at least

---

[18] The Court agrees with Defendants that, unlike with the good cause exception, 5 U.S.C. § 553(a)(1) does not require the agency to state the reasons for the foreign affairs exception in the published rule.  ECF No. 27 at 25; *cf.* § 553(b)(B) ("[W]hen the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) . . . ."  The Second Circuit's statement that an agency has no obligation to state its reasons in the rule "when the consequences are seemingly as evident," as in *Rajah*, therefore adds nothing to the analysis. 544 F.3d at 437.

Nonetheless, when the use of the exception is challenged by litigation, courts have generally required the agency to defend the applicability of the exception by pointing to evidence of undesirable foreign policy consequences.  *See, e.g.*, *Yassini*, 618 F.2d at 1360 n.4; *Jean*, 711 F.2d at 1478 (emphasizing that "[t]he government at trial offered no evidence of undesirable international consequences that would result if rulemaking were employed"); *Doe v. Trump*, 288 F. Supp. 3d 1045, 1076 (W.D. Wash. 2017) ("The court is simply unwilling to apply the exception without some evidence to support its application."); *but see Raoof v. Sullivan*, 315 F. Supp. 3d 34, 44 (D.D.C. 2018) (reasoning that regulation of exchange visitor program "certainly relates to the foreign affairs and diplomatic duties conferred upon the Secretary of State and the State Department" without requiring additional evidence).

United States District Court
Northern District of California

"serious questions going to the merits" of this claim. *Alliance for the Wild Rockies*, 632 F.3d at 1135.

### c.       Good Cause

An agency "must overcome a high bar if it seeks to invoke the good cause exception to bypass the notice and comment requirement." *Valverde*, 628 F.3d at 1164.  In other words, the exception applies "only in those narrow circumstances in which 'delay would do real harm.'" *Id.* at 1165 (quoting *Buschmann v. Schweiker*, 676 F.2d 352, 357 (9th Cir. 1982)).  Courts must conduct this analysis on a "case-by-case [basis], sensitive to the totality of the factors at play." *Id.* at 1164 (quoting *Alcaraz v. Block*, 746 F.2d 593, 612 (9th Cir. 1984)).  "[T]he good cause exception should be interpreted narrowly, so that the exception will not swallow the rule." *Buschmann*, 676 F.2d at 357 (citation omitted).

Here, the Rule invokes the good cause exception "to avoid creating an incentive for aliens to seek to cross the border" during the notice-and-comment period.  83 Fed. Reg. at 55,950.  It cited the same rationale for waiving the 30-day grace period. *Id.*  The Rule reasons that when aliens illegally cross into the United States, it causes harm because they may evade detection entirely or, if apprehended, could "take advantage of a second opportunity to remain in the United States by making credible-fear claims in expedited-removal proceedings." *Id.*  Further, even if their fears were not found credible, "they are likely to be released into the interior pending [additional] proceedings that may not occur for months or years." *Id.*  The Rule emphasizes that these harms are particularly acute given the "large numbers of migrants – including thousands of aliens traveling in groups, primarily from Central America – expected to attempt entry at the southern border in the coming weeks." *Id.*  The incentive to cross illegally "would make more dangerous their already perilous journeys, and would further strain CBP's apprehension operations." *Id.*

The Rule assumes that knowledge that the government was proposing to restrict asylum would encourage more asylum seekers to cross illegally in the interim.  As a matter of social psychology, this makes some intuitive sense.  In applying the foreign affairs exception, *American Association of Exporters and Importers* recognized that "prior announcement of [the agency's]

28

intention to impose stricter quotas pending consultations creates an incentive for foreign interests and American importers to increase artificially the amount of trade in textiles prior to a final administrative determination."  751 F.2d at 1249.  But the Court cannot give this fact the same weight it had in *Exporters*, particularly because migrants seeking asylum in the United States have neither the same access to information nor the same ability to adjust their behavior as the international corporations in that case.  Aliens who enter illegally are already subject to criminal and civil penalties, *see* 8 U.S.C. § 1325, which the government has been prosecuting under a "zero-tolerance" policy, *see* ECF No. 35-3 at 12.  Some record evidence indicates that some of those aliens nonetheless cross illegally for reasons that may be unaffected by the Rule's additional penalties, such as a lack of awareness of entry requirements or by imminent necessity caused by, among other things, threats of immediate violence from criminal groups near the border.  ECF No. 8-4 ¶¶ 26-28; ECF No. 35-4 ¶ 12.

