Pages 1 – 63

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JON S. TIGAR, JUDGE

EAST BAY SANCTUARY COVENANT, et al.,      )
                                          )
              Plaintiffs,                 )
   VS.                                    ) NO. C 18-06810 JST
                                          )
DONALD J. TRUMP, et al.,                  )
                                          ) San Francisco,
              Defendants.                 ) California
_____)

Monday, November 19, 2018

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                    AMERICAN CIVIL LIBERTIES UNION
                    125 Broad Street
                    18th Floor
                    New York, New York  10004
            BY: **LEE GELERNT, ESQ.**

                    AMERICAN CIVIL LIBERTIES UNION
                    39 Drumm Street
                    San Francisco, California  94111
            BY: **CHRISTINE P. SUN, ESQ.**
                **VASUDHA TALLA, ESQ.**
                **SPENCER AMDUR, ESQ.**
                **JULIE MICHELLE VEROFF, ESQ.**

                    SOUTHERN POVERTY LAW CENTER
                    1666 Connecticut Avenue, NW
                    Suite 100
                    Washington, D.C. 20009
            BY: **MELISSA CROW, ESQ.**

Reported By: **BELLE BALL, CSR 8785, CRR, RDR**
                Official Reporter, U.S. District Court

(Appearances continued, next page)

**APPEARANCES, CONTINUED:**

For Plaintiffs:
                CENTER FOR CONSTITUTIONAL RIGHTS
                666 Broadway
                Seventh Floor
                New York, New York  10012
       BY:  **BAHER AZMY, ESQ.**

For Amicus State of Washington:
                WASHINGTON ATTORNEY GENERAL'S OFFICE
                Post Office Box 40100
                Olympia, Washington  98504
       BY:  **MEGAN DY LIN, ESQ.**

For Amicus Immigration Reform Law Institute:
                LAW OFFICE OF LAWRENCE J. JOSEPH
                1250 Connecticut Avenue, NW
                Suite 700
                Washington, D.C.  20036
       BY:  **LAWRENCE J. JOSEPH, ESQ.**

For Defendants:
                U.S. DEPARTMENT OF JUSTICE
                950 Pennsylvania Avenue, NW
                Washington, D.C.  20530
       BY:  **SCOTT G. STEWART, ESQ.**
             **DEPUTY ATTORNEY GENERAL**
             **OFFICE OF IMMIGRATION LITIGATION**

                U.S. DEPARTMENT OF JUSTICE
                Ben Franklin Station
                Post Office Box 868
                Washington, D.C.  20044
       BY:  **FRANCESCA M. GENOVA, ESQ.**
             **TRIAL ATTORNEY**
             **OFFICE OF IMMIGRATION LITIGATION**

Also Present:           **MARY BAUER, ESQ.**

<u>**Monday - November 19, 2018**</u>                                    **9:28 a.m.**

<u>P R O C E E D I N G S</u>

    **THE CLERK:**  Calling Civil Case 18-6810, East Bay Sanctuary Covenant, et al. versus President of U.S. Donald J. Trump, et al.

    Counsel, will you please approach and make your appearances.

    **MR. GELERNT:**  Good morning, Your Honor.  Lee Gelernt from American Civil Liberties Union for plaintiffs.

    **MR. STEWART:**  Good morning, Your Honor.  Scott Stewart on behalf of the Department of Justice for the President and the other defendants.  I'm joined by my colleague, Francesca Genova.  Thank you.

    **THE COURT:**  Welcome, good morning.  And good morning also to other counsel, whose appearances have been noted for the record.

    It also looks like we have a few more people in the gallery than we normally do.  Welcome to you also.  This is a public proceeding.

    Let me deal with a few administrative matters before we get going.  I'm going to set time limits on argument of 45 minutes per side.  That time includes time spent answering questions from the Court.  There may be substantial questions from the Court.

    First the plaintiffs will argue, and then the defendants.

1    And then the Court will take a 15-minute recess.  Then the

2    plaintiffs will make a rebuttal argument if they want to do

3    that and they have time left, and the defendants will make a

4    rebuttal argument if they want to do that and they have time

5    left.  At that time, unless I order otherwise, I will then take

6    the motion under submission.

7         There is no need to reserve time or to ask Mr. Noble to

8    reserve time.  The amount of time you don't take during your

9    initial argument is the time that you will have for your

10   rebuttal.  He will be keeping track of your time.

11        For the administrative convenience of the Court, the

12   amicus brief of the State amici at Docket No. 34 is now deemed

13   filed.  I asked them to file it separately, and for whatever

14   reason, they didn't, so we're just going to dispense with that.

15        Do counsel have anything for the Court's attention before

16   we proceed this morning?

17             **MR. GELERNT:**  No, Your Honor.

18             **MR. STEWART:**  No, Your Honor.

19             **THE COURT:**  All right.  Very good.

20        Mr. Gelernt, you may proceed.

21             **MR. GELERNT:**  Thank you, Your Honor.

22        Congress has made explicit in the Immigration and

23   Nationality Act that an individual may apply for asylum,

24   quote-unquote, whether or not they crossed at a point of entry

25   That was 1980, when they adopted the Refugee Act.

1        1997, they again made explicit that it did not matter

2    where you entered, you could apply for asylum.

3        So what we have here, I believe, Your Honor, is not only a

4    case dealing with an enormous potential humanitarian crisis,

5    but a classic separation-of-powers case.  The administration is

6    trying to override what Congress has done.

7        Congress has made a very explicit decision to say it

8    doesn't matter where you enter.  And the reason, I think, is

9    straightforward.  It's not to condone people entering between

10   ports of entry.  Congress has put in criminal penalties for

11   that.  They have also put in civil penalties.

12       But what Congress recognized and what international law

13   recognizes and what all experts in this area recognize,

14   including our declarants, is that there will be times when

15   people enter between ports of entry.  But entering between a

16   port of entry has no bearing on how much danger you may be in.

17       And so what our declarations show is that there are times

18   when people enter between ports of entry, where they just

19   simply couldn't help it.  Right now, they're being pushed back

20   from ports of entry by the Mexican government.  They're not

21   even allowed to be put on lists.  There are young children in

22   Mexico who are begging to be put on a list at a port of entry,

23   who are not allowed to.  There are long lines.  CBP is pushing

24   people back.  Sometimes they tell families:  Well, you can go

25   to a different port, that's 50 miles away.

1          And contrary to the narrative that's been out there

2     publicly, these are not all criminals, cartel members who are

3     coming here.  These are families.  Yesterday one of our counsel

4     were out there, and little boys are trying to get their teddy

5     bears, they're here without their parents, trying to get in.

6     This is a real humanitarian crisis.

7          And Congress could not have been clearer.  It cannot be

8     that you could not apply for asylum simply because you entered

9     between a port of entry.  And so what the President is trying

10    to do is simply override that.

11         And I think -- in response to the government's suggestion

12    that there's a crisis here, I think there's a legal and factual

13    response to that.  The legal response is what I've just said.

14    Congress has made the decision.  And contrary to the

15    administration's claim that there is now an immediate crisis

16    going on, this is a long-term issue that Congress has been

17    dealing with.  By the government's own admission, there was

18    less than 400,000 apprehensions at the border.  If you look at

19    2000 to 2008, there were well over a million apprehensions in

20    those years, those eight years.

21         Congress has been well aware of this issue, and has taken

22    a variety of steps.  But the one thing it's never done is say:

23    You can't apply for asylum.  And that's just because of the

24    fundamental special nature of asylum.

25         Congress can do a lot.  No one is here condoning people

1  crossing between borders.  But ultimately, people will cross

2  borders because they don't know where the ports are, because

3  they're pushed back, because criminal elements push them

4  between ports.

5       And Congress has said:  You have to be able to apply for

6  asylum.

7       The factual point I would make --

8       **THE COURT:**  Mr. Gelernt, there's a great deal of

9  information in the record, that it's sort of diffuse about the

10  number of people who have entered the United States along the

11  southern border at various ports -- points in time, the number

12  of people who have applied for asylum, and so forth.

13       Is there anything from this record from which I can

14  determine the number of people in a recent period, a recent

15  fixed period such as the most recent fiscal year or some other

16  definable period who were granted asylum under the existing

17  law, but who would have been denied asylum or denied asylum and

18  deported, under the new interim rule?

19       **MR. GELERNT:**  Your Honor, I don't think there's

20  anything that specific in the record.  We certainly can try

21  and supply it.  But I think this is -- this is moving so

22  quickly.  My co-counsel may have some specific number.

23       But I think --

24       **THE COURT:**  Well, perhaps -- I don't mean to -- I'm

25  mindful of our time limitations.  And obviously, there will be

1    an opportunity for rebuttal.  And so a member of your team

2    could be looking for this.  And we can move along to something

3    else.

4          MR. GELERNT:  I think, Your Honor, the answer may be

5    to 20,000 --

6       (Off-the-Record discussion between counsel)

7          MR. GELERNT:  20,000 who applied, and 6,000 who

8    passed.  So we may be talking about --

9          THE COURT:  Well, let's do this.  Let's postpone that

10   question.

11         MR. GELERNT:  Yes, Your Honor.

12         THE COURT:  Because the next time you answer it, I'll

13   be looking for a record cite.

14         MR. GELERNT:  Right, Your Honor.  I apologize.

15         THE COURT:  Let's, let's -- I have some additional

16   questions.

17      Are you challenging the validity of the proclamation,

18   standing alone?  Or just the rule?

