JOSEPH H. HUNT
*Assistant Attorney General*
SCOTT G. STEWART
*Deputy Assistant Attorney General*
AUGUST E. FLENTJE
*Special Counsel*
WILLIAM C. PEACHEY
*Director*
EREZ REUVENI
*Assistant Director*
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 307-4293
Email: Erez.R.Reuveni@usdoj.gov
PATRICK GLEN
*Senior Litigation Counsel*
JOSEPH DARROW
FRANCESCA GENOVA
CHRISTINA GREER
*Trial Attorneys*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| East Bay Sanctuary Covenant, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> Donald J. Trump, President of the United States, *et al.*, <br><br> Defendants. | EMERGENCY MOTION TO STAY TEMPORARY RESTRAINING ORDER PENDING APPEAL <br><br> Civil Action No. 1:18-cv-06810-JST |

## INTRODUCTION

Defendants hereby move the Court to stay its temporary restraining order (TRO) barring enforcement of the Departments of Justice's and Homeland Security's rule, Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations, 83 Fed. Reg. 55934 (Nov. 9, 2018), pending a decision from the Ninth Circuit on Defendants' forthcoming appeal. Defendants also request that the Court enter an order staying its TRO during the interim period while the Court considers this motion. Defendants advise the Court that they intend to seek emergency relief from the Ninth Circuit by Wednesday, November 28, 2018, if this Court does not grant stay relief. Defendants have notified Plaintiffs and Plaintiffs oppose the relief requested in this motion.

As explained below, the balance of harms weighs strongly in favor of a stay and, respectfully, Defendants are likely to prevail on the merits in their appeal. This Court's injunction, which will last for at least 30 days, directly undermines the President's determination that an immediate temporary suspension of entry between ports of entry is necessary to address the ongoing and increasing crisis facing our immigration system. The Court's injunction immediately harms the public by thwarting the rule that limits asylum eligibility for aliens that contravene this suspension of entry, issued in accordance with the Departments' broad and express statutory authority over asylum. The injunction undermines the Executive Branch's efforts, including its international diplomatic efforts, to encourage the large number of aliens transiting Mexico—who, rather than properly presenting themselves at a port of entry, violate our criminal law and endanger themselves, any children accompanying them, and U.S. law enforcement officers by crossing illegally into the country, as recent events have amply demonstrated—to simply follow our laws. Defendants acted well within their statutory and constitutional authorities to address a major crisis, and the Court's injunction irreparably harms the government and jeopardizes important national interests. The organizational Plaintiffs, by contrast, have identified only speculative harms to their abstract missions and to their administrative interests that they claim they would suffer from implementation of the rule.

## STANDARD OF REVIEW

In deciding a motion to stay an order pending appeal, courts consider four factors:

"(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009). A stay is appropriate if the movant demonstrates serious questions going to the merits on appeal and the balance of hardships tips sharply in its favor. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).

## ARGUMENT

### I. The Balance of Harms Weighs Strongly in Favor of a Stay

The serious and irreparable harms to the government and the public from this Court's injunction outweigh any harm that Plaintiffs might suffer if the injunction is stayed. The Supreme Court reached a similar conclusion when it stayed in full the injunctions issued by district courts in *Trump v. Hawaii*, No. 17A550, 2017 WL 5987406 (U.S. Dec. 4, 2017), and *Trump v. International Refugee Assistance Project (IRAP)*, No. 17A560, 2017 WL 5987435 (U.S. Dec. 4, 2017). The Supreme Court necessarily determined that the government's national-security and foreign-policy interests outweighed the plaintiffs' interests in those cases. *See Nken*, 556 U.S. at 434. The government's foreign-policy and public-safety interests here—which relate to the need to work with Mexico and other countries to address large groups of aliens leaving the Northern Triangle and illegally crossing our southern border—are similarly weighty, and, unlike the interest identified in those prior cases, the interest of the aliens here—in crossing our border in violation of criminal law—has *no* weight in this balance.

