Jennifer Chang Newell (SBN 233033)
Cody Wofsy (SBN 294179)
Spencer Amdur (SBN 320069)
Julie Veroff (SBN 310161)
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-0770
F: (415) 395-0950
*jnewell@aclu.org*
*cwofsy@aclu.org*
*samdur@aclu.org*
*jveroff@aclu.org*

Lee Gelernt*
Judy Rabinovitz*
Omar C. Jadwat*
Celso Perez (SBN 304924)
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*ojadwat@aclu.org*
*cperez@aclu.org*

*Attorneys for Plaintiffs* (Additional counsel listed on following page)

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

East Bay Sanctuary Covenant, *et al*.,

      *Plaintiffs*,

      v.

Donald J. Trump, President of the United States, *et al*.,

      *Defendants*.

Case No.: 18-cv-06810-JST

**MOTION FOR PRELIMINARY INJUNCTION**

Hearing: December 19, 2018, 9:30 a.m.

1  Melissa Crow*
   SOUTHERN POVERTY LAW CENTER
2  1666 Connecticut Avenue NW, Suite 100
   Washington, D.C. 20009
3  T: (202) 355-4471
   F: (404) 221-5857
4  *melissa.crow@splcenter.org*

5  Mary Bauer*
   SOUTHERN POVERTY LAW CENTER
6  1000 Preston Avenue
   Charlottesville, VA  22903
7  T:  (470) 606-9307
   F:  (404) 221-5857
8  *mary.bauer@splcenter.org*

9

10

11

12  *Attorneys for Plaintiffs*

13  *Admitted pro hac vice*

Baher Azmy*
Angelo Guisado*
Ghita Schwarz*
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
T: (212) 614-6464
F: (212) 614-6499
*bazmy@ccrjustice.org*
*aguisado@ccrjustice.org*
*gshwartz@aclu.org*

Christine P. Sun (SBN 218701)
Vasudha Talla (SBN 316219)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
T: (415) 621-2493
F: (415) 255-8437
*csun@aclunc.org*
*vtalla@aclunc.org*

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

BACKGROUND .................................................................................................. 1

LEGAL STANDARD......................................................................................... 2

ARGUMENT ..................................................................................................... 2

    I.       PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.. ...................... 2

        A.     The Rule Violates the INA. ....................................................... 2

        B.     The Rule Violates the APA......................................................... 4

        C.     Plaintiffs Have Standing And Satisfy The Prudential Rules. .................... 7

             1. Plaintiffs Have Established Article III Standing.................................... 7

             2. Plaintiffs Satisfy Third Party Standing. ................................. 11

             3. Plaintiffs Fall Within the Relevant Zones of Interest. .......................... 13

    II.      THE BALANCE OF EQUITIES SHARPLY FAVORS PLAINTIFFS.............. 16

        A.     Plaintiffs Will Suffer Irreparable Injury Absent A Preliminary
             Injunction. ......................................................................... 16

        B.     The Government Will Not Be Injured By An Injunction,
             Which Is In the Public Interest................................................... 18

    III.     THE COURT SHOULD ENJOIN THE RULE IN FULL.................................. 20

CONCLUSION.................................................................................. 21

1

## TABLE OF AUTHORITIES

2

**Cases**

3

*Aid for Women v. Foulston*,
441 F.3d 1101 (10th Cir. 2006) ................................................................................ 12

4

*Al Otro Lado, Inc. v. Nielsen*,
5
327 F. Supp. 3d 1284 (S.D. Cal. 2018) ..................................................................... 14

6

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) .................................................................................... 2

7

*Am. Trucking Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*,
8
724 F.3d 243 (D.C. Cir. 2013) .................................................................................. 15

9

*Animal Legal Defense Fund, Inc. v. Glickman*,
154 F.3d 426 (D.C. Cir. 1998) .................................................................................. 14

10

*Apotex, Inc. v. FDA*,
11
2006 WL 1030151 (D.D.C. Apr. 19, 2006) ............................................................. 17

12

*Barnum Timber Co. v. E.P.A.*,
633 F.3d 894 (9th Cir. 2011) .................................................................................... 10

13

*Buschmann v. Schweiker*,
14
676 F.2d 352 (9th Cir. 1982) ...................................................................................... 6

15

*California v. Health & Human Servs.*,
281 F. Supp. 3d 806 (N.D. Cal. 2017) ............................................................... 15, 17

16

*Campos-Hernandez v. Sessions*, 889 F.3d 564 (9th Cir. 2018) .................................... 3

17

*Caplin & Drysdale, Chartered v. United States*,
18
491 U.S. 617 (1989) .................................................................................................. 11

19

*City & Cty. of San Francisco v. Trump*,
897 F.3d 1225 (9th Cir. 2018) .................................................................................... 8

20

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
21
657 F.3d 936 (9th Cir. 2011) ................................................................................ 9, 11

22

*Constr. Indus. Ass'n of Sonoma Cty. v. City of Petaluma*,
522 F.2d 897 (9th Cir. 1975) ...................................................................................... 8

23

*Doe v. Trump*,
24
288 F.Supp.3d 1045 (W.D. Wash. 2017) ............................................................ 14, 16

25

*Earth Island Inst. v. Ruthenbeck*,
490 F.3d 687 (9th Cir. 2007) .................................................................................... 20

26

*Exodus Refugee Immigration, Inc. v. Pence*,
27
165 F. Supp. 3d 718 (S.D. Ind. 2016) .......................................................... 8, 12, 16

28

*FAIC Securities, Inc. v. United States,*
   768 F.2d 352 (D.C. Cir. 1985) ............................................................... 13

*Havens Realty Corp. v. Coleman,*
   455 U.S. 363 (1982) ............................................................................... 11

*Hawaii v. Trump,*
   859 F.3d 741 (9th Cir. 2017) .................................................................. 14

*Hawaii v. Trump,*
   878 F.3d 662 (9th Cir. 2017) .................................................................. 21

*Havasupai Tribe v. Provencio,*
   906 F.3d 1155 (9th Cir. 2018) ........................................................... 13, 15

*Immigrant Assistance Project of Los Angeles Cty. Fed'n of Labor v. I.N.S.,*
   306 F.3d 842 (9th Cir. 2002) .................................................................. 14

*Jacksonville Port Auth. v. Adams,*
   556 F.2d 52 (D.C. Cir. 1977) .................................................................. 20

*Jean v. Nelson,*
   711 F.2d 1455 (11th Cir. 1983) ................................................................ 5

*Kirwa v. Dep't of Defense,*
   285 F. Supp. 3d 21 (D.D.C. 2007) ......................................................... 17

*Kowalski v. Tesmer,*
   543 U.S. 125 (2004) ............................................................................... 11

*League of Women Voters v. Newby,*
   838 F.3d 1 (D.C. Cir. 2016) .................................................................... 16

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
   572 U.S. 118 (2014) ............................................................................... 13

*Lujan v. Nat'l Wildlife Fed'n,*
   497 U.S. 871 (1990) ............................................................................... 15

*Marin-Garcia v. Holder,*
   647 F.3d 666 (7th Cir. 2011) .................................................................. 12

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
   567 U.S. 209 (2012) ........................................................................... 13, 15

*Matter of Pula,*
   19 I&N Dec. 467 (BIA 1987) ................................................................... 3

*Mountain States Legal Found. v. Glickman,*
   92 F.3d 1228 (D.C. Cir. 1996) ............................................................... 16

*Nat'l Cottonseed Products Ass'n v. Brock,*
   825 F.2d 482 (D.C. Cir. 1987) ............................................................... 13

*Nat'l Council of La Raza v. Cegavske,*
    800 F.3d 1032 (9th Cir. 2015) ........................................................................... 11

*Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs,*
    145 F.3d 1399 (D.C. Cir. 1998) ......................................................................... 20

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,*
    886 F.3d 803 (9th Cir. 2018) ............................................................................. 10

*Nken v. Holder,*
    556 U.S. 418 (2009) ...................................................................................... 18, 20

*NWIRP v. USCIS,*
    325 F.R.D. 671 (W.D. Wash. 2016) ................................................................... 14

*Ocean Advocates v. U.S. Army Corps of Engineers,*
    402 F.3d 846 (9th Cir. 2005) ............................................................................. 10

*Open Comms. Alliance v. Carson,*
    286 F. Supp. 3d 148 (D.D.C. 2017) ................................................................... 17

*Pac. Shores Properties, LLC v. City of Newport Beach,*
    730 F.3d 1142 (9th Cir. 2013) ............................................................................. 8

*Paulsen v. Daniels,*
    413 F.3d 999 (9th Cir. 2005) ............................................................................. 15

*Payne-Barahona v. Gonzales,*
    474 F.3d 1 (1st Cir. 2007) ................................................................................. 12

*Perry v. Merit Sys. Prot. Bd.,*
    137 S. Ct. 1975 (2017) ......................................................................................... 4

*Penn. Psychiatric Soc. v. Green Spring Health Servs., Inc.,*
    280 F.3d 278 (3d Cir. 2002) .............................................................................. 13

*Powers v. Ohio,*
    499 U.S. 400 (1991) ..................................................................................... 11, 13

*Ramirez v. U.S. Immigration & Customs Enf't,*
    310 F. Supp. 3d 7 (D.D.C. 2018) ...................................................................... 20

*Regents of the Univ. of California v. U.S. Dep't of Homeland Sec.,*
    908 F.3d 476 (9th Cir. 2018) ........................................................................ 20, 21

*Saravia for A.H. v. Sessions,*
    905 F.3d 1137 (9th Cir. 2018) ............................................................................. 2

*Singleton v. Wulff,*
    428 U.S. 106 (1976) ..................................................................................... 12, 13

*Smith v. Org. of Foster Families For Equal. & Reform,*
    431 U.S. 816 (1977) .......................................................................................... 12

*Toor v. Lynch*,
  789 F.3d 1055 (9th Cir. 2015) ................................................................. 3

*Trump v. Hawaii*,
  138 S. Ct. 2392 (2018) ........................................................................... 4

*United States v. Valverde*,
  628 F.3d 1159 (9th Cir. 2010) ........................................................ 4, 6, 7

*U.S. Dep't of Labor v. Triplett*,
  494 U.S. 715 (1990) .............................................................................. 11

*Valle del Sol Inc. v. Whiting*,
  732 F.3d 1006 (9th Cir. 2013) ........................................................ 11, 16

*Washington v. Trump*,
  847 F.3d 1151 (9th Cir. 2017) ........................................................ 12, 21

*Yassini v. Crosland*,
  618 F.2d 1356 (9th Cir. 1980) ............................................................ 4, 5

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) .............................................................................. 19

**Statutes**

5 U.S.C. § 553 ........................................................................................ 15

5 U.S.C. § 553(a)(1) ................................................................................ 4

5 U.S.C. § 553(b)(B) ............................................................................... 6

8 U.S.C. § 1154(f)(3)(A) ........................................................................ 14

8 U.S.C. § 1158(a)(1) ........................................................................ 2, 20

8 U.S.C. § 1158(d)(4)(A) ....................................................................... 14

8 U.S.C. § 1158(d)(4)(B) ....................................................................... 14

8 U.S.C. § 1229(a)(1) ............................................................................ 14

8 U.S.C. § 1229(b)(2) ............................................................................ 14

8 U.S.C. § 1325 ....................................................................................... 6

8 U.S.C. § 1522(a)(2)(A) ....................................................................... 14

8 U.S.C. § 1522(b)(1)(A) ....................................................................... 14

8 U.S.C. § 1522(c)(1)(A) ....................................................................... 14

8 U.S.C. § 1522(d)(2)(A) ....................................................................... 14

8 U.S.C. § 1525(b)(7) ............................................................................ 14

**Regulations**

83 Fed. Reg. 57661 ............................................................................................... 1

83 Fed. Reg. 55943 ............................................................................................... 1

83 Fed. Reg. 55950 ............................................................................................... 6

83 Fed. Reg. 55951 ............................................................................................... 5

**Legislative History**

H.R. Rep. 96-608, 96th Cong., 1st Sess. (Nov. 9, 1979) ............................................ 20

**Other Authorities**

U.S. Customs and Border Protection, *United States Border Patrol Southwest Family Unit Subject and Unaccompanied Alien Children Apprehensions Fiscal Year 2016*, Statement by Secretary Johnson on Southwest Border Security (Oct. 18, 2016) ........................................... 19

U.S. Citizenship and Immigration Services, *Credible Fear Workload Summary* ...................... 19

PLEASE TAKE NOTICE that Plaintiffs East Bay Sanctuary Covenant, Al Otro Lado, Innovation Law Lab, and Central American Resource Center of Los Angeles hereby move the Court for a preliminary injunction.  A hearing is scheduled for December 19, 2018, at 9:30 a.m., in the courtroom of the Hon. Jon S. Tigar, located at 450 Golden Gate Ave., San Francisco, California.

Plaintiffs seek an order enjoining Defendants and all persons associated with them from implementing or enforcing the Interim Final Rule/Proclamation.  This motion is brought pursuant to Federal Rule of Civil Procedure 65 and is based on this motion and materials cited herein; the accompanying declarations; the pleadings and evidence on file in this matter; and such other materials and argument as may be presented in connection with the hearing on the motion.

## BACKGROUND

The Court is familiar with the statutory and factual background of this case, as set out in the Court's TRO order.  TRO Order at 2-6.  In brief, Defendants issued an interim final rule ("Rule") barring asylum for individuals who enter the country while covered by a presidential proclamation suspending entry at the southern border, and simultaneously issued such a proclamation suspending the entry of individuals who cross between ports at the southern border.  *See Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims*, 83 Fed. Reg. 55934 (Nov. 9, 2018); *Presidential Proclamation Addressing Mass Migration Through the Southern Border of the United States*, 83 Fed. Reg. 57661 (Nov. 9, 2018).  "The combined effect of the Rule and the Proclamation is that any alien who enters the United States across the southern border at least over the next ninety days, except at a designated port of entry, is categorically ineligible to be granted asylum."  TRO Order at 6.

Plaintiffs, organizations that provide representation and services to asylum seekers, filed this action.  On November 19, this Court issued a TRO, holding that Plaintiffs have standing; that the Rule squarely violates the INA; that Defendants' failure to comply with the APA's procedural

requirements presented serious merits questions; and that a nationwide injunction was warranted. The Court also denied a stay pending appeal of the TRO.  The government filed a notice of appeal; its request for a stay from the Ninth Circuit was filed on December 1 and remains pending.[1]

## LEGAL STANDARD

On a motion for a preliminary injunction, the plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Saravia for A.H. v. Sessions*, 905 F.3d 1137, 1142 (9th Cir. 2018).  A preliminary injunction may issue where "serious questions going to the merits [are] raised and the balance of hardships tips sharply in [plaintiff's] favor." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

## ARGUMENT

### I.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

#### A.  The Rule Violates The INA.

As this Court concluded in issuing a TRO, the Rule "irreconcilably conflicts with the INA and the expressed intent of Congress." TRO Order at 2.  In light of that conflict, "[b]asic separation of powers principles dictate" that the Rule must be invalidated.  *Id.* at 21.[2]

Congress specifically established that any noncitizen either "physically present in the United States" or arriving at our borders is entitled to apply for asylum.  8 U.S.C. § 1158(a)(1).  Congress was clear: This command applies "whether or not" the individual arrives "at a designated port of arrival," and applies "irrespective of such alien's status." *Id.*  Because "Congress has directly

---

[1] The Court is familiar with the TRO record, which Plaintiffs incorporate by reference for purposes of this motion.  In addition, Plaintiffs now submit the following declarations: Joint Declaration of Former Officials Madeleine K. Albright et al., Camila Alvarez, Michelle Brané, Lisa Mitchell-Bennett, Second Supplemental Declaration of Stephen Manning, Supplemental Declaration of Madeleine Penman, Nicole Ramos, Jeremy Slack, and Supplemental Declaration of Michael Smith.  Plaintiffs also submit a corrected version of the previously submitted Supplemental Declaration of Erika Pinheiro, which was cut off due to a scanning error.

[2] As the Court observed, "Congress's determination that place of entry not be disqualifying to an application for asylum is consistent with the treaty obligations underlying § 1158's asylum provisions."  TRO Order at 20; *see also* ECF No. 8-5 ¶ 6.

spoken to the precise question at issue," its command "is the end of the matter."  TRO Order at 18

(quoting *Campos-Hernandez v. Sessions*, 889 F.3d 564, 568 (9th Cir. 2018)).

The Court also correctly rejected the government's attempts to avoid the obvious conflict

between the statute's plain text and the Rule.  The government has asserted that § 1158(a)(1)

guarantees people who enter between ports only the right to submit an application, but permits the

government to categorically deny their application based solely on the fact that they entered between

ports.  *See* TRO Order at 21.  As this Court explained, that "argument strains credulity."  *Id*.  Surely

Congress intended to have some effect when it enacted the emphatic language of § 1158(a)(1)

stating that asylum was available "whether or not" the applicant presents at a designated port of

entry.  To accept the government's argument would "render the right to apply a dead letter."  TRO

Order at 21.

Likewise, the government's reliance on the Attorney General's discretion fall flat.  *See* TRO

Order at 21-22.  Whatever power the Attorney General has to establish limitations on asylum

pursuant to 8 U.S.C. § 1158(b)(2)(C), such conditions must be "consistent" with the rest of the

section—including the command of 8 U.S.C. § 1158(a)(1).  *See* TRO Order at 21.  Nor can the

government justify violating the clear intent of Congress by invoking the discretionary authority to

deny asylum on a case-by-case basis.  *See Toor v. Lynch*, 789 F.3d 1055, 1064 (9th Cir. 2015).

Indeed, "[n]ot only does the Rule flout the explicit language of the statute, it also represents an

extreme departure from prior practice."  TRO Order at 22.  As this Court recognized, since at least

*Matter of Pula*, the government and courts have been clear that manner of entry is at most a second-

tier factor among many in the overall exercise of discretion, and "should not be considered in such a

way that the practical effect is to deny relief in virtually all cases."  19 I&N Dec. 467, 473 (BIA

1987); TRO Order at 22 (collecting cases).

Finally, the Rule denying asylum cannot be justified because of the Proclamation.  As the

government has agreed, "the Proclamation does not render any alien ineligible for asylum."  TRO

Order at 17.  That concession is well taken.  The President cannot "by proclamation . . . override Congress's clearly expressed legislative intent, simply because a statute conflicts with the President's policy goals."  *Id*. at 23.  "No court has ever held that § 1182(f) 'allow[s] the President to expressly override particular provisions of the INA.'"  *Id.* (quoting *Trump v. Hawaii*, 138 S. Ct. 2392, 2411 (2018)).  And, for the reasons this Court has explained, the text and structure of §§ 1182(f) and 1185 foreclose any suggestion that Congress delegated to the President authority to dictate who would be eligible for asylum.  *Id*.

Ultimately, as this Court observed in denying a stay, the government apparently just disagrees with the statute.  But executive action is not the lawful response in that event.  "[T]here's a constitutionally prescribed way to do it.  It's called legislation."  Stay Order at 8 (quoting *Perry v. Merit Sys. Prot. Bd.*, 137 S. Ct. 1975, 1990 (2017) (Gorsuch, J., dissenting)).

### B.    The Rule Violates The APA.

As this Court observed, agencies "may not treat" the APA's notice and comment requirements "as an empty formality."  TRO Order at 24.  The government has suggested, however, that Plaintiffs "suffer no harm because they may now comment on the Rule" *after* implementation, but that argument is foreclosed by settled law.  Stay Order at 7-8.  Indeed, "[i]t is . . . 'antithetical to the structure and purpose of the APA for an agency to implement a rule first, and then seek comment later.'"  TRO Order at 24 (quoting *United States v. Valverde*, 628 F.3d 1159, 1164 (9th Cir. 2010)).

1. The government invokes the APA's foreign affairs exception.  5 U.S.C. § 553(a)(1).  As this Court has already made clear, however, the mere fact that this case involves immigration is insufficient.  *See* TRO Order at 25 ("the Ninth Circuit cautioned that '[t]he foreign affairs exception would become distended if applied to [an immigration enforcement agency's] actions generally'") (quoting *Yassini v. Crosland*, 618 F.2d 1356, 1360 n.4 (9th Cir. 1980)) (alterations in original).  Rather, "[f]or the exception to apply, the public rulemaking provisions should provoke definitely undesirable international consequences."  *Id.* (internal quotation marks omitted).

At the TRO stage, the Court accepted "for the purposes of argument that the Rule was part of the President's larger coordinated effort in the realm of immigration." *Id*. at 26. But, it explained, that assumption did not answer the relevant "counterfactual, namely, whether 'definitely undesirable international consequences' would result from following rulemaking procedures." *Id*. (quoting *Yassini*, 618 F.2d at 1360 n.4). In the TRO proceedings, "Defendants . . . were unable to explain . . . how eliminating notice and comment would assist the United States in its negotiations." *Id*. at 27. The Court concluded that Plaintiffs' challenge raised "serious questions," but afforded the government an opportunity to establish a sufficient explanation in the administrative record. *Id*. at 27-28 (internal quotation marks omitted).

The administrative record has now been produced, but there is still no adequate explanation of how notice and comment is supposed to impact the negotiations. Nothing in the record sheds further light on those negotiations, nor connects the dots this Court previously explained were markedly disconnected. *See Jean v. Nelson*, 711 F.2d 1455, 1478 (11th Cir. 1983) ("Not every request for international cooperation seriously may be called 'foreign policy.'"), *dismissed in relevant part as moot*, 727 F.2d 957 (11th Cir. 1984), *aff'd*, 472 U.S. 846 (1985). By contrast, bipartisan foreign policy and security officials—including former Secretaries of State, Defense, and Homeland Security—have submitted a sworn statement that the government's actions are likely to *hurt*, not help, U.S. foreign policy objectives. *See* Joint Decl. of Former Officials ¶ 10.

