**JOINT DECLARATION OF MADELEINE K. ALBRIGHT, WILLIAM J. BURNS, JOHN FEELEY, JONATHAN FINER, CHUCK HAGEL, JOHN KERRY, CECILIA MUÑOZ, JANET A. NAPOLITANO, JAMES C. O'BRIEN, THOMAS R. PICKERING, AMY POPE, JEFFREY PRESCOTT, ANNE C. RICHARD, AND WENDY R. SHERMAN**

We, Madeleine K. Albright, William J. Burns, John Feeley, Jonathan Finer, Chuck Hagel, John Kerry, Cecilia Muñoz, Janet A. Napolitano, James C. O'Brien, Thomas R. Pickering, Amy Pope, Jeffrey Prescott, Anne C. Richard, and Wendy R. Sherman, declare as follows:

1. We are former national security, homeland security, foreign policy, and domestic policy officials in the U.S. government. We have collectively devoted many decades to questions of immigration, border security, and the relationship between the United States and countries south of our border.

    a. Madeleine K. Albright served as Secretary of State from 1997 to 2001. A refugee and naturalized American citizen, she served as U.S. Permanent Representative to the United Nations from 1993 to 1997.
    b. William J. Burns served as Deputy Secretary of State from 2011 to 2014, and previously served as Ambassador of the United States to the Russian Federation and Under Secretary of Political Affairs.
    c. John Feeley served as Ambassador of the United States to Panama from 2016 to 2018, and previously served as the Principal Deputy Assistant Secretary of State for Western Hemisphere Affairs and Deputy Chief of Mission and Chargé d'Affaires for the U.S. Embassy in Mexico.
    d. Jonathan Finer served as Chief of Staff to the Secretary of State from 2015 until January 20, 2017, and Director of the Policy Planning Staff at the U.S. State Department from 2016 until January 20, 2017.
    e. Chuck Hagel served as Secretary of Defense from 2013 to 2015. From 1997 to 2009, he served as U.S. Senator for Nebraska.
    f. John Kerry served as Secretary of State from 2013 to January 20, 2017.
    g. Cecilia Muñoz served as Director of the White House Policy Council from 2012 to January 20, 2017.
    h. Janet A. Napolitano served as Secretary of Homeland Security from 2009 to 2013.
    i. James C. O'Brien served as Special Presidential Envoy for Hostage Affairs from 2015 to January 20, 2017. He served in the State Department from 1989 to 2001, including as Principal Deputy Director of Policy Planning.
    j. Thomas R. Pickering served as Under Secretary of State for Political Affairs from 1997 to 2000, and previously served as Ambassador of the United States to Jordan, Nigeria, El Salvador, Israel, the United Nations, India and Russia.
    k. Amy Pope served as Deputy Homeland Security Advisor at the National Security Council from 2015 to January 20, 2017, Senior Director, Transborder Security at the National Security Council from 2013 to 2015, and Director, Border and Interior Enforcement at the National Security Council from 2012 to 2013.
    l. Jeffrey Prescott served as Deputy National Security Advisor to the Vice President from 2013 to 2015 and Special Assistant to the President for National Security Affairs from 2015 to 2017.

      m.      Anne C. Richard served as Assistant Secretary of State for Population, Refugees and Migration from 2012 to January 20, 2017.

      n.      Wendy R. Sherman served as Under Secretary of State for Political Affairs from 2011 to 2015.

2.      On November 9, 2018, the Trump Administration issued a Rule to bar eligibility for asylum for people fleeing persecution who enter the United States across the southern border outside of a port of entry. The Rule took the form of a Presidential Proclamation[1] and an administrative rule[2] ("Interim Rule") to take effect immediately without delay. In issuing these measures, the Administration claimed an imperative for "urgent" and "immediate" action to address a "crisis" at the border.[3] The Administration has most recently sought "emergency" relief from the U.S. District Court for the Northern District of California and the U.S. Court of Appeals for the Ninth Circuit to reverse a temporary restraining order and allow the new policy to take effect immediately. In our expert opinion, there is no national emergency that requires such a drastic and punitive executive action to combat it, and this rule does not advance, but rather harms, U.S. foreign policy.

