# SUPPLEMENTAL DECLARATION OF STEPHEN W. MANNING, EXECUTIVE DIRECTOR, INNOVATION LAW LAB

I, Stephen W. Manning, declare as follows:

1. I am an attorney licensed to practice in the State of Oregon and am a member in good standing of the bars of the United States District Court for the District of Oregon, the United States Court of Appeals for the Ninth Circuit, and the Supreme Court of the United States. I am a member of the American Immigration Lawyers Association ("AILA"), a former member of the Board of Governors of AILA, and a former Chair of the Oregon Chapter of AILA. I am over 18 and have personal knowledge of the facts described herein.

2. I am the Executive Director of the Innovation Law Lab ("the Law Lab"), a nonprofit in Oregon that I founded to improve the legal rights of immigrants and refugees in the United States.

3. I write this declaration to supplement my prior declaration filed in *East Bay Sanctuary Covenant v. Trump* and to provide an update on the effect the DHS-DOJ regulation and Presidential Proclamation have had on our organization's work.

4. The Rule and Proclamation are frustrating Law Lab's core mission, which is to improve the legal rights of immigrants and refugees in the United States by providing representation to asylum seekers in the United States. We work towards this mission by creating and supporting systems of Massive Collaborative Representation at strategic sites throughout the country where the rule of law is under threat. Massive Collaborative Representation uses data analytics to pinpoint how effective lawyers win cases, and then converts those findings into replicable processes that can be delegated across multiple lawyers and legal workers.

5. In service of our mission, Law Lab runs four fully operational Centers of Excellence—in Atlanta, Georgia; Charlotte, North Carolina; Kansas City, Missouri; and Portland

Oregon—where lawyers work collaboratively to revitalize judicial ecosystems and win every meritorious asylum claim. Our BorderX program seeks to apply the Massive Collaborative Representation model to detention-based advocacy, and creates and implements a collaborative system that allows advocates from across the country to work together on effective and strategic requests for the release of asylum seekers from detention on parole and bond.

6. Because of the confusion that the regulation and Proclamation have wrought on the border, many asylum seekers are now unable to enter the United States, as they must do in order to seek asylum. If the regulation is permitted to take effect, any asylum seeker who entered between ports of entry would be unable to access asylum. Because our mission is to provide representation to asylum seekers *in the United States*, the regulation and Proclamation have frustrated our mission.

7. As a result, and as we had anticipated, our organizational resources have been significantly diverted to remedy the frustration caused by the regulation's implementation. Based on our organizational expertise in building and supporting legal representation projects, we have had to become a collaborative partner in the development of a new project being built to meet the legal needs of asylum seekers at the border who are affected by the new rule. Our participation in this project, and our role as a consulting expert to other responding organizations, has been very time consuming, and has forced us to divert resources away from key organizational services.

8. First, Law Lab's technological resources have been diverted. At the heart of Innovation Law Lab is LawLab, our proprietary data analytics and case management software. LawLab enables attorneys and nonprofit organizations to map out best practices to efficiently represent clients and obtain the best possible outcome in all cases. To that end, we employ three

software engineers—two fulltime and one halftime—to maintain our software and also develop new technologies that improve both our organization's work and the practice of immigration law.

9. The issuance of the Proclamation and the regulation forced us to develop an entirely new technology, as we had to effectively move much of our work with asylum seekers across the border.  Our programs and supporting software are built around the coordination and provision of legal services to asylum seekers within the United States—either to clients in detention centers, or to clients who have been released on parole or bond.  Though the provision of legal services and information is time-sensitive in these contexts, before the Proclamation and regulation, we could safely provide information and representation once asylum seekers were across the border because their manner of entry did not substantively affect asylum eligibility.  After the issuance of the Proclamation and regulation, our usual point of contact and service provision became too late, as individuals who had crossed the border between ports of entry would no longer be eligible for asylum.

10. This frustrated our mission and created new urgency in the timeline of our provision of services and information, as we knew we had to divert our resources away from other program areas to reach our potential clients before they crossed the border in order to preserve their eligibility for asylum.  Our existing software is best suited for use on a computer, which does not pose a problem in office settings and other sites that are remotely connected to the detention centers where we work.  Computers and office space are much less available at the border, however, as much of the client intake and information sharing occurs in crowded group spaces like shelters, parks, and at migrant gatherings near the border.  Thus, we concluded that we needed to develop a new technological tool that would allow legal workers to use mobile

phones to collect confidential case information and upload it to a secure database. The resulting technology has been deployed and is being utilized by our partners and volunteers at the border.

11. Development and implementation of this technology has taken one of our fulltime software engineers, Chris Kuttruff, away from other project needs, however, as he has had to turn to the project almost full-time.  Usually, Chris is tasked with providing infrastructure support for our servers, which support the case databases of our software clients.  His role includes managing server security, implementing automation and monitoring for system reliability, and performing various tests and auditing.  The urgent need for development of the cross-border technological tool has taken Chris away from planned improvements to our case management software and from his monitoring role.  This negatively affects the work of our existing projects, as our programs rely heavily on maintenance and improvement of our case management technology to function effectively.  Eventually, it may also affect our revenue streams, as subscriptions to the LawLab software provide a meaningful percentage of our organizational funding.  We have been unable to roll out planned improvements to the software, which limits our ability to effectively market our product and obtain new subscriptions to the LawLab software. If the disruption continues, this diversion could eventually affect the product satisfaction of our existing customer base and cause us to lose subscribers.

