HARRISON "BUZZ" FRAHN (Bar No. 206822)
hfrahn@stblaw.com
SIMPSON THACHER & BARTLETT LLP
2475 Hanover Street
Palo Alto, California 94304
Telephone:     (650) 251-5000
Facsimile:     (650) 251-5002

*Counsel for Amici Curiae*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| EAST BAY SANCTUARY COVENANT, et al., <br><br> Plaintiffs, <br><br> v. <br><br> DONALD TRUMP, et al., <br><br> Defendants. | Case No. 3:18-cv-06810-JST <br><br> **AGREED MOTION OF TWENTY-THREE ORGANIZATIONS REPRESENTING ASYLUM SEEKERS FOR LEAVE TO FILE AN AMICUS CURIAE BRIEF** <br><br> Judge: Hon. Jon S. Tigar <br> Courtroom: 9, 19th Floor <br> Hearing Date: December 19, 2018 <br> Hearing Time: 9:30 a.m. <br> Date Action Filed: November 9, 2018 |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT the twenty-three organizations listed below, pursuant to Local Rule 7-1, respectfully request expedited leave to file a brief as amici curiae in the above-captioned case in support of Plaintiffs' request for a Preliminary Injunction.  A copy of the proposed amicus brief is attached as **Exhibit A** to this motion.  Counsel for the parties have consented to this filing.  Consistent with the Court's Scheduling Order issued on November 27, 2018, ECF No. 50 at 1–2, Amici have coordinated with counsel for Plaintiffs and with other known amicus groups to avoid making duplicative arguments.

## I.    LEGAL STANDARD.

No specific rules govern leave to file an amicus brief; rather, district courts have "broad discretion" to determine when such leave is appropriate.  *Hoptowit v. Ray*, 682 F.2d 1237, 1260 (9th Cir. 1982), *abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995).  As such, "[d]istrict courts frequently welcome amicus briefs from non-parties concerning legal issues that have potential ramifications beyond the parties directly involved or if the amicus has 'unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide.'"  *NGV Gaming, Ltd. v. Upstream Point Molate, LLC*, 355 F. Supp. 2d 1061, 1067 (N.D. Cal. 2005) (citation omitted).  Here, "amici fulfill the classic role of amicus curiae . . . in a case of general public interest [by] . . . supplementing the efforts of counsel[] and drawing the court's attention to law [and facts] that might otherwise escape consideration."  *Funbus Sys., Inc. v. State of Cal. Pub. Utilities Comm'n*, 801 F.2d 1120, 1125 (9th Cir. 1986) (citation omitted).

## II.    STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE.

Amici are twenty-three non-profit organizations dedicated to ensuring the equitable treatment of immigrants and asylum seekers.  A brief description of each amicus proceeds below.

**Asian Law Alliance**:  The Asian Law Alliance ("ALA"), founded in 1977, is a non-profit public interest legal organization with the mission of providing equal access to the justice system to the Asian and Pacific Islander communities in Santa Clara County, California.  ALA has provided immigration legal services and legal representation to asylum applicants for the past 41 years.

**Bet Tzedek**:  For nearly forty-five years, Bet Tzedek, Hebrew for "House of Justice," has provided free legal services and counsel in a comprehensive range of practice areas.  Today, Bet Tzedek represents unaccompanied immigrant children who qualify for asylum, Special Immigrant Juvenile Status, and other forms of relief.

**CASA**: CASA is the largest membership-based immigrant rights organization in the mid-Atlantic region, with more than 90,000 members.  CASA provides a wide variety of services to immigrant communities in Maryland, as well as the greater Washington, D.C. metropolitan area, Virginia and Pennsylvania.  As part of its legal services program, CASA provides regular consultations to immigrant community members, including many who are recent arrivals to the United States, a significant portion of whom seek advice regarding potential asylum claims.

**Central American Refugee Center**:  Central American Refugee Center ("CARECEN-NY") is a New York legal organization that has provided asylum representation to refugees since 1983.  CARECEN-NY currently represents more than 150 asylum seekers, nearly all of whom arrived in the United States at the U.S.-Mexico Border.  CARECEN-NY expects to provide assistance to as many as 300 additional asylum seekers over the next two years.

**City Bar Justice Center**:  The City Bar Justice Center ("CBJC") is the non-profit, legal services arm of the New York City Bar Association.  The CBJC assists more than 20,000 low-income New Yorkers to access critically needed legal services and matches over 1,800 cases with pro bono attorneys.  The CBJC's Immigrant Justice Project annually helps hundreds of immigrants who are at their most vulnerable, including asylum seekers fleeing persecution who have crossed the Southern border.

**Dolores Street Community Services**:  Dolores Street Community Services ("Dolores Street") nurtures individual wellness and cultivates collective power among low-income and immigrant communities.  Dolores Street's Deportation Defense and Legal Advocacy Program provides pro bono representation to indigent and particularly vulnerable immigrant communities, including many asylum seekers.

**Empire Justice Center**:  The Empire Justice Center is a not-for-profit law firm with offices in Rochester, Albany, White Plains, Yonkers, and Central Islip, New York.  It operates as a

statewide support center for legal services programs and community organizations, providing technical assistance and training in the substantive law areas that have the most impact on low-income communities, including immigration.  The Empire Justice Center also provides direct representation to low-income individuals, including in immigration matters and specifically to asylum seekers.  Many of Empire Justice's asylum clients have entered the United States without authorization in flight from life-threatening persecution.

