1  HARRISON "BUZZ" FRAHN (Bar No. 206822)
   hfrahn@stblaw.com
2  SIMPSON THACHER & BARTLETT LLP
   2475 Hanover Street
3  Palo Alto, California  94304
   Telephone:    (650) 251-5000
4  Facsimile:    (650) 251-5002

5  *Counsel for Amici Curiae*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| EAST BAY SANCTUARY COVENANT, et al., | Case No. 3:18-cv-06810-JST |
| Plaintiffs, | **AMICUS CURIAE BRIEF OF TWENTY-THREE ORGANIZATIONS REPRESENTING ASYLUM SEEKERS** |
| v. | |
| DONALD TRUMP, et al., | Judge:  Hon. Jon S. Tigar |
| Defendants. | Courtroom:  9, 19th Floor<br>Hearing Date:  December 19, 2018<br>Hearing Time:  9:30 a.m.<br>Date Action Filed:  November 9, 2018 |

## I. INTRODUCTION AND INTEREST OF AMICI CURIAE

Amici are twenty-three non-profit organizations[1] dedicated to ensuring the equitable treatment of immigrants and asylum seekers. In this capacity, they have developed an interest and expertise in the unique issues facing migrants, particularly those from Central America. Amici write to underscore the inaccuracies underlying Defendants' stated justifications for the Interim Final Rule "Aliens Subject to a Bar on Entry under Certain Presidential Proclamations; Procedures for Protection Claims" (the "Rule") and the Presidential Proclamation Addressing Mass Migration Through the Southern Border of the United States (the "Proclamation"), which were enacted without notice and comment in violation of the Administrative Procedure Act ("APA"), and thus without the benefit of amici's input. Defendants' false and fundamentally misguided excuses for implementing the Rule and Proclamation in violation of the clear language of the Immigration and Nationality Act ("INA") serve only to mask the true motives of Defendants' hasty attempt to render asylum functionally unavailable to anyone from Latin America: Defendants' well documented animus toward Central and South American migrants, and an antipathy toward the entire asylum framework.

If the Rule and Proclamation are allowed to take effect, amici, all of whom work with asylum seekers and many of whom focus specifically on asylum claims, would lose a vital statutory tool for protecting vulnerable refugee and immigrant communities. By eliminating asylum for those who, in desperation, enter the United States outside of ports of entry, the Rule and Proclamation would needlessly place the lives of countless individuals at risk.

## II. ARGUMENT

The INA unambiguously allows individuals to apply for asylum regardless of how they entered the United States. 8 U.S.C. § 1158(a)(1) ("Any alien who is physically present in the United States or who arrives in the United States[,] *whether or not at a designated port of arrival* . . . , may apply for asylum in accordance with this section.") (emphasis added). The Rule and Proclamation represent a draconian departure from the clear language of the INA and the

---

[1] Amici are listed and described in the accompanying Motion for Leave to File this Amicus Brief.

1

AMICUS CURIAE BRIEF                                                            CASE NO. 3:18-CV-06810-JST

principles that law embodies.  Defendants' stated justifications for the Rule and Proclamation—a "surge" in mass migration, coupled with the notion that would-be asylum seekers present a danger to U.S. security—have no basis in fact and are disproven by the government's own statistics.  The actual driving force behind the Rule and Proclamation is animus toward immigrants, particularly those from Latin America.  Defendants' numerous disparaging statements concerning immigrants, and the asylum process as a whole, make this clear.  Defendants have repeatedly equated immigrants with criminals and terrorists, and likened the asylum provisions of the INA to a legal "loophole."  These baseless assertions reflect a deep animus toward immigrants that cannot be allowed to serve as a basis for any U.S. policy, much less ultra vires agency rulemaking.

The true reality is that the individuals who seek asylum in the United States are overwhelmingly vulnerable victims who are struggling for survival.  An appreciation of this truth is inherent throughout the asylum provisions within the INA.  As the legislative history and decades of jurisprudence interpreting the INA make clear, Congress carefully crafted the asylum laws with a deep understanding of the protections that asylum seekers require.  In doing so, Congress acted with the express expectation that the United States would offer these protections for generations to come, even during periods of increased migration.  Congress and the affected public stakeholders certainly did not expect, nor does the law allow, these statutory protections to be undone by executive fiat.

