1   DAVID C. MARCUS (SBN: 158704)
    david.marcus@wilmerhale.com
2   WILMER CUTLER PICKERING
       HALE AND DORR LLP
3   350 South Grand Avenue, Suite 2100
    Los Angeles, CA 90071
4   Telephone: +1 213 443 5312
    Facsimile: +1 213 443 5400
5

6   *Attorney for Amici Curiae*

7   Additional attorneys listed in signature block

8              **UNITED STATES DISTRICT COURT**

9              **NORTHERN DISTRICT OF CALIFORNIA**

10             **SAN FRANCISCO DIVISION**

11

12  EAST BAY SANCTUARY COVENANT          Case No.  3:18-cv-06810-JST
    ET AL.,
13                                        **BRIEF OF PROFESSORS OF**
14                    Plaintiffs,         **IMMIGRATION LAW AS AMICI**
                                          **CURIAE IN SUPPORT OF**
15          v.                            **PLAINTIFFS**

16  DONALD J. TRUMP, PRESIDENT OF
    THE UNITED STATES ET AL.,
17
18                    Defendants.

19  ──────────────────────────────

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................................... ii

INTEREST OF AMICI ...............................................................................................1

SUMMARY OF ARGUMENT .....................................................................................1

ARGUMENT .............................................................................................................3

I      The DHS Rule Runs Counter to the Plain Meaning of the INA's Asylum Provisions .........3

        A.     Plain Meaning ............................................................................4

        B.     Congress's Intentional Distinction Between Asylum and Withholding ....................5

II     IIRIRA's Conjunction Of Detailed Procedural Limits On Asylum With Threshold Eligibility For Arriving Asylum Seekers Occupies The Field That The New DHS Rule Purports To Cover ...........................................................................................7

        A.     Expedited Removal ......................................................................8

        B.     The 1-Year Rule for Asylum Applications ............................................9

        C.     Provision for Safe Third Country Agreements .......................................10

III    Based On The Statutory Scheme And Past Practice, The Exercise Of Discretion To Deny Asylum Based On An Applicant's Manner Of EntryShould Be Case-by-Case, Not Categorical ...............................................................................................11

CONCLUSION ........................................................................................................13

BRIEF AMICUS CURIAE IN SUPPORT
                                                                                OF PLAINTIFFS

1

## TABLE OF AUTHORITIES

2
Page(s)

3
### CASES

4
*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ..................................12

5
*Guerrero-Sanchez v. Warden York County Prison*, 905 F.3d 208 (3d Cir. 2018) ...........................6

6
*INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) ......................................................5, 6

7
*Matter of A-H-*, 23 I. & N. Dec. 774 (A.G. 2005) .....................................................11

8
*Matter of Pula*, 19 I. & N. Dec. 467 (BIA 1987), *superseded in part by statute on other grounds as recognized in Andriasian v. I.N.S.*, 180 F.3d 1033 (9th Cir. 1999) ..........................3, 11, 12

9

10
*Trump v. Hawaii*, 138 S. Ct. 2392 (2018)..........................................................12

### STATUTES, RULES, AND REGULATIONS

11

12
8 C.F.R. § 208.16 ..........................................................................11

13
8 U.S.C. § 1152 ...........................................................................12

14
8 U.S.C. § 1157............................................................................5, 6

15
8 U.S.C. § 1158 ....................................................................... *passim*

16
8 U.S.C. § 1159...........................................................................6

17
8 U.S.C. § 1182 ..........................................................................3, 12

18
8 U.S.C. § 1225 ........................................................................7, 8, 9

19
Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009-546 ...................................................................2

20

21
Immigration and Nationality Act, Pub. L. No. 82-414, 66 Stat. 163 (1952) ....................12

22
Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (1980) ...............................1, 3, 4

23
### OTHER AUTHORITIES

24
*Immigration in the National Interest Act of 1995: Hearing on H.R. 1915 Before the H. Comm. on the Judiciary*, 104th Cong. 2 (1995) .................................................1

25

26
*Proposals to Reduce Illegal Immigration and Control Costs to Taxpayers: Hearing on S. 269 Before the S. Comm. on the Judiciary,* 104th Cong. 23 (1995) ...........................1

27

28

ii

BRIEF AMICUS CURIAE IN SUPPORT
OF PLAINTIFFS

*Refugee Act of 1979: Hearing on H.R. 2816 Before the H. Subcomm. on Int'l Operations, Comm. on Foreign Affairs*, 96th Congress 72 (1979) ........................................................................2

S. Rep. No. 96-590 (1980) ........................................................................................................5

