1  XAVIER BECERRA
   Attorney General of California
2  MICHAEL L. NEWMAN
   Senior Assistant Attorney General
3  CHRISTINE CHUANG
   Supervising Deputy Attorney General
4  JAMES F. ZAHRADKA II (SBN 196822)
   VILMA PALMA-SOLANA
5  SHUBHRA SHIVPURI
   Deputy Attorneys General
6    1515 Clay Street, 20th Floor
     Oakland, CA 94612-0550
7    Telephone: (510) 879-1247
     E-mail: James.Zahradka@doj.ca.gov
8  *Attorneys for the State of California*

9                IN THE UNITED STATES DISTRICT COURT

10           FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12  **East Bay Sanctuary Covenant; Al Otro Lado;**      Case No. 3:18-cv-06810-JST
    **Innovation Law Lab; and Central American**
13  **Resource Center in Los Angeles,**

14                                      Plaintiffs,     **AMICUS CURIAE BRIEF OF THE**
                                                        **STATES OF CALIFORNIA,**
15          v.                                          **WASHINGTON, MASSACHUSETTS,**
                                                        **NEW YORK, CONNECTICUT, HAWAII,**
16                                                      **ILLINOIS, MARYLAND, MINNESOTA,**
                                                        **NEW JERSEY, OREGON, VERMONT,**
17  **Donald J. Trump, President of the United**        **AND THE DISTRICT OF COLUMBIA IN**
    **States, in his official capacity; Matthew G.**    **SUPPORT OF PLAINTIFFS**
18  **Whitaker, Acting Attorney General, in his**
    **official capacity; U.S. Department of Justice;**
19  **James McHenry, Director of the Executive**        Date:       December 19, 2018
    **Office for Immigration Review, in his official**  Time:       9:30 a.m.
20  **capacity; the Executive Office for Immigration**  Dept:       9
    **Review; Kirstjen M. Nielsen, Secretary of**       Judge:      Hon. Jon S. Tigar
21  **Homeland Security, in her official capacity;**    Trial Date: None
    **U.S. Department of Homeland Security; Lee**       Action Filed: November 9, 2018
22  **Francis Cissna, Director of the U.S. Citizenship**
    **and Immigration Services, in his official**
23  **capacity; U.S. Citizenship and Immigration**
    **Services; Kevin K. McAleenan, Commissioner**
24  **of U.S. Customs and Border Protection, in his**
    **official capacity; U.S. Customs and Border**
25  **Protection; Ronald D. Vitiello, Acting Director**
    **of Immigration and Customs Enforcement, in**
26  **his official capacity; Immigration and Customs**
    **Enforcement,**
27
                                       Defendants.
28

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND STATEMENT OF INTEREST ............................................................... 1

ARGUMENT ............................................................................................................................... 2

      A.    Defendants' Policies Trap Asylum Seekers at the Border While Effectively Refusing to Accept Their Applications. .................................. 2

      B.    The Rule Will Exacerbate Inhumane Border Conditions and Cause Additional Trauma to Already Vulnerable Migrants. ............................... 4

      C.    The States will be harmed by the effects of the Rule. ............................... 7

      D.    A Preliminary Injunction is in the Public Interest Because the Rule Violates the Law. ............................................................................... 10

           1.    The Rule Is Arbitrary and Capricious Under the APA. ............... 10

           2.    The Rule Was Improperly Promulgated Without Notice and Comment. ................................................................................. 14

CONCLUSION ........................................................................................................................... 17

# TABLE OF AUTHORITIES

**Page**

CASES

*Action on Smoking and Health v. Civil Aeronautics Bd.*
713 F.2d 795 (D.C. Cir. 1983) ...................................................................15

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*
273 F.3d 1229 (9th Cir. 2001) ...................................................................12

*Buschmann v. Schweiker*
676 F.2d 352 (9th Cir. 1982) .....................................................................15

*Cal-Almond, Inc. v. U.S. Dep't of Agric.*
14 F.3d 429 (9th Cir. 1993) ........................................................................15

*California v. Health & Human Servs.*
281 F. Supp. 3d 806 (N.D. Cal. 2017) ......................................................17

*Casa de Maryland, Inc. v. Trump*
2018 WL 6192367 (D. Md. Nov. 28, 2018) ..............................................13

*Centro Presente v. United States Dep't of Homeland Sec.*
2018 WL 3543535 (D. Mass. July 23, 2018) ......................................13, 14

*Citizens to Preserve Overton Park, Inc. v. Volpe*
401 U.S. 402 (1971) ...................................................................................12

*East Bay Sanctuary Covenant v. Trump*
2018 WL 6053140 (N.D. Cal. Nov. 19, 2018) ................................. *passim*

*Golden Gate Rest. Ass'n v. City & Cty. of S.F.*
512 F.3d 1112 (9th Cir. 2008) .....................................................................2

*Hernandez v. Sessions*
872 F.3d 976 (9th Cir. 2017) ........................................................................2

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*
407 F.3d 1250 (D.C. Cir. 2005) ............................................................15, 17

*Latino Issues Forum v. U.S. EPA*
558 F.3d 936 (9th Cir. 2009) ......................................................................12

*Marsh v. Oregon Nat. Res. Council*
490 U.S. 360 (1989) ....................................................................................12

*Michigan Citizens for an Indep. Press v. Thornburgh*
1988 WL 90388 (D.D.C. 1988) ..................................................................10

ii

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3

*Michigan v. EPA*
    135 S.Ct. 2699 (2015) ...............................................................................10

4

*Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Automobile Ins. Co.*
    463 U.S. 29 (1983) .............................................................................10, 11

5

6

*Ms. L. v. U.S. Immig. & Customs Enf't*
    302 F. Supp. 3d 1149 (S.D. Cal. 2018) ....................................................13

7

*Ms. L. v. U.S. Immig. & Customs Enf't*
    310 F. Supp. 3d 1133 (S.D. Cal. 2018) ......................................................2

8

9

*Paulsen v. Daniels*
    413 F.3d 999 (9th Cir. 2005)...............................................................14, 15

10

*R.I.L-R v. Johnson*
    80 F. Supp. 3d 164 (D.D.C. 2015) ............................................................13

11

12

*Ramos v. Nielsen*
    2018 WL 4778285 (N.D. Cal. Oct. 3, 2018)........................................13, 14

13

14

*Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*
    279 F. Supp. 3d 1011 (N.D. Cal. 2018) ....................................................10

15

*Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*
    298 F. Supp. 3d 1304 (N.D. Cal. 2018) ....................................................13

16

17

*Riverbend Farms, Inc. v. Madigan*
    958 F.2d 1479 (9th Cir. 1992)...........................................................14, 15

18

19

*Serv. Emps. Int'l Union, Local 102 v. County of San Diego*
    60 F.3d 1346 (9th Cir. 1994)...................................................................15

20

*Stormans, Inc. v. Selecky*
    586 F.3d 1109 (9th Cir. 2009).................................................................2

21

22

*Texas Children's Hosp. v. Burwell*
    76 F. Supp. 3d 224 (D.D.C. 2014) ...........................................................10

23

24

*United States v. Valverde*
    628 F.3d 1159 (9th Cir. 2010).............................................................15, 16

25

26

*Winter v. Nat. Res. Def. Council, Inc.*
    555 U.S. 7 (2008) ....................................................................................2

27

28

iii

## TABLE OF AUTHORITIES
### (continued)

Page

*Yassini v. Crosland*
    618 F.2d 1356 (9th Cir. 1980)...................................................................................16

**STATUTES**

5 United States Code

    § 553(a)(1)...................................................................................................................16
    § 553(b)(B)..................................................................................................................15
    § 553(c).........................................................................................................................17
    § 553(d)........................................................................................................................15
    § 706(2)(A)............................................................................................................11, 12
    § 706(2)(B).................................................................................................................12

**CONSTITUTIONAL PROVISIONS**

Fifth Amendment .........................................................................................................13

