JOSEPH H. HUNT
*Assistant Attorney General*
SCOTT G. STEWART
*Deputy Assistant Attorney General*
AUGUST E. FLENTJE
*Special Counsel*
WILLIAM C. PEACHEY
*Director*
EREZ REUVENI
*Assistant Director*
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 307-4293
Email: Erez.R.Reuveni@usdoj.gov
PATRICK GLEN
*Senior Litigation Counsel*
JOSEPH DARROW
FRANCESCA GENOVA
CHRISTINA P. GREER
KATHRYNE GRAY
BENTON YORK
*Trial Attorneys*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| East Bay Sanctuary Covenant, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION |
| ) | |
| v. ) | Civil Action No. 3:18-cv-06810-JST |
| ) | |
| Donald J. Trump, President of the United ) States, *et al.*, ) | |
| ) | |
| Defendants. ) | |

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................1

BACKGROUND ................................................................................................1

STANDARD .......................................................................................................4

ARGUMENT ......................................................................................................5

I.     Plaintiffs' Claims Are Still Not Justiciable ...........................................5

      A.     Plaintiffs Have Not Suffered an Injury in Fact and thus Lack Article III Standing. .....................................................................................5

      B.     Plaintiffs' Claims Fall Outside the Statutory Zone of Interests. ...........................7

II.    The Rule and Proclamation Are Consistent with the INA.........................9

III.   The Rule Satisfies the APA's Procedural Requirements ...............................13

IV.   The Balance of Harm Factors Foreclose Issuing a Preliminary Injunction...............16

V.    Any Interim Relief Must Be Sharply Limited ...........................................20

      A.     The Court May Not Issue Any Injunctive Relief Impacting Expedited Removal.20

      B.     The Court Cannot Enjoin Operation of the Rule under the APA .........................23

      C.     The Court May Not Issue a Nationwide Injunction.............................................24

CONCLUSION .................................................................................................25

CERTIFICATE OF SERVICE ........................................................................27

# TABLE OF AUTHORITIES

## CASE LAW

*Am. Ass'n for Homecare v. Leavitt*,
   No. 08-cv-0992, 2008 WL 2580217 (D.D.C. June 30, 2008)................................. 19

*Am. Ass'n of Exporters v. United States*,
   751 F.2d 1239 (Fed. Cir. 1985)........................................................................ 13

*Am. Immigration Lawyers Ass'n v. Reno*,
   199 F.3d 1352 (D.C. Cir. 2000) .................................................................. 21, 22

*Amoco Prod. Co. v. Vill. of Gambell*,
   480 U.S. 531 (1987)........................................................................................ 19

*Associated Gen. Contractors of California, Inc. v. Coal. for Econ. Equity*,
   950 F.2d 1401 (9th Cir. 1991) ...................................................................... 19, 20

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013)...................................................................................... 6, 20

*Clarke v. Sec. Indus. Ass'n*,
   479 U.S. 388 (1987)........................................................................................... 7

*Davis v. Michigan Dep't of Treasury*,
   489 U.S. 803 (1989)........................................................................................ 23

*Doe v. Trump*,
   288 F. Supp. 3d 1045 (W.D. Wash. 2017)......................................................... 20

*Earth Island Inst. v. Ruthenbeck*,
   490 F.3d 687 (9th Cir. 2007) ........................................................................... 24

*Elk Associates Funding Corp. v. U.S. Small Bus. Admin.*,
   858 F. Supp. 2d 1 (D.D.C. 2012) ..................................................................... 19

*Exodus Refugee Immigration, Inc. v. Pence*,
   165 F. Supp. 3d 739 (S.D. Ind. 2016), aff'd, 838 F.3d 902 (7th Cir. 2016)............. 20

*Florida Power & Light Co. v. Lorion*,
   470 U.S. 729 (1985)........................................................................................... 4

*Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*,
   528 U.S. 167 (2000)........................................................................................... 5

*Gill v. Whitford*,
   138 S. Ct. 1916 (2018) ................................................................... 20, 24, 25

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) ............................................................................... 5, 6

*Hawaii Helicopter Operators Ass'n v. FAA*,
   51 F.3d 212 (9th Cir. 1995) ....................................................................... 15

*Hawaii v. Trump*,
   878 F.3d 662 (9th Cir. 2017) ..................................................................... 24

*Holder v. Humanitarian Law Project*,
   561 U.S. 1 (2010) ..................................................................................... 16

*Immigrant Assistance Project of Los Angeles Cty. v. INS*,
   306 F.3d 842 (9th Cir. 2002) ....................................................................... 8

*Initiative & Referendum Inst. v. Walker*,
   450 F.3d 1082 (10th Cir. 2006) ................................................................. 25

*INS v. Aguirre-Aguirre*,
   526 U.S. 415 (1999) ................................................................................. 12

*INS v. Cardoza-Fonseca*,
   480 U.S. 421 (1987) ................................................................................. 12

*INS v. Legalization Assistance Project of L.A. Cty.*,
   510 U.S. 1301 (1993) ................................................................................. 8

*INS v. Pangilinan*,
   486 U.S. 875 (1988) ................................................................................. 22

*J.E.F.M. v. Lynch*,
   837 F.3d 1026 (9th Cir. 2016) ................................................................... 21

*Jadeja v. Redflex Traffic Sys., Inc.*,
   764 F. Supp. 2d 1192 (N.D. Cal. 2011) ..................................................... 25

*Kiobel v. Royal Dutch Petroleum*,
   569 U.S. 108 (2013) ................................................................................. 18

*Komarenko v. INS*,
   35 F.3d 432 (9th Cir. 1994) ....................................................................... 11

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*,
   624 F.3d 1083 (9th Cir. 2010) ............................................................... 5

*League of Women Voters v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ................................................................. 20

*Lopez v. Davis*,
   531 U.S. 230 (2001) .......................................................................... 12

*M.M.M. ex rel. J.M.A. v. Sessions*,
   319 F. Supp. 3d 290 (D.D.C. 2018) ...................................................... 22

*Madsen v. Women's Health Ctr., Inc.*,
   512 U.S. 753 (1994) .......................................................................... 24

*Mejia v. Sessions*,
   866 F.3d 573 (4th Cir. 2017) ............................................................... 12

*Mobil Oil Corp. v. DOE*,
   728 F.2d 1477 (TECA 1983) ............................................................... 15

*Motor Vehicle Manufacturers v. State Farm*,
   463 U.S. 29, (1983) ............................................................................ 4

*Mountain States Legal Found. v. Glickman*,
   92 F.3d 1228 (D.C. Cir. 1996) .............................................................. 7

*Munaf v. Geren*,
   553 U.S. 674 (2008) ........................................................................... 4

*Nat'l Mining Assoc. v. U.S. Army Corps of Eng'rs*,
   145 F.3d 1399 (D.C. Cir.1998) ............................................................ 24

*Nat'l Taxpayers Union, Inc. v. United States*,
   68 F.3d 1428 (D.C. Cir. 1995) ......................................................... 7, 20

*Nijjar v. Holder*,
   689 F.3d 1077 (9th Cir. 2012) ............................................................. 10

*NWIRP v. USCIS*,
   325 F.R.D. 671 (W.D. Wash. 2016) ....................................................... 8

*Open Comms. Alliance v. Carson*,
   286 F. Supp. 3d 148 (D.D.C. 2017) ...................................................... 20

*R-S-C v. Sessions,*
  869 F.3d 1176 (10th Cir. 2017) ................................................................. 11

*Regents of the Univ. of California v. DHS,*
  908 F.3d 476 (9th Cir. 2018) ..................................................................... 24

*Reno v. Am.-Arab Anti-Discrimination Comm.,*
  525 U.S. 471, (1999) ................................................................................. 14

*Sampson v. Murray,*
  415 U.S. 61 (1974) ............................................................................. 19, 24

*Valle del Sol Inc. v. Whiting,*
  732 F.3d 1018 (9th Cir 2013) .................................................................... 20

*Trump v. Hawaii,*
  138 S. Ct. 2392 (2018) .......................................................................... 1, 25

*United States v. Mendoza,*
  464 U.S. 154 (1984) .................................................................................. 25

*United States v. Valverde,*
  628 F.3d 1159 (9th Cir. 2010) ................................................................... 16

*Washington v. Trump,*
  847 F.3d 1151 (9th Cir. 2017) ................................................................... 24

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ........................................................................................ 4

*Yang v. INS,*
  79 F.3d 932 (9th Cir. 1996) ....................................................................... 12

*Yassini v. Crosland,*
  618 F.2d 1360 (9th Cir. 1980) ................................................................... 14

*Zepeda v. INS,*
  753 F.2d 719 (9th Cir. 1983) ............................................................... 21, 24

## ADMINISTRATIVE DECISIONS

*Matter of Pula,*
  19 I. & N. Dec. 467 (BIA 1987) ................................................................... 9

*Matter of Salim,*
  18 I. & N. Dec. 311 (BIA 1982) ................................................................. 11

1

**STATUTES**

2

5 U.S.C. § 553 ................................................................................................................. 14

3

5 U.S.C. § 553(a)(1) ........................................................................................................ 2

4

5 U.S.C. § 553(b) ............................................................................................................. 2

