Jennifer Chang Newell (SBN 233033)
Cody Wofsy (SBN 294179)
Spencer Amdur (SBN 320069)
Julie Veroff (SBN 310161)
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-0770
F: (415) 395-0950
*jnewell@aclu.org*
*cwofsy@aclu.org*
*samdur@aclu.org*
*jveroff@aclu.org*

Lee Gelernt*
Judy Rabinovitz*
Omar C. Jadwat*
Celso Perez (SBN 304924)
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*ojadwat@aclu.org*
*cperez@aclu.org*

*Attorneys for Plaintiffs* (Additional counsel listed on following page)

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| East Bay Sanctuary Covenant, *et al*., <br><br> *Plaintiffs*, <br><br> v. <br><br> Donald J. Trump, President of the United States, *et al*., <br><br> *Defendants*. | Case No.: 18-cv-06810-JST <br><br> **REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** <br><br> Hearing: December 19, 2018, 9:30 a.m. |

1  Melissa Crow*
   SOUTHERN POVERTY LAW CENTER
2  1666 Connecticut Avenue NW, Suite 100
   Washington, D.C. 20009
3  T: (202) 355-4471
   F: (404) 221-5857
4  melissa.crow@splcenter.org

5  Mary Bauer*
   SOUTHERN POVERTY LAW CENTER
6  1000 Preston Avenue
   Charlottesville, VA  22903
7  T:  (470) 606-9307
   F:  (404) 221-5857
8  mary.bauer@splcenter.org

Baher Azmy*
Angelo Guisado*
Ghita Schwarz*
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
T: (212) 614-6464
F: (212) 614-6499
bazmy@ccrjustice.org
aguisado@ccrjustice.org
gshwartz@aclu.org

Christine P. Sun (SBN 218701)
Vasudha Talla (SBN 316219)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
T: (415) 621-2493
F: (415) 255-8437
csun@aclunc.org
vtalla@aclunc.org

9
10
11
12  *Attorneys for Plaintiffs*
13  *Admitted pro hac vice*
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

**INTRODUCTION**

Both this Court and the Ninth Circuit have already held that Plaintiffs have standing and are likely to succeed on the merits, and that the rule should be enjoined in full. *See East Bay Sanctuary Covenant v. Trump*, 2018 WL 6428204 (9th Cir. Dec. 7, 2018) (hereinafter CA9 Op.); TRO Order. The administrative record offers nothing to disturb those conclusions, and the government has not submitted any additional evidence.

Congress long ago determined that an individual's manner of entry should not categorically bar her from asylum in the United States. Unsatisfied with that determination, "the Executive has attempted an end-run around Congress," CA9 Op. *17, and has done so in a way that causes irreparable harm to Plaintiffs and threatens the safety of thousands of individuals seeking refuge from persecution. But, as the Ninth Circuit observed, just as judges "may not . . . 'legislate from the bench,' neither may the Executive legislate from the Oval Office." *Id.*[1]

## I.   PLAINTIFFS' CLAIMS ARE JUSTICIABLE

This Court and the Ninth Circuit have held this case is justiciable, and the government has not adduced new evidence on that issue. The government simply reiterates its legal arguments that Plaintiffs cannot establish standing under *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), or an economic-loss theory, *see* Opp. 5, but that position is foreclosed by the Ninth Circuit's decision, *see* CA9 Op. *10-12.[2]

First, as the Ninth Circuit and this Court recognized, the Rule plainly frustrates Plaintiffs' mission. *See id.* at *11 (recognizing frustration of certain Plaintiffs' "mission of providing legal aid 'to affirmative asylum applicants who have entered' the United States between ports of entry,

---

[1] Plaintiffs advise the Court that the government sought a stay in the Supreme Court on Tuesday December 11, 2018. That stay application remains pending.

