1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EAST BAY SANCTUARY COVENANT, et al.,

　　　　　　Plaintiffs,

　　　v.

DONALD J. TRUMP, et al.,

　　　　　　Defendants.

Case No. 18-cv-06810-JST

**ORDER GRANTING PRELIMINARY INJUNCTION**

Re: ECF No. 71, 88

Once again, the parties are before the Court regarding a rule issued recently by the Attorney General and the Department of Homeland Security.  The rule, in combination with a Presidential proclamation, makes anyone who crosses the southern border of the United States somewhere other than a designated port of entry ineligible for asylum.

Plaintiffs previously asked the Court to issue a temporary restraining order against the new rule.  After considering the arguments on both sides and holding a hearing, the Court found the rule was inconsistent with the will of Congress as expressed in the United States' immigration statutes.  Specifically, the rule conflicts with Congress's command that an alien "physically present in the United States or who arrives in the United States . . . *whether or not at a designated port of arrival*" may apply for asylum.  8 U.S.C. § 1158(a)(1) (emphasis added).  Furthermore, the Court found the rule is probably invalid for the additional reason that the Government failed to allow Plaintiffs and other interested members of the public to provide comments about the rule before it went into effect.  The Court also found that the plaintiff immigration organizations had the right to bring this lawsuit, and that allowing the rule to remain in effect while this case was pending was not in the public interest because of the harms that would befall both the plaintiff organizations and immigrants who were legitimately seeking asylum.  Accordingly, this Court

United States District Court
Northern District of California

issued a temporary restraining order preventing the regulation from going into effect.  A few

weeks later, the Ninth Circuit denied a stay and left that order in place.

The Plaintiffs now seek a preliminary injunction that would keep the new rule from going

into effect for an extended period of time.  As set forth below, the arguments on both sides are

nearly identical to those made earlier to this Court and to the Ninth Circuit.  Moreover, what new

evidence and argument there is largely supports Plaintiffs' position.  If anything, the inconsistency

between the new regulation and the immigration laws has been stated more clearly.  The harms to

those seeking asylum are also even clearer, and correspondingly the public interest more plainly

supports injunctive relief.  Not surprisingly then, the result of the present motion is the same:  the

Court again concludes that Plaintiffs have established an overwhelming likelihood that the new

rule barring asylum is invalid.  Accordingly, the Court will grant Plaintiffs' request for a

preliminary injunction.

I.       BACKGROUND

A.       Nature of the Dispute

The Court has previously set forth the relevant legal framework and the challenged

executive actions, ECF No. 43, and it need not repeat them in great detail here.  In brief, on

November 9, 2018, the Department of Justice ("DOJ") and Department of Homeland Security

("DHS") published a joint interim final rule, entitled "Aliens Subject to a Bar on Entry Under

Certain Presidential Proclamations; Procedures for Protection Claims" (the "Rule").  83 Fed. Reg.

55,934 (Nov. 9, 2018) (to be codified at 8 C.F.R. pts. 208, 1003, 1208).   The Rule makes an alien

categorically ineligible for asylum if the alien enters the United States in violation of "a

presidential proclamation or other presidential order suspending or limiting the entry of aliens

along the southern border with Mexico."  *Id.* at 55,952 (to be codified at 8 C.F.R. §§ 208.13(c)(3),

1208.13(c)(3)).   On the same day, the President of the United States issued such a proclamation

(the "Proclamation"),[1] suspending the entry of any alien into United States along the southern

---

[1] *See* Whitehouse.gov, *Presidential Proclamation Addressing Mass Migration Through the Southern Border of the United States*, (November 9, 2018), available at
https://www.whitehouse.gov/presidential-actions/presidential-proclamation-addressing-mass-migration-southern-border-united-states/.

border for ninety days, except for "any alien who enters the United States at a port of entry and properly presents for inspection." Proclamation § 2(b). Taken together, the Rule and the Proclamation "create an operative rule of decision for asylum eligibility" that denies asylum to all aliens who fail to enter at a designated port of entry. *E. Bay Sanctuary Covenant v. Trump*, -- F.3d --, No. 18-17274, 2018 WL 6428204, at *15 (9th Cir. Dec. 7, 2018).

### B.    Procedural History

Four legal and social service immigration organizations, Plaintiffs East Bay Sanctuary Covenant, Al Otro Lado, Innovation Law Lab, and Central American Resource Center of Los Angeles ("CARECEN") (collectively, the "Organizations"), challenged the Rule, arguing that it was inconsistent with provisions of the Immigration and Naturalization Act ("INA"), 8 U.S.C. § 1158, and that the agencies had failed to comply with the notice-and-comment provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553.  ECF No. 1.

### 1.    The Court's TRO

On November 19, 2018, the Court granted the Organizations' motion for a temporary restraining order ("TRO").  ECF No. 43.  The Court concluded that the case was justiciable because the Organizations had Article III standing to bring this challenge and third-party standing to assert the rights of their clients, and that their asserted interests arguably fell within the zone of interests protected by the INA.  *Id.* at 13-17.  Turning to the preliminary relief factors, the Court held that the Organizations were likely to succeed on the merits of their claim that the Rule was inconsistent with the INA, because the Rule purported to deny asylum eligibility on a ground that Congress had clearly stated could not be disqualifying.  *Id.* at 19-23.  Further, the Court concluded that the Organizations had at least raised serious questions going to the merits of their claims that the agencies lacked a basis to assert the foreign affairs or good cause exceptions to the APA's notice-and-comment requirements.  *Id.* at 27-29.

On the remaining equitable factors, the Court found that the Organizations' clients would suffer irreparable harm while the Rule was in place, *id.* at 30-31, and that the Organizations

United States District Court
Northern District of California

1    themselves would be irreparably injured in light of the loss of opportunity to exercise their

2    procedural rights and the Rule's substantive harm to their operations, *id.* at 31.  Finally, the Court

3    concluded that the equities and the public interest weighed in favor of preliminary relief.  *Id.* at 32-

4    33.

5            "Given the need for uniformity in immigration law," the Court determined that a

6    nationwide injunction was appropriate, particularly given Defendants' failure to provide a more

7    narrow but workable alternative.  *Id.* at 34 & n.21.  The Court therefore issued a TRO, to remain in

8    place until December 19, 2018, and ordered Defendants to show cause why a preliminary

9    injunction should not issue.  *Id.* at 36.

10           On November 27, 2018, Defendants appealed the TRO to the Ninth Circuit and filed a

11    motion requesting that the Court stay the TRO pending appeal.  ECF Nos. 51, 52.  After receiving

12    briefing from the parties, the Court denied the motion on November 30, 2018.  ECF No. 61.

13                    **2.        The Ninth Circuit's Denial of a Stay**

14           The next day, Defendants filed a motion for a stay pending appeal with the Ninth Circuit.

15    *E. Bay Sanctuary Covenant v. Trump*, No. 18-17274 (9th Cir.), ECF No. 4.  On December 7, 2018,

16    a divided motions panel of the Ninth Circuit denied the stay in a published order.  *E. Bay*

17    *Sanctuary Covenant*, -- F.3d --, No. 18-17274, 2018 WL 6428204 (9th Cir. Dec. 7, 2018).

18           The Ninth Circuit first held that the TRO possessed the necessary characteristics to be

19    treated "as an appealable preliminary injunction."  *Id.* at *9.

20           Second, the Ninth Circuit held that the Organizations had Article III and statutory standing

21    to pursue their claims.  The court concluded that the Organizations lacked third-party standing

22    because their clients did "not have standing to assert a right to cross the border illegally, to seek

23    asylum or otherwise."  *Id.* at *10.  The Ninth Circuit agreed, however, that the Organizations

24    satisfied the Article III requirements for organizational standing because the Rule "frustrated their

25    mission of providing legal aid to affirmative asylum applicants" and required the Organizations to

26    divert resources from their other initiatives.  *Id.* at *11.  The court also held that the Organizations

27    suffered an independently sufficient cognizable harm because they had shown "that the Rule will

28    cause them to lose a substantial amount of funding."  *Id.* at *12.  Finally, the Ninth Circuit held

United States District Court
Northern District of California

4

1    that the Organizations had statutory standing to pursue their APA claims because their interests

2    arguably fell within the zone of interests protected by the INA.  *Id.* at *13.

3          Turning to the merits of Defendants' stay request, the panel majority held that Defendants

4    had not made the requisite showing, because the Rule was likely inconsistent with the plain

5    language of 8 U.S.C. § 1158(a)(1) and the structure of the INA.  *Id.* at *15-16.  The majority

6    further observed that, even if the statute were ambiguous, the Rule's interpretation was likely

7    unreasonable in light of a practical understanding of the circumstances under which refugees seek

8    asylum, as reflected in international treaty obligations and precedent from numerous Circuits.  *Id.*

9    at *16-17.  Finally, the majority rejected Defendants' argument that the Proclamation provided a

10   valid basis for the Rule.  *Id.* at *18.

