Pages 1 - 32

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jon S. Tigar, Judge

EAST BAY SANCTUARY COVENANT,     )
et al.,                          )
                                 )
          Plaintiffs,            )
                                 )
   VS.                           )     NO. C 18-06810 JST
                                 )
DONALD J. TRUMP, PRESIDENT OF    )
THE UNITED STATES, et al.,       )
                                 )
          Defendants.            )
_____)

                         San Francisco, California
                         Wednesday, December 19, 2018

                 **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                AMERICAN CIVIL LIBERTIES UNION
                  FOUNDATION
                125 Broad Street - 18th Floor
                New York, New York  10004
            BY: **LEE GELERNT, ATTORNEY AT LAW**

                AMERICAN CIVIL LIBERTIES UNION
                  FOUNDATION OF NORTHERN CALIFORNIA
                39 Drumm Street
                San Francisco, California  94111
            BY: **VASUDHA TALLA, ATTORNEY AT LAW**
                **CODY WOFSY, ATTORNEY AT LAW**
                **JULIE M. VEROFF, ATTORNEY AT LAW**

             **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

```
 1   APPEARANCES:   (CONTINUED)

 2   For Plaintiffs:
                    CENTER FOR CONSTITUTIONAL RIGHTS
 3                  666 Broadway - 7th Floor
                    New York, New York  10012
 4             BY:  BAHER AZMY, LEGAL DIRECTOR

 5   For Defendants:
                    U.S. DEPARTMENT OF JUSTICE
 6                  Office of Immigration Litigation
                    P. O. Box 868 - Ben Franklin Station
 7                  Washington, D.C.  20044
               BY:  SCOTT G. STEWART, DEPUTY ASST. ATTORNEY GENERAL
 8                   EREZ REUVENI, ASSISTANT DIRECTOR

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | <u>**Wednesday - December 19, 2018**</u>                          <u>**9:30 a.m.**</u> |

2                        <u>**P R O C E E D I N G S**</u>

3                             ---oOo---

4          **THE CLERK:**  Calling Civil Case 18-6810, East Bay

5    Sanctuary Covenant, et al., versus President of U.S. Donald J.

6    Trump, et al.

7          Counsel, will you please stand and make your appearances.

8          **MR. STEWART:**  Good morning, Your Honor.  May it please

9    the Court, I'm Scott Stewart on behalf of the defendants.

10          **THE COURT:**  Good morning.

11          **MR. GELERNT:**  Good morning, Your Honor.  Lee Gelernt

12   for the plaintiffs from the ACLU.

13          **THE COURT:**  Good morning.

14       Other counsel's appearances have already been noted for

15   the record and will appear in the minutes.

16       The matter is on calendar this morning for consideration

17   of plaintiffs' motion for preliminary injunction.

18       We aren't starting on a clean slate this morning.  This

19   Court already considered the plaintiffs' motion for a temporary

20   restraining order, which I granted, and the Government then

21   sought a stay of that order in the Ninth Circuit.

22       In the course of resolving that motion, the Ninth Circuit

23   was called upon to decide whether the Court's temporary

24   restraining order -- this Court's temporary restraining order

25   was appealable because, in essence, it was sufficiently similar

1    to a preliminary injunction.  It decided it was appealable, and

2    then it expressed its view on the merits.

3         As a District Court, of course, I'm bound by any decisions

4    that were made by the Ninth Circuit.  So almost all of the

5    questions that are before the Court this morning have already

6    been resolved twice, and I'm not allowed to disagree with the

7    Ninth Circuit as to an issue where they've directly reviewed

8    me, and I'm unlikely to disagree with myself since I also have

9    already decided these questions.  So I would encourage the

10   parties to focus on those issues where they really feel there's

11   something new.

12        I recognize that there is likely to be substantial

13   disagreement about the issues that are presented this morning,

14   and so what I just said is not an ironclad rule.  It may be

15   that the parties simply need there to be a clearer record or a

16   better record or they feel the need to make their record this

17   morning.  That is fine.

18        I don't think the parties will need it because you're not

19   starting on a clean slate but, nonetheless, the parties can

20   again have 45 minutes each if they would like to argue.

21        I think the order -- the most sensible order of argument,

22   in light of the Court's temporary restraining order and in

23   light of the Ninth Circuit's order is for the Government to go

24   first and then the plaintiffs and then the Government and then

25   the plaintiffs, and then for me to take the motion for

1    preliminary injunction under submission.

2        I don't have very many questions as I sit here now,

3    although some may arise during the parties' arguments.  I do

4    think it would be helpful for the Government to tell me in

5    concrete terms what it thinks an injunction that only applied

6    to these plaintiffs would look like in the real world.

7        At the temporary restraining order hearing, I made a

8    comment that was sort of a joke, which was if I were to adopt

9    the Government's view of my power to issue a temporary

10   restraining order and confine it to these plaintiff legal aid

11   organizations, I would make them the most popular legal aid

12   organizations at the border.

