**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| EAST BAY SANCTUARY COVENANT; AL OTRO LADO; INNOVATION LAW LAB; CENTRAL AMERICAN RESOURCE CENTER,<br><br>*Plaintiffs-Appellees*,<br><br>v.<br><br>DONALD J. TRUMP, President of the United States; MATTHEW G. WHITAKER, Acting Attorney General; JAMES MCHENRY, Director, Executive Office for Immigration Review (EOIR); KIRSTJEN NIELSEN, Secretary, U.S. Department of Homeland Security; LEE FRANCIS CISSNA, Director, U.S. Citizenship and Immigration Services; KEVIN K. MCALEENAN, Commissioner, U.S. Customs and Border Protection; RONALD VITIELLO, Acting Director, U.S. Immigration and Customs Enforcement,<br><br>*Defendants-Appellants.* | No. 18-17274<br><br>D.C. No. 3:18-cv-06810-JST<br><br>ORDER |

Filed December 7, 2018

Before:  Edward Leavy, Jay S. Bybee,
and Andrew D. Hurwitz, Circuit Judges.

Order by Judge Bybee;
Partial Dissent by Judge Leavy

SUMMARY[*]

**Immigration / Temporary Restraining Order /
Preliminary Injunction**

The panel denied the Government's emergency motion for a stay pending appeal in an action challenging a regulation and presidential proclamation that, together, provide that an alien who enters the United States across the border with Mexico may not be granted asylum unless he or she enters at a port of entry and properly presents for inspection.

On November 9, 2018, the Department of Justice ("DOJ") and Department of Homeland Security ("DHS") published a joint interim final rule, titled "Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims" ("Rule").  83 Fed. Reg. 55,934.  The Rule provides that "[f]or applications filed after November 9, 2018, an alien shall be ineligible for asylum if the alien is subject to a presidential proclamation or other presidential order suspending or limiting the entry of aliens along the

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

southern border with Mexico that is issued pursuant to [8 U.S.C. § 1182(f)]."

On the same day, President Trump issued a presidential proclamation, titled "Addressing Mass Migration Through the Southern Border of the United States" ("Proclamation"). 83 Fed. Reg. 57,661. Expressly invoking 8 U.S.C. § 1182(f), the Proclamation suspends "entry of any alien into the United States across the international boundary between the United States and Mexico," but excludes from the suspension "any alien who enters the United States at a port of entry and properly presents for inspection."

The plaintiffs are various organizations representing applicants and potential applicants for asylum who challenge the procedural and substantive validity of the Rule ("Organizations"). The district court issued a temporary restraining order enjoining the Rule, and the Government filed a notice of appeal, seeking a stay from this court of the district court's temporary restraining order pending appeal.

The panel concluded that the temporary restraining order here could be treated as an appealable preliminary injunction because the Government had an opportunity to be heard and strongly challenged the order, the order was scheduled to remain in effect for 30 days, and the Government argued in this court that emergency relief was necessary to support the national interests.

With respect to standing, the panel concluded that the Organizations lacked third-party standing because they had not identified any cognizable right they were asserting on behalf of their clients. However, the panel concluded that the Organizations had organizational standing because they have

suffered and will continue to suffer direct injuries traceable to the Rule, including diversion of their resources and loss of substantial amounts of funding.

Next, the panel concluded that the Organizations' claims fall within the zone of interests protected or regulated by the Immigration & Nationality Act ("INA"). Outlining the relevant precedent, the panel concluded that it was sufficient that the Organizations' asserted interests are consistent with and more than marginally related to the purposes of the INA.

The panel then turned to the Government's request that it stay the temporary restraining order pending its appeal. In doing so, the panel concluded that it lacked authority under § 706 of the APA to review the Proclamation because the President's actions are not subject to APA requirements. However, the panel concluded that it could review the substantive validity of the Rule together with the Proclamation, explaining that the Rule and the Proclamation together create an operative rule of decision for asylum eligibility. The panel further explained that it is the substantive rule of decision, not the Rule itself, that the Organizations have challenged under the APA, and insofar as DOJ and DHS have incorporated the Proclamation by reference into the Rule, the panel may consider the validity of the agency's proposed action.

Examining the validity of the rule, the panel concluded that the Rule is not likely to be found in accordance with 8 U.S.C. § 1158(a)(1). That section provides that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . .), irrespective of such alien's status, may apply for asylum in accordance with this section." The panel noted

that, rather than restricting who may *apply* for asylum, the rule of decision facially conditions only who is *eligible* to receive asylum. The panel observed that 8 U.S.C. § 1158(b)(2)(C) grants the Attorney General the power to set "additional limitations and conditions" beyond those listed in § 1158(b)(2)(A) on when an alien will be "ineligible for asylum," but only when "consistent" with the section. Despite his facial invocation of § 1158(b)(2)(C), the panel concluded that the Attorney General's rule of decision is inconsistent with § 1158(a)(1), explaining that it is the hollowest of rights that an alien must be allowed to apply for asylum regardless of whether she arrived through a port of entry if another rule makes her categorically ineligible for asylum based on precisely that fact.

The panel further concluded that the Rule is likely arbitrary and capricious for a second reason: it conditions an alien's eligibility for asylum on a criterion that has nothing to do with asylum itself, namely, whether or not the alien arrived lawfully through a port of entry.

With respect to the Organizations' claim that the Government failed to follow the required procedures in promulgating the Rule, the panel rejected the Government's assertion that the Rule was exempt, under the under APA's foreign affairs exception and the good cause exception, from the APA's notice-and-comment procedures and the requirement that the final rule shall not go into effect for at least 30 days.

Thus, the panel concluded, based on the evidence at this stage of the proceedings, the Government has not established that it is likely to prevail on the merits of its appeal of the district court's temporary restraining order.

Next, the panel concluded that the Government had not shown it will be irreparably injured absent a stay. First, the panel rejected the Government's assertion that the district court order undermines the separation of powers by blocking an action of the executive branch. Second, the panel rejected the Government's assertion that the rule is needed to prevent aliens from making a dangerous and illegal border crossing rather than presenting at a port of entry.

The panel concluded that, because the Government had not satisfied the first two factors, the panel need not dwell on the final two factors —"harm to the opposing party" and "the public interest." However, the panel pointed out that a stay of the district court's order would not preserve the status quo: it would upend it, as the temporary restraining order has temporarily restored the law to what it had been for many years prior to November 9, 2018.

Finally, the panel concluded that the district court did not err in temporarily restraining enforcement of the Rule universally, noting that, in immigration matters, this court has consistently recognized the authority of district courts to enjoin unlawful policies on a universal basis.

Dissenting in part, Judge Leavy concurred in the majority's conclusion that this court may treat the district court's order as an appealable preliminary injunction and concurred in the majority's standing analysis.

Judge Leavy dissented from the majority's conclusion that the Rule was not exempt from the standard notice-and-comment procedures, writing that the Attorney General articulated a need to act immediately in the interests of safety of both law enforcement and aliens, and the Rule involves

actions of aliens at the southern border undermining particularized determinations of the President judged as required by the national interest, relations with Mexico, and the President's foreign policy. Judge Leavy also dissented from the denial of the motion to stay, writing that the President, Attorney General, and Secretary of Homeland Security have adopted legal methods to cope with the current problems rampant at the southern border, and that the majority erred by treating the grant or denial of eligibility for asylum as equivalent to a bar to application for asylum, and conflating these two separate statutory directives.

## COUNSEL

Erez Ruveni, Assistant Director; Benton York, Christina Greer, Kathryne Gray, Francesco Genova, and Joseph A. Darrow, Trial Attorneys; Patrick Glen, Senior Litigation Counsel; William C. Peachey, Director; August E. Flentje, Special Counsel; Scott G. Stewart, Deputy Assistant Attorney General; Joseph H. Hunt, Assistant Attorney General; Office of Immigration Litigation, Civil Division, United States Department of Justice; for Defendants-Appellants.

Lee Gelernt, Judy Rabinovitz, Omar C. Jadwat, and Celso Perez, American Civil Liberties Union Foundation Immigrants' Rights Project, New York, New York; Julie Veroff, Spencer Amdur, Cody Wofsy, and Jennifer Chang Newell, American Civil Liberties Union Foundation Immigrants' Rights Project, San Francisco, California; Melissa Crow, Southern Poverty Law Center, Washington, D.C.; Ghita Schwartz, Angelo Guisado, and Baher Azmy, Center for Constitutional Rights, New York, New York; Mary Bauer, Southern Poverty Law Center, Charlottesville,

Virginia; Vasudha Talla and Christine P. Sun, American Civil Liberties Union Foundation of Northern California Inc., San Francisco, California; for Plaintiffs-Appellees.

## ORDER

BYBEE, Circuit Judge:

For more than 60 years, our country has agreed, by treaty, to accept refugees. In 1980, Congress codified our obligation to receive persons who are "unable or unwilling to return to" their home countries "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1101(a)(42), 1158(b)(1). Congress prescribed a mechanism for these refugees to apply for asylum and said that we would accept applications from any alien "physically present in the United States or who arrives in the United States *whether or not at a designated port of arrival* . . . irrespective of such alien's status." *Id.* § 1158(a)(1) (emphasis added) (internal punctuation marks omitted).

We have experienced a staggering increase in asylum applications. Ten years ago we received about 5,000 applications for asylum. In fiscal year 2018 we received about 97,000—nearly a twenty-fold increase. Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. 55,934, 55,935 (Nov. 9, 2018). Our obligation to process these applications in a timely manner, consistent with our statutes and regulations, is overburdened. The current backlog of asylum cases exceeds 200,000—about 26% of the

immigration courts' total backlog of nearly 800,000 removal cases. *Id.* at 55,945. In the meantime, while applications are processed, thousands of applicants who had been detained by immigration authorities have been released into the United States.

In an effort to contain this crisis, on November 9, 2018, the Attorney General and Secretary of Homeland Security proposed a new regulation that took immediate effect ("Rule"). Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. 55,934 (Nov. 9, 2018) (to be codified at 8 C.F.R. §§ 208, 1003, 1208). Under the Immigration and Nationality Act ("INA"), the Attorney General may "by regulation establish additional limitations and conditions . . . under which an alien shall be ineligible for asylum." 8 U.S.C. § 1158(b)(2)(C). The regulation, however, must be "consistent with" existing law. *Id.* The new Rule proposes "additional limitations" on eligibility for asylum, but it does not spell out those limitations. Instead, it prescribes only that an alien entering "along the southern border with Mexico" may not be granted asylum if the alien is "subject to a presidential proclamation . . . suspending or limiting the entry of aliens" on this border. 83 Fed. Reg. at 55,952.

The same day, the President issued a proclamation suspending the "entry of any alien into the United States across the international boundary between the United States and Mexico," but exempting from that suspension "any alien who enters the United States at a port of entry and properly presents for inspection." Addressing Mass Migration Through the Southern Border of the United States, 83 Fed. Reg. 57,661, 57,663 (Nov. 9, 2018) ("Proclamation"). The effect of the Rule together with the Proclamation is to make

asylum unavailable to any alien who seeks refuge in the
United States if she entered the country from Mexico outside
a lawful port of entry.

