Omar C. Jadwat*
Lee Gelernt*
Anand Balakrishnan*
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
*ojadwat@aclu.org*
*lgelernt@aclu.org*
*abalakrishnan@aclu.org*

Katrina Eiland (SBN 275701)
Morgan Russell (SBN 296137)
Spencer Amdur (SBN 320069)
Oscar Sarabia Roman (SBN 341385)
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-0770
F: (415) 395-0950
*keiland@aclu.org*
*mrussell@aclu.org*
*samdur@aclu.org*
*osarabia@aclu.org*

*Attorneys for Plaintiffs (additional counsel listed on following page)*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

East Bay Sanctuary Covenant; Central American Resource Center; Al Otro Lado; Innovation Law Lab; Tahirih Justice Center; National Center for Lesbian Rights; Immigrant Defenders Law Center; and American Gateways,

        *Plaintiffs*,

        v.

Joseph R. Biden, President of the United States, in his official capacity; Merrick Garland, Attorney General, in his official capacity; U.S. Department of Justice; David Neal, Director of the Executive Office for Immigration Review, in his official capacity; the Executive Office for Immigration Review; Alejandro Mayorkas, Secretary of Homeland Security, in his official capacity; U.S. Department of Homeland Security; Ur Jaddou, Director of the U.S. Citizenship and Immigration Services, in her official capacity; U.S. Citizenship and Immigration Services; Troy A. Miller, Acting Commissioner of U.S. Customs and Border Protection, in his official capacity; U.S. Customs and Border Protection; Tae D. Johnson, Acting Director of Immigration and Customs Enforcement, in his official capacity; Immigration and Customs Enforcement,

        *Defendants*.

Case No.: 18-cv-06810-JST

**AMENDED AND SUPPLEMENTAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1    Melissa Crow*                          Keren Zwick**
     CENTER FOR GENDER & REFUGEE           Richard Caldarone**
2    STUDIES                               Colleen Cowgill (SBN 321542)
     1121 14th Street, NW, Suite 200       Mary Georgevich**
3    Washington, DC 20005                  NATIONAL IMMIGRANT JUSTICE
     T: (202) 355-4471                     CENTER
4    F: (415) 581-8824                     224 S. Michigan Ave., Suite 600
     crowmelissa@uchastings.edu            Chicago, IL 60604
5                                          T: (312) 660-1370
     Anne Peterson (SBN 258673)            F: (312) 660-1505
6    Blaine Bookey (SBN 267596)            kzwick@heartlandalliance.org
     Julie Bourdoiseau (SBN 340462)        rcaldarone@heartlandalliance.org
7    Karen Musalo (SBN 106882)             ccowgill@heartlandalliance.org
     CENTER FOR GENDER & REFUGEE           mgeorgevich@heartlandalliance.org
8    STUDIES
     200 McAllister Street                 Michelle (Minju) Y. Cho (SBN 321939)
9    San Francisco, CA  94102              AMERICAN CIVIL LIBERTIES UNION
     T: (415) 610-5729                     FOUNDATION OF NORTHERN
10   F: (415) 581-8824                     CALIFORNIA, INC.
     petersonanne@uchastings.edu           39 Drumm Street
11                                         San Francisco, CA 94111
                                           T: (415) 621-2493
12                                         F: (415) 255-1478
                                           mcho@aclunc.org
13

14   Attorneys for Plaintiffs

15   *Admitted Pro hac vice
     ** Application for admission pro hac vice
16   forthcoming

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

1.      The Rule challenged here attempts to resuscitate and combine the illegal features of the two previous asylum bans that this Court and the Ninth Circuit found to be unlawful.  *See* 83 Fed. Reg. 55,934 (the "entry ban"); 84 Fed. Reg. 33,829 (the "transit ban").  This new Rule is no less illegal or harmful.  It will effectively eliminate asylum for nearly all non-Mexican asylum seekers who enter between designated ports of entry, and even for those who present at a port without first securing an appointment.  *See* Circumvention of Lawful Pathways at 14-16 (May 16, 2023) (the "Rule").[1]  The Rule is set to take effect once the Title 42 policy sunsets at the end of the day on May 11, 2023.  *Id.* at 2.

2.      The Rule is convoluted, but its operation is straightforward: It applies to all non-Mexican asylum seekers at the southern land border and adjacent coastal borders.  *Id.* at 15-16, 326, 438.  It requires the automatic denial of an applicant's asylum claim unless the person satisfies one of three conditions: presenting at a port of entry after securing one of a tightly-restricted number of appointments through a complicated mobile application called CBP One; applying for and being denied asylum in a transit country; or obtaining advance permission to travel to the United States through an approved parole program.  *Id.* at 14, 25-26, 438-49.  The Rule contains extremely narrow exceptions to this asylum bar for things like acute medical emergencies.  *Id.* at 15, 439.  Like the previous asylum bans, the Rule would bar vulnerable people from asylum for reasons wholly unrelated to the strength or urgency of their need for protection under our laws.

3.      The Rule is unlawful in numerous ways.  The Ninth Circuit has already held that the Rule's main requirements are illegal.  The government cannot force asylum seekers to enter at ports. *E. Bay Sanctuary Covenant ("EBSC") v. Biden*, 993 F.3d 640, 658 (9th Cir. 2021) (invalidating the

---

[1] Citations to the Rule refer to the unpublished pdf version that Defendants released for public inspection on May 10, 2023, available at https://public-inspection.federalregister.gov/2023-10146.pdf.  The Rule will not be published in the Federal Register until May 16, 2023.

AM. AND SUPPL. COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

prior entry ban).  And the government cannot force asylum seekers to apply for asylum in transit countries.  *EBSC v. Garland*, 994 F.3d 962, 982 (9th Cir. 2020) (invalidating the prior transit ban).  The Rule revives these illegal requirements by forcing asylum seekers to choose between them, even though neither is consistent with the asylum statute.

4.     In practice, the Rule will function just like the enjoined entry ban, because the Rule's other requirements are virtually impossible for most asylum seekers to meet.  While the prior transit rule was in effect, more than 98% of asylum seekers were unable to satisfy its conditions because of danger and overwhelmed or nonexistent asylum systems in transit countries.

5.     The Rule's other conditions are vanishingly small if they exist at all.  The Rule mentions that people from a handful of countries can obtain advance parole.  Rule at 264.  But virtually no one can overcome the Rule this way, because the Rule only applies at the southern land border, whereas these parole programs require participants to fly to U.S. airports.  *Id.* at 307.

6.     The Rule also contains a few extremely narrow exceptions, many of which mirror similar exceptions in the prior enjoined bans.  *Id.* at 318.

7.     As a result, the Rule will effectively require nearly all covered asylum seekers to enter at a port of entry.  Indeed, that's exactly how the government itself has described the Rule: "[I]ndividuals who unlawfully cross the U.S. southwest border will be presumed ineligible for asylum under new regulations. . . ."

8.     The government cannot reinstate the enjoined entry ban, even if this time it is couched in a more complex set of categories.  Congress provided for an opportunity to seek asylum in this country, "whether or not at a designated port of arrival."  8 U.S.C. § 1158(a)(1).  And it "mandated equity in its treatment of all refugees, however they arrived."  *EBSC v. Biden*, 993 F.3d at 658.  The Rule goes even further than the last entry ban, because even people who present at ports will be cut off from asylum unless they can navigate the CBP One app and wait weeks or months for an appointment.   Rule at 25, 267, 438.

2

AM. AND SUPPL. COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

9.      Although the administration characterizes the Rule as creating only a "rebuttable presumption" of asylum ineligibility, it does no such thing.  The Rule operates just as the Trump administration's prior asylum bans did: Asylum seekers subject to the Rule—all non-Mexicans—are categorically barred unless they satisfy one of the enumerated and limited conditions or exceptions. That's a simple ban with narrow exemptions, and it turns the asylum process on its head.

10.     Like its predecessors, this new ban is both inconsistent with Congress's statutory directive, and arbitrary and capricious, in numerous ways.  Among other reasons, it bars asylum based on manner of entry and transit through a third country, which this Court and the Ninth Circuit have already held to be irrelevant, arbitrary bases on which to bar asylum.  *EBSC v. Trump*, 349 F. Supp. 3d 838, 857-59 (N.D. Cal. 2018); *EBSC v. Biden*, 993 F.3d at 671-72; *EBSC v. Barr*, 385 F. Supp. 3d 922, 945-46 (N.D. Cal. 2019); *EBSC v. Garland*, 994 F.3d at 980.

11.     As with the prior bans, the government has also entirely failed to grapple with evidence that contradicts the Rule's core assumptions.  Transit countries are not safe for many asylum seekers, who continue to be subject to unspeakable violence even when merely passing through them.  In Northern Mexico, where the Rule would force most migrants to wait for limited CBP One appointments, thousands of asylum seekers have been kidnapped, raped, or otherwise violently attacked.  And the underdeveloped asylum systems of transit countries are stretched to the breaking point, unable to handle more than a tiny percentage of the cases that reach the U.S. border each year.  The government not only failed to meaningfully address these facts, but also ignored evidence of the multiple barriers asylum seekers face in trying to access CBP One appointments. Nor has the government meaningfully explored alternatives that would inflict less suffering on asylum seekers.

12.     After campaigning on a promise to restore our asylum system, the Biden administration has instead doubled down on its predecessor's cruel asylum restrictions.  The agencies claim the Rule merely provides consequences for asylum seekers circumventing lawful

3

pathways. Rule at 19, 53. But seeking asylum *is* a lawful pathway protected by our laws *regardless* of how one enters the country. Although the administration's efforts at creating new avenues through country-specific parole programs is a benefit to those who qualify, that limited option cannot substitute for ensuring the basic right to seek asylum for those who arrive at the border.

13.    Plaintiffs now seek a declaration that the Rule violates the INA and the Administrative Procedure Act ("APA") and an order vacating and enjoining the Rule.

## JURISDICTION AND VENUE

14.    This case arises under the APA, 5 U.S.C. § 701, *et seq.* and the INA, 8 U.S.C. § 1101, *et seq.* This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and §§ 2201-02.

15.    Venue is proper under 28 U.S.C. § 1391(e)(1) because the defendants are agencies of the United States and officers of the United States acting in their official capacity, at least one plaintiff resides in this district, and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

### I. Plaintiffs

16.    Plaintiff East Bay Sanctuary Covenant ("EBSC") is a nonprofit organization incorporated in California. EBSC's main office is in Berkeley, California. EBSC was founded in 1982 to assist refugees fleeing the civil wars and violence in El Salvador and Guatemala. EBSC's mission is to offer sanctuary, support, community organizing assistance, advocacy, and legal services to people escaping political persecution, terror, war, intolerance, exploitation, and other violence. One of EBSC's critical missions is to assist individuals fleeing persecution in applying for asylum and other humanitarian relief in the United States. EBSC also trains and mentors law students and attorneys to help people apply for asylum.

17.    Plaintiff Central American Resource Center ("CARECEN") is a nonprofit organization incorporated in California primarily serving the Los Angeles, Van Nuys, and San

4

Bernardino areas.  CARECEN's mission is to empower Central Americans and all immigrants by defending human and civil rights, working for social and economic justice and promoting cultural diversity.  CARECEN offers low-cost immigration legal services, including asylum representation, and community education programs, and engages in advocacy and organizing to achieve fair and more inclusive immigration, education, and labor laws and policies.

18.     Plaintiff Al Otro Lado is a nonprofit, nonpartisan organization established in 2014 and incorporated in California.  Al Otro Lado is a legal services organization that serves indigent deportees, migrants, refugees, and their families, and operates primarily in Los Angeles, California, and Tijuana, Mexico.  Al Otro Lado's mission is to coordinate and provide screening, advocacy, and legal representation for individuals in asylum and other immigration proceedings; to seek redress for civil rights violations; and to provide assistance with other legal and social service needs.[2]

19.     Plaintiff Innovation Law Lab is a nonprofit organization that has projects in multiple states.  Innovation Law Lab seeks to advance the legal rights of immigrants and refugees in the United States, with a focus on providing representation to asylum seekers.[3]

20.     Plaintiff the Tahirih Justice Center ("Tahirih") is a nonprofit and non-partisan organization with offices in San Bruno, California; Falls Church, Virginia; Baltimore, Maryland; Atlanta, Georgia; and Houston, Texas.  Tahirih was founded in 1997 and provides free legal immigration services to survivors of gender-based violence.  Tahirih's mission is to provide free holistic services to women, girls, and other survivors of gender-based violence such as rape, domestic violence, female genital mutilation/cutting, forced marriage, and human trafficking. Tahirih offers legal representation and social services for individuals who seek protection, including asylum, affirmatively and in removal proceedings.  Tahirih also trains and co-counsels with private

---

[2] Al Otro Lado continues to challenge the Trump administration's entry ban, which was the original subject of this case.  It does not bring claims against the new Rule.
[3] Like Al Otro Lado, Innovation Law Lab continues to challenge the original entry ban but does not bring claims against the new Rule.

