Omar C. Jadwat*
Lee Gelernt*
Anand Balakrishnan**
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
*ojadwat@aclu.org*
*lgelernt@aclu.org*
*abalakrishnan@aclu.org*

Katrina Eiland (SBN 275701)
Morgan Russell (SBN 296137)
Spencer Amdur (SBN 320069)
Oscar Sarabia Roman (SBN 341385)
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-0770
F: (415) 395-0950
*keiland@aclu.org*
*mrussell@aclu.org*
*samdur@aclu.org*
*osarabia@aclu.org*

*Attorneys for Plaintiffs (additional counsel listed on following page)*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

East Bay Sanctuary Covenant, *et al.*,

     *Plaintiffs*,

     v.

Joseph R. Biden, President of the United States, *et al.*,

     *Defendants*.

Case No.: 18-cv-06810-JST

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Melissa Crow*
CENTER FOR GENDER & REFUGEE
STUDIES
1121 14th Street, NW, Suite 200
Washington, DC 20005
T: (202) 355-4471
F: (415) 581-8824
crowmelissa@uchastings.edu

Anne Peterson (SBN 258673)
Blaine Bookey (SBN 267596)
Julie Bourdoiseau (SBN 340462)
Karen Musalo (SBN 106882)
CENTER FOR GENDER & REFUGEE
STUDIES
200 McAllister Street
San Francisco, CA  94102
T: (415) 610-5729
F: (415) 581-8824
petersonanne@uchastings.edu

Keren Zwick*
Richard Caldarone*
Colleen Cowgill (SBN 321542)
Mary Georgevich*
NATIONAL IMMIGRANT JUSTICE
CENTER
224 S. Michigan Ave., Suite 600
Chicago, IL 60604
T: (312) 660-1370
F: (312) 660-1505
kzwick@heartlandalliance.org
rcaldarone@heartlandalliance.org
ccowgill@heartlandalliance.org
mgeorgevich@heartlandalliance.org

Michelle (Minju) Y. Cho (SBN 321939)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
T: (415) 621-2493
F: (415) 255-1478
mcho@aclunc.org

*Attorneys for Plaintiffs*

*\*Admitted Pro hac vice*
*\*\* Application for admission pro hac vice*
*forthcoming*

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................ i

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ...................................................................................................................... 1

BACKGROUND ........................................................................................................................ 4

    I.      The Asylum System ...................................................................................................... 4

    II.     Previous Asylum Bans ................................................................................................... 4

    III.    The Rule ........................................................................................................................ 6

LEGAL STANDARD ................................................................................................................ 8

ARGUMENT .............................................................................................................................. 8

    I.      The Rule Violates the Asylum Statute. .......................................................................... 8

          A.  The Rule's Three Asylum Eligibility Conditions Are All Contrary to the Statute. ....... 9

          B.  The Rule Reimposes an Even Harsher Version of the Entry Ban. ............................ 11

    II.     The Rule Is Arbitrary and Capricious. .......................................................................... 14

          A.  The Rule's Justification Relies on Factors That Congress Has Rejected .................... 14

          B.  The Record Contradicts the Rule's Main Justification that Its Pathways Are Widely Available. .................................................................................................................... 16

               1.  CBP One Appointments. ...................................................................................... 16

               2.  Parole Programs. ................................................................................................... 18

               3.  Transit Countries. ................................................................................................. 19

               4.  Particularly Vulnerable Asylum Seekers. ............................................................ 23

           C.  The Record Does Not Support the Rule's Assumption that People Who Enter Between Ports or Pass Through Transit Countries Without Seeking Protection Have Weaker Asylum Claims. ............................................................................................. 24

          D. Defendants Failed to Consider the Impact of Interrelated Border Processing Policies. .................................................................................................................................... 25

    III.    The Rule Is Procedurally Defective. ............................................................................. 28

    IV.    Plaintiffs Have Standing to Challenge the Rule. .......................................................... 30

CONCLUSION ......................................................................................................................... 31

# TABLE OF AUTHORITIES

## **Cases**

*Am. Radio Relay League v. FCC*, 524 F.3d 227 (D.C. Cir. 2008) ................................ 29

*ANR Storage Co. v. FERC*, 904 F.3d 1020 (D.C. Cir. 2018) ........................................ 16

*Arizona v. Mayorkas*, 143 S. Ct. 478 (2022) ............................................................... 6

*Assoc. of Irritated Residents v. EPA*, 10 F.4th 937 (9th Cir. 2021) ............................. 15

*Barr v. EBSC*, 140 S. Ct. 3 (2019) ............................................................................. 5

*Bringas-Rodriguez v. Sessions*, 850 F.3d 1051 (9th Cir. 2017) .......................... 4, 10, 15

*California ex rel. Becerra v. Dep't of the Interior*, 381 F. Supp. 3d 1153 (N.D. Cal. 2019) ......... 28

*Cap. Area Immigrants' Rights Coal. v. Trump*, 471 F. Supp. 3d 25 (D.D.C. 2020) ...................... 5

*Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928 (D. Md. 2020) ........................... 27

*Centro Legal de la Raza v. EOIR*, 524 F. Supp. 3d 919 (N.D. Cal. 2021) .......... 24, 28, 29

*Dist. of Columbia v. USDA*, 444 F. Supp. 3d 1 (D.D.C. 2020) ..................................... 15

*EBSC v. Barr*, 385 F. Supp. 3d 922 (N.D. Cal. 2019) ...................................... passim

*EBSC v. Barr*, 391 F. Supp. 3d 974 (N.D. Cal. 2019) ................................................ 5

*EBSC v. Barr*, 519 F. Supp. 3d 663 (N.D. Cal. 2021) ................................................ 5

*EBSC v. Barr*, 934 F.3d 1026 (9th Cir. 2019) ........................................................... 5

*EBSC v. Biden*, 993 F.3d 640 (9th Cir. 2021)……………………………………………..passim

*EBSC v. Garland*, 994 F.3d 962 (9th Cir. 2020) ................................................ passim

*EBSC v. Trump*, 354 F. Supp. 3d 1094 (N.D. Cal. 2018) ..................................... passim

*Gen. Elec. Co. v. EPA*, 290 F.3d 377 (D.C. Cir. 2002) ............................................. 13

*Gill v. DOJ*, 913 F.3d 1179 (9th Cir. 2019) ............................................................. 13

*Hall v. EPA*, 273 F.3d 1146 (9th Cir. 2001) ............................................................. 28

*Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) ...................................... 30

*I.A. v. Garland*, No. 20-5271, 2022 WL 696459 (D.C. Cir. Feb. 24, 2022) .................... 5

*Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957 (9th Cir. 2002) .............. 16

*Immigrant Legal Res. Ctr. v. Wolf*, 491 F. Supp. 3d 520 (N.D. Cal. 2020) ............ 26, 27

*INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) ......................................................... 14

*INS v. Stevic*, 467 U.S. 407 (1984) ............................................................................... 15

*Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072 (9th Cir. 2006) ................................. 29

*Kiakombua v. Wolf*, 498 F. Supp. 3d 1 (D.D.C. 2020) .................................................. 15

*Louisiana v. CDC*, 603 F. Supp. 3d 406 (W.D. La. 2022) ............................................... 6

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983),
............................................................................................................................. ....15, 16, 25

*Nat. Res. Def. Council, Inc. v. Daley*, 209 F.3d 747 (D.C. Cir. 2000) ........................... 15

*Nat'l Ass'n of Manufacturers v. United States Dep't of Homeland Sec.*, 491 F. Supp. 3d 549 (N.D. Cal. 2020) ...................................................................................................................... 15

*Nat'l Min. Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399 (D.C. Cir. 1998) ..................... 8

*New York v. United States*, 505 U.S. 144 (1992) ........................................................ 8, 9

*Pangea Legal Servs. v. DHS*, 501 F. Supp. 3d 792 (N.D. Cal. 2020) ..................................... 28, 29

*Portland Cement Ass'n v. EPA*, 665 F.3d 177 (D.C. Cir. 2011) ..................................... 26

*Portland Cement Ass'n v. Ruckleshaus*, 486 F.2d 375 (D.C. Cir. 1973) ........................... 29

*Schikore v. BankAmerica Supplemental Ret. Plan*, 269 F.3d 956 (9th Cir. 2001) .......................... 7

*Simmons v. United States*, 390 U.S. 377 (1968) ............................................................ 9

*Succar v. Ashcroft*, 394 F.3d 9 (1st Cir. 2005) ........................................................... 13

*Texas v. DHS*, 6:23-cv-7 (N.D. Tex. Jan. 24, 2023) ..................................................... 19

*Texas v. United States*, 809 F.3d 134 (5th Cir. 2015) .................................................. 14

*Trump v. EBSC*, 139 S. Ct. 782 (2018) ......................................................................... 5

*Yu An v. Napolitano*, 15 F. Supp. 3d 976 (N.D. Cal. 2014) .......................................... 8

*Zheng v. Gonzales*, 422 F.3d 98 (3d Cir. 2005) ...................................................... 11, 13

*Matter of A-G-G-*, 25 I. & N. Dec. 486 (BIA 2011)…………………………………………..7


**Statutes**

8 U.S.C. § 1157 ..........................................................................................4, 11, 15

8 U.S.C. § 1158 ............................................................................................8, 10, 15

8 U.S.C. § 1158(a)(1)......................................................................................... passim

8 U.S.C. § 1158(a)(2)......................................................................................... 4

iii

8 U.S.C. § 1158(a)(2)(A) ........................................................................................ 4, 10

8 U.S.C. § 1158(b)(1)(A) ............................................................................................. 4

8 U.S.C. § 1158(b)(2) .................................................................................................. 4

8 U.S.C. § 1158(b)(2)(A)(vi) ................................................................................. 4, 10

8 U.S.C. § 1158(b)(2)(C) ..................................................................................... 4, 8, 9

8 U.S.C. § 1225(b)(1) ............................................................................................ 4, 15

8 U.S.C.§ 1229a .......................................................................................................... 4

Refugee Act of 1980, Pub. L. No. 96-212 .................................................................. 4

## **Regulations**

8 C.F.R. § 208.2(a)(1) ................................................................................................. 4

Final Rule, Circumvention of Lawful Pathways, 88 Fed. Reg. 31,314 (May 16, 2023) ......... passim

