# DECLARATION OF CAMILA L. ALVAREZ, LEGAL DIRECTOR, CENTRAL AMERICAN RESOURCE CENTER

I, Camila L. Alvarez, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I would testify competently and truthfully to these matters.

2. I am the Legal Director for the Central American Resource Center ("CARECEN"). CARECEN is a non-profit organization that offers low-cost immigration legal services, community education programs, and advocacy and organizing to achieve fair and more inclusive immigration, education, and labor laws and policies in Los Angeles, Van Nuys, and San Bernardino.

3. CARECEN is a 501(c)(3) nonprofit corporation, incorporated in Los Angeles, California. Our main office is located at 2845 W. Seventh St., Los Angeles CA 90005.

4. CARECEN's mission is to empower Central Americans and all immigrants by defending human and civil rights, working for social and economic justice, and promoting cultural diversity. Since its founding in 1983, when thousands of Central Americans fled the brutality of civil war, CARECEN has worked to change unjust immigration laws, provide lawful status for immigrants, and foster community activism on issues such as education reform, workers' and immigrants' rights, economic justice, and community strengthening.

5. As part of its mission, CARECEN (1) provides and manages legal immigration services; (2) educates immigrant communities; and (3) organizes and advocates on behalf of better immigration policies. *First*, CARECEN provides high-quality, affordable immigration legal services to clients in the Los Angeles, Van Nuys, and San Bernardino areas. These services include affirmative asylum cases, removal defense, and assistance in applying for naturalization, Temporary Protected Status ("TPS"), relief under the Violence Against Women Act ("VAWA"),

U and T visas, adjustment of status (green card), Special Immigrant Juvenile Status ("SIJS"), Deferred Action for Childhood Arrivals ("DACA"), and family-based petitions. We provide immigration services at our headquarters in central Los Angeles, a permanent office in the San Fernando Valley (Van Nuys), a permanent office in San Bernardino, as well as 18 other offsite locations throughout Los Angeles and surrounding Counties, where we offer immigration counseling and legal services on a weekly, bi-weekly, or monthly basis. CARECEN also serves as program administrator for another affirmative asylum program in which applicants are represented by attorneys from the nonprofit organization Al Otro Lado. *Second*, CARECEN educates immigrants through a number of programs for children, youth, and adults. These initiatives include citizenship classes, trainings to develop organizing and advocacy skills, and workshops to facilitate the integration of immigrants into their communities. We provide information on changes in immigration law to the community at our offices and through presentations at various locations around Southern California. We operate a day laborer center that provides information and job skills training to workers. We also operate a parent and youth center, and provide academic enrichment and college preparation support to youth.

6. *Third*, CARECEN helps organize immigrant communities to advocate on behalf of their rights on specific policy items. Advocacy activities include legislator visits, forums to educate voters, and marches in support of particular policy changes.

7. The CARECEN legal department was created over three decades ago for the purpose of providing legal advice and representation to asylum seekers who fled violence in Central America. Over the years, we have provided legal counseling and pro se asylum application preparation assistance to thousands of individuals, while providing direct representation to hundreds. As a key part of its mission, CARECEN continues to provide affirmative and defensive

representation for individuals applying for asylum. We currently represent approximately 100 individuals who are applying for asylum. We are litigating a majority of these cases "defensively" in removal proceedings. We also represent several individuals with "affirmative" asylum applications—*i.e.* persons not in removal proceedings who filed their applications with the United States Citizenship and Immigration Services ("USCIS") Asylum Office. Approximately 90 percent of these 100 asylum applicant clients are individuals who entered the United States at the southern border between ports of entry after transiting through at least one other country after leaving their country of origin.

8. Funding for our asylum cases is based in large part on the number of cases we handle per year, and the number of cases we anticipate serving. For instance, the California Department of Social Services ("CDSS") is one of our largest funding sources for our organization. The state sets a flat rate for representing a client. We receive approximately $2,000 for representing a client in an affirmative application process with USCIS and $7,000 for representing a client in removal proceedings. We also receive funding from RepresentLA, which awards us approximately $412,388 per year to fund the salary of two of our staff attorneys, and partially fund the salary of a managing staff attorney, to work on 30 to 45 active cases per attorney in removal proceedings. Funding from these sources does not cover the full cost of our legal services, and it does not increase when we have to expend more time on the removal cases, such as when the case is more complex and time-intensive than average or when an appeal is taken.

9. We currently have approximately 18 staff members who handle affirmative and defensive asylum cases. These staff members carry out legal intakes, work with clients to fill out paperwork, help clients collect relevant evidence for their case, prepare clients for interviews and hearings, and represent clients in affirmative asylum interviews and in removal proceedings. Our

legal staff have also prepared prospective asylum, withholding of removal, and Convention Against Torture applicants for reasonable and credible fear interviews, as well as representing individuals in those interviews.

10. The new Department of Justice ("DOJ") and Department of Homeland Security ("DHS") Final Rule titled Circumvention of Lawful Pathways ("Rule") will seriously frustrate CARECEN's mission, divert organizational resources, and cause irreparable harm to the organization.

