## DECLARATION OF EDNA YANG, AMERICAN GATEWAYS

I, Edna Yang, declare pursuant to 28 U.S.C. § 1726, as follows:

1. My name is Edna Yang, and I am currently the co-executive Director of American Gateways. I have worked at American Gateways since 2002 and have been in my current position since 2020. I have personal knowledge of the matters set forth herein, and I can and will testify thereto if called upon to do so.

2. I am writing to address the substantive harm that American Gateways will experience because of a new Rule issued by the Department of Homeland Security and the Department of Justice titled *Circumvention of Lawful Pathways* ("the Rule").

3. The mission of American Gateways is to champion the dignity and human rights of immigrants, refugees, and survivors of persecution, torture, conflict, or human trafficking. We do so by providing exceptional legal services at low or no cost, by conducting community educational programming, and by engaging in policy-based advocacy on behalf of immigrant communities.

4. American Gateways was founded in Austin, Texas, as the Political Asylum Project of Austin (PAPA), in 1987. The organization's original mission was to provide representation to Central American Immigrants fleeing persecution and seeking asylum in the United States. Over the past thirty-three years, American Gateways has grown to provide a broad range of immigration legal services to low-income individuals and families throughout the region. We have become an indispensable legal service provider for low-income asylum seekers and other immigrants in Central Texas.

5. American Gateways serves immigrant communities throughout Central Texas and has offices in Austin, San Antonio, and Waco, Texas.

6. In my role as co-Executive Director, I oversee all of the work that American Gateways does, including our representation of people seeking asylum and our work at immigration detention centers in Texas.

## The Mission and Work of American Gateways

7. American Gateways provides free, culturally sensitive, trauma-informed legal representation to individuals and families seeking asylum and other kinds of immigration relief in the United States.

8. American Gateways provides direct representation to people appearing in the San Antonio immigration Court. We also provide legal orientation, immigration workshops, and pro bono legal representation at three immigrant detention facilities in Central Texas: the T. Don Hutto Residential Center in Taylor, Texas ("Hutto"); the South Texas Residential Center in Pearsall, Texas ("Pearsall"); and the Karnes County Residential Center in Karnes City, Texas ("Karnes").

9. A central feature of American Gateways' mission is to engage and educate immigrant communities and local stakeholders about immigration law, process, and relief, and about an individual's rights in the immigration process. We regularly hold trainings on these topics in the communities we serve.

10. American Gateways works in co-counsel relationships with *pro bono* attorneys on many of its cases.

11. Since 1987, American Gateways has provided direct immigration legal services to thousands of individuals. In 2022, we provided free direct legal services to 1,367 clients and their families.

12. Although American Gateways represents clients who are applying for a wide array of immigration benefits, many of our clients seek asylum and related protection in the form of withholding of removal and under the Convention Against Torture. Currently, we are representing more than 100 people in their asylum cases.

13. About 30% of our asylum cases are affirmative cases before U.S. Citizenship and Immigration Services. The remainder are defensive cases in immigration court. Almost all of the people we represent in immigration court were, or are, detained at Hutto, Pearsall, or Karnes.

14. In addition to the cases that we take on for full representation, American Gateways is the Legal Orientation Program (LOP) provider for the detention centers that we serve. LOP is a program funded by the Department of Justice's Executive Office for Immigration Review (EOIR) that enables us and other organizations around the country to provide *pro se* assistance to immigrants in selected detention centers and courts. Through our LOP programming, we provide four layers of service: (1) general orientations, (2) individual orientations, (3) pro se workshops, and (4) referrals for *pro bono* representation.

15. In addition to these legal services, a central feature of our mission is to engage and educate immigrant communities, as well as local stakeholders, about immigration law and process, an individual's rights within this process, and forms of relief for which an individual might be eligible.

16. Finally, policy advocacy is another important aspect of our work. Through that work, American Gateways submitted a comment in opposition to the proposed version of the Rule.

### **The Final Rule Seriously and Irreparably Harms American Gateways**

17. The Rule will frustrate the mission of American Gateways, force us to divert organizational resources, and cause irreparable harm to the organization.

18. First, the Rule will directly compromise the ability of American Gateways to serve and represent people seeking asylum. Many of our asylum clients enter the United States at the southern border, and many enter without inspection. In addition, the vast majority of our clients are not Mexican citizens but instead come from Central America. We also serve substantial numbers of clients from Cuba, Venezuela, Cameroon, the Democratic Republic of the Congo, and other countries. In addition, roughly 20% of our asylum clients speak African or Indigenous languages and will be particularly hampered by the requirement to make an appointment through the CBP One app. And none of our clients has sought asylum in a transit country before entering the United States, generally because it would not be safe for them to do so. Given these facts, the vast majority of our clients would be ineligible for asylum under the Rule unless they qualified for one of the Rule's very narrow exceptions.

19. Under the Rule, American Gateways will be unable to assist most people who entered between ports of entry along the southwest land border with the process of filing their asylum applications affirmatively with USCIS, because they would no longer be eligible for asylum. Further, if one of the exceptions to a Rule might apply to a client, we would have to present the claim to USCIS, face the prospect of a referral to immigration court because the exceptions are so narrow, and then update all of the relevant evidence when the case proceeds to a hearing before an immigration judge.

