## DECLARATION OF MARICARMEN GARZA, CHIEF OF PROGRAMS, TAHIRIH JUSTICE CENTER

I, Maricarmen Garza, declare pursuant to 28 U.S.C. § 1726, as follows:

1. I have personal knowledge of the matters set forth herein, and I can and will testify thereto if called upon to do so.

2. Since June 2021, I have served as the Chief of Programs of the Tahirih Justice Center, a nonprofit and non-partisan organization that provides free holistic services to survivors of gender-based violence. Tahirih provides free legal representation for survivors who seek humanitarian immigration relief, including asylum, in the United States. Tahirih also provides social service support to many of its clients.

3. Tahirih has offices in Falls Church, Virginia; Baltimore, Maryland; Atlanta, Georgia; Houston, Texas; and San Bruno, California.

4. In my role, I oversee the functioning of Tahirih's five offices across the country and the legal and social services work conducted by our staff.

**Tahirih's Mission and Scope**

5. Tahirih's mission is to provide free holistic services to women, girls, and other survivors of gender-based violence such as rape, domestic violence, female genital mutilation/cutting, forced marriage, and human trafficking, and who seek legal immigration status under U.S. law. We thoroughly screen each potential client and offer legal representation and social services for individuals who seek protection, including asylum, in their immigration proceedings.

6. In addition to free legal services and social services case management, Tahirih also advocates for its clients more broadly. Through administrative advocacy, legislative campaigns, and outreach, Tahirih aims to increase the efficiency and fairness of the asylum system.

1

7. Tahirih also provides training and education services to professionals in a position to assist immigrant survivors of violence. In 2022, we provided training and outreach to more than 5,800 professionals and community members, including attorneys, judges, police officers, healthcare staff, and social service providers.[1] Tahirih provides information to immigrants through know-your-rights presentations as well as at asylum clinics and other immigration clinics, too.

8. Tahirih further leverages its expertise by working in co-counsel relationships with *pro bono* attorneys on many of its cases.

9. Since Tahirih's founding in 1997, we have provided direct immigration legal services to more than 32,000 people.[2] In 2022, we provided free direct legal services to 1,647 clients and 986 members of their families.[3]

10. Although Tahirih represents clients who seek T and U nonimmigrant status and other kinds of protection, a great many of our clients seek asylum. Currently, 39% of our cases include asylum claims, including a substantial number of affirmative asylum cases.[4]

**The Final Rule Seriously and Irreparably Harms Tahirih and Our Clients**

11. The new final rule titled *Circumvention of Lawful Pathways* ("the Rule") will seriously frustrate Tahirih's mission, divert organizational resources, and cause irreparable harm to the organization.

12. Tahirih's mission as it relates to asylum applicants—both those seeking protection affirmatively and those in removal proceedings—will be severely compromised by the rule.

---

[1] Tahirih Justice Center, *2022 Impact Report: National Programs*, available at https://www.tahirih.org/about-us/annual-reports-and-financials/2022-impact-report/national-programs-2022/ (last accessed May 17, 2023).
[2] *Id.*
[3] *Id.*
[4] *Id.*

13. Although we have clients from all over the globe, Tahirih's clients in recent years have come primarily from Latin America and especially from Central America. The vast majority of our asylum clients are not from Mexico, meaning they generally must transit through at least one country before entering the United States. In 2022, only approximately 13% of our asylum clients were from Mexico, while approximately 87% were not.[5] More than half our clients were from the Northern Triangle countries: 23% were from Honduras, 18% were from El Salvador, and 12% were from Guatemala.[6] The remaining approximately 34% of clients were from other countries.[7]

14. Most of Tahirih's clients entered the United States via the U.S.-Mexico land border.

15. Accordingly, a sizable portion of Tahirih's clients would be ineligible for asylum under the Rule unless they satisfy certain exceptions that, in our experience, are impossible for most people to satisfy.

16. Thus, the Rule severely compromises Tahirih's ability to serve our clients. We will be largely unable to assist anyone who entered by the southwest land border with the process of filing their asylum applications affirmatively to USCIS, because they would no longer be eligible for asylum. Instead, we will only be able to assist them in removal proceedings, which is much more resource-intensive than representing someone who is applying affirmatively. In both 2021 and 2022, Tahirih legal services staff spent over twice as many hours on a typical defensive asylum case as on a typical affirmative asylum case.

17. Further, the Rule will force us to represent the many clients in removal proceedings on withholding of removal and/or Convention Against Torture ("CAT") claims instead of asylum claims. Pursuing these forms of relief requires a significant investment of additional resources.

