## DECLARATION OF MICHAEL SMITH, REFUGEE RIGHTS PROGRAM DIRECTOR, EAST BAY SANCTUARY COVENANT

I, Michael Smith, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I would testify competently and truthfully to these matters.

2. I am the Refugee Rights Program Director of the East Bay Sanctuary Covenant ("EBSC"). I helped start EBSC's affirmative asylum program in 1992, and have been with the organization since. In my current role, I oversee our affirmative asylum practice, which includes over 1500 cases currently pending before the U.S. Citizenship and Immigration Services ("USCIS").

3. EBSC is a 501(c)(3) nonprofit corporation, incorporated in Berkeley, California. Our office is located at 2362 Bancroft Way, Berkeley, California, 94704.

### EBSC's mission and activities

4. EBSC is part of the National Sanctuary Movement founded in 1982 to assist refugees fleeing the terrible civil wars and violence in El Salvador and Guatemala.

5. EBSC's mission is to offer sanctuary, support, community organizing assistance, advocacy, social services, information distribution, and legal services to people from around the world escaping war, terror, political persecution, intolerance, exploitation, and other expressions of violence. In particular, one of EBSC's critical missions is to assist individuals fleeing persecution in applying for asylum and similar humanitarian relief in the United States.

6. As part of its mission, EBSC provides legal and social services to immigrants and refugees primarily within the jurisdiction of the San Francisco Asylum Office, including applicants in California, Washington, Oregon, and part of Nevada. We offer our clients legal assistance in applying for affirmative asylum, Deferred Action for Childhood Arrivals ("DACA"), Temporary

1

Protective Status ("TPS"), Special Immigrant Juvenile Status ("SIJS"), permanent residency, and naturalization. We also provide social services, including regular workshops on integrating new immigrants into the United States, English as a second language tutoring program, and one-on-one assistance in finding housing, employment, or educational opportunities.

7. In addition, as part of its mission, EBSC helps train professionals to assist immigrant and refugee communities. For example, we partner with law schools around the country to provide legal training opportunities to law students and young attorneys looking to get experience in immigration and asylum law.

**EBSC's affirmative asylum program**

8. EBSC's affirmative asylum program is core to the organization's mission, and accounts for almost half of our organizational budget. Affirmative asylum applications are those that are filed with USCIS rather than in immigration court, on behalf of applicants who are not in removal proceedings. Affirmative asylum adjudication is non-adversarial. The process requires the asylum seeker to submit an application and supporting documentation as well as undergo an interview with a USCIS Asylum Officer. Asylum applicants may include their spouse and children as derivative beneficiaries of the primary applicant.

9. Our program is among the largest in the country, and provides legal services to individuals applying for affirmative asylum within the San Francisco Asylum Office jurisdiction. Since the affirmative asylum program began in 1992, we have filed nearly 6,000 cases. Nearly 98 percent of asylum applications we have filed that have been adjudicated have been granted. Currently, we handle about 8 intakes per week, and have over 1,500 pending cases before USCIS.

10. In 2022, approximately 70 percent of the clients for whom we filed affirmative asylum applications entered the United States by crossing the southern border between ports of entry

without inspection. Of those, about 60 percent were Mexican nationals and about 40 percent Central Americans who transited through at least one third country en route to the United States. Accordingly, about 30 percent of our total affirmative clients crossed the border between ports after transiting through a third country. We expect similar numbers for all of 2023.

11. We work mainly with low-income and poor refugees and immigrants. Our clients are often members of especially vulnerable populations, including victims of gender-based violence and domestic violence, indigenous Guatemalans, LGBT (lesbian, gay, bi-sexual, transgender) individuals, and those suffering from HIV/AIDS. These populations are particularly vulnerable to violence and exploitation in the countries they transit through en route to the United States. Moreover, because many are illiterate or only marginally literate, and nearly all are profoundly traumatized, we anticipate that they will have great difficulty accessing protection in the countries of transit and in utilizing the CBP One app to make appointments.

12. Currently, we have 13 staff members who work at least part-time in our affirmative asylum program. These include 6 full-time attorneys, 1 part-time attorney, 3 BIA full-time accredited representatives, 1 part-time BIA accredited representative, and 6 support or administrative staff. These staff members complete detailed intakes, work with clients to complete paperwork, research country conditions, help clients collect relevant evidence for their cases, prepare clients for interviews, and represent clients in affirmative asylum interviews with USCIS officers.

13. We also work with and train law students in externships and summer internships, teaching them to represent clients in affirmative asylum cases. Since 1994, we have worked with well over 500 law students from various law schools around the country, including the University of California Law Schools at Berkeley, San Francisco, and Davis, as well as law schools from the

University of San Francisco, Seattle University, Northeastern University, Harvard, Yale, Colombia, the University of Minnesota, and Chicago University. Currently, we supervise the California Asylum Representation Clinic (CARC) at Berkeley Law, which represents approximately 18 individuals in affirmative asylum this school year. We view the teaching of law students about the refugee process and country conditions around the world as an integral part of our mission, and at the same time, the law students provide invaluable assistance to EBSC in serving the refugee population.

### The threat to EBSC's mission and affirmative asylum program

14. The new Final Rule titled Circumvention of Lawful Pathways ("Rule") will seriously frustrate EBSC's mission, and divert organizational resources. Because of the new Rule, EBSC will have to either expend significant resources to adjust to the new regulatory landscape, significantly reduce the size of our affirmative asylum practice, and/or eliminate the practice altogether. All of these scenarios would result in a significant constriction of our organization, and a diversion of resources from our current practice. The new Rule also directly frustrates EBSC's mission of aiding and supporting individuals fleeing persecution and violence, especially through our affirmative asylum program, as well as the teaching and training of law students.

