**DECLARATION OF NOEMI CALONJE ON BEHALF OF
THE NATIONAL CENTER FOR LESBIAN RIGHTS**

I, Noemi Calonje, declare pursuant to 28 U.S.C. § 1726, as follows:

1.      I have personal knowledge of the matters set forth herein, and I can and will testify thereto if called upon to do so.

2.      My name is Noemi Calonje, and I am currently the Director of the National Center for Lesbian Rights' (NCLR's) Immigration Project. I have worked at NCLR since 1994 and have directed our immigration work since September 2004.

3.      I am writing to address the substantive harm that NCLR will experience because of a new Rule issued by the Department of Homeland Security and the Department of Justice titled Circumvention of Lawful Pathways, (hereinafter, "the Rule").

### My Personal Background

4.      I am an immigrant myself, and I joined NCLR in 1994, just two years after my own family's application for asylum had been granted. Before joining NCLR, I earned my bachelor's degree in Spanish and psychology from the University of California at Davis. Immediately after college, in 1991, I worked as a counselor at Families First, a nonprofit organization serving at-risk youth in the Bay Area.

5.      In my role as NCLR's Immigration Project Director, I respond to immigrants seeking information and assistance from NCLR, represent NCLR at conferences and workshops nationwide, manage our relationships with pro bono and of counsel immigration attorneys representing immigration clients, assist attorneys in the preparation of immigration cases, and act as NCLR's liaison to the broader immigrant rights community.

DECLARATION OF NOEMI CALONJE          1

## **NCLR's Mission & Programs**

6.        NCLR is a national organization located in San Francisco, California. NCLR was founded in 1977, and has grown to become a leading national legal organization committed to advancing the civil and human rights of lesbian, gay, bisexual, transgender, and queer (LGBTQ) people and their families through litigation, legislation, policy, and public education.

7.        NCLR litigates precedent-setting cases at the trial and appellate court levels, advocates for equitable public policies affecting the LGBTQ community, provides free legal assistance to LGBTQ people and their legal advocates, and conducts community education on LGBTQ issues.

8.        When I joined NCLR in 1994, I worked with the organization to found its Immigration Project following the decision by the Board of Immigration Appeals in *Matter of Toboso-Alfonso,* which recognized that sexual orientation could be the basis for the formation of a particular social group for asylum claims. 20 I. & N. Dec. 819 (BIA 1990), *designated for publication by Att'y Gen. Order No. 1895* (June 19, 1994). Through the creation of this project, NCLR became the first national LGBTQ organization to provide immigration specific services.

9.        Since its founding, NCLR's Immigration Project has worked strenuously to advocate for the recognition of LGBTQ asylum claims. Along with other national organizations, we provided amicus support in in *Hernandez-Montiel v. INS*, 225 F. 3d 1084 (9th Cir. 2000), the first case in the United States to recognize a gender-identity based particular social group. We have continued to provide amicus support of this nature in critical asylum and protection based cases. *See, e.g., Bringas-Rodriguez v. Sessions*, 850 F. 3d 1051(9th Cir. 2017) (en banc) (holding that credible evidence of childhood sexual violence against a gay male from Mexico established past persecution for asylum purposes); *Avendano-Hernandez v. Lynch*, 800 F. 3d 1072 (9th Cir.

DECLARATION OF NOEMI CALONJE        2

2015) (approving claim for protection under the Convention Against Torture by a transgender woman from Mexico). Through our work on these cases in federal courts, our aim is to secure recognition of the harms that LGBTQ people face in other parts of the world, and to ensure that they have access to asylum protections in the United States so they are not returned to face further harm.

10.     In addition to this broad-based advocacy designed to ensure protection for LGBTQ migrants, the primary work of NCLR's Immigration Project is direct legal representation of LGBTQ people who are seeking immigration benefits in the United States. The project conducts consultations and provides legal representation to LGBTQ individuals in their immigration proceedings and applications before all components of United States Citizenship and Immigration Services (USCIS) and the Executive Office for Immigration Review (EOIR). In addition to direct representation, we operate a help line for immigrants, do community presentations and Know Your Rights events, and assist with or locate additional counsel for collateral services such as name and gender changes; employment and housing discrimination; and obtaining protective orders for survivors of violence, harassment, or stalking.

11.     All of NCLR's immigration clients identify as part of the LGBTQ community. That aspect of identity, in addition to geographic location in the San Francisco area, are the primary screening mechanisms that we utilize for our immigration cases.