At this preliminary stage, the Court concludes that assessing the reasonableness of the Rule's linchpin assumption in this context would be premature given the fluid state of the record in this fast-moving litigation.  The parties represent that the record will soon be much more robust.  The Immigration Organizations explained at the hearing that they are continually discovering new evidence as to the facts on the ground at the border, which they intend to submit.  For their part, Defendants have not yet had an opportunity to produce the administrative record, but they represented that they were prepared to do so within a matter of days.  The Court therefore concludes that, at this time, there are at least serious questions going to the merits as to whether Defendants have met the "high bar" required for the good cause exception.  *Valverde*, 628 F.3d at 1164.[19]

### C.     Irreparable Harm

The Immigration Organizations "must establish that irreparable harm is *likely*, not just possible, in order to obtain a [TRO]."  *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1172 (9th

---

[19] The Rule offered the same rationale for dispensing with the notice-and-comment requirements and the thirty-day grace period, and the parties do not distinguish between the two good cause exceptions in this motion.

United States District Court
Northern District of California

1   Cir. 2011) (citation omitted).  This factor focuses on "whether the harm to Plaintiffs [i]s

2   irreparable," rather than "the severity of the harm."  *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d

3   1053, 1068 (9th Cir. 2014).  "There must be a 'sufficient causal connection' between the alleged

4   irreparable harm and the activity to be enjoined, and showing that 'the requested injunction would

5   forestall' the irreparable harm qualifies as such a connection."  *Nat'l Wildlife Fed'n v. Nat'l*

6   *Marine Fisheries Serv.*, 886 F.3d 803, 819 (9th Cir. 2018) (quoting *Perfect 10, Inc. v. Google,*

7   *Inc.*, 653 F.3d 976, 981-82 (9th Cir. 2011)).  But the plaintiff "need not further show that the

8   action sought to be enjoined is the exclusive cause of the injury."  *Id.* (quoting *M.R. v. Dreyfus*,

9   697 F.3d 706, 728 (9th Cir. 2012)).

10          Because the Immigration Organizations have standing to assert their clients' rights, the

11   Court considers the irreparable injury to the asylum-seekers.  In the context of stays pending

12   removal, the Ninth Circuit has observed that "[i]n asylum, withholding of removal and CAT cases,

13   the claim on the merits is that the individual is in physical danger if returned to his or her home

14   country."  *Leiva-Perez*, 640 F.3d at 969.  Accordingly, "[c]onsideration of the likelihood of such

15   treatment," regardless of whether other factors would render the alien ineligible for relief, "should

16   be part of the irreparable harm inquiry."  *Id.*

17          As discussed above, the record establishes that, while the Rule is in effect, these asylum

18   seekers experience lengthy or even indefinite delays waiting at designated ports of entry along the

19   southern border.  *See, e.g.*, ECF No. 35-5 ¶¶ 4-5; ECF No. 35-8 ¶ 13.  The record thus belies

20   Defendants' contention that "[t]he rule and proclamation do not prevent any individual alien from

21   seeking asylum."  ECF No. 27 at 32.  The Court may consider harms that flow from the Rule, even

22   if the Rule is not the "exclusive cause."  *Nat'l Wildlife Fed'n*, 886 F.3d at 819 (citation omitted).

23   Further, the record reveals that asylum seekers experience high rates of violence and harassment

24   while waiting to enter, as well as the threat of deportation to the countries from which they have

25   escaped.  *See, e.g.*, ECF No. 35-3 at 1-2, 29-30; ECF No. 35-4 ¶ 6; ECF No. 35-8 ¶¶ 7, 11.  These

26   harms are both irreparable and likely to occur.

27          Defendants argue that any harm can be avoided by simply violating the policy, because the

28   only loss then is "a discretionary benefit to which [asylum seekers] are never entitled" and "they

United States District Court
Northern District of California

remain eligible for mandatory protections from removal." ECF No. 27 at 32. This argument ignores several basic facts. First, Congress has determined that the right to bring an asylum claim *is* valuable, regardless of whether it is discretionary. Second, and more importantly, the application of the Rule will result in the denial of meritorious claims for asylum that would otherwise have been granted. That means that persons who are being persecuted on the basis of their religion, race, or other qualifying characteristic, to whom the United States would otherwise have offered refuge, will be forced to return to the site of their persecution. Moreover, aliens who violate the Rule are placed in expedited removal proceedings under 8 U.S.C. § 1225(b)(1)(B), *see* 83 Fed. Reg. at 55,943, where they receive far fewer procedural protections to review the application of that standard. *See Vasquez v. Holder*, 635 F.3d 563, 566 (1st Cir. 2011) ("The lack of procedural protections accompanying expedited removal stands in contrast to the significant process, specified in 8 U.S.C. § 1229a, that is required to effectuate a formal removal."). Finally, although discretionary, a grant of asylum confers additional important benefits not provided by withholding of removal or CAT protection, such as the ability to proceed through the process with immediate family members, *see* 8 U.S.C. § 1158(b)(3), and a path to citizenship, *see id.* §§ 1159(b)-(c), 1427(a). The Defendants ignore these very real harms.