19         MR. GELERNT:  Your Honor, that's a very important

20   question.  And I think -- what we believe is the only thing we

21   need to challenge it is regulation.  We are not here

22   challenging the proclamation, suspension of entry.  I mean, we

23   have real doubts that does, anything because EWI's, by

24   definition, entering without inspection are already barred.

25      We are simply here challenging the regulation.  We think

1   it's enough to have an injunction on the regulation, because

2   that's what bars asylum.

3            THE COURT:  Got it.  Okay.  As long as I've

4   thoroughly interrupted you anyway, let me --

5            MR. GELERNT:  No, Your Honor.  I apologize for not

6   having that record cite.

7            THE COURT:  No, no, no, please.  At some point this

8   morning I'm going to need to find out what is the term of the

9   relief the plaintiffs are seeking.

10           Is this really a temporary retraining order, or, given the

11  circumstances, is it really in the nature of a request for a

12  preliminary injunction?  And if it's a TRO, what further

13  proceedings do the plaintiffs anticipate, and on what timeline?

14           As you know, the rules anticipate --

15           MR. GELERNT:  Right.

16           THE COURT:  -- a schedule of follow-on proceedings.

17  And I have -- my instinct tells me that the parties are going

18  to seek immediate appellate review.  And that a

19  preliminary-injunction proceeding is not in anybody's

20  near-term future.  But, you may tell me otherwise.  We just

21  have to straighten that out.

22           MR. GELERNT:  Well, Your Honor, I think one thing the

23  Ninth Circuit has said is that if it's a pure TRO, it might

24  not be appealable.  So I think we're looking for a TRO right

25  now, but we would be prepared to move on whatever schedule you

1    think is appropriate for preliminary injunction.

2         So a TRO, as Your Honor knows, would last 14 days.  It

3    could be extended another 14.  So we are prepared to be back

4    here in 14 days, or if you extend it, any time between 14 and

5    28.

6         But on the TRO, I think the reason we believe we need a

7    TRO, a short-term TRO, is because the danger right now.  Every

8    day, people are in real danger of being --

9         **THE COURT:**  The question before the Court is not

10   whether I would not issue a TRO because of -- nothing about my

11   question either expresses a view on the merits of TRO

12   application, or forecloses the possibility of the issuance of

13   a TRO.  But I do wonder what further proceedings does anybody

14   contemplate.

15        We don't even -- no one has even hinted that there might

16   be the production of an administrative record.  I mean, reading

17   the briefs, I think the parties have given me everything they

18   want to give me.  And if that's true -- and I'll ask the

19   government this question --

20        **MR. GELERNT:**  Right.

21        **THE COURT:**  -- in a few minutes, obviously.  What

22   further proceedings do they anticipate.  But I'm -- I guess

23   what I'm saying is -- well, I think I've said what I need to

24   say.

25        **MR. GELERNT:**  No, that's fair, Your Honor.  If there

1    are going to be further proceedings, we believe we have

2    obviously put in enough for either a TRO or a preliminary

3    injunction, which I think what is Your Honor's getting at.

4    And whether, now, you would want a guidance from the Ninth

5    Circuit on going forward.

6        If we were going to go forward, we certainly would want to

7    see some type of record from the government on why the

8    regulation was passed, because we don't think what's in the

9    preamble to the rule was sufficient.

10       We would certainly continue to give Your Honor more

11   information because, as you know, there was no 30-day grace

12   period for the rule to go into effect, and no notice of

13   comment.  And so we've literally been scrambling 24-7 all over

14   the country.  And every day, we're learning about individuals

15   who are in serious danger.

16       So I think if we did go forward, if Your Honor decided to

17   bifurcate, have a TRO and then have a PI, and neither side

18   tried to take up the TRO, I think we would present that type of

19   record evidence for you, because I think people's lives are

20   very much in danger.  They're in danger on the Mexican side

21   because they are stranded there, families, kids, for six weeks,

22   seven weeks.  And it's very dangerous over there.

23       There are also individuals now we're finding who have gone

24   through to this country, been apprehended, would normally apply

25   for asylum, have very strong asylum claims, but are not allowed

1    to be -- not being allowed to apply for asylum and are in

2    imminent damage of being removed.

3          In terms of the record, I think, as Your Honor has pointed

4    out, there is not an administrative record.  There is a fairly

5    conclusory preamble to the regulation.  And I would just want

6    to make two points about that preamble.  One is a sort of

7    conceptual point.

8          If Your Honor looks at that preamble, I think Your Honor

9    will see that almost everything there goes to that the

10   government doesn't -- this administration doesn't believe that

11   people are passing at high enough rates or showing -- passing

12   at too high rates or showing up for their hearings.  All those

13   types of things.

14         And what I think Your Honor will take from that is that

15   really, the beef the administration has is with how the asylum

16   process works.  Not with ports of entry versus entry without

17   inspection, which is really supposed to be the issue.  How

18   often people show up for their hearings.  And we dispute that

19   factually.  And we have an affidavit from the Tahirih

20   declaration -- Tahirih (Phonetic).

21         But that doesn't go to whether you apply at a port of

22   entry or enter without inspection.  That simply goes to the

23   government's feeling that the asylum process is too easy for

24   people.  It's an asylum process, though, that Congress set up.

25         Likewise, the time it takes to do the hearings.  You have

1    Mr. Rodriguez's declaration, who is the head of the United

2    States Citizenship and Immigration Service, who is saying the

3    same amount of time -- it takes the same amount of time to do a

4    hearing at a port as between -- when someone enters at a port

5    versus when they are enter between ports.

6         So most of what you see in there about the high asylum

7    rate for people from the Northern Triangle really doesn't go to

8    where they enter.  It goes to the administration again feeling

9    like the asylum process is not what they would want.  But, it's

10   a asylum process Congress set up.

11        **THE COURT:**  What is the fit between that point, which

12   I think finds support in the record, and the legal fit between

13   that point and your complaint that the proclamation and the

14   rule violate the INA, or that there was an improper failure to

15   utilize a notice and comment period?  Do I incorporate the one

16   into the other?

17        **MR. GELERNT:**  Your Honor, I think that's exactly the

18   right point, because what we are saying is all those facts

19   might suggest that Congress look at the asylum process again.

20   I mean, Congress has looked at it a ton, and said:  We're

21   happy with the asylum process.

22        But all of that goes to whether or not there should be

23   asylum at a port of entry or entering without inspection.  It's

24   the government's burden to come forward and say:  The reason

25   we're shutting down asylum for people between ports but not at

1   ports is there's some government interest in that.

2        And we cannot really find that in the preamble.

3   Everything about the rates, the grant rates of asylum goes to

4   whether you -- doesn't go to where you apply, it goes to

5   whether you can apply, anywhere.

6        The only things the government is saying about why they

7   want people to go to ports is:  Well, they would rather people

8   go to the ports, and it be an orderly process.

9        We don't dispute that.  That's fine.  But the reason we

10  dispute factually is -- well, as I said, Your Honor, it's a

11  legal and factual answer, because legally, Congress has made

12  the decision, is well aware of this issue.  So that's really

13  dispositive.

14       But factually, the government has not put in anything to

15  suggest that this rule will eliminate people going between

16  ports of entry.

17       And I think that's what our declarations say, and there's

18  really nothing in the record to contradict it.  That they're

19  very unsophisticated people, often, who simply don't know where

20  the ports are.  There are criminal gangs who pull people

21  between ports of entry and they say "You have to go here" and

22  they are sometimes at gunpoint.  Sometimes the kids are not

23  allowed to be put on a.

24       List.  What we've learned recently is that the Mexican

25  government is not letting children at ports of entry apply

 1   unless they have a guardian or a parent to tell them -- to --

 2   to sign something.  Well, if they're fleeing from their

 3   parents, they're obviously not going to have a parent there.

 4        So what the administration has said is:  We think putting

 5   out this rule and we think doing it right now will channel

 6   everyone to a port.  It's simply not supported by the record.

 7        And to Your Honor's question I think on the notice and

 8   comment is very important, because what our plaintiffs would

 9   have said in a notice and comment is:  This is not going to

10   work to channel everyone to a port of entry.  And what they

11   would explain based on decades and decades of expert

12   observations is just simply saying:  "Go to a port, you can't

13   apply" is not going to work.  They are indigenous people coming

14   from Central America who have no idea where the ports are.

15   There are cartels telling people at gunpoint:  You must enter

16   here or we're going to kidnap you, rape you.  There are long

17   lines, six weeks, sometimes, little sleeping in Mexico in

18   dangerous areas.  So that would have all been said in a notice

19   of comment.  So I think that's really what's missing from the

20   preamble and the regulation, is any reason to believe that this

21   kind of rule would channel everyone to a port.

22        But again, this is something, Your Honor, that Congress

23   has known for a long time.  Again, 2000 to 2008, well over a

24   million people were entering between ports.  So the

25   administration claiming that all of a sudden there's an

1  emergency now?  This is a long-term issue that Congress has

2  been dealing with.  And Congress has tried a variety of ways.

3  And certainly, everyone says you can channel people to ports if

4  you want, but the one thing you cannot do is buy asylum.

5         (Off-the-Record discussion between counsel)

6         **THE COURT:**  Where in the record could I easily

7  find -- and you can address this in rebuttal too -- the

8  reference to a million people entering between ports between

9  2000 and 2018 (sic)?  I'm just asking for a record cite --

10        **MR. GELERNT:**  I'm sorry, Your Honor --

11        **THE COURT:**  -- to the point you just made, either

12  now, or at some later time in your argument.