#### A. The Preliminary Injunction Irreparably Harms the Government and the Public

This Court's injunction undermines the Executive Branch's constitutional and statutory authority to secure the Nation's borders by enforcing our immigration laws and it enables the very harms to the Nation that the Executive Branch sought to address in the rule and proclamation. The Executive Branch's protection of these interests warrants the utmost deference, particularly where, as here, it acts based on "[p]redictive judgment[s]" regarding specific risks to aliens making dangerous illegal crossings into the United States and the safety of federal officers who guard our border. *Dep't of the Navy v. Egan*, 484 U.S. 518, 529 (1988); *see Holder v. Humanitarian Law*

*Project*, 561 U.S. 1, 33-35 (2010).  Rules "concerning the admissibility of aliens" also "implement[] an inherent executive power." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950).  Thus, a stay pending appeal is appropriate where an injunction "is not merely an erroneous adjudication of a lawsuit between private litigants, but an improper intrusion by a federal court into the workings of a coordinate branch of the Government." *INS v. Legalization Assistance Project*, 510 U.S. 1301, 1305-06 (1993) (O'Connor, J., in chambers); *see Heckler v. Lopez*, 463 U.S. 1328, 1330 (1983) (Rehnquist, J., in chambers); *see also Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978) (per curiam).

The Court's order enjoining enforcement of the rule necessarily imposes irreparable harm on the government and the public.  Even a single State "suffers a form of irreparable injury" "[a]ny time [it] is enjoined by a court from effectuating statutes enacted by representatives of its people." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted); *see, e.g.*, *O Centro Espirita Beneficiente Uniao de Vegetal v. Ashcroft*, 314 F.3d 463, 467 (10th Cir. 2002).  *A fortiori*, this Court's injunction imposes irreparable injury on the Executive Branch and the public given that the rule rests on the discretion-laden judgments of two Cabinet members designed to implement the President's own judgment that the national interest warrants temporarily suspending illegal entries at the southern border.

The Departments explained that 396,579 aliens were apprehended in FY 2018 entering unlawfully between ports of entry on the southwest border.  83 Fed. Reg. at 55948.  That is over 1,000 aliens every day—many with families and children—who are making a dangerous and illegal border crossing rather than presenting themselves for inspection at a port of entry.  The Executive Branch is entitled to use every legal tool available to halt this dangerous and illegal practice, as it has done here.  The Departments acted to address the "urgent need to deter foreign nationals from undertaking dangerous border crossings, and thereby prevent the needless deaths and crimes associated with human trafficking and alien smuggling operations," *id.* at 55950, especially the "thousands of aliens traveling in groups . . . expected to attempt entry at the southern border in the coming weeks," *id*. at 55950.  Immediate action is warranted for the swift protection of the United States' border and laws.  The rule detailed how these illegal crossings put federal

officers at risk. *See id.* Hundreds of aliens die each year. The problem is all the greater given this Court's extension of its order not only to the organizations before the Court, or even to aliens with whom these organizations have an attorney-client relationship, but also to *all aliens worldwide* who now or will seek to break our laws by crossing our southern border illegally and then applying for asylum if apprehended.

The Supreme Court has warned of "the danger of unwarranted judicial interference in the conduct of foreign policy." *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 116 (2013). This Court has engaged in such interference by substituting its independent views on border security for those of the political branches of the U.S. government. *See id.*; *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 248 (1991) (courts should not "run interference" in a "delicate field of international relations"). The Executive Branch—tasked with international relations—has determined that foreign and domestic policy require measures to "encourage . . . aliens to first avail themselves of offers of asylum from Mexico" and is engaging in international diplomatic negotiations accordingly. 83 Fed. Reg. at 55950. It is not the province of any court to itself weigh the balance, based on conclusory and woefully deficient declarations submitted by Plaintiffs, that "asylum seekers experience high rates of violence and harassment while waiting to enter, as well as the threat of deportation to the countries from which they have escaped," against the Executive Branch's determinations about the risks of illegal crossings and how best to resolve international-relations issues. Order 30. The rule makes clear that it took into account the need to prevent "needless deaths and crimes associated with human trafficking and alien smuggling operations," and the Executive Branch can determine that such a goal is best served by using the available lawful tools to control the border—including by taking action necessary to channel to ports of entry those aliens who seek to enter to apply for asylum. Thus, the United States suffers a separation-of-powers harm in the Court's blocking of the Executive Branch's lawful action, on top of the harms to the Nation and the public described above and in Defendants' prior briefing.