The gestures at negotiations with the Northern Triangle countries fare no better. The Rule invokes such negotiations in the vaguest terms, asserting they cover "issues such as how these other countries will develop a process to provide this influx with the opportunity to seek protection at the safest and earliest point of transit possible, and how to establish compliance and enforcement mechanisms for those who seek to enter the United States illegally, including for those who do not avail themselves of earlier offers of protection." 83 Fed. Reg. 55951. Such systems-level negotiations may well be underway—and, indeed, these issues have been discussed for years. That

is not an explanation for why a notice and comment process would make any difference to such negotiations.  *See* Joint Decl. of Former Officials ¶ 10 ("In our professional judgment, the failure to move forward immediately with an emergency rule will not damage our relations with Mexico or Northern Triangle countries. To the contrary, the most likely consequence of this apparently unilateral step is to inflame tensions and undermine our diplomatic relations throughout the Western Hemisphere, compromising critical security and other forms of cooperation with these nations in the process.").

The Court stopped short of finding a likelihood of success on this issue "[p]ending further information produced in the administrative record."  TRO Order at 27.  No such information speaks to the counterfactual the Court identified.  Plaintiffs are now likely to succeed on this issue.

2.     The administrative record also does not suffice to satisfy the APA's good cause exception.  5 U.S.C. § 553(b)(B).  "[T]he good cause exception is essentially an emergency procedure."  *Valverde*, 628 F.3d at 1165 (quoting *Buschmann v. Schweiker*, 676 F.2d 352, 357 (9th Cir. 1982))  Thus, successfully invoking the good cause exception requires an agency to "overcome a high bar," as the exception is to be "'narrowly construed and only reluctantly countenanced.'"  *Id.* at 1164.  As this Court explained, "[t]he good cause exception should be interpreted narrowly, so that the exception will not swallow the rule."  TRO Order at 28 (quoting *Buschmann*, 676 F.2d at 357).

The "linchpin assumption" of the government's good-cause argument, *id.* at 29, is that abiding by the normal notice and comment procedures "could lead to an increase in migration to the southern border to enter the United States before the rule took effect," 83 Fed. Reg. 55950.  As this Court observed, however, the government's assertion was undercut by the TRO record.  TRO Order at 28.  "Aliens who enter illegally are already subject to criminal and civil penalties, *see* 8 U.S.C. § 1325, which the government has been prosecuting under a 'zero-tolerance' policy," and Plaintiffs submitted evidence that "some of those aliens nonetheless cross illegally for reasons that may be

unaffected by the Rule's additional penalties, such as a lack of awareness of entry requirements or by imminent necessity caused by, among other things, threats of immediate violence from criminal groups near the border." TRO Order at 29; Slack Decl. ¶ 19-20 (many migrants unable to safely go to ports because of kidnapping rings and serious violence in border towns); Brané Decl. ¶¶ 22-28, 32-35; Ramos Decl. ¶¶ 5, 15-18. Again, the Court held plaintiffs had raised serious questions on this issue, but deferred further decision pending a "more robust" *record* including the administrative record. TRO Order at 29.

Here also, the administrative record does not supply the critical missing information. Nothing in the record supports the government's inferential leap—that eliminating notice and comment will change migration flows that are driven by a multitude of factors. As the Ninth Circuit has made clear, such assertions of "conclusory speculative harms" are not sufficient to justify abandoning the APA's fundamental procedural requirements. *Valverde*, 628 F.3d at 1167. It is not enough to simply hypothesize that notice and comment *might* have some effect. Indeed, as in *Valverde*, "the existence of stringent . . . criminal sanctions on the books at the time the [interim] regulation was promulgated obviated the case for an emergency." *Id.* at 1168 (second alteration in original, internal quotation marks omitted). The Court does not simply take the government's word for it. *Id.* (calling it "difficult to see what substantial public safety interest was served").

**C.  Plaintiffs Have Standing And Satisfy The Prudential Rules.**

**1.  Plaintiffs Have Established Article III Standing.**

As this Court previously held, Plaintiffs have suffered cognizable injuries in fact sufficient to establish Article III standing in their own right. *See* TRO Order at 8-13; Stay Order at 3. That conclusion remains correct, and is bolstered by Plaintiffs' additional evidence.

*First,* as this Court observed, the "Rule's impairment of the Organizations' ability to pursue asylum cases . . . impairs their functioning by jeopardizing their funding." TRO Order at 12. Indeed, Plaintiffs will suffer an imminent loss of funds and the potential closure of entire organizational

programs because of the Rule.  *See id*. at 13 ("the Court . . . finds that the Immigration Organizations'

loss of per-case funding is certainly impending").

   In particular, much of Plaintiffs' funding is tied directly to their ability to pursue affirmative

asylum claims on a case-by-case basis.  *See* ECF No. 8-7 ¶¶ 16-17 (EBSC at risk of losing $304,000

in government funding annually because it cannot serve clients who entered without inspection in

filing affirmative asylum applications, and of having to close its affirmative asylum program); Smith

Supp. Decl. ¶ 14 (similar); ECF No. 8-3 ¶¶ 7, 12 (CARECEN will suffer financial losses because

attorneys must now devote more hours per case to pursue complex non-asylum relief while still

receiving flat per-case fee from state funder); ECF No. 8-4 ¶¶ 11-12 (similar for Al Otro Lado,

which must now prepare additional applications for family members at greater financial cost);

Corrected Pinheiro Supp. Decl. ¶ 22 (long-term implementation would threaten Al Otro Lado's

ability to comply with its funding obligations and jeopardize future funding); *see also* Manning 2nd

Supp. Decl. ¶¶ 11.  As this Court noted, such threatened losses and programmatic closures are

"sufficient" to establish standing.  TRO Order at 12; s*ee City & Cty. of San Francisco v. Trump*, 897

F.3d 1225, 1235 (9th Cir. 2018) (anticipated "loss of funds" sufficient for injury); *Pac. Shores*

*Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1165 (9th Cir. 2013) ("closure" of

organization's programmatic activities constituted injury); *Constr. Indus. Ass'n of Sonoma Cty. v.*

*City of Petaluma*, 522 F.2d 897, 903 (9th Cir. 1975) (holding that a construction association suffered

cognizable injury from a "restriction on building" where its members "contribute[d] dues to the

Association in a sum proportionate to the amount of business the builders d[id] in the area"); *accord*

*Exodus Refugee Immigration, Inc. v. Pence*, 165 F. Supp. 3d 718, 739 (S.D. Ind. 2016) (granting

preliminary injunction where organizational plaintiff presented evidence that as a result of a loss of

funding, even if only temporary and eventually recoverable, "its organizational objectives would be

irreparably damaged by its inability to provide adequate social services to its clients"), *aff'd* 838

F.3d 902 (7th Cir. 2016).

*Second*, as this Court held, Plaintiffs "mission has been frustrated in numerous cognizable ways." TRO Order at 11. For example, the Rule frustrates EBSC's mission to assist asylum seekers in filing affirmative applications for asylum. *See* Smith Supp. Decl. ¶ 4. EBSC's affirmative asylum work is its most important program, and 80% of the clients in that program entered between ports. *Id.* ¶¶ 2, 5. EBSC cannot represent asylum seekers who enter at a port because it is located far away from the southern border, and because it almost never represents noncitizens who (like those who present at a port of entry) are in removal proceedings, as it lacks the staffing and funding to do so. *Id.* ¶¶ 6-13. Under the new policy, then, EBSC cannot deliver on its key mission. *See also* ECF No. 8-7 ¶¶ 6, 8-9, 15. The missions of the other Plaintiffs are similarly frustrated. *See e.g.,* Corrected Pinheiro Supp. Decl. ¶¶ 4-6, 10, 13, 15-22 (Al Otro Lado clients with potentially meritorious asylum claims are now significantly delayed or wholly unable to pursue them; because of diversion to non-legal work, organization has reduced ability to provide legal services); Ramos Decl. ¶¶ 4-7, 9-13 (significant time now required for non-legal services at expense of legal services); Alvarez Decl. ¶ 4 (CARECEN's mission is to provide services to all noncitizens irrespective of manner of entry); ECF No. 8-3 ¶¶ 6, 10 (CARECEN's core client base—asylum seekers who enter between ports—no longer eligible for asylum); ECF No. 8-6 ¶¶ 9-11 (similar for Innovation Law Lab); Manning 2nd Supp. Decl. ¶¶ 4-6, 10, 17. As the Court explained, "[t]he inability of an organization's constituency to gain access to or participate in the organization's core services is a well-recognized impairment of an organization's ability to function." TRO Order at 12 (citing *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943 (9th Cir. 2011) (en banc)).

The government has criticized the Court for pointing to the government's practice of "metering" asylum seekers at ports of entry and the barriers unaccompanied children face in getting on the list to present at a port, arguing that those practices and policies are not part of the Rule. But "the link" between the Rule and the inability of Plaintiffs' clients to access U.S. asylum procedures

is not "tenuous or abstract." *Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 860 (9th Cir. 2005).  As this Court recognized, it is "*[b]ecause of the Rule*" that Plaintiffs' clients have a previously reliable avenue of seeking asylum closed off to them, and so "are significantly delayed or wholly unable to pursue [their potentially meritorious asylum] claims, which are the Organizations' core service."  TRO Order at 12 (emphasis added); *see also* Stay Order at 3.  Plaintiffs "need not eliminate any other contributing causes to establish [their] standing."  *Barnum Timber Co. v. E.P.A.*, 633 F.3d 894, 901 (9th Cir. 2011); *see also Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 819 (9th Cir. 2018) ("[A] plaintiff [seeking preliminary injunctive relief] 'need not further show that the action sought to be enjoined is the exclusive cause of the injury.'") .

The record also clearly demonstrates that Plaintiffs have been forced to respond to these frustrations by diverting resources to efforts outside their core services, including providing non-legal, effectively day care services for unaccompanied child clients; dialing back other core legal services; and retraining staff, legal professionals, and community members on how to deal with the new regulatory landscape.  *See* TRO Order at 12-13; Corrected Pinheiro Supp. Decl. ¶¶ 14-16 (Al Otro Lado forced to expend significant staff resources to accompany its unaccompanied children clients full-time to safeguard them from danger, thus diverting resources away from providing core legal services); Ramos Decl. ¶¶ 4-7, 9-13 (similar; Al Otro Lado has had to house children in its office, attend to children's emotional and mental health needs); Alvarez Decl. ¶¶ 6-7 (CARECEN has already diverted resources to trainings and materials development it would not otherwise have conducted); ECF No. 8-3 ¶¶ 10-11, 13 (shifting from asylum to withholding and CAT applications forces CARECEN to divert resources away from other core legal services work); ECF No. 8-4 ¶¶ 9-10, 12-13 (similar for Al Otro Lado); ECF No. 8-6 ¶¶ 8-12 (Innovation Law Lab must totally overhaul training materials, deploy expensive and limited engineering resources to recode training software, cease most of its pro bono activities, and divert resources away from noncitizens in its Border X program); Manning 2nd  Supp. Decl. ¶¶ 7-18 (programmatic staff and web-based database

1   developers have been pulled from ongoing projects to provide emergency response to needs arising

2   at the border; staff already have had to devote additional time to screening cases and developing

3   training materials); ECF No. 8-7 ¶¶ 14-15, 17-19 (EBSC must divert resources to training staff and

4   educating community); Smith Supp. Decl. ¶ 15 (same).

5          Under Ninth Circuit law, these types of diversions are plainly sufficient to satisfy standing

6   under *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).  *See, e.g., Comite de Jornaleros*,

7   657 F.3d at 943; *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1018 (9th Cir. 2013); *Nat'l Council of*

8   *La Raza v. Cegavske*, 800 F.3d 1032, 1040 (9th Cir. 2015).

9

10                    **2.  Plaintiffs Satisfy Third-Party Standing.**

11         This Court also correctly concluded that Plaintiffs have third-party standing to assert the

12   legal rights of their clients who wish to enter the United States to apply for asylum but cannot do so

13   in significant part because of the new asylum ban.  To assert a third party's rights, (1) "[t]he litigant

14   must have suffered an 'injury in fact'"; (2) "the litigant must have a close relationship to the third

15   party"; and (3) "there must exist some hindrance to the third party's ability to protect his or her own

16   interests."  *Powers v. Ohio*, 499 U.S. 400, 410-11 (1991) (citation omitted).  These factors are easily

17   met here.

18

19         First, as discussed above, Plaintiffs have adequately demonstrated an injury in fact.

20         Second, Plaintiff Al Otro Lado has documented an "existing attorney-client" relationship

21   with unaccompanied minor children who are stuck in Mexico and unable to seek asylum.  *Kowalski*

22   *v. Tesmer*, 543 U.S. 125, 131 (2004) (emphasis omitted).  The attorney-client relationship is "one of

23   special consequence" that the Supreme Court has made clear is sufficient to support third-party

24   standing.  *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623 n.3 (1989); *U.S. Dep't*

25   *of Labor v. Triplett*, 494 U.S. 715, 720 (1990).

26

27         Third, these clients are plainly hindered in their ability to assert their own rights.  The

28   Supreme Court has made clear that the "hindrance" factor is not a high bar.  The third party need not

face an "insurmountable" barrier to asserting her rights; it is enough that there be a "genuine obstacle." *Singleton v. Wulff*, 428 U.S. 106, 116-117 (1976).  Indeed, the Ninth Circuit has made clear that it is sufficient to show merely that "the third party is *less able* to assert her own rights." *Washington v. Trump*, 847 F.3d 1151, 1160 (9th Cir. 2017) (per curiam) (emphasis added).

Here, Plaintiff's clients face several genuine obstacles, as this Court previously recognized. Critically, the clients are minor children.  "[C]ourts have generally held that a third-party child's minor status, standing alone, is a sufficient hindrance."  Stay Order at 4.  *See Payne-Barahona v. Gonzales*, 474 F.3d 1, 2 (1st Cir. 2007) (explaining that "hindrance" is "rather obvious in the case of minor children"); *Marin-Garcia v. Holder*, 647 F.3d 666, 670 (7th Cir. 2011); *Aid for Women v. Foulston*, 441 F.3d 1101, 1114 (10th Cir. 2006) ("the fact that those patients are minors is an additional obstacle—minors are generally not legally sophisticated and are often unable even to maintain suits without a representative or guardian"); *see also Smith v. Org. of Foster Families For Equal. & Reform*, 431 U.S. 816, 841 n.44 (1977) ("[C]hildren usually lack the capacity to make that sort of decision [as to how best to protect their interests], and thus their interest is ordinarily represented in litigation by parents or guardians.").  Because these children are unaccompanied, and so lack parents or guardians, their attorneys—Plaintiffs—are naturally the "best proponents" for asserting their rights.  Stay Order at 4.

These children are also uniquely vulnerable given that they are fleeing persecution, *see* Corrected Pinheiro Supp. Decl. ¶ 17, and so may wish to avoid drawing attention to themselves through litigation, particularly in light of Defendants' professed opposition to asylum seekers.  *See Exodus Refugee Immigration*, 165 F. Supp. 3d at 732.  Finally, because the children are unable to present themselves at ports of entry, *see* Corrected Pinheiro Supp. Decl. ¶¶ 4-6, 10; Ramos Decl. ¶¶ 5, 8-10; Brané Decl. ¶ 16 and are thus trapped in dangerous border towns without any opportunity to apply for asylum, their practical ability to bring a lawsuit is additionally hindered.  *See* ECF No. 8-4 ¶¶ 38-39 (noting recent record-high murder rate in border town); Corrected Pinheiro Supp. Decl. ¶¶

13-15; Penman Supp. Decl. ¶ 15 (heightened risk of *refoulement* in Mexico); Ramos Decl. ¶¶ 14-18; Slack Decl. ¶¶ 10-11; Brané Decl. ¶¶ 17, 22-28, 31-35 (children in border towns at risk of trafficking).

Courts regularly recognize that such practical hindrances are sufficient to satisfy *Powers*. *See, e.g.*, *Powers*, 499 U.S. at 414-15 (financial disincentive); *Singleton*, 428 U.S. at 117-118 (desire to protect privacy of medical decisions); *Penn. Psychiatric Soc. v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 290 (3d Cir. 2002) ("stigma associated with receiving mental health services").

### 3. Plaintiffs Fall Within The Relevant Zones Of Interests.

Lastly, as this Court correctly held, because Plaintiffs "are asserting the rights of their clients as potential asylum seekers, they easily satisfy the APA's lenient zone-of-interests inquiry." TRO Order at 16; *see also* Stay Order at 3. Indeed, courts have consistently concluded that where a plaintiff has third-party standing, "the third parties' interests c[an] be relied upon to satisfy the 'zone of interests' requirement." *FAIC Securities, Inc. v. United States*, 768 F.2d 352, 358 (D.C. Cir. 1985); *see Nat'l Cottonseed Products Ass'n v. Brock*, 825 F.2d 482, 490 (D.C. Cir. 1987) (same). The government has not explained why Congress would have intended to foreclose suit by a party that is seeking to apply for asylum.

Plaintiff organizations also come within the Refugee Act's zone of interests in their own right. As this Court recognized, the zone-of-interests "test is not 'especially demanding.'" TRO Order at 16 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014)). It forecloses suit only where a plaintiff's interests are "so marginally related to or inconsistent with the purposes implicit in the statute" that Congress could not have intended to allow the suit. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012); *see Lexmark*, 572 U.S. at 130 ("[T]he benefit of any doubt goes to the plaintiff.").

Plaintiffs' interests are neither "marginal[]" nor "inconsistent" with the goals of the Refugee Act. Their entire purpose is to facilitate the Refugee Act's goal of protecting refugees and asylum

1    seekers.  *See, e.g.,* ECF No. 8-3 ¶¶ 4-6; ECF No. 8-4 ¶ 4; ECF No. 8-6 ¶ 7; ECF No. 8-7 ¶¶ 5-8.

2    They are therefore "seek[ing] to vindicate some of the same concerns that underlie" the statute itself.

3    *Havasupai Tribe v. Provencio*, 906 F.3d 1155, 1167 (9th Cir. 2018) (test satisfied on this basis).

4         The Refugee Act, moreover, protects the interests of such organizations in multiple ways.  It

5    directs the government to fund and advertise their services.  *See* 8 U.S.C. §§ 1522(b)(1)(A) (grants to

6    non-profit organizations); 1158(d)(4)(B) (directory of non-profit asylum organizations); 1229(a)(1),

7    (b)(2) (similar).  It requires the government to "consult regularly" with non-profit organizations in

8    setting refugee policy.  *See* 8 U.S.C. §§ 1522(a)(2)(A); 1154(f)(3)(A) (same); 1522(c)(1)(A)

9    
10   (similar); 1522(d)(2)(A) (similar).  And it relies on such organizations to facilitate the Refugee Act's

11   process for adjudicating asylum claims.  *See* 8 U.S.C. § 1158(d)(4)(A) (right to counsel in asylum).

12        That is more than enough to bring the plaintiffs within the Refugee Act's zone of interest.

13   *See Animal Legal Defense Fund, Inc. v. Glickman*, 154 F.3d 426, 444 (D.C. Cir. 1998) (requiring

14   only "some indicia—however slight," that Congress had the plaintiffs in mind when enacting the

15   statutory scheme) (quotation marks omitted).  Indeed, courts have repeatedly found that entities who

16   participate in the Refugee Act scheme come within its zone of interests.  *See Hawaii v. Trump*, 859

17   F.3d 741, 766 (9th Cir. 2017) (States), *vacated as moot*, 138 S.Ct. 377 (2017); *Al Otro Lado, Inc. v.*

18   *Nielsen*, 327 F. Supp. 3d 1284, 1301 (S.D. Cal. 2018) (non-profit organizations); *Doe v. Trump*, 288

19   
20   F. Supp. 3d 1045, 1068 (W.D. Wash. 2017) (same).

21        By contrast, the government has not identified any case in which an organization like the

22   Plaintiffs has been held to be outside the Refugee Act's zone of interests.  *See Immigrant Assistance*

23   *Project v. INS*, 306 F.3d 842, 867 (9th Cir. 2002) (addressing a different statute—the Immigration

24   
25   Reform and Control Act—and relying on a non-precedential single-Justice opinion); *NWIRP v.*

26   *USCIS*, 325 F.R.D. 671, 688 (W.D. Wash. 2016) (holding that an organization was not within the

27   zone of interests of a *DHS regulation*).

28        Thus, even apart from their clients' interests, the plaintiffs are at the very least "arguably"

within the Refugee Act's zone of interests. *Match-E-Be-Nash-She-Wish*, 567 U.S. at 225. There is no reason Congress would deny them the ability to vindicate the precise role the Refugee Act assigns them.

Finally, Plaintiffs independently fall within the zone of interests for the APA's notice-and-comment provision—an issue this Court had no occasion to address in its previous ruling. 5 U.S.C. § 553. Section 553 is the relevant statute for that claim, because it is the statute Plaintiffs "say[] was violated." *Match-E-Be-Nash-She-Wish*, 567 U.S. at 224; *see Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990) (zone-of-interest analysis looks to "the statutory provision whose violation forms the legal basis for [the] complaint"). Courts have accordingly held that a plaintiff can assert a notice-and-comment claim when it comes within the zone of interests of "the APA's notice and comment provision." *California v. Health & Human Servs.*, 281 F. Supp. 3d 806, 823 (N.D. Cal. 2017) (Gilliam, J.).[3]

As "interested participants in the notice and comment process," it is "clear" that the Plaintiffs fall within § 553's zone of interests. *Am. Trucking Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 246-47 (D.C. Cir. 2013). Congress enacted § 553 "to ensure *public* participation in rulemaking," so that all "interested persons" would have "an opportunity to comment" on regulations that affect them. *Paulsen v. Daniels*, 413 F.3d 999, 1004-05 (9th Cir. 2005) (emphasis added, alterations and quotation marks omitted).