3.      The United States has a proud and long-standing humanitarian tradition of opening its borders to those fleeing violence or persecution. This country's founding by the descendants of those escaping religious persecution has defined our nation's fundamental values—including sanctuary for those most in need of help. Although the United States has not always charted a steady path in this regard, it has long since turned away from the darkest days of its history when it shunned people at the borders and returned them to danger. Today, the United States rightly takes great pride in its defining role in establishing, promoting, and enforcing the 1951 Refugee Convention. Across multiple administrations, it has sought to embrace those seeking asylum and refugee, and played an enduring role as a beacon of hope and a safe haven for the most vulnerable.

4.      The Proclamation and Interim Rule at issue are deeply punitive actions that will do great harm to those seeking humanitarian relief. By denying those who enter outside a port of entry eligibility for asylum, the Administration's policy endangers some of the most vulnerable asylum seekers, who face particular obstacles in accessing ports of entry, to include obstacles inherent in their desperate flight from persecution, the violence in border areas they seek to traverse, and the Administration's own limitations on relief at the ports of entry. The people who have no choice but to confront such risks are the ones most likely to be fleeing dire conditions and threats. Furthermore, the Rule will lead to the denial or deterrence of countless legitimate asylees who are unable to make their way to a port of entry, turning them back to countries so dangerous that they evince what one report described as "unprecedented levels of violence outside a war zone."[4]

---

[1] Proclamation No. 9,822, 83 Fed. Reg. 57,661 (Nov. 9, 2018) [hereinafter Proclamation].

[2] Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. 55,934 (Nov. 9, 2018) [hereinafter Interim Rule].

[3] Proclamation, *supra* note 1, at 55,661, 55,662; Interim Rule, *supra* note 2, at 55,941, 55,944, 55, 947, 55,950.

[4] *Forced to Flee Central America's Northern Triangle: A Neglected Humanitarian Crisis*, Doctors Without Borders 8 (May 2017), https://www.msf.org/sites/msf.org/files/msf_forced-to-flee-central-americas-northern-triangle_e.pdf.

5.  Contrary to the Administration's claims, there is no migration emergency at the southern border.

   a.  There has been no sudden increase in the number of individuals seeking to cross the southern border. Fewer individuals were apprehended or deemed inadmissible at the southern border in October 2018 than in October 2016.[5] The month-to-month trend in fiscal year 2018 crossings is similar to the trend for each of fiscal years 2013 to 2016.[6] The number of southwest border apprehensions today stands at one-half of their levels in fiscal year 2007 and one-fifth of their levels in fiscal year 2000.[7] The United States currently hosts the lowest number of undocumented immigrants since 2004, the result of a significant drop in the number of new undocumented immigrants.[8]

   b.  The number of those crossing the southern border who seek asylum has increased over the last decade, but this number has coincided with a legitimate humanitarian crisis. During this period, the Northern Triangle countries—Guatemala, El Salvador, and Honduras—have been among the most violent countries in the world. Civilians are often the targets of gang or cartel violence or forcible recruitment, and gangs frequently employ sexual violence against women and children as a means of controlling members or retaliating against rivals. State governments have been unable to curb the violence or punish the perpetrators. Especially in El Salvador, the United States has contributed to the spread of this violence through the steady deportation of gang members—initially without identifying them as such to the government of El Salvador—with little or no assistance to El Salvador to absorb and retrain them for productive work. Many Northern Triangle residents have seen no choice but to flee, often making their way up through Mexico to seek asylum in the United States. The increase in the percentage of migrants seeking asylum thus reflects a well-documented shift in migration at the southern border from Mexican individuals looking for work, to Central American families fleeing extreme violence and persecution in their home countries. These are long-term trends, rather than a sudden influx that necessitates emergency action.

---

[5] *Southwest Border Migration FY2019*, U.S. Customs & Border Protection, https://www.cbp.gov/newsroom/stats/sw-border-migration (last visited Dec. 2, 2018); *Southwest Border Migration FY 2017*, U.S. Customs & Border Protection, https://www.cbp.gov/newsroom/stats/sw-border-migration-fy2017 (last visited Dec. 2, 2018).

[6] *Southwest Border Migration FY 2018,* U.S. Customs & Border Protection, https://www.cbp.gov/newsroom/stats/sw-border-migration/fy-2018 (last visited Dec. 2, 2018).