12. Second, Law Lab's legal and program staff have been forced to turn significant time and attention to our response to the regulation.  Given the complex legal landscape facing asylum seekers at the border, we have had to devote significant energy to developing the most accurate guidance and effective legal services model we can provide under the circumstances. This has required revisiting and redrafting the existing resources, templates, and guides that we and other partner organizations have developed over years of binational collaboration to support

asylum seekers. The result is a comprehensive set of materials that are being utilized by our partner organizations and volunteer legal workers along the border. Development of these new materials has taken significant time on the part of our program team, who has had to turn away from their existing work on behalf of immigrants at program sites throughout the United States, and requires time of our web developer, who created and is maintaining a secure page to host these materials. Our legal and program staff is also devoting time to developing training materials, related to both the new technology tool and the complex in-flux state of asylum law, for our partner organizations to use with volunteer legal workers.

13. The development, and continued refining, of these materials continues to be a priority for us because of the misinformation that has spread at the border. Even with the TRO in place, the announcement of the Proclamation and the regulation has created significant confusion and misreporting on the ground regarding asylum eligibility and immigration options. This makes accurate, and constantly updated, materials on asylum eligibility crucial so that asylum seekers are able to make informed decisions about their legal options and the corresponding consequences of their choices.

14. Our staff has also been intimately involved in implementing use of these new materials and resources on the ground. Our Program Director, Ian Philabaum, has spent several days a week, on a weekly basis, in a consulting and support role across the border. This involves coordinating and conducting workshops with asylum seekers, developing and adapting materials on-site, and training partners and volunteers who are providing legal and humanitarian assistance in the border regions. Other program staff have traveled to the border and will continue to do so over the coming weeks. This in-person travel—which would not have been required absent the complex situation on the ground at the border fueled by the new policy—is not only expensive

for our small organization, but also takes staff away from existing responsibilities and obligations at their program sites.  For example, Ian runs our BorderX program at several detention centers throughout the United States, and, before implementation of the Proclamation and rule, he was preparing to increase capacity of BorderX's existing sites and expand the program's presence to several new detention centers.  Since he has been forced to turn his attention to the effects of the Proclamation and regulation at the border, the programmatic expansion is on hold; volunteer recruitment and training has slowed; and BorderX has had to lessen its caseload.  In our Centers of Excellence sites, program staff have had to delay the rollout of a pro se workshop series, cancel and reshuffle client appointments, and postpone trainings of pro bono attorneys and volunteers in our Court Watch programs.  All of these delays and postponements negatively affect our existing asylum-seeking clients within the United States, as they are prevented from accessing information and legal services that help them fight, and win, their removal defense cases.

15. Finally, the Proclamation and rule have, and would, frustrate Law Lab's ability to represent non-detained asylum seekers at our program sites throughout the country. Law Lab has recently taken a leading role in launching the Equity Corps, which is Oregon's first government-funded program providing representation for immigrants in removal proceedings.  As the program's "Clearinghouse," we coordinate the screening and placement of eligible cases with participating legal service providers, and provide technical assistance and case expertise in complex removal defense cases.  The vast majority of Equity Corps cases to date are defensive asylum claims, and most of the defensive asylum claims involve asylum seekers who did not cross at a port of entry.

16. The Proclamation and regulation frustrate our ability to serve individuals who crossed between ports because, under the policy, they are no longer eligible for asylum. As a result, under the Proclamation and regulation, we would be forced to provide additional particularized guidance and support to both the intake workers and the legal service providers who work with these clients. Developing this guidance and delivering it will take time away from our other programs. We also would have to devote significant time and resources to defending what would otherwise be more straightforward asylum claims. For example, our staff attorney has already had to devote additional time to screening eligible cases, and to developing training materials that articulate the various eligibility scenarios for Equity Corps clients. In particular, if these clients are unable to access asylum, they will instead have to apply for withholding and Convention Against Torture relief, which are far more time consuming to pursue because of the higher standard for these forms of relief and the corresponding additional legal research and fact-gathering. Additionally, a significant percentage of Equity Corps clients are asylum-seeking families. Because asylum allows family members derivatives, we are usually able to present a single asylum application for a family unit; in a withholding-only world, we would have to prepare separate applications for each family member. The increased time required per case will prevent Equity Corps from serving as many clients as it would have been able to absent the Proclamation and regulation.

17. We also cannot shift to providing representation only to people who enter at ports of entry. This would be inconsistent not only with our mission, which is to serve all asylum seekers, but also with our contracts, as Equity Corps is a universal representation program that does not allow us to pick and choose our clients.

18. In sum, as anticipated, Law Lab's work has been significantly affected by the implementation of the regulation.

I hereby declare under the penalty of perjury pursuant to the laws of the United States that the above is true and correct to the best of my knowledge.

EXECUTED this 4th day of December, 2018.

Stephen W. Manning, OSB #013373