**Her Justice**:  Her Justice is a nonprofit organization that provides free legal help to women living in poverty in New York City.  Among its many services, Her Justice provides free legal help to immigrant women who have experienced domestic violence or other types of gender-based violence, including advising women about their rights and options for applying for lawful status in the United States.  Many of Her Justice's clients will be negatively affected by the Rule and Proclamation.

**HIAS and Council Migration Services, Inc. of Philadelphia**:  HIAS and Council Migration Services, Inc. of Philadelphia d/b/a HIAS Pennsylvania ("HIAS Pennsylvania") is a non-profit 501(c)(3) organization that was founded in 1882 to assist Jewish immigrants fleeing persecution in Europe.  Today it provides legal and supportive services to immigrants, refugees and asylum seekers from all backgrounds in order to assure their fair treatment and full integration into American society.

**Immigrant Justice Corps**:  Immigrant Justice Corps ("IJC") is the country's first immigration legal fellowship program.  IJC Fellows regularly represent clients from countries which are the target of the Proclamation and the Rule, including clients from Honduras, El Salvador, and Guatemala.  Through this representation, IJC Fellows have extensive knowledge of the dire and violent circumstances that force individuals to flee their countries of origin to seek asylum in the United States.

**Immigrant Legal Resource Center**:  Founded in 1979, the Immigrant Legal Resource Center ("ILRC") is a national legal resource center that provides legal trainings, educational materials, technical assistance, and advocacy to advance immigration law and immigrant rights.  ILRC is one of the foremost authorities in the country on immigration law.  Our team responds to

approximately 7,500 annual requests for legal technical assistance from attorneys and other advocates throughout the United States on immigration law, including asylum law, and immigrant rights issues.

**International Refugee Assistance Project**:  The International Refugee Assistance Project ("IRAP") is a legal advocacy organization for refugees and displaced people in need of a safe place to call home.  IRAP works with clients to identify and navigate pathways to safety through free direct representation, policy advocacy, and litigation.

**LatinoJustice PRLDEF**:  LatinoJustice PRLDEF, formerly known as the Puerto Rican Legal Defense & Education Fund, is a national non-profit civil rights legal defense fund that has advocated for and defended the constitutional rights of all Latinos to ensure their equal protection under the law since 1972.  LatinoJustice has engaged in and supported law reform litigation challenging discriminatory policies and practices by governmental agencies and actors in a wide range of areas, including immigrants' rights.

**Legal Aid Society of New York**:  The Legal Aid Society of New York ("LAS") is the nation's oldest and largest program providing direct legal services to low-income families and individuals.  The Immigration Law Unit of LAS comprises a staff of over sixty who represent immigrants at all stages of affirmative and defensive immigration proceedings.  As part of its asylum practice, LAS represents immigrants who presented their asylum claims at ports of entry, or from within the country after lawful admission, or after entry without inspection.

**Loyola Immigrant Justice Clinic**:  The Loyola Immigrant Justice Clinic ("LIJC") is a not-for-profit community-based collaboration of Loyola Law School, Loyola Marymount University, Homeboy Industries Inc., and Dolores Mission Church.  LIJC's dual-pronged mission is to advance the rights of the indigent immigrant population in Los Angeles through direct legal services, education, and community empowerment, while teaching law students effective immigrants' rights lawyering skills in a real-world setting.  LIJC represents a large number of asylum-seeking unaccompanied minors, children and adults through its legal team, clinical law students and pro bono case placement program.

**Make the Road New York**:  Make the Road New York ("MRNY") is a nonprofit, membership-based community organization that provides a full range of legal services to low-income immigrants, including providing assistance to individuals seeking asylum.  MRNY has a membership of 23,000 low-income immigrant New Yorkers, and it works through vibrant community centers.  MRNY is a leading nonprofit organization in New York State with relationships to practitioners, scholars, policymakers, and stakeholders on a city-, state-, and nation-wide basis.

**New York Immigration Coalition**:  The New York Immigration Coalition ("NYIC") represents nearly 200 organizational members and partners working on behalf of immigrants throughout New York State.  The NYIC has taken a lead in coordinating legal services for immigrants, including by providing low-cost immigration legal services.

**Public Law Center**:  The Public Law Center ("PLC") is a non-profit legal services organization located in Santa Ana, California, serving low-income residents of Orange County, California for over 35 years.  Over the past year, PLC's immigration program has directly served over 1,600 individuals, including in the area of asylum.  Over 40% of PLC's asylum seeking clients are from Central America.

**Safe Passage Project**: Safe Passage Project is a nonprofit immigration legal services organization that provides free lawyers to 823 child refugees who are being deported.  More than 2,000 other children living in the New York area are currently facing immigration court without a lawyer. The Safe Passage Project's mission is to get that number to zero.

**The Legal Project**:  The Legal Project ("TLP") is a private non-profit in Albany, NY that provides legal representation and advice to undocumented individuals, including non-detained asylum applicants.  TLP has represented and continues to represent asylum seekers who have crossed the southern border into the U.S. without inspection and outside of a port of entry.  Since June 2018, the Department of Homeland Security has been moving immigration detainees from the southern border to the Albany County Jail and TLP has represented, and expects to represent more of those individuals, in asylum cases.

**Torture Abolition Survivors Support Coalition**:  The Torture Abolition Survivors Support Coalition ("TASSC International") is a non-profit organization based in Washington, D.C.  The mission of TASSC is to end the practice of torture wherever it occurs and support survivors as they empower themselves, their families and communities wherever they are.  The Legal Services Program of TASSC, one of the four direct service programs, provides direct legal representation to asylum-seeking survivors who have fled torture and persecution in their countries of origin as well as facilitates pro bono legal representation for survivors.