**A.    Defendants' Stated Justifications For the Rule and Proclamation are False.**

Despite Defendants' repeated assertions of a migration "crisis" at the border, the number of people crossing the border has steadily declined in recent years.[2]  U.S. Customs and Border Protection's ("CBP") own data demonstrates historically low numbers of apprehensions at the border in the past several years, even as the agency's annual budget continues to balloon.

Defendants have continuously characterized this caravan of migrants heading to the border using heated rhetoric, describing the approximately five thousand individuals as an "invasion,"

---

[2] *See, e.g.*, ECF 27 at 15; Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. 55934, 55947 (Nov. 9, 2018).

"surge," or "rush" threatening to overwhelm the immigration system.[3] In remarks delivered just prior to the issuance of the Proclamation, President Trump warned of "uncontrolled masses of people rushing [the] border."[4] The Proclamation, as well as the Rule, emphasize that "[t]he continuing and threatened mass migration of aliens . . . through our southern border has precipitated a crisis and undermines the integrity of our borders."[5]

Defendants' claims of a burgeoning border crisis are not supported by the evidence. Statistics show that the number of people crossing the U.S.-Mexico border has decreased significantly over the last two decades. In fact, in prior years, CBP has successfully addressed far greater rates of migration at the border than are now occurring.[6] Border patrol agents apprehended more than 1.6 million people in FY 2000 alone,[7] compared to 521,090 people apprehended in FY 2018, representing a 67.4% reduction over eighteen years.[8] The CBP itself emphasized that FY

---

[3] *See, e.g.*, ECF 27 at 12; Nick Miroff & Missy Ryan, *Army Assessment of Migrant Caravans Undermines Trump's Rhetoric*, Washington Post (Nov. 2, 2018), https://www.washingtonpost.com/world/national-security/army-assessment-of-migrant-caravans-undermines-trumps-rhetoric/2018/11/02/78b9d82a-dec0-11e8-b3f0-62607289efee_story.html?utm_term=.e97e6e0f86fa.

[4] *Remarks by President Trump on the Illegal Immigration Crisis and Border Security* (Nov. 1, 2018), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-illegal-immigration-crisis-border-security/.

[5] Presidential Proclamation Addressing Mass Migration Through the Southern Border of the United States (Nov. 9, 2018), https://www.whitehouse.gov/presidential-actions/presidential-proclamation-addressing-mass-migration-southern-border-united-states/. *See also* Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. 55934, 55947 (Nov. 9, 2018) ("In combination with a presidential proclamation directed at the crisis on the southern border, the rule would help ameliorate the pressures on the present system.").

[6] *See U.S. Border Patrol Monthly Apprehensions (FY 2000 – FY 2017)*, U.S. Customs and Border Protection (Dec. 12, 2017), https://www.cbp.gov/sites/default/files/assets/documents/2017-Dec/BP%20Total%20Monthly%20Apps%20by%20Sector%20and%20Area%2C%20FY2000-FY2017.pdf.

[7] *See* Jeffrey S. Passel & D'vera Cohn, *U.S. Unauthorized Immigrant Total Dips to Lowest Level in a Decade*, Pew Research Center (Nov. 27, 2018).

[8] *See Southwest Border Migration FY 2019*, U.S. Customs and Border Protection, https://www.cbp.gov/newsroom/stats/sw-border-migration# (last accessed Dec. 4, 2018).

2017 had the "lowest level of illegal-cross border migration on record."[9]  The sharp downward trend in migrant apprehensions is illustrated in the following graph:

**Southwest Border Apprehension and Border Patrol Staffing Levels, FY 1975–2017**



[10]

Defendants stress the necessity of restricting asylum access, asserting without justification that the number of asylum seekers crossing outside ports of entry will overload the immigration system.[11]  In reality, CBP today has significantly more resources to address far lower rates of migration.  From FY 2003 to FY 2016, CBP's annual budget more than doubled from $5.9 billion to $13.2 billion.[12]  Moreover, the agency currently employs close to 20,000 border agents, of