Schmitt, *Bill to Limit Immigration Faces a Setback in Senate*, N.Y. Times, Mar. 14, 1996.............7

Schrag et al., *Rejecting Refugees: Homeland Security's Administration of the One-Year Bar to Asylum*, 52 Wm. & Mary L. Rev. 651 (2010) ........................................................................9

BRIEF AMICUS CURIAE IN SUPPORT
OF PLAINTIFFS

1

## INTEREST OF AMICI

2    Amici curiae are law professors who teach and publish scholarship about United States

3   immigration law.  Amici have collectively studied the implementation and history of the

4   Immigration and Nationality Act ("INA") for decades, and have written extensively on the topic.

5   They accordingly have an abiding interest in the proper interpretation and administration of the

6   Nation's immigration laws, particularly the INA.[*]

7

## SUMMARY OF ARGUMENT

8    The plain language, plan, and structure of both the Refugee Act of 1980 ("Refugee Act"),

9   Pub. L. No. 96-212, 94 Stat. 102, 105 (1980), and the Immigration and Nationality Act ("INA"), 8

10   U.S.C. §1101 et seq., support threshold eligibility for asylum for any foreign national "at a land

11   border *or* port of entry."  Refugee Act of 1980 § 208 (emphasis added); *see* 8 U.S.C. § 1158(a)(1)

12   (providing that "*[a]ny alien … who arrives in the United States (whether or not at a designated port*

13   *of arrival*) … may apply for asylum").  This robust textual commitment to asylum eligibility

14   provides a stark comparison with the inadequate remedies that the new Department of Homeland

15   Security (DHS) rule reserves for arrivals between designated entry points.

16    The language of the INA did not emerge in a vacuum.  Rather, it was the end-product of a

17   lengthy procession of committee hearings, bipartisan deliberations, and consultations with the White

18   House. The resulting compromise reflected legislators' understanding that asylum was "a cherished

19   thing."  *See Proposals to Reduce Illegal Immigration and Control Costs to Taxpayers: Hearing on S.*

20   *269 Before the S. Comm. on the Judiciary,* 104th Cong. 23 (1995) (Statement of Sen. Alan K.

21   Simpson) [hereinafter Simpson Stmt.].  Yet the current language at 8 U.S.C. § 1158(a)(1) also

22   illustrates some legislators' serious concerns that maintaining border security required stricter

23   asylum procedures, including more summary processing, increased detention of arriving foreign

24   nationals, and time-limits for asylum claims.  *See Immigration in the National Interest Act of 1995:*

25

26

27   [*]    A complete list of amici is set forth in the appendix to this brief.  University affiliations are listed solely for informational purposes.

28

1

1   *Hearing on H.R. 1915 Before the H. Comm. on the Judiciary*, 104th Cong. 2 (1995) (Statement of

2   Rep. Lamar Smith) [hereinafter Smith Stmt.].

3        The restrictions in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996

4   ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009-546 were controversial—they engendered

5   opposition on legal and policy grounds that continues to the present day.  In this case, that

6   controversy is precisely the point.  IIRIRA represented a hard-fought compromise to achieve both

7   access to asylum and protection of U.S. borders.  The new DHS rule seeks to undo the compromise

8   that Congress reached.

9        As Congress heard in deliberations on what ultimately became the Refugee Act of 1980,

10  preserving all arriving asylum-seekers' threshold eligibility serves vital humanitarian purposes.  In

11  testimony before the House Foreign Relations Committee, David A. Martin, a State Department

12  lawyer who subsequently served as a senior government attorney on immigration and became a

13  leading immigration scholar, explained that people flee persecution through any means available to

14  them, and "one way or another, arrive on our shores" seeking refuge.  The *Refugee Act of 1979:*

15  *Hearing on H.R. 2816 Before the H. Subcomm. on Int'l Operations, Comm. on Foreign Affairs*, 96th

16  Congress 72 (1979) (Statement of David A. Martin) [hereinafter Martin Stmt.].  The logic of

17  Professor Martin's comment and the INA's long textual commitment to the principle of threshold

18  eligibility for all arriving asylum seekers is clear: Asylum seekers cannot simply choose the location

19  of their arrival.  Since asylum seekers often flee for their lives and may travel through third countries

20  that are also unsafe, the particular location of the asylum seekers' arrival "on our shores" has no

21  necessary relation to either the asylum seekers' character or to the merits of their claims.

22       In Congress's scheme, preserving asylum-seekers' *threshold* eligibility leaves room for

23  denials on categorical grounds recognized by Congress and for the exercise of case-by-case

24  discretion.  For example, IIRIRA imposes categorical bars hinging on an applicant's criminal record

25  and ongoing threat to the country, threat to national security, and resettlement in another country

26  prior to arriving in the United States.  8 U.S.C. §§ 1158(b)(2)(A)(ii), (iii), (iv), (vi).