**OTHER AUTHORITIES**

83 Fed. Reg. 45486 .......................................................................................................7

83 Fed. Reg. 45519 .......................................................................................................7

83 Fed. Reg. 55934 ..................................................................................................1, 11

83 Fed. Reg. 55935 ................................................................................................11, 13

83 Fed. Reg. 55936 ......................................................................................................11

83 Fed. Reg. 55944 ......................................................................................................11

83 Fed. Reg. 55945 ......................................................................................................11

83 Fed. Reg. 55946 ......................................................................................................11

83 Fed. Reg. 55947 ................................................................................................11, 13

83 Fed. Reg. 55948 ................................................................................................11, 12

83 Fed. Reg. 55949 ......................................................................................................11

83 Fed. Reg. 55950 ..........................................................................................13, 15, 16

83 Fed. Reg. 55951 ................................................................................................13, 16

1

**TABLE OF AUTHORITIES**
(continued)

2
**Page**

3    Allen Keller, et al., *Pre-Migration Trauma Exposure and Mental Health*
4        *Functioning among Central American Migrants Arriving at the US Border* ......................4, 5

5    Amnesty International, *USA: "You Don't Have Any Rights Here"* (Oct. 2018) ............................3

6    Anna Gorman, *Medical Clinics that Treat Refugees Help Determine the Case for*
         *Asylum*, NPR (July 10, 2018)........................................................................................9
7
8    Beth Fertig, *Unaccompanied Minors Have Tougher Time Winning Asylum*,
         WNYC (June 6, 2018)...................................................................................................7

9    Camila Domonoske, *Fact Check: What's Happening on the U.S.-Mexico Border?*
10       NPR (Nov. 27, 2018) ...................................................................................................4

11   Catherine E. Shoichet and Leyla Santiago, *The Tear Gas is Gone. But in This*
         *Shelter at the Border, the Situation Is Getting Worse*, CNN (Nov. 29, 2018).........................5
12
13   Customs and Border Protection (CBP), *Southwest Border Migration FY 2017*...........................3

     CBP, *Southwest Border Migration FY 2019*...............................................................................3
14
15   California Department of Public Health, *Office of Refugee Health*...........................................9

16   California Department of Social Services (CDSS), *Immigration Branch*
         *Immigration Services Funding Tentative Award Announcement* (Oct. 31, 2017) .....................1
17
     CDSS, *Immigration Services Contractors* ...............................................................................1, 8
18
     CDSS, *Immigration Services Program Update* (Mar. 2018)...................................................1, 2
19
20   CDSS, *Refugees, Asylees, and Trafficking Victims*......................................................................8

21   CDSS, *Unaccompanied Undocumented Minors Legal Services Funding*
         *Contractor Referral List*................................................................................................1
22
     Center for Constitutional Rights, *Al Otro Lado v. Kelly* ..............................................................4
23
24   Christine Murray, *Ailing Central American Migrants in Dire Conditions Dig in at*
         *U.S. Border*, Reuters (Nov. 28, 2018).........................................................................5
25
     Christopher Ingraham, *There's No Immigration Crisis, and These Charts Prove It*,
         Wash. Post (June 21, 2018)........................................................................................11
26
27   County of L.A., Dep't of Soc. Services, *Refugee Employment Program* .......................................8

28

v

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3     Cristina Rendon, *Salvadorian Woman Nervously Awaits Contact from Son Seeking
          Asylum at US-Mexico Border*, Fox KTVU (Nov. 26, 2018)...................................6
4

5     Dara Lind, *Even Before the Caravan, Trump Took Steps to Use Travel Bans to
          Limit Asylum*, Vox (Nov. 6, 2018) .................................................................14

6
      Department of Homeland Security (DHS) Office of Inspector General, *DHS
7         Implementation of Executive Order #13769 "Protecting the Nation From
          Foreign Terrorist Entry Into the United States"* (Jan. 18, 2018) ...........................14
8
      DHS Office of Inspector General, *Special Review – Initial Observations
9         Regarding Family Separation Issues Under the Zero Tolerance Policy* (Sept.
          27, 2018) ..............................................................................................3
10
11    DHS, *Individuals Granted Asylum Affirmatively Or Defensively: Fiscal Years
          1990 To 2016* (Jan. 8, 2018)...........................................................................7
12
      DHS, *Myth vs. Fact: Asylum Proclamation and Rule* (Nov. 9, 2018)...........................12
13
      Donald J. Trump (@realDonaldTrump), Twitter (Nov. 18, 2018, 10:42 AM)................3
14

15    Donald J. Trump (@realDonaldTrump), Twitter (Oct. 22, 2018, 5:37 AM)..................14

16    Elliot Spagat, *More Caravan Migrants Arrive in Tijuana, Brace for Long Stay*,
          Fox News (Nov. 15, 2018)..............................................................................6
17
      Fox News, *Secretary Nielsen Talks Immigration, Relationship with Trump* (May
18        15, 2018) .....................................................................................................3

19    Int'l Rescue Comm., *The IRC in Los Angeles, CA.* .................................................9

20    Josiah Heyman and Jeremy Slack, *Blockading Asylum Seekers at Ports of Entry at
          the US-Mexico Border Puts Them at Increased Risk of Exploitation, Violence,
21        and Death*, Ctr. for Migration Studies (June 25, 2018) ......................................6

22    Kate Linthicum, *Rain Turns Migrant Camp in Tijuana into a Miserable, Muddy
          Pit*, L.A. Times (Nov. 29, 2018) .....................................................................5
23

24    Leah McDonald, *Mayor of Tijuana Said the $30,000-a-Day Funding to Assist with
          Caravan of 6,000 Central American migrants Is About to Run Out*, Daily Mail
25        (Nov. 28, 2018) ............................................................................................6

26    Lisa Desjardins, *How Trump Talks About Race*, PBS News Hour (Aug. 22, 2017) ...........14

27    Medicins Sans Frontieres, *Forced to Flee Central American's Northern Triangle:
          A Neglected Humanitarian Crisis* (May 2017) ..................................................4
28

vi

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3  Molly Hennessy-Fiske, *Why and How Are Asylum Seekers Entering the U.S.?*,
     L.A. Times (Nov. 22, 2018) ........................................................................6
4

5  Nadwa Mossad and Ryan Baugh, *Refugees and Asylees: 2016*, DHS Off. of
     Immig. Statistics (Jan. 2018) .....................................................................7
6

   Off. of Refugee Resettlement, *Unaccompanied Alien Children Released to
7    Sponsors by State* (last updated Nov. 29, 2018) ........................................7

8  Opening Doors, *Refugee Programs* ...................................................................9

9  Overview of Ready California (2018) ...............................................................1

10 Ready California, *One California: Immigration Services Funding* (July 28, 2017) ...............1

11 Sarah Kinosian and Joshua Partlow, *LGBT Asylum Seekers Are First to Reach the
     U.S. Border from the Caravan. Now They Wait.*, Wash. Post (Nov. 13, 2018) ...............6
12

13 Sarah Kinosian et al., *Mexico Begins Moving Caravan Migrants to New Shelter
     but Faces Mistrust*, Wash. Post (Nov. 30, 2018) ........................................5
14

15 Sarah Kinosian, *Migrants at Mexico Border Face an Uncertain Future on Their
     Own*, The Guardian (Dec. 1, 2018) ...........................................................2

16 Scott Pelley, *The Chaos Behind Donald Trump's Policy of Family Separation at
     the Border*, CBS (Nov. 26, 2018) ..............................................................13
17

18 SF-CAIRS*, Social Services and Mental Health*...............................................9

19 SF-CAIRS, *Refugee & Asylee Benefits* ..........................................................8

20 Syracuse U. Transactional Records Access Clearinghouse, *Individuals in
     Immigration Court by Their Address* .........................................................7
21