5

6

5 U.S.C. § 553(b)(B) ........................................................................................................ 15

7

5 U.S.C. § 553(c) ............................................................................................................. 2

8

5 U.S.C. § 553(d) ............................................................................................................. 2

9

5 U.S.C. § 553(d)(3) ........................................................................................................ 15

10

5 U.S.C. § 702 ................................................................................................................. 7

11

12

5 U.S.C. § 705 ................................................................................................................. 24

13

5 U.S.C. § 706 ......................................................................................................... 2, 5, 15

14

8 U.S.C. § 1158(a)(1) ............................................................................................... 2, 3, 10

15

8 U.S.C. § 1158(a)(2)(B) ................................................................................................. 10

16

8 U.S.C. § 1158(a)(2)(B)(ii) ............................................................................................ 8

17

18

8 U.S.C. § 1158(a)(5) ...................................................................................................... 8

19

8 U.S.C. § 1158(b)(2)(A) ................................................................................................ 9

20

8 U.S.C. § 1158(b)(2)(C) ............................................................................................. 9, 12

21

22

8 U.S.C. § 1158(b)(9) ...................................................................................................... 8

23

8 U.S.C. § 1158(d)(4) ...................................................................................................... 8

24

8 U.S.C. § 1158(e)(3) ...................................................................................................... 8

25

8 U.S.C. § 1182(f) ........................................................................................................... 1

26

8 U.S.C. § 1185(a)(1) ...................................................................................................... 1

27

8 U.S.C. § 1225(b) ........................................................................................................... 2

28

8 U.S.C. § 1231(b)(3)(A) ..................................................................................... 12

8 U.S.C. § 1252(a)(5) ........................................................................................... 21

8 U.S.C. § 1252(b)(9) ........................................................................................... 21

8 U.S.C. § 1252(e) ................................................................................................ 21

8 U.S.C. § 1252(e)(1) ........................................................................................... 22

8 U.S.C. § 1252(e)(1)(A) ................................................................................ 21, 23

8 U.S.C. § 1252(e)(3) ........................................................................................... 21

8 U.S.C. § 1252(e)(3)(A) ................................................................................ 21, 23

8 U.S.C. § 1252(e)(3)(A)(ii) ................................................................................. 22

8 U.S.C. § 1252(e)(3)(C) ...................................................................................... 22

8 U.S.C. § 1252(e)(3)(D) ...................................................................................... 23

8 U.S.C. § 1252(e)(3)(E) ...................................................................................... 22

8 U.S.C. § 1252(f)(1) ............................................................................................ 23

28 U.S.C. § 1331 ................................................................................................... 21

## REGULATIONS

8 C.F.R. § 208.13 ................................................................................................. 21

8 C.F.R. § 208.16(c) ............................................................................................. 12

8 C.F.R. § 208.30(e)(5) ......................................................................................... 21

8 C.F.R. § 1208.13 ............................................................................................... 21

8 C.F.R. § 1208.16(c) ........................................................................................... 12

8 C.F.R. § 1208.30(e)(5) ....................................................................................... 21

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 23 ................................................................................................. 22

# FEDERAL REGISTER

69 Fed. Reg. 48877 ............................................................................................ 16

82 Fed. Reg. 4770 .............................................................................................. 16

83 Fed. Reg. 55934 .............................................................................................. 1

83 Fed. Reg. 55935 ............................................................................................ 15

83 Fed. Reg. 55944-45 ....................................................................................... 17

83 Fed. Reg. 55946 ............................................................................................ 20

83 Fed. Reg. 55948 ............................................................................................ 16

83 Fed. Reg. 55949-50 ....................................................................................... 15

83 Fed. Reg. 55950 ....................................................................................... 13, 18

83 Fed. Reg. 55950-51 ....................................................................................... 15

# LEGISLATIVE HISTORY

H.R. Rep. No.  104-469 ...................................................................................... 23

# MISCELLANEOUS

*CBP, Southwest Border Migration FY 2019,* (Last visited Dec. 12, 2018), CBP, Southwest
     Border Migration FY 2019 .......................................................................... 17

*U.S. Border Patrol Fiscal Year Southwest Border Sector Deaths (FY 1998 - FY 2017)*, (Last
     visited Dec. 12, 2018), https://www.cbp.gov/sites/default/files/assets/documents/2017-
     Dec/BP%20Southwest% 20Border%20Sector%20Deaths%20FY1998%20-%20FY2017.pdf 17

1

## INTRODUCTION

Plaintiffs, relying on this court's interim order temporarily enjoining the government from implementing the Departments of Justice's and Homeland Security's rule, Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations, 83 Fed. Reg. 55934 (Nov. 9, 2018), move this Court for a preliminary injunction.  That request should be denied.  At the least, because the Ninth Circuit has rejected the primary basis for this Court's nationwide injunction—injury to non-parties and Plaintiffs' would-be clients—any injunction should be limited to Plaintiffs' *bona fide* clients.

## BACKGROUND

The Court is familiar with the legal and factual background of this case, which the government set out in its prior briefing (*see* TRO Opp. 1-7) and incorporates here by reference.

The United States has experienced a surge in the number of aliens entering the country unlawfully from Mexico and, if caught, claiming asylum and remaining in the country while the claim is adjudicated, frequently with little prospect of actually being granted that discretionary relief.  The President, relying on his "broad discretion to suspend the entry of aliens into the United States," *Trump v. Hawaii*, 138 S. Ct. 2392, 2408 (2018), and concerned that the status quo encourages dangerous and illegal border crossings and undermines the integrity of the nation's borders, determined that a temporary suspension of entry by aliens who fail to present themselves for inspection at a port of entry along the southern border is in the nation's interest.  *See* 8 U.S.C. §§ 1182(f), 1185(a)(1).  In conjunction with that action, the Attorney General and Secretary of Homeland Security, exercising their statutory authority to establish "additional limitations . . . under which an alien shall be ineligible for asylum," *id.* § 1158(b)(2)(C), and their general authority and discretion over asylum, *id.* § 1158(b), issued an interim final rule rendering ineligible for asylum any alien who enters the country in violation of a proclamation limiting or suspending entry at the southern border.  *See* 83 Fed. Reg. 55934.  The rule provides a process for aliens covered by the new asylum-eligibility bar who have a reasonable fear of persecution or torture to seek other forms of protection from removal.  Taken together, the rule and proclamation will: channel asylum seekers to ports of entry, where their claims can be processed in an orderly manner; deter unlawful and dangerous border crossings; reduce the backlog of meritless asylum claims;

and assist the President in ongoing diplomatic negotiations with Mexico and other countries regarding mass migration.

On November 9, 2018, before the suspension of entry became operative or had been applied to anyone, Plaintiffs—four organizations that provide legal and social services to immigrants and refugees—filed this suit against the President and Executive Branch agencies and officials.  Plaintiffs allege that the rule and proclamation together unlawfully "bar people from obtaining asylum if they enter the United States somewhere along the southern border other than a designated port of arrival."  Compl. ¶ 3.  Plaintiffs allege that they must "divert organizational resources to, among other things, understand[] the new policy" and "train . . . staff," *id.* ¶ 84, and that the rule and proclamation could mean fewer cases and fewer "funding streams" (*id.* ¶¶ 87, 97) or more cases and fewer "funding streams" (*id.* ¶¶ 90-91).

Plaintiffs bring two claims.  First, they claim that the rule conflicts with the asylum statute—in particular, its provision that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . . ), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, [8 U.S.C. § 1225(b)]," 8 U.S.C. § 1158(a)(1)—and so is "contrary to law" under the Administrative Procedure Act (APA).  Compl. ¶¶ 101-06; *see* 5 U.S.C. § 706.  Second, they claim that the rule violates the APA because it was improperly issued without notice and an opportunity to comment and was published less than 30 days before its effective date.  Compl. ¶¶ 108-10; *see* 5 U.S.C. § 553(b), (c), (d).

The same day they filed suit, Plaintiffs moved for a temporary restraining order preventing the rule and proclamation from taking effect.  On November 19 this Court issued an injunction, styled as a temporary restraining order, that prohibits Defendants from implementing the rule.  Order, ECF 43.  The Court concluded that Plaintiffs had Article III standing to raise their claims in their own right because they might lose funding streams and that they could raise the claims of third party aliens not before the Court because they were their clients and could not raise the claims themselves.  Order 8-15.  The Court also concluded Plaintiffs satisfied the zone of interests test, because they were raising their clients' rights, and aliens abroad seeking asylum were within the

asylum statute's zone of interests.  Order 16-17.  Next, the Court concluded that Plaintiffs were likely to succeed on the merits of their statutory claim because 8 U.S.C. § 1158(a)(1) prohibited relying on manner of entry as a basis to find a class of aliens categorically ineligible for asylum. Order 19-23.  The Court also found that Plaintiffs showed serious questions going to the merits of their notice-and-comment claim.  Order 25-29.  The Court concluded that Plaintiffs demonstrated irreparable harm because their putative clients faced harm in Mexico in the form of delays in processing at ports of entry if they complied with the rule, rather than breaking U.S. law and crossing the border, because Mexico is dangerous and because aliens were entitled to consideration of their asylum claims and the rights that attached to such applications.  Order 23-32.  The Court held that the organizations themselves suffered irreparable harm because they could not comment on the rule before it was implemented.  *Id.*  And the Court held that the balance of harms favored Plaintiffs, based on its view that the predictive harms the government sought to avoid were not sufficiently supported by the rule to outweigh the putative harms Plaintiffs' clients faced in Mexico if not allowed to cross the border illegally and apply for asylum on U.S. soil.  Order 32-33.