[2] Plaintiffs respectfully disagree with the Ninth Circuit's conclusion that they do not have third-party standing to sue, *see* CA9 Op. *10, and preserve the argument for appeal. *See* Motion for Preliminary Injunction ("Mot.") at 11-12.

because the Rule significantly discourages a large number of those individuals from seeking asylum given their ineligibility"); TRO Order 11 (holding Plaintiffs' "mission has been frustrated in numerous cognizable ways"); *see also* Mot. 9 (citing Plaintiff declarations).  Plaintiffs "have also offered uncontradicted evidence that enforcement of the Rule has required, and will continue to require, a diversion of resources, independent of expenses for this litigation, from their other initiatives."  CA9 Op. *11.  For example, Plaintiffs must develop new training materials, retrain staff, conduct detailed screenings for alternative forms of relief, "submit a greater number of applications for family-unit clients who would have otherwise been eligible for asylum," and undertake new education and outreach initiatives, all of which require a diversion of resources away from core organizational services.  *Id.*; *see also* Mot. 10-11 (citing declarations).  The Ninth Circuit has repeatedly held that these types of impacts are sufficient to satisfy Article III.  *See* Mot. 11 (collecting cases).

Second, Plaintiffs have shown that "the Rule will cause them to lose a substantial amount of funding."  CA9 Op. *12; Mot. 8 (citing declarations); ECF No. 82-1 (Amicus States) at 8-9.  Contrary to the government's claim, *see* Opp. 6, Plaintiff EBSC has submitted unrebutted evidence that they cannot maintain this funding by assisting asylum seekers who enter the country at ports of entry.  *See* ECF No. 71-10 (explaining why EBSC cannot represent asylum seekers who enter at ports); Mot. 9.

Because of these injuries, the Ninth Circuit held that Plaintiffs also have Article III standing to challenge the absence of notice-and-comment procedures.  CA9 Op. *12 n.8; *see also, e.g.*, ECF No. 35-10 ¶¶ 3-7; ECF No. 35-6 ¶¶ 2-4.  The government offers no basis to hold otherwise.

The Ninth Circuit further held that Plaintiffs' claims fall within the INA's zone of interests.  CA9 Op. *12-14.[3]  The government provides no basis to revisit that conclusion.  The law is clear

---

[3] For purposes of Plaintiffs' APA notice-and-comment claim, the Ninth Circuit held that because Plaintiffs "are within the zone of interests protected by the INA," they "may challenge the absence of notice-and-comment procedures . . . ."

that a statute need not create a benefit for a plaintiff, nor even that there be "any 'indication of congressional purpose to benefit the would-be plaintiff.'"  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 & n.7 (2012).  "[I]t is sufficient that the Organizations' asserted interests are consistent with and more than marginally related to the purposes of the INA."  CA9 Op. *13.

## II.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

### A.  The Rule Violates the INA.

As this Court and the Ninth Circuit have held, Plaintiffs are "likely to succeed on their claim that the Rule together with the Proclamation is inconsistent with 8 U.S.C. § 1158(a)(1)."  CA9 Op. *15.  Defendants' recycled arguments, *see* Opp. 9-13, do nothing to undermine this conclusion. They continue to suggest that a categorical eligibility limitation established pursuant to 8 U.S.C. § 1158(b)(2)(C) cannot violate § 1158(a)(1) because § 1158(a)(1) addresses only the right to *apply* for asylum, not *eligibility* for asylum.  But that reading of the statute was properly rejected by this Court and the Ninth Circuit.  As the Ninth Circuit explained: "It is the hollowest of rights that an alien must be allowed to apply for asylum regardless of whether she arrived through a port of entry if another rule makes her categorically ineligible for asylum based on precisely that fact. . . .  The technical differences between applying for and eligibility for asylum are of no consequence to a refugee when the bottom line—no possibility of asylum—is the same."  CA9 Op. *15; *see also* TRO Order 21 (similar).

Moreover, the government's suggestion that a § 1158(b)(2)(C) limitation necessarily cannot be inconsistent with § 1158(a)(1) because the former governs eligibility and the latter governs applications is at odds with the plain text of the statute and is foreclosed by the Ninth Circuit, which affirmed this Court's analysis.  See CA9 Op. * 15 (Section 1158(b)(2)(C) permits "'additional

---

CA9 Op. *14.  Plaintiffs preserve the argument that even parties who are *not* within a substantive statute's zone of interests may still satisfy the zone of interests for an APA notice-and-comment claim.  *See* Mot. 15-16 & n.3; TRO Reply at 5 n.4.