11         The majority further found that Defendants were unlikely to succeed on the merits of the

12   foreign affairs exception, noting that "courts have disapproved the use of the foreign affairs

13   exception where the Government has failed to offer evidence of consequences that would result

14   from compliance with the APA's procedural requirements."  *Id.* at *19.  The majority concluded

15   that "the connection between negotiations with Mexico and the immediate implementation of the

16   Rule is not apparent on this record" and invited Defendants "to expand the record on this issue"

17   before this Court.  *Id.*  The majority reached a similar conclusion regarding the good cause

18   exception.  Concerning Defendants' argument that "the 'very announcement' of the Rule itself

19   would give aliens a reason to 'surge' across the southern border," the majority concluded that

20   Defendants' "reasoning is only speculative at this juncture," and that "[a]bsent additional

21   evidence, this inference is too difficult to credit."  *Id.* at *20.

22         On the remaining stay factors, the majority found that Defendants had failed to show a

23   likely irreparable injury.  *Id.* at *21.  The majority addressed the final two factors only briefly.  It

24   noted that "a stay of the district court's order would not preserve the status quo: it would upend it,

25   as the TRO has temporarily restored the law to what it had been for many years prior to November

26   9, 2018," and that the Plaintiffs would suffer real harm if the rule were not enjoined.  *Id.*  The

27   majority acknowledged that there were weighty public interests on both sides, but that "when

28   considered alongside the Government's failure to show irreparable harm, the final two factors do

United States District Court
Northern District of California

1    not weigh in favor of a stay." *Id.*

2        Finally, the majority rejected Defendants' argument that the nationwide scope of the

3    Court's injunctive relief was inappropriate.  The majority explained that, "[i]n immigration

4    matters, we have consistently recognized the authority of district courts to enjoin unlawful policies

5    on a universal basis." *Id.* at 22.  The majority pointed out, moreover, that Defendants had

6    "'fail[ed] to explain how the district court could have crafted a narrower [remedy]' that would

7    have provided complete relief to the Organizations." *Id.*

8        Judge Leavy concurred in the majority's conclusion that the TRO was appealable and in its

9    standing analysis, but he dissented on the merits of the stay.  *E. Bay Sanctuary Covenant v.*

10   *Trump*, No. 18-17274, slip op. at 1 (9th Cir. Dec. 7, 2018) (Leavy, J., dissenting in part).

### 3.    Application for a Stay to the Supreme Court

12       On December 11, 2018, Defendants applied to the Supreme Court for a stay pending

13   appeal, which application was referred to Justice Kagan.  *Trump v. E. Bay Sanctuary Covenant*,

14   No. 18A615 (U.S. 2018).  On December 17, 2018, the Organizations filed their response.  *Id.*

15   Defendants filed a reply today, December 19, 2018.  *Id.*  As of the signing of this order, that

16   application remains pending.

### 4.    Motion for Preliminary Injunction

18       On December 4, 2018, while Defendants' appeal was pending, the Organizations filed a

19   motion for a preliminary injunction.  ECF No. 71.  The Court also permitted six amicus curiae to

20   file briefs in support of an injunction.  *See* ECF Nos. 83, 86.[2]  In addition to their opposition to the

21   injunction, Defendants filed a separate motion to strike various materials that the Organizations

22   attached to the injunction motion or incorporated into the record.  ECF No. 88.

## II.   EFFECT OF INTERVENING DECISIONS

24       The Court starts its analysis by recognizing that, in light of its own prior order and the

25

26

---

27   [2] The amici are two different groups of immigration aid organizations, ECF Nos. 75, 78; a
coalition of law professors, ECF No. 77; Public Citizen, Inc., ECF No. 80; the United Nations
28   High Commissioner for Refugees, ECF No. 81; and a coalition of twelve States and the District of
Columbia, ECF No. 82.

United States District Court
Northern District of California

1    Ninth Circuit's recent decision, it does not decide this motion on a blank slate.[3]

2        As the parties generally seem to agree, the Court must abide by the reasoning in the Ninth

3    Circuit's denial of a stay, which likewise addressed the issues before the Court through the lens of

4    preliminary injunctive relief. *See, e.g.*, ECF No. 87 at 14 ("[A]lthough Plaintiffs and this Court

5    previously relied extensively on third-party standing, the Ninth Circuit has rejected this basis for

6    standing."); ECF No. 92 at 3 n.2 ("Plaintiffs respectfully disagree with the Ninth Circuit's

7    conclusion that they do not have third-party standing to sue, and preserve the argument for

8    appeal." (citation omitted)).

9        "Under the law of the case doctrine, a court will generally refuse to reconsider an issue

10   that has already been decided by the same court or a higher court in the same case." *Gonzalez v.*

11   *Arizona*, 677 F.3d 383, 390 n.4 (9th Cir. 2012) (en banc).  A court may deviate from the law of the

12   case only where "(1) the decision is clearly erroneous and its enforcement would work a manifest

13   injustice, (2) intervening controlling authority makes reconsideration appropriate, or

14   (3) substantially different evidence was adduced at a subsequent trial." *Id.* (citation omitted).  The

15   Ninth Circuit has instructed that a "district court should abide by 'the general rule' that our

16   _____

17   [3] Because the Ninth Circuit concluded that it would "treat the [Court's] order as an appealable
     preliminary injunction," *E. Bay Sanctuary Covenant*, 2018 WL 6428204, at *9, an active appeal of
18   the Court's TRO remains pending.  Though not addressed by the parties, the Court must examine
     the extent of its own jurisdiction.

19   It is well established that "[t]he filing of a notice of appeal is an event of jurisdictional significance
20   – it confers jurisdiction on the court of appeals and divests the district court of its control over
     those aspects of the case involved in the appeal." *Rodriguez v. County of Los Angeles*, 891 F.3d
21   776, 790 (9th Cir. 2018) (quoting *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58
     (1982)).  Though "more accurately characterized as [a] 'mandatory claim-processing rule[],'" this
22   principle still limits the Court's authority.  *Id.* (quoting *Hamer v. Neighborhood Hous. Servs. of
     Chicago*, 138 S. Ct. 13, 17 (2017)).

23   Nonetheless, a district court has the authority "to grant a second injunction pending an
24   interlocutory appeal of the first." *Mayweathers v. Newland*, 258 F.3d 930, 935 (9th Cir. 2001);
     *see also* Fed. R. Civ. P. 62(d).  And in addition to that authority, a district court "may act to assist
25   the court of appeals in the exercise of its jurisdiction," *Davis v. United States*, 667 F.2d 822, 824
     (9th Cir. 1982), such as by "fil[ing] written findings of fact and conclusions of law in support of
26   the preliminary injunction order" on appeal, *Thomas v. County of Los Angeles*, 978 F.2d 504, 507
     (9th Cir. 1992), *as amended* (Feb. 12, 1993).  Finally, the Court notes that the TRO – the order on
27   appeal – expires by its own terms on December 19, 2018, or upon issuance of this order, ECF No.
     43 at 36, and the Ninth Circuit expressly contemplated that the Court would examine certain
28   issues in light of further development of the factual record.  Under these circumstances, the Court
     concludes that it has the authority to grant the relief requested.

7

United States District Court
Northern District of California

1  decisions at the preliminary injunction phase do not constitute the law of the case," but that "[a]ny

2  of our conclusions on pure issues of law, however, are binding." *Ranchers Cattlemen Action*

3  *Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 499 F.3d 1108, 1114 (9th Cir.

4  2007) (citations omitted).  Accordingly, "[t]he district court must apply this law to the facts anew

5  with consideration of the evidence presented" in further proceedings.  *Id.*

6        Though the Ninth Circuit's preliminary injunction rulings on mixed questions of law and

7  fact do not constitute law of the case, they are "'law of the circuit' and, therefore, . . . relevant" as

8  binding precedent.  *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1076 n.5 (9th Cir. 2015) (quoting

9  *Gonzalez*, 677 F.3d at 389 n.4).  Under the "law of the circuit" rule, "a published decision of [the

10  Ninth Circuit] constitutes binding authority which must be followed unless and until overruled by

11  a body competent to do so," *Gonzalez*, 677 F.3d at 390 n.4, subject only to limited exceptions, *see*

12  *id.* (citing *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc); *Nat'l Cable &*

13  *Telecommc'ns Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005)).[4]

14        These principles dictate that, absent the exceptional circumstances outlined above, the

15  Court should not revisit pure issues of law already decided by the Ninth Circuit and should

16  reconsider mixed questions of law and fact only where new facts render the case legally

17  distinguishable from the record presented on appeal.