13       Well, here we are at the preliminary injunction stage and

14   the Government continues to take the position that only these

15   plaintiffs are entitled -- that the Court is only able to

16   extend injunctive relief to these plaintiff organizations.

17   They themselves are not asylum seekers.

18       And so putting aside the Government's arguments that I

19   shouldn't give anybody any relief, if I get to the point where

20   I conclude that injunctive relief is available, maybe the

21   Government will simply repeat the arguments in its briefs; but

22   I honestly can't imagine that the Government thinks the right

23   result is to allow this particular group of legal aid

24   organizations to essentially go to the border and just

25   advertise that if you enter somewhere other than a designated

1    port of entry, your asylum claim will automatically be denied

2    unless you're lucky enough to have one of these four

3    organizations represent you, in which case the rule and

4    proclamation are suspended.  Perhaps I'm missing something.

5        Anyway, that's really the only question I have as I sit

6    here now, and I'll invite the Government to make its opening

7    argument.

8        **MR. STEWART:**  Thank you, Your Honor.  May it please

9    the Court, Scott Stewart on behalf of the United States.

10        Your Honor, we'll take the Court's invitation to not

11    retread ground that two levels of tribunals have hit.  We'd

12    simply say that we continue to assert and maintain the

13    Government's arguments set out in it's TRO and its preliminary

14    injunction briefing on the various merits points.

15        The points I'd emphasize, Your Honor, are sort of, first,

16    I'd like to hit the remedy; second, I'd like to talk about just

17    some record-related items.

18        On the remedy, Your Honor, I'd start by emphasizing that

19    it's the plaintiffs' burden to show what -- the plaintiffs have

20    not come forward with a concrete proposal as to tailored relief

21    that would give their identified *bone fide* clients the relief

22    they're seeking.  They've sought a broad indiscriminate

23    nationwide injunction, and our submission is it needs to be --

24    it needs to be limited to cover only specific aliens who the

25    respondent organizations identify as its actual clients who are

1  in the United States who would otherwise be subject to the

2  rule.  That's appropriate.

3       **THE COURT:**  What if the Court entered a preliminary

4  injunction and there were a future client of one of the

5  organizations who is not presently in the United States but

6  crossed into the United States three months from now while this

7  case was pending and the preliminary injunction were in effect?

8       **MR. STEWART:**  I think we'd have to see the plaintiffs

9  identify that person, Your Honor, and bring them within the

10  scope of the injunction.  I mean, again, it's --

11       **THE COURT:**  How many future proceedings do you

12  anticipate the Court would hold to amend the injunction?  Would

13  it be a weekly roundup?  I mean, how would that work?

14       **MR. STEWART:**  Well, Your Honor, I mean, I think this

15  case is proceeding very quickly as far as resolution is

16  concerned about the final legality of the rule.  I think --

17  again, part of the uncertainty here is because the lack of an

18  affirmative record by the plaintiffs as to whether they have

19  *bone fide* clients.

20       Again, organizations, it's vague.  There's been no

21  proposed real tailoring on the part of plaintiffs.  It's just

22  kind of, "Hey, we have clients that span some geographic

23  areas."  Again, it's -- a lot of the unclarity is the lack of

24  an affirmative kind of proposal by plaintiffs to do something

25  more tailored.

1        So I would emphasize that, again, there are no individual

2   aliens before the Court.  No class is certified.

3        We'd acknowledge -- we'd emphasize, Your Honor, that as

4   Judge Bybee did in his opinion, that Judge Bybee emphasized

5   that third-party standing wasn't available so concerns of

6   individual aliens outside the United States who are allegedly

7   having difficulties applying for asylum are not a cognizable

8   group for any remedy.  It needs to be actual clients who kind

9   of fit within the organization's own standing interests in

10  pursuing the mission and the like that have been identified

11  before this Court.

12       So I'd emphasize the remedy should be tailored to account

13  for just the organization's standing.

14       I'd also emphasize, Your Honor, that on matters of just

15  Ninth Circuit guidance and precedent, the Ninth Circuit, as

16  recently as December 13th, issued a panel opinion in the

17  *California versus Azar* case, which I believe the plaintiffs

18  cite in one of their record submissions.  They cite it on the

19  good cause issues, but I'd emphasize that that case involved

20  conscious objections to contraceptive mandate issues.  Even

21  while upholding the injunction kind of on the merits, on the

22  good cause merits, Your Honor, the --

23       **THE COURT:**  I thought Judge Wallace's scope of

24  injunction language was very helpful.

25       **MR. STEWART:**  Right, Your Honor, it was.  It

1  emphasized that even if there was -- if the Court finds a legal

2  violation, that doesn't mean a nationwide injunction.  It needs

3  to be tailored to remedy the injuries of the plaintiffs before

4  the Court.  He, therefore, limited it in that case to the

5  handful of plaintiff states.  He didn't extend it beyond that.