The plaintiffs are various organizations representing
applicants and potential applicants for asylum who challenge
the procedural and substantive validity of the Rule. The
district court issued a temporary restraining order, finding it
likely that, first, the rule of decision itself was inconsistent
with existing United States law providing that aliens may
apply for asylum "whether or not [the aliens arrived] at a
designated port of arrival," 8 U.S.C. § 1158(a)(1), and
second, the Attorney General failed to follow the procedures
for enacting the Rule, *see* 5 U.S.C. § 553. The Government
now seeks a stay of the district court's temporary restraining
order pending appeal. For the reasons we explain, we agree
with the district court that the Rule is likely inconsistent with
existing United States law. Accordingly, we DENY the
Government's motion for a stay.

## I.  BACKGROUND

We first examine the constitutional authority of the
legislative, executive, and judicial branches to address
questions of immigration; the governing statutory framework;
the Rule and Proclamation at issue; and the proceedings in
this case.

### A.  *Constitutional Authority*

#### 1.  The Legislative Power

Congress is vested with the principal power to control the
nation's borders. This power follows naturally from its

powers "[t]o establish an uniform rule of Naturalization," U.S. CONST. art. I, § 8, cl. 4, to "regulate Commerce with foreign Nations," *id.* art. I, § 8, cl. 3, and to "declare War," *id.* art. I, § 8, cl. 11. *See Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations [and] the war power . . . ."). The Supreme Court has "repeatedly emphasized that 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quoting *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 339 (1909)).

### 2. The Executive Power

The Constitution also vests power in the President to regulate the entry of aliens into the United States. U.S. CONST. art. II. "The exclusion of aliens . . . is inherent in the executive power to control the foreign affairs of the nation." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950). "[T]he historical gloss on the 'executive Power' vested in Article II of the Constitution has recognized the President's 'vast share of responsibility for the conduct of our foreign relations.'" *Garamendi*, 539 U.S. at 414 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610–11 (1952) (Frankfurter, J., concurring)). These foreign policy powers derive from the President's role as "Commander in Chief," U.S. CONST. art. II, § 2, cl. 1, his right to "receive Ambassadors and other public Ministers," *id.* art. II, § 3, and his general duty to "take Care that the Laws be faithfully executed," *id. See Garamendi*, 539 U.S. at 414. And while Congress has the power to regulate naturalization,

12     EAST BAY SANCTUARY COVENANT V. TRUMP

it shares its related power to admit or exclude aliens with the Executive.  *See Knauff*, 338 U.S. at 542.

### 3.   The Judicial Power

"The exclusion of aliens is 'a fundamental act of sovereignty' by the political branches," *Trump v. Hawaii*, 138 S. Ct. 2392, 2407 (2018) (quoting *Knauff*, 338 U.S. at 542), "subject only to narrow judicial review," *Hampton v. Mow Sun Wong*, 426 U.S. 88, 101 n.21 (1976).  The courts have "long recognized" questions of immigration policy as "more appropriate to either the Legislature or the Executive than to the Judiciary."  *Mathews v. Diaz*, 426 U.S. 67, 81 (1976).  We review the immigration decisions of the political branches "only with the greatest caution" where our action may "inhibit [their] flexibility . . . to respond to changing world conditions."  *Id.*; *see also Fiallo*, 430 U.S. at 792 ("Our cases 'have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" (citation omitted)); *Kleindienst v. Mandel*, 408 U.S. 753, 765 (1972) ("In accord with ancient principles of the international law of nation–states, . . . the power to exclude aliens is 'inherent in sovereignty, necessary for maintaining normal international relations and defending the country against foreign encroachments and dangers—a power to be exercised exclusively by the political branches of government.'" (citations and internal alterations omitted)).

Thus, "'it is not the judicial role . . . to probe and test the justifications' of immigration policies." *Hawaii*, 138 S. Ct. at 2419 (quoting *Fiallo*, 430 U.S. at 799).   We may nevertheless review the political branches' actions to

determine whether they exceed the constitutional or statutory scope of their authority.  *See id.*

B.  *Statutory Authority*

  1.  Admissibility of Aliens

The United States did not regulate immigration until 1875.  *See Mandel*, 408 U.S. at 761.  Beginning in the late 19th century, Congress created a regulatory framework and categorically excluded certain classes of aliens.  *See id.*  In 1952, Congress replaced this disparate statutory scheme with the Immigration and Nationality Act ("INA"), which remains the governing statutory framework.  Pub. L. No. 82-414, 66 Stat. 163 (codified as amended at 8 U.S.C. § 1 *et seq.*).  In 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009.  IIRIRA established "admission" as the key concept in immigration law and defines the term as "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer."  8 U.S.C. § 1101(a)(13)(A); *see Vartelas v. Holder*, 566 U.S. 257, 262 (2012).  It also provided that "[a]n alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible." 8 U.S.C. § 1182(a)(6)(A)(i).  The INA provides both criminal and civil penalties for entering the United States "at any time or place other than as designated by immigration officers."  *Id.* § 1325(a).

2.   Asylum

    a.   Refugee Status

Asylum is a concept distinct from admission, which permits the executive branch—in its discretion—to provide protection to aliens who meet the international definition of refugees. *See id.* § 1158.  Our asylum law has its roots in the 1951 Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 150 ("Convention"), and the 1967 Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267 ("Protocol").  The United States was an original signatory to both treaties and promptly ratified both.   The Convention defines a refugee as any person who:

> owing to well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country; or who, not having a nationality and being outside the country of his former habitual residence as a result of such events, is unable or, owing to such fear, is unwilling to return to it.

Convention, art. I, § A(2), 189 U.N.T.S. at 152.[1]  The treaties charge their signatories with a number of responsibilities to refugees.  *See id.* arts. II–XXXIV, 189 U.N.T.S. at 156–76.  Notably, the signatories agreed not to

> impose penalties, on account of their illegal entry or presence, on refugees who, coming directly from a territory where their life or freedom was threatened in the sense of article 1, enter or are present in their territory without authorization, provided they present themselves without delay to the authorities and show good cause for their illegal entry or presence.

*Id.* art. XXXI, § 1, 189 U.N.T.S. at 174.  The Convention and Protocol are not self-executing, so their provisions do not carry the force of law in the United States.  *Khan v. Holder*, 584 F.3d 773, 783 (9th Cir. 2009); *see also INS v. Stevic*, 467 U.S. 407, 428 n.22 (1984) (describing provisions of the Convention and Protocol as "precatory and not self-executing").

Congress enacted the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, to bring the INA into conformity with the United States's obligations under the Convention and Protocol.  *INS v. Cardoza–Fonseca*, 480 U.S. 421, 436–37 (1987).  The Act defines a "refugee" as

---

[1] The Protocol did not alter this definition except to extend its geographic and temporal reach.  The Convention had limited refugee status to Europeans affected by the Second World war.  *See* 19 U.S.T. 6223 art. 1; Joan Fitzpatrick, *The International Dimension of U.S. Refugee Law*, 15 BERKELEY J. INT'L L. 1, 1 (1997).

> any person who is outside any country of such
> person's nationality or, in the case of a person
> having no nationality, is outside any country
> in which such person last habitually resided,
> and who is unable or unwilling to return to,
> and is unable or unwilling to avail himself or
> herself of the protection of, that country
> because of persecution or a well-founded fear
> of persecution on account of race, religion,
> nationality, membership in a particular social
> group, or political opinion.

8 U.S.C. § 1101(a)(42).[2]

> b.  Eligibility to Apply for Asylum

An alien asserting refugee status in the United States must
apply for asylum under the requirements of 8 U.S.C. § 1158.
The Refugee Act of 1980 directed the Attorney General to
accept asylum applications from any alien "physically present
in the United States or at a land border or port of entry,
irrespective of such alien's status." *Id.* § 1158(a) (1980).
Congress amended this section in IIRIRA, 110 Stat. 3009-
579, and it currently provides that "[a]ny alien who is
physically present in the United States or who arrives in the
United States (whether or not at a designated port of arrival
and including an alien who is brought to the United States

---

[2] The INA also permits the President to designate persons *within* the
country of their nationality as refugees; excludes from refugee status
persons who have participated in the persecution of others; and grants
refugee status to persons who have been, or have a well-founded fear of
being, subjected to an involuntary abortion or sterilization.  8 U.S.C.
§ 1101(a)(42).

after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum." *Id.* § 1158(a)(1) (2018).

Section 1158(a) makes three classes of aliens categorically ineligible to apply for asylum: those who may be removed to a "safe third country" in which their "life or freedom would not be threatened" and where they would have access to equivalent asylum proceedings; those who fail to file an application within one year of arriving in the United States; and those who have previously applied for asylum and been denied. *Id.* § 1158(a)(2)(A)–(C). There are two "exceptions to the exceptions": the one-year and previous-denial exclusions may be waived if an alien demonstrates "changed circumstances" or "extraordinary circumstances," *id.* § 1158(a)(2)(D); and the "safe third country" and one-year exclusions do not apply to unaccompanied children, *id.* § 1158(a)(2)(E).

The INA further directs the Attorney General to "establish a procedure for the consideration of asylum applications filed under subsection (a)." *Id.* § 1158(d)(1). The Attorney General's discretion in establishing such procedures is limited by the specifications of § 1158(b) and (d). In the absence of exceptional circumstances, an applicant is entitled to an initial interview or hearing within 45 days of filing the application and to a final administrative adjudication of the application within 180 days. *Id.* § 1158(d)(5)(A)(ii)–(iii). The Attorney General "may provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with this chapter." *Id.* § 1158(d)(5)(B).

### c.  Eligibility to be Granted Asylum

Where § 1158(a) governs who may *apply* for asylum, the remainder of § 1158 delineates the process by which applicants may be *granted* asylum.  An asylum applicant must establish refugee status within the meaning of § 1101(a)(42) by demonstrating that "race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason" for persecution.  *Id.* § 1158(b)(1)(B)(i).  An applicant may sustain this burden through testimony alone, "but only if the applicant satisfies the trier of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee." *Id.* § 1158(b)(1)(B)(ii).  The trier of fact may also require the applicant to provide other evidence of record and weigh the testimony along with this evidence.  *Id.*  An applicant is not entitled to a presumption of credibility; the trier of fact makes a credibility determination "[c]onsidering the totality of the circumstances, and all relevant factors."  *Id.* § 1158(b)(1)(B)(iii).

Six categories of aliens allowed to apply for asylum by § 1158(a) are excluded from being granted asylum by § 1158(b)(2):

> Paragraph (1) shall not apply to an alien if the Attorney General determines that—
>
> (i) the alien ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion;

(ii) the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States;

(iii) there are serious reasons for believing that the alien has committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States;

(iv) there are reasonable grounds for regarding the alien as a danger to the security of the United States;

(v) the alien is described in subclause (I), (II), (III), (IV), or (VI) of section 1182(a)(3)(B)(i) of this title or section 1227(a)(4)(B) of this title (relating to terrorist activity), unless, in the case only of an alien described in subclause (IV) of section 1182(a)(3)(B)(i) of this title, the Attorney General determines, in the Attorney General's discretion, that there are not reasonable grounds for regarding the alien as a danger to the security of the United States; or

(vi) the alien was firmly resettled in another country prior to arriving in the United States.