AM. AND SUPPL. COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

attorneys to provide representation to survivors of gender-based violence in seeking asylum and other protection from removal.

21.     Plaintiff National Center for Lesbian Rights ("NCLR") is a nonprofit organization that was founded in 1977, and is located in San Francisco, California.  NCLR provides free legal services to lesbian, gay, bisexual, transgender, and queer ("LGBTQ") people.  NCLR's mission is to advocate for and advance the rights of LGBTQ people in the United States, including through provision of free legal services to LGBTQ asylum seekers fleeing persecution and torture on account of their sexual orientation, gender identity, or gender expression.  NCLR offers direct legal representation, a help line, community education, and Know Your Rights presentations for LGBTQ individuals who seek protection, including asylum, in their immigration proceedings.

22.     Plaintiff Immigrant Defenders Law Center ("ImmDef") is a nonprofit organization incorporated in California and based in Los Angeles, with additional offices in San Diego, Santa Ana, and Riverside.  It serves immigrants and asylum seekers throughout Southern California and in Tijuana, Mexico.  ImmDef's mission is to defend immigrants against the injustices of the U.S. immigration system.  To this end, they provide *pro bono* legal services through a universal representation model so that no immigrant is forced to face removal proceedings alone.  ImmDef pursues its mission through several different programs and projects, including a Cross-Border Initiative that assists asylum seekers preparing to enter the United States and a Community Defense Program that provides removal defense legal representation and services to immigrants facing deportation.  ImmDef also plays a core role in the California Welcoming Task Force, a bi-national coalition of organizations that provide services to individuals seeking asylum in the United States.

23.     Plaintiff American Gateways is a nonprofit organization founded in 1987 that is incorporated in Texas, with offices in Austin, San Antonio, and Waco, Texas.  American Gateways provides free legal services to migrants and is particularly focused on serving people who are fleeing persecution.  American Gateways' mission is to provide free, culturally sensitive, trauma-informed

6

legal representation to individuals and families seeking asylum and other kinds of immigration relief in the United States.  American Gateways also works to engage and educate immigrant communities and local stakeholders about immigration laws, processes, and about an individual's rights in the immigration process.

## II.  Defendants[4]

24.     Defendant Joseph R. Biden is the President of the United States.  He is sued in his official capacity.  He is successor to the public official who issued the Proclamation challenged in this suit.

25.     Defendant Merrick Garland is the Attorney General of the United States.  He is sued in his official capacity.  In that capacity, he issued the Rule challenged in this suit.  He directs each of the component agencies within the Department of Justice.  The Attorney General is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103 and is empowered to grant asylum or other relief.

26.     Defendant U.S. Department of Justice ("DOJ") is a cabinet-level department of the United States.

27.     Defendant David Neal is the Director of the Executive Office for Immigration Review ("EOIR").  He is sued in his official capacity.

28.     Defendant EOIR is the sub-agency of DOJ that, through its immigration judges and appellate immigration judges, conducts limited review of negative credible fear determinations in expedited removal proceedings and adjudicates regular removal proceedings and agency appeals.

29.     Defendant Alejandro Mayorkas is the Secretary of Homeland Security.  He is sued in his official capacity.  In that capacity, he issued the Rule challenged in this suit.  He directs each of the component agencies within the Department of Homeland Security.  In his official capacity,

---

[4] "The officer's successor is automatically substituted as a party" under Federal Rule of Civil Procedure 25(d).

AM. AND SUPPL. COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Defendant Mayorkas is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103 and is empowered to grant asylum or other relief.

30. Defendant U.S. Department of Homeland Security ("DHS") is a cabinet-level department of the United States federal government. Its components include U.S. Citizenship and Immigration Services ("USCIS"), U.S. Customs and Border Protection ("CBP"), and U.S. Immigration and Customs Enforcement ("ICE").

31. Defendant Ur Jaddou is the Director of USCIS. She is sued in her official capacity.

32. Defendant USCIS is the sub-agency of DHS that, through its asylum officers, conducts interviews of individuals who apply for asylum.

33. Defendant Troy A. Miller is the Acting Commissioner of CBP. He is sued in his official capacity.

34. Defendant CBP is the sub-agency of DHS that is responsible for the apprehension, detention, and processing of individuals seeking asylum or other relief at or near the U.S. border.

35. Defendant Tae D. Johnson is the Acting Director of ICE. He is sued in his official capacity.

36. Defendant ICE is the sub-agency of DHS that is responsible for carrying out removal orders and overseeing immigration detention.

## BACKGROUND

### I. The U.S. Protection System

37. The modern U.S. asylum system was established by the Refugee Act of 1980, Pub. L. 96-212, 94 Stat. 102. The Act reflects "one of the oldest themes in America's history—welcoming homeless refugees to our shores," and "gives statutory meaning to our national commitment to human rights and humanitarian concerns." Sen. Rep. No. 256, 96th Cong., 1st Sess. 1 (1979), *reprinted in* U.S. Code Cong. and Admin. News 141, 141. One of Congress's "primary purposes" in enacting the statutory provisions governing asylum, codified at 8 U.S.C. § 1158, was "to bring

AM. AND SUPPL. COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

United States refugee law into conformance" with international refugee treaties.  *INS v. Cardoza-Fonseca*, 480 U.S. 421, 436 (1987).[5]

**A. Asylum**

38.     Asylum affords protection from removal to individuals who have a "well-founded fear of persecution" on account of one or more of five protected grounds: race, religion, nationality, political opinion, or membership in a particular social group, if their country is unable or unwilling to protect them from this harm.  8 U.S.C. § 1101(a)(42)(A).  A "well-founded fear of persecution" is defined as a ten percent chance of persecution.  *Cardoza-Fonseca*, 480 U.S. at 430, 440.  An asylum seeker's past persecution gives rise to a presumption of a well-founded fear of future persecution and, thus, of asylum eligibility.

39.     There are three principal ways to seek asylum.  First, a noncitizen who is not in removal proceedings may file an "affirmative" application with USCIS and complete a non-adversarial interview with an asylum officer.  8 C.F.R. §§ 208.2(a), 208.9.  Second, a noncitizen in regular removal proceedings, 8 U.S.C. § 1229a, may submit a "defensive" asylum application to the immigration judge as a form of relief from removal, 8 C.F.R. § 208.2(b).  The application is decided in an adversarial proceeding where the noncitizen has the right to be represented by counsel, introduce evidence, and present and cross-examine witnesses.  8 U.S.C. § 1229a(b)(4).  Third, a noncitizen who has been placed in "expedited removal"—a truncated removal process that may be applied to certain noncitizens who arrive at a port of entry or enter without inspection, 8 U.S.C. § 1225(b)(1)—may also seek asylum.  The noncitizen may do so by expressing fear of removal and undergoing a "credible fear" screening interview with an asylum officer.  Any noncitizen who satisfies the threshold screening standard must be referred to regular removal proceedings to apply for asylum.

---

[5] Although the United States is a party only to the later protocol, through that agreement, "the United States agreed to comply with the substantive provisions of Articles 2 through 34 of the 1951 United Nations Convention Relating to the Status of Refugees."  *Cardoza Fonseca*, 480 U.S. at 429.

9

40.     The spouse and children of a person granted asylum can likewise receive asylum as derivative beneficiaries, even if they are not physically present in the United States.  8 U.S.C. § 1158(b)(3).  People granted asylum can become lawful permanent residents, *id.* § 1159(b), and eventually U.S. citizens, *id.* § 1427.

41.     In crafting the statutory provisions governing asylum, Congress took care to ensure that noncitizens already within the United States or arriving at the border or a border port of entry would be able to apply for asylum, regardless of their manner of arrival at or entry within our borders.  8 U.S.C. § 1158(a)(1) specifically provides:

> Any [noncitizen]who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . .), irrespective of such [noncitizen's] status, may apply for asylum.

42.     Accordingly, the Board of Immigration Appeals has long held that—to the extent manner of entry is considered at all—it can be assessed only as one discretionary factor among many once asylum eligibility is determined, and never "in such a way that the practical effect is to deny [asylum] in virtually all cases."  *Matter of Pula*, 19 I&N Dec. 467, 474 (BIA 1987).

43.     Additionally, two provisions of the asylum statute specifically address the terms under which asylum eligibility can be denied based on the ability of an asylum seeker to safely reside in a third country.  Congress imposed significant constraints in these two provisions to ensure that applicants could be barred from asylum in the United States only if residing elsewhere is "genuinely safe."  *EBSC v. Garland*, 994 F.3d at 977.

44.     The first of those, the safe third country provision, 8 U.S.C. § 1158(a)(2)(A), requires a formal international agreement with the third country; that the third country be able to provide asylum seekers "access to a full and fair procedure for determining [their] claim[s] to asylum"; and an individualized determination that the applicant will not face persecution there.

45.     The other, the firm resettlement provision, 8 U.S.C. § 1158(b)(2)(A)(vi), addresses asylum eligibility for applicants who were "firmly resettled in another country prior to arriving in

10

the United States."  For this bar to apply, however, the government must show "that the government of the third country issued to the [noncitizen] a formal offer of some type of official status" permitting indefinite residency, after which the applicant has the opportunity "to show that the nature of his stay and ties was too tenuous, or the conditions of his residence too restricted, for him to be firmly resettled."  *Maharaj v. Gonzales*, 450 F.3d 961, 976-77 (9th Cir. 2006) (en banc).

**B.  Withholding of Removal and Protection Under the Convention Against Torture**

46.    Like asylum, withholding of removal protects noncitizens from removal to any country where they would face persecution on account of a protected ground, such as race, religion, or political opinion.  8 U.S.C. § 1231(b)(3).

47.    Immigration regulations implementing the Convention Against Torture ("CAT") likewise prohibit the removal of a noncitizen to any country where "it is more likely than not that he or she would be tortured."  8 C.F.R. § 208.16(c)(2).

48.    The withholding of removal statute and CAT regulations implement international treaty obligations not to send noncitizens to countries where they face persecution or torture, known as *non-refoulement* obligations, and the relief is mandatory for those who meet the requirements.  *INS v. Stevic*, 467 U.S. 407, 421, 426 n.20 (1984); *Maldonado v. Lynch*, 786 F.3d 1155, 1162 (9th Cir. 2015) (en banc).

49.    These prohibitions encompass both direct *refoulement*—sending asylum seekers directly to countries where they face persecution or torture—and indirect *refoulement*—returning asylum seekers to countries where they are at risk of being sent onward to persecution or torture.

50.    A noncitizen facing removal proceedings, even one who is ineligible for asylum, may be granted withholding of removal or CAT protection by an immigration judge after an adversarial hearing.  However, these forms of relief have significant drawbacks compared to asylum.  First, whereas winning asylum requires showing just a ten percent chance of persecution, being granted

withholding or CAT protection requires showing that persecution or torture is more likely than not—a much higher threshold. *Stevic*, 467 U.S. at 429-30.

51.     Second, these alternative forms of relief from removal do not provide a pathway to permanent residency or U.S. citizenship; they instead come with a removal order and simply prevent the government from executing that order as to a particular country.  The decision to withhold removal can be revoked if conditions change or if a third country agrees to accept the individual. *See* 8 C.F.R. §§ 208.24(b)(1), (f) (termination of withholding of removal); 8 C.F.R. § 208.17(d) (termination of CAT deferral); 8 C.F.R. § 208.16 (removal to third country).

52.     Third, withholding of removal and CAT protection do not permit individuals to include their spouse and children as derivative applicants.  Instead, those individuals must be present in the United States, apply separately, and be granted protection independently, which can result in long-term family separation.