Notice of Proposed Rulemaking, Circumvention of Lawful Pathways, 88 Fed. Reg. 11,704 (Feb. 23, 2023) ................................................................................... 6, 25, 27, 30

Implementation of Changes to the Parole Process for Venezuelans, 88 Fed. Reg. 1,279 (Jan. 9, 2023) ................................................................................................. 12

Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1,266 (Jan 9, 2023) ..................... 27

Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1,255 (Jan 9, 2023) ......... 12, 27

Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1,243 (Jan 9, 2023) .................... 27

Public Health Determination and Order Regarding Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists, 87 Fed. Reg. 19,941 (Apr. 6, 2022) ................................................................................... 6

Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 Fed. Reg. 18,078 (Mar. 29, 2022) ..... 26, 29

Asylum Eligibility and Procedural Modifications, 85 Fed. Reg. 82,260 (Dec. 17, 2020) ................ 5

Notice of Order Under Sections 362 and 365 of the Public Health Service Act Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists, 85 Fed. Reg. 17,060 (Mar. 26, 2020) ................................................................................... 6

Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33,829 (July 16, 2019) ............... 5

Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. 55,934 (Nov. 9, 2018) ............................................................ 5

Aliens and Nationality; Asylum and Withholding of Deportation Procedures, 55 Fed. Reg. 30,674

(July 27, 1990) ............................................................................................................ 4

Aliens and Nationality; Refugee and Asylum Procedures, 45 Fed. Reg. 37,392 (June 2, 1980) ...... 4

**Other Authorities**

Dep't Homeland Sec., Fact Sheet (May 10, 2023) ......................................................... 11

Hamed Aleaziz, Signature Biden Asylum Reform Policy is Now on Hold, L.A. Times (Apr. 12, 2023) ................................................................................................................................... 29

Fed. R. Civ. P. 56(a) .......................................................................................................... 8

## INTRODUCTION

Defendants have adopted a Rule that severely restricts asylum eligibility at the U.S.-Mexico border. Congress provided that anyone who arrives in the United States, anywhere along the border, can seek asylum. Yet the Rule, called Circumvention of Lawful Pathways, 88 Fed. Reg. 31,314 (May 16, 2023), reduces the asylum system to a shell of what Congress created. Virtually all non-Mexicans who enter between ports of entry are ineligible for asylum. And even people who present at ports are ineligible unless they are lucky enough to secure an extremely scarce appointment through a lottery using the new CBP One smartphone app. The Rule is already inflicting untold suffering on thousands of asylum seekers, who are either being deported to persecution or stranded in Mexican states where migrants face horrific and pervasive violence. The Rule is illegal and should be vacated.

The Rule violates the asylum statute. It forces asylum seekers to satisfy one of three conditions to maintain asylum eligibility: enter at a port of entry after securing an appointment; apply for protection in a transit country and receive a denial; or obtain parole approval from outside the country. Those who do not meet a condition are barred from obtaining asylum regardless of the strength of their persecution claims. But the Ninth Circuit has squarely held that the government cannot force asylum seekers to enter at ports or seek asylum in transit countries; nor can the government force asylum seekers to first obtain parole. None of these conditions would be valid if imposed individually, and it is equally invalid to make asylum seekers choose between them.

In practice, the Rule offers asylum seekers no real choice other than to wait for an appointment and present at a port, because the record shows that the other supposed options are inaccessible to almost everyone. Its transit condition mirrors the prior transit ban, which almost no asylum seekers were able to overcome during the year it was in effect. And the parole programs— limited to certain people from select countries—are not actually a way to overcome the Rule, since participants must fly to U.S. airports, whereas the Rule only applies at the land border. The Rule also contains two narrow exceptions, but makes clear they will almost never be satisfied. Therefore, in reality, for the vast majority of asylum seekers, the Rule imposes a requirement to present at a port in order to be considered for asylum. That straightforwardly violates the asylum statute's

mandate that asylum must be available "whether or not" someone enters at a port.  8 U.S.C. § 1158(a)(1).  The Rule thus amounts to a rehash of the prior entry ban.  The agencies cannot reimpose that illegal rule just by making cosmetic changes.

In addition to violating the statute, the Rule is arbitrary and capricious for a host of reasons. Its main justification for scrapping the border asylum system is that asylum seekers have other options, like seeking asylum in other countries, parole programs, the overseas refugee admission program, and work visas.  But Congress, in guaranteeing asylum access at the border, reached precisely the opposite conclusion—that these other mechanisms were insufficient to fulfill our humanitarian and treaty obligations.  Agencies cannot base a regulation on the premise that Congress's core policy judgment was wrong.

The Rule's key factual premise—that asylum seekers can simply avoid the eligibility bar by choosing one of the available "pathways"—runs contrary to a mountain of evidence in the record, which shows that the Rule's three supposed options are unavailable to most asylum seekers.  This is the same flaw that led the Ninth Circuit to hold the prior transit ban arbitrary and capricious.

First, as noted, the parole programs do not exist for most countries, and even where they do, their sponsor, passport, and airfare requirements make them inaccessible to many asylum seekers.

Second, the record shows that port appointments are available only for a small fraction of asylum seekers at the border.  Obtaining one requires waiting weeks or months in some of Mexico's most dangerous areas.  The CBP One app is also unfair and unreliable.  It requires sophisticated smartphones, stable internet, and strong literacy in one of just three languages.  It malfunctions constantly.  Its facial recognition technology doesn't recognize dark skin tones.  The list goes on.

Third, the record overwhelmingly refutes the agencies' premise that seeking protection in transit countries is a real alternative.  Mexico is, if anything, even more dangerous for migrants than when this Court and the Ninth Circuit invalidated the transit ban.  Across the country, asylum seekers face widespread extortion, kidnapping, murder, and rape.  Persecutors easily follow

2

Central American asylum seekers into southern Mexico.  And in northern Mexico, cartels systematically target asylum seekers who are waiting for a chance to enter the United States.  Meanwhile, Mexico's asylum system is near collapse, unable to process more than a fraction of the applications already pending, much less the dramatic increase the Rule envisions.  Its system also imposes obstacles that prevent people from getting asylum *or* the final denials the Rule requires.  The Rule does not identify a single country that is both safe for asylum seekers and able to handle a significant increase in asylum requests.

The Rule barely engages with this damning evidence undermining its core assumptions.  Time and again, its circular response to well-documented barriers to each option is that there are other options.  The Rule never grapples with the fact that *all* of its options are unavailable to most asylum seekers, especially the most vulnerable, which will leave tens of thousands of people without protection.

Finally, the Rule is procedurally defective because the agencies did not provide a meaningful opportunity for public comment.  The short 30-day comment period did not adequately allow commenters to address the Rule's enormous changes and the circumstances in the many countries it implicates.  Meanwhile, the agencies adopted a flurry of separate changes to border processing policies without considering how they would interact with the Rule.  And because they announced some of the changes after the comment period closed, commenters could not assess the full impact of the Rule.  The agencies also deprived commenters of the ability to address the studies and data underlying their conclusion that the end of the Title 42 policy would cause a spike in migration.  These defects require that the Rule be vacated.

At bottom, the Rule re-imposes essentially the same requirements that this Court and the Ninth Circuit have already invalidated, based on premises rejected by Congress and contradicted by the record, all without giving the public sufficient opportunity to weigh in.  The agencies do not have authority to largely nullify the asylum system at the border simply because they find it inconvenient.  The Court should vacate the Rule and, as with both prior asylum bans, restore the system that Congress created.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## BACKGROUND

### I.      The Asylum System

Congress codified the right to seek asylum in the Refugee Act of 1980, Pub. L. No. 96-212. Asylum claims can be raised in several settings, including expedited removal proceedings at the border through credible fear interviews, 8 U.S.C. § 1225(b)(1)(A)-(B), full removal proceedings in immigration court, *id.* § 1229a, and affirmatively before the Department of Homeland Security ("DHS") asylum office, *id.* § 1158(b)(1)(A); 8 C.F.R. § 208.2(a)(1).

The asylum statute guarantees that anyone "physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . . ) . . . may apply for asylum," and may do so "irrespective" of their immigration status upon entry.  8 U.S.C. § 1158(a)(1).  Congress created this system to ensure that anyone who reached U.S. soil could seek asylum without securing advance permission.  *See Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1059-60 (9th Cir. 2017) (en banc); *compare* 8 U.S.C. § 1157 (establishing separate system for refugee admissions from abroad).

The statute creates several narrow categories of people who are ineligible for asylum.  8 U.S.C. § 1158(a)(2), (b)(2).  These include people who have been "firmly resettled in another country," *id.* § 1158(b)(2)(A)(vi), and people who can be removed to a "safe third country" where they are safe and can access "a full and fair procedure" for seeking asylum pursuant to a formal agreement between the United States and the third country, *id.* § 1158(a)(2)(A).  The statutory eligibility bars concern "either the safety of those already in the United States" or "the safety of refugees." *East Bay Sanctuary Covenant ("EBSC") v. Biden*, 993 F.3d 640, 681 (9th Cir. 2021) (*EBSC Entry Ban*).  Though the government may "establish additional limitations and conditions" on asylum eligibility, they must be "consistent with this section."  8 U.S.C. § 1158(b)(2)(C).

### II.      Previous Asylum Bans

For almost 40 years after Congress enacted the asylum statute in 1980, every new regulatory bar to asylum was narrow.  *See, e.g.*, 55 Fed. Reg. 30,674, 30,678, 30,683 (July 27, 1990) (bar for certain criminal convictions); 45 Fed. Reg. 37,392 (June 2, 1980) (firm resettlement bar, later adopted by Congress).

4

In 2018, however, the government issued a regulation and presidential proclamation that together barred asylum to anyone who entered the United States between ports of entry. *See* 83 Fed. Reg. 55,934 (Nov. 9, 2018) ("entry ban"). This Court enjoined the entry ban nationwide, because, among other things, the statute prohibits DHS from requiring asylum seekers to enter the country at designated ports. *EBSC v. Trump*, 354 F. Supp. 3d 1094, 1112, 1121 (N.D. Cal. 2018) (*EBSC Entry PI*). The Ninth Circuit and Supreme Court declined to stay the injunction. *EBSC v. Trump*, 932 F.3d 742, 781 (9th Cir. 2018); *Trump v. EBSC*, 139 S. Ct. 782 (2018). The Ninth Circuit later affirmed this Court's decision in all respects. *EBSC Entry Ban*, 993 F.3d at 681.