11. First, CARECEN'S mission to effectively represent asylum seekers would be frustrated, particularly as it relates to those who entered between ports of entry or without a CBP One appointment after transiting through at least one country. We would be unable to assist many of these asylum seekers in submitting their asylum applications affirmatively to USCIS, because nearly everyone who enters between ports of entry would no longer be eligible for asylum. Additionally, this would also affect CARECEN's representation of individuals seeking asylum in removal proceedings. For example, CARECEN currently represents approximately 80 clients who are applying for asylum in removal proceedings. Going forward, CARECEN would be forced to instead assist individuals who are subject to the new Rule—likely 90 percent of our clients—in applying for withholding and Convention Against Torture Act ("CAT"). Compared to asylum applications, withholding and CAT applications require meeting a higher evidentiary standard, and often require more time and greater legal resources. CARECEN has firsthand experience with the additional resources it takes to litigate withholding and CAT cases. In the past, our attorneys have occasionally represented detained clients who are ineligible for asylum and only eligible for withholding and CAT protection for other reasons, and have had to devote significantly more resources to these cases as compared to asylum cases. Similarly, because the evidentiary higher

is standard for withholding and CAT is higher, the Rule will also likely lead to greater number of losses in immigration court, and the need to file and litigate more appeals.

12. Moreover, in asylum cases, derivative applicants such as the principal applicant's spouse and children can all be included on one asylum application, such that both the principal applicant and all the derivative family members are granted asylum together if the application is granted. However, this is not true for withholding and CAT cases. Spouses and children cannot be included as derivatives on withholding and CAT applications. If just one parent in a family consisting of a married couple and their children applies for and is granted withholding or CAT protection, their spouse and children are not protected. This means that every member of a family must submit their own withholding and CAT applications. Therefore, when CARECEN represents families—which we currently do in 10 percent of our asylum cases—we would have to submit additional withholding and CAT applications for every family member. This would require significant additional staff time preparing and litigating each case, including preparing separate evidence and putting on witnesses in each separate case. The additional staff time required to handle such cases would require diverting resources from other critical areas of work. Our other legal service units, including our Survivors of Violence Unit (representing VAWA, U Visa, and T Visa applicants), are already working at capacity. Diverting the time of experienced attorneys in these units to provide support to individuals applying for withholding and CAT protection would place enormous strain on these critical programs.

13. The new Rule would also put financial strain on our organization. First, as to affirmative asylum representation, the Rule will force CARECEN to expend additional time and resources in its legal intake process to screen potential clients who entered between ports after transiting through at least one country to assess whether they have a viable argument that they

qualify for one of the Rule's narrow and difficult-to-satisfy exceptions, and therefore have a chance of remaining eligible for asylum. For many of those who have no viable argument for an exception, CARECEN would likely be unable to assist them in applying for asylum affirmatively. And for those who we believe may have a viable argument for one of the Rule's narrow exceptions and are able to take on as affirmative asylum clients, it will take significant additional time for our legal staff to work with those clients to gather evidence and prepare arguments concerning the exceptions. All of this would mean that CARECEN will be able to represent fewer clients applying for asylum affirmatively. The Rule will thus jeopardize our funding from CDSS for affirmative asylum representation.

14. It would also reduce the funding that we receive as program administrator for affirmative asylum representation provided by Al Otro Lado—whose attorneys will be able to represent fewer affirmative asylum applicants for all of these same reasons.

15. Additionally, the new Rule will also strain CARECEN's work for clients in removal proceedings. For example, CARECEN will spend more time and resources for asylum seekers who might qualify under one of the Rule's exception and thus would make the cases more burdensome. For those clients who are found ineligible for asylum under the Rule, we will then assist them in applying for withholding of removal and relief under CAT. As mentioned above, for much of its work in removal proceedings, CARECEN receives a flat fee regardless of the time spent on a particular case. Because withholding and CAT cases are more time- and resource-intensive than asylum cases, the Rule's effect of barring many future clients from asylum eligibility—such that they must seek withholding and CAT protection instead—would create a greater financial loss in these cases. In other words, we would likely receive the same funding, but have to devote more staff hours per case. We would have to devote significant additional

resources toward appealing cases for clients who would not meet the higher legal standards for withholding and CAT protection, but would have been eligible for asylum but for the Rule. The same attorneys who provide affirmative and defensive asylum representation would represent these clients on appeal. This would significantly limit their availability to represent asylum applicants and clients in other types of cases.

16. Moreover, CARECEN would have to divert significant resources in other respects because of the new Rule. This would include devoting staff time and organizational resources to fully understanding the new Rule's policy changes and implications for our practice, its impact on the communities we serve, and subsequently training our staff and educating and advising our clients, prospective clients, and the immigrant community, accordingly. CARECEN provides immigration information to the community through presentations at our offices and various other locations. We also operate a hotline and our receptionists provide general information to the immigrant community. The new Rule will create considerable confusion in the immigrant communities we serve, generating significant inquiries at our offices and on our hotline and requiring workshops to address and explain the changes to the community. CARECEN will expend significant resources to adjust to this new regulatory landscape, and likely significantly reduce the number of clients we can assist.

17. Finally, CARECEN is also harmed by the government decision to issue the Rule without a 30-day notice period before its implementation. If we had more time between learning of the final Rule and its actual implementation we would have had some time to adjust our educational materials, train our staff as to the impact of the Rule, prepare advisals for existing clients who are likely to presume that the Rule applies to them, and update key stakeholders. In addition, we would have been able to prepare questionnaires and other materials that we will need

to use for future clients who will be subject to the Rule. Also, we would have been able to prepare an outreach plan to educate community members beyond our current clients.

I hereby declare under penalty of perjury that the foregoing is true and correct.

_____
Camila L. Alvarez

Executed this 12th day of May, 2023