20. One way or another, we will be forced to represent clients like these in removal proceedings. Doing so requires much more staff time than preparing and filing an affirmative

asylum application before USCIS. This impact on affirmative asylum cases will also frustrate our ability to work with pro bono partners. It is much easier for us to find pro bono lawyers willing to take affirmative asylum cases than it is to find pro bono lawyers will to take immigration court cases, because the work of preparing an affirmative asylum application is frontloaded and predictable, whereas immigration court cases are more complex and proceed on a less predictable schedule.

21. The Rule's changes will also frustrate our mission and asylum work in ways that apply to both our affirmative and defensive asylum clients. Because of the bar to asylum in the Rule, we will have to focus on withholding of removal and/or relief under the Convention Against Torture (CAT), not asylum claims, for asylum-barred clients who are referred to removal proceedings. Withholding and CAT relief require even more resources and staff time than defensive asylum claims, because a person bringing them is held to a higher standard of proof. That higher standard of proof will also result in an increased need to take appeals to the Board of Immigration Appeals, further increasing the time and resources we must spend on each case.

22. Furthermore, applications for withholding and CAT relief, unlike applications for asylum, do not cover a person's spouse and children as derivative applicants. We will therefore be unable to serve families as family units. Instead, we will need to apply for withholding and CAT relief separately for each member of the family.

23. The very narrow family-separation exception to the Rule's bar does not change this fact. That exception applies only if derivative family members have no claim to relief of their own. Our attorneys will therefore have to prepare a separate case for every family member who has a colorable claim—a category that covers the vast majority of people we represent.

24. In addition, the Rule will force our attorneys to assess whether our asylum clients are eligible for an exception to the Rule. We will, for example, have to screen for new or recent health problems and for violence or threats of violence that our clients experienced in northern Mexico. This is work that we do not have to do under current law.

25. The Rule will therefore make each of our asylum cases far more resource intensive, both as it relates to staff time and for things like expert witnesses. Those expenditures will divert resources from our other work and other areas of our mission. We will also be able to provide legal representation to fewer people seeking asylum than we do now.

26. The Rule will also force American Gateways to divert resources in other ways, particularly as it relates to our community education and LOP services. The fundamental core of those services is to educate members of the immigrant community of their rights and to help them prepare for self-representation in the event that they are not able to obtain legal counsel. To adequately provide this education, we will have to spend time and money to understand how the Rule operates in practice and the impact it will have on the immigrant communities we serve. We will need to spend significant resources dispelling confusion caused by the Rule in those communities.

27. We will also need to significantly alter the materials we have developed for our LOP workshops in immigration detention facilities. Even determining how best to communicate the complexity of the Rule in orientations and workshops will require significant time and effort. And we will need to make significant changes to the materials we use to train staff, community members, lawyers, and others. For example, we will almost certainly have to develop an entirely new curriculum for the pro se workshops that we provide to detained individuals in advance of a credible fear interview (CFI) or the immigration court review of a negative CFI.

28. Another way that the Rule will harm American Gateways is that it will contribute to the extensive burnout that our staff faces. Many people on our staff are immigrants themselves, and many relate very deeply to the reasons our clients have fled their home countries and the trauma that our clients have faced in their journeys to the United States. Under this Rule our ability to win asylum for our clients will be negatively impacted, and our staff will have the thankless and heartbreaking task of informing people that they are not in fact able to seek asylum in this country. The task of having to be the bearer of this message may lead to depression and burnout. Having to prepare especially complicated cases involving only withholding and CAT relief on the tight timeline in which detained cases are heard in immigration court will also contribute to burnout. That burnout, in turn has a real impact on American Gateways' bottom line. When we face turnover due to cruel policies, that turnover has a direct impact on our ability to receive funding for the services we offer and on overall morale of our staff.

29. In addition to the harms we will face because of the Rule itself, the fact that the agencies issued the final rule without a 30-day notice period before its implementation is also harmful to us. If we had more time between learning of the final Rule and its actual implementation we would have had time to adjust our outreach and educational materials, train our staff as to the impact of the Rule on our work, prepare advisals for existing clients who are likely to presume that the Rule applies to them, and update key stakeholders including pro bono attorneys. In addition, we would have been able to prepare other materials that we will need to use for future clients who will be subject to the Rule.

30. Though American Gateways was able to comment on the Rule, there are a number of issues that we did not raise because we did not have time or were not aware of them until after the close of the comment period. For example, we did not know that the agencies planned to

resume conducting credible fear interviews in the custody of Customs and Border Protection (CBP). We did not know about this change because the agencies announced it only after the close of the comment period. If we had known, as an organization that has significant familiarity with the challenges of assisting migrants in CBP custody, we would have strenuously objected. And, in so doing, we would have explained how problematic it is to make credible fear interviews immensely more complicated while simultaneously cutting off access to legal information to prepare for those interview.

### A Limited Injunction Cannot Remedy the Harms to American Gateways

31. American Gateways is proud to serve 23 counties in Central Texas—and to advocate in ways that will benefit immigrant communities throughout the country—but our work is confined to Texas. We are incorporated in Texas, and we do not have any offices outside of Texas. We do not work in detention centers or immigration courts outside of Texas, and our LOP services are confined to detention centers in Texas. We do not file affirmative asylum applications with any asylum office outside of Houston, Texas, and we do not provide representation in any immigration court outside of San Antonio, Texas.

32. Legal changes that apply only to the Ninth Circuit, including Ninth Circuit precedent, do not affect our work. An injunction blocking the implementation of the Rule in only the Ninth Circuit will not remedy the harms the Rule causes to American Gateways.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 10th day of May, 2023.

_____