---

[5] *Id.*
[6] *Id.*
[7] *Id.*

3

Such claims are subject to a stricter standard than asylum claims and so require meeting a higher evidentiary standard. Satisfying this higher standard often requires more time and greater legal resources. Further, because the standard for withholding and CAT is higher than for asylum, the Rule will likely lead to a greater number of losses in immigration court, and a greater number of appeals to the BIA—and petitions for review by the federal courts of appeals. These additional appeals will also consume significant attorney time.

18. Moreover, unlike asylum claims, withholding and CAT applications do not allow for a principal applicant to petition for derivative applicants such as children, and the Rule's presumption of ineligibility for asylum lifts only if derivative family members have no claim to relief of their own. To ensure the safety of its clients and their families, Tahirih would thus have to submit a greater number of applications for withholding and CAT in instances where it represents clients with families and children. This would require significant additional staff time preparing and litigating each case, including preparing separate evidence and putting on witnesses in each separate case. Particularly for Tahirih clients and their children, who have been significantly traumatized by the violence they are fleeing, the additional resources needed to put on individual cases are substantial. Such additional resources would likely include, but not be limited to, significant attorney time, separate and additional psychological expert testimony, and separate and additional counselling to prepare for testimony that would not be required but for the Rule.

19. The additional time required to handle such cases would require diverting the time of attorneys, the time of social services staff, and financial resources from other critical areas of our work and mission.

20. In addition, because the Rule makes numerous other changes to an applicant's process for seeking relief, even defensive cases litigated under the Rule will consume significantly more time than earlier defensive asylum proceedings.

21. Under the Rule, Tahirih attorneys will also have to assess whether the client might meet an exception to the new bar—and to gather and prepare evidence if an exception might apply. Preparing cases in this manner will involve significant and onerous additional layers of screening. For example, many of Tahirih's clients face sexual and physical violence en route to the United States. Whenever someone does, Tahirih attorneys would likely need to argue that this violence provided a compelling reason not to wait for an appointment via the CBP One app. Gathering this level of information will effectively require our attorneys to screen each of our asylum clients for claims to protection in every transit country in addition to their home country.

22. Tahirih attorneys will also be compelled to investigate other potential exceptions in each and every case. For everyone who has been declared presumptively ineligible for asylum, Tahirih attorneys will have to spend significant time screening for things such as medical concerns that may have arisen in transit or significant barriers that interfered with their ability to utilize the CBP One app. None of these issues currently is necessary for a claim for asylum or withholding of removal, so each of these layers of screening will only add on to the difficulty of representing clients in this context.

23. This means that, in every case subject to the Rule, the attorney will, at a minimum, have to do all of the following: (1) argue for an exception to the Rule so that the client may try to secure asylum; (2) prepare for an asylum case, in case the immigration judge finds that an exception to the bar applies; (3) prepare for a full withholding/CAT case for the client and for each of the client's

family members. The result is that Tahirih will be forced to significantly reduce the numbers of clients we can serve with our funding.

24. Tahirih will have to divert significant resources to understanding the new Rule, its impact on the communities we serve, training staff and volunteers, and advising our clients, prospective clients, and the immigration communities. In addition, we will need to spend resources in developing materials to reflect how the Rule will affect work done by the professional and community members we train.

25. The Rule will also affect Tahirih's funding. The state and local government grants provided to Tahirih restrict services to immigrants who live, work, attend school, or otherwise maintain a meaningful physical presence within certain geographical boundaries delineated by city, county, district, or state. For instance, our San Bruno, California (i.e., San Francisco Bay Area) office receives grant funding from Santa Clara County to provide immigration-related legal services to vulnerable populations. The County provides funding to Tahirih to serve immigrants who live or work in Santa Clara County and who have survived sexual and domestic violence, human trafficking, or other gender-based harms. Because it is geographically limited, Tahirih cannot use these funds to assist or represent people who are not located within Santa Clara County. In total, more than 50% of Tahirih staff time is billed to these geographically limited government grants.