15. As noted above, providing legal services to affirmative asylum applicants who have entered without inspection after transiting through a third country is a key part of EBSC's mission and core activities. If individuals who transit through third countries without being denied asylum elsewhere and enter without inspection are ineligible for asylum, EBSC would be unable to continue much of the affirmative asylum we do. As stated above, about 30 percent of our total affirmative clients crossed the border between ports after transiting through a third country. Because people who fall into that category would be ineligible for asylum under the new Rule,

EBSC would no longer be able to serve nearly a third of our client base in seeking and securing affirmative asylum.

16. The new Rule would also jeopardize EBSC's funding streams. Funding for our affirmative asylum program is based in part on the number of cases we handle per year, and the number of cases we anticipate serving. For instance, one of our main grants is currently from the California Department of Social Services ("CDSS"). In applying for this grant for the year 2023, we relied on the fact that we filed approximately 174 affirmative asylum cases in 2022. We currently receive $2,000 from CDSS for a "simple" affirmative asylum application and $3,000 for a "complex" affirmative asylum application. A "complex" affirmative asylum application is one with one or more dependents or one in which multiple applications are required. This CDSS funding, however, does not cover the full cost of our services, including social services. In 2022, we received approximately $375,000 for 174 affirmative asylum cases, three of which were funded under another program. If EBSC were no longer able to file such cases for most individuals who entered without inspection after transiting through a third country, we would face a marked decrease in our budget, which would jeopardize our entire asylum program.

17. It would not be possible to shift our focus to a new client base to avoid the impact of the Rule on our funding. Our funding from CDSS serves clients who make under 250 percent of the poverty guidelines. The noncitizens who will remain eligible to apply affirmatively for asylum under this Rule are those who have visas of some kind and can travel to the United States by air. However, in our experience, those individuals frequently do not satisfy the income requirements for EBCS's services. In addition, this population falls outside of EBSC's mission to serve poor asylum seekers from all around the world who have few resources and cannot afford attorneys.

18. As a result of the new Rule, we would have to significantly cut our affirmative asylum program and dramatically overhaul our program to provide types of assistance we are not currently equipped for or trained to provide. First, the new Rule will force EBSC to expend additional time and resources to help affirmative asylum clients who might qualify for a narrow exception to attempt to make the case that they remain eligible for asylum. In the event our clients fail to show they satisfy an exception, we would not be able to assist them in applying for asylum affirmatively, frustrating our mission and jeopardizing our funding. Clients who are denied asylum will be referred to removal proceedings where they can apply for other forms of humanitarian relief such as withholding of removal and relief under the Convention Against Torture (CAT).

19. This means that, if EBSC were to continue to assist these clients in their protection claims, we would have to do so in removal proceedings and be prepared to satisfy the much higher standard for withholding of removal and CAT claims and to file separate applications for family members and meet the heavy burden for each. Alternatively, EBSC would be required to abandon its longstanding client base and shift to representing individuals placed directly in removal proceedings who remain eligible for asylum. Either of these scenarios would require EBSC to make enormous and costly shifts in how we provide services.

20. Currently, EBSC rarely provides representation to individuals seeking humanitarian relief in removal proceedings and we are not equipped to do so at any larger scale. Shifting to providing complex removal defense in an adversarial context would be extremely resource intensive—especially for individuals ineligible for asylum—and would involve creating such a program from scratch. EBSC would have to develop training materials, identify and adjust to working with a new client base under significantly different circumstances, provide significant re-training of existing staff, and hire new staff with experience practicing in immigration court.

21. Moreover, we have not received funding from CDSS to provide removal defense. The new Rule would force us to find new funding sources to represent individuals in removal cases. Even if we were to find new funding sources for removal cases, it is unlikely that such funding would cover the additional resources necessary for complex withholding of removal and CAT cases, which are more likely to require expert testimony and additional evidence gathering.

22. In addition, we will have to divert other organizational resources because of the new Rule. This includes devoting staff time and organizational resources to understanding the Rule, its impact on the communities we serve, and subsequently educating and advising our staff, clients, and prospective clients accordingly. Educating the communities we serve about the new policies would demand significant resources and take away from our other existing programs. To properly counsel new prospective clients who seek our affirmative asylum services going forward, we would need to invest resources in training multiple intake staff not only to screen for asylum eligibility based on the new Rule, but to conduct detailed screening for alternative forms of relief to facilitate referrals or other forms of assistance as appropriate.

23. Moreover, as part of its mission, EBSC supervises and trains law students to handle affirmative cases. As a result of the new Rule, however, we would be unable to continue training law students to handle these types of cases, or would have to substantially reduce our training program. This would frustrate our mission of helping to train legal professionals to assist individuals fleeing persecution and violence.

24. Finally, EBSC will be harmed by the fact that the agencies issued the final rule without a 30-day notice period before its implementation. If we had more time between learning of the final Rule and its actual implementation we would have had some time to adjust our educational materials, train our staff as to the impact of the Rule, prepare advisals for existing clients who are

likely to presume that the Rule applies to them, and update key stakeholders. In addition, we would have been able to prepare questionnaires and other materials that we will need to use for future clients who will be subject to the Rule.

I hereby declare under penalty of perjury that the foregoing is true and correct.

_____
Michael Smith

Executed this 10th day of May, 2023