12.     Our Immigration Project is focused on providing legal representation to LGBTQ asylum seekers who have been forced to leave their countries of origin due to physical and sexual abuse and violence on account of their sexual orientation, gender identity, or gender expression. In addition to representing these clients in their affirmative or defensive asylum

claims, we also provide assistance seeking adjustment of status for people who are seeking to do so on the basis of having been granted asylum.

13.     At present we have approximately 112 open immigration cases, more than 60 of which are asylum cases, and 35 of which are adjustment cases for people granted asylum.  Of our current client population, about half are from countries other than Mexico. In addition, our client population contains a good mix of people who have entered the United States by presenting at a port of entry and people who have entered outside such a port. Our current numbers on manner of entry indicate that about 75 percent entered the country outside of a port of entry, but that number may be skewed by the fact that border has been largely closed for the past three years under Title 42.

14.     The vast majority of our asylum practice is affirmative, that is to say before USCIS. In our experience, defensive immigration cases are much more complicated, and we have significantly less capacity to handle a significant number of these cases concurrently.

15.     Since the Immigration Project's founding nearly 30 years ago, we have represented approximately 3500 people, the vast majority of whom have been asylum seekers, and we have maintained a 100% success rate in our asylum cases. In addition to the clients for whom we have obtained protection through direct representation, we have also served thousands of others by conducting community outreach events and Know Your Rights presentations in the community.

16.     Our Immigration Project is a vital component of NCLR's overall mission to serve the LGBTQ community, particularly in the San Francisco area. Our team doing this work, myself included, is a team of LGBTQ identified immigrants.

DECLARATION OF NOEMI CALONJE        4

17.     We believe it is critical to provide LGBTQ inclusive services to our immigrant clients, especially because they tend to have had poor experiences with authority figures in the past. For example, our clients frequently have expressed difficulty describing the abuse they endured or even the fact of their sexuality in border interviews because of past negative experiences they had with government officials in their home countries. In addition, our clients have routinely expressed that their ability to move forward with their immigration cases has been thanks to the inclusive representation that we offer. In particular, we have had numerous clients who have sought representation with other immigration service providers but ultimately felt uncomfortable proceeding with those providers after encountering homophobic or transphobic treatment such as being misgendered, asked inappropriate questions, outed to family members, or otherwise disrespected by virtue of their sexual orientation or gender identity.

18.     We are also aware that LGBTQ migrants have a tendency to come to the San Francisco area because they expect the region to be safest for them or have heard that there are groups here of LGBTQ immigrants from their country or region of origin. When they do so, they often arrive without any resources. We strive to serve people in the Bay Area who cannot afford private immigration representation, and we are particularly connected to the Spanish-speaking immigrant community. We see ourselves as a program for LGBTQ immigrants that is also run by members of that same community.

**The Rule Will Harm NCLR's Immigration Project and Is Already**

19.     For all the reasons described below, this Rule will cause irreparable harm to NCLR's mission of advancing the civil and human rights of LGBTQ individuals through provision of immigration legal services and representation.

DECLARATION OF NOEMI CALONJE        5

20.     Most significantly, the Rule will severely frustrate NCLR's mission as it relates to providing legal representation to LGBTQ asylum seekers. As mentioned above, the vast majority of NCLR's asylum seeking clients are in an affirmative process before USCIS, and nearly all of those clients entered the United States via the U.S.-Mexico border. Additionally, a significant portion of our clients are non-Mexican nationals who would have had to transit through at least Mexico to arrive at the U.S. border, and a significant number of our clients are also individuals who entered the United States without presenting at a port of entry.

21.     Under the Rule, people who enter the United States in this manner will no longer be able to seek asylum affirmatively, and so we expect that our ability to identify clients whom we could serve in this manner will be eviscerated.

22.     Even if asylum seekers were able to pass through the screening at the border under the higher standard, they would be in more complex removal proceedings. We do not have the resources to provide representation at current levels for more clients in a defensive posture before the immigration courts. Because defensive cases are significantly more complicated, we expect that we will have to significantly reduce the number of clients we are able to serve.