In addition, the Immigration Organizations allege that they were deprived of the opportunity to offer comments on the Rule. Courts have recognized that the loss of such opportunity may constitute irreparable injury while a rule promulgated in violation of § 553 is in effect, provided that plaintiffs suffer some additional concrete harm as well. *See, e.g.*, *California v. Health & Human Servs.*, 281 F. Supp. 3d 806, 830 (N.D. Cal. 2017) ("Every day the IFRs stand is another day Defendants may enforce regulations likely promulgated in violation of the APA's notice and comment provision, without Plaintiffs' advance input."). Otherwise, "section 553 would be a dead letter." *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 17 (D.D.C. 2009) (quoting *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 95 (D.C. Cir. 2002)). As discussed above, the Rule frustrates the Immigration Organizations' missions and forces them to divert resources outside of their core services. Moreover, if the Court were to ultimately find the Rule invalid or procedurally defective, any interim harm "would not be susceptible to remedy."

1    *Health & Human Servs.*, 281 F. Supp. 3d at 830; *cf.* 5 U.S.C. § 702 (waiving sovereign immunity

2    for "relief other than money damages").

3          Accordingly, the Court finds that the Immigration Organizations have made a clear

4    showing that it is likely that they and their clients will suffer irreparable harm absent a TRO.

5          **D.      Balance of the Equities and the Public Interest**

6          The Court turns to the final two *Winter* factors.  "When the government is a party, these

7    last two factors merge."  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

8          Here, the balance of the equities and the public interest favor granting a TRO.  As

9    discussed extensively throughout this Order, potential asylum seekers are exposed to numerous

10   harms while waiting to present their claims, including not only physical privations like physical

11   assault but also the loss of valuable, potentially meritorious claims for asylum.  The Rule, when

12   combined with the enforced limits on processing claims at ports of entry, leaves those individuals

13   to choose between violence at the border, violence at home, or giving up a pathway to refugee

14   status.

15         The Court acknowledges Defendants' argument that "[t]he government's interest in

16   efficient administration of the immigration laws at the border also is weighty."  *Landon v.*

17   *Plascencia*, 459 U.S. 21, 34 (1982).  But as *Landon* explained, "control over matters of

18   immigration is a sovereign prerogative, largely within the control of the executive *and the*

19   *legislature*."  *Id.* (emphasis added).  The Court must also consider that the Immigration

20   Organizations are likely to succeed on the merits of their claim that the Rule contravenes

21   Congress's judgment to give full consideration to asylum seekers' claims regardless of their

22   failure to comply with entry requirements.  *See Fish v. Kobach*, 840 F.3d 710, 756 (10th Cir.

23   2016) (recognizing that Congress's clear statutory commands balancing competing interests

24   "demonstrate Congress's determination that the public interest" will be best served in that

25   manner).  The executive's interest in deterring asylum seekers – whether or not their claims are

26   meritorious – on a basis that Congress did not authorize carries drastically less weight, if any.

27         Defendants also contend that maintaining the Rule serves the public interest because,

28   absent the Rule, aliens will continue to cross the border in a dangerous manner.  ECF No. 27 at 32.

United States District Court
Northern District of California

The Rule's sole reference to the danger presented by crossings appears in a quote from a 2004 rule, with no explanation as to how the situation may have evolved in the intervening fourteen years.  *See id.* at 55,950 ("There continues to be an 'urgent need to deter foreign nationals from undertaking dangerous border crossings, and thereby prevent the needless deaths and crimes associated with human trafficking and alien smuggling operations.'" (quoting Designating Aliens for Expedited Removal, 69 Fed. Reg. 44,877, 48878 (Aug. 11, 2004)).  The Rule contains no discussion, let alone specific projections, regarding the degree to which it will alleviate these harms.  On the other side of the scale, the Court must weigh the extensive record evidence of the danger experienced by asylum seekers waiting to cross in compliance with the Rule.  *See, e.g.*, ECF No. 35-3 at 1-2, 29-32; ECF No. 35-4 ¶¶ 10-11; ECF No. 35-5 ¶ 5; ECF No. 35-8 ¶ 15.