13        **MR. GELERNT:**  Yes, Your Honor.  I apologize again.  I

14  hope I don't have to apologize too many more times.

15        **THE COURT:**  You don't have to apologize -- it's a big

16  record.  I don't know where it is, either.  That's why I asked

17  you.  So it's fine.

18        **MR. GELERNT:**  Um -- but -- Your Honor, it is an

19  official United States Border Patrol, and I --

20        (Off-the-Record discussion between counsel)

21        **MR. GELERNT:**  Your Honor, it's cited in the Isacson

22  declaration.  He has two declarations.  One an original, and

23  one a supplemental.  And it's the United States Border Patrol

24  specific southwest border sector numbers.

25     And what it shows is in 2000, there were 1.6 million

1   between the ports.  2001, 1.2 million.  The next two years,

2   over 900,000.  The next two years -- next three years, again

3   over a million.  This year, the government has said there's

4   under 400,000.

5        And so I think the relevance for that for the notice and

6   comment is:  This is not one of those emergency situations.

7        And the notice and comment is very important in a

8   situation like this, because it needs to take into account the

9   views of people on the ground, like our plaintiffs.  And what

10  would have happened if there were notice and comment is we

11  would have explained that the numbers were higher historically,

12  we would have explained why this rule is not going to channel

13  certain people to the ports.

14       And so I think -- what the Ninth Circuit has said is:  You

15  really need a strong showing for good cause.  They have said

16  it's very demanding; the Courts should really scrutinize it.  I

17  don't think the preamble's conclusory assertion that this rule

18  will channel everyone to the ports and that it was truly an

19  emergency is actually -- could come close to satisfying the

20  Ninth Circuit's standard.

21       What the Ninth Circuit has said is that you -- you have to

22  make sure that it's truly an emergency.  What we're talking

23  about here, I know that there's been a lot of talk in the press

24  about the caravan.  But the truth is that when you look at the

25  preamble, there is very little about the caravan, and there is

a lot about annual statistics.  And I think that that is
because, ultimately, the government recognized that the caravan
is not a serious issue.

       And as the Isacson declaration and the Pinheiro
declaration pointed out, caravans -- most of the people usually
end up dropping off.  Our own military has put out that it is
likely to be only 20 percent of the people come.  And most of
those people will come to the ports.

       And, caravans have been coming for years, as our
declarations have said.  I think this narrative about the
caravan has gotten out there, but the truth is it's something
that happens all the time.  Immigration is cyclical.  And the
numbers, as I said, have been way higher.  So I think the need
for putting in this rule immediately was not there.

       And the government has suggested:  Well, there were
foreign affairs.  But again, the courts have been clear that
just because it's immigration doesn't mean it's foreign
affairs.

       And if you look at the *Jean v. Nelson* case out of the
Eleventh Circuit, that was about the Haitians, but they said
the foreign affairs exception wasn't guaranteed -- sorry --
wasn't satisfied.

       If you look at the cases the government is relying on,
they were aware there was serious emergency foreign affairs
issues: That Iran hostage crisis.  After 9-11.  Those are the

types of foreign affairs situations where the Congress has
said:  We will excuse notice and comment.  But not in a
situation where ultimately what the government is saying is:
We don't like the patterns of migration, that Congress has been
aware of.  So we don't believe there's actually been an
emergency.

     I would just say a few words before I sit down about
standing, Your Honor.  The first thing I would say is, as
Your Honor knows, courts regularly find organizational
standing.  And we believe that we have -- declarations clearly
show that there is going to be a diversion of resources and
frustration of mission.

     The other thing I would say is at this point, since as
Your Honor knows, we are moving very quickly, the Ninth Circuit
has said, like, for example, in the case *Valle de Sol*:  At this
stage, the preliminary stage, you don't need to have fullest
possible record.  You just need to have a basic showing.

     I think that we have more than a basic showing about how
all our organizations are going to have to divert resources.
And that's both for our merits INA claim, and our notice and
comment claim.

     And I know the government has also pushed a
zone-of-interest type of argument.  The things I would say
about that are it's a prudential doctrine.  Obviously, at this
stage, the Court can just satisfy itself that there's enough

1    here.

2        And courts routinely find in situations like this that

3    organizations are within the zone of interest.  That's the

4    A.O.L. case by Judge Bashant in the Southern District of

5    California, that's the *Doe* case by Judge Robart.  It's also

6    *Hawai'i v. Trump* where the states are -- where the state was

7    suing under the INA, and found to be within the zone of

8    interest.

9        I think, ultimately, the government's argument proves too

10   much.  If it had to be a non-citizen, then no organization

11   would ever be able to sue.  But courts have routinely found

12   that organizations can sue.  And especially in a situation like

13   this, where things are moving so quickly, and where it's an

14   enormous --

15          THE COURT:  Give me again, please, the name of the

16   Ninth Circuit case on lower --

17          MR. GELERNT:  *Valle de Sol*, Your Honor.  It was the

18   challenge -- it was a 2013 *Valle de Sol* case --

19          THE COURT:  I have it now.  Thanks.

20          MR. GELERNT:  Yeah.

21          THE COURT:  Thank you.

22          MR. GELERNT:  And, and then, then just before I sit

23   down, on the APA notice and comment, I think the government is

24   sort of half-heartedly suggesting the organizations don't have

25   a right to sue on that claim, the APA 553 notice and comment.

1          Truthfully, in the immigration area, those are the only

2     people who actually comment.  A non-citizen, especially a

3     non-citizen abroad, is not commenting on a regulation.  So I

4     think it would have to be the organization who's ultimately

5     going to comment on that.  So we think, clearly, there's

6     standing, especially at this preliminary stage, Your Honor.

7          So unless the Court has questions, I would reserve the

8     rest of my time.

9               **THE COURT:**  Very good.

10              **MR. GELERNT:**  Thank you, Your Honor.

11              **THE COURT:**  Thank you, Mr. Gelernt.

12         Mr. Stewart.

13              **MR. STEWART:**  Thank Your Honor.  May it please the

14      Court.

15          The rule and proclamation at issue in this case respond in

16     a targeted and lawful way to a serious crisis facing our

17     immigration system.  That crisis is the crushing strain caused

18     by large numbers of unlawful entries at our southern border

19     that are followed by ultimately meritless assertions in the

20     credible fear process.

21          This misuse of our asylum system --

22              **THE COURT:**  What's the practical effect of the rule?

23      What does the administration hope to accomplish in terms of

24      the rule's practical effect?

25              **MR. STEWART:**  A few things, Your Honor.  One

practical effect is to channel, as the rule explains, those who seek to enter the country to ports of entry where they can be processed in an orderly, controlled and sensible way, where they don't have to be the subjects of at-large preliminary examinations that put themselves and American law enforcement lives at risk.  That's one.

The other, Your Honor, is to facilitate negotiations with our international partner, Mexico, in the effort to have Mexico as well as the Northern Triangle countries contribute and help address the serious issues caused by migrants transiting through Mexico, making a journey that has potential danger.

So it's aimed also to facilitate an orderly and safe process to get that existing set of problems resolved.

THE COURT:  So I want to pick up on the point that you just made which actually echoes something Mr. Gelernt just said, and that is that the regulation -- the language of the regulation takes the view that, writ large, there are not enough meritorious asylum claims contained within the body of applicants.  And that's essentially what you just said.  And that is that we have too many people applying for asylum who are not qualified.

You and I can agree that some of the applicants are entitled to receive asylum, and they do receive asylum.  Correct?

MR. STEWART:  Correct, Your Honor.

1          **THE COURT:**  That happens.  Is there anything about

2   this rule that increases the percentage of meritorious

3   applications?

4          If that's the problem, what, if anything, does this rule

5   do to solve that problem?

6          **MR. STEWART:**  Your Honor, it discourages people from

7   crossing unlawfully, and essentially buying potentially years

8   of release into the country because of the very low initial

9   threshold by establishing a positive credible fear.

10         **THE COURT:**  Is there any correlation between what you

11  said and the existence of credible fear or the other criteria

12  that would qualify somebody for asylum?

13         How are those things logically related to each other?

14         It's true the rule will discourage people from entering

15  the country to make asylum claims.  That seems clear.  Everyone

16  agrees on that.  And it does that in some ways by making it

17  more difficult to present such a claim.  And there's a debate

18  about whether it's appropriate to make it more difficult than

19  the way the rule does that.  That's why we're here this

20  morning.

21         But my question is:  Having done that, how does that make

22  it more likely that the claims that are ultimately presented

23  are meritorious?

24         **MR. STEWART:**  Because the people who are most likely

25  to present -- to have legitimate asylum claims will then go to

 1    ports of entry, are more likely to go to ports of entry.  Or

 2    they will be beneficiaries of a potential solution with

 3    Mexico, with the Northern Triangles that addresses this issue

 4    on a broader scale, Your Honor.

 5        Your Honor, I would emphasize here that this is not a rule

 6    that targets just asylum-seekers, across the board.  It's

 7    focused on a particular problem of folks who are largely from

 8    Northern Triangle countries who cross illegally between ports

 9    of entry and are able to stay in the country because they pass

10    a federal fear screening, even though they ultimately, by large

11    numbers, don't show up for asylum hearings, don't apply for

12    asylum at all, and when they do apply and do show up, their

13    claims are ruled to have no merit.