### B. A Brief Stay Pending Expedited Appeal Would Not Substantially Harm Plaintiffs

As the government argued in its opposition brief and at the November 19, 2018 hearing, Plaintiffs have not established that they have been injured or, indeed, affected at all by the rule.

The Court's order relies instead on third-party standing notions for "irreparable injury"—an injury that Plaintiffs did not allege either in their complaint or in their motion and instead improperly raised in their reply brief, depriving the government of an opportunity to respond. *See* Compl. ¶¶ 78-100 (discussing "harm to plaintiffs"). Plaintiffs themselves have not shown that they face irreparable harm on their own account that is tied to the rule, and cognizable under the INA, because the rule applies only to aliens who enter the United States unlawfully. Indeed, they have not even identified an actual client in fact affected by the rule. Nor can they rely on financial concern. *See, e.g.*, *Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended . . . are not enough."). And their professed inability to comment does not present irreparable harm: Plaintiffs may comment on the rule now, and any harms tied to the impact of the rule at present are again purely monetary. *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League,* 634 F.2d 1197, 1202 (9th Cir. 1980). And even if Plaintiffs could invoke harms to third parties, those aliens would lack any claim to harm, because they would be able to adjudicate any legal claims they have through the appropriate review channels in the District Court for the District of Columbia or through a petition for review. *See* 8 U.S.C. § 1252(a)(5), (b)(9), (e)(3).

Plaintiffs failed to establish irreparable harm sufficient to warrant a TRO or an injunction. The balance of harms strongly supports a stay of this Court's injunction pending appeal.

## II.     The Government is Likely to Prevail on the Merits

The government respectfully submits that, notwithstanding this Court's order, the government is likely to succeed on the merits of its appeal.

### A.     Justiciability

This Court erred in concluding that Plaintiffs' claims are justiciable.

*First*, the Plaintiff organizations have not themselves suffered a cognizable injury in fact necessary to establish Article III standing. Although the Court concluded that Plaintiffs' mission had been frustrated by the rule and proclamation, Order 11-12, that conclusion is unsupported. Neither the rule nor the proclamation prevents Plaintiffs from "provid[ing] assistance to asylum seekers," which is Plaintiffs' stated mission. Compl. ¶ 78. The Court pointed to certain practices

of border officials and policies that allegedly make it more difficult for individuals to seek asylum, Order 11-12, but those actions are not part of the rule or proclamation that Plaintiffs challenge. Moreover, Plaintiffs do not allege, and this Court did not find, that Plaintiffs cannot continue to assist asylum seekers who enter the country through a port of entry. And Plaintiffs point to nothing to suggest that they could not maintain funding by representing such individuals, who, as the Court acknowledged, are present at ports of entry in significant numbers. Order 11. So Plaintiffs have not identified any redressable injury in fact that could satisfy Article III.