Moreover, in practical terms, organizations like the Plaintiffs form the main constituency that is positioned to exercise this right. Noncitizens abroad are not likely to even know about proposed rulemaking by U.S. agencies, much less submit detailed comments about their wisdom and legality.

---

[3] This Court correctly observed that "[t]he relevant zone of interests is not that of the APA itself, but the underlying statute." TRO Order at 16 (citing *Havasupai Tribe*, 906 F.3d at 1166). That is true where the plaintiff is bringing a substantive claim under a statute like the INA and arguing that the regulation is ultra vires and therefore violates § 706 of the APA, as opposed to the APA's procedural requirements under APA § 533. Indeed, that was the situation in the case this Court cited, *Havasupai Tribe*. But a procedural notice-and-comment violation brought under 5 U.S.C. § 553 is quite different, as explained *infra*.

*See* ECF No. 35-6 ¶¶ 2-4; ECF No. 35-10 ¶¶ 3-6.  As a result, if the Plaintiffs could not bring a notice-and-comment challenge, there would be virtually no one who could, and this critical APA safeguard could be evaded at will.  *See Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1237 (D.C. Cir. 1996) (rejecting zone-of-interests argument that would leave a legal interest "with no conceivable champion in the courts").

## II.        THE BALANCE OF EQUITIES SHARPLY FAVORS PLAINTIFFS.

### A.  Plaintiffs Will Suffer Irreparable Injury Absent A Preliminary Injunction.

As this Court correctly held in issuing a TRO, Plaintiffs, their clients, and other asylum seekers will be substantially injured if the Rule is permitted to go back into effect.  *See* TRO Order at 30-32; Stay Order 7-8.  Plaintiffs now submit additional declarations in support of the Court's findings.

Plaintiffs themselves have suffered and will suffer irreparable injuries in the absence of the protection of the TRO.  As the Court held, the new rule requires dramatic diversion of Plaintiffs' resources and efforts away from their core missions, and places their operations in jeopardy in ways that cannot be remedied after the fact.  *See id.* at 11-13, 31.  The losses Plaintiffs face will force them to lay off employees, restructure their operations, and potentially close down altogether, leaving numerous asylum seekers in the lurch.  *See* ECF No. 8-3 ¶¶ 11-12 ("enormous strain" on operations and serious "financial strain"); Smith Supp. Decl. ¶ 14 ("EBSC stands to lose nearly all of our funding for our affirmative asylum program"); ECF No. 8-4 ¶ 10 (re-routing "virtually all its resources" to removal defense); ECF No. 8-6 ¶ 11 ("cease most of [Law Lab's] pro bono activities"); ECF No. 8-7 ¶¶ 14, 17 (layoffs, closing).

Courts have regularly found that such injuries are sufficient to demonstrate a likelihood of irreparable harm and justify preliminary injunctive relief.  *See, e.g.*, *Valle del Sol*, 732 F.3d at 1018-19, 1029; *Doe*, 288 F. Supp. 3d at 1082-83; *Exodus Refugee Immigration*, 165 F. Supp. 3d at 739; *League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (obstacles that "make it more

difficult for [organizations] to accomplish their primary mission" impose "irreparable harm"); *Open Comms. Alliance v. Carson*, 286 F. Supp. 3d 148, 178 (D.D.C. 2017) ("to show irreparable harm," an organization "need only show that [a] Rule will perceptibly impair [its] programs and directly conflict with the organization's mission") (quotation marks omitted).

Also, absent the protection of TRO, Plaintiffs have suffered and will suffer the loss of an opportunity to comment before the government's dramatic changes to asylum law enter into force. *See* TRO Order at 31-32 (citing, e.g., *California*, 281 F. Supp. 3d at 830 ("Every day the IFRs stand is another day Defendants may enforce regulations likely promulgated in violation of the APA's notice and comment provision, without Plaintiffs' advance input.")).

For Plaintiffs' clients, meanwhile, the need for injunctive relief is a matter of the utmost urgency. These asylum seekers, many of them families and young children, fled extraordinary violence in their home countries. *See, e.g.*, Penman Supp. Decl. ¶¶ 5-8 (describing violence and persecution in Central America); Joint Decl. of Former Officials ¶ 5b ("legitimate humanitarian crisis" in Northern Triangle countries); Ramos Decl. ¶ 6. As this Court observed, those clients "experience lengthy or even indefinite delays waiting at designated ports of entry along the southern border," and face "high rates of violence and harassment while waiting to enter, as well as the threat of deportation to the countries from which they have escaped." TRO Order at 30 (collecting citations to TRO record); *see also* Penman Supp. Decl. ¶¶ 11, 15; Ramos Decl. ¶¶ 5, 9-10; Decl. of Lisa Mitchell-Bennett ¶¶ 5-14. As this Court further concluded, "[t]he Rule, when combined with the enforced limits on processing claims at ports of entry, leaves those individuals to choose between violence at the border, violence at home, or giving up a pathway to refugee status." TRO Order at 32.

Courts regularly find irreparable harm when the government takes away "a statutory entitlement," *Apotex, Inc. v. FDA*, 2006 WL 1030151, at *17 (D.D.C. Apr. 19, 2006), or "block[s] access to an existing legal avenue for avoiding removal," *Kirwa v. Dep't of Defense*, 285 F. Supp. 3d 21, 43 (D.D.C. 2007). And here, the loss of access to asylum in this manner is clearly irreparable.

As this Court observed: "Congress has determined that the right to bring an asylum claim is valuable," "the application of the Rule will result in the denial of meritorious claims for asylum that would otherwise have been granted," "aliens who violate the Rule are placed in expedited removal proceedings . . . where they receive far fewer procedural protections," and "a grant of asylum confers additional important benefits nor provided by withholding of removal or CAT protection, such as the ability to proceed through the process with immediate family members . . . and a path to citizenship." *Id.* at 31.

**B.  The Government Will Not Be Injured By An Injunction, Which Is In The Public Interest.**

In cases against the government, the government's interest and public interest factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).  For its part, the government has offered only abstract interests and conclusory assertions.  But this Court's prior TRO, and the preliminary injunction Plaintiffs now seek, only maintain a legal status quo—the statutorily recognized entitlement to seek asylum between ports of entry—that has been in effect for nearly 40 years.  As this Court previously determined, no government interest warrants the denial of injunctive relief.

The government has cited the number of noncitizens apprehended entering between ports at the southern border last year, but that number is far lower than in recent years, even as U.S. Customs and Border Protection's staff and resources have grown significantly.  *See* ECF No. 8-2 ¶¶ 3-7; Joint Decl. of Former Officials ¶ 5a (fewer individuals apprehended or deemed admissible at southern border in October 2018 than October 2016; southwest border apprehensions today is half that in 2007 and one-fifth that in 2000).  And the current influx of Central Americans seeking asylum at the southern border is not new.  *Id.* ¶ 5b ("These are long-term trends, rather than a sudden influx that necessitates emergency action.").  Individuals apprehended between ports during these previous influxes were provided an opportunity to apply for asylum, and the government offers no reason why

1    the same circumstance now warrants a sudden deviation from longstanding asylum law.[4]

2         Furthermore, this Court noted, "[t]he Rule's sole reference to the danger presented by

3    crossings appears in a quote from a 2004 rule, with no explanation as to how the situation may have

4    evolved in the intervening fourteen years." TRO Order at 33. "The Rule contains no discussion, let

5    alone specific projections, regarding the degree to which it will alleviate these harms." *Id.*

6         Finally, the government's assertion that it is trying to channel noncitizens to ports of entry is

7    belied by the government's efforts to deter asylum seekers from actually applying at ports. *See, e.g.*,

8    ECF No. 35-3 at 17-28; ECF No. 35-4 ¶¶ 5-9; Joint Decl. of Former Officials ¶ 8c. It also ignores

9    the reality that some asylum seekers, out of necessity, must cross between ports to apply. *See, e.g.*,

10   ECF No. 35-4 ¶ 12 (criminal gangs force asylum seekers to cross between ports).

11

12        At bottom, all the government has offered are vague platitudes about executive power. But

13   as this Court explained, "[t]he executive's interest in deterring asylum seekers – whether or not their

14   claims are meritorious – on a basis that Congress did not authorize carries drastically less weight, if

15   any," than actions that are consistent with Congress's dictates. TRO Order at 32. Defendants have

16   endeavored to override by fiat Congress's clear command. *Id.*, at 2. And "[w]hen the President

17   takes measures incompatible with the expressed or implied will of Congress, his power is at its

18   lowest ebb . . . ." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J.,

19   concurring).

20

21        Thus, the public interest sharply favors denying the stay request. Whereas the government

22   cannot identify, or support with evidence, any concrete injury that would occur in the absence of a

23   stay, Plaintiffs have submitted significant record evidence of the harms they, their clients, and other

24

25   _____

[4] *See* U.S. Customs and Border Protection, United States Border Patrol Southwest Family Unit
26   Subject and Unaccompanied Alien Children Apprehensions Fiscal Year 2016, Statement by
     Secretary Johnson on Southwest Border Security (Oct. 18, 2016),
27   https://www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children/fy-2016; U.S.
     Citizenship and Immigration Services, Credible Fear Workload Summary,
28   https://www.uscis.gov/sites/default/files/USCIS/Outreach/Notes%20from%20Previous%20Engagem
     ents/PED_CredibleFearWorkloadReport.pdf.

asylum seekers will experience if the Rule is in effect.  *See Nken*, 556 U.S. at 436 ("Of course there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm.").  Indeed, Congress long ago determined that it is in the public interest to give noncitizens a chance to apply for asylum, regardless of where they enter our country. 8 U.S.C. § 1158(a)(1); *see* H.R. Rep. 96-608, 96th Cong., 1st Sess., at 17-18 (Nov. 9, 1979) (explaining that § 1158 serves "this country's tradition of welcoming the oppressed of other nations" and "our obligations under international law").  Simply put, "[t]he public interest surely does not cut in favor of permitting an agency to fail to comply with a statutory mandate." *Ramirez v. U.S. Immigration & Customs Enf't*, 310 F. Supp. 3d 7, 33 (D.D.C. 2018) (citing *Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977)).  That is especially true where, as here, Congress has left that statutory mandate in place for four decades.

### III.   THE COURT SHOULD ENJOIN THE RULE IN FULL.

This Court's TRO remedy was commensurate with Defendants' statutory violations, and the same scope of relief is warranted for a preliminary injunction.  As this Court observed, "[t]he scope of the remedy is dictated by the scope of the violation."  TRO Order at 34.  Indeed, it is bedrock administrative law that when agency regulations are held unlawful, "the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Regents of the Univ. of California v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 511 (9th Cir. 2018) (quoting *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998)); *see also Earth Island Inst. v. Ruthenbeck*, 490 F.3d 687, 699 (9th Cir. 2007) ("nationwide injunction" was "compelled by the text of the Administrative Procedure Act"), *aff'd in part, rev'd in part sub nom. Summers v. Earth Island Inst.*, 555 U.S. 488 (2009).  Because the Rule conflicts with the INA, the Court should again enjoin the Rule as it applies to anyone, as is standard in APA actions.

The Ninth Circuit also has repeatedly upheld nationwide injunctions of the government's immigration policies.  *See Regents*, 908 F.3d at 512; *Hawaii v. Trump*, 878 F.3d 662, 701 (9th Cir.

2017), *rev'd on other grounds*, 138 S. Ct. 2392 (2018); *Washington v. Trump*, 847 F.3d 1151, 1167 (9th Cir. 2017).  Such relief "promotes uniformity in immigration enforcement."  *Regents*, 490 F.3d at 512; *see also* TRO Order at 34 ("Given the need for uniformity in immigration law, the Court concludes that a nationwide injunction is equally desirable here.").

Practical considerations as well weigh heavily in favor of uniform relief in this case.  The government has made no effort to explain how an injunction limited to Plaintiffs would work as a practical matter.  Plaintiffs operate in various states, foreclosing any geographically limited injunction as complete relief.  *See, e.g.*, ECF No. 8-6 ¶¶ 7, 9, 11 (Innovation Law Lab serves asylum-seekers across the country).  Nor is an injunction limited to Plaintiffs and their clients, as the government suggested, remotely workable.  As this Court observed, that approach would give Plaintiffs' clients "special rights that other immigrants would not have" and undermine "the uniformity of the immigration laws."  TRO Order at 34 n.21.

## CONCLUSION

The Court should grant the preliminary injunction.

1

2    Dated: December 4, 2018                    Respectfully submitted,

3    Jennifer Chang Newell (SBN 233033)          /s/Lee Gelernt
     Cody Wofsy (SBN 294179)                     Lee Gelernt*
4    Spencer Amdur (SBN 320069)                  Judy Rabinovitz*
     Julie Veroff (SBN 310161)                   Omar C. Jadwat*
5    ACLU FOUNDATION                             Celso Perez (SBN 304924)
     IMMIGRANTS' RIGHTS PROJECT                  ACLU FOUNDATION
6    39 Drumm Street                             IMMIGRANTS' RIGHTS PROJECT
     San Francisco, CA 94111                     125 Broad Street, 18th Floor
7    T: (415) 343-0770                           New York, NY 10004
     F: (415) 395-0950                           T: (212) 549-2660
8    jnewell@aclu.org                            F: (212) 549-2654
     cwofsy@aclu.org                             lgelernt@aclu.org
9    samdur@aclu.org                             jrabinovitz@aclu.org
     jveroff@aclu.org                            ojadwat@aclu.org
10                                               cperez@aclu.org

11   Melissa Crow*
     SOUTHERN POVERTY LAW CENTER                 Christine P. Sun (SBN 218701)
12   1666 Connecticut Avenue NW, Suite 100       Vasudha Talla (SBN 316219)
     Washington, D.C. 20009                      AMERICAN CIVIL LIBERTIES UNION OF
13   T: (202) 355-4471                           NORTHERN CALIFORNIA, INC.
     F: (404) 221-5857                           39 Drumm Street
14   melissa.crow@splcenter.org                  San Francisco, CA 94111
                                                 T: (415) 621-2493
15   Mary Bauer*                                 F: (415) 255-8437
     SOUTHERN POVERTY LAW CENTER                 csun@aclu.org
16   1000 Preston Avenue                         vtalla@aclu.org
     Charlottesville, VA  22903
17   T:  (470) 606-9307
     F:  (404) 221-5857                          Baher Azmy*
18   mary.bauer@splcenter.org                    Angelo Guisado*
                                                 Gita Schwarz*
19   Attorneys for Plaintiffs                    CENTER FOR CONSTITUTIONAL RIGHTS
                                                 666 Broadway, 7th Floor
20   *Admitted pro hac vice                      New York, NY 10012
                                                 T: (212) 614-6464
21                                               F: (212) 614-6499
                                                 bazmy@ccrjustice.org
22                                               aguisado@ccrjustice.org
                                                 gschwartz@ccrjustice.org
23

24

25

26

27

28

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| East Bay Sanctuary Covenant, *et al.*, | Case No.: 18-cv-06810-JST |
| *Plaintiffs*, | |
| v. | **[PROPOSED] PRELIMINARY INJUNCTION** |
| Donald J. Trump, President of the United States, *et al.*, | |
| *Defendants*. | |

Plaintiffs' application for a Preliminary Injunction came before this Court for consideration on December 19, 2018.  Upon consideration of the application, and for good cause shown, IT IS HEREBY ORDERED as follows:

## Preliminary Injunction

The Court finds that Plaintiffs have demonstrated a substantial likelihood of success on the merits of their claims that Defendants' Interim Final Rule/Presidential Proclamation are in violation of (1) the Immigration and Nationality Act, and (2) the Administrative Procedure Act.  The Court further finds that Defendants' conduct as alleged above has caused and, absent the requested relief, will continue to cause irreparable harm to Plaintiffs.  The balance of hardships tips sharply in Plaintiffs' favor, and the public interest will be served by the injunction.

Accordingly, IT IS HEREBY ORDERED that, pending the final disposition of this action, Defendants Donald J. Trump, President of the United States, in his official capacity; Matthew G. Whitaker, Acting Attorney General, in his official capacity; U.S. Department of Justice; James McHenry, Director of the Executive Office for Immigration Review, in his official capacity; the Executive Office for Immigration Review; Kirstjen M. Nielsen, Secretary of Homeland Security, in her official capacity; U.S. Department of Homeland Security; Lee Francis Cissna, Director of the U.S. Citizenship and Immigration Services, in his official capacity; U.S. Citizenship and Immigration Services; Kevin K. McAleenan, Commissioner of U.S. Customs and Border Protection, in his official capacity; U.S. Customs and Border Protection; Ronald D. Vitiello, Acting Director of Immigration and Customs Enforcement, in his official capacity; and Immigration and Customs Enforcement, and all persons acting under their direction, are enjoined from implementing or enforcing the Interim Final Rule/Presidential Proclamation.

IT IS SO ORDERED.

Dated:

_____
JON S. TIGAR
United States District Judge

<u>**CORRECTED SUPPLEMENTAL DECLARATION OF ERIKA PINHEIRO**</u>

I, Erika Pinheiro, under the penalty of perjury pursuant to 28 U.S.C. § 1746, declare as follows:

1.   I make this declaration based on my personal knowledge except where I have indicated otherwise.  If called as a witness, I would testify competently and truthfully to these matters.

2.   I submit this declaration to supplement my previous declaration in *East Bay Sanctuary Covenant v. Trump*, which was executed on November 9, 2018.

3.   The implementation of the interim final rule, "Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims," and the Presidential Proclamation Addressing Mass Migration Through the Southern Border of the United States has created a crisis situation for Al Otro Lado.

4.   In recent weeks, Grupo Beta, a service by the National Institute of Migration of Mexico, has refused to allow unaccompanied minors who have journeyed to the southern border to seek asylum to get on the list to cross the border at a port of entry.  Al Otro Lado has been told that if these children show up at the port of entry and attempt to get on the list, they will be taken into custody by the Mexican child custody agency.

5.   For example, Al Otro Lado is working with a child named B.I., a sixteen year old boy from Mexico, who left his home along with his sister to escape from violent abuse they had been suffering from years.  On November 1, 2018, B.I. and his sister went to a port of entry ("POE"), but the U.S. officials would not let them pass into the United States.  Instead, the officials held B.I. and his sister in the POE for several hours, and then moved them to a cell in a different

building, where they stayed for about 18 hours.  After speaking briefly with an official from the Mexican consulate, B.I. and his sister were deported back to Tijuana without ever having been given the opportunity to apply for asylum, despite the fact that they indicated that they wanted to apply for asylum.

6.   On November 6, 2018, B.I. and his sister went to a different POE.  Rigo, a staff member at Al Otro Lado, went with them.  Grupo Beta, the group organizing the list of asylum seekers at the POE, told Rigo and B.I. that children could not get on the list unless they had original identity documents and were accompanied by a parent.  B.I. was unaccompanied and did not have original documents with him.  Grupo Beta also said that if any unaccompanied children tried to get on the list, they will be taken into custody by the Mexican child custody agency.

7.   B.I. has no family he can live with safely in Mexico.  He does not feel safe staying in Mexico.  He wants to apply for asylum in the United States.  He is worried that if he goes back to a port of entry, he will be unable to get on the list to apply for asylum.

8.   Al Otro Lado is also working with another unaccompanied minor, D.D., who had the same experience when an Al Otro Lado staff member went with her to a POE so that she could get in line to apply for asylum.  D.D. is fifteen years old and fled El Salvador to escape her grandfather's sexual abuse.

9.   D.D. left El Salvador in the middle of October 2018.  It took her about three weeks to travel from El Salvador to Tijuana.  When she got to Tijuana, she went to El Chaparral plaza near the San Ysidro port of entry.  People she was traveling with told her she had to go get a number in order to apply for asylum in the United States.  She went to the plaza and showed her identity documents, and the people in charge of the list gave her a number.  She waited at a

shelter for youth in Tijuana called Casa Imca.

10. On November 6, 2018, Rigo from Al Otro Lado went with D.D. to El Chaparral plaza. The people organizing the list of asylum seekers told Rigo and me that unaccompanied minors could not get on the list unless they had original identity documents and were accompanied by a parent. D.D. was not accompanied by her parents.

11. D.D. is afraid to return to El Salvador because her family there now knows about the sexual abuse she suffered. She is afraid that she would be in danger from her grandfather if she returns. She hopes she will be allowed to apply for asylum in the United States, but is concerned because she was told that she cannot apply without her parents.

12. Before the new rule, those children who were refused entry at a port would then enter the United States without inspection and turn themselves in to immigration authorities to apply for asylum.

13. Since the new rule was announced on November 9, 2018, if these children enter without inspection, they will not be able to apply for asylum. These children now have no way to apply for asylum in the United States, and are effectively trapped in Mexico in dangerous border towns, generally without any resources.

14. In the past, children not allowed on a list or not otherwise allowed to present at a port of entry would have, out of necessity, entered between ports of entry in order to apply for asylum.