[7] *United States Border Patrol, Total Illegal Alien Apprehensions By Month – FY 2000*, U.S. Border Patrol, https://www.cbp.gov/sites/default/files/assets/documents/2017-Dec/BP%20Total%20Monthly%20Apps%20by%20Sector%20and%20Area%2C%20FY2000-FY2017.pdf (last visited Dec. 2, 2018); *Southwest Border Migration FY 2018*, *supra* note 6; *see also* Jeffrey S. Passel & D'Vera Cohn, *U.S. Unauthorized Immigrant Total Dips to Lowest Level in a Decade*, Pew Research Ctr. (Nov. 27, 2018), http://www.pewhispanic.org/2018/11/27/u-s-unauthorized-immigrant-total-dips-to-lowest-level-in-a-decade.

[8] Passel & Cohn, *supra* note 7.

      c.      Changes in the number of asylum applicants—as well as their success rates, the backlog to the adjudication of claims, the percent of claims dismissed in absentia, and other considerations—have fluctuated over time in response to a number of factors, including conditions in the home country, changes in U.S. asylum rules and enforcement priorities, resource allocations, and applicants' ability to obtain representation. For instance, although the percent of applicants in 2017 who were denied asylum is higher than it was several years ago, it is lower than it was fifteen years ago.[9]

6.      The Administration has the tools to effectively manage the challenge of large volumes of asylum applications. For example, the Administration could make it a priority to substantially increase resources and personnel for the processing of asylum claims. It could increase resources for the representation of asylum claimants, which would improve the efficiency of the process because judges often give continuances to people mounting their own cases. Or it could streamline the asylum system through any number of administrative measures. The Administration's unwillingness to fully commit to these less punitive tools does not create an emergency that justifies taking more punitive action against those seeking humanitarian relief.

7.      To ease the burdens that the defendants describe, the last Administration launched a number of proactive and non-punitive initiatives, each of which the Trump Administration discontinued.

      a.      The last Administration approved tens of millions in funding to Guatemala, El Salvador, and Honduras to undertake measures to combat security threats. President Trump has repeatedly sought to end this aid, and has attempted to cut Northern Triangle funding each year of his presidency.

      b.      The last Administration initiated the Central American Minors ("CAM") program, which allowed in-country processing of asylum claims for children and families, to discourage them from making the dangerous trek to the border. President Trump ended the CAM program during his first month in office.

      c.      The last Administration launched experiments with family- and community-focused alternatives to detention and implemented supervised release programs for asylum seekers who had entered the United States, which proved cost-effective and secured high appearance rates at hearings. President Trump discontinued these policies as well.

8.      This Administration replaced these programs with several policy measures at the southern border that have only exacerbated the challenges.

      a.      *First*, the Administration sharply altered the detention policy for asylees in early 2017, requiring DHS to detain thousands of asylum seekers who would otherwise

---

[9] *Asylum Representation Rates Have Fallen Amid Rising Denial Rates*, TRAC Immigration, http://trac.syr.edu/immigration/reports/491 (last visited Dec. 2, 2018).

4

      have been released after their credible fear hearings. This policy diverts resources that the Administration could otherwise commit to the range of other tools to effectively manage large volumes of asylum applications.

    b. *Second*, the Administration announced a "zero tolerance" policy in which all border crossers between ports of entry would be criminally prosecuted, further overburdening the system.

    c. *Third*, the Administration has turned away asylees at ports of entry for weeks at a time, forcing them to wait indefinitely to present their claims. There are now families and children sleeping on concrete walkways, without medicine or food or safe drinking water, waiting for the moment when their claims will be considered. The data indicates that this policy decision has led to the predictable outcome of an increase in crossings between ports of entry.[10] Now the Administration wants to turn asylees away merely because they crossed between ports of entry. The implication is clear: the Administration does not want asylees to be able to cross anywhere at all.

It is Kafkaesque to respond to a claimed overloading of an asylum system by denying asylum altogether across the vast expanse of the southern border, then forcing asylees to wait for weeks or months at already grossly overburdened ports of entry. These actions are not addressing any issues with the asylum system—they are closing the doors of that system.