**University of California, Irvine School of Law Immigrant Rights**:  The University of California, Irvine School of Law Immigrant Rights ("UCI IRC") is a law school clinic providing pro bono legal services to low-income immigrants and their families.  Among the cases that the Clinic handles are those of detained immigrants seeking asylum.  Clinic students have met with migrants, including those traveling on caravans, and heard their stories of persecution and harm.

**UnLocal, Inc.**:  UnLocal, Inc. is a non-profit organization that provides direct immigration legal representation, legal consultations, and community education to New York City's undocumented immigrant communities.  UnLocal attorneys currently represent more than 200 asylum seekers, including families and youth, who entered the U.S. without inspection at the southern border.  The majority of these individuals are from Honduras, Guatemala, and El Salvador.

### III.    AMICI CURIAE'S EXPERTISE WILL BENEFIT THE COURT.

The instant dispute involves allegations that the Defendants violated the Administrative Procedure Act ("APA") and the Immigration and Nationality Act ("INA") in an effort to improperly restrict the availability of asylum to desperate immigrants congregating at the southern border of the United States.  Amici, organizations with extensive experience with the asylum process and asylum seekers, possess a "perspective that can help the court" assess the validity of Defendants' asserted excuses for noncompliance with the APA and INA.  *NGV Gaming, Ltd., LLC*, 355 F. Supp. 2d at 1067 (citation omitted).

For example, Defendants have argued that the requirements of the APA were excused by the "good cause" exception codified in 5 U.S.C. § 553(b)(B), which allows non-compliance with

the APA where compliance would be "impracticable, unnecessary, or contrary to the public interest."  Specifically, Defendants claim that good cause exists for ignoring the requirements of the APA because there is currently a "surge" of immigrants that pose a risk of violent crime and terrorism.  With their decades of experience working with immigrants and immigration law in multiple jurisdictions, localities, and sub-specialties, amici are able to provide evidence that the United States is not experiencing a historically large amount of migration; rather, immigration is decreasing.  Amici can similarly provide data on the rates of criminal activity amongst immigrant populations that will show that there is no correlation between increases in immigration and crime rates.

Additionally, amici can explain how the public interest is best served by ensuring asylum seekers are able to apply for asylum consistent with the provisions of the INA, without regard to their method of entry into the United States.  Amici can provide information concerning the dire circumstances currently facing asylum seekers at the U.S.-Mexico border, and directly refute Defendants' disparaging and inaccurate statements concerning would-be asylum seekers.

**IV.    CONCLUSION**.

For the foregoing reasons, the amici respectfully request this Court's leave to file the attached proposed amicus curiae brief on December 5, 2018.


Dated: December 5, 2018                         Respectfully submitted,

                                                By:    */s/ Harrison "Buzz" Frahn*
                                                       Harrison "Buzz" Frahn

                                                Harrison "Buzz" Frahn (Bar No. 206822)
                                                SIMPSON THACHER & BARTLETT LLP
                                                2475 Hanover Street
                                                Palo Alto, California  94304
                                                Telephone:    (650) 251-5000
                                                Facsimile:    (650) 251-5002
                                                hfrahn@stblaw.com

                                                *Counsel for Amici Curiae*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| EAST BAY SANCTUARY COVENANT, et al., | Case No. 3:18-cv-06810-JST |
| Plaintiffs, | **[PROPOSED] ORDER GRANTING MOTION OF TWENTY-THREE ORGANIZATIONS REPRESENTING ASYLUM SEEKERS FOR LEAVE TO FILE AN AMICUS CURIAE BRIEF** |
| v. | |
| DONALD TRUMP, et al., | |
| Defendants. | |

This matter comes before the Court on an Administrative Motion for Leave to File an Amicus Brief in Support of Plaintiffs' request for a preliminary injunction, filed by twenty-three organizations representing asylum seekers (the "Motion").  The Motion includes the proposed amicus brief as an exhibit.  Amici represent that Defendants do not oppose the Motion.

The Court, having reviewed the proposed amicus brief, hereby GRANTS the Motion.


IT IS SO ORDERED.

DATED: _____, 2018

_____
Hon. Jon S. Tigar

1  HARRISON "BUZZ" FRAHN (Bar No. 206822)
   hfrahn@stblaw.com
2  SIMPSON THACHER & BARTLETT LLP
   2475 Hanover Street
3  Palo Alto, California  94304
   Telephone:     (650) 251-5000
4  Facsimile:     (650) 251-5002

5  *Counsel for Amici Curiae*

6

7

8                  **UNITED STATES DISTRICT COURT**

9                 **NORTHERN DISTRICT OF CALIFORNIA**

10                  **SAN FRANCISCO DIVISION**

11

12  EAST BAY SANCTUARY COVENANT, et al.,    Case No. 3:18-cv-06810-JST

13                          Plaintiffs,      **AMICUS CURIAE BRIEF OF TWENTY-
                                            THREE ORGANIZATIONS
                                            REPRESENTING ASYLUM SEEKERS**
14                       v.