---

[9] *CBP Border Security Report FY 2017*, U.S. Customs and Border Protection, 1 (Dec. 5, 2017), https://www.cbp.gov/sites/default/files/assets/documents/2017-Dec/cbp-border-security-report-fy2017.pdf.
[10] *See* Jessica Bolter & Doris Meissner, *Crisis at the Border? Not by the Numbers*, Migration Policy Institute (June 2018), https://www.migrationpolicy.org/news/crisis-border-not-numbers.
[11] *See, e.g.*, ECF 27 at 6, 12; Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. 55934, 55947 (Nov. 9, 2018).
[12] *See The Cost of Immigration Enforcement and Border Security*, American Immigration Council, 2 (Jan. 2017), https://www.americanimmigrationcouncil.org/sites/default/files/research/the_cost_of_immigration_enforcement_and_border_security.pdf.

4

which the majority are assigned to the southwest border.[13]  Considering that Border Patrol previously apprehended at least one million migrants each year for most of the years between 1985 and 2007 with fewer than 10,000 agents,[14] the assertion that the United States lacks the resources to handle a modest and temporary increase in migration is not plausibly supported by the evidence.  Moreover, Defendants' assertion that asylum applicants contribute to the "significant backlog[] in the immigration court system"[15] conveniently ignores the fact that the ballooning backlog can be attributed at least in part to Defendants' own policies, including eliminating Immigration Judges' authority to administratively close cases and requiring DHS to reopen administratively closed cases;[16] as well as ending Immigration and Customs Enforcement attorneys' prosecutorial discretion to drop charges against law-abiding immigrants and referring unauthorized border crossings to the Department of Justice for prosecution.[17]  Defendants cannot use problems born out of their own efforts to undermine the integrity and efficiency of immigration courts to justify their proposed radical shift in policy.

As the administrative record demonstrates, the fact of the matter is that there is no migration crisis unfolding at the border.  Nor would an increase in migration at the border justify Defendants' dramatic and unprecedented restrictions on asylum eligibility, because Congress expressly contemplated increases in migration in drafting the current statutory scheme—and declined to alter that scheme even when migration numbers far outpaced those occurring today. Members of Congress recognized that "[a]s international crises develop, more persons will come

---

[13] *See U.S. Border Patrol Fiscal Year Staffing Statistics (FY 1992 - FY 2017)*, U.S. Customs and Border Protection (Dec. 12, 2017), https://www.cbp.gov/sites/default/files/assets/documents/2017-Dec/BP%20Staffing%20FY1992-FY2017.pdf.
[14] *See id.*
[15] *E.g.*, ECF 27 at 6.
[16] *See* TRAC Immigration Data, Syracuse Univ. (last updated Nov. 6, 2018), http://trac.syr.edu/immigration/reports/536/.
[17] *See* Diane Solis, *AG Sessions' plan to clear immigration case backlog will make things worse, judges and attorneys fear*, Dallas News (April 10, 2018), https://www.dallasnews.com/news/immigration/2018/04/10/immigration-judges-attorneys-worry-sessions-quotas-will-cut-justice-clogged-court-system; Hunter Hallman & Cristobal Ramon, *Record Number of Cases in Immigration Courts is Simmering Crisis*, Bipartisan Policy Center (Oct. 4, 2017), https://bipartisanpolicy.org/blog/record-number-of-cases-in-immigration-courts-is-simmering-crisis/.

under the broad definition of 'refugee'" and that "[i]t is clear that our Government must share the international responsibility for dealing with this most human problem."  Admission of Refugees to the United States: Hearing on H.R. 3056 Before the Subcomm. on Immigration, Citizenship, and International Law of the H. Comm. on the Judiciary, 95th Cong. 15 (1977) (statement of Rep. Hamilton Fish, Jr., R-NY); *see also* Hearing on H.R. 3056, 95th Cong. 16 (1977) (testimony of James Carlin, Deputy Coordinator for Human Rights and Humanitarian Affairs, Dept. of State) ("[W]e should remember that the United States is a land of immigrants, and since the founding of the Republic we have had a special national heritage of concern for the uprooted and persecuted . . . [Furthermore], it is decidedly in our foreign policy interest to project in countries around the world the image of U.S. humanitarian assistance for refugees.").  Nothing in the INA nor in its legislative history suggests that the executive branch can respond to an increase in asylum claims by *restricting* asylum eligibility.