27       In addition to the categorical bars, IIRIRA provides that "[t]he Attorney General may by

28

2

regulation establish additional limitations and conditions, *consistent with this section*."  8 U.S.C. § 1158(b)(2)(C) (emphasis added).  While further exercises of official discretion have a valuable ongoing role in asylum determinations, that discretion is not boundless.  The statute's requirement that discretion be "consistent with this section" includes adherence to the underlying principle of *threshold* eligibility for all arriving aliens.

As a key agency precedent held over thirty years ago, an applicant's manner of entry should influence discretion on a case-by-case—not categorical—basis.  A decisionmaker should treat manner of entry as "one of a number of factors," including whether the claimant has sought asylum in another country before applying in the United States.  *Matter of Pula*, 19 I. & N. Dec. 467, 473 (BIA 1987), *superseded in part by statute on other grounds as recognized in Andriasian v. I.N.S.*, 180 F.3d 1033, 1043-1044 & n.17 (9th Cir. 1999).  Manner of entry "should not be considered in such a way that the practical effect is to deny relief in virtually all cases."  *Id*.

Ignoring this longtime practice, the new DHS rule imposes a categorical bar that would result in denial of virtually all asylum claims filed by foreign nationals arriving at undesignated border points.  In place of asylum, the new DHS rule would limit available remedies to withholding of removal or relief under the Convention Against Torture ("CAT"), which impose exponentially higher standards of proof on the applicant fleeing harm and do not provide lasting protection against removal.  DHS rule's categorical denial of asylum is therefore not "consistent with" the INA.  For the same reason, the Proclamation accompanying the rule is beyond the President's power under 8 U.S.C. § 1182(f).

## **ARGUMENT**

## I      The DHS Rule Runs Counter to the Plain Meaning of the INA's Asylum Provisions

In the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Congress expressly provided that foreign nationals fleeing persecution can "apply for asylum" at any point along a U.S. land border, "*whether or not at a designated port of arrival*."  8 U.S.C. § 1158(a)(1) (emphasis added).  IIRIRA's provision for arriving asylum-seekers' threshold

3

1   eligibility reinforced plain language in the Refugee Act of 1980.  Refugee Act of 1980 § 208

2   (authorizing asylum applications "at a land border" of the United States).  The trajectory of

3   legislative text toward more specific guarantees of threshold eligibility is manifestly inconsistent

4   with the new DHS rule's categorical denial of asylum for foreign nationals who arrive at

5   undesignated border locations.  Moreover, the new rule's effort to force asylum seekers toward more

6   contingent remedies such as withholding of removal and relief under the CAT is inconsistent with

7   both the plain meaning of the asylum provisions and Congress's deliberate prioritizing of asylum

8   over withholding and CAT relief.

9         **A.**    **Plain Meaning**

10        As part of the Refugee Act of 1980's effort to "provide a permanent and systematic

11   procedure for the admission … of refugees," Refugee Act § 101(b), Congress authorized asylum

12   claims by any foreign national "physically present in the United States *or* at a land border or port of

13   entry."  *Id*. § 208.  This language clearly demonstrated Congress's commitment to asylum-seekers'

14   threshold eligibility.  First, Congress decided that any foreign national "physically present in the

15   United States" could establish asylum eligibility regardless of whether the individual entered without

16   inspection ("EWI").  *See id*.; *see also* 8 U.S.C. § 1158(a)(1).  The clear text of the 1980 Refugee Act

17   reflects Congress's explicit decision not to condition eligibility for asylum on an applicant's manner

18   of entry.  Indeed, Congress allowed individuals the ability to apply for asylum whether they entered

19   "at a land border *or* port of entry."

20        Congress amended this text in 1996 to reinforce its adherence to the threshold eligibility of

21   asylum seekers who arrived at *any point* along a land border.  Much of IIRIRA reflected Congress's

22   abiding concern with border security.  Nevertheless, the 1996 legislation balanced an array of stricter

23   procedures with even clearer language about locational asylum eligibility.  For example, the 1996

24   text of § 1158(a)(1) provided that "[a]ny alien who is physically present in the United States or who

25   arrives in the United States (*whether or not at a designated port of arrival* and including an alien

26   who is brought to the United States after having been interdicted in international or United States

27   waters), irrespective of such alien's status, may apply for asylum."  (Emphasis added.)