22 Ted Hesson, *Trump Has Whipped up a Frenzy on the Migrant Caravan*, Politico
     (Oct. 23, 2018) .......................................................................................14
23

24 U. of Cal. Hastings Coll. of the L., *Gender and Refugee Studies* ....................8

25 U. of Cal., Irvine Sch. of L., *Immigrants' Rights Clinic* ...................................8

   U. of Cal.-Davis Sch. of L. *Immigration Law Clinic* ......................................8
26

27 UNICEF, *Statement on Situation of Migrant Children at Mexico-U.S. Border*
     (Nov. 28, 2018) ......................................................................................5

28

vii

## TABLE OF AUTHORITIES
### (continued)

Page

Vivian Salama, *Trump Claims Women 'Are Raped at Levels Never Seen Before'
During Immigrant Caravan*, NBC News (Apr. 5, 2018) ..........................................................14

White House, *Framework on Immigration Reform & Border Security* (Jan. 25,
2018) ..........................................................................................................................................12

White House, *Presidential Proclamation Addressing Mass Migration Through the
Southern Border of the United States* (Nov. 9, 2018) ..............................................................12

viii

**INTRODUCTION AND STATEMENT OF INTEREST**

1
2
3
4
5
6
7
8
9
10
11
12
13

The States of California, Washington, Massachusetts, New York, Connecticut, Hawaii, Illinois, Maryland, Minnesota, New Jersey, Oregon, Vermont, and the District of Columbia (the States) respectfully submit this brief as amici curiae in support of plaintiffs' motion for a preliminary injunction suspending the Interim Final Rule: Aliens Subject to a Bar on Entry under Certain Presidential Proclamations; Procedures for Protection Claims (the Rule), 83 Fed. Reg. 55934. The States have strong interests in the issues raised by plaintiffs' motion. The States invest significant resources to provide education, health care, and other services to immigrants residing within their borders, including asylum-seekers and asylees, in order to appropriately transition them into life in our States. Further, the States have a strong interest in ensuring that their interests and the interests of their residents are considered when important proposed agency actions are proposed, and in ensuring that federal agencies refrain from rulemaking that violates the law and Constitution.

The State of California has a particular interest in this matter. California's Department of Social Services (CDSS) funds three of the plaintiff organizations (East Bay Sanctuary Covenant [EBSC], Al Otro Lado, and Central American Resource Center in Los Angeles [CARECEN-LA]) to provide services to asylum-seekers, among other immigrants.[1] The California Legislature first included funds for immigration services in its 2015 budget, as part of its "One California" Immigration Services Funding program, and has since expanded the scope of this program to include removal defense services and broader forms of affirmative relief.[2] These funds are aimed at increasing "access to immigration legal services and information about constitutional rights so that immigrants in our state can protect themselves and their families."[3] CDSS also provides

---

[1] CDSS, *Immigration Services Contractors*, https://tinyurl.com/Cal-DSS-ISC. For fiscal year 2017-18, CDSS provided over $41 million, including $697,350 to EBSC and $2,387,500 to CARECEN-LA. CDSS, *Immigration Branch Immigration Services Funding Tentative Award Announcement* (Oct. 31, 2017), https://tinyurl.com/Cal-DSS-ISawards. Al Otro Lado is a subcontractor of grantee International Institute of LA, which received $752,900 in the last fiscal year. Al Otro Lado's portion of this funding is not immediately available.
[2] CDSS, *Immigration Services Program Update* (Mar. 2018); Ready California, *One California: Immigration Services Funding*, (July 28, 2017), https://tinyurl.com/OneCal-funding.
[3] Overview of Ready California (2018), https://tinyurl.com/ReadyCal.

1

1    funding for organizations—including EBSC and CARECEN-LA[4]—to assist undocumented

2    unaccompanied minors, many of whom have asylum claims.[5]

3          As detailed below, the States support the issuance of a preliminary injunction to preserve the

4    status quo and prevent widespread harm while the validity of the Rule is adjudicated.

5                                              **ARGUMENT**

6          One of the preliminary injunction factors is whether the "injunction is in the public

7    interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *EBSC v. Trump*, 2018 WL

8    6053140, at *19–20 (N.D. Cal. Nov. 19, 2018).[6] The public interest strongly favors plaintiffs as

9    evidenced, in part, by the significant harm that the States will suffer if the preliminary injunction

10   is not issued and because the Rule violates the APA and the Constitution.

11        **A.    Defendants' Policies Trap Asylum Seekers at the Border While Effectively
              Refusing to Accept Their Applications.**
12

13        Defendants' Rule forcing asylum seekers to apply at ports of entry comes on top of existing

14   policies that have choked off the flow of migrants through these channels, creating a massive

15   backlog of people waiting to avail themselves of their right to claim asylum. The interplay of

16   these unsustainable, cruel, and ineffective policies has created an inhumane situation for those

17   affected.

18        Currently, over 6,000 Central American immigrants, including over 1,000 children, are

19   stranded outside ports of entry waiting for an opportunity to present their asylum claims to federal

20   immigration officials.[7] These migrants represent a fraction of U.S. Customs and Border

21        [4] CDSS, *Unaccompanied Undocumented Minors Legal Services Funding Contractor Referral List* (FY2017-18), https://tinyurl.com/ILS-contractors.

22        [5] CDSS, *Immigration Services, supra* note 2 (noting that CDSS provided almost $3 million for these services in FY 2018-19).

23        [6] The public interest is particularly relevant in cases where the impact of an injunction reaches beyond the parties and carries a potential for public consequences. *Stormans, Inc. v.

24   Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009). Further, in cases like this, which affect many non-parties (including the States), courts consider the hardship to third parties as part of the public

25   interest analysis. *See Golden Gate Rest. Ass'n v. City & Cty. of S.F.*, 512 F.3d 1112, 1126 (9th Cir. 2008); *see also Ms. L. v. U.S. Immig. & Customs Enf't*, 310 F. Supp. 3d 1133, 1148 (S.D.

26   Cal. 2018) (considering hardship to third parties in case involving separation of minor immigrant children from parents) (citing *Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017)).

27        [7] Sarah Kinosian, *Migrants at Mexico Border Face an Uncertain Future on Their Own*, The Guardian (Dec. 1, 2018), https://tinyurl.com/Kinosian.

28

                                                   2

Protection's (CBP) monthly southwest border apprehensions; CBP reported 60,745 apprehensions at the southwest border in October 2018—50,975 between ports of entry and 9,770 at ports of entry.[8] Even if all the individuals currently waiting to be processed entered at once, this would constitute less than 10 percent of monthly apprehensions. CBP has dealt with far larger changes in migrant flows in the past; for example, in the 2017 fiscal year, apprehensions and inadmissible entries fluctuated between approximately 16,000 and 67,000 monthly.[9] Thus, their arrival hardly presents an overwhelming "invasion" as the Administration has claimed.[10]

More broadly, defendants' claims that an unprecedented flood of migrants is causing a crisis are not supported by the facts. As CBP's statistics show, apprehensions at the border in recent months are squarely within the historic range, and indeed considerably lower than they have been in prior years (especially 2014).[11] While October 2018 has been at the higher end of the range, it is not even among the top three months.[12]

As the federal government pushes asylum-seekers to ports of entry, it is simultaneously making it difficult or impossible for them to actually apply for asylum. The Department of Homeland Security (DHS) publicly acknowledges that it has been using a "metering" or "queue management" policy, which amounts to a de facto denial of the ability to apply for asylum.[13] A September 2018 report from the DHS Office of Inspector General (OIG) confirmed that "CBP was regulating the flow of asylum-seekers at ports of entry through 'metering'" since at least 2016.[14] OIG described the process: "When metering, CBP officers stand at the international line out in the middle of the footbridges" and turn asylum-seekers away before they can cross onto

---

[8] *See* Administrative Record ("AR") at 447–48; CBP, *Southwest Border Migration FY2019,* https://tinyurl.com/CBP-app-2019.