The government filed an emergency appeal and moved to stay the Court's order.  This Court denied that request on November 30.  ECF No. 61. The Ninth Circuit, in a 2-1 decision, denied a stay on December 7.  All three judges rejected this Court's holding that Plaintiffs have third-party standing to assert the legal rights of their hypothetical clients or other aliens, Op. 27-28, and also noted that Plaintiffs' "clients, of course, would not have standing to assert a right to cross the border illegally, to seek asylum or otherwise." *Id.* 28.  But the panel concluded that the government had not shown that it was likely to succeed in its appeal from the injunction.  In the panel's view (which included Judge Leavy on this point), Plaintiffs had organizational standing based on their allegations that the "challenged practices have perceptibly impaired their ability to provide the services they were formed to provide," Op. 29, and "will cause them to lose a substantial amount of funding."  Op. 33.  The panel held that Plaintiffs were likely within the asylum statute's zone-of-interests because "Congress took steps to ensure that pro bono legal services of the type that the Organizations provide are available to asylum seekers," Op. 38 (citing 8 U.S.C. § 1158(d)(4)(A)-(B)), and because "other provisions in the INA give institutions like"

Plaintiffs "a role in helping immigrants navigate the immigration process." *Id.* And because Plaintiffs satisfied the asylum statute's zone of interests, they could also raise their "notice-and-comment" claims. *Id.* 39-40.

On the merits, the panel agreed with this Court that the rule likely conflicts with § 1158(a)(1) because "[t]o say that one may apply for something that one has no right to receive is to render the right to apply a dead letter." Op. 45. Although Plaintiffs did not plead an arbitrary-and-capricious claim, the panel also suggested that the rule "is [also] likely arbitrary and capricious" because "it conditions an alien's eligibility for asylum on a criterion that has nothing to do with asylum itself." Op. 46; *see* Op. 46-49. The panel ruled that, based on the record before it, the government had not satisfied the good-cause or foreign-affairs exceptions to notice-and-comment rulemaking. Op. 54-60. Finally, the panel concluded that the government failed to show a likelihood of harm to itself or its goal of preventing "dangerous and illegal border crossing[s]" sufficient to warrant a stay, Op. 61, observed that the "public interest" factor "favor[s] both sides," Op. 62, and agreed with this Court that a "universal" injunction was appropriate. Op. 64.

Plaintiffs now move for a preliminary injunction on the same grounds as their prior motion, asserting that the rule conflicts with § 1158(a)(1), PI Br. 2-4, and was improperly issued without notice-and-comment or a 30-day grace period, *id.* at 4-7; that the rule harms "Plaintiffs, their clients, and other asylum seekers," *id.* at 16; *see id.* at 16-18; that the balance of harms favors an injunction, *id.* at 18-20; and that the Court should enter a universal injunction. *Id.* at 20-21.

## STANDARDS

A preliminary injunction is "an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689 (2008). A party seeking such relief "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where Plaintiffs raise only APA claims, and a record has been submitted to the court, the Court's review of merits issues must be "based on the record the agency presents to the reviewing court." *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985). The Court's function is to assess the lawfulness of the agency's action

based on the reasons offered by the agency. *Motor Vehicle Manufacturers v. State Farm*, 463 U.S. 29, 50, (1983). Thus, the Court may not create a new record for purposes of review of the merits of the agencies' decision to promulgate the rule without notice and comment. 5 U.S.C. § 706.[1]

## ARGUMENT

### I.     Plaintiffs' Claims Are Still Not Justiciable.

#### A.  Plaintiffs Have Not Suffered an Injury in Fact and thus Lack Article III Standing.

Plaintiffs cannot show that they have (1) it suffered an "injury in fact" (2) traceable to the rule; and that (3) it is likely, as opposed to merely speculative that the injury will be redressed by a favorable decision. *See Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). At the outset, although Plaintiffs and this Court previously relied extensively on third-party standing, the Ninth Circuit has rejected that basis for standing: "the Organizations have not identified any cognizable right that they are asserting on behalf of their clients, they do not have third-party standing to sue." Op. 27-28. Plaintiffs' claims thus must rise and fall on their alleged direct injuries alone.

Plaintiffs allege that they will be injured by the rule either because they will need to divert resources to assist the asylum seekers they represent, or because their funding will be reduced. *See* PI Br. 7-11; Compl. ¶¶ 78-99. Organizations may have standing in some situations where the organization's core activities are impaired. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). But, as Defendants have explained, *Havens Realty* and its progeny do not apply here. *See* TRO Opp. 9. *Havens Realty* standing is limited to situations, unlike that presented here, where an organization is forced to divert resources to avoid some other cognizable injury to itself. Thus, in *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083 (9th Cir. 2010), the court held that an organization seeking to allege standing under *Havens Realty* must establish, at a minimum, "that it would have suffered *some other injury* if it had not diverted resources to counteracting the problem." *Id.* at 1088 (emphasis added); *see also id.* at 1088 n.4 ("an organization may sue only if it was forced to choose between suffering an injury and diverting

---

[1] Simultaneous to this filing, the government is moving to strike various extra-record materials Plaintiffs purport to rely on to challenge the rule under the APA.

resources to counteracting the injury").  This understanding accords with the fact that *Havens Realty* involved a challenge to conduct that "perceptibly impaired" the plaintiff organization's own ability to provide services.  *Havens Realty*, 455 U.S. at 379.

Here, there is no harm to the Plaintiffs' mission that could confer standing, even if Plaintiffs will divert resources in response to the rule.  Although the Court previously concluded that Plaintiffs' mission had been frustrated by the rule and proclamation, Order 11-12, Defendants respectfully submit that the record does not support that conclusion.  Neither the rule nor the proclamation prevents Plaintiffs from "provid[ing] assistance to asylum seekers," which is Plaintiffs' stated mission.  Compl. ¶ 78.  In finding standing for the limited purpose of the prior injunction, the Court pointed to practices of border officials and policies that may make it more difficult for individuals to seek asylum.  Order 11-12.  As the Ninth Circuit concluded, however, those actions are not part of the rule or proclamation that Plaintiffs challenge, and cannot support organizational standing.  Op. 28.  And Plaintiffs do not allege, and this Court did not find, that they cannot maintain funding by assisting asylum seekers who enter the country at a port of entry, who, as this Court acknowledged, are present at ports of entry in significant numbers.  *See* Order 11.  And Plaintiffs remain free to represent any aliens who enter the country illegally.  The rule does not preclude such aliens from applying for withholding of removal or CAT protection, or, indeed, asylum, not does it prevent Plaintiffs from representing such aliens.  In any event, respondents have no legally protected interest in preventing the federal government from taking actions that might affect their funding from other sources or not redirecting their efforts or devoting their own resources to advocating for their client.  Thus, any alleged "injury" to Plaintiffs on this basis derives from their own decisions about what cases they take on.  *Cf. Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 415-18 (2013).  Because Plaintiffs can continue to fulfill their missions of aiding asylum seekers, they have not identified any cognizable injury in fact based on the frustration of Plaintiffs' mission that could satisfy Article III.

Plaintiffs also point to the fact that they must adapt to the new requirements by, for example, taking the time to understand changes in the law, *see, e.g.*, PI Br. 10-11 (citing Declaration of Camilla Alvarez ¶¶ 6-7), "revamp[ing] representation strateg[ies]" in legal cases,

Compl. ¶ 89, and devoting "more hours per case to pursue complex non-asylum relief," TRO Br.

19-20.  But if these sorts of "injuries" were sufficient to confer standing, any legal services or advocacy organization could proceed in federal court whenever there is a change in the law, simply because that organization must change its legal strategy and get up to speed on the impact of that change.  Yet courts have repeatedly held that these types of impacts on legal representation are insufficient to satisfy Article III.  *See, e.g.*, *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995) ("The mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization.").

As Defendants have explained, if Plaintiffs' allegations were sufficient to establish standing, then virtually any advocacy organization would have standing to challenge any government policy or practice with which it disagrees so long as it has spent time or money on advocacy efforts in response.  TRO Opp. 8.  Article III requires more, however, and therefore Plaintiffs lack standing to press their claims.

**B.  Plaintiffs' Claims Fall Outside the Statutory Zone of Interests.**

Plaintiffs also cannot bring suit because their claims are outside the zone of interests of any relevant statute.  The APA provides a cause of action only to a plaintiff "adversely affected or aggrieved by agency action within the meaning of a relevant statute."  5 U.S.C. § 702; *see* TRO Br. 9-11.  To be "aggrieved," "the interest sought to be protected by the complainant [must] be arguably within the zone of interests to be protected or regulated by the statute . . . in question." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 396 (1987)  (modifications omitted).