1    limitations and conditions' . . . only when 'consistent'" with § 1158, but "the Attorney General's rule

2    of decision is inconsistent with § 1158(a)(1).").[4]

3         Defendants' reliance on the Attorney General's discretion and *Lopez v. Davis*, 531 U.S. 230

4    (2001), *see* Opp. 12, is likewise foreclosed, as both this Court and the Ninth Circuit have rejected it.

5    CA9 Op. *16 n.13; TRO Order 21.

6         Finally, the government accuses the Court of "misread[ing]" Article 31(1), arguing without

7    any citation that Article 31(1) does not protect individuals who transit through a third country before

8    seeking asylum.  Opp. 13.  But the Ninth Circuit agreed with this Court's analysis.  *See* CA9 Op.

9

10   *16.  And as *amicus curiae* Office of the United Nations High Commissioner for Refugees explains,

11   "Article 31(1)'s protections are available to refugees who have arrived in a State from their country

12   of origin after transiting through a third state."  ECF No. 81-1 at 13 n.4 (citing decisions from other

13   nations' courts).

14   **B. The Rule Violates the APA's Procedural Requirements.**

15        This Court and the Ninth Circuit both rejected the invocation of the good cause and foreign

16   affairs exceptions.  *See* CA9 Op. *19-20; TRO Order 25-29.  Both also invited the government to

17   adduce evidence in support of those exceptions.  *See* CA9 Op. *19-20; TRO Order 27, 29.  The

18   government submitted the administrative record, but no other evidence.  Therefore, the only open

19

20   question with regard to these exceptions is whether they are justified in light of the administrative

21   record.  Nothing in the administrative record remotely supports either exception.

22        1.  Unlike in *Yassini v. Crosland*, 618 F.2d 1356 (9th Cir. 1980), where the government

23

24   submitted affidavits from high-level officials in support of the foreign affairs exception, *id.* at 1361,

25   here, the government points only to the Rule itself and two documents in the administrative record

26
────────────────────────
27   [4] As this Court previously recognized, Plaintiffs "do not argue that the Attorney General cannot adopt *any* limits that render ineligible aliens who are authorized to apply for asylum."  TRO Order 21 n.16.  Rather, they simply argue that the
28   Attorney General cannot impose a categorical bar predicated on a factor that Congress singled out as one that does not affect the right to seek asylum.  Yet Defendants continue to invoke this strawman argument.  *See* Opp. 11.

that are of no help, *see* Opp. 15.

First, the government points to the Rule's assertion that the foreign affairs exception applies, 83 Fed. Reg. at 55950-51, and a sentence in the Rule that states: "The United States has been engaged in sustained diplomatic negotiations with Mexico and the Northern Triangle countries . . . regarding the situation on the southern border, but those negotiations have, to date, proved unable to meaningfully improve the situation," *id.* at 55935.  But both this Court and the Ninth Circuit already considered the preamble to the Rule, so the government's argument that it justifies the exception is foreclosed.  *See* CA9 Op. *18-20; TRO Order 25-28.  Indeed, the Rule says nothing to support the claim that adhering to notice-and-comment procedures would undermine negotiations with Mexico or the Northern Triangle countries.

Second, the government points to remarks made by President Trump just before announcement of the Proclamation and Rule.  *See* Opp. 15 (citing AR 484-91).  But those remarks include nothing about the impact of a new policy on negotiations with Mexico or the Northern Triangle countries, let alone the impact of complying with the APA requirements.[5]

Third, the government points to a 2004 Memorandum of Understanding between the United States and Mexico regarding the repatriation of Mexican nationals, *see* Opp. 15 (citing AR 92-96), but offers no explanation as to its relevance, and none is apparent.  That the United States once successfully negotiated with Mexico regarding migration provides no evidence that immediate publication of the *current* Rule was necessary to avoid undesirable international consequences.