18  **III.    MOTION TO STRIKE**

19        As an additional threshold matter, the Court considers Defendants' motion to strike.  ECF

20  No. 88.  On November 29, 2018, Defendants submitted the administrative record.  ECF No. 60.  In

21  response to the Organizations' motion for a preliminary injunction, Defendants filed a motion to

22  strike various attached or incorporated materials, arguing that they were improper extra-record

23  evidence in this administrative review case.  ECF No. 88.  Defendants agree that the Organizations

24  may submit this evidence "to demonstrate organizational standing or cognizable irreparable

25

26  ───────────────

27  [4] Pending further guidance from a higher court, the Court must accord the motions panel's
    decision the same weight.  In this context, the Ninth Circuit has held that a motions panel's
    published decision constitutes precedent that "binds future panels the same as does a merits
28  panel's published opinion."  *Lair v. Bullock*, 798 F.3d 736, 747 (9th Cir. 2015) (citing *Lair v.
    Bullock*, 697 F.3d 1200, 1204, 1206 (9th Cir. 2012) (motions panel granting stay pending appeal)).

1    harm," but object to its consideration "for any other purpose." *Id.* at 6. The parties dispute

2    whether the Court may consider evidence beyond the administrative record for (1) the merits of

3    the Organizations' notice-and-comment challenges; (2) the preliminary injunction factors

4    regarding the balance of the equities and the public interest; and (3) third-party standing.

5          The Court turns first to the question of the merits. The APA instructs that, in reviewing

6    § 706 challenges, "the court shall review the whole record or those parts of it cited by a party." 5

7    U.S.C. § 706. Therefore, to the extent practicable, a court should determine a plaintiff's likelihood

8    of success on the merits of such a challenge based on the administrative record. *See Am.*

9    *Bioscience, Inc. v. Thompson*, 243 F.3d 579, 582 (D.C. Cir. 2001) (holding that the district court

10   abused its discretion in denying a preliminary injunction by using "the parties' written or oral

11   representations to discern the basis on which the [agency] acted" instead of "calling for the

12   administrative record"). Where review is limited to the administrative record, the Ninth Circuit

13   nonetheless permits consideration of "material outside of the administrative record in four narrow

14   circumstances:"

15                 1) where the extra-record evidence is "necessary to determine
16                 whether the agency has considered all relevant factors and has
                   explained its decision";
17                 2) where "the agency has relied on documents not in the record";
                   3) where "supplementing the record is necessary to explain technical
18                 terms or complex subject matter"; or
                   4) where "plaintiffs make a showing of agency bad faith."

19   *Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. Zinke*, 889 F.3d 584, 600 (9th Cir.

20   2018) (quoting *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1451 (9th

21   Cir. 1996)). Even where the Court allows such supplementary evidence, "[c]onsideration of the

22   evidence to determine the correctness or wisdom of the agency's decision is not permitted, even if

23   the court has also examined the administrative record." *Asarco, Inc. v. U.S. Envtl. Prot. Agency*,

24   616 F.2d 1153, 1160 (9th Cir. 1980).

25         Defendants assert that the Organizations' notice-and-comment claims for violations of 5

26   U.S.C. § 553 arise under § 706(2)(D), which empowers a court to set aside agency action

27   undertaken "without observance of procedure required by law," and are therefore governed by

28   § 706's record requirement. ECF No. 88 at 12; *see also Yassini v. Crosland*, 618 F.2d 1356, 1360

United States District Court
Northern District of California

9

1    (9th Cir. 1980) (addressing claim that action "should be declared void under 5 U.S.C. s 706(2)(D)"

2    because it was not promulgated with notice and comment).  The Organizations do not contend

3    otherwise.

4           Because, as discussed below, the Court concludes that Defendants have likely failed to

5    justify the foreign affairs exception on the administrative record, it does not decide whether the

6    Organizations' evidence is admissible for that purpose.  *See Lands Council v. Powell*, 395 F.3d

7    1019, 1030 (9th Cir. 2005).  As to good cause, the Organizations have not met their "burden of

8    demonstrating that a relevant exception applies."  *San Luis & Delta-Mendota Water Auth. v.*

9    *Locke*, 776 F.3d 971, 993 (9th Cir. 2014).  The Organizations state, without additional

10   explanation, that their evidence "identif[ies] relevant factor the agency did not consider."  ECF

11   No. 93 at 9 & n.7.  This is not sufficient.  Moreover, much of this evidence seems related to the

12   merits of the Rule itself, rather than the relevant question whether good cause existed to dispense

13   with notice and comment.  Accordingly, the Court does not consider this evidence when reviewing

14   good cause.

15          Next, the Court considers the use of extra-record evidence for assessing the balance of the

16   equities and the public interest.  Defendants have cited no authority suggesting that § 706 limits

17   the scope of the evidence that may be considered for those equitable factors.[5]  Defendants'

18   position likewise lacks any support in the text of the APA.  *See United States v. Alisal Water*

19   *Corp.*, 431 F.3d 643, 654 (9th Cir. 2005) ("[T]he court will not generally infer restrictions on

20   inherent judicial authority from congressional silence:  [U]nless a statute in so many words, or by

21   a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of

22   that jurisdiction is to be recognized and applied." (second alteration in original) (internal

23   quotations marks and citation omitted)).  5 U.S.C. § 706 instructs a reviewing court to determine

24   whether agency action has been "unlawfully withheld or unreasonably delayed," *id.* § 706(1), or

25   whether the agency's "action, findings, and conclusions are," for instance, "arbitrary and

---

[5] Defendants simply argue that certain cases did not directly address the issue or the Government conceded it, but provide no court adopting their position.  ECF No. 94 at 8-9 (citing, *e.g.*, *Eco Tour Adventures, Inc. v. Zinke*, 249 F. Supp. 3d 360, 370 n.7 (D.D.C. 2017); *Earth Island Inst. v. Evans*, 256 F. Supp. 2d 1064, 1078 n.16 (N.D. Cal. 2003)).

United States District Court
Northern District of California

capricious" or "without observance of procedure required by law," *id.* § 706(2).  Immediately

thereafter, § 706 states:  "*In making the foregoing determinations*, the court shall review the whole

record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial

error." (emphasis added).  Moreover, Defendants cannot plausibly suggest that a court can assess

"the balance of hardships between the *parties*," *All. for the Wild Rockies v. Cottrell*, 632 F.3d

1127, 1137 (9th Cir. 2011) (emphasis added), based solely on the administrative record.  *See also*

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755,

765 (9th Cir. 2014) ("Balancing the equities in this case requires comparison between the

irreparable environmental harms pled by the LOWD plaintiffs, on the one hand, and the economic

interests of the intervenors, on the other hand.").[6]  The Court therefore denies Defendants' motion

as to these purposes.[7]

 Finally, in their reply, Defendants raise for the first time numerous additional objections

based on the Federal Rules of Evidence.  *See* ECF No. 94 at 15, 17-19.  The Court ordinarily

disfavors new arguments on reply.  *See Hefler v. Wells Fargo & Co.*, No. 16-CV-05479-JST, 2018

WL 1070116, at *9 (N.D. Cal. Feb. 27, 2018) (citing *Ass'n of Irritated Residents v. C & R*

*Vanderham Dairy*, 435 F.Supp.2d 1078, 1089 (E.D. Cal. 2006)).  Because the Court does not rely

on the evidence that Defendants argue is inadmissible as hearsay or not based on personal

knowledge, it need not address these late objections further.

---

[6] Consideration of the public interest at the preliminary relief stage is not, of course, an opportunity to litigate the merits of the agency's decision with extra-record evidence.  But limiting the scope of interests to those considered by the agency would not serve the larger public interest. And Defendants' proposed evidentiary rule would be particularly counter-productive where the disputed agency action is the foregoing of notice-and-comment procedures, as no entity would have been given the opportunity to put its views or interests before the agency and thus, into the record.

[7] Defendants also contend that the Court must strike evidence related to third-party standing in light of the Ninth Circuit's ruling on the merits of that theory.  Given the fact that the parties are concurrently litigating this case before this Court, the Ninth Circuit, and the Supreme Court, the Court finds it imprudent to reach a final decision on the scope of the record regarding this issue at this preliminary stage.

1   IV.     STANDING

2           A.      Article III Standing

3           In their opposition, Defendants renew their argument that the Organizations lack standing.

4   ECF No. 87 at 14-16.

5           The Ninth Circuit concluded that the Organizations had organizational standing under

6   *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), which requires an organization to "show[]

7   that, independent of the litigation, the challenged 'policy frustrates the organization's goals and

8   requires the organization to expend resources in representing clients they otherwise would spend

9   in other ways.'" *E. Bay Sanctuary Covenant*, 2018 WL 6428204, at *11 (quoting *Comite de

10  Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943 (9th Cir. 2011) (en

11  banc)).  The Ninth Circuit cited a number of harms to the Organizations that it found legally

12  cognizable and sufficient to established standing under *Havens*.  *See id.* at 11-12.  Noting a court's

13  ongoing duty to assure its jurisdiction, *see Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583-

14  84, the Ninth Circuit pointed out that "[s]hould facts develop in the district court that cast doubt on

15  the Organizations' standing, the district court is, of course, free to revisit this question."  *Id.* at *9.