6       Similarly here, I think the analogous remedy for good of

7  the limits of the plaintiffs' own standing, for the risks or

8  the damages that nationwide injunctions cause, the equities for

9  nonparties -- there are other parties in other cases in the

10 District of Columbia, Your Honor, who are also pursuing relief

11 and have been arguing their cases this very week, amended their

12 complaints.

13      **THE COURT:**  Well, Judge Moss held off providing

14 anybody any relief until he saw what I did.

15      **MR. STEWART:**  He did, Your Honor.  He's waiting to see

16 what happens here and just otherwise to see what the

17 appropriate next step is, but he stands ready to move very

18 expeditiously and has set a conference for this Friday.

19      And my understanding at that hearing was he was willing to

20 move earlier if he needed to to address the interests claimed

21 by the plaintiffs in those cases.  So a narrow injunction would

22 be consistent with just the extent of plaintiffs' own

23 interests, the development of law in other circuits, the rights

24 of nonparties, equitable principles about just the relief of

25 the judicial power in these kinds of cases.

1          Again, I think it would be helpful if plaintiffs were to

2     come forward with something affirmative identifying how many

3     clients they have or what they -- just -- I mean -- just

4     something because right now it's somewhat vague, but I'd hit

5     those points on the nature of the remedy.

6          Another point, Your Honor, is that this case does not

7     challenge the new rules provisions as they affect expedited

8     removal proceedings.

9               **THE COURT:**  Ah.  I wondered when we'd get there.

10              **MR. STEWART:**  And given --

11              **THE COURT:**  Let's take a look.  So let's take

12    8 C.F.R. 208.30.  This is where you say the court's authority

13    stops because the court's authority extends only to 208.13;

14    right?

15              **MR. STEWART:**  Correct, Your Honor.

16              **THE COURT:**  Okay.  So doesn't the amended 208.30,

17    subpart (e)(5), depend entirely on the existence of or on a

18    finding under 208.13?

19         My question is:  Let's say that I accept your invitation

20    and I enjoin only 208.13.  What's left of 208.30, subpart

21    (e)(5), in its amended form?

22              **MR. STEWART:**  Right.  I think -- to give that effect,

23    Your Honor, I think you need to -- it would require further

24    limiting of the injunction in -- somewhat in the ways I

25    described.

1          **THE COURT:**  Practically is there a difference?

2          **MR. STEWART:**  I'm not sure there is a practical

3    difference, Your Honor.

4          **THE COURT:**  Okay.

5          **MR. STEWART:**  But, again, this is -- I still think --

6    I mean, maybe not as a technical practical matter as far as

7    consequence, but it does seem to me appropriate that the Court

8    should target its remedy at the finding of any legal violation

9    that the Court makes; and further narrowing of the remedial

10   order, Your Honor, would give some practical effect to that if

11   it were tailored as I've proposed.

12        If I can hit a couple points on the record, Your Honor.

13   First, I just want to emphasize, and I think our motion to

14   strike pretty thoroughly covered these issues, but this is an

15   APA record case.  The plaintiffs never moved to supplement the

16   record or challenge the scope of the record.  They simply

17   attached a lot of declarations and cited a lot of nonrecord

18   material in their submissions.  *Amici* did somewhat similar

19   things.

20        The record rule applies here.  There's no basis to

21   supplement the record.  It shows what the decision-makers

22   relied upon, what they thought significant.

23        I think that some of those conclusions, they may not

24   affect Your Honor's conclusions but I will hit a couple of the

25   points there.

1        Parts of the record, as we've cited, AR92 to 96, the MOU,
2   reflects that in the past the United States and Mexico have
3   understood that there's a need to address this problem on kind
4   of a diplomatic level.  There's a need to regulate the flow of
5   persons on their common border as part of an agreement.  There
6   was kind of a baseline for further effort and work.
7        I'd note at AR390 to 400, there's an article that explains
8   kind of the nature of the problem here; that even if maybe
9   aggregate numbers have been down in some years recently, that
10  the problem that the Government is facing and the country is
11  facing at the Southwest border is a dramatic increase in family
12  units, which are very hard to detain and end up being released,
13  which is a particular problem for the reasons we've identified
14  in our briefing and our past argument, because just they're
15  able to enter the country between ports of entry, pass credible
16  fear claims, but they don't actually have in the bulk of cases
17  meritorious claims.  And as the agency, we're entitled to make
18  that conclusion.
19        **THE COURT:**  Let me ask you about that.  The Government
20  says somewhere, I don't have the page cite right in front of
21  me, but it says essentially that one benefit of this rule --
22  and by "rule" I mean the rule in conjunction with the
23  proclamation -- one benefit of the rule or one goal of the rule
24  is to reduce the number of meritless asylum claims.  There's a
25  sentence that says almost exactly that.