*Id.* § 1158(b)(2)(A). Additionally, "[t]he Attorney General may by regulation establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum under paragraph (1)." *Id.*

§ 1158(b)(2)(C); *see Nijjar v. Holder*, 689 F.3d 1077, 1082 (9th Cir. 2012) (suggesting that fraud in the application could be a valid additional ground on which the Attorney General may deem aliens categorically ineligible). However, as far as we can tell, prior to the promulgation of the Rule at issue in this case, the Attorney General had not exercised the authority to establish additional "limitations or conditions" beyond those Congress enumerated in § 1158(a)(2) and (b)(2). *See* 8 C.F.R. § 208.13(c) (effective July 18, 2013 to Nov. 8, 2018); *id.* § 1208.13(c) (effective July 18, 2013 to Nov. 8, 2018).

If an applicant successfully establishes refugee status and is not excluded from relief by § 1158(b)(2), the Attorney General "*may* grant asylum," but is not required to do so. *See* 8 U.S.C. § 1158(b)(1)(A) (emphasis added). Asylum is a form of "discretionary relief." *Moncrieffe v. Holder*, 569 U.S. 184, 187 (2013); *see INS. v. Aguirre–Aguirre*, 526 U.S. 415, 420 (1999). We review the Attorney General's decision to deny asylum for whether it is "manifestly contrary to the law and an abuse of discretion," 8 U.S.C. § 1252(b)(4)(D), but we do not have the authority to award asylum, *see id.* § 1252(e)(4)(B) (a court reviewing an asylum decision "may order no remedy or relief other than to require that the petitioner be provided a hearing" before an immigration judge).

An alien granted asylum gains a number of benefits, including pathways to lawful permanent resident status and citizenship. *See id.* § 1159(b) (governing adjustment of status from asylee to lawful permanent resident); *id.* § 1427(a) (governing naturalization of lawful permanent residents). Additionally, an asylee may obtain derivative asylum for a spouse and any unmarried children, *id.* § 1158(b)(3); is

exempt from removal, *id.* § 1158(c)(1)(A); may work in the United States, *id.* § 1158(c)(1)(B); may travel abroad without prior consent of the government, *id.* § 1158(c)(1)(C); and may obtain federal financial assistance, *id.* § 1613(b)(1).

### 3.  The President's Proclamation Power

Section 212(f) of the INA (codified at 8 U.S.C. § 1182(f)) grants the President the power to suspend entry and impose restrictions on aliens via proclamation:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

*Id.* § 1182(f).  This provision "vests the President with 'ample power' to impose entry restrictions in addition to those elsewhere enumerated in the INA."  *Hawaii*, 138 S. Ct. at 2408 (quoting *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 187 (1993)).  The sole prerequisite to the President's exercise of this power is a finding that the entry of aliens "would be detrimental to the interests of the United States." *Id.* (quoting 8 U.S.C. § 1182(f)).  However, the President may not "override particular provisions of the INA" through the power granted him in § 1182(f).  *Id.* at 2411.

C. *Challenged Provisions*

1. The Rule

On November 9, 2018, the Department of Justice ("DOJ") and Department of Homeland Security ("DHS") published a joint interim final Rule, titled "Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims." 83 Fed. Reg. 55,934.

In relevant part, the Rule provides that "[f]or applications filed after November 9, 2018, an alien shall be ineligible for asylum if the alien is subject to a presidential proclamation or other presidential order suspending or limiting the entry of aliens along the southern border with Mexico that is issued pursuant to [§ 1182(f)]." *Id.* at 55,952 (to be codified at 8 C.F.R. § 208.13(c)(3) (DHS) and 8 C.F.R. § 1208.13(c)(3) (DOJ)). The Rule applies only to aliens who enter the United States "after the effective date of the proclamation or order contrary to the terms of the proclamation or order." *Id.* It explicitly invokes the Attorney General's power pursuant to § 1158(b)(2)(C) "to add a new mandatory bar on eligibility for asylum for certain aliens who are subject to a presidential proclamation suspending or imposing limitations on their entry . . . and who enter the United States in contravention of such a proclamation after the effective date of this rule." *Id.* at 55,939.[3]

---

[3] The Rule also amends the regulations governing credible fear determinations in expedited removal proceedings. 83 Fed. Reg. at 55,952. If an asylum officer finds that an alien entered the United States through Mexico and not at a port of entry, the Rule directs the officer to "enter a negative credible fear determination with respect to the alien's application for asylum." *Id.* (to be codified at 8 C.F.R. § 208.30).

DOJ and DHS enacted the Rule without complying with two Administrative Procedure Act ("APA") requirements: the "notice and comment" process, 5 U.S.C. § 553(b), and the 30-day grace period before a rule may take effect, *id.* § 553(d). The departments invoked two exemptions to the notice-and-comment requirements: the "military or foreign affairs function" exemption, *id.* § 553(a)(1), and the "good cause" exemption, *id.* § 553(b)(B). They also invoked the "good cause" waiver to the grace period, *id.* § 553(d)(3). *See* 83 Fed. Reg. at 55,949–51.

### 2. The Proclamation

On the same day that the joint interim final rule issued, President Trump issued the Proclamation, titled "Addressing Mass Migration Through the Southern Border of the United States." 83 Fed. Reg. 57,661. Expressly invoking 8 U.S.C. § 1182(f), the Proclamation suspends "entry of any alien into the United States across the international boundary between the United States and Mexico," 83 Fed. Reg. at 57,663, § 1, but excludes from the suspension "any alien who enters the United States at a port of entry and properly presents for inspection." *Id.* at 57,663, § 2(b). The suspension is limited to 90 days, effective November 9, 2018. *Id.* at 57,663, § 1.

In the preamble, the President cited a "substantial number of aliens primarily from Central America" who reportedly intend to enter the United States unlawfully and seek asylum as a principle motivating factor for the Proclamation. *Id.* at 57,661. He described the Proclamation as tailored "to channel these aliens to ports of entry, so that, if they enter the United States, they do so in an orderly and controlled manner instead of unlawfully." *Id.* at 57,662. Aliens who present at a port of entry with or without documentation may avail

themselves of the asylum system, but those who do not enter through a port of entry "will be ineligible to be granted asylum under [the Rule]." *Id.* at 57,663.

In support of the Proclamation, the President cited concerns about violence, the integrity of the country's borders, and the strain illegal immigration places on government resources. *Id.* at 57,661–62. He noted that there has been a "massive increase" in asylum applications over the past two decades, and because the "vast majority" of applicants are found to have a "credible fear," many aliens are released into the United States pending final adjudication of their status and do not appear for subsequent hearings or comply with orders of removal.[4] *Id.* at 57,661. These problems are complicated when family units arrive together because the government lacks sufficient detention facilities to house families. *Id.* at 57,662. Accordingly, the President found that "[t]he entry of large numbers of aliens into the United States unlawfully between ports of entry on the southern border is contrary to the national interest, and . . . [f]ailing to take immediate action . . . would only encourage additional mass unlawful migration and further overwhelming of the system." *Id.*

---

[4] In 2010, the executive branch began allowing many asylum applicants who were found to have a credible fear to be released into the United States pending their asylum hearing instead of remaining in detention. Will Weissert & Emily Schmall, *"Credible Fear" for U.S. Asylum Harder to Prove Under Trump*, CHI. TRIB. (July 16, 2018), https://www.chicagotribune.com/news/nationworld/ct-credible-fear-asylum-20180716-story.html. The number of credible fear referrals increased from 5,275 in 2009 to 91,786 in 2016. U.S. DEP'T OF HOMELAND SEC., TOTAL CREDIBLE FEAR CASES COMPLETED, FISCAL YEARS 2007–2016 (2017), https://www.dhs.gov/sites/default/files/publications/Credible_Fear_2016.xlsx.

D.  *Procedural History*

The day the Rule and Proclamation issued, plaintiffs East Bay Sanctuary Covenant, Al Otro Lado, Innovation Law Lab, and Central American Resource Center (collectively, the "Organizations") sued several Government officials, including the President, the Acting Attorney General, and the Secretary of Homeland Security, in the United States District Court for the Northern District of California.  The Organizations claimed that the Rule: (1) was improperly promulgated under 5 U.S.C. § 553; and (2) is an invalid exercise of the Attorney General's power under 8 U.S.C. § 1158(b)(2)(C) because it is inconsistent with 8 U.S.C. § 1158(a)(1).  The Organizations moved immediately for a temporary restraining order ("TRO").

The Government filed an opposition brief arguing that the Organizations' claims were not justiciable because they lacked both Article III standing and statutory standing.  The Government also argued that the Rule was validly promulgated under the APA and does not conflict with § 1158. On November 19, 2018—ten days after the Rule and Proclamation were issued—the district court held a hearing on the motion for a TRO.  The district court granted the TRO later that day.  It held that the Organizations could validly assert Article III standing on two theories: organizational standing and third-party standing.  The court also held that the Organizations' claims fell within the INA's zone of interests.  On the merits, the district court found that the Organizations satisfied the four-factor test for a TRO: a likelihood of success on the merits, a likelihood of irreparable harm in the absence of relief, a favorable balance of the equities, and that a TRO was in the public interest. *See Am. Trucking Ass'ns, Inc. v. City of L.A.*, 559 F.3d 1046, 1052

(9th Cir. 2009).  The TRO took effect immediately and remains in effect until December 19, 2018.  The district court scheduled a hearing on a preliminary injunction for that date and issued an order to show cause.

On November 27, 2018, the Government filed a notice of appeal and an emergency motion in the district court to stay the TRO.  The district court denied the motion to stay on November 30.  On December 1, the Government filed a motion in this court under Ninth Circuit Rule 27-3 for an emergency administrative stay of the TRO and a stay of the TRO pending appeal.  We denied the motion for the emergency administrative stay the same day.

## II.  JURISDICTION

We begin with two threshold issues raised by the parties.  The Organizations argue that we lack jurisdiction over the Government's stay request because the Government's appeal of the TRO is premature.  The Government argues that this case is not justiciable because the Organizations lack standing and because their claims fall outside of the INA's zone of interests.  We address each issue in turn.[5]

### A.  *Appealability of the TRO*

Ordinarily, a TRO is not an appealable order.  *See Abbott v. Perez*, 138 S. Ct. 2305, 2319–20 (2018).  However, where a TRO has the same effect as a preliminary injunction, it is appealable under 28 U.S.C. § 1292(a)(1).  *Id.* (citing *Sampson*

---

[5] Although we realize that the zone of interests inquiry is not jurisdictional, *see Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126, 128 n.4 (2014), we address it here as a threshold issue.