53.     Finally, winning withholding of removal and CAT protection is more time- and resource-intensive for applicants and their attorneys.  Both types of claims have a higher more-likely-than-not standard, and CAT claims have multiple elements that are distinct from both asylum and withholding of removal.  These differences increase the need for expert testimony and other detailed evidence, and require additional legal research and analysis.  These differences also mean more people are denied these forms of protection on the merits, requiring them to pursue complex appeals to the Board of Immigration Appeals and then to the federal Courts of Appeals.

## II.  The Trump Administration's Asylum Bans and Resulting Court Challenges

54.     The new Rule reprises two attempts by the Trump administration to restrict asylum eligibility.  The first was based on an asylum seeker's manner of entry (the "entry ban") and the second was based on their transit through third countries on their way to the southern U.S. border (the "transit ban").  This Court enjoined these earlier bans in decisions affirmed by the Ninth Circuit.

1

**A.  The Entry Ban**

2

55.     The Trump administration issued the entry ban in November 2018 as an interim final

3

rule barring asylum eligibility to anyone subject to a presidential proclamation concerning the

4

southern border.  83 Fed. Reg. 55,934.  That same day, former President Trump issued a

5

proclamation suspending entry of noncitizens through the southern border, excepting only lawful

6

permanent residents and those who presented for inspection at a port of entry.  83 Fed. Reg. 57,661,

7

57,663.  Together, the rule and proclamation barred asylum eligibility for those who crossed the

8

southern border between designated ports of entry.

9

56.     Plaintiffs EBSC, CARECEN, Innovation Law Lab, and Al Otro Lado challenged the

10

entry ban in this Court on November 9, 2018, the same day it was issued, in this case.  This Court

11

enjoined the entry ban, in part, because it "irreconcilably conflict[ed]" with 8 U.S.C. § 1158(a)(1)

12

and was impermissibly issued without notice and comment.  *EBSC v. Trump*, 349 F. Supp. 3d at 844,

13

862-63.

14

57.     The Ninth Circuit denied the government's request to stay that injunction, agreeing

15

with this Court that the ban conflicted with § 1158(a)(1) and impermissibly conditioned "eligibility

16

for asylum on a criterion that has nothing to do with asylum itself"; and that the government violated

17

the APA's requirements.  *EBSC v. Trump*, 932 F.3d 742, 771-72, 775-78 (9th Cir. 2018) (corrected

18

opinion).

19

58.     The Supreme Court likewise denied the government's request to stay this Court's

20

order.  *Trump v. EBSC*, 139 S. Ct. 782 (2018).

21

59.     On February 28, 2020, the Ninth Circuit affirmed this Court's injunction on the

22

merits, reiterating that the ban contravened § 1158(a)(1) and was arbitrary and capricious, and that

23

the government violated the APA.  *EBSC v. Biden*, 993 F.3d 671, 675-77.

24

25

26

27

28

13

60.     Separately, on August 2, 2019, a district court in the District of Columbia vacated the asylum entry ban as in conflict with § 1158(a)(1).  *O.A. v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019), *appeal pending sub nom O.A. v. Biden*, No. 19-5272 (D.C. Cir.).

**B.  The Transit Ban**

61.     In July 2019, with the entry ban enjoined, the Trump administration promulgated the transit ban as an interim final rule.  It provided that noncitizens who transited through another country prior to reaching the southern border of the United States were ineligible for asylum.  84 Fed. Reg. 33,829.  The asylum transit ban had three narrow exceptions for noncitizens who: (1) had applied for and were denied protection in a transit country; (2) met the definition of a "victim of a severe form of trafficking in persons"; or (3) had transited only through countries not party to the Refugee Convention or Protocol or the CAT.  *Id.* at 33,835, 33,843.  These exceptions exempted almost no one from the eligibility bar.

62.     The same day the transit ban issued, EBSC, CARECEN, Innovation Law Lab, and Al Otro Lado again filed suit in this Court, in a case related to this one.  On July 24, 2019, the Court preliminary enjoined the ban.  *EBSC v. Barr*, 385 F. Supp. 3d at 960.  The Court concluded that the transit ban conflicted with the asylum statute's safe third country and firm resettlement provisions, 8 U.S.C. §§ 1158(a)(2)(A) and (b)(2)(A), because, unlike those provisions, it did "virtually nothing to ensure that a third country is a 'safe option.'"  *Id.* at 944.  The Court also held the rule arbitrary and capricious because failure to seek protection in a third country has no bearing on the merits of asylum claims and is thus an invalid basis for denying asylum, *id.* at 945-47, and because the agencies impermissibly ignored extensive contrary evidence documenting the dangers to asylum seekers in Mexico, *id.* at 951-56.  And the Court again determined that the government likely violated the APA's notice-and-comment requirements.  *Id.* at 948-50.

63.     The Ninth Circuit subsequently stayed the operation of this Court's injunction outside the Ninth Circuit.  *EBSC v. Barr*, 934 F.3d 1026 (9th Cir. 2019).  On September 9, 2019, this Court

14

issued a new nationwide injunction supported by further findings. *EBSC v. Barr*, 391 F. Supp. 3d 974, 985 (N.D. Cal. 2019). On September 11, 2019, the Supreme Court entered a four-sentence order staying this Court's preliminary injunction pending appeal. *Barr v. EBSC*, 140 S. Ct. 3 (2019).

64. The transit ban took effect following the Supreme Court's stay decision and remained in place for nearly a year. For those to whom it applied, it functioned as a near-total elimination of asylum. According to government data, the agency determined that 98.3% of more than 25,000 asylum seekers subjected to the transit ban during that time failed to qualify for any exception and were thus barred from asylum.

65. Meanwhile, separate plaintiffs had also challenged the transit ban in the D.C. district court. On June 30, 2020, that court vacated the transit ban interim final rule for violating the APA's notice-and-comment requirements. *Cap. Area Immigrants' Rights Coal. v. Trump*, 471 F. Supp. 3d 25 (D.D.C. 2020), *appeal dismissed sub nom I.A. v. Garland*, No. 20-5271, 2022 WL 696459 (D.C. Cir. Feb. 24, 2022).

66. The Ninth Circuit affirmed this Court's preliminary injunction against the asylum transit ban on the merits, agreeing that the ban conflicted with § 1158's firm resettlement and safe third country provisions and was arbitrary and capricious. *EBSC v. Garland*, 994 F.3d at 977-78, 980-83.

67. In December 2020, the outgoing administration re-issued the transit ban as a final rule, which was "almost verbatim the interim final rule this Court previously enjoined." *EBSC v. Barr*, 519 F. Supp. 3d 663, 665 (N.D. Cal. 2021) (internal quotation marks omitted); *see* 85 Fed. Reg. 82,260 (Dec. 17, 2020). This Court preliminarily enjoined the final rule as contrary to § 1158 and arbitrary and capricious. *EBSC v. Barr*, 519 F. Supp. 3d at 666-68.

68.     Because of the injunctions and vacatur, the prior asylum bans have not been in effect during the Biden administration.

**III.  The Biden Administration's Unwinding of Title 42 and Its New Asylum Ban Rule**

69.     President Biden signaled that his administration's approach to asylum would be different from that of his predecessor.  Shortly after his election, he indicated his intention to "restore and strengthen" the "badly damaged" U.S. asylum system, including by having Defendants Garland and Mayorkas "promptly review and decide whether to rescind" the asylum entry and transit bans. Exec. Order No. 14,010, 86 Fed. Reg. 8,267, 8,269-70 (Feb. 5, 2021).

70.     The Biden administration at first maintained the previous administration's Title 42 policy that has resulted in systematic summary expulsion of asylum seekers under the pretext of a pandemic-related public health measure.  *See* 85 Fed. Reg. 17,060 (Mar. 26, 2020).  However, beginning in February 2021, President Biden ordered DHS to "begin taking steps to reinstate the safe and orderly reception and processing of arriving asylum seekers."  86 Fed. Reg. at 8,269.

71.     On April 1, 2022, the CDC terminated the Title 42 order, effective May 23, 2022, during which time DHS would implement appropriate COVID-19 mitigation protocols in preparation for resuming normal processing.  87 Fed. Reg. at 19,941-42.

72.     But Title 42 did not end on May 23, 2022, or on December 21, 2022—the date by which a D.C. district court ordered its end, *Huisha-Huisha v. Mayorkas*, ___ F. Supp. 3d ___, 2022 WL 16948610 (D.D.C. Nov. 15, 2022) —due to litigation brought by Louisiana and other states, *see Louisiana v. CDC*, 603 F. Supp. 3d 406 (W.D. La. 2022); *Arizona v. Mayorkas*, 143 S. Ct. 478 (2022).

73.     In December 2022, DHS issued a string of press releases asserting that it was continuing to prepare for the end of Title 42 and the resumption of regular Title 8 processing.  News reports that month indicated that the agencies had drafted a version of the Rule to be implemented when Title 42 lifted.

16

74.     On January 5, 2023, DHS and DOJ issued a press release confirming that they would soon issue the Rule challenged here.

75.     Meanwhile, on January 30, 2023, the government announced that it would allow the COVID-19 public health emergency declaration to expire at the end of the day on May 11, 2023, which would also spell the end of Title 42.

76.     On February 23, 2023, Defendants finally published the Notice of Proposed Rulemaking ("NPRM") with a truncated 30-day comment period.  88 Fed. Reg. 11,704 (Feb. 23, 2023).  When more than 170 organizations asked them to extend the comment period, they refused to do so, solely on the ground that Title 42 was set to end on May 11, 2023.

77.     The Rule is virtually unchanged from the NPRM and was issued without the required 30-day delay in effective date—instead taking effect the very next day.  The Rule expressly rescinds and supersedes the enjoined asylum entry and transit bans.  Rule at 370, 380.  Like those bans, however, the new Rule would dramatically curtail the availability of asylum in the United States. While the Rule purports to provide three "options" to preserve asylum eligibility, nearly all covered asylum seekers will be unable to satisfy two of these conditions, and only a limited number will be able to utilize the third: securing scarce appointments booked using CBP One.  The Rule will eviscerate the asylum system that Congress created.

**A.  The New Rule's Asylum Eligibility Bar**

78.     Despite its complex wording, the Rule's basic operation is straightforward.  The asylum eligibility bar applies to anyone who arrives at the southern land border after traveling through a third country en route to the United States.  In other words, it applies to all non-Mexican adults and families seeking asylum at the southern U.S. border.

79.     The Rule bars asylum unless a covered person (1) presents at a port of entry and obtains one of a small number of border port appointments through a complicated mobile application called CBP One; (2) applies for asylum or similar relief in a transit country, and receives a denial

17

before coming to the United States; or (3) applies for parole through a government-approved program and receives advance permission to travel to the United States.  Rule at 25-26, 443-44. People who do not fall into one of these three categories are automatically barred from obtaining asylum, no matter the strength of their claims to refugee protections.

80.     The Rule also contains two extremely narrow exceptions.  The first exception allows a person to avoid the bar in "exceptionally compelling circumstances," including an "acute medical emergency," an "imminent and extreme threat" to life or safety, or being a "victim of a severe form of trafficking in persons."  *Id.* at 26, 444.  The Rule makes clear that these are meant to be circumscribed and only exempt a tiny number of people.  For instance, the "imminent and extreme threat" exception requires an "imminent threat of rape, kidnapping, torture, or murder," *id.* at 26, 444, and does not include "generalized concerns about safety, or based on a prior threat that no longer poses an immediate threat."  *Id.* at 15 n.36.

81.     The second exception is only for individuals who present at a port of entry.  They can avoid the CBP One appointment requirement if they "demonstrate [] by a preponderance of the evidence that it was not possible to access or use the CBP One app due to language barriers, illiteracy, significant technical failure, or other ongoing and serious obstacle."  *Id.* at 298, 444.  This exception only "captures a narrow set of circumstances in which it was truly not possible for the noncitizen to access or use" CBP One.  *Id.* at 298.  Notably, there is no exception for a person's inability to secure one of the limited CBP One appointments due to insufficient availability, regardless of how long someone has attempted to obtain one.  *See id.* at 119-20, 438.  Nor is there an exception for someone who lacks the requisite type of phone, access to internet service, to the ability to charge their phone, or the sophistication necessary to navigate the CBP One app.

82.     Despite this structure, the Rule asserts that it creates only a "presumption" of ineligibility for asylum that can be "rebutted."  That description is inaccurate.  For every person who is subject to the Rule, asylum is barred unless they meet one of the conditions or narrow exceptions

18

that, under the Rule, preserves asylum eligibility.  This Rule is no different from any other prohibition with exemptions, including the enjoined prior bans.