In 2019, the government issued a regulation barring asylum to people who passed through a third country en route to the United States, with narrow exceptions for people who applied for and were denied protection in a transit country and for victims of a "severe form of trafficking." 84 Fed. Reg. 33,829, 33,843-44 (July 16, 2019) ("transit ban"). This Court enjoined the transit ban nationwide, because Congress already addressed the narrow situations where asylum could be denied based on availability of protection in other countries, and because the record contradicted the rule's conclusions that transit countries provided a safe and viable alternative for asylum seekers. *EBSC v. Barr*, 385 F. Supp. 3d 922, 952-57 (N.D. Cal. 2019) (*EBSC Transit PI*). The Ninth Circuit declined to stay the injunction, but narrowed its scope and remanded for further factual development, after which this Court reinstated its nationwide scope. *EBSC v. Barr*, 934 F.3d 1026, 1028-29 (9th Cir. 2019); *EBSC v. Barr*, 391 F. Supp. 3d 974, 985 (N.D. Cal. 2019). The Supreme Court issued a stay without an opinion. *Barr v. EBSC*, 140 S. Ct. 3 (2019). The Ninth Circuit then affirmed this Court's merits ruling in full. *EBSC v. Garland*, 994 F.3d 962, 982, 988 (9th Cir. 2020) (*EBSC Transit Ban*).

After the Supreme Court stayed the injunction, the transit ban applied for almost a year until a district court vacated the rule for failure to follow notice-and-comment procedures. *Cap. Area Immigrants' Rights Coal. v. Trump*, 471 F. Supp. 3d 25 (D.D.C. 2020), *appeal dismissed sub nom I.A. v. Garland*, No. 20-5271, 2022 WL 696459 (D.C. Cir. Feb. 24, 2022). The government then re-issued the transit ban as a final rule, 85 Fed. Reg. 82,260 (Dec. 17, 2020), which this Court enjoined, *EBSC v. Barr*, 519 F. Supp. 3d 663, 666-68 (N.D. Cal. 2021).

In 2020, after the start of the COVID-19 pandemic, the government instituted a new policy, called Title 42, under which asylum seekers were expelled without even being screened for asylum. *See* 85 Fed. Reg. 17,060 (Mar. 26, 2020).  The policy left thousands of asylum seekers stranded in dangerous conditions in Mexico without access to the U.S. asylum system.  *See, e.g.*, PC_30901[1] (13,480 reported violent attacks on migrants in Mexico in 2021 and 2022); PC_32446-47 (2022 State Department report discussing violence against asylum seekers in Mexico).  In February 2021, President Biden instructed the agencies to begin preparing to resume normal asylum processing. AR_555.  The government formally rescinded Title 42 in April 2022, 87 Fed. Reg. 19,941, but the policy remained in effect pursuant to a court order, *Louisiana v. CDC*, 603 F. Supp. 3d 406, 441 (W.D. La. 2022); *see Arizona v. Mayorkas*, 143 S. Ct. 478 (2022), until the COVID-19 public health emergency expired on May 11, 2023, *see* 88 Fed. Reg. 31,319.

### III.     The Rule

The government issued a Notice of Proposed Rulemaking ("NPRM") on February 23, 2023. 88 Fed. Reg. 11,704.  After a truncated 30-day comment period during which it received more than 50,000 comments, the agencies issued the Rule on May 10, 2023—just six weeks later—without any significant changes.  88 Fed. Reg. 31,314.  The Rule took effect the next day.  *Id.*

The Rule, which applies at the U.S.-Mexico border and adjacent coastal areas, eliminates asylum eligibility for all adults and families who enter without authorization after passing through a third country en route to the United States—i.e., all those who are not Mexican—unless they meet one of three conditions.  To avoid the eligibility bar, a person must either have (1) "[p]resented at a port of entry, pursuant to a pre-scheduled time and place" by using a mobile application called CBP One; (2) "[s]ought asylum or other protection in a country through which the [noncitizen] traveled and received a final decision denying that application" (an abandoned claim does not qualify); or (3) received advance permission to travel to the United States "pursuant to a DHS-approved parole process."  *Id.* at 31,450-51.

---

[1] In the administrative record, Defendants stamped documents the agencies compiled with page numbers beginning "CLP_AR"; and stamped public comments (and attachments thereto) with page numbers beginning "CLP_PC."  For clarity, Plaintiffs cite these documents simply as "AR_1," "PC_1," and so on.  Accordingly, all citations beginning with either "AR_" or "PC_" are to evidence in the administrative record.

The Rule contains several extremely narrow exceptions for those who fail to satisfy one of these conditions.  The bar does not apply if a person can show, by a preponderance of the evidence, that "at the time of entry," they faced "exceptionally compelling circumstances," such as an "acute medical emergency," a "severe form of trafficking," or "an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder." *Id.*  This exception does not apply to people requiring ongoing medical treatment for serious diseases, *id.* at 31,391-92; or to people who have experienced threats to their life or safety in Mexico, unless the threats remain "imminent," *id.* at 31,392-93.  People who present at ports of entry can also be excused from the CBP One requirement if they demonstrate, by a preponderance of the evidence, "that it was not possible to access or use" the app.  *Id.*  The exception is intended to "capture[] a narrow set of circumstances." *Id.* at 31,406.  It does not apply to someone who cannot afford a smartphone, *id.* at 31,401, or who cannot read in any of CBP One's available languages, *id.* at 31,406.  There is no exception for an asylum seeker's inability to secure a CBP One appointment because not enough appointments are available.

The Rule confusingly describes the bar as a "presumption" against asylum eligibility that can be "rebutted."  But a rebuttable presumption is generally a conclusion inferred from relevant facts that is deemed true unless evidence is proffered to show that it is not true.  *See, e.g.*, *Schikore v. BankAmerica Supplemental Ret. Plan*, 269 F.3d 956, 961 (9th Cir. 2001).  In asylum law, for instance, the firm resettlement eligibility bar analysis operates as a true rebuttable presumption.  *See Matter of A-G-G-*, 25 I. & N. Dec. 486, 501 (BIA 2011).  The Rule does not work that way.  Rather, it functions simply as a blanket ban with exceptions, barring asylum to all non-Mexicans unless they satisfy one of several conditions unrelated to the merits of their persecution claims.  *See* 88 Fed. Reg. at 31,415 (all covered asylum seekers are barred absent a CBP One appointment, transit-country protection denial, or pre-approved parole request—subject to narrow exceptions); PC_21347-48 (comment from former immigration judges discussing this distinction).

On May 11, 2023, Plaintiffs filed a motion for leave to file an Amended and Supplemental Complaint adding allegations and claims challenging the Rule, which this Court granted.

**LEGAL STANDARD**

A motion for summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Yu An v. Napolitano*, 15 F. Supp. 3d 976, 981 (N.D. Cal. 2014) (quoting Fed. R. Civ. P. 56(a)). When a court "determines that agency regulations are unlawful, the ordinary result is that the rules are vacated." *Nat'l Min. Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1409 (D.C. Cir. 1998).

**ARGUMENT**

**I.      The Rule Violates the Asylum Statute.**

The agencies can only create new asylum bars that are "consistent with" the asylum statute. 8 U.S.C. § 1158(b)(2)(C). The Rule fails this test because it reimposes asylum conditions that the Ninth Circuit has already held are inconsistent with § 1158. *EBSC Entry Ban*, 993 F.3d 640 (invalidating rule that required asylum seekers to enter at ports); *EBSC Transit Ban*, 994 F.3d 962 (invalidating requirement to apply for protection in transit countries).[2] Under binding precedent, the Rule cannot stand.

The Rule is contrary to law because it requires asylum seekers to choose between three options that would each be inconsistent with the statute if imposed as a standalone requirement: the agencies could not require all asylum seekers to enter at ports, or to apply for asylum in transit countries, or to apply for parole from outside the United States. The Ninth Circuit already reached that conclusion as to the entry and transit conditions. And since the agencies could not impose any of those requirements as a standalone condition, they cannot impose them as "alternatives." None of them is "consistent with" the statute, so the supposed choice between them is likewise inconsistent with the statute. 8 U.S.C. § 1158(b)(2)(C); *see New York v. United States*, 505 U.S. 144, 176 (1992) (where each alternative "standing alone" would be invalid, offering a supposed "choice between" them is likewise invalid).

The Rule is also contrary to law because in practice it requires the vast majority of asylum seekers to come to a port of entry, just like the first asylum ban. That's because the record shows

---

[2] This Court enjoined those bans on the same grounds. *EBSC Transit PI*, 385 F. Supp. 3d 922; *EBSC Entry PI*, 354 F. Supp. 3d 1094.

that the Rule's other conditions and exceptions are impossible for almost all non-Mexican asylum seekers to satisfy. Their only real option is therefore to appear at a port of entry, even though § 1158(a)(1) guarantees asylum access "whether or not" at a port. The Rule is therefore straightforwardly unlawful under the Ninth Circuit's decision invalidating the prior entry ban. And in fact, the Rule is even harsher this time, because even at ports, it forces asylum seekers to wait for appointments, which are numerically limited and outright unavailable to many of the most vulnerable. The Rule thus effectively reimposes a stricter version of the prior entry ban.

In both its formal structure and its practical effect, the rule is inconsistent with the asylum statute. It should be vacated.

**A. The Rule's Three Asylum Eligibility Conditions Are All Contrary to the Statute.**

The Rule offers a supposed choice among three conditions to avoid the eligibility bar: port of entry, transit denial, or parole. But under clear precedent, none of the three conditions, if imposed as a standalone requirement for asylum eligibility, would be "consistent with" the asylum statute. 8 U.S.C. § 1158(b)(2)(C). They do not become consistent just because they are imposed in the alternative. Where each requirement is invalid "standing alone," "it follows that [the government] lacks the power to offer [asylum seekers] a choice between the[m]." *See New York*, 505 U.S. at 176 (holding that Congress could not force States to choose among independently-unlawful requirements); *see also, e.g.*, *Simmons v. United States*, 390 U.S. 377, 394 (1968) (where criminal defendant could not be forced to give up constitutional claim or waive privilege against self-incrimination, he could not be forced to choose between those supposed options).