26. If people seeking asylum are unable to obtain an appointment via the CBP One application to enter the United States in the manner demanded by the Rule, or are subjected to expedited removal because they are subject to the asylum ban and receive negative decisions under the Rule's heightened standard for screening interviews for withholding of removal and CAT relief, they cannot reach Tahirih's grant-funded service areas, and Tahirih cannot provide the asylum services required by the grant.Finally, Tahirih is harmed by the government's failure to follow

normal notice and comment procedures. Tahirih submitted a substantial comment on the Rule, which spoke to country conditions in Mexico and Guatemala, the effects of trauma on people seeking asylum, and other issue. But Tahirih was unable to comment fully because of the short, 30-day comment period. Tahirih was also unable to comment on the administration's recent announcement that it intends to screen individuals for credible or reasonable fear and asylum eligibility while they are detained by U.S. Customs and Border Protection. Tahirih could have and would have documented the significant detrimental impacts of CBP detention on a trauma survivor's ability to present a claim and pass a fear or eligibility screening. However, the policy was not announced until after the comment period had closed, depriving Tahirih of the opportunity to present such evidence.

27. The lack of a notice period before implementation of these significant changes further harms Tahirih by limiting our ability to prepare to competently serve clients and service seekers subjected to the Rule. A single day's notice strains Tahirih's resources as we must allocate time and effort to informing our staff of the Rule's intricacies, educating our clients and their communities on the Rule's impact, compiling and responding to stakeholder questions, updating training materials for advocates including pro bono attorneys, and revising screening and other materials for use with clients and service seekers who may be subject to the Rule.

**Tahirih's Clients Cannot Safely Seek Protection en Route to the United States**

28. Tahirih's clients come to the United States to flee gender-based violence, which is endemic and tolerated in the Northern Triangle, widespread in Mexico, and prevalent in many other parts of the Western Hemisphere. The prevalence of gender-based violence in these regions means that women, girls, and LGBTQIA+ people seeking asylum are extremely vulnerable to violence in the Northern Triangle and Mexico. In Mexico in 2022, 70% of women and girls reported that they had

y

experienced violence.[8] In Guatemala, between January and July 2022, the prosecutor's office received almost more than 29,000 complaints of violence against women, despite known underreporting.[9] Honduras has the highest femicide rate in Latin America; in 2021, emergency calls reporting violence against women reached 282 per day.[10] The femicide rate in El Salvador is second only to Honduras; in 2017, 67% of women reported having experienced some violence.[11] Rates of violence against women, girls, and LGBTQIA+ people in all of these countries rose during the pandemic.

29. The countries mentioned in the Rule as putative regional options for individuals seeking asylum—Mexico, Guatemala, Costa Rica, Belize, Colombia, and Ecuador—do not offer adequate protection to Tahirih's clients.

30. People seeking asylum in Mexico are subject to violence and abuse from both government officials and third parties, denied their rights, and illegally returned to their countries of persecution. Mexico is not safe for Tahirih's clients or people seeking asylum more generally.

31. As examples, several of Tahirih's clients seeking asylum endured serious harm while transiting through Mexico. Among them are:

---

[8] Reuters, *Violent against women in Mexico rises to over 70%, study finds* (Aug. 31, 2022), available at https://www.reuters.com/world/americas/violence-against-women-mexico-rises-over-70-study-finds-2022-08-31/ (last accessed May 17, 2023).

[9] Prensa Latina, *Daily reports of violence against women rise in Guatemala* (Aug. 17, 2022), available at https://www.plenglish.com/news/2022/08/17/daily-reports-of-violence-against-women-rise-in-guatemala/ (last accessed May 17, 2023).

[10] United Nations Sustainable Development Group, *Violence against women, the other pandemic impacting Honduras* (Dec. 8, 2021), https://unsdg.un.org/latest/stories/violence-against-women-other-pandemic-impacting-honduras (last accessed May 17, 2023).

[11] Kristina Zanzinger, SJ Fernandez, and Yanxi Liu, *Underreported and Unpunished, Femicides in El Salvador Continue*, NACLA (Mar, 5, 2021), available at https://nacla.org/news/2021/03/04/femicides-el-salvador-pandemic (last accessed May 17, 2023).

- A survivor of domestic violence in Honduras who was kidnapped in Mexico by a cartel, sequestered, forced to work, and raped;
- A woman from Guatemala, sold to sex traffickers in Mexico, who was raped by police officers and government officials in Mexico, forced into pregnancy, and threatened with the sale of her baby;
- A woman from Peru and her two children who were kidnapped by a group self-identifying as immigration officials, then physically and sexually abused and extorted by them; and
- A survivor of sexual violence and incest in Honduras who was sexually assaulted and threatened with death by a member of MS-13.