23.     Representing client in removal cases instead of affirmatively will be more complicated for a number of clear reasons. First, we will have to argue for an exception to the Rule's presumption against asylum eligibility. Doing so will require us to ask detailed questions of our clients about their efforts to use CBP One and their experiences in each transit country. We will also have to inquire about their health and other factors that might lead to a finding that the presumption can be rebutted.  None of these factors was relevant to the process of seeking asylum before the Rule took effect, so the process of preparing a case will require our team to evaluate entirely new issues.

DECLARATION OF NOEMI CALONJE          6

24.      Second, in order to diligently protect our clients from being returned to face harm and violence, we will have to also thoroughly argue that they can meet the higher and harder legal standards that apply to withholding of removal and protection under the Convention Against Torture (CAT). Withholding of removal and CAT claims are more resource-intensive, due to the higher evidentiary standards imposed by each. These standards also make it more difficult to be granted relief before an immigration judge, meaning NCLR will have to devote additional resources to appeals to the Board of Immigration Appeals (BIA) and petitions for review. Importantly, because of our success rate up until now, we have not had to focus any considerable amount of resources to appeals, which will now become critical.

25.      The Rule will also impair our ability to provide a different form of legal service to clients: adjustment of status. Though NCLR has recently narrowed the scope of our immigration representation such that we no longer take on T and U Visa cases, we consider it critical to continue helping our asylee clients on their path to permanent residency. We see that status as critical to our clients' efforts to integrate into the United States and to participate fully in our society. But under the Rule, our clients who are granted withholding of removal or CAT protection will not be eligible to seek adjustment of status, so this entire aspect of our work will become virtually impossible.

26.      We will also have to divert significant resources toward explaining the changes in the Rule to the community. As mentioned above, we view our work of providing LGBTQ focused services to immigrants as critical to their ability to access those services. I expect that we will have to train our staff to talk about the practical effects of this rule on the LGBTQ immigrant communities we serve in plain language accessible to them, and that we will have to take numerous steps to educate the public about the changes imposed by the Rule.

DECLARATION OF NOEMI CALONJE          7

27.     In fact, this work has already begun. NCLR participated in a convening in early

May where concern about the impending Rule and related changes at the border were a source of

great concern and confusion. And since the Rule has taken effect we have seen an increase in

phone calls along with confusion and panic from people who have asylum claims already

pending.  Everyone wants to move forward with their cases but are concerned about being in

jeopardy because of the changes. These changes have required us to spend time dispelling

rumors and educating the community about the Rule and its impact.

28.     The Rule also promises to have a detrimental impact on staff and morale at

NCLR.  As mentioned above, we are a team of LGBTQ immigrants working to serve our own

community, and we have maintained a 100% success rate in our asylum representation. Under

this Rule our ability to win asylum for our clients will be severely negatively impacted. And we

will have the daunting and cruel task of telling our clients and potential clients—who have

already been through enough suffering—that they are not "truly" welcome in the United States

and that they cannot be granted asylum. That reality is likely to lead to depression and burnout.

29.     The application of the Rule to LGBTQ asylum seekers will also frustrate NCLR's

mission. NCLR advocates for equitable policies that reflect the unique vulnerabilities impacting

LGBTQ people. This Rule ignores the realities that this community faces in the process of

making the journey to the United States, and imposes a barrier on asylum seekers that is

improper and unfair for all people but that is outright impossible for most LGBTQ asylum

seekers. When the U.S. Government passes laws and regulations that impose a special harm on

LGBTQ people, it is critical to NCLR's mission to counter those policies. This Rule will require

NCLR to take on new advocacy and education countermand the harms it creates.

DECLARATION OF NOEMI CALONJE          8

30.     Finally, in addition to these substantive harms caused by the Rule, the agencies'

decision to issue a proposed rule with just a 30-day comment period also harmed NCLR. We are

a very small team and our ability to provide substantive comments on a Rule of this scale takes

time. Though we did provide a brief comment, the 30-day comment period was not sufficient for

us to gather the kind of information that we believe would have been important for the agencies

to consider. In particular, given more time, we would have liked to be able to provide more

information about the country-conditions facing LGBTQ people in transit countries, information

that fundamentally undermines the Rule's premise that people can safely seek asylum elsewhere

in the region.

31.     It is hard to overstate the detrimental impact that this Rule will have on NCLR's

clients, staff, and mission. These changes will do nothing to improve the functioning of our

immigration system and will instead infringe on our clients' due process rights, cost us numerous

resources while forcing us to cut back on our services, and impose insurmountable bureaucratic

obstacles on people seeking refuge from persecution and torture.