Finally, the Court considers the administrative burden to Defendants of maintaining the status quo.  The Court initially notes that "[a]ny administrative burden [injunctive relief] places on the government is greatly minimized by the fact that the government already has a process in place for adjudicating" asylum applications for aliens who enter in violation of a Presidential proclamation.  *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1201 (N.D. Cal. 2017), *aff'd*, 905 F.3d 1137 (9th Cir. 2018).  And by the Rule's own estimate, the Rule would reduce Defendants' burdens to administer the immigration system, but would also add some offsetting burdens, such as increased resources towards detaining aliens pending expedited removal.  83 Fed. Reg. at 55,947.[20]  The Court finds that the burden of the existing system does not outweigh the harms that flow from the Rule.

Accordingly, the Court will grant the motion for a TRO.

**E.     Scope of Relief**

Finally, the Court considers the scope of relief due.

### 1.     Geographic Scope

Defendants contend that the Court should limit any injunctive relief to "remedying

---

[20] At this preliminary stage, the Court need not determine the extent to which the Rule's assessment of administrative burdens of the existing system is contradicted by the record.  *But see* ECF No. 35-9.

United States District Court
Northern District of California

Plaintiffs' particular alleged resource-allocation harms."  ECF No. 27 at 34.  As explained above,

however, the Immigration Organizations also assert the rights of their asylum seeker clients in this

proceeding.[21]

The scope of the remedy is dictated by the scope of the violation.  Where a law is

unconstitutional on its face, and not simply in its application to certain plaintiffs, a nationwide

injunction is appropriate.  *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[T]he scope of

injunctive relief is dictated by the extent of the violation established, not by the geographical

extent of the plaintiff.").  Moreover, as another court has observed, the Supreme Court's recent

decision in *Trump v. International Refugee Assistance Project*, 137 S. Ct. 2080, 2082 (2017),

"validates the nationwide application of the preliminary injunction for certain contexts."  *City of*

*Chicago v. Sessions*, No. 17 C 5720, 2017 WL 4572208, at *2 (N.D. Ill. Oct. 13, 2017).  Like

*International Refugee Assistance Project*, this case involves government policy on entering the

country.  Given the need for uniformity in immigration law, the Court concludes that a nationwide

injunction is equally desirable here.

A "nationwide injunction . . . is [also] compelled by the text of the Administrative

Procedure Act, which provides in relevant part:

> To the extent necessary to decision and when presented, the reviewing court shall
> decide all relevant questions of law, interpret constitutional and statutory
> provisions, and determine the meaning or applicability of the terms of an agency
> action. *The reviewing court shall ... (2) hold unlawful and set aside agency action,*
> *findings, and conclusions found to be*—(A) *arbitrary, capricious, an abuse of*
> *discretion, or otherwise not in accordance with law . . . ."*

490 F.3d 687, 699 (9th Cir. 2007) (citing 5 U.S.C. § 706) (emphasis added in original), *aff'd in*

*part, rev'd in part on other grounds sub nom. Summers v. Earth Island Inst.*, 555 U.S. 488 (2009);

*see also Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409-10 (D.C. Cir. 1998)

("We have made clear that '[w]hen a reviewing court determines that agency regulations are

unlawful, the ordinary result is that the rules are vacated – not that their application to the

---

[21] Defendants also do not explain how such a limitation would work in practice, for example,
whether the clients of the Plaintiff firms would have special rights that other immigrants would not
have and what effect that would have on the uniformity of the immigration laws.

individual petitioners is proscribed.'" (quoting *Harmon v. Thornburgh,* 878 F.2d 484, 495 n. 21 (D.C.Cir.1989)).  Because the Court here concludes as a preliminary matter that the Rule is unlawful because it conflicts with the INA, it is unlawful as applied to anyone.  The Court will issue a nationwide injunction.

### 2.   Expedited Removal Procedures

Defendants suggest in passing in their opposition, ECF No. 27 at 33, and reiterated at the hearing, that 8 U.S.C. § 1252(e)(3) limits the scope of the relief the Court may issue.[22]  As an initial matter, the Court could simply enjoin the Rule as it amends asylum eligibility in 8 C.F.R. §§ 208.13, 1208.13, without disturbing any expedited removal procedures.  Defendants have provided no authority to support the proposition that any rule of asylum eligibility that may *be applied* in expedited removal proceedings is swallowed up by § 1252(e)(3)'s limitations.  That interpretation would expand that provision well beyond "section 1225(b) . . . and its implementation."  8 U.S.C. § 1252(e)(3).

Moreover, even if the Court's TRO enjoined the Rule's amendments to the expedited removal regulations, it is not clear that this provision applies to the Immigration Organizations' APA claims.  *See M.M.M. ex rel. J.M.A. v. Sessions*, 319 F. Supp. 3d 290, 293, 296 (D.D.C. 2018) (transferring 5 U.S.C. § 706(2) claim but concluding that it must retain exclusive jurisdiction over 8 U.S.C. § 1252(e)(3) claim).