14        And that --

15        **THE COURT:**  Why is it that people with meritorious

16    asylum claims are more likely to go to ports of entry than

17    people whose claims are not meritorious?  How does the one

18    follow from the other?

19        **MR. STEWART:**  Because if they're rendered ineligible

20    to get asylum, they will -- they will channel to ports of

21    entry because they don't want to miss that shot at asylum.  If

22    they do have an ultimate shot at getting asylum, at meeting

23    their criteria and showing what they need to show, and

24    actually prevailing on their case, then they're likely to say:

25    Oh, gosh, I don't want to blow my shot at this.  I want to

 1    present lawfully, so I can still be eligible for this

 2    discretionary benefit.

 3          That's it, Your Honor.

 4          **THE COURT:**  Doesn't that argument assume that people

 5    whose claims ultimately are going to be denied know that they

 6    are going to be denied in advance?

 7          People say:  Well, my claim is going to be granted, so I

 8    better go here.

 9          Someone says:  Well, my claim's actually going to be

10    denied.  I'll go this different place.

11          Is that the government's position?

12          **MR. STEWART:**  Your Honor, I do think the people who

13    actually -- some people logically know that their asylum

14    claims are going to have more merit than others.  A very small

15    number of these claims turn out to show -- you know, have

16    merit.  It's the people, it seems, who actually show up to

17    their asylum hearings and make out the case.  It's not the

18    case for everyone.  I mean, there's a very small group of

19    people who end up in this group who end up actually getting

20    grants of asylum.

21          And it encourages people to -- who actually know they have

22    a strong case for asylum to go and follow the orderly processes

23    to do that.  So --

24          **THE COURT:**  I think the language -- beg your pardon.

25    I think the language from the Federal Register -- and it says

1   this more than once -- is that:  The government is seeking to

2   facilitate the orderly processing at ports of entry that takes

3   into account resource restraints at ports of entry and in U.S.

4   detention facilities.

5       Now, my question for the government is:  How would you

6   describe the state of the record as to whether the ports of the

7   entry are either, on the one hand, capable of processing what

8   by definition will be an increased flow of asylum applicants,

9   or on the other, whether they are backed up?

10      Or isn't there in the record a statement from the Director

11  of Homeland Security -- although it was not put in by the

12  administration, it comes from her -- that the government is

13  metering people at ports of entry?

14      And isn't that inconsistent with the government's stated

15  goal as it's expressed in this interim rule?

16      **MR. STEWART:**  Your Honor, processing at ports of

17   entry, it does take time.  You know, there can be delays at

18   various times.  And there could be the need to shift

19   additional resources.  And the rule acknowledges the need to

20   potentially do that.

21      There will be, you know, a need to see how some of

22  things -- some things work out, and where -- where additional

23  resources may need to be deployed.

24      But again, I mean, when you have people present at ports

25  of entry, you don't have a situation where you have CBP

officers needing to chase people down, and ugly conditions, and
that sort of thing.  So it does make it orderly.

And presumably, the processing could, ideally, be faster.
There could be needs to put more resources towards that.  But
again, it's early in the process of this rule, and that can be,
you know, worked out soundly and in a controlled way.

THE COURT:  Let's go to a higher level of abstraction
and talk about the law for a second.  And this is a point that
actually I meant to discuss with Mr. Gelernt, and maybe I'll
do it in his rebuttal argument.

What is the burden on the government, if any, for its
stated justification to be supported by the record were
actually true?

You and I are debating right now -- or I think
"discussing" is a better word -- we are discussing how likely
it is that the government could meet its stated goal of
facilitating orderly processing of asylum applicants at ports
of entry.  And we could have the same discussion with regard to
the asserted ground that the government wants to negotiate a
safe third-country agreement with Mexico.  I could ask you how
likely, on the record, the government is to actually achieve
that goal.

But these discussions beg the question of whether the
government has a legal obligation to -- for its asserted
justification to be true, or for it to be supported by the

 1    record.  And I don't know -- and it would be useful to me to

 2    know what you think that burden, if any, is.  And for the

 3    plaintiffs to tell me the same thing.

 4            **MR. STEWART:**  Your Honor, maybe on rebuttal I can

 5    more crisply articulate how I would put that in terms.  But I

 6    think it would be very light, in whatever it is here in this

 7    context, where you have matters at the border in which the

 8    executive branch exercises great authority and discretion.

 9    Particularly matters that are so well-documented in the

10    proposed rule, they're areas of broad authority and

11    discretion.

12            **THE COURT:**  Ah, ah, "so well-documented"?  That's my

13    question.

14            **MR. STEWART:**  The rule well-documents the problem,

15    Your Honor.  It is a problem that's causing great strain on

16    our already backlogged --

17            **THE COURT:**  It makes certain assertions.  And my

18    question is:  To what extent do those assertions need to be

19    supported?

20        To say something is true is not to make it true.

21            **MR. STEWART:**  Your Honor, I don't think that the

22    plaintiffs in this case have actually gone after the actual

23    factual grounds in any meaningful way on which the rule

24    actually relies.

25        The attacks that they make are:  Oh, you know, numbers of

1    apprehensions or appearances at the southern boards are down,

2    overall.

3        This addresses with more specificity --

4        **THE COURT:**  I might conclude otherwise.  And I'm

5    giving the government an opportunity to tell me what standard

6    I should apply.

7        **MR. STEWART:**  I'll try to have a more crisp

8    articulation of that, Your Honor, if I may think about that

9    for a little bit?

10       **THE COURT:**  Yeah.

11       **MR. STEWART:**  I appreciate that, Your Honor.  Thank

12   you.

13       **THE COURT:**  Yeah.

14       **MR. STEWART:**  The numbers in this case show,

15   Your Honor, and as the rule explains, many of this group that

16   transit Mexico and cross unlawfully between ports of entry do

17   not even apply for asylum.  Many fail to show up at their

18   hearings.  And those who do, end up getting asylum in very

19   small numbers, because these claims regularly lack merit.

20       This claim -- this strain on our system has compounded a

21   backlog, drawn resources and attention away from other

22   meritorious claims of the many hundreds of thousands of cases

23   pending, and uniquely strains the immigration system.  These

24   are kind of the central reasons for this rule.  This is what

25   it's targeting, and this is what it's -- what it's doing.

1            **THE COURT:**  The rule -- the rule is predictive of the

2       things you just said.  It says:  These bad things are going to

3       happen, and so we need to implement this rule.  You're using

4       the present tense.

5            Is there anywhere in the record from which I could find

6       support for the notion that the system is now currently being

7       overwhelmed by the caravan, or asylum-seekers from what the

8       government calls the "Northern Triangle"?

9            **MR. STEWART:**  I mean, the numbers -- it explains, you

10      know, in fair terms, Your Honor, that --

11           **THE COURT:**  This is what I did to Mr. Gelernt.  I'm

12      just looking for support in the record.

13           Is there record information that I could cite that says --

14      that is supportive of the contention that, as you said a moment

15      ago, that the strain on our system has compounded a backlog and

16      drawn resources and attention away from other meritorious

17      claims, et cetera?

18           **MR. STEWART:**  The -- the main areas, Your Honor, are

19      on Pages 55945 to -947.  Among other things, those pages

20      catalog the large numbers of folks at issue here who are able

21      to enter, get possible federal -- credible fear screenings.

22           They sap detention resources which are limited and often

23      difficult, especially in the case of family units, which have

24      been rising above -- or have risen, at times, above previous

25      years.  That many of -- many in this group are able to be

 1   released once they have positive credible fear determinations

 2   and stay in the country for months, even years, even though

 3   they don't have an entitlements to be -- they are not

 4   ultimately found to have a meritorious asylum claim.

 5          This adds to what is already, I believe we say, the rule

 6   says that -- -946, the 800,000-plus cases pending in the

 7   current backlog of Section 240 proceedings, over 100,000 of

 8   which involve nationals of Northern Triangle countries.

 9          So those are a few points, Your Honor.  It also details

10   the relative lack of merit of a lot of these claims that are

11   the target of this particular rule.

12          And I could also add additional details.  But I would

13   point to those pages in particular, and the page or so before

14   and after those, Your Honor.

15          **THE COURT:**  Thank you.

16          **MR. STEWART:**  Your Honor, moving to some more

17   fundamental legal points here about why this is a very, very

18   light burden for the executive branch to meet, it's because

19   asylum is not a mandatory obligation.  It's a discretionary

20   benefit that comes with -- you know, comes only with a

21   favorable exercise of discretion, after numerous criteria are

22   met.

23          And it's something that --

24          **THE COURT:**  And, and where are you locating this

25   burden?  Is this the government's good-cause burden to

1   dispense with notice and comment?  Is it a burden that

2   relieves the executive branch of avoiding a conflict, a

3   statutory conflict?

4        When you say it's a light burden, which of the claims or

5   defenses are you now addressing?

6          **MR. STEWART:**  I'm addressing the merits of the

7   Immigration and Nationality Act claim.

8          **THE COURT:**  Okay.

9          **MR. STEWART:**  I can go to good cause and foreign

10  affairs if you would like.

11         **THE COURT:**  No, I just want to make sure I'm

12  following the argument.

13        Is the point that if the government meets what you've

14  described as a very light burden, then if I find that there's a

15  conflict between the rule and the proclamation as they operate

16  together and the language of the INA, that I cannot be worried

17  about the conflict?