*Second*, even if the Plaintiff organizations had suffered a cognizable Article III injury in fact, they are not within the zone of interests of the INA. It is settled that "on any given claim the injury that supplies constitutional standing must be the same as the injury within the requisite 'zone of interests.'" *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996); *see also* Wright & Miller, Fed. Prac. & Proc. § 3531.7, at 513 (3d ed. 2008) ("[T]he same interest must satisfy both tests."). The Court's zone-of-interests analysis, however, rested on speculation about the rights of Plaintiffs' potential future asylum-seeker clients under the INA. Order 16. The Court did not conclude that Plaintiffs' *own* alleged injuries fall within the zone of interests of the INA, and it is well-established that such injuries cannot satisfy that test. *See INS v. Legalization Assistance Project of L.A. Cty.*, 510 U.S. 1301, 1305 (1993) (O'Connor, J., in chambers); *Immigrant Assistance Project of Los Angeles Cty. v. INS*, 306 F.3d 842, 867 (9th Cir. 2002); *Cuban Am. Bar Ass'n, Inc. v. Christopher*, 43 F.3d 1412, 1423 (11th Cir. 1995); *Nw. Immigrant Rights Project v. USCIS*, 325 F.R.D. 671, 688 (W.D. Wash. 2016); *see also* Defs.' TRO Opp. 9-10.[1]

*Third*, the Court erred in concluding that Plaintiffs have third-party standing to assert the rights of asylum-seekers who might become their clients. Any putative practical obstacles that prospective immigrants may face in bringing lawsuits are generally insufficient to support third-party standing. *See, e.g., Am. Immigration Lawyers Ass'n (AILA) v. Reno*, 199 F.3d 1352, 1363-

---

[1] The only reference to organizations such as Plaintiffs in the INA is at 8 U.S.C. § 1158(d)(4)(A). That provision aims to assist the alien and the government in its administration of the asylum program. *See* 8 U.S.C. § 1158(d)(6). Nothing about it reflects a statutory purpose of giving non-profit organizations a role to play in setting asylum-eligibility standards. Indeed, § 1158(d)(7) confirms that § 1158(d) creates no private right of action, which underscores that third-party organizations lack any interest cognizable under § 1158(d)(4)(A).

64 (D.C. Cir. 2000); *Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 809 (D.C. Cir. 1987); *compare Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1689 (2017) (holding that "hindrance" requirement was met because the third party "died in 1976, many years before the current controversy arose").

The Court's order relies on alleged obstacles to asylum-seekers in "begin[ning] the asylum process" or "applying at ports of entry." Order 14. But the relevant question for third-party standing is not whether there are obstacles to individuals actually obtaining asylum; the question is whether "there is a 'hindrance' to the [third parties] advancing their own . . . rights against the [challenged] scheme." *Kowalski v. Tesmer*, 543 U.S. 125, 131 (2004). And here, the Court itself found that the Plaintiff organizations allege that they have "an existing attorney-client relationship" with their clients. Order 14. If that is correct, then neither Plaintiffs nor the Court have explained why there is a meaningful hindrance to the Plaintiff organizations filing suit with their purported clients as named plaintiffs—*i.e.*, identifying those clients and filing suit on their behalf, rather than on behalf of the Plaintiff organizations who then seek to indirectly assert their clients' rights. Therefore, Plaintiffs have not established the requirements for third-party standing.

*Finally*, even if third-party standing were possible here, jurisdiction would still not be proper because the relevant third parties—Plaintiffs' clients—do not themselves fall within the zone of interests of the INA at this time. Asylum seekers have no right under the INA to bring prospective challenges to asylum eligibility policies that have not yet been applied to them. *See, e.g.*, 8 U.S.C. § 1252(a)(5), (b)(9), (d), (e)(2) (e)(3); *see also AILA*, 199 F.3d at 1359-60 (in § 1252, "Congress meant to allow litigation challenging the new system by, and only by, aliens *against whom the new procedures had been applied*" (emphasis added)). Contrary to the Court's assumption, Order 15 n.12, asylum seekers may indeed challenge the rule once they are denied asylum. *See* TRO Opp. 24-25. Even if Plaintiffs had third-party standing to assert the rights of their clients, therefore, that still would not establish a justiciable claim because the clients themselves are also outside the INA's zone of interests at this time.