15. Since the new rule was announced, Al Otro Lado has been overwhelmed with children who traveled to the southern border of the United States to apply for asylum but now cannot do so. These children are very vulnerable, as they are unaccompanied and so have no one to look out for them in Tijuana, a city currently seeing record levels of violence. Lesbian, gay, bisexual, and transgender unaccompanied minors are especially vulnerable.

16. Caring for these children is incredibly time consuming and causing a near complete diversion of Al Otro Lado's resources away from its core mission, which is providing legal services. In addition to providing these children with legal advice, attending to the many non-legal needs of Al Otro Lado's unaccompanied children clients is forcing Al Otro Lado to divert resources away from advising the many other clients who need the organization's legal help, thus undermining our ability to achieve our core mission. For example, staff members are going with the children to try to get them on the list to cross at the port of entry. Staff have also had to negotiate with Mexican officials so that they will not take these children into custody and instead allow them to stay at a local youth shelter while Al Otro Lado determines the best way to ensure that the children have access to a legal means to seek asylum in the United States. Accompanying one to two children to do this takes three to four hours. One staff member has been taking care of these children full-time for the past three days.

17. Al Otro Lado currently is providing legal advice and support to nine children in Tijuana, Mexico, who wish to seek asylum in the United States. Five of these children are from Honduras and identify as LGBT (lesbian, gay, bisexual, or transgender); they have strong asylum claims.

4

18. Al Otro Lado was connected to these clients by Casa YMCA, a shelter where the children are staying.

19. These clients have tried to obtain a number to join the list to present themselves for asylum, but Al Otro Lado has been told by Grupo Beta that the children need to have a parent and documents in order to present and that if they try to take a number they will be taken into custody by Mexican officials.

20. These clients cannot be left alone in Tijuana because of the danger of apprehension by Mexican officials.  Al Otro Lado therefore has to accompany them anytime they leave the shelter at which they are staying for legal proceedings.  This effort is far beyond anything Al Otro Lado usually does for its clients and has been a huge drain on Al Otro Lado's resources.

21. LGBT children cannot safely stay in Mexico.  They are at risk of violence and persecution.  Yet there is now no way for them to access the asylum system in the United States. Al Otro Lado's staff members have been overwhelmed by work outside our core mission since the new rule went into effect.

22. The new rule also seriously jeopardizes a major source of Al Otro Lado's funding. Al Otro Lado receives funding from the California Department of Social Services to represent detained immigrants in their bond proceedings. We have expended significant organizational resources establishing referral systems with the Federal Public Defender office and Innovation Law Lab's Border X Project to receive cases of asylum seekers who have entered without inspection.  Al Otro Lado is required to complete a certain number of cases before the end of next year.  Since the rule went into effect, we have not received a single referral for a bond case, as persons who enter without inspection are ostensibly being put into "Withholding-only" proceedings and no longer initially eligible for bond.  We will have to significantly remake our

5

bond representation program to establish new referral sources, train staff on how to represent other types of clients in bond proceedings, and revise all the templates and materials we currently use in bond hearings for asylum seekers. This will cause an immediate diversion of a significant amount of our resources, and potentially compromise our ability to comply with our obligations under current funding.

23.     The interim final rule mentions the caravan of migrants, primarily from Central America, making their way to the United States. There have been several prior caravans in recent years. None caused any serious danger or otherwise threatened public safety. Caravan members typically seek admission at ports of entry.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Erika Pinheiro

Executed this 4th day of December, 2018

6

**DECLARATION OF CAMILA ALVAREZ, MANAGING ATTORNEY, CENTRAL AMERICAN RESOURCE CENTER**

I, Camila Alvarez, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I would testify competently and truthfully to these matters.

2. I am the Managing Attorney for the Central American Resource Center ("CARECEN") in Los Angeles, California. CARECEN is a plaintiff in *East Bay Sanctuary Covenant v. Trump*. In a previous declaration, submitted November 9, 2018, CARECEN's Legal Director, Daniel Sharp, explained our organization's work and the harms we will experience from the government's new rule banning asylum for those who cross the border between ports of entry. In another previous declaration, submitted November 16, 2018, CARECEN's Accredited Representative, Michelle Seyler, explained how CARECEN would have participated had the public been given an opportunity to submit comments regarding the new rule.

3. I submit this declaration to supplement Daniel Sharp's declaration regarding how the new rule causes CARECEN economic losses, frustrates CARECEN's mission, and causes CARECEN to divert resources to address these harms.

4. CARECEN's mission is to provide universal representation to all asylum seekers, irrespective of their manner of entry. CARECEN cannot, consistent with its mission, cherry pick and serve only those individuals who enter the United States at ports. Serving only asylum seekers who enter at ports would not be consistent with CARECEN's mission.

5. Moreover, as a practical matter, it would be very difficult for CARECEN to change its programs to serve only asylum seekers who enter at ports. During the intake process, CARECEN would have to verify where a noncitizen entered the United States, and enter into an attorney-client relationship accordingly. Doing so at the intake stage would be time consuming and resource

intensive.  CARECEN would not be compensated for that intake work.  Having to do so thus would strain its budget and staff resources.

      6. Since the proclamation and rule were announced on November 9, 2018, CARECEN has devoted significant time at staff meetings to discussing the impact of the asylum ban on our work and clients.

      7. Because of the new policy, CARECEN must divert resources away from its core services to revising its Know Your Rights materials for clients to inform them about the policy.

      I hereby declare under the penalty of perjury pursuant to the laws of the United States that the above is true and correct to the best of my knowledge.

      EXECUTED this 3rd day of December, 2018.

Camila Alvarez

**JOINT DECLARATION OF MADELEINE K. ALBRIGHT, WILLIAM J. BURNS, JOHN FEELEY, JONATHAN FINER, CHUCK HAGEL, JOHN KERRY, CECILIA MUÑOZ, JANET A. NAPOLITANO, JAMES C. O'BRIEN, THOMAS R. PICKERING, AMY POPE, JEFFREY PRESCOTT, ANNE C. RICHARD, AND WENDY R. SHERMAN**

We, Madeleine K. Albright, William J. Burns, John Feeley, Jonathan Finer, Chuck Hagel, John Kerry, Cecilia Muñoz, Janet A. Napolitano, James C. O'Brien, Thomas R. Pickering, Amy Pope, Jeffrey Prescott, Anne C. Richard, and Wendy R. Sherman, declare as follows:

1.      We are former national security, homeland security, foreign policy, and domestic policy officials in the U.S. government. We have collectively devoted many decades to questions of immigration, border security, and the relationship between the United States and countries south of our border.

a.      Madeleine K. Albright served as Secretary of State from 1997 to 2001. A refugee and naturalized American citizen, she served as U.S. Permanent Representative to the United Nations from 1993 to 1997.

b.      William J. Burns served as Deputy Secretary of State from 2011 to 2014, and previously served as Ambassador of the United States to the Russian Federation and Under Secretary of Political Affairs.

c.      John Feeley served as Ambassador of the United States to Panama from 2016 to 2018, and previously served as the Principal Deputy Assistant Secretary of State for Western Hemisphere Affairs and Deputy Chief of Mission and Chargé d'Affaires for the U.S. Embassy in Mexico.

d.      Jonathan Finer served as Chief of Staff to the Secretary of State from 2015 until January 20, 2017, and Director of the Policy Planning Staff at the U.S. State Department from 2016 until January 20, 2017.

e.      Chuck Hagel served as Secretary of Defense from 2013 to 2015. From 1997 to 2009, he served as U.S. Senator for Nebraska.

f.      John Kerry served as Secretary of State from 2013 to January 20, 2017.

g.      Cecilia Muñoz served as Director of the White House Policy Council from 2012 to January 20, 2017.

h.      Janet A. Napolitano served as Secretary of Homeland Security from 2009 to 2013.

i.      James C. O'Brien served as Special Presidential Envoy for Hostage Affairs from 2015 to January 20, 2017. He served in the State Department from 1989 to 2001, including as Principal Deputy Director of Policy Planning.

j.      Thomas R. Pickering served as Under Secretary of State for Political Affairs from 1997 to 2000, and previously served as Ambassador of the United States to Jordan, Nigeria, El Salvador, Israel, the United Nations, India and Russia.

k.      Amy Pope served as Deputy Homeland Security Advisor at the National Security Council from 2015 to January 20, 2017, Senior Director, Transborder Security at the National Security Council from 2013 to 2015, and Director, Border and Interior Enforcement at the National Security Council from 2012 to 2013.

l.      Jeffrey Prescott served as Deputy National Security Advisor to the Vice President from 2013 to 2015 and Special Assistant to the President for National Security Affairs from 2015 to 2017.

m.      Anne C. Richard served as Assistant Secretary of State for Population, Refugees and Migration from 2012 to January 20, 2017.

n.      Wendy R. Sherman served as Under Secretary of State for Political Affairs from 2011 to 2015.

2.      On November 9, 2018, the Trump Administration issued a Rule to bar eligibility for asylum for people fleeing persecution who enter the United States across the southern border outside of a port of entry. The Rule took the form of a Presidential Proclamation[1] and an administrative rule[2] ("Interim Rule") to take effect immediately without delay. In issuing these measures, the Administration claimed an imperative for "urgent" and "immediate" action to address a "crisis" at the border.[3] The Administration has most recently sought "emergency" relief from the U.S. District Court for the Northern District of California and the U.S. Court of Appeals for the Ninth Circuit to reverse a temporary restraining order and allow the new policy to take effect immediately. In our expert opinion, there is no national emergency that requires such a drastic and punitive executive action to combat it, and this rule does not advance, but rather harms, U.S. foreign policy.

3.      The United States has a proud and long-standing humanitarian tradition of opening its borders to those fleeing violence or persecution. This country's founding by the descendants of those escaping religious persecution has defined our nation's fundamental values—including sanctuary for those most in need of help. Although the United States has not always charted a steady path in this regard, it has long since turned away from the darkest days of its history when it shunned people at the borders and returned them to danger. Today, the United States rightly takes great pride in its defining role in establishing, promoting, and enforcing the 1951 Refugee Convention. Across multiple administrations, it has sought to embrace those seeking asylum and refugee, and played an enduring role as a beacon of hope and a safe haven for the most vulnerable.

4.      The Proclamation and Interim Rule at issue are deeply punitive actions that will do great harm to those seeking humanitarian relief. By denying those who enter outside a port of entry eligibility for asylum, the Administration's policy endangers some of the most vulnerable asylum seekers, who face particular obstacles in accessing ports of entry, to include obstacles inherent in their desperate flight from persecution, the violence in border areas they seek to traverse, and the Administration's own limitations on relief at the ports of entry. The people who have no choice but to confront such risks are the ones most likely to be fleeing dire conditions and threats. Furthermore, the Rule will lead to the denial or deterrence of countless legitimate asylees who are unable to make their way to a port of entry, turning them back to countries so dangerous that they evince what one report described as "unprecedented levels of violence outside a war zone."[4]

---

[1] Proclamation No. 9,822, 83 Fed. Reg. 57,661 (Nov. 9, 2018) [hereinafter Proclamation].

[2] Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. 55,934 (Nov. 9, 2018) [hereinafter Interim Rule].

[3] Proclamation, *supra* note 1, at 55,661, 55,662; Interim Rule, *supra* note 2, at 55,941, 55,944, 55, 947, 55,950.

[4] *Forced to Flee Central America's Northern Triangle: A Neglected Humanitarian Crisis*, Doctors Without Borders 8 (May 2017), https://www.msf.org/sites/msf.org/files/msf_forced-to-flee-central-americas-northern-triangle_e.pdf.

5.     Contrary to the Administration's claims, there is no migration emergency at the southern border.

a.     There has been no sudden increase in the number of individuals seeking to cross the southern border. Fewer individuals were apprehended or deemed inadmissible at the southern border in October 2018 than in October 2016.[5] The month-to-month trend in fiscal year 2018 crossings is similar to the trend for each of fiscal years 2013 to 2016.[6] The number of southwest border apprehensions today stands at one-half of their levels in fiscal year 2007 and one-fifth of their levels in fiscal year 2000.[7] The United States currently hosts the lowest number of undocumented immigrants since 2004, the result of a significant drop in the number of new undocumented immigrants.[8]

b.     The number of those crossing the southern border who seek asylum has increased over the last decade, but this number has coincided with a legitimate humanitarian crisis. During this period, the Northern Triangle countries—Guatemala, El Salvador, and Honduras—have been among the most violent countries in the world. Civilians are often the targets of gang or cartel violence or forcible recruitment, and gangs frequently employ sexual violence against women and children as a means of controlling members or retaliating against rivals. State governments have been unable to curb the violence or punish the perpetrators. Especially in El Salvador, the United States has contributed to the spread of this violence through the steady deportation of gang members—initially without identifying them as such to the government of El Salvador—with little or no assistance to El Salvador to absorb and retrain them for productive work. Many Northern Triangle residents have seen no choice but to flee, often making their way up through Mexico to seek asylum in the United States. The increase in the percentage of migrants seeking asylum thus reflects a well-documented shift in migration at the southern border from Mexican individuals looking for work, to Central American families fleeing extreme violence and persecution in their home countries. These are long-term trends, rather than a sudden influx that necessitates emergency action.

---

[5] *Southwest Border Migration FY2019*, U.S. Customs & Border Protection, https://www.cbp.gov/newsroom/stats/sw-border-migration (last visited Dec. 2, 2018); *Southwest Border Migration FY 2017*, U.S. Customs & Border Protection, https://www.cbp.gov/newsroom/stats/sw-border-migration-fy2017 (last visited Dec. 2, 2018).
[6] *Southwest Border Migration FY 2018,* U.S. Customs & Border Protection, https://www.cbp.gov/newsroom/stats/sw-border-migration/fy-2018 (last visited Dec. 2, 2018).
[7] *United States Border Patrol, Total Illegal Alien Apprehensions By Month – FY 2000*, U.S. Border Patrol, https://www.cbp.gov/sites/default/files/assets/documents/2017-Dec/BP%20Total%20Monthly%20Apps%20by%20Sector%20and%20Area%2C%20FY2000-FY2017.pdf (last visited Dec. 2, 2018); *Southwest Border Migration FY 2018*, *supra* note 6; *see also* Jeffrey S. Passel & D'Vera Cohn, *U.S. Unauthorized Immigrant Total Dips to Lowest Level in a Decade*, Pew Research Ctr. (Nov. 27, 2018), http://www.pewhispanic.org/2018/11/27/u-s-unauthorized-immigrant-total-dips-to-lowest-level-in-a-decade.
[8] Passel & Cohn, *supra* note 7.

c.      Changes in the number of asylum applicants—as well as their success rates, the backlog to the adjudication of claims, the percent of claims dismissed in absentia, and other considerations—have fluctuated over time in response to a number of factors, including conditions in the home country, changes in U.S. asylum rules and enforcement priorities, resource allocations, and applicants' ability to obtain representation. For instance, although the percent of applicants in 2017 who were denied asylum is higher than it was several years ago, it is lower than it was fifteen years ago.[9]

6.      The Administration has the tools to effectively manage the challenge of large volumes of asylum applications. For example, the Administration could make it a priority to substantially increase resources and personnel for the processing of asylum claims. It could increase resources for the representation of asylum claimants, which would improve the efficiency of the process because judges often give continuances to people mounting their own cases. Or it could streamline the asylum system through any number of administrative measures. The Administration's unwillingness to fully commit to these less punitive tools does not create an emergency that justifies taking more punitive action against those seeking humanitarian relief.

7.      To ease the burdens that the defendants describe, the last Administration launched a number of proactive and non-punitive initiatives, each of which the Trump Administration discontinued.

a.      The last Administration approved tens of millions in funding to Guatemala, El Salvador, and Honduras to undertake measures to combat security threats. President Trump has repeatedly sought to end this aid, and has attempted to cut Northern Triangle funding each year of his presidency.

b.      The last Administration initiated the Central American Minors ("CAM") program, which allowed in-country processing of asylum claims for children and families, to discourage them from making the dangerous trek to the border. President Trump ended the CAM program during his first month in office.

c.      The last Administration launched experiments with family- and community-focused alternatives to detention and implemented supervised release programs for asylum seekers who had entered the United States, which proved cost-effective and secured high appearance rates at hearings. President Trump discontinued these policies as well.

8.      This Administration replaced these programs with several policy measures at the southern border that have only exacerbated the challenges.

a.      *First*, the Administration sharply altered the detention policy for asylees in early 2017, requiring DHS to detain thousands of asylum seekers who would otherwise

---

[9] *Asylum Representation Rates Have Fallen Amid Rising Denial Rates*, TRAC Immigration, http://trac.syr.edu/immigration/reports/491 (last visited Dec. 2, 2018).

have been released after their credible fear hearings. This policy diverts resources that the Administration could otherwise commit to the range of other tools to effectively manage large volumes of asylum applications.

b.    *Second*, the Administration announced a "zero tolerance" policy in which all border crossers between ports of entry would be criminally prosecuted, further overburdening the system.

c.    *Third*, the Administration has turned away asylees at ports of entry for weeks at a time, forcing them to wait indefinitely to present their claims. There are now families and children sleeping on concrete walkways, without medicine or food or safe drinking water, waiting for the moment when their claims will be considered. The data indicates that this policy decision has led to the predictable outcome of an increase in crossings between ports of entry.[10] Now the Administration wants to turn asylees away merely because they crossed between ports of entry. The implication is clear: the Administration does not want asylees to be able to cross anywhere at all.

It is Kafkaesque to respond to a claimed overloading of an asylum system by denying asylum altogether across the vast expanse of the southern border, then forcing asylees to wait for weeks or months at already grossly overburdened ports of entry. These actions are not addressing any issues with the asylum system—they are closing the doors of that system.

9.    In sum, the Administration has launched a series of counter-productive policy measures that create new humanitarian problems, then mischaracterizes the predictably calamitous outcome of these failed measures as an "emergency" that justifies further punitive actions against asylees themselves. Instead of meaningfully addressing a bona fide humanitarian crisis, the Administration's actions have triggered a new humanitarian crisis of its own making. The Administration's policy effectively seeks to burden or expunge the right to asylum, a right that is solemnly protected under domestic law, and the international law principle of *non-refoulement*, which protects individuals against forced return to countries where they are likely to face persecution.

10.    The Administration cannot plausibly justify this Rule on the basis that it is indispensable to U.S. foreign policy or diplomatic relationships. In our professional judgment, the failure to move forward immediately with an emergency rule will not damage our relations with Mexico or Northern Triangle countries. To the contrary, the most likely consequence of this apparently unilateral step is to inflame tensions and undermine our diplomatic relations in Mexico—which constitutionally permits the free movement of nationals and non-nationals throughout its sovereign territory—and across the Western Hemisphere, compromising critical security and other forms of cooperation with these nations in the process. Beyond that, the Rule will likely be used by leaders around the world to justify their own blanket restrictions on those

---

[10] Dara Lind, *The U.S. Has Made Migrants at the Border Wait Months to Apply for Asylum. Now the Dam is Breaking*, Vox (Nov. 28, 2018, 7:00 AM), https://www.vox.com/2018/11/28/18089048/border-asylum-trump-metering-legally-ports.

seeking humanitarian relief, in contravention of international law. Other countries have long sought pretexts to deny access to refugees; many of these countries have far greater processing burdens to contend with than we do at our southern border. The precedent set by this Administration could have global ripple effects that will lead to dramatically decreased opportunities for refugees and other vulnerable migrants to reach safety, with potentially severe consequences for the individuals seeking safety and our broader interest in regional and global stability. Finally, this Rule will inflict lasting damage on the credibility of the United States and her commitment to the rule of law and basic human dignity. The United States has been a leader in securing the international recognition of rights for the displaced throughout the world, and our direct role in eroding those rights now is all the more devastating as a result.

11.     This Administration presents its Rule as a tailored response to a temporary overloading of asylum processing at the southern border. But from its first days, in addition to the steps described *supra*, this Administration has taken a series of actions targeting those seeking humanitarian relief, including:

   a.     a four-month moratorium on all refugees,

   b.     a ban on Syrian refugees (enjoined by the courts and then abandoned in a later executive order),

   c.     a series of ever-shrinking caps on refugees, by far the lowest in the history of the modern U.S. refugee system,

   d.     a narrowing of the categories of individuals who can seek asylum to severely restrict asylum for those fleeing gang or domestic violence,

   e.     the forcible separation of asylees from their children, and

   f.     the introduction of U.S. troops at the southern border with the authority to use lethal force.

Placed alongside this series of events, as well as the President's numerous hostile statements against refugees and asylees, the punitive rule before this court is revealed for what it truly is: the latest in an effort stretching back to the start of the Administration to prevent and deter people from lawfully seeking humanitarian relief in the United States.

12.     Historically, the United States has proudly held high a beacon to those fleeing oppression or persecution, and seeking safe refuge in our country. The Administration's asylum restriction at issue here once again dims that beacon. In our professional judgment, this claimed emergency Rule—if allowed to go into effect—will undermine the credibility of the United States, and its longstanding commitment to protecting the displaced and dispossessed.

Respectfully submitted,

**s/MADELEINE K. ALBRIGHT***

**s/WILLIAM J. BURNS**
**s/JOHN FEELEY**
**s/JONATHAN FINER**
**s/CHUCK HAGEL**
**s/JOHN KERRY**
**s/CECILIA MUÑOZ**
**s/JANET A. NAPOLITANO**
**s/JAMES C. O'BRIEN**
**s/THOMAS R. PICKERING**
**s/AMY POPE**
**s/JEFFREY PRESCOTT**
**s/ANNE C. RICHARD**
**s/WENDY R. SHERMAN**

Executed on this 4th day of December, 2018.

*Signatures on file with Harold Hongju Koh, Rule of Law Clinic, Yale Law School, New Haven, CT. 06520-8215 203-432-4932.

We declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

## DECLARATION OF JEREMY SLACK, Ph.D.

I, Jeremy Slack, pursuant to 28 USC §1746, declare that the following is true and correct:

1.      I submit this declaration, based on my personal knowledge and extensive empirical research to describe the grave dangers migrants from Central America face from Mexican and Central American gangs – frequently aided or ignored by Mexican authorities – while traveling through Mexico in pursuit of asylum in the United States, a danger that is exacerbated the longer those migrants remain on the Mexican side of border.  I also seek to explain that given the rampant violence and endemic corruption in Mexico, it is not remotely realistic to expect Mexico to be a safe third country for Central American migrants there.

### My Research and Expertise

2.      I am an Assistant Professor of Human Geography at the University of Texas at El Paso with more than fifteen years of research experience in Mexico and along the U.S.-Mexico border. Human geography explores the interaction between human beings and their environments. My areas of expertise and publication focus on drug violence, drug trafficking, undocumented migration, corruption and U.S. Mexico border enforcement.  In particular, I am interested in the questions about how drug violence moves, how and where violence affects people as they change their location.  My research investigates different patterns of violence associated with who is living where, which reveals a great deal about drug cartels, violence in Mexico and the potential danger for people in border cities.

3.      I received my B.A. from the University of Arizona in 2005 in Spanish and International Studies. I received an M.A in Latin American Studies in 2008 at the University of Arizona. I received my Ph.D. from the School of Geography and Development, also at the University of Arizona in 2015.

1

4.      I have testified in court over fifty times as an expert regarding drug smuggling, drug violence and corruption along the border and throughout Mexico in both criminal cases and in immigration court. I was the lead client on an amicus brief that was presented at the Supreme Court (Hernandez v. Mesa).

5.      I have published approximately fifteen peer-reviewed journal articles and numerous essays, book chapters, and scholarly reports. I have written two books about the impacts of drug violence on migrants. The first book, titled "The Shadow of the Wall," was released in April 2018 by the University of Arizona Press.[1] The second book will be released in early 2019 by the University of California Press, is titled "Deported to Death: How drug Violence is Changing Migration" which explores the ways organized crime has targeted migrants through kidnapping, extortion and coerced recruitment.

6.      I have received over $1,000,000 in research grants from foundations, universities and federal agencies to support my research activities. This includes funding from the Department of Homeland Security, the National Science Foundation, Ford Foundation, the Open Society Foundation, and the Social Science Research Council among others.  I have conducted research along the U.S.-Mexico border since 2003 and have travelled and worked extensively throughout Mexico, living and working in migrant shelters in some of the areas of the country hardest hit by drug cartel violence.

7.      I have published about drug cartels in Mexico with particular emphasis on processes of kidnapping and extortion,[2] as well as political corruption, and how cartels use their

---

[1] Slack, J., D.E. Martínez, and S. Whiteford, eds. *The Shadow of the Wall: Violence and Migration on the U.S.-Mexico Border*. 2018, University of Arizona Press: Tucson, Arizona.
[2] Slack, J., Captive bodies: migrant kidnapping and deportation in Mexico. Area, 2015. **48**(3).

2

power to influence and control territory.[3] These publications explore the question about why cartels would target relatively poor individuals for kidnapping and torture. The answer lies in the extreme vulnerability of people in transit who are neglected by local authorities with little to no hope that friends and family would be able to locate them anytime soon. Moreover, members of organized crime also know that migrants have contacts in the United States who can come up with several thousand dollars to pay ransom.

**The Security Situation in Mexico**

8.      Seven major Mexican cartels – the Juárez Cartel (aka La Linea), Gulf Cartel, Zetas (Los Zetas), Sinaloa Cartel, Tijuana Cartel, La Familia Michoacana/Los Caballeros Templarios and the Cartel Jalisco Nueva Generación (CJNG) – are currently locked in violent inter-cartel (and intra-cartel) disputes and a struggle with the Mexican military and police that has cost over 200,000 lives since 2001. The Mexican government is no longer able to protect its people and in many cases law enforcement officers or military officials—affiliated with drug cartels—actually commit acts of murder or torture on behalf of the cartels.[4] In 2016, violence in Mexico skyrocketed, placing the Mexican drug war as the second most violent conflict in the world (behind Syria).[5] It has remained one of the most vicious and bloody conflicts in the world.

---

[3] Slack, J. and H. Campbell, On Narco-coyotaje: Illicit Regimes and Their Impacts on the US–Mexico Border. Antipode, 2016.
Boyce, G.A., J.M. Banister, and J. Slack, *You and What Army? Violence, The State, and Mexico's War on Drugs.* Territory, Politics, Governance, 2015. **3**(4): p. 446-468.
[4] Gibler, J., *To die in Mexico : dispatches from inside the drug war*. 2011, San Francisco, CA: City Lights Books.
[5] IISS, *Armed Conflict Survey 2017*, I.I.f.S. Studies, Editor. 2017: Washington, D.C.

Some analysts thought that, as a result of this violence, Mexico has become or is on the verge of becoming a "failed state."[6]

9.      However, in the years since the conflict began the character has changed. Rather than concentrated hotspots, such as Ciudad Juárez, Chihuahua where 10,000 people were murdered between 2007 and 2010 , the violence has spread out across the country. This is because the major cartels have fractured, leading to conflict between cartels, but also within these organizations themselves. This has been described by scholars as a "balkanization" effect in Mexico,[7] —a reference to the fragmentation of the former Yugoslavian Republic. The internal strife and complex allegiances between and within the cartels makes  makes the security situation in Mexico complex, dynamic and chaotic as violence has spread to areas that were previously considered safe such as Mexico City and Cancun.

10.      In addition to the dangers posed by Mexican cartels, Central American gangs have established relationships with Mexican gangs that heightens the vulnerability of Central American migrants traveling through Mexico. In our research we found members of Central American gangs, MS-13 and Barrio 18 working for the Mexican Zetas and other organizations, as they would often be involved with kidnapping, extorting and charging a toll for migrants to pass through certain areas. Central American gangs patrol the train routes used by migrants traveling North, collecting tolls, killing people who refused or could not pay and giving a cut of the profits to local criminal actors and the police. They would also investigate who people were

---

[6] Longmire, S., *Cartel : the coming invasion of Mexico's drug wars.* 2011, New York: Palgrave Macmillan.
Grayson, G.W., *Mexico : narco-violence and a failed state?* 2010, New Brunswick, N.J.: Transaction Publishers.
[7] Beittel, J., *Mexico: Organized crime and drug trafficking organizations.* Washington: Congressional Research Service, 2015.

and why they were migrating. As the vast majority of Central American asylum seekers are fleeing gang violence,[8] the very same groups they are fleeing have a presence in Mexico and particularly along the border.  It thus makes most border towns on the Mexican side, an extremely perilous place to wait.

11.     The Mexican side of the U.S.-Mexican border as a region has experienced high levels of turmoil and violence in recent years. From 2007-2012 the most dangerous place was the border town of Ciudad Juárez, on the other side of the El Paso, Texas, with over 10,000 murders. Northeastern Mexico has more recently experienced lower levels of murder, but higher levels of disappearances and kidnappings, making it one of the most feared regions of the border. Mass graves containing over 200 bodies were recovered in the area the following years.[9] Multiple mass graves throughout the region have been discovered, often with clear ties to Central American migrants.[10] The largest documented kidnapping of migrants occurred in the far Northeast city of Matamoros – across from Brownsville, TX, with 480 people being kidnapped simultaneously in 2018.[11]  Other regions have experienced high levels of violence as well. Recently, the number of murders in Tijuana nearly doubled from 909 in 2016[12] to 1,744 in 2017, and 2018 is on pace to be even bloodier.[13] [14] In the nearby, Northwestern state of Sonora, a region that has avoided much of the cartel bloodshed, large groups of migrants were abducted

---

[8] Wolf, S., Mano Dura: The Politics of Gang Control in El Salvador. 2017: University of Texas Press.
[9] Ureste, M., A 5 anos de massacre de 72 migrantes en San Fernando, caso sigue impune: Amnistía Internacional, in Animal Politico. 2015: Mexico City.
[10]  Slack, J., Captive bodies: migrant kidnapping and deportation in Mexico. Area, 2015. **48**(3).
[11] Jimenez, M., Suman 480 migrantes rescatados en Matamoros, in El Manana de Matamoros. 2018: Matamoros.
[12] Staff, Horror; 762 homicidios dolosos en seis meses Tijuana, in El Debate. 2017: Tijuana.
[13] Elenes, A., Inicia el 2018 con 7 muertes violentas, in La Jornada de Baja California. 2018: Tijuana.

and disappeared or forced to cross the border due to large amounts of marijuana smuggling through the desert by drug cartels.[14] In Ciudad Juárez deported migrants were found decapitated over the summer of 2017.[15] .[17] While there have been ebbs and flows in the level of violence along the border, the chaotic situation, lawlessness and the violent outbursts against the Central American Caravans have created a dangerous precedent which will likely continue to escalate in the months and years to come.

12.     In the following sections I will expand on the types of violence people are likely to experience if forced to wait in Mexican border cities, why they are targeted and the potential torture, persecution and death.

### Dangers Present for Central Americans in Mexico

13.     Kidnapping has become a pandemic in Mexico and no population is under more threat than Central American migrants. These kidnappings often involve ransom, but are frequently more complex as members of organized crime are looking for information from migrants who might be fleeing from rival or affiliated gangs. Furthermore, criminal organizations use torture as a way to recruit individuals, giving them the option to join the gang, or torture or kill fellow captives and escape this fate. For those unwilling to torture or kill their way out of gang membership, this has become common as a way to forcibly recruit migrants.[16]

---

[14] Slack, J. and H. Campbell, On Narco-coyotaje: Illicit Regimes and Their Impacts on the US–Mexico Border. Antipode, 2016. **48**(5).
Slack, J. and S. Whiteford, *Violence and migration on the Arizona-Sonora border.* Human organization, 2011. **70**(1): p. 11-21.

[15] Staff, Decapitados en Juárez eran deportados de EU, in El Tiempo. 2017: Ciudad Juárez.
[16] Slack, J., Captive bodies: migrant kidnapping and deportation in Mexico. Area, 2015. **48**(3).

14.     In 2016 alone, a rough estimate of over 69,000 kidnappings occurred in Mexico.[17] Other sources have documented over ten thousand cases of kidnapping of migrants in a six-month period in 2011.[18] However, these statistics should be taken as highly conservative since this only relies on reported kidnappings and not the overwhelming majority of kidnappings that go unreported. This is known as the "cifra negra" or the black statistic, because Mexico's census bureau (INEGI) has estimated that 98% of kidnappings go unreported because people do not think the police will help or are afraid to do so.[19]

15.     Unfortunately, there are no exact figures for the kidnapping and torture of Central American migrants in Mexico since many are "disappeared" and killed or flee Mexico as fast as possible. Moreover, the lethality of kidnapping has grown since Mexico enacted tougher laws on kidnapping that sentence people to 80 years in prison in 2014. It has become easier to simply kill people than to let them go.[20]

16.     These kidnappings usually involve the explicit aid of the police or, at the very least, the knowledge that the police will do nothing to prevent the kidnappers from carrying out their gory reprisals.[21] Police in Mexico are highly corrupt and frequently work hand in hand with the drug cartels.[22] Officers that do not work with the cartels are hindered by this corruption and

---

[17] INEGI, Encuesta Nacional de Victimización y Percepción sobre Seguridad Publica (ENVIPE), in ENVIPE, I.N.d.E.y. Geografia, Editor. 2017, INEGI: Mexico, D.F. .
[18] CNDH, *Informe Especial Sobre el Secuestro de Migrantes en Mexico*, C.N.d.l.D. Humanos, Editor. 2011, CNDH: Mexico, DF.
[19] INEGI, Encuesta Nacional de Victimización y Percepción sobre Seguridad Publica (ENVIPE), in ENVIPE, I.N.d.E.y. Geografia, Editor. 2017, INEGI: Mexico, D.F. .
[20] Slack, J., Captive bodies: migrant kidnapping and deportation in Mexico. Area, 2015. **48**(3).
[21] Ibid.
Slack, J. and H. Campbell, On Narco-coyotaje: Illicit Regimes and Their Impacts on the US–Mexico Border. Antipode, 2016. **48**(5).
[22] Sicario, M. Molloy, and C. Bowden, *El Sicario : the autobiography of a Mexican assassin*. 2011, New York: Nation Books.

7

are unable to speak out or investigate crimes against Central American migrants.[23] Local police are underpaid and have to share guns, purchase their own ammunition and sometimes are not even certified to carry weapons. Federal police are better equipped but are generally focused on high profile busts and arresting famous drug kingpins.

17.     On the Mexican border specifically, there are lookouts, known as halcones, who are concentrated there and are tasked with investigating who is coming and going into new areas. This is partly because they are worried about incursions from rival cartels, but also because they are interested in determining which migrants would be able to pay a high ransom, or which might be targeted by affiliated gangs from Central America. The need to understand who has arrived in any given area of the border has become an obsession for organized crime. Because there are so many fractures within these criminal organizations, they are no longer enjoying absolute supremacy and must remain vigilant against incursions from rival groups (or even other members of the same drug cartel). Because of this, lookouts or even people posing as migrants or coyotes, often living or working in migrant shelters, are constantly collecting information about who is arriving. In addition, agents from the Instituto Nacional de Migración have also engaged in high levels of corruption and pass information about migrants along to organized crime.[24]  [2,

---

Hernandez, A., *Los senores del narco*. 2010, Mexico, D.F.: Grijalbo.
Hernández, A., Narcoland: The Mexican drug lords and their godfathers. 2013: Verso Books.
[23] Grillo, I., *El Narco: inside Mexico's criminal insurgency*. 2011, New York: Bloomsbury Press.
Vulliamy, E., *Amexica : war along the borderline*. 2010, New York: Farrar, Straus and Giroux.
Bowden, C., Down by the river : drugs, money, murder, and family. 2002, New York: Simon & Schuster.
Bowden, C. and J.n. Cardona, Murder city : Ciudad Juárez and the global economy's new killing fields. 2010, New York: Nation Books.
[24] Slack, J., Captive bodies: migrant kidnapping and deportation in Mexico. Area, 2015. **48**(3).

29] Should Mexican immigration authorities be increasingly involved in the process of making people apply for asylum from Mexico, it is likely that they will pass information about who is waiting over to organized crime.

18.     In addition to corrupt authorities passing information to organized crime or participating in kidnapping, the lack of protection for Central American migrants has been a huge problem.[30] Mexico has conflicting laws about how to control and police immigration from Central America. This is the root of the fluctuations in treatment by Mexican authorities, at times allowing Central Americans free passage or cracking down, apprehending and deporting migrants. One thing is clear though; the greater the restrictions, the higher the incidences of violence, extortion, torture and murder. The Human Mobility (*Movilidad Humana*) was passed in 2011 to make it legal for Central Americans to traverse Mexico with no documentation in order to prevent future massacres such as those that occurred in Tamaulipas and Durango.[11] Once migrants were allowed to travel through the country in buses, the number of people being kidnapped dropped dramatically. [31, 32] However, periodically, the Mexican government has cracked down on this movement as military checkpoints and police begin stopping buses to check passports. This leads to people taking the infamous bestia, the "beast," a nickname for the dangerous trains people take through Mexico. [33, 34] Throughout our research we have encountered people who lost limbs from being thrown from the train and others who witnessed multiple rapes, murders and kidnapping while riding the train north.

19.     Based on my research into migration and violence in Mexico, I am certain that many migrants will not be able to safely route themselves directly to a port of entry out of

---

París, M.D., et al., Un análisis de los actores políticos y sociales en el diseño y la implementación de la política y la gestión migratoria en México. 2015, El Colegio de la Frontera Norte Tijuana, México.

concern for kidnapping rings along certain routes and that are proliferating in border towns.  In addition, creating delays or a bottleneck at ports of entry along the border will lead to even more unprecedented levels of violence against Central Americans.

20.     Migrants are targeted along the border because of their distance from both destination and home. In my forthcoming book I explore in-depth why targeting migrants is so common and lucrative. They can be extorted, tortured, killed, forced to work for drug smugglers and no one will speak up for them. If people are forced to wait weeks or months along the border they will face numerous threats, from police demanding extortion to kidnappings and forced recruitment by gangs and drug cartels. Few people will be able to live in this limbo. One family I worked with began to get intensified threats, especially to the father, who was being accused of pertaining to a rival gang and the only way for them to be assured that he was not working against them, would be to join the cartel. They were forced to flee, itself a dangerous and difficult proposition.  I am confident that many of those subject to delays and the serious violence they may face on border towns will need to cross between ports of entry out of necessity, to avoid violence laying in wait in Mexican border cities.

21.     In addition, due to a long history of persecution, kidnapping, and murdering Central Americans during their journey through Mexico, there is no doubt that Mexico could not be considered a safe third country for Central Americans.  This could not happen without completely eradicating corruption and organized crime in Mexico, something that would be impossible in the near future.

10

I declare under penalty of perjury that the foregoing is true and correct to the best of our knowledge and understanding.

Jeremy Slack

Dated: December 4, 2018
El Paso, Texas

11

## DECLARATION OF LISA MITCHELL-BENNETT

I, Lisa Mitchell-Bennett, hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746:

1.      I make this declaration based on my personal knowledge except where I have indicated otherwise.  If called as a witness, I could and would testify competently and truthfully to these matters.

2.      I was born on March 30, 1967.  I am a United States citizen. I am fluent in Spanish and English.

3.      I live in Brownsville, TX.  I am employed at a local university as a public health researcher.  I have masters' degrees in public health and international development, and I am currently working on a doctorate in public health.  I am making this declaration in my personal capacity.

4.      I am a concerned citizen volunteering with an ad hoc group of volunteers to help asylum seekers in the Brownsville, TX area.  Since July 2018, I have been assisting asylum seekers waiting to enter the United States at the B&M Bridge ("the bridge") in Matamoros, Mexico.  I take breakfast to the asylum seekers waiting at the bridge most Sunday mornings and occasional other days of the week.  Along with delivering food I bring supplies like diapers, blankets and sanitary napkins in coordination with other volunteers. I have also visited the bridge on and off on some weekdays over the last few months.

5.      I am particularly concerned about the asylum seekers from a public health perspective.  When I visit the bridge, the people I meet are often very wet due to heavy rains or high humidity, and their blankets are soaked through. Children and adults are often dehydrated and suffer severe heat exhaustion and sunburn during the very hot South Texas summers. As winter sets in they are very cold, sleeping on the hard cement with only a blanket and maybe a piece of cardboard beneath them. I have seen skin irritations from lack of bathing and

1

others with fever or severe cold.  The exhaust and noise from the vehicles (cars and trucks) in the bridge crossing line day in and day out, literally a couple of feet from where the people are camped and sleeping, is also of concern. Women and children sleeping alone at the base of the bridge seem particularly vulnerable to crime and violence.

6.   I am also very concerned about psychological damage to the already-traumatized asylum seekers created by the arbitrary "wait and see" situation at the bridge.  They wait at the whims of CBP officers who do not act in a predictable way.  In my opinion, the lack of clarity about what will happen, and when it will happen, causes psychological distress, and the asylum seekers are particularly vulnerable to that distress given the past traumas they have suffered, along with long hours of waiting in a very limited space and fear of remaining in Mexico where some have expressed to me that authorities and criminal elements are a threat to their safety.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 4, 2018 at Brownsville, Texas.

Lisa Mitchell-Bennett

2

Lisa Mitchell-Bennett, MA, MPH
225 Hibiscus Ct. Brownsville, TX 78520
(956) 466-5657
lisa.mitchell-bennett@uth.tmc.edu

Education:

Master of Public Health, MPH
University of Texas, School of Public Health (2010)

Master of Arts, International Development Administration, MA
School for International Training, Brattleboro, VT (1994)

Bachelor of Arts, Political Science/International Relations, BA
University of California, Riverside, CA (1989)
Dean's List; Departmental Honors

Certificate, Estudios Hispanicos (1987)
University of Granada, Spain

Experience:

Project Manager
University of Texas, School of Public Health
Brownsville, TX   2011 – present
Manage a large team of multi-project initiatives with numerous institutional
partners throughout the region. Projects include a diabetes chronic care
management program with community health workers, local hospitals, clinics and
behavioral health providers (Salud y Vida); an evidence-based youth obesity
intervention in the schools and community (MEND); a navigation program for a
mobile clinic serving uninsured, rural population; a community-wide campaign
with media, policy and environmental change working in 9 towns and cities (Tu
Salud ¡Si Cuenta!); and supervising numerous graduate and undergraduate
student for research internships.

Quality Assurance Coordinator
University of Texas, School of Public Health
Brownsville, TX   2011 - 2013
Coordinated monitoring and quality assurance for a multi-disciplinary team;
developed and evaluated interventions to address obesity and diabetes through
a community-wide campaign including media, policy and environmental change
to support healthy choices. Managed relationships with community partner
institutions, provided training and supervision to community health workers,
created and evaluated content for media campaign, involved in grant writing and
reporting. Responsible for monitoring, training and implementing coordinated
efforts with a clinical research unit, local community partners and research

1

investigators. Developed and provided training for organizations and community-health workers across the state.