    9. In sum, the Administration has launched a series of counter-productive policy measures that create new humanitarian problems, then mischaracterizes the predictably calamitous outcome of these failed measures as an "emergency" that justifies further punitive actions against asylees themselves. Instead of meaningfully addressing a bona fide humanitarian crisis, the Administration's actions have triggered a new humanitarian crisis of its own making. The Administration's policy effectively seeks to burden or expunge the right to asylum, a right that is solemnly protected under domestic law, and the international law principle of *non-refoulement*, which protects individuals against forced return to countries where they are likely to face persecution.

    10. The Administration cannot plausibly justify this Rule on the basis that it is indispensable to U.S. foreign policy or diplomatic relationships. In our professional judgment, the failure to move forward immediately with an emergency rule will not damage our relations with Mexico or Northern Triangle countries. To the contrary, the most likely consequence of this apparently unilateral step is to inflame tensions and undermine our diplomatic relations in Mexico—which constitutionally permits the free movement of nationals and non-nationals throughout its sovereign territory—and across the Western Hemisphere, compromising critical security and other forms of cooperation with these nations in the process. Beyond that, the Rule will likely be used by leaders around the world to justify their own blanket restrictions on those

---

[10] Dara Lind, *The U.S. Has Made Migrants at the Border Wait Months to Apply for Asylum. Now the Dam is Breaking*, Vox (Nov. 28, 2018, 7:00 AM), https://www.vox.com/2018/11/28/18089048/border-asylum-trump-metering-legally-ports.

5

seeking humanitarian relief, in contravention of international law. Other countries have long sought pretexts to deny access to refugees; many of these countries have far greater processing burdens to contend with than we do at our southern border. The precedent set by this Administration could have global ripple effects that will lead to dramatically decreased opportunities for refugees and other vulnerable migrants to reach safety, with potentially severe consequences for the individuals seeking safety and our broader interest in regional and global stability. Finally, this Rule will inflict lasting damage on the credibility of the United States and her commitment to the rule of law and basic human dignity. The United States has been a leader in securing the international recognition of rights for the displaced throughout the world, and our direct role in eroding those rights now is all the more devastating as a result.

11. This Administration presents its Rule as a tailored response to a temporary overloading of asylum processing at the southern border. But from its first days, in addition to the steps described *supra*, this Administration has taken a series of actions targeting those seeking humanitarian relief, including:

   a. a four-month moratorium on all refugees,

   b. a ban on Syrian refugees (enjoined by the courts and then abandoned in a later executive order),

   c. a series of ever-shrinking caps on refugees, by far the lowest in the history of the modern U.S. refugee system,

   d. a narrowing of the categories of individuals who can seek asylum to severely restrict asylum for those fleeing gang or domestic violence,

   e. the forcible separation of asylees from their children, and

   f. the introduction of U.S. troops at the southern border with the authority to use lethal force.

Placed alongside this series of events, as well as the President's numerous hostile statements against refugees and asylees, the punitive rule before this court is revealed for what it truly is: the latest in an effort stretching back to the start of the Administration to prevent and deter people from lawfully seeking humanitarian relief in the United States.

12. Historically, the United States has proudly held high a beacon to those fleeing oppression or persecution, and seeking safe refuge in our country. The Administration's asylum restriction at issue here once again dims that beacon. In our professional judgment, this claimed emergency Rule—if allowed to go into effect—will undermine the credibility of the United States, and its longstanding commitment to protecting the displaced and dispossessed.

Respectfully submitted,

s/MADELEINE K. ALBRIGHT*

6

                **s/WILLIAM J. BURNS**
                **s/JOHN FEELEY**
                **s/JONATHAN FINER**
                **s/CHUCK HAGEL**
                **s/JOHN KERRY**
                **s/CECILIA MUÑOZ**
                **s/JANET A. NAPOLITANO**
                **s/JAMES C. O'BRIEN**
                **s/THOMAS R. PICKERING**
                **s/AMY POPE**
                **s/JEFFREY PRESCOTT**
                **s/ANNE C. RICHARD**
                **s/WENDY R. SHERMAN**

Executed on this 4th day of December, 2018.

*Signatures on file with Harold Hongju Koh, Rule of Law Clinic, Yale Law School, New Haven, CT. 06520-8215 203-432-4932.

We declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.