15  DONALD TRUMP, et al.,                    Judge:  Hon. Jon S. Tigar
                                            Courtroom:  9, 19th Floor
16                          Defendants.      Hearing Date:  December 19, 2018
                                            Hearing Time:  9:30 a.m.
17                                           Date Action Filed:  November 9, 2018

18

19

20

21

22

23

24

25

26

27

28

## I.      INTRODUCTION AND INTEREST OF AMICI CURIAE

Amici are twenty-three non-profit organizations[1] dedicated to ensuring the equitable treatment of immigrants and asylum seekers.  In this capacity, they have developed an interest and expertise in the unique issues facing migrants, particularly those from Central America.  Amici write to underscore the inaccuracies underlying Defendants' stated justifications for the Interim Final Rule "Aliens Subject to a Bar on Entry under Certain Presidential Proclamations; Procedures for Protection Claims" (the "Rule") and the Presidential Proclamation Addressing Mass Migration Through the Southern Border of the United States (the "Proclamation"), which were enacted without notice and comment in violation of the Administrative Procedure Act ("APA"), and thus without the benefit of amici's input.  Defendants' false and fundamentally misguided excuses for implementing the Rule and Proclamation in violation of the clear language of the Immigration and Nationality Act ("INA") serve only to mask the true motives of Defendants' hasty attempt to render asylum functionally unavailable to anyone from Latin America: Defendants' well documented animus toward Central and South American migrants, and an antipathy toward the entire asylum framework.

If the Rule and Proclamation are allowed to take effect, amici, all of whom work with asylum seekers and many of whom focus specifically on asylum claims, would lose a vital statutory tool for protecting vulnerable refugee and immigrant communities.  By eliminating asylum for those who, in desperation, enter the United States outside of ports of entry, the Rule and Proclamation would needlessly place the lives of countless individuals at risk.

## II.      ARGUMENT

The INA unambiguously allows individuals to apply for asylum regardless of how they entered the United States.  8 U.S.C. § 1158(a)(1) ("Any alien who is physically present in the United States or who arrives in the United States[,] *whether or not at a designated port of arrival . . .* , may apply for asylum in accordance with this section.") (emphasis added).  The Rule and Proclamation represent a draconian departure from the clear language of the INA and the

---

[1] Amici are listed and described in the accompanying Motion for Leave to File this Amicus Brief.

1

principles that law embodies.  Defendants' stated justifications for the Rule and Proclamation—a "surge" in mass migration, coupled with the notion that would-be asylum seekers present a danger to U.S. security—have no basis in fact and are disproven by the government's own statistics.  The actual driving force behind the Rule and Proclamation is animus toward immigrants, particularly those from Latin America.  Defendants' numerous disparaging statements concerning immigrants, and the asylum process as a whole, make this clear.  Defendants have repeatedly equated immigrants with criminals and terrorists, and likened the asylum provisions of the INA to a legal "loophole."  These baseless assertions reflect a deep animus toward immigrants that cannot be allowed to serve as a basis for any U.S. policy, much less ultra vires agency rulemaking.

The true reality is that the individuals who seek asylum in the United States are overwhelmingly vulnerable victims who are struggling for survival.  An appreciation of this truth is inherent throughout the asylum provisions within the INA.  As the legislative history and decades of jurisprudence interpreting the INA make clear, Congress carefully crafted the asylum laws with a deep understanding of the protections that asylum seekers require.  In doing so, Congress acted with the express expectation that the United States would offer these protections for generations to come, even during periods of increased migration.  Congress and the affected public stakeholders certainly did not expect, nor does the law allow, these statutory protections to be undone by executive fiat.

> **A.      Defendants' Stated Justifications For the Rule and Proclamation are False.**

Despite Defendants' repeated assertions of a migration "crisis" at the border, the number of people crossing the border has steadily declined in recent years.[2]  U.S. Customs and Border Protection's ("CBP") own data demonstrates historically low numbers of apprehensions at the border in the past several years, even as the agency's annual budget continues to balloon.

Defendants have continuously characterized this caravan of migrants heading to the border using heated rhetoric, describing the approximately five thousand individuals as an "invasion,"

---

[2] *See, e.g.*, ECF 27 at 15; Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. 55934, 55947 (Nov. 9, 2018).

"surge," or "rush" threatening to overwhelm the immigration system.[3]  In remarks delivered just prior to the issuance of the Proclamation, President Trump warned of "uncontrolled masses of people rushing [the] border."[4]  The Proclamation, as well as the Rule, emphasize that "[t]he continuing and threatened mass migration of aliens . . . through our southern border has precipitated a crisis and undermines the integrity of our borders."[5]

Defendants' claims of a burgeoning border crisis are not supported by the evidence. Statistics show that the number of people crossing the U.S.-Mexico border has decreased significantly over the last two decades.  In fact, in prior years, CBP has successfully addressed far greater rates of migration at the border than are now occurring.[6]  Border patrol agents apprehended more than 1.6 million people in FY 2000 alone,[7] compared to 521,090 people apprehended in FY 2018, representing a 67.4% reduction over eighteen years.[8]  The CBP itself emphasized that FY

---

[3] *See, e.g.*, ECF 27 at 12; Nick Miroff & Missy Ryan, *Army Assessment of Migrant Caravans Undermines Trump's Rhetoric*, Washington Post (Nov. 2, 2018), https://www.washingtonpost.com/world/national-security/army-assessment-of-migrant-caravans-undermines-trumps-rhetoric/2018/11/02/78b9d82a-dec0-11e8-b3f0-62607289efee_story.html?utm_term=.e97e6e0f86fa.

[4] *Remarks by President Trump on the Illegal Immigration Crisis and Border Security* (Nov. 1, 2018), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-illegal-immigration-crisis-border-security/.

[5] Presidential Proclamation Addressing Mass Migration Through the Southern Border of the United States (Nov. 9, 2018), https://www.whitehouse.gov/presidential-actions/presidential-proclamation-addressing-mass-migration-southern-border-united-states/.  *See also* Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. 55934, 55947 (Nov. 9, 2018) ("In combination with a presidential proclamation directed at the crisis on the southern border, the rule would help ameliorate the pressures on the present system.").