### B. The True Reason for the Rule and Proclamation Is Hostility Toward Immigrant Groups.

Defendants, through this litigation and in numerous public statements, have also sought to justify the Rule and Proclamation by painting a portrait of asylum seekers as a violent group that threatens America's security.  This justification also lacks factual support and is part and parcel of a pattern of hostile rhetoric directed toward immigrant groups, suggesting that the true reason for the Rule and Proclamation is cruel animosity.

For example, Defendants' briefing in this case repeatedly references "dangerous criminal behavior" and the threat of "harm [to] life and public safety."[18]  The Proclamation explicitly references the "violence" allegedly committed by those seeking refuge in the United States.[19]  Defendants have similarly stated that the Central American caravan consists of "[m]any Gang

---

[18] ECF 27 at 13.

[19] *Presidential Proclamation Addressing Mass Migration Through the Southern Border of the United States*, White House (Nov. 9, 2018), https://www.whitehouse.gov/presidential-actions/presidential-proclamation-addressing-mass-migration-southern-border-united-states/.

Members," [20] "very tough fighters and people,"[21] "bad thugs and gang members,"[22] and "stone cold criminals."[23] And, on November 22, after this Court granted the Temporary Restraining Order, Defendant President Donald J. Trump explained that if the TRO is not lifted "there will be only bedlam, chaos, injury, and death"—results that suggest an underlying danger inherent in the asylum seekers stranded at our southern border.[24]

As with Defendants' allegations of a migration "surge," this prejudicial hyperbole has no basis in fact and only serves to stigmatize and foster animosity towards vulnerable minority groups. The true reality is that "the criminal conviction and arrest rates for immigrants [are] well below those of native-born Americans" and "the conviction and arrest rates for illegal immigrants [are also] lower than those for native-born Americans."[25] In fact, "[i]ncreases in the undocumented immigrant population within states are associated with significant *decreases* in the prevalence of violence."[26]

Defendants have also engaged in unfounded fear-mongering to support the Rule and Proclamation. For example, on October 23, President Trump claimed that this Central American caravan included "unknown Middle Easterners"[27]—a view that Vice President Mike Pence echoed, explaining that "[i]t's inconceivable that there are not people of Middle Eastern descent in a crowd of more than 7,000 people advancing toward our border."[28] Even so, when confronted

---

[20] @realDonaldTrump, Twitter (Oct. 29, 2018), https://twitter.com/realDonaldTrump/status/1055820292881350656?s=20.
[21] @realDonaldTrump, Twitter (Oct. 31, 2018), https://twitter.com/realDonaldTrump/status/1057612657665171457?s=20.
[22] @realDonaldTrump, Twitter (Oct. 31, 2018), https://twitter.com/realDonaldTrump/status/1057614564639019009?s=20.
[23] @realDonaldTrump, Twitter (Nov. 26, 2018), https://twitter.com/realDonaldTrump/status/1067015026995879937?s=20.
[24] @realDonaldTrump, Twitter (Nov. 22, 2018), https://twitter.com/realdonaldtrump/status/1065583286188158976
[25] Alex Nowrasteh, *Immigration: Research and Policy Brief*, Cato Institute (2018).
[26] Michael T. Light & Ty Miller, *Does Undocumented Immigration Increase Violent Crime*, 56 Criminology 229, 370 (2018) (emphasis added).
[27] realDonaldTrump, Twitter (Oct. 22, 2018), https://twitter.com/realDonaldTrump/status/1054351078328885248?s=20.
[28] John Wagner & Felicia Sonmez, *Trump Says There's 'No Proof' That Middle Easterners Have Joined Migrant Caravan, Although There 'Could Very Well Be'*, Washington Post (Oct. 23, 2018), https://www.washingtonpost.com/politics/pence-seeks-to-bolster-trumps-unsubstantiated-claim-

regarding the support for his claim, President Trump admitted that "there's no proof of anything."[29] Moreover, these statements, which suggest there is something inherently threatening about "Middle Easterners," reflect a dangerous ethnic animus.