28

Case No.  3:18-cv-06810-JST                    BRIEF AMICUS CURIAE IN SUPPORT
                                                     OF PLAINTIFFS

Compared with the already clear text of the Refugee Act, IIRIRA's language is even more compelling evidence of Congress's commitment to threshold eligibility of asylum seekers arriving at any border location.  The 1996 provision provided a meticulous catalog of arriving asylum seekers. That careful catalog demonstrates Congress's express commitment to the principle of threshold eligibility for asylum seekers who have "one way or another, arrive[d] on our shores," seeking refuge from persecution.  *See* Martin Stmt. 72.

### B. Congress's Intentional Distinction Between Asylum and Withholding

As the Court explained in *INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987), Congress carefully distinguished between asylum and the more demanding and contingent remedy of withholding of removal.  *Id*. at 436-41.  Compared with asylum, withholding of removal—and CAT relief, the other remedy under the new DHS rule available to asylum seekers arriving at an undesignated border point—is both harder to get and easier to lose.  *Id.* at 440-41.  In addition, only asylum provides a successful applicant with a chance for family reunification.  8 U.S.C. §§ 1158(b)(3)(A); 1157(c)(2)(A).  The functional differences between asylum on the one hand, and withholding and CAT relief on the other, demonstrate that Congress's provision for asylum eligibility in § 1158(a)(1) was entirely intentional.  The new DHS rule undermines that legislative choice.

The standard of proof for withholding and CAT relief is far higher than the standard for asylum.  The 1980 Refugee Act's lesser quantum of proof for asylum is "based directly" on and "intended to be construed consistent" with international law.  *See* S. Rep. No. 96-590, at 20 (1980) (cited in *Cardoza-Fonseca*, 480 U.S. at 437).  Both withholding and relief under the CAT require an applicant to show by a preponderance of the evidence that she would be subject to persecution (or torture in the case of the CAT) upon return to her country of origin.  *See Cardoza-Fonseca*, 480 U.S. at 430 (noting that applicant for withholding must "demonstrate a 'clear probability of persecution'").  In contrast, the Supreme Court has held that an applicant can more readily satisfy asylum's "well-founded fear" standard.  *Id.* at 431 (explaining that "[o]ne can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place.").

5

1    Explaining its conclusion that asylum requires a lower standard of proof, the *Cardoza-*

2    *Fonseca* Court cited a vivid example from the work of a leading scholar of refugee law, who had

3    written that "well-founded fear" would logically follow if "it is known that in the applicant's country

4    of origin *every tenth adult male* is either put to death or sent to some remote labor camp."  480 U.S.

5    at 431 (emphasis added).  Parsing the international law standard on which Congress had relied in the

6    1980 Act, the Court found that "[t]here is simply no room in the United Nations' definition [of

7    asylum] for concluding that because an applicant only has a 10% chance of being shot, tortured, or

8    otherwise persecuted … he or she has no 'well-founded fear' of the event happening."  *Id.* at 440

9    (citation omitted).  According to the Court, Congress clearly believed that a standard higher than

10   10% was unduly onerous.  Particularly since a refugee must often leave a place of danger hurriedly

11   and must then reconstruct past events thousands of miles away to gain asylum, insistence on a

12   preponderance standard would provide inadequate protection.

13   Withholding and CAT relief are inherently more contingent and fragile.  Neither withholding

14   nor CAT relief vitiate an already-entered removal order or permit the applicant to adjust to lawful

15   permanent resident (LPR) status.  *See Guerrero-Sanchez v. Warden*, 905 F.3d 208, 216 (3d Cir.

16   2018).  In contrast, an asylee may after one year adjust to LPR status.  8 U.S.C. § 1159(a)(1)-(2).

17   In addition, a grant of asylum, as opposed to withholding or CAT relief, has significant

18   consequences for family reunification.  Congress provided that the spouse and children of an asylee

19   may be granted the very same lawful status when "accompanying, or following to join" a recipient

20   of the asylum.  8 U.S.C. §§ 1158(b)(3)(A), 1157(c)(2)(A).  Recipients of withholding and CAT relief

21   lack this statutory opportunity.

22   Withholding and CAT relief are thus inadequate substitutes for asylum.  Congress was surely

23   aware of this stark difference when it authorized broad threshold eligibility for asylum seekers

24   arriving at any point along the border.  In relegating asylum seekers arriving at an undesignated

25   border point to more contingent and demanding remedies such as withholding and CAT relief, the

26   new DHS rule clashes with the INA's overall scheme.