[9] AR at 350; CBP, *Southwest Border Migration FY2017*, https://tinyurl.com/CBP-FY2017.

[10] *See* Donald J. Trump (@realDonaldTrump), Twitter (Nov. 18, 2018, 10:42 AM), https://tinyurl.com/invasion-tweet ("the U.S. is ill-prepared for this invasion, and will not stand for it").

[11] AR at 301, 347, 373.

[12] *Apprehensions FY 2019,* supra note 8.

[13] Amnesty International, *USA: "You Don't Have Any Rights Here"* (Oct. 2018), https://tinyurl.com/Amnesy-rights; Fox News, *Secretary Nielsen Talks Immigration, Relationship with Trump* (May 15, 2018), https://tinyurl.com/Fox-Nielsen.

[14] OIG, *Special Review – Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy* (Sept. 27, 2018), https://tinyurl.com/OIG-separation.

3

U.S. soil, claiming that there is no space available. *Id.* at 6. CBP instructs officers to "inform individuals that the port is currently at capacity and that they will be permitted to enter once there is sufficient space and resources to process them." *Id.* Legal representatives who accompanied asylum-seekers to ports of entry from 2017 to present have witnessed dozens of people being turned away repeatedly. A lawsuit filed in July 2017 alleges a number of illegal practices at the San Ysidro port of entry, including "falsely representing to individuals that asylum is no longer available in the United States, that asylum seekers need permission from the Mexican government to seek asylum, or that asylum seekers must apply at other locations."[15] Some asylum-seekers were even "threatened and falsely told that if they did not abandon their effort to obtain asylum, they would lose custody of their children." *Id.* As a result of these actions, even before the most recent group of migrants reached the border, the unofficial waiting list administered by asylum-seekers contained 3,000 names, with a month-long projected wait time.[16] Knowing that the Rule would substantially increase the number of asylum-seekers at the ports of entry, the federal government continues these policies, and has made no apparent effort to increase the pace, processing only 40-100 individuals a day at the San Ysidro port of entry.[17]

## B. The Rule Will Exacerbate Inhumane Border Conditions and Cause Additional Trauma to Already Vulnerable Migrants.

As the Administrative Record demonstrates, the Northern Triangle is one of the most violent regions in the world, with conditions "akin to the conditions found in the deadliest armed conflicts in the world today."[18] Asylum-seekers from this region flee from extremely dangerous circumstances, most commonly murders of family members, threats to life or limb, extortion, and

---

[15] Center for Constitutional Rights, *Al Otro Lado v. Kelly*, https://tinyurl.com/AOL-Kelly (discussing *Al Otro Lado, Inc. v. Nielsen*, No. 3:17cv2366 (S.D. Cal., filed July 12, 2017)).
[16] Kinosian, *supra* note 7.
[17] Camila Domonoske, *Fact Check: What's Happening on the U.S.-Mexico Border?*, NPR (Nov. 27, 2018), https://tinyurl.com/Domonoske.
[18] AR at 156–58, 162–63 (Medicins Sans Frontieres, *Forced to Flee Central American's Northern Triangle: A Neglected Humanitarian Crisis* (May 2017) [documenting the reasons for leaving home countries and noting that the violence suffered by people in Northern Triangle is comparable to those in war zones]); *id.* at 161 (noting that homicidal violence in this region has led to significantly more civilian casualties than in any other countries, including countries with armed conflicts or war).

1  domestic violence.[19] Immigrants who flee this violence face additional threats during their

2  journey north, as the Administrative Record also makes clear. Along the route through Mexico

3  and to the United States, immigrants are injured and traumatized from physical violence,

4  abduction, theft, extortion, torture, and rape, perpetrated by gangs and other criminal

5  organizations, or even by Mexican security forces. AR at 156–57, 163–64. Unsurprisingly, these

6  experiences have caused high rates of serious mental health issues, including anxiety, post-

7  traumatic stress disorder and major depressive disorder.[20]

8       This trauma is only exacerbated by defendants' policies, which force migrants to remain

9  at the border while they await entry. Media reports have extensively documented the inhumane

10  conditions outside our ports of entry. The images and stories are grim, as thousands of

11  immigrants, many with young children, are forced to stay in a makeshift camp at a sports

12  complex, a shelter at an abandoned concert venue in one of the most dangerous parts of Tijuana,

13  and on plastic tarps in the streets waiting to be processed by CBP.[21] After multiple instances of

14  rain, the camp at the sports complex became a muddy pit where people lost their limited

15  belongings.[22] The unsanitary conditions "have raised concerns among aid workers and

16  humanitarian organizations that the migrants, packed into a space intended for half their number,

17  are susceptible to outbreaks of disease."[23] Many have developed respiratory infections due to the

18  wet and cold weather, and health officials also reported multiple cases of lice and chicken pox.[24]

19  Children languishing at the border are becoming ill and not attending school, and families are not

20  receiving basic health and social services that the States would otherwise provide, including

21

22       [19] Allen Keller, et al., *Pre-Migration Trauma Exposure and Mental Health Functioning among Central American Migrants Arriving at the US Border*, 12 PloS one e0168692 (Jan. 10, 2017), https://tinyurl.com/Keller-Trauma.

23       [20] *Id.* at 168–69; Keller, *supra* note 19.

24       [21] Catherine E. Shoichet and Leyla Santiago, *The Tear Gas is Gone. But in This Shelter at the Border, the Situation Is Getting Worse*, CNN (Nov. 29, 2018), https://tinyurl.com/Shoichet; Kinosian, *supra* note 7.

25       [22] Kate Linthicum, *Rain Turns Migrant Camp in Tijuana into a Miserable, Muddy Pit*, L.A. Times (Nov. 29, 2018), https://tinyurl.com/Linthicum-LAT.

26       [23] Sarah Kinosian et al., *Mexico Begins Moving Caravan Migrants to New Shelter but Faces Mistrust*, Wash. Post (Nov. 30, 2018), https://tinyurl.com/Kinosian-shelter.

27       [24] Christine Murray, *Ailing Central American Migrants in Dire Conditions Dig in at U.S. Border*, Reuters (Nov. 28, 2018), https://tinyurl.com/Murray-Reuters.

28

5

mental health treatment.[25] Local authorities lack sufficient resources to help immigrants for prolonged periods and have called on humanitarian organizations for assistance.[26]

In addition to adverse physical conditions, vulnerable adults and children are exposed to greatly increased risks of crime and exploitation as they wait at the border.[27] And some LGBTQ immigrants face threats of harassment and violence.[28] *See EBSC*, 2018 WL 6053140, at *19 (discussing "the extensive record evidence of the danger experienced by asylum seekers waiting to cross in compliance with the Rule" in context of public interest factor). The delay in processing asylum applications, expected to take months, will only exacerbate the harms these individuals face and increase the amount and intensity of social services the States will be required to provide to them, as discussed below.

Finally, the harm from the Rule extends to residents of the States who suffer the anguish of uncertainty as their asylum-seeking relatives are in limbo at the border. Many Central American asylum-seekers have relatives across the country, including Los Angeles, Miami, New York, and Washington.[29] These include the Los Angeles family members of a Honduran family with young children[30] and a San Francisco mother, anxiously awaiting the fate of her 15-year-old son, who was detained by Mexican authorities with other minors as they attempted to apply for asylum.[31]

---

[25] *Statement on Situation of Migrant Children at Mexico-U.S. Border*, UNICEF (Nov. 28, 2018), https://tinyurl.com/UNICEF-border (noting "limited access to many of the essential services [children] need for their wellbeing, including nutrition, education, psychosocial support and healthcare").

[26] Leah McDonald, *Mayor of Tijuana Said the $30,000-a-Day Funding to Assist with Caravan of 6,000 Central American migrants Is About to Run Out*, Daily Mail (Nov. 28, 2018), https://tinyurl.com/McDonald-DailyMail.