Neither the INA nor the asylum statutes reflect an intent to benefit third-party organizations like Plaintiffs here, i.e., "nonprofit organizations that provide assistance to asylum seekers." Compl. ¶ 78.  "[O]n any given claim the injury that supplies constitutional standing must be the same as the injury within the requisite 'zone of interests.'"  *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996).  Yet this Court's prior zone-of-interest analysis rested on the rights of Plaintiffs' asylum-seeker clients under the INA.  Order 16 (pointing to "rights of [Plaintiffs'] clients as potential asylum seekers").  This Court did not conclude that

1   Plaintiffs' own alleged injuries fall within the zone of interests of the INA, and it is well-

2   established that such injuries cannot satisfy that test.  *See INS v. Legalization Assistance Project*

3   *of L.A. Cty.*, 510 U.S. 1301, 1305 (1993) (O'Connor, J., in chambers); *Immigrant Assistance*

4   *Project of Los Angeles Cty. v. INS*, 306 F.3d 842, 867 (9th Cir. 2002); *NWIRP v. USCIS*, 325

5   F.R.D. 671, 688 (W.D. Wash. 2016).

6        The asylum statutes do not regulate Plaintiffs' conduct in any way, nor do they create any

7   benefits for which the Plaintiff organizations themselves might be eligible.  TRO Opp. 9-10.  And

8   the INA does not allow Plaintiffs to challenge the denial of asylum to any individual alien or class

9   of aliens.  *See* 8 U.S.C. § 1252(a)(2)(B)(ii), (a)(5), (b)(9), (e)(3); *see infra*.  At a minimum, then,

10  the statute reflects Congress's intent not to allow claims from third-party domestic organizations

11  like Plaintiffs.[2]  Indeed, the Plaintiff organizations are not themselves applying for asylum, but

12  only helping others do so.  Nothing in the "text of the relevant provisions [can] be fairly read to

13  implicate Organizational Plaintiffs' interest in the efficient use of resources."  *NWIRP*, 325 F.R.D.

14  at 688.  And, as Plaintiffs acknowledge, asylum is intended to "afford[] protection to individuals

15  who have a well-founded fear of persecution," TRO Br. 3; asylum was not created for the benefit

16  of domestic legal or social services organizations.  Because the Plaintiff organizations are

17  bystanders to the statutory scheme, the (alleged) effects on their resources are outside the statutory

18  zone of interests.  *See Legalization Assistance Project*, 510 U.S. at 1305.

19       Although the asylum statute does mention legal representation in 8 U.S.C. § 1158(d)(4),

20  that subsection is clearly for the benefit of the alien—requiring notice to the alien "of the privilege

21  of being represented by counsel" in the asylum proceeding—and for the government's benefit.

22  *See id.* § 1158(d)(6) (providing that if the alien has received notice but nonetheless knowingly

23  makes a frivolous application for asylum, "the alien shall be permanently ineligible for any benefits

24  under this chapter").  Also, notably, the legal organizations had an even *greater* statutorily codified

25

26

27

28

---

[2] The Ninth Circuit considering Defendants' stay motion concluded otherwise in its preliminary analysis, Op. 38-40, but Defendants respectfully disagree with that conclusion.  TRO Opp. 10.

1  role in *Legalization Assistance Project*, but that did not prevent Justice O'Connor from concluding

2  that the organizations remained outside the zone of interests.  *See* 510 U.S. at 1305.[3]

3  **II.    The Rule and Proclamation Are Consistent with the INA.**

4  Plaintiffs argue that the rule violates the INA by denying eligibility for asylum to certain

5  unlawful entrants.[4]  PI Br. 4-7.  But the rule falls within the Executive's authority to issue asylum

6  eligibility requirements and to grant or deny asylum.

7  The rule—which renders any alien who contravenes a proclamation suspending entry long

8  the southern border ineligible for asylum—comports with the INA.  Section 1158(b)(1) makes a

9  grant of asylum a matter of the Executive's discretion, and § 1158(b)(2)(C) authorizes the agency

10  heads to "establish *additional* limitations and conditions . . . under which an alien shall be

11  ineligible for asylum" on top of the six statutory bars on asylum eligibility set forth in

12  § 1158(b)(2)(A).  8 U.S.C § 1158(b)(2)(C) (emphasis added).  To be sure, that broad delegation of

13  authority requires that regulatory asylum-eligibility bars be "consistent with" § 1158.  *Id.*

14  § 1158(b)(2)(C).  But that describes the rule here:  Nothing in § 1158 confers *a right* to asylum

15  *eligibility* for aliens who enter in violation of a specific Presidential proclamation governing a

16  specific border for a specific time in response to a specific crisis, and thus the rule is "consistent

17  with" the broad discretion conferred by that section to impose an asylum-eligibility bar tailored to

18  these circumstances.

19  Against this straightforward analysis, Plaintiffs assert that the agencies may not rely "on

20  the Attorney General's discretion, and such a reliance would be a departure from prior practice. PI

21  Br. 3.  But the Board of Immigration Appeals has long taken account of an alien's manner of entry

---

[3]  Despite the Court's initial finding, nothing about the above analysis changes based on Plaintiffs' procedural APA claims.  *See* Order 16-17.  A plaintiff asserting a violation of the APA's notice-and-comment requirements must demonstrate that he comes within the zone of interests protected by the underlying substantive statute the challenged rule implements.  *See* TRO Opp. 11.  Here, that means Plaintiffs must come within the INA's zone of interests to bring their claims, premised on alleged organizational injury only, which they do not for the reasons discussed.

[4]  As the Court previously noted, Plaintiffs do not actually challenge the President's authority under § 1182(f) or § 1185(a).

in determining whether to grant asylum in individual cases.[5]  *See Matter of Pula*, 19 I. & N. Dec. 467, 473 (BIA 1987) (holding that "manner of entry or attempted entry is a proper and relevant discretionary factor in adjudicating asylum applications").

Plaintiffs also suggest that the distinction between applying for and being able to receive asylum is of no consequence, PI Br. 2-4, but the statute draws a careful distinction between the two.  Indeed, while the Refugee Act of 1980 dealt with the two in a single sub-section, IIRIRA broke the two into separate sub-sections.  Section 1158(a) governs who may apply for asylum, includes several categorical bars (*e.g.*, an alien present in the country for more than one year may not apply), 8 U.S.C. § 1158(a)(1), (2)(B), and authorizes the Attorney General to "provide other conditions or limitations on the consideration of an application for asylum not inconsistent with this chapter," *id.* § 1158(d)(5)(B).  Section 1158(b)(1)(A), in turn, authorizes the Attorney General or the Secretary to "grant asylum to an alien who has applied."  And § 1158(b)(2) specifies six categories of aliens to whom "[p]aragraph (1)" (i.e., the discretionary authority to *grant* asylum to an applicant) "shall not apply."  Any alien falling within one of those categories may *apply* for asylum under § 1158(a)(1) but is *ineligible* to receive asylum under § 1158(b), even though that would "render the right to apply a dead letter."  *See also Nijjar v. Holder*, 689 F.3d 1077, 1082 (9th Cir. 2012) ("[f]raud in the application is not mentioned explicitly, but is one of the 'additional limitations under which an alien shall be ineligible for asylum' that the Attorney General is authorized to establish by regulation").  It therefore is not the case that distinguishing between

---

[5] As the Board has explained, "[a] careful reading of the language of [§ 1158(a)(1)] reveals that the phrase 'irrespective of such alien's status' modifies only the word 'alien' in the first clause of the sentence."  *Matter of Pula*, 19 I. & N. Dec. at 473.  "The function of that phrase is to ensure that the procedure established by the Attorney General for asylum applications includes provisions for adjudicating applications from *any* alien present in the United States or at a land or port of entry, 'irrespective of such alien's status.'"  *Id.* (collecting cases).  Thus, Congress made clear that aliens like stowaways, who, at the time the Refugee Act was passed, could not avail themselves of our immigration laws, would be eligible at least to apply for asylum "irrespective of [their] status."  *See id.*  "The phrase does not apply to the second clause of the sentence, which is independent and separate from the first clause," and "contains authorization for the Attorney General to grant asylum applications at his discretion."  *Id.*  "Thus, while [§ 1158](a) provides that an asylum application be accepted from an alien 'irrespective of such alien's status,' no language in that section precludes the consideration of the alien's status in granting or denying the application in the exercise of discretion."  *Id.* at 467.

*applications* for asylum, and the exercise of discretion *granting* asylum, as § 1158(a)(1) itself does, "render[s] the right to apply a dead letter." PI Br. 3. Section 1158(a)(1) by its terms requires only that an alien be permitted to "apply" for asylum, regardless of the alien's manner of entry. It does not require that an alien be eligible to receive asylum, regardless of the alien's manner of entry. Holding that "the Attorney General could not impose any limitations on asylum eligibility because any regulation that 'limits' eligibility necessarily undermines the statutory guarantee that 'any alien . . . irrespective of such alien's status' may apply for asylum" would render § 1158(b)(2)(C)'s delegation "meaningless, disabling the Attorney General from adopting further limitations while the statute clearly empowers him to do so." *R-S-C v. Sessions*, 869 F.3d 1176, 1187 n.9 (10th Cir. 2017).