Because the government still has not explained "how immediate *publication* of the Rule . . . is necessary for negotiations with Mexico," CA9 Op. *19, the facts are as they were before the Ninth Circuit.  The result must therefore be the same.[6]

---

[5] In fact, President Trump's remarks suggested that Mexico already was endeavoring to assist the United States with the influx of migrants.  *See* AR 485 ("The government of Mexico has generously offered asylum, jobs, education, and medical care for people within the caravan . . . .  Mexico has agreed to take them in and encouraged them to stay.").
[6] The record before the Ninth Circuit did not include the Joint Declaration of Former Government Officials submitted in

2.  With regard to the good cause exception, the government urges the Court to limit its consideration to the reasons stated in the Rule, *see* Opp. 16, but doing so is of no benefit to Defendants.  The stated reasons were already held insufficient to show good cause when this question was previously before this Court and the Ninth Circuit.[7]

The government points to two documents in the administrative record, *see* Opp. 16, but neither bolsters the asserted justification.  The first, a news article, states that smuggling guides in Central America "now tell potential customers the Americans do not jail parents who bring children—and to hurry up before they might start doing so again."  AR 391.  But that statement does not demonstrate that migrants actually altered their behavior in response to the alleged change to the family separation policy.  In addition, the statement was about a very different policy, and so does not show that asylum seekers would know about or alter their behavior in response to an announcement regarding the availability of asylum to those who cross between ports.  The article also suggests that the decline in single adults claiming fear of persecution and the increase in parents coming with children is related to the fact that families are not detained long-term.  AR 393.  But, again, the new Rule has nothing to do with detention, so whatever effect a change in detention policy may have had on the evolving demographics of asylum seekers—a change that unfolded over many years, not overnight, *see* AR 97—it is not evidence that migrants will learn of and be able and likely to respond within a short window of time to the announcement of an upcoming change to the availability of asylum based on manner of entry.

As to the second document, a set of credible fear origin data from November 2018, *see* AR

---

support of Plaintiffs, ECF No. 71-4.  As Plaintiffs will explain in their Opposition to Defendants' Motion to Strike Extra-Record Evidence, ECF No. 88, the Court can consider this evidence.  Yet, as argued above, Defendants' invocation of the foreign affairs exception fails even if the Court looks only to the Rule and/or the administrative record.

[7] The government's continued reference to prior interim final rules issued under the good-cause exception is misguided.  As the Ninth Circuit recently underscored: "Because good cause is determined on a case-by-case basis, based on the totality of the factors at play, prior invocations of good cause to justify different IFRs—the legality of which are not challenged here—have no relevance."  *California v. Azar*, No. 18-15144 (9th Cir. Dec. 13, 2018), slip op. at 26 (internal quotation marks and citations omitted).

505-508, it contains nothing that would bear on the impact of a pre-implementation announcement or comment period. *See also* TRO Order 29 (noting that some migrants cross between ports because of "lack of awareness of entry requirements or . . . imminent necessity").

As the Ninth Circuit explained, "the Government's contention that the 'very announcement of the Rule itself would give aliens a reason to 'surge' across the southern border in numbers greater than is currently the case" is an "inference too difficult to credit." CA9 Op. *20. Because the government still cannot provide any "plausible support" for its asserted justification, *United States v. Valverde*, 628 F.3d 1159, 1166 (9th Cir. 2010), and continues to offer nothing more than "conclusory speculative harms," *id.* at 1167, the Ninth Circuit's opinion requires the rejection of the government's arguments.

### III. THE BALANCE OF THE EQUITIES SHARPLY FAVORS PLAINTIFFS

This Court and the Ninth Circuit concluded, based on the TRO record, that Plaintiffs are likely to suffer irreparable harm absent injunctive relief. TRO Order 31-32; CA9 Op. *21. The government has offered no evidence to rebut Plaintiffs' initial showing at the TRO stage, much less evidence to rebut the additional declarations submitted by Plaintiffs with their preliminary injunction motion, which further demonstrate that the Rule has caused and likely will continue to cause them to suffer economic loss, frustration of mission, and diversion of resources—harms that are not able to be remedied after the fact. Mot. 16-17. Thus, the prior decisions control this issue as well.[8]