16          Accordingly, the Court considers whether the current factual record continues to support

17  the Ninth Circuit's legal analysis.  It does.

18          The Organizations have provided ample evidence explaining how the Rule impairs their

19  core programs.  For instance, East Bay's affirmative asylum program involves filing cases with

20  the U.S. Citizenship and Immigration Services rather than an immigration court, and accounts for

21  almost half of East Bay's organizational budget.  ECF No. 8-7 ¶ 8-9.  Moreover, because 80

22  percent of these individuals have historically entered without inspection, *id.*, "[i]f these individuals

23  became categorically ineligible for asylum, East Bay would lose a significant amount of business

24  and suffer a concomitant loss of funding."  *E. Bay Sanctuary Covenant*, 2018 WL 6428204, at

25  *12.  The record continues to show that East Bay must take costly adaptive measures.  ECF No. 8-

26  7 ¶¶ 17-19.  In support of this motion, East Bay further explains that it faces serious obstacles to

27  changing its mission to represent asylum seekers who comply with the Proclamation.  First, East

28  Bay is located near Berkeley, California, and "[m]ost of the asylum seekers who enter at a port of

12

1   entry remain detained in detention facilities near the border" hundreds of miles away.  ECF No.

2   71-10 ¶ 7.  Moreover, those individuals who are released will be placed in removal proceedings

3   and ineligible to apply for affirmative asylum.  *Id.* ¶ 8-9.

4          Innovation Law Lab has likewise experienced difficulty implementing its programs

5   because its operations are not located near the border, and it has expended significant resources to

6   send staff to the border as it attempts to shift its programs.  ECF No. 71-11 ¶ 4, 14.  It has also

7   been forced to devote resources to develop new software and guidance tools to operate in a more

8   time-sensitive environment with fewer technological resources.  *Id.* ¶¶ 9-10.

9          Like East Bay, CARECEN has explained that it will be "forced at the client intake stage to

10   conduct detailed screenings for alternative forms of relief to facilitate referrals or other forms of

11   assistance."  *E. Bay Sanctuary Covenant*, 2018 WL 6428204, at *11; ECF No. 71-3 ¶ 5.

12         Al Otro Lado has provided evidence that it currently has twenty unaccompanied minors as

13   clients who are not allowed to present their claims at a port of entry and are therefore wholly

14   unable to seek asylum under the Rule.  ECF No. 71-8 ¶¶ 4-6.  Because the Rule prevents these

15   clients from entering between ports of entry to seek asylum, Al Otro Lado has devoted significant

16   resources to "address[ing] the non-legal needs of [its] unaccompanied minor clients," such as

17   chaperoning them and arranging shelter and transportation.  *Id.* ¶¶ 10-14.

18         In addition, the record indicates that it will become more expensive on a per-case basis for

19   the Organizations to represent clients who enter in violation of the Proclamation "because other

20   forms of relief from removal – such as withholding of removal and relief under the Convention

21   Against Torture – do not allow a principal applicant to file a derivative application for family

22   members."  *E. Bay Sanctuary Covenant*, 2018 WL 6428204, at *11.  This will greatly increase the

23   number of cases the Organizations must pursue to accomplish the same goals.  ECF No. 8-3 ¶ 11;

24   ECF No. 8-4 ¶ 13; ECF No. 71-11 ¶ 16.

25         The record also supports the second basis for standing identified by the Ninth Circuit – a

26   "showing that the Rule will cause [the Organizations] to lose a substantial amount of funding."  *E.*

27   *Bay Sanctuary Covenant*, 2018 WL 6428204, at *12.  East Bay receives a grant from the state of

28   California that is directly tied to number of asylum cases it pursues.  ECF No. 8-7 ¶ 11.  Similarly,

United States District Court
Northern District of California

13

Al Otro Lado receives state funding "at a fixed per-case rate to represent individuals in bond proceedings," but the Rule renders aliens ineligible for bond for at least six months.  ECF No. 8-4 ¶¶ 10-11.  The Innovation Law Lab also receives government funding that will become less effective as cases become more expensive and time consuming.  ECF No. 71-11 ¶¶ 15-16.

Defendants do not dispute the factual basis for these harms.  Instead, Defendants continue to argue that these harms are legally insufficient, ignoring the Ninth Circuit's decision to the contrary.  For instance, Defendants contend that the Organizations have no cognizable injury because they "remain free to represent any aliens who enter the country illegally."  ECF No. 87 at 15.  But Defendants do not address the Ninth Circuit's explanation, supported by the record, of why pursuing alternative avenues of relief would frustrate the Organization's core missions, require them to divert resources, and impair their funding.  *See E. Bay Sanctuary Covenant*, 2018 WL 6428204, at *11-12.[8]  For the reasons previously stated by this Court and the Ninth Circuit, these arguments lack merit.[9]

Accordingly, the Court concludes that the Organizations have standing for their substantive and procedural claims.  *See id.* at *12 & n.8.

## B.  Zone of Interests

Defendants also renew their argument that the Organizations' claims are not arguably within the zone of interests protected by the INA.  ECF No. 87 at 16-18.

The Ninth Circuit concluded that "the Organizations' claims 'are, at the least, *arguably*

---

[8] Defendants' contention that the Organizations "have no legally protected interest in preventing the federal government from taking actions that might affect their funding" misstates the inquiry.  ECF No. 87 at 15.  The question is not whether the Organizations (or any other entity affected by government regulation) have a legal right to *maintain* the current asylum system or their respective missions or business models.  Rather, the question is whether the Organizations have an injury to their interests "that is (a) concrete and particularized and (b) actual or imminent" such that they are proper plaintiffs to litigate the issue whether the Rule unlawfully changes the system.  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000); *see also Massachusetts v. E.P.A.*, 549 U.S. 497, 517 (2007) ("At bottom, the gist of the question of standing is whether petitioners have such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination." (internal quotation marks and citation omitted)).

[9] The Organizations properly concede that the Ninth Circuit's ruling on third-party standing is controlling, indicating their intent to press the argument on appeal.  ECF No. 92 at 3 n.2.

14

within the zone of interests' protected by the INA." *E. Bay Sanctuary Covenant*, 2018 WL

6428204, at *13 (quoting *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1303 (2017))

(emphasis in original).  "Whether a plaintiff comes within 'the zone of interests' is an issue that

requires [courts] to determine, using traditional tools of statutory interpretation, whether a

legislatively conferred cause of action encompasses a particular plaintiff's claim.*"  Lexmark Int'l,*

*Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014).  The Ninth Circuit's ruling

decided a legal issue that the Court cannot re-adjudicate de novo.

Defendants acknowledge the Ninth Circuit's adverse decision on this point, ECF No. 87

at 17 n.2, but nonetheless press the same arguments before this Court.  For instance, the Ninth

Circuit "reject[ed] the Government's invitation to rely on" *INS v. Legalization Assistance Project*

*of L.A. Cty.*, 510 U.S. 1301, 1305 (1993) (O'Connor, J., in chambers), and *Immigrant Assistance*

*Project of L.A. Cty. v. INS*, 306 F.3d 842, 867 (9th Cir. 2002), finding both distinguishable.  *E.*

*Bay Sanctuary Covenant*, 2018 WL 6428204 at *13 n.10.  Yet Defendants continue to treat

*Legalization Assistance Project* as controlling.  *See* ECF No. 87 at 17-18.[10]  The Court rejects

Defendants' arguments for the reasons provided by the Ninth Circuit.  *See E. Bay Sanctuary*

*Covenant*, 2018 WL 6428204 at *13-14.

## V.     MOTION FOR PRELIMINARY INJUNCTION

### A.     Legal Standard

The Court applies a familiar four-factor test on both a motion for a temporary restraining

order and a motion for a preliminary injunction.  *See Stuhlbarg Int'l Sales Co. v. John D. Brush &*

*Co.*, 240 F.3d 832, 839 n. 7 (9th Cir. 2001).

Preliminary relief is "an extraordinary remedy that may only be awarded upon a clear

showing that the plaintiff is entitled to such relief."  *Winter*, 555 U.S. at 22.  To obtain preliminary

injunctive relief, the moving party must show: (1) a likelihood of success on the merits; (2) a

likelihood of irreparable harm to the moving party in the absence of preliminary relief; (3) that the

---

[10] For the same reason, Defendants' reliance on *Northwest Immigrant Rights Project v. U.S.
Citizenship & Immigration Services*, 325 F.R.D. 671 (W.D. Wash. 2016), is unpersuasive.  The
court there found the claims at issue "analogous to the claims that Justice O'Connor confronted"
in *Legalization Assistance Project*.  *Id.* at 688.

United States District Court
Northern District of California

1    balance of equities tips in favor of the moving party; and (4) that an injunction is in the public

2    interest.  *Id.* at 20.  "[S]erious questions going to the merits and a balance of hardships that tips

3    sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the

4    plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the

5    public interest."  *All. for the Wild Rockies*, 632 F.3d at 1135 (internal quotation marks omitted).