1          But this rule doesn't change the proportion of asylum

2     claims that are meritorious, does it?  It doesn't do anything

3     on that score; right?  It doesn't make a higher percentage of

4     the claims meritorious.

5               MR. STEWART:  I mean, sort of as a matter of just

6     stepping back, if you look at the world and everybody sort of

7     has an asylum claim or they don't, Your Honor, I mean --

8               THE COURT:  Right.

9               MR. STEWART:  -- I think --

10              THE COURT:  It doesn't do anything about that.

11              MR. STEWART:  I don't think it -- yeah, I don't think

12    it affects whether or not somebody would have I guess at least

13    as a matter of statutory criteria.

14              THE COURT:  I don't want -- I'm sorry for talking over

15    you.

16              MR. STEWART:  That's okay.

17              THE COURT:  I don't want to hide the ball.  I'll tell

18    you where I'm going.

19         Isn't the only way that it can reduce the number of

20    meritless asylum claims by simply reducing the total number of

21    asylum claims?  And if that's wrong, how else does it reduce

22    the number of meritless claims?

23              MR. STEWART:  I mean, I think it does reduce the

24    number of -- I think it reduces the number of people claiming

25    credible fear when they're not going to get it, and that in

1  turn reduces the number of asylum claims when they're not going

2  to get asylum.

3          **THE COURT:**  How does it do that?

4          **MR. STEWART:**  Because if somebody is not eligible to

5  receive asylum, then they don't get to kind of pass the

6  credible fear threshold, Your Honor.

7          **THE COURT:**  Well, they're automatically determined not

8  to have a credible fear even if under the old rule, they would

9  be found to have a credible fear.  So that's not a merits

10  determination.  That's sort of a procedural bar, isn't it?

11  This is someone whose claim would have been meritorious before

12  and now because they crossed in the wrong place, it's not

13  meritorious.

14          **MR. STEWART:**  I don't agree with that, Your Honor.

15  The big point of the rule here is that very many of those

16  claims -- a large number of those claims are not meritorious,

17  and we're now accounting for that fact when we -- when the

18  agency has erected the eligibility bar.

19      The problem is that so many of those claims don't have

20  merit even if somebody could surmount the credible fear

21  threshold bar.  They don't end up showing up.  They don't end

22  up applying.  They don't end up getting asylum.

23          **THE COURT:**  No one disputes that point.  The

24  plaintiffs don't.  Not all claims are meritorious.  I guess --

25  I don't want to quibble with you.  I'm just not understanding

1    how it -- how the rule -- the question is:  Is there sort of a

2    throwing out of the baby with the bathwater; right?  Either

3    channeling is 100 percent effective or it's not.  Common sense

4    tells us it would be impossible for it to be 100 percent

5    effective even assuming it occurs.

6         So that means by definition some persons with meritorious

7    claims will never have the opportunity to present them.  I'm

8    assuming that's why there's a reduction in meritless claims

9    because there's just a reduction in claims.  I'm not

10   understanding how there is a reduction only in meritless claims

11   other than the way I just described.

12        **MR. STEWART:**  Your Honor, I don't think we have to

13   show that we have to reduce every single meritless claim.

14   We're simply trying to channel these --

15        **THE COURT:**  I'm not saying you do have to show it.

16   I'm saying you told me that you do that, and I'm asking you to

17   explain how you do that.

18        **MR. STEWART:**  Maybe --

19        **THE COURT:**  And I can get you the page cite in a

20   second if you need it.

21        **MR. STEWART:**  Can you maybe restate your question,

22   Your Honor, so I make sure I'm hitting the right point then?

23                     (Pause in proceedings.)

24        **THE COURT:**  So in the Court we tend to cite ECF pages,

25   which are those electronically affixed numbers at the top of

1    the brief; but using the pages at the bottom that the lawyers

2    put on, just right on page 1 of the Government's opposition to

3    this motion, the very last line, the very last sentence

4    (reading):

5              "Taken together, the rule and proclamation will" --

6         ellipsis, right there at the bottom -- "reduce the backlog

7         of meritless asylum claims."

8         That's what I'm focused on.

9         **MR. STEWART:**  Okay, Your Honor.  If somebody knows

10   that they cannot just enter the country unlawfully, assert a

11   credible fear, and be released into the country for years, it

12   deters meritless asylum claims.  If they know that they're not

13   going to be able to do that, they're going to instead have to

14   show a reasonable fear and, at most, seek some kind of

15   protection under the withholding statute or the convention

16   against torture, then they realize they don't have this very

17   easy burden to clear that gives them a pass into the country

18   for several years.

19        **THE COURT:**  Okay.