*v. Murray*, 415 U.S. 61, 86–88 (1974)).  We treat a TRO as a preliminary injunction "where an adversary hearing has been held, and the court's basis for issuing the order [is] strongly challenged."  *Bennett v. Medtronic, Inc.*, 285 F.3d 801, 804 (9th Cir. 2002) (quoting *Sampson*, 415 U.S. at 87).  Further, a key distinction between a "true" TRO and an appealable preliminary injunction is that a TRO may issue without notice and remains in effect for only 14 days (or longer if the district court finds "good cause" to extend it).  Fed. R. Civ. P. 65(b).

This TRO meets the criteria for treatment as a preliminary injunction.  Most importantly, the Government had an opportunity to be heard: the district court held an adversary hearing, and the Government strongly challenged the court's basis for issuing the order.  The district court scheduled the order to remain in effect for 30 days instead of adhering to Rule 65(b)'s 14-day limit.  Moreover, the Government argues in this court that emergency relief is necessary to support the national interests.  In these circumstances, we may treat the district court's order as an appealable preliminary injunction.  *See Washington v. Trump*, 847 F.3d 1151, 1158 (9th Cir. 2017).

B.  *Standing and Zone of Interests*

The Government contends that the Organizations do not have Article III standing to sue and that their claims do not fall within the zone of interests protected by the INA.  We have an obligation to ensure that jurisdiction exists before proceeding to the merits.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93–95 (1998).  We likewise must determine whether a plaintiff's claim falls within the statute's zone of interests before we can consider the merits of the claim.  *See Lexmark Int'l, Inc. v. Static Control Components,*

*Inc.*, 572 U.S. 118, 129 (2014).  We conclude that, at this preliminary stage of the proceedings, the Organizations have sufficiently alleged grounds for Article III standing and that their claims fall within the INA's zone of interests.[6]

1.  Article III Standing

Article III of the Constitution limits the federal judicial power to the adjudication of "Cases" and "Controversies." U.S. CONST. art. III, § 2, cl. 1.  This fundamental limitation "is founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Summers v. Earth Island Inst.*, 555 U.S. 488, 492–93 (2009) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).  "One of the essential elements of a legal case or controversy is that the plaintiff have standing to sue."  *Hawaii*, 138 S. Ct. at 2416. "[B]uilt on separation-of-powers principles," standing ensures that litigants have "a personal stake in the outcome of the controversy as to justify the exercise of the court's remedial powers on their behalf."  *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (citations and internal alterations omitted).

To demonstrate Article III standing, a plaintiff must show a "concrete and particularized" injury that is "fairly traceable" to the defendant's conduct and "that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v.*

---

[6] We have a continuing obligation to assure our jurisdiction. *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583–84 (1999); Fed. R. Civ. P. 12(h)(3) ("Whenever it appears . . . that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.").  Should facts develop in the district court that cast doubt on the Organizations' standing, the district court is, of course, free to revisit this question.

*Robins*, 136 S. Ct. 1540, 1547–48 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  "At least one plaintiff must have standing to seek each form of relief requested," *Town of Chester*, 137 S. Ct. at 1651, and that party "bears the burden of establishing" the elements of standing "with the manner and degree of evidence required at the successive stages of the litigation," *Lujan*, 504 U.S. at 561.  "At this very preliminary stage," the Organizations "may rely on the allegations in their Complaint and whatever other evidence they submitted in support of their TRO motion to meet their burden." *Washington*, 847 F.3d at 1159.  And they "need only establish a *risk* or *threat* of injury to satisfy the actual injury requirement." *Harris v. Bd. of Supervisors, L.A. Cty.*, 366 F.3d 754, 762 (9th Cir. 2004); *see Spokeo*, 136 S. Ct. at 1548 (noting that the injury must be "actual or imminent, not conjectural or hypothetical" (quoting *Lujan*, 504 U.S. at 560)).

The district court concluded that the Organizations have both third-party standing to sue on their clients' behalf as well as organizational standing to sue based on their direct injuries.

### a.   Third-Party Standing

According to the district court, the Organizations "have third-party standing to assert the legal rights of their clients 'who are seeking to enter the country to apply for asylum but are being blocked by the new asylum ban.'" We disagree.

"Ordinarily, a party 'must assert his own legal rights' and 'cannot rest his claim to relief on the legal rights of third parties.'" *Sessions v. Morales–Santana*, 137 S. Ct. 1678, 1689 (2017) (quoting *Warth*, 422 U.S. at 499).  There is an

exception to this rule if (1) "the party asserting the right has a close relationship with the person who possesses the right" and (2) "there is a hindrance to the possessor's ability to protect his own interests." *Id.* (quoting *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004)). But as a predicate to either of those two inquiries, we must identify the "right" that the Organizations are purportedly asserting on their clients' behalf.

The district court relied on evidence in the record indicating that "the government [is] preventing asylum-seekers from presenting themselves at ports of entry to begin the asylum process." This harm, however, is not traceable to the challenged Rule, which has no effect on the ability of aliens to apply for asylum at ports of entry. Indeed, the Rule purports to *encourage* aliens to apply for asylum at ports of entry and addresses only the asylum eligibility of aliens who illegally enter the United States outside of designated ports of entry. *See* 83 Fed. Reg. at 55,941. The Organizations' clients, of course, would not have standing to assert a right to cross the border illegally, to seek asylum or otherwise. *See Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1093 (10th Cir. 2006) ("[A] person complaining that government action will make his criminal activity more difficult lacks standing because his interest is not 'legally protected.'"). And although the Organizations describe significant hindrances their clients have experienced in applying for asylum at ports of entry, as well as significant risks their clients may face in towns lining the country's southern border, neither of those concerns is at issue in this lawsuit. Because the Organizations have not identified any cognizable

right that they are asserting on behalf of their clients, they do not have third-party standing to sue.[7]

b.   Organizational Standing

We agree, however, with the district court's conclusion that the Organizations have organizational standing. First, the Organizations can demonstrate organizational standing by showing that the challenged "practices have perceptibly impaired [their] ability to provide the services [they were] formed to provide." *El Rescate Legal Servs., Inc. v. Exec. Office of Immigration Review*, 959 F.2d 742, 748 (9th Cir. 1991) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).  This theory of standing has its roots in *Havens Realty*.  There, a fair housing organization alleged that its mission was to "assist equal access to housing through counseling and other referral services." *Havens Realty*, 455 U.S. at 379.   The organization claimed that the defendant's discriminatory housing practices "frustrated" the organization's ability to "provide counseling and referral services for low- and moderate-income homeseekers," and that it forced the plaintiff "to devote significant resources to identify and counteract" the alleged discriminatory practices. *Id.* (citation omitted).  The Supreme Court held that, based on this allegation, "there can be no question that the organization has suffered injury in fact" because it established a "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—[that]

---

[7] Presumably because the Organizations filed this suit on the day the Rule became effective, the Organizations do not assert third-party standing on behalf of any client who entered the country after November 9.  If they now have these clients, they may seek leave to amend on remand.

constitute[d] far more than simply a setback to the organization's abstract social interests."  *Id.*

We have thus held that, under *Havens Realty*, "a diversion-of-resources injury is sufficient to establish organizational standing" for purposes of Article III, *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040 (9th Cir. 2015), if the organization shows that, independent of the litigation, the challenged "policy frustrates the organization's goals and requires the organization 'to expend resources in representing clients they otherwise would spend in other ways,'" *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943 (9th Cir. 2011) (en banc) (quoting *El Rescate Legal Servs.*, 959 F.2d at 748).  In *Comite de Jornaleros*, for example, we concluded that advocacy groups had organizational standing to challenge an anti-solicitation ordinance that targeted day laborers based on the resources spent by the groups "in assisting day laborers during their arrests and meetings with workers about the status of the ordinance."  *Id.*  In *National Council of La Raza*, we found that civil rights groups had organizational standing to challenge alleged voter registration violations where the groups had to "expend additional resources" to counteract those violations that "they would have spent on some other aspect of their organizational purpose."  800 F.3d at 1039–40.  And in *El Rescate Legal Services*, we found that legal services groups had organizational standing to challenge a policy of providing only partial interpretation of immigration court proceedings, noting that the policy "frustrate[d]" the group's "efforts to obtain asylum and withholding of deportation in immigration court proceedings" and required them "to expend resources in representing clients they otherwise would spend in other ways."  959 F.2d at 748; *see also Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1018 (9th

Cir. 2013) (finding organizational standing where the plaintiffs "had to divert resources to educational programs to address its members' and volunteers' concerns about the [challenged] law's effect"); *Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1219 (9th Cir. 2012) (finding organizational standing where the plaintiff responded to allegations of discrimination by "start[ing] new education and outreach campaigns targeted at discriminatory roommate advertising"); 13A Charles Alan Wright et al., *Federal Practice & Procedure* § 3531.9.5 (3d ed. Sept. 2018) (collecting cases).

Under *Havens Realty* and our cases applying it, the Organizations have met their burden to establish organizational standing. The Organizations' declarations state that enforcement of the Rule has frustrated their mission of providing legal aid "to affirmative asylum applicants who have entered" the United States between ports of entry, because the Rule significantly discourages a large number of those individuals from seeking asylum given their ineligibility. The Organizations have also offered uncontradicted evidence that enforcement of the Rule has required, and will continue to require, a diversion of resources, independent of expenses for this litigation, from their other initiatives. For example, an official from East Bay affirmed that the Rule will require East Bay to partially convert their affirmative asylum practice into a removal defense program, an overhaul that would require "developing new training materials" and "significant training of existing staff." He also stated that East Bay would be forced at the client intake stage to "conduct detailed screenings for alternative forms of relief to facilitate referrals or other forms of assistance." Moreover, several of the Organizations explained that because other forms of relief from

removal—such as withholding of removal and relief under the Convention Against Torture—do not allow a principal applicant to file a derivative application for family members, the Organizations will have to submit a greater number of applications for family-unit clients who would have otherwise been eligible for asylum. Increasing the resources required to pursue relief for family-unit clients will divert resources away from providing aid to other clients. Finally, the Organizations have each undertaken, and will continue to undertake, education and outreach initiatives regarding the new rule, efforts that require the diversion of resources away from other efforts to provide legal services to their local immigrant communities.

To be sure, as the district court noted, several of our colleagues have criticized certain applications of the *Havens Realty* organizational standing test as impermissibly diluting Article III's standing requirement. *See Fair Hous. Council*, 666 F.3d at 1225–26 (Ikuta, J., dissenting); *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.* ("*PETA*"), 797 F.3d 1087, 1100–01 (D.C. Cir. 2015) (Millett, J., dubitante). Whatever the force of these criticisms, they are not directly applicable here, because they involve efforts by advocacy groups to show standing by pointing to the expenses of advocacy—the very mission of the group itself, *see Fair Hous. Council*, 666 F.3d at 1226 (Ikuta, J., dissenting); or by identifying a defendant's failure to take action against a third party, *see PETA*, 797 F.3d at 1101 (Millett, J., dubitante). And in any event, we are not free to ignore "the holdings of our prior cases" or "their explications of the governing rules of law." *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc) (citation omitted).