83.     By contrast, a presumption typically arises when one fact is inferred from other facts. A presumption is rebuttable if the party it operates against may provide evidence to disprove the inferred fact.  The Rule doesn't work that way: it doesn't infer one fact from another.  It simply bars a huge category of people from asylum and identifies several narrow categories of people who remain eligible.

84.     Moreover, in practice, the Rule preserves far less asylum eligibility than it does on paper, because two of the three conditions—advance parole and denial of asylum by a transit country—are unavailable to almost all of the asylum seekers who are subject to the Rule.

85.     Under the Rule, for instance, people who "sought asylum or other protection in a country through which the noncitizen traveled and received a final decision denying that application" are not barred.  Rule at 26, 198, 444.  But this purported exception is virtually meaningless.  Many transit countries lack a functioning asylum system, others have systems that are stretched to the breaking point, and most are not remotely safe enough for asylum seekers to find refuge.  As this Court and the Ninth Circuit previously found, it is not possible or advisable for many asylum seekers to seek protection in transit to the United States.

86.     The Rule also purportedly exempts people who were granted permission to enter the United States after applying for parole from outside the United States.  *Id.* at 14.  The Rule points to a handful of nationality-specific parole processes that the government recently launched.  *See id.* at 10, n.19; 82, n.86; 423, n.380 (citing 87 Fed. Reg. 63507 (Oct. 19, 2022) (Venezuela); 88 Fed. Reg. 1243 (Jan. 9, 2023) (Haiti); 88 Fed. Reg. 1255 (Jan. 9, 2023) (Nicaragua); 88 Fed. Reg. 1266 (Jan. 9, 2023) (Cuba); 87 Fed. Reg. 25040 (Apr. 27, 2022) (Ukraine))).  The parole criteria are not tied to the need for asylum or danger in any way.  And nationals of these countries can only obtain parole if they have a financial sponsor in the United States, can afford a plane ticket, and are able to obtain a

19

passport.  *Id.* at 303-05.  Nationals of other countries, including many significant refugee-producing countries, are not eligible for these nationality-specific parole processes.  *See, e.g.*, 88 Fed. Reg. 1243, 1252 (eligibility requirements for Haitian parole program); 87 Fed. Reg. 25040, 25042 (eligibility requirements for Ukrainian parole program).

87.    The Rule's supposed exception for these parolees will encompass almost no one, because the Rule only applies to individuals who enter at the southern U.S. border, while participants in these parole programs are required to fly to U.S. airports—they *may not* enter at the border.  In other words, this supposed "option" for preserving asylum eligibility generally only applies to people who are not subject to the Rule in the first place.

**B.  Procedures for Applying the Bar**

88.    The Rule applies in any proceeding where a person might raise an asylum claim: the affirmative asylum process, expedited removal, and full removal proceedings in immigration court. Rule at 26, 71, 300.

89.    First, the Rule applies in affirmative asylum adjudications conducted by USCIS asylum officers.  *Id.* at 178.  Asylum officers must determine whether an applicant is barred by the Rule, and whether the applicant satisfies any of the Rule's exceptions before adjudicating the merits of their asylum claim.  *Id.* at 300.  If an asylum officer finds that the applicant does not meet a condition or qualify for an exception and is therefore barred from asylum, the applicant will generally be referred to immigration court for removal proceedings.  *Id.* at 35, 72-73, 357, 439-40.

90.    Second, the Rule applies in the credible fear screening process conducted in expedited removal proceedings.  *Id.* at 26, 71.  The statutory standard requires assessing whether the asylum seeker has a "significant possibility" of later establishing asylum eligibility in a full hearing before an immigration judge.  *Id.* at 212-13.  Anyone barred by the Rule will receive a negative credible fear finding and face immediate removal if they are unable to meet a higher screening standard for withholding of removal and CAT claims.  *Id.* at 214-15.  By design, the Rule will result

20

in people being rapidly sent back to persecution because they are barred from asylum.  *See, e.g.*, *id.* at 6, 95, 152-53, 192-93, 225-26.

91.     Third, the Rule applies in immigration court, when a person raises asylum as a defense to removal.  *Id.* at 300.  Immigration judges must determine whether the Rule applies and whether the applicant can meet one of its conditions or exceptions.  *Id.* at 300-01, 445.  Those who are referred for full proceedings after passing a credible fear screening or being denied asylum in affirmative proceedings must also establish, in immigration court, that they are eligible for asylum despite the Rule.  *Id.*

**IV.  Additional Sweeping Changes to the Asylum System**

92.     In addition to the Rule, the government recently has made other sweeping changes to the way the asylum system operates that will compound the Rule's harm.  These significant changes were announced after the comment period on the Rule closed, making it impossible for commenters to assess the true impact of the Rule on border processing and on asylum seekers.

93.     **Credible Fear Interviews in CBP Custody**.  First, in April 2023, the agencies revived the Trump administration's practice of forcing asylum seekers at the border to undergo their credible fear screening interviews on extremely expedited timelines while detained in CBP custody, rather than after being transferred to ICE custody.  Asylum seekers subjected to this policy under Trump had "restricted opportunities to consult with a person of their choosing during the credible fear interview process," *Las Americas Immigrant Advoc. Ctr. v. Wolf*, 507 F. Supp. 3d 1, 9 (D.D.C. 2020), and were subjected to deplorable confinement conditions, both of which negatively impacted their credible fear passage rates.  Now that this policy is reactivated, people barred from asylum under the Rule may be forced, not only to meet a higher screening standard, but to do so under these extremely challenging conditions.  Further, on May 11, DHS announced a related policy change under which the waiting period before a credible fear interview would be reduced to 24 hours, making adequate preparation even more difficult.  Most commenters did not raise these concerns

AM. AND SUPPL. COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

because the resumption of this program came after the close of comments on the Rule, but in response to the few commenters who did raise this issue, the agencies dismissed it as beyond the scope of the Rule.  *See* Rule at 157.

94.    **Execution of Expedited Removal Orders of Third Country Nationals to Mexico**. In the Rule's NPRM, the agencies said, "Once Title 42 is no longer in place," DHS plans to combine implementation of the new Rule with an unprecedented practice of carrying out "Title 8 *removals* of individuals subject to expedited removal" to Mexico.  88 Fed. Reg. at 63,511 (emphasis added).  In one sense, this will continue Defendants' practice of "expelling" certain non-Mexicans to Mexico under Title 42, with even graver consequences for the people subject to removal.  *See* Rule at 69 (recognizing five-year bar to re-entry that applies to people removed under an expedited removal order).  However, the United States has never before sought to systematically subject non-Mexicans to expedited removal to Mexico under the immigration laws.

95.    At minimum, the government plans to subject Haitians, Nicaraguans, Cubans, and Venezuelans to such third-country expedited removals to Mexico.[6]

96.    Despite the mention of this plan in the NPRM, the agencies did not confirm until May 2, 2023, that the Mexican government has agreed to accept removals of third country nationals after Title 42 lifts.

97.    The administration has stated that those barred by the new Rule "will generally be processed under Title 8 expedited removal authority in a matter of days."  Accordingly, for Haitians, Cubans, Venezuelans, and Nicaraguans—and perhaps also for others—being barred from asylum because of the new Rule may lead to rapid removal to northern Mexico, where they will once again face grave dangers.

---

[6] 88 Fed. Reg. at 1,249 (Haitians); 88 Fed. Reg. at 1,260 (Nicaraguans); 88 Fed. Reg. at 1,272 (Cubans); 88 Fed. Reg. at 1,279 (Venezuelans).

22
AM. AND SUPPL. COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

98.     **Asylum Processing Rule**. In addition to these sweeping changes, the Biden administration halted use of an interim final rule (the "asylum processing rule") that made several changes to asylum processing at the border, and like this Rule, was justified as a means of ensuring efficient processing of asylum claims.  87 Fed. Reg. 18,078, 18,098-107 (Mar. 29, 2022); *see* 8 C.F.R. § 1240.17.  The asylum processing rule's central change was to permit asylum officers, rather than just immigration judges, to adjudicate the asylum applications of people who were subject to expedited removal and passed their credible fear screenings.  87 Fed. Reg. at 18,086; 8 C.F.R. § 208.2(a)(1)(ii); *id.* § 208.9(a)(1).

99.     The administration paused the program indefinitely on April 12, 2023, just over a year after issuing the rule, shortly before issuing this Rule but after the close of comments on the NPRM.

**V.  The Rule's Core Assumptions Are False and Contrary to Evidence.**

100.     The Rule assumes that the three conditions, one of which individuals must satisfy to maintain asylum eligibility, are readily available, safe options.  Rule at 60.  This is simply wrong, and the agencies have failed to grapple with the evidence contradicting this premise.

**A.  The Parole Processes Cannot Substitute for Asylum Access.**

101.     The parole processes discussed above may provide a route for some number of people who otherwise would have sought asylum at the border to instead come to the United States via parole.  But they do not justify the Rule's near-elimination of access to asylum at the southern border.

102.     The parole programs the Rule discusses encompass only five nationalities.  In 2019— the last full year before Title 42 went into effect—people from more than 150 countries sought asylum in the United States, and only a fraction of asylum applications was filed by individuals from the parole countries.

AM. AND SUPPL. COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

103.    Even as to individuals from the five countries, these parole programs impose significant barriers to access, which means that the most vulnerable (and thus most in need of refugee protections) will be unable to avail themselves of this process.  For example, to qualify for this parole program, an applicant must have a U.S.-based financial supporter, which may be unavailable for many asylum seekers.  Similarly, the requirement of traveling to the United States on a commercial flight will be unaffordable for many of the most vulnerable asylum seekers.

104.    The programs also impose a passport requirement, which excludes asylum seekers who fear applying for passports from their countries' governments (which may be involved in or complicit in their persecution),  as well as those who cannot afford to do so.  For others, passport application processing times will be a barrier, since many asylum seekers flee immediate dangers.

105.    In addition, the wait required for parole application processing renders parole unavailable to those who must make an urgent decision to flee persecution.

106.    The parole processes are also unavailable to people who entered the United States, Mexico, *or* Panama irregularly after January 9, 2023.  This means that those at whom the Rule is purportedly most directed—asylum seekers waiting in Mexico to seek asylum in the United States at the end of Title 42—cannot actually qualify for parole because they likely entered Panama or Mexico without inspection after the cut-off date.

107.    Finally, the government has capped the number of people who will be accepted into these parole programs, so even individuals who can meet all the requirements may be unable to obtain parole.  And because the parole criteria are not tied to one's need for asylum or danger, some of the limited slots may be used by non-asylum seekers.

**B.  Many Asylum Seekers Are Unable to Present at Ports of Entry with an Appointment.**

108.    The Rule fails to account for the various reasons that many people seeking refuge in the United States cannot present at a port of entry after securing an appointment using CBP One.  As

the Ninth Circuit has recognized, "Many migrants enter between ports of entry out of necessity: they 'cannot satisfy regular exit and entry requirements and have no choice but to cross into a safe country irregularly prior to making an asylum claim.'" *EBSC v. Biden*, 993 F.3d at 673 (citation omitted).

109.    Many asylum seekers are unaware that designated locations for entering the United States even exist.  Those who do know about designated ports of entry often have no idea where they are or how to find them.  Others are unable to access them due to the well-documented dangers— including rampant kidnapping and physical and sexual violence—and unstable living conditions that refugees face in Mexico's northern border region.

110.    Even those who can access ports of entry may still be barred from asylum under the Rule.  That is because nearly all non-Mexican nationals will be forced to obtain a CBP One appointment to remain eligible for asylum, and many will be unable to secure one in a timely fashion.

111.    This requirement will put asylum seekers in an impossible position.  To maintain eligibility for asylum, individuals must secure an appointment using the CBP One app and appear at the designated time and place.  However, there are numerous onerous hurdles to doing so.

112.    First, asylum seekers must spend weeks or months in dangerous areas of Mexico while they wait to obtain an appointment and then appear at the designated time and place.  Recent experience with asylum seekers' use of the CBP One app to make appointments for Title 42 exemptions demonstrates that securing an appointment via CBP One can take significant time.  CBP One appointments have not been made immediately available, and instead have been offered two weeks in the future at the earliest.  In addition, under Title 42, the number of appointments has been tightly restricted to 750 appointments per day border-wide, which does not come anywhere near to matching the demand.  For example, as of late March 2023, in the Mexican border cities along the Rio Grande Valley "approximately 25 people [were] competing for every 1 appointment spot."