**1.** The first condition that asylum seekers may satisfy to overcome the bar is to apply for asylum at a port of entry, after securing an appointment using CBP One. 88 Fed. Reg. at 31,317-18, 31,450-51. But this Court and the Ninth Circuit have held that DHS cannot require asylum seekers to enter at ports of entry, because § 1158(a)(1) allows any noncitizen who arrives in the United States "whether or not at a designated port of arrival" to seek asylum. *EBSC Entry Ban*, 993 F.3d at 669-70; *see id.* at 658 (Congress "mandated equity in its treatment of all refugees, however they arrived."); *EBSC Entry PI*, 354 F. Supp. 3d at 1112-13. This requirement is therefore illegal for the same reasons the prior entry ban was illegal. And in fact, the Rule's entry requirement is

even harsher than before.  Now, even at ports, people must have CBP One appointments, which are drastically limited in number and wholly inaccessible to many.  *See infra* Part II.B.1 (detailing CBP One barriers).  If DHS cannot "require[] migrants to enter the United States at ports of entry to preserve their eligibility for asylum," *EBSC Entry Ban*, 993 F.3d at 669, it certainly cannot limit asylum to a small subset of people who enter at ports.

**2.**   The second condition that asylum seekers can meet to overcome the bar is to apply for protection and receive a denial in a third country en route to the United States.  88 Fed. Reg. at 31,450-51.  This, too, is invalid under circuit precedent.  The Ninth Circuit has held that the agencies could not require asylum seekers to apply for protection and receive denials in transit, because Congress already "specifically addressed" the categories of people who are barred from asylum because they can seek protection in other countries.  *See EBSC Transit Ban*, 994 F.3d at 976-79 (discussing 8 U.S.C. § 1158(a)(2)(A), (b)(2)(A)(vi)); *see also EBSC Transit PI*, 385 F. Supp. 3d at 943-47.  Those two statutory provisions include critical guarantees to assure asylum seekers' safety—guarantees which the prior transit ban and the current ban jettison entirely.  *Id.*  The Rule's transit-denial requirement is therefore invalid because it "would make entirely superfluous the protection provided by the two safe-place bars in § 1158."  *EBSC Transit Ban*, 994 F.3d at 978.

**3.**   The Rule's third possible condition for overcoming the bar—at least for citizens of a few countries—is to apply for parole from abroad and receive permission to travel to the United States.  88 Fed. Reg. at 31,450-51; *see id.* at 31,325, 31,349 (programs exist for only five countries).  Like the others, this is a requirement the government has no power to impose.  The whole purpose of the Refugee Act was to "create a predictable and permanent admissions system" so that asylum seekers would not have to rely on "ad hoc" country-specific uses of "parole."  *Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1060 (9th Cir. 2017) (en banc) (detailing the history).  Congress therefore made asylum available "irrespective of [a] status" like parole.  8 U.S.C. § 1158(a)(1).  And it allowed asylum for anyone who is "physically present" or "arrives at" the border, rejecting the idea that people needed to seek advance permission from outside the country.  *Id.*  Congress specifically created a separate refugee admission system for people to apply for protection from abroad.  8 U.S.C.

§ 1157.  Requiring asylum seekers to first obtain parole would fly in the face of the congressional scheme.

Thus, each of the Rule's three supposed choices would be an illegal condition standing alone. The government cannot force asylum seekers to choose among them, since none of them is consistent with the asylum statute.  Nor do the Rule's narrow exceptions impact the analysis.  They apply only in "exceptionally compelling circumstances," like an "acute medical emergency," an "imminent and extreme threat" to life or safety, or "severe trafficking."  88 Fed. Reg. at 31,450-51; *see also id.* at 31,406 (CBP One exception only for "a narrow set of circumstances" at ports).  The transit ban was enjoined despite also containing narrow exceptions.  *See EBSC Transit PI*, 385 F. Supp. 3d at 935.  Minor exceptions like these have no impact on the Rule's legality.  If they did, an agency could resurrect any illegal rule just by adding some miniscule carveout.  *See, e.g.*, *Zheng v. Gonzales*, 422 F.3d 98, 119 (3d Cir. 2005) ("very narrow exception" did not impact rule's legality).

**B.  The Rule Reimposes an Even Harsher Version of the Entry Ban.**

In reality, the Rule does not offer any real choice at all.  Despite its complex structure, the Rule reduces to a reincarnation of the entry ban, albeit in an even more restrictive form.  Under the Rule, noncitizens arriving at the southern border have only one actual option to seek asylum, and that is to present at a port of entry—and even then, only with a CBP One appointment.  That violates the statute, which provides for asylum "whether or not" a person arrives "at a designated port of arrival."  8 U.S.C. § 1158(a)(1).  This renders the Rule unlawful regardless of the legality of the transit and parole conditions.

The Rule claims that it is "materially different" from the entry ban because asylum seekers can avoid the entry-based condition by choosing a different option.  88 Fed. Reg. at 31,378, 31,382. But the record shows that the Rule's other "pathways" for maintaining eligibility are illusory: They are unavailable to almost all asylum seekers at the border.  And with no other real options, the ban's application turns entirely on a person's manner of entry: If a person enters at a port (with an appointment), asylum eligibility is preserved; if they enter between ports, asylum is barred. Consequently, the Rule functions just like the first entry ban for covered asylum seekers, as the government has described it publicly.  *See* Dep't of Homeland Sec., Fact Sheet (May 10, 2023)

11

(explaining that "individuals who unlawfully cross the U.S. southwest border will be presumed ineligible for asylum" under new regulations).[3]  It is thus squarely controlled by the Ninth Circuit's decision invalidating that ban, *EBSC Entry Ban*, 993 F.3d 640, which held that DHS cannot require asylum seekers to enter at ports.  The agencies cannot evade that holding by adding illusory "alternatives."

The parole condition cannot be satisfied by virtually anyone subject to the Rule.  The Rule applies only at the southern land border and adjacent coastal areas.  88 Fed. Reg. at 31,450-51.  But participants in the parole programs discussed in the Rule cannot enter at the border.  They "must agree to fly at their own expense to an interior U.S. port of entry (POE)," i.e. an airport, "rather than entering at a land POE."  88 Fed. Reg. 1,279, 1,279 (Jan. 9, 2023); *see also, e.g.*, 88 Fed. Reg. 1,255, 1,256, 1,263 (Jan. 9, 2023) (requiring "air travel").  And people cannot be granted parole once they arrive in the U.S.-Mexico border region because the programs disqualify anyone who enters Panama or Mexico irregularly, *e.g.*, 88 Fed. Reg. at 1,255, as nearly all asylum seekers must do, *see, e.g.*, AR_4871-72; PC_22859.  Therefore, although these programs provide an additional way for some people to come to the United States, the programs are not a viable option for asylum seekers at the border.  It's as if the Rule included an exception for people who enter on tourist visas, even though the Rule only applies to people who enter "without documents sufficient for lawful admission." 88 Fed. Reg. at 31,450.  Parole is simply a separate way to enter the United States.  It has virtually no impact on the Rule's operation.

The transit-denial condition is similar.  During the year it was in force, the prior transit ban functioned as a near-total ban on asylum for non-Mexicans, barring asylum in over 98% percent of cases where it applied.  PC_39850 & n.29 (just 421 of 25,158 people subjected to transit ban met its transit-denial or trafficking exceptions).  In other words, it imposed a condition that almost no asylum seekers could meet.  The present Rule's transit-denial condition imposes the exact same requirement and will achieve the same result.[4]

---

[3]     https://www.dhs.gov/news/2023/05/10/fact-sheet-additional-sweeping-measures-humanely-manage-border.

[4] The near-impossibility of overcoming the transit bar presents another reason why that requirement is illegal.  *Compare supra* Part I.A.2 (explaining why transit-denial requirement is illegal on its

The reasons for this are clear.  The record shows that obstacles to pursuing protection are simply too great for most asylum seekers.  *See infra* Part II.B. (detailing this evidence); *EBSC Transit Ban*, 994 F.3d at 982 (rejecting view that transit countries were a "safe option" for most asylum seekers).  Asylum seekers face the ever-present threat of violence and abuse in transit countries, especially in the Mexican states where asylum seekers must wait for CBP One appointments or for Mexico to adjudicate their claims.  *Infra* at 17-20.  And transit countries' asylum systems are either underdeveloped, completely overwhelmed, or both.  *Infra* at 21.  They are unable to process even their existing applications, much less the sizeable increases in filings contemplated by the Rule's transit condition.  *Id.*; *see also EBSC Transit PI*, 385 F. Supp. 3d at 952-53 (transit ban failed to acknowledge that it would necessitate a "massive increase" in asylum claims in Mexico).  And in Mexico, administrative barriers mean that even people who apply for but are not granted protection often do not receive the "final denial" that the Rule requires.  *Infra* at 21.  It is therefore unsurprising that, as DHS's own data confirms, almost no asylum seekers (fewer than 2%) could satisfy the prior transit ban's requirements.

With the Rule's other "alternatives" unavailable to most asylum seekers, the only option left is to present at a port, just like the prior entry ban.  And even at ports, the Rule restricts asylum severely, by requiring appointments that only a small fraction of people can secure.  As a result, the Rule is controlled by the Ninth Circuit's decision invalidating the entry ban.  *See EBSC Entry Ban*, 993 F.3d 640.  An agency cannot re-enact an illegal policy just by using different terminology and adding illusory alternatives.  And courts regularly look to these "practical effects" to assess a rule's legality.  *Gill v. DOJ*, 913 F.3d 1179, 1185 (9th Cir. 2019); *see, e.g.*, *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 382-85 (D.C. Cir. 2002) (same); *Zheng*, 422 F.3d at 120 (statutory violation based on "the

---

face).  It is not "consistent with" § 1158 to impose a condition that, in practice, virtually no one can satisfy, which thereby eliminates asylum for most people.  Congress intended to make asylum broadly available "anywhere along the United States's borders."  *EBSC Entry Ban*, 993 F.3d at 669, 674.  While Congress made certain narrow exceptions, and permitted DHS to add similar ones, *see EBSC Transit Ban*, 994 F.3d at 977-78, Congress did not give DHS a free hand to make most people seeking protection ineligible for asylum.  Courts have applied the same principle in rejecting immigration rules that would "essentially reverse[] the eligibility structure set out by Congress." *Zheng v. Gonzales*, 422 F.3d 98, 119-20 (3d Cir. 2005) (policy rendered most parolees ineligible for adjustment); *see Succar v. Ashcroft*, 394 F.3d 9, 26 (1st Cir. 2005) (agency cannot "render[] ineligible most of the class that Congress rendered eligible").

regulation's effect"); *Texas v. United States*, 809 F.3d 134, 173-74 (5th Cir. 2015) (examining prior similar rule to determine how a new rule would operate in practice). Here, the Rule's effect is plain: For almost all asylum seekers, it reimposes an even harsher version of the same entry ban that this Court and the Ninth Circuit invalidated.