32. In addition, Mexico lacks a full and fair asylum system. The country imposes a draconian thirty-day filing deadline for asylum applications,[12] which prevents many people—including the vast majority of survivors of sexual assault and other kinds of severe trauma—from meaningfully presenting their cases. Applicants are also prohibited from moving between states during the pendency of their applications,[13] meaning that a person whose persecutor follows her into Mexico has nowhere to flee while her application is processed.

33. This is a major problem, because persecutors are often able to locate and continue to threaten survivors who flee persecution in their home countries while traveling to and upon arrival in Mexico. For example, a woman whom Tahirih counseled fled Central America after suffering years of domestic abuse, including regular beatings and rapes. Her husband became increasingly

---

[12] UNHCR Help Mexico, *How to Apply for Refugee Status in Mexico*, available at https://help.unhcr.org/mexico/en/como-solicitar-la-condicion-de-refugiado-en-mexico/ (last accessed May 17, 2023).

[13] Stephanie Brewer, Lesly Tejada, and Maureen Meyer, *Struggling to Survive: the Situation of Asylum Seekers in Tapachula, Mexico* (June 2022), WOLA at 6, available at https://www.wola.org/wp-content/uploads/2022/06/FINAL-Struggling-to-Survive-Asylum-Seekers-in-Tapachula.pdf (last accessed May 17, 2023).

violent toward her and their children. She fled to Tijuana, found a shelter, and applied for asylum in Mexico. But after several weeks, her husband's relative managed to find her in Tijuana and violently attacked her and her children. She had to flee, and thereby abandon her Mexican asylum application, because she was no longer safe in Mexico.

34. The Mexican asylum system forces survivors to face such dangers for long periods of time. Because the volume of asylum applications filed in Mexico has increased dramatically without a concomitant increase in resources, the Mexican asylum agency, COMAR, has failed to issue decisions within the timeframe required under Mexican law in thousands of cases.[14] Delays are protracted and the system is overwhelmed and at risk of collapse.[15] The CBP One app exacerbates the dangers faced by survivors in Mexico. Although Tahirih does not work directly with people in Mexico who are attempting to use the CBP One app, we know that the app poses a significant barrier to many survivors of gender-based violence. Many people who flee domestic violence, stalking, and other gender-based violence are forced to do so in the midst of a life-threatening violent incident, without the chance to collect even essential belongings, such as a mobile phone. Many others travel without a cell phone because they know that their persecutors can use the phone to track their movements and hunt them down. And even for people who do travel with a cell phone and manage to keep that phone during a journey to northern Mexico, the lack of reliable internet access at many shelters prevents access to CBP One. The Rule's requirement that people use the app therefore makes it impossible for survivors to flee to northern Mexico and to remain there in the relative safety of a shelter for any length of time.

---

[14] *Id.*

[15] Daina Beth Solomon and Lizbeth Diaz, *Mexico seeks to curb 'abuse' of asylum system by migrants who do not plan to stay*, Reuters (Feb. 13, 2023), available at https://www.reuters.com/world/americas/mexico-seeks-curb-abuse-asylum-system-by-migrants-who-do-not-plan-stay-2023-02-13/ (last accessed May 17, 2023).

35. Mexico also illegally turns back people seeking asylum and lacks a robust, fair appeals process for those whose applications are denied. Mexico's policy of turning people back is particularly prevalent and problematic for clients from the Northern Triangle. Porous borders and poor enforcement among Northern Triangle countries worsen clients' chances of finding safety from persecutors within the region.

36. Guatemala likewise is not a safe country for survivors of gender-based violence or other people seeking asylum, as the large number of Guatemalans applying for asylum elsewhere makes clear. For example, Tahirih represented a woman who was kidnapped in Guatemala, sex trafficked, forced into sex with police officers, and then sold to another trafficking organization in Mexico.

37. Guatemala's asylum system barely exists and is ill-equipped to assess, adjudicate, and manage the cases of the many Hondurans, Salvadorans, and others who transit through Guatemala on their way to seek safe haven.[16]

38. El Salvador, Guatemala, Honduras, and Nicaragua all participate in a regional free movement agreement that grants their citizens entrance to these countries with minimal border controls. This in turn allows persecutors to track and follow people seeking asylum with ease throughout the region.