### NCLR's Clients Cannot Seek Protection in Transit Countries

32.     In addition to the harms that the Rule will impose on NCLR, I also want to point

out the unreasonableness of the Rule as it relates to the reality facing our clients. As mentioned

above, all of the clients NCLR serves through its Immigration Project identify as LGBTQ. It is

also the case that nearly all of them have entered the United States via the U.S-Mexico border,

and since a significant portion of our clients are not Mexican citizens, that means that most of

them will have traveled through Mexico and often the Northern Triangle to arrive at the border.

33.     The harms and violence facing LGBTQ individuals in Mexico, Central America,

and the rest of Latin America are well documented, and demonstrate that these countries are not

DECLARATION OF NOEMI CALONJE          9

viable asylum options for LGBTQ people. Since the bulk of NCLR's clients come to the United States from Mexico and Central America, we focus on the four countries that are most likely to be part of one of our client's transit journeys to the United States.

a. **Guatemala:** The U.S. State Department Country Report acknowledges that "Violence against LGBTQI+ persons remained a persistent issue" in Guatemala, and members of the LGBTQ community "often experience[] police abuse."[1] The State Department has further acknowledged that there is "general societal discrimination against LGBTQI+ persons in access to education, health care, employment, and housing," and that the Guatemalan government has "made minimal efforts to address this discrimination." *Id.*

b. **Honduras:** The Tenth Circuit has recently recognized that "there is pervasive violence against transgender women in Honduras." *Hernandez Aguilar v. Garland*, 29 F. 4th 1208, 1213-1214 (10th Cir. 2022). Indeed, it held that "[t]he acts of violence are so widespread that any reasonable adjudicator would find a pattern or practice of persecution against transgender women in Honduras." *Id.* In support of this finding, the Court cited a U.S. State Department Country Report as well as expert documentation showing that "[Lesbian, gay, bisexual, transgender, and intersex] individuals in Honduras are murdered, attacked, threatened, and intimidated at alarming rates, and often in brutal and/or public ways." *Id.* The Court noted that these harms "tend to go unpunished, and that such cases are tainted from the start by discriminatory stereotypes." *Id.*

c. **El Salvador:** As the U.S. State Department Country Report acknowledges, "Violence against lesbian, gay, bisexual, transgender, queer, and intersex (LGBTQI+) persons

---

[1] Country Report on Human Rights Practices for 2022: Guatemala, U.S. DEPT. OF STATE, https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/guatemala

DECLARATION OF NOEMI CALONJE        10

was widespread" in El Salvador.[2] The State Department also cited a Human Rights Report,

which "found that transgender persons regularly faced discrimination in health care,

employment, banking, and voting." And under the leadership of President Bukele, who has

declared a state of emergency to try to combat gang violence, police have been given increased

authority. But under that authority, "tens of thousands of people have been detained without due

process, and the rights of vulnerable and marginalized groups have been trampled on."[3] In El

Salvador, "LGBTQ communities are frequently targeted by gang violence, especially

transgender women who are forced into sex work and drug trafficking." *Id.*

d.       **Mexico:** Even though Mexico has passed laws that purport to confer rights on

members of the LGBTQ Community, the State Department itself acknowledges that "the

government did not always investigate and punish those complicit in abuses against LGBTQI+

persons, especially outside of Mexico City."[4] The report further recognizes that police

"routinely" mistreat members of the LGBQ community, that hate crimes remain a serious

problem, and that "six of every 10 members of the LGBTQI+ community reported experiencing

discrimination" with "more than half" facing hate speech and physical violence. *Id.* Indeed, the

fact that many of NCLR's clients are themselves Mexican serves to illustrate how much danger

persists in that country for members of the LGBTQ community.

---

[2] Country Report on Human Rights Practices for 2022: El Salvador, U.S. DEPT. OF STATE, https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/el-salvador/.

[3] Danae Vilchez, Women and LGBTQ people caught up in El Salvador's state of emergency: Government's anti-gang measures are threatening the innocent, vulnerable, and marginalized, say human rights groups" OPEN DEMOCRACY (Feb. 20, 2023), https://www.opendemocracy.net/en/5050/el-salvador-women-lgbt-human-rights-bukele-gangs-maras/

[4] Country Report on Human Rights Practices for 2021: Mexico, U.S. DEPT. OF STATE, https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/mexico/.