---

[22] In relevant part, 8 U.S.C. § 1252(e)(3) provides:

> (3) Challenges on validity of the system
>
> (A) In general
>
> Judicial review of determinations under section 1225(b) of this title and its implementation is available in an action instituted in the United States District Court for the District of Columbia, but shall be limited to determinations of –
> . . . .
>
> (ii) whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law.

United States District Court
Northern District of California

Given the lack of support for Defendants' position, the Court declines to limit its relief on that basis.

## CONCLUSION

For the foregoing reasons, the Court GRANTS the Immigration Organizations' motion for a temporary restraining order. The Court hereby ENJOINS Defendants and their officers, agents, servants, employees, and attorneys, and any other person or entity subject to their control or acting directly or indirectly in concert or participation with Defendants from taking any action continuing to implement the Rule and ORDERS Defendants to return to the pre-Rule practices for processing asylum applications.

This Temporary Restraining Order shall take effect immediately and shall remain in effect until December 19, 2018 or further order of this Court.

### ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

Defendants, and each of them, is hereby ORDERED TO SHOW CAUSE on December 19, 2018, at 9:30 a.m., or as soon thereafter as counsel may be heard[23] in the courtroom of the Honorable Jon S. Tigar, located at 450 Golden Gate Avenue, San Francisco, California, why they, and each of them, and their officers, agents, servants, employees, and attorneys, and any other person or entity subject to their control or acting directly or indirectly in concert or participation with Defendants, should not be enjoined from taking any action continuing to implement the Rule and ordered to return to the pre-Rule practices for processing asylum applications, pending the final disposition of this action.

Rule 65(c) of the Federal Rules of Civil Procedure provides that a district court may grant a preliminary injunction "only if the movant gives security in an amount that the court considers

---

[23] When a temporary restraining order is issued with notice and after a hearing . . . the 14-day limit for such orders issued without notice does not apply. *See Horn Abbot Ltd. v. Sarsaparilla Ltd.*, 601 F.Supp. 360, 368 n. 12 (N.D.Ill.1984). Nevertheless, absent consent of the parties, "[a] court may not extend a 'TRO' indefinitely, even upon notice and a hearing." *Id.*

*Pac. Kidney & Hypertension, LLC v. Kassakian*, 156 F. Supp. 3d 1219, 1223 (D. Or. 2016).

United States District Court
Northern District of California

1   proper to pay the costs and damages sustained by any party found to have been wrongfully

2   enjoined or restrained." Fed. R. Civ. P. 65(c). The district court retains discretion "as to the

3   amount of security required, *if any.*" *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009)

4   (internal quotation marks and citations omitted) (emphasis in original). Here, Defendants have not

5   requested a bond, much less supported the issuance of a bond in any fixed amount. Also, the

6   Court find that balance of equities weighs strongly in favor of the Plaintiffs. Further, there is a

7   significant public interest underlying this action. Accordingly, the Court finds it appropriate to

8   waive a bond. *See Reed v. Purcell*, No. CV 10-2324-PHX-JAT, 2010 WL 4394289, at *5 (D.

9   Ariz. Nov. 1, 2010) ("In the present case, Defendants have not requested a bond, nor have they

10  submitted any evidence regarding their likely damages."); *Taylor-Failor v. County. of Hawaii*, 90

11  F. Supp. 3d 1095, 1103 (D. Haw. 2015) ("Plaintiffs are individuals of limited financial means and

12  there is a significant public interest underlying this action."); *Elliott v. Kiesewetter*, 98 F.3d 47, 60

13  (3d Cir. 1996) ("Where the balance of . . . equities weighs overwhelmingly in favor of the party

14  seeking the injunction, a district court has the discretion to waive the Rule 65(c) bond

15  requirement.").

16          By November 26, 2018, the parties must submit either a stipulation, or competing

17  proposals, for a briefing schedule in advance of the December 19 hearing. The schedule must

18  contain not only the briefs the parties will file and the due dates for those briefs, but also a

19  deadline for the production of the administrative record and for any discovery either party may

20  wish to conduct. The parties may also request the Court continue the December 19 hearing to a

21  later date and continue the TRO in effect. Unless they make such a request, however, no briefing

22  deadline in the parties' proposal(s) may occur later than December 14, 2018 at 5:00 p.m.

23          **IT IS SO ORDERED.**

24  Dated:  November 19, 2018

25  

26  _____
    JON S. TIGAR

27  United States District Judge

28

*United States District Court*
*Northern District of California*