18         **MR. STEWART:**  Your Honor, I'm not going to concede

19  that there's a conflict, and I would disagree that there's a

20  conflict.  I'd like to be able to explain why there's no

21  conflict.

22         **THE COURT:**  You can do that later.  I'm just trying

23  to figure out what -- what is it that the -- that the

24  government doesn't have to -- where is the low burden?  A low

25  burden to do what?

1          **MR. STEWART:**  The low burden to erect discretionary

2     conditions or limitations on eligibility for granting asylum.

3     That's in the statutory language.  That's

4     Section 1158(b)(2)(C).

5          1158(b)(2)(A), I believe it is, Your Honor, makes clear

6     that asylum is discretionary, it may be granted by the Homeland

7     -- by the Secretary of Homeland Security or the Attorney

8     General.  And bars to eligibility can, in turn, be erected, so

9     long as they are consistent with Section 1158, the statute.

10          Section 1158 erects very few barriers.  What it does erect

11     barriers on is in many -- the granting of asylum.  The Attorney

12     General or the Secretary can't grant asylum to certain

13     categories of offenders, and other types of people who fit --

14     fit different categories.

15          In addition, there is a lot of discretion to erect

16     additional bars, so long as they're consistent.  There's

17     nothing inconsistent by erecting a bar for someone who does not

18     just enter, but enters in a particularly problematic manner, as

19     determined by a presidential proclamation.

20          And that's a point that I think I would like to emphasize,

21     Your Honor.

22          **THE COURT:**  The government makes a distinction

23     between Congress saying that:  You can apply for asylum,

24     regardless of -- whether you came in at a port of entry.

25     You'd think, after the amount of preparation for this hearing,

1    I could actually say the statutory language.  But it's

2    escaping me.  Sorry.  I know you know what I mean.

3            **MR. STEWART:**  Yes, Your Honor.

4            **THE COURT:**  And, and then the President and the

5    Attorney General saying:  Well, they can say that, but we can

6    deny asylum on the same ground.

7        Doesn't the second thing render the first thing a nullity?

8        I'll give you an example.  Let's say we said -- we had a

9    Congressional statute that said: You can come to the hearing at

10   the federal courthouse in any vehicle.  You're allowed to ask

11   to come into the courthouse if you come in any vehicle.

12       But then we have a rule that someone passes that says:

13   I'll tell you what, you can ask, but if you came here on a

14   bicycle, you're not coming in.  You're not.

15       What's the point of saying the vehicle that you use to get

16   here doesn't matter?  How does it not render -- I'm not doing

17   as elegant of a job with this as I'd like, but how does it not

18   render the expression of Congressional intent a nullity?

19           **MR. STEWART:**  It would be as if you were to say:  You

20   can come and enter the courthouse so long as you do so,

21   consistent with the remainder of what I'm about to -- you

22   know, the conditions I lay out.

23       So, too, here, Your Honor, with Section 1158(a)(1) it says

24   that as a general rule -- it's captioned "In general" -- an

25   alien who's physically present in the United States may -- dot,

1    dot, dot -- may apply for asylum in accordance with this

2    section.

3         So that means in accordance with other provisions of 1158.

4    Those include, for example, the immediately-following

5    exceptions for even being eligible to apply for asylum.  So

6    yes, there's a broad general rule under 1158(a)(1), Your Honor,

7    to be able to apply for asylum.  But that's immediately

8    qualified by several exceptions just for applying.

9         **THE COURT:**  "In general" is a title.  It's not part

10   of the paragraph.  So to the extent that you're suggesting

11   that Congress meant to draw a distinction, I don't know that

12   the argument is supported by the statute.

13        What the statute says -- and I now have it in front of me,

14   and I wished I had a moment ago --

15             "Any alien who is physically present in the United

16             States or who arrives in the United States, whether

17             or not at a designated port of arrival..."

18        Et cetera.

19             "...may apply for asylum."

20        What's left of that?  I guess that's a better way of

21   asking the question.  If this rule is valid, what's left of

22   that expression of Congressional intent?

23        **MR. STEWART:**  Your Honor, you didn't mention the last

24   several words that follow that which says:

25             "...may apply for asylum in accordance with this

1              section."

2       1158 proceeds to make that general rule subject to a fair

3   number of qualifications, exceptions, establishment,

4   eligibility --

5              **THE COURT:**  It absolutely does.

6              **MR. STEWART:**  Yes.

7              **THE COURT:**  None of them have to do with port of

8    entry.

9              **MR. STEWART:**  Your Honor, it's not inconsistent with

10   that -- well, first of all, Your Honor, what I would say there

11   is that it would render meaningless that -- under that --

12   under that view, it would be anybody can apply for asylum who

13   falls within the six statutory bars, but they would still

14   never be able to get asylum.

15       And, you know, still -- that -- you know, there's no

16   argument there that that somehow guts 1158(a)(1).  It's still a

17   general rule that you may apply, but then at the eligibility

18   stage, other qualifiers and other factors come in.

19       And one of those qualifiers, Your Honor, is 1158(b)(2)(C),

20   which says (As read):

21              "The Attorney General by regulation -- may by

22              regulation establish additional limits and conditions

23              consistent with this section under which an alien

24              shall be eligible for asylum under Paragraph 1."

25       And that's what he's done here, Your Honor.

 1          And if I can --

 2                **THE COURT:**  Well, it has to be consistent with the

 3     section.

 4                **MR. STEWART:**  Right.

 5                **THE COURT:**  I mean, it would be -- we don't have a

 6     situation where Congress said in Subsection (1):  Hey, even if

 7     you've been convicted of a felony -- you know, regardless of

 8     whether you've ever been convicted of a felony, you can come

 9     in.

10          They put that down below.  They say:  If you've been

11     convicted of a felony, you're not eligible.

12          There's nowhere -- I guess my point is the difficulty I

13     have with the government's argument is that there's nowhere

14     else later in this -- yes, yes, there are exceptions.  But none

15     of them have anything to do with this explicit carve-out in any

16     way.

17          But I'll move on because now I feel as though I'm perhaps

18     debating this with you more than asking you.

19          Let me turn to something else.

20                **MR. STEWART:**  Can I add one little point on that,

21     Your Honor?

22                **THE COURT:**  Sure.

23                **MR. STEWART:**  I don't want to --

24                **THE COURT:**  No, no, please.

25                **MR. STEWART:**  The point I would add, Your Honor, is

1    that I think it's undisputed and under a matter of the BIA's

2    decision, it's clear that manner of entry can be relevant, and

3    therefore, is certainly dispositive of asylum eligibility in

4    some cases.

5         There's no -- there's no distinction that can be drawn

6    with that, no principal distinction that can be drawn with

7    that, and making manner of entry in a particular subset of

8    cases a categorical bar.

9         And here, Your Honor, the point I want to emphasize --

10        **THE COURT:**  Well, let's talk about that for a second.

11        Doesn't -- doesn't overwhelming authority say that while

12   manner of entry can be considered, it is to be given very

13   little weight?

14        And so my question would be, first:  Is there any

15   authority for the proposition that it could be given

16   dispositive weight?

17        And -- I guess that's the question.  I don't have a second

18   question.  If I did, it would be:  Wouldn't that, nonetheless,

19   bring whatever court said that, if one ever did, into conflict

20   with the explicit language of the statute?

21        But I don't think there is a court that's ever said that.

22        **MR. STEWART:**  No, Your Honor, it's -- the idea that

23   you can bar subsets of people based on manner of entry,

24   there's not any sort of overwhelming authority of that.

25        The *Pula* decision recognized it can be a factor.  It did

1    that as a general matter in individualized cases.  There's

2    nothing in the statute that prevents the Attorney General and

3    the Secretary, in their broad discretion, to categorically bar

4    that.

5        And if I can emphasize -- this is the point I want to

6    emphasize, Your Honor, is that this rule, accompanied by the

7    proclamation, do not make aliens ineligible for asylum, based

8    merely on illegal entry.  It's not an illegal entry, per se.

9        Rather, it makes them ineligible for asylum on a separate

10   and additional basis.  That -- not just that they illegally

11   entered, but that they contravened a particular presidential

12   proclamation suspending or limiting entry, based on the

13   President's particularized foreign-policy-laden determination

14   that that entry would be detrimental to the national interest.

15       So it's a heightened different-in-kind entry.  It's not

16   manner of entry, per se.  It's different, and it warrants the

17   ineligibility bar imposed here.

18          THE COURT:  What does the presidential proclamation

19    add to illegal manner of entry?

20          MR. STEWART:  For one thing, it points out that this

21    is the -- this violation of law implicates the national

22    interest in a particular way.

23       Two, it notes and tries to encourage potential

24    interdiction efforts to prevent this problem, and kind of

25    facilitate relations with Mexico.

1          And again, it puts the President's backing in his --

2     pursuant to his own broad authority under 1182(f) and 1185(a),

3     to find that this is a serious issue, and it needs to be

4     addressed.

5          **THE COURT:**  I think because the plaintiffs have

6      stated that they are not challenging the proclamation

7      independently, probably I don't reach the issue, because

8      there's no longer a controversy before the Court.

9          But, but because that wasn't clear when I took the bench,

10    let me ask you the same question I asked your opponent.  And

11    that is: in the absence of the rule, does the proclamation have

12    independent legal effect?

13         **MR. STEWART:**  It does, Your Honor, especially with --

14     with respect to the potential interdiction discussions and

15     efforts.  It does embody, you know, a particularized

16     determination.