B.   **APA Claims**

There are serious flaws in the Court's reasoning on Plaintiffs' statutory claims. The Court concluded, for instance, that although the Departments can deny asylum in individual cases based

on the manner of an alien's entry into the country, they cannot do so as a categorical matter. *See* Order 20-21. But if § 1158(a) does not prohibit the agency from considering manner of entry on a case-by-case basis when determining whether to grant asylum under section 1158(b), there is no textual basis to conclude that it somehow prohibits the agency from considering manner of entry categorically. *See, e.g.*, *Lopez v. Davis*, 531 U.S. 230 (2001). The Court acknowledged as much, *id.* at 21, but then suggested that this rule does not apply when "Congress has not spoken to the precise issue and the statute contains a gap." *Id.* at 22. But as the Ninth Circuit explained, "Congress did not expressly declare such an intent in 8 U.S.C. § 1158(a)" with respect to categorical exercises of discretion. *Komarenko v. INS*, 35 F.3d 432, 436 (9th Cir. 1994). Rather, "[t]he statute merely states that 'the alien may be granted asylum in the discretion of the Attorney General,'" *id*. (quoting 8 U.S.C. § 1158(a)(1) (1993)), and thus nothing in the statute "preclude[s] the Attorney General from exercising this discretion by promulgating reasonable regulations applicable to . . . undesirable classes of aliens." *Id*. Although the statute has since been amended, the same discretionary features relevant here remain undiminished, *see* 8 U.S.C. § 1158(a)(1), (b)(1)(A), and nothing in the current provision requires the Departments to rely exclusively on case-by-case adjudication when applying their discretion to deny asylum based on an alien's manner of entry. To the contrary, the statute confers express discretionary authority to enact additional categorical bars on eligibility for asylum. *Id.* § 1158(b)(2)(C). Thus, the Court is simply wrong to suggest that the Departments are not entitled to deference; they are. *See Komarenko*, 35 F.3d at 436 (applying *Chevron* deference to Attorney General's decision to establish mandatory asylum bar and rejecting argument that Congress required that there be "no categories of aliens for whom asylum would be completely unavailable").

The Court also erred in determining that Article 31 of 1967 United Nations Protocol Relating to the Status of Refugees prevents the Departments from promulgating the rule. Order 20. As the Court acknowledged, the protocol "does not have the force of law in American courts." *Khan v. Holder*, 584 F.3d 773, 783 (9th Cir. 2009). Yet the Court concluded that Article 31's provision that "[t]he Contracting States shall not impose penalties, on account of their illegal entry or presence, on refugees who, coming directly from a territory where their life or freedom was

threatened" means that the government may not deny asylum based on an alien's manner of entry. Order 20-21. But even if the Protocol had any force here, it would change nothing. The Protocol's mandatory protections are implemented in the withholding-of-removal protection, which is unchanged. *See* TRO Opp. 22 n.4. And even on its own terms, the Protocol would not justify a universal injunction like that entered by the Court. An eligibility bar to asylum based on manner of entry "does not imprison or fine aliens," and thus is not "the sort of criminal 'penalty' forbidden" by Article 31(1). *Cazun v. Attorney General, United States*, 856 F.3d 249, 257 n.16 (3d Cir. 2017); *see Mejia v. Sessions*, 866 F.3d 573, 588 (4th Cir. 2017) (similar). That is especially so where aliens subject to the bar retain eligibility to seek statutory withholding of removal and protection under the CAT, consistent with the treaty obligations the United States has implemented into its domestic law. *See, e.g., Cazun*, 856 F.3d at 257 ("given the availability of withholding of removal and CAT protection, there is no treaty obligation in conflict with the Government's reading."). And even were that not so, and the Protocol were somehow the law of the land, it would still be of limited relevance: since a penalty is prohibited only for those refugees who "com[e] directly from a territory where their life or freedom was threatened," any violation would be limited to Mexican nationals seeking to make asylum claims, and no one else.