Senior Research Associate
University of Texas, School of Public Health
Brownsville, TX   2003-2011
Coordinated intervention research and community outreach efforts for multiple projects. Facilitated research center's community advisory board; oversaw mini-grant funding for community-based organizations, schools and clinics; provided support and resources to community groups to engage in design, evaluation and dissemination of culturally appropriate programs. Coordinated community health worker training and a media campaign "Tu Salud, Si Cuenta" with U.S. and Mexican media partners. Provided research coordination on numerous community based participatory research studies addressing health disparities including diabetes, teen pregnancy, obesity, cancer (HPV) and emergency preparedness as well as Hispanic science education (manage multi-university summer science high school internship program). Co-facilitated a course on Conducting and Analyzing Focus Group Data and guest lecturer in Evaluation and Health Promotion courses.

Project Director/Health Education Coordinator
Brownsville Community Health Center
Brownsville, TX 1997 - 2003
Managed Campus Care Centers, school-based health center with 3 full-service clinics in a large school district serving uninsured and indigent students and their families; supervised multi-disciplinary team including medical and mental health care providers, social workers, medical assistants and office personnel. Also served as coordinator of health education, prevention and outreach efforts for the community health center (FQHC) in the satellite clinics and schools; coordinated community-based health education on violence prevention and sex education for the school district. Responsible for grant writing, reporting, staff supervision, design and implementation of curriculum for award-winning health promotion efforts in the schools and community.

Division Director, Adult Education and Job Training
Congreso de Latinos Unidos, Philadelphia, PA  1995 - 1997
Directed multi-facet job training and adult education programs for a large inner-city agency in North Philadelphia. Provided contract and grant management; supervision of a large staff including teachers, trainers, social workers and project coordinators; worked closely with city-wide domestic violence programs to recruit and retrain women looking to reenter the workforce; collaborated with the Private Industry Council, the Community College of Philadelphia and the American Street Empowerment Zone; participation on an Executive Management Team for the larger agency.

2

Project Director
Mano a Mano/One Border Foundation
Brownsville, TX—Matamoros, Mexico 1993-1995
Directed and co-founded a bi-national community health worker organization "Mano a Mano" in U.S.-Mexico border communities of Matamoros, Mexico and Brownsville, Texas. Designed and implemented recruitment, training, grant-writing and facilitated project's advisory board. Fostered cross-border, cross institution relationships and supervised community health workers. Accompanied health worker on home visits and addressed barriers.

Legal Advocate/Unaccompanied Minors Program Coordinator
Casa del Proyecto Libertad, Harlingen, TX  1991-1993
Coordinated advocacy and legal services to Central American unaccompanied minors and refugees. Involved in local and national advocacy efforts; provided legal services to detained adult political asylum applicants; represented in Immigration Court as Accredited Representative, researched human rights policy and provided legal rights presentations in immigration detention facilities and shelters.

Associate Editor, Latin America Press
Lima, Peru 1990-1991:
Researched, edited and translated for a scholarly bilingual publication covering a broad range of political and economic issues in Latin America and the Caribbean. Publication based in Lima, Peru.

Trainer, Centro Cultural Costaricense-Norteamericano
San Jose, Costa Rica 1990:
Designed and implemented cross-cultural curriculum for rural Central American youth preparing for high school exchange program and university agricultural programs in the U.S. Worked with U.S. AID funded agricultural grant. Based in San Jose, Costa Rica.

Organizer, Farm Labor Organizing Committee
Toledo, OH   1987
Recruited farmworkers to become members of a labor union through human rights presentations; provided social services and outreach to labor camps across northern Ohio. Organized FLOC annual convention which hosted Cesar Chavez and United Farm Worker Delegates from across the county.

Publications/Presentations:

o  Fernandez ME, McCurdy S, Arvey S, Morales-Campos D, Tyson, S, Useche, B, **Mitchell-Bennett, L**, Sanderson, M.  HPV Knowledge, Attitudes, and Cultural Beliefs among Hispanic Men and Women in South Texas. Ethnicity and Health. December 2009.

- Heredia, N, Lee, M, **Mitchell-Bennett, L,** Reininger, B.M. Tu Salud¡ Sí Cuenta! Your Health Matters! A Community-wide Campaign in a Hispanic Border Community in Texas. Journal of Nutrition Education and Behavior, 2017.

- Heredia, N, Lee, M, **Mitchell-Bennett, L**, Reininger, B.M. Tu Salud, Si Cuenta! Your Health Matters! A quasi-experimental design to assess the contribution of a communitywide campaign to eating behaviors and anthropometric outcomes in a Hispanic border community in Texas. Journal of Nutrition Education and Behavior. In Press.

- Montoya, J. A., Salinas, J. J., Barroso, C. S., **Mitchell-Bennett, L.**, & Reininger, B. (2011). Nativity and nutritional behaviors in the Mexican origin population living in the US–Mexico border region. Journal of Immigrant and Minority Health, 13(1), 94–100. PMCID: PMC3034163

- Reininger, B. M., **Mitchell-Bennett, L.,** Lee, M., Gowen, R. Z., Barroso, C. S., Gay, J. L., & Saldana, M. V. (2015). Tu Salud,¡ Si Cuenta!: Exposure to a community-wide campaign and its associations with physical activity and fruit and vegetable consumption among individuals of Mexican descent. Social Science & Medicine, 143, 98-106. PMCID: PMC4642277

- Reininger, B. M., Barroso, C. S., **Mitchell-Bennett, L**., Chavez, M., Fernandez, M. E., Cantu, E., Smith, K. L., & Fisher-Hoch, S. P. (2014). Socio-ecological influences on healthcare access and navigation among persons of Mexican descent living on the U.S./Mexico border. Journal of Immigrant and Minority Health, 2014 Apr;16(2):218-28 PMCID: PMC4377819

- Reininger, B. M., Barroso, C. S., **Mitchell-Bennett, L.,** Cantu, E., Fernandez, M. E., Gonzalez, D. A., Chavez, M., Freeberg, D., & McAlister, A. (2010). Process evaluation and participatory methods in an obesity-prevention media campaign for Mexican Americans. Health Promotion Practice, 11(3), 347–357. PMCID: PMC2877153

- **Mitchell-Bennett, L.,** "Social cognitive theory and factors associated with Mexican-American parents' beliefs, attitudes and practices regarding communication with their adolescent children about sex" (2010). Texas Medical Center Dissertations (via ProQuest). AAI1470749. http://digitalcommons.library.tmc.edu/dissertations/AAI1470749

- American Public Health Association (APHA) Paper presented (Washington D.C.,2007) "Latina mothers' communication with their

adolescent children about sexuality, sexually transmitted diseases and the reproductive system"
- American Public Health Association (APHA) Paper/Poster presentations (Philadelphia, 2005); "Assessing Cultural Beliefs and Practices Regarding Healthcare Utilization Among Hispanics in the Lower Rio Grande Valley (LRGV)"  &  "Assessing Attitudes and Science Career Choices Among Hispanic Youth in LRGV"
- Research Symposium, University of Texas, Brownsville. "Hispanic Adolescent Attitudes and Preferences Regarding Employment During High School" (2007)
- Healthy Communities Annual Meeting, "Assessing Cultural Beliefs, Attitudes and Practices of Lower Rio Grande Valley Hispanic Parents' Communicating With Their Adolescent Children About Sex" (2006)
- Rio Grande Valley Science Association Annual Conference, San Juan, TX, "Assessing Attitudes and Science Career Choices Among Hispanic Youth in the Lower Rio Grande Valley, Texas" (2005)
- U.S.-Mexico Border Health Conference, El Paso, TX "Campus Care Centers: Comprehensive School Based Health Centers" (1997)
- University of Texas Health Science Center, Border Health Conference, Presenter / Expert Panel Member San Antonio, TX, "Mano a Mano; A Promotora de Salud Model" (1995)

Certifications:

- Department of State Health Services Community Health Worker Instructor certification (2012- present)
- Accredited Representative, Accredited by the Board of Immigration to represent political asylum cases in Federal Immigration Court (1995)

Community Service:

- Board of Directors, Brownsville Wellness Coalition (2017-Present)
- Guardian Ad Litem, Young Center for Immigrant Children's Rights (2015-2017)
- Friends of the West Rail Trail Organizing Committee (2015- Present)
- Board of Directors, Episcopal Day School (2012-2014)
- Board of Directors, Casa del Proyecto Libertad (1999-2005)
- United Brownsville Health Committee (2010-2013)
- Volunteer, La Posada Soup Kitchen, Brownsville, Texas (2010-2013)
- Institutional Animal Care Research Committee, University of Texas, Brownsville (2010)
- Vestry, Church of the Advent Episcopal (2007-2008)
- Rio Grande Valley Science Association, Board Member (2004-2008)
- Steering Committee Member, REACH Coalition/Walk El Valle (2002-2003)
- Advisory Board Member, Mano A Mano Promotoras (1998-2000)
- Health Trendbenders, Healthy Communities of Brownsville (2002-2008)
- Member, National Assembly on School Based Health Care (1997-2000)

- o Steering Committee, American Lung Association (1997-1998)
- o Executive Committee, Save Our Children Brownsville (1997)
- o Board Member, American Street Empowerment Zone (1995-1997)
- o Member, Philadelphia Job Developer's Network (1995-1997)
- o Member, Singing City Philadelphia Inner City Choral Music (1995-1997)
- o Volunteer Director, Cameron Park Community Center (1993-94)
- o Executive Committee, March of Dimes Rio Grande Valley (1993-1995)
- o Delegate, Citizen's Observer Mission to El Salvador (1994)
- o Volunteer, General Board of Global Ministries UMC (1991-1993)
- o Volunteer, Pamplona Alta Soup Kitchen, Lima, Peru (1990-91)

Awards and Honors:
Domonic Napoli Humanitarian Scholarship (1985); United Methodist Church College Scholarship (1985); University of California Alumni Award for Community Service (1989); University of California, Dept. of Political Science Honors (1989); Ford Foundation Immigration Advocates Training Scholarship (1991); Rio Grande Valley Human Rights Award (Holy Spirit Parish-1995); Congress of United Latinos' Service Award (1997); Award for Excellence in Texas School Health (2000); University of Texas, Houston Health Science Center, American Public Health Association Annual Conference Scholarship (2006); Finalist, Fulbright U.S. Student Program Scholarship.

Other Experience:

- o Teacher (English as a Second Language and Spanish),
- o "The Language Connection", Phoenix, Arizona, Phoenix Public Schools,
- o Arizona, and Euroidiomas Language Institute, Lima, Peru.
- o Intern, International Affairs Council, Riverside, CA
- o Teacher Trainer, Brownsville Independent School District Developed and implemented puberty and sexuality education training for district teachers, counselors and nurses, Brownsville, TX

Languages:
English (Fluent); Spanish (Fluent); French (Proficient).
I have lived and/or worked in Mexico, Colombia, Indonesia, Switzerland, Spain, Costa Rica, Peru and the U.S.

References available upon request.

## DECLARATION OF MICHELLE BRANE OF
## THE WOMEN'S REFUGEE COMMISSION

I, Michelle Brané, hereby declare as follows:

1.      I am the Director of the Migrant Rights and Justice (MRJ) Program of the Women's Refugee Commission (WRC), where I have worked on research and policy advocacy since August of 2006.  Prior to joining the WRC, I was the Director of the Access to Justice Program at Lutheran Immigrant and Refugee Services,  a Human Rights Officer and Election Monitor seconded by the U.S. Department of State to the OSCE (Organization for Security and Cooperation in Europe), and an Attorney Advisor at the U.S. Department of Justice, Board of Immigration Appeals.  I am admitted to practice law in New York.  I make this declaration based on my personal knowledge except where I have indicated otherwise.  If called as a witness, I could and would testify competently and truthfully to these matters.

2.      I submit this declaration to document the widespread and systematic denial by the U.S. government of the rights of asylum seekers and danger to which this exposes asylum seekers and especially unaccompanied children, who present themselves at the port of entry in Tijuana/San Isidro.

### The Women's Refugee Commission and the
### Migrant Rights and Justice Program

3.      The WRC is a non-profit organization that advocates for the rights of women, children, and youth fleeing violence and persecution.  The WRC is based in New York, New York; the MRJ Program is based in Washington, D.C.

4.      The WRC was founded in 1989, originally as a program within the International Rescue Committee, after having identified a dearth of programming to protect women and girls displaced by humanitarian crises around the world.  It subsequently evolved into an independent entity.  WRC's mission is to improve the

lives and protect the rights of women, children and youth displaced by conflict and crisis.

5.      The WRC is a leading expert on the needs of refugee women and children, and the policies and programs that can protect and empower them.  The WRC regularly consults displaced women, children, and youth, and works with the community-based organizations that are usually the first responders in any humanitarian crisis.  It then raises those needs with policy makers and implementers, including local and national governments, the United Nations, and other international non-governmental organizations that drive humanitarian policy and practice.

6.      The MRJ program focuses on the right to seek asylum in the United States.  It strives to ensure that refugees, including women and children, are provided with humane reception in transit and in the United States, given access to legal protection, and protected from exposure to gender discrimination or gender-based violence.  The MRJ program regularly consults with diverse stakeholders, including affected migrants and refugees; community-based, national, and international organizations; policymakers, including Members of Congress and their staff; and federal government officials from several departments and agencies that work on immigration-related issues and conduct oversight.

7.      Since 1996, the MRJ team has made numerous visits to the southwest border region, including along Mexico's northern border, as well as to immigration detention centers for adult women and families and to shelters housing unaccompanied children throughout the country.  Based on the information that we collect on these visits and our legal and policy analysis of the issues, we advocate for improvements through various methods, including meetings with government officials and service providers, and by documenting our findings through fact sheets, reports, backgrounders, and other materials.  We make recommendations to address identified or observed gaps or ways in which we believe the corresponding

department or agency could improve its compliance with the relevant standards. We use these materials in our advocacy work to inform the perspectives and decisions of policymakers.  Although the WRC has not litigated cases directly, the MRJ program has filed amicus briefs and declarations in pending litigation on issues such as the conditions and standards for the custody of unaccompanied children.

## **Recent Experiences of Asylum Seekers in**
## **Encounters with U.S. Authorities**

8.      Since December 2016, members of my staff in the MRJ program and I have conducted several visits to the U.S.–Mexico border, after receiving reports from local advocates that asylum seekers were being systematically turned away from U.S. land Ports of Entry.  Most recently we visited Tijuana, Mexico and San Isidro and San Diego, California on November 26 – 30, 2018.  My focus today is on observations and findings from this visit.

9.      The structure of our visit consisted of crossing the border from the United States to Mexico by foot.  Once in Tijuana, Mexico, we met with NGOs Government officials, International Organizations, and migrants, over the course of several days. We observed events and attempts to enter through the port of Entry at "Garita El Chaparal" – or Pedestrain Access West.  We spoke with migrants and asylum seekers about their experiences crossing the border, trying to cross the border, or before attempting to cross the border from Mexico into the United States.  All of the asylum seekers we encountered were seeking safe haven in the United States after fleeing targeted violence or other serious harm in their home countries.

10.      I also met with CBP representatives on the U.S. side of the border, to learn more about what they were observing on these same issues and to share our findings.

1

2           **Manner in Which Asylum Seekers Are Denied Processing**

3           11.     All asylum seekers, including those from Mexico, are told by U.S.

4    border officials that prior to processing or entry they have to coordinate with

5    Mexican immigration authorities.  In practice, what we observed – confirmed by

6    asylum seekers, Mexican and U.S. government officials, and NGOs working in

7    Tijuana – is that asylum seekers must register themselves on a list that is

8    maintained by migrants themselves and the Mexican agency known as "Grupo

9    Beta."

10          12.     Asylum seekers maintaining "the list" are self-appointed through an

11   ad hoc nomination system.  I observed that asylum seekers managing "the list" are

12   stationed at a table outside of the Port of Entry.  Migrants who approach them are

13   asked for their identity documents, their name is put on the list, and they are given

14   a piece of paper with a number on it.  Every evening, this list is given to the

15   Mexican agency, "Grupo Beta" for "safekeeping" overnight.

16          13.     Asylum seekers, NGO personnel, and Grupo Beta themselves

17   informed us that Grupo Beta maintains the lists of asylum seekers waiting to

18   present at a specific Port of Entry every night, and in the morning, after being

19   informed by U.S. authorities how many will be accepted, they escort the

20   individuals whose turn it is to the U.S. officials at the Port of Entry.  We were told

21   that if an asylum seeker approaches the Port without being on 'the list", he or she

22   would be turned away by U.S. authorities, refused processing, and be told that they

23   need to get on "the list".

24          14.     On this visit, we spoke to asylum seekers from Mexico, Honduras,

25   and Venezuela.  All of the asylum seekers with whom I spoke were confused and

26   concerned about the process.

27          15.     Unaccompanied children are unable to access the port of entry

28   through the "metering" system implemented by the United States.  Unaccompanied

children are unable to get on the list – or present themselves at the border based on the list.  They are also unable to approach the port of entry without being on the list.

16.     Any children who present themselves to Mexican authorities (as required by U.S. officials) to be escorted to the Port of Entry are referred to Desarrollo Integral de La Familia (DIF) – the Mexican agency charged with the protection of children. Once referred to DIF, children risk detention and deportation.  As a result, children are unable to get on "the list" and access the port of entry.

17.     DIF is charged with the care and custody of all unaccompanied children in Mexico.  Children and adults to whom we spoke reported that being sent to DIF meant deportation.  While DIF is responsible for screening children for protection, the reality is that this often does not happen and children in custody are often unable to access protection.[1]

18.     In addition to not being able to sign onto the list and access the port of entry, children who are unaccompanied informed us that they are afraid to identify themselves.  Their status as unaccompanied children puts them at increased risk (see examples below).

19.     We also met with Al Otro Lado (AOL), DIF officials, and leaders of the Casa Inca YMCA shelter for unaccompanied children in Tijuana.  Where possible (when they are identified and when there is space available and where a child is willing), unaccompanied children identified by NGOs or DIF are sent to Casa Inca.  When they become aware of unaccompanied children who are interested in applying for asylum in the Unites States, AOL attorneys and volunteers provide them with a legal orientation, do a screening, and in appropriate

---

[1] Georgetown Law Human Rights Institute Fact Finding Project, The Cost of Stemming the Tide, April 2015, https://www.law.georgetown.edu/human-rights-institute/our-work/fact-finding-project/the-cost-of-stemming-the-tide/.

1   cases will accompany a child to the Port of Entry.

2

3                    **Threatening Conditions along Mexico's Northern Border**

4          20.    During my visit to Tijuana, I saw and spoke with many asylum

5   seekers, who reported that CBP had refused to process them.  These individuals,

6   who were waiting in shelters in northern Mexico while figuring out what to do next

7   were in a very vulnerable situation.  A small number have found accommodations

8   either in rental space or with Mexican families.  The majority are  unable to afford

9   private accommodations.  These asylum seekers were dependent on the Mexican

10  authorities or non-governmental entities to provide them with lodging and food.

11         21.    On the day I spoke to migrants whose number was expected to be

12  called who were waiting for entrance, I encountered Mexican, Venezuelan, and

13  Honduran families.  They were fleeing violence and persecution and had been

14  waiting at the port for several weeks.

15         22.    Asylum seekers stranded along Mexico's northern border are

16  particularly susceptible to opportunistic or predatory behavior.

17         23.    One of the shelters we visited – a sports complex known as Benito

18  Juarez– was located in the red light district of Tijuana.  We were told to leave the

19  area before dark because it was extremely dangerous and that the neighborhood

20  was the home base for traffickers. We were told that it was "not safe" to walk or

21  spend time outside around the shelter.  We were also told that there is an unofficial

22  5:00 p.m. curfew in place for the area, since violent crime picks up after dark.

23         24.    Sanitary conditions are extremely concerning at Benito Juarez.  Toilet

24  facilities consisted of a small building with indoor toilets that were overflowing

25  and had a line of about a hundred people pushing to get in.  In addition, there was a

26  line of about 25-30 port-a-potties.  Many had doors completely broken off or

27  falling off the hinges.  They were not segregated by gender.  There were only two

28  showers, outdoor with no privacy barriers or proper drainage.  The area around the

1   toilets was flooded with standing water.

2       25.   Garbage receptacles were inadequate and overflowing.

3       26.   We saw no security within the shelter – which was housing over 4000

4   migrants, except for two civilian clothed municipal employees restricting access to

5   an indoor facility that housed a limited number of women and children, and single

6   men with children. Many women, children, and families remained outside the

7   enclosed area.

8       27.   The only public health presence we witnessed was public health

9   personnel handing out face masks as protection for respiratory illness.

10

11      28.   On November 30 the shelter was transferred to a new location known

    as El Barretal.  The new location is better equipped for sheltering in the winter

12  months because it has a roof and concrete floors.  However, the new shelter is also

13  in a very dangerous neighborhood and is very remote from the city and ports of

14  entry.  Getting access to the port of entry to request asylum, sign up on "the list",

15  or report when your number is called, is difficult.

16      29.   We interviewed many asylum seekers at the shelter and in other

17  shelters in Tijuana.  The majority were from Honduras and told us they were

18  fleeing violence ranging from extreme domestic violence, to gang and cartel

19  violence, and violence from governmental entities based on political opinion.

20  Information about asylum rights is extremely lacking in the shelters.  The majority

21  of the people to whom we spoke expressed fear of returning home but were

22  unfamiliar with asylum or the criteria.  We encountered many unaccompanied

23  children in the shelter who had no information about their rights to protection in

24  Mexico or the United States.

25      30.   Most of the unaccompanied children to whom we spoke did not know

26  how to ask for asylum in the U.S.  They were either unaware of the list or knew

27  about the list and told us that they were unable to get on the list as unaccompanied

28

children. Several told us they "need an adult" to help them cross.