[6] *See U.S. Border Patrol Monthly Apprehensions (FY 2000 – FY 2017)*, U.S. Customs and Border Protection (Dec. 12, 2017), https://www.cbp.gov/sites/default/files/assets/documents/2017-Dec/BP%20Total%20Monthly%20Apps%20by%20Sector%20and%20Area%2C%20FY2000-FY2017.pdf.

[7] *See* Jeffrey S. Passel & D'vera Cohn, *U.S. Unauthorized Immigrant Total Dips to Lowest Level in a Decade*, Pew Research Center (Nov. 27, 2018).

[8] *See Southwest Border Migration FY 2019*, U.S. Customs and Border Protection, https://www.cbp.gov/newsroom/stats/sw-border-migration# (last accessed Dec. 4, 2018).

3

2017 had the "lowest level of illegal-cross border migration on record."[9]  The sharp downward trend in migrant apprehensions is illustrated in the following graph:

**Southwest Border Apprehension and Border Patrol Staffing Levels, FY 1975–2017**



Defendants stress the necessity of restricting asylum access, asserting without justification that the number of asylum seekers crossing outside ports of entry will overload the immigration system.[11]  In reality, CBP today has significantly more resources to address far lower rates of migration.  From FY 2003 to FY 2016, CBP's annual budget more than doubled from $5.9 billion to $13.2 billion.[12]  Moreover, the agency currently employs close to 20,000 border agents, of

---

[9] *CBP Border Security Report FY 2017*, U.S. Customs and Border Protection, 1 (Dec. 5, 2017), https://www.cbp.gov/sites/default/files/assets/documents/2017-Dec/cbp-border-security-report-fy2017.pdf.
[10] *See* Jessica Bolter & Doris Meissner, *Crisis at the Border? Not by the Numbers*, Migration Policy Institute (June 2018), https://www.migrationpolicy.org/news/crisis-border-not-numbers.
[11] *See, e.g.*, ECF 27 at 6, 12; Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. 55934, 55947 (Nov. 9, 2018).
[12] *See The Cost of Immigration Enforcement and Border Security*, American Immigration Council, 2 (Jan. 2017), https://www.americanimmigrationcouncil.org/sites/default/files/research/the_cost_of_immigration_enforcement_and_border_security.pdf.

4

which the majority are assigned to the southwest border.[13]  Considering that Border Patrol previously apprehended at least one million migrants each year for most of the years between 1985 and 2007 with fewer than 10,000 agents,[14] the assertion that the United States lacks the resources to handle a modest and temporary increase in migration is not plausibly supported by the evidence.  Moreover, Defendants' assertion that asylum applicants contribute to the "significant backlog[] in the immigration court system"[15] conveniently ignores the fact that the ballooning backlog can be attributed at least in part to Defendants' own policies, including eliminating Immigration Judges' authority to administratively close cases and requiring DHS to reopen administratively closed cases;[16] as well as ending Immigration and Customs Enforcement attorneys' prosecutorial discretion to drop charges against law-abiding immigrants and referring unauthorized border crossings to the Department of Justice for prosecution.[17]  Defendants cannot use problems born out of their own efforts to undermine the integrity and efficiency of immigration courts to justify their proposed radical shift in policy.

As the administrative record demonstrates, the fact of the matter is that there is no migration crisis unfolding at the border.  Nor would an increase in migration at the border justify Defendants' dramatic and unprecedented restrictions on asylum eligibility, because Congress expressly contemplated increases in migration in drafting the current statutory scheme—and declined to alter that scheme even when migration numbers far outpaced those occurring today.  Members of Congress recognized that "[a]s international crises develop, more persons will come

---

[13] *See U.S. Border Patrol Fiscal Year Staffing Statistics (FY 1992 - FY 2017)*, U.S. Customs and Border Protection (Dec. 12, 2017), https://www.cbp.gov/sites/default/files/assets/documents/2017-Dec/BP%20Staffing%20FY1992-FY2017.pdf.

[14] *See id.*

[15] *E.g.*, ECF 27 at 6.

[16] *See* TRAC Immigration Data, Syracuse Univ. (last updated Nov. 6, 2018), http://trac.syr.edu/immigration/reports/536/.

[17] *See* Diane Solis, *AG Sessions' plan to clear immigration case backlog will make things worse, judges and attorneys fear*, Dallas News (April 10, 2018), https://www.dallasnews.com/news/immigration/2018/04/10/immigration-judges-attorneys-worry-sessions-quotas-will-cut-justice-clogged-court-system; Hunter Hallman & Cristobal Ramon, *Record Number of Cases in Immigration Courts is Simmering Crisis*, Bipartisan Policy Center (Oct. 4, 2017), https://bipartisanpolicy.org/blog/record-number-of-cases-in-immigration-courts-is-simmering-crisis/.

under the broad definition of 'refugee'" and that "[i]t is clear that our Government must share the international responsibility for dealing with this most human problem."  Admission of Refugees to the United States: Hearing on H.R. 3056 Before the Subcomm. on Immigration, Citizenship, and International Law of the H. Comm. on the Judiciary, 95th Cong. 15 (1977) (statement of Rep. Hamilton Fish, Jr., R-NY); *see also* Hearing on H.R. 3056, 95th Cong. 16 (1977) (testimony of James Carlin, Deputy Coordinator for Human Rights and Humanitarian Affairs, Dept. of State) ("[W]e should remember that the United States is a land of immigrants, and since the founding of the Republic we have had a special national heritage of concern for the uprooted and persecuted . . . [Furthermore], it is decidedly in our foreign policy interest to project in countries around the world the image of U.S. humanitarian assistance for refugees.").  Nothing in the INA nor in its legislative history suggests that the executive branch can respond to an increase in asylum claims by *restricting* asylum eligibility.