Defendants' justifications for the Rule and Proclamation are consistent with a pattern of hostility toward immigrant groups expressed by the Administration from the earliest days of the presidential campaign to the present—a pattern that makes clear that the true justification for the Rule and Proclamation is animus toward vulnerable immigrants. Indeed, President Trump began his campaign for president with a speech in which he exclaimed:

> When Mexico sends its people, they're not sending their best. They're not sending you. They're not sending you. They're sending people that have lots of problems, and they're bringing those problems with us. They're bringing drugs. *They're bringing crime. They're rapists.*[30]

Tellingly, the Administration's rhetoric has not slowed or been tempered following the inauguration. Rather, it has repeatedly asserted that, but for illegal immigration and the associated "DUIs, assaults, burglaries, drug crimes, gang crimes, rapes, crimes against children and murders . . . [c]ountless Americans would be alive today,"[31] and "open borders lead[] to massive crime."[32] Defendants singled out the existing asylum system as "an easy ticket to illegal entry into the United States," swamped with "vague, insubstantial, and subjective claims."[33] Specifically,

---

of-middle-easterners-in-a-migrant-caravan/2018/10/23/048ce726-d6d2-11e8-83a2-d1c3da28d6b6_story.html?utm_term=.7867842781d3.

[29] Bill Hutchinson, Jordyn Phelps, & Matt Gutman, *Trump Admits He Hs 'No Proof' of 'Middle Easterners' In Caravan, 'But There Could Very Well Be,'* ABC News (Oct. 23, 2018), https://abcnews.go.com/US/trump-admits-proof-middle-easterners-caravan/story?id=58686056.

[30] *Here's Donald Trump's Presidential Announcement Speech*, Time (June 16, 2015), http://time.com/3923128/donald-trump-announcement-speech/ (emphasis added).

[31] Jefferson B. Sessions III, Att'y General, *Attorney General Sessions Delivers Remarks on Sanctuary Jurisdictions* (Mar. 27, 2017), https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-sanctuary-jurisdictions.

[32] *'Angel Families,' Trump Aides Rally Against Illegal Immigrant Crime*, Fox News (Sept. 7, 2018) https://www.foxnews.com/politics/angel-families-trump-aides-rally-against-illegal-immigrant-crime.

[33] Jeffrey B. Sessions III, Att'y General, *Attorney General Jeff Sessions Delivers Remarks to the Executive Office for Immigration Review* (Oct. 12, 2017), https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-executive-office-immigration-review.

Defendants expressed a desire to "close[] the terrible loopholes exploited by criminals and terrorists to enter our country—and [] finally end[] the dangerous practice of 'catch and release.'"[34]  The Rule and Proclamation are just the latest in a string of anti-immigrant policies, including capping the refugee resettlement program at 30,000;[35] attempting to limit the grounds on which individuals can apply for asylum;[36] and revoking Temporary Protected Status for over 300,000 people.[37]

Defendants' rhetoric toward unaccompanied children has been particularly inflammatory. For example, in September 2017, the Administration asserted, without evidence, that MS-13 was expanding "its ranks by taking advantage of the Unaccompanied Alien Child program" and alleged that some children were "wolves in sheep['s] clothing."[38]  In May 2018, when speaking of unaccompanied minors, President Trump stated "[t]hey look so innocent; they're not innocent."[39] Defendants have consistently deemed important protections for unaccompanied minors as "dangerous loopholes" that have been exploited by gang members posing as vulnerable children.[40]

At bottom, Defendants have repeatedly suggested, without evidence and in direct conflict with the available data, that undocumented immigrants are a source of violence in order to depart

---

[34] *President Donald J. Trump's State of the Union Address*, White House (Jan. 30, 2018), https://www.whitehouse.gov/briefings-statements/president-donald-j-trumps-state-union-address/.
[35] Presidential Memorandum for the Secretary of State (Oct. 4, 2018), https://www.whitehouse.gov/presidential-actions/presidential-memorandum-secretary-state-13/.
[36] *See Matter of A-B-*, 27 I&N Dec. 316 (A.G. 2018).
[37] *See* Miriam Jordan, *Trump Administration Ends Protected Status for Thousands of Hondurans*, N.Y. Times (May 4, 2018), https://www.nytimes.com/2018/05/04/us/honduras-temporary-protected-status.html.
[38] Jefferson B. Sessions III, Att'y General, *Attorney General Sessions Gives Remarks to Federal Law Enforcement in Boston About Transnational Criminal Organizations* (Sept. 21, 2017), https://www.justice.gov/opa/speech/attorney-general-sessions-gives-remarks-federal-law-enforcement-boston-about.
[39] *Remarks by President Trump at a Roundtable Discussion on Immigration, Bethpage, NY* (May 23, 2018), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-roundtable-discussion-immigration-bethpage-ny/.
[40] The White House, *Immigration Principles and Policies* (Oct. 8, 2017), https://www.whitehouse.gov/briefings-statements/president-donald-j-trumps-letter-house-senate-leaders-immigration-principles-policies/; also see *President Donald J. Trump's State of the Union Address*, White House (Jan. 30, 2018), https://www.whitehouse.gov/briefings-statements/president-donald-j-trumps-state-union-address/.