27

28

Case No.  3:18-cv-06810-JST                                    BRIEF AMICUS CURIAE IN SUPPORT
                                                                                OF PLAINTIFFS

1

2

**II      IIRIRA's Conjunction Of Detailed Procedural Limits On Asylum With Threshold Eligibility For Arriving Asylum Seekers Occupies The Field That The New DHS Rule Purports To Cover**

3       IIRIRA was a fraught and hard-fought compromise between the threshold eligibility for

4   asylum affirmed in § 1158(a)(1) and rigorous procedural limits on asylum secured by legislators who

5   contended that the border was in "crisis."  *See* Smith Stmt. 2.  The legislative deal emerged from

6   multiple congressional hearings featuring representatives from a myriad of stakeholders, followed by

7   intensive negotiations and consultation with the White House.  *See* Schmitt, *Bill to Limit*

8   *Immigration Faces a Setback in Senate*, N.Y. Times, Mar. 14, 1996, at B12 (discussing complex

9   legislative maneuvering prior to IIRIRA's passage); *see also* Simpson Stmt. 13 (noting that in the

10  "early 1980's [in preparation for enactment of the Immigration and Control Act of 1986] we held 22

11  hearings" and asserting that, "I don't want to have that many again").  The new DHS rule disrupts

12  that exacting legislative agreement.

13       In 1996, Congress—even as it enacted the clear language on threshold eligibility for

14  asylum—enacted significant procedural curbs.  Most importantly, Congress authorized expedited

15  removal for foreign nationals arrested at or near a U.S. border or port of entry, 8 U.S.C.

16  §§ 1225(b)(1)(A)(i), (ii), required detention of foreign nationals arrested at or near the border, *id.*

17  § 1225(b)(1)(B)(ii), limited the time in which to file asylum applications, *id.* § 1158(a)(2)(B), and

18  authorized the U.S. government to enter into agreements with foreign countries to safely house

19  asylum applicants pending a "full and fair" adjudication in those countries of the individual's claim

20  for asylum or related protection, *id.* § 1158(a)(2)(A).  Each of these restrictions flowed from

21  Congress's concern that the absence of such restrictions would increase unauthorized border

22  crossings, particularly along the boundary between the United States and Mexico.

23       Many legislators accepted these restrictions with great reluctance.[1]  Each of the restrictions

24  has elicited ongoing policy debate, and at least two of the curbs—expedited removal and mandatory

25  detention—continue to face legal challenges.  The debate about including these restrictions

26

27  _____

[1]      *See* 142 Cong. Rec. 26703 (Sept. 30, 1996) (remarks of Sen. Leahy) (arguing that World War II refugees could have been "summarily excluded" from United States under expedited removal provisions).

28

7

1   highlights the perils of construing IIRIRA as authorizing additional atextual restrictions imposed

2   unilaterally by the executive branch.  Additional categorical restrictions not contemplated by

3   Congress would distort the difficult compromise Congress reached in 1996.  That risk is even more

4   dire when the executive branch's curbs modify IIRIRA's clear language on asylum eligibility.

5       **A.      Expedited Removal**

6       The most prominent procedural restriction on asylum in IIRIRA is its provisions for

7   "expedited removal" of arriving foreign nationals.  Expedited removal directly addresses the border

8   pressures that concerned Congress.  Under the provisions, immigration officers who apprehend a

9   foreign national arriving in the United States without a visa may summarily order the removal of that

10  person "*without further hearing or review*."  8 U.S.C. § 1225(b)(1)(A)(i) (emphasis added).

11  Apprehended individuals receive no hearing of any kind before an immigration judge in the

12  Department of Justice's Executive Office for Immigration Review (EOIR).  Instead, U.S.

13  immigration officers may on an expedited basis determine that migrants are removable and may then

14  effect that removal.

15      Removal power is subject to only one caveat, which is relevant to the legality of the new

16  rule.  The expedited removal provisions require additional procedures for an arriving foreign

17  national who "indicates either an intention to apply for asylum under section 1158 … or a fear of

18  persecution."  8 U.S.C. § 1225(b)(1)(A)(ii).  In such instances, further steps are necessary.

19  Importantly, this statutory exception expressly tracks the INA's language on threshold eligibility for

20  asylum.  First, the caveat on expedited removal provides a cross-reference to § 1158 (the asylum

21  procedure provision), which includes express mention of threshold eligibility.  Second, and even

22  more clearly, Congress in the *very first subsection* of the expedited removal provisions inserted

23  language that is virtually identical to the language it used in § 1158, making the provision applicable

24  to an alien who is "present in the United States" or who "arrives in the United States (*whether or not*

25  *at a designated port of arrival* … )."  *Id.* § 1225(a)(1) (emphasis added).