[27] Josiah Heyman and Jeremy Slack, *Blockading Asylum Seekers at Ports of Entry at the US-Mexico Border Puts Them at Increased Risk of Exploitation, Violence, and Death*, Ctr. for Migration Studies (June 25, 2018), https://tinyurl.com/Heyman-Slack.

[28] Sarah Kinosian and Joshua Partlow, *LGBT Asylum Seekers Are First to Reach the U.S. Border from the Caravan. Now They Wait.*, Wash. Post (Nov. 13, 2018), https://tinyurl.com/Kinosian-Partlow.

[29] *See, e.g.*, Molly Hennessy-Fiske, *Why and How Are Asylum Seekers Entering the U.S.?*, L.A. Times (Nov. 22, 2018), https://tinyurl.com/Hennessy-Fiske.

[30] Elliot Spagat, *More Caravan Migrants Arrive in Tijuana, Brace for Long Stay*, Fox News (Nov. 15, 2018), https://tinyurl.com/Spagat-Fox.

[31] Cristina Rendon, *Salvadorian Woman Nervously Awaits Contact from Son Seeking Asylum at US-Mexico Border*, Fox KTVU (Nov. 26, 2018), https://tinyurl.com/Rendon-KTVU.

6

1   These residents of the States are being harmed by the federal government's actions, and the States

2   have a significant interest in preventing this harm from continuing as this litigation proceeds.

3   **C.   The States will be harmed by the effects of the Rule.**

4       The States welcome thousands of potential asylees into their communities who have

5   suffered the trauma discussed above every year, providing or funding a number of social services

6   to help them realize their potential in their new country. The additional mental and physical

7   health harms caused by defendants' policies will make asylees' needs for these services even

8   more intense and challenging to meet, requiring the States to divert resources from other critically

9   needed services.

10      The States signatory to this brief constitute seven of the top ten states of residence of

11  asylees, and have welcomed over 68 percent of the total asylees entering the United States.[32]

12  Since 1990, an average of over 22,000 individuals have been granted asylum annually.[33]

13  California in particular, as the border state that receives by far the most asylees, with almost 44

14  percent of the total, has much at stake in these proceedings. *Id.*[34] For example, almost 8,000

15  individuals with positive "credible fear" determinations, including children, initially resettled in

16  California in 2016.[35] In the 2017 fiscal year, almost 15,000 accompanied children (those arriving

17  with their families) received positive credible fear determinations and were released from federal

18  custody, many in California.[36] And in FY 2018, 4,655 unaccompanied immigrant children were

19  released from federal custody to adult sponsors in California, more than any other state.[37]

20  Historically, a high percentage of these children have had viable claims for asylum, although that

21

22      [32] Nadwa Mossad and Ryan Baugh, *Refugees and Asylees: 2016*, DHS Off. of Immig.
23  Statistics (Jan. 2018), https://tinyurl.com/Mossad-Baugh.
        [33] DHS, *Individuals Granted Asylum Affirmatively Or Defensively: Fiscal Years 1990 To
24  2016* (Jan. 8, 2018), https://tinyurl.com/DHS-Asy-2016.
        [34] Also, more cases are pending in immigration courts in California than in any other state.
25  *See* Syracuse U. Transactional Records Access Clearinghouse (TRAC), *Individuals in
    Immigration Court by Their Address*, https://tinyurl.com/TRAC-Syr.
        [35] Mossad, *supra* note 32.
26      [36] *See* Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied
27  Alien Children, 83 Fed. Reg. 45486, 45519 (proposed Sept. 7, 2018).
        [37]Off. of Refugee Resettlement, *Unaccompanied Alien Children Released to Sponsors by
28  State* (last updated Nov. 29, 2018), https://tinyurl.com/UAC-state.

7

1    percentage has dropped in the past two years.[38]

2        The States, their local jurisdictions, and non-governmental organizations based in the

3    States, will be in the position of assisting the victims of the unnecessary trauma that defendants'

4    policies cause, utilizing resources that will need to be diverted from other purposes. Among other

5    services, the States' public schools will need to educate students who have been traumatized and

6    needlessly missed months or years of schooling while they wait at the border. And the States'

7    public health care systems will have to address the increased health needs of immigrants who

8    have not had access to preventative care, vaccinations, and necessary medical care as they waited

9    at the border.

10        Further, the States have invested in specialized services to meet asylees' needs. For

11    example, in California, the Immigration Branch of CDSS has various forms of assistance for

12    certain eligible asylees and refugees including programs that provide cash assistance and

13    employment services, as well as services for unaccompanied minors and victims of human

14    trafficking.[39] Program benefits and services are typically administered at the local level by county

15    social services departments, or through county contracts with local service providers to deliver

16    direct services, including services for older refugees, integration and language assistance for

17    refugee students, and assistance to unaccompanied minors.[40]

18        Recognizing the importance of proper legal guidance during immigration proceedings,

19    California funds a number of non-profit legal service organizations, including plaintiffs EBSC, Al

20    Otro Lado and CARECEN-LA, to provide free or low-cost legal services for refugees.[41] *See*

21    Compl. ¶¶ 79, 88, 96, ECF 1. These providers use a combination of funds from CDSS and private

22    _____

[38] Beth Fertig, *Unaccompanied Minors Have Tougher Time Winning Asylum*, WNYC
23    (June 6, 2018), https://tinyurl.com/Fertig-WNYC.
[39] *See* CDSS, *Services for Refugees, Asylees, and Trafficking Victims*,
24    https://www.cdss.ca.gov/Refugee-Services.
[40] *Id.*; *see also* SF-CAIRS (the SF Refugee Forum), *Refugee & Asylee Benefits*, http://sf-
25    cairs.org/refugee-asylee-benefits; County of L.A., Dep't of Soc. Services, *Refugee Employment
Program*, https://tinyurl.com/LA-refugee.
26    [41] *See Immigration Services Contractors*, *supra* note 1. California's public universities
also fund programs that provide legal assistance to refugees and migrants seeking asylum. *See,
e.g.*, U. of Cal.-Davis Sch. of L., *Immigration Law Clinic*, https://tinyurl.com/Davis-immig; U. of
27    Cal. Hastings Coll. of the L., *Center for Gender and Refugee Studies*, https://cgrs.uchastings.edu;
U. of Cal., Irvine Sch. of L., *Immigrants' Rights Clinic*, https://tinyurl.com/Irvine-immig.

28

1  donors to ensure these cases are filed properly and adjudicated fairly.[42] Such funding is based, in

2  part, on the number of cases handled per year, and the number of clients legal providers anticipate

3  serving. *See id.* ¶¶ 82, 90–91, 97. By categorically barring asylum for every individual who enters

4  without inspection at the southern border, the Rule will seriously restrict access to legal counsel,

5  frustrate these organizations' missions and imperil their funding streams. *See id.* ¶¶ 80, 86, 89, 90,

6  97. It will also cause them to divert considerable resources to re-strategizing their approaches to

7  representation of clients and eligibility issues, revising their training, and re-allocating staff time.

8  *See id.* ¶¶ 83–86, 89, 98–99. Harms to these organizations redound to their funders, including the

9  States, whose priorities and funding decisions are impacted as well.

10  CDSS also funds qualified nonprofit organizations to provide other immigration-related

11  assistance to individuals who have been granted asylum and reside in California. These

12  organizations provide asylees crucial access to services such as mental health care, education, and

13  resettlement assistance.[43] For example, the International Rescue Committee for the City of Los

14  Angeles provides programs that assist recent refugees and asylum grantees with health care,

15  resettlement, economic opportunities, and community integration and development, and Opening

16  Doors in Sacramento offers a literacy program for refugee women, as well as resettlement

17  assistance and family trauma counseling.[44]

18  The California Department of Public Health (CDPH), Office of Refugee Health works

19  with impacted local health agencies, providers, and resettlement agencies to provide assessments

20  and other health services to newly arrived refugees, asylees, victims of severe forms of human

21  trafficking, and other eligible entrants.[45] For example, the Highland Human Rights Clinic in

22  Oakland (operated by the Alameda County Health System) conducts approximately 80 to 120

23  health assessments of asylees in California annually.[46] According to the Clinic's medical director,

---

[42] Indeed, 97 percent of the almost 5,000 affirmative asylum petitions filed by plaintiff East Bay Sanctuary Covenant have been granted. *See id.* ¶ 80.