Plaintiffs' position thus reduces to the theory that while an alien could be denied asylum on a case-by-case discretionary basis due to his manner of entry or attempted entry, the government cannot categorically deny eligibility for asylum simply because an applicant entered between ports. PI Br. 3 (citing *Pula*, 19 I. & N. Dec. at 474). But that theory does not withstand scrutiny. First, *Pula* merely set forth parameters for deciding whether an alien otherwise eligible for asylum should receive it as a discretionary matter, and decided that such discretion should be exercised based on a multifactor totality-of-the-circumstances approach, not a per se rule treating the manner of entry as disqualifying. 19 I. & N. Dec. at 473. Indeed, as noted above, the BIA concluded that § 1158(a) did not bar the categorical exercise of discretion to deny an alien asylum based on his manner of entry, which was the rule in the years prior to *Pula. See Matter of Salim*, 18 I. & N. Dec. 311, 315-16 (BIA 1982). Rather, the BIA in *Pula* just chose, as a policy matter, to weigh a broader set of factors when exercising discretion to grant or deny asylum claims. *Pula* in no way held that a categorical bar rendering an alien ineligible for asylum based on his manner of entry would violate the INA, and indeed pre-dated the enactment of § 1158(b)(2)(C), which expressly authorized the Attorney General to establish additional eligibility bars "by regulation"—i.e., not on a case-by-case basis. The relevance of *Pula* is that the BIA has properly treated illegal entry as a discretionary factor to consider in the context of individualized asylum adjudications for many years. But nothing in § 1158 forbids the Executive from adopting a categorical eligibility bar—

particularly given the public-safety and foreign-policy problems posed by this specific subset of illegal entrants. *See Komarenko v. INS*, 35 F.3d 432, 436 (9th Cir. 1994). In fact, under *Pula*, consideration of illegal entry will at least sometimes tip the scales against asylum—yet Plaintiffs can provide no explanation how that result is "consistent" with § 1158(a) but the rule here is not. If § 1158(a) does not prohibit the agency from considering manner of entry on a case-by-case basis when determining whether to grant asylum under § 1158(b), there is no textual basis to conclude that it prohibits the agency from considering manner of entry categorically under the express authority to create categorical bars. *See, e.g.*, *Lopez v. Davis*, 531 U.S. 230, 243-44 (2001) (rejecting the argument that the Bureau of Prisons was required to make "case-by-case assessments" of eligibility for sentence reductions and explaining that an agency "is not required continually to revisit 'issues that may be established fairly and efficiently in a single rulemaking'"). The simple fact is that the ultimate "decision whether asylum should be granted to an eligible alien is committed to the Attorney General's [and the Secretary's] discretion," *INS v. Aguirre-Aguirre*, 526 U.S. 415, 420 (1999), and "[u]nder the INA, the term 'discretion' does not supplant [the] general grant of permission for rulemaking," and "'discretion' under section 1158(a) may be exercised by rules giving fixed weight to a particular factor." *Yang v. INS*, 79 F.3d 932, 936-37 (9th Cir. 1996). Indeed, Congress, in enacting 8 U.S.C. § 1158(b)(2)(C), clearly contemplated that the Attorney General would adopt categorical limitations on asylum eligibility, by authorizing the imposition of such restrictions "*by regulation*" and not only case by case. (Emphasis added.)[6]

Finally, the Court's prior reliance on international law is misplaced. Order 20-21. The United States has implemented its "non-refoulement" obligation under the relevant international agreements by providing for withholding of removal, 8 U.S.C. § 1231(b)(3)(A), *see INS v. Cardoza-Fonseca*, 480 U.S. 421, 429 (1987), and protection under the CAT. 8 C.F.R. §§ 208.16(c), 1208.16(c). Asylum is a discretionary benefit that is not required by any treaty commitment.[7] *See, e.g.*, *Mejia v. Sessions*, 866 F.3d 573, 588 (4th Cir. 2017) (ineligibility for

---

[6] In *Pula*, the Board addressed the weight to be given to manner of entry on a case-by-case basis, in the absence of a regulation governing the subject, and prior to § 1158(b)(2)(C)'s existence.

[7] The Ninth Circuit suggested that the Rule may be "arbitrary and capricious" because "it conditions an alien's eligibility for asylum on a criterion that has nothing to do with asylum itself."

asylum not a "penalty" under Article 31(1)).  Moreover, the Court misread the relevant agreements, which pertain only to penalties imposed on refugees "coming directly from a territory where" they face persecution, Article 31(1)—and not, for example, the many aliens from the Northern Triangle countries entering the United States directly from Mexico that the rule seeks to incentivize to stop breaking the law and seek asylum at ports of entry.

## III.    The Rule Satisfies the APA's Procedural Requirements.

This Court did not resolve the merits of Defendants' good-cause and foreign-affairs arguments for issuing the rule without advanced notice-and-comment procedures, Order 24; Stay Order 6, but concluded that both parties demonstrated serious questions going to the merits, Order 28, 29; Stay Order 6.  An injunction cannot be maintained on this basis—the rule was properly issued as an interim final rule.

First, Defendants properly invoked the foreign-affairs exception, which exempts from notice-and-comment rulemaking agency actions "linked intimately with the Government's overall political agenda concerning relations with another country."  *Am. Ass'n of Exporters v. United States*, 751 F.2d 1239, 1249 (Fed. Cir. 1985).  As the Departments explained, "[t]he flow of aliens across the southern border, unlawfully or without appropriate travel documents, directly implicates the foreign policy interests of the United States."  83 Fed. Reg. at 55950.  The rule and proclamation directly relate to "ongoing negotiations with Mexico about how to manage our shared border," and how to consider asylum claims from nationals of Northern Triangle countries, and with the Northern Triangle countries to control the flow of their nationals.  *Id*.  Importantly, "the United States and Mexico have been engaged in ongoing discussions of a safe-third-country agreement"—whereby aliens normally must seek asylum in the first country they enter, rather than transiting one country to seek asylum in another.  *Id*.  By discouraging illegal entry during this crisis and requiring orderly processing, the rule and proclamation will help "develop a process to provide this influx with the opportunity to seek protection at the safest and earliest point of transit possible" and "establish compliance and enforcement mechanisms for those who seek to enter the

---

Op. 46.  But Plaintiffs have not raised that claim, and so this Court cannot premise any injunction on that ground, which must be viewed as dicta.

United States illegally, including for those who do not avail themselves of earlier offers of protection." *Id*. These interlocking goals are all "linked intimately with the Government's overall political agenda concerning relations with another country." *Am. Ass'n of Exporters*, 751 F.2d at 1249. This Court and Plaintiffs err in suggesting that these foreign-affairs consequences are insufficient and second-guessing them. Order 26-27. Indeed, review under this exception is particularly deferential. Unlike the good-cause exception under 5 U.S.C. § 553, which includes a requirement that the agency "incorporate[] the finding [of good cause] and a brief statement of reasons therefor in the rules issued," *id*. § 553(b)(B), there is *no* requirement of a written record or any other language that contemplates anything but deferential judicial review: "This section applies, according to the provisions thereof, except to the extent that there is involved . . . a military or foreign affairs function of the United States." *Id*. § 553(a)(1). Given that Congress was surely aware of the intrusions that would be required for judicial review over "military or foreign affairs function[s]," and given that Congress clearly knew how to enable judicial review with respect to other types of exemptions to the APA's procedural requirements, it is reasonable to assume that, at a minimum, Congress did not intend for expansive or searching judicial review into an agency's invocation of the "foreign affairs function" exception. That makes eminent sense: here, for example, notice-and-comment rulemaking would slow and limit the President's ability to negotiate with Mexico and Northern Triangle governments, and a "prompt response" is needed to address the crisis at the southern border. *Yassini*, 618 F.2d at 1360. The Executive Branch's choice here—to require aliens seeking asylum to undergo orderly processing at ports of entry while safely in Mexico where they could also request asylum—is a "[d]ecision[] involving the relationships between the United States and its alien visitors" that "implicate[s] our relations with foreign powers" and "implement[s] the President's foreign policy." *Id*. at 1361. The Court and Plaintiffs are not positioned to second-guess the Executive Branch's determination that the rule would facilitate negotiations and support the President's foreign policy, and the Attorney General and the Secretary cannot reasonably be expected to spell out its negotiating strategy in detail in the administrative record. *Cf. Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 491, (1999) ("The Executive should not have to disclose its 'real' reasons for deeming nationals of a

particular country a special threat—or indeed for simply wishing to antagonize a particular foreign country by focusing on that country's nationals—and even if it did disclose them a court would be ill equipped to determine their authenticity and utterly unable to assess their adequacy").

Although the Court was wrong to require an evidentiary showing that "undesirable international consequences would result from following rulemaking procedures," Order 26, the record in fact makes that showing. The channeling of aliens to ports of entry itself encourages Mexico to take account of those aliens and to cooperate with the United States in addressing unlawful mass migration, a core plank of the President's foreign-policy agenda that would be undermined by notice-and-comment rulemaking, given that prior "sustained diplomatic negotiations . . . regarding the situation on the southern border" have "to date, proved unable to meaningfully improve the situation." 83 Fed. Reg. at 55935, 55950-51; *see* AR 484-91 (President Trump announcing an upcoming initiative to address the large numbers of people traveling to the United States through Mexico); AR092-96 (Memorandum of Understanding between the United States and Mexico). Plaintiffs' reliance on the opinions of former government officials is not properly before the Court in an APA case, *see* 5 U.S.C. § 706, and in any event those opinions are irrelevant, as the agency heads in the *current* Administration are entitled to make decisions based on *current* information available to them.