---

[8] Defendants' efforts to distinguish the cases Plaintiffs cite are inapt. *See* Opp. 20 n.10. Just like the plaintiffs in *Open Comms. Alliance v. Carson*, 286 F. Supp. 3d 148, 177-78 (D.D.C. 2017), Plaintiffs have submitted declarations explaining the ways in which the Rule frustrates their ability to carry out their mission, perceptibly impairs their programs, and requires them to divert resources away from other services to address the Rule's impact. *Valle del Sol*, *Exodus Refugee Immigration*, and *Doe* were all previously briefed to either this Court or Ninth Circuit. They do not help the government. *Valle del Sol* concluded that the organizational plaintiffs showed "ongoing harms to their organizational missions as a result of the statute." 732 F.3d at 1029. And the district court in *Exodus Refugee Immigration* explained that "Exodus still could demonstrate irreparable harm based on temporary loss of funds." 165 F. Supp. 3d at 739 ("Although the funding denied to Exodus could ultimately be reimbursed, Exodus has presented evidence that, in the interim, its organizational objectives would be irreparably damaged by its inability to provide adequate social services to its clients. This . . . provides another basis to conclude that Exodus has made the necessary showing on [irreparable harm]."). Finally, in *Doe v. Trump*, the district court found irreparable harm to the organizational plaintiffs based on their "*claim* that they will need to lay-off employees, reduce services, cancel established programs, lose institutional

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Nor have Defendants offered evidence indicating that this Court, and the Ninth Circuit, were wrong to conclude they will not be irreparably injured by a preliminary injunction, *see* CA9 Op. *21; TRO Order 32-33, which would maintain the carefully reticulated asylum scheme Congress erected nearly 40 years ago, and is clearly in the public interest.  Defendants again invoke the FY18 apprehension numbers discussed in the Rule, *see* Opp. 17; 83 Fed. Reg. at 55944, but those figures previously failed to persuade this Court and the Ninth Circuit.[9]  Perhaps that is why the government ultimately admits that the total apprehension numbers are "irrelevant."  Opp. 17.  The government's true purpose, it now seemingly concedes, is to deter Central American asylum seekers specifically. *Id.* at 18.  But the fact that the number of individuals from the Northern Triangle asserting a credible fear of persecution has gone up in recent years merely reflects the basic premise of the refugee system: when more people are subject to persecution in their home countries, more people will flee in search of safety.  *See* ECF No. 35-9 ¶ 8.

As the administrative record makes clear, the Northern Triangle is "one of the most violent regions in the world today."  AR 156.  "For millions of people" in those countries, "trauma, fear and horrific violence are dominant facets of daily life."  *Id.*; *see also* ECF No. 35-7; ECF No. 71-4 ¶ 5b. It therefore makes eminent sense that the Northern Triangle countries gave rise to the second, third, and fourth most asylum grants in FY16 and FY17.  AR 331.[10]  Until now, individuals who crossed

knowledge, and ultimately lose goodwill with volunteers and community partners."  288 F. Supp. 3d 1045, 1082 (W.D. Wash. 2017) (emphasis added).  Plaintiffs have adduced similar evidence, *see* Mot. 16, and it likewise should be credited.

[9] Indeed, the number of apprehensions between ports was higher in FY2016, FY2014, FY2013, and every year from FY2010 through FY1973.  *See* AR 301; *see also* ECF No. 8-2 ¶¶ 3-5.  At the same time, U.S. Customs and Border Protection's budget and staffing have doubled.  ECF No. 8-2 ¶¶ 6-7.  *See also* ECF No. 78-2 (Amicus 23 Organizations) at 3-5.

[10] Furthermore, the government's claim that only 17% of CFI-origin cases end in grants of asylum is inaccurate—and almost certainly a substantial underestimate—because most CFI-origin cases, even including all cases begun over the last 10 years, are still pending.  *Compare* AR 442 (354,356 CFI-origin cases initiated in FY 2008-2018) *with* 83 Fed. Reg. 55945 (203,569 remained pending as of November 2, 2018).  The cases that have already been decided—the ones the government is relying on—are disproportionately removals because the immigration courts are able to issue removal orders quickly but often take years to grant relief.  That, in turn, is because removal orders can be issued without

between ports were never categorically denied asylum based only on their manner of entry, even during previous years with high numbers of Central American asylum seekers. *See* AR 97. The government provides no reason why a preliminary injunction maintaining Congress's longstanding asylum scheme will cause them irreparable injury.[11]

As to the government's invocation of the separation of powers, the Ninth Circuit already held that that claim does not alone constitute an irreparable injury. *See* CA9 Op *21. Moreover, "if there is a separation-of-powers concern here, it is between the President and Congress, a boundary that [courts] are sometimes called upon to enforce." *Id.* at *17; *see also* TRO Order 32; Mot. 19.