6        **B.    Likelihood of Success on the Merits**

7            **1.    Validity of the Rule**

8            In arguing that the Rule is consistent with the INA, Defendants largely repackage the same

9    arguments previously made to the Ninth Circuit and this Court.  ECF No. 87 at 18-22.  The

10   arguments failed to persuade the Court the first time.  And this district court is not in a position to

11   review the Court of Appeals' statutory interpretation.  Notwithstanding, Defendants' arguments

12   remain unpersuasive.

13           Defendants continue to rely on the following undisputed points: (1) asylum is a

14   discretionary benefit; (2) the Attorney General may adopt categorical bars to asylum eligibility,

15   *see* 8 U.S.C. § 1158(b)(2)(C); and (3) manner of entry may be considered on a case-by-case basis,

16   *see Matter of Pula*, 19 I. & N. Dec. 467 (BIA 1987).  ECF No. 87 at 19-21.  Like the Ninth

17   Circuit, the Court continues to find these points unresponsive to the statutory conflict at hand.  The

18   Rule purports to deny asylum eligibility to any alien crossing other than at a port of entry.  By

19   contrast, section 1158 states clearly that an alien may apply for asylum when she is "physically

20   present in the United States" or "arrives in the United States (*whether or not at a designated port

21   of arrival . . . .*)"  8 U.S.C. § 1158(a)(1) (emphasis added).  It would be hard to imagine a more

22   direct conflict.  As the Court previously stated when denying Defendants' motion for stay, "where

23   'Congress unambiguously stated that manner of entry has no effect on an alien's ability to *apply*

24   for asylum,' Defendants cannot plausibly contend that 'it can be the sole factor by which the alien

25   is rendered *ineligible*.'"  ECF No. 61 at 5 (quoting ECF No. 43 at 21); *see also* 8 U.S.C.

26   § 1158(a)(1).

27           The BIA's policy prior to *Matter of Pula* is immaterial to this question.  *See* ECF No. 87 at

28   20-21 (citing *Matter of Salim*, 18 I. & N. Dec. 311, 315-16 (BIA 1982)).  Even under the

United States District Court
Northern District of California

framework established in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984), an agency's interpretation carries no weight if it conflicts with a statute that a court determines to be unambiguous. *See Brand X Internet Servs.*, 545 U.S. at 982.

Moreover, Defendants err in discounting the Ninth Circuit's discussion of why the Rule "cannot be considered a reasonable effort to interpret or enforce the current provisions of the INA" as directed at a claim not raised by the Organizations. *E. Bay Sanctuary Covenant*, 2018 WL 6428204, at *16 (citing *Chevron*, 467 U.S. at 843). Given the citation to *Chevron*, the Court understands the Ninth Circuit to have concluded, in the alternative, that the Rule would fail at *Chevron* step two because it is not a reasonable interpretation of the statute. As the Ninth Circuit explained, it has held that "the way in which [the alien] entered this country is worth little if any weight in the balancing of positive and negative factors," *id.* at *16 (alteration in original) (quoting *Mamouzian v. Ashcroft*, 390 F.3d 1129, 1138 (9th Cir. 2004)), and it is far from "alone in [its] view of the relevance of illegal entry to an alien's eligibility for asylum," *id.* at *17 (collecting cases); *see also* ECF No. 43 at 22 (same).

In this discussion, the Ninth Circuit also noted that 8 U.S.C. § 1158(a)(1) "reflects our understanding of our treaty obligation to not 'impose penalties [on refugees] on account of their illegal entry or presence.'" *E. Bay Sanctuary Covenant*, 2018 WL 6428204, at *16 (alteration in original) (quoting 1951 Convention Relating to the Status of Refugees, art. XXXI, § 1, July 28, 1951, 189 U.N.T.S. 150, 174).[11] Defendants argue again that the Rule does not impose a "penalty" under Article 31(1) and that the Article does not apply to refugees who pass through a third country. ECF No. 87 at 21-22. Defendants' reliance on out-of-circuit authority considering a different question of statutory interpretation is not compelling, given the Ninth Circuit's contrary view. *See id.* (citing *Mejia v. Sessions*, 866 F.3d 573, 588 (4th Cir. 2017)).

Defendants also fail to grapple with the reasoned views expressed in the United Nations High Commissioner for Refugees' ("UNHCR") amicus brief, *see* ECF No. 81-1 at 18 ("UNHCR's

---

[11] The United States acceded to the 1967 United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, which "incorporates the substantive provisions of Articles 2 through 34 of the [Convention]." *Delgado v. Holder*, 648 F.3d 1095, 1100 (9th Cir. 2011) (en banc).

United States District Court
Northern District of California

view is that the concept of impermissible 'penalties' in Article 31(1) encompasses civil or administrative penalties as well as civil ones." (citing also *B010 v. Canada*, [2015] 3 S.C.R. 704, 729 (Can.))); *id.* at 18 n.4 ("Article 31(1) should also be interpreted to include those who transit through a third country before seeking asylum.").  Though not binding, *see I.N.S. v. Aguirre-Aguirre*, 526 U.S. 415, 427 (1999), the UNCHR's "analysis provides significant guidance for issues of refugee law."  *Mohammed v. Gonzales*, 400 F.3d 785, 798 (9th Cir. 2005) (citing *I.N.S. v. Cardozo-Fonseca*, 480 U.S. 421, 439-40 (1987)).  This guidance alone distinguishes this case from the brief discussions in the cases on which the Rule relied.  *See Mejia*, 866 F.3d at 573 ("[Petitioner] offers no support for her contention that denying illegal re-entrants the ability to apply for asylum constitutes a 'penalty,' a key term undefined by the Protocol."); *Cazun v. Attorney Gen. United States*, 856 F.3d 249, 257 (3d Cir. 2017) (finding that "neither the text of the Article nor its history clearly indicates that the reinstatement bar, which does not imprison or fine aliens, is the sort of criminal 'penalty' forbidden").

In sum, Defendants have provided no basis to depart from this Court and the Ninth Circuit's conclusions on this issue.

### 2.    Notice-and-Comment Requirements

Because the Organizations have demonstrated a likelihood of success on their claim that the Rule is substantively invalid, the Court need not reach the notice-and-comment exceptions. But given the Ninth Circuit's expressed expectation that the Court would evaluate these claims on a fuller record, the Court discusses them briefly to develop the record for appellate review.[12]

### a.    Foreign Affairs

Defendants' arguments in support of the foreign affairs exception are largely devoted to

---

[12] In evaluating developments subsequent to the Court's prior order, the Court notes that the participation of amici in this case validates the observation that "[t]he greater the public interest in a rule, the greater reason to allow the public to participate in its formation."  *Hoctor v. U.S. Dep't of Agric.*, 82 F.3d 165, 171 (7th Cir. 1996).  For instance, as just noted, the Court has received the analysis of the U.N. High Commissioner on Refugees – views that were not provided to the courts on which the Rule relied for its conclusions about consistency with Article 31(1).  *Cf.* 83 Fed. Reg. at 55,939.  Similarly, the Court has received input regarding the public interest from numerous States who bear many of the primary responsibilities of accommodating asylum seekers, both those who are granted asylum and those who are released pending the adjudication of their applications.  *See* ECF No. 82-1.

arguing that "the Court was wrong to require an evidentiary showing that undesirable international consequences would result from following the rulemaking procedures" and that the justifications set forth in the Rule's preamble are facially sufficient.  ECF No. 87 at 22-24.  Neither contention can be sustained in light of the Ninth Circuit's order.  The Ninth Circuit concluded that "the connection between negotiations with Mexico and the immediate implementation of the Rule [wa]s not apparent on th[e] record" before it – including the text of the Rule and its preamble – and invited the Government to demonstrate the purported connection with further evidence before this Court.  *E. Bay Sanctuary Covenant*, 2018 WL 6428204, at *19.  Moreover, as Defendants forcefully contend in their motion to strike, the Court's review is governed by 5 U.S.C. § 706 and its instruction to consider the "whole record."  *See* ECF No. 88 at 12 ("[T]he APA itself makes clear that judicial review of [the Organizations' foreign affairs and good cause] claim[s] should be limited to the administrative record . . . ." (citing § 706); ECF No. 94 at 10 (same).