20        **MR. STEWART:**  So, I mean, that's the short basic

21   thing.  And I think the rule does well to lay that out,

22   Your Honor.  I'm not certain that I persuaded you of that, but

23   I think that's sort of the short version of why that is.  If

24   there's anything else that I think might be useful, I can try

25   to find that as well.

1          We would reassert, Your Honor, our points on the scope of

2     the record.  As I've said, I think I'd emphasize on the good

3     cause and foreign affairs exceptions.  It's appropriate to

4     give -- I acknowledge the Ninth Circuit, its ruling on this,

5     but I would say that there is some added benefit to the

6     administrative record here about -- somewhat about the agency's

7     thinking.

8          As we've explained in some of these things, with foreign

9     affairs, we, the Government, are not required to and it would

10    be imprudent to get into too much, you know, detail

11    telegraphing our plans, negotiating strategy, that sort of

12    thing.

13         But we have identified a significant foreign affairs

14    problem, a significant issue with dangers in Mexico, many which

15    are echoed by plaintiffs themselves, that we are trying to

16    address via through the Safe Third Country Agreement or other

17    negotiating tools, and I would emphasize those being borne out

18    by the administrative record.

19         If there are no other questions now, Your Honor, I'd be

20    happy to stick with the points in our various briefs and hit

21    any other questions that you'd want to or just simply save time

22    for rebuttal.

23              **THE COURT:**  I don't have any for now.

24              **MR. STEWART:**  All right.

25              **THE COURT:**  That's fine.  Let's turn it over to the

1    plaintiffs.

2         Mr. Gelernt.

3              **MR. GELERNT:**  Good morning, Your Honor.  Thank you.

4    We do not have that much.

5         What we take from this Court's opinion and the

6    Ninth Circuit's opinion is that the Ninth Circuit affirmed all

7    of the legal conclusions with the exception of third-party

8    standing; and as we've said in our brief, we would just like to

9    preserve that.  Who knows what will happen ultimately on

10   appeal, whether there will be a difference, whether it goes

11   *en banc* or in the Supreme Court.

12        But we do not believe that anything has really changed now

13   from the preliminary injunction to the --

14             **THE COURT:**  Let me ask you about one thing.

15             **MR. GELERNT:**  Yes.  Right.

16             **THE COURT:**  So with regard to the notice and comment

17   exceptions, the Ninth Circuit said to the parties, really

18   directing its comment at the Government, "If you have anything

19   else in the record to support these, you might want to show the

20   District Court on remand."

21             **MR. GELERNT:**  Right.

22             **THE COURT:**  And the Government has identified a

23   newspaper article from the *Washington Post* in which it is

24   stated that when there had been a prior change in conditions,

25   and the specifics are eluding me at the moment, but when there

1    had been a prior change in conditions of entry at the border,

2    that smugglers had communicated that fact -- I think it had to

3    do whether you came across as a single person or as a family --

4           **MR. GELERNT:**  Exactly, Your Honor.

5           **THE COURT:**  -- that they communicated that fact to

6    people who were trying to get in the country --

7           **MR. GELERNT:**  Right.

8           **THE COURT:**  -- without documents, and that there was

9    subsequently an increase in families who were crossing.

10         Now, I spent some fair amount of time trying to find as

11   clear authority as I could on how to apply the good cause

12   exception.

13         Now, I will say parenthetically, ironically, the

14   Government in its motion to strike has some very negative

15   things to say about the evidentiary value of a different

16   *Washington Post* article by the same author.  I'll just put that

17   to one side.  You know, there's -- sauce for the goose is an

18   interesting aphorism but it's not very helpful here.

19         I'm not sure that's not enough.  That's what I'm saying.

20   I'm not sure that's not enough.  The law about good cause is

21   not entirely -- a good cause exception is not as clear as I

22   would like it to be.

23         **MR. GELERNT:**  Right.

24         **THE COURT:**  On the one hand, there are many, many

25   courts that say that the exception is to be construed narrowly

1  and that in some words there's a high burden on the Government;

2  but at the end of the day, it's still review of agency action.

3          **MR. GELERNT:**  Right.

4          **THE COURT:**  And I don't know if it gets all the way

5  down to arbitrary and capricious, but I'm not clear on exactly

6  how much the Government has got to put on the table to be

7  entitled to good cause exception.

8          And I would also note that, to the extent that I can

9  discern a pattern in the good cause cases, it would suggest

10  that invoking "Hey, there's an emergency here" is the place

11  where the Government is usually on its most solid ground.

12          **MR. GELERNT:**  Right.

13          **THE COURT:**  So that was a little long-winded, but I

14  would say that if we're in anywhere of a different place than

15  we used to be --

16          **MR. GELERNT:**  Right.

17          **THE COURT:**  -- pre-Ninth Circuit, that's probably the

18  place.