Second, the Organizations can demonstrate organizational standing by showing that the Rule will cause them to lose a substantial amount of funding. "For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'" *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017). We have held that an organization that suffers a decreased "amount of business" and "lost revenues" due to a government policy "easily satisf[ies] the 'injury in fact' standing requirement." *Constr. Indus. Ass'n of Sonoma Cty. v. City of Petaluma*, 522 F.2d 897, 903 (9th Cir. 1975); *cf. City & Cty. of S.F. v. Trump*, 897 F.3d 1225, 1236 (9th Cir. 2018) (holding that "a likely 'loss of funds promised under federal law'" satisfies Article III's standing requirement (quoting *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 965 (9th Cir. 2015))).

According to the Organizations' declarations, a large portion of their funding from the California state government is tied to the number of asylum applications they pursue. Many of the applications filed by the Organizations are brought on behalf of applicants who, under the Rule, would be categorically ineligible for asylum. For example, East Bay has a robust affirmative asylum program in which they file their clients' asylum applications with United States Citizenship and Immigration Services rather than in immigration court. *See generally Dhakal v. Sessions*, 895 F.3d 532, 536–37 (7th Cir. 2018) (describing affirmative and defensive asylum processes). East Bay receives funding from the California Department of Social Services for each asylum case handled, and, historically, approximately 80% of East Bay's affirmative asylum clients have entered the United States outside of designated ports of entry. If these individuals became categorically ineligible for asylum, East

Bay would lose a significant amount of business and suffer a concomitant loss of funding.

Thus, based on the available evidence at this early stage of the proceedings, we conclude that the Organizations have shown that they have suffered and will suffer direct injuries traceable to the Rule and thus have standing to challenge its validity.[8]

### 2. Zone of Interests

We next consider whether the Organizations' claims fall within the INA's "zone of interests." *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1302 (2017). This is a "prudential" inquiry that asks "whether the statute grants the plaintiff the cause of action that he asserts." *Id.* "[W]e presume that a statute ordinarily provides a cause of action 'only to plaintiffs whose interests fall within the zone of interests protected by the law invoked.'" *Id.* (quoting *Lexmark*, 572 U.S. at 126). We determine "[w]hether a plaintiff comes within 'the zone of interests'" using "traditional tools of statutory interpretation." *Id.* at 1307 (quoting *Lexmark*, 572 U.S. at 127).

---

[8] Consequently, the Organizations also have Article III standing to challenge the procedure by which the Rule was adopted. Although a "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing," *Summers*, 555 U.S. at 496, a plaintiff does have standing to assert a violation of "a procedural requirement the disregard of which could impair a separate concrete interest," *Lujan*, 504 U.S. at 572. As explained above, the Organizations have adequately identified concrete interests impaired by the Rule and thus have standing to challenge the absence of notice-and-comment procedures in promulgating it.

The Organizations bring their claims under the APA. Because the APA provides a cause of action only to those "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute," 5 U.S.C. § 702, the relevant zone of interests is not that of the APA itself, but rather "'the zone of interests to be protected or regulated by the statute' that [the plaintiff] says was violated." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (quoting *Assoc. of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)). Here, the Organizations claim that the Rule "is flatly contrary to the INA." Thus, we must determine whether the Organizations' interests fall within the zone of interests protected by the INA.

The Government argues that the INA's asylum provisions do not "even arguably . . . protect[] the interests of nonprofit organizations that provide assistance to asylum seekers" because the provisions "neither regulate [the Organizations'] conduct nor create any benefits for which these organizations themselves might be eligible." Although the Organizations are neither directly regulated nor benefitted by the INA, we nevertheless conclude that their interest in "provid[ing] the [asylum] services [they were] formed to provide" falls within the zone of interests protected by the INA. *El Rescate Legal Servs.*, 959 F.2d at 748 (internal alterations omitted) (quoting *Havens Realty*, 455 U.S. at 379).

The Supreme Court has emphasized that the zone of interests test, under the APA's "generous review provisions," "is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399–400 & n.16 (1987) (footnote omitted) (quoting *Data*

*Processing*, 397 U.S. at 156).  In addition, the contested provision need not directly regulate the Organizations.  Even in cases "where the plaintiff is not itself the subject of the contested regulatory action," *id.* at 399, the zone of interests test "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized the plaintiff to sue." *Lexmark*, 572 U.S. at 130 (quoting *Match-E-Be-Nash-She-Wish*, 567 U.S. at 225) (internal quotation marks omitted).  Thus, it is sufficient that the Organizations' asserted interests are consistent with and more than marginally related to the purposes of the INA.[9]

Here, the Organizations' interest in aiding immigrants seeking asylum is consistent with the INA's purpose to "establish[] . . . [the] statutory procedure for granting asylum to refugees." *Cardoza–Fonseca*, 480 U.S. at 427.  Moreover, we find the Organizations' interests to be more than marginally related to the statute's purpose.  Within the asylum statute, Congress took steps to ensure that pro bono legal services of the type that the Organizations provide are available to asylum seekers. *See* 8 U.S.C. § 1158(d)(4)(A)–(B) (requiring the Attorney General to provide aliens applying for asylum with a list of pro bono attorneys and to advise them of the "privilege of being represented by counsel").  In addition, other provisions in the INA give institutions like the Organizations a role in helping immigrants navigate the immigration process. *See*, *e.g.*, *id.*

---

[9] "[W]e are not limited to considering the [specific] statute under which [plaintiffs] sued, but may consider any provision that helps us to understand Congress' overall purposes in the [INA]." *Clarke*, 479 U.S. at 401 (discussing *Data Processing*, 397 U.S. at 840 n.6).

§ 1101(i)(1) (requiring that potential T visa applicants be referred to nongovernmental organizations for legal advice); *id.* § 1184(p)(3)(A) (same for U visas); *id.* § 1228(a)(2), (b)(4)(B) (recognizing a right to counsel for aliens subject to expedited removal proceedings); *id.* § 1229(a)(1), (b)(2) (requiring that aliens subject to deportation proceedings be provided a list of pro bono attorneys and advised of their right to counsel); *id.* § 1443(h) (requiring the Attorney General to work with "relevant organizations" to "broadly distribute information concerning" the immigration process). These statutes, which directly rely on institutions like the Organizations to aid immigrants, are a sufficient "indicator that the plaintiff[s] [are] peculiarly suitable challenger[s] of administrative neglect . . . support[ing] an inference that Congress would have intended eligibility" to bring suit. *Hazardous Waste Treatment Council v. EPA*, 861 F.2d 277, 283 (D.C. Cir. 1988).[10]  And in light of the "generous review provisions" of the APA, *Clarke*, 479 U.S. at 400 n.16, the Organizations' claims "are, at the least, 'arguably within the zone of interests'" protected by the INA, *Bank of Am.*, 137 S. Ct. at 1303 (quoting *Data Processing*, 397 U.S. at 153).

In addition, "a party within the zone of interests of any substantive authority generally will be within the zone of

---

[10]  We reject the Government's invitation to rely on *INS v. Legalization Assistance Project of Los Angeles County*, 510 U.S. 1301, 1305 (1993) (O'Connor, J., in chambers).  Not only is Justice O'Connor's opinion non-binding and concededly "speculative," *id.* at 1304, but the interest asserted by the organization in that case—conserving organizational resources to better serve *non*immigrants—is markedly different from the interest in aiding immigrants asserted here.  Our opinion in *Immigrant Assistance Project of Los Angeles Cty. v. INS*, 306 F.3d 842, 867 (9th Cir. 2002), also relied on by the Government, is not to the contrary because that case does not discuss the zone of interests test.

interests of any procedural requirement governing exercise of that authority." *Int'l Bhd. of Teamsters v. Pena*, 17 F.3d 1478, 1484 (D.C. Cir. 1994). This is particularly true for claims brought under the APA's notice-and-comment provisions. *See id.*; *see also Mendoza v. Perez*, 754 F.3d 1002, 1016 (D.C. Cir. 2014) (looking to the "zone of interests" of the underlying statute to determine ability to bring a notice-and-comment claim). As explained above, the Organizations are within the zone of interests protected by the INA and thus may challenge the absence of notice-and-comment procedures in addition to the Rule's substantive validity.

## III.  STAY REQUEST

We turn now to the Government's request that we stay the TRO pending its appeal. "A stay is an 'intrusion into the ordinary processes of administration and judicial review,' and accordingly 'is not a matter of right, even if irreparable injury might otherwise result to the appellant.'" *Nken v. Holder*, 556 U.S. 418, 427 (2009) (citations omitted). "It is instead 'an exercise of judicial discretion,' and 'the propriety of its issue is dependent upon the circumstances of the particular case.'" *Id.* at 433 (internal alteration omitted) (quoting *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672–73 (1926)). "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion," and our analysis is guided by four factors:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure

the other parties interested in the proceeding;
and (4) where the public interest lies.

*Id.* at 433–34 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). "The first two factors . . . are the most critical," and the "mere possibility" of success or irreparable injury is insufficient to satisfy them. *Id.* at 434 (internal quotation marks omitted). We consider the final two factors "[o]nce an applicant satisfies the first two." *Id.* at 435.

## A. *Likelihood of Success on the Merits*

The Government argues that it is likely to succeed on the merits of its appeal because the Rule (1) is consistent with the INA's asylum provisions and (2) was properly promulgated. We respectfully disagree. Although the merits of the procedural issue may be uncertain at this stage of proceedings, the Government is not likely to succeed in its argument that the Rule is consistent with the INA. Because the Government must be likely to succeed in *both* its procedural and substantive arguments in order for us to conclude it has met this element of the four-part inquiry, we hold that it has not carried its burden.

### 1.  Substantive Validity of the Rule

Under the APA, we must "hold unlawful and set aside agency action . . . found to be—arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The scope of our review, however, is limited to "agency action," and the President is not an "agency." *See id.* §§ 551(a), 701(b)(1). Accordingly, the President's "actions are not subject to [APA] requirements."

*Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992).[11] We thus do not have any authority under § 706 of the APA to review the Proclamation.

However, we may review the substantive validity of the Rule together with the Proclamation. Our power to review "agency action" under § 706 "includes the whole or part of an agency rule, order, license, sanction, relief, or the equivalent . . . thereof." 5 U.S.C. § 551(13). The Organizations have challenged the Rule as it incorporates the President's Proclamation. The Rule does not itself provide the criteria for determining when aliens who have entered the United States from Mexico will be deemed ineligible for asylum because it is contingent on something else—the issuance of a presidential proclamation. By itself, the Rule does not affect the eligibility of any alien who wishes to apply for asylum. But the Rule and the Proclamation together create an operative rule of decision for asylum eligibility. It is the substantive rule of decision, not the Rule itself, that the Organizations have challenged under the APA, and insofar as DOJ and DHS have incorporated the Proclamation by reference into the Rule, we may consider the validity of the agency's proposed action, including its "rule . . . or the equivalent." *Id.*; *see also Chamber of Commerce of the U.S. v. Reich*, 74 F.3d 1322, 1326 (D.C. Cir. 1996) (explaining that agency regulations that implement an executive order are reviewable under the APA). This is consistent with the principle that a "'final' agency action" reviewable under the APA is one that "determines 'rights or obligations from which legal consequences will flow' and marks the

---

[11] The President's actions are subject to constitutional challenge. *Franklin*, 505 U.S. at 801. The Organizations have not brought a constitutional challenge to the Proclamation.