25

These appointments have been released at a set time each day and claimed in minutes. Reports indicate that some asylum seekers have tried to get an appointment every day for three months without success.

113.    Appointments will not be meaningfully easier to obtain under the Rule. Demand for seeking asylum at ports of entry will continue to far outpace the availability of appointments. In March 2023, the most recent month for which data is publicly available, DHS reported an average of nearly 6,200 encounters per day at the southern border. Yet, on May 5, 2023, the agencies confirmed that they would continue to cap appointments once Title 42 lifts, at just 1,000 per day border-wide. Further, although the agencies recently eliminated the daily scramble for appointments, they have replaced it with a daily lottery system that gives people a longer window in which to request an appointment. *See* Rule at 272 (referring to a "daily appointment allocation process"). The agencies have confirmed that appointments will generally still be available only two weeks in advance.

114.    People are not free to wait in a safe location while they seek a CBP One appointment. CBP One uses "geo-fencing" technology, which requires users to be within a defined proximity to the United States border in order to use the application. Thus, people can only make appointments once they reach the geo-fenced area, currently restricted to central and northern Mexico, and cannot do so earlier to minimize their wait time in the border zone.

115.    This means that, to use CBP One to make an appointment, many asylum seekers must wait weeks or months in dangerous conditions in Mexico.

116.    But many asylum seekers cannot wait to seek protection. Many are subjected to horrific violence while waiting in Mexico to seek asylum in the United States. For example, a Venezuelan family who could not make an appointment at the nearest port of entry was kidnapped, tortured, and extorted en route to another port for a CBP One appointment. In January 2023, a teenager was murdered in Monterrey, Mexico, while waiting with his family for their scheduled CBP One appointment. Asylum seekers in Mexico, particularly Honduran, Salvadoran, Guatemalan

26

nationals, have also reported that persecutors can easily find them within Mexico, including

following them from other parts of the region.  Thus, asylum seekers who need to reach safety as

quickly as possible often feel compelled to enter the United States along the border, outside of a port

of entry, or without an appointment in order to escape their persecutors and the violence on

Mexico's side of the border.

117.    Second, the CBP One app requires individuals to have access to a smartphone that is

compatible with the app and can connect to the internet.  While many people fleeing harm may bring

a smartphone, not all smartphones are able to use CBP One.  For many others, their smartphones are

stolen, lost, or broken on the journey.  By some estimates, three out of every ten individuals seeking

asylum have had to purchase a new cellphone in order to try to access the app.  Purchasing a device

in Mexico presents a financial barrier for many, especially considering that many features of CBP

One reportedly operate better, and in some cases only, on newer, more expensive devices.

118.    Third, CBP One requires reliable internet for a sustained period of time in order to

navigate and input the required information to secure an appointment.  But many asylum seekers at

the border do not have access to reliable and consistent internet.  Further, seeking out a strong

internet connection can require asylum seekers in hiding in Mexico to expose themselves to danger.

Asylum seekers have had to spend their entire savings buying cellphone data to try to schedule

appointments and have been forced to pay cartels to charge their phones.

119.    Fourth, CBP One poses significant language barriers.  To access CBP One, a user

must first create an account through a government site, Login.gov.  The account-creation process is

available only in English, French, and Spanish.  Then, assuming a person is able to complete this

step, the CBP One app is currently available only in English, Spanish, and Haitian Creole.  Many in-

app messages, including important notices and most error messages, appear only in English, even in

the Spanish or Haitian Creole versions.  Therefore, people who cannot read and write in one of these

languages cannot use CBP One.

AM. AND SUPPL. COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

120.    The application thus prejudices refugees who speak Indigenous languages and those from non-English speaking portions of Africa, Asia, and the Middle East.  It also disadvantages native Spanish and Haitian Creole speakers who lack robust literacy skills, because the application requires both "a high level of literacy" and familiarity with smartphone apps.

121.    As a result of these issues, most migrants who have tried to use CBP One in the past several months needed the assistance of others.  Because the app requires assistance for meaningful use, migrants face being charged hundreds or thousands of dollars by people in Mexico offering to "help" with the process, thereby exacerbating the kind of extortion of migrants that the Rule purports to mitigate.  The U.N. International Organization for Migration has reported individuals posing as lawyers or other professionals charging fees to help people navigate the app.

122.    Fifth, CBP One is plagued by technical issues, with many reports of the application repeatedly crashing or freezing.  For example, the app requires frequent updating, is prone to timeout in the middle of the application process, and tends to freeze on various screens without saving data. Nearly everyone interviewed about their attempts to use CBP One has reported that the app freezes or crashes unpredictably.  Others have reported having to try different lighting and backgrounds, just to take a photograph of themselves that the application will accept.

123.    Sixth, CBP One uses problematic and prejudicial facial recognition software.  It routinely fails to register darker skin tones, and without the ability to upload a photo, asylum seekers are unable to move past the photo confirmation page to secure an appointment.

124.    The result of these multiple, compounding barriers is that requiring CBP One appointments will leave many asylum-seekers stranded indefinitely in Mexico, unable to obtain an appointment, and faced with the impossible decision between entering elsewhere along the southern border or waiting longer in dangerous conditions.

### C.  Transit Countries Cannot Provide Vulnerable Asylum Seekers With Protection.

125.    The Rule asserts that asylum seekers can instead readily find refuge in Mexico, Guatemala, Belize, Costa Rica, Colombia, or Ecuador.  Rule at 328.  Easily accessible information, including reports from the U.S. State Department, and other documents cited by many commenters, show this to be false.

126.    In reality, for most asylum seekers who approach the U.S.-Mexico border, applying for protection in a transit country is not an option because it is not safe to do so.  Although some countries in this hemisphere have made efforts to address the needs of migrants, these efforts are limited and leave refugees unprotected.  Even the Rule acknowledges that "Mexico or other countries through which certain individuals travel en route to the United States may not be a safe alternative for particular individuals."  *Id.* at 186.

#### 1. *Mexico*

127.    For most asylum seekers who come to the U.S. southern border, seeking protection in Mexico is not an option.  The country is extraordinarily dangerous for migrants and lacks a full and fair asylum system.

128.    According to the U.S. State Department, migrants in Mexico are frequently victimized throughout the country "by criminal groups and in some cases by police, immigration officers, and customs officials, including at land borders and airports."  Recent years have seen "numerous instances of criminal armed groups extorting, threatening, or kidnapping asylum seekers and other migrants."  In fact, there were nearly 13,500 documented violent attacks, including reports of torture, kidnapping, murder, and rape, of migrants blocked in Mexico or expelled from the United States to Mexico in 2021 and 2022.  Between 2018 and 2021, Mexican authorities registered the killings of 2,823 migrants in just five southern states.  Over 60 percent of these homicides occurred after the kidnapping, assault, robbery, or extortion of the victims by criminal groups.  DHS itself has

1
2
acknowledged that asylum seekers forced to remain in the northern states of Mexico are "subject to extreme violence and insecurity at the hands of transnational criminal organizations."

3
4
5
6
7
8
129.     Certain groups are uniquely vulnerable to harm in Mexico, including women and children, who face a heightened risk of sexual violence, kidnapping, and robbery.  LGBTQI+ people and Indigenous people also regularly experience persecution in Mexico.  Black and non-Spanish speaking asylum seekers face racism, xenophobia, and violence, and language barriers further impede their access to both the asylum system and social services.

9
10
11
12
130.     Mexican authorities fail to protect migrants from harm.  In fact, immigration or law enforcement authorities are responsible for a large share of violence and crimes committed against asylum seekers.  Government agents have dragged, kicked, violently pushed, raped, and killed migrants during enforcement operations.

13
14
15
16
17
18
19
20
131.     In addition to threats from Mexican criminal groups and authorities, migrants also face risks from persecutors who follow them to Mexico.  Gangs operate transnationally and have sophisticated communication networks throughout Central America and Mexico.  People fleeing gangs in Guatemala have been found and threatened by the gangs' members in Mexico, and Honduran asylum seekers detained in Mexico have reportedly been located through gang members detained in the same facility.  Central American survivors of gender-based violence have been tracked down and persecuted in Mexico by their abusive ex-partners.

21
22
23
24
25
132.     The Rule's acknowledgement that "Mexico has a significant asylum backlog" is an understatement.  Rule at 323.  Mexico's asylum system has been "at [] risk of collapsing" and has serious deficiencies.  The system would be unable to support even a modest increase in asylum applications spurred by the Rule's condition to first seek asylum in a transit country.

26
27
133.     Mexico's asylum agency has significant "capacity limitations," which have caused major obstacles to securing protection in Mexico.  The budget of the agency ("COMAR") is "not

28

AM. AND SUPPL. COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

commensurate with the growth in refugee claims in the country."  As a result, in February 2023, COMAR's director stated that the agency is "in a situation of near-breakdown."

134.    Even as increased applications overwhelm Mexico's system, they represent a tiny fraction of the asylum seekers who transit through Mexico.  And they do not accurately reflect the number of asylum seekers who can actually find refuge in Mexico.  For instance, many asylum seekers apply in Mexico only because it allows them to obtain documents that prevent Mexican officials from unlawfully arresting or expelling them to the countries they fled while they travel through Mexico to the United States.  And recent asylum application increases occurred during the same period when access to asylum was blocked at the U.S. southern border under Title 42.  They accordingly do not necessarily signal improved safety or asylum accessibility in Mexico.

135.    Those who do attempt to seek protection in Mexico face "multiple obstacles": they must apply within 30 days of entering the country, with only very limited exceptions; they must apply in person but there are only ten COMAR offices in the country; they must remain in the state where they filed their application and must present themselves at the COMAR office regularly or their applications are considered abandoned; and "many of COMAR's offices are situated in some of the country's poorest states where labor opportunities are scarce."

136.    Mexico's screening for asylum claims is also woefully inadequate, resulting in frequent *refoulement*.  Asylum seekers are often detained in migration stations, frequently without being informed of the option to seek asylum, and quickly expelled.

137.    Many asylum seekers are also detained in deplorable conditions.  They experience overcrowding, unsanitary conditions, lack of services, and inadequate food and healthcare, forcing many detained individuals to forego their claims in order to be released.  The recent horrific fire in a detention facility in Ciudad Juarez that killed at least 39 people—where immigration officials refused to release dozens of migrants from their cells even as they were engulfed in smoke and flames—illustrates the dangers migrants face.  Detained asylum seekers have also endured sexual

31

abuse and corporal punishment, including beatings, electroshock, and choking, and reporting such abuse can lead to retaliation.

### 2. Guatemala

138.    According to the State Department, "Guatemala remains among the most dangerous countries in the world."  The country's "high murder rate is driven by narcotrafficking activity, gang-related violence, a heavily armed population, and a law enforcement and judicial system unable to hold criminals accountable."  Violence against women, including rape and femicide; violence against children, including sexual exploitation and gang-recruitment; and "[e]xtreme violence" against LGBTQI+ persons are all "serious problems" in Guatemala.  For these reasons, in 2019, 2020, and 2021, Guatemala was one of the top four countries whose nationals were granted asylum in the United States.  Asylum seekers who lack social networks and stable housing are even more vulnerable to these dangers.  Due to permeable borders in the region, persecutors are also able to locate individuals from other Central American countries in Guatemala.

139.    Guatemala's asylum system barely functions.  According to the State Department, the asylum process in Guatemala is cumbersome and complicated, resulting in significant delays in decision making and an increasing backlog.  UNHCR data indicate that between 2000 and mid-2022—a period of more than 20 years—Guatemala granted asylum to a cumulative total of just 660 people.  According to an official from the Guatemalan Office of the Ombudsman, Guatemala does not "resolve [asylum] cases because the [National] Migration Authority, the institution responsible for resolving the cases, is not interested in resolving them," as "[a]sylum is not a priority for [the] country."

### 3. Belize

140.    Although the Rule points to the fact that Belize launched an amnesty program for some asylum seekers, Rule at 313, that program is limited to those who filed their claims before March 31, 2020, and migrants who entered irregularly before 2017.

32

141.    Apart from that program, Belize is not an option for asylum seekers.  It "has one of the highest per capita murder rates in the world," and violent crime such as sexual and gender-based violence remains an epidemic.