Thus, because of its operation in practice, the Rule straightforwardly contradicts § 1158(a)(1). Even if the Rule's other conditions were legal, the agencies cannot issue a rule that effectively forces asylum seekers to enter at ports.

## II.      The Rule Is Arbitrary and Capricious.

The Rule is arbitrary and capricious for at least four reasons. First, one of its main justifications for restricting asylum at the border—that other "pathways" are available—relies on factors that Congress did not intend the agencies to consider. Second, the Rule's basic premise that the supposed "pathways" are available to most asylum seekers is contradicted by uncontroverted record evidence. Third, the Rule depends on an assumption—that people barred by the Rule are less likely to have meritorious claims—which finds no support in the record, and which the Ninth Circuit has already rejected. Fourth, the agencies failed to adequately consider the impact of simultaneously-enacted, interrelated policies on the Rule's conclusions.

### A.      The Rule's Justification Relies on Factors That Congress Has Rejected.

The Rule justifies its dramatic restriction of asylum by asserting that asylum seekers have other "pathways" to protection *outside* of the U.S. asylum system at the border: A few people can get asylum in neighboring countries; people from a handful of countries can get parole through an approved program; some will get refugee status through overseas processing; others can get work visas. 88 Fed. Reg. at 31,332-33. But the agencies cannot curtail asylum just by pointing to other supposed options for immigrating. Congress intended to create a robust asylum system knowing full well that these other mechanisms existed, precisely because Congress determined that these other options did not satisfy the United States' humanitarian commitments and treaty obligations. *See, e.g.*, *INS v. Cardoza-Fonseca*, 480 U.S. 421, 436 (1987) (discussing treaty obligations underpinning asylum statute). So even if the other "pathways" mentioned in the Rule were widely available—which they are not, *infra* Part II.B.—this justification relies on factors that "Congress

has not intended [the agencies] to consider." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see, e.g.*, *Nat. Res. Def. Council, Inc. v. Daley*, 209 F.3d 747, 753 (D.C. Cir. 2000) (policy that "completely diverges from any realistic meaning" of the statute arbitrary and capricious); *Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 46 (D.D.C. 2020) (policy that conflicts with "the goals of the statute" is arbitrary and capricious) (quotation marks omitted).[5]

Congress has made asylum broadly available "anywhere along the United States's borders." *EBSC Entry Ban*, 993 F.3d at 669; *see* 8 U.S.C. § 1225(b)(1) (asylum procedures specifically for people at the border). Congress created this system in 1980 and has maintained it in subsequent legislation. *See* 8 U.S.C. § 1158 (amended in 1990, 1994, 1996, 2001, 2002, 2005, and 2008). Critically, this system has always coexisted with the supposed pathways the Rule identifies. The executive has long offered large parole programs on a country-specific basis. *See Bringas-Rodriguez*, 850 F.3d at 1059-60. The refugee admissions program was created alongside asylum in 1980 to allow people to apply for protection from abroad. 8 U.S.C. § 1157. Other countries in the region have long offered asylum as signatories to the same treaties that Congress implemented in the Refugee Act. *See INS v. Stevic*, 467 U.S. 407, 425-27 (1984) (discussing signatory obligations under international refugee treaties). The immigration laws have provided work-related and other visas for decades. *See, e.g.*, *Nat'l Ass'n of Manufacturers v. United States Dep't of Homeland Sec.*, 491 F. Supp. 3d 549, 566 (N.D. Cal. 2020). In creating an asylum system separate from all of these other mechanisms, Congress's necessary premise was that these other options were insufficient to satisfy our international obligations and protect people fleeing persecution. *See Bringas-Rodriguez*, 850 F.3d at 1059-60.

The Rule's rationale depends on exactly the opposite conclusion—that these other alternatives *are* "sufficient avenues for migrants with valid claims to apply for asylum," 88 Fed. Reg. at 31,329, and therefore justify dramatically reducing the availability of asylum at the border.

---

[5] This defect—that the Rule's main policy justification has been rejected by Congress—renders the Rule arbitrary and capricious. But the same defect also helps show why the Rule conflicts with the statute. As the Ninth Circuit has explained,"there is considerable overlap between a [statutory] challenge at *Chevron* step two and an argument that an agency's action is arbitrary and capricious." *Assoc. of Irritated Residents v. EPA*, 10 F.4th 937, 945 (9th Cir. 2021); *see EBSC Entry Ban*, 950 F.3d at 1273 (finding entry ban arbitrary and capricious under *Chevron* step two); *Dist. of Columbia v. USDA*, 444 F. Supp. 3d 1, 24 n.13 (D.D.C. 2020) (collecting cases).

That is an arbitrary and capricious justification. *See ANR Storage Co. v. FERC*, 904 F.3d 1020, 1026 (D.C. Cir. 2018) (invalidating agency action whose "justification" was not "reasonable"); *Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 971 (9th Cir. 2002) (invalidating rule whose "justification" was "directly contrary to one of [Congress's] fundamental purposes"). The government cannot justify a rule on the basis that Congress's core judgment was wrong.

## B. The Record Contradicts the Rule's Main Justification that Its Pathways Are Widely Available.

The Rule's main factual premise is that its several "lawful pathways"—CBP One appointments, parole approval, and asylum in transit countries—provide ample means for asylum seekers at the border to obtain protection. The preamble repeats this premise throughout and invokes it in response to dozens of comments. *See, e.g.*, 88 Fed. Reg. at 31,364-70, 31,375-82. Just as with the prior ban, this premise is contradicted by a "mountain of evidence" that the Rule fails to grapple with. *EBSC Transit Ban*, 994 F.3d at 981 (quoting *EBSC Transit PI*, 385 F. Supp. 3d at 955) (enjoining transit ban on this basis).

In reality, the Rule dramatically curtails asylum access because the "pathways" it identifies are not available to most asylum seekers. CBP One is not a new path to protection, but rather a drastic *reduction* in asylum access at ports of entry. The parole programs discussed in the Rule are available for only five countries and could be canceled or enjoined anytime. And as the Ninth Circuit has held, transit countries do not present a safe or available option for most asylum seekers. The Rule's characterization of itself is therefore deeply inaccurate, because in reality, it eliminates asylum for most people, both at and between ports of entry.

By disregarding all of this contrary evidence, the agencies "failed to consider an important aspect of the problem" and made a decision that "runs contrary to the evidence." *EBSC Transit Ban*, 994 F.3d at 982 (quoting *State Farm*, 463 U.S. at 43).

**1. *CBP One Appointments.*** The Rule touts the app as a new "pathway" to seek protection, *see, e.g.*, 88 Fed. Reg. at 31,397-99, 31,450-51, but, in reality, it sharply reduces asylum access at ports of entry. Previously, asylum was available to anyone who presented at a port. But because the app offers far too few appointments—just 1,250 per day border-wide, AR_2489—access is

restricted to a small fraction of those who would otherwise seek asylum.  *See* PC_ 24902 ("the most pressing issue is the insufficient number of appointments"), 24903-08 (documenting significant unmet demand for CBP One appointments in February 2023); AR_2485, 2489 (DHS projection of approximately 5,400 border encounters per day through September 2023 with the Rule in place).

That fraction will become far smaller if, as the Rule contemplates, asylum seekers who would have otherwise entered between ports now attempt to use CBP One.  DHS has increased the number of daily CBP One appointments since Title 42 ended, but the current 1,250 per day limit is still far too low and DHS has not indicated plans for a further increase.  *See* AR_2489.  The lucky asylum seekers who eventually get appointments in the CBP One lottery must wait weeks or longer in dangerous conditions.  The record amply documents people unsuccessfully trying for weeks or months to obtain CBP One appointments for exemptions from the Title 42 policy.  *E.g.*, PC_20360-61 (families waiting weeks without success), 21167 (wait times of "several months"), 34910-12 ("only two of more than 1,000 migrants got appointments in the first two weeks").

The northern Mexican cities where CBP One forces asylum seekers to wait "are among the most dangerous areas in the world."  PC_25090; *see also* PC_23693 (DHS citing evidence that "individuals awaiting their court hearings" under policy that returned asylum seekers to Mexico "were subject to extreme violence and insecurity at the hands of transnational criminal organizations").  In a 2022 study, large majorities of providers working with asylum seekers in the area reported that more than half their clients had been kidnapped, extorted, sexually assaulted, or raped near the border.  PC_21752.

Moreover, even if appointments were more widely available, the CBP One app imposes significant obstacles.  It is plagued with technological barriers and glitches that make it difficult or impossible for many asylum seekers to use.  The app's "geo-fencing" technology only allows people to make appointments while in northern and central Mexico, 88 Fed. Reg. at 31,399, leaving those who are unable to schedule appointments stranded in dangerous circumstances indefinitely.  *See, e.g.*, PC_20361-62, 31532-33 (documenting attacks on people waiting for appointments).  Many people lack stable internet service or cannot afford the sophisticated smartphone models needed to run the app.  PC_20662, 21093-94, 21170-71, 25460, 31896, 32317, 32973-74, 33006.  The app is

available only in English, Spanish, or Haitian Creole, and requires strong literacy skills.  PC_31531, 31898-900, 32315.  It frequently malfunctions, and its error messages are delivered only in English.  AR_6715; PC_21169-70, 25499-500, 31900, 32315-17, 32975-76.  And its facial recognition technology functions to discriminate against Black and Indigenous people and others with darker skin tones.  PC_21168-69, 25499-500, 34910-11.

Although the Rule has a limited exception to the CBP One requirement for people who present at ports, the preamble makes clear that the exception will almost never be available.  For example, it states that a person may not satisfy the exception even if they cannot afford a smartphone, or cannot read, or cannot understand the app's limited set of languages.  88 Fed. Reg. 31,401, 31,406.  And a person who attempts to assert this or the other exception runs a huge risk: If U.S. officials decide that the exception does not apply, the person may be immediately removed and barred from entry for years, even though they presented to officials believing that an exception applied.