39. People seeking asylum in Mexico and Guatemala have very limited meaningful access to counsel and interpreters.

40. Costa Rica is also not a viable option for survivors of gender-based violence seeking asylum, including Tahirih's clients. While Costa Rica has historically provided safe haven to people seeking asylum, its asylum system is under pressure, resulting in lengthy processing times, job

---

[16] *2021 DOS Guatemala Human Rights Report*, at 18.

instability, financial hardship, and xenophobia.[17] Recent restrictive reforms include a thirty-day deadline to file an asylum application, inability to leave Costa Rica pending the application process, and a presumptive third country transit bar,[18] all restrictions that expose survivors of gender-based violence to increased danger. Expedited work permits are no longer available to people seeking asylum; and in fact many are forced to forego applying for asylum in order to apply for two years of temporary work authorization.[19] These restrictions have greatly reduced Costa Rica's viability as an alternative safe haven for survivors seeking asylum.

41. The asylum system in Belize is so nominal that it barely exists and provides no meaningful protection for survivors of gender-based violence, including Tahirih's clients. In 2021, only 38 people applied for asylum, and not a single application was granted.[20] Asylum applications must be filed within 14 days of arrival—a near-impossible timeline, especially for survivors coping with the sequelae of trauma.[21] A recently-implemented amnesty program applies only to those who arrived

---

[17] Global Compact of Refugees, *MIRPS – Regional Response in Central America and Mexico: Costa Rica*, available at https://globalcompactrefugees.org/gcr-action/countries/costa-rica (last accessed May 17, 2023).

[18] Javier Cordoba, *Costa Rica tightens overwhelmed asylum system*, AP News (Dec. 14, 2022) available at https://apnews.com/article/latin-america-mexico-caribbean-germany-costa-rica-0e2db787358228fe308023ba259d1d3f (last accessed May 17, 2023).

[19] News in America Periodico Digital Centroamericano y del Caribe, *Costa Rica Rightens Overwhelmed Asylum System*, available at https://newsinamerica.com/en/headlinenews/2023/costa-rica-tightens-overwhelmed-asylum-system/ (last accessed May 17, 2023).

[20] World Data.info, *Asylum applications and refugees from Belize*, available at https://www.worlddata.info/america/belize/asylum.php (last accessed May 17, 2023).

[21] UNHCR ACNUR, *Belize: UNHCR Acknowledges GOB for efforts to Protect Asylum Seekers in Amnesty* (Mar. 4, 2022), available at https://www.acnur.org/noticias/belize-unhcr-acknowledges-gob-efforts-protect-asylum-seekers-amnesty (last accessed May 17, 2023).

in Belize before March 2020—excluding nearly everyone affected by the Rule.[22] Such a deficient system provides no meaningful access to stable protection for survivors of gender-based violence such as Tahirih's clients.

42. Colombia does not offer sufficient protection for survivors of gender-based violence, including Tahirih's clients. Colombia's asylum system is near capacity and at risk of backsliding. In recent years, Colombia welcomed approximately 2.5 million Venezuelan migrants; in the words of former Colombian President Juan Manuel Santos, additional pressure from the rule would be "unsustainable."[23] In Colombia, an asylum application filed more than two months after arrival must overcome a presumption of ineligibility.[24] Meanwhile, migrants face disproportionately high rates of gender-based violence against women, girls, and LGBTQIA+ people.[25] Colombia provides insufficient protection for survivors of gender-based violence seeking asylum.

43. Ecuador is facing deteriorating security and rising xenophobia,[26] limiting its ability to provide safety for survivors of gender-based violence seeking asylum, including Tahirih's clients.

---

[22] *Id.*

[23] Juan Manuel Santos, *Time for the Americas to step up (again) on migration*, El Pais (Mar. 6, 2023), available at https://english.elpais.com/opinion/2023-03-06/time-for-the-americas-to-step-up-again-on-migration.html (last accessed May 17, 2023).

[24] UNHCR ACNUR, *Ayuda: Colombia: Solicitud de la condición de refugiado*, available at https://help.unhcr.org/colombia/solicitando-la-condicion-de-refugiado/solicitud-de-la-condicion-de-refugiado/ (last accessed May 17, 2023).

[25] Amnesty International, *Colombia and Peru: Abandoned by the state in host countries, Venezuelan women face increasing gender-based violence* (July 12, 2022), available at https://www.amnesty.org/en/latest/news/2022/07/colombia-peru-venezuelan-women-face-gender-based-violence/ (last accessed May 17, 2023).

[26] UNHCR Global Focus, *Ecuador: Strategy 2023: Situation analysis*, available at https://reporting.unhcr.org/ecuador#toc-narratives (last accessed May 17, 2023).

The asylum system is operationally deficient and people seeking asylum face significant barriers to basic services and access to the formal labor market.[27] Ecuador does not provide a viable safe option for survivors seeking asylum.