34.     Given this reality, NCLR's clients face heightened risks, not only in their home countries, but also in the countries they must travel through in order to reach the United States. For example, many of NCLR's clients have been forced to stay at shelters in Mexico before being allowed to enter the United States. NCLR's clients have reported that cartels and Mexican police check the shelters and that they have witnessed and/or experienced homophobic and transphobic words and actions from many of these individuals.

35.     Our clients have reported being harassed, having rocks thrown at them, being sexually abused by police and gang members, being followed and extorted, or otherwise facing physical violence in Mexico and other countries on the way to the U.S. border.

36.     It is important to reiterate that this violence is not limited to Central America; it is prevalent in Mexico in particular. Clients consistently share that reporting such instances to Mexican police is not safe. Mexican authorities are often themselves perpetrators of abuses against LGBTQ people or otherwise turn a blind eye to such violence. Courts have recognized what our clients routinely report. *See, e.g. Avendano Hernandez*, 800 F. 3d at 1080 (granting CAT protection to transgender woman from Mexico and noting that Mexico's legal reforms for LGBTQ people "may do little to protect a transgender woman like Avendano-Hernandez from discrimination, police harassment, and violent attacks in daily life"); *see also Bringas-Rodriguez*, 850 F. 3d at 1072 (recognizing that Mexico's "de jure commitments to LGBTI protection do not align with the de facto reality" that LGBTQ people face in the country).

37.     In addition to security risks, NCLR clients report being unable to find stability in the countries they travel through due to the lack of access to gender affirming and/or HIV care. Without access to critical medical care, the health and safety of our clients is at risk the longer they are forced to stay in transit countries.

DECLARATION OF NOEMI CALONJE          12

38.      Given this harsh reality, nearly every client that NCLR represents who transited through Mexico has faced some form of violence, discrimination, or abuse relating to their sexual orientation or gender identity. For example, our client Elena (a pseudonym) is a transgender woman from El Salvador who was raped, and physically assaulted in Mexico while en route to the United States.  And our client Jose (a pseudonym) is a cisgender, gender non-conforming man from Guatemala who was targeted and physically attacked in Mexico by cartel members while he was en route to the United States.

39.      By expecting people to seek protection in transit to the United States, the Rule acts as an all-out barrier to asylum for NCLR's clients. And the limited exception for people who crossed the border because of an imminent and extreme threat will be insufficient to protect NCLR's clients. That is so because the exception would require them to wait for something terrible to happen to them—or very nearly happen—before fleeing to the border to invoke their right to seek protection.

### Many of NCLR'S Clients Will Be Unable to Navigate CBP One

40.      The Rule also erects a barrier to asylum for people who fail to utilize the CBP One application to get an appointment to approach the U.S. border. Though we have not worked with clients in the process of utilizing this specific application, our experience helping our clients navigate technology in general suggests that using this program will prove impossible for many.

41.      First, many of our clients come to the United States without a smart phone or having lost their phone en route. I expect that for many the process of getting a phone, finding a place to use it, and then actually navigating the process will prove too difficult to manage.

42.      I base this conclusion on the fact that we assist clients in setting up appointments, and there is a lot of variance in our clients' educational levels and their exposure to technology.

DECLARATION OF NOEMI CALONJE        13

The clients who enter the United States via the southern border are likely the same clients who were unable to get visas and enter via flight, and they are the same subset of our client base that will likely be unable to navigate the CBP One process.

43.     Second, I believe NCLR's clients would be subject to compounded harassment at the border in the process of trying to get an appointment via CBP One. As I understand it, most people will have to congregate in a place where there is readily available internet in order to book an appointment. Our experience shows that the longer our clients spend in exposed places, particularly if they are clustered with other migrants or other LGBTQ people, the greater risk they face of physical and sexual violence as well as extortion.

## Conclusion

44.     Overall, NCLR opposes this Rule because it eliminates access to asylum to LGBTQ people, who represent some of this country's most in-need applicants for refugee protections. The requirement to make an appointment using CBP One will be unrealistic for our clients, and the alternative of seeking asylum in a transit country will be outright dangerous.  As a result, the Rule threatens to completely upend NCLR's Immigration Project.

I hereby declare under penalty of perjury that the foregoing is true and correct.



_____

Noemi Calonje

Executed on the 3rd day of June, 2023, in San Francisco, California.

DECLARATION OF NOEMI CALONJE          14