17         What I would say, Your Honor, is that I don't -- the

18    proclamation is what triggers the ineligibility bar under the

19    rule.

20         So, I mean, there's really no basis to -- invalidating the

21    rule doesn't make a lot of sense.  It should be, if anything,

22    saying that there's an issue with the proclamation such that

23    another proclamation could be issued, potentially.

24         But I would say the proclamation does add, but there is a

25    lot of the two working in tandem here, Your Honor.

1          **THE COURT:**  The ports of entry -- the ability to seek

2     asylum through ports of entry is contained in the

3     proclamation, but not the rule.  Right?

4          **MR. STEWART:**  Um, I believe -- that's right,

5     Your Honor.  I mean, it is what's expressly addressed, but

6     they kind of, you know, interlock.

7          **THE COURT:**  So is it also correct that there is no

8     check in the rule, itself, on the President's ability to deny

9     asylum to anybody who enters at the southern border,

10    irregardless of where they enter?

11         **MR. STEWART:**  Your Honor, I don't know what that

12    argument means by the plaintiffs.  There's nothing in the

13    proclamation that purports to deny asylum to anyone.  It --

14    you know, it suspends and limits entry.

15         And there is an effect of you know, whether or not -- it

16    doesn't get into the issue of:  Oh, could the President,

17    himself --

18         **THE COURT:**  I think the argument goes to the question

19    of how much authority the interim rule purports to confer on

20    the President.

21         Anyway, I don't have a more specific question for you.

22         **MR. STEWART:**  It's really the departments exercising

23    their authority, Your Honor, to, under Title 8, and doing so

24    based in part on a presidential determination that the

25    President is, himself, expressly statutorily authorized to

1  make.

2      Your Honor, if I could turn maybe to some of the APA

3  procedural issues?

4          **THE COURT:**  Sure.

5      **MR. STEWART:**  And I want to hopefully save some -- a

6  decent amount of time for rebuttal.  But really quickly,

7  Your Honor --

8      (Reporter interruption)

9          **MR. STEWART:**  Thank you.

10     First, Your Honor, on the issue of good cause, the

11  declarations and the plaintiffs' briefing do not get to the key

12  good-cause argument that the preamble of this rule advances.

13     That good-cause argument is not, you know:  Oh, just

14  everyday continuation of normal migration patterns.  Rather,

15  the concern is that announcing an ineligibility rule but not

16  giving it immediate effect would lead to a surge in dangerous

17  and unlawful border crossings in order to evade this asylum

18  ineligibility bar.

19     That is logical; it makes sense.  When we have a situation

20  where I believe about a thousand folks are entering unlawfully

21  between ports of entry at the southern border, that means on

22  average, every day, you have another thousand who are within

23  range.

24     By plaintiffs' own declarations, it's pretty clear that

25  the communication streams to -- whether it be to caravans or

others who are transiting toward the southern border, hear

about that things.  And it's really the risk of a surge and all

the resource difficulties and the dangers to both life and

safety on both sides of the border that that occasions.

On foreign affairs, Your Honor, the plaintiffs and their

declarants also ignore, give short shrift to the key foreign

affairs here.  We are not just saying, Your Honor, that:  Oh,

because this involves immigration, it therefore automatically

meets the foreign affairs exception.

What's really trying to go -- you know, be facilitated

here, Your Honor, are negotiations with Mexico and with the

Northern Triangle countries to deal with this difficult problem

of, you know, each country taking responsibility for its own

nationals, for providing asylum, and that sort of things.

THE COURT:  In *Doe versus Trump*, my colleague

Judge Robart, in Washington, rejected the assertion of the

foreign-affairs exception on the ground that the government

had not provided any evidence to support the assertion.  So

this is similar to the question that I asked you before about

a different aspect of the government's argument.

And the question is:  What obligation, if any, is there on

the government to support an assertion of the foreign affairs

doctrine?  And if you say none, then that's your argument, and

then you can -- you don't have to say anything more.

And if you say it is anything other than none, the

 1   question is:  How likely do you think it is that the United

 2   States will be able to negotiate a safe third-party-country

 3   agreement with Mexico?  And, what basis is there for thinking

 4   that it's likely?

 5            MR. STEWART:  We don't need to establish any definite

 6   likelihood that it will be established, Your Honor.

 7            THE COURT:  Is saying it sufficient?

 8            MR. STEWART:  Your Honor, I'm not sure that saying it

 9   would be sufficient, but it's not what the issue is here.  It

10   says -- we are --

11            THE COURT:  It is -- if I'm asking you about it, it's

12   the issue here.

13            MR. STEWART:  Your Honor, the rule explains that we

14   are in diplomatic discussions with Mexico and the other

15   countries, to try to deal with this problem.  And we can't

16   guarantee that that will bear a fruitful agreement, that that

17   will resolve all issues, but we're trying, we're hopeful --

18            THE COURT:  Can you please explain the relationship

19   between denying asylum to those who do not enter at a

20   designated port of entry and the likelihood that negotiations

21   with Mexico to achieve a safe-third-party-country agreement

22   will go up?

23            MR. STEWART:  Sure, Your Honor.  I think it goes

24   beyond the safe-third-country agreement.  But if I can give

25   you my kind of foreign-affairs pitch here, it's simply that

1   Mexico has a responsibility for the people transiting its

2   country and for its border with the United States.  One aspect

3   of that responsibility is not to turn a blind eye to people

4   who transit through that country, and then break United States

5   law by entering.

6        By closing the border between ports of entry and requiring

7   channeling to those ports of entry, the executive branch has

8   here recognized the importance of these principals, these

9   obligations, as well.  And it has signaled to Mexico that:

10  These are important to us, you can't just have this happening,

11  you need work with us to find a more comprehensive solution

12  that hopefully will be a safe-third-country agreement.

13       It will, in all events, hopefully produce something, you

14  know, fruitful that helps address this shared problem that by

15  plaintiffs' own declarations, you know, is one that is

16  significant and is worth addressing.

17       It is an international negotiation.  We can't guarantee a

18  result.  But it is intimately tied with the President's

19  foreign-affairs agenda, and his effort to do this.

20       If I may, Your Honor, if there's nothing immediate, can I

21  save the rest of my time for rebuttal?

22            **THE COURT:**  Sure, you may.  Thank you for being so

23  responsive to the Court's questions.

24       Ladies and gentlemen, the Court will be in recess for 15

25  minutes.  Thank you.

1          **THE CLERK:**  All rise.

2      (Recess taken from 10:24 a.m. to 10:43 a.m.)

3          **THE COURT:**  All right, let's go back on the record.

4      Mr. Gelernt.

5          **MR. GELERNT:**  Thank Your Honor.  If I could start by

6   answering some of your questions about the record.

7      In the proclamation -- in the rule, itself, the preamble,

8   at 55935, it shows that 6,000 people who EWI'ed -- sorry -- who

9   entered without inspection, received asylum.  And 74,000 passed

10  their CFI, the credible fear initial screening.  So those are

11  the numbers that I think we are looking at with this rule in

12  one year.

13     I know Your Honor had asked about burdens.  And I want to

14  just mention a couple of cases that I think are relevant to the

15  government's burden.  One is on the good cause.

16     I think the D.C. Circuit in the *Sorenson* case which we

17  cite lays out pretty clearly what the good-cause inquiry is

18  about and what the government's burden is.  And talks about how

19  it needs to be meticulous and demanding, it's narrowly

20  construed.  It's an extremely demanding burden.  So I think the

21  *Sorenson* case is what we would cite for that.

22     On the foreign-affairs exception, I think the Ninth

23  Circuit has a particularly demanding standard.  And I would

24  cite the Court to the *Yassini* case from the Ninth Circuit,

25  about the Iran hostage crisis.

```
1              THE COURT:  I  love Yassini, because both sides love
2    that case.  Every now and then, you get that.  It's like --
3    anyway.
4              MR. GELERNT:  Yeah.  Well, for our part, we would
5    cite Footnote --
6              THE COURT:  You like Footnote 4.
7              MR. GELERNT:  Exactly.  So I don't need to tell
8    Your Honor about it, then.
9              THE COURT:  I read the case.
10             MR. GELERNT:  On the burden on the INA claim, I
11   wasn't sure exactly what the government was saying its burden
12   was, but what we would answer it this way, is, that where
13   Congress has addressed the precise issue, no amount of
14   evidence the executive branch can put in would allow it to
15   override Congress.  Congress has made the judgment; they've
16   put it in the statute.
17       I don't hear the government to say that the Attorney
18   General can override Congress if it has -- if the Attorney
19   General had enough evidence.  It's a fight about what the
20   statute means.
21       And I think Your Honor has pinpointed what we believe are
22   the holes in the government's argument about the express
23   language being inconsistent with their role.
24             THE COURT:  Let me ask you a standing question.  And
25   I think Mr. Stewart probably wanted to hammer away a little
```

 1   bit at the government's standing argument.  But I had a lot of
 2   questions for him.  So perhaps we will hear more of that on
 3   rebuttal.
 4       But my question for you is:  Is there any way for
 5   asylum-seekers who enter between designated ports of entry who
 6   I'll just call "third-party plaintiffs" for purposes of our
 7   discussion, is there any way for them to challenge the interim
 8   final rule in their immigration proceedings?
 9           MR. GELERNT:  Your Honor, as I understand it, I think
10   the government may say that there's limited judicial review
11   when you're putting in an expedited removal case, which is
12   what's going to happen -- expedited removal proceeding, which
13   are those summary proceedings at the border.
14       My understanding from past cases, and I think from this
15   case as well --
16           THE COURT:  I think after the IJ level, there's no
17   judicial review.  And I think it says that.
18           MR. GELERNT:  That's the government's position.
19           THE COURT:  Yeah, I think that sentence is in there,
20   either in the interim rule or the proclamation.  I'd have to
21   go back.
22           MR. GELERNT:  Just to be fair, to put the Court on
23   notice, we are challenging that, saying there has to be
24   judicial review, unrelated to this rule.  That's a case --
25   that's an issue that goes way back.  But at the moment,

1   Your Honor, that is the law of the land, that there's no

2   review of expedited removal.