      The Court's good-cause/foreign-affairs analysis is also erroneous. As to foreign affairs, the Court incorrectly concluded that the rule must be supported by a showing of "definitely undesirable international consequences," and that showing a need for "speed and flexibility" is insufficient. Order 26-27. Neither conclusion is correct. *See* 5 U.S.C. § 553(a)(1) (no such showing required to invoke); *Yassini v. Crosland*, 618 F.2d 1356, 1360 (9th Cir. 1980) ("prompt response" required to embassy takeover sufficient for foreign affairs exception). Nor was the Court correct in concluding that the Departments relied only on speed and flexibility in invoking the foreign-affairs exception. The choice of the Executive Branch here—to require aliens seeking asylum to undergo orderly processing at ports of entry along the southern border, as part of the Executive Branch's efforts in negotiations with other countries—is a "[d]ecision[] involving the relationships between the United States and its alien visitors" that "implicate[s] our relations with foreign powers" and "implement[s] the President's foreign policy." *Id.* at 1361.

Likewise, the good-cause analysis was fundamentally flawed. The Court accepted the *possibility* that the rule's cited purpose to encourage aliens to present at ports of entry might "make[] some intuitive sense." Order 28. But it then concluded that it must "assess[] the reasonableness of the Rule's linchpin assumption" through further proceedings. *Id.* at 29. But that is not how the good-cause exception works. All the government must do is state its reasons for invoking the exception in the rule. *See* 5 U.S.C. §§ 553(b)(B), (d)(3). And the Court does not conduct a *de novo* hearing as to the veracity of the government's stated reasons *ex post*. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010) (courts are particularly ill-equipped to second-guess the Executive Branch's prospective judgment about future risks, as decisions about how best to "confront evolving threats" are "an area where information can be difficult to obtain and the impact of certain conduct difficult to assess"). Thus, "[t]he Government, when seeking to prevent imminent harms in the context of international affairs and national security, is not required to conclusively link all the pieces in the puzzle before [the courts] grant weight to its empirical conclusions." *Id.* at 35; *see Oryszak v. Sullivan*, 576 F.3d 522, 525-26 (D.C. Cir. 2009) ("review of the breadth of [the margin of error acceptable in assessing security risk posed by an individual] is outside the authority of a nonexpert body."). Rather, the Court simply analyzes the government's proffered reasons on the face of the rule, taking the government at its word. *See, e.g.*, *Malek-Marzban v INS*, 653 F.2d 113, 116 (4th Cir. 1981). The Court's suggestion that some evidentiary record beyond the stated reasons found in the rule was necessary to address the good-cause argument was thus incorrect. *See United States v. Valverde*, 628 F.3d 1159, 1165 (9th Cir. 2010) (rule need only provide a "rational justification").

Finally, the court's injunction imposes particularly sweeping harm because it defies the rule that injunctions "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). An injunction based on harm to third-party clients of Plaintiffs must be so limited—and to Plaintiffs' actual clients. *See Log Cabin Republicans v. United States*, 658 F.3d 1162, 1168 (9th Cir. 2011)

## CONCLUSION

For the reasons stated above, a stay pending appeal should be granted.

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

SCOTT G. STEWART
Deputy Assistant Attorney General

AUGUST E. FLENTJE
Special Counsel

WILLIAM C. PEACHEY
Director

By: /s/ *Erez Reuveni*
EREZ REUVENI
Assistant Director
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 307-4293
Email: Erez.R.Reuveni@usdoj.gov

PATRICK GLEN
Senior Litigation Counsel

JOSEPH DARROW
FRANCESCA GENOVA
CHRISTINA GREER
Trial Attorneys

Dated: November 27, 2018        *Attorneys for Defendants*

# CERTIFICATE OF SERVICE

I hereby certify that on November 27, 2018, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of for the Northern District of California by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

By: */s/ Erez Reuveni*
 EREZ REUVENI
 Assistant Director
 United States Department of Justice
 Civil Division