31.    Unaccompanied children were very hesitant to tell us they were unaccompanied.  They explained that if they encountered authorities they would be taken, detained, and deported.  Most of the children we spoke to expressed great fear of being returned to their home countries.

32.    In several cases their understanding gave us serious concern that they were at risk of trafficking or of getting themselves into risky smuggling situations. Where we identified unaccompanied children, we referred them to attorneys and the children's shelter but the children were often mistrustful and not sure what to do, and both space at the shelter and attorneys are limited.

33.    We encountered one 16-year-old boy who was traveling with his 8-year-old half-brother. The boy was afraid to stay at the Benito Juarez shelter or go to the new shelter because conditions were so bad and dangerous.  He was also afraid to go to the border or to try to get on the list because he was unaccompanied and feared he would be detained and deported.  He wanted to go to his family in the U.S. but had no idea how.  We told him about the children's shelter and he said he would try to find his brother and bring him, but by the time he went to look for his brother, he had left.

34.    We encountered a 13-year-old girl from Honduras who was looking for safety.  She was alone and knew that she would not be able to register at the job fair offered by Mexican authorities because she was too young.  She was also aware of the risk of deportation if she presented herself to the Mexican authorities for registration.  She did not know how to get to the port of entry because she knew she needed an adult to do so.  While we were speaking to her we were approached by a woman who said she was looking out for her. The girl looked uncomfortable. The woman asked her why she was speaking to us and the girl said she was trying to get information about seeking protection.  The woman said "Why would you need protection? You have me."  The girl had made an arrangement to care for the

1 | young woman's child while she worked.  We told the girl where to find the
2 | attorneys who could explain her rights to her and get her to the children's shelter,
3 | but we do not know if she made it there.

4 | 35.   Cases like these two children's are common.  Unaccompanied
5 | children who are turned away from the border are often left with no recourse and
6 | are very vulnerable to exploitation.

7 | 36.   WRC continues to remain very concerned about this trend and will
8 | continue to invest resources in monitoring this issue, due to the serious impacts it
9 | has on the rights and well-being of asylum seeking individuals and in particular
10 | unaccompanied children arriving at the U.S. border.

12 | I declare under penalty of perjury under the laws of the United States of
13 | America that the foregoing is true and correct.

14 | Executed on December 5, 2018 at *Washington, DC*.

17 | Michelle Brané

Lisa Mitchell-Bennett, MA, MPH
225 Hibiscus Ct. Brownsville, TX 78520
(956) 466-5657
lisa.mitchell-bennett@uth.tmc.edu

Education:

Master of Public Health, MPH
University of Texas, School of Public Health (2010)

Master of Arts, International Development Administration, MA
School for International Training, Brattleboro, VT (1994)

Bachelor of Arts, Political Science/International Relations, BA
University of California, Riverside, CA (1989)
Dean's List; Departmental Honors

Certificate, Estudios Hispanicos (1987)
University of Granada, Spain

Experience:

Project Manager
University of Texas, School of Public Health
Brownsville, TX   2011 – present
Manage a large team of multi-project initiatives with numerous institutional
partners throughout the region. Projects include a diabetes chronic care
management program with community health workers, local hospitals, clinics and
behavioral health providers (Salud y Vida); an evidence-based youth obesity
intervention in the schools and community (MEND); a navigation program for a
mobile clinic serving uninsured, rural population; a community-wide campaign
with media, policy and environmental change working in 9 towns and cities (Tu
Salud ¡Si Cuenta!); and supervising numerous graduate and undergraduate
student for research internships.

Quality Assurance Coordinator
University of Texas, School of Public Health
Brownsville, TX   2011 - 2013
Coordinated monitoring and quality assurance for a multi-disciplinary team;
developed and evaluated interventions to address obesity and diabetes through
a community-wide campaign including media, policy and environmental change
to support healthy choices. Managed relationships with community partner
institutions, provided training and supervision to community health workers,
created and evaluated content for media campaign, involved in grant writing and
reporting. Responsible for monitoring, training and implementing coordinated
efforts with a clinical research unit, local community partners and research

1

investigators. Developed and provided training for organizations and community-health workers across the state.

Senior Research Associate
University of Texas, School of Public Health
Brownsville, TX   2003-2011
Coordinated intervention research and community outreach efforts for multiple projects. Facilitated research center's community advisory board; oversaw mini-grant funding for community-based organizations, schools and clinics; provided support and resources to community groups to engage in design, evaluation and dissemination of culturally appropriate programs. Coordinated community health worker training and a media campaign "Tu Salud, Si Cuenta" with U.S. and Mexican media partners. Provided research coordination on numerous community based participatory research studies addressing health disparities including diabetes, teen pregnancy, obesity, cancer (HPV) and emergency preparedness as well as Hispanic science education (manage multi-university summer science high school internship program). Co-facilitated a course on Conducting and Analyzing Focus Group Data and guest lecturer in Evaluation and Health Promotion courses.

Project Director/Health Education Coordinator
Brownsville Community Health Center
Brownsville, TX 1997 - 2003
Managed Campus Care Centers, school-based health center with 3 full-service clinics in a large school district serving uninsured and indigent students and their families; supervised multi-disciplinary team including medical and mental health care providers, social workers, medical assistants and office personnel. Also served as coordinator of health education, prevention and outreach efforts for the community health center (FQHC) in the satellite clinics and schools; coordinated community-based health education on violence prevention and sex education for the school district. Responsible for grant writing, reporting, staff supervision, design and implementation of curriculum for award-winning health promotion efforts in the schools and community.

Division Director, Adult Education and Job Training
Congreso de Latinos Unidos, Philadelphia, PA  1995 - 1997
Directed multi-facet job training and adult education programs for a large inner-city agency in North Philadelphia. Provided contract and grant management; supervision of a large staff including teachers, trainers, social workers and project coordinators; worked closely with city-wide domestic violence programs to recruit and retrain women looking to reenter the workforce; collaborated with the Private Industry Council, the Community College of Philadelphia and the American Street Empowerment Zone; participation on an Executive Management Team for the larger agency.

Project Director
Mano a Mano/One Border Foundation
Brownsville, TX—Matamoros, Mexico 1993-1995
Directed and co-founded a bi-national community health worker organization
"Mano a Mano" in U.S.-Mexico border communities of Matamoros, Mexico and
Brownsville, Texas. Designed and implemented recruitment, training, grant-
writing and facilitated project's advisory board. Fostered cross-border, cross
institution relationships and supervised community health workers. Accompanied
health worker on home visits and addressed barriers.

Legal Advocate/Unaccompanied Minors Program Coordinator
Casa del Proyecto Libertad, Harlingen, TX  1991-1993
Coordinated advocacy and legal services to Central American unaccompanied
minors and refugees. Involved in local and national advocacy efforts; provided
legal services to detained adult political asylum applicants; represented in
Immigration Court as Accredited Representative, researched human rights policy
and provided legal rights presentations in immigration detention facilities and
shelters.

Associate Editor, Latin America Press
Lima, Peru 1990-1991:
Researched, edited and translated for a scholarly bilingual publication covering a
broad range of political and economic issues in Latin America and the Caribbean.
Publication based in Lima, Peru.


Trainer, Centro Cultural Costaricense-Norteamericano
San Jose, Costa Rica 1990:
Designed and implemented cross-cultural curriculum for rural Central American
youth preparing for high school exchange program and university agricultural
programs in the U.S. Worked with U.S. AID funded agricultural grant. Based in
San Jose, Costa Rica.

Organizer, Farm Labor Organizing Committee
Toledo, OH   1987
Recruited farmworkers to become members of a labor union through human
rights presentations; provided social services and outreach to labor camps
across northern Ohio. Organized FLOC annual convention which hosted Cesar
Chavez and United Farm Worker Delegates from across the county.

Publications/Presentations:

o  Fernandez ME, McCurdy S, Arvey S, Morales-Campos D, Tyson, S,
   Useche, B, **Mitchell-Bennett, L**, Sanderson, M.  HPV Knowledge,
   Attitudes, and Cultural Beliefs among Hispanic Men and Women in South
   Texas. Ethnicity and Health. December 2009.

- Heredia, N, Lee, M, **Mitchell-Bennett, L,** Reininger, B.M. Tu Salud¡ Sí Cuenta! Your Health Matters! A Community-wide Campaign in a Hispanic Border Community in Texas. Journal of Nutrition Education and Behavior, 2017.

- Heredia, N, Lee, M, **Mitchell-Bennett, L**, Reininger, B.M. Tu Salud, Si Cuenta! Your Health Matters! A quasi-experimental design to assess the contribution of a communitywide campaign to eating behaviors and anthropometric outcomes in a Hispanic border community in Texas. Journal of Nutrition Education and Behavior. In Press.

- Montoya, J. A., Salinas, J. J., Barroso, C. S., **Mitchell-Bennett, L.**, & Reininger, B. (2011). Nativity and nutritional behaviors in the Mexican origin population living in the US–Mexico border region. Journal of Immigrant and Minority Health, 13(1), 94–100. PMCID: PMC3034163

- Reininger, B. M., **Mitchell-Bennett, L.,** Lee, M., Gowen, R. Z., Barroso, C. S., Gay, J. L., & Saldana, M. V. (2015). Tu Salud,¡ Si Cuenta!: Exposure to a community-wide campaign and its associations with physical activity and fruit and vegetable consumption among individuals of Mexican descent. Social Science & Medicine, 143, 98-106. PMCID: PMC4642277

- Reininger, B. M., Barroso, C. S., **Mitchell-Bennett, L**., Chavez, M., Fernandez, M. E., Cantu, E., Smith, K. L., & Fisher-Hoch, S. P. (2014). Socio-ecological influences on healthcare access and navigation among persons of Mexican descent living on the U.S./Mexico border. Journal of Immigrant and Minority Health, 2014 Apr;16(2):218-28 PMCID: PMC4377819

- Reininger, B. M., Barroso, C. S., **Mitchell-Bennett, L.,** Cantu, E., Fernandez, M. E., Gonzalez, D. A., Chavez, M., Freeberg, D., & McAlister, A. (2010). Process evaluation and participatory methods in an obesity-prevention media campaign for Mexican Americans. Health Promotion Practice, 11(3), 347–357. PMCID: PMC2877153

- **Mitchell-Bennett, L.,** "Social cognitive theory and factors associated with Mexican-American parents' beliefs, attitudes and practices regarding communication with their adolescent children about sex" (2010). Texas Medical Center Dissertations (via ProQuest). AAI1470749. http://digitalcommons.library.tmc.edu/dissertations/AAI1470749

- American Public Health Association (APHA) Paper presented (Washington D.C.,2007) "Latina mothers' communication with their

4

adolescent children about sexuality, sexually transmitted diseases and the reproductive system"
- American Public Health Association (APHA) Paper/Poster presentations (Philadelphia, 2005); "Assessing Cultural Beliefs and Practices Regarding Healthcare Utilization Among Hispanics in the Lower Rio Grande Valley (LRGV)" & "Assessing Attitudes and Science Career Choices Among Hispanic Youth in LRGV"
- Research Symposium, University of Texas, Brownsville. "Hispanic Adolescent Attitudes and Preferences Regarding Employment During High School" (2007)
- Healthy Communities Annual Meeting, "Assessing Cultural Beliefs, Attitudes and Practices of Lower Rio Grande Valley Hispanic Parents' Communicating With Their Adolescent Children About Sex" (2006)
- Rio Grande Valley Science Association Annual Conference, San Juan, TX, "Assessing Attitudes and Science Career Choices Among Hispanic Youth in the Lower Rio Grande Valley, Texas" (2005)
- U.S.-Mexico Border Health Conference, El Paso, TX "Campus Care Centers: Comprehensive School Based Health Centers" (1997)
- University of Texas Health Science Center, Border Health Conference, Presenter / Expert Panel Member San Antonio, TX, "Mano a Mano; A Promotora de Salud Model" (1995)

Certifications:

- Department of State Health Services Community Health Worker Instructor certification (2012- present)
- Accredited Representative, Accredited by the Board of Immigration to represent political asylum cases in Federal Immigration Court (1995)

Community Service:

- Board of Directors, Brownsville Wellness Coalition (2017-Present)
- Guardian Ad Litem, Young Center for Immigrant Children's Rights (2015-2017)
- Friends of the West Rail Trail Organizing Committee (2015- Present)
- Board of Directors, Episcopal Day School (2012-2014)
- Board of Directors, Casa del Proyecto Libertad (1999-2005)
- United Brownsville Health Committee (2010-2013)
- Volunteer, La Posada Soup Kitchen, Brownsville, Texas (2010-2013)
- Institutional Animal Care Research Committee, University of Texas, Brownsville (2010)
- Vestry, Church of the Advent Episcopal (2007-2008)
- Rio Grande Valley Science Association, Board Member (2004-2008)
- Steering Committee Member, REACH Coalition/Walk El Valle (2002-2003)
- Advisory Board Member, Mano A Mano Promotoras (1998-2000)
- Health Trendbenders, Healthy Communities of Brownsville (2002-2008)
- Member, National Assembly on School Based Health Care (1997-2000)

- o Steering Committee, American Lung Association (1997-1998)
- o Executive Committee, Save Our Children Brownsville (1997)
- o Board Member, American Street Empowerment Zone (1995-1997)
- o Member, Philadelphia Job Developer's Network (1995-1997)
- o Member, Singing City Philadelphia Inner City Choral Music (1995-1997)
- o Volunteer Director, Cameron Park Community Center (1993-94)
- o Executive Committee, March of Dimes Rio Grande Valley (1993-1995)
- o Delegate, Citizen's Observer Mission to El Salvador (1994)
- o Volunteer, General Board of Global Ministries UMC (1991-1993)
- o Volunteer, Pamplona Alta Soup Kitchen, Lima, Peru (1990-91)

Awards and Honors:
Domonic Napoli Humanitarian Scholarship (1985); United Methodist Church College Scholarship (1985); University of California Alumni Award for Community Service (1989); University of California, Dept. of Political Science Honors (1989); Ford Foundation Immigration Advocates Training Scholarship (1991); Rio Grande Valley Human Rights Award (Holy Spirit Parish-1995); Congress of United Latinos' Service Award (1997); Award for Excellence in Texas School Health (2000); University of Texas, Houston Health Science Center, American Public Health Association Annual Conference Scholarship (2006); Finalist, Fulbright U.S. Student Program Scholarship.

Other Experience:

- o Teacher (English as a Second Language and Spanish),
- o "The Language Connection", Phoenix, Arizona, Phoenix Public Schools,
- o Arizona, and Euroidiomas Language Institute, Lima, Peru.
- o Intern, International Affairs Council, Riverside, CA
- o Teacher Trainer, Brownsville Independent School District Developed and implemented puberty and sexuality education training for district teachers, counselors and nurses, Brownsville, TX

Languages:
English (Fluent); Spanish (Fluent); French (Proficient).
I have lived and/or worked in Mexico, Colombia, Indonesia, Switzerland, Spain, Costa Rica, Peru and the U.S.

References available upon request.

6

DECLARATION OF NICOLE RAMOS

I, Nicole Ramos, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I would testify competently and truthfully to these matters.

2. I am a U.S. licensed attorney practicing in the area of immigration law and human rights. I am barred by the State of New York, and I am a former Assistant Federal Public Defender. I am over the age of 18.

3. I am the Project Director for the Border Rights Project of Al Otro Lado, a nonprofit organization based in Los Angeles.

4. My colleagues and I currently represent about twenty unaccompanied children who wish to apply for asylum in the United States.

5. Because of the interim final rule, Al Otro Lado has been and, without an injunction will be, forced to divert substantial resources away from our core mission of providing legal services to individuals and families with children, to instead address the basic needs of unaccompanied children, who are our most vulnerable clients and who are presenting the most urgent humanitarian concerns in Tijuana. As detailed below, Mexican officials are not permitting unaccompanied minors – including numerous minors we represent – to enter the United States at ports of entry, causing an enormous concentration of vulnerable minors facing danger and desperation in Tijuana. The interim final rule categorically prevents our clients and others from obtaining asylum should they cross between ports of entry, and thus prevents children from crossing out of necessity between ports to seek asylum. Absent an injunction of the rule's operation, therefore, the humanitarian crisis in Tijuana – and the corresponding, overwhelming demands on our time and resources to assist these minors – will escalate and divert our focus from our core mission.

6.  Every one of the children Al Otro Lado is representing has articulated to me or a member of our staff an intent to apply for asylum in the United States.  In my opinion, most of the children have strong claims.  Several of the children are LGBT and have faced severe persecution as a result.  Others have been forced to engage in child labor. Some have family members who have been targeted for violence, putting the children at serious risk because of their family relationships.  One child from Honduras was forced to watch the murder of his cousin; after that, he fled because he understood his life was at risk because of his family relationship.  Several of the children fled after corrupt police perceived them to be informants.  Should the interim final rule not be enjoined, they would be stuck in Tijuana, unable to be processed at a port of entry there, yet unable to cross between ports to seek asylum.

7.  Advising and assisting our unaccompanied minor clients has been particularly time-consuming and emotionally draining.  It has required staff on the Border Rights Project to shift our focus away from our core mission of providing legal services in order to focus almost exclusively on providing extensive non-legal services to unaccompanied minors.

8.  As my colleague, Erika Pinheiro, explained in her supplemental declaration executed on November 16, 2018, and filed in this case, these unaccompanied children have no way to apply for asylum in the United States.  Prior to the TRO, and without an injunction in force, they will be categorically ineligible for asylum if they enter between ports.  They also are not being allowed to apply for asylum at ports of entry for the reasons detailed in the declaration.

9.  Because unaccompanied children cannot apply on their own for asylum at ports of entry, on November 21, nine Al Otro Lado legal observers escorted eight unaccompanied children directly to the San Ysidro port of entry so that they could try to present

themselves to CBP and express their desire to seek asylum. This effort required many hours of preparation to advise the children on what to expect and orient the legal observers who would accompany them to the port of entry. Although we were able to accompany these nine, we cannot accompany all children to the border due to resource constraints.

10. Despite our efforts, Mexican officials apprehended two of the children near the end of the line—a 17-year-old from Honduras and a 15-year-old from Mexico—before we reached the port of entry. These two children were detained by the Mexican immigration authorities for five days. They were released only after I spent dozens of hours over the course of five days negotiating with the Mexican government to facilitate their release. Both were severely traumatized as a result of this experience.

11. Our staff has worked many more hours than usual to address the non-legal needs of our unaccompanied minor clients, including helping to find them accommodations and coordinating with a local youth shelter to provide transportation. Immediately after the interim final rule was announced, up to 15 children at a time were waiting in our office around the clock while we arranged their accommodations. Our office often felt more like a daycare center than a legal services organization. Because our office was being used to shelter our unaccompanied minor clients, we could not spend as much time with our other clients.

12. After these clients moved to a local youth shelter, one of our attorneys spent several hours purchasing cell phones to make sure the children could communicate with us. That attorney's time would otherwise have been spent on casework.

13. Al Otro Lado has also spent countless hours attending to the emotional and mental health needs of our unaccompanied minor clients. Some of them have expressed suicidal

thoughts.  Currently, two of our staff members spend about half their time addressing the needs of our unaccompanied child clients.

14. Conditions for asylum seekers on the Mexican side of the border have become increasingly intolerable.

15. The Tijuana government opened up the Benito Juarez Sports Complex ("Benito Juarez") as a temporary shelter/camp for the migrants.  I have visited Benito Juarez on several occasions.  I have witnessed incredibly squalid conditions, with many migrants, including pregnant women and children, sleeping in the dirt with only plastic sheeting to protect them from the elements. I saw migrants sleeping in shelters made from branches that had fallen from the trees. Many migrants were suffering from respiratory illnesses, as evidenced by their persistent coughs.

16. More than 5,800 migrants had taken shelter at this outdoor facility by the end of November.  This figure represents about three times the capacity of the facility. Migrants formed hours-long lines to get food and water, and migrants reported that there was not enough food for everyone. People do not have basic necessities, including diapers, blankets, or warm clothes.

17. The safety of the migrants at the camp is of grave concern.  Recently, twenty migrants were kidnapped outside the sports complex.  Despite promises of paid work, these individuals were transported to Sonora, Mexico, where they were held against their will for several days.  During this period, they were forced to clean blood and biological waste from a warehouse.  They finally escaped through a window and made their way to a shelter, where many members of the group were recaptured.  The kidnappers are currently seeking to extort money from the victims' families.  One of the victims was released after someone paid his ransom.  He is currently in hiding in Tijuana.

18. On Thursday, November 29, the government opened an indoor shelter facility in Ejido

Matamoros, a very dangerous neighborhood.  It is approximately a 30-minute drive from

the San Ysidro port of entry.  On foot, the journey would take about 30 hours.  Initially,

migrants had the option to stay at Benito Juarez or move to the new facility.  Many were

reluctant to move due to concerns about safety and the difficulty of making repeated trips

to the port of entry to see what number was being called from "the list."  As of Friday,

November 30, local officials announced that they would be removing all portable toilets

and cease providing services at Benito Juarez. Even with no water, electricity, and scarce

food, there were still several hundred migrants at Benito Juarez as of December 2, 2018.

Even with the addition of the new shelter, the available space remains inadequate, with

the result that many migrants are sleeping in tents or outside in various locations around

Tijuana.

    Executed this __ day of December 2018.

Nicole Ramos

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
-----------------------------------------------------------X
EAST BAY SANCTUARY COVENANT et al.,

**SUPPLEMENTAL**
**DECLARATION OF**
**MADELEINE PENMAN**

*Plaintiffs,*

v.