**B.     The True Reason for the Rule and Proclamation Is Hostility Toward Immigrant Groups.**

Defendants, through this litigation and in numerous public statements, have also sought to justify the Rule and Proclamation by painting a portrait of asylum seekers as a violent group that threatens America's security.  This justification also lacks factual support and is part and parcel of a pattern of hostile rhetoric directed toward immigrant groups, suggesting that the true reason for the Rule and Proclamation is cruel animosity.

For example, Defendants' briefing in this case repeatedly references "dangerous criminal behavior" and the threat of "harm [to] life and public safety."[18]  The Proclamation explicitly references the "violence" allegedly committed by those seeking refuge in the United States.[19] Defendants have similarly stated that the Central American caravan consists of "[m]any Gang

---

[18] ECF 27 at 13.

[19] *Presidential Proclamation Addressing Mass Migration Through the Southern Border of the United States*, White House (Nov. 9, 2018), https://www.whitehouse.gov/presidential-actions/presidential-proclamation-addressing-mass-migration-southern-border-united-states/.

Members," [20] "very tough fighters and people,"[21] "bad thugs and gang members,"[22] and "stone cold criminals."[23]   And, on November 22, after this Court granted the Temporary Restraining Order, Defendant President Donald J. Trump explained that if the TRO is not lifted "there will be only bedlam, chaos, injury, and death"—results that suggest an underlying danger inherent in the asylum seekers stranded at our southern border.[24]

As with Defendants' allegations of a migration "surge," this prejudicial hyperbole has no basis in fact and only serves to stigmatize and foster animosity towards vulnerable minority groups.  The true reality is that "the criminal conviction and arrest rates for immigrants [are] well below those of native-born Americans" and "the conviction and arrest rates for illegal immigrants [are also] lower than those for native-born Americans."[25]  In fact, "[i]ncreases in the undocumented immigrant population within states are associated with significant *decreases* in the prevalence of violence."[26]

Defendants have also engaged in unfounded fear-mongering to support the Rule and Proclamation.  For example, on October 23, President Trump claimed that this Central American caravan included "unknown Middle Easterners"[27]—a view that Vice President Mike Pence echoed, explaining that "[i]t's inconceivable that there are not people of Middle Eastern descent in a crowd of more than 7,000 people advancing toward our border."[28]  Even so, when confronted

---

[20] @realDonaldTrump, Twitter (Oct. 29, 2018),
https://twitter.com/realDonaldTrump/status/1055820292881350656?s=20.
[21] @realDonaldTrump, Twitter (Oct. 31, 2018),
https://twitter.com/realDonaldTrump/status/1057612657665171457?s=20.
[22] @realDonaldTrump, Twitter (Oct. 31, 2018),
https://twitter.com/realDonaldTrump/status/1057614564639019009?s=20.
[23] @realDonaldTrump, Twitter (Nov. 26, 2018),
https://twitter.com/realDonaldTrump/status/1067015026995879937?s=20.
[24] @realDonaldTrump, Twitter (Nov. 22, 2018),
https://twitter.com/realdonaldtrump/status/1065583286188158976
[25] Alex Nowrasteh, *Immigration: Research and Policy Brief*, Cato Institute (2018).
[26] Michael T. Light & Ty Miller, *Does Undocumented Immigration Increase Violent Crime*, 56 Criminology 229, 370 (2018) (emphasis added).
[27] realDonaldTrump, Twitter (Oct. 22, 2018),
https://twitter.com/realDonaldTrump/status/1054351078328885248?s=20.
[28] John Wagner & Felicia Sonmez, *Trump Says There's 'No Proof' That Middle Easterners Have Joined Migrant Caravan, Although 'Could Very Well Be'*, Washington Post (Oct. 23, 2018), https://www.washingtonpost.com/politics/pence-seeks-to-bolster-trumps-unsubstantiated-claim-

7

regarding the support for his claim, President Trump admitted that "there's no proof of anything."[29]  Moreover, these statements, which suggest there is something inherently threatening about "Middle Easterners," reflect a dangerous ethnic animus.

Defendants' justifications for the Rule and Proclamation are consistent with a pattern of hostility toward immigrant groups expressed by the Administration from the earliest days of the presidential campaign to the present—a pattern that makes clear that the true justification for the Rule and Proclamation is animus toward vulnerable immigrants.  Indeed, President Trump began his campaign for president with a speech in which he exclaimed:

> When Mexico sends its people, they're not sending their best. They're not sending you. They're not sending you. They're sending people that have lots of problems, and they're bringing those problems with us. They're bringing drugs. *They're bringing crime. They're rapists*.[30]

Tellingly, the Administration's rhetoric has not slowed or been tempered following the inauguration.  Rather, it has repeatedly asserted that, but for illegal immigration and the associated "DUIs, assaults, burglaries, drug crimes, gang crimes, rapes, crimes against children and murders . . . [c]ountless Americans would be alive today,"[31] and "open borders lead[] to massive crime."[32]  Defendants singled out the existing asylum system as "an easy ticket to illegal entry into the United States," swamped with "vague, insubstantial, and subjective claims."[33]  Specifically,

---

of-middle-easterners-in-a-migrant-caravan/2018/10/23/048ce726-d6d2-11e8-83a2-d1c3da28d6b6_story.html?utm_term=.7867842781d3.