from long-standing principles of law, discriminate against vulnerable populations, and bring life to an unfounded animus toward asylum seekers.

### C. Congress and the Courts Recognize the Unique Vulnerabilities of Asylum Seekers.

As the administrative record in this case illustrates, asylum seekers, by their very nature, are often impoverished, endangered, and helpless.  They come to our borders, often at great expense[41] and danger to their personal safety,[42] leaving behind their homelands and loved ones, simply for survival.  Many are children traveling alone, without the protection of a guardian.[43]  Notably, the number of adult migrants without families is at its second lowest point since 1970, a shift indicative of the driving causes of current migration: extreme violence and other threats in El Salvador, Guatemala, and Honduras, with no hope of protection from the governments of those countries.[44]  Recognition of the vulnerability of asylum seekers is baked into the statutes governing asylum in the United States, as the legislative history of our asylum laws and decades of well-settled jurisprudence make clear.

The humanitarian crisis facing Central American refugees, particularly those from the Northern Triangle, is well documented.  El Salvador and Honduras rank second and fourth worldwide, respectively, in terms of violent death rates per 100,000 persons; only Syria surpasses El Salvador.[45]  The U.S. State Department has noted the "climate of fear"[46] that pervades this

---

[41] Fees for smugglers typically range from $2,400 to $15,000.  Admin. R. at 244.  Families often take out loans with their homes or land as collateral to finance a family member's journey.  If the migration fails (i.e., if the migrant dies or is unable to relocate to the United States), the migrant's entire family can be left homeless.  Admin. R. at 245.
[42] A survey conducted by Doctors Without Borders found that 38.3% of migrants and refugees reported having been victims of violence while in transit to the United States.  Admin. R. at 178.
[43] Peter J. Meyer et al., Cong. Research Serv., R43702, Unaccompanied Children from Central America: Foreign Policy Considerations 1 (2016).
[44] Adam Isacson, *The U.S. Government's 2018 Border Data Clearly Shows Why the Trump Administration is on the Wrong Track*, Washington Office on Latin America (Nov. 9, 2018), https://www.wola.org/analysis/us-government-2018-border-data-trump-immigration-asylum-policy/.
[45] Claire McEvoy & Gergely Hideg, Global Violent Deaths 2017 25 (2017), *available at* http://www.smallarmssurvey.org/fileadmin/docs/U-Reports/SAS-Report-GVD2017.pdf.
[46] U.S. Dep't of State, *El Salvador Country Reports on Human Rights Practices* 218 (2017).

region, which is characterized by frequent homicides, kidnappings, rapes, and other human rights abuses perpetrated by organized criminals as well as governmental bodies and security forces.[47] Tellingly, despite Defendants' contention that most asylum claims "ultimately lack merit," ECF 27 at 6, the administrative record shows that applicants from the Northern Triangle represented 30% of granted asylum applications in the United States—more granted applications than any other geographic region.[48]

In decades of serving refugees, amici have become intimately acquainted with the tragic circumstances that compel individuals to flee their homes.  They arrive here scared, tired, and in dire need of the protections the asylum laws were so carefully crafted to provide.  It is the universal experience of amici that, while the quantitative number of immigrants coming to the United States has declined, for those asylum seekers who continue to seek asylum access through the U.S.-Mexico border, their claims are more dire than ever.  This is particularly true of the children who are seeking entry through the U.S.-Mexico border.  Virtually without exception, these children have suffered brutal violence, including rape, assault, the murder of friends and family, extortion, and countless other crimes.  They have a profound fear of being forced to return to their home countries, a fear so profound that these children had no other option than to flee and travel thousands of miles to the United States.