26      Under expedited removal, persons asserting a claim for asylum "whether or not at a

27  designated port of arrival" get only an interview with an asylum officer, who determines whether the

28

8

applicant has a "credible fear" of persecution.  8 U.S.C. § 1225(b)(1)(B)(ii).  If the asylum officer

decides that the applicant lacks a credible fear, the asylum officer shall order the removal of the

applicant "without further hearing or review."  *Id.* § 1225(b)(1)(B)(iii)(I).

The only procedural safeguard provided in this situation is a nonadversarial hearing before an

immigration judge, held very quickly after the determination of no credible fear, consistent with the

statutory requirement to conduct the review "as expeditiously as possible."  8 U.S.C.

§ 1225(b)(1)(iii)(III).  Applicants only receive an adversarial hearing before an immigration judge if

the asylum officer determines that the applicant *has* a "credible fear" of persecution.  *Id.*

§ 1225(b)(1)(B)(ii).  Moreover, the asylum seeker may be detained for the pendency of the EOIR

proceeding.  *Id.*  The rigorous procedural gauntlet established by Congress's detailed expedited

removal process indicates that Congress was fully mindful of the issue of border inflow that the new

DHS rule purports to address.

**B.      The 1-Year Rule for Asylum Applications**

As part of its extensive web of detailed procedural restrictions on asylum, IIRIRA also

imposed a significant temporal limit on filing of asylum applications.  Absent "changed … or

extraordinary circumstances," an applicant has to file for asylum "within 1 year" of the applicant's

arrival in the United States.  *See* 8 U.S.C. §§ 1158(a)(2)(B), (D).  The one-year rule drastically

narrows the relief available to persons who entered the United States at an undesignated border

point.  *See* Schrag et al., *Rejecting Refugees: Homeland Security's Administration of the One-Year

Bar to Asylum*, 52 Wm. & Mary L. Rev. 651, 666 (2010).

Under the 1-year rule, a foreign national in the United States, including one who has entered

the United States at an undesignated border location (EWI) has only a year to file an asylum claim

"affirmatively" (i.e., on his or her own initiative) or assert an asylum claim "defensively" to gain

relief in removal proceedings.  Congress was well aware that EWIs filed asylum claims after their

entry.  *See* Simpson Stmt. 23.  If Congress wished to categorically curtail these post-entry asylum

applications by EWIs, it could have simply precluded *all* such claims.  Moreover, legislators would

likely have viewed enactment of the one-year rule as less urgent if Congress had empowered

BRIEF AMICUS CURIAE IN SUPPORT
                                                                                                    OF PLAINTIFFS

1    immigration officials to categorically deny EWIs' asylum claims, as the new DHS rule provides.

2    Congress's choice of the time limit, instead of direct curbs on asylum-seekers' manner of entry,

3    shows that Congress chose to preserve threshold eligibility but subject it to significant restraints.

4    Again, the new DHS rule undermines Congress's carefully calibrated compromise.

5          **C.     Provision for Safe Third Country Agreements**

6          Yet another procedural limitation in IIRIRA is contingent but potentially momentous

7    regarding the border: the provision for establishment of "[s]afe third country" agreements.  8 U.S.C.

8    § 1158(a)(2)(A).  Under this provision, the United States would be able to remove an asylum

9    applicant to another country, if the United States and that country had entered into a bilateral

10   agreement to that effect or each was a party to a multilateral agreement on the subject.  Removal

11   under this provision would require a finding by the Attorney General that the country receiving

12   transferees would not threaten them with persecution.  In addition, transfer would have to include

13   access to a "full and fair procedure" for adjudicating the applicant's asylum petition.  *Id.*

14         Congress clearly intended the safe third country concept to provide a potential safety valve

15   for pressure from border inflows.  *See* Simpson Stmt. 23 (criticizing "people fleeing … just wanting

16   to get out of their country … [t]hey go through three or four other countries and get here and say

17   they are seeking asylum").  An agreement with another country that met the conditions set out above

18   would relieve pressure at U.S. borders.  Although the provision does not identify any possible third

19   countries by name, the contiguity of Mexico with the United States suggests strongly that legislators

20   contemplated Mexico as a plausible partner with the United States on such arrangements.

21         As with the other procedural restrictions mentioned in this part, the safe third country

22   provision has elicited widespread criticism from refugee advocates and legal scholars.  Congress was

23   willing to take this risk to ease pressure on the border.  Here, too, however, the detailed nature of

24   Congress's restriction illuminates Congress's reinforcement of threshold eligibility in cases when a

25   safe third country agreement cannot be reached.  Given the level of detail in Congress's restrictions,

26   the additional categorical limits on threshold eligibility in the new DHS rule are simply not

27   "consistent" with the INA's asylum provisions, as the statute requires.  8 U.S.C. § 1158(b)(2)(C).