[43] *See, e.g.,* SF-CAIRS, *Social Services and Mental Health*, http://sf-cairs.org/mental-health/.

[44] Int'l Rescue Comm., *The IRC in Los Angeles, CA*, https://tinyurl.com/IRC-refugee; Opening Doors, *Refugee Programs*, https://tinyurl.com/OD-refugee.

[45] CDPH, *Office of Refugee Health*, https://tinyurl.com/CDPH-refugee.

[46] Anna Gorman, *Medical Clinics that Treat Refugees Help Determine the Case for Asylum*, NPR (July 10, 2018), https://tinyurl.com/Gorman-NPR.

1    the vast majority of the patients he evaluates need mental health referrals, due to years of abuse

2    and trauma. *Id.* These needs will only be increased by the additional trauma that migrants will

3    endure while languishing in dangerous, unhealthy conditions at the border due to the Rule.

4         All of these state-provided resources will be further impacted due to the increased harms

5    that the Rule causes to individuals who are eventually able to present their asylum claims and

6    enter the country. California specifically will have to meet this additional need at a time that the

7    State is dealing with multiple challenges, including one of the most destructive wildfires in

8    United States history.

9         **D.    A Preliminary Injunction is in the Public Interest Because the Rule**
              **Violates the Law.**
10

11        In addition to the serious harms the Rule will inflict on the States and our current and

12   future residents, the Rule is fatally flawed from a legal perspective. Plaintiffs have ably set forth a

13   number of ways in which the Rule violates the APA's substantive and procedural requirements.

14   Mot. for Prelim. Inj. at 2–7 (PI Mot.), ECF 71. The Rule has additional legal infirmities that

15   further demonstrate that a preliminary injunction is in the public interest. *See, e.g., Texas*

16   *Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 246 (D.D.C. 2014) ("the Secretary's compliance

17   with applicable law constitutes a . . . compelling public interest") (quotation omitted); *Michigan*

18   *Citizens for an Indep. Press v. Thornburgh*, 1988 WL 90388, at *7 (D.D.C. 1988) ("The general

19   public has an interest in seeing that laws are administered reasonably, in accordance with law and

20   not arbitrarily").

21             **1.   The Rule Is Arbitrary and Capricious Under the APA.**

22        The Rule is arbitrary and capricious in violation of the APA for several reasons. First,

23   defendants failed to address, or gave only passing attention to, a number of relevant factors.

24   Under the APA, federal agencies must consider "the advantages *and* the disadvantages of agency

25   decision" before taking action. *Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 279 F.

26   Supp. 3d 1011, 1046 (N.D. Cal. 2018) (*Regents I*) (quoting *Michigan v. EPA*, 135 S.Ct. 2699,

27   2707 (2015)). As the Supreme Court has held, "agency action is lawful only if it rests on a

28   consideration of the relevant factors," and an agency may not "entirely fail to consider an

                                        10

important aspect of the problem" when deciding whether regulation is appropriate. *Michigan*, 135 S. Ct. at 2706–07 (quoting *Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)) (brackets and quotation marks omitted). If an agency action is not "based on a consideration of the relevant factors," that action is arbitrary and capricious under the APA. *State Farm*, 463 U.S. at 40–43 (citing 5 U.S.C. § 706(2)(A)).

The discussion in the Rule is one-sided, focused on the "crisis" at the border and the Rule's projected positive effects. While briefly discussing the Rule's effect on 70,000 asylum applicants annually, 83 Fed. Reg. 55948, the Rule does not discuss the likely harm to would-be asylees, their families in the United States, and the States that this change could create. In fact, there is nothing in Administrative Record that indicates defendants even considered these points. And given the current situation at ports of entry discussed above, defendants' repeated references to how the Rule will allow "orderly processing" of asylum-seekers, *see, e.g.,* 83 Fed. Reg. 55934, -49, demonstrates how little consideration they gave to the foreseeable consequences of the Rule.

Second, defendants failed to adequately justify their actions in implementing the Rule. The Rule contains voluminous discussion of the ostensible "crisis" at the southern border, 83 Fed. Reg. 55934–36, 55944–49, focusing on the increasing number of asylum claims and credible fear findings (an odd "problem" for defendants to highlight, as it actually supports the legitimacy of many asylum-seekers' claims); the large backlog of asylum cases; the allegedly large percentage of asylum seekers who do not appear for their hearings; and the supposedly low ultimate rate of asylum grants compared with applications. A number of these claims are questionable at best. As plaintiffs point out, and as third-party analyses and documents in the Administrative Record confirm, migration at the southern border is generally lower (despite a slight uptick in 2018), and Border Patrol budget and staffing higher, than in recent years. *See* Compl. ¶¶ 71–76; *see also* AR at 301, 347, 373, 447.[47] Defendants' suggestion that many putative asylees fail to appear in court is also contrary to the evidence; as plaintiffs state in the complaint, 89 percent of asylum seekers appear at their hearings. Compl. ¶ 77. Further, asylum seekers who are assisted by counsel in

---

[47] *See also* Christopher Ingraham, *There's No Immigration Crisis, and These Charts Prove It*, Wash. Post (June 21, 2018), https://tinyurl.com/Ingraham-WaPo.

navigating the complex process actually have a very high rate of asylum grants, as evidenced by plaintiff EBSC's 97 percent rate of approvals. *See* Compl. ¶ 80. Moreover, the Administrative Record provides ample evidence of the reasons why North Triangle migrants are fleeing violence in their home countries (and may therefore have meritorious asylum claims). *See* AR at 156–63. Yet the Rule severely restricts their ability to seek asylum, and ignores the consequences to the individuals and families if they are unable to present legitimate claims and forced to return to their countries of origin.[48] Because they failed to conduct a "reasoned evaluation of the relevant factors," *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)) (quotation marks omitted), and to draw a "rational connection between the facts found and the choice made," *Latino Issues Forum v. U.S. EPA*, 558 F.3d 936, 941 (9th Cir. 2009) (quoting *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1236 (9th Cir. 2001)) (quotation marks omitted), defendants' actions are arbitrary and capricious under the APA. 5 U.S.C. § 706(2)(A).

Finally, the Rule violates the APA because it is "not in accordance with law," and "contrary to constitutional right." 5 U.S.C. § 706(2)(A)-(B). First, despite defendants' claims that the Rule is "not intended to deter legitimate asylum seekers from seeking protection,"[49] one of the primary purposes of the Rule is in fact to deter people from asserting asylum claims.[50] This focus

---

[48] *See also* AR at 331 (listing El Salvador, Honduras, and Guatemala as second, third, and fourth, respectively, on list of countries whose nationals received asylum in FY2017).

[49] DHS, *Myth vs. Fact: Asylum Proclamation and Rule* (Nov. 9, 2018), https://tinyurl.com/DHS-myth-fact.

[50] *See* 83 Fed. Reg. 55948 (discussing how Rule "could . . . affect the decision calculus" of putative asylees), 55950 (discussing "urgent need to deter foreign nationals from undertaking dangerous border crossings" and desire to "[c]hannel[] [putative asylees from Northern Triangle counties] to ports of entry [which] would encourage these aliens to first avail themselves of offers of asylum from Mexico," presumably due to their discouragement at extensive wait times at ports of entry). *See also* White House, *Presidential Proclamation Addressing Mass Migration Through the Southern Border of the United States* (Nov. 9, 2018), https://tinyurl.com/Pres-Proc ("[v]irtually all members of family units . . . that are found to have a credible fear of persecution, are . . . released into the United States. Against this backdrop of near-assurance of release, the number of such aliens traveling as family units who enter through the southern border and claim a credible fear of persecution has greatly increased. . . . Failing to take immediate action to stem the mass migration the United States is currently experiencing and anticipating would only encourage additional mass unlawful migration"); *see also EBSC*, 2018 WL 6053140, at *19 (questioning "[t]he executive's interest in deterring asylum seekers—whether or not their claims are meritorious—on a basis that Congress did not authorize").