Second, this Court's prior good-cause analysis was flawed. The good-cause exception applies when "the very announcement of a proposed rule itself can be expected to precipitate activity by affected parties that would harm the public welfare." *Mobil Oil Corp. v. DOE*, 728 F.2d 1477, 1492 (TECA 1983). Significant "threat[s] to public safety" provide good cause to make rules without pre-promulgation notice and comment. *Hawaii Helicopter Operators Ass'n v. FAA*, 51 F.3d 212, 214 (9th Cir. 1995). The Departments recognized that pre-promulgation notice and comment or a delayed effective date "would result in serious damage to important interests" by encouraging a surge of aliens to enter between ports of entry before the rule took effect and that such crossings risk the safety of aliens and Border Patrol agents. 83 Fed. Reg. at 55949-50.

This Court (and the Ninth Circuit) accepted that the rule's purpose of encouraging aliens to present at ports of entry "makes some intuitive sense." Order 28; *see* Op. 56. Yet this Court

concluded that it must "assess[] the reasonableness of the Rule's linchpin assumption" through further proceedings.  Order 29.  But under the good-cause exception, the government need only state its reasons for invoking the exception.  *See* 5 U.S.C. § 553(b)(B), (d)(3).  That is because this exception often involves predicting future actions and risks, where courts are ill-equipped to second-guess the Executive Branch's prospective judgment.  *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 34-35 (2010) ("The Government, when seeking to prevent imminent harms in the context of international affairs and national security, is not required to conclusively link all the pieces in the puzzle before we grant weight to its empirical conclusion.").  The Court thus does not conduct an evidentiary hearing to assess the government's stated reasons ex post; rather, it evaluates the reasons set forth to determine whether they are arbitrary and capricious.  *See United States v. Valverde*, 628 F.3d 1159, 1165 (9th Cir. 2010) (stating rule need did not provide a "rational justification" for good cause). Those reasons are plainly not arbitrary and capricious given this Court's acknowledgement that the government's concern "makes . . . intuitive sense" and given that rules governing border crossing are often issued under this exception to avoid the same harms.  *See* 82 Fed. Reg. at 4770; 69 Fed. Reg. 48877.

And even if the Court and Plaintiffs were correct that the government must affirmatively show through a record that the undesired consequences were likely to occur, the record amply demonstrates that the behaviors of intending migrants change as policy changes—including making quick decisions based on perceptions of future policies.  *See* AR 391 (recounting how smugglers "now tell potential customers the Americans do not jail parents who bring children— and to hurry up before they might start doing so again"); *see also* AR 393 (discussing the correlation between the decline in single adults claiming a fear of persecution and the increase in parents entering with children claiming a fear of persecution and suggesting this is related to the fact that single adults are detained during their proceedings while families are not); AR 505-08 (discussing data reflecting motivations for crossing the border illegally and asserting credible fear).

## IV.   The Balance of Harm Factors Foreclose Issuing a Preliminary Injunction

An injunction would undermine the Executive Branch's constitutional and statutory authority to secure the Nation's borders, and it invites the very harms to the public that the

Executive Branch sought to address in the rule and proclamation. The Departments explained that the rule is urgently needed to discourage aliens from crossing the border illegally, raising meritless asylum claims, and securing release into the country. In FY2018, 396,579 aliens were apprehended entering unlawfully between ports of entry along the southern border. 83 Fed. Reg. at 55948. That is over 1,000 aliens every day—many with families and children—who are making a dangerous and illegal border crossing rather than properly presenting at a port of entry. And the rate of aliens asserting a "credible fear" has gone up by 2000% since 2008, from "5,000 a year in [FY] 2008 to about 97,000 in FY 2018," while a large majority of these asylum claims are not meritorious. *Id.* at 55935, 55946 (of 34,158 case completions in FY2018 that began with a credible-fear claim, 71% resulted in a removal order, and asylum was granted in only 17%). The Departments acted to address the "urgent need to deter foreign nationals from undertaking dangerous border crossings," especially the "thousands of aliens traveling in groups . . . expected to attempt entry at the southern border in the coming weeks." *Id.* at 55950. The rule explained that immediate action was warranted for the swift protection of the United States' southern border, immigration officers, and the many aliens who die each year crossing the border, *see id.*, numbering in the hundreds.[8]

Plaintiffs dismiss these risks as "vague platitudes," but these facts are real and indisputable. *See* note 8. Plaintiffs also suggest that the number of aliens apprehended entering between ports of entry "is far lower than in recent years." PI Br. 18. But the total number of individuals apprehended has in fact increased since last year,[9] and individuals apprehended specifically from Northern Triangle countries—the very problem the rule seeks to combat—has dramatically increased. 83 Fed. Reg. at 55944-45; AR 509 (of the 20,784 cases completed in 2018 that originated from positive credible fear determinations for aliens from El Salvador, Guatemala, and Honduras, only 1,989 were granted relief—approximately 9.6%). And it is also irrelevant: a

---

[8] U.S. Border Patrol Fiscal Year Southwest Border Sector Deaths (FY 1998 - FY 2017), https://www.cbp.gov/sites/default/files/assets/documents/2017-Dec/BP%20Southwest%20Border%20Sector%20Deaths%20FY1998%20-%20FY2017.pdf (294 deaths in FY2017); *see also* https://missingmigrants.iom.int/region/americas?region=1422 (368 deaths thus far in 2018).
[9] CBP, Southwest Border Migration FY 2019, https://www.cbp.gov/newsroom/stats/sw-border-migration.

central problem that the rule addresses is not just apprehensions overall, but aliens, primarily from Northern Triangle countries, breaking our laws and then, if caught, filing meritless asylum claims in order to secure release into the interior. *See id*. Enjoining the rule thus exacerbates these real and undeniable harms.

The injunction also constitutes a major and "unwarranted judicial interference in the conduct of foreign policy." *Kiobel v. Royal Dutch Petroleum*, 569 U.S. 108, 116 (2013). The Executive Branch—tasked with foreign relations—decided to "encourage . . . aliens to first avail themselves of offers of asylum from Mexico" and is engaging in international negotiations accordingly. 83 Fed. Reg. at 55950. This Court second-guessed that decision based on conclusory declarations submitted by Plaintiffs that "asylum seekers experience high rates of violence and harassment while waiting to enter, as well as the threat of deportation to the countries from which they have escaped." Order 30. The Court lacked authority to engage in such second-guessing premised on risks that any alien whether or not subject to the rule risks by migrating through Mexico. Indeed, the rule seeks to prevent "needless deaths and crimes associated with human trafficking and alien smuggling operations" (83 Fed. Reg. 55950) and ensures that aliens in the United States who are ineligible for asylum will not be returned to countries where they face a likelihood of persecution or torture. The injunction undermines the separation of powers by blocking the Executive Branch's lawful use of its authority to serve these goals and prevents the Executive from relying on the rule to aid diplomatic negotiations for at least 30 days, a significant portion of the time the President determined that exigent measures at the southern border were needed.

In contrast, Plaintiffs have not shown that they themselves face irreparable harm cognizable under the INA and tied to the rule. They assert that they, "their clients, and other asylum seekers" will be irreparably harmed if the rule goes back into effect. PI Br. 16. They are mistaken.

First, Plaintiffs may not rely on alleged harms to "their clients" or "other asylum seekers." Plaintiffs rely on this Court's observation that "those clients 'experience lengthy or even indefinite delays waiting at designated ports of entry along the southern border,'" and face 'high rates of violence and harassment while waiting to enter, as well as the threat of deportation to the countries

from which they have escaped," requiring them to "choose between violence at the border, violence at home, or giving up a pathway to refugee status."  PI Br. 17 (quoting Order 30, 32).  But as the Ninth Circuit held in rejecting Plaintiffs' third-party standing claims, "these harm[s] . . . [are] not traceable to the challenged Rule, which has no effect on the ability of aliens to apply for asylum at ports of entry."  Op. 27.  And Plaintiffs' "clients, of course, would not have standing to assert a right to cross the border illegally, to seek asylum or otherwise."  Op. 28 ("although the Organizations describe significant hindrances their clients have experienced in applying for asylum at ports of entry, as well as significant risks their clients may face in towns lining the country's southern border, neither of those concerns is at issue in this lawsuit").  And because Plaintiffs may not demonstrate Article III standing based on alleged harms to their clients or other asylum seekers, they cannot rely on those allegations to demonstrate irreparable harm.  *See Associated Gen. Contractors of California, Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1410 (9th Cir. 1991).  Thus, this Court's reliance on harms to third parties because "Defendants have not shown serious questions on third-party standing," Stay Order 7, cannot stand.