As this Court already determined, without an injunction, the public interest will be harmed because there is a serious risk that individuals with legitimate asylum claims who cannot satisfy the higher standards for withholding and CAT relief will be removed to countries where they are likely to face serious harm. *See Nken v. Holder*, 556 U.S. 418, 436 (2009). Even those who are granted withholding or CAT relief will have lost the ability to receive asylum, a benefit Congress determined to be of value. *See* TRO Order 31. Departing from Congress's determination that it is in the public

---

individual hearings, and also because detained cases move more quickly than nondetained cases and are disproportionately more likely to result in removal. *See also* ECF No. 35-2 (discussing flaws with in absentia data).

[11] Defendants note the Rule's reference to noncitizens who die each year crossing the border, *see* Opp. 17, but, as this Court already explained, the only reference to the danger presented by crossings in the Rule itself is in the context of quoting a 2004 rule. *See* TRO Order 33; PI Mo. 19. The Ninth Circuit, too, rejected the government's assertions about deterring border crossings as implausible and vague. *See* CA9 Op. *21 (("The Rule has no direct bearing on the ability of an alien to cross the border outside of designated ports of entry: That conduct is already illegal. . . . [V]ague assertions that the Rule may 'deter' this conduct are insufficient" for irreparable harm. Moreover, there is evidence in the record suggesting that the Government itself is undermining its own goal of channeling asylum-seekers to lawful entry by turning them away upon their arrival at our ports of entry."). The government now cites additional sources in its brief, *see* Opp. 17 n.8, but that data shows that border deaths have remained relatively constant between 1998 and 2018 (ranging from 249 to 471), *see id.*, even though, during the same period, the number of apprehensions at the southern border has declined dramatically and the number of asylum seekers has increased, thus undermining any notion that there is a particularly acute crisis in border deaths now at hand.

Nor should the Rule's invocation of the migrant caravan, *see* 83 Fed. Reg. 55935, 55947, affect the balance of the equities. The U.S. military expected only "about 20 percent" of the caravan to reach the United States. *See* Nick Miroff & Missy Ryan, "Army assessment of migrant caravans undermines Trump's rhetoric," Washington Post (Nov. 2, 2018), https://wapo.st/2JC2m4p. Many of the caravan's members are expected seek asylum at a port of entry. *See* ECF No. 8-2 ¶ 10; ECF No. 35-5 ¶ 9; Vanessa Romo, "LGBT Splinter Group from Migrant Caravan is the 1st to Arrive in Tijuana," NPR (Nov. 13, 2018), https://www.npr.org/2018/11/13/667622622/lgbt-caravan-splinter-group-is-the-first-to-arrive-in-tijuana.

1
2
3
4
5
6
7
8

interest to give noncitizens a chance to obtain asylum irrespective of their manner of entry, *see* Mot. 20, is particularly acute when applied to individuals who are forced to cross between ports due to lack of knowledge, threats of violence, or other reasons of imminent necessity.[12]  Furthermore, the Rule will force potential asylum seekers who are able to route to ports to risk exposure to serious harms while waiting to present their claims at ports of entry, including obstacles erected by the government itself.[13] Finally, bipartisan former foreign policy and security officials advise that the Rule is likely to undermine U.S. foreign policy objectives.  *See* ECF No. 71-4 ¶ 10.

9
10
11
12
13
14

And, of course, the public interest is served by compliance with the laws Congress wrote. *See* Mot. 20; *Alcaraz v. Block*, 746 F.2d 593, 610 (9th Cir. 1984) (discussing public interest served by notice-and-comment rulemaking); CA9 Op. *21 ("[T]he public . . . has an interest in ensuring that 'statutes enacted by [their] representatives' are not imperiled by executive fiat.") (quoting *Maryland v. King*, 567 U.S. 1301, 1301 (2012) (Roberts, C.J., in chambers)).