Defendants now cite two portions of the administrative record.  First, Defendants cite remarks by President Trump on November 1, 2018, announcing in general terms the Rule's upcoming implementation.  *See* ECF No. 87 at 24 (citing AR 484-91).  These remarks do not mention negotiations with Mexico.  Rather, the President largely focused on domestic consequences, such as the number of asylum applicants, the merits of their claims, and the length of time to adjudicate their cases.  *See, e.g.*, AR 486 ("The overwhelming majority of claims are rejected by the courts, but by that time, the alien has usually long since disappeared into our country.").  To the extent the President discussed the Mexican government, his remarks do not indicate that foregoing notice and comment "encourages Mexico to take account of th[e] aliens and to cooperate with the United States."  ECF No. 87 at 24.  Rather, the President indicated that Mexico had already attempted to do so, but repeatedly stated that its efforts had been ineffective.  *See* AR 485 (stating that "[t]he government of Mexico has generously offered asylum, jobs, education, and medical care for people within the caravan, but many members of the caravan have refused those offers"); AR 488 ("Anybody throwing stones, rocks – like they did to Mexico and the Mexican military, Mexican police, where they badly hurt police and soldiers of Mexico – we will consider that a firearm."); AR 489 ("All we know is they're pretty tough people when they

1    can blast through the Mexican military and Mexican police.  They're pretty tough people.  Even

2    Mexico said, 'Wow, these are tough people.'  I don't want them in our country.  Women want

3    security.  Men don't want them in our country.  But the women do not want them.  Women want

4    security.  You look at what these women are looking for.  They want to have security.  They don't

5    want to have these people in our country.  And they're not going to be in our country.").

6    Defendants have identified no indication in these remarks that additional efforts from the Mexican

7    government were possible or likely forthcoming, let alone contingent to any degree upon

8    "*immediate* publication of the Rule, instead of *announcement* of a proposed rule followed by a

9    thirty-day period of notice and comment."  *E. Bay Sanctuary Covenant*, 2018 WL 6428204, at

10    *19.[13]

11          Second, Defendants cite a 2004 Memorandum of Understanding ("MOU") between

12    Mexico and the United States.  AR 92-96.  This MOU was discussed in the Rule, which explained

13    that "since 2004, the United States and Mexico have been operating under a memorandum

14    understanding concerning the repatriation of Mexican nationals," and that "Article 6 . . . reserves

15    the movement of third-country nationals through Mexico and the United States for further bilateral

16    negotiations."  83 Fed. Reg. at 55,950 n.15.  Providing a copy of the MOU, with no additional

17    information or explanation, does not come any closer to revealing the connection the Ninth Circuit

18    found lacking on the face of the Rule.

19          Because Defendants have failed to articulate the connection demanded by the Ninth

20    Circuit, the Court concludes that the Organizations are likely to succeed on the merits of this

21    claim.

22                              **b.      Good Cause**

23          Defendants similarly suggest that the Court may not look beyond the Rule's facial

24    justifications to determine whether good cause exists.  ECF No. 87 at 25.  Again, this is flatly

25    inconsistent with the Ninth Circuit's conclusion that "the Government's contention that the 'very

26

27    _____

     [13] *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 491 (1999), on which Defendants
     rely, involved different considerations regarding the availability of a selective prosecution claim in
28    the deportation context, and therefore does not alter the showing required by the Ninth Circuit to
     justify the foreign affairs exception.

United States District Court
Northern District of California

announcement' of the Rule itself would give aliens a reason to 'surge' across the southern border in numbers greater than is currently the case" was, "[a]bsent additional evidence, . . . too difficult to credit." *E. Bay Sanctuary Covenant*, 2018 WL 6428204, at *20; *see also California v. Azar*, -- F.3d --, No. 18-15144, 2018 WL 6566752, at *11 (9th Cir. Dec. 13, 2018) ("This is speculation unsupported by the administrative record and is not sufficient to constitute good cause."). If the Court cannot look beyond the Rule, then Defendants simply lose this point. *See E. Bay Sanctuary Covenant*, 2018 WL 6428204, at *20 ("Again, the Government is free to supplement the record and renew its arguments in the district court.").

The Court must also reject Defendants' reliance on the invocation of good cause for prior rulemakings not before the Court. *See Azar*, 2018 WL 6566752, at *11 ("[P]rior invocations of good cause to justify different [rules] – the legality of which are not challenged here – have no relevance.").

Turning to the administrative record, Defendants cite a newspaper article[14] indicating that, when the United States halted its policy of "separating parents from their children" due to the controversy it engendered, smugglers told potential asylum seekers that "the Americans do not jail parents who bring children – and to hurry up before they might start doing so again." AR 391. The article further indicates that the number of asylum seekers entering as families has risen in proportion to that of single adults and suggests a link to knowledge of those policies. AR 393. Reviewing this report with deference to the agencies' views, it at least supports the inference that smugglers might similarly communicate the Rule's potentially relevant change in U.S. immigration policy, albeit in non-technical terms. The Court concludes the Government has identified a "rational connection between the facts found and the choice made" to promulgate the interim rule on an emergency basis, *United States v. Valverde*, 628 F.3d 1159, 1168 (9th Cir.

---

[14] Nick Miroff & Carolyn Van Houten, *The border is tougher to cross than ever. But there's still one way into America*, The Washington Post (Oct. 24, 2018). The Court notes that, in Defendants' motion to strike, they contend that another Washington Post article by the same author is inadmissible because it "constitute[s] layers and layers of hearsay." ECF No. 94 at 19-20 & n.17 (citing Nick Miroff & Missy Ryan, *Army assessment of migrant caravans undermines Trump's rhetoric*, Washington Post (Nov. 2, 2018)). The Court notes the irony but nonetheless considers the article on which Defendants rely.

21

1   2010) (citation omitted), and that the Government is likely to prevail on its claim regarding the

2   good cause exception.

3       **C.     Irreparable Injury**

4       Because the Ninth Circuit has held that the Organizations lack third-party standing, the

5   Court considers only whether the Organizations themselves have made a sufficient showing of

6   irreparable harm.

7       The Court's "analysis focuses on irreparability, 'irrespective of the magnitude of the

8   injury.'" *Azar*, 2018 WL 6566752, at *14 (quoting *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 725

9   (9th Cir. 1999)).  "A threat of irreparable harm is sufficiently immediate to warrant preliminary

10  injunctive relief if the plaintiff 'is likely to suffer irreparable harm before a decision on the merits

11  can be rendered.'" *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016) (quoting

12  *Winter*, 555 U.S. at 22).

13      Defendants argue that the Organizations' economic harms do not qualify, relying on cases

14  involving "the temporary loss of income, ultimately to be recovered." *Sampson v. Murray*, 415

15  U.S. 61, 89 (1974).  But as the Ninth Circuit recently reiterated, the general rule that "[e]conomic

16  harm is not normally considered irreparable" does not apply where there is no adequate remedy to

17  recover those damages, such as in APA cases.  *Azar*, 2018 WL 6566752, at *14 (citing 5 U.S.C.

18  § 702); *see also Idaho v. Coeur d'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015) (reasoning

19  that "the State would likely suffer irreparable harm to its economic and public policy interests"

20  because "the Tribe's sovereign immunity likely would bar the State from recovering monetary

21  damages incurred during the course of this litigation").  Given the injuries described above, the

22  Organizations "have established a likelihood of irreparable harm" based on their showing of

23  serious "ongoing harms to their organizational missions," including diversion of resources and the

24  non-speculative loss of substantial funding from other sources.  *Valle del Sol Inc. v. Whiting*, 732

25  F.3d 1006, 1029 (9th Cir. 2013); *see also Azar*, 2018 WL 6566752, at *14 ("As we previously

26  explained in our analysis of standing, the harm is not speculative; it is sufficiently concrete and

27  supported by the record.").  Defendants' repetition of their standing arguments, ECF No. 87 at 29,

28  is unconvincing.

United States District Court
Northern District of California

1    Finally, "[t]hat the [Organizations] promptly filed an action following the issuance of the

2    [Rule] also weighs in their favor" for the irreparable harm analysis. *Azar*, 2018 WL 6566752, at

3    *14.

4    Accordingly, the Court concludes that the Organizations have demonstrated a likelihood of

5    irreparable injury.

6    **D.    Balance of the Equities and the Public Interest**

7    Turning to the balance of the equities and the public interest, the Court continues to find

8    that these factors favor preliminary relief.

9    The Ninth Circuit has provided substantial guidance on the equities involved. First, as the

10   court observed, an injunction would essentially preserve the status quo by "temporarily restor[ing]

11   the law to what it ha[s] been for many years prior to November 9, 2018," and avert irreparable

12   harm to the Organizations. *E. Bay Sanctuary Covenant*, 2018 WL 6428204, at *21. Moreover,

13   the Ninth Circuit has already rejected Defendants' argument that an injunction irreparably

14   "'undermines the separation of powers by blocking' an action of the executive branch." *Id.* at *21;

15   *see* ECF No. 87 at 27 ("The injunction undermines the separation of powers by blocking the

16   Executive Branch's lawful use of its authority . . . ."). The court likewise rejected the proposition

17   that enjoining the Rule will "*irreparably* thwart[]" Defendants' goals of discouraging illegal

18   border crossings. *E. Bay Sanctuary Covenant*, 2018 WL 6428204, at *21; *see also id.*

19   ("[Injunctive relief] does not prohibit the Government from combating illegal entry into the United

20   States, and vague assertions that the Rule may 'deter' this conduct are insufficient. Moreover,

21   there is evidence in the record suggesting that the Government itself is undermining its own goal

22   of channeling asylum-seekers to lawful entry by turning them away upon their arrival at our ports

23   of entry.").