19          **MR. GELERNT:**  Absolutely, Your Honor.  And I think

20  that is the one place where the Ninth Circuit did say if the

21  Government has anything more, put it in with the administrative

22  record.  And obviously they've put in only the administrative

23  record and no additional affidavits.

24          I'm also not going to argue with you that the good cause

25  cases are perfectly reconcilable and easily understood as a

1   unified body of law.

2          THE COURT:  Do you want to give me one I might have

3   missed?

4          MR. GELERNT:  Your Honor, I think -- we don't have

5   cases I think that you probably missed, but I do -- what I

6   think is the critical point here, Your Honor, is that whatever

7   the body of case law may say or not say, that I think the

8   Ninth Circuit said in this case "We find it very difficult to

9   believe this inferential leap."  And so they did say to the

10  Government, "If you have stuff, put it in."

11         And I think given that they did say "This is a difficult

12  inferential leap for us to make," a newspaper article that

13  smugglers about some other policy may have been effective, I

14  don't think that's what the Ninth Circuit was looking for.

15         So I think you're right, Your Honor, that this body of

16  case law doesn't give you the perfect guidance you would want,

17  but I --

18         THE COURT:  What's the standard of review of that

19  fact?  I say it's not enough because it's not?  It's like admin

20  law Mad Libs.  Okay.

21         MR. GELERNT:  Right.

22         THE COURT:  Fill in the blank.  What do I say?

23         MR. GELERNT:  Well, I do think in light of the

24  Ninth Circuit's opinion, you would say "Is this enough to

25  overcome?"  Using logical sort of inference, I do think that's

1  what you would ask because I think that's what Judge Bybee was

2  saying.

3          **THE COURT:**  On a more likely than not, I'm not

4  personally persuaded by this evidence?

5          **MR. GELERNT:**  Well, I think that's what Judge Bybee

6  was saying, is that this is an enormous leap and you need real

7  evidence.  And so I think you would have --

8          **THE COURT:**  He didn't have any evidence.  That's my

9  question.

10          **MR. GELERNT:**  Well --

11          **THE COURT:**  I'm asking you -- you want me to write an

12  opinion in your favor.  I need you to tell me what the sentence

13  says.  I don't think that question is unfair.  "I read this

14  newspaper article.  It doesn't meet the following standard"

15  colon.  What do I say?

16          **MR. GELERNT:**  I think you would say "In light of

17  Judge Bybee's decision, this does not overcome the gap in logic

18  from the Administration's opinion and I am reviewing this

19  *de novo*.  This is not sufficient evidence."

20      I think if Judge Bybee thought that you were limited in

21  how you look at this, he would not have said "What's the

22  evidence?"  I think he was intending for you to look at how

23  much sufficient evidence there is in that respect.

24      I think the Ninth Circuit was very clear that it doubted

25  this inference, and I don't take the Ninth Circuit's opinion to

1    be saying, "Well, look, if they have one newspaper article."

2    Because I think the same basic evidence was in the rule, and

3    the fact that they're now citing an old opinion, I think that's

4    really where we come out, is that nothing in the administrative

5    record was conceptually different than what is in the

6    administrative record.

7         And the one thing I would note is that in part they're

8    relying on the President's speech that there could be a surge.

9    The one thing I did want to point out about that that's not in

10   our brief is if advanced notice to immigrants overseas was

11   going to create a surge, then why did the President have a

12   public press conference and why did the Administration give it

13   to the press a week before they announced the rule if the very

14   thing they were worried about was a surge and people having

15   advanced notice?

16        And so I think that actually the record evidence that they

17   put in or that's in the administrative record would cut against

18   that.

19        So, you know, Your Honor, I agree, and I know I'm

20   belaboring this, that there's no sort of clear way to look at

21   the good cause; but I do think in this case the Ninth Circuit

22   was very clear that they didn't buy the inferential leap and

23   that they were looking for some real evidence.

24        And this is a *Washington Post* article, and not to

25   denigrate the *Washington Post* article --

1          **THE COURT:**  That's okay.  They did so you can.  That's

2   fine.

3          **MR. GELERNT:**  -- but it's more to say that this is

4   about a different policy with very slight evidence.  And now

5   had the Ninth Circuit said "Well, we basically buy this but is

6   there a little more evidence," that would be one thing.  But

7   for the Ninth Circuit to say "This is way too big an

8   inferential leap," I don't see them coming back and saying,

9   "Well, there is this newspaper article about a wholly different

10  policy that may have had some effect."

11         **THE COURT:**  Yes, it's unquestionably thin.  I don't

12  want to give -- I mean, part of the point of oral argument is

13  to push people as hard as you can to see what they come up

14  with.

15         **MR. GELERNT:**  Right.

16         **THE COURT:**  So you don't want the other side

17  necessarily to take all the comfort they might from that.  It's

18  thin, but the question is:  Is thin enough; right?  So I have

19  to figure that out.