'consummation' of the agency's decisionmaking process." *Hyatt v. Office of Mgmt. & Budget*, 908 F.3d 1165, 1172 (9th Cir. 2018) (internal alterations omitted) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).

The district court concluded that the Organizations were likely to succeed on their claim that the Rule together with the Proclamation is inconsistent with 8 U.S.C. § 1158(a)(1). That section provides that "[a]ny alien who is physically present in the United States or who arrives in the United States (*whether or not at a designated port of arrival . . .*), irrespective of such alien's status, may apply for asylum in accordance with this section."   *Id.* (emphasis added). Congress followed this section with three enumerated restrictions—three categories of aliens who are ineligible to apply for asylum: those who can safely be removed to a third country, those who fail to apply within one year of their arrival in the United States, and those who have previously been denied asylum. *Id.* § 1158(a)(2)(A)–(C).  Congress then granted to the Attorney General the authority to add "other conditions or limitations on the consideration of an application for asylum," as long as those conditions or limitations are "not inconsistent with this chapter."   *Id.* § 1158(d)(5)(B).  If the Attorney General had adopted a rule that made aliens outside a "designated port of arrival" ineligible to *apply* for asylum, the rule would contradict § 1158(a)(1)'s provision that an alien may apply for asylum "whether or not [the alien arrives through] a designated port of arrival."   Such a rule would be, quite obviously, "not in accordance with law."  5 U.S.C. § 706(2)(A); *see Rodriguez v. Smith*, 541 F.3d 1180, 1188 (9th Cir. 2008) ("[A]n agency's authority to promulgate categorical rules is limited by clear congressional intent to the contrary." (quoting *Wedelstedt v. Wiley*, 477 F.3d 1160, 1168 (10th Cir. 2007))).

Rather than restricting who may *apply* for asylum, the rule of decision facially conditions only who is *eligible* to receive asylum.  The INA grants the Attorney General the power to set "additional limitations and conditions" beyond those listed in § 1158(b)(2)(A) on when an alien will be "ineligible for asylum," but only when "consistent" with the section.  8 U.S.C. § 1158(b)(2)(C).  Despite his facial invocation of § 1158(b)(2)(C), the Attorney General's rule of decision is inconsistent with § 1158(a)(1).  It is the hollowest of rights that an alien must be allowed to apply for asylum regardless of whether she arrived through a port of entry if another rule makes her categorically ineligible for asylum based on precisely that fact.  Why would any alien who arrived outside of a port of entry apply for asylum?  Although the Rule technically applies to the decision of whether or not to *grant* asylum, it is the equivalent of a bar to *applying* for asylum in contravention of a statute that forbids the Attorney General from laying such a bar on these grounds.  The technical differences between applying for and eligibility for asylum are of no consequence to a refugee when the bottom line—no possibility of asylum—is the same.[12]

---

[12] Although the INA distinguishes between criteria that disqualify an alien from applying for asylum and criteria that disqualify an alien from eligibility for (i.e., receiving) asylum, it is not clear that the difference between the two lists of criteria is significant.  *Compare* 8 U.S.C. § 1158(a)(2)(A)–(C), *with id.* § 1158(b)(2)(A).  For example, an alien cannot apply if she has previously applied for asylum and been denied.  *Id.* § 1158(a)(2)(C).  But the restriction can be enforced at any time in the process, even if that information came to light after the alien actually filed a second application.  Similarly, an alien who was "firmly resettled" in another country prior to arriving in the United States is not eligible for asylum.  *Id.* § 1158(a)(2)(A)(vi).  Although that criterion does not disqualify a firmly resettled alien from applying, that alien might save herself the trouble of applying given her ineligibility and, indeed, she might well be advised by counsel not to apply.

As the district court observed, "[t]o say that one may apply for something that one has no right to receive is to render the right to apply a dead letter." We agree. *See United States v. Larionoff*, 431 U.S. 864, 873 (1977) ("[I]n order to be valid [regulations] must be consistent with the statute under which they are promulgated."); *cf. Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984) ("[If] Congress has directly spoken to the precise question at issue . . . that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."). We conclude that the Rule is not likely to be found "in accordance with law," namely, the INA itself. 5 U.S.C. § 706(2)(A).**[13]**

The Rule is likely arbitrary and capricious for a second reason: it conditions an alien's eligibility for asylum on a criterion that has nothing to do with asylum itself. The Rule thus cannot be considered a reasonable effort to interpret or enforce the current provisions of the INA. *See Chevron*, 467 U.S. at 843. In accordance with the Convention and Protocol, Congress required the Government to accept asylum applications from aliens, irrespective of whether or not they

---

**[13]** The Government's reliance on *Lopez v. Davis*, 531 U.S. 230 (2001), is misplaced. There, the Supreme Court found the Bureau of Prisons was permitted to add a regulation that categorically denied early release to a class of inmates. *Id.* at 238. But as we have explained, *Lopez* "pointedly discussed the absence from the statutory language of any criteria the [agency] could use in applying the statute," and noted that Congress had not spoken to the precise issue. *Rodriguez v. Smith*, 541 F.3d 1180, 1188 (9th Cir. 2008) (citing *Lopez*, 531 U.S. at 242). Here, § 1158 contains several criteria for asylum determinations, and Congress spoke to the precise issue when it stated that aliens may apply "whether or not" they arrived at a designated port of entry.

arrived lawfully through a port of entry.  This provision reflects our understanding of our treaty obligation to not "impose penalties [on refugees] on account of their illegal entry or presence." Convention, art. XXXI, § 1, 189 U.N.T.S. at 174.  One reason for this provision is that, in most cases, an alien's illegal entry or presence has nothing to do with whether the alien is a refugee from his homeland "unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42).  For example, whether an alien enters the United States over its land border with Mexico rather than through a designated port of entry is uncorrelated with the question of whether she has been persecuted in, say, El Salvador.

The BIA recognized some thirty years ago that although "an alien's manner of entry or attempted entry is a proper and relevant *discretionary* factor to consider in adjudicating asylum applications, . . . it should not be considered in such a way that the practical effect is to deny relief in virtually all cases." *Matter of Pula*, 19 I. & N. Dec. 467, 473 (BIA 1987) (emphasis added).  Following the BIA's lead, we have observed  that "the way in which [the alien] entered this country is worth little if any weight in the balancing of positive and negative factors."  *Mamouzian v. Ashcroft*, 390 F.3d 1129, 1138 (9th Cir. 2004).  Indeed, we have considered that, in some cases, an alien entering the United States illegally is "wholly consistent with [a] claim to be fleeing persecution." *Akinmade v. INS*, 196 F.3d 951, 955 (9th Cir. 1999).

We are not alone in our view of the relevance of illegal entry to an alien's eligibility for asylum.  For example, the Second Circuit, again following the BIA's lead, has held that "manner of entry cannot, as a matter of law, suffice as a basis for a discretionary denial of asylum in the absence of other adverse factors."  *Huang v. INS*, 436 F.3d 89, 99 (2d Cir. 2006).  In a similar vein, the Eleventh Circuit has observed that "there may be reasons, fully consistent with the claim of asylum, that will cause a person to possess false documents . . . to escape persecution by facilitating travel."  *Nreka v. U.S. Attorney Gen.*, 408 F.3d 1361, 1368 (11th Cir. 2005) (quoting *In Re O-D-*, 21 I. & N. Dec. 1079, 1083 (BIA 1998)); *see Yongo v. INS*, 355 F.3d 27, 33 (1st Cir. 2004) (same).  This is not to say that the manner of entry is never relevant to an alien's eligibility for asylum.  At least under current law, it may be considered but only as one piece of the broader application.  As the Sixth Circuit recently explained, "although the BIA may consider an alien's failure to comply with established immigration procedures, it may not do so to the practical exclusion of all other factors."  *Hussam F. v. Sessions*, 897 F.3d 707, 718 (6th Cir. 2018); *see also Zuh v. Mukasey*, 547 F.3d 504, 511 n.4 (4th Cir. 2008) (immigration law violations should be considered in "a totality of the circumstances inquiry" and should not be given "too much weight").

We wish not to be misunderstood: we are not suggesting that an alien's illegal entry or presence will always be independent of his claim to refugee status, nor are we saying that Congress could not adopt such a criterion into law.  But the rule of decision enforced by the Government—that illegal entry, through Mexico specifically, will always be disqualifying—is inconsistent with the treaty obligations that the United States has assumed and that Congress has

enforced.  As the Second Circuit observed, "if illegal manner of flight and entry were enough independently to support a denial of asylum, . . . virtually no persecuted refugee would obtain asylum."  *Huang*, 436 F.3d at 100.  The Rule together with the Proclamation is arbitrary and capricious and therefore, likely to be set aside under 5 U.S.C. § 706(2)(A).

The Government attempts to avoid the implications of its new rule of decision by pointing to the President's authority to suspend aliens from entering the country, and to do so by proclamation.  8 U.S.C. § 1182(f); *see Hawaii*, 138 S. Ct. at 2408.  The rule of decision, however, is not an exercise of the President's authority under § 1182(f) because it does not concern the *suspension* of entry or otherwise "impose on the entry of aliens . . . restrictions [the President] deem[s] to be appropriate."  8 U.S.C. § 1182(f).  To be sure, the rule of decision attempts to discourage illegal entry by penalizing aliens who cross the Mexican border outside a port of entry by denying them eligibility for asylum.  But the rule of decision imposes the penalty on aliens already present within our borders.  By definition, asylum concerns those "physically present in the United States," *id.* § 1158(a)(1), and "our immigration laws have long made a distinction between those aliens who have come to our shores seeking admission . . . and those who are within the United States after an entry, irrespective of its legality."  *Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958); *see Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law. . . . [O]nce an alien enters the country, the legal circumstance changes . . . whether [the alien's] presence here is lawful, unlawful, temporary, or permanent.").

The Government asserts that the TRO "constitutes a major and 'unwarranted judicial interference in the conduct of foreign policy'" and "undermines the separation of powers by blocking the Executive Branch's lawful use of its authority." But if there is a separation-of-powers concern here, it is between the President and Congress, a boundary that we are sometimes called upon to enforce. *See, e.g.*, *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189 (2012); *INS v. Chadha*, 462 U.S. 919 (1983). Here, the Executive has attempted an end-run around Congress. The President's Proclamation by itself is a precatory act.[14] The entry it "suspends" has long been suspended: Congress criminalized crossing the Mexican border at any place other than a port of entry over 60 years ago. *See* Pub. L. No. 82-414, 66 Stat. 163-229 (codified as amended at 8 U.S.C. § 1325). The Proclamation attempts to accomplish one thing. In combination with the Rule, it does indirectly what the Executive cannot do directly: amend the INA. Just as we may not, as we are often reminded, "legislate from the bench," neither may the Executive legislate from the Oval Office.