142.    Moreover, Belize's asylum system is inefficient and cumbersome, and receives and processes very few applications each year.  In the nearly 20 years between 2003 and mid-2022, Belize granted asylum or other forms of protection in just 129 cases.

**4. Costa Rica**

143.    Costa Rica—a nation of just five million people—is already tightening its asylum policies "in the face of an overwhelmed system" that cannot absorb any significant increase in asylum seekers from neighboring Nicaragua or elsewhere.  In recent years, Costa Rica has received eight times as many asylum requests per capita, and has accepted *ten* times as many refugees per capita, as the United States.  In March 2022, UNCHR reported that ongoing migration will "strain Costa Rica's already stretched asylum system and overwhelm support networks in the country."  As DHS acknowledged in January 2023, "increasing numbers of Nicaraguans are traveling north to the [southwest Border] due to renewed unrest in Nicaragua and the strained asylum system in Costa Rica."

144.    The number of asylum officers in Costa Rica is inadequate to deal with the increased flow of asylum applications, resulting in extreme processing delays.  As of September 2022, over 200,000 asylum applications were pending in Costa Rica, and over 50,000 individuals were waiting for appointments to make formal applications.  From 2018 to mid-2022, Costa Rica adjudicated only 22% of its total pending asylum cases, and granted asylum in only about 10% of cases.  UNHCR data indicates that between 2000 and mid-2022, Costa Rica granted asylum or other protection to only around 20,000 people.

145.    In response to the backlog of asylum applications, Costa Rica's new government has severely curtailed asylum eligibility and imposed a one-month deadline to apply for asylum.  It has

33

also discouraged people from seeking asylum by restricting access to employment authorization for those with pending applications.  The Rule mentions that Costa Rica has responded to the overwhelming strain on its system in part by offering Nicaraguan, Cuban, and Venezuelan asylum applicants an option to instead request temporary status.  However, this program is only available to people who applied for asylum in Costa Rica by September 30, 2022.

146.    Xenophobia and discrimination against migrants in Costa Rica have increased as the number of refugees from Nicaragua and other countries has grown.  Due to xenophobia, migrants' access to public services and social welfare is limited in Costa Rica.  Nicaraguans in particular face discrimination in the Costa Rican education system, leading to social exclusion, harassment, and hostile treatment by academic officials.  In addition, according to the State Department, groups of Nicaraguan exiles in Costa Rica have "alleged harassment and political oppression by parapolice and [Ortega regime] sympathizers who crossed the border to target exiles, as well as by intelligence officials within the Nicaraguan embassy in Costa Rica."

### 5. Colombia

147.    According to the State Department, homicide, assault, armed robbery, extortion, robbery, and kidnapping are widespread in Colombia.  Other significant human rights abuses include arbitrary killings, torture and arbitrary detention.  Black, Indigenous, and LGBTQI+ individuals are at particular risk, and gender-based violence is also prevalent.  Armed groups and narcotics traffickers routinely perpetrate violent crimes, and millions of people were affected by conflicts involving these groups in 2022.  Government corruption is rampant, and perpetrators generally operate with impunity.

148.    Colombia is particularly dangerous for many asylum seekers and refugees. According to UNHCR data, Venezuelans make up about 86% of refugees in Colombia and 99% of applicants with pending asylum claims.  During the first half of 2021, 1,059 assaults, 362 homicides, and 335 incidents of sexual violence against Venezuelans were reported in Colombia.  Over the previous five-year period, from 2015 to 2020, there were a reported 1,933 homicide cases and 2,319 incidents

34

of sexual violence against Venezuelans.  Moreover, according to the State Department, Venezuelans in Colombia face a heightened risk of forced labor, domestic servitude, forced begging, and forced recruitment.  Venezuelan women repeatedly experience brutal abuse and sexual violence, and Venezuelan transgender women are especially vulnerable.  A recent study documented that displaced Venezuelan women in Colombia "are repeatedly subjected to attacks and sexual violence in public spaces, both in the host cities where they live and along the migration route."

149.    The Rule discusses a temporary status for Venezuelans, which is only available to people who entered Colombia before January 31, 2021.  Rule at 312-13.  This temporary program has not alleviated this dangerous situation for migrants, either, and Venezuelans and other migrants continue to suffer throughout the country.

150.    Colombia's limited asylum system is inefficient, bureaucratic, and cumbersome.  The two-month deadline for filing an application presents a substantial roadblock, especially given the general lack of information about the asylum process and the small number of offices that adjudicate asylum claims.  The adjudication process can last for a prolonged period, sometimes years.  A tiny group of government officials reviews asylum applications, conducts interviews, and makes non-binding adjudication recommendations.  The Minister of Foreign Relations, a high-level cabinet member, then makes final determinations.  While awaiting their decisions, asylum seekers are permitted to remain in Colombia, but cannot work legally or access basic services.

151.    UNHCR data from 2019 to mid-2022 show that only 1,257 applicants were granted asylum, out of more than 40,000 filed, while the vast majority of claims were either closed or remained pending.  It is no surprise that Colombia's asylum system is overtaxed, as the country already accommodates more foreign refugees than any country except Turkey.

### 6. *Ecuador*

152.    The Rule mentions a temporary option for people who entered Ecuador prior to August 2023. But this program is limited, providing only a two-year status and providing a benefit

35

only to people who have entered the country by a few months into the Rule's validity period. The State Department warns that murder, assault, express kidnapping, and armed robbery are common in Ecuador.  From 2020 to 2021, homicides increased by 180 percent, and in 2022 Ecuador recorded its highest rate of violent deaths.  The mayor of Guayaquil, the most populous city in Ecuador, stated that "criminal gangs have become a state within a state."  As a result of the violence, an increasing number of Ecuadorans have been forced to flee the country.

153.    According to the State Department, migrants and refugees, especially women, children and LGBTQ+ individuals, face sexual and gender-based violence and human trafficking in Ecuador.  Venezuelan refugee women face a particular risk of physical, psychological, sexual, patriarchal, and other acts of violence in public and private spaces.  The Ecuadoran state is not capable of protecting these women.  The State Department has also reported an increase in forced labor, sex trafficking, and forced recruitment of migrants and refugees into criminal activity on Ecuador's northern and southern borders, "particularly by transnational criminal organizations and criminal groups that also operated in Colombia."

154.    Asylum seekers in Ecuador face significant barriers in accessing the asylum system. These barriers include a 90-day application deadline, as well as a general lack of information about asylum proceedings.  Moreover, some applicants must travel long distances to certain large cities for their interviews.  Ecuadoran migration officials reportedly discourage asylum seekers from applying for refugee status.

155.    Ecuador has granted refugee status in only about 4% of cases, while about 68% were rejected and about 28% remain pending.

### 7.  Other Transit Countries

156.    The Rule fails to address whether asylum seekers can find refuge in other transit countries not listed.  For example, the Rule makes no mention of El Salvador, Honduras, or Nicaragua—and for good reason.  The evidence from the thousands of comments submitted in

36

response to the NPRM shows that these countries are exceptionally dangerous for their own citizens and migrants alike.  Indeed, El Salvador's president placed that country under a state of emergency to combat overwhelming gang violence that the country faces, Nicaragua's ruling party uses a campaign of terror and violence to hold on to power, and Honduras has one of the highest murder rates in the world.  Moreover, these countries have wholly inadequate asylum systems incapable of fairly processing even tiny numbers of applications.

**VI.  The Rule Will Cause Irreparable Harm to Plaintiffs.**

157.    Plaintiffs are nonprofit organizations that aid asylum seekers. Many of their current clients are from countries other than Mexico, entered the United States outside a port of entry, have experienced significant violence or harm in their journey to the United States, and could not have sought asylum in transit.  The substantive changes in the Rule will cause each Plaintiff significant harm, and they are also harmed by the abbreviated comment period and lack of a 30-day implementation delay for the Rule's effective date.

**A.  EBSC**

158.    Plaintiff EBSC provides legal and social services to immigrants and refugees in California, Washington, Oregon, and part of Nevada.  EBSC's affirmative asylum program is a key part of the organization's mission, and accounts for nearly half of its budget.  Since 1992, EBSC has filed nearly 6,000 affirmative asylum cases.  Nearly 98 percent of the decided cases have been granted.

159.    In 2022, a significant percentage of the clients in EBSC's affirmative asylum program were non-Mexicans who entered the United States by crossing the southern border between ports of entry.  It expects its client base to consist of similar individuals in the future.

160.    The Rule frustrates EBSC's central mission of providing legal services to these affirmative asylum applicants.  If such people are made ineligible for asylum, EBSC will be unable to continue much of its affirmative asylum work.  The new Rule will force EBSC to expend

additional time and resources to help the relatively small number of affirmative asylum clients who might qualify for a narrow exception.  EBSC will be unable to assist the large majority of prospective clients with no viable argument for an exception, frustrating its mission and jeopardizing its funding.

161.    To serve clients barred under the Rule, EBSC will have to try to represent them in removal proceedings, and attempt to satisfy the much higher standards for withholding of removal and CAT claims.  Alternatively, EBSC will have to abandon much of its longstanding client base and shift to representing people placed directly in removal proceedings who remain eligible for asylum.  Either of these scenarios will require EBSC to make enormous and costly shifts in its operations.

162.    Shifting from an affirmative asylum model to providing complex removal defense in an adversarial context would be extremely resource intensive, especially for people ineligible for asylum.  Currently, EBSC very rarely provides representation in removal proceedings, and it does not have the funding or capacity to do so on a larger scale.

163.    The new Rule also jeopardizes EBSC's existing funding streams.  Funding for EBSC's affirmative asylum program is based in part on the number of cases EBSC handles per year. If EBSC is no longer able to represent people barred by the Rule in their affirmative asylum applications, it will face a marked decrease in its budget and will have to significantly cut its program and staff, or else dramatically overhaul its program to provide types of assistance is it not currently equipped or trained to provide.

164.    EBSC will also have to divert significant resources to, among other things, understanding the new policy and its impact on the communities EBSC serves, and educating and advising its staff, clients, and prospective clients accordingly.

**B.  CARECEN**

165.    Plaintiff CARECEN provides and manages immigration legal services to clients throughout Southern California.  These services include affirmative and defensive representation for asylum seekers.

166.    Funding for CARECEN's asylum work is based in part on the number of cases it handles and expects to handle each year.  The Rule will frustrate CARECEN's mission and divert organizational resources.

167.    For example, CARECEN's mission as it relates to affirmative asylum applicants will be frustrated because it will be unable to assist asylum seekers barred by the Rule.  The Rule will force CARECEN to expend additional time and resources in its intake process to assess whether potential clients are subject to the Rule's bar and whether they have viable arguments for any of its narrow exceptions.  CARECEN will likely be unable to assist many of those without such arguments in applying for asylum affirmatively.

168.    Representing clients with viable exception arguments will require significant additional time gathering and reviewing supporting evidence.  All of this will mean that CARECEN will have to represent fewer affirmative asylum clients.  The Rule will thus jeopardize CARECEN's per-case funding for affirmative asylum representation and reduce the funding that it receives as program administrator for affirmative asylum representation by another nonprofit provider.

169.    CARECEN's representation of people who seek asylum defensively in removal proceedings will also be frustrated.  The vast majority of CARECEN's clients are individuals who would be subject to the new Rule.  CARECEN will have to assist these removal clients in applying for withholding and CAT protection, which are more time- and resource-intensive, and this will require diverting resources from other critical areas of work.  And because the standards for withholding and CAT are more demanding, the Rule will also likely lead to more losses in immigration court and a need to litigate more appeals.

170.     Moreover, unlike in asylum cases that allow derivative beneficiaries, CARECEN will be required to submit withholding and CAT applications for every member of a family.  This will result in significant additional staff time preparing and litigating each case, including preparing separate evidence and putting on witnesses in each case, which will require diverting resources from other critical areas of work.

171.     CARECEN will also have to divert resources to training staff and educating prospective clients and community members about the effects of the new Rule.

**C.  Tahirih**

172.     Plaintiff Tahirih provides free legal and social services to women, girls, and other survivors of gender-based violence who are seeking asylum or other protection under U.S. law.

173.     Tahirih conducts a sizeable affirmative asylum practice, and most of its clients—regardless of nationality—enter the United States via the land border with Mexico.