Thus, because appointments are so limited, and because of the endless problems the app continues to generate, forcing people to use CBP One unreasonably decimates asylum access at ports.

**2.  *Parole Programs*.**  The parole programs cited in the Rule, while helpful to those who qualify, do little to preserve the asylum access that the *Rule* curtails.  Programs exist for only five countries, which means asylum seekers from most of the world do not have access.  *See* 88 Fed. Reg. at 31,325, 31,349 (programs for Ukraine, Cuba, Haiti, Nicaragua, and Venezuela only).  Excluded countries include many that are experiencing acute refugee emergencies right now.  *See, e.g.*, PC_22932-33 (Cameroon), 22955-57 (Colombia), 22973-75 (El Salvador), 22978-79 (Eritrea), 23014-15 (Honduras), 23158-59 (Sudan).  Even within the five countries, access is limited, because the programs require people to obtain passports, find U.S. sponsors, and pay for plane tickets, all of which are out of reach for many.  *See supra* Part I.B.  As explained, the four largest parole programs do not present any option for asylum seekers at the southern border where the Rule applies, because the programs require air travel and individuals in Mexico are nearly all disqualified due to their irregular entry into Panama or Mexico.  *See supra* at 12.  Moreover, the current parole programs are

completely discretionary and are not incorporated into the Rule.  *See* 88 Fed. Reg. at 31,370.  They could be rescinded (or enjoined) at any time.[6]  *See* 88 Fed. Reg. at 31,410 (recognizing that parole programs could end).

In short, while they are a positive development for those who benefit, the parole programs are categorically unavailable to asylum seekers from most countries and to nearly everyone at the border covered by the Rule.

**3.  *Transit Countries*.**  The agencies disregarded overwhelming evidence that obtaining asylum in transit countries remains unrealistic for most people, just like the last time this Court and the Ninth Circuit considered the issue.  *See EBSC Transit Ban*, 994 F.3d at 980 (holding transit ban arbitrary and capricious because record contradicted agencies' assumption that Mexico was a "feasible" or "safe option").  Transit countries are not remotely safe for most asylum seekers to transit through, let alone wait months or years for asylum decisions.  The Rule fails to identify a single country that is both safe for asylum seekers and equipped to handle any substantial increase in asylum applications.

The pattern of violence and exploitation against asylum seekers in Mexico is even more well-documented in the current record than it was for the transit ban.  Violent crime in the country has reached historic highs, and cartels "prey upon people migrating through Mexico."  PC_23079, 23082.  Such attacks are alarmingly common: nearly 13,500 instances of kidnapping, rape, torture, murder, and other violent attacks on asylum seekers in Mexico were documented in 2021 and 2022.  PC_30901; *see also* PC_76248-87 (cataloging crimes).  Central American asylum seekers in particular are in danger of being pursued into Mexico by the same persecutors they sought to flee.  AR_4881; PC_25090, 29741.

Crimes against asylum seekers in Mexico are rarely investigated or punished.  PC_23082.  When a Salvadoran asylum seeker tried to report her kidnapping and rape to Mexican police, officers told her they would not "accept her complaint because she was a migrant and 'migrants liked to be raped.'"  PC_31901.  When a Black Honduran asylum seeker tried to report that she had been

---

[6] *See Texas v. DHS*, 6:23-cv-7 (N.D. Tex. filed Jan. 24, 2023) (challenging parole programs for Cuba, Haiti, Nicaragua, and Venezuela), Dkt. 90 (scheduling expedited trial for June 2023).

kidnapped, beaten, and raped in front of her son, Mexican police "instead taunted her, asking her how much she would charge to give them a turn." PC_31902.

Mexican authorities themselves also victimize migrants. AR_4881; PC_23082, 32446; *see also, e.g.*, PC_22857, 29743-44, 32447, 33178 (discussing incidents). Women, LGBTQ+, and Black asylum seekers are particularly vulnerable. AR_4862 (women and Black migrants especially at risk of abuse by authorities); PC_22672 (Mexican police targeting Black asylum seekers); PC_29701-02, 29704-06 (Mexican officials target LGBTQ+ asylum seekers for extortion and violence); PC_29741 ("[m]any assaults" on women transiting Mexico "involve Mexican authorities"); PC_32769 (one-fifth of Haitian asylum seekers in Mexico surveyed in 2021 had been threatened, extorted, or beaten by police).

The record makes clear that people seeking asylum also face severe violence in Guatemala and other transit countries. The State Department reports that Guatemala "remains among the most dangerous countries in the world," with "widespread and serious" sexual and gender-based violence. PC_24105, 25150. Migrants transiting the country are abused, assaulted, and extorted by police and immigration authorities. PC_29447. Guatemala thus cannot provide asylum seekers "even minimal levels of safety and well-being." PC_26150. Similarly, Belize has "one of the highest per capita murder rates in the world," and rape and other violent crimes are common. PC_23728. The State Department likewise warns of extensive violence in Colombia, and reports that migrants there are subjected to forced labor with impunity. PC_23780-82, 34263. Refugee women in Colombia face especially frequent attacks. PC_29608. Ecuador presents similar dangers, PC_23232, 23829, with women and LGBTQ+ asylum seekers at particular risk, PC_22586, 34282. Other common transit countries are no safer. *E.g.*, AR_996 ("widespread and violent repression and human rights violations" in Nicaragua); PC_25181 (asylum seekers in Honduras suffer "abuse and sexual exploitation by criminal organizations"); PC_23875-76, 34188-89 (widespread violence in El Salvador); PC_21610 ("gender-based violence is present for girls, women, and LGBTIQ+ persons along the entire migratory route" from Panama through Mexico).

Transit countries also continue to have woefully inadequate asylum systems unequipped to process the applications they already receive.  Many transit countries have asylum systems that are so underdeveloped as to be effectively nonexistent.  *See, e.g.*, PC_25143, 26235, 26309, 29465 (Guatemala); PC_23478-80, 23483-86 (UNHCR data reflecting extremely low numbers of asylum grants in Belize, Colombia, Guatemala, and Honduras).  The asylum systems in the only two transit countries that process a meaningful number of claims—Mexico and Costa Rica—are already at a breaking point.  Costa Rica—a country of just five million people—already has ten times more asylum applicants per capita than the United States.  PC_29161-62.  Asylum seekers make up 4% of its population.  PC_30102; *see also* PC_23473-74 (from mid-2021 to early 2022, the number of Nicaraguan asylum seekers in Costa Rica doubled to 150,000).  As a result, Costa Rica's system is "under severe stress."  PC_23348.  Asylum seekers face a "years-long wait for an appointment" to even begin the process; one applicant's appointment was scheduled for 2030.  PC_30102, 30107.

Meanwhile, Mexico's asylum agency is "in a situation of near-breakdown," according to its director.  PC_22811.  The "overwhelmed" and underfunded agency has a quickly-growing backlog of cases.  PC_22855; *see* PC_22864 (174-fold caseload increase from 2011 to 2021, while funding increased just 2.5-fold); PC_23388-89 (applications rose from just under 1,300 in 2014 to nearly 130,000 in 2021).  At its peak in 2021, Mexico's asylum agency decided just 38,102 applications.  AR_5707.  That is less than a third of the number of applications it received that year.  *Id.*  And since then, the number of cases Mexico decided actually *fell* in 2022.  *Id.*  Even though Mexico already can only decide a fraction of the applications it receives each year, the Rule contemplates that tens of thousands more people will now apply for asylum in Mexico (or other already-overstrained countries).  *See* 88 Fed. Reg. at 31,410-11; *see also* PC_23388 ("[I]t is expected that the . . . rule will significantly increase the number of asylum applications filed in Mexico.").  Just as before, "[t]he Rule does not even acknowledge this outcome, much less suggest that Mexico is prepared to accommodate such a massive increase."  *EBSC Transit PI*, 385 F. Supp. 3d at 952.

Transit countries' restrictive policies and practices make the Rule's condition even less realistic.  Mexico imposes a harsh 30-day filing deadline that many asylum seekers cannot meet.  AR_4866; PC_21976, 22852, 33406.  Those who miss the deadline do not have their claims

adjudicated but do not receive a denial either. *See* PC_20781, 23430. Indeed, the thousands of people currently at the U.S.-Mexico border are likely well past the 30-day deadline. Mexico also has asylum offices in only ten places, many situated in the country's poorest and most dangerous states, and an application is considered abandoned if someone either leaves the state or misses weekly check-ins where they applied. *See* AR_4877; PC_21965-66, 21980-83, 22858, 23388, 33410. These policies mean that thousands of people who try to apply in Mexico get neither asylum *nor* final decisions denying their claims. Even those who pursue applications in Mexico are regularly refouled to persecution. PC_21587, 21962, 22504, 22856, 23433-34; *see also, e.g.*, PC_22605, 33450 (similar refoulement by Ecuador and Guatemala). And those who make it through this gauntlet and receive final denials may be deported from Mexico before they can reach the United States. *See* PC_21961-62 (describing Mexico's "mass detention and deportation of migrants"); *see also* AR_4881, 4889; PC_23318-19, 22665.

Rather than confront these glaring facts about transit countries, the agencies inaccurately dismiss them as "generalizations," and persist in assuming that these countries provide viable options for asylum seekers. 88 Fed. Reg. at 31,410-11. For example, instead of grappling with the specific deficiencies in Mexico's ability to provide safe refuge, the Rule cites the recent increase in asylum applicants there, on the premise that those applicants "felt safe enough to apply for asylum in Mexico." *Id.* at 31,414-15; *see* AR_5707 (three-fold increase in applicants from 2020 to 2021); *compare EBSC Transit PI*, 385 F. Supp. 3d at 952 (agencies likewise defended transit ban based on increased applications in Mexico). But more applications do not signal that conditions in Mexico have meaningfully improved. The marked increase in applicants in 2021 and 2022 over earlier years happened only after the Title 42 policy effectively ended access to asylum in the United States in 2020, leaving many asylum seekers trapped in Mexico with no choice but apply there—"even if they do not feel safe in Mexico," AR_4874. The record also makes clear that many people file asylum applications in Mexico just to obtain documents they hope will reduce their risk of refoulement while they travel onward. AR_4874; PC_22811, 23442. And as explained, Mexico has been utterly unable to keep pace with the increase so far, which does not include the further spike in applications that the Rule contemplates.