**The Rule Must Be Enjoined Nationwide to Remedy Tahirih's Injuries**

44. To fully remedy the harm caused to Tahirih by the Rule, it is essential that the Rule be enjoined nationwide. This is so for several reasons. As noted above, Tahirih has five offices nationwide and operates across multiple judicial circuits, including in the Ninth Circuit (California), the Fifth Circuit (Texas), the Fourth Circuit (Maryland and Virginia), and the Eleventh Circuit (Georgia). In addition, it is a critical part of Tahirih's mission to serve survivors of gender-based violence regardless of where or how they entered the United States or where their asylum proceedings are conducted. Accordingly, Tahirih's services are not limited to clients who entered the United States in a certain set of states.

45. In our experience, it is quite common for people seeking asylum to enter the country at one place along the southern border and travel to other parts of the country before applying for asylum. For example, people seeking asylum who present at a port of entry or are apprehended near the border may be detained by the government and transferred to a location far away from their point of entry. As a result, those people seeking asylum may have a credible fear interview in a different circuit from that in which they entered. People seeking asylum who are placed in removal proceedings after passing credible fear screening and then released on bond or parole may travel to any part of the country and request to have their removal proceedings transferred there. Thus, a person seeking asylum may, for example, enter the United States through Texas, have her credible fear interview in New Jersey, and ultimately apply for asylum in removal proceedings held in

---

[27] *Id.*

California. Affirmative asylum applicants likewise might enter the United States via a state in one circuit and then apply for asylum in another circuit.

46. Moreover, most of Tahirih's direct service staff work outside the Ninth Circuit, and most of their time on asylum cases is devoted to matters outside the Ninth Circuit. Tahirih's largest office is in Houston, Texas, and the attorneys in that office recorded spending more time on asylum cases in 2022 than the attorneys in any other Tahirih office.

47. In 2022, the vast majority of the work that Tahirih direct service staff spent on asylum cases in which Tahirih provides full representation, either in house or in partnership with pro bono partners, occurred outside the Ninth Circuit.

48. The Rule will severely compromise both Tahirih's budget and its mission, has already forced Tahirih to divert significant resources, and will leave countless survivors of gender-based violence in severe danger in Mexico and elsewhere.

**I Have Witnessed the Rule's Harms and Its Inaccurate Assumptions**[28]

49. On May 11, 2023, and following days, I journeyed with a delegation of colleagues from other nonprofit organizations to the southern border region and witnessed the severe hardship faced by migrants fleeing persecution in search of safety in the U.S.

50. Shelters were made of sheets, trash bags or tarps on the ground with no running water or toilets. Basic necessities that people need to survive are not available. Many of the families have used all their money already on their journey and are facing food insecurity. I saw young children playing with their toys and trying to have a normal life in a situation that is so far from normal.

---

[28] Maricarmen Garza, *I will never forget what I saw at the border* (May 25, 2023), available at https://www.tahirih.org/news/i-will-never-forget-what-i-saw-at-the-border/ (last accessed May 30, 2023).

Precarious forms of housing like the overcrowded shelters and encampments that I saw significantly increase the risk of experiencing gender-based violence.

51. Migrants also become a target for cartels and organized crime. I met one young man at the border who was kidnapped as soon as he arrived in the city and had just recently been released. He was terrified of leaving the shelter again after that painfully traumatic experience.

52. Despite the inhumane conditions and danger, families are trying to enter this country legally by waiting for a chance to apply. The difference between what the Rule and its preamble describe and what I saw with my own eyes at the border was stark. There was no "surge" or "invasion" as the Rule's unfounded assumptions predicted. Migrants have been waiting patiently at the border for months in many cases.

53. This Rule has created so many barriers to safety for these people. In particular, the new requirement to make an appointment through the smartphone app CBPOne before going to a port of entry to request asylum has created immense frustration and confusion, as I witnessed firsthand. One woman I witnessed tried repeatedly to submit an application only to experience glitches and have to start over again and again. Finally, she was able to submit a request for an appointment, but she will have to wait another day before finding out if she has received one of the limited number of daily appointments distributed by lottery. She is one of the lucky ones who speaks one of the three languages that the app is translated into and has access to a smart phone and WiFi in her shelter. Another young woman I met at an encampment was there with her young child and told me that she doesn't have a phone and she can't afford a phone or internet. She told me her hope now is to find a group of people who might be able to help her access a phone and internet.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of June, 2023.

_____
Maricarmen Garza