3            **THE COURT:**  Okay.  So let's -- let's just assume that

4   what happens is if the rule goes into effect, that an alien or

5   an immigrant is apprehended having crossed at other than a

6   designated port of entry, and pursuant to the rule, is deemed

7   not to have a credible fear, and placed into -- you know, and,

8   given a reasonable-fear interview, and if found not to meet

9   that standard, placed into expedited removal.

10       Anywhere in there, would that person have the opportunity

11   to challenge this final rule?

12            **MR. GELERNT:**  The government's position is:  No, they

13   would not.  So they would be removed.  So I think that is what

14   we're looking at is individuals now being removed, without

15   even a chance to challenge the rule.

16       And I think, you know, the government may take issue with

17   jurisdictional positions -- I don't know what they're going to

18   say about jurisdiction -- generally is that there's no

19   jurisdiction over that.  But you certainly could issue a TRO, a

20   preliminary injunction, and reserve that question.

21       But right now, Your Honor's exactly right, that is the

22   government's position.  They're going to get that expedited

23   removal, and the government is going to say:  You can't apply

24   for asylum and -- based on the rule, and then you're going to

25   be removed.

1         And that is what we're seeing now in the last few days.

2              **THE COURT:**  If this case were not present, in other

3    words, if this case had not been filed and we were not having

4    our discussion, could that individual asylum-seeker file a

5    habeas case in Federal District Court if they couldn't get

6    relief directly in Immigration --

7              **MR. GELERNT:**  The government's position is:  No.  And

8    so that's why I think we're here, seeking a TRO.

9         And I just want to raise one point that you brought up

10   about third-party standing.  What we have learned in the last

11   48 hours is that there's an acute problem on the borders in

12   Mexico, where the Mexican government is not letting

13   unaccompanied children get on the waiting list.  Even though

14   the list is so long and they're in danger, but they're not even

15   allowed to be on the list.

16        So one of our plaintiffs, A.O.L., is going to represent

17   them.  But I think in order for them to challenge, they

18   couldn't even get into the country because they're not allowed

19   on a port of -- they're not allowed to apply at a port of

20   entry.

21        So we believe, in addition to all the other standing

22   arguments and zone of interest, which we believe we satisfied,

23   that there is third-party standing.  And it's classic

24   third-party standing where these children who are in Mexico

25   would not even be in those expedited-removal proceedings.  Even

1   if there were habeas, they wouldn't be able to access even the

2   IJ proceedings, the AO and -- asylum officer and IJ

3   proceedings.

4       So I think that's why we believe there's a critical need.

5   There's just too many people now in danger.  Those kids are in

6   desperate danger on the Mexican side.

7       And again, that goes back to some of Your Honor's points

8   about putting this in place so quickly, before there's even a

9   system to handle people at ports.  That's even assuming that,

10  ultimately, this rule would channel people.

11      The other point I would make is that I think Your Honor

12  pulled out the exact phrase in the promulgation -- the preamble

13  that's critical to understanding the disconnect between the

14  rule and what they're trying to do.  And that's where they say:

15  We're talking about writ large, the asylum process.

16      I mean, that really seems to be what's going on, is they

17  don't like the asylum process.  That's fine; the administration

18  can have that battle with Congress.  But ultimately, I think,

19  as the government concedes, the proclamation is not what's

20  denying asylum.  The Attorney General can have that fight with

21  Congress.  But there's really no connection between the rule

22  and the problems they see in the asylum process.

23      Now, we believe the asylum process is working.  Congress

24  made it clear that they wanted a low threshold at the border in

25  these summary hearings, because someone is traumatized, they

 1  don't have counsel, they're not going to understand how to

 2  present their claim.  And so Congress wanted a low threshold in

 3  that first hearing.

 4      But ultimately, this is more a fight between, I think, the

 5  executive branch and Congress.  Congress has made a decision;

 6  Congress can alter it.  But right now, Congress has been very

 7  clear that people who enter between ports are allowed to apply.

 8      And I think saying that they can apply but not eligible,

 9  I'm not sure I can add anything to what Your Honor has said

10  about that would render it a nullity.

11      Unless there are further questions, Your Honor, I think I

12  would sit down, then.

13          THE COURT:  Thank.  I don't have any --

14          MR. GELERNT:  Thank you, Your Honor.

15          THE COURT:  -- more questions.  Thank you.

16      Mr. Stewart.

17          MR. STEWART:  Thank you, Your Honor.

18      A few points, Your Honor, that I just want to hit home

19  before I sit down.

20      One is that one of the strange things about this suit was

21  that it was brought -- it was filed the very day that this

22  regulation came out, before the rule and proclamation had

23  actually been applied to anyone.  So we have this odd situation

24  where we have organizations that are alleging speculative harms

25  that may not come to pass.  You know, they haven't waited to

 1  see how the actual rule will play out.  You know, they're not

 2  -- they're asserting they're going to be injured in certain

 3  ways.

 4      And we don't really have the situation of somebody filing

 5  suit in the concrete context of having the rule applied to

 6  them.  Those suits would be -- to the extent there would be a

 7  systemic challenge to those folks, the exclusive venue for

 8  those would be in the District of Columbia Federal Court, where

 9  challenges to the validity of the expedited removal system

10  could be processed.

11          **THE COURT:**  Do you disagree, by the way, with

12  Mr. Gelernt that an individual asylum applicant who were

13  apprehended after -- excuse me -- who was apprehended after

14  crossing between designated ports of entry would not have an

15  opportunity to challenge the interim final rule?  In -- at any

16  point in the immigration proceedings?  Or, Mr. Gelernt would

17  say otherwise?

18      Well, actually, he said it was your position.  He didn't

19  tell me what his position was.  But that's what he said your

20  position would be.  Is he right?

21          **MR. STEWART:**  No, Your Honor, I think the right

22  challenge for that would -- again, it would be in the District

23  of -- it would be in DDC.  That's where a systemic challenge

24  -- you know, judicial review by somebody who is subject to an

25  expedited-removal determination, that's where those venues

 1  lie, just given the need for national uniformity.  But you

 2  actually need a person who's been subjected to the system.  So

 3  that would be the way to challenge that.

 4      There's also --

 5          THE COURT:  Would that halt the person's expedited

 6  removal?

 7          MR. STEWART:  It would -- I mean, it would depend on

 8  what the Court would say there, Your Honor.  I mean I don't --

 9  I won't concede that the Court could properly do that, but I

10  would add that the Court --

11          THE COURT:  So a court could do it improperly?  I

12  mean, I'm not trying to argue with you, but I'm just trying to

13  figure out who -- just what standing is about.  Who has the

14  right to stand up in court for these people.  Who lets them do

15  that.

16      So does the government -- let's put aside what Mr. Gelernt

17  would say if he were arguing the case in the District of the

18  District of Columbia.  Okay?  What would you say?

19      You're at the podium, and District Court says to you:  Is

20  this person -- hey, they just filed this lawsuit, the person's

21  in expedited removal.  Are you going to stop the expedited

22  removal?

23      What would the government's position be?

24          MR. STEWART:  I'm not going to commit to a position

25  on this at that time, Your Honor, in part, because I would

1   need to see what the situation is of the person challenging

2    the expedited removal.

3           Again, as we've emphasized, this is a premature suit, but

4   it is -- a challenge to the expedited removal system is venued

5   in DDC.  This court doesn't have authority to touch that

6   system.

7           And the District of Columbia is authorized and directed by

8   statute to proceed very quickly in dealing with those kinds of

9   suits.  It is the -- it is the place where these suits have

10   happened before.  One attempted such suit was filed not that

11   long ago, a couple months ago, I want to say.

12           The D.C. Circuit and the DDC have spoken authoritatively

13   to this question, and pointed out the problems of organizations

14   trying to seek relief on behalf of people, because what that

15   really is is somebody -- you need people who are subject to

16   this determination.  And the DDC can properly address those

17   things.

18           On the issue of relief, Your Honor, you asked --

19   Your Honor asked Mr. Gelernt earlier what the nature of any

20   relief would be.  I would emphasize that the plaintiffs were

21   asking for extraordinarily -- extraordinary emergency relief,

22   halting in its tracks an important executive branch policy,

23   based on abstract, remote, self-inflicted theories of injury.

24           And any relief that this Court could provide would have to

25   be sharply limited to their particular circumstances.  At most,

1    it would have to apply to the plaintiffs, themselves, and

2    people who are demonstrably their clients and, you know, would

3    be supposedly connected to the harm that they allege.

4            THE COURT:  I'd make these organizations the most

5    popular lawfirms at the border if I did that, wouldn't I?