DONALD TRUMP, et al.,

*Defendants.*
-----------------------------------------------------------X

I, MADELEINE PENMAN, declare pursuant to 28 U.S.C. § 1746 and subject to the

penalty of perjury, that the following is true and correct:

1.      I am a Researcher on Mexico for the International Secretariat of Amnesty

International. I make this statement in support of Plaintiffs' Motion for a Preliminary Injunction

and to supplement the declaration I made in support of Plaintiffs' Motion for a Temporary

Restraining Order.  (ECF No. 35-7, filed 11/16/2018). I am over 18 and have personal

knowledge of the facts described herein.

2.      My experience and qualifications are set forth in my Declaration in Support of

Plaintiffs' Motion for a Temporary Restraining Order. As described therein, I earned Bachelor of

Arts and Bachelor of Law degrees from Macquarie University in Australia, and am a Ph.D.

candidate in Latin American Studies at Australian National University. Since 2015 I have

worked as a Researcher based in Mexico City, investigating human rights violations in several

countries in the Americas, specializing in migration in Central America and Mexico. A

significant part of my work focuses on the migration of people fleeing the Northern Triangle

(Honduras, Guatemala, and El Salvador). Since 2016, Amnesty International has conducted intensive research and campaigning on asylum seekers and refugees in Central and North America. My colleagues and I at the Americas Regional Office of Amnesty International have published six reports and briefings about the experiences of people fleeing the Northern Triangle in search of international protection.

3.      I am the author of our most recent report, *Americas: Stuck at the Door: The Urgent Need for Protection of Central American Refugees, Asylum Seekers, and Migrants in the Caravans* (Amnesty International, November 26, 2018) ("*Stuck at the Door*" or "the Report"). The Report is the product of Amnesty International's fact-finding missions undertaken in October and November of 2018 in southern Mexico and Guatemala as well as Tijuana and Mexico City. In addition to information obtained from governments in the region and international and civil society organizations in the field, Amnesty International has spoken to more than 200 members of caravans, either as individuals or in groups, including families, women with children, and members of the LGBTI community.

4.      The Report focuses on the harmful effects of attempts to implement hard-line border controls that aim to deter migration. It concludes that rather than stem the number of people migrating, these attempts force migrants to use more clandestine and dangerous means of fleeing, causing great risk to human life and fuelling criminal networks. The Report also places the exceptional phenomenon of caravans of migrants in the context of an overall decrease in migration levels.   A summary of the findings in the Report is set forth below.

*The Flight of Central Americans from Violence and Persecution in Their Home Countries*

5.      Recent years have seen a dramatic increase in the number of people from El Salvador, Guatemala, and Honduras fleeing violence and persecution. According to the United Nations High Commissioner on Refugees (UNHCR), the number of people applying to be recognized as refugees from those countries increased 1007% between 2012 and 2017. (Report at 4).

6.      The *maras*, violent criminal groups that exercise territorial control over significant portions of the Northern Triangle, operate with impunity. Citizens in the Northern Triangle do not have government protection from epidemic homicide rates, extortion, death threats, sexual violence (particularly against women and LGBTI individuals) and forced recruitment of children and adolescents. (Report at 4).

7.      Since April 2018, thousands of Nicaraguans have begun fleeing their country as a result of their government's violent repressive response to social protests, including extrajudicial killings, torture, and arbitrary detentions. (Report at 4).

8.      Amnesty International has documented that many members of caravans are fleeing violence and persecution in Honduras and El Salvador, as well as repressive government actions in Nicaragua. (Report at 4).

9.      Conditions on the route from Central America are extremely difficult and dangerous. Many members of the caravans are unaccompanied minors, women, children, LGBTI individuals, and people with disabilities, and are in need of special protection. But in the course of their flight, members of caravans have been subjected to harsh conditions, violence, and abuse of state authority. Honduran, Guatemalan, and Mexican authorities have arbitrarily closed border crossings, causing migrants to wait for days in unsafe and unsanitary conditions

or to take more dangerous routes. Some members of caravans, like thousands of migrants and asylum-seekers before them, have faced violence, extortion, kidnappings, and denounced disappearances while in Mexico. These crimes are not properly investigated by authorities, and in some instances government authorities themselves have been involved in harassment and extortion. (Report at 5).

10. Mexican and Guatemalan military and police have been deployed to the Mexico-Guatemala border in response to the arrival of the caravans. On October 19, 2018 the Mexican Federal Police used tear gas on thousands of migrants who were confined within barriers on a border bridge between Mexico and Guatemala. On October 28, during the arrival on the bridge of a second large caravan, a Honduran man was killed, his death evidently the result of either a rubber bullet or a projectile designed to disperse a chemical irritant in a closed space. (Report at 4-5).

11. Mexican authorities do not adequately inform migrants of their rights and appear to have violated international principles of *non-refoulement*. Although Mexico's migration law allows for several options for caravan members, including humanitarian visas that would protect migrants from detention or deportation, most caravan members have received no provisional document. (Report at 9). Mexico reported receiving 3230 asylum applications from members of caravans at the end of October. But after many of these applicants were detained, Mexico claimed on November 14 that 533 abandoned their claims. On November 25, Mexican authorities reported that 2000 caravan members had been returned to their home countries. This number likely undercounts the number of migrants returned to their home countries: the Honduran government has reported that more than 4000 Hondurans were returned from Mexico between October 15 and November 7. Amnesty International has also documented the

apprehension of hundreds of caravan members along Mexican highways, including families with children. Testimony collected by Amnesty International from members of caravans demonstrates that numerous asylum-seekers have been deported on buses, in some cases following mass-detentions on highways. (Report at 6-7). In short, Mexico is not a "safe country for all asylum-seekers." (Report at 10).

*Arrival of Caravans at the United States Border with Mexico in Tijuana*

12. The United States government has implemented a number of measures that interfere with the rights of asylum seekers and violate *non-refoulement* principles. These include mass illegal pushbacks of asylum seekers; illegal family separations that cause extreme suffering; and arbitrary, punitive, and indefinite detention of asylum seekers without parole.

13. As members of caravans have begun arriving at the United States border with Mexico in Tijuana, the U.S. Department of Homeland Security has continued its policy of limiting processing of asylum seekers and erected new barriers. In recent months, agents of U.S. Customs & Border Protection (CBP) have limited the processing of asylum seekers at the San Ysidro Port of Entry to no more than 30 to 70 per day. (Report at 9). There is no indication that the United States intends to increase capacity for processing asylum seekers to meet the needs of the caravans, even as it deploys 7000 troops to the border. (Report at 9). In the aftermath of President Trump's proclamation, on November 9, making those who cross the southern border without inspection ineligible for asylum, authorities have also erected physical barriers, including concertina wire in the car lanes leading to the Port of Entry, to stop asylum-seekers from approaching. (Report at 9).

14. Moreover, United States authorities have subjected caravan members to repeated rights violations and use of force. On November 25, agents of U.S. Customs & Border

Protection (CBP) sprayed teargas into a group of hundreds of migrants and refugees, including families with young children, who had approached the border fence near the San Ysidro Port of Entry after a public march. Analysis by Amnesty International of photographs and video of this incident demonstrate that CBP also used projectiles that may have been batons or bean bag rounds, including at close range. (Report at 9).

15.     Purported negotiations between the United States and Mexico to arrange for asylum seekers to seek refuge in Mexico are not adequate to protect caravan members. Policies that seek to return asylum seekers en masse to a "safe third country" undermine authorities' obligations to make an individualized assessment of each asylum claim. Moreover, it is clear that Mexico is not uniformly safe for asylum-seekers and that there is a heightened risk of *refoulement* of asylum-seekers to persecution and violence in their countries of origin. (Report at 10). Such a result would violate international law.

*Conclusion*

16.     Amnesty International has made numerous recommendations to countries of origin in Central America, to authorities of transit and receiving countries, and to the government of Mexico and the United States. (Report at 10-11). It is crucial that the United States halt its policy of illegal pushbacks of asylum-seekers at Ports of Entry; ban family separations; and provide adequate resources at Ports of Entry to protect those seeking refuge. (Report at 11-12).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on this 3rd day of December. 2018

Madeleine Penman
Amnesty International

**DECLARATION OF MICHAEL SMITH, REFUGEE RIGHTS PROGRAM DIRECTOR, EAST BAY SANCTUARY COVENANT**

I, Michael Smith, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I make this declaration based on my personal knowledge except where I have indicated otherwise.  If called as a witness, I would testify competently and truthfully to these matters.

2. I am the Refugee Rights Program Director of the East Bay Sanctuary Covenant ("EBSC").  I helped start EBSC's affirmative asylum program in 1992, and have been with the organization since.  In my current role, I oversee our affirmative asylum practice, which includes over 500 cases currently pending before the U.S. Citizenship and Immigration Services ("USCIS").  The vast majority of clients in our affirmative asylum program—approximately 80%—entered without inspection.

3. I submit this declaration to supplement my previous declaration in *East Bay Sanctuary Covenant v. Trump*, which was executed on November 9, 2018.

4. The Presidential Proclamation and Interim Final Rule at issue in *East Bay Sanctuary Covenant v. Trump* frustrate EBSC's mission to assist asylum seekers in filing affirmative applications for asylum.

5. EBSC's affirmative asylum program is the organization's most important program.  It is the reason EBSC has grown and developed other programs.

6. EBSC cannot represent asylum seekers who enter at a port of entry along the southern border, for two principal reasons.

7. First, EBSC cannot represent asylum seekers who enter at a port of entry because EBSC is not located near the southern border.  We are located hundreds of miles away, in Berkeley, California.  Most of the asylum seekers who enter at a port of entry remain detained in detention facilities located near the border.

8. Second, EBSC cannot represent asylum seekers who enter at a port of entry because we only rarely represent people in removal proceedings. Our program is focused on representing individuals who file affirmative applications for asylum. Noncitizens who present at a port of entry and ask to apply for asylum are not eligible to file an affirmative application for asylum. Instead, they are limited to seeking asylum defensively in removal proceedings.

9. Thus, even those asylum seekers who arrive at a port of entry and are fortunate enough to be granted release from detention, and who then manage to relocate to the Bay Area, are not the kind of asylum applicants we can represent. That is because they will still be in removal proceedings and cannot apply for asylum affirmatively.

10. The only noncitizens who enter at ports of entry who might later be eligible to file affirmative applications for asylum are those who have visas of some kind. But for the most part, such individuals fall outside of the population who it is EBSC's mission is to serve, as they make too much money to qualify for EBSC's services.

11. EBSC's mission is to serve poor individuals who have few resources and cannot afford attorneys. And the grant that funds EBSC's work is only for people who make under 250% of the poverty guideline.

12. EBSC does affirmative asylum cases, not defensive asylum cases. We only do defensive asylum cases in the rare situation that one of our clients who initially applies affirmatively is then referred to immigration court by the Asylum Office.

13. EBSC is neither staffed nor funded to provide representation for asylum applicants in removal proceedings. To do so would involve a fundamental change in our program and mission.

14. As explained in my prior declaration, if the new policy remains in effect, EBSC stands to lose nearly all of our funding for our affirmative asylum program, because 80% of our clients in that program entered without inspection.  But under the new policy, if they enter without inspection, they will no longer be able to access asylum at all.

15. Since the announcement of the new policy, EBSC has had to divert resources away from its core programs to address the new policy.  We have had to dedicate time to training staff on the new policy as well as to speaking with clients who have heard about the policy and are concerned about how it may affect them.

I hereby declare under the penalty of perjury pursuant to the laws of the United States that the above is true and correct to the best of my knowledge.

EXECUTED this  3rd day of December, 2018.


Michael Smith

**SUPPLEMENTAL DECLARATION OF STEPHEN W. MANNING, EXECUTIVE DIRECTOR, INNOVATION LAW LAB**

I, Stephen W. Manning, declare as follows:

1.      I am an attorney licensed to practice in the State of Oregon and am a member in good standing of the bars of the United States District Court for the District of Oregon, the United States Court of Appeals for the Ninth Circuit, and the Supreme Court of the United States.  I am a member of the American Immigration Lawyers Association ("AILA"), a former member of the Board of Governors of AILA, and a former Chair of the Oregon Chapter of AILA. I am over 18 and have personal knowledge of the facts described herein.

2.      I am the Executive Director of the Innovation Law Lab ("the Law Lab"), a nonprofit in Oregon that I founded to improve the legal rights of immigrants and refugees in the United States.

3.      I write this declaration to supplement my prior declaration filed in *East Bay Sanctuary Covenant v. Trump* and to provide an update on the effect the DHS-DOJ regulation and Presidential Proclamation have had on our organization's work.

4.      The Rule and Proclamation are frustrating Law Lab's core mission, which is to improve the legal rights of immigrants and refugees in the United States by providing representation to asylum seekers in the United States.  We work towards this mission by creating and supporting systems of Massive Collaborative Representation at strategic sites throughout the country where the rule of law is under threat.  Massive Collaborative Representation uses data analytics to pinpoint how effective lawyers win cases, and then converts those findings into replicable processes that can be delegated across multiple lawyers and legal workers.

5.      In service of our mission, Law Lab runs four fully operational Centers of Excellence—in Atlanta, Georgia; Charlotte, North Carolina; Kansas City, Missouri; and Portland

Oregon—where lawyers work collaboratively to revitalize judicial ecosystems and win every meritorious asylum claim.  Our BorderX program seeks to apply the Massive Collaborative Representation model to detention-based advocacy, and creates and implements a collaborative system that allows advocates from across the country to work together on effective and strategic requests for the release of asylum seekers from detention on parole and bond.

6.   Because of the confusion that the regulation and Proclamation have wrought on the border, many asylum seekers are now unable to enter the United States, as they must do in order to seek asylum.  If the regulation is permitted to take effect, any asylum seeker who entered between ports of entry would be unable to access asylum.  Because our mission is to provide representation to asylum seekers *in the United States*, the regulation and Proclamation have frustrated our mission.

7.   As a result, and as we had anticipated, our organizational resources have been significantly diverted to remedy the frustration caused by the regulation's implementation. Based on our organizational expertise in building and supporting legal representation projects, we have had to become a collaborative partner in the development of a new project being built to meet the legal needs of asylum seekers at the border who are affected by the new rule.  Our participation in this project, and our role as a consulting expert to other responding organizations, has been very time consuming, and has forced us to divert resources away from key organizational services.

8.   First, Law Lab's technological resources have been diverted.  At the heart of Innovation Law Lab is LawLab, our proprietary data analytics and case management software. LawLab enables attorneys and nonprofit organizations to map out best practices to efficiently represent clients and obtain the best possible outcome in all cases.  To that end, we employ three

software engineers—two fulltime and one halftime—to maintain our software and also develop new technologies that improve both our organization's work and the practice of immigration law.

9.      The issuance of the Proclamation and the regulation forced us to develop an entirely new technology, as we had to effectively move much of our work with asylum seekers across the border.  Our programs and supporting software are built around the coordination and provision of legal services to asylum seekers within the United States—either to clients in detention centers, or to clients who have been released on parole or bond.  Though the provision of legal services and information is time-sensitive in these contexts, before the Proclamation and regulation, we could safely provide information and representation once asylum seekers were across the border because their manner of entry did not substantively affect asylum eligibility. After the issuance of the Proclamation and regulation, our usual point of contact and service provision became too late, as individuals who had crossed the border between ports of entry would no longer be eligible for asylum.

10.     This frustrated our mission and created new urgency in the timeline of our provision of services and information, as we knew we had to divert our resources away from other program areas to reach our potential clients before they crossed the border in order to preserve their eligibility for asylum.  Our existing software is best suited for use on a computer, which does not pose a problem in office settings and other sites that are remotely connected to the detention centers where we work.  Computers and office space are much less available at the border, however, as much of the client intake and information sharing occurs in crowded group spaces like shelters, parks, and at migrant gatherings near the border.  Thus, we concluded that we needed to develop a new technological tool that would allow legal workers to use mobile

phones to collect confidential case information and upload it to a secure database. The resulting technology has been deployed and is being utilized by our partners and volunteers at the border.

11.     Development and implementation of this technology has taken one of our fulltime software engineers, Chris Kuttruff, away from other project needs, however, as he has had to turn to the project almost full-time.   Usually, Chris is tasked with providing infrastructure support for our servers, which support the case databases of our software clients.   His role includes managing server security, implementing automation and monitoring for system reliability, and performing various tests and auditing.   The urgent need for development of the cross-border technological tool has taken Chris away from planned improvements to our case management software and from his monitoring role.   This negatively affects the work of our existing projects, as our programs rely heavily on maintenance and improvement of our case management technology to function effectively.   Eventually, it may also affect our revenue streams, as subscriptions to the LawLab software provide a meaningful percentage of our organizational funding.  We have been unable to roll out planned improvements to the software, which limits our ability to effectively market our product and obtain new subscriptions to the LawLab software. If the disruption continues, this diversion could eventually affect the product satisfaction of our existing customer base and cause us to lose subscribers.

12.     Second, Law Lab's legal and program staff have been forced to turn significant time and attention to our response to the regulation.  Given the complex legal landscape facing asylum seekers at the border, we have had to devote significant energy to developing the most accurate guidance and effective legal services model we can provide under the circumstances. This has required revisiting and redrafting the existing resources, templates, and guides that we and other partner organizations have developed over years of binational collaboration to support

asylum seekers.  The result is a comprehensive set of materials that are being utilized by our partner organizations and volunteer legal workers along the border.  Development of these new materials has taken significant time on the part of our program team, who has had to turn away from their existing work on behalf of immigrants at program sites throughout the United States, and requires time of our web developer, who created and is maintaining a secure page to host these materials.  Our legal and program staff is also devoting time to developing training materials, related to both the new technology tool and the complex in-flux state of asylum law, for our partner organizations to use with volunteer legal workers.

13.     The development, and continued refining, of these materials continues to be a priority for us because of the misinformation that has spread at the border.  Even with the TRO in place, the announcement of the Proclamation and the regulation has created significant confusion and misreporting on the ground regarding asylum eligibility and immigration options. This makes accurate, and constantly updated, materials on asylum eligibility crucial so that asylum seekers are able to make informed decisions about their legal options and the corresponding consequences of their choices.

14.     Our staff has also been intimately involved in implementing use of these new materials and resources on the ground.  Our Program Director, Ian Philabaum, has spent several days a week, on a weekly basis, in a consulting and support role across the border. This involves coordinating and conducting workshops with asylum seekers, developing and adapting materials on-site, and training partners and volunteers who are providing legal and humanitarian assistance in the border regions.  Other program staff have traveled to the border and will continue to do so over the coming weeks.  This in-person travel—which would not have been required absent the complex situation on the ground at the border fueled by the new policy—is not only expensive

for our small organization, but also takes staff away from existing responsibilities and obligations at their program sites. For example, Ian runs our BorderX program at several detention centers throughout the United States, and, before implementation of the Proclamation and rule, he was preparing to increase capacity of BorderX's existing sites and expand the program's presence to several new detention centers. Since he has been forced to turn his attention to the effects of the Proclamation and regulation at the border, the programmatic expansion is on hold; volunteer recruitment and training has slowed; and BorderX has had to lessen its caseload. In our Centers of Excellence sites, program staff have had to delay the rollout of a pro se workshop series, cancel and reshuffle client appointments, and postpone trainings of pro bono attorneys and volunteers in our Court Watch programs. All of these delays and postponements negatively affect our existing asylum-seeking clients within the United States, as they are prevented from accessing information and legal services that help them fight, and win, their removal defense cases.

15.     Finally, the Proclamation and rule have, and would, frustrate Law Lab's ability to represent non-detained asylum seekers at our program sites throughout the country. Law Lab has recently taken a leading role in launching the Equity Corps, which is Oregon's first government-funded program providing representation for immigrants in removal proceedings. As the program's "Clearinghouse," we coordinate the screening and placement of eligible cases with participating legal service providers, and provide technical assistance and case expertise in complex removal defense cases. The vast majority of Equity Corps cases to date are defensive asylum claims, and most of the defensive asylum claims involve asylum seekers who did not cross at a port of entry.

16.     The Proclamation and regulation frustrate our ability to serve individuals who crossed between ports because, under the policy, they are no longer eligible for asylum.  As a result, under the Proclamation and regulation, we would be forced to provide additional particularized guidance and support to both the intake workers and the legal service providers who work with these clients.  Developing this guidance and delivering it will take time away from our other programs.  We also would have to devote significant time and resources to defending what would otherwise be more straightforward asylum claims.  For example, our staff attorney has already had to devote additional time to screening eligible cases, and to developing training materials that articulate the various eligibility scenarios for Equity Corps clients. In particular, if these clients are unable to access asylum, they will instead have to apply for withholding and Convention Against Torture relief, which are far more time consuming to pursue because of the higher standard for these forms of relief and the corresponding additional legal research and fact-gathering. Additionally, a significant percentage of Equity Corps clients are asylum-seeking families.  Because asylum allows family members derivatives, we are usually able to present a single asylum application for a family unit; in a withholding-only world, we would have to prepare separate applications for each family member.  The increased time required per case will prevent Equity Corps from serving as many clients as it would have been able to absent the Proclamation and regulation.

17.     We also cannot shift to providing representation only to people who enter at ports of entry.  This would be inconsistent not only with our mission, which is to serve all asylum seekers, but also with our contracts, as Equity Corps is a universal representation program that does not allow us to pick and choose our clients.

18.    In sum, as anticipated, Law Lab's work has been significantly affected by the implementation of the regulation.

I hereby declare under the penalty of perjury pursuant to the laws of the United States that the above is true and correct to the best of my knowledge.

EXECUTED this 4th day of December, 2018.

Stephen W. Manning, OSB #013373