[29] Bill Hutchinson, Jordyn Phelps, & Matt Gutman, *Trump Admits He Hs 'No Proof' of 'Middle Easterners' In Caravan, 'But There Could Very Well Be*,' ABC News (Oct. 23, 2018), https://abcnews.go.com/US/trump-admits-proof-middle-easterners-caravan/story?id=58686056.
[30] *Here's Donald Trump's Presidential Announcement Speech*, Time (June 16, 2015), http://time.com/3923128/donald-trump-announcement-speech/ (emphasis added).
[31] Jefferson B. Sessions III, Att'y General, *Attorney General Sessions Delivers Remarks on Sanctuary Jurisdictions* (Mar. 27, 2017), https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-sanctuary-jurisdictions.
[32] *'Angel Families,' Trump Aides Rally Against Illegal Immigrant Crime*, Fox News (Sept. 7, 2018) https://www.foxnews.com/politics/angel-families-trump-aides-rally-against-illegal-immigrant-crime.
[33] Jeffrey B. Sessions III, Att'y General, *Attorney General Jeff Sessions Delivers Remarks to the Executive Office for Immigration Review* (Oct. 12, 2017), https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-executive-office-immigration-review.

Defendants expressed a desire to "close[] the terrible loopholes exploited by criminals and terrorists to enter our country—and [] finally end[] the dangerous practice of 'catch and release.'"[34]  The Rule and Proclamation are just the latest in a string of anti-immigrant policies, including capping the refugee resettlement program at 30,000;[35] attempting to limit the grounds on which individuals can apply for asylum;[36] and revoking Temporary Protected Status for over 300,000 people.[37]

Defendants' rhetoric toward unaccompanied children has been particularly inflammatory. For example, in September 2017, the Administration asserted, without evidence, that MS-13 was expanding "its ranks by taking advantage of the Unaccompanied Alien Child program" and alleged that some children were "wolves in sheep['s] clothing."[38]  In May 2018, when speaking of unaccompanied minors, President Trump stated "[t]hey look so innocent; they're not innocent."[39] Defendants have consistently deemed important protections for unaccompanied minors as "dangerous loopholes" that have been exploited by gang members posing as vulnerable children.[40]

At bottom, Defendants have repeatedly suggested, without evidence and in direct conflict with the available data, that undocumented immigrants are a source of violence in order to depart

---

[34] *President Donald J. Trump's State of the Union Address*, White House (Jan. 30, 2018), https://www.whitehouse.gov/briefings-statements/president-donald-j-trumps-state-union-address/.
[35] Presidential Memorandum for the Secretary of State (Oct. 4, 2018), https://www.whitehouse.gov/presidential-actions/presidential-memorandum-secretary-state-13/.
[36] *See Matter of A-B-*, 27 I&N Dec. 316 (A.G. 2018).
[37] *See* Miriam Jordan, *Trump Administration Ends Protected Status for Thousands of Hondurans*, N.Y. Times (May 4, 2018), https://www.nytimes.com/2018/05/04/us/honduras-temporary-protected-status.html.
[38] Jefferson B. Sessions III, Att'y General, *Attorney General Sessions Gives Remarks to Federal Law Enforcement in Boston About Transnational Criminal Organizations* (Sept. 21, 2017), https://www.justice.gov/opa/speech/attorney-general-sessions-gives-remarks-federal-law-enforcement-boston-about.
[39] *Remarks by President Trump at a Roundtable Discussion on Immigration, Bethpage, NY* (May 23, 2018), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-roundtable-discussion-immigration-bethpage-ny/.
[40] The White House, *Immigration Principles and Policies* (Oct. 8, 2017), https://www.whitehouse.gov/briefings-statements/president-donald-j-trumps-letter-house-senate-leaders-immigration-principles-policies/; also see *President Donald J. Trump's State of the Union Address*, White House (Jan. 30, 2018), https://www.whitehouse.gov/briefings-statements/president-donald-j-trumps-state-union-address/.

9

from long-standing principles of law, discriminate against vulnerable populations, and bring life to an unfounded animus toward asylum seekers.

### C.   Congress and the Courts Recognize the Unique Vulnerabilities of Asylum Seekers.

As the administrative record in this case illustrates, asylum seekers, by their very nature, are often impoverished, endangered, and helpless.  They come to our borders, often at great expense[41] and danger to their personal safety,[42] leaving behind their homelands and loved ones, simply for survival.  Many are children traveling alone, without the protection of a guardian.[43] Notably, the number of adult migrants without families is at its second lowest point since 1970, a shift indicative of the driving causes of current migration: extreme violence and other threats in El Salvador, Guatemala, and Honduras, with no hope of protection from the governments of those countries.[44]  Recognition of the vulnerability of asylum seekers is baked into the statutes governing asylum in the United States, as the legislative history of our asylum laws and decades of well-settled jurisprudence make clear.

The humanitarian crisis facing Central American refugees, particularly those from the Northern Triangle, is well documented.  El Salvador and Honduras rank second and fourth worldwide, respectively, in terms of violent death rates per 100,000 persons; only Syria surpasses El Salvador. [45]  The U.S. State Department has noted the "climate of fear"[46] that pervades this

---

[41] Fees for smugglers typically range from $2,400 to $15,000.  Admin. R. at 244.  Families often take out loans with their homes or land as collateral to finance a family member's journey.  If the migration fails (i.e., if the migrant dies or is unable to relocate to the United States), the migrant's entire family can be left homeless.  Admin. R. at 245.

[42] A survey conducted by Doctors Without Borders found that 38.3% of migrants and refugees reported having been victims of violence while in transit to the United States.  Admin. R. at 178.

[43] Peter J. Meyer et al., Cong. Research Serv., R43702, Unaccompanied Children from Central America: Foreign Policy Considerations 1 (2016).