Congress drafted the asylum laws with a clear understanding of the needs of asylum applicants, knowing that "[t]he refugees of tomorrow, like the refugees of today, [would] continue to look to the United States for safe haven and resettlement opportunities – and our government [would] continue to be called upon to help."  S. Rep. No. 96-256, p. 3 (1979).  Indeed, Congress sought to "establish a national policy of *welcome* to refugees."  S. Rep. No. 96-590, at 82 (1980) (Conf. Rep.) (emphasis added).  This is particularly true for unaccompanied children, who have

---

[47] *Id.* at 9; U.S. Dep't of State, *Honduras Country Reports on Human Rights Practices* 1-2, 4 (2017); U.S. Dep't of State, *Guatemala Country Reports on Human Rights Practices* 7, 16 (2017).
[48] Admin. R. at 331.

11

AMICUS CURIAE BRIEF                                               CASE NO. 3:18-CV-06810-JST

1  special asylum protections created by Congress, which are now effectively dismantled by the
2  Administration.[49]

3  Courts, too, recognize that the fundamental purpose of the U.S. asylum system is to
4  "provide refuge to desperate refugees who reach our shores with nowhere else to turn." *Sall v.*
5  *Gonzales*, 437 F.3d 229, 233 (2d Cir. 2006); *see also Bolanos-Hernandez v. INS*, 767 F.2d 1277,
6  1280 (9th Cir. 1984) ("In passing the Refugee Act, Congress was motivated by the enduring
7  'historic policy of the United States to respond to the urgent needs of persons subject to
8  persecution in their homelands[.]'") (quoting the Refugee Act of 1980, § 101, Pub. L. No. 96-212,
9  94 Stat. 101, 102 (1982)).  This is true regardless of how the refugee enters the United States.
10 Congress explicitly sought to expand the availability of asylum protections in order to bring U.S.
11 law into conformance with the 1967 United Nations Protocol, *INS v. Cardoza-Fonseca*, 480 U.S.
12 421, 436 (1987), which unambiguously prohibits penalizing refugees "on account of their illegal
13 entry or presence."  United Nations Protocol Relating to the Status of Refugees, Art. 31.1, Jan. 31,
14 1967, 19 U.S.T. 6223, T.I.A.S. No. 6577 (1968).

15 It is Congress's considered judgment on the importance of providing an opportunity for
16 safe haven, regardless of where an asylum applicant enters the country, which reflects
17 humanitarian principles of well-settled international law, that must guide the Court, and not
18 Defendants' flawed statements that do little to mask an underlying disdain for refugees.

19 **III.    CONCLUSION**

20 Defendants have offered no justification for disregarding the clear text of the INA or the
21 principles on which it is based.  Instead, it is clear that the justifications offered are a pretext for a
22 policy animated by hostility to immigrants, particularly those from Latin America.  Amici support

---

[49] *See*, William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA") § 235(d)(7)(B), Public Law 110-457 (not specifying any restrictions on initial jurisdiction); *but see*, L. Francis Cissna, Director, *USCIS, Procedural Guidance for Implementing Regulatory Changes Created by Interim Final Rule, Aliens Subject to a Bar on Entry under Certain Presidential Proclamations; Procedures for Protection Claims* (Nov. 9, 2018) ("Therefore, while such [unaccompanied minors] will continue to be processed in accordance with 6 U.S.C. § 279 and 8 U.S.C. § 1232, they would per the terms of [the Rule and Proclamation] be barred from asylum eligibility").

the issuance of a preliminary injunction, and they respectfully request that the Court grant Plaintiffs' motion.

Dated: December 5, 2018

Respectfully submitted,

By: */s/ Harrison "Buzz" Frahn*
Harrison "Buzz" Frahn

Harrison "Buzz" Frahn (Bar No. 206822)
SIMPSON THACHER & BARTLETT LLP
2475 Hanover Street
Palo Alto, California  94304
Telephone:     (650) 251-5000
Facsimile:      (650) 251-5002
hfrahn@stblaw.com

*Counsel for Amici Curiae*