28

III     **Based On The Statutory Scheme And Past Practice, The Exercise Of Discretion To Deny Asylum Based On An Applicant's Manner Of Entry Should Be Case-by-Case, Not Categorical**

Based on past practice, immigration officials have viewed discretion as applying on a case-by-case basis.  As asylum law has matured since 1980, certain uses of discretion have hardened into categorical bars, often with express statutory authorization.  However, longtime administrative precedent indicates that an applicant's manner of entry into the United States should be considered on a case-by-case basis, not as a categorical bar.  *See Pula*, 19 I. & N. Dec. at 473.

Outside of statutory bars such as disqualification based on a "particularly serious crime," 8 U.S.C. § 1158(b)(2)(A)(ii), agency practice has disfavored categorical bases for denial.  For example, in *Matter of A-H-*, 23 I. & N. Dec. 774, 780-83 (A.G. 2005), the Attorney General determined that the exercise of discretion to deny asylum was appropriate regarding a former senior political official in an Algerian organization that collaborated with groups notorious for terrorist violence.  Yet, even in this charged setting, the Attorney General considered the "equities that weigh in the respondent's favor," including his United States-citizen children.  *Id.* at 783.  It would be incongruous to exercise case-by-case discretion in cases of political violence, yet resort to categorical rules to deny asylum seekers who merely arrive at undesignated border locations.

Indeed, the asylum regulations even restrict *case-by-case* discretionary denials.  For example, the regulations require that when an applicant receives withholding of removal *after* a discretionary denial of asylum, the denial of asylum "shall be reconsidered."  8 C.F.R. 208.16(e).  The regulation requires reconsideration to minimize hardship to the applicant's "spouse or minor children," who in the event of an asylum grant would be able to join the applicant in the United States.  *See id.*; *see also* 8 U.S.C. § 1158(b)(3)(A) (granting asylum status to spouse and children "accompanying, or following to join," the asylee); *cf. Pula*, 19 I. & N. Dec. at 474 (exercise of discretion to deny an asylum claim triggers "particular concern" when a claimant proves "well-founded fear" for asylum but "cannot meet the higher burden required for withholding of deportation… [d]eportation to a country where the alien may be persecuted thus becomes a strong possibility").  To be sure, this regulation does not *mandate* that the decisionmaker reverse a prior discretionary denial.  Yet, the

11

BRIEF AMICUS CURIAE IN SUPPORT
                                                                  OF PLAINTIFFS

1  reconsideration that the rules require illustrates the agency's well-established awareness of the

2  adverse and lasting consequences of discretionary denials and their tension with statutory

3  protections, including provisions for prompt family reunification.  The new DHS rule, promulgated

4  without prior notice and comment, has jettisoned the regulations' focus on these statutory goals.

5        Past practice has particularly disfavored categorical rules regarding an asylum applicant's

6  manner of entry.  The Board of Immigration Appeals (BIA) has held that manner of entry "should

7  not be considered in such a way that the practical effect is to deny relief in virtually all cases."

8  *Matter of Pula*, 19 I. & N. Dec. at 473.  Because asylum seekers are often fleeing for their lives and

9  cannot pick and choose their mode of border-crossing, categorical use of undesignated-entry-point

10  arrival to deny asylum claims would risk barring a substantial number of valid asylum claims.

11  Consequently, the BIA has held that manner of entry "should not be considered in such a way that

12  the practical effect is to deny relief in virtually all cases," but should instead be considered as "only

13  one of a number of factors which should be balanced in exercising discretion."  *Id.*  If

14  decisionmakers should temper the exercise of negative discretion, as in *Pula*, even when addressing

15  the use of fraudulent exit documents, then past practice surely counsels similar care regarding arrival

16  at an undesignated entry point, which does not in itself involve fraud at all.  The new DHS rule's

17  abrupt pivot to categorical denial of asylum is thus inconsistent with longtime administrative

18  construction of the statutory scheme.

19        The specificity of the statutory scheme rules out any additional increment of authority for the

20  President under 8 U.S.C. § 1182(f).  When Congress has enacted a specific scheme that is later in

21  time than an earlier, more amorphous provision, the later, more specific scheme should govern.  *See*

22  *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000).  Here Congress enacted the

23  current language on threshold asylum eligibility in 1996, forty-five years after enactment of

24  § 1182(f).  *See* Pub. L. No. 82-414, § 212, 66 Stat. 163, 188 (1952).