12

on deterrence is consistent with the federal government's stated goal of deterring migration

through harsh policies.[51] Courts have held that similar policies treating asylum-seekers harshly in

order to deter others from attempting to enter the United States to claim asylum are

unconstitutional. *See R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 188–90 (D.D.C. 2015) (granting

preliminary injunction against policy of detaining asylum seekers to send "a message of

deterrence to other Central American individuals who may be considering immigration").[52]

Second, the Rule discriminates against individuals based on their race, ethnicity, and

national origin in violation of the Equal Protection Clause of the Fifth Amendment. Courts have

recognized similar infirmities relating to the federal government's immigration policies that

primarily impact non-European, non-white migrants. *See, e.g., Regents of Univ. of Cal. v. U.S.*

*Dep't of Homeland Sec.*, 298 F. Supp. 3d 1304, 1315 (N.D. Cal. 2018) (denying motion to

dismiss Equal Protection claims, holding that allegations raised "a plausible inference that racial

animus towards Mexicans and Latinos was a motivating factor in the decision to end DACA")

(*Regents II*), *aff'd*, 908 F.3d 476 (9th Cir. 2018) (*Regents III*); *see also Ramos v. Nielsen*, 2018

WL 4778285, at *16–21 (N.D. Cal. Oct. 3, 2018) (*Ramos II*); *Centro Presente v. United States*

*Dep't of Homeland Sec.*, 2018 WL 3543535, at *14–15 (D. Mass. July 23, 2018); *Casa de*

*Maryland, Inc. v. Trump*, 2018 WL 6192367, at *12 (D. Md. Nov. 28, 2018).  The Rule bears

many of the hallmarks of these earlier actions, including weighing more heavily on some

---

[51] *See* White House, *Framework on Immigration Reform & Border Security* (Jan. 25, 2018), https://tinyurl.com/WH-framework (providing that "[t]he Department of Homeland Security must have tools to deter illegal immigration"; pledging to "[d]eter illegal entry" by ending "catch-and release and by closing legal loopholes that have eroded our ability to secure the immigration system and protect public safety"); *see also* Scott Pelley, *The Chaos Behind Donald Trump's Policy of Family Separation at the Border*, CBS (Nov. 26, 2018), https://tinyurl.com/Pelley-CBS (discussing "family separation" campaign, which included policy to arrest and detain all adults who crossed the border between ports of entry, and reporting that DHS memorandum "explains a reason for the policy—deterrence—as it 'will have the greatest impact on current flows' [of immigrants]").

[52] *See also Ms. L. v. U.S. Immig. & Customs Enf't*, 302 F. Supp. 3d 1149, 1166–67 (S.D. Cal. 2018) (denying motion to dismiss substantive due process claim, holding that alleged "government practice. . . to separate parents from their minor children in an effort to deter others from coming to the United States . . . is emblematic of the exercise of power without any reasonable justification . . . . Such conduct . . . is brutal, offensive, and fails to comport with traditional notions of fair play and decency").

13

racial/ethnic groups than others[53] and being promulgated in a manner that significantly departs

from the normal decision-making process, a sign that the policy was enacted for illegitimate

reasons.[54] In addition, President Trump has a history of statements and actions indicating racial

animus towards non-white immigrants and Latinos, Latino asylum-seekers, and migrants from

Central America.[55] The President strongly implied that members of a similar caravan earlier this

year were rapists[56] and also claimed that the current caravan contains members of the MS-13

gang and criminals, as well as "unknown Middle Easterners," with no evidence.[57] The strong

probability that the Rule (and Proclamation) were driven by animus in violation of the

Constitution and the APA shows that the public interest favors a preliminary injunction.

### 2. The Rule Was Improperly Promulgated Without Notice and Comment.

In addition to being arbitrary and capricious and contrary to substantive law, the Rule was

improperly promulgated without complying with the APA's notice and comment and waiting

period requirements. "The notice and comment requirements are designed to ensure public

---

[53] Both the Rule and Southern Border Proclamation are applicable solely to entrance through the southern border and discuss asylum applicants from Central America on their face. *See, e.g.,* 83 Fed. Reg. 55935, -947, -950, -951; *see Ramos II,* 2018 WL 4778285, at *18 ("the impact of the TPS terminations clearly bears more heavily on non-white, non-European individuals; indeed, it affects those populations exclusively").

[54] *See* Dara Lind, *Exclusive: Even Before the Caravan, Trump Took Steps to Use Travel Bans to Limit Asylum,* Vox (Nov. 6, 2018), https://tinyurl.com/Lind-vox (reporting that officials "hastily . . . scramble[d]" to develop Rule). *Cf.* OIG, *DHS Implementation of Executive Order #13769 "Protecting the Nation From Foreign Terrorist Entry Into the United States"* (Jan. 18, 2018), https://tinyurl.com/OIG-travel-ban (finding that DHS "was largely caught by surprise" by the travel ban, and had "no opportunity to provide expert input in drafting" it); *Regents III,* 908 F.3d at 519 (citing "unusual history behind the rescission" of DACA, which "suggests that the normal care and consideration within the agency was bypassed") (internal quotation marks omitted); *Ramos II,* 2018 WL 4778285, at *21 (N.D. Cal. Oct. 3, 2018) (noting "departures from the normal procedural sequence during the TPS decision-making process" as evidence that animus drove decision); Pelley, *supra* note 6 (former DHS official stating that the family separation order "was so abrupt it bypassed the usual review").

[55] *Ramos II,* 2018 WL 4778285, at *17–18; *Centro Presente,* 2018 WL 3543535, at *4–5; *see also, e.g.,* Lisa Desjardins, *How Trump Talks About Race,* PBS News Hour (Aug. 22, 2017) (updated Aug. 23, 2018), https://tinyurl.com/Desjardins-PBS.

[56] Vivian Salama, *Trump Claims Women 'Are Raped at Levels Never Seen Before' During Immigrant Caravan,* NBC News (Apr. 5, 2018), https://tinyurl.com/Salama-NBC.

[57] *See* Donald J. Trump (@realDonaldTrump), Twitter (Oct. 22, 2018, 5:37 AM), https://tinyurl.com/mid-easterners-tweet; Ted Hesson, *Trump Has Whipped up a Frenzy on the Migrant Caravan,* Politico (Oct. 23, 2018), https://tinyurl.com/Hesson-Politico.

14

1  participation in rulemaking." *Paulsen v. Daniels*, 413 F.3d 999, 1004 (9th Cir. 2005) (quoting

2  *Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1485 (9th Cir. 1992)) (ellipses and brackets

3  omitted). Public participation ensures that "agency regulations are tested via exposure to diverse

4  public comment"; that the process is "fair[] to affected parties"; and that affected parties have "an

5  opportunity to develop evidence in the record to support their objections to the rule and thereby

6  enhance the quality of judicial review." *Int'l Union, United Mine Workers of Am. v. Mine Safety*

7  *& Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005). As this Court stated, "[t]hese purposes

8  apply with particular force in important cases." *EBSC*, 2018 WL 6053140, at *14. "It is

9  antithetical to the structure and purpose of the APA for an agency to implement a rule first, then

10  seek comment later." *United States v. Valverde*, 628 F.3d 1159, 1164 (9th Cir. 2010) (quoting

11  *Paulsen*, 413 F.3d at 1004); see *EBSC*, 2018 WL 6053140, at *14 (same, citing *Valverde*).