Second, the alleged "loss of an opportunity to comment," PI Br. 17, on a rule is not sufficient to demonstrate irreparable harm.  *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987) (there could be no presumption of irreparable harm based on violation of a statutory procedural requirement).  A putative procedural violation generally does not produce irreparable injury because the violation has already occurred and can "be remedied by a decision on the merits" (such as by requiring the agency to re-do the decision using the proper procedures). *See Elk Associates Funding Corp. v. U.S. Small Bus. Admin.*, 858 F. Supp. 2d 1, 31 (D.D.C. 2012).  Thus, "irreparable injury cannot stand on procedural violation alone without showing another actual injury not compensable in money damages."  *Am. Ass'n for Homecare v. Leavitt*, No. 08-cv-0992, 2008 WL 2580217, at *5 (D.D.C. June 30, 2008) (collecting cases).

That leaves Plaintiffs' claim that the rule causes "diversion of Plaintiffs' resources and efforts away from their core missions, and places their operations in jeopardy in ways that cannot be remedied after the fact."  PI Br. 16.  But while such injuries may be sufficient to establish *standing* under the Ninth Circuit's analysis, they fail to demonstrate immediate and irremediable

harm for purposes of an injunction.  *See Sampson v. Murray*, 415 U.S. 61, 90 (1974) (injuries "in terms of money, time and energy" insufficient).  Plaintiffs' declarants merely speculate that recoverable monetary losses will come too late, but such speculation is insufficient.  Indeed, even asylum-ineligible aliens may still apply for withholding of removal and CAT protection, and do so through the same asylum application process, so it is entirely speculative that this state of affairs will somehow cause Plaintiffs imminent and irremediable losses.  *See* 83 Fed. Reg. at 55946 ("current backlog of asylum cases exceeds 200,000" and more than 200,000 inadmissible aliens present themselves for inspection at ports of entry annually (even without the additional incentive to do so that the rule would create)).  Given the large universe of potential clients, any adverse effect on Plaintiffs' funding or mission is merely conjuncture at this point.[10]

Nor can Plaintiffs manufacture injury by spending additional resources in response to the rule.  Plaintiffs have no "legally protected interest," *Gill*, 138 S. Ct. at 1929, in not devoting their own resources to advocating for their clients.  *See, e.g.*, *Nat'l Taxpayers Union,* 68 F.3d at 1434.  And so they cannot demonstrate irreparable harm based on the same alleged injury.  *Associated Gen. Contractors*, 950 F.2d at 1410.  And even if Plaintiffs had a legally protected interest in not reallocating their resources, any injury to that interest would not be caused by the rule but rather by Plaintiffs' own choices in response to the rule; such "self-inflicted injuries" would not be fairly traceable to the rule, and thus not a harm, let alone an irreparable one, caused by it.  *See Clapper*, 568 U.S. at 416.

## V.    Any Interim Relief Must Be Sharply Limited.

Even if Plaintiffs were entitled to any relief, it would have to be strictly limited.

---

[10] The cases Plaintiffs rely on are inapt.  PI Br. 16-17.  *League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016), and *Open Comms. Alliance v. Carson*, 286 F. Supp. 3d 148, 178 (D.D.C. 2017), requires an actual *showing* that the agencies programs have been "perceptibly impaired."  *Valle del Sol*, 732 F.3d at 1018-19, 1029 (9th Cir 2013) and *Exodus Refugee Immigration*, 165 F. Supp. 3d at 739 did not address irreparable harm tied to funding at all, but rather addressed whether *constitutional* violations may support irreparable harm.  *Doe v. Trump*, 288 F. Supp. 3d 1045, 1082 (W.D. Wash. 2017), involved actual evidence, rather than speculation, that the organizations would "need to lay-off employees, reduce services, cancel established programs, lose institutional knowledge, and ultimately lose goodwill with volunteers and community partner."  None of these cases suggest that bare speculation, absent an actual *showing* of harm, is sufficient.

**A.  The Court May Not Issue Any Injunctive Relief Impacting Expedited Removal**

First, as the Ninth Circuit held, Plaintiffs may not invoke the rights of individual aliens. Op. 27-28.  An injunction premised on such injuries would therefore be inappropriate.  *See Zepeda v. INS*, 753 F.2d 719, 728 n.1 (9th Cir. 1983).  Such aliens may pursue their own claims, but only in the correct venue—either before the District Court for the District of Columbia in a challenge to expedited removal or credible-fear procedures or in full removal proceedings before the immigration courts.  *See* 8 U.S.C. § 1252(a)(5), (b)(9), (e)(3).  Indeed, organizations like Plaintiffs may not pursue such claims with respect to expedited removal procedures, *see Am. Immigration Lawyers Ass'n v. Reno (AILA)*, 199 F.3d 1352, 1359 (D.C. Cir. 2000), or full removal proceedings, *see J.E.F.M. v. Lynch*, 837 F.3d 1026, 1035 (9th Cir. 2016), and the INA carefully circumscribes the forms of relief available in such proceedings.  So it would be especially inappropriate to enter an injunction that reaches third-party aliens.

Plaintiffs have no answer to this argument and the Ninth Circuit did not address it, given its other rulings.  And although this Court suggested that § 1252(e)(3) did not limit its authority, that was wrong.  First, the Court's suggestion that it "could simply enjoin the Rule as it amends asylum eligibility in 8 C.F.R. §§ 208.13, 1208.13," Order 35, is misplaced, because that Court went beyond that provision, and also enjoined the rule's amendment of 8 C.F.R. §§ 208.30(e)(5) and 1208.30(e)(5), which apply exclusively in expedited removal proceedings.  Second, it is "clear that this provision applies to" organizational Plaintiffs' APA claims.  Order 35.  Section 1252(e)(3) is by its terms the sole basis for jurisdiction for any challenge to expedited removal or credible fear procedures.  *See* 8 U.S.C. §§ 1252(e)(1)(A) (limiting remedies to those authorized by subsequent provision of § 1252(e)), 1252(e)(3)(A) (providing the exclusive means for judicial review of determinations under § 1225(b)).  Thus, no one, let alone an organizational plaintiff, can invoke 28 U.S.C. § 1331 as grounds for jurisdiction.

And even as to situations where jurisdiction does lie—again, only in the District of Columbia—relief can extend only to the individual seeking relief that is subject to an expedited removal order.  Congress provided for "judicial review of determinations under section 1225(b) and its implementation."  8 U.S.C. § 1252(e)(3)(A).  A "determination under section 1225(b) and

its implementation" is an individual "determin[ation] than an alien . . . is inadmissible" and "order[ed] . . . removed" or subject to expedited credible-fear screening and the implementation of those statutory provisions.  *Id.* § 1225(b)(1)(A)(i) & (ii).  In other words, the District of Columbia—and only that court—reviews—and can issue relief that extends only so far as—the expedited removal determinations of the individuals before that court.  *AILA*, 199 F.3d at 1359 (claim may be brought "by, and only by, aliens against whom the new procedures ha[ve] been applied").  It is in the context of those "determinations under section 1225(b) and its implementation" that the court "determin[es] . . .whether . . . a regulation, or a written policy . . . issued . . . to implement such section . . . is . . . in violation of law."  8 U.S.C. § 1252(e)(3)(A)(ii).  Thus, if the Court finds that a regulation or policy violates the law, the appropriate relief is to vacate the expedited removal determination that was issued based on that erroneous policy.  Such an order is then subject to expedited appeal.  *Id*. § 1252(e)(3)(C) & (E).  As the D.C. Circuit has explained, Congress imposed these limits "to cabin judicial review," and "Congress, having barred class actions," did not "intend[] to permit actions on behalf of a still wider group of aliens, actions in which no class representative appears as a party and the plaintiffs are unconstrained by the requirements of Federal Rule of Civil Procedure 23."  *AILA*, 199 F.3d at 1359, 1364.[11]

Second, the statute precludes injunctive relief.  Section 1252(e)(1), which limits the scope of relief that the Court can provide under § 1252(e)(2) and (3), provides that "[w]ithout regard to the nature of the action or claim and without regard to the identity of the party or parties bringing the action, no court may . . . enter declaratory, injunctive, or other equitable relief in any action pertaining to an order to exclude an alien in accordance with section 1225(b)(1) of this title except as specifically authorized in a subsequent paragraph of this subsection."  8 U.S.C. § 1252(e)(1). No other "subsequent paragraph" of § 1252(e) authorizes courts to enter a preliminary injunction.  Section 1252(e)(3) is silent on this point, so it cannot be read to affirmatively authorize what § 1252(e)(1) explicitly forbids.  *See INS v. Pangilinan*, 486 U.S. 875, 883 (1988) ("courts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of