## IV.  NATIONWIDE RELIEF IS APPROPRIATE

15
16
17
18

The Ninth Circuit upheld the nationwide scope of this Court's Order, CA9 Op. *22, and the government simply recycles the same arguments the Ninth Circuit already rejected.  *See* Mot. 20-21.[14]

19
20

## CONCLUSION

The Court should grant the preliminary injunction.

21
22
23

---

[12] *See* ECF No. 8-4 ¶¶ 26-28; ECF No. 8-6 ¶ 14; ECF No. 35-4 ¶ 12; ECF No. 71-2 ¶¶ 4-14, 19; ECF No. 71-5 ¶¶ 19-20; CA9 Op. *16-17.

24
25
26

[13] *See, e.g.*, ECF No. 8-4 ¶¶ 29-41; ECF No. 35-1 ¶ 12; ECF No. 35-3 ¶¶ 3-9; ECF No. 35-4 ¶¶ 5-11; ECF No. 35-5 ¶¶ 5, 7; ECF No. 71-2 ¶¶ 15, 21; ECF No. 71-5 ¶¶ 8-21; ECF No. 71-6 ¶¶ 5-6; ECF No. 71-7 ¶¶ 11-35; ECF No. 71-9 ¶¶ 12-14; ECF No. 84-1 ¶¶ 14-18; ECF No. 82-1 (Amicus States) at 3-10; ECF No. 75-1 (Amici National Center for Lesbian Rights et al.) at 1-2, 5-9.

27
28

[14] The only new argument offered by the government is that this Court cannot enjoin the Rule to the extent it amends the expedited removal procedures, because a challenge to expedited removal procedures must be brought in the District of Columbia under 8 U.S.C. § 1252(e)(3).  Opp. 21-22.  But at both the TRO hearing and in their PI brief, the government did not even concede that Plaintiffs could bring a challenge under § 1252(e)(3).

1

2

Dated: December 14, 2018

Respectfully submitted,

3

Jennifer Chang Newell (SBN 233033)
Cody Wofsy (SBN 294179)

/s/Lee Gelernt
Lee Gelernt*
Judy Rabinovitz*

4

Spencer Amdur (SBN 320069)
Julie Veroff (SBN 310161)

Omar C. Jadwat*
Celso Perez (SBN 304924)

5

ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT

ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT

6

39 Drumm Street
San Francisco, CA 94111

125 Broad Street, 18th Floor
New York, NY 10004

7

T: (415) 343-0770
F: (415) 395-0950

T: (212) 549-2660
F: (212) 549-2654

8

*jnewell@aclu.org*
*cwofsy@aclu.org*

*lgelernt@aclu.org*
*jrabinovitz@aclu.org*

9

*samdur@aclu.org*
*jveroff@aclu.org*

*ojadwat@aclu.org*
*cperez@aclu.org*

10

Melissa Crow*

11

SOUTHERN POVERTY LAW CENTER
1666 Connecticut Avenue NW, Suite 100

Christine P. Sun (SBN 218701)
Vasudha Talla (SBN 316219)
AMERICAN CIVIL LIBERTIES UNION OF

12

Washington, D.C. 20009
T: (202) 355-4471

NORTHERN CALIFORNIA, INC.
39 Drumm Street

13

F: (404) 221-5857
*melissa.crow@splcenter.org*

San Francisco, CA 94111
T: (415) 621-2493

14

Mary Bauer*

F: (415) 255-8437
*csun@aclu.org*

15

SOUTHERN POVERTY LAW CENTER
1000 Preston Avenue

*vtalla@aclu.org*

16

Charlottesville, VA  22903
T:  (470) 606-9307

Baher Azmy*
Angelo Guisado*

17

F:  (404) 221-5857
*mary.bauer@splcenter.org*

Gita Schwarz*
CENTER FOR CONSTITUTIONAL RIGHTS

18

*Attorneys for Plaintiffs*

666 Broadway, 7th Floor
New York, NY 10012

19

*Admitted pro hac vice*

T: (212) 614-6464
F: (212) 614-6499

20

*bazmy@ccrjustice.org*

21

*aguisado@ccrjustice.org*
*gschwartz@ccrjustice.org*

22

23

24

25

26

27

28