24   The Ninth Circuit further noted that "aspects of the public interest favor both sides," given

25   that "the public has a 'weighty' interest 'in efficient administration of the immigration laws at the

26   border'" – counterbalanced here by an "interest in ensuring that 'statutes enacted by [their]

27   representatives' are not imperiled by executive fiat." *E. Bay Sanctuary Covenant*, 2018 WL

28   6428204, at *21 (first quoting *Landon v. Plasencia*, 459 U.S. 21, 34 (1982); then quoting

United States District Court
Northern District of California

23

United States District Court
Northern District of California

*Maryland v. King*, 567 U.S. 1301, 1301 (2012) (Roberts, C.J., in chambers)).  For the following reasons, the Court concludes that additional considerations tip the public interest sharply in favor of injunctive relief.

First, the Court must consider "the public's interest in ensuring that we do not deliver aliens into the hands of their persecutors."  *Leiva-Perez v. Holder*, 640 F.3d 962, 971 (9th Cir. 2011) (per curiam).  The Rule contemplates that, despite its "severe downstream consequences," *E. Bay Sanctuary Covenant*, 2018 WL 6428204, at *21, many of an estimated 70,000 aliens per year will still cross between ports of entry.  83 Fed. Reg. at 55,948.  As a logical consequence of applying the higher reasonable-fear standard to those aliens, the Rule recognizes that some "aliens who would have previously received a positive credible-fear determination [will] now receive . . . a negative credible-fear and reasonable-fear determination," not because they have no credible fear, but because they did not comply with the Rule.  *Id.* at 55,947.  Those aliens will be removed, regardless whether they have otherwise meritorious asylum claims.[15]  The administrative record underscore the dangers of returning those aliens to the country of persecution.  *See, e.g.*, AR 178 ("Furthermore, being deported can be a death sentence as migrants and refugees are sent back to the same violence they are fleeing from."); 393 ("Migrant advocates have documented cases of rejected asylum applicants being killed after they were sent back.").[16]

Second, "[w]here a valid law speaks to the proper level of deference to a particular public interest, it controls."  *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 725 F.3d 940, 946 (9th Cir. 2013).  The INA and its implementation of the U.N. Protocol reflect the balance

---

[15] The Government's fiscal year 2018 statistics provide some indication of the magnitude of this injury.  "[O]f 34,158 case completions in FY2018 that began with a credible-fear claim, 71% resulted in a removal order, and asylum was granted in . . . 17%."  ECF No. 87 at 26 (citing 83 Fed. Reg. at 55,935, 55,946).  This means that asylum was granted to over 5,000 persons.  Even if the Proclamation and Rule resulted in an across-the-board reduction of asylum claims of only 25 percent, more than 1,250 refugees with meritorious claims – persons facing persecution based on "race, religion, nationality, membership in a particular social group, or political opinion," 8 U.S.C. §§ 1101(a)(42), 1158(b)(1) – will never be heard on the merits.  That extinguishment is contrary to the public interest.

[16] *See also* AR 175 ("Many returnees who fled violence fear returning to their neighborhood.  Upon return, women are often targeted and experience direct threats from gang members, often the same individuals who drove the families to flee. . . .  Most of the women interviewed for this report revealed that upon return they were forced to live in hiding as a way to protect themselves from violent groups.").

United States District Court
Northern District of California

1   Congress struck between the public interests in rendering aliens who enter illegally inadmissible

2   and subject to criminal and civil penalties, 8 U.S.C. §§ 1182(a)(6)(A)(i), 1325(a)-(b), and

3   notwithstanding such conduct, preserving their ability to seek asylum, *id.* §§ 1158(a)(1),

4   1225(b)(1)(A)(i)-(ii), (B).  Because the Rule upends that balance in a likely unlawful manner, it is

5   "at loggerheads with the public interest of the United States."  *Inst. of Cetacean Research*, 725

6   F.3d at 946.

7         There is undoubtedly also a substantial public interest in preventing the unnecessary deaths

8   of asylum seekers who attempt to cross between ports of entry.  Though Defendants do not cite the

9   administrative record, their extra-record evidence demonstrates that deaths at the border are a

10  serious, longstanding, and ongoing problem.  *See* ECF No. 87 at 26 & n.8.[17]  Further, the

11  administrative record highlights that the dangers faced by asylum seekers begin far from the U.S.

12  border.  *See* AR 157 ("68.3 percent of the migrant and refugee populations entering Mexico

13  reported being victims of violence during their transit toward the United States."), 160 ("The

14  violence experienced by the population of the [Northern Triangle of Central America] is not unlike

15  that of individuals living through war.").  But Defendants have not shown that the Rule actually

16  addresses these problems.  And even if it did so in some small measure, that would not justify the

17  usurpation of Congressional authority.  As the Ninth Circuit noted:  "There surely are enforcement

18  measures that the President and the Attorney General can take to ameliorate the crisis, but

19  continued inaction by Congress is not a sufficient basis under our Constitution for the Executive to

20  rewrite our immigration laws."  *E. Bay Sanctuary Covenant*, 2018 WL 6428204, at *18.

21        Accordingly, the Court concludes that the *Winter* factors favor a preliminary injunction.

22  **E.     Scope of Relief**

23         **1.     Statutory Constraints**

24        The Court next turns to the proper scope of the injunction.  Defendants argue that 8 U.S.C.

25

26  ───────────────

27  [17] Pursuant to its resolution of Defendants' motion to strike, the Court takes judicial notice of the extra-record information cited by Defendants to consider the public interest, *see* ECF No. 87 at 26 n.8, because it is contained in publicly available government documents and the Organizations do not dispute the truth of the information.  *See Kater v. Churchill Downs Inc.*, 886 F.3d 784, 788 n.3 (9th Cir. 2018).

28

§ 1252(e)(3) inhibits the Court's ability to enjoin the portion of the Rule amending expedited removal or credible fear proceedings.  ECF No. 87 at 30.[18]

The Court agrees with Defendants that it lacks the authority to enjoin "procedures and policies adopted by the Attorney General to *implement the provisions of section 1225(b)(1)* of [Title 8]."  8 U.S.C. § 1252(a)(2)(A)(iv) (emphasis added); *see also id.* § 1252(e)(3).  But Defendants have not shown that these provisions immunize the primary asylum eligibility portions of the Rule from judicial review.  As the Court previously noted, "Defendants have provided no authority to support the proposition that any rule of asylum eligibility that may *be applied* in expedited removal proceedings is swallowed up" by these restrictions.  ECF No. 43 at 35.  Defendants make no attempt to argue that the Attorney General's exercise of authority under 8 U.S.C. § 1158(b)(2)(C) to establish conditions "under which an alien shall be ineligible for asylum under [§ 1158(b)(1)]" constitutes the "implement[ation]" of § 1225(b)(1).  *See id.* § 1252(a)(2)(A)(iv).[19]

Congress did not impose this restriction on review of claims pertaining to § 1158, such as the ones at issue here, or on asylum determinations in other proceedings, *see* 8 U.S.C. § 1229; 8 C.F.R. § 208.9.  As the Supreme Court has observed, where "Congress wanted [a] jurisdictional bar to encompass [particular] decisions [under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA")] . . . . it expressed precisely that meaning."  *Kucana v.*

---

[18] Defendants suggest that the Ninth Circuit did not address the issue "given its other rulings," ECF No. 87 at 30, but a review of Defendants' appellate briefing reveals that Defendants did not raise this argument, save for citing § 1252(e)(3) in a string citation on a different point, *see E. Bay Sanctuary Covenant*, No. 18-17274 (9th Cir.), ECF No. 4-1 at 26-27; ECF No. 9 at 12.

[19] Similarly, Defendants do not contend that § 1252(f)(1)'s limitation on injunctive relief regarding "the operations of the provisions of part IV of this subchapter," 8 U.S.C. §§ 1221-1232, applies to § 1158.  *See also Gonzales v. Dep't of Homeland Sec.*, 508 F.3d 1227, 1233 (9th Cir. 2007) ("Section 1252(f)(1) does not prohibit the current injunction because . . . it directly implicates the adjustment of status provision which falls under part V of subchapter II, notwithstanding that a reinstatement proceeding [under part IV] may be a collateral consequence of an unsuccessful adjustment application."); *Catholic Soc. Servs., Inc. v. I.N.S.*, 232 F.3d 1139, 1150 (9th Cir. 2000) (en banc) ("However, the district court in this case issued the preliminary injunction under 8 U.S.C. § 1255a, located in part V, 'Adjustment and Change of Status.'  Therefore, by its terms, the limitation on injunctive relief does not apply to the preliminary injunction granted by the district court.").  Nor do Defendants argue that the Organizations' claims "aris[e] from any action taken or proceeding brought to remove an alien."  8 U.S.C. § 1252(b)(9).