20         **MR. GELERNT:**  Yeah.  No, I don't think -- I don't

21  think the cases suggest that anything floats, and I certainly

22  don't read the Ninth Circuit's opinion as saying as long as

23  they put in something.  I think the Ninth Circuit looked at

24  this fairly fully.  This is not a -- you know, sometimes the

25  stay opinions, as Your Honor noted, can be cryptic, but this is

1   a sort of full --

2          THE COURT:  I have always been envious of

3   Judge Bybee's writing.

4          MR. GELERNT:  And this is a full discussion of good

5   cause, and I think he went through it.

6          You know, at the end of the day, when you look at what's

7   in the administrative record, it's conceptually identical to

8   what's in the rule.

9          And as Your Honor noted, I think those are the only

10  places, good cause and foreign affairs, where they're pointing

11  to anything in the administrative record.  So that would be the

12  only place, I think, where we're in a different place.

13         Standing, obviously the administrative record doesn't go

14  to standing, and they haven't put in any affidavits.

15         On the INA claim that Your Honor found and the

16  Ninth Circuit affirmed, that's obviously straight legal claim,

17  and so that wouldn't be affected by the administrative record.

18         In terms of the motion to strike, I don't know whether

19  Your Honor was going to split up the argument.  I gather not.

20  And so if Your Honor had questions about --

21         THE COURT:  You know, I cleared my calendar and I

22  figure people can talk about whatever they want.

23         MR. GELERNT:  Right.  Okay.

24         THE COURT:  Given the importance of the case to the

25  parties, I felt that it would be appropriate just to give them

1  a bigger forum or something like that.  It's not usually the

2  case that people spend lots of time on motions to strike.

3          **MR. GELERNT:**  Right.  I just -- the only thing I

4  wanted to say, Your Honor, is if you did have questions, my

5  colleague, Ms. Veroff, would address those.

6          **THE COURT:**  I think it's pretty clear.

7          **MR. GELERNT:**  Okay.

8          **THE COURT:**  You can't consider extra-record evidence

9  on the APA claim.  I don't need the record even if I could

10 consider it, and I don't think I can on this statutory

11 consistency point; but this is an injunction case, and I'm

12 allowed to consider extra-record evidence when it comes to the

13 public interest and the balance of harms.  That's a separate

14 question from your standing, for example.

15     So the parties -- there isn't actually that much

16 disagreement in the parties' motions.

17         **MR. GELERNT:**  That's exactly right, Your Honor.

18 That's what I was going to emphasize.  I mean, they are

19 claiming that we can't put in evidence on third party or zone

20 of interest.  We think that's wrong for the reasons we've

21 stated in our brief, that all of standing would be something

22 you could put evidence in --

23         **THE COURT:**  You don't need it on zone of interest

24 anyway.

25         **MR. GELERNT:**  Right.

1           **THE COURT:**  I'm bound by the Ninth Circuit's findings.

2           **MR. GELERNT:**  Well, that's exactly right, Your Honor.

3      And it sounds like you understand you can put it in for the

4      irreparable harm.  That's not saying the administrative record.

5           We do have arguments for why we think you can consider for

6      good cause or foreign affairs.  Those are laid out in our

7      brief, and we would rest on those unless you had any questions

8      about that.

9           **THE COURT:**  I don't.

10          **MR. GELERNT:**  Okay.  Thank you, Your Honor.

11          **THE COURT:**  Thank you.

12     Mr. Stewart?

13          **MR. STEWART:**  Just a few very quick points,

14     Your Honor.

15          Just if I could follow-up on Your Honor's question about

16     the first page in our brief and dissuading.  The target here

17     that Northern Triangle nationals who come to the country

18     between ports of entry, it lowers the incentives for those

19     Northern Triangle nationals to enter between ports of entry

20     because they know they won't, under the combined rule of the --

21     the combination of the rule and proclamation, be able to get

22     through a credible fear proceeding that would then likely

23     potentially enable their release for years and allow them to

24     stay in the country for years, so that's the incentive it

25     focuses on.

1    I think Your Honor hit -- echoed some of our record

2    points.  We'd rest on our briefing otherwise on those, on the

3    motion to strike issues.

4    On good cause and foreign affairs, Your Honor, I'd say

5    that something that the production of the record does help show

6    now is that there is -- the agency had its conclusions in the

7    rule.  Their predictive judgments do have good support.  They

8    reflect a rational connection between the facts that were

9    before them, the information, the incentives, the concerns, and

10   an appropriate response to those.  So they do pass the relevant

11   standard of review.  The agencies did provide some explanation

12   and that does meet the standards of the APA on both of those.

13   On the order point, Your Honor, what I'd emphasize, again,

14   we still have not seen from the plaintiffs a kind of order that

15   would target and provide the alleged protection needed for

16   individual clients.