---

[14] The Government's illusion appears on the very first page of its motion: "The President . . . determined that entry must be suspended temporarily for the many aliens who . . . violate our criminal law and . . . cross[ ] illegally into the United States." Such entry, of course, is "suspended" *permanently* by statute. *See* 8 U.S.C. §§ 1182(a)(6)(A)(i), 1325(a). When asked by the district court to explain what the Proclamation independently accomplishes, the Government simply posited that the Proclamation "points out that . . . this violation of law implicates the national interest in a particular way." This description does not have any practical effect that we can discern.

This separation-of-powers principle hardly needs repeating. "The power of executing the laws . . . does not include a power to revise clear statutory terms that turn out not to work in practice," and it is thus a "core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2446 (2014). Where "Congress itself has significantly limited executive discretion by establishing a detailed scheme that the Executive must follow in [dealing with] aliens," the Attorney General may not abandon that scheme because he thinks it is not working well—at least not in the way in which the Executive attempts to do here. *Jama v. Immigration & Customs Enf't*, 543 U.S. 335, 368 (2005). There surely are enforcement measures that the President and the Attorney General can take to ameliorate the crisis, but continued inaction by Congress is not a sufficient basis under our Constitution for the Executive to rewrite our immigration laws.

We are acutely aware of the crisis in the enforcement of our immigration laws. The burden of dealing with these issues has fallen disproportionately on the courts of our circuit. And as much as we might be tempted to revise the law as we think wise, revision of the laws is left with the branch that enacted the laws in the first place—Congress.

## 2. Exemption from Notice-and-Comment Procedures

The Organizations also argued, and the district court agreed, that the Rule was likely promulgated without following proper notice-and-comment procedures. In general, the APA requires federal agencies to publish notice of proposed rules in the Federal Register and then allow

"interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(c). The "agency must consider and respond to significant comments received during the period for public comment." *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015). Section 553(d) also provides that a promulgated final rule shall not go into effect for at least thirty days. 5 U.S.C. § 553(d). These procedures are "designed to assure due deliberation" of agency regulations and "foster the fairness and deliberation that should underlie a pronouncement of such force." *United States v. Mead Corp.*, 533 U.S. 218, 230 (2001) (quoting *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 741 (1996)); *see also Envtl. Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005) (noting that notice-and-comment procedures "give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review" (citation omitted)).

The parties do not dispute that the Rule was promulgated without a thirty-day grace period or notice-and-comment procedures. The Government asserts, however, that the Rule was exempt under the APA's foreign affairs and good cause exceptions. Under the foreign affairs exception, the APA's notice-and-comment procedures do not apply "to the extent that there is involved—a . . . foreign affairs function of the United States." 5 U.S.C. § 553(a)(1). And § 553(b)(B) provides an exception to the notice-and-comment requirements "when the agency for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." *Id.* § 553(b)(B). Section 553(d)(3) also provides an exception to

the APA's 30-day grace period "for good cause found and published with the rule." *Id.* § 553(d)(3).

*Foreign Affairs Exception.* The Government raises two arguments in support of its claimed foreign affairs exception. First, it asserts that the Rule "necessarily implicate[s] our relations with Mexico and the President's foreign policy," and thus falls under the foreign affairs exception because it addresses immigration across the nation's southern border. 83 Fed. Reg. at 55,950. Although the Organizations do not dispute that the Government's Rule *implicates* foreign affairs, they argue that the "general nexus between immigration and foreign affairs" is insufficient to trigger the APA's foreign affairs exception.

We agree that the foreign affairs exception requires the Government to do more than merely recite that the Rule "implicates" foreign affairs. The reference in the Rule that refers to our "southern border with Mexico" is not sufficient. As we have explained, "[t]he foreign affairs exception would become distended if applied to [an immigration enforcement agency's] actions generally, even though immigration matters typically implicate foreign affairs." *Yassini v. Crosland*, 618 F.2d 1356, 1360 n.4 (9th Cir. 1980). Accordingly, we have held that the foreign affairs exception applies in the immigration context only when ordinary application of "the public rulemaking provisions [will] provoke definitely undesirable international consequences." *Id.* Other circuits have required a similar showing, noting that "it would be problematic if incidental foreign affairs effects eliminated public participation in this entire area of administrative law." *City of N.Y. v. Permanent Mission of India to United Nations*, 618 F.3d 172, 202 (2d Cir. 2010); *see Rajah v. Mukasey*, 544 F.3d 427, 437 (2d Cir. 2008).

Under this standard, courts have approved the Government's use of the foreign affairs exception where the international consequence is obvious or the Government has explained the need for immediate implementation of a final rule. *See*, *e.g.*, *Rajah*, 544 F.3d at 437 (rule responding to September 11, 2001 attacks); *Yassini*, 618 F.2d at 1361 (rule responding to Iranian hostage crisis); *Malek–Marzban v. INS*, 653 F.2d 113, 116 (4th Cir. 1981) (rule responding to Iranian hostage crisis); *see also Am. Ass'n of Exps. & Imps.–Textile & Apparel Grp. v. United States*, 751 F.2d 1239, 1249 (Fed. Cir. 1985) (rule regarding stricter import restrictions that would provoke immediate response from foreign manufacturers). On the other hand, courts have disapproved the use of the foreign affairs exception where the Government has failed to offer evidence of consequences that would result from compliance with the APA's procedural requirements. *See*, *e.g.*, *Zhang v. Slattery*, 55 F.3d 732, 744–45 (2d Cir. 1995) (rule regarding refugee status based on China's "one child" policy); *Jean v. Nelson*, 711 F.2d 1455, 1477–78 (11th Cir. 1983) (rule regarding the detention of Haitian refugees), *vacated in relevant part*, 727 F.2d 957 (11th Cir. 1984) (en banc), *aff'd*, 472 U.S. 846 (1985).

The Government contends that following the notice-and-comment procedures would result in undesirable international consequences. In particular, the Government claims that the Rule is "directly relate[d] to . . . ongoing negotiations with Mexico" and other Northern Triangle countries. The Government believes that the Rule will "facilitate the likelihood of success in future negotiations" and asserts that requiring normal notice-and-comment procedures in this situation would hinder the President's ability to address the "large numbers of aliens . . . transiting through Mexico *right now*."

The Government's argument, in theory, has some merit. Hindering the President's ability to implement a new policy in response to a current foreign affairs crisis is the type of "definitely undesirable international consequence" that warrants invocation of the foreign affairs exception. But the Government has not explained how immediate *publication* of the Rule, instead of *announcement* of a proposed rule followed by a thirty-day period of notice and comment, is necessary for negotiations with Mexico. We are sensitive to the fact that the President has access to information not available to the public, and that we must be cautious about demanding confidential information, even *in camera*. *See Kerry v. Din*, 135 S. Ct. 2128, 2141 (2015) (Kennedy, J., concurring in the judgment); *Chi. & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948). Nevertheless, the connection between negotiations with Mexico and the immediate implementation of the Rule is not apparent on this record.

The Government, of course, is free to expand the record on this issue in the district court. *See Yassini*, 618 F.2d at 1361 (noting affidavits in support of the foreign affairs exception from the Attorney General and Deputy Secretary of State). But as it stands now, we conclude that the Government is not likely to succeed on its appeal of this issue at this preliminary juncture of the case.

*Good Cause Exceptions.* The Government also argues that the Rule is exempt from both notice-and-comment procedures and the thirty-day grace period under the APA's

"good cause" exceptions.  5 U.S.C. § 553(b)(B), (d)(3).[15]
Because "[t]he good cause exception is essentially an
emergency procedure," *United States v. Valverde*, 628 F.3d
1159, 1165 (9th Cir. 2010) (quoting *Buschmann v. Schweiker*,
676 F.2d 352, 357 (9th Cir. 1982)), it is "narrowly construed
and only reluctantly countenanced," *Jifry v. FAA*, 370 F.3d
1174, 1179 (D.C. Cir. 2004).   As a result, successfully
invoking the good cause exception requires the agency to
"overcome a high bar" and show that "delay would do real
harm" to life, property, or public safety.  *Valverde*, 628 F.3d
at 1164–65 (quoting *Buschmann*, 676 F.2d at 357); *see also
Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 706 (D.C.
Cir. 2014); *Haw. Helicopter Operators Ass'n v. FAA*, 51 F.3d
212, 214 (9th Cir. 1995).

The Government asserts that providing notice and
comment would be "impracticable" and "contrary to the
public interest" because it would "create[] an incentive for
aliens to seek to cross the border" during the notice-and-
comment period.  83 Fed. Reg. at 55,950.  The Government
explains that this "surge" in illegal border crossing would
pose an imminent threat to human life because "[h]undreds
die each year making the dangerous border crossing," and
because these border crossings "endanger[] . . . the U.S.
Customs and Border Protection ("CBP") agents who seek to
apprehend them."  *Id.* at 55,935.  The Government thus

---

[15] As we explained previously, there are two good cause exceptions
under the APA, one excuses compliance with notice-and-comment
procedures, 5 U.S.C. § 553(b)(B), and the other allows an agency to forgo
the thirty-day waiting period, *id.* § 553(d)(3).  "[D]ifferent policies
underlie the exceptions, and . . . they can be invoked for different
reasons."  *Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1485 (9th
Cir. 1992).  In this case, however, the Government has supplied the same
rationale for both exceptions, and our reasoning applies to both.

concludes that "the very announcement of [the] proposed rule itself can be expected to precipitate activity by affected parties that would harm the public welfare."

We recognize that, theoretically, an announcement of a proposed rule "creates an incentive" for those affected to act "prior to a final administrative determination." *Am. Ass'n of Exps. & Imps.*, 751 F.2d at 1249. But in this case, the Rule, standing alone, does not change eligibility for asylum for any alien seeking to enter the United States; that change is not effected until the Rule is combined with a presidential proclamation. Thus, we would need to accept the Government's contention that the "very announcement" of the Rule itself would give aliens a reason to "surge" across the southern border in numbers greater than is currently the case. Absent additional evidence, this inference is too difficult to credit.[16] Indeed, even the Government admits that it cannot "determine how . . . entry proclamations involving the southern border could affect the decision calculus for various categories of aliens planning to enter." 83 Fed. Reg. at 55,948. Because the Government's reasoning is only speculative at this juncture, we conclude that the district court's holding is correct. Again, the Government is free to supplement the record and renew its arguments in the district court.

\*    \*    \*

---

[16] The Government claims that courts cannot "second-guess" the reason for invoking the good cause exception as long as the reason is "rational." But an agency invoking the good cause exception must "make a sufficient showing that good cause exist[s]." *Nat. Res. Def. Council, Inc. v. Evans*, 316 F.3d 904, 912 (9th Cir. 2003); *cf. Yassini*, 618 F.2d at 1361.