174.     The Rule will severely compromise Tahirih's mission. Because far fewer people who enter via the U.S.-Mexico border will be eligible for asylum under the Rule, Tahirih will no longer have a substantial pool of clients eligible for affirmative asylum.  Instead, almost all of Tahirih's new clients will have to seek relief defensively in immigration court. On average, Tahirih attorneys spend twice as much time on defensive cases as affirmative cases—meaning that, even if the Rule made no other relevant changes, Tahirih would be able to take on only one defensive client under the Rule for every two affirmative clients it could have previously served.

175.     The Rule, however, makes three other changes that would independently and significantly reduce the number of clients Tahirih could serve. First, the Rule forces Tahirih attorneys to represent new clients in removal proceedings on claims for statutory withholding of removal or CAT relief.  Because an applicant for such relief must meet higher standards than people seeking asylum, the preparation of withholding or CAT cases is even more time consuming than the preparation of a defensive asylum case.

AM. AND SUPPL. COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

176.     Second, under the Rule, Tahirih must file separate, individual CAT and withholding petitions for the spouses and children of clients, because they could no longer be included as derivatives on an asylum application. For many family members, especially children fleeing trauma, this would require not only significant additional attorney time but also time devoted to finding both counseling for trauma and psychiatric evaluations.

177.     Third, Tahirih attorneys representing clients under the Rule will also have to assess whether they believe a client might meet one of the narrow exceptions to the Rule. If a client might do so, the attorney will have to gather evidence, and present legal argument, not only on that issue but on every element of an asylum claim as well as withholding and CAT claims.

178.     For these reasons, under the Rule, Tahirih will be able to serve only a fraction of the number of clients it currently serves.

179.     The Rule has also required, and will continue to require, Tahirih to divert significant resources. Tahirih must expend money and staff time to understand the Rule's impact on the communities it serves, to train staff and volunteers, to update guidance materials given to professional partners and community members, and to advise prospective clients, and immigrant communities.

180.     The Rule will also affect Tahirih's funding.  More than half of Tahirih's staff time is billed to grants that require clients to be physically present within designated areas within the United States.  Because the Rule uses CBP One to limit the number of people who can seek asylum in the United States and imposes heightened screening standards at the credible fear stage for people who are barred from asylum, the Rule will significantly lower the number of people who are allowed to enter the United States to pursue *any* kind of relief.  By preventing people from reaching the areas in which Tahirih provides service, the Rule will have a direct and substantial impact on Tahirih's budget.

**D. NCLR**

181.    Plaintiff NCLR provides free legal services to LGBTQ individuals who are seeking asylum or other protection under U.S. law.

182.    The vast majority of NCLR's asylum practice, which comprises the largest portion of its immigration project, is affirmative and nearly all of its clients entered the United States via the U.S.-Mexico border.

183.    The Rule will severely compromise NCLR's mission.  Under the Rule, most people who enter the United States between ports of entry on the U.S.-Mexico border will be ineligible for affirmative asylum.  Because of this, NCLR's ability to identify clients for affirmative asylum representation will be severely limited.  Instead, many of NCLR's otherwise prospective clients will be in more complex defensive removal proceedings or will be removed before they can even reach those proceedings.  Because of the additional time required to prepare cases in a defensive posture, NCLR will have to significantly reduce the number of clients it serves.

184.    Aside from being in a defensive posture, other aspects of the Rule will require additional staff resources, further limiting the number of clients NCLR can serve.  First, NCLR staff will have to argue for an exception to asylum ineligibility.  This will require gathering significant additional information, including asking detailed questions about clients' efforts to use CBP One and their experiences in Northern Mexico, gathering evidence, and presenting legal arguments to support an exception.  Notably, because the most common transit countries for NCLR's clients—Mexico, and the Northern Triangle—are exceptionally dangerous for LGBTQ people, the task of pursuing an exemption to the Rule's bar will be onerous for NCLR and traumatizing for its clients as they try to demonstrate the risk of persecution in a client's home country, as well as harms they may have experienced in transit.

185.    Second, under the Rule, NCLR will be forced to represent clients on claims for withholding of removal and CAT relief.  These forms of relief have higher evidentiary standards

than asylum, meaning that, on top of the additional preparation detailed above, NCLR will have to devote additional resources in order to represent clients on these claims.

186.    For these reasons, under the Rule, NCLR will be able to serve only a fraction of the number of clients it currently serves.

187.    The Rule has also required, and will continue to require, NCLR to divert significant resources towards understanding and explaining the Rule's impact to staff and the communities it serves.  NCLR must expend money and staff time to update guidance and training materials disseminated to immigrant communities and professional partners.

**E.  ImmDef**

188.    Plaintiff ImmDef represents approximately 2,500 noncitizens in their removal proceedings on a pro bono basis and provides other types of free legal services to approximately 21,000 additional noncitizens annually.  At present, ImmDef has approximately 2,150 open immigration cases, more than half of which involve asylum-eligible clients. The vast majority of ImmDef's clients who pursue asylum are in removal proceedings.  Most of ImmDef's asylum-seeking clients are not Mexican nationals.  Many of these clients are Guatemalan, Salvadoran, Honduran, Afghan, and Colombian. Most of ImmDef's clients enter the United States through the U.S.-Mexico border.

189.    In accordance with ImmDef's mission of expanding access to representation to any and all noncitizens within the immigration system, they assist and represent individuals without regard to how they entered the United States or what countries they transited through on their way to the border. The Rule will severely compromise ImmDef's mission, and it will force the organization to divert substantial resources away from its existing programs and alter its service-delivery model, both to address the urgent needs of asylum seekers at the border and to represent individuals who are barred from asylum.

AM. AND SUPPL. COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

190.     ImmDef has already been forced to divert resources from other projects in response to the Rule and will continue to do so.  Since April 2023, members of ImmDef's San Diego team have had to reduce the time they dedicate to providing removal defense legal services in order to provide triage information for individuals in Mexico who are waiting for CBP One appointments and who need assistance in completing the registration process.

191.     The fact that ImmDef's San Diego office will be able to handle fewer removal cases than they would otherwise accept could impact the San Diego-based team's funding stream, as they must maintain set caseloads to receive sufficient funding under ImmDef's contract with the State of California.  Further, as panel attorneys through a program with the Public Defenders Office in San Diego, ImmDef will not receive any of its budgeted funding from that source if they are unable to take on new matters.

192.     A significant portion of ImmDef's future asylum-seeking client base will be ineligible for asylum under the Rule.  As a result, ImmDef will have to take on more cases in a defensive posture.

193.     The Rule will also make ImmDef's representation of such clients subject more complicated and labor intensive.  In order to attempt to establish an exception to the Rule, ImmDef will have to spend more time conducting intakes, preparing arguments, and collecting evidence, thereby reducing the total number of cases that ImmDef can take on.

194.     Because more clients will be eligible only for withholding of removal or protection under the Convention Against Torture, ImmDef will be forced to invest more resources in each case. The number of ImmDef cases requiring appeals to the Board of Immigration Appeals and petitions to the Ninth Circuit Court of Appeals will also increase.

195.     The mandatory use of CBP One will continue to frustrate ImmDef's mission to provide all immigrants with counsel in their immigration proceedings.  Given the requirement to obtain a CBP One appointment, despite its capacity limits, errors, and glitches, individuals and

44

families who would otherwise have been able to present themselves at the border to seek asylum will be unable to access the asylum system.

196.    To provide legal advice and assistance to individuals subject to the Rule, ImmDef will be forced to engage in international, cross-border travel to Mexico.  This work entails additional costs, including travel expenses to both Tijuana and Mexicali from Los Angeles, Santa Ana, and San Diego, international phone plans for staff, and international travel insurance.  Since January 2023, ImmDef has spent approximately $16,500 to support limited representation, Know Your Rights presentations, and CBP One clinics for asylum seekers at the southern border.  ImmDef has largely funded this work through the reallocation of previously raised funds that had been designated for removal defense and the provision of other legal services, including representation at bond hearings and on appeals before the Board of Immigration Appeals.

197.    ImmDef will also be forced to respond to the rule by increasing the number of legal clinics, community education sessions, and Know Your Rights presentations it provides to individuals and families, and by creating new materials to explain the Rule and its limitations on the ability to obtain asylum.

**F.  American Gateways**

198.    Plaintiff American Gateways represents people seeking asylum before the asylum office in Houston, Texas, and the immigration court in San Antonio, Texas. It also provides legal orientations and legal workshops at three immigration detention facilities in Texas.

199.    Roughly one-third of the asylum cases that American Gateways handles are affirmative cases before USCIS and two-thirds are defensive cases in immigration court.  In defensive asylum cases, American Gateways generally represents people who are, or were, detained. Many of the organization's asylum clients entered the United States via the border with Mexico, and the vast majority are non-Mexican.

AM. AND SUPPL. COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

200.     The Rule will frustrate both the ability of American Gateways to represent people seeking asylum and its organizational mission.  After the Rule takes effect, DHS has said that it may parole the few people who remain eligible for asylum through CBP One appointments.  As a result, all of the clients that American Gateways serves in Texas detention centers—a population that accounts for most of its asylum clients—would be ineligible for asylum.

201.     American Gateways will thus be forced to bring claims for statutory withholding of removal or relief under the Convention Against Torture on behalf of its detained clients.  These claims involve higher standards of proof and therefore are more time consuming than asylum claims. Further, because spouses and children may not be included on claims for withholding or CAT relief, American Gateways will have to prepare individual applications for each member of every family it serves.  It will also have to screen each client to determine whether they might fall within an exception to the bar and prepare evidence and arguments on that additional issue. The result is that American Gateways will be able to serve fewer detained asylum clients than it does today.

202.     The Rule will also make it more difficult for American Gateways to serve affirmative asylum clients. Far fewer people will be eligible for asylum under the Rule, including the African and Indigenous language speakers, who make up roughly 20% of American Gateways' client base but who will face serious trouble using the CBP One application. The number of affirmative asylum clients in Central Texas—the sole area that American Gateways serves—will therefore decline, and much of the affirmative asylum work that American Gateways does will therefore be shifted to representation of clients in immigration court proceedings on time-consuming withholding and CAT claims. This shift, too, will cause American Gateways to serve fewer clients and harm its mission.

203.     The Rule will require American Gateways to divert its resources.  Most significantly, the Rule will require American Gateways to revamp the materials and presentations it uses for legal orientations and legal workshops at Texas detention centers.  American Gateways will also have to

AM. AND SUPPL. COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

divert resources to understanding how the Rule operates in practice and how it affects immigrant

communities in Central Texas, and to educating those communities on the Rule and its effects.

**VII.  If It Were Reinstated, the Entry Ban Would Cause Irreparable Harm to Plaintiffs EBSC, CARECEN, Al Otro Lado, and Innovation Law Lab.**

204.    The original plaintiffs continue to assert claims against the entry ban.  Should it go

back into effect, those plaintiffs will continue their challenge, because the entry ban would cause

them the same harms they have asserted throughout this case.

**A.  EBSC**

205.    The entry ban would seriously frustrate EBSC's mission and cause it to divert

organizational resources.

206.    As a result of the entry ban, EBSC would have to divert significant resources to,

among other things, understanding the new policy and its impact on the communities ESBC

serves, and educating and advising its staff, clients, and prospective clients accordingly. To properly

counsel new prospective clients who seek its affirmative asylum services going forward, ESBC will

need to invest resources in training multiple intake staff not only to screen for asylum eligibility

based on the new rule, but to conduct detailed screenings for alternative forms of relief to facilitate

referrals or other forms of assistance as appropriate.

207.    Under the entry ban, EBSC would no longer be able to train law students to handle

affirmative asylum cases, or would have to substantially reduce its training program, which would

frustrate its mission of helping to train legal professionals to assist individuals fleeing violence and

persecution.

208.    The ban would also directly frustrate EBSC's mission of providing assistance and

support to individuals fleeing persecution and violence.

209.    The ban would jeopardize ESBC's funding streams. If ESBC is no longer able to

handle affirmative asylum cases for individuals who enter without inspection, it will face a marked

decrease in its budget and will have to significantly cut its program and staff, or dramatically overhaul its program to provide types of assistance it is not currently equipped or trained to provide.

**B. CARECEN**

210.     Plaintiff CARECEN provides immigration legal services to clients throughout Southern California. These services include affirmative and defensive representation for asylum seekers.  CARECEN educates immigrants through citizenship classes, trainings to develop organizing and advocacy skills, and workshops to facilitate the integration of immigrants into their communities.  CARECEN also helps to organize immigrant communities to advocate on behalf of their rights on specific policy items.