Similarly, the Rule highlights Colombia and Belize as two other transit countries that have "made significant strides" in providing protection, citing a Colombian temporary status program for Venezuelans and an amnesty program in Belize.  88 Fed. Reg. at 31,411.  It elsewhere notes a regularization program in Costa Rica.  *Id.* at 31,416.  But the eligibility cut-offs for all three programs have passed.  PC_22823 (Costa Rica's program available to people who sought asylum there by September 2022); PC_22825 (Belize's program available to those who sought asylum there by March 2020); PC_23398, 23400 (Colombia's program available to people who entered the country legally by January 2023 or others who entered by January 2021).  They do not indicate that these countries can provide refuge to asylum seekers going forward.

The record thus makes clear that the three main "pathways" the Rule invokes are plagued with problems and unavailable to most asylum seekers.  As with the previous asylum bans, the agencies have "failed to consider" these problems and instead made assumptions that "run[] counter to the evidence."  *EBSC Transit Ban*, 994 F.3d at 983.

In response to these defects, the Rule's circular refrain is that the failures of one pathway are curable by the other pathways.  *See, e.g*., 88 Fed. Reg. at 31,412, 31,415 (people who are not safe in transit countries can seek parole or use CBP One); *id.* at 31,408, 31,327 (people who cannot seek parole can use CBP One); *id.* at 31,370 (if parole programs end, those nationals can use CBP One); *id.* at 31,340 (pointing to "multiple ways" to rebut the presumption).  Those pivots amount to a refusal to grapple with contrary evidence in the record.  If the facts show that each "pathway" is narrow, unsafe, and inaccessible for many asylum seekers, it cannot be enough for the agencies to respond that other narrow, unsafe, and inaccessible pathways are also available.

**4.  *Particularly Vulnerable Asylum Seekers*.**  The irrationality of this approach is underscored by the Rule's responses to concerns raised about the most vulnerable asylum seekers, such as women and LGBTQ+, Indigenous, and Black people.  These groups together constitute a large share of all asylum seekers and face heightened barriers to accessing all three "pathways."  *See, e.g.*, AR_4862, 4883; PC_90-93, 20232, 20620, 20669, 22586, 22671-72, 24935, 26352, 29608, 29701, 29741, 31901-02, 32769, 33348, 34282, 75948, 76254-55, 76278 (detailing increased vulnerability to violence and discrimination).  Yet the Rule utterly failed to consider its

23

uniquely harmful impact on them.  *See EBSC Transit Ban*, 994 F.3d at 983-84 (holding ban arbitrary and capricious for failure to adequately grapple with its effect on a group that faces "special vulnerability").

In response to comments about the Rule's disproportionate impact on women and LGBTQ+ people due to increased risk of harm in transit countries and while waiting for CBP One appointments, the Rule simply says that they should use a "pathway[] . . . that does not involve a dangerous journey to the United States."  88 Fed. Reg. at 31,351.  But the Rule fails to acknowledge that, for most women and LGBTQ+ people, the Rule contains no viable alternative.  As the agencies concede, *id.*, the transit countries that make the journey dangerous cannot be safe havens for these asylum seekers.  And the parole programs apply only to a select few people in a select few countries.  If a person is not from one of those countries and cannot safely wait in Mexico, the Rule leaves them without any options at all.

Similarly, commenters and legislators raised concerns about the Rule's "particularly detrimental" and "discriminatory impact" on Black and Indigenous asylum seekers, because they face increased violence and discriminatory treatment in transit countries, and because of the biased limitations of CBP One.  88 Fed. Reg. at 31,349, 31,352-53; *see also, e.g.*, AR_1258-64 (letters from U.S. Senators addressing racial bias in CBP One's facial recognition function); AR_4881 (Black and Indigenous asylum seekers face racism from Mexican officials); PC_90 (Black and Indigenous asylum seekers targeted in Mexico); PC_22671 (anti-Black racism by Mexican officials); PC_69080-89 (documenting experiences of Black migrants).  The agencies again brushed aside concerns raised about this group's ability to access any of the pathways.  However, when confronted with facts that so seriously undermine the Rule's core assumptions, agencies must do more than "nod to concerns raised by commenters only to dismiss them in a conclusory manner." *Centro Legal de la Raza v. EOIR*, 524 F. Supp. 3d 919, 958 (N.D. Cal. 2021) (cleaned up).

### C. The Record Does Not Support the Rule's Assumption that People Who Enter Between Ports or Pass Through Transit Countries Without Seeking Protection Have Weaker Asylum Claims.

Just like the previous transit ban, the Rule arbitrarily assumes that applicants subject to its bar are "not likely to have a meritorious asylum claim."  *EBSC Transit Ban*, 994 F.3d at 980

(invalidating transit ban on this basis).  The Rule explains that, by barring people who did not apply in transit countries and who do not wait for an appointment at a port, the Rule allows immigration courts "to focus on those claims most likely to warrant protection." 88 Fed. Reg. at 31,381 (citing NPRM, 88 Fed. Reg. at 11,742); *see id.* at 31,329, 31,335-36, 31,343, 31,387 (focus on excluding people who likely do not have "meritorious" claims); NPRM, 88 Fed. Reg. at 11,737 ("[T]hose who would circumvent orderly procedures and forgo readily available options may be less likely to have a well-founded fear of persecution than those individuals who do avail themselves of an available lawful opportunity.").

This assumption continues to be arbitrary for a host of reasons.  There simply "is no evidence in the record to support the Rule's assumption." *EBSC Transit Ban*, 994 F.3d at 982.  The agencies keep extensive data about people's migration histories, means of entry, and case outcomes.  And yet the Rule points to no evidence showing that people who transit without seeking protection, or people who enter between ports, are less likely to have meritorious claims.

This assumption also "ignores extensive evidence in the record documenting the dangerous conditions" and dysfunctional asylum systems in transit countries, which "would lead [noncitizens] with valid asylum claims to pursue those claims in the United States." *Id.* at 983.  Indeed, a "long line of cases" in the Ninth Circuit recognizes that "the failure to apply for asylum in a [third] country through which [a noncitizen] has traveled has no bearing on the validity of [a noncitizen's] claim for asylum in the United States." *Id.* at 982-83 ("preference for asylum in the United States rather than Guatemala or Mexico is irrelevant to the merits"); *see EBSC Entry Ban*, 993 F.3d at 671 (entering between ports "says little about the ultimate merits of [an] asylum application").

### D. Defendants Failed to Consider the Impact of Interrelated Border Processing Policies.

Finally, Defendants "entirely failed to consider an important aspect of the problem" by neglecting to consider how this Rule—and their purported justifications for it—interacts with other contemporaneous and interrelated policy changes. *State Farm*, 463 U.S. at 43.  A rule that "bas[es] its decision on a premise the agency itself has already planned to disrupt is arbitrary and capricious," particularly when "contemporaneous" and "closely related" policy changes are implicated.

*Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011). In other words, an agency must consider separate policy changes made "by the same agency, at the same time, on overlapping topics." *Immigrant Legal Res. Ctr. v. Wolf*, 491 F. Supp. 3d 520, 541 (N.D. Cal. 2020).

Defendants made a number of interrelated policy changes to asylum processing close in time to the Rule's effective date. For example, DHS decided to resume the practice of conducting some credible fear interviews in Customs and Border Patrol ("CBP") custody and later shortened the notice period for such interviews from 48 to 24 hours. *See* AR_2188. The agencies also implemented a policy of removing certain non-Mexican nationals in expedited removal to Mexico. 88 Fed. Reg. at 31,317 n.21; *see also infra* at 29 (discussing recent DHS decision to cease implementing another asylum processing regulation, 87 Fed. Reg. 18,078 (Mar. 29, 2022)). These separately-adopted changes impact the agencies' justifications for the Rule, but the agencies did not consider their interaction with the Rule at all.

For instance, the Rule relies on another erroneous premise that stricter asylum screening at the border is necessary to address the supposedly high credible fear interview ("CFI") passage rate. *See* 88 Fed. Reg. at 31,330. Critically, however, the agencies did not consider the compounding effect of conducting many of these interviews in CBP custody and within 24 hours of asylum seekers' arrival. This is a significant oversight, as rapid CFIs in CBP custody make it extremely difficult for asylum seekers to present their claims due to poor conditions of confinement, inadequate access to counsel and basic information about the process, and lack of opportunity to adjust physically or prepare even minimally for the high-stakes interview. *E.g.*, PC_31507-09, 32980-82. Evidence from the policy's prior iteration shows that the CFI passage rate for asylum seekers interviewed in CBP custody was significantly lower than that of the general population. 88 Fed. Reg. at 31,362. With both policies now in place, many asylum seekers not only have to confront the Rule's eligibility bar, but also must to do so under even more challenging conditions. Although that policy's reinstatement was announced after the close of the Rule's comment period, some commenters raised concerns that it might be revived and stressed the harmful cumulative impact of the two policies. In their response, the agencies refused to consider the other policy's intersection with Rule and simply stated that it was outside the scope of the Rule. *Id.* at 31,355, 31,363. But

where a key justification for the Rule is the purported high CFI passage rate, simultaneously-enacted policies that also predictably lower that rate are directly relevant.

The agencies also failed to adequately address the Rule's interaction with DHS's separate decision to begin executing the expedited removal orders of certain third country nationals to Mexico instead of their countries of origin. *See* 88 Fed. Reg. 31,317, n.21 (citing AR_4631-32, "The White House, Mexico and United States Strengthen Joint Humanitarian Plan on Migration" (May 2, 2023)). That unprecedented policy allows DHS to more quickly remove individuals from countries like Haiti, Nicaragua, Venezuela, and Cuba to which expedited removals have recently proven difficult. *See, e.g.*, 88 Fed. Reg. at 11,711 (challenges repatriating citizens of Venezuela and Nicaragua); 88 Fed. Reg. at 1,259 (DHS able to repatriate only small number of Nicaraguans leading to longer periods in custody); 88 Fed. Reg. at 1,270-72 (challenges to repatriating Cuban nationals and resulting pressure on DHS resources); 88 Fed. Reg. at 1,247-48 (same for Haitian nationals). The agencies justified the need for the Rule's eligibility bar based in part on limited detention capacity and overcrowding in border facilities. *See* 88 Fed. Reg. 31,363; 88 Fed. Reg. 11,715. Yet the agencies entirely failed to consider that the third-country removal policy would necessarily address the same issues, by leading to shorter periods in custody for thousands of noncitizens.

Courts in this District and elsewhere have held similar failures to be arbitrary and capricious. *See, e.g.*, *Immigrant Legal Res. Ctr.*, 491 F. Supp. 3d at 541 ("By failing to consider the combined impact of [two related rules regarding DHS fees], DHS either failed to consider an important aspect of the problem and disregarded 'inconvenient facts' about the combined impact of these rules, or DHS reached a conclusion that defies common sense."); *Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 965 (D. Md. 2020) (criticizing DHS for failing to consider "the cumulative impact of [two different] rules on bona fide asylum seekers"). In failing to assess the combined impact of these intertwined policies, Defendants violated a fundamental tenet of reasoned decision-making.

### III.    The Rule Is Procedurally Defective.

For at least three reasons, the agencies violated the APA by failing to "provide the public with a *meaningful* opportunity to comment on the proposed provisions."  *See Hall v. EPA*, 273 F.3d 1146, 1162 (9th Cir. 2001) (emphasis added) (cleaned up).

First, the agencies provided only an abbreviated 30-day comment period, which courts in this District have repeatedly held is generally too "short" for a rule like this one that makes significant and sweeping changes.  *See Pangea Legal Servs. v. DHS*, 501 F. Supp. 3d 792, 818-19 (N.D. Cal. 2020); *California ex rel. Becerra v. Dep't of the Interior*, 381 F. Supp. 3d 1153, 1177 (N.D. Cal. 2019); *see also Centro Legal de la Raza v. EOIR*, 524 F. Supp. 3d 919, 953-55 (N.D. Cal. 2021).  This short period was a particular obstacle here given the Rule's enormous, complex changes that impact matters of life or death for people fleeing persecution.  *See* 88 Fed. Reg. at 31,433, 31,447.  The Rule implicates the asylum systems and security situations in a dozen countries.  It was impossible for commenters to gather and analyze comprehensive information on these and other topics in only 30 days.  *See, e.g.*, AR_6669-76 (more than 170 organizations requesting additional time and specifying how it would allow them to more effectively explain the Rule's devastating effects on people seeking asylum); PC_31497-99 (Plaintiff American Gateways), 32363-64 (Plaintiff ImmDef), 32713 n.10, 32743 (Plaintiff Tahirih).

Second, the harm from the deficient comment period was compounded by the agencies' closely related, extensive policy changes, some of which they initiated after the comment period closed.  *See supra* Part II.D.  As explained above, the agencies' revival of CFIs in CBP custody, which occurred after the comment period closed, provides a stark example of the consequences of the agencies' piecemeal approach.  Most commenters on the Rule were unable to address this concerning intersection because they did not know the CBP-custody policy would soon be reinstated.  And the late-breaking announcement of the CBP-custody interviews allowed the agencies to dismiss the few comments raising the potential for compounding harms as outside the scope of the Rule.  88 Fed. Reg. at 31,362-63.

Likewise, just days after the close of the comment period, the agencies announced an indefinite pause on a different regulation issued in March 2022,[7] which permits asylum officers, rather than just immigration judges, to adjudicate the asylum applications of people who were subject to expedited removal and passed their CFIs.  *See* 87 Fed. Reg. 18,078, 18,090 (Mar. 29, 2022).  This major policy shift was not yet public during the comment period and, in fact, DHS continued to tout the 2022 rule as a centerpiece of the agencies' approach to asylum.  *See* AR_ 1252. As a result, commenters were unable to address the agencies' decision to abandon that policy in favor of the Rule's drastically different and significantly more harmful approach.

Courts have enjoined other immigration rules on this same ground, where, like here, agencies issued "numerous intertwined" and significant policy changes in a piecemeal manner that "directly intersect" with the Rule.  *Centro Legal*, 524 F. Supp. 3d at 958, 962.  In doing so, the "true impact" of the Rule was "obscured and the public was deprived of a meaningful opportunity to comment." *Id.* at 962; *see also Pangea Legal Servs.*, 501 F. Supp. 3d at 821 (similar "staggered" policymaking in which "the full impact of a [r]ule was not clear until after the comment period").

Third, the agencies failed to provide the public with critical data underpinning the Rule. "Integral to an agency's notice requirement is its duty to 'identify and make available technical studies and data that it has employed in reaching the decisions to propose particular rules.'" *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006) (quoting *Solite Corp. v. EPA*, 952 F.2d 473, 484 (D.C. Cir. 1991)).  Nor does the APA "allow[] an agency to cherry-pick" studies or data for public comment.  *Am. Radio Relay League v. FCC*, 524 F.3d 227, 237 (D.C. Cir. 2008). After all, "'[i]t is not consonant with the purpose of a rule-making proceeding to promulgate rules on the basis of . . . data that, to a critical degree, is known only to the agency.'"  *Id.* (quoting *Portland Cement Ass'n v. Ruckleshaus*, 486 F.2d 375, 393 (D.C. Cir. 1973)).

That is just what the agencies did here.  The agencies' asserted need for the Rule rested on their "anticipation of a potential surge in migration at the southwest border . . . following the termination of" Title 42.  88 Fed. Reg. at 31,314.  The agencies' sole evidence for that "surge"

---

[7] Hamed Aleaziz, Signature Biden Asylum Reform Policy is Now on Hold, L.A. Times (Apr. 12, 2023), https://www.latimes.com/politics/story/2023-04-12/biden-asylum-processing-rule-pause.

29

comes from an analysis by the Office of Immigration Statistics ("OIS") of DHS's own "Southwest Border Planning Model." *Id.* at 31,316 & n.14; *see also* 88 Fed. Reg. at 11,705 & n.11. But the NPRM did not provide the public with that OIS analysis, the planning model underlying it, or the data the model used. The agencies instead hid the ball, preventing the public from assessing the key evidence purportedly justifying the Rule. That is a straightforward violation of the APA.

## IV.    Plaintiffs Have Standing to Challenge the Rule.

The Ninth Circuit has held that organizations in the exact position as Plaintiffs had Article III standing to challenge the prior entry and transit bans because those rules forced them to divert resources and lose clients, threatening their "core mission and their organizational funding." *EBSC Transit Ban*, 994 F.3d at 975; *see EBSC Entry PI*, 354 F. Supp. 3d at 1109-10 (same); *EBSC Transit PI*, 385 F. Supp. 3d at 937 (same).

The present Rule causes Plaintiffs these same injuries. It diverts their resources and frustrates their shared mission of serving asylum seekers by making their representation costlier and more time- and labor-intensive. *See* Smith Decl. (EBSC) ¶¶ 4-15, 18-20; Alvarez Decl. (CARECEN) ¶¶ 4-7, 11-16; Garza Decl. (Tahirih) ¶¶ 5-10, 12-23; Calonje Decl. (NCLR) ¶¶ 6-10, 13-18, 20-31; Toczylowski Decl. (ImmDef) ¶¶ 5-15, 18, 36-37; Yang Decl. (American Gateways) ¶¶ 3, 7-14, 17-25; *see also EBSC Entry Ban*, 993 F.3d at 663 (holding that the organizations established that the entry ban has "'perceptibly impaired' [their] ability to perform the services they were formed to provide") (citation omitted). Accordingly, Plaintiffs have standing under *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). The Rule also costs Plaintiffs clients, which in turn costs several of them funding, either because their funding is place-specific and the Rule will prevent clients from reaching them, or because "a large portion of their funding [is] tied to the number of asylum applications pursued." *See EBSC Transit Ban*, 994 F.3d at 974; Smith Decl. (EBSC) ¶¶ 16-22; Alvarez Decl. (CARECEN) ¶¶ 8, 13-16; Garza Decl. (Tahirih) ¶¶ 16-26; Toczylowski Decl. (ImmDef) ¶¶ 32-40; *see also* Yang Decl. (American Gateways) ¶ 28. Those injuries likewise establish standing. *See EBSC Transit Ban*, 994 F.3d at 974; *EBSC Entry Ban*, 993 F.3d at 663-64.

**CONCLUSION**

The Court should grant Plaintiffs' motion for summary judgment and vacate the Rule.

Dated: June 5, 2023

Lee Gelernt*
Omar Jadwat*
Anand Balakrishnan**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
lgelernt@aclu.org
ojadwat@aclu.org
abalakrishnan@aclu.org

Melissa Crow*
CENTER FOR GENDER & REFUGEE
STUDIES
1121 14th Street, NW, Suite 200
Washington, D.C. 20005
T: (202) 355-4471
F:  (415) 581-8824
crowmelissa@uchastings.edu

Anne Peterson (SBN 258673)
Blaine Bookey (SBN 267596)
Julie Bourdoiseau (SBN 340462)
Karen Musalo (SBN 106882)
CENTER FOR GENDER & REFUGEE
STUDIES
200 McAllister Street
San Francisco, CA  94102
T: (415) 610-5729
F: (415) 581-8824
petersonanne@uchastings.edu

Respectfully submitted,

/s/ Katrina Eiland
Katrina Eiland (SBN 275701)
Morgan Russell (SBN 296137)
Spencer Amdur (SBN 320069)
Oscar Sarabia Roman (SBN 341385)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
keiland@aclu.org
mrussell@aclu.org
samdur@aclu.org
osarabia@aclu.org

Keren Zwick*
Richard Caldarone*
Colleen Cowgill (SBN 321542)
Mary Georgevich*
NATIONAL IMMIGRANT JUSTICE
CENTER
224 S. Michigan Ave., Suite 600
Chicago, Illinois 60604
T: (312) 660-1370
F: (312) 660-1505
kzwick@heartlandalliance.org
rcaldarone@heartlandalliance.org
ccowgill@heartlandalliance.org
mgeorgevich@heartlandalliance.org

Michelle (Minju) Y. Cho (SBN 321939)
AMERICAN CIVIL LIBERTIES UNION OF
NORTHERN CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
T: (415) 621-2493
F: (415) 255-1478
mcho@aclu.org

*Attorneys for Plaintiffs*

*Admitted Pro hac vice*

*\*\* Application for pro hac vice admission forthcoming*