6    This rule doesn't apply to you or your clients, but it applies

7    to every other law firm that might be trying to help

8    asylum-seekers?  How's that going to work?

9            MR. STEWART:  I'm not -- I'm recommending denying the

10   TRO, Your Honor, that's our position, but --

11           THE COURT:  No, I get that.  But this is a

12   manageability question.

13       But you're saying if you don't deny it I should just apply

14   the relief to them.  And I'm just wondering how that would

15   actually work, in practical effect.

16           MR. STEWART:  I think anybody who would -- again,

17   it's very hard here, Your Honor, because we have a situation

18   where we have speculative theories of harm where we don't know

19   how these -- this asylum application -- we don't have

20   confirmation that this asylum application situation is going

21   to play out the way hypothesized by the plaintiff

22   organizations.

23           THE COURT:  Let me ask you the same case-management

24   point that I asked Mr. Gelernt.  And that is:  Let's say I do

25   issue a temporary retraining order.  Then what?

1        Do you anticipate that there would be further proceedings?

2   Would there be another hearing with regard to a preliminary

3   injunction?  Would the parties take discovery from each other?

4        What do you think should happen, if I do issue a TRO?

5        MR. STEWART:  This would be an administrative-record

6   case, Your Honor.  The Court should -- if the Court were to

7   grant a TRO in any sort of -- in any sort of respect, it

8   should have administrative-record and preliminary-injunction

9   briefing as expeditiously as possible to get this matter

10  resolved.

11       It's a very important initiative.  It's --

12       THE COURT:  How quickly is the government prepared to

13  produce the administrative record?

14       MR. STEWART:  I could check on that, Your Honor, but

15  it could be -- you know, I'm -- you know --

16       THE COURT:  Everyone's acting like they're surprised

17  this might lead to a preliminary-injunction hearing.  But

18  anyway, okay.  So we'll take that under advisement.

19       MR. STEWART:  Right, Your Honor.  We'd be prepared

20  to, you know, move in a matter of days, you know,

21  expeditiously.  It's difficult for me to stand here and say,

22  you know, a couple of days --

23       THE COURT:  Fair enough.

24       MR. STEWART:  -- after a truncated week, what the day

25  would be.  But we'd want to move very expeditiously if that

1    were the direction things were headed in.

2              **THE COURT:**   All right.

3              **MR. STEWART:**   I would emphasize, Your Honor, you

4    asked earlier about the burden on these factual assertions.   I

5    think Mr. Gelernt actually somewhat hit on this when he

6    emphasized that the nature of his challenge is a legal one.

7              What I would say is that to the extent there is some

8    challenge on the accuracy of the government's assessments or

9    predictions, that would be an arbitrary and capricious type

10   challenge, I believe.

11             That kind of challenge has not been brought.   And it would

12   need to await the production of the administrative record, in

13   any event.   But it's just not at issue in this hearing.   And I

14   think Mr. Gelernt, in effect, said that when he said that the

15   nature of his challenge is really legal.

16             Zone of interest, Your Honor, just briefly, you know, we

17   hit this in our briefing, somewhat gets to some of the standing

18   issues, too.   But -- which I've also hit.   But the zone of

19   interest here, the people who would really be affected by this

20   rule are, you know, the aliens, themselves.   The immigration

21   laws are really aimed at the interests of aliens.

22             You know, there will presumably be aliens who fall within

23   the zone of the interest in these statutes.   But organizations

24   who fall into this category just do not fit within the aims of

25   the immigration laws in the same way.

1    I would also add that challenges to expedited or to -- you

2    see other indicators in the statute of expedited removal

3    challenges are channeled to D.C.  As I've said, challenges to

4    removal often take an individualized form.  And there's just

5    not this kind of organization -- you know, broad organizational

6    theory for this subset of cases.

7    And also, just on standing more generally, Your Honor, I

8    haven't seen any limiting principle that the plaintiffs had

9    offered to the *Havens Realty* point about just -- if they were

10   allowed standing here, then any organization that kind of has

11   its mission in the area of law that changed could claim

12   standing because it would, you know, affect what -- you know,

13   affect their mission, and they could choose to divert resources

14   in response to it.

15   Another point, Your Honor, I don't think that you had

16   mentioned this much, but this was a big theme, at least in the

17   briefing, and I don't know if this has been mentioned except by

18   Mr. Gelernt earlier today, is, I want to emphasize that a theme

19   in the ACLU's briefing has been -- ACLU and colleagues'

20   briefing, has been that that this rule effectively returns

21   people to their persecutors and torturers.

22   I want to emphasize, it does no such thing.  Asylum is a

23   discretionary benefit.  The key protections for avoiding return

24   to a country where someone is going to be persecuted or

25   tortured are statutory withholding in removal and protection

1    under the regulation implementing -- the regulations

2    implementing the convention against torture.

3           **THE COURT:**  Persons who are suffering from torture

4    don't also make asylum claims, sometimes?

5           **MR. STEWART:**  Some do, Your Honor, some do.  But

6    again, asylum is a discretionary benefit.  And the capability

7    of torture claims still is there in full force.

8           **THE COURT:**  It's discretionary, but it has a lower

9    bar.

10          **MR. STEWART:**  It has a lower bar for the showing of

11   demonstrating refugee status, Your Honor.  But there are

12   also -- not to change uses of the word "bars" -- other

13   prohibitions on it, and it also requires an ultimate favorable

14   exercise of discretion.

15       Again, it comes with a lot of benefits, Your Honor.  But

16   the --

17          **THE COURT:**  But the discretion is reviewable.  It's

18   easier to get.  But it's discretionary.  And so the effect of

19   this would be that there might be some persons -- I mean, my

20   question is:  Isn't it true that the effect of this would be

21   that there might be some persons who are subject to torture,

22   who might qualify for these are other forms of relief?  But

23   because, in the view of the authorities, they are not able to

24   meet what would now be the higher bar of mandatory forms of

25   relief, they don't get relief.

 1          And it's not because they are not entitled to it, under

 2     any circumstances.   It's that they are not entitled to it under

 3     the form of relief that has a lower bar.

 4          Isn't that what would happen?

 5               MR. STEWART:   Your Honor, I think it's a shift --

 6     it's a different way of exercising discretion over an

 7     already-discretionary benefit.   And when you have a large

 8     system, you know, you work with a system as perfectly as you

 9     can, you know, to hammer things out in individual cases.

10          But it meets the United States's obligation, and it

11     properly allows people who are claiming some kind of

12     persecution or fear that's cognizable under the law to make

13     those claims.

14          The plaintiffs repeatedly insist that, you know, a great

15     many of the people whose interests they are claiming to look

16     after have very strong claims about torture and persecution.

17     They can still bring those claims.   The problem that we're

18     going after with this rule --

19               THE COURT:   Does the government contend none of them

20     that would have been granted in the past will now be denied?

21     That is a yes-or-no question.

22               MR. STEWART:   I don't think we, you know -- granted

23     what, Your Honor?

24               THE COURT:   Does the government contend -- your

25     argument -- I take your argument to be:   Look, the plaintiffs

 1     can still bring these claims.  What's the problem?

 2         And my question for you is:  Does the government contend

 3     that some claims for relief -- that no claims for relief that

 4     would have been granted in the past will now be denied?

 5             MR. STEWART:  I can't -- I can't predict what will

 6     happen, Your Honor.  I mean, it just -- nothing changes as far

 7      as the availability of withholding of removal or a convention

 8      under the protection against torture.  Those remain

 9      unaffected.

10         It's just the discretionary benefit of asylum, which is --

11     brings with it a lot of other additional direct and collateral

12     benefits, is what's affected here.  And it's affected in

13     response to a major, major crisis.

14         And I'd add that many people subject to asylum bars could

15     similarly have claims -- claims of, you know, persecution, for

16     example, that they're now, despite those claims, ineligible to

17     get because, say, they fall under one of the six statutory

18     bars.  So there are circumstances in which people otherwise

19     eligible for asylum have been barred from asylum, as a

20     categorical matter.

21         This (Indicating), given the broad statutory authority and

22     the broad discretion in the executive branch, falls comfortably

23     within the legal authorization to do that.

24             THE CLERK:  You have one minute remaining.

25             MR. STEWART:  Thank you.

1    See if I have -- I just emphasize, as I've said,

2  Your Honor, in rebuttal, that to the extent any relief were

3  granted, you know, it should be very limited, very carefully

4  tailored, and very sensitive to the extraordinary executive

5  branch interests of this case in addressing a serious crisis in

6  our asylum system.

7    But in addition to that, I would, as I've explained, ask

8  the Court to deny the TRO, and allow the rule and proclamation

9  to continue to their effect.

10    Thank you, Your Honor.

11         **THE COURT:**  Mr. Stewart, thank you.  Gentlemen, thank

12   you both for your arguments.  Ladies and gentlemen, thank you

13   both for your briefing.

14    This matter is now under submission, and court is now in

15  recess.

16    (Proceedings concluded)

17

18

19

20

21

22

23

24

25

1

2

3

4                    **<u>CERTIFICATE OF REPORTER</u>**

5          I, BELLE BALL, Official Reporter for the United States

6    Court, Northern District of California, hereby certify that the

7    foregoing is a correct transcript from the record of

8    proceedings in the above-entitled matter.

9

10

11    _____/s/ Belle Ball_____

12              Belle Ball, CSR 8785, CRR, RDR

13              Tuesday, November 20, 2018

14

15

16

17

18

19

20

21

22

23

24

25