[44] Adam Isacson, *The U.S. Government's 2018 Border Data Clearly Shows Why the Trump Administration is on the Wrong Track*, Washington Office on Latin America (Nov. 9, 2018), https://www.wola.org/analysis/us-government-2018-border-data-trump-immigration-asylum-policy/.

[45] Claire McEvoy & Gergely Hideg, Global Violent Deaths 2017 25 (2017), *available at* http://www.smallarmssurvey.org/fileadmin/docs/U-Reports/SAS-Report-GVD2017.pdf.

[46] U.S. Dep't of State, *El Salvador Country Reports on Human Rights Practices* 218 (2017).

region, which is characterized by frequent homicides, kidnappings, rapes, and other human rights abuses perpetrated by organized criminals as well as governmental bodies and security forces.[47] Tellingly, despite Defendants' contention that most asylum claims "ultimately lack merit," ECF 27 at 6, the administrative record shows that applicants from the Northern Triangle represented 30% of granted asylum applications in the United States—more granted applications than any other geographic region.[48]

In decades of serving refugees, amici have become intimately acquainted with the tragic circumstances that compel individuals to flee their homes. They arrive here scared, tired, and in dire need of the protections the asylum laws were so carefully crafted to provide. It is the universal experience of amici that, while the quantitative number of immigrants coming to the United States has declined, for those asylum seekers who continue to seek asylum access through the U.S.-Mexico border, their claims are more dire than ever. This is particularly true of the children who are seeking entry through the U.S.-Mexico border. Virtually without exception, these children have suffered brutal violence, including rape, assault, the murder of friends and family, extortion, and countless other crimes. They have a profound fear of being forced to return to their home countries, a fear so profound that these children had no other option than to flee and travel thousands of miles to the United States.

Congress drafted the asylum laws with a clear understanding of the needs of asylum applicants, knowing that "[t]he refugees of tomorrow, like the refugees of today, [would] continue to look to the United States for safe haven and resettlement opportunities – and our government [would] continue to be called upon to help." S. Rep. No. 96-256, p. 3 (1979). Indeed, Congress sought to "establish a national policy of *welcome* to refugees." S. Rep. No. 96-590, at 82 (1980) (Conf. Rep.) (emphasis added). This is particularly true for unaccompanied children, who have

---

[47] *Id.* at 9; U.S. Dep't of State, *Honduras Country Reports on Human Rights Practices* 1-2, 4 (2017); U.S. Dep't of State, *Guatemala Country Reports on Human Rights Practices* 7, 16 (2017).
[48] Admin. R. at 331.

1     special asylum protections created by Congress, which are now effectively dismantled by the

2     Administration.[49]

3          Courts, too, recognize that the fundamental purpose of the U.S. asylum system is to

4     "provide refuge to desperate refugees who reach our shores with nowhere else to turn." *Sall v.*

5     *Gonzales*, 437 F.3d 229, 233 (2d Cir. 2006); *see also Bolanos-Hernandez v. INS*, 767 F.2d 1277,

6     1280 (9th Cir. 1984) ("In passing the Refugee Act, Congress was motivated by the enduring

7     'historic policy of the United States to respond to the urgent needs of persons subject to

8     persecution in their homelands[.]'") (quoting the Refugee Act of 1980, § 101, Pub. L. No. 96-212,

9     94 Stat. 101, 102 (1982)). This is true regardless of how the refugee enters the United States.

10    Congress explicitly sought to expand the availability of asylum protections in order to bring U.S.

11    law into conformance with the 1967 United Nations Protocol, *INS v. Cardoza-Fonseca*, 480 U.S.

12    421, 436 (1987), which unambiguously prohibits penalizing refugees "on account of their illegal

13    entry or presence." United Nations Protocol Relating to the Status of Refugees, Art. 31.1, Jan. 31,

14    1967, 19 U.S.T. 6223, T.I.A.S. No. 6577 (1968).

15          It is Congress's considered judgment on the importance of providing an opportunity for

16    safe haven, regardless of where an asylum applicant enters the country, which reflects

17    humanitarian principles of well-settled international law, that must guide the Court, and not

18    Defendants' flawed statements that do little to mask an underlying disdain for refugees.

19    **III. CONCLUSION**

20          Defendants have offered no justification for disregarding the clear text of the INA or the

21    principles on which it is based. Instead, it is clear that the justifications offered are a pretext for a

22    policy animated by hostility to immigrants, particularly those from Latin America. Amici support

23

24    ――――――――――――――――――
[49] *See*, William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008

25    ("TVPRA") § 235(d)(7)(B), Public Law 110-457 (not specifying any restrictions on initial jurisdiction); *but see*, L. Francis Cissna, Director, *USCIS, Procedural Guidance for Implementing*

26    *Regulatory Changes Created by Interim Final Rule, Aliens Subject to a Bar on Entry under Certain Presidential Proclamations; Procedures for Protection Claims* (Nov. 9, 2018)

27    ("Therefore, while such [unaccompanied minors] will continue to be processed in accordance with 6 U.S.C. § 279 and 8 U.S.C. § 1232, they would per the terms of [the Rule and Proclamation] be

28    barred from asylum eligibility").

the issuance of a preliminary injunction, and they respectfully request that the Court grant Plaintiffs' motion.

Dated: December 5, 2018                    Respectfully submitted,

By:    */s/ Harrison "Buzz" Frahn*
          Harrison "Buzz" Frahn

Harrison "Buzz" Frahn (Bar No. 206822)
SIMPSON THACHER & BARTLETT LLP
2475 Hanover Street
Palo Alto, California  94304
Telephone:     (650) 251-5000
Facsimile:      (650) 251-5002
hfrahn@stblaw.com

*Counsel for Amici Curiae*