25        In *Trump v. Hawaii*, 138 S. Ct. 2392 (2018), the Supreme Court read § 1182(f) broadly.

26  However, that broad construction flowed from the Court's view that the INA's nondiscrimination

27  provision, 8 U.S.C. § 1152(a)(1)(A), should be read narrowly to bar only discrimination in the

28

1    issuance of immigrant visas, not decisions about who should enter the United States.  *Id*. at 2414-15.

2    In contrast, the threshold asylum eligibility language in § 1158(a)(1), read together with IIRIRA's

3    expedited removal provisions containing virtually identical phrasing, demonstrates Congress's

4    enactment of a specific framework that covers the field.  The INA's asylum provision already

5    provides for executive discretion, as long as that discretion is "consistent with this section."  *Id*.

6    § 1158(b)(2)(C).  Under the circumstances, resorting to § 1182(f) to broaden the scope of executive

7    discretion would upset the framework that Congress labored to craft in 1996.

8                                              **<u>CONCLUSION</u>**

9            For the foregoing reasons, Plaintiffs' motion for a preliminary injunction should be granted.

10

11   DATED: December 5, 2018                       Respectfully submitted,

12

13   PETER S. MARGULIES (*pro hac vice*)           By:      /s/ David C. Marcus
     Roger Williams University School of Law[*]     DAVID C. MARCUS (SBN: 158704)
14   10 Metacom Avenue                             david.marcus@wilmerhale.com
     Bristol, RI 02809                             WILMER CUTLER PICKERING
15   Telephone: 401 254 4564                         HALE AND DORR LLP
                                                   350 South Grand Avenue, Suite 2100
16   SHOBA SIVAPRASAD WADHIA (*pro hac vice*)      Los Angeles, CA 90071
     Penn State Law[*]                             Telephone: 213 443 5312
17   329 Innovation Blvd., Suite 118              Facsimile: 213 443 5400
     University Park, PA 16802
18   Telephone: 814 865 3823

19

20

21

22

23

24

25

26

27   [*]      University affiliations are listed solely for informational purposes.

28
                                              13

**APPENDIX: LIST OF AMICI**[*]

Sabrineh Ardalan, Assistant Clinical Professor of Law
        Harvard Law School

Linda Bosniak, Professor of Law
        Rutgers Law School

Jason Cade, Associate Professor of Law
        University of Georgia School of Law

Jennifer M. Chacón, Professor of Law
        UCLA School of Law

Gabriel J. Chin, Professor of Law
        University of California, Davis School of Law

Marisa Cianciarulo, Professor, Associate Dean
        Chapman University Dale E. Fowler School of Law

Alina Das, Professor of Clinical Law
        New York University School of Law

Ingrid V. Eagly, Professor of Law
        University of California, Los Angeles School of Law

Maryellen Fullerton, Interim Dean and Professor of Law
        Brooklyn Law School

Denise L. Gilman, Clinical Professor
        University of Texas at Austin School of Law

Pratheepan Gulasekaram, Professor of Law
        Santa Clara University School of Law

Margaret Hu, Associate Professor of Law
        Washington and Lee School of Law

Alan Hyde, Distinguished Professor of Law
        Rutgers Law School

Kate Jastram, Professor of Law
        University of California Hastings College of the Law

---

[*]    University affiliations are listed solely for informational purposes.

A1

Anil Kalhan, Professor of Law
     Drexel University Thomas R. Kline School of Law

Daniel Kanstroom, Professor of Law
     Boston College Law School

Linda Kelly, Professor of Law
     Indiana University Robert H. McKinney School of Law

Stephen Legomsky, Professor Emeritus
     Washington University Law

Matthew Lindsay, Associate Professor of Law
     University of Baltimore School of Law

Peter S. Margulies, Professor of Law
     Roger Williams University School of Law

M. Isabel Medina, Professor of Law
     Loyola University New Orleans College of Law

Michael Olivas, William B. Bates Distinguished Chair in Law
     University of Houston Law Center

Jaya Ramji-Nogales, Associate Dean for Academic Affairs
     Temple Beasley School of Law

David Rubenstein, Professor of Law
     Washburn University School of Law

Andrew Schoenholtz, Professor from Practice
     Georgetown University Law Center

Anita Sinha, Assistant Professor of Law
     American University Washington College of Law

Juliet Stumpf, Professor of Law
     Lewis & Clark Law School

Philip L. Torrey, Lecturer on Law
     Harvard Law School

Shoba Sivaprasad Wadhia, Professor of Law
     Penn State Law

A2

BRIEF AMICUS CURIAE IN SUPPORT
OF PLAINTIFFS