12       Defendants insist that this unilateral action is supported by "good cause," and that giving

13  the States and the public an opportunity to comment on drastic changes to federal immigration

14  policy would be "impracticable" and "contrary to the public interest." 83 Fed. Reg. 55950 (citing

15  5 U.S.C. § 553(b)(B)). They also purport to make the rule effective immediately, dispensing with

16  the 30-day waiting period required by 5 U.S.C. 553(d), arguing that "immediate implementation

17  of this rule is essential to avoid creating an incentive for aliens to seek to cross the border." 83

18  Fed. Reg. 55950.

19       "The good cause exception is essentially an emergency procedure." *Valverde*, 628 F.3d at

20  1165 (quoting *Buschmann v. Schweiker*, 676 F.2d 352, 357 (9th Cir. 1982)). Failing to follow

21  notice and comment procedures may be excused "only in those narrow circumstances" in which

22  taking the time to comply with the APA's procedural requirements "would do real harm." *Id.* at

23  1164–65. "[T]he good cause exception . . . authorizes departure from the APA's requirements

24  only when compliance would interfere with the agency's ability to carry out its mission." *Cal-*

25  *Almond, Inc. v. U.S. Dep't of Agric.*, 14 F.3d 429, 441 (9th Cir. 1993) (quoting *Riverbend Farms*,

26  958 F.2d at 1485). It is to be "sparingly used in order to promote public input into agency

27  rulemaking," *Serv. Emps. Int'l Union, Local 102 v. County of San Diego*, 60 F.3d 1346, 1353 (9th

28  Cir. 1994), lest it "carve the heart out of the statute," *Action on Smoking and Health v. Civil*

1    *Aeronautics Bd.*, 713 F.2d 795, 800 (D.C. Cir. 1983); *see also EBSC*, 2018 WL 6053140, at *17

2    ("The good cause exception should be interpreted narrowly, so that the exception will not

3    swallow the rule") (quoting *Buschmann v. Schweiker*, 676 F.2d 352, 357 (9th Cir. 1982) (internal

4    quotation marks and brackets omitted). The Rule was issued without notice, in the absence of any

5    emergency such as an imminent threat of a terrorist attack, an accident or natural disaster that

6    imperils human life, or even a fiscal emergency. *See* Pls. Mem. in Supp. of TRO 7–8, ECF No. 8-

7    1. Thus, the government fails to overcome the "high bar" to the good cause exception. *Valverde*,

8    628 F.3d at 1164.

9         The federal government also invokes the "foreign affairs" exception to the APA's

10   procedural requirements, 5 U.S.C. § 553(a)(1). 83 Fed. Reg. 55950. However, the Ninth Circuit

11   has rejected this exception's application to the kind of regulation at issue here, holding that: "The

12   foreign affairs exception would become distended if applied to [DHS] actions generally, even

13   though immigration matters typically implicate foreign affairs. For the exception to apply, the

14   public rulemaking provisions should provoke definitely undesirable international consequences."

15   *Yassini v. Crosland*, 618 F.2d 1356, 1360 n.4 (9th Cir. 1980) (internal citations omitted); *see also*

16   *EBSC*, 2018 WL 6053140, at *16 (citing *Yassini*, noting lack of "apparent logical connection

17   between dispensing with notice and comment and achieving a foreign affairs goal" here).

18   Although foreign relations are briefly discussed in the Rule, *see* 83 Fed. Reg. 55950–51, the

19   government's focus is on the United States' internal interests, not international relations. *See also*

20   PI Mot. at 5–6 (discussing lack of support in Rule and AR for foreign policy rationale).

21        Defendants' failure to engage in pre-Rule notice and comment as required by the law

22   deprived the States of their right to participate in the rulemaking process. The opportunity to

23   comment on proposed federal regulations is vital to States' interests in governmental

24   transparency. As sovereigns responsible for the health, safety, and welfare of millions of people

25   within their respective borders, the States have unique interests and perspectives to contribute on

26   issues of national importance and widespread impact, particularly when such policies will cause

27   prospective residents of our States unnecessary, substantial, and enduring harm. If the States had

28   been provided with an opportunity to comment on the Rule before it was promulgated, they

16

1  would have raised the myriad harmful impacts and illegal aspects of the Rule discussed above

2  before it took effect.[58] The agencies would have been required to consider those comments in

3  crafting the final regulation, *see* 5 U.S.C. § 553(c), and may have made changes to the proposed

4  rule in response, as agencies often do. The record developed through the notice and comment

5  process in turn would have aided the Court in its review of the action. *See United Mine Workers*,

6  407 F.3d at 1259; *see also EBSC*, 2018 WL 6053140, at *19 (noting irreparable harm from

7  deprivation of ability to offer "advance input" on Rule) (quoting *California v. Health & Human

8  Servs.*, 281 F. Supp. 3d 806, 830 (N.D. Cal. 2017)) (internal quotation marks omitted).

9  <center>**CONCLUSION**</center>

10      For the reasons set forth above, the States support plaintiffs' motion for a preliminary

11  injunction against the Rule to maintain the status quo during the pendency of this action.

12  Dated: December 5, 2018          Respectfully submitted,

13           XAVIER BECERRA
         Attorney General of California

14           MICHAEL L. NEWMAN
         Senior Assistant Attorney General

15           CHRISTINE CHUANG
         Supervising Deputy Attorney General

16           *s/ James F. Zahradka II*

17           JAMES F. ZAHRADKA II
         VILMA PALMA-SOLANA

18           SHUBHRA SHIVPURI
         Deputy Attorneys General

19           *Attorneys for the State of California*

20

21

22

23

24

25

26

---

27  [58] For example, California has submitted 59 comment letters on anticipated or proposed actions by the federal government to delay, repeal or adopt federal regulations since February 2017. Washington State has offered more than 45 since March 2016, Massachusetts has submitted

28  dozens, and New York has sent 45.

<center>17</center>

| | | |
|---|---|---|
| 1 | ROBERT W. FERGUSON<br>*Attorney General*<br>*State of Washington*<br>P.O. Box 40100<br>Olympia, WA 98504 | MAURA HEALEY<br>*Attorney General*<br>*Commonwealth of Massachusetts*<br>One Ashburton Place<br>Boston, MA 02108 |
| 4 | BARBARA D. UNDERWOOD<br>*Attorney General*<br>*State of New York*<br>28 Liberty Street<br>New York, NY 10005 | GEORGE JEPSEN<br>*Attorney General*<br>*State of Connecticut*<br>55 Elm Street<br>Hartford, CT  06106 |
| 7 | KARL A. RACINE<br>*Attorney General*<br>*District of Columbia*<br>441 4th Street, N.W.<br>Washington, D.C. 20001 | RUSSELL A. SUZUKI<br>*Attorney General*<br>*State of Hawaii*<br>425 Queen Street<br>Honolulu, HI 96813 |
| 10 | LISA MADIGAN<br>*Attorney General*<br>*State of Illinois*<br>100 W. Randolph St, 12th Fl.<br>Chicago, IL 60601 | BRIAN E. FROSH<br>*Attorney General*<br>*State of Maryland*<br>200 St. Paul Place<br>Baltimore, MD 21202 |
| 13 | LORI SWANSON<br>*Attorney General*<br>*State of Minnesota*<br>75 Rev. Dr. Martin Luther King Jr. Blvd.<br>St. Paul, MN 55155 | GURBIR S. GREWAL<br>*Attorney General*<br>*State of New Jersey*<br>25 Market Street, Box 080<br>Trenton, NJ 08625 |
| 16 | ELLEN F. ROSENBLUM<br>*Attorney General*<br>*State of Oregon*<br>1162 Court Street NE<br>Salem, OR 97301 | THOMAS J. DONOVAN, JR.<br>*Attorney General*<br>*State of Vermont*<br>109 State Street<br>Montpelier, VT 05609 |

18