---

[11] The Court's prior reliance on *M.M.M. ex rel. J.M.A. v. Sessions*, 319 F. Supp. 3d 290, 293, 296 (D.D.C. 2018), is thus misplaced, as *M.M.M.* involved *individual* plaintiffs and the claims transferred did not arise from the expedited removal determinations

law"). Instead, the sole specifically authorized remedy that § 1252(e)(3) affords is a "determination[]" on the merits—not preliminary equitable relief—regarding the validity of the policies before it in the context of an individual expedited removal order, 8 U.S.C. § 1252(e)(3)(A), and an "order" to that effect, *id*. § 1252(e)(3)(C). That provision, which authorizes a "determination," does not "specifically authorize[]" equitable relief. *Id*. § 1252(e)(1)(A); *compare id*. § 1252(e)(4)(B) (specifically authorizing delimited equitable relief in habeas). Importantly, the number of expedited removals in a year are in the hundreds of thousands, and there is no right under the Constitution to obtain court consideration of a request to enter the country. In this context, Congress did not intend for preliminary relief, based on equitable factors, to be obtained by individual persons subject to expedited removal or for relief to extend beyond that individual case. Instead, challenges would go forward without interfering with expedited removal until—if the Supreme Court determines that the issue warrants its attention—there is a final binding determination that the policy is not lawful. *See id*. § 1252(e)(3)(D); *id*. § 1252(f)(1) (only Supreme Court may "enjoin or restrain the operation of the provisions" implementing removal).[12]

## B.  The Court Cannot Enjoin Operation of the Rule under the APA

If this Court were to ultimately hold that the government exceeded its authority or needs to engage in notice-and-comment rulemaking, the remedy—after a determination on the merits— would be to remand to the agencies for a rulemaking consistent with the Court's order. At this

---

[12] Even were § 1252(e)(3) not clear, it "must be read in [its] context and with a view to [its] place in the overall statutory scheme." *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989). The legislative history of IIRIRA, which added § 1252 and established expedited removal, shows that Congress generally intended that only "the Supreme Court [has the authority] to enjoin the operation" of the expedited removal scheme and its implementation. H.R. Rep. No. 104-469(I), "Immigration in the National Interest Act of 1995" (Mar. 4, 1996). The limitations on relief "do not preclude challenges to . . . new procedures, but the procedures will remain in force while such lawsuits are pending." *Id*. "[S]ingle district courts or courts of appeal do not have authority to enjoin" such procedures but may only "issue injunctive relief pertaining to the case of an individual alien." *Id*.; *see also* 8 U.S.C. § 1252(f)(1). It would make no sense for Congress to have precluded injunctive relief in this way in the general scheme, to reiterate that restriction on equitable relief in (e)(3), and to also expressly bar class actions, only to then nonetheless permit, with no clear statement, broad injunctive remedies that extended beyond the individual seeking relief in the expedited removal scheme under § 1252(e)(3), where Congress sought to limit court involvement the most given the need for border operations to be unimpeded.

intermediate stage, the APA itself provides that the Court may, "to the extent necessary to prevent irreparable injury," only "preserve [the] status or rights [of plaintiffs] pending conclusion of the review proceedings."  5 U.S.C. § 705.  That provision does not "confer authority to grant relief" beyond the narrow confines of permitting appellate courts "to issue appropriate writs in aid of [their] jurisdiction."  *Sampson*, 415 U.S. at 69, 73, & n.15; *cf. Nat'l Mining Assoc. v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399 (D.C. Cir.1998) (allowing permanent injunction but only *after* decision on the merits).  In allowing preliminary injunctions only "to the extent necessary to prevent irreparable injury," the APA thus codifies the principle that preliminary injunctions are not designed to "enjoin all possible breaches of the law," but rather to "remedy the specific harms" allegedly suffered by *plaintiffs*.  *Zepeda*, 753 F.2d at 728 n.1.

Plaintiffs' contrary arguments are misplaced.  *Regents of the Univ. of California v. DHS*, 908 F.3d 476, 511 (9th Cir. 2018), involved a claim that government action was arbitrary and capricious; no such claim is presented here, and *Regents* is the subject of a pending petition for certiorari.  *Nat'l Mining Ass'n*, 145 F.3d at 1409, addresses a *permanent* injunction after decision on the merits on an APA claim.  *Earth Island Inst. v. Ruthenbeck*, 490 F.3d 687, 699 (9th Cir. 2007), was reversed on other grounds after the Supreme Court granted certiorari on the scope-of-relief question.  And *Hawaii v. Trump*, 878 F.3d 662, 701 (9th Cir. 2017), and *Washington v. Trump*, 847 F.3d 1151, 1167 (9th Cir. 2017), did not involve APA claims and where either reversed on other grounds (*Hawaii*) or mooted by a subsequent executive order (*Washington*).

## C.  The Court May Not Issue a Nationwide Injunction

Finally, even if some sort of preliminary relief were appropriate, the Court lacks authority to enjoin the rule's application nationwide as Plaintiffs request.  PI Br. 20-21.  Article III and equitable principles require that relief be no broader than necessary to redress the Plaintiffs' injuries.  Under Article III, "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury."  *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018).  And the rule in equity is that injunctions "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."  *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).  Indeed, nationwide injunctions "did not emerge until a century and a half after the founding," and they

1    "take a toll on the federal court system—preventing legal questions from percolating through the

2    federal courts, encouraging forum shopping, and making every case a national emergency for the

3    courts and for the Executive Branch."  *Hawaii*, 138 S. Ct. at 2425 (Thomas, J., concurring).  And

4    such injunctions mean a plaintiff need only win once to stop a national law or policy—but the

5    government needs to win every case.  *Cf. United States v. Mendoza*, 464 U.S. 154, 158-64 (1984).

6            Plaintiffs insist that a nationwide injunction is appropriate because to hold otherwise would

7    give their "clients special rights" in the form of their injunction.  PI Br. 21.  But that is how any

8    injunctive relief works—the parties to the case are bound, and thus have rights different from the

9    public at large. But more to the point, given the Ninth Circuit's decision, Plaintiffs cannot rely on

10   any injuries to third parties, since they lack standing to assert claims based on them, Op. 27-28,

11   and so, contrary to this Court's prior order, any remedy may not be premised on "the rights of their

12   asylum seeker clients."  Order 34.  There is thus no concern of "undermin[ing] the uniformity of

13   the immigration laws," as any injunction must "be tailored to redress" Plaintiffs' particular alleged

14   resource-allocation harms, the only injuries they have standing to seek a remedy for.  *See Gill*, 138

15   S. Ct. at 1934.[13]  Accordingly, any injunction must be limited to Plaintiffs actual, bona fide clients,

16   which to date they have failed to identify.  Op. 28 ("the Organizations do not assert third-party

17   standing on behalf of any client who entered the country" affected by the rule).  And to the extent

18   that Plaintiffs assert funding harms premised on applications they might file in the future on behalf

19   of illegal entrants, they would not have "standing to assert a right to cross the border illegally, to

20   seek asylum or otherwise" on behalf of aliens any more than the aliens themselves would, Op. 29,

21   and may not assert a right to the entry of a third-party alien premised on the fact that their business-

22   model depends on those aliens breaking the law.  *See, e.g.*, *Initiative & Referendum Inst. v. Walker*,

23   450 F.3d 1082, 1093 (10th Cir. 2006); *Jadeja v. Redflex Traffic Sys., Inc.*, 764 F. Supp. 2d 1192,

24   1196 (N.D. Cal. 2011).  So any injunctive relief cannot remedy such a non-cognizable "harm."

## CONCLUSION

26          For these reasons, the Court should deny the motion for a preliminary injunction.

---

[13] Even if there was a concern of uniformity, it is unfounded: the petition for review procedure countenances dis-uniformity writ large, as 11 different circuit courts address immigration issues on a case-by-case basis, such that the law is inconsistent by design.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

SCOTT G. STEWART
Deputy Assistant Attorney General

AUGUST E. FLENTJE
Special Counsel

WILLIAM C. PEACHEY
Director

By: /s/ Erez Reuveni
EREZ REUVENI
Assistant Director
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 307-4293
Email: Erez.R.Reuveni@usdoj.gov

PATRICK GLEN
Senior Litigation Counsel

JOSEPH DARROW
FRANCESCA GENOVA
KATHRYNE GRAY
CHRISTINA P. GREER
BENTON YORK
Trial Attorneys

Dated: December 12, 2018                    *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on December 12, 2018, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of for the Northern District of California by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

By: */s/ Erez Reuveni*
EREZ REUVENI
Assistant Director
United States Department of Justice
Civil Division

JOSEPH H. HUNT
*Assistant Attorney General*
SCOTT G. STEWART
*Deputy Assistant Attorney General*
AUGUST E. FLENTJE
*Special Counsel*
WILLIAM C. PEACHEY
*Director*
EREZ REUVENI
*Assistant Director*
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 307-4293
Email: Erez.R.Reuveni@usdoj.gov
PATRICK GLEN
*Senior Litigation Counsel*
JOSEPH DARROW
KATHRYNE GRAY
FRANCESCA GENOVA
CHRISTINA GREER
BENTON YORK
*Trial Attorneys*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| East Bay Sanctuary Covenant, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> Donald J. Trump, President of the United States, *et al.*, <br><br> Defendants. | [PROPOSED] ORDER DENYING MOTION FOR PRELIINARY INJUNCTION <br><br> Civil Action No. 1:18-cv-06810-JST |

Before the Court is the Plaintiffs' motion for a preliminary injunction.  Having reviewed the motion, Defendants' response, and Plaintiffs' reply, IT IS HEREBY ORDERED that the motion is DENIED.

Issued this _____ day of _____, 2018.

_____
United States District Judge

[PROPOSED] ORDER
*East Bay Sanctuary v. Trump*,
Case No. 1:18-cv-06810-JST