United States District Court
Northern District of California

*Holder*, 558 U.S. 233, 248 (2010). It is therefore unlikely that a challenge to the Attorney

General's exercise of § 1158 rulemaking authority falls within § 1252(a)(2)(A)(iv) or (e)(3). *See*

*id.* at 249 ("[W]here Congress includes particular language in one section of a statute but omits it

in another section of the same Act, it is generally presumed that Congress acts intentionally and

purposely in the disparate inclusion or exclusion." (alteration in original) (quoting *Nken v. Holder*,

556 U.S. 418, 430 (2009)). And contrary to Defendants, ECF No. 87 at 30, the Court cannot rely

on generalized assertions about Congress's intent to limit judicial review rather than the actual

language of the provisions imposing those limits. In *Kucana*, the Supreme Court acknowledged

that "many provisions of IIRIRA [we]re aimed at protecting [from court review exercises of] the

Executive's discretion," 558 U.S. at 252 (alterations in original) (quoting *Reno v. Am.-Arab Anti-*

*Discrimination Comm.*, 525 U.S. 471, 486 (1999)), but emphasized that "no law pursues its

purpose at all costs, and . . . the textual limitations upon a law's scope are no less a part of its

purpose than its substantive authorizations," *id.* (alterations in original) (internal quotation marks

omitted) (quoting *Rapanos v. United States*, 547 U.S. 715, 752 (2006) (plurality opinion)).

Accordingly, the Court concludes that it has jurisdiction to enjoin the portions of the Rule

amending 8 C.F.R. § 208.13 and 8 C.F.R. § 1208.13. *See* 83 Fed. Reg. at 55,952.[20]

### 2.    Nationwide Injunction

Finally, Defendants reiterate their contention that a nationwide injunction is overbroad.

---

[20] Defendants are incorrect that 5 U.S.C. § 705 limits the Court's injunctive authority. Section 705 "was primarily intended to reflect existing law under the Scripps-Howard doctrine," *Sampson*, 415 U.S. at 73 n.15, which recognized a reviewing court's "historic power" to "stay the enforcement of an order pending the determination of an appeal[] challenging its validity." *Scripps-Howard Radio v. F.C.C.*, 316 U.S. 4, 16-17 (1942). This power is guided by a familiar four-factor stay test that has "substantial overlap" with the *Winter* factors governing a preliminary injunction. *Nken*, 556 U.S. at 434. Defendants provide no reason that the outcome would be different under this test.

More importantly, it is well established that courts may issue preliminary injunctions, as an alternative to stays, in APA challenges. Indeed, the Ninth Circuit treated the Court's TRO as a preliminary injunction. *Winter* itself concerned a preliminary injunction issued based on a National Environmental Policy Act claim, 555 U.S. at 26, which is brought under 5 U.S.C. § 706, *see All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1216-17 (9th Cir. 2017); *see also Azar*, 2018 WL 6566752, at *2, 17 (affirming in part preliminary injunction in APA notice-and-comment challenge). Defendants' attempt to distinguish *Regents of the University of California v. U.S. Department of Homeland Security*, 908 F.3d 476, 511-12 (2018), collapses under scrutiny. ECF No. 87 at 33. The Organizations' claim that the Rule is "not in accordance with law" because it is inconsistent with the INA likewise arises under 5 U.S.C. § 706(2)(A). *See* ECF No. 1 ¶¶ 103-04.

1    ECF No. 87 at 33-34.

2        The Ninth Circuit applied the same standard Defendants advance now, stating that

3    "[e]quitable relief may 'be no more burdensome to the defendant than necessary to provide

4    complete relief to the plaintiffs.'" *E. Bay Sanctuary Covenant*, 2018 WL 6428204, at *22

5    (quoting *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994)).  Nonetheless, the Ninth

6    Circuit stressed that, "[i]n immigration matters, we have consistently recognized the authority of

7    district courts to enjoin unlawful policies on a universal basis." *E. Bay Sanctuary Covenant*, 2018

8    WL 6428204, at *22; *see also id.* ("Such relief is commonplace in APA cases, promotes

9    uniformity in immigration enforcement, and is necessary to provide the plaintiffs here with

10   complete redress." (quoting *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d

11   476, 512 (9th Cir. 2018)).  Though it acknowledged the "growing uncertainty about the propriety

12   of universal injunctions," the Ninth Circuit found "no grounds on which to distinguish this case

13   from [its] uncontroverted line of precedent."  *Id.*[21]

14        The Court notes that, in the interim, another three-judge panel of the Ninth Circuit has

15   reiterated the principle that "[t]he scope of the remedy must be no broader and no narrower than

16   necessary to redress the injury shown by the plaintiff."  *Azar*, 2018 WL 6566752, at *16.  In

17   narrowing an injunction directed at health care regulations, the *Azar* court further noted that

18   "[d]istrict judges must require a showing of nationwide impact or sufficient similarity to the

19   plaintiff."  *Id.* at 17.  The Court concludes that the *Azar* decision does not undermine the Ninth

20   Circuit's analysis of this case.  Because *Azar* did not involve immigration laws, it did not cast

21   doubt on the Ninth Circuit's "uncontroverted line of precedent" regarding nationwide injunctions

22   in this context, *E. Bay Sanctuary Covenant*, 2018 WL 6428204, at *22, which assuredly involve

23   issues of "nationwide impact," *Azar*, 2018 WL 6566752, at *17.  And unlike the plaintiff states in

24

25   [21] As the Court previously noted, this line of precedent is also consistent with the Supreme Court's
     stay order in *Trump v. International Refugee Assistance Project*, which left in place a nationwide
26   injunction to the extent that it involved all "foreign nationals who have a credible claim of a bona
     fide relationship with a person or entity in the United States."  137 S. Ct. 2080, 2088 (2017).
27   Although the Supreme Court stayed the injunction with respects to all other foreign nationals, it
     likewise did so on a nationwide basis.  *Id.*  Defendants have not suggested, nor does the Court
28   find, any similar criteria that make group-by-group tailoring appropriate in this context.

United States District Court
Northern District of California

*Azar*, the Organizations do not operate in a fashion that permits neat geographic boundaries.  *See, e.g.*, ECF No. 71-11 ¶¶ 5, 10, 14 (operating centers in Georgia, North Carolina, Missouri, and Oregon, and on-the-ground support at the southern border).

Given these circumstances, Defendants still have not explained how the Court could tailor a narrower remedy to "provide[] complete relief to the Organizations."  *Id.*  Defendants' suggestion that "any injunction must be limited to Plaintiffs['] actual, bona fide clients" conflates the question of relief with the question of third-party standing.  ECF No. 87 at 34.  As explained above, the Organizations' harms are not limited to their ability to provide services to their *current* clients, but extend to their ability to pursue their programs writ large, including the loss of funding for future clients.  Accordingly, Defendants' suggestion would not redress the Organizations' harms.

Defendants' contention that the Organizations lack standing for an injunction because their "business-model depends on . . . aliens breaking the law" likewise lacks merit.  ECF No. 34 at 36. This simply seeks to relitigate the organizational standing issues already decided by the Ninth Circuit, which found that the Organizations had standing based on harms to their asylum programs and related funding.  Moreover, Congress specifically provided that aliens have a right to apply for asylum notwithstanding this particular illegal behavior, *see* 8 U.S.C. § 1158(a)(1), and "took steps to ensure that pro bono legal services of the type that the Organizations provide are available to asylum seekers."  *E. Bay Sanctuary Covenant*, 2018 WL 6428204, at *13.  That the Organizations fulfill that role does not make their harms any less susceptible to injunctive relief.

## CONCLUSION

For the foregoing reasons, the Organizations' motion for preliminary injunction is granted. Defendants are hereby ORDERED AND ENJOINED, pending final judgment herein or other order, from taking any action continuing to implement the Rule and ORDERED to return to the pre-Rule practices for processing asylum applications.  Pursuant to the Court's discussion above, this injunction applies insofar as the Rule amends the regulations governing asylum eligibility in 8

1    C.F.R. §§ 208.13 and 1208.13.[22]

2         The Court sets this matter for a case management conference on March 18, 2019 at 2:00

3    p.m.  A joint case management statement is due by March 11, 2019.

4         **IT IS SO ORDERED.**

5    Dated:  December 19, 2018



6                                                    JON S. TIGAR
7                                            United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26  [22] As the Government acknowledged at the motion hearing, the remainder of the Rule rests on the
amendments to §§ 208.13 and 1208.13.  *See, e.g.,* 83 Fed. Reg. 55952 (proposing an amended 8
27  C.F.R. 208.30 that begins, "If the alien is found to be an alien described in 8 CFR 208.13(c)(3)").
Thus, although the Court is not enjoining the removal provisions of the Rule, they have no
28  independent effect.

30