17   **THE COURT:**  Yeah, because they don't want that order.

18   They're never going to provide that order.  That's why I asked

19   you.  This is what you told me last time.  Why would they

20   provide that order?  They think they're entitled to a

21   nationwide injunction, and Judge Bybee agrees with them.

22   **MR. STEWART:**  And we would stick with our points,

23   Your Honor, that it still needs to be *bone fide* clients,

24   otherwise -- given the limitations of these organizations

25   standing, the focus on immigration laws on individual aliens,

1   the absence of identified aliens subject to the policies that

2   have been tangibly harmed, but we're happy to stick with the

3   positions I've articulated on that and in our briefing.

4        And this is, I believe, in our briefing, Your Honor, but

5   in addition to some of the points I've mentioned here, I'd just

6   point Your Honor to the record at pages 484 to '92.  This

7   reflects some of the President's --

8              THE COURT:  AR484?

9              MR. STEWART:  Yes, Your Honor, AR484 to '92 and AR505

10  to 509, which gets to some of the statistics and some of the

11  concerns that the agency heads were trying to respond to.

12       If there are no further questions, Your Honor, I think

13  that's all the Government would like to add to our prior

14  arguments and submissions.

15             THE COURT:  Very good.

16             MR. STEWART:  Thank you, Your Honor.

17             THE COURT:  Thanks.

18       Anything further from the plaintiffs?

19             MR. GELERNT:  Your Honor, just one quick point on good

20  cause.

21       I think probably -- this is not to take back that I think

22  that the good cause cases are all perfectly uniform, but I

23  think the best case probably to look at from the Ninth Circuit

24  is *Valverde* where it says --

25             THE COURT:  That's a SORNA case; right?

1            **MR. GELERNT:**  Right.  It's either *de novo* or arbitrary

2    and capricious.  We think they lose under either one, but what

3    ultimately the Ninth Circuit said is it has to be plausible in

4    *Valverde*.  And I think that's what Judge Bybee is getting at,

5    is that it was much too -- it was a much too great a leap of

6    logic.  And so I think that this one newspaper article is not

7    going to make it.

8            Plus, the other thing I would say about the newspaper

9    article, just not to belabor that, is that we're talking about

10   a change in policy over a long time.

11           Here, what I think the Ninth Circuit emphasized in

12   Footnote 15 on page 58 of the opinion is that we're talking

13   about how much in 30 days is going to happen.  We're talking

14   about notice and comment and the grace period of 30 days.  You

15   know, is the word going to get out, are smugglers going to

16   create posters, and is all this going to change in 30 days?

17           We're not talking about a delay of, you know, months and

18   months.  We're talking about 30 days, and I think that's why

19   the Ninth Circuit emphasized that it's too much to assume that

20   in 30 days all this is going to happen and that's going to

21   create the surge.

22           Unless there are further questions, thank you, Your Honor.

23           **THE COURT:**  There are not.  Thank you.

24           Let me just say -- oh, yeah.  Mr. Stewart.

25           **MR. STEWART:**  I apologize, Your Honor.  Can I add just

1  one, like, little proposal?  And I didn't mean to preempt

2  Mr. Gelernt.

3          **THE COURT:**  Why not?

4          **MR. STEWART:**  Another option, if Your Honor were

5  inclined to again issue some kind of injunctive relief, one

6  possibility to finding a tailored remedy would be for the

7  parties to confer on a narrower order.  If they disagree, they

8  could each submit dueling orders as to what might be more

9  tailored.  I raise that as an option, and we would be happy to

10 do that, Your Honor --

11         **THE COURT:**  Thank you.

12         **MR. STEWART:**  -- if that would be helpful.

13     Thank you.

14         **THE COURT:**  Mr. Stewart, you've clearly done your

15 research and you know how much I love baseball arbitration, but

16 I'm unlikely to go down that path today.

17     I want to start by acknowledging that the temporary

18 restraining order expires either at midnight tonight or upon

19 issuance of a preliminary injunction, and I'm mindful of that

20 and so I intend to get an order out today barring some

21 emergency that I can't even foresee what that might be.

22     And I'd also just want to thank the parties for their

23 really excellent advocacy on both sides and for -- I know you

24 didn't allow me to work on the case, the computer here did

25 that, but it's been a pleasure reading your work product and

1   listening to your advocacy, and so I thank you for that.

2         This motion is now under submission.

3              (Proceedings adjourned at 10:11 a.m.)

4                          ---oOo---

5

6

7                    __CERTIFICATE OF REPORTER__

8         I certify that the foregoing is a correct transcript

9   from the record of proceedings in the above-entitled matter.

10

11  DATE:   Monday, February 11, 2019

12

13

14

15  _____

16       Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                 U.S. Court Reporter

17

18

19

20

21

22

23

24

25