In sum, based on the evidence at this stage of the proceedings, we conclude that the Government has not established that it is likely to prevail on the merits of its appeal of the district court's temporary restraining order.

B.  *Irreparable Harm*

We next consider whether the Government has shown that it "will be irreparably injured absent a stay." *Nken*, 556 U.S. at 434 (quoting *Hilton*, 481 U.S. at 776). The claimed irreparable injury must be *likely* to occur; "simply showing some 'possibility of irreparable injury'" is insufficient. *Id.* (citation omitted). The Government has not shown that a stay of the district court's TRO is necessary to avoid a likely irreparable injury in this case.

First, the Government asserts that the district court's order "undermines the separation of powers by blocking" an action of the executive branch. But "claims that [the Government] has suffered an institutional injury by erosion of the separation of powers" do not alone amount to an injury that is "irreparable," because the Government may "pursue and vindicate its interests in the full course of this litigation." *Washington*, 847 F.3d at 1168; *see also Texas v. United States*, 787 F.3d 733, 767–68 (5th Cir. 2015) (rejecting the Government's reliance on "claims that the injunction offends separation of powers and federalism" to show irreparable injury because "it is the resolution of the case on the merits, not whether the injunction is stayed pending appeal, that will affect those principles").

Second, the Government asserts that the rule is needed to prevent aliens from "making a dangerous and illegal border crossing rather than presenting at a port of entry." Although

the Government's stated goal may be sound, the Government fails to explain how that goal will be *irreparably* thwarted without a stay of the TRO. The Rule has no direct bearing on the ability of an alien to cross the border outside of designated ports of entry: That conduct is already illegal. The Rule simply imposes severe downstream consequences for asylum applicants based on that criminal conduct as one of many means by which the Government may discourage it. The TRO does not prohibit the Government from combating illegal entry into the United States, and vague assertions that the Rule may "deter" this conduct are insufficient. Moreover, there is evidence in the record suggesting that the Government itself is undermining its own goal of channeling asylum-seekers to lawful entry by turning them away upon their arrival at our ports of entry.

## C. *Balance of Hardships and Public Interest*

Because the Government has not "satisfie[d] the first two factors," we need not dwell on the final two factors—"harm to the opposing party" and "the public interest." *Nken*, 556 U.S. at 435. We point out, however, a stay of the district court's order would not preserve the status quo: it would upend it, as the TRO has temporarily restored the law to what it had been for many years prior to November 9, 2018. As explained above, the Organizations have adduced evidence indicating that, if a stay were issued, they would be forced to divert substantial resources to its implementation. Moreover, aspects of the public interest favor both sides. On the one hand, the public has a "weighty" interest "in efficient administration of the immigration laws at the border." *Landon v. Plascencia*, 459 U.S. 21, 34 (1982). But the public also has an interest in ensuring that "statutes enacted by [their] representatives" are not imperiled by executive fiat.

*Maryland v. King*, 567 U.S. 1301, 1301 (2012) (Roberts, C.J., in chambers).   We need go no further than this; when considered alongside the Government's failure to show irreparable harm, the final two factors do not weigh in favor of a stay.

## IV.  REMEDY

The Government also challenges the universal scope of the temporary restraining order as impermissibly broad.  But "the scope of [a] remedy is determined by the nature and extent of the . . . violation."  *Milliken v. Bradley*, 433 U.S. 267, 270 (1977).  "[T]he scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff."  *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).  An injunction may extend "benefit or protection" to nonparties "if such breadth is necessary to give prevailing parties the relief to which they are entitled."  *Bresgal v. Brock*, 843 F.2d 1163, 1170 (9th Cir. 1987). However, a TRO "should be restricted to . . . preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing and no longer."  *Granny Goose Foods, Inc. v. Bd. of Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423, 439 (1974).  Equitable relief may "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."  *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994); *see L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011).

In immigration matters, we have consistently recognized the authority of district courts to enjoin unlawful policies on a universal basis.  *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 511 (9th Cir. 2018) ("A

final principle is also relevant: the need for uniformity in immigration policy."); *Hawaii v. Trump*, 878 F.3d 662, 701 (9th Cir. 2017), *rev'd on other grounds*, 138 S. Ct. 2392 (2018) ("Because this case implicates immigration policy, a nationwide injunction was necessary to give Plaintiffs a full expression of their rights."); *Washington*, 847 F.3d at 1166–67 ("[A] fragmented immigration policy would run afoul of the constitutional and statutory requirement for uniform immigration law and policy." (citing *Texas*, 809 F.3d at 187–88)). "Such relief is commonplace in APA cases, promotes uniformity in immigration enforcement, and is necessary to provide the plaintiffs here with complete redress." *Univ. of Cal.*, 908 F.3d at 512.

Although we recognize a growing uncertainty about the propriety of universal injunctions,[17] the Government raises no grounds on which to distinguish this case from our uncontroverted line of precedent. Further, the Government "fail[ed] to explain how the district court could have crafted a narrower [remedy]" that would have provided complete relief to the Organizations. *Id*. We thus conclude that the district court did not err in temporarily restraining enforcement of the Rule universally.

## V.  CONCLUSION

We stress, once again, that this case arrives at our doorstep at a very preliminary stage of the proceedings. Further development of the record as the case progresses may alter our conclusions. But at this time, the Government has

---

[17] *See Hawaii*, 138 S. Ct. at 2424–29 (Thomas, J., concurring); Samuel Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 HARV. L. REV. 417, 424 (2017).

EAST BAY SANCTUARY COVENANT V. TRUMP     61

not satisfied the standard for a stay.  The Government's emergency motion for a stay pending appeal is therefore **DENIED**.

LEAVY, Circuit Judge, dissenting in part:

I respectfully dissent in part.  I concur in the majority's conclusion that we may treat the district court's order as an appealable preliminary injunction.  I also concur in the majority's standing analysis.

I dissent from the majority's conclusion that the Rule was not exempt from the standard notice-and-comment procedures.  The Attorney General articulated a need to act immediately in the interests of safety of both law enforcement and aliens, and the Rule involves actions of aliens at the southern border undermining particularized determinations of the President judged as required by the national interest, relations with Mexico, and the President's foreign policy.

I dissent from the denial of the motion to stay because the President, Attorney General, and Secretary of Homeland Security have adopted legal methods to cope with the current problems rampant at the southern border.

The question whether the Rule is consistent with 8 U.S.C. § 1158 goes to the consideration of likelihood of success on the merits.  The majority errs by treating the grant or denial of eligibility for asylum as equivalent to a bar to application for asylum, and conflating these two separate statutory directives.

An alien does not obtain the right to apply for asylum because he entered illegally.  The reason "any alien" has the right to apply, according to the statute, is because he is physically present in the United States or has arrived in the United States.  The parenthetical in 8 U.S.C. § 1158(a)(1) ("whether or not at a designated port of arrival"),which the majority chooses to italicize, does not expand upon who is eligible to apply beyond the words of the statute, "any alien."

The majority concludes that the Rule conditioning eligibility for asylum is the equivalent to a rule barring application for asylum.  But the statute does not say that, nor does the Rule.  I would stick to the words of the statute rather than discerning meaning beyond the words of the statute and Rule in order to find the action of the Attorney General and Secretary "not in accordance with the law."  5 U.S.C. § 706(2)(A).

Congress placed authorization to apply for asylum in one section of the statute, 8 U.S.C. § 1158(a)(1).  Congress then placed the exceptions to the authorization to apply in another section, 8 U.S.C. § 1158(a)(2).  Congress placed the eligibility for asylum in a different subsection, 8 U.S.C. § 1158(b)(1), and disqualifications for eligibility in 8 U.S.C, § 1158(b)(2)(A)(i)–(vi).  The Attorney General or the Secretary of Homeland Security has no authority to grant asylum to the categories of aliens enumerated in § 1158(b)(2)(A).  Congress has decided that the right to apply for asylum does not assure any alien that something other than a categorical denial of asylum is inevitable.  Congress has instructed, by the structure and language of the statute, that there is nothing inconsistent in allowing an application for asylum and categorically denying any possibility of being granted asylum on that application.  Thus, Congress has

instructed that felons and terrorists have a right to apply for asylum, notwithstanding a categorical denial of eligibility.

Congress has provided in U.S.C. § 1158(b)(2)(C) that the Attorney General may by regulation "establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum." *Id*. The majority is correct that an alien's manner of entry can be a relevant discretionary factor in adjudicating asylum applications. Nothing in the structure or plain words of the statute, however, precludes a regulation categorically denying eligibility for asylum on the basis of manner of entry.

On November 9, 2018, the Attorney General and the Department of Homeland Security published a joint interim final rule ("Rule"), 83 Fed. Reg. 55, 934, imposing prospective limitations on eligibility for asylum. The Rule does not restrict who may apply for asylum; rather, the Rule provides additional limitations on eligibility for asylum. The Rule states that an alien shall be ineligible for asylum if the alien enters the United States "contrary to the terms of a proclamation or order." *Id.* at 55,952.

The President, citing the executive authority vested in him by the Constitution and 8 U.S.C. §§ 1182(f), 1185(a), issued a Proclamation suspending and limiting the entry for 90 days of "any alien into the United States across the international boundary between the United States and Mexico." Proclamation No. 9822, Addressing Mass Migration Through the Southern Border of the United States, 83 Fed. Reg. 57,661 §§ 1, 2 (Nov. 9, 2018). The limitations do not apply to "any alien who enters the United States at a port of entry and properly presents for inspection, or to any lawful permanent resident of the United States." *Id.* at 57,663 § 2(b). The

Proclamation is not challenged in this litigation. The Proclamation describes an ongoing mass migration of aliens crossing unlawfully through the southern border into the United States, contrary to the national interest, which has caused a crisis undermining the integrity of the border.

The district court concluded that the Rule contravenes the "unambiguous" language of § 1158(a). If the language of § 1158(a) is unambiguous, then I fail to see why the district court found it necessary to discern Congressional intent by looking to Article 31 of the 1967 United Nations Protocol Relating to the Status of Refugees. Section 1158(a) provides unambiguously that any alien physically present in the United States may apply for asylum. The Rule does not restrict or remove any alien's right to apply for asylum; rather, it imposes an additional, time-specific, area-specific limitation on an alien's eligibility for a grant of asylum because of a proclamation. Nothing in the text of § 1158(a) prohibits the Attorney General from designating unauthorized entry as an eligibility bar to asylum when an alien's manner of entry violates a Proclamation regarding the southern border, for a limited time, pursuant to the President's judgment concerning an articulated national interest. The Proclamation and the Attorney General's regulation seek to bring safety and fairness to the conditions at the southern border.

The government has made a sufficient showing of irreparable harm, and the public has a significant interest in efficient border law administration. I conclude that the balance of harm to the plaintiffs does not weigh in their favor. Accordingly, I would grant the Government's motion for a stay pending appeal.