211.     Funding for CARECEN's asylum cases is based in part on the number of cases it handles per year, and the number it anticipates serving.  The entry ban would seriously harm CARECEN in multiple respects, and frustrate CARECEN's mission and divert organizational resources.

212.     For example, CARECEN's mission as it relates to affirmative asylum applicants would be frustrated because the organization will be unable to assist asylum seekers who entered between ports of entry because they would no longer be eligible for asylum.  CARECEN's representation of individuals who enter between ports of entry and seek asylum while in removal proceedings also would be compromised, and CARECEN would be forced to assist them in applying for withholding and CAT, which require additional resources and would divert staff time from other critical areas of work.

213.     CARECEN would also have to divert resources to training staff and educating prospective clients about the effects of the new policy.

**C. Al Otro Lado**

214.     Plaintiff Al Otro Lado routinely provides representation or other assistance to asylum seekers who have entered the United States between ports of entry.

48

AM. AND SUPPL. COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

215.     The entry ban would frustrate Al Otro Lado's mission and force Al Otro Lado to divert significant resources away from its other programs.  Because individuals who enter without inspection at the southern border are categorically ineligible for asylum under entry ban, Al Otro Lado has to revamp its representation strategy, overhaul the materials it uses to train pro bono attorneys, and evaluate the eligibility of each of its clients for other types of immigration relief.  It also has to expend resources to brief eligibility issues, resulting in additional hearings and time spent on each case.

216.     The new entry ban would also jeopardize some of Al Otro Lado's most critical funding streams.

217.     Most of Al Otro Lado's asylum clients are families traveling with minor children. Because they will be ineligible for asylum under the new policy, spouses and minor children can no longer be counted as derivatives in a single application.  Al Otro Lado must now prepare separate cases for each family member, exponentially increasing the number of hours required to prepare a family's case.

**D.  Innovation Law Lab**

218.     Plaintiff Innovation Law Lab, among other services, has established "Centers of Excellence," which provide support to noncitizens and their pro bono attorneys including legal, technical, and strategic assistance in the preparation and presentation of claims.  These projects are established in Georgia, Kansas, Missouri, North Carolina, and Oregon.

219.     The entry ban would require Innovation Law Lab to significantly divert its limited resources.  The vast majority of people Innovation Law Lab serves are asylum seekers.  The entry ban would, among other things, require Innovation Law Lab to entirely rework the advice and guidance it provides in pro se workshops, and respond to a flood of inquiries and uncertainty from the immigrant communities Innovation Law Lab serves regarding the attempt to change asylum law.

It would also require Innovation Law Lab to evaluate eligibility for other types of relief in all of the cases that it screens and mentors.

220.    The changes created by the entry ban would have a substantial impact on Innovation Law Lab.  For example, the Law Lab would have to deploy expensive and limited engineering resources to recode its software to create new analytical modeling to account for the new rule.  The Innovation Law Lab publishes materials for pro bono attorneys and asylum applicants, including printed guides, worksheets, training videos, self-help videos, and other resources that are used around the country.  The entry ban would require the Innovation Law Lab to substantially revise this material and create new learning engagements and materials on the asylum rule.

221.    Thousands of individuals rely on the Innovation Law Lab's systems; the entry ban would require the organization to divert its limited resources away from other projects and priorities. For example, Innovation Law Lab would have to divert its attention away from the noncitizen population who remain eligible for asylum under the entry ban and who would remain in desperate need of Innovation Law Lab's services.  Innovation Law Lab would also have to divert its limited resources away from developing additional, new technologies to support and improve the rights of immigrants.

### FIRST CLAIM FOR RELIEF[7]
***Challenge to Circumvention of Lawful Pathways Rule***
***by Plaintiffs EBSC, CARECEN, Tahirih, NCLR, ImmDef and American Gateways***

**(Violation of Immigration and Nationality Act and Administrative Procedure Act, Contrary to Law)**

222.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

223.    The Immigration and Nationality Act provides, with certain exceptions not relevant here, that "[a]ny alien who is physically present in the United States or who arrives in the United

---

[7] Counts I, II, and III, which address the present Rule, are brought only by Plaintiffs EBSC, CARECEN, Tahirih, ImmDef, NCLR, and American Gateways.

AM. AND SUPPL. COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

States (whether or not at a designated port of arrival . . . ), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title." 8 U.S.C. § 1158(a)(1).

224.     The Immigration and Nationality Act further provides that a noncitizen is ineligible for asylum if he or she "was firmly resettled in another country prior to arriving in the United States." 8 U.S.C. § 1158(b)(2)(A)(vi).

225.     The Immigration and Nationality Act further provides that asylum is not available to a noncitizen "if the Attorney General determines that the alien may be removed, pursuant to a bilateral or multilateral agreement, to a country" where, among other things, "the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection."  8 U.S.C. § 1158(a)(2)(A).

226.     Any additional condition or limitation on asylum established by regulation must be "consistent with" § 1158. *See* 8 U.S.C. § 1158(b)(2)(C); *see also id.* § 1158(d)(5)(B) (providing that any "conditions or limitations on the consideration of an application for asylum" established by regulation must be "not inconsistent with this chapter").

227.     The Administrative Procedure Act, 5 U.S.C. § 706, provides that a Court "shall hold unlawful and set aside agency action, findings, and conclusions found to be" "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; [or] "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. §§ 706(2)(A)-(C).

228.     The Rule is contrary to law, including 8 U.S.C. §§ 1158(a)(1), (a)(2)(A), and (b)(2)(A)(vi).

229.    The Rule exceeds the authority delegated to the Attorney General by Congress in 8 U.S.C §§ 1158(b)(2)(C) and (d)(5)(B).  The Attorney General lacks the authority to issue asylum bars that conflict with the asylum statute.

## SECOND CLAIM FOR RELIEF

### *Challenge to Circumvention of Lawful Pathways Rule*
### *by Plaintiffs EBSC, CARECEN, Tahirih, NCLR, ImmDef and American Gateways*
### **(Violation of Administrative Procedure Act, Arbitrary & Capricious)**

230.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

231.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

232.    Among other reasons, the Rule is arbitrary and capricious because, in adopting it, Defendants have failed to articulate a reasoned explanation for their decision, which represents a change in the agency's longstanding policy; considered factors that Congress did not intend to be considered; entirely failed to consider important aspects of the problem; and offered explanations for their decision that run counter to the evidence before the agency.

## THIRD CLAIM FOR RELIEF

### *Challenge to Circumvention of Lawful Pathways Rule*
### *by Plaintiffs EBSC, CARECEN, Tahirih, NCLR, ImmDef and American Gateways*

### **(Violation of the APA, 5 U.S.C.§ 706(2)(D) – Failure to Observe Required Procedures)**

233.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

234.    The APA provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D). Specifically, the APA provides that agencies must "give interested persons an opportunity to participate in the rule making," *id.* § 553(c), which requires a meaningful opportunity to comment.

235.     Defendants failed to comply with the APA's requirement of an adequate opportunity to comment by imposing a truncated, 30-day comment period.

236.     The abbreviated comment period deprived the public of the ability to comment on the interaction between the Rule and the other proposed (and subsequently enacted) rules, among other infringements on the right to an adequate opportunity to comment.

237.     Defendants failed to provide a 30-day period between the Rule's enactment and its effective date, and did not have good cause to skip this requirement.

### FOURTH CLAIM FOR RELIEF[8]

*Challenge to Trump Administration's Entry Ban by Plaintiffs EBSC, CARECEN, Al Otro Lado, and Innovation Law Lab*

### (Violation of the Immigration and Nationality Act and APA)

238.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

239.     The Proclamation and entry ban rule that effectuate the entry ban are contrary to law, including 8 U.S.C. § 1158.

240.     The President's power to suspend or restrict entry pursuant to 8 U.S.C. § 1182(f) does not encompass the ability to limit the forms of relief available to noncitizens once they have entered the country, nor does his power pursuant to 8 U.S.C. § 1158(a)(1).

241.     The entry ban exceeds the authority delegated to the Attorney General by Congress in 8 U.S.C §§ 1158(b)(2)(C) and (d)(5)(B).  The Attorney General lacks the authority to issue asylum bars as broad as the President's § 1182(f) entry suspension authority permits.

### FIFTH CLAIM FOR RELIEF

*Challenge to Trump Administration's Entry Ban by Plaintiffs EBSC, CARECEN, Al Otro Lado, and Innovation Law Lab*

### (Violation of the Administrative Procedure Act)

---

[8] Counts IV and V, which address the entry ban, are brought only by original Plaintiffs EBSC, CARECEN, Al Otro Lado, and Innovation Law Lab.

AM. AND SUPPL. COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    242.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

2    243.    In promulgating the entry ban, DHS failed to provide notice and an opportunity to

3    comment in a timely manner.

4    244.    In promulgating the entry ban, DHS failed to publish the regulation 30 days before its

5    effective date.

6    245.    DHS has not articulated reasons sufficient to shown good cause why these

7    requirements are inapplicable, nor is the foreign affairs exception applicable.

8                                  **PRAYER FOR RELIEF**

9    **WHEREFORE**, Plaintiffs respectfully pray for the following relief:

10

11   a.   A declaration pursuant to 28 U.S.C. § 2201 that the entry ban and the Rule are unlawful and

12        invalid;

13   b.   Vacatur of the entry ban and the Rule;

14   c.   A preliminary and permanent injunction enjoining Defendants, their officials, agents,

15        employees, assigns, and all persons acting in concert or participating with them from

16        implementing or enforcing the entry ban or the Rule;

17   d.   An order awarding Plaintiffs costs of suit, and reasonable attorneys' fees and expenses

18        pursuant to any applicable law;

19   e.   Such other and further relief as the Court deems equitable, just, and proper.

20

21

22

23   Dated: May 11, 2023                          Respectfully submitted,

24   Lee Gelernt*
     Omar Jadwat*                                 /s/ Katrina Eiland
25   Anand Balakrishnan*                          Katrina Eiland (SBN 275701)
     AMERICAN CIVIL LIBERTIES UNION               Morgan Russell (SBN 296137)
26   FOUNDATION                                   Spencer Amdur (SBN 320069)
     IMMIGRANTS' RIGHTS PROJECT                   Oscar Sarabia Roman (SBN 341385)
27   125 Broad St., 18th Floor                    AMERICAN CIVIL LIBERTIES UNION
     New York, NY 10004                           FOUNDATION
28   T:  (212) 549-2660                           IMMIGRANTS' RIGHTS PROJECT
     F:  (212) 549-2654                           39 Drumm Street
     *lgelernt@aclu.org*                          San Francisco, CA 94111

AM. AND SUPPL. COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

ojadwat@aclu.org
abalakrishnan@aclu.org

Melissa Crow*
CENTER FOR GENDER & REFUGEE
STUDIES
1121 14th Street, NW, Suite 200
Washington, D.C. 20005
T: (202) 355-4471
F: (415) 581-8824
crowmelissa@uchastings.edu

Anne Peterson (SBN 258673)
Blaine Bookey (SBN 267596)
Julie Bourdoiseau (SBN 340462)
Karen Musalo (SBN 106882)
CENTER FOR GENDER & REFUGEE
STUDIES
200 McAllister Street
San Francisco, CA  94102
T: (415) 610-5729
F: (415) 581-8824
petersonanne@uchastings.edu

T:  (415) 343-1198
F:  (415) 395-0950
keiland@aclu.org
mrussell@aclu.org
samdur@aclu.org
osarabia@aclu.org

Keren Zwick**
Richard Caldarone**
Colleen Cowgill (SBN 321542)
Mary Georgevich**
NATIONAL IMMIGRANT JUSTICE
CENTER
224 S. Michigan Ave., Suite 600
Chicago, Illinois 60604
T: (312) 660-1370
F: (312) 660-1505
kzwick@heartlandalliance.org
rcaldarone@heartlandalliance.org
ccowgill@heartlandalliance.org
mgeorgevich@heartlandalliance.org

Michelle (Minju) Y. Cho (SBN 321939)
AMERICAN CIVIL LIBERTIES UNION OF
NORTHERN CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
T: (415) 621-2493
F: (415) 255-1478
mcho@aclu.org

Attorneys for Plaintiffs

*Admitted Pro hac vice

** Application for pro hac vice admission
forthcoming

AM. AND SUPPL. COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF