# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

East Bay Sanctuary Covenant, *et al.,*

　　　　*Plaintiffs*,

　　v.

Joseph R. Biden, President of the United States, *et al.*,

　　　　*Defendants*.

Case No.: 18-cv-06810-JST

## PLAINTIFFS' APPENDIX

The following documents are excerpts of the administrative records Defendants produced in this case, which have been cited in support of Plaintiffs' concurrently filed motion for summary judgment.

## INDEX OF "CLP_AR" DOCUMENTS

|    | Title | Page Number |
|----|-------|-------------|
| 1. | *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at United States Border*, Exec. Order 14,010, 86 Fed. Reg. 8,267 (Feb. 5, 2021) | CLP_AR_000553-57 |
| 2. | *Implementation of a Parole Process for Nicaraguans*, 88 Fed. Reg. 1,255 (Jan. 9, 2023) | CLP_AR_000995-1006 |
| 3. | Letter from Brenda Abdelall, Assistant Sec'y, Off. of Partnership & Engagement, Dep't of Homeland Sec., response to Rafael Malpica Padilla, Exec. Dir. Of Serv. & Justice, Evangelical Lutheran Church in Am., (Mar. 23, 2023) | CLP_AR_001252-54 |
| 4. | Letter from Cory Booker, Member of Cong., inquiry to Alejandro Mayorkas, Sec'y to U.S. Dep't of Homeland Sec. (Mar. 27, 2023) | CLP_AR_001258-60 |
| 5. | Letter from Edward Markey, Member of Cong., inquiry to Alejandro Mayorkas, Sec'y to U.S. Dep't of Homeland Sec. (Feb. 21, 2023) | CLP_AR_001261-64 |
| 6. | U.S. Dep't of Homeland Sec., Fact Sheet, *U.S. Government Announces Sweeping New Actions to Manage Regional Migration* (Apr. 27, 2023) | CLP_AR_002187-89 |
| 7. | U.S. Dep't of Homeland Sec., Off. of Immigration Statistics, *Data for May 2023 Final Rule* | CLP_AR_002374-2484 |
| 8. | U.S. Dep't of Homeland Sec., Off. of Immigration Statistics, *Encounter Projections* (May 3, 2023) | CLP_AR_002485-95 |

| | Title | Page Number |
|---|---|---|
| 9. | U.S. Dep't of Homeland Sec., Press Release, *CBP Makes Changes to CBP One App* (May 5, 2023) | CLP_AR_002575-79 |
| 10. | White House, Press Release, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023) | CLP_AR_004631-32 |
| 11. | *Biden's Asylum Ban Will Continue to Place Survivors in Harm's Way*, TAHIRIH (Feb. 21, 2023) | CLP_AR_004847-51 |
| 12. | Brewer, Stephanie et al, *Struggling to Survive: the Situation of Asylum Seekers in Tapachula, Mexico*, WASH. OFF. ON LATIN AM. (June 2022) | CLP_AR_004858-96 |
| 13. | Comprehensive Regional Protection and Solutions Framework, *MIRPS 2022 - Annual Report of the Regional Comprehensive Framework for Protection and Solutions* (Dec. 8, 2022) | CLP_AR_004948-98 |
| 14. | Gov't of Mex., *La COMAR en Números* (Dec. 2022) | CLP_AR_005707 |
| 15. | Gov't of Mex., Mexican Refugee Assistance Commission, *La COMAR en números: Octobre 2022* (Nov. 7, 2022) | CLP_AR_005752 |
| 16. | Letter from Advocates for Human Rights et al., inquiry to Alejandro Mayorkas et al., Sec'y to U.S. Dep't of Homeland Sec. (Mar. 1, 2023) | CLP_AR_006669-76 |
| 17. | Letter from Michael Kippins, Laws. for Civ. Rts., inquiry to Alejandro Mayorkas, Sec'y to U.S. Dep't of Homeland Sec. (Mar. 27, 2023) | CLP_AR_006715-17 |

## INDEX OF "CLP_PC" DOCUMENTS

| | **Title** | **Page Number** |
|---|---|---|
| 1. | Human Rights First, *Human Rights Stain, Public Health Farce* (Dec. 2022) | CLP_PC_000081-101 |
| 2. | National Immigration Project (NIPNLG) Public Comment (Mar. 23, 2023) | CLP_PC_020225-40 |
| 3. | Kino Border Initiative Public Comment (Mar. 24, 2023) | CLP_PC_020355-64 |
| 4. | Immigrant Law Center of Minnesota Public Comment (Mar. 24, 2023) | CLP_PC_020616-27 |
| 5. | Catholic Legal Immigration Network, Inc. Public Comment (Mar. 24, 2023) | CLP_PC_020658-73 |
| 6. | Asylum Access, *Mexican Asylum System for U.S. Immigration Lawyers FAQ* (Nov. 2019) | CLP_PC_020773-82 |
| 7. | George Washington University Law School Public Comment (Mar. 27, 2023) | CLP_PC_021091-98 |
| 8. | Yale Law School Immigrant Justice Project Public Comment (Mar. 27, 2023) | CLP_PC_021162-81 |
| 9. | Round Table of Former Immigration Judges Public Comment (Mar. 27, 2023). | CLP_PC_021345-56 |
| 10. | Nebraska Appleseed Public Comment (Mar. 27, 2023) | CLP_PC_021444-49 |
| 11. | Instituto para las Mujeres en la Migración (IMUMI) & the Women's Refugee Commission (WRC), *Stuck in Uncertainty and Exposed to Violence: The Impact of US and Mexican Migration Polices on Women Seeking Protection in 2021* (Feb. 2022) | CLP_PC_021586-94 |
| 12. | Women's Refugee Commission et al., *The consequences of US and Mexican immigration policies on the protection of Venezuelan women and LGBTIQ+ individuals in Southwest Mexico* (Dec. 2022) | CLP_PC_021595-615 |
| 13. | Tahirih Justice Center & Oxfam, *Surviving Deterrence* (2022) | CLP_PC_021741-72 |

| | | |
|---|---|---|
| 14. | Helen Kerwin, *The Mexican Asylum System in Regional Context*, 33 MD. J. INT'L L. 290 (2018) | CLP_PC_021944-67 |
| 15. | Eduardo Torre Cantalapiedra et al.*, The Mexican Asylum System: Between Protecting and Control*, Frontera Norte (Apr. 2021) | CLP_PC_021968-91 |
| 16. | Amnesty International Public Comment (Mar. 27, 2023) | CLP_PC_022038-44 |
| 17. | Amnesty International, *Overlooked, Under-Protected: Mexico's Deadly Refoulment of Central Americans Seeking Asylum* (2018) | CLP_PC_022500-23 |
| 18. | Amnesty International, *Unprotected in Ecuador: Venezuelan Refugee Women Survivors of Gender-Based Violence* (2022) | CLP_PC_022583-623 |
| 19. | Black Alliance for Just Immigration, *"There is a Target on Us" – The Impact of Anti-Black Racism on African Migrants at Mexico's Southern Border* (2021) | CLP_PC_022632-736 |
| 20. | Daina Beth Solomon & Lizbeth Diaz, *Mexico Seeks to Curb "Abuse" of Asylum System by Migrants Who Do Not Plan to Stay*, Reuters (Feb. 13, 2023) | CLP_PC_022810-12 |
| 21. | Fragomen, Del Rey, Bernsen & Loewy LLP, *Costa Rica: Special Permit for Cuban, Nicaraguan & Venezuelan Refugees Will Reopen* (Dec. 19, 2022) | CLP_PC_022823-24 |
| 22. | Government of Belize, *Ministry of Foreign Affairs, Foreign Trade & Immigration, Amnesty 2022: Who Qualify? (2023)* (accessed Mar. 16, 2023) | CLP_PC_022825-26 |
| 23. | Human Rights First, *Is Mexico Safe for Refugees and Asylum Seekers?* (Nov. 2018) | CLP_PC_022851-52 |
| 24. | Humans Rights Watch, *Mexico: Asylum Seekers Face Abuses at Southern Border* (June 6, 2022) | CLP_PC_022853-68 |
| 25. | Human Rights Watch, *World Report 2023: Events of 2022* (2023) | CLP_PC_022869-3231 |
| 26. | International Crisis Group, *Ecuador's High Tide of Drug Violence* (Nov. 4, 2022) | CLP_PC_023232-41 |
| 27. | Andrew Selee et al., *Laying the Foundation for Regional Cooperation*, MIGRATION POLICY INSTITUTE (Apr. 2021) | CLP_PC_023302-66 |
| 28. | Arturo Castellanos-Canales, *Mexico's Asylum System: Good in Theory, Insufficient in Practice*, NATIONAL IMMIGRATION FORUM (Mar. 15, 2023) | CLP_PC_023385-94 |
| 29. | Nate Edwards, *Colombia's Support for Venezuelan Migrants and Refugees: President Petro reaffirms commitment to integration, but continued progress requires more international support*, NYU CENTER ON INTERNATIONAL COOPERATION & PATHFINDERS FOR PEACEFUL, JUST AND INCLUSIVE SOCIETIES (Sept. 2022) | CLP_PC_023395-404 |
| 30. | Rachel Schmidtke, *A New Way Forward: Strengthening the Protection Landscape in Mexico*, Refugees International (Nov. 12, 2020) | CLP_PC_023428-41 |
| 31. | Rosa Flores, *Mexico rethinks asylum initiative after controversial US announcement*, CNN (Feb. 24, 2023) | CLP_PC_023442-45 |
| 32. | UNHCR The UN Refugee Agency, *Ecuador Monthly Update* (Nov. 2022) | CLP_PC_023463-69 |
| 33. | UNHCR The UN Refugee Agency, *Number of displaced Nicaraguans in Costa Rica doubles in less than a year* (Mar. 25, 2022) | CLP_PC_023473-77 |

| 34. | UNHCR The UN Refugee Agency, Datasets of Asylum Decisions in Belize, Colombia, Costa Rica, Guatemala, and Honduras (2022) | CLP_PC_023478-86 |
|---|---|---|
| 35. | Memorandum from Alejandro N. Mayorkas, Sec'y of Homeland Sec., Termination of the Migrant Protection Protocols (Oct. 29, 2021) | CLP_PC_023691-94 |
| 36. | U.S. Dep't of State, *Belize International Travel Information* (last visited Mar. 16, 2023) | CLP_PC_023726-30 |
| 37. | U.S. Dep't of State, *Colombia Travel Advisory* (last visited Mar. 16, 2023) | CLP_PC_023780-82 |
| 38. | U.S. Dep't of State, *Ecuador Travel Advisory* (last visited Mar. 17, 2023) | CLP_PC_023828-31 |
| 39. | U.S. Dep't of State, *El Salvador International Travel Information* (last visited Mar. 16, 2023) | CLP_PC_023874-79 |
| 40. | Overseas Security Advisory Council, Bureau of Diplomatic Security, U.S. Dep't of State, *Guatemala Country Security Report* (Aug. 15, 2022) | CLP_PC_024105-12 |
| 41. | U.S. Customs and Border Protection, *CBP Releases January 2023 Monthly Operational Update* (Feb. 10, 2023) | CLP_PC_024814-23 |
| 42. | Stephanie Leutert & Caitlyn Yates, *Asylum Processing at the U.S.-Mexico Border: February 2023*, UNIVERSITY OF TEXAS AT AUSTIN STRAUSS CENTER FOR INTERNATIONAL SECURITY AND LAW (Feb. 2023) | CLP_PC_024899-910 |
| 43. | Tahirih Justice Center & Oxfam, *Surviving Deterrence* (2022) | CLP_PC_024919-50 |
| 44. | Washington Office on Latin America (WOLA), Asylum Access, & the Institute for Women in Migration (IMUMI), *Key Issues on Access to Asylum in Mexico, Protections for Migrant Children, and U.S. Cooperation* (Mar. 23, 2021) | CLP_PC_025089-91 |
| 45. | U.S. Dep't of State, Bureau of Democracy, Human Rights and Labor, *Guatemala 2022 Human Rights Report* (2022) | CLP_PC_025128-70 |
| 46. | U.S. Dep't of State, Bureau of Democracy, Human Rights and Labor, *Honduras 2022 Human Rights Report* (2022) | CLP_PC_025171-96 |
| 47. | Letter from 172 national, state, and local organizations, inquiry to Alejandro Mayorkas, Sec'y of Homeland Sec., et. al. (Mar. 1, 2023) | CLP_PC_025280-87 |
| 48. | Kate Morrissey, *Asylum seekers in Tijuana are scrambling through mobile app error messages for few appointments into the U.S.*, SAN DIEGO UNION-TRIBUNE (Jan. 22, 2023) | CLP_PC_025454-65 |
| 49. | Letter from Jesús G. "Chuy" García et al., Members of Cong., inquiry to Alejandro Mayorkas, Sec'y of Homeland Sec. (Mar. 13, 2023) | CLP_PC_025477-82 |
| 50. | Letter from Edward J. Markey, United States Senator, inquiry to Alejandro Mayorkas, Sec'y of Homeland Sec. (Feb. 21, 2023) | CLP_PC_025485-88 |
| 51. | John Washington, *Glitchy CBP One app turning volunteers into Geek Squad support for asylum-seekers in Nogales*, ARIZONA LUMINARIA (Mar. 20, 2023) | CLP_PC_025499-500 |
| 52. | U.S. Customs and Border Protection, *U.S. Customs and Border Protection (CBP) Encounters Nationwide, Southwest Land Border and Northern Land Border Encounters by Fiscal Year (FY)* (Mar. 3, 2023) | CLP_PC_025573-90 |

| 53. | Dr. Eric Hershberg, Director of the Center for Latin American & Latino Studies (CLALS), *Expert Declaration of Dr. Eric Hershberg* (Feb. 28, 2020) | CLP_PC_026149-203 |
|---|---|---|
| 54. | Expert Declaration of Claudia Paz y Paz Bailey, Director of the Center for Latin American & Latino Studies (CLALS), American University (Feb. 28, 2020) | CLP_PC_026234-49 |
| 55. | Human Rights Watch, *Deportation with a Layover: Failure of Protection under the US-Guatemala Asylum Cooperative Agreement* (May 19, 2020) | CLP_PC_026308-33 |
| 56. | Yael Schacher & Rachel Schmidtke, *Harmful Returns: The Compounded Vulnerabilities of Returned Guatemalans in the Time of COVID-19*, REFUGEES INTERNATIONAL (June 2020) | CLP_PC_026341-72 |
| 57. | Karen Musalo, *Biden's Embrace of Trump's Transit Ban Violates US Legal and Moral Refugee Obligations*, JUST SECURITY (Feb. 8, 2023) | CLP_PC_029159-63 |
| 58. | USCIS Refugee, Asylum and Int'l Operations Research Unit, *Guatemala: Treatment of Non-Guatemalan Migrants (*Nov. 15, 2019) | CLP_PC_029447-56 |
| 59. | Email from Giovanni Bassu to Glenn Coine et al. (Oct. 4, 2019) | CLP_PC_029465-66 |
| 60. | Amnesty International, *Unprotected: Gender-Based Violence Against Venezuelan Refugee Women in Colombia and Peru* (July 2022) | CLP_PC_029634-61 |
| 61. | Ari Sawyer, *US: LGBT Asylum Seekers in Danger at the Border* (May 31, 2022) | CLP_PC_029700-08 |
| 62. | Instituto para las Mujeres en la Migración (IMUMI) & the Women's Refugee Commission (WRC), *Stuck in Uncertainty and Exposed to Violence: The Impact of US and Mexican Migration Policies on Women Seeking Protection in 2021* (Dec. 2021) | CLP_PC_029738-46 |
| 63. | Instituto para las Mujeres en la Migración (IMUMI) et al., *Memo: Impacts of U.S. and Mexican migration enforcement on migrant and refugee rights in Mexico* (Sept. 2021) | CLP_PC_029747-55 |
| 64. | Moises Castillo & Christopher Sherman, *Fleeing Nicaraguans strain Costa Rica's asylum system*, AP News (Sept. 2, 2022) | CLP_CP_030101-12 |
| 65. | Refugees International Public Comment (Mar. 27, 2023) | CLP_PC_030637-43 |
| 66. | FWD.us Public Comment (Mar. 27, 2023) | CLP_PC_030665-83 |
| 67. | Human Rights First, *Human Rights Stain, Public Health Farce* (Dec. 2022) | CLP_PC_030900-20 |
| 68. | American Gateways Public Comment (Mar. 27, 2023) | CLP_PC_031496-518 |
| 69. | Florence Immigrant & Refugee Rights Project Public Comment (Mar. 27, 2023) | CLP_PC_031519-45 |
| 70. | Taylor Levy Public Comment (Mar. 27, 2023) | CLP_PC_031894-907 |
| 71. | Black Immigrant Bail Fund, Cameroon Advocacy Network, Haitian Bridge Alliance, and Robert F. Kennedy Human Rights Public Comment (Mar. 27, 2023) | CLP_PC_032290-359 |
| 72. | Immigrant Defenders Law Center Public Comment (Mar. 27, 2023) | CLP_PC_032360-76 |
| 73. | U.S. Dep't of State, Mexico 2022 Human Rights Report (2022) | CLP_PC_032428-73 |
| 74. | Tahirih Justice Center Public Comment (Mar. 27, 2023) | CLP_PC_032709-44 |
| 75. | Youth Center for Immigrant Children's Rights Public Comment (Mar. 27, 2023) | CLP_PC_032745-71 |
| 76. | Texas Civil Rights Project Public Comment (Mar. 27, 2023) | CLP_PC_032967-83 |

| 77. | Frente Accion Latinx de Minnesota Public Comment (Mar. 27, 2023) | CLP_PC_032995-3012 |
| 78. | Lads Americas Immigrant Advocacy Center Public Comment (Mar. 27, 2023) | CLP_PC_033167-87 |
| 79. | Al Otro Lado Public Comment (Mar. 27, 2023) | CLP_PC_033339-59 |
| 80. | Center for Justice and International Law (CEJIL) & International huma Rights Clinic (IHRLC), *Asylum in Mesoamerica: Accessing International Protection in Mexico and Guatemala*, AMERICAN UNIVERSITY, WASHINGTON COLLEGE OF LAW | CLP_PC_033392-457 |
| 81. | U.S. Dep't of State, El Salvador 2022 Human Rights Report | CLP_PC_034188-223 |
| 82. | U.S. Dep't of State, Colombia 2022 Human Rights Report | CLP_PC_034224-66 |
| 83. | U.S. Dep't of State, Ecuador 2022 Human Rights Report | CLP_PC_034267-304 |
| 84. | Elliot Spagat, *Online System to Seek Asylum in US is Quickly Overwhelmed*, AP (Jan. 28, 2023) | CLP_PC_034909-912 |
| 85. | Ryan Baugh, *Homeland Security: Fiscal Year 2020 Refugees and Asylees Annual Flow Report* (Mar. 8, 2022) | CLP_PC_039827-50 |
| 86. | Black Immigrant Bail Fund, Cameroon Advocacy Network, Haitian Bridge Alliance, and Robert F. Kennedy Human Rights Public Comment (Mar. 27, 2023) | CLP_PC_069077-145 |
| 87. | Human Rights First, *Two Years of Suffering: Biden Administration Continues Use of Discredited Title 42 Order to Flout Refugee Law* (Mar. 2022) | CLP_PC_075945-50 |
| 88. | Human Rights First, *Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021* (2022) | CLP_PC_076248-87 |



---

Federal Register

Vol. 86, No. 23

Friday, February 5, 2021

# Presidential Documents

---

Title 3—

The President

Executive Order 14010 of February 2, 2021

**Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border**

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.,* it is hereby ordered as follows:

**Section 1**. *Policy.* For generations, immigrants have come to the United States with little more than the clothes on their backs, hope in their hearts, and a desire to claim their own piece of the American Dream. These mothers, fathers, sons, and daughters have made our Nation better and stronger.

The United States is also a country with borders and with laws that must be enforced. Securing our borders does not require us to ignore the humanity of those who seek to cross them. The opposite is true. We cannot solve the humanitarian crisis at our border without addressing the violence, instability, and lack of opportunity that compel so many people to flee their homes. Nor is the United States safer when resources that should be invested in policies targeting actual threats, such as drug cartels and human traffickers, are squandered on efforts to stymie legitimate asylum seekers.

Consistent with these principles, my Administration will implement a multipronged approach toward managing migration throughout North and Central America that reflects the Nation's highest values. We will work closely with civil society, international organizations, and the governments in the region to: establish a comprehensive strategy for addressing the causes of migration in the region; build, strengthen, and expand Central and North American countries' asylum systems and resettlement capacity; and increase opportunities for vulnerable populations to apply for protection closer to home. At the same time, the United States will enhance lawful pathways for migration to this country and will restore and strengthen our own asylum system, which has been badly damaged by policies enacted over the last 4 years that contravened our values and caused needless human suffering.

**Sec. 2**. *United States Strategies for Addressing the Root Causes of Irregular Migration and for Collaboratively Managing Migration in the Region.* (a) The Assistant to the President for National Security Affairs (APNSA), in coordination with the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the heads of any other relevant executive departments and agencies, shall as soon as possible prepare:

(i) the United States Strategy for Addressing the Root Causes of Migration (the "Root Causes Strategy"); and

(ii) the United States Strategy for Collaboratively Managing Migration in the Region (the "Collaborative Management Strategy").

(b) The Root Causes Strategy shall identify and prioritize actions to address the underlying factors leading to migration in the region and ensure coherence of United States Government positions. The Root Causes Strategy shall take into account, as appropriate, the views of bilateral, multilateral, and private sector partners, as well as civil society, and it shall include proposals to:

(i) coordinate place-based efforts in El Salvador, Guatemala, and Honduras (the "Northern Triangle") to address the root causes of migration, including by:

(A) combating corruption, strengthening democratic governance, and advancing the rule of law;

(B) promoting respect for human rights, labor rights, and a free press;

(C) countering and preventing violence, extortion, and other crimes perpetrated by criminal gangs, trafficking networks, and other organized criminal organizations;

(D) combating sexual, gender-based, and domestic violence; and

(E) addressing economic insecurity and inequality;

(ii) consult and collaborate with the Office of the United States Trade Representative, the Secretary of Commerce, and the Secretary of Labor to evaluate compliance with the Dominican Republic-Central America Free Trade Agreement to ensure that unfair labor practices do not disadvantage competition; and

(iii) encourage the deployment of Northern Triangle domestic resources and the development of Northern Triangle domestic capacity to replicate and scale efforts to foster sustainable societies across the region.

(c) The Collaborative Management Strategy shall identify and prioritize actions to strengthen cooperative efforts to address migration flows, including by expanding and improving upon previous efforts to resettle throughout the region those migrants who qualify for humanitarian protection. The Collaborative Management Strategy should focus on programs and infrastructure that facilitate access to protection and other lawful immigration avenues, in both the United States and partner countries, as close to migrants' homes as possible. Priorities should include support for expanding pathways through which individuals facing difficult or dangerous conditions in their home countries can find stability and safety in receiving countries throughout the region, not only through asylum and refugee resettlement, but also through labor and other non-protection-related programs. To support the development of the Collaborative Management Strategy, the United States Government shall promptly begin consultations with civil society, the private sector, international organizations, and governments in the region, including the Government of Mexico. These consultations should address:

(i) the continued development of asylum systems and resettlement capacities of receiving countries in the region, including through the provision of funding, training, and other support;

(ii) the development of internal relocation and integration programs for internally displaced persons, as well as return and reintegration programs for returnees in relevant countries of the region; and

(iii) humanitarian assistance, including through expansion of shelter networks, to address the immediate needs of individuals who have fled their homes to seek protection elsewhere in the region.

**Sec. 3.** *Expansion of Lawful Pathways for Protection and Opportunity in the United States.* (a) The Secretary of State and the Secretary of Homeland Security shall promptly review mechanisms for better identifying and processing individuals from the Northern Triangle who are eligible for refugee resettlement to the United States. Consideration shall be given to increasing access and processing efficiency. As part of this review, the Secretary of State and the Secretary of Homeland Security shall also identify and implement all legally available and appropriate forms of relief to complement the protection afforded through the United States Refugee Admissions Program. The Secretary of State and Secretary of Homeland Security shall submit a report to the President with the results of the review.

(b) As part of the review conducted pursuant to section 3(a) of this order, the Secretary of Homeland Security shall:

CLP_AR_000554

(i) consider taking all appropriate actions to reverse the 2017 decision rescinding the Central American Minors (CAM) parole policy and terminating the CAM Parole Program, *see* "Termination of the Central American Minors Parole Program," 82 FR 38,926 (August 16, 2017), and consider initiating appropriate actions to reinstitute and improve upon the CAM Parole Program; and

(ii) consider promoting family unity by exercising the Secretary's discretionary parole authority to permit certain nationals of the Northern Triangle who are the beneficiaries of approved family-sponsored immigrant visa petitions to join their family members in the United States, on a case-by-case basis.

(c) The Secretary of State and the Secretary of Homeland Security shall promptly evaluate and implement measures to enhance access for individuals from the Northern Triangle to visa programs, as appropriate and consistent with applicable law.

**Sec. 4**. *Restoring and Enhancing Asylum Processing at the Border.* (a) *Resuming the Safe and Orderly Processing of Asylum Claims at United States Land Borders.*

(i) The Secretary of Homeland Security and the Director of the Centers for Disease Control and Prevention (CDC), in coordination with the Secretary of State, shall promptly begin consultation and planning with international and non-governmental organizations to develop policies and procedures for the safe and orderly processing of asylum claims at United States land borders, consistent with public health and safety and capacity constraints.

(ii) The Secretary of Homeland Security, in consultation with the Attorney General, the Secretary of Health and Human Services (HHS), and the Director of CDC, shall promptly begin taking steps to reinstate the safe and orderly reception and processing of arriving asylum seekers, consistent with public health and safety and capacity constraints. Additionally, in furtherance of this goal, as appropriate and consistent with applicable law:

(A) The Secretary of HHS and the Director of CDC, in consultation with the Secretary of Homeland Security, shall promptly review and determine whether termination, rescission, or modification of the following actions is necessary and appropriate: "Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists," 85 FR 65,806 (October 13, 2020); and "Control of Communicable Diseases; Foreign Quarantine: Suspension of the Right to Introduce and Prohibition of Introduction of Persons into United States from Designated Foreign Countries or Places for Public Health Purposes," 85 FR 56,424 (September 11, 2020) (codified at 42 CFR 71.40).

(B) The Secretary of Homeland Security shall promptly review and determine whether to terminate or modify the program known as the Migrant Protection Protocols (MPP), including by considering whether to rescind the Memorandum of the Secretary of Homeland Security titled "Policy Guidance for Implementation of the Migrant Protection Protocols" (January 25, 2019), and any implementing guidance. In coordination with the Secretary of State, the Attorney General, and the Director of CDC, the Secretary of Homeland Security shall promptly consider a phased strategy for the safe and orderly entry into the United States, consistent with public health and safety and capacity constraints, of those individuals who have been subjected to MPP for further processing of their asylum claims.

(C) The Attorney General and the Secretary of Homeland Security shall promptly review and determine whether to rescind the interim final rule titled "Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims," 83 FR 55,934 (November 9,

CLP_AR_000555

2018), and the final rule titled "Asylum Eligibility and Procedural Modifications," 85 FR 82,260 (December 17, 2020), as well as any agency memoranda or guidance that were issued in reliance on those rules.

(D) The Attorney General and the Secretary of Homeland Security shall promptly review and determine whether to rescind the interim final rule titled "Implementing Bilateral and Multilateral Asylum Cooperative Agreements Under the Immigration and Nationality Act," 84 FR 63,994 (November 19, 2019), as well as any agency memoranda or guidance issued in reliance on that rule. In the interim, the Secretary of State shall promptly consider whether to notify the governments of the Northern Triangle that, as efforts to establish a cooperative, mutually respectful approach to managing migration across the region begin, the United States intends to suspend and terminate the following agreements:

(1) "Agreement Between the Government of the United States of America and the Government of the Republic of Guatemala on Cooperation Regarding the Examination of Protection Claims," 84 FR 64,095 (July 26, 2019).

(2) "Agreement Between the Government of the United States of America and the Government of the Republic of El Salvador for Cooperation in the Examination of Protection Claims," 85 FR 83,597 (September 20, 2019).

(3) "Agreement Between the Government of the United States of America and the Government of the Republic of Honduras for Cooperation in the Examination of Protection Claims," 85 FR 25,462 (September 25, 2019).

(E) The Secretary of Homeland Security shall promptly cease implementing the "Prompt Asylum Case Review" program and the "Humanitarian Asylum Review Program" and consider rescinding any orders, rules, regulations, guidelines or policies implementing those programs.

(F) The following Presidential documents are revoked:

(1) Executive Order 13767 of January 25, 2017 (Border Security and Immigration Enforcement Improvements).

(2) Proclamation 9880 of May 8, 2019 (Addressing Mass Migration Through the Southern Border of the United States).

(3) Presidential Memorandum of April 29, 2019 (Additional Measures to Enhance Border Security and Restore Integrity to Our Immigration System).

(4) Presidential Memorandum of April 6, 2018 (Ending "Catch and Release" at the Border of the United States and Directing Other Enhancements to Immigration Enforcement).

(5) Presidential Memorandum of April 4, 2018 (Securing the Southern Border of the United States).

(G) The Secretary of State, the Attorney General, and the Secretary of Homeland Security shall promptly take steps to rescind any agency memoranda or guidance issued in reliance on or in furtherance of any directive revoked by section 4(a)(ii)(F) of this order.

(b) *Ensuring a Timely and Fair Expedited Removal Process.*

(i) The Secretary of Homeland Security, with support from the United States Digital Service within the Office of Management and Budget, shall promptly begin a review of procedures for individuals placed in expedited removal proceedings at the United States border. Within 120 days of the date of this order, the Secretary of Homeland Security shall submit a report to the President with the results of this review and recommendations for creating a more efficient and orderly process that facilitates timely adjudications and adherence to standards of fairness and due process.

(ii) The Secretary of Homeland Security shall promptly review and consider whether to modify, revoke, or rescind the designation titled "Designating Aliens for Expedited Removal," 84 FR 35,409 (July 23, 2019), regarding the geographic scope of expedited removal pursuant to INA section

**Federal Register** / Vol. 86, No. 23 / Friday, February 5, 2021 / Presidential Documents **8271**

235(b)(1), 8 U.S.C. 1225(b)(1), consistent with applicable law. The review shall consider our legal and humanitarian obligations, constitutional principles of due process and other applicable law, enforcement resources, the public interest, and any other factors consistent with this order that the Secretary deems appropriate. If the Secretary determines that modifying, revoking, or rescinding the designation is appropriate, the Secretary shall do so through publication in the *Federal Register*.

(c) *Asylum Eligibility*. The Attorney General and the Secretary of Homeland Security shall:

(i) within 180 days of the date of this order, conduct a comprehensive examination of current rules, regulations, precedential decisions, and internal guidelines governing the adjudication of asylum claims and determinations of refugee status to evaluate whether the United States provides protection for those fleeing domestic or gang violence in a manner consistent with international standards; and

(ii) within 270 days of the date of this order, promulgate joint regulations, consistent with applicable law, addressing the circumstances in which a person should be considered a member of a ''particular social group,'' as that term is used in 8 U.S.C. 1101(a)(42)(A), as derived from the 1951 Convention relating to the Status of Refugees and its 1967 Protocol.

**Sec. 5**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*February 2, 2021.*

[FR Doc. 2021–02561
Filed 2–4–21; 8:45 am]
Billing code 3295–F1–P

CLP_AR_000557


### B. Paperwork Reduction Act (PRA)

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to two collections of information, as follows.

OMB has recently approved a new collection, Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–NEW). This new collection will be used for the Haiti parole process, and is being revised in connection with this notice, including by increasing the burden estimate. To support the efforts described above, DHS has created a new information collection that will be the first step in these parole processes and will not use the paper USCIS Form I–134 for this purpose. U.S.-based supporters will submit USCIS Form I–134A online on behalf of a beneficiary to demonstrate that they can support the beneficiary for the duration of their temporary stay in the United States. USCIS has submitted and OMB has approved a request for emergency authorization of the required changes (under 5 CFR 1320.13) for a period of 6 months. Within the next 90 days, USCIS will immediately begin normal clearance procedures under the PRA.

OMB has previously approved an emergency request under 5 CFR 1320.13 for a revision to an information collection from CBP entitled Advance Travel Authorization (OMB control number 1651–0143). In connection with the implementation of the process described above, CBP is making multiple changes under the PRA's emergency processing procedures at 5 CFR 1320.13, including increasing the burden estimate and adding Haitian nationals as eligible for a DHS established process that necessitates collection of a facial photograph in CBP One™. OMB has approved the emergency request for a period of 6 months. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA.

More information about both collections can be viewed at *www.reginfo.gov*.

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2023–00255 Filed 1–5–23; 4:15 pm]
**BILLING CODE 9110–09–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### Implementation of a Parole Process for Nicaraguans

**ACTION:** Notice.

**SUMMARY:** This notice describes a new effort designed to enhance the security of our Southwest Border (SWB) by reducing the number of encounters of Nicaraguan nationals crossing the border without authorization, as the U.S. Government continues to implement its broader, multi-pronged and regional strategy to address the challenges posed by a surge in migration. Nicaraguans who do not avail themselves of this new process, and instead enter the United States without authorization between ports of entry (POEs), generally are subject to removal—including to third countries, such as Mexico. As part of this effort, the U.S. Department of Homeland Security (DHS) is implementing a process—modeled on the successful Uniting for Ukraine (U4U) and Process for Venezuelans—for certain Nicaraguan nationals to lawfully enter the United States in a safe and orderly manner and be considered for a case-by-case determination of parole. To be eligible, individuals must have a supporter in the United States who agrees to provide financial support for the duration of the beneficiary's parole period, pass national security and public safety vetting, and fly at their own expense to an interior POE, rather than entering at a land POE. Individuals are ineligible for this process if they have been ordered removed from the United States within the prior five years; have entered unauthorized into the United States between POEs, Mexico, or Panama after the date of this notice's publication, with an exception for individuals permitted a single instance of voluntary departure or withdrawal of their application for admission to still maintain their eligibility for this process; or are otherwise deemed not to merit a favorable exercise of discretion.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on January 6, 2023.

**FOR FURTHER INFORMATION CONTACT:** Daniel Delgado, Acting Director, Border and Immigration Policy, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528–0445; telephone (202) 447–3459 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

## I. Background—Nicaraguan Parole Process

This notice describes the implementation of a new parole process for certain Nicaraguan nationals, including the eligibility criteria and filing process. The parole process is intended to enhance border security by reducing the record levels of Nicaraguan nationals entering the United States between POEs, while also providing a process for certain such nationals to lawfully enter the United States in a safe and orderly manner.

The announcement of this new process followed detailed consideration of a wide range of relevant facts and alternatives, as reflected in the Secretary's decision memorandum dated December 22, 2022.[1] The complete reasons for the Secretary's decision are included in that memorandum. This **Federal Register** notice is intended to provide appropriate context and guidance for the public regarding the policy and relevant procedures associated with this policy.

### A. Overview

The U.S. Government is engaged in a multi-pronged, regional strategy to address the challenges posed by irregular migration.[2] This long-term strategy—a shared endeavor with partner nations—focuses on addressing the root causes of migration, which are currently fueling unprecedented levels of irregular migration, and creating safe, orderly, and humane processes for migrants seeking protection throughout the region. This includes domestic efforts to expand immigration processing capacity and multinational collaboration to prosecute migrant-smuggling and human-trafficking criminal organizations, as well as their facilitators, and money-laundering networks. While this strategy shows great promise, it will take time to fully implement. In the interim, the U.S. government needs to take immediate steps to provide safe, orderly, humane pathways for the large numbers of individuals seeking to enter the United States and to discourage such individuals from taking the dangerous journey to, and arriving without authorization at, the SWB.

---

[1] *See* Memorandum for the Secretary from the Under Secretary for Strategy, Policy, and Plans, Acting Commissioner of U.S. Customs and Border Protection, and Director of U.S. Citizenship and Immigration Services, Parole Process for Certain Nicaraguan Nationals (Dec. 22, 2022).

[2] In this notice, irregular migration refers to the movement of people into another country without authorization.

CLP_AR_000995

Building on the success of the successful Uniting for Ukraine (U4U) process and the Process for Venezuelans, DHS is implementing a similar process to address the increasing number of encounters of Nicaraguan nationals at the SWB, which have reached record levels over the past six months. Similar to Venezuela, Nicaragua has restricted DHS's ability to remove individuals to Nicaragua, which has constrained DHS's ability to respond to this surge.

In October 2022, DHS undertook a new effort to address the high number of Venezuelans encountered at the SWB.[3] Specifically, DHS provided a new parole process for Venezuelans who are backed by supporters in the United States to come to the United States by flying to interior ports of entry—thus obviating the need for them to make the dangerous journey to the SWB. Meanwhile, the Government of Mexico (GOM) for the first time made an independent decision to accept the returns of Venezuelans who crossed the SWB without authorization pursuant to the Title 42 public health Order, thus imposing a consequence on Venezuelans who sought to come to the SWB rather than avail themselves of the newly announced Parole Process. Within a week of the October 12, 2022 announcement of that process, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under 200 per day, and, as of the week ending December 4, to an average of 86 per day.[4] The new process and accompanying consequence for unauthorized entry also led to a precipitous decline in irregular migration of Venezuelans throughout the Western Hemisphere. The number of Venezuelans attempting to enter Panama through the Darién Gap—an inhospitable jungle that spans between Panama and Colombia—was down from 40,593 in October 2022 to just 668 in November.[5]

DHS anticipates that implementing a similar process for Nicaraguans will reduce the number of Nicaraguans seeking to irregularly enter the United States between POEs along the SWB by coupling a meaningful incentive to seek a safe, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter without authorization pursuant to this process. Only those who meet specified criteria and pass national security and public safety vetting will be eligible for consideration for parole under this process. Implementation of the new parole process for Nicaraguans is contingent on the GOM accepting the return, departure, or removal to Mexico of Nicaraguan nationals seeking to enter the United States without authorization between POEs on the SWB.

As in the process for Venezuelans, a supporter in the United States must initiate the process on behalf of a Nicaraguan national (and certain non-Nicaraguan nationals who are an immediate family member of a primary beneficiary), and commit to providing the beneficiary financial support, as needed.

In addition to the supporter requirement, Nicaraguan nationals and their immediate family members must meet several eligibility criteria in order to be considered, on a case-by-case basis, for advance travel authorization and parole. Only those who meet all specified criteria are eligible to receive advance authorization to travel to the United States and be considered for a discretionary grant of parole, on a case-by-case basis, under this process. Beneficiaries must pass national security, public safety, and public health vetting prior to receiving a travel authorization, and those who are approved must arrange air travel at their own expense to seek entry at an interior POE.

A grant of parole under this process is for a temporary period of up to two years. During this two-year period, the United States will continue to build on the multi-pronged, long-term strategy with our foreign partners throughout the region to support conditions that would decrease irregular migration, work to improve refugee processing and other immigration pathways in the region, and allow for increased removals of Nicaraguans from both the United States and partner nations who continue to migrate irregularly but who lack a valid claim of asylum or other forms of protection. The two-year period will also enable individuals to seek humanitarian relief or other immigration benefits for which they may be eligible, and to work and contribute to the United States. Those who are not granted asylum or any other immigration benefit during this two-year parole period generally will need to depart the United States prior to the expiration of their authorized parole period or will be placed in removal proceedings after the period of parole expires.

The temporary, case-by-case parole of qualifying Nicaraguan nationals pursuant to this process will provide a significant public benefit for the United States by reducing unauthorized entries along our SWB while also addressing the urgent humanitarian reasons that are driving hundreds of thousands of Nicaraguans to flee their home country, to include widespread and violent repression and human rights violations and abuses by the Ortega regime. Most significantly, DHS anticipates this process will: (i) enhance the security of the U.S. SWB by reducing irregular migration of Nicaraguan nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) enhance border security and national security by vetting individuals prior to their arrival at a U.S. POE; (iii) reduce the strain on DHS personnel and resources; (iv) minimize the domestic impact of irregular migration from Nicaragua; (v) disincentivize a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere.

The Secretary retains the sole discretion to terminate the Nicaragua process at any point.

## B. Conditions at the Border

### 1. Impact of Venezuela Process

This process is modeled on the Venezuela process—as informed by the way that similar incentive and disincentive structures successfully decreased the number of Venezuelan nationals making the dangerous journey to and being encountered along the SWB. The Venezuela process demonstrates that combining a clear and meaningful consequence for irregular entry along the SWB with a significant incentive for migrants to wait where they are and use a safe, orderly process to come to the United States can change migratory flows. Prior to the October 12, 2022 announcement of the Venezuela process, DHS encountered approximately 1,100 Venezuelan nationals per day between POEs—with peak days exceeding 1,500.[6] Within a week of the announcement, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under

---

[3] Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[4] DHS Office of Immigration Statistics (OIS) analysis of data pulled from CBP Unified Immigration Portal (UIP) December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[5] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, *https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20PDF_%20DARI%C3%89N_NOVIEMBRE_2022.pdf* (last viewed Dec. 11, 2022).

[6] OIS analysis of OIS Persist Dataset based on data through October 31, 2022.

CLP_AR_000996

200 per day, and as of the week ending December 4, an average of 86 per day.[7]

Panama's daily encounters of Venezuelans also declined significantly over the same time period, falling some 88 percent, from 4,399 on October 16 to 532 by the end of the month—a decline driven entirely by Venezuelan migrants' choosing not to make the dangerous journey through the Darién Gap. The number of Venezuelans attempting to enter Panama through the Darién Gap continued to decline precipitously in November—from 40,593 encounters in October, a daily average of 1,309, to just 668 in November, a daily average of just 22.[8]

The Venezuela process fundamentally changed the calculus for Venezuelan migrants. Venezuelan migrants who had already crossed the Darién Gap returned to Venezuela by the thousands on voluntary flights organized by the governments of Mexico, Guatemala, and Panama, as well as civil society.[9] Other migrants who were about to enter the Darién Gap turned around and headed back south.[10] Still others who were intending to migrate north are staying where they are to apply for this parole process.[11] Put simply, the Venezuela process demonstrates that combining a clear and meaningful consequence for irregular entry along the SWB with a significant incentive for migrants to wait where they are and use this parole process to come to the United States can yield a meaningful change in migratory flows.

### 2. Trends and Flows: Increase of Nicaraguan Nationals Arriving at the Southwest Border

The last decades have yielded a dramatic increase in encounters at the SWB and a dramatic shift in the

demographics of those encountered. Throughout the 1980s and into the first decade of the 2000s, encounters along the SWB routinely numbered in the millions per year.[12] By the early 2010s, three decades of investments in border security and strategy contributed to reduced border flows, with border encounters averaging fewer than 400,000 per year from 2011–2017.[13] However, these gains were subsequently reversed as border encounters more than doubled between 2017 and 2019, and—following a steep drop in the first months of the COVID–19 pandemic—continued to increase at a similar pace in 2021 and 2022.[14]

Shifts in demographics have also had a significant effect on migration flows. Border encounters in the 1980s and 1990s consisted overwhelmingly of single adults from Mexico, most of whom were migrating for economic reasons.[15] Beginning in the 2010s, a growing share of migrants have come from Northern Central America[16] (NCA) and, since the late 2010s, from countries throughout the Americas.[17] Migrant populations from these newer source countries have included large numbers of families and children, many of whom are traveling to escape violence, political oppression, and for other non-economic reasons.[18]

[12] OIS analysis of historic CBP data.

[13] *Id.*

[14] *Id.*

[15] According to historic OIS Yearbooks of Immigration Statistics, Mexican nationals accounted for 96 to over 99 percent of apprehensions of persons entering without inspection between 1980 and 2000. On Mexican migrants from this era's demographics and economic motivations see Jorge Durand, Douglas S. Massey, and Emilio A. Parrado, "The New Era of Mexican Migration to the United States," *The Journal of American History* Vol. 86, No. 2 (Sept. 1999): 518–536.

[16] Northern Central America refers to El Salvador, Guatemala, and Honduras.

[17] According to OIS analysis of CBP data, Mexican nationals continued to account for 89 percent of total SWB encounters in FY 2010, with Northern Central Americans accounting for 8 percent and all other nationalities for 3 percent. Northern Central Americans' share of total encounters increased to 21 percent by FY 2012 and averaged 46 percent in FY 2014–FY 2019, the last full year before the start of the COVID–19 pandemic. All other countries accounted for an average of 5 percent of total SWB encounters in FY 2010–FY 2013, and for 10 percent of total encounters in FY 2014–FY 2019.

[18] Prior to 2013, the overall share of encounters who were processed for expedited removal and claimed fear averaged less than 2 percent annually. Between 2013 and 2018, the share rose from 8 to 20 percent, before dropping with the surge of family unit encounters in 2019 (most of whom were not placed in expedited removal) and the onset of T42 expulsions in 2020. At the same time, between 2013 and 2021, among those placed in expedited removal, the share making fear claims increased from 16 to 82 percent. OIS analysis of historic CBP and USCIS data and OIS Enforcement Lifecycle through June 30, 2022.

Historically, Nicaraguans migrated south to Costa Rica, resulting in relatively few Nicaraguan encounters at the SWB. Consistent with this trend, the number of Nicaraguans seeking asylum in Costa Rica has grown rapidly in recent years, putting immense pressure on the country's asylum system and causing many asylum seekers to wait years for an initial interview.[19] According to United Nations High Commissioner for Refugees (UNHCR), as of February 2022, "more Nicaraguans are currently seeking protection in Costa Rica than all the refugees and asylum seekers combined, during Central America's civil wars in the 1980s, when Costa Rica was a sanctuary for those fleeing violence."[20] The Government of Costa Rica recently announced its intention to regularize the status of more than 200,000 Nicaraguan migrants and asylum seekers providing them with access to jobs and healthcare as part of the process.[21]

Despite Costa Rica's efforts, increasing numbers of Nicaraguans are traveling north to the SWB due to renewed unrest in Nicaragua and the strained asylum system in Costa Rica. As a result, the United States and Mexico saw surges in migration from Nicaragua, with Nicaraguans claiming asylum in Mexico at three times the rate through October 31 of this year than the previous year and with a surge in migration having significantly contributed to the rising number of encounters at the SWB.[22] Unique encounters of Nicaraguan nationals increased throughout fiscal year (FY) 2021, totaling 47,300,[23] and increased further—and sharply—in FY 2022. DHS encountered an estimated 157,400 unique Nicaraguan nationals in FY 2022, which composed nine percent

[19] AP News, Fleeing Nicaraguans Strain Costa Rica's Asylum System (Sept. 2, 2022), *https://apnews.com/article/covid-health-elections-presidential-caribbean-52044748d15dbbb6ca706c66cc7459a5*.

[20] UNHCR, 'Sharp rise' in Nicaraguans fleeing to Costa Rica, strains asylum system, *https://news.un.org/en/story/2022/03/1114792*, Mar. 25, 2022 (last viewed Dec. 6, 2022).

[21] Reuters, Costa Rica prepares plan to regularize status of 200,000 mostly Nicaraguan migrants, *https://www.reuters.com/world/americas/costa-rica-prepares-plan-regularize-status-200000-mostly-nicaraguan-migrants-2022-08-10/*, Aug. 10, 2022 (last viewed Dec. 4, 2022).

[22] Boris Cheshirkov, Number of displaced Nicaraguans in Costa Rica doubles in less than a year, *https://www.unhcr.org/news/briefing/2022/3/623d894c4/number-displaced-nicaraguans-costa-rica-doubles-year.html*, Mar. 25, 2022 (last viewed Dec. 7, 2022).

[23] OIS analysis of OIS Persist Dataset based on data through October 31, 2022. Unique encounters include encounters of persons at the Southwest Border who were not previously encountered in the prior 12 months. Throughout this memo unique encounter data are defined to also include OFO parolees and other OFO administrative encounters.

[7] OIS analysis of data pulled from CBP UIP December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[8] Servicio Nacional de Migración de Panamá, Iregulares en Tránsito Frontera Panamá-Colombia 2022, *https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEMBRE_2022.pdf*, (last viewed Dec. 11, 2022).

[9] La Prensa Latina Media, *More than 4,000 migrants voluntarily returned to Venezuela from Panama*, *https://www.laprensalatina.com/more-than-4000-migrants-voluntarily-returned-to-venezuela-from-panama/*, Nov. 9 2022 (last viewed Dec. 8, 2022).

[10] Voice of America, *U.S. Policy Prompts Some Venezuelan Migrants to Change Route*, *https://www.voanews.com/a/us-policy-prompts-some-venezuelan-migrants-to-change-route/6790996.html*, Oct. 14, 2022 (last viewed Dec. 8, 2022).

[11] Axios, *Biden's new border policy throws Venezuelan migrants into limbo*, *https://www.axios.com/2022/11/07/biden-venezuela-border-policy-darien-gap*, Nov. 7, 2022 (last viewed Dec. 8, 2022).

of all unique encounters and was the fourth largest origin group.[24] Between FY 2021 and FY 2022, unique encounters of Nicaraguan nationals rose 232 percent while unique encounters of all other nationalities combined increased just 47 percent.[25] FY 2022 average unique monthly encounters of Nicaraguan nationals at the land border totaled 13,113 as opposed to an average monthly rate of 316 encounters in FYs 2014–2019, a 41-fold increase.[26]

These trends thus far are only accelerating in FY 2023. In October and November of 2022, DHS encountered 51,000 Nicaraguan nationals at the border—nearly one third the record total of Nicaraguan encounters in FY 2022.[27]

### 3. Push and Pull Factors

DHS assesses that the high—and rising—number of Nicaraguan nationals encountered at the SWB is driven by two key factors: First, a confluence of political, economic, and humanitarian crises in Nicaragua—exacerbated by the widespread and violent crackdown on democratic freedoms by the Ortega regime and the government's numerous human rights violations against its own population—are causing thousands to leave the country. This situation is compounded by the fact that increasingly sophisticated human smugglers often target migrants in such circumstances to offer them a facilitated opportunity to travel to the United States—at a cost. Second, the United States faces significant limits on the ability to remove Nicaraguan nationals who do not establish a legal basis to remain in the United States to Nicaragua or elsewhere; absent such an ability, more individuals are willing to take a chance that they can come—and stay.

#### i. Factors Pushing Migration From Nicaragua

Current political, economic, and humanitarian crises in Nicaragua are driving migration of Nicaraguans throughout the hemisphere as well as to our border.[28] As conditions have deteriorated in Nicaragua due to this confluence of factors, the Government of Nicaragua has shown little tolerance for those who openly criticize their regime

and moves swiftly to brazenly silence dissent.[29]

Since 2007, Daniel Ortega and his party, the Sandinista National Liberation Front (FSLN), have gradually consolidated control over the country's institutions and society, including by eliminating presidential term limits.[30] Human Rights Watch (HRW) reported in July 2022 that "[s]ince taking office in 2007, the Ortega administration has dismantled all institutional checks on presidential power, including the judiciary." [31] According to the Inter-American Commission on Human Rights (IACHR), this consolidation of power in the executive "has facilitated Nicaragua's transformation into a police state in which the executive branch has instituted a regime of terror and of suppression of all freedoms. . . supported by the other branches of government." [32] The IACHR reported in June 2022 that "the state's violent response to the social protests that started on April 18, 2018, triggered a serious political, social, and human rights crisis in Nicaragua," [33] and that as of late September, "more than 2,000 organizations of civil society—linked to political parties, academic, and religious spaces—have been cancelled" since April 2018.[34] Further, HRW reported that the shutting down of non-governmental organizations in Nicaragua "is part of a much broader effort to silence civil society groups and independent media through a combination of repressive tactics that include abusive legislation,

intimidation, harassment, arbitrary detention, and prosecution of human rights defenders and journalists." [35]

Since early 2021, the IACHR has observed the escalation of repression by the Nicaraguan government, characterized by a series of state actions leading to the elimination of the opposition's participation in the elections even before they were held.[36] In December 2021, the IACHR expressed its concern "about the increasing number of people who have been forced to flee Nicaragua and to request international protection in the context of the ongoing serious human rights crisis in the country." [37] In August 2022, Ortega had a bishop, five priests, and two seminarians arrested, claiming that the bishop "persisted in destabilizing and provocative activities." [38] Prior to the November 2022 municipalities election, the government closed 200 nongovernmental groups and over 50 media outlets.[39]

Exacerbated by political repression, Nicaragua is one of the poorest countries in Latin America. According to the World Bank, Nicaragua's gross domestic product (GDP) per capita in 2021 was only $2,090.80, the second lowest in the region, above Haiti.[40] According to the World Food Program, almost 30 percent of Nicaraguan families live in poverty in the country, "over 8 percent struggle in extreme poverty, surviving on less than $1.25 daily," and "17 percent of children aged under five suffer from chronic malnutrition." [41] Migrants often seek economic opportunities to be able to support their families that remain in Nicaragua. Remittances from the United

---

[24] OIS analysis of OIS Persist Dataset based on data through October 31, 2022.

[25] *Id.*

[26] *Id.*

[27] *Id.*; OIS analysis of UIP CBP data pulled on November 28, 2022.

[28] Voice of America, *With Turmoil at Home, More Nicaraguans Flee to the U.S.* (July 29, 2021), *https://www.voanews.com/a/americas_turmoil-home-more-nicaraguans-flee-us/6208907.html.*

[29] Los Angeles Times, *Sandinistas Complete Their Political Domination of Nicaragua Following Local Elections* (Nov. 8, 2022), *https://www.latimes.com/world-nation/story/2022-11-08/sandinistas-complete-political-domination-nicaragua-local-elections.*

[30] Reuters, *Ortega's Path to Run for Fourth Straight Re-election as Nicaraguan President* (Nov. 3, 2021), *https://www.reuters.com/world/americas/ortegas-path-run-fourth-straight-re-election-nicaraguan-president-2021-11-03/.*

[31] Office of the United Nations High Commissioner for Human Rights (OHCHR), *Human Rights Situation in Nicaragua* 2 (Sept. 2, 2022), *https://reliefweb.int/report/nicaragua/human-rights-situation-nicaragua-report-united-nations-high-commissioner-human-rights-ahrc5142-unofficial-english-translation.*

[32] Inter-American Commission on Human Rights, *Nicaragua: Concentration of Power and the Undermining of the Rule of Law*, OEA/Ser.L/V/II, Doc. 288, 65 (Oct. 25, 2021), *https://www.oas.org/en/iachr/reports/pdfs/2021_nicaragua-en.pdf.*

[33] Inter-American Commission on Human Rights, *Annual Report 2021*, Chapter IV.B—Nicaragua, 775, (June 2, 2022), *https://www.oas.org/en/iachr/reports/ia.asp?Year=2021.*

[34] In light of serious allegations regarding the closure of civic spaces in Nicaragua, UN and IACHR Special Rapporteurs urge authorities to comply with their international obligations to respect and guarantee fundamental freedoms, IACHR, Sept. 28, 2022, *https://www.oas.org/en/iachr/expression/showarticle.asp?lID=1&artID=1257.*

[35] Nicaragua: Government Dismantles Civil Society, Human Rights Watch, July 19, 2022, *https://www.hrw.org/news/2022/07/19/nicaragua-government-dismantles-civil-society.*

[36] IACHR, *Annual Report 2021*, Chapter IV.B—Nicaragua, 775 (June 2, 2022), *https://www.oas.org/en/iachr/reports/ia.asp?Year=2021.*

[37] Inter-American Commission on Human Rights, *IACHR Calls for International Solidarity, Urges States to Protect the People Who Have Been Forced to Flee from Nicaragua* (Dec. 20, 2021), *http://www.oas.org/en/IACHR/jsForm/?File=/en/iachr/media_center/PReleases/2021/346.asp.*

[38] The Washington Post, *Nicaragua Detains Catholic Bishop in Escalating Crackdown on Dissent* (Aug. 19, 2022), *https://www.washingtonpost.com/world/2022/08/19/nicaragua-bishop-rolando-alvarez-arrest-ortega/.*

[39] Politico, *Sandinistas Complete Their Political Domination of Nicaragua* (Nov. 8, 2022), *https://www.politico.com/news/2022/11/08/nicaragua-sandinistas-ortega-repression-00065603.*

[40] The World Bank, *GDP per Capita (Current U.S. $)—Latin America & Caribbean, Nicaragua, https://data.worldbank.org/indicator/NY.GDP.PCAP.CD?locations=ZJ-NI&most_recent_value_desc=false* (last visited Dec. 6, 2022).

[41] World Food Programme, *Nicaragua, https://www.wfp.org/countries/nicaragua* (last visited: Sept. 26, 2022).

CLP_AR_000998

States to Nicaragua from January–September 2022 have surpassed the total remittances sent in all of 2021.[42]

According to the UNHCR, approximately 200,000 Nicaraguans have sought international protection worldwide.[43] More than 100,000 filed asylum applications in 2021; this is a five-fold increase from 2020.[44] Daniel Ortega's repressive policies, coupled with widespread poverty, have pushed thousands of Nicaraguans to seek humanitarian relief in the Western Hemisphere, including increasingly in the United States.[45]

ii. Return Limitations

The Government of Nicaragua is not accepting returns or removals of their nationals at a volume that allows the United States to effectively manage the number of encounters of Nicaraguans by the United States. Additionally, the GOM has generally not allowed returns of Nicaraguan nationals pursuant to Title 42 authorities, or their removal from the United States pursuant to Title 8 authorities.[46] Other countries have similarly refused to accept Title 8 removals of Nicaraguan nationals. As a result, DHS was only able to repatriate a small number of Nicaraguan nationals to Nicaragua in FY 2022.

Moreover, returns alone are not sufficient to reduce and divert irregular flows of Nicaraguans. The United States will combine a consequence for Nicaraguan nationals who seek to enter the United States without authorization at the land border with an incentive to use the safe, orderly process to request authorization to travel by air to, and seek parole to enter, the United States, without making the dangerous journey to the border.

4. Impact on DHS Resources and Operations

To respond to the increase in encounters along the SWB since FY 2021—an increase that has accelerated in FY 2022, driven in part by the number of Nicaraguan nationals encountered—DHS has taken a series of extraordinary steps. Since FY 2021,

DHS has built and now operates 10 soft-sided processing facilities at a cost of $688 million. U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement (ICE) detailed a combined 3,770 officers and agents to the SWB to effectively manage this processing surge. In FY 2022, DHS had to utilize its above threshold reprogramming authority to identify approximately $281 million from other divisions in the Department to address SWB needs, to include facilities, transportation, medical care, and personnel costs.

The Federal Emergency Management Agency (FEMA) has spent $260 million in FYs 2021 and 2022 combined on grants to non-governmental organizations (NGO) and state and local entities through the Emergency Food and Shelter Program—Humanitarian (EFSP–H) to assist with the reception and onward travel of irregular migrants arriving at the SWB. This spending is in addition to $1.4 billion in additional FY 2022 appropriations that were designated for SWB enforcement and processing capacities.[47]

The impact has been particularly acute in certain border sectors. The increased flows of Nicaraguan nationals are disproportionately occurring within the remote Del Rio and Rio Grande Valley sectors, all of which are at risk of operating, or are currently operating, over capacity. In FY 2022, 80 percent of unique encounters of Nicaraguan nationals occurred in these two sectors.[48] There have also been a growing number of encounters in El Paso sector since September 2022. In FY 2023, Del Rio, El Paso, and Rio Grande Valley sectors have accounted for 88 percent of encounters of Nicaraguan nationals.[49] In FY 2022, Del Rio sector encountered almost double (85 percent increase) the number of migrants as compared to FY 2021. Driven in part by the sharp increase in Nicaraguan nationals being encountered in this sector, this was an eighteen-fold increase over the average for FY 2014–FY 2019.[50]

The focused increase in encounters within those three sectors is particularly challenging. Del Rio sector is

geographically remote, and because—up until the past two years—it has not been a focal point for large numbers of individuals entering without authorization, has limited infrastructure and personnel in place to safely process the elevated encounters that CBP is now seeing there. The Yuma Sector is along the Colorado River corridor, which presents additional challenges to migrants, such as armed robbery, assault by bandits, and drowning, as well as to the U.S. Border Patrol (USBP) agents encountering them. El Paso sector has relatively modern infrastructure for processing noncitizens encountered at the border but is far away from other CBP sectors, which makes it challenging to move individuals for processing elsewhere during surges.

In an effort to decompress sectors that are experiencing surges, DHS deploys lateral transportation, using buses and flights to move noncitizens to other sectors that have additional capacity to process. In November 2022, U.S. Border Patrol (USBP) sectors along the SWB operated a combined 602 decompression bus routes to neighboring sectors and operated 124 lateral decompression flights, redistributing noncitizens to other sectors with additional capacity.[51]

Because DHS assets are finite, using air resources to operate lateral flights reduces DHS's ability to operate international repatriation flights to receiving countries, leaving noncitizens in custody for longer and further taxing DHS resources. Fewer international repatriation flights in turn exacerbates DHS's inability to return or remove Nicaraguans and other noncitizens in its custody by sending the message that there is no consequence for illegal entry. DHS assesses that a reduction in the flow of Nicaraguan nationals arriving at the SWB would reduce pressure on overstretched resources and enable the Department to more quickly process and, as appropriate, return or remove those who do not have a lawful basis to stay.

II. DHS Parole Authority

The Immigration and Nationality Act (INA or Act) provides the Secretary of Homeland Security with the discretionary authority to parole noncitizens ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or

---

[42] Banco Central de Nicaragua, Remesas Por País de Origen, https://www.bcn.gob.ni/sites/default/files/estadisticas/siec/datos/remesas_origen.htm (last visited Dec. 6, 2022).

[43] UNHCR USA, Displacement in Central America, https://www.unhcr.org/en-us/displacement-in-central-america.html.

[44] UNHCR, 2021 Global Trends Report, June 16, 2022, https://www.unhcr.org/62a9d1494/global-trends-report-2021.

[45] OIS analysis of OIS Persist Dataset based on data through October 31, 2022.

[46] There are some limited exceptions to this prohibition, including Nicaraguan nationals that have Mexican family members.

[47] DHS Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, to Interested Parties, DHS Plan for Southwest Border Security and Preparedness (Apr. 26, 2022), https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf.

[48] OIS analysis of OIS Persist Dataset based on data through October 31, 2022.

[49] Id., and CBP UIP data for November 1–27 pulled on November 28, 2022.

[50] OIS analysis of OIS Persist Dataset based on data through October 31, 2022.

[51] Data from SBCC, as of December 11, 2022.

CLP_AR_000999

**1260** **Federal Register** / Vol. 88, No. 5 / Monday, January 9, 2023 / Notices

significant public benefit."[52] Parole is not an admission of the individual to the United States, and a parolee remains an "applicant for admission" during the period of parole in the United States.[53] DHS may set the duration of the parole based on the purpose for granting the parole request and may impose reasonable conditions on parole.[54] Individuals may be granted advance authorization to travel to the United States to seek parole.[55] DHS may terminate parole in its discretion at any time.[56] Individuals who are paroled into the United States generally may apply for and be granted employment authorization.[57]

This process will combine a consequence for those who seek to enter the United States irregularly between POEs with a significant incentive for Nicaraguan nationals to remain where they are and use a lawful process to request authorization to travel by air to, and ultimately apply for a discretionary grant of parole into, the United States for a period of up to two years.

## III. Justification for the Process

As noted above, section 212(d)(5)(A) of the INA confers upon the Secretary of Homeland Security the discretionary authority to parole noncitizens "into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit."[58]

### A. Significant Public Benefit

The parole of Nicaraguan nationals and their immediate family members under this process—which imposes new consequences for Nicaraguans who seek to enter the United States without authorization between POEs, while providing an alternative opportunity for eligible Nicaraguan nationals and their immediate family members to seek advance authorization to travel to the United States to seek discretionary parole, on a case-by-case basis, in the United States—serves a significant public benefit for several, interrelated

reasons. Specifically, we anticipate that the parole of eligible individuals pursuant to this process will: (i) enhance border security through a reduction in irregular migration of Nicaraguan nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) improve vetting for national security and public safety; (iii) reduce strain on DHS personnel and resources; (iv) minimize the domestic impact of irregular migration from Nicaragua; (v) provide a disincentive to undergo the dangerous journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere and, as part of those efforts, to establish additional processing pathways from within the region to discourage irregular migration.

### 1. Enhanced Border Security by Reducing Irregular Migration of Nicaraguan Nationals

As described above, Nicaraguan nationals make up a significant and growing number of those encountered seeking to cross between POEs without authorization. Without additional and more immediate consequences imposed on those who seek to do so, together with a safe and orderly process for Nicaraguans to enter the United States, without making the journey to the SWB, the numbers will continue to grow.

By incentivizing individuals to seek a safe, orderly means of traveling to the United States through the creation of an alternative pathway to the United States, while imposing additional consequences to irregular migration, DHS assesses this process could lead to a meaningful drop in encounters of Nicaraguan individuals along the SWB. This expectation is informed by the recently implemented process for Venezuelans and the significant shifts in migratory patterns that took place once the process was initiated. The success to date of the Venezuela process provides compelling evidence that coupling effective disincentives for irregular entry with incentives for a safe, orderly parole process can meaningfully shift migration patterns in the region and to the SWB.

Implementation of this parole process is contingent on the GOM's acceptance of Nicaraguan nationals who voluntarily depart the United States, those who voluntarily withdraw their application for admission, and those subject to expedited removal who cannot be removed to Nicaragua or another designated country. The ability to effectuate voluntary departures,

withdrawals, and removals of Nicaraguan nationals to Mexico will impose a consequence on irregular entry that currently does not exist.

### 2. Improve Vetting for National Security and Public Safety

All noncitizens whom DHS encounters at the border undergo thorough vetting against national security and public safety databases during their processing. Individuals who are determined to pose a national security or public safety threat are detained pending removal. That said, there are distinct advantages to being able to vet more individuals before they arrive at the border so that we can stop individuals who could pose threats to national security or public safety even earlier in the process. The Nicaraguan parole process will allow DHS to vet potential beneficiaries for national security and public safety purposes *before* they travel to the United States.

As described below, the vetting will require prospective beneficiaries to upload a live photograph via an app. This will enhance the scope of the pre-travel vetting—thereby enabling DHS to better identify those with criminal records or other disqualifying information of concern and deny authorization to travel under this process before they arrive at our border, representing an improvement over the status quo.

### 3. Reduce the Burden on DHS Personnel and Resources

By reducing encounters of Nicaraguan nationals at the SWB, and channeling decreased flows of Nicaraguan nationals to interior POEs, we anticipate that the process will relieve some of the impact increased migratory flows have had on the DHS workforce along the SWB. This process is expected to free up resources, including those focused on decompression of border sectors, which in turn may enable an increase in removal flights—allowing for the removal of more noncitizens with final orders of removal faster and reducing the number of days migrants are in DHS custody. While the process will also draw on DHS resources within U.S. Citizenship and Immigration Services (USCIS) and CBP to process requests for discretionary parole on a case-by-case basis and conduct vetting, these requirements involve different parts of DHS and require fewer resources as compared to the status quo.

In addition, permitting Nicaraguans to voluntarily depart or withdraw their application for admission one time and still be considered for parole through the process also will reduce the burden

---

[52] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(4) (charging the Secretary with the responsibility for "[e]stablishing and administering rules . . . governing . . . parole"). Nicaraguans paroled into the United States through this process are not being paroled as refugees, and instead will be considered for parole on a case-by-case basis for a significant public benefit or urgent humanitarian reasons. This parole process does not, and is not intended to, replace refugee processing.

[53] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

[54] *Id.*

[55] *See* 8 CFR 212.5(f).

[56] *See* 8 CFR 212.5(e).

[57] *See* 8 CFR 274a.12(c)(11).

[58] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

CLP_AR_001000

on DHS personnel and resources that would otherwise be required to obtain and execute a final order of removal. This includes reducing strain on detention and removal flight capacity, officer resources, and reducing costs associated with detention and monitoring.

### 4. Minimize the Domestic Impact

Though the Venezuelan process has significantly reduced the encounters of Venezuelan nationals, other migratory flows continue to strain domestic resources, which is felt most acutely by border communities. Given the inability to remove, return, or repatriate Nicaraguan nationals in substantial numbers, DHS is currently conditionally releasing 96 percent of the Nicaraguan nationals it encounters at the border, pending their removal proceedings or the initiation of such proceedings, and Nicaraguan nationals accounted for 18 percent of all encounters released at the border in October 2022.[59] The increased volume of provisional releases of Nicaraguan nationals puts strains on U.S. border communities.

Generally, since FY 2019, DHS has worked with Congress to make approximately $290 million available through FEMA's EFSP to support NGOs and local governments that provide initial reception for migrants entering through the SWB. These entities have engaged to provide services and assistance to Nicaraguan nationals and other noncitizens who have arrived at our border, including by building new administrative structures, finding additional housing facilities, and constructing tent shelters to address the increased need.[60] FEMA funding has supported building significant NGO capacity along the SWB, including a substantial increase in available shelter beds in key locations.

Nevertheless, local communities have reported strain on their ability to provide needed social services. Local officials and NGOs report that the temporary shelters that house migrants are quickly reaching capacity due to the high number of arrivals,[61] and stakeholders in the border region have expressed concern that shelters will

eventually reach full bed space capacity and not be able to host any new arrivals.[62] Since Nicaraguan nationals account for a significant percentage of the individuals being conditionally released into communities after being processed along the SWB, this parole process will address these concerns by diverting flows of Nicaraguan nationals into a safe and orderly process in ways that DHS anticipates will yield a decrease in the numbers arriving at the SWB.

DHS anticipates that this process will help minimize the burden on communities, state and local governments, and NGOs who support the reception and onward travel of arriving migrants at the SWB. Beneficiaries are required to fly at their own expense to an interior POE, rather than arriving at the SWB. They also are only authorized to come to the United States if they have a supporter who has agreed to receive them and provide basic needs, including housing support. Beneficiaries also are eligible to apply for work authorization, thus enabling them to support themselves.

### 5. Disincentivize a Dangerous Journey That Puts Migrant Lives and Safety at Risk and Enriches Smuggling Networks

The process, which will incentivize intending migrants to use a safe, orderly, and lawful means to access the United States via commercial air flights, cuts out the smuggling networks. This is critical, because transnational criminal organizations—including the Mexican drug cartels—are increasingly playing a key role in human smuggling, reaping billions of dollars in profit and callously endangering migrants' lives along the way.[63]

In FY 2022, more than 750 migrants died attempting to enter the United States across the SWB,[64] an estimated 32 percent increase from FY 2021 (568 deaths) and a 195 percent increase from FY 2020 (254 deaths).[65] The approximate number of migrants

rescued by CBP in FY 2022 (almost 19,000 rescues)[66] increased 48 percent from FY 2021 (12,857 rescues), and 256 percent from FY 2020 (5,336 rescues).[67] Although exact figures are unknown, experts estimate that about 30 bodies have been taken out of the Rio Grande River each month since March 2022.[68] CBP attributes these rising trends to increasing numbers of migrants, as evidenced by increases in overall U.S. Border Patrol encounters.[69] The increased rates of both migrant deaths and those needing rescue at the SWB demonstrate the perils in the migrant journey.

Meanwhile, these numbers do not account for the countless incidents of death, illness, and exploitation migrants experience during the perilous journey north. These migratory movements are in many cases facilitated by numerous human smuggling organizations, for which the migrants are pawns;[70] the organizations exploit migrants for profit, often bringing them across inhospitable deserts, rugged mountains, and raging rivers, often with small children in tow. Upon reaching the border area, noncitizens seeking to cross into the United States generally pay transnational criminal organizations (TCOs) to coordinate and guide them along the final miles of their journey.[71] Tragically, a significant number of individuals perish along the way. The trailer truck accident that killed 55 migrants in Chiapas, Mexico, in December 2021 and the tragic incident in San Antonio, Texas, on June 27, 2022, in which 53 migrants died of the heat in appalling conditions, are just two examples of many in which TCOs

[59] OIS analysis of and CBP subject-level data and OIS Persist Dataset based on data through October 31, 2022.

[60] CNN, *Washington, DC, Approves Creation of New Agency to Provide Services for Migrants Arriving From Other States* (Sept. 21, 2022), *https://www.cnn.com/2022/09/21/us/washington-dc-migrant-services-office.*

[61] San Antonio Report, *Migrant aid groups stretched thin as city officials seek federal help for expected wave* (Apr. 27, 2022), *https://sanantonioreport.org/migrant-aid-groups-stretched-thin-city-officials-seek-federal-help/.*

[62] KGUN9 Tucson, *Local Migrant Shelter Reaching Max Capacity as it Receives Hundreds per Day* (Sept. 23, 2022), *https://www.kgun9.com/news/local-news/local-migrant-shelter-reaching-max-capacity-as-it-receives-hundreds-per-day.*

[63] CBP, Fact Sheet: Counter Human Smuggler Campaign Updated (Oct. 6, 2022), *https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th.*

[64] CNN, *First on CNN: A Record Number of Migrants Have Died Crossing the U.S.-Mexico Border* (Sept. 7, 2022), *https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html.*

[65] Department of Homeland Security, U.S. Customs and Border Protection, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*

[66] CNN, *First on CNN: A Record Number of Migrants Have Died Crossing the U.S.-Mexico Border* (Sept. 7, 2022), *https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html.*

[67] Department of Homeland Security, U.S. Customs and Border Protection, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*

[68] The Guardian, *Migrants Risk Death Crossing Treacherous Rio Grande River for 'American Dream'* (Sept. 5, 2022), *https://www.theguardian.com/us-news/2022/sep/05/migrants-risk-death-crossing-treacherous-rio-grande-river-for-american-dream.*

[69] Department of Homeland Security, U.S. Customs and Border Protection, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*

[70] DHS Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, to Interested Parties, *DHS Plan for Southwest Border Security and Preparedness* (Apr. 26, 2022), *https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf.*

[71] New York Times, *Smuggling Migrants at the Border Now a Billion-Dollar Business,* (July 25, 2022), *https://www.nytimes.com/2022/07/25/us/migrant-smuggling-evolution.html.*

engaged in human smuggling prioritize profit over safety.[72]

DHS anticipates this process will save lives and undermine the profits and operations of the dangerous TCOs that put migrants' lives at risk for profit because it incentivizes intending migrants to use a safe and orderly means to access the United States via commercial air flights, thus ultimately reducing the demand for smuggling networks to facilitate the dangerous journey to the SWB. By reducing the demand for these services, DHS is effectively targeting the resources of TCOs and human smuggling networks that so often facilitate these unprecedented movements with utter disregard for the health and safety of migrants. DHS and federal partners have taken extraordinary measures— including the largest-ever surge of resources against human smuggling networks—to combat and disrupt the TCOs and smugglers and will continue to do so.[73]

6. Fulfill Important Foreign Policy Goals To Manage Migration Collaboratively in the Hemisphere

Promoting a safe, orderly, legal, and humane migration strategy throughout the Western Hemisphere has been a top foreign policy priority for the Administration. This is reflected in three policy-setting documents: the U.S. Strategy for Addressing the Root Causes of Migration in Central America (Root Causes Strategy);[74] the Collaborative Migration Management Strategy (CMMS);[75] and the Los Angeles Declaration on Migration and Protection (L.A. Declaration), which was endorsed in June 2022 by 21 countries.[76] The

CMMS and the L.A. Declaration call for a collaborative and regional approach to migration, wherein countries in the hemisphere commit to implementing programs and processes to stabilize communities hosting migrants or those of high outward-migration; humanely enforce existing laws regarding movements across international boundaries, especially when minors are involved; take actions to stop migrant smuggling by targeting the criminals involved in these activities; and provide increased regular pathways and protections for migrants residing in or transiting through the 21 countries.[77] The L.A. Declaration specifically lays out the goal of collectively "expand[ing] access to regular pathways for migrants and refugees."[78]

This new process helps achieve these goals by providing an immediate and temporary orderly process for Nicaraguan nationals to lawfully enter the United States while we work to improve conditions in sending countries and expand more permanent lawful immigration pathways in the region, including refugee processing and other lawful pathways into the United States and other Western Hemisphere countries. It thus provides the United States another avenue to lead by example.

The process also responds to an acute foreign policy need. Key allies in the region—including specifically the Governments of Mexico and Costa Rica—are affected by the increased movement of Nicaraguan nationals and have been seeking greater U.S. action to address these challenging flows for some time. These Nicaraguan flows contribute to strain on governmental and civil society resources in Mexican border communities in both the south and the north—something that key foreign government partners have been urging the United States to address.

Along with the Venezuelan process, this new process adds to these efforts and enables the United States to lead by example. Such processes are a key mechanism to advance the larger domestic and foreign policy goals of the U.S. Government to promote a safe, orderly, legal, and humane migration strategy throughout our hemisphere. The new process also strengthens the foundation for the United States to press regional partners—many of which are already taking important steps—to undertake additional actions with regard to this population, as part of a regional response. Any effort to meaningfully address the crisis in

Nicaragua will require continued efforts by these and other regional partners.

Importantly, the United States will only implement the new parole process while able to remove or return to Mexico Nicaraguan nationals who enter the United States without authorization across the SWB. The United States' ability to execute this process thus is contingent on the GOM making an independent decision to accept the return or removal of Nicaraguan nationals who bypass this new process and enter the United States without authorization.

For its part, the GOM has made clear its position that, in order to effectively manage the migratory flows that are impacting both countries, the United States needs to provide additional safe, orderly, and lawful processes for migrants who seek to enter the United States. The GOM, as it makes its independent decisions as to its ability to accept returns of third country nationals at the border and its efforts to manage migration within Mexico, is thus closely watching the United States' approach to migration management and whether it is delivering on its plans in this space. Initiating and managing this process— which is dependent on GOM's actions— will require careful, deliberate, and regular assessment of GOM's responses to independent U.S. actions and ongoing, sensitive diplomatic engagements.

As noted above, this process is responsive to the GOM's request that the United States increase lawful pathways for migrants and is also aligned with broader Administration domestic and foreign policy priorities in the region. The process couples a meaningful incentive to seek a lawful, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter without authorization along the SWB. The goal of this process is to reduce the irregular migration of Nicaraguan nationals while the United States, together with partners in the region, works to improve conditions in sending countries and create more lawful immigration and refugee pathways in the region, including to the United States.

*B. Urgent Humanitarian Reasons*

The case-by-case temporary parole of individuals pursuant to this process will address the urgent humanitarian needs of Nicaraguan nationals who have fled the Ortega regime and Nicaragua. The Government of Nicaragua continues to repress and punish all forms of dissent and public criticism of the regime and has continued to take actions against

---

[72] Reuters, *Migrant Truck Crashes in Mexico Killing 54* (Dec. 9, 2021), *https://www.reuters.com/article/uk-usa-immigration-mexico-accident-idUKKBN2IP01R*; Reuters, *The Border's Toll: Migrants Increasingly Die Crossing into U.S. from Mexico* (July 25, 2022), *https://www.reuters.com/article/usa-immigration-border-deaths/the-borders-toll-migrants-increasingly-die-crossing-into-u-s-from-mexico-idUSL4N2Z247X*.

[73] *See* DHS Update on Southwest Border Security and Preparedness Ahead of Court-Ordered Lifting of Title 42 (Dec. 13, 2022), *https://www.dhs.gov/publication/update-southwest-border-security-and-preparedness-ahead-court-ordered-lifting-title-42*.

[74] National Security Council, *Root Causes of Migration in Central America* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf*.

[75] National Security Council, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf?utm_medium=email&utm_source=govdelivery*.

[76] *Id.*; The White House, *Los Angeles Declaration on Migration and Protection* (LA Declaration) (June 10, 2022) *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/*.

[77] *Id.*

[78] *Id.*

CLP_AR_001002

**Federal Register** / Vol. 88, No. 5 / Monday, January 9, 2023 / Notices

**1263**

those who oppose its positions.[79] This process provides a safe mechanism for Nicaraguan nationals who seek to leave their home country to enter the United States without having to make the dangerous journey to the United States.

## IV. Eligibility To Participate in the Process and Processing Steps

### A. Supporters

U.S.-based supporters must initiate the process by filing Form I–134A on behalf of a Nicaraguan national and, if applicable, the national's immediate family members.[80] Supporters may be individuals filing on their own, with other individuals, or on behalf of non-governmental entities or community-based organizations. Supporters are required to provide evidence of income and assets and declare their willingness to provide financial support to the named beneficiary for the length of parole. Supporters are required to undergo vetting to identify potential human trafficking or other concerns. To serve as a supporter under the process, an individual must:

• be a U.S. citizen, national, or lawful permanent resident; hold a lawful status in the United States; or be a parolee or recipient of deferred action or Deferred Enforced Departure;

• pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns; and

• demonstrate sufficient financial resources to receive, maintain, and support the intended beneficiary whom they commit to support for the duration of their parole period.

### B. Beneficiaries

In order to be eligible to request and ultimately be considered for a discretionary issuance of advance authorization to travel to the United States to seek advance grant of parole at the POE, such individuals must:

• be outside the United States;

• be a national of Nicaragua or be a non-Nicaraguan immediate family member[81] and traveling with a Nicaraguan principal beneficiary;

• have a U.S.-based supporter who filed a Form I–134A on their behalf that USCIS has vetted and confirmed;

• possess an unexpired passport valid for international travel;

• provide for their own commercial travel to an air U.S. POE and final U.S. destination;

• undergo and pass required national security and public safety vetting;

• comply with all additional requirements, including vaccination requirements and other public health guidelines; and

• demonstrate that a grant of parole is warranted based on significant public benefit or urgent humanitarian reasons, as described above, and that a favorable exercise of discretion is otherwise merited.

A Nicaraguan national is ineligible to be considered for advance authorization to travel to the United States as well as parole under this process if that person is a permanent resident or dual national of any country other than Nicaragua, or currently holds refugee status in any country, unless DHS operates a similar parole process for the country's nationals.[82]

In addition, a potential beneficiary is ineligible for advance authorization to travel to the United States as well as parole under this process if that person:

• fails to pass national security and public safety vetting or is otherwise deemed not to merit a favorable exercise of discretion;

• has been ordered removed from the United States within the prior five years or is subject to a bar to admissibility based on a prior removal order;[83]

• has crossed irregularly into the United States, between the POEs, after January 9, 2023 except individuals permitted a single instance of voluntary departure pursuant to INA section 240B, 8 U.S.C. 1229c or withdrawal of their application for admission pursuant to INA section 235(a)(4), 8 U.S.C. 1225(a)(4) will remain eligible;

• has irregularly crossed the Mexican or Panamanian border after January 9, 2023; or

• is under 18 and not traveling through this process accompanied by a parent or legal guardian, and as such is a child whom the inspecting officer would determine to be an unaccompanied child.[84]

*Travel Requirements:* Beneficiaries who receive advance authorization to travel to the United States to seek parole into the United States will be responsible for arranging and funding their own commercial air travel to an interior POE of the United States.

*Health Requirements:* Beneficiaries must follow all applicable requirements, as determined by DHS's Chief Medical Officer, in consultation with the Centers for Disease Control and Prevention, with respect to health and travel, including vaccination and/or testing requirements for diseases including COVID–19, polio, and measles. The most up-to-date public health requirements applicable to this process will be available at *www.uscis.gov/CHNV.*

### C. Processing Steps

Step 1: Declaration of Financial Support

A U.S.-based supporter will submit a Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, with USCIS through the online myUSCIS web portal to initiate the process. The Form I–134A identifies and collects information on both the supporter and the beneficiary. The supporter must submit a separate Form I–134A for each beneficiary they are seeking to support, including Nicaraguans' immediate family members and minor children. The supporter will then be vetted by USCIS to protect against exploitation and abuse, and to ensure that the supporter is able to financially support the beneficiary whom they agree to support. Supporters must be vetted and confirmed by USCIS, at USCIS' discretion, before moving forward in the process.

Step 2: Submit Biographic Information

If a supporter is confirmed by USCIS, the listed beneficiary will receive an email from USCIS with instructions to create an online account with myUSCIS and next steps for completing the application. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting the eligibility requirements.

As part of confirming eligibility in their myUSCIS account, individuals who seek authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 3: Submit Request in CBP One Mobile Application

After confirming biographic information in myUSCIS and

---

[79] OHCHR, Presentation of Report on the Human Rights Situation in Nicaragua, Human Rights Council Resolution 49/3 (Sept. 13, 2022), *https:// www.ohchr.org/en/speeches/2022/09/presentation-report-human-rights-situation-nicaragua.*

[80] Certain non-Nicaraguans may use this process if they are an immediate family member of a Nicaraguan beneficiary and traveling with that Nicaraguan beneficiary. For purposes of this process, immediate family members are limited to a spouse, common-law partner, and/or unmarried child(ren) under the age of 21.

[81] See preceding footnote.

[82] This limitation does not apply to immediate family members traveling with a Nicaraguan national.

[83] *See, e.g.,* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[84] As defined in 6 U.S.C. 279(g)(2). Children under the age of 18 must be traveling to the United States in the care and custody of their parent or legal guardian to be considered for parole at the POE under the process.

CLP_AR_001003

completing required eligibility attestations, the beneficiary will receive instructions through myUSCIS for accessing the CBP One mobile application. The beneficiary must then enter limited biographic information into CBP One and submit a live photo.

Step 4: Approval to Travel to the United States

After completing Step 3, the beneficiary will receive a notice in their myUSCIS account confirming whether CBP has, in CBP's discretion, provided the beneficiary with advance authorization to travel to the United States to seek a discretionary grant of parole on a case-by-case basis. If approved, this authorization is generally valid for 90 days, and beneficiaries are responsible for securing their own travel via commercial air to the United States.[85] Approval of advance authorization to travel does not guarantee parole into the United States. Whether to parole the individual is a discretionary determination made by CBP at the POE at the time the individual arrives at the interior POE.

All of the steps in this process, including the decision to grant or deny advance travel authorization and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds.

Step 5: Seeking Parole at the POE

Each individual arriving at a POE under this process will be inspected by CBP and considered for a grant of discretionary parole for a period of up to two years on a case-by-case basis.

As part of the inspection, beneficiaries will undergo additional screening and vetting, to include additional fingerprint biometric vetting consistent with CBP inspection processes. Individuals who are determined to pose a national security or public safety threat or otherwise do not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate processing pathway and may be referred to ICE for detention.

Step 6: Parole

If granted parole pursuant to this process, each individual generally will be paroled into the United States for a period of up to two years, subject to

applicable health and vetting requirements, and will be eligible to apply for employment authorization from USCIS under existing regulations. USCIS is leveraging technological and process efficiencies to minimize processing times for requests for employment authorization. All individuals two years of age or older will be required to complete a medical screening for tuberculosis, including an IGRA test, within 90 days of arrival to the United States.

*D. Scope, Termination, and No Private Rights*

The Secretary retains the sole discretion to terminate the process at any point.The number of travel authorizations granted under the Parole Process for Nicaraguans shall be spread across this process and the separate and independent Parole Process for Cubans, the Parole Process for Haitians, and Parole Process for Venezuelans (as described in separate notices published concurrently in today's edition of the **Federal Register**) and shall not exceed 30,000 each month in the aggregate. Each of these processes operates independently, and any action to terminate or modify any of the other processes will have no bearing on the criteria for or independent decisions with respect to this process.

This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal.

**V. Regulatory Requirements**

*A. Administrative Procedure Act*

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds, and is therefore amenable to immediate issuance and implementation.

*First,* the Department is merely adopting a general statement of policy,[86] *i.e.,* a "statement[ ] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." [87] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary of Homeland Security "in his discretion."

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment

rulemaking and a delayed effective date, the process would be exempt from such requirements because it involves a foreign affairs function of the United States.[88] Courts have held that this exemption applies when the rule in question "is clearly and directly involved in a foreign affairs function." [89] In addition, although the text of the Administrative Procedure Act does not expressly require an agency invoking this exemption to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing.[90] This process satisfies both standards.

As described above, this process is directly responsive to requests from key foreign partners—including the GOM—to provide a lawful process for Nicaraguan nationals to enter the United States. The United States will only implement the new parole process while able to return or remove to Mexico Nicaraguan nationals who enter without authorization across the SWB. The United States' ability to execute this process is contingent on the GOM making an independent decision to accept the return or removal of Nicaraguan nationals who bypass this new process and enter the United States without authorization. Thus, initiating and managing this process will require careful, deliberate, and regular assessment of the GOM's responses to U.S. action in this regard, and ongoing, sensitive diplomatic engagements.

Delaying issuance and implementation of this process to undertake rulemaking would undermine the foreign policy imperative to act now. It also would complicate broader discussions and negotiations about migration management. For now, the GOM has indicated it is prepared to make an independent decision to accept the return or removal of Nicaraguan nationals. The GOM's willingness to accept the returns or removals could be impacted by the delay associated with a public rulemaking process involving advance notice and comment and a delayed effective date. Additionally, making it publicly known that we plan to return or remove nationals of Nicaragua to Mexico at a future date would likely result in an even greater surge in migration, as migrants rush to the border to enter before the process begins—which would adversely impact each country's border security and

---

[85] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[86] 5 U.S.C. 553(b)(A); *id.* 553(b)(2).

[87] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[88] 5 U.S.C. 553(a)(1).

[89] *Mast Indus.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[90] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

CLP_AR_001004

further strain their personnel and resources deployed to the border.

Moreover, this process is not only responsive to the interests of key foreign partners—and necessary for addressing migration issues requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a web of carefully negotiated actions by multiple governments (for instance in the L.A. Declaration). It is the view of the United States that the implementation of this process will advance the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong bilateral relationships.

The invocation of the foreign affairs exemption here is also consistent with Department precedent. For example, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[91] DHS similarly invoked the foreign affairs exemption more recently, in connection with the Venezuela parole process.[92]

*Third,* DHS assesses that there is good cause to find that the policy associated with implementing this process through notice-and-comment rulemaking and with a delayed effective date would be contrary to the public interest and impracticable.[93] The numbers of Nicaraguans encountered at the SWB are already high, and a delay would greatly exacerbate an urgent border and national security challenge and would miss a critical opportunity to reduce and divert the flow of irregular migration.[94]

Undertaking notice-and-comment rulemaking procedures would be contrary to the public interest because an advance announcement of the process would seriously undermine a key goal of the policy: it would incentivize even more irregular migration of Nicaraguan nationals seeking to enter the United

States before the process would take effect. There are urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[95] It has long been recognized that agencies may use the good cause exception, and need not take public comment in advance, where significant public harm would result from the notice-and-comment process.[96] If, for example, advance notice of a coming price increase would immediately produce market dislocations and lead to serious shortages, advance notice need not be given.[97] A number of cases follow this logic in the context of economic regulation.[98]

The same logic applies here, where the Department is responding to exceedingly serious challenges at the border, and advance announcement of that response would significantly increase the incentive, on the part of migrants and others (such as smugglers), to engage in actions that would compound those very challenges. It is well established that migrants may change their behavior in response to perceived imminent changes in U.S. immigration policy.[99] For example, as

detailed above, implementation of the parole process for Venezuelans was associated with a drastic reduction in irregular migration by Venezuelans. Had the parole process been announced prior to a notice-and-comment period, it likely would have had the opposite effect, resulting in many hundreds of thousands of Venezuelan nationals attempting to cross the border before the program went into effect. Overall, the Department's experience has been that in some circumstances when public announcements have been made regarding changes in our immigration laws and procedures that would restrict access to immigration benefits to those attempting to enter the United States along the U.S.-Mexico land border, there have been dramatic increases in the numbers of noncitizens who enter or attempt to enter the United States. Smugglers routinely prey on migrants in response to changes in domestic immigration law.

In addition, it would be impracticable to delay issuance of this process in order to undertake such procedures because—as noted above—maintaining the status quo, which involves record numbers of Nicaraguan nationals currently being encountered at the SWB, coupled with DHS's extremely limited options for processing, detaining, or quickly removing such migrants, would unduly impede DHS's ability to fulfill its critical and varied missions. At current rates, a delay of just a few months to conduct notice-and-comment rulemaking would effectively forfeit an opportunity to reduce and divert migrant flows in the near term, harm border security, and potentially result in scores of additional migrant deaths.

The Department's determination here is consistent with past practice in this area. For example, in addition to the Venezuelan process described above, DHS concluded in January 2017 that it was imperative to give immediate effect to a rule designating Cuban nationals arriving by air as eligible for expedited removal because "pre-promulgation notice and comment would . . . endanger[ ] human life and hav[e] a potential destabilizing effect in the region." [100] DHS cited the prospect that "publication of the rule as a proposed rule, which would signal a significant change in policy while permitting

---

[91] *See* 82 FR 4902 (Jan. 17, 2017).

[92] *See* 87 FR 63507 (Oct. 19, 2022).

[93] *See* 5 U.S.C. 553(b)(B); *id.* 553(d)(3).

[94] *See Chamber of Commerce of U.S.* v. *SEC,* 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ["good cause"] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." (citations omitted)).

[95] *See* 5 U.S.C. 553(b)(B).

[96] *See, e.g., Mack Trucks, Inc.* v. *EPA,* 682 F.3d 87, 94–95 (D.C. Cir. 2012) (noting that the "good cause" exception "is appropriately invoked when the timing and disclosure requirements of the usual procedures would defeat the purpose of the proposal—if, for example, announcement of a proposed rule would enable the sort of financial manipulation the rule sought to prevent [or] in order to prevent the amended rule from being evaded" (cleaned up)); *DeRieux* v. *Five Smiths, Inc.,* 499 F.2d 1321, 1332 (Temp. Emer. Ct. App. 1975) ("[W]e are satisfied that there was in fact 'good cause' to find that advance notice of the freeze was 'impracticable, unnecessary, or contrary to the public interest' within the meaning of section 553(b)(B). . . . Had advance notice issued, it is apparent that there would have ensued a massive rush to raise prices and conduct 'actual transactions'—or avoid them—before the freeze deadline." (cleaned up)).

[97] *See, e.g., Nader* v. *Sawhill,* 514 F.2d 1064, 1068 (Temp. Emer. Ct. App. 1975) ("[W]e think good cause was present in this case based upon [the agency's] concern that the announcement of a price increase at a future date could have resulted in producers withholding crude oil from the market until such time as they could take advantage of the price increase.").

[98] *See, e.g., Chamber of Commerce of U.S.* v. *SEC.,* 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ["good cause"] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare."); *Mobil Oil Corp.* v. *Dep't of Energy,* 728 F.2d 1477, 1492 (Temp. Emer. Ct. App. 1983) ("On a number of occasions . . . this court has held that, in special circumstances, good cause can exist when the very announcement of a proposed rule itself can be expected to precipitate activity by affected parties that would harm the public welfare.").

[99] *See, e.g.,* Tech Transparency Project, Inside the World of Misinformation Targeting Migrants on

---

Social Media, *https:// www.techtransparencyproject.org/articles/inside-world-misinformation-targeting-migrants-social-media,* July 26, 2022 (last viewed Dec. 6, 2022).

[100] Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769, 4770 (Jan. 17, 2017).

continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule.'' [101] DHS found that ''[s]uch a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities. A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations.'' [102] DHS concluded that ''a surge could result in significant loss of human life.'' [103]

### B. Paperwork Reduction Act (PRA)

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to two collections of information, as follows.

OMB has recently approved a new collection, Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–NEW). This new collection will be used for the Nicaragua parole process, and is being revised in connection with this notice, including by increasing the burden estimate. To support the efforts described above, DHS has created a new information collection that will be the first step in these parole processes and will not use the paper USCIS Form I–134 for this purpose. U.S.-based supporters will submit USCIS Form I–134A online on behalf of a beneficiary to demonstrate that they can support the beneficiary for the duration of their temporary stay in the United States. USCIS has submitted and OMB has approved a request for emergency authorization of the required changes (under 5 CFR 1320.13) for a period of 6 months. Within the next 90 days, USCIS will immediately begin normal clearance procedures under the PRA.

OMB has previously approved an emergency request under 5 CFR 1320.13 for a revision to an information collection from CBP entitled Advance Travel Authorization (OMB control

---

[101] *Id.*

[102] *Id.*

[103] *Id.; accord, e.g.,* Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (finding the good cause exception applicable because of similar short-run incentive concerns).

---

number 1651–0143). In connection with the implementation of the process described above, CBP is making multiple changes under the PRA's emergency processing procedures at 5 CFR 1320.13, including increasing the burden estimate and adding Nicaraguan nationals as eligible for a DHS established process that necessitates collection of a facial photograph in CBP One™. OMB has approved the emergency request for a period of 6 months. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA.

More information about both collections can be viewed at *www.reginfo.gov.*

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2023–00254 Filed 1–5–23; 4:15 pm]
**BILLING CODE 9110–9M–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### Federal Emergency Management Agency

**[Internal Agency Docket No. FEMA–4679–DR; Docket ID FEMA–2022–0001]**

### West Virginia; Major Disaster and Related Determinations

**AGENCY:** Federal Emergency Management Agency, DHS.

**ACTION:** Notice.

**SUMMARY:** This is a notice of the Presidential declaration of a major disaster for the State of West Virginia (FEMA–4679–DR), dated November 28, 2022, and related determinations.

**DATES:** The declaration was issued November 28, 2022.

**FOR FURTHER INFORMATION CONTACT:** Dean Webster, Office of Response and Recovery, Federal Emergency Management Agency, 500 C Street SW, Washington, DC 20472, (202) 646–2833.

**SUPPLEMENTARY INFORMATION:** Notice is hereby given that, in a letter dated November 28, 2022, the President issued a major disaster declaration under the authority of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the ''Stafford Act''), as follows:

I have determined that the damage in certain areas of the State of West Virginia resulting from severe storms, flooding, landslides, and mudslides during the period of August 14 to August 15, 2022, is of sufficient severity and magnitude to warrant a major disaster declaration under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the

''Stafford Act''). Therefore, I declare that such a major disaster exists in the State of West Virginia.

In order to provide Federal assistance, you are hereby authorized to allocate from funds available for these purposes such amounts as you find necessary for Federal disaster assistance and administrative expenses.

You are authorized to provide Public Assistance in the designated areas and Hazard Mitigation throughout the State. Consistent with the requirement that Federal assistance be supplemental, any Federal funds provided under the Stafford Act for Public Assistance and Hazard Mitigation will be limited to 75 percent of the total eligible costs.

Further, you are authorized to make changes to this declaration for the approved assistance to the extent allowable under the Stafford Act.

The Federal Emergency Management Agency (FEMA) hereby gives notice that pursuant to the authority vested in the Administrator, under Executive Order 12148, as amended, Jeffrey L. Jones, of FEMA is appointed to act as the Federal Coordinating Officer for this major disaster.

The following areas of the State of West Virginia have been designated as adversely affected by this major disaster:

Fayette County for Public Assistance.

All areas within the State of West Virginia are eligible for assistance under the Hazard Mitigation Grant Program.

The following Catalog of Federal Domestic Assistance Numbers (CFDA) are to be used for reporting and drawing funds: 97.030, Community Disaster Loans; 97.031, Cora Brown Fund; 97.032, Crisis Counseling; 97.033, Disaster Legal Services; 97.034, Disaster Unemployment Assistance (DUA); 97.046, Fire Management Assistance Grant; 97.048, Disaster Housing Assistance to Individuals and Households In Presidentially Declared Disaster Areas; 97.049, Presidentially Declared Disaster Assistance—Disaster Housing Operations for Individuals and Households; 97.050, Presidentially Declared Disaster Assistance to Individuals and Households—Other Needs; 97.036, Disaster Grants—Public Assistance (Presidentially Declared Disasters); 97.039, Hazard Mitigation Grant.

**Deanne Criswell,**
*Administrator, Federal Emergency Management Agency.*
[FR Doc. 2023–00178 Filed 1–6–23; 8:45 am]
**BILLING CODE 9111–23–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### Implementation of a Parole Process for Cubans

**ACTION:** Notice.

**SUMMARY:** This notice describes a new effort designed to enhance the security

CLP_AR_001006



*Office of Partnership and Engagement*
**U.S. Department of Homeland Security**
Washington, DC 20528

March 23, 2023

Reverend Dr. Rafael Malpica Padilla
Executive Director, Service and Justice
Evangelical Lutheran Church in America
8765 W Higgins Road
Chicago, IL  60631

Dear Reverend Dr. Malpica Padilla:

Thank you for your January 23, 2023, letter to the Department of Homeland Security (DHS) related to your concerns with DHS and Department of Justice's (DOJ) intent to issue a Notice of Proposed Rulemaking that would place certain conditions on individuals who circumvent available, established pathways to lawful migration, and fail to seek protection in a country through which they traveled on their way to the United States.  Secretary Mayorkas asked that I respond on his behalf.

I appreciate the concerns you have raised about the proposed rule.  When the proposed rule was published in the Federal Register on February 23, DHS and DOJ invited public comment and the comment period closes on March 27, 2023.  We are interested in your input and encourage you to submit written comments to the docket for careful, on-the-record consideration of your views.  You can view the rule and submit comments at: https://www.federalregister.gov/documents/2023/02/23/2023-03718/circumvention-of-lawful-pathways.

DHS is also pursuing phased implementation of the Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and Convention Against Torture (CAT)Protection Claims by Asylum Officers interim final rule (IFR)[1], which took effect May 31, 2022.  The IFR allows U.S. Citizenship and Immigration Services to adjudicate, in the first instance, the asylum claims of individuals who receive a positive credible fear determination after being placed into expedited removal.  That rule is a key step toward implementing the Administration's Blueprint for a Fair, Orderly, and Humane Immigration System by building a more functional and sensible asylum system to increase the efficiency and fairness of the process by which noncitizens who are placed into expedited removal proceedings are either removed or, if

---

[1] https://www.federalregister.gov/documents/2022/03/29/2022-06148/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat

Rev. Dr. Rafael Malpica Padilla
Page 2

eligible, granted protection.  It also aims to reduce the growing backlog of asylum applications in immigration courts.

In addition, DHS published a temporary final rule[2] in recognition of delays in the timely processing of Form I-765, Application for Employment Authorization.  The rule, effective on May 4, 2022, increased the automatic extension period of employment authorization documents (EAD) for certain EAD renewal applicants, including asylees, individuals with pending asylum applications, individuals who have been granted Temporary Protected Status (TPS), and certain TPS applicants.

DHS has also continued, in consultation with the Department of State, to monitor and evaluate conditions in countries around the globe for consideration of newly designating or extending designations of specific countries for TPS.  TPS provides much-needed humanitarian relief to nationals of the designated country already present in the United States as of a date specified in the TPS designation.  DHS has prioritized administering TPS in an equitable manner, regularly monitoring country conditions across the globe.  There are 16 countries whose nationals currently receive TPS benefits, including 12 countries which have been newly designated or redesignated since January 2021.

Finally, *Uniting for Ukraine* and the parole process for Venezuelans provides certain eligible nationals and family members an opportunity to seek authorization to travel to the United States to be considered, on a case-by-case basis, for a temporary period of parole for up to two years and employment authorization.  Building upon the success of *Uniting for Ukraine*, DHS announced similar processes on January 5, 2023 for nationals of Cuba, Haiti, and Nicaragua and their family members who face unique challenges in their home countries.  The processes for these applicants have been effective; individuals are successfully using this lawful pathway and encounters of Cuban, Haitian, Nicaraguan, and Venezuelan nationals attempting to cross the Southwest Border unlawfully have decreased dramatically since President Biden announced these processes.  Information about these parole processes is accessible and available in English, Spanish, and Haitian Creole.

In addition to these new lawful pathways, the U.S. Government (USG) provides durable solutions for humanitarian protection through the U.S. Refugee Admissions Program for applicants who qualify.  The USG intends to welcome at least 20,000 refugees from Latin America and the Caribbean in Fiscal Years 2023 and 2024, which would put the United States on pace to more than triple refugee admissions from the Western Hemisphere this fiscal year alone.  The USG also continues to work with our partners to expand access to refugee resettlement more broadly throughout the Western Hemisphere.

DHS is committed to strengthening the availability of legal, orderly pathways to the United States while providing consequences to those who fail to use those pathways.  We are operating within a fundamentally broken immigration system.  The steps we are taking reflect the constraints of our outdated laws, which have not been updated in decades and were designed to

---

[2] https://www.federalregister.gov/documents/2022/05/04/2022-09539/temporary-increase-of-the-automatic-extension-period-of-employment-authorization-and-documentation

Rev. Dr. Rafael Malpica Padilla
Page 3

address a fundamentally different migratory reality than that which exists today along the Southwest Border and around the world.

Thank you again for your letter and interest in these important issues.  Please share this response with your members and congregations.  Should you have any questions, please contact the DHS Office of Partnership and Engagement.

Sincerely,

Brenda F. Abdelall
Assistant Secretary for Partnership and Engagement
Office of Partnership and Engagement

RECEIVED
By ESEC at 9:09 am, Mar 28, 2023

# United States Senate

## WASHINGTON, DC 20510

March 27, 2023

The Honorable Alejandro Mayorkas
Secretary of Homeland Security
U.S. Department of Homeland Security
2801 Nebraska Avenue, NW
Washington, DC 20528

The Honorable Troy A. Miller
Acting Commissioner
U.S. Customs and Border Protection
U.S. Department of Homeland Security
1300 Pennsylvania Avenue NW Washington, D.C. 20229

Dear Secretary Mayorkas and Acting Commissioner Miller,

I write to express my grave concerns about the implementation of the CBP One mobile application as the sole method for migrants to seek asylum at the border and for Haitians, Nicaraguans, Cubans, and Venezuelans to seek humanitarian parole. Public reporting has showed that users continue to experience a multitude of technical problems, which could ultimately lead to more migrants turning to potentially fatal, unregulated border crossings.[1]

Since the app became the primary method for seeking asylum and humanitarian parole in January 2023, it has been plagued by inconsistencies that have created an inequitable process. U.S Customs and Border Protection (CBP) releases a limited number of appointments each day. Successfully receiving an appointment is akin to winning the lottery for the thousands of migrants living in camps waiting to secure an interview slot. Beyond the odds of getting an appointment, technical issues make it virtually impossible for many migrants to access the app – antiquated devices, poor cell phone service, or language access have all become barriers.

When CBP established the app as the sole method for Haitians, Nicaraguans, Cubans, and Venezuelans to seek humanitarian parole, the app was only available in English and Spanish. This overlooked the fact that the majority of Haitian nationals speak only Haitian Creole.[2] I applaud CBP for quickly addressing the problem and offering a Haitian Creole translation in February 2023. However, error messages still only appear in English, leaving non-English speakers without direction when they encounter an issue.[3]

---

[1] Bernard Debusmann Jr., *At U.S. Border, Tech Issues Plague New Migrant Applications*, BBC NEWS (March 8, 2023) https://www.bbc.com/news/world-us-canada-64814095.
[2] Dara Lind, *How To Seek Asylum (Under Biden's Proposed Asylum Transit Ban), In 12 Not-At-All-Easy Steps*, IMMIGRATION IMPACT (Feb. 22, 2023) https://immigrationimpact.com/2023/02/22/steps-to-seek-asylum-biden-transit-ban/.
[3] *Id.*

CLP_AR_001258

News reports in early February indicated that Black migrants attempting to use CBP One faced additional challenges because the app is failing to register the photo of their faces.[4] Despite staff-level assurances that this issue was due to user error and not a problem with the app itself, these reports have continued.[5] I remain deeply concerned that the technology used to capture faces with darker complexions has not been adequately tested and structurally disadvantages Black asylum seekers and urge the agency to address the issue.

During a recent visit to Matamoros, Mexico, I had the opportunity to speak with migrant mothers who shared their experience attempting to sign up for appointments through the app. CBP and State Department officials also acknowledged problems, confirming recent reports of families with children who cannot secure appointments for their entire family. For example, by the time a family with two parents and two children has completed the application for an appointment, all of the appointments made available that day are usually filled. This results in family members who have appointment times presenting themselves and abandoning their children or other member of their family that did not successfully obtain an appointment.[6] I am glad that CBP recently addressed this issue to make it easier for family units to secure appointments by releasing appointments in larger batches at fewer intervals of time. Even with this improvement, I urge CBP to review and assess its implementation and efficiency to ensure families are not faced with the difficult decision of separating at the border in order to seek asylum.

The process for registering for appointments is also in need of improvement. Many migrants have antiquated mobile devices that are slow to connect to the internet. Some migrants do not have phones at all, while others cannot use CBP One because they do not read or write. These difficulties result in a select group of asylum seekers securing appointments. Additional impediments include the requirement that asylum seekers be in Mexico in order to register for an appointment, leading them to wait, sometimes for months at a time, in migrant camps at the border in deplorable conditions. Occasionally, the app wrongly identifies migrants who are in Mexico as already inside the U.S. and blocks them from registering for appointments.

Pregnant or nursing mothers are also particularly harmed by the current CBP One process because they do not qualify for a life-threatening injury or medical emergency exemption to Title 42. Service providers in the area have communicated to my staff that this interpretation has forced some pregnant women to cross outside ports of entry and present themselves to CBP agents in the United States, where they can receive adequate and safe medical care.

I welcome the changes CBP made to the app to respond to these glaring problems, but several issues remain that must be addressed. First, the process does not consider the how long it has been since a person registered on the app when that person then tries to secure an appointment. Since appointments open every day and fill within minutes of opening, CBP One has created a

---

[4] Arelis Hernández, *Desperate Migrants Seeking Asylum Face a New Hurdle: Technology*, WASHINGTON POST (Mar. 11, 2023) https://www.washingtonpost.com/nation/2023/03/11/asylum-seekers-mexico-border-app/.

[5] Melissa Del Bosque, *Facial Recognition Bias Frustrates Black Asylum Applicants to US, Advocates say*, THE GUARDIAN (Feb. 8, 2023) https://www.theguardian.com/us-news/2023/feb/08/us-immigration-cbp-one-app-facial-recognition-bias.

[6] Andrea Castillo, *Asylum Seekers Face Decision to Split up Families or Wait Indefinitely Under New Border Policy*, LA TIMES (Feb. 24, 2023) https://www.latimes.com/politics/story/2023-02-24/asylum-seeking-families-consider-separation-shortage-mobile-app-appointments.

CLP_AR_001259

luck-based lottery system to gain an appointment. Some migrants could obtain an appointment the same day they register, others could be forced to wait for months. Reports have indicated that some asylum seekers have turned to use automation apps that employ "inhumanly fast reflexes" previously employed by ticket scalpers to gain access to one of the limited daily appointments.[7] CBP must implement a more orderly process does not reward people seeking to game the system.

Even if the CBP One app was as efficient, user friendly, fair, and inclusive as possible – which I hope one day it will be – it would still be inherently discriminatory. To use the app, a person must have a working cell phone, a reliable internet connection, and must have adequate resources and be in good enough health to safely stay in a single location either near the southern border or in their country of origin. This situation is not the reality for asylum seekers whose lives are threatened in their home country or in northern Mexico. It is not a reality for pregnant women, who do not qualify for a humanitarian exception to the CBP One appointment process. And it is not a reality for asylum seekers who travel to our border or stay in their country of origin but do not have phone or internet access, or are unable to use a cell phone.

These shortcomings are the logical result of a rushed and inadequate development and testing process. Documents detailing the development of the CBP One app acquired by the American Immigration Council indicate that the rapid implementation of the app has confused CBP officials, and that there has been little consideration of the app's flaws or transparency surrounding the app's functions.[8] While the expansion of opportunities for asylum seekers to have their claims heard is vital, I am disappointed that precautions were not taken before our government made the CBP One app the sole avenue to schedule appointments.

As your agency prepares for the long-overdue end of Title 42 expulsions in May 2023, I strongly support increasing the number of appointments available on CBP One to accommodate as many legitimate asylum claims of migrants who cannot return to their homes. I also encourage you explore additional pathways that would allow people without the resources necessary to secure CBP One appointments to safely claim asylum at ports of entry.

Thank you for your attention to this important matter.

Sincerely,

Cory A. Booker
United States Senator

---

[7] Stephania Corpi Arnaud, *Once a Ticket Scalpers' Tool, Auto Clickers Now Help Migrants Enter the U.S.,* REST OF THE WORLD (Feb. 22, 2023) https://restofworld.org/2023/auto-clicker-migrants-us-mexico/.

[8] Government Documents Reveal Information about the Development of the CBP One App, AMERICAN IMMIGRATION COUNCIL (Feb. 28, 2023) https://www.americanimmigrationcouncil.org/FOIA/government-documents-reveal-information-about-development-cbp-one-app.

CLP_AR_001260

RECEIVED
By ESEC at 10:41 am, Feb 22, 2023

EDWARD J. MARKEY
MASSACHUSETTS

COMMITTEES:
ENVIRONMENT AND PUBLIC WORKS
CHAIR:
SUBCOMMITTEE ON CLEAN AIR, CLIMATE, AND
NUCLEAR SAFETY
HEALTH, EDUCATION, LABOR, AND PENSIONS
CHAIR:
SUBCOMMITTEE ON PRIMARY HEALTH AND
RETIREMENT SECURITY
COMMERCE, SCIENCE, AND TRANSPORTATION
SMALL BUSINESS AND ENTREPRENEURSHIP
CHAIR:
U.S. SENATE CLIMATE CHANGE TASK FORCE

# United States Senate

SUITE SD–255
DIRKSEN BUILDING
WASHINGTON, DC 20510–2107
202–224–2742

975 JFK FEDERAL BUILDING
15 NEW SUDBURY STREET
BOSTON, MA 02203
617–565–8519

1550 MAIN STREET, 4TH FLOOR
SPRINGFIELD, MA 01103
413–785–4610

February 21, 2023

The Honorable Alejandro Mayorkas
Secretary of Homeland Security
U.S. Department of Homeland Security
3801 Nebraska Avenue, NW
Washington, DC 20016

Dear Secretary Mayorkas,

I write to urge the Department of Homeland Security (DHS) to cease using the CBP One mobile application, which DHS recently made a requirement for migrants seeking asylum in the United States at the southern border. Under the new DHS policy, those asylum seekers must now use the CBP One app to submit biometric information and schedule appointments to present themselves at certain points of entry (POEs).[1] This expanded use of the CBP One app raises troubling issues of inequitable access to — and impermissible limits on — asylum, and has been plagued by significant technical problems and privacy concerns. DHS should shelve the CBP One app immediately.

I appreciate that, through the expanded use of the CBP One app — initially launched in October 2020 with limited functionality—the Biden administration intended to ensure the safe and orderly processing of noncitizens at POEs. But requiring asylum seekers to use a virtual platform accessible only with a smartphone effectively denies to indigent migrants their legally protected right to seek asylum.[2] Those fleeing dangerous conditions often lack access to technology, including smartphones and the internet access required to download and use the CBP One app.[3]

Furthermore, even migrants with the resources and know-how to obtain and use this technology must schedule an appointment at, and travel to, one of only eight POEs participating in the CBP One app's expanded rollout—out of 328 POEs nationwide.[4] Advocates report that migrants in

---

[1] *DHS Continues to Prepare for End of Title 42: Announces New Border Enforcement Measures and Additional Safe and Orderly Processes*, Dep't of Homeland Security (Jan. 5, 2023), https://www.dhs.gov/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-new-border-enforcement-measures-and.
[2] CBP One Mobile Application, U.S. Customs and Border Protection, *NEW: Submit Advance Information and Schedule an Appointment Capability for Non-Citizens without Appropriate Travel Documents*, https://www.cbp.gov/about/mobile-apps-directory/cbpone.
[3] *Id.*
[4] *DHS Continues to Prepare for End of Title 42: Announces New Border Enforcement Measures and Additional Safe and Orderly Processes*, Dep't of Homeland Security (Jan. 5, 2023), https://www.dhs.gov/news/2023/01/05/dhs-

The Honorable Alejandro Mayorkas
Page **2** of **4**

Reynoso and Matamoros, Mexico were given appointments for asylum in Tijuana, some 1,500 miles away.[5] Technology can facilitate asylum processing, but we cannot allow it to create a tiered system that treats asylum seekers differently based on their economic status — including the ability to pay for travel — language, nationality, or race.

According to reports, the app also was not ready for its expanded use, could not handle the volume of applicants, and frequently did not work.[6] One user described how she "would create an account, go through several more steps and the app would then restart to step one, a seemingly endless cycle."[7]

Additionally, the use of the CBP One app to collect biometric information raises privacy concerns and poses unique threats to immigrant communities. According to DHS, the CBP One app uses facial comparison and cloud technology to collect, store, and process data — including biometric and geolocation information — on asylum seekers before they enter the United States.[8] But this technology is fraught with serious problems. An analysis of face recognition software tools conducted by the National Institute of Standards and Technology (NIST) found that "one-to-one matching . . . saw higher rates of false positives for Asian and African American faces relative to images of Caucasians," up to a factor of 100 times.[9] It therefore comes as no surprise that CBP One has reportedly rejected photos from some migrants — particularly those with dark complexions — delaying or rejecting their applications and requiring them to start the arduous process all over again.[10] Accuracy issues aside, government collection of biometric data is extremely problematic because it is highly invasive and invites serious privacy violations.

The use of geolocation tracking and cloud storage also raises surveillance concerns. These features allow the government to identify and track migrants' movements without their knowledge or consent. Communities of color are systematically subjected to over-policing. The proliferation of biometric surveillance tools is therefore likely to disproportionately infringe on the privacy of individuals in Black, Brown, and immigrant communities.

Last, but certainly not least, the CBP One app promotes the false notion that, in order to seek asylum in the United States, an appointment is required. It is not, under either U.S. or international law. Indeed, according to DHS guidance from November 2021, "asylum seekers or

---

continues-prepare-end-title-42-announces-new-border-enforcement-measures-and; *At Ports of Entry*, U.S. Customs and Border Protection, https://www.cbp.gov/border-security/ports-entry.
[5] Sandra Sanchez, *CBP One app gives cash-strapped asylum-seekers interviews hundreds of miles away* (Jan. 18, 2023), https://www.borderreport.com/immigration/cbp-one-app-gives-cash-strapped-asylum-seekers-interviews-hundreds-of-miles-away/.
[6] Regina Yurrita, *Asylum seekers met with issues from new CBP One app*, CBS8 (Feb. 1, 2023), https://www.cbs8.com/article/news/local/asylum-seekers-met-with-issues-from-cbp-one-app/509-5f69579c-05e1-4999-a7a9-720eab0cc680.
[7] *Id.*
[8] *Privacy Impact Assessment for CBP One*, Dep't of Homeland Security (Feb. 19, 2021), https://www.dhs.gov/sites/default/files/2023-01/privacy-pia-cbp068-cbpmobileapplication-jan2023.pdf.
[9] National Institute of Standards and Technology, *NIST Study Evaluates Effects of Race, Age, Sex on Face Recognition Software* (Dec. 19, 2019), https://www.nist.gov/news-events/news/2019/12/nist-study-evaluates-effects-race-age-sex-face-recognition-software.
[10] Suzanne Monyak, *Migrants grapple with government app to make asylum appointments*, RollCall (Jan. 31, 2023), https://rollcall.com/2023/01/31/migrants-grapple-with-government-app-to-make-asylum-appointments/.

The Honorable Alejandro Mayorkas
Page **3** of **4**

others seeking humanitarian protection cannot be required to submit advance information in order to be processed at a Southwest Border land POE."[11] Disturbingly, requiring asylum seekers to remain in Mexico and await their appointments mirrors "metering" efforts under the Trump administration.[12] And those awaiting their appointments can face dangerous conditions, In January, a 17-year old Cuban boy awaiting his scheduled CBP One appointment in Monterrey, Mexico was fatally shot, underscoring the dangers facing asylum seekers.[13]

Currently, the CBP One app is required for asylum seekers requesting an exception from Title 42; after Title 42 restrictions are lifted, its use will be greatly expanded.[14] This carries profound long-term implications for the U.S. immigration system. In order to help us better understand current and future issues surrounding the CBP One app, please provide written answers to the following questions by March 10, 2023:

1. Will DHS commit to permanently cease using the CBP One application to screen asylum applicants? If not, why not, and will DHS at least temporarily stop using it until DHS can remove any biometric technology and geolocation functionality and fix the app's technical issues?
2. Will DHS ensure that there is an alternative means for migrants to seek asylum at the southern border, one that does not require an app or internet access? Currently, are asylum seekers who lack a smartphone or internet access — and therefore cannot schedule an appointment through CBP One — turned back when they present themselves at a POE?
3. How is DHS preventing the CBP One app from discriminating against applicants of color, including the app's rejecting photos of applicants with darker complexions?
4. What assistance, if any, is DHS providing to asylum seekers whose photos are rejected, or who receive error messages or experience other technical problems with CBP One? Can migrants seeking asylum at the southern border still exercise that right without using the CBP One app?
5. Before CBP One's expanded rollout, was the application tested to screen for technology glitches or failures? If not, why not?
6. Before CBP One's expanded rollout, were civil society or nongovernmental organizations consulted? If not, why not?
7. Why are only eight POEs participating in CBP One? How and why did DHS decide on this number and the specific locations?
8. How many appointments does DHS make available each day through the CBP One app?

---

[11] *Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry*, U.S. Customs and Border Protection (Nov. 1, 2021), https://www.cbp.gov/sites/default/files/assets/documents/2021-Nov/CBP-mgmt-processing-non-citizens-swb-lpoes-signed-Memo-11.1.2021-508.pdf
[12] *Metering and Asylum Turnbacks*, American Immigration Council (Mar. 8, 2021), https://www.americanimmigrationcouncil.org/research/metering-and-asylum-turnbacks.
[13] Press Release, *Teenager Killed While Waiting in Mexico to Seek Asylum in the United States*, Young Center for Immigrant Children's Rights (Jan. 26, 2023), https://www.theyoungcenter.org/media-press-releases/2023/1/26/teenager-killed-while-waiting-in-mexico-to-seek-asylum-in-the-united-states.
[14] *DHS Continues to Prepare for End of Title 42: Announces New Border Enforcement Measures and Additional Safe and Orderly Processes*, Dep't of Homeland Security (Jan. 5, 2023), https://www.dhs.gov/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-new-border-enforcement-measures-and.

The Honorable Alejandro Mayorkas
Page **4** of **4**

9. In what geographic areas does the CBP One application work and how was this decided?

10. How is DHS working with Mexico to ensure the safety of individuals who must travel in order to present themselves at one of the eight participating POEs?

11. The CBP One app is available only in English, Spanish, and Haitian Creole languages. This makes the app inaccessible to asylum seekers who speak a different language. How did DHS decide on these three languages? What options are available for asylum seekers using the CBP One app who don't speak those three languages?

12. What steps is DHS taking to prevent exploitation of asylum seekers through clone apps or scam attempts? How is DHS defending against misinformation around the CBP One app?

13. How is DHS safeguarding biometric and geolocation information obtained through use of the CBP One App? How is DHS ensuring that this information cannot be misused? Has CBP shared any personal information collected by the CBP One App with any other government agencies or law enforcement entities? If so please describe that sharing in detail.

Rather than mandating use of an app that is inaccessible to many migrants, and violates both their privacy and international law, DHS should instead implement a compassionate, lawful, and human-rights centered approach for those seeking asylum in the United States.

Thank you for your attention to this urgent matter, and I look forward to your response.

Sincerely,

_____
Edward J. Markey
United States Senator

4/27/23, 12:47 PM                    Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration | Homeland Security

Case 4:18-cv-06810-JST  Document 169-8  Filed 06/05/23  Page 34 of 1047



U.S. Department of Homeland Security

# Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration

**Release Date:** April 27, 2023

Today, the Department of State (State) and Department of Homeland Security (DHS) are announcing sweeping new measures to further reduce unlawful migration across the Western Hemisphere, significantly expand lawful pathways for protection, and facilitate the safe, orderly, and humane processing of migrants.

Like many other COVID-era public health measures, the CDC's temporary Title 42 public health order will also come to an end. But the lifting of the Title 42 order does not mean the border is open. When the Title 42 order lifts at 11:59 PM on May 11, the United States will return to using Title 8 immigration authorities to expeditiously process and remove individuals who arrive at the U.S. border unlawfully. These decades-old authorities carry steep consequences for unlawful entry, including at least a five-year ban on reentry and potential criminal prosecution for repeated attempts to enter unlawfully. The return to processing under Title 8 is expected to reduce the number of repeat border crossings over time, which increased significantly under Title 42. Individuals who cross into the United States at the southwest border without authorization or having used a lawful pathway, and without having scheduled a time to arrive at a port of entry, would be presumed ineligible for asylum under a new proposed regulation, absent an applicable exception.

The measures announced today will be implemented in close coordination with regional partners, including the governments of Mexico, Canada, Spain, Colombia, and Guatemala. They draw on the success of recent processes that have significantly reduced unlawful border crossings through a combination of expanded lawful pathways and swift removal of those who fail to use those lawful pathways.

Importantly, these measures do not supplant the need for congressional action. Only Congress can provide the reforms and resources necessary to fully manage the regional migration challenge. Since taking office, President Biden has continually called on Congress to pass legislation to update and reform our outdated immigration system. State and DHS are taking action with the tools and resources available under current law, but Congress's failure to pass and fund the President's plan will increase the challenge at the southwest border.

The measures announced today include:

## Imposing Stiffer Consequences for Failing to Use Lawful Pathways

The transition back to Title 8 processing for all individuals encountered at the border will be effective immediately when the Title 42 order lifts. Individuals who unlawfully cross the U.S. Southwest border:

- will generally be processed under Title 8 expedited removal authorities in a matter of days
- will be barred from reentry to the United States for at least five years if ordered removed; and
- would be presumed ineligible for asylum under the proposed Circumvention of Lawful Pathways regulation, absent an applicable exception

To avoid these consequences, individuals are encouraged to use the many lawful pathways the United States has expanded over the past two years. Today, the United States is announcing additional lawful pathways, including:

- **Expanded Access to the CBPOne App to Appear at a U.S. Port of Entry.** When the Title 42 order lifts, migrants located in Central and Northern Mexico will have access to the CBPOne mobile application to schedule an appointment to present themselves at a port of entry rather than trying to enter between ports. CBPOne will make additional appointments available, and the use of this tool will enable safe, orderly, and humane processing.
- **New Family Reunification Parole Processes.** DHS is creating new family reunification parole processes for El Salvador, Guatemala, Honduras and Colombia. The agency is also modernizing existing family reunification parole processes for Cuba and Haiti. These processes, once finalized, will allow vetted individuals with already approved family-based petitions to be paroled into the United States, on a case-by-case basis. The U.S. Government will deliver timely and efficient authorization for those approved and vetted to travel. Individuals paroled into the U.S. under these processes would be eligible to apply for work authorization.
- **Double Number of Refugees from Western Hemisphere.** The United States will commit to welcoming thousands of additional refugees per month from the Western Hemisphere – with the goal of doubling the number of refugees the United States committed to welcome as part of the

CLP_AR_002187

Case 4:18-cv-06810-JST   Document 169-8   Filed 06/05/23   Page 35 of 1047

Los Angeles Declaration on Migration and Protection. To achieve this goal, the United States is building on processing efficiencies achieved over the last two years and further increasing resources and staffing to the U.S. Refugee Admissions Program in this region.

In addition, the United States will continue to accept up to 30,000 individuals per month from Venezuela, Nicaragua, Cuba, and Haiti as part of the expanded parole processes announced earlier this year. Encounters at the border for these nationalities plummeted when DHS expanded the parole programs. The United States will also continue to utilize available authorities to continue to strengthen and expand additional lawful pathways.

## Humanely Managing Migration Flows with Regional Partners

A border-only approach to managing migration is insufficient. From day one, the Biden-Harris Administration has approached migration as a regional challenge – rebuilding relationships with key partners across the Western Hemisphere, bringing 20 world leaders together through the Los Angeles Declaration on Migration and Protection to jointly manage migration flows, and securing commitments from across the Western Hemisphere to expand lawful pathways, address root causes, and step up enforcement.

Building on these efforts, the United States is joining forces with partners across the Western Hemisphere to:

- **Open Regional Processing Centers Across the Western Hemisphere to Facilitate Access to Lawful Pathways.** In a historic move, the United States alongside other countries of the Los Angeles Declaration today announced they will establish Regional Processing Centers (RPCs) in key locations throughout the Western Hemisphere to reduce irregular migration and facilitate safe, orderly, humane, and lawful pathways from the Americas. The first centers will be established in several countries, including Colombia and Guatemala, in the region. Individuals from the region will be able to make an appointment on their phone to visit the nearest RPC before traveling, receive an interview with immigration specialists, and if eligible, be processed rapidly for lawful pathways to the United States, Canada, and Spain.
- **Launch an Aggressive Anti-Smuggling Campaign Targeting Criminal Networks in the Darien.** Panama, Colombia and the United States reached an historic agreement to launch a 60-day surge campaign to address the unprecedented migration through the dangerous Darien corridor. The campaign officially launched on April 20 and is focused on disrupting criminal networks that facilitate the illicit movement of people and increasing state presence in the jungle. As the authorities reclaim control of this region and root out criminal actors, migrants are urged to wait and avail themselves of safe, orderly lawful pathways, including new pathways announced today.
- **Increase Removals of Those Without a Lawful Basis to Stay.** The United States, in coordination with our regional partners, has dramatically scaled up the number of removal flights per week. That includes flights to Cuba, which resumed this week following a pause due to COVID-19. The number of weekly flights will double or triple for some countries. With this increase in removal flights, migrants who cross the U.S. border without authorization and who fail to qualify for protection should expect to be swiftly returned with at least a five-year bar to returning. The United States is also collaborating with foreign partners to crack down on criminal networks that charge enormous fees to migrants to facilitate migration by air. Individuals who arrive at international airports in the region with the intent to cross the U.S. border unlawfully should expect to be turned around and subject to consequences. DHS has also made those who attempt to migrate irregularly to the U.S. via dangerous maritime means ineligible for the parole processes announced in January.
- **Combat Smuggler Misinformation.** Smugglers are already ramping up misinformation campaigns to profit off of vulnerable migrants ahead of the return to Title 8 processing. To combat this misinformation, State's diplomatic missions across the hemisphere are broadcasting accurate information about U.S. migration laws and engaging with a wide spectrum of regional audiences to counter smuggler narratives. It will be incumbent upon all elected leaders and stakeholders – regardless of political affiliation – to work to counter smuggler misinformation and propaganda, not contribute to it.

## Facilitating Safe, Orderly, and Humane Processing of Migrants

The measures announced today aim to change the incentive structure that drives individuals to flee their countries and seek unlawful immigration pathways. They facilitate safe and orderly access to lawful pathways throughout the Western Hemisphere so that fewer migrants are putting their lives at risk to arrive directly at the Southwest border.

To facilitate the safe, orderly, and humane processing of migrants who arrive at the Southwest border, the United States will:

- **Expeditiously Process and Remove Individuals Who Arrive at the Southwest Border and Don't Have a Legal Basis to Remain.** Individuals in expedited removal proceedings and who express a fear of persecution in their country of nationality or designated country of removal will be referred to a U.S. Citizenship and Immigration Services officer with specialized asylum training for a credible fear interview. Interviews of single adults, as well as any immigration judge review of a negative determination, will take place while the noncitizen is in DHS custody, either in a U.S. Border Patrol or U.S. Immigration and Customs Enforcement facility. By expediting review of these asylum claims, DHS will be able to provide relief more quickly to those who are eligible and to more quickly remove those who are not. To support faster processing, DHS is increasing its holding capacity, expanding capabilities and technologies, installing hundreds of phone lines and privacy booths to conduct credible fear interviews (CFIs) and increase access to counsel, and schedule CFI interviews within 24 hours. DHS and the Department of Justice

CLP_AR_002188

Case 4:18-cv-06810-JST    Document 169-8    Filed 06/05/23    Page 36 of 1047

(DOJ) are also surging asylum officers and immigration judges, respectively, to complete immigration proceedings at the border more quickly. Like single adults, families will be placed in removal proceedings, which will include expedited removal. DHS is currently focused on utilizing its Alternatives to Detention program for families, including GPS monitors and enhanced supervision, such as curfews, and expanding case management services. More stringent measures may be used for those who do not comply. Like single adults, families with final orders of removal will be removed.

- **Surge Additional Resources.** DHS is significantly scaling up its air and ground transportation capabilities to quickly remove migrants when warranted or transport migrants to less-congested border sectors for further immigration enforcement proceedings. DHS is also making an additional $15 million available for its Case Management Pilot Program to provide voluntary case management and other services to noncitizens to increase compliance with court dates and accelerate processing times. Services will be made available to certain noncitizens enrolled in DHS's Alternatives to Detention program, which is an important tool used by DHS for individuals and families as they await the outcome of immigration proceedings.
- **Manage Resource Needs.** The initial actions announced today are necessary to prepare the return to Title 8 processing and increased encounters along the Southwest Border but are not in and of themselves sufficient to address the resources requirements DHS will incur after Title 42 is lifted. DHS notified Congress of its intent to reprogram funds within its budget to support other emerging requirements across DHS. The reprograming of existing funds to address the immediate shortfalls in border operations should not be interpreted as adequate for the longer term needs of securing our border and enforcing our laws. The Administration requested $4.9 billion for these functions but received only $2.7 billion in the Omnibus passed in December, which is not an adequate level to address both the anticipated short-term surge following the end of Title 42 on May 11 and the longer-term constraints of operating within a broken immigration system that Congress has not updated for decades. While the Department is prudently utilizing the limited funding Congress has provided to prepare for the post-Title 42 environment, this notification of repurposing existing funds is only a fraction of what DHS will ultimately need.
- **Reduce Impacts on Border Communities.** DHS has awarded more than $135 million to communities to date this fiscal year and will award an additional $290 million in the coming weeks. The Administration is also ramping up coordination between state and local officials and other federal agencies to provide resources, technical assistance and support, including through regular information sessions with stakeholders to ensure that the program is broadly understood and the funds are accessible. The Administration will continue to mobilize faith-based and non-profit organizations supporting migrants, including those providing temporary shelter, food, transportation, and humanitarian assistance as individuals await the outcome of their immigration proceedings.

The Biden-Harris Administration has been preparing for the eventual lifting of the Title 42 public health order for well over a year. In addition to working to combat misinformation and coordinating with local communities and NGOs, DHS began contingency planning efforts to prepare for the eventual lifting of Title 42. In February 2022, DHS formally stood up the Southwest Border Coordination Center, which leads the planning and coordinating of a whole of government response to the anticipated increase in border encounters. In April 2022, Secretary Mayorkas issued the DHS Plan for Southwest Border Security and Preparedness, laying out a six-pillar plan to manage an increase in encounters once Title 42 is no longer in effect, and updated the plan in December 2022.

Notwithstanding these efforts, we expect the days following the end of Title 42 public health order will be challenging and that encounters will increase for a time, as smugglers will seek to spread disinformation to capitalize on this change. Through the approach described below and the work of our outstanding personnel, the Biden-Harris Administration will do everything within its authority to manage this challenge, but until and unless Congress delivers on the immigration reform measures President Biden requested on his first day in office, the United States' immigration system will remain broken.

## Topics

BORDER SECURITY (/TOPICS/BORDER-SECURITY)     CITIZENSHIP AND IMMIGRATION SERVICES (/TOPICS/CITIZENSHIP-AND-IMMIGRATION-SERVICES)
IMMIGRATION AND CUSTOMS ENFORCEMENT (/TOPICS/IMMIGRATION-AND-CUSTOMS-ENFORCEMENT)

## Keywords

BORDER SECURITY (/KEYWORDS/BORDER-SECURITY)     CUSTOMS AND BORDER PROTECTION (CBP) (/KEYWORDS/CUSTOMS-AND-BORDER-PROTECTION-CBP)
ENFORCEMENT AND REMOVAL OPERATIONS (ERO) (/KEYWORDS/ENFORCEMENT-AND-REMOVAL-OPERATIONS-ERO)
FAMILY REUNIFICATION (/KEYWORDS/FAMILY-REUNIFICATION)     HUMAN SMUGGLING (/KEYWORDS/HUMAN-SMUGGLING)     IMMIGRATION (/KEYWORDS/IMMIGRATION)
IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE) (/KEYWORDS/IMMIGRATION-AND-CUSTOMS-ENFORCEMENT-ICE)
INTERNATIONAL PARTNERSHIP (/KEYWORDS/INTERNATIONAL-PARTNERSHIP)     MIGRATION (/KEYWORDS/MIGRATION)
PORT OF ENTRY (POE) (/KEYWORDS/PORT-ENTRY-POE)     REFUGEE (/KEYWORDS/REFUGEE)     REMOVAL (/KEYWORDS/REMOVAL)
SOUTHWEST BORDER (/KEYWORDS/SOUTHWEST-BORDER)     TRANSNATIONAL CRIMINAL ORGANIZATION (TCO) (/KEYWORDS/TRANSNATIONAL-CRIMINAL-ORGANIZATION-TCO)

Last Updated: 04/27/2023

CLP_AR_002189

Quote: Analysis by the DHS Office of Immigration Statistics ("OIS") found that even while CDC's Title 42 public health Order has been in place, encounters at our SWB —referring to the number of times U.S. officials encounter noncitizens attempting to
Source: OIS analysis of OIS Persist Dataset based on data through March 31, 2023; OIS Analysis of historic U.S. Border Patrol data.
Filters: SWB (ALWAYS Southwest Land Border); excludes CBPOne

Monthly encounters are highlighted red if larger than 14-19 average

| | Brazil | Colombia | Cuba | Ecuador | El Salvador | Haiti | Nicaragua | Peru | Venezuela | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Oct-19 | 1,504 | 41 | 1,843 | 1,343 | 2,582 | 230 | 348 | 72 | 728 | 45,139 |
| Nov-19 | 1,698 | 67 | 1,182 | 1,181 | 2,175 | 459 | 313 | 63 | 588 | 42,642 |
| Dec-19 | 1,331 | 58 | 949 | 1,638 | 1,939 | 657 | 304 | 72 | 693 | 40,563 |
| Jan-20 | 1,141 | 60 | 655 | 1,565 | 1,330 | 490 | 218 | 72 | 243 | 36,583 |
| Feb-20 | 726 | 61 | 596 | 1,437 | 1,488 | 839 | 209 | 58 | 206 | 36,686 |
| Mar-20 | 327 | 40 | 432 | 1,381 | 1,441 | 586 | 215 | 77 | 166 | 34,457 |
| Apr-20 | 81 | 4 | 164 | 682 | 553 | 20 | 89 | 18 | 9 | 17,106 |
| May-20 | 39 | 17 | 535 | 368 | 471 | 8 | 70 | 4 | 10 | 23,237 |
| Jun-20 | 61 | 12 | 947 | 146 | 542 | 151 | 97 | 16 | 13 | 33,029 |
| Jul-20 | 50 | 18 | 1,567 | 151 | 947 | 158 | 110 | 13 | 36 | 40,949 |
| Aug-20 | 34 | 16 | 2,181 | 685 | 1,478 | 55 | 126 | 5 | 49 | 50,007 |
| Sep-20 | 169 | 10 | 2,359 | 1,518 | 2,219 | 882 | 192 | 14 | 46 | 57,668 |
| Oct-20 | 163 | 26 | 1,679 | 2,220 | 3,014 | 593 | 256 | 12 | 143 | 71,927 |
| Nov-20 | 229 | 69 | 1,590 | 2,765 | 3,650 | 97 | 387 | 22 | 184 | 72,113 |
| Dec-20 | 291 | 73 | 2,067 | 3,676 | 3,921 | 237 | 640 | 63 | 206 | 73,994 |
| Jan-21 | 308 | 69 | 1,899 | 3,598 | 3,580 | 1,718 | 534 | 52 | 295 | 78,414 |
| Feb-21 | 991 | 76 | 3,848 | 3,440 | 5,599 | 827 | 706 | 81 | 913 | 101,098 |
| Mar-21 | 3,995 | 179 | 5,700 | 5,579 | 9,475 | 3,084 | 1,930 | 126 | 2,566 | 173,277 |
| Apr-21 | 8,750 | 260 | 3,288 | 8,079 | 11,043 | 1,250 | 3,074 | 250 | 6,048 | 178,795 |
| May-21 | 7,374 | 408 | 2,664 | 11,691 | 10,462 | 2,817 | 4,414 | 296 | 7,499 | 180,597 |
| Jun-21 | 6,566 | 481 | 3,072 | 12,803 | 11,582 | 5,904 | 7,435 | 450 | 7,583 | 189,034 |
| Jul-21 | 8,643 | 751 | 3,559 | 17,335 | 12,719 | 5,521 | 13,456 | 438 | 6,126 | 213,593 |
| Aug-21 | 9,100 | 1,562 | 4,496 | 17,611 | 12,692 | 7,569 | 9,979 | 511 | 6,301 | 209,840 |
| Sep-21 | 10,471 | 2,248 | 4,812 | 7,353 | 10,953 | 17,638 | 7,298 | 896 | | 192,001 |
| Oct-21 | 7,904 | 3,015 | 5,896 | 748 | 9,801 | 908 | 9,255 | 1,024 | 13,416 | 164,837 |
| Nov-21 | 6,955 | 3,368 | 6,605 | 556 | 9,664 | 1,022 | 13,627 | 1,193 | 20,388 | 174,845 |
| Dec-21 | 7,926 | 4,094 | 7,986 | 673 | 8,874 | 7,144 | 15,297 | 1,268 | 24,801 | 179,253 |
| Jan-22 | 2,766 | 3,911 | 9,721 | 602 | 5,810 | 3,372 | 11,564 | 860 | 22,779 | 154,874 |
| Feb-22 | 1,402 | 9,608 | 16,557 | 683 | 7,146 | 1,877 | 13,296 | 1,458 | 3,073 | 166,010 |
| Mar-22 | 1,346 | 15,373 | 32,153 | 877 | 8,403 | 2,171 | 16,017 | 2,460 | 4,053 | 222,574 |
| Apr-22 | 3,024 | 13,128 | 34,839 | 1,636 | 8,355 | 5,739 | 12,565 | 3,573 | 4,107 | 235,785 |
| May-22 | 5,125 | 19,320 | 25,643 | 3,046 | 8,980 | 10,514 | 19,034 | 9,744 | 5,088 | 241,137 |
| Jun-22 | 4,026 | 12,597 | 16,172 | 3,231 | 9,123 | 4,069 | 11,200 | 5,853 | 13,199 | 207,834 |
| Jul-22 | 5,504 | 13,454 | 20,098 | 2,948 | 7,952 | 5,380 | 12,073 | 7,216 | 17,647 | 200,162 |
| Aug-22 | 5,747 | 13,497 | 19,060 | 3,681 | 6,675 | 6,551 | 11,749 | 7,782 | 25,361 | 204,087 |
| Sep-22 | 1,732 | 13,807 | 26,178 | 5,379 | 6,247 | 5,163 | 18,199 | 8,231 | 33,804 | 227,547 |
| Oct-22 | 747 | 17,191 | 28,841 | 7,030 | 5,995 | 6,577 | 20,919 | 9,079 | 22,039 | 228,603 |
| Nov-22 | 709 | 15,609 | 34,709 | 11,995 | 5,457 | 5,385 | 34,236 | 8,529 | 7,963 | 231,021 |
| Dec-22 | 1,215 | 17,428 | 42,653 | 16,203 | 4,804 | 5,073 | 35,387 | 11,357 | 8,131 | 248,604 |
| Jan-23 | 1,084 | 9,215 | 6,229 | 9,013 | 3,680 | 2,640 | 3,352 | 3,890 | 3,740 | 146,485 |
| Feb-23 | 1,286 | 12,576 | 189 | 7,003 | 4,515 | 185 | 412 | 5,029 | 1,614 | 135,691 |

14-19 yearly totals, and 14-19 average. If higher than this average, unprecedented

| Row Label | Brazil | Colombia | Cuba | Ecuador | El Salvador | Haiti | Nicaragua | Peru | Venezuela |
|---|---|---|---|---|---|---|---|---|---|
| 2014 | 583 | 330 | 17,564 | 4,858 | 68,385 | 493 | 1,874 | 974 | 78 |
| 2015 | 1,410 | 413 | 31,065 | 2,659 | 45,110 | 343 | 1,069 | 541 | 163 |
| 2016 | 4,648 | 490 | 41,617 | 2,980 | 80,566 | 6,427 | 1,377 | 687 | 326 |
| 2017 | 4,703 | 293 | 15,557 | 1,586 | 57,188 | 9,263 | 1,150 | 567 | 395 |
| 2018 | 5,917 | 320 | 7,124 | 1,554 | 36,999 | 308 | 3,553 | 682 | 686 |
| 2019 | 19,513 | 631 | 33,014 | 13,374 | 92,345 | 3,067 | 14,380 | 934 | 7,677 |
| 14-19 | 6,129 | 413 | 24,324 | 4,502 | 63,432 | 3,317 | 3,901 | 731 | 1,554 |

CLP_AR_002374

Mar-23   2,247   16,596   193   6,729   5,427   328   232   8,248   3,860   169,035

CLP_AR_002375

cross the SWB of the United States without authorization to do so— reached an all-time high in 2022, driven in large part by an unprecedented exodus of migrants at different times from countries such as Brazil, Colombia, Cuba, Ecuador, Haiti, N

**USBP SWB Encounters (Yearbook)**

| Year | Encounters | | |
|------|-----------|---|---|
| 1960 | 21,022 | | |
| 1961 | 21,745 | average FY1983-2006 | 1,190,461 |
| 1962 | 21,103 | average FY2011-2018 | 377,364 |
| 1963 | 29,644 | Factor increase from 2017-2019 | 2.80 |
| 1964 | 32,519 | Factor increase from 2019-2021 | 1.95 |
| 1965 | 40,020 | Factor increase from 2021-22 | 1.33 |
| 1966 | 62,640 | 2022 all time high | 2,206,437 |
| 1967 | 73,973 | | |
| 1968 | 96,641 | | |
| 1969 | 137,968 | | |
| 1970 | 201,780 | | |
| 1971 | 263,991 | | |
| 1972 | 321,326 | | |
| 1973 | 441,066 | | |
| 1974 | 571,606 | | |
| 1975 | 512,264 | | |
| 1976 | 607,499 | | |
| 1977 | 733,193 | | |
| 1978 | 789,441 | | |
| 1979 | 795,798 | | |
| 1980 | 690,554 | | |
| 1981 | 749,808 | | |
| 1982 | 745,820 | | |
| 1983 | 1,033,974 | | |
| 1984 | 1,058,276 | | |
| 1985 | 1,183,351 | | |
| 1986 | 1,615,844 | | |
| 1987 | 1,122,067 | | |
| 1988 | 942,561 | | |
| 1989 | 852,506 | | |
| 1990 | 1,049,321 | | |
| 1991 | 1,077,876 | | |
| 1992 | 1,145,574 | | |
| 1993 | 1,212,886 | | |
| 1994 | 979,101 | | |
| 1995 | 1,271,390 | | |
| 1996 | 1,507,020 | | |
| 1997 | 1,368,707 | | |
| 1998 | 1,516,680 | | |
| 1999 | 1,537,000 | | |
| 2000 | 1,643,679 | | |

CLP_AR_002376

| | |
|------|-----------|
| 2001 | 1,235,718 |
| 2002 | 929,809 |
| 2003 | 905,065 |
| 2004 | 1,139,282 |
| 2005 | 1,171,396 |
| 2006 | 1,071,972 |
| 2007 | 858,638 |
| 2008 | 705,005 |
| 2009 | 540,865 |
| 2010 | 447,731 |
| 2011 | 327,577 |
| 2012 | 356,873 |
| 2013 | 414,397 |
| 2014 | 479,370 |
| 2015 | 331,333 |
| 2016 | 408,870 |
| 2017 | 303,916 |
| 2018 | 396,579 |
| 2019 | 851,508 |
| 2020 | 400,635 |
| 2021 | 1,659,206 |
| 2022 | 2,206,437 |

CLP_AR_002377

Nicaragua, Peru, and Venezuela.

CLP_AR_002378

Quote: The U.S. Border Patrol ("USBP") completed 221,710 encounters between ports of entry in December 2022, second only to May 2022 (224,371 encounters) for the most monthly encounters since at least Fiscal Year ("FY") 2000 (the period f
Footnote: OIS analysis of OIS Production data based on data through March 31, 2023.
Filters: SWB; USBP

Average daily encounters 2000-2019: **1,977**   Average daily encounters 2014-2019: **1,265**

| | USBP Encounters | | USBP Encounters | | | |
|---|---|---|---|---|---|---|
| Oct-21 | 159,113 | 12/01/202 | 7532 | | | |
| Nov-21 | 167,015 | 12/02/202 | 8736 | Low | **3,532** | |
| Dec-21 | 170,602 | 12/03/202 | 7119 | High | **8,736** | |
| Jan-22 | 147,877 | 12/04/202 | 7100 | Average | **7,152** | |
| Feb-22 | 159,170 | 12/05/202 | 7369 | Over 8000 | **11** | |
| Mar-22 | 211,181 | 12/06/202 | 7415 | | | |
| Apr-22 | 203,504 | 12/07/202 | 8390 | | | |
| May-22 | **224,371** | 12/08/202 | 8371 | | | |
| Jun-22 | 192,399 | 12/09/202 | 8497 | | | |
| Jul-22 | 181,834 | 12/10/202 | 8181 | | | |
| Aug-22 | 181,774 | 12/11/202 | 7902 | | | |
| Sep-22 | 207,597 | 12/12/202 | 7811 | | | |
| Oct-22 | 204,885 | 12/13/202 | 8073 | | | |
| Nov-22 | 207,448 | 12/14/202 | 8281 | | | |
| Dec-22 | **221,710** | 12/15/202 | 8132 | | | |
| Jan-23 | 128,936 | 12/16/202 | 6849 | | | |
| Feb-23 | 130,024 | 12/17/202 | 6940 | | | |
| Mar-23 | 162,317 | 12/18/202 | 6904 | | | |
| | | 12/19/202 | 7309 | | | |
| | | 12/20/202 | 8568 | | | |
| | | 12/21/202 | 8431 | | | |
| | | 12/22/202 | 8086 | | | |
| | | 12/23/202 | 7301 | | | |
| | | 12/24/202 | 6247 | | | |
| | | 12/25/202 | 3532 | | | |
| | | 12/26/202 | 5013 | | | |
| | | 12/27/202 | 6084 | | | |
| | | 12/28/202 | 5914 | | | |
| | | 12/29/202 | 5512 | | | |
| | | 12/30/202 | 4736 | | | |
| | | 12/31/202 | 5375 | | | |

USBP SW Land Border Apprehensions: FY2000-FY2023YTD (March)

| FY | CY | Month | Mon-FY | Mon-CY | n of count | Daily Avg | FY Totals | Days/year | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2000 | 1999 | Oct | Oct-00 | Oct-99 | 87,819 | 2,833 | 1,566,421 | 366 | 1,977 | Oct |
| 2000 | 1999 | Nov | Nov-00 | Nov-99 | 74,362 | 2,479 | | | | Nov |
| 2000 | 1999 | Dec | Dec-00 | Dec-99 | 66,256 | 2,137 | | | | Dec |
| 2000 | 2000 | Jan | Jan-00 | Jan-00 | 175,383 | 5,658 | | | | Jan |
| 2000 | 2000 | Feb | Feb-00 | Feb-00 | 200,619 | 7,165 | | | | Feb |
| 2000 | 2000 | Mar | Mar-00 | Mar-00 | 209,311 | 6,752 | | | | Mar |
| 2000 | 2000 | Apr | Apr-00 | Apr-00 | 170,621 | 5,687 | | | | Apr |
| 2000 | 2000 | May | May-00 | May-00 | 155,961 | 5,031 | | | | May |
| 2000 | 2000 | Jun | Jun-00 | Jun-00 | 103,856 | 3,462 | | | | Jun |
| 2000 | 2000 | Jul | Jul-00 | Jul-00 | 111,963 | 3,612 | | | | Jul |
| 2000 | 2000 | Aug | Aug-00 | Aug-00 | 113,448 | 3,660 | | | | Aug |
| 2000 | 2000 | Sep | Sep-00 | Sep-00 | 96,822 | 3,227 | | | | Sep |
| 2001 | 2000 | Oct | Oct-01 | Oct-00 | 81,995 | 2,645 | 1,231,412 | 365 | | |
| 2001 | 2000 | Nov | Nov-01 | Nov-00 | 67,217 | 2,241 | | | | |
| 2001 | 2000 | Dec | Dec-01 | Dec-00 | 54,828 | 1,769 | | | | |
| 2001 | 2001 | Jan | Jan-01 | Jan-01 | 124,586 | 4,019 | | | | |
| 2001 | 2001 | Feb | Feb-01 | Feb-01 | 150,616 | 5,379 | | | | |
| 2001 | 2001 | Mar | Mar-01 | Mar-01 | 169,904 | 5,481 | | | | |
| 2001 | 2001 | Apr | Apr-01 | Apr-01 | 142,040 | 4,735 | | | | |
| 2001 | 2001 | May | May-01 | May-01 | 123,054 | 3,969 | | | | |
| 2001 | 2001 | Jun | Jun-01 | Jun-01 | 89,034 | 2,968 | | | | |
| 2001 | 2001 | Jul | Jul-01 | Jul-01 | 83,853 | 2,705 | | | | |
| 2001 | 2001 | Aug | Aug-01 | Aug-01 | 84,837 | 2,737 | | | | |
| 2001 | 2001 | Sep | Sep-01 | Sep-01 | 59,448 | 1,982 | | | | |
| 2002 | 2001 | Oct | Oct-02 | Oct-01 | 37,746 | 1,218 | 930,341 | 365 | | |
| 2002 | 2001 | Nov | Nov-02 | Nov-01 | 32,694 | 1,090 | | | | |
| 2002 | 2001 | Dec | Dec-02 | Dec-01 | 31,531 | 1,017 | | | | |
| 2002 | 2002 | Jan | Jan-02 | Jan-02 | 79,647 | 2,569 | | | | |
| 2002 | 2002 | Feb | Feb-02 | Feb-02 | 95,645 | 3,416 | | | | |
| 2002 | 2002 | Mar | Mar-02 | Mar-02 | 126,906 | 4,094 | | | | |
| 2002 | 2002 | Apr | Apr-02 | Apr-02 | 121,908 | 4,064 | | | | |
| 2002 | 2002 | May | May-02 | May-02 | 97,571 | 3,147 | | | | |
| 2002 | 2002 | Jun | Jun-02 | Jun-02 | 78,730 | 2,624 | | | | |
| 2002 | 2002 | Jul | Jul-02 | Jul-02 | 76,719 | 2,475 | | | | |
| 2002 | 2002 | Aug | Aug-02 | Aug-02 | 82,860 | 2,673 | | | | |
| 2002 | 2002 | Sep | Sep-02 | Sep-02 | 68,384 | 2,279 | | | | |
| 2003 | 2002 | Oct | Oct-03 | Oct-02 | 61,913 | 1,997 | 906,734 | 365 | | |
| 2003 | 2002 | Nov | Nov-03 | Nov-02 | 47,919 | 1,597 | | | | |
| 2003 | 2002 | Dec | Dec-03 | Dec-02 | 37,930 | 1,224 | | | | |
| 2003 | 2003 | Jan | Jan-03 | Jan-03 | 87,002 | 2,807 | | | | |
| 2003 | 2003 | Feb | Feb-03 | Feb-03 | 97,016 | 3,465 | | | | |

CLP_AR_002379

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 2003 | 2003 | Mar | Mar-03 | Mar-03 | 98,625 | 3,181 | | |
| 2003 | 2003 | Apr | Apr-03 | Apr-03 | 75,564 | 2,519 | | |
| 2003 | 2003 | May | May-03 | May-03 | 88,845 | 2,866 | | |
| 2003 | 2003 | Jun | Jun-03 | Jun-03 | 75,634 | 2,521 | | |
| 2003 | 2003 | Jul | Jul-03 | Jul-03 | 79,396 | 2,561 | | |
| 2003 | 2003 | Aug | Aug-03 | Aug-03 | 84,651 | 2,731 | | |
| 2003 | 2003 | Sep | Sep-03 | Sep-03 | 72,239 | 2,408 | | |
| 2004 | 2003 | Oct | Oct-04 | Oct-03 | 65,388 | 2,109 | 1,140,247 | 366 |
| 2004 | 2003 | Nov | Nov-04 | Nov-03 | 57,942 | 1,931 | | |
| 2004 | 2003 | Dec | Dec-04 | Dec-03 | 43,663 | 1,408 | | |
| 2004 | 2004 | Jan | Jan-04 | Jan-04 | 92,751 | 2,992 | | |
| 2004 | 2004 | Feb | Feb-04 | Feb-04 | 110,824 | 3,958 | | |
| 2004 | 2004 | Mar | Mar-04 | Mar-04 | 155,089 | 5,003 | | |
| 2004 | 2004 | Apr | Apr-04 | Apr-04 | 135,632 | 4,521 | | |
| 2004 | 2004 | May | May-04 | May-04 | 118,811 | 3,833 | | |
| 2004 | 2004 | Jun | Jun-04 | Jun-04 | 94,607 | 3,154 | | |
| 2004 | 2004 | Jul | Jul-04 | Jul-04 | 92,152 | 2,973 | | |
| 2004 | 2004 | Aug | Aug-04 | Aug-04 | 93,299 | 3,010 | | |
| 2004 | 2004 | Sep | Sep-04 | Sep-04 | 80,089 | 2,670 | | |
| 2005 | 2004 | Oct | Oct-05 | Oct-04 | 75,908 | 2,449 | 1,171,391 | 365 |
| 2005 | 2004 | Nov | Nov-05 | Nov-04 | 65,110 | 2,170 | | |
| 2005 | 2004 | Dec | Dec-05 | Dec-04 | 48,410 | 1,562 | | |
| 2005 | 2005 | Jan | Jan-05 | Jan-05 | 93,029 | 3,001 | | |
| 2005 | 2005 | Feb | Feb-05 | Feb-05 | 113,776 | 4,063 | | |
| 2005 | 2005 | Mar | Mar-05 | Mar-05 | 143,044 | 4,614 | | |
| 2005 | 2005 | Apr | Apr-05 | Apr-05 | 140,074 | 4,669 | | |
| 2005 | 2005 | May | May-05 | May-05 | 115,817 | 3,736 | | |
| 2005 | 2005 | Jun | Jun-05 | Jun-05 | 90,796 | 3,027 | | |
| 2005 | 2005 | Jul | Jul-05 | Jul-05 | 94,964 | 3,063 | | |
| 2005 | 2005 | Aug | Aug-05 | Aug-05 | 96,745 | 3,121 | | |
| 2005 | 2005 | Sep | Sep-05 | Sep-05 | 93,718 | 3,124 | | |
| 2006 | 2005 | Oct | Oct-06 | Oct-05 | 83,561 | 2,696 | 1,071,976 | 365 |
| 2006 | 2005 | Nov | Nov-06 | Nov-05 | 70,954 | 2,365 | | |
| 2006 | 2005 | Dec | Dec-06 | Dec-05 | 52,663 | 1,699 | | |
| 2006 | 2006 | Jan | Jan-06 | Jan-06 | 101,262 | 3,267 | | |
| 2006 | 2006 | Feb | Feb-06 | Feb-06 | 125,030 | 4,465 | | |
| 2006 | 2006 | Mar | Mar-06 | Mar-06 | 160,696 | 5,184 | | |
| 2006 | 2006 | Apr | Apr-06 | Apr-06 | 126,554 | 4,218 | | |
| 2006 | 2006 | May | May-06 | May-06 | 105,443 | 3,401 | | |
| 2006 | 2006 | Jun | Jun-06 | Jun-06 | 68,365 | 2,279 | | |
| 2006 | 2006 | Jul | Jul-06 | Jul-06 | 59,633 | 1,924 | | |
| 2006 | 2006 | Aug | Aug-06 | Aug-06 | 59,733 | 1,927 | | |
| 2006 | 2006 | Sep | Sep-06 | Sep-06 | 58,082 | 1,936 | | |
| 2007 | 2006 | Oct | Oct-07 | Oct-06 | 60,726 | 1,959 | 858,736 | 365 |
| 2007 | 2006 | Nov | Nov-07 | Nov-06 | 51,592 | 1,720 | | |
| 2007 | 2006 | Dec | Dec-07 | Dec-06 | 40,527 | 1,307 | | |
| 2007 | 2007 | Jan | Jan-07 | Jan-07 | 72,000 | 2,323 | | |

CLP_AR_002380

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 2007 | 2007 | Feb | Feb-07 | Feb-07 | 79,273 | 2,831 | | |
| 2007 | 2007 | Mar | Mar-07 | Mar-07 | 114,136 | 3,682 | | |
| 2007 | 2007 | Apr | Apr-07 | Apr-07 | 104,465 | 3,482 | | |
| 2007 | 2007 | May | May-07 | May-07 | 88,510 | 2,855 | | |
| 2007 | 2007 | Jun | Jun-07 | Jun-07 | 71,336 | 2,378 | | |
| 2007 | 2007 | Jul | Jul-07 | Jul-07 | 66,793 | 2,155 | | |
| 2007 | 2007 | Aug | Aug-07 | Aug-07 | 59,801 | 1,929 | | |
| 2007 | 2007 | Sep | Sep-07 | Sep-07 | 49,577 | 1,653 | | |
| 2008 | 2007 | Oct | Oct-08 | Oct-07 | 51,355 | 1,657 | 705,049 | 366 |
| 2008 | 2007 | Nov | Nov-08 | Nov-07 | 42,208 | 1,407 | | |
| 2008 | 2007 | Dec | Dec-08 | Dec-07 | 31,824 | 1,027 | | |
| 2008 | 2008 | Jan | Jan-08 | Jan-08 | 59,034 | 1,904 | | |
| 2008 | 2008 | Feb | Feb-08 | Feb-08 | 73,483 | 2,624 | | |
| 2008 | 2008 | Mar | Mar-08 | Mar-08 | 89,769 | 2,896 | | |
| 2008 | 2008 | Apr | Apr-08 | Apr-08 | 91,552 | 3,052 | | |
| 2008 | 2008 | May | May-08 | May-08 | 69,240 | 2,234 | | |
| 2008 | 2008 | Jun | Jun-08 | Jun-08 | 53,850 | 1,795 | | |
| 2008 | 2008 | Jul | Jul-08 | Jul-08 | 49,468 | 1,596 | | |
| 2008 | 2008 | Aug | Aug-08 | Aug-08 | 48,544 | 1,566 | | |
| 2008 | 2008 | Sep | Sep-08 | Sep-08 | 44,722 | 1,491 | | |
| 2009 | 2008 | Oct | Oct-09 | Oct-08 | 42,937 | 1,385 | 540,851 | 365 |
| 2009 | 2008 | Nov | Nov-09 | Nov-08 | 32,782 | 1,093 | | |
| 2009 | 2008 | Dec | Dec-09 | Dec-08 | 25,946 | 837 | | |
| 2009 | 2009 | Jan | Jan-09 | Jan-09 | 44,503 | 1,436 | | |
| 2009 | 2009 | Feb | Feb-09 | Feb-09 | 49,211 | 1,758 | | |
| 2009 | 2009 | Mar | Mar-09 | Mar-09 | 67,342 | 2,172 | | |
| 2009 | 2009 | Apr | Apr-09 | Apr-09 | 58,493 | 1,950 | | |
| 2009 | 2009 | May | May-09 | May-09 | 50,883 | 1,641 | | |
| 2009 | 2009 | Jun | Jun-09 | Jun-09 | 46,044 | 1,535 | | |
| 2009 | 2009 | Jul | Jul-09 | Jul-09 | 43,841 | 1,414 | | |
| 2009 | 2009 | Aug | Aug-09 | Aug-09 | 43,519 | 1,404 | | |
| 2009 | 2009 | Sep | Sep-09 | Sep-09 | 35,350 | 1,178 | | |
| 2010 | 2009 | Oct | Oct-10 | Oct-09 | 40,890 | 1,319 | 447,731 | 365 |
| 2010 | 2009 | Nov | Nov-10 | Nov-09 | 32,815 | 1,094 | | |
| 2010 | 2009 | Dec | Dec-10 | Dec-09 | 25,034 | 808 | | |
| 2010 | 2010 | Jan | Jan-10 | Jan-10 | 34,784 | 1,122 | | |
| 2010 | 2010 | Feb | Feb-10 | Feb-10 | 42,790 | 1,528 | | |
| 2010 | 2010 | Mar | Mar-10 | Mar-10 | 61,361 | 1,979 | | |
| 2010 | 2010 | Apr | Apr-10 | Apr-10 | 55,237 | 1,841 | | |
| 2010 | 2010 | May | May-10 | May-10 | 47,045 | 1,518 | | |
| 2010 | 2010 | Jun | Jun-10 | Jun-10 | 32,955 | 1,099 | | |
| 2010 | 2010 | Jul | Jul-10 | Jul-10 | 25,609 | 826 | | |
| 2010 | 2010 | Aug | Aug-10 | Aug-10 | 26,415 | 852 | | |
| 2010 | 2010 | Sep | Sep-10 | Sep-10 | 22,796 | 760 | | |
| 2011 | 2010 | Oct | Oct-11 | Oct-10 | 26,165 | 844 | 327,577 | 365 |
| 2011 | 2010 | Nov | Nov-11 | Nov-10 | 22,405 | 747 | | |
| 2011 | 2010 | Dec | Dec-11 | Dec-10 | 19,429 | 627 | | |

CLP_AR_002381

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 2011 | 2011 | Jan | Jan-11 | Jan-11 | 23,926 | 772 | | | |
| 2011 | 2011 | Feb | Feb-11 | Feb-11 | 28,786 | 1,028 | | | |
| 2011 | 2011 | Mar | Mar-11 | Mar-11 | 42,014 | 1,355 | | | |
| 2011 | 2011 | Apr | Apr-11 | Apr-11 | 36,251 | 1,208 | | | |
| 2011 | 2011 | May | May-11 | May-11 | 31,236 | 1,008 | | | |
| 2011 | 2011 | Jun | Jun-11 | Jun-11 | 27,166 | 906 | | | |
| 2011 | 2011 | Jul | Jul-11 | Jul-11 | 23,170 | 747 | | | |
| 2011 | 2011 | Aug | Aug-11 | Aug-11 | 24,166 | 780 | | | |
| 2011 | 2011 | Sep | Sep-11 | Sep-11 | 22,863 | 762 | | | |
| 2012 | 2011 | Oct | Oct-12 | Oct-11 | 25,612 | 826 | 356,873 | 366 | |
| 2012 | 2011 | Nov | Nov-12 | Nov-11 | 23,368 | 779 | | | |
| 2012 | 2011 | Dec | Dec-12 | Dec-11 | 18,983 | 612 | | | |
| 2012 | 2012 | Jan | Jan-12 | Jan-12 | 25,714 | 829 | | | |
| 2012 | 2012 | Feb | Feb-12 | Feb-12 | 31,579 | 1,128 | | | |
| 2012 | 2012 | Mar | Mar-12 | Mar-12 | 42,218 | 1,362 | | | |
| 2012 | 2012 | Apr | Apr-12 | Apr-12 | 40,628 | 1,354 | | | |
| 2012 | 2012 | May | May-12 | May-12 | 36,966 | 1,192 | | | |
| 2012 | 2012 | Jun | Jun-12 | Jun-12 | 30,669 | 1,022 | | | |
| 2012 | 2012 | Jul | Jul-12 | Jul-12 | 26,978 | 870 | | | |
| 2012 | 2012 | Aug | Aug-12 | Aug-12 | 27,567 | 889 | | | |
| 2012 | 2012 | Sep | Sep-12 | Sep-12 | 26,591 | 886 | | | |
| 2013 | 2012 | Oct | Oct-13 | Oct-12 | 28,929 | 933 | 414,397 | 365 | |
| 2013 | 2012 | Nov | Nov-13 | Nov-12 | 27,636 | 921 | | | |
| 2013 | 2012 | Dec | Dec-13 | Dec-12 | 23,243 | 750 | | | |
| 2013 | 2013 | Jan | Jan-13 | Jan-13 | 26,921 | 868 | | | |
| 2013 | 2013 | Feb | Feb-13 | Feb-13 | 35,042 | 1,252 | | | |
| 2013 | 2013 | Mar | Mar-13 | Mar-13 | 47,293 | 1,526 | | | |
| 2013 | 2013 | Apr | Apr-13 | Apr-13 | 48,212 | 1,607 | | | |
| 2013 | 2013 | May | May-13 | May-13 | 43,856 | 1,415 | | | |
| 2013 | 2013 | Jun | Jun-13 | Jun-13 | 34,436 | 1,148 | | | |
| 2013 | 2013 | Jul | Jul-13 | Jul-13 | 33,230 | 1,072 | | | |
| 2013 | 2013 | Aug | Aug-13 | Aug-13 | 33,797 | 1,090 | | | |
| 2013 | 2013 | Sep | Sep-13 | Sep-13 | 31,802 | 1,060 | | | |
| 2014 | 2013 | Oct | Oct-14 | Oct-13 | 35,312 | 1,139 | 479,370 | 365 | ==1264.982== |
| 2014 | 2013 | Nov | Nov-14 | Nov-13 | 31,896 | 1,063 | | | |
| 2014 | 2013 | Dec | Dec-14 | Dec-13 | 29,528 | 953 | | | |
| 2014 | 2014 | Jan | Jan-14 | Jan-14 | 28,668 | 925 | | | |
| 2014 | 2014 | Feb | Feb-14 | Feb-14 | 36,403 | 1,300 | | | |
| 2014 | 2014 | Mar | Mar-14 | Mar-14 | 49,596 | 1,600 | | | |
| 2014 | 2014 | Apr | Apr-14 | Apr-14 | 51,502 | 1,717 | | | |
| 2014 | 2014 | May | May-14 | May-14 | 60,683 | 1,958 | | | |
| 2014 | 2014 | Jun | Jun-14 | Jun-14 | 57,861 | 1,929 | | | |
| 2014 | 2014 | Jul | Jul-14 | Jul-14 | 40,708 | 1,313 | | | |
| 2014 | 2014 | Aug | Aug-14 | Aug-14 | 31,388 | 1,013 | | | |
| 2014 | 2014 | Sep | Sep-14 | Sep-14 | 25,825 | 861 | | | |
| 2015 | 2014 | Oct | Oct-15 | Oct-14 | 26,450 | 853 | 331,333 | 365 | |
| 2015 | 2014 | Nov | Nov-15 | Nov-14 | 24,641 | 821 | | | |

CLP_AR_002382

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 2015 | 2014 | Dec | Dec-15 | Dec-14 | 25,019 | 807 | | |
| 2015 | 2015 | Jan | Jan-15 | Jan-15 | 21,514 | 694 | | |
| 2015 | 2015 | Feb | Feb-15 | Feb-15 | 24,376 | 871 | | |
| 2015 | 2015 | Mar | Mar-15 | Mar-15 | 29,791 | 961 | | |
| 2015 | 2015 | Apr | Apr-15 | Apr-15 | 29,750 | 992 | | |
| 2015 | 2015 | May | May-15 | May-15 | 31,576 | 1,019 | | |
| 2015 | 2015 | Jun | Jun-15 | Jun-15 | 29,303 | 977 | | |
| 2015 | 2015 | Jul | Jul-15 | Jul-15 | 28,388 | 916 | | |
| 2015 | 2015 | Aug | Aug-15 | Aug-15 | 30,239 | 975 | | |
| 2015 | 2015 | Sep | Sep-15 | Sep-15 | 30,286 | 1,010 | | |
| 2016 | 2015 | Oct | Oct-16 | Oct-15 | 32,724 | 1,056 | 408,870 | 366 |
| 2016 | 2015 | Nov | Nov-16 | Nov-15 | 32,838 | 1,095 | | |
| 2016 | 2015 | Dec | Dec-16 | Dec-15 | 37,014 | 1,194 | | |
| 2016 | 2016 | Jan | Jan-16 | Jan-16 | 23,758 | 766 | | |
| 2016 | 2016 | Feb | Feb-16 | Feb-16 | 26,072 | 931 | | |
| 2016 | 2016 | Mar | Mar-16 | Mar-16 | 33,316 | 1,075 | | |
| 2016 | 2016 | Apr | Apr-16 | Apr-16 | 38,089 | 1,270 | | |
| 2016 | 2016 | May | May-16 | May-16 | 40,337 | 1,301 | | |
| 2016 | 2016 | Jun | Jun-16 | Jun-16 | 34,450 | 1,148 | | |
| 2016 | 2016 | Jul | Jul-16 | Jul-16 | 33,723 | 1,088 | | |
| 2016 | 2016 | Aug | Aug-16 | Aug-16 | 37,048 | 1,195 | | |
| 2016 | 2016 | Sep | Sep-16 | Sep-16 | 39,501 | 1,317 | | |
| 2017 | 2016 | Oct | Oct-17 | Oct-16 | 46,184 | 1,490 | 303,916 | 365 |
| 2017 | 2016 | Nov | Nov-17 | Nov-16 | 47,211 | 1,574 | | |
| 2017 | 2016 | Dec | Dec-17 | Dec-16 | 43,251 | 1,395 | | |
| 2017 | 2017 | Jan | Jan-17 | Jan-17 | 31,576 | 1,019 | | |
| 2017 | 2017 | Feb | Feb-17 | Feb-17 | 18,754 | 670 | | |
| 2017 | 2017 | Mar | Mar-17 | Mar-17 | 12,195 | 393 | | |
| 2017 | 2017 | Apr | Apr-17 | Apr-17 | 11,127 | 371 | | |
| 2017 | 2017 | May | May-17 | May-17 | 14,519 | 468 | | |
| 2017 | 2017 | Jun | Jun-17 | Jun-17 | 16,087 | 536 | | |
| 2017 | 2017 | Jul | Jul-17 | Jul-17 | 18,187 | 587 | | |
| 2017 | 2017 | Aug | Aug-17 | Aug-17 | 22,288 | 719 | | |
| 2017 | 2017 | Sep | Sep-17 | Sep-17 | 22,537 | 751 | | |
| 2018 | 2017 | Oct | Oct-18 | Oct-17 | 25,488 | 822 | 396,579 | 365 |
| 2018 | 2017 | Nov | Nov-18 | Nov-17 | 29,085 | 970 | | |
| 2018 | 2017 | Dec | Dec-18 | Dec-17 | 28,995 | 935 | | |
| 2018 | 2018 | Jan | Jan-18 | Jan-18 | 25,975 | 838 | | |
| 2018 | 2018 | Feb | Feb-18 | Feb-18 | 26,666 | 952 | | |
| 2018 | 2018 | Mar | Mar-18 | Mar-18 | 37,390 | 1,206 | | |
| 2018 | 2018 | Apr | Apr-18 | Apr-18 | 38,243 | 1,275 | | |
| 2018 | 2018 | May | May-18 | May-18 | 40,339 | 1,301 | | |
| 2018 | 2018 | Jun | Jun-18 | Jun-18 | 34,089 | 1,136 | | |
| 2018 | 2018 | Jul | Jul-18 | Jul-18 | 31,299 | 1,010 | | |
| 2018 | 2018 | Aug | Aug-18 | Aug-18 | 37,524 | 1,210 | | |
| 2018 | 2018 | Sep | Sep-18 | Sep-18 | 41,486 | 1,383 | | |
| 2019 | 2018 | Oct | Oct-19 | Oct-18 | 51,005 | 1,645 | 851,508 | 365 |

CLP_AR_002383

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 2019 | 2018 | Nov | Nov-19 | Nov-18 | 51,857 | 1,729 | | |
| 2019 | 2018 | Dec | Dec-19 | Dec-18 | 50,751 | 1,637 | | |
| 2019 | 2019 | Jan | Jan-19 | Jan-19 | 47,979 | 1,548 | | |
| 2019 | 2019 | Feb | Feb-19 | Feb-19 | 66,883 | 2,389 | | |
| 2019 | 2019 | Mar | Mar-19 | Mar-19 | 92,833 | 2,995 | | |
| 2019 | 2019 | Apr | Apr-19 | Apr-19 | 99,273 | 3,309 | | |
| 2019 | 2019 | May | May-19 | May-19 | 132,856 | 4,286 | | |
| 2019 | 2019 | Jun | Jun-19 | Jun-19 | 94,902 | 3,163 | | |
| 2019 | 2019 | Jul | Jul-19 | Jul-19 | 71,978 | 2,322 | | |
| 2019 | 2019 | Aug | Aug-19 | Aug-19 | 50,684 | 1,635 | | |
| 2019 | 2019 | Sep | Sep-19 | Sep-19 | 40,507 | 1,350 | | |
| 2020 | 2019 | Oct | Oct-20 | Oct-19 | 35,402 | 1,142 | 400,635 | 366 |
| 2020 | 2019 | Nov | Nov-20 | Nov-19 | 33,524 | 1,117 | | |
| 2020 | 2019 | Dec | Dec-20 | Dec-19 | 32,853 | 1,060 | | |
| 2020 | 2020 | Jan | Jan-20 | Jan-20 | 29,205 | 942 | | |
| 2020 | 2020 | Feb | Feb-20 | Feb-20 | 30,077 | 1,074 | | |
| 2020 | 2020 | Mar | Mar-20 | Mar-20 | 30,389 | 980 | | |
| 2020 | 2020 | Apr | Apr-20 | Apr-20 | 16,182 | 539 | | |
| 2020 | 2020 | May | May-20 | May-20 | 21,593 | 697 | | |
| 2020 | 2020 | Jun | Jun-20 | Jun-20 | 30,816 | 1,027 | | |
| 2020 | 2020 | Jul | Jul-20 | Jul-20 | 38,556 | 1,244 | | |
| 2020 | 2020 | Aug | Aug-20 | Aug-20 | 47,276 | 1,525 | | |
| 2020 | 2020 | Sep | Sep-20 | Sep-20 | 54,762 | 1,825 | | |
| 2021 | 2020 | Oct | Oct-21 | Oct-20 | 69,032 | 2,227 | 1,659,206 | 365 |
| 2021 | 2020 | Nov | Nov-21 | Nov-20 | 69,169 | 2,306 | | |
| 2021 | 2020 | Dec | Dec-21 | Dec-20 | 71,141 | 2,295 | | |
| 2021 | 2021 | Jan | Jan-21 | Jan-21 | 75,316 | 2,430 | | |
| 2021 | 2021 | Feb | Feb-21 | Feb-21 | 97,643 | 3,487 | | |
| 2021 | 2021 | Mar | Mar-21 | Mar-21 | 169,216 | 5,459 | | |
| 2021 | 2021 | Apr | Apr-21 | Apr-21 | 173,699 | 5,790 | | |
| 2021 | 2021 | May | May-21 | May-21 | 172,654 | 5,569 | | |
| 2021 | 2021 | Jun | Jun-21 | Jun-21 | 178,649 | 5,955 | | |
| 2021 | 2021 | Jul | Jul-21 | Jul-21 | 200,658 | 6,473 | | |
| 2021 | 2021 | Aug | Aug-21 | Aug-21 | 196,514 | 6,339 | | |
| 2021 | 2021 | Sep | Sep-21 | Sep-21 | 185,515 | 6,184 | | |
| 2022 | 2021 | Oct | Oct-22 | Oct-21 | 159,113 | 5,133 | 2,206,437 | 365 |
| 2022 | 2021 | Nov | Nov-22 | Nov-21 | 167,015 | 5,567 | | |
| 2022 | 2021 | Dec | Dec-22 | Dec-21 | 170,602 | 5,503 | | |
| 2022 | 2022 | Jan | Jan-22 | Jan-22 | 147,877 | 4,770 | | |
| 2022 | 2022 | Feb | Feb-22 | Feb-22 | 159,170 | 5,685 | | |
| 2022 | 2022 | Mar | Mar-22 | Mar-22 | 211,181 | 6,812 | | |
| 2022 | 2022 | Apr | Apr-22 | Apr-22 | 203,504 | 6,783 | | |
| 2022 | 2022 | May | May-22 | May-22 | 224,371 | 7,238 | | |
| 2022 | 2022 | Jun | Jun-22 | Jun-22 | 192,399 | 6,413 | | |
| 2022 | 2022 | Jul | Jul-22 | Jul-22 | 181,834 | 5,866 | | |
| 2022 | 2022 | Aug | Aug-22 | Aug-22 | 181,774 | 5,864 | | |
| 2022 | 2022 | Sep | Sep-22 | Sep-22 | 207,597 | 6,920 | | |

CLP_AR_002384

| 2023 | 2022 | Oct | Oct-23 | Oct-22 | 204,885 | 6,609 | 1,055,320 | 365 |
| 2023 | 2022 | Nov | Nov-23 | Nov-22 | 207,448 | 6,915 | | |
| 2023 | 2022 | Dec | Dec-23 | Dec-22 | 221,710 | 7,152 | | |
| 2023 | 2023 | Jan | Jan-23 | Jan-23 | 128,936 | 4,159 | | |
| 2023 | 2023 | Feb | Feb-23 | Feb-23 | 130,024 | 4,644 | | |
| 2023 | 2023 | Mar | Mar-23 | Mar-23 | 162,317 | 5,236 | | |

CLP_AR_002385

or which detailed records are available), and very likely the most ever.

SWB Encounters, March 12 - April 10, 2023 from UIP

| | | | | | |
|---|---|---|---|---|---|
| 31 | | | Low | 3,630 |
| 30 | 12-Mar | 4,756 | High | 6,370 |
| 31 | 13-Mar | 4,875 | Average | 5,255 |
| 31 | 14-Mar | 5,678 | Over 5200 | 17 |
| 28 | 15-Mar | 5,381 | | |
| 31 | 16-Mar | 5,662 | | |
| 30 | 17-Mar | 4,980 | | |
| 31 | 18-Mar | 5,118 | | |
| 30 | 19-Mar | 4,366 | | |
| 31 | 20-Mar | 5,355 | | |
| 31 | 21-Mar | 5,677 | | |
| 30 | 22-Mar | 5,195 | | |
| | 23-Mar | 5,597 | | |
| | 24-Mar | 5,348 | | |
| | 25-Mar | 5,470 | | |
| | 26-Mar | 5,384 | | |
| | 27-Mar | 5,569 | | |
| | 28-Mar | 6,087 | | |
| | 29-Mar | 6,327 | | |
| | 30-Mar | 6,370 | | |
| | 31-Mar | 5,152 | | |
| | 1-Apr | 4,906 | | |
| | 2-Apr | 4,629 | | |
| | 3-Apr | 5,343 | | |
| | 4-Apr | 5,470 | | |
| | 5-Apr | 5,470 | | |
| | 6-Apr | 5,705 | | |
| | 7-Apr | 4,790 | | |
| | 8-Apr | 4,758 | | |
| | 9-Apr | 3,630 | | |
| | 10-Apr | 4,596 | | |

Source: Data pulled from UIP on 4/13/2023.

CLP_AR_002386

Quote: Daily encounters between POEs averaged 7,152 for December 2022 and exceeded 8,000 per day 11 times during the month, as compared to average daily encounters of 1,977 for all of 2000-2019 and average daily encounters of 1,265 i
Footnote: OIS analysis of OIS Production data for FY 2000 – March 2023 and OIS Yearbook data for FY 1925 – FY 1999. As discussed further below, encounters between ports of entry fell sharply in January 2023 following the launch of the Cuba,
Filters: SWB; USBP

Average daily encounters 2000-2019:   1,977      Average daily encounters 2014-2019:   1,265

USBP SW Land Border Apprehensions: FY2000-FY2023YTD (March)

| FY | CY | Month | Mon-FY | Mon-CY | n of count | Daily Avg | FY Totals | Days/year | | | |
|----|----|-------|--------|--------|-----------|-----------|-----------|-----------|---|---|---|
| 2000 | 1999 | Oct | Oct-00 | Oct-99 | 87,819 | 2,833 | 1,566,421 | 366 | 1,977 | Oct | 31 |
| 2000 | 1999 | Nov | Nov-00 | Nov-99 | 74,362 | 2,479 | | | | Nov | 30 |
| 2000 | 1999 | Dec | Dec-00 | Dec-99 | 66,256 | 2,137 | | | | Dec | 31 |
| 2000 | 2000 | Jan | Jan-00 | Jan-00 | 175,383 | 5,658 | | | | Jan | 31 |
| 2000 | 2000 | Feb | Feb-00 | Feb-00 | 200,619 | 7,165 | | | | Feb | 28 |
| 2000 | 2000 | Mar | Mar-00 | Mar-00 | 209,311 | 6,752 | | | | Mar | 31 |
| 2000 | 2000 | Apr | Apr-00 | Apr-00 | 170,621 | 5,687 | | | | Apr | 30 |
| 2000 | 2000 | May | May-00 | May-00 | 155,961 | 5,031 | | | | May | 31 |
| 2000 | 2000 | Jun | Jun-00 | Jun-00 | 103,856 | 3,462 | | | | Jun | 30 |
| 2000 | 2000 | Jul | Jul-00 | Jul-00 | 111,963 | 3,612 | | | | Jul | 31 |
| 2000 | 2000 | Aug | Aug-00 | Aug-00 | 113,448 | 3,660 | | | | Aug | 31 |
| 2000 | 2000 | Sep | Sep-00 | Sep-00 | 96,822 | 3,227 | | | | Sep | 30 |
| 2001 | 2000 | Oct | Oct-01 | Oct-00 | 81,995 | 2,645 | 1,231,412 | 365 | | | |
| 2001 | 2000 | Nov | Nov-01 | Nov-00 | 67,217 | 2,241 | | | | | |
| 2001 | 2000 | Dec | Dec-01 | Dec-00 | 54,828 | 1,769 | | | | | |
| 2001 | 2001 | Jan | Jan-01 | Jan-01 | 124,586 | 4,019 | | | | | |
| 2001 | 2001 | Feb | Feb-01 | Feb-01 | 150,616 | 5,379 | | | | | |
| 2001 | 2001 | Mar | Mar-01 | Mar-01 | 169,904 | 5,481 | | | | | |
| 2001 | 2001 | Apr | Apr-01 | Apr-01 | 142,040 | 4,735 | | | | | |
| 2001 | 2001 | May | May-01 | May-01 | 123,054 | 3,969 | | | | | |
| 2001 | 2001 | Jun | Jun-01 | Jun-01 | 89,034 | 2,968 | | | | | |
| 2001 | 2001 | Jul | Jul-01 | Jul-01 | 83,853 | 2,705 | | | | | |
| 2001 | 2001 | Aug | Aug-01 | Aug-01 | 84,837 | 2,737 | | | | | |
| 2001 | 2001 | Sep | Sep-01 | Sep-01 | 59,448 | 1,982 | | | | | |
| 2002 | 2001 | Oct | Oct-02 | Oct-01 | 37,746 | 1,218 | 930,341 | 365 | | | |
| 2002 | 2001 | Nov | Nov-02 | Nov-01 | 32,694 | 1,090 | | | | | |
| 2002 | 2001 | Dec | Dec-02 | Dec-01 | 31,531 | 1,017 | | | | | |
| 2002 | 2002 | Jan | Jan-02 | Jan-02 | 79,647 | 2,569 | | | | | |
| 2002 | 2002 | Feb | Feb-02 | Feb-02 | 95,645 | 3,416 | | | | | |
| 2002 | 2002 | Mar | Mar-02 | Mar-02 | 126,906 | 4,094 | | | | | |
| 2002 | 2002 | Apr | Apr-02 | Apr-02 | 121,908 | 4,064 | | | | | |
| 2002 | 2002 | May | May-02 | May-02 | 97,571 | 3,147 | | | | | |
| 2002 | 2002 | Jun | Jun-02 | Jun-02 | 78,730 | 2,624 | | | | | |
| 2002 | 2002 | Jul | Jul-02 | Jul-02 | 76,719 | 2,475 | | | | | |
| 2002 | 2002 | Aug | Aug-02 | Aug-02 | 82,860 | 2,673 | | | | | |
| 2002 | 2002 | Sep | Sep-02 | Sep-02 | 68,384 | 2,279 | | | | | |
| 2003 | 2002 | Oct | Oct-03 | Oct-02 | 61,913 | 1,997 | 906,734 | 3 | | | |
| 2003 | 2002 | Nov | Nov-03 | Nov-02 | 47,919 | 1,597 | | | | | |
| 2003 | 2002 | Dec | Dec-03 | Dec-02 | 37,930 | 1,224 | | | | | |

SWB Encounters, March 12 - April 10, 2023 from UIP

| | | | | |
|---|---|---|---|---|
| 12-Mar | 4,756 | | Low | 3,630 |
| 13-Mar | 4,875 | | High | 6,370 |
| 14-Mar | 5,678 | | Average | 5,255 |
| 15-Mar | 5,381 | | Over 5200 | 17 |
| 16-Mar | 5,662 | | | |
| 17-Mar | 4,980 | | | |
| 18-Mar | 5,118 | | | |
| 19-Mar | 4,366 | | | |
| 20-Mar | 5,355 | | | |
| 21-Mar | 5,677 | | | |
| 22-Mar | 5,195 | | | |
| 23-Mar | 5,597 | | | |
| 24-Mar | 5,348 | | | |
| 25-Mar | 5,470 | | | |
| 26-Mar | 5,384 | | | |
| 27-Mar | 5,569 | | | |
| 28-Mar | 6,087 | | | |
| 29-Mar | 6,327 | | | |
| 30-Mar | 6,370 | | | |
| 31-Mar | 5,152 | | | |
| 1-Apr | 4,906 | | | |
| 2-Apr | 4,629 | | | |
| 3-Apr | 5,343 | | | |
| 4-Apr | 5,470 | | | |
| 5-Apr | 5,470 | | | |
| 6-Apr | 5,705 | | | |
| 7-Apr | 4,790 | | | |
| 8-Apr | 4,758 | | | |
| 9-Apr | 3,630 | | | |
| 10-Apr | 4,596 | | | |

Source: Data pulled from UIP on 4/13/2023.

Chart Title

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 2003 | 2003 | Jan | Jan-03 | Jan-03 | 87,002 | 2,807 | | |
| 2003 | 2003 | Feb | Feb-03 | Feb-03 | 97,016 | 3,465 | | |
| 2003 | 2003 | Mar | Mar-03 | Mar-03 | 98,625 | 3,181 | | |
| 2003 | 2003 | Apr | Apr-03 | Apr-03 | 75,564 | 2,519 | | |
| 2003 | 2003 | May | May-03 | May-03 | 88,845 | 2,866 | | |
| 2003 | 2003 | Jun | Jun-03 | Jun-03 | 75,634 | 2,521 | | |
| 2003 | 2003 | Jul | Jul-03 | Jul-03 | 79,396 | 2,561 | | |
| 2003 | 2003 | Aug | Aug-03 | Aug-03 | 84,651 | 2,731 | | |
| 2003 | 2003 | Sep | Sep-03 | Sep-03 | 72,239 | 2,408 | | |
| 2004 | 2003 | Oct | Oct-04 | Oct-03 | 65,388 | 2,109 | 1,140,247 | |
| 2004 | 2003 | Nov | Nov-04 | Nov-03 | 57,942 | 1,931 | | |
| 2004 | 2003 | Dec | Dec-04 | Dec-03 | 43,663 | 1,408 | | |
| 2004 | 2004 | Jan | Jan-04 | Jan-04 | 92,751 | 2,992 | | |
| 2004 | 2004 | Feb | Feb-04 | Feb-04 | 110,824 | 3,958 | | |
| 2004 | 2004 | Mar | Mar-04 | Mar-04 | 155,089 | 5,003 | | |
| 2004 | 2004 | Apr | Apr-04 | Apr-04 | 135,632 | 4,521 | | |
| 2004 | 2004 | May | May-04 | May-04 | 118,811 | 3,833 | | |
| 2004 | 2004 | Jun | Jun-04 | Jun-04 | 94,607 | 3,154 | | |
| 2004 | 2004 | Jul | Jul-04 | Jul-04 | 92,152 | 2,973 | | |
| 2004 | 2004 | Aug | Aug-04 | Aug-04 | 93,299 | 3,010 | | |
| 2004 | 2004 | Sep | Sep-04 | Sep-04 | 80,089 | 2,670 | | |
| 2005 | 2004 | Oct | Oct-05 | Oct-04 | 75,908 | 2,449 | 1,171,391 | 365 |
| 2005 | 2004 | Nov | Nov-05 | Nov-04 | 65,110 | 2,170 | | |
| 2005 | 2004 | Dec | Dec-05 | Dec-04 | 48,410 | 1,562 | | |
| 2005 | 2005 | Jan | Jan-05 | Jan-05 | 93,029 | 3,001 | | |
| 2005 | 2005 | Feb | Feb-05 | Feb-05 | 113,776 | 4,063 | | |
| 2005 | 2005 | Mar | Mar-05 | Mar-05 | 143,044 | 4,614 | | |
| 2005 | 2005 | Apr | Apr-05 | Apr-05 | 140,074 | 4,669 | | |
| 2005 | 2005 | May | May-05 | May-05 | 115,817 | 3,736 | | |
| 2005 | 2005 | Jun | Jun-05 | Jun-05 | 90,796 | 3,027 | | |
| 2005 | 2005 | Jul | Jul-05 | Jul-05 | 94,964 | 3,063 | | |
| 2005 | 2005 | Aug | Aug-05 | Aug-05 | 96,745 | 3,121 | | |
| 2005 | 2005 | Sep | Sep-05 | Sep-05 | 93,718 | 3,124 | | |
| 2006 | 2005 | Oct | Oct-06 | Oct-05 | 83,561 | 2,696 | 1,071,976 | 365 |
| 2006 | 2005 | Nov | Nov-06 | Nov-05 | 70,954 | 2,365 | | |
| 2006 | 2005 | Dec | Dec-06 | Dec-05 | 52,663 | 1,699 | | |
| 2006 | 2006 | Jan | Jan-06 | Jan-06 | 101,262 | 3,267 | | |
| 2006 | 2006 | Feb | Feb-06 | Feb-06 | 125,030 | 4,465 | | |
| 2006 | 2006 | Mar | Mar-06 | Mar-06 | 160,696 | 5,184 | | |
| 2006 | 2006 | Apr | Apr-06 | Apr-06 | 126,554 | 4,218 | | |
| 2006 | 2006 | May | May-06 | May-06 | 105,443 | 3,401 | | |
| 2006 | 2006 | Jun | Jun-06 | Jun-06 | 68,365 | 2,279 | | |
| 2006 | 2006 | Jul | Jul-06 | Jul-06 | 59,633 | 1,924 | | |
| 2006 | 2006 | Aug | Aug-06 | Aug-06 | 59,733 | 1,927 | | |
| 2006 | 2006 | Sep | Sep-06 | Sep-06 | 58,082 | 1,936 | | |
| 2007 | 2006 | Oct | Oct-07 | Oct-06 | 60,726 | 1,959 | 858,736 | 365 |
| 2007 | 2006 | Nov | Nov-07 | Nov-06 | 51,592 | 1,720 | | |



CLP_AR_002388

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 2007 | 2006 | Dec | Dec-07 | Dec-06 | 40,527 | 1,307 | | |
| 2007 | 2007 | Jan | Jan-07 | Jan-07 | 72,000 | 2,323 | | |
| 2007 | 2007 | Feb | Feb-07 | Feb-07 | 79,273 | 2,831 | | |
| 2007 | 2007 | Mar | Mar-07 | Mar-07 | 114,136 | 3,682 | | |
| 2007 | 2007 | Apr | Apr-07 | Apr-07 | 104,465 | 3,482 | | |
| 2007 | 2007 | May | May-07 | May-07 | 88,510 | 2,855 | | |
| 2007 | 2007 | Jun | Jun-07 | Jun-07 | 71,336 | 2,378 | | |
| 2007 | 2007 | Jul | Jul-07 | Jul-07 | 66,793 | 2,155 | | |
| 2007 | 2007 | Aug | Aug-07 | Aug-07 | 59,801 | 1,929 | | |
| 2007 | 2007 | Sep | Sep-07 | Sep-07 | 49,577 | 1,653 | | |
| 2008 | 2007 | Oct | Oct-08 | Oct-07 | 51,355 | 1,657 | 705,049 | 366 |
| 2008 | 2007 | Nov | Nov-08 | Nov-07 | 42,208 | 1,407 | | |
| 2008 | 2007 | Dec | Dec-08 | Dec-07 | 31,824 | 1,027 | | |
| 2008 | 2008 | Jan | Jan-08 | Jan-08 | 59,034 | 1,904 | | |
| 2008 | 2008 | Feb | Feb-08 | Feb-08 | 73,483 | 2,624 | | |
| 2008 | 2008 | Mar | Mar-08 | Mar-08 | 89,769 | 2,896 | | |
| 2008 | 2008 | Apr | Apr-08 | Apr-08 | 91,552 | 3,052 | | |
| 2008 | 2008 | May | May-08 | May-08 | 69,240 | 2,234 | | |
| 2008 | 2008 | Jun | Jun-08 | Jun-08 | 53,850 | 1,795 | | |
| 2008 | 2008 | Jul | Jul-08 | Jul-08 | 49,468 | 1,596 | | |
| 2008 | 2008 | Aug | Aug-08 | Aug-08 | 48,544 | 1,566 | | |
| 2008 | 2008 | Sep | Sep-08 | Sep-08 | 44,722 | 1,491 | | |
| 2009 | 2008 | Oct | Oct-09 | Oct-08 | 42,937 | 1,385 | 540,851 | 365 |
| 2009 | 2008 | Nov | Nov-09 | Nov-08 | 32,782 | 1,093 | | |
| 2009 | 2008 | Dec | Dec-09 | Dec-08 | 25,946 | 837 | | |
| 2009 | 2009 | Jan | Jan-09 | Jan-09 | 44,503 | 1,436 | | |
| 2009 | 2009 | Feb | Feb-09 | Feb-09 | 49,211 | 1,758 | | |
| 2009 | 2009 | Mar | Mar-09 | Mar-09 | 67,342 | 2,172 | | |
| 2009 | 2009 | Apr | Apr-09 | Apr-09 | 58,493 | 1,950 | | |
| 2009 | 2009 | May | May-09 | May-09 | 50,883 | 1,641 | | |
| 2009 | 2009 | Jun | Jun-09 | Jun-09 | 46,044 | 1,535 | | |
| 2009 | 2009 | Jul | Jul-09 | Jul-09 | 43,841 | 1,414 | | |
| 2009 | 2009 | Aug | Aug-09 | Aug-09 | 43,519 | 1,404 | | |
| 2009 | 2009 | Sep | Sep-09 | Sep-09 | 35,350 | 1,178 | | |
| 2010 | 2009 | Oct | Oct-10 | Oct-09 | 40,890 | 1,319 | 447,731 | 365 |
| 2010 | 2009 | Nov | Nov-10 | Nov-09 | 32,815 | 1,094 | | |
| 2010 | 2009 | Dec | Dec-10 | Dec-09 | 25,034 | 808 | | |
| 2010 | 2010 | Jan | Jan-10 | Jan-10 | 34,784 | 1,122 | | |
| 2010 | 2010 | Feb | Feb-10 | Feb-10 | 42,790 | 1,528 | | |
| 2010 | 2010 | Mar | Mar-10 | Mar-10 | 61,361 | 1,979 | | |
| 2010 | 2010 | Apr | Apr-10 | Apr-10 | 55,237 | 1,841 | | |
| 2010 | 2010 | May | May-10 | May-10 | 47,045 | 1,518 | | |
| 2010 | 2010 | Jun | Jun-10 | Jun-10 | 32,955 | 1,099 | | |
| 2010 | 2010 | Jul | Jul-10 | Jul-10 | 25,609 | 826 | | |
| 2010 | 2010 | Aug | Aug-10 | Aug-10 | 26,415 | 852 | | |
| 2010 | 2010 | Sep | Sep-10 | Sep-10 | 22,796 | 760 | | |
| 2011 | 2010 | Oct | Oct-11 | Oct-10 | 26,165 | 844 | 327,577 | 365 |

CLP_AR_002389

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 2011 | 2010 | Nov | Nov-11 | Nov-10 | 22,405 | 747 | | | |
| 2011 | 2010 | Dec | Dec-11 | Dec-10 | 19,429 | 627 | | | |
| 2011 | 2011 | Jan | Jan-11 | Jan-11 | 23,926 | 772 | | | |
| 2011 | 2011 | Feb | Feb-11 | Feb-11 | 28,786 | 1,028 | | | |
| 2011 | 2011 | Mar | Mar-11 | Mar-11 | 42,014 | 1,355 | | | |
| 2011 | 2011 | Apr | Apr-11 | Apr-11 | 36,251 | 1,208 | | | |
| 2011 | 2011 | May | May-11 | May-11 | 31,236 | 1,008 | | | |
| 2011 | 2011 | Jun | Jun-11 | Jun-11 | 27,166 | 906 | | | |
| 2011 | 2011 | Jul | Jul-11 | Jul-11 | 23,170 | 747 | | | |
| 2011 | 2011 | Aug | Aug-11 | Aug-11 | 24,166 | 780 | | | |
| 2011 | 2011 | Sep | Sep-11 | Sep-11 | 22,863 | 762 | | | |
| 2012 | 2011 | Oct | Oct-12 | Oct-11 | 25,612 | 826 | 356,873 | 366 | |
| 2012 | 2011 | Nov | Nov-12 | Nov-11 | 23,368 | 779 | | | |
| 2012 | 2011 | Dec | Dec-12 | Dec-11 | 18,983 | 612 | | | |
| 2012 | 2012 | Jan | Jan-12 | Jan-12 | 25,714 | 829 | | | |
| 2012 | 2012 | Feb | Feb-12 | Feb-12 | 31,579 | 1,128 | | | |
| 2012 | 2012 | Mar | Mar-12 | Mar-12 | 42,218 | 1,362 | | | |
| 2012 | 2012 | Apr | Apr-12 | Apr-12 | 40,628 | 1,354 | | | |
| 2012 | 2012 | May | May-12 | May-12 | 36,966 | 1,192 | | | |
| 2012 | 2012 | Jun | Jun-12 | Jun-12 | 30,669 | 1,022 | | | |
| 2012 | 2012 | Jul | Jul-12 | Jul-12 | 26,978 | 870 | | | |
| 2012 | 2012 | Aug | Aug-12 | Aug-12 | 27,567 | 889 | | | |
| 2012 | 2012 | Sep | Sep-12 | Sep-12 | 26,591 | 886 | | | |
| 2013 | 2012 | Oct | Oct-13 | Oct-12 | 28,929 | 933 | 414,397 | 365 | |
| 2013 | 2012 | Nov | Nov-13 | Nov-12 | 27,636 | 921 | | | |
| 2013 | 2012 | Dec | Dec-13 | Dec-12 | 23,243 | 750 | | | |
| 2013 | 2013 | Jan | Jan-13 | Jan-13 | 26,921 | 868 | | | |
| 2013 | 2013 | Feb | Feb-13 | Feb-13 | 35,042 | 1,252 | | | |
| 2013 | 2013 | Mar | Mar-13 | Mar-13 | 47,293 | 1,526 | | | |
| 2013 | 2013 | Apr | Apr-13 | Apr-13 | 48,212 | 1,607 | | | |
| 2013 | 2013 | May | May-13 | May-13 | 43,856 | 1,415 | | | |
| 2013 | 2013 | Jun | Jun-13 | Jun-13 | 34,436 | 1,148 | | | |
| 2013 | 2013 | Jul | Jul-13 | Jul-13 | 33,230 | 1,072 | | | |
| 2013 | 2013 | Aug | Aug-13 | Aug-13 | 33,797 | 1,090 | | | |
| 2013 | 2013 | Sep | Sep-13 | Sep-13 | 31,802 | 1,060 | | | |
| 2014 | 2013 | Oct | Oct-14 | Oct-13 | 35,312 | 1,139 | 479,370 | 365 | 1264.982 |
| 2014 | 2013 | Nov | Nov-14 | Nov-13 | 31,896 | 1,063 | | | |
| 2014 | 2013 | Dec | Dec-14 | Dec-13 | 29,528 | 953 | | | |
| 2014 | 2014 | Jan | Jan-14 | Jan-14 | 28,668 | 925 | | | |
| 2014 | 2014 | Feb | Feb-14 | Feb-14 | 36,403 | 1,300 | | | |
| 2014 | 2014 | Mar | Mar-14 | Mar-14 | 49,596 | 1,600 | | | |
| 2014 | 2014 | Apr | Apr-14 | Apr-14 | 51,502 | 1,717 | | | |
| 2014 | 2014 | May | May-14 | May-14 | 60,683 | 1,958 | | | |
| 2014 | 2014 | Jun | Jun-14 | Jun-14 | 57,861 | 1,929 | | | |
| 2014 | 2014 | Jul | Jul-14 | Jul-14 | 40,708 | 1,313 | | | |
| 2014 | 2014 | Aug | Aug-14 | Aug-14 | 31,388 | 1,013 | | | |
| 2014 | 2014 | Sep | Sep-14 | Sep-14 | 25,825 | 861 | | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 2015 | 2014 | Oct | Oct-15 | Oct-14 | 26,450 | 853 | 331,333 | 365 |
| 2015 | 2014 | Nov | Nov-15 | Nov-14 | 24,641 | 821 | | |
| 2015 | 2014 | Dec | Dec-15 | Dec-14 | 25,019 | 807 | | |
| 2015 | 2015 | Jan | Jan-15 | Jan-15 | 21,514 | 694 | | |
| 2015 | 2015 | Feb | Feb-15 | Feb-15 | 24,376 | 871 | | |
| 2015 | 2015 | Mar | Mar-15 | Mar-15 | 29,791 | 961 | | |
| 2015 | 2015 | Apr | Apr-15 | Apr-15 | 29,750 | 992 | | |
| 2015 | 2015 | May | May-15 | May-15 | 31,576 | 1,019 | | |
| 2015 | 2015 | Jun | Jun-15 | Jun-15 | 29,303 | 977 | | |
| 2015 | 2015 | Jul | Jul-15 | Jul-15 | 28,388 | 916 | | |
| 2015 | 2015 | Aug | Aug-15 | Aug-15 | 30,239 | 975 | | |
| 2015 | 2015 | Sep | Sep-15 | Sep-15 | 30,286 | 1,010 | | |
| 2016 | 2015 | Oct | Oct-16 | Oct-15 | 32,724 | 1,056 | 408,870 | 366 |
| 2016 | 2015 | Nov | Nov-16 | Nov-15 | 32,838 | 1,095 | | |
| 2016 | 2015 | Dec | Dec-16 | Dec-15 | 37,014 | 1,194 | | |
| 2016 | 2016 | Jan | Jan-16 | Jan-16 | 23,758 | 766 | | |
| 2016 | 2016 | Feb | Feb-16 | Feb-16 | 26,072 | 931 | | |
| 2016 | 2016 | Mar | Mar-16 | Mar-16 | 33,316 | 1,075 | | |
| 2016 | 2016 | Apr | Apr-16 | Apr-16 | 38,089 | 1,270 | | |
| 2016 | 2016 | May | May-16 | May-16 | 40,337 | 1,301 | | |
| 2016 | 2016 | Jun | Jun-16 | Jun-16 | 34,450 | 1,148 | | |
| 2016 | 2016 | Jul | Jul-16 | Jul-16 | 33,723 | 1,088 | | |
| 2016 | 2016 | Aug | Aug-16 | Aug-16 | 37,048 | 1,195 | | |
| 2016 | 2016 | Sep | Sep-16 | Sep-16 | 39,501 | 1,317 | | |
| 2017 | 2016 | Oct | Oct-17 | Oct-16 | 46,184 | 1,490 | 303,916 | 365 |
| 2017 | 2016 | Nov | Nov-17 | Nov-16 | 47,211 | 1,574 | | |
| 2017 | 2016 | Dec | Dec-17 | Dec-16 | 43,251 | 1,395 | | |
| 2017 | 2017 | Jan | Jan-17 | Jan-17 | 31,576 | 1,019 | | |
| 2017 | 2017 | Feb | Feb-17 | Feb-17 | 18,754 | 670 | | |
| 2017 | 2017 | Mar | Mar-17 | Mar-17 | 12,195 | 393 | | |
| 2017 | 2017 | Apr | Apr-17 | Apr-17 | 11,127 | 371 | | |
| 2017 | 2017 | May | May-17 | May-17 | 14,519 | 468 | | |
| 2017 | 2017 | Jun | Jun-17 | Jun-17 | 16,087 | 536 | | |
| 2017 | 2017 | Jul | Jul-17 | Jul-17 | 18,187 | 587 | | |
| 2017 | 2017 | Aug | Aug-17 | Aug-17 | 22,288 | 719 | | |
| 2017 | 2017 | Sep | Sep-17 | Sep-17 | 22,537 | 751 | | |
| 2018 | 2017 | Oct | Oct-18 | Oct-17 | 25,488 | 822 | 396,579 | 365 |
| 2018 | 2017 | Nov | Nov-18 | Nov-17 | 29,085 | 970 | | |
| 2018 | 2017 | Dec | Dec-18 | Dec-17 | 28,995 | 935 | | |
| 2018 | 2018 | Jan | Jan-18 | Jan-18 | 25,975 | 838 | | |
| 2018 | 2018 | Feb | Feb-18 | Feb-18 | 26,666 | 952 | | |
| 2018 | 2018 | Mar | Mar-18 | Mar-18 | 37,390 | 1,206 | | |
| 2018 | 2018 | Apr | Apr-18 | Apr-18 | 38,243 | 1,275 | | |
| 2018 | 2018 | May | May-18 | May-18 | 40,339 | 1,301 | | |
| 2018 | 2018 | Jun | Jun-18 | Jun-18 | 34,089 | 1,136 | | |
| 2018 | 2018 | Jul | Jul-18 | Jul-18 | 31,299 | 1,010 | | |
| 2018 | 2018 | Aug | Aug-18 | Aug-18 | 37,524 | 1,210 | | |

CLP_AR_002391

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 2018 | 2018 | Sep | Sep-18 | Sep-18 | 41,486 | 1,383 | | |
| 2019 | 2018 | Oct | Oct-19 | Oct-18 | 51,005 | 1,645 | 851,508 | 365 |
| 2019 | 2018 | Nov | Nov-19 | Nov-18 | 51,857 | 1,729 | | |
| 2019 | 2018 | Dec | Dec-19 | Dec-18 | 50,751 | 1,637 | | |
| 2019 | 2019 | Jan | Jan-19 | Jan-19 | 47,979 | 1,548 | | |
| 2019 | 2019 | Feb | Feb-19 | Feb-19 | 66,883 | 2,389 | | |
| 2019 | 2019 | Mar | Mar-19 | Mar-19 | 92,833 | 2,995 | | |
| 2019 | 2019 | Apr | Apr-19 | Apr-19 | 99,273 | 3,309 | | |
| 2019 | 2019 | May | May-19 | May-19 | 132,856 | 4,286 | | |
| 2019 | 2019 | Jun | Jun-19 | Jun-19 | 94,902 | 3,163 | | |
| 2019 | 2019 | Jul | Jul-19 | Jul-19 | 71,978 | 2,322 | | |
| 2019 | 2019 | Aug | Aug-19 | Aug-19 | 50,684 | 1,635 | | |
| 2019 | 2019 | Sep | Sep-19 | Sep-19 | 40,507 | 1,350 | | |
| 2020 | 2019 | Oct | Oct-20 | Oct-19 | 35,402 | 1,142 | 400,635 | 366 |
| 2020 | 2019 | Nov | Nov-20 | Nov-19 | 33,524 | 1,117 | | |
| 2020 | 2019 | Dec | Dec-20 | Dec-19 | 32,853 | 1,060 | | |
| 2020 | 2020 | Jan | Jan-20 | Jan-20 | 29,205 | 942 | | |
| 2020 | 2020 | Feb | Feb-20 | Feb-20 | 30,077 | 1,074 | | |
| 2020 | 2020 | Mar | Mar-20 | Mar-20 | 30,389 | 980 | | |
| 2020 | 2020 | Apr | Apr-20 | Apr-20 | 16,182 | 539 | | |
| 2020 | 2020 | May | May-20 | May-20 | 21,593 | 697 | | |
| 2020 | 2020 | Jun | Jun-20 | Jun-20 | 30,816 | 1,027 | | |
| 2020 | 2020 | Jul | Jul-20 | Jul-20 | 38,556 | 1,244 | | |
| 2020 | 2020 | Aug | Aug-20 | Aug-20 | 47,276 | 1,525 | | |
| 2020 | 2020 | Sep | Sep-20 | Sep-20 | 54,762 | 1,825 | | |
| 2021 | 2020 | Oct | Oct-21 | Oct-20 | 69,032 | 2,227 | 1,659,206 | 365 |
| 2021 | 2020 | Nov | Nov-21 | Nov-20 | 69,169 | 2,306 | | |
| 2021 | 2020 | Dec | Dec-21 | Dec-20 | 71,141 | 2,295 | | |
| 2021 | 2021 | Jan | Jan-21 | Jan-21 | 75,316 | 2,430 | | |
| 2021 | 2021 | Feb | Feb-21 | Feb-21 | 97,643 | 3,487 | | |
| 2021 | 2021 | Mar | Mar-21 | Mar-21 | 169,216 | 5,459 | | |
| 2021 | 2021 | Apr | Apr-21 | Apr-21 | 173,699 | 5,790 | | |
| 2021 | 2021 | May | May-21 | May-21 | 172,654 | 5,569 | | |
| 2021 | 2021 | Jun | Jun-21 | Jun-21 | 178,649 | 5,955 | | |
| 2021 | 2021 | Jul | Jul-21 | Jul-21 | 200,658 | 6,473 | | |
| 2021 | 2021 | Aug | Aug-21 | Aug-21 | 196,514 | 6,339 | | |
| 2021 | 2021 | Sep | Sep-21 | Sep-21 | 185,515 | 6,184 | | |
| 2022 | 2021 | Oct | Oct-22 | Oct-21 | 159,113 | 5,133 | 2,206,437 | 365 |
| 2022 | 2021 | Nov | Nov-22 | Nov-21 | 167,015 | 5,567 | | |
| 2022 | 2021 | Dec | Dec-22 | Dec-21 | 170,602 | 5,503 | | |
| 2022 | 2022 | Jan | Jan-22 | Jan-22 | 147,877 | 4,770 | | |
| 2022 | 2022 | Feb | Feb-22 | Feb-22 | 159,170 | 5,685 | | |
| 2022 | 2022 | Mar | Mar-22 | Mar-22 | 211,181 | 6,812 | | |
| 2022 | 2022 | Apr | Apr-22 | Apr-22 | 203,504 | 6,783 | | |
| 2022 | 2022 | May | May-22 | May-22 | 224,371 | 7,238 | | |
| 2022 | 2022 | Jun | Jun-22 | Jun-22 | 192,399 | 6,413 | | |
| 2022 | 2022 | Jul | Jul-22 | Jul-22 | 181,834 | 5,866 | | |

CLP_AR_002392

| 2022 | 2022 | Aug | Aug-22 | Aug-22 | 181,774 | 5,864 | | |
| 2022 | 2022 | Sep | Sep-22 | Sep-22 | 207,597 | 6,920 | | |
| 2023 | 2022 | Oct | Oct-23 | Oct-22 | 204,885 | 6,609 | 1,055,320 | 365 |
| 2023 | 2022 | Nov | Nov-23 | Nov-22 | 207,448 | 6,915 | | |
| 2023 | 2022 | Dec | Dec-23 | Dec-22 | 221,710 | 7,152 | | |
| 2023 | 2023 | Jan | Jan-23 | Jan-23 | 128,936 | 4,159 | | |
| 2023 | 2023 | Feb | Feb-23 | Feb-23 | 130,024 | 4,644 | | |
| 2023 | 2023 | Mar | Mar-23 | Mar-23 | 162,317 | 5,236 | | |

CLP_AR_002393

n the immediate pre-pandemic period, 2014-2019.

, Haiti, and Nicaragua parole processes, and daily encounters at the SWB averaged just over 5,200 a day 17 the 30 days ending April 10, 2023. OIS analysis of Unified Immigration Portal (UIP) data pulled on April 13, 2023.

| | USBP Encounters | | | |
|---|---|---|---|---|
| 12/01/202 | 7532 | | | |
| 12/02/202 | 8736 | Low | 3,532 |
| 12/03/202 | 7119 | High | 8,736 |
| 12/04/202 | 7100 | Average | 7,152 |
| 12/05/202 | 7369 | Over 8000 | 11 |
| 12/06/202 | 7415 | | | |
| 12/07/202 | 8390 | | | |
| 12/08/202 | 8371 | | | |
| 12/09/202 | 8497 | | | |
| 12/10/202 | 8181 | | | |
| 12/11/202 | 7902 | | | |
| 12/12/202 | 7811 | | | |
| 12/13/202 | 8073 | | | |
| 12/14/202 | 8281 | | | |
| 12/15/202 | 8132 | | | |
| 12/16/202 | 6849 | | | |
| 12/17/202 | 6940 | | | |
| 12/18/202 | 6904 | | | |
| 12/19/202 | 7309 | | | |
| 12/20/202 | 8568 | | | |
| 12/21/202 | 8431 | | | |
| 12/22/202 | 8086 | | | |
| 12/23/202 | 7301 | | | |
| 12/24/202 | 6247 | | | |
| 12/25/202 | 3532 | | | |
| 12/26/202 | 5013 | | | |
| 12/27/202 | 6084 | | | |
| 12/28/202 | 5914 | | | |
| 12/29/202 | 5512 | | | |
| 12/30/202 | 4736 | | | |
| 12/31/202 | 5375 | | | |

CLP_AR_002394

Quote: The practical result of this growing backlog is that those with meritorious claims may have to wait years for their claims to be granted, while individuals who are ultimately denied protection may spend years in the United States before being issu

Footnote: OIS analysis of EOIR data as of March 31, 2023

Filters: Limited to 862 cases; medians days calculated from NTA (the date EOIR receives and lodge the case) to the completion date

| comp_FY | ABSENTIA=No | | | | ABSENTIA=Yes | | | |
|---|---|---|---|---|---|---|---|---|
| | N Obs | Mean | Median | Median Years | N Obs | Mean | Median | Median Years |
| 2000 | 66,939 | 42 | 13 | 0.04 | 17,055 | 105 | 87 | 0.24 |
| 2001 | 97,395 | 109 | 28 | 0.08 | 28,132 | 177 | 145 | 0.40 |
| 2002 | 115,984 | 172 | 46 | 0.13 | 30,214 | 209 | 163 | 0.45 |
| 2003 | 140,238 | 211 | 50 | 0.14 | 29,843 | 195 | 120 | 0.33 |
| 2004 | 142,799 | 252 | 52 | 0.14 | 40,400 | 157 | 92 | 0.25 |
| 2005 | 149,545 | 283 | 43 | 0.12 | 92,538 | 114 | 67 | 0.18 |
| 2006 | 160,378 | 308 | 50 | 0.14 | 93,956 | 134 | 79 | 0.22 |
| 2007 | 179,931 | 283 | 36 | 0.10 | 28,938 | 268 | 171 | 0.47 |
| 2008 | 190,483 | 264 | 22 | 0.06 | 23,527 | 324 | 172 | 0.47 |
| 2009 | 197,954 | 267 | 26 | 0.07 | 19,480 | 319 | 143 | 0.39 |
| 2010 | 189,025 | 351 | 48 | 0.13 | 20,882 | 320 | 174 | 0.48 |
| 2011 | 187,304 | 389 | 61 | 0.17 | 18,549 | 377 | 249 | 0.68 |
| 2012 | 166,071 | 504 | 145 | 0.40 | 16,389 | 443 | 301 | 0.82 |
| 2013 | 142,194 | 671 | 392 | 1.07 | 17,975 | 464 | 323 | 0.88 |
| 2014 | 125,665 | 710 | 423 | 1.16 | 22,033 | 390 | 258 | 0.71 |
| 2015 | 122,721 | 791 | 518 | 1.42 | 32,614 | 347 | 210 | 0.58 |
| 2016 | 133,188 | 868 | 594 | 1.63 | 29,992 | 494 | 332 | 0.91 |
| 2017 | 129,902 | 795 | 426 | 1.17 | 37,232 | 535 | 299 | 0.82 |
| 2018 | 143,266 | 837 | 466 | 1.28 | 41,844 | 650 | 410 | 1.12 |
| 2019 | 172,989 | 835 | 392 | 1.07 | 82,754 | 459 | 231 | 0.63 |
| 2020 | 136,958 | 834 | 358 | 0.98 | 82,043 | 306 | 157 | 0.43 |
| 2021 | 110,598 | 1,463 | 1,244 | 3.41 | 7,602 | 930 | 720 | 1.97 |
| 2022 | 284,075 | 1,608 | 1,351 | 3.70 | 58,928 | 749 | 559 | 1.53 |
| 2023 | 178,733 | 1,369 | 1,245 | 3.41 | 71,639 | 789 | 494 | 1.35 |

| comp_FY | EOIR_DECIN | Obs | Mean | Median | Meidan Years | | |
|---|---|---|---|---|---|---|---|
| 2000 | FO/VD | 58121 | 32.79237 | 11 | 0.030055 | 2000 | 366 |
| 2000 | Relief | 3389 | 146.5841 | 132 | 0.360656 | 2001 | 365 |
| 2000 | Terminate | 4871 | 72.13373 | 49 | 0.13388 | 2002 | 365 |
| 2001 | FO/VD | 76374 | 75.74231 | 16 | 0.043836 | 2003 | 365 |
| 2001 | Relief | 11006 | 282.5668 | 273 | 0.747945 | 2004 | 365 |
| 2001 | Terminate | 9203 | 175.3252 | 142 | 0.389041 | 2005 | 365 |
| 2002 | FO/VD | 89235 | 121.0808 | 21 | 0.057534 | 2006 | 365 |
| 2002 | Relief | 15657 | 407.784 | 390 | 1.068493 | 2007 | 365 |
| 2002 | Terminate | 10175 | 258.2852 | 194 | 0.531507 | 2008 | 366 |
| 2003 | FO/VD | 107450 | 150.8352 | 19 | 0.052055 | 2009 | 365 |
| 2003 | Relief | 21113 | 490.8419 | 434 | 1.189041 | 2010 | 365 |
| 2003 | Terminate | 10624 | 259.2037 | 139 | 0.380822 | 2011 | 365 |
| 2004 | FO/VD | 106317 | 173.8404 | 16 | 0.043836 | 2012 | 365 |
| 2004 | Relief | 24020 | 582.1776 | 492 | 1.347945 | 2013 | 365 |
| 2004 | Terminate | 11207 | 288.0162 | 134 | 0.367123 | 2014 | 365 |
| 2005 | FO/VD | 112704 | 189.4396 | 15 | 0.041096 | 2015 | 365 |
| 2005 | Relief | 24921 | 676.4903 | 561 | 1.536986 | 2016 | 366 |
| 2005 | Terminate | 10795 | 353.3629 | 167 | 0.457534 | 2017 | 365 |
| 2006 | FO/VD | 111228 | 171.3595 | 13 | 0.035616 | 2018 | 365 |
| 2006 | Relief | 29851 | 725.0457 | 568 | 1.556164 | 2019 | 365 |
| 2006 | Terminate | 17212 | 468.9618 | 289 | 0.791781 | 2020 | 365 |
| 2007 | FO/VD | 127581 | 149.3074 | 14 | 0.038356 | 2021 | 365 |
| 2007 | Relief | 26431 | 773.654 | 599 | 1.641096 | 2022 | 365 |
| 2007 | Terminate | 21998 | 463.2345 | 287 | 0.786301 | 2023 | 365 |
| 2008 | FO/VD | 145197 | 137.2008 | 11 | 0.030055 | | |
| 2008 | Relief | 24994 | 814.8601 | 592 | 1.617486 | | |
| 2008 | Terminate | 18682 | 497.0126 | 273 | 0.745902 | | |
| 2009 | FO/VD | 152535 | 130.3314 | 13 | 0.035616 | | |
| 2009 | Relief | 25515 | 867.1162 | 617 | 1.690411 | | |
| 2009 | Terminate | 17859 | 560.4533 | 322 | 0.882192 | | |
| 2010 | FO/VD | 132342 | 154.1929 | 18 | 0.049315 | | |
| 2010 | Relief | 28493 | 932.4361 | 690 | 1.890411 | | |
| 2010 | Terminate | 26406 | 700.7074 | 433 | 1.186301 | | |
| 2011 | FO/VD | 129823 | 181.9396 | 21 | 0.057534 | | |
| 2011 | Relief | 29768 | 944.6407 | 711 | 1.947945 | | |
| 2011 | Terminate | 25986 | 779.1678 | 511 | 1.4 | | |
| 2012 | FO/VD | 103356 | 219.7137 | 25 | 0.068493 | | |
| 2012 | Relief | 34967 | 1016.39 | 808 | 2.213699 | | |
| 2012 | Terminate | 27079 | 932.6871 | 665 | 1.821918 | | |
| 2013 | FO/VD | 73752 | 305.7366 | 47 | 0.128767 | | |
| 2013 | Relief | 37835 | 1090.18 | 871.5 | 2.387671 | | |

CLP_AR_002395

| Year | Type | | | | |
|---|---|---|---|---|---|
| 2013 | Terminate | 30808 | 1046.19 | 771 | 2.112329 |
| 2014 | FO/VD | 62378 | 308.7534 | 49 | 0.134247 |
| 2014 | Relief | 31785 | 1110.57 | 947 | 2.594521 |
| 2014 | Terminate | 32109 | 1113.63 | 852 | 2.334247 |
| 2015 | FO/VD | 49854 | 315.9406 | 61 | 0.167123 |
| 2015 | Relief | 33038 | 1160.63 | 1016 | 2.783562 |
| 2015 | Terminate | 41221 | 1082.71 | 777 | 2.128767 |
| 2016 | FO/VD | 51161 | 339.6952 | 80 | 0.218579 |
| 2016 | Relief | 39250 | 1234.61 | 1091 | 2.980874 |
| 2016 | Terminate | 45174 | 1154.2 | 803 | 2.193989 |
| 2017 | FO/VD | 69981 | 402.7517 | 87 | 0.238356 |
| 2017 | Relief | 27755 | 1255.1 | 1100 | 3.013699 |
| 2017 | Terminate | 32596 | 1234.38 | 883 | 2.419178 |
| 2018 | FO/VD | 92652 | 574.5763 | 132 | 0.361644 |
| 2018 | Relief | 24833 | 1375.87 | 1202 | 3.293151 |
| 2018 | Terminate | 23832 | 1331.23 | 909.5 | 2.491781 |
| 2019 | FO/VD | 118056 | 666.518 | 224 | 0.613699 |
| 2019 | Relief | 32612 | 1377.52 | 1127 | 3.087671 |
| 2019 | Terminate | 25152 | 900.9169 | 432 | 1.183562 |
| 2020 | FO/VD | 90218 | 624.9785 | 269 | 0.736986 |
| 2020 | Relief | 25139 | 1300.86 | 990 | 2.712329 |
| 2020 | Terminate | 21867 | 1051.26 | 594 | 1.627397 |
| 2021 | FO/VD | 33493 | 1012.14 | 704 | 1.928767 |
| 2021 | Relief | 20490 | 1766.82 | 1483 | 4.063014 |
| 2021 | Terminate | 54144 | 1639.04 | 1455 | 3.986301 |
| 2022 | FO/VD | 54180 | 1037.34 | 739 | 2.024658 |
| 2022 | Relief | 43247 | 1757.71 | 1500 | 4.109589 |
| 2022 | Terminate | 180861 | 1748.85 | 1458 | 3.994521 |
| 2023 | FO/VD | 41241 | 963.6735 | 489 | 1.339726 |
| 2023 | Relief | 26632 | 1571.82 | 1500 | 4.109589 |
| 2023 | Terminate | 104665 | 1489.53 | 1317 | 3.608219 |

CLP_AR_002396

ued a final order of removal.

CLP_AR_002397

Quote: As the demographics of border encounters have shifted in recent years to include larger numbers of non-Mexicans—who are far more likely to assert asylum claims—and as the time required to process and remove noncitizens ineligible for pro

Footnote: For noncitizens encountered at the SWB in FY 2014–FY 2019 who were placed in expedited removal, 6 percent of Mexican nationals made fear claims that were referred U.S. Citizenship and Immigration Services ("USCIS") for adjudication

Filter: Exclude AM, OFO admin cases (crewmembers, parolees, withdrawals). Total exclusions made up 2.9 percent of total encounters between FY2013 and FY2023 Q1.

Correlation coefficient between mean days and OTM % Apprehensions:   **0.909028939**

| Fiscal Year | Mean days for EOIR completion | OTM % of Apprehensions | OTM encounters |
|---|---|---|---|
| 2000 | 42 | 2% | 25,738 |
| 2001 | 109 | 2% | 29,902 |
| 2002 | 172 | 3% | 28,299 |
| 2003 | 211 | 4% | 39,478 |
| 2004 | 252 | 6% | 65,917 |
| 2005 | 283 | 13% | 166,071 |
| 2006 | 308 | 9% | 110,287 |
| 2007 | 283 | 8% | 72,206 |
| 2008 | 264 | 8% | 64,940 |
| 2009 | 267 | 9% | 53,870 |
| 2010 | 351 | 11% | 59,953 |
| 2011 | 389 | 14% | 57,049 |
| 2012 | 504 | 26% | 109,218 |
| 2013 | 671 | 35% | 172,050 |
| 2014 | 710 | 50% | 284,546 |
| 2015 | 791 | 43% | 191,196 |
| 2016 | 868 | 54% | 302,908 |
| 2017 | 795 | 56% | 233,680 |
| 2018 | 837 | 57% | 298,233 |
| 2019 | 835 | 76% | 740,162 |
| 2020 | 834 | 35% | 160,374 |
| 2021 | 1,463 | 62% | 1,079,092 |
| 2022 | 1,608 | 66% | 1,570,605 |
| 2023 | 1,369 | 73% | 340,038 |

Note: OIS calculated mean days from EOIR case received date to EOIR case completion date by pulling all EOIR case completions from OIS production data, and linking each completion to its case receipt date. In absentia removal orders and case completions that did not result in decisions, terminations, or closures were excluded from the analysis. OIS calculated OTMs as a % of encounters by dividing total non-Mexican SWB encounters by total SWB encounters, pulling from OIS production data.

### Final or Most Current Outcomes, Total SW Border Encounters by Fear Claims by Country

| MOST CURRENT OUTCOMES | TOTAL | MEXI |
|---|---|---|
| Total Encounters[1] | 100.0% | 100. |
| Processed for Expedited Removal (ER) as a Percent of Total Encounters | 42.2% | 45 |
| No fear claim as a Percent of ER | 61.8% | 93 |
| No Fear Claim - confirmed removal or return as a Percent of No Fear Claim | 97.0% | 99 |
| Fear Claims Withdrawn (Based on APSO Receipts) as a Percent of ER | 1.8% | |
| *Credible Fear Claims (APSO check-in Only) as a Percent of ER* | 36.4% | 5 |
| Positive fear determinations as a percent of Credible Fear Claims | 75.8% | 59 |
| Negative fear determinations as a percent of Credible Fear Claims | 13.3% | 18 |
| Negative fear determinations appealed to EOIR as a percent of negative fear | 79.8% | 71 |
| Negative fear determinations vacated by EOIR as a percent of appealed negative fear | 23.0% | 1 |
| Negative fear determinations upheld by EOIR as a percent of appealed negative fear | 77.0% | 88 |
| Case closures as a percent of Credible Fear Claims | 10.8% | 21 |
| Case closures referred to EOIR as a percent of case closures | 44.4% | 14 |
| Case closures not referred to EOIR as a percent of case closures | 55.6% | 86 |
| Non-Referrals to EOIR as a percent of fear claims | 387.3% | 285 |
| Executed Removal Orders as a percent of non-referrals to EOIR | 73.3% | 69 |
| Total Referrals to EOIR (Includes closed cases, vacated negative decisions and positive decisions) as a percent of fear claims | 1465.0% | 340 |
| **EOIR cases started as a percent referrals to EOIR** | 95.5% | 96 |
| Still in EOIR Proceedings as a percent of EOIR cases | 37.6% | 27 |
| EOIR Cases completed as a percent of EOIR cases | 62.4% | 72 |
| Asylum Granted or other EOIR Relief from Removal | 16.5% | 8 |
| Grants of relief + other favorable-to-noncitizen judgements appealed to BIA as a percent of relie | 5.3% | 7 |
| Removal Orders as a percent of EOIR cases | 61.7% | 71 |
| EOIR Removal Orders + other favorable-to-OPLA judgements appealed to BIA as a percent o | 29.5% | 23 |
| Executed Removal Orders as a percent of removal orders | 30.7% | 48 |

Notes: Results based on source data as of December 31, 2022 and OIS Enforcement Lifecycle methodology as of May 31, 2021.
Source: DHS Office of Immigration Statistics Enforcement Lifecycle.
1 Excludes Accompanied Minors (AM), and OFO administrative cases including, crewmembers, parolee, and withdrawals. Total e

...otection has grown (during which individuals may become eligible to apply for employment authorization), the deterrent effect of apprehending noncitizens at the SWB has become more limited.

..., compared to 57 percent of people from Northern Central America, and 90 percent of all other nationalities.  OIS analysis of Enforcement Lifecycle data as of December 31, 2022.  Of note, according to OIS analysis of historic EOIR and CBP data, there is

| CO | NCA | All Others |
|---|---|---|
| .0% | 100.0% | 100.0% |
| 5.8% | 36.6% | 55.6% |
| 3.2% | 40.8% | 6.9% |
| 4.8% | 90.1% | 88.6% |
| 1.1% | 2.4% | 3.0% |
| 5.7% | 56.8% | 90.1% |
| 4.8% | 73.9% | 84.6% |
| 4.8% | 13.7% | 10.9% |
| 4.0% | 76.9% | 92.5% |
| 4.3% | 21.1% | 31.6% |
| 4.7% | 78.9% | 68.4% |
| 4.4% | 12.3% | 4.5% |
| 4.0% | 46.7% | 68.4% |
| 4.0% | 53.3% | 31.6% |
| 5.8% | 919.1% | 129.2% |
| 4.5% | 75.7% | 67.7% |
|  |  |  |
| 4.0% | 3371.0% | 940.3% |
| 4.7% | 94.9% | 96.8% |
| 4.7% | 39.2% | 36.2% |
| 4.3% | 60.8% | 63.8% |
| 4.5% | 9.8% | 31.4% |
| 4.2% | 6.4% | 5.5% |
| 4.0% | 70.6% | 42.2% |
| 4.9% | 28.7% | 34.3% |
| 4.0% | 24.9% | 43.4% |

Encounters include USBP

...exclusions made up 2.9 perce...

CLP_AR_002399

a clear correlation since FY 2000 between the increasing time it takes to complete immigration proceedings and the lower share of noncitizens being removed, and the growth in non-Mexican encounters at the SWB.  Both trends accelerated in the 201(

CLP_AR_002400

0s, as non-Mexicans became the majority of border encounters, and they have accelerated further since FY 2021, as people from countries other than Mexico and Northern Central America now account for the largest numbers of border encounters

CLP_AR_002401

Quote: In the weeks between the November announcement that the Title 42 public health Order would be lifted and the December 19 stay order that kept the Title 42 public health Order in place, encounter rates jumped from an average of just under
Footnote: Month over month change from November to December for all of FY 2013 – FY2022 averaged negative 2 percent. OIS analysis of OIS Persist Dataset based on data through March 31, 2023.
Filters: SWB; CBPOne excluded

| Date | CBP daily SWB Encounters | Rolling 7-day avg | | Date | USBP 7-day Rolling Avg SWB Encounters | |
|---|---|---|---|---|---|---|
| 26-Oct | 7,617 | | | | | |
| 27-Oct | 7,916 | | | | | |
| 28-Oct | 7,732 | | | | | |
| 29-Oct | 7,984 | | | | | |
| 30-Oct | 6,490 | | | | | |
| 31-Oct | 6,881 | | | | | |
| 1-Nov | 7,811 | 7,490 | Average encounters two weeks ending 11/15/22   7,658 | 1-Nov | 6,605 | Average encounters two weeks ending 11/15/22   6,687 |
| 2-Nov | 8,239 | 7,579 | Average encounters two weeks ending 12/24/22   8,794 | 2-Nov | 6,549 | Average encounters two weeks ending 12/24/22   7,823 |
| 3-Nov | 7,027 | 7,452 | Number of days 11/15 - 12/24 > 9K encounters   5 | 3-Nov | 6,636 | Number of days 11/15 - 12/24 > 9K encounters   0 |
| 4-Nov | 7,790 | 7,460 | | 4-Nov | 6,505 | |
| 5-Nov | 6,983 | 7,317 | | 5-Nov | 6,522 | |
| 6-Nov | 7,866 | 7,514 | | 6-Nov | 6,378 | |
| 7-Nov | 7,405 | 7,589 | | 7-Nov | 6,566 | |
| 8-Nov | 8,457 | 7,681 | | 8-Nov | 6,635 | |
| 9-Nov | 7,586 | 7,588 | | 9-Nov | 6,727 | |
| 10-Nov | 8,118 | 7,744 | | 10-Nov | 6,627 | |
| 11-Nov | 8,469 | 7,841 | | 11-Nov | 6,793 | |
| 12-Nov | 7,523 | 7,918 | | 12-Nov | 6,898 | |
| 13-Nov | 7,116 | 7,811 | | 13-Nov | 6,970 | |
| 14-Nov | 7,899 | 7,881 | | 14-Nov | 6,867 | |
| 15-Nov | 8,147 | 7,837 Announcement date | Announce | 15-Nov | 6,944 Announcement date | |
| 16-Nov | 8,205 | 7,925 | | 16-Nov | 6,904 | |
| 17-Nov | 9,583 | 8,135 | | 17-Nov | 6,999 | |
| 18-Nov | 7,940 | 8,059 | | 18-Nov | 7,206 | |
| 19-Nov | 7,920 | 8,116 | | 19-Nov | 7,121 | |
| 20-Nov | 6,956 | 8,093 | | 20-Nov | 7,184 | |
| 21-Nov | 7,989 | 8,106 | | 21-Nov | 7,207 | |
| 22-Nov | 7,971 | 8,081 | | 22-Nov | 7,226 | |
| 23-Nov | 7,529 | 7,984 | | 23-Nov | 7,209 | |
| 24-Nov | 7,372 | 7,668 | | 24-Nov | 7,122 | |
| 25-Nov | 7,162 | 7,557 | | 25-Nov | 6,816 | |
| 26-Nov | 8,049 | 7,575 | | 26-Nov | 6,705 | |
| 27-Nov | 7,166 | 7,605 | | 27-Nov | 6,725 | |
| 28-Nov | 7,748 | 7,571 | | 28-Nov | 6,718 | |
| 29-Nov | 7,677 | 7,529 | | 29-Nov | 6,677 | |
| 30-Nov | 9,244 | 7,774 | | 30-Nov | 6,629 | |
| 1-Dec | 8,541 | 7,941 | | 1-Dec | 6,870 | |
| 2-Dec | 9,671 | 8,299 | | 2-Dec | 7,014 | |
| 3-Dec | 7,962 | 8,287 | | 3-Dec | 7,372 | |
| 4-Dec | 7,977 | 8,403 | | 4-Dec | 7,367 | |
| 5-Dec | 8,367 | 8,491 | | 5-Dec | 7,481 | |

| Date | | | Date | |
|---|---|---|---|---|
| 6-Dec | 8,422 | **8,598** | 6-Dec | 7,562 |
| 7-Dec | 9,352 | **8,613** | 7-Dec | 7,657 |
| 8-Dec | 9,419 | **8,739** | 8-Dec | 7,666 |
| 9-Dec | 9,520 | **8,717** | 9-Dec | 7,786 |
| 10-Dec | 9,156 | **8,888** | 10-Dec | 7,752 |
| 11-Dec | 8,874 | **9,016** | 11-Dec | 7,903 |
| 12-Dec | 8,810 | **9,079** | 12-Dec | 8,018 |
| 13-Dec | 9,093 | **9,175** | 13-Dec | 8,081 |
| 14-Dec | 9,319 | **9,170** | 14-Dec | 8,175 |
| 15-Dec | 9,137 | **9,130** | 15-Dec | 8,159 |
| 16-Dec | 7,861 | **8,893** | 16-Dec | 8,125 |
| 17-Dec | 7,895 | **8,713** | 17-Dec | 7,890 |
| 18-Dec | 7,788 | **8,558** | 18-Dec | 7,713 |
| 19-Dec | 8,352 | **8,492** | 19-Dec | 7,570 |
| 20-Dec | 9,564 | **8,559** | 20-Dec | 7,498 |
| 21-Dec | 9,469 | **8,581** | 21-Dec | 7,569 |
| 22-Dec | 9,102 | **8,576** | 22-Dec | 7,590 |
| 23-Dec | 8,330 | **8,643** | 23-Dec | 7,584 |
| 24-Dec | 7,130 | **8,534** | 24-Dec | 7,648 |
| 25-Dec | 4,381 | **8,047** | 25-Dec | 7,549 |
| 26-Dec | 5,911 | **7,698** | 26-Dec | 7,068 |
| 27-Dec | 7,137 | **7,351** | 27-Dec | 6,740 |
| 28-Dec | 6,955 | **6,992** | 28-Dec | 6,385 |
| 29-Dec | 6,497 | **6,620** | 29-Dec | 6,025 |
| 30-Dec | 5,745 | **6,251** | 30-Dec | 5,658 |
| 31-Dec | 6,275 | **6,129** | 31-Dec | 5,291 |

CLP_AR_002403

7,700 per week (early November) to nearly 8,800 per week (mid-December), a change not predicted by normal seasonal effects.

**seasonal pattern**

Month over month change from November to December for all of FY 2013 – FY2022 averaged negative 2 percent. OIS

Average month over month change 2013 -    -2%

| Fiscal Year | 10 | 11 | 12 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2013 | 28929 | 27636 | 23243 | 26921 | 35042 | 47293 | 48212 | 43856 | 34436 | 33230 | 33797 | 31802 |
| 2014 | 35312 | 31896 | 29528 | 28668 | 36403 | 49596 | 51502 | 60683 | 57861 | 40708 | 31388 | 25825 |
| 2015 | 26450 | 24641 | 25019 | 21514 | 24376 | 29791 | 29750 | 31576 | 29303 | 28388 | 30239 | 30286 |
| 2016 | 32724 | 32838 | 37014 | 23758 | 26072 | 33316 | 38089 | 40337 | 34450 | 33723 | 37048 | 39501 |
| 2017 | 46184 | 47211 | 43251 | 31576 | 18754 | 12195 | 11127 | 14519 | 16087 | 18187 | 22288 | 22537 |
| 2018 | 25488 | 29085 | 28995 | 25975 | 26666 | 37390 | 38243 | 40339 | 34089 | 31299 | 37524 | 41486 |
| 2019 | 51005 | 51857 | 50751 | 47979 | 66883 | 92833 | 99273 | 132856 | 94902 | 71978 | 50684 | 40507 |
| 2020 | 35402 | 33524 | 32853 | 29205 | 30077 | 30389 | 16182 | 21593 | 30816 | 38556 | 47276 | 54762 |
| 2021 | 69032 | 69169 | 71141 | 75316 | 97643 | 169216 | 173699 | 172654 | 178649 | 200658 | 196514 | 185515 |
| 2022 | 159113 | 167015 | 170602 | 147877 | 159170 | 211181 | 203504 | 224371 | 192399 | 181834 | 181774 | 207597 |
| 2023 | 204885 | 207448 | 221710 | 128936 | 130024 | 162317 | | | | | | |
| Grand Tot: | 714524 | 722320 | 734107 | 587725 | 651110 | 875517 | 709581 | 782784 | 702992 | 678561 | 668532 | 679818 |

|  | Month-over month change: November - December |
|---|---|
| 2013 | -0.15896 |
| 2014 | -0.07424 |
| 2015 | 0.01534 |
| 2016 | 0.12717 |
| 2017 | -0.08388 |
| 2018 | -0.00309 |
| 2019 | -0.02133 |
| 2020 | -0.02002 |
| 2021 | 0.02851 |
| 2022 | 0.021477 |
| 2023 | 0.06875 |

CLP_AR_002404

While a number of factors make it particularly difficult to precisely project the numbers of migrants who would seek to cross the SWB without authorization or present at a U.S. port of entry ("POE") without documents sufficient for admission afte
DHS SWB Encounter Planning Model generated April 18, 2023.  The complexity of international migration limits the Department's ability to precisely project border encounters under the best of circumstances.  The current period is characterized b
V1

**FOUO**
**Blended Projections, Totals**
Assumptions:                          Title 42, CHNV returns to Mexico, and CHNV paroles end May 11. NPRM not implemented.

Projection Type:                      Planning. All projections are for planning purposes, showing what OIS estimates may happen under these assumptions. Effects of these policy assumptions are also based on best available info
                                      Operational confidence intervals (not assuming growing uncertainty over time) are used to quantify model uncertainty.

                                      Users should not treat these results as a precise statement of what will happen.

|  | 23-Apr | 23-May | 23-Jun | 23-Jul | 23-Aug | 23-Sep | Total |
|---|---|---|---|---|---|---|---|
| **Total** | | | | | | | |
| **Projection** | **5,392** | **6,768** | **7,527** | **6,878** | **7,119** | **7,712** | **6,900** |
| Moderately High | 6,817 | 8,147 | 8,953 | 8,257 | 8,499 | 9,137 | 8,301 |
| Moderately Low | 4,098 | 5,407 | 6,130 | 5,511 | 5,750 | 6,423 | 5,553 |
| High | 8,186 | 9,471 | 10,321 | 9,581 | 9,823 | 10,505 | 9,647 |
| Low | 3,208 | 4,174 | 4,824 | 4,252 | 4,494 | 5,203 | 4,358 |
| **FM** | | | | | | | |
| **Projection** | **1,145** | **2,089** | **2,787** | **2,244** | **2,326** | **2,466** | **2,177** |
| Moderately High | 1,826 | 2,748 | 3,468 | 2,903 | 2,985 | 3,147 | 2,847 |
| Moderately Low | 584 | 1,449 | 2,127 | 1,598 | 1,670 | 1,921 | 1,558 |
| High | 2,480 | 3,381 | 4,122 | 3,536 | 3,618 | 3,801 | 3,490 |
| Low | 266 | 893 | 1,522 | 1,019 | 1,099 | 1,408 | 1,034 |
| **SA** | | | | | | | |
| **Projection** | **3,814** | **4,243** | **4,233** | **4,182** | **4,335** | **4,769** | **4,263** |
| Moderately High | 4,521 | 4,927 | 4,940 | 4,866 | 5,020 | 5,476 | 4,958 |
| Moderately Low | 3,118 | 3,559 | 3,532 | 3,498 | 3,658 | 4,062 | 3,571 |
| High | 5,200 | 5,584 | 5,619 | 5,523 | 5,677 | 6,155 | 5,626 |
| Low | 2,578 | 2,916 | 2,867 | 2,852 | 3,007 | 3,391 | 2,935 |
| **UC** | | | | | | | |
| **Projection** | **433** | **436** | **507** | **452** | **458** | **476** | **460** |
| Moderately High | 470 | 472 | 545 | 488 | 493 | 513 | 497 |
| Moderately Low | 397 | 400 | 470 | 416 | 422 | 439 | 424 |
| High | 506 | 506 | 580 | 522 | 528 | 549 | 532 |
| Low | 363 | 366 | 435 | 382 | 387 | 404 | 389 |
| **HHS Referrals** | | | | | | | |
| **Projection** | **326** | **338** | **397** | **352** | **347** | **356** | **353** |
| Moderately High | 356 | 367 | 427 | 381 | 376 | 387 | 382 |
| Moderately Low | 297 | 309 | 367 | 323 | 318 | 327 | 324 |
| High | 459 | 435 | 488 | 424 | 444 | 450 | 450 |
| Low | 270 | 282 | 339 | 295 | 291 | 299 | 296 |

CLP_AR_002405

CLP_AR_002406

r the lifting of the Title 42 public health Order, DHS encounter projections and planning models from early April suggest that encounters could rise to 11,000 encounters per day, absent policy changes and absent a viable mechanism for removing Cuban y greater than usual uncertainty due to ongoing changes in the major migration source countries (i.e., the shift from Mexico and Northern Central America to new countries of origin, discussed further below), the growing impact of climate change on m

rmation.

CLP_AR_002407

, Haitian, Nicaraguan, and Venezuelan ("CHNV") nationals who do not have a valid protection claim

ligration, political instability in several source countries, the evolving recovery from the COVID pandemic, and uncertainty generated by border-related litigation, among other factors.OIS leads an interagency SWB Encounter Projections Working Group t

CLP_AR_002408

that generates encounter projections every 2-4 weeks, with ongoing refinements to the model based on feedback from the working group and model diagnostics.  The enterprise encounter projection utilizes a mixed method blended model that combin

CLP_AR_002409

…es a Bayesian structural time series sta

CLP_AR_002410

Quote: As discussed in greater detail below, data indicate that recently announced enforcement processes, as applied to CHNV nationals, which couple new parole processes with prompt returns of those who attempt to cross the SWB witho

Footnote: In the week prior to the announcement of the parole processes (ending October 12, 2022 for Venezuela and January 6, 2023 for Cuba, Haiti, and Nicaragua), the daily average of CHNV encounters was nearly 2,000 between POEs. A

Filter: SWB; beginning Jan 11, 23 - remove CBPOne Appointments

**Daily average week prior to announcement**

| Cuba | Haiti | Nicaragua | Venezuela | CHNV |
|---|---|---|---|---|
| 666 | 2 | 241 | 1088 | 1996 |

**1 month later**

| | | | | |
|---|---|---|---|---|
| 10 | 1 | 17 | 261 | 288 |

**Last 7 days ending April 10**

| | | | | |
|---|---|---|---|---|
| 6 | 5 | 6 | 179 | 195 |

| | Country of Citizenship | | | | | USBP | |
|---|---|---|---|---|---|---|---|
| | | CHN | | | | | |
| Date | Venezuela | Cuba | Haiti | Nicaragua | CHN Sum | Non-CHNV | |
| 10/1/2022 | 1,240 | 766 | 7 | 606 | 1,379 | 4,048 | 6,667 |
| 10/2/2022 | 1,512 | 984 | 5 | 553 | 1,542 | 3,958 | 7,012 |
| 10/3/2022 | 1,366 | 965 | 10 | 421 | 1,396 | 3,987 | 6,749 |
| 10/4/2022 | 1,260 | 716 | 5 | 833 | 1,554 | 4,945 | 7,759 |
| 10/5/2022 | 1,139 | 1,039 | 5 | 700 | 1,744 | 5,240 | 8,123 |
| 10/6/2022 | 1,174 | 822 | 7 | 913 | 1,742 | 4,711 | 7,627 |
| 10/7/2022 | 1,083 | 829 | 2 | 671 | 1,502 | 4,568 | 7,153 |
| 10/8/2022 | 1,006 | 1,115 | 7 | 800 | 1,922 | 4,244 | 7,172 |
| 10/9/2022 | 1,202 | 937 | 0 | 770 | 1,707 | 3,875 | 6,784 |
| 10/10/2022 | 1,224 | 905 | 8 | 590 | 1,503 | 3,824 | 6,551 |
| 10/11/2022 | 1,128 | 925 | 9 | 578 | 1,512 | 4,354 | 6,994 |
| 10/12/2022 | 796 | 1,074 | 1 | 544 | 1,619 | 4,056 | 6,471 |
| 10/13/2022 | 1,256 | 1,006 | 2 | 642 | 1,650 | 4,360 | 7,266 |
| 10/14/2022 | 1,053 | 936 | 3 | 697 | 1,636 | 4,017 | 6,706 |
| 10/15/2022 | 834 | 692 | 4 | 694 | 1,390 | 3,640 | 5,864 |
| 10/16/2022 | 484 | 640 | 1 | 633 | 1,274 | 3,530 | 5,288 |
| 10/17/2022 | 298 | 746 | 7 | 514 | 1,267 | 4,039 | 5,604 |
| 10/18/2022 | 185 | 613 | 1 | 487 | 1,101 | 4,636 | 5,922 |
| 10/19/2022 | 156 | 897 | 4 | 659 | 1,560 | 4,417 | 6,133 |
| 10/20/2022 | 159 | 911 | 4 | 564 | 1,479 | 4,797 | 6,435 |
| 10/21/2022 | 132 | 1,027 | 1 | 795 | 1,823 | 4,583 | 6,538 |
| 10/22/2022 | 145 | 966 | 2 | 656 | 1,624 | 4,264 | 6,033 |
| 10/23/2022 | 160 | 1,054 | 4 | 554 | 1,612 | 4,207 | 5,979 |
| 10/24/2022 | 247 | 830 | 3 | 480 | 1,313 | 4,261 | 5,821 |
| 10/25/2022 | 296 | 1,089 | 3 | 758 | 1,850 | 5,094 | 7,240 |
| 10/26/2022 | 415 | 798 | 1 | 710 | 1,509 | 4,740 | 6,664 |
| 10/27/2022 | 301 | 1,107 | 3 | 661 | 1,771 | 4,897 | 6,969 |
| 10/28/2022 | 408 | 1,078 | 1 | 855 | 1,934 | 4,406 | 6,748 |
| 10/29/2022 | 405 | 1,267 | 1 | 978 | 2,246 | 4,430 | 7,081 |
| 10/30/2022 | 331 | 1,066 | 10 | 859 | 1,935 | 3,332 | 5,598 |

| | CHN | non-CHNV |
|---|---|---|
| 1/1/2023 | 467 | 1,980 |
| 1/2/2023 | 691 | 2,106 |
| 1/3/2023 | 1,046 | 2,606 |
| 1/4/2023 | 766 | 2,297 |
| 1/5/2023 | 928 | 2,577 |
| 1/6/2023 | 800 | 2,725 |
| 1/7/2023 | 853 | 2,813 |
| 1/8/2023 | 691 | 2,667 |
| 1/9/2023 | 575 | 2,946 |
| 1/10/2023 | 264 | 3,757 |
| 1/11/2023 | 354 | 3,930 |
| 1/12/2023 | 285 | 3,981 |
| 1/13/2023 | 235 | 4,007 |
| 1/14/2023 | 213 | 4,244 |
| 1/15/2023 | 188 | 3,612 |
| 1/16/2023 | 114 | 3,747 |
| 1/17/2023 | 164 | 4,240 |
| 1/18/2023 | 110 | 4,542 |
| 1/19/2023 | 158 | 4,201 |
| 1/20/2023 | 111 | 4,495 |
| 1/21/2023 | 73 | 4,362 |
| 1/22/2023 | 91 | 4,042 |
| 1/23/2023 | 49 | 4,443 |
| 1/24/2023 | 49 | 4,240 |
| 1/25/2023 | 46 | 4,745 |
| 1/26/2023 | 62 | 4,709 |
| 1/27/2023 | 43 | 4,952 |
| 1/28/2023 | 39 | 4,756 |
| 1/29/2023 | 37 | 4,087 |
| 1/30/2023 | 43 | 4,418 |

| | Ven | non-CHNV |
|---|---|---|
| 10/1/2022 | 1,240 | 4,048 |
| 10/2/2022 | 1,512 | 3,958 |
| 10/3/2022 | 1,366 | 3,987 |
| 10/4/2022 | 1,260 | 4,945 |
| 10/5/2022 | 1,139 | 5,240 |
| 10/6/2022 | 1,174 | 4,711 |
| 10/7/2022 | 1,083 | 4,568 |
| 10/8/2022 | 1,006 | 4,244 |
| 10/9/2022 | 1,202 | 3,875 |
| 10/10/2022 | 1,224 | 3,824 |
| 10/11/2022 | 1,128 | 4,354 |
| 10/12/2022 | 796 | 4,056 |
| 10/13/2022 | 1,256 | 4,360 |
| 10/14/2022 | 1,053 | 4,017 |
| 10/15/2022 | 834 | 3,640 |
| 10/16/2022 | 484 | 3,530 |
| 10/17/2022 | 298 | 4,039 |
| 10/18/2022 | 185 | 4,636 |
| 10/19/2022 | 156 | 4,417 |
| 10/20/2022 | 159 | 4,797 |
| 10/21/2022 | 132 | 4,583 |
| 10/22/2022 | 145 | 4,264 |
| 10/23/2022 | 160 | 4,207 |
| 10/24/2022 | 247 | 4,261 |
| 10/25/2022 | 296 | 5,094 |
| 10/26/2022 | 415 | 4,740 |
| 10/27/2022 | 301 | 4,897 |
| 10/28/2022 | 408 | 4,406 |
| 10/29/2022 | 405 | 4,430 |
| 10/30/2022 | 331 | 3,332 |
| 10/31/2022 | 430 | 3,769 |
| Nov-2022 | 6,753 | 131,790 |
| Dec-2022 | 6,183 | 137,518 |

UIP data pulled 4/13/

| | CUBA | HAITI |
|---|---|---|
| 4-Apr | 3 | 4 |
| 5-Apr | 6 | 1 |
| 6-Apr | 12 | 3 |
| 7-Apr | 6 | 2 |
| 8-Apr | 2 | 7 |
| 9-Apr | 7 | 5 |
| 10-Apr | 3 | 11 |
| daily avera | 6 | 5 |

CLP_AR_002411

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/31/2022 | 430 | 1,011 | 3 | 721 | 1,735 | 3,769 | 5,934 | | Jan-2023 | 2,344 | 117,027 |
| 11/1/2022 | 412 | 1,106 | 5 | 1,131 | 2,242 | 4,194 | 6,848 | | Feb-2023 | 1,455 | 127,972 |
| 11/2/2022 | 331 | 1,166 | 3 | 1,210 | 2,379 | 4,561 | 7,271 | | Mar-2023 | 3,301 | 158,506 |
| 11/3/2022 | 305 | 898 | 2 | 686 | 1,586 | 4,166 | 6,057 | | Apr 1-15, 2023 | | |
| 11/4/2022 | 348 | 1,154 | 0 | 983 | 2,137 | 4,380 | 6,865 | | | | |
| 11/5/2022 | 250 | 1,066 | 0 | 681 | 1,747 | 4,074 | 6,071 | | | | |
| 11/6/2022 | 239 | 1,133 | 3 | 1,506 | 2,642 | 4,032 | 6,913 | | | | |
| 11/7/2022 | 265 | 869 | 0 | 994 | 1,863 | 4,293 | 6,421 | | | | |
| 11/8/2022 | 263 | 1,068 | 6 | 1,167 | 2,241 | 4,984 | 7,488 | | | | |
| 11/9/2022 | 262 | 935 | 1 | 902 | 1,838 | 4,477 | 6,577 | | | | |
| 11/10/2022 | 262 | 1,055 | 0 | 1,167 | 2,222 | 4,735 | 7,219 | | | | |
| 11/11/2022 | 341 | 1,425 | 4 | 956 | 2,385 | 4,871 | 7,597 | | | | |
| 11/12/2022 | 192 | 1,142 | 0 | 846 | 1,988 | 4,398 | 6,578 | | | | |
| 11/13/2022 | 197 | 1,113 | 3 | 915 | 2,031 | 3,964 | 6,192 | | | | |
| 11/14/2022 | 158 | 1,543 | 0 | 972 | 2,515 | 4,287 | 6,960 | | | | |
| 11/15/2022 | 168 | 1,200 | 1 | 1,091 | 2,292 | 4,744 | 7,204 | | | | |
| 11/16/2022 | 498 | 850 | 1 | 1,219 | 2,070 | 4,674 | 7,242 | | | | |
| 11/17/2022 | 1,074 | 1,492 | 1 | 1,096 | 2,589 | 5,004 | 8,667 | | | | |
| 11/18/2022 | 212 | 985 | 1 | 955 | 1,941 | 4,850 | 7,003 | | | | |
| 11/19/2022 | 91 | 1,555 | 0 | 1,206 | 2,761 | 4,171 | 7,023 | | | | |
| 11/20/2022 | 118 | 1,210 | 0 | 1,218 | 2,428 | 3,801 | 6,347 | | | | |
| 11/21/2022 | 84 | 1,443 | 1 | 1,424 | 2,868 | 4,141 | 7,093 | | | | |
| 11/22/2022 | 126 | 1,048 | 2 | 1,280 | 2,330 | 4,629 | 7,085 | | | | |
| 11/23/2022 | 81 | 1,273 | 0 | 1,012 | 2,285 | 4,270 | 6,636 | | | | |
| 11/24/2022 | 60 | 1,094 | 0 | 1,223 | 2,317 | 4,150 | 6,527 | | | | |
| 11/25/2022 | 51 | 987 | 1 | 1,299 | 2,287 | 3,889 | 6,227 | | | | |
| 11/26/2022 | 55 | 1,387 | 0 | 1,274 | 2,661 | 4,442 | 7,158 | | | | |
| 11/27/2022 | 75 | 827 | 1 | 1,686 | 2,514 | 3,713 | 6,302 | | | | |
| 11/28/2022 | 65 | 1,006 | 0 | 1,334 | 2,340 | 4,397 | 6,802 | | | | |
| 11/29/2022 | 83 | 1,046 | 0 | 1,064 | 2,110 | 4,557 | 6,750 | | | | |
| 11/30/2022 | 87 | 1,598 | 0 | 1,698 | 3,296 | 4,942 | 8,325 | | | | |
| 12/1/2022 | 102 | 1,275 | 2 | 1,336 | 2,613 | 4,817 | 7,532 | | | | |
| 12/2/2022 | 95 | 1,614 | 1 | 1,720 | 3,335 | 5,306 | 8,736 | | | | |
| 12/3/2022 | 79 | 1,464 | 0 | 1,426 | 2,890 | 4,150 | 7,119 | | | | |
| 12/4/2022 | 126 | 1,712 | 1 | 1,298 | 3,011 | 3,963 | 7,100 | | | | |
| 12/5/2022 | 120 | 1,320 | 2 | 1,594 | 2,916 | 4,333 | 7,369 | | | | |
| 12/6/2022 | 84 | 1,151 | 0 | 1,572 | 2,723 | 4,608 | 7,415 | | | | |
| 12/7/2022 | 144 | 1,698 | 1 | 1,809 | 3,508 | 4,738 | 8,390 | | | | |
| 12/8/2022 | 49 | 1,690 | 0 | 1,813 | 3,503 | 4,819 | 8,371 | | | | |
| 12/9/2022 | 88 | 1,944 | 0 | 1,592 | 3,536 | 4,873 | 8,497 | | | | |
| 12/10/2022 | 101 | 1,786 | 1 | 1,758 | 3,545 | 4,535 | 8,181 | | | | |
| 12/11/2022 | 161 | 1,487 | 1 | 1,606 | 3,094 | 4,647 | 7,902 | | | | |
| 12/12/2022 | 114 | 1,463 | 2 | 1,699 | 3,164 | 4,533 | 7,811 | | | | |
| 12/13/2022 | 157 | 1,459 | 2 | 1,548 | 3,009 | 4,907 | 8,073 | | | | |
| 12/14/2022 | 116 | 1,601 | 0 | 1,555 | 3,156 | 5,009 | 8,281 | | | | |
| 12/15/2022 | 145 | 1,547 | 2 | 1,447 | 2,996 | 4,991 | 8,132 | | | | |
| 12/16/2022 | 91 | 1,178 | 0 | 699 | 1,877 | 4,881 | 6,849 | | | | |

CLP_AR_002412

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 12/17/2022 | 146 | 1,444 | 0 | 996 | 2,440 | 4,354 | 6,940 |
| 12/18/2022 | 187 | 1,398 | 2 | 909 | 2,309 | 4,408 | 6,904 |
| 12/19/2022 | 231 | 1,538 | 1 | 867 | 2,406 | 4,672 | 7,309 |
| 12/20/2022 | 254 | 1,336 | 1 | 1,201 | 2,538 | 5,776 | 8,568 |
| 12/21/2022 | 362 | 1,341 | 0 | 1,122 | 2,463 | 5,606 | 8,431 |
| 12/22/2022 | 723 | 1,131 | 1 | 933 | 2,065 | 5,298 | 8,086 |
| 12/23/2022 | 267 | 1,729 | 0 | 817 | 2,546 | 4,488 | 7,301 |
| 12/24/2022 | 306 | 1,181 | 0 | 1,004 | 2,185 | 3,756 | 6,247 |
| 12/25/2022 | 254 | 586 | 5 | 290 | 881 | 2,397 | 3,532 |
| 12/26/2022 | 234 | 944 | 3 | 501 | 1,448 | 3,331 | 5,013 |
| 12/27/2022 | 353 | 1,382 | 1 | 493 | 1,876 | 3,855 | 6,084 |
| 12/28/2022 | 247 | 1,056 | 1 | 590 | 1,647 | 4,020 | 5,914 |
| 12/29/2022 | 257 | 1,176 | 0 | 390 | 1,566 | 3,689 | 5,512 |
| 12/30/2022 | 263 | 705 | 0 | 397 | 1,102 | 3,371 | 4,736 |
| 12/31/2022 | 327 | 1,280 | 1 | 380 | 1,661 | 3,387 | 5,375 |
| 1/1/2023 | 309 | 289 | 3 | 175 | 467 | 1,980 | 2,756 |
| 1/2/2023 | 280 | 487 | 1 | 203 | 691 | 2,106 | 3,077 |
| 1/3/2023 | 270 | 795 | 1 | 250 | 1,046 | 2,606 | 3,922 |
| 1/4/2023 | 366 | 592 | 3 | 171 | 766 | 2,297 | 3,429 |
| 1/5/2023 | 142 | 591 | 3 | 334 | 928 | 2,577 | 3,647 |
| 1/6/2023 | 98 | 625 | 0 | 175 | 800 | 2,725 | 3,623 |
| 1/7/2023 | 77 | 679 | 2 | 172 | 853 | 2,813 | 3,743 |
| 1/8/2023 | 61 | 574 | 0 | 117 | 691 | 2,667 | 3,419 |
| 1/9/2023 | 70 | 450 | 1 | 124 | 575 | 2,946 | 3,591 |
| 1/10/2023 | 73 | 161 | 1 | 102 | 264 | 3,757 | 4,094 |
| 1/11/2023 | 56 | 189 | 5 | 160 | 354 | 3,930 | 4,340 CBP One Removed |
| 1/12/2023 | 57 | 114 | 0 | 171 | 285 | 3,981 | 4,323 |
| 1/13/2023 | 35 | 80 | 0 | 155 | 235 | 4,007 | 4,277 |
| 1/14/2023 | 50 | 112 | 6 | 95 | 213 | 4,244 | 4,507 |
| 1/15/2023 | 41 | 66 | 0 | 122 | 188 | 3,612 | 3,841 |
| 1/16/2023 | 43 | 19 | 4 | 91 | 114 | 3,747 | 3,904 |
| 1/17/2023 | 21 | 42 | 0 | 122 | 164 | 4,240 | 4,425 |
| 1/18/2023 | 28 | 26 | 2 | 82 | 110 | 4,542 | 4,680 |
| 1/19/2023 | 22 | 56 | 0 | 102 | 158 | 4,201 | 4,381 |
| 1/20/2023 | 32 | 23 | 1 | 87 | 111 | 4,495 | 4,638 |
| 1/21/2023 | 24 | 29 | 3 | 41 | 73 | 4,362 | 4,459 |
| 1/22/2023 | 24 | 33 | 4 | 54 | 91 | 4,042 | 4,157 |
| 1/23/2023 | 20 | 10 | 2 | 37 | 49 | 4,443 | 4,512 |
| 1/24/2023 | 8 | 27 | 2 | 20 | 49 | 4,240 | 4,297 |
| 1/25/2023 | 35 | 17 | 0 | 29 | 46 | 4,745 | 4,826 |
| 1/26/2023 | 17 | 23 | 0 | 39 | 62 | 4,709 | 4,788 |
| 1/27/2023 | 11 | 24 | 0 | 19 | 43 | 4,952 | 5,006 |
| 1/28/2023 | 18 | 19 | 1 | 19 | 39 | 4,756 | 4,813 |
| 1/29/2023 | 30 | 15 | 0 | 22 | 37 | 4,087 | 4,154 |
| 1/30/2023 | 10 | 13 | 1 | 29 | 43 | 4,418 | 4,471 |
| 1/31/2023 | 16 | 8 | 1 | 11 | 20 | 4,800 | 4,836 |
| 2/1/2023 | 11 | 10 | 1 | 20 | 31 | 4,642 | 4,684 |

CLP_AR_002413

| Date | | | | | | | |
|---|---|---|---|---|---|---|---|
| 2/2/2023 | 17 | 4 | 0 | 20 | 24 | 4,637 | 4,678 |
| 2/3/2023 | 8 | 12 | 0 | 24 | 36 | 4,667 | 4,711 |
| 2/4/2023 | 46 | 6 | 3 | 8 | 17 | 4,178 | 4,241 |
| 2/5/2023 | 32 | 10 | 1 | 16 | 27 | 4,009 | 4,068 |
| 2/6/2023 | 77 | 17 | 0 | 23 | 40 | 4,414 | 4,531 |
| 2/7/2023 | 20 | 4 | 1 | 18 | 23 | 5,054 | 5,097 |
| 2/8/2023 | 254 | 4 | 0 | 27 | 31 | 4,770 | 5,055 |
| 2/9/2023 | 327 | 7 | 0 | 13 | 20 | 4,821 | 5,168 |
| 2/10/2023 | 144 | 7 | 0 | 7 | 14 | 4,461 | 4,619 |
| 2/11/2023 | 40 | 4 | 2 | 5 | 11 | 4,231 | 4,282 |
| 2/12/2023 | 42 | 10 | 0 | 17 | 27 | 3,969 | 4,038 |
| 2/13/2023 | 24 | 14 | 0 | 20 | 34 | 4,630 | 4,688 |
| 2/14/2023 | 22 | 8 | 0 | 29 | 37 | 4,674 | 4,733 |
| 2/15/2023 | 22 | 4 | 1 | 8 | 13 | 4,608 | 4,643 |
| 2/16/2023 | 26 | 6 | 1 | 19 | 26 | 4,663 | 4,715 |
| 2/17/2023 | 21 | 8 | 1 | 11 | 20 | 4,708 | 4,749 |
| 2/18/2023 | 20 | 3 | 1 | 9 | 13 | 4,482 | 4,515 |
| 2/19/2023 | 11 | 1 | 0 | 17 | 18 | 4,325 | 4,354 |
| 2/20/2023 | 43 | 8 | 0 | 6 | 14 | 4,388 | 4,445 |
| 2/21/2023 | 30 | 2 | 5 | 13 | 20 | 4,633 | 4,683 |
| 2/22/2023 | 8 | 2 | 0 | 9 | 11 | 4,456 | 4,475 |
| 2/23/2023 | 32 | 1 | 0 | 17 | 18 | 4,931 | 4,981 |
| 2/24/2023 | 37 | 3 | 0 | 6 | 9 | 4,971 | 5,017 |
| 2/25/2023 | 21 | 8 | 0 | 8 | 16 | 4,760 | 4,797 |
| 2/26/2023 | 59 | 3 | 0 | 8 | 11 | 4,121 | 4,191 |
| 2/27/2023 | 21 | 3 | 3 | 13 | 19 | 4,311 | 4,351 |
| 2/28/2023 | 40 | 7 | 1 | 9 | 17 | 5,458 | 5,515 |
| 3/1/2023 | 17 | 6 | 0 | 7 | 13 | 5,429 | 5,459 |
| 3/2/2023 | 21 | 2 | 1 | 10 | 13 | 5,099 | 5,133 |
| 3/3/2023 | 43 | 4 | 2 | 10 | 16 | 5,359 | 5,418 |
| 3/4/2023 | 15 | 10 | 7 | 10 | 27 | 5,226 | 5,268 |
| 3/5/2023 | 42 | 3 | 5 | 5 | 13 | 4,925 | 4,980 |
| 3/6/2023 | 72 | 4 | 1 | 4 | 9 | 4,828 | 4,909 |
| 3/7/2023 | 31 | 8 | 4 | 6 | 18 | 6,064 | 6,113 |
| 3/8/2023 | 48 | 4 | 7 | 11 | 22 | 5,280 | 5,350 |
| 3/9/2023 | 40 | 4 | 5 | 3 | 12 | 5,310 | 5,362 |
| 3/10/2023 | 15 | 2 | 12 | 2 | 16 | 5,350 | 5,381 |
| 3/11/2023 | 31 | 0 | 12 | 1 | 13 | 5,022 | 5,066 |
| 3/12/2023 | 78 | 2 | 9 | 5 | 16 | 4,467 | 4,561 |
| 3/13/2023 | 66 | 3 | 3 | 9 | 15 | 4,594 | 4,675 |
| 3/14/2023 | 66 | 2 | 17 | 10 | 29 | 5,368 | 5,463 |
| 3/15/2023 | 30 | 3 | 13 | 3 | 19 | 5,156 | 5,205 |
| 3/16/2023 | 41 | 0 | 18 | 9 | 27 | 5,450 | 5,518 |
| 3/17/2023 | 21 | 2 | 8 | 4 | 14 | 4,772 | 4,807 |
| 3/18/2023 | 37 | 1 | 7 | 7 | 15 | 4,874 | 4,926 |
| 3/19/2023 | 61 | 5 | 4 | 2 | 11 | 4,095 | 4,167 |
| 3/20/2023 | 91 | 0 | 3 | 15 | 18 | 5,032 | 5,141 |

CLP_AR_002414

| | | | | | | |
|---|---|---|---|---|---|---|
| 3/21/2023 | 68 | 3 | 1 | 4 | 8 | 5,433 | 5,509 |
| 3/22/2023 | 53 | 3 | 4 | 2 | 9 | 4,910 | 4,972 |
| 3/23/2023 | 38 | 1 | 5 | 12 | 18 | 5,376 | 5,432 |
| 3/24/2023 | 28 | 5 | 1 | 8 | 14 | 5,091 | 5,133 |
| 3/25/2023 | 58 | 4 | 4 | 10 | 18 | 5,194 | 5,270 |
| 3/26/2023 | 108 | 2 | 1 | 5 | 8 | 5,013 | 5,129 |
| 3/27/2023 | 162 | 4 | 4 | 4 | 12 | 5,200 | 5,374 |
| 3/28/2023 | 125 | 1 | 2 | 5 | 8 | 5,732 | 5,865 |
| 3/29/2023 | 560 | 7 | 5 | 17 | 29 | 5,419 | 6,008 |
| 3/30/2023 | 1,006 | 14 | 3 | 13 | 30 | 4,888 | 5,924 |
| 3/31/2023 | 229 | 8 | 1 | 11 | 20 | 4,550 | 4,799 |

CLP_AR_002415

ut utilizing these processes, are effectively deterring irregular migration from those countries to the United States, thus yielding a substantial decrease in encounter numbers for nationals of CHNV countries

month after the parole announcements, daily encounters of CHNV nationals averaged just under 300 encounters. In the most recent seven days ending April 10, 2023, CHNV daily encounters averaged 195. OIS analysis of OIS Persist dataset based on da

23

| NICAR | VENEZ | CHNV |
|---|---|---|
| 3 | 48 | 58 |
| 2 | 69 | 78 |
| 8 | 95 | 118 |
| 7 | 45 | 60 |
| 2 | 83 | 94 |
| 11 | 103 | 126 |
| 8 | 812 | 834 |
| | | |
| 6 | 179 | 195 |

Daily average week prior to announcement

| Cuba | Haiti | Nicaragua | Venezuela | CHNV |
|---|---|---|---|---|
| 665.5714 | 1.714286 | 241.1429 | 1087.571 | 1996 |

1 month later

| | | | | |
|---|---|---|---|---|
| 9.571429 | 0.857143 | 17.42857 | 260.5714 | 288.4286 |

Last 7 days ending April 10

| | | | | |
|---|---|---|---|---|
| 5.571429 | 4.714286 | 5.857143 | 179.2857 | 195.4286 |

CLP_AR_002416

ata through March 31, 2023, and OIS analysis of CBP UIP data downloaded April 13, 2023.

CLP_AR_002417

Quote: In the absence of the policy changes included in the rule, most non-Mexicans processed for expedited removal under Title 8 would likely establish credible fear  and remain in the United States for the foreseeable future despite the fact t

Footnote: Overall, 63 percent of non-Mexicans placed in expedited removal from 2014-2019 made fear claims, and 85 percent of those claiming fear (54 percent of all those placed in ER) established fear or were otherwise placed in section §240

**Final or Most Current Outcomes, Total SW Border Encounters by Fear Claims and Fiscal Year or Month: Fiscal Years 2013 - 2023 YTD (February 2023)**

| MOST CURRENT OUTCOMES | Sum FY 2014 - 2019 non-Mexican encounters | | |
|---|---|---|---|
| Total Encounters[1] | 1,650,462 | | |
| T8 Encounters | 1,650,462 | | |
| T42 Encounters | 0 | | |
| Placed in ER (CBP ER Dispositions) | 651,806 | | |
| APSO fear claims[2] | 413,219 | 63% | |
| Referred to EOIR[3] | 350,000 | 85% | 54% |
| Still in proceedings[4] | 125,644 | | |
| EOIR case completion[5] | 210,623 | | |
| Relief[6] | 35,266 | | |
| Relief on merits[7] | 33,967 | | |
| Other relief[8] | 1,299 | | |
| Removal Order + VD[9] | 126,823 | | |
| Absentia | 48,892 | | |
| Confirmed departure | 4,135 | | |
| No confirmed departure | 44,757 | | |
| Not absentia | 77,931 | | |
| Confirmed departure | 34,994 | | |
| No confirmed departure | 42,937 | | |
| Terminate/Dismiss/closure/other[10] | 48,534 | | |

[1] Excludes accompanied minors, unaccompanied children, and OFO administrative cases including, crewmembers, parolees, and withdrawals.

[2] Includes individuals placed in ER and found to have a credible fear case in USCIS APSO system.

[3] Includes USCIS positive fear determinations, negative fear determinations vacated by EOIR, and case closures referred to EOIR.

[4] Includes cases with no EOIR completion code or completion codes indicating change of venue, transfer, fear vacated, zero bond, BIA appeal, or decision rescinded.

[5] Includes cases with the EOIR completion codes indicating an IJ decision or other completion codes indicating termination, dismissal, administrative closure, failure to prosecute, and other administrative completions.

[6] Includes cases with completion codes for relief on merits and other types of relief.

[7] Includes completion  codes for conditional grants of asylum, grants of asylum, and adjustment of status under various statutory provisions.

[8] Includes completion codes for asylum withholding, statutory withholding of removal, deferral of removal under CAT, withholding of removal under CAT, findings of non-removability, cancellation of removal.

[9] Includes completion codes for removal order, voluntary departure, withdrawal, abandonment, denial, and DHS negative fear decision affirmed.

[10] Includes completion codes for termination, dismissal, administrative closure, failure to prosecute, and other administrative completions.

Notes: Results based on OIS Enforcement Lifecycle methodology as of December 7, 2022. Encounters include USBP apprehensions and OFO inadmissibility determinations on the Southwest Border by year of encounter.

Source: DHS Office of Immigration Statistics Enforcement Lifecycle data as of February 28, 2023.

CLP_AR_002418

hat many of them will not ultimately be granted asylum,  a scenario that would likely incentivize an increasing number of migrants to the United States and further increase the likelihood of sustained, high encounter rates

) removal proceedings as a result of their fear claim. These rates are likely to be higher after May 11, 2023 because of the growing prevalence of extra-regional nationals, who are more likely than Northern Central Americans to make fear claims and to e

establish fear. OIS analysis of OIS Enforcement Lifecycle data based on data through February 28, 2023.

CLP_AR_002420

Quote: A week before the announcement of the Venezuela parole process on October 12, 2022,  Venezuelan encounters between POEs at the SWB averaged over 1,100 a day from October 5–11.  About two weeks after the announcement, Ve

Footnote: OIS analysis of OIS Persist Dataset based on data through March 31, 2023.

Quote: U.S. Customs and Border Protection ("CBP") encountered an average of 106 Venezuelans between POEs per day in March 2023, about one-tenth the number of encounters prior to the announcement of the parole process.

Footnote: OIS analysis of OIS Persist Dataset based on data through March 31, 2023.

Filter: SWB, USBP

| Country of Citizenship | | | | | | USBP |
| | | CHN | | | | |
| | Venezuela | Cuba | Haiti | Nicaragua | CHN Sum | Non-CHNV |
| Date | | | | | | | |
| 10/1/2022 | 1,240 | 766 | 7 | 606 | 1,379 | 4,048 | 6,667 |
| 10/2/2022 | 1,512 | 984 | 5 | 553 | 1,542 | 3,958 | 7,012 |
| 10/3/2022 | 1,366 | 965 | 10 | 421 | 1,396 | 3,987 | 6,749 |
| 10/4/2022 | 1,260 | 716 | 5 | 833 | 1,554 | 4,945 | 7,759 |
| 10/5/2022 | 1,139 | 1,039 | 5 | 700 | 1,744 | 5,240 | 8,123 |
| 10/6/2022 | 1,174 | 822 | 7 | 913 | 1,742 | 4,711 | 7,627 |
| 10/7/2022 | 1,083 | 829 | 2 | 671 | 1,502 | 4,568 | 7,153 |
| 10/8/2022 | 1,006 | 1,115 | 7 | 800 | 1,922 | 4,244 | 7,172 |
| 10/9/2022 | 1,202 | 937 | 0 | 770 | 1,707 | 3,875 | 6,784 |
| 10/10/2022 | 1,224 | 905 | 8 | 590 | 1,503 | 3,824 | 6,551 |
| 10/11/2022 | 1,128 | 925 | 9 | 578 | 1,512 | 4,354 | 6,994 |
| 10/12/2022 | 796 | 1,074 | 1 | 544 | 1,619 | 4,056 | 6,471 |
| 10/13/2022 | 1,256 | 1,006 | 2 | 642 | 1,650 | 4,360 | 7,266 |
| 10/14/2022 | 1,053 | 936 | 3 | 697 | 1,636 | 4,017 | 6,706 |
| 10/15/2022 | 834 | 692 | 4 | 694 | 1,390 | 3,640 | 5,864 |
| 10/16/2022 | 484 | 640 | 1 | 633 | 1,274 | 3,530 | 5,288 |
| 10/17/2022 | 298 | 746 | 7 | 514 | 1,267 | 4,039 | 5,604 |
| 10/18/2022 | 185 | 613 | 1 | 487 | 1,101 | 4,636 | 5,922 |
| 10/19/2022 | 156 | 897 | 4 | 659 | 1,560 | 4,417 | 6,133 |
| 10/20/2022 | 159 | 911 | 4 | 564 | 1,479 | 4,797 | 6,435 |
| 10/21/2022 | 132 | 1,027 | 1 | 795 | 1,823 | 4,583 | 6,538 |
| 10/22/2022 | 145 | 966 | 2 | 656 | 1,624 | 4,264 | 6,033 |
| 10/23/2022 | 160 | 1,054 | 4 | 554 | 1,612 | 4,207 | 5,979 |
| 10/24/2022 | 247 | 830 | 3 | 480 | 1,313 | 4,261 | 5,821 |
| 10/25/2022 | 296 | 1,089 | 0 | 758 | 1,850 | 5,094 | 7,240 |
| 10/26/2022 | 415 | 798 | 1 | 710 | 1,509 | 4,740 | 6,664 |
| 10/27/2022 | 301 | 1,107 | 3 | 661 | 1,771 | 4,897 | 6,969 |
| 10/28/2022 | 408 | 1,078 | 1 | 855 | 1,934 | 4,406 | 6,748 |
| 10/29/2022 | 405 | 1,267 | 1 | 978 | 2,246 | 4,430 | 7,081 |
| 10/30/2022 | 331 | 1,066 | 10 | 859 | 1,935 | 3,332 | 5,598 |
| 10/31/2022 | 430 | 1,011 | 3 | 721 | 1,735 | 3,769 | 5,934 |
| 11/1/2022 | 412 | 1,106 | 5 | 1,131 | 2,242 | 4,194 | 6,848 |
| 11/2/2022 | 331 | 1,166 | 3 | 1,210 | 2,379 | 4,561 | 7,271 |
| 11/3/2022 | 305 | 898 | 2 | 686 | 1,586 | 4,166 | 6,057 |
| 11/4/2022 | 348 | 1,154 | 0 | 983 | 2,137 | 4,380 | 6,865 |
| 11/5/2022 | 250 | 1,066 | 0 | 681 | 1,747 | 4,074 | 6,071 |
| 11/6/2022 | 239 | 1,133 | 3 | 1,506 | 2,642 | 4,032 | 6,913 |

| | |
| Daily Average 10/5-10/11 | 1,137 |
| Daily Average 10/18-10/24 | 169 |
| Daily Average 11/23-11/29 | 67 |
| Daily Average 1/16-1/22 | 28 |
| Daily Average March 2023 | 106 |
| | |
| Daily Average 10/6-10/12 | 1,088 |
| | |
| Daily Average Oct | 704.0 |
| Daily Average Nov | 225.1 |
| Daily Average Jan | 75.6 |
| Daily Average Mar | 106.5 |

| Date | | | | | | | |
|---|---|---|---|---|---|---|---|
| 11/7/2022 | 265 | 869 | 0 | 994 | 1,863 | 4,293 | 6,421 |
| 11/8/2022 | 263 | 1,068 | 6 | 1,167 | 2,241 | 4,984 | 7,488 |
| 11/9/2022 | 262 | 935 | 1 | 902 | 1,838 | 4,477 | 6,577 |
| 11/10/2022 | 262 | 1,055 | 0 | 1,167 | 2,222 | 4,735 | 7,219 |
| 11/11/2022 | 341 | 1,425 | 4 | 956 | 2,385 | 4,871 | 7,597 |
| 11/12/2022 | 192 | 1,142 | 0 | 846 | 1,988 | 4,398 | 6,578 |
| 11/13/2022 | 197 | 1,113 | 3 | 915 | 2,031 | 3,964 | 6,192 |
| 11/14/2022 | 158 | 1,543 | 0 | 972 | 2,515 | 4,287 | 6,960 |
| 11/15/2022 | 168 | 1,200 | 1 | 1,091 | 2,292 | 4,744 | 7,204 |
| 11/16/2022 | 498 | 850 | 1 | 1,219 | 2,070 | 4,674 | 7,242 |
| 11/17/2022 | 1,074 | 1,492 | 1 | 1,096 | 2,589 | 5,004 | 8,667 |
| 11/18/2022 | 212 | 985 | 1 | 955 | 1,941 | 4,850 | 7,003 |
| 11/19/2022 | 91 | 1,555 | 0 | 1,206 | 2,761 | 4,171 | 7,023 |
| 11/20/2022 | 118 | 1,210 | 0 | 1,218 | 2,428 | 3,801 | 6,347 |
| 11/21/2022 | 84 | 1,443 | 1 | 1,424 | 2,868 | 4,141 | 7,093 |
| 11/22/2022 | 126 | 1,048 | 2 | 1,280 | 2,330 | 4,629 | 7,085 |
| 11/23/2022 | 81 | 1,273 | 0 | 1,012 | 2,285 | 4,270 | 6,636 |
| 11/24/2022 | 60 | 1,094 | 0 | 1,223 | 2,317 | 4,150 | 6,527 |
| 11/25/2022 | 51 | 987 | 1 | 1,299 | 2,287 | 3,889 | 6,227 |
| 11/26/2022 | 55 | 1,387 | 0 | 1,274 | 2,661 | 4,442 | 7,158 |
| 11/27/2022 | 75 | 827 | 1 | 1,686 | 2,514 | 3,713 | 6,302 |
| 11/28/2022 | 65 | 1,006 | 0 | 1,334 | 2,340 | 4,397 | 6,802 |
| 11/29/2022 | 83 | 1,046 | 0 | 1,064 | 2,110 | 4,557 | 6,750 |
| 11/30/2022 | 87 | 1,598 | 0 | 1,698 | 3,296 | 4,942 | 8,325 |
| 12/1/2022 | 102 | 1,275 | 2 | 1,336 | 2,613 | 4,817 | 7,532 |
| 12/2/2022 | 95 | 1,614 | 1 | 1,720 | 3,335 | 5,306 | 8,736 |
| 12/3/2022 | 79 | 1,464 | 0 | 1,426 | 2,890 | 4,150 | 7,119 |
| 12/4/2022 | 126 | 1,712 | 1 | 1,298 | 3,011 | 3,963 | 7,100 |
| 12/5/2022 | 120 | 1,320 | 2 | 1,594 | 2,916 | 4,333 | 7,369 |
| 12/6/2022 | 84 | 1,151 | 0 | 1,572 | 2,723 | 4,608 | 7,415 |
| 12/7/2022 | 144 | 1,698 | 1 | 1,809 | 3,508 | 4,738 | 8,390 |
| 12/8/2022 | 49 | 1,690 | 0 | 1,813 | 3,503 | 4,819 | 8,371 |
| 12/9/2022 | 88 | 1,944 | 0 | 1,592 | 3,536 | 4,873 | 8,497 |
| 12/10/2022 | 101 | 1,786 | 1 | 1,758 | 3,545 | 4,535 | 8,181 |
| 12/11/2022 | 161 | 1,487 | 1 | 1,606 | 3,094 | 4,647 | 7,902 |
| 12/12/2022 | 114 | 1,463 | 2 | 1,699 | 3,164 | 4,533 | 7,811 |
| 12/13/2022 | 157 | 1,459 | 2 | 1,548 | 3,009 | 4,907 | 8,073 |
| 12/14/2022 | 116 | 1,601 | 0 | 1,555 | 3,156 | 5,009 | 8,281 |
| 12/15/2022 | 145 | 1,547 | 2 | 1,447 | 2,996 | 4,991 | 8,132 |
| 12/16/2022 | 91 | 1,178 | 0 | 699 | 1,877 | 4,881 | 6,849 |
| 12/17/2022 | 146 | 1,444 | 0 | 996 | 2,440 | 4,354 | 6,940 |
| 12/18/2022 | 187 | 1,398 | 2 | 909 | 2,309 | 4,408 | 6,904 |
| 12/19/2022 | 231 | 1,538 | 1 | 867 | 2,406 | 4,672 | 7,309 |
| 12/20/2022 | 254 | 1,336 | 1 | 1,201 | 2,538 | 5,776 | 8,568 |
| 12/21/2022 | 362 | 1,341 | 0 | 1,122 | 2,463 | 5,606 | 8,431 |
| 12/22/2022 | 723 | 1,131 | 1 | 933 | 2,065 | 5,298 | 8,086 |
| 12/23/2022 | 267 | 1,729 | 0 | 817 | 2,546 | 4,488 | 7,301 |

CLP_AR_002422

| Date | | | | | | | |
|---|---|---|---|---|---|---|---|
| 12/24/2022 | 306 | 1,181 | 0 | 1,004 | 2,185 | 3,756 | 6,247 |
| 12/25/2022 | 254 | 586 | 5 | 290 | 881 | 2,397 | 3,532 |
| 12/26/2022 | 234 | 944 | 3 | 501 | 1,448 | 3,331 | 5,013 |
| 12/27/2022 | 353 | 1,382 | 1 | 493 | 1,876 | 3,855 | 6,084 |
| 12/28/2022 | 247 | 1,056 | 1 | 590 | 1,647 | 4,020 | 5,914 |
| 12/29/2022 | 257 | 1,176 | 0 | 390 | 1,566 | 3,689 | 5,512 |
| 12/30/2022 | 263 | 705 | 0 | 397 | 1,102 | 3,371 | 4,736 |
| 12/31/2022 | 327 | 1,280 | 1 | 380 | 1,661 | 3,387 | 5,375 |
| 1/1/2023 | 309 | 289 | 3 | 175 | 467 | 1,980 | 2,756 |
| 1/2/2023 | 280 | 487 | 1 | 203 | 691 | 2,106 | 3,077 |
| 1/3/2023 | 270 | 795 | 1 | 250 | 1,046 | 2,606 | 3,922 |
| 1/4/2023 | 366 | 592 | 3 | 171 | 766 | 2,297 | 3,429 |
| 1/5/2023 | 142 | 591 | 3 | 334 | 928 | 2,577 | 3,647 |
| 1/6/2023 | 98 | 625 | 0 | 175 | 800 | 2,725 | 3,623 |
| 1/7/2023 | 77 | 679 | 2 | 172 | 853 | 2,813 | 3,743 |
| 1/8/2023 | 61 | 574 | 0 | 117 | 691 | 2,667 | 3,419 |
| 1/9/2023 | 70 | 450 | 1 | 124 | 575 | 2,946 | 3,591 |
| 1/10/2023 | 73 | 161 | 1 | 102 | 264 | 3,757 | 4,094 |
| 1/11/2023 | 56 | 189 | 5 | 160 | 354 | 3,930 | 4,340 |
| 1/12/2023 | 57 | 114 | 0 | 171 | 285 | 3,981 | 4,323 |
| 1/13/2023 | 35 | 80 | 0 | 155 | 235 | 4,007 | 4,277 |
| 1/14/2023 | 50 | 112 | 6 | 95 | 213 | 4,244 | 4,507 |
| 1/15/2023 | 41 | 66 | 0 | 122 | 188 | 3,612 | 3,841 |
| 1/16/2023 | 43 | 19 | 4 | 91 | 114 | 3,747 | 3,904 |
| 1/17/2023 | 21 | 42 | 0 | 122 | 164 | 4,240 | 4,425 |
| 1/18/2023 | 28 | 26 | 2 | 82 | 110 | 4,542 | 4,680 |
| 1/19/2023 | 22 | 56 | 0 | 102 | 158 | 4,201 | 4,381 |
| 1/20/2023 | 32 | 23 | 1 | 87 | 111 | 4,495 | 4,638 |
| 1/21/2023 | 24 | 29 | 3 | 41 | 73 | 4,362 | 4,459 |
| 1/22/2023 | 24 | 33 | 4 | 54 | 91 | 4,042 | 4,157 |
| 1/23/2023 | 20 | 10 | 2 | 37 | 49 | 4,443 | 4,512 |
| 1/24/2023 | 8 | 27 | 2 | 20 | 49 | 4,240 | 4,297 |
| 1/25/2023 | 35 | 17 | 0 | 29 | 46 | 4,745 | 4,826 |
| 1/26/2023 | 17 | 23 | 0 | 39 | 62 | 4,709 | 4,788 |
| 1/27/2023 | 11 | 24 | 0 | 19 | 43 | 4,952 | 5,006 |
| 1/28/2023 | 18 | 19 | 1 | 19 | 39 | 4,756 | 4,813 |
| 1/29/2023 | 30 | 15 | 0 | 22 | 37 | 4,087 | 4,154 |
| 1/30/2023 | 10 | 13 | 1 | 29 | 43 | 4,418 | 4,471 |
| 1/31/2023 | 16 | 8 | 1 | 11 | 20 | 4,800 | 4,836 |
| 2/1/2023 | 11 | 10 | 1 | 20 | 31 | 4,642 | 4,684 |
| 2/2/2023 | 17 | 4 | 0 | 20 | 24 | 4,637 | 4,678 |
| 2/3/2023 | 8 | 12 | 0 | 24 | 36 | 4,667 | 4,711 |
| 2/4/2023 | 46 | 6 | 3 | 8 | 17 | 4,178 | 4,241 |
| 2/5/2023 | 32 | 10 | 1 | 16 | 27 | 4,009 | 4,068 |
| 2/6/2023 | 77 | 17 | 0 | 23 | 40 | 4,414 | 4,531 |
| 2/7/2023 | 20 | 4 | 1 | 18 | 23 | 5,054 | 5,097 |
| 2/8/2023 | 254 | 4 | 0 | 27 | 31 | 4,770 | 5,055 |

CLP_AR_002423

| Date | | | | | | | |
|---|---|---|---|---|---|---|---|
| 2/9/2023 | 327 | 7 | 0 | 13 | 20 | 4,821 | 5,168 |
| 2/10/2023 | 144 | 7 | 0 | 7 | 14 | 4,461 | 4,619 |
| 2/11/2023 | 40 | 4 | 2 | 5 | 11 | 4,231 | 4,282 |
| 2/12/2023 | 42 | 10 | 0 | 17 | 27 | 3,969 | 4,038 |
| 2/13/2023 | 24 | 14 | 0 | 20 | 34 | 4,630 | 4,688 |
| 2/14/2023 | 22 | 8 | 0 | 29 | 37 | 4,674 | 4,733 |
| 2/15/2023 | 22 | 4 | 1 | 8 | 13 | 4,608 | 4,643 |
| 2/16/2023 | 26 | 6 | 1 | 19 | 26 | 4,663 | 4,715 |
| 2/17/2023 | 21 | 8 | 1 | 11 | 20 | 4,708 | 4,749 |
| 2/18/2023 | 20 | 3 | 1 | 9 | 13 | 4,482 | 4,515 |
| 2/19/2023 | 11 | 1 | 0 | 17 | 18 | 4,325 | 4,354 |
| 2/20/2023 | 43 | 8 | 0 | 6 | 14 | 4,388 | 4,445 |
| 2/21/2023 | 30 | 2 | 5 | 13 | 20 | 4,633 | 4,683 |
| 2/22/2023 | 8 | 2 | 0 | 9 | 11 | 4,456 | 4,475 |
| 2/23/2023 | 32 | 1 | 0 | 17 | 18 | 4,931 | 4,981 |
| 2/24/2023 | 37 | 3 | 0 | 6 | 9 | 4,971 | 5,017 |
| 2/25/2023 | 21 | 8 | 0 | 8 | 16 | 4,760 | 4,797 |
| 2/26/2023 | 59 | 3 | 0 | 8 | 11 | 4,121 | 4,191 |
| 2/27/2023 | 21 | 3 | 3 | 13 | 19 | 4,311 | 4,351 |
| 2/28/2023 | 40 | 7 | 1 | 9 | 17 | 5,458 | 5,515 |
| 3/1/2023 | 17 | 6 | 0 | 7 | 13 | 5,429 | 5,459 |
| 3/2/2023 | 21 | 2 | 1 | 10 | 13 | 5,099 | 5,133 |
| 3/3/2023 | 43 | 4 | 2 | 10 | 16 | 5,359 | 5,418 |
| 3/4/2023 | 15 | 10 | 7 | 10 | 27 | 5,226 | 5,268 |
| 3/5/2023 | 42 | 3 | 5 | 5 | 13 | 4,925 | 4,980 |
| 3/6/2023 | 72 | 4 | 1 | 4 | 9 | 4,828 | 4,909 |
| 3/7/2023 | 31 | 8 | 4 | 6 | 18 | 6,064 | 6,113 |
| 3/8/2023 | 48 | 4 | 7 | 11 | 22 | 5,280 | 5,350 |
| 3/9/2023 | 40 | 4 | 5 | 3 | 12 | 5,310 | 5,362 |
| 3/10/2023 | 15 | 2 | 12 | 2 | 16 | 5,350 | 5,381 |
| 3/11/2023 | 31 | 0 | 12 | 1 | 13 | 5,022 | 5,066 |
| 3/12/2023 | 78 | 2 | 9 | 5 | 16 | 4,467 | 4,561 |
| 3/13/2023 | 66 | 3 | 3 | 9 | 15 | 4,594 | 4,675 |
| 3/14/2023 | 66 | 2 | 17 | 10 | 29 | 5,368 | 5,463 |
| 3/15/2023 | 30 | 3 | 13 | 3 | 19 | 5,156 | 5,205 |
| 3/16/2023 | 41 | 0 | 18 | 9 | 27 | 5,450 | 5,518 |
| 3/17/2023 | 21 | 2 | 8 | 4 | 14 | 4,772 | 4,807 |
| 3/18/2023 | 37 | 1 | 7 | 7 | 15 | 4,874 | 4,926 |
| 3/19/2023 | 61 | 5 | 4 | 2 | 11 | 4,095 | 4,167 |
| 3/20/2023 | 91 | 0 | 3 | 15 | 18 | 5,032 | 5,141 |
| 3/21/2023 | 68 | 3 | 1 | 4 | 8 | 5,433 | 5,509 |
| 3/22/2023 | 53 | 3 | 4 | 2 | 9 | 4,910 | 4,972 |
| 3/23/2023 | 38 | 1 | 5 | 12 | 18 | 5,376 | 5,432 |
| 3/24/2023 | 28 | 5 | 1 | 8 | 14 | 5,091 | 5,133 |
| 3/25/2023 | 58 | 4 | 4 | 10 | 18 | 5,194 | 5,270 |
| 3/26/2023 | 108 | 2 | 1 | 5 | 8 | 5,013 | 5,129 |
| 3/27/2023 | 162 | 4 | 4 | 4 | 12 | 5,200 | 5,374 |

CLP_AR_002424

| | | | | | | |
|---|---|---|---|---|---|---|
| **3/28/2023** | 125 | 1 | 2 | 5 | 8 | 5,732 | 5,865 |
| **3/29/2023** | 560 | 7 | 5 | 17 | 29 | 5,419 | 6,008 |
| **3/30/2023** | 1,006 | 14 | 3 | 13 | 30 | 4,888 | 5,924 |
| **3/31/2023** | 229 | 8 | 1 | 11 | 20 | 4,550 | 4,799 |

CLP_AR_002425

nezuelan encounters averaged  under 200 per day between October 18 and 24.

CLP_AR_002426

Quote: Between the announcement of these processes on January 5, 2023, and January 21, the number of daily encounters between POEs of CHN nationals dropped from 928 to 73, a 92 percent decline.

Footnote: OIS Persist based on data through March 31, 2023.

CHN encounters between POEs continued to decline to an average of fewer than 17 per day in March 2023.

OIS Persist based on data through March 31, 2023.

Filter: SWB, USBP

| | USBP | |
|---|---|---|
| | CHN | non-CHNV |
| 12/27/2022 | 1,876 | 3,855 |
| 12/28/2022 | 1,647 | 4,020 |
| 12/29/2022 | 1,566 | 3,689 |
| 12/30/2022 | 1,102 | 3,371 |
| 12/31/2022 | 1,661 | 3,387 |
| 1/1/2023 | 467 | 1,980 |
| 1/2/2023 | 691 | 2,106 |
| 1/3/2023 | 1,046 | 2,606 |
| 1/4/2023 | 766 | 2,297 |
| 1/5/2023 | 928 | 2,577 |
| 1/6/2023 | 800 | 2,725 |
| 1/7/2023 | 853 | 2,813 |
| 1/8/2023 | 691 | 2,667 |
| 1/9/2023 | 575 | 2,946 |
| 1/10/2023 | 264 | 3,757 |
| 1/11/2023 | 354 | 3,930 |
| 1/12/2023 | 285 | 3,981 |
| 1/13/2023 | 235 | 4,007 |
| 1/14/2023 | 213 | 4,244 |
| 1/15/2023 | 188 | 3,612 |
| 1/16/2023 | 114 | 3,747 |
| 1/17/2023 | 164 | 4,240 |
| 1/18/2023 | 110 | 4,542 |
| 1/19/2023 | 158 | 4,201 |
| 1/20/2023 | 111 | 4,495 |
| 1/21/2023 | 73 | 4,362 |
| 1/22/2023 | 91 | 4,042 |
| 1/23/2023 | 49 | 4,443 |
| 1/24/2023 | 49 | 4,240 |
| 1/25/2023 | 46 | 4,745 |
| 1/26/2023 | 62 | 4,709 |
| 1/27/2023 | 43 | 4,952 |
| 1/28/2023 | 39 | 4,756 |
| 1/29/2023 | 37 | 4,087 |
| 1/30/2023 | 43 | 4,418 |
| 1/31/2023 | 20 | 4800 |
| 2/1/2023 | 31 | 4642 |
| 2/2/2023 | 24 | 4637 |
| 2/3/2023 | 36 | 4667 |

| | |
|---|---|
| % change 5 Jan to 21 Jan, 2023: | -92% |
| Average in March 2023: | 16.5 |

| Date | | |
|---|---|---|
| 2/4/2023 | 17 | 4178 |
| 2/5/2023 | 27 | 4009 |
| 2/6/2023 | 40 | 4414 |
| 2/7/2023 | 23 | 5054 |
| 2/8/2023 | 31 | 4770 |
| 2/9/2023 | 20 | 4821 |
| 2/10/2023 | 14 | 4461 |
| 2/11/2023 | 11 | 4231 |
| 2/12/2023 | 27 | 3969 |
| 2/13/2023 | 34 | 4630 |
| 2/14/2023 | 37 | 4674 |
| 2/15/2023 | 13 | 4608 |
| 2/16/2023 | 26 | 4663 |
| 2/17/2023 | 20 | 4708 |
| 2/18/2023 | 13 | 4482 |
| 2/19/2023 | 18 | 4325 |
| 2/20/2023 | 14 | 4388 |
| 2/21/2023 | 20 | 4633 |
| 2/22/2023 | 11 | 4456 |
| 2/23/2023 | 18 | 4931 |
| 2/24/2023 | 9 | 4971 |
| 2/25/2023 | 16 | 4760 |
| 2/26/2023 | 11 | 4121 |
| 2/27/2023 | 19 | 4311 |
| 2/28/2023 | 17 | 5458 |
| 3/1/2023 | 13 | 5429 |
| 3/2/2023 | 13 | 5099 |
| 3/3/2023 | 16 | 5359 |
| 3/4/2023 | 27 | 5226 |
| 3/5/2023 | 13 | 4925 |
| 3/6/2023 | 9 | 4828 |
| 3/7/2023 | 18 | 6064 |
| 3/8/2023 | 22 | 5280 |
| 3/9/2023 | 12 | 5310 |
| 3/10/2023 | 16 | 5350 |
| 3/11/2023 | 13 | 5022 |
| 3/12/2023 | 16 | 4467 |
| 3/13/2023 | 15 | 4594 |
| 3/14/2023 | 29 | 5368 |
| 3/15/2023 | 19 | 5156 |
| 3/16/2023 | 27 | 5450 |
| 3/17/2023 | 14 | 4772 |
| 3/18/2023 | 15 | 4874 |
| 3/19/2023 | 11 | 4095 |
| 3/20/2023 | 18 | 5032 |
| 3/21/2023 | 8 | 5433 |
| 3/22/2023 | 9 | 4910 |

CLP_AR_002428

| | | |
|---|---|---|
| 3/23/2023 | 18 | 5376 |
| 3/24/2023 | 14 | 5091 |
| 3/25/2023 | 18 | 5194 |
| 3/26/2023 | 8 | 5013 |
| 3/27/2023 | 12 | 5200 |
| 3/28/2023 | 8 | 5732 |
| 3/29/2023 | 29 | 5419 |
| 3/30/2023 | 30 | 4888 |
| 3/31/2023 | 20 | 4550 |

CLP_AR_002429

Quote: DHS estimates that the drop in CHNV encounters in January through March was almost four times as large as the number of people permitted entry under the parole processes

Footnote: In December 2022, prior to the announcement of the CHN parole processes, the OIS Enterprise Encounter Projection predicted 273,000 total encounters of CHNV nationals in January through March 2023, a projection equivalent to 2(

**December 8, 2022 Encounter Projection**

| | Jan-23 | Feb-23 | Mar-23 | Apr-23 | May-23 | Jun-23 | Jul-23 | Aug-23 | Sep-23 | jan-mar total |
|---|---|---|---|---|---|---|---|---|---|---|
| Cuba | 36,367 | 36,995 | 38,820 | 38,018 | 38,258 | 37,442 | 37,059 | 37,788 | 38,523 | 112,182 |
| Haiti | 5,895 | 5,727 | 5,962 | 5,964 | 6,877 | 6,315 | 6,347 | 6,806 | 7,840 | 17,584 |
| Nicaragua | 35,523 | 36,781 | 37,808 | 36,190 | 38,601 | 37,029 | 37,337 | 37,323 | 38,048 | 110,112 |
| Venezuela | 11,583 | 9,921 | 11,378 | 11,637 | 12,677 | 13,639 | 13,433 | 14,578 | 16,044 | 32,882 |

Jan-Mar total=    272,760

Ratio of drop in encounters to CHNV process paroles          3.953328

| | Projected Encounters | Unique Encounter Rate (FY 2022) | Projected Unique Encounters[1] | Actual Unique Encounters[2] | Pojected minus Actual | CHNV Parolees |
|---|---|---|---|---|---|---|
| Cuba | 112,200 | 0.97 | 109,370 | 6,407 | 102,963 | 14,814 |
| Haiti | 17,600 | 0.94 | 16,458 | 2,810 | 13,648 | 18,439 |
| Nicaragua | 110,100 | 0.97 | 106,583 | 3,726 | 102,857 | 7,512 |
| Venezuela | 32,900 | 1.00 | 32,768 | 7,261 | 25,507 | 21,202 |
| **CHNV Total** | **272,800** | | **265,180** | **20,204** | **244,976** | **61,967** |

Notes: Data are for Jan - March 2023.
1 Projected Unique Encounters calculated by applying unique encounter rate for FY 2022 to projected Jan - March encounters
2 Excludes CBP One encounters

Source: Projected encounters from December 8, 2022 Enterprise Encounter Projection; Encounters, unique encounter rates, and CBP One encounters from OIS Persist; CHNV parolees from OFO Advanced Travel Authorization Report.

CLP_AR_002430

65,000 unique encounters given CHNV repeat encounter rates.  During that same period, following the enactment of the CHN parole processes, unique SWB encounters (excluding scheduled arrivals via the CBP One app) of CHNV nationals was 20,204—

CLP_AR_002431

-245,000 fewer unique encounters than had been predicted.  By comparison, a total of 61,967 CHNV nationals entered the United States pursuant to the CHNV parole processes during the same period. OIS analysis of OIS Persist Dataset is based on data

CLP_AR_002432

through March 31, 2023, and of CBP OFO CHNV Advance Travel Authorization reports.

CLP_AR_002433

Quote: Thirty-eight percent of all noncitizens who entered along the SWB, received a positive credible fear determination, and were placed into proceedings before EOIR between FY 2014 and FY 2019 remained in EOIR proceedings as of December 31, 2022.
Footnote: See OIS Enforcement Lifecycle data through December 31, 2022.
Quote: Further, almost half (47 percent) of EOIR cases who received positive credible fear determinations resulting from FY 2019 encounters (referrals to EOIR) remained in proceedings as of December 31, 2022.
Footnote: Id.
Filters:

| | | | | | | % still in EOIR out of Comprehensive Positive Fear (TOTAL): | **38.12%** |
| | | | | | | % still in EOIR out of Comprehensive Positive Fear (2019): | **47.07%** |

| Most Recent Outcome | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|---|
| Total Encounters | 471,989 | 359,453 | 438,908 | 336,791 | 439,776 | 878,156 | **2,925,073** |
| T8 Encounters | 471,989 | 359,453 | 438,908 | 336,791 | 439,776 | 878,156 | **2,925,073** |
| Processed for Expedited Removal | 229,165 | 180,592 | 227,911 | 160,305 | 214,667 | 223,200 | **1,235,840** |
| No fear claim | 175,510 | 130,839 | 130,728 | 89,438 | 115,118 | 121,748 | **763,381** |
| No Fear Claim - confirmed removal or return | 167,324 | 129,954 | 127,975 | 86,711 | 110,035 | 118,662 | **740,661** |
| Fear Claims Withdrawn (Based on APSO receipts) | 5,025 | 3,447 | 4,623 | 2,288 | 4,013 | 3,365 | **22,761** |
| *Credible Fear Claims (APSO cases Only)* | 48,630 | 46,306 | 92,560 | 68,579 | 95,536 | 98,087 | **449,698** |
| Positive fear determinations | 34,966 | 33,835 | 73,487 | 53,442 | 74,460 | 70,869 | **341,059** |
| Negative fear determinations | 9,088 | 7,502 | 9,360 | 7,275 | 9,107 | 17,645 | **59,977** |
| Negative fear determinations appealed to EOIR | 7,242 | 6,226 | 7,572 | 5,842 | 6,730 | 14,253 | **47,865** |
| Negative fear determinations vacated by EOIR | 1,265 | 1,221 | 1,983 | 1,425 | 1,270 | 3,837 | **11,001** |
| Negative fear determinations upheld by EOIR | 5,977 | 5,005 | 5,589 | 4,417 | 5,460 | 10,416 | **36,864** |
| Case closures | 4,576 | 4,969 | 9,713 | 7,862 | 11,969 | 9,573 | **48,662** |
| Case closures referred to EOIR | 1,531 | 1,815 | 4,606 | 3,814 | 6,550 | 3,305 | **21,621** |
| Case closures not referred to EOIR | 3,045 | 3,154 | 5,107 | 4,048 | 5,419 | 6,268 | **27,041** |
| Non-Referrals to EOIR | 15,893 | 12,882 | 17,107 | 12,186 | 17,269 | 23,441 | **98,778** |
| Executed Removal Orders | 10,578 | 9,216 | 11,910 | 9,630 | 12,139 | 18,908 | **72,381** |
| **EOIR cases started** | 37,193 | 36,422 | 78,225 | 56,693 | 77,084 | 71,392 | **357,009** |
| Still in EOIR Proceedings | 9,002 | 9,895 | 24,180 | 21,982 | 33,995 | 35,164 | **134,218** |
| EOIR Cases completed | 28,191 | 26,527 | 54,045 | 34,711 | 43,089 | 36,228 | **222,791** |
| Terminations / Dismissals | 4,996 | 4,422 | 9,705 | 7,543 | 10,530 | 11,287 | **48,483** |

CLP_AR_002434

Quote: Excluding in absentia orders, the mean completion time for EOIR cases in FY 2022 was 3.7 years.
Footnote: OIS analysis of EOIR data as of March 31, 2023
Filters: Limited to 862 cases; medians days calculated from NTA (the date EOIR receives and lodge the case) to the completion date

Median years 2022:   3.7

| comp_FY | ABSENTIA=No | | | | ABSENTIA=Yes | | | |
|---|---|---|---|---|---|---|---|---|
| | N Obs | Mean | Median | Median Years | N Obs | Mean | Median | Median Years |
| 2000 | 66,939 | 42 | 13 | 0.04 | 17,055 | 105 | 87 | 0.24 |
| 2001 | 97,395 | 109 | 28 | 0.08 | 28,132 | 177 | 145 | 0.40 |
| 2002 | 115,984 | 172 | 46 | 0.13 | 30,214 | 209 | 163 | 0.45 |
| 2003 | 140,238 | 211 | 50 | 0.14 | 29,843 | 195 | 120 | 0.33 |
| 2004 | 142,799 | 252 | 52 | 0.14 | 40,400 | 157 | 92 | 0.25 |
| 2005 | 149,545 | 283 | 43 | 0.12 | 92,538 | 114 | 67 | 0.18 |
| 2006 | 160,378 | 308 | 50 | 0.14 | 93,956 | 134 | 79 | 0.22 |
| 2007 | 179,931 | 283 | 36 | 0.10 | 28,938 | 268 | 171 | 0.47 |
| 2008 | 190,483 | 264 | 22 | 0.06 | 23,527 | 324 | 172 | 0.47 |
| 2009 | 197,954 | 267 | 26 | 0.07 | 19,480 | 319 | 143 | 0.39 |
| 2010 | 189,025 | 351 | 48 | 0.13 | 20,882 | 320 | 174 | 0.48 |
| 2011 | 187,304 | 389 | 61 | 0.17 | 18,549 | 377 | 249 | 0.68 |
| 2012 | 166,071 | 504 | 145 | 0.40 | 16,389 | 443 | 301 | 0.82 |
| 2013 | 142,194 | 671 | 392 | 1.07 | 17,975 | 464 | 323 | 0.88 |
| 2014 | 125,665 | 710 | 423 | 1.16 | 22,033 | 390 | 258 | 0.71 |
| 2015 | 122,721 | 791 | 518 | 1.42 | 32,614 | 347 | 210 | 0.58 |
| 2016 | 133,188 | 868 | 594 | 1.63 | 29,992 | 494 | 332 | 0.91 |
| 2017 | 129,902 | 795 | 426 | 1.17 | 37,232 | 535 | 299 | 0.82 |
| 2018 | 143,266 | 837 | 466 | 1.28 | 41,844 | 650 | 410 | 1.12 |
| 2019 | 172,989 | 835 | 392 | 1.07 | 82,754 | 459 | 231 | 0.63 |
| 2020 | 136,958 | 834 | 358 | 0.98 | 82,043 | 306 | 157 | 0.43 |
| 2021 | 110,598 | 1,463 | 1,244 | 3.41 | 7,602 | 930 | 720 | 1.97 |
| 2022 | 284,075 | 1,608 | 1,351 | 3.70 | 58,928 | 749 | 559 | 1.53 |
| 2023 | 178,733 | 1,369 | 1,245 | 3.41 | 71,639 | 789 | 494 | 1.35 |

CLP_AR_002435

Quote: As noted in the NPRM, for the 30 days ending December 24, 2022, total daily encounters along the SWB consistently fluctuated between approximately 7,100 and 9,700 per day, averaging approximately 8,500 per day, with encounters exceeding 9,000 per day on 12 different occasions during this 30-day stretch.
Footnote: OIS Persist Dataset based on data through March 31, 2023.
Filter: SW Land Border

SWB Encounters, November 25 - December 24, 2022

| Date | | | | USBP |
|---|---|---|---|---|
| 25-Nov | 7162 | Low | 7130 | 6227 |
| 26-Nov | 8049 | High | 9671 | 7158 |
| 27-Nov | 7166 | Average | 8538.567 | 6302 |
| 28-Nov | 7748 | Over 9000 | 12 | 6802 |
| 29-Nov | 7677 | | | 6750 |
| 30-Nov | 9244 | | | 8325 |
| 1-Dec | 8541 | | | 7532 |
| 2-Dec | 9671 | | | 8736 |
| 3-Dec | 7962 | | | 7119 |
| 4-Dec | 7977 | | | 7100 |
| 5-Dec | 8367 | | | 7369 |
| 6-Dec | 8422 | | | 7415 |
| 7-Dec | 9352 | | | 8390 |
| 8-Dec | 9419 | | | 8371 |
| 9-Dec | 9520 | | | 8497 |
| 10-Dec | 9156 | | | 8181 |
| 11-Dec | 8874 | | | 7902 |
| 12-Dec | 8810 | | | 7811 |
| 13-Dec | 9093 | | | 8073 |
| 14-Dec | 9319 | | | 8281 |
| 15-Dec | 9137 | | | 8132 |
| 16-Dec | 7861 | | | 6849 |
| 17-Dec | 7895 | | | 6940 |
| 18-Dec | 7788 | | | 6904 |
| 19-Dec | 8352 | | | 7309 |
| 20-Dec | 9564 | | | 8568 |
| 21-Dec | 9469 | | | 8431 |
| 22-Dec | 9102 | | | 8086 |
| 23-Dec | 8330 | | | 7301 |
| 24-Dec | 7130 | | | 6247 |

Source: Data pulled from Persist as of 3/31/2023.

SWB Encounters, March 12 - April 10, 2023 from UIP

| Date | | | | USBP |
|---|---|---|---|---|
| 44997 | 4756 | Low | 3630 | 4535 |
| 44998 | 4875 | High | 6370 | 4648 |
| 44999 | 5678 | Average | 5254.8 | 5445 |
| 45000 | 5381 | Over 9000 | 0 | 5169 |
| 45001 | 5662 | | | 5469 |
| 45002 | 4980 | | | 4770 |
| 45003 | 5118 | | | 4900 |
| 45004 | 4366 | | | 4146 |
| 45005 | 5355 | | | 5121 |
| 45006 | 5677 | | | 5494 |
| 45007 | 5195 | | | 4955 |
| 45008 | 5597 | | | 5379 |
| 45009 | 5348 | | | 5122 |
| 45010 | 5470 | | | 5255 |
| 45011 | 5384 | | | 5171 |
| 45012 | 5569 | | | 5367 |
| 45013 | 6087 | | | 5900 |
| 45014 | 6327 | | | 6167 |
| 45015 | 6370 | | | 6202 |
| 45016 | 5152 | | | 4980 |
| 45017 | 4906 | | | 4736 |
| 45018 | 4629 | | | 4425 |
| 45019 | 5343 | | | 5159 |
| 45020 | 5470 | | | 5249 |
| 45021 | 5470 | | | 5263 |
| 45022 | 5705 | | | 5525 |
| 45023 | 4790 | | | 4586 |
| 45024 | 4758 | | | 4610 |
| 45025 | 3630 | | | 3448 |
| 45026 | 4596 | | | 4372 |

Source: Data pulled from UIP on 4/13/2023.

CLP_AR_002436

Quote: While commenters are correct that the Title 42 public health Order has increased the percentage of repeat crossing attempts relative to the 2010s, since 2022 over 97 percent of extra-regional migrants – the people representing the greatest pr...

Footnote: OIS analysis of OIS Persist Dataset based on data through March 31, 2023.

Filter: FY 2023 includes data through March 31. Table exc ludes administartive encounters by OFO (most OFO parolees and persons permitted to withdraw applications for admission without prejudice, a total of 2.7 percent of SWB encounters during th...

| Row Label | Mexico | | | | N. Central America | | | | Extra-Regional | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Repeat | Unique | Total | % Unique | Repeat | Unique | Total | % Unique | Repeat | Unique | Total | % Unique |
| 2013 | 91987 | 217314 | 309301 | 70% | 16158 | 124171 | 140329 | 88% | 562 | 27267 | 27829 | 98% |
| 2014 | 81834 | 196233 | 278067 | 71% | 22736 | 225208 | 247944 | 91% | 405 | 18251 | 18656 | 98% |
| 2015 | 62247 | 181532 | 243779 | 74% | 13199 | 129016 | 142215 | 91% | 342 | 17137 | 17479 | 98% |
| 2016 | 61832 | 182814 | 244646 | 75% | 12316 | 214985 | 227301 | 95% | 390 | 32749 | 33139 | 99% |
| 2017 | 41611 | 124011 | 165622 | 75% | 9912 | 177510 | 187422 | 95% | 346 | 31802 | 32148 | 99% |
| 2018 | 46863 | 153925 | 200788 | 77% | 11708 | 246433 | 258141 | 95% | 382 | 39073 | 39455 | 99% |
| 2019 | 50962 | 166971 | 217933 | 77% | 21863 | 601421 | 623284 | 96% | 2158 | 114034 | 116192 | 98% |
| 2020 | 106620 | 182517 | 289137 | 63% | 24654 | 82013 | 106667 | 77% | 12092 | 41321 | 53413 | 77% |
| 2021 | 325417 | 323123 | 648540 | 50% | 191004 | 509796 | 700800 | 73% | 51131 | 326476 | 377607 | 86% |
| 2022 | 388234 | 406491 | 794725 | 51% | 152576 | 388772 | 541348 | 72% | 20903 | 984523 | 1005426 | 98% |
| 2023 | 156594 | 208305 | 364899 | 57% | 46873 | 139867 | 186740 | 75% | 16381 | 584144 | 600525 | 97% |

CLP_AR_002437

ocessing challenge – are unique encounters.

is period.

CLP_AR_002438

Quote: Today's encounter totals are, in fact, the highest ever observed, both absolutely and when measured as unique crossers.

Footnote: Concrete data on unique versus repeat encounters are only available since 2010. During that period, for the years prior to the implementation of Title 42 expulsions, the percentage of encounters that were unique increased each ye

Filters: (???)

| Year | Unique Encounters | Repeat Encounters | Total Encounters | Unique percent |
|------|-------------------|-------------------|------------------|----------------|
| 2000 | 1,566,000 | NA | 1,566,000 | NA |
| 2001 | 1,231,000 | NA | 1,231,000 | NA |
| 2002 | 930,000 | NA | 930,000 | NA |
| 2003 | 907,000 | NA | 907,000 | NA |
| 2004 | 1,140,000 | NA | 1,140,000 | NA |
| 2005 | 1,171,000 | NA | 1,171,000 | NA |
| 2006 | 1,072,000 | NA | 1,072,000 | NA |
| 2007 | 859,000 | NA | 859,000 | NA |
| 2008 | 705,000 | NA | 705,000 | NA |
| 2009 | 541,000 | NA | 541,000 | NA |
| 2010 | 283,000 | 165,000 | 448,000 | 63% |
| 2011 | 223,000 | 105,000 | 328,000 | 68% |
| 2012 | 264,000 | 93,000 | 357,000 | 74% |
| 2013 | 311,000 | 104,000 | 415,000 | 75% |
| 2014 | 378,000 | 101,000 | 479,000 | 79% |
| 2015 | 259,000 | 73,000 | 332,000 | 78% |
| 2016 | 336,000 | 73,000 | 409,000 | 82% |
| 2017 | 254,000 | 50,000 | 304,000 | 84% |
| 2018 | 337,000 | 59,000 | 396,000 | 85% |
| 2019 | 774,000 | 78,000 | 852,000 | 91% |
| 2020 | 257,000 | 143,000 | 400,000 | 64% |
| 2021 | 1,079,000 | 581,000 | 1,660,000 | 65% |
| 2022 | 1,630,000 | 577,000 | 2,207,000 | 74% |

CLP_AR_002439

ear from 2010 – 2019. OIS analysis of OIS Persist Dataset based on data through March 31, 2023. While specific data on numbers of unique encounters are not available prior to 2010, it is widely accepted that in the years before the 2010, and particularl

CLP_AR_002440

ly in the years before 2000, were characterized by much larger numbers of repeat encounters, as most encounters were of Mexican nationals who were permitted to return to Mexico without being subject to formal removal proceedings or other enforc

CLP_AR_002441

cement consequences. Also see FY 2021 Border Security Metrics Report, https://www.dhs.gov/immigration-statistics/border-security/border-security-metrics-report.  Also see DHS, FY 2021 Border Security Metrics Report (Apr. 27, 2022), available at htt

ps://www.dhs.gov/immigration-statistics/bor

CLP_AR_002443

Quote: As recently as the 2000s, unauthorized migration to the SWB consisted almost entirely of single adults from Mexico.

Footnote: According to historic OIS Yearbooks of Immigration Statistics, Mexican nationals accounted for 97 percent of all administrative arrests by the legacy Immigration and Nationality Service from 1981-1999. According to OIS Production data

Quote: Families and UCs accounted for increasing shares of unauthorized migrants in the 2010s, as did migrants from Nothern Central America; and "extra-regional" migrants have driven increased flows in the 2020s, accounting for an absolute n

Footnote: Families and unaccompanied children accounted for an estimated 11 percent of SWB encounters in 2013, rising to 62 percent in 2019, and have averaged 30 percent in 2020 – March 2023. Data on unaccompanied children were first co

Filter: Apprehensions data for 1981 - 1999 include nationwide adminstrative immigration arrests of persons present in the United States without no record of a lawful entry, the large majority of which occured at the southwest border.

| | Apprehensions of EWIs: Mexican nationals | Apprehensions of EWIs: total | Mx% total |
|---|---|---|---|
| 1981 | 894,771 | 898,550 | 100% |
| 1982 | 870,806 | 902,463 | 96% |
| 1983 | 1,157,948 | 1,190,198 | 97% |
| 1984 | 1,159,101 | 1,196,353 | 97% |
| 1985 | 1,291,734 | 1,300,691 | 99% |
| 1986 | 1,661,997 | 1,720,321 | 97% |
| 1987 | 1,133,092 | 1,166,983 | 97% |
| 1988 | 943,147 | 985,479 | 96% |
| 1989 | 914,516 | 922,443 | 99% |
| 1990 | 1,080,699 | 1,131,454 | 96% |
| 1991 | 1,120,099 | 1,161,495 | 96% |
| 1992 | 1,193,455 | 1,225,993 | 97% |
| 1993 | 1,258,009 | 1,294,256 | 97% |
| 1994 | 1,029,039 | 1,064,068 | 97% |
| 1995 | 1,330,017 | 1,365,171 | 97% |
| 1996 | 1,586,492 | 1,620,033 | 98% |
| 1997 | 1,463,573 | 1,499,267 | 98% |
| 1998 | 1,598,903 | 1,627,748 | 98% |
| 1999 | 1,614,492 | 1,654,011 | 98% |

Source: OIS Yearbook of Immigration Statistics,

| FY | Mexico | Grand Total | Mx% total |
|---|---|---|---|
| 2000 | 1540683 | 1566421 | 98% |
| 2001 | 1201510 | 1231412 | 98% |
| 2002 | 902042 | 930341 | 97% |
| 2003 | 867256 | 906734 | 96% |
| 2004 | 1074330 | 1140247 | 94% |
| 2005 | 1103162 | 1269230 | 87% |
| 2006 | 1058026 | 1168309 | 91% |
| 2007 | 882216 | 954396 | 92% |
| 2008 | 727494 | 792409 | 92% |
| 2009 | 565248 | 619113 | 91% |
| 2010 | 467461 | 527413 | 89% |
| 2011 | 344013 | 401058 | 86% |
| 2012 | 316890 | 426105 | 74% |

Source: OIS Production Data

| FY | Mexico | N. Central America | Extra-Regional | Total | Mx % of Total | Extra-regional % of total |
|---|---|---|---|---|---|---|
| 2013 | 317562 | 140442 | 31608 | 489612 | 65% | 6% |
| 2014 | 285502 | 248063 | 36483 | 570048 | 50% | 6% |
| 2015 | 253660 | 142341 | 48855 | 444856 | 57% | 11% |
| 2016 | 256083 | 227458 | 75450 | 558991 | 46% | 13% |
| 2017 | 181519 | 187539 | 46141 | 415199 | 44% | 11% |
| 2018 | 221711 | 258413 | 39820 | 519944 | 43% | 8% |
| 2019 | 237067 | 623569 | 116593 | 977229 | 24% | 12% |
| 2020 | 297692 | 106760 | 53614 | 458066 | 65% | 12% |
| 2021 | 655591 | 701049 | 378043 | 1734683 | 38% | 22% |
| 2022 | 808340 | 541618 | 1028987 | 2378945 | 34% | 43% |
| 2023 | 371742 | 186824 | 600873 | 1159879 | 32% | 52% |

Source: OIS Persist

| FY | AM | FM |
|---|---|---|
| 2013 | | 12934 |
| 2014 | | 67040 |
| 2015 | | 39834 |
| 2016 | | 103053 |
| 2017 | | 104987 |
| 2018 | 1320 | 160827 |
| 2019 | 948 | 526975 |
| 2020 | 688 | 70990 |
| 2021 | 2108 | 479716 |
| 2022 | 2963 | 560630 |

Note: Data on accompanied min

Source: OIS Persist

a, Mexican nationals, also accounted for 97 percent of SWB encounters from 2000-2003. Mexico's share of SWB border encounters fell to 94 percent in 2004, an all-time low, then averaged 91 percent for the remainder of the 2000s. OIS analysis of OIS

najority of encounters in FY 2023 YTD

llected in 2008 and data on other family statuses were first collected in 2013, but not universally collected until 2016. Mexican nationals accounted for an average of 57 percent of SWB encounters from 2013-2015, fell to an all-time low of 24 percent in

| SA | UC | UNK | Grand Tot: | SA% of tot | SA+ UNK % | FM+UC% of Total |
|---|---|---|---|---|---|---|
| 359643 | 41177 | 75858 | 489612 | 73% | 89% | 11% |
| 341482 | 72755 | 88771 | 570048 | 60% | 75% | 25% |
| 251505 | 44123 | 109394 | 444856 | 57% | 81% | 19% |
| 327864 | 66362 | 61712 | 558991 | 59% | 70% | 30% |
| 257901 | 48618 | 3693 | 415199 | 62% | 63% | 37% |
| 299157 | 58234 | 406 | 519944 | 58% | 58% | 42% |
| 368306 | 80634 | 366 | 977229 | 38% | 38% | 62% |
| 353003 | 33233 | 152 | 458066 | 77% | 77% | 23% |
| 1105683 | 146925 | 251 | 1734683 | 64% | 64% | 36% |
| 1662477 | 152057 | 818 | 2378945 | 70% | 70% | 30% |

ors are unavailable prior to 2018; data on family unit individuals are unavailable prior to 2013. CBP assumes all unknown family statuses are single adults.

CLP_AR_002445

Yearbook on Immigration Statistics, 1981-1999; OIS Production Data, 2000-2009.

2019 (when Northern Central Americans accounted for 64 percent of the total), and have averaged 35 percent of encounters from 2021 through March 2023. Extra regional nationals accounted for an average of 9 percent of SWB encounters from 201

CLP_AR_002446

3-2018, 12 percent from 2019-2020, and account for 52 percent in the first six months of FY 2023. OIS analysis of OIS Persist Dataset based on data through March 31, 2023.

CLP_AR_002447

Quote: However, the U.S. immigration system has experienced extreme strain with a dramatic increase of noncitizens attempting to cross the SWB in between POEs without authorization, reaching an all-time high of 2.2 million encounters in Fis
Footnote: OIS Analysis of historic USBP data.
Filter: SWB, USBP

**USBP SWB Encounters (Yearbook)**

| Year | Encounters | | |
|------|------------|---|---|
| 1960 | 21,022 | | |
| 1961 | 21,745 | average FY1983-2006 | 1,190,461 |
| 1962 | 21,103 | average FY2011-2018 | 377,364 |
| 1963 | 29,644 | Factor increase from 2017-2019 | 2.80 |
| 1964 | 32,519 | Factor increase from 2019-2021 | 1.95 |
| 1965 | 40,020 | Factor increase from 2021-22 | 1.33 |
| 1966 | 62,640 | 2022 all time high | 2,206,437 |
| 1967 | 73,973 | | |
| 1968 | 96,641 | | |
| 1969 | 137,968 | | |
| 1970 | 201,780 | | |
| 1971 | 263,991 | | |
| 1972 | 321,326 | | |
| 1973 | 441,066 | | |
| 1974 | 571,606 | | |
| 1975 | 512,264 | | |
| 1976 | 607,499 | | |
| 1977 | 733,193 | | |
| 1978 | 789,441 | | |
| 1979 | 795,798 | | |
| 1980 | 690,554 | | |
| 1981 | 749,808 | | |
| 1982 | 745,820 | | |
| 1983 | 1,033,974 | | |
| 1984 | 1,058,276 | | |
| 1985 | 1,183,351 | | |
| 1986 | 1,615,844 | | |
| 1987 | 1,122,067 | | |
| 1988 | 942,561 | | |
| 1989 | 852,506 | | |
| 1990 | 1,049,321 | | |
| 1991 | 1,077,876 | | |
| 1992 | 1,145,574 | | |
| 1993 | 1,212,886 | | |
| 1994 | 979,101 | | |
| 1995 | 1,271,390 | | |
| 1996 | 1,507,020 | | |
| 1997 | 1,368,707 | | |
| 1998 | 1,516,680 | | |
| 1999 | 1,537,000 | | |
| 2000 | 1,643,679 | | |
| 2001 | 1,235,718 | | |

CLP_AR_002448

| | |
|------|-----------|
| 2002 | 929,809 |
| 2003 | 905,065 |
| 2004 | 1,139,282 |
| 2005 | 1,171,396 |
| 2006 | 1,071,972 |
| 2007 | 858,638 |
| 2008 | 705,005 |
| 2009 | 540,865 |
| 2010 | 447,731 |
| 2011 | 327,577 |
| 2012 | 356,873 |
| 2013 | 414,397 |
| 2014 | 479,370 |
| 2015 | 331,333 |
| 2016 | 408,870 |
| 2017 | 303,916 |
| 2018 | 396,579 |
| 2019 | 851,508 |
| 2020 | 400,635 |
| 2021 | 1,659,206 |
| 2022 | 2,206,437 |

CLP_AR_002449

cal Year ("FY") 2022

CLP_AR_002450

The Departments believe that without a meaningful policy change, border encounters could dramatically rise to as high as 11,000 a day after the Title 42 public health Order is lifted
DHS SWB Encounter Planning Model generated April 184, 2023. DHS SWB Encounter Planning Model generated January 6, 2023.

**FOUO**
**Blended Projections, Totals**
Assumptions:    **Title 42, CHNV returns to Mexico, and CHNV paroles end May 11. NPRM not implemented.**

Projection Type:   **Planning. All projections are for planning purposes, showing what OIS estimates may happen under these assumptions. Effects of these policy assumptions are also based on best available information.**
**Operational confidence intervals (not assuming growing uncertainty over time) are used to quantify model uncertainty.**

**Users should not treat these results as a precise statement of what will happen.**

|  | 23-Apr | 23-May | 23-Jun | 23-Jul | 23-Aug | 23-Sep | Total |
|---|---|---|---|---|---|---|---|
| **Total** | | | | | | | |
| **Projection** | **5,392** | **6,768** | **7,527** | **6,878** | **7,119** | **7,712** | **6,900** |
| Moderately High | 6,817 | 8,147 | 8,953 | 8,257 | 8,499 | 9,137 | 8,301 |
| Moderately Low | 4,098 | 5,407 | 6,130 | 5,511 | 5,750 | 6,423 | 5,553 |
| High | 8,186 | 9,471 | 10,321 | 9,581 | 9,823 | 10,505 | 9,647 |
| Low | 3,208 | 4,174 | 4,824 | 4,252 | 4,494 | 5,203 | 4,358 |
| **FM** | | | | | | | |
| **Projection** | **1,145** | **2,089** | **2,787** | **2,244** | **2,326** | **2,466** | **2,177** |
| Moderately High | 1,826 | 2,748 | 3,468 | 2,903 | 2,985 | 3,147 | 2,847 |
| Moderately Low | 584 | 1,449 | 2,127 | 1,598 | 1,670 | 1,921 | 1,558 |
| High | 2,480 | 3,381 | 4,122 | 3,536 | 3,618 | 3,801 | 3,490 |
| Low | 266 | 893 | 1,522 | 1,019 | 1,099 | 1,408 | 1,034 |
| **SA** | | | | | | | |
| **Projection** | **3,814** | **4,243** | **4,233** | **4,182** | **4,335** | **4,769** | **4,263** |
| Moderately High | 4,521 | 4,927 | 4,940 | 4,866 | 5,020 | 5,476 | 4,958 |
| Moderately Low | 3,118 | 3,559 | 3,532 | 3,498 | 3,658 | 4,062 | 3,571 |
| High | 5,200 | 5,584 | 5,619 | 5,523 | 5,677 | 6,155 | 5,626 |
| Low | 2,578 | 2,916 | 2,867 | 2,852 | 3,007 | 3,391 | 2,935 |
| **UC** | | | | | | | |
| **Projection** | **433** | **436** | **507** | **452** | **458** | **476** | **460** |
| Moderately High | 470 | 472 | 545 | 488 | 493 | 513 | 497 |
| Moderately Low | 397 | 400 | 470 | 416 | 422 | 439 | 424 |
| High | 506 | 506 | 580 | 522 | 528 | 549 | 532 |
| Low | 363 | 366 | 435 | 382 | 387 | 404 | 389 |
| **HHS Referrals** | | | | | | | |
| **Projection** | **326** | **338** | **397** | **352** | **347** | **356** | **353** |
| Moderately High | 356 | 367 | 427 | 381 | 376 | 387 | 382 |
| Moderately Low | 297 | 309 | 367 | 323 | 318 | 327 | 324 |
| High | 459 | 435 | 488 | 424 | 444 | 450 | 450 |
| Low | 270 | 282 | 339 | 295 | 291 | 299 | 296 |

Quote: In March 2023, for example, 26 percent of encounters at the SWB involved individuals who had at least one prior encounter during the previous 12 months, compared to an average 1-year re-encounter rate of 14 percent for FYs 2014–201

Footnote: Including CBP enforcement encounters at or between ports of entry. OIS Persist based on data through March 31, 2023.

Filter: SWB; Enforcment Encoutners

CBP

| Date | T42 Repeat | T42 Unique | T42 Total | T8 Repeat | T8 Unique | T8 Total | Total Repeat | Total | T42 Recidi | T8 Recidivi | Total Recid |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Oct-17 | | | | 4365 | 28635 | 33000 | 4365 | 33000 | | 13% | 13% |
| Nov-17 | | | | 4302 | 32914 | 37216 | 4302 | 37216 | | 12% | 12% |
| Dec-17 | | | | 4131 | 34572 | 38703 | 4131 | 38703 | | 11% | 11% |
| Jan-18 | | | | 4373 | 29462 | 33835 | 4373 | 33835 | | 13% | 13% |
| Feb-18 | | | | 4718 | 30270 | 34988 | 4718 | 34988 | | 13% | 13% |
| Mar-18 | | | | 6238 | 42265 | 48503 | 6238 | 48503 | | 13% | 13% |
| Apr-18 | | | | 6524 | 42860 | 49384 | 6524 | 49384 | | 13% | 13% |
| May-18 | | | | 5642 | 44580 | 50222 | 5642 | 50222 | | 11% | 11% |
| Jun-18 | | | | 4480 | 37125 | 41605 | 4480 | 41605 | | 11% | 11% |
| Jul-18 | | | | 4239 | 33678 | 37917 | 4239 | 37917 | | 11% | 11% |
| Aug-18 | | | | 4965 | 39587 | 44552 | 4965 | 44552 | | 11% | 11% |
| Sep-18 | | | | 4976 | 43483 | 48459 | 4976 | 48459 | | 10% | 10% |
| Oct-18 | | | | 5590 | 53333 | 58923 | 5590 | 58923 | | 9% | 9% |
| Nov-18 | | | | 4835 | 55782 | 60617 | 4835 | 60617 | | 8% | 8% |
| Dec-18 | | | | 3894 | 55182 | 59076 | 3894 | 59076 | | 7% | 7% |
| Jan-19 | | | | 4360 | 52144 | 56504 | 4360 | 56504 | | 8% | 8% |
| Feb-19 | | | | 5455 | 69455 | 74910 | 5455 | 74910 | | 7% | 7% |
| Mar-19 | | | | 6766 | 95221 | 101987 | 6766 | 101987 | | 7% | 7% |
| Apr-19 | | | | 7141 | 100546 | 107687 | 7141 | 107687 | | 7% | 7% |
| May-19 | | | | 8490 | 133956 | 142446 | 8490 | 142446 | | 6% | 6% |
| Jun-19 | | | | 7444 | 95548 | 102992 | 7444 | 102992 | | 7% | 7% |
| Jul-19 | | | | 6280 | 74101 | 80381 | 6280 | 80381 | | 8% | 8% |
| Aug-19 | | | | 7057 | 54011 | 61068 | 7057 | 61068 | | 12% | 12% |
| Sep-19 | | | | 7671 | 43147 | 50818 | 7671 | 50818 | | 15% | 15% |
| Oct-19 | | | | 8242 | 35373 | 43615 | 8242 | 43615 | | 19% | 19% |
| Nov-19 | | | | 7799 | 33410 | 41209 | 7799 | 41209 | | 19% | 19% |
| Dec-19 | | | | 7480 | 31812 | 39292 | 7480 | 39292 | | 19% | 19% |
| Jan-20 | | | | 7643 | 27885 | 35528 | 7643 | 35528 | | 22% | 22% |
| Feb-20 | | | | 7571 | 28007 | 35578 | 7571 | 35578 | | 21% | 21% |
| Mar-20 | 2287 | 4863 | 7150 | 5701 | 20867 | 26568 | 7988 | 33718 | 32% | 21% | 24% |
| Apr-20 | 7188 | 8334 | 15522 | 271 | 1201 | 1472 | 7459 | 16994 | 46% | 18% | 44% |
| May-20 | 9971 | 10924 | 20895 | 418 | 1685 | 2103 | 10389 | 22998 | 48% | 20% | 45% |
| Jun-20 | 13280 | 16529 | 29809 | 736 | 2176 | 2912 | 14016 | 32721 | 45% | 25% | 43% |
| Jul-20 | 16837 | 20054 | 36891 | 1008 | 2746 | 3754 | 17845 | 40645 | 46% | 27% | 44% |
| Aug-20 | 20705 | 23741 | 44446 | 1565 | 3626 | 5191 | 22270 | 49637 | 47% | 30% | 45% |
| Sep-20 | 22680 | 27381 | 50061 | 1984 | 5237 | 7221 | 24664 | 57282 | 45% | 27% | 43% |
| Oct-20 | 29813 | 35079 | 64892 | 1837 | 4804 | 6641 | 31650 | 71533 | 46% | 28% | 44% |
| Nov-20 | 31315 | 31915 | 63230 | 2005 | 6499 | 8504 | 33320 | 71734 | 50% | 24% | 46% |
| Dec-20 | 33240 | 29102 | 62342 | 2895 | 8365 | 11260 | 36135 | 73602 | 53% | 26% | 49% |
| Jan-21 | 32775 | 31529 | 64304 | 2623 | 10918 | 13541 | 35398 | 77845 | 51% | 19% | 45% |
| Feb-21 | 35851 | 38414 | 74265 | 3494 | 22648 | 26142 | 39345 | 100407 | 48% | 13% | 39% |

Right-side annotations:

| | | | |
|---|---|---|---|
| Average revidivism pre-T42 | 10% | 10% | 12% |
| Average recidivism post-T42 | 27% | | 31% |
| Average recidivism T42 | 46% | | 46% |
| Average recidvidism T8 | 12% | | 12% |
| pre-T42 | 12% | | 12% |
| post-42 | 12% | | 11% |

| | T42 Repeat | T42 Unique | T42 Total | % Repeat |
|---|---|---|---|---|
| TOTAL | 1,284,837 | 1,493,708 | 2,778,545 | |
| TOTAL 2022 | 497,151 | 582,356 | 1,079,507 | 46% |
| T8 2022 | 64,562 | 1,197,430 | 1,261,992 | 5% |

Recid rate 2014-19    14%

| | Repeat | Unique | Total | Recid Rate |
|---|---|---|---|---|
| 2013 | 108707 | 368752 | 477459 | 0.227678 |
| 2014 | 104975 | 439692 | 544667 | 0.192732 |
| 2015 | 75788 | 327685 | 403473 | 0.187839 |
| 2016 | 74538 | 430548 | 505086 | 0.147575 |
| 2017 | 51869 | 333323 | 385192 | 0.134658 |
| 2018 | 58953 | 439431 | 498384 | 0.118288 |
| 2019 | 74983 | 882426 | 957409 | 0.078319 |
| 2020 | 143366 | 305851 | 449217 | 0.319146 |
| 2021 | 567552 | 1159395 | 1726947 | 0.328645 |
| 2022 | 561713 | 1779786 | 2341499 | 0.239895 |
| 2023 | 219848 | 932316 | 1152164 | 0.190813 |

CLP_AR_002452

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Mar-21 | 47923 | 61326 | 109249 | 5126 | 58263 | 63389 | 53049 | 172638 | 44% | 8% | 31% |
| Apr-21 | 52053 | 60537 | 112590 | 5090 | 60431 | 65521 | 57143 | 178111 | 46% | 8% | 32% |
| May-21 | 59210 | 54182 | 113392 | 5941 | 60571 | 66512 | 65151 | 179904 | 52% | 9% | 36% |
| Jun-21 | 55828 | 49100 | 104928 | 6209 | 77149 | 83358 | 62037 | 188286 | 53% | 7% | 33% |
| Jul-21 | 49869 | 46383 | 96252 | 6223 | 110248 | 116471 | 56092 | 212723 | 52% | 5% | 26% |
| Aug-21 | 43967 | 51440 | 95407 | 6213 | 107363 | 113576 | 50180 | 208983 | 46% | 5% | 24% |
| Sep-21 | 44518 | 58155 | 102673 | 3534 | 84974 | 88508 | 48052 | 191181 | 43% | 4% | 25% |
| Oct-21 | 42831 | 51692 | 94523 | 3298 | 66138 | 69436 | 46129 | 163959 | 45% | 5% | 28% |
| Nov-21 | 40510 | 49677 | 90187 | 3028 | 80420 | 83448 | 43538 | 173635 | 45% | 4% | 25% |
| Dec-21 | 37681 | 44472 | 82153 | 3428 | 92450 | 95878 | 41109 | 178031 | 46% | 4% | 23% |
| Jan-22 | 37629 | 42086 | 79715 | 2735 | 71214 | 73949 | 40364 | 153664 | 47% | 4% | 26% |
| Feb-22 | 45103 | 48050 | 93153 | 3363 | 68331 | 71694 | 48466 | 164847 | 48% | 5% | 29% |
| Mar-22 | 54073 | 58008 | 112081 | 5178 | 101330 | 106508 | 59251 | 218589 | 48% | 5% | 27% |
| Apr-22 | 48621 | 51953 | 100574 | 7939 | 106016 | 113955 | 56560 | 214529 | 48% | 7% | 26% |
| May-22 | 46699 | 59075 | 105774 | 9814 | 124183 | 133997 | 56513 | 239771 | 44% | 7% | 24% |
| Jun-22 | 42133 | 52547 | 94680 | 6590 | 105354 | 111944 | 48723 | 206624 | 45% | 5% | 24% |
| Jul-22 | 34028 | 43678 | 77706 | 6283 | 114916 | 121199 | 40311 | 198905 | 44% | 5% | 20% |
| Aug-22 | 34137 | 40572 | 74709 | 6729 | 121389 | 128118 | 40866 | 202827 | 46% | 5% | 20% |
| Sep-22 | 33706 | 40546 | 74252 | 6177 | 145689 | 151866 | 39883 | 226118 | 45% | 4% | 18% |
| Oct-22 | 33194 | 46871 | 80065 | 6866 | 140530 | 147396 | 40060 | 227461 | 41% | 5% | 18% |
| Nov-22 | 27667 | 41380 | 69047 | 6732 | 154066 | 160798 | 34399 | 229845 | 40% | 4% | 15% |
| Dec-22 | 20127 | 31744 | 51871 | 9625 | 185888 | 195513 | 29752 | 247384 | 39% | 5% | 12% |
| Jan-23 | 26827 | 39312 | 66139 | 7438 | 71558 | 78996 | 34265 | 145135 | 41% | 9% | 24% |
| Feb-23 | 32697 | 43259 | 75956 | 4717 | 53810 | 58527 | 37414 | 134483 | 43% | 8% | 28% |
| Mar-23 | 37864 | 49798 | 87662 | 6094 | 74100 | 80194 | 43958 | 167856 | 43% | 8% | 26% |

Note: Exludes administrative encounters. SWB only.
Source: OIS Persist march 2023

CLP_AR_002453

.9.

of total 42 in FY22

.

CLP_AR_002454

Quote: Overall, since the start of the pandemic and the initiation of Title 42 expulsions, 39 percent of all Title 42 expulsions have been followed by a re-encounter of the same individual within 30 days versus a 9 percent 30-day re-encounter rate f
Footnote: OIS analysis of OIS Enforcement Lifecycle based on data through December 31, 2022.
Quote: While a portion of the overall gap between Title 42 and Title 8 re-encounter rates is likely explained by the fact that many Title 42 expulsions are to Mexico and almost all Title 8 repatriations are to individuals' countries of citizenship, it is r
Footnote: For Mexican nationals, since the start of the pandemic, the 30-day re-encounter rates are 44 percent for Title 42 expulsions versus 15 percent for Title 8 repatriations, and the 12-month re-encounter rates are 55 percent for Title 42 exp
Filter: FY 2023 includes data through March 31. Table exc ludes administartive encounters by OFO (most OFO parolees and persons permitted to withdraw applications for admission without prejudice, a total of 2.7 percent of SWB encounters dur

One-Year Re-Encounter Rates by Title Authority of Initial Repatriation

| | T42 | | | | | T8 | | | | | One-Year Re-Encount |
| Repatriation Month | Not Re-encountered | Re-encountered | Total Repatriations | % of Repatriations Re-encountered | | Not Re-encountered | Re-encountered | Total Repatriations | % of Repatriations Re-encountered | | Repatriation Month |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Mar-20 | 3,957 | 3,213 | 7,170 | 45% | | 24,641 | 7,189 | 31,830 | 23% | | Mar-20 |
| Apr-20 | 7,529 | 8,015 | 15,544 | 52% | | 8,780 | 1,872 | 10,652 | 18% | | Apr-20 |
| May-20 | 9,494 | 11,465 | 20,959 | 55% | | 7,599 | 1,420 | 9,019 | 16% | | May-20 |
| Jun-20 | 14,192 | 15,745 | 29,937 | 53% | | 7,581 | 1,361 | 8,942 | 15% | | Jun-20 |
| Jul-20 | 17,261 | 19,897 | 37,158 | 54% | | 8,188 | 1,589 | 9,777 | 16% | | Jul-20 |
| Aug-20 | 20,520 | 24,553 | 45,073 | 54% | | 8,836 | 1,758 | 10,594 | 17% | | Aug-20 |
| Sep-20 | 24,030 | 26,899 | 50,929 | 53% | | 9,323 | 1,758 | 11,081 | 16% | | Sep-20 |
| Oct-20 | 30,705 | 35,091 | 65,796 | 53% | | 12,387 | 2,631 | 15,018 | 18% | | Oct-20 |
| Nov-20 | 28,880 | 34,927 | 63,807 | 55% | | 8,855 | 2,306 | 11,161 | 21% | | Nov-20 |
| Dec-20 | 27,453 | 35,665 | 63,118 | 57% | | 8,865 | 2,867 | 11,732 | 24% | | Dec-20 |
| Jan-21 | 28,962 | 35,819 | 64,781 | 55% | | 9,137 | 2,875 | 12,012 | 24% | | Jan-21 |
| Feb-21 | 35,164 | 39,400 | 74,564 | 53% | | 6,898 | 2,093 | 8,991 | 23% | | Feb-21 |
| Mar-21 | 54,254 | 55,367 | 109,621 | 51% | | 8,461 | 2,355 | 10,816 | 22% | | Mar-21 |
| Apr-21 | 54,737 | 58,161 | 112,898 | 52% | | 8,069 | 2,343 | 10,412 | 23% | | Apr-21 |
| May-21 | 51,641 | 62,144 | 113,785 | 55% | | 8,423 | 2,469 | 10,892 | 23% | | May-21 |
| Jun-21 | 48,594 | 56,860 | 105,454 | 54% | | 8,654 | 2,251 | 10,905 | 21% | | Jun-21 |
| Jul-21 | 47,775 | 49,246 | 97,021 | 51% | | 9,133 | 2,151 | 11,284 | 19% | | Jul-21 |
| Aug-21 | 50,063 | 46,499 | 96,562 | 48% | | 8,981 | 2,162 | 11,143 | 19% | | Aug-21 |
| Sep-21 | 57,931 | 45,736 | 103,667 | 44% | | 8,282 | 2,063 | 10,345 | 20% | | Sep-21 |
| Oct-21 | 50,484 | 44,967 | 95,451 | 47% | | 10,392 | 2,472 | 12,864 | 19% | | Oct-21 |
| Nov-21 | 48,886 | 42,100 | 90,986 | 46% | | 10,591 | 2,330 | 12,921 | 18% | | Nov-21 |
| Dec-21 | 44,139 | 39,225 | 83,364 | 47% | | 9,922 | 2,198 | 12,120 | 18% | | Dec-21 |
| Jan-22 | 39,682 | 41,196 | 80,878 | 51% | | 9,631 | 2,347 | 11,978 | 20% | | Jan-22 |
| Total | 796,333 | 832,190 | 1,628,523 | 51% | | 221,629 | 54,860 | 276,489 | 20% | | Total |

CLP_AR_002455

or Title 8 repatriations.  Similarly, the 12-month re-encounter rates are 51 percent for Title 42 expulsions versus 20 percent for Title 8 repatriations

notable that a large gap between Title 42 and Title 8 re-encounter rates is also observed in the case of Mexican naionals, all of whom are repatriated to Mexico
ulsions versus 26 percent for Title 8 repatriations. OIS analysis of OIS Enforcement Lifecycle based on data through December 31, 2022.
ring this period.

ter Rates by Title Authority of Initial Repatriation, Mexican Nationals

| T42 | | | | T8 | | | |
| Not Re-encountered | Re-encountered | Total Repatriations | % of Repatriations Re-encountered | Not Re-encountered | Re-encountered | Total Repatriations | % of Repatriations Re-encountered |
|---|---|---|---|---|---|---|---|
| 2277 | 2401 | 4,678 | 51% | 15442 | 6027 | 21,469 | 28% |
| 5000 | 6183 | 11,183 | 55% | 5702 | 1373 | 7,075 | 19% |
| 7641 | 9815 | 17,456 | 56% | 4778 | 1067 | 5,845 | 18% |
| 11804 | 13549 | 25,353 | 53% | 4697 | 1031 | 5,728 | 18% |
| 13339 | 16376 | 29,715 | 55% | 4852 | 1135 | 5,987 | 19% |
| 14728 | 19177 | 33,905 | 57% | 5273 | 1223 | 6,496 | 19% |
| 16067 | 19584 | 35,651 | 55% | 5117 | 1222 | 6,339 | 19% |
| 19330 | 24294 | 43,624 | 56% | 6146 | 1652 | 7,798 | 21% |
| 17805 | 22413 | 40,218 | 56% | 5204 | 1867 | 7,071 | 26% |
| 14989 | 19656 | 34,645 | 57% | 5417 | 2451 | 7,868 | 31% |
| 15396 | 20464 | 35,860 | 57% | 5157 | 2276 | 7,433 | 31% |
| 17279 | 22388 | 39,667 | 56% | 3963 | 1774 | 5,737 | 31% |
| 24558 | 32099 | 56,657 | 57% | 4751 | 1943 | 6,694 | 29% |
| 25797 | 33416 | 59,213 | 56% | 4664 | 1970 | 6,634 | 30% |
| 27213 | 35918 | 63,131 | 57% | 4773 | 2050 | 6,823 | 30% |
| 24527 | 32178 | 56,705 | 57% | 4665 | 1891 | 6,556 | 29% |
| 22548 | 28465 | 51,013 | 56% | 4546 | 1681 | 6,227 | 27% |
| 21307 | 26623 | 47,930 | 56% | 4500 | 1714 | 6,214 | 28% |
| 24723 | 29425 | 54,148 | 54% | 4308 | 1658 | 5,966 | 28% |
| 28114 | 32131 | 60,245 | 53% | 5123 | 1927 | 7,050 | 27% |
| 27325 | 29879 | 57,204 | 52% | 4909 | 1758 | 6,667 | 26% |
| 20758 | 24612 | 45,370 | 54% | 4487 | 1640 | 6,127 | 27% |
| 23531 | 30176 | 53,707 | 56% | 4845 | 1882 | 6,727 | 28% |
| 426,056 | 531,222 | 957,278 | 55% | 123,319 | 43,212 | 166,531 | 26% |

30-Day  Re-Encounter Rates by Title Authority of Initial Repatr

| | T |
| Repatriation Month | Not Re-encountered | Re-encountered |
|---|---|---|
| Mar-20 | 5,107 | 2,063 |
| Apr-20 | 9,865 | 5,679 |
| May-20 | 12,285 | 8,674 |
| Jun-20 | 18,159 | 11,778 |
| Jul-20 | 22,136 | 15,022 |
| Aug-20 | 26,294 | 18,779 |
| Sep-20 | 30,631 | 20,298 |
| Oct-20 | 38,839 | 26,957 |
| Nov-20 | 36,628 | 27,179 |
| Dec-20 | 35,553 | 27,565 |
| Jan-21 | 35,977 | 28,804 |
| Feb-21 | 42,885 | 31,679 |
| Mar-21 | 65,041 | 44,580 |
| Apr-21 | 65,149 | 47,749 |
| May-21 | 62,305 | 51,480 |
| Jun-21 | 58,183 | 47,271 |
| Jul-21 | 56,108 | 40,913 |
| Aug-21 | 58,341 | 38,221 |
| Sep-21 | 66,314 | 37,353 |
| Oct-21 | 59,655 | 35,796 |
| Nov-21 | 57,375 | 33,611 |
| Dec-21 | 52,352 | 31,012 |
| Jan-22 | 47,118 | 33,760 |
| Feb-22 | 54,532 | 39,936 |

CLP_AR_002456

...iation
42

T8

30-Day Re-Encounter Rates by Title Authority of Initial Repatriation, Mexican Nationals

T42

| Total Repatriations | % of Repatriations Re-encountered | Not Re-encountered | Re-encountered | Total Repatriations | % of Repatriations Re-encountered |
|---|---|---|---|---|---|
| 7,170 | 29% | 29,142 | 2,688 | 31,830 | 8% |
| 15,544 | 37% | 10,295 | 357 | 10,652 | 3% |
| 20,959 | 41% | 8,697 | 322 | 9,019 | 4% |
| 29,937 | 39% | 8,599 | 343 | 8,942 | 4% |
| 37,158 | 40% | 9,367 | 410 | 9,777 | 4% |
| 45,073 | 42% | 10,142 | 452 | 10,594 | 4% |
| 50,929 | 40% | 10,588 | 493 | 11,081 | 4% |
| 65,796 | 41% | 14,353 | 665 | 15,018 | 4% |
| 63,807 | 43% | 10,287 | 874 | 11,161 | 8% |
| 63,118 | 44% | 10,560 | 1,172 | 11,732 | 10% |
| 64,781 | 44% | 10,830 | 1,182 | 12,012 | 10% |
| 74,564 | 42% | 7,970 | 1,021 | 8,991 | 11% |
| 109,621 | 41% | 9,683 | 1,133 | 10,816 | 10% |
| 112,898 | 42% | 9,225 | 1,187 | 10,412 | 11% |
| 113,785 | 45% | 9,681 | 1,211 | 10,892 | 11% |
| 105,454 | 45% | 9,829 | 1,076 | 10,905 | 10% |
| 97,021 | 42% | 10,307 | 977 | 11,284 | 9% |
| 96,562 | 40% | 10,100 | 1,043 | 11,143 | 9% |
| 103,667 | 36% | 9,395 | 950 | 10,345 | 9% |
| 95,451 | 38% | 11,756 | 1,108 | 12,864 | 9% |
| 90,986 | 37% | 11,929 | 992 | 12,921 | 8% |
| 83,364 | 37% | 11,230 | 890 | 12,120 | 7% |
| 80,878 | 42% | 10,782 | 1,196 | 11,978 | 10% |
| 94,468 | 42% | 12,259 | 1,391 | 13,650 | 10% |

| Repatriation Month | Not Re-encountered | Re-encountered | Total Repatriations | % of Repatriations Re-encountered |
|---|---|---|---|---|
| Mar-20 | 2,992 | 1,686 | 4,678 | 36% |
| Apr-20 | 6,639 | 4,544 | 11,183 | 41% |
| May-20 | 9,894 | 7,562 | 17,456 | 43% |
| Jun-20 | 15,091 | 10,262 | 25,353 | 40% |
| Jul-20 | 17,043 | 12,672 | 29,715 | 43% |
| Aug-20 | 18,875 | 15,030 | 33,905 | 44% |
| Sep-20 | 20,474 | 15,177 | 35,651 | 43% |
| Oct-20 | 24,538 | 19,086 | 43,624 | 44% |
| Nov-20 | 22,851 | 17,367 | 40,218 | 43% |
| Dec-20 | 19,951 | 14,694 | 34,645 | 42% |
| Jan-21 | 19,886 | 15,974 | 35,860 | 45% |
| Feb-21 | 21,730 | 17,937 | 39,667 | 45% |
| Mar-21 | 30,582 | 26,075 | 56,657 | 46% |
| Apr-21 | 31,926 | 27,287 | 59,213 | 46% |
| May-21 | 34,212 | 28,919 | 63,131 | 46% |
| Jun-21 | 30,712 | 25,993 | 56,705 | 46% |
| Jul-21 | 27,865 | 23,148 | 51,013 | 45% |
| Aug-21 | 26,122 | 21,808 | 47,930 | 45% |
| Sep-21 | 29,802 | 24,346 | 54,148 | 45% |
| Oct-21 | 33,953 | 26,292 | 60,245 | 44% |
| Nov-21 | 32,619 | 24,585 | 57,204 | 43% |
| Dec-21 | 25,822 | 19,548 | 45,370 | 43% |
| Jan-22 | 28,357 | 25,350 | 53,707 | 47% |
| Feb-22 | 33,878 | 30,350 | 64,228 | 47% |

CLP_AR_002457

**T8**

| Not Re-encountered | Re-encountered | Total Repatriations | % of Repatriations Re-encountered |
|---|---|---|---|
| 18,846 | 2,623 | 21,469 | 12% |
| 6,734 | 341 | 7,075 | 5% |
| 5,549 | 296 | 5,845 | 5% |
| 5,405 | 323 | 5,728 | 6% |
| 5,622 | 365 | 5,987 | 6% |
| 6,080 | 416 | 6,496 | 6% |
| 5,901 | 438 | 6,339 | 7% |
| 7,218 | 580 | 7,798 | 7% |
| 6,252 | 819 | 7,071 | 12% |
| 6,742 | 1,126 | 7,868 | 14% |
| 6,316 | 1,117 | 7,433 | 15% |
| 4,759 | 978 | 5,737 | 17% |
| 5,646 | 1,048 | 6,694 | 16% |
| 5,532 | 1,102 | 6,634 | 17% |
| 5,706 | 1,117 | 6,823 | 16% |
| 5,547 | 1,009 | 6,556 | 15% |
| 5,344 | 883 | 6,227 | 14% |
| 5,269 | 945 | 6,214 | 15% |
| 5,078 | 888 | 5,966 | 15% |
| 6,018 | 1,032 | 7,050 | 15% |
| 5,766 | 901 | 6,667 | 14% |
| 5,336 | 791 | 6,127 | 13% |
| 5,653 | 1,074 | 6,727 | 16% |
| 6,304 | 1,283 | 7,587 | 17% |

CLP_AR_002458

Quote: However, as noted in the NPRM, encounters of non-Mexican nationals at the SWB in between POEs have reached a 10-year high of 1.5 million in FY 2022, driven by smuggling networks that enable and exploit this unprecedented moveme
Footnote: OIS analysis of OIS Persist Dataset based on data through March 31, 2023.
Filter: SWB; USBP

USBP SWB Encounters (persist)

| | Mexico | NTriangle | Other | Non-Mex | Grand Total |
|---|---|---|---|---|---|
| 2013 | 265,409 | 137,548 | 11,440 | 148,988 | 414,397 |
| 2014 | 226,770 | 237,860 | 14,740 | 252,600 | 479,370 |
| 2015 | 186,017 | 133,528 | 11,788 | 145,316 | 331,333 |
| 2016 | 190,760 | 199,401 | 18,709 | 218,110 | 408,870 |
| 2017 | 127,938 | 162,891 | 13,087 | 175,978 | 303,916 |
| 2018 | 152,257 | 223,604 | 20,718 | 244,322 | 396,579 |
| 2019 | 166,458 | 607,774 | 77,276 | 685,050 | 851,508 |
| 2020 | 253,104 | 103,816 | 43,715 | 147,531 | 400,635 |
| 2021 | 608,037 | 683,894 | 367,275 | 1,051,169 | 1,659,206 |
| 2022 | 738,781 | 520,602 | 947,054 | 1,467,656 | 2,206,437 |

ent of people.

CLP_AR_002460

Quote: Indeed, most noncitizens who receive a positive credible fear determination will be able to live and work in the United States for the duration of their removal proceedings—which, on average, take almost 4 years.

Footnote: OIS analysis of DOJ EOIR data based on data through March 31, 2023.

Median years (2022):  **3.70**

| comp_FY | ABSENTIA=No | | | | ABSENTIA=Yes | | | |
|---|---|---|---|---|---|---|---|---|
| | N Obs | Mean | Median | Median Years | N Obs | Mean | Median | Median Years |
| 2000 | 66,939 | 42 | 13 | 0.04 | 17,055 | 105 | 87 | 0.24 |
| 2001 | 97,395 | 109 | 28 | 0.08 | 28,132 | 177 | 145 | 0.40 |
| 2002 | 115,984 | 172 | 46 | 0.13 | 30,214 | 209 | 163 | 0.45 |
| 2003 | 140,238 | 211 | 50 | 0.14 | 29,843 | 195 | 120 | 0.33 |
| 2004 | 142,799 | 252 | 52 | 0.14 | 40,400 | 157 | 92 | 0.25 |
| 2005 | 149,545 | 283 | 43 | 0.12 | 92,538 | 114 | 67 | 0.18 |
| 2006 | 160,378 | 308 | 50 | 0.14 | 93,956 | 134 | 79 | 0.22 |
| 2007 | 179,931 | 283 | 36 | 0.10 | 28,938 | 268 | 171 | 0.47 |
| 2008 | 190,483 | 264 | 22 | 0.06 | 23,527 | 324 | 172 | 0.47 |
| 2009 | 197,954 | 267 | 26 | 0.07 | 19,480 | 319 | 143 | 0.39 |
| 2010 | 189,025 | 351 | 48 | 0.13 | 20,882 | 320 | 174 | 0.48 |
| 2011 | 187,304 | 389 | 61 | 0.17 | 18,549 | 377 | 249 | 0.68 |
| 2012 | 166,071 | 504 | 145 | 0.40 | 16,389 | 443 | 301 | 0.82 |
| 2013 | 142,194 | 671 | 392 | 1.07 | 17,975 | 464 | 323 | 0.88 |
| 2014 | 125,665 | 710 | 423 | 1.16 | 22,033 | 390 | 258 | 0.71 |
| 2015 | 122,721 | 791 | 518 | 1.42 | 32,614 | 347 | 210 | 0.58 |
| 2016 | 133,188 | 868 | 594 | 1.63 | 29,992 | 494 | 332 | 0.91 |
| 2017 | 129,902 | 795 | 426 | 1.17 | 37,232 | 535 | 299 | 0.82 |
| 2018 | 143,266 | 837 | 466 | 1.28 | 41,844 | 650 | 410 | 1.12 |
| 2019 | 172,989 | 835 | 392 | 1.07 | 82,754 | 459 | 231 | 0.63 |
| 2020 | 136,958 | 834 | 358 | 0.98 | 82,043 | 306 | 157 | 0.43 |
| 2021 | 110,598 | 1,463 | 1,244 | 3.41 | 7,602 | 930 | 720 | 1.97 |
| 2022 | 284,075 | 1,608 | 1,351 | 3.70 | 58,928 | 749 | 559 | 1.53 |
| 2023 | 178,733 | 1,369 | 1,245 | 3.41 | 71,639 | 789 | 494 | 1.35 |

CLP_AR_002461

Quote: Finally, the unprecedented migratory flow of non-Mexican migrants, who are far more likely to apply for protection, has contributed to a growing backlog of cases awaiting review by AOs and IJs

Footnote: For noncitizens encountered at the SWB in FYs 2014-FY 2019 who were placed in expedited removal, 6 percent of Mexican nationals made fear claims that were referred to USCIS for adjudication compared to 57 percent of people from North

Filter:

## Final or Most Current Outcomes, Total SW Border Encounters by Fear Claims by Country

| MOST CURRENT OUTCOMES | TOTAL | MEXICO | NCA | All Others |
|---|---|---|---|---|
| Total Encounters[1] | 100.0% | 100.0% | 100.0% | 100.0% |
| Processed for Expedited Removal (ER) as a Percent of Total Encounters | 42.2% | 45.8% | 36.6% | 55.6% |
| No fear claim as a Percent of ER | 61.8% | 93.2% | 40.8% | 6.9% |
| No Fear Claim - confirmed removal or return as a Percent of No Fear Claim | 97.0% | 99.8% | 90.1% | 88.6% |
| Fear Claims Withdrawn (Based on APSO Receipts) as a Percent of ER | 1.8% | 1.1% | 2.4% | 3.0% |
| *Credible Fear Claims (APSO clock-in Only) as a Percent of ER* | 36.4% | 5.7% | 56.8% | 90.1% |
| Positive fear determinations as a percent of Credible Fear Claims | 75.8% | 53.8% | 73.9% | 84.6% |
| Negative fear determinations as a percent of Credible Fear Claims | 13.3% | 18.8% | 13.7% | 10.9% |
| Negative fear determinations appealed to EOIR as a percent of negative fear | 79.8% | 71.0% | 76.9% | 92.5% |
| Negative fear determinations vacated by EOIR as a percent of appealed negative fear | 23.0% | 11.3% | 21.1% | 31.6% |
| Negative fear determinations upheld by EOIR as a percent of appealed negative fear | 77.0% | 88.7% | 78.9% | 68.4% |
| Case closures as a percent of Credible Fear Claims | 10.8% | 21.4% | 12.3% | 4.5% |
| Case closures referred to EOIR as a percent of case closures | 44.4% | 14.0% | 46.7% | 68.4% |
| Case closures not referred to EOIR as a percent of case closures | 55.6% | 86.0% | 53.3% | 31.6% |
| Non-Referrals to EOIR as a percent of fear claims | 387.3% | 285.8% | 919.1% | 129.2% |
| Executed Removal Orders as a percent of non-referrals to EOIR | 73.3% | 69.5% | 75.7% | 67.7% |
| Total Referrals to EOIR (Includes closed cases, vacated negative decisions and positive decisions) as a percent of fear claims | 1465.0% | 340.0% | 3371.0% | 940.3% |
| EOIR cases started as a percent referrals to EOIR | 95.5% | 96.7% | 94.9% | 96.8% |
| Still in EOIR Proceedings as a percent of EOIR cases | 37.6% | 27.7% | 39.2% | 36.2% |
| EOIR Cases completed as a percent of EOIR cases | 62.4% | 72.3% | 60.8% | 63.8% |
| Asylum Granted or other EOIR Relief from Removal | 16.5% | 8.5% | 9.8% | 31.4% |
| Grants of relief + other favorable-to-noncitizen judgements appealed to BIA as a percent of relief | 5.9% | 7.2% | 6.4% | 5.5% |
| Removal Orders as a percent of EOIR cases | 61.7% | 71.0% | 70.6% | 42.2% |
| EOIR Removal Orders + other favorable-to-OPLA judgements appealed to BIA as a percent of | 29.5% | 23.9% | 28.7% | 34.3% |
| Executed Removal Orders as a percent of removal orders | 30.7% | 48.0% | 24.9% | 43.4% |

Notes: Results based on source data as of December 31, 2022 and OIS Enforcement Lifecycle methodology as of May 31, 2021. Encounters include USBP
Source: DHS Office of Immigration Statistics Enforcement Lifecycle.
1 Excludes Accompanied Minors (AM), and OFO administrative cases including, crewmembers, parolee, and withdrawals. Total exclusions made up 2.9 percen

CLP_AR_002462

hern Central America and 90 percent of all other nationalities.  OIS analysis of Enforcement Lifecycle data as of December 31, 2022.

CLP_AR_002463

Quote: DHS was encountering an average of approximately 8,800 noncitizens per day during the first ten days of December 2022—a new record—and expects that encounter numbers could increase to 11,000 per day following the termination

Footnote: See DHS Post-Title 42 Planning Model generated April 18, 2023; see also OIS analysis of CBP UIP data downloaded January 13, 2023.

Filter: SWB; all CBP

| | CBP Enc | | daily average first 10 weeks: | 8,839 |
|---|---|---|---|---|
| 12/1/2022 | 8,541 | | | |
| 12/2/2022 | 9,671 | | | |
| 12/3/2022 | 7,962 | | | |
| 12/4/2022 | 7,977 | | | |
| 12/5/2022 | 8,367 | | | |
| 12/6/2022 | 8,422 | | | |
| 12/7/2022 | 9,352 | | | |
| 12/8/2022 | 9,419 | | | |
| 12/9/2022 | 9,520 | | | |
| 12/10/2022 | 9,156 | | | |
| 12/11/2022 | 8,874 | | | |
| 12/12/2022 | 8,810 | | | |
| 12/13/2022 | 9,093 | | | |
| 12/14/2022 | 9,319 | | | |
| 12/15/2022 | 9,137 | | | |
| 12/16/2022 | 7,861 | | | |
| 12/17/2022 | 7,895 | | | |
| 12/18/2022 | 7,788 | | | |
| 12/19/2022 | 8,352 | | | |
| 12/20/2022 | 9,564 | | | |
| 12/21/2022 | 9,469 | | | |
| 12/22/2022 | 9,102 | | | |
| 12/23/2022 | 8,330 | | | |
| 12/24/2022 | 7,130 | | | |
| 12/25/2022 | 4,381 | | | |
| 12/26/2022 | 5,911 | | | |
| 12/27/2022 | 7,137 | | | |
| 12/28/2022 | 6,955 | | | |
| 12/29/2022 | 6,497 | | | |
| 12/30/2022 | 5,745 | | | |
| 12/31/2022 | 6,275 | | | |

**FOUO**

**Blended Projections, Totals**

**Assumptic Title 42, CHNV returns to Mexico, and CHNV paroles end May 11. NPRM not implemented.**

**Projection Planning. All projections are for planning purposes, showing what OIS estimates may happen under these assumptions. Effects c Operational confidence intervals (not assuming growing uncertainty over time) are used to quantify model uncertainty.**

**Users should not treat these results as a precise statement of what will happen.**

| | 23-Apr | 23-May | 23-Jun | 23-Jul | 23-Aug | 23-Sep | Total |
|---|---|---|---|---|---|---|---|
| **Total** | | | | | | | |
| **Projection** | **5,392** | **6,768** | **7,527** | **6,878** | **7,119** | **7,712** | **6,900** |
| Moderatel | 6,817 | 8,147 | 8,953 | 8,257 | 8,499 | 9,137 | 8,301 |
| Moderatel | 4,098 | 5,407 | 6,130 | 5,511 | 5,750 | 6,423 | 5,553 |
| High | 8,186 | 9,471 | 10,321 | 9,581 | 9,823 | 10,505 | 9,647 |
| Low | 3,208 | 4,174 | 4,824 | 4,252 | 4,494 | 5,203 | 4,358 |
| **FM** | | | | | | | |
| **Projection** | **1,145** | **2,089** | **2,787** | **2,244** | **2,326** | **2,466** | **2,177** |
| Moderatel | 1,826 | 2,748 | 3,468 | 2,903 | 2,985 | 3,147 | 2,847 |
| Moderatel | 584 | 1,449 | 2,127 | 1,598 | 1,670 | 1,921 | 1,558 |
| High | 2,480 | 3,381 | 4,122 | 3,536 | 3,618 | 3,801 | 3,490 |
| Low | 266 | 893 | 1,522 | 1,019 | 1,099 | 1,408 | 1,034 |
| **SA** | | | | | | | |
| **Projection** | **3,814** | **4,243** | **4,233** | **4,182** | **4,335** | **4,769** | **4,263** |
| Moderatel | 4,521 | 4,927 | 4,940 | 4,866 | 5,020 | 5,476 | 4,958 |
| Moderatel | 3,118 | 3,559 | 3,532 | 3,498 | 3,658 | 4,062 | 3,571 |
| High | 5,200 | 5,584 | 5,619 | 5,523 | 5,677 | 6,155 | 5,626 |
| Low | 2,578 | 2,916 | 2,867 | 2,852 | 3,007 | 3,391 | 2,935 |
| **UC** | | | | | | | |
| **Projection** | **433** | **436** | **507** | **452** | **458** | **476** | **460** |
| Moderatel | 470 | 472 | 545 | 488 | 493 | 513 | 497 |
| Moderatel | 397 | 400 | 470 | 416 | 422 | 439 | 424 |
| High | 506 | 506 | 580 | 522 | 528 | 549 | 532 |
| Low | 363 | 366 | 435 | 382 | 387 | 404 | 389 |
| **HHS Referrals** | | | | | | | |
| **Projection** | **326** | **338** | **397** | **352** | **347** | **356** | **353** |
| Moderatel | 356 | 367 | 427 | 381 | 376 | 387 | 382 |
| Moderatel | 297 | 309 | 367 | 323 | 318 | 327 | 324 |
| High | 459 | 435 | 488 | 424 | 444 | 450 | 450 |
| Low | 270 | 282 | 339 | 295 | 291 | 299 | 296 |

CLP_AR_002464

of the Title 42 public health Order.

**of these policy assumptions are also based on best available information.**

CLP_AR_002465

Quote: Total migrants interdicted at sea by the U.S. Coast Guard (USCG) increased by 502 percent between FY 2020 (2,079) and FY 2022 (12,521)
Footnote: OIS analysis of USCG data through March 31, 2023.
Quote: Interdictions continued to rise in FY 2023 with 8,822 migrants interdicted at sea through March, almost 70 percent of the total in FY 2022 within six months.
Footnote: Id.

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023YTD |
|---|---|---|---|---|---|---|---|---|---|---|
| Cuba | 2,090 | 2,736 | 5,221 | 1,465 | 259 | 381 | 43 | 827 | 5,740 | 5,427 |
| Haiti | 968 | 561 | 380 | 419 | 609 | 824 | 398 | 1,205 | 4,025 | 2,565 |
| Dominica | 269 | 257 | 570 | 519 | 492 | 920 | 1,201 | 744 | 1,804 | 560 |
| Mexico | 33 | 11 | 3 | 50 | 123 | 160 | 343 | 612 | 676 | 208 |
| Venezuela | 0 | 0 | 1 | 1 | 1 | 0 | 10 | 0 | 63 | 2 |
| Honduras | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 2 | 32 | 0 |
| Jamaica | 12 | 13 | 15 | 16 | 8 | 25 | 3 | 16 | 29 | 5 |
| Ecuador | 0 | 3 | 23 | 3 | 57 | 7 | 2 | 9 | 18 | 3 |
| Uzbekista | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 16 | 0 |
| Colombia | 0 | 0 | 0 | 2 | 7 | 7 | 1 | 11 | 15 | 1 |
| Other | 19 | 32 | 121 | 37 | 106 | 104 | 77 | 82 | 103 | 51 |
| **Total** | **3,391** | **3,614** | **6,334** | **2,512** | **1,662** | **2,429** | **2,079** | **3,508** | **12,521** | **8,822** |

% change 22 to 20   502%
% of total, 23YTD/22   70%

Quote: For instance, between the announcement of the CHN processes on January 5, 2023, and January 21, 2023, the number of daily encounters between POEs of CHN nationals dropped from 928 to 73, a 92 percent decline
Source: OIS Persist based on data through March 31, 2023.
Quote: CHN encounters between POEs continued to decline to an average of fewer than 17 per day in March 2023
Source: Id.

| | |
|---|---|
| Jan 5 CHN | 928 |
| Jan 21 CHN | 73 |
| % change | -92% |
| Daily Average CHN March 2023 | 16.45 |

| Date | Country of Citizenship | | | | | | USBP |
|---|---|---|---|---|---|---|---|
| | | CHN | | | | | |
| | Venezuela | Cuba | Haiti | Nicaragua | CHN Sum | Non-CHN | N |
| 10/1/2022 | 1,240 | 766 | 7 | 606 | 1,379 | 4,048 | 6,667 |
| 10/2/2022 | 1,512 | 984 | 5 | 553 | 1,542 | 3,958 | 7,012 |
| 10/3/2022 | 1,366 | 965 | 10 | 421 | 1,396 | 3,987 | 6,749 |
| 10/4/2022 | 1,260 | 716 | 5 | 833 | 1,554 | 4,945 | 7,759 |
| 10/5/2022 | 1,139 | 1,039 | 5 | 700 | 1,744 | 5,240 | 8,123 |
| 10/6/2022 | 1,174 | 822 | 7 | 913 | 1,742 | 4,711 | 7,627 |
| 10/7/2022 | 1,083 | 829 | 2 | 671 | 1,502 | 4,568 | 7,153 |
| 10/8/2022 | 1,006 | 1,115 | 7 | 800 | 1,922 | 4,244 | 7,172 |
| 10/9/2022 | 1,202 | 937 | 0 | 770 | 1,707 | 3,875 | 6,784 |
| ######## | 1,224 | 905 | 8 | 590 | 1,503 | 3,824 | 6,551 |
| ######## | 1,128 | 925 | 9 | 578 | 1,512 | 4,354 | 6,994 |
| ######## | 796 | 1,074 | 1 | 544 | 1,619 | 4,056 | 6,471 |
| ######## | 1,256 | 1,006 | 2 | 642 | 1,650 | 4,360 | 7,266 |
| ######## | 1,053 | 936 | 3 | 697 | 1,636 | 4,017 | 6,706 |
| ######## | 834 | 692 | 4 | 694 | 1,390 | 3,640 | 5,864 |
| ######## | 484 | 640 | 1 | 633 | 1,274 | 3,530 | 5,288 |
| ######## | 298 | 746 | 7 | 514 | 1,267 | 4,039 | 5,604 |
| ######## | 185 | 613 | 1 | 487 | 1,101 | 4,636 | 5,922 |
| ######## | 156 | 897 | 4 | 659 | 1,560 | 4,417 | 6,133 |
| ######## | 159 | 911 | 4 | 564 | 1,479 | 4,797 | 6,435 |
| ######## | 132 | 1,027 | 1 | 795 | 1,823 | 4,583 | 6,538 |
| ######## | 145 | 966 | 2 | 656 | 1,624 | 4,264 | 6,033 |
| ######## | 160 | 1,054 | 4 | 554 | 1,612 | 4,207 | 5,979 |
| ######## | 247 | 830 | 3 | 480 | 1,313 | 4,261 | 5,821 |
| ######## | 296 | 1,089 | 3 | 758 | 1,850 | 5,094 | 7,240 |
| ######## | 415 | 798 | 1 | 710 | 1,509 | 4,740 | 6,664 |
| ######## | 301 | 1,107 | 3 | 661 | 1,771 | 4,897 | 6,969 |
| ######## | 408 | 1,078 | 1 | 855 | 1,934 | 4,406 | 6,748 |
| ######## | 405 | 1,267 | 1 | 978 | 2,246 | 4,430 | 7,081 |
| ######## | 331 | 1,066 | 10 | 859 | 1,935 | 3,332 | 5,598 |
| ######## | 430 | 1,011 | 3 | 721 | 1,735 | 3,769 | 5,934 |
| 11/1/2022 | 412 | 1,106 | 5 | 1,131 | 2,242 | 4,194 | 6,848 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 11/2/2022 | 331 | 1,166 | 3 | 1,210 | 2,379 | 4,561 | 7,271 |
| 11/3/2022 | 305 | 898 | 2 | 686 | 1,586 | 4,166 | 6,057 |
| 11/4/2022 | 348 | 1,154 | 0 | 983 | 2,137 | 4,380 | 6,865 |
| 11/5/2022 | 250 | 1,066 | 0 | 681 | 1,747 | 4,074 | 6,071 |
| 11/6/2022 | 239 | 1,133 | 3 | 1,506 | 2,642 | 4,032 | 6,913 |
| 11/7/2022 | 265 | 869 | 0 | 994 | 1,863 | 4,293 | 6,421 |
| 11/8/2022 | 263 | 1,068 | 6 | 1,167 | 2,241 | 4,984 | 7,488 |
| 11/9/2022 | 262 | 935 | 1 | 902 | 1,838 | 4,477 | 6,577 |
| ######## | 262 | 1,055 | 0 | 1,167 | 2,222 | 4,735 | 7,219 |
| ######## | 341 | 1,425 | 4 | 956 | 2,385 | 4,871 | 7,597 |
| ######## | 192 | 1,142 | 0 | 846 | 1,988 | 4,398 | 6,578 |
| ######## | 197 | 1,113 | 3 | 915 | 2,031 | 3,964 | 6,192 |
| ######## | 158 | 1,543 | 0 | 972 | 2,515 | 4,287 | 6,960 |
| ######## | 168 | 1,200 | 1 | 1,091 | 2,292 | 4,744 | 7,204 |
| ######## | 498 | 850 | 1 | 1,219 | 2,070 | 4,674 | 7,242 |
| ######## | 1,074 | 1,492 | 1 | 1,096 | 2,589 | 5,004 | 8,667 |
| ######## | 212 | 985 | 1 | 955 | 1,941 | 4,850 | 7,003 |
| ######## | 91 | 1,555 | 0 | 1,206 | 2,761 | 4,171 | 7,023 |
| ######## | 118 | 1,210 | 0 | 1,218 | 2,428 | 3,801 | 6,347 |
| ######## | 84 | 1,443 | 1 | 1,424 | 2,868 | 4,141 | 7,093 |
| ######## | 126 | 1,048 | 2 | 1,280 | 2,330 | 4,629 | 7,085 |
| ######## | 81 | 1,273 | 0 | 1,012 | 2,285 | 4,270 | 6,636 |
| ######## | 60 | 1,094 | 0 | 1,223 | 2,317 | 4,150 | 6,527 |
| ######## | 51 | 987 | 1 | 1,299 | 2,287 | 3,889 | 6,227 |
| ######## | 55 | 1,387 | 0 | 1,274 | 2,661 | 4,442 | 7,158 |
| ######## | 75 | 827 | 1 | 1,686 | 2,514 | 3,713 | 6,302 |
| ######## | 65 | 1,006 | 0 | 1,334 | 2,340 | 4,397 | 6,802 |
| ######## | 83 | 1,046 | 0 | 1,064 | 2,110 | 4,557 | 6,750 |
| ######## | 87 | 1,598 | 0 | 1,698 | 3,296 | 4,942 | 8,325 |
| 12/1/2022 | 102 | 1,275 | 2 | 1,336 | 2,613 | 4,817 | 7,532 |
| 12/2/2022 | 95 | 1,614 | 1 | 1,720 | 3,335 | 5,306 | 8,736 |
| 12/3/2022 | 79 | 1,464 | 0 | 1,426 | 2,890 | 4,150 | 7,119 |
| 12/4/2022 | 126 | 1,712 | 1 | 1,298 | 3,011 | 3,963 | 7,100 |
| 12/5/2022 | 120 | 1,320 | 2 | 1,594 | 2,916 | 4,333 | 7,369 |
| 12/6/2022 | 84 | 1,151 | 0 | 1,572 | 2,723 | 4,608 | 7,415 |
| 12/7/2022 | 144 | 1,698 | 1 | 1,809 | 3,508 | 4,738 | 8,390 |
| 12/8/2022 | 49 | 1,690 | 0 | 1,813 | 3,503 | 4,819 | 8,371 |
| 12/9/2022 | 88 | 1,944 | 0 | 1,592 | 3,536 | 4,873 | 8,497 |
| ######## | 101 | 1,786 | 1 | 1,758 | 3,545 | 4,535 | 8,181 |
| ######## | 161 | 1,487 | 1 | 1,606 | 3,094 | 4,647 | 7,902 |
| ######## | 114 | 1,463 | 2 | 1,699 | 3,164 | 4,533 | 7,811 |
| ######## | 157 | 1,459 | 2 | 1,548 | 3,009 | 4,907 | 8,073 |
| ######## | 116 | 1,601 | 0 | 1,555 | 3,156 | 5,009 | 8,281 |
| ######## | 145 | 1,547 | 2 | 1,447 | 2,996 | 4,991 | 8,132 |
| ######## | 91 | 1,178 | 0 | 699 | 1,877 | 4,881 | 6,849 |
| ######## | 146 | 1,444 | 0 | 996 | 2,440 | 4,354 | 6,940 |
| ######## | 187 | 1,398 | 2 | 909 | 2,309 | 4,408 | 6,904 |

CLP_AR_002468

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ####### | 231 | 1,538 | 1 | 867 | 2,406 | 4,672 | 7,309 |
| ####### | 254 | 1,336 | 1 | 1,201 | 2,538 | 5,776 | 8,568 |
| ####### | 362 | 1,341 | 0 | 1,122 | 2,463 | 5,606 | 8,431 |
| ####### | 723 | 1,131 | 1 | 933 | 2,065 | 5,298 | 8,086 |
| ####### | 267 | 1,729 | 0 | 817 | 2,546 | 4,488 | 7,301 |
| ####### | 306 | 1,181 | 0 | 1,004 | 2,185 | 3,756 | 6,247 |
| ####### | 254 | 586 | 5 | 290 | 881 | 2,397 | 3,532 |
| ####### | 234 | 944 | 3 | 501 | 1,448 | 3,331 | 5,013 |
| ####### | 353 | 1,382 | 1 | 493 | 1,876 | 3,855 | 6,084 |
| ####### | 247 | 1,056 | 1 | 590 | 1,647 | 4,020 | 5,914 |
| ####### | 257 | 1,176 | 0 | 390 | 1,566 | 3,689 | 5,512 |
| ####### | 263 | 705 | 0 | 397 | 1,102 | 3,371 | 4,736 |
| ####### | 327 | 1,280 | 1 | 380 | 1,661 | 3,387 | 5,375 |
| 1/1/2023 | 309 | 289 | 3 | 175 | 467 | 1,980 | 2,756 |
| 1/2/2023 | 280 | 487 | 1 | 203 | 691 | 2,106 | 3,077 |
| 1/3/2023 | 270 | 795 | 1 | 250 | 1,046 | 2,606 | 3,922 |
| 1/4/2023 | 366 | 592 | 3 | 171 | 766 | 2,297 | 3,429 |
| 1/5/2023 | 142 | 591 | 3 | 334 | 928 | 2,577 | 3,647 |
| 1/6/2023 | 98 | 625 | 0 | 175 | 800 | 2,725 | 3,623 |
| 1/7/2023 | 77 | 679 | 2 | 172 | 853 | 2,813 | 3,743 |
| 1/8/2023 | 61 | 574 | 0 | 117 | 691 | 2,667 | 3,419 |
| 1/9/2023 | 70 | 450 | 1 | 124 | 575 | 2,946 | 3,591 |
| 1/10/2023 | 73 | 161 | 1 | 102 | 264 | 3,757 | 4,094 |
| 1/11/2023 | 56 | 189 | 5 | 160 | 354 | 3,930 | 4,340 CBP One Removed |
| 1/12/2023 | 57 | 114 | 0 | 171 | 285 | 3,981 | 4,323 |
| 1/13/2023 | 35 | 80 | 0 | 155 | 235 | 4,007 | 4,277 |
| 1/14/2023 | 50 | 112 | 6 | 95 | 213 | 4,244 | 4,507 |
| 1/15/2023 | 41 | 66 | 0 | 122 | 188 | 3,612 | 3,841 |
| 1/16/2023 | 43 | 19 | 4 | 91 | 114 | 3,747 | 3,904 |
| 1/17/2023 | 21 | 42 | 0 | 122 | 164 | 4,240 | 4,425 |
| 1/18/2023 | 28 | 26 | 2 | 82 | 110 | 4,542 | 4,680 |
| 1/19/2023 | 22 | 56 | 0 | 102 | 158 | 4,201 | 4,381 |
| 1/20/2023 | 32 | 23 | 1 | 87 | 111 | 4,495 | 4,638 |
| 1/21/2023 | 24 | 29 | 3 | 41 | 73 | 4,362 | 4,459 |
| 1/22/2023 | 24 | 33 | 4 | 54 | 91 | 4,042 | 4,157 |
| 1/23/2023 | 20 | 10 | 2 | 37 | 49 | 4,443 | 4,512 |
| 1/24/2023 | 8 | 27 | 2 | 20 | 49 | 4,240 | 4,297 |
| 1/25/2023 | 35 | 17 | 0 | 29 | 46 | 4,745 | 4,826 |
| 1/26/2023 | 17 | 23 | 0 | 39 | 62 | 4,709 | 4,788 |
| 1/27/2023 | 11 | 24 | 0 | 19 | 43 | 4,952 | 5,006 |
| 1/28/2023 | 18 | 19 | 1 | 19 | 39 | 4,756 | 4,813 |
| 1/29/2023 | 30 | 15 | 0 | 22 | 37 | 4,087 | 4,154 |
| 1/30/2023 | 10 | 13 | 1 | 29 | 43 | 4,418 | 4,471 |
| 1/31/2023 | 16 | 8 | 1 | 11 | 20 | 4,800 | 4,836 |
| 2/1/2023 | 11 | 10 | 1 | 20 | 31 | 4,642 | 4,684 |
| 2/2/2023 | 17 | 4 | 0 | 20 | 24 | 4,637 | 4,678 |
| 2/3/2023 | 8 | 12 | 0 | 24 | 36 | 4,667 | 4,711 |

CLP_AR_002469

| Date | | | | | | |
|---|---|---|---|---|---|---|
| 2/4/2023 | 46 | 6 | 3 | 8 | 17 | 4,178 | 4,241 |
| 2/5/2023 | 32 | 10 | 1 | 16 | 27 | 4,009 | 4,068 |
| 2/6/2023 | 77 | 17 | 0 | 23 | 40 | 4,414 | 4,531 |
| 2/7/2023 | 20 | 4 | 1 | 18 | 23 | 5,054 | 5,097 |
| 2/8/2023 | 254 | 4 | 0 | 27 | 31 | 4,770 | 5,055 |
| 2/9/2023 | 327 | 7 | 0 | 13 | 20 | 4,821 | 5,168 |
| 2/10/2023 | 144 | 7 | 0 | 7 | 14 | 4,461 | 4,619 |
| 2/11/2023 | 40 | 4 | 2 | 5 | 11 | 4,231 | 4,282 |
| 2/12/2023 | 42 | 10 | 0 | 17 | 27 | 3,969 | 4,038 |
| 2/13/2023 | 24 | 14 | 0 | 20 | 34 | 4,630 | 4,688 |
| 2/14/2023 | 22 | 8 | 0 | 29 | 37 | 4,674 | 4,733 |
| 2/15/2023 | 22 | 4 | 1 | 8 | 13 | 4,608 | 4,643 |
| 2/16/2023 | 26 | 6 | 1 | 19 | 26 | 4,663 | 4,715 |
| 2/17/2023 | 21 | 8 | 1 | 11 | 20 | 4,708 | 4,749 |
| 2/18/2023 | 20 | 3 | 1 | 9 | 13 | 4,482 | 4,515 |
| 2/19/2023 | 11 | 1 | 0 | 17 | 18 | 4,325 | 4,354 |
| 2/20/2023 | 43 | 8 | 0 | 6 | 14 | 4,388 | 4,445 |
| 2/21/2023 | 30 | 2 | 5 | 13 | 20 | 4,633 | 4,683 |
| 2/22/2023 | 8 | 2 | 0 | 9 | 11 | 4,456 | 4,475 |
| 2/23/2023 | 32 | 1 | 0 | 17 | 18 | 4,931 | 4,981 |
| 2/24/2023 | 37 | 3 | 0 | 6 | 9 | 4,971 | 5,017 |
| 2/25/2023 | 21 | 8 | 0 | 8 | 16 | 4,760 | 4,797 |
| 2/26/2023 | 59 | 3 | 0 | 8 | 11 | 4,121 | 4,191 |
| 2/27/2023 | 21 | 3 | 3 | 13 | 19 | 4,311 | 4,351 |
| 2/28/2023 | 40 | 7 | 1 | 9 | 17 | 5,458 | 5,515 |
| 3/1/2023 | 17 | 6 | 0 | 7 | 13 | 5,429 | 5,459 |
| 3/2/2023 | 21 | 2 | 1 | 10 | 13 | 5,099 | 5,133 |
| 3/3/2023 | 43 | 4 | 2 | 10 | 16 | 5,359 | 5,418 |
| 3/4/2023 | 15 | 10 | 7 | 10 | 27 | 5,226 | 5,268 |
| 3/5/2023 | 42 | 3 | 5 | 5 | 13 | 4,925 | 4,980 |
| 3/6/2023 | 72 | 4 | 1 | 4 | 9 | 4,828 | 4,909 |
| 3/7/2023 | 31 | 8 | 4 | 6 | 18 | 6,064 | 6,113 |
| 3/8/2023 | 48 | 4 | 7 | 11 | 22 | 5,280 | 5,350 |
| 3/9/2023 | 40 | 4 | 5 | 3 | 12 | 5,310 | 5,362 |
| 3/10/2023 | 15 | 2 | 12 | 2 | 16 | 5,350 | 5,381 |
| 3/11/2023 | 31 | 0 | 12 | 1 | 13 | 5,022 | 5,066 |
| 3/12/2023 | 78 | 2 | 9 | 5 | 16 | 4,467 | 4,561 |
| 3/13/2023 | 66 | 3 | 3 | 9 | 15 | 4,594 | 4,675 |
| 3/14/2023 | 66 | 2 | 17 | 10 | 29 | 5,368 | 5,463 |
| 3/15/2023 | 30 | 3 | 13 | 3 | 19 | 5,156 | 5,205 |
| 3/16/2023 | 41 | 0 | 18 | 9 | 27 | 5,450 | 5,518 |
| 3/17/2023 | 21 | 2 | 8 | 4 | 14 | 4,772 | 4,807 |
| 3/18/2023 | 37 | 1 | 7 | 7 | 15 | 4,874 | 4,926 |
| 3/19/2023 | 61 | 5 | 4 | 2 | 11 | 4,095 | 4,167 |
| 3/20/2023 | 91 | 0 | 3 | 15 | 18 | 5,032 | 5,141 |
| 3/21/2023 | 68 | 3 | 1 | 4 | 8 | 5,433 | 5,509 |
| 3/22/2023 | 53 | 3 | 4 | 2 | 9 | 4,910 | 4,972 |

CLP_AR_002470

| | | | | | | |
|---|---|---|---|---|---|---|
| 3/23/2023 | 38 | 1 | 5 | 12 | 18 | 5,376 | 5,432 |
| 3/24/2023 | 28 | 5 | 1 | 8 | 14 | 5,091 | 5,133 |
| 3/25/2023 | 58 | 4 | 4 | 10 | 18 | 5,194 | 5,270 |
| 3/26/2023 | 108 | 2 | 1 | 5 | 8 | 5,013 | 5,129 |
| 3/27/2023 | 162 | 4 | 4 | 4 | 12 | 5,200 | 5,374 |
| 3/28/2023 | 125 | 1 | 2 | 5 | 8 | 5,732 | 5,865 |
| 3/29/2023 | 560 | 7 | 5 | 17 | 29 | 5,419 | 6,008 |
| 3/30/2023 | 1,006 | 14 | 3 | 13 | 30 | 4,888 | 5,924 |
| 3/31/2023 | 229 | 8 | 1 | 11 | 20 | 4,550 | 4,799 |

CLP_AR_002471

Quote: For instance, as noted in the proposed rule, in the week prior to the announcement of the Venezuela parole process on October 12, 2022, encounters of Venezuelan nationals between POEs at the SWB averaged over 1,100 a day from October 5

Footnote: USBP encountered an average of 225 Venezuelans per day in November 2022 and 199 per day in December 2022. OIS analysis of OIS Persist Dataset based on data through March 31, 2023. Data are limited to USBP encounters to exclude thos

Quote: The low trend continued with a daily average of 106 in March 2023.

Footnote: OIS analysis of OIS Persist Dataset based on data through March 31, 2023.

Quote: Between the announcement of the new processes on January 5, 2023, and January 21, the number of daily encounters between POEs of CHN nationals dropped from 928 to 73, a 92 percent decline.

Footnote: Id.

Quote: Encounters between POEs of CHN nationals continued to decline to a daily average of fewer than 17 per day in March 2023.

Footnote: Id.

Filter: SWB; beginning Jan 11, 2023 - remove CBP One Appointments, USBP only

| Jan 5 CHN | 928 |
| Jan 21 CHN | 73 |
| % change | -92% |

| | Country of Citizenship | | | | | | USBP |
| | CHN | | | | | | |
| Date | Venezuela | Cuba | Haiti | Nicaragua | CHN Sum | Non-CHNV | N |
| 10/1/2022 | 1,240 | 766 | 7 | 606 | 1,379 | 4,048 | 6,667 |
| 10/2/2022 | 1,512 | 984 | 5 | 553 | 1,542 | 3,958 | 7,012 |
| 10/3/2022 | 1,366 | 965 | 10 | 421 | 1,396 | 3,987 | 6,749 |
| 10/4/2022 | 1,260 | 716 | 5 | 833 | 1,554 | 4,945 | 7,759 |
| 10/5/2022 | 1,139 | 1,039 | 5 | 700 | 1,744 | 5,240 | 8,123 |
| 10/6/2022 | 1,174 | 822 | 7 | 913 | 1,742 | 4,711 | 7,627 |
| 10/7/2022 | 1,083 | 829 | 2 | 671 | 1,502 | 4,568 | 7,153 |
| 10/8/2022 | 1,006 | 1,115 | 7 | 800 | 1,922 | 4,244 | 7,172 |
| 10/9/2022 | 1,202 | 937 | 0 | 770 | 1,707 | 3,875 | 6,784 |
| ######## | 1,224 | 905 | 8 | 590 | 1,503 | 3,824 | 6,551 |
| ######## | 1,128 | 925 | 9 | 578 | 1,512 | 4,354 | 6,994 |
| ######## | 796 | 1,074 | 1 | 544 | 1,619 | 4,056 | 6,471 |
| ######## | 1,256 | 1,006 | 2 | 642 | 1,650 | 4,360 | 7,266 |
| ######## | 1,053 | 936 | 3 | 697 | 1,636 | 4,017 | 6,706 |
| ######## | 834 | 692 | 4 | 694 | 1,390 | 3,640 | 5,864 |
| ######## | 484 | 640 | 1 | 633 | 1,274 | 3,530 | 5,288 |
| ######## | 298 | 746 | 7 | 514 | 1,267 | 4,039 | 5,604 |
| ######## | 185 | 613 | 1 | 487 | 1,101 | 4,636 | 5,922 |
| ######## | 156 | 897 | 4 | 659 | 1,560 | 4,417 | 6,133 |
| ######## | 159 | 911 | 4 | 564 | 1,479 | 4,797 | 6,435 |
| ######## | 132 | 1,027 | 1 | 795 | 1,823 | 4,583 | 6,538 |
| ######## | 145 | 966 | 2 | 656 | 1,624 | 4,264 | 6,033 |
| ######## | 160 | 1,054 | 4 | 554 | 1,612 | 4,207 | 5,979 |
| ######## | 247 | 830 | 3 | 480 | 1,313 | 4,261 | 5,821 |
| ######## | 296 | 1,089 | 3 | 758 | 1,850 | 5,094 | 7,240 |
| ######## | 415 | 798 | 1 | 710 | 1,509 | 4,740 | 6,664 |
| ######## | 301 | 1,107 | 3 | 661 | 1,771 | 4,897 | 6,969 |
| ######## | 408 | 1,078 | 1 | 855 | 1,934 | 4,406 | 6,748 |
| ######## | 405 | 1,267 | 1 | 978 | 2,246 | 4,430 | 7,081 |

| | CHN | non-CHNV |
| 1/1/2023 | 467 | 1,980 |
| 1/2/2023 | 691 | 2,106 |
| 1/3/2023 | 1,046 | 2,606 |
| 1/4/2023 | 766 | 2,297 |
| 1/5/2023 | 928 | 2,577 |
| 1/6/2023 | 800 | 2,725 |
| 1/7/2023 | 853 | 2,813 |
| 1/8/2023 | 691 | 2,667 |
| 1/9/2023 | 575 | 2,946 |
| 1/10/2023 | 264 | 3,757 |
| 1/11/2023 | 354 | 3,930 |
| 1/12/2023 | 285 | 3,981 |
| 1/13/2023 | 235 | 4,007 |
| 1/14/2023 | 213 | 4,244 |
| 1/15/2023 | 188 | 3,612 |
| 1/16/2023 | 114 | 3,747 |
| 1/17/2023 | 164 | 4,240 |
| 1/18/2023 | 110 | 4,542 |
| 1/19/2023 | 158 | 4,201 |
| 1/20/2023 | 111 | 4,495 |
| 1/21/2023 | 73 | 4,362 |
| 1/22/2023 | 91 | 4,042 |
| 1/23/2023 | 49 | 4,443 |
| 1/24/2023 | 49 | 4,240 |
| 1/25/2023 | 46 | 4,745 |
| 1/26/2023 | 62 | 4,709 |
| 1/27/2023 | 43 | 4,952 |
| 1/28/2023 | 39 | 4,756 |
| 1/29/2023 | 37 | 4,087 |
| 1/30/2023 | 43 | 4,418 |

| Daily Average 10/5-10/11 | 1,137 |
| Daily Average 10/18-10/24 | 169 |
| Daily Average 11/23-11/29 | 67 |
| Daily Average 1/16-1/22 | 28 |
| Daily Average March 2023 | 106 |

| Daily Average CHN March 2023 | 16 |
| Daily Average V November 2022 | 225 |
| Daily Average V December 2022 | 199 |
| Daily Average V March 2023 | 106 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ####### | 331 | 1,066 | 10 | 859 | 1,935 | 3,332 | 5,598 |
| ####### | 430 | 1,011 | 3 | 721 | 1,735 | 3,769 | 5,934 |
| 11/1/2022 | 412 | 1,106 | 5 | 1,131 | 2,242 | 4,194 | 6,848 |
| 11/2/2022 | 331 | 1,166 | 3 | 1,210 | 2,379 | 4,561 | 7,271 |
| 11/3/2022 | 305 | 898 | 2 | 686 | 1,586 | 4,166 | 6,057 |
| 11/4/2022 | 348 | 1,154 | 0 | 983 | 2,137 | 4,380 | 6,865 |
| 11/5/2022 | 250 | 1,066 | 0 | 681 | 1,747 | 4,074 | 6,071 |
| 11/6/2022 | 239 | 1,133 | 3 | 1,506 | 2,642 | 4,032 | 6,913 |
| 11/7/2022 | 265 | 869 | 0 | 994 | 1,863 | 4,293 | 6,421 |
| 11/8/2022 | 263 | 1,068 | 6 | 1,167 | 2,241 | 4,984 | 7,488 |
| 11/9/2022 | 262 | 935 | 1 | 902 | 1,838 | 4,477 | 6,577 |
| ####### | 262 | 1,055 | 0 | 1,167 | 2,222 | 4,735 | 7,219 |
| ####### | 341 | 1,425 | 4 | 956 | 2,385 | 4,871 | 7,597 |
| ####### | 192 | 1,142 | 0 | 846 | 1,988 | 4,398 | 6,578 |
| ####### | 197 | 1,113 | 3 | 915 | 2,031 | 3,964 | 6,192 |
| ####### | 158 | 1,543 | 0 | 972 | 2,515 | 4,287 | 6,960 |
| ####### | 168 | 1,200 | 1 | 1,091 | 2,292 | 4,744 | 7,204 |
| ####### | 498 | 850 | 1 | 1,219 | 2,070 | 4,674 | 7,242 |
| ####### | 1,074 | 1,492 | 1 | 1,096 | 2,589 | 5,004 | 8,667 |
| ####### | 212 | 985 | 1 | 955 | 1,941 | 4,850 | 7,003 |
| ####### | 91 | 1,555 | 0 | 1,206 | 2,761 | 4,171 | 7,023 |
| ####### | 118 | 1,210 | 0 | 1,218 | 2,428 | 3,801 | 6,347 |
| ####### | 84 | 1,443 | 1 | 1,424 | 2,868 | 4,141 | 7,093 |
| ####### | 126 | 1,048 | 2 | 1,280 | 2,330 | 4,629 | 7,085 |
| ####### | 81 | 1,273 | 0 | 1,012 | 2,285 | 4,270 | 6,636 |
| ####### | 60 | 1,094 | 0 | 1,223 | 2,317 | 4,150 | 6,527 |
| ####### | 51 | 987 | 1 | 1,299 | 2,287 | 3,889 | 6,227 |
| ####### | 55 | 1,387 | 0 | 1,274 | 2,661 | 4,442 | 7,158 |
| ####### | 75 | 827 | 1 | 1,686 | 2,514 | 3,713 | 6,302 |
| ####### | 65 | 1,006 | 0 | 1,334 | 2,340 | 4,397 | 6,802 |
| ####### | 83 | 1,046 | 0 | 1,064 | 2,110 | 4,557 | 6,750 |
| ####### | 87 | 1,598 | 0 | 1,698 | 3,296 | 4,942 | 8,325 |
| 12/1/2022 | 102 | 1,275 | 2 | 1,336 | 2,613 | 4,817 | 7,532 |
| 12/2/2022 | 95 | 1,614 | 1 | 1,720 | 3,335 | 5,306 | 8,736 |
| 12/3/2022 | 79 | 1,464 | 0 | 1,426 | 2,890 | 4,150 | 7,119 |
| 12/4/2022 | 126 | 1,712 | 1 | 1,298 | 3,011 | 3,963 | 7,100 |
| 12/5/2022 | 120 | 1,320 | 2 | 1,594 | 2,916 | 4,333 | 7,369 |
| 12/6/2022 | 84 | 1,151 | 0 | 1,572 | 2,723 | 4,608 | 7,415 |
| 12/7/2022 | 144 | 1,698 | 1 | 1,809 | 3,508 | 4,738 | 8,390 |
| 12/8/2022 | 49 | 1,690 | 0 | 1,813 | 3,503 | 4,819 | 8,371 |
| 12/9/2022 | 88 | 1,944 | 0 | 1,592 | 3,536 | 4,873 | 8,497 |
| ####### | 101 | 1,786 | 1 | 1,758 | 3,545 | 4,535 | 8,181 |
| ####### | 161 | 1,487 | 1 | 1,606 | 3,094 | 4,647 | 7,902 |
| ####### | 114 | 1,463 | 2 | 1,699 | 3,164 | 4,533 | 7,811 |
| ####### | 157 | 1,459 | 2 | 1,548 | 3,009 | 4,907 | 8,073 |
| ####### | 116 | 1,601 | 0 | 1,555 | 3,156 | 5,009 | 8,281 |
| ####### | 145 | 1,547 | 2 | 1,447 | 2,996 | 4,991 | 8,132 |

CLP_AR_002473

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ####### | 91 | 1,178 | 0 | 699 | 1,877 | 4,881 | 6,849 |
| ####### | 146 | 1,444 | 0 | 996 | 2,440 | 4,354 | 6,940 |
| ####### | 187 | 1,398 | 2 | 909 | 2,309 | 4,408 | 6,904 |
| ####### | 231 | 1,538 | 1 | 867 | 2,406 | 4,672 | 7,309 |
| ####### | 254 | 1,336 | 1 | 1,201 | 2,538 | 5,776 | 8,568 |
| ####### | 362 | 1,341 | 0 | 1,122 | 2,463 | 5,606 | 8,431 |
| ####### | 723 | 1,131 | 1 | 933 | 2,065 | 5,298 | 8,086 |
| ####### | 267 | 1,729 | 0 | 817 | 2,546 | 4,488 | 7,301 |
| ####### | 306 | 1,181 | 0 | 1,004 | 2,185 | 3,756 | 6,247 |
| ####### | 254 | 586 | 5 | 290 | 881 | 2,397 | 3,532 |
| ####### | 234 | 944 | 3 | 501 | 1,448 | 3,331 | 5,013 |
| ####### | 353 | 1,382 | 1 | 493 | 1,876 | 3,855 | 6,084 |
| ####### | 247 | 1,056 | 1 | 590 | 1,647 | 4,020 | 5,914 |
| ####### | 257 | 1,176 | 0 | 390 | 1,566 | 3,689 | 5,512 |
| ####### | 263 | 705 | 0 | 397 | 1,102 | 3,371 | 4,736 |
| ####### | 327 | 1,280 | 1 | 380 | 1,661 | 3,387 | 5,375 |
| 1/1/2023 | 309 | 289 | 3 | 175 | 467 | 1,980 | 2,756 |
| 1/2/2023 | 280 | 487 | 1 | 203 | 691 | 2,106 | 3,077 |
| 1/3/2023 | 270 | 795 | 1 | 250 | 1,046 | 2,606 | 3,922 |
| 1/4/2023 | 366 | 592 | 3 | 171 | 766 | 2,297 | 3,429 |
| 1/5/2023 | 142 | 591 | 3 | 334 | 928 | 2,577 | 3,647 |
| 1/6/2023 | 98 | 625 | 0 | 175 | 800 | 2,725 | 3,623 |
| 1/7/2023 | 77 | 679 | 2 | 172 | 853 | 2,813 | 3,743 |
| 1/8/2023 | 61 | 574 | 0 | 117 | 691 | 2,667 | 3,419 |
| 1/9/2023 | 70 | 450 | 1 | 124 | 575 | 2,946 | 3,591 |
| 1/10/2023 | 73 | 161 | 1 | 102 | 264 | 3,757 | 4,094 |
| 1/11/2023 | 56 | 189 | 5 | 160 | 354 | 3,930 | 4,340 CBP One Removed |
| 1/12/2023 | 57 | 114 | 0 | 171 | 285 | 3,981 | 4,323 |
| 1/13/2023 | 35 | 80 | 0 | 155 | 235 | 4,007 | 4,277 |
| 1/14/2023 | 50 | 112 | 6 | 95 | 213 | 4,244 | 4,507 |
| 1/15/2023 | 41 | 66 | 0 | 122 | 188 | 3,612 | 3,841 |
| 1/16/2023 | 43 | 19 | 4 | 91 | 114 | 3,747 | 3,904 |
| 1/17/2023 | 21 | 42 | 0 | 122 | 164 | 4,240 | 4,425 |
| 1/18/2023 | 28 | 26 | 2 | 82 | 110 | 4,542 | 4,680 |
| 1/19/2023 | 22 | 56 | 0 | 102 | 158 | 4,201 | 4,381 |
| 1/20/2023 | 32 | 23 | 1 | 87 | 111 | 4,495 | 4,638 |
| 1/21/2023 | 24 | 29 | 3 | 41 | 73 | 4,362 | 4,459 |
| 1/22/2023 | 24 | 33 | 4 | 54 | 91 | 4,042 | 4,157 |
| 1/23/2023 | 20 | 10 | 2 | 37 | 49 | 4,443 | 4,512 |
| 1/24/2023 | 8 | 27 | 2 | 20 | 49 | 4,240 | 4,297 |
| 1/25/2023 | 35 | 17 | 0 | 29 | 46 | 4,745 | 4,826 |
| 1/26/2023 | 17 | 23 | 0 | 39 | 62 | 4,709 | 4,788 |
| 1/27/2023 | 11 | 24 | 0 | 19 | 43 | 4,952 | 5,006 |
| 1/28/2023 | 18 | 19 | 1 | 19 | 39 | 4,756 | 4,813 |
| 1/29/2023 | 30 | 15 | 0 | 22 | 37 | 4,087 | 4,154 |
| 1/30/2023 | 10 | 13 | 1 | 29 | 43 | 4,418 | 4,471 |
| 1/31/2023 | 16 | 8 | 1 | 11 | 20 | 4,800 | 4,836 |

CLP_AR_002474

| | | | | | | |
|---|---|---|---|---|---|---|
| 2/1/2023 | 11 | 10 | 1 | 20 | 31 | 4,642 | 4,684 |
| 2/2/2023 | 17 | 4 | 0 | 20 | 24 | 4,637 | 4,678 |
| 2/3/2023 | 8 | 12 | 0 | 24 | 36 | 4,667 | 4,711 |
| 2/4/2023 | 46 | 6 | 3 | 8 | 17 | 4,178 | 4,241 |
| 2/5/2023 | 32 | 10 | 1 | 16 | 27 | 4,009 | 4,068 |
| 2/6/2023 | 77 | 17 | 0 | 23 | 40 | 4,414 | 4,531 |
| 2/7/2023 | 20 | 4 | 1 | 18 | 23 | 5,054 | 5,097 |
| 2/8/2023 | 254 | 4 | 0 | 27 | 31 | 4,770 | 5,055 |
| 2/9/2023 | 327 | 7 | 0 | 13 | 20 | 4,821 | 5,168 |
| 2/10/2023 | 144 | 7 | 0 | 7 | 14 | 4,461 | 4,619 |
| 2/11/2023 | 40 | 4 | 2 | 5 | 11 | 4,231 | 4,282 |
| 2/12/2023 | 42 | 10 | 0 | 17 | 27 | 3,969 | 4,038 |
| 2/13/2023 | 24 | 14 | 0 | 20 | 34 | 4,630 | 4,688 |
| 2/14/2023 | 22 | 8 | 0 | 29 | 37 | 4,674 | 4,733 |
| 2/15/2023 | 22 | 4 | 1 | 8 | 13 | 4,608 | 4,643 |
| 2/16/2023 | 26 | 6 | 1 | 19 | 26 | 4,663 | 4,715 |
| 2/17/2023 | 21 | 8 | 1 | 11 | 20 | 4,708 | 4,749 |
| 2/18/2023 | 20 | 3 | 1 | 9 | 13 | 4,482 | 4,515 |
| 2/19/2023 | 11 | 1 | 0 | 17 | 18 | 4,325 | 4,354 |
| 2/20/2023 | 43 | 8 | 0 | 6 | 14 | 4,388 | 4,445 |
| 2/21/2023 | 30 | 2 | 5 | 13 | 20 | 4,633 | 4,683 |
| 2/22/2023 | 8 | 2 | 0 | 9 | 11 | 4,456 | 4,475 |
| 2/23/2023 | 32 | 1 | 0 | 17 | 18 | 4,931 | 4,981 |
| 2/24/2023 | 37 | 3 | 0 | 6 | 9 | 4,971 | 5,017 |
| 2/25/2023 | 21 | 8 | 0 | 8 | 16 | 4,760 | 4,797 |
| 2/26/2023 | 59 | 3 | 0 | 8 | 11 | 4,121 | 4,191 |
| 2/27/2023 | 21 | 3 | 3 | 13 | 19 | 4,311 | 4,351 |
| 2/28/2023 | 40 | 7 | 1 | 9 | 17 | 5,458 | 5,515 |
| 3/1/2023 | 17 | 6 | 0 | 7 | 13 | 5,429 | 5,459 |
| 3/2/2023 | 21 | 2 | 1 | 10 | 13 | 5,099 | 5,133 |
| 3/3/2023 | 43 | 4 | 2 | 10 | 16 | 5,359 | 5,418 |
| 3/4/2023 | 15 | 10 | 7 | 10 | 27 | 5,226 | 5,268 |
| 3/5/2023 | 42 | 3 | 5 | 5 | 13 | 4,925 | 4,980 |
| 3/6/2023 | 72 | 4 | 1 | 4 | 9 | 4,828 | 4,909 |
| 3/7/2023 | 31 | 8 | 4 | 6 | 18 | 6,064 | 6,113 |
| 3/8/2023 | 48 | 4 | 7 | 11 | 22 | 5,280 | 5,350 |
| 3/9/2023 | 40 | 4 | 5 | 3 | 12 | 5,310 | 5,362 |
| 3/10/2023 | 15 | 2 | 12 | 2 | 16 | 5,350 | 5,381 |
| 3/11/2023 | 31 | 0 | 12 | 1 | 13 | 5,022 | 5,066 |
| 3/12/2023 | 78 | 2 | 9 | 5 | 16 | 4,467 | 4,561 |
| 3/13/2023 | 66 | 3 | 3 | 9 | 15 | 4,594 | 4,675 |
| 3/14/2023 | 66 | 2 | 17 | 10 | 29 | 5,368 | 5,463 |
| 3/15/2023 | 30 | 3 | 13 | 3 | 19 | 5,156 | 5,205 |
| 3/16/2023 | 41 | 0 | 18 | 9 | 27 | 5,450 | 5,518 |
| 3/17/2023 | 21 | 2 | 8 | 4 | 14 | 4,772 | 4,807 |
| 3/18/2023 | 37 | 1 | 7 | 7 | 15 | 4,874 | 4,926 |
| 3/19/2023 | 61 | 5 | 4 | 2 | 11 | 4,095 | 4,167 |

CLP_AR_002475

| | | | | | | |
|---|---|---|---|---|---|---|
| 3/20/2023 | 91 | 0 | 3 | 15 | 18 | 5,032 | 5,141 |
| 3/21/2023 | 68 | 3 | 1 | 4 | 8 | 5,433 | 5,509 |
| 3/22/2023 | 53 | 3 | 4 | 2 | 9 | 4,910 | 4,972 |
| 3/23/2023 | 38 | 1 | 5 | 12 | 18 | 5,376 | 5,432 |
| 3/24/2023 | 28 | 5 | 1 | 8 | 14 | 5,091 | 5,133 |
| 3/25/2023 | 58 | 4 | 4 | 10 | 18 | 5,194 | 5,270 |
| 3/26/2023 | 108 | 2 | 1 | 5 | 8 | 5,013 | 5,129 |
| 3/27/2023 | 162 | 4 | 4 | 4 | 12 | 5,200 | 5,374 |
| 3/28/2023 | 125 | 1 | 2 | 5 | 8 | 5,732 | 5,865 |
| 3/29/2023 | 560 | 7 | 5 | 17 | 29 | 5,419 | 6,008 |
| 3/30/2023 | 1,006 | 14 | 3 | 13 | 30 | 4,888 | 5,924 |
| 3/31/2023 | 229 | 8 | 1 | 11 | 20 | 4,550 | 4,799 |

CLP_AR_002476

¡–11.  About two weeks after the announcement, encounters of Venezuelan nationals averaged  under 200 per day between October 18 and 24.

se being paroled in through ports of entry.

CLP_AR_002477

Quote: Total migrants interdicted at sea by the U.S. Coast Guard (USCG)  increased by 502 percent between FY 2020 (2,079) and FY 2022 (12,521)

Footnote: OIS analysis of USCG data through March 31, 2023.

Quote: Interdictions continued to rise in FY 2023 with 8,822 migrants interdicted at sea through March, almost 70 percent of the total in FY 2022 within six months

Footnote: Id.

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023YTD |
|---|---|---|---|---|---|---|---|---|---|---|
| Cuba | 2,090 | 2,736 | 5,221 | 1,465 | 259 | 381 | 43 | 827 | 5,740 | 5,427 |
| Haiti | 968 | 561 | 380 | 419 | 609 | 824 | 398 | 1,205 | 4,025 | 2,565 |
| Dominica | 269 | 257 | 570 | 519 | 492 | 920 | 1,201 | 744 | 1,804 | 560 |
| Mexico | 33 | 11 | 3 | 50 | 123 | 160 | 343 | 612 | 676 | 208 |
| Venezuela | 0 | 0 | 1 | 1 | 1 | 0 | 10 | 0 | 63 | 2 |
| Honduras | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 2 | 32 | 0 |
| Jamaica | 12 | 13 | 15 | 16 | 8 | 25 | 3 | 16 | 29 | 5 |
| Ecuador | 0 | 3 | 23 | 3 | 57 | 7 | 2 | 9 | 18 | 3 |
| Uzbekista | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 16 | 0 |
| Colombia | 0 | 0 | 0 | 2 | 7 | 7 | 1 | 11 | 15 | 1 |
| Other | 19 | 32 | 121 | 37 | 106 | 104 | 77 | 82 | 103 | 51 |
| **Total** | **3,391** | **3,614** | **6,334** | **2,512** | **1,662** | **2,429** | **2,079** | **3,508** | **12,521** | **8,822** |

| | |
|---|---|
| % increase FY2020 to 2022: | 502% |
| 2023 YTD % of 2022: | 70% |

CLP_AR_002478

Quote: Individuals departing from Cuban and Haitian nationals in the Caribbean make up the vast majority of maritime interdictions.  Maritime migration from Cuba increased by nearly 600 percent in FY 2022, with 5,740 Cuban nationals interc
Footnote: OIS analysis of USCG data through March 31, 2023.
Quote: Similarly, maritime migration from Haiti more than tripled in FY 2022, with 4,025 Haitian nationals interdicted at sea, compared to 1,205 in FY 2021 and 398 in FY 2020.
Footnote: OIS analysis of USCG data through March 31, 2023.
Quote: In the first six months of FY 2023, Cuban interdictions were nearly equal to the Cuban FY 2022 total, comprising 62 percent of all FY 2023 interdictions at sea; Haitian interdictions were almost 50 percent of the Haitian FY 2022 total, con
Footnote: OIS analysis of USCG data through March 31, 2023.

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023YTD |
|---|---|---|---|---|---|---|---|---|---|---|
| Cuba | 2,090 | 2,736 | 5,221 | 1,465 | 259 | 381 | 43 | 827 | 5,740 | 5,427 |
| Haiti | 968 | 561 | 380 | 419 | 609 | 824 | 398 | 1,205 | 4,025 | 2,565 |
| Dominica | 269 | 257 | 570 | 519 | 492 | 920 | 1,201 | 744 | 1,804 | 560 |
| Mexico | 33 | 11 | 3 | 50 | 123 | 160 | 343 | 612 | 676 | 208 |
| Venezuela | 0 | 0 | 1 | 1 | 1 | 0 | 10 | 0 | 63 | 2 |
| Honduras | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 2 | 32 | 0 |
| Jamaica | 12 | 13 | 15 | 16 | 8 | 25 | 3 | 16 | 29 | 5 |
| Ecuador | 0 | 3 | 23 | 3 | 57 | 7 | 2 | 9 | 18 | 3 |
| Uzbekista | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 16 | 0 |
| Colombia | 0 | 0 | 0 | 2 | 7 | 7 | 1 | 11 | 15 | 1 |
| Other | 19 | 32 | 121 | 37 | 106 | 104 | 77 | 82 | 103 | 51 |
| **Total** | **3,391** | **3,614** | **6,334** | **2,512** | **1,662** | **2,429** | **2,079** | **3,508** | **12,521** | **8,822** |

| | | |
|---|---|---|
| Cuba | % change 21-22 | 594% |
| | % of whole 21 | 24% |
| | % of whole 22 | 46% |
| | % of whole 23YTD | 62% |
| | % of last year's total | 95% |
| Haiti | % change 21-22 | 234% |
| | % of whole 21 | 34% |
| | % of whole 22 | 32% |
| | % of whole 23YTD | 29% |
| | % of last year's total | 64% |

CLP_AR_002479

dicted at sea, compared to 827 in FY 2021.

nprising 30 percent of all FY 2023 interdictions at sea

CLP_AR_002480

Quote: There were 5,978 such apprehensions in FY 2022, nearly triple the number of apprehensions in FY 2021 (2,045).  And in FY 2023 to date, there have already been 6,364 USBP apprehensions of noncitizens who made landfall in southeast

Footnote: OIS analysis of OIS Persist Dataset based on data through March 31, 2023.

Filter: Maritime Border, USBP

Coastal USBP

| | Cuba | Haiti | Other | Total | | % Cuba | % Cuba+Haiti |
|---|---|---|---|---|---|---|---|
| 2013 | 539 | 708 | 1,915 | 3,162 | | 17% | 39% |
| 2014 | 956 | 1,014 | 1,972 | 3,942 | | 24% | 50% |
| 2015 | 1,040 | 370 | 1,748 | 3,158 | | 33% | 45% |
| 2016 | 1,845 | 160 | 2,658 | 4,663 | | 40% | 43% |
| 2017 | 547 | 77 | 2,964 | 3,588 | | 15% | 17% |
| 2018 | 107 | 75 | 3,065 | 3,247 | | 3% | 6% |
| 2019 | 144 | 64 | 3,377 | 3,585 | | 4% | 6% |
| 2020 | 83 | 116 | 2,031 | 2,230 | | 4% | 9% |
| 2021 | 239 | 601 | 1,205 | 2,045 | | 12% | 41% |
| 2022 | 2,675 | 1,840 | 1,463 | 5,978 | 192% | 45% | 76% |
| 2023 | 4,522 | 809 | 1,033 | 6,364 | 6% | 71% | 84% |

Persist

CLP_AR_002481

: coastal sectors, more than the total for all of FY 2022. Cuban and Haitian nationals made up 76 percent of these apprehensions in FY 2022 and 84 percent of apprehensions so far in FY 2023.

CLP_AR_002482

Quote: Within two days of the court's decision, total encounters at the SWB reached 9,583 in a single day on November 17, 2022, a 17 percent increase from the day before
Footnote: OIS Persist based on data through March 31, 2023.
Filter: SWB; excludes CBPOne appointments; CBP (USBP+OFO)

| | Total CBP Encounters |
|---|---|
| | N |
| Date | |
| 11/4/2022 | 7,790 |
| 11/5/2022 | 6,983 |
| 11/6/2022 | 7,866 |
| 11/7/2022 | 7,405 |
| 11/8/2022 | 8,457 |
| 11/9/2022 | 7,586 |
| 11/10/2022 | 8,118 |
| 11/11/2022 | 8,469 |
| 11/12/2022 | 7,523 |
| 11/13/2022 | 7,116 |
| 11/14/2022 | 7,899 |
| 11/15/2022 | 8,147 |
| 11/16/2022 | 8,205 |
| 11/17/2022 | 9,583 |
| 11/18/2022 | 7,940 |
| 11/19/2022 | 7,920 |
| 11/20/2022 | 6,956 |
| 11/21/2022 | 7,989 |
| 11/22/2022 | 7,971 |
| 11/23/2022 | 7,529 |
| 11/24/2022 | 7,372 |
| 11/25/2022 | 7,162 |
| 11/26/2022 | 8,049 |
| 11/27/2022 | 7,166 |
| 11/28/2022 | 7,748 |
| 11/29/2022 | 7,677 |
| 11/30/2022 | 9,244 |

| | |
|---|---|
| Nov 17 SWB | 9,583 |
| % increase from yesterday | 17% |

CLP_AR_002483

Quote: The baseline number of encounters decreased in March 2023 from April 2022 and also consisted of a much lower share of nationals from countries that have stopped or limited returns of their own nationals
Footnote: OIS Persist based on data through March 31, 2023.
Filter: SWB; excludes CBPOne Appointments; CBP (USBP+OFO)

| | Cuba | El Salvador | Guatemala | Haiti | Honduras | Mexico | Nicaragua | Venezuela | Total | | | MEX+NCA | NCA | CHNV | MEX | Other | Total | | Select Cou | CHNV/Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Oct-21 | 5,896 | 9,801 | 19,374 | 908 | 21,861 | 66,049 | 9,255 | 13,416 | 164,837 | | Oct-21 | 154,907 | 38,430 | 50,428 | 66,049 | 9,930 | 164,837 | | 94% | 31% |
| Nov-21 | 6,605 | 9,664 | 20,469 | 1,022 | 20,105 | 63,846 | 13,627 | 20,388 | 174,845 | | Nov-21 | 168,331 | 43,760 | 60,725 | 63,846 | 6,514 | 174,845 | | 96% | 35% |
| Dec-21 | 7,986 | 8,874 | 21,009 | 7,144 | 18,141 | 51,475 | 15,297 | 24,801 | 179,253 | | Dec-21 | 162,880 | 45,180 | 66,225 | 51,475 | 16,373 | 179,253 | | 91% | 37% |
| Jan-22 | 9,721 | 5,810 | 13,856 | 3,372 | 12,011 | 60,341 | 11,564 | 22,779 | 154,874 | | Jan-22 | 147,646 | 31,230 | 56,075 | 60,341 | 7,228 | 154,874 | | 95% | 36% |
| Feb-22 | 16,557 | 7,146 | 18,215 | 1,877 | 14,075 | 71,850 | 13,296 | 3,073 | 166,010 | | Feb-22 | 157,508 | 38,657 | 47,001 | 71,850 | 8,502 | 166,010 | | 95% | 28% |
| Mar-22 | 32,153 | 8,403 | 21,392 | 2,171 | 16,213 | 88,132 | 16,017 | 4,053 | 222,574 | | Mar-22 | 202,380 | 45,812 | 68,436 | 88,132 | 20,194 | 222,574 | | 91% | 31% |
| Apr-22 | 34,839 | 8,355 | 19,910 | 5,739 | 15,734 | 82,568 | 12,565 | 4,107 | 235,785 | | Apr-22 | 190,643 | 40,830 | 67,245 | 82,568 | 45,142 | 235,785 | | 81% | 29% |
| May-22 | 25,643 | 8,980 | 21,468 | 10,514 | 19,730 | 77,454 | 19,034 | 5,088 | 241,137 | | May-22 | 196,431 | 49,482 | 69,495 | 77,454 | 44,706 | 241,137 | | 81% | 29% |
| Jun-22 | 16,172 | 9,123 | 24,648 | 4,069 | 24,177 | 66,730 | 11,200 | 13,199 | 207,834 | | Jun-22 | 176,449 | 44,971 | 64,748 | 66,730 | 31,385 | 207,834 | | 85% | 31% |
| Jul-22 | 20,098 | 7,952 | 20,212 | 5,380 | 20,340 | 55,692 | 12,073 | 17,647 | 200,162 | | Jul-22 | 166,087 | 40,237 | 70,158 | 55,692 | 34,075 | 200,162 | | 83% | 35% |
| Aug-22 | 19,060 | 6,675 | 15,681 | 6,551 | 16,219 | 60,772 | 11,749 | 25,361 | 204,087 | | Aug-22 | 167,266 | 34,105 | 72,389 | 60,772 | 36,821 | 204,087 | | 82% | 35% |
| Sep-22 | 26,178 | 6,247 | 15,331 | 5,163 | 14,417 | 63,431 | 18,199 | 33,804 | 227,547 | | Sep-22 | 195,806 | 39,777 | 92,598 | 63,431 | 31,741 | 227,547 | | 86% | 41% |
| Oct-22 | 28,841 | 5,995 | 14,727 | 6,577 | 13,793 | 65,377 | 20,919 | 22,039 | 228,603 | | Oct-22 | 192,610 | 41,641 | 85,592 | 65,377 | 35,993 | 228,603 | | 84% | 37% |
| Nov-22 | 34,709 | 5,457 | 14,432 | 5,385 | 12,881 | 58,160 | 34,236 | 7,963 | 231,021 | | Nov-22 | 202,074 | 54,125 | 89,789 | 58,160 | 28,947 | 231,021 | | 87% | 39% |
| Dec-22 | 42,653 | 4,804 | 14,814 | 5,073 | 13,050 | 47,038 | 35,387 | 8,131 | 248,604 | | Dec-22 | 201,264 | 55,005 | 99,221 | 47,038 | 47,340 | 248,604 | | 81% | 40% |
| Jan-23 | 6,229 | 3,680 | 11,860 | 2,640 | 10,641 | 60,761 | 3,352 | 3,740 | 146,485 | | Jan-23 | 103,615 | 18,892 | 23,962 | 60,761 | 42,870 | 146,485 | | 71% | 16% |
| Feb-23 | 189 | 4,515 | 14,093 | 185 | 10,150 | 64,016 | 412 | 1,614 | 135,691 | | Feb-23 | 95,401 | 19,020 | 12,365 | 64,016 | 40,290 | 135,691 | | 70% | 9% |
| Mar-23 | 193 | 5,427 | 14,911 | 328 | 11,594 | 76,390 | 232 | 3,860 | 169,035 | | Mar-23 | 112,839 | 20,570 | 15,879 | 76,390 | 56,196 | 169,035 | | 67% | 9% |

**FOUO**

**Encounter Projections: Blended**                    Release Date: **2023-05-03**

Key updates from previous version: Machine learning (LightGBM) is used to model FM and UC encounters. BSTS continues to be used for SA encounters. May and June SME survey results are used for Model 1. Model 2 is assumed to have the same uncertainty as Model 1, so the width of Model 2's confidence intervals are set equal to that of Model 1.

**Policy Assumptions**:

- Title 42 public health Order ends on May 11, 2023 (all models)

Model 1:

- CHNV returns to Mexico end June 30, 2023.

- NPRM not in effect.

Model 2:

- CHNV returns to Mexico continue.

- Presumed implementation of NPRM after the lifting of the Title 42 public health Order. Enforcement measures and lawful pathways (e.g.- expanded CBP One, CHNV parole processes, in-country refugee processing) are also implemented.


**Workbook Details:** This workbook presents the most recent Blended Encounter Projections.  The workbook contains the following worksheets:

- **Overview**: Current worksheet, providing details about the workbook and the projections.
- **Model 1**: Daily average of the encounter projections by Total, Family Type, and HHS Referrals.
    - o   Note: HHS Referrals are estimated by summing all non-Mexican UC encounter projections.  This estimate is likely to be a slight underestimate because there are usually a small number of Mexican UCs who do get referred to HHS.
- **Model 2**: Daily average of the encounter projections by Total, Family Type, and HHS Referrals.
    - o   Note: HHS Referrals are estimated by summing all non-Mexican UC encounter projections.  This estimate is likely to be a slight underestimate because there are usually a small number of Mexican UCs who do get referred to HHS.
- **Graphs-High**: Graphs of the High lines from each scenario for total and by family type, as well as actuals for the prior 13 months.
- **Graphs-Moderately High**: Graphs of the Moderately High lines from each scenario for total and by family type, as well as actuals for the prior 13 months.

CLP_AR_002485

**The Blended Encounter Projections:** A mixed-methods approach that combines the knowledge and intel of subject matter expertise with mathematical, regression-based predictive models.  More specifically, the current Blended Projections average, or 'blend', the:

- Hybrid Model.
- Bayesian Structural Time Series (BSTS) Model projections.
- LightGBM Model projections.

**Model Specifications and Notes:**

- Uses actuals of encounters through:
  - Hybrid Model: **NA.**
  - BSTS Model: **2023-03-31.**
  - LightGBM Model: **2023-03-31.**
- Model Descriptions:
  - The Hybrid Model combines field level intelligence, SME analysis of relevant policies and factors, historic monthly change, and current and past trends. It also has a specific focus on accounting for expectations of the consequences of ending the Title 42 public health Order.
    - Broken down into results by country with country-family type proportions based on encounter actuals for last 3 months.
  - The BSTS Model was built using a machine learning approach and includes: a 12-seasonal component, a semi-local linear trend (except for CHNV), an autoregressive component (AR(1)), and a regression component.
    - The BSTS regression component includes the following predictors: Mexico Apprehensions (through Jan 2023), USA Unemployment **(through Jan 2023)**, and ratio of Removals by T8 Encounters **(through Jan 2023)**.
  - The LightGBM Model was built using a machine learning approach and includes predictors from the BSTS.

CLP_AR_002487

**FOUO**

**Blended Projections, Totals**

Assumptions:          Title 42 ends May 11. CHNV returns to Mexico and CHNV paroles end June 30. NPRM not implemented.

Projection Type:      Planning. All projections are for planning purposes, showing what OIS estimates may happen under these assumptions. Effects of these policy assumptions are also based on best available information. Operational confidence intervals (not assuming growing uncertainty over time) are used to quantify model uncertainty.

Users should not treat these results as a precise statement of what will happen.

| | Apr-23 | May-23 | Jun-23 | Jul-23 | Aug-23 | Sep-23 | Total |
|---|---|---|---|---|---|---|---|
| **Total** | | | | | | | |
| **Projection** | **5,392** | **6,768** | **7,527** | **6,878** | **7,119** | **7,712** | **6,900** |
| Moderately High | 6,817 | 8,147 | 8,953 | 8,257 | 8,499 | 9,137 | 8,301 |
| Moderately Low | 4,098 | 5,407 | 6,130 | 5,511 | 5,750 | 6,423 | 5,553 |
| High | 8,186 | 9,471 | 10,321 | 9,581 | 9,823 | 10,505 | 9,647 |
| Low | 3,208 | 4,174 | 4,824 | 4,252 | 4,494 | 5,203 | 4,358 |
| **FM** | | | | | | | |
| **Projection** | **1,145** | **2,089** | **2,787** | **2,244** | **2,326** | **2,466** | **2,177** |
| Moderately High | 1,826 | 2,748 | 3,468 | 2,903 | 2,985 | 3,147 | 2,847 |
| Moderately Low | 584 | 1,449 | 2,127 | 1,598 | 1,670 | 1,921 | 1,558 |
| High | 2,480 | 3,381 | 4,122 | 3,536 | 3,618 | 3,801 | 3,490 |
| Low | 266 | 893 | 1,522 | 1,019 | 1,099 | 1,408 | 1,034 |
| **SA** | | | | | | | |
| **Projection** | **3,814** | **4,243** | **4,233** | **4,182** | **4,335** | **4,769** | **4,263** |
| Moderately High | 4,521 | 4,927 | 4,940 | 4,866 | 5,020 | 5,476 | 4,958 |
| Moderately Low | 3,118 | 3,559 | 3,532 | 3,498 | 3,658 | 4,062 | 3,571 |
| High | 5,200 | 5,584 | 5,619 | 5,523 | 5,677 | 6,155 | 5,626 |
| Low | 2,578 | 2,916 | 2,867 | 2,852 | 3,007 | 3,391 | 2,935 |
| **UC** | | | | | | | |
| **Projection** | **433** | **436** | **507** | **452** | **458** | **476** | **460** |
| Moderately High | 470 | 472 | 545 | 488 | 493 | 513 | 497 |
| Moderately Low | 397 | 400 | 470 | 416 | 422 | 439 | 424 |
| High | 506 | 506 | 580 | 522 | 528 | 549 | 532 |
| Low | 363 | 366 | 435 | 382 | 387 | 404 | 389 |
| **HHS Referrals** | | | | | | | |
| **Projection** | **326** | **338** | **397** | **352** | **347** | **356** | **353** |
| Moderately High | 356 | 367 | 427 | 381 | 376 | 387 | 382 |
| Moderately Low | 297 | 309 | 367 | 323 | 318 | 327 | 324 |
| High | 459 | 435 | 488 | 424 | 444 | 450 | 450 |
| Low | 270 | 282 | 339 | 295 | 291 | 299 | 296 |

CLP_AR_002488

**FOUO**

**Blended Projections, Totals**

Assumptions: CHNV Returns to Mexico continue. CHNV parole (30,000 monthly) continues. NPRM begins May 12. Title 42 ends May 11. CBP One increases from 740 per day to 1,000 per day on May 12, then to 1,250 per day on June 1. In-country refugee processing in Latin America expands.

Projection Type: Planning. All projections are for planning purposes, showing what OIS estimates may happen under these assumptions. Effects of these policy assumptions are also based on best available information. Model 2 is assumed to have equal uncertainty as the operational confidence interval (not assuming growing uncertainty over time) from Model 1.

Users should not treat these results as a precise statement of what will happen.

| | Apr-23 | May-23 | Jun-23 | Jul-23 | Aug-23 | Sep-23 | Total |
|---|---|---|---|---|---|---|---|
| **Total** | | | | | | | |
| **Projection** | **5,392** | **5,480** | **5,580** | **5,079** | **5,258** | **5,730** | **5,420** |
| Moderately High | 6,807 | 6,860 | 7,005 | 6,458 | 6,638 | 7,156 | 6,820 |
| Moderately Low | 4,108 | 4,119 | 4,182 | 3,713 | 3,889 | 4,441 | 4,075 |
| High | 8,165 | 8,184 | 8,373 | 7,782 | 7,962 | 8,524 | 8,165 |
| Low | 3,227 | 2,887 | 2,877 | 2,453 | 2,633 | 3,221 | 2,883 |
| **FM** | | | | | | | |
| **Projection** | **1,145** | **1,239** | **1,499** | **1,233** | **1,337** | **1,511** | **1,326** |
| Moderately High | 1,826 | 1,898 | 2,180 | 1,892 | 1,996 | 2,192 | 1,998 |
| Moderately Low | 584 | 598 | 839 | 587 | 681 | 966 | 709 |
| High | 2,480 | 2,531 | 2,834 | 2,525 | 2,629 | 2,846 | 2,641 |
| Low | 266 | 43 | 234 | 8 | 110 | 453 | 186 |
| **SA** | | | | | | | |
| **Projection** | **3,814** | **3,805** | **3,610** | **3,426** | **3,496** | **3,776** | **3,655** |
| Moderately High | 4,521 | 4,489 | 4,317 | 4,110 | 4,180 | 4,483 | 4,350 |
| Moderately Low | 3,118 | 3,121 | 2,910 | 2,741 | 2,818 | 3,069 | 2,963 |
| High | 5,200 | 5,146 | 4,996 | 4,767 | 4,837 | 5,162 | 5,018 |
| Low | 2,578 | 2,478 | 2,245 | 2,095 | 2,168 | 2,398 | 2,327 |
| **UC** | | | | | | | |
| **Projection** | **433** | **436** | **470** | **420** | **425** | **443** | **438** |
| Moderately High | 470 | 472 | 507 | 456 | 461 | 480 | 474 |
| Moderately Low | 397 | 400 | 433 | 384 | 390 | 406 | 402 |
| High | 506 | 507 | 543 | 490 | 496 | 515 | 509 |
| Low | 363 | 366 | 398 | 350 | 355 | 370 | 367 |
| **HHS Referrals** | | | | | | | |
| **Projection** | **326** | **339** | **368** | **327** | **323** | **332** | **336** |
| Moderately High | 356 | 367 | 398 | 356 | 352 | 362 | 365 |
| Moderately Low | 297 | 310 | 338 | 299 | 294 | 302 | 307 |
| High | 459 | 436 | 459 | 400 | 420 | 425 | 433 |
| Low | 270 | 282 | 310 | 271 | 267 | 274 | 279 |

FOUO

| | | Feb-22 | Mar-22 | Apr-22 | May-22 | Jun-22 | Jul-22 | Aug-22 | Sep-22 | Oct-22 | Nov-22 | Dec-22 | Jan-23 | Feb-23 | Mar-23 | Apr-23 | May-23 | Jun-23 | Jul-23 | Aug-23 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | Actual | 5,885 | 7,048 | 7,146 | 7,733 | 6,885 | 6,414 | 6,540 | 7,535 | 7,334 | 7,657 | 7,975 | 4,679 | 4,759 | 5,393 | | | | | |
| Title 42 & CHNV end | Model 1 | | | | | | | | | | | | | | 5,393 | 8,165 | 9,452 | 10,264 | 9,530 | 9,771 |
| Policy Bundle | Model 2 | | | | | | | | | | | | | | 5,393 | 8,165 | 8,184 | 8,373 | 7,782 | 7,962 |
| FM | Actual | 955 | 1,172 | 1,418 | 1,920 | 1,725 | 1,681 | 1,672 | 1,798 | 1,875 | 2,031 | 2,420 | 1,080 | 933 | 1,090 | | | | | |
| Title 42 & CHNV end | Model 1 | | | | | | | | | | | | | | 1,090 | 2,480 | 3,381 | 4,122 | 3,536 | 3,618 |
| Policy Bundle | Model 2 | | | | | | | | | | | | | | 1,090 | 2,480 | 2,531 | 2,834 | 2,525 | 2,629 |
| SA | Actual | 4,503 | 5,420 | 5,326 | 5,340 | 4,653 | 4,306 | 4,503 | 5,340 | 5,072 | 5,189 | 5,160 | 3,298 | 3,443 | 3,910 | | | | | |
| Title 42 & CHNV end | Model 1 | | | | | | | | | | | | | | 3,910 | 5,200 | 5,584 | 5,619 | 5,523 | 5,677 |
| Policy Bundle | Model 2 | | | | | | | | | | | | | | 3,910 | 5,200 | 5,146 | 4,996 | 4,767 | 4,837 |
| UC | Actual | 427 | 455 | 402 | 473 | 508 | 427 | 365 | 396 | 387 | 436 | 395 | 301 | 384 | 394 | | | | | |
| Title 42 & CHNV end | Model 1 | | | | | | | | | | | | | | 394 | 506 | 506 | 580 | 522 | 528 |
| Policy Bundle | Model 2 | | | | | | | | | | | | | | 394 | 507 | 507 | 543 | 490 | 496 |
| HHS Referrals | Actual | 334 | 358 | 314 | 394 | 437 | 367 | 295 | 320 | 309 | 367 | 335 | 224 | 292 | 297 | | | | | |
| Title 42 & CHNV end | Model 1 | | | | | | | | | | | | | | 297 | 459 | 435 | 488 | 424 | 444 |
| Policy Bundle | Model 2 | | | | | | | | | | | | | | 297 | 460 | 435 | 459 | 400 | 421 |









CLP_AR_002490







4,000
3,000
2,000
1,000
0
Feb-22 Mar-22 Apr-22 May-22 Jun-22 Jul-22 Aug-22 Sep-22 Oct-22 Nov-22 Dec-22 Jan-23 Feb-23 Mar-23 Apr-23 May-23 Jun-23 Jul-23 Aug-23 Sep-23
Actual
Model 1
Model 2

400
300
200
100
0
Feb-22 Mar-22 Apr-22 May-22 Jun-22 Jul-22 Aug-22 Sep-22 Oct-22 Nov-22 Dec-22 Jan-23 Feb-23 Mar-23 Apr-23 May-23 Jun-23 Jul-23 Aug-23 Sep-23
Actual
Model 1
Model 2

Blended Projections, HHS Referrals
600
500
400
300
200
100
0
Feb-22 Mar-22 Apr-22 May-22 Jun-22 Jul-22 Aug-22 Sep-22 Oct-22 Nov-22 Dec-22 Jan-23 Feb-23 Mar-23 Apr-23 May-23 Jun-23 Jul-23 Aug-23 Sep-23
Actual
Model 1
Model 2

[redacted]

| Sep-23 |
|---|
| 10,451 |
| 8,524 |
| 3,801 |
| 2,846 |
| 6,155 |
| 5,162 |
| 549 |
| 516 |
| 450 |
| 426 |

CLP_AR_002492

**FOUO**

| | | Feb-22 | Mar-22 | Apr-22 | May-22 | Jun-22 | Jul-22 | Aug-22 | Sep-22 | Oct-22 | Nov-22 | Dec-22 | Jan-23 | Feb-23 | Mar-23 | Apr-23 | May-23 | Jun-23 | Jul-23 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | Actual | 5,885 | 7,048 | 7,146 | 7,733 | 6,885 | 6,414 | 6,540 | 7,535 | 7,334 | 7,657 | 7,975 | 4,679 | 4,759 | 5,393 | | | | |
| | Title 42 & CHNV end Model 1 | | | | | | | | | | | | | | 5,393 | 6,807 | 8,138 | 8,905 | 8,215 |
| | Policy Bundle Model 2 | | | | | | | | | | | | | | 5,393 | 6,807 | 6,860 | 7,005 | 6,458 |
| FM | Actual | 955 | 1,172 | 1,418 | 1,920 | 1,725 | 1,681 | 1,672 | 1,798 | 1,875 | 2,031 | 2,420 | 1,080 | 933 | 1,090 | | | | |
| | Title 42 & CHNV end Model 1 | | | | | | | | | | | | | | 1,090 | 1,826 | 2,748 | 3,468 | 2,903 |
| | Policy Bundle Model 2 | | | | | | | | | | | | | | 1,090 | 1,826 | 1,898 | 2,180 | 1,892 |
| SA | Actual | 4,503 | 5,420 | 5,326 | 5,340 | 4,653 | 4,306 | 4,503 | 5,340 | 5,072 | 5,189 | 5,160 | 3,298 | 3,443 | 3,910 | | | | |
| | Title 42 & CHNV end Model 1 | | | | | | | | | | | | | | 3,910 | 4,521 | 4,927 | 4,940 | 4,866 |
| | Policy Bundle Model 2 | | | | | | | | | | | | | | 3,910 | 4,521 | 4,489 | 4,317 | 4,110 |
| UC | Actual | 427 | 455 | 402 | 473 | 508 | 427 | 365 | 396 | 387 | 436 | 395 | 301 | 384 | 394 | | | | |
| | Title 42 & CHNV end Model 1 | | | | | | | | | | | | | | 394 | 470 | 472 | 545 | 488 |
| | Policy Bundle Model 2 | | | | | | | | | | | | | | 394 | 470 | 472 | 507 | 456 |
| HHS Referrals | Actual | 334 | 358 | 314 | 394 | 437 | 367 | 295 | 320 | 309 | 367 | 335 | 224 | 292 | 297 | | | | |
| | Title 42 & CHNV end Model 1 | | | | | | | | | | | | | | 297 | 356 | 367 | 427 | 381 |
| | Policy Bundle Model 2 | | | | | | | | | | | | | | 297 | 356 | 367 | 398 | 356 |









CLP_AR_002493









3,000
2,000
1,000
0
Feb-22 Mar-22 Apr-22 May-22 Jun-22 Jul-22 Aug-22 Sep-22 Oct-22 Nov-22 Dec-22 Jan-23 Feb-23 Mar-23 Apr-23 May-23 Jun-23 Jul-23 Aug-23 Sep-23
Actual Model 1 Model 2

300
200
100
0
Feb-22 Mar-22 Apr-22 May-22 Jun-22 Jul-22 Aug-22 Sep-22 Oct-22 Nov-22 Dec-22 Jan-23 Feb-23 Mar-23 Apr-23 May-23 Jun-23 Jul-23 Aug-23 Sep-23
Actual Model 1 Model 2

Blended Projections, HHS Referrals
500
450
400
350
300
250
200
150
100
50
0
Feb-22 Mar-22 Apr-22 May-22 Jun-22 Jul-22 Aug-22 Sep-22 Oct-22 Nov-22 Dec-22 Jan-23 Feb-23 Mar-23 Apr-23 May-23 Jun-23 Jul-23 Aug-23 Sep-23
Actual Model 1 Model 2

[redacted]

| Aug-23 | Sep-23 |
|---|---|
| 8,456 | 9,093 |
| 6,638 | 7,156 |
| | |
| 2,985 | 3,147 |
| 1,996 | 2,192 |
| | |
| 5,020 | 5,476 |
| 4,180 | 4,483 |
| | |
| 493 | 513 |
| 461 | 480 |
| | |
| 376 | 387 |
| 352 | 362 |

CLP_AR_002495



An official website of the United States government

<u>Here's how you know</u>

**U.S. Customs and Border Protection**

MENU

**Home** »   **Newsroom** »   **National Media Release** »

CBP Makes Changes to CBP One App

## Newsroom

### Accountability and Transparency

### Legal Notices

### Advisories

### Media Releases

### Photo Gallery

### Video Gallery

### Press Officers

### Publications

### Social Media Directory

### Speeches/Statements

### Spotlights

### Stats and Summaries

### COVID-19

**Newsroom**

# CBP Makes Changes to CBP One App

CBP_AR_002575

**Release Date:** Fri, 05/05/2023 - 12:00

*App will expand number of appointments, allow for additional time, prioritize those first registered*

**WASHINGTON** — U.S. Customs and Border Protection today announced changes to the CBP One app to expand the number of appointments available, allow for additional time to complete requests, and prioritize those who have been waiting the longest. Scheduling an appointment in CBP One provides a safe, orderly, and humane process for noncitizens to access ports of entry rather than attempting to enter the United States irregularly.

CBP One will transition to a new appointment scheduling system on May 10 that will address previous volume issues around specific times in the day by making appointments available for 23 hours each day instead of at a designated time, allowing for more flexibility and access to the scheduling system. Noncitizens will receive notification to confirm their appointments after submitting their request. CBP will also increase the number of appointments available to approximately 1,000 each day, and will prioritize noncitizens who have waited the longest.

Specifically, CBP One App will now:

- **Allow for additional time to complete the appointment request.** Currently, all CBP One appointments become available at the same time each day. With these changes, noncitizens will no longer be required to access CBP One during that one short period of time to schedule an appointment. Instead, the appointment request process will have two steps, so requestors have ample time to make requests and confirm appointments at their convenience over the course of a day.
  - Noncitizens will be allowed to request appointments at any point during a full 23-hour period each day and, if allocated an appointment, will have another 23-hour period to confirm that appointment.
  - Allowing noncitizens a longer window of time to ask for and to confirm their appointment will reduce time pressure and dependency on internet speed and connectivity.

- **Expand the number of daily appointment allotments.** CBP will add additional appointments each day, totaling up to approximately 1,000 each day starting May 12, and continually evaluate expanding the number of available appointments as operations and efficiencies allow.

- **Cut out smugglers who are preying on noncitizens by prioritizing appointments for those who have been waiting the longest.** A percentage of daily available appointments will be allocated to the earliest registered CBP One profiles, so noncitizens who have been trying to obtain appointments for the longest time will be prioritized.

CLP_AR_002576

Importantly, these new changes will not change the way noncitizens initially register themselves, their families, or others via the CBP One app, nor does it change the requirements for individuals to confirm their appointments. The enhanced process will give noncitizens more time to navigate the appointment scheduling app, along with prioritizing noncitizens who have been waiting the longest for an appointment.

These changes will provide noncitizens with limited connectivity the same opportunity to schedule appointments to present themselves for inspection at Southwest Border ports of entry as those with better internet connections. CBP continues to advance innovative technologies and improve the delivery of its critical homeland security mission, including to streamline safe and efficient processes at ports of entry. CBP One remains a key part of the Department of Homeland Security's multi-pronged strategy to address migrant flows at the southwest border. By using CBP One for these appointments, we have increased our capacity to process noncitizens at ports of entry, a critical part of our commitment to safe, orderly, and humane migration processes.

Noncitizens must still be physically located within central or northern Mexico to both request and schedule an appointment via CBP One. Appointments are being offered at eight ports of entry: Brownsville, Paso Del Norte in El Paso, Eagle Pass, Hidalgo, and Laredo in Texas; Calexico and San Ysidro in California; and Nogales in Arizona.

More information on the CBP One mobile application, available in English, Spanish, Haitian Creole, Portuguese, and Russian, can be found at **https://www.cbp.gov/about/mobile-apps-directory/cbpone**. The CBP One application can be downloaded for free from the Apple and Google Application Stores as well from the CBP **website**.

*U.S. Customs and Border Protection is the unified border agency within the Department of Homeland Security charged with the comprehensive management, control, and protection of our nation's borders, combining customs, immigration, border security, and agricultural protection at and between official ports of entry.*

**Tags: Biometrics, Border Security, Office of Field Operations**

**Last Modified: May 5, 2023**

Click 'Share This Page' button to display social media links.


Share This Page.

CLP_AR_002577



## **Media Contacts**

**Office of Public Affairs**

⊘ **(202) 344-1780**

✉ **CBPMEDIARELATIONS**

**All Other Inquiries**
⊘ **(202) 325-8000**

[Return to top](#)

**Travel**      **Trade**      **Border Security**      **Newsroom**      **About CBP**      **Careers**

**Employee Resources**

     





CLP_AR_002578

**Contact CBP**



CBP.gov

**An official website of the U.S. Department of Homeland Security**

# National Terrorism Advisory System

Accessibility

Accountability

DHS Components

FOIA

Forms

Inspector General

No FEAR Act

Privacy

Site Policies

The White House

USA.gov

Vulnerability Disclosure Program

CLP_AR_002579

Case 4:18-cv-06810-JST Document 169-8 Filed 06/05/23 Page 164 of 1047

MAY 02, 2023

# Mexico and United States Strengthen Joint Humanitarian Plan on Migration

Today, President Andrés Manuel López Obrador of Mexico and U.S. Homeland Security Advisor Dr. Elizabeth Sherwood-Randall met in Mexico City to build on the successful migration initiative that President López Obrador and President Biden announced in January 2023. Following that meeting, the United States and Mexico are announcing a set of additional measures to address the humanitarian situation caused by unprecedented migration flows at our shared border and in the region.

First, Mexico and the United States will increase joint actions to counter-human smugglers and traffickers that are exploiting migrants. This complements the 60-day surge campaign that the United States recently launched with Colombia and Panama to counter human smuggling in the Darien.

Second, the two countries committed to continue to enhance their efforts in Central America to address the root causes of migration and expand legal pathways. Specifically, Mexico and the United States will redouble their development efforts that focus on people-to-people support.

Third, Mexico recognized the great potential value of the regional processing centers that the United States announced last week, and discussed how Mexico can contribute to their effectiveness. The United States intends to welcome as many as 100,000 individuals from Honduras, Guatemala, and El Salvador under the family reunification parole processes that Secretary Mayorkas announced last week.

Fourth, Mexico and the United States commit to continue the successful joint initiative that President López Obrador and President Biden announced in January 2023 beyond May 11, 2023. This initiative – which combines expanded legal pathways with consequences for irregular migration – achieved a 95 percent drop in border encounters at our shared border. Today, the United States committed to continue to welcome individuals from Cuba, Haiti, Nicaragua and Venezuela under our parole process. For its part, Mexico will continue to accept back migrants on humanitarian grounds.

CLP_AR_004631

Fifth, we affirm our commitment to modernize our 2000-mile shared border. To that end, President Biden approved moving forward on a Presidential Permit to advance the expansion of Calexico East Land Port of Entry. We jointly commit to take steps to finalize this project by the end of the year – a step that will benefit both the U.S. and Mexican economies.

###

CLP_AR_004632

_(/)_ 

Get Help (/get-help)     Donate (https://www.tahirih.org/donate/)

- LinkedIn (https://www.linkedin.com/company/tahirih-justice-center)
- YouTube (http://www.youtube.com/channel/UCijnWEiM_0yc0-DHoRQoWdQ)
- Instagram (https://www.instagram.com/tahirihjustice/)
- Twitter (https://twitter.com/tahirihjustice)
- Facebook (http://www.facebook.com/pages/Tahirih-Justice-Center/142257595231)

Search

About Us (/about-us)     What We Do (/what-we-do)

Who We Serve (/who-we-serve)     Get Involved (/get-involved)     Give (/give)

News (/news-media)     Locations (/locations)

Tahirih Updates

# Biden's Asylum Ban Will Continue to Place Survivors in Harm's Way

February 21st, 2023

CLP_AR_004847



**Focus Area Filter:** Direct Services (https://www.tahirih.org/focus_area/direct-services/), Policy Advocacy (https://www.tahirih.org/focus_area/policy-advocacy/)
**Location Filter:** National (https://www.tahirih.org/location/national/)
**Topic Filter:** Asylum (https://www.tahirih.org/tag/asylum/), Fair Immigration Laws (https://www.tahirih.org/tag/fair-immigration-laws/)

This article was originally published on February 21, 2023.

**Washington, D.C.** – Today, the Department of Homeland Security issued a proposed rule that would drastically limit eligibility for asylum for many people seeking safety at our Southern border. Under these new regulations, a person seeking asylum at a U.S. port of entry on the Southern border who does not have an appointment or traveled through another country without applying for protection there first will be considered ineligible for asylum here – with few exceptions. **This asylum ban cuts off a critical path to safety for survivors and sends them back to dangerous conditions where they often face further violence and trauma.**

---

"The purpose of asylum is to protect, not punish, people in desperate circumstances fleeing for their lives," said **Casey Carter Swegman, Director of Public Policy**. "While the administration has repeatedly promised to promote a fair and humane asylum system, the impact of this new rule will mean that many survivors of gender-based and other violence will be swiftly sent back into harm's way. This rule would extinguish the last beacon of hope for some of the world's most vulnerable people."

Deciding whether someone *could have* successfully obtained protection from another country or made an appointment is a matter best left to a U.S. asylum officer or immigration judge in the context of a fair hearing that promotes due process. An outright ban simply keeps out those who might qualify under the law.

Everyone who comes to the U.S. seeking safety – no matter where they are from or how they arrived – must be given a fair chance to show why they fear persecution in their home country, and policies that aim to stop migrants from seeking asylum in the U.S. like this latest asylum ban rarely succeed at deterring migration (https://immigrationimpact.com/2021/04/02/immigrants-coming-to-the-border-deterrence-policies/). Instead, they greatly exacerbate the risk and prevalence of gender-based violence (GBV) at the border harming the most vulnerable groups of people, including women, girls, and LGBTQIA+ individuals.

It is a fact that **migrants turned away at the U.S.-Mexico border are more vulnerable to GBV at the hands of cartels and other organized crime groups.** In our recent study (https://www.tahirih.org/wp-content/uploads/2022/10/Oxfam_Tahrih_Surviving-Deterrence_English_2022.pdf), service providers noted that between 30% and 90% of their clients have experienced GBV while at the border, and 68% indicated that their clients frequently report that they have been raped and/or sexually assaulted at the border. President Biden has stated that ending violence against women is the cause of his life (https://www.whitehouse.gov/briefing-room/statements-releases/2022/11/23/statement-by-president-joe-biden-on-the-occasion-of-international-day-for-the-elimination-of-violence-against-women-2/) and this administration has positioned itself as champions of that cause and yet immigrant survivors seeking asylum continue to be forgotten.

President Biden and Congress must stop pointing fingers and work together to fix our broken immigration system instead of doubling down on harmful, failed policies that place migrants at increased danger.

For media inquiries, please email Karla Flores at media@tahirih.org (mailto:media@tahirih.org).

*The Tahirih Justice Center is a national, nonprofit organization that serves immigrant survivors of gender-based violence. By amplifying the experiences of survivors in communities, courts, and Congress, Tahirih's mission is to create a world in which all people share equal rights and live in safety and with dignity.*

MORE Tahirih Updates

CLP_AR_004849

Project Empower: A Guaranteed Income Program for Survivors of Gender-Based Violence (https://www.tahirih.org/news/project-empower-a-guaranteed-income-program-for-survivors-of-gender-based-violence/)

February 15th, 2023

First-of-its-Kind Guaranteed Income Pilot Provided Financial Support and Long-Term Stability to Domestic Violence Survivors and their Children (https://www.tahirih.org/news/first-of-its-kind-guaranteed-income-pilot-provided-financial-support-and-long-term-stability-to-domestic-violence-survivors-and-their-children/)

February 15th, 2023

## Latest News

- Biden's Asylum Ban Will Continue to Place Survivors in Harm's Way (https://www.tahirih.org/news/bidens-asylum-ban-will-continue-to-place-survivors-in-harms-way/)

  Today, the Department of Homeland Security issued a proposed rule that would drastically limit eligibility for asylum for many people seeking safety at our Southern border. Under these new regulations, a person seeking asylum at a U.S. port of entry on the Southern border who does not have an appointment or traveled through another country without applying for protection there first will be considered ineligible for asylum here – with few exceptions. This asylum ban cuts off a critical path to safety for survivors and sends them back to dangerous conditions where they often face further violence and trauma.

  February 21, 2023

- Project Empower: A Guaranteed Income Program for Survivors of Gender-Based Violence (https://www.tahirih.org/news/project-empower-a-guaranteed-income-program-for-survivors-of-gender-based-violence/)

  Project Empower is a first-of-its-kind guaranteed income (GI) program designed to support immigrant survivors of gender-based violence. This program offered unconditional, regular cash transfers of $1000 per month to 10 […]

  February 15, 2023

- ## Survivor Voices

  -  (https://www.tahirih.org/survivor-voices/camila/)

    Camila (https://www.tahirih.org/survivor-voices/camila/)

    "I hope my story is helpful to someone else…and can inspire many women to be stronger. We need to help young women identify toxic relationships, so that there are fewer Camilas that go through such difficult things, let alone have our children suffer."

    November 21, 2022

  - 
    (https://www.tahirih.org/survivor-voices/brenda/)

    Brenda (https://www.tahirih.org/survivor-voices/brenda/)

    When I was 15 years old, I left my parents' home in Mexico. I was sexually abused by my stepfather, and I thought I would be safer moving out with […]

    November 14, 2022

CLP_AR_004851

# Struggling to Survive: the Situation of Asylum Seekers in Tapachula, Mexico

By: Stephanie Brewer, Lesly Tejada, and Maureen Meyer

**JUNE 2022**



RESEARCH
**REPORT**



Advocacy for Human Rights in the Americas

CLP_AR_004858

# TABLE OF CONTENTS

## Key Findings........................................... 1

## Introduction and Acknowledgements ................. 3

## Background on Mexico's Asylum System............. 5

### Legal and institutional framework .......................... 5

### Trends in asylum claims and approvals........................ 6

### Migration enforcement role of the armed forces, including the National Guard ................................................... 8

### The role of Tapachula in the asylum process.................... 8

## Findings from WOLA's 2022 Visit to Tapachula...... 10

### Lack of immediate access to asylum at Mexico's southern border puts families and individuals at risk................................ 10

### Diverse factors have caused drastic increases in asylum claims, overwhelming COMAR .................................... 12

### Asylum seekers' and institutions' responses, 2021-2022.......... 15

### The importance of resettlement and integration support to stabilize forced migration................................................ 18

CLP_AR_004859

**Asylum intake patterns in 2022** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18**

**The "prison city": migrants and asylum seekers caught between a rock and a hard place** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20**

# U.S. government engagement with Mexico on access to protection for refugees . . . . . . . . . . . . . . . . . . . . . . . **27**

**U.S. government support to Mexico's asylum system and efforts to address root causes** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

**U.S. migration policies and Mexico: a failed attempt to deter largely forced migration** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **29**

# Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **31**

# Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . **32**

# Endnotes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **35**

# KEY FINDINGS

- **Migrants and asylum seekers arriving in Tapachula—the city in southern Mexico where the vast majority of asylum claims are made—face what service providers repeatedly described to us as a "system to wear people down" (*política de desgaste*).** This refers not to a written policy, but rather to the combined effects of a series of government actions and omissions that leave people struggling to survive and vulnerable to abuse and arbitrary treatment as they navigate multiple backlogged legal processes. These conditions do not contribute to addressing forced migration to or through Mexico; rather, they increase the suffering and risks faced by people on the move.

- **Skyrocketing asylum claims in Mexico reflect growing forced displacement and protection needs in the region and worldwide. They also reflect a failure to respond adequately to the different needs of the migrant population, including people who migrate in search of economic opportunities or for other reasons that fall outside the recognized grounds for seeking asylum.** Asylum claims in Mexico have grown a hundredfold since 2013 to reach over 130,000 in 2021. Mexico's asylum system is overwhelmed and under-resourced, with prolonged delays in case processing times. In addition to large numbers of people in need of international protection, Mexican migration authorities' reticence to facilitate access to other legal pathways has the effect of channeling people into Mexico's asylum system as though it were the only option to seek a documented status in the country, creating an even more acute situation.

- **Those needing protection are almost never able to request it at ports of entry. This puts people at further risk and constitutes an undue barrier to seeking asylum.** People displaced from their homes by violence, repression, or other threats to their survival arrive at Mexico's border with protection needs, generally after additional violence and trauma on the journey north. Yet even if they are prepared to claim asylum, protection-seeking families and individuals have found themselves blocked from doing so at ports of entry, where agents of the National Migration Institute (*Instituto Nacional de Migración*, INM) may instead tell them that this is not the right place to seek asylum or instruct them to cross between ports of entry without documentation. Migrants who are able to request asylum at ports of entry will generally be detained by the INM and held for at least a few days for processing. As a result, asylum seekers are often forced to cross between ports and try to reach the offices of Mexico's refugee agency (*Comisión Mexicana de Ayuda a Refugiados*, COMAR) to claim asylum without being

CLP_AR_004861

detained by enforcement authorities or victimized by criminals.

- **While trapped in Tapachula, asylum seekers struggle to survive. Mexican authorities' efforts to contain them there are both arbitrary and untenable.** Mexican asylum law requires asylum seekers to wait out their cases in the state where they made their claim. In reality, security forces generally block them from leaving Tapachula itself. Asylum seekers in Tapachula face scarce employment opportunities, obstacles to healthcare, and a dearth of affordable housing, with government, United Nations, and civil society support programs insufficient to meet overwhelming levels of demand. Tapachula's close proximity to Central America puts some people at risk of encounters with their persecutors. Asylum seekers also face abuses by authorities ranging from arbitrary detention to extortion to other forms of violence. Women and Afro-descendant migrants face particular situations of risk and discrimination. All of these factors point to the need to end Mexico's containment policy for asylum seekers.

- **Deterrence-based tactics that only serve to put more suffering and danger in migrants' paths will not decrease forced migration to and through Mexico.** Closing off legal paths to migration forces the displaced population into hiding along dangerous migratory routes, while the growing list of visa restrictions for South American countries that prevent people from flying into Mexico force more people to cross north by land. These inescapable realities highlight the need to prioritize access to protection in regional migration management, alleviating the human suffering in places like Tapachula, and developing sustainable solutions for the migrant population.

- **Initiatives to support migrants' and asylum seekers' integration into other parts of Mexico, such as those currently led by the UN Refugee Agency (UNHCR), are crucial to preventing humanitarian crises in Tapachula and providing solutions and stability to the migrant population.** As desperation, overcrowding, and marches by migrants increased over 2021, the INM sporadically transported migrants and asylum seekers to other states, but it did so without clear criteria or coordination with other institutions. A regularized relocation system, more resources for Mexico's refugee agency, and additional efforts to provide legal status to migrants seeking better opportunities would be important measures to address the growing number of migrants arriving at Mexico's southern border.

CLP_AR_004862

# Introduction and acknowledgements



*WOLA staff and partners at the Mexico-Guatemala border in Cuidad Hidalgo, a crossing point for many asylum seekers bound for Tapachula*

This report is based on a visit by WOLA staff to Mexico City and Tapachula, Chiapas state, in late February and early March 2022.

As part of WOLA's work on regional migration patterns, access to asylum, and the impact of border enforcement measures, in recent years we have closely monitored and visited the city of Tapachula on Mexico's southern border, a crucial crossing point where the vast majority of Mexico's asylum requests are filed. Tapachula provides both a relevant snapshot of northward migration trends and a paradigmatic example of the consequences of containment policies on asylum seekers. The present report fits within our reporting from the Mexico-Guatemala border over the past decade and our overall analysis of the impacts of U.S. and regional migration policies on the movement and rights of migrants throughout the hemisphere.

On this occasion, the WOLA delegation met with asylum seekers, government officials, UN agencies, and civil society partners providing services to people on the move in southern Mexico. We particularly acknowledge the support of the Fray Matías de Córdova Human Rights Center, a 2020 WOLA Human Rights Award recipient organization, whose staff generously helped us to convene meetings with civil society organizations and asylum seekers, as well as providing information on the trends and practices they are documenting in their day-to-day work with the asylum-seeking population. We are also especially grateful to the three asylum seekers who agreed to be interviewed on video by the WOLA team so that their stories could be quoted in this report and shown in the videos that accompany it.

During our visit, we also met with officials of the Tapachula and national offices of Mexico's refugee agency, the Mexican Commission for Refugee Assistance (*Comisión Mexicana de Ayuda a Refugiados*, COMAR); the Tapachula and national offices of the UN Refugee Agency

CLP_AR_004863

(UNHCR); the Tapachula office of Mexico's Welfare Ministry (*Secretaría de Bienestar*); and the U.S. Embassy in Mexico City. We spoke with representatives of legal service providers and civil society organizations including *Formación y Capacitación* (FOCA), American Friends Service Committee (AFSC), the Migration Program (*Programa de Asuntos Migratorios*, Prami) of the Universidad Iberoamericana Mexico City, *Una Mano Amiga en la Lucha contra el SIDA*, *Iniciativas para el Desarrollo Humano*, Coalition for Humane Immigrant Rights (CHIRLA), Jesuit Refugee Service, and the Institute for Women in Migration (*Instituto para las Mujeres en la Migración*, IMUMI). Most of these organizations form part of the Southeast Mexico Human Rights Observation and Monitoring Collective (*Colectivo de Observación y Monitoreo de Derechos Humanos en el Sureste Mexicano*), which documents human rights abuses against migrants and asylum seekers. Despite our attempts to obtain a meeting with the National Migration Institute (*Instituto Nacional de Migración*, INM), we were unable to meet with representatives of this agency.

The information provided in these meetings, our observations in different parts of Tapachula and at the Mexico-Guatemala border, as well as our ongoing written research and monitoring have led to the present report, which aims to present an updated window into the situation of asylum seekers arriving and seeking protection in Tapachula. Our analysis leads us to set out recommendations for the Mexican and U.S. governments, focusing both on domestic policies and regional collaboration to respond to forced migration.

CLP_AR_004864

# BACKGROUND ON MEXICO'S ASYLUM SYSTEM

## *Legal and institutional framework*

In 2000, Mexico became a party to the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees, the cornerstone United Nations (UN) agreements that provide for the right to seek asylum from persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. Mexico's Law on Refugees, Complementary Protection and Political Asylum (*Ley Sobre Refugiados, Protección Complementaria y Asilo Político*, "Law on Refugees") incorporates this protection framework as well as gender-based persecution. It further incorporates additional grounds for protection outlined in the Cartagena Declaration.[1] Thus, Mexican law recognizes refugee status for people who have fled their country of origin "because their lives, security, or freedom have been threatened by generalized violence, foreign aggression, internal conflicts, massive human rights violations, or other circumstances that have seriously disturbed public order[.]"[2]



*Mural near the Mexico-Guatemala border*

Mexico's refugee law also provides for "complementary protection" to people who are not recognized as refugees but whose life would be in danger or who would be at risk of torture or ill treatment if returned to another country.[3] Complementary protection applies to the person who requested protection, but it is not extended to their family members. These different forms of protection do not cover all people forcibly displaced from their countries of origin: in particular, disasters provoked by climate change and other environmental factors are increasingly relevant drivers of forced migration, but families and individuals displaced by climate disasters were not understood to be refugees at the time the aforementioned international and national legal instruments were drafted. However, Mexico's legal framework protects a decidedly broader class of refugees than U.S. law does.

CLP_AR_004865

The Mexican Commission for Refugee Assistance (COMAR), housed within the Ministry of the Interior (*Secretaría de Gobernación*, SEGOB) is the government agency charged with processing asylum claims. COMAR has central offices in Mexico City, as well as offices in the south and north of the country (two in Chiapas and one each in the states of Tabasco, Veracruz, Coahuila, Nuevo León, Baja California, and the central state of Jalisco).

The National Migration Institute (INM), also within SEGOB, is in charge of overseeing migrant arrivals at ports of entry, granting visas and legal residency, and migration enforcement. One of the INM's functions as outlined by the Law on Refugees' implementing regulations is to detect individuals in need of international protection and assist and coordinate with COMAR in facilitating their access to the asylum system.[4]

Families and individuals seeking asylum must submit their application no later than 30 business days after entering the country.[5] After the application has been received, COMAR issues a document (*constancia*) that serves as proof of an open asylum case. Once someone has requested refugee protection, legally they cannot be returned back to their country of origin during the processing of their case.[6]

With their *constancia* from COMAR, asylum seekers can apply with the INM to receive a humanitarian visa, known as a Visitor Card for Humanitarian Reasons (*Tarjeta de Visitante por Razones Humanitarias*, TVRH), which confers legal permission for people to live and work in Mexico for a year.

To determine refugee status, COMAR will interview applicants about the reason for leaving their country (with the participation of interpreters when an asylum seeker does not speak Spanish).[7] By law, COMAR has 45 business days to process applications, which may be extended up to 90 days.[8] These limits are not currently observed, as will be discussed below. Crucially, while a claim is being processed, asylum seekers are required by the Law on Refugees' current regulations to remain in the state where they filed their asylum request,[9] unless they receive special permission to relocate and continue their case from a different state.[10]

### *Trends in asylum claims and approvals*

In 2021 Mexico received a record-breaking 130,627 asylum requests, more than 100 times the number received just eight years ago in 2013.[11] The top three nationalities that applied for asylum in Mexico in 2021 were Haitians, Hondurans, and Cubans. The number of Haitian asylum seekers saw the most dramatic increase from 2020 to 2021, from 5,917 to 51,337. Children born to Haitian parents also accounted for a large percentage of 2021 asylum seekers from Chile and Brazil, who increased from a combined total of 1,170 in 2020 to 10,749 in 2021.

CLP_AR_004866



In 2021, COMAR resolved 38,054 asylum cases, with an overall asylum grant rate of 72 percent (74 percent counting complementary protection), considerably higher than the average U.S. asylum approval rate of roughly 37 percent in FY2021. There were significant disparities in approval rates for applicants of different nationalities. The major nationalities that saw the highest percentage of approval rates last year were Venezuelans (97 percent), Hondurans (85 percent), and Salvadorans (85 percent). COMAR regularly evaluates applications from nationals of these countries under the broader criteria of the Cartagena Declaration. Of the top asylum-seeking nationalities, Haitians had the lowest approval rate at 23 percent.



CLP_AR_004867

**7  Struggling to Survive** *June 2022*

Asylum claims in Mexico continue to rise and may be on track to break new records, with 40,026 requests filed in the first four months of 2022—the highest number in the January-April period in the past three years.

### Migration enforcement role of the armed forces, including the National Guard

While not officially responsible for the asylum process, Mexico's armed forces currently play a leading role in migration enforcement, bringing them into direct contact with arriving families and individuals, with consequences that can impact people's access to asylum. As of late April 2022, 28,542 military troops were deployed in a migration enforcement role at Mexico's borders. Available data suggest that military forces, in particular the army and the National Guard,[12] carry out or collaborate in the majority of migratory detentions in Mexico, depriving hundreds of thousands of migrants of their liberty in recent years.

Military troops are primarily trained to combat enemy forces, a background that raises obvious concerns when assigning troops to be potential first contact points for migrant and asylum-seeking families, children, and adults. The deployment of the armed forces to intercept migrants is a clear example of an official response that treats migration—including forced migration and those seeking protection—as though it were a national security threat rather than a movement of people who have disproportionately high levels of vulnerability, trauma, and humanitarian needs. Concerns regarding militarization of border and migration tasks in Mexico are not just theoretical: in 2021, army and National Guard troops shot and killed two migrants in separate incidents in Chiapas, while the National Human Rights Commission (*Comisión Nacional de los Derechos Humanos*, CNDH) has issued recommendations finding National Guard troops responsible for other violations against migrants at Mexico's southern border. In 2021, the CNDH received complaints against the National Guard in Chiapas for cruel and inhumane treatment, arbitrary detention, and torture.

While a detailed analysis of border militarization is beyond the scope of this report, this remains one of the most concerning aspects of the armed forces' multiplying roles in Mexico. It is also an area in which the U.S. government has negatively influenced migrant rights and access to protection in Mexico in recent years by pressuring Mexican authorities to crack down on northward migration, including through the threat of tariffs on Mexican exports during the Trump administration and by praising Mexico's efforts to stop migrant caravans, which translates into the deployment of military troops.

### The role of Tapachula in the asylum process

Due to its location just inland of the Mexico-Guatemala border, size, and connectivity to main highways from Central America, Tapachula is the main point of arrival for a significant portion of migrants and asylum seekers coming by land to Mexico. A large majority of asylum claims—89,613 in 2021—were filed in COMAR's Tapachula office, creating an enormous strain on this office and prolonged delays in case processing, stretching into wait times of many months for asylum applicants.

CLP_AR_004868

*Map showing Tapachula/southern border*



Since asylum seekers are generally required to wait out their cases in the state where they file their claims, tens of thousands of asylum seekers are currently expected to live in Chiapas, the southern border state where Tapachula is located (and Mexico's poorest state, with a poverty rate of 75.5 percent in 2020). In practice, Mexican authorities seek to confine these families and individuals not just to Chiapas state, but to the city of Tapachula itself. For this reason, Tapachula is known as the "prison city" (*ciudad cárcel*) for asylum seekers. As we will discuss below, this containment policy has led to a series of negative consequences including lack of access to basic services and the means to survive, pushing asylum seekers to try to find ways to leave the city.



*Bicentennial Park in Tapachula, where migrants and asylum seekers without a place to stay often spend the night*

CLP_AR_004869

# FINDINGS FROM WOLA'S 2022 VISIT TO TAPACHULA

*Lack of immediate access to asylum at Mexico's southern border puts families and individuals at risk*

While Mexico continues to experience mixed migration flows, a large number of people arriving in Tapachula have international protection needs after fleeing life-threatening circumstances in their home countries.

Migrants and asylum seekers generally arrive in Mexico after living through different forms of violence, trauma, and exploitation during their journey north. As numerous people told us, every step along the migratory route to Mexico costs money, whether due to criminal extortion, bribes demanded by authorities, fees to secure guides, or other payments necessary to move from one place to another with as little violence as possible. Even those able to muster resources through their family and social networks are still vulnerable to violence and repeated criminal attacks, including kidnapping and rape, while people forced to flee their homes with little prior notice are likely to travel with even fewer resources and thus have even less of an opportunity to fend off detention and violent attacks. Regardless of their circumstances, arriving migrants and asylum seekers in Tapachula, especially those in a heightened situation of vulnerability such as children, are likely to arrive in need of physical, psychological, and other humanitarian attention after their journey, as well as with the right to request international protection or to pursue other pathways for temporary or permanent legal status.

**"It's impossible to live in Honduras. It's so dangerous now. The gangs see 12-year-olds, 13-year-olds, and they already want to recruit them… I have a 10-year-old daughter and a 14-year-old daughter, that's why I had to leave my country, leave my family and everything behind, because the gangs came… they said they were going to recruit my daughters… and that if I didn't let them, they were going to kill us all, my children and me…"**

**–"Maria," Honduran asylum seeker**

Families and individuals face severe obstacles in requesting asylum when they arrive at Mexico's border because COMAR does not have a regular presence at ports of entry, which are instead manned by INM agents. Despite the INM's legal mandate to assist and collaborate with COMAR, according to multiple service providers in Tapachula, INM agents at ports of entry are known to tell asylum seekers that they cannot seek asylum at the border and cannot enter Mexico without documents.

Paradoxically, rather than seeking truly to block the path of asylum seekers into Mexico, the

CLP_AR_004870

INM agents themselves may also instruct people to cross between ports of entry in order to make their way to COMAR's Tapachula office to claim asylum. Only in certain cases, such as when a service-providing organization has contacted authorities to request entry for an asylum-seeking person or group, are there greater guarantees of asylum seekers' being able to cross at a port of entry and to avoid detention in the INM's migration stations (detention centers) while their paperwork is being processed.



*The Suchiate River, which divides Tecún Umán, Guatemala from Ciudad Hidalgo, Mexico*

The result of this approach by the INM is that many asylum-seeking families and individuals must cross Mexico's border in hiding and try to make it from the border to the COMAR office or an NGO or other service provider without documentation that authorizes their presence in Mexico. These journeys put asylum seekers at risk of attacks and extortion by criminal groups who prey on migrants and of detention or extortion by INM agents, state and local police, and military forces.

**"When you're an immigrant and you're on the move… the authorities, instead of helping you because they're authorities, no, what they do is take what little you have… even if you have children, they don't care, they take their papers, and it's, 'either give me what you have or I'll send you back or I'll imprison you…' As a migrant, you're afraid, so you agree to whatever they ask of you… you just say, 'yes.'"**

**–"Maria," Honduran asylum seeker**

WOLA staff heard accounts of detentions and abuses by the INM, police agents, and the military even against migrants with official permission to be in Mexican territory; for arriving asylum seekers with no documentation who are forced to cross irregularly into the country,

CLP_AR_004871

the risks are even higher. According to data collected from 2,742 asylum seekers in Tapachula between October 2020 and October 2021 by the Danish Refugee Council (DRC) and the Jesuit Refugee Service Mexico (JRS), 98.3 percent of respondents affirmed having entered Mexico irregularly, and 34.3 percent of these respondents "describe incidents of extortion, violence, threats, and other abuses, compared with only 9.1% of respondents who indicate having entered the country regularly."

Detention by authorities may lead to extortion and/or temporary imprisonment in the INM's detention centers. According to international standards and guidelines, detention of asylum seekers should be exceptional and based on an evaluation of the specific need for detention in each case. In Mexico, such detention tends to respond to few criteria other than migratory status and may be prolonged for months. While an alternatives-to-detention program exists in Mexico, which releases asylum seekers from detention and refers them to shelters in coordination with COMAR and support from the UN Refugee Agency, the INM has curtailed its use in recent years. Interviews conducted during our visit and reporting from organizations working with asylum seekers suggest that the INM has become less responsive to requests for migrants to be released from detention.

Once detained, many asylum seekers are told that if they make a protection claim, they will remain locked up while their case moves forward. This factor alone makes it much more difficult for people to prepare their asylum case, as they face obstacles such as inadequate access to information, legal assistance, and healthcare, overcrowding, or safety issues. This leads some people with protection needs to desist from their claims in order to be released from detention.

A 2020 reform to Mexico's migration and refugee framework established that children (unaccompanied and those with their families) should not be held in detention by the INM.[13] Children and their families should instead be referred to the National System for Integral Family Development (*Sistema Nacional para el Desarrollo Integral de la Familia*, DIF). However, service providers told WOLA that this sometimes amounts to little more than a change of detention setting for individuals and families sent to DIF shelters. Civil society counterparts also told WOLA of the INM's practice of separating families, for instance by detaining a father in a migration station and sending a mother and children to a DIF facility.

**"At the first checkpoint… [the authorities] took me; they brought me to the *Siglo XXI* migrant detention center… I was scared when I got there, I've never been detained… after three and a half months, I couldn't stand it there anymore… I decided not to continue [with that asylum request], because I wasn't sleeping, I wasn't eating well by then… it got to the point where I would talk to myself…"**

**–Nelson, Nicaraguan asylum seeker**

### Diverse factors have caused drastic increases in asylum claims, overwhelming COMAR

Mirroring global trends, there has been a dramatic increase in people displaced from their homes throughout the Western Hemisphere. Mexico, which in 2021 became the third country

worldwide in the number of asylum requests received, has become a significant destination country for a growing number of people.

Latin America has witnessed an increase in human mobility in recent years as both long-standing and emerging causes of displacement force more people to flee their homes. Latin American and Caribbean countries consistently lead the world in homicide rates, with gang violence in Central America and organized crime in Mexico continuing to be significant causes of displacement. Repression and political and humanitarian crises, exemplified in different forms in countries such as Venezuela, Nicaragua, and Cuba, add to forced displacement. The devastation caused by Hurricanes Eta and Iota in Central America in 2020 highlighted the increasing percentage of people on the move who can be considered climate refugees. Violence, poverty, and other already life-threatening crises have now been aggravated by the Covid-19 pandemic.

In addition to people fleeing directly from their countries of origin, a large percentage of 2021 asylum requests in Mexico came from people of Haitian origin who had previously fled Haiti following its devastating 2010 earthquake, resettled for a time in South American countries (notably Brazil and Chile), but once again found themselves on the move due to shrinking visa availability, scant labor opportunities, and racism and discrimination in South America, with fewer possibilities than ever of returning to Haiti as gang violence, political crises, and natural disasters engulfed the country in 2021.

In this context, the modern face of northward migration through Latin America includes a significant percentage of women and children, with many families migrating and seeking asylum together.



**Asylum seekers in Mexico, 2021**

Girls
11.8%

Boys
12.4%

Adult men
46.5%

Adult women
29.3%

Source: COMAR • Created with Datawrapper

In addition to these trends, both authorities and civil society counterparts agree that people on the move are currently funneled into Mexico's asylum system even though Mexican law has some other paths available to those seeking a legalized status in the country. In particular, while

CLP_AR_004873

Mexican law makes TVRH humanitarian visas available to migrants who have been victims of or witnessed a crime in Mexico, children, or for other humanitarian purposes or public interest reasons,[14] in practice these visas have not been made widely available to migrants. Even asylum seekers face steep obstacles in obtaining a TVRH. In 2021, the INM issued 87,174 TVRHs. However, only 35,397 were provided to asylum seekers, contributing to the obstacles WOLA staff witnessed in Tapachula with asylum seekers unable to access employment because they lacked this visa. At the same time, the fact that more than half (48,611) of these visas were issued for humanitarian reasons, including 30,057 to Haitians (and another 6,547 to Brazilians and Chileans, many of whom are likely children of Haitians born in these countries), illustrates that in the context of high levels of forced migration and significant pressure as a result of the tens of thousands of migrants and asylum seekers trapped in Tapachula in the fall of 2021, the Mexican government more broadly used TVRHs as a tool to provide temporary status in Mexico. In contrast, the INM issued only 25,414 TVRHs in 2020, with less than a thousand, 862, provided for humanitarian reasons.

Given the INM's reticence to offer alternatives to migrants arriving at Mexico's southern border, seeking asylum is seen as the necessary route to obtain a TVRH for most arriving migrants, contributing to COMAR's increased caseload. This also means that an unknown number of people who intend to reach the United States to reunite with family or for other reasons find themselves channeled into applying for asylum in Mexico to regularize their presence in the country, even though Mexico is not their final destination.

Finally, with the U.S. border closed to many arriving asylum seekers under Title 42 since March 2020, some asylum seekers may have requested protection from COMAR even if they do not feel safe in Mexico, following expulsion or being blocked at U.S. ports of entry. If the Title 42 policy is lifted, part of this population will likely move to the U.S. border in the hope of being able to request asylum in the United States. These asylum seekers would join a growing number of other foreign nationals who have been bottled up along the U.S.-Mexico border awaiting their chance to approach a port of entry and request asylum in the United States, with U.S. authorities estimating this number could be around 25,000.

The record-breaking rise in asylum requests in Mexico has meant that those arriving find themselves navigating an asylum system that is overwhelmed, under-resourced, and severely backlogged. Nowhere is this reality more evident than in Tapachula.

**"I came here, not because I had some American dream, but because I was fleeing so that [the authorities] wouldn't hurt my family, first of all, and secondly to protect my own life…**

**[This has been] an emotional and economic change that hit me hard, believe me… I don't wish this on anyone. That's what I can tell you: I don't wish this on anyone."**

**–Nelson, Nicaraguan asylum seeker**

CLP_AR_004874

As has been evident in the images of hundreds of asylum seekers waiting outside of COMAR's offices in Tapachula, the agency has yet to secure enough resources to process current caseloads. In response to rising numbers of claims, COMAR has expanded in recent years with support from the UN Refugee Agency; today, COMAR has <u>nine offices</u> throughout the country and plans to open more, including a coordinating office in Chiapas state to oversee the work of the multiple Chiapas COMAR offices. With <u>UNHCR support</u>, COMAR increased its processing capacity by <u>116</u> percent between 2020 and 2021, and has gone from 20,466 case determinations in 2019 to 38,054 in 2021. In December 2021, COMAR signed <u>a new agreement</u> with UNHCR that will allow COMAR to directly hire 230 staff members (under Mexican law, government officers must be the ones to make asylum determinations; that is, staff directly paid by UNHCR cannot substitute COMAR in this role).



However, even with this additional support, the resources afforded to COMAR are still far from sufficient to enable prompt processing of incoming asylum requests, with the agency's overall domestic budget remaining essentially stable from 2021 to 2022 despite skyrocketing levels of asylum claims.[15]

**COMAR's annual budget in U.S. dollars (to the nearest thousand)**

| | |
|---|---|
| 2021 | 2,194,000 |
| 2022 | 2,255,000 |

Source: Secretaría de Hacienda y Crédito Público • Created with Datawrapper

### Asylum seekers' and institutions' responses, 2021–2022

As mentioned, delays of many months in refugee determinations, coupled with Mexico's containment policy, have effectively trapped tens of thousands of foreign nationals in

CLP_AR_004875

untenable conditions in Tapachula. As this situation reached crisis levels in 2021, lack of access to job opportunities, housing, healthcare, and other necessities in Tapachula; safety concerns; discrimination; and desperation at seemingly never-ending legal processes led large groups of asylum seekers to try to leave the city.

In perhaps the best-known example, hundreds of foreign nationals sought to leave Tapachula by marching north together in "caravans" in the second half of 2021, particularly beginning at the end of August. However, the caravans met with blockades, detention, and sometimes violent repression from INM agents and the National Guard. Since then, multiple caravans have left Tapachula, with some reaching other states, though none remaining intact beyond the center of the country.



*Mexican immigration agents detain a Haitian migrant in Escuintla, Chiapas state, Mexico in September 2021 (AP Photo/Marco Ugarte)*

For its part, COMAR's Tapachula office tried several strategies throughout 2021 to increase its capacity to process asylum claims. At the beginning of the year, unable to keep up with case intake, the office began issuing appointment notices (*citatorios*), which stipulate a later date for the formalization of a family's or individual's asylum application. In mid-2021, COMAR set up an online platform for use in Tapachula to request asylum appointments. However, WOLA staff was told, the system received tens of thousands of online requests in a single week, grew to include people who had not yet arrived in Mexico, and led to large numbers of case inquiries. Service providers pointed out that the online system also created challenges for asylum seekers unfamiliar with navigating the internet or unable to access the online platform.

Changing tactics, from late September to late November COMAR convened asylum seekers to come in person to Tapachula's stadium to confirm their appointment requests, in an unprecedented strategy in which UN agencies and other Mexican institutions collaborated. Approximately 55,000 asylum seekers participated, allowing COMAR to reorganize and open up appointment times.

CLP_AR_004876

These efforts were disrupted, however, by the INM's own parallel response strategies. As growing numbers of desperate asylum seekers sought to leave Tapachula on foot, producing high-level news coverage including images of caravans and repression, the INM began offering caravan participants or would-be participants humanitarian visas and relocation by bus to a series of other Mexican states. In this context, the INM announced that it too would use Tapachula's stadium at the end of November 2021 to program transportation to other states. INM's announcement prompted families and individuals to abandon jobs, housing, and other activities in Tapachula to camp out around the stadium, awaiting what they believed would be their turn to leave. Given Tapachula's extremely hot conditions, the situation for families and children in particular was often unbearable according to service providers who sought to assist asylum seekers at the time.

Not everyone waiting at the stadium received transportation, however. In December, the INM began issuing QR codes to migrants and asylum seekers, instructing them to pay their own way to one of a list of different states (determined in each case by the QR code) and then report to an INM office within 30 days to regularize their status. It is estimated that some 35,000 people were relocated to 17 central and northern Mexican cities through the INM programs. The long list of states in which the INM issued over 1,000 humanitarian visas in December 2021 (44,425 TVRHs in total) is one indicator of the application of this program.

While the initiative to move people out of Tapachula points to recognition of the failure of the containment policy, the INM has implemented this plan in a piecemeal and reactive manner, and it is not permanently or universally available. The main criterion for busing seems to be a desire to break up caravans, deactivate protests, and diminish the crisis of overcrowding in Tapachula.

The INM also failed to adequately coordinate its busing project with COMAR, and asylum seekers were sometimes unwittingly considered to have abandoned their claims by virtue of no longer being able to show up at Tapachula's COMAR office. Some, having struggled to leave Tapachula, even found themselves returning there once they realized they could not follow up on their cases from other states. WOLA was told that the INM eventually began providing more complete data to COMAR on which asylum seekers were transported to what destinations, which would allow COMAR to re-open their cases. However, it is unclear what will happen to many of the transported migrants who wish to pursue their asylum claims.

**"Abuses by authorities, corruption, and impunity are very severe problems… and they're aggravated when the victim is a person who isn't perceived as a person… they're perceived as the other."**

**–Brenda Ochoa, Director of the Fray Matías de Córdova Human Rights Center**

CLP_AR_004877

### The importance of resettlement and integration support to stabilize forced migration

Stakeholders interviewed by WOLA emphasized that the extent to which resettlement and integration is available and supported in Mexico, giving refugees access to services and the ability to live and work throughout the country, influences the number of people who will opt to resettle in Mexico and the stability of that resettlement. In this vein, while many counterparts spoke of the need to facilitate immediate humanitarian visas to asylum seekers and other migrants who qualify for them, several also signaled the need to think beyond short-term solutions and to recognize that without permanent resident status, people on the move will live in a more vulnerable situation in which they must constantly renew their documentation.

Positive examples of integration support exist and can provide guidance for expanding such efforts. In particular, UNHCR has led an integration program (Local Integration Program, *Programa de Integración Local*,  PIL) that has helped more than 10,000 refugees relocate within Mexico and start their lives in their new communities since 2016. The program has helped move refugees from the southern part of the country to eight cities in the center and north of Mexico. A UN study demonstrates the success of the program: while in southern Mexico, only 10 percent of refugees were employed and 17 percent had sporadic informal jobs, but after their relocation, 92 percent were in formal employment with earnings that were on average 60 percent higher than in the south.

In December 2021, the International Organization for Migration (IOM) and UNHCR presented a pilot project that aims to support the stabilization and integration of Haitians in Mexico. The program will allow Haitian families who have not applied for asylum to participate in the PIL program. It will be important to monitor the success of this new initiative, including the extent to which it is able to facilitate access to work for women as well as men.

Initiatives such as this one fit within the overall, recognized need for countries to expand legal pathways to resettlement for people who need to leave their homes. For example, UNHCR has emphasized the importance of complementary pathways, or safe and regulated avenues that complement refugee resettlement, which offer alternatives to resorting to irregular and dangerous movement and facilitate the acquisition of a sustainable and durable migration status. Complementary pathways for admission are diverse and can include humanitarian visas, family reunification, and education and labor opportunities, among others.

### Asylum intake patterns in 2022

During our visit, COMAR's Tapachula offices were intaking some 250 asylum seekers per day, although that number is sometimes several times higher on Mondays. Stakeholders were unanimous in telling us of an increase in the number of Venezuelans, Cubans, and Nicaraguans arriving by land this year. They also noted an increase in extra-continental migrants and asylum seekers, largely from African countries.

In part, these movements reflect trends apparent in 2021, which saw significant increases in the number of Venezuelans, Cubans, and Nicaraguans requesting asylum in Mexico and detained in Mexico (a total of 26,705 people of these nationalities were apprehended by Mexican authorities in 2021, a more than tenfold increase from the 2,204 Venezuelans, Cubans,

CLP_AR_004878

and Nicaraguans detained in 2020). However, more recent reported upticks in the number of Venezuelans arriving in Tapachula in particular would seem also to be a consequence of Mexico's new visa requirements for Venezuelans, imposed in January 2022 following reported requests from the United States, which block air travel to many Venezuelan migrants and hence drive more Venezuelans to migrate north by land through Central America and Mexico. Mexico similarly imposed visa requirements on nationals of Brazil and Ecuador in 2021 in response to increasing arrivals from those countries at the U.S. southern border.

More Cubans are also arriving in Mexico, in part due to Nicaragua's lifting of visa requirements for Cubans in November 2021, enabling them to fly to Nicaragua to continue their journey north. COMAR's asylum applications reflect these shifts in nationalities, with more Cubans requesting asylum in Mexico in the first four months of 2022 (8,445) than in all of 2021 (8,298), while 4,270 Venezuelans requested protection in this same period, as compared to 6,192 in all of 2021. In the first four months of 2022, 841 people from Senegal also requested protection in Mexico.



The land route from South America to Mexico passes through the notorious Darién Gap that connects Colombia to Panama, a migratory corridor known for extreme levels of lawlessness and violence (including rape), robbery and extorsion, deaths from exposure to extreme conditions, and other life-threatening and trauma-inducing conditions. In November 2021, Doctors without Borders reported that since April of that year they had attended 288 victims of sexual violence in the Darién Gap in their reception centers and with the Panamanian Ministry of Health, estimating that this represented only a quarter of the actual cases. U.S., Mexican, or other regional migration policies that channel larger numbers of people through this route thus will necessarily have extremely severe negative effects on the lives of migrants and asylum seekers.

CLP_AR_004879

**"In our group [of migrants crossing the Darién Gap], one man fell… I don't know how he managed to grab onto something, because if he had fallen to the bottom there, he would have died. […] [On the path] you see things, you see dead bodies, you see everything people have left behind, because you get to a point where even your own clothes weigh you down from the sweat. […] At a certain point, I couldn't breathe… I said, 'go on ahead, I'm going to stay here a while…' […] And when I woke up, there were only two people there… they said they hadn't left because they saw that I was still breathing. Because I had lost consciousness completely. […] We walked and walked and walked and walked and walked and walked…"**

**-Frantz, Haitian asylum seeker**

Finally, we note that COMAR may acquire a large new portfolio of work stemming from a proposed Underlined General Law on Forced Displacement that has passed in Mexico's House of Representatives and is now under consideration in the Senate. This law would recognize and create a system for attending to Mexico's own large population of internally displaced people (IDPs), with tens of thousands of people displaced in large-scale movements in 2021 alone and potentially hundreds of thousands displaced in total in recent years. Under the proposed legislation, COMAR will become the institution in charge of implementing the law and supporting the IDP population. However, WOLA was told that the agency's plan is to keep its refugee and IDP functions as separate as possible, ensuring separate structures and budgets to cover both. It remains to be seen if the law passes in its current form and how implementation and funding of the law will play out in practice. The Mexican Senate ended its normal legislative session in late April 2022 without moving forward with the legislation.

*The "prison city": migrants and asylum seekers caught between a rock and a hard place*

Recalling that Chiapas is Mexico's poorest state and Tapachula is a city of some 350,000 residents, it is unsurprising that foreign nationals' need for jobs surpass Tapachula's labor market. As was described to us repeatedly during our visit, migrants and asylum seekers in Tapachula also tend to face obstacles to accessing healthcare, education, and housing, as well as experiencing racial discrimination and abuses by authorities, including arbitrary detention. Language barriers and racism faced by Haitian and other Afro-descendant and indigenous migrants have further impeded their access to public services. WOLA staff conversations with a Spanish-speaking Haitian asylum seeker also made clear that language barriers impact Haitians' ability to access and understand Mexico's asylum system, as has been documented by several civil society organizations. These circumstances make clear that, as thousands of people continue to arrive and ask for protection, authorities must remove existing obstacles to dignified living conditions in the city, improve access to services for non-Spanish-speaking

CLP_AR_004880

migrants, address institutional racism, and reform the containment policy so that Tapachula is no longer a prison city for people on the move.

A migrant or asylum seeker's stay in Tapachula is marked by arbitrary rules and long wait times that leave them in a constant state of uncertainty. INM agents and the National Guard operate fixed and moving checkpoints in and around the city, as well as conducting raids, particularly at night, in which they detain migrants for alleged failure to demonstrate their permission to be in Mexico. In reality, detentions have swept up people with legal permission to be in Mexico, including asylum seekers. Service providers told us that security forces will target a certain park or hotel to raid, and sometimes ask to see even bystanders' identifications; we heard accounts of such authorities destroying asylum seekers' documents that proved that they were lawfully present or had ongoing cases.

**"In the raids [to detain migrants], authorities commit serious abuses, there is a lot of violence even against women, girls, boys, adolescents…"**

**–Brenda Ochoa, Director of the Fray Matías de Córdova Human Rights Center**

Those detained may be imprisoned for weeks or more in INM detention centers, where, according to civil society investigations, INM agents regularly pressure asylum seekers to abandon their cases—and some, desperate to be released from detention, opt to do so. As mentioned, an alternatives-to-detention program, albeit an imperfect one, has existed since 2016, but the INM has greatly curtailed access to the program since 2020. Detention of asylum seekers deprives them of a wide variety of rights, separates families, exacerbates trauma, and makes it much more difficult for them to continue their asylum cases with due process.

Even the many asylum seekers who are able to avoid detention and live in Tapachula face safety risks that include extortion by authorities and attacks by criminals. Tapachula's close proximity to Guatemala means that gang members can easily show up there, and service providers told us of cases in which asylum seekers had been found by members of the Central American gangs from which they had fled in the first place. Although a request can be made for COMAR to transfer cases to a COMAR office in another state for security reasons, it is a cumbersome process requiring the asylum seeker to present detailed documentation of the risk.

Beyond safety concerns, day to day living conditions are often untenable, aggravated by the bureaucracy of the processes required to regularize one's migratory status. Desperation was palpable the day that members of WOLA and the Fray Matías Center visited the overflowing line of migrants waiting all day in direct sunlight and sweltering heat outside an INM office for a chance at an appointment, a pattern often repeated day after day.

CLP_AR_004881



*Migrants and asylum seekers waiting for appointments outside the National Migration Institute*

Most asylum seekers need income to survive. However, existing employment opportunities in the formal sector are <u>insufficient</u> and require that people have documentation showing their permission to work in Mexico—though employers may balk at hiring migrants even when presented with humanitarian visas. Some asylum seekers set up stands or other informal businesses to provide goods and services to the population, but municipal authorities sometimes clear them out of certain parks or areas, making it harder for them to earn income.



*Sign that prohibits migrants from selling their wares in a plaza in Tapachula*

CLP_AR_004882

Mexico's Welfare Ministry (*Secretaría de Bienestar*) runs a program for asylum seekers and other migrants seeking regularization in which it provides them with cash support in exchange for several hours of volunteer work through its Social Emergency Program (*Programa de Emergencia Social*). Participating migrants take part in construction, planting, cleaning, translating, and other jobs. Officials in charge of the program in Tapachula told WOLA that enrolled migrants generally remain in Tapachula throughout the duration of their regularization processes. However, the program does not have the capacity to include all the asylum seekers and migrants who seek to participate: we were told in March 2022 that it covered approximately 1,400 people in Tapachula. The day of our visit, a crowd of people was lined up at the door of the program's headquarters, seeking to enroll.

Asylum seekers face steep obstacles in access to housing. Shelters in Tapachula lack the capacity to house the arriving population, and local landlords have taken advantage of increased migration levels to charge usurious rates to rent apartments or rooms, including charging per person for renting shared rooms between groups of people.

Healthcare is another right that many migrants and asylum seekers are prevented from accessing. Service providers and asylum seekers told WOLA that hospitals and other healthcare providers require identification and ask for documentation that asylum seekers may not have, especially if they have arrived recently. Service providers expressed particular concern for the situation of women, including pregnant women and non-Spanish speakers. Those who require care unavailable in Tapachula face difficulties in accessing it; partners told us that it is complicated to obtain permission to bring a migrant even as far as the capital city of Chiapas state. In addition to physical ailments or injuries, migrants and asylum seekers frequently need psychological healthcare after surviving trauma along the migratory route.

**"My 6-year-old daughter had an accident… Here at the hospital, they didn't want to perform surgery on her; they said that they couldn't send her to a different hospital because I was an immigrant…"**

**–"Maria," Honduran asylum seeker**

To help address asylum seekers' need for services in Tapachula, UNHCR provides direct assistance to them after an initial interview to identify their needs, a process facilitated by the opening in March 2021 of the Center to Support Refugees (*Centro de Atención a Refugiados*, CAR), which operates next to COMAR's registration center. However, the scope of this program depends on the availability of resources, which are currently insufficient. UNHCR seeks to support asylum seekers with school inscription, protection against threats to their safety, psychosocial attention, access to healthcare and medicines, and orientation about available migrant shelters and other support mechanisms.

Certain migrant and asylum-seeking groups face particularly acute situations, especially as migrants have become more visible and vulnerable to local xenophobia. It is not uncommon for longstanding Tapachula residents to reject the presence of migrants in the city because of the perception that they are taking jobs from the local people.

CLP_AR_004883

There is an insufficient offer of adapted public services for migrants who do not speak Spanish. In the case of families from countries where Spanish is not a common language, women are especially likely to face language barriers that further reduce their access to services. This leads to patterns in which women's access to services is dependent on male relatives' liaising with authorities.

As mentioned, Haitian migrants and asylum seekers face anti-Black discrimination as well as frequent language barriers. An investigation by the Center for Gender and Refugee Studies, IMUMI, and Haitian Bridge Alliance found that "[f]ew to none of the immigration officials or non-governmental service providers in Tapachula speak Kreyol, and as a result, Haitian migrants have difficulty understanding the immigration system and how to access the networks of legal and humanitarian services available to them." By December 2021, COMAR's Tapachula office had increased its number of Haitian Creole interpreters from two to eight, but concerns persist about how Haitian cases are processed. Legal service providers signal that the notably low rates of asylum grants for Haitians bely insufficient analysis of their cases, especially given the high rates of approvals for other nationalities whose countries of origin suffer from generalized violence or crises. Beyond the asylum process itself, Haitian migrants report experiencing racism from both authorities and the local population.

During WOLA's visit, we were struck by the fact that multiple institutional actors expressed that asylum seekers of Haitian nationality or descent were unlikely to qualify for asylum. While we understand that they were referencing a pattern of secondary movements by Haitians who had previously migrated to South American countries (which differs from a 'typical' asylum case in which a person flees directly from their country of persecution), we recall that domestic and international asylum law require an individualized evaluation of each person's case. We also note that growing numbers of Haitians are now arriving directly from Haiti following that country's 2021 security, political, and natural crises. Furthermore, unlike asylum claims from Honduras, Venezuela, and El Salvador, which are generally processed using the standards outlined in the Cartagena Declaration, COMAR has not designated Haiti as a country whose nationals have access to this differentiated asylum procedure.

Given all of the conditions described above, migrants and asylum seekers in Tapachula increasingly protest in a variety of ways to call for permission to leave Tapachula and regularize their migratory status; the caravans attempting to leave the city are one clear expression of this. In order to bring attention to the desperate situation they are facing, migrants have sewn their lips together, gone on hunger strikes, chained themselves, and marched with crosses. On March 11, 2022, during president Andrés Manuel López Obrador's visit to Tapachula, migrants protested outside a military base where the president held his daily news conference. Those 150 migrants were told they would receive humanitarian visas by the end of the day, in addition to approximately 800 migrants who were given documents in the days leading up to the president's visit, according to immigration authorities. These numbers are just a small fraction of the tens of thousands of foreign nationals waiting in Tapachula.

**"The paperwork... they keep you going round in circles to see if you get tired."**

**–Frantz, Haitian asylum seeker**

CLP_AR_004884

Asylum seekers and migrants defend their rights not just by protesting, but also by providing direct assistance to other asylum seekers and migrants and by advocating with relevant authorities. As always, non-governmental organizations and migrant shelters also continue to be on the front lines of providing migrants with legal representation and humanitarian assistance, as well as documenting abuses against them. Throughout 2020 and 2021, the organizations that form part of the <u>Southeast Mexico Human Rights Observation and Monitoring Collective</u> have been documenting abuses against migrants and asylum seekers throughout the region and monitoring INM and National Guard actions during caravans and other moments of mass movements of migrants.

**"[The police] arrived, they broke open the door, and they said, 'down,' pointing at us with guns, anti-gang police they're called here… They took us to an empty lot and they started beating us… and asking us what gang we belonged to, what cartel, what organization…"**

**-Nelson, Nicaraguan asylum seeker**

The inspiring work done by partners on the ground in Tapachula and elsewhere in Chiapas, and the tireless struggle of migrants and asylum seekers themselves, have led to growing recognition of the crisis caused by Mexico's attempts to contain tens of thousands of vulnerable people at its southern border. Until reforms are made, however, asylum seekers in Tapachula will continue to face what multiple interviewees described to us as a "system to wear people down" *(política de desgaste)*—a combination of norms, arbitrary actions, inefficiencies, and lack of capacity that traps people in a prolonged limbo of uncertainty, risk, and precarious conditions. This situation represents the worst of all worlds: it increases the suffering and vulnerability of asylum seekers while doing nothing to sustainably or constructively manage migratory flows or advance a regionally shared plan to provide protection to those who need it.



*Patio of the Fray Matías de Córdova Human Rights Center*

CLP_AR_004885

"I went to the park and I could identify the people who didn't speak Spanish. And I said to them, 'what do you need?' Like one patient asking another patient, 'what do you need?' And one says, 'I don't understand the paperwork,' because sometimes [the authorities] give you a document and you have to read it and you don't understand. 'Oh, no? I'll translate for you.' Pretty soon, I had 20, 30 people waiting for me to translate for them… So, I started helping people… […] And soon, every day I would get up… and go to the park… to Fray Matías [Human Rights Center]… to COMAR… Sometimes I would lose my voice by the time I got home. Because I was so hoarse from the work that we had done."

**-Frantz, Haitian asylum seeker**

CLP_AR_004886

# U.S. GOVERNMENT ENGAGEMENT WITH MEXICO ON ACCESS TO PROTECTION FOR REFUGEES

U.S. influence on people's access to protection in Mexico stems from both U.S. support for Mexico's asylum system and overall U.S. migration policy—two frameworks that do not necessarily align with one another.

### *U.S. government support to Mexico's asylum system and efforts to address root causes*

The State Department's Bureau of Population, Refugees, and Migration (PRM) manages U.S. support for access to asylum in Mexico and Central America, focusing on humanitarian assistance, capacity-building, and diplomatic engagement.[16] The U.S. government is the largest financial supporter of UNHCR activities in Mexico: in 2021, UNHCR Mexico reported a U.S. contribution of $38,715,766, which constituted 77 percent of total UNHCR contributions earmarked for Mexico in 2021. In turn, UNHCR funds a large share of COMAR's work, enabling it to operate with significantly more staff than it could with its domestic budget.

While such U.S. support has been ongoing over a number of years, the U.S. Congress has recently reinforced the need to invest in Mexico's asylum processing capacity in the face of its overwhelming caseload, including language linked to U.S. foreign assistance specifying the need to support COMAR and INM "to improve intake facilities and asylum case management and processing."[17]

In a letter sent to Secretary of State Antony Blinken in March 2021, 19 members of Congress stated that Mexico's asylum system "merits priority attention":

> While Mexico's refugee agency, Comisión Mexicana de Ayuda a Refugiados (COMAR), has improved its processing capacity, asylum seekers continue to face inadequate screening for protection concerns by migration enforcement officials, poor conditions in detention centers, and long processing times. [...] U.S.-Mexico cooperation should seek to improve access to protection in Mexico, in coordination with the United Nations High Commissioner for Refugees (UNHCR) and civil society organizations, by increasing COMAR's presence throughout the country, supporting alternatives to detention for asylum seekers, and further improving COMAR's capacity.

In July 2021, the White House published its Collaborative Migration Management Strategy (CMMS), which lays out eight lines of action through which the U.S. government seeks a comprehensive regional approach to migration. One of these is "Expand Access to International Protection," an area in which the Biden administration specifically cites cooperation with Mexico, stating:

> The United States will support regional government efforts to strengthen and expand their asylum systems to provide vulnerable individuals with

CLP_AR_004887

protection... [...] For example, since 2016, the Mexican Commission for Refugee Assistance has expanded dramatically with U.S. support, opening new field offices and tripling its annual case processing capacity. The United States will continue to work with Mexico to build on this success and with other regional governments to help expand their asylum systems.

The CMMS also points to Mexico as an example of the need for strong internal relocation and resettlement programs:

> The United States will support inclusion and integration programs that ensure individuals can access livelihood opportunities, services, healthcare, and education, and can develop roots in their new communities. The United States will look to expand successful ongoing integration efforts, such as a program that relocates protection recipients from southern Mexico to industrial belt municipalities in Mexico with labor needs.

In line with the CMMS, U.S. embassy officials in Mexico City told WOLA that the embassy, led by U.S. Ambassador Ken Salazar, advocates with Mexican authorities for migration management that includes, among other components, addressing the root causes of migration, attending to the displaced population, effective asylum processing, and modernized border infrastructure.

The Biden administration has made especially clear that it seeks to address the root causes of forced migration, particularly from Central America. The White House published its multifaceted Root Causes Strategy along with the CMMS in July 2021. For its part, Mexico's federal government is implementing social programs in northern Central America through its international development agency, AMEXCID (*Agencia Mexicana de Cooperación Internacional para el Desarrollo*). These programs largely replicate the Mexican government's signature domestic social programs "Sowing Life" (*Sembrando Vida*, a program that pays participants to plant trees) and Youth Constructing the Future (*Jóvenes Construyendo el Futuro*, a paid internship program for young people). AMEXCID reports that its programs dramatically decrease Central American participants' plans to emigrate, although investigations have denounced irregularities in the implementation of these programs in Mexico. USAID and AMEXCID are coordinating certain assistance in Honduras, Guatemala, and El Salvador within a framework known as "Sowing Opportunities" (*Sembrando Oportunidades*).

Beyond the actions described above, there is a need to improve U.S.-Mexico collaboration to protect specific groups of people who arrive in Mexico with protection needs but whose safe and sustainable resettlement warrants relocation to the United States. This is the case, for example, of unaccompanied asylum-seeking children trying to reunite with U.S.-based family members. Such children should not be forced either to seek asylum in Mexico or to migrate north in hiding when it is clearly in their best interest to join their relatives in the United States. In other cases, families or individuals may have compelling safety reasons to seek protection in the United States rather than in Mexico. Identifying such cases and facilitating a pathway to request protection in the United States would avoid the need for these groups to be processed by Mexico's asylum system when ultimately Mexico will not be a viable destination for them.

CLP_AR_004888

*U.S. migration policies and Mexico: a failed attempt to deter largely forced migration*

Despite its financial support for Mexico's asylum system, overall U.S. migration policy under the Biden administration has followed that of previous administrations and prioritized reducing the number of migrants and asylum seekers crossing the Mexico-U.S. border. U.S. actions have included prolonging Title 42, the Trump-era anti-asylum policy that blocks or expels asylum seekers back into Mexico without a chance to request protection; asking Mexican authorities to crack down on northward-bound migration through Mexico; and requesting Mexico to implement increased visa requirements for other nationalities. This overall context helps to explain Mexico's harsh and arbitrary enforcement of its asylum seeker containment policy in Tapachula, failure to facilitate a greater number of humanitarian visas to migrants, large numbers of migrant detentions (with a record 307,679 in 2021), and continued militarization of migration enforcement along its borders.

Such U.S. strategies are not new. As WOLA has reported previously, in response to the surge of unaccompanied minors from Central America in 2014 (during the administration of president Barack Obama), the U.S. government backed Mexico's Southern Border Program, which increased apprehensions and deportations of migrants traveling through Mexico's southern border region. In 2019, when migrant arrivals increased at the U.S. border once more, then-president Trump threatened to impose tariffs on Mexican goods if Mexican authorities did not tighten migration enforcement, which resulted in the Mexican government's agreement to deploy the National Guard at its borders to crack down on migration (a policy in place in Mexico today). In addition to this containment role centered on blocking migrants' paths through Mexico, Mexico's federal government under López Obrador has accepted unlawful and counterproductive U.S. anti-asylum programs in its territory, including Title 42 expulsions and the Remain in Mexico program, which forces select U.S.-bound asylum seekers to wait in Mexico for their immigration hearings. The Biden administration even flew Central American nationals on expulsion flights to Tapachula and Villahermosa, Tabasco state during several months in 2021, where Mexican immigration agents and National Guard troops forced them to cross into Guatemala without the opportunity to request asylum in Mexico, violating international law and placing people in danger of what the UN has termed "chain refoulement."

These sorts of policies increase risks to asylum seekers and create obstacles and delays in their access to protection in either Mexico or the United States. What they do not do is end forced migration. As shown by WOLA's analysis of trends in U.S. Customs and Border Protection (CBP) southwest border encounters over the past decade, crackdowns do not lead to sustainable reductions in migration. As pointed out by the American Immigration Council, U.S. government strategies centered on deterrence, blocking, family separation, and detention of migrants and asylum seekers follow a cyclical pattern in which they have "temporarily suppressed arrivals, but the push factors in home countries and drivers of migration have remained. Within a few years of each punitive policy's implementation, there was another increase in people coming to the border."

CLP_AR_004889



**U.S. Border Patrol migrant encounters at U.S.-Mexico border***

Source: U.S. Customs and Border Protection • Created with Datawrapper

*\*Note that FY2020 and FY2021 data, in particular, overestimate total migrants encountered. This occurs due to increased repeat crossings prompted by Title 42 border expulsions. For instance, the total number of individuals encountered in FY2021 is likely just over one million. Source of FY2021 data: https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters. Source of FY2006–FY2020 data: https://www.cbp.gov/newsroom/media-resources/stats.*

During our visit to Tapachula, numerous counterparts stated that Mexican authorities' reluctance to expand access to legal migration pathways outside the asylum system, such as visas for humanitarian or public interest reasons, has stemmed in part from opposition by the U.S. government, as temporary legal status for migrants in Mexico has been viewed as a factor that would increase arrivals at the U.S. border. Ironically, however, to the extent that current practices make it difficult to obtain legal status in Mexico (and hence to resettle in Mexico with access to work, school, and other services), migrants who otherwise would seek to make their lives in Mexico may instead be pushed to continue north to the United States. At the same time, migrants and asylum seekers determined to set out for the United States due to family connections or other needs will continue to do so both on their own and through the networks of smugglers who fill this demand.

Against this backdrop, it is urgent for the U.S. and Mexican governments, as well as other governments of the region, to recognize the counterproductive nature of deterrence and containment policies as responses to forced migration—and especially as responses to families and individuals fleeing life-threatening conditions in their home countries.

A concrete opportunity to do so will occur shortly after the publication of this report at the Ninth Summit of the Americas, hosted by the U.S. government in June 2022 in Los Angeles. While not one of the Summit's official themes, regional cooperation on migration will be one of the focus issues of the Summit, which comes after Biden administration officials' participation in ministerial meetings on regional migration management in Colombia in October 2021 and Panama in April 2022, as well as numerous bilateral meetings with Mexican and other officials, including the signing of bilateral arrangements on migration and protection with Panama and Costa Rica. Ahead of the Summit, a coalition of civil society organizations, including WOLA, have laid out a set of guiding principles for regional migration cooperation, centering human rights, access to protection, and sustainable solutions to forced displacement.

CLP_AR_004890

# CONCLUSIONS

Like regional forced migration in general, migration to and through Tapachula will not diminish anytime soon, and certainly will not decrease through deterrence-based tactics that only serve to put more suffering and danger in migrants' and asylum seekers' paths. On the contrary, policies designed to block migration through Mexico, such as the growing list of visa restrictions for South American countries that prevent people from flying into Mexico, force more people from these countries to cross north by land through treacherous routes. This inescapable reality highlights the need to make good on government pledges to prioritize access to protection in regional migration management, alleviating the human suffering in places like Tapachula and developing sustainable solutions for the migrant population.

In the case of Tapachula, guaranteeing access to asylum requires ensuring that arriving families and individuals can safely and immediately file their asylum claims and that authorities in charge of border crossing points, intake, and processing are from appropriate agencies and attend to the needs of this population as required by Mexican and international law. It also requires diversifying responses to the migrant population, recognizing that arriving people have different needs and that Mexican law provides for regularization for a number of reasons—not just due to filing an asylum claim.

Mexican authorities must take decisive steps to end abuses and discrimination by authorities against the asylum-seeking and migrant population. This includes curbing arbitrary detentions by the INM and the military, investigating allegations of abuse against migrants and asylum seekers and sanctioning those agents found responsible, and ensuring access to basic services. Finally, in addition to taking needed steps to promptly resolve asylum claims, the Mexican government should cease holding asylum seekers in Tapachula and reform its state-based containment policy to allow asylum seekers to access work and dignified living conditions in other parts of Mexico.

CLP_AR_004891

# RECOMMENDATIONS

*To the Mexican government:*

- **Guarantee that asylum-seeking families, children, and adults arriving at Mexico's southern border can request protection at official ports of entry.** This could be done by stationing COMAR personnel at ports of entry to register asylum claims. To the extent that ports of entry continue to be manned by INM agents, these agents should be instructed to admit asylum seekers and facilitate their access to COMAR without automatic detention, and mechanisms should be established to monitor and guarantee compliance with these obligations. Arriving asylum seekers should immediately receive documents indicating that they have permission to be in Mexico, avoiding scenarios in which people are forced to cross irregularly and make their way to COMAR.

- **End the practice of containing asylum seekers in Tapachula.** It is illegal and untenable to forcibly contain tens of thousands of asylum seekers in a single city for months or years, much less one that is ill-equipped to provide them with adequate public services and employment opportunities. The federal government should reform the official state-based containment policy currently established in administrative regulations, promptly allowing asylum seekers to move to different states in order to find work, reunite with family, and otherwise begin integration processes. COMAR should strengthen its ability to transfer asylum cases between its offices.

- **End detention of asylum seekers** except where compelling reasons exist for such a measure, as foreseen in international law. Detention should be exceptional and based only on an analysis of the need for such a measure in the individual case. Unnecessary detention dissuades asylum claims, causes people to desist from existing requests, makes it more difficult to pursue ongoing cases, and causes needless suffering, economic impacts, and health consequences for the detained people and their family members. (We define "detention" as housing people inside government or other facilities from which they are not free to leave, regardless of the institution in charge of such facilities or the terms used under Mexican law to describe such deprivation of liberty.)

- **Provide humanitarian and other visas as foreseen in Mexican law.** The National Migration Institute should make available humanitarian and other visas to those who qualify for them based on any of the grounds set out in domestic law. Asylum seekers who have submitted their claim before COMAR should be promptly provided with a humanitarian visa (TVRH).

- **Develop a coordinated system amongst Mexican agencies for the asylum process.** Instead of pursuing legal processes before COMAR and the INM, asylum seekers should only have to provide their information once. Since applying for asylum entitles the applicant to a TVRH, this should automatically be processed and issued based on the asylum application filed with COMAR.

- **Ensure access to healthcare, schools, and other basic services.** Authorities in these sectors should receive all necessary guidelines on guaranteeing registration and access of migrant children, families, and adults to vital services, and officials should promptly investigate reports of exclusion from such services and implement corrective measures. In particular,

CLP_AR_004892

accusations of discrimination by Mexican officials against women, Afro-descendant, indigenous, or other migrants should be investigated and adequately addressed.

- **Maximize integration and resettlement programs.** This crucial component of the migration and refugee process is the subject of ongoing and pilot programs coordinated by UNHCR. Mexican authorities should continue to collaborate with these efforts as well as strengthening their domestic inter-agency coordination and programming to ensure that growing numbers of asylum seekers, refugees, and other migrants are able not only to relocate, but also to integrate into a range of Mexican cities and states, providing a sustainable response to forced migration.

- **Increase government funding and support for COMAR.** Mexico received the third highest number of asylum requests worldwide for 2021. In spite of this, COMAR's 2022 budget remains essentially unchanged. While UNHCR provides crucial support and resources for COMAR, the Mexican government must also do its part. Insufficient resources contribute to long processing times, overworked staff, a lack of interpreters to support asylum seekers who speak indigenous languages and Haitian Creole, and limits on COMAR's presence along Mexico's southern border.

- **Hold Mexican migration agents and security forces accountable for abuses against migrants and asylum seekers.** Mexican and international civil society organizations have documented widespread abuses against migrants and asylum seekers in southern Mexico by INM agents, members of the military and National Guard, and police forces, as has the CNDH in a growing number of cases. Afro-descendant migrants, particularly Haitian migrants, have also faced racism and discrimination by Mexican authorities. The failure to hold agents accountable for their actions facilitates the perpetration of further abuses.

*To the U.S. government:*

- **Ensure that migration cooperation with Mexico and other countries prioritizes access to protection and solutions for the forcibly displaced population, rather than a counterproductive focus on blocking the paths of migrants and asylum seekers.** Measures such as border militarization, increases in detentions, and visa requirements produce changes in migration patterns, but a sustainable reduction in forced migration is not one of these changes. Approaches centered on deterrence and detention push migrants and asylum seekers to dangerous and hidden routes, increase demand and profits for human smugglers, and increase suffering and loss of life among people on the move. Families, children, and adults will continue to be displaced and to migrate as long as violence, extreme poverty, climate disasters, and other factors leave them no realistic path to safety and survival at home. Only by offering options for short- and long-term resettlement can the governments of the region stabilize the crisis of forced displacement, bring migrants and asylum seekers out of hiding, cut profits to organized criminal groups, and ensure protection for vulnerable families and individuals.

- **Work with Mexican authorities to identify and facilitate access to the United States for unaccompanied children seeking to reunite with U.S.-based family members and for people who cannot resettle in Mexico due to risks deriving from their concrete situation.** Even with improvements to its asylum system, Mexico is not a logical destination for all individuals. People arriving in Mexico who identify the United States as their destination

CLR_tAR_004893

and who have compelling reasons to seek protection there, such as reunification with adult family members, should be supported in doing so.

- **Continue to provide robust funding to support access to protection in Mexico, while upholding national and international law on the ability to access asylum in the United States.** The United States continues to be the largest donor for UNHCR in Mexico, providing almost $39 million in assistance in 2021. Additional support to COMAR and international organizations operating in Mexico has been provided through the State Department's Bureau of Population, Refugees and Migration.

CLP_AR_004894

# ENDNOTES

1       The Cartagena Declaration is a regional agreement on refugees specific to Latin America. It delineates broader grounds for refugee status that include threats of generalized violence and disturbance of public order.

2       Law on Refugees, art. 13.II.

3       Law on Refugees, art. 28.

4       Regulations of the Law on Refugees, art. 16.

5       Law on Refugees, art. 18.

6       Law on Refugees, art. 7; Regulations of the Law on Refugees, art. 22.

7       Law on Refugees, art. 23.

8       Law on Refugees, art. 24.

9       Regulations of the Law on Refugees, art. 38.

10      Regulations of the Law on Refugees, art. 23.

11      These and all asylum statistics quoted subsequently come from COMAR's monthly information bulletin, as updated through May 1, 2022, at: https://www.gob.mx/cms/uploads/attachment/file/722490/ Cierre_Abril-2022__1-Mayo_.pdf, except for data on women and children, which are updated as of February 2022 and are available here: https://www.gob.mx/cms/uploads/attachment/file/707121/02_MUJERES_ NNA_Febrero-2022.pdf and here: https://www.gob.mx/cms/uploads/attachment/file/706715/Cierre_Febrero-2022__1-Marzo_.pdf.

12      The National Guard is a militarized security force proposed by Mexican president Andrés Manuel López Obrador and created by law in 2019. It replaced the Federal Police and was announced as a new force to prevent crime and maintain public security, formally housed within the Ministry of Security and Citizen Protection (*Secretaría de Seguridad y Protección Ciudadana*, SSPC). Despite formally belonging to a civilian ministry, the National Guard is under the operational control of the Ministry of Defense (*Secretaría de la Defensa Nacional*, SEDENA) and is composed primarily of members of the armed forces. President López Obrador has announced that he will propose the formal incorporation of the National Guard into SEDENA, which would constitute the final step in the militarization of federal policing tasks in Mexico. The deployment of the National Guard to Mexico's border with Guatemala began in 2019, as part of the Mexican government's June 2019 agreement with the Trump administration to increase immigration enforcement.

13      See, for example, Law on Refugees, art. 20.

14      Migration Law (*Ley de Migración*), art. 52.V.

15      COMAR's annual budget can be viewed at line N00 of the Ministry of the Interior's annual budget, available at: https://www.pef.hacienda.gob.mx/work/models/aVbnZty0/PEF2022/kgp8l9cM/docs/04/r04_aae. pdf (2022) and https://www.pef.hacienda.gob.mx/work/models/PEF2021/docs/04/r04_aae.pdf (2021).

16      According to the PRM website: "PRM support in the region aims to address the humanitarian needs of vulnerable migrants, internally displaced persons, asylum seekers, and refugees, in support of national government responses. PRM funding supports programming in the following sectors: protection (including child protection and GBV prevention and response); emergency and cash based initiatives; shelter; water, health, and sanitation; and livelihood programming. The Bureau funds its traditional partners, including the United Nations High Commissioner for Refugees (UNHCR), the International Committee of the Red Cross (ICRC), the International Organization for Migration (IOM), and NGOs (in limited locations)."

17      The joint explanatory statement accompanying the FY2022 omnibus appropriations legislation incorporates these instructions set out on page 119 of House Report 117-84. The same document notes troubling reports "that agents in Mexico's National Migration Agency have committed human rights violations and have not been held accountable." Ibid.

CLP_AR_004895

# ABOUT THE AUTHORS

Stephanie Brewer is the Director for Mexico and Migrant Rights at WOLA. Lesly Tejada is the Program Assistant for the Mexico and Migration & Border Security programs at WOLA. Maureen Meyer serves as WOLA's Vice President for Programs.

# ACKNOWLEDGEMENTS

This report would not have been possible without the generous support of the Open Society Foundations.

## ABOUT WOLA

WOLA is a leading research and advocacy organization advancing human rights in the Americas. We envision a future where public policies in the Americas protect human rights, recognize human dignity, and where justice overcomes violence.

**WOLA.ORG** | 1666 CONNECTICUT AVE NW, SUITE 400, WASHINGTON DC 20009| 202-797-2171

CLP_AR_004896



MIRPS 2022

Informe anual del Marco Integral
Regional para la Protección y Soluciones

CLP_AR_004948



**Marco Integral Regional para la Protección y Soluciones**

# **MIRPS** 2022

**Informe anual del Marco Integral Regional para la Protección y Soluciones**

CLP_AR_004949



# ÍNDICE

## CRÉDITOS

Se reconocen las contribuciones de la Presidencia Pro-tempore Honduras 2022, los equipos técnicos nacionales de los países MIRPS y sus socios en la elaboración de este informe.

## PRODUCCIÓN

Presidencia Pro-tempore Honduras 2022, Equipos técnicos nacionales del MIRPS, Secretaría Técnica ACNUR-OEA (Oficina Regional del ACNUR para las Américas y Departamento de Inclusión Social, Secretaría de Acceso a Derechos y Equidad de la OEA). Los gráficos en esta publicación no implican la expresión de ninguna opinión por parte de los gobiernos de países MIRPS ni sus socios, con respecto al estatus legal de ningún país o territorio, o la delimitación de fronteras.

Portada: © UNHCR/Diana Diaz



Con el apoyo de la Secretaría Técnica

 

PRESENTACIÓN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

CONTEXTO REGIONAL . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

TRABAJO REGIONAL MIRPS
PLAN REGIONAL 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . .17

01. Actualización de los planes de acción nacional y grupos de coordinación nacional . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

02. Diálogo acerca de las causas subyacentes del desplazamiento . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

03. Grupos de trabajo y espacios políticos OEA . . . . . . . . . . . . . . .21

04. Alianzas con socios estratégicos . . . . . . . . . . . . . . . . . . . . . . . . 29

MIRPS EN ACCIÓN
AVANCES NACIONALES . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Belice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Costa Rica . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

El Salvador . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Guatemala . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Honduras . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

México . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

Panamá . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

PLATAFORMA DE APOYO AL MIRPS . . . . . . . . . . . . . 89

CLP_AR_004950

# ACRÓNIMOS

## GENERALES

**ACNUR:** Alto Comisionado de Naciones Unidas para los Refugiados

**BCIE:** Banco Centroamericano de Integración Económica

**BID:** Banco Interamericano de Desarrollo

**CAJP:** Comisión de Asuntos Jurídicos y Políticos de la OEA

**CAM:** Comisión de Asuntos Migratorios de la OEA

**CENTROESTAD:** Comisión Centroamericana de Estadística del SICA

**CEPAL:** Comisión Económica para América Latina y el Caribe

**CGLU:** Ciudades y Gobiernos Locales Unidos

**CICR:** Comité internacional de la Cruz Roja

**CIDI:** Consejo Interamericano para el Desarrollo Integral

**COI:** Información de país de origen

**CONARE:** Comisión Nacional para Refugiados

**COVID-19:** Virus SARS-CoV-2

**CRM:** Conferencia Regional sobre Migración (GRF por sus siglas en inglés)

**CSAN:** Comité de Selección de Alto Nivel del Fondo MIRPS

**DIS:** Departamento de Inclusión Social de la OEA

**ETN:** Equipo técnico nacional del MIRPS

**FMR:** Foro Mundial sobre los Refugiados

**GI-TOC:** Iniciativa Global contra el Crimen Organizado Transnacional

**LGBTIQ+:** Lesbianas, Gays, Bisexuales, Trans, Intersexo y Queer

**MIRPS:** Marco Integral Regional para la Protección y Soluciones

**MMC:** Consejo de Alcaldes por la Migración (Mayors Migration Council)

**NNA:** Niñas, Niños y Adolescentes

**OEA:** Organización de los Estados Americanos

**OIM:** Organización Internacional para las Migraciones

**OIT:** Organización Internacional del Trabajo

**ONU:** Organización de las Naciones Unidas

**PDD:** Plataforma sobre Desplazamiento por Desastres PPT: Presidencia Pro-tempore

**PNUD:** Programa de las Naciones Unidas para el Desarrollo

**SART:** Sistemas de Alerta y Respuesta Temprana

**SICA:** Sistema de la Integración Centroamericana

**UE:** Unión Europea

**UNICEF:** Fondo de las Naciones Unidas para la Infancia

**VBG:** Violencia basada en género

## BELICE

**MSMEs:** Micro, pequeñas y medianas empresas

## COSTA RICA

**CCSS:** Caja Costarricense del Seguro Social

**IMAS:** Instituto Mixto de Ayuda Social

## EL SALVADOR

**DAV:** Dirección de Atención a Víctimas

**DGME:** Dirección General de Migración y Extranjería

**MTPS:** Ministerio de Trabajo y Previsión Social

## GUATEMALA

**CAI:** Centro de Atención Infantil

**DPI-E:** Documento Personal de Identificación Especial

**DRER:** Departamento de Reconocimiento de Estatus de Refugiado

**EOUM:** Escuela Oficial Urbana Mixta

**IGM:** Instituto Guatemalteco de Migración

**INEB:** Instituto Nacional de Educación Básica

**INTECAP:** Instituto Técnico de Capacitación y Productividad

**MINEDUC:** Ministerio de Educación

**MINTRAB:** Ministerio de Trabajo y Previsión Social

**MSPAS:** Ministerio de Salud Pública y Asistencia Social

**PDH:** Procuraduría de Derechos Humanos

**PEX:** Plataforma Electrónica de Permisos de Trabajo para Extranjeros

**PGN:** Procuraduría General de la Nación

**SBS:** Secretaría de Bienestar Social de la Presidencia de la República

**SVET:** Secretaría contra la Violencia Sexual, Explotación y Trata de Personas

## HONDURAS

**AMHON:** Asociación de Municipios de Honduras

**CIPPDV:** Comisión Interinstitucional para la Protección de Personas Desplazadas por la Violencia

**DIPPDV:** Dirección General de Atención y Protección a las Personas Desplazadas Internamente

**INM:** Instituto Nacional de Migración

**IP:** Instituto de la Propiedad

**MAHE:** Mecanismo de Asistencia Humanitaria de Emergencia

**MMAHE:** Mecanismo Municipal de Asistencia Humanitaria de Emergencia

**SEDH:** Secretaría de Derechos Humanos

**VTP:** Vivienda, tierra y propiedad

## MÉXICO

**CAIMFS:** Coordinación para la Atención Integral de la Migración en la Frontera Sur

**COMAR:** Comisión Mexicana de Ayuda a Refugiados

**CURP:** Clave Única de Registro de Población

**IMER:** Instituto Mexicano de la Radio

**INEA:** Instituto Nacional para la Educación de los Adultos

**INM:** Instituto Nacional de Migración

**PNDH:** Programa Nacional de Derechos Humanos

**PRONAPINNA:** Programa Nacional de Protección de Niñas, Niños y Adolescentes

**RENAPO:** Registro Nacional de Población

**SCJN:** Suprema Corte de Justicia de la Nación

**SEGOB:** Secretaría de Gobernación

**SEP:** Secretaría de Educación Pública

**SIRE:** Sistema de Información sobre Refugiados

**UPMRIP:** Unidad de Política Migratoria, Registro e Identidad

## PANAMÁ

**CONARE:** Comisión Nacional para los Refugiados

**HIAS:**

**INADEH:** Instituto Nacional de Formación Profesional y Capacitación para el Desarrollo Humano

**ONPAR:** Oficina Nacional para la Atención a Refugiados

CLP_AR_004951

# PRESENTACIÓN



© UNHCR/Santiago Escobar-Jaramillo

En 2022, a cinco años de la adopción de la Declaración de San Pedro Sula, el Gobierno de Honduras asumió la Presidencia Pro-Tempore (PPT) del Marco Integral Regional para la Protección y Soluciones (MIRPS) con la convicción de promover y fortalecer la coordinación y respuestas regionales y nacionales en materia de prevención, protección y soluciones duraderas para las personas refugiadas, solicitantes de la condición de refugiado, desplazadas internas y personas retornadas con necesidades de protección en Centroamérica y México.

Dando seguimiento a las iniciativas propiciadas por las anteriores Presidencias, Honduras ha promovido el diálogo político y el intercambio acordado en las Declaraciones previamente adoptadas, buscando fortalecer al MIRPS como un mecanismo orientado a la acción y a resultados de alto impacto, que se traducen en respuestas de protección y soluciones para la población desplazada y/o en riesgo de desplazamiento y las comunidades que los acogen.

El V Informe Anual presenta la visión estratégica regional del MIRPS a partir de la actualización de los Planes de Acción Nacional de los países que lo conformamos: Belice, Costa Rica, El Salvador, Guatemala, Honduras, México y Panamá, reforzando la visibilidad y el diálogo regional acerca de las causas subyacentes del desplazamiento a partir del intercambio regional en el marco de los Grupos de Trabajo del MIRPS y espacios políticos de la OEA, y fortaleciendo las alianzas con socios estratégicos, incluyendo miembros a los de la Plataforma de Apoyo, el Sistema de las Naciones Unidas, actores de desarrollo, el sector privado y la sociedad civil.

El trabajo coordinado con la Plataforma de Apoyo ha permitido dar mayor visibilidad sobre la situación y retos de la región en foros internacionales, propiciando la generación de alianzas con la cooperación, actores de desarrollo y otros socios estratégicos a nivel regional.

CLP_AR_004952

A través de los cuatro pilares del MIRPS -i) recepción y admisión; ii) necesidades inmediatas; iii) países y comunidades de acogida; y iv) soluciones duraderas-, el presente informe es una confirmación de que los países que integramos el MIRPS seguiremos revisando los avances y desafíos a nivel local, nacional y regional. Este informe también da muestra de los esfuerzos que se continúan propiciando a nivel de la región para la articulación de respuestas integrales en base al principio de responsabilidad compartida en materia de prevención, protección y soluciones duraderas para las personas refugiadas, solicitantes de la condición de refugiado, desplazadas internas y personas retornadas con necesidades de protección en Centroamérica y México.

Como Presidencia Pro-Témpore saliente, Honduras expresa su agradecimiento a los Estados MIRPS, Estados y organizaciones miembros de la Plataforma de Apoyo y Organismos Internacionales amigos, agradeciendo su apoyo y compromiso a lo largo de este año. A la vez damos la más cordial bienvenida, a la nueva Presidencia Pro-Témpore de Panamá 2023, a quien le manifestamos nuestro apoyo para respaldar los esfuerzos planificados, con el objeto de seguir avanzando en conjunto.

**Presidencia Pro-Témpore del MIRPS 2022**

# CONTEXTO REGIONAL



Nuevas aplicaciones de asilo en los países del MIRPS en 2022

| | |
|---|---|
| 🔴 Mexico | 58622 |
| 🟠 Costa Rica | 69280 |
| 🟡 Guatemala | 501 |
| 🔵 Panama | 378 |
| ⚪ El Salvador | 48 |
| ⚫ Belice | 106 |
| ⚫ Honduras | 86 |

Fuente: ACNUR, corte a junio 2022

CLP_AR_004953



## Personas desplazadas por la fuerza en los países del MIRPS

- 🟠 Personas refugiadas
- 🔴 Solicitantes de asilo
- ⚪ Personas desplazadas internas
- 🟡 Otras personas que necesitan protección internacional

### MÉXICO
- 🟠 84594
- 🔴 180264
- ⚪ 0
- 🟡 83130

### PANAMÁ
- 🟠 2568
- 🔴 11253
- ⚪ 0
- 🟡 142031

### COSTA RICA
- 🟠 11187
- 🔴 204730
- ⚪ 0
- 🟡 20293



### GUATEMALA
- 🟠 611
- 🔴 1472
- ⚪ 0
- 🟡 0

### HONDURAS
- 🟠 164
- 🔴 111
- ⚪ 24709
- 🟡 0

### EL SALVADOR
- 🟠 84
- 🔴 54
- ⚪ 71500
- 🟡 0

### BELICE
- 🟠 89
- 🔴 2071
- ⚪ 0
- 🟡 0

Fuente: ACNUR, corte a junio 2022

CLP_AR_004954

Al cierre del año 2022, más de un millón de personas se encontraban desplazadas por la fuerza desde y hacia países de Centroamérica y México. La inseguridad, violencia, pobreza y desigualdad, agravadas por el impacto económico y social de la pandemia y la inflación global, así como los efectos adversos del cambio climático y los desastres continuaban afectando desproporcionadamente a las personas que viven en entornos inseguros y de mayor vulnerabilidad, actuando como factores aceleradores de la movilidad humana en la región. Los desafíos de la movilidad se han visto asimismo profundizados a partir de un marcado aumento en el número de personas que se desplazan a través de la región involucradas en movimientos mixtos, acrecentando la presión sobre los mecanismos de recepción y atención en los países de tránsito y destino de dichos movimientos.

El número de personas refugiadas y solicitantes de asilo en países de Centroamérica y México ha aumentado año tras año desde la firma de la Declaración de San Pedro Sula, pasando de 44,554 en 2017 a 499,252 en 2022. Un total de 128,278 nuevas solicitudes de la condición de refugiado se reportaban en la subregión este año. Si bien México se ha mantenido como un país de tránsito para personas involucradas en movimientos mixtos hacia el norte, el país se ha consolidado como un destino para personas necesitadas de protección, albergando a fines de 2022 a 264,858 refugiados y solicitantes de asilo, un aumento del 14% en comparación con el año anterior. El fortalecimiento de los mecanismos de registro, documentación y manejo de casos ha contribuido de modo significativo a mitigar los riesgos de protección y explotación, y ha favorecido el acceso a los servicios básicos y al mercado laboral.

Entre las personas que se desplazan desde países del norte de Centroamérica a México, una gran proporción manifestó que abandonaron sus hogares después de sufrir violencia y persecución. Las causas del desplazamiento incluyen situaciones de extorsión, despojo de tierras y viviendas, reclutamiento forzado, violencia sexual y de género contra mujeres y niñas, casos de abuso doméstico y violencia contra personas LGBTIQ+. Si bien han continuado los movimientos en grupos grandes y poco organizados, la mayoría de las personas que se desplazan lo hacen individualmente, en pequeños grupos y unidades familiares. Los efectos adversos de los desastres, exacerbados por el impacto del cambio climático y la degradación ambiental, representan un catalizador adicional del desplazamiento en la región.

Costa Rica alberga a 216,145 personas con necesidad de protección internacional, de las cuales 11,187 han sido reconocidas como refugiadas y 204,730 son solicitantes de asilo (incluyendo personas con cita pendiente para formalizar su solicitud de asilo). Costa Rica se ubica entre los cuatro principales países de registro individual de nuevos solicitantes de asilo a nivel mundial en 2021 y 2022 con 68,537 nuevas solicitudes de asilo presentadas este año. Este elevado número de personas que buscan protección internacional en Costa Rica ha ejercido una presión adicional sobre las capacidades del sistema nacional de asilo y los servicios esenciales, incluida la educación y la atención médica, particularmente en la región fronteriza norte, donde el 90% de los solicitantes de asilo provienen de Nicaragua.

Además de un número creciente de personas que se desplazan a través de fronteras internacionales en busca de protección, la escala del desplazamiento interno forzado en la subregión continúa planteando serios desafíos. La situación de desplazamiento interno incluye a 318,590 desplazados internos en El Salvador y Honduras. La respuesta a este fenómeno ha visto fortalecido un enfoque en la estabilización de las comunidades desplazadas y en riesgo a través de la protección basada en la comunidad. Esto ha implicado ampliar la presencia del estado y la colaboración con la sociedad civil y las organizaciones de base para fortalecer las respuestas de prevención y protección junto a las comunidades. Se han realizado inversiones en instituciones nacionales de derechos humanos, educación, prevención y respuesta a la violencia de género, programas de protección infantil, provisión de alternativas de protección temporal y, en la medida de lo posible, soluciones a través de la integración local sostenible.

La región ha sido testigo de movimientos mixtos y sucesivos de personas cada vez más complejos. Se trata de personas que viajan juntas, generalmente de forma irregular, utilizando las mismas rutas y medios de transporte, pero por diferentes motivos. El perfil de las personas involucradas en dichos movimientos mixtos puede incluir a personas solicitantes de la condición refugiado, refugiadas, apátridas, víctimas de trata, menores no acompañados o separados y migrantes. El número de personas que entre los meses de enero y septiembre atravesaron de forma irregular el Tapón de Darién, en la frontera entre Colombia y Panamá, alcanzó la cifra de 151,582, registrándose un récord mensual en septiembre con 48,204

llegadas. Esto representa un aumento del 58%, en comparación con el mismo período del año 2021. La principal nacionalidad de personas involucradas en movimientos mixtos a través de Darién corresponde a personas provenientes de Venezuela, seguidos por personas provenientes de Ecuador, Colombia, Cuba y Haití, así como personas provenientes de países de Asia y África.

En un contexto de movilidad y desplazamiento forzado cambiante en la subregión, los Estados MIRPS actualizaron sus Planes de Acción Nacionales a mediados de año, los cuales reflejan en la actualidad 180 compromisos políticos para continuar ampliando el acceso a la protección internacional en los países de acogida y en los países de origen, la protección para grupos en riesgo, la intensificación de soluciones duraderas y mayores esfuerzos para integrar y estabilizar a las poblaciones desplazadas y las comunidades de acogida. La colaboración regional entre los Estados en 2022 se ha concentrado en avanzar la respuesta colectiva para la recepción y admisión de personas con necesidades de protección internacional, el desplazamiento interno, la colaboración con las autoridades locales y la certificación de habilidades y competencias para facilitar la inclusión laboral.

Un enfoque renovado del diálogo regional sobre las causas subyacentes del desplazamiento significó un avance importante este año, informando futuras inversiones de desarrollo en seguridad y estabilidad en la subregión. Esta iniciativa ha incluido el intercambio y la identificación de intervenciones comunitarias contra la extorsión por parte de las Secretarías de Seguridad Pública de los Estados MIRPS, junto

CLP_AR_004955

con una primera consulta MIRPS sobre desplazamiento en el contexto de desastres y cambio climático, donde las Secretarías de Medio Ambiente e instituciones nacionales de protección civil, gestión de riesgos y atención de emergencia debatieron acerca de la protección de las personas desplazadas a través de fronteras por desastres, y la gestión de los riesgos de desplazamiento por desastres en las comunidades en riesgo.

Al momento en que Belice, Costa Rica, El Salvador, Guatemala, Honduras, México y Panamá concluyen el quinto año del MIRPS, la estabilización y las soluciones para garantizar que las personas obligadas a huir tengan la oportunidad de integrarse en sus comunidades, acceso a atención médica, educación y asegurar empleos significativos y oportunidades para el es-

píritu empresarial se ven consolidadas como prioridades compartidas de este proceso. Los compromisos e iniciativas acordados en el contexto de la Declaración de Los Ángeles sobre Migración y Protección representan un desarrollo positivo, mientras que la complementariedad y la alineación con la Conferencia Regional sobre Migración (CRM) y el Sistema de la Integración Centroamericana (SICA) se plantean como un objetivo común. Al final del año, los Estados MIRPS renovaron su compromiso conjunto con la protección y las soluciones, y dieron la bienvenida a una mayor colaboración internacional con la Plataforma de Apoyo al MIRPS, en la previa del Foro Mundial sobre Refugiados (GRF por sus siglas en inglés) a desarrollarse el próximo año.



La región ha sido testigo de movimientos mixtos y sucesivos de personas cada vez más complejos. Se trata de personas que viajan juntas, generalmente de forma irregular, utilizando las mismas rutas y medios de transporte, pero por diferentes motivos.



© UNHCR/Nicolo Filippo Rosso

CLP_AR_004956



© UNHCR/Diana Diaz

# TRABAJO REGIONAL MIRPS

Plan regional 2022

CLP_AR_004957

# 01. Actualización de los planes de acción nacional y grupos de coordinación nacional

—

En 2022, el MIRPS cumplía el quinto año de implementación de los Planes de Acción Nacional que los estados miembros adoptaron al momento de integrarse a dicho proceso. Considerando que durante los últimos años la región ha experimentado un aumento en los desafíos que enfrenta, incluyendo la pandemia, los desastres, las diferentes manifestaciones de violencia, las crecientes necesidades humanitarias, el primer objetivo de la Presidencia Pro-tempore 2022 fue hacer un llamado a los países MIRPS a revisar y actualizar sus Planes de Acción Nacional, de modo que reflejen los contextos actuales de los países de origen, tránsito y destino de la región.

Los siete países llevaron a cabo procesos de recopilación de los compromisos alcanzados, adaptación de los compromisos pendientes a los desafíos actuales, y análisis de la necesidad de involucrar a nuevos actores en la implementación de los mismos y la consecuente ampliación de sus equipos técnicos nacionales. Los Planes de Acción Nacional actualizados pueden encontrarse aquí.

Asimismo, se han establecido los Grupos de Coordinación Nacional, como espacios de diálogo y trabajo conjunto entre los Equipos Técnicos Nacionales y otros actores relevantes para la implementación de los Planes de Acción Nacional en los países MIRPS: representaciones diplomáticas de los miembros de la Plataforma de Apoyo a nivel nacional, agencias de cooperación para el desarrollo, agencias de la ONU, sociedad civil y otras partes interesadas. En los capítulos país de este reporte se incluirán los avances y logros de cada Grupo nacional, que seguirán siendo promovidos como un foro común para la evaluación de necesidades de protección, brechas operativas y prioridades de respuesta en el contexto de la movilidad humana, y para discutir políticas y explorar oportunidades y prioridades operativas del MIRPS, basadas en intereses compartidos y en un enfoque coordinado.

# 02. Diálogo acerca de las causas subyacentes del desplazamiento

—

En línea con el objetivo estratégico del Plan de Trabajo Regional de la Presidencia Pro-Tempore del MIRPS 2022 dirigido a fortalecer el diálogo regional y aumentar la visibilidad sobre las causas subyacentes del desplazamiento forzado, se realizaron dos sesiones de consulta y diálogo en línea entre los siete Estados MIRPS en materia de desplazamiento en el contexto de extorsión, y el impacto de los desastres y el cambio climático. Las sesiones fueron organizadas en colaboración con la Iniciativa Global contra el Crimen Organizado Transnacional (GI-TOC), y la Plataforma sobre Desplazamiento por Desastres (PDD).

## EXTORSIÓN

Se realizó una reunión virtual sobre extorsión, que convocó a la representación de cinco Equipos Técnicos Nacionales del MIRPS, y a puntos focales de las policías nacionales, ministerios públicos, tribunales y miembros de la sociedad civil. El encuentro brindó una oportunidad para que los participantes revisaran las tendencias sobre este fenómeno, que constituye uno de los principales impulsores del desplazamiento forzado en los países del norte de Centroamérica. Asimismo, los participantes compartieron algunas de las respuestas institucionales nacionales al fenómeno delictivo, buenas prácticas de la región y herramientas para generar respuestas desde las propias comunidades.

Entre las principales conclusiones, se destacó que el sector privado, uno de los principales generadores de empleo, se ha visto particularmente afectado por la extorsión, afectando a propietarios de pequeñas y grandes empresas, comerciantes, trabajadores agrícolas, además de docentes y directores de instituciones educativas, médicos, trabajadoras sexuales, niños, niñas, adolescentes y habitantes de comunidades donde maras y pandillas ejercen un grado considerable de control. Se destacó en estos contextos, algunos elementos que facilitan la implementación de respuestas incluyen el fortalecimiento de la comprensión específica

CLP_AR_004958

del contexto en el que tiene lugar la extorsión, el fortalecimiento de las capacidades institucionales y comunitarias; el empoderamiento de las respuestas locales basadas en el conocimiento y las capacidades existentes; y la generación de confianza entre las autoridades y la ciudadanía.

La consulta también brindó la oportunidad de destacar el "Manual de Acción para la Resiliencia Comunitaria en Centroamérica", desarrollado por GI-TOC a partir de un proceso de consultas regionales con múltiples partes interesadas en Guatemala. El Manual de Acción incluye módulos enfocados en conceptos, definiciones e información sobre tipos y modalidades de extorsión, ideas sobre iniciativas frente al fenómeno delictivo, recomendaciones sobre cómo actuar ante un caso de extorsión de acuerdo con los lineamientos de la autoridad, e ideas y herramientas para el diagnóstico, planificación y seguimiento que los diversos actores comunitarios pueden utilizar para el registro, denuncia y seguimiento de los casos de extorsión.

Conozca más información sobre la reunión **aquí**

## DESASTRES Y CAMBIO CLIMÁTICO

En la sesión sobre Desastres y Cambio Climático participaron representantes de todos los Equipos Técnicos Nacionales del MIRPS, junto con representantes de los Ministerios de Medio Ambiente, instituciones y servicios de protección civil, gestión de riesgos y atención de emergencias y la academia. Durante la sesión, los Estados intercambiaron sus perspectivas sobre este tema que ha cobrado particular relevancia en los últimos años, y a su vez, discutieron los avances en la implementación de

la *Agenda para la protección de las personas desplazadas a través de fronteras en el contexto de desastres y cambio climático* de la Iniciativa Nansen.

La Agenda de Protección fue aprobada en una consulta intergubernamental global en 2015 y consolidó los resultados de una serie de consultas regionales convocadas por la Iniciativa Nansen. La Agenda de Protección integra medidas para gestionar los riesgos de desplazamiento por desastres en el país de origen, incluye prácticas efectivas para reducir vulnerabilidades y fortalecer la resiliencia ante el riesgo de desplazamiento en el contexto de desastres. Para informar la consulta, los participantes fueron invitados a sumarse a consultas grupales paralelas. Un grupo, presidido por México, abordó "*La protección de las personas desplazadas a través de las fronteras por desastres*", mientras que el grupo que fue presidido por Honduras, discutió la "*Gestión de riesgos de desplazamiento por desastres en comunidades en riesgo*".

Como resultado de la consulta, los Estados participantes recomendaron aprovechar el MIRPS como un foro de coordinación regional entre Estados para promover el intercambio de información y de buenas prácticas para garantizar respuestas comunes al desplazamiento en el contexto del cambio climático y los desastres; asimismo, adoptar un enfoque transversal al desplazamiento en el contexto del cambio climático y los desastres, con el objetivo de informar la planificación armonizada en cada país.

El documento completo de recomendaciones se puede encontrar **aquí**.

# 03. Grupos de trabajo y espacios políticos OEA

—

## GRUPO DE TRABAJO SOBRE RECEPCIÓN, ADMISIÓN Y PROCESAMIENTO DE PERSONAS CON NECESIDAD DE PROTECCIÓN INTERNACIONAL

**PAÍSES INTEGRANTES: Todos los países MIRPS**
**PAÍS LÍDER: México**
**CON EL APOYO TÉCNICO Y FINANCIERO DE: Brasil, Canadá, Estados Unidos, ACNUR**

El Grupo de Trabajo sobre Recepción y Admisión y Procesamiento de personas con necesidad de protección internacional se enfoca en el fortalecimiento de los sistemas de asilo/protección de refugiados, para mejorar la atención y acogida de personas refugiadas, en situaciones de movimientos mixtos incluyendo la identificación de necesidades de protección internacional, gestión de casos y registro biométrico y el uso de modalidades diferenciadas de determinación de la condición de refugiado. Durante el 2022, el Grupo llevó a cabo una reunión regional de hermanamiento, que reunió

a las autoridades de asilo de los países MIRPS con representantes de Brasil, Canadá y Estados Unidos, como miembros de la Plataforma de Apoyo MIRPS que expresaron interés en establecer acuerdos de hermanamiento para fortalecer los sistemas de asilo en Centroamérica y México. La reunión dio como resultado la presentación de proyectos y/o acuerdos de hermanamiento concretos que buscan responder a las necesidades inmediatas y a largo plazo de los países sobre el tema de fortalecimiento de sistemas de asilo. A partir de la misma, se han logrado los siguientes avances:

CLP_AR_004959



© UNHCR/Ruben Salgado

- Apoyo al fortalecimiento de capacidades entre pares por medio de intercambios de experiencias bilaterales México-Brasil y Guatemala-México, centrados en la mejora de las modalidades diferenciadas para el procesamiento de solicitudes de asilo/refugio.
- Reunión Regional de Información de País de Origen (COI), en la que participaron los siete países del MIRPS, acompañada de Brasil, Canadá, Estados Unidos, Uruguay y la Unión Europea como Miembros de la Plataforma de Apoyo. Los participantes conocieron las diferentes metodologías de investigación, buenas prácticas, productos y estructuras organizativas de las unidades de COI participantes. Asimismo, se sometió a la consideración de los participantes el establecimiento de una red regional de COI que sirva de apoyo adicional a los CONARE de la región en la recopilación y difusión de COI, y la promoción de buenas prácticas metodológicas para actividades conjuntas como la producción de informes de COI y la realización de misiones de investigación de COI en el terreno. A la vez, se promovió el uso y la relevancia de la COI en el marco de los procedimientos de reconocimiento *prima facie* de la condición de refugiado en la región, y se compartió información sobre país de origen relativa a Haití y Venezuela de parte de expertos invitados.
- Capacitación sobre la determinación de la condición de la persona refugiada en materia de género, con el apoyo de Canadá como Miembro de la Plataforma de Apoyo. Esta capacitación se realizó en el margen de los 16 Días de Activismo contra la Violencia de Género, fortaleciendo las capacidades técnicas de 90 oficiales de elegibilidad, agentes fronterizos y oficiales de los gobiernos de Costa Rica, El Salvador, Guatemala, Honduras, México y Panamá, en relación al análisis y resolución de casos fundados en situaciones de violencia basada en género y sobre los procedimientos para el manejo de casos de VBG basados en las guías actualizadas de la Comisión de Inmigración y Refugiados de Canadá y las guías de orientación del ACNUR.

Visitar **aquí** el sitio web del Grupo de Trabajo.

## GRUPO DE TRABAJO SOBRE DESPLAZAMIENTO INTERNO

**PAÍSES INTEGRANTES: El Salvador, Honduras, México**
**PAÍS LÍDER: El Salvador**
**CON EL APOYO TÉCNICO DE: Colombia, UNICEF, ACNUR, OEA.**

El Grupo de Trabajo MIRPS sobre Desplazamiento Interno que se encuentra en su tercer año de funcionamiento, se consolida como un espacio dirigido al fortalecimiento de las capacidades y el desarrollo de marcos legales e institucionales que contribuyen a la respuesta al desplazamiento interno en El Salvador, Honduras y México. Durante el 2022 y de cara al 2023, el Grupo de Trabajo avanza en:

- Articulación con las Oficinas Nacionales de Estadísticas y con el Grupo Técnico de Migración y Desplazamiento de la Comisión Centroamericana de Estadística del SICA (CENTROESTAD) para la mejora de los mecanismos de recolección, gestión, uso, análisis y divulgación de datos sobre desplazamiento interno. El uso de información sobre el desplazamiento forzado permite la identificación de escenarios y perfiles de riesgo, así como a partir de los contextos la caracterización de la vulnerabilidad que se deriva del desplazamiento forzado. Lo anterior, de conformidad con las Recomendaciones Internacionales para la Generación de Estadísticas sobre Personas Desplazadas Internas otras normas internacionales pertinentes, así como las recomendaciones que puedan aportarse desde las experiencias de otros países en la materia.

- Intercambio de experiencias sobre identificación de alternativas de prevención de los factores que conducen al desplazamiento. Con el acompañamiento de la OEA, el Grupo aprendió experiencias aplicadas en la región como los Sistemas de Alerta y Respuesta Temprana (SART). Estos mecanismos de prevención y atención de conflictos que se enfocan en la recolección sistemática (cuantitativa o cualitativa), procesamiento y análisis de información de situaciones de violencia, cuyo propósito es alertar a los decisores políticos para tomar medidas o acciones que eviten el surgimiento o escalada de un conflicto.

Asimismo, se ha organizado un plan de trabajo continuo hasta el 2023 con el acompañamiento de Colombia y UNICEF, para fortalecer la coordinación y la calidad de las respuestas de protección y asistencia a personas en situaciones de desplazamiento interno, asegurando su acceso a los servicios públicos, focalizado en documentación, educación, medios de vida, tierras y asistencia humanitaria.

Visitar **aquí** el sitio web del Grupo de Trabajo.

CLP_AR_004960

## GRUPO DE TRABAJO SOBRE GOBERNABILIDAD LOCAL

> **PAÍSES INTEGRANTES: Costa Rica, Guatemala, Honduras, Panamá, y El Salvador como observador**
> **PAÍS LÍDER: Guatemala**
> **CON EL APOYO TÉCNICO DE: CGLU, BID, Municipalidad de Medellín, MMC, OEA, PNUD y ACNUR**

El Grupo de Trabajo convocó tres sesiones centradas en: Iniciativas y Marcos Globales sobre Gobernabilidad Local, Ciudades Solidarias, y las funciones y responsabilidades de las organizaciones regionales e internacionales. Las consultas proporcionaron una plataforma para que los participantes compartan sus experiencias, buenas prácticas y conocimientos en protección e inclusión. Los participantes también aprovecharon la experiencia técnica de otros países e instituciones que han desa-

rrollado experiencias relevantes parala gobernabilidad local. Como uno de los resultados de las consultas, los doce municipios participantes acordaron considerar un 'Compromiso colectivo bajo el Llamado a la Acción Local para Migrantes y Refugiados', con el fin de alinear esfuerzos comunes para implementar Ciudades Solidarias en Centroamérica.

Visitar **aquí** el sitio web del Grupo de Trabajo.



© UNHCR/Victor Sánchez Mejía

## GRUPO DE TRABAJO SOBRE EMPLEO Y MEDIOS DE VIDA

> **PAÍSES INTEGRANTES: Todos los países MIRPS**
> **PAÍS LÍDER: Costa Rica**
> **CON EL APOYO TÉCNICO DE: OIT, PNUD, ACNUR, BID, OEA.**
> **CON EL APOYO FINANCIERO DE: España, Unión Europea, OEA.**

Considerando los desafíos que tiene la región en materia de integración laboral de las personas en situación de desplazamiento, dentro de la estructura del MIRPS se continuó el abordaje regional desde el Grupo de Trabajo sobre Empleo y Medios de Vida. Bajo el liderazgo de Costa Rica, la prioridad durante el 2022 fue el avance en la creación de una ruta que permita a las personas trabajadoras en situación de desplazamiento y movilidad el reconocimiento de las competencias adquiridas previamente y obtener información para su inserción laboral, facilitando su integración social y económica.

Durante el 2022, el Grupo ha logrado los siguientes avances:
- Identificación y sistematización de los mecanismos de los países miembros del MIRPS para el reconocimiento de competencias laborales que les permiten a las personas trabajadoras migrantes, refugiadas y solicitantes de asilo acceder a oportunidades en el mercado laboral del país de acogida.
- Mapeo de oportunidades de articulación en la metodología que tienen los países miembros del MIRPS para el reconocimiento de competencias laborales.

- Elaboración de una ruta conjunta entre los países miembros del MIRPS, para lograr que las personas trabajadoras migrantes, refugiadas y solicitantes de asilo, tengan acceso a servicios para el reconocimiento de sus competencias laborales, que favorezcan su ingreso y movilidad al mercado laboral del país de acogida.

Se ha conformado una red regional de especialistas gubernamentales de los siete países del MIRPS, representados por funcionarios de los Departamentos de Migración, las Direcciones de Empleo de los Ministerios de Trabajo y de los Institutos de Formación Profesional encargados de la certificación de competencias en el país. Esta red se encargará de la implementación de la hoja de ruta para la construcción de la Estrategia Regional para el reconocimiento de competencias de personas trabajadoras en situación de desplazamiento y movilidad.

Visitar **aquí** el sitio web del Grupo de Trabajo

CLP_AR_004961

## POSICIONAMIENTO ESTRATÉGICO DEL MIRPS DESDE LA OEA

Las prioridades del MIRPS se siguen posicionando y en espacios estratégicos dentro de la agenda hemisférica promovida dentro de la OEA. En 2022, se han procurado oportunidades para divulgar y compartir el trabajo y los avances del MIRPS de manera más amplia en foros de relevancia hemisférica.

En el ámbito de la protección de los derechos humanos, la Comisión de Asuntos Jurídicos y Políticos (CAJP) de la OEA en la órbita del Consejo Permanente de la Organización, el órgano político de más rango después de la Asamblea General, se ha dado seguimiento a los avances del MIRPS desde su establecimiento. En 2022, en la CAJP se presentó un balance de los progresos alcanzados por los Estados MIRPS, dando visibilidad a la magnitud de la crisis de desplazamiento en la región, mostrando las repercusiones y los efectos prolongados de la pandemia del COVID-19 en las poblaciones desplazadas por la fuerza, y revisando las tendencias actuales de los movimientos mixtos de personas en estos países.

A su vez, en la esfera de desarrollo integral, dentro de la Comisión de Asuntos Migratorios (CAM) de la OEA, se analizaron los retos, las buenas prácticas y las oportunidades para el desarrollo de un abordaje integral y hemisférico para responder a la migración y el desplazamiento forzado en la región. Esta fue una ocasión para destacar al MIRPS como uno de los mecanismos regionales de respuestas integrales que en corto tiempo ha logrado resultados tangibles y efectivos en beneficio de las personas solicitantes de asilo, refugiadas, desplazadas internas, y retornadas con necesidades de protección internacional conectando con actores de desarrollo. Asimismo, ante el Consejo Interamericano para el Desarrollo Integral (CIDI), la Presidencia Pro-Tempore del MIRPS compartió las buenas prácticas que se realizan en materia de gobernanza del desplazamiento forzado que puedan servir de ejemplo a otros Estados. En estas discusiones se generaron espacios de coordinación con otros mecanismos subregionales sobre el tema buscando promover sinergias y la articulación de acciones conjuntas.

En el marco de la Novena Cumbre de las Américas, que reunió a los Presidentes y mandatarios de las Américas en Los Ángeles, California, el MIRPS fue resaltado en un evento paralelo de alto nivel sobre Gobernanza regional en materia migratoria y de protección internacional. Este evento tuvo como objetivo abordar la importancia del fortalecimiento de la gobernanza regional en materia migratoria y de protección internacional, así como revisar diversos roles para coordinar esfuerzos entre los diversos mecanismos regionales de respuesta. También en el marco de esta cumbre, todos los Estados del MIRPS suscribieron la Declaración de Los Ángeles sobre Migración y Protección, en la cual los Estados suscriptores reiteraron su voluntad de fortalecer los esfuerzos regionales y hemisféricos a fin de crear las condiciones para una migración segura, ordenada, humana y regular, y de fortalecer los marcos necesarios para la protección y cooperación internacional. En esta declaración, el MIRPS es uno de los mecanismos regionales de respuesta que se distinguen como efectivos para aportar de manera concreta a lograr los objetivos de este documento.

Finalmente, en el marco de la Asamblea General de la OEA celebrada en el mes de octubre, los Cancilleres de las Américas reconocieron al MIRPS por quinto año consecutivo en la resolución referida a la protección de las personas refugiadas en las Américas. En este documento se resalta cómo desde el MIRPS se impulsan acciones conjuntas para mitigar las causas estructurales del desplazamiento en la región al igual que las medidas para responder a las necesidades humanitarias y de protección de las personas desplazadas.

La Secretaría General de la OEA seguirá acompañando a los Estados participantes del MIRPS poniendo a disposición los espacios de diálogo, articulación e intercambio a nivel hemisférico disponibles para resaltar las virtudes de este mecanismo que pone en el centro de su respuesta a más de un millón de personas desplazadas en y desde Centroamérica y México.

## FONDO MIRPS EN ACCIÓN

El Fondo MIRPS es uno de los mecanismos clave para la consecución de recursos y la coordinación de los apoyos requeridos por los Estados del MIRPS en complemento a los mecanismos existentes para atender la crisis de desplazamiento en la región. El Fondo MIRPS, establecido por el Consejo Permanente de la OEA, se puso a disposición por primera vez en el Primer Evento de Solidaridad que tuvo lugar en 2021. A finales de ese año, el Gobierno de España anunció una aportación pionera al Fondo MIRPS siendo un hito a nivel regional en términos de solidaridad y responsabilidad compartida para apoyar las respuestas de los países del MIRPS en brindar protección y soluciones a la situación de las personas desplazadas y de las comunidades de acogida.

A partir de esta primera contribución, en 2022, se puso en marcha todo el marco de operación del Fondo con participación de los propios Estados MIRPS, y se abrió la convocatoria al primer llamado a propuestas del Fondo MIRPS, para que cada país MIRPS presentara sus propuestas de proyectos en consonancia con los Planes de Acción Nacional de los países del MIRPS.

Para la revisión y análisis de las propuestas, se ha constituido un Comité de Selección de Alto Nivel (CSAN) del Fondo MIRPS, conformado por dos expertos independientes seleccionados por los países MIRPS, un representante de la Plataforma de Apoyo al MIRPS, y un representante de cada una de las instituciones que conforman la Secretaría Técnica conjunta del MIRPS, el ACNUR y el Departamento de Inclusión Social de la OEA.

Las propuestas recibidas y evaluadas por el CSAN abordan diversas temáticas que buscan alcanzar los objetivos planteados en el marco del MIRPS: el fortalecimiento de las capacidades institucionales para una mejor atención y protección de personas solicitantes de la condición de refugiado, refugiadas, desplazadas internas y retornadas con necesidades de protección; ampliar el acceso a la asistencia humanitaria y brindar medios de vida y autosuficiencia para estas poblaciones, fortalecer mecanismos para la integración socioeconómica de las poblaciones desplazadas y fortalecer los procesos de reconocimiento del derecho a la identidad y documentación de las poblaciones desplazadas en sus comunidades de acogida; entre otras. Los proyectos presentados por los Estados MIRPS están alineados a los pilares del MIRPS y a los compromisos actualizados en el 2022, lo que permitirá a los Estados beneficiarios avanzar la

CLP_AR_004962

implementación de acciones definidas en sus Planes nacionales. Asimismo, los proyectos incluyen de manera transversal una perspectiva de derechos e inclusión, así como un enfoque de género, edad y atención a las necesidades diferenciadas de algunas poblaciones en especial situación de vulnerabilidad, por ejemplo, la protección de niñas, niños y adolescentes retornados con necesidades de protección, garantizando que al menos la mitad de las beneficiarias directas sean mujeres desplazadas.

Según mandato del Consejo Permanente (CP/RES. 1154 (2286/20), refrendado a nivel de la Asamblea General de la OEA 2020, el Departamento de Inclusión Social (DIS) de la OEA, tiene a su cargo la administración, gestión financiera y rendición de cuentas del FONDO MIRPS. En esa calidad y en la etapa de ejecución de los proyectos específicos por los Estados MIRPS, el DIS les estará brindando acompañamiento y asistencia para asegurar la consecución de los resultados esperados. El Fondo MIRPS se encuentra abierto a recibir nuevas contribuciones, y continuar implementando iniciativas y proyectos en terreno en los Estados MIRPS.



© UNHCR/Nicolo Filippo Rosso

# $04.$ Alianzas con socios estratégicos

—

## ALIANZAS CON EL SECTOR PRIVADO

La comunidad empresarial en los países MIRPS representa un actor clave para la implementación de acciones que prioricen la inversión dirigida a la inclusión laboral e integración de las personas desplazadas. En 2022, la Secretaría Técnica del MIRPS ha continuado los esfuerzos para fortalecer el dialogo, la sensibilización y el acercamiento con el sector empresarial promoviendo buenas prácticas por la inclusión de personas en situación de desplazamiento.

Parte de estos esfuerzos incluyeron un mayor acercamiento con representantes de empresas del sector privado canadiense con presencia en Centroamérica, a iniciativa de Canadá como Presidencia de la Plataforma de apoyo con el fin de explorar posibilidades de participación y apoyo a las poblaciones en situación de desplazamiento en la región.
Como resultado, se amplió la gama de actores, alcanzando 40 organizaciones empresariales en tres niveles: A Nivel Regional, con asociaciones empresariales, asociaciones de cámaras de comercio y organizaciones de Responsabilidad Social Empresarial; a nivel gremial, con las agrupaciones gremiales regionales, Cámaras de comercio nacionales, organizaciones de sectores productivos; y a nivel Empresarial, con organizaciones empresariales, multinacionales y empresarios particulares con presencia importante en la región.

La Secretaría Técnica del MIRPS ha planteado también un esquema de participación del sector privado en múltiples ámbitos de las actividades del MIRPS. Entre ellos:
• Espacios de diálogo y cooperación regionales del MIRPS tal como en la reunión anual del MIRPS y el evento anual de Solidaridad. Durante el evento de solidaridad internacional del 2022, se presentó la **"Expresión Conjunta de Solidaridad del Sector Privado para fortalecer la protección y promover soluciones para las personas**

CLP_AR_004963

desplazadas y sus comunidades de acogida en Centroamérica y México". La expresión de solidaridad fue suscrita por doce organizaciones empresariales de la región.

- Eventos de sensibilización e intercambio entre gobiernos y sector privado de la región. En 2022, la Secretaría técnica del MIRPS organizó cinco eventos con la participación del sector privado sobre la situación de desplazamiento forzado en la región. Estos eventos se dieron en el marco de sesiones del MIRPS, la Cumbre de las Américas, la Convención Anual de Rotary International, diálogo directo con los gobiernos de la región, entre otros.
- Buenas prácticas e iniciativas empresariales en materia de inclusión de población desplazada. La Secretaría Técnica del MIRPS avanzó en el desarrollo de una "Caja de Herramientas MIRPS: Aportes de la comunidad empresarial a la situación de desplazamiento forzado en Centroamérica y México". Este documento recoge alrededor de 30 iniciativas y buenas prácticas que actualmente están adelantando las organizaciones del sector empresarial en la región.

De cara al 2023, la estrategia regional con el sector empresarial se enfocará en seguir fortaleciendo las vías **de cooperación desde el cual el sector empresarial puede contribuir a** las respuestas de los Estados de acuerdo a las líneas de acción:

- **Acción 1**: Mejorar el conocimiento de los empresarios sobre el marco normativo de los derechos laborales de las personas refugiadas, retornadas y desplazadas.
- **Acción 2: Promover el diálogo y la interlocución público-privada** para el desarrollo de acciones conjuntas para abordar las causas subyacentes del desplazamiento forzado.
- **Acción 3: Desarrollar una cultura de hospitalidad, integración y respeto** hacia las poblaciones desplazadas, buscando cambiar narrativas para erradicar prácticas discriminatorias y xenófobas dentro de los entornos empresariales.

Guiados por el trabajo técnico de los Grupos de Trabajo del MIRPS se buscará estrechar la interlocución de estos socios en espacios estratégicos, la articulación con la Plataforma de apoyo del MIRPS liderada por Estados Unidos, y la movilización del sector privado en eventos de solidaridad del MIRPS con acuerdos de cooperación y compromisos específicos. Todo ello dirigido a la conformación progresiva de una red activa y dinámica de actores del sector privado que contribuyan con programas concretos para mejorar las oportunidades económicas, los medios de vida y la autosuficiencia de las personas desplazadas en Centroamérica y México.

## SOCIEDAD CIVIL

El trabajo de sociedad civil en acompañamiento a los objetivos del MIRPS se ha fortalecido, por medio de la promoción de derechos, difusión de información y trabajo conjunto, entendiendo los retos nacionales y locales de las organizaciones que forman parte del Mecanismo de Diálogo de la Sociedad Civil del MIRPS.

En el 2022, se ha avanzado en la consolidación del Mecanismo de organizaciones de sociedad civil del MIRPS. La organización mexicana "Programa Casa Refugiado" fungió como presidencia rotativa y se mantuvo la participación continua de 40 organizaciones a nivel nacional. De esta manera, se sostuvieron reuniones de coordinación con la Presidencia Pro-tempore del MIRPS, con gobiernos de países MIRPS, ACNUR, OEA y la Plataforma de Apoyo al MIRPS.

El Mecanismo ha trabajado de manera regional y nacional, desarrollando espacios de diálogo con gobiernos, organismos y empresas. Asimismo, se compartieron posicionamientos públicos en diferentes eventos, tales como el Evento de Solidaridad Internacional del MIRPS, y en distintos foros donde se impulsó la colaboración, el trabajo en redes y el fortalecimiento de los espacios de coordinación con participación múltiple.

El Mecanismo también hizo la presentación del Informe resultado de una serie de diagnósticos realizados en los siete países MIRPS (2021). Se presentaron las buenas prácticas, retos y avances de la región en relación al abordaje del desplazamiento forzado, desde la perspectiva de las organizaciones de sociedad civil que contribuyen a los planes de acción nacional del MIRPS.

Finalmente, es importante reconocer que el año reportado ha permitido reinterpretar las dinámicas de colaboración desde el MIRPS, como espacio de encuentro para la construcción de acuerdos y sinergias, para mejorar el acompañamiento y el fortalecimiento de la colaboración en las realidades nacionales.



© UNHCR/Víctor Sánchez Mejía

CLP_AR_004964



© UNHCR/Santiago Escobar-Jarami

# MIRPS
# EN ACCIÓN

Avances nacionales

CLP_AR_004965

# BELICE

## FOMENTANDO LAS OPORTUNIDADES DE EDUCACIÓN PARA SOLICITANTES DE ASILO EN EL SUR DE BELICE

*En Belice, 10 jóvenes solicitantes de asilo tuvieron la oportunidad de ampliar sus estudios en una institución técnico-profesional.*

El sonido de la alarma despierta a Joe de un salto. Son las 4:00 de la mañana y el solicitante de asilo de 20 años se levanta para prepararse para la escuela. Camina durante veinte minutos por un tranquilo camino de tierra, agradecido por la oportunidad de experimentar la paz en su nueva comunidad. Cuando llega a la parada del autobús, sus compañeros están esperando el autobus que los llevarán al Instituto de Educación y Formación Técnica y Profesional (ITVET) de Stann Creek. Es un viaje de dos horas y media cada día, pero es un sacrificio que hacen con gusto.

Joe es uno de los 10 jóvenes solicitantes de asilo que han tenido la oportunidad de volver a estudiar luego de que vieran interrumpidos sus estudios cuando se vieron repentinamente obligados a huir de sus hogares por la violencia.

"No podíamos quedarnos allí porque era totalmente inseguro", recuerda Joe. "Cuando llega una amenaza así, lo único que sigue es la muerte. Es algo grave. No es fácil. Estaba en mi último año de instituto y no pude terminar porque simplemente no podíamos sobrevivir más en ese lugar."

Selena\*, una solicitante de asilo de 17 años procedente de Honduras, no pudo terminar el el colegio tras sobrevivir a un violento asalto a su casa por parte de miembros de una banda, que se resultó en el asesinato de su hermano. Tras este hecho, tanto ella como los demás miembros de su familia recibieron numerosas amenazas de muerte y huyeron a Belice en busca de seguridad.

"Me siento muy feliz de haber podido volver a la escuela", dice Selena. "No pensé que podría seguir estudiando hasta que recibí esta oportunidad, y estoy muy agradecida por ello".

Después de un año de superar los retos del aprendizaje en un nuevo sistema escolar y en un idioma desconocido, los estudiantes se gradúan con un diploma técnico que equivale a un título de secundaria.

"Para mí, esta debería ser una oportunidad que todos los solicitantes de asilo puedan recibir para tener un futuro mejor y poder encontrar un buen trabajo", dice Selena.

Cerca de la mitad de los niños refugiados del mundo -el 48%- no están escolarizados. El ACNUR en Belice, junto con el Gobierno y los socios locales, trabaja para garantizar que la educación sea accesible para todos los niños, niñas y jóvenes, incluidos los solicitantes de asilo.

\*Nombre cambiado por motivos de protección



> "No pensé que podría seguir estudiando hasta que recibí esta oportunidad, y estoy muy agradecida por ello"

CONOCE MÁS SOBRE ESTA HISTORIA

© ACNUR/Aida Escobar

CLP_AR_004966

# CONTEXTO NACIONAL

En 2022, Belice continuó construyendo sobre los cimientos establecidos en 2021 en lo que concerniente al refuerzo de la protección y la aplicación de soluciones duraderas para las personas desplazadas por la fuerza a escala regional y mundial. Belice continúa creando alianzas con actores relevantes y fomentando iniciativas destacadas de los sectores humanitarios y de desarrollo, público y privado.  Con la ayuda de aliados estratégicos, Belice ha ido mejorando el mecanismo de recepción y admisión, respondiendo a las necesidades humanitarias y de protección e implementando soluciones duraderas para los desplazados forzosos. A través de diversas iniciativas, Belice sigue trabajando en el marco del MIRPS en una respuesta regional coordinada al desplazamiento forzoso. El Departamento de Refugiados emitió aproximadamente 211 cartas de remisión, que representaban a unas 408 personas recomendadas pero no confirmadas como solicitantes de asilo, para su presentación ante el Departamento de Gestión de Fronteras y Servicios de Inmigración para la emisión de Permisos Especiales de trabajo en agroindustrias. Este servicio se dio sin coste alguno para estos solicitantes y sus dependientes. Los permisos especiales les permitían seguir residiendo en Belice y trabajar en las industrias de cítricos, plátanos o caña de azúcar. Esta categoría especial se concedió únicamente a las personas que habían sido recomendadas previamente por el Comité de Elegibilidad de Refugiados, pero que no habían sido confirmadas hasta finales de 2020. Además, el ACNUR aprobó una propuesta de proyecto para la ampliación y mejora del Departamento de Refugiados. Asimismo, se concedió una amnistía a unos 298 migrantes irregulares cuyas prórrogas de visado caducaron durante el cierre de fronteras del periodo COVID 19, y el año 2021 concluyó con el anuncio de la tercera amnistía de inmigración de Belice, que se centra en la gestión de la migración para la seguridad nacional y el desarrollo socioeconómico de Belice, proporcionando la residencia permanente con una vía hacia la ciudadanía a los migrantes aprobados.

> El Gobierno ha dado un primer paso para introducir cambios en la política actual de las autoridades de inmigración en relación al acceso de los solicitantes de asilo a los mercados laborales nacionales.

# INDICADORES

## 4.175

refugiados y solicitantes de asilo
(Gob. de Belice, octubre de 2022)

## 3.000

otras personas de interés
(ACNUR, septiembre de 2022)

• **Principales razones para no acogerse a la amnistía:** No tenía información previa sobre la amnistía (45%), no estoy interesado (18%), no cumplo los requisitos de elegibilidad (12%) y temo ser identificado por las autoridades (9%).

Fuente: Evaluación de perfiles en Belice, ACNUR, Julio de 2002

• El **85%** de los hogares evaluados declararon tener **relaciones positivas con su comunidad de acogida**
• Alrededor del **7%** de los niños de entre 7 y 12 años no están escolarizados. De los matriculados, el 72% lo están en los niveles 1 a 4.

• **Principales razones para no solicitar asilo (entre quienes no lo solicitaron):** No tenía información sobre cómo o dónde hacerlo (34%), No sé lo que es (20%), Lo intenté pero no me lo permitieron por falta de documentos (9%) y Otros (14%).

• **Principales motivos de entrada irregular en el país:** Falta de documentos para los adultos (13%), Miedo a la deportación (4%) y Falta de documentos para los niños (3%).
• Las principales dificultades para encontrar un lugar donde alojarse fueron la falta de recursos económicos (71%), la falta de documentos (25%) y el rechazo por motivos de nacionalidad (15%).

CLP_AR_004967

- **Amnistía de 1984:** se registraron **8.680 inmigrantes irregulares.**
- **Amnistía de 1999: 11.168 migrantes irregulares** obtuvieron la residencia permanente.
- En diciembre de 2021, se anunció un programa de amnistía para regularizar a los migrantes irregulares en Belice. En virtud de la amnistía de 2022, los migrantes irregulares que cumplan alguno de los ocho (8) criterios de cualificación pueden solicitar la residencia permanente para regularizar su presencia en Belice.

- La encuesta de citas en línea informa de que la mayoría (90%) de los solicitantes se encuentran dentro de los años productivos.



- 45-54 **14%**
- 18-24 **19%**
- **90%**
- 25-34 **33%**
- 35-44 **24%**

# 5.097 

personas y dependientes habían aplicado al 30 de septiembre de 2022 (2 meses después de que finalizara el periodo de registro de 4 meses).

# 4.500 

solicitantes cumplen los requisitos para solicitar la amnistía

# 749

solicitantes de asilo han solicitado y recibido la carta de referencia de amnistía del Departamento de Refugiados a 30 de septiembre de 2022 (2 meses del Periodo de Registro de 4 meses).
- La mayoría de las solicitudes se recibieron en las oficinas urbanas de Amnistía 2022.
- La mayoría de los participantes son mujeres (54%).
- La mayoría de los solicitantes (70%) no tienen personas a su cargo. La segunda categoría más numerosa son los solicitantes con sólo 1 persona a cargo (20%) .

- Un 70% de los solicitantes informan de que tienen conocimientos de comunicación en inglés
- La mayoría de los solicitantes vinieron a Belice por reunificación familiar (25%), empleo (25%), acompañaban a un padre o tutor (20%), o como resultado de un desplazamiento forzoso debido a la tasa de criminalidad en su país (15%)



- **Hay solicitantes de treinta y dos (32) países de todo el mundo.**
- Estos Treinta y Dos (32) países están dispersos globalmente en Siete (7) regiones, a saber, Europa (8), América del Sur (5), Islas del Caribe (5), Asia (5), América Central (4), América del Norte (3) y África (2).

- En cuanto al número real de solicitantes por región, hay que señalar que **Centroamérica es la que cuenta con el mayor número de solicitantes (97%)**, seguida de Norteamérica (2%). Las solicitudes de nacionales de las otras cinco (5) regiones suman un 1%.
- Información adicional informa que alrededor del **55% de las solicitudes son de guatemaltecos,** 23% de salvadoreños, 18% de hondureños, 1% de nicaragüenses, y todas las solicitudes de otros nacionales se incluyen en el 3% restante.

Fuente: Reporte sobre la Amnistía del Gobierno de Belice, Septiembre 2002

CLP_AR_004968

# AVANCES



## PROTECCIÓN

El 2022 inició el proyecto de dos años aprobado por el ACNUR titulado "Fortalecimiento de la capacidad institucional del Departamento de Refugiados/Ministerio de Inmigración". Este proyecto ha sido esencial para la contratación de tres nuevos funcionarios de admisibilidad, el desarrollo de la capacidad técnica de todos los empleados, el suministro de tecnología de la información, espacio de oficinas, equipos de oficina y el desarrollo de bases de datos. Esta asociación ha ampliado la capacidad de tramitación del asilo en relación con la reducción de la acumulación de solicitudes y la mejora de las modalidades de gestión de los nuevos casos de asilo. Al mismo tiempo, los procesos de registro, almacenamiento y análisis de datos de los departamentos se están modernizando con nuevos equipos y programas informáticos. El Comité de Admisibilidad de Refugiados ha recibido formación técnica en profundidad para la resolución de las solicitudes de asilo.

La revisión de la legislación nacional relativa a los refugiados ha comenzado bajo los auspicios del proyecto del ACNUR y las perspectivas para 2023 incluyen la conclusión de este proceso con una ley de refugiados moderna, racionalizada y actualizada, revisada y apoyada por el Ejecutivo y aprobada por el Legislativo. Los diversos puntos focales de los proyectos forman sinergias en términos de tener un sistema de asilo robusto, gestionado por empleados formados internacionalmente, utilizando un sistema tecnológico digitalizado y moderno para proporcionar protección y asistencia a los apátridas, solicitantes de asilo y refugiados en Belice.

Hacia finales de 2021, el Gobierno anunció un programa de amnistía para determinadas personas indocumentadas que permanecen en Belice. En una primera fase, se decidió incluir a las personas con necesidades de protección internacional y a los solicitantes de asilo registrados, para quienes la amnistía ofrece una vía alternativa para regularizar su situación migratoria en Belice. Hasta el 30 de septiembre de 2022, dos meses después de un periodo de registro de cuatro meses, unos 749 solicitantes de asilo registrados habían solicitado la carta de referencia de la amnistía. La Organización Internacional para las Migraciones (OIM) y el ACNUR han desempeñado un papel decisivo a la hora de orientar y ayudar a las personas afectadas en el proceso de solicitud.



## EDUCACIÓN

Belice sigue centrado desde principios de 2020 en ampliar los servicios de formación profesional técnica a los jóvenes refugiados y solicitantes de asilo, junto con los jóvenes de las comunidades de acogida. En 2022 se continuó la movilización de recursos para centrarse a nivel nacional en el crecimiento de las micro, pequeñas y medianas empresas-MSMEs, con el fin de proporcionar nuevas vías para que los solicitantes de asilo y los refugiados se inscriban en iniciativas formales de desarrollo empresarial gestionadas por el Servicio de Desarrollo del Comercio y la Inversión, el Centro de Desarrollo de Pequeñas Empresas y el Centro de Formación y Empleo de Belice.



©UNHCR/Diana Díaz

CLP_AR_004969

# COSTA RICA

### REFUGIADO NICARAGÜENSE LIDERA ALBERGUE QUE UN DÍA LE ACOGIÓ

Tras graduarse de la carrera de derecho, Ernesto planeaba ejercer su profesión y crear su propia firma legal. Sin embargo, tuvo que salir de Nicaragua y empezar una nueva vida en medio de la crisis sociopolítica que inició en abril del 2018. Recién graduado, puso sus sueños en una maleta y buscó refugio en Costa Rica.

A su llegada a Costa Rica, fue atendido en un albergue en San José, la capital, donde no solo encontró personas solidarias que le atendieron, sino que ese mismo lugar se convirtió en el lugar de trabajo que hoy lidera con pasión.

La integración de Ernesto no hubiera sido posible sin el acceso a los documentos de identidad que le otorgó el Estado costarricense. Como solicitante de refugio, Ernesto logró establecerse como líder del albergue y por su formación como abogado, no solo ha dado asistencia humanitaria, también ha logrado que otras personas accedan a esta documentación y a otros derechos que otorga el país a personas solicitantes de refugio y refugiadas en Costa Rica.

Su trabajo se ha extendido durante casi cuatro años, brindando atención a personas solicitantes de refugio de la región. "Nos ha tocado atender a personas de Nicaragua, Haití y más recientemente Venezuela", asegura satisfecho y orgulloso de la ayuda que ha brindado.

Ahora Ernesto, reconocido como una persona refugiada, sueña con convertirse en psicólogo, carrera que inició en Costa Rica. "Siempre quise ser abogado o psicólogo. Me decanté por derecho sin saber que algún día terminaría dando ayuda psicosocial a personas que, como yo, tuvieron que huir de su país", dice Ernesto.

Sin su documentación, Ernesto no imagina como hubiese sido el tiempo que ha transcurrido en el país. Primero como solicitante de refugio y ahora como refugiado, Ernesto ahora mira al futuro con la esperanza de seguir brindando ayuda a quienes, como él, un día requirieron de una mano solidaria en el país que les acogió.



"Nos ha tocado atender a personas de Nicaragua, Haití y más recientemente Venezuela"

©ACNUR/Austin Ramírez Reyes

CLP_AR_004970

# CONTEXTO NACIONAL

Costa Rica ha sido tradicionalmente un país de acogida para personas que han sido desplazadas forzosamente de sus países de origen. Gracias a su estabilidad democrática, instituciones robustas y su tradición de respeto a los derechos humanos, el país ofrece las condiciones para que estas personas encuentren la seguridad y las posibilidades necesarias para rehacer sus vidas.

En los últimos años, Costa Rica ha ampliado su rol como país de destino debido a las situaciones de persecución y violencia en la región, particularmente en Nicaragua, Venezuela, Cuba y el Norte de Centroamérica. Desde el 2018 y hasta el 30 de setiembre del 2022, el país contabilizó 218,788 personas con necesidad de protección internacional, de las cuales 12,077 corresponden a personas refugiadas, 206,711 solicitantes de refugio. Adicionalmente, hay 67 personas reconocidas como apátridas y 125 en proceso de determinación de esa condición (al 30 de setiembre 2022).

El aumento sostenido del número de personas que buscan protección internacional en el país ha incrementado la presión sobre la institucionalidad costarricense y su capacidad de respuesta. La pandemia por Covid-19 y su impacto en la situación económica, profundizaron los retos del país para atender de forma oportuna a esta

población. En el primer semestre del 2022, 50,224 personas formalizaron su solicitud de reconocimiento de la condición de persona refugiada.

A pesar de que el país cuenta con un sistema de asilo robusto, el contexto de desplazamiento actual plantea nuevos desafíos para la respuesta a esta población, en un escenario donde la demanda de servicios y atención no avanza al mismo ritmo que la oferta. Cuando las personas ingresan al territorio costarricense en búsqueda de protección internacional, son las comunidades fronterizas quienes brindan la primera respuesta a las necesidades de las personas desplazadas forzosamente. Las comunidades de la zona norte del país, segunda región con menor desarrollo humano del país, brindan a estas personas servicios básicos de atención en salud, educación y ayuda humanitaria. Por ello, es que el Gobierno de la República y el Sistema de Naciones Unidas en Costa Rica promueven una intervención territorial en la que participen actores de desarrollo como los Organismos Financieros Internacionales y agencias humanitarias para fortalecer las comunidades de acogida y asegurar el acceso a derechos y servicios de todos los habitantes del territorio. Costa Rica apela a la comunidad internacional para apoyar los esfuerzos del país para su atención y respuesta.

# INDICADORES

 **4 AÑOS**

Tiempo promedio de procesamiento desde la formalización de la solicitud de refugio hasta la adopción de una decisión sobre la solicitud de refugio en primera instancia.

**3225\***

POBREZA EXTREMA: 2703
POBREZA: 1050

Número de personas solicitantes de refugio o refugiadas en situación de pobreza y pobreza extrema.

**67.175**

Número de personas solicitantes de refugio con documentos de identidad o credenciales legalmente reconocidas.

**684** 

Número de personas solicitantes de refugio o refugiadas menores de edad en situación de pobreza y pobreza extrema beneficiarias de un subsidio de estudio.

 **3,2%**

POBLACIÓN TOTAL:
5.213.506 \*

NÚMERO ESTIMADO DE
SOLICITANTES DE REFUGIO:
167.330 \*\*

Proporción de personas solicitantes de refugio con respecto a la población nacional.

**57.732**
(EL 100% DE
LAS PERSONAS
MAYORES DE EDAD)

Número de personas solicitantes de refugio que poseen un permiso de trabajo.

CLP_AR_004971

# AVANCES



### PROTECCIÓN

Medida de protección complementaria para personas venezolanas, nicaragüenses y cubanas. En diciembre del 2020, el Gobierno de la República aprobó la medida de protección complementaria que brinda protección a personas de esas tres nacionales cuya solicitud de refugio ha sido denegada en firme, pero existen elementos que les impiden regresar a sus países de origen. Esta medida fue un piloto que se extendió hasta febrero del 2022 el cual brindó seguridad jurídica a estas personas y les autorizó a realizar actividades remuneradas sin ninguna restricción. Esta medida fue solicitada por 4,038 personas y beneficiado a 3,934 personas, con un promedio de aprobación superior al 99%.

promedio de aprobación superior al

## 99%



### PROTECCIÓN SOCIAL

Acceso de las personas refugiadas y solicitantes de refugio a los programas estatales de reducción de la pobreza. Costa Rica garantiza el acceso de las personas solicitantes de refugio y refugiadas en situación de pobreza y pobreza extrema a los programas de reducción de la pobreza del Instituto Mixto de Ayuda Social (IMAS) en igual de condiciones que las personas costarricenses. El acceso a estos programas permite acceder a la oferta de programas de protección y movilidad social. En el 2021, se otorgaron beneficios a 4,134 personas refugiadas y solicitantes de refugio.

En el 2021, se otorgaron beneficios a

## 4,134
personas

> Costa Rica garantiza el acceso de las personas solicitantes de refugio y refugiadas en situación de pobreza y pobreza extrema a los programas de reducción de la pobreza del Instituto Mixto de Ayuda Social (IMAS) en igual de condiciones que las personas costarricenses.



### EMPLEO Y MEDIOS DE VIDA

Acceso a la documentación que permite a las personas solicitantes de refugio incorporarse al mercado laboral. El Gobierno de la República otorga a las personas refugiadas y solicitantes de esa condición un permiso laboral para poder integrarse al mercado laboral y apoya esa integración a través del sistema nacional de empleo, plataforma que articula programas de capacitación que ofrece el estado costarricense con las necesidades de contratación de las empresas. En el 2021, esta plataforma registró 5,490 personas incluyendo 35 personas refugiadas y solicitantes de refugio. Asimismo, desarrolló procesos formativos para aumentar la empleabilidad de 81 personas refugiadas.

En el 2021, esta plataforma registró

## 5,490
personas



### SALUD

Aseguramiento médico en salud para personas solicitantes de refugio y refugiadas. La Caja Costarricense de Seguro Social (CCSS), brinda aseguramiento médico temporal a personas solicitantes de refugio o refugiadas en el marco del Convenio suscrito con el ACNUR. Esta medida garantiza el acceso de las personas solicitantes de refugio y refugiadas a los servicios de salud públicos en todo el territorio. Actualmente este convenio beneficia a 6,000 personas.

Actualmente este convenio beneficia a

## 6,000
personas

> Esta medida garantiza el acceso de las personas solicitantes de refugio y refugiadas a los servicios de salud públicos en todo el territorio

CLP_AR_004972



# EL SALVADOR

## EMPODERANDO MUJERES MEDIANTE EL EMPRENDIMIENTO

Como residente de una zona urbana de El Salvador asediada por pandillas, Letty* veía pocas posibilidades para su futuro. Pero a través de cursos impartidos en centros de Ciudad Mujer, recibió capacitación para desarrollar ideas de negocio y para incrementar el potencial productivo de microempresas.

Con ese apoyo Letty logró que su emprendimiento de dulces artesanales se destacara entre la competencia. Lo hizo innovando las combinaciones de sabores, como la de su famoso dulce de coco rallado con menta.

"Desde que empecé a ir a Ciudad Mujer me siento más segura por la asistencia psicológica y ayuda para fortalecer mi emprendimiento." señala.

Los dulces de Letty* son elaborados con ingredientes locales y ella sigue probando nuevas combinaciones para seguir siendo competitiva. Además, ahora su marca tiene nombre y logotipo, consciente de lo importante que es para formalizar el negocio y expandirse. "Ahorita tengo que producir una orden para uno de mis clientes que va a llevar los dulces a Estados Unidos," comparte Letty* con emoción.

La estrategia de Ciudad Mujer busca fortalecer la autonomía económica de mujeres desplazadas internamente y sobrevivientes de violencia de género. Las participantes reciben apoyo para expandir su clientela y el alcance de sus mercados, asesoría para establecer hojas de ruta para hacer la transición de sus negocios hacia la economía formal. Este proceso complementa el apoyo que las mujeres han recibido previamente de la Comisión Nacional de la Micro y Pequeña Empresa (CONAMYPE), desarrolladas en el marco de metodologías de capacitación provistas por la Organización Internacional de Trabajo para crear, expandir y sostener pequeñas empresas.

Ciudad Mujer, administrada por el Instituto Salvadoreño de la Mujer (ISDEMU), contribuye a mejorar las condiciones de vida de mujeres salvadoreñas en áreas como participación en el lugar de trabajo, salud sexual y reproductiva, prevención y atención de la violencia, y prevención de embarazos en adolescentes. También tiene como objetivo mejorar las oportunidades socioeconómicas para mujeres en riesgo de desplazamiento forzado y para mujeres retornadas con necesidades de protección.

*Nombre cambiado por motivos de protección

"Desde que empecé a ir a Ciudad Mujer me siento más segura por la asistencia psicológica y ayuda para fortalecer mi emprendimiento"

© ACNUR/Alejandra Romo

48

49

CLP_AR_004973

# CONTEXTO NACIONAL

En enero de 2020, el país aprobó la legislación para proteger y ofrecer soluciones duraderas a las personas desplazadas internamente, así como, a aquellos en riesgo de serlo. A la vez, la complejidad del contexto de movilidad humana en Centroamérica y México se manifiesta en el aumento progresivo del número de personas solicitantes de asilo y refugiadas en El Salvador, para las cuales el país contempla una respuesta integral.

Los avances existentes en la legislación y en las respuestas operativas para la protección de las personas desplazadas forzosamente y refugiadas representan avances importantes y deben continuar, así como todas las respuestas integrales para abordar las causas subyacentes de dichos fenómenos. El Salvador se unió al MIRPS en 2019, y manifestó su compromiso a través de un Plan de Acción Nacional, el cual se alinea con los compromisos asumidos durante el Foro Global sobre los Refugiados de 2019.

# INDICADORES                                    2022



En el periodo comprendido de enero a junio 2022, **se asistió a 3 personas en áreas fronterizas**. Asimismo, **se asistió a un total de 9 personas en la sede de la Secretaría de la Comisión para la Determinación de la Condición de Personas Refugiadas**.



En el periodo comprendido de enero a junio 2022, se acreditó un total **31 documentos de identidad a personas solicitantes de refugio**, y a **18 personas reconocidas como refugiados se les acreditó un documento de identidad** reconocido legalmente.

## 11 MESES 

El tiempo promedio es alrededor de 11 meses aproximadamente. Es preciso resaltar que dependiendo del tipo de caso puede ser menor el tiempo.

 483

Entre 2021 y 2022 han accedido al programa "Mi Primer Trabajo" del Ministerio de Trabajo y Previsión Social (MTPS), 483 personas.

# AVANCES



## PROTECCIÓN

- En 2022, el Gobierno de El Salvador cuenta con los resultados de un pilotaje como base para la actualización del estudio de caracterización sobre desplazamiento forzado interno. La información cuantitativa y cualitativa sobre el desplazamiento forzoso que recopilará el estudio permitirá la toma de decisiones basadas en evidencia para el diseño de sólidas políticas públicas.

- En 2022, la apertura de dos nuevos espacios de atención "A tu Lado" en los municipios de San Miguel y Santa Ana fortalece la capacidad de respuesta territorial a poblaciones desplazadas, y la oferta de información sobre derechos y asistencia de manera gratuita, segura y confidencial. Además, continúa el funcionamiento de los 27 Puntos de Atención a Víctimas, que se encuentran descentralizados en todos los departamentos del país, ubicados en hospitales nacionales, alcaldías y otros espacios de Apoyo.

- El Salvador, durante el año 2022, ha fortalecido las capacidades de los servidores públicos que forman parte de la Dirección de Atención a Víctimas, así como de las instituciones que conforman la ruta de atención a personas retornadas. Para ello, se han abordado las siguientes temáticas: protección humanitaria, gestión de casos, derechos humanos y asistencia a las víctimas.

- El Anteproyecto de Política Nacional de Ordenamiento y Desarrollo Territorial existente incorpora lineamientos preliminares relacionados a la atención de personas desplazadas.

- En 2022, se ha fortalecido técnica y operativamente a la Dirección de Atención a Víctimas (DAV) en el marco de la ampliación de su estrategia de atención a víctimas, específicamente aquellas afectadas por el desplazamiento forzado interno.

- El Módulo de Protección del Sistema Único de Información Migratoria de la Dirección General de Migración y Extranjería (DGME) se ha implementado satisfactoriamente. Esta herramienta permite la referencia oportuna a servicios especializados para personas retornadas con necesidades de protección, aplicando rutas existentes.

CLP_AR_004974



## EDUCACIÓN

- El fortalecimiento de las modalidades educativas ha permitido a los niños, niñas y adolescentes continuar su educación a través de la implementación de 1) modalidades regulares; y 2) flexibles (aceleradas, a distancia, semipresenciales, nocturnas y virtuales), que utilizan una gama de plataformas tecnológicas que incluyen televisión, radio y otros canales de comunicación.
- Durante el presente año las Consejerías Escolares ofrecen servicios mejorados de ayuda psicosocial a niños y niñas en condición de desplazamiento forzado interno. Este programa trabaja para generar entornos educativos seguros, lo cual contribuye a la continuidad educativa.
- En 2022, se cuenta con un modelo de continuidad educativa en albergues tipo casas cerradas o casas abiertas, a través de un enfoque inclusivo para niños, niñas y adolescentes.
- En 2022 se han fortalecido las capacidades instaladas para la respuesta nacional de atención, protección y continuidad educativa a la niñez desplazada forzosamente o en riesgo de serlo, así como, para mejorar la identificación, referencia y gestión de casos de niñez, adolescencia y sus familias.
- El Salvador ha aprobado y ratificado un nuevo marco normativo para protección de la niñez y la adolescencia, y previo a su entrada en vigor se han revisado los instrumentos de atención para la población estudiantil desplazada o en riesgo de desplazamiento forzado interno y sus familias.

> Durante el presente año las Consejerías Escolares ofrecen servicios mejorados de ayuda psicosocial a niños y niñas en condición de desplazamiento forzado interno.



## EMPLEO Y MEDIOS DE VIDA

- El programa "Mi Primer Trabajo" implementado permite a los jóvenes en riesgo fortalecer las habilidades para acceder a oportunidades de empleo, fortaleciendo, a la vez, las alianzas con el sector privado.
- Se ha mantenido un constante trabajo de fortalecimiento con Programas especializados y vocacionales que favorecen el acceso a oportunidades de empleo de jóvenes a través del desarrollo de habilidades blandas y capacitaciones técnicas para jóvenes en riesgo.
- Mujeres desplazadas internamente y/o sobrevivientes de violencia de género reciben apoyo psicosocial y fortalecen sus habilidades microempresariales en talleres específicos sobre fortalecimiento de habilidades y desarrollo de negocios.
- El Ministerio del Trabajo se sumó al Espacio de Apoyo "A tu Lado" en el departamento de San Salvador para brindar servicios presenciales una vez por semana con la finalidad de brinda información y asistencia sobre derechos laborales, ofertas de trabajo y oportunidades de profesionalización. Se espera que este servicio se amplíe a lo largo del país.



## SALUD

- El Protocolo de Atención Psicosocial de las personas afectadas por violencia con énfasis en desplazamiento forzado interno muestra avances en su elaboración y revisión interna.
- La continuidad del proceso de formación al personal multidisciplinario y de primer nivel de salud, permite la oportuna atención y seguimiento de los casos de desplazamiento forzado. De esta forma en 2022, 323 funcionarios del Ministerio de Salud (221 Mujeres y 102 hombres) fueron sensibilizados a través del curso de desplazamiento forzado, derecho y salud, a fin de brindar una oferta de servicios de salud especializada de manera inclusiva a mujeres y personas que requieren atención médica y psicosocial.
- Desde enero hasta junio del 2022 se han atendido clínicamente, desde el área de psicología, a 315 personas (266 mujeres y 49 hombres) víctimas de violencia en riesgo. Se han brindado 12 psicoterapias y 6 grupos de autoayuda, como parte de terapia colectiva y restaurativa.

Desde enero hasta junio de 2022 se han atendido clínicamente a

## 315

personas víctimas de violencia de género

CLP_AR_004975

# GUATEMALA

### UNA REFUGIADA SALVADOREÑA AYUDA A QUE OTRAS MUJERES LOGREN LA INDEPENDENCIA FINANCIERA

*Cuando llegó a Guatemala, Alma se sentía sola y desamparada. Pero superó su dolor y ahora lidera un grupo de ahorros para las mujeres de su comunidad.*

Para Alma, una salvadoreña de 35 años, lo peor del exilio fue la soledad. Ella tuvo que huir de su país para salvar su vida, pues las pandillas habían tomado el control de su comunidad y las amenazas de muerte eran constantes.

En Petén, zona en el norte de Guatemala donde encontró protección, era una desconocida. Abrió un pequeño taller de confección como el que tenía en su país, pero no logró integrarse con su comunidad de acogida.

Hasta el momento en que pudo solicitar la condición de refugiado, estatus que le dio la posibilidad de residir legalmente en Guatemala, abrir una cuenta bancaria y tener acceso a servicios de salud y educación. Y lo más importante: no ser devuelta a su país.

También recibió apoyo económico para su emprendimiento y participó en actividades organizadas por la alcaldía local, para la integración y generación de medios de vida entre mujeres guatemaltecas y refugiadas.

Alma hizo parte del programa de asistencia de Ixqik, Asociación de Mujeres de Petén, que acompaña a las sobrevivientes de violencia con un equipo interdisciplinario de asesoría legal, emocional, médica, liderazgo y generación de ingresos.

"Sentí confianza en mí misma. Me animé a aprender cosas nuevas y liderar", relata. Participó en una capacitación de ahorro comunitario y se animó a crear un grupo con las mujeres de su aldea. "Jamás me hubiera imaginado hacer eso antes", afirma entre sonrisas.

El grupo cumple ya dos años y cuenta con ocho participantes, quienes se reúnen cada mes. Funciona a través de consensos y por votación decidieron que Alma fuera la presidenta.

Hoy en día es la diseñadora principal de los trajes de gala de su aldea y apoya a las demás a cumplir sus sueños. "La independencia económica hace que las mujeres puedan hacer cualquier cosa que se propongan", dice con convicción.



© ACNUR/Ángela Hurtado

"Sentí confianza en mí misma. Me animé a aprender cosas nuevas y liderar"

CONOCE MÁS
SOBRE ESTA HISTORIA



54

55

CLP_AR_004976

# CONTEXTO NACIONAL

Guatemala es considerado país de origen, tránsito, destino y retorno de personas en contexto de movilidad humana. Actualmente, Guatemala asume un rol importante como país de acogida para un número cada vez más creciente de personas que huyen de sus países para salvaguardar sus vidas y llegan en búsqueda de protección internacional. Las instituciones miembros del Equipo Técnico Nacional -ETN- desde sus distintos mandatos contribuyen a generar las condiciones de protección, educación, salud, empleo y medios de vida a las personas refugiadas, solicitantes de la condición de refugiados y retornados junto a las comunidades de acogida.

Actualmente el país, a través de sus instituciones, realiza esfuerzos constantes y dirigidos para atender a las personas refugiadas, solicitantes de esta condición y con necesidades de protección internacional para asegurar:

1. La provisión de condiciones de acogida especializadas, diferenciadas, seguras y dignas;
2. El fortalecimiento de las instituciones que se ocupan del tema, especialmente en las zonas fronterizas y rutas de tránsito;
3. La atención de los retornados con necesidades de protección;
4. El abordaje y atención de grupos en situación de alta vulnerabilidad;
5. El trabajo y medios de vida para promover la inclusión laboral; entre otras acciones valiosas para la protección y las soluciones duraderas.

Es oportuno destacar que las acciones generadas en el seno del Equipo Técnico Nacional, permiten a Guatemala consolidar una posición integral, presentada por el Ministerio de Relaciones Exteriores, de acuerdo a su competencia y función de ente coordinador, en los diferentes foros regionales y multilaterales en materia de refugio.

> Las acciones generadas en el seno del Equipo Técnico Nacional, permiten a Guatemala consolidar una posición integral, presentada por el Ministerio de Relaciones Exteriores, de acuerdo a su competencia y función de ente coordinador, en los diferentes foros regionales y multilaterales en materia de refugio.

# INDICADORES

 **4**

**Procesos de formación** dirigidos a miembros de la CONARE sobre temas de Refugio y Protección Internacional

 **7**

**Procesos de Capacitación** sobre asuntos de Refugio, Protección Internacional y Procedimientos de Revisión de Casos dirigido a funcionarios del IGM

 **54**

**Permisos de trabajo** otorgados a personas refugiadas

**537**

**Permisos de trabajo** otorgados a personas solicitantes de la condición de refugiado

 **25**

**Funcionarios capacitados** en el uso de la plataforma PEX

**70**

**Personas refugiadas y solicitantes capacitadas** para conocer y utilizar la plataforma PEX

*MINTRAB*

 **10**

**Acuerdos suscritos** con Municipalidades y Gobernaciones Departamentales

**765.000**

**Beneficiarios** directos

**3.000.000**

**Beneficiarios** indirectos

*INICIATIVA CIUDADES SOLIDARIAS*

**642**

**Atenciones** en área psicosocial

**20**

**Adolescentes y jóvenes** formados en proyecto Servidor Cívico Social

*MODELO CASA JOVEN AMATITLÁN DE LA SBS*

CLP_AR_004977

# AVANCES



## PROTECCIÓN

Para dar continuidad al fortalecimiento del Sistema Nacional de Refugio, los representantes de la Comisión Nacional para Refugiados —CONARE- realizaron una visita de intercambio de buenas prácticas de la Comisión Mexicana de Ayuda a Refugiados —COMAR- en México. En dicha misión se conocieron los mecanismos, procedimientos y herramientas diferenciadas para la atención, registro y seguimiento de casos de solicitantes y refugiados.

Como resultado de esta visita oficial, el Departamento de Reconocimiento de Estatus de Refugiado -DRER- de la Subdirección de Atención y Protección de los Derechos Fundamentales de los Migrantes del Instituto Guatemalteco de Migración -IGM- ha desarrollado herramientas valiosas para optimizar la revisión de los casos y solicitudes, tales como: a) Modelo de Informe Técnico; b) Modelo de Registro; y, c) Perfiles de Situación de País de Origen.

Adicionalmente, el DRER como parte de su mandato continúa realizando acciones coordinadas junto a los puestos de control migratorio en las fronteras orientadas a garantizar el acceso al sistema nacional de refugio.

A través de la reciente apertura de **Casa Joven en el municipio Amatitlán** de la Secretaría de Bienestar Social de la Presidencia de la República -SBS- con el apoyo del ACNUR, ha atendido entre enero y septiembre 2022 un aproximado de 889 casos. De este total, 41.3% corresponde a jóvenes y adultos de 18 a 59 años; con una tasa de atención similar para adolescentes entre 12 a 17 años con 39.6%; mientras que, un 17.5% corresponde a niñas y niños de 0 a 11 años de edad. Este puede ser considerado como un Modelo integral, ya que ofrece servicios y atenciones a niños, niñas, adolescentes y jóvenes quienes junto a sus familias pueden acceder a programas de educación, acompañamiento pedagógico, intervención psicosocial, actividades deportivas y de recreación, formación para el servicio cívico social, entre otros. Este programa introduce prácticas novedosas de coordinación y articulación de esfuerzos que involucra, tanto a la comunidad y sus autoridades locales, instituciones

**Se ha atendido entre enero y septiembre 2022 un aproximado de**

# 889

**casos**

públicas, organizaciones de la sociedad civil, sector privado, entre otros para la atención, coordinación y derivación de las familias de personas refugiadas y solicitantes de esta condición, retornados y guatemaltecos en riesgo.

En marzo 2022, en Flores, Petén, se inauguró el **Centro de Atención Integral Infantil -CAI-** construido por la Municipalidad y El Refugio de la Niñez con apoyo técnico y financiero del AC-NUR. Este Centro a cargo de la Secretaría de Bienestar Social de la Presidencia de la República -SBS- contribuye al desarrollo, el cuidado y la enseñanza de la niñez local y refugiada en el municipio. El CAI tiene una capacidad para 80 niños, niñas y adolescentes, de los cuales recibe actualmente 28, promoviendo espacios seguros de cuidado y con ello, facilitando a sus madres el acceso al mercado laboral.



## EMPLEOS Y MEDIOS DE VIDA

El Ministerio de Trabajo y Previsión Social —MINTRAB- ha realizado un proceso de descentralización y modernización de la Plataforma Electrónica de Permisos de Trabajo para Extranjeros -PEX- con el propósito de eficientizar esta gestión y permitir realizar el procedimiento en línea desde cualquier parte del territorio nacional. Así, el MINTRAB ha simplificado y automatizado el proceso de presentación, emisión y autorización del permiso de trabajo para personas solicitantes del estatuto de refugiado y refugiadas en un promedio de tiempo de gestión de 4 días.

A través de la Campaña "Renaciendo en Guate" impulsada por el MINTRAB se busca sensibilizar al sector empresarial, a los funcionarios públicos y a la población en general sobre los motivos que obligan a los refugiados a abandonar sus países y la importancia de brindar oportunidades para su integración.

La Oficina del Adulto Mayor de la Delegación Departamental de Petén del MINTRAB fue remozada con el apoyo del ACNUR, con el fin de brindar una atención digna a los vecinos y refugiados que habitan en el lugar.

El Instituto Técnico de Capacitación y Productividad —INTECAP- realizó un ajuste a su sistema informático para facilitar a las personas refugiadas y solicitantes de esta condición con el Documento Personal de Identificación Especial (DPI-E) el acceso a los servicios y programas

CLP_AR_004978

que ofrece. Ahora, pueden acceder a capacitación vocacional y técnica, así como, a certificación de competencias laborales. Asimismo, el INTECAP está desarrollando un curso de formación y capacitación sobre "Finanzas Básicas para el Hogar" enfocado en población vulnerable, incluyendo refugiados y solicitantes del estatuto de refugiado. Con ello pretende, que la población guatemalteca y refugiada pueda mejorar su capacidad en la gestión de sus finanzas personales. Por ejemplo, para el caso del INTECAP en Izabal a partir de julio de este año, seis personas refugiadas en Puerto Barrios tuvieron la oportunidad de participar en el Curso sobre Gastronomía Guatemalteca y obtener un certificado válido que se traduce en una herramienta útil y sumamente valiosa para su integración al mercado laboral local.

---



### SALUD

**78**
personas que colaboran en las diferentes direcciones municipales han sido capacitadas en protección internacional

Como parte de la iniciativa de Ciudades Solidarias, en febrero de este año, se inauguró el nuevo Centro de Salud Comunitario de San Pedro Cadenas, en Petén, a cargo del Área de Salud Petén Sur Oriental del Ministerio de Salud Pública y Asistencia Social –MSPAS-. Dicho Centro beneficia a los vecinos de las comunidades locales y personas en movimientos mixtos en tránsito y en ingreso a este departamento. Este Centro ofrece un espacio seguro y de coordinación interinstitucional, en el cual instituciones como Secretaría de Bienestar Social –SBS-, Procuraduría General de la Nación -PGN-, Secretaría contra la Violencia Sexual, Explotación y Trata de Personas –SVET-, Procuraduría de Derechos Humanos –PDH- y organizaciones de la sociedad civil pueden brindar información, hacer entrevistas y otros abordajes con el fin de mejorar condiciones de recepción e ingreso a Petén. El Proyecto ha beneficiado a 1,700 personas de las comunidades de Cadenas y de Livingston en Izabal; con un aproximado de 4,680 personas con necesidad de asistencia humanitaria que formaban parte de los movimientos mixtos.

En abril, las Clínicas de Atención a Víctimas de Violencia Sexual de los Hospitales de Melchor de Mencos, Poptún, Sayaxché y San Benito del departamento de Petén recibieron equipos y mobiliario para fortalecer la atención integral en salud para los usuarios locales, en tránsito y refugiados.

En el marco de la iniciativa de Ciudades Solidarias y como parte de los esfuerzos que realiza la Municipalidad de Esquipulas, se realizó la construcción y equipamiento de un Puesto de Salud en la comunidad Valle de Jesús que beneficia a los habitantes de la aldea, de comunidades cercanas y las personas en flujos mixtos que transitan por el lugar. Asimismo, se construyeron y equiparon áreas nuevas del Centro de Salud de Esquipulas para atender a pacientes con VIH, tuberculosis y niñez con desnutrición, beneficiando a poco más de 60 mil personas. Todo ello con el aval y el liderazgo del Ministerio de Salud Pública y Asistencia Social –MSPAS- a través del Área de Salud del departamento de Chiquimula.

La Municipalidad de San Benito en Petén construyó y habilitó la Clínica Municipal que proporciona atención médica gratuita que incluye la atención en salud, exámenes de laboratorio, radiografías y rayos X, atención dental, entre otros. Todo ello en beneficio de los vecinos y refugiados del municipio.

Desde febrero, la Municipalidad de Livingston, Izabal cuenta con un bote equipado para atender situaciones de emergencia conocido como "Ambulancha", la cual facilita la atención médica y traslados a personas guatemaltecas y refugiadas que residen a lo largo del Río Sarstún, áreas cercanas al municipio y comunidades de acogida en la zona de adyacencia con Belice. Un modelo novedoso que alcanza a llegar a las áreas más remotas que únicamente pueden accederse por la vía acuática y que, antes implicaba un trayecto de más de 6 horas para una atención de emergencia. Con este modelo, se privilegia la atención de mujeres en situación de vulnerabilidad y sobrevivientes de violencia, con una fuerte participación de mujeres indígenas.

Como parte de la iniciativa de Ciudades Solidarias, la Municipalidad de Puerto Barrios, a través del Refugio de la Niñez, construyó el Centro de Atención Integral para Mujeres. El Centro brinda asistencia y servicios de protección a sobrevivientes de violencia, independientemente de su nacionalidad. Actualmente cuenta con personal especializado para brindar atención en salud, albergue temporal, asistencia legal y psicológica, con una capacidad para atender 40 pacientes por un promedio de 6 días.

La Municipalidad de Guatemala a través de las cuatro "Casas Móviles de la Mujer" brinda atención psicológica, nutricional y médica y orientación legal a mujeres. Las Casas promueven la prevención de las violencias basadas en género, y buscan empoderar a las mujeres a través de la cobertura en servicios e información.

La Municipalidad de Villa Nueva como Ciudad Solidaria realiza bimestralmente, Ferias de Inclusión y Convivencia Pacífica en las cuales se brindan servicios de salud y orientación legal; se promueven actividades de sensibilización para prevención de la violencia de género, y se realizan actividades deportivas y recreativas. En dichas ferias intervienen las Direcciones de Salud, de la Mujer, de Seguridad Integral y la Secretaría de Obras Sociales de la Esposa del Alcalde. La Municipalidad ofrece estos servicios a toda la comunidad, incluyendo personas refugiadas y solicitantes del estatuto de refugiado. Estas ferias han alcanzado a la fecha más de 5 mil personas, entre niñas, niños, adolescente, jóvenes, mujeres, hombres y adultos mayores. Además, 78 personas que colaboran en las diferentes direcciones municipales han sido capacitadas en protección internacional, violencia de género, mecanismos de referencia de casos de atención y protección.

CLP_AR_004979



## EDUCACIÓN

En el marco de la iniciativa Ciudades Solidarias, la Municipalidad de Esquipulas en Chiquimula con el apoyo del ACNUR a través de su socio Save The Children, remozó y equipó tres escuelas que favorecen el acceso a la educación de los niños, niñas y adolescentes guatemaltecos en situación de riesgo, refugiados y retornados. Con estos proyectos, se estima que poco más de 90 niños y niñas sean beneficiados directamente y aproximadamente 110 familias de manera indirecta, en las comunidades rurales de La Ranchería, La Rinconada y el Mirador, Olopita.

La Municipalidad de Puerto Barrios en coordinación con la Dirección Departamental de Educación del Ministerio de Educación -MINEDUC- a través del Refugio de la Niñez remozó y equipó tres escuelas (EOUM Mariano Gálvez, INEB Hugo Leonel Sance y EOUM Mariano Méndez Montenegro) en el municipio con el propósito de promover y facilitar la integración al sistema nacional educativo de los niños y niñas guatemaltecos, retornados y refugiados.

Dado que el municipio de Guatemala concentra el mayor número de las personas refugiadas y solicitantes de esta condición, la Municipalidad ha realizado esfuerzos importantes para integrarlos a través de sus programas como: "Bibliotecas Municipales", "MuniEduca Móviles", "Inglés para todas" y Escuela Taller, espacios que hacen parte de las Direcciones de Desarrollo Social, Mujer y Escuela Taller de la Municipalidad. Dichas actividades, se vienen implementando desde marzo de manera escalonada debido a la pandemia y han logrado llegar a 6,600 personas beneficiarias entre refugiados, solicitantes y comunidad de acogida, mujeres víctimas de violencia de género, y segmentos que cubren desde la niñez hasta los adultos mayores. Además, con el Centro de Emprendimiento y la Dirección de Desarrollo Social se han realizado 5 ferias de emprendimiento y reactivación económica, teniendo como resultado un aproximado de 57 mil quetzales en ventas a emprendedores refugiados, solicitantes y guatemaltecos. Al menos 90 personas que colaboran en diferentes direcciones de la Municipalidad han sido capacitadas en protección internacional, violencia basada en género y trata de personas, así como, en mecanismos de referencia de casos.



© UNHCR/Ruben Salgado Escudero

CLP_AR_004980

## HONDURAS

### CON EL APOYO DE INSTITUCIONES, CARLA PUEDE RECONSTRUIR SU VIDA EN HONDURAS

Cargando solo una bolsa con sus recuerdos familiares, unos cuantos juguetes y lo que traían puesto, Carla*, sus tres hijas y sus dos nietas se vieron forzadas a dejar la aldea donde nacieron -en una ciudad de Honduras- luego de que su esposo fuera asesinado y ellas recibieran amenazas contra sus vidas.

"Recibí una nota en un papel que decía que, si no salía de la casa ese mismo día, todas nosotras iríamos a acompañar a mi esposo", recuerda la madre de familia, quien todavía está en proceso de recuperarse por la pérdida de su esposo y su hogar. "No tenía tiempo que perder, no podía arriesgar a mis hijas, a mis nietas, tenía que sacarlas de ahí rápidamente".

Con ayuda de la policía y de un familiar cercano, Carla y su familia recogieron lo que les cabía en las manos y se subieron al vehículo policial para salir del único lugar que conocían hasta ese momento. Primero, llegaron a casa de un hermano de Carla en otra ciudad en Honduras, pero ella tenía claro que rápidamente tendrían que buscar su propia vivienda.

Una vez instalada, Carla buscó ayuda en la Secretaría de Derechos Humanos (SEDH). "Yo había escuchado que había personas que ayudaban cuando a uno le pasan cosas malas, pero pensé que no era cierto", comentó Carla. "Pero, a los pocos días de que llamé, llegaron a visitarme e inmediatamente nos dieron ayuda; primero con vales para alimentación y artículos de limpieza personal, eso nos ayudó a subsistir".

Después de dos semanas, Carla entró al programa para emprendedores de la SEDH apoyado por ACNUR, donde recibió capital semilla que le permitió empezar a generar ingresos para sostener a su familia. "Yo ya tenía experiencia con negocio de venta de comestibles y bebidas. Con eso apoyaba a la economía familiar en mi antiguo hogar", destacó emocionada Carla, quien en este negocio ha encontrado un respaldo que le permite seguir adelante.

"Me puse a buscar una zona donde no hubiera otras tiendas similares, así encontré la casa donde vivimos ahora. Somos la única pulpería (tienda de abastos) en este sector de la colonia, todos los vecinos me compran tortillas temprano y ya no tienen que caminar tanto para conseguir lo que necesitan, así que ellos también están contentos con nuestra llegada", finalizó Carla, quien, a pesar de las inmensas dificultades, ha encontrado esperanza y la fuerza para seguir adelante.

Carla y sus hijas forman parte de las más de 247,000 personas desplazadas internamente en Honduras. Como parte de la respuesta, hace cinco años Honduras se adhirió al MIRPS y en 2022 lideró el mecanismo como Presidencia Pro-Tempore. En este rol, Honduras extendió su respuesta a 13 distintas instituciones, que impulsan programas para la atención de personas con necesidades de protección.

*Nombre cambiado para proteger la identidad de la persona.



"No tenía tiempo que perder, no podía arriesgar a mis hijas, a mis nietas, tenía que sacarlas de ahí rápidamente"

CONOCE MÁS SOBRE ESTA HISTORIA

© ACNUR/Danielle Álvarez

CLP_AR_004981

# CONTEXTO NACIONAL

Según datos oficiales al menos 247,090 personas fueron desplazadas internamente por violencia entre 2004 y 2018. Las causas están relacionadas con las amenazas, homicidios, restricciones a la movilidad, lesiones, extorsiones, violencia sexual, despojo de viviendas, tierras y propiedades, y reclutamiento forzado, afectando principalmente a mujeres, niños, niñas, adolescentes, jóvenes, líderes comunitarios, transportistas, comerciantes y personas LGBTIQ. A su vez, desde 2015 a la fecha, 573,654[1] hondureños han sido retornados; y desde el 2014 al 2022, 546 personas solicitaron asilo en Honduras. Por otro lado, el aumento de personas que transitan por Honduras en situación irregular desde 2010 al 2022 ha alcanzado cifras de 281,167 personas, de los cuales 149,837 han sido registradas entre enero y el 10 de octubre 2022. Estas cifras evidencian la presión sobre la institucionalidad hondureña y su capacidad de respuesta para la atención de personas con necesidades de protección.

En el 2013, el Estado de Honduras reconoció el desplazamiento forzado causado por la violencia, impulsando políticas de prevención, atención, protección y búsqueda de soluciones duraderas a personas desplazadas, creando así la Comisión Interinstitucional para la Protección de Personas Desplazadas por la Violencia (CIPPDV); el nuevo gobierno a través de las Comisiones de Migración, Seguridad y Justicia y Derechos Humanos del Congreso Nacional, discute la ley para la prevención, atención y protección de las personas

desplazadas forzadamente. Recientemente, durante la reunión sobre la Declaración de los Ángeles, Honduras se comprometió a priorizar la finalización de su legislación sobre desplazamiento interno, que se encuentra pendiente en el Congreso Nacional.

Además, Honduras sufre con los impactos del cambio climático y desastres naturales. Solamente entre el 01 de septiembre y 10 de octubre del 2022, más de 80 mil personas han sido afectadas por las frecuentes lluvias y los consecuentes deslizamientos de tierra e inundaciones, con más de 20 mil personas evacuadas, tres mil viviendas afectadas y 130 mil cultivos de la población campesina dañados. Colonias como la de Guillén, en Tegucigalpa, y municipios de la zona norte fueran fuertemente afectados por las inundaciones.

Dado este contexto complejo, el Gobierno de Honduras adoptó el MIRPS en 2017 comprometiéndose de esta manera con el establecimiento de una respuesta integral al desplazamiento forzado por violencia, y de atención e integración a los retornados con necesidades de protección, a refugiados y a solicitantes de asilo. En 2022, Honduras ha promovido la ampliación del equipo nacional del MIRPS ahora extendido a 13 instituciones estatales como ser la Secretaría de Relaciones Exteriores y Cooperación Internacional, Secretaría de Derechos Humanos, Instituto Nacional de Migración, Secretaría de Educación, Secretaría de Salud, Secretaría de la Mujer,

Secretaría del Trabajo y Seguridad Social, Secretaría de Desarrollo Social, Instituto Nacional de Formación Profesional, Instituto de la Propiedad, Servicio Nacional de Emprendimiento y de Pequeños Negocios, Dirección De Niñez Adolescencia y Familia, Asociación de Municipios de Honduras. Asimismo, ha fortalecido su vinculación con las Universidades del país y con el trabajo coordinado de sociedad civil, avanzando en los mecanismos de atención de personas con necesidades de protección.

Estos esfuerzos nacionales tanto en la abogacía por un marco normativo, en la coordinación con los gobiernos locales, y en la facilitación de acceso a servicios para personas en riesgo de desplazamiento, demuestran el compromiso del Estado para: (i) continuar impulsando la consolidación del marco normativo e institucional; (ii) mejorar las condiciones de recepción, y los mecanismos de protección y asistencia; y (iii) vincular los mecanismos de asistencia a los programas de protección social y medios de vida para ampliar las posibilidades de soluciones duraderas, entre otras.

## INDICADORES
### (DATO DE 1 ENERO DE 2022 AL 30 DE SEPTIEMBRE 2022)

**94**
Número de personas que necesitan protección internacional identificadas, asistidas y referidas en áreas fronterizas/de tránsito

**230**
Número de personas desplazadas o en riesgo de desplazamiento atendidas por los mecanismos estatales de protección

**17**
Número de bienes presuntamente abandonados que se han identificado mediante ejercicios comunitarios.

**137**
Número de retornados/deportados en municipios de intervención prioritaria que acceden a programas de apoyo a condiciones de seguridad y dignidad

---

1. https://conmigho.hn/comparativo-retornados/

CLP_AR_004982

# AVANCES



promedio de
aprobación
superior al

## 99%

## PROTECCIÓN

- El **Mecanismo de Asistencia Humanitaria en Emergencia (MAHE)** para la atención de personas desplazadas internamente por la violencia implementado por la Secretaría de Derechos Humanos (SEDH), en el 2022 se ha avanzado en la respuesta del Estado en protección y ayuda humanitaria a las personas desplazadas internamente por violencia en el país.
- Honduras avanza en la consolidación de un **mecanismo nacional de protección de los derechos de vivienda, tierra y propiedad (VTP)** de las personas desplazadas internamente por la violencia con el liderazgo del Instituto de la Propiedad (IP). Para el 2022, se ha priorizado la adecuación de la normativa en materia registral y catastral del país de manera que sea sensible al conflicto y pueda responder al contexto de violencia. Por ello, la Dirección de Registro, Catastro y la Superintendencia del IP, han implementado una hoja de ruta para el establecimiento de un Registro Especial de Bienes Abandonados por las Personas Desplazadas Internamente por la Violencia, así como, la inclusión del enfoque de protección en los Lineamientos Unificados de Registro de VTP que aplica el IP a nivel nacional. En materia catastral, también se desarrolló una herramienta de inclusión de enfoque de protección en los procedimientos de mensura catastral que realiza el IP, en todas aquellas zonas afectadas por la violencia y con alto indicio de abandono.
- Desde el 2017 la CIPPDIV -a través de la Secretaría de Derechos Humanos- ha impulsado el **fortalecimiento de capacidades técnicas a nivel de los gobiernos locales, priorizando los municipios de San Pedro Sula, El Progreso y Distrito Central**, así mismo, se ha ampliado la cobertura a los municipios de Choloma, Choluteca, Juticalpa y Danlí. En ese sentido, se ha fortalecido en un pilotaje el municipio de San Pedro Sula siendo fundamental la identificación de buenas prácticas y oportunidades de mejora en la metodología formulada para el trabajo con gobiernos locales; a la fecha, se ha logrado implementar un Mecanismo Municipal de Asistencia Humanitaria de Emergencia (MMAHE) a través de la instalación de un Comité Municipal de Respuesta, adscrito a la Alcaldía.

- En 2022 se determinó la actualización de la metodología para incluir fases de análisis de contexto, diagnóstico situacional y sistematización e intercambio de experiencias en el proceso de construcción de planes y políticas municipales de respuesta al desplazamiento interno. Además, a partir del escenario de transición gubernamental en el país, se ha estimado retomar las fases de sensibilización y capacitación con todos los municipios, incluyendo a otros que, si bien no estaban contemplados como priorizados en un principio, han manifestado interés de participar del proceso a partir de las necesidades observadas en sus regiones, entre ellos, La Ceiba, Danlí, Tocoa, Comayagua y Ocotepeque.
- A partir de 2021, la Comisión Interinstitucional de Protección a Personas Desplazadas Internamente por la Violencia (CIPPDV) cuenta con el **"Curso especializado en desplazamiento interno por violencia"**. Éste es una oferta formativa en línea desarrollada por la Secretaría de Derechos Humanos con el apoyo de ACNUR, que está disponible en la plataforma de aprendizaje de la SEDH, cuyo objetivo es mejorar los conocimientos y fortalecer las capacidades de protección de funcionarios y funcionarias públicas en materia de desplazamiento interno. La primera cohorte culminó en el primer trimestre de 2022 y contribuyó a fortalecer las capacidades de los representantes de las instituciones que integran la CIPPDV, mediante el desarrollo de 5 módulos enfocados en conceptos básicos y estándares internacionales, situación del desplazamiento interno en Honduras, protección, aplicación de enfoques diferenciados y soluciones durade-

ras. Al ser una oferta formativa permanente, el curso contribuirá a mejorar las capacidades de los actores claves de instituciones del gobierno central y gobiernos locales que tienen competencias específicas para la protección de las personas desplazadas internamente, para contar con un marco conceptual y normativo común que permita avanzar en el diseño de las políticas públicas de respuesta.
- El Proyecto de **Ley para la Prevención, Atención y Protección de las Personas Desplazadas Forzadamente**, fue entregado a miembros del Congreso Nacional de Honduras, para su discusión y aprobación. El proyecto de ley es consistente con los Principios Rectores de los Desplazamientos Internos y con estándares internacionales. Asimismo, recoge las recomendaciones del Relator Especial para los Derechos Humanos de los Desplazados Internos plasmadas en el Informe de su visita oficial a Honduras (Julio/2016) y lecciones aprendidas en experiencias en otros países. Este proyecto de Ley es integral en la medida que define la estructura nacional para la respuesta al desplazamiento, atribuyendo roles y responsabilidades, tanto a nivel nacional como local; asimismo, establece el diseño de medidas específicas de protección para las personas más afectadas, promueve la protección de bienes abandonados a raíz de la violencia y crea el Sistema de Alertas Tempranas para la prevención y protección del desplazamiento.
- Por su parte el Instituto Nacional de Migración, a través de la Gerencia de Derechos Humanos y Atención al Migrante en las delegaciones de Danlí, Trojes y Choluteca, trabaja para organizar y atender a un alto número

CLP_AR_004983

de personas en situación de movilidad que ingresan al país, proporcionándoles un trato digno y una atención eficiente al momento de realizar su control migratorio. El INM ha fortalecido estas delegaciones con Oficiales de Derechos Humanos que tienen presencia permanente y brindan atención a las personas con necesidad de protección internacional, de esta manera agilizar las solicitudes de refugio en el país. Por otro lado, se ha establecido la aplicación de una amnistía para la suspensión del cobro de la sanción administrativa, por lo que desde el 4 de agosto a la fecha se han beneficiado de esta amnistía más de 80,056 personas en el país, principalmente de nacionalidad venezolana, cubana, ecuatoriana y haitiana, pese a esto continua la tarea de asegurar que todas las personas reciban protección y

respeto a sus derechos. A su vez, el Estado hondureño está revisando y actualizando la política migratoria humanista donde se establezca un marco estratégico por 10 años.
• Asimismo, se han fortalecido las capacidades técnicas del INM en relación al proceso de análisis de las solicitudes de permisos especiales de permanencia en la categoría migratoria por razones humanitarias y solicitudes de refugio. También el INM, para asegurar acciones de asistencia y protección en el municipio de Danlí, inició el proceso de instalación de un albergue temporal para migrantes y personas con necesidad de protección en el cual recibirán alojamiento, asistencia humanitaria, registro biométrico. Dicho espacio contará con áreas diferenciadas para núcleos familiares, mujeres, hombres, niñez no acompañada y con áreas lúdicas.



## EMPLEOS Y MEDIOS DE VIDA

La Secretaría de Derechos Humanos por medio de la DIPPDIV ejecuta acciones del Componente Capital Semilla, que tiene como objetivo general, fortalecer y generar oportunidades para las personas desplazadas internamente por violencia por medio de actividades económicas y/o empleabilidad.

Además, la Secretaría de Relaciones Exteriores y Cooperación Internacional y la Asociación de Municipios de Honduras (AMHON) han establecido la firma de un Convenio de colaboración mutua con el objetivo de coordinar acciones vinculadas a la temática de protección y reinserción donde los gobiernos locales se vinculan con los procesos administrativos de gestión. Esto lo desarrolla la institución en atención a las personas retornadas, a la vez que lleva a cabo acciones conducentes para brindarles atención integral, que permita su reinserción a la sociedad de forma positiva.



©UNHCR/Santiago Escobar-Jaramillo

CLP_AR_004984



© ACNUR/Stephanie Galeana

<div style="writing-mode: vertical-rl">MÉXICO</div>

### TENER DOCUMENTACIÓN FACILITA A FAMILIA SALVADOREÑA EL ACCESO A EMPLEO Y EDUCACIÓN EN NUEVO LEÓN

Obtener documentos de identidad oficiales en México cambió la vida de María, una mujer refugiada salvadoreña, de 30 años, que vive con su esposo y sus dos hijos adolescentes en el estado de Nuevo León.

Contar con la Clave Única de Registro de Población (CURP) ha facilitado que María y su esposo accedan a empleos formales, ella como operadora de empaque en una compañía procesadora de carne y él como guardia de seguridad. La CURP también ha permitido que sus hijos puedan ir a la escuela.

"Cuando no tenía la CURP era medio difícil porque me la pedían en todos lados, hasta para la escuela de los niños y ahora que ya la tengo es más fácil, no tengo que batallar", comentó María.

La CURP sirve para registrar en forma individual a todas las personas que residen en México, nacionales y extranjeras, para formar parte del registro poblacional y constituye la llave para acceder a programas y servicios públicos.

Dentro de los esfuerzos del Marco Integral Regional para la Protección y Soluciones (MIRPS), la Comisión Mexicana de Ayuda a Refugiados, el Registro Nacional de Población y el Registro Civil de Nuevo León iniciaron un programa piloto a nivel estatal que permite a las personas solicitantes de asilo y refugiadas obtener la CURP, acreditar su identidad y acceder a diversos servicios como salud, educación y empleo. La familia de María fue de las primeras beneficiarias.

Antes de tener la CURP, señaló María, sus hijos podían inscribirse en la escuela, pero no tenían acceso a las calificaciones, hoy no tienen ningún obstáculo y sus hijos van contentos a sus clases. El más pequeño, de 10 años, quiere ser policía, el de 13, sueña con ser doctor.

"En la pandemia tomaron las clases en línea, casi no podían estudiar, pero ahora ya están en la escuela y lo disfrutan mucho. Los veo levantarse temprano y acomodar sus cosas para irse a la escuela y me da mucho gusto", dijo.

Desde diciembre de 2019, se han expedido más de 700 claves CURP a familias y personas solicitantes de la condición de refugiado como parte de este programa en Nuevo León. El esquema se ha replicado en Baja California, y está previsto que entre en vigor en los estados de México, Querétaro, Chiapas, Tabasco, Veracruz, Oaxaca, Puebla y Coahuila.

> "En la pandemia tomaron las clases en línea, casi no podían estudiar, pero ahora ya están en la escuela y lo disfrutan mucho. Los veo levantarse temprano y acomodar sus cosas para irse a la escuela y me da mucho gusto"

CLP_AR_004985

# CONTEXTO NACIONAL

En los últimos años, México ha recibido flujos mixtos cada vez más complejos de migrantes y solicitantes de refugio de la región y de fuera de ella. En 2021, se convirtió en el tercer país receptor de nuevas solicitudes de refugio a nivel mundial. México (a través de la Secretaría de Gobernación y la Secretaría de Relaciones Exteriores) ha participado en el MIRPS desde 2017 y ha buscado implementar una serie de compromisos para el diseño de modelos de protección y soluciones para las personas solicitantes de refugio y desplazadas internamente, fortaleciendo la autosuficiencia de las personas refugiadas, solicitantes de refugio y otros grupos vulnerables; así también se han adoptado estrategias para apoyar a las comunidades de acogida. Los compromisos asumidos en el proceso del MIRPS se complementan con una serie de promesas realizadas durante el Foro Mundial sobre los Refugiados 2019. A nivel regional, México tomó el liderazgo del proceso MIRPS asumiendo la primera presidencia Pro-tempore en 2019. A nivel nacional, México diseñó la Mesa Interinstitucional sobre Refugio y Protección Complementaria, presidida por la Subsecretaría de Derechos Humanos, Población y Migración de la Secretaría de Gobernación, que ofrece un foro político para validar las propuestas realizadas por cuatro grupos de trabajo técnicos del MIRPS centrados en el acceso a la educación (presidido por la Secretaría de Educación), el acceso a la salud (Secretaría de Salud), el empleo (Secretaría del Trabajo y Previsión Social), así como la documentación e identidad (Registro Nacional de Población-RENAPO). A nivel federal, la Comisión Mexicana de Refugiados (COMAR), apoyada por el ACNUR, juega un papel importante de apoyo como secretaría técnica de las mesas. Desde el año 2020, la COMAR extendió las mesas de trabajo del MIRPS al nivel local, con el objetivo de crear un entorno favorable de inclusión e integración en los principales entornos urbanos.

> En los últimos años, México ha recibido flujos mixtos cada vez más complejos de migrantes y solicitantes de refugio de la región y de fuera de ella.

# INDICADORES

## 47
Número de personas refugiadas y solicitantes de la condición de refugiado beneficiadas de salidas de Estaciones Migratorias

## 86,000
Número de personas solicitantes de la condición de refugiado que cuentan con CURP temporal

## 859
Número de NNA no acompañados solicitantes de asilo canalizados por la COMAR a autoridades de protección de niñez

## 1,629
Número de personas de interés canalizadas por la COMAR a servicios públicos de salud

## 26,328
Número de personas solicitantes y refugiadas beneficiadas por el Programa de Integración Local

## 50
Número de personas solicitantes y refugiadas atendidas a través del programa de Educación Sin Fronteras (INEA)

CLP_AR_004986

# AVANCES



### COORDINACIÓN

CONSOLIDACIÓN DE LA MESA INTERINSTITUCIONAL SOBRE REFUGIO Y PROTECCIÓN COMPLEMENTARIA. La Mesa interinstitucional sobre refugio y protección complementaria ha mantenido sesiones especializadas, a través de las mesas temáticas sobre salud, educación, documentación de identidad e inclusión en el mercado laboral de solicitantes de refugio. Esto facilita la coordinación entre los las distintas Secretarías o autoridades competentes y la Secretaría de Gobernación, las agencias de la ONU y las organizaciones de la sociedad civil.



### PROTECCIÓN

EMISIÓN DE DOCUMENTOS DEL REGISTRO DE POBLACIÓN PARA SOLICITANTES DE REFUGIO Y REFUGIADOS. El Registro Nacional de Población (RENAPO) ha expedido 357 mil Claves de Registro de Población (CURP) a solicitantes de refugio desde junio de 2018, facilitando su acceso a programas públicos y su integración. El RENAPO también ha instalado módulos de registro que emiten CURP temporal.

MEJORA EN LA EFICIENCIA DEL REGISTRO Y TRAMITACIÓN DE CASOS La COMAR ha fortalecido los procedimientos de registro, a través de la adopción de herramientas para la atención de solicitudes de reconocimiento de la condición de refugiado de manera simplificada, desarrolladas con el apoyo del equipo de la Iniciativa de Calidad de Asilo del ACNUR, que facilitan el "triaje" de casos. Por otra parte, se han desarrollado modificaciones en el Sistema de Información Sobre Refugiados (SIRE), con la finalidad de lograr una atención más ágil in situ en cada una de las Oficinas de Representación de la COMAR. De manera adicional se está en proceso de consolidar unidades de archivo con la finalidad de volverlos más eficientes mediante la digitalización de nuestros expedientes, los procedimientos de consulta electrónica, para la intervención y seguimiento de casos por parte de las distintas áreas de la COMAR. Asimismo, mediante la plataforma SIRE se busca también agilizar el intercambio de información entre la COMAR y la Secretaría de Relaciones Exteriores, sobre las condiciones prevalecientes en el país de origen de los solicitantes, a fin de contribuir a reducir los tiempos en la determinación de las solicitudes.

AUMENTO DE LA PROTECCIÓN DE LOS NIÑOS Y ADOLESCENTES EN EL CONTEXTO DE LA MOVILIDAD HUMANA En enero de 2021 entraron en vigor las reformas legales en materia de niñez en movilidad, que contribuirán a fortalecer el sistema de protección de la niñez, concretamente evitando que los niños, niñas y adolescentes permanezcan en las estaciones migratorias y en cualquier otro centro de detención, y garantizando que se priorice su interés superior. Por otra parte la COMAR forma parte del Programa Nacional de Protección de Niñas, Niños y Adolescentes (PRONAPINNA), para fortalecer las estrategias de atención de los niños, niñas y adolescentes en contexto de movilidad y con necesidad de protección internacional, por lo cual se ha reforzado la comunicación con las Procuradurías de Protección de Niñas, Niños y Adolescentes a nivel estatal y federal, para garantizar el acompañamiento a los niños, niñas y adolescentes desde el inicio de su trámite de reconocimiento de la condición de refugiado.

AVANCES EN LA PROTECCIÓN DE LOS DESPLAZADOS INTERNOS. Con la cooperación de la Secretaría de Relaciones Exteriores y a la Secretaría de Gobernación (SEGOB) la Relatora Especial de la ONU sobre los derechos humanos de los desplazados internos realizó su visita oficial a México del 29 de agosto al 9 de septiembre, para evaluar la situación de derechos humanos de las personas desplazadas internas en el país. Sus observaciones preliminares ya se encuentran disponibles y en junio de 2023 se podrán conocer sus recomendaciones finales.

La Ley General de Desplazamiento Interno Forzado continúa en revisión del Senado. En paralelo a la aprobación del marco normativo, la Unidad de Política Migratoria, Registro e Identidad de Personas de la Secretaría de Gobernación en conjunto con el ACNUR realizaron el informe titulado "Análisis del marco normativo y de política pública en México a nivel federal para la atención integral y protección de las personas en situación de desplazamiento forzado interno", el cual busca activar respuestas a partir del marco vigente a la par de la aprobación de la ley, así como identificar la legislación y políticas públicas que pueden redirigidas y/o armonizadas.

El Programa Nacional de Derechos Humanos 2020-2024 (PNDH) ha incluido acciones específicas en materia de Desplazamiento Forzado Interno, particularmente sobre prevención, análisis de riesgos, gestión de información, sensibilización y capacitación a personas servidoras públicas, entre otras. La Unidad de Política Migratoria, Registro e Identidad (UPMRIP) creó un micrositio en el que publica los avances en materia de desplazamiento interno, y en 2022 realizó dos publicaciones que dan muestra de una ruta para desarrollar un marco de respuesta; además, invitó a las entidades federativas a desarrollar un marco legislativo que considere los estándares nacionales e internacionales. La Suprema Corte de Justicia de la Nación (SCJN), con el apoyo del ACNUR y el CICR, emitió en junio de 2022 el Manual sobre Desplazamiento Interno el cual ofrece lineamientos claves para

El Registro Nacional de Población (RENAPO) ha expedido

# 357 mil

Claves de Registro de Población (CURP) a solicitantes de refugio desde junio de 2018

CLP_AR_004987

orientar al Poder Judicial de la Federación en la resolución de casos de desplazamiento interno.

En el marco del referido PNDH, la Coordinación para la Atención Integral de la Migración en la Frontera Sur (CAIMFS), en conjunto con la (COMAR), han realizado acciones en materia de difusión, entre ellas, el lanzamiento del libro "Desplazamiento Forzado Interno en México: del reconocimiento a los desafíos", el cual contiene 20 artículos escritos por expertos en la materia, académicos, organizaciones de la sociedad civil, organizaciones internacionales y servidores públicos de los diferentes niveles de gobierno.

Con el objetivo de impulsar el marco normativo en materia de desplazamiento interno, dichas instituciones han colaborado en la elaboración del proyecto de reglamento para la Ley de desplazamiento del Estado de Chiapas, y en el proyecto de Ley sobre desplazamiento en el Estado de Oaxaca, así como en el diseño del Programa de Atención Integral al desplazamiento del Estado de Guerrero.

En colaboración con el ACNUR, se implementa el proyecto piloto para la adecuación del Programa de Inclusión Local para contemplar a personas internamente desplazadas, que ha permitido la detección y atención de casos, así como el desarrollo de instrumentos administrativos para impulsar su acceso a vivienda, empleo, salud y educación, principalmente.

Aunado a lo descrito, se han realizado trabajos conjuntos con autoridades de la Unidad de Política Interior y Análisis de Información de la SEGOB, con el objetivo de desarrollar una metodología para la representación cartográfica de los incidentes de desplazamiento, particularmente en los estados de Guerrero, Chiapas y Oaxaca, a fin de que contar con insumos suficientes para la elaboración de análisis de riesgos, así como el diseño e implementación de programas de prevención. En ese mismo rubro, se elaboró un proyecto de Protocolo de prevención en materia de prevención al desplazamiento, el cual está siendo compartido con diversas autoridades federales y estatales para ser retroalimentando con experiencias locales. Además, la CAIMF-COMAR ha ofrecido cursos de capacitación y sensibilización en materia de desplazamiento interno a personas servidoras públicas del Sistema Nacional y Estatales para el Desarrollo Integral de la Familia, autoridades del estado de Chiapas y Guerrero, así como a los Centros de Justicia para Mujeres en los estados de la frontera sur.

> El Programa de Inclusión Local contempla a personas internamente desplazadas, y permite la detección y atención de casos, e impulsa el acceso a vivienda, empleo, salud y educación.



## EDUCACIÓN

INCLUSIÓN DE LOS Y LAS NIÑAS SOLICITANTES DE REFUGIO Y REFUGIADOS EN EL REGRESO A CLASES En el marco del inicio del ciclo escolar 2022-2023, la Subsecretaría de Educación Básica de la Secretaría de Educación Pública (SEP), la Comisión Mexicana de Ayuda a Refugiados (COMAR), ACNUR, y el Instituto Mexicano de la Radio (IMER), presentaron la campaña "Todas las infancias a la escuela, por el derecho a la educación de la niñez refugiada", con la que se busca sensibilizar sobre la importancia de la inserción escolar de niñas, niños y adolescentes refugiados en México, destacando la normativa de inclusión de NNA sin importar su condición migratoria.



## EMPLEO Y MEDIOS DE VIDA

PROGRAMA DE INTEGRACIÓN LABORAL Y REUBICACIÓN Desde 2016, más de 27,000 personas reconocidas como refugiadas han sido identificadas en el sur del país han sido reubicadas en el centro y el norte, concretamente en ciudades como Saltillo, Guadalajara y Monterrey, y se les ha conectado con oportunidades de trabajo con 400 empresas, acceso a la educación pública y apoyo psicosocial, lo que ha permitido a miles de familias disfrutar de oportunidades de subsistencia, lo que les ha permitido ser autosuficientes.

CAPACITACIÓN A 700 REPRESENTANTES DEL SECTOR PRIVADO EN INSERCIÓN LABORAL En conjunto con el Servicio Nacional del Empleo, la COMAR, el INM y el ACNUR capacitaron a más de 700 representantes de compañías del sector privado sobre la documentación requerida, al tiempo que se compartieron buenas prácticas para la inclusión de personas refugiadas y en movilidad en el mercado laboral mexicano.

*Capacitación a*
# 700
*representantes del sector privado en inserción laboral*

CLP_AR_004988

# PANAMÁ



## PROGRAMA DE EMPLEABILIDAD POTENCIA HABILIDADES DE PERSONAS REFUGIADAS EN PANAMÁ

Desde el primer día que Delsy llegó a Panamá, empezó a practicar su talento: el arte de la costura. En Colombia, era profesora de educación artística y tenía su emprendimiento de pijamas hechos a mano. Después de huir de su país, ella se encontró en Panamá sin otra opción que confiar en sí misma para seguir adelante.

Los primeros meses fueron muy difíciles para Delsy. Sin acceso a un trabajo digno que pudiera darle estabilidad laboral, Delsy explicó que "La diferencia es muy grande porque cuando trabajas sin documentación no tienes los derechos que tiene un trabajador (formal)".

Para mejorar sus habilidades de atención al cliente, Delsy entró a ser parte de Talento Sin Fronteras, un programa de empleabilidad para personas refugiadas desarrollado por ACNUR, la Agencia de la ONU para los Refugiados, ManpowerGroup y HIAS. El programa busca potenciar las capacidades y habilidades de las personas refugiadas y panameñas en condiciones de vulnerabilidad, creando oportunidades para mejorar su condición de vida a través del trabajo digno. Visto el potencial del programa, Talento sin Fronteras fue incluido en la estrategia de resiliencia del Municipio de Panamá.

"Nos enseñaron que lo primero que hay que hacer cuando llega el cliente es preguntarle su nombre, sonreírle y darle la bienvenida", cuenta Delsy, que aplicó inmediatamente lo aprendido en su día a día. "Me funcionó lo que aprendí, ya que empezaron a felicitar a mi jefa porque yo los atendía muy bien".

Desde 2018, más de 500 personas refugiadas y panameñas fueron capacitadas por los socios del programa para desarrollar las herramientas y habilidades necesarias para una postulación laboral de impacto, alineada a la realidad laboral actual.

Además de trabajar con las personas refugiadas, Talento sin Fronteras ha sensibilizado a 45 empresas en el país, algunas de las cuales han brindado la oportunidad a algunos de sus participantes para realizar pasantías en dichas empresas.

"Espero que muchas personas refugiadas puedan aprovechar Talento Sin Fronteras, porque es un programa que nos ayuda a crecer", dice Delsy con una sonrisa.

"En la pandemia tomaron las clases en línea, casi no podían estudiar, pero ahora ya están en la escuela y lo disfrutan mucho. Los veo levantarse temprano y acomodar sus cosas para irse a la escuela y me da mucho gusto"

© ACNUR/Talento Sin Fronteras/Johanna Ramos.

CLP_AR_004989

# CONTEXTO NACIONAL

La República de Panamá es actualmente el hogar de aproximadamente 12,027 personas en necesidad de protección internacional, con 2,573 refugiados y 9,449 solicitantes de la condición de refugiado; predominantemente de Colombia, El Salvador, Cuba, Nicaragua y Venezuela; quienes residen principalmente en el área metropolitana de la Ciudad de Panamá. Además de ser un país que recibe personas forzadas a huir, Panamá también es un país de tránsito para miles de personas de Venezuela, Haití, Cuba, África y el sur de Asia que cruzan el Tapón del Darién, camino al norte, en búsqueda de nuevas oportunidades, reunificación familiar o protección. En los últimos años, el Darién se ha convertido en uno de los puntos de tránsito más importantes y riesgosos de

la región. En 2021, aproximadamente 133,726 personas ingresaron al país de manera irregular a través de esta frontera, un número récord de personas en movimientos mixtos que se dirigen hacia el norte del continente.

Según el Servicio Nacional de Migración, en los primeros diez meses de 2022, más de 211,355 personas cruzaron el Tapón del Darién, superando toda la cifra récord del 2021, con entre 1,000-3000 entradas por día. En 2022, la nacionalidad más común de quienes han transitado es la venezolana. La mayoría de las personas que solicitan la condición de refugiado en Panamá ingresa al país por vía aérea, y los casos de personas que han más han solicitado la condición de refugiado en 2022 han sido de Colombia.

## INDICADORES
### (AL MES DE SEPTIEMBRE DE 2022)

**NÚMERO DE PERSONAS SOLICITANTES DE LA CONDICIÓN DE REFUGIADO Y REFUGIADOS RECONOCIDOS QUE RECIBIERON DOCUMENTO DE IDENTIFICACIÓN OFICIAL DURANTE EL AÑO 2022**

**539** 
Constancia de solicitud reconocimiento de la condición de refugiado (nuevos solicitantes)

**208** 
Carné de solicitantes de la condición de refugiado admitidos a trámite

**137** 
Renovación de Carnet de refugiado reconocido

**70** 
Carné de Residencia permanente

**133** 
Solicitudes de carné de residencia temporal

**1** 
Documento de apátrida reconocido

**12**  
Documento como personas en proceso de reconocimiento de apatridia

**6 A 12 MESES**
Tiempo promedio de procesamiento de solicitudes de reconocimiento de la condición de refugiado desde su recepción hasta la decisión final

**48** Permiso de trabajo para solicitantes de la condición de refugiado admitidos a trámite

**NÚMERO DE PERSONAS SOLICITANTES DE LA CONDICIÓN DE REFUGIADO ADMITIDAS AL PROCEDIMIENTO Y REFUGIADOS RECONOCIDOS QUE HAN SOLICITADO O RENOVADO PERMISO DE TRABAJO DURANTE EL 2022.**

**39** Renovación de Permiso de trabajo para refugiados reconocidos

**78** Permiso de trabajo indefinido para refugiados que obtuvieron residencia permanente

CLP_AR_004990

# AVANCES



### PROTECCIÓN

Mayores capacidades técnicas de funcionarios gubernamentales en protección internacional. En 2021 y 2022, más de 900 funcionarios de estamentos de seguridad pública (de la Policía Nacional, Servicio Nacional de Fronteras, Servicio Nacional Aeronaval), de la Defensoría del Pueblo, Instituto Nacional de la Mujer, CONARE, ONPAR, y el Ministerio de Relaciones Exteriores) participaron en entrenamientos sobre protección internacional. Reconocimiento de la apatridia. El Ministerio de Relaciones Exteriores continúa implementando los compromisos acordados en una reunión de alto nivel que llevó a la creación de un mecanismo interinstitucional para facilitar la coordinación e implementación del decreto ejecutivo que aprueba el procedimiento de apatridia. Con este avance, otras autoridades relacionadas han hecho anuentes de sus responsabilidades dentro de este marco legal.

Expansión de la presencia de ONPAR en áreas fronterizas críticas, para responder a la necesidad de las personas que ingresan al país como parte de movimientos mixtos a través del Tapón del Darién. Esto ha facilitado identificar y dar curso a casos específicos que han solicitado protección internacional en Panamá, y a otros que de otro modo no lo hubieran hecho. En coordinación con Registro Civil, Servicio Nacional de Migración y Defensoría del Pueblo, se realizó el registro de 90 recién nacidos en la Provincia de Darién en 2020 de personas que se encontraban en los movimientos mixtos. Este es un importante logro para reducir el riesgo de apatridia en el futuro, ya que se asegura que su registro de nacimiento y se le reconoce como nacionales del Estado Panameño al haber nacido en el territorio.



### INTEGRACIÓN LOCAL

La participación de los solicitantes de la condición de refugiado y refugiados en consultas públicas. El año pasado, solicitantes de la condición de refugiado y refugiados participaron en una consulta nacional para la creación de políticas públicas inclusivas orientadas a cerrar brechas económicas, sociales, educativas y de salud, llamada "Pacto Bicentenario". Los solicitantes de la condición de refugiado y refugiados presentaron 14 recomendaciones como su contribución a esta iniciativa. Participación en actividades coordinadas por gobiernos locales A través de un acuerdo con el Municipio de La Chorrera, se incluyó a solicitantes de la condición de refugiado y refugiados en programas de prevención de violencia basada en género; no solo como beneficiarios, sino también como actores clave, empoderados para brindar apoyo y consejo para otras personas en la comunidad. Adicionalmente, espacios de coexistencia pacífica se llevaron a cabo mediante entrenamientos deportivos enfocados en la integración y protección de más de 200 niños y niñas a través de una oferta innovadora en educación socioemocional en las instituciones educativas junto a Futbol con Corazón.

> Solicitantes de la condición de refugiado y refugiados participaron en una consulta nacional para la creación de políticas públicas inclusivas y presentaron 14 recomendaciones a esta iniciativa.

CLP_AR_004991



## EMPLEOS Y MEDIOS DE VIDA

Intervenciones efectivas y soluciones duraderas apoyaron a las personas refugiadas en su inserción en los mercados locales mediante empleabilidad y emprendimiento. La implementación del programa semipresencial de empleabilidad "Talento sin Fronteras", en alianza con ManpowerGroup y HIAS, continuó, para fortalecer las capacidades y habilidades de personas reconocidas como refugiados promoviendo su acceso al mercado laboral formal, y facilitando su integración en el país. Adicionalmente para el área de emprendimiento junto a Fundación Ciudad del Saber, se implementó un nuevo programa de medios de vida llamado *Emprendiendo juntos* el cual tiene como objetivo ayudar a los refugiados y solicitantes de la condición de refugio a recuperarse del impacto socioeconómico de la pandemia, así como promover asociaciones innovadoras para la inclusión de emprendimientos hechos por refugiados. Estos programas facilitan la integración de la población refugiada en los sistemas económicos y sociales de Panamá promoviendo su autosuficiencia y mejorando el acceso a los recursos productivos y a la incorporación de estrategias colectivas que tiendan a la asociatividad.

Acceso a formación profesional para refugiados El Instituto Nacional de Formación Profesional y Capacitación para el Desarrollo Humano (INADEH) ha habilitado formalmente que los refugiados puedan acceder a sus programas de capacitación profesional, los cuales solían estar disponibles solamente para ciudadanos panameños y para extranjeros con más de 10 años de residir en el país.



© UNHCR/Santiago Escobar-Jarami

> El programa de empleabilidad "Talento sin Fronteras", fortalece las capacidades y habilidades de personas refugiadas promoviendo su acceso al mercado laboral formal, y facilitando su integración en el país.

CLP_AR_004992



© UNHCR/Pierre Albouy

# PLATAFORMA DE APOYO AL MIRPS

—

CLP_AR_004993

A tres años de su lanzamiento a los márgenes del Foro Mundial sobre los Refugiados en 2019, la Plataforma de Apoyo al MIRPS se presenta como un mecanismo eficiente para impulsar los esfuerzos de los países MIRPS en ofrecer protección y soluciones al desplazamiento forzado en Centroamérica y México. En línea con el Pacto Mundial sobre los Refugiados, la Plataforma de Apoyo al MIRPS continúa aprovechando el apoyo de una amplia gama de actores para promover una mayor responsabilidad compartida.

Actualmente, los miembros de la Plataforma de Apoyo incluyen a Argentina, Brasil, Canadá, Colombia, la Unión Europea (UE), Francia, España, Suiza, Uruguay, los Estados Unidos de América, el Banco Interamericano de Desarrollo (BID), el Grupo del Banco Mundial, el Comisión Económica para América Latina y el Caribe (CEPAL) y la Organización de los Estados Americanos (OEA). El Alto Comisionado de las Naciones Unidas para los Refugiados (ACNUR) actúa como Secretaría de la Plataforma.

## MIEMBROS DE LA PLATAFORMA DE APOYO AL MIRPS

    

    

    



© ACNUR/Soo-Jung Kim

Canadá asumió el cargo de Presidencia de la Plataforma de Apoyo en julio de 2021, luego de que España finalizara su periodo como Presidencia inaugural. El Evento de Solidaridad Internacional para Fortalecer la Protección y Promover Soluciones para los Desplazados Forzosos y las Comunidades de Acogida en Centroamérica y México en septiembre de 2022, marcó la culminación del mandato de Canadá y el traspaso a los Estados Unidos de América como Presidencia entrante.

Presidencia de la Plataforma de Apoyo, Canadá centró su trabajo destacando el tema **"Protección y Empoderamiento de Mujeres y Niñas en Situación de Desplazamiento"** buscando llamar la atención sobre las necesidades de protección de las mujeres, niñas, y personas LGBTIQ+ desplazadas forzosamente en situaciones vulnerables. Canadá se centró en tres objetivos principales durante su mandato como Presidencia de la Plataforma de Apoyo del MIRPS, que a su vez promovió los objetivos principales de la Plataforma de Apoyo como una aplicación regional del Pacto Mundial sobre los Refugiados.

CLP_AR_004994

**Objetivo 1: Impulsar los compromisos políticos, financieros, técnicos y materiales para atender las necesidades de índole humanitaria y de desarrollo identificadas por los países del MIRPS**

Canadá generó espacios y diálogos entre los países MIRPS y los miembros de la Plataforma de Apoyo al MIRPS para trabajar en colaboración e intercambiar buenas prácticas y experiencias. De marzo a junio de 2022, se realizaron cinco Talleres Técnicos para facilitar el intercambio de las mejores prácticas sobre: i) recepción y admisión, ii) desplazamiento interno, iii) formación profesional y participación en el mercado laboral, iv) gobernanza local, y v) alianzas con el sector privado. Los Talleres Técnicos resultaron en la provisión de apoyo técnico entre los Países MIRPS y los Miembros de la Plataforma de Apoyo al MIRPS para avanzar elementos de los Planes de Acción Nacionales MIRPS, incluso a través de los Grupos de Trabajo del MIRPS.

La **Reunión de Hermanamiento Regional sobre Fortalecimiento de los Sistemas de Asilo** en Panamá en mayo de 2022, reforzó la colaboración entre los Países MIRPS, reflejando ejemplos de responsabilidad compartida en la región. A partir del mismo, se generó un plan de colaboraciones que se materializaron a lo largo del año en visitas de terreno y talleres regionales presenciales y virtuales (ver más información en la sección sobre Grupo de Trabajo sobre Recepción, Admisión y Procesamiento de personas con necesidad de protección internacional, página 23).

En mayo de 2022, el **"Evento Insignia sobre Reasentamiento, Vías Complementarias, e Integración"** reunió a la Plataforma de Apoyo al MIRPS, los Países MIRPS, y otros actores estratégicos para compartir buenas prácticas y lecciones aprendidas con respecto a la política y el procesamiento del reasentamiento, las vías complementarias, así como políticas y prácticas de integración. Durante tres días del evento, participaron 112 representantes de gobiernos, sociedad civil, academia, Naciones Unidas y OEA, que conformaron 8 paneles de expertos con 41 expertos. Los participantes subrayaron la necesidad crítica de que la comunidad internacional amplíe el acceso a protección para las personas de Centroamérica y México. Este evento sentó las bases para la organización de un taller técnico en junio de 2022, donde las empresas canadienses, las Cámaras de Comercio de Canadá, y asociaciones empresariales con presencia y operaciones en Centroamérica y México lanzaron discusiones sobre oportunidades para animar a otras empresas a implementar sus propias prácticas o iniciativas de contratación inclusiva para las personas refugiasdas y desplazadas por la fuerza.

El **Evento de Solidaridad Internacional para Fortalecer la Protección y Promover Soluciones para los Desplazados Forzosos y las Comunidades de Acogida en Centroamérica y México** coorganizado por Canadá y los Estados Unidos de América en colaboración con Honduras, en la ciudad de Nueva York en septiembre de 2022 a los márgenes del Asamblea General de la ONU, generó USD 210 millones en compromisos financieros como amplias expresiones de solidaridad y apoyo a las respuestas operativas en la región a través de una variedad de socios, junto con otras formas generosas de apoyo técnico y político en la región. Se acogió con satisfacción la participación de una Una amplia gama de actores, incluidos los países MIRPS y los Estados Miembros de la Plataforma de Apoyo al MIRPS, instituciones financieras internacionales, representantes del sector privado, la academia, el Mecanismo Regional de la Sociedad Civil para el MIRPS, organismos de las Naciones Unidas, y el CICR participaron en el evento.

**Objetivo 2: Incrementar la visibilidad internacional del MIRPS y los compromisos de apoyo por parte de un espectro más amplio de actores**

Múltiples eventos de alto nivel aumentaron la visibilidad internacional del MIRPS, comenzando con el **"Evento virtual de alto nivel sobre protección y empoderamiento de mujeres y niñas desplazadas de América Central y México"** en diciembre de 2021, coorganizado por Canadá y Honduras. La Plataforma se unió a los 16 Días de Activismo contra la Violencia de Género de la Agencia de la ONU para los Refugiados, para llamar la atención sobre las necesidades de protección internacional y la importancia de empoderar a las mujeres y niñas refugiadas en la región, así como la necesidad de proteger los derechos humanos de las personas desplazadas, mujeres, niñas y personas LGBTIQ+ en situaciones vulnerables, y movilizar a la comunidad internacional para ampliar el apoyo a estos esfuerzos regionales. En este evento, Canadá anunció un compromiso de USD 10 millones durante los próximos cuatro años, planeando trabajar con la Organización Internacional para las Migraciones (OIM) y la Agencia de las Naciones Unidas para los Refugiados (ACNUR) para ayudar a las mujeres y niñas afectadas por la migración irregular y el desplazamiento forzado en Honduras, Guatemala, y El Salvador.

Canadá buscó involucrar sustancialmente a los miembros de la Plataforma de Apoyo a lo largo de su mandato, al mismo tiempo ampliaba la base de apoyo al involucrarse con nuevos actores. En el "Evento de Solidaridad Internacional" en septiembre de 2022, la Plataforma de Apoyo recibió con satisfacción al Banco Mundial como nuevo miembro. La membresía del Banco Mundial y del Banco Interamericano de Desarrollo (BID), así como el involucramiento del Banco Centroamericano de Integración Económica (BCIE), representan una importante oportunidad para continuar aumentado la colaboración del MIRPS con las instituciones

CLP_AR_004995

financieras internacionales, con el propósito de alinear las agendas de reducción de la pobreza y desarrollo económico, vinculando las inversiones en apoyo de las personas desplazadas y las comunidades de acogida, y facilitando la creación de soluciones duraderas.

Como resultado del acercamiento para aumentar el compromiso con el sector privado, Palliser Furniture y Tent Foundation participaron en el "Evento de Solidaridad Internacional".

Doce empresas y actores del sector privado respaldaron una declaración conjunta que reconoció el papel fundamental del sector privado en la contribución a las soluciones para las poblaciones desplazadas y se comprometió a explorar formas de mejorar las oportunidades económicas y de capacitación, los medios de vida y la autosuficiencia de los refugiados, solicitantes de asilo, retornados y otras poblaciones desplazadas por la fuerza en la región.

## PRÓXIMOS PASOS

En el transcurso de 2022, la Plataforma de Apoyo al MIRPS, junto con los Países MIRPS, lograron avances significativos en la adopción de un enfoque inclusivo de la sociedad como un todo, que reunió a los gobiernos, la sociedad civil, la academia, el sector privado y las personas refugiadas y desplazadas, y sigue siendo un ejemplo exitoso de colaboración regional en apoyo a la implementación del Pacto Mundial sobre los Refugiados.

Desde que asumió el cargo de la Presidencia de la Plataforma de Apoyo en septiembre de 2022, los Estados Unidos de América ha planteado alinear el trabajo de la Plataforma con el Plan de la Presidencia Pro-tempore Panamá 2023, para brindar apoyo concreto a los Países MIRPS en la implementación de sus Planes de Acción Nacionales y esfuerzos regionales para brindar protección y buscar soluciones a las poblaciones desplazadas forzadamente en Centroamérica y México.

> **Objetivo 3: Fortalecer la Plataforma de Apoyo como mecanismo eficaz para movilizar respuestas integrales a la situación del desplazamiento forzado en la región**

Como la segunda Presidencia de la Plataforma de Apoyo al MIRPS, Canadá se basó en el progreso realizado por España como Presidencia inaugural al continuar fortaleciendo la gobernanza de la Plataforma de Apoyo MIRPS. Canadá presentó el Modelo de Liderazgo de la Troika, formalizando los roles de la Presidencia actual, la Presidencia anterior y la Presidencia entrante, con el fin de apoyar la sostenibilidad de la Plataforma y reforzar su gobernanza.

A lo largo de su mandato, Canadá buscó enfocarse en actividades prácticas y técnicas, como mesas redondas y talleres técnicos, así como el intercambio de los espacios de diálogo y discusión creados por España para intercambiar ideas y mejores prácticas entre los países del MIRPS y los miembros de la Plataforma de Apoyo.



© UNHCR/Tito Herrera

CLP_AR_004996



CLP_AR_004997

# MIRPS 2022

**Informe anual del Marco Integral
Regional para la Protección y Soluciones**



**MIRPS**

**Marco Integral
Regional para
la Protección y
Soluciones**



CLP_AR_004998

## *1.- SOLICITUDES*

### SOLICITUDES POR DELEGACION

| DELEGACION | 2020 CASOS | 2020 PERSONAS | 2021 CASOS | 2021 PERSONAS | 2022 CASOS | 2022 PERSONAS |
|---|---|---|---|---|---|---|
| BAJA CALIFORNIA | 1,306 | 1,676 | 2,462 | 3,683 | 2,406 | 3,416 |
| **CDMX | 5,840 | 7,714 | 11,932 | 18,101 | 12,798 | 17,364 |
| CHIAPAS/TAPA. | 17,146 | 26,503 | 48,849 | 89,540 | 46,127 | 76,239 |
| CHIAPAS/PALEN. | 124 | 157 | 3,437 | 5,689 | 5,452 | 7,967 |
| TABASCO | 1,988 | 2,745 | 4,323 | 7,110 | 2,976 | 5,728 |
| **VERACRUZ | 1,574 | 2,119 | 3,484 | 5,668 | 5,595 | 7,764 |
| TOTAL | 27,978 | 40,914 | 74,477 | 129,791 | 75,354 | 118,478 |

### SOLICITUDES DE 2013-2022 (personas)

| 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|
| 1,296 | 2,137 | 3,423 | 8,796 | 14,619 | 29,569 | 70,314 | 40,914 | 129,791 | 118,478 |

Total de solicitantes del 2013 a 2022   419,337

## 2.- COMPARATIVO ENERO-DICIEMBRE (2020-2021-2022)

### ****SOLICITANTES DE ENERO-DICIEMBRE 2020

| ENE. | FEB. | MAR. | ABR. | MAY. | JUN. | JUL. | AGO. | SEPT. | OCT. | NOV. | DIC. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 5,966 | 5,900 | 5,278 | 968 | 928 | 1,225 | 1,760 | 1,966 | 3,309 | 4,644 | 4,208 | 4,762 |

total Ene-Dic 2020   40,914

### SOLICITUDES DE ENERO-DICIEMBRE 2021

| ENE. | FEB. | MAR. | ABR. | MAY. | JUN. | JUL. | AGO. | SEPT. | OCT. | NOV. | DIC. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 6,497 | 6,932 | 8,993 | 9,061 | 9,209 | 10,297 | 12,677 | 12,930 | 12,770 | 17,492 | 14,787 | 8,146 |

total Ene-Dic 2021   129,791

### SOLICITUDES DE ENERO-DICIEMBRE 2022

| ENE. | FEB. | MAR. | ABR. | MAY. | JUN. | JUL. | AGO. | SEPT. | OCT. | NOV. | DIC. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 5,838 | 10,170 | 13,130 | 10,396 | 9,132 | 9,675 | 8,504 | 10,742 | 8,972 | 11,487 | 14,188 | 6,244 |

total Ene-Dic 2022   118,478

### ***SOLICITANTES X NACIONALIDAD 2020, 2021 Y 2022 (PERSONAS)

| TOP10 | NACIONALIDAD | 2020 PERSONAS |
|---|---|---|
| 1- | HONDURAS | 15,364 |
| 2- | HAITÍ | 5,909 |
| 3- | CUBA | 5,712 |
| 4- | EL SALVADOR | 4,011 |
| 5- | VENEZUELA | 3,241 |
| 6- | GUATEMALA | 3,002 |
| 7- | CHILE | 806 |
| 8- | NICARAGUA | 803 |
| 9- | COLOMBIA | 496 |
| 10- | BRASIL | 368 |
|  | OTROS PAISES | 1,202 |
|  | TOTAL | 40,914 |

| TOP 10 | NACIONALIDAD | 2021 PERSONAS |
|---|---|---|
| 1- | HAITÍ | 50,954 |
| 2- | HONDURAS | 36,080 |
| 3- | CUBA | 8,249 |
| 4- | CHILE | 6,893 |
| 5- | VENEZUELA | 6,123 |
| 6- | EL SALVADOR | 5,944 |
| 7- | GUATEMALA | 4,321 |
| 8- | BRASIL | 3,800 |
| 9- | NICARAGUA | 2,894 |
| 10- | COLOMBIA | 1,236 |
|  | OTROS PAISES | 3,497 |
|  | TOTAL | 129,791 |

| TOP 10 | NACIONALIDAD | 2022 PERSONAS |
|---|---|---|
| 1- | HONDURAS | 31,086 |
| 2- | CUBA | 18,087 |
| 3- | HAITÍ | 17,068 |
| 4- | VENEZUELA | 14,823 |
| 5- | NICARAGUA | 8,971 |
| 6- | EL SALVADOR | 7,803 |
| 7- | GUATEMALA | 5,271 |
| 8- | BRASIL | 2,592 |
| 9- | COLOMBIA | 2,482 |
| 10- | REPÚBLICA DOMINICANA | 1,421 |
|  | OTROS PAISES | 8,874 |
|  | TOTAL | 118,478 |



COMPARATIVO DE LOS AÑOS 2020, 2021 Y 2022.

## 3.- TASA DE RECONOCIDOS COMO REFUGIADOS (TOP 5)

### TASA DE POSITIVOS EN RELACION AL TOTAL DE RESUELTOS 2019.

| PAIS | RESUELTOS: Positivo, P.C, Negativo. | POSITIVOS | TASA DE POSITIVOS |
|---|---|---|---|
| HONDURAS | 8,214 | 6,273 | 76% |
| VENEZUELA | 4,742 | 4,678 | 99% |
| EL SALVADOR | 3,470 | 2,364 | 68% |
| CUBA | 1,766 | 340 | 19% |
| GUATEMALA | 992 | 467 | 47% |
| OTROS | 1,316 | 546 | 41% |
| TOTAL | 20,500 | 14,668 | 72% |

### TASA DE P.C. EN RELACION AL TOTAL DE RESUELTOS 2019.

| PAIS | RESUELTOS: Positivo, PC, Negativo. | PC | TASA DE P.C. |
|---|---|---|---|
| HONDURAS | 8,214 | 528 | 6% |
| VENEZUELA | 4,742 | 2 | 0% |
| EL SALVADOR | 3,470 | 617 | 18% |
| CUBA | 1,766 | 134 | 8% |
| GUATEMALA | 992 | 150 | 15% |
| OTROS | 1,316 | 300 | 23% |
| TOTAL | 20,500 | 1,731 | 8% |

### TASA DE POSITIVOS MAS P.C. EN RELACION AL TOTAL DE RESUELTOS 2019.

| PAIS | RESUELTOS: Positivo, P.C. Negativo. | POSITIVOS + P.C. | TASA DE POSITIVO y P.C. |
|---|---|---|---|
| HONDURAS | 8,214 | 6,801 | 83% |
| VENEZUELA | 4,742 | 4,680 | 99% |
| EL SALVADOR | 3,470 | 2,981 | 86% |
| CUBA | 1,766 | 474 | 27% |
| GUATEMALA | 992 | 617 | 62% |
| OTROS | 1,316 | 846 | 64% |
| TOTAL | 20,500 | 16,399 | 80% |

### TASA DE POSITIVOS EN RELACION AL TOTAL DE RESUELTOS 2020.

| PAIS | RESUELTOS: Positivo, PC, Negativo. | POSITIVOS | TASA DE POSITIVOS |
|---|---|---|---|
| HONDURAS | 7,508 | 6,408 | 85% |
| VENEZUELA | 4,333 | 4,233 | 98% |
| CUBA | 3,431 | 1,537 | 45% |
| EL SALVADOR | 2,400 | 2,003 | 83% |
| HAITI | 2,319 | 501 | 22% |
| OTROS | 2,683 | 1,274 | 47% |
| TOTAL | 22,674 | 15,956 | 70% |

### TASA DE P.C. EN RELACION AL TOTAL DE RESUELTOS 2020.

| PAIS | RESUELTOS: Positivo, PC, Negativo. | PC | TASA DE P.C. |
|---|---|---|---|
| HONDURAS | 7,508 | 7 | 0% |
| VENEZUELA | 4,333 | 12 | 0% |
| CUBA | 3,431 | 133 | 4% |
| EL SALVADOR | 2,400 | - | 0% |
| HAITI | 2,319 | 664 | 29% |
| OTROS | 2,683 | 312 | 12% |
| TOTAL | 22,674 | 1,128 | 5% |

### TASA DE POSITIVOS MAS P.C. EN RELACION AL TOTAL DE RESUELTOS 2020.

| PAIS | RESUELTOS: Positivo, P.C. Negativo. | POSITIVO + P.C. | TASA DE POSITIVO y P.C. |
|---|---|---|---|
| HONDURAS | 7,508 | 6,415 | 85% |
| VENEZUELA | 4,333 | 4,245 | 98% |
| CUBA | 3,431 | 1,670 | 49% |
| EL SALVADOR | 2,400 | 2,003 | 83% |
| HAITI | 2,319 | 1,165 | 50% |
| OTROS | 2,683 | 1,586 | 59% |
| TOTAL | 22,674 | 17,084 | 75% |

### TASA DE POSITIVOS EN RELACION AL TOTAL DE RESUELTOS 2021.

| PAIS | RESUELTOS: Positivo, PC, Negativo. | POSITIVOS | TASA DE POSITIVOS |
|---|---|---|---|
| HONDURAS | 17,705 | 14,954 | 84% |
| HAITI | 5,522 | 1,261 | 23% |
| EL SALVADOR | 3,575 | 3,040 | 85% |
| VENEZUELA | 3,995 | 3,874 | 97% |
| CUBA | 2,568 | 1,779 | 69% |
| OTROS | 4,737 | 2,446 | 52% |
| TOTAL | 38,102 | 27,354 | 72% |

### TASA DE P.C. EN RELACION AL TOTAL DE RESUELTOS 2021.

| PAIS | RESUELTOS: Positivo, PC, Negativo. | PC | TASA DE P.C. |
|---|---|---|---|
| HONDURAS | 17,705 | 4 | 0% |
| HAITI | 5,522 | 657 | 12% |
| EL SALVADOR | 3,575 | - | 0% |
| VENEZUELA | 3,995 | 3 | 0% |
| CUBA | 2,568 | 2 | 0% |
| OTROS | 4,737 | 182 | 4% |
| TOTAL | 38,102 | 846 | 2% |

### TASA DE POSITIVOS MAS P.C. EN RELACION AL TOTAL DE RESUELTOS 2021.

| PAIS | RESUELTOS: Positivo, P.C. Negativo. | POSITIVO + P.C. | TASA DE POSITIVO y P.C. |
|---|---|---|---|
| HONDURAS | 17,705 | 14,958 | 84% |
| HAITI | 5,522 | 1,918 | 35% |
| EL SALVADOR | 3,575 | 3,040 | 85% |
| VENEZUELA | 3,995 | 3,875 | 97% |
| CUBA | 2,568 | 1,781 | 69% |
| OTROS | 4,737 | 2,628 | 55% |
| TOTAL | 38,102 | 28,200 | 74% |

### TASA DE POSITIVOS EN RELACION AL TOTAL DE RESUELTOS 2022.

| PAIS | RESUELTOS: Positivo, PC, Negativo. | POSITIVOS | TASA DE POSITIVOS |
|---|---|---|---|
| HONDURAS | 11,845 | 10,647 | 90% |
| HAITI | 8,502 | 1,061 | 12% |
| VENEZUELA | 3,888 | 3,597 | 93% |
| EL SALVADOR | 3,100 | 2,712 | 87% |
| CUBA | 1,884 | 932 | 49% |
| OTROS | 5,543 | 2,255 | 41% |
| TOTAL | 34,762 | 21,204 | 61% |

### TASA DE P.C. EN RELACION AL TOTAL DE RESUELTOS 2022.

| PAIS | RESUELTOS: Positivo, PC, Negativo. | PC | TASA DE P.C. |
|---|---|---|---|
| HONDURAS | 11,845 | 1 | 0% |
| HAITI | 8,502 | 596 | 7% |
| VENEZUELA | 3,888 | 1 | 0% |
| EL SALVADOR | 3,100 | - | 0% |
| CUBA | 1,884 | - | 0% |
| OTROS | 5,543 | 133 | 2% |
| TOTAL | 34,762 | 731 | 2% |

### TASA DE POSITIVOS MAS P.C. EN RELACION AL TOTAL DE RESUELTOS 2022.

| PAIS | RESUELTOS: Positivo, P.C. Negativo. | POSITIVO + P.C. | TASA DE POSITIVO y P.C. |
|---|---|---|---|
| HONDURAS | 11,845 | 10,648 | 90% |
| HAITI | 8,502 | 1,657 | 19% |
| VENEZUELA | 3,888 | 3,598 | 93% |
| EL SALVADOR | 3,100 | 2,712 | 87% |
| CUBA | 1,884 | 932 | 49% |
| OTROS | 5,543 | 2,388 | 43% |
| TOTAL | 34,762 | 21,935 | 63% |

## 4.- RECONOCIDOS COMO REFUGIADOS, 2013 A 2022 (TOP 7)

REFUGIADOS RECONOCIDOS, POR NACIONALIDAD TOTAL (2013 - 2022).

| PAIS | RESUELTOS: Positivo, PC, Negativo. | RECONOCIDOS POSITIVOS | OTORGADOS P.C. | NO RECONOCIDOS (Negativo) |
|---|---|---|---|---|
| HONDURAS | 54,908 | 41,472 | 2,640 | 10,796 |
| VENEZUELA | 22,538 | 21,825 | 31 | 682 |
| EL SALVADOR | 20,765 | 13,583 | 2,509 | 4,673 |
| HAITÍ | 16,829 | 2,868 | 1,968 | 11,993 |
| CUBA | 9,882 | 4,618 | 277 | 4,987 |
| GUATEMALA | 7,201 | 3,749 | 446 | 3,006 |
| NICARAGUA | 3,588 | 1,862 | 474 | 1,252 |
| OTROS | 6,276 | 2,053 | 544 | 3,679 |
| TOTAL | 141,987 | 92,030 | 8,889 | 41,068 |

| PAIS | POSITIVOS + P.C. |
|---|---|
| HONDURAS | 44,112 |
| VENEZUELA | 21,856 |
| EL SALVADOR | 16,092 |
| CUBA | 4,895 |
| HAITÍ | 4,836 |
| GUATEMALA | 4,195 |
| NICARAGUA | 2,336 |
| OTROS | 2,597 |
| TOTAL | 100,919 |

* El número de solicitudes, no necesariamente es el número de solicitudes en trámite, toda vez que puede haber anexiones o algunas de ellas se encuentran aún en prevención.

** Se debe tomar en cuenta que la oficina de Veracruz incluye además de ese estado a Oaxaca, Quintana Roo, Campeche y Yucatan, mientras que la oficina de CDMX cubre, la CDMX  y todas las entidades restantes con la excepción de las cubiertas por Veracruz, Chiapas, Tabasco y Baja

*** Los datos presentados son preliminares, tienen carácter informativo y no son definitivos.

**** Solicitudes refiere al titular del procedimiento, más dependientes en caso de tenerlos. Solicitantes refiere a personas individuales.

P.C.= Protección Complementaria.

(Datos al cierre de Diciembre 2022)

31/Diciembre/2022

CLP_AR_005707

**1.- SOLICITUDES**

*SOLICITUDES POR DELEGACION*

| DELEGACION | 2020 | | 2021 | | 2022 Octubre. | |
|---|---|---|---|---|---|---|
| | CASOS | PERSONAS | CASOS | PERSONAS | CASOS | PERSONAS |
| BAJA CALIFORNIA | 1,306 | 1,676 | 2,462 | 3,683 | 2,113 | 3,039 |
| **CDMX | 5,842 | 7,716 | 11,920 | 18,096 | 9,097 | 12,457 |
| CHIAPAS/TAPACHU. | 17,146 | 26,504 | 48,850 | 89,566 | 38,987 | 64,360 |
| CHIAPAS/PALTA. | 124 | 157 | 3,437 | 5,689 | 4,501 | 6,505 |
| TABASCO | 1,988 | 2,745 | 4,323 | 7,110 | 2,521 | 4,900 |
| **VERACRUZ | 1,574 | 2,119 | 3,485 | 5,669 | 4,783 | 6,712 |
| TOTAL | **27,980** | **40,917** | **74,477** | **129,813** | **62,002** | **97,973** |

*SOLICITANTES AÑOS 2013-2022 (personas)*

| 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|
| 1,296 | 2,137 | 3,423 | 8,796 | 14,619 | 29,570 | 70,317 | 40,917 | 129,813 | 97,973 |
| | | | | | | | Total de solicitantes del 2013 a 2022 | | 398,861 |

***SOLICITANTES X NACIONALIDAD 2020, 2021 Y 2022 (PERSONAS)**

| TOP10 | NACIONALIDAD | 2020 PERSONAS | TOP 10 | NACIONALIDAD | 2021 PERSONAS | TOP 10 | NACIONALIDAD | Oct. 2022 |
|---|---|---|---|---|---|---|---|---|
| 1- | HONDURAS | 15,364 | 1- | HAITÍ | 50,972 | 1- | HONDURAS | 26,223 |
| 2- | HAITÍ | 5,909 | 2- | HONDURAS | 36,085 | 2- | CUBA | 15,730 |
| 3- | CUBA | 5,712 | 3- | CUBA | 8,249 | 3- | HAITÍ | 13,493 |
| 4- | EL SALVADOR | 4,012 | 4- | CHILE | 6,896 | 4- | VENEZUELA | 10,214 |
| 5- | VENEZUELA | 3,243 | 5- | VENEZUELA | 6,122 | 5- | NICARAGUA | 6,813 |
| 6- | EL SALVADOR | 3,002 | 6- | EL SALVADOR | 5,945 | 6- | EL SALVADOR | 6,651 |
| 7- | CHILE | 808 | 7- | GUATEMALA | 4,121 | 7- | GUATEMALA | 4,460 |
| 8- | NICARAGUA | 803 | 8- | BRASIL | 3,800 | 8- | BRASIL | 3,146 |
| 9- | COLOMBIA | 496 | 9- | NICARAGUA | 2,894 | 9- | COLOMBIA | 2,091 |
| 10- | COLOMBIA | 368 | 10- | COLOMBIA | 1,236 | 10- | REPÚBLICA DOMINICANA | 1,154 |
| | OTROS PAÍSES | 1,202 | | OTROS PAÍSES | 3,493 | | OTROS PAÍSES | 7,498 |
| | **TOTAL** | **40,917** | | **TOTAL** | **129,813** | | **TOTAL** | **97,973** |

**2.- COMPARATIVO ENERO-OCTUBRE (2020-2021-2022)**

****SOLICITANTES DE ENERO-OCTUBRE 2020**

| ENE. | FEB. | MAR. | ABR. | MAY. | JUN. | JUL. | AGO. | SEPT. | OCT. |
|---|---|---|---|---|---|---|---|---|---|
| 5,966 | 5,900 | 5,278 | 968 | 928 | 1,226 | 1,760 | 1,966 | 3,311 | 4,644 |
| **total Ene-Oct 2020** | 31,947 | | | | | | | | |

*SOLICITANTES DE ENERO-OCTUBRE 2021*

| ENE. | FEB. | MAR. | ABR. | MAY. | JUN. | JUL. | AGO. | SEPT. | OCT. |
|---|---|---|---|---|---|---|---|---|---|
| 6,497 | 6,932 | 8,993 | 9,061 | 9,209 | 10,298 | 12,677 | 12,943 | 12,781 | 17,489 |
| **total Ene-Oct 2021** | 106,880 | | | | | | | | |

*SOLICITANTES DE ENERO-OCTUBRE 2022*

| ENE. | FEB. | MAR. | ABR. | MAY. | JUN. | JUL. | AGO. | SEPT. | OCT. |
|---|---|---|---|---|---|---|---|---|---|
| 5,839 | 10,172 | 13,127 | 10,393 | 9,130 | 9,677 | 8,506 | 10,762 | 8,976 | 11,391 |
| **total Ene-Oct 2022** | 97,973 | | | | | | | | |



*Comparativo Enero-Octubre de los años (2020, 2021, 2022)*

**3.- TASA DE RECONOCIDOS COMO REFUGIADOS (TOP 5)**

*TASA DE POSITIVOS EN RELACION AL TOTAL DE RESUELTOS 2019.*

| PAIS | RESUELTOS: Positivo, P.C, Negativo. | POSITIVOS | TASA DE POSITIVOS |
|---|---|---|---|
| HONDURAS | 8,229 | 6,285 | 76% |
| VENEZUELA | 4,743 | 4,679 | 99% |
| EL SALVADOR | 3,475 | 2,370 | 68% |
| CUBA | 1,762 | 336 | 19% |
| GUATEMALA | 979 | 454 | 46% |
| OTROS | 1,312 | 544 | 41% |
| TOTAL | **20,500** | **14,668** | **72%** |

*TASA DE P.C. EN RELACION AL TOTAL DE RESUELTOS 2019.*

| PAIS | RESUELTOS: Positivo, P.C, Negativo. | PC | TASA DE P.C. |
|---|---|---|---|
| HONDURAS | 8,229 | 528 | 6% |
| VENEZUELA | 4,743 | 2 | 0% |
| EL SALVADOR | 3,475 | 617 | 18% |
| CUBA | 1,762 | 134 | 8% |
| GUATEMALA | 979 | 150 | 15% |
| OTROS | 1,312 | 300 | 23% |
| TOTAL | **20,500** | **1,731** | **8%** |

*TASA DE POSITIVOS MAS P.C. EN RELACION AL TOTAL DE RESUELTOS 2019.*

| PAIS | RESUELTOS: Positivo + P.C, Negativo. | POSITIVO + P.C. | TASA DE POSITIVO y P.C. |
|---|---|---|---|
| HONDURAS | 8,229 | 6,813 | 83% |
| VENEZUELA | 4,743 | 4,681 | 99% |
| EL SALVADOR | 3,475 | 2,987 | 86% |
| CUBA | 1,762 | 470 | 27% |
| GUATEMALA | 979 | 604 | 62% |
| OTROS | 1,312 | 844 | 64% |
| TOTAL | **20,500** | **16,399** | **80%** |

*TASA DE POSITIVOS EN RELACION AL TOTAL DE RESUELTOS 2020.*

| PAIS | RESUELTOS: Positivo, P.C, Negativo. | POSITIVOS | TASA DE POSITIVOS |
|---|---|---|---|
| HONDURAS | 7,509 | 6,408 | 85% |
| VENEZUELA | 4,331 | 4,231 | 98% |
| CUBA | 3,431 | 1,536 | 45% |
| EL SALVADOR | 2,400 | 2,003 | 83% |
| HAITÍ | 2,319 | 501 | 22% |
| OTROS | 2,683 | 1,274 | 47% |
| TOTAL | **22,673** | **15,953** | **70%** |

*TASA DE P.C. EN RELACION AL TOTAL DE RESUELTOS 2020.*

| PAIS | RESUELTOS: Positivo, P.C, Negativo. | PC | TASA DE P.C. |
|---|---|---|---|
| HONDURAS | 7,509 | 7 | 0% |
| VENEZUELA | 4,331 | 12 | 0% |
| CUBA | 3,431 | 133 | 4% |
| EL SALVADOR | 2,400 | - | 0% |
| HAITÍ | 2,319 | 664 | 29% |
| OTROS | 2,683 | 312 | 12% |
| TOTAL | **22,673** | **1,128** | **5%** |

*TASA DE POSITIVOS MAS P.C. EN RELACION AL TOTAL DE RESUELTOS 2020.*

| PAIS | RESUELTOS: Positivo + P.C, Negativo. | POSITIVO + P.C. | TASA DE POSITIVO y P.C. |
|---|---|---|---|
| HONDURAS | 7,509 | 6,415 | 85% |
| VENEZUELA | 4,331 | 4,243 | 98% |
| CUBA | 3,431 | 1,669 | 49% |
| EL SALVADOR | 2,400 | 2,003 | 83% |
| HAITÍ | 2,319 | 1,165 | 50% |
| OTROS | 2,683 | 1,586 | 59% |
| TOTAL | **22,673** | **17,081** | **75%** |

*TASA DE POSITIVOS EN RELACION AL TOTAL DE RESUELTOS 2021.*

| PAIS | RESUELTOS: Positivo, P.C, Negativo. | POSITIVOS | TASA DE POSITIVOS |
|---|---|---|---|
| HONDURAS | 17,708 | 14,957 | 84% |
| HAITÍ | 5,522 | 1,263 | 23% |
| EL SALVADOR | 3,574 | 3,040 | 85% |
| VENEZUELA | 3,991 | 3,869 | 97% |
| CUBA | 2,568 | 1,776 | 69% |
| OTROS | 4,737 | 2,447 | 52% |
| TOTAL | **38,100** | **27,352** | **72%** |

*TASA DE P.C. EN RELACION AL TOTAL DE RESUELTOS 2021.*

| PAIS | RESUELTOS: Positivo, P.C, Negativo. | PC | TASA DE P.C. |
|---|---|---|---|
| HONDURAS | 17,708 | 4 | 0% |
| HAITÍ | 5,522 | 657 | 12% |
| EL SALVADOR | 3,574 | - | 0% |
| VENEZUELA | 3,991 | 1 | 0% |
| CUBA | 2,568 | 2 | 0% |
| OTROS | 4,737 | 182 | 4% |
| TOTAL | **38,100** | **846** | **2%** |

*TASA DE POSITIVOS MAS P.C. EN RELACION AL TOTAL DE RESUELTOS 2021.*

| PAIS | RESUELTOS: Positivo + P.C, Negativo. | POSITIVO + P.C. | TASA DE POSITIVO y P.C. |
|---|---|---|---|
| HONDURAS | 17,708 | 14,961 | 84% |
| HAITÍ | 5,522 | 1,920 | 35% |
| EL SALVADOR | 3,574 | 3,040 | 85% |
| VENEZUELA | 3,991 | 3,870 | 97% |
| CUBA | 2,568 | 1,778 | 69% |
| OTROS | 4,737 | 2,629 | 55% |
| TOTAL | **38,100** | **28,198** | **74%** |

*TASA DE POSITIVOS EN RELACION AL TOTAL DE RESUELTOS 2022.*

| PAIS | RESUELTOS: Positivo, P.C, Negativo. | POSITIVOS | TASA DE POSITIVOS |
|---|---|---|---|
| HONDURAS | 10,258 | 9,261 | 90% |
| HAITÍ | 7,731 | 1,035 | 13% |
| EL SALVADOR | 3,331 | 3,107 | 93% |
| VENEZUELA | 2,700 | 2,391 | 89% |
| CUBA | 1,727 | 866 | 50% |
| OTROS | 4,435 | 1,701 | 38% |
| TOTAL | **30,182** | **18,361** | **61%** |

*TASA DE P.C. EN RELACION AL TOTAL DE RESUELTOS 2022.*

| PAIS | RESUELTOS: Positivo, P.C, Negativo. | PC | TASA DE P.C. |
|---|---|---|---|
| HONDURAS | 10,258 | 1 | 0% |
| HAITÍ | 7,731 | 547 | 7% |
| VENEZUELA | 3,331 | 1 | 0% |
| EL SALVADOR | 2,700 | - | 0% |
| CUBA | 1,727 | 866 | 0% |
| OTROS | 4,435 | 129 | 3% |
| TOTAL | **30,182** | **678** | **2%** |

*TASA DE POSITIVOS MAS P.C. EN RELACION AL TOTAL DE RESUELTOS 2022.*

| PAIS | RESUELTOS: Positivo, P.C, Negativo. | POSITIVO + P.C. | TASA DE POSITIVO y P.C. |
|---|---|---|---|
| HONDURAS | 10,258 | 9,262 | 90% |
| HAITÍ | 7,731 | 1,582 | 20% |
| VENEZUELA | 3,331 | 3,108 | 93% |
| EL SALVADOR | 2,700 | 2,391 | 89% |
| CUBA | 1,727 | 866 | 50% |
| OTROS | 4,435 | 1,830 | 41% |
| TOTAL | **30,182** | **19,039** | **63%** |

**4.- RECONOCIDOS COMO REFUGIADOS, 2013 A 2022 (TOP 7)**

*REFUGIADOS RECONOCIDOS, POR NACIONALIDAD TOTAL (2013 - 2022).*

| PAIS | RESUELTOS: Positivo, P.C, Negativo. | RECONOCIDOS POSITIVOS | OTORGADOS P.C. | NO RECONOCIDOS (Negativo) |
|---|---|---|---|---|
| HONDURAS | 53,294 | 40,061 | 2,640 | 10,593 |
| VENEZUELA | 21,942 | 21,306 | 31 | 605 |
| EL SALVADOR | 20,360 | 13,257 | 2,509 | 4,594 |
| HAITÍ | 16,056 | 2,842 | 1,917 | 11,297 |
| CUBA | 9,725 | 4,551 | 277 | 4,897 |
| GUATEMALA | 6,870 | 3,528 | 446 | 2,896 |
| NICARAGUA | 3,505 | 1,806 | 474 | 1,225 |
| OTROS | 5,510 | 1,671 | 540 | 3,299 |
| **TOTAL** | **137,262** | **89,022** | **8,834** | **39,406** |

| PAIS | POSITIVOS + P.C. |
|---|---|
| HONDURAS | 42,701 |
| VENEZUELA | 21,337 |
| EL SALVADOR | 15,766 |
| CUBA | 4,828 |
| HAITÍ | 4,759 |
| GUATEMALA | 3,974 |
| NICARAGUA | 2,280 |
| OTROS | 2,211 |
| **TOTAL** | **97,856** |

\* El número de solicitudes, no necesariamente es el número de solicitudes en trámite, toda vez que puede haber anexiones o algunas de ellas se encuentran aún en prevención.

\*\* Se debe tomar en cuenta que la oficina de Veracruz incluye además de ese estado a Oaxaca, Quintana Roo, Campeche y Yucatán, mientras que la oficina de la CDMX cubre, la CDMX y todas las entidades restantes con la excepción de las cubiertas por Veracruz, Chiapas, Tabasco y Baja California.

\*\*\* Los datos presentados son preliminares, tienen carácter informativo y no son definitivos.
\*\*\*\* Solicitudes refiere al titular del procedimiento, más dependientes en caso de tenerlos. Solicitantes refiere a personas individuales.
P.C.= Protección Complementaria.
**(Datos al cierre de Octubre 2022)**

01/Noviembre/2022

CLP_AR_005752

RECEIVED
By ESEC at 9:47 am, Mar 03, 2023

Hon. Merrick Garland Attorney General
Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530

Hon. Alejandro Mayorkas
Secretary
U.S. Department of Homeland Security
(DHS)
3801 Nebraska Avenue, NW
Washington, DC 20016

David Neal, Director
Executive Office for Immigration Review
U.S. Department of Justice (DOJ)

Ur Jaddou, Director
U.S. Citizenship and Immigration Services
(USCIS)
DHS

Lauren Alder Reid, Assistant Director
Office of Policy
Executive Office for Immigration Review
DOJ

Daniel Delgado, Acting Director,
Border and Immigration Policy,
Office of Strategy, Policy, and Plans,
DHS

Richard Revesz, Administrator
Office of Information & Regulatory Affairs
(OIRA)
Office of Management and Budget (OMB)
Executive Office of the President

March 1, 2023

**Re:**   **Request to Provide a Minimum of 60 days for Public Comment in Response to the Department of Homeland Security (DHS), United States Citizenship and Immigration Services (USCIS), and Department of Justice (DOJ) Executive Office for Immigration Review (EOIR) (the Departments) Joint Notice of Proposed Rulemaking (NPRM): Circumvention of Lawful Pathways**

Dear Attorney General Garland, Secretary Mayorkas, Director Neal, Director Jaddou, Assistant Director Reid, Acting Director Delgado, and Mr. Revesz:

We, the undersigned 172 national, state, and local organizations, write to urge the Departments to allow at least 60 days for public comment on the above referenced NPRM. We make this request due to the length and complexity of the 153-page proposed rule and the critical interests it implicates. As explained below, the Departments have no basis for merely providing a

CLP_AR_006669

truncated comment period. A robust comment period is particularly important given the devastating impact of this NPRM.

As President Biden recognized upon taking office, Executive Order 12866 governs the regulatory process and requires agencies to "afford the public a meaningful opportunity to comment on any proposed regulation, which in most cases should include a comment period of *not less than 60 days*." Executive Order 13563 likewise directs agencies to "...afford the public a meaningful opportunity to comment through the Internet on any proposed regulation, with a comment period that should generally be *at least 60 days*." 60 days is the minimum, with some courts referencing 90 days as the "usual" length period for comments. Nevertheless, the Departments proceed with a 30-day comment period, citing their plan to "move as expeditiously as possible" to implement this rule prior to the termination of Title 42 expulsions. Their haste also indicates their intent to predetermine the outcome of this notice-and-comment period, rather than afford a meaningful opportunity to impacted stakeholders.

There is no compelling reason to truncate the public comment period by half or two thirds, and thereby deprive stakeholders of a meaningful opportunity to weigh in on the vast changes proposed in this rule.  Rather, the highly technical, nuanced, legal and policy issues the NPRM addresses — and, above all, the severe human cost it is certain to inflict — illustrate why a minimum of 60 days must be allowed for the public to file comments in response to the rule. Despite this, the Departments have provided no plausible justification for providing only 30 days for public comment.

The Departments explain this expedited time frame by citing the expected termination date for Title 42 by May 11, when the COVID-19 public health emergency will expire. They cite the possibility of increased encounters of asylum seekers who have waited for processing and lament that DHS lacks the resources to prepare for this increase. They thus propose a rule that would result in the summary returns of many asylum seekers, rather than offer them the process they require under domestic and international law.

There is little merit to the Departments' alarm regarding the impending end of Title 42; the Departments have known this policy had an expiration date since the moment President Biden took office. Indeed, the Biden administration has faced significant pressure to end the Trump-era Title 42 policy since its inauguration, fielding letters from scores of epidemiologists and medical experts, more than 100 members of Congress, as well as civil, human, and refugee rights organizations urging the program's end. This pressure extended to senior Biden administration officials, who proceeded to resign in protest of the Biden administration's continued use of Title 42.

Importantly, the Departments are relying on the impending expiration date of the Title 42 policy

to truncate the comment period *even though the Biden administration itself formally sought to end the Title 42 policy nearly one full year ago.* In April 2022, the Centers for Disease Control and Prevention announced its plan to do away with this Trump-era policy which it deemed "no longer necessary." DHS' Customs and Border Protection (CBP), the highest funded federal law enforcement agency in the nation, began to prepare for the end of Title 42 since April 2022 and received $14.8 billion in the December 2022 omnibus appropriations package — significantly more than the President's budget request. In addition to its own preparations to end Title 42 months ago, the administration has faced the prospected end of Title 42 as it fought back litigation from asylum seeking families who have challenged the legality of Title 42 for years.

In sum, the Biden administration has faced pressure to end Title 42 from the day it took office, sought to end it nearly a year ago, has prepared for its end and received boosted funding from Congress while facing years of litigation challenging the legality of this expulsion policy, and now anticipates its predictable demise once the public health emergency lapses on May 11, 2023. To claim, as the Departments do, that they now face an "urgent and extreme situation" appears hyperbolic at best — and disingenuous at worst. This cannot justify truncating the comment period and rushing towards the finalization of a rule of this magnitude.

This rule has vast implications on all stages of asylum processing, imposing new and complex requirements on asylum seekers before they reach the border, during their initial fear screening, as well as during immigration court review. The rule implicates substantive areas in domestic asylum law as well as U.S. obligations under the 1967 Protocol Relating to the Status of Refugees and the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment (CAT).

Recycling prior Trump bans, this rule would foreclose asylum access to people via unprecedented new requirements during their fear screenings, while in CBP detention, without access to counsel, and with limited linguistic and legal access to understand the complex rules they must navigate. The proposed rule further codifies the usage of a CBP app that has proven to be chaotic, nearly inaccessible for Black asylum seekers, and altogether disastrous for its own purported goal of orderly processing at ports of entry.

The Departments engineered this rule to adversely impact large numbers of asylum seekers and "decrease the number of asylum grants," resulting in a five-year bar for people returned to harm. In other words, the implications of this proposed rule are potentially deadly for countless asylum seekers, including children. The human cost is beyond measure and demands the most careful research, analysis, and public consultation. It is highly inappropriate to afford the public a mere 30 days to comment on a proposal that violates domestic laws and international obligations on its face.

To honor the public's right to a meaningful and fair opportunity to respond to the NPRM, consistent with the Executive Orders cited above and the spirit and intent of the Administrative Procedure Act, a comment period of *a minimum* of 60 days must be provided.

Please contact Azadeh Erfani at [aerfani@heartlandalliance.org](mailto:aerfani@heartlandalliance.org) with any questions or concerns, and we look forward to your prompt response.

Sincerely,


National
The Advocates for Human Rights
African Communities Together (ACT)
African Human Rights Coalition
Alianza Americas
America's Voice
American Immigration Lawyers Association
Americans for Immigrant Justice
Amnesty International USA
Asian Americans Advancing Justice | AAJC
Asian Pacific Institute on Gender-Based Violence
ASISTA Immigration Assistance
Asylum Seeker Advocacy Project (ASAP)
The Black Alliance for Just Immigration (BAJI)
Border Kindness
Boston University School of Law, Immigrants' Rights and Human Trafficking Program
Bridges Faith Initiative
Capital Area Immigrants' Rights (CAIR) Coalition
CASA
Catholic Legal Immigration Network, Inc.
Center for Gender & Refugee Studies
Center for Law and Social Policy
Center for Popular Democracy
Center for Victims of Torture
Children's HealthWatch
The Children's Partnership
Church World Service
Civil Rights Education and Enforcement Center
Communities United for Status & Protection (CUSP)
Community Change Action

Comunidad Maya Pixan Ixim
Congregation of Our Lady of Charity of the Good Shepherd, U.S. Provinces
Cooperative Baptist Fellowship
Disciples Immigration Legal Counsel
Electronic Privacy Information Center (EPIC)
Esperanza United
Fight for the Future
FIRM Action
First Focus on Children
Franciscan Action Network
Freedom Network USA
Friends Committee on National Legislation
Futures Without Violence
Government Information Watch
Haitian Bridge Alliance
Harvard Immigration and Refugee Clinical Program
HIAS
Hope Border Institute
Human Rights First
Immigration Center for Women and Children
Immigration Equality
The Immigration Hub
Immigration Law & Justice Network
Immigrant Legal Resource Center
Innovation Law Lab
Institute for Justice and Democracy in Haiti
International Refugee Assistance Project (IRAP)
Japanese American Citizens League
Justice Action Center
Justice for Migrant Women
Justice in Motion
Kids in Need of Defense
Kino Border Initiative
Latin America Working Group (LAWG)
Lawyers for Good Government
MPower Change
Maryknoll Office for Global Concerns
Mennonite Central Committee U.S.
MomsRising/MamásConPoder
Muslim Advocates

NAKASEC
National Advocacy Center of the Sisters of the Good Shepherd
National Coalition Against Domestic Violence
The National Domestic Violence Hotline
National Education Association
National Immigrant Justice Center
National Immigration Law Center
The National Immigration Project (NIPNLG)
National Network for Immigrant and Refugee Rights
National Network to End Domestic Violence
National Partnership for New Americans
NETWORK Lobby for Catholic Social Justice
Never Again Action
Oxfam America
Refugees International
Sakhi For South Asian Women
Save the Children
Sisters of Mercy of the Americas Justice Team
South Asian Americans Leading Together (SAALT)
Southern Border Communities Coalition
Southern Poverty Law Center
Sunita Jain Anti-Trafficking Policy Initiative , Loyola Law School
Tahirih Justice Center
Taylor Levy Law
T'ruah
UndocuBlack Network
Unitarian Universalist Association
Unitarian Universalist Service Committee
USAHello
U.S. Committee for Refugees and Immigrants (USCRI)
VECINA
Washington Office on Latin America
We Are All America
#WelcomeWithDignity campaign for asylum rights
Welcoming America
Witness at the Border
Women's Refugee Commission
Young Center for Immigrant Children's Rights

<u>State</u>

Advocates for Basic Legal Equality

Alabama Coalition for Immigrant Justice

Aldea - The People's Justice Center

Al Otro Lado

Catholic Charities Community Services, Immigrant & Refugee Services, NY

Center for Safety & Change

Central Washington Justice For Our Neighbors

The Children's Partnership

Coalition for Humane Immigrant Rights (CHIRLA)

Colorado Children's Campaign

Daya Inc.

Fellowship Southwest

Florence Immigrant & Refugee Rights Project

Honest Law Group

Hope Border Institute

Immigrant ARC

Immigrant Legal Advocacy Project

Immigrant Legal Center

Iowa Migrant Movement for Justice

Just Neighbors

Legal Aid Justice Center

Make the Road Nevada

Make the Road New York

Mariposa Legal, Program of COMMON Foundation

Michigan Immigrant Rights Center

Mobilization for Justice, Inc.

New York Immigration Coalition

Oasis Legal Services

OneAmerica

Our Children Oregon

Rocky Mountain Immigrant Advocacy Network

Safe Passage Project

Sanctuary for Families

Surveillance Technology Oversight Project

Tennessee Justice for Our Neighbors

Texas Civil Rights Project

Wind of the Spirit Immigrant Resource Center

<u>Local</u>

American Gateways

Arizona Justice for Our Neighbors

Ayuda

Bhutanese Community Association of Pittsburgh (BCAP)

Central American Minors Working Group

Central American Legal Assistance

Central American Resource Center of Northern CA - CARECEN SF

Cleveland Jobs with Justice

DC Dorothy Day Catholic Worker House

Galveston-Houston Immigrant Representation Project (GHIRP)

The Healing Trust

Houston Immigration Legal Services Collaborative

Human Rights Initiative Of North Texas

Immigrant Defenders Law Center

Indivisible Brooklyn

Jewish Activists for Immigration Justice of Western MA

Jewish Family Service of San Diego

Justice for Our Neighbors El Paso

Justice For Our Neighbors North Central Texas

The Legal Aid Society (New York)

The Legal Project

New Sanctuary Movement of Philadelphia

New York Justice for Our Neighbors

Queens Defenders

Rockland Immigration Coalition

Student Clinic for Immigrant Justice

Westchester Jewish Coalition for Immigration

Womankind



**LAWYERS FOR
CIVIL RIGHTS**
BOSTON

**RECEIVED**
By ESEC at 12:51 pm, Apr 04, 2023

March 27, 2023

**BY FIRST CLASS MAIL AND EMAIL**

The Honorable Alejandro Mayorkas
Office of the Executive Secretary
MS 0525
Department of Homeland Security
2707 Martin Luther King Jr. Ave SE
Washington, DC 20528-0525

Re:    **Concerns Relating to CBP One Mobile Application**

Dear Secretary Mayorkas:

Lawyers for Civil Rights (LCR) writes to express concerns surrounding features of the CBP One mobile application that create unfair and unnecessary obstacles for people seeking immigration protection and relief in the United States. At best, CBP One appears to be technologically deficient, and, at worst, it functions in a racially discriminatory manner. We respectfully request a meeting with the Department of Homeland Security (DHS), Customs and Border Protection (CBP), and the Office for Civil Rights and Civil Liberties (CRCL) to discuss our concerns regarding the implementation and functionality of CBP One.

Haitian families and individuals affiliated with Haitian-Americans United, a community-based group in Boston, have contacted LCR regarding their experiences with CBP One, including: (1) serious language access issues, and (2) the required photo submission process disproportionately rejects people with darker skin tones. Because the use of CBP One is mandatory for certain immigration applications, these obstacles place a prohibitive burden on the ability to apply for, much less actually obtain, immigration protection and relief.

**Language Access**

With regard to language access issues, certain CBP One prompts and informational displays on the app are not fully translated from English into other languages, including Haitian Creole. For example, certain instructions and error messages are either not translated at all or are not translated thoroughly. This inconsistency creates a language barrier to entry at the first step of the immigration application process, and it runs contrary to DHS and CBP standards and guidance for interaction with those seeking immigration protection.

DHS has internal regulations requiring that CBP provide meaningful language access to those seeking immigration protection, as set forth in the CBP Language Access Plan. The Language Access Plan "sets forth the standards, principles, and guidelines which CBP will use to provide, and improve, meaningful access to agency programs and activities" to those with limited English

CLP_AR_006715

proficiency.[1] The DHS regulations are mandated by Executive Order 13166 (2000), which directs federal agencies to identify and address the language needs of the public they serve. *See* 65 C.F.R. 159 (2000). CBP acknowledges that many individuals with whom they interact "do not read, write, speak, or understand English as their primary language."[2] CBP also recognizes that "[l]anguage barriers can negatively impact interactions with the public, provision of services, and law enforcement activities," and, therefore "[e]nsuring effective communication with all persons, including persons who are limited English proficient, facilitates the CBP mission."[3] The language access issues with CBP One demonstrate an area in which DHS and CBP have failed to live up to that mission by rolling out CBP One without adequate translation, effectively denying access to those with limited English proficiency.

## Photo Requirement

CBP One requires applicants to take and submit a photo of themselves in real time to complete the application process. However, in many instances photos taken by applicants with darker skin tones have been repeatedly rejected by CBP One. For example, LCR is aware of applicants who attempted to submit a photo more than 30 times over the course of several days and using a variety of lighting conditions before CBP One would accept a photo. Practically speaking, unless CBP One eventually accepts a photo, the applicant cannot move forward in the process and will not be eligible for immigration protection, all as a result of merely having darker skin. This result – disproportionate exclusion of people with darker skin tones from this immigration process – is untenable. In addition, as the demand for access to CBP One increases, the disproportionate impact on people with darker skin tones will almost certainly increase.

## Conclusion

Issues with language access and the photo submission process create significant burdens for those seeking immigration protection and relief. For example, in some instances, applicants were required to miss days of work and spend significant sums of money to travel long distances to areas where they could find and utilize translation services. In this manner, CBP One's deficiencies create insurmountable burdens on applicants that are tantamount to a denial of the opportunity to seek immigration protection and relief.

LCR urges DHS and CBP to: (1) thoroughly translate the application, including instructions and error messages, for all languages currently available on the platform; (2) immediately upgrade the photo submission software to eliminate the issue of rejecting applicants with darker skin tones; and (3) thoroughly test any new technology with the demographic expected to use it, prior to implementing it for full use.

---

[1] CBP Language Access Plan (Nov. 2016). Available at
https://www.cbp.gov/sites/default/files/assets/documents/2017-
Oct/CBP%20Language%20Access%20Plan%2011%2018%202016.pdf.

[2] U.S. Customs and Border Protection, Language Access in Customs and Border Protection. Available at
https://www.cbp.gov/about/language-access.

[3] *See* note 2.

CLP_AR_006716

It is crucial that DHS and CBP address these issues expeditiously to minimize the disproportionate burdens placed on non-English speakers and people with darker skin tones, in accord with the goal of fostering equitable access to immigration protection and relief. Further, LCR requests the opportunity to meet and discuss the resolution of these issues.

Sincerely,

/s/ Michael A. Kippins

Michael A. Kippins
Lawyers for Civil Rights
61 Batterymarch Street, 5th Floor
Boston, MA 02110
mkippins@lawyersforcivilrights.org
(781) 591-0123

cc:     Troy A. Miller
        Commissioner
        U.S. Customs and Border Protection
        1300 Pennsylvania Avenue NW
        Washington, DC 20229

        Officer for Civil Rights and Civil Liberties
        U.S. Department of Homeland Security
        2707 Martin Luther King, Jr. Avenue, SE
        MS 0190
        Washington, DC 20528-0190

CLP_AR_006717



# HUMAN RIGHTS STAIN, PUBLIC HEALTH FARCE

## Evasion of Asylum Law and Title 42 Abuse Must End— and Never Be Revived

December 2022

CLP_PC_000081

## Introduction

For nearly two years, the Biden administration has wielded the Trump administration's Title 42 policy to block people from seeking asylum at official ports of entry, expel to grave dangers asylum seekers and migrants who cross the border, and evade the due process and refugee protection provisions of U.S. immigration and asylum law. Though efforts to force continuation of this cruel and counterproductive policy continue, after a federal district court in Washington DC vacated it in November for violating U.S. law, it is scheduled to end on December 21, 2022.

The misuse of Title 42 has been a public health, border management and human rights fiasco. Human Rights First has, as of the date this report was issued, tracked over 13,480 reports of murder, torture, kidnapping, rape, and other violent attacks on migrants and asylum seekers blocked in or expelled to Mexico under Title 42 since President Biden took office. It is a staggering number that will continue to mount every day that Title 42 or similar policies that evade refugee law are in place.

The Centers for Disease Control and Prevention (CDC) attempted to end the Title 42 policy in May 2022, but in the wake of a court order issued by a federal judge in Louisiana forcing the policy's continuation in a case brought by state attorneys general aligned with the former Trump administration, the Department of Homeland Security (DHS) continued to use it. In October 2022, in a disturbing step backwards, the Biden administration announced it would expand use of the policy to expel Venezuelans seeking refuge at the southern U.S. border without allowing them to apply for asylum, attempting to justify this abrogation of asylum law by pairing it with a limited parole program available to some Venezuelans. Since then, DHS has expelled thousands of Venezuelans to dangerous conditions in Mexico where they are also at risk of *refoulement, i.e.* illegal return, to persecution in Venezuela. In response to the October parole announcement, the U.N. Refugee Agency (UNHCR), IOM and UNICEF immediately warned that such efforts "cannot come at the expense of the fundamental human right to seek asylum."

The targeted, expanded use of Title 42 against Venezuelans again confirms that this policy has no basis in public health. As medical and public health experts have repeatedly affirmed and recently-revealed Congressional testimony of a top CDC scientist confirms, the Title 42 policy has no scientific basis. It was adopted at the behest of Stephen Miller and other Trump administration officials as yet another discriminatory effort to restrict immigration and block asylum. As leading epidemiologists and public health experts warned President Biden in November, the continued and expanded use of Title 42 is "a travesty" that manipulates, misuses and undermines trust in public health, and "feeds and propagates racially-based tropes that falsely paint migrants as vectors of disease, fostering stigma and heightening the vulnerability of already marginalized groups in a manner that is antithetical to the tenets of good public health practice."

Some members of Congress have attempted to force continuation of Title 42 or a similar suspension of asylum at the border – a codification of failed Trump policy that would eviscerate U.S. refugee law and subvert international refugee law globally. At the same time, the Biden administration is considering replacing Title 42 with other inhumane Trump policies or versions of them, including an illegal policy that, when in effect, turned refugees away to danger and deprived other refugees of a path to family reunification, stability and citizenship, as Human Rights First detailed in a 2020 report.

Senior Biden administration officials are reportedly planning to impose other harsh policies as Title 42 ends, as well as use the notorious migrant detention center at Guantánamo Bay or other third country detention facilities to hold Haitians interdicted at sea. The United States recently returned 180 men, women and children – who had attempted to reach safety in the United States by boat – to Haiti despite multiple U.N. authorities' calls for states to halt returns to Haiti given the life-threatening conditions there.

A ruling by the U.S. Court of Appeals for the D.C. Circuit that took effect in May 2022 prohibits DHS from using Title 42 to return asylum-seeking families "to places where they will be persecuted or tortured." As the policy's scheduled end date approaches, DHS retains clear authority, consistent with the various court rulings, to except individuals from Title 42. It also remains obligated under U.S. refugee law and binding treaty commitments, and a November D.C. Circuit Court decision, not to return anyone—family, adult, or child—to persecution or torture, consistent with the legal rationale of the D.C. Circuit Court. In his November ruling concluding that the Title 42 policy violated the Administrative Procedure Act, the D.C. District Court judge who vacated the Title 42 policy cited Human Rights First's prior research documenting violent attacks against people impacted by the policy and emphasized the "harms Plaintiffs face if summarily expelled to countries [where] they may be persecuted or tortured" as well as the earlier finding by the Court of Appeals for the D.C. Circuit that "the record is replete with stomach-churning evidence of death, torture, and rape." The Trump-aligned state attorneys general who initiated the Louisiana litigation are now seeking to intervene in the separate case before the D.C. District Court and also seeking to stay that court's November ruling requiring the Title 42 policy to end on December 21. Their stay request is now pending before the D.C. Circuit Court after the District Court denied it.

It is far past time to end this illegal, inhumane, and ineffective policy and all attempts to force its continuation. After nearly two years in office, the Biden administration should institute a more effective and humanitarian response to the reception, identification, and processing of refugees seeking protection in the United States – a response that upholds U.S. refugee and immigration laws, as Human Rights First has outlined in its recommendation papers. The Biden administration should not replace one failed and illegal Trump policy with another by embracing, supporting or employing the ineffective, inhumane, xenophobic and racist immigration policies of the prior administration.

This report is based on in-person interviews Human Rights First conducted with asylum seekers in Tijuana in September 2022 and Ciudad Juárez in December 2022; and interviews by telephone and in-person with attorneys, other humanitarian workers, and additional asylum seekers in Mexico conducted from October to December 2022; reports of attacks drawn from an ongoing

4

survey of asylum seekers in Mexico conducted by Al Otro Lado between mid-June and early November 2022; open-source information identified by students from the University of California Network for Human Rights and Digital Fact Finding (Berkeley, Santa Cruz, Los Angeles); review of U.S. government data; and media and other human rights reporting.

Human Rights First published prior research on the Title 42 policy in June 2022, April 2022 (with Al Otro Lado and Haitian Bridge Alliance), March 2022, February 2022, January 2022, December 2021, November 2021 (with Florence Immigrant and Refugee Rights Project), October 2021, August 2021, July 2021 (with Hope Border Institute), June 2021, May 2021 (with RAICES and Interfaith Welcome Coalition), April 2021 (with Al Otro Lado and Haitian Bridge Alliance), December 2020, and May 2020.

---

**Key Findings**

- **The use of the Trump-initiated Title 42 policy over the nearly two years since President Biden took office, its forced continuation through court order, and its recent expansion by the administration have inflicted terrible human rights abuses.** Human Rights First has tracked 13,480 reports of murder, kidnapping, rape, torture, and other violent attacks against people blocked in or expelled to Mexico due to Title 42 since January 2021. These numbers are likely just the tip of the iceberg as many victims have not spoken with investigators, journalists, or attorneys. Some recent examples include: Mexican officers kidnapped a Guatemalan family with two young children after DHS expelled them to Nuevo Laredo, and turned them over to a cartel that held them hostage for three months and tortured them; a Honduran asylum seeker and her four-year-old daughter were kidnapped, the daughter beaten and the mother raped in front of her daughter as they waited in Tijuana due to Title 42; a 13-year-old girl was nearly abducted at gunpoint in Juárez after her family fled political persecution in Venezuela but was expelled under Title 42; and a Guatemalan lesbian trans woman was raped by Mexican police in Piedras Negras after CBP turned her away from protection at the Eagle Pass port of entry. Black and Indigenous asylum seekers continue to be targets of bias-motivated violence and discrimination while stranded in Mexico.

- **The Biden administration's expansion of Title 42 to Venezuelans in October 2022 has denied thousands access to the U.S. asylum process in flagrant violation of U.S. refugee law. The expansion has stranded adults, families, and children in dangerous Mexican border cities where they are targets of kidnapping, torture, and brutal attacks. It has subjected others to onward *refoulement* to persecution and torture. It has also separated many families.** In some cases, this expansion has resulted in the separation of married couples and the delivery of mothers, wives, teenage daughters, and other family members to grave dangers in Mexico. CBP has subjected many Venezuelans to "lateral expulsions," transporting them to areas far from where they entered the United States and to locations where they have no knowledge of the specific dangers or local refugee shelters. In many cases, asylum seekers appear to have been transported to cities that lack shelter capacity.

- **Mexican asylum seekers fleeing persecution and torture have been trapped in or expelled by CBP to the very country they are trying to flee without access to the U.S. asylum process in violation of U.S. law and non-refoulement legal obligations**. They include: a woman who was decapitated by the cartel that had threatened her after DHS, citing Title 42, would not let her

seek asylum; a lesbian women who had suffered multiple attacks, rape, and threats due to her sexual orientation and was refused the right to seek asylum at the San Ysidro port of entry; a gay man who had suffered beatings, sexual assaults, and an attempted kidnapping due to his sexual orientation and was turned away from asylum at the El Paso port of entry; and an Indigenous woman who had been attacked by police, threatened, and her family members murdered for her activism defending her Indigenous community was turned away from seeking asylum with her three children at the San Ysidro port of entry in September 2022 and subsequently suffered sexual abuse by Mexican police.

- **Faith-based, humanitarian, and legal workers assisting asylum seekers stranded in Mexico by the Title 42 policy face acute and mounting threats and attacks from violent cartels that exercise widespread control over territory in Mexico.** Recent threats and attacks include the June 2022 kidnapping and November 2022 threats against a Baptist pastor in Nuevo Laredo, the armed raiding of a shelter in Ciudad Juarez in late November 2022, the forced closure of a Nuevo Laredo shelter after threats demanding that the shelter pay a "protection fee," and the robbery at gunpoint of a staff member of a legal organization in a Tijuana plaza near the San Ysidro port of entry while the staff member accompanied asylum seekers instructed by CBP to appear at 6 a.m. to be processed for a Title 42 exemption.

- **CBP and Border Patrol officers continue to use Title 42 to expel migrants and asylum seekers in ways that make them even more vulnerable to harm in Mexico and undermine their ability to seek asylum in the United States** – including by sometimes expelling asylum seekers in the middle of the night, depriving them of necessary medical care, or taking their passports or other identity documents, religious items, medical items, or other documents necessary for their asylum cases. Many were expelled to deplorable conditions without secure housing, leaving some sleeping on the streets. Mexican authorities transported some expelled Venezuelans to other parts of Mexico, abandoning them in cities where migrant shelters are full beyond capacity.

- **The Title 42 policy has continued to inflict disorder at the border, triggering multiple border crossings, artificially inflating CBP border statistics,** pushing dangerous crossings away from ports of entry, and facilitating exploitation. With Title 42 spurring dangerous attempts to cross into the United States outside of ports of entry, at least 853 asylum seekers and migrants have died in border crossings in FY 2022, making it the deadliest year since the U.S. government began record keeping on border crossing deaths in 1998.

---

**Recommendations**

- **Congress:** Reject any efforts to codify or legislatively extend the Title 42 policy or similar policies that suspend refugee law or improperly block refugees from seeking asylum, direct sufficient appropriations for asylum adjudications and to community-based, non-profit organizations providing temporary housing, transportation, and other assistance to people seeking refuge at the border, and continue to conduct oversight of the disorder and human rights abuses caused by the Title 42 policy and any similar policies that deny access to asylum.

- **Biden Administration:** Take all steps to ensure a final end to the Title 42 policy, restore compliance with U.S. refugee law and treaties, continue to request appropriations to conduct timely asylum adjudications and address backlogs, oppose any efforts to force continuation or resurrection of the Title 42 policy or similar policies, and reject any proposals to replace Title 42 with other policies that block, ban or prevent refugees from seeking asylum in the United States and/or turn them away to danger. Never again use an actual or purported pathway to the U.S. as an excuse to evade refugee law or abrogate the right to seek asylum.

- **Department of Homeland Security:** As Title 42 ends, uphold U.S. refugee law at U.S. ports of entry and along the border, ramp up asylum adjudication capacity and end attempts to replace it with other illegal and inhumane Trump-era policies, and during the time Title 42 is still in place, take all legally available actions to restore asylum access at and between ports of entry and mitigate the harms of Title 42, including through the use of exceptions to Title 42 and by affirmatively screening individuals subjected to Title 42 for fear of return to persecution and torture, as U.S. law and international treaty obligations require.

- **Centers for Disease Control and Prevention:** Publicly identify steps to ensure public health authority is never again misused to evade refugee law and endanger the lives and safety of people seeking protection, and if the Title 42 policy should be prolonged yet again, take any additional steps necessary to help ensure its firm and final termination.

- **The Government of Mexico**: End cooperation with U.S. policies that violate international law and/or result in human rights violations, and take steps to end Mexican police and other officers' perpetration of and complicity or acquiescence in attacks, extortions, kidnappings, rape and other harms inflicted on migrants and asylum seekers.

---

**Title 42 expansion returns Venezuelans fleeing persecution and humanitarian catastrophe to danger, deplorable conditions**

On October 12, 2022, the Biden administration announced it would expand the use of Title 42 to expel Venezuelans to Mexico, through a "New Migration Enforcement Process," pairing the expansion with a new limited humanitarian parole program that would enable some Venezuelans to enter the United States. The parole program's requirements actually preclude many refugees from accessing it, including due to its identification, sponsorship, and airline ticket purchase requirements, as well as its numerical limitations. The Hope Border Institute, which interviewed expelled asylum seekers in October, concluded that the program "left no path for relief for the people in the most vulnerable situations" and left thousands of Venezuelans in Mexico "in a cruel state of limbo."

While UNHCR and other U.N. agencies welcomed efforts to provide safe pathways for displaced persons, they warned that such pathways "cannot come at the expense of the fundamental human right to seek asylum." In their statement, these U.N. authorities specifically reminded the United States that: "**Access to safe territory for asylum seekers is a cornerstone of the 1951 Refugee Convention and of international refugee law. We remain concerned by asylum restrictions that are inconsistent with international law standards, including those imposed through Title 42 public health action, and reiterate the call for their urgent termination.**" Days after the Biden administration's decision to expand Title 42 to expel Venezuelans seeking U.S.

asylum, CBP again acknowledged in an October 21, 2022 statement that recent arrivals at the southern border included "an increased number of asylum seekers fleeing [the] authoritarian regime[] in Venezuela."

Venezuelans expelled to or blocked in Mexico due to Title 42's expanded use are now stranded in highly dangerous Mexican border cities as well as other locations in Mexico that lack capacity to safely accommodate them. Many are also at risk of onward *refoulement* – illegal return - to persecution and torture, with some Venezuelans pushed across the border into Guatemala and others flown directly back to Venezuela by Mexican authorities. Title 42 expulsions of Venezuelans by DHS are also separating families at the border.

The expanded use of Title 42 has already resulted in thousands of Venezuelans expelled to Mexico without access to the U.S. asylum process. Between October 12 and mid-November 2022, more than 8,000 Venezuelans were expelled by DHS to Mexico. As of November 7, more than 2,100 Venezuelans had been expelled to Ciudad Juárez alone since the policy was expanded less than a month prior. Human Rights First researchers interviewed multiple sources who indicated that around December 1, 2022, DHS in the El Paso region began conducting lateral expulsions of Venezuelans to Matamoros and other cities and appeared to have halted direct expulsions to Ciudad Juárez.

As it has wielded Title 42 to expel Venezuelans to Mexico, CBP has separated some families at the border and turned away mothers, daughters, wives, partners, and other family members to danger in Mexico. For example:

- **In October 2022, DHS released Miguel Peñaranda, a Venezuelan man, and his 18-year-old stepson into the United States but expelled to Mexico Peñaranda's wife, Heyllyn Yepez, and his 18-year-old stepdaughter.** The family members, who had entered the United States in El Paso, were separated and flown to other parts of the border within Texas: Peñaranda and his stepson were flown to Brownsville, where they were released, while Yepez and her daughter were flown to Laredo, where they were expelled at the border and then bused to Acapulco, Mexico. Yepez told *The New York Times*, **"I never, ever could have imagined this happening…How can they do this to families? It's so inhuman."**

- **DHS separated a Venezuelan family of four in October 2022, releasing the father and son into the United States to pursue their asylum claims while expelling the mother and daughter to Mexico under Title 42,** according to a migrant shelter director in Austin, Texas.

- **A young Venezuelan woman was separated from her mother at the border in October 2022, and while she was processed into the United States, her mother was expelled to Mexico,** according to a migrant shelter director in Austin, Texas.

- **DHS has separated numerous Venezuelan married couples since October 2022.** A woman who was returned to Ciudad Juárez without her husband in October 2022 told *Reuters*, "I am alone in a country where I have no one to help me. He was my only companion, my only help, my only support."

- **In October 2022, DHS expelled a mother to Mexico while her 20-year-old son was permitted to seek asylum in the United States.**

- **DHS separated** Luis Alexander Bonilla **from his mother, sister, and nine-year-old nephew at the border, detained Bonilla for 11 days, and expelled him to Tijuana, Mexico in October 2022.** Bonilla told Milenio his mother had been expelled to Ciudad Juárez, Mexico. Two weeks after the family had entered the United States, Bonilla was unaware of the whereabouts of his sister and nephew.

Venezuelans who are stranded after expulsion or are unable to seek asylum at ports of entry due to Title 42's continuation face grave dangers in Mexico. As UNHCR, IOM and UNICEF publicly warned the United States after it announced this Title 42 expansion in October, "[m]any people subject to this measure since its implementation in March 2020 have been sent to border communities with significant security challenges, limited support networks and inadequate shelter capacities, making their return to Mexico both dangerous and unsustainable." Many Venezuelan asylum seekers have already been targeted by cartels and corrupt officials in Mexico for kidnappings and other violent attacks in the wake of this Title 42 expansion. Some recent examples include:

- **In November 2022, a Venezuelan police investigator fleeing death threats for investigating cases of disappeared people was assaulted and robbed by armed men who bashed his head with the back of a gun, ordered him off the bus he was riding near Ciudad Juárez, and tried to kidnap him.** He managed to escape, but when he arrived in Ciudad Juárez, police stopped him and stole his money. The man told Human Rights First he is terrified to stay in Juárez, where he remains stranded due to Title 42, because the cartel hunting him in Venezuela also operates there.

- **In November 2022, a gay Venezuelan man was sexually assaulted and robbed in the public plaza where he had been sleeping in Ciudad Juárez.** The man told Human Rights First that he had been staying in a makeshift tent encampment near the El Paso port of entry while blocked from seeking U.S. asylum due to Title 42. After Mexican authorities forced him to leave the encampment, he moved to the plaza where he was then attacked.

- **A 13-year-old girl was nearly abducted at gunpoint in Juárez after her parents and sibling, who had fled political persecution in Venezuela, were denied the right to seek asylum and expelled to danger in Mexico in November 2022 by CBP under the Title 42 Venezuelan expansion.** They were detained by CBP for 10 days without blankets or access to showers. A CBP officer told them "You should have stayed in your country," confiscated and kept their documents, and lied to the family, telling them they were being transferred to a U.S. shelter only to then laugh at them as they were instead subjected to a lateral expulsion and sent to Sonora. The family made their way back to Juárez only to face the attempted abduction and a cartel shooting outside their shelter, as the mother explained to Human Rights First researchers.

- **A Venezuelan family with two young daughters stranded in Mexico due to Title 42 was** kidnapped **from a hotel in Ciudad Juárez by two hooded, armed men.** The family had been waiting for an opportunity to seek asylum in the United States. The kidnappers held the family captive for 12 days until their relatives were forced to pay a $30,000 ransom.

The U.S. government's expulsion of Venezuelans to Mexico violates U.S. *non-refoulement* legal obligations not only by exposing them to serious harm in Mexico but also because returned individuals are at high risk of onward or so-called chain *refoulement* to countries where they would face persecution or torture. Mexican officials ordered some expelled Venezuelans to

depart Mexico through the southern border within 15 days, while others were provided Mexican migration documents (*forma migratoria múltiple* or FMM) leaving them with temporary status in Mexico for reportedly as little as one week in some cases.

Expelled Venezuelans are at risk of detention and potential deportation by Mexican authorities without access to the asylum process in Mexico. For instance, a video posted online in October 2022 appears to show hundreds of Venezuelans and other nationals detained in a Mexican National Migration Institute (*Instituto Nacional de Migración* or INM) facility near the U.S.-Mexico border, reporting they had been held in crowded, unsanitary conditions for weeks. Venezuelans, as well as other asylum seekers and migrants in Mexico often report that Mexican police and other government officials routinely extort them by threatening them with deportation. In Ciudad Juárez, Mexican National Guard officers have reportedly entered hotels where Venezuelans are staying, demanded their documents, and detained those without valid visas, according to a witness account in a video posted to social media.

In early November 2022, INM began flying some Venezuelans, who supposedly agreed to be repatriated, directly to Venezuela – though there is no indication that any international or independent authorities observed these returns to confirm that they were voluntary. Concerningly, displaced Venezuelans transiting through Mexico reported in October 2022 that Mexican migration officials forced them to sign false documentation stating that they had voluntarily requested to leave Mexico through the southern border to Guatemala. In late September 2022, just prior to the Title 42 expansion, hundreds of Venezuelans were reportedly deceived by Mexican authorities into boarding buses that transported them to the land border with Guatemala. These incidents reflect a well-documented history of failures by Mexican immigration officers to inform detained migrants of their right to seek asylum and failure to forward their requests to the Mexican asylum agency.

Displaced Venezuelans in Guatemala may face further chain expulsion. In 2022, with support from the U.S. government, Guatemalan authorities expelled more than 9,000 Venezuelans across the border into Honduras without consistently administering protection screenings.

Many Venezuelans expelled by DHS to Mexico have been stranded in deplorable conditions without secure housing, leaving some sleeping on the streets. Mexican authorities have transported some expelled Venezuelans to other parts of Mexico, abandoning them in cities where migrant shelters are full beyond capacity. For instance:

- **DHS has expelled hundreds of Venezuelans to Tijuana since October 2022, including some who were flown from the Texas border and expelled to Tijuana without being provided any information about what was happening to them.** Mexican immigration officers also reportedly abandoned at a bus station in Tijuana 60 Venezuelans whom DHS had expelled. With Tijuana shelters full, some spent several nights sleeping on the ground. A fitness center was later prepared to provide temporary shelter for 300 Venezuelans expelled to Tijuana from the United States.

- **On a Saturday in October 2022, Mexican migration officers bused approximately 100 displaced Venezuelans whom DHS had expelled to Mexico City, abandoning them without food, accommodation, or basic support outside an office of the Comisión Mexicana de Ayuda a Refugiados (COMAR), the Mexican refugee assistance agency, which was closed for the weekend.** As of December 2022, migrant shelters in Mexico City are full beyond their capacity as Venezuelans expelled from the United States continue to be bused there, resulting in hundreds sleeping in city streets. Shelters are operating at double capacity with many sleeping on mattresses in common spaces, according to Gretchen Kuhner, director of the *Instituto para las Mujeres en la Migración* (IMUMI). Kuhner said IMUMI and other nonprofit organizations in

CLP_PC_000089

Mexico City have had to provide food, shelter, medications, and other supplies to Venezuelans arriving in the city.

- **The Mexican government has bused at least** 600 **Venezuelans whom DHS had expelled from the United States to the central Mexican city of Hermosillo, where shelters struggling to meet their needs are requesting food and clothing donations.** Those bused to Hermosillo include 24-year-old Juan Carlos García, who reported that he could not afford to travel to Mexico City to reunite with his relatives, from whom DHS separated him at the border.

- **Thousands of Venezuelans, including many who had been expelled from the United States under Title 42, have been sleeping in dangerous conditions in makeshift tent encampments.** Approximately 12,000 migrants and asylum seekers, most of whom are Venezuelan, have been sleeping in a makeshift tent encampment on a muddy sports field in San Pedro Tapanatepec in Oaxaca state, Mexico. In Ciudad Juárez, in November 2022, as many as a thousand Venezuelans were staying in a tent encampment on the Rio Grande near the El Paso port of entry, where temperatures had dropped below freezing and many fell ill. In November 2022, members of an organized criminal group attempted to kidnap residents of the encampment, rt thm into separate lines for men, women, and families, and instructed them to enter nearby vehicles, but the kidnappers retreated when law enforcement intervened. Ciudad Juárez government officials cleared the camp in late November 2022, citing safety concerns.

The Hope Border Institute in El Paso concluded based on its interviews with asylum seekers and migrants that the expanded expulsions of Venezuelans "separated family units and placed individuals, including vulnerable people such as young children, single mothers and elderly people on the streets, lacking access to food, shelter and medical support."

---

**Court-ordered Title 42 continuation condemns asylum seekers and migrants expelled to or blocked in Mexico to grave dangers**

The continued implementation of Title 42 is causing mounting human rights abuses against asylum seekers and migrants blocked in or expelled to Mexico. Individuals and families who are expelled or blocked from protection due to Title 42 are targeted for attacks in Mexico by corrupt officials as well as powerful cartels that exercise control throughout the border region and profit from kidnapping, torturing, and extorting asylum seekers turned away by the United States. These attacks often target asylum seekers and other migrants on account of their race, gender, sexual orientation, gender identity, and nationality. Black and Indigenous asylum seekers continue to be targets of bias-motivated violence and discrimination while stranded in or transiting through Mexico.

**As of the date this report was published in December 2022, Human Rights First has tracked at least** 13,480 **reports of murder, kidnapping, rape, torture, and other violent attacks against people blocked in or expelled to Mexico due to Title 42 since January 2021.** This count is likely just the tip of the iceberg since many asylum seekers have not spoken with investigators, journalists, or attorneys. Some recent attacks on people stranded in or expelled to Mexico due to Title 42's court-ordered continuation and recent expansion by DHS include:

- **Ibrahima Gueye, a 39-year-old Senegalese man, was shot and killed in a Tijuana park in broad daylight on October 18, 2022.** Police believe Gueye, who was carrying a backpack with clothing and personal belongings, was attacked by members of the violent "de la Castillo" group, which is engaged in criminal migrant smuggling in the area. With asylum seekers unable to approach ports of entry to request asylum, some have attempted to cross into the United States, unaware of danger from violent groups that control access to the border.

- **In October 2022, a Guatemalan lesbian trans woman was violently raped by Mexican police officers in Piedras Negras soon after CBP officers turned her away from protection at the Eagle Pass port of entry.** The woman reported to Al Otro Lado that she had sought protection due to her gender and sexual orientation.

- **A Haitian asylum seeker, whom DHS had previously expelled to Haiti under Title 42, was robbed at gunpoint in Tijuana in summer 2022 while unable to seek U.S. asylum at a port of entry due to the continuation of Title 42.** The armed assailants pulled the man's pants down and groped him looking for money, according to his cousin, another asylum seeker who spoke with Human Rights First.

- **A Guatemalan woman and her four-year-old son were kidnapped in Nogales and held captive for four days after DHS expelled them under Title 42. The family had sought U.S. protection to escape threats from the son's father.** The man who kidnapped the family had approached them offering help after DHS expelled them to Nogales, where they had no support and were unfamiliar with the area, according to Kino Border Initiative, who spoke with the woman in July 2022.

- **Mexican immigration (INM) officers kidnapped and turned over to the Zetas cartel a Guatemalan family with two young children after DHS expelled them to Nuevo Laredo.  The cartel held the family hostage for three months, tortured them, and extorted their relatives.** The mother told Kino Border Initiative in July 2022 that the family had watched as their captors killed other migrants who attempted to escape.

- **An Indigenous Guatemalan woman and her three young children were kidnapped and extorted after CBP officers turned them away from asylum protection at the Nogales port of entry.** The woman told Kino Border Initiative in September 2022 that after the family was expelled, a woman approached them offering to bring them to a free shelter, but instead led them to a house where they were held captive for ransom.

- **In August 2022, a Salvadoran woman and her two children were held captive for hours by members of an armed group who forced them to strip and robbed them of all their belongings, including their clothing, shoes, and water.** The family had been attempting to enter the United States near Calexico to seek asylum when the armed group approached them. "They were asking their boss what to do with us…I thought they were going to kill us," the woman told Human Rights First.

- **Juárez police sexually assaulted a Honduran mother and her four-year-old daughter after the family was blocked from seeking protection in Ciudad Juárez in August 2022, then turned**

**them over to cartel members who held the family captive for 22 days, raped the mother in front of the daughter, and physically attacked the daughter.** The mother reported the incident to Al Otro Lado.

With Title 42 still in place, Mexican asylum seekers fleeing persecution and torture are trapped in or expelled by DHS to the very country they are trying to flee without access to the U.S. asylum process in violation of U.S. law and non-refoulement legal obligations. Mexican asylum seekers stranded in Mexico or turned away from U.S. protection due to Title 42 have been brutally attacked and threatened, including:

- **A young asylum-seeking woman was decapitated by cartel members who had previously threatened her in southern Mexico after DHS turned her and her children away and would not allow them to seek asylum at a port of entry, citing Title 42.** The woman's brother-in-law, who is also seeking asylum, told Human Rights First in September 2022 that the family had been unable to find space in Tijuana shelters and after spending several nights in the streets, had no choice but to return to their hometown where they had been threatened.

- **In late October 2022, DHS used Title 42 to turn away a transgender woman from southern Mexico who had sought protection at a port of entry near Tijuana, Mexico, after an assailant had tried to kill her.** She reported to Al Otro Lado that she had suffered violence and discrimination based on her gender and sexual orientation, including multiple rapes, in Mexico.

- **A trans woman from the south of Mexico and her Indigenous partner remain stranded in Ciudad Juárez after fleeing death threats based on their race, gender, and sexual orientation by a criminal group who disappeared the woman's gay cousin and warned her not to look for him.** The woman told Human Rights First, "I am harassed every day of my life. I am afraid to go outside. There is so much hate. Even churches won't help us."

- **A woman from Michoacán who travelled to the Calexico port of entry in August 2022 with her infant and her younger brothers, ages 10 and 13, was threatened by cartel members after DHS officers turned them away due to Title 42.** The cartel members shot and killed the woman's husband in front of the family while they were eating lunch together, then threatened the woman after she reported the murder to police. The family had attempted to seek asylum at the Calexico port of entry, but U.S. officers turned them away because of Title 42. The woman told Human Rights First they fled to another city after receiving messages from neighbors warning them that the cartel members who had threatened them knew they were in Mexicali.

- **A Mexican lesbian woman who had suffered multiple attacks in her hometown due to her sexual orientation, including being kidnapped, raped, and threatened with death by police officers, was turned away from asylum protection at the San Ysidro port of entry in October 2022.** The woman reported her experience to Al Otro Lado.

- **A gay man from southern Mexico who had suffered beatings, sexual assaults, and an attempted kidnapping in his hometown due to his sexual orientation was turned away from**

**asylum at the El Paso port of entry in October 2022.** The man reported to Al Otro Lado that the people threatening him had killed his nephew to intimidate him.

- **A Mexican family of five was nearly kidnapped after DHS turned them away from seeking asylum at the San Ysidro port of entry in November of 2022.** The mother reported to Al Otro Lado that her husband and son had been kidnapped, beaten, and held for ransom in their home state in southern Mexico. After the expulsion, the family continued to receive death threats.

- **An Indigenous Triqui woman from Oaxaca who had been beaten by police, threatened, and her family members murdered for her activism defending her Indigenous community was turned away from seeking asylum with her three children at the San Ysidro port of entry in September 2022 in Tijuana.** She shared with Al Otro Lado that after the family was turned away, she was sexually abused by Mexican police in Tijuana.

The broad reach of cartels and other organized criminal groups in Mexico, which often have ties to government authorities (including Mexican military collusion with cartels that was recently confirmed by data leaks), can make relocation within Mexico impossible for Mexicans fleeing persecution and torture. For instance, at least three Mexican asylum seekers reported to Kino Border Initiative in October 2022 that the organized criminal groups persecuting them had pursued them to multiple cities within the country where they had moved in an attempt to escape these threats, confirming the national reach of these organizations.

In addition, humanitarian, faith, and legal workers assisting asylum seekers stranded in Mexico continue to face threats, as Human Rights First has previously documented, including:

- **In June 2022, cartel members kidnapped Baptist Pastor Lorenzo Ortiz, who has long provided humanitarian aid to asylum seekers in Nuevo Laredo and Monterrey, including those expelled or blocked under Title 42.** In July 2022, the U.N. Special Rapporteur on human rights defenders condemned the kidnapping, indicating that the cartel who kidnapped Ortiz accused him of stealing their business and refused to believe he aids migrants free of charge. The Special Rapporteur said, "Ortiz's case shows the extraordinary risk that human rights defenders run to provide basic support in the region. This is not an acceptable state of affairs." In November 2022, the Special Rapporteur continued to express grave concern that Pastor Ortiz was being "threatened, surveilled and harassed for his work in defence of the rights of migrants," and that asylum seekers and migrants "in his shelters are being abducted, harassed and extorted, with the alleged acquiescence of local police."

- **Another shelter in Nuevo Laredo was forced to shut down after a violent cartel demanded the shelter pay a "protection fee,"** according to a migrant who had been staying there and who reported the incident to Kino Border Initiative in October 2022. The migrant said that when the shelter closed, their family and other shelter residents were forced onto Nuevo Laredo streets, where members of a cartel photographed and threatened them.

- **In August 2022, an Al Otro Lado staff member was robbed at gunpoint in Tijuana in a plaza near the San Ysidro port of entry while accompanying asylum seekers who had been**

> instructed by CBP to appear at the port at 6 a.m. to be processed under an exception to Title 42.

- **Members of organized criminal groups have threatened numerous staff and residents of several Tijuana shelters, including Ágape Misión Mundial and Espacio Migrante, in connection with their work assisting migrants with the Title 42 exemption process.** In November 2022, Embajada Migrante, a migrant shelter in Tijuana, was forced to close due to threats by members of an organized criminal group. A director of Embajada Migrante told EFE that members of an organized criminal group that controls the area have been harassing shelter staff for months, and at one point forcibly entered the shelter at night, demanding $200 from each of the migrants as a fee for crossing the border.

- **In November 2022, members of a violent cartel attacked a migrant shelter in Ciudad Juárez, plowing down its gate with a truck.** The cartel members forced the migrants to line up against a wall and ordered them to turn over their cell phones. The cartel retreated after realizing the space was a faith-based migrant shelter.

### Triggering Multiple Crossings, Artificially Inflating CBP's Border Encounters Statistics

The continued and now expanded use of Title 42 is, while in place, trampling on U.S. refugee and immigration laws, preventing them from being upheld, prolonging disorder at the border, and inflating Customs and Border Protection (CBP) encounter statistics due to repeat entry attempts. Due to Title 42, the percentage of individuals who have attempted to repeatedly cross the southern border has increased, according to government data. Information released by CBP shows that in FY 2019 repeat crossings made up 7 percent of Border Patrol encounters, but with Title 42 in place since March 2020, repeated crossings rose to 27 percent of Border Patrol encounters in FY 2021, were 22 percent in August 2022 and 19 percent in September and October 2022 (the last months with data available).

Repeat crossings triggered by Title 42 expulsions have artificially inflated CBP's border apprehension statistics. CBP has concluded that the number of border encounters "was partly driven by high recidivism rates (repeat encounters) among individuals processed under the CDC's Title 42 public health authorities, meaning the actual number of unique individuals attempting to cross the border was substantially lower than total encounters." For example, in September 2022, government data shows that at least 43,000 encounters with Border Patrol were with individuals who had crossed the border multiple times, such that CBP acknowledged that its encounters statistics "overstate the number of unique individuals arriving at the border." Recent analysis by Syracuse University's Transactional Records Access Clearinghouse emphasizes the need for more accurate CBP data on repeat entry attempts. The American Immigration Council estimates that there were over 1.2 million repeat border encounters from August 2021 to September 2022 with Title 42 in place – inflating CBP's border apprehension data.

**Pushing dangerous crossings, resulting in record deaths as asylum remains blocked at ports of entry**

As Title 42 continues to block asylum at ports of entry, tens of thousands of migrants and asylum seekers are waiting in border cities for the opportunity to enter the United States through a limited exemption process. The exemption process requires nonprofit organizations and service providers, including migrant shelters, to refer migrants and asylum seekers with particular vulnerabilities in Mexico to DHS for consideration for Title 42 exemptions. Border cities in Mexico lack capacity to serve the thousands of migrants and asylum seekers stranded in Mexico awaiting the opportunity to request Title 42 exemptions. For example, shelters are full beyond capacity in Reynosa, forcing many migrants and asylum seekers to sleep in tent encampments or on the streets, often in sweltering heat or freezing temperatures. In September 2022, Haitian migrants frustrated by the slow Title 42 exemption process protested outside Reynosa shelters. Likewise, small tent encampments have emerged outside shelters in Tijuana, where tens of thousands of migrants and asylum seekers remain stranded as they await the opportunity to request Title 42 exemptions.

For people seeking refuge from persecution, the denial of access to asylum at U.S. ports of entry leaves them stranded in dangerous border cities and pushes some to attempt risky and sometimes life-threatening border crossings.  These crossings result in severe injuries, dehydration, starvation, and drownings as well as kidnappings and other violent attacks by cartels and organized criminal groups that control border crossings. At least 853 asylum seekers and migrants have died in border crossings in FY 2022, making it the deadliest year since the U.S. government began tracking and recording border crossing deaths in 1998. The true number of deaths is likely much higher, as Border Patrol only counts deaths of individuals the agency identifies.

Some of the people who have died or were seriously injured while attempting to cross the U.S.-Mexico border to reach refuge in the United States include:

- **Dozens of migrants and asylum seekers have drowned since July 2022 attempting to cross the Rio Grande to enter Texas from the Mexican state of Chihuahua.** They include a five-year-old Guatemalan girl who drowned after a strong current ripped the girl from her mother's arms in August 2022, a 3-year-old boy who died in August 2022, nine individuals whose bodies were recovered on a single day in September 2022, and 12 people whose bodies were recovered on a single day in July 2022. Eagle Pass fire chief Manuel Mello said, "it's basically a drowning a day that you're seeing."

- **Twenty-two migrants and asylum seekers have drowned in the river and in the agricultural canals of the El Paso, Texas region in 2022 while attempting to cross the U.S.-Mexico border.** They include a young Colombian man whose body was recovered from the Rio Bravo in Reynosa, Mexico in November 2022.

- **In December 2022, a Russian man and another migrant drowned in the Pacific Ocean while attempting to swim across the U.S. border from Tijuana.**

- **In August 2022, Mexican brothers Carlos Enrique Mendoza and Edgar Mendoza died from dehydration, and were found with their bodies embracing,** in the Arizona desert after a criminal smuggling organization abandoned them.

- **A Guatemalan asylum seeker fleeing death threats in his country who had previously been expelled under Title 42 was hospitalized after he became lost in the desert in the Arizona border region as he attempted to seek U.S. protection** for the second time in September 2022. He was expelled again after recovering, according to Kino Border Initiative.

- **In December 2022, an Indian man and his 3-year-old son died after falling off the border wall** attempting to enter the United States from Tijuana, Mexico. An Indian woman also fell off the border wall and sustained injuries.

---

**CBP misconduct exacerbates danger for people subjected to Title 42**

CBP and Border Patrol officers continue to use Title 42 to expel migrants and asylum seekers in ways that increase their vulnerability to danger and violent crime in Mexico. Some Border Patrol agents have failed to provide medical attention to people with injuries, carried out Title 42 expulsions in the middle of the night, and expelled migrants and asylum seekers without their personal belongings. These practices exacerbate the risks migrants and asylums seekers face in Mexico after expulsion.

For example, CBP has endangered the lives of migrants at the Arizona border by carrying out expulsions in the middle of the night. Kino Border Initiative reported that CBP expelled at least sixteen migrants and asylum seekers to Nogales between the nighttime hours of 12:00 and 3:00 a.m. in August 2022. The organization also reported that some migrants were expelled in the rain, at times when shelters and services were closed, and had to sleep in the streets. After these CBP expulsions, some migrants were then robbed by Mexican police and other individuals. Those expelled at night include a Mexican mother and daughter fleeing sexual violence, who were expelled to Nogales at 3:00 am in August 2022.

CBP also continues to separate families subjected to Title 42 expulsions. In addition to the many examples of Venezuelan family separations detailed in a previous section, CBP separated a Mexican family fleeing death threats by cartel members in Guerrero who burned their house and killed a relative. CBP allowed the mother and younger brother to seek U.S. asylum but expelled the 18-year-old sister to Ciudad Juárez alone, according to a shelter director who assisted the young woman.

In its research, Human Rights First heard numerous accounts of instances where Border Patrol and CBP agents engaged in abusive conduct or failed to provide necessary medical attention for migrants and asylum seekers with serious medical conditions or injuries before expelling them to Mexico, including:

- **Border Patrol agents refused to provide medical attention to a woman who was eight months pregnant and who requested aid for complications with her pregnancy.** The woman

told Kino Border Initiative in October 2022 that she had requested a medical examination on three occasions while in Border Patrol custody after she had not felt the baby move in hours, but Border Patrol officers expelled her to Nogales, Mexico without allowing her to see a doctor. The following morning, the woman experienced severe pain and went to a hospital, where she learned the baby had died.

- **In July 2022, a Border Patrol officer beat an asylum seeker who requested water in the Arizona desert and told him "if you want water, go it in your own country,"** The man told Kino Border Initiative that the officer had shoved his face into the ground, kicked him repeatedly, and stood on the back of his head, causing the man to bleed and lose consciousness. Officers eventually took the man to the hospital after repeated requests but expelled him to Mexico without any of his medical paperwork. He said, **"I'm trying to escape death in my country, only to nearly die here [in the US]."**

- **Border Patrol agents denied medical attention to a migrant who was stung on his hip by a venomous scorpion and was having difficulty breathing.** A Border Patrol agent told him to "sit down and be quiet" when he asked for medical attention for the sting. He was only brought to the emergency room and provided an anti-venom shot many hours later, after his condition had worsened while he waited in a holding cell. The man told Kino Border Initiative in October 2022 that Border Patrol agents later expelled the man to Mexico without returning his personal belongings.

- **Border Patrol agents ignored the pleas for medical attention of a man who had been severely beaten by members of an organized criminal group before seeking U.S. protection.** The man told Kino Border Initiative in October 2022 that Border Patrol agents expelled him to Mexico without providing medical attention and instructed him to ask Mexican authorities for help for his injuries.

CBP and Border Patrol officers also seize and fail to return migrants' personal property. In October 2022, ACLU of Arizona and other nonprofit organizations assisting migrants at the Arizona border sent a letter expressing concern about the practice to CBP Commissioner Chris Magnus. They wrote: "Border Patrol agents in Arizona are forcing migrants they apprehend to discard all their belongings into on-site dumpsters, the only exceptions being a single layer of clothing and certain items that can fit into a 7-by-7-inch plastic bag…The mass dispossession of migrants' belongings by Border Patrol agents is not new, yet the problem has now reached unprecedented levels of magnitude and severity." Personal belongings migrants have been forced to discard include "**items of religious, sentimental, medical, and legal significance.**" The letter indicates that in some cases, Border Patrol has provided claim tickets that would supposedly enable migrants to reclaim seized belongings, but the agency expelled those individuals to Mexico under Title 42 without providing them an opportunity to reclaim their property.

In November 2022, members of Congress Bennie Thompson, Joaquin Castro, Raúl Grijalva and Nanette Barragán requested that the Government Accountability Office "conduct a review of [CBP's] activities, policies, and procedures regarding the handling of personal property belonging to individuals in its custody."

During the course of its research, Human Rights First also heard reports of CBP and Border Patrol taking personal possessions from asylum seekers or migrants, or forcing them to discard passports, religious items, money, and other essential personal items. For example:

- **Several Venezuelan asylum seekers told Human Rights First in December 2022 that CBP expelled them without their personal possessions.** One family was expelled in November 2022 without any of the documents they had brought that were critical to their asylum case, including identification documents, birth certificates, and evidence for their asylum cases.

- **In October 2022, CBP expelled dozens of migrants and asylum seekers, including many Venezuelans, to Tijuana without any of their personal possessions, including their passports and clothing.** Nicole Ramos, Al Otro Lado's Border Rights Project director, said Al Otro Lado has had to purchase clothes and other basic supplies for individuals whose personal belongings had been seized by CBP.

- **At least thirty migrants and asylum seekers have reported to Kino Border Initiative that Border Patrol or CBP destroyed or failed to return their personal possessions from September to November 2022.** One man said Border Patrol agents confiscated his cash, a diamond ring his father had given him, a bible, the keys to his home, his cell phone with all his contacts, and his identity documents, including his birth certificate.

- **Another person reported to Kino Border Initiative that Border Patrol officers seized the SIM card from his cell phone, pocketed the cash and credit cards from his wallet, and tore up his birth certificate in front of him.** Another individual observed a Border Patrol agent rip up $3,000 pesos from a migrant they had apprehended. The officer said, "this is trash, this is of no value to you here" before disposing of the ripped bills in a trash can.

**Expansive use of Title 42 further undermines specious public health rationale, violates U.S. refugee obligations**

The increasingly expansive use of Title 42 and the calls to further prolong its use as a tool – albeit an ineffective and counterproductive one – for border management have completely undermined the already flimsy pretense that the Title 42 policy is justified on public health grounds. Indeed, Marty Cetron, the director of the CDC's Division of Global Migration and Quarantine, told congressional investigators in May 2022 that the CDC order issued by the Trump administration to expel asylum seekers and migrants under Title 42 "did not originate from CDC." It has long been confirmed that the White House pressured the CDC to issue the order after the CDC's medical experts objected to its lack of justification as a public health measure. Cetron noted that he had refused to sign the CDC order, asked to be "excused" from the policy, and warned of the "significant harms" that could arise from its use. In addressing a statement he had reportedly made to colleagues at the time, Cetron confirmed to congressional investigators that this statement was consistent with some of his concerns about the order: "**to use public health authority that has never, ever been used this way, it's to keep Hispanics out of the country and it's wrong**."

The Biden administration's decision to expand use of Title 42 to Venezuelans, which was clearly a decision based on migration management considerations, was additional confirmation that the

policy has nothing to do with public health. Following the announcement of this expansion, which made no mention of public health in the context of Title 42 expulsions and repeatedly described the expansion as part of a migration management strategy, leading epidemiologists and public health experts wrote to President Biden emphasizing that the continued and expanded use of Title 42 is a "travesty" and that the Biden administration was "manipulating and misusing public health to advance immigration control objectives."

Not only has DHS expanded its misuse of Title 42 public health authority by adding a new nationality to its expulsion list, but some DHS officers appear to be using the supposed public health policy to expel people who have been in the United States for weeks or years, evading the (minimal but critical) due process protections of U.S. immigration law. Some DHS officers have used Title 42 as cover to expel individuals who have long resided in the United States to Mexico without due process, in some instances in coordination with Texas state officers. For example:

- **In 2022 DHS expelled to Mexico a young Honduran man who had been living in the United States for nine years and had a pending immigration court hearing in Houston, Texas scheduled for December 2022, as his attorney reported to Human Rights First.** After being expelled to Mexico, the man was beaten by Mexican police officers, kidnapped by a cartel, and threatened at gunpoint. He was only able to reenter the United States with assistance from his attorney.

- **DHS also expelled a middle-aged Mexican man who had been in the United States for at least several weeks after a Texas state sheriff pulled over the trailer truck he was driving in a small Texas town in July 2022.** The sheriff demanded to see the man's permit to drive the truck, which he produced, and then asked for his work permit, which the man did not have. The sheriff detained the man in an isolated area where the man was provided no opportunity to speak with U.S. officials or to make any phone calls before DHS expelled him to Mexico, according to Kino Border Initiative.

The U.S. government is also using Title 42 to expel asylum seekers and migrants to Mexico after they have been arrested, jailed for weeks or months, and subjected to state prosecution under Texas' illegal Operation Lone Star. These prosecutions violate Article 31 of the Refugee Convention which generally prohibits the penalization of asylum seekers for their entry or presence in a country to seek refugee protection. DHS's expulsion of asylum seekers subject to Operation Lone Star also interferes with their ability to defend themselves against pending state criminal charges and to challenge abusive and discriminatory treatment by state and local authorities. Examples of these wrongful expulsions include:

- **In August 2022, DHS expelled to Honduras a 22-year-old Honduran asylum seeker who had spent three weeks in Texas state custody after he was charged with criminal trespass under Operation Lonestar.** The young man had posted bond so that he could be released to challenge the criminal charges against him, but Texas authorities immediately turned him over to CBP upon release from custody. Though the man was visibly distressed and expressed his fear of returning to Honduras on multiple occasions, DHS expelled him to Honduras, where he remains in hiding from individuals who threatened his life, according to a South Texas legal services provider.

- **The same legal services office assisted two other Honduran individuals whom DHS expelled to Mexico under Title 42 after they had spent two months in Texas state custody on pending criminal charges under Operation Lonestar, which were dismissed.**

The expansive and expanded misuse of Title 42 is additional confirmation that the Title 42 policy has nothing to do with public health but has instead been wielded to punish people for migrating or for exercising their human right to seek asylum from persecution.

**Acknowledgements**

This report was written and researched by Julia Neusner, Kennji Kizuka, Eleanor Acer, Ana Ortega and Alejandra Aguilar Ruiz. Rebecca Gendelman, Ruby Ritchin, Robyn Barnard, Licha Nyiendo, and Jim Bernfield contributed edits to the report. Camille Chabot, Crystal Choi, Rosie Foulds, Lauren Good, Leslie Herrera, Hannah Ismael, Akif Khan, Diana Padilla Legaspi, Ana Linares, Valeria Gerber Mariscal, Chris Mathrua, Neeka Mirpour, Samantha Navarrete, Semantha Norris, Ivette Orozco, Jemma Paradise, Ashley Quezada, Kathleen Quinn, Rachel Raps, Gwenyth Rodriguez, Cole Seither, and Syeda Shagufta of the University of California Network for Human Rights and Digital Fact Finding (Berkeley, Santa Cruz, Los Angeles) contributed additional research for this report. Our thanks to the many colleagues, including those from Al Otro Lado, Las Americas Immigrant Advocacy Center, Hope Border Institute, Immigrant Defenders Law Center, Instituto para las Mujeres en la Migración, Kino Border Initiative, UC Hastings Center for Gender and Refugee Studies, and other attorneys, law firms, and service providers who provided case examples and assisted in referring asylum seekers for interview. Human Rights First thanks the donors and foundations who provide invaluable support for the organization's research on access to asylum and representation of asylum seekers. We thank the numerous asylum seekers who bravely shared their stories in hopes of bettering the system for all those who seek protection and refuge in the United States.

**Mission Statement**

Human Rights First works to create a just world in which every person's intrinsic human rights are respected and protected, to build societies that value and invest in all their people. To reach that goal demands assisting victims of injustice, bringing perpetrators of abuse to justice, and building institutions that ensure universal rights.

Human Rights First is a nonprofit, nonpartisan international human rights organization based in Los Angeles, New York, and Washington D.C.

© 2022 Human Rights First All Rights Reserved.

This report is available online at humanrightsfirst.org



2201 Wisconsin Ave. Suite 200, Washington, DC 20007 │Tel. (617) 227-9727 Fax (617) 227-5495 │ nipnlg.org
@nipnlg

March 23, 2023

*Submitted via: https://www.regulations.gov.*

Daniel Delgado                                    Lauren Alder Reid
Acting Director                                   Assistant Director,
Border and Immigration Policy                     Office of Policy,
Office of Strategy, Policy, and Plans             Executive Office for Immigration Review
U.S. Department of Homeland Security              U.S. Department of Justice
telephone (202) 447-3459                          telephone (703) 305-0289

**Re: National Immigration Project's (NIPNLG) Comment on the Proposed Rule by the Department of Homeland Security (DHS) and the Executive Office for Immigration Review (EOIR) on Circumvention of Lawful Pathways, CIS No. 2736-22; Docket No: USCIS 2022-0016; A.G. Order No. 5605-2023**

Dear Acting Director Daniel Delgado and Assistant Director Lauren Alder Reid:

The National Immigration Project (NIPNLG) submits this comment in response to the request for comments on the Department of Justice (DOJ) and the Department of Homeland Security (DHS) (the agencies) Notice of Proposed Rulemaking (NPRM) on "Circumvention of Lawful Pathways," CIS No. 2736-22; Docket No: USCIS 2022-0016; A.G. Order No. 5605-2023," 88 Fed. Reg. 11704 (February 27, 2023).

NIPNLG is a national nonprofit membership organization that provides support, referrals, and legal and technical assistance to attorneys, community organizations, families, and advocates seeking to advance the rights of noncitizens. NIPNLG focuses especially on the immigration consequences of criminal convictions, and its mission is to fight for justice and fairness for noncitizens who have contact with the criminal legal system. Additionally, we fight for fairness and transparency in immigration adjudication systems and believe that all noncitizens should be afforded the right to fair adjudications of their claims to remain in the United States. We have engaged in litigation to ensure that asylum seekers are afforded their right to pursue protection in the United States, especially in the face of unlawful and discriminatory border policies.

NIPNLG strongly urges the agencies to withdraw this proposed rule in its entirety. The rule would be unlawful and conflict with the statutory right to seek asylum as set forth at

Immigration and Nationality Act (INA) § 208(a)(1). By finalizing this rule the Biden administration would renege on its promise to restore faith in the immigration system. Furthermore, as the administration plans to enforce this rule only at the border, and not as to those with greater financial means arriving at airports, the rule will have a disproportionate impact on Black, Indigenous and People of Color (BIPOC) noncitizens, again betraying promises to advance racial equity throughout the federal government.[1]

Throughout the preamble to the rule, the agencies consistently talk about the goal of decreasing "non-meritorious" cases, which it equates with cases where an asylum seeker does not ultimately prevail. We strongly disagree with this fundamental premise of the rule.[2] There are many reasons that an asylum seeker may not be successful with their claim including: being unable to find, or afford counsel;[3] appearing in a "no asylum" zone where immigration judges deny the vast majority of cases without regard to the merit of the case;[4] years-long backlogs may make it more difficult to prove cases;[5] and ever-changing legal standards governing asylum eligibility.[6] The implication throughout the NPRM, that those who pass a credible fear interview but do not ultimately prevail on their claims necessarily had non-meritorious claims that take resources away from claims with merit, is fundamentally flawed and improperly colors the underlying premises of the rulemaking.[7]

As asylum seekers' procedural rights are curtailed, we have seen administrations in the past create self-fulfilling prophesies—asylum grant rates plummet when they do not have counsel and are placed through expedited proceedings, and administrations then use those low grant rates to justify their reduction in procedural rights claiming that the asylum seekers did not

---

[1] President Joe Biden, Executive Order On Advancing Racial Equity and Support for Underserved Communities Through the Federal Government, (Jan. 20, 2021) https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/executive-order-advancing-racial-equity-and-support-for-underserved-communities-through-the-federal-government/.

[2] The statistics cited in the NPRM are misleading. *See* EOIR, Executive Office for Immigration Review Adjudication Statistics: Asylum Decision and Filing Rates in Cases Originating with a Credible Fear Claim (Oct. 13, 2022), https://www.justice.gov/eoir/page/file/1062976/download. Of cases adjudicated on the merits in the cited statistics, the asylum grant rate is actually higher than the denial rate. Moreover, the "No Asylum Filed" rate which peaked in 2013 at over 56% was below 28% in 2022. Thus, the implication in the NPRM that noncitizens who pass credible fear are not truly coming to the United States to seek asylum, if not borne out by EOIR's own statistics.

[3] Jacob Czarnecki and Haley Hamblin, "Legal Representation for Asylum Seekers: An Overlooked Area of Reform for a System in Crisis," Niskanen Center, (Aug. 24, 2021) https://www.niskanencenter.org/legal-representation-for-asylum-seekers-an-overlooked-area-of-reform-for-a-system-in-crisis/. (Asylum seekers "represented by counsel are at least three times more likely to have their claims approved.").

[4] *See,* Innovation Law Lab and Southern Poverty Law Center, The Attorney General's Judges How The U.S. Immigration Courts Became A Deportation Tool, 2019, https://www.splcenter.org/sites/default/files/com_policyreport_the_attorney_generals_judges_final.pdf.

[5] *See* Guilia McDonnell Nieto del Rio, "Court Cases in New York Are Scheduled Out to 2023, Leaving Asylum Seekers Hopeless," DOCUMENTED (Aug. 22, 2021) (Heather Axford, legal director at Central American Legal Assistance explains, "'Witnesses get hard to find, and facts get old . . .when you're looking at a forward-looking benefit like asylum where really the question is what happens if we go back now.'")

[6] *See,* for example, *Matter of L-E-A-*, 28 I&N Dec. 304 (A.G. 2021) (restoring a 2017 decision recognizing family group membership as a potential protected characteristic for asylum purposes after that 2017 decision had been vacated in 2019.)

[7] The NPRM also implies that noncitizens may be coming to the United States to seek employment authorization, 88 Fed. Reg. 1105, but gives no citation as to how it reached this conclusion.

CLP_PC_020226

have meritorious cases from the outset.[8] We call on the administration to live up to the promise it laid out in its early executive orders, and restore faith in our immigration system[9] and advance racial equity[10] rather than repackaging unlawful Trump-era regulations justified by similar disingenuous rationalizations.

**What the Agencies Laud as "Orderly Processing" Is Actually Prohibiting Vulnerable Noncitizens from Accessing the U.S. Asylum System**

The NPRM claims success in reducing the number of border encounters with Cuban, Haitian, Nicaraguan, and Venezuelan noncitizens, 88 Fed. Reg. 1106, but the primary cause of this "success" is expelling noncitizens from those countries at the border, leaving them with no opportunity to seek protections guaranteed by law in the United States. It is hardly surprising that swift removal "can reduce migratory flows," 88 Fed. Reg. 11713, but the administration cannot do so by violating asylum seekers' statutory rights. It is difficult to see how this denial of access to the asylum system and denial of fundamental procedural rights, can be claimed as a "success," notwithstanding the fact that some percentage of this population that had not yet fled their countries might be able to obtain parole in the future under this rule.

Throughout the preamble, the government focuses on quantitative analysis at the expense of discussing the qualitative issues that are raised by the rule: human beings seeking protection in the United States. For example, the preamble notes that Cubans and Nicaraguans have recently accounted for 32 percent of border encounters, 88 Fed. Reg. 11712, but it does not discuss the human rights abuses that have escalated in those countries, causing their citizens to seek protection elsewhere. In July 2021, the White House issued a plan to address the root causes of migration from the Northern Triangle of Central America,[11] however, it has not issued a similar plan to address the increased migration from Cuba, Haiti, Nicaragua, or Venezuela.

The preamble says that the agencies considered but rejected maintaining the "status quo" because "the numbers of migrants have increased, and demographics of encounters have shifted over the past nine months."  88 Fed. Reg. 11730-31. Put another way, this rulemaking is the agencies' response to the increasing numbers of failed states creating humanitarian crises in the Western Hemisphere. For example, UNHCR has recently accused Nicaraguan President, Daniel

---

[8] *See* Jeff Sessions, *Attorney General Sessions Delivers Remarks to the National Association of School Resource Officers* (June 25, 2018) https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-national-association-school-resource-officers. ("[O]ur courts find that 80 percent of asylum claims are without merit.")

[9] President Joe Biden, Executive Order on Restoring Faith in Our Legal Immigration Systems and Strengthening Integration and Inclusion Efforts for New Americans (Feb. 2, 2022) https://www.whitehouse.gov/briefing-room/presidential-actions/2021/02/02/executive-order-restoring-faith-in-our-legal-immigration-systems-and-strengthening-integration-and-inclusion-efforts-for-new-americans/. [Hereinafter, "Restoring Faith."]

[10] President Joe Biden, Executive Order On Advancing Racial Equity and Support for Underserved Communities Through the Federal Government (Jan. 20, 2021) https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/executive-order-advancing-racial-equity-and-support-for-underserved-communities-through-the-federal-government/.

[11] The White House, "U.S. Strategy For Addressing The Root Causes Of Migration In Central America," (Jul. 2021) https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.

CLP_PC_020227

Ortega, of "crimes against humanity."[12] The shifting demographics have led thousands to flee ruthless dictatorships; this unprecedented rise of violence within the Western Hemisphere should be met with an unprecedented response in welcoming those fleeing harm, not by treating those seeking safety as numbers on a spreadsheet that must be reduced. That is, while the "status quo" may not be a viable option for the government, the NPRM does not seriously consider adding resources to process increased numbers of asylum seekers as a result of the humanitarian crises in Nicaragua, Cuba, Haiti, and Venezuela.[13]

The preamble also considers, and rejects, restarting the so-called Migrant Protection Protocols. 88 Fed. Reg. 11731. Secretary Mayorkas has acknowledged the due process and humanitarian deficiencies in that program, and recognized the need for asylum seekers to be on U.S. soil to have "the ability to appeal, be represented by counsel, and present additional evidence as necessary to ensure due process, respect for human dignity, and equity."[14] NIPNLG strongly agrees that MPP must not be restarted.

Likewise, the preamble considers and rejects resurrecting so-called Safe Third Country agreements. 88 Fed. Reg. 11731-32. As discussed elsewhere in this comment, many of the countries through which asylum seekers travel are extremely dangerous. It is irrational both to consider sending asylum seekers to unsafe countries with which they have no connection and to force them to seek asylum (as this rule does) in those countries in order to access the U.S. asylum system. NIPNLG strongly agrees that these agreements should not be resurrected.

NIPNLG supports the alternative solution that the preamble rejects—placing asylum seekers into INA § 240 proceedings without going through expedited removal. As the preamble correctly states, 88 Fed. Reg. 11732, this course of action would free up asylum officers to address the affirmative backlog and to conduct asylum merits interviews. The expedited removal process is inherently flawed;[15] NIPNLG would support changes to the rules which would eliminate expedited removal and afford noncitizens who arrive at the border greater due process rights.

While the agencies highlight their claimed inability to fairly implement the 1996 immigration laws, given changes in migration flows at the border over the past three decades, 88 Fed. Reg. 11716, changes in numbers at the border, like increases in population generally,[16] do not justify abandoning the law as devised by Congress. When Congress created the expedited removal process in 1996, it greatly curtailed existing rights that noncitizens presenting at the

---

[12] UNHCR, "Nicaragua: Crimes Against Humanity Being Committed Against Civilians for Political Reasons, Investigation Says," (Mar. 2, 2023) https://www.ohchr.org/en/press-releases/2023/03/nicaragua-crimes-against-humanity-being-committed-against-civilians.
[13] *See* American Immigration Lawyers Association, Policy Brief: What Does a Secure Border Look Like? (Dec. 27, 2022) https://www.aila.org/advo-media/aila-policy-briefs/policy-brief-what-does-a-secure-border-look-like (emphasizing an "all of government" approach to quickly and fairly processing noncitizens at the border.)
[14] DHS, Explanation of the Decision to Terminate the Migrant Protection Protocols, at 36 (Oct. 29, 2021) https://www.dhs.gov/sites/default/files/2022-01/21_1029_mpp-termination-justification-memo-508.pdf.
[15] Human Rights First, *Pretense of Protection, Biden Administration and Congress Should Avoid Exacerbating Expedited Removal Deficiencies* (Aug. 3, 2022) https://humanrightsfirst.org/wp-content/uploads/2023/01/PretenseofProtection-21.pdf.
[16] U.S. population has increased 24 percent since the enactment of 1996 immigration laws.

4

border had at the time. Rather than receiving a full exclusion hearing before an immigration judge, anyone presenting at a port of entry without a visa, or apprehended near the border, could be given a removal order by DHS that could only be vacated by passing a credible fear interview.[17] The entire expedited removal system has been criticized as having racist origins.[18] President Biden called on agencies to begin a review of procedures for individuals placed in expedited removal through the Executive Order on Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border.[19] Advocates for noncitizens, including NIPNLG, hoped that the administration would reimagine expedited removal, and wrote to the administration urging it to end the use of expedited removal for asylum seekers.[20] Instead, the agencies now seek to further curtail the rights of those arriving at the border, making it impossible for most asylum seekers to access the statutory asylum system. The expedited removal system already prevents bona fide asylum seekers from accessing the U.S. asylum system; the agencies' plans to further vitiate rights at the border flies in the face of this administration's promises to restore faith in the immigration system, and unlawfully restricts statutory rights.

The NPRM devotes considerable space to discussing its view on the authority given to the agencies to issue this proposed rule. 88 Fed. Reg. 11732-35. However, the agencies cannot issue regulations that contradict the INA. Section 208 (a)(1) of the INA unequivocally grants the right to any noncitizen physically present in the United States to apply for asylum. This rule will prevent the vast majority of asylum seekers apprehended near the border from exercising this right. Claiming that "discretion" allows the agencies to foreclose asylum to most asylum seekers at the border, is a misuse of the agencies' discretionary authority, which has been used on a case-by-case basis for asylum seekers. Moreover, the agencies' argument that Congress only required the ability to "apply" for asylum and not to actually "win" asylum contradicts Congress's actual intent and is disingenuous at best. 88 Fed. Reg. 11735.

While NIPNLG shares the administration's goal of decreasing the role of smugglers who prey on noncitizens, 88 Fed. Reg. 11713, we fundamentally disagree that this rule will limit that role. In fact, once it becomes clear to those fleeing harm that they cannot access the asylum system through ports of entry, it is likely that the role of smugglers will **increase** for noncitizens

---

[17] 8 CFR§ 208.30(f).

[18] *See* Ebba Gebisa, *Constitutional Concerns with the Enforcement and Expansion of Expedited Removal*, UNIVERSITY OF CHICAGO LEGAL FORUM: Vol. 2007: Iss. 1, Article 18, 565 at 586 -87, http://chicagounbound.uchicago.edu/uclf/vol2007/iss1/18. ("By allowing a high level of discretion that is influenced by the racist sentiments of the time, this arrangement aggravates the problem that facially neutral immigration laws can, in practice, discriminate on the basis of race. This could be particularly problematic in the enforcement of expedited removal because statistics covering the first few years of its enforcement clearly indicate that, from its inception, the procedure has been used disproportionately to remove certain nationalities.")

[19] President Joe Biden, Executive Order on Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border, (Feb. 02, 2021) https://www.whitehouse.gov/briefing-room/presidential-actions/2021/02/02/executive-order-creating-a-comprehensive-regional-framework-to-address-the-causes-of-migration-to-manage-migration-throughout-north-and-central-america-and-to-provide-safe-and-orderly-processing/.

[20] Various NGOs, Re: Use of Expedited Removal Process for Asylum Seekers at the Border (Feb. 16, 2021) https://www.humanrightsfirst.org/sites/default/files/LetterDHSExpeditedRemoval_2.16.21.pdf.

CLP_PC_020229

who have traveled to Mexico and understand that they will be ineligible for asylum if they present at a port of entry without the difficult-to-obtain CBP One appointments.[21]

**Parole Is Not a Reasonable Alternative to Border Processing Because Many Asylum Seekers Cannot Safely Remain in Their Countries and Do Not Meet the Parole Criteria**

While NIPNLG commends the agencies for expanding parole options for noncitizens,[22] those options cannot be a substitute for permitting noncitizens to exercise their legal rights to seek protection on U.S. soil.

Among the processes that the preamble states have made a positive difference in border encounters is the parole process it established for Venezuelans. For example, the preamble notes that the "new process for Venezuelans . . . created a strong incentive for Venezuelans *to wait in safe places* to access an orderly process to come to the United States." 88 Fed. Reg. 11718 [emphasis added]. But for most asylum seekers, their home country is not a "safe place," and requiring them to remain in danger hoping that their parole applications will be approved is unreasonable and unsafe.

Additionally, as laid out in the preamble, noncitizens abroad can only access the parole pathway if they have a U.S. supporter who can file an application and promise financial support on their behalf. 88 Fed. Reg. 11718. But as was witnessed during the controversial bussing of asylum seekers to interior cities, many Venezuelans (and other asylum seekers) have no U.S. supporters.[23] Thus while the parole program may be politically expedient—preventing mayors in interior cities from complaining of recently arrived noncitizens—it fails to offer protection to those who are most at risk of imminent harm, that is those whom the asylum statute is designed to protect. While NIPNLG supports expanding pathways to entry into the United States, the parole program cannot substitute for access to the asylum system at the border, especially when those at the border are most likely to be people without financial means and BIPOC people.

**CBP One Provides Insurmountable Barriers to Many Asylum Seekers**

A key aspect of the proposed rule is that asylum seekers who are in Mexico must download a smart phone application (App) to make an appointment with Customs and Border Protection (CBP) prior to presenting at a port of entry. 88 Fed. Reg. 11719-20. This requirement creates unreasonable barriers to protection. Already, there have been reports about the failures of the CBP One system. These failures include:

---

[21] *See*, Ivón Padilla-Rodríguez," U.S. Policies Like Title 42 Make Migrants More Vulnerable To Smugglers," WASHINGTON POST, Jan. 3, 2023, https://www.washingtonpost.com/made-by-history/2023/01/03/us-policies-like-title-42-make-migrants-more-vulnerable-smugglers/. ("The lesson here is that the multibillion-dollar smuggling industry is enriched, not obstructed, by punitive border enforcement.")

[22] The preamble also sets forth other steps the administration has taken to ease backlogs and allow noncitizens from Cuba and Haiti to enter the United States. 88 Fed. Reg. 11718-19. While NIPNLG supports efforts to eliminate backlogs in other entry categories, we do not see these proposed improvements as a substitute for complying with the statute that allows noncitizens on U.S. soil to seek asylum.

[23] *See* PBS NEWSHOUR, "NYC Opens Emergency Shelter For Surge Of Migrants Bused From Border States," Oct. 19, 2022, https://www.pbs.org/newshour/nation/nyc-opens-emergency-shelter-for-surge-of-migrants-bused-from-border-states.

CLP_PC_020230

- Asylum seekers may not have smart phones;
- Asylum seekers may not be literate;
- Asylum seekers may not speak one of the five languages that are available on the App[24]
- Asylum seekers may not have adequate access to Wi-Fi or data networks to use the App
- There are not enough appointments available for those seeking them, forcing asylum seekers to remain in dangerous conditions as they did under the unlawful CBP "metering" policy.[25]

As with the parole section of the rule, the need to have a functioning smart phone and access to reliable data or Wi-Fi mean that asylum seekers who are wealthier will have a greater ability to access the asylum system; there should never be a wealth test for protection from persecution or torture. Under the proposed rule, wealthier noncitizens will be more likely to have working smart phones, will be more likely to be tech-savvy, and will be more likely to have access to data plans or rented space with Wi-Fi.

While the proposed rule does include limited exceptions to the requirement to successfully use CBP One, the exceptions will likely prove impractical to access at the border. Proposed 8 CFR § 208.33(a)1)(ii) provides the following exceptions to making a CBP One appointment: "if the alien demonstrates by a preponderance of the evidence that it was not possible to access or use the DHS scheduling system due to [a] language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle." However, neither the proposed rule, nor the explanatory preamble material, provides any guidance on how this provision would be implemented.

Perhaps the most significant flaw in requiring a noncitizen to prove their inability to use CBP One is that in practice it would likely be impossible for the asylum seeker to even access a CBP officer to attempt to prove "by a preponderance of the evidence" that they were shut out of the system by one of these barriers. Since the purpose of CBP One is to limit interaction of CBP officials to only those asylum seekers who have made appointments, how would an asylum seeker without a pre-scheduled appointment even be allowed access to a port of entry?

Even if there is some mechanism for asylum seekers to try to put forth their claimed inability to access CBP One, which is not discussed in the proposed rule, it would be a nearly impossible hurdle for an asylum seeker to have to prove a negative. How does an individual prove that they are illiterate? Does a "significant technical failure" include not being able to afford a smart phone, having that phone stolen or broken, or being unable to access stable Wi-Fi? How would a noncitizen prove any of these facts by a preponderance of the evidence, and to whom would they make this showing?

---

[24] CBP One Fact Sheets are available in English, Spanish, Haitian Creole, Portuguese, and Russian. It is not clear whether the App itself functions in these five languages. https://www.cbp.gov/about/mobile-apps-directory/cbpone#:~:text=Fact%20sheets%20for%20CBP%20One,are%20available%20in%20English%20and .

[25] *Al Otro Lado, Inc. v. Mayorkas*, No. 17-CV-02366-BAS-KSC, 2021 WL 3931890, at *18 (S.D. Cal. Sept. 2, 2021), judgment entered, No. 17-CV-02366-BAS-KSC, 2022 WL 3970755 (S.D. Cal. Aug. 23, 2022).

CLP_PC_020231

Additionally, noncitizens are required to upload a photo and the technology has been rejecting photos of asylum seekers with "darker complexions,"[26] creating barriers based on race to accessing the U.S. border. And there are many languages used by asylum seekers that are not available on the App, including indigenous languages. Similarly, already in the early days of the CBP One rollout, there have been significant reports of the App crashing and of noncitizens waking up at dawn to try to get very limited appointments.[27] Would the inability to get an appointment at all after repeated efforts constitute an "other ongoing and serious obstacle"? Again, to whom would the asylum seeker make that showing and how would they document their many unsuccessful efforts to make an appointment?

Instead of promoting orderly entry at the border, the CBP One will act as a gatekeeper. It is a high tech implementation of the "metering" system that a federal court rejected in *Al Otro Lado, Inc. v. Mayorkas*.[28] In that case, a federal district judge granted summary judgment, finding:

> an asylum seeker must only arrive and indicate an intention to apply for asylum for inspection and referral to commence. Requiring asylum seekers to arrive again at POEs requires an additional step neither stated in nor contemplated by [8 U.S.C.] § 1225(b)(1)(A)(ii). Therefore, failing to inspect and refer class members upon arrival, and instead turning them back, conditions the ability to apply for asylum "on a migrant's manner of entry," and "flouts this court's and the BIA's discretionary, individualized treatment of refugees' methods of entry[.]" *E. Bay Sanctuary Covenant*, 993 F.3d at 675. Accordingly, the Court concludes that turning back asylum seekers at POEs without inspecting and referring them upon their arrival unlawfully withholds Defendants' statutory duties under 8 U.S.C. § 1158(a)(1) and  § 1225.

If CBP One is simply a high tech roadblock to accessing ports of entry, it will serve the same function as CBP officials turning asylum seekers away and telling them there is no room for them. The agencies cannot limit asylum access through a glitchy App that will disproportionately benefit wealthy (those with high quality smart phones and access to data plans); white (those who do not have "darker complexions"); and educated (literate and tech savvy) asylum seekers.

---

[26] *See* Suzanne Monyak, "House Democrats Call to Improve Border Appointment App Lawmakers Say Glitches, Accessibility Limits on CBP One App Have Caused 'Grave Harm,'" ROLL CALL, Mar. 14, 2023, https://rollcall.com/2023/03/14/house-democrats-call-to-improve-border-appointment-app/?utm_campaign=HubSpot-AILA8-03-15-2023&utm_medium=email&_hsmi=250418420&_hsenc=p2ANqtz-97rsaHGnJV_9l7OiLqPTGBYsZywUMh5uWNCmcb7-3loXsBE2lKILrh44QRB_wjBzzU3H2ICbphYLNoWZe0f6lmzUFbNQ&utm_content=250418420&utm_source=hs_email.

[27] Bernd Debusmann Jr, "At US Border, Tech Issues Plague New Migrant Applications, BBC, Mar. 8, 2023, https://www.bbc.com/news/world-us-canada-64814095. ("'The CBP One app has left thousands of people out of the process,' [Raul Pinto, an attorney at the American Immigration Council,] said.").

[28] *Al Otro Lado, Inc. v. Mayorkas*, No. 17-CV-02366-BAS-KSC, 2021 WL 3931890, at *18 (S.D. Cal. Sept. 2, 2021), judgment entered, No. 17-CV-02366-BAS-KSC, 2022 WL 3970755 (S.D. Cal. Aug. 23, 2022).

CLP_PC_020232

**The Proposed Rule Would Codify Family Separation**

One of the most insidious aspects of this proposed rule is its resurrection of the Trump-era asylum transit ban. While this administration promised to end family separation, there is no question that limiting those fleeing harm to withholding of removal or Convention Against Torture (CAT) protection will result in family separation. Neither of these forms of protection provide derivative status. Thus, families are likely to face permanent separation and have to make the impossible choice between living in safety in the United States or living forever separated from immediate relatives.

The proposed rule makes a nod to avoiding family separation by allowing family members to enter the United States along with a principal asylum seeker, even though that principal asylum seeker would only be eligible for withholding or CAT protection under the new asylum ban. Proposed 8 CFR 1208.33(d). However, this provision would only preserve family unity for those family members who traveled together, and not for spouses or minor children who traveled separately or remained in the home country. As a result of this provision, there may be an incentive for whole families to travel to the United States together, including young children, rather than having the family member most at risk leave on their own, once noncitizens come to understand that splitting up before travel will likely result in permanent separation.

Whether the family travels together to the United States, or whether only the family member facing the most immediate threat of harm comes to the United States alone, the result would be the same. If the noncitizen is granted withholding or CAT and the family member who is with them cannot meet this very high legal standard, the family member will be ordered removed. Likewise, if the noncitizen came to the United States alone and wins their withholding or CAT case, they will have no ability to bring their family member to the United States. Moreover, with a removal order against the noncitizen, they would never be able to travel abroad to see family members and be permitted to return to the United States. The NPRM discusses the effect of the proposed rule on families in its Family Assessment section and incorrectly concludes that the rule will not have an impact on families because it includes provisions that accommodate families that are traveling together across the border during the credible fear process only. 88 Fed. Reg. 11749. This rule would codify cruelty and legalize separating families, in direct contravention of President Biden's Executive Order on the Reunification of Families.[29]

**Countries Through Which Asylum Seekers Transit Do Not Provide Adequate Asylum Protections**

Under the proposed rule, asylum seekers who have not been paroled into the United States, or granted a CBP One appointment, would be foreclosed from asylum unless they had applied for asylum and been denied in a country en route to the United States. Proposed § 8 CFR

---

[29] President Joe Biden, Executive Order, on the Establishment of Interagency Task Force on the Reunification of Families, (Feb. 2, 2021) ("My Administration condemns the human tragedy that occurred when our immigration laws were used to intentionally separate children from their parents or legal guardians (families). . ."). https://www.whitehouse.gov/briefing-room/presidential-actions/2021/02/02/executive-order-the-establishment-of-interagency-task-force-on-the-reunification-of-families/.

CLP_PC_020233

208.33(a)(1)(ii). The preamble to the rule devotes considerable space to justifying this aspect of the rule by explaining how the agencies believe that protection systems in other Western Hemisphere countries have improved. 88 Fed. Reg. 11719-23.The agencies acknowledge, without expanding on the point, that many of the countries in which the United States would now be requiring noncitizens to seek asylum, are themselves countries from which high numbers of asylum seekers flee. ("While some of the countries below are the origin for sizable numbers of asylum seekers in the region, they also demonstrably provide protection for others who do consider those countries to be safe options where they are free from persecution or torture.") 88 Fed. Reg. 11720.

It is difficult to reconcile this language with the realities in the countries from which asylum seekers flee. In fact, it has been well documented that Mexico, one of the primary countries in which those fleeing harm would be expected to seek asylum under the rule, has been extremely unsafe for asylum seekers. Secretary Mayorkas himself recognized the safety concerns for asylum seekers in Mexico in issuing his memo seeking to end the so-called Migrant Protection Protocols, stating, that the "adverse living conditions and violence experienced by migrants returned to Mexico pursuant to MPP are of grave concern to the Secretary."[30]

The preamble goes on to commend the development of the Guatemalan asylum system, even though it appears to receive fewer than 2,000 application per year 88 Fed. Reg. 11721 and Guatemala continues to be a primary country from which asylum seekers flee.[31] Likewise, the preamble lauds Ecuador for receiving several thousand asylum applications from Venezuelans, 88 Fed. Reg. 11723 but, again, does not acknowledge the recent increase in Ecuadorian asylum seekers, fleeing conditions in that country.[32]

The United States cannot outsource its obligations to provide protection to those fleeing persecution and torture. This is especially true when the countries through which noncitizens travel are themselves documented to be dangerous and lack protections.

A cornerstone of the proposed rule is to cut off asylum eligibility for noncitizens who do not seek asylum in one of the countries through which they transit. Since the vast majority of Northern Triangle asylum seekers, as well as other Central American and South American asylum seekers can neither afford plane tickets nor qualify for tourist visas, they have no choice but to transit over land to seek safety in the United States. As with the CBP One App and the parole options, the third country transit ban disproportionately affects low income asylum seekers including BIPOC asylum seekers. NIPNLG calls on the administration to live up to its

---

[30] DHS, Explanation of the Decision to Terminate the Migrant Protection Protocols,  at 14, (Oct. 29, 2021) https://www.dhs.gov/sites/default/files/2022-01/21_1029_mpp-termination-justification-memo-508.pdf.

[31]  Between 2018 and 2020 more Guatemalans sought asylum defensively than from any other country; Guatemala was also the third highest country for affirmative asylum during that period. DHS, "Fiscal Year 2020 Refugees and Asylees Annual Flow Report," at 17, (Mar. 8, 2022) https://www.dhs.gov/sites/default/files/2022-03/22_0308_plcy_refugees_and_asylees_fy2020_1.pdf.

[32] Vincent  Ricci, "More Ecuadorians leaving for US amid 'burst in migration'" AL JAZEERA, Sep. 23, 2021, https://www.aljazeera.com/news/2021/9/23/more-ecuadorians-leaving-for-us-amid-burst-in-migration.

CLP_PC_020234

promise of seeking racial equity[33] under U.S. law, rather than codifying racial and economic animus into the regulations.

### Exceptions to the "Rebuttable Presumption" Are Insufficient

Under the proposed rule, asylum seekers would be subject to a presumption of ineligibility for asylum unless they meet specific exceptions that very few asylum seekers will be able to meet. Pursuant to proposed 8 CFR §§ 208.33(a)(1) and 1208.33(a)(1), those fleeing harm would be barred from asylum unless they had valid entry documents; entered through the parole programs which are limited to only four countries; applied for asylum in a third country and was denied; or successfully made an appointment using CBP One (unless they qualify for limited exceptions to the CBP One requirement.) Additionally, the presumption can be rebutted if "exceptionally compelling circumstances exist."

The only categories of per se rebuttable grounds listed at proposed 8 CFR §1208.33(a)(2) are for noncitizens (or immediate family members with whom they are traveling) who: (i) Faced an acute medical emergency; (ii) Faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or (iii) Satisfied the definition of ''victim of a severe form of trafficking in persons'' provided in 8 CFR §214.11.

These exceptions are inadequate for many of the same reasons that the exceptions to using CBP One are inadequate. First, again, there is no discussion of how a noncitizen would even approach a port of entry to explain to a CBP officer that they fall under one of these exceptions. While it would seem to be easiest to demonstrate an "acute medical emergency," there is no explanation of how this exception would work in practice. If the emergency is truly severe, the noncitizen might need hospitalization in Mexico. If the noncitizen needs life-saving future treatment, how would they prove to a CBP officer that the issue they face is "acute"?

Similarly, it is difficult to understand, in practice how an asylum seeker would be able to prove to a CBP official that they are in imminent danger of kidnapping, rape, torture, or death. These are the types of claims that require full evidentiary interviews before asylum officers or hearings before immigration judges to prove. Would CBP officers receive specialized training to assess the likelihood that the noncitizen is in "imminent" danger? Would a noncitizen who had already been subjected to one of these harms qualify for an exception, or is the exception only forward-looking?

Finally, again, it is difficult to comprehend how a trafficking victim would be able to prove this harm to a CBP officer. Most trafficking victims do not understand the legal definition of trafficking and require extensive counseling both by mental health and by legal professionals to fully comprehend that the harm they experienced is legally defined as "trafficking." For these populations all of whom, by definition, are vulnerable, the proposed rule provides no mechanism for them to present their exceptions to a trained CBP official.

---

[33] President Joe Biden, Executive Order On Advancing Racial Equity and Support for Underserved Communities Through the Federal Government (Jan. 20, 2021) https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/executive-order-advancing-racial-equity-and-support-for-underserved-communities-through-the-federal-government/.

CLP_PC_020235

The proposed rule does explain that for asylum seekers who have been put into expedited removal, presumably those who entered the United States without inspection, asylum officers will conduct a two-tiered interview, first determining whether any of the three above exceptions have been met, and then, if not, conducting a reasonable fear interview. "Accordingly, the proposed rule would implement changes to and build on this existing system and would instruct asylum officers to apply the lawful pathways rebuttable presumption during credible fear screenings." 88 Fed. Reg. 11724. While asylum officers have more training on humanitarian relief than CBP officers, the questions still remain how an asylum seeker would be able to prove "imminent" danger or to even comprehend what trafficking is.

Thus, in addition to conducting credible fear or reasonable fear interviews, asylum officers would have to conduct extensive questioning concerning the potential exceptions under the proposed rule. That questioning will add to the length of interviews, further straining asylum office resources, and adding to Asylum Office backlogs that already number over 600,000.[34] The NPRM recognizes the greater resources the rule would require, and it even explains why it was wrong under the "Global Asylum Rule" to have asylum officers apply all bars in fear screenings, 88 Fed. Reg. 11744, yet states that applying the new bars under the current rule will not be that resource-intensive. The preamble further justifies the use of these greater resources at the border finding that increased expenditure of resources acceptable because "fewer will pass the screening process." 88 Fed. Reg. 11737. Thus, the purpose of the rule is crystalized—allow fewer noncitizens access to asylum protections.

Equally disturbing is the fact that the three exceptions listed in the proposed rule appear to be the only exceptions. That is, the rule does not state that the "exceptionally compelling circumstances" *include* the three listed exceptions; it states that they **are** the exceptions. While the preamble states, "In addition to the per se grounds for rebuttal, the presumption also could be rebutted in other exceptionally compelling circumstances, as the adjudicators in the sound exercise of their judgment may determine," 88 Fed. Reg. 11707, the language of the actual proposed regulation does not include such expansive language. Thus, it is unclear whether other, "equally compelling exceptions," would even be considered. For example, a parent could be separated by smugglers from a young child who has already entered the United States, but it does not appear that there would be a way for an asylum seeker to bring that situation to the attention of CBP or to rebut the presumption against asylum in the course of a fear-based interview with an asylum officer.

 The preamble expends considerable space discussing litigation that found similar Trump-era regulations to be unlawful. 88 Fed. Reg. 11738-42, and seeking to differentiate the current rule because there are some potential legal pathways, as discussed above, that favor wealthy and well-educated asylum seekers, that some noncitizens may use. Notwithstanding those limited legal pathways, the proposed rule is resurrecting the Trump-era asylum bans, and no number of pages in the NPRM's preamble can disguise the fact that the agencies are defending the indefensible.

---

[34] USCIS, Asylum Quarterly Engagement and Listening Session Script & Talking Points, 5 (Dec. 13, 2022) https://www.uscis.gov/sites/default/files/document/foia/Asylum_Quarterly_Engagement-FY23_Quarter_1_Script_and_Talking_Points.pdf.

CLP_PC_020236

Further, with the ports of entry essentially closed, other than to the fortunate few who have secured CBP One appointments, asylum seekers in desperate situations, in dangerous border towns, will have no choice but to cross unlawfully into the United States and be placed into the flawed (and, under this rule, more restrictive) expedited removal system. That reality, along with the more in-depth asylum officer interviews, will further strain the asylum system.

Finally, as discussed above, the expedited removal system already severely limits rights of asylum seekers. It is extremely difficult for asylum seekers who have just completed a harrowing journey to the United States, and who often do not have the benefits of consulting with legal counsel, to explain why they fled their country in a way that aligns with the complexities of U.S. asylum law. Under this rule, the stakes would be even higher, as those fleeing harm would have to meet a "reasonable possibility" standard rather than the "significant possibility" standard that Congress enshrined in the INA. Necessarily, thousands of noncitizens who could meet the "significant possibility" standard will be unable to meet the higher "reasonable possibility" standard and will be promptly removed—even though they have met the standard prescribed by Congress.

### The Proposed Rule Would Constitute an Abrupt Departure from Conclusions Reached by the Agencies Less Than One Year Ago

The NPRM acknowledges that less than a year ago, in the Asylum Processing Rule regulation, the agencies recommitted to the statutory "significant possibility" standard yet, now the agencies claim that it is acceptable to use the higher "reasonable possibility" because of the high number of expected border encounters. The agencies now claim that "the interests balance differently and warrant a different approach from the one generally applied in credible fear screenings." 88 Fed. Reg. 11742. They then attempt to justify using the "reasonable possibility" standard for withholding and CAT claims, even though that standard is not set forth in the statute, for future fear claims at the border.

The agencies thus set up a strawman for expedited fear claims: the statute requires the use of the "significant possibility" standard for asylum so, rather than implement Congressional intent that an inclusive standard be used, the agencies knock out the possibility of seeking asylum so that the Congressional standard is no longer applicable. It is wrong for the agencies to use this gamesmanship to subvert Congressional intent. Moreover, this abrupt change in reasoning from less than a year ago, indicates that the impetus behind this proposed rule is political rather than based on reasoned decision making.[35]

The preamble further explains that if a noncitizen succeeds in demonstrating a reasonable possibility of persecution or torture, they will be placed in INA section 240 proceedings and the immigration judge would not owe deference to the asylum officer's determination that they did

---

[35] Zachary B. Wolf, "Don't Try to Make Sense of Biden's Border Policy," CNN, Jan. 9, 2023, https://www.cnn.com/2023/01/09/politics/biden-border-title-42-what-matters/index.html. ("President Joe Biden's immigration policy is confusing and full of contradictions. . . Even though he is essentially expanding the policy, the president also acknowledged last week his move could makes things worse because it almost encourages people turned away at the border to try repeatedly to enter the US.")

CLP_PC_020237

not rebut the presumption of asylum ineligibility. 88 Fed. Reg. 11742. While that result is better for asylum seekers who still have some possibility of winning their claim (and not facing the permanent legal limbo of withholding of removal), it also reinforces the fundamental unfairness of applying the higher standard at the border, and the likelihood that many thousands of asylum seekers will face summary removal because they were not able to marshal the evidence they needed during expedited removal interviews to demonstrate why they qualify for an exception to the presumptions against asylum eligibility.

**NIPNLG Strongly Opposes the Removal of Automatic Immigration Judge Review of Negative Fear Interviews and the Ability to Request Reconsideration of Wrongful Credible Fear Interview Decisions**

At the same moment that the agencies propose dramatically altering accepted standards at the border and curtailing the rights of noncitizens, the NPRM simultaneously proposes to require noncitizens to affirmatively request IJ review of negative fear interviews. We strongly oppose this change. Many noncitizens are disoriented and do not understand the American legal system at the time they go through a credible or reasonable fear interview process. Requiring them to affirmatively request immigration judge review of a negative fear finding will result in more people being removed who should have been permitted to pursue fear claims inside the United States. Immigration judges overturn asylum officer credible fear denials in 25 percent of all cases.[36] The proposed rule will likely exacerbate problems with asylum officer fear-based interviews, since officers would have to learn how to implement the two-tiered approach, evaluate exceptions to the new bans, and then apply either the "significant possibility" standard or the "reasonable possibility" standard based on the results of their asylum ban analysis. Given the significant error rate by asylum officers and the incredibly high stakes in expedited removal—removal with no hearing on the merits—the agencies should not remove automatic review of asylum officer denials. Automatic review of asylum officer denials has been an important safeguard against (substantial) asylum officer errors in these interviews; it would be wrong to eliminate this safeguard at the moment that the agencies force noncitizens to meet a higher threshold in their fear interviews. The USCIS Asylum Division continue to be plagued by high attrition rates and is struggling to fill funded positions. As of December 2022 fully 50 percent of its AO2 officers had been on the job for under one year.[37] The stakes for asylum seekers are too high to leave these decisions in the hands of inexperienced asylum officers with no required review.

Likewise, NIPNLG strongly condemns removing the ability of noncitizens and their counsel to request reconsideration from USCIS asylum officers. NIPNLG and partner organizations have filed complaints with CRCL outlining egregious misapplication of the law by Houston Asylum Officers in credible fear interviews.[38] Already under the Asylum Processing Rule's restrictions on RFRs it has been nearly impossible to gather needed information and file

---

[36] TRAC, Immigration Judges Overturn Asylum Officer's Negative Credible Fear Findings in a Quarter of All Cases, (Mar. 14, 2023), https://trac.syr.edu/whatsnew/email.230314.html.
[37] USCIS, Asylum Quarterly Engagement and Listening Session Script & Talking Points, 4 (Dec. 13, 2022) https://www.uscis.gov/sites/default/files/document/foia/Asylum_Quarterly_Engagement-FY23_Quarter_1_Script_and_Talking_Points.pdf
[38] *See*, NIPNLG et al, CRCL Complaint, (Apr. 27, 2022) https://nipnlg.org/PDFs/2022_27April-CFI-complaint.pdf.

CLP_PC_020238

within the 7-day period. Stating that USCIS retains discretion to reconsider its decisions—but no one can ask them to do so—is, in practice, eliminating requests for reconsideration before USCIS. Removing any ability for advocates to seek asylum office review of wrongful credible fear denials—no matter how egregious the error may be or how imminent the danger to the asylum seeker may be—will result in asylum seekers being wrongly returned to the country they fled and put at risk of potential persecution or torture.

### The 24-Month Sunset Date Is Entirely Arbitrary

The rule includes a sunset date 24 months after it is finalized. The preamble to the rule primarily cites to the impending end of Title 42 expulsions to justify the radical restrictions on asylum eligibility. 88 Fed. Reg. 11727. While it may be correct that the lifting of Title 42 will temporarily increase border entries, that is a problem of the agencies' own making by using COVID as a pretext to unlawfully expel asylum seekers. The preamble gives *no* explanation of how it arrived at 24 months as a time when the provisions would sunset, simply stating that it needs more than a "short period" to account for the end of Title 42. *Id.* Moreover, while the preamble emphasizes that the rule is temporary, it also makes clear that the rule could be extended beyond this 24 month period.

If the rule actually does end in 2025, (which of course is preferable to a permanent rule), there is no logical reason that two people who are situated identically would have radically different rights and futures in the United States based on the timing of a rule that offers no explanation about its own reasons for this period of time. Cynically, it appears that the 24-month end date was chosen so that the rule would remain in effect through the next presidential election cycle.

### The NPRM Would Radically Redefine Asylum Eligibility and Should Not Have Been Issued with a Mere 30-Day Comment Period

The Administrative Procedures Act (APA) § 553 requires that the public "interested persons" have "an opportunity to participate in the rule making." In general, the agencies, must afford "interested persons a reasonable and meaningful opportunity to participate in the rulemaking process."[39] Courts have found that for the agencies to comply with this participation requirement the comment period they give must be "adequate" to provide a "meaningful opportunity."[40] Given the importance of the public's participation in the rule-making process, Executive Order 12866 specifies that "in most cases should include a comment period of not less than 60 days."[41] Executive Order 13563 explicitly states, "To the extent feasible and permitted by law, each agency shall afford the public a meaningful opportunity to comment through the Internet on any proposed regulation, with a comment period that should generally be at least 60 days."[42] Despite the radical changes the proposed rule would make to the rights of asylum

---

[39] *Forester v. CPSC*, 559 F.2d 774, 787 (D.C. Cir. 1977).

[40] *N.C. Growers' Ass'n v. UFW*, 702 F.3d 755, 770 (4th Cir. 2012).

[41] *See* Exec. Order No. 12866, § 6(a), 58 Fed. R. 51,735 (October 4, 1993)

[42] *See* Executive Order 13563—Improving Regulation and Regulatory Review (Jan. 18, 2011), https://obamawhitehouse.archives.gov/the-press-office/2011/01/18/executive-order-13563-improving-regulationand-regulatory-review. [emphasis added].

CLP_PC_020239

seekers, it does not even attempt to justify the short time frame for comments other than the impending end of Title 42 expulsions. Indeed, the NPRM states that the agencies intend to implement the rule on May 11—meaning that they have already determined they will have time to respond to the comments and make any required revision to the rule within just over a month's time of the close of the comment period. It is arbitrary and capricious for the agencies to decide in advance how long their response to comments will take before the agencies know how many comments they will receive or what the content of the comments will be. Indeed, as of March 23, 2023, over 15,200 comments have been submitted.[43]

**NIPNLG Supports the Sections of the Rulemaking that Will End Trump-Era Asylum Bans**

The proposed rule would formally rescind several Trump-era asylum rules designed to severely restrict access to the asylum system. NIPNLG fully supports the recission of "Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims," 83 FR 55934 (Nov. 9, 2018) and "Asylum Eligibility and Procedural Modifications," 85 FR 82260 (Dec. 17, 2020). As discussed above, asylum seekers have statutory rights to seek asylum and NIPNLG opposes any rules that restrict these rights. Thus, we fully support a formal recission of restrictions on asylum access. NIPNLG urges the agencies to withdraw this proposed rulemaking except for the sections that rescind the Trump era rules.

**Conclusion**

NIPNLG is appalled that the agencies are seeking to reissue some of the worst regulations that were proposed under the Trump administration. The NPRM is designed to curtail the rights of asylum seekers in order to reduce the number of individuals who seek safety at the Southern Border. The administration should not abridge statutory rights and rights under international law in an effort to score political points. This rule resurrects Trump-era policies that have been found unlawful. Moreover, it represents a stark departure from President Biden's commitment to restoring faith in our immigration system and in addressing historic problems of racial equity.

We request that the agencies withdraw this rule in its entirety or, at a minimum, make significant changes before finalizing it.  Please do not hesitate to contact Victoria Neilson at victoria@nipnlg.org if you have any questions or need any further information. Thank you for your consideration.

Victoria Neilson
Supervising Attorney
National Immigration Project (NIPNLG)
2201 Wisconsin Ave., NW, Suite 200
Washington, DC 20007
(202) 742-4447

---

[43] *See* https://www.federalregister.gov/documents/2023/02/23/2023-03718/circumvention-of-lawful-pathways.

CLP_PC_020240



P.O. Box 159
Nogales, AZ 85628-0159
(520) 287-2370

www.kinoborderinitiative.org

Edificio 3, Dept. 401
Colonia Fovissste II,
C.P. 84020 Nogales, Sonora
(631) 316-2086

March 24, 2023

Daniel Delgado
Acting Director
Border and Immigration Policy
Office of Strategy, Policy, and Plans
U.S. Department of Homeland Security
telephone (202) 447-3459

Lauren Alder Reid
Assistant Director,
Office of Policy, EOIR
U.S. Department of Justice
telephone (703) 305-0289

**Re: Comment on the Proposed Rule by the Department of Homeland Security (DHS) and the Executive Office for Immigration Review (EOIR) on Circumvention of Lawful Pathways, CIS No. 2736-22; Docket No: USCIS 2022-0016; A.G. Order No. 5605-2023**

Dear Acting Director Daniel Delgado and Assistant Director Lauren Alder Reid:

The Kino Border Initiative (KBI) submits this comment to urge the Department of Justice (DOJ) and the Department of Homeland Security (DHS) to withdraw the proposed rule: "Circumvention of Lawful Pathways" in its entirety. These regulations would ban individuals and families fleeing violence and persecution from accessing the protection they desperately need, deserve, and are entitled to under both international (UN 1951 Refugee Convention and 1967 Protocol) and domestic law (Refugee Act of 1980), regardless of how they enter.

To exclusively condition access to asylum at ports of entry on having the means and knowledge to download and operate the CBP One application on a cell phone or tablet device is cruel, inhumane, and completely disconnected from the difficulties endured by people seeking asylum at the southern border. Furthermore, it is unfair to punish individuals and families for the decisions

CLP_PC_020355

they are forced to make to seek safety when US officials deny them regular access to asylum processing at ports of entry.

The KBI is a binational Catholic organization that provides direct humanitarian assistance, such as food, shelter, clothing, and medical attention, to migrants in Nogales, Mexico. Our faith teaches us to welcome the stranger and protect people from violence, especially those most at risk in our society, like women and children. Our faith also informs our involvement in advocacy, since we believe we have a moral obligation to promote laws and policies that protect life and oppose those that treat some lives as disposable. This proposed regulation violates Catholic teaching in that it blocks certain families from seeking protection, which we know in the past has led to death for some of our most at-risk brother and sister migrants.

In 2022, we provided direct assistance and accompaniment to 4485 migrants who expressed violence as their primary reason for migration. These individuals come from a range of geographic locations: 3,730 from Mexico, 268 from Guatemala, 136 from Honduras, 86 from Venezuela, 69 from El Salvador, 58 from Nicaragua, 49 from the U.S., 39 from Haiti, 23 from Ecuador, 12 from Peru, 8 from Cuba, 6 from Russia, and 1 from Guinea.

This direct assistance provides us with a unique understanding of the on-the-ground realities of the southern border. We also collaborate closely with the Florence Immigrant and Refugee Rights Project to provide legal orientation and basic legal assistance to individuals and families who are currently stranded in Nogales, Mexico and attempting to access safety in the US. Current border policies, such as Title 42, force people fleeing violence and persecution to navigate extremely limited options to access safety, placing them in ongoing danger.

**The Proposed Rule Violates US/International Law and Treaty Obligations**
In 1980, Congress passed the Refugee Act, codifying the US' obligations under the 1951 Refugee Convention and Protocol. The Refugee Act of 1980 incorporated into US law non-discriminatory access to asylum, the prohibition against returning refugees to places they would face persecution and the prohibition against improper penalties on asylum seekers based on manner of entry. The proposed rule conditions access to the asylum system on manners of transit and entry, in violation of US and international refugee law. People seeking asylum are fleeing for their lives, which in most cases means their options for when and how they leave their place of origin are extremely limited, as has been recognized since the 1951 Refugee Convention. As we have seen time and again, placing the burden of further restrictions on families in these dire circumstances simply means some will not be able to access safety.

**Asylum Seekers Cannot Access to Meaningful Asylum Processes in Transit Countries**
The proposed rule would require all asylum seekers to make appointments through the CBP One app or be subject to a presumption of ineligibility, unless they can prove they applied for and were

denied asylum in a country through which they traveled through. In reality, the asylum processes in transit countries have numerous shortcomings, which means that they are not a viable alternative to protection in the US. The regulation as proposed overestimates the functionality of other countries' asylum processes.

Specifically in Mexico, the authority in charge of receiving refugee applications, COMAR (Mexican Commission for Refugee Assistance), does not have adequate funding to decide cases. In part as a result of funding limitations, officers with the authority to decide refugee cases are not present in most geographical locations. When a COMAR officer is not in a physical location, they rely on the support of the National Institute of Migration for case resolution despite the fact that agency is the authority in charge of surveillance, control, security, and expulsion of migrants. In other words, an applicant who is in a place in Mexico where COMAR does not have a presence is forced to submit their application to the same authority that could deport them. Understandably many applicants out of fear of deportation do not go to the National Institute of Migration to initiate an asylum case.

Even when the case makes it to COMAR either directly or through the National Institute of Migration, the few trained personnel in COMAR are saturated with unresolved applications. Legally, the office must resolve all cases within 45 days but in practice, it takes an average of one year and in the worst case up to two years. In the meantime, applicants must remain in the geographical area where they originally applied, unless granted a transfer by COMAR. If they move, which is frequently necessary for their own safety or economic stability, their case is considered abandoned. Importantly, that abandoned case is not considered a denial under Mexican law and would not meet the regulation's current threshold of "received a final decision denying that application." Therefore, they neither have legal status in Mexico, nor do they qualify for full asylum consideration in the US under this proposed regulation.

The aforementioned obstacles are exacerbated by the fact that people in need of protection encounter a void of information and support in the process. COMAR is limited to only receiving refugee applications and does not carry out effective dissemination of people's rights in the process. Unless an applicant is lucky enough to be in a Mexican entity where they find assistance from civil associations and/or public defenders it is unlikely that they will be aware of how to proceed in their case.

To illustrate the difficulties with arriving at a final case resolution, we share the details of one case the KBI accompanied with representation by our Mexican attorney:

*Mario, a native of Nicaragua, arrived in Mexico asking COMAR for protection due to political persecution in his country. He began his refugee status recognition process in April 2021 in the state of Chiapas, Mexico. A month after he submitted his application, he was persecuted and

harassed by members of organized crime in that state and requested support from a nonprofit legal services provider to transfer his proceedings to the state of Sonora. COMAR took a month to agree to the request for a transfer, during which time Mario was terrified, living in hiding and unable to go out to work. When he arrived in the state of Sonora, he had to appear before the National Migration Institute and continue his refugee process. He was afraid to visit that office because of the risk of deportation, and only followed up on his case because KBI provided legal representation through our Mexican attorney. It took a total of 2 years and 1 month for Mario to receive a final resolution of his process, including a year in which he had to work irregularly since the COMAR-issued Visitor Card for Humanitarian Reasons expired after the first year. If it were not for the extraordinary support of civil society groups, especially KBI, Mario would not have been able to finalize his process and may have tried to cross into the US, in which case the proposed regulation would have severely limited his chance at accessing protection.

**Asylum Seekers Cannot Find Safety in Transit Countries**

Not only do asylum seekers lack access to a meaningful asylum procedure but they also face persecution and insecurity in transit countries. Our first hand experience makes clear that Mexico is not a safe third country for non-Mexican nationals. There have been over 13,000 reported attacks against asylum seekers stranded in Mexico under Title 42 in just the past two years.  At KBI, we directly hear stories of extortion, abuse of power, and crimes committed against migrants and asylum seekers stranded in and returned to Mexico, including the following examples.

Wilhelmina* fled Venezuela after her parents were killed. She left with her 2 children and her cousin, who is a transgender woman. In early February, they were all kidnapped in a Mexican border city and her cousin was raped by their captors. Wilhemina escaped with her children, and they turned themselves into Border Patrol. They begged the agents not to send them back to Mexico, as they feared for their lives and safety. Border Patrol took away all their clothing and expelled them back to the same city where they had been kidnapped. Whilhelmina has not heard from her cousin since February 8, 2023.

Reina* fled Venezuela earlier this year to save herself and her son after her husband and brother were killed. In Mexico, the mafia forced them off of the bus they were traveling on and kidnapped them for 15 days until her niece in the US could pay the ransom fee. They have tried twice to cross into the US and CBP expelled them twice, which puts them in danger of the mafia targeting them yet again.

Madeline* is an asylum seeker from Haiti and had been trying to get an appointment in Reynosa, where she had experienced numerous abuses. One night, at 3 am, Mexican police broke down the front door of the house and pointed their guns at all the inhabitants, yelling, "Do you have Venezuelans here? Cubans? Colombians?" After checking all their identifications at gunpoint and finding only Haitians, they left. In other instances, Madeline had been stopped by armed

organized crime members to check if she had tattoos and told by organized crime members at gunpoint that it was too late to be outside at 7 pm.

Jovani* fled Ecuador due to discrimination based on his sexual orientation. He was detained by Mexican Immigration in Southern Mexico, and when the agents found out he was HIV positive, they said so in front of everyone in the detention center. They detained him in a separate cell, where sick people were, and each time they detained an additional person there, they told them that Jovani had HIV.

Juan* a young man from Venezuela  fled due to political persecution and violence. He trekked through the Darien Gap, one of the most treacherous migration routes in the world. Juan recounted seeing people dead along the way and he feared that he would not make it. But he did. And he continued his journey through Panama, Costa Rica, Nicaragua, Honduras, Guatemala, and lastly, Mexico. In Mexico, Juan was extorted numerous times by Mexican authorities, and he was kidnapped three times. He explained that during one of these kidnappings,Mexican Immigration authorities with their faces covered kidnapped him in collusion with organized crime. By the grace of God, he survived and managed to make it to the southern border where he now battles to secure an appointment to seek asylum through the CBP One application. When asked if he tried to seek asylum in another country before seeking asylum in the United States, he said, "My journey through Mexico was worse than anything that I experienced in the Darien Gap. Why would I ever seek asylum in a country that has nearly killed me several times? I cannot stay here. I am not safe here."

**The Proposed Rule Would Force More Asylum Seekers to Cross in Dangerous Ways**

Obstacles to the asylum process, such as Title 42 and the proposed rule, ignore the lived experience of asylum seekers and force families and individuals to seek protection in whatever way they can. Since mid-May of 2018, there has been some type of policy blocking regular, timely access to the asylum system at ports of entry, beginning with the  border-wide policy of so-called metering, which forced families to wait weeks or months in Mexico before accessing a process at a port of entry. Families forced to wait in Mexico have faced discrimination as they attempt to piece together the resources to survive, from hospitals that deny them services in life-threatening situations to schools and daycare centers that refuse to admit students for fear that the violence they are fleeing will follow them. Due to this widespread discrimination, and despite the efforts of the KBI and others, civil society organizations in northern Mexico cannot fill the gap created when families are forced to wait in uncertainty in a region plagued by organized crime and ill-equipped to support families for months while they attempt to access a process that is increasingly designed to exist beyond their reach. For families and individuals in a desperate humanitarian situation, or who fear for their lives in northern Mexico, restrictions on access to the port of entry may make crossing between ports the only viable option. In fact, the DHS Office of the Inspector General concluded

that limiting the numbers processed at ports does lead asylum seekers who would have otherwise presented legally to cross the border between ports of entry.

The asylum ban does not advance the national security objectives of the federal government. Most asylum seekers do not wish to evade detection but instead to present themselves to CBP to start the asylum process. In the event that people seeking safety who are not able to get an appointment through CBPOne are blocked from access to asylum, smuggling operations and organized crime in Mexico will only gain more power, take individuals on more treacherous routes to evade detection, and Border Patrol will have to invest more resources to detain individuals. In Nogales, we already see the strong control that organized crime exercises over vulnerable individuals. Migrants report that they are forced to pay from $1,000 USD to $15,000 USD to cross into the US to access safety when they would prefer to cross through legal channels. Researchers have documented the way obstacles to asylum strengthen organized crime groups at the border, and this ban will only contribute to the problem, rather than promoting safety and security.

**The Proposed Rule Would Disproportionately Harm Vulnerable Asylum Seekers**
The proposed rule also disproportionately harms the most vulnerable asylum seekers. The rule would discriminate against people seeking safety based on their manner of transit and entry, disproportionately impacting people who do not have the resources to enter the US by plane and who must present themselves at the Southern border. What distinguishes a person who presents at the port of entry and a person who crosses between ports is not their desire to follow the law, but rather the resources they have access to: whether or not they can get a visa to travel to the US based on their country of origin, whether they can financially afford to travel by plane, what kind of access to legal information they have, and whether they can afford passport processing fees, among other factors. The ban on access to asylum for individuals who cross between ports is an unjust approach and punishes people based on lack of access to resources.

For example, Brenda* and her 2 children are fleeing violence in Southern Mexico. They spent 4 months in Matamoros, Tamaulipas, Mexico waiting for a chance to seek asylum and tried for 6 weeks to schedule an appointment through CBPOne. They felt very unsafe in Matamoros and almost never went outside. Finally, they decided to try to cross through the desert, out of their desperation to access safety in the US.

**CBPOne Denies Access to Asylum and Inflicts Harm**
Further, this rule requires asylum seekers at the southern border to use the CBPOne application to access the asylum system, despite the well-documented reality that CBPOne is impossible for many asylum seekers to use or access. The application requires that asylum seekers own a smartphone, can pay for internet and phone data to use the application, are literate in one of the 3 languages in which the application is offered, have the technological literacy to navigate an

application, and the resources to spend months trying to schedule an appointment on an application full of technological glitches and offering an extremely limited number of slots.

This requirement bans the most vulnerable asylum seekers from seeking asylum, such as Black and Brown asylum seekers who encounter racialized facial recognition bias in the application, people who speak indigenous languages or other languages not offered in the application, people with literacy challenges or learning disabilities, and those with scarce financial resources. This month, 35 Members of Congress expressed their opposition to the proposed rule and its requirement that asylum seekers use the CBPOne application due to the grave harm it has already caused. For instance, after a family from Cuba had been trying for weeks to get an appointment and finally scheduled one for February 3, 2023 , their 17-year old son was murdered in Monterrey, Mexico before that day ever came. At KBI, we have also received reports about the dangers that families and individuals face while waiting for their appointments.

Jaime,* his wife and his son fled Venezuela and arrived in Piedras Negras, Coahuila. There, they were able to schedule an appointment through CBP One, but the only available appointment was in San Ysidro, Baja California, over 1200 miles away. While traveling to San Ysidro by bus, the entire family was kidnapped, tortured, and extorted by a criminal group. The people who boarded the bus identified themselves as Mexican immigration agents, and after asking Jaime and his family where they were from, told them they needed to get off the bus so they could check their documents. These supposed immigration agents brought them to a house, where they were held for 20 days, extorted, and tortured. One night at 3:00 a.m., they were blindfolded, put in a truck and taken to the border wall. They said they had to walk and cross and if they tried to come back, their captors would kill them. Once they crossed, they called 911 and explained what happened. Border Patrol arrived and they explained that they had been kidnapped, had missed their CBP One appointment while being held hostage, and were forced to cross. The agent responded that they were the criminals, as they had crossed illegally. A few hours later, Border Patrol expelled them to Nogales, Mexico.

The CBPOne application also separates families. The extremely limited number of appointments available means every morning that new appointments are released, they are gone in a matter of seconds. Average-sized families of 3 or 4 people have found it nearly impossible to get an appointment for all members of their family. This means that families are forced to separate when they can only secure appointments for 1 or 2 family members at a time.

KBI has been advocating for 17 families who faced family separation/rejection at the POE in February 2023. Out of these families, 5 are from Haiti. These families reported that they had been attempting to schedule an appointment for all their family members for weeks, but were not able to. Some of them missed the larger batch of appointments that were originally made available on January 12, 2023 because at that time, CBPOne was not available in Haitian Kreyol. All of the

Haitian families have a child/children 5 years or younger, were only able to schedule CBPOne appointments for one parent, and therefore, faced family separation and/or rejection at the Nogales POE.

These families reported that even though none of them were allowed to enter as a complete family unit, they saw other families who were able to do so, despite not having all family members on their appointment. Some of these families were made to form a line at the POE with other families whose children lacked appointments and saw 8-9 families before them be allowed to enter, only to be denied the same opportunity because CBP officers told them they had already let in enough families. When the families began to speak out against this injustice, CBP officers began to threaten to call the Mexican police if they didn't leave and started yelling loudly: "GO! GO AWAY!"

In the case of 3 families, CBP refused to allow their young child[ren] to enter with the parent who had the appointment because the children's names were not on the appointment. This resulted in family separations that have greatly affected these children. These families report that their young children who have been separated from their mothers or fathers cry nonstop, have difficulty sleeping, refuse to eat, or fear being out of sight of the parent they remain with for even a moment.

To illustrate this pattern, here are the details of one of these instances:

In mid-February 2023, Jesús*, Rosa* and their 2 kids approached the port of entry with a CBPOne appointment. The application would only allow the family to list Jesús and Rosa and would not permit them to add their 2 children, ages 4 and 6, to the same appointment. The CBP agent at the Nogales POE said the children could not be admitted because they were not registered, and if Jesús and Rosa wanted to keep their appointment, they would have to cross and leave their children behind. Jesús asked if he and his son could cross together instead, so that Rosa would only have to try to secure an appointment for 2 people, rather than 4 if they all stayed. The official aggressively responded that he could not. As they tried to figure out what to do, CBP officials said if they didn't vacate the premises they were going to call the Mexican police to remove them. Jesús finally decided he would cross alone, so that he could find a way to support his family, figuring it would be slightly easier for Rosa to secure 3 appointments. After informing the officer of his decision, the officer asked Jesús, "Are you really going to leave your family all alone?" As a result of these obstacles to seeking asylum as a family unit, Jesús and his family decided he would cross alone.

**Inadequate Safeguards for Rogue Officer Behavior: Case of CBPOne Rejections**
In Nogales, the Port of Entry processes 40 CBPOne appointments daily: 20 at 7 am and 20 at 12 pm. On March 18, 2023, KBI received 13 reports of people who presented at the POE with

CBPOne appointments and were rejected. They reported this happened to at least 15 people out of the 20 who had appointments at 12 pm. The port rejected a similar number the following day and on March 21, 2023, while arriving in Mexico at the POE, I personally ran into a group of 15 people who all had CBPOne appointments at 12 pm and had been rejected. That same day, I met a family from Haiti who told me they had an appointment scheduled for March 23 and had decided to camp out at the POE to try to understand this sudden change, fearing they would also be turned away on the day of their appointment.

KBI has spoken with 30 people who have arrived at our migrant aid center and reported a POE rejection. The experiences and circumstances of the rejections were inconsistent, causing confusion for migrant people. However, nearly all of the cases KBI has received involve people from countries other than Mexico. In some cases, CBP officers asked individuals and families fear screening questions, such as "Why did you leave your country of origin?"; "Have you been threatened in Mexico?". In some cases, people told Kino they expressed fear of persecution in their home country and were still rejected. CBP officers asked some people other questions, such as those directed toward Venezuelans and Haitians: "If you crossed through 8 countries, why didn't you seek asylum in one of those countries? Why the US?"

In some cases, CBP officers did not ask any questions and simply told people they were rejected, told them to leave and to try again to get another appointment through CBPOne. In other cases, CBP officers rejected people for only having a photocopy of their identification, even though these people explained they had lost their original in the Darien Gap.

On March 19, 2023, Ariel* arrived for his appointment at the Nogales POE. He fled Venezuela and after trying for months to schedule an appointment from Ciudad Juarez, finally got one in Nogales, Sonora. At the appointment, the CBP officers asked him when and why he had left Venezuela and he explained he faced government persecution due to the job he had there. They asked how many countries he had traveled through and why he didn't stay in one of those countries or in Mexico. He waited for a while in the CBP station and saw other people and families receiving Notices to Appear with court dates. Then, an agent called Ariel and 3 others, opened the door and told them to leave, saying that they were not accepted and that they try to get another appointment. A woman who was rejected alongside Ariel asked the agent why she had been rejected while another person she was traveling with had been accepted and the agent responded, "Do you want me to reject him too?"

On the same day, Javier* of El Salvador presented at the POE for his appointment. He is a gay man fleeing persecution in his home country. The agents did a DNA swab on him and rejected him with no explanation along with about 15 other people. For Jonathon* of Venezuela, CBP officers asked him, "Why didn't you stay in Colombia, Costa Rica, Panama or Mexico?" and rejected him in the group of 15 people.

After advocacy and case documentation by KBI, CBP OFO provided a pathway to remedy for those affected individuals and families that remained in Nogales, Sonora. However, this situation is a troubling case study and relevant to the rationale for our rejection of this proposed rule. The rule relies on impeccable port of entry processing of asylum seekers, including CBP officers consistently acting in good faith and in compliance with all relevant law, policy, and protocol. In practice, CBP is an agency with a track record of abuse of power and impunity. Asylum seekers risk encountering arbitrary and abusive decisions by officers at the port, which can drive them to seeking asylum between ports of entry. Vulnerable individuals and families should not have to pay the consequences of government failure.

**Conclusion**

Given the legal, moral, and practical issues with this rule, we at the KBI oppose this regulation banning access to asylum for those who enter between ports. We urge the government to withdraw this rule and to develop solutions that humanely and fairly process asylum seekers who arrive at the Southern Border.

Sincerely,

Joanna Williams
Executive Director
Kino Border Initiative


*Names changed to protect privacy.*



March 24, 2023

Submitted via www.regulations.gov

Daniel Delgado, Acting Director
Border and Immigration Policy
Office of Strategy, Policy, and Plans
U.S. Department of Homeland Security

Lauren Alder Reid, Assistant Director, Office of Policy,
Executive Office for Immigration Review
U.S. Department of Justice

**RE: DHS RIN 1615-AC83/EOIR RIN 1125-AB26 or Docket No. USCIS 2022-0016/A.G.
Order No. 5605-2023
Public Comment Opposing Proposed Rule: Circumvention of Lawful Pathways**

Dear Acting Director Delgado and Assistant Director Reid:

The Immigrant Law Center of Minnesota submits this comment in response to the proposed rule
published in the Federal Register on February 23, 2023. Our organization urges the Department
of Justice (DOJ) and Department of Homeland Security (DHS) to withdraw this proposed rule in
its entirety.

The Immigrant Law Center of Minnesota (ILCM) has provided legal services to low-income
immigrants since 1996. ILCM's mission is to enhance opportunities for immigrants and refugees
through legal representation for low-income individuals, and through education and advocacy
with diverse communities. ILCM has offices across Minnesota and serves thousands of clients
each year in a wide variety of humanitarian immigration cases.

ILCM works directly with asylum seekers, usually in our deportation defense program.  We also
help successful applicants to adjust their status after a year, and to apply for citizenship when
eligible. Among these clients are individuals who leave behind their homes and families, and
travel long and arduous journeys, often at great financial expense, in order to escape danger. The

new rule would endanger asylum seekers by forcing them to seek asylum in countries facing problems similar to those they are attempting to flee.

This proposed rule echoes the previous administration's transit ban, with very limited exceptions. Its reliance on the CBP One app implements a variation of prior metering policies that severely restrict access to interviews at border ports of entry, thereby denying migrants the ability to seek protection from persecution and harm.

Based on our work with these vulnerable populations, ILCM strongly opposes the rule for the following reasons:

### I. The proposed rule contravenes international and U.S. asylum law.

The proposed rule states that asylum seekers would be barred from obtaining asylum in the United States, should they have passed through a third country to reach the United States, unless they have applied for asylum in that country and been denied. Such refusal to consider migrants' applications for asylum contravenes international and national immigration law.

In 1968, the United States ratified the 1967 Protocol Relating to the Status of Refugees without reservation. The 1967 Protocol extends protection to asylum seekers beyond the 1951 Refugees Convention and applies to people seeking asylum in the United States. In ratifying the protocol, the United States was bound to uphold Articles 2-34 of the 1951 Refugee Convention. As such, under Article 33, the United States cannot send asylum seekers back to dangerous countries. Article 33 states: "No contracting state shall expel or return (*refoul*) a refugee under any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership in a particular social group, or political opinion." [1]

Because the United States incorporated its international legal obligations into the U.S. immigration and Nationality Act (INA), the proposed Rule also contradicts U.S. immigration law. Under the INA, "any alien who is physically present in the United States or who arrives in the United States (whether or not a designated port of arrival and including an alien who is brought to the United States after being interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum." [2]

According to international law and U.S. immigration law, migrants entering the United States have the legal right to apply for asylum regardless of the countries through which they transited. The proposed rule pays lip service to the right to apply for asylum by framing the bar to asylum as a "rebuttable presumption" rather than as a bar to application.

> "First, the presumption would not prohibit noncitizens from applying for asylum. Section 208 draws a distinction between those permitted to apply for asylum and those eligible to receive a grant of asylum." [3]

---

[1] 1951 Convention Relating to the Status of Refugees, Article 33
[2] Immigration and Nationality Act, 208(a)(1)
[3] Federal Register/Vol. 88, No. 36/Thursday, February 23, 2023/Proposed Rules, p. 11735.

CLP_PC_020617

While the proposed rule purports to be in compliance with U.S. asylum law by allowing the asylum seeker to ask for asylum, it then rejects the asylum seeker based on this rebuttable presumption against eligibility, without even a preliminary consideration of the merits of their request. This is a violation of both the letter and the spirit of U.S. asylum law.

**II. The conditions under which asylum seekers may still request asylum under the rule are so limited as to make nearly all asylum seekers ineligible to apply for asylum.**

The proposed rule creates an unreasonable "rebuttable presumption" that an asylum seeker is **ineligible** for asylum unless the individual

1. has been granted parole through one of the established "humanitarian parole" programs, or
2. has presented themselves at a port of entry through a pre-scheduled time and place by using the CBP One app, or
3. has sought asylum or other protection in any country they traveled through and received a final denial.

Establishing a "rebuttable presumption" of ineligibility is inconsistent with U.S. law, which allows "any alien who is physically present in the United States or who arrives in the United States" to apply for asylum.

**A. The presumption of asylum ineligibility can be rebutted only in very narrow and extreme circumstances.**

The presumption of asylum ineligibility could potentially be rebutted if, at the time they entered the United States, the asylum seeker or a family member traveling with them suffered a severe medical emergency, faced an imminent or extreme threat to their life or safety, was a victim of a severe form of human trafficking, or faced other exceptionally compelling circumstances. The exceptions to the proposed rule are very narrow and require a showing by a "preponderance of the evidence." Even those who could potentially meet one of these exceptions may not be in possession of medical documentation or proof of imminent harm other than their own testimony in order to meet this evidentiary standard. Moreover, asylum officers and immigration judges are not medical experts with the required expertise to evaluate these types of medical issues. Asylum seekers without counsel will have yet another hurdle to contend with to meet the heightened "preponderance of the evidence" standard to rebut the presumption of asylum ineligibility.

**B. A majority of asylum seekers who arrive at the U.S. southern border are not, and will likely never, be eligible to enter the United States through one of the established humanitarian parole programs.**

The recently implemented humanitarian parole programs only apply to a select number of nationalities — Cuban, Haitian, Nicaraguan or Venezuelan — and require the person fleeing to have contacts in the United States with specific immigration statuses able to financially sponsor

them. While these humanitarian parole programs may help some people fleeing conflict zones and/or authoritarian regimes, these programs only benefit those who have the ability to obtain passports or travel documents and who have U.S.-based contacts with ample resources to provide money for airfare and a place to stay in the United States.

Even for people from the select few countries designated for humanitarian parole, these programs require asylum seekers to wait in their home countries until they can obtain visas, airline tickets, sponsorship, and approval. Such waiting periods further endanger asylum seekers whose safety is already at risk. Conditioning the possibility of parole or asylum on financial resources and close personal connections in the United States is inconsistent with U.S. law.

The vast majority of asylum seekers come from countries other than Cuba, Haiti, Nicaragua, or Venezuela, and thus are completely ineligible for these humanitarian parole programs. In February 2023, 61 percent of migrant encounters at the southern border were nationals of Mexico, Honduras, Guatemala, and El Salvador.[4] While not all of these individuals are asylum seekers, many are—and none would be eligible for the humanitarian parole programs. Nor would more than 4,500 Russians and additional thousands from China, India, and other countries.[5]

### C. Requiring the use of the CBP One application as a precondition for asylum eligibility violates U.S. asylum law.

The proposed rule requires that asylum seekers download the CBP One application on their phones, register themselves and their families, and search for an appointment to present themselves to Customs and Border Protection, or CBP, in order to seek asylum.

The small number of slots available through CBP One means that it functions as a metering system. In February 2023, fewer than 800 CBP One slots were available daily, distributed among eight ports of entry.[6] These slots usually filled within minutes of the 6 a.m. release time each day.[7]

In addition to the small number of slots available, CBP One functions to exclude many asylum seekers. Many of those waiting at the border have weak wi-fi connections, making the

---

[4] "Migrant encounters from Mexico and the Northern Triangle and From Elsewhere." Washington Office on Latin America. 3/16/2023.  <https://borderoversight.org/2023/03/16/migrant-encounters-from-mexico-and-the-northern-triangle-and-from-elsewhere/> Consulted March 18, 2023.

[5] "All Port of Entry, Non-Expelled Migrant Encounters at the U.S.-Mexico Border (Country List)" Washington Office on Latin America. 3/16/2023.  <https://borderoversight.org/2023/03/16/all-port-of-entry-non-expelled-migrant-encounters-at-the-u-s-mexico-border-country-list/>  and "All Border Patrol Migrant Encounters at the U.S.-Mexico Border (Country List)" Washington Office on Latin America, 3/16/2023. <https://borderoversight.org/2023/03/16/all-border-patrol-migrant-encounters-at-the-u-s-mexico-border-country-list/> Consulted March 18, 2023.

[6] "Asylum Processing at the U.S.-Mexico Border: February 2023." The University of Texas at Austin Strauss Center for International Security and Law. February 2023. <https://www.strausscenter.org/wp-content/uploads/Feb_2023_Asylum_Processing.pdf> Consulted March 18, 2023.

[7] Kate Morrissey, "Asylum seekers in Tijuana are scrambling through mobile app error messages for few appointments into the U.S.," *The San Diego Union-Tribune*, January 22, 2023, <https://www.sandiegouniontribune.com/news/ immigration/story/2023-01-22/cbp-one-app-asylum-tijuana> Consulted 3/18/2023.

CLP_PC_020619

application impossible to use. Because of the small number of slots available, families needing multiple slots are often rejected, or only a single family member manages to get an appointment. Difficulties with the photo function result in disproportionate and discriminatory rejection of applications by darker-skinned applicants.[8]

Further, CBP One is available in only a few languages, which excludes asylum seekers who do not speak, read, and write in English, Spanish, or Haitian Kreyol. Of particular note: this excludes many indigenous people of Mexico and Central America who may not be fluent in Spanish.

The proposed rule does allow for an exception if a person is unable to utilize the CBP One app, but the individual bears the burden of proving that they were unable to use the app. This poses a hardship to those who face language barriers and illiteracy who are the most vulnerable and unlikely to be able to explain how their challenges make it harder for them to navigate these byzantine asylum procedures. Many people who are unable to use the app will find it difficult or impossible to demonstrate that the app was inaccessible to them.

### III. The proposed rule would return asylum seekers to danger.

The proposed rule outlines that one can be exempted from the presumption of asylum ineligibility if they apply for and are denied asylum in a third country. This is essentially a transit ban similar to the one the Trump administration issued in 2019 which was struck down by the courts in 2021.

The requirement to seek asylum in a third country ignores the rates of violence and persecution and the inadequate asylum systems that are realities in Central American countries and Mexico.

### A. Applying for asylum and awaiting a subsequent denial in a third country is dangerous for most fleeing asylum seekers.

The rates of violence and, in particular, the rates of sexual and gender-based violence in the Northern Triangle countries of Guatemala, Honduras, and El Salvador is alarming.[9] Honduras has the highest rate of femicide per capita in the world.[10] At least 62 women per month are killed in Guatemala, a country roughly the size of Tennessee.[11] In El Salvador, a woman was murdered

---

[8] Melissa del Bosque, "Facing Bias: CBP's Immigration App Doesn't Recognize Black Faces, Barring Thousands from Seeking Asylum," *The Border Chronicle*, February 7, 2023, <https://www.theborderchronicle.com/p/facing-bias-cbps- immigration-app> Consulted March 18, 2023.

[9] Kids in Need of Defense, Latin America Working Group, Women's Refugee Commission, "Sexual and Gender Based Violence (SGBV) & Migration Fact Sheet," July 2018. <https://supportkind.org/wp-content/uploads/2018/08/SGBV-Fact-sheet.-July-2018.pdf > Consulted March 19,2023.

[10] *Id.* See also Juju Chang  Et al. "Men Can do Anything they Want to Women in Honduras: Inside One of the Most Dangerous Places on Earth to be a Woman" ABC News, May 3, 2017. <http://abcnews.go.com/International/men-women-honduras-inside-dangerousplaces-earth-woman/story?id=47135328> Consulted March 19, 2023.

[11] "At Least 62 Women Killed every Month in Guatemala: Report", Telesur, November 3, 2017. <https://www.telesurenglish.net/news/At-Least-62-Women-Killed-Every-Month-in-Guatemala-Report-20171103-0028.html> Consulted March 19,2023.

every 16 hours in 2015.[12]  Many women and children arriving at the border are fleeing terrible violence at the hands of intimate partners, criminal gangs, or police or other authorities.[13] These individuals undertake perilous journeys because their abusers and ubiquitous criminal gangs are able to commit atrocities without accountability and government institutions fail to provide protections.

ILCM currently represents women and children from each of these countries. Some of our clients have fled abuse by domestic partners or parents, while others are seeking safety from criminal gangs who have targeted them. One of our clients came to the United States because his life repeatedly was threatened because he testified against a gang member.

By compelling asylum seekers to apply for asylum in transit countries such as Guatemala and Mexico, the United States exposes these individuals to the exact problems they are fleeing. According to the United Nations High Commissioner for Refugees, "The [Northern Triangle] countries have recently experienced some of the highest homicide rates ever recorded. While a rate above 10 intentional homicides per 100,000 people per year is classified as 'epidemic', in Guatemala, homicide rates have reached 30-40 in recent years. In Honduras the homicide rate peaked at over 90 in 2011-2012, and reached 103 in El Salvador in 2015." [14]

Central American migrants are not only unsafe in their own countries where they face persecution based on race, nationality, religion, or membership in a particular social group, but they are also not safe while transiting in Mexico or Guatemala, countries grappling with criminal gang problems of their own. According to Just Security, "…Central American migrants are in actual danger in both Mexico and Guatemala, where they are victims to threats, extortion and violence by both government officials and criminal gangs. Such threats are aimed at them because of their nationality and arguably because of their 'membership in a particular social group.' They are regarded as vulnerable prey by both corrupt government officials and criminals who operate with impunity and, in some cases, with the cooperation of government officials."[15]

### B. Applying for asylum and awaiting a subsequent denial in a third country is nearly impossible for most fleeing asylum seekers.

Mexico, while a signatory to the 1951 UN Convention on Refugees and its 1967 Protocol, lacks the will and capacity to carry out its obligations to asylum seekers. According to Human Rights Watch, while "on paper, Mexican law and procedures reflect international standards in many

---

[12] Kids in Need of Defense, *Neither Security nor Justice: Sexual and Gender Based Violence in El Salvador, Honduras, and Guatemala,* May 4, 2017, available at: https://supportkind.org/wp-content/uploads/2017/05/Neither-Security-nor-Justice_SGBV-Gang-Report-FINAL.pdf [internal citations omitted] Consulted March 19,2023.

[13] Kids in Need of Defense, Latin America Working Group, Women's Refugee Commission, "Sexual and Gender Based Violence (SGBV) & Migration Fact Sheet," July 2018, available at: https://supportkind.org/wp-content/uploads/2018/08/SGBV-Fact-sheet.-July-2018.pdf> Consulted March 19,2023.

[14]  UN High Commissioner for Refugees (UNHCR), *Call to Action: Protection Needs in the Northern Triangle of Central America. UNHCR Discussion Paper. A Proposal for a Strategic Regional Response*, August 2016, available at: <https://www.refworld.org/docid/57a8a8844.html> Consulted March 19,2023.

[15]  Gzesh, Susan. Just Security, "'Safe Third Country' Agreements Would Be Unlawful". July 15, 2019. <https://www.justsecurity.org/64918/safe-third-country-agreements-with-mexico-and-guatemala-would-be-unlawful/ > Consulted March 19,2023.

CLP_PC_020621

respects, our research found wide discrepancies between Mexico's law and the way it is enforced. Those who may have claims for refugee recognition confront multiple obstacles in applying for refugee recognition from the moment they are taken into custody by INM[16]. These obstacles include:[17]

1. The limited number of COMAR locations for asylum applications in Mexico—10 locations, many of which have been overwhelmed by applications in recent years;
2. The requirement for weekly check-ins after application, which confines applicants to the vicinity of the often-remote COMAR office, without access to employment opportunities.
3. A huge increase in applications has overwhelmed the capacity of the underfunded COMAR system: from 1,296 in 2014 to 129,791 in 2021. While the number decreased slightly in 2022, to 118,478, implementation of the proposed rule would greatly accelerate the growth of applications. While COMAR's budget increased from $1.1 million USD in 2017 to $10.3 million in 2023, that remains far too little to cope with application processing.

In addition, Mexico's capacity to absorb migrants is limited by both economic and demographic factors. With a population that is much younger than that of the United States, Mexico already has excess workers, leaving little capacity to employ asylum seekers. And, as noted above, Mexico's gang and gender-related violence endangers asylum seekers there.

Other transit countries, particularly Guatemala, have asylum systems that are in far smaller and in far worse shape than that of Mexico, as well as infinitely less capacity to absorb migrants.

Guatemala is not a safe country in which migrants can seek refuge. According to reports by the United Nations High Commissioner for Refugees, 34,800 Guatemalans sought asylum in the United States in 2018 alone. [18] These individuals fled due to "persecution based on their status as indigenous people, women threatened with domestic violence and young people subjected to gang recruitment." [19]

Guatemala's recently-enacted laws seeking to criminalize people who help migrants are further evidence of the futility of seeking asylum there.[20]

---

[16]  The National Migration Institute (*Instituto Nacional de Migración*) the governmental unit which controls and supervises migration in the country.

[17]  Arturo Castellanos-Canales. "Mexico's Asylum System: Good in Theory, Insufficient in Practice" National Immigration Forum, 3/15/2023. <https://immigrationforum.org/article/mexicos-asylum-system-good-in-theory-insufficient-in-practice/#_ftn39> Consulted March 18, 2023.

[18]  United Nations High Commissioner for Refugees, Global Trends, Forced Displacement in 2018. <https://www.unhcr.org/en-us/statistics/unhcrstats/5d08d7ee7/unhcr-global-trends-2018.html>  Consulted 3/18/2023.

[19]  Gzesh, Susan. Just Security, "'Safe Third Country' Agreements Would Be Unlawful". July 15, 2019. <https://www.justsecurity.org/64918/safe-third-country-agreements-with-mexico-and-guatemala-would-be-unlawful/>  Consulted 3/18/2023.

[20]  Jeff Abbott. "The Other Americans: Migration Crackdowns Are Targeting Migrant Shelters in Guatemala" The Progressive, 2/15/2023. <https://progressive.org/latest/other-americans-migrant-shelters-targeted-abbott-24223/> Consulted 3/18/2023.

### C. The proposed rule irresponsibly delegates U.S. obligations to asylum seekers to already-overburdened third countries.

Other countries in the hemisphere, with smaller populations and less economic capacity to absorb migrants, have admitted far more migrants, in proportion to their populations, than the United States.

As Colombian President Juan Manuel Santos points out:[21]

> "Since the beginning of last decade, countries throughout the hemisphere have taken in millions from Haiti, Venezuela, and Nicaragua. All told, more than seven million Venezuelans and hundreds of thousands from each of the other two countries have fled in search of survival; nearly all have found a new home in Latin America and the Caribbean."

More than 200,000 refugees and asylees have been admitted to Costa Rica since 2018. Asylees and refugees arriving in the past five years make up nearly five percent of its population of five million.

Expecting other countries in the hemisphere to absorb even more asylum seekers is not realistic or fair.

### IV. The proposed rule is discriminatory against certain asylum seekers based on racial, economic, and other factors.

Migrants at the southern border should be able to safely seek asylum without discrimination. The proposed rule discriminates against certain asylum seekers based on racial, economic, and other factors.

### A. The proposed rule is discriminatory against Black, Brown and Indigenous asylum seekers.

The requirement to apply for asylum in a transit country is disproportionately dangerous for Black asylum seekers who have historically been turned away from the asylum process or suffered race-based discrimination in transit countries such as Mexico.

Both Haitians and migrants from Africa report discrimination in the handling of their asylum claims in Mexico.[22] They also report extortion by officials, threats of deportation to Guatemala, and confiscation or destruction of documents.

---

[21] Juan Manuel Santos. "Time for the Americas to step up (again) on migration." El País, 3/6/2023. <https://english.elpais.com/opinion/2023-03-06/time-for-the-americas-to-step-up-again-on-migration.html> Consulted 3/18/2023.

[22] Shahid Meighan. "Black migrants see nothing in Tapachula but racism and a dead end." Tucson Sentinel, 7/28/22. <https://www.tucsonsentinel.com/nationworld/report/072822_black_tapachula/black-migrants-see-nothing-tapachula-but-racism-and-dead-end/> Consulted March 19, 2023.

CLP_PC_020623

A report by the National Migration Institute details the difficulties faced by African immigrants throughout Latin America, summarizing:

> "In addition to the challenges associated with understanding and acquiring humanitarian protection or other statuses in Latin American countries, African migrants face considerable obstacles to accessing their rights during transit and to long-term integration. Throughout the route, African migrants face myriad difficulties rooted in differences between their nationalities, languages spoken, religions practiced, and their race and ethnicity and those of the societies through which they travel.167 Racism, a lack of interpretation and translation services, and a lack of understanding of cultural and individual practices make transit and longer-term settlement particularly difficult for African migrants in the Americas. These factors set the dynamics of African migration apart from those of migrants transiting the region from Venezuela, Central America, and other parts of Latin America."[23]

In addition to the general challenges posed by cultural and language differences, African immigrants in Mexico face discrimination at many levels, including discrimination by government officials:

> "The challenges in Mexico fit into three main categories. First, there is wide-ranging direct and structural racism, including discrimination in detention centers, police violence, employment discrimination, and a lack of access to Mexico's education system. In interviews conducted as part of this study, researchers and members of civil society in Mexico described African migrants being refused food in Mexican migrant detention centers unless there is food left after all non-Black migrants have eaten; factory workers refusing to work on the line with Black employees; and teachers walking out of classrooms to avoid teaching Black children. Africans are also targeted by criminal groups, based on the understanding that the Mexican police will not punish them for crimes committed against Black migrants.176 Local police forces themselves also reportedly extort some African migrants, threatening to report them to the migration authorities if they do not pay." [24]

### B. The proposed rule unfairly privileges asylum seekers with economic means.

Those who have a working smartphone and can remain in an area with the sustained and reliable internet needed to make an appointment using CBP One have greater access to the asylum system. This privileges individuals with sufficient funds to stay in more expensive hotels and discriminates against those who wait in crowded camps or on the streets of border cities.

During the first days of CBP One appointment availability, observers in Tijuana saw mainly Russians arriving for appointments. The explanation was simple: the Russian migrants had

---

[23] Caitlin Yates and Jessica Bolter. "African Migration Through the Americas." Migration Policy Institute, October 2021. p. 33. <https://www.migrationpolicy.org/sites/default/files/publications/mpi-african-migration-americas-eng_final.pdf> Consulted March 19, 2023.
[24] Ibid, p. 34.

money to stay in hotels, which gave them better access to the CBP One process.[25] Observers documented the difficulties experienced by immigrants who lived in camps and were repeatedly unable to connect to CBP One for the few appointments available each day.[26]

Due to the limitations of the CBP One application, asylum seekers who cannot read or understand English, Spanish or Haitian Kreyòl; people with darker complexions not recognized by facial recognition software; and people with disabilities have a hard time making an appointment using CBP One and will therefore have less opportunity to apply for asylum. Hinging asylum eligibility on having the right connections in the United States or having economic resources is discriminatory and unfair.

### C. The proposed rule endangers LGBTQI asylum seekers.

These asylum seekers are already at grave risk of assault and worse while on their journey to the United States. More than half of those from the Northern Triangle countries have already experienced sexual and physical violence, Once they arrive in Mexico, they face continuing discrimination and violence.[27, 28] The U.S. Department of Homeland Security itself has acknowledged that migrants are "at increased risk of harm in Mexico due their sexual orientation or gender identity."[29]

### V. The proposed rule violates asylum seekers' due process rights, and arbitrarily raises the standard of proof for asylum seekers at the initial credible fear determination.

### A. The proposed rule violates the due process rights of legitimate asylum seekers.

Critically, the proposed rule eviscerates two safeguards for asylum applicants who are given negative credible fear findings: it would require asylum seekers to affirmatively request immigration judge review of a negative credible fear finding, and it would eliminate asylum office reconsideration of negative decisions.

---

[25] Kate Morrissey. "Asylum seekers in Tijuana are scrambling through mobile app error messages for few appointments into the U.S.." San Diego Union Tribune, 1/22/23. <https://www.sandiegouniontribune.com/news/immigration/story/2023-01-22/cbp-one-app-asylum-tijuana > Consulted 3/19/2023.

[26] "Asylum Processing at the U.S.-Mexico Border: February 2023." The University of Texas at Austin Strauss Center for International Security and Law. February 2023. Pp. 8-9. <https://www.strausscenter.org/wp-content/uploads/Feb_2023_Asylum_Processing.pdf> Consulted March 18, 2023.

[27] Katherine Fobear. "Addressing Central and South American LGBTQ Asylum Seekers." Georgetown Journal of International Affairs. November 16, 2021. <https://gjia.georgetown.edu/2021/11/16/addressing-central-and-south-american-lgbtq-asylum-seekers/> Consulted March 17, 2023.

[28] "Every Day I Live in Fear: Violence and Discrimination Against LGBT People in El Salvador, Guatemala, and Honduras, and Obstacles to Asylum in the United States." Human Rights Watch, October 2020. p. 122 et seq. <https://www.hrw.org/sites/default/files/media_2020/10/centralamerica_lgbt1020_web_0.pdf> Consulted March 17, 2023.

[29] "Guidance regarding the Court-Ordered Reimplementation of the Migrant Protection Protocols." Memorandum from Department of Homeland Security. December 2, 2021. <https://www.dhs.gov/sites/default/files/2022-01/21_1202_plcy_mpp-policy-guidance_508.pdf> Consulted March 17, 2023.

The use of reconsiderations is needed to safeguard the rights and due process of asylum seekers where the asylum officer in the first instance issues an erroneous decision.[30] Erroneous decisions, hearings held in a language that the applicant does not understand, and denial of the right to counsel in credible fear hearings have all been reported, and can be most readily rectified by prompt reconsideration of erroneous decisions.

Many asylum seekers in credible fear proceedings do not have access to an attorney and would not know to affirmatively ask for immigration judge review. Review of rulings is essential because of the high error rate documented in past years—just over one in four credible fear denials is overturned on appeal to an immigration judge:

> "On average slightly over 25 percent of IJ decisions over the last 25 years have found that migrants had established having a credible fear of persecution or torture after an asylum officer initially denied the claim. It is important to remember that most credible fear reviews are conducted by asylum officers in US Citizenship and Immigration Services (USCIS). The cases Immigration Judges hear are only those which were first turned down by asylum officers, that is the asylum officer did not find credible fear to be established. This means that IJ decisions found that 25 percent of asylum seekers who didn't pass this first screening, actually should have passed and, as a result, the IJ overturned these asylum officers' decisions."[31]

Moreover, these appeal decisions are not protracted affairs: "On average, these decisions are made within ten days. Last month in February 2023, cases took an average of just five days."[32]

Eliminating these safeguards would certainly send many asylum seekers back into the hands of their persecutors.

### B. The proposed rule arbitrarily raises the standard of proof for findings of probable persecution or torture justifying withholding of removal or protection under the Convention Against Torture .

The statute setting forth the standard of proof for credible fear hearings, 8 U.S.C. 1225(b)(1)(B)(v), provides that "For purposes of this subparagraph, the term 'credible fear of persecution' means that there is a significant possibility …" The proposed rule changes the standard of proof for withholding of removal and CAT petitions from "significant possibility" to "reasonable possibility," noting that "This . . . screening process is modeled on the credible-fear screening process, but requires the alien to meet a higher screening standard." (p. 11743)

---

[30] Rebecca Gendelman. "Biden Administration Move to Eliminate Requests for Reconsideration Would Endanger Asylum Seekers, Deport Them to Persecution and Torture." Human Rights First, 10/1/22. <https://humanrightsfirst.org/library/biden-administration-move-to-eliminate-requests-for-reconsideration-would-endanger-asylum-seekers-deport-them-to-persecution-and-torture/ > Consulted 3/19/2023.

[31] "Immigration Judge Decisions Overturning Asylum Officer Findings in Credible Fear Cases." Transactoinal Records Access Clearinghouse (TRAC), Syracuse University, 3/14/23. <https://trac.syr.edu/reports/712/> Consulted March 19, 2023.

[32] Ibid.

CLP_PC_020626

DHS explains that using a higher screening standard will reduce "the impact on the immigration adjudication system overall" by reducing the number of people who could gain protection. Denying protection to people who may be in danger of persecution or torture and who have been arbitrarily excluded from asylum eligibility because of the "rebuttable presumption" is a failure of the moral obligation of the United States.

**Conclusion**

The conditions under which asylum seekers may still request asylum under the proposed rule are so limited as to make nearly all asylum seekers ineligible to apply for asylum.  The proposed rule is discriminatory against certain asylum seekers based on racial, economic, and other factors. The proposed rule violates asylum seekers' due process rights, and arbitrarily raises the standard of proof for asylum seekers at the initial credible fear determination. The proposed rule, if enacted in its current form, would return scores of asylum seekers to danger in Mexico, another transit country, or their country of origin. The proposed rule is similar in substance to the asylum bans issued by the Trump administration.

The United States' asylum system has been a model for countries around the world to welcome refugees who come to its door. This proposed rule is not in line with the American value of welcoming refugees and asylum seekers and, more importantly, the proposed rule is contrary to U.S. and international law which protects the right to safely seek asylum.

Instead of devoting U.S. resources to adjudication of a newly-created rebuttable presumption against asylum, we need to increase the number of immigration judges and asylum officers prepared to give a full, fair, and prompt hearing to asylum claims. Rather than making asylum less accessible, our goal should be to make the asylum system work. We call upon the administration to withdraw this proposed rule in its entirety.


Respectfully submitted,

Veena Iyer, Executive Director
Immigrant Law Center of Minnesota
450 North Syndicate Street, Suite 200
Saint Paul, Minnesota 55104
Phone: 651-641-1011
veena.iyer@ilcm.org



CATHOLIC LEGAL
IMMIGRATION
NETWORK, INC.

8757 Georgia Avenue ● Suite 850 ● Silver Spring, MD 20910● Tel: 301.565.4800● Fax: 301.565.4824 ● Website: www.cliniclegal.org

Submitted via www.regulations.gov

March 24, 2023

Daniel Delgado, Acting Director
Border and Immigration Policy
Office of Strategy, Policy, and Plans
U.S. Department of Homeland Security

Lauren Alder Reid, Assistant Director, Office of Policy,
Executive Office for Immigration Review
U.S. Department of Justice
5107 Leesburg Pike, Falls Church, VA 22041

**RE: DHS RIN 1615-AC83/EOIR RIN 1125-AB26 or Docket No. USCIS 2022-0016/A.G. Order No. 5605-2023 Public Comment Opposing Proposed Rule: Circumvention of Lawful Pathways**

The Catholic Legal Immigration Network, Inc. or CLINIC[1], submits these comments regarding the Notice of Proposed Rulemaking, or proposed rule, titled Circumvention of Lawful Pathways, which would deny most people the right to seek asylum at the southern border and disqualify asylum seekers who don't seek asylum at an official U.S. port of entry. Our organization strongly urges the Department of Justice (DOJ) and Department of Homeland Security (DHS) to withdraw this proposed rule in its entirety.

Embracing the Gospel value of welcoming the stranger, CLINIC has promoted the dignity and protected the rights of immigrants in partnership with a dedicated network of Catholic and community legal immigration programs since its founding in 1988. CLINIC's network, originally comprised of 17 programs, has now increased to more than 450 diocesan and community-based programs in 49 states and the District of Columbia. CLINIC is the largest nationwide network of nonprofit immigration programs. In partnership with its affiliates, CLINIC advocates for the just and humane treatment of noncitizens. Many of CLINIC's affiliates offer legal services to help qualified noncitizens apply for asylum, an immigration benefit that will be affected by this proposed rule.

As a Catholic organization, we base our work with immigrants on our belief in the fundamental and equal dignity of all people as created in the image of God, as well as our call as Christians to welcome the stranger and care for the vulnerable. Catholic social teaching on immigration strongly supports the right of migrants to seek asylum. The U.S. Conference of Catholic Bishops has consistently condemned policies that would weaken asylum access, including this and previous iterations of an asylum or transit ban.

---

[1] Reena Arya, Supervising Senior Attorney; Elnora Bassey, Policy Advocate; Elizabeth Carlson, Senior Attorney; Joanna Mexicano Furmanska, Senior Attorney; and Tania Guerrero, Project Attorney authored these comments. The authors would like to thank Michelle Sardone for her contributions to this comment.

This proposed rule is all too reminiscent of the previous administration's transit ban and is also very similar to its metering[2] policy, which denied migrants the ability to seek protection from persecution and harm. Asylum is a lifeline for tens of thousands of vulnerable noncitizens seeking refuge, and this proposed rule violates the United States' obligations under both domestic and international law to accept applications for asylum and offer asylum seekers protection if they meet certain criteria. The rule on its face would erase the possibility of asylum protections for nearly all individuals who seek asylum at the southern border. The proposed rule would leave many applicants who qualify for asylum only eligible to be considered for withholding of removal or protection under the Convention Against Torture. While both avenues allow for some limited protection in the United States, they do not provide the full rights and protection of asylum, including family reunification and permanent immigration status.

Our organization objects to the proposed rule for the following reasons:

## I.       Thirty days is insufficient time to comment on and respond to the Notice of Proposed Rule Making.

The Biden administration is providing a 30-day comment period for the proposed rule, which is an insufficient timeframe given the complexity of the rule and that the rule denies people the right to seek asylum in violation of U.S. law. Executive Order 12866[3] states that "each agency should afford the public a meaningful opportunity to comment on any proposed regulation, which in most cases should include a comment period of not less than 60 days."

The proposed rule is approximately 50 pages long and many of these pages include technical background language. The proposed rule includes very detailed language concerning asylum procedures, specifically credible fear interviews, and how the rule purportedly differs from similar rules enacted by the previous administration. Given this complexity, it is unconscionable for the government to give a brief 30-day comment period on such a procedurally complicated rule that will have an impact so severe on asylum seekers that it will surely result in significant harm, and even worse, death. Thus, we urge the administration to rescind the proposed rule. If it wishes to reissue the proposed regulations, it should grant the public at least 60 days to have adequate time to provide comprehensive comments. On March 1, 2023, 172 organizations wrote to the agencies urging them to provide at least 60 days to comment on this complex rule.[4]

---

[2] *US: Mexican Asylum Seekers Ordered to Wait*, HUMAN RIGHTS WATCH, (December 23, 2019), https://www.hrw.org/news/2019/12/23/us-mexican-asylum-seekers-ordered-wait.
[3] Exec. Order No. 12866, 3 C.F.R., Vol. 58, No. 190 (1993), https://www.archives.gov/files/federal-register/executive-orders/pdf/12866.pdf.
[4] Letter from Nongovernmental Organizations to Merrick Garland, Attorney General, et al., *Request to Provide a Minimum of 60 days for Public Comment in Response to the Department of Homeland Security (DHS), United States Citizenship and Immigration Services (USCIS), and Department of Justice (DOJ) Executive Office for Immigration Review (EOIR) (the Departments) Joint Notice of Proposed Rulemaking (NPRM): Circumvention of Lawful Pathways* (March 1, 2023), https://immigrantjustice.org/sites/default/files/content-type/commentary-item/documents/2023-03/Biden%20Asylum%20Ban%20-%20Extension%20letter%20to%2030-days%20comment%20period%20FINAL.pdf.

CLP_PC_020659

## II.     The Notice of Proposed Rule Making conflicts with U.S. and international law on asylum eligibility.

Should this proposed rule move forward, most migrants seeking refuge at the U.S. southern border would be found ineligible for asylum and sent into harm's way. The proposed rule would require that asylum seekers jump through unnecessary hoops to access the U.S. asylum system—contrary to the intent of the 1980 Refugee Act and the United States's treaty obligations under the 1951 Convention Relating to the Status of Refugees and its 1967 Protocol. Indeed, the Ninth Circuit explicitly found an earlier proposed regulation restricting eligibility for asylum based on manner of entry ran afoul of these treaty obligations, as an unlawful entry is not considered a serious crime or danger to the United States that would justify barring asylum eligibility under these treaties.[5]

This proposed rule is contrary to Congress's intent for asylum eligibility. By law, asylum seekers can apply for asylum regardless of how and where they enter the United States.[6] Specifically, the statutory language provides any noncitizen "who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival...)" the right to apply for asylum in accordance with this section.[7] This proposed rule is in direct conflict with this statutory language. While the statute does provide authority to the Attorney General to "establish... limitations and conditions" on asylum eligibility, the proposed rule introduces severe restraints on the availability of asylum, going above and beyond the other restrictions on asylum specified in the statute itself.[8] While prior administrations have invoked their authority to enact bars beyond those required by statute, most of these proposed rules were enjoined by federal courts as unlawful.[9]

The proposed rule attempts to distinguish between those who may "apply" for asylum and those who may be "granted" asylum.[10] This is a distinction without a difference, as the practical implication is the same. Those with meritorious asylum claims will be denied relief, contrary to Congressional intent, which allowed for expansive access to the asylum system. Indeed, the Ninth Circuit explicitly rejected such reasoning when it struck down a prior regulation severely curtailing eligibility for asylum, finding that drawing a distinction between those who may apply and those who may be granted asylum "borders on absurdity."[11]

The proposed rule offers various policy rationale for its adoption, arguing that the asylum system was designed "decades ago" when migratory flows were "dramatically different" than they are today.[12] However, if the asylum system needs reforms, Congress has the authority to enact legislation addressing these concerns. Congress's failure to do so does not justify enacting regulations that are in clear conflict with the statute.

## III.    The conditions under which asylum seekers may still request asylum under the rule are so limited as to make nearly all asylum seekers ineligible to apply for asylum.

The proposed rule creates an unreasonable "rebuttable presumption" that an asylum seeker is **ineligible** for asylum unless the individual is granted parole prior to arrival or has presented themselves at a port of entry through

---

[5] E. Bay Sanctuary Covenant v. Biden, 993 F.3d 640 (9th Cir. 2020).
[6] Immigration and Nationality Act (INA) § 208(a)(1), 8 USC 1158 (2006).
[7] Id.
[8] INA § 208(b)(2)(C).
[9] See, e.g., Circumvention of Lawful Pathways, 88 Fed. Reg. 11704, at 11735 (proposed Feb. 23, 2023) (listing five regulations limiting asylum eligibility proposed by prior administrations, three of which were enjoined as unlawful by courts).
[10] Id.
[11] E. Bay Sanctuary Covenant, 993 F.3d 640 (9th Cir. 2020).
[12] Circumvention of Lawful Pathways, 88 Fed. Reg. 11704, at 11715.

CLP_PC_020660

a pre-scheduled time and place by using the CBP One app and has sought asylum or other protection in any country they traveled through and received a final denial. It is nearly impossible for an asylum seeker without the assistance of a legal representative to establish any of these three prerequisites to preserve asylum eligibility, and furthermore, setting these additional standards is currently inconsistent with U.S. law.

### A. A majority of asylum seekers who arrive at the U.S. southern border are not and will likely never be eligible to enter the United States through one of the established humanitarian parole programs.

One of the exceptions to the proposed rule's application is that the asylum seeker must travel to the United States through one of the newly established parole programs. While these programs are a welcome opportunity for individuals to travel to the United States, they should not be a substitute for a fair asylum system. The recently implemented humanitarian parole programs only apply to a select number of nationalities, namely Cuban, Haitian, Nicaraguan or Venezuelan.

While these humanitarian parole programs may help some people fleeing conflict zones and/or authoritarian regimes, they are no trade-off for a safe, fair, transparent and humane asylum system. These programs only benefit those who have the ability to obtain passports or travel documents and who have contacts with ample resources to provide money for airfare and a place to stay in the United States.

> For instance, a family of three from Venezuela has been in Juarez for over six months. They fled Venezuela and once they arrived in Mexico, they made their way to the United States-Mexico border, in hopes of seeking asylum, only to be expelled back to Mexico under Title 42. The U.S. immigration officers who processed and expelled them, took their passports and did not return them. When the parole program for Venezuelans was rolled out, they thought they would be eligible; however, as it turns out, without their passports they discovered they are not eligible to apply. To make matters worse, they are not able to return to Venezuela to obtain new passports due to receiving death threats. If this family tries to contact anyone to initiate any kind of renewal process from afar, which is likely to take months, it might alert those who are threatening to harm them. This family is now stranded in an overcrowded shelter in Juarez and they are ineligible to apply for the parole program, nor can they present themselves at an official U.S. port of entry to request asylum.

Significantly, migrants who enter the U.S., Mexico or Panama, after January 9, 2023, without meeting the eligibility requirements, or Venezuelans who arrive before October 19, 2022, will be barred from the parole programs. Effectively, these parole programs punish those who would benefit from it the most—asylum seekers in search of safety. Most asylum seekers fleeing for their lives should not have to risk jeopardizing their safety, and they certainly do not have the privilege to wait in their home countries in order to apply for humanitarian parole.

The commentary in the proposed rule mentions the countries chosen for the parole programs—Cuba, Haiti, Nicaragua and Venezuela—had the highest border encounters for FY 2021 and FY 2022.[13] While Venezuela and Cuba have seen the highest net increases since 2021, in the number of pending asylum cases before EOIR, the number of cases pending from Northern Triangle (Guatemala, Honduras, El Salvador), for example, remain

---

[13] Circumvention of Lawful Pathways, 88 Fed. Reg. 11704, at 11708.

CLP_PC_020661

high.[14] Similarly, the three Northern Triangle countries remain in the top ten countries for numbers of affirmative asylum grants by USCIS.[15] And although the numbers of asylum seekers from the Northern Triangle at the border have dropped in recent years,[16] this drop is likely due to the use of Title 42 policies curtailing asylum access at the border, not to a decrease in viable claims for asylum. A program that only benefits those who can wait patiently in their home countries, demonstrate proven connections with those in the United States that have resources, have access to passports and only benefit a small subset of the countries of origin for all migrants arriving at the border, is not a sufficient substitute for an asylum system in the United States.

### B.  Requiring the use of the CBP One application as a precondition for asylum eligibility violates U.S. asylum law.

The proposed rule requires that asylum seekers download the CBP One application on their phones and search for an appointment to present themselves to Customs and Border Protection, or CBP, in order to seek asylum. Given the technical difficulties many have with using CBP One, its existence has been equated to another 'metering' system, which the courts have found to be illegal.[17] Under the metering system, asylum seekers had to schedule a time to come to the U.S. Port of Entry to seek asylum.

The administration's requirement that asylum seekers must access this application in order to be eligible to apply for asylum is also concerning for a variety of other reasons.[18] For one, advocates and asylum seekers have both complained that the application requires reliable internet for a sustained period of time in order to successfully and consistently search within it for an appointment with CBP. Many asylum seekers on the border do not have access to reliable and consistent internet, which means scheduling an appointment via their mobile phones is not a viable option for them. These asylum seekers should not be deemed ineligible for asylum simply because they lack the technological capacity to make an appointment on a mobile application or because the government has placed an unlawful condition on the right to seek asylum.

The proposed rule indicates that the majority of asylum seekers at the border have cellphones. However, the CBP One app is not compatible with all cellphones. Many times, the glitches are due to the incompatibility between app and cellphone. It is plainly inequitable to condition the right to seek asylum on an individual's ability to obtain a smart phone, particularly a recent model, just to be able to schedule an appointment and present themselves at a port of entry.

Another significant glitch in the CBP One app is in the facial recognition feature. As a requirement to complete registration, asylum seekers must have their faces scanned for facial recognition. Many times, this feature freezes or marks error.

---

[14] *A Sober Assessment of the Growing U.S. Asylum Backlog*, TRAC IMMIGR. (Dec. 22, 2022), trac.syr.edu/reports/705/.

[15] *Yearbook of Immigration Statistics 2021*, U.S. DEP'T OF HOMELAND SEC., tbl 17, "Individuals Granted Asylum Affirmatively by Region and Country of Nationality: Fiscal Years 2012 to 2021," https://www.dhs.gov/immigration-statistics/yearbook/2021 (last updated 3/3/2023).

[16] Diana Roy, *Ten Graphics that Explain the U.S. Struggle with Migrant Flows in 2022*, COUNCIL ON FOREIGN RELATIONS, Dec. 1, 2022, https://www.cfr.org/article/ten-graphics-explain-us-struggle-migrant-flows-2022

[17] *Al Otro Lado Inc., Et al. V. Mayorkas, et al.*, S. POVERTY L. CENTER, https://www.splcenter.org/seeking-justice/case-docket/al-otro-lado-inc-et-al-v-mayorkas-et-al (last visited Mar. 24, 2023).

[18] Jack Herrera, *Fleeing for Your Life? There's an App for That*, TEX. MONTHLY, March 2, 2023, https://www.texasmonthly.com/news-politics/cbp-app-asylum-biden-administration/.

CLP_PC_020662

In Juarez, an advocate who was trying to assist asylum seekers complete their registration, struggled for one hour to take the picture of a young man. This young asylum seeker was one of several dozen awaiting assistance. The facial recognition feature in the app is a serious limitation for asylum seekers to complete registration and be able to utilize the app to schedule an appointment. Another asylum seeker shared she had finalized her registration, and when she tried to enter the app later in the day, it failed to recognize her. After many attempts, she was able to access the platform; however, she continues to have this recurring issue.

The CBP One app has a feature that does consider the loss or destruction of the cellphone which allows for people to access their accounts through borrowed cellphones with a series of codes as a security measure. This in practice, translates into people locking themselves out of the app and having to re-register. Also, despite an asylum seeker having the option to borrow a phone to register, the app continues to place asylum seekers who do not own a compatible smart phone at a disadvantage because it reduces their probability to obtain an appointment. It is taking months for someone who does own a compatible smart phone to schedule an appointment; for someone who does not own a phone, it is essentially impossible. The CBP One app is inequitable and marginalizes those who are already in dangerous circumstances.

The proposed rule does allow for an exception to asylum ineligibility if a person is unable to utilize the CBP One app, but the individual bears the burden of proving that they were unable to use the app. A person arriving at the southern border can rebut the presumption of asylum ineligibility if they can show by "a preponderance of the evidence that it was not possible to use the scheduling system [due to illiteracy, a language barrier or significant technical challenge] and other compelling reasons." However, those who face language barriers and illiteracy are the most vulnerable and unlikely to be able to explain how their challenges make it harder for them to navigate these intricate asylum procedures. Many people who are unable to use the app will find it difficult or impossible to demonstrate that the app was inaccessible to them.

There is an extremely vulnerable group of people who are disenfranchised by the CBP One app, such as those without cellphones, those who are illiterate, those who lack access to a working internet, and those with disabilities. The proposed rule does carve out exceptions for this group but only in theory. In practice, this population is not able and/or is unaware of how to make these circumstances known to an officer without being intimidated by them or threatened and physically assaulted by Mexican authorities.

For instance, Magdalena*[19], a woman fleeing her home in Guerrero, Mexico with her three minor children has been stranded in a border town for three months. She and her children are perceived as foreigners in their own country. They are Mixteco and speak very little Spanish. They have experienced prolonged homelessness, racial discrimination, and physical abuse while attempting to not be found by the cartel that murdered her husband and her children's father. Magdalena and her children have unsuccessfully attempted to present themselves at a U.S. port of entry. Mexican authorities serve as the first barrier to safety. U.S. officers have expelled the family, returning them directly to danger. Magdalena never had an opportunity to explain her situation to anyone.

The CBP One app is the ultimate barrier for this family to seek protection. Magdalena does not have a cellphone. She does not know how to read or write in any language and is constantly worried about the safety and well-being of her children, while mourning the loss of her husband and her entire life as she knew it.

---

[19] Names with asterisks have been changed for privacy purposes.

CLP_PC_020663

Conditioning the access to asylum on the use of the CBP One app has left Magdalena and her family in immense danger without an opportunity to explain her circumstance to any U.S. immigration authority. Under the proposed rule, Magdalena bears the burden of proving that she and her children were unable to use the app to be able to rebut the presumption of asylum ineligibility if they can show by a preponderance of the evidence that it was not possible to use the scheduling system due to Magdalena's illiteracy and technical challenge. Despite exceptions in the proposed rule, it is certain that in practice, having an opportunity to prove any of these exceptions would be impossible.

### C. Applying for asylum and awaiting a subsequent denial in a third country is nearly impossible for most fleeing asylum seekers.

The proposed rule outlines that one can be exempted from the presumption of asylum ineligibility if they apply for and are denied asylum in a third country. This is essentially a transit ban similar to the one the prior administration issued in 2019, which was finally struck down by the courts in 2021. In East Bay Sanctuary Covenant v. Barr, the Ninth Circuit held the prior "transit ban" was "not in accordance with the law" or "in excess of statutory limitations" because it was inconsistent with the safe third country bar to eligibility to apply for asylum or the firm resettlement mandatory bar to asylum.[20]

The Ninth Circuit made clear that the prior administration's Transit Ban ran afoul of the safeguards established by Congress. One such safeguard, is the safe third country bar which explicitly requires that there be a formal agreement between a 'safe third country', such as we have with Canada, and that there should be a 'full and fair' asylum system.[21] The second safeguard, found within the exceptions to the firm resettlement mandatory bar to asylum, applies to asylum seekers who face persecution in the country of asylum or those who never intended the country of asylum to be their final destination. The Ninth Circuit stated that "[t]he sole protection provided by the [Final] Rule is its requirement that the country through which the barred [asylum seeker] has traveled be a 'signatory' to the 1951 Convention and the 1967 Protocol" without requiring these countries have any meaningful or established asylum procedures.[22] The Ninth Circuit twice held that "[t]his requirement does not remotely resemble the assurances of safety built into the two safe-place bars of § 1158 [firm resettlement bar exceptions and safe third country bar]," and in fact is inconsistent with those provisions.[23] The Transit Ban was finally struck down in 2020.[24]

The countries asylum seekers most often travel through, namely Mexico and other Central American countries, do not have asylum procedures similarly structured to that of the United States, have backlogged asylum systems, and are generally unsafe.[25]

For example, in Mexico, asylum seekers must reside in the state where they applied for asylum and cannot go to other parts of the country where they have connections or are able to find work. They also must apply for asylum within 30 days after entering Mexico,[26] rendering many migrants ineligible by the time they start to understand

---

[20] *East Bay v. Barr*, 964 F.3d 832, 841, 845-49 (9th Cir. 2021).
[21] Id. at 841.
[22] Id. at 847.
[23] Id. at 845-49.
[24] *CAIR Coalition v. Trump*, 19-2117, 2020 WL 3542481 (D.D.C. Jun. 30, 2020).
[25] *Is Guatemala Safe for Refugees and Asylum Seekers?*, HUMAN RIGHTS FIRST (June 2019), available at https://humanrightsfirst.org/wp-content/uploads/2022/10/IsGuatemalaSafeforRefugeesandAsylumSeekers.pdf.
[26] *Key Points on Access to Asylum in Mexico, Protections for Migrant Children and U.S. Cooperation*, WOLA (Mar. 23, 2021), https://www.wola.org/analysis/key-points-migration-march-2021/.

CLP_PC_020664

the various legal systems to which they are subject. While asylum seekers await decisions, some end up suffering worse persecution from gangs or organized crime or are confronted with the same persecutors from whom they fled.[27] The proposed rule does not address the dangers to vulnerable populations, such as members of the LGBTQI community, where Human Rights Watch reports that:

> Six asylum seekers and migrant rights workers reported that some of the shelters in Ciudad Juárez that accepted LGBT asylum seekers subjected them to discriminatory treatment, including the shelter where LGBT asylum seekers were forced to go to Christian religious services. Shelters in Ciudad Juárez are at capacity, meaning they would be homeless if they did not agree to go to the service. Some migrant shelters in Ciudad Juárez would not accept LGBT asylum seekers at all, migrant rights workers there said.[28]

Moreover, indigenous groups, women with children, pregnant women[29] and those with disabilities will continue to face discrimination, violence, extortion, sexual and gender-based violence and detention in transit countries such as Mexico and Guatemala. Strikingly, the proposed rule ignores the wealth of reports that highlight the dangerous and even deadly situation Black asylum seekers face in countries of transit, such as Mexico. A recent report from Black Alliance for Just Immigration and Instituto para las Mujeres en la Migración states:

> Due to their skin color, African and other Black migrants are often more visible to immigration authorities when travelling without documentation. They are afraid to challenge officials and are also easy targets for local gangs. Some attempt to evade apprehension by travelling north by boat off Mexico's Pacific Coast, but this journey is dangerous and has proved fatal. For example, in October 2019, a small boat carrying Cameroonian migrants sank off the coast of Chiapas, killing two of the men on board.[30]

Haitian asylum seekers continue to face discrimination and in some cases persecution in transit countries. For example, Haitians are subject to a much narrower definition of asylum than those applicable to Venezuelan and Central American applicants. [31] According to a recent report from Refugees International, Haitian asylum seekers have also been targeted for attacks, detention and face hurdles even accessing the Mexican asylum system.[32]

---

[27] *Mexico: Asylum Seekers Face Abuses at Southern Border, Improve Conditions, Procedures; US Should End Pressure to Block Arrivals*, HUMAN RIGHTS FIRST (June 2022), available at https://www.hrw.org/news/2022/06/06/mexico-asylum-seekers-face-abuses-southern-border.

[28] *US: LGBT Asylum Seekers in Danger at the Border*, HUMAN RIGHTS FIRST (May 31, 2022) available at https://www.hrw.org/news/2022/05/31/us-lgbt-asylum-seekers-danger-border.

[29] *Migrant and Refugee Caravans: Failed Responses to Women and Children in Need of International Protection and Humanitarian Aid*, WOMEN'S REFUGEE COMMISSION (May 2019) available at http://www.womensrefugeecommission.org/wp-content/uploads/2020/04/Migrant-and-Refugee-Caravans-Failed-Responses-to-Women-Children-in-Need-of-International-Protection-Humanitarian-Aid.pdf.

[30] S. PRIYA MORLEY ET AL., BLACK ALLIANCE FOR JUST IMMIGR., "THERE IS A TARGET ON US" – THE IMPACT OF MEXICO'S ANTI-BLACK RACISM ON AFRICAN MIGRANTS AT MEXICO'S SOUTHERN BORDER, (2021), available at https://www.immigrationresearch.org/system/files/The-Impact-of-Anti-Black-Racism-on-African-Migrants-at-Mexico.pdf.

[31] *Not Safe Anywhere: Haitians On The Move Need Urgent International Protection*, HUMAN RIGHTS WATCH (Dec. 2021), available at www.amnesty.org/en/wp-content/uploads/2021/12/AMR3649202021ENGLISH.pdf.

[32] *Pushed into the Shadows: Mexico's Reception of Haitian Migrants*, REFUGEES INT'L (Apr. 2022), available at https://static1.squarespace.com/static/506c8ea1e4b01d9450dd53f5/t/6288057cedeca34f11b74610/1653081471581/Mexico+Report+-+April+2022+-+5.20.22+-+ENGLISH.pdf.

CLP_PC_020665

The proposed rule is no different from the prior administration's Transit Ban. The government argues in the commentary that asylum seekers can rebut the presumption of asylum ineligibility with evidence of serious illness, imminent threats, or severe forms of trafficking. As mentioned later in this comment, most asylum seekers will not be able to rebut the presumption with a preponderance of the evidence leaving many to languish in countries of transit, namely Mexico. This proposed rule would have the same deleterious effect as the prior administration's illegal transit ban.

> **CLINIC Case:** One of CLINIC's clients, Inez,* fled Nicaragua with her two minor children after suffering domestic violence from her ex-partner, and after suffering persecution from the Nicaraguan government for her anti-government political activities. En route to the US border, where she wanted rebuild her life, Inez was raped by the "coyote" who was guiding her and her family to the United States. Inez was held captive for days before she was able to escape and eventually arrive to the U.S. border. She was placed in MPP and suffered PTSD, nightmares, headaches, and anxiety thinking about her future and reliving the trauma she suffered in Mexico and Nicaragua. She eventually was allowed to come into the United States and seek asylum when MPP was discontinued.

Under the proposed rule, Inez would not be able to seek asylum. Inez could never have stayed in Nicaragua long enough to apply for parole, nor would she be able to obtain a passport. Moreover, Inez did not seek asylum in Mexico, where she was sexually assaulted and terrified, and needed to get her family to safety.

> In another instance, Carmen,* an 18-year-old woman, fled Nicaragua in late 2019, due to her political activism against the ruling political party. She traveled across several countries before reaching the United States-Mexico border. She was returned to Mexico under Migrant Protection Protocols or Remain in Mexico (MPP) and suffered gender-based violence and xenophobia while in Mexico. CLINIC staff met with her and were able to obtain *pro bono* representation for her. At the time, the prior transit ban was in place and *pro bono* counsel was successful in obtaining withholding of removal for Carmen. Despite her grant, she was detained for days. She had overcome all obstacles, survived attempts against her life and met all legal U.S. requirements and yet she was still being detained and denied a pathway to stability and safety within the U.S. Her *pro bono* counsel appealed when the third country transit ban was struck down by federal courts. Carmen was granted asylum and is thriving in her safe and stable new home in the United States.

Under this proposed rule, Carmen would be denied asylum. She is the tangible representation of luck and persistence. Carmen is one of thousands who entered the United States through the southern border in search of asylum and who had to transit through several countries to do so. She also is in the minimal percentage of those who were represented, and even smaller percentage of those who were able to appeal under the previous transit ban and ultimately be granted asylum.

If implemented, this proposed rule will effectively eliminate the possibility for people like Carmen who enter the southern border to seek protection by asylum.

CLP_PC_020666

## IV.    The presumption of asylum ineligibility can be rebutted only in very narrow and extreme circumstances.

The presumption of asylum ineligibility could potentially be rebutted if, at the time they entered the United States, the asylum seeker or a family member traveling with them suffered a severe medical emergency, faced an imminent or extreme threat to their life or safety, was a victim of a severe form of human trafficking, or faced other exceptionally compelling circumstances. The exceptions to the proposed rule are very narrow and require a showing by a "preponderance of the evidence." These exceptions only cover the most extreme situations, such as imminent harm or a severe medical condition. Moreover, those who could potentially meet one of these exceptions to the presumption of asylum ineligibility may not be in possession of medical documentation or proof of imminent harm other than their own testimony, and asylum officers and immigration judges are not medical experts with the required expertise to evaluate these claims. Pro se asylum seekers will have yet an additional hurdle to contend with to meet the heightened "preponderance of the evidence" standard to rebut the presumption of asylum ineligibility.

Asylum Officers and Immigration Judges are not medical experts and will not have the required expertise to determine whether something is considered an "acute" medical emergency. By the time the determination is made, the asylum seeker's health emergency may have worsened or the imminent threat they feared may have been carried out. Requiring a separate legal process to determine if asylum ineligibility has been rebutted will further strain limited government resources and will inefficiently prolong the asylum process for legitimate asylum seekers.

In practice, before an asylum officer or immigration judge, border patrol and CBP are the first filter for an asylum seeker to enter the United States. In most instances, these officers are who make the first determination of what is a medical emergency or what constitutes being in imminent threat of danger. Domingo*, a Guatemalan asylum seeker at the southern border was a witness to this:

> Domingo* fled Guatemala with his 13-year-old son. While traveling through Mexico, they had endured a great ordeal. Once in northern Mexico, Domingo and son presented at a U.S. port of entry and were pushed back to Mexico. While they decided what their next steps were going to be, Domingo took odd jobs to be able to provide for his son and himself. Both being fully aware of the dangers they could face, they created a pact; if Domingo did not return to his son after four days, his son would do everything possible to enter the United States and flee from there.

> One day an unknown man approached Domingo on the street and offered him a job. Domingo eagerly accepted and did not return to his son. Domingo was kidnapped by organized crime. He was released on the condition he would always be available and cooperative with them. By the time Domingo returned, his son was gone. Domingo ran to the border and tried to turn himself in to U.S. immigration officers. Immigration officers told him he was lying because he had no evidence to prove what had happened to him and that he did not look like he was in any danger.

Domingo's story serves as another reason why the proposed rule should not enter effect. Border officers are demonstrably ineffective at providing protection in situations of imminent threat.

CLP_PC_020667

U.S. immigration authorities also do not have the requisite expertise in evaluating medical emergencies.

> In another instance, a man by the name of Jesus* arrived in Ciudad Juarez, Mexico in the fall of 2022, after fleeing from the organized crime network that had murdered his spouse, children, and mother by burning them alive. He managed to escape with the help of others and presented himself before U.S. immigration officers at the Santa Fe, port of entry in Ciudad Juarez, completely unaware of the internal injuries he suffered during the attack, yet was unwell and extremely weak. Despite the officers observing Jesus' weak appearance, they informed him that the border was closed due to Title 42. The same night he was expelled back to Mexico, he was rushed to the emergency room and operated on immediately due to the injuries he sustained during his persecution by the organized crime network. Yet again, another asylum seeker is turned away due to the lack of medical expertise officials have to determine whether the individual presenting at the border is suffering from an acute medical emergency.

Finally, this proposed rule, by means of narrow exceptions and asterisks excludes and punishes individuals and families whose only crime is trying to seek safety and peace for themselves and their loved ones. This proposed rule is part of a continued effort to prioritize deterrence at the cost of human life.

Asylum seekers left stranded at the U.S.-Mexico border, are targets of many levels of violence, and the complicity between the United States and Mexico's governments in building intangible walls to deny access to asylum cannot be ignored. Mexico's immigration officers have increased raids and detention and use excessive force to do so. The human rights violations committed in order to implement and carry out policies that revive asylum bans of the recent past such as the proposed rule, should not be overlooked simply because they are being done in another country. The U.S. government's externalization of its legal and moral obligations is reprehensible and should end once and for all.

## V.     The proposed rule is discriminatory against certain asylum seekers based on racial, economic, and other factors.

Migrants at the southern border should be able to safely seek asylum without discrimination. The proposed rule discriminates against certain asylum seekers based on racial, economic, and other factors.

First, the proposed rule is discriminatory against Black asylum seekers. Advocates and asylum seekers have long complained about the widespread discrimination,[33] disparate treatment, and violence, Black asylum seekers suffer both in Mexico and in the United States. One need only look to the incidents of CBP officers rounding up Black asylum seekers at the border on horseback[34] to see that this is true. The proposed rule would only heighten the barriers and dangers these asylum seekers already face. For one, in order to be eligible to apply for asylum, an asylum seeker must apply for asylum and wait for a decision in a transit country, such as Mexico. This can be dangerous for Black asylum seekers who have historically been turned away from the asylum process and have suffered race-based harassment and persecution in Mexico. Second, the CBP One application uses facial

---

[33] MORLEY, *supra* note 30.
[34] *US: Treatment of Haitian Migrants Discriminatory*, HUMAN RIGHTS WATCH (Sep. 21, 2021, 2:49 PM), hrw.org/news/2021/09/21/us-treatment-haitian-migrants-discriminatory.

CLP_PC_020668

recognition software which does not easily recognize children or people with darker complexions.[35] Unless these technological glitches are addressed, Black asylum seekers will have a harder time getting appointments to seek asylum and will continue to face further discrimination.

In addition, the proposed rule unfairly privileges asylum seekers with economic means. Some asylum seekers who have connections to sponsors in the United States with economic resources are able to enter via a humanitarian parole program and subsequently apply for asylum. Asylum seekers who lack these connections to sponsors in the United States who have the necessary resources, are unable to seek asylum. This is discriminatory and inequitable.

Even if some asylum seekers were to have connections to people in the United States who can financially support them, a requirement for seeking parole, the humanitarian parole programs currently established are only available to migrants from certain countries. As described above, at present, these countries are Ukraine, Cuba, Haiti, Nicaragua, and Venezuela. Offering humanitarian protection to only these countries ignores the significant numbers of individuals continuing to seek protection from a host of other source countries. Presuming ineligibility for all asylum seekers who do not first seek parole through one of the established parole programs is discriminatory against those whose countries are not part of the programs, particularly those from the Central American countries that continue to represent the greatest numbers of migrants needing protection. Although there is a mechanism to apply for humanitarian parole outside of these programs, it is well known that there are extreme backlogs in the processing of these applications. Further, much is described below in relation to requiring individuals to register through CBP One, individuals who have limited resources to apply for parole through the USCIS website or other agency channels due to financial, educational, linguistic, or other restraints will be prejudiced by this parole requirement. Requiring individuals to apply for and await adjudication of parole before coming to the border to seek asylum places them in danger of further persecution and harm.

The proposed rule also favors those who have the resources to remain in an area with sustained internet to make an appointment using CBP One. Those with better access to technology and the financial resources to wait in Mexico will have increased access to asylum as compared to those without these resources. Life-saving humanitarian protection should not be limited to those who have the educational background, linguistic understanding, or mental or physical ability to access and understand the complicated process of registering through CBP One. Asylum seekers who cannot read or understand English, Spanish or Haitian Kreyol, those with larger families with small children, and people with disabilities all have a hard time making an appointment using CBP One and will therefore have less opportunity to apply for asylum. This is assuming they even know that they need to register for and enroll through CBP One in the first place and speak or read in one of the three languages offered in the app. These same individuals who have limited access due to financial constraints or other cultural, educational, or linguistic limitations will also be less likely to even learn of CBP One.

> CLINIC has obtained anecdotal examples from our partners in the field exemplifying the above problems. Recall Magdalena and her Mixteco family from Guerrero, Mexico, fleeing the cartel in their hometown after it murdered the patriarch. This family, who speaks very little Spanish, has already experienced discrimination as indigenous refugees inside Mexico; requiring them to apply for an appointment on CBP One would further discriminate against them on this basis. They do not have a mobile phone to access the application, and even if they did, their limited Spanish skills would make it impossible in practice to use. There is no established parole program for Mexican

---

[35] Kade Crockford, *How is Face Recognition Surveillance Technology Racist?* AMERICAN CIVIL LIBERTIES UNION (June 16, 2020), aclu.org/news/privacy-technology/how-is-face-recognition-surveillance-technology-racist.

CLP_PC_020669

families seeking protection, and discriminating against an indigenous family with limited resources and even more limited Spanish essentially sends them into the arms of the cartel.

## VI.     The proposed rule would lead to the permanent separation of families.

The proposed rule makes some effort to maintain family unity for those subject to the "lawful pathways" rebuttable presumption. Specifically, where a principal asylum applicant is eligible for statutory withholding of removal or CAT protection and would be granted asylum but for the "lawful pathways" rebuttable presumption, and where the denial would lead to the separation of the family, the family separation constitutes an "exceptionally compelling circumstance" to rebut the lawful pathways presumption of ineligibility.[36]

However, this provision does not go nearly far enough to protect family unity. This provision as written benefits only those families who are physically present in the United States and in section 240 removal proceedings together. It does not assist applicants whose family members remain outside the United States. Individuals granted withholding of removal under INA § 241(b)(3) or CAT protection live in a constant state of limbo. They cannot travel internationally; they cannot work if their employment authorization expires; they can never become residents or citizens; and, perhaps most importantly, they can never petition for family members to join them in the United States. With no ability to travel abroad and no ability to petition for relatives, a grant of withholding or CAT only leads to de facto, permanent family separation. This includes the permanent separation of parents from their minor children.

The imposition of the one-year filing deadline by Congress for asylum cases already has a devastating impact on family unity.[37] However, it is within Congress's authority to place such a restriction on asylum eligibility in the statute. The proposed rule looks to the one-year filing deadline as a policy support for its position, stating that "Congress concluded that the interest in ensuring overall system efficiency outweighed the fact that there would be applicants who would have received asylum but for the one-year deadline. The Departments have made a similar calculation in the interest of system efficiency."[38] However, it is only within Congress's authority to make such a determination. The administration lacks the power to deny asylum to huge numbers of asylum seekers when Congress has not explicitly authorized it. It is unconscionable as a matter of policy for the administration to seek to further separate families from each other. However, it is also illegal as a matter of law to make such sweeping changes to the asylum system and the goals of family unity in the absence of explicit Congressional authorization.[39]

## VII.     The proposed rule violates asylum seekers' due process rights.

The proposed rule violates the due process rights of legitimate asylum seekers. Critically, the proposed rule eviscerates two safeguards for asylum applicants who are given negative credible fear findings. First, when an asylum officer issues a negative credible fear determination to an asylum applicant, the officer explains that the asylum applicant has the right to have the finding reviewed by an immigration judge or IJ. Under the new rule, asylum applicants will have to affirmatively request immigration judge review, or they will be deported. This part

---

[36] Circumvention of Lawful Pathways, 88 Fed. Reg. 11704, at 11752 (Proposed 8 C.F.R. § 1208.33(d)).

[37] *See* Lindsay M. Harris, *The One-Year Bar to Asylum in the Age of the Immigration Court Backlog*, 2016 WIS. L. REV. 1185, 1193 (2016) (detailing separation of mothers from their children).

[38] Circumvention of Lawful Pathways, 88 Fed. Reg. 11704, at 11737.

[39] *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640 (9th Cir. 2021) (striking down prior transit ban as contrary to statute).

CLP_PC_020670

of the proposed rule is identical to the previous administration's attempt[40] to destroy due process protections for credible fear applicants and contradicts President Biden's promise to a fair immigration system for asylum seekers.

One of the bedrock principles of the credible fear process is full review of a negative credible fear determination by an IJ to ensure full due process. When an asylum officer gives a negative credible fear determination to an applicant, the asylum officer must explain the due process rights available to the asylum seeker. One of these core rights is that the applicant can seek review with the immigration judge. During this explication process, many asylum seekers do not completely understand what is going on, many are still tired and traumatized from their journeys, and some have been separated from their children and families by the U.S. government.[41] During this time, many asylum seekers, mostly unrepresented, will not understand what it means to seek "IJ review" and many will simply not answer the question.[42] That indication, historically, has meant asylum officers must request this review on behalf of the asylum seekers. The proposed rule would reverse existing policy and force asylum officers to mark that the asylum applicant does not want "IJ review" when the asylum seekers are understandably unresponsive.

The proposed rule does not include any statistics on how many asylum seekers succeeded in their credible fear claims before the IJ without having articulated a desire for IJ review to the asylum officer. Nor does it contain any data on how many of these IJ reviews are, "expeditiously" resolved after the IJ explains the asylum seeker's rights and the asylum seeker may choose to not pursue IJ review. CLINIC has grave concerns that asylum officers will increase denials of credible fear interviews and bona fide asylum seekers will never receive a day in court, not even to have their credible fear interview denial reviewed by an IJ.  A recent report[43] from Syracuse University states IJs continue to overturn asylum officer decisions nearly a quarter of the time. The highest percentage of overturned decisions are those of Cameroonian and Syrian asylum seekers – both countries with bad human rights records.[44]

In creating the expedited removal system, Senator Patrick Leahy aptly stated in discussing the case of Fauziya Kasinga:

> The bill gives virtually final authority to immigration officers at 300 ports of entry to this country. Each is directed to interview people seeking asylum and exclude them if he finds that they do not have 'a credible fear of persecution.' That phrase is unknown to international law. The officer's summary decision is subject only to 'Immediate review by a supervisory office at the port.' The bill prohibits further administrative review, and it says, 'no court shall have jurisdiction' to review summary denials of asylum or to hear any challenge to the new process. (Our present system for

---

[40] Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 Fed. Reg. 36264 (June 15, 2020), EOIR Docket No. 18-0002, A.G. Order No. 4714-2020, 8 CFR § 208.20; 8 CFR § 1208.20.

[41] *See Family Separation Policy Continues Two Years After Trump Administration Claims It Ended*, S. POVERTY L. CENTER (June 18, 2020), https://www.splcenter.org/news/2020/06/18/family-separation-policy-continues-two-years-after-trump-administration-claims-it-ended.

[42] Samantha Balaban et al., *Without a Lawyer, Asylum-Seekers Struggle with Confusing Legal Processes*, NPR, Feb. 25, 2018, " https://www.npr.org/2018/02/25/588646667/without-a-lawyer-asylum-seekers-struggle-with-confusing-legal-processes.

[43] *Immigration Judge Decisions Overturning Asylum Officer Findings in Credible Fear Cases*, TRAC IMMIGR. (March 14, 2023), available at https://trac.syr.edu/reports/712/.

[44] *2021 Country Reports on Human Rights Practices: Cameroon*, U.S. DEP'T OF STATE (2021), https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/cameroon/; *2021 Country Reports on Human Rights Practices: Syria*, U.S. DEP'T OF STATE (2021), https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/syria.

CLP_PC_020671

handling asylum applications works efficiently, so there is no administrative need for change.) Stripping away the protection of the courts may be the most alarming feature of the legislation.[45]

Requiring an asylum applicant to ask for immigration review of a negative credible fear decision would, in many cases, effectively bar them from receiving independent review. Giving one agency unfettered power to decide whether an asylum seeker ever has a day in court goes against the intent of Congress.[46] Review by an immigration judge is critical to ensure the due process rights of asylum seekers in credible fear cases, and preventing unrepresented asylum seekers the opportunity to request review is wrong and unfair. As with the previous administration's attempt to destroy due process protection to credible fear applicants, this proposed rule will eventually fail.

The second safeguard the proposed rule eviscerates is the opportunity for asylum seekers to request reconsideration of a negative credible fear finding. Currently, when an asylum seeker is given negative credible fear finding, they can request that the decision be reconsidered by the asylum office. The request for reconsideration was placed in the regulations, 8 CFR 208.30, as a safeguard in the expedited removal process. Reconsideration of officer decisions is critical to protecting asylum seekers from erroneous decisions and ensuring their due process.[47]

## VIII.   Conclusion

This proposed rule contains several procedural elements that require a full 60-day comment period to be adequately addressed. The proposed rule, if enacted in its current form, would return scores of asylum seekers to danger in Mexico, another transit country, or their country of origin. The proposed rule is similar in substance to the asylum bans issued by the Trump administration then struck down by the courts. The United States' asylum system has been a model for countries around the world to welcome refugees who come to its door. This proposed rule is not in line with the American value of welcoming refugees and asylum seekers and, more importantly, the proposed rule is contrary to U.S. and international law which protects the right to safely seek asylum. As stated by Bishop Seitz in a recent article on this administration's proposed rule, "Policies that fail to secure protections for the vulnerable are morally deficient. Death simply cannot be an acceptable part of the overhead costs of our immigration policies." [48] Therefore, we call upon the administration to withdraw this proposed rule in its entirety.

---

[45] 142 Cong. Rec. S4461 (daily ed. May 1, 1996) (statement of Sen. Leahy).
[46] See Katherine Shattuck, Comment, *Preventing Erroneous Expedited Removals: Immigration Judge Review And Requests For Reconsideration of Negative Credible Fear Determinations*, 93 WASH. L. REV. 459, 459 (2018).
[47] *Biden Administration Move To Eliminate Requests For Reconsideration Would Endanger Asylum Seekers, Deport Them To Persecution And Torture*, HUMAN RIGHTS FIRST (Oct. 2021), available at https://humanrightsfirst.org/library/biden-administration-move-to-eliminate-requests-for-reconsideration-would-endanger-asylum-seekers-deport-them-to-persecution-and-torture/
[48] Mark J. Seitz, *Bishop Seitz on Biden's new asylum policy: Death cannot be the cost of our immigration laws,* AMERICA: THE JESUIT REV., March 14, 2023, https://www.americamagazine.org/politics-society/2023/03/14/biden-asylum-immigration-244876 .

CLP_PC_020672

Thank you for your consideration of these comments. Please do not hesitate to contact Karen Sullivan, Director of Advocacy, at ksullivan@cliniclegal.org, with any questions or concerns about our recommendations.

Sincerely,

Anna Gallagher
Executive Director

16

CLP_PC_020673

 

# Mexican Asylum System for U.S. Immigration Lawyers FAQ

November 2019

<u>Summary</u>

Mexico has adopted a broader refugee definition than the U.S. and grants a higher percentage of asylum applications. Recognized refugees in Mexico can access rights to work, healthcare, education, and family reunification. Recent U.S. policy changes, however, have overwhelmed the Mexican asylum system and pushed Mexico to militarize its southern border, leading to long wait times, poor-quality decisions, and high levels of detention and deportation without access to the asylum system. Legal barriers, including a bar to applications submitted more than 30 days after entering the country, further limit access to the asylum process. The legal and practical challenges within Mexico's asylum system make clear that it cannot replace the U.S. role in refugee protection. Nonetheless, Mexico may offer better options for certain refugees who cannot find international protection in the U.S. A better understanding of the Mexican asylum system may help U.S. lawyers advise clients who are subject to the U.S. third-country-asylum rule or who are deciding where to seek asylum.

**Who is protected by Mexico's asylum law?**                                    **2**

**What is the Mexican asylum process?**                                         **3**

**What rights do asylum seekers have during the process?**                      **4**

**What rights are granted with asylum status?**                                 **4**

**What is the grant rate?**                                                     **5**

**What are the barriers to asylum?**                                            **5**

**How has recent U.S. policy affected asylum in Mexico?**                       **6**

**Accessing and interpreting Mexican asylum records as a U.S. immigration lawyer**  **8**
*What does a denial of asylum look like? What are other possible statuses from the Mexican asylum system?*   **8**
*How do I get my client's records from the Mexican asylum system?*              **9**

**How can I get more involved with Asylum Access Mexico?**                      **10**

**What other resources are available on the Mexican asylum system?**            **10**

CLP_PC_020773

 

**Who is protected by Mexico's asylum law?**

Legal Framework:

1. 1951 Convention Relating to the Status of Refugees
2. Mexican Constitution, Article 11, guarantees the right to seek & receive asylum
3. Cartagena Declaration: voluntary regional protection framework
4. Law of Refugees, Political Asylum, and Complementary Protection (2011) and its implementing Regulation (2012)

Mexico has acceded to the 1951 Refugee Convention and its 1967 Optional Protocol, and signed the Cartagena Declaration, a nonbinding regional protection framework. The Mexican Constitution guarantees the right to seek and receive asylum. The Mexican Refugee Law, passed in 2011, establishes the asylum process. This law has a broad definition of refugees eligible for asylum.

A refugee in Mexico is someone who is outside their country of origin and:

- cannot return to that country due to a well-founded fear of persecution on account of race, religion, nationality, political opinion, membership in a particular social group (1951 Convention categories), or gender (added by Mexican asylum law); or
- has fled their country because their life, safety, or freedom was threatened by generalized violence, foreign aggression, internal conflict, massive human rights violations, or other circumstances that have gravely disturbed public order (Cartagena Decl.).

An asylum seeker may be recognized under either prong of the refugee definition. All asylum petitions are decided under the same process and all recognized refugees enjoy the same protections. It is incumbent upon the government to analyze all potential grounds for protection and to issue a well-reasoned decision explaining the rationale for a grant or denial of any individual petition. If a person does not meet the refugee definition, they still may be eligible for complementary protection if they have a well founded fear of torture or their life is in danger in their country of origin.

The Mexican government has indicated to the UN High Commission for Refugees (UNHCR) that it will apply the Cartagena Definition to all Honduran and El Salvadoran asylum seekers. This implies *prima facie* recognition that these countries are plagued by generalized violence and/or massive human rights violations. Therefore, an asylum seeker from these countries only needs to show (1) they are from the country (2) they

 

left due to violence or human rights violations; and (3) they are not excluded for committing a serious crime or human rights violation in their country of origin.

Other relevant laws to know:

1. Law for the Protection of Children:
   a. Outlaws administrative detention of children
   b. Obligates the state to act according to the best interest of the child
2. Immigration Law:
   a. Defines legal statuses, including the humanitarian status
   b. Recognizes rights to free transit, healthcare, and education
   c. Creates immigration detention and deportation process

**What is the Mexican asylum process?**



Agencies:

- COMAR: Mexico's refugee commission, la Comisión Mexicana de Ayuda a Refugiados
- INM: Mexico's immigration institution, el Instituto Nacional de Migración

Petition: Asylum petitions should be presented to either COMAR or INM. COMAR is ultimately responsible for the process and its staff are specially trained in asylum practice. INM acts as an intermediary in the many parts of the country without COMAR offices.

Documentation: Upon application, an asylum seeker should be issued a *constancia*. This document proves legal status, is valid throughout the process and protects against deportation. Constancias should be issued immediately but may take weeks to months because of administrative delays.

CLP_PC_020775

 

Consideration: Under law, COMAR has 45 working days to make a decision or 90 working days under exceptional circumstances. Due to backlog, COMAR has recently said that all cases are exceptional and thus subject to the 90-day deadline. This deadline is regularly missed. Consideration can now take 6 months to a year.

Interview: COMAR interviews asylum seekers. The applicant may bring an attorney but is not provided with one. An attorney can help an applicant prepare for the interview, compile evidence and country of origin information, and ensure the interviewer conducts a thorough and legally compliant interview.

Decision: COMAR is required to issue a well-reasoned, written decision, laying out the justification for a grant or denial. If asylum is granted, the applicant becomes a permanent resident. Denials may be appealed administratively and then subjected to judicial review.

**What rights do asylum seekers have during the process?**

While waiting for a final decision, an asylum seeker should be issued a *constancia*, which documents legal status, and an ID called a Clave Único de Registro de Población (CURP) that permits them to access employment, education, and healthcare. Due to administrative issues, many asylum seekers are not issued CURPs, and even those who have them may be denied access to rights. Legal aid significantly improves the chances of an asylum seeker receiving a CURP and/or accessing rights.

**What rights are granted with asylum status?**

If asylum is granted, the asylum seeker becomes a permanent resident with the right to stay indefinitely, access employment, healthcare, and education, and apply for naturalization after four years. The naturalization process is long and expensive, however, and few refugees have, as of this date, availed themselves of this process.

Recognized refugees can pass on derivative beneficiary status to family members with them in Mexico and may file reunification petitions for family members outside the country. Family reunification is available for extended family members (up to 4th-level relatives, including cousins, great-grandparents, great-grandchildren, aunts, uncles, etc.), but the petitioner must show a financially-dependent relationship with the beneficiary.

CLP_PC_020776

 

**What is the grant rate?**

The 2019 asylum grant rates averaged 71%, according to COMAR. This varies by nationality. The grant rate for Guatemalans was only 34% while the rate for Venezualans was 99%. When complementary protection is considered, the grant rate rises to 86%. However, this does not count abandoned cases or people deported without the opportunity to apply for asylum.

**What are the barriers to asylum?**

   1.  *30-Day Bar*

Mexican law requires that asylum applicants apply within 30 days of entering the country or show good cause for not having done so. COMAR interprets good cause broadly, and has issued waivers based on lack of information about the process, language barriers, detention, incapacity, incompetence, or similar circumstances. Applicants with competent counsel usually receive waivers. Mexico regular deports or coerces "voluntarily return" of pro se asylum seekers subject to the 30 day bar. Asylum Access Mexico is challenging this law in the courts but it is in force currently.

   2.  *Travel Restrictions*

An asylum seeker must remain in the state where they first applied throughout the pendency of their claim, and must sign a form in the state's COMAR or INM office weekly or biweekly to prove their presence. Violation of this regulation will lead COMAR to deem the application abandoned.

Because most asylum seekers are near the southern and northern borders, this restriction is a significant burden. Mexico's southern border is poorer, has worse infrastructure, and fewer job opportunities than the rest of the country. There is also a significant presence of Central American gangs and other agents of persecution in the southern states. The northern border states are plagued by violent crime, kidnappings, and high presence of drug cartels. In either case, with the current backlog, asylum seekers may be stuck where they apply for over a year.

CLP_PC_020777

 

*3.  INM processing instead of COMAR*

In many parts of the country, including many of the places refugees are gathered at the northern border, there are no COMAR offices. Therefore, refugees must solicit asylum through INM. This creates substantial problems. INM acts as an intermediary, sending applications to COMAR for issuance of status documents and final decisions, which slows down the process considerably. Moreover, INM officers are not trained to sensitively interact with vulnerable or traumatized populations. Although eligibility interviews are done by COMAR (often by phone), INM officials supervise check-ins, receive and transmit documents, and regularly provide erroneous legal advice to asylum seekers.

*4.  Language barriers*

Many refugees in Mexico do not speak Spanish fluently. Some speak indigenous languages, Hatian Creole, or come from African or Asian countries. Mexican law requires that the asylum process be conducted in a language the asylum seeker understands, but this requirement is routinely ignored and translators are rarely provided.

*5.  Militarized immigration enforcement*: see below

**How has recent U.S. policy affected asylum in Mexico?**

Recent U.S. policies, including metering, the Migrant Protection Protocols, the third country transit rule and tariff threats, have had substantial effects on the Mexican immigration system, leading to an overburdened system and militarized enforcement.

Overburdening of the Asylum System

U.S. policies have made it much more difficult for refugees to claim asylum at the U.S. border. Under the "metering" system, Customs and Border Patrol allows only a small, unpredictable, number of asylum seekers to approach a border gate in a day. Asylum seekers are required to put their names on informal lists at the border and wait for weeks or months for their number to be called. Under the Migrant Protection Protocols, asylum seekers are required to wait in Mexico for their hearings in U.S. immigration court. Under the Third Country Transit rule, the Trump Administration has announced

CLP_PC_020778

 

the intention to deny asylum to any applicant who passed through a third country on their way to the U.S. border without soliciting asylum there. The combined effect of these policies is to leave tens of thousands of refugees who intended to seek asylum in the U.S. waiting in Mexico. Some of the affected migrants will decide to stay in Mexico.

These policies have contributed to a substantial increase in refugees seeking asylum in Mexico and the Mexican government has not provided a commensurate budgetary increase to process the applications. COMAR is severely under resourced in comparison with current demand. It only has around 48 protection staff deciding the cases of up to 80,000 asylum seekers.



There have been 60,000 asylum petitions so far in 2019 and COMAR estimates there will be 80,000 by the end of the year. In 2015, there were 5,000 claims and the number was increasing linearly before skyrocketing in 2019 due to U.S. policy changes. The 2015 budget was 25 million pesos (est. $1.3M USD), while the 2019 budget was only 20 million pesos (est. $1M USD). The current 2020 budget is 27 million (est. $1.4M USD). Under these circumstances, COMAR cannot hire or train the needed staff or give applications the necessary attention. This new demand has put a huge stress on the Mexican asylum system and led to an enormous backlog in applications, leaving refugees waiting for over a year.



 

<u>Militarized Immigration Enforcement under Tariff Threats</u>
In June 2019, the Trump administration threatened significant tariffs on virtually all Mexican exports unless Mexico acted immediately to curtail migration to the U.S. Mexico responded drastically, deploying 6,000 National Guard troops to the southern border, militarizing the southern states and making it much harder for migrants to travel. It increased detention and deportations. It stopped regularly issuing travel permits for refugees to travel to the U.S. border. It threatened private transportation companies and migrant rights activists with human trafficking prosecutions.

This has had a significant impact on the safety and security of migrants throughout Mexico. Refugees are attempting more dangerous routes and have drowned trying to take boats up the Chiapas coast. Those who are detained are frequently deported without the opportunity to claim asylum.

**Accessing and interpreting Mexican asylum records as a U.S. immigration lawyer**

The Trump Administration's third country transit rule requires U.S. authorities to deny asylum to anyone who passed through another country without seeking asylum there before arriving at the U.S. border. The rule does not apply to anyone who receives a "final judgment" denying protection in a third country. This rule is being challenged in court but the Supreme Court has permitted it to go into effect during litigation. Many U.S. immigration lawyers are attempting to determine how this rule will be applied. Immigration lawyers may need to show that their client has been denied asylum in Mexico or to advise a client to attempt to seek asylum in Mexico prior to entering the U.S. Asylum Access cannot provide an opinion as to how the U.S. government will interpret this rule, but the following sections may help U.S. immigration lawyers to access and interpret Mexican asylum records.

**What does a denial of asylum look like? What are other possible statuses from the Mexican asylum system?**

We do not know how the U.S. immigration system will apply this policy or interpret Mexican law. However, here are some possible scenarios:
1. Denial on the merits: the client's case has been fully adjudicated and found not to meet the criteria for Mexican asylum. The first denial will be issued by COMAR. It

CLP_PC_020780

 

is unclear if US Immigration Judges and Courts will consider this to be a "a final judgment denying the alien protection" under the IFR. As noted, a denial from COMAR can be administratively appealed through a 'Recurso de Revision,' within 15 days of issuance of the decision. It is virtually impossible for an asylum seeker to be successful in this administrative appeal without legal counsel, and *pro se* appeals will likely be denied on procedural grounds. Following administrative denials, an asylum seeker may seek judicial review through an 'Acción de Amparo' (similar to a request of injunction or writ of mandamus). Asylum Access cannot offer any opinion as to how the U.S. government will interpret the term 'final judgment,' and as of this writing, no official guidance has been issued. A redacted example of a final denial is available [here](#).

2. Denial for the 30-day bar: the client's application has been rejected because they applied more than 30 days after entering the country without showing good cause. This denial can also be subject to administrative or judicial review. Their case has not been adjudicated on the merits. Again, it is unclear how this type of denial will be interpreted under the IFR.

3. Abandonment: the client left the state in which they initially applied for asylum, or failed to comply with the signing/registration requirements to prove presence, and COMAR determined the case to be abandoned.

4. Humanitarian status
   a. Asylum seekers are granted temporary humanitarian status during the pendency of their claims.
   b. The document does not mean the application has been accepted or denied. It is not permanent residency.

5. Grant of Complementary Protection: COMAR determines an asylum seeker does not meet the refugee definition but has a well founded fear of torture, cruel, inhuman or degrading treatment, or death in their country of origin. This protection includes a grant of permanent residence, but no family reunification or straightforward path to naturalization.

6. Asylum grant

**How do I get my client's records from the Mexican asylum system?**
There are several options:
1. Go to a Mexican consulate in the U.S. with a written authorization from a client (preferably notarized) and file a formal records request. The consulate will then request the records from COMAR. This is the process COMAR suggests but not all consulates have cooperated consistently.

 

2. Have your client give power of attorney to a Mexican attorney to request the records from COMAR.
3. Request the records from UNHCR with a privacy waiver from your client.

**How can I get more involved with Asylum Access Mexico?**

Asylum Access Mexico (AAMX) has 7 offices throughout Mexico where we help refugees access their rights through legal services, help them find jobs and cultural opportunities through the Hospitality Route, and advocate for improvements to access to and quality of asylum.

We have a robust volunteer program and are frequently hiring staff. See asylumaccess.org for more information.

Follow Asylum Access Mexico on Twitter @AsylumAccessMX (mostly in Spanish) and Asylum Access global @AsylumAccess (mostly in English).

Any other questions? Email brynne.oneal@asylumaccess.org

**What other resources are available on the Mexican asylum system?**

Mexico's Secretary of Government has collected legal sources on refugee and asylum law: https://www.gob.mx/comar/documentos/marco-juridico-en-materia-de-refugiados

COMAR: https://www.gob.mx/comar

United Nations Refugee Agency Mexico: https://www.acnur.org/mexico.html

CLP_PC_020782



March 27, 2023


Secretary Alejandro Mayorkas
Department of Homeland Security
U.S. Citizenship and Immigration Services
5900 Capital Gateway Drive
Camp Springs, MD 20746


Re: DHS Docket Number USCIS 2022-0016, Circumvention of Lawful Pathways


Dear Secretary Mayorkas,

Thank you for the opportunity to submit this comment regarding the Department of Homeland Security's proposed changes to the asylum regulations. We are both student-attorneys at the George Washington University Law School's Immigration Clinic. As a community legal clinic serving clients in the Washington, D.C. area since 1979, we provide pro bono representation to clients from around the world on immigration law matters, including removal proceedings and petitions for affirmative and defensive asylum, before federal administrative tribunals. Both of us currently represent incredibly brave individuals who escaped unbelievable circumstances and endured grueling hardship to make a new life for themselves in this great country through asylum. One of our clients, E-M-G, is a young woman from El Salvador who faced a vicious gang that murdered her brother and claimed her as their prize before escaping through a coyote and being admitted at our southern border. M-P-M, also a native and citizen of El Salvador, fled her home country because the local gangs and police targeted her on the basis of her identity as a transgender woman and work as a health rights activist. E-M-G now works full-time and cares for her five-year-old daughter as a single mother, and M-P-M has similarly established a new life for herself utilizing the protections afforded to her as an asylum seeker.

Both of these women faced true desperation, entrusted their lives to the benevolence of the United States, and now are already contributing to the country that saved their lives. Simply put, these women represent the purest form of the American Dream. However, the proposed rule perversely denies deserving asylum seekers like them an opportunity to have their cases fairly adjudicated by imposing unrealistic technological, logistical, and evidentiary requirements, exposing migrants to additional harm and serving as a constructive ban on asylum in direct contravention of domestic law and international treaties.

**The George Washington University Law School**
2000 G Street, NW | Washington, DC 20052
t 202-994-7463 | f 202-994-4946 | f 202-994-4693 | www.law.gwu.edu/clinics

CLP_PC_021091



### I.    The proposed rule violates our legal and moral commitments to asylum seekers.

Although we commend the Department of Homeland Security for introducing parole processes for nationals of Cuba, Haiti, Nicaragua, and Venezuela, such an expansion cannot serve as a justification for the proposed restrictions on asylum seekers. In particular, it is unconscionable to restrict asylum pathways at the southwest border to individuals who have either scheduled an appointment to arrive at a port of entry or sought asylum in a third country before entering the United States but were denied. Because those requirements are unrealistic, the proposed rule flies in the face of well-established domestic law which provides that, "*any* alien who is physically present in the United States or who arrives in the United States…irrespective of [their] status, may apply for asylum."[1] This unambiguous statutory language reflects and implements our international treaty obligations to a widely inclusive definition of "refugee" and the principles of non-discrimination and non-penalization for asylum seekers.[2] The proposed rule, however, would exploit the statutory language of "may apply"[3] to impose a discriminatory condition on asylum seekers' eligibility for protections that penalizes statutorily eligible asylum seekers based on adherence to arbitrary procedural requirements, in clear violation of the letter and spirit of our domestic law and international treaty obligations. If enacted, the proposed rule will fail to serve as any type of fix to a broken immigration system. Rather, it will inevitably impose further harms on migrants simply seeking to exercise a legal right codified under both U.S. and international law.

### II.   The proposed rule denies asylum seekers a meaningful and realistic opportunity to seek protection in the United States.

Setting aside the parole pathways program, which applies only to nationals of certain countries, the proposed rule requires the broad swath of migrants entering at the southwest border to seek asylum in the United States via one of two burdensome pathways: an appointment to arrive at a port of entry or proof of application and denial of asylum in a third country through which they traveled. The former incorrectly presumes that the average migrant has the means to possess and maintain a fully functioning smartphone on their journey to the United States and the latter disregards the discrimination, including other serious harms, migrants often face in third countries, especially Mexico.

   A.   The CBP One App imposes unrealistic technological and logistical requirements on asylum seekers.

The proposed rule provides that, "once the Title 42 public health Order is terminated, the United States will expand implementation of the CBP One application…for noncitizens to schedule a time to arrive at ports of entry...to allow an increasing number of migrants who may

---

[1]  8 U.S.C. § 1158(a)(1).
[2]  Protocol on the Status of Refugees art. 31, Jan. 31, 1967, 606 U.N.T.S. 267.
[3]  8 U.S.C. § 1158(a)(1).



wish to claim asylum to request an available time and location to present and be inspected and processed at certain ports of entry."[4] This proposal, based on limited data gathered by Customs and Border Protection officers on December 11, 2022,[5] is impractical. It incorrectly assumes that the average migrant seeking asylum at the southwest border has the financial resources, technological literacy, and access to wireless infrastructure required to regularly access the CBP One application via a smartphone, let alone secure an appointment to arrive at a port of entry. Furthermore, it contradicts data released by U.S. Customs and Immigration Enforcement, which reveals that the Biden Administration issued over 322,000 smartphones to migrants awaiting hearings in immigration court, in FY22, at a cost of approximately $300,000 per day.[6]

Consider the story of our client, M-P-M. A native and citizen of El Salvador, M-P-M fled her home country, leaving behind her friends and family, because the local gangs and police targeted her on the basis of her identity as a transgender woman and work as a health rights activist. Although M-P-M had a cell phone in her possession when she fled El Salvador for Guatemala, it was as functional as a brick cube given that charging stations were few and far between. On the rare occasion that M-P-M was able to charge her cell phone at the various shelters she encountered on her journey to the United States, the charge could not be sustained in between. Moreover, she was required to purchase a SIM card in each country she traveled through on her way to the United States to ensure her cell phone was functional. When she entered Mexico, her cell phone broke. However, M-P-M fortunately had the financial resources to replace her cell phone, such that she entered the United States with a functional smartphone two and a half months after fleeing El Salvador. Her story evinces the fact that even those asylum seekers fortunate enough to frequently have access to a cell phone will encounter problems that make using the CBP One app impractical.

The story of our client E-M-G provides another illustration of the proposed rule's blindness to the reality of asylum seekers' situations and access to the technology and resources required to successfully use the CBP One App. E-M-G had only one practical option to escape the persecution of MS-18, the gang that killed her brother and claimed her as their prize: the services of a coyote. Traveling by group through a coyote ensured E-M-G had a planned route by bus and car and reasonably safe sleeping accommodations in those vehicles, but she and the other migrants had to leave their cellphones behind because of the reality that it would be impossible for everyone in the group to keep their phones charged, putting aside the carrier and SIM card issues inherent to their international journey. E-M-G and the other asylum seekers chose the safest and most affordable option to escape their persecution, but the practical reality is

---

[4] Circumvention of Lawful Pathways, 88 Fed. Reg. 11704 (proposed Feb. 23, 2023) (to be codified at 8 C.F.R. pt. 208).
[5] *Id.*
[6] U.S. Customs and Immigration Enforcement, *Detention Management*, https://www.ice.gov/detain/detention-management (last visited Mar. 14, 2023).

**The George Washington University Law School**
2000 G Street, NW | Washington, DC 20052
t 202-994-7463 | f 202-994-4946 | f 202-994-4693 | www.law.gwu.edu/clinics

CLP_PC_021093



that it necessarily cut off all access to cellphones, a circumstance which would likely be damning for asylum seekers under the proposed rule.

Finally, consider the story of another Immigration Clinic client, M-B-S. A native and citizen of Honduras, she fled her home country to escape abuse at the hands of her Aunt and Uncle, who served as her guardians because her parents moved to the United States when she was young. M-B-S left home with a non-smart cell phone, which only permitted her to make phone calls. Because she could only afford to purchase a cell phone that lacked a built-in camera and did not provide wireless connectivity, she would have been precluded from accessing the CBP one application as a means to gain asylum in the United States. Although M-B-S purchased a non-smart cell phone to call her parents during her journey, she recounted that it was nearly impossible to do so because she struggled to access charging stations along the way. Since coming to the United States, M-B-S has reunited with her parents and continued her education. Given her lack of access to a smartphone, however, this outcome would not have been likely if the proposed rule was in place at the time of her crossing at the southern border.

Even if we ignore the obvious technological access problems that M-P-M, E-M-G, and M-B-S faced, and that countless other asylum seekers face today, the CBP One App's scheduling requirements impose another barrier that will deny many deserving migrants protection, or worse, render them more vulnerable to exploitation during their journey to the United States. M-P-M's and E-M-G's stories evince the impossibility of knowing the exact date and time of arrival at the border: M-P-M's solo journey took approximately three months and was affected by technological and other problems that delayed her, and E-M-G's month-long journey through a coyote still couldn't guarantee any given date of arrival. This uncertainty means that asylum seekers could be forced to spend days waiting in the dangerous area surrounding the border, exacerbating the ongoing humanitarian disaster there.

B.   The rebuttable presumption imposes an unrealistic evidentiary burden on asylum seekers.

Our asylum system already forces asylum seekers to play "discretion roulette," but the proposed rule's rebuttable presumption makes asylum seekers take another spin while stacking the odds even further against them. This is because the only way to rebut the presumption requires a showing of an "imminent and extreme threat" present at the time the applicant reached the border,[7] such an unrealistically high evidentiary burden on asylum seekers as to force them to prove the merits of their case twice over or else face automatic denial of their claims.

---

[7] Circumvention of Lawful Pathways, 88 Fed. Reg. 11704 (proposed Feb. 23, 2023) (to be codified at 8 C.F.R. pt. 208).

**The George Washington University Law School**
2000 G Street, NW  |  Washington, DC 20052
t  202-994-7463  |  f  202-994-4946  |  f  202-994-4693  |  www.law.gwu.edu/clinics

CLP_PC_021094



Even the most clearly deserving asylum seekers will be hard-pressed to produce evidence that shows their persecutors' threats are "imminent" simply because persecution frequently doesn't leave a paper trail, leaving them subject to adjudicators' discretion and subjective evaluations of credibility. E-M-G escaped physical and sexual abuse at the hands of MS-18 and her circumstances clearly meet the statutory requirements for a grant of asylum, but the merits of her case mean absolutely nothing under the proposed rule if the adjudicator doesn't believe that her persecution still constituted an "imminent and extreme" threat when she reached our southwestern border.

But what evidence could she produce to prove her persecution is ongoing? Fleeing persecution by a murderous gang doesn't exactly leave one in a position to fight a legal battle: MS-18 had violently coerced her family into silence and she didn't have police reports since she knew they didn't have the capacity or willingness to protect her. This leaves her with only one option: to verbally recount every traumatic detail and hope she's lucky enough to be given the benefit of the doubt rather than a crash course in "expedited removal." Under the existing system, as long as she shows a well-founded fear of persecution her asylum claim can be successful; but the proposed rule would add the additional hurdle of proving that the reasons for her fear followed her from El Salvador and remained "imminent" all the way to our southwestern border. The cruel absurdity of demanding that asylum seekers carefully document their own persecution and come to the border prepared with receipts just for the chance at protection is painfully evident in stories like E-M-G's, and it's equally clear that countless meritorious claims will be denied and countless asylum seekers sent back to their persecutors if the proposed rule goes into effect.

The CBP One App's check-in and appointment scheduling requirements are an inhumane farce, standing in stark contrast to the reality of asylum seekers' circumstances and providing a meaningful opportunity only to the mythical asylum seeker who can escape persecution while maintaining consistent cellular connection and a spotless itinerary. The proposed rule's allowance for a showing of inability to use the App provides no meaningful exceptions but instead places another significant evidentiary burden on those least equipped to satisfy it.

### III. The proposed rule will expose migrants to further harm.

Individuals should be able to access our asylum system regardless of how they enter, as has been the law for decades. They should not be forced to seek asylum in transit to the United States, especially not in countries where they may also face harm. Requiring asylum seekers to seek and be denied asylum in a third country on their journey to the United States will inevitably expose them to discrimination and other serious harms.

**The George Washington University Law School**
2000 G Street, NW | Washington, DC 20052
t 202-994-7463 | f 202-994-4946 | f 202-994-4693 | www.law.gwu.edu/clinics

CLP_PC_021095



M-P-M, who fled El Salvador through Guatemala and traveled through Mexico before reaching the United States, recounted that she faced similar harassment in Mexico as she did in her home country because the Mexican people are not accepting of LGBTQ individuals, let alone migrants. In Tabasco, Mexico, locals would often yell at her on the streets telling her to leave, calling her derogatory names and threatening physical violence if she remained in the country. Members of the Los Zetas gang also made it their goal to run M-P-M out of town with threats to harm her. Threats to M-P-M's safety did not end there. While in Mexico, she was routinely approached by the cartels who insisted she needed their assistance to cross the border and demanded payment. Despite her attempts to make clear that she had no interest in engaging with them, they attacked her with a screwdriver to her arm in an attempt to coerce her to utilize their services. Given the traumatic experiences she endured during her brief stay in Mexico, is it any wonder that she declined to prolong her stay by seeking asylum? M-P-M's experience in Mexico is not unique. Migrants often experience discrimination in Mexico[8] and are discouraged from applying for asylum and awaiting a resolution of their case.

The proposed rule further complicates the asylum process by imposing a rebuttable presumption of asylum ineligibility for those seeking to enter via the southwestern border who neither made an appointment to appear at a port of entry nor sought asylum in a third country through which they traveled.  If enacted, the rebuttable presumption will inevitably preclude the average migrant from exercising their legal right to seek asylum in the United States, as it unrealistically assumes that migrants fleeing their home countries, often due to imminent danger, are capable of compiling adequate evidence to demonstrate that they experienced an "exceptionally compelling circumstance" by a "preponderance of the evidence."[9]

In our role as student-attorneys, we require weeks, if not months, to carefully develop our clients' asylum applications and pretrial filing materials. Unlike migrants crossing the southwestern border following a long and arduous journey, we are equipped with legal training and access to resources to understand and attempt to satisfy the evidentiary requirements. It is unjust to place this burden on individuals seeking protection on U.S. soil in addition to the significant traumas they are very likely experiencing.

If enacted, asylum seekers with otherwise meritorious claims will inevitably be negatively impacted by this rule. Their inability to rebut the presumption of asylum ineligibility will limit their possible avenues for protection on U.S. soil to include only Withholding of

---

[8]ACLU, *Asylum-Seekers Stranded in Mexico Face Homelessness, Kidnapping, and Sexual Violence*, https://www.aclu.org/issues/immigrants-rights/immigrants-rights-and-detention/asylum-seekers-stranded-mexico-face, (last visited Mar. 14, 2023).
[9] *Id.*

**The George Washington University Law School**
2000 G Street, NW  |  Washington, DC 20052
t  202-994-7463  |  f  202-994-4946  |  f  202-994-4693  |  www.law.gwu.edu/clinics

CLP_PC_021096



Removal or protection under the Convention Against Torture, neither of which provide a path to legal permanent residency nor other protections comparable to those resulting from a grant of asylum. Moreover, the protections would be harder to obtain given the higher evidentiary standard required to demonstrate reasonable fear.

## IV. The proposed rule will fail to accomplish its goal of reducing border traffic.

The proposed rule has no real chance of achieving its goal of improving border conditions by reducing smuggler traffic because it fundamentally ignores the reasons asylum seekers choose to make the journey to our southwestern border, whether through coyotes or otherwise. E-M-G, for instance, didn't choose to enlist a coyote out of ignorance or out of disrespect for official immigration channels; rather, she made that choice because a coyote was her only safe and affordable opportunity to reach the United States. Asylum seekers like E-M-G will continue to enlist the services of coyotes as long as they promise an escape from persecution, no matter the chance of successfully receiving asylum protections. The proposed rule won't ameliorate border conditions or reduce the exploitation of asylum seekers, but instead will deprive countless deserving asylum seekers of protection, rendering them even more vulnerable to exploitation on either side of the border.

The proposed rule assumes asylum seekers have perfect knowledge of current U.S. asylum policy as well as a wide range of choices in how and when to arrive at the southern border, but the reality is that even the draconian "rebuttable presumption" still affords a better chance at safety than continuing to endure violent persecution. Because of this, the rule's cruelty won't provide a meaningful travel disincentive to asylum seekers, even though it may cripple their chances at receiving the asylum protections they need.

Take the example of E-M-G, who endured a living nightmare of physical, sexual, and psychological abuse in El Salvador so vile and demoralizing that she attempted to take her own life on three separate occasions. When she made plans to leave her home, she had in mind only the chance at escaping her living nightmare and creating a better life for herself. It would be contrary to logic as well as morality to believe that the fact that she may not win asylum, or the legal ramifications of the circumstances of her eventual entry into the United States, should shape her plans and lead her to comply with such inaccessible requirements as those set forth by the proposed rule.

The proposed rule will be completely ineffective in reducing border traffic because no matter how cruel and draconian the requirements for asylum protections, those facing

**The George Washington University Law School**
2000 G Street, NW  |  Washington, DC 20052
t 202-994-7463  |  f 202-994-4946  |  f 202-994-4693  |  www.law.gwu.edu/clinics

CLP_PC_021097



life-or-death decisions will always choose life. Deserving asylum seekers like M-P-M, E–M-G, and M-B-S will always take the opportunity to create a better life for themselves in the United States, even if they'll ultimately be denied the asylum protections they seek, and the cruelty of the proposed rule's arbitrary requirements, rebuttable presumption, and expedited removal will only evince the righteousness of their claims.

## IV. Conclusion

The United States must adhere to our obligations under domestic law and international treaties to protect the right to seek asylum and to not return people to countries where they would face persecution or torture. As drafted, this proposed rule would deny families and other vulnerable migrants along the southwest border a fair chance at receiving asylum protections while not providing meaningful exceptions. We cannot, and must not, increase legal pathways via parole pathways for entry for some at the expense of restricting access for asylum seekers who are coming to the United States for protection. This proposed rule does not fully anticipate the human aspects of immigration. Accordingly, we strongly encourage the Department of Homeland Security to restore full access to our asylum system once Title 42 is lifted.

Sincerely,

Jeremy Reiner
J.D. Candidate, May 2024
Student-Attorney, Immigration Clinic
The George Washington University Law
School

Wintana Yohannes
J.D. Candidate, May 2023
Student-Attorney, Immigration Clinic
The George Washington University Law
School

**The George Washington University Law School**
2000 G Street, NW  |  Washington, DC 20052
t 202-994-7463  |  f 202-994-4946  |  f 202-994-4693  |  www.law.gwu.edu/clinics

CLP_PC_021098

March 27, 2023

*Submitted via* https://www.regulations.gov/commenton/USCIS-2022-0016-0001

Lauren Alder Reid, Assistant Director
Office of Policy
Executive Office for Immigration Review, Department of Justice
Falls Church, VA

Daniel Delgado, Acting Director
Border and Immigration Policy
Office of Strategy, Policy, and Plans
U.S. Department of Homeland Security
Washington, D.C.

**RE:     Comment in Opposition to the Joint Notice of Proposed Rulemaking** *Circumvention of Lawful Pathways***, 88 Fed. Reg. 11704 (proposed Feb. 23, 2023).**

Dear Assistant Director Reid and Acting Director Delgado:

The Yale Law School Immigrant Justice Project respectfully submits the following comment to the Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (USCIS), and the Department of Justice (DOJ), Executive Office for Immigration Review (EOIR) ("the agencies") in response and opposition to the above-referenced Notice of Proposed Rulemaking (NPRM or "the Rule") issued by the agencies on February 23, 2023. We staunchly oppose the Proposed Rule, for the reasons detailed below, and urge the agencies to withdraw the Rule in its entirety.

The Yale Law School Immigrant Justice Project organizes law students in support of immigrant communities within New Haven, Connecticut and beyond. We engage in direct legal services under supervision and advance strategic advocacy to support immigrant justice. On March 17, 2023, our team traveled to Brownsville, Texas in partnership with Project Corazón and Lawyers for Good Government (L4GG) to meet with immigration advocates and stakeholders in the Río Grande Valley and visit migrant camps and shelters in the cities of Matamoros and Reynosa in Mexico. Over the course of several days, we provided Know Your Rights trainings, conducted intake interviews for humanitarian parole requests, fielded questions from migrants and community leaders, and spoke with dozens of migrants about their experiences using the CBP One mobile application. We also documented abhorrent conditions across several migrant camps in Reynosa. Our experiences with migrants and asylum-seekers in Reynosa and Matamoros directly inform our deep opposition to this Rule.

CLP_PC_021162

## I.     General Opposition to the Proposed Rulemaking

While the proposed Rule purports to "encourage migrants to avail themselves of lawful, safe, and orderly pathways into the United States, or otherwise to seek asylum or other protection in countries through which they travel, thereby reducing reliance on human smuggling networks that exploit migrants for financial gain," **in practice, the Rule's implementation undermines its own stated purpose.**

**First, the proposed Rule impermissibly redefines the statutory right to asylum under the Immigration and Nationality Act (INA), and further erodes the provision of due process in the application for asylum.**  The Rule states that migrants will have a "*rebuttable presumption of asylum ineligibility* if they neither avail themselves of a lawful, safe, and orderly pathway to the United States nor seek asylum or other protection in a country through which they travel." *Circumvention of Lawful Pathways*, 88 Fed. Reg. 11704, 11704 (proposed Feb. 23, 2023) (to be codified at 8 C.F.R. 208 & 1208) (emphasis added). The INA grants that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . . may apply for asylum." 8 U.S.C. § 1158(a)(1) (2018). The proposed rebuttable presumption of ineligibility for asylum effectively creates a new legal framework by which to evaluate asylum claims. This framework goes far beyond the statutory exceptions Congress enacted, upending existing asylum law under the INA. Further, this proposed change will reduce the scope of asylum adjudication to an admissibility determination and expedited removal process by Customs and Border Patrol (CBP), shifting asylum determinations away from USCIS and EOIR. As such, this proposed change denies migrants access to the due process and fairness they might receive if their asylum claim were adjudicated properly, with sufficient time to seek counsel, gather documentation, and prepare effective declarations, as is their legal right.

**Second, this proposed Rule will, in effect, disable any semblance of a "lawful, safe, and orderly" process for migrants seeking asylum.** The Rule states that the "Departments expect the proposed Rule to lead to a reduction in the numbers of migrants who seek to cross the [Southwest border] without authorization to enter, thereby reducing the reliance by migrants on dangerous human smuggling networks, protecting against extreme overcrowding in border facilities, and helping to ensure that the processing of migrants seeking protection in the United States is done in an effective, humane, and efficient manner." *Circumvention of Lawful Pathways*, 88 Fed. Reg. at 11704. However, due to the significant technological and logistical hurdles posed by the CBP One application, migrants are functionally unable to present at the border, and are forced to wait at the border for months attempting to secure scarce appointments. While waiting, these vulnerable migrants are often completely dependent on third parties for shelter, water, food, electricity and internet access. Those they depend on are typically Mexican nationals who must make arrangements with the cartels that control the area, or are members of the cartels themselves. Accordingly, under this process, migrants are forced to rely on cartels to secure access to basic

CLP_PC_021163

human necessities, and as a result, endure economic and physical exploitation. For example, we spoke with several migrants who had been kidnapped by cartel members in exchange for ransom. At least one migrant we spoke with was sexually exploited during the course of their kidnapping. The Rule will increase migrants' reliance on cartel networks and further encourage cartels to capitalize on the vulnerability of the migrants who are forced to wait months to secure an appointment to present at a port of entry.

**Third, the proposed Rule unlawfully bars applicants who traveled through another country *en route* to the United States and did not stop in that country to apply for asylum.** As the Rule currently stands, there is no assessment of whether the transit country is actually safe or if it has a functioning immigration/asylum system. As evidenced by rigorous research and country conditions reports published by expert organizations including the U.S. Department of State, common transit countries including Guatemala, El Salvador, Honduras, and Mexico are not safe countries for asylum-seekers and other migrants. Furthermore, these countries do not have immigration systems capable of providing access to a "full and fair" procedure for determining asylum, as mandated by U.S. and international law. As a result of this Rule, many asylum-seekers may be wrongfully refouled to these countries, where they will face immediate grave danger and could be harmed, assaulted, tortured, or killed in direct violation of INA 208(a)(2)(A) and our international legal obligations as a nation that ratified the 1967 Protocol Relating to the Status of Refugees, the United Nations Convention Against Torture, and the International Convenant on Civil and Political Rights. The procedures contemplated by the Rule are blatantly inconsistent with the existence of a fair, impartial, and independent process for all asylum-seekers who seek a determination of whether their fear of persecution or torture is well-founded, to which they are *legally entitled*.

**Fourth, implementing the Rule through the expedited removal process means that applicants must rebut the presumption of ineligibility through an already problematic procedure without prior knowledge of the Rule and without access to counsel, all within hours or days from the trauma of their flight.** The Rule states that "the applicability of the rebuttable presumption would be adjudicated during the credible fear process for noncitizens processed for expedited removal, as well as applied to merits adjudications." *Circumvention of Lawful Pathways*, 88 Fed. Reg. at 11725. Since its initial inception over 20 years ago, expedited removal has been rife with error and misconduct. A 2005 study commissioned by Congress documented "serious problems" in the expedited removal process "which put . . . asylum seekers at risk of improper return." *Report on Asylum Seekers in Expedited Removal: Volume I: Findings & Recommendations*, U.S. Comm'n on Int'l Religious Freedom 4-5, 10 (Feb. 2005), https://www.uscirf.gov/sites/default/files/resources/stories/pdf/asylum_seekers/Volume_I.pdf.

CBP officers systematically interfere with the rights of individuals in expedited removal to pursue asylum claims. For example, officers regularly fail to record statements by individuals subject to expedited removal that indicate a fear of return; fail to refer individuals who express fear of return

3

for Credible Fear Interviews (CFIs); fail to ask individuals in expedited removal proceedings about their fear of return; and subject these individuals to harassment and misinformation that actively interferes with their ability to pursue asylum claims. *See, e.g.*, *"You Don't Have Rights Here": US Border Screening and Returns of Central Americans to Risk of Serious Harm*, Hum. Rts. Watch 6 (Oct. 2014), https://www.hrw.org/sites/default/files/reports/us1014_web_0.pdf (finding that fewer than half of individuals interviewed who claimed a fear of return were referred for credible fear hearings); *Discretion to Deny: Family Separation, Prolonged Detention, and Deterrence of Asylum Seekers at the Hands of Immigration Authorities Along the U.S.-Mexico Border*, Borderland Immigr. Council 12 (2017), http://media.wix.com/ugd/e07ba9_72743e60ea6d4c3aa796becc71c3b0fe.pdf ("In 12% of the cases documented for this report, individuals expressing fear of violence upon return to their country of origin were not processed for credible fear screenings and instead, were placed into removal proceedings."); Off. Inspector Gen., Dep't Homeland Sec., OIG-18-84, *Special Review—Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy* 5 (Sept. 27, 2018) (describing CBP practices amounting to failure to properly refer asylum-seekers for CFIs in order to "regulat[e] the flow of asylum-seekers at ports of entry"). The Rule's proposed expansion of expedited removal would only amplify these systemic problems which have long gone unresolved by DHS.

**Fifth, the 30-day comment period provided by the government for this Rule flagrantly violates the policies set out in prior Executive Orders governing the regulatory process**, namely Executive Order 12866, which require federal agencies to "afford the public a meaningful opportunity to comment on any proposed regulation, which in most cases should include a comment period of *not less than 60 days.*" Exec. Order No. 12866, *Regulatory Planning and Review*, 58 Fed. Reg. 51735, 51740 (Oct. 4, 1993) (emphasis added). Relevant federal agencies have failed to provide any compelling explanation for the abbreviated public comment period. Such rash conduct is painfully reminiscent of prior administrations' attempts to suppress the voices of immigration non-governmental organizations (NGOs) and advocates, and limit their ability to provide necessary insight and expertise on these critical issues.

## II.   Documented Technological and Accessibility Concerns with the CBP One Application

The Rule currently alleges that use of the CBP One Application "protects migrants from having to wait in long lines of unknown duration at the ports of entry, and enables the ports of entry to manage the flows in a safe and efficient manner." *Circumvention of Lawful Pathways*, 88 Fed. Reg. at 11707. Based on our own observations, this is patently false. **Instead, the application significantly limits the number of people who may obtain appointments for inspection and gravely undermines fairness and due process.**

4

On March 20, 2023, we visited migrants waiting at migrant camps and shelters in Reynosa, Mexico, near the McAllen-Hidalgo International Bridge leading to Hidalgo, Texas. On March 21, 2023, we visited migrants waiting in Matamoros, Mexico, in visible sight of the Gateway International Bridge leading to Brownsville, Texas. On both days, we interviewed dozens of migrants and observed the use of the CBP One application in real-time as new appointments became available. Our first-hand observations below are supplemented with reports from legal service providers, asylum-seekers, and other aid workers operating in the border region during the rollout and implementation of the CBP One application.

1. **The application reduces the number of people who may obtain appointments for presentation at the border.** The number of individuals seeking entry at the Southwest border fluctuates between approximately 7,100 and 9,700 per day, averaging approximately 8,500 per day, with encounters exceeding 9,000 per day on 12 different occasions during the 30-day stretch preceding December 24, 2022. *Circumvention of Lawful Pathways*, 88 Fed. Reg. at 11708.

    a. In February 2023, the total number of CBP One entry appointments across the entire Southwest border was "capped" at approximately 740 per day, Defendants' Report at 3, Louisiana v. Ctrs. for Disease Control & Prevention, No. 6:22-cv-00885 (W.D. La. Apr. 3, 2022), despite the presence of more than 9,000 individuals seeking asylum each day, Circumvention of Legal Pathways, 88 Fed. Reg. at 11705. Importantly, this "cap" is a fictitious creation of the Biden Administration and is not statutorily or legally binding. The Administration has the power to increase the number of migrants it processes each day. The minimal number of people CBP is currently processing per day is a gravely insufficient response to the existing need, and significantly curtails access to the right to seek asylum, leaving migrants vulnerable to violence and disease while living in inhumane conditions mere miles from the United States.

    b. The Rule provides no information on how the government will apportion daily appointments. Given that there are no current plans to increase capacity and infrastructure at the Port of Entry to process migrants asylum-seekers, the United States is undermining its commitment to ensuring the legal right of vulnerable individuals to seek asylum, enshrined in the 1948 Universal Declaration of Human Rights, the Refugee Convention of 1951 and in its 1967 Protocol. Importantly, the INA itself does not provide for a numerical cap on the number of migrants allowed to present at the border daily.

5

2. **There are accessibility issues with the CBP One application that undermine fairness and due process.** There are significant issues with the implementation of the CBP One application that have serious consequences for access, fairness, and due process. Below, we document several categories of concern that warrant immediate attention and improvement:

    a. **Given the insufficient number of appointments available, wait times and the ensuing delays are unconscionably long.** *See infra* Figures B3-4.

        i. Migrants frequently report that the time to receive an appointment is several months. Though the application has been in use since mid-January, many have reported that they have been unable to obtain a CBP One appointment, despite trying to do so *every single day* since the application has launched. During this time, migrants – including young children – have been waiting in deplorable conditions without consistent access to running water, food, basic sanitation, or medical care. Interviews with migrants and asylum-seekers in Reynosa, Mex. (Mar. 20, 2023); Interviews with migrants and asylum-seekers in Matamoros, Mex. (Mar. 21, 2023).[1]

        ii. As of March 2023, the majority of migrants currently in Reynosa and Matamoros have already endured these conditions for weeks to months, with no end in sight. Interview with Priscilla Orta, Attorney, L4GG, in Brownsville, Tex. (Mar. 18, 2023). If the Proposed Rule proceeds as written, there is no viable pathway to ending the long-term delay migrants will face at the Southwest border, which will exacerbate the already horrific humanitarian crisis. We can safely assume that these conditions will continue to intensify as months and years pass.

        iii. Further, many migrants are seeking asylum and a safe haven from persecution. As a result, they are particularly vulnerable to violence and extortion by both the individuals they are fleeing from, as well as the local cartels in the areas where they are waiting. Interview with Brendon Tucker, Global Response Medicine, in Reynosa, Mex. (Mar. 20, 2023).

        iv. Migrants report significant psychological impact of the anxiety of waiting and seeking a CBP One appointment. In Matamoros alone, we encountered dozens of individuals who said they had been trying to schedule appointments daily since the application launched in January. We spoke with one Venezuelan applicant who has been trying to secure an appointment for her family of four. She told us that her eldest daughter, a minor, was experiencing severe anxiety and suicidal ideation as a result of living in an encampment for a prolonged, indefinite period of time. Another

---

[1] We omit the names of the migrants and asylum-seekers to protect their safety.

CLP_PC_021167

asylum-seeker, who is a survivor of domestic violence and fleeing her homicidal abuser, reported daily severe migraines and lack of appetite as a result of the stress induced from constantly reloading CBP One in the hopes of securing an appointment and escaping her abuser who had recently identified her location in Matamoros. Interviews with asylum-seekers in Matamoros, Mex. (Mar. 21, 2023).

v. Appointments are usually gone within minutes of release at 10 AM. *See infra* Figure B4 (showing that by 10:02 AM, all appointments have been reserved). The CBP officials with whom we spoke encouraged migrants to check for appointments throughout the day, in the case of a cancellation. This practice forces migrants to constantly check the application at all hours of the day, increasing anxieties, exacerbating financial inequities of data and battery usage, and straining migrants' feelings of hope. CBP officials likened obtaining an appointment through CBP One to "buying tickets for a really popular concert." Meeting with CBP Officers in Hidalgo, Tex. (Mar. 20, 2023). This sentiment, referring to the capacity of the application, has been echoed by legal service providers in recent news articles. *See* Nick Miroff, *How Biden Officials Aim To Use a Mobile App To Cut Illegal U.S. Entries*, Wash. Post (Feb. 20, 2023), https://www.washingtonpost.com/immigration/2023/02/20/cbpone-boder-app-biden-migrants/.

vi. Being forced to wait in unsanitary and inhumane camps for months to get an appointment through a glitching, inaccessible application is a significant violation of migrants' right to safety and security under United States' asylum law. *See infra* Part III, Section 2.

**b. The application's photo requirements discriminate against migrants with darker skin tones.** *See infra* Figure B9.

i. Many of the migrants currently waiting at the Reynosa and Matamoros ports of entry are Haitian and Venezuelan. These migrants have much darker skin tones than migrants from other countries of origin. The application often fails to recognize the facial features of darker-skinned individuals, and therefore does not allow these users to pass what CBP calls a "liveness check," which requires two photos taken in real-time to verify identity. Interviews with migrants and asylum-seekers in Reynosa, Mex. (Mar. 20, 2023); *see also* Nick Miroff, *How Biden Officials Aim To Use a Mobile App To Cut Illegal U.S. Entries*, Wash. Post (Feb. 20, 2023), https://www.washingtonpost.com/immigration/2023/02/20/cbpone-boder-app-biden-migrants/.

CLP_PC_021168

ii.     Migrants frequently report issues with the camera function that requires an initial and final photo to be taken when requesting an appointment, or the "liveness check" discussed above. The initial photo is to be captured during the account creation stage, while the final photo is to be captured during the appointment scheduling stage. Many migrants with darker skin tones report difficulties uploading both of these photos on the application, as the camera function regularly fails to recognize their faces and therefore does not allow them to capture a photo. Interviews with migrants and asylum-seekers in Reynosa, Mex. (Mar. 20, 2023).

iii.    Because of the limited number of appointments available, even the slightest delay in entering the required final photo can impact who is able to schedule their appointment. In the one or two minutes that available appointments are taken each day, many darker-skinned migrants find themselves stuck trying to upload their final photo. Interviews with migrants and asylum-seekers in Reynosa, Mex. (Mar. 20, 2023).

iv.     This issue has particular implications for unequal treatment by race, raising significant concerns for future equal protection discrimination claims by Black and Indigenous migrants who are severely disadvantaged from accessing appointments through the CBP One application.

v.      In light of the changing racial demographics among migrant groups at the border, more systematic data is needed to determine which groups are able to access the application, and which groups are being excluded, through various mechanisms including the CBP One application, from accessing appointments.

**c. The application has connectivity issues and functions poorly, undermining fair and equal access.** *See infra* Figures B1-2; B5-8.

i.      One hundred percent of the dozens of migrants we spoke with said that the application is glitchy, poorly implemented, and essentially, nonfunctional in the vast majority of cases. In addition to crashing frequently, many users complained that the application operates slowly, that they cannot correct errors, and that it freezes unpredictably, without options to correct the submitted materials. Interviews with migrants and asylum-seekers in Reynosa, Mex. (Mar. 20, 2023); Interviews with migrants and asylum-seekers in Matamoros, Mex. (Mar. 21, 2023).

ii.     Users commonly reported needing to create a new account every day to request appointments. This was due, in part, to the inadequacy of the software and the nonfunctional camera feature. Users state that the application's data validation and error messaging is poorly designed.

8

CLP_PC_021169

Oftentimes, error messages are nonsensical and displayed in programming language. Interviews with migrants and asylum-seekers in Reynosa, Mex. (Mar. 20, 2023); Interviews with migrants and asylum-seekers in Matamoros, Mex. (Mar. 21, 2023).

iii.   Even when error messages appear properly, they only appear in English and oftentimes do not identify the source of the error.  Users also describe difficulties with editing fields to address these errors. These issues lead users to create new accounts daily, as they see no way to correct the errors in their accounts otherwise. *See infra* Figures B5-8.

iv.   Individuals also saw themselves forced to create new accounts every day to circumvent the inadequacy of the glitchy application and to resolve issues with the camera feature. As described in the above section, to ensure that their initial and final photos can both be captured and will match, users often create a new account daily in order to capture each photo under similar conditions. Even when attempting to take both photos in one sitting, the facial recognition software continues to lag in recognizing the faces of those with darker skin tones. *See, e.g., infra* Figure B9. Previous queries

**d.  The requirement of an application is economically inaccessible for individuals living in poverty, without access to reliable internet and/or smartphones.**

i.   Many of the border regions lack sufficient internet infrastructure to support the need in the area to access the internet. One local legal provider noted that even her own premium phone and international service plan does not provide quality service in either Reynosa or Matamoros. Interview with Priscilla Orta, L4GG, in Brownsville, Tex. (Mar. 18, 2023).

ii.   During our visit, migrants reported spending all of their savings to buy minutes and access wifi and data, in order to use the CBP One application. Interviews with migrants and asylum-seekers in Reynosa, Mex. (Mar. 20, 2023); Interviews with migrants and asylum-seekers in Matamoros, Mex. (Mar. 21, 2023). We witnessed hundreds of migrants crowded around gas stations, convenience stores, and outside of private homes, as well as waiting in long lines in the street for hours at a time, hoping to get a signal.

iii.   Migrants reported that the CBP One application drains their phone batteries. They are then forced to pay businesses and other third parties, including cartels, to charge their phone batteries every day in order to access the application the following day. Interviews with migrants and asylum-seekers in Reynosa, Mex. (Mar. 20, 2023); Interviews with migrants and asylum-seekers in Matamoros, Mex. (Mar. 21, 2023). The requirement to rely on a digital application is financially unsuitable for vulnerable migrants living in

CLP_PC_021170

poverty who are also at significant risk of extortion in order to access the internet.

iv. The above points also presume that the majority of people seeking access to the United States through the Southwest border have smartphones capable of downloading a mobile application. The Rule states that, "A CBP survey of migrants at the Hidalgo and Brownsville Ports of Entry on December 11, 2022, substantiates that observation—finding that 93 of 95 migrants of all ages had smartphones." *Circumvention of Lawful Pathways*, 88 Fed. Reg. at 11720. First and foremost, the Rule provides no information as to how, where, or with whom the study was conducted. Second, based on our observations of the limited technology access in several of the informal migrant encampments in Reynosa, that number is likely a significant overestimate. CBP officials are also aware that, of the migrants who do own smartphones, many own smartphones from brands that are not functionally reliable or compatible with the application. Nonetheless, CBP officials maintain that the application is a tool to advance equity for migrants. Meeting with CBP Officers in Hidalgo, Tex. (Mar. 20, 2023).

v. CBP officials claimed that developing a desktop application would improve issues with accessibility. Meeting with CBP Officers in Hidalgo, Tex. (Mar. 20, 2023). However, this option has yet to be implemented despite repeated requests. *Government Documents Reveal Information About the Development of the CBP One App*, Am. Immigr. Council (Feb. 28, 2023), https://www.americanimmigrationcouncil.org/FOIA/government-documents-reveal-information-about-development-cbp-one-app. There is little clarity as to whether and when such an option would be implemented, despite officials' knowledge of the issue.

vi. In addition, access to desktop computers is nonexistent for the vast majority of migrants and asylum-seekers. Interview with Brendon Tucker, Global Response Medicine, in Reynosa, Mex. (Mar. 20, 2023). The nonprofit organizations who would be expected to provide such services to migrants lack the necessary resources and security to do so. *Id.* Further, NGOs have no governmental support to provide computers or internet access. *Id.*

**e. There are language-access issues within the application and for non-Spanish speakers.**

i. Currently, the application is only written in English and Spanish. Only a few parts are also written in Haitian Kreyòl.

ii. Importantly, many parts of the application are not translated at all. Specifically, the terms of service, error messages, and other crucial

CLP_PC_021171

communications within the application are not sufficiently translated to guarantee fair access. *See, e.g., infra* Figures B5-8.

iii. Further, the error messages are not clear, leaving migrants with no recourse to fix the errors or resubmit their requests. Often, errors will appear as a mix of unintelligible code and text that does not make sense in English, let alone in any other language. *Id*. As a result, migrants are unable to appropriately access and engage with the application.

iv. This barrier to access is particularly relevant for Indigenous asylum-seekers, as well as those from other countries inside and outside of Latin America who do not speak Spanish or English, and significantly undermines the purported aims to "increase the accessibility of humanitarian protection" *Circumvention of Lawful Pathways*, 88 Fed. Reg. at 11707.

f. **Families face additional difficulties obtaining CBP One appointments.** *See infra* Figure B10.

i. Currently, families apply for a CBP One appointment via one family member acting as the primary applicant. This applicant adds, through their own account, the identities and basic biographical information of all other family members seeking to present at the border.

ii. Rather than assigning each family a slot, the CBP One application attempts to assign each additional family member their own appointment slot. For example, a family of five would require five appointments, as opposed to one. Additionally, if there are only four slots available, a family of five would not be able to get *any* appointments. *Id.*

iii. One CBP Field Office on the Southwest border reported that it has not interviewed families with more than six family members, and it has interviewed few families even of this size. Meeting with CBP Officers in Hidalgo, Tex. (Mar. 20, 2023). This is extremely concerning in light of how many families are waiting near the border with over six family members. Interview with Priscilla Orta, L4GG, in Matamoros, Mex. (Mar. 21, 2023).

iv. Based on our experience, and those of the service providers in the area, it has been effectively impossible for larger families to obtain interview slots. Some families have been trying to obtain interview appointments by splitting up. For example, even within three-person families, we've heard of fathers trying to obtain one appointment, while their respective spouses and children try to obtain a second appointment, exacerbating the likelihood of family separation. Interview with Priscilla Orta, L4GG, in Matamoros, Mex. (Mar. 21, 2023).

CLP_PC_021172

**g. The application has an inconsistent and unclear prioritization structure, with significant implications for fairness and equality.**

    i.    Currently, the application's first-come, first-serve scheduling design appears to result in a type of haphazard lottery. As such, there is no priority pathway for migrants who have been waiting longer, those with particular vulnerabilities, or those who are enduring harsher or more dangerous conditions. It is not clear that CBP or any other agency tracks the amount of time individuals have been waiting at a port of entry for an appointment.

    ii.    Further, there is no prioritization of individuals or families who have obtained an appointment and are turned away at that appointment for a logistical issue. For example, we spoke to a Venezuelan man in Matamoros who was able to obtain an appointment in February for himself, his spouse, and his child, only to be turned away for a photo verification issue, despite having no control over the photo verification process and its race-based problems. He and his family have not been able to get an appointment since. Interview with asylum-seeker in Matamoros, Mex. (Mar. 21, 2023).

    iii.    Alarmingly, there is also a growing resale market for CBP One appointments, which further endangers vulnerable migrants who are at risk for kidnapping, extortion, and violence from the local cartels, desperate community members, and scammers. Interview with Priscilla Orta, L4GG, in Brownsville, Tex. (Mar. 21, 2023). The risk of appointment resale suggests that the security function of the CBP One application is internally insufficient as a matter of application design, and in addition, may exacerbate the existing danger and violence. There are widespread concerns about the explosion of a secondary market for CBP One appointments following the implementation of this requirement under the proposed Rule. *Id.* Further, legal service providers have indicated that, although the CBP One application includes a geo-fence feature that aims to limit those who can apply for an appointment to people located along the U.S.-Mexico border, some migrants may be able to get around this security feature through the use of VPNs, further exacerbating inequity and the persistent access issues. Together, the poor application function and apparent lack of security directly contravenes the stated purpose of the Rule to promote "lawful, safe, and orderly" pathways to entry.

## III. Documented Logistical and Humanitarian Concerns as a Result of the Proposed Rule

**1. The new parole programs' requirements disadvantage asylum-seekers in most dire need of protection.**

CLP_PC_021173

a. In Matamoros, we spoke with dozens of Venezuelan migrants regarding the existing alternative humanitarian parole process available to Venezuelans, Cubans, Haitians, and Nicaraguans that functions somewhat similarly to the proposed new parole programs. *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, U.S. Citizenship & Immigr. Servs. (Mar. 22, 2023), https://www.uscis.gov/CHNV. These conversations clearly demonstrated that such parole programs are functionally inaccessible to the vast majority of migrants we encountered. Interviews with migrants and asylum-seekers in Matamoros, Mex. (Mar. 21, 2023).

 i. First, many of the migrants we spoke with were not aware of the parole program prior to our conversations. *Id.* As a result, they would never have been able to apply for the programs from their countries of origin or in neighboring countries prior or during their journey to the Southwest border.

 ii. Several migrants we spoke with also did not have government passports or any access to immigration officials in their country of origin that might be able to provide such documents. Many of these migrants had lost their documents while traveling through the jungle or had them stolen. *Id.*

 iii. Furthermore, in the event that migrants are able to remain safely in their home country before attempting to fly to the United States, there are a significantly limited (and often prohibitively expensive) number of weekly flights from Venezuela, Haiti, Cuba, and Nicaragua, which poses broader access issues. *See, e.g.* Off. Sec'y, U.S. Dep't Transp., Order No. 2019-5-5, *Suspension of Air Service to and from Venezuela* 1 (May 15, 2019) (limiting air travel between the United States and Venezuela).

 iv. Finally, many of the Venezuelan and Nicaraguan migrants and asylum-seekers we spoke with did not know anyone currently living in the U.S. and thus had no viable sponsors. Among the few who did have contacts living in the U.S., those contacts were most often recent arrivals who could not yet establish the financial requisites of sponsorship. Interviews with migrants and asylum-seekers in Matamoros, Mex. (Mar. 21, 2023). We can safely assume that thousands of other migrants are similarly situated.

2. **The use of CPB One creates unconscionable conditions and a humanitarian crisis in migrant encampments in Reynosa, Mexico.** *See infra* Figures A1-3.

a. During our visit to Reynosa, we observed how the appointment system under CBP One has forced migrants to live in abysmal conditions while awaiting the opportunity to present at the border. We visited several migrant shelters and encampments, all of which were struggling with limited resources to meet the high volume and severe needs of migrants – including men, women, and children – who are seeking asylum in the United States.

CLP_PC_021174

b. We highlight the conditions at Camp Río as a particularly acute example of the humanitarian crisis U.S. policy, current scheduling restraints under the CBP One application, has caused. The proposed Rule change would only exacerbate these conditions.

    i. In Camp Río, approximately 700 migrants were crowded into a makeshift tent camp, with no access to running water, sanitation, or consistent medical care. Interview with Brendon Tucker, Global Response Medicine, in Reynosa, Mex. (Mar. 20, 2023).

    ii. At the camp, the few existing portable toilets were extremely unsanitary or non-functional. It was clear that they were insufficient to meet the physical needs of all the camp members. In addition, Camp Río has only two small water containers to serve the entire camp. As a result, the nearby open fields and cliff sides were used as makeshift toilets, with open defecation sites directly adjacent to the tents. Alarmingly, these open defecation sites are located next to and above the river, and runoff from the sites goes directly into the river. As a result, the river water, which is simultaneously used for bathing, washing clothes, and food preparation, is heavily contaminated with human feces, thereby posing enormous health risks for migrants who reside in Camp Río and the surrounding communities. This humanitarian health risk poses significant and immediate concerns for serious feces-borne illnesses. *See infra* Figures A2-3. We were told by a medical professional who visited Camp Río that the camp has already shown widespread rates of communicable gastrointestinal and skin diseases across all age groups, particularly among young children. The camp has also seen incidences of fatal infections, including cholera. Interview with a Mexican medical doctor, Global Response Medicine, in Reynosa, Mex. (Mar. 21, 2023).[2]

    iii. Further, the camp has no access to sanitation or waste disposal services, and as a result, trash is burned in open fires near the tent encampments. *See infra* Figure A3. Burning waste and trash is well-documented to carry serious health hazards and toxic environmental risks, such as the emission of toxic fumes. *See, e.g.*, Env. Prot. Agency, EPA530-F-03-012, *The Hidden Hazards of Backyard Burning* (Aug. 2003) ("Burning household waste produces many toxic chemicals . . . . These pollutants can have immediate and long-term health effects such as: Asthma, emphysema, or other respiratory illnesses. Nervous system, kidney, or liver damage. Reproductive or developmental disorders.").

    iv. According to legal service providers, migrants, and other aid workers we spoke with, there is no consistent or reliable access to medical care for

---

[2] We omit the name of the doctor to protect his safety.

CLP_PC_021175

migrants awaiting CBP One appointments in Camp Río. Interview with a Mexican medical doctor, Global Response Medicine, in Reynosa, Mex. (Mar. 21, 2023).

v.   In addition, migrants who are forced to wait in these unconscionable conditions are at serious risk for kidnapping, extortion, and other types of violence, including sexual and domestic violence, as a result of their vulnerability, poverty, and dependency on the United States to allow them to present at the border. Interview with Brendon Tucker, Global Response Medicine, in Reynosa, Mex. (Mar. 20, 2023). As these asylum-seekers are unlikely to return to the site of their persecution in their home states, the proposed Rule is effectively recreating conditions of abject poverty and fueling a serious humanitarian crisis which will not be solved until access to seek asylum at the Southwest border is accessible and functional.

## IV.   Concluding Comments in Opposition to the Proposed Rule and the continued use of the CBP One Application

Few U.S.-based groups – including U.S. officials whose policies directly affect asylum-seekers – have observed migrants' use of the dysfunctional CBP One application or the inhumane conditions of migrant settlements at locations such as Camp Río. The Yale Law School Immigrant Justice Project's firsthand observations, coupled with our knowledge of the legal obligations owed by the United States to asylum-seekers, inform our group's staunch opposition to the Proposed Rule.

There is a clear technological and humanitarian crisis at our Southern border. The CBP One application's technical inadequacies, racial discrimination against dark-skinned migrants, and economic inaccessibility have actively harmed migrants' right to seek asylum and have exacerbated the humanitarian crisis the application is ostensibly seeking to redress. Additionally, the Proposed Rule creates significant legal and prudential issues, including disparate treatment, fairness, and due process concerns, and directly contravenes the stated aims of the Rule. Functionally, the Proposed Rule impermissibly rewrites asylum law to fit into a badly-coded, discriminatory smartphone application.

The asylum-seekers we met are fleeing devastating violence and unthinkable horrors in their home countries. They have arrived at our Southwest border after traveling for months across treacherous terrain, facing insurmountable odds, and living in perpetual fear, only to be obstructed by dysfunctional technology and abysmal conditions while they are delayed and denied their rightful entry into the United States. All the while, they have preserved their hope and employed impressive creativity to stay alive.

CLP_PC_021176

Given our experiences, and those of the migrants we met, we categorically reject this Rule as proposed and strongly urge the agencies to withdraw the Rule in its entirety. The CBP One application is not the equity-preserving, digital future that the U.S. government envisions it to be; in practice, the application exacerbates what is already a catastrophic humanitarian crisis and even more of the government's time and resources will be required to rectify the problems the application creates. We strongly urge the U.S. government to reply appropriately to these concerns, not by bulldozing more migrant settlements or troubleshooting an application at the expense of migrant lives, but by fully repealing the Proposed Rule. We appreciate your careful consideration of these comments in response and opposition to this NPRM. We look forward to your response.

Respectfully,
**Yale Law School Immigrant Justice Project**

     Jennifer Dikler
     Dylan Farrell-Bryan
     Megan Handau
     Audrey Huynh
     Rosalyn Dietrich Leban
     María Mendoza
     Neha Srinivasan
     Gabriela Torres-Lorenzotti

CLP_PC_021177

**Appendix A: Conditions in Camp Río, Reynosa**

**Figure A1:** Tent Encampment



**Figure A2**: Open defecation field



**Figure A3**: Waste fire; Run-off pipe



CLP_PC_021178

**Appendix B: Documentation of Application Errors**

**Figures B1-2:** Frozen Application Screen for Appointments at the Hidalgo International Bridge



**Figures B3-4**: No available appointments for April 2023 (as of March 21, 2023)



CLP_PC_021179

**Figures B5-8**: Unintelligible Error Messages



CLP_PC_021180

**Figure B9:** Camera Function Unable to Capture Darker Skin Tones



**Figure B10**: No availability or application support for larger families, here, a family of five. Identifying information redacted.



CLP_PC_021181



**ROUND TABLE**
of Former Immigration Judges

March 27, 2023

Submitted via: https://www.regulations.gov.

Daniel Delgado
Acting Director
Border and Immigration Policy
Office of Strategy, Policy, and Plans
U.S. Department of Homeland Security
telephone (202) 447-3459

Lauren Alder Reid
Assistant Director,
Office of Policy, EOIR
U.S. Department of Justice
telephone (703) 305-0289

**Re: Comment on the Proposed Rule by the Department of Homeland Security
(DHS) and the Executive Office for Immigration Review (EOIR) on
Circumvention of Lawful Pathways, CIS No. 2736-22; Docket No: USCIS
2022-0016; A.G. Order No. 5605-2023**

Dear Acting Director Delgado and Assistant Director Alder Reid:

The Round Table of Former Immigration Judges is composed of more than 50 former
Immigration Judges and Appellate Immigration Judges of the Board of Immigration
Appeals. We were appointed by and served under both Republican and Democratic
administrations. We have centuries of combined experience adjudicating asylum

CLP_PC_021345

applications and appeals. Our members include nationally-respected experts on asylum law; many regularly lecture at law schools and conferences and author articles on the topic.

Our members issued decisions encompassing wide-ranging interpretations of our asylum laws during our service on the bench. Whether or not we ultimately reached the correct result, those decisions were always exercised according to our "own

understanding and conscience,"[1] and not in acquiescence to the political agenda of the party or administration under which we served.

We as judges understood that whether or not we agreed with the intent of Congress, we were still bound to follow it. The same is true of the Attorney General, Secretary of Homeland Security, and for that matter, the President.

**The 30-Day Comment Period Provides Insufficient Time to Comment on the Rule**

The Biden administration has provided only 30 days for the public to comment on the proposed rule, effectively denying the public the right to meaningfully comment under the notice and comment rulemaking procedures required by the Administrative Procedure Act. This timeframe is insufficient for a sweeping proposed rule that would deny many people access to asylum in violation of U.S. law. On March 1, 2023, 172 organizations wrote to the agencies urging them to provide at least 60 days to comment on the complex 153-page rule that would have enormous implications for asylum access at the border and in USCIS and immigration court asylum proceedings.

Executive Orders 12866 and 13563 state that agencies should generally provide at least 60 days for the public to comment on proposed regulations. A minimum of 60 days is especially critical given the rule's attempt to ban asylum for many refugees in violation of U.S. law and international commitments and return many to death, torture, and violence. While the agencies cite the termination of the Title 42 policy in May 2023 as a justification to curtail the public's right to comment on the proposed rule, this reasoning is specious especially given that the administration itself sought to formally end Title 42 nearly a year ago and has had ample time to prepare for the end of the policy.

---

[1] *See Accardi v. Shaughnessy*, 347 U.S. 260, 266-67 (1954).

CLP_PC_021346

Because of the insufficient time frame provided for comments, we will regrettably have to limit our comments to a few specific issues.

**Comments on Specific Issues:**

**The rule creates a bar, and not a rebuttable presumption.**

The proposed rule refers to the bar it seeks to create as a "rebuttable presumption of asylum ineligibility." This term is a misnomer. The rule seeks to create an outright bar to asylum, with three very narrow exceptions that most applicants will not be able to fall within.

The Merriam Webster online dictionary includes as definitions for the word "presumption" "an attitude or belief dictated by probability: Assumption; the ground, reason, or evidence lending probability to a belief; a legal inference as to the existence or truth of a fact not certainly known that is drawn from the known or proved existence of some other fact."[2]

Asylum law does contain actual rebuttable presumptions. For example, 8 C.F.R. § 1208.13(b)(1) creates a presumption that one who has suffered past persecution has a well-founded fear of persecution, while 8 C.F.R. § 1208.13(b)(3)(ii) creates a presumption that where the persecutor is the government or is government sponsored, internal relocation would not be reasonable. These presumptions are logically drawn from established facts. For example, it is logical to presume that where conditions have not changed, one who has already been persecuted might be persecuted again in the future. It is also reasonable to assume a national government's reach is country-wide and cannot be avoided by moving within the country it governs.

However, as to the proposed rule, there is nothing about the fact of arriving at the border without having procured an appointment that would give rise to a logical presumption that one is either not a refugee, or is undeserving of or no longer in need of protection.

The proposed rule is actually akin to the one-year bar found in section 208(a)(2) of the I&N Act. Significantly, that requirement was made by Congress through the legislative process, while the present rule attempts to create an additional bar through regulation alone.  Although section 208(2)(D) creates two exceptions (for changed or extraordinary circumstances), we have never heard the one-year bar referred to as a rebuttable presumption; it is rather a bar to asylum.

---

[2] https://www.merriam-webster.com/dictionary/presumption.

CLP_PC_021347

While it may sound less harsh to refer to the rule as a "rebuttable presumption," the term is misleading and inaccurate. And because the proposed bar conflicts with international law and Congressional intent, and will invariably result in wrongful removals, the rule should be withdrawn in its entirety.

**The proposed bar conflicts with international law.**

In a precedential *en banc* decision, the Board of Immigration Appeals (which at the time included three current members of our Round Table) stated:

> In enacting the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, Congress sought to bring the Act's definition of "refugee" into conformity with the United Nations Convention and Protocol Relating to the Status of Refugees and, in so doing, give "statutory meaning to our national commitment to human rights and humanitarian concerns." See S. Rep. No. 256, 96th Cong., 2d Sess. 1, 4, reprinted in 1980 U.S.C.C.A.N. 141, 144. Such an approach is designed to afford a generous standard for protection in cases of doubt.

*Matter of S-P-*, 21 I&N Dec. 486, 492 (BIA 1998) (en banc) (quoting S. REP. NO. 256, 96th Cong., 2d Sess. 1, 4, reprinted in 1980 U.S.C.C.A.N. 141, 144). *See also Matter of S-M-J-*, 21 I&N Dec. 722 (BIA 1997).

Given the explicit intent of Congress in passing the 1980 Refugee Act of bringing our domestic laws into compliance with international law, it is particularly necessary for the agencies to construe section 208 of the Act in conformity with such law. *See Weinberger v. Rossi*, 456 U.S. 25, 32 (1982) (noting that construing federal statutes to avoid violating international law has 'been a maxim of statutory construction since the decision' in *Charming Betsy*); *Lauritzen v. Larsen*, 345 U.S. 571, 578-79 (1953); *MacLeod v. United States*, 229 U.S. 416, 434 (1913); *Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804).

With this goal, for more than 35 years, our courts have sought guidance from UNHCR's Handbook on Procedures and Criteria for Determining Refugee Status in interpreting the 1980 Refugee Act. *See INS. v. Cardoza-Fonseca*, 480 U.S. 421, 438-39 (1987).

We note that paragraph 28 of the UNHCR Handbook states:

CLP_PC_021348

> A person is a refugee within the meaning of the 1951 Convention as soon as
> he fulfils the criteria contained in the definition. This would necessarily
> occur prior to the time at which his refugee status is formally determined.
> Recognition of his refugee status does not therefore make him a refugee but
> declares him to be one. He does not become a refugee because of
> recognition, but is recognized because he is a refugee.

We therefore ask the agencies to explain how it is consistent with international law
(and thus, Congressional intent) to deny the opportunity to even seek recognition
and protection to those considered refugees under international law solely because
they attempted to enter without first successfully procuring an appointment through
a government app.

The proposed rule creates a ban to asylum that does not fall within any of the
cessation clauses or exclusion clauses found in Articles 1(C) and 1(F) of the 1951
Refugee Convention. While Congress may have the authority to create additional
restrictions (as it did in creating the one-year filing requirement), we question what
authority Executive Branch agencies have to create additional bars in the guise of
interpreting a statute which Congress sought to be consistent with international
law.

**The rule's impact on credible fear determinations contradicts Congressional
intent.**

In 1996, Congress created an expedited removal process that denied clearly
inadmissible noncitizens access to the immigration court system. However,
Congress was careful to create an exception for those with meritorious claims for
asylum.

As noted by a U.S. District Court Judge, "it is the will of Congress—not the whims
of the Executive—that determines the standard for expedited removal." *Grace v.
Whitaker*, 344 F. Supp. 3d 96, 105 (Dist. D.C. 2018).[3]

*Grace* continued to summarize Congress's intent on the subject:

---

[3] Reversed in part by *Grace v. Barr*, 965 F.3d 883 (D.C. Cir., 2020).

CLP_PC_021349

Expediting the removal process, however, risks sending individuals who are potentially eligible for asylum to their respective home countries where they face a real threat, or have a credible fear of persecution. Understanding this risk, Congress intended the credible fear determinations to be governed by a low screening standard. See 142 CONG. REC. S11491-02 ("The credible fear standard ... is intended to be a low screening standard for admission into the usual full asylum process"); see also H.R. REP. NO. 104-469, pt. 1, at 158 (1996)(stating "there should be no danger that an alien with a genuine asylum claim will be returned to persecution").

*Id*. at 107.

Current regulations require application of the same low level "credible fear" standard to fears of torture as well. Thus, although a grant of protection pursuant to the Convention Against Torture ("CAT") requires a higher probability of harm than a claim for asylum, both forms of relief require the same low "credible fear" screening standard in order to be spared from expedited removal and be afforded the right to a full evidentiary hearing before an Immigration Judge (and full right to further administrative and federal court review) on their applications for relief.

However, the proposed rule would toss aside these statutorily mandated protections for anyone arriving at the border without having procured an appointment and who does not satisfy one of the three narrow exceptions. In addition to barring such individuals from even seeking asylum, regardless of the merits of their claim, the rule also seeks to raise the present credible fear standard applied to claims for withholding of removal under both section 241(b)(3) of the Act and under the Convention Against Torture ("CAT"). While such change would align with the whims of the Executive, it does not reflect the will of Congress.

**The rule undermines the entire purpose of credible fear review**

The new regulation would exploit flaws in the current credible fear system. These flaws exist due to changes in the circumstances under which the regulation is applied, which have arisen since the time of its enactment.

6

Congress created expedited removal in 1996 in response to reports of exploitation of our asylum system occurring at U.S. airports. Congress sought to prevent the use of clearly fraudulent asylum claims to gain entry to the U.S.[4]

Perhaps because credible fear initially targeted fraud, EOIR's Immigration Court Manual denies asylum seekers the right to counsel in Credible Fear Review hearings before Immigration Judges.[5]

Today, credible fear determinations turn far less frequently on adverse credibility findings. It is more common at present for a credible fear determination to be denied due to a far more complex legal issue such as the cognizability of a particular social group, whether a persecutor may have imputed a political opinion to the asylum seeker's words or actions or, for CAT purposes, whether torture will occur with "government acquiescence."

Those determinations are made by USCIS asylum officers. In the credible fear context, Immigration Judges who normally function as trial judges play the role of appellate judges, reviewing the reasonableness of the asylum officer's decision.

Appellate courts hear the legal arguments of lawyers, and not the testimony of the litigants themselves. Yet for some reason, EOIR's rules continue to deny the right to counsel in Credible Fear Review hearings. While there are Immigration Judges who will nevertheless allow attorney participation, many others simply direct lawyers to sit down and remain silent. Thus, often the only person in the courtroom capable of arguing why the asylum officer erred as a matter of law is prohibited from doing so.

As a result, Credible Fear Review hearings can be shockingly brief. While it will vary depending on the particular Immigration Judge presiding, an April 2018 episode of  HBO's "Last Week Tonight With John Oliver" played the transcript of

---

[4] *See*, e.g., Congressional Record - House, March 19, 1996, at H2385 (Remarks of Rep. McCollum), https://www.congress.gov/congressional-record/volume-142/issue-38/house-section/article/H2378-5.

[5] EOIR's Immigration Court Practice Manual at Chapter 7.4(d)(4)(C) states that "the noncitizen is not represented at the credible fear review.  Accordingly, persons acting on the noncitizen's behalf are not entitled to make opening statements, call and question witnesses, conduct cross examinations, object to evidence, or make closing arguments."

CLP_PC_021351

one such hearing in its entirety; it lasted one minute and 43 seconds, and consisted of two questions asked of the asylum-seeker.[6] The Immigration Judge's decision in its entirety was: "The government of the U.S. doesn't afford your protection [sic] for this reason. I affirm the asylum officer's decision."[7]

Furthermore, a significant number of Immigration Judges hired over the past several years lacked prior immigration law experience. As one commentator has noted,

> attorneys do not need immigration law experience to become an immigration judge.

> You read that correctly: Aspiring immigration judges need not have actual experience — just strong credentials in skills necessary to be a judge. The government will "train" them in the law. The problem is the training program for new judges does not spend enough time teaching immigration law to give them the knowledge they will need as immigration judges.[8]

Should the new rule take effect, many Credible Fear Review hearings will involve CAT claims. Based on our extensive experience, the legal issues that arise in these cases involve determinations of complex legal issues, such as what entities constitute state actors, when state actors are acting under color of law, and when torture by non-state actors occurs with government acquiescence. These are not determinations suited for a two-minute hearing involving unrepresented noncitizens and judges new to asylum law.

---

[6] "Last Week Tonight With John Oliver," (HBO) Season 5, episode 6 (April 1, 2018); script available at https://subslikescript.com/series/Last_Week_Tonight_with_John_Oliver-3530232/season-5/episode-6-Immigration_Courts.

[7] *Id.*

[8] Nolan Rappaport, "How Many of Our Immigration Judges Are Amateurs at Immigration Law?" *The Hill*, Nov. 23, 2020, https://thehill.com/opinion/immigration/527104-how-many-of-our-immigration-judges-are-amateurs-at-immigration-law/. The author served as Immigration Counsel to the House Judiciary Committee, and as an Attorney Advisor at the Board of Immigration Appeals.

CLP_PC_021352

Furthermore, there is no right to appeal a Credible Fear Review decision.[9] Even if an Immigration Judge gets the facts or law completely wrong, the incorrect decision is the final one.

In spite of these systemic flaws, a recent study found that Immigration Judges reverse negative credible fear findings twenty-five percent of the time. Over the past two years, Immigration Judges have reversed USCIS credible fear denials in 28% of claims from El Salvador and Honduras, in 26% of claims from Mexico, and in 22% of claims from Guatemala.

The safeguard that is most likely responsible for this significant reversal rate is the low credible fear threshold. Congress was aware that asylum seekers subject to credible fear review are newly arrived, detained, and thus hampered in their ability to obtain legal counsel and evidence to support their claims. And IJ error committed at the full hearing stage is subject to correction on review by the BIA or the circuit courts.

However, the low standard is the precise safeguard the new rule seeks to take away. What was designed to be a preliminary method to screen out clearly fraudulent claims will, under the proposed rules, become a recipe for error not subject to review, and for speedy removals in violation of our country's international treaty obligations.

**The proposed rule's exception to the bar imposes a higher legal standard than that required for asylum eligibility**

One of the three stated exceptions to the asylum bar under the rule would require the applicant to demonstrate that they "faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder."

The NPRM further clarifies that "[t]he term 'imminent' refers to the immediacy of the threat; it makes clear that the threat cannot be speculative, based on generalized concerns about safety, or based on a prior threat that no longer poses an immediate threat. The term 'extreme' refers to the seriousness of the threat; the threat needs to be sufficiently grave, such as a threat of rape, kidnapping, torture, or murder, to trigger this ground for rebuttal." (NPRM at Fn. 27)

---

[9] *See DHS v. Thuraissigiam*, 140 S.Ct. 1959 (2020).

CLP_PC_021353

The new rule would thus impose a higher degree of risk for excusing an improper border entry than is required for asylum eligibility itself.

For example, several circuits have held that threats alone may constitute past persecution. In rejecting a requirement that the harm threatened must be "imminent," the Third Circuit has explained:

> "Imminence" is a misnomer here. We have neither required that the threat portend immediate harm nor that it be in close temporal proximity to other acts of mistreatment… Indeed, our interest is not the imminence of the threat at all, but rather the likelihood of the harm threatened—a concept subsumed in the inquiry as to whether the threat is "concrete."

*Herrera-Reyes v. Attorney Gen. of the U.S.*, 952 F.3d 101, 108 (3rd Cir. 2020).

Of course, one who has never been persecuted can also establish asylum eligibility based on a ten-percent likelihood of suffering persecution, a risk that falls far short of imminent danger. As the Second Circuit has explained, an applicant can establish a well-founded fear of persecution "even if it is improbable that he will be persecuted upon his return to his own country." *Guan Shan Liao v. U.S. Dep't of Justice*, 293 F.3d 61, 69 (2d Cir. 2002). Only "a slight, though discernible, chance of persecution" is required. *Tambadou v. Gonzales*, 446 F.3d 298, 302 (2d Cir. 2006). In an unpublished decision, the Second Circuit rejected the government's argument that the failure of Albanian officials to fulfill their threats against an asylum-seeker in spite of having opportunities to do so rendered the petitioner's fear unreasonable. Finding the government's standard too exacting, the court found "[a]ny reasonable person so situated [as the petitioner] would fear that her luck will change." *Qosaj v. Barr*, No. 17-3116 (2d Cir. Sept. 18, 2019) (unpublished).

Also, the concept of qualifying for asylum based on a "pattern or practice" of persecution is designed to grant asylum where persecution is not imminent, based on the likelihood that a member of a targeted group will eventually find themselves at risk. In the words of the Ninth Circuit:

> Certainly, it would not have been necessary for each individual Jew to await a personal visit to his door by Nazi storm troopers in order to show a well-founded fear of persecution. Similarly, it would be unnecessary for members

CLP_PC_021354

of other systematically persecuted groups to show that they have been selected on an individual basis as subjects of persecution.

*Kotasz v. INS*, 31 F.3d 847, 852 (9th Cir. 1994)

**Grave risks of harm faced in Mexico will fail to satisfy the proposed standard.**

A recent report of Human Rights First documented the extreme dangers facing asylum seekers forced to wait in Mexico as a result of the Title 42 ban. According to Human Rights First,

> "As of the date this report was published in December 2022, Human Rights First has tracked at least 13,480 reports of murder, kidnapping, rape, torture, and other violent attacks against people blocked in or expelled to Mexico due to Title 42 since January 2021. This count is likely just the tip of the iceberg since many asylum seekers have not spoken with investigators, journalists, or attorneys."[10]

A September 2022 report of Human Rights First on the impact of the "Remain in Mexico" ("RMX") policy stated:

> The devastating toll of violent attacks on people subjected to RMX continued to mount under the court-ordered reimplementation of the policy. Recent kidnappings, rapes, and other violent assaults on people after DHS returned them to Mexico under RMX 2.0 include: a Nicaraguan woman kidnapped and sexually assaulted; a Venezuelan asylum seeker beaten and shot at; a teenage girl sexually assaulted; and two Nicaraguans kidnapped by a cartel and forced to watch as cartel members put a gun in another man's mouth and threatened to kill him. These attacks add to the at least 1,544 publicly reported cases of kidnappings, murder, torture, rape and other violent attacks against people returned to Mexico under RMX that Human Rights First tracked during the Trump administration. Given how few individuals in RMX have been interviewed by human rights investigators, journalists, and other researchers, the number of reported attacks is surely a

---

[10] Human Rights First, "Human Rights Stain, Public Health Farce" (December 2022), https://humanrightsfirst.org/wp-content/uploads/2022/12/HumanRightsStainPublicHealthFarce-1.pdf, at 10.

CLP_PC_021355

severe undercount of the true scale of the harms inflicted on people forced to wait in danger in Mexico under RMX.[11]

Any asylum seeker forced to wait in Mexico until they can succeed in scheduling an appointment to proceed to a designated border post faces a very real risk of serious harm under the above-described conditions. However, the NPRM specifically states that fear based on general country conditions is insufficient to warrant an exception to the bar. Instead, the intending asylum applicant must remain at risk in Mexico until the threat of their being raped, kidnapped, tortured, or murdered is "imminent." Of course, by then, it may well be too late to avoid such harm.

In considering eligibility for asylum itself, in the words of the Third Circuit, "To expect Petitioner to remain idle in that situation – waiting to see if his would-be executioners would go through with their threats – before he could qualify as a refugee would upend the "fundamental humanitarian concerns of asylum law." *Doe v. Attorney Gen.*, 956 F.3d 135, 144 (3d Cir. 2020)  (Citing *Matter of S-P-*, 21 I. & N. Dec. 486, 492 (BIA 1996)). But the new rule would upend those same concerns in requiring individuals who may well be refugees to do the same simply to not be barred from filing an application for asylum in the U.S.

**Conclusion**

For the reasons stated above, the proposed rule exceeds the agencies' authority by seeking to create a ban on asylum that contradicts Congressional intent and international law. As former Immigration Judges, we can confidently predict that the rule would result in individuals being erroneously deported even where they face a genuine threat of persecution or torture. We urge that the rule be withdrawn in its entirety.

Respectfully submitted,

The Round Table of Former Immigration Judges

By:    Jeffrey S. Chase (jeffchase99@gmail.com)

---

[11] Human Rights First, "Fatally Flawed" (September 2022), https://humanrightsfirst.org/wp-content/uploads/2022/10/FatallyFlawed.pdf, at 2.

12

CLP_PC_021356



NEBRASKA
APPLESEED
STAND UP FOR JUSTICE

March 27, 2023

The Honorable Secretary Alejandro Mayorakas
Department of Homeland Security
Washington, DC 20528

**RE: Circumvention of Lawful Pathways Notice of Proposed Rulemaking, DHS Docket No. USCIS-2022-0016**

Dear Secretary Mayorakas,

Nebraska Appleseed is a statewide nonprofit, nonpartisan law and policy organization dedicated to justice and opportunity for all Nebraskans. We work closely with immigrant community members across our state who contribute to the social and economic fabric of society. We are writing to express our strong opposition to the proposed asylum rule because it contradicts our nation's history, commitment, and principles of ensuring the right to seek safety from persecution as established in federal[1] and international law in the aftermath of World War II and the Holocaust.[2] The right to seek safety through asylum should not be subject to the route an individual takes to escape persecution or their eligibility for other immigration processes. The proposed rule erodes access to asylum by adding dangerous contingencies that force people to first seek refuge in any country they travel through, even though they may not be safe in that country, and making asylum dependent on an individual's financial resources. This will result in disparate access to asylum in the United States. Nebraska Appleseed supports positive immigration policies that keep families together, ensure safety, and create a way for longtime

---

[1] 8 U.S.C. § 1182.
[2] The U.S. signed and ratified the Refugee Convention and codified the treaty in the Refugee Act as a humanitarian effort to provide a safe haven for people fleeing violence and persecution, a right and process our country decided to establish in law after the atrocities of World War II.

CLP_PC_021444

community members to apply for residency and citizenship. Nebraska Appleseed opposes the proposed rule because it: (1) forces people with fewer financial resources to remain in danger and rely on less accessible and less permanent immigration processes and (2) will disproportionately affect Black, Brown, and Indigenous people fleeing violence and danger if they travel through Latin America to seek safety.

## I.   The Proposed Rule Forces People with Fewer Financial Resources to Remain in Danger and Rely on Less Accessible and Less Permanent Immigration Processes.

The proposed rule creates a presumption of asylum ineligibility if people arriving at the Southwestern border fail to either apply for asylum-style protections in the nations they traveled through or, alternatively, "avail themselves of a lawful, safe, and orderly" immigration process within the United States.[3] Requiring people to apply for protection in the nations they travel through prejudices those who arrive at the Southwestern border via a land route and advantages people who arrive via air travel. It also advantages people who apply for asylum after having been first issued an immigrant or non-immigrant visa. The rule, therefore, makes asylum less accessible to people who lack the financial resources to afford air travel or apply for other visas. Additionally, the rule will require asylum seekers to seek protection in transit-nations that may subject them to the same danger and risk of persecution they fled in their home country. This is particularly true for LGBTQ+ asylum seekers who frequently experience persecution in multiple countries en route to the United States.[4] The core purpose of asylum is to offer protections to people likely to be persecuted because of their identity or beliefs; creating a rule that advantages people with greater financial resources or continues to subject them to the dangerous conditions they fled overtly undermines that core purpose.

The second prerequisite, which requires people to first avail themselves of other immigration processes, is also deeply problematic. Specifically, the proposed rule submits that H-2 visa programs, increased refugee processing in the Western hemisphere, and the introduction

---

[3] *Circumvention of Lawful Pathways*, 88 Fed. Reg. 11704 (Feb. 23, 2023).
[4] Human Rights Watch, *US: LGBT Asylum Seeker in Danger at the Border* (May 31, 2022), https://www.hrw.org/news/2022/05/31/us-lgbt-asylum-seekers-danger-border?gclid=CjwKCAjwq-WgBhBMEiwAzK SH6CnOX9X9r4JqDwvADZEAnp0wgRobiRB7-mNRItTEPcZiTdm4DyXJ4hoCyVgQAvD_BwE.

CLP_PC_021445

of new humanitarian parole processes should be the procedures people should rely on before seeking asylum at the Southwestern border.[5] The proposed rule notes that the Biden administration has increased the availability of H-2 visas to nationals from Guatemala, Honduras, and El Salvador.[6] Unlike asylum, which has no statutory cap, some H-2 visas are capped.[7] Additionally, the H-2 visas prohibit stays in the United States longer than 3 years.[8] Under asylum, by contrast, individuals are eventually eligible for legal permanent residence[9] and naturalization.[10] This dynamic has no relation to a person's safety in their country of origin and prevents long-term inclusion and community stability in the United States. Increasing refugee processing in the Western hemisphere is beneficial, but the administration's current commitments insufficiently address current migration patterns in Latin America. In 2021, for example, the United States government resettled approximately 2,485 refugees from the Western hemisphere.[11] This number represents only a small percentage of people who may have eligible claims. In 2021, the Department of Homeland Security (DHS) received over 148,000 asylum applications in the United States[12] and, in December of 2022, encountered over 250,000 people along the Southwest border.[13] If refugee processing is to serve as a substitute for asylum, then the Biden administration should process a volume of claims that reflects actual migration patterns in the Western hemisphere.

Finally, the proposed rule relies on humanitarian parole as a means of ensuring access to safety in the United States.[14] Like the H-2 visa programs, however, humanitarian parole has limitations relative to asylum. First, humanitarian parole offers no permanent process to apply for legal permanent residency or citizenship. Unlike asylum, it is a temporary measure that allows

---

[5] *Id.*

[6] *Id.* at 11719.

[7] U.S. Citizen & Immigr. Serv., *H-2B Temporary Non-Agricultural Workers*, https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-2b-temporary-non-agricultural-workers (last visited Mar. 18, 2023).

[8] *Id.*

[9] 8 C.F.R. § 209.2.

[10] 8 U.S.C. § 1427.

[11] *Circumvention of Lawful Pathways*, 88 Fed. Reg.  at 11719.

[12] Dep't. of Homeland Sec., *Refugees and Asylees: 2021* (Sept. 2022), https://www.dhs.gov/sites/default/files/2023-03/2022_0920_plcy_refugees_and_asylees_fy2021_v2.pdf.

[13] Customs and Border Patrol, CBP Releases December 2022 Monthly Operational Update (Jan. 20, 2023), https://www.cbp.gov/newsroom/national-media-release/cbp-releases-december-2022-monthly-operational-update#:~:text=CBP%20Nationwide%20Total%20Encounters%20for,encounters%20than%20the%20prior%20month..

[14] *Circumvention of Lawful Pathways*, 88 Fed. Reg.  at 11718.

CLP_PC_021446

individuals to enter the United States for a limited purpose.[15] Second, parole requires people to secure a sponsor in the United States who pledges to financially support them.[16] Despite the requirement to have a fiscal sponsor, not all humanitarian parole programs provide an employment authorization document (EAD) incident to status; currently, this procedure is available only to people entering the United States through the special parole programs for Afghanistan and Ukraine.[17] Therefore, humanitarian parole and the special parole programs designed for Cuba, Haiti, Nicaragua, and Venezuela lack the same guarantees of financial stability and self-support that are integral to asylum[18] and the Afghan and Ukrainian processes. In summary, the presumption of asylum ineligibility is problematic because it creates a preference for wealthier people who do not need to travel to the United States via land and requires people to rely on immigration processes that are less accessible and less permanent than asylum.

## II.     The Proposed Rule Will Disproportionately Affect Black, Brown, and Indigenous People Fleeing Violence and Danger if They Travel Through Latin America to Seek Safety.

The proposed rule is also problematic because it continues a pattern of immigration practices that disproportionately harm Black, Brown, and Indigenous people seeking safety in the United States if they travel through Latin American nations. Already, even without the proposed rule, asylum is one of the least accessible immigration processes. In 2021, DHS only granted 17,692 of the 148,332 filed asylum claims.[19] People leaving predominantly Black nations in the Caribbean, however, generally experience the highest rates of claim denial. From 2012 through 2017, for instance, 86% of Haitian asylum petitions had their asylum claims denied; this was the

---

[15] U.S. Citizen & Immigr. Serv., *Humanitarian or Significant Public Benefit Parole for Individuals Outside the United States,* https://www.uscis.gov/humanitarian/humanitarianpublicbenefitparoleindividualsoutsideUS (Last visited Mar. 21, 2023).

[16] *Id*.

[17] Soc. Sec. Admin., *Enumeration: New Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans (CHNV)* (Mar. 8, 2023), *available at:* https://secure.ssa.gov/apps10/reference.nsf/links/03082023064544AM.

[18] U.S. Citizen & Immigr. Serv., *Handbook for Employers M-274: Refugees and Asylees*, https://www.uscis.gov/i-9-central/form-i-9-resources/handbook-for-employers-m-274/60-evidence-of-status-for-ce rtain-categories/63-refugees-and-asylees#:~:text=Refugees%20and%20asylees%20are%20employment,immigratio n%20status%20does%20not%20expire (last visited Mar. 21, 2023).

[19] Dep't. of Homeland Sec., *Refugees and Asylees: 2021* (Sept. 2022), https://www.dhs.gov/sites/default/files/2023-03/2022_0920_plcy_refugees_and_asylees_fy2021_v2.pdf.

CLP_PC_021447

second highest rate behind only Mexico at 88%.[20] Additionally, in the early 2000s, Jamaica frequently had the highest denial rate at around 92%.[21] Since people migrating from Caribbean nations are more likely to travel to the United States across multiple national borders, the proposed rule is likely to exacerbate the long-standing disparities that have made the United States less accessible to Black migrants.

People migrating to the United States from Central America also see similar disparities. Although petitioners from Central America file the majority of asylum petitions, their claims are often granted less frequently than people petitioning from countries outside Central America. In 2021, for example, about 1,975 of the 5,343 people seeking asylum from China saw their asylum claims granted.[22] DHS, however, only approved 1,459 of the 13,594 petitions filed by Salvadorans.[23] DHS similarly received 21,279 asylum petitions from Guatemalans, but only granted 1,336.[24] Here again, the proposed rule accentuates these preexisting disparities because many asylum seekers from Central America travel to the United States via a land route across multiple national borders. Additionally, they are more likely to lack access to the financial resources that would allow them to access another immigration process or travel to the United States by air.[25]

### III.   Conclusion: The Biden Administration Should Not Promulgate a Final Rule Based on the NPRM.

The Biden administration should not promulgate a Final Rule based on the proposed rule because it violates the history, purpose, and principles of our asylum system by preventing people from seeking safety in the United States. In doing so, it will unnecessarily expose people to the very persecution they are fleeing and continue a pattern of recent immigration policies that

---

[20] Peniel Ibe, *Immigration is a Black Issue,* American Friends Service Committee (Feb. 16, 2021), *available at:* https://afsc.org/news/immigration-black-issue.

[21] Syracuse University, *Asylum Denial Rates by Nationality*, https://trac.syr.edu/immigration/reports/160/include/nat_denial_0005.html (last visited Mar. 18, 2023).

[22] Dep't. of Homeland Sec., *Refugees and Asylees: 2021* (Sept. 2022), https://www.dhs.gov/sites/default/files/2023-03/2022_0920_plcy_refugees_and_asylees_fy2021_v2.pdf.

[23] *Id.*

[24] *Id.*

[25] Immigration Justice Network, https://immigrationjustice.quorum.us/campaign/44910/ (last visited Mar. 15, 2023).

CLEP_PC_021448

limit long term access to the United States in favor of short-term programs that are less accessible and less permanent. Additionally, it perpetuates a historic pattern of promulgating policies that advantage wealthier people seeking access to the United States and exacerbates the racial inequities that have, for centuries, permeated immigration law. We are at a moment in time when the Biden administration and Congress should be working to create positive immigration laws and policies that offer solutions to preserve families, create long-term community stability, and ensure that access to safety in the United States is not determined by race, financial status, or country of origin. Although the responsibility to create many of the long-term solutions rests primarily with Congress, the proposed asylum rule only exacerbates these failures.

Thank you for considering these comments,

Nick Grandgenett
Immigrants & Communities Staff Attorney
Nebraska Appleseed




## Stuck in Uncertainty and Exposed to Violence: The Impact of US and Mexican Migration Policies on Women Seeking Protection in 2021

## Introduction

In 2021, policies on both sides of the US-Mexico border negatively affected women seeking protection. As we head into 2022, marking the first year of the Biden administration, Trump-era restrictive policies remain in place at the US-Mexico border, exacerbating the situation for women forced to wait at Mexico's northern border for the opportunity to seek asylum in the US. In addition, under pressure from the Biden administration, the Mexican government continues to intensify enforcement to deter migrants and individuals seeking protection at Mexico's southern border, worsening the situation for women stuck there.

In the fall of 2021, the Instituto para las Mujeres en la Migración (IMUMI) and the Women's Refugee Commission (WRC) monitored events and carried out interviews with women seeking protection to understand the challenges and the dangers they face in Mexico.[1] This report outlines those challenges and provides recommendations for the US and Mexican governments.

## US Policies in 2021

Early on, the Biden administration committed to building a fair, orderly, and humane immigration system and reversing illegal Trump-era policies that endangered the lives of people seeking protection at the US-Mexico border. In its first few months in office, it made positive strides on several promises, including creating initiatives to provide reparative justice for those harmed by Trump-era policies. In February 2021, President Biden created the Interagency Task Force on the Reunification of Families to reunify the nearly 4,000 children who were separated from their parents under Trump's "zero tolerance" policy, which aimed to criminally prosecute all migrants crossing into the US between ports of entry. That month, the administration also announced the creation of a process—in collaboration with international organizations, regional task forces, and local NGOs—that would allow individuals returned to Mexico under the Trump-era "Remain in Mexico" (RMX) policy to return to the US and continue their immigration cases in the US rather than continuing to wait in Mexico. It also reversed the Trump-era legal decisions that made it nearly impossible for survivors of domestic and gang violence to qualify for asylum.

In addition, the administration's strategies included a focus on protection and a gender lens. In summer 2021, the administration launched a whole-of-government blueprint of strategies to reform the US immigration system. One of the strategies that aimed to address the root causes of migration in Central

---

[1] This report draws on interviews from IMUMI and WRC, cases from IMUMI's legal clinic, as well as media reports and research publications. IMUMI interviewed women in shelters in Mexico City between September and December 2021. On November 2, 2021, WRC staff visited two shelters in Mexico City and interviewed individuals from Haiti, Venezuela, El Salvador, Guatemala, and other countries. On December 3, 2021, WRC staff visited two migrant shelters in Tijuana and interviewed individuals from Mexico, Honduras, El Salvador, Guatemala, Cameroon, and other countries. IMUMI and WRC obtained informed consent from all individuals interviewed.

CLP_PC_021586

Stuck in Uncertainty and Exposed to Violence:
The Impact of US and Mexican Migration Policies
on Women Seeking Protection in 2021

Case 4:18-cv-06810-JST   Document 169-8   Filed 06/05/23   Page 406 of 1047




America included a pillar "to combat sexual, gender-based, and domestic violence."[2] Another strategy laid out a comprehensive approach to regional migration management. Yet, in practice, the Biden administration has largely focused on enforcement and deterrence in its engagement with countries in the region. Notably, it reportedly has requested that the Mexican government sign a "safe third country" agreement, requiring most non-Mexican individuals to first seek protection in Mexico before requesting asylum in the US.

The Biden administration's positive actions and strategies have been profoundly overshadowed by its failure to restore access to asylum at the border, including at ports of entry, for most arriving migrants and people seeking asylum. In December 2021, the Biden administration announced the reinstatement (pursuant to a court order) and expansion of RMX[3] and extended the Trump-era Title 42 CDC public health order that summarily blocks and expels people from the US-Mexico border, often repeatedly, to danger in Mexico and countries of origin. Since President Biden took office, people have been expelled more than 1.1 million times, including more than 187,000 expulsions of parents and children,[4] who were denied the opportunity to seek protection. In August 2021, the administration began expulsion flights to southern Mexico, where Mexican authorities forcibly returned people across the border to Guatemala or sent them on buses to Honduras, in an act of chain refoulement.[5] In clear violation of non-refoulement, the Biden administration also sent individuals on Title 42 expulsion flights directly to back to Haiti, Guatemala, Honduras, and other countries of origin, without screening them for risk of harm upon return or otherwise providing them an opportunity to seek protection.

## Mexican Policies in 2021

Over the course of 2021, under pressure from the White House, the Mexican government took a number of measures to step up its immigration enforcement to deter migrants and asylum seekers from accessing protection at the US-Mexico border. In 2021, authorities from Mexico's National Migration Institute (INM) worked with the Mexican National Guard and security forces to carry out a record number of migrant apprehensions; approximately 30 percent of those apprehended were women, and 27 percent were children. These figures include families and unaccompanied children who were initially apprehended by INM or the National Guard and then referred to state or civil-society shelters, a requirement of Mexico's new children protection reform implemented in 2021. The reform requires that after referral, the protection offices determine the child's best interests, whether that means deportation, remaining in Mexico with humanitarian legal status, or being reunited with family in another country. While this reform is a big step

---

2 In addition to its immigration blueprint, in November 2021, the administration launched the first National Strategy on Gender Equity and Equality. Through this whole-of-government approach, the administration committed to work to build "a fair and humane immigration system that welcomes immigrants [and] keeps families together" and create improved protection pathways for those fleeing persecution, including victims of gender-based violence.

3  The restart of Remain in Mexico was pursuant to a court order; however, prior to the ruling in early August 2021, the Biden administration reportedly was already considering implementing a supposedly more "humane" version of RMX. In August 2021, a Texas judge ordered the administration to restore RMX "in good faith." The administration appealed that order and issued a new memo terminating RMX in October 2021. The Biden administration has committed to ending RMX eventually, but said that it planned to comply with the court's order to restart RMX. In the new iteration, the administration expanded the program to all non-Mexicans from the Western Hemisphere.

4  This includes Customs and Border Protection Title 42 expulsion statistics from February to December 2021.

5  The principle of non-refoulement in international law prohibits countries that are receiving asylum seekers from removing them or returning them to a country where there is reason to believe that they would be at risk of irreparable harm or human rights violations. Chain refoulement occurs when individuals are sent back to a country that will not protect people from the onward transfer in violation of non-refoulement. In this case, the US expelled asylum seekers back to southern Mexico by plane and the Mexican government bussed them to Guatemala. This occurred with Guatemalan, Salvadoran, and Honduran nationals in 2021.

CLP_PC_021587

Stuck in Uncertainty and Exposed to Violence:
The Impact of US and Mexican Migration Policies
on Women Seeking Protection in 2021



Case 4:18-cv-06810-JST   Document 169-8   Filed 06/05/23   Page 407 of 1047

forward for the rights of families and children, implementation across Mexico has been uneven[6] and many challenges remain, including the need for better funding and training to ensure the best interests of children are consistently upheld.

The Andrés Manuel Lopez Obrador administration also took greater measures to restrict travel by migrants and individuals seeking protection, pushing many people to hire smugglers and risk dangerous travel routes. It also created new travel regulations requiring proof of immigration status to purchase a bus ticket, leading to discrimination and racial profiling of both migrants in transit and Mexicans, especially Indigenous and Afro-descendent Mexicans. In addition, the US requested that the Mexican government put into place new travel requirements to make it more difficult for the citizens of countries who have been arriving at the US southern border in high numbers to transit through Mexico. Since August 2021, the Mexican government announced new requirements that Ecuadorians, Brazilians, and Venezuelans, some of whom are fleeing danger, acquire a visa to travel to Mexico as tourists. Mexican immigration authorities also stepped up restrictive tactics at Mexican airports, where they denied entry to a record 72,895 foreigners in 2021, more than double the number of denials in 2019 (31,008). Officials at airports turned around individuals aiming to present their claim to COMAR (Mexico's agency responsible for asylum processing and adjudications) and instead detained in isolation for weeks. Furthermore, Mexico continued to coordinate with the US on the Biden administration's expulsions under Title 42, agreeing to receive expelled individuals from Guatemala, Honduras, and El Salvador, and worked with the Biden administration to re-implement and expand RMX.

Meanwhile, as Mexican authorities increased enforcement and US restrictive policies persisted, last year Mexico became one of the top destinations worldwide for individuals seeking protection. In 2021, COMAR received a historic high of 131,448 applications, with women representing 41 percent of applicants[7] and children representing 24 percent. This record number of applicants is an 87 percent increase from the prior high of 70,351 applications in 2019. Underfunded despite the critical need, COMAR has been unable to keep up with the increase in claims, leaving many people in southern Mexico—where the vast majority submit their applications[8]—to wait for decisions on their protection claims in precarious conditions for months or even up to two years in some cases. Mexican refugee law requires that applicants remain in the jurisdiction where they applied throughout the adjudication process, which prevents individuals applying for protection from reuniting with family and community networks in safer regions of the country with better employment opportunities.

***Note that the following section of the report contains graphic descriptions of sexual violence.***

## The Impact of US and Mexican Policies on Women

Taken together, the US and Mexican governments' policies and practices forced women seeking protection to wait for extended periods, often in precarious and dangerous circumstances, at Mexico's northern and southern borders. Throughout 2021, IMUMI and WRC carried out interviews with women and monitored events to understand the challenges and dangers they were facing.

---

6  There has been less progress in some Mexican states on the reform implementation than others due to a lack of training, funding, and political will of local authorities. As a result, despite the reform, some children may continue to be detained by immigration authorities or deported without a proper best interest determination. In fall 2021, a panel featuring IMUMI and other civil society organizations discussed some of the challenges with implementation.

7  Since 2016, women have represented approximately 40 percent of applicants to COMAR.

8  Approximately 68 percent of applications were filed in the state of Chiapas and 5 percent in Tabasco.

CLP_PC_021588

Stuck in Uncertainty and Exposed to Violence:
The Impact of US and Mexican Migration Policies
on Women Seeking Protection in 2021

 

1. **Women seeking protection experience violence in Mexico that exacerbates prior traumas that forced them to flee their countries of origin in the first place.** A 2015 UN report found that approximately 60 percent of surveyed women seeking asylum from Honduras, Guatemala, and El Salvador were fleeing gender-based violence, which includes any form of sexual, physical, mental, and economic harm directed at an individual due to their gender. A recent 2021 report by Kids in Need of Defense (KIND) found that violence against women in Central America drastically increased during the COVID-19 pandemic due to lockdowns that confined women with their perpetrators and to gangs gaining greater control over local communities.

   The violence that women seeking protection experience in transit in Mexico and while waiting at Mexico's northern border cities—including kidnapping, rape, trafficking, and other forms of harassment—compounds their previous traumatic experiences. For example, a Guatemalan woman, Liliana,[9] shared with IMUMI that after fleeing from a violent relationship with her husband who served in the military, she was kidnapped by a group of men in Tijuana. While she was being held by her kidnappers, she heard the men making arrangements on the phone to sexually exploit her. This experience was so traumatizing that after Liliana was released, she decided to travel to Mexico City to seek asylum while staying in a safe shelter instead of waiting to request asylum at the US-Mexico border.

2. **Women seeking protection do not feel safe in Mexico's southern and northern border cities and worry that they can be tracked down by their persecutors.** IMUMI documented various cases of Central American women who have been tracked down by their perpetrators in Mexico. A Guatemalan woman, Cristina, traveling with her husband and three children, described to WRC staff the "terror of being forced to wait in Tijuana where our persecutors can find us." In southern Mexico, a Honduran woman, Sara, described to IMUMI that she and her family were kidnapped by members of the Mara Salvatrucha gang. After Sara fled Honduras, one of the perpetrators found her in Tapachula, Chiapas, forcing her and her family to flee to another city and give up their asylum claim in Mexico.

3. **Women seeking protection are subjected to violent gender-based crimes in Mexico, including rape and sexual assault, and face heightened barriers to report these crimes and receive support services.** Women who are returned to Mexico alone or with their families experience many types of violent attacks. A 2017 Doctors Without Borders survey found that 31.4 percent of women seeking protection had been abused during their transit through Mexico. Some women are kidnapped and raped by their captors, often in front of their children. Many assaults involve Mexican authorities. A Honduran woman, Jessica, in the Mexico City detention center described to IMUMI how she and a friend were detained by the National Guard in Ciudad Juarez after being expelled from the US. The agents sexually abused both women, who remained in detention in Ciudad Juarez for two months before being transferred to the Mexico City detention center. The women were deported from Mexico before they had the chance to file a complaint against the agents.

   In another case documented by IMUMI, a Honduran woman was offered a job in Chiapas, Mexico, that turned out to be a ploy to traffic her. After six months of being routinely sexually abused, she escaped, but despite her reporting the crime, authorities did not protect her or investigate the crime, forcing her to leave the state and look for protection on her own.

   Many sexual violence crimes are not reported or investigated in Mexico. According to the National Survey for Urban Public Security, between July and December 2020, 98.6 percent of sexual crimes were

---

9   All names have been changed to protect the privacy of the women interviewed.

CLP_PC_021589

Stuck in Uncertainty and Exposed to Violence:
The Impact of US and Mexican Migration Policies
on Women Seeking Protection in 2021

 

not reported or not investigated. Women who lack migration status and those detained face additional risks of being the victim of a sexual crime and heightened barriers to accessing justice and support services, including psychological support and medical care.

4. **Women seeking protection are separated from their children as a result of restrictive policies**. In some cases, parents are victims of crimes, such as kidnapping, and their children are left alone to cross to safety into the US. Several months after being returned to Mexico, Sandra, a Black woman from Honduras, went to look for a job in downtown Piedras Negras, where she was kidnapped and held for three days. Her four children crossed the border on their own because they did not know what had happened to their mother and were frightened. In other cases, due to the danger in Mexican border cities, coupled with US policies preventing many families and adults from seeking asylum, parents are forced to make the heartbreaking decision to send their children alone to safety in the US.

5. **Women continue to wait in squalid conditions in Mexican northern and southern border cities.** Limited shelter capacity in Mexico's northern border cities has left many women sleeping on the streets and in precarious conditions, including at the informal tent encampments in Tijuana and Reynosa. WRC staff spoke with a Honduran woman, Eleana, in Tijuana who tried to secure accommodations in Tijuana shelters after being expelled from the US, but was turned away due to limited capacity. She was forced to stay in squalid conditions in a house far away from the city center. A mere 15 days after Eleana and her family attempted to seek protection after crossing into the US and were expelled by Border Patrol to the streets of Tijuana, a rabid dog attacked and killed her 20-month-old toddler. In Tapachula, Chiapas, women asylum seekers and their families waited months for their Mexican asylum cases to be resolved while living in shelters, rented rooms on the outskirts of the city, or camped in the city's central plaza, with limited access to bathrooms or showers.

6. **Women seeking protection struggle to find child care and enroll their children in school in Mexico.** According to Mexican law, all children—regardless of their immigration status—should be able to enroll in public school. However, many barriers to enrollment in schools remain, such as discrimination and misinformation from local school administrators. One woman, Karina, recounted to WRC how she had not been able to enroll her two young children in local public schools because administrators (falsely) told her she would have to pay a sizable enrollment fee for each child. Women asylum seekers in Tapachula, Chiapas, told IMUMI that some schools require certified translations of birth certificates and vaccination records, making it impossible to enroll their children as they either do not have the documents, or cannot afford to have them translated.

Child care responsibilities and barriers enrolling children in school made it difficult for women to find part- or full-time work, while they wait to access asylum in the US or in Mexico. A number of women expressed to WRC fear of leaving their children alone due to the dangers in border cities, and worries over being unable to support themselves and their families since they could not work.

7. **Women seeking protection struggle to access vital health services, including reproductive health services.** Mexico's 2011 Migration Law guarantees access to health services to people regardless of their immigration status in Mexico. Despite this, pregnant people expelled to Mexico by US authorities under Title 42 have been turned away by local hospitals and denied medical care. A Salvadoran woman, Brenda, told WRC she was denied prenatal care in Tijuana, where local hospital workers told her, "We can't help you because you aren't Mexican." A Honduran woman, Marina, represented by IMUMI, was turned away from a public hospital because she did not have the required documents to prove financial

CLP_PC_021590

Stuck in Uncertainty and Exposed to Violence:
The Impact of US and Mexican Migration Policies
on Women Seeking Protection in 2021




need. A lawyer resolved the situation, but shared with IMUMI that almost all of her clients require legal assistance to access basic reproductive health services in Mexico.

8. **LGBTQI+, Black, Indigenous, and non-Spanish speaking women seeking protection face additional dangers in Mexico.** In particular, Black asylum seekers face anti-Black racism, discrimination, and targeting from Mexican authorities. Several Haitian asylum seekers in Mexico City told WRC that they did not even try to look for employment opportunities because of the discrimination they were certain they would face by employers. Restrictive US border policies force individuals to wait in Mexico where they often are vulnerable to the same risks, discrimination, and dangers that they fled in their countries of origin. For example, Laura, a trans woman who fled Honduras due to death threats and her house being burned down, told WRC she was threatened at gunpoint by Mexican authorities during her journey to Tijuana. She did not feel safe in Mexico and struggled to secure housing due to discrimination. A Guatemalan asylum seeker in Mexico City, Karen, described to IMUMI staff that a teacher discriminated against her daughter for being "darker" and wearing Indigenous clothing.

9. **Due to Mexico's increased enforcement and travel restrictions, women seeking protection are forced to look for ways to evade immigration and military checkpoints by traveling in caravans for safety or relying on smugglers.** In 2021, the situation was particularly harrowing in Tapachula, Chiapas, where 89,668 asylum seekers (approximately 68 percent of all applicants) awaited adjudication of their protection claims. Many families attempted to move from Tapachula to other cities with better job opportunities and safer conditions. However, INM and National Guard checkpoints and increased enforcement in southern Mexico made transit difficult.

One Honduran woman, Veronica, told IMUMI that she and her family decided to join a migrant caravan in August 2021. INM officials stopped them, told them that the letter proving their pending asylum application was not valid, and tore up the documents. When she tried to film the incident with her telephone, agents took it away from her. During a press conference in September 2021, a Haitian woman in Tapachula described how Haitians are racially profiled by Mexican authorities and removed from buses. "We can barely get around Tapachula even though we are asylum seekers with a letter from COMAR. It is practically impossible to get on a bus to go to another city without paying smugglers a fee to get through the checkpoints."

In the bus terminals in Tapachula and throughout Mexico, private bus companies began checking immigration status as a prerequisite for buying a bus ticket. Two women in the Mexico City detention center told IMUMI in September 2021 that they had been detained in a Mexico City bus station even though they had letters proving their immigration status.[10]

10. **Women seeking protection are subjected to use of force and violence by Mexican and US authorities.** In August 2021, Mexican immigration authorities and the Mexican National Guard were filmed kicking migrants, violently pushing women and children into vehicles, and threatening family separation as tactics to break up large groups. In one video, a woman who had been detained could be seen screaming that she had been separated from her two-year-old son during the raid. While she screamed and tried to get out of the INM van, an agent could be seen pushing her on the breasts back into the van. In October 2021, a Haitian woman was found dead along a highway in Chiapas. Her clothes had

---

10  Since bus ticket agents have neither the authority nor the training to verify immigration status, they have begun sending anyone they deem suspicious to talk to INM officials stationed in the bus stations, who would then detain the individual.

CLP_PC_021591

Case 4:18-cv-06810-JST   Document 169-8   Filed 06/05/23   Page 411 of 1047

Stuck in Uncertainty and Exposed to Violence:
The Impact of US and Mexican Migration Policies
on Women Seeking Protection in 2021




been removed and she had been raped and strangled. Four municipal police officers were detained in relation to the crime. In September 2021, armed US Border Patrol agents in Del Rio, Texas were photographed abusing Black migrant families and driving them back across the border to Mexico.

**Many women seeking protection who transit through Mexico are subjected to more than one of the above risks during their stay, which often lasts months or even years due to restrictive policies**. A Honduran woman, Mariana, recounted to IMUMI her misfortunes over the past two years waiting in Mexico, and how the Biden administration's policies—following on the Trump administration's attacks on the asylum system—have resulted in her ongoing inability to seek asylum in the US:

*"I fled Honduras with my two children in 2019 because my husband beat us and he was involved in a criminal gang that protected him. After several months in Mexico, we arrived at the US-Mexico border to request protection and we were sent back under [Remain in Mexico] through Nuevo Laredo. Since I had my two small children, we made our way to Monterrey, Mexico [a city several hours to the south], where we were living on the street. I was raped and became pregnant.*

*"A kind Mexican woman took us in and allowed us to live with her until the baby was born in October 2020. My kids didn't go to school in all of 2020. I still had a dream to live with my sister in the US and be safe, but things were really difficult. Then in April 2021, I learned that I could sign up for the [RMX wind-down process] even though I had never had my hearing, so I signed up for Conecta.[11] I got help to register my baby so he would have a birth certificate. Then I got an email stating that Conecta had closed and that I would have to wait again.*

*"I don't understand what I am supposed to do, where I am supposed to go. I have been trying for two years to follow the rules, but my kids are two years older now, I have a baby, and I don't know what to do. I can't go back to Honduras, I am afraid to be in Mexico, and I'm not allowed to request protection at the border. I feel lost."*

## Conclusion and Recommendations

Both President Biden and President Andrés Manuel López Obrador recognize that many women are fleeing gender-based violence and persecution in their countries of origin and need access to protection in both countries. IMUMI and WRC are deeply concerned about practices by both governments that normalize human rights violations, including the violation of the right to request asylum. Instead of restrictive policies and enforcement actions that put women and children seeking protection in harm's way, the US and Mexican governments should strengthen asylum systems in both countries and broaden complementary pathways for protection. We urge the Biden and López Obrador administrations to implement the following recommendations to ensure that the rights of women—including the right to access protection—are upheld.

---

11  Conecta was a web platform run by the United Nations High Commissioner for Refugees (UNHCR) where individuals who were subjected to the first iteration of RMX could enroll to access the RMX wind-down process and continue their immigration cases within the US. This platform was operational between February and August 2021. It was suspended due to the court order regarding the reinstatement of RMX.

CLP_PC_021592

Stuck in Uncertainty and Exposed to Violence:
The Impact of US and Mexican Migration Policies
on Women Seeking Protection in 2021

Case 4:18-cv-06810-JST   Document 169-8   Filed 06/05/23   Page 412 of 1047

 

## Recommendations for the Biden administration

» End the use of Title 42 to expel adults and families to Mexico and their countries of origin via land expulsions and expulsion flights.

» Restore access to asylum at ports of entry, so that individuals can approach a port of entry and request protection and other relief from inside the United States.

» Refrain from pressuring Mexico to increase enforcement by immigration and security forces or implementing new visa restrictions for nationalities arriving in large numbers. Focus the Collaborative Migration Management Strategy (CMMS) on expanding access to protection in the region and complementary pathways to protection, without sacrificing access to asylum at the US southern border.

» Reverse the expansion and stop further implementation of RMX.

» Release monthly Customs and Border Protection (CBP) data that is disaggregated by gender on encounters, expulsions, returns under RMX, and other statistics relating to US asylum processing.

## Recommendations for the Mexican government

» Allocate adequate funding to COMAR to decrease wait times, open more offices, and hire additional protection officers.

» Reform the Mexican Refugee Law to allow people to continue their asylum procedures from different parts of the country where they have family and community networks, better employment opportunities, and safer conditions.

» Ensure that women who have suffered or who remain in danger of violence in Mexico have access to relocation programs and services where they can safely wait for their asylum process.

» Expedite humanitarian visitor cards for asylum seekers, victims and witnesses of crimes, migrant children, and other vulnerable populations.

» Refuse to collaborate with the US government on the implementation of policies such as Title 42 and RMX that violate US, Mexican, and international law.[12]

» Eliminate the use of the National Guard and all armed forces in migration enforcement in compliance with the Mexican Constitution and international law.

» Eliminate unconstitutional internal enforcement revisions and checkpoints that result in illegal racial profiling.

» Rescind the provision that requires foreigners to show proof of migration status to purchase a bus ticket in Mexico.

» Ensure access to public education for all migrant and refugee children.

» Ensure access to health services for migrant and refugee women and girls, especially reproductive health services.

---

12  Mexican organizations have pending litigation and complaints with the National Human Rights Commission against the bus travel restrictions, Mexico's participation in Remain in Mexico 1.0 and Remain in Mexico 2.0, Mexico´s implementation of internal Title 42 expulsion flights, discriminatory enforcement practices at internal checkpoints, and the participation of the National Guard in migration enforcement. For additional information about the lawsuits: 1. RMX 1.0 (Instituto para las Mujeres en la Migración (IMUMI), A.C. vs. SEGOB, SRE, INM, INMUJERES) - Mexican Supreme Court - 302/2020. 2. RMX2 – Mexico City District Court – exp. 1887/2021 3. Tit. 42 Expulsions – Mexico City Circuit Court - 153/2021. 4. Bus Travel Migration Status Restriction - Mexico City District Court - 1647/21 5. Discriminatory Migration Enforcement Practices - Mexican Supreme Court (E, A y J VM vs. INM, Cámara de Diputados y otros) -- 275/2019 6. National Guard Participation in Migration Enforcement -- (Gretchen Louise Kuhner Vs. Congreso de la Unión y Presidente de los Estados Unidos Mexicanos), Mexican Supreme Court, 73/2020.

CLP_PC_021593

Case 4:18-cv-06810-JST   Document 169-8   Filed 06/05/23   Page 413 of 1047

Stuck in Uncertainty and Exposed to Violence:
The Impact of US and Mexican Migration Policies
on Women Seeking Protection in 2021

 

» Increase access to housing for asylum seekers through ongoing support to civil society shelters, including safe spaces for vulnerable groups such as women, families, and LGTBQI+ individuals.

## Additional resources

» Analysis of Gender Violence: Women Seeking International Protection in Mexico, IMUMI, 2021.
» Asylum Denied: Remain in Mexico 2.0, Women's Refugee Commission, 2021.
» Dual Crises: Gender-Based Violence and Inequality Facing Children and Women During the COVID-19 Pandemic in El Salvador, Guatemala, and Honduras, KIND, 2021.
» Pathways to Justice: Gender-Based Violence and the Rule of Law, Wilson Center, 2021.
» Center for Gender and Refugee Studies (CGRS) Publications.

_____

This report was written by Gretchen Kuhner of the Instituto para las Mujeres en la Migración (IMUMI) and Savitri Arvey of the Women's Refugee Commission (WRC). It was reviewed by Katharina Obser, Ursela Ojeda, and Dale Busher from WRC. Patricia Arroyo reviewed statistics, Sara Velasco helped with fact checking, and Miriam Gonzalez reviewed the Spanish translation on behalf of IMUMI. It was edited by Joanna Kuebler and Diana Quick from WRC, and designed by Diana Quick.

IMUMI and WRC extend deep thanks to the women who generously shared their time and experiences, as well as the migrant shelters and organizations that provided information and facilitated the interviews with women.

This report was made possible by the generous support of the Open Society Foundations.

For additional information, please contact Gretchen Kuhner, director, IMUMI (gretchenk@imumi.org) or Savitri Arvey, policy advisor, WRC (SavitriA@wrcommission.org).

**Women's Refugee Commission**
The Women's Refugee Commission (WRC) improves the lives and protects the rights of women, children, and youth who have been displaced by conflict and crisis. We research their needs, identify solutions, and advocate for programs and policies to strengthen their resilience and drive change in humanitarian practice. Since our founding in 1989, we have been a leading expert on the needs of refugee women, children, and youth and the policies that can protect and empower them. womensrefugeecommission.org.

**IMUMI**
The Institute for Women in Migration, AC (IMUMI) is a civil society organization based in Mexico City that promotes the rights of women and their families in migration. IMUMI provides legal support to women and their families, collaborates with civil society organizations, academic institutions, and government bodies to ensure issues relevant to women are included in regional migration policy. imumi.org.

February 2022

CLP_PC_021594

# The consequences of US and Mexican immigration policies on the protection of Venezuelan women and LGBTIQ+ individuals in Southwest Mexico






CLP_PC_021595

December, 2022

# The consequences of US and Mexican immigration policies on the protection of Venezuelan women and LGBTIQ+ individuals in Southwest Mexico

© 2022 Apoyo a Migrantes Venezolanos, Mexico; Institute for Women in Migration (IMUMI), Mexico; Women's Refugee Commission (WRC), United States; and Center for Democracy in the Americas (CDA), United States.

## Research and Writing

Andrea Virrueta, IMUMI
July Rodríguez, Apoyo a Migrantes Venezolanos
Mara Tissera Luna, consultora independiente para CDA
Savitri Arvey, WRC

## Review

Gretchen Kuhner, IMUMI
María José Espinosa, CDA

## Design

Isaac Ávila
Ramón Arceo

## Acknowledgements

We are deeply grateful to the Venezuelan women and individuals from the LGBTIQ+ community in the Hospitalidad y Solidaridad shelters and Casa Frida in Tapachula who shared their experiences with us. We are also incredibly thankful to all of the women from various countries, accompanied by FOCA, who shared their migratory experience with us in Tuxtla Gutierrez. We obtained consent from all the interviewed individuals to share their testimonies.

In addition, we are also grateful for the time and valuable contributions of the experts and organizations that we interviewed in the following locations:

**Tapachula Chiapas.** Alto Comisionado de las Naciones Unidas para los Refugiados (ACNUR - México); Albergue Hospitalidad y Solidaridad; Casa Frida; Centro de Derechos Humanos Fray Matías de Córdova A.C.; Coalición por los Derechos Humanos de los Inmigrantes (CHIRLA) ; Fermina Rodríguez, experta y consultora para Instituto Nacional de las Mujeres (INMUJERES); Haitian Bridge Alliance; HIAS; International Rescue Committee; Kids in Need of Defense (KIND); Médicos del Mundo Francia; y el  Fondo de las Naciones Unidas para la Infancia (UNICEF - México).

**Tuxtla Gutiérrez, Chiapas.** Formación y Capacitación A.C. (FOCA).

**San Pedro Tapanatepec, Oaxaca.** Médicos Sin Fronteras; y Servicio Pastoral a Migrantes San Martín de Porres (SEPAMI), Diócesis de San Cristóbal de las Casas, A.C.

December, 2022

# INDEX

04   EXECUTIVE SUMMARY

06   I.    NEW MEASURES ANNOUNCED ON OCTOBER 12
     BY THE US AND MEXICAN GOVERNMENTS FOR
     VENEZUELAN NATIONALS

08   II.   PRESENCE OF VENEZUELANS IN THE
     SOUTHWEST OF MEXICO

18   III. RECOMMENDATIONS

CLP_PC_021597

# EXECUTIVE SUMMARY

This monitoring report assesses the main political and legal challenges that hinder the ability of Venezuelan girls, women and LGBTIQ+ individuals on the move in the Southwest of Mexico from accessing international protection, asylum, or regularized status in Mexico or the US. The report focuses on how these populations were impacted by the latest regional migration policies: Mexico's visa requirements for Venezuelans instituted in January 2022; the US 's government  expansion, in cooperation with the the Mexican government, of Title 42, which leads to the expulsion to Mexico of most Venezuelans who cross the US-Mexico border; the humanitarian parole program announced by the US in October; the closure of the Panama border for Venezuelans traveling from Costa Rica; and the Costa Rican government's announcement about closing its border with Panama. To achieve this, Apoyo a Migrantes Venezolanos, the Institute for Women in Migration (IMUMI), Women's Refugee Commission (WRC), and the Center for Democracy in the Americas (CDA) carried out fieldwork in Tapachula, Chiapas, and San Pedro Tapanatepec, Oaxaca, between November 7th and 11th, 2022.

During this monitoring trip, we identified the following issues affecting Venezuelan migrants and asylum seekers in Southwest Mexico:

— A scarcity of official, complete, actionable information in plain language on the new policies, the options to request protection in Mexico and the US, and the options for regularization along the migratory route.

— A lack of government planning in regards to accommodations and shelter, along with the scarcity of housing options and shelters that meet the needs of Venezuelans with vulnerabilities, all exacerbate gender-based violence against Venezuelan women.

— Venezuelans traveling with children or adolescents are at heightened risk of family separation.  Given the lack of identity documents, it is difficult, and sometimes impossible, to provide Mexican migration authorities with proof of family ties.

— In their journey through Mexico, Venezuelan women and LGBTIQ+ individuals continue to be exposed to all forms of gender-based violence. This includes sexual violence when they take alternative isolated routes as a means to avoid the checkpoints run by the migration authorities and security forces on major roads.

Among other recommendations, we urge the **Mexican government** to:

1. Offer Venezuelans humanitarian visitor cards (*Tarjetas de Visitante por Razones Humanitarias,* or TVRH) with valid work authorization for at least one year.

CLP_PC_021598

2. Terminate the strategy of installing National Institute for Migration (INM) temporary assistance centers for the FMM *(Forma Migratoria Múltiple)* -a Mexican immigration document that acts as a visitor's permit or tourist card− in remote locations. This includes the module that was in operation in San Pedro Tapanatepec between July and December 2022.

3. End the unconstitutional practice of immigration checkpoints and stop and search operations in accordance with the ruling by Mexico's Supreme Court (SCJN) 275/2019.

4. Disseminate information to migrants about their rights, including information about the process to apply for refugee status in Mexico with the Mexican Commission for Refugee Assistance (COMAR), if they so choose.

5. Increase financial support and other resources for shelters, in particular to ensure that they are able to comply with age-, gender- and diversity-sensitive protection standards, and provide psychological, legal and economic support to survivors of gender-based violence.

6. Increase humanitarian assistance services in Tapachula Chiapas in collaboration with United Nations agencies operating in the subregion.

7. Invest in the integration of migrants and asylum seekers.

In addition, we urge the **US government** to:

1. Stop pressuring the Mexican government to participate in migration policies that infringe on the country's legal framework, such as immigration checkpoints and the reception of migrants and asylum seekers expelled to Mexico by US authorities.

2. Take all legally permissible steps to end Title 42 and restore access to asylum at the US-Mexico border.

3. Increase financial and humanitarian assistance to international organizations and non-governmental organizations providing services to refugees and migrants along the migratory route.

4. Eliminate the stringent requirements for the special parole program for Venezuelans and increase the cap for the program.

5. Work with international agencies and national and local NGOs to increase and broaden the reach of information campaigns on the parole program for Venezuelans.

# I.   NEW MEASURES ANNOUNCED ON OCTOBER 12 BY THE US AND MEXICAN GOVERNMENTS FOR VENEZUELAN NATIONALS

In 2022, there was an increase in the number of Venezuelans arriving at the US-Mexico border, the majority seeking protection. Between October 2021 and September 2022, 189,520 Venezuelans were encountered by Customs and Border Protection (CBP) at the US southern border, a historic record and marked increase from the previous year, when CBP encountered 50,499 Venezuelans between October 2020 and September 2021. Initially, in fall 2021, many Venezuelans arrived by plane to Mexico and then traveled by to the US southern border. Yet, in the past year, Mexico and a number of Central American countries have instituted visa requirements, reportedly due to pressure from the US. After these visa requirements were implemented in January and February 2022, CBP encounters of Venezuelans decreased for several months. Soon after, there was an increase in the number of Venezuelans crossing by land through the Darien Gap in Panama, with 148,285 Venezuelans crossing from January to October 2022 alone, compared to 2,819 Venezuelans in all of 2021.

On October 12, the Department of Homeland Security (DHS) announced the implementation of a new "migration enforcement process for Venezuelans" in collaboration with the Mexican Ministry of Foreign Affairs (SRE). As of that date, Venezuelans crossing the U.S.-Mexico border between ports of entry may be rapidly expelled to Mexico without the opportunity to request protection under Title 42.[1] Subject to Mexico accepting the returns of Venezuelans, the United States inaugurated a new limited parole program. This program grants legal status for two years and has a cap of 24,000 individuals. Individuals who crossed into Mexico or Panama following October 19th would not be eligible for the parole program. The announcement made it clear that the aim of this parole program was not to benefit Venezuelan asylum seekers, as most do not have a valid passport or sponsorship in the United States, two of the eligibility requirements. The objective of these two announcements, as stated by DHS, is to *"reduce the number of people arriving at the southwest border of the United States"*.

---

[1]   Title 42 is a little-known provision of US code that the Trump administration implemented in March 2020 to achieve its goal of denying access to asylum at the U.S.-Mexico border under the guise of public health. Title 42 allows for the immediate expulsion of individuals at the Mexico border, where they are sent back to Mexico or their countries of origin. In March 2020, the Mexican government officially accepted the expulsion of individuals from El Salvador, Guatemala, and Honduras, although there have been occasional removals in small numbers of other nationalities, such as from Cuba and Nicaragua. While the Biden administration ended Title 42 in April 2022, it has remained in effect through litigation, but a court ordered Title 42 to end on December 21.

CLP_PC_021600

According to press releases, Mexico agreed to receive up to 1,000 Venezuelans per day in five border cities: Tijuana, Nogales, Ciudad Juárez, Piedras Negras, and Matamoros. However, since the announcements, they have never expelled that number per day number per day, as the number of Venezuelans crossing the U.S.-Mexico border has dropped. In October, following the announcements, CBP expelled 5,859 Venezuelans into Mexico. On October 22, the two governments announced that in the first days of the program, 7,500 applications were submitted and DHS had approved the first 100 Venezuelans to fly to the United States. On December 8, it was reported that DHS had approved more than 14,000 Venezuelans for the parole program and more than 5,900 had already arrived in the US.

# II. PRESENCE OF VENEZUELANS IN THE SOUTHWEST OF MEXICO



**Note.** Route taken by migrants (Tapachula, Huixtla, Tonalá, Arriaga, San Pedro Tapanatepec), that can last 4-5 days.

## 1. Tapachula, Chiapas

All individuals and organizations interviewed agreed that over the past summer there was an increase in the number of arrivals of Venezuelans across the Mexico-Guatemala border, especially across the Suchiate River. Most of the Venezuelans stayed only one or two nights in Tapachula before continuing their journey north. Relatively few people applied with COMAR for refugee status in Mexico. This was due to several factors including lack of information about the option, wait times for a COMAR appointment in Tapachula, and also because the final destination for many Venezuelans was the US due to the presence of family members and support networks. However, those interviewed explained that, after the

CLP_PC_021602

October 12 announcements, there was an increase in the number of Venezuelans staying for longer periods in Tapachula, and a slight increase in the number of people applying to COMAR for refugee status. In the following weeks, many Venezuelans who were in the Darien Gap or in Central America at the time of the October 12 announcements continued to arrive in Tapachula. Roughly three weeks after the October 12 announcement, the numbers of Venezuelans arriving went down; fewer Venezuelans began arriving in Tapachula.

Both the demographic profiles of Venezuelans who transited the Darien Gap collected by the International Organization for Migration (IOM) between May and July 2022, as well as our interviews, show that the Venezuelan population arriving in Mexico has been in very precarious economic conditions. According to IOM, between 27 and 39 percent of the Venezuelans who crossed the Darien during these periods needed to work while in transit in order to reach their destination. In 93 to 95 percent of cases, the destination of these Venezuelans was the United States. All of the Venezuelans interviewed in Tapachula explained that they had almost no money left, either because they had spent it during the journey or because they had been assaulted by criminal groups and/or extorted by the security forces while in transit. All individuals needed to work to support themselves and their families while in transit, but various factors prevented them from working including discrimination in the job market for not having Mexican documentation, xenophobia, high rates of unemployment and informal employment in southeastern Mexico, and the lack of free childcare services. According to the organizations interviewed, the lack of economic opportunities and formal employment makes Venezuelans more vulnerable to domestic violence (including economic as well as physical and sexual violence), trafficking, and exploitation. In recent research with Latin American women on the move in Mexico, the Hebrew Immigrant Aid Society (HIAS) and the United Nations High Commissioner for Refugees (UNHCR) found that 70 percent of women were not working, while 23 percent were in the informal sector and 7 percent had formal employment; 32 percent of women surveyed identified lack of economic opportunities as the factor that most exposes them to gender-based violence.

## 2. San Pedro Tapanatepec, Oaxaca

Between July 28th and December 12th, 2022, Venezuelans were forced to travel to San Pedro Tapanatepec, a small municipality in Oaxaca with approximately 15,000 residents, where the INM operated a "módulo de atención", a temporary assistance center where it granted FMMs. The majority of Venezuelans walked 180 miles from Tapachula to San Pedro Tapanatec, which took them 4-5 days, often in small caravans, passing 19 checkpoints along the way managed by the INM, the State Police, the Municipal Police, and the Prosecutor's Office. Many joined small caravans.



**Photo.** Makeshift encampments made of sticks and plastic bags in the entrance to San Pedro Tapanatepec, Oaxaca.

On November 10th, our delegation traveled by car from Tapachula to San Pedro Tapanatepec. On the way, we observed two caravans of 100 to 300 people each. In the caravans, we saw women (including pregnant and lactating women), as well as families and infants, walking in 95°F. On the day of our visit in San Pedro Tapanatepec, it was estimated that there were between 12,000 and 15,000 migrants and asylum seekers waiting for their FMMs. According to Center for Human Rights (CDH) Fray Matías de Córdova, by October 26, approximately 80 percent of the people in the shelters en route from Tapachula to San Pedro and the camp in San Pedro were Venezuelan.

Venezuelans went to San Pedro in order to get an FMM, which would give them legal status to transit throughout Mexico. However, we observed that INM in San Pedro changed the allotted period from 180 days of regularized status to 7 or 14 days. Also, while we were there, all the FMMs had a stamp indicating that they were only valid within the state of Oaxaca. Limiting the movement of Venezuelans to the state of Oaxaca is also a clear violation of Mexico's immigration and constitutional framework.[2]

Finally, on December 12, after four and a half months in operation, the INM closed the temporary assistance center. During its operation, INM granted more than half a million FMMs to migrants and asylum seekers from more than 100 countries in San Pedro Tapanatepec. The INM did not provide an explanation for the closure. Following the closure, individuals can now obtain their FMMs in Tapachu-

---

2   Article 7 of Mexico's Migration Law stipulates that "All individuals have the right to freely transit, and all authorities must promote this right and respect it. No individual will be required to prove his or her nationality and migratory status in Mexico, except by the competent authority in the events and under the circumstances established in this Law." Likewise, the Political Constitution of the United Mexican States recognizes the right to free transit.

CLP_PC_021604

la, where INM set up a temporary assitance center in the city's Ecological Park, at the end of November. Individuals can also obtain FMMS in the municipality of Huixtla, about 25 miles from Tapachula.



**Image.** Example of a FMM (Forma Migratoria Múltiple) issued by the National Institute of Migration in San Pedro Tapanatepec, Oaxaca.

## 3. Lack of clear information about the new policies and options for Venezuelans

Our interviews indicated that, throughout the migratory route from Venezuela or individuals' last country of residence, there is a lack of official and complete information on the new migration policies for Venezuelans, options for requesting protection in Mexico or the United States, and options for regularization in Mexico. This includes a lack of easy-to-understand information in plain language tailored to the needs and concerns of vulnerable individuals. Unfortunately, this information vacuum is often filled by rumors and misinformation campaigns on social media. Such misinformation often overestimates the possibilities of obtaining protection in the United States and underestimates the

dangers of crossing the Darien Gap. All the women interviewed regretted not seeking out reliable sources about the dangers of the Darien before embarking on the journey.

The Hospitalidad y Solidaridad shelter, Center of Human Rights Fray Matías de Córdova A.C. and the Coalition for Humane Immigrant Rights (CHIRLA) all agreed that the announcements of the new measures on October 12 were drastic and unexpected, and, that due to misinformation and the uncertainty, generated a crisis among the Venezuelan population in southern Mexico. As one of the Venezuelan women described:

> *"One arrives in Mexico with the plan to cross it as quickly as possible, because of the history of insecurity against women, but [the October 12th announcement] caught us here and we have to stay.(...) they did not even give us time to get to the border, the news was that 'from now on' it was not possible to enter the United States, then one was left thinking 'what do I do?"*

*The Mexican government, international organizations and NGOs disseminated some official information about the humanitarian parole program (although there was a lack of sufficient dissemination). However, there appeared to be a high level of uncertainty among both Venezuelans and service providers about what kind of international protection or regular status those already in Mexico can receive who do not wish to or cannot return to Venezuela because they would be at risk.*

Many of the organizations interviewed (UNHCR Mexico, Center for Human Rights Fray Matías de Córdova A.C., CHIRLA, Servicio Pastoral a Migrantes San Martín de Porres (SEPAMI), Diócesis de San Cristóbal de las Casas, A.C) provide legal information and guidance on the process to apply for refugee status in Mexico and the new U.S. parole program for Venezuelans. They provided this information to Venezuelans in transit both in Tapachula, as well as in San Pedro Tapanatepec while the INM temporary assistance center was in operation. During the monitoring trip, Mexican authorities in Chiapas and Oaxaca said that the best option for migrants is to obtain an FMM in San Pedro Tapanatepec, Oaxaca. They did not appear to provide information about the process of applying for refugee status in Mexico or about the new U.S. parole program for Venezuelans. This FMM card was valid only within the state of Oaxaca and, in most cases, for seven to ten days. As the organization Formación y Capacitación A.C. (FOCA) explained: "People are offered the promise that if they move to a certain place *(nowadays it's San Pedro)*, they'll be able to receive something that will give them security to stay and transit in Mexico, but it is only the FMM".

COMAR was not present in San Pedro Tapanatepec and, during our interview, INM explained that its temporary assistance center in that municipality didn't process applications for refugee status to COMAR, as other INM offices do. People on the move interested in this procedure by COMAR, thus, needed to travel to the City of Oaxaca (an estimated 236 miles from San Pedro) or Salina Cruz (an estimated 91 miles from San Pedro).

The Venezuelan women interviewed agreed that, because the new measures were announced abruptly, they didn't have enough time to get informed and decide what to do next. All of them recommended that the US and Mexican governments take special measures for Venezuelans who arrived in Mexico before or on the day of the October 12th announcement, and who have been stranded in the

country since then. One of the women called on the governments to:

> "[...] Reconsider the measures for people who are already here, who didn't leave Venezuela to come to Mexico, but to get to the US, and who

> have been through so much. I never thought I would end up in Mexico; if someone had given me a choice between staying where I was and Mexico, I would have never come to Mexico due to how unsafe it is for girls [my children]."

## 4. Return Flights to Venezuela

In the weeks following the October 12 announcement, the Venezuelan Consulate in Mexico offered to return Venezuelans in Mexico on commercial "humanitarian" flights departing from Mexico City, with Venezuelans charged half the flight fare ($200). Likewise, INM has sent "voluntary return" flights departing from Mexico City to Venezuela. Witness at the Border estimates that in November INM carried out 7 of these return flights.

Many Venezuelans in Mexico have been shocked by the announcement to expand Title 42, especially those Venezuelans who were expelled after crossing into the US following the announcement. Many were unaware of the requirements for the U.S. parole program or the option of applying for refugee status in Mexico with COMAR, and many had very

limited legal status in Mexico (only 7-30 days via FMMs or an *oficio de salida*). In this context, they felt compelled to accept to return to the same country from which they had fled due to human rights violations and a lack of basic services and food. In addition, some Venezuelans told Apoyo para Migrantes Venezolanos that INM officials pressured them to sign documents accepting their departure from Mexico. Given all these factors, it is doubtful that these return flights are truly "voluntary".

To our understanding, there have been no return flights from southern Mexico, and UN agencies have not been involved in return flights or an assisted voluntary return program. There appears to be no pre-flight protection screening nor monitoring of the reception of Venezuelans in Venezuela.

## 5. Lack of planning for shelters and housing

The scarcity of decent housing options and shelters that meet the needs of individuals with multiple vulnerabilities in southwestern Mexico (as well as of humanitarian assistance in San Pedro Tapanatepec while the INM module operated there), aggravates gender-based violence against Venezuelan women. According to expert Fermina Rodríguez, activist and consultant for Inmujeres, overcrowding in shelters, small, rented properties, or the street

situation generate situations of gender-based violence because:

> "[...] people come very burdened, and when they arrive here, the uncertainty, the anguish and the concern of -When is my appointment? Will they resolve my case? What do I have to say in the interview? What's next? leaves them in a

*very stressful situation, and they explode very easily".*

In Tapachula, the lack of adequate housing policies for people on the move is long-standing. Many of the shelters that house women and LGBTIQ+ people awaiting the 3-6 month refugee status adjudication process before COMAR are overcrowded. While civil society-run shelters work hard to support those individuals with almost no resources and no public support, most do not have sufficient funding or staff to apply age-, gender- and diversity-sensitive protection standards or provide specialized services to gender-based violence survivors. In addition, the cost of rent for foreigners is exorbitant, leaving many crammed into small apartments. Finally, many women end up on the streets. In addition to the makeshift camps that form next to the Comar I offices (Mercado de los Laureles), many women sleep in Tapachula's main parks (Central and Bicentenario), waiting for their refugee status adjudication or for a caravan to form.

Several of the organizations interviewed denounced the Mexican government's decision to gradually install INM "temporary asistance centers" *[modulos de atencion],* in locations further and further away from Mexico's southern border, describing the move as yet another reactive and unpredictable policy measure. At the same time, the government has also failed to expand capacity in terms of shelters, sanitation, humanitarian assistance or psychosocial services, as the Colectivo de Observación y Monitoreo de Derechos Humanos en el Sureste Mexicano (COMDHSEM) has denounced. In this context, there is a proliferation of makeshift camps that lack safe spaces, adequate sanitation, or protective measures to prevent gender-based violence, as was evident from the humanitarian crisis that transpired in San Pedro Tapanatepec, Oaxaca.



**Photo.** Encampment that formed during the operation of the National Institute of Migration's "temporary assistance center" (módulo de atención) in San Pedro Tapanatepec, Oaxaca.

CLP_PC_021608

While INM officials claimed that the installation of "offices for migratory procedures" in San Pedro Tapanatepec was intended to relieve pressure from Tapachula, this measure, coupled with a lack of planning and coordination, worsened the protection situation. In Arriaga and Tonalá, two municipalities in Chiapas on the route between Tapachula and San Pedro Tapanatepec, the federal government had installed temporary shelters. These shelters were set up in structures that were not originally designed for that purpose and offered only very basic services. In San Pedro, during the monitoring visit, the people waiting to obtain an FMM were mostly homeless. Some individuals improvised an encampment next to the large tents installed by INM; others set up tents with sticks and plastic bags in the surrounding areas.

Although various agencies and organizations (Doctors without Borders, Doctors of the World, UNHCR, Servicio Pastoral a Migrantes San Martin de Porres) provided legal information, medical services, and referrals to other services in San Pedro while the INM module operated there. The local community filled the void of basic public services. Residents rented part of their house for individuals to sleep in or charged for the use of their bathrooms and shower, etc. However, the rent costs were prohibitive for most women and families, who arrived in San Pedro Tapanatepec with almost no resources and no possibility of working.

## 6. Family separation of Venezuelans

As a consequence of Mexico's implementation of a visa requirement for Venezuelans, an increasing number of Venezuelans started crossing the Darien Gap. This has resulted in the damage or loss of their identity documents due to the extreme conditions of their crossings. This has directly impacted the protection of children and their families, including diverse families.

The organizations and agencies interviewed reported cases of family separation of people on the move with children and adolescents, given it is difficult, and sometimes impossible, to demonstrate their legal family ties. It was observed that, faced with increasing numbers of children and youth travelling with extended family members (i.e., godmothers, godfathers, second-degree or third-degree relatives like aunts or uncles) or with same-sex parents, the authorities refer children to the National System for Integral Development of Families (DIF), leading to family separation.

Venezuelans do not have access to a consulate in Southern Mexico. This makes it more complicated to provide proof of family ties via birth certificates or identity documents. Due to the extended family reunification process, many extended family members opt to abandon the children and continue their journey to reach the US. Kids In Need of Defense (KIND) explained that, when it comes to families belonging to the LGBTIQ+ community, separation is the direct consequence of the lack of understanding of authorities that LGBTIQ+ families are also families.

When it comes to abandoned Venezuelan children, there is the risk that they will see an incorrect interpretation by Mexican authorities of the determination of the best interests of the child, which could

potentially lead children to being returned to risk and violence (as it has already occurred to children of other nationalities). Either way, while they await the resolution of their case, they spend many months at *Centros de Asistencia Social* (CAS), residential care institutions. The effects of all these practices negatively impact the well-being of children and families.

## 7. Gender-based violence against women and LGBTIQ+ individuals

During this monitoring trip, it was identified that gender-based violence is present for girls, women, and LGBTIQ+ persons along the entire migratory route. Girls and youth are at heightened risk of gender-based violence because they are the main target in contexts of sexual violence. Sexual violence is a risk already when they cross the Darien Gap, where, since 2019, violence against people on the move has been rising and worsening. The high levels of brutality in the Darien jungle led Doctors Without Borders to publicly demand safe routes between Colombia and Panama, and that governments protect people on the move from violence along the whole route.

During their journey across Mexico, girls, women, and LGBTIQ+ persons are also exposed to different forms of violence, among them sexual violence, when they take alternative countryside routes as a means to avoid the checkpoints on major roads run by the migration officials and security forces. The risk of sexual violence is also very high in the camp and tents where people spent the night in San Pedro, according to NGOs and international agencies, because no age, gender and diversity sensitive protection measures have been applied. Among other risk factors, there's the lack of exclusive spaces for women, children and LGBTIQ+ persons. Toilets are located in a poorly lit area, which leads some to use the street as an alternative, where there's no surveillance.

International agencies and NGOs provided support to sexual violence along the migratory route, including in Mexico. Governments and UN agencies have set up individual case management systems, but the capacity is insufficient and does not provide all the support that the Mexican government must fulfill in order to respect, protect and promote the human rights of survivors. One of the challenges is the lack of capacity to identify survivors of violence.

Another challenge is providing support to women and LGBTIQ+ individuals who prioritize continuing their migratory journey over their physical and psycho-emotional health. One of the reasons for this is fear or uncertainty about changes in immigration policy. There are other challenges for women and the LGBTIQ+ population in accessing comprehensive services and models, including the lack of a gender analysis-informed intersectoral, intersectional approach. There are also obstacles in individual case management systems that hinder access to the justice system for survivors without revictimizing them.

Another expression of gender-based violence is that some women feel they have no option but to start and continue their journey with their main perpetrator, especially in cases of intimate partner violence

(IPV), because they consider their partner/perpetrator their "caretaker" or "protector" from strangers who could be violent towards them. In the case of the LGBTIQ+ population, the most common expressions of gender-based violence are threats to their integrity or life due to their gender identity or sexual orientation and threats of sexual violence, which may have pushed them to embark in secondary or tertiary migrations.

> "Because of our sexual orientation, [my partner's] coworkers started bullying him [...] he was assaulted [...] There were always many threats, and the decisive factor was when they showed up at the saloon, beat us, and threatened to kill us. And to prevent getting to that point, because their violence was going to continue, we decided to leave. That was when we lost everything [...] In fact, I came out from Venezuela due to a similar situation, I was attacked and stabbed four times. That is, the fact that I'm still alive is a miracle. In my country of origin, I was also assaulted due to my sexual orientation".

As Fray Matías pointed out, there are individual case management systems, such as the *mesa interinstitucional*, an inter-institutional mechanism where some government bodies participate. There is another individual case management system for survivors of gender-based violence, created by organizations such as Fray Matías, Médicos del Mundo, and Doctors Without Borders, with the support of IOM and UNHCR. However, insufficient coordination between these entities and the specific obstacles faced by survivors on the move all hinder effective assistance. There are current attempts by the above organizations and others to map out services for women on the move. Nevertheless, to access some governmental services for survivors of gender-based violence, women first must file a com-plaint against their perpetrators, which is challenging due to misinformation, as well as mistrust and fear of the Mexican authorities.

# III. RECOMMENDATIONS

The U.S. and Mexican governments should fulfill the commitment they made in the Los Angeles Declaration on Migration and Protection to "protecting the safety and dignity of all migrants, refugees, asylum seekers, and stateless persons, regardless of their migratory status, and respecting their human rights and fundamental freedoms." In this regard, we make the following recommendations:

## To the U.S. and Mexican government

1. Work with governments and subnational authorities along the migratory route to implement measures that support protection-sensitive border entry systems throughout the region that are able to identify international protection needs and refer individuals into appropriate legal pathways. UNHCR's 10-Point Plan of Action provides a roadmap for such action.

2. Continue to design and negotiate with partners throughout the region, in the context of the Los Angeles Declaration, safe, regular and orderly human mobility pathways to reduce the risk of loss of life, gender-based violence and other human rights abuses.

## To the Mexican government

1. Offer Venezuelans humanitarian visitor cards (*Tarjetas de Visitante por Razones Humanitarias*, or TVRH) with valid work authorization for at least one year so that they can consider their options and have time to seek a sponsor if they wish to participate in the new parole program. Article 52 of the Migration Law offers discretion to the Mexican government to provide humanitarian visitor cards.

2. Terminar la estrategia de instalación de módulos de atención del Instituto Nacional de Migración (INM) para la entrega de Formas Migratorias Múltiples (FMMs) en lugares remotos, como el módulo que operó en San Pedro Tapanatepec entre julio y diciembre de 2022. Si el INM va a seguir entregando FMMs en esa región del país, lo debería hacer en Ciudad Hidalgo o en Tapachula, donde hay servicios integrales y tienen acceso a todas las opciones para su estancia en México, como hacer la solicitud ante la Comisión Mexicana de Ayuda a Refugiados (COMAR).

3. End the strategy of installing INM temporary assistance centers for FMMs in remote locations, such as the center that operated in San Pedro Tapanatepec between July and December 2022. If INM is going to continue issuing FMMs in the

CLP_PC_021612

southwest of the country, it should do so in Ciudad Hidalgo or Tapachula, where there are comprehensive services and they have access to all regularization options for their stay in Mexico, such as applying to refugee status with COMAR.

4. End the unconstitutional practice of immigration checkpoints in accordance with the ruling of the Supreme Court of Justice of the Nation (SCJN) 275/2019, which in addition to promoting discrimination, puts people on the move at greater risk of extortion, violence at the hands of the authorities or organized crime, and human trafficking.

5. Refuse to collaborate with the US government on the implementation of policies such as Title 42 that violate US, Mexican, and international law, and stop accepting the returns of Venezuelans and individuals of other nationalities. Publish in the Official Gazette of the Federation (DOF) guidelines of how Mexico's reception of Venezuelans expelled under Title 42 complies with minimum standards of protection from the perspectives of childhood, adolescence, gender and disability, in accordance with Mexico's Supreme Court ruling 302/2020

6. Disseminate information to migrants about their rights, including the process to apply for refugee status in Mexico before COMAR, if they so decide.

7. Increase financial and human resource support for shelters, particularly to ensure that they apply age-, gender- and diversity-sensitive protection standards, and provide psychological, legal and economic support to survivors of gender-based violence.

8. Work with international and national human rights and humanitarian agencies to adopt and implement a human rights-based, age-, gender-

and diversity-sensitive approach to migration management that emphasizes a protection approach to border management.

9. In collaboration with UN agencies present in the sub-region (IOM, UNHCR, UNICEF), increase humanitarian assistance in Tapachula, in particular psychological, legal and economic support to gender-based violence survivors.

## To the U.S. government

1. Stop pressuring the Mexican government to engage in immigration policies that violate the legal framework such as immigration checkpoints and the acceptance of asylum seekers expelled to Mexico under Title 42.

2. Take all possible actions to end Title 42 and restore access to asylum at the U.S.-Mexico border.

3. Increase financial and humanitarian assistance to institutions and non-governmental organizations that provide services to migrants and refugees along the migratory route.

4. Eliminate the Venezuelan parole program requirements of a U.S. sponsor and a passport, as they prevent many vulnerable Venezuelans, including women and LGBTIQ+ persons, from accessing the program. Expand the number of slots available for the program from 24,000 to 150,000, to match the needs of the Venezuelan population.

5. Work with international agencies and local NGOs to increase information campaigns targeting Venezuelan migrants and asylum seekers about the parole program and options in other countries.

6. Work with regional governments, in consultation with IOM and UNHCR, to ensure that Venezuelans

are properly screened for protection needs, and that they are never returned to unsafe conditions, as the international community has recognized currently exists in Venezuela. Venezuelans fleeing persecution should not be returned to Venezuela, which could be in violation of the principle of non-refoulement.

CLP_PC_021614

# The consequences of US and Mexican immigration policies on the protection of Venezuelan women and LGBTIQ+ individuals in Southwest Mexico






CLP_PC_021615



# SURVIVING DETERRENCE:

## HOW US ASYLUM DETERRENCE POLICIES NORMALIZE GENDER-BASED VIOLENCE

A Report by Oxfam America and the Tahirih Justice Center



CLP_PC_021741

**Oxfam** is an international confederation of 21 organizations, working with its partners and allies, reaching out to millions of people around the world. Together, we tackle inequalities to end poverty and injustice, now and in the long term—for an equal future. For further information visit www.oxfam.org.

**The Tahirih Justice Center** is a national, nonprofit organization that serves immigrant survivors of gender-based violence. Tahirih's interdisciplinary, trauma-informed model of service combines free legal services and social services case management with bridge-building policy advocacy and research-based training and education. Tahirih's programs efficiently and effectively leverage donated professional services from a vast network of attorneys, medical professionals, and other experts to serve as many immigrant survivors as possible. By amplifying the experiences of survivors in communities, courts, and Congress, Tahirih's mission is to create a world in which all people share equal rights and live in safety and with dignity. For further information visit https://www.tahirih.org/.

**Authors:** Sara Duvisac, Research and Policy Advisor, American Council of Learned Societies/Mellon Public Fellow, Oxfam America; and Irena Sullivan, Senior Immigration Policy Counsel, Tahirih Justice Center

CLP_PC_021742

## ACKNOWLEDGEMENTS

The authors would like to thank the numerous service providers who participated in our interviews and took our survey. This research would not have been possible without their tremendously valuable contributions, insights, and analysis. We are grateful to Talia Mills, our research consultant, who led the interview data collection process. We would also like to thank Jessica Addis, Savitri Arvey, Richard Calderone, Casey Carter Swegman, M. Rosario Castro Bernardini, Nick Galasso, Cristina Garcia, Oliver Gottfried, Noah Gottschalk, Namalie Jayasinghe, Diana Kearney, Adriana LopezMartinez, Archi Pyati, Adam Revello, Rebecca Rewald, Jorge Romero, Emma Shaw-Crane, Rachel Sheridan, Patricia Stottlemyer, and Sarah Tuckey for their suggestions and comments for this report. We are grateful for the assistance of Al Otro Lado; Casa Monarca. Humanitarian Aid for Migrants, Refugees and IDPs; Church of the Good Samaritan Shelter;  Espacio Migrante; the Hebrew Immigrant Aid Society; and Human Rights First during the research process.

### Content Warning

Please be aware that this report contains secondhand accounts of sexual violence, torture, kidnapping, assault, harassment, racism, and transphobia that migrants and asylum seekers have faced at the US southern border. These are painful stories of survival that detail trauma and abuse by fellow migrants, organized criminal networks, and state officials, and include accounts of institutional harm and neglect.

## ACRONYMS

| | |
|---|---|
| CBP | US Customs and Border Protection |
| DHS | US Department of Homeland Security |
| DOJ | US Department of Justice |
| DOS | US Department of State |
| EO | Executive Order |
| GBV | Gender-based violence |
| INA | US Immigration and Nationality Act |
| LGBTQI+ | Lesbian, gay, bisexual, transgender, queer, and intersex |
| MPP | Migrant Protection Protocols (also referred to as RMX) |
| PSG | Particular social group |
| RMX | Remain in Mexico (policy and program; also referred to as MPP) |
| UNHCR | United Nations High Commissioner for Refugees |

CLP_PC_021743

# EXECUTIVE SUMMARY

Migrants and asylum seekers often flee unspeakable acts of gender-based violence (GBV) at home such as human trafficking, sexual assault, sexual slavery, kidnapping, harassment, and other trauma. In trying to seek safety in the US, many endure further atrocities and exploitation at the US-Mexico border. Drawing on interviews and surveys of social and legal service providers working at the US southern border, this report documents how migrants and asylum seekers experience gender-based harm in two different but related ways as a consequence of seeking safe haven in the US. This report focuses on the experiences of women, girls, and lesbian, gay, bisexual, transgender, queer, and intersex (LGBTQI+) individuals.

First, we find that US asylum deterrence policies engender conditions that cause GBV to proliferate at the US southern border because:

1) Border closures and expulsions increasingly force migrants to rely on precarious housing conditions that make them more susceptible to various forms of GBV;

2) cartels and other organized criminal networks can more easily target migrants when they wait for prolonged periods of time at the border or are routinely expelled while trying to access US asylum and immigration processes; and

3) survivors of GBV who are fleeing persecutors at home face an increased risk of being found and re-harmed by such persecutors while waiting at the border to access the US asylum process.

The risks of suffering GBV while waiting at the southern US border are compounded for Black migrants who are disproportionately impacted by US deterrence policies and consequently face further anti-Black discrimination from other migrants, criminal networks, and Mexican officials.

Second, the US asylum process is woefully trauma-uninformed and systemically disadvantages and re-traumatizes survivors of GBV who are ultimately able to apply for relief. In implementing policies that are by design punitive and cruel, the very gatekeepers of the asylum process—US Customs and Border Protection (CBP) officers[i]—routinely engage in abusive and even violent conduct in certain cases. We also find that the US asylum legal framework itself denies equal access to protection for survivors by failing to explicitly name gender as a ground of asylum.

We find that the harm that women, girls, and LGBTQI+ individuals suffer on account of their sex, gender identity and expression, and sexual orientation—while both waiting to access, and in the course of applying for, relief—is experienced as an inevitable and normalized consequence of seeking safety in the US. While the Biden administration has recently taken some steps to restore access to asylum at the US border, more must be done to ensure that the US fully abandons its punitive, deterrence-based approach to asylum. We conclude that by choosing this approach, the US is complicit in systemically harming and devaluing the lives of women, girls, and LGBTQI+ individuals desperately seeking access to safe haven through the asylum process as enshrined in US law. As such, the US is repudiating its legal obligations under both domestic US law and the United Nations 1951 Convention and 1967 Protocol Relating to the Status of Refugees. The US is also failing its moral obligations to respect the dignity of all migrants.

---

[i]   We use the term "CBP" because the vast majority of our interview respondents refer to US officials at the border as "CBP." These officials are most likely Border Patrol agents.

CLP_PC_021744

Rectifying these harms requires the US to reject a punitive deterrence-based paradigm in favor of one that honors the humanity of all. Such a transformation necessitates a significant normative shift in US politics and culture. To help realize this transformative vision, the US government should take the following immediate and significant steps:

1) Discontinue the use of deterrence policies designed to penalize and punish migration. Fully abandoning these policies will help mitigate the conditions that foster widespread GBV in Mexico at the US border and re-traumatization of asylum seekers at the hands of US officials.

In place of deterrence policies, we urge the US government to:

2) Invest in an asylum-seeker-centered model of service provision by establishing Welcome Centers where asylum seekers can access critical legal and humanitarian resources. Access to key trauma-informed resources and information in survivors' native languages promotes protection for survivors while helping to prevent re-traumatization and reduce instances of racial and gender-based harm by US officials.

3) Implement trauma-informed policies and practices within all components of US agencies that interface with migrants and asylum seekers, with a particular focus on US Border Patrol. Implementation must include rigorous trainings on such practices, collaboratively developed with outside experts including survivors, and robust accountability measures for lack of compliance.

4) Eradicate racial bias within all components of US agencies that interface with migrants, with a particular focus on US Border Patrol. Training on agencies' Equity Action Plans must be developed and presented collaboratively with outside experts and those most directly impacted by racial bias. Robust accountability measures for lack of compliance must be imposed.

5) Explicitly recognize gender as a key modality of persecution alongside those already named in the Refugee Convention. The US can do so by amending the Immigration and Nationality Act to name gender as a sixth ground of asylum and as a cognizable particular social group (PSG), and by revising the asylum application accordingly so that survivors are aware of their eligibility for relief.

6) Support alternative pathways for processing asylum seekers; for example, through the Refugee Protection Act's Central American Refugee Program. The program protects survivors of GBV through its designation of Refugees of Special Humanitarian Concern.

7) Align US immigration and asylum policies with US foreign policy goals that seek to reduce GBV and promote women's economic and social empowerment. US foreign policies must mitigate the risk of GBV and economic deprivation that women, girls, and LGBTQI+ migrants experience at the US southern border. The US government must also ensure that bilateral migration agreements include commitments to ensure safe and secure journeys.

# 1. INTRODUCTION

Every day, migrants and asylum seekers who have experienced violence, deprivation, and exploitation arrive at the US southern border. They are, however, often met with hostile US policies that violate their humanity as well as their legal rights. For decades, the primary objective of US immigration and asylum policy has been to deter migrants and asylum seekers from reaching US borders. Widely condemned policies such as family separation, expulsions of asylum seekers via Title 42 of the US Code (Title 42),[2] and forcing asylum seekers to return to Mexico to await their day in court under the Department of Homeland Security's (DHS) so-called "Migrant Protection Protocols" (MPP),[3] also referred to as Remain in Mexico (RMX),[4] are only the most recent and sweeping efforts designed to achieve this objective. Other examples include border walls; increased surveillance; minimal due process; detention of migrants and asylum seekers; prosecution of asylum seekers for unlawful entry; reduced access to benefits such as health care and labor rights; and bilateral agreements with countries of origin or third countries to limit the ability of asylum seekers to reach US borders.[i]

Yet extensive research shows that deterrence policies rarely discourage migration.[ii] Rather, they harm and endanger those whose circumstances at home are so dire that they risk their lives to flee at all costs. For some, these policies can make the journey in pursuit of safety more perilous than the initial threat that prompted them to flee.[iii] For example, a social services provider we interviewed for this report, Alicia,[5] shared the story of a former client, a young mother, who endured gender-based violence (GBV) both in her home country and during her journey to the US-Mexico border in search of safety. Rather than being welcomed with compassion, she encountered a closed border. Despite this, Alicia's client noted that she would endure the severe trauma of her journey all over again for the chance to secure a safe future for her son:

*"I saw an 18-year-old girl who...had experienced significant trauma...She was...sold to men in organized crime back in [her home country]. She made the journey [to the US-Mexico border] by herself with her two-year-old son...She was sexually assaulted several times during that journey... when you saw her, she was just like a shell of a person... And she ended up telling me, 'You know, I don't care. I would do it again...I mean, at least he would have a chance.' That really stuck with me because...they're fleeing violence and impossible situations, so we're the ones that need to do so much better."[6]*

Alicia's client's experience highlights in devasting detail the reality that deterrence policies do not stop migrants and asylum seekers from seeking refuge. It also illustrates the particular trauma and harm that survivors of GBV endure to seek asylum in the US.

---

2    Title 42 U.S.C. Section 265 of the 1944 Public Health and Service Act allows the US government to deny the entry of any individual who poses a danger of introducing communicable diseases into the US. It has been used since the beginning of the COVID-19 pandemic by the US government to exclude and expel migrants seeking asylum at US borders. See https://www.cdc.gov/quarantine/pdf/CDC-Order-Prohibiting-Introduction-of-Persons_Final_3-20-20_3-p.pdf.

3    Pursuant to Section 235(b)(2)(C) of the Immigration and Nationality Act, the US government has implemented the Migrant Protection Protocols (MPP) since 2019 in order to expel or return asylum seekers to Mexico for the duration of their immigration proceedings. The policy is referred to as the "Remain in Mexico" (RIM or RMX) policy by those seeking to highlight how the policy does not in fact offer "protection" to migrants.

4    In this report we refer to Migrant Protection Protocols (MPP) as Remain in Mexico (RMX). However, many of our interview respondents refer to it as "MPP."

5    All names of interviews respondents have been changed to maintain anonymity.

6    Interview 23, April 2022.

CLP_PC_021746



Scene inside the dormitories at the Agape Mission which currently serves as a migrant shelter. Tijuana, Baja California Norte, Mexico. Winter, 2022. Pease note that the data and analysis of this report do not include this shelter. *©James Rodriguez/Oxfam America.*

US expulsion and other deterrence-driven policies also, as this report demonstrates, actively create conditions that foster GBV at the US southern border and harm and marginalize survivors during the asylum process. Our research uncovers how expulsions under Title 42, "returns" under RMX,[7] and asylum "turnbacks,"[8] including those under the now-defunct metering program, have led to increased exposure to bodily harm and psychological trauma for migrants at the border, including those who have already experienced GBV at home. Second, we find that the US government is directly responsible for causing harm to survivors. The very gatekeepers of the asylum process—US Customs and Border Protection (CBP) officials—routinely engage in conduct that perpetuates institutional harm against asylum seekers. And, for those survivors who manage to overcome these obstacles and apply for asylum in the US, we find that the

asylum application process itself obstructs survivors' access to protection and can re-traumatize them as they seek legal status and safety.

In sum, this report concludes that asylum deterrence measures increase migrants' risk of exposure to GBV at the US-Mexico border, and the lack of a more trauma-informed asylum process harms and disadvantages survivors. The US has a legal and moral obligation to protect the rights and respect the dignity of migrants. Deterrence policies directly conflict with US international human rights obligations and domestic laws[9] by blocking, rather than facilitating, access to the asylum process. Accordingly, the US must reject a deterrence-based framework and replace it with a trauma-informed, equitable, accountable, and service-oriented one for the benefit of all.

---

7  Under RMX, Customs and Border Protection (CBP) officers systematically prohibit asylum seekers from remaining in the US while their asylum claims are pending, instead returning them to Mexico to wait; this is referred to as "return."

8  A "turnback" occurs when US officials block or reject asylum seekers from making an asylum claim at a port of entry along the U.S.-Mexico border. For example, under the metering program, which was rescinded in 2021, turnbacks occurred when US CBP officers, would not accept asylum claims at the port of entry, and instead placed asylum seekers on a waitlist, forcing them to wait in a queue in Mexico to be able to apply. The metering program is only one example of how turnbacks may occur.

9  For example, the 1951 United Nations Convention Relating to the Status of Refugees, the 1967 Protocol, and the US Refugee Act of 1980.

CLP_PC_021747

# 2. OVERALL METHODOLOGY AND STUDY PARAMETERS

Oxfam America and the Tahirih Justice Center jointly produced this report. Our research draws on 30 semi-structured interviews and 34 surveys of social and legal service providers working directly with survivors of GBV on both sides of the US southern border. Research subjects were compensated for their participation.[10] Both the interviews and surveys were anonymized and conducted in English and Spanish; all names of providers found within this report are pseudonyms. The data were collected between January 2022 and May 2022 and apply to conditions at the border and shifts in US policies between 2018 and 2022. A potential limitation of interview and survey data is that they cannot quantitatively capture the total number of migrants who experience the types of harm that the report documents. However, the data do give an indication of the overall prevalence of such harm.

Our methods were grounded in feminist research principles;[11] in particular, with regard to our decision to interview providers who serve survivors rather than survivors themselves. This method minimizes the risks of re-traumatizing survivors during the research process, particularly in light of our limited ability to adequately provide care for them in the event of re-traumatization. In two instances, interviewees, who were paid staff of their organizations, were also migrants themselves, but they did not disclose whether they were survivors of GBV. Consistent with feminist research methodologies, we shared our draft report with a small pool of interview participants and provided an opportunity for them to comment on it. The report is available in Spanish and has been shared with all interview and survey participants who indicated they wanted a copy.

## 2.1 DEFINITIONS

For the purposes of our research, we define GBV as a pernicious and pervasive systemic human rights abuse inflicted because of one's gender identity, gender expression, sexual orientation, and/or sex assigned at birth.[12] There are various forms of GBV, including domestic and intimate partner violence, rape, sexual harm, forced female genital mutilation/cutting, forced intersex genital surgeries, forced marriage, forced sterilization, forced pregnancy, human trafficking, and other forms of physical, sexual, psychological, economic, or sociocultural violence often inflicted as punishment for violating gender norms.[13] Although GBV impacts individuals of all gender identities and sexual orientations, the findings in the report reflect the experiences of women, girls, and lesbian, gay, bisexual, transgender, queer, and intersex (LGBTQI+) individuals, and not cisgender heterosexual men and boys. We define the US-Mexico border as encompassing cities, ports of entry, immigration detention centers, public spaces, shelters, and encampments located within 100 miles of the US-Mexico border in either country. Throughout the report we use the term "migrant" to mean any individual who is travelling from their home country seeking entry into the US. These individuals may or may not intend to claim asylum in the US. We use the term "asylum seekers" when referring to individuals who are specifically seeking to claim asylum (or are currently doing so) in the US.

---

10  Participants in the study were compensated with Amazon (Mexico and US) and Visa gift cards.

11  We drew from the following resource: Oxfam Canada, "Feminist Monitoring, Evaluation, Accountability and Learning" (2021), https://www.oxfam.ca/wp-content/uploads/2020/06/Oxfam-Canada-Feminist-MEAL-Guidance-Note-English.pdf.

12 We base this definition on the one provided by United Nations High Commissioner for Refugees (UNHCR). See UNHCR, "Gender-Based Violence," https://www.unhcr.org/en-us/gender-based-violence.html.

13  This is not an exhaustive list and is based on some of the more prevalent types of GBV that are included in asylum cases.

CLP_PC_021748

## 2.2. INTERVIEW METHODOLOGY

Interview participants included service providers from 17 distinct nonprofit, nongovernmental organizations, 7 of which are based in Mexico, 7 of which operate in both the US and in Mexico, and 3 of which are based exclusively in the US. The 30 providers we interviewed include those who operate shelters and provide psychosocial support, medical services, humanitarian relief, legal assistance, and other social services. The majority work on the Mexican side of the border. Five participating social service organizations indicated that they specifically serve Black migrants, and 6 organizations indicated that they specifically serve LGBTQI+ migrants. Providers work in 15 cities along the border, which encompass towns in the US states of California and Texas and the Mexican states of Baja California, Coahuila, Nuevo Leon, and Tamaulipas.

All interviews but one were conducted by a research consultant fluent in both English and Spanish; the remaining interview was conducted in English by one of the authors. Prior to the start of the interviews, all participants signed informed consent forms detailing their right to: 1) terminate the interview at any time; 2) refuse to answer any question; 3) understand how the data would be used; and 4) review any full quotes that would be used in the study. All research protocols were reviewed by Oxfam America's Safeguarding officer. All interviews were conducted virtually, recorded with participants' written consent, and then transcribed. Interviews were generally 45 minutes to one hour in length. The transcriptions of the interviews were coded by hand and analyzed.

## 2.3. SURVEY METHODOLOGY

We conducted 34 online surveys to augment the interview data and findings. The survey was only open to providers who work with clients who have experienced GBV. We drew upon the initial interview findings to develop the survey questions in order to fill gaps in our research. Namely, given that our interviews were heavily focused on providers in Mexico, most could not speak to the experiences of asylum applicants. As a result, the survey sample includes a larger number of providers who work in the US, and the survey yielded additional data relating to the asylum process itself. Further, the survey sought to gather data on the prevalence of GBV at the border and the prevalence of the dynamics identified in the interview data.[14] That is, survey respondents were asked to rank on a scale of 1–5 (not at all, sometimes, about half the time, frequently, or very frequently) how common it is for their own clients to experience various forms of gendered harm and violence. This includes evaluating the likelihood of harm at the hands of particular types of perpetrators and at certain sites of violence as well as institutional harm in relation to experiences with US immigration officers and the asylum process. Respondents were asked to select rankings based on their direct personal knowledge of trends in their clients' experiences. As noted above, the survey responses were anonymized, and the survey was distributed through email listservs of providers who assist asylum seekers. We had to pause data collection for a few hours due to spamming from respondents not working with migrants. Responses from that time period are excluded from our analysis to ensure that it is not inadvertently based on false data. In the aftermath of the spamming incident, a new link that was password protected was shared over provider listservs, and an additional eight responses were recorded.

---

14 The broad categories of questions included: 1) prevalence of GBV among clients; 2) the forms of GBV that clients most frequently experience, including types of perpetrators and sites of violence; 3) experiences of GBV after expulsion from the US; 4) experiences with CBP officers; and 5) clients' experiences with applying for asylum.

# 3. US ASYLUM DETERRENCE POLICIES

The US has long imagined itself as a nation that welcomes refugees and immigrants, and as a model human rights champion for the rest of the world to emulate. Yet the US simultaneously implements policies deliberately designed to keep even the most vulnerable individuals out.[15]

The US's asylum deterrence policies contrast sharply with its long-standing commitment to upholding the right to asylum for refugees. By ratifying the 1967 Protocol to the 1951 United Nations Convention Relating to the Status of Refugees (the Refugee Convention), the US acceded to all of the critical provisions of the Convention[16] and passed the Refugee Act of 1980 to implement its obligations under it. By adopting the Convention's refugee definition, the Refugee Act creates the possibility of obtaining legal immigration status and a pathway to citizenship for individuals who cannot return to their home countries due to past persecution or a well-founded fear of future persecution based on race, religion, nationality, political opinion, and membership in a particular social group (PSG).[iv]

However, in both policy and practice, the US falls far short of its domestic and international legal obligations. In addition to forbidding turning away refugees,[17] the Convention prohibits penalizing individuals who enter a country irregularly to seek asylum.[18] It also bars discrimination based on race, religion, or country of origin.[19] Yet, despite these obligations, the US disproportionately incarcerates non-white migrants and asylum seekers as a means of deterrence.[20]

Modern US asylum deterrence policies have evolved out of the racialized efforts of the US government in the 1970s and 1980s to block Black, brown, and Indigenous[21] asylum seekers from entering the US; specifically, Haitians,[v] El Salvadorans, and Guatemalans.[vi] Following substantial non-white migration in the 1980s and early 1990s, the US discriminatory approach to asylum hardened into a broader strategy of deterrence through punitive measures. The 1996 Illegal Immigration Reform and Immigration Responsibility Act pushed more asylum seekers into adversarial immigration courts and established a one-year filing deadline for asylum, with limited exceptions. In 1994, the US Border Patrol expressly adopted "prevention

---

15   Two recent examples being Title 42 and the Remain in Mexico policy.

16   The 1967 Protocol Relating to the Status of Refugees (also known as the Refugee Protocol) incorporated articles 2–34 of the Convention (M. A. Sweeney, S. Shebaya, and D. K Collopy, "Detention as Deterrent: Denying Justice to Immigrants and Asylum Seekers," *Georgetown Immigration Law Journal* 36 (2021): 292–323).

17   Article 33(1) of the Convention requires that "no Contracting State shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion."

18   Article 31 of the Convention provides that "the Contracting States shall not impose penalties, on account of their illegal entry or presence, on refugees who, coming directly from a territory where their life or freedom was threatened in the sense of article 1, enter or are present in their territory without authorization, provided they present themselves without delay to the authorities and show good cause for their illegal entry or presence

19   Congressional Research Service 2019, pg. 9; quoting US Department of Justice, Immigration and Naturalization Service Asylum Program, History of the United States INS Asylum Officer Corps and Sources of Authority for Asylum Adjudication, September 1999, which states that the Refugee Act intended "to establish a politically and geographically neutral adjudication for both asylum status and refugee status, a standard to be applied equally to all applicants regardless of country of origin."

20   For one example, see J. Loyd and A. Mountz, "The Caribbean Roots of U.S. Migration Policy," *NACLA Report on the Americas* 51:1 (2019): 78–84.

21   We use the term "Indigenous" to refer to individuals from Indigenous groups in Central and South America, who may not speak Spanish as their first language. However, we recognize that many migrants from Central and South America may not self-identify as Indigenous, but rather as part of specific ethnic groups that are marginalized in their country of origin.

CLP_PC_021750

through deterrence"[22] as a fundamental strategic objective, putting to paper a policy that had existed in practice for at least two decades. Further, in 2014, the Obama administration announced that it would increase detention of asylum-seeking families at the southern border, "to deter others from...illegally crossing into the United States."[vii]

The most recent examples of US asylum deterrence policies that are addressed in this report include Title 42 expulsions, implemented in March 2020; RMX, implemented in January 2019; and the metering program,[23] first implemented in 2016 and rescinded in 2021.[24, 25]

Fortunately, RMX was officially terminated in August 2022 pursuant to a court order.[26] Asylum seekers are no longer being enrolled in the program, and those who are already in it are gradually being disenrolled. Unfortunately, however, asylum seekers remain in danger because DHS requires them to wait until their next court appearance to disenroll, which could be weeks or months away.[27] In addition, ongoing litigation over RMX could force—or at least allow—DHS to begin re-enrolling people as soon as October 2022.

As for expulsions under Title 42, children are currently exempt, and families may not be expelled to a country where they fear persecution or torture. In practice, many families who do fear persecution are still being expelled though because DHS requires them to affirmatively volunteer such information when they first encounter a Border Patrol agent. Further, a May 20, 2022 court order requires the Administration to continue Title 42 expulsions unless it issues regulations ending the program following public comment. The administration has yet to begin that process. Expulsions under Title 42 therefore continue; as of July 2022, the total number of expulsions under this policy for fiscal year 2022 have already far exceeded all Title 42 expulsions for fiscal year 2021.

Title 42 expulsions, returns under RMX, and the prior implementation of metering all underscore how policies designed to deter asylum seeking are in effect used as a proxy for border control to limit overall immigration to the US.[viii, ix] As further evidence of the US's most recent efforts to limit immigration writ large, the refugee acceptance ceiling and actual refugee admissions were significantly slashed in fiscal year 2017. While the Biden administration set the ceiling for fiscal year 2022 at 125,000, which is much higher than in previous years, actual admissions continue to fall well below it. And, as noted above, the US has consistently used punitive measures across administrations to deter migration generally, such as minimal due process, incarceration of migrants, and location of detention centers in remote areas where access to counsel is scarce.

There have been racial disparities in the implementation of Title 42 expulsions: in early to mid-2022, a number of asylum seekers from Ukraine and Russia were granted entry into the US while the vast majority of Black, brown, and Indigenous asylum seekers were simultaneously denied entry.[x] Studies also document the disproportionate levels of violence that Black migrants face at the hands of US officials at the US border.[xi] By placing those most vulnerable to harm in Mexico, such as LGBTQI+ asylum seekers, the US's Title 42 expulsion policy leaves them at an even greater risk for violence.[xii] Moreover, recent studies have found that expulsions under Title 42 are associated with a significant number of kidnappings and violent attacks on migrants who have been expelled.[xiii] These reports uncover that the violence migrants face after expulsion includes sexual assault and attacks due to gender identity and/or expression. This report builds on these previous findings to examine how US policies impact GBV at the US-Mexico border and the ways in which US asylum deterrence policies impact those who have previously survived GBV.

---

22  See https://www.hsdl.org/?abstract&did=721845.

23  Metering was a process by which CBP officers stationed at the US-Mexico border placed a daily limit on the processing of asylum seekers by citing a supposed lack of capacity and thereby forced asylum seekers to stay in Mexico for months before beginning the asylum process. CBP began using metering in 2016, and it was expanded border-wide in the summer of 2018. CBP largely suspended the use of metering in 2020 and fully rescinded the policy in 2021. See https://crsreports.congress.gov/product/pdf/LSB/LSB10295.

24  Please see https://refugees.org/wp-content/uploads/2022/03/MPP-TimelineFinal.pdf for a detailed timeline.

25  Other changes in the second iteration of RMX include the requirements that 1) the US provide transportation for program enrollees from ports of entry to shelters; and that 2) a spot in a shelter for migrants is guaranteed.

26  https://time.com/6192726/supreme-court-remain-in-mexico/.

27  https://time.com/6208555/remain-in-mexico-mpp-program-unwind/.

CLP_PC_021751

# 4. FINDINGS

## 4.1. HIGH RISK OF EXPOSURE TO GBV AT THE US–MEXICO BORDER

US expulsions, returns, and turnbacks of asylum seekers have exponentially increased the volume of individuals regularly concentrated at the border at any given time. Ninety-two percent of survey respondents have clients who have been expelled under Title 42, while 86 percent have clients who were turned away from the border without being able to make an asylum claim.[28] One estimate suggests that in February 2020, approximately 15,000 people were waiting at the border to begin asylum processes, with some of these individuals already having waited multiple years.[xiv] A recent estimate from April 2022 indicated that between 30,000 to 60,000 migrants were waiting at the US-Mexico border.[xv]

Our data indicate that rates of GBV in border cities in Mexico—where most of our interview respondents work—are very high: respondents estimate that anywhere between 30 percent and 90 percent of their clients experience GBV there. And 75 percent of survey respondents indicate that their clients have faced kidnapping and/or extortion at the border either frequently or about half the time; 68 percent indicate that their clients have been raped and/or sexually assaulted frequently at the border.

While various factors can impact the risk of GBV in any setting, 87 percent of interview respondents (26 out of 30) note that by forcing vulnerable individuals to wait at the border indefinitely, US deterrence policies foster conditions that significantly increase the risk of exposure to GBV. They do so in three specific ways:

1) Border closures[29] and expulsions increasingly force migrants into precarious housing conditions such as severely overcrowded shelters; informal, ad hoc camp settlements; and homelessness. These conditions make migrants more vulnerable to various forms of GBV.

2) Cartels and other organized criminal networks can more easily target migrants for GBV when they wait for prolonged periods of time at the border, are routinely expelled from the US, lack employment opportunities, and also lack secure housing.

3) Waiting at the border in Mexico, rather than being able to access the asylum process within the US, increases the likelihood that persecutors from home whom asylum seekers are fleeing will find and harm them with impunity.

### 4.1.1. OVERCROWDING AND INSECURE LIVING CONDITIONS

As noted above, US policies have closed the border to the majority of asylum seekers for the past three years. As a result, they have had to wait en masse for permission to enter and/or apply for relief for extended periods without access to safe, sustainable housing. According to our survey participants, migrants frequently experience overcrowding in shelters and informal camps, or homelessness after enrollment in RMX or after expulsion from the US under Title 42. Many providers directly tie the existence of the camps and overcrowding at shelters to US policies:

---

28  As a reminder, any time an asylum seeker is denied or blocked from making an asylum claim, it is referred to as a turnback

29  In this section, and throughout the rest of the of the report, we use the term "border closure" to encompass policies that "return" and "turn back" migrants and asylum seekers attempting to enter the US.

CLP_PC_021752

*"[T]hese camps...shouldn't exist; people should be able to go to the port of entry and say, "I would like to apply for asylum," and the person should be allowed to enter the US and be put into immigration proceedings. That's how it's supposed to work. But because of these policies, like metering[30] and Title 42 and MPP,[31] instead people are forced to wait indefinitely in extraordinarily dangerous conditions in order to even have the most basic access to the US asylum system; [they] are forced to be homeless or to live in migrant shelters that are crowded."[32]*

Another respondent further argues that "if the immigration system worked the way it should work, there wouldn't even be shelters."[33]

Approximately 60 percent of interview respondents have clients who have experienced GBV within shelters themselves. Survey respondents, on average, note that their clients have faced GBV at camps, shelters, or public spaces due to homelessness about half the time. Women, girls, and LGBTQI+ individuals, our interviews highlight, are the most vulnerable to GBV in shelters and camps at the hands of other migrants staying there, persecutors from home, and/or members of organized criminal networks. As one respondent reflects:

*"In the case of women, and especially in the case of adolescents and girls, they experience sexual violence by people who are staying in the same shelter or in the same space in the same camp."[34]*

Because shelters are often overcrowded and under-resourced, staff are ill-equipped to ensure that they are safe spaces or to follow up on allegations of abuse. The crowded nature of the shelters, many respondents note, makes it easier for perpetrators of GBV to inflict violence unnoticed:

*"Sometimes there are people in the shelters that are abusers themselves. We've had many reports of children who have been sexually abused in migrant shelters because of the amount of people that are staying there. It can be hard for the people running the shelters to control that sort of thing, and then people are afraid to report it."[35]*

Furthermore, some respondents note that the rapid proliferation of shelters due to the increasing number of migrants waiting at the border has increased concerns about the lack of resources for the oversight of the individuals or organizations that are running them:

## Approximately 60 percent of interview respondents have clients who have experienced GBV within shelters.

*"[Shelters] have been overwhelmed in their capacity...[There is a] lack of training for those in charge of the shelters. Some of these [shelters] are born out of people's good will, but there is no preparation, no capacity, no security... which represents a risk in the face of the possible entry of organized crime into these spaces."[36]*

Migrants who cannot find accommodation in shelters may resort to living in informal camp settlements. Close to 30 percent of interview respondents share stories of clients living in camps who experienced GBV. Encampments pose distinct risks for GBV from those posed by shelters, given the additional lack of privacy and increased exposure to the environment and potential new or repeat abusers:

*"All the conditions are in place for gender-based violence to occur in these spaces...Women have to protect themselves from practically everything when they are in a camp...At least in shelters, there is a door that distinguishes one [space] from another one that [may] serve as a safeguard. But in a camp, they are outside; they are susceptible to anyone [entering to] violate them."[37]*

Cartels are also a significant threat for migrants in camps; respondents highlight that cartels often survey camps in order to target migrants:

*"And really, there are very few options for people at their tent camp. It's just...a place that was really dangerous, surveilled by cartels, where people had been kidnapped."[38]*

Additionally, some respondents note that some camps are effectively controlled by cartels, increasing the risk of GBV. Vulnerability to GBV is just as pronounced for those who live in abandoned or derelict buildings or on the streets. Survey respondents, on average, note that clients who have been sexually assaulted have been frequently assaulted in public spaces due to homelessness.

30  Although CBP formally rescinded the metering program in 2021, research participants were asked to reflect on the impacts of US immigration and asylum policies over the past five years, which encompassed a range of policies, including metering.
31  As a reminder, MPP refers to Remain in Mexico.
32  Interview 7, February 2022.
33  Interview 6, February 2022. Please note that the original language of the quote is Spanish.
34  Interview 20, March 2022.Please note that the original language of the quote is Spanish.
35  Interview 7, February 2022.
36  Interview 5, March 2022. Please note that the original language of the quote is Spanish.
37  Interview 12, February 2022. Please note that the original language of the quote is Spanish.
38  Interview 7, February 2022.

In these ways, overcrowding at the border exacerbates the risk of experiencing GBV. Although these conditions—namely, insecure housing and the violence it drives—exist in Mexico, US policies play a significant role in fueling them. In fact, migrants experiencing GBV as a result of unsafe housing conditions have had little recourse but to continue to wait in such conditions to gain access to asylum. For example, a provider shares how her client had sought an exemption to expulsion[39] under Title 42 because she had been raped in a shelter by the shelter's owners, only to be denied.[40] A number of providers note that most of their clients who experience sexual assault, rape, and/or harassment rarely report these experiences of violence, citing the apathy of officials in Mexico as the reason. Such experiences have normalized the idea that GBV is inevitable if one hopes to seek asylum. As our data show above, the expectation of experiencing GBV is intimately tied to US policies that expel and close the border to asylum seekers.

## 4.1.2 INCREASED EXPOSURE TO CARTELS

The violence that migrants experience at the hands of cartels has been well documented in previous studies.[xvi] Research conducted between 2018 and 2021 documents the high number of kidnappings of asylum seekers who were expelled under Title 42 or subjected to RMX.[xvii, xviii] Over 40 percent of our interview respondents likewise recount stories of clients targeted by cartels for GBV. In particular, survey respondents on average indicate that members of cartels and/or organized criminal networks are frequently the perpetrators of GBV upon their clients—specifically, sexual assault. To paraphrase an interview participant, the US government hands the cartels their victims because migrants at the border have no other way and are desperate.[41] We detail below how US expulsion and border closure policies make migrants sitting targets for violence by cartels and particularly GBV (kidnapping, trafficking, extortion, and sexual assault).

First, such policies create a large, at-risk population whose location, actions, and vulnerabilities are predictable. Survey respondents on average note that their clients have experienced kidnapping and/or sexual assault within 72 hours after being enrolled in RMX about half the time. Interview respondents note that cartels surveil ports of entry and other locations where migrants are known to be expelled or turned back in order to target them for violence. For example, one respondent, Ana, describes how cartels may easily target migrants returned under RMX:[42]

*"People [subject to the] MPP would be taken to court, and then they'd be released back into Mexico after their court date in the same place at the same time every day. And the cartels have observers all over the place, and so they started catching on to this pattern, and they would just kidnap people upon release out of US custody because those were folks that they thought were most likely to have someone in the US that they can extort for dollars."*[43]

A provision under the Biden administration's second RMX program required that the US transport enrolled individuals from ports of entry to shelters in Mexico and confirm that a shelter will accept them. While this may have helped thwart cartel surveillance of migrants' movements, many of our interview respondents note that their clients continued to be at high risk of violence by cartels because RMX processing was so lengthy. In fact, the provider above, Ana, notes that even under the second, revamped RMX program, many clients who were returned to Mexico or denied entry into the US remained "easy targets for cartels," particularly for sexual assault. For example, as described in the previous section, cartels often surveil informal encampments, increasing risks specifically for women and girls; further, our research indicates that shelters are sites of GBV. Another respondent describes how in 2022, RMX enrollees had to incur enormous costs to travel to the US for their asylum proceedings because renting a car kept them safer from the cartels than taking the bus.

Expulsions under Title 42 are also associated with repeated crossings: prior to Title 42 expulsions in March 2020, only about 7 percent of migrants crossed the border multiple times, which increased to around 27 percent in 2021.[xix] Repeated crossings increase migrants' exposure to violence by cartels and in turn increase the risk of expulsion itself. Asylum seekers in desperate need of safe haven are more likely to attempt to re-cross using more dangerous routes than during previously unsuccessful attempts to cross at ports of entry. Expulsions can be particularly risky for women,[xx] especially when carried out in the middle of the night as one respondent, Tina,[45] notes:

*"CBP will expel women at 3 a.m. in one of the most dangerous cities in the world. So, they are completely unprotected. They don't know where they are, and our [US] government just dumps them in the middle of the night...The process of expulsion is really traumatic."*[46]

---

39  Under Title 42, asylum seekers can be granted permission to enter with consideration given to "significant law enforcement,  officer and public safety, humanitarian, and public health interests."

40  Interview 22, April 2022.

41  Interview 4, January 2022.

42  It is likely that Ana is referring here to the implementation of RMX under the Trump administration. However, we were unable to confirm this definitively.

43  Interview 13, February 2022.

44  We use the term "women" to denote all who identify as women.

45  All names have been changed.

46  Interview 22, April 2022.

CLP_PC_021754

## 58 percent of survey respondents note that their clients have frequently or very frequently faced violence because of their sexual orientation or non-cisgender identity while at the border.

Second, many migrants are unable to support themselves at the border because of limited economic opportunities. Migrants awaiting entry into the US often have to live in remote parts of border towns and cities, far from downtown areas where employment opportunities are more plentiful. Extended wait times because of exclusion from the asylum process increase asylum seekers' economic vulnerability as well as their desperation in needing to generate income. As another respondent explains, this often means that women who are in the process of searching for work, or who do have employment but who have to travel for work, face an even greater risk of violence from the cartels, such as sex trafficking:

*"In general, women who are trying to either find work or [who are]...commuting to and from their jobs, [are] exposed...to the risk of being followed. It is already known that in border cities, or at least in Ciudad Juarez, people know how to identify migrants and go after them for extortion, often to kidnap them in order to get what little money they have. They are...very clear targets for certain criminal groups in Mexico, many of which are dedicated exclusively to extorting migrants. And well, women are a more vulnerable target...And if we add to that the issue of sexual violence? I think this is a very big challenge for women: how to survive during the time it takes for the resolution of their [asylum] processes."[47]*

As the respondent states, prolonged wait times to apply for asylum at the border yield a dire economic reality, increasing the risk that women will be targeted by cartels. In addition, the longer they wait, the more isolated they are from any type of stable community, which makes women and LGBTQI+ individuals in particular even more vulnerable to violent crime. Tina, who spoke above about the dangers that expulsions pose, continues, by explaining:

*"[The] MPP is traumatic...It forces women to be unemployed... and vulnerable to organized crime and to just sort of be victims of random crime as well, because they're clearly migrants."*

Moreover, as another respondent notes, the extreme poverty that migrants face while waiting and trying to apply for asylum at the border is violence in and of itself:

*"I have hundreds of messages from women, from single mothers asking me for support for milk, for diapers...So that is violence, that is violence against the person."[48]*

As such, expulsion itself, and the insecure economic and housing conditions that expulsions and border closures engender, not only produce harm in and of themselves, but as discussed above, also increase the risk of migrants being targeted by cartels. News reports indicate that some cartels' primary criminal activities specifically involve extorting migrants.[xx] Our data, in particular, indicate that members of cartels are frequently the preparators of GBV, namely, sexual assault. Although cartel violence is widespread in certain border regions in Mexico, our data indicate that cartel violence against migrants does not occur in a vacuum; it is tied to the border conditions driven by US immigration and asylum deterrence policies.

---

47   Interview 12, February 2022. Please note that the original language of the quote is Spanish.
48   Interview 1, February 2022. Please note that the original language of the quote is Spanish.

CLP_PC_021755

---

**"it's almost like the border is used [as a] conduit for abusers."**

### 4.1.3 INCREASED EXPOSURE TO VIOLENCE FROM PERSECUTORS FROM HOME

Approximately 20 percent of interview respondents and 25 percent of survey respondents indicate that increased wait times at the border mean that women are frequently found and harmed by the persecutors from whom they initially fled in search of safety. As one respondent characterizes the border, "it's almost like the border is used [as a] conduit for abusers."[49] Interviews highlight that one of the consequences of border closure and the virtual elimination of asylum access is that a number of abusers are able to locate and re-traumatize survivors:

*"Well, the biggest barrier right now is Title 42, that people are not able to access the asylum system at all. This directly puts people's lives in danger. There are people whose… abusers have found them at the border, have continued to attack them physically [and] continue[d] to threaten them."[50]*

Several respondents have clients whose abusers found them in shelters or camp settlements as they waited to seek asylum in the US. As noted above and by other respondents, the existing network of shelters dedicated to survivors is under enormous strain and cannot adequately protect clients from abusers. Furthermore, interviews highlight that some women attempt to move from border city to border city to escape abusers, which makes them even more susceptible to violence as they travel. Relatedly, we find that GBV at the hands of partners or family members is common for migrants at the border: our survey respondents, on average, indicate that their clients have experienced GBV in the form of domestic, intimate partner, or other intrafamilial violence frequently. For these survivors, prolonged wait times at the border only further increase the risk of repeated violence by abusers that they have had to travel with.

### 4.1.4 COMPOUNDED RISKS FOR LGBTQI+ MIGRANTS

The risks of experiencing GBV, specifically due to insecure housing and exposure to violence at the hands of cartels at the border, are compounded for LGBTQI+ migrants.[51] LGBTQI+ migrants experience GBV at high rates at the border: 58

percent of survey respondents note that their clients have frequently or very frequently faced violence because of their sexual orientation or non-cisgender identity while at the border. One survey respondent notes that 100 percent of their LGBTQI+ clients have faced sexual violence. All of the providers we interviewed who work with LGBTQI+ migrants note that homophobia and transphobia are prevalent at the border. This environment, coupled with the protracted and uncertain nature of displacement at the border due to US immigration policies, increases the risk of violence for LBGTQI+ migrants.

The discrimination that LGBTQI+ migrants face also increases the difficulty of securing safe housing. Moreover, many interviews highlight the targeting of LGBTQI+ individuals within shelters:

*"We've seen a lot of attacks happening in shelters, especially where, you know, we've seen the attackers making comments like, "I'll teach you how to be a real woman" when they know that the person identifies as lesbian or queer. We've seen many, many trans women get beat up because of their gender identity, and it's extremely dangerous for them to be at the border."[52]*

Our interviews also highlight that transgender clients in particular are at risk for GBV at the border; approximately 65 percent of all interview respondents spoke of the risk of violence that their transgender clients face as they wait to make asylum claims. Interview respondents cite countless examples of transgender clients who are physically assaulted because of their gender identity and state that many are solicited for sex work. Interviews also highlight that LGBTQI+ migrants face many barriers to finding employment, which increases their vulnerability to GBV. Moreover, the interview data indicate that LGBTQI+ migrants face significant harassment by police in border towns in Mexico, further exacerbating their risk of experiencing violence. These factors—housing discrimination, risk of violence in camps and shelters, lack of employment opportunities, and harassment by the police owing to their gender identities and sexual orientations—compound the risks of violence as LGBTQI+ migrants wait to apply for asylum.

In addition, transgender migrants experience GBV as they interact with the US asylum and immigration systems. For example, respondents note that transgender migrants become targets for violence when held in US immigration detention centers together with populations that do not match their gender identities. One respondent further describes how transgender migrants are often placed in isolation because of their gender identity, which negatively affects their mental health:

---

49  Interview 10, March 2022.
50  Interview 7, February 2022.
51  Our data from interviews generally reflect on the experiences of gay, lesbian, queer, and transgender individuals; interviewees did not raise the experiences of non-binary or intersex clients.
52  Interview 7, February 2022.

CLP_PC_021756

*"Detention centers don't have any specific area for trans folks, and they're not very willing to house trans folks with men or with women. And so, they'll just put them in solitary, and they'll be in solitary for the whole time that they're in detention—[for] months at a time—not to mention [lack of] access to hormones [and other] medication."[53]*

As such, LGBTQI+ migrants not only experience significant risk of GBV while they wait at the border, but also once they have entered the US immigration system, as has been documented in other reports.

## 4.1.5 COMPOUNDED RISKS OF GBV FOR BLACK MIGRANTS

Similarly, anti-Blackness at the border can magnify the risks of GBV for Black migrants, particularly for women, girls, and non-cisgender individuals (in particular those from Haiti and West Africa) as they wait in Mexico for the opportunity to apply for asylum in the US. Providers who work with Black clients (approximately 30 percent of our interview respondents) note that Black women and girls are often heavily sexualized and suffer high rates of harassment as they are frequently solicited for sex work. One respondent recounted how the first words her client, a young Black woman, learned in Spanish were "How much?" because of how often men propositioned her for sex work.[54] This young woman's experience reflects the long history, rooted in colonialism, of the hypersexualization of Black women across a variety of different countries.[xiii]

Many respondents also note that non-Spanish- and non-English-speaking Black migrants face significant barriers to accessing employment and services, from housing to food to translation. Interview respondents note that the isolation posed by language and cultural barriers can cause harm, particularly for Black women travelling with their persecutors, because they have such limited access to the support they need in order to escape. One provider recalls how a former client from Haiti who was travelling with her abuser was unable to leave him due primarily to language and cultural barriers:

*"I had one very memorable case of a woman who was in an abusive relationship she was trying to flee from. Because she was stuck in Tijuana and not able to cross, [her abuser] had confiscated her passport and all of her documents. It was very clear that he was able to kind of control her in a way that was unique to her vulnerability, that was a product of the geographic situation of her being stuck in Tijuana and reliant on a limited Haitian-[Creole]-speaking community there."[55]*

The risks of GBV for many Black migrants are also compounded because of discrimination in housing and targeting by cartels, similar to the experience of LGBTQI+ migrants. Our data find that Black migrants face significant difficulty securing housing free of harassment and discrimination. Black clients, many providers note, are also easier targets for cartels due to their racial identity and/or skin color. A provider gave the example of one of his clients, a Garifuna woman, who, after being kidnapped and raped by cartel members, lives in added fear because she knows that her skin color makes her status as a migrant more conspicuous. As a result of her experiences at the border as a Black woman, she felt that she had no choice but to have her daughter try to cross into the US without her while she continues to wait for a chance to apply for asylum.

Interviews also highlight that the safety risks for Black migrants posed by insecure housing and cartels are compounded by discrimination at the hands of the Mexican police. Lana, a service provider, shares the particularly harrowing experience of one her clients that underscores the intersectional vulnerability of being Black and bisexual at the border:

*"He was walking on the street in Tijuana one day and some men drove up in a car and asked him, 'Are you looking for work? Are you Haitian?' And he said, 'Yes.' They took him in the car, put a gun to his head, and kidnapped him, taking him to a compound where there were about 10 people in the building. They told him, 'You are going to become a prostitute. This is your job.' They forced him to have sex with all 10 of the people in the house. He was kidnapped and kept in this house for months, where he was forced to have sex with both men and women. He is bisexual, which made him a lot more vulnerable. He was finally able to escape. But he didn't file a police report because he was told that if he filed a police report, the same cartel that kidnapped him would find him because the police worked with the cartel…He had absolutely no access to justice. And now he is just living every single day in fear. He told us that when he is walking down the street in Tijuana and a car slows down, he just sprints because he is afraid of getting kidnapped again."[56]*

---

**"We've seen many, many trans women get beat up because of their gender identity, and it's extremely dangerous for them to be at the border."**

---

53   Interview 13, February 2022

54   Interview 11, February 2022.

55   Interview 28, March 2022.

56   Interview 24, February 2022.

CLP_PC_021757

It is important to understand the violence perpetrated upon Lana's client as the intersection of anti-Blackness and the inhumane conditions at the border exacerbated by US policies. As this report argues, the prevalence of cartels targeting migrants must be understood as a byproduct of US policies that have created a large population of vulnerable migrants, such as the client above, for the cartels to target.

Further, respondents note that Black migrants have an even harder time accessing asylum and are often treated differently than other migrants by US immigration officials. Previous studies also document the violence that Black migrants face at the hands of US immigration officials both at the border[xxiii]—a recent example being the treatment of Haitian migrants in Del Rio, Texas in 2021[xxiv]—and within the immigration system at large.[xxv] In one example, a respondent notes that immigration officials routinely ask for additional identification and documentation from Black migrants as compared to non-Black migrants:

*"I would take people to the border to present to the volunteer who would be registering people to be, you know, part of the waitlist [for metering]...They would routinely, for Black migrants, ask for two forms of identification, whereas with, you know, migrants who are from Central America and not Black...they would just ask for one form of identification."[57]*

By disproportionately expelling or returning Black migrants to Mexico, US policies place them at further risk of GBV at the border—a risk that is then compounded by the significant anti-Black discrimination that they face there.

## 4.2. THE US ASYLUM PROCESS IS COMPLICIT IN MARGINALIZING AND HARMING SURVIVORS OF GBV

Just as US border policies create conditions that increase the risk of GBV for migrants at the US-Mexico border, our research finds that the actual US asylum process is hostile rather than compassionate towards those survivors of GBV who are ultimately able to surmount the obstacles to accessing it. The harm that GBV survivors experience within the US asylum system is indicative of broader harm that US asylum processes engender; providers we spoke to characterize the US asylum system as devoid of "empathy" and as a producer of institutional harm.

In particular, many respondents note that US immigration institutions are not responsive to the specific concerns of women and LGBTQI+ migrants, producing institutional gender-based harm. As another provider sums it up, the US system should be one where "women are heard, [and] where children are listened to and cared for"[58] as a step toward making it more humane. A painful example, shared by a provider recalling a client who had been detained by CBP[59] at the border, highlights the ways in which US officials ignore women's needs. This client, a young woman, was forced by CBP to spend over 72 hours in a cell without access to sanitary items she needed for menstruation while being harassed by a CBP officer:

*"She was held in a holding cell that you're not supposed to be in for more than 72 hours, like right at the border, but she was there for...maybe five days...She was held for significantly longer than she was supposed to be and was only allowed to be in her underwear. She was on her period and was given no menstrual sanitary items—pads, tampons or anything...[She was] forced to sit there cold in her underwear with this one officer that she said she felt like had it out for her...[he would] say really mean things to her and not let her sleep and make her get her little kid up who's only five."[60]*

The harrowing experience of this client is indicative of a system that regularly violates the dignity and safety of asylum seekers, often marginalizing women as well as LGBTQI+ migrants. These violations, as our research demonstrates, produce institutional harm for survivors of GBV seeking asylum in the US. As further described below, survivors frequently face an adversarial system through the intimidation, harassment, and in some cases violent conduct of US immigration officials, as well as through the mechanics of an asylum application process that is woefully and glaringly trauma uninformed.

"[Survivors are] telling their stories of... rape and sexual assault, and the [Border Patrol] officers are just grilling them about minor inconsistencies..."

---

57   Interview 28, March 2022.
58   Interview 1, February 2022. Please note that the original language of the quote is Spanish.
59   See footnote 1.
60   Interview 13, February 2022.

CLP_PC_021758

## 4.2.1. THE ROLE OF US CBP OFFICERS IN DISMISSING, DETERRING, AND HARMING SURVIVORS

A well-established fact about the US asylum system is the arbitrary nature of whether one is granted relief.[xxvi] Our interviews and a number of other studies[xxvii] describe how success often depends on one's port of entry and the jurisdiction where one's asylum case is heard. CBP officers, as gatekeepers to the US asylum process, also hold tremendous discretion in deciding the fate of asylum seekers. Our interview data show how this is particularly problematic and pronounced for survivors of GBV. While survivors at the border must first inform CBP officials that they wish to apply for asylum in order to do so, engaging with CBP can itself re-traumatize them and set them up for failure. Providers also note that CBP officers often decide whether to grant or deny humanitarian parole[61] requests with little explanation or pattern:

*"We really don't understand why CBP approves some people for humanitarian parole and denies others. We have so many clients who are living in such vulnerable conditions and are really living in life-or-death situations, and CBP has rejected their humanitarian parole applications. One of the first cases that I personally worked on was a Haitian man who was HIV-positive with very severe mental health issues. He was experiencing suicidal ideation while living in the Chaparral refugee camp, and his humanitarian parole case was denied."[62]*

Moreover, consistent with the goal of deterrence itself, the behavior of CBP officers toward asylum seekers is often demeaning; a number of respondents recount instances where they ignored or belittled survivors:

*"Yeah, I mean, we've had people who are victims of gender-based violence in Mexico, go to the port of entry and ask immigration officials if they could apply for asylum...[In some cases] immigration officials responded by laughing at the person. I've seen this personally in multiple cases."[63]*

Such behavior by CBP officers not only leaves survivors feeling degraded, but contrary to the dictates of the Refugee Convention, it can also discourage survivors from asking for asylum at all, even upon arriving at the border:

*"She wanted to tell the officer, 'I want to seek asylum. I'm afraid to return to my country.' But the officer made it impossible for her to say that; he did not allow her [to speak], shut her down every single moment and said, 'I am talking, you need to listen to me.'"[64]*

Such behavior also underscores how asylum seekers interact with officers who are not trained to engage with them as survivors of trauma. Alarmingly, there is copious evidence that DHS enforcement agents, including CBP officers, are perpetrators of gender-based violence themselves, including allegations of domestic abuse and sexual harassment of colleagues.[xxviii] Reports also suggest a widespread lack of accountability for abuse perpetuated by CBP officers, including significant bodily harm inflicted upon migrants.[xxix] Relatedly, the use of CBP officers to regulate the entry of asylum seekers poses additional challenges for survivors who have been abused by military, police, or paramilitary forces. For example, one interview respondent describes how a client from Cameroon who had been assaulted by military police could not bring herself to interact with border patrol as a result.

These and countless other examples from previous reports[xxx] illustrate how US policies driven by deterrence both reflect and influence the conduct of CBP officials. In DHS's 2020–2024 fiscal year plans, one of the only references to asylum is a note that the US immigration system remains "vulnerable to fraudulent claims for asylum and refugee status."[xxxi] This focus on deterrence and fraud prevention comes at the cost of protecting vulnerable asylum seekers and affording them basic due process.[65]

*"They [CBP] make it abundantly clear that their job is keeping people out and not to actually do anything to monitor the safety or the well-being of people that are in the border region."[66]*

While the adversarial approach taken by CBP does not deter migration, this approach violates the Refugee Convention by reducing the chances that survivors who have already risked their lives to flee will even begin the asylum application process: 65 percent of survey respondents indicate that their clients have been expelled or turned back frequently or very frequently from the US because CBP officials have not followed required procedures, e.g., allowing asylum seekers to apply for asylum if they indicate a desire to do so. Survey respondents, on average, also indicate that about half the time their clients have not applied for asylum because of intimidation or discouragement by US immigration officials at the border. Providers note that CBP officers are generally unaware of asylum law and proceedings:

*"CBP specifically doesn't really understand asylum law, and so they often don't understand how to place people in proper proceedings. I think that that's also a failure of our system of not having any oversight of CBP...There needs to be a lot more oversight of CBP and training."[67]*

---

61  Humanitarian parole allows an individual to remain in the US temporarily for urgent humanitarian reasons, or to confer a significant public benefit. See https://www.uscis.gov/forms/explore-my-options/humanitarian-parole.

62  Interview 24, February 2022.

63  Interview 7, February 2022

64  Interview 25, February 2022.

65  Recent news reports suggest that border patrol officers may be discarding documents, including passports and birth certificates of migrants that they interact with, which could negatively impact any potential asylum claims. See M. del Bosque, "," *The Guardian*, May 8, 2022.

66  Interview 29, February 2022.

67  Interview 30, April 2022.

CLP_PC_021759

The lack of trauma-informed training and accountability for the very gatekeepers to the asylum system serves in effect as yet another form of deterrence for survivors—this time, at the back end of their flight from persecution.[68]

## 4.2.2. TRAUMA, GBV, AND THE ASYLUM APPLICATION PROCESS

The United Nations High Commissioner for Refugees (UNHCR), in its "Handbook on the Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees," calls upon states to implement asylum procedures that consider the trauma, fear, and dispossession that many refugees face. It asks states to provide translators and other services and to ensure that refugees interact with state officials who understand human rights commitments. The UNHCR's handbook also acknowledges that asylum seekers may not have access to documentary proof for their claims, and as such it should be the responsibility of the government agent to either try to gather the necessary proof or to ascertain by other means the validity of asylum seekers' claims. In short, asylum seekers are to be given the benefit of the doubt.[69]

The US asylum system, by contrast, takes an inappropriately adversarial approach to asylum seekers. This is particularly evident in how the impacts of trauma are given little-to-no consideration when CBP officials encounter survivors or other officials are required to evaluate their credibility. Over 60 percent of interview respondents observed manifestations of post-traumatic stress disorder in the demeanor and/or conduct of their clients who are GBV survivors. Interview respondents note that as a result of trauma, survivors may need to participate in multiple interviews, and need sufficient time, before they are able to share their stories:

*"Because of the trauma and the shame that is associated with gender-based violence, [clients] are reluctant to admit what's happened to them…A client…who had been raped in Honduras where she was from was so afraid that she didn't*

*want to tell anyone, including the Border Patrol officers that interviewed her…it took many, many hours' worth of interviewing before she felt comfortable enough to talk to us about it as well."[70]*

Due to both acute and/or prolonged trauma, a survivor of GBV may be unable to articulate their need for asylum on the spot in a way that is acceptable to CBP.[71] Their statements may then be taken out of context and unfairly used to discredit them if they try to ask for asylum again in the future.

Our interviews highlight how critical it is for survivors of trauma to receive specialized mental health services to help them process and ultimately articulate what has happened to them, as required in order to fill out the asylum application and orally present their cases in interviews with US asylum officers and during adversarial court proceedings. Many also struggle to build a legal narrative that the US asylum system deems credible because of how trauma impacts memory and compromises one's ability to recall and recount details in a linear, chronological manner.[72] Approximately 60 percent of our interview respondents note that their clients who are survivors of GBV have difficulty gathering evidence and creating coherent timelines to fit inappropriately narrow credibility standards. Interviews highlight that when hearing testimony from survivors, asylum officials may seize upon small discrepancies in details or timelines that, in light of trauma, may have no actual bearing on credibility. As one provider who works with minors explains:

*"The level of trauma [for survivors] is very high because they're telling their stories of gender-based violence, often rape and sexual assault, and the officers are just grilling them about minor inconsistencies…But we see that over and over again with both immigration judges [and] asylum officers who act like our clients are lying or kind of start from a place where they doubt their credibility."[73]*

---

68   See *Zubeda v. Ashcroft*, 333 F.3d 463, 476 (3d. Cir. 2003) (vacating a Board of Immigration Appeals decision based in part on inconsistencies between the asylum testimony and the credible fear interview): "Numerous factors that might make it difficult for an [individual] to articulate his/her circumstances with the degree of consistency one might expect from someone who is neither burdened with the language difficulties, nor haunted by the traumatic memories, that may hamper communication between a government agent in an asylum interview and an asylum seeker."

69   See https://www.unhcr.org/4d93528a9.pdf, in particular Sections 195–205.

70   Interview 7, February 2022.

71   Simply recounting sexual abuse can be traumatic, because in doing so, the victim must "relive the crime mentally and emotionally, leading some to feel as though the sexual assault is recurring." See M. Garvin et al., "Allowing Adult Sexual Assault Victims to Testify at Trial via Live Video Technology" (National Crime Victim Law Institute, Violence Against Women Bulletin at 1–2, September 2011).

72   See J. Chaudhary, "Memory and Its Implications for Asylum Decisions," *Journal of Health & Biomedical Law* 37 (2010): 44–45. Victims of repeated physical or sexual abuse may confuse details of particular incidents such as time or dates of particular assaults. Singh v. Gonzales, 403 F.3d 1081, 1091 (9th Cir. 2005) (citing D. Davis and W. C. Follette, "Foibles of Witness Memory for Traumatic/High Profile Events," *Journal of Air Law and Commerce* 66, no. 4, article 6 (2001): 1421–1549; see also, e.g., *Fiadjoe v. Att'y Gen.*, 411 F.3d 135, 154 (3d Cir. 2005) ("Trauma … may have a significant impact on the ability to present testimony."). See also, e.g., Dept. of Health and Human Services, SAMSA, "A Treatment Protocol: Trauma-Informed Care in Behavioral Health Services," 61–62 (2014) (common effects of trauma include "exhaustion, confusion, sadness, anxiety, agitation, numbness, dissociation, confusion, physical arousal, and blunted affect");136 id. at 69 (noting that signs of dissociation include fixed or "glazed" eyes, sudden flattening of affect, long periods of silence, monotone, responses that are not congruent with the present context or situation).

73   Interview 30, April 2022.

CLP_PC_021760

Another example of how trauma impacts credibility for survivors of GBV is the fact that, according to a number of interviewees, many survivors choose not to report violence to their local authorities. Survivors may fear humiliation by police and retaliation from their abusers if they find out. In societies where police routinely ignore such reports, there is little incentive for survivors to come forward and risk the wrath of an enraged abuser determined to inflict punishment.[xxxii] Yet survivors' failure to report violence is often used to discredit them. Lack of reporting, as our interview respondents note, also makes it very difficult for survivors to prove a basic element of asylum: a failure of state protection.[xxxiii]

The process of establishing credibility is also often racialized within the US asylum system. A respondent recalls a case in which a judge did not a believe a Black woman because he felt that her demeanor as a survivor of GBV was different from other, non-Black survivors.[74] For Indigenous clients, language barriers compound challenges to building convincing narratives. Interviewees note that many clients from Central and South America who do not speak Spanish have a hard time accessing appropriate interpreters. The lack of adequate translation services can lead to gaps or inconsistencies in clients' statements during the initial asylum screening process, which can then be used against them during court proceedings.

Given the discretionary power that judges hold in adjudicating asylum cases[xxxiv] and the inadequacy of training on trauma-informed practices, survivors can face significant re-traumatization within the courtroom. This is particularly the case when they lack legal counsel. One interviewee recalls how her client, a young mother from Central America, was derided by the immigration judge for bringing her crying child to the courtroom. The interviewee notes that this left her client unable to effectively share her story with the judge. And for survivors who identify as women, encountering cisgender male officials throughout the asylum process can often create barriers to sharing their stories:

<div style="color:green">

───────────────

"She wanted to tell the officer, 'I want to seek asylum. I'm afraid to return to my country.' But the officer made it impossible for her to say that; he did not allow her [to speak], shut her down every single moment."

</div>

*"Women who are historically accustomed to being persecuted by men are obviously going to have a very difficult time telling their story, revealing the most important issues that have been traumatic for them to a male judge and to be grilled by a male trial attorney...[The asylum] structure tends to still be very male dominated, which intuitively creates an environment that makes women feel uncomfortable and unsafe."[75]*

In these ways, the US's adversarial asylum system does not account for how trauma impacts asylum seekers—and particularly survivors of GBV—and puts them at a distinct disadvantage at every step of the process.

---

74  Interview 22, April 2022.
75  Interview 22, April 2022.

CLP_PC_021761

## 4.2.3 THE US LEGAL FRAMEWORK FOR ASYLUM INHERENTLY DISADVANTAGES SURVIVORS OF GBV

The difficulties survivors face in meaningfully accessing the US asylum system are further exacerbated by the asylum legal framework itself. To win asylum, claimants must prove past persecution or fear of future persecution on account of one or more of the following five categories: race, religion, nationality, membership in a PSG, and/or political opinion. Sex, gender, or GBV are not explicitly named as a basis for asylum. This framework is reflected in the questions claimants are required to answer on the asylum application. Likewise, the questions make no mention of gender-based persecution, and—more importantly—the specific types of harm that this term signifies.  This can create an additional burden on survivors to understand asylum law and how their experience of GBV can be a ground of asylum.  In fact, 62 percent of survey respondents note that their clients who are GBV survivors frequently or very frequently do not apply for asylum because of a lack of familiarity with the complexities of US asylum law and procedures.

On average, respondents in our survey state that survivors frequently have not applied for asylum because of the difficulty of building a narrative—including around GBV—that is responsive to the application questions as currently worded. Of the providers who assist survivors with their applications, many note the difficulty of describing GBV as the basis of the claim. Some providers advise clients to make it a secondary basis because they fear GBV alone will not be enough. Most disturbing—but not surprising—is that our interviewees report that many survivors do not even classify the harm that they have survived as violence at all. Rather, they note that survivors understand their experiences of GBV such as rape and attempted femicide or torture as simply a "normal" part of their lives.[76]

Asylum claims based on GBV are often brought under the PSG ground,  yet interviewees also note the extreme challenge of explaining to judges that survivors can be members of a cognizable PSG. Providers with experience working with clients on asylum cases note that judges can be highly skeptical of the PSG survivors assert. One interviewee shares an example of a specific PSG that a survivor of domestic violence asserted membership in: "women who cannot leave their marriage." The judge found that the abuser was not motivated to abuse

> "Sixty-two percent of survey respondents note that their clients who are GBV survivors frequently or very frequently do not apply for asylum because of a lack of familiarity with the complexities of US asylum law...."

the applicant because of her membership in this PSG, but rather that he would indiscriminately abuse all women. The interviewee explains that judges often reject this PSG as too broad when an abuser has a history of abusing other partners. At the same time, this provider notes that judges often see GBV as a personal dispute that happens within the home, and as such, it is not the US's problem to fix. In these cases, a gender-based PSG might be considered too narrow. As a result, this provider notes that women who are political dissidents or former election officials are much likelier to succeed when they bring claims on this basis than those who bring claims on the basis of membership in a gender-based PSG.

By omitting explicit mention of gender, the US asylum framework both reflects and perpetuates a long-standing, culturally entrenched devaluation of women, girls, and non-cisgender individuals among both adjudicators and survivors alike.

Finally, in light of the above, survivors face tremendous obstacles to navigating the asylum process if they do not have legal representation and mental health services. Yet the US does not fund counsel for asylum seekers, and low-cost, or pro bono, legal access is quite limited: 59 percent of survey respondents note that their clients who are survivors of GBV have not applied for asylum frequently or very frequently because of a lack of legal representation. Most survivors need highly specialized, expert legal assistance to develop a compelling gender-based asylum case within a system that does not explicitly name gender as a basis for asylum. In this way, the system they encounter itself reduces their chances of gaining asylum in the US.

---

76   For example, in 2022, a Tahirih client who survived repeated sexual assaults was denied permission to apply for asylum at the US border because she told a Border Patrol officer that she came to the US in search of a better life for her son. She did not know to specify that a better life meant a life free of persecution.

CLP_PC_021762

# 5. POLICY RECOMMENDATIONS AND CONCLUSION

In the US, opposing visions of immigration exist. In one, the US is a land of immigrants and one that welcomes asylum seekers. The other argues for an ethnonationalist state that must protect itself from the "threat" of migrants. Since its inception, US immigration policy has aimed to keep out certain groups of immigrants based mostly on racial identity.  At the same time, the ethnonationalist view of the US has arguably become more mainstream and strident in the past few decades. This report documents the human toll of such a vision, and specifically how it harms women, girls, and LGBTQI+ individuals.

Our findings show how US asylum deterrence policies, as well as the US asylum legal framework and process itself, are complicit in harming and marginalizing survivors of GBV and those most vulnerable to it. These policies normalize GBV as an inevitable consequence of pursuing safe haven in the US. Although our research highlights GBV that occurs in Mexico, our data demonstrate that US policies integrally influence its nature and scope.

First, our data show how policies such as expulsions under Title 42, returns under RMX, and turnbacks contribute to conditions that foster various forms of GBV at the US-Mexico border such as rape, human trafficking, sexual assault, psychological trauma, kidnapping, and other abuses in the following ways:

1) Expulsions and border closures increasingly force migrants into precarious housing conditions. This increases their vulnerability to violence and harassment because of sex, gender identity and expression, sexual orientation, and racial or ethnic identity.

2) Cartels and other organized criminal networks can more easily target migrants for GBV when they wait for prolonged periods of time at the border, are routinely expelled from the US, lack employment opportunities, and also lack secure housing.

3) Prolonged wait times at the border in conjunction with insecure housing make it much easier for perpetrators of GBV to locate and re-harm survivors who have tried to flee persecution at home such as domestic violence and related abuse.

The risks of suffering GBV at the US border are magnified for Black migrants who are disproportionately impacted by hostile US policies and consequently face further anti-Black discrimination and violence at the border.

Second, our report details the ways in which the US asylum system and application process itself can re-traumatize survivors of GBV and impair their ability to fully and fairly present their claims. US Border Patrol officers—as the gatekeepers of the asylum process—routinely engage in abusive and even violent conduct toward survivors in certain cases. We also find that the US asylum legal framework itself denies equal access to protection for survivors by failing to explicitly name gender as a ground of asylum.

To rectify these harms, the US must implement a vastly different system than the one it currently employs. It must be one that is humane and that actively centers the legal rights and dignity of asylum seekers and migrants, rather than one that harms them. This new approach requires a significant normative shift in US politics and public discourse.

CLP_PC_021763

There are, however, concrete steps that the US government can take at the executive and congressional levels to begin to realize such a transformation and to mitigate the harm that current US policies engender. To that end, we urge the US government to take the following actions:

## 1. Abandon the deterrence-based immigration and asylum paradigm.

Extensive research shows that deterrence policies do not actually work to deter migration[xxxix] and needlessly harm migrants and asylum seekers instead, in clear violation of US human rights obligations. To restore compliance, and promote a system that respects the dignity of all migrants, the Biden administration must:

- **Cease the use of policies that require asylum seekers to wait in Mexico before or while applying for relief.** Examples past and present include the metering program, the Migrant Protection Protocols/Remain in Mexico,[77] and expulsions under Title 42.  Specifically, the administration should immediately:

  promulgate regulations terminating the Title 42 expulsions policy consistent with State of Louisiana et al. v. Centers for Disease Control and Prevention, et al.[78] In the interim, consistent with Huisha-Huisha v. Mayorkas[79, 80]  as well as the Immigration and Nationality Act of 1965, DHS should also require all Border Patrol officials to affirmatively ask all migrant families and individuals they encounter in the US who have entered without inspection if they have a fear of return and would like to apply for asylum;

  permit remaining RMX enrollees to disenroll from the program at any US port of entry.

- **Cease the use of new or other existing immigration and asylum deterrence policies.** While ending border closure and expulsion policies is a critical first step toward promoting a more humane asylum system and restoring compliance with US human rights obligations, these policies must not be replaced with new deterrence policies. The US should also abandon use of other policies that harm rather than protect asylum seekers such as detention and prosecution for irregular entry. It is well known that detention produces significant psychological and physical harm.[81] It adversely impacts LGBTQI+ individuals in particular; many experience harassment while in detention because of their sexual orientation and/or gender identities. And transgender individuals who are placed in isolation or with populations that do not match their gender identities face further threats to their physical and mental wellbeing.[xl]

> **Our findings show how US asylum deterrence policies, as well as the US asylum legal framework and process itself, are complicit in harming and marginalizing survivors of GBV and those most vulnerable to it. These policies normalize GBV as an inevitable consequence of pursuing safe haven in the US.**

The US Congress should also pass legislation such as the Refugee Protection Act, which would expressly prohibit expulsions and turnbacks of asylum seekers.[82]

## 2. Invest in an asylum-seeker-centered model of service provision.

Legislation establishing and funding "Welcome Centers" for asylum seekers at the border is one potential new pathway toward creating a more humane and service-oriented system that rejects a deterrence-based approach. We propose that at these centers, asylum seekers would receive Know Your Rights information translated into their native languages. They would further receive assistance accessing government-funded and/ or other legal counsel, social services, medical, employment, mental health, cultural orientation, transportation, housing, and other auxiliary services as potentially complemented by the DHS Case Management Pilot Program (CMPP).[xli]

We envision that Welcome Center personnel would have experience in trauma-informed, survivor-centered service delivery as defined in recommendation  3 below. Personnel would receive regular, in-person training anchored in compassion, respect, and the fundamental premise that pursuing asylum is a legal right under the Immigration and Nationality Act. Both training curricula and resources provided to asylum seekers would be developed collaboratively with outside experts—including survivors of trauma and practitioners who serve them. Independent monitors would have unrestricted access to Welcome Centers, and personnel performance evaluations would include detailed assessments of compliance with trauma-informed, survivor-centered practices.

---

77   See http://justiceactioncenter.org/wp-content/uploads/2022/08/certified-judgment-RMX.pdf.

78   For an overview see Law360, "*Louisiana et al. v. Centers for Disease Control and Prevention* et al.," https://www.law360.com/cases/624af481d47fb101112b48db/articles.

79   For an overview see ACLU, "*Huisha-Huisha v. Mayorkas*" (2022), https://www.aclu.org/cases/huisha-huisha-v-mayorkas.

80   Oxfam America is a plaintiff in this suit.

81   See for example the following article on the impact of detention on the health of asylum seekers: E. K. Singer, K. Molyneux, K. Kaur, N. Kona, G. S. Malave, and K. A. Baranowski, "The Impact of Immigration Detention on the Health of Asylum Seekers during the COVID-19 Pandemic," SSM - *Qualitative Research in Health* 2 (2022).

82   See Section 135.

CLP_PC_021764

### 3. Fully and meaningfully implement trauma-informed, survivor-centered policies and practices within all US Department of Homeland Security (DHS), Department of Justice (DOJ), and Department of State (DOS) components that interface with migrants and asylum seekers.

Policies should be anchored in compassion, respect, and the fundamental premise that pursuing asylum is a legal right under the Immigration and Nationality Act. According to DOJ, a trauma-informed approach "emphasizes creating services and programs that are sensitive and directly responsive to the trauma that many survivors experience after a violent crime. Trauma-informed care programs identify and limit potential triggers to reduce their re-traumatization and protect their mental and emotional health…"[xiii] DOJ defines a victim/survivor-centered[83] approach as: "[T]he systematic focus on the needs and concerns of a victim to ensure the compassionate and sensitive delivery of services in a nonjudgmental manner…[It] seeks to minimize re-traumatization…by providing the support of victim advocates and service providers."[84]

Trauma-informed and survivor-centered policies that the Biden administration should adopt include:

- **allowing survivors sufficient time to process trauma and access counsel and mental health services before requiring them to present their asylum claims.** Policies that impose accelerated adjudication times for all asylum claims[85] should be rejected;

- **applying credibility standards generously, consistent with UNHCR guidelines on women's refugee status determinations[86] and best practices developed by trauma experts that recognize how trauma impacts the demeanor of survivors and their ability to recount chronological timelines and traumatic details.** For example, during asylum interviews, survivors must be informed of their right to pursue asylum as a principal applicant and not merely as a derivative of their husband or parent. Accurate, culturally competent translation must also be viewed as essential to the adjudication process, and survivors should be permitted to choose the gender of their adjudicator and interpreter.

Comprehensive, up-to-date, ongoing in-person training on policies should be mandatory for all agency personnel. Training curricula should be developed and presented collaboratively with outside experts, including survivors of GBV and practitioners who serve them. Topics should include trauma, gender-based violence, racial discrimination, exploitation of children, and discrimination against LGBTQI+ persons.

To help ensure that the US Border Patrol in particular complies with trauma-informed and survivor-centered policies:

- **the Biden administration should promulgate regulations requiring that US Border Patrol personnel performance evaluations include detailed, ongoing assessments of compliance and that awarding of annual bonuses is contingent upon compliance.**

The US Congress should:

- **establish independent monitors to oversee US Border Patrol** engagement with all migrants. Monitors should reinforce the fundamental premise that all individuals are entitled to due process in applying for relief as provided in the Immigration and Nationality Act, and that Border Patrol's functions do not include influencing an asylum seeker's decision as to whether to apply. Monitors should document and intervene if they observe any attempt, through threats, coercion, intimidation, antagonism, or any other means, to dissuade an individual from pursuing their legal rights;

- **pass legislation that promotes independent accountability measures.** Examples include:

  **the Investigative Integrity Act.** The Act is designed to "protect the integrity of criminal investigations into use-of-force incidents involving federal employees and to prevent agencies from sidestepping Department of Justice (DOJ) oversight. The Investigative Integrity Act will: (1) Establish Department of Justice (DOJ) primacy over all use-of-force investigations involving federal law enforcement officers; (2) Provide DOJ authority to analyze federal agency patterns and practices of use of force. (DOJ currently only has authority to look at state/local law enforcement patterns and practices); and (3) If a federal employee does interfere with the DOJ investigation, the bill mandates that the Attorney General (AG) consider charging that person with obstruction of justice;"[87]

---

83   We use the term "survivor" to denote individual who has experienced GBV. However, the US DOJ uses the term "victim."

84   This definition is used by the DOJ in the context of human trafficking prosecutions but is equally applicable in the immigration and asylum context: https://www.ovcttac.gov/taskforceguide/eguide/1-understanding-human-trafficking/13-victim-centered-approach/.

85   See Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 Fed. Reg. 18,078 (Mar. 29, 2022), DHS Docket No. USCIS-2021-0012, RIN 1615– AC67; A.G. Order No. 5369-2022, RIN 1125-AB20.

86   UNHCR Guidelines on International Protection, Gender-Related Persecution within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol Relating to the Status of Refugees, Section 68; see also, e.g., Executive Committee of the High Commissioner's Programme, Refugee Women and International Protection No. 64, § (a)(iii) (1990).137

87   See < https://www.congress.gov/bill/117th-congress/senate-bill/1700>

CLP_PC_021765

the Border Accountability, Oversight, and Community Engagement Act. The Act aims to promote accountability by (1) establishing a DHS Commission comprised of representatives from northern and southern border states to help develop policy; (2) establishing the DHS Office of the Ombudsman to address border issues; (3) establishing a CBP border liaison office; (4) mandating certain training and education for CBP; and (5) requiring reports on CBP use of body-worn cameras, use of force policies, and death of migrants while in custody.[88]

## 4. Eradicate racial bias within Department of Justice (DOJ), Department of Homeland Security (DHS), and Department of State (DOS) components that interface with migrants and asylum seekers.

This report and many others document how racial bias continues to shape the development and implementation of US asylum and immigration policies. As this report explains, racial bias can be particularly insidious for women and LGBTQI+ individuals. It is past time for the DOJ, DHS, and DOS to address and rectify the inherent racial bias within US immigration and asylum policies.

DOJ, DHS, and DOS have all issued Equity Action Plans that aim to advance equity, racial justice, civil rights, and equal opportunity for all, including "people of color and others who have been historically underserved, marginalized, and adversely affected by persistent poverty and inequality."[xliii, xliv, xlv] We urge the administration to fully implement the Equity Action Plans. We acknowledge, however, that their implementation cannot mitigate the full force of racial bias in US immigration and asylum policies. Yet it is a critical starting point.

Training curricula for the Equity Action Plans should be developed and presented collaboratively with outside experts, including directly impacted individuals and practitioners who serve them.

To help ensure compliance with the Equity Action Plans, the Biden administration should promulgate regulations requiring that agency personnel performance evaluations include detailed, ongoing assessments of compliance, and that awarding of annual bonuses is contingent upon compliance. Regulations should also require that, pursuant to Section V of DHS's Plan, information about complaint and redress procedures be appended to all immigration forms.

## 5. Explicitly recognize gender as a key modality of persecution in US asylum law.[xlvi]

Survivors of gender-based violence, and particularly those who are indigent and have no access to counsel, face systemic obstacles when applying for asylum. Survivors have no way of knowing that they may qualify when filling out the asylum application because it omits any mention of gender as a basis for relief. This is because gender is not explicitly named in the US Immigration and Nationality Act (INA) as a ground of asylum, nor is it listed in either the INA or implementing regulations as an example of a cognizable PSG. The 1951 Refugee Convention did not explicitly include gender in its definition of a refugee, although UNHCR guidelines allow for gender-based claims to be brought, most often under the PSG ground. Numerous other Convention and Protocol signatories—such as Spain, Sweden, and the Czech Republic—have updated their laws to name gender as a PSG and/or an independent, sixth ground of asylum.[xlvii, xlviii] It is past time for the US to do the same.

To this end, the US Congress should amend the Immigration and Nationality Act to name gender as a sixth independent ground of asylum and also name gender as an example of a cognizable PSG. In the interim, until the INA is amended, the administration should promulgate regulations that 1) name gender as an example of a cognizable PSG; 2) require that DHS append its pamphlet on GBV[89] to all immigration forms, with links to translated versions; and 3) require that the asylum form specify that gender is an example of a PSG and include a non-exhaustive list of examples of GBV such as domestic violence, forced marriage, and female genital mutilation/cutting.

---

88   See https://www.lujan.senate.gov/newsroom/press-releases/lujan-colleagues-introduce-border-patrol-accountability-legislation/
89   See https://www.dhs.gov/sites/default/files/2022-07/OPS_DHS_GenderBasedViolence_%20ENG.pdf.

CLP_PC_021766

**Despite the administration's stated goal of reducing gender-based violence at home and abroad, and its recognition that economic insecurity increases vulnerability to violence and abuse, in practice, US immigration and asylum policy systematically disenfranchises and endangers women, girls, and LGBTQI+ individuals.**

### 6. Support alternative pathways for processing asylum seekers, such as the Refugee Protection Act Section 206(c)(5)(A).

The US Congress must pass the Refugee Protection Act, which creates a Central American Refugee Program protecting "Refugees of Special Humanitarian Concern."[90] Refugees of Special Humanitarian Concern are those who have suffered or fear persecution in the form of domestic, sexual, or other forms of gender-based violence, including forced marriage and persecution based on sexual orientation or gender identity. The program must include 1) comprehensive outreach to inform the public of its existence; 2) a trauma-informed approach to staff hiring, service delivery, and training; 3) full funding and implementation of the State Department Equity Action Plan; 4 staff performance evaluations that assess compliance with the plan and trauma-informed practices outlined in the training curricula; 5) collaboration in developing training curricula with outside experts—including survivors of trauma and practitioners who serve them—on trauma, gender-based violence, human trafficking, exploitation of children, and racial equity; 6) safety measures that aim to reduce survivors' risk of harm while they wait for their cases to be processed; and 7) independent monitors to oversee proper implementation of the program.

### 7. Align US immigration and asylum policies with US foreign policy goals that seek to reduce gender-based violence and promote women's economic and social empowerment.

In March 2021, President Biden signed an Executive Order (EO) establishing the White House Gender Policy Council (GPC).[i] The EO mandates that the GPC coordinate the federal government's activities related to gender equity and equality, including: 1) to coordinate an "interagency response to gender-based violence at home and abroad;" and 2) to establish a new position—the Special Assistant to the President and Senior Advisor on Gender-Based Violence, tasked with reviewing and updating the 2016 "United States Strategy to Prevent and Respond to Gender-Based Violence Globally."[ii]

Building on this EO, in October 2021 the administration released the first-ever National Strategy on Gender Equity and Equality, which included "Promot[ing] Gender Equity and Fairness in Justice and the Immigration System" as one of its 10 strategic priorities.[iii] In particular, the strategy commits to reducing "vulnerability to abuse and exploitation" while strengthening access to "safety, justice, and asylum and humanitarian relief for immigrants and noncitizens, especially women, girls, and LGBTQI+ individuals," including those who have faced persecution "on the basis of membership in a gender-based group—such as victims of gender-based violence." The strategy also promises to "seek timely adjudication of immigration petitions for survivors of domestic violence, sexual assault, and human trafficking, and other crimes" and to "support humane and trauma-informed practices at the US border."[iii]

Similarly, the administration's foreign policy goals are grounded in the notion that the "full participation of all people—including women and girls—across all aspects of our society is essential to the economic well-being, health, and security of our Nation and of the world."[iv] This is particularly relevant in Central America, where the US has invested heavily in promoting women's empowerment and combatting gender-based violence, both for its own sake and as a means of addressing irregular migration.

Despite the administration's stated goal of reducing gender-based violence at home and abroad, and its recognition that economic insecurity increases vulnerability to violence and abuse, in practice, US immigration and asylum policy systematically disenfranchises and endangers women, girls, and LGBTQI+ individuals. As the accounts in this report demonstrate, the US has a long way to go to live up to these and other commitments on gender equity; in fact, the US is one of only seven countries that has yet to ratify the International Convention on the Elimination of All Forms of Discrimination Against Women (CEDAW).

---

90   See Refugee Protection Act of 2019, https://www.congress.gov/bill/116th-congress/house-bill/5210/text#toc-H22B00371629540SAAA177F47B6CE4C42.

CLP_PC_021767



Tents on the courtyard of the Agape Mission which currently serves as a migrant shelter. Tijuana, Baja California Norte, Mexico. Winter, 2022. Pease note that the data and analysis of this report do not include this shelter. ©James Rodriguez/ Oxfam America.

While US foreign policies focus on addressing the root causes of migration and supporting gender equality, they must also address the ways in which bilateral[iv, iv] migration agreements that aim to deter migration fuel perilous journeys that increase the risk of GBV. This includes agreements that result in the US abdicating its responsibilities to asylum seekers and in third-party countries enforcing deterrence measures on behalf of the US;[91] this is neither sustainable nor humane. We urge the Biden administration to:

· **include commitments to ensure safe and secure journeys in bilateral migration agreements**. Agreements must be transparent and consistent with US domestic and international human rights obligations;

· **Implement US foreign policies that promote women's economic empowerment, prevent the economic deprivation that women, girls, and LGBTQI+ migrants experience at the US southern border, and mitigate the risk of their exposure to GBV;**

· **fully fund and implement all of the immigration justice-related commitments in the National Strategy on Gender Equity and Equality, particularly improving pathways to safety for GBV survivors.**

The US's racialized, deterrence-based asylum system harms survivors of gender-based violence, and women, girls, and LGBTQI+ individuals in particular. It drives conditions that increase their risk of experiencing GBV at the US southern border. It is imperative and long overdue for the US to change course by implementing policies that align with, rather than violate, its international human rights commitments and moral obligations. We believe that these recommendations will bring the US closer to establishing a more humane and welcoming immigration and asylum system rooted in dignity and respect for all migrants, rather than in dehumanization and xenophobia. If implemented, these recommendations will serve as a critical step toward establishing a system that centers, rather than marginalizes and harms, the most vulnerable. Continuing to use deterrence as the foundation of US migration policies will only inflict further suffering upon large numbers of individuals, including survivors of GBV and other abuses. We urge the adoption of the recommendations in their entirety.

---

91   A recent example is the now-defunct Asylum Cooperation Agreements that the US had with El Salvador, Guatemala, and Honduras that required asylum seekers to seek ref-uge in those countries before applying for asylum in the US. The US also routinely relies on Mexico's National Guard to deter US-bound migrants from crossing from Mexico's southern border with Guatemala (see *Aljazeera*, "Mexico and US to Launch Plan to Stem Central American Migration," December 1, 2021, https://www.aljazeera.com/news/2021/12/1/mexico-and-us-to-launch-plan-to-stem-central-america-migration.

CLP_PC_021768

# ENDNOTES

i   J. Kent, K. P. Norman, and K. H. Tennis, "Changing Motivations or Capabilities? Migration Deterrence in the Global Context," International Studies Review 22, no. 4 (December 2020): 853–878.

ii   J. Hiskey, A. Córdova, M. Malone, and D. Orcés, "Leaving the Devil You Know: Crime Victimization, US Deterrence Policy, and the Emigration Decision in Central America," Latin American Research Review 53, no. 3 (2018): 429–447, doi:10.25222/larr.147.

iii   S. N. Chambers, G. A. Boyce, S. Launius, and A. Dinsmore, "Mortality, Surveillance and the Tertiary 'Funnel Effect' on the US-Mexico Border: A Geospatial Modeling of the Geography of Deterrence," Journal of Borderlands Studies 36, no. 3 (2021): 443–468.

iv   American Immigration Council, "Asylum in the United States Fact Sheet," published June 11, 2020, and modified August 16, 2022, https://www.americanimmigrationcouncil.org/research/asylum-united-states; and U.S. Code, https://uscode.house.gov/view.xhtml?req=granuleid%3AUSC-prelim-title8-section1158&num=0&edition=prelim.

v   J. Loyd and A. Mountz, "The Caribbean Roots of U.S. Migration Policy," NACLA Report on the Americas 51:1 (2019): 78–84.

vi   S. Gzesh, "Central Americans and Asylum Policy in the Reagan Era" (Migration Policy Institute, 2006).

vii   M. A. Sweeney, S. Shebaya, and D. K Collopy, "Detention as Deterrent: Denying Justice to Immigrants and Asylum Seekers," Georgetown Immigration Law Journal 36 (2021): 292–323. See also https://www.theborderchronicle.com/p/cruelty-as-border-policy-the-biden?s=r; https://immigrantjustice.org/staff/blog/newly-released-records-show-abusive-policies-continue-under-guise-deterrence

viii   American Immigration Council, "Rising Border Encounters: An Overview and Analysis" (2021), https://www.americanimmigrationcouncil.org/rising-border-encounters-in-2021.

ix   Ibid.

x   Human Rights First, Haitian Bridge Alliance, and Al Otro Lado, "Extending Title 42 Would Escalate Dangers, Exacerbate Disorder, and Magnify Discrimination" (2021), https://www.humanrightsfirst.org/resource/extending-title-42-would-escalate-dangers-exacerbate-disorder-and-magnify-discrimination.

xi   Robert F. Kennedy Human Rights and the Haitian Bridge Alliance, "Beyond the Bridge: Documented Human Rights Abuses and Civil Rights Violations Against Haitian in the Del Rio, Texas Encampment" (2022), https://rfkhr.imgix.net/asset/Del-Rio-Report.pdf.

xii   Human Rights Watch, "US: LGBT Asylum Seekers in Danger at the Border" (2022), https://www.hrw.org/news/2022/05/31/us-lgbt-asylum-seekers-danger-border.

xiii   Human Rights First and Al Otro Lado, "Two Years of Suffering: Biden Administration Continues Use of Discredited Title 42 Order to Flout Refugee Law" (2022), https://www.humanrightsfirst.org/sites/default/files/TwoYearsofSuffering.pdf.

xiv   American Immigration Council, 2021.

xv   C. E. Schoichet, "We're Expecting a Big Increase in Migrants at the US-Mexico Border. But This Time It Is Different," CNN, April 1, 2022, https://www.cnn.com/2022/03/31/politics/border-title-42-whats-next-cec/index.html.

xvi   P. Diaz, "Migrants at US-Mexico Border Must Get Past Cartels Before Long Journey Ends," The Conversation, March 18, 2020, https://theconversation.com/migrants-at-us-mexico-border-must-get-past-cartels-before-their-long-journey-ends-129403.

xvii   S. Leutert, "Migrant Kidnapping in Nuevo Laredo During MPP and Title 42" (Strauss Center for International Security and Law, The University of Texas at Austin and Vecina, 2021), https://www.strausscenter.org/wp-content/uploads/Migrant-Kidnappings-in-Nuevo-Laredo-.pdf.

xviii   Human Rights First and Al Otro Lado, "Two Years of Suffering."

xix   American Immigration Council, 2021.

xx   A. Iacson, "U.S. Migration Policy is Enriching Cartels at the Busiest, and Most Dangerous Part of the US-Mexico Border," Inter Press Service, April 5, 2022.

xxi   Human Rights Watch, "Do You See How Much I'm Suffering Here?" Abuse against Transgender Women in US Immigration Detention" (2016).

xxii   A. A. F. Benard, "Colonizing Black Female Bodies within Patriarchal Capitalism: Feminist and Human Rights Perspectives," Sexualization, Media, & Society (October–December 2016): 1–11.

xxiii   S. Morley and M. Goss, "There is a Target on Us"—The Impact of Anti-Black Racism on African Migrants at Mexico's Southern Border" (Black Alliance for Just Immigration, 2021), http://baji.org/wp-content/uploads/2021/01/The-Impact-of-Anti-Black-Racism-on-African-Migrants-at-Mexico.pdf .

xxiv   Robert F. Kennedy Human Rights and the Haitian Bridge Alliance, "Beyond the Bridge."

xxv   M. L-G. Sone, "Black Lives Matter. Black Immigrant Lives Matter. Black Asylum Seekers' Lives Matter. Immigration is a Black Issue" (Friends Committee on National Legislation, 2020), https://www.fcnl.org/updates/2020-12/black-lives-matter-black-immigrants-lives-matter-black-asylum-seekers-lives-matter.

xxvi   Center for Gender and Refugee Studies, "Recent TRAC Reports Reinforce the Conclusion that Asylum Decision-Making Remains Arbitrary and Unfair" (2017).

xxvii   Ibid.

xxviii   A. Zagorin and N. Schwellenbach, "Protecting the Predators at DHS: How a Federal Watchdog Suppresses Findings of Sexual Harassment and Domestic Violence" (Project on Government Oversight, April 7, 2022), https://www.pogo.org/investigation/2022/04/protecting-the-predators-at-dhs.

xxix   Southern Border Communities Coalition, "Abuse of Power and Its Consequences" (August 11, 2022), https://www.southernborder.org/border_lens_abuse_of_power_and_its_consequences.

xxx   J. Heyman, D. E. Martinez, and J. Slack, "Why Border Patrol Officers and CBP Officers Should Not Serve as Asylum Officers" (Center for Migration Studies Essays, 2019).

xxxi   Department of Homeland Services, "Department of Homeland Security's Strategic Plan for Fiscal Years 2020–2024," https://www.dhs.gov/publication/department-homeland-securitys-strategic-plan-fiscal-years-2020-2024.

xxxii   See Tahirih Justice Center, "Precarious Protection: How Unsettled Policy and Current Laws Harm Women and Girls Fleeing Persecution" (Tahirih Justice Center, Washington DC, 2009).

xxxiii   Ibid.

xxxiv   Center for Gender and Refugee Studies, 2017.

CLP_PC_021769

xxxv   Tahirih Justice Center, "Ensuring Equal and Enduring Access to Asylum" (2021), https://www.tahirih.org/wp-content/uploads/2021/09/Ensuring-Equal-and-Enduring-Access-to-Asylum-Tahirih-Justice-Center.pdf.

xxxvi   Ibid.

xxxvii   B. Lobo, "Women as a Particular Social Group: A Comparative Assessment of Gender Asylum Claims in the United States and United Kingdom," *Georgetown Immigration Law Journal* 26 (2013): 361.

xxxviii   K. R. Johnson, "The Immigration Laws, And Domestic Race Relations: A 'Magic Mirror' into the Heart of Darkness," *Indiana Law Journal* 73, no. 4, article 2 (fall, 1998): 1111–1159.

xxxix   Hiskey et al., "Leaving the Devil You Know."

xl   Human Rights First, "I'm a Prisoner Here: Biden Administration Policies Lock Up Asylum Seekers" (2022).

xli   Department of Homeland Security, "DHS Case Management Pilot Program," https://www.dhs.gov/dhs-cmpp.

xlii   Office on Violence Against Women, "The Importance of Understanding Trauma Informed Care and Self-Care Victim Service Providers" (2014), https://www.justice.gov/archives/ovw/blog/importance-understanding-trauma-informed-care-and-self-care-victim-service-providers.

xliii   US Department of Homeland Security, "DHS Releases First Ever Action Plan" (2022), https://www.dhs.gov/news/2022/04/14/dhs-releases-first-ever-equity-action-plan.

xliv   US Department of State, "Equity Action Plan" (2022), https://www.state.gov/wp-content/uploads/2022/04/Equity-Action-Plan-Website-04132022.pdf.

xlv   Department of Justice, "Equity Action Plan" (2022), https://www.justice.gov/doj/page/file/1494516/download.

xlvi   Tahirih Justice Center, "Ensuring Equal and Enduring Access."

xlvii   Tahirih Justice Center, "Countries with Asylum/Refugee Laws That Explicitly Protect Those Fleeing Gender-Based Persecution" (2021), https://1ttls613brjl37btxk4eg60v-wpengine.netdna-ssl.com/wp-content/uploads/2021/04/Appendix-1-List-of-other-countries-with-gender-listed-in-asylum-laws.pdf .

xlviii   Tahirih Justice Center, "Ensuring Equal and Enduring Access."

xlix   The White House, "Executive Order Creating a Comprehensive Regional Framework to Address the Causes of Migration to Manage Migration Throughout North and Central America and to Provide Safe and Orderly Processing" (2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/02/02/executive-order-creating-a-comprehensive-regional-framework-to-address-the-causes-of-migration-to-manage-migration-throughout-north-and-central-america-and-to-provide-safe-and-orderly-processing/.

l   The White House, "Executive Order on Establishment of the White House Gender Policy Council" (2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/03/08/executive-order-on-establishment-of-the-white-house-gender-policy-council/.

li   Ibid.

lii   US Government, "National Strategy on Gender Equity and Equality" (2021), https://www.whitehouse.gov/wp-content/uploads/2021/10/National-Strategy-on-Gender-Equity-and-Equality.pdf.

liii   Ibid.

liv   Ibid.

lv   US Citizenship and Immigration Services and the Executive Office for Immigration, "Review. Implementing Bilateral and Multilateral Asylum Cooperative Agreements Under the Immigration and Nationality Act" (2019),https://www.federalregister.gov/documents/2019/11/19/2019-25137/implementing-bilateral-and-multilateral-asylum-cooperative-agreements-under-the-immigration.

lvi   The White House, "Executive Order Creating a Comprehensive Regional Framework to Address the Causes of Migration to Manage Migration Throughout North and Central America and to Provide Safe and Orderly Processing" (2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/02/02/executive-order-creating-a-comprehensive-regional-framework-to-address-the-causes-of-migration-to-manage-migration-throughout-north-and-central-america-and-to-provide-safe-and-orderly-processing/.

CLP_PC_021770

CLP_PC_021771

**COVER IMAGE:** Scene inside the dormitories at the Agape Mission which currently serves as a migrant shelter. Tijuana, Baja California Norte, Mexico. Winter, 2022. The image was chosen so as to protect the anonymity of its subject. Please note that the data and analysis does of the report does not include the shelter in this image. *©James Rodriguez/Oxfam America.*





**US HEADQUARTERS**
226 CAUSEWAY STREET, 5TH FLOOR
BOSTON, MA 02114-2206
(800) 77-OXFAM

**US POLICY & ADVOCACY**
1101 17TH STREET NW, SUITE 1300
WASHINGTON, DC 20036-4710
(202) 496-1180

info@oxfamamerica.org
oxfamamerica.org

OXFAM IS A GLOBAL MOVEMENT OF PEOPLE WORKING TOGETHER TO END THE INJUSTICE OF POVERTY. WITH 70 YEARS OF EXPERIENCE IN MORE THAN 90 COUNTRIES, OXFAM TAKES ON THE BIG ISSUES THAT KEEP PEOPLE POOR: INEQUALITY, DISCRIMINATION, AND UNEQUAL ACCESS TO RESOURCES INCLUDING FOOD, WATER, AND LAND. WE HELP PEOPLE SAVE LIVES IN DISASTERS, BUILD STRONGER FUTURES FOR THEMSELVES, AND HOLD THE POWERFUL ACCOUNTABLE. JOIN US.

© 2022. Oxfam America Inc. All Rights Reserved. Oxfam America is a registered trademark of Oxfam America Inc., and the Oxfam logo is a registered trademark of Stichting Oxfam International. 2102019

CLP_PC_021772

# Maryland Journal of International Law

Volume 33 | Issue 1                                                                      Article 13

# The Mexican Asylum System in Regional Context

Helen Kerwin

Follow this and additional works at: https://digitalcommons.law.umaryland.edu/mjil

Recommended Citation

Helen Kerwin, *The Mexican Asylum System in Regional Context*, 33 Md. J. Int'l L. 290 (2018).
Available at: https://digitalcommons.law.umaryland.edu/mjil/vol33/iss1/13

This Symposium: Articles and Essays is brought to you for free and open access by the Academic Journals at DigitalCommons@UM Carey Law. It has been accepted for inclusion in Maryland Journal of International Law by an authorized editor of DigitalCommons@UM Carey Law. For more information, please contact smccarty@law.umaryland.edu.

CLP_PC_021944

# The Mexican Asylum System in Regional Context

## HELEN KERWIN[†]

## I. INTRODUCTION

This Article examines the functioning and response of Mexico's asylum system to an exponential increase in asylum claims in recent years within the larger countervailing context of an aggressive border enforcement policy, in cooperation with the United States, that limits access to asylum. While scarcity of resources to attend to an ever-growing population of asylum-seekers goes some way toward explaining the existing protection gaps in the system, Mexico's policy of large-scale detention and deportation[1] itself constitutes the greatest barrier to effective access to asylum.

Since the introduction of a new asylum system administered and adjudicated entirely by the Mexican government in 2011, the number of asylum petitions presented annually has skyrocketed by more than 1,000 percent, from 752 in 2011 to 8,788 in 2016;[2] in 2017, asylum

© 2018 Helen Kerwin

† Legal Fellow, Inter-American Commission on Human Rights. J.D. The University of Texas School of Law; M.A. International Studies, The University of Oklahoma. The views expressed in this piece are the author's alone and do not reflect those of the Inter-American Commission or any other organization.

1. *E.g.* Jo Tuckman, *Mexico's Migration Crackdown Escalates Dangers for Central Americans*, THE GUARDIAN (Oct. 13, 2015, 8:30 AM), https://www.theguardian.com/world/2015/oct/13/mexico-central-american-migrants-journey-crackdown; *Mexico Deporta más Centroamericanos que EU*, EXCELSIOR (June 18, 2015, 2:45 PM), http://www.excelsior.com.mx/nacional/2015/06/18/1030178; *see infra* Section II.B.i.

2. Mark Manly (@MarkManly), TWITTER (Aug 23, 2017, 9:48 AM), https://twitter.com/MarkManly/status/900399250554662912; Mark Manly (@MarkManly), TWITTER (Sept. 7, 2017, 9:21 AM), https://twitter.com/MarkManly/status/905828381228498944. Manly is the current UNHCR Representative in Mexico.

CLP_PC_021945

2018]     THE MEXICAN ASYLUM SYSTEM IN REGIONAL CONTEXT     291

petitions reached a historic high of 14,596, fueling concerns about growing backlogs.[3] This growth in asylum petitions largely responds to worsening conditions in northern Central America (Honduras, El Salvador, and Guatemala)—where violence associated with gangs (*maras*), drug trafficking, and, in lesser measure, state actors, have caused the highest homicide rates in the world for countries not at war[4]—and Venezuela—where a deepening economic and political crisis has made access to food and medicine precarious.[5] Mexico also receives smaller numbers of Cuban and Haitian asylum-seekers, as well as asylum-seekers from outside the American continent.[6] At the same time, increased awareness of the existence of asylum in Mexico has likely led to a greater number of applications year on year.[7]

Given its proximity to northern Central America, Mexico is a

3.   Comisión Nacional de los Derechos Humanos (CNDH), Press Release: *La CNDH hace un llamado urgente al gobierno federal ante el posible colapso del sistema de protección a refugiados en Mexico* [CNDH urgently calls on the federal government given the possible collapse of the refugee protection system in Mexico], CNDH, February 25, 2018, http://www.cndh.org.mx/sites/all/doc/Comunicados/2018/Com_2018_046.pdf.

4.   *See generally* Kirk Semple, *Fleeing Gangs, Central American Families Surge Toward U.S.*, N.Y. TIMES (Nov. 12, 2016), https://www.nytimes.com/2016/11/13/world/americas/fleeing-gangs-central-american-families-surge-toward-us.html; Emilio González González, *Crisis Humanitaria, Violencia Criminal y Desplazamiento Forzado en el Triángulo Norte de Centroam. . .rica (Humanitarian Crisis and Survival Migration in Central America's Northern Triangle)*, 2 STAN. INT´L POL'Y REV. 27 (2015); *Arrancados de Raiz*, U.N. HIGHER COMMISSIONER ON REFUGEES [hereinafter UNHCR] (2014), http://www.acnur.org/fileadmin/scripts/doc.php?file=fileadmin/Documentos/Publicaciones/2014/9828; *Children on the Run: Unaccompanied Children Leaving Central America and Mexico and the Need for International Protection*, UNHCR 6 (2016), http://www.unhcr.org/en-us/about-us/background/56fc266f4/children-on-the-run-full-report.html; *Women on the Run: First-Hand Accounts of Refugees Fleeing El Salvador, Guatemala, Honduras, and Mexico*, UNHCR (2015), http://www.unhcr.org/en-us/publications/operations/5630f24c6/women-run.html.

5.   Meridith Kohut & Isayen Herrera, *As Venezuela Collapses, Children Are Dying of Hunger*, N.Y. TIMES (Dec. 17, 2017), https://www.nytimes.com/interactive/2017/12/17/world/americas/venezuela-children-starving.html?_r=0; Nicholas Casey, *Dying Infants and No Medicine: Inside Venezuela's Failing Hospitals*, N.Y. TIMES (May 15, 2016), https://www.nytimes.com/2016/05/16/world/americas/dying-infants-and-no-medicine-inside-venezuelas-failing-hospitals.html; Nicholas Casey, *Venezuelans Ransack Stores as Hunger Grips the Nation*, N.Y. TIMES (June 19, 2016), https://www.nytimes.com/2016/06/20/world/americas/venezuelans-ransack-stores-as-hunger-stalks-crumbling-nation.html; *see also Operation Portal: Venezuela Situation*, UNHCR (2018), https://data2.unhcr.org/en/situations/vensit (last visited Mar. 24, 2018).

6.   Comisión Mexicana de Ayuda a Refugiados (COMAR), *Estadísticas 2013–2017 (4to semestre)* [Statistics 2013–2017 (4th quarter)], SEGOB SECRETARÍA DE GOBERNACIÓN, https://www.gob.mx/cms/uploads/attachment/file/290340/ESTADISTICAS_2013_A_4TO_TRIMESTRE_2017.pdf (last visited May 12, 2018).

7.   *See, e.g.*, Andrea Villaseñor & Elba Coria, *Protection Gaps in Mexico*, FORCED MIGRATION REV. 6–9 (Oct. 2017).

292      MARYLAND JOURNAL OF INTERNATIONAL LAW      [Vol. 33:290

critical country of asylum for persons fleeing violence in Honduras, El Salvador, and Guatemala. But Mexico's immigration policy in recent years has been better characterized by increased immigration enforcement and a heightened number of detentions and deportations, particularly following the so-called "surge" of unaccompanied Central American children who arrived at the United States' southern border in the summer of  2014 and the contemporaneous introduction of Mexico's Plan Frontera Sur ("Southern Border Plan"), first announced in July 2014.[8] Mexico's aggressive border enforcement has decreased access to the US' southern border—including to ports of entry,[9] where asylum-seekers have the right under international law to seek asylum—and correspondingly lowered detentions and deportations of Central Americans.

The logic of aggressive border enforcement dramatically impacts the availability of asylum to people who need it. This is evident, first, in the disparity between the number of deportations of Central Americans and the number of asylum petitions presented by Central Americans during this period—in 2016, less than six percent of the total number of Central Americans detained by Mexican authorities presented asylum petitions.[10] While no comprehensive studies currently exist on the total number of Central American nationals leaving their countries who may be in need of international protection, UNHCR has indicated that up to half of all Northern Triangle nationals leaving their countries could be in need of international protection.[11] The case of unaccompanied children is especially egregious. One study conducted in 2016 indicates that 58 percent of children leaving Central America may need international protection;[12] however, among the tens of thousands of children detained and deported each year, just 229 unaccompanied children presented asylum petitions in 2016.[13] These

---

8.   *See infra* Section II.B.i.

9.   Caitlin Dickerson & Miriam Jordan, *'No Asylum Here': Some Say U.S. Border Agents Rejected Them*, N.Y. TIMES (May 3, 2017), https://www.nytimes.com/2017/05/03/us/asylum-border-customs.html?_r=1&ref=nyt-es&mcid=nyt-es&subid=article.

10.   *Boletines Estadisticos*, SEGOB SECRETARÍA DE GOBERNACIÓN (Jan. 31, 2018), http://www.politicamigratoria.gob.mx/es_mx/SEGOB/Boletines_Estadisticos (according to government statistics, Mexico carried out 147,370 deportations in 2016 and received 8,788 asylum petitions in the same year).

11.   James Frederick, *Before Migrants Reach U.S., Mexico Deports Central Americans*, NPR (Aug. 26, 2016, 4:29 PM), https://www.npr.org/2016/08/26/491531862/before-migrants-reach-u-s-mexico-deports-central-americans; *see also Children on the Run*, *supra* note 4, at 6; *Women on the Run*, *supra* note 4.

12.   *Children on the Run*, *supra* note 4, at 6.

13.   This represents a slight increase over 138 petitions presented in 2015, and 55 presented in 2013.

data indicate serious gaps in access to protection for those who wish to seek it in Mexico.

This article proceeds in three parts: first, it describes Mexico's substantive asylum law and adjudication in theory and in practice, based partially on interviews with Mexican asylum practitioners;[14] second, it analyzes some of the most serious barriers to asylum in Mexico, loosely classified into issues related to resource constraints and issues related to the policy of massive detention and deportation, signaling in particular the concerning situation of unaccompanied children. Finally, it concludes by considering the importance of both ensuring that Mexico's asylum system provides accessible and effective international protection to those who need it and choose to pursue it, while also recognizing the importance of family unity and effective enjoyment of rights for vulnerable groups, and that the asylum system is not itself a mechanism of border control.

## II. LEGAL FRAMEWORK AND THE ADMINISTRATIVE ASYLUM PROCESS

Mexico's substantive law of asylum offers fairly broad protection based on a variety of international and regional sources, and the administrative asylum process administered by the Mexican Refugee Commission ("COMAR," *Comisión Mexicana de Ayuda a Refugiados*) is designed to be efficient. However, in practice, practitioners express concerns about the application of the law and the celerity and fairness of the administrative process. This section of the Article provides basic information about Mexico's asylum law and administrative asylum process, about which there is little information available in English to date, as well as about the practical application of the law and procedure.

### A. The Substantive Law

Mexico's refugee law, the Law on Refugees, Complementary Protection, and Political Asylum (*Ley sobre Refugiados, Protección Complementaria y Asilo Político*), was passed in 2011 and updated in 2014.[15] The law incorporates four separate forms of international

---

14.  Interviews with Representatives from Fray Matías Centro de Derechos Humanos (from Tapachula and Tuxtla Gutierrez, Chiapas), Sin Fronteras (from Mexico City), and Representatives from the Clínica Jurídica de Refugiados "Alaíde Foppa" (from the Universidad Iberoamericana in Mexico City). Interviews took place in Austin, Tx. (May 9, 2017).

15.  Ley Sobre Refugiados y Protección Complementaria (Law on Refugees and Complementary Protection), Diario Oficial de la Federación [DOF] 27-01-2011, últimas reformas DOF 30-10-2014 (Mex.).

CLP_PC_021948

294          MARYLAND JOURNAL OF INTERNATIONAL LAW          [Vol. 33:290

protection: 1) Convention asylum, based on the definition in the 1951 Convention Relating to the Status of Refugees;[16] 2) Cartagena asylum, based on the expanded refugee definition set out in the 1984 Cartagena Declaration on Refugees;[17] 3) "complementary protection," based on the concept of *non-refoulement*;[18] and 4) political asylum, derived from the regional tradition of granting discretionary asylum on political grounds in Latin America.[19] There is no legal difference between

---

16.   1951 Convention Relating to the Status of Refugees (Refugee Convention), July 21, 1951, 189 U.N.T.S. 2545; 1967 Protocol Relating to the Status of Refugees (Refugee Protocol), Jan. 31, 1967, 606 U.N.T.S. 8791 (both available at: http://www.unhcr.org/3b66c2aa10.pdf); Ley Sobre Refugiados y Protección Complementaria (Law on Refugees and Complementary Protection), art. 13, sec. I, Diario Oficial de la Federación [DOF] 27-01-2011, últimas reformas DOF 30-10-2014 (Mex.); Mexico's law expands the Convention definition to include gender, defined as "the gender or sexual preferences of the applicant," as a protected ground. This definition helps to ensure recognition of claims based on sexual and gender-based violence, and claims by LGBTQ asylum-seekers. Reglamento de la Ley Sobre Refugiados y Protección Complementaria (Regulations of the Law on Refugees and Complementary Protection) [RLRPC], art. 4, sec. IV, Diario Oficial de la Federación [DOF] 21-02-2012 (Mex.).

17.   Cartagena Declaration on Refugees, Colloquium on the International Protection of Refugees in Central America, Mexico and Panama (Cartagena Declaration), Nov. 22, 1984, https://www.oas.org/dil/1984_cartagena_declaration_on_refugees.pdf; Ley Sobre Refugiados y Protección Complementaria (Law on Refugees and Complementary Protection), art.13 sec. II, Diario Oficial de la Federación [DOF] 27-01-2011, últimas reformas DOF 30-10-2014 (Mex.). This Declaration created an expanded definition of refugee in light of a massive increase during the 1980s of Central Americans in need of international protection who did not fit the 1951 Convention definition, including those fleeing their countries "because their lives, safety or freedom have been threatened by generalized violence, foreign aggression, internal conflicts, massive violation of human rights or other circumstances which have seriously disturbed public order," (Cartagena Declaration) 3, Nov. 22, 1984, https://www.oas.org/dil/1984_cartagena_declaration_on_refugees.pdf.

18.   Ley Sobre Refugiados y Protección Complementaria (Law on Refugees and Complementary Protection), art. 28, art. 2, sec. VII, Diario Oficial de la Federación [DOF] 27-01-2011, últimas reformas DOF 30-10-2014 (Mex.); *see also* Ley Sobre Refugiados y Protección Complementaria (Law on Refugees and Complementary Protection), art. 29-31, Diario Oficial de la Federación [DOF] 27-01-2011, últimas reformas DOF 30-10-2014 (Mex.); "Complementary Protection" in Mexican law is similar to Withholding of Removal under the Convention Against Torture ("CAT Withholding") in US law, granting protection to individuals not recognized as refugees but who require protection in order not to be "returned to the territory of another country where their life would be threatened or where there are reasonable grounds to believe that they would be in danger of being subjected to torture or other cruel, inhuman, or degrading treatment or punishment." A grant of complementary protection is only considered, but is considered automatically, upon the denial of an asylum claim. Ley Sobre Refugiados y Protección Complementaria (Law on Refugees and Complementary Protection), art. 32, Diario Oficial de la Federación [DOF] 27-01-2011, últimas reformas DOF 30-10-2014 (Mex.).

19.   "Protection granted by the Mexican State to a foreigner who it considers is persecuted for political motives or crimes, or for common crimes that are connected to political motives, whose life, liberty, or security is in danger. The protection may be requested by diplomatic or territorial channels." Ley Sobre Refugiados y Protección Complementaria (Law on Refugees and Complementary Protection), art. 2 sec. I, Diario Oficial de la Federación [DOF] 27-01-2011, últimas reformas DOF 30-10-2014 (Mex.); *see also Ficha T. . .cnica Sobre el Derecho*

refugees recognized under the 1951 Convention definition and the Cartagena definition in Mexico; all receive the same legal status and legal benefits upon a positive adjudication.[20] The exclusion and cessation grounds included in the 1951 Convention are also incorporated into the Mexican law.[21]

COMAR has not apparently used any part of the Cartagena definition in favor of Central American applicants to date, continuing to find that the violence in the Northern Triangle countries, though pervasive, is not indiscriminate but remains targeted against specific individuals.[22] However, practitioners report that since 2016, COMAR has begun to use the "massive violations of human rights" subsection of the Cartagena Declaration to recognize claims by Venezuelans, citing the lack of access to basic nutrition and medication in that country.[23]

In addition to the Law on Refugees, additional sources of relevant law include the Law's implementing Regulations (*Reglamento de la Ley sobre Refugiados, Protección Complementaria y Asilo Político*),[24] the Migration Law (*Ley de Migración*)[25] and its implementing Regulations (*Reglamento de la Ley de Migración*),[26] the General Law

---

*a Buscar y Recibir Asilo*, UNHCR, 2-3, (Art. 22.7) http://www.acnur.org/fileadmin/scripts/doc.php?file=fileadmin/Documentos/BDL/2017/112 16 (on the history of political asylum in Latin America).

20. *See* Ley Sobre Refugiados y Protección Complementaria (Law on Refugees, Complementary Protection and Political Asylum), Diario Oficial de la Federación [DOF] 27-01-2011, últimas reformas DOF 30-10-2014 (Mex.) (creating same legal benefits for all "refugees").

21. *See* 1951 Convention, Art. 1(c),(f); Ley Sobre Refugiados, Protección Complementaria y Asilo Político (Law on Refugees, Complementary Protection and Political Asylum), arts. 27, art. 34, Diario Oficial de la Federación [DOF] 27-01-2011, últimas reformas DOF 30-10-2014 (Mex.).

22. *See also Eligibility Guidelines for Assessing the International Protection Needs of Asylum-Seekers from El Salvador,* UNHCR 45 (2016), http://www.refworld.org/docid/56e706e94.html; *Eligibility Guidelines for Assessing the International Protection Needs of Asylum-Seekers from Honduras,* UNHCR (2016), http://www.refworld.org/docid/579767434.html. (Both of these documents consider that the violence in those countries is not indiscriminate).

23. *See also* Josefina Salomón, *Venezolano Cambiaría Forma en que México Trata a Refugiados* [Venezuelan Man Would Change the Way Mexico Treats Refugees], NEWSWEEK EN ESPAÑOL (Dec. 21, 2017), https://newsweekespanol.com/2017/12/venezolano-cambiaria-forma-en-que-mexico-trata-refugiados/.

24. Reglamento de la Ley Sobre Refugiados y Protección Complementaria (Regulations of the Law on Refugees and Complementary Protection) [RLRPC], Diario Oficial de la Federación [DOF] 21-02-2012 (Mex.).

25. Ley de Migración (Migration Law) [LM], Diario Oficial de la Federación [DOF] 25-05-2011, últimas reformas DOF 21-04-2016 (Mex.).

26. Reglamento de la Ley de Migración, Diario Oficial de la Federación (Regulations of the Law on Migration) [DOF] 28-09-2012, últimas reformas DOF 23-05-2014. (Mex.).

on Children's Rights (*Ley General de los Derechos las Niñas, Niños y Adolescentes*, LGDNNA)[27] and its implementing Regulations (*Reglamento de la LGDNNA*).[28] Because Mexico has accepted the jurisdiction of the Inter-American Court of Human Rights and, since its 2011 constitutional reform, incorporated international human rights law into its internal law, Inter-American legal precedents on asylum are also an important source of law.[29]

Mexico's Law on Migration (*Ley de Migración*) also creates a visa for "visitors for humanitarian reasons" ("*visitante por razones humanitarias*"), available according to the terms of the law to migrants who have been the victim or witness of a crime in Mexico and report the crime to the police; asylum-seekers; and unaccompanied children.[30] The visa is valid for one year, or for the duration of the asylum proceedings, and does not create a path to permanent residency.[31] By law, holders of humanitarian visas are authorized to work, but practitioners indicate that the ID cards granted to visa holders do not indicate actual work authorization and do not contain a *clave única de registro de población* (CURP, like a Social Security number), both of which make practical access to legal work difficult or impossible in

---

27. Ley General de los Derechos las Niñas, Niños y Adolescentes, [LGDNNA], Diario Oficial de la Federación [DOF] 04-12-2014 (Mex.).

28. Reglamento de La Ley General De Los Derechos De Niños, Niñas, y Adolescents [RGDNNA] Diario Oficial de la Federación, 02-12-2015 (Mex.).

29. Key Inter-American Court decisions regarding asylum include: Familia Pacheco Tineo v. Bolivia, Preliminary Objections, Merits, Reparations and Costs, Judgment, Inter-Am. Ct. H.R. (ser. C) No. 272 (Nov. 13, 2013); and Rights and Guarantees of Children in the Context of Migration and/or in Need of International Protection, Advisory Opinion 21/14, Inter-Am. Ct. H.R. (ser. 21) (Aug. 19, 2014). The Inter-American Commission's report, *Human Rights of Migrants, Refugees, Stateless Persons, Victims of Human Trafficking and Internally Displaced Persons: Norms and Standards of the Inter-American Human Rights System* (2015), http://www.oas.org/en/iachr/reports/pdfs/HumanMobility.pdf, compiles other relevant cases and standards of the Inter-American Commission and Inter-American Court. An interesting new development in the area of Inter-American jurisprudence on asylum are the precautionary measures granted by the Inter-American Commission in 2016 in the cases of E.S.G. and A.E.S.G. v. US, Precautionary Measure No. 297-15, Inter-Am. Comm'n H.R., Resolution 30/2016, (May 11, 2016), and D.S. v. U.S., Precautionary Measure No. 152-16, Inter-Am. Comm'n H.R., Resolution 21/2016, (April 9, 2016) (involving Salvadoran claimants alleging serious due process violations in expedited removal proceedings).
The reports: *Refugees and Migrants in the United States: Families and Unaccompanied Children*, INTER-AMERICAN COMMISSION ON HUMAN RIGHTS [IACHR] (June 24, 2015), http://www.oas.org/en/iachr/reports/pdfs/Refugees-Migrants-US.pdf; and *Human Rights of Migrants and Other Persons in the Context of Human Mobility in Mexico*, INTER-AMERICAN COMMISSION ON HUMAN RIGHTS [IACHR] (Dec. 30, 2013), http://www.oas.org/en/iachr/migrants/docs/pdf/report-migrants-mexico-2013.pdf also contain useful Inter-American legal standards and analysis.

30. Ley de Migración (Migration Law) [LM], art. 52 sec. V, Diario Oficial de la Federación [DOF] 25-05-2011, últimas reformas DOF 21-04-2016 (Mex.).

31. *Id.*

practice.[32]

## B. The Administrative Asylum Process

Asylum applications are handled by the Mexican Refugee Commission ("COMAR")[33] in a purely administrative (non-adversarial) process.[34] By statute, the process lasts 45 business days (about three months), with up to ten additional business days (two weeks) to analyze the possibility of granting complementary protection after a denial of asylum;[35] however, wait times continue to increase given the growing number of asylum claims and limited institutional capacity to process them, and many claims were even indefinitely suspended following the September 2017 earthquake that affected Mexico City.[36] The process includes one merits interview toward the end of the 45 day period; these interviews generally last about two hours, and asylum-seekers are permitted to have a lawyer present (though the lawyer is not always permitted to speak), as well as in some cases a psychologist.[37]

By law, asylum-seekers must present themselves before any COMAR office or National Migration Institute ("INM")[38] delegation in the country to request asylum within 30 business days of their entry

32.   Interview with lawyer from Sin Fronteras, *supra* note 14. *See also*, *e.g.*, Mark Manly, (@MarkManly),   TWITTER   (Sept.   6,   2017,   6:10   PM) https://twitter.com/MarkManly/status/905599203681812481.

33.   Both COMAR and INM are located within the Ministry of the Interior (Secretaria de Gobernación, SEGOB). COMAR has existed since the 1980s, though prior to the 2011 law reform its role was largely focused on the provision of humanitarian aid. For decades, UNHCR performed refugee status determination in Mexico by mandate; COMAR began adjudicating refugee claims in collaboration with UNHCR in 2003, and assumed complete control over the adjudication of refugee claims in 2011, after the Refugee Law was passed. Relevant legal norms governing COMAR's work can be found at: *Marca Normativo en Materia de Refugiados*,   COMISIÓN MEXICANA DE AYUDA REFUGIADOS   (Mar.   9,   2016), http://www.gob.mx/comar/documentos/marco-juridico-en-materia-de-refugiados.

34.   There is no adversarial asylum process analogous to defensive asylum proceedings before an Immigration Judge in the US; all asylum claims are handled administratively in the first instance by COMAR's asylum officers.

35.   Reglamento de la Ley de Migración, Art. 45, Diario Oficial de la Federación [DOF] 28-09-2012, últimas reformas DOF 23-05-2014. (Mex.).

36.   Comisión Nacional de los Derechos Humanos (CNDH), Press Release: *La CNDH hace un llamado urgente al gobierno federal ante el posible colapso del sistema de protección a refugiados en México* [CNDH urgently calls on the federal government given the possible collapse of the refugee protection system in Mexico], CNDH, February 25, 2018, http://www.cndh.org.mx/sites/all/doc/Comunicados/2018/Com_2018_046.pdf.

37.   Interview with Representatives from Fray Matías Centro de Derechos Humanos, Sin Fronteras, Clínica Jurídica de Refugiados "Alaíde Foppa," *supra* note 14.

38.   INM is responsible for immigration enforcement in Mexico, performing functions analogous to Customs and Border Protection (CBP) and Immigration and Customs Enforcement (ICE) in the US.

into the country.[39] COMAR offices currently exist only in Mexico City; Tapachula, Chiapas; and Acayucan, Veracruz.[40] INM delegations exist throughout the country.[41] Any person in immigration detention (*estación migratoria*, EM) may request asylum before the INM officers present there; nonetheless, a number of problems inside the centers impede migrants from requesting asylum in detention.[42] While many asylum-seekers remain detained for the duration of the adjudication of their asylum claim, alternatives to detention are sometimes granted to asylum-seekers.[43]

All asylum-seekers whose claims are denied by COMAR are entitled to an administrative review of the decision by the same agency through a *recurso de revisión*.[44] Essentially, upon filing the *recurso de revisión*, the 45-business-day clock is restarted, and the decision is reviewed.[45] However, this review generally examines only the legality of the process (without re-assessing the merits of the claim); practitioners advise that they generally pursue *recursos de revisión* only when there are extremely evident problems with the first-instance decision, such as incorrect names or material facts in the decision.[46] Further appeals after a negative decision may be pursued via a *juicio de nulidad*, a legal proceeding in which the asylum-seeker petitions to have COMAR's previous order vacated ("nullified") and substituted with a favorable decision, before the *Tribunal Federal de Justicia Administrativa* ("TFJA"), an administrative law tribunal.[47] Historically

---

39.   Ley de Migración (Mgration Law) [LM], art. 18, Diario Oficial de la Federación [DOF] 25-05-2011, últimas reformas DOF 21-04-2016 (Mex.).

40.   *Oficinas y delegaciones de la COMAR*, COMISIÓN MEXICANA DE AYUDA A REFUGIADOS, last visited May 12, 2018, http://www.comar.gob.mx/en/COMAR/Oficinas.

41.   *Horario y Oficinas del INM*, INSTITUTO NACIONAL DE MIGRACIÓN (June 14, 2016), https://www.gob.mx/inm/acciones-y-programas/horario-y-oficinas-del-inm.

42.   See *infra Section* II.B.ii.

43.   *Id.*

44.   Ley de Migración (Migration Law) [LM], art. 25, Diario Oficial de la Federación [DOF] 25-05-2011, últimas reformas DOF 21-04-2016 (Mex.).

45.   *Id.*

46.   Interview with Representatives from Sin Fronteras and Clínica Jurídica de Refugiados "Alaíde Foppa," *supra* note 14.

47.   *Id.*; *see also* Article 83 of the Federal Law on Administrative Procedure: "A judicial review or, when appropriate, a judicial trial corresponds against the acts and resolutions of administrative authorities that finalized the administrative procedure". Ley Federal de Procedimiento Administrativo (Federal Adminstrative Procedure Law) [LFPA], Art. 83, Diario Oficial de la Federación [DOF] 08-04-1994, últimos reformas DOF 19-04-2000, 30-05-2000 (Mex.); Ley Sobre Refugiados, Protección Complementaria y Asilo Político, arts. 25, 39, and 47, Diario Oficial de la Federación [DOF], 27-01-2011, últimas reformas DOF 30-10-2014 (Mex.); Reglamento de la Ley Sobre Refugiados y Protección Complementaria (Regulation of the Law on Refugees and Conplementary Protections) [RLRPC], arts. 45, 55, 59, & 60, Diario Oficial de la Federación [DOF], 21-02-2012 (Mex.); Ley Federal del

a tax court, the tribunal has been the subject of criticisms by practitioners that its magistrates and staff are not familiar with human rights law or especially well-equipped or trained to adjudicate refugee cases.[48] There are an increasing number of TFJA precedents on refugee law that COMAR is bound to follow; these precedents could be overruled by future precedents from the *Poder Judicial* (the judicial branch).

Asylum-seekers may also seek judicial protection via a *recurso de amparo*, a constitutional claim brought when human rights have been violated.[49] Asylum-seekers may seek an *amparo* before the courts at any point to allege human rights violations in the asylum process (e.g. in the context of detention). For example, one court recently ruled in an (non-precedential) *amparo* proceeding that detention of asylum-seekers is exceptional, and liberty should be the rule.[50] To date, there is no binding precedent on refugee law from the judicial power.[51]

Asylum-seekers and migrants can also present complaints to Mexico's National Human Rights Commission ("CNDH") about any human rights violation they suffer in Mexico (including for example immigration detention conditions, due process violations in the asylum process, children's rights violations, and so on).[52] The CNDH does not have any formal role in the asylum adjudication process, and so cannot review or revise decisions in individual cases, but its recommendations can change policies and practices within relevant institutions, including COMAR and INM.[53] CNDH complaints are also useful as an

---

Procedimiento Contencioso Administrativo (Federal Law of Administrative Disputes Procedures) [LFPCA], Art. 2, Diario Oficial de la Federación [DOF] 01-12-2005, últimas reformas DOF 27-01-2017 (Mex.).

48.  Jorge Ríos, *Un "Tribunal de Asilo" para México*, SINEMBARGO (June 7, 2016), http://www.sinembargo.mx/07-07-2016/3063642; *Evolución y Retos del Asilo en M. . .xico*, SIN      FRONTERAS      I.A.P.,      55      (2016),      http://sinfronteras.org.mx/wp-content/uploads/2017/06/InformeAsilo_2016_WEB_02.pdf.

49.  Ley de Amparo, Reglamentaria de los Artículos 103 y 107 de la Constitución Política de los Estados Unidos Mexicanos (Constitutional Protection Law, Regulating Articles 103 and 107 of the Political Constitution fo the Mexican United States) [LARACPEUM], art. 1, Diario Oficial de la Federación [DOF] 10-01-2011, últimas reforma DOF 06-17-2016 (Mex.).

50.  *See En principio, solicitantes de asilo no podrán ser privados de libertad, fallo histórico del Poder Judicial en México [¡Conoce la sentencia!]*, IJPP/CJR "Alaíde Foppa," (May 5, 2017), http://ijpp.mx/images/IJPP-comunicado-PJF-fallo-historico-2017.pdf.

51.  Interview with Representatives from Sin Fronteras, *supra* note 14.

52.  *Id.*; *see also Quinta Vistaduría General*, COMISIÓN DE LOS DERECHOS HUMANOS, last visited May 12, 2018, http://www.cndh.org.mx/Estructura (information under "Quinta Visitaduría").

53.  For example, the CNDH recently declared irregularities in COMAR's adjudication practices and INM's detention practices. *Recomendación de CNDH Reconoce que COMAR e INM Violan Derechos Humanos de Solicitantes de Asilo* [CNDH recommendation recognizes

300        MARYLAND JOURNAL OF INTERNATIONAL LAW        [Vol. 33:290

information-gathering mechanism.[54]

III. CURRENT CHALLENGES FOR MEXICO'S ASYLUM SYSTEM

### A. Growing Numbers of Asylum-Seekers Strain COMAR and Civil Society Capacity

The number of asylum claims presented each year in Mexico has skyrocketed since 2011.[55] While the makeup of asylum applications has been fairly constant in recent years, with Honduras consistently in first place and El Salvador in second or third, in 2017, the number of Venezuelan asylum claimants increased significantly.[56]

While these growing numbers likely reflect a growth in the absolute number of persons in need of international protection fleeing Central America, they also undoubtedly indicate an increased knowledge of and access to the asylum system in Mexico, driven by increased outreach efforts by governmental, international, and civil society agencies, and word of mouth. A growth in asylum claims of more than 1000 percent in six years has, unsurprisingly, put serious strain on existing systems for aid and attention to migrants. The following sections examine some of the administrative strains being put on this system.

### 1. COMAR

Undoubtedly the most serious barrier to the effective adjudication of asylum claims in Mexico is COMAR's extremely limited staff and its limited geographic reach. Until late 2016, there were fewer than 20 COMAR officials in the country; there are now reportedly between 30 and 40 officials who hear and decide cases.[57] The statutory 45-day

---

that COMAR and INM violate the human rights of asylum-seekers], CMDPDH (Oct. 20, 2017), http://cmdpdh.org/2017/10/recomendacion-cndh-reconoce-comar-e-inm-violan-derechos-humanos-solicitantes-asilo/.

54. Interview with Representatives from Sin Fronteras and Clinica Jurídica de Refugiados "Alaíde Foppa," *supra* note 14.

55. *See supra* notes 2, 3 and accompanying text; Kevin Lui, *Mexico's Asylum Application Numbers Are Up by 150% Since the U.S. Election*, TIME (Apr. 19, 2017), http://time.com/4745785/mexico-asylum-applications-trump-election/.

56. Mark Manly, (@MarkManly), TWITTER (Sept. 7, 2017, 9:21 AM), https://twitter.com/MarkManly/status/905828381228498944.

57. Interview with Representatives from Sin Fronteras, Clínica Jurídica de Refugiados "Alaíde Foppa," and Fray Matías Centro de Derechos Humanos, *supra* note 14; *see also* Luis Alfredo Arriola Vega, *Policy Adrift: Mexico's Southern Border Program*, JAMES A. BAKER III INSTITUTE FOR PUBLIC POLICY OF RICE UNIVERSITY, 4 (June 2017), https://www.bakerinstitute.org/media/files/files/fa7ac127/MEX-pub-FronteraSur-

period for adjudication is being extended (usually for an additional forty-five days) due to the high numbers of petitions with increasing frequency, reportedly often without advising asylum-seekers—and since the October 2017 earthquake that affected Mexico City, wait times are reportedly even longer.[58] Staff turnover is reported to be very high, making training a constant challenge.[59]

In this context, practitioners report that decisions by COMAR often demonstrate a lack of legal analysis and reasoning.[60] This is likely a result both of limited training and limited time to spend on cases. Another serious procedural flaw identified by practitioners is that COMAR generally interviews only the person designated as the principal applicant on the petition (usually the male head of household), which is both *machista* and can lead to negative case outcomes when other family members, including wives and adolescent children, have relevant information about the claim but are not given the opportunity to communicate it to adjudicators. Additionally, merits interviews are recorded, but practitioners report that it is more common for COMAR officials to review and use the interview notes (which are not a transcript) for their written decision.[61] Practitioners report that COMAR is regularly performing interviews just a few days before the 45-day window for adjudication runs out, raising concerns that COMAR is writing its decisions largely on the basis of the intake forms, rather than on the interviews.[62] Taken together, these issues present serious concerns about the consistency and fairness of the COMAR adjudication process.[63]

---

062317.pdf.

58. Diana Higareda, *México deja a refugiados en el limbo*, EL UNIVERSAL (Apr. 2, 2018), http://www.eluniversal.com.mx/nacion/sociedad/mexico-deja-refugiados-en-el-limbo.

59. Interview with Representatives from Fray Matías Centro de Derechos Humanos, Sin Fronteras, Clínica Jurídica de Refugiados "Alaíde Foppa," *supra* note 14.

60. *Id.*; *see also Informe Preliminar: La interpretación y aplicación del derecho internacional y nacional de los refugiados en México: Análisis de las resoluciones de primera instancia de la Comisión Mexicana de Ayuda a Refugiados*, COMISIÓN MEXICANA DE AYUDA A REFUGIADOS (2017), http://192.203.177.41/sites/all/themes/ibero/descargables/ibero/pdh/resumen-ejecutivo-informe-asilo.pdf.

61. Interview with Representatives from Clínica Jurídica de Refugiados "Alaíde Foppa," Fray Matías Centro de Derechos Humanos, and Sin Fronteras, *supra* note 14.

62. *Id.*

63. The phenomenon of disparities in asylum adjudication is an issue that would also benefit from further comparative research among countries in the future, in the areas of both procedural due process and substantive guarantees of protection. *See, e.g.*, JAYA RAMJI-NOGALES, ANDREW I. SCHOENHOLTZ, & PHILIP G. SCHRAG, REFUGEE ROULETTE: DISPARITIES IN ASYLUM ADJUDICATION AND PROPOSALS FOR REFORM (2009); REBECCA HAMLIN, LET ME BE A REFUGEE: ADMINISTRATIVE JUSTICE AND THE POLITICS OF ASYLUM IN THE UNITED STATES,

CLP_PC_021956

302 MARYLAND JOURNAL OF INTERNATIONAL LAW [Vol. 33:290

Because COMAR has brick-and-mortar delegations only in Mexico City, Tapachula, and Acayucan, asylum claims presented in other parts of the country may be adjudicated by the Mexico City office, or by mobile field units.[64] These geographic limitations mean that asylum interviews often take place in general immigration facilities rather than in dedicated asylum offices. They also often take place by telephone under inadequate conditions, including a lack of privacy, though advocacy by practitioners is beginning to change the practice of telephone interviews.[65]

### 2. Civil Society

The increase in asylum-seekers in Mexico has also placed corresponding burdens on civil society actors, including migrant shelters, lawyers, social workers, psychotherapists, food banks, and other providers of humanitarian aid, among others.

The migrant shelter network in Mexico continues to adjust to provide services to asylum-seekers during multi-month stays, rather than to migrant workers during overnight stays, with substantial financial and logistical support from UNHCR.[66] These shelters provide an important point of civil society contact with migrants in Mexico, providing humanitarian aid and information about access to asylum, as well as a point of contact to gather demographic and qualitative data about the situation of irregular migrants in Mexico.[67]

The few NGOs that provide legal representation to asylum-seekers are similarly strained by the growing demand for their services.

---

CANADA, AND AUSTRALIA (2014).

64. *Oficinas y Delegaciones de la COMAR, supra* note 40.

65. Interview with Representatives from Fray Matías Centro de Derechos Humanos, Clínica Jurídica de Refugiados "Alaíde Foppa," *supra* note 14.

66. Alejandro Olayo-Méndez, *La 72: An Oasis Along the Migration Routes in Mexico*, 56 FORCED MIGRATION REV. 10, 10–11 (2017); Víctor Hugo Gutierrez Albertos, *La 72 Como Espacio Intercultural de Emancipación y Resistencia Trans en la Frontera sur de México*, XII No. 2 PENÍNSULA 69, 80 (2017); *Mexican Shelter Provides Safe Space for Central Americans*, UNHCR (Oct. 17, 2017), http://www.unhcr.org/en-us/news/latest/2017/10/59e085fb4/mexican-shelter-provides-safe-space-central-americans.html.

67. *See, e.g.*, REDODEM (Red de Documentación de las Organizaciones Defensoras de Migrantes), MIGRACIÓN EN TRÁNSITO: ROSTRO DE UNA CRISIS HUMANITARIA INTERNACIONAL (2016), https://www.entreculturas.org/sites/default/files/informe_redodem.pdf (report on the situation of irregular migrants in Mexico based on data gathered by a network of migrant shelters across Mexico); CNDH, LOS DESAFÍOS DE LA MIGRACIÓN Y LOS ALBERGUES COMO OASIS: ENCUESTA NACIONAL DE PERSONAS MIGRANTES EN TRÁNSITO POR MÉXICO (2017), http://www.cndh.org.mx/sites/all/doc/Informes/Especiales/Informe-Especial-Desafios-migracion.pdf.

CLP_PC_021957

Lawyers additionally report barriers to performing their jobs, including limitations on the scope of representation permitted by COMAR.[68] The availability of psychological services for asylum-seekers and refugees, particularly outside of Mexico City, is similarly limited.[69]

Asylum-seekers often face serious barriers to making ends meet and integrating into Mexican society.[70] Humanitarian assistance and other assistance to asylum-seekers remains limited, and perhaps the most common complaint among asylum-seekers is that it is difficult in practice to find legal work.[71] First, because their legal work authorization is difficult to prove and access, and second, because the lived experience of being an asylum-seeker in Mexico is one of waiting in endless queues: to check in weekly with COMAR and/or INM, and to obtain humanitarian aid, medical care, and food.[72] These realities severely limit the options for stable work.[73] Difficulty finding work, or well-paid work, makes conditions of life difficult for asylum-seekers.[74]

## B. The Larger Context of Aggressive Border Enforcement Limits Access to Asylum

Notwithstanding the serious challenges to accessing asylum in Mexico generated by the context of scarce resources described above, access is much more severely limited by Mexico's wider immigration policy of large-scale detention and deportation. This limits migrants' access to information about asylum as well as access to the proceeding itself, disincentivizes migrants from beginning or completing the process, including due to intolerable detention conditions, and

68. Interview with Representatives from Fray Matías Centro de Derechos Humanos, Clínica Jurídica de Refugiados "Alaíde Foppa," and Sin Fronteras, *supra* note 14.

69. *Id.*; *see also* Comisión Interamericana de Derechos Humanos, *México: Solicitantes de Asilo y Refugiados*, YOUTUBE (Mar. 17, 2017), https://www.youtube.com/watch?v=i8eQaP89u_c; Inter-American Commission on Human Rights (IACHR), *Report on the 161st Session of the IACHR* (Mar. 22, 2017), http://www.oas.org/en/iachr/media_center/PReleases/2017/035A.asp (giving brief summary in English of "Mexico: Solicitantes de asilo y refugiados"); *Situación de los Derechos Humanos de las Personas Solicitantes de Asilo y Refugiadas en México*, 20–26 (Mar. 17, 2017) http://sinfronteras.org.mx/wp-content/uploads/2017/03/InformeAuienciaCIDH_-17_Marzo.pdf (report from above-referenced hearing).

70. Interview with Representatives from Fray Matías Centro de Derechos Humanos, Clínica Jurídica de Refugiados "Alaíde Foppa," and Sin Fronteras, *supra* note 14; *see also* Diana Higareda, *México deja a refugiados en limbo*, EL UNIVERSAL (Apr. 2, 2018), http://www.eluniversal.com.mx/nacion/sociedad/mexico-deja-refugiados-en-el-limbo.

71. *Id.*

72. *Id.*

73. *Id.*

74. *Id.*

304          MARYLAND JOURNAL OF INTERNATIONAL LAW          [Vol. 33:290

particularly harms unaccompanied children.

### 1. Plan Frontera Sur and U.S.-Mexico Border Enforcement Cooperation

Mexico's growing asylum system exists within a larger policy context of mass immigration detention, and deportation, carried out largely for the benefit of the United States.[75] The United States has specifically cooperated with and given money to Mexico for border enforcement at least since 2008, within the framework of the Mérida Initiative.[76] Since July 2014, when the so-called "Plan Frontera Sur" ("Southern Border Plan") was first publicly announced,[77] Mexico has substantially increased immigration enforcement across the country, particularly in the southern states.[78] The announcement of the Plan Frontera Sur coincided virtually exactly with the peak of the "surge" of unaccompanied Central American children arriving on the U.S.'s southern border, which provoked heavy media coverage and public concern that the children presented a grave threat to U.S. border security and an unsustainable burden on its immigration system.[79] The Plan Frontera Sur was created to address migration, security, and border enforcement issues, though it has been criticized as "disjointed" and incomplete policy.[80]

While Mexico's southern border with Guatemala—the vast majority of which is composed of the shallow Suchiate River and the Petén rainforest—has traditionally been described with adjectives like

---

75.   Arriola Vega, *supra* note 57.

76.   *Id.* at 6.

77.   CHRISTOPHER WILSON & PEDRO VALENZUELA, WILSON CENTER MEXICO'S SOUTHERN BORDER STRATEGY: PROGRAMA FRONTERA SUR (2014).

78.   Alejandra Castillo, *The Mexican Government's Frontera Sur Program: An Inconsistent Immigration Policy*, COUNCIL ON HEMISPHERIC AFFAIRS (OCT. 25, 2016), http://www.coha.org/wp-content/uploads/2016/10/The-Mexican-Government%E2%80%99s-Frontera-Sur-Program-An-Inconsistent-Immigration-Policy.pdf.

79.   Some academics and practitioners have questioned whether this event in fact constituted a "crisis," given that the numbers of women and children who arrived on the U.S.'s southern border that summer constituted neither a historic high in immigration nor an increase in arrivals to the U.S. out of line with recent trends in migration. *See, e.g.,* Arriola Vega, *supra* note 57; Karen Musalo & Eunice Lee, *Seeking a Rational Response to a Regional Refugee Crisis: Lessons from the Summer 2014 "Surge" of Central American Women and Children at the US-Mexico Border*, 5 J. ON MIGRATION AND HUM. SECURITY 137 (2017); William C. Gruben, & Tony Payan, *"Illegal" Immigration on the U.S.-Mexico Border: Is it Really a Crisis?*, BAKER INSTITUTE FOR PUBLIC POLICY (Oct. 17, 2014, 5:46 PM), https://www.bakerinstitute.org/research/illegal-immigration-usmexico-border-it-really-crisis/.

80.   Arriola Vega, *supra* note 57.

"porous"[81] (not to say, to a large extent, nonexistent), Plan Frontera Sur has concentrated immigration enforcement operations particularly in southern states like Chiapas, Tabasco, Oaxaca, and Veracruz—sometimes described as a policy of "pushing the U.S. border south" or creating a new "vertical border"[82] within Mexico. This increased border enforcement, with the collaboration and financing of the U.S. government largely via Mérida Initiative funds,[83] has quickly turned Mexico into the country that deports the greatest number of Central Americans; the uptick of deportations from Mexico in recent years corresponds quite closely with a decrease in deportations from the U.S. (see Figure 1). Recently, the Trump Administration has proposed taking border externalization a step further by designating Mexico as a so-called "Safe Third Country," which could prevent tens of thousands of Central American and other asylum-seekers who reach the U.S. via Mexico from effectively accessing asylum in the U.S. if it is determined that they could have requested asylum in Mexico.[84] It has also contributed to a fragmentation of migrant routes through southern Mexico away from the traditional train routes, taking migrants further from the established network of shelters and exposing them to danger at the hands of human traffickers and criminal groups.[85]

---

81. CLARE RIBANDO SEELKE & KRISTIN FINKLEA, CONG. RESEARCH SERV., RL41349, U.S.-MEXICAN SECURITY COOPERATION: THE MÉRIDA INITIATIVE AND BEYOND, 21 (2017).

82. *Cf.* José Carlos Yee Quintero & Eduardo Torre Cantalapiedra, *Lidiando con la Frontera Vertical: Estrategias Migratorias de los Hondureños en Tránsito por México [Dealing with the vertical border: migration strategies of Hondurans in transit through Mexico]*, 47 REMHU - REV. INTERDISCIP. MOBIL. HUM. 97, 99–100 (2016).

83. SEELKE & FINKLEA, *supra* note 81; Arriola Vega, *supra* note 57, at 6. While the full extent and nature of cooperation in this area is not publicly known, reports indicate that the U.S. additionally provides other kinds of technical assistance and equipment to Mexican authorities as well. ADAM ISACSON, MAUREEN MEYER, & HANNAH SMITH, *Increased Enforcement at Mexico's Southern Border: An Update on Security, Migration, and U.S. Assistance*, WASHINGTON OFFICE ON LATIN AMERICA (WOLA), 2 (2015) https://www.wola.org/files/WOLA_Increased_Enforcement_at_Mexico's_Southern_Border _Nov2015.pdf.

84. HUM. RTS. FIRST, DANGEROUS TERRITORY: MEXICO STILL NOT SAFE FOR REFUGEES, 1 (2017).

85. WASHINGTON OFFICE ON LATIN AMERICA, *Migration through Mexico: A Humanitarian Emergency* (2016), https://www.wola.org/analysis/migration-through-mexico-a-humanitarian-emergency/.

306        Maryland Journal of International Law        [Vol. 33:290

Figure 1[86]



The growth in deportations from Mexico in recent years has been enormous, and almost entirely targeted toward the detention and deportation of nationals of Guatemala, Honduras, or El Salvador ("Northern Triangle nationals").[87] Whereas in 2013, Mexico detained a total of 86,298 individuals and deported 80,902, by 2015 that number peaked at 198,141 detentions and 181,163 deportations—of which 177,949 detentions (89.8 percent) and 175,136 deportations (96.7 percent) were of Northern Triangle nationals.[88] In 2016, Mexico detained 186,216 and deported 159,872 foreigners, of which 150,035 (80.6 percent) and 149,540 (93.5 percent), respectively, were Northern Triangle nationals.[89]

### 2. INM Detention and Deportation Practices

The principal agency in charge of administering Mexico's "deportation machine" is the Instituto Nacional de Migración (INM,

---

86.   Department of Homeland Security (DHS) and Secretaría de Gobernación (SEGOB) statistics.

87.   *See* Rodrigo Dominguez Villegas & Victoria Rietig, Migration Policy Institute, Migrants Deported from the United States and Mexico to the Northern Triangle, A Statistical and Socioeconomic Profile, 1 (2015) ("Together, the United States and Mexico have apprehended almost 1 million people who originated from the Northern Triangle of Central America in the past five years, and have deported more than 800,000 of them").

88.   Unidad de Política Migratoria, Boletín mensual de estadísticas migratorias 2017 (2017).

89.   *Id.*

2018]     THE MEXICAN ASYLUM SYSTEM IN REGIONAL CONTEXT     307

National Migration Institute), which carries out the mass detention and deportation of migrants.[90] As an organ of the State, INM is obligated to act to guarantee the State's obligation of non-refoulement by identifying, referring, and, in every case, avoiding the deportation of individuals who may need international protection.[91] However, practitioners, asylum-seekers, and international human rights organizations regularly report that INM creates barriers to accessing the asylum system and sometimes fails to guarantee access even to those who expressly state their desire to seek asylum.[92] Indeed, a recent survey by Amnesty International found that as many as 40 percent of respondents who had been detained by INM gave "solid indications" of having been returned to their home countries despite evidence of a need for international protection, in likely violation of international law.[93]

Asylum-seekers may request asylum before COMAR or INM. While COMAR offices currently exist only in Mexico City; Tapachula, Chiapas; and Acayucan, Veracruz, INM delegations exist throughout the country; the vast majority of potential asylum-seekers are thus more likely to first come into contact with INM than with COMAR. Nonetheless, INM officials and asylum-seekers alike see these delegations as primarily involved in immigration enforcement procedures, including detention and deportation, rather than processing of refugee claims.[94] While any person in immigration detention (*estación migratoria*, EM) has the right to request asylum before the INM officers, reports of poor detention conditions, abusive

90.  *¿Qué hacemos? [What do we do?]*, INSTITUTO NACIONAL DE MIGRACIÓN, https://www.gob.mx/inm/que-hacemos (Mex.).

91.  *Ley de Refugiados*. *See* 1951 Convention Relating to the Status of Refugees, 22 Apr. 1954, 189 U.N.T.S. 150, art. 33; Case of the Pacheco Tineo Family v. Bolivia, Inter-Am. Ct. H.R. (Nov. 25, 2013), http://www.corteidh.or.cr/docs/casos/articulos/seriec_272_ing.pdf; Rights and Guarantees of Children in the Context of Migration and/or in Need of International Protection, Advisory Opinion OC-21/14, Inter-Am. Ct. H.R. (Aug. 19, 2014), http://www.corteidh.or.cr/docs/opiniones/seriea_21_eng.pdf.

92.  *Closed Doors: Mexico's Failure to Protect Central American Refugee and Migrant Children*, HUMAN RIGHTS WATCH, 48 (2016), https://www.hrw.org/report/2016/03/31/closed-doors/mexicos-failure-protect-central-american-refugee-and-migrant-children; Joselin Barja Coria, *Derechos Cautivos: La situación de las personas migrantes y sujetas a protección internacional en los centros de detención migratoria: siete experiencias de monitoreo desde la sociedad civil* (2015); *Facing Walls: USA and Mexico's Violations of the Rights of Asylum-Seekers*, AMNESTY INTERNATIONAL (2017), https://www.amnestyusa.org/reports/facing-walls-usa-mexicos-violation-rights-asylum-seekers/.

93.  *Descarga el informe 'Ignoradas y sin protección', la mortal devolución de personas solicitantes de asilo*, AMNESTY INTERNATIONAL, (Jan. 23, 2018), https://amnistia.org.mx/contenido/descarga-el-informe-ignoradas-y-sin-proteccion-la-mortal-devolucion-de-personas-solicitantes-de-asilo/.

94.  *Closed Doors*, *supra* note 92.

behavior by immigration officials, a lack of adequate information inside detention centers about the existence and availability of asylum, insecurity inside the facilities, and attempts by immigration officials to dissuade migrants from claiming asylum, or to convince migrants that they should accept a voluntary deportation[95] and come back to seek asylum in liberty, are common factors that impede migrants from requesting asylum in detention.[96] Of course, migrants in parts of the country where COMAR is not located are likely to be understandably wary of approaching INM in liberty to request asylum at all, which further limits access to protection.

Conditions in Mexican immigration detention centers are notoriously bad.[97] Asylum-seekers and other individuals who may need international protection detained in INM facilities may request deportation because they cannot endure the prison-like conditions of the detention centers.[98] For example, the Siglo XXI detention center in Tapachula, Chiapas—the largest immigration detention facility in Latin America, with the capacity to hold up to 990 migrants[99]—is badly overcrowded, forcing migrants to sleep on cots or mats in crowded rooms where lights are left on all night.[100] There are separate

---

95.   Unlike in the U.S., prior deportations from Mexico do not in general have future immigration consequences, so asylum-seekers should not fear future ineligibility for asylum as a consequence of accepting a deportation. (With the caveat that, if they made a prior asylum claim, a lack of new facts/persecution in a future claim may be a bar to success on the merits, as in the U.S.)

96.   *See generally Closed Doors*, *supra* note 92; *see also The Cost of Stemming the Tide: How Immigration Enforcement Practices in Southern Mexico Limit Migrant Children's Access to International Protection*, GEORGETOWN LAW HUMAN RIGHTS INSTITUTE, 35 (2015), https://www.law.georgetown.edu/academics/centers-institutes/human-rights-institute/fact-finding/upload/HRI-Fact-Finding-Report-Stemming-the-Tide-Web-PDF_English.pdf; Joselin Barja Coria, *Derechos Cautivos: La situación de las personas migrantes y sujetas a protección internacional en los centros de detención migratoria: siete experiencias de monitoreo desde la sociedad civil* (2015).

97.   *See, e.g.*, ARDELIO VARGAS FOSADO, COMISIÓN NACIONAL DE DERECHOS HUMANOS, INFORME 7/2016 DEL MECANISMO NACIONAL DE PREVENCIÓN DE LA TORTURA SOBRE ESTACIONES MIGRATORIAS Y ESTANCIA PROVISIONALES EN LOS ESTADOS DE GUERRERO, MICHOACÁN, NUEVO LEÓN, QUINTANA ROO, SONORA Y VERACRUZ (2016) http://www.cndh.org.mx/sites/all/doc/PrevTortura/7_2016.pdf (Mex.); Valeria Fernández, *On the way to the US, children seeking asylum are often put in Mexico's detention centers*, PRI (Jan. 3, 2017), https://www.pri.org/stories/2017-01-03/children-fleeing-violence-central-america-who-don-t-make-it-us-often-end-mexican; *Closed Doors*, *supra* note 92.

98.   *The Cost of Stemming the Tide*, *supra* note 96, at 35–37; *see also* CENTER FOR GENDER AND REFUGEE STUDIES, NIÑEZ Y MIGRACIÓN EN CENTRO Y NORTE AMERICA: CAUSAS, POLÍTICAS, PRÁCTICAS Y DESAFÍOS, 249–250 (Feb. 2015), http://www.acnur.org/t3/fileadmin/Documentos/Publicaciones/2015/9927.pdf?view=1.

99.   *See, e.g. The Cost of Stemming the Tide*, *supra* note 96, at 22, n.85.

100.   *Closed Doors*, *supra* note 92 ("Accounts from children and adults held in Tapachula's Siglo XXI detention center indicate not only that it is overcrowded but also that mattresses are in short supply; moreover, they described conditions that were far less hygienic than those we

areas for men, women, and adolescents, aged 13-17[101] (unaccompanied children are turned over to child protection officials).[102] Families are generally separated,[103] except for mothers with children aged 12 and under, or adolescent daughters.[104] Despite improvements in the use of alternatives to detention, immigration detention continues to be "the rule and not the exception."[105]

The situation of unaccompanied children in detention is especially concerning. By law, unaccompanied child asylum-seekers must be referred to Family Welfare Agency ("DIF") shelters, where they must stay at least until the adjudication of their asylum claims.[106] The DIF shelters are secure facilities—children cannot leave the facility and are not integrated into the community—and so are not completely distinct from detention centers.[107] Furthermore, many unaccompanied adolescent boys and girls, as well as children accompanied by their mothers, may be held in adult immigration detention.[108] Such detention violates the regulations implementing the Law on Children's Rights, which prohibit immigration detention of children, both accompanied and unaccompanied,[109] as well as

---

saw in the Acayucan immigration detention center."); *The Cost of Stemming the Tide*, *supra* note 96, at 36; Barja Coria, *supra* note 96, at 67.

101. *The Cost of Stemming the Tide*, *supra* note 96, at 33; Baria Coria, *supra* note 96, at 67.

102. *The Cost of Stemming the Tide*, *supra* note 96 ("Transfer to DIF is the exception rather than the rule, even though Mexican law calls for the immediate transfer of all unaccompanied children to DIF shelters.")

103. *Closed Doors*, *supra* note 92, at 86 ("Mexico's INM-run immigration detention centers that are authorized to receive children usually have separate sections for adult men, adolescent boys, and women and girls, meaning that families are generally separated when they are detained"); GEORGETOWN LAW HUMAN RIGHTS INSTITUTE, *The Cost of Stemming the Tide* 33 (2015).

104. *Closed Doors*, *supra* note 92, at 87("Children under the age of 12 are generally assigned to a detention center's section for women and girls if they have mothers or other family members in that section. Unaccompanied boys under 12 may also be held in the section for women and girls."); Baria Coria, *supra* note 96, at 69 ("Los niños y niñas tienen un tratamiento diferencial según sexo y edad: las niñas de 12 a 17 años permanecen con sus madres en el módulo de mujeres, pero los niños de la misma edad son detenidos en el área específica de adolescentes").

105. Simón Hernández León, *La política de detención de solicitantes de asilo en Mexico y su impacto en la integridad personal*, NEXOS, February 27, 2018, https://eljuegodelacorte.nexos.com.mx/?p=7777.

106. Reglamento de la Ley General de los Derechos de Niñas, Niños y Adolescentes [RLGDNNA], Diario Oficial de la Federación [DOF] 02-12-2015.

107. *See, e.g. Closed Doors*, *supra* note 92, at 104.

108. *See also Facing Walls*, *supra* note 92, at 32–33.

109. Reglamento de la Ley General de los Derechos de Niñas, Niños y Adolescentes [RLGDNNA], Art. 111, Diario Oficial de la Federación [DOF] 02-12-2015. [T2: Foreign Jurisdictions – Mexico – Regulations] ("Migrant children, whether or not traveling in the company of an adult person, shall at no time be deprived of their liberty in detention centers,

310          MARYLAND JOURNAL OF INTERNATIONAL LAW          [Vol. 33:290

international law.[110]

### 3. Issues Within the Asylum System

The repressive logic of Mexico's migration system is further replicated within aspects of its international protection system, principally in limitations placed on asylum-seekers' freedom of movement during the adjudication process, as well as the treatment of unaccompanied or separated migrant children.

COMAR places a variety of restrictions on asylum-seekers' freedom of movement during the adjudication process with the apparent aim of preventing movement within the country, including northward, during adjudication. Asylum-seekers are not permitted to travel outside of the Mexican state in which they request asylum without prior authorization by COMAR until they receive a positive adjudication of their application;[111] transfers within Mexico are generally permitted only for reasons of personal safety or upon proof of relation to a family member in another part of the country who can demonstrate financial ability to receive the asylum-seeker.[112] COMAR tends to be quite stringent with requests for transfer of asylum-seekers, likely because transfers away from states where it has delegations place administrative burdens on COMAR, and because it tends to be suspicious of requests to relocate further north in Mexico, perhaps considering that individuals will seek to abandon their claims in

---

nor in any other immigration detention facility.")

110.   *Rights and Guarantees of Children in the Context of Migration and/or in Need of International Protection*, Advisory Opinion OC-21/14, Inter-Am. Ct. H.R. ¶ 154 (Aug. 19, 2014), http://www.corteidh.or.cr/docs/opiniones/seriea_21_eng.pdf ("[T]he Court finds that the deprivation of liberty of children based exclusively on migratory reasons exceeds the requirement of necessity, because this measure is not absolutely essential in order to ensure their appearance at the immigration proceedings or to guarantee the implementation of a deportation order … [T]he Court finds that the deprivation of liberty of a child in this context can never be understood as a measure that responds to the child's best interest. …In sum … the deprivation of liberty of a child migrant in an irregular situation, ordered on this basis alone, is arbitrary and, consequently, contrary to both the Convention and the American Declaration."); Comm. on the Rights of the Child, General Comment No. 6: Treatment of Unaccompanied and Separated Children Outside their Country of Origin, ¶ 61, U.N. Doc. CRC/GC/2005/6 (Sept. 1, 2005), http://www.refworld.org/docid/42dd174b4.html; DETENTION GUIDELINES: GUIDELINES ON THE APPLICABLE CRITERIA AND STANDARDS RELATING TO THE DETENTION OF ASYLUM-SEEKERS AND ALTERNATIVES TO DETENTION, UNHCR, Guideline 9.2 (2012), http://www.unhcr.org/505b10ee9.html.

111.   *See generally Facing Walls*, note 92 (making the argument to put in place special mechanisms for vulnerable groups of asylum-seekers, in particular transgender women, that may need to be urgently transferred from border areas to other parts of the country to await the outcome of their asylum proceedings).

112.   Interview with representatives from Fray Matías Centro de Derechos Humanos, Sin Fronteras, Clínica Jurídica de Refugiados "Alaíde Foppa," *supra* note 14.

Mexico and travel on to the United States if they are permitted freedom of movement during the asylum process.[113] Additionally, asylum-seekers may be required to check in ("ir a firmar") weekly with COMAR and/or INM in the place where their asylum claim is being adjudicated to ensure that the person is following through with the asylum application and process.[114]

The situation of unaccompanied or separated children in Mexico is particularly concerning. While estimates indicate that more than half of Central American children in Mexico may be in need of international protection, the number of asylum claims presented yearly by unaccompanied children is shockingly low. In 2015, for example, Mexico detained about 18,000 unaccompanied children, but fewer than 150 of them (less than one percent) lodged asylum claims.[115] While it seems likely that this is attributable in part to the fact that many or most unaccompanied children are seeking to reunite with family members in the United States, the low rate of asylum claims brought by unaccompanied children is also caused by grave problems in Mexico's child protection system.[116]

Unaccompanied children who present asylum claims are housed in Family Welfare Agency (DIF) shelters, which are closed-door facilities.[117] This situation likely leads some youth to abandon potential asylum claims to avoid prolonged detention. Furthermore, if an unaccompanied child is recognized as a refugee and cannot be reunited with family in Mexico, they will be required to live in the care of the State in a DIF shelter until they turn eighteen years old, as they are unlikely to be released into foster care due to lack of family placements.[118] This arrangement may make unaccompanied children understandably wary of seeking asylum in Mexico, particularly if they

---

113.  *Id.* COMAR's role should not be one of policing the U.S. border by preventing asylum-seekers from reaching the United States, or one of obliging individuals to pursue asylum in Mexico only. In reality, an individual may have genuine protection needs but also desire to rejoin family in the United States for needed support during the asylum process and upon recognition of refugee status. Family unity is in fact recognized as fundamental in Mexico's Refugee Law (art. 5), as well as in international law. Problems with delays and inaccessibility of services in Mexico may also contribute to a decision to abandon the process and/or continue on to the United States.

114.  *Id.*

115.  *Estadísticas 2013–2017*, *supra* note 6. The number of unaccompanied children seeking asylum has not increased significantly in subsequent years: COMAR reports that just 141 unaccompanied children sought asylum in 2015; 242 in 2016; and 259 in 2017. *Id.*

116.  *Id.*

117.  *See Closed Doors*, *supra* note 92.

118.  *Id.* at 98 (suggesting that foster care is a possibility that should be explored).

have family in the U.S. who they are seeking to rejoin.[119] Yet they may have no other choice beyond seeking asylum in Mexico in order to avoid deportation back to a country where they may face extreme danger.

## IV. CONCLUSION

The issues facing Mexico's international protection system examined in this Article signal serious challenges for effective access to the asylum system and fair adjudication of asylum claims. Throughout the process, barriers to receiving information about asylum, effectively presenting asylum petitions, receiving access to the rights and guarantees associated with asylum-seeker and refugee status, and integrating into Mexican society limit the effectiveness of international protection in Mexico. This particularly affects those who are detained and deported summarily without appropriate screening and referral for possible international protection needs, but also those who find themselves unable to get by in the country, whether due to procedural delays and inaccessibility of services in Mexico or because they need support from family in other countries with which they have been unable to reunite. This is particularly the case for unaccompanied children. In this regard, continued efforts to improve governmental and non-governmental aid and services available to asylum-seekers and refugees in Mexico are vitally necessary. By the same token, these realities do not relieve Mexico's migration system of the obligation to ensure access to international protection in Mexico to those who pursue it.

---

119.   Though they travel alone, unaccompanied children most often have adults in the country of origin who send them, and adults in the country of destination waiting to receive them. This is evident, for example, in the rate of release of unaccompanied children detained by U.S. border enforcement into private custody, as well as from extensive personal testimonies by parents and children who have made the journey to the U.S. For example, in FY 2016, the U.S. Department of Homeland Security (DHS) reported that it apprehended 59,757 unaccompanied children, who are then transferred to the custody of the Office of Refugee Resettlement (ORR); during the same year, ORR reported that it released 52,147 children (87.2 percent of the total apprehended by DHS) to the custody of family members in the U.S. *DHS Releases End of Year Fiscal Year 2016 Statistics*, DHS (Dec. 30, 2016), https://www.dhs.gov/news/2016/12/30/dhs-releases-end-year-fiscal-year-2016-statistics; *Unaccompanied Alien Children Released to Sponsors by State*, ORR (June 30, 2017), https://www.acf.hhs.gov/orr/resource/unaccompanied-alien-children-released-to-sponsors-by-state. *See also* John Bowden, *Federal officials lose track of nearly 1,500 Migrant Children in US*, THE HILL (Apr. 27, 2018), http://thehill.com/latino/385148-federal-officials-lose-track-of-nearly-1500-migrant-children-in-us. Although there are certainly cases of children, usually orphaned or abandoned, who flee their countries alone because there is no one in the world to care for them, they are in the minority.



# FRONTERA NORTE

**e-ISSN:** 2594-0260

Revista internacional de fronteras, territorios y regiones / International Journal of Borders, Territories and Regions

FRONTERA NORTE VOL. 33, ART. 7, 2021

https://doi.org/10.33679/rfn.v1i1.2103

## The Mexican Asylum System: Between Protecting and Control

## El sistema de refugio mexicano: entre proteger y contener

Eduardo Torre Cantalapiedra,[1] María Dolores París Pombo[2] and Eduardo Elías Gutiérrez López[3]

ABSTRACT

In a context of restriction of both irregular migration flows and those in need of protection in the global North, the objective of this article is to analyze the implementation of Mexican refuge policies after the legal changes of 2011. Based on the documentary review and the statistics from the administrative records of COMAR, the obstacles encountered by those who require international protection to be granted refugee status, or, in this case, complementary protection (*protección complementaria*), are analyzed. While Mexican legislation is generous in terms of the possibility of granting these legal protections, the analysis of their implementation allows us to account for practices of blocking, deterrence and immobilization that – in the logic of containment –make it difficult, as well as with often prevent, achieve international protection.

*Keywords*: 1. refugees,  2. complementary protection,  3. international protection,  4. Central America, 5. Mexico.

RESUMEN

En un contexto de restricción tanto de los flujos migratorios irregulares como de necesitados de protección en el Norte global, el objetivo de este artículo es analizar la implementación de las políticas de refugio mexicanas tras los cambios legales de 2011. Con base en la revisión documental y las estadísticas de los registros administrativos de la Comisión Mexicana de Ayuda a Refugiados (COMAR), se analizan los obstáculos que encuentran quienes requieren de protección internacional para que se les otorgue la condición de refugiado, o en su caso, protección complementaria. Mientras que la legislación mexicana es generosa en cuanto a la posibilidad de otorgar estas protecciones legales, el análisis de su puesta en marcha permite dar cuenta de prácticas de bloqueo, disuasión e inmovilización que –en la lógica de la contención– dificultan, así como con frecuencia impiden, alcanzar protección internacional.

*Palabras clave*: 1. refugiados, 2. protección internacional, 3. protección complementaria, 4. México, 5. Centroamérica.

Received: April 28th, 2020
Approved: August 14th, 2020
Online publication: April 15th, 2021

[1] El Colegio de la Frontera Norte, Mexico, e.torreca@gmail.com, https://orcid.org/0000-0002-4074-3752

[2] El Colegio de la Frontera Norte, Mexico, mdparis@colef.mx, https://orcid.org/0000-0003-1714-2112

[3] Universidad Autónoma de Baja California, México, elias.gutierrez@uabc.edu.mx, https://orcid.org/0000-0002-9171-8813



Frontera Norte is a yearly digital journal published by El Colegio de la Frontera Norte. https://fronteranorte.colef.mx

CLP_PC_021968

## INTRODUCTION

As of the nineties, each year thousands of alien individuals -including an important proportion of people in need of international protection- traverse over the Mexican territory in order to reach the United States (El COLEF *et al.*, 2019), either to irregularly enter the US or to ask for asylum or another sort of humanitarian protection. In response to these flows, the American government has pressured their Mexican peers to impose migration controls for decades; such political and economic pressure intensified more than ever under Trump's administration (2017-2021) and focused on imposing restrictions for the arrival of people in need of international protection from the south. The US has intended to make Mexico a third safe country to be able to reject asylum seekers, arguing they should have asked for protection previously in Mexico.

The administration of Andrés Manuel López Obrador –who assumed office in December 2018– has not accepted to sign any third safe country agreement– which allows alien people in Mexico to have the option to ask for asylum in the US. By contrast, Lopez Obrador's administration gave in due to a sudden progressive tariff escalation in May 2019, and redoubled efforts to contain irregular migration –which made it difficult for migrants to reach American soil to ask for asylum. Moreover, as of January 2019, Mexican government has accepted to temporarily receive asylum seekers so that they wait in Mexico for months while their processes are carried out in some court in the United States by means of a program called "Migrant Protection Protocols" (MPP).[4]

The regularization options for people who enter Mexico without documents are almost exclusively limited for asylum seekers. That is to say, most of the migrants have to travel over Mexico irregularly, at risk of being detained and deported by Mexican authorities.[5]

In this context of restrictive policies in Mexico and the US, in recent years, a growing number of people, though still a minority, has been noticed to settle down in Mexico – from the beginning or after giving up entering into the US (Torre Cantalapiedra, 2020). Obtaining the status of refugee in Mexico has been a mechanism to do so. Nevertheless, most migrants and people in need of international protection still prefer reaching the US, as they have intended for decades (El COLEF *et al.*, 2019).

In order to address people who decide to ask for international protection, Mexico has developed a number of juridical instruments over recent years to grant them a legal status and other sort of support for their integration. The 2011 Law on Refugees, Complementary Protection and Political Asylum, reformed in 2014 –which owing to

---

[4] Asylum seekers in this program attend the sentry the day of their hearing in the court and are presented to the judge by American migration authorities. After the hearing, they are returned to Mexican territory.

[5] Considering that Mexico does not recognize itself as a third safe country, it is paradoxical that the alternative to deportation offered by the government to most of the migrants is the refugee status.

CLP_PC_021969

Case 4:18-cv-06810-JST   Document 169-8   Filed 06/05/23   Page 493 of 1047

FRONTERA NORTE VOL. 33, ART. 7, 2021, e-ISSN 2594-0260   3
https://doi.org/10.33679/rfn.v1i1.2103

clarity will be referred to as Law on Refugees– sets forth the suppositions under which the refugee status is recognized for an alien individual who applies for it, or as the case may be, complementary protection (CP). As pointed put by other authors, the status of refugee generally depends on political and economic interest, and administrative decisions as well. Moreover, refugee policies tend to subordinate to migration policies and intergovernmental relationships. In this way, the tendency in the US and many European and other countries around the world is toward incongruence and hypocrisy. Despite their legal commitments, they have opted for hindering in various ways the access to international protection and deporting rejected asylum seekers (Arango, 2019). The fundamental question is, what has been the setting into motion of the new Mexican legislation like in a context of exclusion of those who seek / need international protection and pressure/influence from the American government so that Mexico contains migration flows?

In this context of restriction of irregular migration flows and people in need of international protection, the goal of this article is to analyze the implementation of Mexican asylum laws after the legal changes in 2011. This work is divided into three sections. In the first place, a debate is held on who the refugees are, and in a broader sense, people in need of international protection, and how they are seen in the current debates as regards restrictive measures for refugees/asylum seekers in various countries. Secondly, two juridical instruments in the Law on Refugees to shelter foreign individuals in need of international protection are succinctly analyzed: the status of refugee and CP. In the third place, on the basis of a document revision, statistics on asylum seekers[6] and resolutions by *Comisión Mexicana de Ayuda a Refugiados*, COMAR [Mexican Commission to Aid Refugees], as well as previous fieldworks, the obstacles found by asylum seekers to attain the status of refugee, or CP, and how these vary in function of the applicants' national background are analyzed.

### *People in need of international protection in a world of restrictions*

Refugees are people who meet certain criteria established in national and international legislations, which give them right to receive special protection in the destination country (Espinar Ruiz, 2010). Therefore, asylum is a legal construction, which as such varies from one country to another in function of the international treaties they ratify and the way these are developed in the national legislations. In any case, this figure is similar between

---

[6] Data from the statistics produced by *Unidad de Política Migratoria* [Units for Migration Policies], *Registro e Identidad de Personas*, UMPRIP [Registration and Identity of Individuals] of the Secretariat of Government were retaken from COMAR administrative records.

CLP_PC_021970

countries, since most of them, including Mexico, adhere to the 1951 Refugee Convention, Geneva, and the 1967 Protocol Relating to the Status of Refugees, New York.

There is a usual distinction between: i) refugees who have the status by a certain State or the UN High Commissioner for Refugees (UNHCR); and, ii) *de facto* refugees, i.e., those who meet the conditions established by the Convention and Protocol, but who owing to various reasons do not have such status in the recipient country: they did not ask for it; they asked for it, but was denied; the State in question does not recognize this juridical figure; among others.

Among the refugees defined in terms of the 1951 Convention and the migrants called "voluntary" there is a grey area of people with need for protection as valid as those of the "convention refugees" (McAdam, 2006; Betts, 2013). To address such individuals, several countries have decided to broaden the concept of asylum as well as utilize other additional protection instruments.

In relation to Latin America, some countries, Mexico among them, have adhered to the 1984 Cartagena Declaration on Refugees, which expands the definition for the refugee status. Plus, some national legislations have incorporated instruments that grant equal or lower protection than someone with refugee status, though it may be granted to people who do not meet the requirements to be a refugee (McAdam, 2006; Espinar Ruiz, 2010); this is the case of CP in Mexican legislation.[7] Other ejection factors that have become noticeable in the debate on asylum are climate change, environmental degradation and natural or anthropogenic disasters. In any case, people with acute needs are excluded from the international umbrella protection, for example, those who run away from extreme poverty –save if these individuals have other characteristics that meet the parameters to receive international protection at the same time.

Those who meet the requirements find it increasingly complicated to attain international protection, since most of the developed countries have privileged migration control over their commitments regarding asylum and refugees. For decades in Europe, there has been a progressive withdrawal from the commitments of the 1951 Refugee Convention, under the fallacious reason that most are economic immigrants (Fassin, 2015). That same discourse has been wielded by the US since the 1980's at least (Aguayo Quezada, 1986) and has reached a peak under Donald Trump, who promoted a political agenda against asylum seekers who arrive from the southern border.

The States of the Global North introduce a combination of obstacles with a view to preventing those who seek / need international protection from reaching their territories, dissuading they even try or else, *de facto* denying asylum or the refugee status for the

---

[7] In this work we use the term international protection to refer not only to the instruments that confer a higher protection level –refugee status and political asylum–, but to the instrument that adds to the previous, CP.

CLP_PC_021971

FRONTERA NORTE VOL. 33, ART. 7, 2021, e-ISSN 2594-0260   5
https://doi.org/10.33679/rfn.v1i1.2103

individuals who reach these countries (Gammeltoft-Hansen & Tan, 2017; FitzGerald, 2019). In this way, countries have externalized their boundaries by means of pressure and arrangements so that the origin and transit countries detain irregular migrants and those in need of international protection. In this sense, the term neo-refoulement has been coined to refer to the return made by those who seek asylum and other migrants toward regions in the origin or transit countries before they reach the territories where they might process their requests, being understood more as a problem related to security than protection to refugees or asylum (Hyndman & Mountz, 2008). Another mechanism has been the creation of contention areas (FitzGerald, 2019). For the European Union, these areas have been set up in the south of the Mediterranean; in the case of the US, Mexico has served as a country to contain unwanted migration flows.

Moreover, the systems to detect and deport in the destination countries that intend to discourage irregular immigration also dissuade the asylum seekers to make an application (Hyndman and Mountz, 2008; Amnistía Internacional, 2008). The detention centers establish long waits while the cases are reviewed, while migrants are threatened to be deported to their countries of origin if their petitions are denied. The long waits are a privileged dissuasion mechanism among the asylum policies of the Global North, not only when applicants are detained, but also when waits take place in conditions of vulnerability, with no access to basic services and in dangerous territories (París Pombo, 2020).

Some of the barriers most difficult to overcome for asylum seekers are the very international protection policies; they impose long, expensive and tortuous administrative or juridical processes on asylum seekers, frequently with no legal accompaniment and without economic support. In these processes, there is almost always suspicion on the testimony of the applicant, mistrust has thus become the dominating tone in the analysis of asylum requests. As a result, only a minority of requests is legally recognized with the status of refugee (Fassin, 2015).

Before protection instruments, some authors have read the systems of asylum in light of turning them into instruments in favor of the securitization of migrations. In this sense, Gammeltoft-Hansen and Tan (2017, p. 29) speak of the "dissuasion paradigm" instrumented in developed countries and imposed on transit ones: the main response in the face of enforced migrations is preventing people in need of international protection from reaching their borders at all costs.

## JURIDICAL INSTRUMENTS IN THE LAW ON REFUGEES

Ever since *Instituto Nacional de Migración*, INM [National Migration Institute] was created in 1993, Mexico has built complex devices to stop and deport people in movement. In parallel, it has created laws and institutions to assist people in need of international protection. However, most of the people who flee from their countries owing

to persecution or generalized violence has not been able to use the protection mechanisms in this country.

*A brief review of the historic background*

The recent history of refugees in Mexico dates back to the 1980's, with the arrival of mass flows of Central Americans during the armed conflicts in Guatemala and El Salvador, the creation of COMAR in 1980 and the opening of the UNHCR office in 1982. In the case of Guatemalan refugees, the answer of the Mexican government varied: 1) at first, in 1981, it did not accept they were refugees and deported about two thousand; 2) in 1982, it accepted UNHCR in Mexico and refugee camps in Chiapas were created. In the absence of *ad hoc* legal instruments, the refugees were regularized by means of non-migrant border visitor visas (FM8) that had to be renewed every 90 days, or as agricultural workers; 3) in 1984, it relocated almost half of the refugees in the camps to Campeche and Quintana Roo (Aguayo Quezada, 1986; Aguayo Quezada & O'Dogherty, 1986; Rodríguez Chávez, 2011). After the signing of the peace agreements, thousands of Guatemalans decided to return to their places of origin, while some others stayed in Mexico and obtained Mexican nationality (Lerma Rodríguez, 2016).

While camps in the south of the country emerged, hundreds of thousands of people from Nicaragua, El Salvador and Guatemala entered Mexico looking for security. This population, considered disperse refugees, was also under the command of UNHCR (París Pombo, 2017).

Paradoxically, the recognition of the figure of refugee in the General Population Law in 1990 and its regulation in 1992, occurred at a time when pressure for asylum decreased. At once, over such decade the flows of Central American migrants crossing over Mexico heading for the US as well as detentions and deportations by INM noticeably grew (París Pombo, 2017). In 2002, two years after the ratification of the 1951 Convention, in Mexico, COMAR started to analyze requests for the refugee status individually via investigation (Rea Granados, 2016), taking the same recognition logic followed by Global North countries. In spite of which, Mexican asylum policy remained particularly restrictive: between 2002 and 2011, COMAR received 5 255 requests, of which 1,186 were positive (Cobo and Fuerte, 2012, p. 63). That is to say, Mexico granted on average the refugee status to 118 individuals a year.

In 2011, the Congress approved the Law on Refugees, which is analyzed below.

CLP_PC_021973

FRONTERA NORTE VOL. 33, ART. 7, 2021, e-ISSN 2594-0260    7
https://doi.org/10.33679/rfn.v1i1.2103

*Refugee Status and CP*[8]

Article 13 of Law on Refugees set forth the suppositions under which the status of refugee will be recognized. In its three sections, it retakes the definition of refugee in the 1951 Geneva Convention –incorporating gender as a reason for persecution– (fraction I), the extended definition in 1984 Cartagena Declaration (fraction II), and the definition of *sur place*[9] refugee (fraction III) (ACNUR & COMAR, 2012; Impacto Social Consultores, 2019). The Mexican state is urged to recognize the status of refugee for every foreign individual who meets such definitions. The three suppositions necessarily imply that the request for the status of refugee is applied at an official Mexican crossing point or else, when the foreign individual is already in Mexico.

According to Article 12 of the Law on Refugees, when the refugee status is recognized in Mexico, this migratory benefit also applies for the spouse, partner, blood relatives of the spouse up to second degree who economically depend on the applicant and who are as well in Mexico. In the understanding that the status of refugee according to provisions in Article 54 of the Law on Migration has the same migratory and legal effects as permanent residence in Mexico.

CP means not to return certain individuals who had been previously denied the refugee status "to a territory in another country where their life would be at risk or would be in danger of experiencing torture or other cruel, inhuman or degrading treatments" (Law on Refugees, 2011: fraction VII of article 2).

Deciding that an individual is eligible to receive CP must be notified in the same resolution that rejects the status of refugee (Law on Refugees, 2011, art 30). In terms of migratory status, this legal figure has the same juridical effects as refugee status in Mexico and people under this protection become permanent residents. However, it must be stated that CP does not have some rights conferred to people deemed refugees; for example, it does not include family reunification, refugee status for their relatives and access to public services and programs in order to facilitate their integration in the terms of the Law on Refugees (Sin Fronteras I. A. P., 2016). Besides, the Secretariat might revoke CP if the causes that motivated the protection disappear (Law on Refugees, 2011, Art. 32 II).

---

[8] In addition to Refugee status and CP, fraction one of article 2 of the Law on Refugees incorporates Political Asylum. Unlike asylum, political asylum is discretionally granted out of political reasons and can be requested via diplomacy. Since it is an instrument whose idiosyncrasy is utterly different from the refugee status and that very few people with a public political profile obtain international protection in this manner, we will not pay attention to this figure in this work analysis.

[9] A *sur place* refugee is an individual who was not a refugee when they left their country of origin, but became one owing to later events which make them afraid of being persecuted if they return to their country of origin.

CLP_PC_021974

*Administrative process*

Foreigners may ask for the status of refugee in any of the four COMAR offices (in Mexico City; Acayucan, Veracruz; Tapachula, Chiapas; and Tenosique, Tabasco). In the rest of the cities, processes associated to the status of refugee have to be carried out in INM, which sends the information to the nearest COMAR office. Foreigners can also ask for asylum at migratory stations and airports (CEAR, 2018).

COMAR must provide foreigners with information on the right to apply for a refugee status and the proceedings (Regulation of the Law on Refugees, 2012, Art. 15 I). INM has the attribution of detecting people who presumably need international protection and communicate them their right to ask for the recognition of the status of refugee (Regulation of the Law on Refugees, 2012, Art. 16 I)

In principle, every individual has a 30-working-day deadline to process their request after arriving in Mexico. Though, people can ask for the status of refugee after these 30 days, if they justify it in writing and it is accepted by the authority.

Once the request for the status of refugee is made, it has to be admitted by COMAR, which delivers the individual a certificate that recognizes them as requesters and so, it accredits that the process has begun (ACNUR México, 2020). As of the moment when the individuals express they want to apply for the status of refugee in Mexico, they cannot be deported (CEAR, 2018). With this certificate, they can ask for a visitor's card owing to humanitarian reasons (VCHR) at INM, which allows the applicant to work and travel at will over the national territory for a year.

During the proceedings to obtain the refugee status, the applicant must remain in the state they made the application and weekly attend COMAR or an INM office to sign a certificate of permanence in the state, if they do not attend two weeks in a row, the application is deemed void (ACNUR México, 2020).

The applicants must fill in a questionnaire and have an interview that defines whether their fear of persecution is well-based in accordance with the Law on Refugees.

> Then, COMAR staff interviews the applicants, studies the cases and issues a resolution. In order to do so, the state has a 45–day deadline, extendable to forty–five days plus ten days to notify the resolution. That is to say, the longest duration of the process to obtain the status of refugee legally provided at a first instance is one hundred days (CEAR, 2018, p. 16).

If the resolution is favorable, the individual has to attend to INM to process their permanent residence in Mexico as a refugee. If the resolution is not favorable, the solicitant may resort to various sorts of resources (in this regard, see Kerwin, 2018).

FRONTERA NORTE VOL. 33, ART. 7, 2021, e-ISSN 2594-0260   9
https://doi.org/10.33679/rfn.v1i1.2103

ANALYSIS OF THE IMPLEMENTATION OF ASYLUM POLICIES:
OBSTACLES FOR REFUGEES

The review of documents and administrative data in COMAR, together with the experience on the field, allow stating that obtaining the refugee status implies overcoming a series of obstacles, which vary according to the nationality of the applicant, from the beginning to the end of the process. Following, we review those we consider most relevant.

### Barriers for applications

The contention policy carried out by Mexican authorities is the first barrier to grant the right to ask for refuge in Mexico, since it has as an objective to detect foreign people who enter the country irregularly and deport them soon (Kerwin, 2018).

Amnesty International (2018) found out that Mexican authorities had returned asylum seekers and people with credible fear to their countries of origin, thus compromising their lives and physical integrity. By contrast, the same authorities had not duly performed the identification of the prospective refugees, nor had they fully informed them about their right to ask for asylum in the country (Kerwin, 2018; Amnistía Internacional, 2018). Even if they receive the information, at once they are discouraged to apply as they are told the difficulties they will face to successfully proceed (Human Rights First, 2017).

The rule to ask for asylum within 30 working days, counted from the next day after entering the country, has become an impediment for people who deserve this recognition to receive protection (Sin Fronteras I. A. P., 2016). In this regard, UNHCR has pointed out that the best practice is not to set a deadline to ask for asylum (UNHCR Regional Legal Unit cited in Rea Granados, 2016).

### Applications received

The number of applications for the refugee status grew exponentially from 2013 to 2019, distinguishing the fact that in only four years this figure changed from 3 424 to 70 302 applications (graph1). Figures would possibly be higher if the barriers mentioned above did not exist, and as argued below, if the overall functioning of the asylum program was simpler.

CLP_PC_021976

Graph 1. Applications for the status of refugee received by COMAR, 2013-2019*



* Data for 2019 are preliminary.
Source: own elaboration based on data from UPMRIP, COMAR and SEGOB
(2019, 2020).

The increase is propitiated by the combination of various factors such as:

1) The situation lived in the main countries of origin of the applicants: Honduras, El Salvador and Venezuela, which makes more people in need of protection reach Mexico.

2) A better understanding of the process among foreigners, which is likely due to the dissemination of this figure by international agencies, civil society organizations (CSO), the Mexican government itself and communication media, adding to the circulation of this information in the applicants' social media, friends, families, *coyotes*, among others, and also previous mobility experiences. With data from Emif Sur, it was demonstrated there was substantial growth in the percentage Central Americans returned by Mexican authorities who declared they were informed on the right to ask for asylum, protection, or refugee status by such authorities, because between 2016 and 2019, they changed from 6 to 31 percent (Bermúdez Lobera, 2020).

3) Anti-immigrant policies and those against people in need of international protection in the US, plus the supporting Mexican contention policies promote that migrants and people in need of international protection settle down in Mexico (París Pombo, 2019; Torre Cantalapiedra, 2020).

CLP_PC_021977

Case 4:18-cv-06810-JST   Document 169-8   Filed 06/05/23   Page 501 of 1047

FRONTERA NORTE VOL. 33, ART. 7, 2021, e-ISSN 2594-0260   11
https://doi.org/10.33679/rfn.v1i1.2103

4) The use of the application for the refugee status to obtain documents to travel over Mexico toward the US.

Another aspect to underscore in graph 1 is that up to 2016, the majority of applications was from Central America; however, as of 2017, some countries outside this region (especially South America and the Caribbean) start to become important. Accordingly, it is worth analyzing the number of applicants by country of origin.

The country of origin of most of the applications is Honduras, which year after year produced the highest number of applications and 42.4 percent of the period total (Table 1). It is followed by El Salvador which from 2013 to 2017 showed application figures similar to Honduras', but with much lower figures the last two years; for example, in 2019 applications from Salvadorans were 8 991 (12.8%) v. 30 045 Hondurans (42.7%). To a lesser extent, Guatemala and Nicaragua also participate among the countries of origin of the applicants. Application figures for these four Central American countries are a thermometer of the situation experienced by citizens in the countries of origin. The third country with the most applications is Venezuela, which evinces the worsening of the political situation in that country which began to be noticed in 2016.

By 2019, the application figure from Venezuelans was the largest in absolute terms for this population over the analyzed period with 4 662 applications. The case of applications of Cuban citizens must be understood in the context of the termination of the "wet-foot/dry-foot policy" by Obama's administration in 2017. While between 2013 and 2016, annual applications of Cuban citizens did not surpass a hundred, in 2017, they were 796. However, this pales in comparison with the events only two years later: after a drop in application figures in 2018 to 214 they soared to 8 677 in 2019. This is explained because that year, the National Institute for Migration stopped issuing a so called "departure document" (*oficio de salida*) with which Cubans used to travel to the north to enter the US by land; this way, applications for the status of refugee might be one way to obtain legal documents to travel in the country. In relation to applications from Haitians, it is considered they have a very similar pattern to that of Cubans.

CLP_PC_021978

12    The Mexican asylum system: between protecting and control
Torre Cantalapiedra, E., París Pombo, M.D. & Gutiérrez López, E. E.

Table 1. Applications for the status of refugee received by COMAR by country of origin, 2013-2019

| | 2013 | | 2014 | | 2015 | | 2016 | | 2017 | | 2018 | | 2019* | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Abs. | % | Abs. | % | Abs. | % | Abs. | % | Abs. | % | Abs. | % | Abs. | % | Abs. | % |
| Honduras | 530 | 40.9 | 1,035 | 48.4 | 1 560 | 45.6 | 4 129 | 46.9 | 4 274 | 29.3 | 13 678 | 46.2 | 30 045 | 42.7 | 55 251 | 42.4 |
| El Salvador | 309 | 23.8 | 626 | 29.3 | 1 476 | 43.1 | 3 494 | 39.7 | 3 708 | 25.4 | 6 193 | 20.9 | 8 991 | 12.8 | 24 797 | 19.0 |
| Guatemala | 47 | 3.6 | 108 | 5.1 | 102 | 3.0 | 437 | 5.0 | 676 | 4.6 | 1,347 | 4.5 | 3 758 | 5.3 | 6 475 | 5.0 |
| Nicaragua | 20 | 1.5 | 28 | 1.3 | 28 | 0.8 | 70 | 0.8 | 62 | 0.4 | 1,271 | 4.3 | 2 227 | 3.2 | 3 706 | 2.8 |
| Venezuela | 1 | 0.1 | 56 | 2.6 | 57 | 1.7 | 361 | 4.1 | 4 038 | 27.7 | 6 327 | 21.4 | 7 662 | 10.9 | 18 502 | 14.2 |
| Haiti | 14 | 1.1 | 25 | 1.2 | 16 | 0.5 | 47 | 0.5 | 436 | 3.0 | 78 | 0.3 | 5 538 | 7.9 | 6 154 | 4.7 |
| Cuba | 98 | 7.6 | 96 | 4.5 | 37 | 1.1 | 43 | 0.5 | 796 | 5.5 | 214 | 0.7 | 8 677 | 12.3 | 9 961 | 7.7 |
| Others | 277 | 21.4 | 163 | 7.6 | 147 | 4.3 | 215 | 2.4 | 613 | 4.2 | 522 | 1.8 | 3404 | 4.8 | 5 341 | 4.1 |
| **Total** | 1 296 | 100 | 2 137 | 100 | 3 423 | 100 | 8 796 | 100 | 14 603 | 100 | 29 630 | 100 | 70 302 | 100 | 130 187 | 100 |

* Preliminary data.

Source: own elaboration based on data from UPMRIP, COMAR and SEGOB (2019, 2020).

CLP_PC_021979

FRONTERA NORTE VOL. 33, ART. 7, 2021, e-ISSN 2594-0260   13
https://doi.org/10.33679/rfn.v1i1.2103

*Long waits, restrictions for mobility and deprivations of liberty*

During the process substantiation, every individual who requests asylum in Mexico has to face long waits, and as the case may be, restrictions for mobility or deprivations of liberty. For the purpose of clarity, we differentiate between migratory stations' applicants –who are under detention, either for only a part of the process– and office applicants – who are free over the substantiation of the procedure because they started the process directly in a COMAR (or else INM) office.

At least as of 2017, waiting times to have a resolution are longer or much longer than set forth in the law (Human Rights First, 2017; CEAR, 2018). At present, requesting the status of refugee takes months or even longer than a year. With COMAR data obtained via a transparency request, Asylum Access (2020, p. 10) points out "that 13,089 people who asked for the status of refugee in 2018 were still waiting for a resolution on October 25th, 2019, including 6.230 people waiting for more than a year and 662 who had been waiting for more than 18 months so far". In the case of those who submit their request at an INM office, the process takes even longer than usual (Gutiérrez López, 2019). Delays are attributed to the lack of resources of the institutions to address the increasing number of applications made.

For office applicants, the wait begins before starting the process, when the person in need of international protection approaches to COMAR offices. At that moment, they are appointed to fill in the application, which usually takes place several weeks later. On the basis of a survey carried out in Tapachula by CDHMC and El COLEF (2020) among applicants for the refugee status between November 2018 and January 2019, it is estimated that for 181 cases the average waiting time was 24 days per applicant. About a half of the applicants had to wait more than a month to "begin" their process. As in the US, Mexico has a metering system for the number of applications that can be started each day.[10]

Once the application is completed, the individual has to wait for more weeks before receiving the statement of acceptance and begin the process in INM to receive a VCHR, which can take several weeks to process. Thousands of office applicants are forced to desist or abandon the process due to long waiting times and difficulty to obtain resources from labor activities. Consequently, remaining in Mexico irregularly or continuing to travel to the north over increasingly dangerous and uncertain routes implies the risk of being deported to their countries of origin where their life and physical integrity are at risk. Most of these individuals have to look for remunerated activities to earn some resources with which to afford lodging and basic services, which leads them to precarious

---

[10] Even though it is a wait before the process, owing to clarity and as it is a waiting mechanism, it was included in this section.

CLP_PC_021980

jobs in regions where they are processing their application.[11] The weekly signature in COMAR, or INM, is a grave problem for many applicants who lack economic resources to visit the offices. On the other hand, if applicants find an employment, even an informal one, they may lose it as they miss a day to attend the COMAR office.

This is the case of Armando, who arrived in Mexico with the first migrant caravan by the end of 2018, and accepted the possibility offered by the Mexican government to request the status of refugee. After 20 days in a detention center, he was released and given a *Clave Única de Registro de Población, CURP* [Single Population Registration Number] so that they were able to work and carry on with the process in COMAR under the office modality. This way, Armando tried to remain in Mexico, he stayed a little longer than a week in Tapachula before he dropped the process and retook the initial plan to go to the US. The reason is a mixture of impossibility to earn means for survival and live up in decent conditions and the burdensome process in COMAR:

> I had to get a job in Chiapas, [...] I had to sign and be in migration and COMAR, I lost my job, slept for long where the buses are, I slept there a lot, about three nights because I had no money to pay for the hotel (Armando, face-to-face communication, December 31st, 2018).

The spatial immobilization implied by the refugee process in a certain state prevents the applicants from going to other Mexican states, where they may have better opportunities to find employment and better security. Although some obtain a permit from COMAR to attend another office, most of them are forced to look for employment in some of the most impoverished and insecure regions in the country such as Chiapas, Oaxaca and Tabasco.

One of the reasons why it is intended to restrict the applicants' spatial mobility seems to be related to keeping aliens from going to the US, at least until the process finishes. Owing to Mexico's geographic location, it is difficult to distinguish between asylum seekers who want to settle down in Mexico and those who resort to this instrument as a means to carry on traveling toward the United States (Rodríguez Chávez, 2011). In the face of the arrival of two migrant caravans from Central America, in October 2018 (during the administration of Peña Nieto) and January 2020, Mexican authorities expressed the possibility that migrants may stay in Mexico as temporary workers and have promoted refugee status as an option to remain in that region.[12] Within a context of heavy pressures

---

[11] As of 2018, UNHCR provide the applicants with a little income for the first three months, though not every individual access this economic aid. In the city of Tapachula, where almost half of the applications concentrate, such international agency also rents a hotel where families and people in particular vulnerability conditions, such as LGBTQ individuals, are lodged.

[12] In October 2018, the administration of Enrique Peña Nieto fostered the program "You are at home" promoting the insertion of migrant population into temporary employment in Chiapas and Oaxaca, and also the application for the refugee status at COMAR. In

Case 4:18-cv-06810-JST   Document 169-8   Filed 06/05/23   Page 505 of 1047

FRONTERA NORTE VOL. 33, ART. 7, 2021, e-ISSN 2594-0260   15
https://doi.org/10.33679/rfn.v1i1.2103

from the US on Mexico to control migration flows, the Mexican government responds trying to retain people in the south of the country with temporary employment programs and making the application at COMAR.

The applicants for the status of refugee who submit their request in a point of entry, or are retained by Mexican authorities before starting the process, have to wait for its substantiation in a migratory station, unless a CSO makes the necessary proceedings to ask for the legal and due transfer to any address and report it to the Mexican migration authorities. As of 2016, the growing number of applicants for the status of refugee can leave the migratory status via a pilot program for "detention alternatives" fostered by UNHCR in collaboration with CSO and shelters. In the context of this program, INM regularly sends the High Commissioner a list of the people who have asked for international protection at a migratory station and have already received their certificate. UNHCR identifies those in vulnerable situation (children, adolescents, pregnant women, LGBTQ+ community,[13] et cetera), communicates with shelters nearby to find out the spaces available and accordingly reports to INM the name of the people who might receive an alternative to detention in equal number as the spaces available (CEAR, 2018). This program has been successively extended, however the increase in asylum seekers has rendered these spaces insufficient (París Pombo, 2019).

Even if the asylum seekers who are at a migratory station may have their basic needs covered, they have their liberty restricted during the substantiation of their processes and frequently face very precarious conditions (sanitary, abuses, and so on) which have led many people in need of international protection to desist and *voluntarily* accept their repatriation (Human Rights First, 2017).

*Withdrawal and abandonment*

The applicants' long waits in detention or in high-vulnerability situations (with no means for survival, lodging, no access to services, etc.) make many of them despair and promote withdrawal. In this sense, COMAR records show that year by year an important percentage of applicants desists via a document in which they express their desire to stop the process, or they drop out of it due to missing the weekly signatures.

Based on data from a transparency request that comprises 90 397 asylum seekers from January 1st, 2018, to October 25th, 2019, Asylum Access México (2020) states that 9 549 applications were dropped, which account for 10.6 percent of the total applications, while the average number of days between applying and dropping out was 149. For their part,

---

January 2020, a very similar program was boosted, once again, promoting the processing of the request at COMAR (SEGOB, 2018, 2020).
[13] LGBT+ refers to lesbian, gay, bisexual, transexual, transgender, transvestite and intersexual.

CLP_PC_021982

532 were withdrawn, which accounts for 0.5 percent of the total requests and with an average time between application and withdrawal of 54 days. The figures above, significant on their own, will be significantly higher, for 70.6 percent of the applicants is still waiting for a resolution.

Another possible explanation for withdrawals and abandonments is the fact that some of the applicants carry out this process with a view to obtaining the documents that enable them to traverse the Mexican territory regularly; thereby, if they receive a VCHR they will drop out of the process to carry on with their journey toward the US.[14] Nevertheless, given the times to receive this sort of documents and its cumbersome processing, it is likely a last resort.

*Deficits against the effectiveness of the due process*

A key aspect regarding the due process is having legal assistance, though many asylum seekers have to navigate the complex asylum system on their own (Human Rights First, 2017). In spite of the existence of more than a dozen CSO, considered UNHRC partners, that offer legal advice for applicants,[15] the accelerated increase in requests makes it increasingly difficult to provide legal assistance for most of the applicants.

Various organizations have documented processes and resolutions that incorporated a number of violations to the due process such as failure to meet deadlines, interviews on the phone or with no qualified interpreters, dissuasion to use legal assistance by COMAR staff, short notices for appointments, resolutions with information from other cases, resolutions with no studies following the CP patterns, wrongly substantiated juridical resolutions, resolutions that discriminate women and minors, among others (Rea Granados, 2016; Sin Fronteras I. A. P., 2016; Universidad Iberoamericana Ciudad de México *et al.*, 2017).

*Recognition of international protection*

Early in 2020, only 37 076 out of 130 187 applications in COMAR between 2013 and 2019 had been solved (table 2); in Mexico, more than 20 000 individuals received the status of refugee and more than 5 000, CP. Most of the people with a positive resolution comes from Venezuela (8 779), followed by Honduras (6 198), and El Salvador (4 671); very far are Guatemala (539) and Nicaragua (266). As for CP, distinguishable are

---

[14] VCHR allows freely moving without the risk of being detained and deported; it enables, according to personal resources, choosing the safest means of transport (Torre Cantalapiedra & Mariscal Nava, 2020).

[15] *Servicio Jesuita a Refugiados* [Jesuit Service for Refugees], Asylum Access, Sin Fronteras I. A. P., Fray Matías de Córdova Human Rights Center, among others.

CLP_PC_021983

FRONTERA NORTE VOL. 33, ART. 7, 2021, e-ISSN 2594-0260   17
https://doi.org/10.33679/rfn.v1i1.2103

Honduras (2 457) and El Salvador (2 338). These two Central American countries also receive the majority of negative resolutions (5 113 and 3 195, respectively).

Table 2. Resolutions issued by COMAR
by nationality and according to sort of resolution (total for 2013-2019)*

| Country | Refugee Status | CP | Non recognized | Total |
|---|---|---|---|---|
| Honduras | 6 108 | 2 457 | 5 113 | 13 678 |
| El Salvador | 4 671 | 2 338 | 3 195 | 10 204 |
| Guatemala | 539 | 351 | 749 | 1 639 |
| Nicaragua | 266 | 274 | 148 | 688 |
| Venezuela | 8 779 | 15 | 156 | 8 950 |
| Cuba | 131 | 38 | 703 | 872 |
| Haiti | 23 | 13 | 177 | 213 |
| Other | 349 | 63 | 420 | 832 |
| *Total* | 20 866 | 5 549 | 10 661 | 37 076 |

\* Preliminary data, including all the resolutions issued within 2013-2019.
Source: own elaboration based on data from UPMRIP, COMAR and SEGOB (2019, 2020).

A large part of the explanation for such figures is in the application of different criteria for the various nationalities. As previously pointed out, Venezuelans were included in the broadest definition of 1984 Cartagena Declaration, which has meant that their applications are almost always given the refugee status (98.1%, graph 2). The rest of the countries are applied a more restrictive definition of the 1951 Geneva Convention, which explains the higher rate of negative resolutions. At the other end, the Cubans and Haitians who concluded the process –very few– have very high rates of rejection, in these two cases over 80 percent. As regards Central Americans, they are at an "intermediate" point; as noticed, the percentage of positive resolutions for this population oscillates between 32.9 percent for Nicaraguans and 44.7 for Hondurans. It is worth underscoring that CP becomes greatly relevant in the international protection given to Central American countries. In the case of Nicaraguans, CP was given more often than the refugee status.

CLP_PC_021984

Graph 2. Percentage distribution of resolutions issued by COMAR by nationality and according to sort of resolution (total for 2013-2019)



* Preliminary data, including all the resolutions issued within 2013-2019.
Source: own elaboration based on data from UPMRIP, COMAR and SEGOB (2019, 2020).

   This differentiated treatment according to national origin cannot be explained only in legal terms, but taking domestic and foreign policy reasons into account. This way, during Peña Nieto's administration (2012-2018) the figure of refugee was privileged for Venezuelans, at once the Mexican government took part in censorship and sanctions against the government of such country. As regards people from the Caribbean, their transit across Mexico was facilitated by means of departure documents. Conversely, in the case of Central Americans, thus far the policy has been to force them to remain in the south for months or years by means of humanitarian devices, such as refugee camps in the 1980's or the long processes in COMAR at present, or else with projects for temporary labor insertion in the states of southern Mexico.


CONCLUSIONS

The analysis of some instruments in the Law on Refugees allows noticing that Mexico recognizes a right to asylum that allows continuing with the advance in this regard as of the 1980's and which adopted additional protection mechanisms such as CP. By contrast, those who need / look for international protection in Mexico face a series of obstacles to receive it, which are mostly due to the action or omission of the Mexican state actors, institutions and actions to manage the flows of migrants and refugees; these are blocks,

CLP_PC_021985

FRONTERA NORTE VOL. 33, ART. 7, 2021, e-ISSN 2594-0260   19
https://doi.org/10.33679/rfn.v1i1.2103

dissuasion and immobilization, which follow the logic of contention, make it difficult and frequently prevent the obtaining of international protection:

1) Certain policies to control migration flows that stop and block, at once, access to refugee status.
2) Those who manage to apply for refugee status experience long waits, which do not comply with the legislation, in detention or in liberty, though in precarious conditions without the right to move freely over the country. This fact and high rejection rates represent a deterrent for many to begin the process or drop it to be deported, settle down or travel irregularly over Mexico (being subject to detention and deportation).
3) Many applicants have to face the process with no assistance from an attorney and have to endure other multiple violations to the due process, which affects their possibility of success.

What the Mexican governments have been trying to do –since the passing of the Law on Refuges and up to the present– is resorting to its own institutional dysfunctionality and incapability. In the facts, this means restricting the number of people who receive international protection and somehow stop or slow down the mobility processes that involve those in need of international protection. Even though more than 20 000 people had obtained the refugee status and more than 5 000, CP, during the 2013-2019 period, these figures pale in comparison with the Central American migration phenomenon and the demographic size of Mexico, and show that solidarity in this regard is far from the grandiloquent discourses of the authorities about the generosity of Mexico with alien people and its asylum system.

Another finding of this work points at certain dependence of the Mexican international protection system on the contention of migration flows in transit over the country. The pressures and influence exercised by the US on Mexico to perform contention tasks, and more explicitly after Trump's arrival, seem to even have had an effect on the Mexican asylum system. The way these individuals are immobilized in certain cases and the slow functioning are possibly due to the concern that foreigners will use this juridical instrument to reach American soil. In this sense, future research should thoroughly approach the interconnections between migratory control and international protection policies between Mexico and the US. In like manner, it would be interesting to research how the migrants navigate these and those.

After analyzing the Mexican asylum system, it is evident that the control of mobility is not only exercised by controlling the space and physical and human barriers, but also by managing times. Because of this, it is recommendable that future research on the policies to manage international migrations toward Mexico and in transit on this country retake the growing literature that approaches the migration phenomenon underscoring time.

CLP_PC_021986

In recent years the role of Mexico as an asylum country has increased and it is expected that it will continue growing to the extent the United States weakens its asylum system and demands that applicants ask for protection in the transit countries in the first place. Therefore, it is necessary to increase the discussion about the figures that Mexico may receive, the way in which the system that provides international protection works, the way the applicants are treated and integrating those who receive the status of refugee or CP, and also what to do with those who are rejected.

Translation: Luis Cejudo-Espinosa

## REFERENCES

Alto Comisionado de las Naciones Unidas para los Refugiados (ACNUR). México. (2020). *¿Cómo solicitar la condición de refugiado en México?* [Online]. Retrieved from https://help.unhcr.org/mexico/solicitando-la-condicion-de-refugiado/como-solicitar-la-condicion-de-refugiado-en-mexico/

Alto Comisionado de las Naciones Unidas para los Refugiados. (ACNUR) y Comisión Mexicana de Ayuda a Refugiados (COMAR). (2012). Los derechos humanos de las personas migrantes en las estaciones migratorias. En J. C. Calleros Alarcón (Coord), *La protección de los derechos humanos de las personas migrantes: una guía para las y los servidores públicos* (pp. 247-274). Mexico: Centro de Estudios Migratorios/Unidad de Política Migratoria/Subsecretaría de Población, migración y Asuntos Religiosos/Secretaría de Gobernación/Instituto Nacional de Migración/ Alto Comisionado de Naciones Unidas para los Derechos Humanos.

Aguayo Quezada, S. (1986, 1 de noviembre). Los centroamericanos olvidados en México. *Nexos*, Retrieved from https://www.nexos.com.mx/?p=4685

Aguayo Quezada, S. y O'Dogherty, L. (1986). Los refugiados guatemaltecos en Campeche y Quintana Roo. *Foro Internacional, 27*(2), 266-295. Retrieved from https://forointernacional.colmex.mx/index.php/fi/article/view/1054/1044

Amnistía Internacional. (2008). *La detención relacionada con la migración, motivo de preocupación en todo el mundo.* Retrieved from https://www.amnesty.org/download/Documents/56000/pol330042008spa.pdf

Amnistía Internacional. (2018). *México: Ignoradas y sin protección. La mortal devolución de personas centroamericanas solicitantes de asilo desde México.* Retrieved from https://www.amnesty.org/download/Documents/AMR4176022018SPANISH.PDF

Arango, J. (2019). Eficacia frente a principios. Políticas de extrema dureza contra la inmigración y el asilo en Estados Unidos y Europa. *Anuario CIDOB de la Inmigración*, 34-49. doi:doi.org/10.24241/AnuarioCIDOBInmi.2019.34

CLP_PC_021987

FRONTERA NORTE VOL. 33, ART. 7, 2021, e-ISSN 2594-0260   21
https://doi.org/10.33679/rfn.v1i1.2103

Asylum Access México. (2020). *Hoja informativa sobre el asilo en México.* Retrieved from https://asylumaccess.org/wp-content/uploads/2020/01/HOJA-INFORMATIVA-SOBRE-EL-ASILO-MEXICANO.pdf

Bermúdez Lobera, J. (2020). Análisis sobre los eventos de presentación y devolución de personas migrantes por parte del Instituto Nacional de Migración entre 2011 y 2019. *MovilidadES,* (4), 8-19. Retrieved from http://www.politicamigratoria.gob.mx/work/models/PoliticaMigratoria/CEM/Publicaciones/Revistas/movilidades/4/

Betts, A. (2013). Survival Migration. In A. Betts (Autor), *Survival Migration: Failed Governance and the Crisis of Displacement* (pp. 10-28). London: Cornell University Press. Retrieved from https://www.jstor.org/stable/10.7591/j.ctt32b5cd.6

Centro de Derechos Humanos Fray Matías de Córdova (CDHFMC) y El Colegio de la Frontera Norte (El COLEF). (2020). *Vulnerabilidad y precariedad en la frontera sur de México. La encuesta de derechos humanos de migrantes y solicitantes de refugio en Tapachula, Chiapas. 2018-2019.* Retrieved from https://observatoriocolef.org/wp-content/uploads/2020/02/INFORME-CDHFMC-COLEF-17feb2020.pdf

Comisión Española de Ayuda al Refugiado (CEAR). (2018). *México: Destino forzoso para personas refugiadas.* Madrid: Autor. Retrieved from https://www.cear.es/wp-content/uploads/2018/05/INFORME_MEXICO.pdf

Cobo, S. & Fuerte, P. (2012). *Refugiados en México: Perfiles Sociodemográficos e intergración social.* México: Centro de Estudios Migratorios /Unidad de Política Migratoria/Subsecretaría de Población, Migración y Asuntos Religiosos/Secretaría de Gobernación/Instituto Nacional de Migración/Secretaría de Gobernación-Comisión Mexicana de Ayuda a Refugiados/Alto Comisionado de Naciones Unidas para los Refugiados. Retrieved from https://www.acnur.org/fileadmin/Documentos/Publicaciones/2013/9167.pdf

*Ley sobre Refugiados, Protección Complementaria y Asilo Político. Diario Oficial de la Federación*, México, 27 de enero de 2011. Retrieved from https://www.gob.mx/cms/uploads/attachment/file/211049/08_Ley_sobre_Refugiados__Protecci_n_Complementaria_y_Asilo_Pol_tico.pdf

*Reglamento de la Ley Sobre Refugiados y Protección Complementaria. Diario Oficial de la Federación,* México, 21 de febrero de 2012. Retrieved from http://www.diputados.gob.mx/LeyesBiblio/regley/Reg_LRPC.pdf

El Colegio de la Frontera Norte (El COLEF), Secretaría de Gobernación (SEGOB), Unidad de Política Migratoria, Registro e Identidad de Personas (UPMRIP), Consejo Nacional de la Población (CONAPO), Secretaría de Relaciones Exteriores (SER), Secretaría de Trabajo y Prevención Social (STPS), Consejo Nacional para Prevenir la Discriminación (CONAPRED) y Secretaría de Desarrollo Social (SEDESOL). (2019).

CLP_PC_021988

*Encuesta sobre Migración en la Frontera Sur de México, Informe anual de Resultados 2018.* Retrieved from https://www.gob.mx/conapo/articulos/encuesta-sobre-migracion-en-la-frontera-sur-de-mexico-2004-2015-emif-sur?idiom=es

Espinar Ruiz, E. (2010). Migrantes y refugiados: reflexiones conceptuales. *Obets. Revista de Ciencias Sociales, 5*(1), 35-47.

Fassin, D. (2015). La economía moral del asilo. Relexiones críticas sobre la "crisis de refugiados" de 2015 en Europa. *Revista de Dialectología y Tradiciones Populares, LXX*(2), 277-290. Retrieved from http://dra.revistas.csic.es/index.php/dra/article/view/477/481

FitzGerald, D. S. (2019). *Refuge beyond Reach. How Rich Democracies Repel Asylum Seekers.* United Kingdom: Oxford University Press.

Gammeltoft-Hansen, T. & Tan, N. F. (2017). The End of the Deterrence Paradigm? Future Directions for Global Refugee Policy. *Journal on Migration and Human Security, 5*(1), 28-56. doi:https://doi.org/10.1177/233150241700500103

Gutiérrez López, E. E. (2019). México: ¿espacio de tránsito, destino temporal o país de refugiados?. In N. González Martín (Coord.), *Caravanas Migrantes: las respuestas de México* (pp. 43-49). Ciudad de México: Universidad Nacional Autónoma de México/Instituto de Investigaciones Jurídicas. Retrieved from https://archivos.juridicas.unam.mx/www/bjv/libros/12/5804/6.pdf

Human Rights First. (2017, 18 de julio). *Dangerous Territory Mexico Still Not Safe for Refugees.* [Online]. Retrieved from https://www.humanrightsfirst.org/resource/dangerous-territory-mexico-still-not-safe-refugees

Hyndman, J. & Mountz, A. (2008). Another Brick in the Wall? Neo-Refoulement ant the Externalization of Asylum by Australia and Europe. *Government and Opposition, 43*(2), 249-269.

Impacto Social Consultores. (2019). *ENPORE 2017. Encuesta sobre la Población Refugiada en México.* México: Agencia de la ONU para los Refugiados (ACNUR)/ Comisión Mexicana de Ayuda a Refugiados (COMAR)/ Secretaría de Gobernación (SEGOB)/Unidad de Política Migratoria, Registro e Identidad de Personas (UMPRIP). Retrieved from https://www.acnur.org/publications/pub_inf/5ddff2ca4/encuesta-sobre-la-poblacion-refugiada-en-mexico-enpore-2017.html

Kerwin, H. (2018). The Mexican Asylum System in Regional Context. *Maryland Journal of International Law, 33*(1), 290-312.

Lerma Rodríguez, E. (2016). "Guatemalteco-mexicano-estadounidenses" en Chiapas: Familias con estatus ciudadano diferenciado y su multiterritorialidad. *Migraciones Internacionales*, *8*(3), 85-124. https://doi.org/10.17428/rmi.v8i3.616

CLP_PC_021989

FRONTERA NORTE VOL. 33, ART. 7, 2021, e-ISSN 2594-0260    23
https://doi.org/10.33679/rfn.v1i1.2103

McAdam, J. (2006). *Complementary protection and beyond: How states deal with human rights protection*. Australia: University of Sydney. Retrieved from https://www.unhcr.org/research/working/42fb1f045/complementary-protection-beyond-states-deal-human-rights-protection-jane.html

París Pombo, M. D. (2017). *Violencias y migraciones centroamericanas en México.* Tijuana: El Colegio de la Frontera Norte.

París Pombo, M. D. (2019). *La crisis del refugio en México.* Tijuana: El Colegio de México. Retrieved from https://observatoriocolef.org/boletin/la-crisis-del-refugio-en-mexico/

París Pombo, M. D. (2020). La extraterritorialización de la espera y la negación del derecho al asilo en Estados Unidos. *LASA Forum, 51*(2), 75-79. Retrieved from https://forum.lasaweb.org/files/vol51-issue2/Dossier2-2.pdf

Rea Granados, S. A. (2016). Retos actuales en la implementación de la ley sobre refugiados y protección complementaria en México: identificación, admisión y acceso al procedimiento de asilo. *Anuario Mexicano de Derecho Internacional, XVI*, 373-348.

Rodríguez Chávez, E. (2011). Asilo, refugio y otras formas de protección humanitaria en el México del siglo XXI. En K. Somohano y P. Yankelevich (Coords.), *El refugio en México. Entra la historia y los desafíos contemporáneos* (pp. 69-78). Mexico: Comisión Mexicana de Ayuda a Refugiados/Secretaría de Gobernación.

Secretaría de Gobernación (SEGOB). (2018, 26 de octubre). *El Presidente Enrique Peña Nieto anuncia el Plan "Estás en tu casa" en apoyo a los migrantes centroamericanos que se encuentran en México.* Mexico: Autor, Retrieved from https://www.gob.mx/segob/prensa/el-presidente-enrique-pena-nieto-anuncia-el-plan-estas-en-tu-casa-en-apoyo-a-los-migrantes-centroamericanos-que-se-encuentran-en-mexico-180268?hootPostID=97986b618b4d2d255e90b9dd87766f5f

Secretaría de Gobernación (SEGOB). (2020, 17 de enero). *Atenderán INM y COMAR trámites de ingreso de personas migrantes en el sur del país*. Mexico: Autor, Retrieved from https://www.gob.mx/segob/prensa/atenderan-inm-y-COMAR-tramites-de-ingreso-de-personas-migrantes-en-el-sur-del-pais?idiom=es

Sin Fronteras I. A. P. (2016). *Evolución y retos del Asilo en México. 20 años de asistencia legal e incidencia por las personas refugiadas.* Mexico: Autor. Retrieved from http://sinfronteras.org.mx/asiloporderecho.sinfronteras.org.mx/wp-content/uploads/2016/09/InformeAsilo_2016_WEB.compressed.pdf

Torre Cantalapiedra, E. (2020). Destino y asentamiento en México de los migrantes y refugiados centroamericanos. *TRACE. Procesos Mexicanos y Centroamericanos,* (77), 122-145. Retrieved from https://www.academia.edu/42010723/Destino_y_asentamiento_en_M%C3%A9xico_de_los_migrantes_y_refugiados_centroamericanos

CLP_PC_021990

Torre Cantalapiedra, E., & Mariscal Nava, D. M. (2020). Batallando con fronteras: estrategias migratorias en tránsito de participantes en caravanas de migrantes. *Estudios Fronterizos, 21*, 1-21. doi:https://doi.org/10.21670/ref.2005047

Universidad Iberoamericana Ciudad de México, Clínica Jurídica para Refugiados Alaíde Foppa y Centro de Derechos Humanos Fray Matías de Córdova A. C. (2017). *La interpretación y aplicación del derecho internacional y nacional de los refugiados en México.* Mexico: Autores. Retrieved from http://cdhfraymatias.org/web/wp-content/uploads/2017/06/LA-             INTERPRETACION-Y-APLICACION-DEL-DERECHO-DE-LOS-REFUGIADOS-FINAL.pdf

Unidad de Política Migratoria, Registro e Identidad de Personas (UPMRIP), Comisión Mexicana de Ayuda a Refugiados (COMAR), Secretaría de Gobernación (SEGOB). (2019). *Boletín Estadítico de Solicitantes de Refugio en México 2018.* México: Secretaría de Gobernación. Retrieved from http://portales.segob.gob.mx/es/PoliticaMigratoria/Refugio

Unidad de Política Migratoria, Registro e Identidad de Personas (UPMRIP), Comisión Mexicana de Ayuda a Refugiados (COMAR), Secretaría de Gobernación (SEGOB). (2020). *Estadísticas de solicitantes de refugio en la COMAR al mes de enero de 2020.*

CLP_PC_021991



# AMNESTY INTERNATIONAL

27 March 2023

**RE: Circumvention of Lawful Pathways (DHS Docket Number USCIS-2022-0016)**

Amnesty International[1] is grateful for the opportunity to submit comments regarding the notice of proposed rulemaking (NPRM) "Circumvention of Lawful Pathways" (DHS Docket Number USCIS 2022-0016).[2]

## I.      Overview

The Department of Homeland Security (DHS) and the Department of Justice are issuing a notice of proposed rulemaking "in anticipation of a potential surge of migration at the southwest border of the United States" following the eventual termination of the Centers for Disease Control and Prevention's Title 42 Public Health Order, which is expected to end on May 11, 2023.[3]

The NPRM imposes a rebuttable presumption of asylum ineligibility for asylum-seekers who enter the United States outside of a "lawful pathway" or without first seeking protection in a third country in the region that they have travelled through.[4]

## II.      The NPRM violates the United States' international human rights obligations

All individuals have the universal human right to seek and enjoy asylum from harm. Under domestic[5] and international law,[6] the United States is obligated to provide access to individualized and fair assessments of all requests for protection by asylum-seekers seeking safety at the border, in a way that does not discriminate based on manner of entry or immigration status. However, the NPRM violates the United States' international human rights obligations.

Under the NPRM, asylum-seekers arriving at the southwest land border of the United States without

---

[1] Amnesty International is a non-governmental, non-profit organization with a global support base of more than ten million members, supporters, and activists in more than 150 countries and territories, and domestic entities set up in more than seventy countries and territories. Amnesty International's vision is of a world in which every person enjoys all of the human rights enshrined in the Universal Declaration of Human Rights and other international human rights instruments. Amnesty International works independently and impartially to promote respect for human rights. It monitors domestic law and practices in countries throughout the world for compliance with international human rights law and international humanitarian law and standards, and it engages in advocacy, litigation, and education to prevent and end human rights violations and to demand justice for those whose rights have been violated. Amnesty International has particular expertise in international law and policies concerning the rights of refugees and asylum-seekers.

[2] Regulations.gov, Proposed Rule, Circumvention of Lawful Pathways, USCIS-2022-0016-0001, https://www.regulations.gov/document/USCIS-2022-0016-0001.

[3] Regulations.gov, Proposed Rule, Circumvention of Lawful Pathways, USCIS-2022-0016-0001, https://www.regulations.gov/document/USCIS-2022-0016-0001.

[4] Federal Register, Department of Homeland Security & Department of Justice, Circumvention of Lawful Pathways, Docket No: USCIS 2022-0016, https://public-inspection.federalregister.gov/2023-03718.pdf.

[5] The U.S. Code safeguards the right to seek asylum in the United States "whether or not at a designated port of arrival". See: 8 U.S.C. § 1158 and §1225, https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1158&num=0&edition=prelim.

[6] The United States is state party to the 1967 United Nations Protocol Relating to the Status of Refugees. Congress passed the Refugee Act in 1980 in a sweeping effort to bring the United States' domestic laws in line with its international obligations and thereby provide additional assurances and protections to asylum-seekers and refugees. See: Refugee Act of 1980, Pub. L. No. 96-212, § 101(a), 94 Stat. 102 (1980), https://www.govinfo.gov/content/pkg/STATUTE-94/pdf/STATUTE-94-Pg102.pdf. See: *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 672 (9th Cir. 2021) ("To … implement the country's new treaty commitments, Congress passed the Refugee Act of 1980"), https://cdn.ca9.uscourts.gov/datastore/opinions/2021/03/24/18-17274.pdf.

1

authorization after traveling through a third country would be presumed ineligible for asylum unless they, or a member of their family with whom they are traveling, meet at least one of three exceptions:

- They were provided authorization to travel to the United States pursuant to a DHS-approved parole process;
- They used the CBP One application to schedule a time and place to present at a port of entry, or they presented at a port of entry without using the CBP One application and established that it was not possible to access or use the CBP One application due to a language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle; or
- They applied for and were denied asylum in a third country en route to the United States.[7]

Regarding the first exception, while Amnesty International welcomes the new humanitarian parole program for Cubans, Haitians, Nicaraguans and Venezuelans to apply for protection without having to make the dangerous journey to the border, it must not come at the expense of the fundamental human right to seek asylum.[8] The new policy for Cubans, Haitians, Nicaraguans and Venezuelans was coupled with an expansion of Title 42 for nationals from these countries seeking protections at the border and has resulted in massive deterrence for individuals from these countries to seek protection, deportations from Mexico without adequate protection screenings, and violent pushbacks at the U.S. border. The requirements of these programs disadvantage the most vulnerable, who are unlikely to have passports, support persons in the U.S. or the means to finance their travel to the U.S. Further, these new policies undoubtedly have a disparate impact on Black, Brown and Indigenous asylum-seekers.[9] In fact, Amnesty International previously found that the cruel treatment of Haitians under Title 42 subjected Haitian asylum-seekers to arbitrary detention and discriminatory and humiliating ill-treatment that amounts to race-based torture.[10] The humanitarian parole program cannot be seen as a replacement for asylum, and regardless of its existence, the United States has international obligations to uphold the right of individuals to seek international protection.

With regards to the second exception, Amnesty International and other organizations have received information regarding numerous problems with the CBP One application since its introduction in January 2023 as the way to make asylum claims at a U.S. port of entry. There are accessibility hurdles given that asylum-seekers must be literate, speak either English, Spanish or Haitian Creole, have access to a cell phone with data or internet service, and have basic knowledge of the new system.[11] Members of the U.S. Congress, asylum-seekers and civil society organizations have reported numerous difficulties in obtaining appointments through the application including frequent crashes, looping error messages, facial comparison flaws –which has a disproportionate impact on racialized individuals[12]–, the early morning release times of new appointments and slow internet at shelters.[13] There are also an insufficient number

[7]   DHS, Fact Sheet: Notice of Proposed Rulemaking "Circumvention of Lawful Pathways", 21 February 2023, https://www.dhs.gov/news/2023/02/21/fact-sheet-notice-proposed-rulemaking-circumvention-lawful-pathways.

[8]   Amnesty International, "Amnesty International condemns Biden Administration's Asylum Ban", 21 February 2023, https://www.amnestyusa.org/press-releases/amnesty-international-condemns-biden-administrations-asylum-ban/.

[9]   Amnesty International, "Amnesty International USA condemns Biden Administration's attack on asylum", 5 January 2023, https://www.amnestyusa.org/press-releases/amnesty-international-usa-advocacy-director-for-the-americas-amy-fischer-pathways-to-asylum-seekers/.

[10] Amnesty International, *"They did not treat us like people": Race and migration-related torture and other ill-treatment of Haitians seeking safety in the USA*, 22 September 2022, AMR 36/5973/2022, https://www.amnesty.org/en/documents/amr36/5973/2022/en/.

[11] Robert Strauss Center for International Security and Law at the University of Texas at Austin, *Asylum Processing at the U.S.-Mexico Border: February 2023*, p. 2, https://www.strausscenter.org/wp-content/uploads/Feb_2023_Asylum_Processing.pdf.

[12] The Guardian, "Facial recognition bias frustrates Black asylum applicants to US, advocates say", 8 February 2023, https://www.theguardian.com/us-news/2023/feb/08/us-immigration-cbp-one-app-facial-recognition-bias.

[13] Robert Strauss Center for International Security and Law at the University of Texas at Austin, *Asylum Processing at the U.S.-Mexico Border: February 2023*, p. 2, https://www.strausscenter.org/wp-content/uploads/Feb_2023_Asylum_Processing.pdf; Immigration Impact, "CBP One is riddled with flaws that make the app inaccessible to many asylum seekers", 28 February 2023, https://immigrationimpact.com/2023/02/28/cbp-

2

of appointments compared to the number of waiting individuals which has left asylum-seekers stranded at the U.S.-Mexico border. Some asylum-seekers are attempting to secure appointments in other cities which involves security and financial costs.[14] Further, large family groups are experiencing even more difficulties in making appointments, which has resulted in families separating themselves to improve their chances or deciding to send their children as unaccompanied minors across the border.[15] Most significantly, the lack of sufficient appointments means that some asylum-seekers may never be able to make an appointment through the application and thus, under the NPRM, would remain ineligible for asylum in the United States.

Additionally, while one of the stated aims of the NPRM is to avoid migrants and asylum-seekers "waiting in long lines at the border for unknown periods of time in conditions that could put them at risk",[16] the insufficient number of appointments available through the CBP One application is resulting in exactly this, as asylum-seekers find themselves stranded at the border where they face unstable living conditions and security risks.[17] Civil society organizations have reported that Black, Brown, LGBTIQ+ and Indigenous asylum-seekers experience additional challenges and targeted discrimination in Mexican border towns.[18] Amnesty International believes that the use of the CBP One application as the sole means of making an asylum appointment at the southwest border is akin to the previous "metering" policy[19] in that asylum-seekers are now once again forced to sign up for appointments at ports-of-entry to access asylum.

---

one-app-flaws-asylum-seekers/; Congress of the United States, House of Representatives, 13 March 2023, https://chuygarcia.house.gov/sites/evo-subsites/chuygarcia.house.gov/files/evo-media-document/cbponeletter_final.pdf; BBC, "At US border, tech issues plague new migrant applications", 8 March 2023, https://www.bbc.com/news/world-us-canada-64814095; The Washington Post, "Desperate migrants seeking asylum face a new hurdle: Technology", 11 March 2023, https://www.washingtonpost.com/nation/2023/03/11/asylum-seekers-mexico-border-app/?pwapi_token=eyJ0eXAiOiJKV1QiLCJhbGciOiJIUzI1NiJ9.eyJzdWJpZCI6IjM2NDQ2MDUiLCJyZWFzb24iOiJnaWZ0IiwibmJmIjoxNjc4NTEwODAwLCJpc3MiOiJzdWJzY3JpcHRpb25zIiwiZXhwIjoxNjc5ODAzMTk5LCJpYXQiOjE2Nzg1MTA4MDAsImp0aSI6ImIzZjE5ODRjLTg5NTItNDY2YS04ZDY0LTkyZDc1OWU1MjZhZiIsInVybCI6Imh0dHBzOi8vd3d3Lndhc2hpbmd0b25wb3N0LmNvbS9uYXRpb24vMjAyMy8wMy8xMS9hc3lsdW0tc2Vla2Vycy1tZXhpY28tYm9yZGVyLWFwcC8ifQ.-3rBQtEghmvmGTbBbGisxERu84Iou1x847eFAmFfu1g.

14 Robert Strauss Center for International Security and Law at the University of Texas at Austin, *Asylum Processing at the U.S.-Mexico Border: February 2023*, p. 3, https://www.strausscenter.org/wp-content/uploads/Feb_2023_Asylum_Processing.pdf; myRGV.com, "Families consider separation to seek asylum as they face limited appointments through CBP app", 21 February 2023, https://myrgv.com/local-news/2023/02/21/families-consider-separation-to-seek-asylum-as-they-face-limited-appointments-through-cbp-app/.

15 Robert Strauss Center for International Security and Law at the University of Texas at Austin, *Asylum Processing at the U.S.-Mexico Border: February 2023*, p. 3, https://www.strausscenter.org/wp-content/uploads/Feb_2023_Asylum_Processing.pdf; myRGV.com, "Families consider separation to seek asylum as they face limited appointments through CBP app", 21 February 2023, https://myrgv.com/local-news/2023/02/21/families-consider-separation-to-seek-asylum-as-they-face-limited-appointments-through-cbp-app/; Congress of the United States, House of Representatives, 13 March 2023, https://chuygarcia.house.gov/sites/evo-subsites/chuygarcia.house.gov/files/evo-media-document/cbponeletter_final.pdf.

16 Federal Register, Department of Homeland Security & Department of Justice, Circumvention of Lawful Pathways, Docket No: USCIS 2022-0016, p. 33, https://public-inspection.federalregister.gov/2023-03718.pdf.

17 Robert Strauss Center for International Security and Law at the University of Texas at Austin, *Asylum Processing at the U.S.-Mexico Border: February 2023*, p. 3, https://www.strausscenter.org/wp-content/uploads/Feb_2023_Asylum_Processing.pdf; Amnesty International, Amnesty International statement for hearing on "Examining the Human Rights and Legal Implications of DHS's 'Remain in Mexico' Policy", 18 November 2019, https://www.amnestyusa.org/wp-content/uploads/2019/11/11.18.2019-Amnesty-International-Statement-for-House-HSC-Border-Security-Subcommittee-Hearing-on-RIM-1.pdf.

18 Robert Strauss Center for International Security and Law at the University of Texas at Austin, *Asylum Processing at the U.S.-Mexico Border: February 2023*, p. 3, https://www.strausscenter.org/wp-content/uploads/Feb_2023_Asylum_Processing.pdf.

19 Under the metering policy, by which tens of thousands of migrants and asylum-seekers were forced to wait in violent border regions in northern Mexico –sometimes for months before they were permitted to request asylum– and without access to adequate accommodations, food, healthcare, legal representation, or physical security from abuses by State and non-State actors. See: Amnesty International, *Americas: Pushback practises and their impact on the human rights of migrants and refugees, Amnesty International Submission to the United Nations (UN) Special Rapporteur on the human rights of migrants, February 2021*, 8 February 2021, AMR 01/3658/2021, https://www.amnesty.org/en/documents/amr01/3658/2021/en/; Amnesty International, *'You Don't Have Any Rights Here': Illegal Pushbacks, Arbitrary Detention, and Ill-treatment of Asylum-Seekers in the United States*, 11 October 2018, AMR 51/9101/2018, p. 11, https://www.amnesty.org/en/documents/amr51/9101/2018/en/; Amnesty International, *Facing Walls: USA and Mexico Violations of the Rights of Asylum-seekers*, 15 June 2017, AMR 01/6426/2017, https://www.amnesty.org/en/documents/amr01/6426/2017/en/.

3

Under its international human rights obligations, the United States is prohibited from "refusing to process claims for asylum or unduly prolong[ing] them"[20] and must mandate "access to the territory and fair and efficient asylum procedures".[21] Using the CBP One application as the sole manner of making asylum claims and the limited number of appointments available through the application are contrary to these obligations. While the NPRM does include exemptions for individuals who are not able to use the application due a language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle, it is unclear how this will be determined at the border and if border agents will have discretion in these decisions. Further, it is deeply concerning that there are no similar exemptions for vulnerable populations such as people with medical or mental health conditions, LGBTQI+ individuals, or others such as Black, Brown and Indigenous populations that may face particular risk waiting in Mexico.

The last exception, which requires individuals who travel through a third country before arriving to the southwest border to apply for asylum in that country, infringes on the rights of these individuals to seek asylum. Amnesty International has documented that countries throughout the Americas through which asylum-seekers are likely to travel prior to reaching the southwest border of the United States are failing in their treaty obligations to protect those who are in need of international protection, as well as repeatedly violating the principle of *non-refoulement*.[22] In a report published in 2018 based on 500 responses from migrants and asylum-seekers interviewed during their journey through Mexico, Amnesty International documented 120 statements containing strong indications that there had been *refoulement*. This represented 24% of the total number of responses and 40% of responses from former National Migration Institute (INM) detainees. These statements detailed how detainees who expressed fear for their lives in their countries of origin were nonetheless returned to these countries without consideration of their asylum requests.[23] Amnesty International has also documented the particular challenges experienced by Haitian asylum-seekers, fueled by racism, which demonstrate that multiple states across the region are failing to provide them with protection.[24] The documented deficiencies in asylum systems throughout the Americas and repeated violations of the principle of *non-refoulement* by these states make it unreasonable for the United States to request that asylum-seekers make asylum claims in these countries in order to be eligible for asylum in the U.S. People in vulnerable situations are once again the most impacted by such requirements.

The requirements set out in the NPRM will also likely result in asylum-seekers resorting to more dangerous routes to attempt to arrive in the United States. While the NPRM "seeks to mitigate the role of would-be smugglers by incentivizing intending asylum-seekers to utilize lawful, safe, and orderly pathways for seeking protection in the United States or elsewhere",[25] the NPRM will likely result in smugglers attempting to take asylum-seekers via more dangerous routes. Further, the NPRM's exceptions favor one community seeking refuge over another by providing rights if a person arrives by plane instead of on foot.

---

[20] U.N. Committee Against Torture, *General Comment No. 4 (2017) on the Implementation of Article 3 of the Convention in the context of article 22*, CAT/C/GC/4, 4 September 2018, para. 14, http://www.ohchr.org/Documents/HRBodies/CAT/CAT-C-GC-4_EN.pdf.

[21] UNHCR, *Advisory Opinion on the Extraterritorial Application of Non-Refoulement Obligations Under the 1951 Convention Relating to the Status of Refugees and Its 1967 Protocol*, 26 January 2007, para. 8, https://www.unhcr.org/4d9486929.pdf.

[22] Amnesty International, *Overlooked, under-protected: Mexico's deadly refoulement of Central Americans seeking asylum*, 23 January 2018, AMR 41/7602/2018, https://www.amnesty.org/en/documents/amr41/7602/2018/en/; Amnesty International, *Americas: Pushback practises and their impact on the human rights of migrants and refugees, Amnesty International Submission to the United Nations (UN) Special Rapporteur on the human rights of migrants*, February 2021, AMR 01/3658/2021, https://www.amnesty.org/en/documents/amr01/3658/2021/en/.

[23] Amnesty International, *Overlooked, under-protected: Mexico's deadly refoulement of Central Americans seeking asylum*, 23 January 2018, AMR 41/7602/2018, https://www.amnesty.org/en/documents/amr41/7602/2018/en/;

[24] Amnesty International, *Not safe anywhere: Haitians on the move need urgent international protection*, 28 October 2021, AMR 36/4920/2021, https://www.amnesty.org/en/documents/amr36/4920/2021/en/.

[25] Federal Register, Department of Homeland Security & Department of Justice, Circumvention of Lawful Pathways, Docket No: USCIS 2022-0016, p. 30, https://public-inspection.federalregister.gov/2023-03718.pdf.

4

These types of restrictions are systematically designed to favor wealthy and mainly white individuals, and leave mostly Black, Brown and Indigenous asylum-seekers out of the asylum process.[26]

In accordance with the NPRM, asylum-seekers who do not meet one of the three exceptions set out above would be ineligible to apply for asylum in the United States. Nevertheless, the United States has domestic and international obligations to ensure that asylum-seekers are able to request protection either at official U.S. ports-of-entry or after they cross irregularly into the country.[27]

The turning away of asylum-seekers violates the principle of *non-refoulement*, which is binding on all countries as a principle of customary and non-derogable international law and is integrated into U.S. legislation. The principle of *non-refoulement,* as it applies to people who may be refugees and are in search of recognition as such, prohibits states from returning or turning away people to territories where their "life or freedom" would be threatened.[28]

The United Nations Refugee Agency (UNHCR) has described *non-refoulement* as encompassing "any measure attributable to a State which could have the effect of returning an asylum-seeker or refugee to the frontiers of territories where his or her life or freedom would be threatened," or where an asylum-seeker or refugee would risk persecution. This includes rejection at the border, interception and indirect *refoulement*, whether of an individual seeking asylum or in situations of mass influx.[29] In an authoritative advisory opinion on state obligations under refugee law,[30] UNHCR held that the principle of *non-refoulement* is violated in situations of non-admission at the border and applies to returns not only to countries-of-origin, but also to "any other place" where a person has reason to fear for their life.[31] Most importantly, it holds that "States will be required to grant individuals seeking international protection access to the territory and to fair and efficient asylum procedures."[32] The United Nations Convention Against Torture (CAT), which the United States has also ratified and incorporated into domestic law, similarly forbids *refoulement*.[33]

---

[26] Amnesty International, "Immigrants' rights organizations rally in D.C., demand the Biden Administration not ban asylum or lock up families", 16 March 2023, https://www.amnestyusa.org/press-releases/immigrants-rights-demand-biden-not-lock-up-families/.

[27]    8    U.S.C.    §1158–Asylum,    https://uscode.house.gov/view.xhtml?req=granuleid%3AUSC-prelim-title8-section1158&num=0&edition=prelim#:~:text=To%20establish%20that%20the%20applicant%20is%20a%20refugee%20within%20the,reason%20for%20persecuting%20the%20applicant.;UNGA, UNGA, Convention Relating to the Status of Refugees (1951), 189 UNTS 137, http://www.unhcr.org/3b66c2aa10. Although the United States never ratified the 1951 Convention itself, it acceded to the 1967 Protocol, by which it became bound by Articles 2 to 34 of the 1951 Convention; UNGA, Protocol relating to the Status of Refugees (1967), 606 UNTS 267, https://www.refworld.org/docid/3ae6b3ae4.html.

[28] Article 33 of the 1951 Convention codifies the principle of non-refoulement by prohibiting returning an asylum-seeker "in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." In recent decades, the principle has further developed in other areas of international human rights law and now applies to all individuals subjected to a transfer of jurisdiction, whether or not they claim international protection or are entitled to it.

[29] UNHCR, *Note on International Protection*, 13 September 2001, A7AC.96/951, para. 16, https://www.refworld.org/docid/3bb1c6cc4.html.

[30] The legal status of Advisory Opinions of the UNHCR is explained in the Statute of the Office of the UNHCR: UNGA, Statute of the Office of the United Nations High Commissioner for Refugees, General Assembly Resolution 428(v) of 14 December 1950, http://www.unhcr.org/4d944e589.pdf. These Advisory Opinions are generally considered to be guidance for compliance with the 1951 Convention.

[31] UNHCR, *Advisory Opinion on the Extraterritorial Application of Non-Refoulement Obligations Under the 1951 Convention Relating to the Status of Refugees and Its 1967 Protocol*, 26 January 2007, para. 7, https://www.unhcr.org/4d9486929.pdf.

[32] UNHCR, *Advisory Opinion on the Extraterritorial Application of Non-Refoulement Obligations Under the 1951 Convention Relating to the Status of Refugees and Its 1967 Protocol*, 26 January 2007, para. 8, https://www.unhcr.org/4d9486929.pdf.

[33] Article 3 of the U.N. Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment: "No State Party shall expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." UNGA, Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, UNGA Resolution 39/46, 10 December 1984, https://www.ohchr.org/en/instruments-mechanisms/instruments/convention-against-torture-and-other-cruel-inhuman-or-degrading.

5

CLP_PC_022042

Individuals who fail to rebut the presumption of ineligibility proposed in the NPRM would not have access to fair and efficient asylum procedures and thus, could be returned to places where they are at risk, contrary to the United States' domestic and international obligations. Further, asylum-seekers waiting in Mexico to make an appointment through the CBP One application could be subjected to systematic *refoulement* back to their countries of origin. Amnesty International observed that systematic *refoulement* occurred under previous U.S. migration policies, including the Migrant Protection Protocols (MPP) and Title 42 expulsions. Specifically, migrants pushed back into Mexico under MPP and Title 42 faced rampant kidnapping and physical and sexual violence.[34] As mentioned above, Mexico is also routinely failing to protect migrants in the country including by refouling individuals seeking safety without protection screenings, to Guatemala, Haiti and Venezuela, among other countries.[35]

Overall, the NPRM violates the United States' international human rights obligations and runs contrary to the principle of *non-refoulement*.

### III.   The NPRM will result in family separation and the exploitation of unaccompanied minors

Amnesty International believes that the NPRM will fuel the indirect separation of families. The fact that the proposed rule does not apply to unaccompanied minors, compounded with the difficulties that families are experiencing in making appointments through the CBP One application, as outlined above, will likely push families to make an impossible choice, send their children across the border alone to seek safety or stay together as a family in danger.

Amnesty International previously documented that border policies, including the MPP and Title 42 expulsions, fueled the indirect separation of families. In an interview with Amnesty International in April 2021, and documented in the report, "Pushed Into Harm's Way: Forced Returns of Unaccompanied Migrant Children To Danger By the USA and Mexico," a government employee described the demographics of the unaccompanied children being held at an emergency intake site in Texas and confirmed that many of the thousands of children crossing into the United States to seek safety had separated from their asylum-seeking families who were still stranded in northern Mexico due to Title 42.[36] It is likely that the NPRM will also result in family separation, which can lead to multiple human rights violations.

Further, a recent investigation by the New York Times found that unaccompanied migrant children are increasingly working in dangerous and exploitative labor conditions in the United States.[37] The NPRM, by indirectly fueling family separation, is likely to exacerbate this trend.

### IV.   Alleged capacity constraints do not absolve the United States of its international human rights obligations

---

[34] Amnesty International, Amnesty International statement for hearing on "Examining the Human Rights and Legal Implications of DHS's 'Remain in Mexico' Policy", 18 November 2019, https://www.amnestyusa.org/wp-content/uploads/2019/11/11.18.2019-Amnesty-International-Statement-for-House-HSC-Border-Security-Subcommittee-Hearing-on-RIM-1.pdf.

[35] Amnesty International, *Americas: Pushback practises and their impact on the human rights of migrants and refugees, Amnesty International Submission to the United Nations (UN) Special Rapporteur on the human rights of migrants, February 2021*, 8 February 2021, AMR 01/3658/2021, https://www.amnesty.org/en/documents/amr01/3658/2021/en/; Amnesty International, *Pushed Into Harm's Way: Forced Returns of Unaccompanied Migrant Children To Danger By the USA and Mexico*, 11 June 2021, AMR 51/4200/2020, https://www.amnesty.org/en/documents/amr51/4200/2021/en/.

[36] Amnesty International, *Pushed Into Harm's Way: Forced Returns of Unaccompanied Migrant Children To Danger By the USA and Mexico*, 11 June 2021, AMR 51/4200/2020, https://www.amnesty.org/en/documents/amr51/4200/2021/en/.

[37] The New York Times, "Alone and exploited, migrant children work brutal jobs across the U.S.", 28 February 2023, https://www.nytimes.com/2023/02/25/us/unaccompanied-migrant-child-workers-exploitation.html.

6

As indicated above, one of the rationales behind the NPRM is the assumption that border encounters could rise following the lifting of the Title 42 public health order and that DHS allegedly "does not have the infrastructure, personnel or funding to sustain the processing of migratory flows of this magnitude in a safe and orderly manner over time".[38] Nevertheless, from 2018 to the present, U.S. Customs and Border Protection (CBP), which is a component of DHS, has employed more than 60,000 workers and officials in the United States, with the number of personnel steadily increasing each year.[39] The NPRM also states that DHS has taken "a series of extraordinary steps" to respond to the accelerated increase in encounters along the southwest border since January 2021.[40]

Amnesty International emphasizes that, regardless of these alleged capacity constraints, the United States has both domestic and international obligations to provide access to individualized and fair assessments of all requests for protection by asylum-seekers seeking safety at the border. Further, even in situations of mass influx, the right to seek asylum and the principle of *non-refoulement* –including non-rejection at the border– cannot be suspended.[41]

### V.       Recommendations

The NPRM is indisputably intended to deter asylum-seekers from requesting protection in the United States. Not only is it contrary to the United States' domestic and international human rights obligations, it also violates the rights of individuals to seek asylum. For these reasons, Amnesty International calls on the Biden Administration to immediately abandon the proposed rule. Instead, Amnesty International urges the Biden Administration to end Title 42 and invest in systems to process asylum-seekers at the border without delay and provide them with support to pursue their asylum claims in U.S. communities with access to housing, social services, and legal supports.

Once again, we are grateful for the opportunity to provide these recommendations. For more information, please contact Amy Fischer, Amnesty International USA's Americas Advocacy Director, at (202) 768-4082 or afischer@aiusa.org.

Sincerely,
Amy Fischer
Americas Advocacy Director
Amnesty International USA

---

[38] Federal Register, Department of Homeland Security & Department of Justice, Circumvention of Lawful Pathways, Docket No: USCIS 2022-0016, https://public-inspection.federalregister.gov/2023-03718.pdf.

[39] U.S. Customs and Border Protection, "On a typical day is Fiscal Year 2022, CBP...", https://www.cbp.gov/newsroom/stats/typical-day-fy2022.

[40] Federal Register, Department of Homeland Security & Department of Justice, Circumvention of Lawful Pathways, Docket No: USCIS 2022-0016, https://public-inspection.federalregister.gov/2023-03718.pdf.

[41] UNHCR, Protection of Asylum-Seekers in Situations of Large-Scale Influx, No. 22 (XXXII) - 1981, 21 October 1981, https://www.unhcr.org/excom/exconc/3ae68c6e10/protection-asylum-seekers-situations-large-scale-influx.html.

CLP_PC_022044



# OVERLOOKED,

# UNDER-PROTECTED

MEXICO'S DEADLY *REFOULEMENT* OF CENTRAL AMERICANS SEEKING ASYLUM

I WELCOME



CLP_PC_022500

Amnesty International is a global movement of more than 7 million people who campaign for a world where human rights are enjoyed by all.

Our vision is for every person to enjoy all the rights enshrined in the Universal Declaration of Human Rights and other international human rights standards.

We are independent of any government, political ideology, economic interest or religion and are funded mainly by our membership and public donations.



© Amnesty International 2018
Except where otherwise noted, content in this document is licensed under a Creative Commons (attribution, non-commercial, no derivatives, international 4.0) licence.
https://creativecommons.org/licenses/by-nc-nd/4.0/legalcode
For more information please visit the permissions page on our website: www.amnesty.org
Where material is attributed to a copyright owner other than Amnesty International this material is not subject to the Creative Commons licence.

First published in 2018 by Amnesty International Ltd
Peter Benenson House, 1 Easton Street, London WC1X 0DW, UK

Index: AMR 41/7602/2018
Original language: English

**amnesty.org**

**Cover photo:**
*Illustration by Joaquin Castro Caceres for Amnistía Internacional*
*© Amnesty International / Joaquin Castro Caceres*

# CONTENTS

| | |
|---|---|
| **GLOSSARY** | **4** |
| **1. EXECUTIVE SUMMARY** | **5** |
| 1.1 Methodology | **6** |
| **2. FALLING THROUGH THE CRACKS: FAILURES IN SCREENING PROCESSES** | **8** |
| 2.1 First stage of screening by INM field agents | **10** |
| 2.2 Falling through the cracks: Second stage of screening in detention centres | **11** |
| **3. LEGAL LIMBO AND HASTY RETURNS** | **14** |
| 3.1 Voluntary return papers | **14** |
| 3.2 The failure to fully inform individuals about their casefile | **16** |
| 3.3 Failures of INM information systems | **16** |
| **4. ILL-TREATMENT OF MIGRANTS AS PART OF THE DEPORTIONS MACHINE** | **18** |
| 4.1 Arbitrary detention of asylum seekers and its impact on *refoulement* | **20** |
| **5. RECOMMENDATIONS** | **22** |

CLP_PC_022502

# GLOSSARY

| TERM | DESCRIPTION |
|---|---|
| **REFUGEE** | A refugee is a person who has fled from their own country because they have a well-founded fear of persecution and their government cannot or will not protect them. Asylum procedures are designed to determine whether someone meets the legal definition of a refugee. When a country recognizes someone as a refugee, it gives them international protection as a substitute for the protection of their home country. |
| **ASYLUM-SEEKER** | An asylum-seeker is someone who has left their country seeking protection but has yet to be recognized as a refugee. During the time that their asylum claim is being examined, the asylum-seeker must not be forced to return to their country of origin. Under international law, being a refugee is a fact-based status, and arises before the official, legal grant of asylum. |
| **MIGRANT** | A migrant is a person who moves from one country to another to live and usually to work, either temporarily or permanently, or to be reunited with family members. **Regular migrants** are foreign nationals who, under domestic law, are entitled to stay in the country. **Irregular migrants** are foreign nationals whose migration status does not comply with the requirements of domestic immigration legislation and rules. They are also called "undocumented migrants". The term "irregular" refers only to a person's entry or stay. **Amnesty International does not use the term "illegal migrant."** |
| **UN REFUGEE CONVENTION AND PROTOCOL** | The 1951 Convention Relating to the Status of Refugees is the core binding international treaty that serves as the basis for international refugee law. The 1967 Protocol relating to the Status of Refugees retakes the entire content of the 1951 Convention and simply adds an extension on its application to all refugees, not just those arising from specific time bound conflicts in the 1940s and 50s. Mexico has ratified both the Convention and the Protocol while the USA has ratified the Protocol, which gives it identical obligations. This treaty, along with the International Covenant on Civil and Political Rights of 1966, ratified by both USA and Mexico, provide a series of fundamental rights to be enjoyed by all humans. |
| **REFOULEMENT** | *Refoulement* is the forcible return of an individual to a country where they would be at real risk of serious human rights violations (the terms "persecution" and "serious harm" are alternatively used). Individuals in this situation are entitled to international protection; it is prohibited by international law to return refugees and asylum-seekers to the country they fled – this is known as the principle of non-*refoulement*. The principle also applies to other people (including irregular migrants) who risk serious human rights violations such as torture, even if they do not meet the legal definition of a refugee. Indirect *refoulement* occurs when one country forcibly sends them to a place where they at risk of onwards *refoulement*; this is also prohibited under international law. |
| **MARAS** | Colloquial name commonly given to organized groups from the Northern Triangle of Central America that are characterized by violent criminal activities and generally associated with territorial control. |

CLP_PC_022503

# 1. EXECUTIVE SUMMARY

Mexico is witnessing a hidden refugee crisis on its doorstep. For a number of years, citizens from nearby countries who formerly passed through Mexico in search of economic opportunities have been leaving their countries due to fear for their lives and personal liberty. This briefing analyses the results of a survey carried out by Amnesty International with 500 responses from migrants and people seeking asylum travelling through Mexico. The information presented demonstrates that the Mexican government is routinely failing in its obligations under international law to protect those who are in need of international protection, as well as repeatedly violating the *non-refoulement* principle[1], a binding pillar of international law that prohibits the return of people to a real risk of persecution or other serious human rights violations. These failures by the Mexican government in many cases can cost the lives of those returned to the country from which they fled.

The so-called "Northern Triangle" countries of Guatemala, El Salvador and Honduras continue to experience generalized violence, with homicide rates four to eight times higher than what the World Health Organization considers "epidemic" homicide levels.[2] Nearly all of the respondents to Amnesty International's survey came from these three Central American countries.[3] Of those detained by Mexican authorities, 84% (263 out of 310 that answered the question) did not desire to be returned to their country. Of these, 54% (167 out of 310) identified violence and fear as a principal reason for not wanting to go back to their country, and 35% (108 out of 310) identified direct personal threats to their life back home as the reason for not wanting to return.

Violations by Mexican authorities of the *non-refoulement* principle directly affect human lives and deny protection to those most at need. One man who came to Mexico seeking asylum after fleeing death threats in Honduras told Amnesty International he wept in desperation to try to stop his deportation, yet officials did not listen to him or inform him of his right to lodge an asylum claim, and simply deported him back to his country. This testimony echoes dozens collected by Amnesty International and contrasts with the official responses received from Mexican authorities, who informed Amnesty International that *refoulement* cases were rare.

Amnesty International analysed the 500 responses received and found 120 testimonies that gave solid indications that a *refoulement* had occurred, which is 24% of the total set of responses, and equates to 40% of the responses provided by those individuals who had been detained by the National Institute of Migration (INM). These testimonies involved people explicitly seeking asylum or expressing fear for their lives in their country of origin, yet nevertheless being ignored by the INM and deported to their country.

In addition, Amnesty International found that 75% of those people detained by the INM were not informed of their right to seek asylum in Mexico, despite the fact that Mexican law expressly requires this and public officials assured Amnesty International that the requirement is complied with. Amnesty International also found evidence of a number of procedural violations of the rights that people seeking asylum should be afforded in line with international human rights law. These violations effectively deny them the possibility to challenge their deportation and to obtain protection in Mexico.

---

1. Article 33 of the 1951 UN Convention Relating to the Status of Refugees provides that states must not return persons to territories where their "life or freedom" would be threatened. The *non-refoulement* principle is also considered a binding principle of international customary law.
2. The World Health Organization (WHO) considers a murder rate of more than 10 per 100,000 inhabitants to be an epidemic level. However, in 2016, the murder rate in El Salvador was recorded as 81.2 per 100,000 inhabitants (National Civil Police), in Honduras 58.9 per 100,000 (SEPOL) and in Guatemala 27.3 per 100,000 (National Civil Police). 2017 figures from these same sources noted 60 per 100,000 for El Salvador, 42.8 per 100,000 for Honduras, and 26.1 per 100,000 for Guatemala.
3. Of the 385 people interviewed, 208 people were from Honduras, 97 from El Salvador, 59 from Guatemala, and a series of other countries represented less than five cases each

CLP_PC_022504

# 1.1 METHODOLOGY

Between May and September 2017 Amnesty International carried out a survey of irregular migrants and asylum seekers with the aim of understanding how Mexican authorities are implementing their obligations to ensure the effective enjoyment of the right to seek asylum in Mexico. Surveys were carried out in queues for government offices, lawyers and UN offices, as well as in migrant shelters, in the southern states of Chiapas, Tabasco and the northern state of Coahuila. Surveys were also carried out in a reception centre for deportees in Guatemala. Three hundred and eighty-five people were surveyed in individual interviews responding to a standardized questionnaire that was read out to them.[4] Many of these people detailed multiple experiences of entering Mexico, giving a total of 500 responses to the questionnaire based on 500 discrete episodes of leaving one's country. Many migrants and people seeking asylum cross by land into Mexico more than once, which means that the data set for this survey was based on each separate experience of crossing into Mexico. At times, one interviewee filled out a number of survey responses, based on separate journeys they had made over the years.

Eighty-two per cent of the interviewees were men, 17% were women, 1% did not wish to specify their gender and 2 cases identified as transgender. The over-representation of males is reflected in the migratory flow as noted by officials statistics, with females accounting for approximately a quarter of the apprehensions of irregular migrants carried out in 2017.[5] Nevertheless, this official data does not take into account other routes that may be more precarious or clandestine that women may be forced to make and precise assessments of women-led migration routes are not readily available.

Of the 500 survey responses collected by Amnesty International, 297 pertained to migrants or people seeking asylum that had been at one point apprehended by the INM. The rest had either never been apprehended by Mexican officials, or had been apprehended by police (116 responses) the Army (11 responses) or the Navy (4 responses). Further detail on the role of the police in apprehending migrants (mostly illegally), will be outlined briefly below, however the focus of this briefing is the role of migration authorities. Survey responses were anonymous and participants were offered no benefit in their individual cases in return. The data set gathered is not a randomized sample of the estimated 500,000 irregular migrants that cross Mexico's southern border annually.[6] As such, the percentages presented here in graphs, while an indication of wider trends, are not a statistical sample of the hundreds of thousands of people that pass through Mexico each year. Nevertheless, the data obtained from the survey provides important information on the common practices of Mexican authorities in order to inform Amnesty International's recommendations.

---

4. Of the 385 people surveyed, 208 people were from Honduras, 97 from El Salvador, 59 from Guatemala, and a series of other countries represented less than five cases each.
5. From January to November 2017, females accounted for 29% of irregular migrants aprehended by the INM:See: Unit for Migratory Policy, Ministry of the Interior, Unidad de Política Migratoria, Secretaría de Gobernación, Extranjeros Presentados y Devueltos, 2017 Cuadro 3.1.3: Eventos de extranjeros presentados ante la autoridad migratoria, según grupos de edad, condición de viaje y sexo, available at: http://www.politicamigratoria.gob.mx/es_mx/SEGOB/Extranjeros_presentados_y_devueltos. Last accessed XX January 2018
6. United Nations High Commissioner for Refugees, "Factsheet – Mexico" February 2017  - Available at: http://reporting.unhcr.org/sites/default/files/Mexico%20Fact%20Sheet%20-%20February%202017.pdf

CLP_PC_022505

# THE HUMAN EXPERIENCE OF REFOULEMENT



1. You flee threats to your life and grave danger.
2. You enter Mexico without documents.
3. Tired and hungry, you travel by foot or bus.
4. Migration agents (INM) detain you without explaining anything to you.
5. They lock you up without explaining your right to seek protection in Mexico.
6. They pressure you to sign a deportation paper.
7. They deport you by bus to your possible death back in your country.

CLP_PC_022506

# 2. FALLING THROUGH THE CRACKS: FAILURES IN SCREENING PROCESSES

**"Here we are not interested in your lives. Our job is to deport you."**

Mexican INM agent in response to a 27 year old Honduran man who expressed fear of returning to his country.[7]

The National Institute of Migration (INM) is the federal government body responsible for regulating borders, travel and residence documents and the flow of regular and irregular migration throughout the country. The INM is also responsible for apprehending and deporting irregular migrants. It pertains to the Interior Ministry and has a staff of close to 6,000.[8] The officials of the INM that have direct contact with people seeking asylum generally fall into two categories: INM field agents who carry out a first stage of interception and apprehensions in field activities such as highways or checkpoints; and INM officials assigned to migration detention centres, of which the INM has 54 throughout the country.

Amnesty International analysed the 500 survey responses received and found 120 testimonies that gave solid indications that a *refoulement* had occurred, which is 24% of the total set of responses, and equates to 40% of the responses provided by those individuals that had specifically been detained by the INM. These testimonies involved people seeking asylum more specifically expressing fear for their lives in their country of origin, yet despite this being ignored by the INM and deported to their country of origin.

These failures are more than simply negligent practices, and each case of *refoulement* is a human rights violation that risks costing the lives of people seeking asylum. The practical experience of an illegal deportation or *refoulement* involves the return of a person seeking asylum by land to Guatemala, Honduras and El Salvador. In the case of El Salvador and Honduras, these countries comprise limited amounts of territory where *mara* networks stretch across nearly all regions. Deportation centres and highway drop-off points for deportees are easily trackable places for these powerful and violent networks to operate and persecute deportees from different parts of the country.

---

7. Anonymous survey response from a 27 year old Honduran man interviewed by Amnesty International in the city of Saltillo on 18 September 2017
8. According to the Federal Budget of 2017 (*Presupuesto de Egresos de la Federación*, 2017), the INM had a staff of 5,809 employees.

CLP_PC_022507





*Amnesty International interviewed Saúl just days before he was murdered. [An asterisk next to his name* indicates Amnesty International has changed the name in order to protect his identity.] ©Amnesty International/Encarni Pindado*

## SAÚL*: MURDERED THREE WEEKS AFTER BEING ILLEGALY DEPORTED BACK TO HONDURAS BY THE INM

Saúl worked in the transport industry as a bus driver in Honduras. The transport industry has been specifically outlined by the UNHCR as one of five specific categories of at-risk profiles within the context of widespread violence in Honduras, given the grip that *maras* have through demanding bus drivers extortions or "war taxes." In November 2015 Saúl suffered an armed attack in which two of his sons were seriously wounded. Fearing for his life, Saúl fled to Mexico and applied for asylum. The COMAR denied him asylum arguing that he had options for security in his country, and the INM subsequently violated the *non-refoulement* principle by deporting him within the 15 day legal window in which he had the right to appeal his claim. Amnesty International researchers interviewed Saúl in Honduras in July 2016, three weeks after he had been deported. He expressed an acute fear for his life and had already suffered an attack in his house on arriving home. A few days later, Saul was murdered.

Officials of the INM are required by domestic law to "detect foreigners that, based on their expressions to the authority, or indeed based on their personal condition, can be presumed to be possible asylum seekers, informing them of their right to request asylum."[9] They are also required to channel those people that express their intention to seek asylum to Mexico's refugee agency, the *Comisión Mexicana de Ayuda a Refugiados* (COMAR).[10] The law and regulations do not distinguish between different categories of INM officials in relation to this obligation, as all are required to comply with these requirements, whether they are field agents or officials in detention centres. A representative of the INM informed Amnesty International that regardless of whether INM officials carry out activities related to interception and apprehensions in field operations, or whether they are in migration detention centres, they are all given uniform training on human rights and international refugee law.[11] Indeed, authorities should be capable of screening for protection needs in a variety of settings.[12]

9. Article 16 of the Reglamento de la Ley sobre Refugiados y Protección Complementaria, available at: http://www.diputados.gob.mx/LeyesBiblio/regley/Reg_LRPC.pdf
10.   Article 21 of Mexico's Refugee Law (*Ley de Refugiados y Protección Complementaria*) outlines that: "Any authority that becomes aware of the intention of a foreigner to seek refugee status, must immediately advise in writing to the Ministry of the Interior [to which the COMAR pertains.] The failure to comply with the requirement will be sanctioned in line with the legal stipulations on responsibility of public servants. [Own translation].
11.   Amnesty International interview with INM delegation in Chiapas, southern Mexico, 16 August 2017
12.   The United Nations High Commissioner for Refugees (UNHCR) outlines that "Screening and referral can be conducted at border or coastal entry points, in group reception facilities or in places where detention takes place (including detention centres). See: United Nations High Commissioner for Refugees, "The 10-point action plan: Mechanisms for Screening and Referral", available at: http://www.refworld.org/pdfid/5804e0f44.pdf, page 119.

CLP_PC_022508

# 2.1. FIRST STAGE OF SCREENING BY INM FIELD AGENTS

***"The INM agent said to me: now that you've been detained, you're screwed and you're gonna get deported to your country."***

Comments from a Honduran man[13] who had fled death threats, describing the response he received from an INM field agent when he expressed his fear of returning.

The field agents of the INM are often the very first point of contact with Mexican authorities for a number of migrants and people seeking asylum. Yet, they do not have their names on their official uniforms, and in many cases function as a faceless force dedicated to apprehending migrants and asylum seekers and turning them over to migration detention centres without an individualized assessment of each detainee's personal circumstances and protection needs.

Amnesty International analysed the conduct of INM field agents and found that this first stage of screening during interception and apprehension of migrants displays overt failures to detect people seeking asylum and act accordingly. Amnesty International noted just 10 cases out of 297 people apprehended by the INM where field agents responded according to the law, by explaining asylum seekers their right to seek protection in Mexico and informing them of the procedure they could undergo in the COMAR. While these are promising practices from public officials, the fact that this was the minority of cases is extremely concerning and points to grave and systemic failures by the INM to comply with law and international human rights obligations.  The vast majority of cases involved INM field agents ignoring or at times humiliating people seeking asylum in response to their expressions of fear of return to their country.

Amnesty International found that 69% of those that had been apprehended by INM noted that the field agent never asked them their reasons for having left their country. This is despite the fact that in the Latin American Regional Guidelines for the preliminary identification and referral mechanisms for Migrant Populations,[14] one of the preliminary questions that should be asked to irregular migrants is why the person left their country. While this is one of a series of questions that can be asked during the first stages of identification of asylum-seekers and refugees, and Amnesty International recommends more precise questions,[15] the fact that field agents did not pose even such entry-level questions reveals a lack of adequate attention to their legal obligations to screen for people seeking asylum. Many responses to Amnesty International's questionnaire noted that INM field agents did not allow migrants and people seeking asylum to speak and simply shouted orders at them and loaded them into vans.

A number of survey responses pointed to the indifference of INM field agents to the comments from people seeking asylum as to their fear of returning to their country; comments that by law should detonate a response from the agent that informs asylum authorities of the intention of the person to seek asylum.[16] A number of responses to Amnesty International's survey outlined a rude or teasing attitude from INM agents. INM field agents routinely ignored asylum seekers' concerns, and told asylum seekers they could not do anything and that they should talk to their colleagues once they arrived at the migration detention centre. This response, as will be seen below, is inadequate, given the fact that the processes in the migration detention centres also routinely fail to detect people seeking asylum.

---

13.  Interview response to survey carried out with Honduran man in Tapachula, Chiapas state, 14 August 2017
14.  These guidelines were agreed upon in an IOM and UNHCR sanctioned process that produced this document in 2013: http://rosanjose.iom.int/site/sites/default/files/LINEAMIENTOS%20ingles.pdf Page 19.
15.  See Amnesty International discussion of screening procedures in Italy: *Hotspot Italy: How EU's flagship approach leads to violations of refugee and migrant rights*, 3 November 2016, Index number: EUR 30/5004/2016, p34ff.
16.  Op Cit. See footnote 9.

CLP_PC_022509

One person seeking asylum told Amnesty International "I asked [the INM field agents] for asylum, and they told me that it didn't exist, and that in Mexico they didn't like Hondurans because we commit mischief."Another migrant told Amnesty International "the field agents know that you don't know your rights. They say whatever they want."

**WHAT WAS THE INM FIELD AGENT´S ATTITUDE WHEN YOU EXPRESSED YOUR REASONS FOR NOT WANTING TO RETURN TO YOUR COUNTRY?**
(171 responses to this question)



Very good 2%    Good 33%    Mediocre 16%    Bad 34%    Very bad 15%

# 2.2 FALLING THROUGH THE CRACKS: SECOND STAGE OF SCREENING IN DETENTION CENTRES

Mexico has 54 migration detention centres, many of which are highly securitized and controlled facilities resembling prison-style conditions.[17] These detention centres are the second stage of processing for irregular migrants and asylum seekers and are run by a different category of INM officials that interview detainees, prepare a casefile for each, and determine whether they are to be deported, which in the case of Central Americans, involves loading them onto buses that leave from the migration detention centres on Mexico's southern border. In the case of people seeking asylum, the law requires that these persons are channelled to COMAR without delay and are shielded from deportation.[18]

The INM informed Amnesty International that each migrant or asylum seeker that enters a detention centre is given at least an hour individually where they are interviewed and explained their rights.[19] Nevertheless, only 203 of 297 (68%) of responses from people that passed through detention centres indicated to Amnesty International they were given an interview when they entered. Of those that said they were given an interview, 57% said that it lasted less than ten minutes. Thirty-five percent said their interview lasted less than 30 minutes, and only 8% noted that it lasted more than half an hour. The UNHCR notes that the recommended time for screening interviews is between 30 minutes and a few hours per person.[20]

---

17.   The UN Special Rapporteur on Torture and other cruel, inhuman and degrading punishment noted having received reports of beatings, threats, humiliation and insults experienced by migrants in Mexico's migration detention centres in his visit to Mexico in 2014
18.   Op. cit. see footnote 9.
19.   Representative of the General Directorate for Control and Verification of the INM in an Interview with Amnesty International, Mexico City, 2 May 2017.
20.   United Nations High Commissioner for Refugees, December 2016:  "The 10-point action plan: Mechanisms for Screening and Referral", available at: http://www.refworld.org/pdfid/5804e0f44.pdf, page 119

CLP_PC_022510

The data collected by Amnesty International demonstrates a systematic failure to properly inform detained migrants and people seeking asylum of their rights. This is a violation of the law by the INM, which aims to ensure proper protection for asylum seekers and guard against illegal *refoulement* of people whose lives are at risk. It is extremely concerning that 75% of responses from people who passed through detention centres noted that they were not informed of their right to seek asylum in Mexico.

**WERE YOU INFORMED OF YOUR RIGHT TO SEEK ASYLUM?**
(297 responses of people that passed through migration detention centres)



**DURATION OF THE INTERVIEW IN THE MIGRATION DETENTION CENTRE**
(297 responses of people that passed through a migration center)



CLP_PC_022511

# *"The INM has not improved in informing people about asylum. People get the information by word of mouth."*

Lawyer working on asylum and migration cases in Chiapas in the south of Mexico

Also of concern is the fact that in numerous cases, INM officers told people seeking asylum that their consul was the person in charge of explaining to them their rights to asylum in Mexico, thereby indirectly pushing them to contact their consular authorities. International practice tends to shield asylum-seekers from contact with their consular authorities, as a form of protection against the risk of identification, retaliation and human rights violations at the hands of state agents.[21]

**GIVEN THE RUN-AROUND IN THREE MIGRATION DETENTION CENTERS:**

"The people in the migration detention centre did not advise or direct me well. They told me that it would be better to return to my country, ...They gave me lots of pretexts, "buts". They said there was no COMAR office in the state I was in, so it was going to take months for my claim, so it was better to go back to my country. At first I was in the migration detention centre [in a northern state of the country]. From that place, and from the very first moment, I said I wanted asylum. They told me they couldn't do anything. On arrival at the next migration detention centre in Mexico City, the official said to me: "I can't do anything, you are already on the list to be returned to your country." It was not until Tapachula, after speaking to my consul, that I was able to speak to the COMAR!"

Comments from an El Salvadorian woman interviewed by Amnesty International who passed through three different detention centres: One in a state of northern Mexico [location has been omitted to protect the identity of the interviewee], then Mexico City and then Tapachula, Chiapas, on the southern border. In none of these did the INM properly inform her and it was only by chance that her consul informed her of the asylum procedure.

---

21.   Article 21 of Mexico's Refugee Law (*Ley de Refugiados y Protección Complementaria*) outlines that consuls must not be informed of their citizens' asylum claim, only unless the person gives express consent.

CLP_PC_022512

# 3. LEGAL LIMBO AND HASTY RETURNS

> **"I can't do anything for you – you are already on the list for the deportation bus."**
>
> Comments by an INM official to a 25-year-old man from El Salvador who expressed fear for his life if he was returned to his country. He told Amnesty International that INM officials did not let him read his return papers, and simply loaded him onto the bus to be deported.[22]

The detention and return of an irregular migrant or asylum seeker to their country of origin is the default response that the INM takes in relation to Central Americans arriving in Mexico. The INM opens a casefile for each person detained, taking the form of an administrative legal procedure, in which the person detained has 15 days to present arguments in their favour and seek legal counsel.[23] Once all of these stages are completed, or once the person signs papers withdrawing their intention to present arguments within the 15 day window, the INM prepares a resolution concluding the casefile and places the irregular migrant on a list to board a bus headed for their country of origin. The names on this list are checked off by the consul of the country of origin who verifies the nationality of each person.

## 3.1 VOLUNTARY RETURN PAPERS

An alarming aspect of the way the administrative migratory procedure is implemented in practice is that one of the very first steps in putting together a casefile involves detainees signing a number of papers, accepting their "voluntary return"[24] to their country and waiving their rights to present legal arguments in their favour within the stipulated 15-day procedural window. This is the default process that is carried out in the first interview or "declaration" (*comparecencia*) of the migrant or asylum-seeker before an INM official in the detention centre. This *comparecencia* takes place within the first 24 hours of a migrant or asylum-seeker entering the detention centre, and it is at this time that the INM official is by law required to comprehensively explain to them their right to asylum, among other rights. In practice, this process often involves the INM official asking the detainee to sign a number of papers, often without explaining their contents. It is extremely concerning that the signing of return papers and the waiving of very important procedural rights are the default steps in this process. Rather than being informed in detail of the different avenues available to them, including seeking asylum, thereby allowing an informed decision by each person, migrants are routinely asked to sign "voluntary return"

---

22.    Anonymous survey responses from an interview carried out with an El Salvadoran man seeking asylum in Mexico, interviewed in Tapachula, Chiapas state, 8 August 2017
23.    Article 56 of the Federal Law on Administrative Procedures (*Ley Federal de Procedimiento Administrativo*) outlines that each party in an administrative legal process must be formerly notified with the lodging of a deed as to the opening of the period for arguments and responses. Nevertheless, this does not occur in relation to the Migratory Administrative Process (Procedimiento Administrativo Migratorio).
24.    "Voluntary return" refers to deportations which do not imply administrative sanctions on re-entry in Mexico, as opposed to official deportations, which have punitive implications upon re-entry.

CLP_PC_022513

papers, which effectively allow for their deportation. Since the signing of the "voluntary return" paper is a default step on arriving at a migration detention centre, in order not to be returned to their country detainees must actively desist from this return, and only then will it be reversed. Reasons for desisting on "voluntary return" papers may include the decision to request asylum, or the decision to open a judicial proceeding to stop one's deportation. However, many irregular migrants and asylum seekers are also asked to sign a paper waiving their rights to present legal arguments in their favour within the stipulated 15 day procedural window.

> ## "The INM official in the detention centre said 'if you don't sign here [my voluntary return paper], we won't give you food, you won't be able to have a shower. We will treat you like you don't exist.' "
>
> Comments from a 23 year old Honduran man[25] to Amnesty International regarding his experience in the detention centre in Acayucan, Veracruz, in 2017.

According to the testimonies collected by Amnesty International, people seeking asylum whose lives are at risk in Central America are very frequently pressured into signing "voluntary return" deportation papers. Amnesty International received numerous testimonies of people in detention centres being hastily asked to sign voluntary return papers without being explained what they were, as well as a number of cases where people desired to seek asylum yet were ignored and told to sign their return papers. In some cases, INM officials in immigration detention centres were verbally forceful with asylum seekers or even pressured them into signing papers through coercive tactics. These overt displays of illegality on the part of INM officials are demonstrative of an institutional culture that enables systematic failures in complying with the *non-refoulement* principle.

> ## "The lady from INM told me 'I'm not even going to talk with you.' She got angry with me because I didn't sign my deportation."
>
> Comments from a Guatemalan woman who had asked for asylum but was refused access to the procedure while in immigration detention

---

25.  Anonymous survey interview carried out in Saltillo, Coahuila state, 19 September 2017

CLP_PC_022514

## 3.2 THE FAILURE TO FULLY INFORM INDIVIDUALS ABOUT THEIR CASEFILE

People seeking asylum and migrants are made even more vulnerable by the fact that they are never given a copy of their "voluntary return" paper or the casefile that pertains to them. This undermines their ability to understand the process they are being subjected to or to oppose any of the decisions made about their case. In the case of "voluntary return" papers, a public official co-signs each of these papers alongside the detainee. Denying rights-holders a copy of these papers strips them of any possibility for redress in light of arbitrary or illegal actions by authorities.

A lawyer working on dozens of cases of detained migrants and asylum seekers in the state of Chiapas told Amnesty International it is even very difficult for her to access casefiles. The fact that legal representatives also battle to access such information gravely undermines asylum seekers' rights to effective legal counsel.[26]

## 3.3 FAILURES OF INM INFORMATION SYSTEMS

In addition, internal systems within the INM enable repeated breaches of the *non-refoulement* principle. In an interview with Amnesty International, an INM chief in the southern state of Chiapas[27] admitted that the internal INM computer registries do not have a field on each person's individual file as to whether they are an asylum seeker or not. This is a grave oversight from the INM, the very same body that is able to control a sophisticated system of biodata, travel permissions and entry permits for each passport holder on its computer database. The fact that no unified system exists within INM databases that indicates whether a person is an asylum seeker or not is extremely concerning and leaves open the possibility that these at risk populations fall through the cracks. Amnesty International has received a number of reports of people seeking asylum being deported despite being in a current process of an asylum claim before the COMAR. Amnesty International has also received a number of reports of INM field agents apprehending asylum seekers and then ripping up their official paper from COMAR. This paper specifically calls on the INM to refrain from deporting them and asylum seekers carry it on them with their name and photo.

---

26.   In line with article 8 (1) and (2) of the American Convention of Human Rights, those people before an administrative legal process, as is the case with detained migrants and asylum seekers subject to deportation, have the right to be heard before competent authority; to have access to a legal representative and interpreter at no charge; and the right to appeal the decision that affects them (including deportation or "voluntary return").
27.   Amnesty International interview with INM delegation in Chiapas, southern Mexico, 16 August 2017

CLP_PC_022515





*Emilia and one of her younger sons*
*©Amnesty International/Benjamín Alfaro Velázquez*

## EMILIA* AND FAMILY: FINDING SAFETY AND A NEW LIFE IN MEXICO AFTER FORMERLY BEING DEPORTED

Emilia fled El Salvador and arrived in Mexico in late 2016 with her seven children,[28] after two of her other children and her brother had been killed by the *mara* in El Salvador. Her teenage daughter had also been attacked by the *mara* and the family couldn't take it anymore and fled the country. On arrival to Mexico, Emilia's eldest daughter went in to labor and had to be rushed to a hospital on entry into Mexico in order to give birth to Emilia's first grandchild, a baby girl. The family rented a small hotel room in southern Mexico in the days following, and soon afterwards Emilia had to take a bus back to the hospital to carry out paperwork for the vaccinations of the newborn baby. On her way to the regional hospital in Tapachula, Chiapas state, Emilia was stopped at an INM checkpoint alongside her teenage son who was accompanying her. Emilia pleaded with the INM agents not to return her to El Salvador where her life was at risk, and through tears, told them that she was on her way to the hospital for the paperwork for her newborn granddaughter. INM agents ignored her pleas, and detained her and her son in the nearby detention centre where they were separated and deported a few days later. By sheer luck, on arriving in El Salvador, Emilia was able to find her son and a willing citizen lent her some money to quickly return to Mexico. She found the rest of her family on return to Mexico, and remained living in a cramped room on the border, all together, for months on end while they awaited their asylum claim outcome.  Emilia and her family were granted international protection in Mexico in April 2017. After a few months, the family organized themselves to move to northern Mexico where they currently live. Emilia's children are now attending school and her baby granddaughter is now walking. Her eldest daughter is working in a local shop and the elder sons have obtained agricultural work. The family told Amnesty International they feel safe and out of harm's way.

---

28.   For the full story of threats and persecution against Emilia and her family, see: Amnesty International Facing Walls: USA and Mexico's Violation of the Rights of Asylum Seekers. June 15, 2017. AMR 01/6426/2017. Available at: https://www.amnesty.org/es/documents/amr01/6426/2017/en/

CLP_PC_022516

# 4. ILL-TREATMENT OF MIGRANTS AS PART OF THE DEPORTATION MACHINE

The almost automatic response by federal authorities to irregular migrants is to apprehend them and turn them over to migration detention centres. As outlined above, the INM is the authority responsible for this function, nevertheless Mexico's Migration Law specifically allows for the Federal Police to act in an auxiliary function alongside the INM in migratory verification exercises.[29] Notwithstanding this stipulation, the involvement of the Federal Police must respond to an express request by the INM, and police cannot simply pick up migrants in different parts of the country as part of their daily functions.[30] Unfortunately, irregular migrants and people seeking asylum are often subjected to arbitrary detentions by federal, state and municipal police.

## POLICE VIOLENCE AND ILL-TREATMENT

A total of 68% of those 116 responses that detailed a detention by the police described their treatment as "bad" or "very bad".

Federal and municipal police were most commonly mentioned as being involved in apprehensions that very frequently involved robbery or extortion of migrants by police. On a limited number of occasions police handed migrants over to migration detention centres.



Some testimonies noted torture or ill-treatment by police: One migrant told Amnesty International:

***"They beat me and applied electric shocks to me and they took my money. I told them I had rights, but they tortured me with a pistol that they had on their waist. They gave me electric shocks for 10 minutes"*** [31]

The treatment by INM agents in apprehensions did not rate as poorly as the police in the response to Amnesty International's survey. While this is promising to note, the fact that the INM did not present such overwhelmingly poor ratings as police does not mean there is no cause for concern.

---

29.   Mexico's Migration Law (*Ley de Migración*) outlines in its Article 81: The revision of documents of people entering and leaving the country, as well as the inspection of transport lines entering and leaving the country, are considered actions of migratory control. In these actions, the Federal Police will act in an auxiliary function, in coordination with the National Institute of Migration.
30.   Mexico's Migration Law (*Ley de Migración*) outlines in its Article 96: Authorities will collaborate with the National Institute of Migration in the exercise of its functions, when the Institute requests it, without this implying that authorities can independently carry out functions of migratory control, verification and revision.
31.   Amnesty International has received a number of reports about the use of Tasers against migrants and asylum seekers throughout Mexico. The reports focus on the use of these instruments by federal agents, yet it is not clear in testimonies whether the INM also carries these instruments.

CLP_PC_022517

Amnesty International received a number of reports of grave human rights violations committed by INM officials during the moments of apprehension as well as in detention centres. One Honduran man[32] told Amnesty International that on entering Mexico in the southern state of Tabasco, he was apprehended by INM agents who tied him up and beat him with a tennis ball wrapped inside a wet sock in order to avoid leaving marks on his body. A number of other migrants and asylum seekers mentioned beatings and forceful treatment during their apprehension by INM agents, as well as racist and humiliating remarks. One young Honduran man told Amnesty International that an INM agent offered to let him go free in return for sexual favours.[33] This chain of ill treatment against people seeking asylum and migrants is replicated during the time in immigration detention. While a number of migrants and asylum seekers told Amnesty International that the treatment in immigration detention centers was "fine", a number of responses pointed to ill- treatment. In addition, Amnesty International has documented a number of instances of prolonged detentions for months or even up to a year, including the detention of small children and babies in detention centers. A citizen advisory body of the INM recently released a comprehensive report based on site visits and inspections of migration detention centres, which signalled the commonplace use of practices that undermine the physical and mental health of detainees and go against international standards that call for the non-detention of people seeking asylum.[34]

In addition, Amnesty International has received a number or reports from lawyers and civil society organizations of solitary confinement in "punishment cells" in migration detention centres, where detainees can be kept for weeks on end.  In at least three testimonies, Amnesty International was informed by detainees that they had been separated and placed in a small cell with very little light, where they remained all day and were not able to join other detainees during meal times. The reasons for placing detainees in these cells were in two cases in response to a fight or scuffle that guards claimed the detainee had been part of, and in the third case the confinement was a response to a woman who had experienced a psychotic episode while inside the detention centre.

Amnesty International questioned the INM on the existence of these solitary confinement cells. After an initial denial of their existence, officials admitted that their installations did in fact allow for this sort of imposed segregation of certain individuals.[35] While there are no doubt security concerns inside migration detention centres that may warrant limited disciplinary measures, the conditions reported in these "punishment cells" appear disproportionate in relation to international standards on the deprivation of liberty and rights of detainees.[36] In addition, it is important to emphasize that irregular migrants and asylum seekers have not committed a crime and are not being detained on criminal charges, as would be the case in prisons.

---

32.  Honduran man interviewed in an anonymous survey response in the city of Saltillo, Coahuila state, on 18 September 2017
33.  Survey interview  - anonymous response from a 20 year old man from Honduras interviewed in Tenosique, Tabasco State, 29 May 2017
34.  Citizen Council of the National Institute of Migration, (Consejo Ciudadano del Instituto Nacional de Migración). Personas en detención migratoria en México: Misión de Monitoreo de Estaciones Migratorias y Estancias Provisionales del Instituto Nacional de Migración, July 2017
35.  Amnesty International interview with INM delegation in Chiapas, southern Mexico, 16 August 2017.
36.  The United Nations Standard Minimum Rules for the Treatment of Prisoners (the Nelson Mandela Rules) prohibits solitary confinement under a variety of circumstances. For more information, see: https://www.unodc.org/documents/justice-and-prison-reform/GA-RESOLUTION/E_ebook.pdf

CLP_PC_022518

# 4.1 ARBITRARY DETENTION OF ASYLUM SEEKERS AND ITS IMPACT ON *REFOULEMENT*

Migrants, asylum seekers and refugees should not suffer any restriction on their liberty or other rights (either detention or so-called alternatives to detention) unless such a restriction is (a) prescribed by law; (b) necessary in the specific circumstances; and (c) proportionate to the legitimate aim pursued. In particular, any measure (either custodial or non-custodial) restricting the right to liberty of migrants, asylum-seekers and refugees must be exceptional



↑ 👁
*The entry point for men at a migration detention centre in the southern state of Chiapas*
©*Amnesty International*

and based on a case-by-case assessment of the personal situation of the individual concerned, including their age, history, need for identification and risk of absconding, if any. The individual concerned should be provided with a reasoned decision in a language they understand. Children, both those unaccompanied and those who migrate with their family, should never be detained, as detention is never in their best interests.[37]

In the case of Mexico, the decision to detain an irregular migrant or asylum seeker is almost completely devoid of any individualized assessment. Detention is the automatic response, and all irregular migrants apprehended by INM are detained, even if they express a wish to seek asylum. This flies in the face of international law under Article 9 of the International Covenant on Civil and Political Rights (ICCPR) which prohibits arbitrary detention.[38] In addition, due to the failures in the screening system discussed above, asylum-seekers end up being unlawfully detained together with the migrants.

Under the UN Refugee Convention and its 1967 Protocol, states are not allowed to apply punitive measures to those seeking asylum.[39] The detention of people seeking asylum can be seen as a punitive measure that undermines their intention to seek protection. In Mexico, the prospect of being unlawfully detained often pushes asylum-seekers to return to their country of origin, despite the risks they face upon return.

---

37.   See also:"UNHCR's position regarding the detention of refugee and migrant children in the migration context" (January 2017) clarifying that "children should not be detained for immigration purposes, irrespective of their legal/migratory status or that of their parents, and detention is never in their best interests.: http://www.refworld.org/docid/503489533b8.html
38.   In addition, The UN Working Group on Arbitrary Detention has explicitly stated that where the detention of unauthorized immigrants is mandatory, regardless of their personal circumstances, it violates the prohibition of arbitrary detention in Article 9 of the UDHR and Article 9 of the ICCPR. See Report of the Working Group on Arbitrary Detention on its visit to the United Kingdom, E/ CN.4/1999/63/Add.3, 18 December 1998, Paragraph33
39.   1951 UN Convention on Refugees, Article 31. Full text of the Convention available at: http://www.unhcr.org/3b66c2aa10

CLP_PC_022519

There may be a correlation between periods in migration detention and *refoulement* of asylum seekers from Mexico. Of 49 responses that noted that they wished to return to their country, eight that had been apprehended by INM said that the reason they wanted to return to their country was because they did not want to remain in migration detention. In the case of Emilia* (see Section 3), despite the fact that her life was at grave risk in El Salvador, she told Amnesty International that she could not bear to be locked up and separated from her son in detention, so she decided to risk her life and sign her voluntary return paper that would allow her to get out of detention, yet at the same time risk her life in the hope of being released and reunited with her son and family.

Such examples demonstrate that the failures in screening processes for asylum seekers, coupled with the failures of the migration detention system, end up enabling further violations by Mexico of the *non-refoulement* principle.

A recent promising development from the INM has been the implementation of the Programme of Alternatives to Detention (*Programa de Alternativas a la Detención*) since August 2016, as a result of an agreement between COMAR, INM and the UNCHR. Amnesty has observed that a number of asylum seekers are being released as a result of this programme, yet many failures remain. Before August 2016, asylum seekers making claims from inside a migration detention centre remained in detention for up to 3 months or more. Since late 2016, the majority of asylum seekers in detention centres are now being released within a matter of weeks due to the Programme of Alternatives to Detention that places them in migrant shelters run by civil society organizations.

Nevertheless, it is concerning that this programme is not institutionalized or published officially and thus risks being simply an act of good faith that could disappear at any moment.

In 2016, 24% of asylum claims commenced with COMAR were abandoned by the asylum seeker before the procedure was concluded. The 2017 rate of abandonment of asylum claims had dropped to 16% by August, according to figures published by the COMAR.  These figures demonstrate that the fact that asylum seekers are no longer being detained for such prolonged periods could be having an impact on their adherence to the asylum procedure in Mexico and possibilities for obtaining protection rather than being returned to their country.



*Street scene near Ciudad Hidalgo, on the Mexico - Guatemala border*
*© Amnesty International*

CLP_PC_022520

# 5. RECOMMENDATIONS

**TO THE PRESIDENT:**

- Urgently order a review of screening processes implemented by the National Institute of Migration (INM). This review must have the aim of:

    - Ensuring irregular migrants who are apprehended and detained are properly informed of their right to seek asylum in Mexico;

    - Guaranteeing that their access to asylum procedures faces no obstacles; and

    - Curbing illegal practices of *refoulement* and ensuring they are met with administrative sanction.

**TO THE NATIONAL INSTITUTE OF MIGRATION (INM):**

- Urgently implement a review of screening processes implemented by the National Institute of Migration (INM). This review must have the aim of:

    - Implementing a pro-active screening system that improves identification of potential asylum seekers within the first moments of contact with the INM;

    - Ensuring irregular migrants who are apprehended and detained are properly informed of their right to seek asylum in Mexico;

    - Guaranteeing their access to asylum procedures faces no obstacles;

    - Curbing illegal practices of *refoulement* and ensure they are met with administrative sanction.

- Improve internal coordination databases and processes to ensure that asylum seekers are clearly identified in official registries to avoid oversights that enable unlawful deportations.

- Publish and institutionalize the Programa de Alternativas a la Detención in the Official Gazette (Diario Official de la Federacion).

- Provide all detained migrants and asylum seekers, as well as their legal representatives, with a full photocopy of their casefile papers on entry to a detention centre as well as a copy of their voluntary return paper and resolution in their administrative migratory procedure.

CLP_PC_022521

# AMNESTY INTERNATIONAL IS A GLOBAL MOVEMENT FOR HUMAN RIGHTS. WHEN INJUSTICE HAPPENS TO ONE PERSON, IT MATTERS TO US ALL.

CONTACT US

 info@amnesty.org

 +44 (0)20 7413 5500

JOIN THE CONVERSATION

 www.facebook.com/AmnestyGlobal

 @AmnestyOnline

CLP_PC_022522

# OVERLOOKED,

# UNDER-PROTECTED

## MEXICO'S DEADLY *REFOULEMENT* OF CENTRAL AMERICANS SEEKING ASYLUM

Mexico is witnessing a hidden refugee crisis on its doorstep. Citizens from nearby countries who formerly left Guatemala, Honduras and El Salvador and passed through Mexico in search of economic opportunities have for a number of years been leaving their countries due to fear for their lives and personal liberty. This briefing outlines the results of a questionnaire carried out by Amnesty International with 500 responses from migrants and people seeking asylum travelling through Mexico. The information presented demonstrates that the Mexican government is routinely failing in its treaty obligations under international law to protect those who are in need of international protection, as well as repeatedly violating the *non-refoulement* principle, a binding pillar of international law that prohibits the return of people to life-threatening situations.

Index: AMR 41/7602/2018
January 2018

amnesty.org



AMNESTY
INTERNATIONAL

CLP_PC_022523



# UNPROTECTED IN ECUADOR

VENEZUELAN REFUGEE WOMEN SURVIVORS OF GENDER-BASED VIOLENCE



CLP_PC_022583

Amnesty International is a movement of 10 million people which mobilizes the humanity in everyone and campaigns for change so we can all enjoy our human rights. Our vision is of a world where those in power keep their promises, respect international law and are held to account. We are independent of any government, political ideology, economic interest or religion and are funded mainly by our membership and individual donations. We believe that acting in solidarity and compassion with people everywhere can change our societies for the better.

© Amnesty International 2022
Except where otherwise noted, content in this document is licensed under a Creative Commons (attribution, non-commercial, no derivatives, international 4.0) https://creativecommons.org/licenses/by-nc-nd/4.0/legalcode
 For more information please visit the permissions page on our website: https://www.amnesty.org/en/about-us/permissions/.
Where material is attributed to a copyright owner other than Amnesty International this material is not subject to the Creative Commons licence.
First published in 2022
by Amnesty International Ltd.
Peter Benenson House, 1 Easton Street. London WC1X 0DW, UK

**Index number: AMR 28/6137/2022**
**Original language: Spanish**

**amnesty.org**



**Cover photo: Venezuelan woman in Huaquillas, Ecuador, interviewed** by Amnesty International on 6 September 2022.
© Ana María Buitrón | Amnesty International



CLP_PC_022584

# CONTENTS

**1. EXECUTIVE SUMMARY**                                                                4

**2. METHODOLOGY**                                                                      8

**3. VIOLENCE IN MULTIPLE SPACES**                                                      4

**4. LACK OF ACCESS TO MIGRATION DOCUMENTATION**                                        16
4.1. DIFFICULTIES IN OBTAINING RECOGNITION OF REFUGEE STATUS                            16
4.2. OBSTACLES TO REGULARIZATION OF MIGRATION STATUS                                    19

**5. OBSTACLES TO VENEZUELAN WOMEN'S ACCESS TO PROTECTION MECHANISMS**                  21
5.1. "WE DON'T EVEN KNOW WHERE TO GO"                                                   21
5.2. FEAR AND DISTRUST OF THE AUTHORITIES                                               23

**6. SHORTCOMINGS IN THE STATE RESPONSE TO GENDER-BASED VIOLENCE**                      26
6.1. SHORTCOMINGS IN FRONTLINE SERVICES TO IDENTIFY AND RESPOND TO CASES OF
     GENDER-BASED VIOLENCE                                                              26
6.2. SHORTCOMINGS IN THE JUSTICE SYSTEM                                                 34

**7. CONCLUSIONS AND RECOMMENDATIONS**                                                  37

# 1. EXECUTIVE SUMMARY

Ecuador is the third host country for Venezuelans in the world, after Colombia and Peru, with 502,214 Venezuelan refugees in its territory. Of these, about half are women. Gender-based violence is a systemic and prevalent problem in Ecuador: two out of three women experience some form of gender-based violence during their lives.[1] In this context, Venezuelan refugee women are at even greater risk of physical, psychological, sexual, patrimonial, gynaecological-obstetric and cyber violence in public and private spaces, both along their migration route and at their destination.

This report documents the response of the Ecuadorian state, including access to justice and protection mechanisms for Venezuelan refugee women survivors of gender-based violence in Ecuador. While an effective judicial response is essential in order to obtain justice and redress for violations of women's right to live a life free from violence, a precondition for this is an effective protection system in other areas.

The gender-based violence faced by Venezuelan women in Ecuador often remains hidden because most survivors do not turn to the state for protection. This research shows that the Ecuadorian state is failing to guarantee the rights of Venezuelan refugee women at different levels. The authorities are failing to provide Venezuelan women with information on the protection mechanisms available and the institutions that provide care pathways for survivors of gender-based violence.

In addition, Amnesty International found that, although some efforts have been initiated, the Ecuadorian state is not ensuring that Venezuelans have effective access to the procedures to determine refugee status and alternative forms of regularization. The failure to disseminate information on the refugee determination procedure is worrying, as is the low level of people recognized as in need of protection, according to the Cartagena Declaration, despite Ecuador's obligations. This research also highlights the practical difficulties Venezuelans face in meeting the requirements of migration regularization programmes. In both cases, Amnesty International noted that the institutions implementing these procedures do not have appropriate standardized protocols that take into account the specific needs of survivors of gender-based violence.

These obstacles, which restrict Venezuelan people's access to regular migration status, also exacerbate the lack of protection for Venezuelan women survivors of gender-based violence. The information gathered shows that their irregular migration status is one of the factors that discourage women from turning to the protection and justice services because they fear being expelled from the country or criminalized.

Amnesty International found that the Ecuadorian authorities do not provide adequate care and support to the few Venezuelan women who, despite the above, do seek the services of frontline institutions dealing with gender-based violence or the system for the administration of justice. Amnesty International identified structural problems in both types of institutions, linked for example to the prevalence among staff of gender stereotypes and discrimination and xenophobia against Venezuelan women, which constitute a further form of violence against women.

---

[1] National Institute for Statistics and Censuses (Instituto Nacional de Estadística y Censos, INEC), National Survey of Family Relations and Gender-Based Violence against Women (Encuesta Nacional sobre Relaciones Familiares y Violencia de Género contra las Mujeres, ENVIGMU) November 2019, www.ecuadorencifras.gob.ec/violencia-de-genero/ (Spanish only).

This is compounded by a lack of human and material resources to enable services to function properly, the shortage of shelters and the failure to institutionalize good practices, which, although they affect all women survivors of gender-based violence in the country, have a disproportionate impact on the situation of Venezuelan women due to the particular circumstances they face as refugees, often without access to support networks.

In practice, this combination of obstacles renders access to justice and reparation for Venezuelan women little more than a utopia. Moreover, it violates their right to a life free of violence, which the state has an obligation to guarantee to all women, without discrimination. Amnesty International believes that the failures and shortcomings of the state response to gender-based violence against Venezuelan refugee women in the country constitute a failure by the Ecuadorian authorities to fulfil their duty of due diligence in addressing gender-based violence.



*Venezuelan woman in Machala, 8 September 2022 © Ana María Buitrón | Amnesty International*

## KEY RECOMMENDATIONS

Based on the research set out in this report, Amnesty International has formulated a series of general **recommendations for all state institutions responsible for addressing the needs of Venezuelan refugee women in Ecuador:**

- Strengthen and expand the dissemination of information on the rights of people on the move in Ecuador, with a gender perspective, as well as information for women on care pathways for survivors of gender-based violence, with a focus on people on the move, throughout the country, paying particular attention to border areas, far from the capital. This information must be accompanied by strategies and messages aimed at addressing and overcoming the fear of approaching institutions to initiate these procedures because of the risk of detention and deportation to Venezuela.

- Ensure that all institutions that support survivors of gender-based violence have effective protocols for dealing with cases of gender-based violence that address the particular needs of refugee and migrant women survivors of gender-based violence, incorporating intersectionality and the duty of non-discrimination.

CLP_PC_022587

- Implement, or strengthen, training programmes for public officials – particularly those working in the police, prosecutors' offices, migration and health services – on the rights of refugees and migrants, including access to international protection and other forms of migration regularization, from a gender perspective.

- Provide appropriate, systematic, mandatory, initial and ongoing training on the prevention and detection of gender-based violence, gender equality and intersectional discrimination for all staff responsible for responding to the needs of survivors of gender-based violence, such as the police, prosecutors, migration officials and health personnel. In addition to raising awareness about women's rights, including the rights of transgender women, these programmes should be aimed at actively challenging harmful gender stereotypes and myths about gender-based violence among officials, and should address the particular needs of refugee and migrant women survivors of gender-based violence, from a perspective of intersectionality and the obligation of non-discrimination.

Amnesty International also makes **specific recommendations** for each of the following institutions:

**Ministry of Foreign Affairs and Human Mobility:**

- Ensure effective access to procedures to determine refugee status under the Convention Relating to the Status of Refugees and the Cartagena Declaration for all those in need of international protection.

- Ensure that all Venezuelans are included in alternative regularization processes such as the VIRTE visa and consider extending this visa to all those who entered the country irregularly or after 26 August 2019.

**Human Rights Secretariat:**

- Urgently adopt measures to guarantee effective access for all survivors of gender-based violence who require it to shelters with sufficient capacity, in accordance with international standards.

**To the National Police:**

- Ensure that all departments involved in addressing gender-based violence have sufficient staff and financial resources, at the national and local levels, including the Department on Domestic Violence (Departamento de Violencia Intrafamiliar, DEVIF), so that it can fulfil its functions.

- Develop protocols for emergency responses to cases of gender-based violence for personnel responding to emergency calls (911) and Community Police Units, according to human rights standards and with a gender and human mobility perspective. These should include issues such as not engaging in mediation in cases of gender-based violence, psychological first aid and efficient coordination with other state entities, such as the Public Health Ministry, the Ministry for Economic and Social Inclusion and the Attorney General's Office.

**Public Health Ministry:**

- Adopt measures to ensure comprehensive healthcare for women survivors of gender-based violence, regardless of their migration status, including timely psychological assistance services.

- Ensure that all institutions in the health system have sufficient staff and financial resources to carry out their functions. In particular, ensure that health personnel issue accurate medical certificates that adequately reflect the violence perpetrated against women survivors of gender-based violence.

- Implement, in accordance with current legislation, initial reception wards in all hospitals and Type B health centres in Ecuador that have adequate staff and resources to respond to emergency cases from the perspectives of forensic medicine, mental health and social work.

- Promote legislative reform aimed at eliminating unnecessary requirements, such as the lodging of official complaints, that restrict the right to abortion in cases of rape for women, in particular Venezuelan women who have experienced sexual violence outside Ecuadorian territory and cannot lodge complaints about events that occurred outside Ecuador.

**To the system for the administration of justice:**

- Conduct thorough, impartial and independent investigations into all acts of violence against women and ensure that investigations have a gender perspective.

- Ensure that all institutions in the justice system, including the Attorney General's Office, have sufficient staff and financial resources to meet their obligations to conduct prompt, independent and effective investigations and thus guarantee the right of survivors of gender-based violence to justice.



*Mural where the focus group with Venezuelan women was held in Huaquillas, "Speak, Listen, Act, for a life free from violence", 6 September 2022 © Ana María Buitrón | Amnesty International*

# 2. METHODOLOGY

The findings of this report are based on research carried out between June and September 2022. Fieldwork was carried out in the cities of Huaquillas, Machala and Quito in August and September. A total of 99 people participated in various research activities, including 63 women survivors of gender-based violence, 19 representatives of civil society organizations, seven members of international organizations and 10 representatives of government entities.[2] In order to safeguard the safety of the people who participated in the research, pseudonyms are used in the report.



*Venezuelan women speaking about their experiences in a focus group in Huaquillas, 6 September 2022 © Ana María Buitrón | Amnesty International*

---

[2] Among the civil society organizations consulted who agreed to be named are: Akuanuna, Diálogo Diverso, Movimiento de Mujeres de El Oro, PLAPLERTS, Quimera and Surkuna; other organizations asked to remain anonymous. Amnesty International interviewed officials from the Public Defender's Office, the Ombudsperson's Office, the International Protection Directorate of the Ministry of Foreign Affairs, the Attorney General's Office, the Municipality of Quito, the National Police, the Prefecture of Pichincha and the Human Rights Secretariat.

CLP_PC_022590

Amnesty International made 10 requests for access to public information to Ecuadorian state bodies, including the Ministry of Foreign Affairs, the Attorney General's Office, the Human Rights Secretariat, the Ombudsperson's Office, the Public Defender's Office, the National Council for Gender Equality, the National Council for Equality in Human Mobility, the National Police, and the Ministry of Government. At the time this report was completed, seven institutions had responded to these requests. In addition, a review was carried out of current legislation, public policies, existing literature and press reports on the issue.

The report's conclusions and recommendations are based on an analysis of the state's duty of care regarding gender-based violence, including the obligation to ensure, without discrimination, women's access to justice and protective protection mechanisms. These obligations are reflected both in national legislation and in the various instruments of the universal and the inter-American human rights systems to which Ecuador is a party. In particular, the report refers to the fulfilment of the obligations of the Ecuadorian state towards Venezuelan refugee women survivors of gender-based violence living in its territory.

In accordance with the definition of refugee in the Cartagena Declaration, recognized by the Ecuadorian state in Article 98 of the Organic Law on Human Mobility, Amnesty International considers that Venezuelans who left their country because of massive human rights violations have international protection needs and are refugees. The report therefore refers to Venezuelan refugee women, regardless of their current migration status in the country.

Amnesty International is grateful to all individuals, entities and organizations that participated in the research and in particular to all the Venezuelan women who shared their stories of human rights violations and have given permission for them to be included in this report.



*The Ecuador-Peru border, 5 September 2022 © Ana María Buitrón l Amnesty International*

CLP_PC_022591

# 3. VIOLENCE IN MULTIPLE SPACES

The continuing humanitarian crisis and massive human rights violations in Venezuela have led to the forced displacement of 7.1 million Venezuelans[3] who have fled their homes in search of international protection.[4] Ecuador is the third receiving country for Venezuelans globally, after Colombia and Peru, with 502,214 Venezuelan refugees in its territory.[5] According to the Inter-Agency Coordination Platform for Refugees and Migrants from Venezuela (R4V), it is estimated that, by the end of 2022, there will be 803,000 Venezuelans in Ecuador, 551,000 seeking to remain and 252,000 in transit.[6] Women, who make up about half of those arriving from Venezuela, face various kinds of gender-based violence in public spaces and in the family, as well as along their migration route and at their destination.[7]



---

[3] Inter-Agency Coordination Platform for Refugees and Migrants from Venezuela (R4V), Refugees and Migrants from Venezuela, 5 September 2022, https://www.r4v.info/en/refugeeandmigrants

[4] Amnesty International, "Americas: Urgent measures: Venezuelans need international protection" (AMR 01/9019/2018), 3 September 2018.

[5] Inter-Agency Coordination Platform for Refugees and Migrants from Venezuela (R4V), Refugees and Migrants from Venezuela, 5 September 2022, https://www.r4v.info/en/refugeeandmigrants

[6] Interagency Coordination Platform for Refugees and Migrants of Venezuela (R4V), "Chapter on Ecuador RMRP 2022", 9 December 2021, https://www.r4v.info/sites/default/files/2021-12/RMRP%202022_Final%20Version_WEB2.pdf

[7] United Nations Development Programme (UNDP), *Reinventarse sobre la marcha: Mujeres refugiadas y migrantes de Venezuela: Un estudio de sus condiciones y accesos a medios de vida en Colombia, Ecuador y Perú*, 30 September 2020, www.undp.org/es/latin-america/publications/reinventarse-sobre-la-marcha-mujeres-migrantes-y-refugiadas-de-venezuela

Gender-based violence is a grave violation of women's human rights, as recognized in various instruments of the universal and inter-American human rights systems, to which Ecuador is a state party.[8] Ecuador also has a comprehensive legal framework for the prevention and eradication of gender-based violence, which recognizes women's right to a life free from violence. The Comprehensive Organic Law to Prevent and Eradicate Violence against Women recognizes different forms of gender-based violence: physical, psychological, sexual, economic, patrimonial, symbolic, political, obstetric-gynecological and cyber violence.[9] This law establishes a comprehensive national system for the prevention and eradication of violence against women to guide state institutions in the development of policies for the prevention and eradication of all forms of gender-based violence against women. In addition, the law recognizes women on the move as a group that should receive priority attention because of the particular risks they face.[10]

Despite this normative framework, Amnesty International notes with concern the high levels of gender-based violence against women. According to data from the National Institute for Statistics and Censuses (INEC), 65 out of every 100 women in Ecuador have experienced some type of violence during their lifetime, including psychological, physical, sexual, economic and patrimonial violence, in some aspect of their lives.[11] The most extreme forms of violence against women also prevail. According to data from the Feminist Alliance for the Mapping of Femi(ni)cidios in Ecuador, in 2022, every 28 hours a woman was killed as a result of gender-based violence.[12]

Although Venezuelan women refugees in Ecuador are at greater risk of gender-based violence, this violence is often invisible and is not reflected in the statistics on violence.[13] According to data provided by the Attorney General's Office, between January and August 2022, Ecuador registered 19,359 complaints of violence against women: 2,864 were complaints of physical violence, 16,297 of psychological violence and 198 of sexual violence. Of these, Ecuador registered 64 Venezuelan women victims of physical violence, 521 of psychological violence and four of sexual violence.[14]

This information contrasts with that gathered by civil society organizations. According to a study by Plan International, 72% of Venezuelan women surveyed said that as a group they face some form of gender-based violence in Ecuador. The most common forms of violence identified are: psychological violence in public and private spaces (51%), sexual harassment at work (41%), physical assault within the home (32%) and income control (10%).[15] In addition, international and civil society organizations have expressed concern that femicides of Venezuelan women that have come to their knowledge through their work



---

[8] See the Convention on the Elimination of All Forms of Discrimination against Women (1979); the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (1984); and the Inter-American Convention on the Prevention, Punishment and Eradication of Violence against Women (Convention of Belém do Pará) (1994).
[9] Law No. 175/2018, the Comprehensive Organic Law to Prevent and Eradicate Violence against Women, Arts 9 and 11 www.igualdad.gob.ec/wp-content/uploads/downloads/2018/05/ley_prevenir_y_erradicar_violencia_mujeres.pdf (Spanish only).
[10] Law No. 175/2018, the Comprehensive Organic Law to Prevent and Eradicate Violence against Women, Art. 7, www.igualdad.gob.ec/wp-content/uploads/downloads/2018/05/ley_prevenir_y_erradicar_violencia_mujeres.pdf
[11] National Institute of Statistics and Censuses (INEC), National Survey on Family Relations and Gender-Based Violence against Women (Encuesta Nacional sobre Relaciones Familiares y Violencia de Género contra las Mujeres, ENVIGMU) November 2019. www.ecuadorencifras.gob.ec//violencia-de-genero/ (Spanish only).
[12] Fundación Aldea, "206 femi(ni)cidios en Ecuador ¡Nos declaramos en alerta nacional y vigilia permanente!", 16 September 2022, www.fundacionaldea.org/noticias-aldea/tercermapa2022
[13] United Nations Development Programme (UNDP), Reinventarse sobre la marcha: Mujeres refugiadas y migrantes de Venezuela: Un estudio de sus condiciones y acceso a medios de vida en Colombia, Ecuador y Perú, 30 September 2020, www.undp.org/es/latin-america/publications/reinventarse-sobre-la-marcha-mujeres-migrantes-y-refugiadas-de-venezuela
[14] Attorney General's Office, response to public information request, 30 August 2022.
[15] Plan Internacional, Estudio sobre violencia basada en género hacia las mujeres migrantes y/o refugiadas en los países receptores de Perú y Ecuador, August 2021, p. 10, www.r4v.info/es/document/Plan_International_Estudio_Binacional_VBG_Feb22

in the field are not registered in official figures and that impunity for these crimes prevails because the victims do not have relatives to press for the case to be followed up.[16]

The Committee on the Elimination of Discrimination against Women (CEDAW Committee) expressed concern about the intersectional forms of discrimination faced by, among others, migrant women, women seeking asylum and refugee women in Ecuador.[17] Various vulnerability factors, coupled with stereotypes that hypersexualize Venezuelan women, increase their exposure to trafficking, sexual exploitation and other forms of gender-based violence.[18]



---

[16] Representative of an international organization interviewed on 13 July 2022. Staff of civil society organization in Machala interviewed on 10 August 2022.
[17] Committee on the Elimination of Discrimination against Women (CEDAW Committee), Concluding observations on the tenth periodic report of Ecuador (CEDAW/C/ECU/CO/10), 24 November 2021, para. 13.
https://tbinternet.ohchr.org/_layouts/15/treatybodyexternal/Download.aspx?symbolno=CEDAW%2FC%2FECU%2FCO%2F10&Lang=en
[18] UN Women, *Diagnóstico: Mujeres en Movilidad Humana y Violencia Basada en Género*, October 2020.

During their journey, especially in areas bordering Colombia and Peru, Venezuelan women are at high risk of multiple forms of gender-based violence, including sexual violence and human trafficking for sexual and labour exploitation.[19] The visa requirement for Venezuelans who want to enter Ecuador, in place since August 2019, together with borders closures due to the Covid-19 pandemic between 2020 and 2022, meant that, as they were unable to obtain a visa, Venezuelan people were forced to enter Ecuadorian territory using irregular routes, mostly dominated by criminal gangs that operate with impunity.[20]

International and civil society organizations recorded an increase in violence against women in these spaces: "We saw that many cases of gender-based violence were happening along the trails [irregular border crossings]. Women reported having been [sexually assaulted]. Every woman who reported this to us said that there were eight, 10 more women who went through the same thing but they never came to our offices."[21] While borders are currently open, the visa requirement, and therefore the use of irregular border crossings by Venezuelans, persist. In recent months alone, the Ecuadorian National Police has identified about 47 active irregular crossings that the state does not have the capacity to control.[22]

Amnesty International has documented how, in Ecuador, as in other countries in the region hosting Venezuelan populations,[23] violence against Venezuelan women in public spaces is common. Most Venezuelan women who participated in the research reported feeling unsafe in public spaces, where they are often psychologically harassed, physically and even sexually assaulted.[24] These forms of violence are closely related to stereotypes faced by Venezuelan women because of their nationality.



**SAMIRA**
**VENEZUELAN WOMAN INTERVIEWED IN HUAQUILLAS[25]**

*"When I lived in Quito, I couldn't even go to the supermarket in peace. There was always an Ecuadorian man there who would come up to me at the door and want me to have sex with him. He always made me feel humiliated when he told me that all us Venezuelan women are like that. When I said no, he would insult me even more. I had to go there with my older siblings and without my baby so he would leave me alone."*



 © Ana María Buitrón | Amnesty International

---

[19] UNFPA, "Violencia basada en género en las fronteras: un problema ahondado por la pandemia", 24 March 2021, https://ecuador.unfpa.org/es/news/violencia-basada-en-g%C3%A9nero-en-las-fronteras-un-problema-ahondado-por-la-pandemia
[20] To enter Ecuador using regular routes, Venezuelans must apply for a visa at the Ecuadorian Consulate in Venezuela. All visas require, among other things, depending on the visa, a valid passport, valid for at least six months. This is something which a large part of the Venezuelan population cannot access. See Insight Crime, "*Ecuador Smuggling Rings See Windfall in Migrants*", 19 November 2021, https://insightcrime.org/news/ecuador-smuggling-rings-profit-off-migrant-windfall/
[21] Representative of an international organization interviewed on 25 July 2022.
[22] Interview with the National Police of Ecuador, 14 September 2022.
[23] See Amnesty International, *Unprotected: Gender-based violence against Venezuelan refugee women in Colombia and Peru*, 12 July 2022, https://www.amnesty.org/en/documents/amr01/5675/2022/en/ and Amnesty International, "Peru is failing in its care of Venezuelan women who survive gender-based violence", 25 November 2021, https://www.amnesty.org/en/latest/news/2021/11/peru-failing-care-venezuelan-women-survive-gender-based-violence/
[24] Women's Focus Group in Quito, 4 August 2022; LBT Women's Focus Group in Quito, 8 August 2022; Women's Focus Group 1 in Huaquillas, 6 September 2022 and Women's Focus Group 2 in Machala, 8 September 2022.
[25] Samira, Venezuelan woman in Huaquillas interviewed on 6 September 2022.



**VENEZUELAN WOMAN**
**FOCUS GROUP PARTICIPANT IN QUITO**[26]

*"They tell Venezuelan women, using crude language, to 'get out, go back to your country'. [My partner and I] had a food cart, and there was always an Ecuadorian man on the street who insulted us while we were working."*

Venezuelan women are at risk of sexist and xenophobic violence when working, looking for work, doing business, socializing or crossing through public spaces. Given the lack of job opportunities and the discrimination on the basis of their gender and nationality that they experience in accessing employment, many Venezuelan women are forced to perform unpaid domestic work in their families, reproducing inequalities in access to a livelihood.[27] Other women, including lesbian and transgender women, have opted for sex work.[28]



**SAMANTHA**
**VENEZUELAN WOMAN INTERVIEWED IN MACHALA**[29]

*"In Machala, I started working on the streets, with my body. I wanted to get one of those jobs that you can do in a store... but there was a lot of discrimination... It turned into something that at times would make my tears flow because you were doing something you didn't want to do for a few pennies, in order to not spend a night without eating."*



*Samantha, Venezuelan woman interviewed in Machala, 8 September 2022 © Ana María Buitrón | Amnesty International*

---

[26] LBT Women's Focus Group in Quito, 8 August 2022.

[27] Women's Focus Group in Quito, 4 August 2022; LBT Women's Focus Group in Quito, 8 August 2022; Women's Focus Group 1 in Machala, 8 September 2022; and Women's Focus Group 2 in Machala, 8 September 2022. According to the CEDAW Committee, 75% of unpaid care work is performed by women and the unemployment rate for women is 1.5 times higher than for men (Concluding observations on the tenth periodic report of Ecuador, 24 November 2021, para. 13), https://tbinternet.ohchr.org/_layouts/15/treatybodyexternal/Download.aspx?symbolno=CEDAW%2FC%2FECU%2FCO%2F10&Lang=en

[28] Care, *Análisis rápido de género en Ecuador*, November 2019, www.care.org.ec/wp-content/uploads/2020/06/CARE-Analisis-Rapido-Genero-Ecuador-Nov20192.pdf

[29] Samantha, a Venezuelan woman in Machala, interviewed on 8 September 2022.

CLP_PC_022596

The home is also not a safe space for Venezuelan women in Ecuador. Amnesty International found that factors such as the lack of support networks, irregular migration status, economic dependence on their partners and the state's failure to ensure access to information and services contribute to increasing the risk that Venezuelan women will experience gender-based violence in the families.[30]



**SILVIA**

**VENEZUELAN WOMAN INTERVIEWED IN MACHALA[31]**

*"After a year of being together, my husband began to get very agitated, verbally abusive and pushing me about. During the pregnancy, he shoved me so hard that I thought I'd lost my baby. We separated several times, but I went back out of [economic] necessity."*

In its Constitution, Ecuador recognizes that everyone has the right to access to justice and to effective, impartial and prompt protection of their rights and interests, without discrimination based on sex/gender, gender identity, sexual orientation, socio-economic status or migration status, among others.[32] However, Amnesty International has identified significant barriers to access to protection services for Venezuelan refugee women and these are closely linked to the lack of effective access to the refugee determination procedure or other form of migration regularization.

---

[30] Women's Focus Group in Quito, 4 August 2022; LBT Women's Focus Group in Quito, 8 August 2022; Women's Focus Group 1 in Machala, 8 September 2022; and Women's Focus Group 2 in Machala, 8 September 2022.
[31] Silvia, a Venezuelan woman in Machala, interviewed on 9 September 2022.
[32] Constitution of the Republic of Ecuador, 20 October 2008, Art. 11 and Art. 75. www.oas.org/juridico/pdfs/mesicic4_ecu_const.pdf (Spanish only). See also Art. 25 of the American Convention on Human Rights.

# 4. LACK OF ACCESS TO MIGRATION DOCUMENTATION

The majority of Venezuelan women in Ecuador have irregular migration status. Of an estimated 502,214 Venezuelans in Ecuador, only 13.37% (67,185 people) have regular migration status with a valid visa.[33] Venezuelans' limited access to international protection and alternative forms of migration regularization increases the vulnerability of Venezuelan women survivors of gender-based violence.

## 4.1. DIFFICULTIES IN OBTAINING RECOGNITION OF REFUGEE STATUS

In Ecuador, the process for determining refugee status is regulated by the Organic Law on Human Mobility and its associated regulations.[34] In accordance with its commitments as a state party to the 1951 Convention relating to the Status of Refugees and as a signatory to the 1984 Cartagena Declaration, Ecuador recognizes as a refugee any person who:

> 1. Owing to well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of their nationality and is unable or, owing to such fear, is unwilling to avail themselves of the protection of that country; or who, not having a nationality and being outside the country of their former habitual residence as a result of such events, is unable or, owing to such fear, is unwilling to return to it.

> 2. Have fled or are unable to return to their country because their lives, safety or freedom has been threatened by generalized violence, foreign aggression, internal conflicts, massive violations of human rights or other circumstances which have seriously disturbed public order and cannot avail themselves of the protection of the country of their nationality or habitual residence.[35]

An application for recognition of refugee status may be submitted up to 30 days after entering Ecuadorian territory, regardless of whether the person has entered the country regularly or irregularly. If the time limit has expired, individuals may submit a justification in order to access the process. Once they have accessed the procedure, people have access to a temporary humanitarian visa for six months, renewable for the

---

[33] Ministry of Foreign Affairs and Human Mobility, 29 August 2022, information provided in response to a public information request by Amnesty International.
[34] See Organic Law on Human Mobility, 2017, www.registrocivil.gob.ec/wp-content/uploads/downloads/2018/03/ley_org%C3%A1nica_de_movilidad_humana.pdf.A1nica_de_movilidad_humana.pdf and Regulations to the Organic Law on Human Mobility, 2022, www.cancilleria.gob.ec/wp-content/uploads/2017/08/decreto_111.pdf (Spanish only).
[35] Organic Law on Human Mobility, 2017, Art. 98. www.registrocivil.gob.ec/wp-content/uploads/downloads/2018/03/ley_org%C3%A1nica_de_movilidad_humana.pdf.A1nica_de_movilidad_humana.pdf (Spanish only).

duration of the administrative process, and, if recognized, to a refugee visa for two years that can be renewed indefinitely.[36]

Unlike equivalent visas in the international protection systems of Colombia and Peru, the humanitarian visa allows people to work legally in Ecuador. Furthermore, according to the authorities, the Ministry of Foreign Affairs and Human Mobility grants permits for refugees and asylum seekers to return to their countries for a certain period of time in the event of an emergency.[37]

Between 2018 and 2022, a total of 27,889 Venezuelans applied for refugee status in Ecuador. In that time, only 1,100 Venezuelans, among them 555 women, were recognized as refugees;18,934 applications were rejected and 7,855 are still being processed. Of the 1,100 recognized refugees, 1,006 have been recognized under the definition of the 1951 Convention, 60 under the Cartagena Declaration and in 34 cases this was not unspecified.[38] These figures indicate a limited_application of the Cartagena Declaration definition of refugee, given that massive human rights violations in Venezuela would justify people forced to flee the country having unrestricted access to international protection systems.[39]

However, Amnesty International has received reports that Venezuelans were discouraged from applying for refugee status by officials of the International Protection Directorate. Civil society organizations explained that "[they] have had cases of officials telling people to forget about this, that [Venezuelan people] are never going to be recognized as refugees."[40] While the Ministry of Foreign Affairs has clarified that this does not represent the official position of the Ecuadorian government on international protection matters,[41] former International Protection Directorate officials corroborated these allegations, indicating that previous authorities maintained that Art. 98.2 of the Organic Law on Human Mobility, that is, the definition of a refugee according to the Cartagena Declaration, does not apply to the situation of Venezuelans.[42]

As noted above, Amnesty International considers that denying international protection to Venezuelan individuals despite the expanded definition of the Cartagena Declaration constitutes a breach by states of their human rights obligations which seriously endangers the lives and physical integrity of Venezuelans.[43]

At present, the International Protection Directorate maintains that the assessment of refugee applications is carried out on an individual basis and that the institution's officials have received training on the applicability of the definition of a refugee.[44] International organizations indicate that the number of Venezuelans recognized as refugees has increased in the last six months, since the change in authorities.[45]

Considering that Ecuador hosts 502,214 Venezuelans in its territory, the number of Venezuelans who decide to apply for recognition of their refugee status is markedly low.[46] This is partly due to the lack of information on procedures. Many women interviewed said they did not know about the possibility of seeking refugee status.[47] Among those who knew about the process, most decided not to file an application because "they told me that it does not apply to Venezuelans", or because they had heard of cases of Venezuelans whose applications have been denied.[48]

Another important factor with respect to the low level of refugee applications in Ecuador is the need to travel to carry out the administrative procedure. Although the first stage of the process can be carried out online,

---

[36] Organic Law on Human Mobility, 2017, www.registrocivil.gob.ec/wp-content/uploads/downloads/2018/03/ley_org%C3%A1nica_de_movilidad_humana.pdf.A1nica_de_movilidad_humana.pdf (Spanish only)..
[37] Ministry of Foreign Affairs, Directorate of International Protection, 8 August 2022, information provided in response to a public information request made by Amnesty International.
[38] Ministry of Foreign Affairs, Directorate of International Protection, 8 August 2022, information provided in response to a public information request made by Amnesty International.
[39] Amnesty International, "Americas: Urgent measures: Venezuelans need international protection" (AMR 01/9019/2018), 3 September 2018, https://www.amnesty.org/en/documents/amr01/9019/2018/en/
[40] Representative of an international organization interviewed on 19 July 2022. Staff of civil society organization in Huaquillas interviewed on 29 July 2022.
[41] Ministry of Foreign Affairs, Response regarding the investigation on the situation of Venezuelan women survivors of gender-based violence in Ecuador, 15 November 2022.
[42] Former official at the International Protection Directorate of the Ministry of Foreign Affairs and Human Mobility interviewed on 4 August 2022.
[43] Amnesty International has also documented this situation in Peru. See Amnesty International, *In search of safety: Peru turns its back on people fleeing Venezuela*, 4 February 2020, https://www.amnesty.org/en/documents/amr46/1675/2020/en/
[44] International Protection Directorate of the Ministry of Foreign Affairs and Human Mobility interviewed on 15 September 2022.
[45] "About six months ago in reality the recognition of the Venezuelan population as refugees in the country was very limited. Recently, however, it has been observed that many of the applications of people in a situation of mobility, particularly Venezuelans, are admitted for processing, that is to say, that they are asylum seekers and beyond this, many of the cases are being recognized as refugees. There is a fairly significant and positive opening for the recognition of refugee status for people in a situation of mobility, particularly Venezuelans." Representative of an international organization interviewed on 19 July 2022.
[46] Inter-Agency Coordination Platform for Refugees and Migrants from Venezuela (R4V), Refugees and Migrants from Venezuela, 5 August 2022, https://www.r4v.info/en/refugeeandmigrants
[47] Women's Focus Group in Machala, 8 September 2022.
[48] Women's Focus Group in Quito, 4 August 2022.

people need to go to the offices of the International Protection Directorate for their interview. People in rural localities, or even medium-sized cities, have to go to major cities. In the case of Huaquillas and Machala, people have to go to the Guayaquil office, which is approximately four hours away.[49]



 *Venezuelan woman who shared her experience of being denied refugee status and the obstacles faced by those who have to go to Guayaquil, Machala on 9 September 2022  © Ana María Buitrón | Amnesty International*

Regarding women survivors of gender-based violence seeking access to this process, the CEDAW Committee recommended that the Ecuadorian state: "Ensure that the process of determining refugee status is gender-responsive and that the specific needs of asylum-seeking and refugee women and girls are addressed as a matter of priority throughout the asylum process, in particular their protection needs upon arriving in the State party".[50]

While the International Protection Directorate recognizes women survivors of gender-based violence as a priority group, there is no established protocol to provide them with care and support in practice.[51] Organizations consulted said that this has been an advocacy priority since 2021, but changes of authorities have hindered progress.[52] At the same time, although the International Protection Directorate collects data on specific protection needs on the digital platform ProGres, only 100 Venezuelan women, including those whose applications have received a negative response, have been identified as women at risk.[53] Considering that about 72% of Venezuelan women experience gender-based violence,[54] the low figures show that many women survivors of gender-based violence are not identified as such when they go to the International Protection Directorate.

The information gathered highlights some of the ad hoc practices adopted to prioritize survivors. In Quito, for example, civil society organizations explained that, when a situation of gender-based violence is identified, they can contact the International Protection Directorate to ask for family separation in the database and request different interview dates for people.[55] However, these individual solutions are informal and so are not

---

[49] The Directorate of International Protection has carried out brigades in cities such as Lago Agrio, Santo Domingo, San Lorenzo and Manta, but not in Huaquillas and Machala. Ministry of Foreign Affairs, Response regarding the investigation into the situation of Venezuelan women survivors of gender-based violence in Ecuador, 15 November 2022.
[50] CEDAW Committee, Concluding observations on the tenth periodic report of Ecuador, CEDAW/C/ECU/CO/10, 24 November 2021, para. 48a.
[51] Ministry of Foreign Affairs, Directorate of International Protection, 8 August 2022, information provided in response to a public information request made by Amnesty International.
[52] Representative of an international organization interviewed on 13 July 2022.
[53] Representative of an international organization interviewed on 13 July 2022.
[54] Plan Internacional, *Estudio sobre violencia basada en género hacia las mujeres migrantes y/o refugiadas en los países receptores de Perú y Ecuador*, August 2021, p. 10, www.r4v.info/es/document/Plan_International_Estudio_Binacional_VBG_Feb22
[55] Representative of an international organization interviewed on 19 July 2022.

implemented in all locations. In addition, they are not available to survivors who do not have the support of civil society organizations.

# 4.2. OBSTACLES TO REGULARIZATION OF MIGRATION STATUS

Prior to 2019, Venezuelans could enter Ecuador regularly as tourists, without the need for a visa, simply by presenting any valid identity document, such as identity card or passport. This migration status lasted 90 days and did not give Venezuelans the right to work in the country.

In August 2019, Ecuador introduced a visa requirement for Venezuelans and put in place the option of obtaining an exceptional temporary residence visa for humanitarian reasons, also known as VERHU, lasting two years and renewable once, in order to regularize the status of Venezuelans already in the country and who met two conditions: 1) that they had entered Ecuadorian territory regularly and 2) that their irregular migratory situation was due to their having exceeded the duration of their visa.[56] In practice, these requirements exclude Venezuelans who entered Ecuador after August 2019, that is, approximately 130,301 people.[57]

From 26 August 2019 to 27 July 2022, Ecuador granted a total of 58,425 VERHU visas to Venezuelans, 29,867 to women and 28,558 to men.[58] Amnesty International believes that the difficulties in complying with the requirements put in place could be one of the factors that explain why few Venezuelans accessed this visa compared to the number in the country.

While civil society organizations often provide support to cover the cost of USD 50 to obtain the VERHU, the other requirements, such as having a passport (valid or expired for up to five years) and a certificate of their criminal record from the country of origin officially stamped by the Venezuela authorities, were impossible for most Venezuelan people to comply with.[59] These requirements are especially inaccessible for women survivors of gender-based violence, since at the time of leaving the cycle of violence "their former cohabitees have thrown out the documents or burned them. An so they are left completely without documentation, given that it is very difficult for Venezuelans to access identity documents."[60]

Between 2021 and 2022, a large percentage of the visas issued as part of the VERHU regularization process expired, leaving thousands of Venezuelans in an irregular migration situation.[61] It is important to note that in this regularization process, the Ecuadorian state did not make provision to prioritize people in vulnerable situations or to the specific needs of survivors of gender-based violence, such as the loss of documents at the hands of their abusers.[62]

In June 2022, the government announced a new regularization process for Venezuelans, through the granting of the Exceptional Temporary Residence Visa for Venezuelan Citizens (Visa de Residencia Temporal de Excepción para Ciudadanos Venezolanos, VIRTE).[63] A VIRTE is available to people who entered Ecuador before 26 August 2019, on presentation of an identity card and payment of USD 50 for the visa application.[64]

Accepting an identity card as an alternative to a passport represents an improvement in accessibility. However, it is important to note that many Venezuelans in Ecuador do not have any documentation and,

---

[56] Executive Decree No. 826 of 25 July 2019 www.cancilleria.gob.ec/wp-content/uploads/2019/09/acuerdo_ministerial_103_medidas_migratorias_a_favor_de_ciudadanos_venezolanos0169571001567716139.pdf (Spanish only)..
[57] In October 2019, Ecuador registered 371,913 Venezuelans in its territory. Today, the number is 502,214.
[58] Ministry of Foreign Affairs and Human Mobility, 29 August 2022. Information provided in response to a public information request made by Amnesty International.
[59] BBC Mundo, "Por qué es tan difícil conseguir un pasaporte para salir de Venezuela", 29 August 2018. www.bbc.com/mundo/noticias-america-latina-45292923 National civil society organization staff interviewed on 2 August 2022.
[60] Staff of civil society organization in Huaquillas interviewed on 29 July 2022.
[61] Staff of a community organization in Quito, interviewed on 5 August 2022.
[62] Staff of civil society organization in Huaquillas interviewed on 29 July 2022.
[63] Executive Decree No. 436, 1 June 2022, https://www.venezuelanecuador.com/sitio/wp-content/uploads/2022/06/Decreto_Ejecutivo_No._436_20220503163733_20220503163738-VIRTE-REGULARIZACION.pdf (Spanish only). According to the authorities, the immigration registration process to obtain the visa began in September 2022 and the process to issue visas began on 1 October 2022. Ministry of Foreign Affairs and Human Mobility, 29 August 2022. Information provided in response to a public information request made by Amnesty International.
[64] Ministry of Foreign Affairs and Human Mobility, 29 August 2022. Information provided in response to a public information request made by Amnesty International.

while the Ministry of Foreign Affairs has decreed the granting of this visa free of charge, the economic barrier of having to pay USD 50 for the visa application form remains.[65] At the same time, Amnesty International notes with concern that this process again excludes Venezuelan people who entered irregularly after 26 August 2019, a restriction that ignores the continuing humanitarian crisis experienced by Venezuelan people on the move, which to date has not abated. The requirement of regular entry represents an additional barrier for Venezuelans in accessing regularization through the mechanisms put in place by Ecuador which, in practice, exclude all Venezuelans who have arrived in the country in the last three years. The Ministry of Foreign Affairs told Amnesty International that the regularization process will have a third phase directed at Venezuelan people who have entered Ecuador irregularly, which will allow them to regularize their immigration status in Ecuador.[66]

While there are other types of visas, such as work permits and amparo visas,[67] high costs and migration requirements, such as having a valid passport, and, if people entered irregularly, the payment of a fine of USD 800,[68] limit access for most Venezuelans in a precarious economic situation linked to the grave human rights crisis in Venezuela. This is reflected in the numbers of visas granted to date: only 38,933 Venezuelans have obtained permanent visas or other migratory categories (beyond the VERHU and humanitarian or refugee visas).[69]



### TRANS WOMEN:
### DIFFICULTIES IN OBTAINING NATIONAL IDENTITY DOCUMENTS

According to information received by Amnesty International, Venezuelan trans women pursuing the regularization process on grounds of gender expression experience discrimination from Civil Registry staff on the basis of gender and, on certain occasions, of nationality. Antonella described how the official she dealt with to process her identity card forced her to change her appearance:

> "When I went to get my ID [after getting my visa], they sent me to take off the shirt [that I was wearing]. In fact, that shirt I have [in the ID photo] belongs to an office employee. I was forced to take off my blouse, all my makeup, they almost made me tie my hair up. I was discriminated against there. I complained, but I was told you'll lose your turn and we'll give you an appointment in a year. And the language was xenophobic: 'you cannot come demanding things in a foreign country'. We all have rights, I have a visa, regardless of whether or not it is permanent, and I contribute to the GDP, I also pay taxes, and I am a consumer."[70]

Antonella, Venezuelan trans woman interviewed in Quito.

Despite the fact that the law allows trans people to request an identity document according to their gender identity,[71] in practice Venezuelan trans women are unable to exercise their right to change their name and gender in their identity documents. The organization Diálogo Diverso explains that this process, by requiring trans women to prove their gender identity through a series of documents, is more accessible to Ecuadorian people, but not to Venezuelan refugees in the country. "For people who come from Venezuela, the process is inaccessible since that country has a very high degree of deinstitutionalization whereby countless documents have been lost and others are very difficult to obtain, starting with birth certificates. So, the chance of this happening is one in a million, at best."[72]

[65] Staff of civil society organization in Huaquillas interviewed on 29 July 2022.
[66] Ministry of Foreign Affairs, Response regarding the investigation into the situation of Venezuelan women survivors of gender-based violence in Ecuador, November 15, 2022.
[67] The amparo visa is a temporary authorization to remain granted by the Ecuadorian state to foreign nationals, children, spouses or common-law partners, legally recognized, who intend to reside in the country under the protection of the holder of a migration category provided for in article 60 of the Organic Law on Human Mobility. Since 2021, the Ecuadorian government has stopped processing UNASUR visa applications, due to Ecuador's decision to leave this organization.
[68] Staff of civil society organization in Huaquillas interviewed on 29 July 2022.
[69] Ministry of Foreign Affairs and Human Mobility, 29 August 2022. Information provided in response to a public information request made by Amnesty International.
[70] Antonella, Venezuelan trans woman in Quito, interviewed on 16 September 2022.
[71] The legal recognition of gender identity, which governs the change from the field of "sex" to that of "gender" on the Identity Card, is recognized for the first time in Ecuador's legislative history in the Organic Law on Identity Management and Civil Data. See Organic Law on Identity Management and Civil Data, Art. 94. www.registrocivil.gob.ec/wp-content/uploads/downloads/2018/03/ley_organica_de_gestion_de_la_identidad_y_datos_civiles.pdf (Spanish only).
[72] Staff of civil society organization in Quito Interviewed on 12 September 2022.

# 5. OBSTACLES TO VENEZUELAN WOMEN'S ACCESS TO PROTECTION MECHANISMS

Despite the high levels of gender-based violence faced by Venezuelan women in Ecuador, in response to a request for information the Attorney General's Office reported only 64 cases of physical violence, 521 of psychological violence and four of sexual violence against Venezuelan women between January 2018 and July 2022. For Amnesty International, the low number of cases brought to the attention of the authorities suggests and even greater degree of under-reporting than is usually observed in cases of gender-based violence against Ecuadorian women. The organization has identified that Venezuelan women refugees in Ecuador, as well as those in Colombia and Peru,[73] do not usually turn to the authorities due to a number of additional obstacles. Not only do they lack information on care pathways available in a country other their own, but they fear approaching the authorities because of their irregular migration status. These obstacles in turn mean that they experience greater lack of protection.

## 5.1. "WE DON'T EVEN KNOW WHERE TO GO"[74]

One of the main obstacles that the women interviewed identified when approaching state institutions when they have experienced gender-based violence is the lack of information on existing complaints and protection mechanisms.[75]

Ecuador has made institutional efforts to disseminate information about care pathways for women, such as training in community assemblies by the National Police and sharing care pathways on the websites of institutions such as Cantonal Rights Councils.[76] Amnesty International notes, however, that these initiatives do not focus specifically on refugee women and that there are no mass information campaigns directed at Venezuelan women by state institutions.

---

[73] See Amnesty International, *Unprotected: Gender-based violence against Venezuelan refugee women in Colombia and Peru*, 12 July 2022. https://www.amnesty.org/en/documents/amr01/5675/2022/en/
[74] Women's Focus Group in Machala, 8 September 2022.
[75] Plan Internacional, *Estudio sobre violencia basada en género hacia las mujeres migrantes y/o refugiadas en los países receptores de Perú y Ecuador*, August 2021, p. 11. www.r4v.info/es/document/Plan_International_Estudio_Binacional_VBG_Feb22
[76] For example, the National Police Department on Domestic Violence (Departamento de Violencia Intrafamiliar, DEVIF) conducts training in community assemblies for the prevention of gender-based violence. Public official in Machala, interviewed on 7 September 2022. See also Ministry of Government, "DEVIF avanza en la prevención de violencia intrafamiliar dentro y fuera de la Policía Nacional", 2022, www.ministeriodegobierno.gob.ec/devif-avanza-en-la-prevencion-de-violencia-intrafamiliar-dentro-y-fuera-de-la-policia-nacional/ and Consejo de Protección de Derechos Quito, *Violencia/Ruta de atención, protección y restitución de derechos de mujeres en situación de violencia en el marco del sistema de protección integral*, 2017. www.proteccionderechosquito.gob.ec/adjuntos/rutas/RUTA_VIF_2017.pdf



*Focus Group in Machala, 8 September 2022 © Ana María Buitrón | Amnesty International*

The lack of knowledge about care pathways is especially noticeable in places where state institutions with a mandate to deal with cases of gender-based violence, such as the Human Rights Secretariat, the Ombudsperson's Office, the Public Defender's Office and the National Police, among others, have a lesser presence, such as the southern border of the country. In Huaquillas, for example, the Domestic Violence Department (DEVIF) of the National Police has only two civil servants covering several cantons, the Ombudsperson's Office does not have permanent staff in the territory and the Public Defender's Office does not have staff specialized in gender-based violence.[77] The situation is even more critical in rural areas where the state has no presence at all: "In the upper part of the province of El Oro, there is a shortage of police personnel, resulting in violence becoming more commonplace. There is not even a phone signal to call the police, women don't file reports, they have to travel for 40 minutes by [horse, mule] or on foot to access a Community Police Unit."[78]

Many women, particularly in localities such as Huaquillas and Machala, pointed out that they were unaware of the role of state institutions such as the Human Rights Secretariat, the Public Defender's Office, the Ombudsperson's Office, the Cantonal Councils for the Protection of Rights and other key institutions in dealing with cases of gender-based violence in Ecuador.[79]

In practice, it is civil society organizations and international cooperation that are trying to fill this gap in support and information left by the Ecuadorian state, through community protection initiatives and by training women leaders, as well as mass information campaigns specifically aimed at Venezuelan refugee women. The Office of the United Nations High Commissioner for Refugees (UNHCR), for example, has a website and communication modalities through WhatsApp aimed at providing information to refugees in Ecuador on rights and obligations in the country and access to services, among other issues.[80]

---

[77] Public official in Huaquillas, interviewed on 7 September 2022. Public official in Huaquillas, interviewed on 7 September 2022. Public official in Huaquillas, interviewed on 7 September 2022.
[78] Official of a public body in Machala, interviewed on 9 September 2022.
[79] Women's Focus Group in Huaquillas, 6 September 2022 and Women's Focus Group in Machala, 8 September 2022.
[80] United Nations High Commissioner for Refugees, "CNUR abre nuevo canal de comunicación con las personas refugiadas en Ecuador a través de WhatsApp", 6 November 2020, www.acnur.org/noticias/press/2020/11/5fa58b274/acnur-abre-nuevo-canal-de-comunicacion-con-las-personas-refugiadas-en-ecuador.html
See also: Other civil society organizations, at the national and local levels, make efforts to reach the community through fairs and have telephone lines where people can communicate for information.

CLP_PC_022604

The Venezuelan women interviewed agreed that, when faced with a situation of violence, they have gone or would go first to international and civil society organizations to seek help. Most of the Venezuelan women interviewed who indicated that they knew where to turn in cases of gender-based violence had obtained this information through the services of international or civil society organizations[81] or digital media.

# 5.2. FEAR AND DISTRUST OF THE AUTHORITIES

As noted above, due to Venezuelans' limited access to international protection and alternative forms of migration regularization, the majority of Venezuelan women in Ecuador are in an irregular migratory situation. For women survivors of gender-based violence, the lack of regular migration status is also a significant obstacle in seeking protection from the authorities.

In its concluding observations on Ecuador's most recent report of November 2021, the CEDAW Committee noted with concern that women asylum seekers and migrants, in particular those in an irregular situation, who suffer gender-based violence, including domestic violence and rape, refrain from accessing victim support services out of fear of the immigration authorities.[82]

The Venezuelan women, in an irregular migratory situation, interviewed for this research nine months later also reported being afraid to approach state institutions to ask for help or report acts of violence for fear that they will be given economic fines that they cannot pay or even be expelled from the country.[83]

Although one of the grounds for deportation established in law is entering Ecuadorian territory through an unauthorized crossing, this in principle is not applicable to people subject to international protection, such as Venezuelans.[84] Ecuadorian legislation guarantees the non-refoulement of individuals to countries where their lives or those of their relatives are at risk and prohibits the expulsion of groups of foreign nationals.[85] Despite this, in 2019, for example, the Ecuadorian authorities carried out mass expulsions of Venezuelans to Colombia. The Constitutional Court noted that these practices violate the rights to migrate, to freedom of movement and to due process as well as the prohibition of collective expulsion.[86]

However, since they had not received information about their rights, many Venezuelan women were unaware that Ecuadorian law allowed them to seek protection or lodge a complaint with the Attorney General's Office, even if they did not have an identity document. Amnesty International believes it is essential that the Ecuadorian authorities take prompt measures to strengthen the dissemination of information to refugees and migrants on the response to gender-based violence, ensuring that dissemination strategies address people's fear of going to institutions because they do not have regular migration status.

Amnesty International noted that the fear of going to the authorities is compounded by other factors, such as widespread perceptions of impunity and the ineffectiveness of the justice system, which discourage women, both local and foreign, from reporting this violence.[87]

> **"We often meet women who tell us 'I'm not going to report', because they've lost confidence in the state, because they're not sure that their situation will be examined and their rights restored. They are afraid, on the contrary, that this system will end up persecuting them, criminalizing**

---

[81] Women's Focus Group in Quito, 4 August 2022.
[82] CEDAW Committee, Concluding observations on the tenth periodic report of Ecuador, CEDAW/C/ECU/CO/10, November 2021, para. 47a.
[83]Cis Women's Focus Group in Quito, 4 August 2022. See also: Inter-American Court of Human Rights, Migraciones irregulares y derecho internacional: Gestión de los flujos migratorios, devolución de extranjeros en situación administrativa irregular y Derecho Internacional de los Derechos Humanos, 2012 https://www.corteidh.or.cr/tablas/r31009.pdf
[84] Organic Law on Human Mobility, Art. 143, 2017. www.registrocivil.gob.ec/wp-content/uploads/downloads/2018/03/ley_org%C3%A1nica_de_movilidad_humana.pdf.A1nica_de_movilidad_humana.pdf (Spanish only)..
[85] Constitution of the Republic of Ecuador, 20 October 2008, Art. 66, www.oas.org/juridico/pdfs/mesicic4_ecu_const.pdf and Organic Law on Human Mobility, Art. 2, 2017. www.registrocivil.gob.ec/wp-content/uploads/downloads/2018/03/ley_org%C3%A1nica_de_movilidad_humana.pdf.A1nica_de_movilidad_humana.pdf (Spanish only)..
[86] Constitutional Court of Ecuador, Judgment: No. 639-19-JP/20, 2020 [http://portal.corteconstitucional.gob.ec:8494/FichaRelatoria.aspx?numdocumento=639-19-JP/20 Spanish only].
[87] Cis Women's Focus Group in Quito, 4 August 2022 and Cis Women's Focus Group 1 in Machala, 8 September 2022. International organization official interviewed on 13 July 2022.

> ## them and returning them to their country and putting their lives and security at risk."[88]

Representative of an international organization

This perception is shared by several civil society organizations.[89]

> ## "After filing a complaint, it comes to nothing. I don't know of a single case where there's been any action other than just the report. There is never any follow-up by the justice system. At the shelter, we always persuade women that it is best to file a complaint, but the reality is that it is not the best thing. Those processes crush their self-esteem and are a thorn in their sides when they want to move on."[90]

Shelter staff member

According to Plan International, 71% of Venezuelan women in Ecuador believe that cases of violence against women are not usually reported, compared to 29% who said they are. And 27% mentioned mistrust of public institutions as the main reasons for not reporting.[91]

It should be noted that many Venezuelan refugee women who experience violence come from previous contexts of violence, both in their country of origin and along the migration route. In the case of Ecuador, most Venezuelans have arrived in the country after travelling through Colombia, and in many cases, having settled there for some time, or after having lived in Peru.[92] In the report *Unprotected: Gender-Based Violence against Venezuelan Refugee Women in Colombia and Peru*, Amnesty International documented significant gaps in access to justice in Colombia and Peru. In both countries, there are high levels of impunity for gender-based violence against Venezuelan refugee women.[93]

Some women who have travelled through countries where the state did not respond adequately when they filed a complaint have stated that they prefer not to approach Ecuadorian institutions for fear of a repetition of similar experiences.

 **LISETH**
**VENEZUELAN TRANS WOMAN INTERVIEWED IN MACHALA[94]**

*"I have no faith in any state institution, I am traumatized since Colombia. In Colombia I did try to make a complaint at the Attorney General's Office and they told us, 'And why the complaint?' Because we need to be supported, because [experiencing violence] is not right. They told us, 'Yes, but is it right for you to be here?' So then I left that institution."*

---

88 Representative of an international organization interviewed on 13 July 2022.
89 Civil society organization representative in Machala, interviewed on 2 August 2022. Representative of community organization in Quito, interviewed on 5 August 2022. Representative of civil society organization in Quito, interviewed on 9 August 2022. Staff at a shelter, interviewed on 29 August 2022. Representative of civil society organization in Machala, interviewed on 8 September 2022. Representative of civil society organization in Quito, interviewed on 12 September 2022.
90 Staff at a shelter, interviewed on 29 August 2022.
91 Plan Internacional, *Estudio sobre violencia basada en género hacia las mujeres migrantes y/o refugiadas en los países receptores de Perú y Ecuador*, August 2021, p. 11, www.r4v.info/es/document/Plan_International_Estudio_Binacional_VBG_Feb22
92 Representative of a civil society organization in Quito, interviewed 8 August 2022.
93 According to the Corporación Sisma Mujer report on violence against women of in Colombia, in 2021, 82.92% of the complaints of domestic violence were at the investigation stage, which indicates a high level of impunity because only 16.09% of these cases were at trial stage and only 0.8% at sentencing stage. With regard to sexual offences, the report states that during the same period, 88.19% of cases of sexual offences against women were at the investigation stage. Only 6.85% of cases reached trial and in only 0.13% of cases were sentences imposed. The Peruvian Ombudsperson's Office, in a statement on the urgent need for effective action by the justice system in the face of an increase in cases of feminicide, noted that in 2020 in only six out of 138 cases of feminicides (that is, 4%) were the perpetrators convicted of aggravated feminicide. See also Amnesty International, *Unprotected: Gender-based violence against Venezuelan refugee women in Colombia and Peru*, 12 July 2022, https://www.amnesty.org/en/documents/amr01/5675/2022/en
94 Liseth, Venezuelan trans woman in Machala, interviewed on 8 September 2022.

In the case of trans women, these feelings of distrust are further reinforced by the experience of discrimination that, as a community, they have suffered at the hands of institutions such as the police. One of the Venezuelan trans women interviewed explained that, in the event of incidents of gender-based violence, her "response is to try to resolve things internally and not pass it to [state institutions] because there is more abuse there. The police instead of being a friend is an enemy, because there is a lot of this discrimination at the hands of officials."[95]



*Antonella, Venezuelan trans woman interviewed in Quito, 16 September 2022 © Ana María Buitrón | Amnesty International*

These factors result in women survivors of gender-based violence not going to the authorities and therefore not getting access to protection. According to Ecuador's Judicial Council, 90% of women who have experienced gender-based violence in Ecuador do not report it.[96] For Venezuelan refugee women, these statistics are likely to be even more pronounced because of the situation of vulnerability they face.

---

[95] Antonella, Venezuelan trans woman in Quito, interviewed on 16 September 2022.
[96] Plan Internacional, *Estudio sobre violencia basada en género hacia las mujeres migrantes y/o refugiadas en los países receptores de Perú y Ecuador*, August 2021, p. 11, www.r4v.info/es/document/Plan_International_Estudio_Binacional_VBG_Feb22

# 6. SHORTCOMINGS IN THE STATE RESPONSE TO GENDER-BASED VIOLENCE

Effective access to justice for women survivors of gender-based violence includes, in addition to access to effective remedies and judicial protection, the availability of state emergency services for the protection of survivors of gender-based violence. The Inter-American Commission on Human Rights (IACHR) has established that states must ensure that judicial, administrative, political or other remedies for women and girls who have been subjected to gender-based violence, such as restraining orders and shelters, are women-centred, available, accessible, acceptable and address the needs of the victim/survivor.[97]

Amnesty International has identified structural problems in these services, which, while affecting effective access to justice for all women in Ecuador, have a differentiated impact on Venezuelan women at risk. These shortcomings, which affect both front-line services and the administration of justice, prevent Venezuelan refugee women from enjoying effective protection from gender-based violence and restrict their right to access to justice.

## 6.1. SHORTCOMINGS IN FRONTLINE SERVICES TO IDENTIFY AND RESPOND TO CASES OF GENDER-BASED VIOLENCE

### 6.1.1. NATIONAL POLICE

As the body responsible for internal public order,[98] the National Police, which has approximately 52,000 female officers, is in the front line of responding to cases of gender-based violence.

---

[97] Inter-American Commission on Human Rights (IACHR), *Violence and Discrimination against Women and Girls: Best Practices and Challenges in Latin America and the Caribbean*, OEA/Ser.L/V/II.Doc. 233, para. 146, 14 November 2019, http://www.oas.org/en/iachr/reports/pdfs/ViolenceWomenGirls.pdf
[98] Constitution of the Republic of Ecuador, 20 October 2008, Art. 11 and Art. 75. www.oas.org/juridico/pdfs/mesicic4_ecu_const.pdf (Spanish only).

CLP_PC_022608

According to bodies of the universal human rights system[99] and the inter-American human rights system,[100] gender stereotypes among officials in charge of support and protection processes are one of the main obstacles limiting access to justice for women survivors of gender-based violence.

According to the Domestic Violence Department (DEVIF), everyone receives training on issues of violence and procedures to respond to it as part of the comprehensive programme that includes human rights approaches.[101] Despite this, various sources interviewed by Amnesty International reported the prevalence of stereotypes that in practice result in discrimination against women seeking access to justice.[102]



### KARINA
### VENEZUELAN WOMAN INTERVIEWED IN QUITO[103]

*"When I went to the Community Police Unit in the sector where I live, I didn't get a good response from them... Their response was: 'Why are you doing this, when tomorrow you're going back to your husband'.*



*Without my even having explained to them what was happening, they made fun of me, they did not want to listen to me. That public body is supposed to defend the community, women. I was not received well or politely or anything.*

*The same policeman who dealt with me on that occasion came to my empanada cart afterwards. I asked him, 'Do you remember that one time I came to ask you for help because my husband had hit me and you ignored me? You were on your mobile.' 'Oh, it's just that so many women come along with those kinds of problems, I really don't remember.' I said to him:*

*'Well, remember, you didn't help me at that time when I needed you, I had to go back to my house to see that person, that aggressor, to wait and see if he did something to me or to my children, to see if he was going kill me. I went home alone, but I made it and got out, but not thanks to your help. Now here I am selling empanadas, and you know what, you told me, "why am I going to help you when you're going to go back to him", I have not gone back to him, I am alone'. He said to me, 'Look, I'm sorry, the thing is that there are many women who come, file a complaint and go back to their partner.'"[104]*

© Ana María Buitrón | Amnesty International

---

[99] CEDAW Committee, General Recommendation 33: Women's access to justice. CEDAW/C/GC/33, 3 August 2015, https://tbinternet.ohchr.org/Treaties/CEDAW/Shared%20Documents/1_Global/CEDAW_C_GC_33_7767_E.pdf
[100] Inter-American Court of Human Rights, *Case of González et al. ("Cotton Field") v. Mexico*, Preliminary Objection, Merits, Reparations and Costs, Judgment of 16 November 2009, https://www.corteidh.or.cr/docs/casos/articulos/seriec_205_ing.pdf and Inter-American Court of Human Rights, *Velásquez Paiz v. Guatemala*, Preliminary Objection, Merits, Reparations and Costs, Judgment of 19 November 2015, https://www.corteidh.or.cr/docs/casos/articulos/seriec_307_ing.pdf
[101] Interview with the Ecuadorian National Police, 14 September 2022.
[102] Cis Women's Focus Group in Quito, 4 August 2022. LBT Women's Focus Group in Quito, 8 August 2022. Cis Women's Focus Group 1 in Huaquillas, 6 September 2022. Cis Women's Focus Group 8 in Machala, 8 September 2022. Karina, Venezuelan woman in Quito, interviewed on 16 September 2022.
[103] Karina, Venezuelan woman in Quito, interviewed on 16 September 2022.
[104] Karina, Venezuelan woman in Quito, interviewed on 16 September 2022.

CLP_PC_022609

Amnesty International also identified unlawful practices being carried out unofficially, such as attempts at mediation, in cases of violence.[105] Amnesty International heard from a refugee woman in northern Quito whose daughter was the victim of sexual violence in her home by a neighbour between 2021 and 2022. When the National Police came to the house as part of the investigation of the case, they put pressure on her to reach an agreement with the perpetrator's family: "He told me it's better to do that so your daughter doesn't have to go through more things. That puzzled me. I said to him, 'how come a police officer is telling me, the victim, in front of the aggressor's mother, that we should settle this together so that my daughter does not have to go through the process of giving testimony?'"[106]

Lack of police human and financial resources also negatively affects the response to survivors. The province of El Oro has only eight police officers specialized in gender-based violence as part of the DEVIF,[107] for a population of approximately 715,751 inhabitants.[108] Reduced staffing means that this unit does not have the capacity to respond to women survivors of violence directly and has to prioritize other activities such as notifying alleged perpetrators of restraining orders. In the case of Huaquillas, the DEVIF has only two people and one vehicle, which, due to lack of resources for repairs and fuel, is often unusable.[109]

According to the National Police, the institution's officials have a duty to accompany any woman victim of violence to a health centre and to file a complaint with the Attorney General's Office.[110] However, representatives of the police state that, in practice, it is not possible to do this because the process can take up to seven hours, "which means seven hours in which a sector is left without protection".[111] To solve these problems, the Eloy Alfaro Police District in Quito developed a liaison protocol with the Ministry of Public Health that allows them to refer cases directly to the sector health centre. According to the National Police, although this protocol has yielded positive results in the sector, it has not been possible to replicate it in other areas of the country due to lack of logistical resources.[112]

The National Police has mechanisms aimed at protecting people at the community level, such as the Security Button Programme, which allows people to use their mobile phone to make direct contact with the nearest Community Police Unit to request immediate assistance.[113] However, the institutional weaknesses mentioned above have a negative impact on the effectiveness of these mechanisms in practice.



**KARINA**

**VENEZUELAN WOMAN INTERVIEWED IN QUITO**[114]

*"When I activated the [security] button, they called me and asked me what had happened. And I told them that there was an incident and still they did not come to the scene, I told them that he had tried to hit me but had not hit me. He told me to stay calm, to lock myself in my room and not leave until [the aggressor] left. They never came to the house."*

In Amnesty International's view, the aforementioned shortcomings constitute a breach by the Ecuadorian authorities of their duty to act with due diligence in cases of gender-based violence, given that these should not be limited to creating an adequate framework or mechanism for prevention and protection against

---

[105] In its General Recommendation 33 the CEDAW Committee recommends that states ensure that cases of violence against women, including domestic violence, are under no circumstances referred to any alternative dispute resolution procedures. See CEDAW Committee, General Recommendation 33: Access to justice, CEDAW/C/GC/33, para. 58 (c) https://tbinternet.ohchr.org/Treaties/CEDAW/Shared%20Documents/1_Global/CEDAW_C_GC_33_7767_E.pdf  General Recommendation 35 of the CEDAW Committee provides that states parties are obliged to ensure that gender-based violence against women is not mandatorily referred to alternative dispute resolution procedures, including mediation and conciliation. It also states that: "The use of these procedures should be strictly regulated and allowed only when a previous evaluation by a specialised team ensures the free and informed consent by the affected victim/survivor and that there are no indicators of further risks for the victim/survivor or their family members." See CEDAW Committee, General Recommendation 35: Gender-based violence against women updating General Recommendation 19, CEDAW/C/GC/35, 26 July 2017, para 45, https://tbinternet.ohchr.org/Treaties/CEDAW/Shared%20Documents/1_Global/CEDAW_C_GC_35_8267_E.pdf
[106] Josselyn, Venezuelan woman in Quito, interviewed on 19 September 2022.
[107] Public official in Huaquillas, interviewed on 7 September 2022.
[108] National Institute of Statistics and Census (INEC), Population Projections, 2011, www.ecuadorencifras.gob.ec/proyecciones-poblacionales/ (Spanish only).
[109] Public official in Huaquillas, interviewed on 7 September 2022.
[110] Interview with the Ecuadorian National Police, 14 September 2022.
[111] Interview with the Ecuadorian National Police, 14 September 2022.
[112] Interview with the Ecuadorian National Police, 14 September 2022.
[113] Ventanilla Digital de Trámites del Ecuador, Activación de Botones de Seguridad para Casos de Emergencia, no date, www.gob.ec/pn/tramites/activacion-botones-seguridad-casos-emergencia
[114] Karina, Venezuelan woman in Quito, interviewed on 16 September 2022.

gender-based violence, but must be accompanied by measures to guarantee the effective realization of women's right to live a life free from violence.

# 6.1.2. HEALTHCARE SERVICES

Public health services, including hospitals and community health centres, are essential not only to provide care for women survivors of gender-based violence, but also to identify cases of violence. The Comprehensive Organic Law for the Prevention and Eradication of Gender-Based Violence against Women establishes the need for all hospitals and health centres that are responsible for prevention, promotion and recovery – also known as Type B hospitals[115] – to have reception wards for women survivors of violence.[116]

Amnesty International welcomes the efforts of the Ministry of Public Health to establish these initial reception wards for women survivors of violence, such as the Initial Reception Ward of the Enrique Garcés Hospital in Quito. However, it notes with concern that not all hospitals and health centres responsible for prevention, promotion and recovery – Type B hospitals – have such facilities.

 **INITIAL RECEPTION WARD AT THE ENRIQUE GARCÉS HOSPITAL**

The Reception and Forensic Medicine Ward of the Enrique Garcés Hospital in Quito was created with the support of UNHCR with the aim of providing comprehensive and specialized care to victims of sexual and domestic violence. It consists of a team of professionals specialized in forensic medicine, mental health and social work.[117] In addition to providing immediate care to survivors, officials in the ward are responsible for making referrals and coordinating other services on an inter-institutional basis, in conjunction with other government and civil society organizations, such as shelters.

Civil society organizations interviewed value the fluid communication and coordination with the initial reception ward, attributed mainly to the personal commitment of these trained officials, which allow appropriate care to be provided to survivors. However, they highlight the need to institutionalize these good practices, through protocols, so that they continue beyond any possible changes in ward staff.[118]

In addition, there are continuing concerns regarding the care that the Ministry of Public Health provides for women survivors of violence in other non-specialized centres at the national level: "If survivors go directly to obtain a medical appointment or go directly to the health system, there are still gaps in care, failures to properly identify cases, a lack of a comprehensive approach to cases of gender-based violence."[119]

Amnesty International was also concerned about statements regarding the extent to which the public health system in Ecuador is overstretched, affecting those seeking psychological care in situations of gender-based violence, whether Ecuadorian or foreign nationals. Although it is a fundamental aspect of the support that survivors of gender-based violence should receive, established by law,[120] in the Carlos Andrade Marín Specialist Hospital (Hospital de Especialidades Médicas Carlos Andrade Marín, HCAM), one of the main hospitals of Quito, appointments for psychotherapies are granted every three to six months.[121] None of the

---

[115] Type A health centres are those that provide basic and primary care; Type B health centres are those that provide promotion, prevention and recovery services; and Type C is a primary hospital, that is, it provides permanent care.
[116] See Law No. 175/2018. Comprehensive Organic Law to Prevent and Eradicate Violence against Women, Art. 59. ww.igualdad.gob.ec/wp-content/uploads/downloads/2018/05/ley_prevenir_y_erradicar_violencia_mujeres.pdf (Spanish only).
[117] Ministry of Public Health, the Initial Reception Ward at the Enrique Garcés Hospital provides comprehensive and specialized care to victims of violence, no date, www.salud.gob.ec/sala-de-primera-acogida-del-hospital-enrique-garces-brinda-atencion-integral-y-especializada-a-victimas-de-violencia/ Spanish only).
[118] Staff of civil society organization in Quito interviewed on 9 August 2022.
[119] Representative of an international organization interviewed on 19 July 2022.
[120] The Comprehensive Organic Law for the Prevention and Eradication of Gender-Based Violence against Women reaffirms the right to "receive specialized, comprehensive, immediate and free social, medical, psychological and psychiatric assistance for the woman and her dependents" ["recibir asistencia social, médica, psicológica y psiquiátrica especializada, integral, inmediata y gratuita para ella y sus dependientes"] Law No. 175/2018. Comprehensive Organic Law to Prevent and Eradicate Violence against Women, Art. 12. ww.igualdad.gob.ec/wp-content/uploads/downloads/2018/05/ley_prevenir_y_erradicar_violencia_mujeres.pdf Spanish only).
[121] GK, "Una mente se desploma por el desabastecimiento de medicinas", 20 July 2022, https://gk.city/2022/07/20/mente-desploma-desabastecimiento-medicinas-historia-desabastecimiento-medicinas-hospitales-ecuador/

women survivors of gender-based violence interviewed by Amnesty International had been able to access psychological care in the public health system. In practice, civil society fills this gap with free psychological care services for Venezuelan refugee women.[122]



**JOSSELYN**
**VENEZUELAN WOMAN INTERVIEWED IN QUITO[123]**

*"Mentally I was in a very bad state, I had many suicidal thoughts. I was hoping the state would give me a certificate referring me for psychological treatment... And I tell you straight up, if it wasn't for [a civil society organization], I wouldn't be here, it really was necessary because it was a really difficult situation. The support they gave me was invaluable, something that the state could not give me, either in the hospital, or in the Attorney General's Office, or anywhere. It gives me the courage to continue my struggle for justice."*

Amnesty International noted with concern that Venezuelan women also reported discrimination based on nationality when seeking access to health services for general healthcare. Samantha, for example, said that "sometimes in health centres and hospitals they say, you are not Ecuadorian, and they have priority over you, Venezuelans."[124]

In 2021, the CEDAW Committee, after expressing concern about migrant and refugee women's limited access to healthcare in the country, had recommended that the Ecuadorian authorities adopt measures to guarantee adequate access to healthcare services for all these women, regardless of their migration status.[125]

On the other hand, it is important to highlight that medical certificates issued by health services have an important role in enabling criminal proceedings to move forward and the possibility of prosecuting cases. The Comprehensive Organic Criminal Code specifies that when the assault on the victim causes harm lasting less than three days this is a infraction, while if it has consequences requiring more than three days of sick leave, it is a crime.[126] Therefore, a medical certificate detailing precisely the severity of the injuries is essential for women's pursuit of justice and reparation.

However, Amnesty International received allegations that medical personnel in the public health system do not always record the physical harm caused accurately, to avoid additional burdens on their work such as going to testify before a judge, which they would not be able to take on, thus violating the right of women to access to justice.[127]

# 6.1.3. SHELTERS

The Comprehensive Organic Law to Prevent and Eradicate Violence against Women establishes that the governing body for public policies in justice and human rights must strengthen, expand coverage, guarantee resources and enhance specialization in the system of shelter and healthcare centres in order to respond to the needs of all subjects protected by this Law and for all types of violence.[128] In Ecuador, the Human Rights Secretariat is responsible for ensuring safe spaces where women can be taken when their lives are in danger.

---

[122] Civil society organizations at the national and local levels, such as HIAS and Akuanuna, among others, provide psychological care services for women survivors of gender-based violence, including Venezuelan refugee women.
[123] Josselyn, Venezuelan woman in Quito, interviewed on 19 September 2022.
[124] Samantha, Venezuelan woman in Machala, interviewed on 8 September 2022.
[125] CEDAW Committee, Concluding observations on the tenth periodic report of Ecuador, CEDAW/C/ECU/CO/10, 24 November 2021, paras 47 and 48.
[126] Attorney General's Office, "La violencia contra la mujer y la familia es sancionada como delito", 23 August 2015, www.fiscalia.gob.ec/la-violencia-contra-la-mujer-y-la-familia-es-sancionada-como-delito/ (Spanish only). See also Art. 159 of the Comprehensive Penal Code which provides for a penalty of deprivation of liberty of between seven and 30 days if the injuries cause incapacity of up to three days.
[127] Public official in Machala, interviewed on 9 September 2022.
[128] "fortalecer, ampliar la cobertura, garantizar los recursos y especializar al sistema de casas de acogida y centros de atención con el fin de dar atención a todos los sujetos protegidos por esta Ley y a todos los tipos de violencia", Law No. 175/2018. Comprehensive Organic Law to Prevent and Eradicate Violence against Women, Art. 59. ww.igualdad.gob.ec/wp-content/uploads/downloads/2018/05/ley_prevenir_y_erradicar_violencia_mujeres.pdf (Spanish only).

CLP_PC_022612

Under international standards, states must ensure that there is a functioning shelter for every 10,000 inhabitants that provides a safe emergency space, qualified counselling and assistance in seeking secure housing.[129] These spaces must be accessible and adequately staffed and funded to be able to reach victims proactively.[130] According to this standard, Ecuador should have at least 1,700 shelters nationwide. In 2021, the CEDAW Committee highlighted the limited availability of specialized state support services for victims, including shelters for victims of gender-based violence.[131]

The Ecuadorian Human Rights Secretariat has identified the existence of 12 shelters for women survivors of gender-based violence, four of which are currently funded by the central government.[132] There are also shelters that are run by Decentralized Autonomous Governments (Gobiernos Autónomos Descentralizados).



*Shelter in Quito, 29 August 2022 © Karen Toro | Amnesty International*

However, there is a lack of clarity regarding public policy on shelters. Since 2008, some shelters run by civil society have signed agreements with the state on their financing, but not always with the same entity.[133] Organizations agree that the lack of clarity in public policies has led to delays in the delivery of state financial support for shelters: "In the past almost 13 years, shelters and centres have had to cope with delays in state payments; the agreements have almost always been signed in March of each year. This means that the centres have to operate for three months without funds, relying on the trust of suppliers, asking partners to be patient and running around trying to raise funds for such essential things as paying for electricity, water and the internet and giving a balanced diet to the women and children who live there."[134]

As of April 2022, only five shelters were funded by the Human Rights Secretariat. In April 2022, a new agreement was signed that included only three of these shelters and a new one, which received their budget with a cut of around USD 24,000, representing 18.46% of their budget, leading to staff reductions.[135]

[129] UN Women, *Handbook for Legislation on Violence against Women*, p. 29
https://www.unwomen.org/sites/default/files/Headquarters/Attachments/Sections/Library/Publications/2012/12/UNW_Legislation-Handbook%20pdf.pdf
[130] Council of Europe, Council of Europe Convention on preventing and combating violence against women and domestic violence, Art. 23.
[131] Committee on the Elimination of Discrimination against Women (CEDAW Committee), Concluding observations on the tenth periodic report of Ecuador, CEDAW/C/ECU/CO/10, 24 November 2021, para. 21.b.
[132] Ecuador Secretariat of Human Rights, interview carried out on 5 October 2022.
[133] GK, "Casas de acogida de mujeres víctimas de violencia en el Ecuador, otra vez en peligro", 3 January 2022,
https://gk.city/2022/01/03/casa-acogida-mujeres-violencia-ecuador-peligro-cerrar/
[134] GK, "Casas de acogida de mujeres víctimas de violencia en el Ecuador, otra vez en peligro", 3 January 2022,
https://gk.city/2022/01/03/casa-acogida-mujeres-violencia-ecuador-peligro-cerrar/
[135] Wambra Medio Comunitario, "Menos fondos, menos recursos: la pomposa entrega de presupuesto para las casas de acogida", 16 May 2022, www.wambra.ec/menos-fondos-menos-recursos-la-pomposa-entrega-de-presupuesto-para-las-casas-de-acogida/

Two shelters that previously received public funding did not take part in the call for applications because they did not agree with the reduction of the budget for shelters or with the creation of the procedural rules for selection, the signing of agreements and the operation of comprehensive care centres and shelters without the participation of women's organizations.[136]

This led to the closure of shelters in places critical for the Venezuelan population, in particular in the border areas where they enter Ecuador.[137] International and civil society organizations which Amnesty International met in the course of this research reiterated their concerns:

> **"This year there was a very serious crisis, to the point that for example, the Federation of Women of Sucumbíos, in Lago Agrio, closed the shelter..., and we were left unable to respond on the northern border. It is very worrying, especially in the Amazon region because the region is unique, some of these localities have the highest rates of gender-based violence against women and these services are very necessary. They closed these services, leaving not only the national population without support, but also people in human mobility. We had to look for temporary alternative support [such as referring cases to other provinces]. But these stopgaps can't be maintained for a whole year."[138]**

> Representative of an international organization

There are shelters run by government entities, both at the national and local levels. At the local level, GDAs share responsibility for ensuring the availability of shelters for women survivors of violence.[139] In Quito, centres such as La Casa de la Mujer and Casa del Hermano (for families), which receive funds from the Municipality of Quito Patronato San José, also face significant financial challenges.

> **"There are designated funds for the shelters, but the processes are too bureaucratic and delay the funds from arriving in a timely manner. It is common for processes to stagnate. This has had a real impact on care in the shelter. For example, we do not have personal toiletries [hygiene kits and soap], and we have had to ask people arriving at the shelter to get them. The last purchase of toiletries was in 2020 [two years earlier] and 110 people a day must be catered for."[140]**

> Staff member at the shelter.

---

See also, Primicias, "Casas de acogida hacen cuentas para operar con menos recursos públicos", 27 April 2022, www.primicias.ec/noticias/sociedad/casas-acogida-mujeres-reduccion-presupuesto/

[136] Wambra Medio Comunitario, "Menos fondos, menos recursos: la pomposa entrega de presupuesto para las casas de acogida", 16 May 2022, www.wambra.ec/menos-fondos-menos-recursos-la-pomposa-entrega-de-presupuesto-para-las-casas-de-acogida/

[137] Staff of a civil society organization in Machala, interviewed on 8 September 2022. See also, GK, "Casas de acogida de mujeres víctimas de violencia en el Ecuador, otra vez en peligro", 3 January 2022, https://gk.city/2022/01/03/casa-acogida-mujeres-violencia-ecuador-peligro-cerrar/

[138] Representative of an international organization interviewed on 13 July 2022.

[139] The Human Rights Secretariat, in response to a request for information by the GK media, stated: "en relación al financiamiento de Casas De Acogida Y Centros De Atención Integral establece: Los Gobiernos Autónomos Descentralizados deben garantizar a las mujeres víctimas de violencia de género, los servicios integrales de casas de acogida con personal especializado, tanto en los cantones como en las provincias" [in relation to the financing of Shelters and Comprehensive Care Centres: Decentralized Autonomous Governments must guarantee women victims of gender-based violence the comprehensive services of shelters with specialized personnel, both in the cantons and in the provinces]. See also, GK, "Casas de acogida de mujeres víctimas de violencia en el Ecuador, otra vez en peligro", 3 January 2022, https://gk.city/2022/01/03/casa-acogida-mujeres-violencia-ecuador-peligro-cerrar/

[140] Staff member at a shelter in Quito, interviewed on 8 August 2022.



*Shelter in Quito, "We want us free", 29 August 2022 © Karen Toro | Amnesty International*

Many women are left out of these support systems. Amnesty International received allegations that the available shelters do not have specialized services for women with special physical or mental needs.[141] In the case of lesbian, bisexual and transgender (LBT) women, several sources pointed out that the options for finding a safe place are considerably more limited, due to discrimination against them in many shelters. According to the information received, not all spaces accept LBT women, despite the fact that discrimination based on sex/gender or sexual orientation is prohibited in Ecuador:

> **"In the case of trans women, the justification is that for them they are not women, they are men and they cannot be accepted in the shelter. [In the case of] people in a situation of human mobility, a trans person who has not been able to change their name on their ID card because in order to do that in Ecuador there have to be countless documents coming from Venezuela, then, the mere presence of the identity card or passport that this person is able to present results in them being rejected at the shelter even though they are a trans person, a woman. In the case of lesbian women, this absurd idea persists that a lesbian woman is going to contaminate non-lesbian women in the shelter. It is very rare for shelters to engage in efforts aimed at integrating lesbian women."[142]**

Civil society organization staff member

---

[141] Staff of civil society organization in Quito, interviewed on 8 August 2022.
[142] Staff of civil society organization in Quito interviewed on 12 September 2022.

> **"So how do these women feel? Rejected and without any safe place to go."[143]**
>
> Representative of an international organization

As Amnesty International has pointed out, the lack of shelters is particularly critical for Venezuelan women survivors of gender-based violence. In precarious economic situations and without family and social support networks, these temporary shelters are, for the vast majority of them, their only option of finding a place of safety.[144]

# 6.2. SHORTCOMINGS IN THE JUSTICE SYSTEM

> **"What does it mean [for women in general] to have to deal with the Ecuadorian justice system? It means having to be a victim again, several times. It means you have to have money in your pocket, in order to access justice. Services are supposed to be free, but this is not the case because justice has totally broken down. So, in order to have minimal access, you have to pay a lawyer and you even have to pay for the authorities to do their job."[145]**
>
> Civil society organization staff member

## 6.2.1. FILING A COMPLAINT

The law in force in Ecuador allows foreign nationals to file a complaint with the Attorney General's Office without any restrictions, including people who do not have an identity document. However, Amnesty International found that Venezuelan women continue to face difficulties when filing a complaint. As is the case with other institutions, these difficulties are related to the persistence of stereotypes regarding Venezuelan women, lack of knowledge of the applicable regulations and the limited resources at the institution's disposal.

Staff at a shelter in Quito reported recommending a Venezuelan woman survivor of physical violence file a complaint with the Attorney General's Office. However, they said that a frontline official "told her that she must have liked it, and when the woman went back again, they told her 'move house, move house, what other option is there.' When we filed a complaint, they said 'there must have been some misunderstanding'. Now, before I refer cases, I contact a lawyer friend. This is how we work a lot here; the cases are handled by my friends because I refer them."[146] Civil society organizations reported the constant need to accompany women when submitting a complaint or to have direct referral mechanisms so that they are adequately addressed.[147]

Amnesty International has received statements from Venezuelan women who, in addition to identifying their abuser, have been asked for detailed information on the aggressor as a precondition for accepting the complaint, despite the fact that it is up to the authorities in charge of the investigation to establish the whereabouts of any person who commits a crime or offence. "When I filed the first complaint, I didn't know

---

[143] Representative of an international organization interviewed on 13 July 2022.
[144] See Amnesty International, *Unprotected: Gender-based violence against Venezuelan refugee women in Colombia and Peru*, 12 July 2022, https://www.amnesty.org/en/documents/amr01/5675/2022/en/ ; Amnesty International, "Peru is failing in its care of Venezuelan women who survive gender-based violence", 25 November 2021, https://www.amnesty.org/en/latest/news/2021/11/peru-failing-care-venezuelan-women-survive-gender-based-violence/
[145] Staff of civil society organization in Quito interviewed on 12 September 2022.
[146] Staff member at a shelter in Quito, interviewed on 8 August 2022.
[147] Staff of civil society organization in Quito, interviewed on 9 August 2022.

where my aggressor lived and that's why they didn't accept my complaint. I didn't know where he was, but I did know who he was and they didn't accept my complaint because I didn't have that information."[148]

In the case of refugee women, when crimes occur in border areas or on migration routes, the situation is much more complex because, applying the principle of territoriality of criminal law,[149] the Attorney General's Office does not receive complaints for acts that occurred outside Ecuadorian territory. One organization interviewed indicated that the Attorney General's Office could receive the complaint and send it directly to the consulate of the person's country of origin. However, this is not standard practice, leaving migrant women in a situation of lack of protection.[150]

This is particularly relevant in the case of women on the move who wish to exercise their right to abortion in cases of rape. Ecuadorian law requires that a complaint be filed with the relevant authorities as a precondition for access to abortion services in such cases.[151] International organizations have pointed out that the requirement to report the crime in order to access abortion is an unnecessary barrier that puts women's rights at risk.[152]

## 6.2.2. SLOW, REVICTIMIZING AND COSTLY JUDICIAL PROCESSES

Access to justice for women survivors of gender-based violence is severely constrained by the fact that sufficient resources are not allocated to institutions responsible for the administration of justice.

According to the information received, at the national level, there is a shortfall of 500 prosecutors at the Office of the Attorney General to pursue investigations and prosecutions in general, the Public Defender's Office does not have enough public attorneys to represent victims and the Office of the Ombudsperson does not have the capacity to monitor compliance with due process.[153]

These shortfalls are even more pronounced in border areas, far from the capital. On several occasions, the CEDAW Committee recommended that the Ecuadorian authorities take measures to strengthen the enforcement of legislation and policies aimed at eliminating discrimination against women, giving priority to the allocation of human and financial resources for their implementation in rural and remote areas and autonomous territories.[154]

However, Amnesty International found that in Huaquillas, a critical location for Venezuelan women refugees in Ecuador, the Public Defender's Office has only two officials, one dealing with criminal cases, assigned to defend the accused, and one dealing with social issues, who does not cover cases of gender-based violence.[155] Under these conditions, women survivors are forced to seek the support of private law firms or civil society organizations in order to seek justice.

In addition, specialized personnel from the different entities are located solely in Machala, the provincial capital, 72 km from Huaquillas. In the case of the Attorney General's Office, this means that women also have to move locality multiple times for each procedure, such as the psychological and social evaluation necessary for the formulation of charges, using their own resources to pay for transport and, at the same time, losing several day's work to carry out the necessary procedures.[156] The same distance also applies to police protection through the Victim and Witness Protection Programme.[157] The Ombudsperson's Office is

---

[148] Women's Focus Group in Quito, 4 August 2022.
[149] See article 14.2.a) of the Penal Code, https://tbinternet.ohchr.org/Treaties/CEDAW/Shared%20Documents/ECU/INT_CEDAW_ARL_ECU_18950_S.pdf (Spanish only).
[150] Staff of civil society organization in Quito, interviewed on 5 August 2022.
[151] Law on the Voluntary Interruption of Pregnancy in Cases of Rape, May 2022, Art. 19. www.derechoecuador.com/ley-regula-interrupcion-voluntaria-de-embarazo-en-caso-de-violacion/  (Spanish only).
[152] World Health Organization, *Abortion Care Guideline*, "Executive summary, Grounds-based approaches", 2022, p. xxv, https://www.who.int/publications/i/item/9789240039483  See also Human Rights Committee, General Comment 36, CCPR/C/GC/3636, 3 September 2019, https://tbinternet.ohchr.org/_layouts/15/treatybodyexternal/Download.aspx?symbolno=CCPR/C/GC/36&Lang=en
[153] Public official at the national level, interviewed on 12 September 2022. Public official in Machala, interviewed on 9 September 2022.
[154] CEDAW Committee, Concluding observations on the tenth periodic report of Ecuador, CEDAW/C/ECU/CO/10, 24 November 2021, para. 14a.
[155] Public official in Machala, interviewed on 9 September 2022.
[156] Public official in Huaquillas, interviewed on 7 September 2022.
[157] Public official in Huaquillas, interviewed on 7 September 2022.

not involved in the monitoring due process, because of the lack of personnel, since the person assigned to Huaquillas comes from Machala once a week and handles cases remotely.[158]

Although the law provides for the free justice services, in practice survivors of violence are obliged to bear a number of costs throughout the judicial process in order for proceedings to continue. Often they have to pay, with their own resources, from the photocopies necessary to create and consult the case file, to the transport for public officials to carry out the necessary procedures: "If the social worker wants to go to your house to do an inspection to see the living environment in which you experience violence, you have to pay for the taxi or go to collect them and bring them to your house directly using private transport because the institutions do not have the resources."[159]

In addition, the information gathered shows that going through the justice system is revictimizing for survivors of gender-based violence, national or foreign, because they are forced to testify on multiple occasions, to different institutions and officials, and often face questions from officials that reflect sexist and xenophobic stereotypes.[160]

The interviews also show that psychological care for survivors of violence and their families from the Judicial Council, as established in article 34 of the Comprehensive Organic Law to Prevent and Eradicate Violence against Women, is also not efficient in practice.[161] Women are referred to a collapsed health system, where they cannot get appointments in a timely manner, despite international recognition of the need for specialized and multidisciplinary support for women survivors of gender-based violence.[162] This gap, like many others, is filled by civil society and international cooperation.[163]

This series of justice system shortcomings and failures in cases of gender-based violence discourages survivors and results in many abandoning the process.[164] For Venezuelan women, in a precarious socio-economic situation and without support networks, these shortcomings and failures block any possibility of them obtaining justice.

[158] Public official in Huaquillas, interviewed on 7 September 2022.
[159] Staff of civil society organization in Quito, interviewed on 5 August 2022.
[160] Josselyn, Venezuelan woman in Quito, interviewed on 19 September 2022. Staff of civil society organization in Quito, interviewed on 5 August 2022.
[161] Law No. 175/2018. Comprehensive Organic Law to Prevent and Eradicate Violence against Women, Art. 9 and 11, ww.igualdad.gob.ec/wp-content/uploads/downloads/2018/05/ley_prevenir_y_erradicar_violencia_mujeres.pdf (Spanish only).
[162] Inter-American Commission on Human Rights, Access to Justice for Women Victims of Violence in the Americas, 20 January 2007, https://www.cidh.oas.org/women/access07/chap2.htm  See also Pan American Health Organization, World Report on Violence and Health, Chapter 6, Sexual violence, 2003, https://www.paho.org/en/documents/world-report-violence-and-health-paho-2003-1 .
[163] Staff of civil society organization in Quito, interviewed on 9 August 2022. Women's Focus Group in Quito, 4 August 2022. Women's Focus Group 1 in Machala, 8 September 2022.
[164] Public official in Huaquillas, interviewed on 7 September 2022.

# 7. CONCLUSIONS AND RECOMMENDATIONS

It was estimated that some 502,214 of the 7.1 million people who had been forced to flee Venezuela because of the grave human rights crisis and the complex humanitarian emergency there were in Ecuador, as of September 2022. Among them, are thousands of women who face multiple forms of gender-based violence in different aspects and spaces of their daily lives.

The information collected by Amnesty International for this report shows that Ecuadorian authorities are failing to guarantee the rights of Venezuelan women survivors of gender-based violence by not providing the appropriate conditions for them to access protection mechanisms and justice. In addition to the lack of information about the mechanisms and institutions whose role is dealing with cases of gender-based violence in the country, women are also afraid of being expelled or punished because of their irregular migration status if they seek protection. Amnesty International believes that the difficulties faced by Venezuelans in accessing regularization and procedures to determine refugee status, as described in this report, exacerbate the lack of protection experienced by women survivors of gender-based violence.

There are also serious shortcomings in the frontline services and justice system that should enable cases of gender-based violence to be identified and survivors supported. Amnesty International notes with concern the persistence of sexist and xenophobic prejudices and stereotypes, which not only limit Venezuelan women's access to protection services and justice, but also constitute further forms of violence against them. In addition, Amnesty International found that the health system and shelters in the country are failing to respond effectively to the needs of women survivors of gender-based violence.

The various obstacles to accessing appropriate care, protection mechanisms and effective justice services faced by Venezuelan women survivors of gender-based violence breach the state's obligations to respect, protect and prevent gender-based violence against women, including Venezuelan women, without discrimination and to guarantee their right to live a life free from violence. In response, Amnesty International makes the following recommendations to the Ecuadorian authorities.

**To all state institutions dealing with Venezuelan refugee women:**

- Strengthen and expand the dissemination of information on the rights of people on the move in Ecuador, with a gender perspective, as well as information for women on care pathways for survivors of gender-based violence, with a focus on people on the move, throughout the country, paying particular attention to border areas, far from the capital. This information must be accompanied by strategies and messages aimed at addressing and avoiding the fear of approaching institutions to initiate these procedures because of the risk of detention and deportation to Venezuela.

- Ensure that information dissemination strategies are consulted in advance with women, including refugee and migrant women, in order to reach in particular those who are most at risk and excluded.

- Ensure that all institutions that support survivors of gender-based violence have effective protocols for dealing with cases of gender-based violence that address the particular needs of refugee and migrant women survivors of gender-based violence, incorporating intersectionality and the duty of non-discrimination.

- Implement, or strengthen, training programmes for public officials – particularly those working in the police, prosecutors' offices and migration and health services – on the rights of refugees and migrants, including access to international protection and other forms of migration regularization, from a gender perspective.

- Provide appropriate, systematic, mandatory, initial and ongoing training on the prevention and detection of gender-based violence, gender equality and intersectional discrimination for all staff responsible for responding to the needs of survivors of gender-based violence, such as the police, prosecutors and migration and health personnel. In addition to raising awareness about women's rights, including the rights of transgender women, these programmes should be aimed at actively challenging harmful gender stereotypes and myths about gender-based violence among officials and should address, from a perspective of intersectionality and the obligation of non-discrimination, the particular needs of refugee and migrant women survivors of gender-based violence.

- Ensure that institutions responsible for providing care and support in cases of gender-based violence have sufficient staff and financial resources, at the national and local levels, to implement effective protection measures for women survivors of gender-based violence, and are available and accessible to women, regardless of their migration status.

- Address the underlying causes, structural inequalities and stereotypes about gender, nationality and migration status that perpetuate violence against Venezuelan women.

**To the Ministry of Foreign Affairs and Human Mobility:**

- Ensure effective access to procedures to determine refugee status under the Convention Relating to the Status of Refugees and the Cartagena Declaration for all those in need of international protection.

- Create and implement protocols to meet the needs of survivors of gender-based violence that incorporate good practices developed in the country in the following areas: coordination with other state institutions for case referral, prioritization of cases in situations of risk, separation of the family unit in the ProGres database of cases of domestic violence and non-revictimization.

- Continue to provide ongoing training for Directorate for International Protection officials on gender-based violence, the situation in the country of origin and the application of existing regulations, in compliance with international refugee law and international human rights law.

- Ensure that all Venezuelans are included in alternative regularization processes such as the VIRTE visa and consider extending this visa to all those who entered the country irregularly or after 26 August 2019.

**To the Human Rights Secretariat:**

- Urgently adopt measures to guarantee effective access for all survivors of gender-based violence who require it to shelters with sufficient capacity, in accordance with international standards.

- Develop clear guidelines for adequate funding of shelters in the country, in order to ensure appropriate care and support for women survivors of gender-based violence.

**To the National Police:**

- Ensure that all departments involved in addressing gender-based violence have sufficient staff and financial resources, at the national and local levels, including the Department on Domestic Violence (Departamento de Violencia Intrafamiliar, DEVIF), so that it can fulfil its functions.

- Develop protocols for emergency responses to cases of gender-based violence for personnel responding to emergency calls (911) and Community Police Units, according to human rights standards and with a focus on gender and people on the move. These should include issues such as not engaging in mediation in cases of gender-based violence, psychological first aid and efficient coordination with other state entities, such as the Public Health Ministry, the Ministry for Economic and Social Inclusion and the Attorney General's Office.

**To the Public Health Ministry:**

- Adopt measures to ensure comprehensive healthcare for women survivors of gender-based violence, regardless of their migration status, including timely psychological assistance services.

- Ensure that all institutions in the health system have sufficient staff and financial resources to carry out their functions. In particular, ensure that health personnel issue accurate medical certificates that adequately reflect the violence perpetrated against women survivors of gender-based violence.

- Implement, in accordance with current legislation, initial reception wards in all hospitals and Type B health centres in Ecuador that have adequate staff and resources to respond to emergency cases from the perspectives of forensic medicine, mental health and social work.

- Promote legislative reform aimed at eliminating unnecessary requirements, such as the lodging of official complaints, that restrict the right to abortion in cases of rape for women, in particular Venezuelan women who have experienced sexual violence outside Ecuadorian territory and cannot lodge complaints about events that occurred outside Ecuador.

**To the system for the administration of justice:**

- Conduct thorough, impartial and independent investigations into all acts of violence against women and ensure that investigations have a gender perspective.

- Ensure that all institutions in the justice system, including the Attorney General's Office, have sufficient staff and financial resources to meet their obligations to conduct prompt, independent and effective investigations and thus guarantee the right of survivors of gender-based violence to justice

# AMNESTY INTERNATIONAL IS A GLOBAL MOVEMENT FOR HUMAN RIGHTS. WHEN INJUSTIE HAPPENS TO ONE PERSON, IT MATTERS TO US ALL.

## CONTÁCTANOS

 info@amnesty.org

 +44 (0)20 7413 5500

## ÚNETE A LA CONVERSACIÓN

 www.facebook.com/AmnistiaAmericas

 @AmnistiaOnline

CLP_PC_022622

# UNPROTECTED IN ECUADOR

## VENEZUELAN REFUGEE WOMEN SURVIVORS OF GENDER-BASED VIOLENCE

Ecuador is the country with the third largest Venezuelan refugee population on the continent. Women, who make up about half of this population, face multiple forms of violence in different spaces, private and public. This report documents how the Ecuadorian state is failing to guarantee the rights of Venezuelan women survivors of gender-based violence who are refugees in the country by not providing them with information or effective access to protection and justice mechanisms.

There is concern at the prevalence of gender stereotypes and discrimination and xenophobia against Venezuelan women among front-line personnel dealing with gender-based violence and justice, which are further violations of women's rights, as well as other shortcomings linked to the lack of resources allocated and shelters, which have a differentiated impact on the situation of these Venezuelan refugee women

Amnesty International also stresses the need to guarantee effective access to refugee determination procedures and alternative forms of regularization for Venezuelans because the lack of regular migration status exacerbates the lack of protection experienced by Venezuelan women survivors of gender-based violence, who are reluctant to approach the protection and justice services because they fear being expelled from the country.

INDEX: AMR 28/6137/2022
NOVEMBER 2022

**amnesty.org**

AMNESTY INTERNATIONAL

CLP_PC_022623

# " THERE IS A TARGET ON US "

## The Impact of Anti-Black Racism on African Migrants at Mexico's Southern Border





CLP_PC_022632

"There is a Target on Us" –   The Impact of Anti-Black Racism on African Migrants at Mexico's Southern Border

© 2021, Black Alliance for Just Immigration
All rights reserved.

This Report is published in its original version on the websites of the Black Alliance for Just Immigration and Instituto para las Mujeres en la Migración, and may be published elsewhere only with permission. Please contact info@baji.org for more information.

**ISBN 978-1-7923-4943-0**

Black Alliance for Just Immigration
1360 Fulton St Bldg. B Suite 427
Brooklyn, NY 11216
http://baji.org/

This Report should be cited as:
S. Priya Morley et al., "There is a Target on Us" – The Impact of Mexico's Anti-Black Racism on African Migrants at Mexico's Southern Border (2021).

CLP_PC_022633

# "There is a Target on Us"
## The Impact of Anti-Black Racism on African Migrants at Mexico's Southern Border

CLP_PC_022634

## ABOUT THE AUTHORS AND ACKNOWLEDGMENTS

**PRIMARY INVESTIGATOR & AUTHOR**
S. Priya Morley, Arthur Helton Global Human Rights Fellow, NYU School of Law

**CO-INVESTIGATOR**
Molly Goss, Transnational Family Case Manager, IMUMI

**CONTRIBUTING AUTHORS & RESEARCHERS**
Yusuf Abdulkareem, Legal Intern, IMUMI
Tsion Gurmu, Legal Director, BAJI
Katherine La Puente, Volunteer, IMUMI

**El Instituto para las Mujeres en la Migración, A.C.** ("Institute for Women in Migration" or "IMUMI") is a Mexican NGO that advocates for women migrants and their families within the region of Mexico, the U.S., and Central America. IMUMI addresses issues important to migrant women through legal strategies, research, communication, and advocacy. IMUMI collaborates with other civil society organizations, academic institutions, and governments to advocate for gender-specific migration and human rights policies.

**The Black Alliance for Just Immigration** ("BAJI") is a racial justice and migrant rights organization which engages in legal representation, advocacy, community organizing, education, and cross-cultural alliance-building in order to end the racism, criminalization, and economic disenfranchisement of African American and Black immigrant communities. BAJI was founded in Oakland, CA by veteran civil rights activists and clergy who were concerned about a wave of unjust immigration enforcement laws. BAJI subsequently expanded its mission to include advocacy on behalf of all Black immigrants and refugees, and today has offices and/or staff members in New York, NY; Los Angeles, CA; Oakland, CA; Atlanta, GA; Miami, FL; Washington, DC; Minneapolis, MN; and Houston, TX.

IMUMI is grateful for the *pro bono* legal research provided by Moreen Barzic, Gina Girak, and Anna Pregartner of the DeForest Abogados law firm.

The Authors appreciate the advice and assistance provided by Yamel Athie Guerra, Dianela Angulo Vázquez, Lorena Cano Padilla, Nora Caro, Marcela Daumas Posada, Elizabeth Fulton, Helen Kerwin, Gretchen Kuhner, Pamela Maas Pérez, Valeria Scalisse García, Berenice Valdez Rivera, and Diana Villamar Ramírez.

Cite checking support was provided by: Victor Adame.

Formatting and publication by: Eva Islas Ramos and Miriam González Sánchez.

IMUMI's design and publication work on this Report would not have been possible without the generous support of Open Society Foundations, Heinrich Böll Foundation and Foundation for a Just Society.

CLP_PC_022635

# TABLE OF CONTENTS

**FOREWORD**................................................................................................................**9**

**CHAPTER ONE: INTRODUCTION**.......................................................................**10**

**CHAPTER TWO: OBJECTIVES OF THE REPORT AND METHODOLOGY**..........**12**

Mujeres Negras Migrantes en México.................................................................**12**

BAJI's Interviews in 2019.....................................................................................**12**

Additional Interviews from March to August 2020.............................................**13**

Objectives of the Report and Methodology........................................................**13**

**CHAPTER THREE: RACIAL DISCRIMINATION IN MEXICO AND ITS HISTORY**...........**15**

A. Historical roots of racism in mexico................................................................**15**

B. Afro-mexicans...................................................................................................**16**

C. Widespread anti-black racism in mexico.........................................................**16**

D. Discrimination law in mexico...........................................................................**18**

**CHAPTER FOUR: AFRICAN MIGRATION TO AND THROUGH MEXICO**.............**20**

A. Recent african migration to the americas.......................................................**20**

B. Causes of african migration to and through mexico........................................**21**

Push Factors From Countries of Origin.............................................................**21**

*Cameroon*.......................................................................................**23**

*The Democratic Republic of Congo ("DRC")*.................................**24**

*Eritrea*.............................................................................................**25**

*Ghana*..............................................................................................**25**

*Somalia*............................................................................................**26**

Impact of more restrictive migration policies in Europe..................................**27**

C. Migration route.................................................................................................**28**

Migration to and through South and Central America......................................**29**

CLP_PC_022636

Migration directly to Mexico........................................................................................**30**

Intended destination(s)..............................................................................................**30**

**CHAPTER FIVE: AFRICAN MIGRANTS IN THE MEXICAN IMMIGRATION SYSTEM**......................**32**

A. Highlights of mexican immigration law.....................................................................**32**

B. Mexico's restrictive immigration enforcement since 2019......................................**34**

C. Restrictive immigration policy in the united states.................................................**35**

**CHAPTER SIX: AFRICAN MIGRANTS STRANDED IN TAPACHULA FROM MID-2019**......................**36**

A. Organizing by african migrants in tapachula............................................................**36**

B. Jean's migration journey............................................................................................**38**

C. Anti-black racism in tapachula..................................................................................**40**

Racism in Detention Facilities.................................................................................**40**

Police Violence.........................................................................................................**41**

Language Barriers.....................................................................................................**41**

Racism in Public Spaces..........................................................................................**42**

Employment Discrimination.....................................................................................**42**

Housing Discrimination............................................................................................**43**

Educational Barriers.................................................................................................**43**

D. Gender-based discrimination in tapachula...............................................................**44**

**CHAPTER SEVEN: CURRENT SITUATION IN MEXICO**...........................................................**45**

**CHAPTER EIGHT: KEY TAKEAWAYS AND RECOMMENDATIONS**..........................................**46**

**APPENDIX ONE: STATISTICS OF AFRICAN MIGRATION IN MEXICO**..............................................**51**

**ENDNOTES**..............................................................................................................................**89**

CLP_PC_022637

## LIST OF ENTITIES INTERVIEWED FOR THE STUDY

*La Asamblea de Migrantes Africanos y Africanas en Tapachula* ("Assembly of African Migrants" or the "Assembly"), Tapachula, Mexico

*Centro de Derechos Humanos Fray Matías de Córdova A.C.* ("Fray Matías Human Rights Center" or "*Fray Matías*"), Tapachula, Mexico.

*Programa Casa Refugiados* ("*Casa Refugiados*" or "PCR"), Mexico City, Mexico

*Servicio Jesuita a Migrantes* ("Jesuit Refugee Services" or "JRS"), Tapachula, Mexico

*Sin Fronteras IAP* ("*Sin Fronteras*"), Mexico City, Mexico

## TABLE OF ACRONYMS

**BAJI**. Black Alliance for Just Immigration

**CEDAW**. Committee on the Elimination of Discrimination Against Women

**CERD**. Committee on the Elimination of Racial Discrimination

**CMW**. Committee on the Protection of the Rights of All Migrant Workers and Members of Their Families

**COMAR**. Comisión Mexicana de Ayuda a Refugiados

**CONAPRED**. Consejo Nacional Para Prevenir La Discriminación

**CNDH.** Comisión Nacional de los Derechos Humanos

**EU**. European Union

**HRW**. Human Rights Watch

**IMUMI**. Instituto para las Mujeres en la Migración

**INEGI**. Instituto Nacional de Estadística y Geografía

**INM**. Instituto Nacional de Migración

**IRC**. International Rescue Committee

**LGBTQIA+**. Lesbian, gay, bisexual, transgender, queer/questioning, intersex, asexual+

**MSF**. Médecins Sans Frontières

**SGBV**. Sexual and Gender-Based Violence.

**TRT**. Tarjeta de Residente Temporal

**TRP**. Tarjeta de Residente Permanente

**TVRH**. Tarjetas de Visitante Por Razones Humanitarias

**UNSOM**. United Nations Assistance Mission in Somalia

**UNHCR**. United Nations High Commissioner for Refugees

**UN**. United Nations

**UPR**. Universal Periodic Review

CLP_PC_022638

## DEFINITIONS

The Authors use the umbrella term "migrant", defined as "a person who moves away from his or her place of usual residence, whether within a country or across an international border, temporarily or permanently, and for a variety of reasons."[1]

The Authors use the term "refugee" to describe someone who, it has been recognized, "has been forced to flee his or her country because of persecution, war or violence." "Asylum seeker" describes someone who is applying for refugee status but has not yet been determined to be a refugee.[2]

The Authors use the term "Black" to describe all peoples of African descent who are in Mexico as migrants. When referring to Black Mexicans, the Authors use the term "Afro-Mexican" but recognize that individuals and communities in Mexico may identify otherwise, for example as "Afro-descendant" or "Black."[3]

The Authors use the term "sexual and gender-based violence" or "SGBV" to describe "any act that is perpetrated against a person's will and is based on gender norms and unequal power relationships. It encompasses threats of violence and coercion. It can be physical, emotional, psychological, or sexual in nature, and can take the form of a denial of resources or access to services."[4]

CLP_PC_022639

# The Impact of Anti-Black Racism on African Migrants at Mexico's Southern Border:

*"There is a Target on Us" – The Impact of Anti-Black Racism on African Migrants at Mexico's Southern Border* comes at an important moment and centers the stories of people of African descent migrating through Mexico.  As this Report goes to press, the world grapples with the intersections of draconian family separation and detention policies, dramatic disregard of refugee and migration rights, a stunning lack of compassion for people fleeing violence and conflict, and a global pandemic that has shown dramatic racial disparities and devastated Black and Brown communities internationally.

This Report offers specific stories that highlight resilience, even in the face of racial discrimination and violence. This includes the Assembly of African Migrants, a source of safety and mutual support for people navigating the life-threatening risks in migration. In addition, this Report offers context for the journeys that test local and national commitments to human rights and international treaty obligations and which, in many cases, are found quite wanting. This Report also offers a fresh and timely analysis of how intersecting policies, procedures, and practices have increasingly eviscerated the rights to freedom of movement and migration rights, including the meaningful right to seek asylum and sovereign obligations under the Refugee Convention and associated domestic law in relevant countries.

As importantly, this work highlights how racial bias creates widespread discrimination, racial violence, and diminished access to the resources that do exist for migrants, refugees, and asylum-seekers.  As the authors indicate herein, this is particularly true for people of African descent, who face violence and disparagement from the state, with a particular focus here on the United States and Mexico, and non-state actors fail to have the ability to turn to the relevant state authorities for recourse from racial violence from non-state actors.

**Dominique Day**
Chair, UN Working Group of Experts on People of African Descent

CLP_PC_022640

# CHAPTER ONE:
## INTRODUCTION

"We passed through rivers and great hardship to arrive here
 and look at how they welcome us – with hate and racism."
-Adamo, a Cameroonian migrant in Tapachula

Each year, Africans continue to flee their countries of origin in order to find safety and survival. As immigration to Europe has become more difficult, particularly since the continent began externalizing its immigration policy in 2015, many Africans have been forced to take an alternative route – flying to South America and making the harrowing journey through jungles and rivers to reach Mexico and travel onward to the United States or Canada. This has led to an increase in African migration into Mexico, including from Cameroon, the Democratic Republic of the Congo, Eritrea, Ghana, and Somalia, over the same period.

Since 2019, the current U.S. and Mexican Administrations have been working together to externalize U.S. immigration enforcement into Mexican territory.[5] This resulted in thousands of African migrants being stranded in the southern Mexican city of Tapachula from mid-2019 on. It was difficult or impossible for Mexico to deport them back to their countries of origin, yet immigration officials would not permit them to travel freely to the Mexico-U.S. border. In Tapachula, African migrants congregated around the main immigration detention center, *Siglo XXI*. They organized and formed the Assembly of African Migrants, outlined their demands in a written statement, and protested their treatment. This movement shed light on the particular experiences of African, Caribbean, and other Black migrants in Mexico. The Assembly raised the issue of the anti-Black discrimination that migrants face in their interactions with Mexican immigration officials, other government officials, and citizens, as well as when looking for work or accessing services like education or health care. In the course of its work providing immigration and other support to Black migrants, BAJI, a signatory to the Assembly's written statement, travelled to Tapachula ten times in 2019 and interviewed 20 migrants about their experiences of anti-Black discrimination in Mexico.

In this Report, the Authors situate those interviews, and African migration to Mexico in general, within a broader discourse of anti-Black racism in the country. The Report begins with an overview of how discrimination on the bases of race and skin color impacts Afro-Mexicans, Black migrants, and other peoples of African descent. Next, the Report describes the recent migration of Africans to and through Mexico, including the causes of migration out of Africa and through Latin America. The Report then highlights how African migration through Mexico has been impeded by the current Mexican Administration's restrictive immigration enforcement. Within this context, the Report outlines the findings from BAJI's interviews and additional interviews that the Authors conducted with a leader of the Assembly as well as service providers, including about the intersectional discrimination faced by African women in Mexico. Finally, the Authors recommend some steps to address the impact of Mexico's anti-Black racism on African migrants, as well as other Black migrants, at the country's southern border.

CLP_PC_022641

African migrants rarely form part of the narrative of migration through Latin America, or in Mexican society in general. This Report is a partial response to that failure of public discourse and policy analysis, and points to the need to address that void in a systemic way. The current context in Mexico – like the current global anti-Black racism movement – demands and creates an opening for this work.

CLP_PC_022642

# CHAPTER TWO:
# OBJECTIVES OF THE REPORT AND METHODOLOGY

### Mujeres Negras Migrantes en México

This Report forms part of *Mujeres Negras Migrantes en México* ("Black Migrant Women in Mexico"), a research project on the experiences of Black migrant women entering, transiting through, and/or settling in Mexico. This project was initiated in 2019 and is supervised by S. Priya Morley (NYU School of Law) and Molly Goss (IMUMI). From fall 2019 to early 2020, S. Priya Morley conducted preliminary desk research and outreach with experts and stakeholders, including: UN agencies, international organizations, academia, Mexican and U.S. civil society organizations, and members of the Afro-Mexican community.

As a result of these consultations, the project's initial focus was on Black African and Caribbean migrant women that had entered Mexico via its southern border. For this project, S. Priya Morley developed a survey in order to interview women in Tapachula and Mexico City in spring 2020. With partner organizations, IMUMI conducted interviews with Haitian migrant women in Tapachula in March 2020 and published a report on the findings: *A Journey of Hope: Haitian Women's Migration to Tapachula, Mexico*. As part of this project, IMUMI had planned to conduct further interviews with African and Caribbean migrant women in Tapachula and Mexico City in spring 2020, but was unable to proceed due to the COVID-19 pandemic.

Instead, IMUMI partnered with BAJI in order to situate their previously-collected interview data, outlined below, within the framework of anti-Black discrimination in Mexico.

### BAJI's Interviews in 2019

While working with Black asylum seekers at the Mexico-U.S. border in 2019, BAJI learned about more than 3,000 African and Caribbean migrants being forcibly held in Tapachula. BAJI organized a delegation to southern Mexico to bear witness, engage in advocacy efforts, and document the human rights abuses experienced by Black migrants traveling through Mexico. During the course of ten visits in 2019, BAJI interviewed 20 Black migrants about their experiences with, and perspectives on, anti-Black racism in Mexico. BAJI also interviewed staff at human rights organizations that work closely with Black migrants in Tapachula, including *Centro de Derechos Humanos Fray Matías de Córdova A.C.* ("Fray Matías Human Rights Center" or "*Fray Matías*"). *Fray Matías* is a non-governmental, non-profit organization with more than 15 years of experience and located in the city of Tapachula, Chiapas, at the southern border between Mexico and Guatemala. The organization was founded in 1994 and was constituted as a civil association in 1997.

All 20 Black migrants interviewed were residing in Tapachula at the time of their interview. They were from Angola, Cameroon, Congo, the Democratic Republic of the Congo ("DRC"), Eritrea, Ethiopia, Ghana, Guinea, Haiti, and Sierra Leone. BAJI sought to interview Black migrants of different ethnicities,

CLP_PC_022643

age groups, immigration status, professions, and gender identities. Despite extensive efforts, all interviewees were cis-gender and the voices of trans and gender nonconforming Black migrants are absent from the interview data. There were also few Black women interviewees due to various barriers including practical challenges relating to childcare, fear of retribution for speaking about their lived experiences, and a culture of gender inequality.

All interviews were preceded by a detailed discussion and agreement on informed consent, and interviewees were informed of how the information they shared would be used in BAJI publications and advocacy. To ensure that no interviewees face any risk of repercussions for sharing information about their experiences, BAJI has used pseudonyms to protect their identities and withheld the date of individual interviews. Interviewees did not receive any compensation for participating in interviews, but were reimbursed for any transportation costs to and from the interview. All interviews were conducted in person by researchers and attorneys from BAJI. Some interviews were conducted with the assistance of a French-language interpreter, otherwise they were conducted in English. The findings from BAJI's interviews are summarized later in the report (*see* Chapter 6).

### Additional Interviews from March to August 2020

From March to July 2020, the Authors conducted interviews with experts, service providers in Mexico, academics, and Mexican immigration lawyers. In particular, the Authors interviewed the following non-profit human rights organizations that provide legal, psycho-social, and other services to migrants: *Servicio Jesuita a Migrantes* ("Jesuit Refugee Services" or "JRS"); *Programa Casa Refugiados* ("*Casa Refugiados*" or "PCR"); and *Sin Fronteras IAP* ("*Sin Fronteras*"). JRS provides service to people in transit through Mexico as they migrate to the United States and those who have decided to settle in the southern area of Mexico. *Casa Refugiados* is a Mexican non-profit, non-partisan, and secular Mexican civil society organization that operates in collaboration with the United Nations High Commissioner for Refugees ("UNHCR"). *Sin Fronteras* is a civil society organization founded by social activists and academics in 1995 to respond to international migration from a human rights perspective.

In addition, in August 2020, the Authors interviewed one of the leaders of *La Asamblea de Migrantes Africanos y Africanas en Tapachula* ("Assembly of African Migrants" or the "Assembly") who has settled in the United States (*see* Chapter 6). The Assembly, a collective of several thousand migrants from different African countries, was formed in Tapachula in 2019 to advocate for African and other Black migrants' rights.[6] This interview was conducted in Spanish.

### Objectives of the Report and Methodology

This Report (1) documents the factors behind, and migration route of, the increasing number of African migrants arriving to Mexico's southern border, (2) outlines how Mexico's restrictive immigration policies under the current Administration has directly impacted African migrants, as exemplified by the experiences of African migrants stranded in Tapachula in fall 2019, and (3) highlights the anti-Black racism, xenophobia, and gender-based discrimination experienced by these African migrants as well as other Black migrants.

CLP_PC_022644

In relation to Objectives (2) and (3), the Report relies on data from BAJI's and the Authors' additional interviews, outlined above. In addition, in relation to (1), (2), and (3), the Report relies on data from a number of secondary sources to supplement the Authors' understanding, including: Mexican and U.S. immigration law; Mexican and international human rights law; migration statistics published by the Mexican government; studies and reports published by academics, human rights organizations, and the UNHCR and other UN agencies; and media coverage on relevant issues. The analysis in this Report was done with an intersectional lens that recognizes, and highlights where possible, the heightened vulnerability of Black migrant women in Mexico.

CLP_PC_022645

# CHAPTER THREE:
# RACIAL DISCRIMINATION IN MEXICO AND ITS HISTORY

Before discussing the situation of African and other Black migrants in Mexico, as well as BAJI's and the Authors' interviews, it is necessary to first examine the broader discourse and history of racial discrimination in Mexico. This Chapter provides an overview of racial inequalities, particularly against the Afro-Mexican population, and the prevalent but seldom-discussed anti-Black racism in Mexican society. It then outlines the existing legal protections against discrimination in Mexico.

## A. HISTORICAL ROOTS OF RACISM IN MEXICO

Many Mexicans identify as *mestizos*, a term with historical roots dating back to the caste systems established during Spanish colonization.[7] The term *mestizo* originally referred to the offspring of a Spanish man and an Indigenous woman, considered lower in caste than a *peninsular* (one who was born in Spain) or a *criollo* (one who was born in the New World to Spanish parents). The caste system established during these times created terms for various racial mixtures of Spanish, Indigenous, and Black people, as depicted in paintings of those times. Some of these include: *mulato* (Spanish man with a Black woman) and *morisco* (*mulatto* man with a Spanish woman). One caste painting shows that if a *castizo* man (offspring of a *mestizo* man and a Spanish woman) had a child with a Spanish woman, their offspring would then be considered an *español* (Spaniard), showing that the addition of Spanish blood (and thus diminution of Indigenous blood) could confer higher status. In addition to the establishment of the caste system and the assignment of castes to individuals, skin color was another determinant of social status during these times. For example, if an Indigenous person had fair skin, then they could pass as *mestizo* or white.[8]

These concepts of European descendance and whiteness dictating social status are still reflected in modern Mexican society. Post-colonial Mexico defined itself as a nation of *mestizos*. Much of this *mestizo* identity originated in José Vasconcelos' *La raza cósmica* ("The Cosmic Race"), in which he discussed a new race – a cosmic race – comprised of various races.[9] Despite the apparent universality of this concept, Vasconcelos also hypothesized on the eventual disappearance of undesirable traits in this form of "aesthetic eugenics," including Black people.[10] Additionally, concepts like "improving the race" by marrying someone with fairer skin are still in existence in Mexico today.[11] So while Mexico's identity as *mestizo* appears to honor racial mixing, it has done so at the expense of neglecting Blackness and Indigenous identities and upholding whiteness.

This idea of *mestizo* has contributed to the popularization of a race-blind rhetoric in modern Mexican society.[12] However, as outlined below, different studies have revealed that skin tone as well as Blackness impact educational and financial prosperity in Mexico. Racial discrimination is pervasive in Mexico and has significant effects on Afro-Mexicans and Black migrants, including unequal treatment by government officials and barriers to accessing services and integrating into society.

CLP_PC_022646

## B. AFRO-MEXICANS

In the last five years, Afro-Mexicans – and the racial discrimination they experience – have gained visibility at the national level. Since colonization, Mexico has been inhabited by people of African descent, in addition to European colonizers and Indigenous peoples.[13] Afro-Mexicans, who predominantly live in the coastal states of Guerrero, Oaxaca, and Veracruz, make up at least 1.2 percent of the country's population.[14] The Mexican government has recently begun to officially count and recognize them as the country's *tercera raíz* ("third root").[15] After years of organizing, the national government allowed Afro-Mexicans to self-identify for the first time[16] in the 2015 intercensal survey, and again in the 2020 national census.[17] Further, the Constitution of Mexico was amended in 2019 to officially recognize Afro-Mexicans.[18] This was an important first step to address the discrimination, including on the basis of race, that affects both Afro-Mexicans and Black migrants in Mexico. This racism manifests overtly, such as almost a quarter of all Mexicans saying they would not rent to an Afro-descendant person;[19] and structurally, such as the inverse correlation between dark skin and educational and economic outcomes in Mexico.[20]

The human rights violations experienced by Afro-Mexicans and Black migrants are intertwined. For instance, officials of the *Instituto Nacional de Migración* ("National Institute for Migration" or "INM") have routinely targeted Afro-Mexicans at immigration check-points. In one case, INM officials detained two Mexican brothers, intended to deport them to the Dominican Republic, and only released them after over two weeks when the family's advocacy efforts were finally successful.[21] In another example, a Mexican tour guide was detained at an airport for one day on the suspicion that he was Honduran because of his darker skin color.[22] In some egregious cases, Mexican citizens have been unlawfully deported to countries with visible Black populations – like Haiti and Honduras – due to the colour of their skin.[23] The INM has been admonished by Mexico's *Comisión Nacional de los Derechos Humanos* ("National Human Rights Commission" or "CNDH") (described in Section D below) for this practice of treating Mexican citizens as if they are foreigners.[24]

## C. WIDESPREAD ANTI-BLACK RACISM IN MEXICO

Inequality in Mexico has typically been associated with socioeconomic status or ethnicity.[25] Many Mexicans believe that age, gender, and social class have a more significant impact on their daily lives than race (or, relatedly, skin color).[26]

While some Mexicans still dispute that racial discrimination exists in Mexico,[27] a 2017 study revealed that skin color is a significant determinant of economic and educational attainment in the country.[28] On average, people with white skin complete 10 years of schooling while people with darker skin complete about 6.5.[29] Although the average income of a Mexican household was about US $193 per month, people with lighter skin earned more than that – about US $220 per month. Conversely, darker-skinned people earned US $137 per month – 41.5 percent less than their lighter-skinned counterparts.[30] These social and economic inequalities further demonstrate that Mexico's *mestizo* identity is a fiction, and whiteness is socially and economically valued in Mexican society.

CLP_PC_022647

These findings have been echoed in subsequent reports. A 2019 Oxfam report found that 35 percent of Mexicans who self-identify as dark skinned (and 72 percent of those who speak an Indigenous language) fall in the bottom quartile of an index that measures occupational, educational, and economic indicators.[31] The Mexican government generally does not admit that racism exists,[32] but racism has been documented in Mexico's allocation of public resources,[33] politics,[34] and the labor market.[35] According to a national survey conducted by *Instituto Nacional de Estadística y Geografía* ("National Institute of Statistics and Geography" or "INEGI"), 21 percent of women and 24 percent of men surveyed would not rent a room to an Afro-descendant person, 11 percent of women and 12 percent of men would not be in agreement with their child marrying an Afro-descendant person, and 56 percent of those surveyed believed that the rights of Afro-descendant people were respected little or not at all.[36]

A 2019 study from *El Colegio de México* ("College of Mexico") showed that racialized physical features – particularly skin tone – was the main trigger for discrimination.[37] Most respondents said that they experienced discrimination in the workplace and job market more than anywhere else,[38] and that family, friends, and relatives were the main perpetrators of racial discrimination.[39] In one example, a restaurant owner explained how skin color determined where customers are seated. He stated that "young, good-looking people" were seated in the outside tables while people with "darker skin, you hide them a bit in the back tables."[40] Another example of how deeply embedded racism is in Mexico was a casting call by Aeroméxico (a Mexican airline) that excluded dark-skinned people from applying to the advertised position.[41]

Black women in particular face widespread racial and gender-based discrimination in Mexico. In addition, African immigrant women in Mexico, as in many countries in the world, are particularly affected by job market inequalities, isolation and absence of social networks, and inadequate social services to meet mental health needs.[42] (*See* Chapter 6, Section D.)

Amid the resurgence of the Black Lives Matter movement since the death of George Floyd by the police in Minnesota, United States on May 25, 2020, demonstrators have also taken to Mexican streets to protest anti-Black violence. Both Mexican civilians and the police have been shown to commit violence against Afro-Mexicans and Black migrants.[43] Police violence is particularly endemic in the country. In one recent example, protests erupted after Giovanni Lopez, a Mexican construction worker, was beaten to death by the police.[44] Some protestors – on their way to protest police violence – revealed that plainclothes policemen had forced them into an unmarked van and told them, "We're going to disappear you."[45] The police in Mexico apprehended protestors, some of whom reported that they were robbed and shot with stun guns or beaten with wooden clubs.[46] In another recent incident, which further highlights the interconnection of Afro-Mexican and Black migrant experiences in Mexico, Black Lives Matter protesters in Tijuana chanted *"No puedo respirar"* ("I can't breathe"), evoking the message commonly expressed by their counterparts in the United States.[47] Black Lives Matter Tijuana issued a letter in June 2020 specifically connecting the movement in both countries and condemning racism faced by Afro-Mexicans, Haitian, and African migrants, as well as all other members of the Black community in Tijuana.[48]

CLP_PC_022648

## D. DISCRIMINATION LAW IN MEXICO

Mexican law prohibits discrimination, including on the bases of race and gender. The Constitution of Mexico expressly prohibits discrimination against any person in Mexican territory and guarantees the full enjoyment of human rights contained in the Constitution, as well as in the international instruments that Mexico has ratified with no restrictions under any circumstances.[49] Further, the *Ley Federal Para Prevenir Y Eliminar La Discriminación* ("Federal Law to Prevent and Eliminate Discrimination" or "Discrimination Law")[50] aims to prevent and eliminate all forms of discrimination and to promote equality of opportunity and treatment.[51] It specifically prohibits discrimination based on the following grounds: ethnic or national origin, skin color, culture, sex, gender, age, disabilities, social status, economic status, health or legal issues, religion, physical appearance, genetic characteristics, pregnancy, language, opinions, sexual preferences, identity or political affiliation, marital status, family situation, family responsibilities, language, criminal record, or any other reason.[52] The *Consejo Nacional Para Prevenir La Discriminación* ("National Council to Prevent Discrimination" or "CONAPRED") is a federal body created pursuant to the Discrimination Law.[53] CONAPRED has authority to hear complaints of alleged discrimination against individuals or federal authorities, and any person in Mexican territory (including migrants) can file complaints.[54] The CNDH, which is the national human rights institution, also receives complaints of alleged violations of Mexico's domestic and international human rights obligations.[55] The CNDH has as its mandate "the defence, promotion, study and dissemination of human rights recognized in the Mexican Constitution, international treaties and laws."[56]

Mexico is also party to a number of international instruments that prohibit discrimination, including on the bases of race and gender.[57] International instruments ratified by Mexico enjoy the same legal status as the Mexican Constitution.[58] Therefore, they have primacy over federal and local laws, and the obligations created by those instruments can also be regarded as domestic human rights obligations. Pursuant to these international instruments, such as the International Convention on the Elimination of all Forms of Racial Discrimination, Mexico has a duty to refrain from engaging in any "act or practice of racial discrimination against persons, groups of persons or institutions and to ensure that all public authorities and public institutions, national and local, shall act in conformity with this obligation."[59] The Convention on Elimination of All Forms of Discrimination Against Women requires that States Parties "condemn discrimination against women in all its forms," and "pursue by all appropriate means and without delay a policy of eliminating discrimination against women."[60] Mexico recently became a party to the Inter-American Convention Against Racism, Racial Discrimination and Related Forms of Intolerance, which provides that States "undertake to prevent, eliminate, prohibit, and punish, in accordance with their constitutional norms and the provisions of this Convention, all acts and manifestations of racism, racial discrimination, and related forms of intolerance."[61]

Notwithstanding these legal obligations, the Mexican government has been repeatedly admonished by international bodies for failing to meet its human rights obligations towards Afro-Mexicans and migrants (including Black and women migrants). In its concluding observations on Mexico from December 2019, the Committee on the Elimination of Racial Discrimination ("CERD Committee") found that Mexico is not doing enough to combat racial discrimination within its borders. The CERD

CLP_PC_022649

Committee noted that racial discrimination against Afro-Mexicans "continues to be deeply rooted and is an obstacle to the construction of a multicultural society based on equality and fairness." [62] The CERD Committee further noted that Afro-Mexicans "continue to face discrimination, high levels of marginalization and social exclusion."[63] In addition, the CERD Committee expressed concern that Mexico's migration policies have violated the rights of migrants and asylum seekers. [64] In particular, the CERD Committee expressed concern about the negative impact of using the *Guardia Nacional* ("National Guard"), a civilian-led security force involved in migration control (*see* Chapter 5, Section B), and the increased use of "racial profiling by migration authorities, which has led to arbitrary detention and systematic refoulement without adequate legal advice."[65] Similarly, the CERD Committee noted the use of excessive force against migrants and the increase in "discourse informed by discriminatory views, racial hatred and xenophobia targeting migrants."[66]

In addition, in its December 2018 Report, the Working Group on the Universal Periodic Review ("UPR") recommended that Mexico take specific measures and elaborate policies to address systemic discrimination against women, migrants, and peoples of African descent.[67] The UPR is a mechanism of the UN Human Rights Council through which the human rights records of UN member states are reviewed to ensure member states are fulfilling their human rights obligations.

Further, in its concluding observations from July 2018, the Committee on the Elimination of Discrimination against Women ("CEDAW Committee") was especially concerned by the fact that some migrant women in Mexico were automatically detained, the lack of gender-sensitive asylum procedures, and the lack of adequate protection of rights of migrant women to work and healthcare.[68] The CEDAW Committee noted that Mexican women of African descent faced high levels of poverty and inequality,[69] as well as limited access to employment opportunities.[70] The CEDAW Committee further encouraged the Mexican government to ensure that migrant, refugee, and asylum-seeking women and girls have access to health services, housing, and employment.[71] Similarly, in its concluding observations from September 2017, the Committee on the Protection of the Rights of All Migrant Workers and Members of their Families ("CMW Committee") found that women migrant workers in traditional roles (i.e. domestic work) in Mexico do not have enough legal guarantees protecting their rights.[72] The CMW Committee recommended that Mexico implement better measures to protect the rights of women migrant workers, monitor working conditions, and ensure a more gender-sensitive approach.[73]

Having outlined the context of anti-Black racism and xenophobia, as well as gender-based discrimination, that pervades Mexican society, the next Chapter examines the increase in African migration to and through Mexico since 2015.

CLP_PC_022650

# CHAPTER FOUR:
# AFRICAN MIGRATION TO AND THROUGH MEXICO

Many African migrants leave their countries of origin because they require protection as a refugee. Under the the 1951 Convention Relating to the Status of Refugees and the 1967 Protocol Relating to the Status of Refugees, a refugee is defined as a person who flees their country of origin to seek protection in another country to escape danger or persecution based on "their race, religion, nationality, membership in a particular social group, or political opinion."[74] Mexican law incorporates this definition, and also recognizes gender-based asylum claims (*see* Chapter 5, Section A for an overview of Mexican immigration law).[75]

Other African migrants, including some who may not fit the Convention definition of a refugee, undertake undocumented migration out of economic necessity.[76] As observed by the UN, many are migrating to Europe and North America in search of employment or higher education, in addition to asylum seekers.[77] Migrants move because of complex, often interrelated reasons, and many do not fall into the "refugee" and "economic migrant" dichotomy, the premise of which is itself subject to scrutiny.[78] Most migrants' decisions and actions are based on multiple reasons.[79] Their migration experiences are not linear or static, and they can cross back and forth between being considered a refugee or economic migrant over the course of their journey.[80]

## A. RECENT AFRICAN MIGRATION TO THE AMERICAS

Although modern African migration has largely been intra-continental or extra-continental to former colonial powers in Europe, African migration to the Americas has been steadily increasing since the end of the 20th century.[81] Some African migrants enter the United States or Canada directly. For instance, in 2010, a large number of Africans immigrated to or were resettled in the United States under the diversity visa program, family reunification, or refugee resettlement.[82] By comparison, recent African migration into Mexico has largely been transitory and undocumented.[83] Several sources have recorded Africans migrating north through the Americas since the beginning of the 21st century: Ghanaians and Ethiopians since 2000,[84] Somalis as early as 2001,[85] and Eritreans since the early 2000s.[86] In 2007, Mexico started including African migrants in its annual reports.[87] Since this data has been collected, there has been a steady increase in the number of African migrants who have had contact with Mexican immigration authorities.[88] In 2014, Mexico registered 785 detentions of African nationals.[89] By 2019, the number increased to 7065.[90] Based on a review of available data in the last five years, nationals from Cameroon, the DRC, Eritrea, Ghana, and Somalia represent the highest numbers of African nationals detained by INM authorities.[91] While it is not possible to determine the exact numbers of Africans entering Mexico, the data on detentions suggests that these five countries are among the top countries of origin of African migrants in the country.

African migration to and through Mexico continues to increase as more Africans flee their countries of origin and use the Americas as a corridor to seek refuge in the United States or Canada. However, due to increasingly restrictive immigration policies, it is more difficult to transit through Mexico to the

CLP_PC_022651

Mexico-U.S. border (*see* Chapter 5, Section B). This new phenomenon has been changing Mexico from a transit country to, in some cases, a country in which African migrants are settling temporarily or permanently.[92]

## B. CAUSES OF AFRICAN MIGRATION TO AND THROUGH MEXICO

This section outlines some of the recent social and political dynamics that have led Africans to arrive in growing numbers to Mexico, including conditions causing them to leave their countries of origin as well as increased European immigration enforcement. With migration to Europe becoming more difficult, African migrants have been forced into other options and have relied on permissive immigration policies in Ecuador, Brazil, or Guyana as an entry-point for a difficult and dangerous journey by land towards Mexico and onwards to the United States or Canada (*see* Section C).

### Push Factors From Countries of Origin

African migration is increasing, both within and outside of the continent.[93] The surge in the number of African migrants seeking asylum has been linked to political upheaval and violence in some African countries, which has caused death, displacement, and increases in rape and other forms of sexual and gender-based violence ("SGBV").[94] The effects of this upheaval are reflected in the number of sub-Saharan Africans displaced within their own countries, which doubled to nine million between 2010 and 2016.[95] Further, although the economies of some African countries are growing, many countries still have persistent high unemployment rates and low wages. In some cases, this economic disparity persists even in countries with abundant natural resources; as some African migrants have observed, corrupt regimes are in some cases receiving support from developed countries who rely on these natural resources.[96]

The factors that cause Africans to migrate vary depending on their country of origin, but generally include one or a combination of the following factors: civil wars and violence, including SGBV, political instability, poor standard of living, persecution based on sexual orientation or gender identity, or the desire for better economic opportunities.[97] Although it is outside the scope of this report to engage deeply with the root causes of migration from all African countries of origin, this section provides a contextual overview of conditions in Cameroon, the DRC, Eritrea, Ghana, and Somalia.[98]

CLP_PC_022652





CLP_PC_022653

## Cameroon

Cameroon is in a state of unrest, with an ongoing conflict that has led to an exodus of Cameroonians seeking safety and security. This conflict, dubbed the "Anglophone conflict" in reference to the tensions between the English- and French-speaking parts of the country, has claimed the lives of thousands and displaced hundreds of thousands.[99] Cameroon has a history of colonization of different parts of the country by England and France. As of 2019, around 80 percent of Cameroonians spoke French, and the other 20 percent spoke English.[100] The ongoing conflict can be traced to peaceful protests in 2016, in which English-speakers claimed that the majority Francophone country was trying to force the Anglophone minority to assimilate into Francophone legal and educational systems.[101] This protest was met with deadly force by the government and, in the wake of the government's response, the protesters' calls for autonomy gradually morphed into calls for secession.[102] The government has justified its attack on English-speakers in Cameroon by claiming that the separatists who want to secede from the country have attacked government forces and civilians.[103] Human rights groups have also reported that armed separatists have been guilty of human rights abuses, including burning down schools and attacking security forces.[104]

Vulnerable groups, such as women and children, have been particularly harmed by the conflict. Human rights groups have reported that the conflict has forced thousands of schools to shut, forcing more children to work and making them vulnerable to servitude-like conditions, while others have been forced into sex work for their economic survival.[105] Journalists and social workers in Cameroon have documented that girls who cannot attend school are prone to early pregnancies, with complicated deliveries because of their young age.[106] In addition, pregnant and breastfeeding women face increased difficulties in accessing basic health services.[107] There have also been cases of 'corrective rape' of lesbians in Cameroon, with homosexuality carrying a prison sentence of up to five years in prison.[108] A study by a local non-profit group in Cameroon found that rape had become a weapon of war in the ongoing conflict.[109] In another study conducted by the International Rescue Committee ("IRC") in some of the most affected areas in the Southwest region of Cameroon, more than 85 percent of respondents said women and girls experience rape, sexual assault, intimate partner violence, the denial of resources/opportunities, psychological abuse, physical violence, and/or early marriage.[110] As of May 2020, there were about 976,773 internally displaced people in Cameroon.[111] Although many Cameroonians seek asylum in neighboring countries, others have been traveling to and through the Americas to seek refuge. Although as early as 2007 there were a small number of Cameroonians been detained by INM authorities in Mexico for having irregular status, it was not until 2015 that there was a significant increase in the number of detentions of Cameroonians.[112] From 2015 to 2016, there was a fourfold increase in the number of Cameroonians detained, from 21 to 93. In 2019, a record 3,124 Cameroonians were detained. It appears that a growing number of Cameroonians are settling in Mexico. This is most evident in the 318 Cameroonians who sought asylum from January 2018 through 2019.[113] A smaller number of Cameroonians have sought other forms of legal status in Mexico, such as temporary residence status through *tarjetas de residente temporal* ("temporary residence cards" or "TRT cards") and permanent residence status through *tarjetas de residente permanente* ("permanent residence cards" or "TRP cards"). Since there is no sign of the Anglophone conflict abating anytime soon, likely neither will the number of Cameroonians displaced and, as a result, seeking transit through or refuge in Mexico. (*See* Appendix 1 for more migration data.)

CLP_PC_022654

### The Democratic Republic of the Congo ("DRC")

The DRC, like Cameroon and other countries in the region, has a history of political violence that has caused external migration. The DRC's history of political violence goes back to its independence in 1960.[114] In more recent years, the country has seen violent clashes and political turmoil,[115] most often between government forces and ethnic militias.[116] In particular, the waves of violence in the DRC since the end of the civil war in 2003 have killed and displaced millions of civilians.[117] In 2017 and 2018, the DRC had the highest number of internally displaced people in Africa, with a total of about 4.5 million people.[118] It was estimated in 2019 that about 12.8 million people in the DRC needed humanitarian assistance and protection.[119]

Most of the people affected by the conflict, including internally displaced people, are exposed to various human rights abuses and health problems, such as SGBV, chronic malnutrition, and epidemics such as cholera, measles, and Ebola. For example, between May 2017 and September 2018, *Médecins Sans Frontières* ("Doctors Without Borders" or "MSF") treated 2,600 victims of sexual violence just in the town of Kananga in Kasai Central province.[120] Victims also told MSF about other forms of violence, such as decapitations, multiple rapes of teenagers, and systematic theft and beatings.[121] The country has also had to contend with an Ebola outbreak that disproportionately affected women and children.[122] The latest (and tenth) Ebola outbreak in the DRC was declared over on June 25, 2020; there were 3,470 cases, 2,287 deaths and 1,171 survivors. [123]

Political violence is not the only reason citizens of the DRC are fleeing their country. LGBTQIA+ people also leave to avoid persecution on the basis of gender identity and/or sexual orientation. Although homosexuality is not illegal in the DRC, members of the LGBTQIA+ community still face discrimination and are subjected to intimidation, violence, kidnapping, and arrest.[124] Student activists or organizers fleeing government oppression also represent a small number of Congolese needing to seek asylum.[125]

While some refugees from the DRC have been resettled directly to the United States, many have had to seek alternative routes to find refuge. In Mexico, the data shows significant increases in the number of detentions of Congolese migrants in the past four years: 1,009 were detained in 2016, up from eight the previous year, and 2019 saw a record of 1,822 detentions of Congolese migrants.[126] Few Congolese migrants sought asylum in Mexico between 2013 and 2017; there were between zero and five asylum/refugee status applications recorded each year.[127] That changed in 2018-2019, when 207 asylum/refugee status applications of Congolese migrants were recorded in Mexico, the highest to date by far.[128] A handful of TRT and TRP cards have been issued to Congolese migrants, mostly under the work category.[129] (*See* Appendix 1 for more migration data.)

CLP_PC_022655

## Eritrea

There have also been many Eritreans migrating to or through Mexico, though for different reasons than the countries mentioned above. Human rights abuses, including indefinite military service and forced labor, by the Eritrean government have led to a large number of civilians fleeing the country.[130] The President of Eritrea used his country's conflict with Ethiopia to justify his nearly three decades of authoritarian rule.[131] Most men and unmarried women are forced into open-ended service for the government.[132] Eritreans need exit permits to leave the country and those who leave without obtaining a permit from the government may be killed or arrested.[133] In addition, the government also officially recognizes only four religions – Sunni Islam, Eritrean Orthodox, Roman Catholic, and Evangelical churches – and citizens who profess a religion other than these four are at risk of raids on their homes, arrest, or torture.[134] Unrecognized denominations such as Evangelical and Pentecostal Christians, as well as Jehovah's Witnesses, account for less than five percent of the Christian population and have been subjected to violations of their religious and personal freedoms.[135] Further, the government has also clamped down on freedom of speech, expression, and association. Eritrea has been described by the Committee to Protect Journalists as the "world's most censored country" and also the sub-Saharan African country with the highest number of incarcerated journalists.[136] All these factors have led to a steady rise in the number of Eritreans fleeing the country over the years, especially with the opening of the Ethiopian-Eritrean border in 2019.[137]

Although hundreds of Eritreans have been detained in Mexico by the INM since 2007 – a peak of 723 in 2010, followed by 636 in 2017, and only 47 in the first five months of 2020 – very few have chosen to seek legal status in Mexico.[138] The record number of asylum seekers was four in 2014, three TRT cards issued in 2016, and two permanent residency cards issued as recently as 2019.[139] It can be implied from the data that many Eritreans intend to continue to the Mexico-U.S. border. (*See* Appendix 1 for more migration data.)

## Ghana

Unlike migrants from the previously discussed African countries, the majority of Ghanaians leaving their country of origin are not fleeing conflict.[140] There is no ongoing war in Ghana, and ethnic or religious conflicts have historically been rare.[141] Ghana has a vibrant democracy, and elections are generally free and fair.[142] Instead, unemployment and poverty are the main reasons that Ghanaians are migrating, and others flee to avoid violence and discrimination based on their sexual orientation.[143] The criminalization of homosexuality under Ghanaian law is vague; strictly speaking, only sodomy is illegal.[144] Nevertheless, LGBTQIA+ people are often targets of "physical violence and psychological abuse, extortion and discrimination in many different aspects of daily life, because of their sexual orientation and gender identity."[145] Human Rights Watch ("HRW") documented how people suspected of being LGBTQIA+ have been attacked by mobs and even members of their own families, as well as being subjected to physical and sexual assault and extortion.[146] For instance, in August 2015 in Nima, Accra, a man was physically assaulted by members of a vigilante group known as *Safety Empire* simply because they suspected he was gay.[147]

CLP_PC_022656

Although few Ghanaian migrants have been detained by INM authorities since 2007, like their Cameroonian and Congolese counterparts, some Ghanaian migrants have settled in Mexico over the last few years. The record number of asylum/refugee status applications by Ghanaian asylum seekers was 97 in the time period between January 2018 and October 2019; more have sought TRT and TRP cards per year in the last three years compared to the previous seven; and several have been granted humanitarian status with *tarjetas de visitante por razones humanitarias* ("visitor cards for humanitarian reasons" or "TVRH cards," often referred to as "humanitarian visas") (*see* Chapter 5, Section A for more information).[148] (*See* Appendix 1 for more migration data.)

## Somalia

Similar to Eritreans, there is data of Somalis being detained in Mexico since data collection began in 2007.[149] Clan identity became politicized in Somalia in the 1970's, with some clans enjoying the favor of the government and some not.[150] This categorization led to frequent and deadly power struggles between clans that continue today. All the actors in the conflict – the government forces, Al-Shabab, foreign troops, and warring clans – have been accused of "serious abuses against children, including killings, maiming, and the recruitment and use of child soldiers."[151] Currently, armed conflict and drought in Somalia have been the driving factors that have forced Somalis to flee their country.[152] Government forces have been accused by human rights groups of responding to peaceful demonstrations with deadly force.[153] The United Nations Assistance Mission in Somalia ("UNSOM") estimated that Al-Shabab, the armed Islamic terrorist group, is responsible for 67 percent of the 1,154 civilian casualties that occurred in the country between January and mid-November of 2019.[154]

Somalis began to flee their country in the early 1990s, and by the end of 2013 there were over 970,000 Somali refugees in the world.[155] Although the number has decreased since then, an estimated 2.2 million people still face food insecurity, and about 2.6 million people are displaced, with drought increasingly said to be the reason for displacement.[156] Women and girls are always more vulnerable under these circumstances and the UN has documented many cases of sexual violence against girls.[157]

Similar to Eritreans, existing data does not suggest that Somali migrants intend to stay in Mexico. The record number of detained Somali migrants was 864 in 2015.[158] However, there were only three asylum/refugee status applications by Somali nationals in all of 2017, one Somali was granted asylum in 2015, three Somalis have been granted TRP cards since 2009, and three have renewed their TRP since 2010.[159] Few Somalis have been granted humanitarian status with TVRH cards – a record number of 11 TVRH cards were issued to Somalis in 2017.[160] As Somalis continue to be exposed to human rights abuses, deaths, and continued conflict in the country, it is likely that outward migration will continue in the coming years. (*See* Appendix 1 for more migration data.)

CLP_PC_022657

**Impact of more restrictive migration policies in Europe**

International migration policies have significantly impacted the travel route and preferred destination of African migrants. Since 2015, there has been an increase in the number of Africans attempting to travel through Mexico to reach the United States or Canada.[161] The change in immigration policies of the European Union ("E.U.") is partially responsible.[162] Mexican authorities reported that 785 African migrants were detained in Mexico in 2014.[163] That number more than doubled to 2,078 in 2015 and continued to climb until recent border closures resulting from the COVID-19 pandemic.[164]

This increase coincided with the E.U.'s increasingly hard-line approach to immigration. Since 2015, undocumented migration has been a popular topic in European politics, with right-wing populist parties in countries such as France, Germany, and Poland stoking anti-migration sentiments to win support.[165] The E.U. has responded to the influx of migrants, many of whom arrive by boat over the Mediterranean Sea in extremely dangerous conditions, by externalizing its migration policy.[166] In other words, the E.U. has increasingly tried to exert control over migration by influencing the migration policies of non-E.U. countries from which migrants arrive to its territory. The E.U. has achieved this by making migration a central issue in its foreign relations with non-E.U. countries.[167] For example, in 2016, the E.U. signed a statement with Turkey that sped up the elimination of visa requirements for Turkish citizens, while at the same time providing that, going forward, all undocumented migrants crossing from Turkey into the Greek islands will be returned to Turkey unless they successfully applied for asylum in Greece.[168]

One of the most significant consequences of the E.U.'s policies is the situation faced by African migrants in Libya. Many African migrants travel north across the continent to Libya, from where they continue by boat to Italy or Greece. Since 2016, the E.U. has intensified its cooperation with Libya to prevent boat departures from Libya towards Europe.[169] The E.U. has provided millions of Euros to strengthen the Libyan Coast Guard and other government authorities to enable them to apprehend asylum seekers and other migrants.[170] Libya has become an official processing hub for African migrants, and migrants apprehended while attempting to cross the Mediterranean Sea from any African country into Greece are detained in Libya.[171] With the fall of the former government led by Colonel Muammar Gaddafi, and the political chaos and militia fighting that resulted, Libya is a dangerous place for anyone and especially migrants, who have been subjected to violence from smugglers and armed groups.[172] There is currently no unified government in Libya; the two main Administrations are propped up by armed militias that shift allegiances to survive.[173]

Libya does not have a legal framework on refugees and does not recognize refugee status, which increases migrants' vulnerability. The country does have laws that criminalize illegal entry, exit, and departure from the country, thereby forcing refugees and migrants who do not have the protection of the law into the fringes of society.[174] There have been documented reports of migrants who are captured by the Libyan coastguard, with help from the Italian military, and tortured after they are returned to Libya.[175] HRW has observed inhumane conditions in detention centers in Libya, such as "severe overcrowding, unsanitary conditions, poor quality food and water that has led to malnutrition, lack of adequate healthcare, and disturbing accounts of violence by guards, including beatings,

CLP_PC_022658

whippings, and the use of electric shocks."[176] The dire humanitarian situation in detention centers in Libya have been well documented, and the addition of migrants and asylum seekers apprehended at sea has made the situation worse.[177]

The desire to avoid the detention centers in Libya has contributed to the increased numbers of Africans traveling overland in the Americas instead of making the journey from northern Africa to Europe. The E.U. has been able to externalize its borders by keeping Europe-bound asylum seekers in Libya, in the same way that the current U.S. and Mexican Administrations have taken steps to prevent asylum seekers from entering the United States (*see* Chapters 5 and 6).

## C. MIGRATION ROUTE

Africans arrive to Mexico using various routes. The majority travel through South and Central America, while others take a more direct approach by flying into Mexico. The choice of route depends on different factors, such as the presence of family members in Mexico, the financial situation of the migrants, and reason(s) for leaving their countries of origin.



CLP_PC_022659

**Migration to and through South and Central America**

There has been a steady increase of African migrants making the harrowing journey overland from South America, through Central America and into Mexico, in an attempt to cross the Mexico-U.S. border into the United States and, in some cases, continue on to Canada.[178] Although Central American migrants are most often in the spotlight, many Asian, African, and Caribbean migrants also transit through Latin America.[179]

Over the past five years, with the tightening of immigration controls in Europe, many African migrants have looked to the Americas as a more viable and accessible destination.[180] It is often cheaper to fly from Africa into South America rather than North America.[181] In addition, since the United States began blocking travel to the country from certain Muslim-majority countries, including Somalia, in 2017, more Somalis have been traveling through South and Central America into Mexico.[182] African migrants first enter the continent through visa-friendly countries such as Ecuador and Brazil.[183] For example, prior to August 2019, citizens of Ghana, Cameroon, and the DRC could enter Ecuador without a visa and stay for 90 days.[184] After entering South America, migrants progress north to Mexico, sometimes with the help of smugglers (i.e. *coyotes*) or the aid of social media posts of those who have gone before them.[185] This overland migration route usually originates in Brazil, then Peru, Ecuador, Colombia, Panama, Costa Rica, Nicaragua, Honduras, and Guatemala, to reach Mexico,[186] and the transportation methods used typically include a combination of buses, private cars, walking on foot, and boats.[187] The complete journey from Brazil to Mexico can take anywhere from two to four months, and can cost between $2,500 and $13,000 U.S. dollars, depending on negotiating skill and number of travelers.[188]

The most dangerous part of the journey is crossing the Darien Gap, a jungle on the border of Colombia and Panama.[189] The Gap is dominated by armed groups and guerillas, as well as drug traffickers; migrants also have to safely navigate natural dangers when trekking through the jungle, such as venomous snakes, dangerous wildlife, starvation, and flash floods.[190] Another difficult part of the trip is the need to enlist the services of smugglers, sometimes in multiple countries, who can charge as much as $1,500 U.S. dollars per person.[191] Migrants also have to be wary of smugglers who may rob and abandon them,[192] or even rape and kill them.[193]

As with other migrants making the journey, even after the Darien Gap, Africans face significant harm when making their way through Central America to Mexico.[194] The violence faced by migrants typically begins in their countries of origin and continues during their transit through Central America, into Mexico, while crossing the U.S. border, and even upon arrival at their destination.[195] For example, in a report published by MSF in 2020, 61 percent of migrants and refugees surveyed had experienced violence in the two years prior to leaving their countries of origin,[196] and 57.3% had experienced some form of violence along the migration route to and in Mexico.[197] While almost all of the migrants surveyed in this report were from Guatemala, Honduras, and El Salvador, Africans also travel through Central America and confront various forms of violence, including racialized violence. In addition to the risks of extortion, kidnapping, violence, and abuse that migrants face, migrant women are also

CLP_PC_022660

vulnerable to SGBV, including rape and sexual assault.[198] In the same cross-sectional study, sexual violence was observed among women more than men, with 21.6 percent of women reporting rape, compared to 1.5 percent of men.[199]

A different cross-sectional study between 2009-2015 also confirmed the dangers that migrants navigate on their journey.[200] This study documented the experiences of migrants after they arrived to Mexico, and showed that 29.4 percent of migrants transiting between Mexico and the United States suffered from many different forms of violence.[201] Nearly 24 percent reported physical violence, 19.5 percent experienced psychological violence, and approximately two percent reported sexual violence.[202]

Language and cultural barriers increase the vulnerability of African migrants on the migration route, and they have less access to services when travelling through a continent where services are usually not provided in their native language.[203]

### Migration directly to Mexico

While the majority of African migrants take the route described in the previous section, some also fly directly into Mexico and go through a regular immigration process. Many of the Africans who travel directly into Mexico either have relatives in the country, or travel because of an arranged marriage or job opportunity.[204] In many cases, where the arranged marriages and job opportunities fall through, the migrants fall into undocumented status.[205] Some of them become undocumented because they lack options to regularize their status and it is often too late to apply for asylum, even where the basis for an asylum claim exists, and many do not have the financial means to travel back home.[206] Some Africans fly into Caribbean countries and travel by boat to the Mexican port city of Veracruz.[207]

### Intended destination(s)

The available migration data suggests that few African migrants seek asylum or otherwise settle in Mexico. Instead, each year, the number of African migrants that are apprehended and registered as detained by immigration authorities (which suggests in many cases that they are in transit) far exceeds the number of asylum/refugee claims or other types of residency issued.[208] For some migrants, the high level of violence in Mexico makes them feel unsafe in the country and reluctant to stay.[209] Also, African migrants primarily speak French or English, which makes communicating in Spanish with officials and even other migrants difficult. Those who do not want to stay in Mexico often believe that the United States or Canada are safer and also offer better economic opportunities; as one migrant from Cameroon told a reporter, "Mexico has nothing to offer me."[210]

Furthermore, as outlined throughout this Report, African migrants arriving via Mexico's southern border experience racial and other forms of discrimination that impact their ability to find safety, security, and protection in Mexico. In its written statement issued in late August 2019, the Assembly of African Migrants advised that some of its members needed to continue their journey north to seek refuge in the United States or Canada, whereas some others were intending to claim asylum

CLP_PC_022661

in Mexico.[211] Few African migrants initially perceive Mexico as a destination country, in which to seek refuge. As noted by staff members of *Sin Fronteras*, a civil society organization based in Mexico City, those who settle in Mexico typically do so as a result of the restrictions and obstacles they must overcome to reach the United States.[212] Others apply for asylum in Mexico in order to be released from immigration detention, where they are detained under deplorable conditions.[213] (*See* Chapter 6 for more information about racial discrimination in Tapachula and the Assembly.)

Whether or not they intend to seek asylum or another form of residence in Mexico, African migrants still have to engage with the Mexican immigration system. As discussed further below, under the current U.S. and Mexican Administrations, it became increasingly difficult for them to leave southern Mexico and transit north to the Mexico-U.S. border.

CLP_PC_022662

# CHAPTER FIVE:
# AFRICAN MIGRANTS IN THE MEXICAN IMMIGRATION SYSTEM

Given the recent influx of African migrants into Mexico, it is necessary to understand the Mexican immigration system's response. This Chapter provides a basic overview of Mexican immigration law before discussing recent changes in Mexico's approach to immigration enforcement and the resulting impact on African migrants' ability to transit freely through Mexico.

## A. HIGHLIGHTS OF MEXICAN IMMIGRATION LAW

Mexican law defines a "refugee" more broadly than other jurisdictions, including the United States. The *Ley Sobre Refugiados, Protección Complementaria y Asilo Político* ("Law on Refugees, Complementary Protection and Political Asylum" or "Refugee Law") incorporates the international definition of "refugee" outlined in the 1951 Convention Relating to the Status of Refugees and the 1967 Protocol Relating to the Status of Refugees: a refugee is a person who, "owing to a well-founded fear of being persecuted" on the basis of race, religion, nationality, membership in a particular social group, or political opinion, cannot return to their country of origin.[214] The Mexican definition goes further by recognizing gender-based persecution as a basis for a claim. In addition, the Refugee Law incorporates "complementary protection" (known internationally as the principle of *nonrefoulement*). This protection applies where, even if a person is not found to be a refugee, their life would be in danger or they have well-founded fear of being subjected to torture or other cruel, inhuman, or degrading treatment if returned to their country of origin.[215]

The Refugee Law also incorporates the protections outlined in the 1984 Cartagena Declaration, a regional non-binding agreement that defines a "refugee" to include a person who had fled their country of origin due to generalized violence, foreign aggression, internal conflicts, massive human rights violations, or other circumstances that have gravely disturbed public order.[216] Currently, the Mexican government applies the Declaration protections to asylum seekers from Venezuela, Honduras, and El Salvador, which "implies *prima facie* recognition that these countries are plagued by generalized violence and/or massive human rights violations."[217]

Asylum seekers may file claims with Mexico's *Comisión Mexicana de Ayuda a Refugiados* ("Mexican Commission for Refugee Assistance" or "COMAR") or the INM within 30 business days of entering Mexico, irrespective of whether they entered the country with documentation. Claims are processed by COMAR in accordance with the procedure outlined in the *Reglamento de la Ley Sobre Refugiados y Protección Complementaria* ("Regulation of the Law on Refugees and Complementary Protection").[218] (For more information on asylum/refugee law and procedure, see Chapter 3 of *A Journey of Hope: Haitian Women's Migration to Tapachula, Mexico* and the cited materials.)[219] The number of African migrants filing refugee claims in Mexico has historically been small (*see* Chapter 4).

CLP_PC_022663

In addition to asylum/refugee status, as referenced above, Mexican law also provides for the granting of humanitarian status or TVRH cards. The *Ley de Migración* ("Migration Law")[220] outlines specific circumstances in which a person may be issued a TVRH card, such as an asylum seeker whose claim is pending with COMAR. The Migration Law also includes a 'catch-all' provision that TVRH cards may be granted where it is in the public interest or for a humanitarian purpose.[221] Humanitarian status entitles the recipient to work in Mexico,[222] but is temporary and granted for a term of up to one year (renewable for so long as underlying conditions persist, i.e. for so long as an individual remains an asylum seeker).[223] Between 2014 and May 2020, only 311 Africans were granted TVRH cards.[224]

Migrants have rights to access various services while in the country. Asylum claimants, refugees, and beneficiaries of complementary protection have the right to work.[225] Further, the *Secretaría de Salud* ("Secretary of Health"), in coordination with the health authorities at different levels of government, is obligated to promote health services for foreigners, without prejudice to their immigration status and in conformity with any applicable laws.[226] The Mexican government has specifically stated that healthcare for migrants is a priority.[227] In addition, public education is free in Mexico and the Constitution of Mexico guarantees the right to education for everyone.[228] The current Administration's Migration Policy emphasizes the importance of guaranteeing access to education for all migrants without discrimination on the basis of their ethnic or national origin, sex, gender, age, disability, social or economic condition, health status, pregnancy, language, religion, opinions, sexual preferences, or marital status.[229] In practice, however, migrants have not always been able to access these services due to various barriers. For instance, *Casa Refugiados*, which supports refugees in Mexico City, has documented instances where public officials have denied them the right to education[230] Furthermore, with little or no official documentation, some refugees have been prevented from registering themselves at healthcare facilities and subsequently denied healthcare.[231]

As noted in Chapter 4, the number of African migrants who have sought asylum or other forms of residency in Mexico has been limited. Instead, it appears that most African migrants enter Mexico in order to travel north to the United States or Canada. Until mid-2019, many Africans could simply transit through Mexico after receiving an *oficio de salida del país* ("exit permit," often called "salvoconducto") from the INM in Tapachula. This document gave recipients a specified amount of time (often 20 days) to leave the country, which they used to travel north.[232] Immigration officials usually issued exit permits to migrants who were not eligible for, or not requesting, asylum in Mexico; whose intended destination was the United States (or Canada); and who came from countries to which repatriation by Mexico would be "difficult and expensive," meaning that the receiving country lacked consular representation or repatriation agreements with Mexico, or where the receiving country would not accept the citizen's return.[233] African nationals were among the groups that were, until mid-2019, often issued *oficios de salida del país*. Due to the limited consular representation of some African countries in Mexico, African nationals are rarely returned to their countries of origin. For example, in 2013, of the 545 Africans that were detained by INM, only 12 were returned."[234]

CLP_PC_022664

## B. MEXICO'S RESTRICTIVE IMMIGRATION ENFORCEMENT SINCE 2019

After President Andrés Manuel López Obrador took office in December 2018, there was a brief period of time in which his Administration claimed to adopt a more permissive, human rights-based approach to immigration than his predecessor.[235] For example, in early 2019, in response to migrant caravans arriving to the Mexico-Guatemala border, immigration authorities increased the number of TVRH cards being issued on public interest/humanitarian bases.[236] During these six months, Mexico's deportation rates were low compared with recent years.[237]

However, in response to economic pressure exerted by the United States, President López Obrador's Administration quickly adopted a hard-line approach to immigration enforcement in southern Mexico.[238] In late May 2019, U.S. President Donald Trump threatened to impose tariffs on imported Mexican goods if Mexico did not prevent undocumented migrants from entering the United States through the Mexico-U.S. border.[239] In response, Mexico deployed thousands of National Guard officers to conduct immigration enforcement at its southern border – to curb the flow of migrants into Mexico.[240] The National Guard is mandated to be a civilian-led security force that addresses crime and public security.[241] In reality, it has been staffed in part by Mexican military officers and federal police officers. This militarization of public security, which violates international law, has been condemned by international human rights groups.[242] While the National Guard was mentioned in the Mexican Constitution of 1917, it was not created or mobilized until the current Administration. Under the current Administration, the National Guard has been given significant powers to exercise its public security functions in the context of migration.[243] Mexican civil society groups, including IMUMI, argue that this is unconstitutional and frames migration as a national security – rather than a human rights – issue.[244]

The deployment of the National Guard resulted in a significant increase in the apprehension and detention of migrants. There was a surge of detentions in June, with an estimated 31,416 migrants detained that month alone, reflecting "the highest monthly total in all publicly available data going back to 2001."[245] In the state of Chiapas, in which Tapachula is located, 66 percent more migrants were apprehended between January and September 2019 than over the same period in 2018.[246] This caused extreme overcrowding in immigration detention centers, including at *Siglo XXI* ("21st Century") detention center in Tapachula.[247] In addition, as outlined in Chapter 6, the INM in Tapachula stopped issuing *oficios de salida del país* that allowed African and other migrants to travel north.

Due to their skin color, African and other Black migrants are often more visible to immigration authorities when travelling without documentation.[248] They are afraid to challenge officials, and are also easy targets for local gangs.[249] Some attempt to evade apprehension by travelling north by boat off Mexico's Pacific Coast, but this journey is dangerous and has proved fatal. For example, in October 2019, a small boat carrying Cameroonian migrants sank off the coast of Chiapas, killing two of the men on board.[250]

CLP_PC_022665

## C. RESTRICTIVE IMMIGRATION POLICY IN THE UNITED STATES

Under the current U.S. Administration, even migrants who successfully reach the Mexico-U.S. border face additional hurdles to claiming asylum in the United States. This section, while not comprehensive, outlines some of these U.S. policies.

The Trump Administration has consistently implemented policies that limit the eligibility of migrants arriving at the Mexico-U.S. border to claim asylum in the United States. The "third country transit ban," which went into effect in July 2019, required asylum seekers arriving to the border to have already claimed asylum (and been rejected) in at least one transit country before being eligible to claim asylum in the United States.[251] This ban fails to acknowledge that it is counterintuitive for migrants arriving to the United States to seek asylum in many of these transit countries. El Salvador, Guatemala, and Honduras, in particular, have some of the highest homicide, rape, trafficking, femicide, and overall violence rates in the world.[252] Likewise, for the reasons discussed throughout this Report, Mexico is not viewed by many African migrants as a viable place to seek asylum due to the continuing violence and discrimination they experience in the country. As of August 2020, the ban is not operational due to a decision of the U.S. Federal Court, but already had a significant and devastating impact on Africans that arrived to the Mexico-U.S. border when the ban was in place.[253]

Further, the Trump Administration has been preventing African and other asylum seekers from even entering the United States for years. The so-called "metering" policy limits the number of migrants that can be processed by U.S. immigration officials each day at official ports of entry on the Mexico-U.S. border, and requires all others to wait in Mexico.[254] Although metering was first instituted under the previous U.S. Administration, reports from non-governmental organizations along the Mexico-U.S. border indicate that, since early 2018, metering has gone from a temporary measure at some ports to standard procedure at major border crossings.[255] The Cameroon American Council documented around two dozen cases of human rights violations against Cameroonians that occurred in the period that they were forced to stay in northern Mexico due to metering.[256] The long wait times have had a detrimental effect on the health of African migrants. For instance, when a woman from Uganda died in Ciudad Juárez in 2019, her companions believed that the long wait times and language barrier hindered her medical care, and that her death could have been prevented.[257] In addition, reports indicate that it is more difficult for Africans to get on the metering list than for other migrants, and Africans are required to submit more documentation than Latin Americans to be added to the list.[258] As of May 2020, there were approximately 14,580 asylum seekers on waitlists in 11 Mexican border cities.[259] About 40 percent of asylum seekers in Reynosa, one of these cities, are from African countries.[260]

Having outlined the recent Mexican and U.S. immigration policies in this Chapter, the next Chapter highlights how this hard-line approach to immigration resulted in thousands of African migrants being stranded in Tapachula in 2019, and the harm they suffered and protested against.

CLP_PC_022666

# CHAPTER SIX:
# AFRICAN MIGRANTS STRANDED IN TAPACHULA
# FROM MID-2019

In the context of Mexico's increasingly hard-line approach to migration, discussed in Chapter 5, immigration officials in Tapachula stopped facilitating the onward migration of Africans to the Mexico-U.S. border. Starting in mid-2019, the INM in Tapachula began issuing the *oficios de salida del país* with a requirement that the recipient leave Mexico by its southern border.[261] With this shift in the INM's practices, thousands of African migrants entering Mexico by its southern border were unable to continue their journey: they lacked documentation that facilitated their journey north but were unable to leave Tapachula without being apprehended by immigration authorities. Many of them did not intend to seek asylum in Mexico, either because their destination was the United States or Canada, or because they believed Mexico to be too unsafe, insecure, or discriminatory to provide refuge. This Chapter outlines the experience of some of these migrants, from their perspective, including by reference to interviews BAJI and the Authors conducted with African migrants and service providers that supported them.

## A. ORGANIZING BY AFRICAN MIGRANTS IN TAPACHULA

Beginning in June 2019, African migrants who were unable to leave Tapachula began settling around the *Siglo XXI* immigration detention center. The migrants, including children and pregnant women, that were camped outside of *Siglo XXI* were living without shelter and their basic needs were not being met.[262] They began organizing, informally at first. Local civil society organizations, like *Fray Matías*, helped to organize roundtables and press conferences to allow African migrants to communicate their concerns about being stranded in Tapachula and the abuse they were suffering.[263] The migrants persisted even through periods of extreme heat and heavy rain.[264] As observed by a staff member of JRS, a civil society organization that supports migrants in Tapachula, this took an "inhuman physical, emotional, and mental toll" on people who had already endured a difficult journey to Mexico.[265]

By August 2019, about 3,000 migrants came together to form a collective: the Assembly of African Migrants (the "Assembly").[266] The Assembly was comprised of migrants from many different African nations, all of whom had fled their countries of origin in order to survive. Its membership continued to grow as more migrants entered Tapachula.[267] In a written statement issued in late August, the Assembly expressed the migrants' "despair, hopelessness, fear, demoralization, loneliness, and abandonment."[268] The majority of the members of the Assembly had been detained for a period in the *Siglo XXI* detention center, without ever benefitting from language interpretation in order to better understand their situation. They described how Mexican officials "made them sign [immigration] documents that they did not understand" yet, in many cases, they were still not able to leave Tapachula.[269] The Assembly asserted that the government provided no assistance to them and, on the contrary, they were under constant surveillance of the National Guard and police. With the Mexican government no longer issuing *oficios de salida del país*, which facilitated onward travel to the Mexico-U.S. border, the Assembly demanded other immigration documents from the Mexican

CLP_PC_022667

government. They sought for those migrants who intended to continue north to the United States or Canada to be granted humanitarian status in Mexico, in order that they could at least leave Tapachula. Further, for those migrants who wished to seek asylum in Mexico, the Assembly requested that their asylum claims be processed without delay. The Assembly also requested humanitarian assistance as well as protection from the National Guard and police.[270]

The Assembly organized demonstrations to assert their human rights.[271] Despite not always being able to communicate in Spanish, they were creative in their use of "traditional songs, dances, performances, all of which were representative of their African cultures and identities," as a means of communication.[272] National and international coverage of these events brought attention to the heightened vulnerability faced by African and other Black migrants in Mexico. A staff member of JRS noted that many local residents "observed the marches with curiosity, even joy." [273] However, locals did not always recognize the marches as a "demonstration for rights" due to their lack of exposure to and awareness of Africans and other Black migrants.[274] Further, some of the demonstrations outside *Siglo XXI* turned violent with the involvement of the National Guard and police.[275] The demonstrations continued through fall 2019 and, when the situation did not improve, a group of African, Caribbean, and Central American migrants attempted to travel north in a caravan.[276] They were blocked almost immediately by the National Guard and many were detained.[277]

In November 2019, Mexican officials demanded that the migrants camped outside of *Siglo XXI* evacuate the premises by December 15, 2019.[278] Some African migrants were issued TVRH cards and, with this temporary status, could leave Tapachula. Others, including some of the Assembly's leaders, were subsequently subject to an expedited process to obtain permanent residence in Mexico after being determined as stateless (*see* Jean's personal account in Section B below).[279] Mexican law provides that the INM, acting on behalf of the *Secretaría de Relaciones Exteriores* ("Secretariat of Foreign Affairs"), may determine a migrant to be stateless where they have no nationality or where it is determined to be impossible to verify their identity. Stateless persons, along with refugees or recipients of complementary protection, gain permanent residency in Mexico.[280] While permanent residence is in many cases a desirable outcome for migrants who seek documentation to settle in Mexico, many of the African migrants in this case intended to seek asylum in the United States or Canada instead. In violation of their rights, they were often not informed about the immigration process in Mexico in a language they understood (*see* Section C below for some personal accounts from this period).[281] They were also unaware of the potential that accepting permanent residence in Mexico might make it more challenging to seek asylum in the United States.[282] Neither the migrants nor service providers interviewed for this Report were given an explanation for why, in November 2019, Mexican officials took this approach. As a staff member from JRS noted, this outcome seemed to be a direct result of the Assembly's demands, over many months, that the Mexican government find a solution that allowed Africans to leave Tapachula.[283]

CLP_PC_022668

## B. JEAN'S MIGRATION JOURNEY

In August 2020, the Authors conducted an interview with Jean[284] – one of the leaders of the Assembly – about his migration journey and experience in Tapachula. This section outlines, from his perspective, his family's journey from the DRC, through South America, into Mexico, and finally to the United States (where the family is currently settled).

Jean is originally from Kinshasa, the capital city of the DRC. His native languages are *Kikongo* and *Bambara* and he also speaks fluent French. Jean explained, in the DRC "we had so many problems – violations, war, political issues, many problems. I don't feel happy talking about my country. We had to leave everything. We left our country to find protection, as human beings. So many people [in the DRC] are looking to migrate." Sometime in 2016, Jean, his wife Marie, and their children travelled from the DRC to South Africa. They then flew to Brazil. After spending some time in Brazil, they went first to Argentina, then traveled through Bolivia, Peru, Ecuador, and into Colombia. They were in South America for a long time but were never settled anywhere. To leave Colombia, the family spent eight days travelling on foot in the Darien Gap jungle. It was raining and wet, and they had to sleep outside without any shelter. Jean said that, while traversing the Darien Gap, "we saw dead bodies and people dying, suffering, and attacked by bandits" as well as "people with nothing to eat." It was an immensely challenging part of the journey. After reaching Panama, the family continued on through Costa Rica, Nicaragua, Honduras, Guatemala, and finally across the Mexican border into Tapachula in July 2019.

After arriving in Mexico, the family was detained for a period before they were released without being issued any documentation. After their release, until November 2019, the family camped outside the *Siglo XXI* detention center along with Africans from 17 countries "such as [the DRC], Angola, Burkina Faso, Mali, Cameroon, Congo-Brazzaville," including 32 pregnant women. Marie was also pregnant at the time. As Jean described, "Mexico didn't let us pass and they didn't give us anything to eat, or anywhere to put our heads down to sleep. The kids slept outside while it rained every day and in lots of heat, like 38-40 degrees Celsius [100-104 degrees Fahrenheit]." Despite the protections in Mexican law, Marie and the other pregnant women "didn't [in practice] have the right to go to the hospital, get a consult, or anything. If you arrive at a health center with pain, they attend to the [Mexican] nationals first and if you are a migrant they require a document from COMAR – without this you can't be seen. Only if they needed to give birth, would they let [the pregnant women] into the hospital, but after they gave birth they had to leave and go back to the camp [outside *Siglo XXI*] and live in the heat with the newborn baby." Marie's experience of being pregnant in Tapachula was "torture." The only help the family received was from JRS and other humanitarian organizations. "Life was very difficult. We weren't considered to be human beings in Mexico."

Over time, in August 2019, Jean, Marie, and thousands of other migrants organized and formed the Assembly. Jean recalled that the majority (around 1800) of the members were from Cameroon, around 600 were from the DRC, around 700 were from Angola, and the rest were from other countries. While they were stuck in Tapachula, more migrants continued to come into the city. The Assembly grew to around 4500 migrants, few of whom spoke or understood

CLP_PC_022669

Spanish. Jean and Marie, who had learned Spanish in South America, were both leaders of the Assembly and were able to interpret for the other Africans as well as speak with Mexican and international media. The Assembly formed out of a sense of solidarity among the Africans stuck in Tapachula. As Jean described, "we shared advice on how to live, how to find food, and how to be supported." They were united in looking for protection and they gathered support, including from local human rights defenders, who informed them about Mexican migration law. As a result, as Jean said, "we saw that we had rights in the law but they were not being put into practice, and that's why we were abused and dehumanized." As a visible member of the Assembly's leadership, Jean was threatened by municipal police and feared for his life. On one occasion, the police shot at and injured another man who they mistook for Jean. After this incident, Jean made a complaint to the INM but he was not aware of any action being taken.

In late September 2019, the UN High Commissioner for Refugees visited Tapachula. This coincided with the inauguration of a new COMAR office there. Jean, Marie, and other migrants tried to speak with the High Commissioner about their situation but were blocked by federal police. Sometime after the High Commissioner's visit, INM officers came to the camp outside *Siglo XXI* and told the migrants to return to detention, as if they had just entered Mexico, and start the immigration process again. After Jean, Marie, and their children returned to detention for 14 days, the INM declared them as "stateless" on the basis that the DRC did not have consular representation in Mexico. Jean was not told why this happened or what had changed. However, with this documentation, the family was finally permitted to leave Tapachula, after

over four months in the city. They travelled by bus to the Mexico-U.S. border. They encountered numerous immigration checkpoints on the journey but were able to pass through each one after showing the documentation they had received from the INM. After three days on the bus, the family reached Mexico's northern border. Jean told (U.S.) immigration that they were stateless, registered their names with the authorities (on the metering list), and waited on the Mexico side of the border until they were allowed to cross into the United States and seek asylum. Marie gave birth to their fourth child shortly after they left Mexico, in December 2019.

When Jean and Marie left the DRC in 2016, it was not their goal to settle in the United States. Their only "objective was to get to a country where we could be protected and start our lives again." For the whole journey, Jean was motivated by the thought that "we would eventually arrive somewhere where we would be considered as human beings. But we were never considered as human beings" anywhere in Latin America – especially not in Mexico. Since arriving to the United States, the family has experienced discrimination and xenophobia but at least "we are considered and treated like human beings." Even months later, Jean does not like talking about his experience in Mexico: "Normally, I don't want to talk more about it. The experience hurt my heart. Because of the Mexican authorities, we had a very bad time. It was a very bad time in our life."

CLP_PC_022670

## C. ANTI-BLACK RACISM IN TAPACHULA

In 2019, while African migrants were camped outside of *Siglo XXI* as described above, BAJI traveled to Tapachula and spoke with 20 Black migrants – from Angola, Cameroon, Congo, DRC, Eritrea, Ethiopia, Ghana, Guinea, Haiti, and Sierra Leone – about their experiences since arriving in Mexico. These migrants raised a number of concerns, specifically about the discrimination they faced from immigration authorities, police, and other government officials. In addition, the migrants described the poor conditions they were living in and their experiences of racism in the contexts of employment, housing, and education. This section summarizes the findings from the interviews.[285]

### Racism in Detention Facilities

After the INM in Tapachula stopped facilitating the onward migration of African migrants by issuing *oficios de salida del país*, many were detained in immigration detention centers (like *Siglo XXI*) either while waiting to be processed in the immigration system or after attempting to leave Tapachula without documentation and being apprehended by immigration authorities. Abdul, a Sierra Leonean migrant, said about his experience in detention: "The Mexican immigration officials tell Black people that detention is a necessary part of seeking status in Mexico, but this is not the case for non-Black migrants." He observed, "All Black people are detained for at least 21 days, including babies, children, and sick people. Also, if we attempt to leave Tapachula, then we are detained again. Some people have been detained up to five or six times." Abdul concluded from his experience that, "Mexican officials are much harsher inside the detention centers than they are outside in public."

The interviewees shared multiple accounts of anti-Black racism within immigration detention centers. In some cases, the interviewees were denied the basic necessities of water and access to medical care. Dauda, who is from Sierra Leone, noted the frequency of illness in detention and stated,

> "When Black migrants require medication, we are only given pain relievers and not proper medication like other migrants. [One week before the date of the interview], a Black migrant from Mauritania almost died in detention because he was not given medication. While we were in detention together, he collapsed and they gave him the same tablets."

The poor conditions in detention fostered the spread of illnesses, such as flus and fevers. As Adamo, a migrant from Cameroon, stated, "Black people are dying in detention and the Mexican officials do not even care enough to allow us access to proper medical care."

Further, interviewees described a stark difference in the quality of food provided to Black migrants in detention relative to other detainees. Manu, who is from Cameroon, summarized the food disparities: "Black people are the last to eat and severely mistreated. If you are Black, you are not able to access the same food in detention. Black people are only given rice to eat while in detention, while other detainees are given rice and chicken." Prison officials went so far as to change the food once they saw Black migrants approaching, giving more nutritious food to other detainees. Mohamed, a migrant from Guinea, recalled officials making statements such as, "You are African, so you cannot eat that." In all aspects, the interviewees expressed that they were treated as subhuman.

CLP_PC_022671

Finally, interviewees described the ways in which systems of segregation played out inside the detention facilities. Mohamed stated, "When an Ethiopian man attempted to enter a line designated for Honduran detainees, he was beat up by all of the Hondurans while the Mexican officials watched the attack take place and did not stop it."

### Police Violence

Even after being released from detention and living in informal housing settlements, the interviewees were still subjected to racism and abuse from state actors. Patrick, a Cameroonian migrant, cited the constant presence of police and frequent arrests:

> "We have many experiences of being harassed and attacked by the Mexican police and immigration officials who bully those of us who are living here in the makeshift camp. Once, the officers stopped a Black man who was walking back to the camp. He was stopped, harassed, forced into a car, and robbed by the police – the people who are supposed to be protecting us. We do not feel safe walking around in Tapachula."

Most interviewees recalled several instances of local police harassing, robbing, and physically attacking Black migrants. Rui, a migrant from Angola, recalled one particularly gruesome attack:

> "At around 7 or 8pm one evening, an Angolan man was coming back to the *Siglo XXI* area. One of the municipal police cars blocked him, and the police came out and pointed a gun at him. While pointing a gun at him, another officer used his baton to choke the man. They beat him up and took all of his money and possessions. Then they put him in the car and left him in the forest. Eventually, the man came to and returned to the *Siglo XXI* area beaten and bloody. We took him to the hospital and discovered that he had internal bleeding and could not walk for a few days…
> After seeing the abuse and violence inflicted by immigration officials and police on Black people, [Mexico] is not a place where we feel safe. We left home with hopes of a better future, but here we have less safety and access to basic needs than we did in our home countries."

The interviewees identified significant fear of police and said there was no accountability for this type of police violence. Thierno, an Angolan migrant stated, "Whenever we see police cars at night, we must run because we know that no one will protect us from their abuse." Even when police violence was reported, there were no consequences or increased protections for Black migrants. As Emmanuel, a migrant from the DRC, described, "The municipal police are also extremely violent and attack Black migrants. We reported this to the federal police…but there was no consequence for this violence."

### Language Barriers

Many of the interviewees believed that the United States would be a safer country in which to seek protection as a refugee than Mexico, due to the discrimination that Black migrants experience in Mexico and the barriers to integration in Mexican society. However, many of the interviewees felt that

CLP_PC_022672

they had been forced by Mexican immigration officials to agree to immigration outcomes that they did not fully understand or want. They felt pressured to sign documents that were not in a language they understood, without any translation or interpretation, and they had no legal representation. As described by Patrick, "Many of us were tricked into signing documents that gave us permanent residence here in Mexico, which is not what we wanted." Manu stated, "They know that we are unable to communicate in Spanish, and so unable to work [in Mexico]. Also, we are unable to understand immigration documents, but were forced to sign these documents." Similarly, Adamo stated: "They use the language barrier to make Black migrants seem uneducated and below others. They also use this to confuse and force Black migrants to seek status in Mexico against our will."

### Racism in Public Spaces

Black migrants were often subjected to extreme forms of social isolation and psychological harm in public spaces. Many interviewees stated that they were faced with stereotypes of being "smelly" or "rowdy." Patrick stated, "The Mexican people insult us on the street, try to avoid getting close or touching us, and cover their noses when we get close to them on minibuses." Many interviewees noted high levels of anti-Black discrimination in stores and other establishments and expressed skepticism about whether language barriers were the cause of such discrimination. Artur, an Angolan migrant, stated, "When you enter stores, you experience immediate discrimination based on your skin color. They do not even respond to us when we speak to them. I speak Spanish, and they will ignore me as well." Many interviewees also recalled Mexican nationals regularly referring to Black migrants as "Negroes" or "apes."

### Employment Discrimination

The widespread racial discrimination complicates Black migrants' access to employment in Tapachula, and their ability to provide for themselves and their families. Several interviewees recounted that Black migrants were repeatedly denied jobs after persistently searching for employment, or were paid significantly less than other employees, if at all. None of the interviewees had been able to secure employment in Mexico. Rui stated, "There have been multiple shops that have posted hiring signs, but when Black migrants (including those with immigration status here) apply they claim that they are no longer hiring. Then when non-Black individuals approach the stores, they are suddenly hiring again." Manu said, "We cannot get jobs due to our race and immigration status. As a result, we are unable to support ourselves, much less provide support for our family members left in Africa." The inability to find work has serious consequences for migrants in Tapachula. In Patrick's words: "We are resorting to various means to escape Tapachula because we are struggling to stay alive here. We do not have money and we are unable to work."

The interviews demonstrated that employment discrimination exists irrespective of immigration status. As described by Abdul, "Even Black migrants who have been granted legal permanent residence in Mexico are unable to find employment in Tapachula because of widespread discrimination. I have not seen any employed Black migrant men in Tapachula, unless they are working under the table." Jean, a Cameroonian migrant, recounted his own experience looking for work "under the table":

CLP_PC_022673

"I asked about employment helping with construction. They said that they would pay us at least 4,000 pesos (approximately $200 US dollars), even though other workers were given 6,000 pesos (approximately $300 US dollars) for the same job. But in the end, they refused to pay us altogether. I worked for 5 days (4 hours a day) from the morning until the afternoon, and I have nothing to show for it. I was very confused about what to do when they refused to pay me because I had nowhere to turn. I know that the police are racist against Blacks, as are the immigration officials."

For Black families traveling together, employment discrimination can result in family separation. Emmanuel cited employment discrimination as the main reason for his family being separated in Mexico: "I could not find a job, so I gave the money we had to my wife and child so they could continue north to the Mexico-U.S. border, and I am waiting to get enough money to go north as well – she left Tapachula two days ago. I think she is still on the road to Acuña, but I do not have a phone and she does not have a phone either, so we are not able to communicate."

### Housing Discrimination

As a result of rampant housing and employment discrimination, many Black migrants were homeless or living in a makeshift refugee shelter outside of the *Siglo XXI* detention facility, where they were holding regular protests and actions (as described in Section A above). Many of the Black migrants did not have tents, and slept on the bare, dirty floor until BAJI and other humanitarian organizations provided tents. Rui, who was living outside of *Siglo XXI* in a tent provided by BAJI, stated, "When we attempt to rent homes, they hike up the prices or deny us housing altogether. Hotels in the city center hike up prices for Black migrants because they do not want Black people residing in their hotels. There is no opportunity here for us to live safely or comfortably." This view was echoed by other interviewees who were unable to secure housing. Manu said: "Even when we attempt to stay in local hotels, we are told to keep our money and get out of their hotels because we are Black and stink." Emmanuel stated, "Before organizations like BAJI came here, there were not tents for people. Other Black people came as individuals and NGOs from the US and provided food and shelter for the Black migrants here. We would have expected the Mexican government to provide these things, but it did not. The fact that they have not done these things shows they do not want us here."

### Educational Barriers

According to the interviewees, local educational institutions were sometimes unwilling to accept Black migrant students, which prevented them from benefitting from the supports available to them. The UNHCR office in Tapachula offered to assist Black migrant youth to enroll in continuing education. However, in practice, the students were denied access to the classes. As Rui explained,

"The UNHCR helped us register in an IT class and as soon as we came to the class, the teacher immediately stopped the class and told all of the students that they could leave – even before we had the opportunity to introduce ourselves. The first day, we arrived late, so we thought that was perhaps why they stopped the class so abruptly. But we arrived on

CLP_PC_022674

time the following five days and the same thing happened. We [were informed] that the teachers refused to teach Black migrants because they say we smell and are rowdy. We stopped attending classes for this reason."

Similarly, Adamo stated, "Our Black children are not going to school, and the Mexican officials do not care. There is no reason why the potential of our children is wasting away here."

## D. GENDER-BASED DISCRIMINATION IN TAPACHULA

As noted above, BAJI was not able to speak with many African women. In order to add a gender perspective to the racial discrimination faced by African migrants, the Authors interviewed various service providers in Mexico about the unique challenges faced by African migrant women in Tapachula. Migration laws and policies, and the migration process overall, affect women differently.[286] The experience of women in migration is dependent on "the social roles of women, their autonomy and capacity to make decisions, their access to resources, and the existing gender stratification in countries of origin and destination."[287] The intersection of gender, race, and migratory status often make it more challenging for women to navigate the migratory process than men. Further, irrespective of their immigration status, women in Mexico are generally subjected to greater social and economic discrimination.[288]

Although many African women pass through Tapachula, they more often stay close to home than their male family members. In her work with African migrants, a staff member from JRS observed that women's contribution to the family economy tended to be through non-remunerated work such as "caring for children, preparing food, [and] going to the river to wash clothing."[289] Conversely, the men are usually responsible for the family's interactions with the INM. Because the women are not always aware of the details of the family's immigration case, they are left in a precarious situation relative to the immigration authorities and, in some cases, at risk of domestic violence or other abuse.[290] This lack of knowledge or involvement with immigration officials is also problematic if the family's asylum claim relies on persecution of which the woman has primary knowledge, or if she has a freestanding gender-based violence asylum claim (including with respect to an abuser she may be traveling with).

African women face numerous barriers to integration in Tapachula and are especially vulnerable in the context of healthcare. Many who give birth in the public hospitals "suffer discrimination, negligence and obstetric-gynecological violence because of their race."[291] This discrimination includes racist comments and critiques of their cultural practices. In addition, some locals "believe that the women bring deadly diseases like Ebola."[292] The public hospitals do not have interpreters available to explain the procedures the women are undergoing, and there is often inadequate access to medications. JRS is aware of "several cases of stillbirth or neonatal death resulting from a lack of medical attention during pregnancy or being denied access to timely medical services during delivery."[293]

As explored in the next Chapter, all African and other migrants in Tapachula are especially vulnerable in the context of the COVID-19 pandemic.

CLP_PC_022675

# CHAPTER SEVEN:
# CURRENT SITUATION IN MEXICO

Prior to March 2020, when the United States suspended the processing of asylum claims due to the COVID-19 pandemic, shelters in Mexico were already full and migrants were living in tents along the Mexico-U.S. border, with the pandemic worsening the situation.[294] As of August 2020, Mexico has one of the highest infection rates in the world, and asylum seekers are facing an increased risk of contracting the virus.[295] Some shelters in Mexico have had to stop accepting newcomers as a precaution because the United States is not testing migrants for COVID-19 before deporting them.[296] In addition, although Mexican law provides that migrants have access to healthcare, many are currently being turned away because hospitals are overwhelmed.[297] The federal government has failed to provide support to migrant shelters or civil society organizations working with migrants.[298]

Since the outbreak began, the job and socio-economic security of migrants in Mexico has deteriorated, leading to increased difficulties in accessing housing, healthcare, and food. The stay-at-home order caused many asylum seekers, who mostly have jobs in restaurants, factories, and construction, to become unemployed.[299] In addition, there has also been a noticeable increase in SGBV, family violence, as well as violence against girls, boys, and adolescents.[300]

While the pandemic led to a drastic fall in the number of asylum claims in Mexico, hundreds of people are still making claims.[301] By the end of May 2020, 19,211 had applied for asylum.[302] COMAR is currently accepting fewer asylum claims, and has suspended reviewing them indefinitely.[303] COMAR is operating at reduced hours, and has eliminated the requirement for applicants to check-in weekly at a COMAR office.[304]

The COVID-19 pandemic has left many migrants at different points in transit. Honduras, El Salvador, and Guatemala closed their borders in mid-March 2020.[305] However, the pandemic and border closures have not deterred migrants from attempting to cross into Mexico. For example, in June 2020, African, Cuban, and Haitian migrants who had been stranded in Honduras since March due to border closures started migrating north in a bid to reach the United States; Honduran authorities ultimately detained 300 of the migrants.[306] There have also been reports of smaller migrant caravans departing from Honduras at various times in 2020.[307] As many as 1,600 migrants – among them Africans – have been stranded in Panama since the pandemic began.[308] In June, there were reports of 200 migrants who were isolated in the treacherous Darien Gap jungle, after 90 had tested positive for COVID-19.[309] Despite the current challenges, migrants will continue to travel towards Mexico's southern border.

CLP_PC_022676

# CHAPTER EIGHT:
## KEY TAKEAWAYS AND RECOMMENDATIONS

As outlined in this Report, the racism, as well as xenophobia and gender-based discrimination, in Mexico continues to impact African and other Black migrants in the country. Moreover, the forces behind migration from Africa and through South America still persist. Africans will continue to make the long and dangerous journey to Mexico's southern border in hopes of finding safety and security the United States or Canada. Further, with entry across the Mexico-U.S. border becoming increasingly elusive, more Africans may – by choice or necessity – begin seeking asylum or otherwise settling in Mexico.

It is therefore increasingly important for Mexico to take steps to address the discrimination and other barriers that impact African and other Black migrants in transit or seeking asylum in the country. Recent events – including the official national recognition of Afro-Mexicans, the Assembly of African Migrants' work to raise awareness about their situation, and the current global anti-Black racism movement – suggest that there is an opening for change. However, genuine political will and concrete action at the national level are necessary in order to begin to dismantle the structures that perpetuate racism against Africans and others in Mexico's immigration system.

The events in Tapachula from June-December 2019 highlighted both how the demographics of Mexico's migrant population are shifting, as well as the limits of the country's response. While in no way comprehensive, the Authors make the following recommendations to address and improve the situation in Tapachula. The Authors also hope that this Report will initiate a conversation about what further steps must be taken.

CLP_PC_022677

# Recommendations for the Mexican government and its agencies, including the INM and COMAR

### 1. Ensure the non-detention of migrant children and families

The Assembly, as well as African and other Black migrants interviewed for this Report, identified the deplorable conditions in immigration detention centers in Tapachula, including *Siglo XXI*. In particular, they noted the discrimination against Black migrants relative to other detained migrants and the segregation of detained migrants by race. Migrants often did not receive culturally appropriate language services (like interpreters), medical care, food, or other necessities while in immigration detention. The CNDH, which monitors human rights violations in immigrant detention facilities, must exercise this responsibility with more attention and the government must provide the funding necessary for this work to be done.

Immigration detention must be the exception, not the rule, and immigration officials must comply with the limits to detention under Mexican law.[310] Under the Migration Law, migrants must be released from detention in 15 business days.[311] Also, according to the regulations of the *Ley General de los Derechos de Niñas, Niños y Adolescentes* ("General Law on the Rights of Children and Adolescents"), no child – accompanied or unaccompanied – may be detained.[312] As IMUMI has argued elsewhere, this means that migrant families must not be detained.[313]

In addition, despite the fact that in November 2020 reforms were approved that integrate the content of the General Law on the Rights of Children and Adolescents with the Migration Law, prohibiting the detention of children and adolescents, to date, they continue to be housed in detention facilities until these reforms go into effect.

BAJI is always working toward the abolition of immigration detention. BAJI's demand for the eradication of immigration detention recognizes that reforming immigration detention, which incarcerates human beings and separates families, is not practical. BAJI promotes community-based alternatives to detention that allow families to remain together while their immigration cases are being processed.[314]

### 2. Provide migrants that have been released from detention with housing and other humanitarian support

The interviewees identified that they were forced to live in informal housing settlements upon their arrival in Tapachula or after being released from immigration detention. This increased their vulnerability to abuse, including police violence. As the interviewees noted, even where they sought accommodation, or employment to be able to support themselves, they were often discriminated against on the basis of race.

Although some civil society organizations were able to provide tents and other interim support in fall 2019, the state must take the responsibility – with UN support – to appropriately house and

CLP_PC_022678

provide humanitarian support to migrants waiting in Tapachula while they are being processed in the immigration system. While the UNHCR provides limited financial support to migrants arriving in Mexico, clearly this has not been sufficient given the backlog of cases in the immigration system and resulting delays in processing migrants arriving in Tapachula.

### 3. Provide immigration officials, police, and other state actors interacting with migrants with anti-Black racism, gender discrimination, and cultural competency training

The interviewees described their experiences of anti-Black racism by government officials and in their interaction with the immigration system. Immigration officials, including at COMAR, the INM, and in immigration detention, must be trained on anti-Black racism, cultural competency, and how to bring a gendered lens to their work.

### 4. Provide anti-Black racism, gender discrimination, and cultural competency training to service providers, including in educational institutions and public hospitals

Many interviewees and service providers identified the negative treatment – ranging from ignorance to overt discrimination – that African and other Black migrants experience in educational institutions and hospitals. The government must ensure that staff in public institutions serving migrants are trained in anti-Black racism, gender discrimination, and cultural competency. The government should support private institutions serving migrants to do the same. Further, the public hospitals in Tapachula must provide the translation/interpretation support necessary to ensure that migrant patients receive the care that they need.

### 5. Immigration officials must provide necessary translation/interpretation to ensure that migrants understand the Mexican immigration process, and the INM must not pressure migrants to accept any particular immigration outcome

Due in part to language barriers and a lack of legal representation, numerous interviewees felt "tricked" into signing immigration documents without understanding their significance or potential implications for later seeking asylum in the United States. Immigration officials must not, in any way, pressure Africans or other migrants to accept any particular immigration outcome. Further, all actions undertaken by immigration officials regarding a migrant's case must be taken only with the migrant's informed consent. This includes an explanation in a language they understand and, where applicable, access to their own legal representative both of which are guaranteed under Mexican law.

### 6. The National Guard must not carry out any immigration enforcement functions

As outlined in the Report, deploying the National Guard to southern Mexico to conduct immigration enforcement led to the apprehension and detention of migrants in alarming numbers, including in Chiapas state. As noted in the Report, IMUMI, along with other Mexican civil society organizations, disputes the constitutional and international legal legitimacy of the National Guard, which despite being a civilian-led force in name is comprised of numerous military and federal police officers. The National Guard should not be involved in any way in immigration enforcement.

CLP_PC_022679

### 7. CONAPRED, the CNDH, and the INM's internal complaint processes must provide an effective response to discrimination complaints by Black migrants

Numerous interviewees identified overt discrimination and violence at the hands of police and other state actors, including in the detention context. Yet, they either did not know how to report these violations or when they filed complaints they did not result in accountability.

CONAPRED and the CNDH both have jurisdiction over migrants' human rights complaints and must respond effectively to the human rights violations they are experiencing. The Authors encourage CONAPRED and the CNDH to provide, within their respective mandates, specific support to Black migrants that are experiencing discrimination in the immigration system as well as in access to housing, employment, education, and health. In addition, the Authors note that President López Obrador suggested dismantling CONAPRED and strongly reject this proposal.[315]

Further, the Órgano Interno de Control ("Internal Control Mechanism"),[316] which has jurisdiction over misconduct by public servants such as INM officials, must respond to and root out misconduct by officers who violate migrants' rights.

### 8. The Mexican government must accept the outstanding request of the Special Rapporteur on contemporary forms of racism, racial discrimination, xenophobia and related intolerance to visit Mexico

Since March 2001, Mexico has issued a "standing invitation" to all UN thematic special procedures to officially visit the country.[317] This means that Mexico has announced that it will always accept requests to visit the country from all special procedures. However, as of the drafting of this report on contemporary forms of racism, racial discrimination, xenophobia and related intolerance ("Special Rapporteur") has not visited Mexico.[318] An initial visit request was issued to Mexico on September 9, 2008, and a reminder visit request was issued by the current Special Rapporteur on January 30, 2019.[319] Mexico must respond to and facilitate an official visit by the Special Rapporteur. This would constitute an important step to acknowledging and, subsequently, addressing the structures that perpetuate racism in Mexico. The Authors hope that the Special Rapporteur will scrutinize the situation of African migrants and others in Mexico's immigration system, including in southern Mexico.

CLP_PC_022680

# Recommendations for international organizations and civil society organizations operating in Tapachula

### 9. Organizations should engage in public education and awareness-raising efforts

Many interviewees and service providers identified the anti-Black racism that migrants experience in public spaces, as well in the contexts of employment, housing, education, and healthcare. This reflects the deeply rooted racism that pervades Mexican society, which affects not only Black migrants but also Afro-Mexicans and other darker-skinned Mexicans and migrants.

Effecting a cultural shift is complex and outside the scope of this Report. However, as an initial step, the Authors recommend that organizations working with and in support of Black migrants in Tapachula consider public education and other awareness-raising efforts (such as public art installations or other cultural events) to inform locals about the migrants' cultures and facilitate cross-cultural exchange.

CLP_PC_022681



# APPENDIX ONE

CLP_PC_022682

# Statistics of African Migration in Mexico

CLP_PC_022683

**Figure 1.** Asylum/refugee status applications submitted by nationals of all African countries, 2013 – October 2019



**Sources:** Government of México, Secretaría de Gobernación, Comisión Mexicana de Ayuda a Refugiados (COMAR). *Boletín Estadístico de Solicitantes de Refugio en México (2013 – 2018)*. Asylum Access, "New COMAR data shows over 13,000 asylum applicants waiting since 2018", 2020. Prepared by Katherine La Puente.

**Figure 2.** Asylum/refugee status applications submitted by nationals of all African countries, 2013 – October 2019, by gender



**Sources:** Government of México, Secretaría de Gobernación, Comisión Mexicana de Ayuda a Refugiados (COMAR). *Boletín Estadístico de Solicitantes de Refugio en México (2013 – 2018)*. Asylum Access, "New COMAR data shows over 13,000 asylum applicants waiting since 2018", 2020. Prepared by Katherine La Puente. Note: COMAR does not specify transgender individuals.

CLP_PC_022684

**Figure 3.** Asylum/refugee status applications submitted by nationals of selected five African countries, 2013 – October 2019



**Sources:** Government of México, Secretaría de Gobernación, Comisión Mexicana de Ayuda a Refugiados (COMAR). *Boletín Estadístico de Solicitantes de Refugio en México (2013 – 2018)*. Asylum Access, "New COMAR data shows over 13,000 asylum applicants waiting since 2018", 2020. Prepared by Katherine La Puente.

**Figure 4.** Asylum/refugee status applications submitted by females of selected five African countries, 2013 – October 2019



**Sources:** Government of México, Secretaría de Gobernación, Comisión Mexicana de Ayuda a Refugiados (COMAR). *Boletín Estadístico de Solicitantes de Refugio en México (2013 – 2018)*. Asylum Access, "New COMAR data shows over 13,000 asylum applicants waiting since 2018", 2020. Prepared by Katherine La Puente.
Note: COMAR does not specify transgender individuals.

CLP_PC_022685

**Table 1.** Migrants presented to migration authorities and detained in INM migration stations, by selected five African countries, 2007 – May 2020

| Year | Africa (all) | Cameroon | DRC | Eritrea | Ghana | Somalia |
|---|---|---|---|---|---|---|
| **2020 (Jan – May)** | 482 | 45 | 162 | 47 | 80 | 7 |
| **2019** | 7,065 | 3,124 | 1,822 | 369 | 196 | 4 |
| **2018** | 2,791 | 950 | 704 | 539 | 131 | 39 |
| **2017** | 2,178 | 425 | 316 | 636 | 116 | 98 |
| **2016** | 3,910 | 199 | 1,009 | 334 | 606 | 373 |
| **2015** | 2,078 | 93 | 8 | 155 | 631 | 864 |
| **2014** | 785 | 21 | 1 | 83 | 169 | 403 |
| **2013** | 545 | 14 | 3 | 69 | 65 | 339 |
| **2012** | 323 | 6 | 0 | 61 | 22 | 176 |
| **2011** | 287 | 4 | 1 | 136 | 13 | 83 |
| **2010** | 1,282 | 6 | 4 | 723 | 13 | 311 |
| **2009** | 823 | 8 | 4 | 330 | 9 | 303 |
| **2008** | 658 | 7 | 0 | 363 | 9 | 134 |
| **2007** | 460 | 10 | 0 | 232 | 1 | 110 |

**Sources:** Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2007-2020).* *Prepared by Katherine La Puente.*

**Table 2.** Minors presented to migration authorities and detained in INM migration stations, by selected five African countries, 2007 – May 2020

| Year | Africa (all) | Cameroon | DRC | Eritrea | Ghana | Somalia |
|---|---|---|---|---|---|---|
| **2020 (Jan – May)** | 95 | 5 | 65 | 0 | 13 | 0 |
| **2019** | 1,218 | 28 | 701 | 5 | 19 | 0 |
| **2018** | 396 | 3 | 300 | 6 | 12 | 0 |
| **2017** | 155 | 7 | 98 | 1 | 3 | 6 |
| **2016** | 120 | 9 | 47 | 2 | 7 | 9 |
| **2015** | 31 | 0 | 0 | 1 | 8 | 11 |
| **2014** | 12 | 0 | 0 | 6 | 2 | 3 |

**Sources:** Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2014-2020).* *Prepared by Katherine La Puente.*

CLP_PC_022686

**Table 3.** Migrants returned by INM authorities, by selected five African countries, 2007 – 2013*

| Year | Africa (all) | Cameroon | DRC | Eritrea | Ghana | Somalia |
|------|------|------|------|------|------|------|
| 2013 | 12 | 5 | 0 | 0 | 1 | 0 |
| 2012 | 10 | 1 | 0 | 0 | 0 | 0 |
| 2011 | 11 | 0 | 0 | 0 | 0 | 0 |
| 2010 | 24 | 1 | 2 | 0 | 2 | 0 |
| 2009 | 17 | 1 | 0 | 0 | 5 | 0 |
| 2008 | 13 | 0 | 0 | 0 | 0 | 0 |
| 2007 | 53 | 7 | 0 | 0 | 0 | 0 |

*Includes minors.*

**Sources:** Government of México, Instituto Nacional de Migración. Boletín mensual de estadísticas migratorias (2007-2013). Prepared by Katherine La Puente.

Note on immigration categories: Family includes financial dependents; Work includes foreigners whose motive to stay is work or an offer of employment; Property owner, which includes property and real estate owners, investors, retirees or pensioners; Humanitarian includes victims or witnesses or humanitarian causes; Others include those whose motive to stay are scientific research projects, public interest, or others.

Note on visa types: Temporary Resident Visa was previously known as FM3 and referred as such in INM documents. Permanent Resident Visa was previously known as FM2.

CLP_PC_022687

# COUNTRY 1
# CAMEROON

CLP_PC_022688

**Table 1.1.** Asylum/Refugee Status Application Outcomes of Cameroonians by outcome type and by female gender, 2013 – October 2019.

| Year or Time Period | Asylum/ Refugee Status Granted Total (# Female) | Complementary Protection (CP) Granted Total (# Female) | Asylum/ Refugee Status Denied Total (# Female) | Abandoned or Withdrawn Case Total (# Female) | Total Number Total (# Female) | Grant Rate^ Overall | Grant Rate^ for Females |
|---|---|---|---|---|---|---|---|
| 2013 | 1 (0) | 0 (0) | 4 (1) | 2 (0) | 7 (1) | 20% | 0% |
| 2014 | 1 (1) | 1 (0) | 2 (1) | 1 (1) | 5 (3) | 50% | 50% |
| 2015 | 2 (1) | 0 (0) | 1 (1) | 1 (0) | 4 (2) | 66.7% | 50% |
| 2016 | 1 (0) | 0 (0) | 8 (3) | 17 (9) | 26 (12) | 11.1% | 0% |
| 2017 | 2 (2) | 3 (1) | 3 (0) | 82 (43) | 90 (46) | 62.5% | 100% |
| 2018 (Jan – Sep) | 0 (0) | 0 (0) | 0 (0) | 1 (0) | 1 (0) | - | - |
| Jan 2018 – Oct 2019 | 3 (2) | N/A | 0 (0) | 8 (3) | 11 (5) | 100% | 100% |

**Sources:** Government of México, Secretaría de Gobernación, Comisión Mexicana de Ayuda a Refugiados (COMAR). *Boletín Estadístico de Solicitantes de Refugio en México (2013 – 2018);* Asylum Access, "New COMAR data shows over 13,000 asylum applicants waiting since 2018", 2020. Prepared by Katherine La Puente.
- / grant rate not applicable since applications were neither granted nor denied.
\* includes unaccompanied minors
^Grant rate is defined as asylum/refugee status and complementary protection (CP) granted out of all applications that were either granted or denied. It does not include applications that were abandoned or withdrawn.

**Table 1.2.** Cameroonians not subject to return, by alternative option, 2016 – May 2020

| Year | Regularization of migration status | Exit permit | Asylum/refugee applications | Total |
|---|---|---|---|---|
| 2020 (Jan – May) | 13 | 7 | 17 | 37 |
| 2019 | 2,364 | 304 | 403 | 3,071 |
| 2018 | 24 | 911 | N/A | 935 |
| 2017 | 207 | 211 | N/A | 418 |
| 2016 | 100 | 93 | N/A | 193 |

**Sources: Government of México, Instituto Nacional de Migración.** *Boletín mensual de estadísticas migratorias (2016-2020).* Prepared by Katherine La Puente.

CLP_PC_022689

**Table 1.3.** Temporary Residence Card (TRT) Issued for Cameroonians, by immigration category, 2009 – May 2020

| Year | Family | Work | Property Owner | Student | Humanitarian | Others | Total |
|------|--------|------|----------------|---------|--------------|--------|-------|
| 2020 (Jan – May) | 1 | 1 | 0 | 0 | N/A | 0 | 2 |
| 2019 | 3 | 2 | 0 | 1 | N/A | 4 | 10 |
| 2018 | 2 | 3 | 0 | 1 | N/A | 1 | 7 |
| 2017 | 2 | 10 | 0 | 0 | N/A | 3 | 15 |
| 2016 | 4 | 6 | 0 | 1 | N/A | 4 | 15 |
| 2015 | 0 | 11 | 0 | 4 | N/A | 2 | 17 |
| 2014 | 8 | 9 | 0 | 3 | N/A | 2 | 22 |
| 2013 | 0 | 4 | 0 | 5 | 0 | 2 | 11 |
| 2012 | 0 | 0 | 0 | 4 | 0 | 1 | 5 |
| | Political Asylum | Correspondent | Student | Minister | Refugee | Visitor | Distinguished Visitor | Provisional Visitor | |
| 2011 | 0 | 0 | 0 | 1 | 0 | 7 | 0 | 0 | 8 |
| 2010 | 0 | 0 | 0 | 2 | 1 | 6 | 0 | 0 | 9 |
| 2009 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 13 |

**Sources:** Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2009-2020). Prepared by Katherine La Puente.*

**Table 1.4.** *Temporary Residence Card* (TRT) Renewed for Cameroonians, by immigration category, 2010 – May 2020

| Year | Family | Work | Property Owner | Student | Humanitarian Reasons | Others | Total |
|------|--------|------|----------------|---------|----------------------|--------|-------|
| 2020 (Jan – May) | 0 | 5 | 0 | 1 | N/A | 0 | 6 |
| 2019 | 1 | 6 | 0 | 3 | N/A | 3 | 13 |
| 2018 | 0 | 9 | 0 | 3 | N/A | 4 | 16 |
| 2017 | 4 | 11 | 1 | 8 | N/A | 1 | 25 |
| 2016 | 4 | 12 | 1 | 6 | N/A | 2 | 25 |
| 2015 | 3 | 10 | 0 | 8 | N/A | 1 | 22 |
| 2014 | 0 | 10 | 1 | 9 | N/A | 0 | 20 |
| 2013 | 2 | 14 | 3 | 8 | 0 | 4 | 31 |
| 2012 | 2 | 5 | 0 | 1 | 0 | 6 | 14 |
| | Political Asylum | Correspondent | Student | Minister | Refugee | Visitor | Distinguished Visitor | Provisional Visitor | |
| 2011 | 0 | 0 | 4 | 8 | 0 | 7 | 0 | 0 | 19 |
| 2010 | 0 | 0 | 4 | 4 | 2 | 18 | 0 | 0 | 28 |

**Sources: Government of México, Instituto Nacional de Migración.** *Boletín mensual de estadísticas migratorias (2010-2020). Prepared by Katherine La Puente.*

CLP_PC_022690

**Table 1.5.** *Permanent Residence Card (***TRP***) I*ssued for Cameroonians, by immigration category, 2009 – May 2020

| Year | Family | Work | Property Owner | Humanitarian Reasons | Others | Total |
|---|---|---|---|---|---|---|
| 2020 (Jan – May) | 3 | 1 | 0 | 1 | 1 | 6 |
| 2019 | 12 | 4 | 0 | 3 | 2 | 21 |
| 2018 | 11 | 3 | 0 | 1 | 0 | 15 |
| 2017 | 8 | 2 | 0 | 3 | 1 | 14 |
| 2016 | 6 | 2 | 0 | 6 | 1 | 15 |
| 2015 | 5 | 4 | 0 | 1 | 2 | 12 |
| 2014 | 11 | 10 | 0 | 2 | 0 | 23 |
| 2013 | 18 | 4 | 0 | 2 | 5 | 29 |
| 2012 | 0 | 4 | 0 | 0 | 1 | 5 |

| | Artists & Athletes | Assimilated | Trusted Director | Scientist | Relatives | Investor | Professional | Property Owner | Technician | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2011 | 0 | 1 | 6 | 0 | 0 | 0 | 1 | 0 | 0 | 8 |
| 2010 | 0 | 1 | 12 | 0 | 8 | 0 | 0 | 0 | 10 | 31 |
| 2009 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 19 |

**Sources: Government of México, Instituto Nacional de Migración.** *Boletín mensual de estadísticas migratorias (2009-2020). Prepared by Katherine La Puente.*

**Table 1.6.** *Permanent Residence Card (***TRP***) Renewed for Cameroonians, by immigration category,* 2010 – May 2020

| Year | Family | Work | Property Owner | Humanitarian Reasons | Others | Total |
|---|---|---|---|---|---|---|
| 2020 (Jan – May) | 0 | 0 | N/A | 0 | 0 | 0 |
| 2019 | 0 | 0 | N/A | 0 | 0 | 0 |
| 2018 | 0 | 0 | N/A | 0 | 0 | 0 |
| 2017 | 0 | N/A | N/A | 0 | 0 | 0 |
| 2016 | 0 | N/A | N/A | 0 | 0 | 0 |
| 2015 | 0 | N/A | N/A | 0 | 0 | 0 |
| 2014 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2013 | 1 | 0 | 0 | 0 | 0 | 1 |
| 2012 | 4 | 29 | 1 | 0 | 9 | 43 |

| | Artists & Athletes | Assimilated | Trusted Director | Scientist | Relatives | Investor | Professional | Property Owner | Technician | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2011 | 2 | 7 | 26 | 0 | 18 | 0 | 0 | 1 | 7 | 61 |
| 2010 | 1 | 2 | 14 | 0 | 4 | 0 | 0 | 0 | 2 | 23 |

**Sources:** Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2010-2020). Prepared by Katherine La Puente.*
**Note:** *2010-2012 refers to renewals as "refrendos", which we take to mean renewals in this context.*

CLP_PC_022691

**Table 1.7.** *Permanent Residence Card (**TRP**) for regularization of migration situation for Cameroonians, 2013 – May 2020*

| Year | Family | Work | Property Owner | Humanitarian Reasons | Others | Total |
|------|--------|------|----------------|----------------------|--------|-------|
| 2020 (Jan – May) | 2 | N/A | N/A | 0 | 0 | 2 |
| 2019 | 3 | N/A | N/A | 0 | 0 | 3 |
| 2018 | 3 | N/A | N/A | 0 | 0 | 3 |
| 2017 | 6 | N/A | N/A | 0 | 0 | 6 |
| 2016 | 2 | N/A | N/A | 0 | 0 | 2 |
| 2015 | 2 | N/A | N/A | 0 | 0 | 2 |
| 2014 | 5 | 0 | 0 | 0 | 0 | 5 |
| 2013 | 3 | 0 | 0 | 0 | 0 | 3 |

**Sources:** Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2013-2020).* *Prepared by Katherine La Puente.*

**Table 1.8.** *Cameroonians documented as permanent residents due to recognition of refugee status, 2012 – May 2020*

| Year | Number of Individuals |
|------|----------------------|
| 2020 (Jan – May) | 1 |
| 2019 | 3 |
| 2018 | 1 |
| 2017 | 2 |
| 2016 | 6 |
| 2015 | 0 |
| 2014 | 1 |
| 2013 | 2 |
| 2012 | 1 |

**Sources:** Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2012-2020)***.** Prepared by Katherine La Puente.

**Table 1.9.** *Visitor Cards for Humanitarian Reasons (TVRH) Issues and Extensions for Cameroonians, 2014 – May 2020*

| Year | Issues | Extensions |
|------|--------|------------|
| 2020 (Jan – May) | 9 | 0 |
| 2019 | 19 | 2 |
| 2018 | 13 | 0 |
| 2017 | 5 | 0 |
| 2016 | 1 | 0 |
| 2015 | 0 | 0 |
| 2014 | 2 | 0 |

**Note:** Although the condition of visitor for humanitarian reasons (TVRH) was established under the Migration Law passed in 2011, there is only publicly available data for TVRH issues beginning in 2014.
**Sources:** Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2014-2020).* *Prepared by Katherine La Puente.*

CLP_PC_022692

**Table 1.10.** *TRT Issued under Migratory Regularization Program, by immigration category for Cameroonians, 2015-2018*

| Year | Family | Work | Property Owner | Student | Humanitarian Reasons | Others | Total |
|------|--------|------|----------------|---------|----------------------|--------|-------|
| 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2017 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2015 | 1 | 2 | 0 | 0 | 0 | 0 | 3 |

**Sources: Government of México, Instituto Nacional de Migración.** *Boletín mensual de estadísticas migratorias (2015-2018). Prepared by Katherine La Puente.*

CLP_PC_022693

# COUNTRY 2
# DEMOCRATIC REPUBLIC
# OF CONGO (DRC)

CLP_PC_022694

**Table 2.1.** Asylum/Refugee Status Application Outcomes of Congolese (DRC) by outcome type and by female gender, 2013 – October 2019

| Year or Time Period | Asylum/ Refugee Status Granted<br><br>*Total (# Female)* | Complementary Protection (CP) Granted<br><br>*Total (# Female)* | Asylum/ Refugee Status Denied<br><br>*Total (# Female)* | Abandoned or Withdrawn Case<br><br>*Total (# Female)* | Total Number<br><br>*Total (# Female)* | Grant Rate^ Overall | Grant Rate^ for Females |
|---|---|---|---|---|---|---|---|
| 2013 | 0 (0) | 0 (0) | 0 (0) | 0 (0) | 0 (0) | - | - |
| 2014 | 0 (0) | 0 (0) | 0 (0) | 0 (0) | 0 (0) | - | - |
| 2015 | 0 (0) | 0 (0) | 0 (0) | 0 (0) | 0 (0) | - | - |
| 2016 | 1 (0) | 2 (2) | 2 (0) | 0 (0) | 0 (0) | 60% | 100% |
| 2017 | 1 (0) | 0 (0) | 0 (0) | 0 (0) | 1 (0) | 100% | - |
| 2018 (Jan – Sep) | 0 (0) | 0 (0) | 0 (0) | 0 (0) | 0 (0) | - | - |
| Jan 2018 – Oct 2019 | 1 (0) | N/A | 0 (0) | 0 (0) | 0 (0) | 100% | - |

**Sources:** Government of México, Secretaría de Gobernación, Comisión Mexicana de Ayuda a Refugiados (COMAR). *Boletín Estadístico de Solicitantes de Refugio en México (2013 – 2018)*; Asylum Access, "New COMAR data shows over 13,000 asylum applicants waiting since 2018", 2020. Prepared by Katherine La Puente.
- / grant rate not applicable since applications were neither granted nor denied.
* includes unaccompanied minors
^Grant rate is defined as asylum/refugee status and complementary protection (CP) granted out of all applications that were either granted or denied. It does not include applications that were abandoned or withdrawn.

**Table 2.2** Congolese (DRC) not subject to return, by alternative option, 2016 – May 2020

| Year | Regularization of migration status | Exit permit | Asylum/refugee applications | Total |
|---|---|---|---|---|
| 2020 (Jan – May) | 40 | 44 | 1 | 85 |
| 2019 | 1,324 | 291 | 202 | 1,817 |
| 2018 | 4 | 695 | N/A | 699 |
| 2017 | 199 | 109 | N/A | 308 |
| 2016 | 943 | 67 | N/A | 1,010 |

**Sources:** Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2016-2020).* Prepared by Katherine La Puente.

CLP_PC_022695

**Table 2.3.** Temporary Residence Card (TRT) Issued for Congolese (DRC), by immigration category, 2009 – May 2020

| Year | Family | Work | Property Owner | Student | Humanitarian | Others | Total |
|---|---|---|---|---|---|---|---|
| 2020 (Jan - May) | 0 | 2 | 0 | 0 | N/A | 0 | 2 |
| 2019 | 0 | 8 | 0 | 5 | N/A | 0 | 13 |
| 2018 | 2 | 2 | 0 | 2 | N/A | 5 | 11 |
| 2017 | 2 | 4 | 0 | 0 | N/A | 5 | 11 |
| 2016 | 2 | 12 | 0 | 1 | N/A | 3 | 18 |
| 2015 | 0 | 10 | 0 | 7 | N/A | 1 | 18 |
| 2014 | 4 | 4 | 0 | 10 | N/A | 2 | 20 |
| 2013 | 0 | 5 | 0 | 5 | 2 | 0 | 12 |
| 2012 | 0 | 7 | 0 | 0 | 0 | 0 | 8 |

| | Political Asylum | Correspondent | Student | Minister | Refugee | Visitor | Distinguished Visitor | Provisional Visitor | |
|---|---|---|---|---|---|---|---|---|---|
| 2011 | 0 | 0 | 1 | 3 | 0 | 2 | 0 | 0 | 6 |
| 2010 | 0 | 0 | 1 | 1 | 5 | 3 | 0 | 0 | 10 |
| 2009 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 30 |

**Sources:** Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2009-2020). Prepared by Katherine La Puente.*

**Table 2.4.** Temporary Residence Card (TRT) Renewed for Congolese (DRC), by immigration category, 2010 – May 2020

| Year | Family | Work | Property Owner | Student | Others | Total |
|---|---|---|---|---|---|---|
| 2020 (Jan - May) | 1 | 5 | 0 | 1 | 0 | 7 |
| 2019 | 4 | 9 | 0 | 2 | 0 | 15 |
| 2018 | 0 | 13 | 0 | 4 | 1 | 18 |
| 2017 | 0 | 21 | 1 | 4 | 4 | 30 |
| 2016 | 0 | 12 | 1 | 5 | 2 | 20 |
| 2015 | 4 | 8 | 0 | 12 | 0 | 24 |
| 2014 | 1 | 6 | 1 | 13 | 0 | 21 |
| 2013 | 1 | 10 | 0 | 8 | 3 | 22 |
| 2012 | 2 | 8 | 0 | 3 | 4 | 17 |

| | Political Asylum | Correspondent | Student | Minister | Refugee | Visitor | Distinguished Visitor | Provisional Visitor | |
|---|---|---|---|---|---|---|---|---|---|
| 2011 | 0 | 0 | 6 | 8 | 2 | 4 | 0 | 0 | 20 |
| 2010 | 0 | 0 | 3 | 4 | 5 | 3 | 0 | 0 | 15 |

**Sources: Government of México, Instituto Nacional de Migración.** *Boletín mensual de estadísticas migratorias (2010-2020). Prepared by Katherine La Puente.*

CLP_PC_022696

**Table 2.5.** Permanent Residence Card (TRP) Issued for Congolese (DRC), by immigration category, 2009 – May 2020

| Year | Family | Work | Property Owner | Humanitarian Reasons | Others | Total |
|---|---|---|---|---|---|---|
| 2020 (Jan – May) | 3 | 3 | 0 | 0 | 4 | 10 |
| 2019 | 6 | 1 | 0 | 7 | 0 | 14 |
| 2018 | 4 | 1 | 0 | 5 | 4 | 14 |
| 2017 | 3 | 4 | 0 | 0 | 0 | 7 |
| 2016 | 7 | 7 | 0 | 0 | 7 | 21 |
| 2015 | 6 | 2 | 0 | 1 | 0 | 9 |
| 2014 | 1 | 2 | 0 | 2 | 7 | 12 |
| 2013 | 6 | 3 | 0 | 5 | 4 | 18 |
| 2012 | 0 | 0 | 0 | 0 | 0 | 0 |

| Year | Artists & Athletes | Assimilated | Trusted Director | Scientist | Relatives | Investor | Professional | Property Owner | Technician | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2011 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2 |
| 2010 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 2 |
| 2009 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 3 |

**Sources:** Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2009-2020). Prepared by Katherine La Puente.*

**Table 2.6.** Permanent Residence Card (TRP) Renewed for Congolese (DRC), by immigration category, 2010 – May 2020

| Year | Family | Work | Property Owner | Humanitarian Reasons | Others | Total |
|---|---|---|---|---|---|---|
| 2020 (Jan – May) | 0 | 0 | N/A | 0 | 0 | 0 |
| 2019 | 2 | 0 | N/A | 0 | 1 | 3 |
| 2018 | 0 | 0 | N/A | 0 | 0 | 0 |
| 2017 | 0 | N/A | N/A | 0 | 0 | 0 |
| 2016 | 0 | N/A | N/A | 0 | 0 | 0 |
| 2015 | 0 | N/A | N/A | 0 | 0 | 0 |
| 2014 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2013 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2012 | 3 | 4 | 0 | 0 | 3 | 10 |

| Year | Artists & Athletes | Assimilated | Trusted Director | Scientist | Relatives | Investor | Professional | Property Owner | Technician | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2011 | 0 | 1 | 4 | 2 | 4 | 0 | 0 | 0 | 0 | 11 |
| 2010 | 0 | 1 | 1 | 4 | 0 | 0 | 0 | 0 | 6 | |

**Sources:** Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2010-2020). Prepared by Katherine La Puente.*
**Note:** *2010-2012 refers to renewals as "refrendos", which we take to mean renewals in this context.*

CLP_PC_022697

**Table 2.7.** Permanent Residence Card (TRP) for regularization of migration situation for Congolese (DRC), 2013 – May 2020

| Year | Family | Work | Property Owner | Humanitarian Reasons | Others | Total |
|------|--------|------|----------------|----------------------|--------|-------|
| 2020 (Jan – May) | 1 | N/A | N/A | 0 | 0 | 1 |
| 2019 | 2 | N/A | N/A | 0 | 0 | 2 |
| 2018 | 1 | N/A | N/A | 0 | 0 | 1 |
| 2017 | 0 | N/A | N/A | 0 | 0 | 0 |
| 2016 | 0 | N/A | N/A | 0 | 0 | 0 |
| 2015 | 2 | N/A | N/A | 0 | 0 | 2 |
| 2014 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2013 | 0 | 0 | 0 | 0 | 0 | 0 |

**Sources:** Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2013-2020). Prepared by Katherine La Puente.*

**Table 2.8.** Congolese (DRC) documented as permanent residents due to recognition of refugee status, 2012 – May 2020

| Year | Number of Individuals |
|------|-----------------------|
| 2020 (Jan – May) | 0 |
| 2019 | 7 |
| 2018 | 4 |
| 2017 | 0 |
| 2016 | 0 |
| 2015 | 1 |
| 2014 | 2 |
| 2013 | 3 |
| 2012 | 6 |

**Sources:** Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2012-2020)***.** Prepared by Katherine La Puente.

**Table 2.9.** Visitor Cards for Humanitarian Reasons (TVRH) Issues and Extensions for Congolese (DRC), 2014 – May 2020

| Year | Issues | Extensions |
|------|--------|------------|
| 2020 (Jan – May) | 0 | 0 |
| 2019 | 11 | 0 |
| 2018 | 4 | 1 |
| 2017 | 0 | 0 |
| 2016 | 0 | 0 |
| 2015 | 1 | 0 |
| 2014 | 1 | 0 |

**Note:** Although the condition of visitor for humanitarian reasons (TVRH) was established under the Migration Law passed in 2011, there is only publicly available data for TVRH issues beginning in 2014.

**Sources:** Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2014-2020). Prepared by Katherine La Puente.*

CLP_PC_022698

**Table 2.10.** *TRT Issued under Migratory Regularization Program, by immigration category for Congolese (DRC), 2015-2018*

| Year | Family | Work | Property Owner | Student | Humanitarian Reasons | Others | Total |
|------|--------|------|----------------|---------|----------------------|--------|-------|
| 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2015 | 0 | 1 | 0 | 0 | 0 | 1 | 2 |

**Sources:** Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2015-2018).* *Prepared by Katherine La Puente.*

CLP_PC_022699

# COUNTRY 3
## ERITREA

CLP_PC_022700

**Table 3.1.** Asylum/Refugee Status Application Outcomes of Eritreans by outcome type and by female gender, 2013 – October 2019

| Year or Time Period | Asylum/ Refugee Status Granted Total (# Female) | Complementary Protection (CP) Granted Total (# Female) | Asylum/ Refugee Status Denied Total (# Female) | Abandoned or Withdrawn Case Total (# Female) | Total Number Total (# Female) | Grant Rate^ Overall | Grant Rate^ for Females |
|---|---|---|---|---|---|---|---|
| 2013 | 1 (1) | 0 (0) | 0 (0) | 0 (0) | 1 (1) | 100% | 100% |
| 2014 | 0 (0) | 0 (0) | 0 (0) | 4 (0) | 4 (0) | - | - |
| 2015 | 0 (0) | 0 (0) | 0 (0) | 0 (0) | 0 (0) | - | - |
| 2016 | 0 (0) | 0 (0) | 0 (0) | 2 (1) | 2 (1) | - | - |
| 2017 | 0 (0) | 0 (0) | 0 (0) | 2 (0) | 2 (0) | - | - |
| 2018 (Jan – Sep) | 0 (0) | 0 (0) | 0 (0) | 0 (0) | 0 (0) | - | - |
| Jan 2018 – Oct 2019 | 0 (0) | N/A | 0 (0) | 0 (0) | 0 (0) | - | - |

**Sources:** Government of México, Secretaría de Gobernación, Comisión Mexicana de Ayuda a Refugiados (COMAR). *Boletín Estadístico de Solicitantes de Refugio en México (2013 – 2018)*; Asylum Access, "New COMAR data shows over 13,000 asylum applicants waiting since 2018", 2020. Prepared by Katherine La Puente.
- / grant rate not applicable since applications were neither granted nor denied.
* includes unaccompanied minors
^Grant rate is defined as asylum/refugee status and complementary protection (CP) granted out of all applications that were either granted or denied. It does not include applications that were abandoned or withdrawn.

**Table 3.2** Eritreans not subject to return, by alternative option, 2016 – May 2020

| Year | Regularization of migration status | Exit permit | Asylum/refugee applications | Total |
|---|---|---|---|---|
| 2020 (Jan – May) | 13 | 19 | 0 | 32 |
| 2019 | 263 | 34 | 45 | 342 |
| 2018 | 16 | 523 | N/A | 539 |
| 2017 | 34 | 564 | N/A | 598 |
| 2016 | 182 | 155 | N/A | 337 |

**Sources:** Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2016-2020)*. Prepared by Katherine La Puente.

CLP_PC_022701

**Table 3.3.** *Temporary Residence Card (***TRT***) Issued for Eritreans, by immigration category, 2009 – May 2020*

| Year | Family | Work | Property Owner | Student | Humanitarian | Others | Total |
|---|---|---|---|---|---|---|---|
| 2020 (Jan – May) | 0 | 0 | 0 | 0 | N/A | 0 | 0 |
| 2019 | 0 | 0 | 0 | 0 | N/A | 0 | 0 |
| 2018 | 0 | 0 | 0 | 1 | N/A | 1 | 2 |
| 2017 | 0 | 0 | 0 | 0 | N/A | 0 | 0 |
| 2016 | 1 | 0 | 0 | 1 | N/A | 1 | 3 |
| 2015 | 0 | 2 | 0 | 0 | N/A | 0 | 2 |
| 2014 | 0 | 0 | 0 | 0 | N/A | 0 | 0 |
| 2013 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| 2012 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | Political Asylum | Correspondent | Student | Minister | Refugee | Visitor | Distinguished Visitor | Provisional Visitor | |
| 2011 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2010 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2009 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 1 |

**Sources:** Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2009-2020). Prepared by Katherine La Puente.*

**Table 3.4.** *Temporary Residence Card* (TRT) *Renewed for Eritreans, by immigration category, 2010 – May 2020*

| Year | Family | Work | Rentier | Student | Humanitarian Reasons* | Others | Total |
|---|---|---|---|---|---|---|---|
| 2020 (Jan –May) | 0 | 0 | 0 | 0 | N/A | 0 | 0 |
| 2019 | 0 | 0 | 0 | 1 | N/A | 0 | 1 |
| 2018 | 0 | 2 | 0 | 1 | N/A | 0 | 3 |
| 2017 | 0 | 2 | 0 | 1 | N/A | 0 | 3 |
| 2016 | 0 | 2 | 0 | 0 | N/A | 0 | 2 |
| 2015 | 0 | 0 | 0 | 0 | N/A | 0 | 0 |
| 2014 | 0 | 0 | 0 | 0 | N/A | 0 | 0 |
| 2013 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| 2012 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Political Asylum | Correspondent | Student | Minister | Refugee | Visitor | Distinguished Visitor | Provisional Visitor | |
| 2011 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 |
| 2010 | 0 | 0 | 0 | 1 | 1 | 1 | 0 | 0 | 3 |

**Sources:** Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2010-2020). Prepared by Katherine La Puente.*

CLP_PC_022702

**Table 3.5.** *Permanent Residence Card* (TRP) Issued for Eritreans, by immigration category, 2009 – May 2020

| Year | Family | Work | Property Owner | Humanitarian Reasons | Others | Total |
|---|---|---|---|---|---|---|
| 2020 (Jan - May) | 0 | 0 | 0 | 0 | 0 | 0 |
| 2019 | 0 | 1 | 0 | 0 | 1 | 2 |
| 2018 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2017 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2016 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2015 | 0 | 0 | 0 | 1 | 0 | 1 |
| 2014 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2013 | 1 | 0 | 0 | 1 | 0 | 2 |
| 2012 | 0 | 1 | 0 | 0 | 0 | 1 |

| | Artists & Athletes | Assimilated | Trusted Director | Scientist | Relatives | Investor | Professional | Property Owner | Technician | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2011 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2010 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2009 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 0 |

**Sources:** Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2009-2020).* Prepared by Katherine La Puente.

**Table 3.6.** *Permanent Residence Card* (TRP) Renewed for Eritreans, by immigration category, 2010 – May 2020

| Year | Family | Work | Property Owner | Humanitarian Reasons | Others | Total |
|---|---|---|---|---|---|---|
| 2020 (Jan -May) | 0 | 0 | N/A | 0 | 0 | 0 |
| 2019 | 0 | 0 | N/A | 0 | 0 | 0 |
| 2018 | 0 | 0 | N/A | 0 | 0 | 0 |
| 2017 | 0 | N/A | N/A | 0 | 0 | 0 |
| 2016 | 0 | N/A | N/A | 0 | 0 | 0 |
| 2015 | 0 | N/A | N/A | 0 | 0 | 0 |
| 2014 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2013 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2012 | 0 | 1 | 0 | 0 | 0 | 1 |

| | Artists & Athletes | Assimilated | Trusted Director | Scientist | Relatives | Investor | Professional | Property Owner | Technician | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2011 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| 2010 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 2 |

**Sources:** Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2010-2020).* Prepared by Katherine La Puente.
**Note:** *2010-2012 refers to renewals as "refrendos", which we take to mean renewals in this context.*

CLP_PC_022703

**Table 3.7.** *Permanent Residence Card* (TRP) for regularization of migration situation for Eritreans, 2013 – May 2020

| Year | Family | Work | Property Owner | Humanitarian Reasons | Others | Total |
|------|--------|------|----------------|----------------------|--------|-------|
| 2020 (Jan - May) | 0 | N/A | N/A | 0 | 0 | 0 |
| 2019 | 0 | N/A | N/A | 0 | 0 | 0 |
| 2018 | 0 | N/A | N/A | 0 | 0 | 0 |
| 2017 | 0 | N/A | N/A | 0 | 0 | 0 |
| 2016 | 0 | N/A | N/A | 0 | 0 | 0 |
| 2015 | 0 | N/A | N/A | 0 | 0 | 0 |
| 2014 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2013 | 0 | 0 | 0 | 0 | 0 | 0 |

**Sources:** Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2013-2020). Prepared by Katherine La Puente.*

**Table 3.8.** *Eritreans documented as permanent residents due to recognition of refugee status, 2012 – May 2020*

| Year | Number of Individuals |
|------|----------------------|
| 2020 (Jan - May) | 0 |
| 2019 | 0 |
| 2018 | 0 |
| 2017 | 0 |
| 2016 | 0 |
| 2015 | 1 |
| 2014 | 0 |
| 2013 | 1 |
| 2012 | 0 |

**Sources:** Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2012-2020)***.** Prepared by Katherine La Puente.

**Table 3.9.** Visitor Cards for Humanitarian Reasons (TVRH) Issues and Extensions for Eritreans, 2014 – May 2020

| Year | Issues | Extensions |
|------|--------|------------|
| 2020 (Jan - May) | 0 | 0 |
| 2019 | 0 | 0 |
| 2018 | 0 | 0 |
| 2017 | 0 | 0 |
| 2016 | 0 | 0 |
| 2015 | 0 | 0 |
| 2014 | 0 | 0 |

**Note:** Although the condition of visitor for humanitarian reasons (TVRH) was established under the Migration Law passed in 2011, there is only publicly available data for TVRH issues beginning in 2014.

**Sources:** Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2014-2020). Prepared by Katherine La Puente.*

CLP_PC_022704

**Table 3.10.** *TRT Issued under Migratory Regularization Program, by immigration category for Eritreans, 2015-2018*

| Year | Family | Work | Property Owner | Student | Humanitarian Reasons | Others | Total |
|------|--------|------|----------------|---------|----------------------|--------|-------|
| 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2015 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

**Sources: Government of México, Instituto Nacional de Migración.** *Boletín mensual de estadísticas migratorias (2015-2018). Prepared by Katherine La Puente.*

CLP_PC_022705

# COUNTRY 4
# GHANA

CLP_PC_022706

**Table 4.1.** Asylum/Refugee Status Application Outcomes of Ghanaians by outcome type and by female gender, 2013 – October 2019

| Year or Time Period | Asylum/ Refugee Status Granted  *Total (# Female)* | Complementary Protection (CP) Granted  *Total (# Female)* | Asylum/ Refugee Status Denied  *Total (# Female)* | Abandoned or Withdrawn Case  *Total (# Female)* | Total Number  *Total (# Female)* | Grant Rate^ Overall | Grant Rate^ for Females |
|---|---|---|---|---|---|---|---|
| 2013 | 1 (0) | 0 (0) | 5 (1) | 7 (0) | 13 (1) | 16.7% | 0% |
| 2014 | 0 (0) | 0 (0) | 2 (0) | 1 (0) | 3 (0) | 0% | - |
| 2015 | 1 (0) | 0 (0) | 1 (0) | 5 (0) | 7 (0) | 50% | - |
| 2016 | 0 (0) | 0 (0) | 15 (0) | 0 (0) | 15 (0) | 0% | - |
| 2017 | 1 (0) | 1 (0) | 3 (2) | 11 (3) | 16 (5) | 40% | 0% |
| 2018 (Jan - Sep) | 0 (0) | 0 (0) | 0 (0) | 1 (0) | 1 (0) | - | - |
| Jan 2018 - Oct 2019 | 1 (0) | N/A | 2 (0) | 1 (0) | 4 (0) | 33.3% | - |

**Sources:** Government of México, Secretaría de Gobernación, Comisión Mexicana de Ayuda a Refugiados (COMAR)**.** *Boletín Estadístico de Solicitantes de Refugio en México (2013 – 2018)***;** Asylum Access, "New COMAR data shows over 13,000 asylum applicants waiting since 2018", 2020. Prepared by Katherine La Puente.
- / grant rate not applicable since applications were neither granted nor denied.
* includes unaccompanied minors
^Grant rate is defined as asylum/refugee status and complementary protection (CP) granted out of all applications that were either granted or denied. It does not include applications that were abandoned or withdrawn.

**Table 4.2** Ghanaians not subject to return, by alternative option, 2016 – May 2020

| Year | Regularization of migration status | Exit permit | Asylum/refugee applications | Total |
|---|---|---|---|---|
| 2020 (Jan - May) | 36 | 26 | 1 | 63 |
| 2019 | 146 | 26 | 16 | 188 |
| 2018 | 2 | 129 | N/A | 131 |
| 2017 | 92 | 23 | N/A | 115 |
| 2016 | 449 | 196 | N/A | 645 |

**Sources:** Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2016-2020).* Prepared by Katherine La Puente.

CLP_PC_022707

**Table 4.3.** *Temporary Residence Card* (TRT) Issued for Ghanaians, by immigration category, 2009–May 2020

| Year | Family | Work | Property Owner | Student | Humanitarian | Others | Total |
|---|---|---|---|---|---|---|---|
| 2020 (Jan - May) | 3 | 5 | 0 | 0 | N/A | 5 | 13 |
| 2019 | 4 | 6 | 0 | 1 | N/A | 3 | 14 |
| 2018 | 5 | 10 | 0 | 1 | N/A | 6 | 22 |
| 2017 | 4 | 11 | 0 | 0 | N/A | 0 | 15 |
| 2016 | 3 | 3 | 0 | 1 | N/A | 1 | 8 |
| 2015 | 1 | 2 | 0 | 1 | N/A | 1 | 5 |
| 2014 | 2 | 5 | 0 | 2 | N/A | 0 | 9 |
| 2013 | 2 | 6 | 0 | 0 | 0 | 1 | 9 |
| 2012 | 0 | 1 | 0 | 1 | 0 | 2 | 4 |

| Year | Political Asylum | Correspondent | Student | Minister | Refugee | Visitor | Distinguished Visitor | Provisional Visitor | Total |
|---|---|---|---|---|---|---|---|---|---|
| 2011 | 0 | 0 | 1 | 1 | 0 | 3 | 0 | 0 | 5 |
| 2010 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 2 |
| 2009 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 1 |

**Sources:** Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2009-2020).* Prepared by Katherine La Puente.

**Table 4.4.** *Temporary Residence Card* (TRT) Renewed for Ghanaians, by immigration category, 2010–May 2020

| Year | Family | Work | Rentier | Student | Humanitarian Reasons | Others | Total |
|---|---|---|---|---|---|---|---|
| 2020 (Jan - May) | 0 | 2 | 0 | 0 | N/A | 3 | 5 |
| 2019 | 1 | 7 | 0 | 1 | N/A | 1 | 10 |
| 2018 | 0 | 6 | 0 | 0 | N/A | 1 | 7 |
| 2017 | 0 | 4 | 1 | 0 | N/A | 0 | 5 |
| 2016 | 0 | 4 | 0 | 1 | N/A | 0 | 5 |
| 2015 | 1 | 4 | 0 | 0 | N/A | 1 | 6 |
| 2014 | 1 | 2 | 0 | 1 | N/A | 1 | 5 |
| 2013 | 0 | 2 | 2 | 1 | 0 | 1 | 6 |
| 2012 | 0 | 2 | 0 | 1 | 0 | 1 | 4 |

| Year | Political Asylum | Correspondent | Student | Minister | Refugee | Visitor | Distinguished Visitor | Provisional Visitor | Total |
|---|---|---|---|---|---|---|---|---|---|
| 2011 | 0 | 0 | 1 | 1 | 0 | 3 | 0 | 0 | 5 |
| 2010 | 0 | 0 | 3 | 1 | 0 | 2 | 0 | 0 | 6 |

**Sources:** Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2010-2020).* Prepared by Katherine La Puente.

CLP_PC_022708

**Table 4.5.** *Permanent Residence Card* (TRP) Issued for Ghanaians, by immigration category, 2009–May 2020

| Year | Family | Work | Property Owner | Humanitarian Reasons | Others | Total |
|---|---|---|---|---|---|---|
| 2020 (Jan – May) | 4 | 0 | 0 | 6 | 0 | 10 |
| 2019 | 4 | 0 | 0 | 7 | 0 | 11 |
| 2018 | 5 | 1 | 0 | 1 | 0 | 7 |
| 2017 | 2 | 1 | 0 | 1 | 0 | 4 |
| 2016 | 2 | 1 | 0 | 1 | 0 | 4 |
| 2015 | 2 | 0 | 0 | 1 | 0 | 3 |
| 2014 | 2 | 1 | 0 | 0 | 0 | 3 |
| 2013 | 2 | 2 | 0 | 2 | 0 | 6 |
| 2012 | 0 | 1 | 0 | 0 | 0 | 1 |

| | Artists & Athletes | Assimilated | Trusted Director | Scientist | Relatives | Investor | Professional | Property Owner | Technician | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2011 | 0 | 1 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 4 |
| 2010 | 0 | 1 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 3 |
| 2009 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 2 |

**Sources:** Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2009-2020).* Prepared by Katherine La Puente.

**Table 4.6.** *Permanent Residence Card* (TRP) Renewed for Ghanaians, by immigration category, 2010 – May 2020

| Year | Family | Work | Property Owner | Humanitarian Reasons | Others | Total |
|---|---|---|---|---|---|---|
| 2020 (Jan - May) | 0 | 0 | N/A | 2 | 0 | 2 |
| 2019 | 0 | 0 | N/A | 0 | 0 | 0 |
| 2018 | 0 | 0 | N/A | 0 | 0 | 0 |
| 2017 | 0 | N/A | N/A | 0 | 0 | 0 |
| 2016 | 0 | N/A | N/A | 0 | 0 | 0 |
| 2015 | 0 | N/A | N/A | 0 | 0 | 0 |
| 2014 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2013 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2012 | 1 | 4 | 1 | 0 | 2 | 8 |

| | Artists & Athletes | Assimilated | Trusted Director | Scientist | Relatives | Investor | Professional | Property Owner | Technician | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2011 | 0 | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 1 | 7 |
| 2010 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 4 |

**Sources:** Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2010-2020).* Prepared by Katherine La Puente.
**Note:** *2010-2012 refers to renewals as "refrendos", which we take to mean renewals in this context.*

CLP_PC_022709

**Table 4.7.** *Permanent Residence Card* (TRP) for regularization of migration situation for Ghanaians, 2013 – May 2020

| Year | Family | Work | Property Owner | Humanitarian Reasons | Others | Total |
|------|--------|------|----------------|----------------------|--------|-------|
| 2020 (Jan – May) | 2 | N/A | N/A | 0 | 0 | 2 |
| 2019 | 1 | N/A | N/A | 0 | 0 | 1 |
| 2018 | 1 | N/A | N/A | 0 | 0 | 1 |
| 2017 | 0 | N/A | N/A | 0 | 0 | 0 |
| 2016 | 2 | N/A | N/A | 0 | 0 | 2 |
| 2015 | 0 | N/A | N/A | 0 | 0 | 0 |
| 2014 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2013 | 1 | 0 | 0 | 0 | 0 | 1 |

**Sources:** Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2013-2020).* Prepared by Katherine La Puente.

**Table 4.8.** *Ghanaians documented as permanent residents due to recognition of refugee status, 2012 – May 2020*

| Year | Number of Individuals |
|------|-----------------------|
| 2020 (Jan – May) | 3 |
| 2019 | 2 |
| 2018 | 0 |
| 2017 | 1 |
| 2016 | 1 |
| 2015 | 1 |
| 2014 | 0 |
| 2013 | 2 |
| 2012 | 2 |

**Sources:** Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2012-2020)*. Prepared by Katherine La Puente.

**Table 4.9.** Visitor Cards for Humanitarian Reasons (TVRH) Issues and Extensions for Ghanaians, 2014 – May 2020

| Year | Issues | Extensions |
|------|--------|------------|
| 2020 (Jan – May) | 3 | 1 |
| 2019 | 16 | 0 |
| 2018 | 5 | 0 |
| 2017 | 32 | 0 |
| 2016 | 2 | 0 |
| 2015 | 4 | 1 |
| 2014 | 2 | 0 |

**Note:** Although the condition of visitor for humanitarian reasons (TVRH) was established under the Migration Law passed in 2011, there is only publicly available data for TVRH issues beginning in 2014.
**Sources:** Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2014-2020).* Prepared by Katherine La Puente.

CLP_PC_022710

**Table 4.10.** *TRT Issued under Migratory Regularization Program, by immigration category for Ghanaians, 2015-2018*

| Year | Family | Work | Property Owner | Student | Humanitarian Reasons | Others | Total |
|------|--------|------|----------------|---------|----------------------|--------|-------|
| 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2016 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 2015 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |

**Sources:** Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2015-2018).* *Prepared by Katherine La Puente.*

CLP_PC_022711

# COUNTRY 5
# SOMALIA

CLP_PC_022712

**Table 5.1.** Asylum/Refugee Status Application Outcomes of Somalis by outcome type and by female gender, 2013 – October 2019

| Year or Time Period | Asylum/ Refugee Status Granted  *Total (# Female)* | Complementary Protection (CP) Granted  *Total (# Female)* | Asylum/ Refugee Status Denied  *Total (# Female)* | Abandoned or Withdrawn Case  *Total (# Female)* | Total Number  *Total (# Female)* | Grant Rate^ Overall | Grant Rate^ for Females |
|---|---|---|---|---|---|---|---|
| 2013 | 0 (0) | 0 (0) | 0 (0) | 2 (0) | 2 (0) | - | - |
| 2014 | 0 (0) | 0 (0) | 0 (0) | 4 (0) | 4 (0) | - | - |
| 2015 | 1 (0) | 0 (0) | 0 (0) | 0 (0) | 1 (0) | 100% | - |
| 2016 | 0 (0) | 0 (0) | 0 (0) | 0 (0) | 0 (0) | - | - |
| 2017 | 0 (0) | 0 (0) | 8 (0) | 12 (3) | 20 (3) | 0% | - |
| 2018 (Jan - Sep) | 0 (0) | 0 (0) | 0 (0) | 0 (0) | 0 (0) | - | - |
| Jan 2018 – Oct 2019 | 0 (0) | N/A | 0 (0) | 0 (0) | 0 (0) | - | - |

**Sources:** Government of México, Secretaría de Gobernación, Comisión Mexicana de Ayuda a Refugiados (COMAR). *Boletín Estadístico de Solicitantes de Refugio en México (2013 – 2018)*; Asylum Access, "New COMAR data shows over 13,000 asylum applicants waiting since 2018", 2020. Prepared by Katherine La Puente.

- / grant rate not applicable since applications were neither granted nor denied.

\* includes unaccompanied minors

^Grant rate is defined as asylum/refugee status and complementary protection (CP) granted out of all applications that were either granted or denied. It does not include applications that were abandoned or withdrawn.

**Table 5.2** Somalis not subject to return, by alternative option, 2016 – May 2020

| Year | Regularization of migration status | Exit permit | Asylum/refugee applications | Total |
|---|---|---|---|---|
| 2020 (Jan – May) | 3 | 4 | 0 | 7 |
| 2019 | 3 | 1 | 0 | 4 |
| 2018 | 1 | 38 | N/A | 39 |
| 2017 | 2 | 87 | N/A | 89 |
| 2016 | 240 | 164 | N/A | 404 |

**Sources:** Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2016-2020)*. Prepared by Katherine La Puente.

CLP_PC_022713

**Table 5.3.** *Temporary Residence Card (*TRT*) Issued for Somalis, by immigration category, 2009 – May 2020*

| Year | Family | Work | Property Owner | Student | Humanitarian | Others | Total |
|------|--------|------|----------------|---------|--------------|--------|-------|
| 2020 (Jan – May) | 0 | 0 | 0 | 0 | N/A | 0 | 0 |
| 2019 | 0 | 0 | 0 | 0 | N/A | 0 | 0 |
| 2018 | 0 | 0 | 0 | 0 | N/A | 0 | 0 |
| 2017 | 0 | 0 | 0 | 0 | N/A | 0 | 0 |
| 2016 | 0 | 0 | 0 | 0 | N/A | 0 | 0 |
| 2015 | 0 | 0 | 0 | 0 | N/A | 0 | 0 |
| 2014 | 0 | 0 | 0 | 0 | N/A | 0 | 0 |
| 2013 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2012 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Political Asylum | Correspondent | Student | Minister | Refugee | Visitor | Distinguished Visitor | Provisional Visitor | |
| 2011 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2010 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2009 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 0 |

**Sources:** Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2009-2020).* Prepared by Katherine La Puente.

**Table 5.4.** *Temporary Residence Card (*TRT*) Renewed for Somalis, by immigration category, 2010 – May 2020*

| Year | Family | Work | Property Owner | Student | Humanitarian Reasons | Others | Total |
|------|--------|------|----------------|---------|----------------------|--------|-------|
| 2020 (Jan – May) | 0 | 0 | 0 | 0 | N/A | 0 | 0 |
| 2019 | 0 | 0 | 0 | 0 | N/A | 0 | 0 |
| 2018 | 0 | 0 | 0 | 0 | N/A | 0 | 0 |
| 2017 | 0 | 0 | 0 | 0 | N/A | 0 | 0 |
| 2016 | 0 | 0 | 0 | 0 | N/A | 0 | 0 |
| 2015 | 0 | 0 | 0 | 0 | N/A | 0 | 0 |
| 2014 | 0 | 0 | 0 | 0 | N/A | 0 | 0 |
| 2013 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2012 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Political Asylum | Correspondent | Student | Minister | Refugee | Visitor | Distinguished Visitor | Provisional Visitor | |
| 2011 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2010 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

**Sources:** Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2010-2020).* Prepared by Katherine La Puente.

CLP_PC_022714

**Table 5.5.** *Permanent Residence Card* (TRP) Issued for Somalis, by immigration category, 2009 – May 2020

| Year | Family | Work | Property Owner | Humanitarian Reasons | Others | Total |
|---|---|---|---|---|---|---|
| 2020 (Jan – May) | 0 | 0 | 0 | 0 | 0 | 0 |
| 2019 | 0 | 0 | 0 | 1 | 0 | 1 |
| 2018 | 0 | 0 | 0 | 1 | 0 | 1 |
| 2017 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2016 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2015 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2014 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2013 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2012 | 0 | 0 | 0 | 0 | 0 | 0 |

| | Artists & Athletes | Assimilated | Trusted Director | Scientist | Relatives | Investor | Professional | Property Owner | Technician | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2011 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2010 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2009 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 1 |

**Sources:** Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2009-2020)*. Prepared by Katherine La Puente.

**Table 5.6.** *Permanent Residence Card* (TRP) Renewed for Somalis, by immigration category, 2010 – May 2020

| Year | Family | Work | Property Owner | Humanitarian Reasons | Others | Total |
|---|---|---|---|---|---|---|
| 2020 (Jan – May) | 0 | 0 | N/A | 0 | 0 | 0 |
| 2019 | 0 | 0 | N/A | 0 | 0 | 0 |
| 2018 | 0 | 0 | N/A | 0 | 0 | 0 |
| 2017 | 0 | N/A | N/A | 0 | 0 | 0 |
| 2016 | 0 | N/A | N/A | 0 | 0 | 0 |
| 2015 | 0 | N/A | N/A | 0 | 0 | 0 |
| 2014 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2013 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2012 | 1 | 0 | 0 | 0 | 0 | 1 |

| | Artists & Athletes | Assimilated | Trusted Director | Scientist | Relatives | Investor | Professional | Property Owner | Technician | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2011 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| 2010 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |

**Sources:** Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2010-2020)*. Prepared by Katherine La Puente.
**Note:** *2010-2012 refers to renewals as "refrendos", which we take to mean renewals in this context.*

CLP_PC_022715

**Table 5.7.** *Permanent Residence Card* (TRP) for regularization of migration situation for Somalis, 2013 – May 2020

| Year | Family | Work | Property Owner | Humanitarian Reasons | Others | Total |
|------|--------|------|----------------|----------------------|--------|-------|
| 2020 (Jan – May) | 0 | N/A | N/A | 0 | 0 | 0 |
| 2019 | 0 | N/A | N/A | 0 | 0 | 0 |
| 2018 | 0 | N/A | N/A | 0 | 0 | 0 |
| 2017 | 0 | N/A | N/A | 0 | 0 | 0 |
| 2016 | 0 | N/A | N/A | 0 | 0 | 0 |
| 2015 | 0 | N/A | N/A | 0 | 0 | 0 |
| 2014 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2013 | 0 | 0 | 0 | 0 | 0 | 0 |

**Sources:** Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2013-2020).* Prepared by Katherine La Puente.

**Table 5.8.** *Somalis documented as permanent residents due to recognition of refugee status, 2012 – May 2020*

| Year | Number of Individuals |
|------|-----------------------|
| 2020 (Jan – May) | 0 |
| 2019 | 0 |
| 2018 | 0 |
| 2017 | 0 |
| 2016 | 0 |
| 2015 | 0 |
| 2014 | 0 |
| 2013 | 0 |
| 2012 | 0 |

**Sources:** Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2012-2020)*. Prepared by Katherine La Puente.

**Table 5.9.** Visitor Cards for Humanitarian Reasons (TVRH) Issues and Extensions for Somalis, 2014 – May 2020

| Year | Issues | Extensions |
|------|--------|------------|
| 2020 (Jan – May) | 0 | 0 |
| 2019 | 2 | 0 |
| 2018 | 0 | 1 |
| 2017 | 11 | 0 |
| 2016 | 0 | 0 |
| 2015 | 0 | 0 |
| 2014 | 0 | 0 |

**Note:** Although the condition of visitor for humanitarian reasons (TVRH) was established under the Migration Law passed in 2011, there is only publicly available data for TVRH issues beginning in 2014.
**Sources:** Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2014-2020).* Prepared by Katherine La Puente.

CLP_PC_022716

**Table 5.10.** *TRT Issued under Migratory Regularization Program, by immigration category for Somalis, 2015-2018*

| Year | Family | Work | Property Owner | Student | Humanitarian Reasons | Others | Total |
|------|--------|------|----------------|---------|----------------------|--------|-------|
| 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2015 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

**Sources:** Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2015-2018)*. Prepared by Katherine La Puente.

CLP_PC_022717

## REFERENCES

1.  México, Secretaría de Gobernación, Subsecretaria de Población, Migración, y Asuntos Religiosos, Unidad de Política Migratoria, Comisión Mexicana de Ayuda a Refugiados. *Boletín Estadístico de Solicitantes de Refugio en México 2013*. 2018.

2.  México, Secretaría de Gobernación, Subsecretaria de Población, Migración, y Asuntos Religiosos, Unidad de Política Migratoria,   Comisión Mexicana de Ayuda a Refugiados. *Boletín Estadístico de Solicitantes de Refugio en México 2014*. 2018.

3.  México, Secretaría de Gobernación, Subsecretaria de Población, Migración, y Asuntos Religiosos, Unidad de Política Migratoria,   Comisión Mexicana de Ayuda a Refugiados. *Boletín Estadístico de Solicitantes de Refugio en México 2015***. 2018.

4.  México, Secretaría de Gobernación, Subsecretaria de Población, Migración, y Asuntos Religiosos, Unidad de Política Migratoria,   Comisión Mexicana de Ayuda a Refugiados. *Boletín Estadístico de Solicitantes de Refugio en México 2016***. 2018.

5.  México, Secretaría de Gobernación, Subsecretaria de Población, Migración, y Asuntos Religiosos, Unidad de Política Migratoria,   Comisión Mexicana de Ayuda a Refugiados. *Boletín Estadístico de Solicitantes de Refugio en México 2017***. 2018.

6.  México, Secretaría de Gobernación, Subsecretaria de Población, Migración, y Asuntos Religiosos, Unidad de Política Migratoria,   Comisión Mexicana de Ayuda a Refugiados. *Boletín Estadístico de Solicitantes de Refugio en México 2018*. 2018.

7.  México, Secretaría de Gobernación, Instituto Nacional de Migración, Centro de Estudios Migratorios. *Boletín mensual de estadísticas migratorias 2007*. 2008.

8.  México, Secretaría de Gobernación, Instituto Nacional de Migración, Centro de Estudios Migratorios. *Boletín mensual de estadísticas migratorias 2008*. 2009.

9.  México, Secretaría de Gobernación, Instituto Nacional de Migración, Centro de Estudios Migratorios. *Boletín mensual de estadísticas migratorias 2009*. 2009.

10. México, Secretaría de Gobernación, Instituto Nacional de Migración, Centro de Estudios Migratorios. *Boletín mensual de estadísticas migratorias 2010*. 2010.

11. México, Secretaría de Gobernación, Instituto Nacional de Migración, Centro de Estudios Migratorios. *Boletín mensual de estadísticas migratorias 2011*. 2011.

12. México, Secretaría de Gobernación, Subsecretaria de Población, Migración, y Asuntos Religiosos, Unidad de Política Migratoria Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias 2012*. 2013.

13. México, Secretaría de Gobernación, Subsecretaria de Población, Migración, y Asuntos Religiosos, Unidad de Política Migratoria Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias 2013*. 2013.

CLP_PC_022718

**14.** México, Secretaría de Gobernación, Subsecretaria de Población, Migración, y Asuntos Religiosos, Unidad de Política Migratoria   Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias 2014.* 2014.

**15.** México, Secretaría de Gobernación, Subsecretaria de Población, Migración, y Asuntos Religiosos, Unidad de Política Migratoria. *Boletín mensual de estadísticas migratorias 2015.* 2016.

**16.** México, Secretaría de Gobernación, Subsecretaria de Población, Migración, y Asuntos Religiosos, Unidad de Política Migratoria. *Boletín mensual de estadísticas migratorias 2016.* 2017.

**17.** México, Secretaría de Gobernación, Subsecretaria de Población, Migración, y Asuntos Religiosos, Unidad de Política Migratoria. *Boletín mensual de estadísticas migratorias 2017.* 2018.

**18.** Subsecretaria de Derechos Humanos, Población, y Migración, Unidad de Política Migratoria, Registro e Identidad de Personas. Boletín mensual de estadísticas migratorias 2018. 2019.

**19.** México, Secretaría de Gobernación, Subsecretaria de Derechos Humanos, Población, y Migración, Unidad de Política Migratoria, Registro e Identidad de Personas. *Boletín mensual de estadísticas migratorias 2019.* 2020.

**20.** México, Secretaría de Gobernación, Subsecretaria de Derechos Humanos, Población, y Migración, Unidad de Política Migratoria, Registro e Identidad de Personas. *Boletín mensual de estadísticas migratorias 2020. 2020.*

**21.** *"New COMAR data shows over 13,000 asylum applicants waiting since 2018". Asylum Access, 8 Jan. 2020, https://asylumaccess.org/new-comar-data-shows-over-13000-asylum-applicants-waiting-since-2018/.* Press Release.

CLP_PC_022719

# ENDNOTES

CLP_PC_022720

**1**. International Organization for Migration – UN Migration, Who is a Migrant?, Migration, IOM – UN Migration, **https://www.iom.int/who-is-a-migrant** (accessed July 30, 2020).

**2**. USA for UNHCR – The UN Refugee Agency, What is a Refugee?, Refugee Facts, UNHCR, **https://www.unrefugees.org/refugee-facts/what-is-a-refugee/** (accessed July 30, 2020).

**3**. Ciudad de Mexico, Personas Afrodescendientes, Monografías por la No Discriminación, Consejo para Prevenir y Eliminar la Discriminación de la Ciudad de México (COPED), **http://data.copred.cdmx.gob.mx/por-la-no-discriminacion/personas-afrodescendientes/**.

**4**. USA for UNHCR – The UN Refugee Agency, Sexual and Gender Based Violence, Protection, What We Do, UNHCR, **https://www.unhcr.org/sexual-and-gender-based-violence.html** (accessed July 30, 2020).

**5**. This Report is focused on the current Mexican Administration's approach, including deploying the Guardia Nacional ("National Guard") to the southern border, and the resulting barriers to entry/transit through Mexico for migrants. However, the Authors recognize that previous Administrations have undertaken policies to control immigration, including at the southern border. For instance, the Programa Frontera Sur ("Southern Border Program"), launched in July 2014 by Former Mexican President Enrique Peña Nieto, also focused, inter alia, on increasing security at border crossings into southern Mexico. Christopher Wilson & Pedro Valenzuela, Mexico's Southern Border Strategy: Programa Frontera Sur, Wilson Center (July 11, 2014), **https://www.wilsoncenter.org/publication/mexicos-southern-border-strategy-programa-frontera-sur**.

**6**. Voces Meso Americanas, [Communicado] Asamblea de Migrantes Africanos y Africans en Tapachula [Communication] Assembly of African and African Migrants in Tapachula, Voces Meso Americanas (Aug. 29, 2019), **https://vocesmesoamericanas.org/prensa/comunicado-asamblea-de-migrantes-africanos-y-africanas-en-tapachula-29-de-agosto-2019/**.

**7**. Darío Brooks, Criollos, mestizos, mulatos o saltapatrás: cómo surgió la división de castas durante el dominio español en América, BBC Mundo (Oct. 12, 2017), **https://www.bbc.com/mundo/noticias-america-latina-41590774**.

**8**. Ibid.

**9**. Maria Elisa Velázquez & Gabriela Iturralde Nieto, Afrodescendientes en Mexico (Consejo Nacional para Prevenir la Discriminación, Instituto Nacional de Antropología e Historia, 2012).

**10**. José Vasconcelos, La Raza Cósmica (Editorial Stylo, 1948).

**11**. Alberto Nájar, 10 frases que los mexicanos usan todos los días… y no saben que son racistas, BBC Mundo (May 19, 2016), **https://www.bbc.com/mundo/noticias/2016/05/160517_mexico_frases_racistas_cultura_an**.

**12**. Daniel Zizumbo-Colunga & Ivan Flores Martinez, Study Reveals Racial Inequality in Mexico, Disproving its 'Race-Blind' Rhetoric, The Conversation (Dec. 13, 2017), **https://theconversation.com/study-reveals-racial-inequality-in-mexico-disproving-its-race-blind-rhetoric-87661**.

**13**. Afro-Mexicans Profile, Minority Rights, **https://minorityrights.org/minorities/afro-mexicans/** (accessed Aug. 8, 2020). María Elisa Velásquez & Gabriela Iturralde Nieto, INAH, CONAPRED, *Afrodescendientes en México, Una historia de Silencio y Discriminación* (Mar. 8, 2016), **http://www.africafundacion.org/afrodescendientes-en-mexico-una-historia-de-silencio-y-discriminacion-por-m%C2%AA-elisa-velazquez-gabriela-iturralde-nieto-inah-conapred.** María Camila Díaz Casas & María Elisa Velázquez, *Estudios Afromexicanos: Una Revisión Historiográfica y Antropológica* (Oct. 10, 2017), **https://www.revistatabularasa.org/numero27/estudios-afromexicanos-una-revision-historiografica-y-antropologica/**.

**14**. Consejo Nacional para Prevenir la Discriminación, Discriminacion Afrodescendientes, **http://www.conapred.org.mx/index.php?contenido=pagina&id=99&id_opcion=40&op=40** (accessed August 21, 2020). Gobierno de México, Infografía de la población afrodescendiente, 2015, Consejo Nacional de Población (May 10, 2016), **https://www.gob.mx/conapo/documentos/infografia-de-la-poblacion-afrodescendiente-2015**.

**15**. Gabriel Moyssen, Afro-descendants: Mexico's forgotten third root, El Universal (Feb. 22, 2019), **https://www.eluniversal.com.mx/english/afro-descendants-mexicos-forgotten-third-root**.

**16**. Some state governments had previously officially recognized Afro-Mexicans in their state constitutions.

**17**. Instituto Nacional de las Mujeres, Datos de la Población Afrodescendiente en México, México – Gobierno de la República, **https://www.gob.mx/cms/uploads/attachment/file/199489/Datos_INEGI_poblacio_n_afromexicana.pdf** (accessed Aug. 8, 2020).

Instituto Nacional de Estadística y Geografía, *Muestra Cuestionario para Viviendas Particulares Habitadas y Población*, Encuesta Intercensal 2015, **https://www.inegi.org.mx/contenidos/programas/intercensal/2015/doc/eic2015_cuestionario.pdf** (accessed Aug. 8, 2020).

Instituto Nacional de Estadística y Geografía, *Perfil sociodemográfico de la población afrodescendiente en México*, Encuesta Intercensal 2015 (2017), **https://www.cndh.org.mx/documento/perfil-sociodemografico-de-la-poblacion-afrodescendiente-en-mexico**.

Gretel Morales, *Mexico seeks to vindicate the Afro-Mexican community*, El Universal (Feb. 6, 2020), **https://www.eluniversal.com.mx/english/mexico-seeks-to-vindicate-afro-mexican-community**.

CLP_PC_022721

**18**. Constitución Política de los Estados Unidos Mexicanos, CP, Artículo 2(C), Diario Oficial de la Federación [DOF] 05-02-1917, Última reforma publicada DOF 08-05-2020 (Mex.).

Ebony Bailey, *Afro-Mexicans May Finally Get Recognition in the Mexican Constitution, But Many Say That's Not Enough*, Culture, Remezcla (May 3, 2019, 1:57 PM) https://remezcla.com/features/culture/afro-mexicans-constitution-recognition/.

**19**. Secretaría de Gobernación, Consejo Nacional para PrevPrevenir la Discriminación, Ficha Temática Pueblos y Comunidades Afromexicanas, http://www.conapred.org.mx/userfiles/files/160620%20Ficha%20tem%C3%A1tica%20-%20Pueblos%20y%20comunidades%20afrodescendientes.pdf (accessed August 21, 2020).

**20**. Daniel Zizumbo-Colunga & Iván Flores Martinez, Is Mexico a Post-Racial Country?, Latin American Public Opinion (LAPOP) (Nov. 6, 2017) https://www.vanderbilt.edu/lapop/insights/ITB031en.pdf.

**21**. Témoris Grecko, Afromexicanos: La discriminación visible, El Proceso (Apr. 1, 2017), https://www.proceso.com.mx/480201/afromexicanos-la-discriminacion-visible.

**22**. Id.

**23**. Arlene Gregorius, The black people 'erased from history', BBC News, Mexico (Apr. 10, 2016) https://www.bbc.com/news/magazine-35981727.

**24**. See, for example: Luis Raúl González Pérez, Comisión Nacional de los Derechos Humanos (CNDH), Recomendación No. 68/2017 ¶ 78 (Dec. 11, 2017) [hereinafter Recomendación No. 68/2017].

**25**. Zizumbo-Colunga, supra note 12.

**26**. Ibid.

**27**. David Páramo, Guerra de Castas Recargada, translated in Dinero en Imagen (June 19, 2017), https://www.dineroenimagen.com/2017-06-19/87906

**28**. Zizumbo-Colunga, supra note 20.

**29**. Ibid.

**30**. Ibid.

**31**. Patricio Solis, Braulio Guemez Graniel & Virginia Lorenzo Holm, Por Mi Raza: Hablara La Desigualdad, translated by Oxfam Mexico (July 2019), https://www.oxfammexico.org/sites/default/files/Por%20mi%20raza%20hablara%20la%20desigualdad_0.pdf.

**32**. Benjamin Russell, Mexico's Messy Reckoning with Racism, Americas Quarterly (June 22, 2020), https://www.americasquarterly.org/article/mexicos-messy-reckoning-with-racism/.

Earl Ofari Hutchinson, *Mexican Officials Must Come Clean on Racism*, IMDiversity, https://imdiversity.com/villages/hispanic/mexican-officials-must-come-clean-on-racism (last visited Aug. 8, 2020).

**33**. Guillermo Trejo & Melina Altamirano, The Mexican Color Hierarchy: How Race and Skin Tone Still Define Life Chances 200 Years After Independence, The Double Blind: The Politics of Racial & Class Inequalities in the Americas 3-16 (Juliet Hooker and Alvin B. Tillery, Jr., American Political Science Association eds., 2016).

**34**. Rosario Aguilar, "The Tones of Democratic Challenges: Skin Color and Race in Mexico," Política y gobierno 25-57 (2013).

**35**. Eva O Arceo-Gomez & Raymundo M. Campos-Vazquez, Race and Marriage in the Labor Market: A Discrimination Correspondence Study in a Developing Country, American Economic Review 104, No.5, 376-80 (2014).

**36**. Instituto Nacional de Estadística y Geografía, Principales Resultados, Encuesta Nacional Sobre Discriminación 2017, INEGI, https://www.inegi.org.mx/contenidos/programas/enadis/2017/doc/enadis2017_resultados.pdf (last visited Aug. 8, 2020).

**37**. Patricio Solis, Alice Krozer, Carlos Arroyo Batista, & Braulio Guemez Graniel, Ethnic/Racial Discrimination in Mexico: A Taxonomy of Discrimination Practices, Working Paper #1, Project On Ethnic/Racial Discrimination in Mexico (PRODER), El Colegio de Mexico 10 (Aug. 21, 2019), https://discriminacion.colmex.mx/wp-content/uploads/2019/08/dt1-en.pdf.

**38**. Id. at 8.

**39**. Id. at 9-10.

**40**. Id. at 18.

**41**. Cindy R. Rodriguez, Aeromexico: Sorry for casting call telling dark-skinned people to not apply, CNN (Aug. 18, 2013), https://edition.cnn.com/2013/08/16/world/americas/mexico-dark-skinned/index.html.

**42**. Researchers from the University of Alberta conducted a scoping review of African immigrant women who have settled in the United States, Canada, United Kingdom, Australia, Germany, France, and Spain that revealed that African immigrant women are particularly affected by job market inequalities, isolation and absence of social networks, and inadequate social services to meet mental health needs. See: Okeke-Ihejirika, Philomina, Bukola Salami & Ahmad Karimi, African Immigrant Women's Experience in Western Host Societies: A Scoping

CLP_PC_022722

Review, Journal of Gender Studies 27, no. 4 at 438 (2016).

**43**. Madeleine Wattenbarger, Protests against anti-Black violence and polices spread to Mexico, Toward Freedom (June 7, 2020), **https:// towardfreedom.org/story/protests-against-anti-black-violence-and-police-spread-to-mexico**.

**44**. Ibid.

**45**. Analy Nuno & David Agren, 'We'll Disappear You': Mexican Protestors Recount Terror of Police Abduction, The Guardian (June 8, 2020), **https://www.theguardian.com/world/2020/jun/08/well-disappear-you-mexican-protesters-recount-terror-of-police-abduction**.

**46**. Ibid.

**47**. Paulina Olvera Cáñez, Ebony Bailey & Leslie Meyer, Commentary: "No puedo respirar." The Black Lives Matter movement is growing in Tijuana, The San Diego Union-Tribune (June 25, 2020), **https://www.sandiegouniontribune.com/opinion/commentary/story/2020-06-25/ commentary-no-puedo-respirar-the-black-lives-matter-movement-is-growing-in-tijuana**.

**48**. Al Otro Lado (@AlOtroLado_org), Twitter (June 22, 2020, 2:02 PM), **https://twitter.com/alotrolado_org/status/1275172387554840578?s=21**.

**49**. Constitución Política de los Estados Unidos Mexicanos, CP, Artículo 1, Diario Oficial de la Federación [DOF] 05-02-1917, Última reforma publicada DOF 08-05-2020 (Mex.).

**50**. Ley Federal Para Prevenir Y Eliminar La Discriminacion [LFPED], Artículo 1, Diario Oficial de La Federacion [DOF] 06-11-2003, Última reforma publicada DOF 21-06-2018, (Mex.).

**51**. Ibid.

**52**. Id. Artículo 1(iii).

**53**. Ibid.

**54**. Id. Artículo 43.

**55**. CNDH Mexico, "Regulatory framework", **https://www.cndh.org.mx/cndh/marco-normativo** (accessed August 13, 2020).

**56**. CNDH Mexico, "Frequent questions", **https://www.cndh.org.mx/cndh/preguntas-frecuentes** (accessed August 13, 2020).

**57**. United Nations, International Convention on the Elimination of All Forms of Racial Discrimination art. 2, adopted by the General Assembly of the United nations in resolution 2106 (XX) of Dec. 21, 1965, 660 U.N.T.S. 195 (entered into force Jan. 4, 1969); Organization of American States, American Convention on Human Rights art. 1.1, Nov. 22, 1969, 1144 U.N.T.S. 123; United Nations, International Covenant on Civil and Political Rights art. 26, opened for signature at New York on Dec. 19, 1966, 999 U.N.T.S. 171 (entered into force Mar. 23, 1976; Mar. 28, 1979); United Nations, International Covenant on Economic, Social and Cultural Rights art. 2(2), opened for signature at New York on Dec. 19, 1966, 993 U.N.T.S. 3 (entered into force Jan. 3, 1976); United Nations, Convention on the Elimination of All Forms of Discrimination against Women art. 2, opened for signature at the United Nations Headquarters on Mar. 1, 1980, 1249 U.N.T.S. 13 (entered into force Sept. 3, 1981); United Nations, International Convention on the Protection of the Rights of All Migrant Workers and Their Families art. 7, adopted by the General Assembly of the United nations in resolution A/RES/45/158 of Dec. 18, 1990, 2220 U.N.T.S. 3 (entered into force July 1, 2003); Organization of American States, Inter-American Convention Against Racism, Racial Discrimination and Related Forms of Intolerance art. 2, adopted by the OAS General Assembly at La Antigua on June 5, 2013, annex A, No. 54915 (entered into force Nov. 11, 2017).

**58**. Constitución Política de los Estados Unidos Mexicanos, CP, Artículo 133, Diario Oficial de la Federación [DOF] 05-02-1917, Última reforma publicada DOF 08-05-2020 (Mex.).

**59**. CP, Artículo 2(a).

**60**. Id. Artículo 2.

**61**. Id. Artículo 4.

**62**. Committee on the Elimination of Racial Discrimination, Concluding observations on the combined eighteenth to twenty-first periodic reports of Mexico § 14, International Convention on the Elimination of All Forms of Racial Discrimination (Sept. 19, 2019).

**63**. Id. at § 16.

**64**. Id. at § 34.

**65**. Ibid.

**66**. Ibid.

**67**. Human Rights Council, Report of the Working Group on the Universal Periodic Review: Mexico § 132, United Nations General Assembly, Universal Periodic Review (Dec. 27, 2018).

**68**. Committee on the Elimination of Discrimination Against Women, Concluding observations on the ninth periodic report of Mexico § 47 (July 20, 2018).

**69**. Id. at § 43(a).

CLP_PC_022723

**70**. Id. at §39(e).

**71**. Id. at § 48(c).

**72**. Committee for the Protection of All Migrant Workers and Members of their Families, Concluding observations on the third periodic report of Mexico § 29, International Convention on the Protection of the Rights of All Migrant Workers and Members of their Families (Sept. 27, 2017).

**73**. Ibid.

**74**. The United Nations High Commissioner for Refugees (UNHCR), Convention and Protocol Relating to The Status of Refugees art. 1(A)(2), UNHCR, https://www.unhcr.org/3b66c2aa10 (accessed June 17, 2020).

**75**. Although the Convention definition does not explicitly include gender, the UN has encouraged states to include gender-based asylum claims, which Mexico has. See: Executive Committee of the High Commissioner's Programme, Refugee Women and International Protection No. 39 (XXXVI) § (k), UNHCR (Oct. 18, 1985), https://www.unhcr.org/excom/exconc/3ae68c43a8/refugee-women-international-protection.html. See also Jane Freedman, Mainstreaming gender in refugee protection, Cambridge Review of International Affairs, 589-607 (Jan. 6, 2011), https://doi.org/10.1080/09557571.2010.523820.

**76**. United Nations Development Program, Scaling Fences: Voices of Irregular African Migrants to Europe, UNDP 2019, https://www.undp.org/content/dam/rba/docs/Reports/UNDP-Scaling-Fences-EN-2019.pdf (accessed Aug. 8, 2020).

**77**. Id. at pp 5-6, 31; Tendayi Achiume, Migration as Decolonization, 71 Stan. L. Rev. 1509 (2019).

**78**. Heaven Crawley & Dimitris Skleparis, Refugees, migrants, neither, both: categorical fetishism and the politics of bounding in Europe's "migration crisis", 44 Journal of Ethnic and Migration Studies 48, 59 (July 6, 2017), tandfonline.com/doi/full/10.1080/1369183X.2017.1348224.

**79**. Jorgen Carling, Refugee Advocacy and the Meaning of "Migrants", Peace Research Institute Oslo, PRIO Policy Brief, p. 3 (Feb. 2017), https://www.prio.org/Publications/Publication/?x=10471.

**80**. Crawley, supra note 78.

**81**. April Gordon, The New Diaspora – African Immigration to the United States, 15 Journal of Third World Studies No. 1, pp. 79-103 (1998), https://www.jstor.org/stable/45197785 (accessed July 23, 2020). Kevin J. A. Thomas, What Explains the Increasing Trend in African Emigration to the U.S.?, 45 International Migration Review No. 1, pp3-28 (2011) https://www.jstor.org/stable/23016187 (accessed July 23, 2020).

**82**. Randy Capps, Kristen McCabe & Michael Fix, Diverse Streams: African Migration to the United States, National Center on Immigration Policy, Migration Policy Institute, https://www.migrationpolicy.org/pubs/CBI-AfricanMigration.pdf (accessed on Aug. 8, 2020).

**83**. Although undocumented migration from Africa to the Americas is a relatively recent phenomenon, there is a history of migration from Africa to Mexico. After African countries gained independence from former colonial powers, many formally established diplomatic ties between newly formed African nations and Mexico in the mid-20th century. This led to more Africans migrating to Mexico for scientific, academic, or cultural reasons. For instance, under cultural cooperation agreements, African students from various countries, such as Ethiopia, Angola, and Ghana, were granted scholarships to study in Mexico and some chose to stay permanently. See Maguemati Wabgou, Aiming for Latin America: African Immigration to Mexico, Migration in the Service of African Development 113, muse.jhu.edu/book/26143 (accessed on July 11, 2020); Massimango Cangabo Kagabo, La presencia contemporánea de África en México, 1 Asociación Latinoamericana de Estudios Afroasiáticos sec. 2, (2001).

**84**. Marc R. Rosenblum & Ariel G. Ruiz Soto, An Analysis of Unauthorized Immigrants in the United States by Country and Region of Birth, Migration Policy Institute (MPI) (Aug. 205), https://www.migrationpolicy.org/research/analysis-unauthorized-immigrants-united-states-country-and-region-birth (accessed on Aug. 17, 2020).

**85**. Gretchen Kuhner, Problemas Que Enfrentan Los Migrantes En Las Fronteras Sur Y Norte De México, Y En Su Viaje Entre Las Dos, BBC Mundo, http://www.bbc.co.uk/spanish/especiales/humanrights/entrefront.shtml (accessed on Aug. 9, 2020).

**86**. Tricia Redeker Hepner, Generation Nationalism and Generation Asylum: Eritrean Migrants, the Global Diaspora, and the Transnational Nation-State, 18 Diaspora: A Journal of Transnational Studies no. 1, 184-207, Project Muse, https://muse.jhu.edu/article/573619.

**87**. Gustavo Solis, Record Number of African Migrants at U.S.-Mexico Border, The Los Angeles Times (Dec. 8, 2019), https://www.latimes.com/story/2019-12-08/record-number-of-african-migrants-at-u-s-mexico-border.

**88**. Ibid.

**89**. Gobierno de Mexico, Boletin Mensual de Estadisticas Mirgatorias 2014, Secretaría de Gobernación, http://portales.segob.gob.mx/es/PoliticaMigratoria/CuadrosBOLETIN?Anual=2014 (accessed on Aug. 9, 2020).

**90**. Gobierno de Mexico, Boletin Mensual de Estadisticas Mirgatorias 2019, Secretaría de Gobernación. http://www.politicamigratoria.gob.mx/work/models/PoliticaMigratoria/CEM/Estadisticas/Boletines_Estadisticos/2019/Boletin_2019.pdf (accessed on Aug. 12, 2020).

**91**. Gobierno de Mexico, Boletin Mensual de Estadisticas Mirgatorias 2015-2020, Secretaría de Gobernación, http://portales.segob.gob.

CLP_PC_022724

mx/es/PoliticaMigratoria/Boletines_Estadisticos (accessed on Aug. 9, 2020).

**92.** Luis Andres Henao, African immigrants drift toward Latin America, Reuters World News (Nov. 15, 2009), https://www.reuters.com/article/us-latinamerica-africans-idUSTRE5AF0AG20091116. ACNUR, Movimientos migratorios mixtos cambian el perfil del asilo en las Américas, UNHCR (Nov. 9, 2010), https://www.acnur.org/noticias/noticia/2010/11/5b0c205512/movimientos-migratorios-mixtos-cambian-el-perfil-del-asilo-en-las-americas.html.

**93.** See for example, Pew Research Center, At Least a Million Sub-Saharan Africans Moved to Europe Since 2010, Global Attitudes & Trends, Pew Research Center (Mar. 22, 2018), https://www.pewresearch.org/global/2018/03/22/at-least-a-million-sub-saharan-africans-moved-to-europe-since-2010/.

**94.** Sarah Salvadore, U.S.-Mexico Border Sees Surge in African Migrants, Who Face Limited Options, National Catholic Reporter (Nov.18, 2019), https://www.ncronline.org/news/people/us-mexico-border-sees-surge-african-migrants-who-face-limited-options.

**95.** Pew Research Center, supra note 93.

**96.** Voces Meso Americanas, supra note 6.

**97.** Giovanni Carbone, Between a Rock and Hard Place: Why African's Migrate, in Out of Africa: Why People Migrate 13-30 (Giovanni Carbone ed., 2017).

**98.** Cameroon, the DRC, Eritrea, Ghana, and Somalia were chosen as the countries for analysis as they were the African countries of origin with the highest total number of migrants detained in migration stations by INM when taking the total of the past 6 years, according to statistics published yearly by INM during 2015-2020. For more information on statistics, see Appendix 1 Statistics of African Migration in Mexico.

**99.** Jess Craig, Briefing: Cameroon's Intensifying Conflict and What it Means for Civilians, The New Humanitarian (Feb. 6, 2020), https://www.thenewhumanitarian.org/news/2020/02/06/Cameroon-elections-anglophone-separatist-insurgency-Ambazonia; Ngala Killian Chimtom, Cameroon's Conflict: Will The National Dialogue Make Any Difference?, BBC News (Oct. 5, 2019), https://www.bbc.com/news/world-africa-49931662; UNHCR Reporting Cameroon, https://reporting.unhcr.org/cameroon.

**100.** Siobhan O'Grady, Divided by Language: Cameroon's Crackdown on its English-Speaking Minority is Fueling a Support for a Secessionist Movement, The Washington Post (Feb. 5, 2019), https://www.washingtonpost.com/graphics/2019/world/cameroon-anglophone-crisis/.

**101.** Ibid. Craig, supra note 99.

**102.** Craig, supra note 99.

**103.** O'Grady, supra note 100.

**104.** Ibid.

**105.** Thomson Reuters Foundation, Separatist Conflict in Cameroon Traps Girls in Sex and Servitude, Thomson Reuters Foundation News (June 3, 2019), https://news.trust.org/item/20190602234353-9x3nh.

**106.** Amindeh Blaise Atabong, Women and children bear the brunt of Cameroon's conflict, Equal Times (Oct. 3, 2018), https://www.equaltimes.org/women-and-children-bear-the-brunt?lang=en#.XwYR3y2z3fZ.

**107.** Ibid.

**108.** Katy Migiro, Lesbian 'Witches' Chained and Raped by Families in Cameroon, Reuters News (Oct. 1, 2018), https://www.reuters.com/article/us-cameroon-lgbt-rape/lesbian-witches-chained-and-raped-by-families-in-cameroon-idUSKCN1MC001.

**109.** Moki Edwin Kindzeka, Study: Abortions From Rape on Rise in Cameroon's Conflicts Zones, VOA News (Feb. 20, 2019), https://www.voanews.com/africa/study-abortions-rapes-rise-cameroons-conflict-zones; Human Rights Watch, Security Forces Kill Civilians, Rape Women, Human Rights Watch (July 22, 2019, 3:00 AM), https://www.hrw.org/news/2019/07/22/cameroon-security-forces-kill-civilians-rape-woman.

**110.** International Rescue Committee, IRC Cameroon Country Program Women's Protection and Empowerment, International Rescue Committee (Jan. 19, 2019), https://www.humanitarianresponse.info/sites/www.humanitarianresponse.info/files/documents/files/gbv_rapid_assesment_key_findings_-_south_west_cameoron_-_irc_-_january_2019_-_final_0.pdf.

**111.** UNHCR, Cameroon MCO-Factsheet, UNHCR The UN Refugee Agency (May 2020), https://data2.unhcr.org/en/documents/download/77406.

**112.** See Appendix 1, Table 1. Migrants presented to migration authorities and detained in INM migration stations, by selected five African countries, 2007 – May 2020. See Appendix 1 for more statistics of Cameroonian migrants in Mexico.

**113.** See Appendix 1, Figure 3.

**114.** USA for UNHCR, Democratic Republic of the Congo Refugee Crisis Explained, UNHCR (Feb. 6, 2020), https://www.unrefugees.org/news/democratic-republic-of-the-congo-refugee-crisis-explained/#:~:text=In%20addition%20to%20the%20over,to%20conflict%20

CLP_PC_022725

in%20the%20country.&text=Despite%20the%20end%20of%20a,to%20flee%20from%20their%20homes.

**115.** Jason Burke Masisi, 'The Wars Will Never Stop'- Millions Flee Bloodshed as Congo Falls Apart, The Guardian (Apr. 3, 2020), https://www.theguardian.com/world/2018/apr/03/millions-flee-bloodshed-as-congos-army-steps-up-fight-with-rebels-in-east.

**116.** Kathryn Reid, DRC Conflict: Facts, FAQs, and How to Help, World Vision (July 23, 2019), https://www.worldvision.org/disaster-relief-news-stories/drc-conflict-facts.

**117.** Ibid.; Jason Burke Masisi, 'The Wars Will Never Stop'- Millions Flee Bloodshed as Congo Falls Apart, The Guardian (Apr. 3, 2020), https://www.theguardian.com/world/2018/apr/03/millions-flee-bloodshed-as-congos-army-steps-up-fight-with-rebels-in-east; Human Rights Watch, Democratic Republic of Congo. Events of 2018, World Report 2019, Human Rights Watch, https://www.hrw.org/world-report/2019/country-chapters/democratic-republic-congo (accessed June 19, 2020).

**118.** Reid, supra note 116.

**119.** United Nations Office for the Coordination of Humanitarian Affairs, About OCHA DRC, OCHA, https://www.unocha.org/democratic-republic-congo-drc/about-ocha-drc (accessed July 3, 2020).

**120.** Doctors Without Borders, Rape in Democratic Republic of Congo: MSF Reports Shocking Levels of Sexual Violence in Kasai Region, Doctors Without Borders (Nov. 2, 2018), https://www.doctorswithoutborders.ca/article/rape-democratic-republic-congo-msf-reports-shocking-levels-sexual-violence-kasai-region; See also Jason Burke, They Killed my Children and Raped Me: Sexual Violence Remains Rife in Congo, The Guardian (Nov. 2, 2018, 11:04 AM), https://www.theguardian.com/global-development/2018/nov/02/they-killed-my-children-and-raped-me-horrific-violence-remains-rife-in-democratic-republic-of-the-congo.

**121.** Burke, supra note 120.

**122.** Vittoria Elliot, Briefing: Why Women and Childen are at Greatest Risk as Ebola Continues to Spread in Congo, The New Humanitarian (Sept. 5, 2019), https://www.thenewhumanitarian.org/news/2019/09/05/Congo-Ebola-epidemic-hits-women-children-hardest.

**123.** World Health Organization, 10th Ebola Outbreak in the Democratic Republic of the Congo Declared Over; Vigilance against Flare-ups and Support for Survivors Must Continue, World Health Organization Newsroom (June 25, 2020), https://www.who.int/news-room/detail/25-06-2020-10th-ebola-outbreak-in-the-democratic-republic-of-the-congo-declared-over-vigilance-against-flare-ups-and-support-for-survivors-must-continue.

**124.** Esther Nsapu, Members of the LGBT Community in DRC Face Violence and Excommunication, Global Press Journal (Mar. 30, 2018), https://globalpressjournal.com/africa/democratic-republic-of-congo/members-lgbt-community-drc-face-violence-excommunication.

**125.** Sarah Salvadore, supra note 94; Jason Burke, 'They killed my children and raped me': sexual violence remains rife in Congo, The Guardian (Nov. 2, 2018, 11:04 AM), https://www.theguardian.com/global-development/2018/nov/02/they-killed-my-children-and-raped-me-horrific-violence-remains-rife-in-democratic-republic-of-the-congo.

**126.** See Appendix 1, Table 1. Migrants presented to migration authorities and detained in INM migration stations, by selected five African countries, 2007 – May 2020. See Appendix 1 for more statistics of Congolese migrants in Mexico.

**127.** See Appendix 1, Figure 3. Asylum/refugee status applications submitted by nationals of selected five African countries, 2013 – October 2019.

**128.** Ibid.

**129.** Ibid.

**130.** Alex Green, Why Are So Many People Fleeing Eritrea?, Help Refugees (Feb. 27, 2019), https://helprefugees.org/news/why-are-so-many-people-fleeing-eritrea/.

**131.** Human Rights Watch, Eritrea: Events of 2019, World Report 2020, 195 https://www.hrw.org/sites/default/files/world_report_download/hrw_world_report_2020_0.pdf (accessed on Aug. 8, 2020).

**132.** Id. at 196.

**133.** Id. at 199. UN Human Rights Council, Report of the Special Rapporteur on the Situation of Human Rights in Eritrea, A/HRC/44/23 para. 70 (May 11, 2020), https://undocs.org/a/hrc/44/23.

**134.** Id. at 197; UN Human Rights Council, Report of the Special Rapporteur on the Situation of Human Rights in Eritrea, A/HRC/44/23 para. 43 (May 11, 2020), https://undocs.org/a/hrc/44/23.

**135.** Ewelina V. Ochab, Is Eritrea Becoming the North Korea of Africa?, Forbes Business (June 13, 2018), https://www.forbes.com/sites/ewelinaochab/2018/06/13/is-eritrea-becoming-the-north-korea-of-africa/#21159c733248; U.S. Department of State, 2018 Report on International Religious Freedom: Eritrea 3, https://www.state.gov/wp-content/uploads/2019/05/ERITREA-2018-INTERNATIONAL-RELIGIOUS-FREEDOM-REPORT.pdf (accessed July 21, 2020).

**136.** Human Rights Watch, supra note 131, at 196.

**137.** Human Rights Watch, supra note 131, at 199. For more information on the situation in Eritrea, see Nicole Hirt, Fleeing Repression:

CLP_PC_022726

Inside Eritrea, in Out of Africa: Why People Migrate 95-118 (Giovanni Carbone ed., 2017).

**138**. See Appendix 1, Table 1. Migrants presented to migration authorities and detained in INM migration stations, by selected five African countries, 2007 – May 2020. See Appendix 1 for more statistics of Eritrean migrants in Mexico.

**139**. See Appendix 1, Tables 3.1 – 3.10.

**140**. Brennan Weiss, Ghana is Safe and Stable, but It's Young People Are Still Risking Their Lives to Cross to Europe, Quartz Africa (June 13, 2017), https://qz.com/africa/1003249/young-ghanaians-are-risking-their-lives-to-get-to-europe-illegally/.

**141**. Ibid.

**142**. Cadman Atta Mills, Politics, Policy, and Implementation: The 'Ghanaian Paradox', Brookings (July 18, 2018), https://www.brookings.edu/blog/africa-in-focus/2018/07/18/politics-policy-and-implementation-the-ghanaian-paradox/.

**143**. Human Rights Watch, No Choice but to Deny Who I Am, Human Rights Watch (Jan. 8, 2018), https://www.hrw.org/report/2018/01/08/no-choice-deny-who-i-am/violence-and-discrimination-against-lgbt-people-ghana.

**144**. For an in-depth discussion of homosexuality under Ghanaian law, see Raymond Atuguba, Homosexuality in Ghana: Morality, Law, Human Rights, 12 Journal of Politics and Law No. 4, 113-126, http://www.ccsenet.org/journal/index.php/jpl/article/download/0/0/41428/42916 (accessed on Aug. 8, 2020).

**145**. Human Rights Watch, supra note 143.

**146**. Ibid.

**147**. Ibid.

**148**. See Appendix 1, Tables 4.1 – 4.10.

**149**. See Appendix 1.

**150**. Mohammed Haji Ingiriis, State and Clan Violence in Somalia, in 8 African Conflict and Peacebuilding Review No. 1, 80, https://www.jstor.org/stable/10.2979/africonfpeacerevi.8.1.04?seq=1 (accessed on Aug. 8, 2020).

**151**. Human Rights Watch, Somalia: Events of 2019, Human Rights Watch, World Report 2020, https://www.hrw.org/world-report/2020/country-chapters/somalia (accessed on Aug. 8, 2020).

**152**. United Nations Children's Fund (UNICEF), Somalia: Humanitarian Situation Report No. 1, UNICEF (Jan. 1-31, 2020), https://www.unicef.org/appeals/files/UNICEF_Somalia_Humanitarian_Situation_Report_January_2020.pdf.

**153**. Human Rights Watch, supra note 151.

**154**. Ibid.

**155**. USA for UNHCR, Somalia Refugee Crisis Explained, UNHCR (Jan. 7, 2020), https://www.unrefugees.org/news/somalia-refugee-crisis-explained/#Is%20the%20number%20of%20people%20fleeing%20Somalia%20increasing%20or%20decreasing?.

**156**. United Nations Office for the Coordination of Humanitarian Affairs, Somalia: Humanitarian Dashboard-July 2019, OCHA (Aug. 25, 2019), https://reliefweb.int/sites/reliefweb.int/files/resources/Somalia%20Humanitarian%20Dashboard_July%202019.pdf.

**157**. Human Rights Watch, supra note 149.

**158**. See Appendix 1, Table 1. Migrants presented to migration authorities and detained in INM migration stations, by selected five African countries, 2007 – May 2020. See Appendix 1 for more statistics of Somali migrants in Mexico.

**159**. See Appendix 1, Tables 5.1 – 5.10.

**160**. See Appendix 1, Table 5.9.

**161**. Nicole Narea, More Migrants from Africa Are Trying to Reach the U.S. Through Mexico, Vox (Dec. 9, 2019, 1:20 PM), https://www.vox.com/2019/12/9/21002715/africa-migrant-asylum-refugee-mexico-central-america-cameroon-sierra-leone-congo-eu-immigration.

**162**. Ibid.

**163**. Gobierno de Mexico, Boletin Mensual de Estadisticas Mirgatorias 2014, Secretaría de Gobernación, http://portales.segob.gob.mx/es/PoliticaMigratoria/CuadrosBOLETIN?Anual=2014 (accessed on Aug. 9, 2020).

**164**. Gobierno de Mexico, Boletin Mensual de Estadisticas Mirgatorias 2015, Secretaría de Gobernación, http://portales.segob.gob.mx/es/PoliticaMigratoria/CuadrosBOLETIN?Anual=2015&Secc=3 (accessed on Aug. 9, 2020).

**165**. Nadia Petroni, Why E.U States are Converging on Restrictive Migration Policies, Despite their Different Political Traditions, European Politics and Policy, The London School of Economics and Political Science (July 17, 2019), https://blogs.lse.ac.uk/europpblog/2019/07/17/why-eu-states-are-converging-on-restrictive-migration-policies-despite-their-different-political-traditions/.

**166**. Natasja Reslow, Horizontal and Vertical Diversity: Unintended Consequences of EU External Migration Policy, 54 The International Spectator (Special Issue) No. 1, 31-44, https://doi.org/10.1080/03932729.2019.1548840.

CLP_PC_022727

**167**. Ibid.

**168**. Council of Europe, E.U.-Turkey Statement, Council of the EU (Mar. 18, 2016), https://www.consilium.europa.eu/en/press/press-releases/2016/03/18/eu-turkey-statement/pdf; See also Elena Becatoros, 3 Years on, What's Become of the E.U.-Turkey Migration Deal?, AP (Mar. 20, 2019), https://apnews.com/2eb94ba9aee14272bd99909be2325e2b.

**169**. Human Rights Watch, No Escape From Hell: E.U. Policies Contribute to Abuse of Migrants in Libya, Human Rights Council (Jan. 21, 2019), https://www.hrw.org/report/2019/01/21/no-escape-hell/eu-policies-contribute-abuse-migrants-libya.

**170**. Human Rights Watch, Time to Review and Remedy Cooperation Policies Facilitating Abuse of Refugees and Migrants in Libya, Human Rights Watch (Apr. 28, 2020, 5:56 AM), https://www.hrw.org/news/2020/04/28/eu-time-review-and-remedy-cooperation-policies-facilitating-abuse-refugees-and.

**171**. Nicole Narea, supra note 161.

**172**. Tracey Shelton, Moamar Gaddafi has been dead eight years yet Libya is still at war with itself. What went wrong?, ABC News (Oct. 19, 2019, 12:46 PM), https://www.abc.net.au/news/2019-10-20/libya-civil-war-gaddafi-eight-years-on/11210742; Marwa Mohamed, Locked up with no escape: Refugees and migrants in Libya face bombs, virus, and everything in between, Open Democracy (May 18, 2020), https://www.opendemocracy.net/en/north-africa-west-asia/locked-no-escape-refugees-and-migrants-libya-face-bombs-virus-and-everything-between/.

**173**. BBC News, Why is Libya so Lawless?, BBC News Africa (Jan. 23, 2020), https://www.bbc.com/news/world-africa-24472322.

**174**. Marwa Mohamed, supra note 172.

**175**. Charles Heller & Lorenzo Pezzani, Mare Clausum: Italy and the EU's undeclared operation to stem migration across the Mediterranean, Forensic Oceanograph 67-84 (May 2018), pg. 67-84, https://content.forensic-architecture.org/wp-content/uploads/2019/05/2018-05-07-FO-Mare-Clausum-full-EN.pdf (accessed on Aug. 9, 2020).

**176**. Human Rights Watch, No Escape From Hell: E.U. Policies Contribute to abuse of Migrants in Libya, Human Rights Watch (Jan. 21, 2019), https://www.hrw.org/report/2019/01/21/no-escape-hell/eu-policies-contribute-abuse-migrants-libya.

**177**. Human Rights Watch, Time to Review and Remedy Cooperation Policies Facilitating Abuse of Refugees and Migrants in Libya, Human Rights Watch (Apr. 28, 2020, 5:56 AM), https://www.hrw.org/news/2020/04/28/eu-time-review-and-remedy-cooperation-policies-facilitating-abuse-refugees-and.

**178**. Gustavo Solis, supra note 87.

**179**. Caitlyn Yates, As More Migrants from Africa and Asia Arrive in Latin America, Governments Seek Orderly and Controlled Pathways, Migration Policy Institute (Oct. 22, 2019), https://www.migrationpolicy.org/article/extracontinental-migrants-latin-america.

**180**. Deborah Bonello, From Africa to Mexico: How Far Would You Go for the American Dream?, The Telegraph, https://www.telegraph.co.uk/news/african-migrants-in-america/ (accessed June 22, 2020); Molly O'Toole, As Trump Blocks Refugees, Africans Fleeing Violence Make the Treacherous Trip to the U.S. Through Mexico, The Intercept (Dec.13, 2017), https://theintercept.com/2017/12/13/africans-refugees-mexico-immigration-trump/.

**181**. Telephone Interview with El Instituto para las Mujeres en la Migración, A.C., [IMUMI].

**182**. Ibid.

**183**. Bonello, supra note 180; O'Toole, supra note 180.

**184**. Ministerio de Relaciones Exteriores Y Movilidad Humana [Ministry of Foreign Relations and Human Mobility], Ecuador Exige Visa a los Cindadanos de 11 Paises, Cancillería (Aug. 12, 2019), https://www.cancilleria.gob.ec/2019/08/12/ecuador-exige-visa-a-los-ciudadanos-de-11-paises/.

**185**. Shola Lawal, For African Migrants Trying, and Dying, to Reach North America and the Darien Gap is the 'New Mediterranean', Equal Times (Dec. 9, 2019), https://www.equaltimes.org/for-migrants-trying-and-dying-to?lang=en#.XvDXnGpKjfY.

**186**. O'Toole, supra note 180.

**187**. Yates, supra note 179.

**188**. Jacqueline Charles, New Migrations: Haitians Carve a Dangerous 7,000 Mile Path to the U.S., Miami Herald (Sept. 24, 2016, 8:33 AM), https://www.miamiherald.com/news/nation-world/world/americas/haiti/article103920086.html.

**189**. For a video representation of this journey in the Darien Gap, see PBS NewsHour, "What migrants face as they journey through the deadly Darien Gap," https://www.youtube.com/watch?v=XMPX1547Pss (accessed August 15, 2020).

**190**. Jason Motlagh, A Terrifying Journey Through the World's Most Dangerous Jungle, Outside (July 19, 2016), https://www.outsideonline.com/2098801/skull-stake-darien-gap; Yates, supra note 179.

**191**. Kirk Semple, Haitians After Perilous Journey, Find Door to U.S. Abruptly Shut, The New York Times (Sept. 23, 2016), https://www.nytimes.com/2016/09/24/world/americas/haitians-mexico-brazil-deport-united-states.html?; Kate Linthicum, Crossing the Darien Gap,

CLP_PC_022728

Los Angeles Times (Dec. 22, 2016), https://www.latimes.com/projects/la-fg-immigration-trek-america-colombia/; Charles, supra note 188.

**192.** Semple, supra note 191.

**193.** Linthicum, supra note 191; Lawal, supra note 185.

**194.** Washington Office on Latin America (WOLA), Five Facts about Migration from Central America's Northern Triangle, WOLA (Jan. 15, 2016), https://www.wola.org/analysis/five-facts-about-migration-from-central-americas-northern-triangle/; Lisa Laventure, Central American Corridor a Dangerous Route for Migrants Heading to Canada, CBC News (Feb. 22, 2017), https://www.cbc.ca/news/world/african-migrants-mexico-dreams-canada-1.3992471.

**195.** Wendy A. Vogt, Crossing Mexico: Structural violence and the commodification of undocumented Central American migrants, 40 American Ethnologist No. , 764–780 (accessed on Aug. 9, 2020); Daniel E. Martınez, Robin C. Reineke, Raqueal Rubio-Goldsmith, Bruce O. Parks, Structural Violence and Migrant Deaths in Southern Arizona: Data from the Pima County Office of the Medical Examiner, 1990–2013, 2 Journal on Migration and Human Security No. 4, 257–286 https://doi.org/10.1177/233150241400200401 (accessed on Aug. 9, 2020); Cesar Infante, Alvaro J. Idrovo, Mario S. Sanchez-Domınguez, Stephanie Vinhas, Tonatiuh Gonzalez-Vazquez, Violence Committed Against Migrants in Transit: Experiences on the Northern Mexican Border, 14 Journal of Immigrant and Minority Health No. 3, 449–459, https://doi.org/10.1007/s10903-011-9489-y (accessed on Aug. 9, 2020).

**196.** Médecins Sans Frontières ("Doctors Without Borders"), No way out: The humanitarian crisis for migrants and asylum seekers trapped between the United States, Mexico and the Northern Triangle of Central America, Doctors Without Borders 11 (Feb. 2020), https://www.msf.org/report-no-way-out-central-american-migration.

**197.** Id. at 17.

**198.** Anjali Fleury, Women Migrating to Mexico for Safety: The Need for Improved Protections and Rights, Policy Report No. 03/08. Barcelona: United Nations University Institute on Globalization, Culture and Mobility (UNU-GCM) 6 (2016); United Nations High Commissioner for Refugees (UNHCR), Women on the Run: First-Hand Accounts of Refugees Fleeing El Salvador, Guatemala, Honduras, and Mexico, UNHCR, https://www.unhcr.org/publications/operations/5630f24c6/women-run.html (accessed on Aug. 9, 2020).

**199.** Rene Leyva-Flores, Cesar Infante, Juan Pablo Gutierrez, Frida Quintino-Perez, Maria Gomez-Saldivar, Christian Torres- Robles, Migrants in transit through Mexico to the US: Experiences with violence and related factors, 2009-2015, 14 PLOS ONE No. 8, 1, https://doi.org/10.1371/journal (accessed on Aug. 9, 2020).

**200.** Ibid.

**201.** Ibid.

**202.** Ibid.

**203.** Gustavo Solis, supra note 87.

**204.** Telephone Interview with El Instituto para las Mujeres en la Migración, A.C., [IMUMI].

**205.** Ibid.

**206.** Ibid.

**207.** Ibid.

**208.** See Appendix 1, Tables 1-2 and 1.1 – 5.10.

**209.** Mary Beth Sheridan, Mexico's Homicide Count in 2019 Among its Highest, The Washington Post (Jan. 21, 2020), https://www.washingtonpost.com; Santiago Perez, Violence Makes Mexico an Unwelcoming Refuge, The Wall Street Journal (June 7, 2019), https://www.wsj.com/articles/violence-makes-mexico-an-unwelcoming-refuge-11559899802.

**210.** Shola Lawal, Exporting the American Dream, Boston Globe (Dec. 6, 2019), https://www.bostonglobe.com/2019/12/05/opinion/mexico-is-trumps-wall/.

**211.** Voces Meso Americanas, supra note 6.

**212.** Telephone Interview with Sin Fronteras IAP ("Sin Fronteras"). See also Delphine Schrank, Migrants describe overcrowded Mexican Detention Centers as Trump Ratchets up Pressure, Reuters (June 23, 2019), https://www.reuters.com/article/us-mexico-immigration/migrants-describe-overcrowded-mexican-detention-centers-as-trump-ratchets-up-pressure-idUSKCN1TO0DF; Associated Press, Overcrowding, Abuse seen at Mexico Migrants Detention Center, NBC News (June 17, 2019), https://www.nbcnews.com/news/latino/overcrowding-abuse-seen-mexico-migrant-detention-center-n1018231.

**213.** Telephone Interview with Sin Fronteras.

**214.** UNHCR, Convention and Protocol Relating to the Status of Refugees Article 1, https://www.unhcr.org/3b66c2aa10 (accessed on Aug. 9, 2020). Ley Sobre Refugiados, Protección Complementaria y Asilo Político art 13, sec. 1, Diario Oficial de la Federación [DOF] 27-01-2011,última reforma publicada DOF 30-10-2014 (Mex.).

**215.** Id. at art 28, art 2 sec. VII. See also arts 29-31.

CLP_PC_022729

**216**. UNNHCR, Cartagena Declaration on Refugees, UNCHR, **https://www.unhcr.org/about-us/background/45dc19084/cartagena-decla-ration-refugees-adopted-colloquium-international-protection.html** (accessed on Aug. 9, 2020). Ley Sobre Refugiados, Pretecccción Complementaria y Asilo Político art 13 sec. 2.

**217**. Asylum Access Mexico, Asylum in Mexico by the Numbers, Asylum Access, **https://asylumaccess.org/wp-content/uploads/2020/01/Asylum-in-Mexico-by-the-Numbers.pdf** (accessed on Aug. 9, 2020).

**218**. Reglamento de la Ley Sobre Refugiados y Protección Complementaria [Regulation of the Law on Refugees and Complementary Protection], RLRPC, Diario Oficial de la Federación DOF 21-02-2012, nuevo reglamento publicado en el Diario Oficial de la Federación 21-02-2012 (Mex.).

**219**. For more information about Mexico's asylum/refugee system in English, see: Asylum Access, Mexican Asylum System for U.S. Immigration Lawyers FAQ, Asylum Access Mexico (Nov. 2019) **https://asylumaccess.org/wp-content/uploads/2019/11/Mexican-Asy-lum-FAQ-for-US-Immigration-Lawyers.pdf** (accessed on Aug. 9, 2020); Ariel G. Ruiz Soto, One Year after the U.S.-Mexico Agreement: Reshaping Mexico's Migration Policies, Migration Policy Institute (June 2020), **https://www.migrationpolicy.org/research/one-year-us-mex-ico-agreement** (accessed on Aug. 9, 2020); Helen Kerwin, The Mexican Asylum System in Regional Context, 33 Maryland Journal of International Law No. 1, 297, **https://digitalcommons.law.umaryland.edu/cgi/viewcontent.cgi?article=1680&context=mjil** (accessed on Aug. 9, 2020);

**220**. Ley de Migración [Migration Law], LM, Diario Oficial de la Federación, DOF 25-5-2011.

**221**. Ley de Migración [Migration Law], art 52 sec. V. See also Reglamento de la Ley de Migración [Regulation of Law on Migration] art 137, Diario Oficial de la Federación, DOF 28-9-2012, Última Reforma DOF 23-05-2014. Note: The Migration Law also provides for the regularization of status, and subsequent permanent residency. This pathway is available where a migrant has close family ties with a Mexican national or legal resident, in cases of extreme vulnerability, or in other circumstances.

**222**. Kerwin, supra note 219.

**223**. Ley de Migración [Migration Law], art 52 sec. V. See also Reglamento de la Ley de Migración [Regulation of Law on Migration] art 137, Diario Oficial de la Federación, DOF 28-9-2012, Última Reforma DOF 23-05-2014.

**224**. Gobierno de Mexico, Boletin Mensual de Estadisticas Mirgatorias 2014-2020, Secretaría de Gobernación, **http://portales.segob.gob.mx/es/PoliticaMigratoria/Boletines_Estadisticos** (accessed on Aug. 9, 2020).

**225**. Constitución Política de los Estados Unidos Mexicanos, CP, Artículo 123; the Law on Refugees, Complementary Protection and Political Asylum, Art. 44, section IV. and Ley de Migración [Migration Law], art. 52 sec. V (c).

**226**. Ley de Migración [Migration Law], LM art. 27, sec. 1, Diario Oficial de la Federación, DOF 25-5-2011. The right to public healthcare is also established in Ley Sobre Refugiados, Pretecccción Complementaria y Asilo Político art 44 sec II; Ley General de Salud [General Health Law], LGS art 7, Diario Oficial de la Federación [DOF] 07-02-1984, última reforma publicada DOF 29-11-2019 (Mex.); Reglamento de la Ley General de Salud en Materia de Protección Social en Salud [Regulations of the General Health Law Regarding Social Protection], RLGSMPSS art 42, Diario Oficial de la Federación [DOF] 04-05-2004, última reforma publicada DOF 17-12-2014 (Mex.).

**227**. Gobierno de México, Prioritaria e inmediata la atención médica a migrantes, Secretaría de Relaciones Exteriores (June 28, 2019), **https://www.gob.mx/sre/prensa/prioritaria-e-inmediata-la-atencion-medica-a-migrantes-206873**.

**228**. Constitución Política de los Estados Unidos Mexicanos, CP, Artículo 3. See also the Law on Refugees, Complementary Protection and Political Asylum, Art. 44., Ley General de Educación [General Education Law], LGE art. 4, Art. 33, section XI, and the Agreement 286, Guidelines of the Ministry of Public Education for revalidation and equivalence of studies, accreditation of knowledge and certification of training for work.

**229**. Gobierno de México, Nueva Política Migratoria del Gobierno de México 2018-2024, Secretaria de Gobernación 24, **https://www.gob.mx/cms/uploads/attachment/file/530166/Nueva_Politica_Migratoria_2018-2024.pdf** (accessed on Aug. 9, 2020).

**230**. Telephone Interview with Programa Casa Refugiados ("Casa Refugiados").

**231**. Ibid.

**232**. Telephone Interview with Servicio Jesuita de Migrantes [JRS] and El Instituto para las Mujeres en la Migración, A.C. [IMUMI]; Ley de Migración [Migration Law], LM art. 3, XVII :"Oficio de salida del país: a la resolución que expide la autoridad migratoria del lugar destinado al tránsito internacional de personas, que autoriza a la persona extranjera en situación migratoria irregular a abandonar territorio nacional dentro del plazo otorgado."

**233**. Jessica Bolter, The Evolving and Diversifying Nature of Migration to the U.S.-Mexico Border, Migration Information Source, Migration Policy Institute (Feb. 16, 2017), **https://www.migrationpolicy.org/article/evolving-and-diversifying-nature-migration-us-mexico-border**. Maureen Meyer and Adam Isacson, The 'Wall' Before the Wall: Mexico's Crackdown on Migration at its Southern Border 38, Washington Office on Latin America (WOLA) (Dec. 17, 2019),, **https://www.wola.org/analysis/mexico-southern-border-report/**; See: Caitlin Katsiaficas & Areil G. Ruiz Soto, Migrants and Smigglers Get Creative to Circumvent Immigration Enforcement, Migration Information Source, Migration

CLP_PC_022730

Policy Institute (Dec. 8, 2016), https://www.migrationpolicy.org/article/migrants-and-smugglers-get-creative-circumvent-immigration-enforcement.

**234**. Only 8 African countries have consular representations in Mexico. See Maguemati Wabgou. "Aiming for Latin America: African Immigration to Mexico", 2012. Of the countries discussed in Chapter 4, only Ghana has an embassy in Mexico, which is closed at the time of writing: Secretaría de Relaciones Exteriores, Comunicado Conjunto: Secretaría de Relaciones Exteriores de México y Ministerio de Asuntos Exteriores e Integración Regional de Ghana, Gobierno de Mexico (Aug. 21, 2019),

https://www.gob.mx/sre/prensa/comunicado-conjunto-secretaria-de-relaciones-exteriores-de-mexico-y-ministerio-de-asuntos-exteriores-e-integracion-regional-de-ghana. INM 2013 Boletin and *Appendix 1, Tables 1 and 3*.

**235**. Joshua Partlow & Nick Miroff, Mexico's Next President Could be on a Collision Course with Trump Over Immigration, The Washington Post (Sept. 21, 2018), https://www.washingtonpost.com/world/the_americas/mexicos-next-president-could-be-on-a-collision-course-with-trump-over-immigration/2018/09/21/f3d934ca-b5de-11e8-ae4f-2c1439c96d79_story.html; Lydia Arista, México va a hacer su parte con los migrantes centroamericanos: Alejandro Encinas [ Migrant Exodus, Mexico is Going to do its Part with Central American Migrants: Alejandro Encinas], El Economista (Nov. 3, 2018), https://www.eleconomista.com.mx/politica/Mexico-va-a-hacer-su-parte-con-los-migrantes-centroamericanos-Alejandro-Encinas-20181103-0009.html; Meyer & Isacson, supra note 233, at 6; Rodrigo Dominguez-Villegas, Protection and Reintegration: Mexico Reforms Migration agenda in an Increasingly Complex Era, Migration Policy Institute (Mar. 7, 2019), https://www.migrationpolicy.org/article/protection-and-reintegration-mexico-reforms-migration-agenda.

**236**. Meyer & Isacson, supra note 233, at 6.

**237**. Meyer & Isacson, supra note 233, at 6.

**238**. Although the Administration took additional measures throughout Mexico, including at the Mexico-U.S. border, this Report outlines the situation in Tapachula in particular.

**239**. Donald Trump (@realDonaldTrump), Twitter (May 30, 2019, 4:30PM), https://twitter.com/realdonaldtrump/status/1134240653926232064 "On June 10th, the United States will impose a 5% Tariff on all goods coming into our Country from Mexico, until such time as illegal migrants coming through Mexico, and into our Country, STOP. The Tariff will gradually increase until the Illegal Immigration problem is remedied, …"

**240**. Asylum Access, Mexican Asylum System for U.S. Immigration Lawyers FAQ, Asylum Access Mexico (Nov. 2019), https://asylumaccess.org/wp-content/uploads/2019/11/Mexican-Asylum-FAQ-for-US-Immigration-Lawyers.pdf (accessed on Aug. 9, 2020); Joint Declaration; Carin Zissis, LatAm in Focus: Explaining Mexico's National Guard, AS/COA (July 17, 2019), https://www.as-coa.org/articles/latam-focus-explaining-mexicos-national-guard; Anthony Esposito, Mexico's New National Guard was Created to Fight Crime, but now It's in a Face-off with Migrants, Reuters (July 7, 2019), https://www.reuters.com/article/us-usa-immigration-mexico-security/mexicos-new-national-guard-was-created-to-fight-crime-but-now-its-in-a-face-off-with-migrants-idUSKCN1U20HU; Lorenza Hope, El Sol de México (August 21, 2020), https://www.elsoldemexico.com.mx/analisis/la-gn-como-policia-migratoria-de-trump-5653720.html.

**241**. Andres Manuel Lopez Obrador, Plan Nacional de Paz y Seguridad [National Peace and Security Plan] 2018-2024, Lopez Obrador, https://lopezobrador.org.mx/wp-content/uploads/2018/11/Plan-Nacional-de-Paz-y-Seguridad_.pdf (accessed on Aug. 9, 2020); Inigo Guevara Moyano, Mexico's National Guard: When Police are Not Enough, Wilson Center (Jan. 2020), https://www.wilsoncenter.org/sites/default/files/media/uploads/documents/Mexico%27s%20National%20Guard.pdf (accessed on Aug. 9, 2020); Elizabeth Melimopoulos, Mexico's National Guard: What, Who, and When, Al Jazeera (June 30, 2019), https://www.aljazeera.com/news/2019/06/mexico-national-guard-190630095444350.html. The National Guard began formal operations on June 30, 2019.

**242**. International Organizations Denounce that Proposed National Guard Model in Mexico Violates International Law, WOLA (February 21, 2019), https://www.wola.org/2019/02/mexico-national-guard-violates-international-law/; Mexico: Rushed Approval of Public Security Laws is Putting Human Right's at Risk, Amnesty International (May 22, 2019), https://www.amnesty.org/en/latest/news/2019/05/mexico-leyes-de-seguridad-publica-ponen-en-riesgo-derechos-humanos/; Melimopoulos, supra note 241.

**243**. WOLA, supra note cclxii; Amnesty International, Mexico: Rushed Approval of Public Security Laws is Putting Human Right's at Risk, Amnesty News (May 22, 2019), https://www.amnesty.org/en/latest/news/2019/05/mexico-leyes-de-seguridad-publica-ponen-en-riesgo-derechos-humanos/; Melimopoulos, supra note 241.

**244**. Clínica Jurídica del Programa Universitario de Derechos Humanos de la UNAM, Análisis sobre la inconstitucionalidad de la Ley de la Guardia Nacional en materia migratoria (June 6, 2019) unpublished memo on file with IMUMI.

**245**. A total of 31,416 migrants were apprehended at Mexico's Southern border in July 2019. Maureen Meyer & Adan Isacson, The "Wall" Before the Wall: Mexico's Crackdown on Migration at its Southern Border 9, WOLA (Dec. 17, 2019), https://www.wola.org/analysis/mexico-southern-border-report/#introduction; the July 2019 statement by IMUMI and others states 23,917. See the Mexican government's database on migrant apprehensions: Registro e Identificación de Personas, Boletín Mensual de Estadísticas Migratorias 2020, Unidad de Política Migratoria (July 2020), http://portales.segob.gob.mx/es//PoliticaMigratoria/Boletines_Estadisticos (accessed Aug. 17, 2020).

**246**. Meyer & Isacson, supra note 233, at 17. Regarding the impact of the US-Mexico agreement in June 2019: WOLA, 6 Points About the

CLP_PC_022731

U.S.-Mexico Migration Agreement and the Latest Border Apprehension Numbers, WOLA (Sept. 10, 2019), **https://www.wola.org/analysis/migration-agreement-mexico-border-migrant-arrests/**.

**247**. Maria Verza, Overcrowding, Abuse seen at Mexico Migrant Detention Center, AP News (June 17, 2019), **https://apnews.com/cae4919e5d5d4d6eb280785618dfa865**. ]

**248**. Carrie Khan, African Migrants Stuck in Mexico Plan to March Toward U.S., NPR (Oct. 7, 2019), **https://www.npr.org/2019/10/07/768032924/african-migrants-stuck-in-mexico-plan-to-march-toward-u-s**.

**249**. Anna-Catherine Brigida, Death of Ugandan Shows Risks for African Asylum Seekers in Mexico, The New Humanitarian (Feb. 3, 2020), **https://www.thenewhumanitarian.org/news/2020/02/03/African-migrants-Mexico-metering**.

**250**. Al Jazeera, Two Dead as Migrant Boat Sinks Off Mexico, Al Jazeera (Oct. 12, 2019), **https://www.aljazeera.com/news/2019/10/dead-migrant-boat-sinks-mexico-191012054725447.html**.

**251**. Homeland Security Department & Executive Office for Immigration Review, Asylum Eligibility and Procedural Modifications, Federal Register (July 16, 2019), **https://www.federalregister.gov/documents/2019/07/16/2019-15246/asylum-eligibility-and-procedural-modifications**.

**252**. Human Rights First, Asylum Denied, Families Divided: Trump Administration's Illegal Third-Country Transit Ban, Human Rights First (July 2020), **https://www.humanrightsfirst.org/sites/default/files/AsylumDeniedFamiliesDivided.pdf** (accessed on Aug. 9, 2020).

**253**. CAIR Coalition v. Trump; Spencer S. Hsu, Federal judge strikes down Trump asylum rule targeting Central Americans, The Washington Post (July 1, 2020), **https://www.washingtonpost.com/local/legal-issues/us-judge-strikes-down-trump-asylum-rule-targeting-central-americans/2020/07/01/96e57616-bb4a-11ea-bdaf-a129f921026f_story.html**; Katie Shepherd, Federal Court Strikes Down Trump's Asylum Transit Ban in Momentous Victory, American Immigration Council (July 1, 2020), **https://immigrationimpact.com/2020/07/01/asylum-transit-ban-legal-litigation/**.

**254**. Brigida, supra note 249. For more information on metering, see the Robert Strauss Center for International Security and Law's reports: **https://www.strausscenter.org/campi-publications/**.

**255**. Dara Lind, "The U.S. has Made Migrants at the Border Wait Months to Apply for Asylum. Now the Dam is Breaking." Vox, November 18, 2018, **https://www.vox.com/2018/11/28/18089048/border-asylum-trump-metering-legally-ports**

**256**. Brigida, supra note 249.

**257**. Brigida, supra note 249; Alfredo Corchado, Her Hopes for America Ended in Death, but it Took Black Lives Matter to get her Buried, The Dallas Morning News (June 12, 2020),

**https://www.dallasnews.com/news/immigration/2020/06/12/her-hopes-for-america-ended-in-death-and-it-took-black-lives-matter-to-get-her-buried**.

**258**. Brigida, supra note 249.

**259**. Stephanie Leutert et. al, Metering Update, Robert S. Strauss Center at The University of Texas at Austin and the Center for U.S.- Mexican Studies (USMEX) 1 (May 2020), **https://usmex.ucsd.edu/_files/metering-update_may-2020.pdf** (accessed on Aug. 9, 2020).

**260**. Leutert, supra note 259, at 5.

**261**. Meyer & Isacson, supra note 233, at 38; Telephone Interview with Servicio Jesuita de Migrantes [JRS]. Service providers in Tapachula observed that, since late 2019, the INM has stopped issuing oficios de salida del país altogether.

**262**. Voces Meso Americanas, supra note 6.

**263**. Telephone interview with Servicio Jesuita de Migrantes [JRS].

**264**. Carolina Jimenez, An Invisible Crises: Thousands of African Migrants Are Stranded in Mexico Hoping to Head North, Democracy Now (Sept. 10, 2019), **https://www.democracynow.org/2019/9/10/african_migrants_mexico_transit_policy**; Fernanda Hernandez, Racism Without Borders: Experts Share Struggles of Afro and Indigenous Migrants, University Times (Jan. 8, 2020), **https://csulauniversitytimes.com/racism-without-borders/**; Ann Deslades, African Migrants are Trying to Cross North America to Make it to Canada. Trump is Keeping them in Mexico, Insider (October 2, 2019), **https://www.insider.com/african-migrants-us-mexico-border-canada-2019-10**; Sandra Cuff, One Year into 'Remain in Mexico', The U.S. is Enlisting Central America in its Crackdown on Asylum, The Intercept (Jan. 29, 2020), **https://theintercept.com/2020/01/29/remain-in-mexico-year-anniversary-central-america/**; Telephone interview with Servicio Jesuita de Migrantes [JRS].

**265**. Telephone interview with Servicio Jesuita de Migrantes [JRS].

**266**. Deslades, supra note 264; Voces Meso Americanas, supra note 6.

**267**. Id.

**268**. Id.

**269**. Id.

CLP_PC_022732

**270**. Deslades, supra note 264.

**271**. Chloe Lauvergnier, African Migrants Trapped in Mexico, The Observers (Aug. 27, 2019), **https://observers.france24.com/en/20190826-mexico-african-migrants-trapped-protest-journey**; Mexico News Daily, Migrants' Protest in Chiapas Triggers Confrontations with Security Forces, Mexico News Daily (Aug. 23, 2019), **https://mexiconewsdaily.com/news/migrants-protest-in-chiapas-triggers-confrontations/**; Alianza Americas, Africans and Haitians Under Siege Due to New Restrictions on Mobility in Mexico, Alianza Americas (Aug. 28, 2019), **https://www.alianzaamericas.org/blog/africans-and-haitians-under-siege-due-to-new-restrictions-on-mobility-in-mexico/?lang=en**.

**272**. Telephone Interview with Servicio Jesuita de Migrantes [JRS].

**273**. Ibid.

**274**. Ibid.

**275**. Voces Meso Americanas, supra note 6.

**276**. Benjamin Alfaro & Amy Guthrie, Hundreds of Migrants Corralled at Detention Center in Mexico, AP News (Oct. 13, 2019), **https://apnews.com/bc196d02586e4978bc8f236f23d7c046**; Sandra Cuff, Mexican National Guard Blocks U.S.-Bound Migrant Caravan, Al Jazeera (Oct. 13, 2019), **https://www.aljazeera.com/news/2019/10/mexican-national-guard-blocks-bound-migrant-caravan-191013185355131.html**.

**277**. Alfaro, supra note 276.

**278**. Telephone interview with BAJI.

**279**. Telephone interview with Servicio Jesuita de Migrantes [JRS]; Telephone interview with BAJI.

**280**. Note: In addition to the above, Mexican authorities may also determine a migrant to be stateless where they have no nationality or it is found to be impossible to verify their nationality (Regulation of Migration Law, arts. 149-151). The governing regulation provides that if a foreign national requests a determination of statelessness, the INM (acting on behalf of the Secretariat of Foreign Affairs) will request an opinion from COMAR. In rendering this opinion, COMAR will conduct at least one interview with the foreign national where it will provide interpretation or translation, if needed, to ensure the migrant understands. The INM is ultimately responsible for exercising its discretion to make determinations of statelessness. Mexico's law on statelessness has been criticized for lacking guidelines that clearly determine what is meant by a "stateless person" or what procedural criteria immigration authorities must consider ( Universidad Iberoamericana, Apatrida en México: El uso de la protección internacional como instrumento de la política migratoria, Program de Derechos Humanos, **https://ibero.mx/files/2019/3-pdh2018_apatridia.pdf** (accessed on Aug. 9, 2020).) Migrants are sometimes declared stateless where their country of origin lacks consular representation in Mexico and, therefore, immigration officials are unable to verify their passport or other documentation. Migrants determined to be stateless, along with refugees, asylees, or recipients of complementary protection, are eligible for permanent residency in Mexico at the conclusion of their process (Ley de Migración [Migration Law], LM art. 59).

**281**. See rights to interpretation/translation and legal representation throughout the process in: Refugee Law, Regulation of the Law on Refugees and Complementary Protection, Migration Law; Regulation of Migration Law.

**282**. Telephone interview with BAJI; telephone interview with Servicio Jesuita de Migrantes [JRS]. For more information about "firm resettlement" under U.S. law, see: "Mexican Tarjetas de Visitante por Razones Humanitarias and Firm Resettlement: A Practice Advisory for Advocate," **https://imumi.org/attachments/2019/Mexican%20Tarjetas%20de%20Visitante%20por%20Razones%20Humanitarias%20and%20Firm%20Resettlement%20-%20A%20Practice%20Advisory%20for%20Advocates.pdf** (accessed August 19, 2020).

**283**. Telephone interview with Servicio Jesuita de Migrantes [JRS].

**284**. Note: Both "Jean" and "Marie" are pseudonyms.

**285**. Note: All names used in this section are pseudonyms.

**286**. Institute for Women's Migration (IMUMI), What is the Institute for Women's Migration (IMUMI) 9, 2018.

**287**. Division for the Advancement of Women, Women and International Migration, Department of Economic and Social Affairs, United Nations, **https://www.un.org/en/development/desa/population/migration/events/coordination/3/docs/P01_DAW.pdf** (accessed July 23, 2020).

**288**. Observatorio Genero Y COVID-19 En Mexico, Mujeres Migrantes [Migrant Women], Observatorio Genero Y COVID-19 En Mexico, **https://genero-covid19.gire.org.mx/tema/mujeres-migrantes/** (accessed on July 24, 2020).

**289**. Telephone interview with Servicio Jesuita de Migrantes [JRS].

**290**. Ibid.

**291**. Ibid.

**292**. Ibid.

**293**. Ibid.

CLP_PC_022733

**294**. Alfredo Pena, First COVID-19 Case Confirmed in Asylum Seeker Camp at U.S.-Mexico Border, TIME (June 30, 2020), **https://time. com/5862084/asylum** seekers-u-s-mexico-border-covid-19/; Alice Driver, At the U.S.- Mexico Border, Asylum Chaos and Coronavirus Fear, The New Humanitarian (June 22, 2020), **https://www.thenewhumanitarian.org/news/2020/06/22/US-Mexico-border-asylum-chaos-coro-navirus-fear.**

**295**. Driver, supra note 294.

**296**. Ibid.

**297**. Julia Ainsley, As COVID-19 Looms, Conditions for Migrants Stalled at U.S. Border are a 'Disaster in the Making', NBC News (May 12, 2020), **https://www.nbcnews.com/politics/immigration/covid-19-looms-conditions-migrants-stalled-u-s-border-are-n1204506**; Observa-torio Género Y COVID-19 En Mexico, Migrant Population,, **https://genero-covid19.gire.org.mx/tema/mujeres-migrantes/** (accessed July 24, 2020).

**298**. Andrea Jiménez, No habrá recursos para migrantes: delegado, Press Reader (May 26, 2020), **https://www.pressreader.com/mexico/la-cronica/20200526/281578062869576.**

**299**. Leutert, supra note 259, at 2.

**300**. Observatorio Genero Y COVID-19 En Mexico, Migrant Population,, **https://genero-covid19.gire.org.mx/tema/mujeres-migrantes/** (accessed July 24, 2020).; Carlos Mari, Coronavirus jaque a migrantes en Mexico, Inter Press Service (May 6, 2020), **http://www.ipsnoticias. net/2020/05/coronavirus-pone-jaque-migrantes-mexico/.**

**301**. Pierre-Marc Rene, Death Threats Drive Refugees to Flee Coronavirus Lockdown, UNHCR (Apr. 28, 2020), **https://www.unhcr.org/news/stories/2020/4/5ea713024/death-threats-drive-refugees-flee-coronavirus-lockdown.html.**

**302**. Diego Carranza Jimenez, Mexico Exceeds 10,000 Deaths From COVID-19 and Reaches More Than 93,400 Infections, AA (June 2, 2020), **https://www.aa.com.tr/es/mundo/m%C3%A9xico-supera-las-10-mil-muertes-por-covid-19-y-alcanza-m%C3%A1s-de-93400-con-tagios/1861500.**

**303**. COMAR, Comunicado No. 61/2020 [Release No. 61/2020], Gobierno de México (May 27, 2020), **https://www.gob.mx/comar/articu-los/comunicado-no-61-2020.**

**304**. Asylum Access, Asylum Law in a Pandemic: Interview With an Asylum Access Mexico Lawyer in Tijuana, Asylum Access (Ap. 9, 2020), **https://asylumaccess.org/asylum-law-in-a-pandemic-interview-with-an-asylum-access-mexico-lawyer-in-tijuana/.**

**305**. Gustavo Palencia, African, Haitian Migrants in Honduras Defy Border Closure in Attempt to Reach U.S., Reuters (June 2, 2020), **https://www.reuters.com/article/us-usa-immigration-honduras/african-haitian-migrants-in-honduras-defy-border-closure-in-attempt-to-reach-us-idUSKBN2392U3.**

**306**. Ibid. Forbes Staff, Honduras frena caravana de africanos, cubanos y haitianos rumbo a E.U, Forbes Centroamerica (June 3, 2020, 12:24 PM), **https://forbescentroamerica.com/2020/06/03/honduras-frena-caravana-de-africanos-cubanos-y-haitianos-rumbo-a-e-u/.**

**307**. Jason Pena, Guatemala to Screen New U.S.-Bound Migrant Caravan from Honduras for Coronavirus, Center for Immigration Studies (Mar. 10, 2020), **https://cis.org/Pena/Guatemala-Screen-New-USBound-Migrant-Caravan-Honduras-Coronavirus**; Jason Pena, A Second Migrant Caravan from Honduras Heads North, Center for Immigration Studies (March 13, 2020), **https://cis.org/Pena/Second-Migrant-Car-avan-Honduras-Heads-North.**

**308**. Juan Zamorano, Panamá promote mejorar condiciones de migrantes en Darién, AP News (Apr. 17, 2020), **https://apnews.com/40c3af-252fa520b689f9508ed2cec6a8.**

**309**. Andres Suárez Jaramillo, Panamá obligó a cientos de migrantes a confinarse en la agreste selva del Darién, France 24 (June 11, 2020, 10:09 PM), **https://www.france24.com/es/20200611-los-mas-vulnerables-panama-migrantes-confinados-darien.**

**310**. See: IMUMI et. al., Propuestas y Recomendaciones para la Construcción de una Agenda Migratoria y de Asilo en México, **http://pendientesenmigracion.imumi.org/wp-content/uploads/2019/07/Propuestas-y-recomendaciones-para-la-construcci%C3%B3n-de-una-agenda-migratoria-y-de-asilo-en-M%C3%A9xico.pdf**, p. 29 (accessed on August 24, 2020). While it is outside the scope of this Report to engage in legal arguments regarding the validity of immigration detention under international human rights law, please see for example: "Revised Deliberation No. 5 on deprivation of liberty of migrants," UN Working Group on Arbitrary Detention, 7 February 2018, **https://www.ohchr.org/Documents/Issues/Detention/RevisedDeliberation_AdvanceEditedVersion.pdf** (accessed August 24, 2020). Further, while not the focus of this Report, the Authors affirm the arguments made elsewhere that migrants must be released from immigration detention in Mexico in the context of the COVID-19 pandemic. See the ongoing litigation of IMUMI and other civil society organizations regarding Mexico's obligation to release vulnerable migrants from immigration detention and provide health care. See also: Human Rights Watch, "Mexico: Free Detained Migrants Amid Pandemic", April 14, 2020, **https://www.hrw.org/news/2020/04/14/mexico-free-detained-mi-grants-amid-pandemic** (accessed on August 24, 2020).

**311**. Ley de Migración [LM], Artículo 111, Diario oficial de la Federación [DOF] 12-07-2018, Última reforma publicada 12-07-2018, (Mex.).

**312**. Reglamento de la Ley General de los Derechos de Niñas, Niños y Adolescentes, Artículo 111, Diario Oficial de la Federación [DOF]

CLP_PC_022734

2-12-2015, Última reforma publicada DOF 2-12-2015, (Mex.); IMUMI, Propuestas y Recomendaciones Para la Construcción de Una Agenda Migratoria y de Asilo en México Ficha #5 [Proposals and Recommendations for the Construction of a Migration and Asylum Agenda in Mexico: File #5], available at: **http://pendientesenmigracion.imumi.org/wp-content/uploads/2019/07/Ficha-6-Eliminar-la-detenci%C3%B3n-de-ni%C3%B1as-ni%C3%B1os-y-adolescentes.pdf** (accessed on August 24, 2020).

**313**. See: IMUMI, Gabriela Díaz Prieto, Familias Centroamericanas Migrantes en México, **http://observatoriocolef.org/wp-content/uploads/2017/11/Familias-centroamericanas-completo-IMUMI-ilovepdf-compressed.pdf**, p. 4 (accessed on 24, 2020).

**314**. For more information, see: Detention Watch Network, "#CommunitiesNotCages", **https://www.detentionwatchnetwork.org/take-action/communitiesnotcages** (accessed on August 25, 2020).

**315**. Mario González, López Obrador: Se tiene que combatir el racismo sin necesidad de más instituciones, CNN Español (June 18, 2020, 8:54 PM), **https://cnnespanol.cnn.com/video/amlo-conapred-eliminacion-lopez-obrador-consejo-gobernacion-olga-cordero-perspectivas-mexico-cnne-vo-sot/**.

**316**. "Órgano Interno de Control", Gobierno de México, **http://www.imss.gob.mx/transparencia/oic#:~:text=El%20%C3%93rgano%20Interno%20de%20Control,p%C3%BAblicos%2C%20mediante%20la%20realizaci%C3%B3n%20de** (accessed August 15, 2020).

**317**. United Nations Human Rights Office of the High Commissioner, Standing Invitations, UNHR, **https://spinternet.ohchr.org/StandingInvitations.aspx?lang=en** (accessed on Aug. 8, 2020).

**318**. United Nations Human Rights Office of the High Commissioner, Special Rapporteur on contemporary forms of racism, UNHR, **https://www.ohchr.org/en/issues/racism/srracism/pages/indexsrracism.aspx** (accessed on Aug. 9, 2020); United Nations Human Rights Office of the High Commissioner, Country Visits, UNHR, **https://www.ohchr.org/EN/Issues/Racism/SRRacism/Pages/CountryVisits.aspx** (accessed on Aug. 9, 2020).

**319**. United Nations Human Rights Office of the High Commissioner, View Country visits of Special Procedures of the Human Rights Council since 1998, UNHR, **https://spinternet.ohchr.org/ViewCountryVisits.aspx?visitType=all&country=MEX&Lang=en** (accessed on Aug. 9, 2020).

CLP_PC_022735




CLP_PC_022736

Case 4:18-cv-06810-JST Document 169-9 Filed 06/05/23 Page 692 of 1047

A

# Mexico seeks to curb 'abuse' of asylum system by migrants who do not plan to stay



[1/2] Migrants rest outside the Siglo XXI migrant detention center as they seek humanitarian visas to cross the country and reach the U.S., in Tapachula, Chiapas state, Mexico, January 11, 2023. REUTERS/Jacob Garcia

Read more

1

2

MEXICO CITY, Feb 13 (Reuters) - Mexico's overwhelmed asylum agency is strengthening efforts to weed out high numbers of applicants who "abuse" the system while passing through Mexico to reach the United States, Mexico's top asylum official said on Monday.

Mexico has the world's third highest number of asylum applications after the United States and Germany, reflecting growing numbers of refugee seekers that have strained resources at the Mexican Commission for Refugee Assistance (COMAR).

Advertisement · Scroll to continue

CLP_PC_022810

Once migrants request asylum, they are exempt from deportation and are eligible to seek work, motivating many to file applications even without the intent to stay in Mexico, said Andres Ramirez, COMAR's director.

"It's an abuse of the asylum system," he told reporters at COMAR's busy Mexico City office. "Treating COMAR like a kind of travel agency."

The agency recently began a pilot in the southern city of Tapachula near the Guatemala border, where it has its biggest load of applicants, geared at quickly rejecting cases that do not merit asylum, Ramirez added.

Advertisement · Scroll to continue

He noted some applicants falsely believe COMAR distributes permits allowing travel within Mexico. In reality, asylum seekers typically must stay in the state where they began their cases.

"This has put us in a situation of near-breakdown," Ramirez told a news conference.

COMAR received close to 119,000 applications last year, slightly fewer than the year before.

This January, the number more than doubled from the same month in 2022. The claims included 430 from Afghans - a soaring increase from past years.

Yet Ramirez noted many Afghans are unlikely to see out their cases in Mexico, where so many aspects of daily life from religion to food are so different than home.

"Many Afghans do not necessary want to stay in Mexico," he said. "In the United States, there's a much bigger Afghan community than what we have here."

Advertisement · Scroll to continue

CLP_PC_022811

3/16/23, 9:20 PM
Case 4:18-cv-06810-JST   Document 169-9   Filed 06/05/23   Page 694 of 1047
Mexico seeks to curb abusive asylum system if migrants do not apply for legal reader mode

Reporting by Lizbeth Diaz and Daina Beth Solomon; Editing by Lincoln Feast.

CLP_PC_022812

Case 4:13-cv-06840-JST   Document 169-8   Filed 06/05/23   Page 695 of 1047

# FRAGOMEN

# Costa Rica: Special Permit for Cuban, Nicaraguan and Venezuelan Refugees Will Reopen

December 19, 2022

## Country / Territory

 Costa Rica

On March 1, 2023, for 12 months, the General Immigration Directorate will re-open applications for the special humanitarian permit for eligible Cuban, Nicaraguan and Venezuelan nationals to reside and work in Costa Rica for up to two years initially. Applicants must meet the following criteria to qualify for the permit:

- Must have filed for refugee status between January 1, 2010 and September 30, 2022 and their application has either been denied or is pending;

- Remained in Costa Rica since they filed their refugee status application;

- Must not hold any approved visa or legal status in Costa Rica; and

- Have a clean criminal record.

Applicants must register with the General Immigration Directorate within 90 days of receiving the resolution approving their permit. The permit may be renewed if the holder has not entered or exited Costa Rica illegally after receiving it. Interested applicants should contact their immigration professional for more information and case-specific advice.

*This alert is for informational purposes only. If you have any questions, please contact the global immigration professional with whom you work at Fragomen or send an email to lar@fragomen.com.*

CLP_PC_022823

Cookies Settings

CLP_PC_022824

BELIZE IMMIGRATION | Ministry of Foreign Affairs, Foreign Trade & Immigration

Home    The Ministry ⌄    Forms

Contact Us



# BELIZE IMMIGRATION

Passport ⌄    Citizenship ⌄    Residence ⌄    Permits ⌄    Visa ⌄    Refugees

Other Services ⌄    🔍

### AMNESTY MENU

ESPAÑOL



...ackground Information

...ho Qualify?

...hat Documents You ...eed?

...ow To Apply?

...hat is the Cost?

...AQs

...orms

## Who Qualify?

**Qualifying criteria for migrants who are residing in Belize**

1. Registered as asylum seekers with the Department of Refugees (must have been registered before 31 March 2020).
2. Residing in Belize before 31st December 2016.
3. Have at least one (1) child born in Belize on or before 31st December 2021.
4. Completed primary, secondary and or tertiary education in Belize.
5. Married to a citizen of Belize for at least one (1) year.
6. In common-law union with a citizen of Belize for at least five (5) years.
7. Referrals by the Department of Human Services (minors/adolescence and victims of human trafficking).
8. Maintained gainful employment in Belize for five (5) years.

---

**SERVICES MENU**

Passport

Citizenship

Residence

Visa

**TOP MENU**

Home

The Ministry    ›

Forms

Contact Us

Search...    🔍

**DESIGNED AND MAINTAINED BY**

CLP_PC_022825

Permits

Refugees

CSME Skilled Certificate

Border Crossing Card



Copyright © 2023. Government of Belize | Ministry of Foreign Affairs, Foreign Trade & Immigration | All Rights Reserved.

f

CLP_PC_022826



# Is Mexico Safe for Refugees and Asylum Seekers?

President Trump has repeatedly falsely <u>asserted</u> that the United States can turn away asylum seekers who have crossed through Mexico without seeking asylum there first—even though there is no legal basis for this claim. Secretary of Homeland Security Kirstjen M. Nielsen has also incorrectly <u>stated</u> that asylum seekers must "seek protections in the first safe country they enter, including Mexico."

Despite this rhetoric, **many refugees face deadly dangers in Mexico. For many, the country is not at all safe.** Mexico falls far short of meeting the legal requirements that would permit U.S. officials to treat it as a "safe third country" for the purpose of turning back asylum seekers. And since there is no safe third country agreement in place, the president and members of his administration have no legal basis to state that asylum seekers must apply for asylum in Mexico.

Rather than returning refugees to a country that is currently unable to provide them safety, the United States should strengthen support to build an effective refugee protection system in Mexico. This factsheet explains the concept of safe third country agreements under U.S. law and why Mexico does not meet the legal requirements.

## What is a "safe third country"?

Under a "safe third country" agreement, the United States and another country recognize that both countries effectively protect refugees seeking asylum. With an agreement in place, asylum seekers who request protection in the United States after first passing through the "safe" country may be returned there and given an opportunity to request protection in that other country.

**Canada is the only country that has a safe third country agreement with the United States.** The <u>Canada-U.S. Safe Third Country Agreement</u> was signed on December 5, 2002 and came into effect on December 29, 2004. As a result, asylum seekers who enter the United States after passing through Canada will be returned and permitted to request asylum there unless they qualify for an exception to the agreement.

Congress has spelled out three requirements that must be met before U.S. officials and agencies can block refugees from asylum on these grounds. **Specifically**, **to be a safe third country, the** <u>Immigration and Nationality Act</u> **requires that the country must:**

- ☑ **Guarantee asylum seekers protection from persecution:** The country must be a place where the refugee's "life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion."

- ☑ **Provide access to "full and fair" procedures to assess asylum requests:** The country must afford "access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection."

- ☑ **Agree to be designated a safe third country:** The country must have entered into a bilateral or multilateral safe third country agreement with the United States.

CLP_PC_022851

## Mexico does not meet "safe third country" legal requirements

As Human Rights First has long **documented**, given the deadly dangers in Mexico and the deficiencies in its refugee protection system, Mexico falls far short of meeting "safe" country standards under U.S. law:

### Refugees are not adequately protected in Mexico.

As detailed in Human Rights First's 2017 **report** and updated in a 2018 **fact sheet**, **refugees and migrants face acute risks of kidnapping, disappearance, sexual assault, trafficking, and other grave harms in Mexico.** Refugees in Mexico are targeted due to their inherent vulnerabilities as refugees but also on account of their race, nationality, gender, sexual orientation, gender identity, and other reasons. Certain groups—"**including** the LGBTQ community, people with indigenous heritage, and foreigners in general"—face consistent persecution in Mexico and are often forced to seek protection outside of the country. **Gay men** and **transgender women**, for example, flee discrimination, beatings, attacks, and a lack of protection by police in Mexico. **Some refugees have been trafficked into forced labor**, while women and girls have been trafficked to Mexico's southern border where they have been exploited in bars and night clubs that cater to police, military, and other forces. Doctors Without Borders **reported** that 68% of refugees and migrants it interviewed had been exposed to violence and almost one third of refugee and migrant women had been sexually assaulted. Additionally, Amnesty International **reports** that criminal investigations of massacres and crimes against migrants remain "shrouded by impunity."

### Many refugees are left unprotected due to lack of access to full and fair procedures

**Deficiencies, barriers, and flaws in Mexico's asylum system leave many refugees unprotected** and Mexican authorities continue to improperly return asylum seekers to their countries of persecution. A 2018 Amnesty International **report** found that Mexican migration officials routinely turn back Central American asylum seekers and that **75 percent of migrants and asylum seekers surveyed were not informed of their right to seek asylum** by migration officers in detention facilities, even though this is required by Mexican law. Less than one percent of unaccompanied children apprehended in Mexico receive international protection, as **detailed** by Human Rights Watch.

Despite progress since launching an asylum system, barriers persist, leaving many refugees unprotected. The system for seeking legal protection lacks national reach and capacity. COMAR—"The Mexican Commission for Refugee Aid"—has only four offices around the country, leaving many refugees without access to the system. After halting its processing of asylum applications in 2017, Mexico only **reopened** its system in 2018 after a successful lawsuit by the Mexican Commission for the Defense and Protection of Human Rights. Refugee processing in Mexico remains plagued by backlogs and understaffing. In addition, **refugees are blocked from protection under an untenable 30-day filing deadline, denied protection by COMAR officers who claim that refugees targeted by groups with national reach can safely relocate within their countries, and lack an effective appeal process** to correct wrongful denials of protection. Finally, **declining** and **disparate** asylum recognition rates for Central Americans raise concerns that individuals from those countries remain unprotected.

### Mexico has not agreed to be a safe third country.

Mexico and the United States do not have a "safe third country" agreement.

CLP_PC_022852



**JUNE 6, 2022**

# Mexico: Asylum Seekers Face Abuses at Southern Border

Improve Conditions, Procedures; US Should End Pressure to Block Arrivals
Published in

(Los Angeles) – Migrants and asylum seekers who enter Mexico through its southern border face abuses and struggle to obtain protection or legal status as a result of policies aimed at preventing them from reaching the US, Human Rights Watch said today. As leaders meet in Los Angeles for the Summit of the Americas, they should commit to ending abusive anti-immigration policies and to ensuring people seeking protection are received humanely in the US, Mexico, and elsewhere.



A Mexican Marine orders a group of migrants from Bangladesh, India and Pakistan off a bus at an immigration checkpoint outside the town of Viva Mexico, near Tapachula, in Chiapas state, Mexico, June 21, 2019.

© 2019 AP Photo/Oliver de Ros

Refugee status applications and migrant apprehensions in Mexico have risen dramatically as US President Joe Biden has continued restricting access to asylum at the US southern border, and pushed Mexican President Andrés Manuel López Obrador to heavily regulate travel to and within Mexico in order to prevent non-Mexican migrants from reaching the US. Those who cross Mexico's southern border fleeing violence and persecution struggle to obtain protection, face serious abuses and delays, and are often forced to wait for months in inhumane conditions near Mexico's southern border while struggling to find work or housing.

"Outsourcing US immigration enforcement to Mexico has led to serious abuses and forced hundreds of thousands to wait in appalling conditions to seek protection," said Tyler Mattiace, Americas researcher at Human Rights Watch. "The Summit of the Americas is an opportunity for regional leaders, including presidents Biden and López Obrador, to commit to a regional migration agreement that moves away from heavy-handed enforcement policies and towards protection and human rights."

CLP_PC_022853

Leaders from the Western Hemisphere are expected to sign a regional declaration on migration and protection during the Summit of the Americas, hosted by President Biden in Los Angeles. Any agreement signed should include commitments by leaders to restore and expand access to protection across the continent, to end heavy-handed enforcement policies that have led to abuses.

Mexico apprehended 307,569 migrants in 2021, the highest number ever recorded. A record 130,863 people also applied for refugee status in Mexico in 2021, the third-highest number in the world according to the United Nations refugee agency UNHCR. A decade ago, just a few thousand applied per year.

Most of those entering the southern border are Black, brown, and Indigenous people from Central America and the Caribbean who lack visas to enter Mexico. Nearly half of all asylum applicants in Mexico in 2021 were Haitians. Most enter near the city of Tapachula, in Chiapas state. Around 70 percent of those who apply for refugee status in Mexico do so in Tapachula.

Human Rights Watch interviewed more than 100 migrants, asylum seekers, representatives of migrants' rights groups and UN agencies, and officials from Guatemala, Honduras, and Mexico, between August 2021 and April 2022, in person and by phone, in Tapachula and Mexico City, and in Tecun Uman, Guatemala, near the main border crossing.

## Video, Israel, 24, Nicaragua

Most asylum seekers enter Mexico undocumented. Most said they came fleeing violence or persecution in their home countries but did not attempt to request protection at an official border crossing, fearing agents from Mexico's immigration authority, the National Migration Institute (INM) would deport them. Most applied for refugee status once in Mexico. A few said they sought protection at the border and were turned away by INM agents or security guards. Many said INM agents dissuaded them from seeking refugee status in Mexico and pressured them to accept voluntary returns to their countries.

"I thought they would help us when we got to Mexico, but when we came to the border bridge and asked for protection they turned us away," said one man who fled forced gang recruitment in Honduras. "I never thought I would have to leave my country. Now, I know if I went back, I wouldn't last very long alive. If you don't obey the gangs there, they force you to – or they kill you."

In 2021, nearly 90,000 people applied for refugee status in Tapachula, equivalent to a quarter of the city's population. Most wait many months for their applications to be reviewed and to receive documents proving their legal status and allowing them to leave. They often face discrimination, and struggle to find work and housing. Support programs by UNHCR and the Mexican government are insufficient. Some interviewees said they felt unsafe in Tapachula because it is close to the Guatemalan border, where the criminal groups they had fled were operating.

CLP_PC_022854

Mexico's refugee system has been overwhelmed by the enormous growth in applicants. The budget for the refugee authority, the Mexican Commission for Refugee Assistance (COMAR), which is separate from the INM, has not kept pace, and it has a growing backlog of refugee status applications. In 2021, it received more than 130,000 but only processed 38,005. UNHCR pays for many basic operating costs, including two-thirds of staff's salaries. UNHCR contributed $4.5 million in 2021. The federal government contributed just over $2 million. State governments provide free space for some offices and refugee centers.

Most asylum seekers said they were fleeing death threats, extortion, and forced recruitment by gangs or drug cartels in Honduras, Guatemala, or El Salvador – or political persecution and generalized human rights abuses in Cuba, Nicaragua, and Venezuela.



Senior INM officials said they do not believe most people seeking refugee status in Mexico have legitimate claims, either because they do not believe they are truly fleeing violence and persecution or because they believe most would prefer to seek asylum in the US. Mexican Foreign Relations Secretary Marcelo Ebrard has expressed similar sentiments publicly.

COMAR is able to review only some of the refugee status applications it receives. It grants protection to nearly all Hondurans, Salvadorans, and Venezuelans whose cases it reviews. But it rejects most applicants from Haiti, saying they do not qualify as refugees. COMAR officials have acknowledged that Haitians cannot be safely returned due to the severe security crisis there. The INM issued temporary "humanitarian" visas to about 50,000 Haitians in 2021. In 2022 it began a pilot program to allow 200 Haitian families who do not qualify as refugees to apply for residency in Mexico.

US President Joe Biden has continued many of former president Donald Trump's abusive anti-immigration policies, including pressuring Mexico to stop migrants from reaching the US and blocking access to asylum at the US southern border through policies like Title 42 and Remain in Mexico. President Andrés Manuel López Obrador has deployed almost 30,000 soldiers alongside National Migration Institute (INM) agents to apprehend undocumented migrants throughout Mexico.

Both the Biden and López Obrador administrations have a role in improving access to asylum procedures and the processing of refugee status applications in Mexico, Human Rights Watch said. The US should restore access to asylum at its border and stop pressuring Mexico to crack down on migration. Mexico should ensure

CLP_PC_022855

that COMAR is properly funded and that asylum seekers are able to make claims at border crossings and from detention centers. Mexico should streamline processing of residence visas for those who have been recognized as refugees. And it should ensure that Haitians have access to protection and legal status.

"President López Obrador has often portrayed Mexico as a champion of migrants and asylum seekers," Mattiace said. "If that is true, he should demonstrate it by ensuring asylum seekers in southern Mexico get a humane welcome."

**For additional information on the findings, recommendations, and a selection of cases, please see below. Unless noted otherwise, the cases are based on the direct testimony of interviewees.**

Human Rights Watch interviewed 80 migrants and asylum seekers in Tecun Uman, Guatemala, and Tapachula, Mexico, primarily in August and September 2021, with additional interviews conducted into May 2022, with 28 representatives of UN bodies, the Mexican, Guatemalan, and Honduran governments, the Chiapas state prosecutor's office, and migrants' rights organizations. Human Rights Watch also reviewed documents, photos, videos, text messages, and voice notes that supported and often directly corroborated individual case accounts and received information from the Mexican federal and the Chiapas state government.

The findings are consistent with previous Human Rights Watch work, conducted in 2015 and 2020, which found that the immigration agency pressured migrants not to claim refugee status or to abandon claims and illegally expelled some, including children, who feared for their lives in their home countries.

**Stepped Up Immigration Enforcement**

President López Obrador has intensified immigration restrictions and enforcement efforts in response to US pressure. He imposed new visa requirements, making it harder for Brazilians, Venezuelans, and Ecuadorians to travel to Mexico. He has also imposed new restrictions on domestic travel, including requiring proof of immigration status for domestic bus trips and regular immigration status checks on domestic flights.

The INM has a significant presence across Mexico and operates one of the largest immigration detention systems in the world, with over 6,000 staff in 499 locations, including 194 points of entry and 66 immigration detention centers. Soldiers and immigration agents conduct "control and verification" operations nationwide to apprehend undocumented migrants. They operate checkpoints on major roads and conduct patrols and surprise inspections on buses and airplanes, at hotels, along the northern and southern borders, and in public spaces like parks. They regularly publicize these efforts. The Mexican Supreme Court recently ruled these checkpoints unconstitutional. Congress will need to amend the law for the ruling to take effect.

CLP_PC_022856

In some cases, efforts to apprehend undocumented migrants have led to serious violence and even deaths. In October 2021, National Guard troops <u>opened fire on a truck</u> carrying migrants, in an apparent attempt to detain them, killing two. According to news reports, survivors alleged that the troops tried to <u>cover up</u> the killings by planting a weapon on one of the victims and claiming they had shot in self defense. This is a common and <u>well-documented practice</u> by soldiers. In March 2021, soldiers <u>shot and killed a Guatemalan man</u> who failed to stop at a checkpoint. In September, immigration agents were <u>filmed kicking and beating</u> families in a migrant caravan.



**Mexico's Refugee System**

Under Mexican and international law, anyone has the right to apply for refugee status and have their claim heard by appropriate authorities. Officials are prohibited from returning people to a country where their life would be threatened or they would be at risk of torture or cruel, inhuman, or degrading treatment, regardless of whether they intend to apply for refugee status in Mexico.Mexico's refugee system is overseen by COMAR, a much smaller agency than the INM, which oversees all other immigration issues, including enforcement. COMAR receives and decides refugee status claims at its nine offices throughout the country. It has no permanent presence at airports or border crossings.

Mexican law recognizes anyone fleeing generalized violence, internal conflict, or massive human rights abuses that seriously disturb public order, among others, as a refugee. COMAR has determined that Salvadorans, Hondurans, and Venezuelans come from countries where these conditions are prevalent. As long as their reason for fleeing is connected to the disturbance of public order, COMAR nearly always presumes they are refugees and grants them protection.

But applicants from other countries where Human Rights Watch has documented similarly dangerous conditions, <u>such as Cubans</u> and <u>Haitians,</u> are not given this treatment, and are much less likely to receive protection. COMAR officials say most Haitians do not qualify as refugees, since many previously had legal status in Chile or Brazil and do not cite disturbed public order as a reason for leaving Haiti.

COMAR can also grant a legal status called "complementary protection" to anyone who does not qualify as a refugee but cannot be safely returned to a home country. COMAR officials have acknowledged Haitians

CLP_PC_022857

cannot be safely returned, but COMAR rarely grants complementary protection to any applicants, including Haitians.

COMAR provides applicants a certificate confirming their status as a refugee status applicant. They can use it to apply to the INM for a temporary "humanitarian" visa, valid until their claim is resolved, which they can show to avoid being detained if stopped by INM agents. COMAR also provides applicants a temporary national ID number, needed to work and access services.

Applicants are not allowed to leave the state while their application is pending, even if they have a "humanitarian" visa. Those found to have done so by immigration agents are considered to have "abandoned" their application and can be detained and deported.

Once someone is recognized as a refugee, their temporary "humanitarian" visa is no longer valid. They must apply to the INM for a permanent residence visa. Without it, they cannot travel within Mexico and may be detained and considered undocumented if they reach a checkpoint. Recognized refugees are exempt from visa application fees.

## Barriers to Protection for Detained Migrants

Human Rights Watch interviewed 19 people who had been held in immigration detention centers. Most said they were detained after entering the country undocumented, before applying for asylum.

Some said immigration agents tried to dissuade them from applying for refugee status and pressured them to agree to voluntary return, even when they said they would be at risk of violence and persecution in their home countries. Some said they were instructed to sign voluntary return documents without reading them. Others said agents used poor conditions in detention as a deterrent, saying they would spend months in detention if they sought refugee status.

Immigration officials said that their agents always inform detained migrants of their right to seek refugee status. However, COMAR rarely receives refugee status claims from apprehended migrants, according to official statistics. Of the over 130,000 refugee status applications received by COMAR in 2021, only 4,177, about 3 percent, came from people apprehended by the immigration agents at the border.

All asylum seekers are identified by pseudonyms for their protection. The following are some of their accounts:

*They detained me on Friday. On Monday, the immigration agent arrived. She took us up to the second floor. She told us "You have two options here: deportation or COMAR. The best thing for you to do is request voluntary deportation, because if you request COMAR you could be here from 90 days to three years waiting*

CLP_PC_022858

*for a decision. And apart from that you need to wait for your visa. You're going to waste a lot of time that way. Why don't you just go back to your countries?* **-Emiliano, 51, Venezuela**

**Video, Emiliano, 51, Venezuela**

*The day after I was detained, the immigration agent came and said we all had to sign our deportation papers. I told him "I don't want to be deported. I want asylum." He asked me my name. Then he turned to the group and said "Julio is talking about asylum. You should all know that if you request asylum, you will be here for six months." The others said they didn't want to be in detention for six months, so they signed the papers and were sent back. I was the only one who refused to sign.* **-Julio, 29, Honduras**

*They never said to me "Do you want COMAR? Do you want to request COMAR or do you want deportation?" They didn't say anything to me. I didn't know anything about that. And they brought me to talk to the consul. They asked for my personal information, my age. And then, two days after talking with the consul, they came with my deportation papers, and they didn't let me read anything. They said: "sign quickly, fingerprint quickly," and you couldn't read what you were going to sign.* **-Juana, 21, Honduras**

**Video, Juana, 21, Honduras**

*When you enter that place, you lose your human rights. I asked a guard if I could have my phone back to tell my family where I was. He told me "No one here gets to talk with their family." There were so many of us, we slept one on top of the other. We were even sleeping on the bathroom floor – like a prison. Lots of us had fever, flu, or a cough. They didn't give you any medicine. I was coughing, but they told me "You're not dying yet. Come back when you're dying." Half of us had Covid-19 symptoms. I was afraid I would die.* **-Emiliano, 51, Venezuela**

**Difficulties Accessing Protection at the Border**

Migrants and asylum seekers should be able to request protection from immigration agents at border crossings or after entering Mexico, under Mexican and international law. The agents are legally prohibited from turning away anyone with a refugee status claim or anyone whose life would be at risk upon return to their home country. They are required to allow them into Mexico and to forward their requests to COMAR.

But most enter Mexico irregularly, even those intending to seek refugee status. Nearly every interviewee said they had entered Mexico irregularly, taking a raft or wading across the Suchiate River, which separates Mexico and Guatemala. They had not gone through an official border crossing, fearing immigration agents would detain and deport them when they attempted to enter the country or request protection, they said.

**Video, Israel, 24, Nicaragua**

CLP_PC_022859

Immigration officials said asylum seekers rarely enter at official crossings, but if they do, the policy is to take adults into custody and transfer them to an immigration detention center – and to transfer children and families to a shelter – where they wait to speak to a COMAR representative and make a refugee status claim.

But the interviews suggest the situation is more complicated. Experiences varied, suggesting immigration agents and private security guards on the Rodolfo Robles border bridge, connecting Tecún Uman, Guatemala and Ciudad Hidalgo, Mexico, at



A raftsman prepares to take passengers across the Suchiate river from Ciudad Hidalgo, Mexico to Tecun Uman, Guatemala, August 12, 2021.

© 2021 Tyler Mattiace

times decide on their own how to respond. Human Rights Watch also spoke to the Human Rights Monitoring and Observation Collective for Southwest Mexico (COMDHSM), a collective of migrants' rights groups that helped some of the migrants.

COMDHSM said they helped 87 asylum seekers enter legally between February and June 2021. They stopped doing so, they said, after receiving phone calls from an immigration official who threatened them with a criminal investigation on human trafficking charges. Immigration agents often harassed the COMDHSM staff at the border, they said, attempting to prevent them from entering the immigration office or speaking to asylum seekers.

Once, as they accompanied a family of asylum seekers, National Guard troops and two Suchiate municipal police officers arrived, threatening to detain them, they said. They reported the incident to the National Human Rights Commission, which urged the immigration agency to ensure their safety. The agency later sent the groups a letter saying it had instructed staff at the border to follow its code of conduct.

Nine people interviewed said that they or their families attempted to enter the country by telling agents on the Rodolfo Robles border bridge that they wished to seek refugee status in Mexico.

**Video, Francisco, 28, Honduras**

**Video, Ximena, 31, Honduras**

CLP_PC_022860

*My husband was in jail for 12 years, from age 14 to 26. In jail, you have to join a gang if you want to survive. He didn't want to do it, but they made him. A few years before he was released, he told the gang he was going to quit. That night, someone broke into his mother's house and shot her. We knew that as soon as he got out of jail it could happen to us too. The Red Cross told us we could go to Tecún Uman and request asylum in Mexico. The whole family went – seven of us. On the bridge, the Mexican immigration agents made us wait for hours. Finally, they said only the two children and one adult could enter. The rest of our family would have to stay in Guatemala. We said "it's all of us or no one." In Guatemala, they gave us the contact of a Mexican organization. The next week, they met us at the bridge and talked with the immigration agents, who finally let us cross. -Ana, 30, Guatemala*

*When we got to Tecun Uman, people told us: to avoid problems on the bridge, just cross on a raft. But I don't do things like that. Take a raft across the river with my two kids? Cross a border illegally? No. We're supposed to rely on the authorities to protect us. We went to the bridge. But they kept telling me to leave. They wouldn't look at my papers until someone from the human rights group came and helped us. -Ximena, 31 Honduras*

### Forced to Wait in Poor Conditions in Tapachula

People applying for refugee status can wait for months in Tapachula – a month or more for the initial COMAR appointment; then from a month to more than a year for review, depending on the complexity of the case; and, upon approval, three to six months for an appointment for a residence visa. Without a visa, they are usually not allowed to travel. The immigration agency operates checkpoints throughout Chiapas, including on roads leading out of town and throughout the state, and at bus stations and airports.

While neither government officials nor migrants' rights groups know how many migrants are waiting in Tapachula, a city of just over 350,000, the 90,000 refugee status applications made there in 2021 suggest the number is high. Interviewees said that living conditions in shelters are often abysmal, jobs are difficult or impossible to get, they have difficulty obtaining medicine, and many receive little or no support while they wait.

### Video, Israel, 24, Nicaragua

### Video, Ximena, 31, Honduras

The Danish Refugee Council conducts regular surveys of migrants in Tapachula, asking about access to work, housing, and services. Seventy-five percent of the 438 families they surveyed for their January 2022 report said nobody in their family had worked in the past three months. Eighty-one percent said their children were

CLP_PC_022861

not enrolled in schools, as they did not intend to stay in Tapachula. Around half said they could not afford to buy medicines and 40 percent said they did not know how to access medical treatment. About 70 percent said they did not have a national ID number, which is required to be seen at public hospitals.

The Chiapas secretary of education confirmed that just over 1,000 non-North American students were enrolled in Tapachula public schools in the 2020-2021 school year. The secretary of health keeps no record of the nationality of patients at public clinics.

Financial support programs provided by UNHCR and the government for refugee status applicants fail to reach many who need help. UNHCR short-term cash assistance for vulnerable people, of US $100-300 per month for up to three months, reaches about 100 households each week. In a federal welfare program for refugee status applicants, most of the approximately 1,500 participants a week plant trees or do farm work, officials said. They receive US $130 every two weeks. Human Rights Watch saw hundreds of people lined up every morning seeking to enroll in both programs.

*I can't leave Tapachula. I have to stay here. With regards to work, it's difficult. People don't feel comfortable giving work to a foreigner, and it has been really hard being in a country that is not yours. I've gone through lots of situations that I've never had to deal with before. Like being on the street without a single cent. Not having anything to eat. Not having anything to drink. It's really hard.* **-Israel, 24, Nicaragua**

*We left Honduras because a drug cartel kicked us off our farm. But here, in the shelter, a woman came up to me and said her family is with the same cartel. She knew about us. She threatened us. I just want to leave Chiapas and be somewhere safer. –* **Carla, 27, Honduras**

Some said landlords and employers refuse to rent to or hire non-Mexicans. Signs posted outside some businesses advertised jobs for Mexicans only.



A worker clears forest to make space to plant fruit trees as part of a Mexican government program providing temporary jobs to refugee status applicants, August 25, 2021.

© 2021 Nelson González

CLP_PC_022862

*It's hard to find someplace to live here. The shelters are awful; I don't feel safe there with my children. I recently found an apartment. The landlord told me the building doesn't allow foreigners; it's written in the lease. He told me if the neighbors hear my accent or figure out I'm Honduran, he'll evict me.* **-Ximena, 31, Honduras**



A sign posted outside a storefront in downtown Tapachula, Mexico advertises a vacancy for a job as a cashier, specifying "Mexican nationality" as a requirement to apply, August 15, 2021.

© 2021 Tyler Mattiace

*I was a taxi driver in Honduras. MS-13 came and demanded a "tax." I ignored it. Then they came to my house. They said if I didn't pay they would kill us. But they wanted more money than I earned; I had no way to pay. I have some friends in Monterrey [in northern Mexico], so we wanted to go there. But right now we can't leave Tapachula. When we got here, we didn't know what to do. At first, we slept in the park, me, my wife, and my two kids. Then, we found a shelter. They say we have to wait here for months. But I can't get work here. I don't know what we'll do.* **-Joel, 20, Honduras**

**Difficulties Leaving Tapachula**

Most people interviewed said they were desperate to leave Tapachula, either because they felt unsafe or could not find housing or work. Some said they had family or friends in other parts of Mexico who could help. Officials and migrants' rights groups confirmed that as a common complaint.

COMAR allows refugee status applicants to transfer their case to an office in another state, but officials said they only approve requests in exceptional cases, such as when applicants demonstrate they are being threatened or are otherwise in danger in Tapachula.

As waiting time for humanitarian visas and residence visas has grown, those waiting in Tapachula have begun to protest delays and difficulties. They have organized hunger strikes, sewn their mouths shut, burned tires, attacked immigration offices, and clashed with soldiers and police. They have organized frequent pedestrian "caravans," trying to pass checkpoints. In some cases, immigration agents and the National Guard have violently broken up caravans.

The INM response has been disorganized and opaque, and Tapachula migrants' rights groups say it has caused "confusion and tension." In November and December, when large numbers of Haitian asylum seekers were

CLP_PC_022863

waiting in Tapachula, the agency circulated <u>messages on social media</u> encouraging those who wished to leave to come to the city's football stadium for the opportunity to transfer to another state. Tens of thousands came.

Conditions in the stadium were crowded, disorganized, and unsanitary, with people waiting in the sun and sleeping on the ground, no garbage facilities or drinking water, and dirty, overused toilets, said Refugees International, which visited in December. Soldiers patrolled the stadium. The INM said it transferred 42,000 people to other states in December, mostly Haitians.

Since then, the agency has expedited humanitarian visas or provided transfers for those who protest or form caravans, seemingly to avoid the unwanted international media attention that these often draw. Others continue to wait months for appointments in Tapachula. As of April, the INM said it had transferred more than 50,000 people since November 2021 to 24 states.

In May, the INM told us it had more than doubled its capacity in Chiapas in an effort to reduce wait times and could now receive 1,110 applications per day, up from 468.

UNHCR operates an integration program that relocates recognized refugees from southern Mexico to 10 cities in central and northern Mexico and helps them find housing and work. The program has relocated over 18,000 since it began in 2016.

The International Organization for Migration began a pilot program in 2022 to help families in Tapachula who do not qualify as refugees obtain legal status, relocate to central Mexico, and find work and housing there. It had relocated 60 families as of May and plans to relocate 200 by the end of 2022.

**Overwhelmed Refugee System**

Refugee status applications in Mexico have soared as the US has restricted access to asylum and Mexico has stepped up immigration enforcement, making it harder to reach the US. Many interviewees said they had left home hoping to reach the US but, upon realizing the challenges, would accept staying in Mexico.

COMAR funding has not kept pace. While refugee status applications increased 174-fold over the past decade, government funding for COMAR increased just 2.5-fold, to 44 million pesos (US $2.2 million) in 2021.

| Year | Refugee Status Applicants | COMAR Funding (USD) |
|---|---|---|
| 2011 | 752 | $1,369,899 |

| | | |
|---|---|---|
| 2012 | 811 | $1,551,517 |
| 2013 | 1,296 | $1,805,209 |
| 2014 | 2,137 | $1,866,070 |
| 2015 | 3,423 | $1,637,955 |
| 2016 | 8,796 | $1,207,568 |
| 2017 | 14,619 | $1,346,249 |
| 2018 | 29,574 | $1,343,380 |
| 2019 | 70,327 | $1,083,855 |
| 2020 | 40,962 | $2,221,224 |
| 2021 | 130,863 | $2,190,278 |



Mexican Federal Government Funding (in USD) for the Mexican Commission for Refugee Assistance (COMAR), 2011 – 2021

Source: Mexican Commission for Refugee Assistance (COMAR)

COMAR officials said existing funding is insufficient even for basic operational expenses; they rely heavily on outside support. UNHCR provided US $4.5 million in 2021, twice as much as the Mexican government. UNHCR pays for the buildings COMAR uses in some cities and covers office supplies like paper and printer ink. Until recently, UNHCR employed 230 of COMAR's 361 staff through an outsourcing agency. This caused problems since outsourced staff cannot perform some basic tasks like signing official documents.

CLP_PC_022865

Case 4:18-cv-06810-JST   Document 169-8   Filed 06/05/23   Page 714 of 1047

**Video, Andrés Ramírez, COMAR**

In April, UNHCR began transferring money to enable COMAR to directly employ most staff, although 12 were still outsourced as of May. COMAR has also received support from the Coahuila, Jalisco, and Chiapas state governments, which have provided buildings and land for offices and processing centers.

Despite this support, COMAR is struggling to process the growing number of applications in a timely manner. A backlog of unresolved cases means asylum seekers can face waits of more than two years. In 2021, COMAR received applications from 130,863 people and resolved or closed just 38,000.

About 70 percent of refugee status claims are made through the COMAR office in Tapachula, where officials have struggled to manage demand for appointments. To receive an appointment, usually in a month, crowds of asylum seekers form a line outside the office early in the morning. Some spend the night in line.



In August 2021, COMAR created an online appointment system. Within a few weeks, appointments were booked until the end of the year. Media reported that people were selling appointments for the equivalent of hundreds of dollars. In September, COMAR took the system offline and announced that it would temporarily receive applications in Tapachula's football stadium. As of April, officials said they were back to assigning appointments at the office.



Asylum seekers wait in line outside the offices of the Mexican Commission for Refugee Assistance and the UN refugee agency in Tapachula, Mexico, August 13, 2021

© 2021 Tamara Taraciuk Broner

**Recommendations**

**To the INM**

- Ensure that immigration agents inform all apprehended migrants of their right to seek refugee status or other forms of international protection in Mexico, as required by national law, and do not attempt to dissuade people from seeking protection.
- Improve conditions of migration detention, particularly by ensuring:

CLP_PC_022866

Case 4:18-cv-06810-JST   Document 169-8   Filed 06/05/23   Page 715 of 1047

- adequate, clean, and safe sanitation facilities;
- proper and clean bedding for each detainee;
- access to telephones; and
- timely, proper responses to requests for medical care.

- Expedite procedures to apply for residence visas for recognized refugees.
- Make it simpler and less costly for those already eligible for legal status in Mexico to apply for and receive it without applying for refugee status.
- Work with the International Organization for Migration to expand the pilot program to help non-refugees obtain legal status and integrate in cities in Central Mexico.

**To COMAR**

- Place representatives at border crossings and points of entry to facilitate protection for those requiring it.
- Expand presence at detention centers to ensure that detained asylum seekers can seek refugee status.
- Evaluate claims from Haitians using the same standard applied to other applicants from countries experiencing generalized violence, or mass human rights violations that have seriously disturbed public order.
- Grant complementary protection to Haitians who do not qualify as refugees and do not have legal status in another country, since they cannot be safely returned to Haiti.

**To the Mexican Interior Ministry**

- Conduct an audit of COMAR's needs and capacity, and ensure that the agency is sufficiently staffed and funded.

**To the Biden Administration**

- Restore access to asylum at the US border.

- Stop pushing Mexico to prevent migrants from reaching the US border, and collaborate with Mexico and other governments to create a holistic regional plan for access to protection and safe, dignified migration.
- Provide support for COMAR to permanently expand its capacity.

# Related Content

[Mexico's Supreme Court Bans 'Random' Immigration Checks](#) [Mexico: Address Persistent Violence Against Journalists](#) [Mexico: Shelve Regressive Bill to Curb Civil Society Groups](#)
Region / Country

CLP_PC_022867

Case 4:18-cv-06810-JST   Document 169-8   Filed 06/05/23   Page 716 of 1047

- <u>Americas</u>
- <u>Guatemala</u>
- <u>Mexico</u>

Topic

- <u>Refugees and Migrants</u>

---

**Source URL:** *https://www.hrw.org/news/2022/06/06/mexico-asylum-seekers-face-abuses-southern-border*

CLP_PC_022868





**HUMAN RIGHTS WATCH**

# WORLD REPORT
## 2023
### EVENTS OF 2022

CLP_PC_022869

**HUMAN RIGHTS WATCH**

350 Fifth Avenue
New York, NY 10118-3299
www.hrw.org



This 33rd annual World Report summarizes human rights conditions
in over 100 countries and territories worldwide in 2022.
It reflects extensive investigative work that Human Rights Watch
staff conducted during the year, often in close partnership with
domestic human rights activists.

# WORLD REPORT
## 2023
### EVENTS OF 2022

CLP_PC_022870



Copyright © 2023 Human Rights Watch
All rights reserved.
Printed in the United States of America
ISBN 978-1-64421-240-0



Cover photo: Children from Mariupol, Ukraine, look out the window of their family's car, marked with the word "children," after arriving at an evacuation point for people fleeing areas under Russian control, May 2, 2022.

© 2022 Chris McGrath/Getty Images

Cover and book design by Rafael Jiménez

**www.hrw.org**

## Human Rights Watch defends the rights of people worldwide.

We scrupulously investigate abuses, expose facts widely, and pressure those with power to respect rights and secure justice.

Human Rights Watch is an independent, international organization that works as part of a vibrant movement to uphold human dignity and advance the cause of human rights for all.

Human Rights Watch began in 1978 with the founding of its Europe and Central Asia division (then known as Helsinki Watch). Today it also includes divisions covering Africa, the Americas, Asia, Europe and Central Asia, the Middle East and North Africa, and the United States. There are thematic divisions or programs on arms; business and human rights; children's rights; crisis and conflict; disability rights; the environment and human rights; international justice; lesbian, gay, bisexual, and transgender rights; refugee rights; and women's rights.

The organization maintains offices in Amman, Amsterdam, Beirut, Berlin, Bishkek, Brussels, Chicago, Geneva, Goma, Hong Kong, Johannesburg, Kiev, Kinshasa, London, Los Angeles, Miami, Moscow, Nairobi, New York, Paris, San Francisco, São Paulo, Seoul, Silicon Valley, Stockholm, Sydney, Tokyo, Toronto, Tunis, Washington DC, and Zurich, and field presences in more than 50 other locations globally.

Human Rights Watch is an independent, nongovernmental organization, supported by contributions from private individuals and foundations worldwide. It accepts no government funds, directly or indirectly.

CLP_PC_022871

# Table of Contents

**A New Model for Global Leadership on Human Rights**    1
by Tirana Hassan

## COUNTRIES    15

Afghanistan ........................................................17
Algeria ..............................................................24
Angola ..............................................................29
Argentina ..........................................................34
Armenia .............................................................40
Australia ............................................................47
Azerbaijan ..........................................................54
Bahrain ..............................................................61
Bangladesh .........................................................67
Belarus ..............................................................73
Bolivia ...............................................................80
Bosnia and Herzegovina .......................................86
Brazil ................................................................91
Burkina Faso ......................................................101
Burundi .............................................................106
Cambodia ..........................................................111
Cameroon ..........................................................117
Canada ..............................................................125
Central African Republic ......................................132
Chad .................................................................138
Chile ................................................................142
China ................................................................149
Colombia ...........................................................162
Cuba .................................................................171

Democratic Republic of Congo ................................180
Ecuador .............................................................185
Egypt ................................................................191
El Salvador .........................................................199
Eritrea ..............................................................208
Eswatini .............................................................213
Ethiopia .............................................................217
European Union ....................................................224
France ...............................................................236
Georgia .............................................................244
Germany ............................................................250
Greece ..............................................................259
Guatemala ..........................................................265
Haiti .................................................................272
Honduras ...........................................................280
Hungary .............................................................287
India .................................................................291
Indonesia ...........................................................300
Iran ..................................................................306
Iraq ..................................................................315
Israel and Palestine ..............................................324
Italy .................................................................334
Japan ................................................................340
Jordan ...............................................................345
Kazakhstan .........................................................351
Kenya ...............................................................357
Kosovo ..............................................................362
Kuwait ..............................................................366
Kyrgyzstan ..........................................................371
Lebanon .............................................................377
Libya ................................................................385
Malaysia ............................................................393

CLP_PC_022872

Maldives ................................................................400
Mali ......................................................................405
Mexico ................................................................411
Morocco and Western Sahara ...........................420
Mozambique ......................................................427
Myanmar ............................................................432
Nepal ..................................................................440
Nicaragua ...........................................................444
Nigeria ................................................................451
North Korea ........................................................460
Pakistan ..............................................................466
Papua New Guinea .............................................473
Peru .....................................................................478
Philippines ..........................................................485
Poland .................................................................490
Qatar ...................................................................495
Russian Federation ............................................500
Rwanda ...............................................................513
Saudi Arabia .......................................................518
Serbia ..................................................................525
Singapore ...........................................................529
Somalia ...............................................................533
South Africa ........................................................538
South Korea ........................................................545
South Sudan .......................................................550
Spain ...................................................................555
Sri Lanka .............................................................561
Sudan ..................................................................569
Syria ....................................................................575
Tajikistan ............................................................585
Tanzania ..............................................................590

Thailand ..............................................................593
Tunisia ................................................................600
Turkey .................................................................606
Turkmenistan .....................................................617
Uganda ...............................................................623
Ukraine ...............................................................629
United Arab Emirates .........................................646
United Kingdom ..................................................651
United States ......................................................661
Uzbekistan ..........................................................677
Venezuela ...........................................................683
Vietnam ..............................................................693
Yemen .................................................................700
Zimbabwe ...........................................................706

CLP_PC_022873

## A New Model for Global Leadership on Human Rights

By **Tirana Hassan,** *Acting Executive Director*

The obvious conclusion to draw from the litany of human rights crises in 2022— from Russian President Vladimir Putin's deliberate attacks on civilians in Ukraine and Xi Jinping's open-air prison for the Uyghurs in China to the Taliban's putting millions of Afghans at risk of starvation —is that unchecked authoritarian power leaves behind a sea of human suffering. But 2022 also revealed a fundamental shift in power in the world that opens the way for all concerned governments to push back against these abuses by protecting and strengthening the global human rights system, especially when the actions of the major powers fall short or are problematic.

We have witnessed world leaders cynically trading away human rights obligations and accountability for human rights abusers in exchange for seeming short-term political wins. US presidential candidate Joe Biden's principled pledge to make Saudi Arabia a "pariah state" over its human rights record was eviscerated once he was in office and facing high gas prices by his bro-like fist bump with Saudi Arabia's Mohammed Bin Salman. And the Biden administration, despite its rhetoric about prioritizing democracy and human rights in Asia, has tempered criticism of abuses and increasing authoritarianism in India, Thailand, the Philippines, and elsewhere in the region for security and economic reasons, instead of recognizing that all are linked.

Of course, these kinds of double standards are not solely the purview of global superpowers.  Pakistan has supported the United Nations high commissioner for human rights' monitoring of abuses in Muslim-majority Kashmir, but owing to its close relationship with China, has turned its back on possible crimes against humanity against Uyghur and other Turkic Muslims in Xinjiang. Pakistan's hypocrisy is especially glaring given its coordinator role of the 57-member Organisation of Islamic Cooperation.

Human rights crises do not arise from nowhere. Governments that fail to live up to their legal obligations to protect human rights at home sow the seeds of discontent, instability, and ultimately crisis. Left unchecked, the egregious actions of abusive governments escalate, cementing the belief that corruption, censor-

1

CLP_PC_022874

ship, impunity, and violence are the most effective tools to achieve their aims. Ignoring human rights violations carries a heavy cost, and the ripple effects should not be underestimated.

But in a world of shifting power, we also found opportunity in preparing our 2023 World Report, which examines the state of human rights in nearly 100 countries. Each issue needs to be understood and addressed on its own merits, and each requires leadership. Any state that recognizes the power that comes from working in concert with others to affect human rights change can provide that leadership. There is more space, not less, for governments to stand up and adopt rights-respecting plans of action.

New coalitions and new voices of leadership have emerged that can shape and further this trend. Finland, Norway, and Sweden have taken a principled approach to holding Saudi Arabia accountable for war crimes in Yemen. South Africa, Namibia, and Indonesia have paved the way for more governments to recognize that Israeli authorities are committing the crime against humanity of apartheid against Palestinians.

Pacific Island nations as a bloc have demanded more ambitious emissions reductions from those countries that are polluting the most, while Vanuatu leads an effort to put the adverse effects of climate change before the International Court of Justice for their own sake—and ours.

And while the US Supreme Court struck down 50 years of federal protection for reproductive rights, the "green wave" of abortion-rights expansions in Latin America—notably Argentina, Colombia, and Mexico—offers a compelling counternarrative.

This is the overarching lesson of our ever-more disrupted world: we need to reimagine how power in the world is exercised, and that all governments not only have the opportunity but the responsibility to take action to protect human rights within and beyond their borders.

### Ukraine: Beacon and Rebuke

Vladimir Putin's full-scale invasion of Ukraine in February and ensuing atrocities quickly rose to the top of the world's human rights agenda in 2022. After Ukrainian troops forced the Russian military's withdrawal from Bucha, north of the cap-

ital, Kyiv, the UN found that at least 70 civilians had been the victims of unlawful killings, including summary executions, which are war crimes. This pattern of Russian atrocity has been repeated countless times.

At the Drama Theater in Mariupol, hundreds of displaced residents took refuge, painting the Russian word "DETI" (children) on the ground outside in letters so large they could be seen in satellite imagery. This alert was meant to protect the civilians, including many children, sheltering inside. Instead, it seemed only to serve as an inducement for Russian forces whose bombs destroyed the building and killed at least a dozen, and likely more, of its occupants. Inflicting civilian suffering, such as the repeated strikes on the energy infrastructure that Ukrainians depend on for electricity, water, and heat, seems to be a central part of the Kremlin's strategy.

Putin's brazenness has been made possible largely because of his longstanding free hand to operate with impunity. The loss of civilian life in Ukraine comes as no surprise to Syrians who suffered grave abuses from airstrikes following Russia's intervention to support Syrian forces under Bashar al-Assad in 2015. Putin tapped prominent military commanders from that campaign to lead the war effort in Ukraine, with predictable—and devastating—consequences for Ukrainian civilians. Russia has accompanied its brutal military actions in Ukraine with a crackdown on human rights and anti-war activists in Russia, throttling dissent and any criticism of Putin's rule.

But one positive outcome of Russia's actions has been to activate the full global human rights system created to deal with crises like this. The UN Human Rights Council promptly opened an investigation to document and preserve evidence of human rights violations in the war, and later created a special rapporteur to monitor the human rights situation inside Russia. The UN General Assembly four times condemned—mostly by wide margins—both Russia's invasion and its human rights violations. The General Assembly also suspended Russia from the UN Human Rights Council, blunting its spoiler capacity on Ukraine and other serious human rights crises on the council's docket.

European countries welcomed millions of Ukrainian refugees, a commendable response that also exposed the double standards of most European Union member countries in their ongoing treatment of countless Syrians, Afghans, Palestini-

CLP_PC_022875

ans, Somalis, and others seeking asylum. The prosecutor of the International Criminal Court (ICC) in The Hague opened a Ukraine investigation following a referral of the situation by an unprecedented number of the court's member countries. Governments have also mobilized to weaken Putin's global influence and military power, with the European Union, the United States, the United Kingdom, Canada, and others imposing targeted international sanctions against Russian individuals, companies, and other entities.

This extraordinary response showed what is possible for accountability, for refugee protection, and for safeguarding the human rights of some of the world's most vulnerable people. At the same time, the attacks on civilians and horrendous abuses in Ukraine should be a reminder that this consolidated support, critical as it is, should not be confused with a quick fix.

Rather, governments should reflect on where the situation would be if the international community had made a concerted effort to hold Putin to account much earlier—in 2014, at the onset of the war in eastern Ukraine; in 2015, for abuses in Syria; or for the escalating human rights crackdown within Russia over the last decade. The challenge going forward is for governments to replicate the best of the international response in Ukraine and scale up the political will to address other crises around the world until there is meaningful human rights improvement.

### Achieving Accountability in Ethiopia

The armed conflict in northern Ethiopia has received only a tiny fraction of the global attention focused on Ukraine, despite two years of atrocities, including a number of massacres, by the warring parties.

In 2020, tensions between Ethiopia's federal government and Tigray's regional authorities, the Tigray People's Liberation Front (TPLF), boiled over into conflict in the Tigray region, with Amhara regional forces and Eritrea's military supporting the Ethiopian armed forces. The government has heavily restricted access to conflict-affected areas for independent rights investigators and journalists ever since, making scrutiny of abuses as they unfold difficult, even as the conflict spread to the neighboring Amhara and Afar regions.

Governments and the UN have condemned the summary killings, widespread sexual violence, and pillage, but have done little else. An ethnic cleansing campaign against the Tigrayan population in Western Tigray resulted in many deaths, sexual violence, mass detention, and the forced displacement of thousands. The government's effective siege of the Tigray region continued through 2022, denying the civilian population access to food, medicine, and life-saving humanitarian aid, as well as electricity, banking, and communication, in violation of international law.

The three elected African members of the UN Security Council—Gabon, Ghana, and Kenya—as well as Russia and China, have blocked even placing Ethiopia on its formal agenda for discussion, despite the council's mandate to maintain and restore international peace and security.

Governments have also hesitated to adopt targeted sanctions against Ethiopian entities and individuals responsible for abuses. International scrutiny has instead rested with the UN Human Rights Council, which narrowly renewed the mandate of the mechanism it created in December 2021 to investigate and preserve evidence of grave abuses and identify those responsible. However, Ethiopian federal authorities continue to block its work fiercely.

A 10-day African Union-led peace process culminated in November in a truce between the Ethiopian federal government and Tigrayan authorities, which offers an opportunity for outside states to play a leadership role in supporting solutions that can break deadly cycles of violence and impunity. With pathways for domestic accountability elusive, international monitoring of the agreement is needed, along with credible efforts to hold accountable those responsible for wartime abuses.

The agreement's key backers and observers, including the AU, UN, and US, should signal and maintain pressure to ensure that independent investigative organizations can access conflict areas, and document and preserve evidence. Accountability for these crimes needs to remain a priority so victims and their families can obtain a measure of justice and reparations.

### A Brighter Spotlight on Beijing

Chinese President Xi Jinping secured a precedent-breaking third term as head of the Chinese Communist Party in October, setting himself up as a "leader for life," and all but ensuring the Chinese government's unrelenting hostility to human rights protections will continue. Xi has surrounded himself with loyalists

and doubled down on building a security state, deepening rights violations across the country.

In the Xinjiang region, Beijing's mass detention of an estimated one million Uyghurs and other Turkic Muslims—who are subject to torture, political indoctrination, and forced labor—and severe restrictions on rights to religion, expression, and culture for the general population, stand out for their gravity, scale, and cruelty. The UN found that violations in Xinjiang could amount to crimes against humanity, echoing the findings of Human Rights Watch and other human rights groups.

The rigorous report of the then-UN high commissioner for human rights, Michelle Bachelet, based on years of investigation and the Chinese government's internal documents, laws, policies, data, and policy statements, created a critical common reference point from which governments should act. That the report was released only in the final minutes of Bachelet's term is indicative of Beijing's intense pressure to bury it.

The report sparked notable diplomatic mobilization. A resolution to open a debate about the report was introduced in the Human Rights Council and fell short by only two votes. The result reflected Beijing's pressure on governments like Indonesia—which said we "must not close our eyes" to the plight of Uyghurs and then voted "no"—as well as its influence on the actions of those states that abstained, including Argentina, India, Mexico, and Brazil. But the "yes" votes of Somalia, Honduras, and Paraguay, and the co-sponsorship support of Turkey and Albania, together with 24 mostly Western countries, show the potential in cross-regional alliances and fresh coalitions to come together to challenge the Chinese government's expectation of impunity.

The collective spotlight on the dismal human rights situation in Xinjiang has put Beijing on the defensive, and the Chinese government is working hard to explain away its heinous behavior. The outcome in Geneva heightens the responsibility of the UN leadership to throw its full political weight behind the report and to continue to monitor, document, and report on the situation in Xinjiang, and more broadly in China. Anything less would be an abdication of the human rights pillar of the UN system's responsibility to protect Turkic Muslims in Xinjiang.

Meanwhile, as discomfort around the Chinese government's repressive ambitions has grown, governments, including those of Australia, Japan, Canada, the UK, EU, and US have looked to cultivate trade and security alliances with India, taking cover behind its brand as the "world's largest democracy." But Prime Minister Narendra Modi's Hindu-nationalist Bharatiya Janata Party has mimicked many of the same abuses that have enabled Chinese state repression—systematic discrimination against religious minorities, stifling of peaceful dissent, and use of technology to suppress free expression—to tighten its grip on power.

The seemingly careless trade-off on human rights that world leaders make, justified as the cost of doing business, ignores the longer-term implications of their compromises. Deepening ties with the Modi government while avoiding its troubling rights record squanders valuable leverage to protect the precious, but increasingly endangered, civic space on which India's democracy relies.

### *Respect for Rights as a Prescription for Stability*

Autocrats benefit from the illusion they project as being indispensable to maintaining stability, which in turn seemingly justifies their oppression and widespread human-rights violations committed toward achieving that end.

But this "stability," driven by the endless quest for power and control, infects and erodes every pillar needed for a functional society based on the rule of law. The result is frequently massive corruption, a broken economy, and a hopelessly partisan judiciary. Vital civic space is dismantled, with activists and independent journalists in jail, in hiding, or fearing retaliation.

The months-long protests in Iran in 2022 underline the grave risks for autocracies of imagining that repression is a shortcut to stability. Protests erupted across the country in response to the death of the 22-year-old Kurdish-Iranian woman Mahsa (Jina) Amini in September, following her arrest by "morality police" for wearing an "improper hijab." But protest against the mandatory use of the hijab is just the most visible symbol of repression. The new generation of protesters across the country echoes the frustrations of generations past: people tired of living without fundamental rights, and of being ruled by those who callously disregard the welfare of their people.

CLP_PC_022877

The demand for equality triggered by women and schoolgirls has morphed into a nationwide movement by the Iranian people against a government that has systematically denied them their rights, mismanaged the economy, and driven people into poverty. Iranian authorities have ruthlessly cracked down on what became widespread anti-government protests with excessive and lethal force, followed by sham trials and death sentences for those who dare challenge the government's authority. Hints that authorities may disband the morality police fall well short of the demand to abolish the discriminatory compulsory hijab laws, and even further from the fundamental structural reforms the protesters are demanding to make the government more accountable.

The link between impunity for abuses and mismanaged governance can be seen elsewhere. Shortages in fuel, food, and other essentials, including medicine, sparked massive protests in Sri Lanka, forcing Prime Minister Mahinda Rajapaksa, and then his brother, President Gotabaya Rajapaksa, to resign. Unfortunately, the man who parliament chose to replace them, Ranil Wickremasinghe, has walked away from commitments to justice and accountability for egregious violations committed during the country's 26-year civil war, which ended in 2009. President Wickremasinghe, instead of focusing on the economic crisis and ensuring social justice, cracked down on protests, even using the notorious Prevention of Terrorism Act to detain student activists.

Cracks have also emerged in the foundations of seemingly impenetrable countries. In November, mounting frustration over Beijing's strict lockdown measures as part of its "zero Covid" strategy spilled over into the streets, with protesters in cities across the country denouncing the Communist Party's draconian measures and, in some cases, Xi's rule. These remarkable shows of defiance, led mostly by young people and young women, demonstrate that desires for human rights cannot be erased despite the enormous resources the Chinese government has devoted to repressing them.

It is easy to celebrate the protesters who take the fight for human rights to the streets. But we cannot expect the protesters to diagnose the problems—which they do at great risk to themselves and their families—and to hold those responsible for the deprivations they have suffered to account by themselves. Rights-respecting governments need to lend their political stamina and attention to ensure that needed human rights change comes to fruition. Governments should

live up to their global human rights responsibilities, not just ponder and posture about them.

Consider Sudan, whose people's revolution of 2018-19 challenged the abusive power structure that repressed the country for decades. The two-year joint civilian-military transition that led the country was sabotaged by a military coup in late 2021, putting Sudanese autocrats and military commanders implicated in serious abuses—some of whom are once again committing abuses—in charge of the country's future.

But Sudanese grassroots Resistance Committees—pro-democracy civilian groups created out of the 2018 revolution—persist, despite deadly crackdowns. These groups insist on a civilian-only transition and want those responsible for abuses to be held to account. In December, political actors reached a preliminary agreement with the military coup leaders, postponing discussions on justice and security sector reforms to a later stage, but protesters and victims' groups have rejected the deal.

If Sudan is to move toward a more rights-respecting future, the demands of these groups, including calls for justice and an end to impunity for those in command, should be a priority of the US, UN, EU, and regional partners in engaging with Sudan's military leadership. Those who staged a coup to obtain power will not give it up without deterrents or financial costs.

Similarly, centering the demands of the millions of people pressing for human rights and democratic civilian rule in Myanmar remains critical to addressing the ongoing crisis. In February 2021, Myanmar's military staged a coup and has brutally suppressed widespread opposition ever since. For two years, the military junta has carried out systematic abuses, including extrajudicial killings, torture, and sexual violence, that amount to crimes against humanity and war crimes.

The Association of Southeast Asian Nations (ASEAN) produced a "Five Point Consensus"—negotiated between the bloc and Myanmar's junta—to address the crisis in the country. It has failed, with several ASEAN countries, including Malaysia, Indonesia, and Singapore acknowledging the junta's refusal to comply. Since the coup, ASEAN has barred Myanmar junta representatives from the bloc's high-level meetings. Beyond that, ASEAN has imposed minimal pressure on Myanmar, while other powerful governments, including those of the US and UK, hide behind regional deference to justify their own limited action.

To achieve a different result, ASEAN needs to adopt a different approach. In September, Malaysia's then-Foreign Minister Saifuddin Abdullah was the first ASEAN official to meet openly with representatives of Myanmar's opposition National Unity Government, formed by elected lawmakers, ethnic minority representatives, and civil society activists after the coup. The bloc should follow suit and extend its engagement to representatives of civil society.

ASEAN should also intensify pressure on Myanmar by aligning with international efforts to cut off the junta's foreign currency revenue and weapons purchases, which would in turn weaken Myanmar's military. As ASEAN chair in 2023, Indonesia should lead a review of the junta's human rights record and failure to comply with the Five-Point Consensus and consider suspending Myanmar to uphold the bloc's commitment to a "people-oriented, people-centered ASEAN."

### Human Rights Can Define—and Design—the Path Ahead

Another year of shrinking real and virtual civic space around the world brings the recognition that attacks on the human rights system are due in part to its effectiveness—because by exposing the abuses and elevating the voices of survivors and those at risk, the human rights movement makes it harder for abusive governments to succeed.

In 2022, six weeks into the full-scale invasion of Ukraine, Russian authorities summarily shuttered the Human Rights Watch office in Moscow after 30 years of continuous operation, together with those of more than a dozen foreign nongovernmental organizations. The closures followed a decade of repressive laws and measures that the Russian government adopted to decimate civil society and force hundreds of activists, journalists, human rights lawyers, and other critics into exile. The Kremlin has gone to such great lengths to extinguish dissent because dissent threatens it. And therein lies a fundamental truth: those who work assiduously to repress human rights show their weakness, not their strength.

Time and again, human rights prove to be a powerful lens through which to view the most existential threats we face, like climate change. From Pakistan to Nigeria to Australia, every corner of the world faces a nearly nonstop cycle of catastrophic weather events that will intensify because of climate change, alongside slow onset changes like sea-level rise. In simple terms, we are seeing the cost of

government inaction, a continued assault by big polluters, and the toll on communities, with those already marginalized paying the highest price.

The unbreakable link between people and nature has been recognized by the UN General Assembly, which last year confirmed the universality of the human right to a clean, healthy, and sustainable environment. With the destructive effects of climate change intensifying around the world, there is a legal and moral imperative for government officials to regulate the industries whose business models are incompatible with protecting basic rights.

To stave off the worst effects of climate change and confront the human rights toll at all stages of their operations, governments need to urgently work to implement a just transition to phase out fossil fuels and prevent agribusiness from continuing to raze the world's forests. At the same time, governments should act with urgency in upholding human rights in their responses to climate extremes and slow-onset changes that are already inevitable, protecting those populations most at risk, including Indigenous peoples, women, children, older people, people with disabilities, and people living in poverty.

Many of these communities are also leading the charge to protect their ways of life and their homes against coal, oil, and gas operations that pollute the water they rely on to cook, clean, and drink, and result in the rising of the seas that engulf the lands where they live. Centering frontline communities and environmental defenders is one of the most powerful ways to push back against corporate and government activities that harm the environment and protect critical ecosystems needed to address the climate crisis.

Indigenous forest defenders are critical to the protection of the Brazilian Amazon, an ecosystem vital for slowing climate change by storing carbon. Rather than supporting them, the administration of then-President Jair Bolsonaro enabled illegal deforestation and weakened Indigenous rights protections. The spectacular environmental destruction during his four-year term went hand-in-hand with serious rights violations, including violence and intimidation against those who tried to stop it.

Brazil's newly elected president, Luiz Inácio Lula da Silva, has pledged to reduce Amazon deforestation to zero and defend Indigenous rights. During his previous two terms from 2003 to 2010, deforestation dropped dramatically, but his administration also promoted dams and other infrastructure projects with high en-

CLP_PC_022879

vironmental and social impacts in the Amazon. President Lula's ability to deliver on his climate and human rights commitments are critical for Brazil and the world.

A New International Embrace of Human Rights

The magnitude, scale, and frequency of human rights crises across the globe show the urgency of a new framing and new model for action. Viewing our greatest challenges and threats to the modern world through a human rights lens reveals not only the root causes of disruption but also offers guidance to address them.

Every government has the obligation to protect and promote respect for human rights. After years of piecemeal and often half-hearted efforts on behalf of civilians under threat in places including Yemen, Afghanistan, and South Sudan, the world's mobilization around Ukraine reminds us of the extraordinary potential when governments realize their human rights responsibilities on a global scale. All governments should bring the same spirit of solidarity to the multitude of human rights crises around the globe, and not just when it suits their interests.

CLP_PC_022880



**LEAVE NO ONE BEHIND**

People with Disabilities and Older People
in Climate-Related Disasters



WORLD REPORT
2023

COUNTRIES

CLP_PC_022881

# Bolivia

Political interference plagued Bolivia's justice system during the governments of former President Evo Morales (January 2006-November 2019) and former Interim President Jeanine Áñez (November 2019-2020). President Luis Arce, who took office in November 2020, has failed to spur justice reform.

The Arce administration supports unsubstantiated and excessive charges of terrorism and genocide against former President Áñez. In June 2022, a judge sentenced her to 10 years in prison on charges of dereliction of duty and contravening the law, which are defined very broadly in Bolivia. She was not allowed to attend her trial in person.

Nobody has been held accountable for 37 killings in the context of election-related protests in 2019, including of 20 people in two massacres during which state security forces opened fire on protesters, according to witnesses.

Women and girls remain at high risk of violence. Prison overcrowding—and excessive pretrial detention—continues. Indigenous communities face obstacles to exercising their right, under international law, to free, prior, and informed consent to measures that may affect them.

## Judicial Independence and Due Process

The Morales and Áñez governments pursued what appeared to be politically motivated charges against political rivals.

After winning the October 2020 presidential election, President Arce said the justice system should be independent from politics, but his government has failed to take concrete steps to reform it.

In a May 2022 report, the United Nations special rapporteur on the independence of judges and lawyers said external interference in the justice system is a long-standing, continuing problem. Almost 50 percent of judges and 70 percent of prosecutors in Bolivia remained "temporary" as of February, the report noted. Officials who lack security of tenure may be vulnerable to reprisals, including arbitrary dismissal, if they make decisions that displease those in power.

In March 2021, police detained former Interim President Áñez and two of her former ministers on terrorism and other charges. The attorney general later accused Áñez of genocide in connection with two massacres during her government. Human Rights Watch reviewed the charging documents and found the terrorism and genocide charges unsubstantiated and grossly disproportionate. The definition of those crimes is overly broad under Bolivian law. As of October 2022, the two former ministers remained in pretrial detention.

In June 2022, in a separate case, a tribunal sentenced Áñez to ten years of prison for dereliction of duty and taking decisions contrary to the law—crimes that are also very broadly defined in Bolivian law—for her actions as she took office as interim president in November 2019. Áñez was not allowed to attend her own trial in person, as judges argued that they could not guarantee her health or security in the courthouse. That prevented Áñez from conferring with her lawyers during the hearings.

In April, Marco Aramayo died in his seventh year of detention amid serious allegations of inadequate health care and ill-treatment. In 2015, after he became the director of the state Indigenous development fund, he reported several corruption schemes allegedly involving prominent supporters of the Morales government. Instead of properly investigating those allegations, prosecutors had him detained and charged with corruption, according to ITEI, a Bolivian nonprofit.

Responding to criticism by Human Rights Watch and others, police said in June they would stop presenting people they had arrested to the press, a practice that risked violating the presumption of innocence. Yet, the minister of the interior continued to post photos of suspects on social media.

## Protest-Related Violence and Abuses

The Interdisciplinary Group of Independent Experts (GIEI, in Spanish), established under a government agreement with the Inter-American Commission on Human Rights (IACHR), issued a report in August 2021 documenting the deaths of 37 people in the context of protests over contested October 2019 elections.

It documented acts of violence "instigated" by the Morales administration, including injuries, abductions, and torture of anti-Morales protesters. It asserted that police failed to protect people from violence by both pro- and anti-Morales

CLP_PC_022914

supporters, and in some locations encouraged and collaborated with violent groups of anti-Morales supporters acting as "para-police."

It also concluded that, during the Áñez government, security forces killed 20 pro-Morales protesters and injured more than 170 people in massacres in Sacaba, a city in Cochabamba, and Senkata, a neighborhood of El Alto. The report provided robust evidence of other abuses throughout the country, including illegal detentions, sexual violence, and "systematic" torture by police in the predominantly Indigenous city of El Alto.

The GIEI highlighted major flaws in probes of the abuses and called on the Attorney General's Office to reopen cases it had closed without crucial investigative steps. As of October 2022, no one had been held responsible for the crimes; Congress and the government were discussing a bill and policy to provide reparation to victims.

In March, the government signed an agreement with the IACHR for creation of an international mechanism to monitor implementation of the GIEI's recommendations, but it failed to create a national-level mechanism for which the GIEI had also called.

### Freedom of Expression and Access to Information

The National Press Association, which represents the country's main print media, reported several cases of violence by police or demonstrators against reporters in 2022.

In August, the Attorney General's Office announced an investigation of two journalists, a newscaster and other individuals who worked for a state TV channel during the Áñez administration, for allegedly paying the former newscaster a salary that was higher than the allowable rate. The crimes they were accused of carry a maximum penalty of ten years in prison. The president of the La Paz Press Association viewed the investigation as an attempt by the Arce administration, working with prosecutors, to intimidate Bolivian journalists.

Bolivia lacks a law regulating the allocation of paid advertising by the state. From January through August, 80 percent of the advertising contracts by the state with print media had gone to only two pro-government newspapers, several media reported.

Bolivia also lacks a law to implement the right of access to information enshrined in its constitution. In May 2022, the Arce administration said journalists' associations—not the government—should draft an access to information bill.

### Accountability for Past Abuses

Bolivian authorities have made insufficient efforts to hold accountable officials responsible for human rights violations under authoritarian governments between 1964 and 1982. Only a handful have been prosecuted. The armed forces have generally refused to share information.

After camping outside the Justice Ministry for more than a decade, several victims' associations signed an agreement with the government in August, in which the Arce administration committed itself to reparation payments to victims or family members of various authoritarian-era abuses.

### Detention Conditions

Detention centers in Bolivia hold more than 2.5 times more detainees than they were built to accommodate. The prison population grew 12 percent between November 2021 and March 2022, to 20,864 people, official data obtained by Fundación Construir, a Bolivian nongovernmental organization (NGO), showed.

Bolivia's justice system continues to use pretrial detention excessively. As of March 2022, 65 percent of male detainees and 71 percent of female detainees were awaiting trial, Fundación Construir said.

### Indigenous Rights

The 2009 constitution includes comprehensive guarantees of Indigenous peoples' rights to collective land titling; intercultural education; protection of Indigenous justice systems; and free, prior, and informed consent on development projects. Yet, Indigenous peoples face barriers in exercising those rights.

The Documentation and Information Center of Bolivia (CEDIB), an NGO, and the United Nations special rapporteur on toxics and human rights reported that growing, illegal use of mercury in mining is damaging the health of Indigenous communities.

CLP_PC_022915

### Women's and Girls' Rights

Women and girls remain at high risk of violence, despite a 2013 law establishing comprehensive measures to prevent and prosecute gender-based violence. The law created the crime of "femicide," defining it as the killing of a woman under certain circumstances, including domestic violence.

The attorney general reported 108 femicides in 2021 and 69 from January through September 2022.

A study published in The Lancet in February 2022 estimated, using data from 2000 to 2018, that 42 percent of Bolivian girls and women between 15 and 49 years old have suffered violence by a partner or former partner, the highest percentage in Latin America and the Caribbean.

Under Bolivian law, abortion is not a crime when pregnancy results from rape or when necessary to protect the life or health of a pregnant person. However, women and girls seeking such legal abortions are likely to encounter stigma, mistreatment, and revictimization.

### Sexual Orientation and Gender Identity

In December 2020, Bolivia's civil registry abided by a court order and registered a gay couple's relationship as a "free union," Bolivia's first same-sex union. In May 2022, after delaying a year, the registry also registered a lesbian couple's relationship.

The case brought by the first gay couple is pending before the Constitutional Court, which is expected to determine whether all same-sex couples can join in "free unions."

### Key International Actors

Throughout 2022, Bolivia has consistently opposed scrutiny on certain states' human rights records and failed to protect victims' rights in international forums. In the United Nations General Assembly and the UN Human Rights Council, it abstained or voted against multiple resolutions condemning Russia's rights violations in Ukraine and voted against renewing the mandate of the UN fact-finding mission in Venezuela and holding a debate on the human rights situation in the Xinjiang Uyghur Autonomous Region of China. In the Organization of American States, it abstained from a resolution calling on the Nicaraguan government to release political prisoners and cease persecution of media.

In March, the UN Human Rights Committee urged Bolivia to guarantee judges' and prosecutors' independence and impartiality; allow same-sex couples to enter into free unions; and protect journalists from threats and violence.

In July, the Committee on the Elimination of Discrimination against Women expressed its concern over high levels of gender-based violence in Bolivia and called on the government to ensure thorough investigations. It also urged Bolivia to remove barriers to legal abortion, and to decriminalize abortion.

CLP_PC_022916

In May, the European Parliament condemned the Cambodian government's continuing abuses and reiterated its call on the EU Council to adopt targeted sanctions against Cambodia's political leadership and leaders of the security forces responsible for the crackdown in the country. It urged the EU to consider a full withdrawal of Cambodia's EBA privileges.

In May, the United States hosted Prime Minister Hun Sen at a United States-Association of Southeast Asian Nations (ASEAN) Special Summit at the White House ahead of the ASEAN Summit chaired and hosted by Cambodia, in an effort to strengthen engagement and shore up alliances with ASEAN countries.

A French court issued arrest warrants against two senior Cambodian generals for the grenade attack on an opposition political rally in Phnom Penh on March 30, 1997, which killed 16 people and injured more than 150. The court stated that it also issued a summons for Prime Minister Hun Sen for his role in the attack, but the French government blocked its delivery, citing head of state immunity.

# Cameroon

In 2022, armed groups and government forces committed human rights abuses, including unlawful killings, across Cameroon's Anglophone regions and in the Far North region.

As the crisis in the Anglophone regions continued for the sixth year 598,000 people were internally displaced as of August and at least 2 million people needed humanitarian aid in the North-West and South-West.

Separatists, who have violently enforced a boycott on education since 2017, continued to attack schools, students and education professionals, destroying buildings and depriving hundreds of thousands of children of their fundamental right to education.

The Islamist armed groups Boko Haram and Islamic State in West Africa Province (ISWAP) continued attacks in the Far North region from January to April, killing scores of civilians and contributing to the internal displacement of over 378,000 people as of July. Government forces violated applicable international humanitarian and human rights law by failing to fairly prosecute suspected members of the Islamist groups who committed serious crimes. The government has fallen short on its promises to assist former members of Boko Haram and ISWAP who voluntarily left as part of a disarmament program. The authorities have also failed to assist and protect women and children linked to these groups.

Restrictions against freedoms of expression and association continued as did persecution of lesbian, gay, bisexual, and transgender (LGBT) people. Mob attacks against members of the LGBT community intensified.

Government forces subjected Cameroonian asylum seekers deported from the United States in 2020 and 2021 to serious human rights violations following their return, including physical assault and abuse, arbitrary arrest and detention, extortion, and confiscation of identity documents, thus impeding freedom of movement, ability to work, and access to public services.

In April, Cameroon took an important step to protect the right to education of students who are pregnant and adolescent mothers. The government's new re-entry policy prescribes that pregnant students will be able to stay in school until

CLP_PC_022932

the 26th week of their pregnancy and will be allowed back in school after delivery, subject to a number of conditions.

## Anglophone Crisis

At least 6,000 civilians have been killed by both government forces and armed separatist fighters since late 2016 in the North-West and South-West regions, as armed separatist groups seek independence for the country's minority Anglophone regions.

## Violations by Government Forces

Security forces responded to separatist attacks with a heavy hand, often targeting civilians across the Anglophone regions.

On April 24, in Ndop, North-West region, soldiers from the Rapid Intervention Battalion (*Bataillon d'intervention rapide*, BIR) stopped, severely beat, and detained between 30 and 40 motorbike riders who were part of a funeral convoy, allegedly because they suspected the bikers of being separatist fighters. Up to 17 of those detained are presumed forcibly disappeared. As of September, their whereabouts remained unknown.

On June 1, soldiers from the 53rd Motorized Infantry Battalion (*Bataillon d'infanterie motorisée*, BIM) killed nine people, including four women and an 18-month-old girl, in Missong village, North-West region, in a reprisal operation against a community suspected of harboring separatist fighters.

On June 8, soldiers conducted a military operation in Chomba, North-West region, burning a home and looting the local health center. They also arrested a woman along with her 11-year-old foster child and held them for 24 days at the BIR barracks in Bafut, North-West region.

From June 9 to 11, in Belo, North-West region, security forces killed one man, injured another, burned at least 12 homes, destroyed a community health center, and looted at least 10 shops.

## Abuses by Armed Separatists

Separatist fighters continued to kill, torture, assault, and kidnap civilians. They also continued their attacks against pupils, teachers, and education, depriving thousands of students of the right to education.

On June 12, separatist fighters physically assaulted, threatened, and humiliated a group of 11 students, aged from 14 to 18, walking to the Bokova high school, in Buea, South-West region. They shot one of the students in the right leg and seized or destroyed the students' school material.

On January 19, separatist fighters attacked the government high school in Weh, North-West region, abducting five teachers, and injuring two students for not complying with a school boycott and for not contributing financially to their struggle for independence. The teachers were released on January 24 following a ransom payment.

Separatist fighters, vowing to disrupt the Africa Cup of Nations soccer tournament, which was held in Cameroon between January 9 and February 6, carried out a series of attacks in the town of Buea on January 12. They declared a lockdown and punished people who did not observe it. They shot and killed a 30-year-old male taxi driver and another man at Bwitingi market area and shot a man in both his legs and stomach at the checkpoint area in the same area of the city.

On January 13, separatist fighters attacked a rubber estate plantation of the Cameroon Development Corporation (CDC), a public agribusiness company, in Tiko, South-West region, abducted nine workers, six of whom were women, and set a tractor ablaze. The workers were all released on January 25 following a ransom payment.

On February 11, separatist fighters set fire to three dormitories of the all-girls boarding secondary school Queen of the Rosary College, in Okoyong, South-West Region.

On April 5, separatists stormed the campus of the Bamenda university, North-West region, shooting in the air, causing panic among students and teachers, leading to a stampede that injured at least five people. The fighters attacked the

CLP_PC_022933

university for not observing a "lockdown," or stay-at-home order, that they had declared across the area.

On April 28, separatist fighters attacked the taxi and bus station in Mamfe, South-West region. They burned at least five cars and killed three men, accusing station workers of operating during their declared lockdown.

On May 30, suspected separatist fighters kidnapped and killed Lukong Francis, a retired teacher at the government high school in Jakiri, North-West region, and a member of the ruling party, in retaliation for his participation in the May 20 public celebrations for Cameroon's Unity Day, which separatist groups oppose.

On June 10, suspected separatist fighters burned down the district hospital in Mamfe, South-West region, depriving 85,000 people of access to health care.

On September 16, armed militants attacked and set fire to St. Mary's Church in Nchang, diocese of Mamfe, and kidnapped nine people – including five priests. Pope Francis joined an appeal by bishops from Bamenda Provincial Episcopal Conference to release those abducted. The nine abducted people were all released on October 23.

### Restrictions on Humanitarian Access and Abuses against Aid Workers

Humanitarian access was restricted in the Anglophone and Far-North regions and humanitarian workers have been victims of attacks by both government forces and armed groups. According to the United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA), humanitarian actors continued to operate under severe constraints including repeated lockdowns, harassment at checkpoints, and the risk of improvised explosive devices by armed separatist fighters in the Anglophone regions.

In April, Médecins Sans Frontières (Doctors Without Borders, MSF) suspended all its activities in the South-West region following the "unjust detention" of four of its workers. In December 2020, Cameroonian authorities had suspended MSF activities in the North-West region, accusing the organization of being too close to Anglophone separatists, leaving tens of thousands of people in the region without access to health care.

Separatist fighters and Islamist armed groups have hindered aid agencies' access in the areas under their control.

On February 25, unidentified armed men kidnapped five MSF workers from their residence in Fotokol, Far-North region, an area where Boko Haram operates. They were released a month later.

On February 26, separatist fighters stopped two vehicles from the Cameroon Baptist Convention Health Services (CBCHS), a nonprofit medical organization, at a checkpoint in Mile 90, North-West region. They fired at one vehicle, killing a 46-year-old nurse, and injuring another nurse and a doctor.

On July 2, in the Far-North region, suspected Boko Haram fighters attacked the Mada hospital in the Logone-et-Chari division, killing one civilian, leading to the temporary closure of the health facility, and leaving thousands without essential healthcare.

### Attacks by Boko Haram and ISWAP

Attacks and raids by the Islamist armed groups Boko Haram and ISWAP continued in the Far North region.

The UN Department of Safety and Security (UNDSS) reported an escalation of violence with 23 attacks by both Boko Haram and ISWAP, leading to 13 civilians killed, including 2 children and one woman; 12 injured, 10 kidnapped, and an additional 7, 600 internally displaced. In response to this resurgence of attacks, Cameron has deployed hundreds of additional troops to the Far North region.

### Crackdown on Political Opposition, Dissent

The government continued to limit the ability of the political opposition and civil society to function freely.

On April 22, four UN special rapporteurs focusing on human rights defenders, extrajudicial executions, the right to freedom of expression and the right to association, addressed a letter to Cameroon's President Paul Biya raising concern over repeated death threats sent since 2015 to the president of Organic Farming for Gorillas, a Cameroonian civil-society organization which has exposed abuses by businesses in the North-West regions.

CLP_PC_022934

On August 11, soldiers arrested Abdul Karim Ali, a prominent Cameroonian Anglophone peace activist, in Bamenda, North-West region. While there are no official charges against Ali, he was told he is accused of "apology for terrorism" for possessing a video on his phone showing alleged human rights abuses committed by a Cameroonian soldier against civilians in the country's English-speaking regions. As of September, Ali remained in detention awaiting trial.

At least 105 opposition party members and supporters arrested in September 2020 for defying a ban on protests remain in detention as they have been sentenced by military courts to prison terms ranging from two to five years on politically motivated charges. They include Olivier Bibou Nissack and Alain Fogué Tedom, two prominent members of the Cameroon Renaissance Movement.

Some detainees died in appalling detention conditions in the country's prisons, including Rodrigue Ndagueho Koufet, one of six detainees in Douala prison who died of cholera between February and April. Koufet had been held arbitrarily since September 2020 for taking part in peaceful assemblies.

In an October opinion adopted at its 94th session, the UN Working Group on Arbitrary Detention qualified the 2018 arrest and detention of 10 Cameroonian activists in Abuja, Nigeria, as arbitrary and called for their immediate release. The group observed that the individuals were forcibly returned from Nigeria to Cameroon in 2018, in violation of the principle of non-refoulement, and concluded that the overall proceedings of the court did not meet international standards.

### Sexual Orientation and Gender Identity

Cameroon's penal code punishes "sexual relations between persons of the same sex" with up to five years in prison. There was an uptick in violence and abuse against LGBTI people in Cameroon in 2022.

From March to May, security forces arbitrarily arrested at least 6 people and detained 11, for alleged consensual same-sex conduct and gender nonconformity. In April, a crowd of about eight men armed with machetes, knives, sticks, and wooden planks, attacked a group of at least 10 LGBTI people. Gendarmes detained and beat at least two of the victims.

### Justice and Accountability

Between January and August, eight hearings were held in the trial of three security force members accused of involvement in the killings of 21 civilians in Ngarbuh village, North-West region. The trial is being held before a military court in Yaoundé and at time of writing had lasted 21 months. Senior officers who could have command responsibility have not been arrested or charged, and there are limited opportunities for access by victims' families.

In June 2020, the French ambassador to Cameroon told the media that President Biya had assured him that an investigation would be opened into the death in custody of journalist Samuel Wazizi in August 2019. However, as of September, there has not been any progress on the investigation.

In a June 7 press release, Cameroon's army spokesperson Col. Cyrille Serge Atonfack Guemo acknowledged the military's responsibility for the killing of nine people in Missong village, North-West region, on June 1. He said that four soldiers have been arrested and an investigation has been opened. As of September, there has not been any progress on the investigation.

In a September 21 press release, the Ministry of Defense acknowledged the responsibility for the killing of 2 civilians in Momo division, North-West region, on September 19. The communique indicates that elements of the Defence and Security Forces acted in violation of the instructions.

### Key International Actors

On March 21, the European Union expressed concerns over "the ongoing crisis in the North-West and South-West regions" and called for "immediate end to the violence, respect of human rights and humanitarian principles, unimpeded humanitarian access and a safe environment for humanitarian work."

On April 15, the United States Department of Homeland Security announced the designation of Cameroon for Temporary Protected Status (TPS) for 18 months. Cameroonian nationals residing in the US as of April 1, and who cannot safely return due to the conditions in their home country—including violence by government forces and armed groups, destruction of civilian infrastructure, economic

CLP_PC_022935

instability, and food insecurity—will be able to remain in the US until conditions improve.

On July 25 and 26, French President Emmanuel Macron visited Cameroon and met with President Biya. The visit focused on strengthening political and economic ties between Paris and Yaoundé. Macron did not publicly express concerns on the human rights situation in the country.

# Canada

In September 2021, Prime Minister Justin Trudeau was elected for a third term following a snap election. In office since 2015, his government has championed human rights, but longstanding challenges remain across Canada. These include widespread violations of the rights of marginalized groups including Indigenous peoples, immigration detainees, people with disabilities, and older people.

The Trudeau government has also failed to address serious human rights concerns beyond Canada's border, including impunity for abuses by Canadian mining companies overseas. Canada also continues to ignore the need to adopt and implement robust climate mitigation policies. For over three years, the government has also rebuffed calls by Canada-based family members and top United Nations officials to repatriate dozens of Canadians, most of them children, unlawfully detained in life-threatening conditions in northeast Syria.

### Rights of Indigenous Peoples

Decades of structural and systemic discrimination against Indigenous peoples has led to widespread abuses that persist across Canada.

Inadequate access to clean, safe drinking water continues to pose a major public health concern in many Indigenous communities and impede efforts to advance Indigenous rights in Canada, one of the world's most water-rich countries.

The government of Prime Minister Trudeau committed to end all drinking water advisories on First Nations reserves by 2021 but, as of September, 28 First Nations communities across Canada remained subject to long-term water advisories, which alert communities when their water is not safe to drink.

In July, Canada signed a US$14 billion final settlement agreement to compensate First Nations children and families unnecessarily taken into government care due to its failure to provide funding for child and family services in Indigenous communities.

CLP_PC_022936

# Colombia

Abuses by armed groups, limited access to justice, and high levels of poverty, especially among Indigenous and Afro-descendant communities, remain serious human rights concerns in Colombia.

The 2016 peace accord between the Revolutionary Armed Forces of Colombia (FARC) and the government ended a five-decade-long conflict and brought an initial decline in violence. But violence took new forms and abuses by armed groups increased in many remote areas in later years, reaching similar levels in 2022 to those that existed immediately before the peace process.

Human rights defenders, journalists, demobilized FARC fighters, Indigenous and Afro-descendant leaders, and other activists face pervasive death threats and violence.

President Gustavo Petro took office in August and Francia Marquez, an environmental leader, became Colombia's first Afro-Colombian vice president. The new government vowed to fight climate change, implement the 2016 peace accord, and prioritize a "total peace" policy that would seek an accord with the National Liberation Army (ELN) guerrillas and the negotiated disarmament of other armed groups, including criminal gangs.

In February, the Constitutional Court decriminalized abortion in all circumstances up to the 24th week of pregnancy.

## *Abuses by Armed Groups*

Numerous armed groups operate in Colombia fueled by illegal economies, including drug trafficking and illegal mining. These include the ELN guerrillas, which was formed in the 1960s; over 30 "dissident" groups that emerged from the 2017 demobilization of the FARC; and the Gaitanist Self-Defense Forces of Colombia (AGC), which emerged from the demobilization of paramilitary groups in the mid-2000s and are also known as "Gulf Clan."  Many of these groups have fluid and complex links to each other and some are parties to non-international armed conflicts.

Armed groups continue to commit serious abuses against civilians, including killings, child recruitment, and rape, especially in rural areas of the Pacific region and along the Venezuelan and Ecuadorian borders. Security forces and judicial authorities have failed to effectively protect the population, ensure victims' access to justice, and prosecute and dismantle the groups.

In May, the AGC ordered an "armed strike," imposing movement restrictions on civilians in over 170 municipalities in 11 states. The restrictions suggested an alarming geographical expansion, compared to its 2012 armed strike, affecting 26 municipalities. The strike came in response to the extradition to the United States of its top commander, Darío Antonio Úsuga David, alias "Otoniel." The group also killed 36 police from June through August 2022.

Fears of antipersonnel landmines, threats by armed groups, and the hazards of crossfire prevented 96,000 people from leaving their communities between January and October a situation known as "confinement."

The Office of the High Commissioner for Human Rights (OHCHR) reported 60 "massacres," defined as the intentional killing of three or more civilians in a single incident, in 2022, as of October.

In the southern state of Nariño, fighting among FARC dissident groups has displaced thousands, mainly Afro-descendants and Awá Indigenous people, who also suffer threats, confinement, kidnappings, and killings.

In neighboring Cauca, the ELN and FARC dissident groups have recruited over 500 mostly Indigenous children since 2021, according to local groups. Nasa Indigenous people who oppose abuses by armed groups have been threatened and killed. Fighting by armed groups, mainly in Argelia municipality, left more than 2,600 people displaced and confined.

In the border areas of Colombia's Arauca and Venezuela's Apure state, fighting between the ELN and a coalition of FARC dissident groups have caused a dramatic increase in violence, including a spike in killings. Over 12,000 people were displaced or confined. In Apure, ELN fighters conducted joint operations with members of the Venezuelan security forces, which were complicit in their abuses.

CLP_PC_022955

In Putumayo state, on the Ecuadorian border, Comandos de la Frontera and the Carolina Ramírez Front, two groups that emerged from the FARC, control the population, imposing dress codes and curfews and threatening to kill those who fail to comply.

## Violations by Public Security Forces

Security force abuses remain a serious concern.

On March 28, 2022, 11 people died in a controversial army operation in El Remanso, Putumayo state, in southern Colombia. The army claimed it complied with international humanitarian law, saying the operation had targeted Comandos de Frontera. At least four civilians died, including one Indigenous and one community leaders. Criminal investigations into whether the army used excessive force continued as of October.

Police have committed serious human rights violations in response to largely peaceful protests across Colombia since 2019. Efforts to investigate and prosecute them have been limited.

In 2021, Human Rights Watch reviewed evidence linking police to 25 killings of protesters and bystanders, as well as dozens of injuries and arbitrary arrests, in the context of peaceful demonstrations. As of October, four officers had been charged and five others indicted in connection with homicides. Nobody had been charged for the injuries or arbitrary arrests.

There have been limited reforms to improve accountability and prevent future violations.

In August, President Petro appointed Iván Velásquez, a widely respected former judge and anti-corruption prosecutor, as the minister of defense. Velásquez said the government would pursue further police reform, including by transferring the police out of the Ministry of Defense, where the line between its functions and the military's have often been blurred.

## Violence Against Human Rights Defenders, Other Community Leaders

More than 1.000 human rights defenders and social leaders have been killed in Colombia since 2016, according to the Human Rights Ombudsperson's Office.

Colombian law includes a broad range of policies, mechanisms, and laws to prevent abuses against human rights defenders and protect former FARC fighters. But implementation, especially of measures established under the 2016 peace accord, has often been poor.

The Human Rights Ombudsperson's Office reported 182 killings of human rights defenders between January and October 2022.

In February 2022, in San Martín municipality, Cesar state, armed men killed Teófilo Acuña and Jorge Tafur, prominent peasant leaders who, for decades, led small-farmer and small-scale miner communities. As of October, one person had been charged in connection with their killings.

## Peace Negotiations, Negotiated Disarmament, and Accountability

The 2016 peace agreement created a truth commission; the Special Jurisdiction for Peace (JEP), charged with trying abuses committed during the conflict; and an agency to seek the bodies of those disappeared during the conflict.

The Truth Commission presented its findings in June 2022 and established a committee to monitor, for seven years, implementation of its recommendations to the government, including creating an "anti-violence policy," re-starting peace negotiations with the ELN, and reforming security and drug policies. The report included comprehensive analysis of violence committed against women, LGBT people, children, Afro-descendants and Indigenous people.

The JEP has made significant strides in investigating and prosecuting war crimes and crimes against humanity, charging top former FARC commanders with hostage-taking and several army officers with extrajudicial executions, known as "false positive" killings.

CLP_PC_022956

In July, the JEP said it would initiate a nation-wide "macro-case" into sexual violence and other crimes based on prejudice committed by the FARC and security forces, which will encompass crimes motivated by gender, sex, sexual orientation, and gender identity.

In late October, the JEP issued its first indictment, accusing 11 army officers and one civilian of extrajudicial executions committed in North Santander in 2007 and 2008.

In November, the JEP indicted former FARC top commanders for their responsibility in hostage-taking. The commanders had acknowledged their role in these crimes in a June hearing, and the JEP said they should be sentenced to between five and eight years of "special sanctions."

In early December, the JEP indicted 14 other army officers for their role in "false positive" killings committed on the Caribbean Coast between 2002 and 2005. The judges said that 12 of the officers had fully acknowledged their responsibility and confessed to their crimes, but that two others had not and should stand trial.

Defendants who fully cooperate with the JEP and confess to their crimes are subject to up to eight years of "special sanctions," including restrictions on liberty but no prison time. Because the language in the existing legislation on these sanctions is vague and no punishments have been imposed, it remains unclear how the "special sanctions" will operate in practice.

In early November, Congress passed a Petro administration-sponsored law that allows it to negotiate a peace accord, including new transitional justice mechanisms, with some armed groups, such as the ELN. On November 21, the peace talks with the ELN re-started in Venezuela. Authorities said that they would also introduce a bill to offer reduced sentences for other armed groups. As of November, it remained unclear how authorities would ensure victims' access to justice and to what extent the government would treat gangs and armed groups that are parties to the conflict differently.

### Internal Displacement, Reparations, and Land Restitution

Conflict-related violence has displaced almost 8.4 million Colombians since 1985, government figures show.

The United Nations Office for the Coordination of Humanitarian Affairs (OCHA) reported 70,000 people displaced between January and October 2022, in "mass displacements" of 50 or more people or 10 or more families.

Municipalities and state governments often lack sufficient funding to assist displaced people, and national government assistance has often been slow and insufficient.

In 2011, Congress passed a Victims' Law to ensure redress for victims and restore millions of hectares left behind or stolen from Colombians displaced during the conflict. As of October 2022, courts had issued rulings on only 13,507 of over 142,000 claims filed. Under 14 percent of over 9 million registered victims of the armed conflict had received reparations, as of October.

### Refugees, Asylum Seekers, and Migrants

Colombia has received by far the largest number of refugees, asylum seekers, and migrants fleeing the human rights and humanitarian crises in Venezuela. As of February, more than 2.5 million Venezuelans lived in Colombia.

In 2021, then-President Iván Duque announced temporary protection for Venezuelans, granting them 10 years of legal status. As of October 2022, authorities had granted temporary protection to over 1.4 million Venezuelans, out of more than 2.4 million who had requested it.

More than 3,000 people, including Venezuelans and Colombians who had been living in Venezuela's Apure state, fled to Colombia's Arauca and Vichada states in early 2022, escaping fighting and abuses by armed groups. Aid has been very limited.

Hundreds of thousands of migrants—mostly Venezuelan—crossed Colombia's Darien gap into Panama in 2022, believed to be heading in most cases to the US. The number of people crossing the gap increased significantly, in large part driven by the flow of Venezuelans. During their days-long walk across the gap,

migrants of all nationalities are frequently victims of robbery and serious abuses, including rape. They receive little security, aid, or access to justice.

### Gender, Sexuality, and Gender-Based Violence

Gender-based violence, including by armed groups, is widespread. Lack of training and poor implementation of treatment protocols impede timely access to medical services and create obstacles for women and girls seeking post-violence care and justice. Perpetrators of violent, gender-based crimes are rarely held accountable.

Despite many legal protections based on sexual orientation and gender identity, lesbian, gay, bisexual, and transgender people in Colombia continue to face high levels of violence and discrimination. In 2021, the organization Colombia Diversa registered attacks against 405 LGBT people in the country, including 103 cases of police violence and 205 homicides attributed to other actors. Between January and late-October 2022, the Attorney General's Office registered homicides against 111 LGBT persons.

In February, the Constitutional Court decriminalized abortion in all circumstances up to the 24th week of pregnancy, and maintained access beyond that time in cases of rape, a non-viable pregnancy, or risk to a pregnant person's health or life.

In February, the court also recognized a non-binary gender marker, the first such ruling issued by a supreme or constitutional court in the region.

### Economic and Social Rights

High levels of poverty especially among Indigenous and Afro-descendant communities remain a serious human rights concern.

The 2016 peace accord established "Territorial Development Programs" (PDET) to increase the presence of state institutions in 170 municipalities highly affected by the armed conflict, poverty, and illegal economies. In 2020, the multidimensional poverty rate (32.9 percent) in these areas was nearly double the national rate (18.1 percent). Efforts to implement the PDET have been limited.

Between January and November 2022, at least 65 children under age five—the majority Indigenous Wayuu—died in La Guajira state of causes associated with malnutrition and limited access to safe drinking water.

### Technology and Rights

The Education Ministry failed to act following reports that it had recommended unsafe online learning products for children during the Covid-19 pandemic. All eight products surveilled or had the capacity to surveil children online, outside of school hours, and deep into their private lives.

### Climate Policy and Impacts

Colombia's national plan to reduce greenhouse gas emissions is "highly insufficient" to meet the Paris Agreement goal of limiting global warming to 1.5ºC above pre-industrial levels, according to the Climate Action Tracker. The plan commits Colombia to reducing deforestation to 50,000 hectares per year by 2030. Colombia subsequently joined the Glasgow Declaration, which commits it to "halt and reverse forest loss and land degradation by 2030."

Government figures registered 174,000 hectares deforested in 2021, a 1.5 percent increase over 2020, and figures for the first trimester of 2022 show deforestation increased 10 percent compared to the same trimester in 2021. More than 9,000 hectares were razed on land officially held by Indigenous peoples, in some cases leading to their forced displacement. Roughly two-thirds of deforestation occurs in the Amazon region.

Cattle ranchers and FARC dissident groups primarily drive deforestation, pressuring residents to fell trees, extorting farmers, promoting coca crops to produce cocaine, and threatening people who defend conservation.

The former Duque government's flagship initiative to combat deforestation, Operation Artemisa, achieved limited results.

In September, the environment minister announced that, as part of a new forest conservation strategy, the government would work with communities to prevent logging and seek criminal prosecutions against people and armed groups who promote it.

CLP_PC_022958

### Key International Actors

The US, the most influential foreign actor in Colombia, approved US$471 million in assistance for fiscal year 2022. In October, Secretary of State Antony Blinken met President Petro in Bogota and expressed his support for implementing the 2016 peace accord.

In 2016, the UN Security Council established a political mission to monitor and verify implementation of the FARC peace accord, which was succeeded in 2017 by the UN Verification Mission in Colombia. In 2022, the Security Council extended the mission's mandate until October 2023, including the verification of compliance with JEP sanctions.

President Petro and Venezuelan President Nicolás Maduro re-established diplomatic relations in August and reopened the border on September 26. President Maduro agreed in September to take part in peace negotiations between the National Liberation Army (ELN) and the Colombian government.

In early August, Colombia did not support a resolution in the Organization of Americas States (OAS) to condemn human rights violations in Nicaragua. Foreign Minister Alvaro Leyva later said that the decision was part of an effort to seek the negotiated release of political prisoners, but the Daniel Ortega government in Nicaragua seemingly rejected the request; the detainees remained behind bars, as of writing.

In September, Colombia withdrew from a "core group" of governments from across the political spectrum—Brazil, Canada, Chile, Ecuador, Guatemala, and Paraguay—that led the initiative to extend the mandate of the United Nations Fact Finding Mission on Venezuela.

Also in September, President Petro rightly criticized the "war against drugs," calling for it to end to during his speech in the United Nations General Assembly.

# Cuba

The government continues to repress and punish virtually all forms of dissent and public criticism, as Cubans endure a dire economic crisis affecting their rights.

Authorities responded with brutal, systematic repression and censorship when thousands of Cubans took to the streets in July 2021 to protest the Covid-19 response, scarcity of food and medicines, and long-standing restrictions on rights. Trials of hundreds of such protesters in 2022 often violated basic due process guarantees and resulted in disproportionate prison terms.

Demonstrations across the country continued in 2022, triggered by blackouts, shortages, and deterioration of living conditions.

The government's repression and apparent unwillingness to address the underlying causes that took people to the streets have forced Cubans to leave the country in unprecedent numbers.

The United States continued a failed policy of isolation towards Cuba, including a decades-long embargo on trade with Cuba.

### Arbitrary Detention and Prosecution

The government continued to employ arbitrary detention to harass and intimidate critics, independent activists, political opponents, and others.

Security officers rarely presented arrest warrants when detaining critics. Officers prevented people from attending protests, arresting critics and journalists on their way—or keeping them from leaving home.

On July 11, 2021, thousands took to the streets in the largest nationwide demonstrations against the government since the Cuban revolution. One protester, Diubis Laurencio Tejeda, a 36-year-old singer, died, seemingly at the hands of police.

Cuban rights groups counted more than 1,500 people, mostly peaceful demonstrators or bystanders, detained; more than 660 remained behind bars as of Oc-

CLP_PC_022959

### Environment and Human Rights

Congo's territory contains most of the world's second largest rainforest, which holds billions of tons of carbon underground and is home to Indigenous peoples.

In April, the Environment Ministry released an audit by the General Inspectorate of Finance, dated May 2021, that revealed at least six former ministers had granted illegal logging permits in violation of a nationwide moratorium. The audit also showed widespread tax avoidance by concession holders. The government suspended 12 concessions but fell short of cancelling all illegal permits.

In November, Tshisekedi signed a new law on the Protection and Promotion of the Rights of Indigenous Pygmy Peoples.

In July, the government launched an auction for licensing rights to 27 oil and 3 gas blocks, opening an estimated 11 million hectares of the rainforest to drilling. Drilling in these blocks could release up to 5.8 billion tons of carbon, more than 14 percent of the world's total greenhouse gas emissions in 2021.

### Key International Actors

In June, King Philippe of Belgium visited Congo for the first time and reaffirmed his "deepest regrets" for colonial-era abuses but did not offer an apology or raise the issue of reparations. Belgian authorities returned a tooth of the murdered Congolese independence hero Patrice Lumumba to his family. The relic from the country's first prime minister was taken around Congo ahead of a funeral in Kinshasa.

In August, United States Secretary of State Antony Blinken met with President Tshisekedi in Kinshasa and pledged an additional $10 million to promote peaceful political participation and transparent elections.

In December, the European Union added eight individuals to its targeted sanctions list (freezing of financial assets and travel bans), bringing to 17 the number of people, including senior officials, subjected to restrictive measures.  The same month, the UN Security Council extended MONUSCO's mandate for one year.

# Ecuador

Insecurity is a top concern for many Ecuadorians. The homicide rate had increased to nearly 16 per 100,000 citizens, as of October.  In response to gang violence, the government in August declared the fourth state of emergency since October 2021.

Overcrowding and lack of state control in Ecuador's prisons have enabled detained gang members to commit several massacres nationwide since 2021, killing around 400 detainees.

Anti-government protests in June highlighted longstanding structural problems impacting Indigenous communities and households in poverty. Demonstrators protested inadequate access to health care, education, and employment, and removal of fuel subsidies. Security forces responded with abuses at times, and violence by protesters—or infiltrators—erupted.

Weak rule of law, alleged corruption, lack of enforcement of Indigenous peoples' rights, restrictions on access to abortion, and limited protection of children and lesbian, gay, bisexual, and transgender (LGBT) people remained serious concerns.

### Prison Conditions and Killings

Poor prison conditions, including overcrowding, contributed to a string of gang-related mass killings. Between February 2021 and October 2022, nine massacres left approximately 400 detainees dead and dozens injured. Human Rights Watch documented insufficient steps to stop the killings, including an eight-hour delay before police entered a Guayaquil prison during a November 12, 2021, massacre.

As of August, nobody had been convicted for participating in any of the 2022 massacres.

Overcrowding appears to be rooted in excessive use of pretrial detention, harsh drug policies and delays in granting benefits. Prison guards are poorly trained and insufficient to contain violence.

In February, the government adopted a policy to improve prison conditions and detainees' access to basic services. In April, it initiated a process to hire and train 1,400 guards.

CLP_PC_022966

In June, a commission of experts convened by the president to reform the prison system released its final report, concluding that Ecuador's prisons are "punishment warehouses" rather than centers for rehabilitation.

Ecuador's government has not kept accurate data on the number and identity of detainees. A census to collect socio-demographic information on the prison population started on August 22.

### Use of Force by Security Forces

In Quito and Guayaquil, police responded to peaceful demonstrations commemorating International Women's Day, March 8, with excessive force, including indiscriminate use of teargas and pepper spray.

During anti-government protests starting June 13, police responded several times with excessive force, shooting teargas canisters directly at demonstrators or close to areas sheltering children and injured people. Protests began peacefully but turned violent. Demonstrators blamed provocateurs for vandalism, looting, and blocking medical deliveries to hospitals. Six civilians and one member of the military died, and over 300 people suffered injuries, Ecuadorian human rights groups and media reported. In one case, the government confirmed a death by teargas canister impact.

On August 22, a law took effect prohibiting security forces from using excessive, arbitrary, or illegitimate force, and stressing that the use of force should follow principles of legality, necessity, proportionality, precaution, humanity, non-discrimination and accountability. The law allows use of lethal weapons only under threat of severe injury or death.

### Rule of Law and Anti-Corruption Efforts

Democratic institutions damaged under former President Rafael Correa (2007-2017) remain fragile, amid allegations of corruption, interference in the appointment of authorities, and politically motivated removal of authorities prior to the end of their term. Several reforms improved the independence of key judicial institutions. But reports of trial delays, lack of due process and improper pressure on courts continued.

### Rights of Indigenous Peoples

On June 30, officials and Indigenous leaders reached an agreement to stop the protests organized in response to authorities' perceived unwillingness to address structural problems. Protesters' demands included guaranteeing Indigenous peoples' collective rights and access to health, education, and employment; lowering the prices of food and other essential goods; and repairing the social and environmental impacts of mining and oil extraction in Indigenous territories.

The 90-day dialogue between government and Indigenous groups to discuss the issues that prompted the protests concluded on October 14 with over 120 agreements.

Many Indigenous communities have long-opposed oil development in the Amazon. In January, the Heavy Crude Oil Pipeline ruptured, affecting areas of the Cayambe Coca National Park. Contaminated water reached dozens of Indigenous Kichwa communities. The company and government started a cleanup, and authorities began an investigation into the cause and environmental impact.

That same month, the Constitutional Court ruled Indigenous communities must be consulted on extractive projects that could affect their lands, and that only in exceptional circumstances can officials authorize projects without the community's consent.

In September, the government declared a temporary moratorium on 15 extraction areas and said it will grant no further mining concessions until a law regulating consultation processes is approved.

At time of writing, the Inter-American Court of Human Rights was considering its first case on Indigenous communities in voluntary isolation. The Tagaeri and Taromenane ethnic groups sued Ecuador for harming their territories, natural resources, and way of life, and for failing to prevent violent deaths of community members. Ecuador has accepted partial responsibility, including for failing to investigate the deaths.

CLP_PC_022967

## Women's Rights

A Constitutional Court ruling in 2021 decriminalized abortion in rape cases, setting in motion an effort to amend legislation accordingly.

President Guillermo Lasso, in March, partially vetoed an abortion bill. Legislators accepted his proposed restrictions on access, including short deadlines, broad conscientious objection, and unreasonable requirements like first reporting rapes to authorities. The amended law entered into force in April.

The Constitutional Court provisionally suspended measures requiring raped girls to obtain a legal representative's authorization for abortion. At time of writing, a final decision was pending.

Stigmatization, mistreatment, fear of criminal prosecution, and a narrow interpretation of the health exception to the general abortion ban remain barriers to access.

The Attorney General's Office reported 53 femicides—murders of women deemed gender related—between January and August. Civil society organizations reported an increase in all killings of women compared to previous years; over 200 as of September.

## Disability Rights

On September 16, complying with an Inter-American Court of Human Rights ruling, Ecuador publicly recognized its responsibility for the disappearance of Luis Eduardo Guachalá Chimbo, a 23-year-old with a mental health condition. Guachalá disappeared from a hospital in 2004, and Ecuador did not fulfill its obligation to search for him, the court found. The ruling established standards on informed consent, legal capacity and supported decision making for people with disabilities.

## Children's Rights

Sexual violence is a longstanding problem in public and private schools. Nearly 30 percent of over 14,000 reports of sexual violence that Ecuador's Ministry of Education registered between January 2014 and April 2022 happened in schools. Publicly reported cases probably represent only a fraction of cases. Many survivors face re-traumatization at school and barriers to accessing justice.

Human Rights Watch research found that Educa Contigo, an Education Ministry website launched during the Covid-19 pandemic, collected and transmitted children's personal data to third-party companies, enabling them to track and target children for advertising purposes.

## Sexual Orientation and Gender Identity

The National Assembly has yet to comply with Constitutional Court orders to revise civil marriage provisions to include same-sex couples; to allow self-determination in gender recognition procedures; to regulate assisted reproduction methods; and to allow same-sex couples to register children with their surnames.

The constitution discriminates against same-sex couples by excluding them from access to adoption.

## Refugees, Asylum Seekers, and Migrants

From January to July 2022, Ecuador recognized 1,857 people as refugees. As of September, the country was sheltering more than 500,000 Venezuelan migrants and refugees. Most asylum seekers are Venezuelan.

President Lasso decreed a year-long regularization process for Venezuelans, starting September 1. Those with irregular status who entered through official border checkpoints before June 1 can receive temporary visas lasting two years, with an option to extend for a third.

## Freedom of Expression

During June protests, the non-governmental organization Fundamedios documented physical and verbal attacks by, mainly, protesters against 114 journalists, 40 cameramen and 80 media outlets.

On October 3, the Constitutional Court ruled some provisions of a communications bill restricted the right to freedom of expression, partially agreeing with an August veto by Lasso. At time of writing, the bill has not entered into force.

CLP_PC_022968

### Key International Actors and Foreign Policy

The Inter-American Commission on Human Rights (IACHR) released a report, in March, describing longstanding government abandonment of the prison system. In May, a spokesperson for the United Nations High Commissioner for Human Rights reiterated deep alarm at recurring prison violence.

On June 9, Ecuador was elected as a non-permanent member of the UN Security Council starting in January 2023.

On June 10, Ecuador signed the Los Angeles Declaration on Migration and Protection, committing to strengthening and expanding paths toward safe, legal migration and asylum.

During the June protests, the IACHR and its special rapporteur for freedom of expression expressed concern about attacks against journalists and violence. The UN Committee on the Rights of the Child expressed concern over security force violence against children, including indiscriminate use of tear gas.

Ecuador condemned Russia's invasion of Ukraine and human rights violations in Venezuela. After sham elections in Nicaragua, it did not send a delegation to Daniel Ortega's inauguration.

Ecuador and five other countries in the region led the renewal, in October, of the UN Independent International Fact-Finding Mission on Venezuela.

# Egypt

September 2022 marked one year since the Egyptian government launched the national human rights strategy, but authorities took few if any steps to ease the wholesale campaign of repression against critics or repeal any of the numerous laws that are routinely used to curtail basic freedoms. While authorities released hundreds of detainees in a piecemeal manner, they arrested many others and re-arrested some of those released. Thousands remain unjustly detained for their peaceful activism.

President Abdel Fattah al-Sisi declared 2022 the "year of civil society," but key members of civil society continued to face arbitrary travel bans, asset freezes, and criminal investigations in retaliation for their peaceful activism or criticism.

Egypt faced an intensifying economic crisis in 2022, which increasingly impacted access to food and other socioeconomic rights, while the government negotiated yet another loan agreement with the International Monetary Fund.

### Abuses by Police and Security Forces

Interior Ministry police and National Security agents continued to forcibly disappear opponents in unofficial detention places where detainees are subjected to torture and forced confessions.

On January 12, security forces disappeared Hossam Menoufy, a supporter of the Muslim Brotherhood, after a plane carrying him from Khartoum to Istanbul made an unscheduled landing in Luxor. Although Egypt's Interior Ministry said in a January 15 statement that Menoufy was detained and under investigation, authorities refused to respond to questions about his whereabouts.

Authorities failed to investigate incidents of torture and mistreatment, which remained widespread. In May 2022, Egypt's Supreme State Security head prosecutor, Khaled Diaa, referred for mass trial a group of detainees who had appeared in two leaked videos, published by the *Guardian,* showing them in a Cairo police station with wounds that appeared to be the result of torture. The alleged police perpetrators faced no serious investigation.

In February, President al-Sisi attended the EU-AU summit in Brussels, receiving little if any public criticism by European leaders. In June, the EU and Egypt endorsed their 2021-27 partnership priorities at the bilateral Association Council meeting. The document refers to an allegedly "shared commitment to the universal values of democracy, the rule of law and the respect of human rights," but fails to acknowledge the deep human rights crisis in Egypt. In November, the European Parliament adopted a damning resolution on human rights in Egypt reiterating its call for a "profound and comprehensive review" of the EU's relations with the country.

In September, two NGOs filed complaints in France urging judicial authorities to investigate France's alleged involvement in a secret Egyptian military operation on the Libyan border on the basis that it involved acts amounting to crimes against humanity.

# El Salvador

President Nayib Bukele and his majority in the Legislative Assembly have systematically dismantled democratic checks and balances. In September, he announced he would seek re-election in 2024, despite a constitutional prohibition on immediate re-election.

In March, the National Assembly declared a state of emergency and suspended basic rights in response to gang violence. Authorities committed widespread human rights violations, including mass arbitrary detention, enforced disappearances, ill-treatment in detention, and due process violations.

Gangs continue to exercise control over some neighborhoods and extort residents. They forcibly recruit children and sexually abuse women, girls, and lesbian, gay, bisexual, and transgender (LGBT) people. They kill, disappear, rape, or displace those who resist.

## Judicial Independence

Since taking office in 2019, President Bukele and his allies have taken steps to effectively co-opt democratic institutions.

In May 2021, Bukele's two-thirds majority in the Assembly summarily removed and replaced all five judges on the Supreme Court's Constitutional Chamber and the attorney general.

In June 2021, the Assembly appointed five new judges to the Supreme Court for a total of 10 out of 15 Supreme Court judges, although under the law each newly elected legislature is allowed to appoint only five judges to the court.

In September 2021, lawmakers passed laws allowing the Supreme Court and the attorney general to dismiss judges and prosecutors over 60 years of age and expanding their power to transfer judges and prosecutors to new posts. The laws have been used to abusively dismiss or transfer independent judges or prosecutors.

Also in September, the Supreme Court's Constitutional Chamber ruled that the constitution allowed for immediate presidential re-election, although it had been consistently interpreted to forbid immediate re-election.

A Bukele administration-sponsored overhaul to the constitution, which would reform the courts and other bodies, remained pending at time of writing.

### Gang Violence

Gangs continued to forcibly recruit children and sexually assault, kill, abduct, rape, and displace people. For decades, the response by authorities has oscillated between obscure negotiations with gangs and iron fist security policies that have led to rights violations.

Violence in areas controlled by gangs drives internal displacement. The Office of the United Nations High Commissioner for Refugees in 2021 reported 71,500 internally displaced people. More than 153,000 Salvadorans sought asylum in other countries, mostly the US, in 2021.

El Faro, a prestigious digital news outlet, reported that, before being fired in 2021, former Attorney General Raúl Melara had been investigating negotiations between the Bukele administration and the country's three largest gangs. According to El Faro, the government offered members prison privileges and employment opportunities in exchange for lowering the homicide rate.

Between March 24 and 27, 92 people were killed in El Salvador, seemingly by gangs; the highest homicide number in years, which led to authorities' state of emergency declaration. According to El Faro, the wave of violence in March was triggered by the collapse of government negotiations with the MS-13 gang. Nobody had been convicted of the killings as of September.

The government reported that there were no homicides during many days of 2022, but authorities have told journalists that the aggregated data on homicides is "classified." The official homicide rate declined from about 36 per 100,000 in 2019 to 17 per 100,000 in 2021. In July 2019, the government changed the way killings are counted, excluding cases in which police officers were reported to have killed alleged gang members in confrontations.



**"We Can Arrest Anyone We Want"**
Widespread Human Rights Violations Under El Salvador's "State of Emergency"

### Abuses During the State of Emergency

In March 2022, the Legislative Assembly adopted for 30 days a state of emergency that suspends some basic rights. Legislators had extended the measure six times and it remained in place at time of writing.

Also in March, legislators approved gang-related legislation that allows authorities to imprison children as young as 12 and expands the use of pretrial detention.

Over 55,000 people were detained under the state of emergency between late March and mid-October, authorities report. Many arrests appear to have been based on the appearance or social background of the detainees, and local human rights groups have documented that hundreds of people with no connection to gangs have been detained.

Human rights organizations, including Cristosal and Human Rights Watch, have documented serious abuses by security forces during the state of emergency, including arbitrary arrests, enforced disappearances, torture and other forms of ill-treatment, and due process violations.

Cristosal reported over 2,900 cases of human rights violations during the state of emergency.

Over 45,000 people arrested during the state of emergency went into pre-trial detention, contributing to prison populations increasing to an estimated 84,000 detainees, over three times official capacity. Historically poor conditions in detention—overcrowding, violence, and poor access to such services as food and drinking water—worsened.

Over 80 detainees died in prison, local rights groups reported. In some cases, authorities have failed to conduct autopsies or else follow internationally accepted medical and legal standards.

### Disappearances

The Attorney General's Office registered more than 28,000 complaints of missing people between January 2005 and August 2021. This is more than the estimated 8,000 to 10,000 disappeared during the 12-year civil war that ended in 1992. Between January and May 2022, Foundation Studies for the Application of Law (FESPAD), a local nongovernmental organization, counted 500 disappearances registered by the National Civil Police. Perpetrators include gangs and security forces. Accountability in these cases is rare.

### Transparency and Anti-Corruption

At the time of his removal, in May 2021, Attorney General Melara was investigating six government officials for alleged corruption regarding funds allocated for Covid-19.

In June 2021, the new Attorney General, Rodolfo Delgado, ended a cooperation agreement with the International Commission Against Impunity in El Salvador (CICIES), a body backed by the Organization of American States (OAS) to fight corruption.

In January 2022, the Attorney General's Office raided the offices of prosecutors who had, under Melara, been investigating allegations of corruption and officials' negotiations with gangs. Four prosecutors fled the country, fearing persecution.

The Bukele administration has weakened the role of the Access to Public Information Agency including by changing the agency's regulations in ways that undermine its autonomy and by dismissing one of its members.

Prosecutors in 2017 charged former President Mauricio Funes (2009-2014), living in Nicaragua since 2016, with offenses involving corruption, embezzlement, and money laundering. Nicaraguan President Daniel Ortega granted Funes Nicaraguan citizenship in 2021.

### Freedom of Expression

The government has created a hostile environment for the media.

The Association of Journalists of El Salvador (APES) reported 421 "press freedom violations" between 2019 and 2021, including physical attacks, digital harassment, and restrictions on journalists' work and access to public information. APES also reported that nine journalists fled the country fearing harassment and arbitrary arrests.

CLP_PC_022975

In January 2022, Citizen Lab and Access Now reported that Pegasus spyware had been used to hack the mobile phones of at least 35 Salvadoran journalists and civil society members, including 22 reporters from El Faro.

In April, the Legislative Assembly passed an overly broad law establishing new criminal offenses carrying prison sentences of up to 15 years for journalists who reproduce messages by gangs.

The Bukele administration proposed a "foreign agents" law, in November 2021, requiring individuals and organizations that "directly or indirectly" receive funding from abroad to register as "foreign agents." In August 2022, the speaker of the government's party, Christian Guevara, said authorities would use it, once passed, to punish El Faro.

### Accountability for Past Abuses

Impunity for abuses committed during the country's civil war (1980-1992) remains the norm.

Nobody has been sentenced for the 1981 massacre in El Mozote village, in which a US-trained battalion killed 978 civilians, including 553 children, and raped and tortured many victims. A trial of former military commanders accused in the massacre started in 2016. In 2021, Jorge Guzmán, the judge in the criminal case against the alleged perpetrators of the massacre, was ousted and the trial stalled.

### Women and Girls' Sexual and Reproductive Rights

Abortion is illegal under all circumstances.

Many women have been convicted, and in some cases sentenced to decades, in prison, on related charges, including after miscarriages or obstetric emergencies. In June 2022, a court sentenced a woman who suffered an obstetric emergency to 50 years in prison for "aggravated homicide."

Between September 2021 and September 2022, courts released six women who had served 6 to 13 years in prison on charges of abortion, homicide, or aggravated homicide.

El Salvador officially ratified the International Labour Organization Convention on Violence and Harassment (C190), after the Legislative Assembly ratified it in May 2022. The treaty obligates El Salvador to provide comprehensive protections to ensure a world of work free from violence and harassment, including gender-based violence and sexual harassment."

### Disability Rights

El Salvador's legislative framework remains inconsistent with international disability rights law, with restrictions on legal capacity for people with intellectual and psychosocial disabilities—and insufficient measures to improve physical and communications access.

### Sexual Orientation and Gender Identity

Lesbian, gay, bisexual, and transgender (LGBT) people remain targets of homophobic and transphobic violence by police, gangs, and the general public. In many cases, LGBT people are forced to flee the country, and often seek safety in the United States.

In February 2022, the Supreme Court ordered the Legislative Assembly to create, within one year, a procedure for transgender people to change their names on identity documents. Legislators had not begun discussions as of September 2022. Meanwhile, transgender people continue to experience discrimination due to a mismatch between their gender and their identity documents, including in the ambits of health, employment, voting, and banking.

### Key International Actors

For fiscal year 2022, the US appropriated over US$66 million in bilateral aid to El Salvador, particularly to reduce extreme violence and strengthen state institutions. The US Congress prohibited Foreign Military Financing to El Salvador and, in 2021, the United States Agency for International Development redirected assistance away from the National Police and the Institute for Access to Public Information and towards civil society groups.

CLP_PC_022976



## "We Just Want to Live Our Lives"

El Salvador's Need for Legal Gender Recognition





In July 2022, the administration of US President Joe Biden added six Salvadorans to the 19 already on the "Engel List" of individuals engaged in "significant corruption" or acts that "undermine democratic processes." They included President Bukele's legal advisor and press secretary, and the speaker of his party.

In March 2022, UN Secretary-General Antonio Guterres expressed concern about soaring violence in El Salvador and asked authorities to address it with measures "in line with international human rights law and standards."

In April 2022, the Office of the UN High Commissioner for Human Rights expressed concern over the Salvadoran government's response to gang violence, including arrests without warrants, reports of ill-treatment, and amendments to the criminal code.

In June, six United Nations experts expressed "serious concerns" over allegations of abuses committed during the state of emergency, including enforced disappearances and a "pattern" of arbitrary arrests.

In March 2021, El Salvador announced it was re-negotiating a US$1.3 billion loan with the International Monetary Fund (IMF). Negotiations have been stalled, apparently due to El Salvador's adoption in September 2021 of bitcoin as legal tender and concerns over the weakening of judicial independence and the reduction of transparency and accountability. The Inter-American Development Bank approved $1.3 billion in funds for El Salvador for 2021-2024 and, in 2021, the Central American Bank of Economic Integration approved an $8,884.7 million loan—its largest to any country in the region.

CLP_PC_022977

ple's faces and fingerprints were still pending. The program is inconsistent with international human rights standards on privacy and likely to amplify ongoing discrimination, including ethnic profiling resulting from the government's targeted sweep operations against migrants.

### Women's Rights

The government came under increasing pressure to combat domestic violence, including by making femicide a standalone crime, as the murders of two women in one day in August sparked public outrage and protests. The killing of a woman set on fire by her husband in September and of another woman and her 10-month-old baby brought the total to at least 17 women murdered so far this year.

# Guatemala

President Alejandro Giammattei and his allies deepened the democratic backsliding in Guatemala in an apparent effort to avoid accountability for widespread high-level corruption.

Authorities appointed two key figures in 2022: the attorney general and the human rights ombudsperson in selection processes that were neither fair nor transparent. In May, Giammattei reappointed attorney general Consuelo Porras. Porras has blocked investigations into corruption and brought arbitrary proceedings against independent journalists, prosecutors, and judges.

Harassment and violence against journalists and human rights defenders and challenges in protecting the rights of women and girls, lesbian, gay, bisexual, and transgender (LGBT) people, and migrants remain major concerns.

### Corruption

Investigations by the United Nations-backed International Commission against Impunity in Guatemala (CICIG), which operated from 2007 to 2019, and by the Attorney General's Office exposed more than 120 corruption schemes in all three branches of government.

In 2019, then-President Jimmy Morales terminated the CICIG's mandate and forced its head to leave the country. Since then, Attorney General Consuelo Porras has weakened the Office of the Special Prosecutor against Impunity (FECI), responsible for investigating corruption, and progress on the cases has come to a standstill.

The Americas Society and Council of the Americas ranked Guatemala 13th out of 15 Latin American countries in their ability to detect, punish, and prevent corruption, experiencing the sharpest decline in the index from 2021.

Years of investigations have shown that businesspeople have acted in coordination with corrupt officials. Money obtained through corruption and criminal activity is often used to finance electoral campaigns.

CLP_PC_023006

### Judicial Independence and Checks on Executive Power

Measures adopted recently by Congress, the Attorney General's Office, and other authorities have impeded accountability for corruption and abuses, undermined the rule of law, and weakened human rights guarantees.

As of September, Congress had yet to comply with a 2020 Constitutional Court ruling ordering it to appoint judges and magistrates to fill vacant seats on the Supreme Court and appeals courts for the period 2019-2024. The selection process has been marred by delays and influence peddling allegations.

On May 16, President Giammattei appointed Consuelo Porras as attorney general for a second term, after a selection process marred by several attempts by government authorities and others to undermine the fairness and independence of the process.

During her initial four years in office, Porras undermined investigations into corruption and human rights abuses. She transferred, fired, or, in some cases, promoted spurious criminal proceedings against independent judges, prosecutors, and journalists.

In January 2022, the Attorney General's Office opened seemingly arbitrary investigations into Judge Erika Aifán, who had presided over high-level corruption cases reportedly involving President Giammattei. Aifán fled Guatemala in March.

In February, Virginia Laparra, an anti-corruption prosecutor, was imprisoned on spurious grounds. She remained behind bars as of September.

In late June and early July, Porras abruptly removed eight prosecutors, including Hilda Pineda, who in 2013 prosecuted former President Efraín Ríos Montt for "genocide" and "crimes against humanity" in connection with his alleged role in massacres committed during the country's 1960-1996 civil war.

In July, Congress appointed a new ombudsperson, José Alejandro Cordova, a Giammattei administration ally, through a process that lacked transparency.

In November, Congress appointed the new comptroller general, Frank Bode. The comptroller plays a key role in preventing corruption and the office's work is crucial to ensure free and fair elections presidential elections in June 2023.

### Freedom of Expression

The Giammattei administration and Attorney General Consuelo Porras have created a hostile environment for independent journalists and media outlets, including with verbal attacks, restrictions on the press, and abusive criminal proceedings.

The Journalists' Association of Guatemala reported 66 incidents of attacks, persecution, and criminalization of media workers during the first six months of 2022.

In some cases, government officials have used a 2008 anti-gender-based violence law to harass journalists who write about them, claiming that their reporting is a form of "psychological violence" against officials or their female relatives.

On March 8, journalist Orlando Villanueva from *Noticias del Puerto* was shot dead by unidentified individuals in Puerto Barrios, the capital of Izabal department. Other journalists in that department have faced attacks and official harassment, particularly for covering issues related to a mining project in the Indigenous community of El Estor. In September, a judge acquitted journalist Carlos Choc from *Prensa Comunitaria*, who had been accused without evidence of "incitement to commit crime" for his coverage of an October 2021 protest related to the mining project.

In April, journalist Juan Luis Font fled Guatemala. Font has been subject to apparently spurious criminal investigations related to his reporting on corruption allegations against former infrastructure minister Alejandro Sinibaldi, who is under investigation for taking bribes.

In July, prosecutors arrested Jose Rubén Zamora, the owner of the well-respected media outlet El Periódico, which has uncovered several incidents of corruption in the country. He is accused of "money laundering," "blackmail," and "influence peddling".

### Accountability for Past Human Rights Violations

The limited progress that Guatemala was making in adjudicating crimes committed during the armed conflict (1960-1996) seems to have come to a standstill in

CLP_PC_023007

recent years, particularly because of attacks and spurious prosecutions against prosecutors and judges working on such cases.

Challenges persist in searching for and identifying the disappeared during the armed conflict, mainly Indigenous Mayans.

In January, a court in Guatemala sentenced five former members of a paramilitary unit to 30 years in prison for crimes against humanity after finding them responsible for raping and enslaving 36 Mayan women between 1981 and 1985.

In July, legislators introduced a bill that would grant amnesty to security forces for "actions or omissions" they committed during the armed conflict. It was the third time such a bill has been introduced in recent years. It had yet to be discussed as of writing.

### Human Rights Defenders

Abuses against human rights defenders and social leaders increased in the last five years, according to the non-profit Unidad de Protección a Defensoras y Defensores de Derechos Humanos de Guatemala (Udefegua), which recorded 11 killings and 1,002 incidents of defamation, harassment or spurious judicial complaints directed mainly at justice operators, journalists, peasants, and land defenders in 2021.

In June 2021, a law limiting the work of nongovernmental organizations (NGOs) took effect. It includes overly broad provisions that could be used by the executive branch to cancel the legal status of organizations that undertake activities "against public order."

### Women's and Girls' Rights

The Observatory for Sexual and Reproductive Rights reported over 60,000 pregnancies among adolescents and girls as of July, including 1,323 in girls between 10 and 14 years old.

Abortion is legal only when a pregnant person's life is at risk. On March 8, lawmakers passed a bill increasing penalties and broadening the circumstances under which people could be prosecuted for accessing abortion—broadly defined as the "natural or provoked death" of an embryo or fetus. Congress shelved the bill, after President Giammattei threatened to veto it.

### Sexual Orientation and Gender Identity

Guatemala has no comprehensive civil legislation protecting people from discrimination on the grounds of sexual orientation and gender identity, nor a legal gender recognition procedure for transgender people. Authorities have failed to adequately protect LGBT people from violence and discrimination.

In January, a commission in Congress passed a bill that would stigmatize transgender people and curtail children's and adolescents' rights to education, information, and health. The bill remained pending in Congress as of September.

In March, Congress passed—but then shelved at the president's request—a bill that would have banned same-sex marriage and unions and appeared aimed at legally protecting discrimination on the basis of sexual orientation.

Guatemalan civil society organizations reported that, as of October, at least 25 LGBT people had been killed in 2022.

### Disability Rights

Children with disabilities with high support requirements are forced to live in institutions in Guatemala. There are few if any policies that would enable them to live in a family household. Reports of abuses against children with disabilities living in institutions are not properly investigated or resolved.

### Children's Rights

According to data shared by the Ombudsperson's Office in June, almost half of the children under 5 years old in Guatemala suffer chronic malnutrition—a situation that worsened during the Covid-19 pandemic. According to government data, there were 15,862 cases of severe malnutrition of children under 5, and 42 had died as of September.

Human Rights Watch found that Mineduc Digital, an online learning product used by the Education Ministry during the Covid-19 pandemic, transmitted chil-

CLP_PC_023008

dren's personal data to advertising technology companies, enabling them to track and target children across the internet. As of September, the ministry had failed to stop children's privacy violations.

### Migrants and Asylum Seekers

In cooperation with the administration of US President Joe Biden, President Giammattei has increased efforts to prevent non-Guatemalan migrants and asylum seekers from reaching the United States. From January through October 2022, police detained and expelled more than 13,000 people to Honduras, mostly Venezuelans without a visa.

President Giammattei has deployed police and soldiers to Guatemala's southern border to prevent migrants from entering the country. In October, they clashed violently with a migrant caravan attempting to cross the border from Honduras.

In September 2021, after an increase in the number of Ecuadorians arriving at the US border, and a decision by Mexico to end visa-free travel for Ecuadorians, Guatemala did the same.

### Key International Actors

In March, the United Nations High Commissioner for Human Rights said that Guatemala faced "systemic and structural challenges," including regarding the "the fight against impunity, democratic spaces and citizen participation."

Between February and May, the European Union issued four statements expressing concern over deteriorating rule of law, threats to judicial independence, and the reappointment of Attorney General Consuelo Porras.

In April, the European Parliament adopted a resolution expressing concern for the rule of law in Guatemala, condemning the criminalization, detention, and harassment against judicial operators, human rights defenders, and journalists, and urging to respect the separation of powers between branches of government.

In June, the Inter-American Commission on Human Rights included Guatemala, along with Venezuela, Cuba, and Nicaragua, in the chapter of its annual report

reserved for states with grave, massive, or systematic violations of human rights and serious attacks to democratic institutions.

In the same month, Guatemala signed the Los Angeles Declaration on Migration and Protection, committing to strengthening and expanding paths toward safe, legal migration and asylum.

In July 2022, the US Department of State released its Corrupt and Undemocratic Actors Report for 2021. It includes several current and former Guatemalan public officials, as well as five Guatemalan businesspeople.

President Giammattei did not attend the Ninth Summit of the Americas in Los Angeles following criticism by the Biden administration of Guatemala's decision to reappoint Attorney General Consuelo Porras. Shortly before the summit, the US placed sanctions on Porras, citing involvement in significant corruption.

Guatemala and five other countries led the renewal of the mandate for the UN Independent International Fact-Finding Mission on Venezuela in October.

CLP_PC_023009

# Honduras

In January 2022, Xiomara Castro became the first female president of Honduras, after winning the elections by a wide margin, promising to defend human rights. In April, former President Juan Orlando Hernández (2014-2022) was extradited to the United States on drug trafficking and gun charges.

Honduras' justice system has suffered political interference for years. As of October, the Castro administration and the United Nations were negotiating to establish an international commission to investigate corruption. Congress repealed an overly broad secrecy law but has not revoked other laws that pose major barriers to corruption investigations.

Gang violence and human rights violations cause internal displacement and migration. Women, human rights defenders, Indigenous, Afro-Honduran, and lesbian, gay, bisexual, and transgender (LGBT) people are at particular risk of violence.

## Judicial Independence and the Fight Against Corruption

President Castro campaigned on a promise to work for independent and impartial justice. The justice system's weak response to corruption, a structural problem in Honduras, and a series of laws hindering prosecutors' capacity to investigate have enabled impunity for corrupt acts that contribute to human rights violations.

In February, Congress passed a government-supported amnesty for people charged, on "political grounds," for protesting or defending rights, including on land, as well as for former public officials during the administration of Manuel Zelaya (2006-June 2009), President Castro's husband. While human rights organizations applauded the amnesty for defenders and protesters, anti-corruption organizations warned that overbroad language—amnesty for authorities charged or convicted for "actions related to the exercise of their public function"—could shield corrupt former officials.

In July, Congress passed a law regulating the committee in charge of nominating candidates for the 15 Supreme Court vacancies that will open in January 2023.

The law specifies evaluation standards for the committee; requires that sessions and interviews be public; allows civil society, media, and UN agencies to participate as observers; and reserves at least seven seats on the new Supreme Court for women. The committee started working in September.

But the law did not set any criteria for Congress as a whole to choose the new justices from the list of at least 45 candidates sent by the committee. In the past, parties have split the vacancies among them, according to the proportion of seats they held in Congress.

Lack of transparency and clear criteria also plague the selection of lower-court judges and decisions over their careers. The Supreme Court president has ultimate power over selection, promotion, transfer, and discipline of lower-court judges.

Congress took a positive step by repealing the so-called official secrets law in March. Previous governments had abused it, classifying, for up to 25 years, budgets, expenses, and other documents having nothing to do with national security. But, as of October, the Castro administration had not informed the public about the use of a fund, previously considered secret, that collected a tax from any financial transaction. Congress has not repealed other laws that drastically curtail prosecutors' power to conduct anti-corruption investigations.

President Castro's negotiations with the UN to implement an international commission against impunity and corruption continued, as of October.

## Human Rights Defenders

The UN special rapporteur on the situation of human rights defenders called Honduras, in 2019, one of Latin America's most dangerous countries for defenders. From January through August 2022, the Office of the High Commissioner for Human Rights (OHCHR) reported attacks on 120 human rights defenders, including 78 environment and land defenders. Such defenders are frequently unfairly charged with misappropriation, theft, or other crimes—or sued—to impede their work, the OHCHR said.

In February, a court annulled, because of due process violations, a trial against eight Guapinol River defenders who protested opening an iron oxide mine inside

CLP_PC_023014

a national park. It ordered the release of six who remained in pretrial detention and had spent more than 29 months in jail. In 2020, the UN Working Group on Arbitrary Detention had found their detentions arbitrary.

In June, David Castillo was sentenced to more than 22 years in prison as a co-conspirator in the killing of environmental and Indigenous rights activist Berta Cáceres, in 2016. The tribunal said Castillo targeted Cáceres for her opposition to a private hydroelectric dam project he directed. Cáceres' family and the organization she led, the Consejo Cívico de Organizaciones Populares e Indígenas de Honduras (COPINH), say prosecutors are not thoroughly investigating others who helped orchestrate the killing.

The mechanism Honduras created in 2015 to protect journalists, human rights defenders, and justice system professionals has serious flaws. In January, its then-director told Human Rights Watch that it suffered from staff shortages, lack of financial autonomy, and prioritization of reactive measures rather than root causes. Naming a new director in July, the Castro administration vowed to coordinate with civil society to make the mechanism more effective, transparent, and accountable.

### Attacks on Journalists

Honduras is one of Latin Americas' deadliest countries for journalists, Reporters Without Borders noted in 2022. From 2001 to October 2022, 98 journalists were killed—5 in 2022—C-Libre, a Honduran free-speech NGO reported. In only 10 cases—about 10 percent—were killers tried and found guilty, C-Libre said.

### Migration, Asylum, and Internal Displacement

Violence, lack of opportunity, unemployment, and climate-related disasters contribute to push thousands of Hondurans to flee, studies by the United Nations High Commissioner for Refugees (UNHCR), the International Organization for Migration (IOM), and the Migration Policy Institute (MPI) show.

From January through September, 23,146 Hondurans—more than any other nationality—requested asylum in Mexico, Mexico's refugee agency reported. Many more continue to the United States. Migrants face serious risks—including kidnapping, robbery, and discrimination—throughout the journey.

From January through September, 72,111 Hondurans were forcibly returned—more than throughout 2021—the government reported, almost all from Mexico and the US, evenly divided.

As they transit Honduras, heading north, Haitians, Nicaraguans, Cubans, Venezuelans, and other migrants risk being targeted for serious crimes such as robbery, sexual abuse, and murder.

Gang violence and human rights violations caused the internal displacement of some 191,000 people between 2004 and 2018, the latest comprehensive government data shows. Those most affected are children fleeing forced gang recruitment, professionals and business owners facing extortion, domestic violence survivors, and LGBT people and members of ethnic minorities enduring discrimination and violence, the Inter-American Commission on Human Rights (IACHR) reports.

### Prison Conditions

The military took control of prisons in 2019, but in August, President Castro ordered national police to take charge for a year, calling for a plan to gradually transfer their oversight to other civilian authorities.

As of September, almost 20,000 detainees occupied prisons with capacity for under 11,000. Almost half of male and more than half of female detainees were in pretrial detention, official statistics show.

### Women's and Girls' Rights

Honduras has the highest rate of femicide—defined as "the killing of a woman by a man in the context of unequal power relations between men and women based on gender"—in Latin America, the UN Economic Commission for Latin America and the Caribbean reports. The *Centro de Derechos de Mujeres*, a Honduran NGO that monitors media reports, counted 211 femicides from January through September 2022. In January, UN Women estimated that 90 percent of Honduran femicides go unpunished.

CLP_PC_023015

Abortion is illegal in Honduras under all circumstances, with prison sentences of up to six years for people who have abortions and their providers. Emergency contraception—the "morning-after pill"—to prevent pregnancy after rape, unprotected sex, or contraceptive failure, is prohibited.

## Sexual Orientation and Gender Identity

LGBT people in Honduras continue to suffer high levels of violence and discrimination in all areas of life, pushing some to flee the country.

In May, President Castro committed to implement a 2021 Inter-American Court of Human Rights ruling finding Honduras responsible for the killing of Vicky Hernández, a transgender woman, during the 2009 military coup. Among other measures, the ruling ordered the creation of a simple and accessible procedure through which trans people can change their name and gender on official documents to reflect their gender identity. As of October, it had not been established.

## Indigenous Rights

Honduras has no national legislation implementing Indigenous people's right under international law to free, prior, and informed consent to legislative or administrative measures affecting them.

In April, Congress revoked a law that had created so-called ZEDEs (Areas of Employment and Economic Development, in Spanish), geographic areas in which private companies were granted extensive operational autonomy, including the power to establish their own courts. Indigenous and *garifuna*—Afro-Indigenous—organizations say authorities created zones within their traditional territories without proper consultation. As of October, they reported that ZEDEs that had been established before the April law repeal were still operating.

Indigenous and Afro-Honduran communities report enormous obstacles to obtaining title to traditional lands, which the National Agrarian Institute administers.

## Children's Rights

Honduras' fragile institutions fail to protect children's—including adolescents'—rights and access to education and health care, the IACHR reported in 2019.

More than 256,000 children ages 5 through 17 work, the National Statistics Unit reported in 2021, and almost a third of those under 17 do not attend school.

Child recruitment by gangs has caused many children to flee, abandoning school. The average age of first contact with gangs is 13, the UN Development Programme reported in 2020.

## Key International Actors

Under President Castro, Honduras maintained a hesitant stance on human rights in its foreign policy. It voted in favor of multiple UN resolutions condemning Russia's rights violations in Ukraine. It abstained from UN Human Rights Council resolutions renewing the mandate of the UN fact-finding mission in Venezuela and initially voted against, but then clarified its intention to abstain on, a resolution establishing a group of experts to investigate human rights violations in Nicaragua.

Honduras also abstained on a vote to create a new special rapporteur on Russia but was one of only two countries in the region to vote in favor of a decision to discuss a report by the High Commissioner for Human Rights on violations against Uyghurs and other predominantly Muslim communities in the Xinjiang region of China. In the Organization of American States, it abstained from a resolution urging Nicaragua to release political prisoners and cease media persecution.

CLP_PC_023016

Mission in Mali (MINUSMA). In August, it renewed the Mali Panel of Experts, which monitors the 2017 travel bans and asset freezes imposed on individuals obstructing implementation of a 2015 peace agreement.

Throughout the year, Malian authorities imposed operational constraints including no-fly zones on MINUSMA, obstructed investigations into alleged human rights abuses by state security forces, hindering MINUSMA's ability to fulfil its mandate and straining relationships with troop-contributing countries. In July, Malian authorities arrested 49 Ivorian soldiers working for a MINUSMA contractor and days later expelled the UN spokesperson for comments made about their arrests. The soldiers were charged in August with "undermining state security."

# Mexico

Since the beginning of the "war" on organized crime in 2006, rates of violent crime have skyrocketed in Mexico, reaching historic highs under the administration of current President Andrés Manuel López Obrador, who took office in December 2018. Although authorities often blame this violence on criminal groups, most crimes are not investigated and those responsible are never identified or prosecuted.

Since 2007, successive governments have deployed the military domestically to fight organized crime and conduct law enforcement tasks. Soldiers, police, and prosecutors have committed serious, widespread human rights violations, including torture, enforced disappearances, and extrajudicial killings, with near total impunity. Efforts to reform police and prosecutors' offices have been ineffective. Congress, controlled by López Obrador's party, disbanded the Federal Police in 2019. It formally transferred police functions to the Ministry of Defense in 2022.

Thousands of people continue to disappear every year. Over 105,000 were officially considered missing as of September. Most disappeared after 2006.

Mexico is one of the deadliest countries in the world for journalists and human rights defenders.

President López Obrador has collaborated with the US government in anti-immigration policies aimed at preventing migrants from travelling through Mexico to reach the United States.

## Violence and Impunity

Levels of violent crime have reached historic highs under President López Obrador. The homicide rate was 28 homicides per 100,000 in 2021.

Around 90 percent of crimes are never reported, a third of reported crimes are never investigated, and just under 16 percent of investigations are "resolved," (either in court, through mediation, or through some form of compensation), meaning authorities resolved just over 1 percent of all crimes committed in 2021, according to the national statistics agency.

CLP_PC_023079

### Criminal Justice System

Police, prosecutors, and soldiers commonly use torture to obtain confessions, and engage in other abuses against those accused of crimes. The justice system regularly fails to ensure due process.

Judges are legally required to order pretrial detention for those accused of many offenses, without evaluating the circumstances of the case, violating international human rights standards. Around 85 percent of those sent to prison in 2020 had not been convicted of any crime, according to an analysis of official data by human rights organization Intersecta. Congress, controlled by López Obrador's party, expanded the list of crimes requiring mandatory pretrial detention in 2019.

Prisons are notoriously unsanitary and overcrowded. Prosecutors continue to use arraigo detention, a mechanism allowing them to obtain judicial authorization to detain anyone for up to 40 days without charge, in violation of international human rights standards.

### Torture

Torture is widely practiced by police, prosecutors, and soldiers to obtain confessions and extract information. In the most recent survey of incarcerated people conducted by Mexico's national statistics office in July 2021, nearly half of respondents said that, after they were detained, police or soldiers had subjected them to physical abuse. Among those who had confessed to a crime, 38 percent said they did so only because authorities had beaten or threatened them.

The use of evidence obtained through torture in criminal trials is prohibited. However, many defendants face barriers and delays to proving they were tortured, limiting the effectiveness of the prohibition. A 2017 law required the attorney general to create a registry to track torture complaints. As of September 2022, the registry had yet to be created.

### Military Abuses

Soldiers and marines have been deployed for law enforcement and to fight organized crime for decades, leading to widespread human rights violations. From 2007 through September 2022, the army killed 5,335 civilians, according to government data. Since 2018, the number of human rights commission complaints against the Army and National Guard has steadily increased. In 2021, the commission received 940 such complaints, the highest number in eight years.

President López Obrador has greatly expanded the budget, autonomy, and responsibilities of the armed forces, deploying them for hundreds of tasks traditionally conducted by civilian authorities, such as law enforcement, customs enforcement, controlling irregular immigration, running social programs, and administering public works projects. The military can legally detain civilians, take charge of crime scenes, and preserve evidence. Charging the military with these tasks has in the past contributed to human rights abuses.

In October, an investigation by human rights groups and journalists reported that the military had purchased the spyware Pegasus in 2019 and used it to illegally spy on human rights defenders, journalists, and opposition party politicians despite promises by President López Obrador that the government no longer spied on civilians.

Abuses by members of the military against civilians are supposed to be prosecuted in civilian, not military, courts, but those responsible are rarely brought to justice. In 2022, Congress passed a reform to ensure that soldiers assigned to carry out civilian policing activities are subject to the Military Code of Justice rather than to civilian law.

Emails obtained by journalists as part of "Guacamaya Leaks" suggest senior military officials have obstructed the investigation of abuses possibly committed by soldiers and that the secretary of defense may have pressured civilian authorities not to pursue an investigation into an army officer implicated in the Ayotzinapa case.

As of September, there were seven cases before the Supreme Court, filed by human rights groups and opposition parties, challenging the use of the military for law enforcement as unconstitutional.

CLP_PC_023080

### Disappearances

At least 105,000 people are missing in Mexico, according to official statistics. Authorities believe the true number is likely higher. Nearly 90,000 of them have disappeared since the beginning of the "war" on organized crime in 2006. Thousands continue to disappear every year. More than 36,000 have disappeared since President López Obrador took office.

Authorities believe many of the disappeared have been buried in common graves by state and local officials after forensic services declared them "unidentified" or "unclaimed." From 2006 to 2020, at least 50,000 bodies passed through the custody of state and local forensic medical services without being properly identified, according to freedom of information requests by activists. Others may have been killed and buried in hidden graves by police, the military, or criminal groups. From 2006 to 2021, authorities reported having found at least 4,000 such graves across the country.

When families report disappearances, prosecutors and police rarely investigate. Families of the disappeared have formed more than 130 "search collectives" to investigate disappearances, including, frequently, by digging up mass graves.

In 2019, a well-respected human rights defender was appointed to head the government's National Search Commission (CNB). Since then, the CNB has taken steps to update the official missing persons' registry by requesting information from state and local officials and it has created an online platform to report disappearances anonymously and show real-time numbers of those disappeared, excluding personally identifying information. It has also begun creating a series of Human Identification Centers to exhume bodies from mass graves and attempt to identify them using the registry.

In April, the United Nations Committee on Enforced Disappearances presented the report on its visit to Mexico—its first visit to any country. The committee criticized Mexican officials for their "passive attitude" towards disappearances and expressed concern over "near total impunity" for these crimes. At the time the report was released, just 36 people had been convicted for involvement in enforced disappearances.

### Attacks on Journalists and Human Rights Defenders

Journalists and human rights defenders—particularly those who criticize public officials or expose the work of criminal cartels—often face attacks, harassment, and surveillance by government authorities and criminal groups.

Mexico is one of the most dangerous countries in the world for journalists. From January to September 2022, 15 journalists were killed. In the first half of 2022, Article 19 recorded 331 threats, attacks, or other forms of aggression against journalists. Many journalists self-censor.

Authorities routinely fail to investigate crimes against journalists adequately. The federal Special Prosecutor's Office to investigate crimes against journalists had opened 1,552 investigations and obtained 32 convictions, including seven for homicide, from its creation in 2010 through September 2022. The vast majority of convictions have been obtained since the current special prosecutor was appointed in 2017.

Mexico is also one of the most dangerous countries in the world for human rights defenders. In the first six months of 2022, 12 human rights defenders were killed, according to the human rights groups Comité Cerezo. As with journalists, violence against human rights defenders is rarely investigated or prosecuted.

In 2012, the federal government established the Protection Mechanism for Human Rights Defenders and Journalists, which provides bodyguards, armored cars, and panic buttons, and helps beneficiaries temporarily relocate in response to serious threats. The mechanism lacks sufficient staff and funding and struggles to coordinate with state and local officials, leaving it sometimes unable to meet protection needs. Eight journalists and two human rights defenders have been killed under the program's protection, seven of them since President López Obrador took office.

### Women's and Girls' Rights

A wave of states legalized abortion in 2022. As of November, eleven states allowed abortion for any reason up to at least 12 weeks of pregnancy. All states allow abortion in cases of rape. Despite legalization, people continue to face many barriers when trying to access abortion.

CLP_PC_023081

The Supreme Court ruled in 2021 that absolute criminalization of abortion is unconstitutional, and that people should not be criminally prosecuted for undergoing the procedure; that state governments do not have the authority to legislate that life begins at conception; and that medical staff's right to conscientiously object to performing abortions is subject to limits.

In 2021, the government reported around 3,700 killings of women, a quarter of which were considered femicides—killings of women because of their gender. Women's rights groups say femicide is likely under-reported.

Mexico officially ratified the International Labour Organization Convention on Violence and Harassment (C190) in July 2022. The treaty obligates Mexico to provide comprehensive protections to ensure a world of work free from violence and harassment, including gender-based violence and sexual harassment.

## Migrants and Asylum Seekers

Criminal cartels, common criminals, and sometimes police and migration officials prey upon people migrating through Mexico, although crimes against migrants are rarely reported, investigated, or punished.

President López Obrador has intensified efforts to prevent migrants from traveling through Mexico to reach the US. He has deployed nearly 30,000 soldiers for immigration enforcement.

Soldiers and immigration agents operate immigration checkpoints throughout the country. Often, they target Black, brown, or Indigenous people. In May, the Supreme Court ruled these checkpoints unconstitutional, saying they disproportionately affect Indigenous and Afro-Mexican people.

Mexico detained more than 307,000 migrants in 2021—the highest number ever. Mexico's immigration detention centers are notoriously overcrowded and unsanitary. Staff there often pressure migrants to agree to "assisted return" to their countries and discourage them from applying for asylum even when they say their life could be in danger if sent back.

The López Obrador administration has imposed stricter visa rules and other new entry requirements on travelers from Venezuela, Ecuador, Brazil, and Colombia. News media reported the US had pressed the administration to tighten entry re-

quirements and prevent migrants from flying through Mexico to reach the US. Since the visa requirement for Venezuelans was put in place in January, the number making the dangerous trip through the Darien Gap, between Colombia and Panama, has skyrocketed.

Mexico's asylum system is severely overstretched. Since 2013, the number of new applications has nearly doubled every year, but funding has not kept pace. Mexico's refugee agency relies heavily on funding and other support from the Office of the UN High Commissioner for Refugees (UNHCR). Mexico received more than 130,000 asylum applications in 2022, a record high and the third highest number in the world in 2021, according to UNHCR, but processed just 40,000, including many from previous years. From January to September 2022, it received more than 86,000 applications.

## Sexual Orientation and Gender Identity

A wave of states voted to legalize same-sex marriage in 2022. As of November, it was available in all 32 states. In five states (Nuevo León, Aguascalientes, Chiapas, Chihuahua, and Guanajuato), the governor has decided officials should perform same-sex marriages although the state legislature has not reformed the civil code to recognize the practice.

Twenty states have passed laws creating a procedure permitting transgender people to change their names and gender markers on birth certificates through a simple administrative process. In 2019, the Mexican Supreme Court issued a landmark ruling with clear guidelines on legal gender recognition, holding that it must be an administrative process that "meets the standards of privacy, simplicity, expeditiousness, and adequate protection of gender identity" set by the Inter-American Court of Human Rights. In March, the court expanded the right to legal gender recognition to include children and adolescents.

## Disability Rights

Under the López Obrador administration, serious gaps remain in protecting the rights of people with disabilities. They lack access to justice, education, legal standing, legal capacity, protection from domestic violence, and informed consent in health decisions. In 2019, Human Rights Watch documented cases of

CLP_PC_023082

state-run hospitals and private individuals who shackled people with disabilities. Women with disabilities suffer disproportionate violence.

In many states, people with disabilities have no choice but to depend on their families for assistance or to live in institutions, which is inconsistent with their right to live independently and be included in the community under the Convention on the Rights of Persons with Disabilities (CRPD).

In October 2021, following a CRPD committee recommendation, the government publicly apologized to a man with intellectual and psychosocial disabilities who had been imprisoned for four years after a judge had found him unfit to stand trial.

In 2021 the Supreme Court ruled that guardianship was unconstitutional, but federal and state legislatures still need to legislate to ensure legal capacity and supported decision-making for people with disabilities.

In May, Congress passed amendments to the General Health Act prohibiting forced psychiatric treatment and any restraints, including shackling. The reform mandates community-based services and conversion of psychiatric hospitals to general hospitals.

### Climate Policy and Impacts

As one of the world's top 15 emitters of greenhouse gases, Mexico is contributing to the climate crisis that is taking a growing toll on human rights around the globe. In 2021, a judge annulled the López Obrador administration's climate action plan because it did not increase emissions reductions targets in violation of Mexican law. In November 2022, the government announced its intention to present a new more ambitious plan.

The López Obrador administration attempted to reform the constitution to favor the distribution of energy from state-owned fossil-fuel power plants over renewable energy providers, but Congress rejected his proposal in April. In parallel, it has pursued a policy of investment in fossil fuels, acquiring an oil refinery in the US and fast-tracking the construction of another in Dos Bocas, Tabasco. In 2022, more than 70 percent of the federal budget under "climate change mitigation

and adaptation effects" was allocated to the transport infrastructure of fossil gas.

### Key International Actors and Foreign Policy

Mexico's foreign policy regarding human rights under the López Obrador administration has been based on the principle of "non-intervention." In June 2021, Mexico criticized other countries in the region that had condemned the jailing of critics and opposition candidates in Nicaragua, saying that they were intervening in Nicaragua's internal affairs.

In June 2020, Mexico was elected as a non-permanent member of the UN Security Council for 2021 to 2022. Mexico highlighted that one of its priorities on the council would be the protection of children. Mexico endorsed the Safe Schools Declaration in May 2021.

In October 2020, Mexico was re-elected to the UN Human Rights Council. Mexico did not support a decision to discuss a report by the UN High Commissioner for Human Rights on possible crimes against humanity in Xinjiang, China, nor a resolution to renew the independent fact-finding mission to investigate possible crimes against humanity in Venezuela.

In 2020, Mexico appointed itself as one of 23 "Champion countries" of the Global Compact for Safe, Orderly and Regular Migration.

CLP_PC_023083

# Nicaragua

The government of President Daniel Ortega and his wife, Vice-President Rosario Murillo, deepened its systematic repression against critics, journalists, and human rights defenders. Dozens of people arbitrarily detained remain behind bars.

Since taking office in 2007, the government has dismantled all institutional checks on presidential power. Amid repression of critics and political opponents, President Ortega was elected, in 2021, to a fourth consecutive term.

The government closed over 2,000 nongovernmental organizations (NGOs) in 2022 and intensified its crackdown against members of the Catholic Church.

Abuses by the National Police and armed pro-government groups during a brutal 2018 crackdown that left over 300 protesters and bystanders dead remain unpunished.

Persistent problems include a total abortion ban and severe restrictions on freedom of expression and association.

## Arbitrary Prosecution of Critics

As of September 2022, 209 people perceived as government critics remained in detention, according to local rights groups, including many who were arrested in the context of the 2021 elections.

Critics have been charged with undermining national integrity, propagating false news, laundering money, and related crimes. In many cases, they have been held incommunicado for weeks or months at El Chipote detention facility, some in prolonged solitary confinement. On the limited occasions when visits have been allowed, detainees have reported to family members abusive conditions, including repeated interrogations, inadequate medical attention, and insufficient food.

From February through May 2022, 50 government critics, including seven presidential candidates in the 2021 elections, received sentences of up to 13 years in prison and were disqualified from holding public office. Criminal proceedings were based on bogus charges and violated basic due process rights.

Hugo Torres, 73, a government critic, who was a guerrilla fighter in the 1970s revolution that first brought Ortega to power, died in detention in February 2022. Torres had been arbitrarily arrested in June 2021 and reportedly held in inhumane conditions, and incommunicado for prolonged periods.

In August 2022, police arbitrarily arrested Bishop Rolando Álvarez, an outspoken critic, along with five priests, two seminarians, and one cameraman, after holding them hostage at the episcopal curia of Matagalpa for two weeks. The police accused Álvarez of "acts of hatred" and "destabilizing the state." Authorities sent him to house arrest. The others are currently being held in detention. A judge granted prosecutors' requests to hold them 90 days in detention without charges.

In October, police arbitrarily detained Bishop Enrique Martínez Gamboa. He remained in detention at time of writing.

## Freedom of Expression, Association

Human rights defenders, journalists and critics are targets of death threats, assault, intimidation, harassment, surveillance, online defamation campaigns, and arbitrary detention and prosecution.

Police frequently station themselves outside critics' homes, preventing them from leaving, in what in many cases amounts to arbitrary arrest. Those harassed are unable to visit friends and family, attend meetings, go to work, or participate in protests, religious events, or political activities. Some have been arrested repeatedly—sometimes abused in detention—for periods ranging from several days to several months.

Six journalists detained in the context of the 2021 elections were convicted of spreading "fake news," money laundering, and undermining national integrity, in 2022, and sentenced to up to 13 years in prison.

Police detained two La Prensa workers in July 2022, and a judge granted prosecutors' requests to hold them in detention for 90 days without charge. La Prensa then reported that an unspecified number of its reporters, editors, and photographers had left Nicaragua, citing constant police harassment. Since 2018, 200 journalists have reportedly gone into exile. La Prensa ended its newspaper's

CLP_PC_023096

print edition in August 2021, when the Customs Authority withheld newsprint it had imported.

Authorities closed over 2,000 NGOs in 2022, including women's, religious, international aid, and medical groups. Many of these closures are based on abusive legislation, including a "foreign agents" law, passed 2020. At least 70 more were closed from 2018 through 2021. They also canceled the legal status of 18 universities, between December 2021 and February 2022, stranding thousands of students.

In August 2022, authorities closed at least 17 radio stations, including some run by the Catholic Church, citing, for example, lack of operating permits.

In September 2022, authorities suspended CNN's Spanish-language service from all cable channels in the country.

Legislators have passed several laws that severely restrict freedom of expression and association and have used them to forcibly close hundreds of non-profits, universities, and media outlets and to arbitrarily detain and prosecute journalists and human rights defenders.

In April 2022, the National Assembly passed a "Regulation and Control of Non-Profit Organizations" law that allows the Interior Ministry to ask legislators to cancel the legal status of groups that "promote campaigns to destabilize the country." Authorities can also seize the assets of associations that commit "unlawful acts," violate "public order," or hinder the Interior Ministry's "control and surveillance."

In 2020, authorities passed a cybercrime law that criminalizes a wide range of online communications, including by punishing with sentences of up to five years the "publication" or "dissemination" of "false" or "distorted" information on the internet that is "likely to spread anxiety, anguish or fear." The same year a "Foreign Agents" law was enacted, which allows cancellation of the legal status of organizations that obtain foreign funds for activities that "interfere in Nicaragua's internal affairs."

### Right to Vote and Run for Office

Legislation passed between October 2020 and February 2021 has been used to deter critical speech, inhibit opposition participation in elections, and keep critics in prison without bringing formal charges.

After the National Assembly appointed Supreme Electoral Council (CSE) members loyal to President Ortega in 2021, the CSE stripped the main opposition parties' registration.

In July 2022, authorities dismissed five elected opposition mayors, de facto, citing their party's lack of registration, and appointed government party members to replace them.

### Indigenous Peoples' Rights

Indigenous and Afro-descendant people face discrimination, reflected in poverty rates, precarious living conditions, and persistent violence.

Investigations into homicides and attacks related to territorial disputes in the Mayangna Sauni As Territory have stalled, the UN Office of the High Commissioner for Human Rights (OHCHR) reported in 2022.

### Impunity for 2018 Crackdown

Police, in coordination with armed pro-government groups, repressed massive anti-government protests in 2018, killing at least 328 people, injuring some 2,000, and detaining hundreds. Authorities reported that 21 police officers were killed in the context of demonstrations.

Many protesters were detained for months, subjected to torture and other ill-treatment including electric shocks, severe beatings, fingernail removal, asphyxiation, and rape. Serious violations of due process and other rights also marred prosecutions against protesters.

No police officer has been convicted in connection with these abuses.

CLP_PC_023097

### Women's and Girls' Sexual and Reproductive Rights

Nicaragua has, since 2006, prohibited abortion under all circumstances, even when a pregnancy is life-threatening or results from rape or incest. Those who have abortions face prison sentences up to two years; medical professionals who perform them, up to six years. The ban forces those confronting unwanted pregnancies to seek illegal and unsafe abortions, risking their health and lives.

Rates of domestic abuse, violence against women, and femicide, defined as a man's murder of a woman "in the public or private sphere," increased from August 2019 to December 2020, OHCHR reported.

The government did not publish figures on femicides and other forms of violence against women in 2022. A local human rights organization reported 46 femicides between January and October 2022.

### Nicaraguan Asylum Seekers

Between April 2018 and March 2022, 200,000 citizens fled Nicaragua, the UN High Commissioner for Refugees reported.

The United States Border Patrol apprehended 164,600 Nicaraguans from January to September 2022, up from 50,000 in all of 2021 and only a few thousand in years prior. Many others fled to Costa Rica, Mexico, Panama, and Europe.

### Key International Actors

In March 2022, the United Nations Human Rights Council established a group of human rights experts with a one-year mandate to investigate human rights violations committed in Nicaragua since April 2018.

No international monitoring bodies have been allowed to enter the country since 2018, when authorities expelled the Inter-American Commission on Human Rights (IACHR)'s Special Monitoring Mechanism for Nicaragua (MESENI), the IACHR-appointed Interdisciplinary Group of Independent Experts (GIEI), and OHCHR.

Also in March, authorities expelled Apostolic Nuncio to Nicaragua Monsignor Waldemar Stanisław Sommertag. In July, authorities cancelled the legal registra-

tion and expelled the Missionaries of Charity Association of the Order of St. Teresa of Calcutta. In August, after the police arrested Bishop Rolando Álvarez, Pope Francis said that he was "following closely, with concern and sorrow, the situation in Nicaragua."

In September 2022, OHCHR reported a "deterioration of the human rights crisis," saying the government continued "silencing critical and dissenting voices" and was "drastically reducing civic space."

In November 2021, Nicaragua announced its withdrawal from the Organization of American States (OAS). The OAS General Assembly and Permanent Council had said that the 2021 elections were not free nor fair, and that Nicaragua had violated its commitments under the Inter-American Democratic Charter. In April 2022, the Ortega government said the withdrawal was "completed," seized the OAS office in the country; and revoked the credentials of OAS representatives; however, the OAS says that the OAS Charter remains in effect in Nicaragua until the end of 2023, requiring Nicaragua's compliance with obligations under the Inter-American System.

The US sanctioned additional Nicaraguan officials and the state mining company, bringing to 53 the individuals and entities sanctioned, as of September, under the Global Magnitsky Act of 2016, the Nicaraguan Human Rights and Corruption Act of 2018, and other US laws and executive orders. In October 2022, the US Department of State imposed visa restrictions on over 500 Nicaraguans and the Department of the Treasury's Office of Foreign Assets Control imposed sanctions on the Nicaraguan mining authority, the General Directorate of Mines (DGM).

In November 2021, the US enacted a law to monitor, report on, and address corruption by the Ortega government and human rights abuses by Nicaraguan security forces.

In September 2022, the European Parliament denounced the "deterioration" of the rule of law and "escalation" of repression against the Catholic Church.

Also in September, the Ortega government expelled the European Union envoy to Nicaragua days after the EU delegation to the UN called for the restoration of democracy and the freeing of political prisoners. The government also severed

CLP_PC_023098

diplomatic relations with the Netherlands after it cited concerns with human rights violations and deteriorating democratic institutions in Nicaragua when cancelling funding for a hospital project.

The EU maintains sanctions on 21 individuals and three state-linked entities in Nicaragua. They were renewed in October for a one-year period. The United Kingdom has sanctioned 13 individuals implicated in human rights violations, and Canada has sanctioned 35.

# Nigeria

Political tensions were high as Nigeria prepared for 2023 general elections that will usher in a new president. The elections are set to take place amid worsening insecurity and threats from multiple armed groups.

The brutal killing of 40 worshippers in a church in southwest Ondo State by gunmen and spates of attacks by Islamist and other armed groups within proximity of Nigeria's seat of government in Abuja signaled critical levels of insecurity in 2022.

Boko Haram and its splinter factions, including the Islamic State West Africa Province (ISWAP), continued to carry out attacks in the northeast and expanded their activities beyond the region. ISWAP carried out a high-profile attack on a prison in Kuje within the Federal Capital Territory (FCT) that allowed hundreds of prisoners to escape, and was linked to other incidents including the church killings and an attack on a train from Abuja to Kaduna in which eight people were killed and 72 kidnapped.

In January, Nigerian authorities officially categorized criminal groups operating in the northwest as terrorists. The groups, popularly known as "bandits," emerged following years of conflict between nomadic herdsmen and farming communities. In 2022, bandits carried out kidnappings for ransom, killings, rape, and looting across communities in the region. The Abuja-based Center for Democracy and Development stated in April that over 100 bandit groups with an average of 30 members each operate with military grade weapons in largely ungoverned spaces in the northwest.

Gunmen agitating for the secession of the southeast region continued killings of residents and government officials in the region.

Nigerian authorities responding to the security threats across the country were also implicated in abuses.

CLP_PC_023099

# Peru

President Pedro Castillo decreed at least four states of emergency in 2022, suspending basic rights and deploying armed forces on streets and highways, supposedly to fight crime and respond to a strike. Peruvian rules for use of force by security forces do not comply with international standards.

The attorney general charged the president with corruption-related crimes. Prosecutors have accused him of obstructing corruption investigations.

Multiple members of Congress and the runner-up in the 2021 presidential election, Keiko Fujimori, are also under investigation on various criminal charges.

Congress replaced six of the seven members of the Constitutional Court in May through a selection process that lacked sufficient transparency.

Earlier in the year, the court issued several rulings that were inconsistent with international human rights standards, including on same-sex marriage, Indigenous rights, and justice for crimes against humanity.

Threats to freedom of expression and violence against women and defenders of environmental and Indigenous rights remain major concerns.

## *Judicial Independence and Rule of Law*

As of September, prosecutors had opened six investigations into alleged corruption and other crimes against President Castillo, his relatives, and members of his administration. In October, the attorney general charged the president and two former cabinet members with belonging to a criminal organization, influence peddling and collusion.

The attorney general accused the administration, in August, of "constant obstruction" of investigations against the president. President Castillo called those investigations politically motivated.

In July, a former interior minister said the president dismissed him after he created a police unit to work with prosecutors investigating corruption in his administration. He was in office for two weeks.

In September, the head of the National Police Search Unit, who led a search in the presidential palace as part of a corruption investigation, was removed, a decision that the chief anti-corruption prosecutor viewed as retaliatory. In response to criticism, the administration reinstated him.

An obscure constitutional provision allows Congress to find the president "morally incapable" of governing and declare the presidency "vacated." In recent years, Congress has misused the provision, including, in 2020, to remove then-President Martín Vizcarra. Members have twice attempted to remove President Castillo by applying it. They were trying a third time, as of September 2022.

The congressional committee leading the selection process for Constitutional Court members did not apply consistent evaluation criteria or ensure sufficient transparency and civil-society participation. The committee presented the full Congress with six candidates for six vacancies, preventing it from making a genuine selection. Congress approved them in May. The replacement of a seventh member remained pending, as of October.

## *Public Security*

Police used excessive force in Lima in 2020, during largely peaceful protests about the removal of President Vizcarra. Over 200 people were injured, and two protesters killed. The attorney general charged President Manuel Merino—the president of Congress who took over as President after Vizcarra's removal—and his prime minister and interior minister with involvement in abuses. A congressional subcommittee, in June 2022, blocked the prosecution after approving a flawed report that ignored solid evidence of human rights violations during the protests.

President Castillo issued disproportionate emergency decrees—in February, March, and April—suspending freedom of movement and assembly, permitting arbitrary home searches and arrests, and allowing deployment of the armed forces in Lima and neighboring Callao, supposedly to fight crime. An additional April decree suspended similar rights throughout the national road network, in response to a transportation workers strike. The states of emergency were no longer in effect as of September.

CLP_PC_023113

Congress passed a law in 2020 eliminating an explicit requirement that use of force be proportionate and granting police new protections against prosecution. Under Peru's use of force rules, the police and armed forces cannot be held criminally responsible for causing injuries or even death "when fulfilling their constitutional duty" and using their weapons "in accordance with regulations." In February 2022, the government approved state-of-emergency rules allowing police to request the armed forces to back them up, including by firing their weapons, when police "capacity," during any operation, is "overwhelmed."

In June 2022, then-Interior Minister Dimitri Senmache incorrectly told police officers that when "a criminal picks up a weapon, they lose the right to life."

### Confronting Past Abuses

The Shining Path, other armed groups, or state agents killed or disappeared almost 70,000 people, Peru's Truth and Reconciliation Commission estimates, during an armed conflict from 1980 to 2000. The vast majority of those killed were low-income farmers; most spoke Indigenous languages.

Authorities have made slow progress in prosecuting abuses by government forces during the conflict. As of September 2022, courts had issued 50 convictions in 92 cases, Peruvian human rights groups reported.

Former President Alberto Fujimori (1990-2000) was sentenced in 2009 to 25 years in prison for crimes against humanity and corruption. In 2017, then-President Pedro Pablo Kuczynski granted him a humanitarian pardon on claims of illness. The Supreme Court, in 2018, reversed the pardon, but the Constitutional Court reinstated it in March 2022. The Inter-American Court of Human Rights then ordered Peru not to release Fujimori, and authorities, as of September, were abiding by that.

In March 2021, prosecutors charged Fujimori and three former health ministers with the forced sterilizations of thousands of mostly poor and Indigenous women during his presidency. The case remains pending.

In February 2022, the Constitutional Court upheld a 2013 decision that the 1986 killing, by Navy officers, of 113 detainees was not a crime against humanity. The ruling allows the statute of limitations to apply to the officers, which could lead to closing ongoing trials.

### Freedom of Expression

Threats to freedom of expression remain a serious concern in Peru, as several journalists face prosecution for their work.

Peru's penal code punishes defamation with up to two years in prison, violating international standards. President Castillo's allies in Congress introduced a bill, in August, to increase the sentence to up to four years.

Charges of defamation have repeatedly been used to stifle reporting in the public interest in Peru, the Committee to Protect Journalists said.

Since late 2018, journalists Paola Ugaz and Pedro Salinas have faced criminal prosecution for alleged defamation and other offenses in several cases in connection with their reporting on sexual abuse scandals involving a Catholic lay organization. In five of seven cases, courts dismissed the case or complainants withdrew them.

Similarly, former presidential candidate César Acuña filed a criminal complaint against journalists Christopher Acosta and Daniel Yovera, and publisher Jerónimo Pimentel, for defamation, after they reported on accusations of corruption against Acuña. A judge sentenced Acosta and Pimentel to two years in prison and payment of over US$ 100,000 in damages. Acuña later dropped the complaint, and the convictions were annulled.

### Women's and Girls' Rights

Gender-based violence is a significant problem. The Ministry of Women reported 136 femicides, defined as the killing of a woman in certain contexts, including domestic violence, in 2021—and 75 between January and August 2022.

Women and girls can legally access abortions only when a pregnancy threatens their life or health. In 2014, the Ministry of Health adopted technical guidelines for legal abortions, but many health service providers have failed to implement them, creating barriers to access. As of September, Congress was discussing a

bill recognizing the "right to be born," which if approved, could become an additional obstacle to accessing a legal abortion.

Free distribution of emergency contraception pills has been subject to litigation since 2006. The pills have been distributed free of charge, pursuant to an injunction, since 2016. A ruling by the Constitutional Court on the constitutionality of free emergency contraception is pending.

In February, the UN Committee on the Elimination of Discrimination against Women urged Peru to fully decriminalize abortion and ensure effective investigations, prosecution, and punishment in gender-based violence cases.

## Children's Rights

In June, Congress passed a law mandating shared custody of children between divorced or separated parents, as a general rule. Rights groups warned that it violates children's rights to safety, health, and well-being, and the rights of women, particularly those who are victims of domestic abuse.

In May, Congress passed a law granting parents' associations discretion to approve or reject educational materials. The law enables the restriction of comprehensive sexuality and gender education in schools. A lawsuit against it remained pending as of September.

## Sexual Orientation and Gender Identity

During the 2021 campaign, President Castillo made disparaging comments about trans people and, once in office, appointed several ministers with a record of homophobic comments.

Same-sex couples are not allowed to marry or enter into civil unions. In 2021, certain courts recognized same-sex marriages contracted by Peruvians abroad. But in April 2022, the Constitutional Court ruled against recognizing any same-sex marriage abroad, by either Peruvians or foreigners.

An appeals court, in January, overturned a decision allowing trans Peruvians to change their name and gender marker on national identity documents. An appeal before the Constitutional Court remained pending as of September.

## Environment and Indigenous Rights

At least seven environmental defenders, including six Indigenous people, were killed from January through September 2022. Their communities believe they were killed because of their defense of the environment.

In 2019, the Ministry of Justice established an inter-agency mechanism for protection of human rights defenders, but communities and rights groups complain it is ineffective.

Peru signed the Escazú Agreement, a treaty promoting access to information and the protection of environmental defenders, in 2018, but Congress voted against ratification in 2020. A congressional commission rejected ratification again in July 2022.

The right to free, prior, and informed consent of Indigenous people about measures and projects that affect them is enshrined in Peruvian law, and the country has ratified International Labor Organization Convention 169, which also protects this right. Yet, in March, the Constitutional Court dismissed the right of consultation of the Puno Chila Chambilla and Chila Pucara Indigenous communities, arguing that the right is not "fundamental" because it is not spelled out in the constitution.

In January, an oil tanker transferring crude oil to a refinery spilled at least 11,900 barrels in the ocean, Peru's government said. The spill reached at least 80 kilometers of coast, included protected areas, and affected the livelihoods of fishing and tourism workers, and other local residents, UN experts said.

## Refugees and Migrants

As of June, the United Nations High Commissioner for Refugees reported more than 1.3 million Venezuelan migrants and asylum seekers in Peru. Peru had received more than 606,000 asylum requests from Venezuelans as of January, the Ombudsperson's Office said, and had granted asylum to 4,125—less than 1 percent.

President Castillo's government has acted increasingly hostile to Venezuelan migrants. In December 2021, the government tried to fly 41 undocumented mi-

CLP_PC_023115

grants—none with criminal records in Peru—to Venezuela but failed to secure authorization to enter Venezuelan air space.

In August, President Castillo announced a program to expel migrants who "have come to commit crimes" in Peru.

A bill pending before Congress, as of September, would allow the government to limit the entry of foreigners for reasons of "national security, public health, internal order and public safety."

# Philippines

The six-year term of President Rodrigo Duterte, which ended on June 30, was defined by the politics of threats and intimidation, thousands of extrajudicial killings of mostly impoverished Filipinos from urban areas, and serious damage to the country's democratic institutions. Since the inauguration of Ferdinand Marcos Jr. as president, the human rights situation has hardly changed.

The United Nations Office of the High Commissioner for Human Rights (OHCHR), in a September report that assessed the progress of the Philippines-UN Joint Program on Human Rights, which began in June 2021, laid out major human rights problems facing the country. Among these are the continued "harassment, threats, arrests, attacks, red-tagging against civil society actors, as well as the continued drug related killings by police." The report also noted that "access to justice for victims of human rights violations and abuses remained very limited."

President Marcos has sought to reassure the international community that he is committed to human rights. His officials, speaking before the United Nations Human Rights Council in October, highlighted several steps that they intended to take, while asserting that the human rights situation in the Philippines has improved. Human rights and civil society groups, however, debunked these claims with reports to the council of continuing human rights violations.

## *"Drug War" Killings*

Soon after taking office on June 30, President Marcos stated he would continue the "war against drugs" initiated by his predecessor. While Marcos claimed his administration would do a "slightly different" anti-drug campaign by focusing on the rehabilitation of drug users, the unlawful use of force by police and government agents continued. Monitoring by Dahas, a program run by the Third World Studies Center of the University of the Philippines, found that at least 90 people had been killed in what the center termed "drug-related violence" in the period since Marcos' inauguration and September 30.

The government reported that members of the Philippine National Police and the Philippine Drug Enforcement Agency killed 6,252 individuals during anti-drug operations from July 1, 2016, to May 31, 2022. After Marcos took office, the gov-

CLP_PC_023116

called on Sri Lankan authorities to implement reforms to "enlist the trust and confidence of Sri Lankans who are waiting to see the change that they feel they were promised."

The European Union is an important trading partner that has leverage over Sri Lanka through its GSP+ program, which grants the country tariff-free access to the EU market in exchange for Sri Lanka's obligation to comply with human rights and labor rights conventions. The EU urged Sri Lanka to replace the PTA, and to meanwhile reduce its use and release PTA prisoners detained without charges. Throughout the protests, the EU delivered humanitarian assistance and urged authorities to respect human rights and undertake structural reforms.  to respect human rights and undertake structural reforms.

The UN Human Rights Council resolution on Sri Lanka was led by a core group including the United Kingdom, United States, Canada, Germany, and Malawi.

# Sudan

Since the October 25, 2021 coup, protest groups that took to the streets faced repression from heavily deployed security forces.

As of September, at least 117 people had been killed and nearly 6,000 injured by state security forces since the October 25 coup in connection with repression of the protests. Security forces also unlawfully detained, forcibly disappeared, and committed sexual and gender-based violence against individuals perceived to be active in the protest movement.

Though the state of emergency imposed following the coup was lifted on May 29, 2022, abuses justified under it have continued, including arbitrary arrests of protesters.

The international response to the coup, including by the previously established "Troika" (United States, United Kingdom, and Norway), has been muted. The United Nations Integrated Mission to Support Transition in Sudan (UNITAMS), the African Union (AU), and Inter-Governmental Authority on Development (IGAD) in May established a tripartite mechanism to facilitate a political dialogue between various actors, including the military. Protest groups rejected the mechanism, saying it sidelined their demands.

In September, the steering committee of the Sudan Bar Association concluded discussions around a draft transitional constitution.

The International Criminal Court's (ICC) trial of Ali Kosheib, or Kushayb, former Janjaweed leader, began in April. He is charged with 31 counts of war crimes and crimes against humanity allegedly committed in Darfur. The ICC prosecutor expects to complete presenting his case against Kushayb in early 2023.

Given the political instability created by the coup, ongoing protests, and suspended international funds, Sudan's economy continued to deteriorate. This impacted an array of social and economic rights, including access to basic health care. Price hikes, particularly on food, linked in part to the conflict in Ukraine, has resulted in further economic hardships. The United Nations (UN) World Food Program (WFP) warned that 40 percent of the population may slip into food insecurity.

CLP_PC_023158

### Conflict, Abuses in Darfur, and Blue Nile

In Darfur, the site of widespread abuses for almost two decades, attacks against civilians continued. In West Darfur, a renewed cycle of violence since December 2021 left hundreds dead, thousands displaced, hundreds of civilian homes scorched, and property looted.

Between December 5 and 7, 2021, armed groups from Arab tribes attacked the Kereneik locality in West Darfur, including a displaced persons' camp in the area, leaving 44 dead and at least 15,000 displaced.

In April, there was another large-scale attack on Kereneik locality, which affected at least 16 nearby villages. Over 160 people were killed and 98,000 displaced according to local authorities. Survivors of the attack said armed Arabs, joined by members of the Rapid Support Forces (RSF), launched the attack which also resulted in significant property damage, including through arson.

In Blue Nile, that borders Ethiopia and is governed by Sudan People's Liberation Army/Movement-North (SPLA/M-North), clashes which occurred between the Hausa and Birta ethnic groups left over 100 people dead, and caused a massive displacement in the region.

### Ongoing Crackdown on Protesters

Protests against the coup and for a new civilian transition continued throughout the year, primarily in Khartoum but also in other cities such as Atbara, in River Nile state in northern Sudan, and Wad Madani, in the central region.

The junta deployed a range of security forces, primarily from the Central Reserve Police (CRP) and anti-riot police, but on occasion military units, to suppress the protests.

In efforts to suppress protests since the coup, security forces have killed at least 117 people, including 23 children. They have regularly resorted to excessive use of force, including lethal force. On November 17, 2021, security forces violently dispersed protests in Khartoum's Bahri area, killing 16 people, the deadliest day since the beginning of the coup. On January 17, security forces used live ammunition, killing seven protesters. The use of lethal force by security forces continued throughout the year, with eight protesters killed on June 30 in Khartoum.

In addition to live ammunition, security forces also unlawfully used tear gas canisters, stun grenades, and rubber bullets, causing severe physical harm.

Security forces also targeted hospitals and medical care providers. Several hospitals in Khartoum were raided by security forces, arresting wounded protesters, and disrupting provision of medical care.

### Unlawful Detention, Arrest, and Ill-Treatment

Security forces, notably from the Criminal Investigative Directorate (CID), have unlawfully detained hundreds, many of whom are active or perceived by the authorities to be active in the protest movement and forcibly disappeared scores. Security forces have ill-treated detained protesters and threatened women protesters with sexual violence. In December 2021, the UN reported receiving at least 13 reports of cases of rape and gang rape of female protesters by security forces.

Security forces have also ill-treated children, including allegedly stripping them naked and partially shaving their heads.

Authorities have detained hundreds in prisons in Khartoum under vague emergency orders without judicial or prosecutorial oversight. Following the lifting of the state of emergency on May 29, the UN said a total of 171 detainees in connection to the protests were released. Detaining authorities have also violated due process, including denying lawyers and families' access to detainees.

In May, several Forces of Freedom and Change (FFC) leaders were released from prison after being charged with financial related offenses.

On January 14, seven people were arrested in connection with the killing of a CRP commander at a protest the day before. Four have since been released. However, Mohamed Adam, then 17; Ahmed al-Fatih ("al-Nannah"); and Mohamed el-Fatih remained in detention at time of writing. Lawyers said the three have been tortured and been forced to deliver false confessions. The three appeared in court on May 28 but the trial was postponed after the court ordered a medical examination into the allegation of torture.

CLP_PC_023159

### Accountability

There have been no meaningful domestic steps toward accountability for abuses committed against protesters since the coup, or for prior abuses including the June 3, 2019 massacre, or decades of war crimes and crimes against humanity committed against civilians in Darfur, Blue Nile, and South Kordofan. Days after seven protesters were killed on January 17, al-Burhan ordered an investigation into the killings and for findings to be submitted within 72 hours. To date, no findings have been made public.

On April 5, the ICC held its first Darfur trial of Ali Kosheib, or Kushayb. Proceedings are ongoing. In August, the ICC prosecutor visited three internally displaced people's (IDP) camps in Central and South Darfur, and, for the first time, briefed the UN Security Council from the site of a situation country, warning against "a false dawn" after "a backwards step on cooperation" from the Sudanese authorities in the previous months.

### Right to Education

Sudan's penal code criminalizes sex outside of marriage. As a result, unmarried pregnant girls and adolescent mothers may face criminal punishments, and often do not manage to stay in school.

### Sexual Orientation and Gender Identity

Individuals accused of "homosexual sex" face between five years and life imprisonment, depending on the number of prior convictions.

### Refugees and Migrants

Sudan hosted more than 1.1 million refugees and asylum seekers during 2021, most of whom were South Sudanese. While the government maintains an open border policy for refugees, protection gaps undermine their liberty, safety, and dignity. Some lack access to registration, documentation, and public services. Sudan's encampment policy imposes movement restrictions by requiring asylum seekers and refugees to stay in designated camps. Outside camps, some refugees and asylum seekers were subjected to arrest, detention, harassment, or extortion.

### Key International Actors

In November 2021, the UN High Commissioner for Human Rights designated Adama Dieng as Sudan's independent expert, mandated to report on human rights abuses following the coup. Dieng traveled to Sudan in February 2022 and again in June 2022.

As international funding remained suspended following the coup, the deputy head of the Sovereign Council, Mohamed Hamdan Dagalo ("Hemedti"), headed to Moscow for meetings with Russian officials to discuss economic relationships among other issues. The visit aimed at deepening ties with Russia which faced western sanctions as result of its invasion of Ukraine.

On March 21, the United States (US) Department of the Treasury's Office of Foreign Assets Control (OFAC) designated the Sudan Central Reserve Police (CRP) for serious human rights abuses. In July, the US House of Representatives passed a Congress approved resolution that condemned the coup and called on the administration to identify leaders of the coup for potential targeted sanctions. No steps have so far been taken by the US government against individuals for their role in repression in Sudan. In August, the first US ambassador in 25 years, John Godfrey, arrived in Khartoum to assume duties.

Sudan's regional and international partners supported a tripartite mechanism, composed of UNITAMS, AU, and IGAD. The mechanism has facilitated a series of talks with various actors, but resistance committees and other protest groups boycotted the process. Meanwhile, the US, UK, Saudi Arabia, and United Arab Emirates (UAE) (known as the "Quad") have also sought to facilitate talks between different stakeholders.

International actors, including the World Bank and United States Agency for International Development (USAID), suspended assistance to Sudan shortly after the coup. Sudan lost access to around US$4 billion pledged by international actors that was dedicated to support multiple projects, including agriculture, energy, as well as direct budget support.

CLP_PC_023160

In June, Paris Club countries suspended Sudan's debt removal process. The decision, triggered by the coup and failure to fulfil agreed conditions, was a setback to efforts by the ousted government to write off over $23 billion of debt.

The World Food Program announced in July that they received $100 million from the World Bank for food and cash transfers to over two million people, including internally displaced people. The WFP already warned that almost 40 percent of the population could slide into hunger by September.

Border clashes between Sudan and Ethiopia continued to be reported. In June, Sudan accused Ethiopia of capturing and killing seven soldiers and a civilian.

# Syria

In 2022, civilians in Syria faced another year of grave abuses and severe hardship, perpetuated by the Syrian government and other parties to the conflict and compounded by the worst economic and humanitarian crisis the country has faced since the start of the conflict in 2011. In September, the chair of the United Nations Independent International Commission of Inquiry (COI) on Syria warned that the country may again return to "larger-scale fighting."

In June, the UN Human Rights Office announced that more than 306,000 civilians were killed in Syria between March 1, 2011, and March 31, 2021. As of August, the Syrian Network for Human Rights declared that around 111,000 people remain disappeared, most at the hands of the Syrian government.

Although Syria remains unsafe, refugee hosting countries like Turkey and Lebanon began advocating for large-scale returns of Syrian refugees in 2022.

### Government-Held Areas (Central, West, and Southwest Syria)

Syrian security forces and government-affiliated militias continue to arbitrarily detain, disappear, and mistreat people across the country, including children, people with disabilities and older people, and returnees and individuals in retaken areas who have signed so-called reconciliation agreements. Authorities also continued to unlawfully confiscate property and restrict access to areas of origin for returning Syrians.

On March 30, the Syrian government passed a law criminalizing torture and assigning a penalty ranging from three years' imprisonment up to the death penalty where the torture results in death or involves rape. The law also prohibited any authority from ordering torture and invalidated any evidence gathered through torture. However, according to the COI's September 2022 report, "torture and ill-treatment in detention remained systematic, including in Sednaya prison and in several detention facilities operated by Syrian intelligence."

On April 18, Syrian President Bashar al-Assad ratified a new cybercrimes law aimed at curbing the "misuse of technology," and combatting "cybercrime" in the face of new technologies. The new law introduced harsh punishments for

CLP_PC_023161

cording to the UN, human rights were among the topics Mohammed raised during the visit.

In March, European officials conducted a monitoring visit to review Uzbekistan's progress fulfilling its obligations under the Generalised Scheme of Preferences (GSP+) unilateral trade preferences, a schemed conditioned on the ratification and implementation of core human rights treaties. The officials addressed human rights and rule of law concerns, paying particular attention to "registration of NGOs and Trade Unions and anti-discrimination."

During its Human Rights Dialogue with Uzbekistan in March, the EU raised concerns on freedom of expression, freedom of assembly, registration of NGOs, and anti-discrimination, and called for prompt investigations of attacks against bloggers and protesters. On July 6, the EU and Uzbekistan formally concluded negotiations for a new Enhanced Partnership and Cooperation Agreement, which provides for cooperation on human rights and fundamental freedoms, among others.

# Venezuela

In November 2021, the International Criminal Court (ICC) prosecutor Karim Khan opened an investigation into possible crimes against humanity in Venezuela. In 2020, the United Nations Fact-Finding Mission (FFM) had found sufficient grounds to believe crimes against humanity have been committed as part of a state policy to repress opponents.

The UN Office of the High Commissioner for Human Rights (OHCHR), which has a presence in Venezuela, lost access in 2022 to detention centers where political prisoners are held.

Judicial authorities have participated or been complicit in the abuses, serving as a mechanism of repression.

Venezuela faces a severe humanitarian emergency, with millions unable to access adequate health care and nutrition.

Authorities harass and persecute journalists, human rights defenders, and civil society organizations. Persistent concerns include brutal policing practices, lack of protection for Indigenous people, and poor prison conditions.

An exodus of some 7.1 million Venezuelans represents one of the largest migration crises in the world.

A 2022 report by a European Union electoral observation mission laid out concrete recommendations to pave the way to free and fair elections.

Negotiations, that were stalled since October 2021, resumed in November.

### Persecution of Political Opponents, Arrests, and Torture

The government has jailed political opponents and disqualified them from running for office. As of October, the Penal Forum, a network of pro-bono defense lawyers, reported 245 political prisoners.

At least 114 political prisoners have spent more than three years in pretrial detention, despite time limits included in a recent Criminal Code reform. Approximately 875 of the 15,770 civilians arbitrarily arrested from 2014 through June 2022 have been prosecuted in military courts, the Penal Forum reported.

CLP_PC_023215

While some detainees have been released or transferred from Bolivarian National Intelligence Service (SEBIN) facilities to prisons, new critics have been subject to arbitrary detention.

OHCHR continued receiving complaints of torture, ill-treatment, and incommunicado detentions in 2022.

Security forces and colectivos—pro-government armed groups—have repeatedly attacked demonstrations since 2014, including with violent raids, brutal beatings and point-blank range shootings.

According to official sources consulted by OHCHR, the Attorney General's Office recorded 235 complaints of human rights violations involving deprivation of liberty, from May 2021 through April 2022, including 20 in terrorism-related charges.

OHCHR and the UN Working Group on Arbitrary Detentions, reported persistent challenges to ensuring the rights to liberty and fair trials. There are also delays in implementing judicial release orders.

In September, the UN FFM reported that crimes committed by intelligence services, on orders of high-level authorities, including Nicolás Maduro, were part of a deliberate policy to repress government opponents. The mission again described these as crimes against humanity.

### Alleged Extrajudicial Killings

Agents of the Special Action Forces (FAES) and other police and military units have killed and tortured with impunity in low-income communities, including during security raids called "Operations To Liberate the People."

Between 2016 and 2019, security forces alleged "resistance to authority" in more than 19,000 killings. Evidence showed many were extrajudicial killings. OHCHR documented continuing patterns of such killings in marginalized neighborhoods but reported a significant reduction in number in 2022.

### Armed Groups

Armed groups—including the National Liberation Army (ELN), Patriotic Forces of National Liberation (FPLN), and groups that emerged from the Revolutionary Armed Forces of Colombia (FARC)—operate mostly in border states, establishing and brutally enforcing curfews and regulations governing everyday activities.

On January 1, 2022, clashes broke out between the Joint Eastern Command—a coalition of dissident groups that emerged from the demobilized FARC—and ELN guerrillas, over control of territory in Colombia's Arauca state and Venezuela's Apure state. Both groups committed abuses including killings; forced displacement; and forced recruitment, including of children.

Venezuelan security agents have conducted joint operations with ELN fighters and have been complicit in their abuses.

### Judicial Independence, Impunity for Abuses

The judiciary stopped functioning as an independent branch of government in 2004.

There has been no meaningful justice for crimes committed with knowledge or acquiescence of high-level authorities.

Judicial authorities have been complicit in abuses, the FFM reported in 2021, including by issuing retrospective warrants for illegal arrests, ordering pre-trial detention routinely, upholding detentions based on flimsy evidence, and failing to protect victims of torture.

Venezuela's National Assembly, controlled by supporters of Nicolás Maduro, revised the Organic Law of the Supreme Court of Justice in January, requiring an entirely new Supreme Court, which plays a critical role in appointing and removing lower court judges, of 20 justices—down from 32. The selection process, was not independent. Although Venezuela's constitution allows only one 12-year term, justices who had failed to act as a check on executive power were reappointed for longer.

CLP_PC_023216

### Indigenous Rights and Mining

Authorities reportedly failed to consult residents before creating a special mining zone in 2016, which encompasses 14 Indigenous territories. Mining is one of the main drivers of deforestation and water pollution, contributing to diseases including malaria. SOS Orinoco and the media outlet Correo del Caroní reported that people from Indigenous communities close to mines are experiencing severe poisoning from the mercury used to separate gold from impurities. Some have been forcibly displaced.

Authorities have failed to protect Indigenous populations from violence, forced labor, and sexual exploitation. Human Rights Watch has documented horrific abuses—amputations, shootings, and killings—by groups controlling illegal gold mines in southern Venezuela, operating with government acquiescence.

On March 20, a clash between the Bolivarian National Armed Forces (FANB) and a remote Yanomami Indigenous community in Amazon State left four Indigenous people dead. Authorities held incommunicado at a Caracas military hospital for more than three months a 16-year-old who had been shot and was seriously injured. OHCHR urged a proper investigation, including of the incident's "underlying causes." Lawyers said investigations are stalled.

The UN FFM in September referred to abuses by security forces and armed groups, including the ELN,  against people in mining areas.

Several Indigenous leaders have been threatened or attacked by state and non-state actors. In June, Virgilio Trujillo, an Indigenous leader who opposed illegal mining in the Uwottuja community and had received death threats, was shot dead.

### Disability Rights

In May the Committee on the Rights of Persons with Disabilities concluded there is no law or mechanism to combat and punish discrimination against people with disabilities and a non-inclusive education model. There is a need to ensure accessibility, access to justice, and remove restrictions on legal capacity.

### Sexual Orientation and Gender Identity

Venezuela has no comprehensive civil legislation protecting people from discrimination on the grounds of sexual orientation and gender identity, apart from specific provisions in the Labor Code and the housing law. There are no legal protections for same-sex couples.

The Military Code of Justice punishes consensual same-sex conduct by service personnel with up to three years in prison and dismissal. Following a challenge by the group Venezuela Igualitaria, the Supreme Court of Justice has announced that it will review the provision.

### Women's Rights

Abortion is criminalized in Venezuela except when the life of the pregnant woman is at risk.

According to a study by HumVenezuela, an independent platform by civil society organizations monitoring the humanitarian emergency,  sexual and reproductive health services for women suffer from a loss of capacity. By March, there was a 61.7 percent shortage of contraceptives and 55.8 percent of pregnant women were "unable to receive adequate obstetric care."

In September, the UN FFM documented that women and girls have reported sexual violence by FANB agents working at checkpoints and armed actors controlling mining areas.

### Right to Vote

In February, the European Union mission that monitored 2021 elections issued a final report describing serious obstacles to voting and running for office, including arbitrary disqualification of government opponents seeking to run, partisan use of state resources, unequal access to media and social media, blocking of websites, and lack of judicial independence and respect for the rule of law. Such conditions, they said, undermined the election's fairness and transparency.

Presidential elections are scheduled for 2024, legislative and regional elections for 2025.

CLP_PC_023217

### Humanitarian Emergency

The 2022-2023 UN Humanitarian Response Plan for Venezuela estimates that there are 5.2 million people in need of support in areas such as health, food security and water, sanitation, and hygiene.

HumVenezuela said in March that most Venezuelans face difficulties in accessing food, with 10.9 million undernourished or chronically hungry. Some 4.3 million are deprived of food, sometimes going days without eating.

The collapse of Venezuela's health system has allowed a resurgence of vaccine-preventable and infectious diseases. Barriers to performing transplants are reportedly resulting in hundreds of deaths. As of March, some 8.4 million gravely ill people were having trouble obtaining medical services, and more than 9 million people needing medications and healthcare supplies could not afford them. Power and water outages at healthcare centers—and emigration of healthcare workers—were further weakening operational capacity.

The government has not published official epidemiological data since 2017.

Lack of access to basic services aggravates the humanitarian crisis. Access to drinking water and sanitation declined from 2021 to 2022, HumVenezuela reported, leaving some 4.4 people in dire need of drinking water and 1.3 million people in dire need of basic sanitation services.

### Refugee Crisis

Some 7.1 million Venezuelans have fled the country since 2014, the Inter-Agency Coordination Platform for Refugees and Migrants from Venezuela (R4V) reports, some 5.9 million to Latin American and Caribbean countries.

While many neighboring governments welcome them, lack of a coordinated regional strategy leaves thousands stranded in inadequate conditions or unable to obtain refugee status or other legal protection, forcing them to head north. Xenophobia remains a significant challenge.

New visa restrictions have prevented Venezuelans from flying to Mexico and Central American countries, significantly increasing the number struggling through a dangerous jungle on the Darien Gap, along the Colombia–Panama border. over

107,000 Venezuelans crossed the gap between January and September, compared to around 1,500 in 2021. They face egregious abuses, including sexual violence.

As of May, some 76,000 Venezuelans had obtained Temporary Protected Status in the United States. In July, the US extended protection for them through March 10, 2024.

On October 12, the US and Mexican governments announced that Venezuelans crossing the border irregularly would be expelled to Mexico without the chance to seek asylum. A new program will allow some Venezuelans to apply to travel to the US by plane. Requirements to apply to the program are often difficult to fulfil.

### Freedom of Expression

Authorities have stigmatized, harassed and repressed the media, closing dissenting outlets. Fear of reprisals makes self-censorship a serious problem.

Authorities use the vague 2017 Law Against Hatred—under which publishing "messages of intolerance and hatred" is punishable by imprisonment of up to 20 years—to restrict anti-government speech.

In February, internet service providers blocked media websites, including of Efecto Cocuyo, Crónica Uno, and El Nacional, the watchdog VeSinFiltro reported. The Inter-American Commission on Human Rights' (IACHR) Office of the Special Rapporteur for Freedom of Expression, in July, reported increased censorship through deliberate blocking digital platforms and cuts in Internet service.

### Human Rights Defenders

Venezuelan authorities harass and persecute human rights defenders and civil society organizations addressing the human rights and humanitarian emergencies.

Javier Tarazona, from the group Fundaredes, remained in prison, as of writing. He was arbitrarily detained in July 2021, after exposing links between Venezuelan security forces and armed groups.

CLP_PC_023218

Several organizations and the IACHR expressed concerns that an international cooperation bill introduced in the National Assembly in May could enable arbitrary cancelations of organizations' legal status for promoting or participating in activities contrary to government interests.

On June 28, authorities dismissed charges brought in 2021 against five workers of the humanitarian group Azul Positivo.

In September, two intelligence officers visited the offices of the human rights organization Provea, which was hosting a press conference with family members of union workers arrested in July.

### Prison Conditions

Corruption, weak security, deteriorating infrastructure, overcrowding, insufficient staffing, and improperly trained guards allow armed gangs effectively to control detainees.

The Venezuelan Observatory of Prisons (OVP) estimates around 54 percent of detainees are being held pretrial.

The OVP estimates 7,792 people died in prison between 1999 and 2021. Low-quality hygiene and medical services and lack of access to clean water and sufficient, nutritious food contribute to hunger and disease. In the past four years, deaths from malnutrition and tuberculosis exceeded violent deaths, according to OVP.

### Key International Actors

In October, the UN Human Rights Council extended the FFM's mandate for an additional two years. In a September report, it concluded high level authorities were responsible for a deliberate policy to repress opponents and the Venezuelan government "colluded" with "criminal groups" in the Arco Minero region.

During a visit to Venezuela in March, the ICC prosecutor announced he would establish an in-country office in Caracas. On April 15, Venezuelan authorities asked him to defer his investigation into possible crimes against humanity, asserting their "genuine will" to investigate cases domestically. On April 20, Khan notified

ICC judges of Venezuela's request, indicating he would ask them to reject it and allow him to continue his probe.

The UN high commissioner for human rights updated the Human Rights Council, in March, on continuing abuses, including challenges to due process, restriction of civic space, and arbitrary detentions. In June, she called for independent investigations and accountability, reparations for victims and families, strengthening judicial independence, and separation of powers. She mentioned persistent challenges to the full realization of economic, social, and cultural rights.

The UN's World Food Program, which gained permission from the Maduro government in 2021 to supply food to young children, had by August 2022 delivered meals to 210,000 beneficiaries in 1,700 schools across seven states. Representatives expect the program to reach 1.5 million people by the end of the 2022-2023 school year.

The R4V Platform called for US$1.79 billion to assist 8.4 million people in the region, including Venezuelan migrants, Colombian returnees, and host communities. As of October, only 16.8 percent of the plan was funded.

The 2022-2023 UN Humanitarian Response Plan for Venezuela called for $795 million to assist 5.2 million of the most vulnerable Venezuelans. As of October, $130.7 million was raised, covering 16.4 percent of the plan.

In October, Venezuela failed in its bid to be re-elected as a member of the UN Human Rights Council.

Several governments and institutions retain targeted sanctions against Venezuelan officials implicated in human rights abuses and corruption.

Newly elected Colombian President Gustavo Petro announced Colombia would reopen its border with Venezuela and appointed an ambassador, who took office in Caracas on August 29. Argentina also announced its intention to reestablish diplomatic relations in April.

In March and June, the United States sent official delegations to Caracas for the first time in years for conversations apparently prompted by an interest in accessing Venezuelan oil. In June, President Biden offered his support to Juan Guaido--whom the US acknowledges as the interim President of Venezuela- and reaffirmed the US willingness to calibrate sanctions policy based on the out-

CLP_PC_023219

comes of negotiations. During a congressional hearing on Venezuela, Assistant Secretary of State for Western Hemisphere Affairs Brian Nichols [right?] warned of additional sanctions if negotiations do not restart. The US eased oil sanctions the same day negotiations resumed in November.

In October, Venezuela released seven US citizens wrongfully detained,in exchange for the release of two nephews of Nicolas Maduro's wife who were detained in the US on drug smuggling charges.

In November the Venezuelan government and opposition signed an agreement to increase the humanitarian aid reaching Venezuelan people

.

# Vietnam

Vietnam systematically suppresses basic civil and political rights. The government, under the dictatorial one-party rule of the Communist Party of Vietnam (CPV), severely restricts the rights to freedom of expression, association, peaceful assembly, movement, and religion.

Government prohibitions remain in place on independent labor unions, human rights organizations, and political parties. People trying to establish organizations or workers' groups outside approved government structures face harassment, intimidation, and retaliation from the authorities. Authorities require approval for public gatherings, and systematically refuse permission for meetings, marches, or public gatherings they deem to be politically unacceptable.

A decree issued on August 31 restricts international nongovernmental organizations (NGOs) operating in Vietnam from doing anything against "national interests, laws, national defense, security, social order and safety" and "social ethics, national fine customs and practices, national traditions, identity or great national unity" of Vietnam. No definitions of these terms are provided in the decree, but groups deemed to violate these provisions will be shut down.

Authorities blocked access to sensitive political websites and social media pages, and pressured social media and telecommunications companies to remove or restrict content critical of the government or the ruling party.

Critics of the government face police intimidation, harassment, restricted movement, arbitrary arrest and detention, and imprisonment after unfair trials. Police regularly hold political detainees for months without access to legal counsel and subject them to abusive interrogations. Party-controlled courts sentence bloggers and activists to long prison sentences on bogus national security charges.

In March, Vietnam lifted all Covid-19 requirements for both domestic and international travel, but it continued to restrict freedom of movement for rights activists, dissidents, and government critics.

In October, Vietnam was elected to the United Nations Human Rights Council for the 2023-2025 term despite concerns about rights abuses.

CLP_PC_023220

CLP_PC_023230

H U M A N

R I G H T S

W A T C H



# WORLD REPORT 2023

This 33rd annual World Report summarizes human rights conditions in over 100 countries and territories worldwide in 2022.

It reflects extensive investigative work that Human Rights Watch staff conducted during the year, often in close partnership with domestic human rights activists.

Cover photo: Children from Mariupol, Ukraine, look out the window of their family's car, marked with the word "children," after arriving at an evacuation point for people fleeing areas under Russian control, May 2, 2022.
© 2022 Chris McGrath/Getty Images

**HUMAN RIGHTS WATCH**

350 Fifth Avenue, New York, NY 10118-3299
www.hrw.org



**SEVEN STORIES PRESS**

140 Watts Street
New York, NY 10013
www.sevenstories.com

$44.00 US / $59.00 CAN / £36.99 UK

ISBN 978-1-64421-240-0



CLP_PC_028231



Ecuador's High Tide of Drug Violence | Crisis Group

**COMMENTARY** / LATIN AMERICA & CARIBBEAN       04 NOVEMBER 2022

# Ecuador's High Tide of Drug Violence

*Ecuador's proximity to major cocaine producers, dollarised economy and corruptible state institutions, as well as COVID-19's devastating impact, have turned the country into Latin America's latest hotbed of drug trafficking and other violent crime.*



**Related Tags**

GENDER AND CONFLICT

ECUADOR

Events in Ecuador's most populous city, Guayaquil, have taken a dark and lethal turn. Widely known by an evocative moniker, the "pearl of the Pacific", the port town has become the country's murder capital, a place where criminal violence is almost routine. In a particularly gruesome display on 14 August, gunfire and an explosion – what authorities described as a "declaration of war on the state" by organised crime – killed five people and injured twenty more in the city. According to the local press, Ecuador tallied no fewer than 145 bomb attacks in the year to mid-August; half of them occurred in Guayaquil.

In an open letter addressed to President Guillermo Lasso, Guayaquil's mayor wrote that "criminal gangs have become a state within a state". According to local media, the 14 August blast is connected to a hitch in

CLP_PC_023232

Ecuador's High Tide of Drug Violence | Crisis Group

took place in the city earlier that month, with one revenge killing following another in a seemingly interminable battle for supremacy among various criminal organisations.

Though Ecuador has seen killing sprees before, it previously had no notable history of guerrilla or cartel activity; it has also in recent years been seen as one of the safer countries in Latin America. That, however, appears to have changed. Today, Ecuador has become the latest country to suffer a vicious escalation in violent crime. Homicides have risen at a startling rate, increasing by 180 per cent from 2020 to 2021, and reaching a total of 3,538 this year until the end of October - already the highest tally ever recorded in the country. Police attribute 80 per cent of these murders to clashes among criminal groups vying to control the distribution and export of drugs, primarily cocaine. As gang warfare has worsened, headline-grabbing acts of brutality have littered the news: not just car bombs but decapitations, hanging of corpses from bridges and drones dropping explosives on prisons. Jailhouse violence of all kinds has soared. The most recent data show that prison murders jumped from 46 in 2020 to over 300 in 2021.



As of 17 August, Ecuador had recorded 2,593 homicides in 2022 compared to 2,471 in all of 2021. Around 38 per cent of the murders occurred in Guayaquil.

## Life and Death in Guasmo

Guasmo, a working-class neighbourhood in southern Guayaquil, sits close to the seaport, which handles 85 per cent of Ecuador's non-oil exports. Subdivided by invisible borders drawn by organised crime, it is subject to incessant violence. The criminal groups are battling for turf near the port, which they reportedly use to hide cocaine in cargo

CLP_PC_023233

Case 4:18-cv-06810-JST    Document 160-8    Filed 06/05/23    Page 786 of 1047

containers leaving for Europe and the U.S. On 3 August, police found a mass grave in the neighbourhood with the remains of six people. By September, 1,000 murders had been recorded in Guayaquil and the neighbouring cantons of Durán and Samborondón – all part of the Guayas province – eclipsing the total for the whole of the previous year, and far above the 384 recorded in 2020. "Here people will die like this; everything has been corrupted", a Guasmo resident told Crisis Group.

Life is harrowing for many in Guasmo. Laura (not her real name), a mother of four who lives in the area, wistfully observed in an interview that she has forbidden her younger children from playing in the park for fear of stray bullets and from leaving the house after 6pm. Her older children, who have graduated from high school, cannot find work, and are at risk of becoming members of the gangs that control her neighbourhood. In tears, she spoke of her worry that her children could become addicted to drugs. They are cheap and easy to buy, she said. They are not necessarily of good quality, though – another resident complained that the drugs available in Ecuador are "leftovers. … The United States and Europe get the best batches".

Residents of the neighbourhood have little access to education and lack health-care facilities or reliable water supply. Parents in Guasmo told Crisis Group that public schools ask for "contributions" for school supplies, including toilet paper. When they take their children to the hospital, there are no medicines; if surgery is needed, the family has to purchase items needed for the operation.

Jobs are also scarce. One of Laura's sons, David (not his real name), had recently turned 19 when Crisis Group spoke with him. He said his friends are either dead or in jail, though a few had just been released. David had worked as a day labourer, painting or picking up garbage, but admitted that it is hard to avoid the lure of both using and dealing narcotics when they are so plentiful in the area. A journalist investigating the uptick of violence in Guayaquil, who has been tracking violent crime in the city for the past five years, confirmed that the social impact of drug trafficking is devastating. Poverty and addiction feed one another as dealers get paid in cocaine, while the stress and boredom of unemployment spurs substance abuse. For $2, David explained, one can buy a small bag of cocaine; young people can be seen snorting the powder openly in a Guasmo park. Nearby, dealers sell 25g of cocaine for $60 and a pound (about half a kilogram) of "crispy" (marijuana mixed with cocaine) for $360. Those of David's friends who are fresh out of prison continue to steal or sell drugs because, in their words, "There is simply no other way to survive".

*The livelihoods of many families … depend on the drug business.*

The livelihoods of many families in this and other neighbourhoods depend on the drug business. Most street dealers are men. But be...

CLP_PC_023234

the scenes, women are involved, too, packing cocaine in plastic bags and even selling small quantities. Residents say the police are either too scared to patrol or bought off. They claim the gang controlling a particularly rough part of Guasmo, known as Los Lagartos, has bribed security personnel, adding that some officers have actually joined the gang. The police deny these accusations.

Perhaps nothing has more clearly demonstrated the feeble reach of state authorities in poor areas of Guayaquil than the early days of the COVID-19 pandemic. As the virus rampaged through the city in March and April 2020, the world saw horrifying images of corpses in makeshift shrouds kept in homes or left on the streets as the surge of deaths overwhelmed the local health system, emergency phone lines and funeral parlours. Deluged by the sheer number of dead, the national government brought in a businessman to handle the disposal of bodies. Across the country as a whole, the pandemic's economic impact was also severe, according to a survey by the Central University of Ecuador, with close to 30 per cent of households having a member who lost a job in the first half of 2020.

For Laura and her family, the pandemic was ruinous, pushing them deeper into poverty. David attempted to find a job as a driver, but he could not find one, lamenting that he was discriminated against because of his social background, tattoos and history of drug abuse. Tragically, just two months after Crisis Group met him, David was shot three times in his neighbourhood and died. According to an acquaintance, he was operating as a gang member at the time of his interview with Crisis Group and was targeted for killing a member of a rival outfit.

## A New Drug Hub

Only a few years ago, Ecuador's government declared something close to victory in its fight to curb violent crime. The president at the time, left-leaning populist Rafael Correa, as well as officials from his government, claimed credit for a drop in violence, attributing it to a number of reforms: the creation of a Ministry of Justice, the expansion of community policing, and doubling of the budget for public security and crime prevention. At the same time, the authorities made efforts to legalise (ie, treat as "cultural associations" rather than criminal groups) the country's largest gangs, such as the Latin Kings. It provided resources to support young adult gang members looking for "life-changing" alternatives – a policy that, according to the Inter-American Development Bank, helped reduce violence and "transform the social capital of the gang". The homicide rate in Ecuador dropped from around fifteen killings per 100,000 people in 2011 – close to Brazil's rate – to about five in 2017.

Despite the success of these policies, criminal organisations were also invigorated over roughly the same period. Ecuador's prison populat

CLR_PC_023235

Case 4:18-cv-06810-JST   Document 160-8   Filed 06/05/23   Page 788 of 1047

rose from 11,000 in 2009 to almost 40,000 in 2021 as drug trafficking in particular underwent spectacular growth. According to a local news outlet, 27 per cent of all inmates, and 50 per cent of the women, are serving time for drug possession or sales. Many of the inmates arrested for non-violent drug-related offences proved easy targets for forcible recruitment by organised crime. In July, Human Rights Watch reported that "many detainees, including those held in pre-trial detention or sentenced for minor crimes, are forced to work with organised crime groups to protect their own physical integrity or to access basic necessities, such as mattresses, bedding and health supplies".

Against this backdrop, after years of sustained declines in violence, homicides started to rise again in 2018, when in the span of several months a car bomb outside a police station on the border with Colombia injured more than ten officers; security forces on both sides of the border were ambushed with mortars and automatic weapons; a bomb killed three marines; and two local journalists and their driver were kidnapped and murdered. The government affirmed that the attacks had been carried out by FARC dissidents – ie, individuals formerly affiliated with the Revolutionary Armed Forces of Colombia (FARC), the guerrilla force that had demobilised in 2017. Members of a group of dissidents have since admitted responsibility for killing the journalists.

At the same time that the ex-FARC fighters were causing mayhem along the Ecuador-Colombia border, other criminal networks were flexing their muscles elsewhere. Ecuador has long been a transit hub for illicit drugs, which largely explains why the jail population rose despite Correa's reforms. But changing patterns of criminal activity as well as booming coca and cocaine production in Colombia have given the country a far more prominent role in the narcotic supply chain, deepening its involvement in production, refining, storage and transport. Ecuador's dollarised economy – the country made the U.S. dollar its national currency in 2000 in a bid to stall a sharp devaluation of the sucre – and weak financial controls simultaneously made it a hotspot for laundering illicit profits. A former high-level politician in Guayaquil told Crisis Group that the relationship between legal and illegal business, rooted in what he called "lucrative permissiveness", started over a decade ago. To underline the point, he pointed to numerous legitimate firms that he claimed are sustained by drug money.

---

*Behind Ecuador's rising star in the global cocaine market lurks Mexican organised crime, which tends to sub-contract parts of the supply chain.*

---

CLP_PC_023236

Behind Ecuador's rising star in the global cocaine market lurks Mexican organised crime, which tends to sub-contract parts of the supply chain. According to a Quito-based political analyst, Mexican criminal groups negotiate drug shipments with Colombian outfits, such as the Frente Oliver Sinisterra (the FARC dissident outfit behind the killings of the journalists in 2018) or Columna Móvil Urías Rondón, which send coca paste south to Ecuador. Local criminal groups refine the paste in laboratories and ship it in containers carrying food from Guayaquil to the U.S. and Europe. In August, authorities seized 3.5 tonnes of cocaine worth $127 million packed with bananas bound for Britain and the Netherlands. Ecuadorians and Colombians have also been arrested for transporting cocaine in fishing boats and other vessels. An Ecuadorian was among those captured aboard a "narco-submarine" found to be carrying 2.2 tonnes of cocaine, with a reported value of $55 million, in waters close to El Salvador.

Despite warning signs, Quito was slow to address the mounting wave of criminal violence, and at times took steps that hobbled its capacity to respond. Part of the reason no doubt relates to economics: the state is burdened by stubborn fiscal deficits, and facing constant scrutiny from the International Monetary Fund, its budget is under persistent strain. Security experts told Crisis Group that the violence at the Colombian-Ecuadorian border in 2018 should have triggered reforms to address the surge in illicit trafficking. Instead, former President Lenin Moreno eliminated the justice ministry and reduced the prison budget by 30 per cent, all part of a government plan to cut public spending.

Over the same period, violence that had traditionally been limited to trafficking hubs has undergone the sort of escalation in scale and significance seen previously in Colombia, Brazil, Mexico or Guatemala, and akin to that under way in Paraguay. High-level officials are now targeted, as are civilians allegedly involved in drug trafficking or money laundering for rival groups. Ecuadorian public prosecutor Luz Marina Delgado was shot and killed in May in her car, allegedly by Venezuelan and Colombian hit men. Four years earlier, Delgado had issued a warrant for the wife of Washington "Gerald" Prado Álava – who is sometimes referred to as "Ecuador's Pablo Escobar". Many observers connect the two events, though no charges have been filed. Linked to efforts to bribe and murder prosecutors and investigators, Prado was the first Ecuadorian to be extradited from Colombia to the U.S., on charges of smuggling 250 tonnes of cocaine. Since May, two more prosecutors have been assassinated.

### The Prison Dilemma

If drug trafficking has upended the lives of people in places like Guasmo, jails have become the sites where organised crime plots its battles for control of the drug trade in Ecuador. According to

Case 4:18-cv-06810-JST   Document 160-8   Filed 06/05/23   Page 790 of 1047

authorities, around 11,000 of today's 32,000 inmates – a slight drop-off from 2021 due to an early release program aimed at reducing overcrowding – belong to a criminal outfit.

*One prison in Guayaquil … has twelve wings, each reportedly under the protection of a different criminal organisation.*

Prisons have become the centre of operations for these groups, aided by what the Inter-American Commission on Human Rights described in 2022 as "unprecedented levels of violence and corruption [that] respond to the abandonment of the penitentiary system by the state". One prison in Guayaquil, known as La Peni, has twelve wings, each reportedly under the protection of a different criminal organisation. A lawyer close to a renowned criminal outfit explained that jails serve as safe havens for mafia bosses who surround themselves with henchmen and feel protected from the turf wars outside the prison walls. Yet these same places seethe with danger – with gangs seemingly treating them as staging grounds for grisly acts of violence meant to send a message to a wide audience.

The first such case came in 2019, when William "Cubano" Humberto Poveda, leader of the eponymous Cubanos gang, was decapitated and incinerated; his head was displayed inside the jail, and videos circulated of prisoners playing soccer with it. So began a litany of similar atrocities, generally linked together in a cycle of revenge killings, while the situation inside Ecuador's jails grew increasingly explosive. The country saw its bloodiest prison riot on 28 September 2021, when at least 119 inmates were killed, six of them beheaded, as rival gangs armed with guns and grenades battled to control a prison in Guayaquil. Close to 400 inmates have been killed since February 2021.

The sway of criminal groups over jails and the extreme violence that flares up inside them are linked in many ways. A lawyer who previously worked at a Guayaquil prison told Crisis Group that inmates smuggle in weapons, drugs, cell phones and other contraband hidden in food or other deliveries with the complicity of police and prison guards. Media reports have indicated that prison directors in some facilities warn gang leaders before carrying out "random" searches. Inmates sometimes hand over machetes, knives and pistols for seizure to deflect closer inspection that might reveal a more intimidating arsenal featuring machine guns and grenades. According to a special commission created in 2021 by the Lasso administration to assess the country's prisons, criminal groups have spent $1 million on smuggling weapons inside and have bribed police officers to buy arms; the report concluded that at least 10 per cent of the prison system authorities are receiving monthly payments from organised crime.

The power of jailed gang leaders extends well beyond prison walls. According to a former government official, as soon as new wardens assume their jobs, the crime bosses summon them to "kiss the hand

CLP_PC_023238

Gang leaders also decide from their cells how the battles in Guasmo and other Guayaquil neighbourhoods should unfold. A young man who was born and raised in Guasmo, and who has family and friends in one of Guayaquil's most notorious jails, said these leaders decide who should die, when and where to distribute drugs, and how to mark off territory to keep it from competitors. Criminal groups even supply water and food to prisons – a fact the government is aware of, according to a National Assembly member.

For those who have no protection or resources, prisons are desperate places. A criminal lawyer discussed with Crisis Group the case of 31-year-old Erick, who had completed his sentence for drug possession, but had to remain in jail as his family could not afford to skip work to initiate his release, and lacked the financial means to hire an attorney to help. Erick was killed in 2021 in a prison riot, waiting for his freedom. Several lawyers agreed that detention beyond the end of a sentence is not uncommon among poorer inmates. If the inmate lacks the funds necessary to bribe officers, the release process can last between three and six months. A lawyer who has defended several gang members commented that judges tend to seek monetary compensation from inmates asking for leniency in court. "If you have money, you might leave prison alive", a former prisoner, jailed for failing to pay child support, observed scornfully.

LGBTQ+ inmates are particularly vulnerable. In 2021, Helen Maldonado was murdered during one of the bloodiest prison riots in Ecuador's history. A trans woman serving a 30-month sentence for non-violent drug possession, Helen was housed in the men's facility, despite the fact that her ID card reflected her chosen female gender. Helen and other inmates were tortured and killed by unknown assailants, according to the NGO Vivir Libre. Seven months later, the government returned her remains to her family in a black plastic bag.

According to Vivir Libre there are around 280 LGBTQ+ inmates, who are targets of regular, severe violence and harassment by both prison guards and inmates. Odalys, a trans woman who served five years in a men's prison, observed that trans women often have no choice but to trade sex for protection, food, access to medical attention, cell phones and other necessities. She described how survival for minority groups inside the prison often depends on their ability to earn the protection of criminal leaders, usually referred to as "uncles".

## The State Response

Residents of Guasmo with whom Crisis Group spoke agreed almost unanimously on what they felt was the ideal response to the bane of violent crime in Ecuador: they wanted a strongman to take control. "We need someone like the guy from Central America" was a common refrain. Here they were referring to El Salvador's President Nayib Bukele, who has waged an unstinting "iron fist" campaign of

CLR_PC_023239

arrests of suspected gang members, part of his general disregard for democratic norms.

But there is little to suggest that this strategy would succeed, in part because Quito has not shied away from strong-arm tactics. Following the 14 August blast, President Lasso declared the sixth state of emergency since taking office in 2021, in order to boost military deployments in Guayaquil. It had little if any impact: the murder rate remains unchanged since then, with Ecuador on track to surpass the regional average for violent deaths by the end of 2022.

Against this backdrop, analysts are highlighting the security forces' shortcomings in addressing the crime wave. In addition to the military, the police force's investigative capacities are reportedly below par, and a revolving cast of senior police commanders has hurt the continuity of security policies. Accusations of corruption in the security forces are also likely to undermine Lasso's efforts to seek additional U.S. funds to launch his proposed Plan Ecuador, an initiative aimed at attracting U.S. and European Union funds and law enforcement assistance to strengthen the country's police and military. The U.S. embassy in Quito continues to revoke visas for public security officers and officials in the judicial system – including judges – on the basis of alleged corruption, bribery and drug trafficking. A reconfiguration of transborder drug supply chains and a series of institutional failings, above all in the prison system, have made Ecuador a favoured destination for criminal groups to traffic drugs and launder profits.

But that does not make the uptick in violence irreversible. For one, the criminal scene in Ecuador is not yet as formidable as it is in neighbouring countries. Local criminal groups still lack clear hierarchies, loyalty mechanisms and the sort of business acumen that their counterparts display elsewhere in the region, above all Colombia and Mexico, where illegal outfits have branched out into numerous new lines of business.

Furthermore, the government appears to be making real efforts to respond to the challenge. Created in August, the National Secretariat of Public and State Security is now charged with designing a plan to address the institutional flaws described above. It would do well to look at the experiences of Latin American neighbours that have previously fought similar battles with varying degrees of success, and make the achievement of higher standards of criminal investigation a priority. In addition, Ecuador should ideally pursue the sort of comprehensive penal system reforms undertaken with international support in Guatemala before 2019 rather than seeking short-term results by embracing the use of military personnel and techniques in law enforcement. An area that certainly needs strengthening is access to rehabilitation for younger inmates.

CLP_PC_023240

Case 4:18-cv-06810-JST    Document 160-8    Filed 06/05/23    Page 793 of 1047

In parallel, the state, in partnership with the private sector and donors, should provide a way for young people in neighbourhoods such as Guasmo to avoid the conveyor belt to crime and hard drug use. Creating legal employment opportunities and a path out of hopelessness – building on some of what the state did a decade ago with a previous generation of gangs – is essential if Guayaquil and other communities across Ecuador wish to end the wave of crime and violence that has disrupted their peace.

CLP_PC_023241



# Laying the Foundation for Regional Cooperation

## Migration Policy and Institutional Capacity in Mexico and Central America

Andrew Selee
Ariel G. Ruiz Soto
Andrea Tanco
Luis Argueta
Jessica Bolter



CLP_PC_023302

# Laying the Foundation for Regional Cooperation

## Migration Policy and Institutional Capacity in Mexico and Central America

Andrew Selee
Ariel G. Ruiz Soto
Andrea Tanco
Luis Argueta
Jessica Bolter

**Migration Policy Institute**

April 2021

CLP_PC_023303

# Contents

**Executive Summary** .................................................................................................. 1

**1   Introduction** ...................................................................................................... 3

**2   Mexico: Rewiring Institutional Capacity and Mandates to Meet New Migration Challenges** ........................................................................................ 5

    A.   Migration Trends Shifting Mexico's Identity ............................................................. 5

    B.   A New Paradigm: Policy Changes and Institutional Mandates .............................. 10

    C.   Assessing the Capacity of Mexican Migration Institutions ................................... 12

    D.   The Implications of Policy Changes and Gaps to Be Addressed ........................... 18

    E.   Moving beyond Reactive Policymaking ................................................................ 22

**3   Guatemala, Honduras, and El Salvador: Emerging Institutions and Critical Partnerships** ..................................................................................... 22

    A.   Migration Patterns Shifting Priorities in Central America ..................................... 23

    B.   Migration Management Structures: Incipient and Yet to Be Fully Institutionalized .. 26

    C.   The Importance of Interagency Coordination and International Cooperation ......... 38

**4   Costa Rica and Panama: A Study in Institutional Contrasts for Managing Migration** ........................................................................................ 40

    A.   Changing Immigration and Asylum Trends ........................................................... 41

    B.   Migration Laws and Institutions .......................................................................... 43

    C.   Addressing Transit Migration .............................................................................. 49

    D.   The Challenge Ahead .......................................................................................... 51

**5   Conclusions and Opportunities for the Future** ............................................ 51

**Appendix. List of National and Regional Stakeholders Interviewed** ................. 55

**About the Authors** .................................................................................................. 59

**Acknowledgments** .................................................................................................. 60

CLP_PC_023304

# Executive Summary

The countries in the region that stretches from Panama northward to the United States are part of a major corridor for unauthorized migration. Today, most of this irregular migration comes from Guatemala, Honduras, and, to a lesser extent, El Salvador, and those who migrate are generally headed to the United States. But there are also significant numbers of people who come from outside the immediate region and transit through Central America on their way to the U.S.-Mexico border. Notably, an increasing number of migrants have been settling down in Mexico, Costa Rica, and Panama, often seeking asylum, as it has become harder to get to and enter the United States.

Today, these countries face an unprecedented opportunity to lay the foundation necessary to build a regional migration system that privileges safe, orderly, and legal migration by adopting four shared strategies:

► developing legal, employment-based migration pathways;

► creating humanitarian protection mechanisms as close as possible to where people in need of protection live;

► professionalizing border and immigration enforcement throughout the region; and

► investing strategically in development, sustainability, and rule of law.

Understanding the institutional capacities, legal frameworks, and existing policies of countries in the region is an important starting point for building this long-term regional cooperation. While previous work by the Migration Policy Institute on regional migration has focused on the policies, institutions, and capacities of the U.S. government,[1] this report examines these facets of migration management in Mexico and Central American countries, including Guatemala, Honduras, El Salvador, Costa Rica, and Panama.[2] Building on interviews with more than 75 stakeholders from across the region, this research focuses not only on how governments operate, but also how civil-society organizations contribute to regional migration management within and among these countries.

*Understanding the institutional capacities, legal frameworks, and existing policies of countries in the region is an important starting point for building this long-term regional cooperation.*

Countries in the region have developed significant new capacities to manage migration over the past five years, but these have often been fragile, *ad hoc*, and weakly institutionalized. In addition, these developments have often been overly weighted toward border and immigration enforcement priorities, at the expense of other equally important challenges. Other than Costa Rica, no government has managed to

---

1   This includes recent work by the Migration Policy Institute (MPI) as part of the Rethinking U.S. Immigration Policy initiative. See MPI, "Rethinking U.S. Immigration Policy: Building a Responsive, Effective Immigration System," accessed March 4, 2021.

2   This study does not address Nicaragua because, at present, the potential for including the Nicaraguan government in regional cooperation arrangements seems distant.

CLP_PC_023305

create a clear, sustainable process for developing migration policy or for coordinating among the agencies involved in migration and integration issues, despite emerging attempts. And in most governments, agencies' responsibility for different aspects of migration management is often poorly defined and overlapping in ways that have led to confusion and uneven implementation.

Among the most notable advances—and some key limitations—in the region are:

► growing attention to and resourcing of migration functions within governments;

► enhanced capacity for border and immigration enforcement, although the responsibilities of different agencies remain unclear in most countries, and there is a need for more transparent and clear policies and protocols to ensure compliance with national and international laws;

► increased investment in asylum agencies' institutional and operating capacities in most countries, though these have been eclipsed by sharp increases in demand for protection in Mexico and Costa Rica, and humanitarian protection mechanisms are still poorly institutionalized elsewhere;

► incipient legal frameworks for addressing internal displacement and protection needs in Mexico and El Salvador, although some elements of these still need to be put into practice, and civil-society organizations continue to lead the majority of efforts on the ground;

► some increasing attention to labor migration policies and practices, with a vetted pipeline of potential workers for seasonal migration programs in Guatemala and streamlined processes for the recruitment of agricultural workers in Costa Rica, but most countries have yet to fully leverage the potential of legal migration pathways; and

► limited but tailored investments in programs to support the return and reintegration of migrants in Mexico, Guatemala, El Salvador, and Honduras, though the bulk of these efforts continue to be run by civil-society organizations.

Across the region, international organizations, especially the United Nations High Commissioner for Refugees (UNHCR) and the International Organization for Migration (IOM), have played an important role in supporting the development of capacity in different areas of migration management. They have also been instrumental in creating regional conversations among migration agencies and government leaders on these issues. In all countries, civil-society organizations play an important role in expanding migrants' access to protection and reintegration mechanisms, but these are often divorced from government initiatives and only occasionally supported by governments.

These recent institutional and policy changes pave the way for the critical further development of institutional capacity among these countries, so that they can be part of a regional migration system based on co-responsibility. These efforts will require governments to establish sustainable decision-making processes; rebalance priorities to include not only enforcement but also protection, labor migration, and return and reintegration; and find ways of building communication across government agencies and with nongovernmental actors. The U.S. government can play an important role as a partner in building a

CLP_PC_023306

holistic approach to regional migration cooperation and helping improve migration management, but the driving force for these changes will have to come from the countries themselves, with governments actively engaging international organizations, civil society, and each other in this process.

# 1   Introduction

In recent years, the region that includes Central America, Mexico, and the United States has seen large-scale unauthorized migration. Most of these migrants originate in Guatemala, Honduras, and, to a lesser extent, El Salvador and are headed to the United States. But there is also movement from Mexico northward, and notable numbers of migrants come from countries outside the immediate region, including Haiti, Cuba, and countries in South America, Africa, and Asia. And increasingly, many of those who are trying to get to the United States are settling down elsewhere, often in Mexico, Costa Rica, or Panama.

This report looks at how Central American countries and Mexico, in cooperation with the United States and other partners, can better manage migration in the region they share, so that large movements of unauthorized migrants give way over time to more predictable legal migration. In particular, the report looks at the institutional capacities, legal frameworks, and existing policies of countries in the region that can serve as building blocks for greater regional cooperation. While much of the focus is on what governments do, this analysis also takes into account the reality that nongovernmental organizations (NGOs) also play a vital role in addressing migration-related challenges all of these countries. Among other sources, it draws on more than 75 interviews with policymakers, civil-society leaders, and other stakeholders from across the region, a full list of whom can be found in the appendix of this report.[3]

Experience has taught us that enforcement-only approaches to managing migration are unlikely on their own to deter unauthorized migration from countries where there is significant unemployment and underemployment; livelihoods are affected by both short-term climate events and long-term climate change; citizens face violence from gangs, organized crime groups, and the effects of political conflict; corruption undermines attempts to create sustainable institutions; and where people have ties to family and friends already living in the destination country.

As an alternative, it makes sense to take a multi-pronged approach to regional cooperation, one that includes at least the following four key elements that require a commitment to co-responsibility across all countries in the region:[4]

> ▶ **Developing legal pathways for seasonal work.** Such pathways open legal opportunities to move to and work in the United States and other countries within the region, removing some of the pressures to migrate through unauthorized channels.

---

3   Because of the COVID-19 pandemic, some interviews that would normally have been held in person were conducted virtually. Throughout the report, particular observations are not attributed to individual interviewees except where specific permission was granted to do so, given the sensitive nature of some of the topics explored and to encourage interviewees to speak openly about them.

4   For a more extensive discussion of these four elements of managing regional migration, see Andrew Selee and Ariel G. Ruiz Soto, *Building a New Regional Migration System: Redefining U.S. Cooperation with Mexico and Central America* (Washington, DC: MPI, 2020).

CLP_PC_023307

► **Creating humanitarian protection systems.** This entails helping to identify those in the greatest danger as close as possible to where they live, in addition to providing options for asylum in each country.

► **Professionalizing immigration and border enforcement.** Efforts to do so much be consistent with rule of law and appropriate for dealing with civilian populations, including those with protection needs and other vulnerabilities.

► **Investing in long-term development and rule of law.** In addition to providing local opportunities for people who may otherwise attempt an unauthorized journey abroad, this should include robust efforts to support the reintegration of migrants returning to their country of origin so that they can re-establish their lives there and contribute effectively to the development of their communities.

Over time, this kind of multi-pronged approach, coordinated among the countries in the region, could lead to more predictable, regular migration, but it will require ongoing focus, intentional cooperation, and necessary investments in institutional capacity. This report is particularly concerned with this final element—what capacities exist or may need to be strengthened in each country to allow them to participate fully in regional migration solutions.

The body of this report is divided into the three sections, with the first focused on Mexico; the second on Guatemala, Honduras, and El Salvador; and the third on Costa Rica and Panama. Mexico continues to be a major source country for migration to the United States, though in recent years most of this migration has followed legal channels. It is also a major country of transit and, increasingly, a country of destination

*This kind of multi-pronged approach, coordinated among the countries in the region, could lead to more predictable, regular migration, but it will require ongoing focus, intentional cooperation, and necessary investments in institutional capacity.*

for migrants from other countries. The Mexican government has only recently begun to embrace its role as a transit and receiving country, and significant investments in strengthening asylum processes, professionalizing enforcement, and developing legal pathways—and in building up the institutions responsible for managing these portfolios—still need to be made, and a clearer structure for migration decision-making needs to be created.

Costa Rica and Panama have similarly become destinations for migrants from various countries, especially Nicaragua and Venezuela in the case of Costa Rica, and Venezuela and Colombia in the case of Panama. They have also seen significant transit migration from outside the region, and a growing number of migrants headed south from El Salvador and Honduras as well. Costa Rica has robust institutions for managing migration and asylum, and a sophisticated interagency process for making decisions, but its resources and capacities have been stretched by the sheer volume of arrivals in the past few years. Panama is only now building its institutional capacity for setting policy and managing migration, but the direction of this structural change is still unclear.

CLP_PC_023308

Guatemala, Honduras, and El Salvador are the largest countries for out-migration in the region, but they are also major countries of return and transit. They have only recently started to invest in their institutions, laws, and policies for managing migration, and most of these areas remain significantly underdeveloped. They have also established incipient capacities to help returning migrants adjust to life in their origin country, but these efforts lack institutionalization.

The report's final section draws critical conclusions related to the state of institutional capacities, legal frameworks, and policies in the region and their ability to serve as the foundation for future regional cooperation. There are huge opportunities to build on existing structures and policies, but the way forward is not necessarily easy or clear in some cases. Significant investments will need to be made in both public and nongovernmental institutions to make regional cooperation around migration management possible. Understanding the starting point is critical for any effort to build up a shared regional migration system and make it sustainable going forward.

# 2   Mexico: Rewiring Institutional Capacity and Mandates to Meet New Migration Challenges[5]

The intersection of diverse migration flows to and through Mexico since 2015 has left a lasting impression on the country's demographic makeup and challenged its identity as primarily a country of emigration.[6] It has also challenged its institutions to respond quickly and creatively to new migration dynamics. Unequipped to address increasingly diverse and mixed migration, Mexico's primary migration agencies— the National Institute of Migration (INM) and the Commission for Refugee Assistance (COMAR)—have resorted to reactive measures and relied on the support of auxiliary agencies.

## A.   Migration Trends Shifting Mexico's Identity

Long a country of emigration, Mexico has in recent years also become a transit country and destination for migrants from other countries. As Mexican migration to the United States slowed and more Mexican migrants returned home, both voluntarily and involuntarily,[7] unauthorized migration from Central America increased rapidly. Starting in 2014 and through 2015, an elevated number of unaccompanied children from Guatemala, El Salvador, and Honduras entered and transited through Mexico, seeking to reach the United States. This trend challenged Mexico's migration management system, which had historically focused on apprehending, detaining, and returning Central

*Long a country of emigration, Mexico has in recent years also become a transit country and destination for migrants from other countries.*

---

5   This section was researched and written primarily by Ariel G. Ruiz Soto and Andrea Tanco, with additional input from the report's other authors.

6   For background on shifting migration trends from Mexico, see Ariel G. Ruiz Soto and Andrew Selee, *A Profile of Highly Skilled Mexican Immigrants in Texas and the United States* (Washington, DC: MPI, 2019). See also Andrew Selee, Silvia E. Giorguli-Saucedo, Ariel G. Ruiz Soto, and Claudia Masferrer, *Investing in the Neighborhood: Changing Mexico-U.S. Migration Patterns and Opportunities for Sustainable Cooperation* (Washington, DC: MPI, 2019).

7   Ana Gonzalez-Barrera, *More Mexicans Leaving Than Coming to the U.S.* (Washington, DC: Pew Research Center, 2015).

CLP_PC_023309

American adult migrants. Established in June 2014 with U.S. assistance, Mexico's Southern Border Program (Programa Frontera Sur) strengthened migration control measures along the Mexico-Guatemala border and sought to improve detention center conditions and expand services for migrants. As the program's border security and migration management measures were implemented, migrant apprehensions ballooned from 127,000 in 2014 to a record 198,000 in 2015 (see Figure 1).

FIGURE 1

**Migrant Apprehensions by Mexican Authorities, by Country of Birth, 2014–20**



Source: Mexican Interior Ministry (SEGOB), "Boletín Mensual de Estadísticas Migratorias, 2014-2020," accessed February 23, 2021.

In 2016, an increasing number of Central American migrant families, as well as migrants from the Caribbean, travelled through Mexico, resulting in sustained high levels of apprehensions. That year, the number of apprehensions of Central American migrant children travelling with family members (21,000) surpassed the number of those who were unaccompanied (17,000). Meanwhile, apprehensions of Caribbean migrants— primarily from Haiti and Cuba—more than doubled, rising from 10,000 in 2015 to 21,000 to 2016.[8] Then, largely in response to migrants' perception of changes in U.S. policy following the start of the Trump administration, migration and migrant apprehensions fell across the board in 2017.

The most notable trend since 2018 has been the increasing frequency, size, and visibility of Central American migration, with migrants often traveling in caravans and seeking humanitarian protection in Mexico or the United States. A constellation of factors—including high unemployment, prolonged droughts, increasing hunger, persistent violence, and political corruption—have manifested differently in Guatemala, El Salvador, and Honduras and led to high emigration rates.[9] Family ties and better employment

---

8    Mexican Interior Ministry (SEGOB), "Boletín Mensual de Estadísticas Migratorias, 2016," accessed March 15, 2021.

9    Randy Capps, Doris Meissner, Ariel G. Ruiz Soto, Jessica Bolter, and Sarah Pierce, *From Control to Crisis: Changing Trends and Policies Reshaping U.S.-Mexico Border Enforcement* (Washington, DC: MPI, 2019); Reuters, "Hunger in Central America Skyrockets, U.N., Agency Says," Reuters, February 23, 2021.

CLP_PC_023310

and livelihood opportunities in the United States, as well as the perception that U.S. migration policies favor children and families, have also played a role in incentivizing migration.[10]

Migrant apprehensions by Mexican authorities escalated significantly in 2019 and, though they did not surpass the level seen in 2015, these included large numbers of families and children. Of the 187,000 apprehensions in 2019, 54,000 were of children and about 75 percent of those were of children traveling with an adult.[11] In response to the sharp increase in migration, the United States implemented an interlocking set of policies at the U.S.-Mexico border to stem unauthorized migration and narrow access to asylum, including the Migrant Protection Protocols (MPP, also known as "Remain in Mexico") that allowed U.S. authorities to return asylum seekers to Mexico while their cases were adjudicated.[12]

> *Migrant apprehensions by Mexican authorities escalated significantly in 2019 and, though they did not surpass the level seen in 2015, these included large numbers of families and children.*

Although requests for humanitarian protection in Mexico began to increase gradually around 2014, requests rose sharply in 2019 as possibilities to seek asylum in the United States narrowed. COMAR received 70,000 asylum requests in 2019, more than double the 30,000 requests in 2018 and more than four times as many as the 15,000 received in 2017 (see Figure 2). Honduran asylum seekers accounted for 43 percent of all requests in 2019, followed by those from El Salvador (13 percent), Cuba (12 percent), Venezuela (11 percent), and Haiti (8 percent).[13] In fact, Hondurans have filed the majority of asylum applications in Mexico over the last five years, while the proportions of requests made by asylum seekers from the other four countries have fluctuated.

The upward trend in the number of protection requests reversed in April 2020 as Mexico implemented mobility restrictions due to the COVID-19 pandemic. However, monthly requests increased gradually in the fall and returned to 2019 levels by December, prompted in part by two hurricanes that caused heavy damage in Honduras and Guatemala in October and November 2020. Mexico received a total of 41,000 asylum requests in 2020. Notably, the upward trend appears to have continued into 2021, with about 14,000 requests submitted to COMAR in January and February 2021—a 14 percent increase compared to the same two-month period in 2020.[14]

---

10   Capps, Meissner, Ruiz Soto, Bolter, and Pierce, *From Control to Crisis*.

11   SEGOB, "Boletín Mensual de Estadísticas Migratorias, 2019," accessed March 15, 2021.

12   Ariel G. Ruiz Soto, *One Year after the U.S.-Mexico Agreement: Reshaping Mexico's Migration Policies* (Washington, DC: MPI, 2020).

13   Mexico's Commission for Refugee Assistance (COMAR), "Solicitudes de Refugio al Cierre de Febrero 2021," accessed March 15, 2021.

14   COMAR, "Solicitudes de Refugio al Cierre de Febrero 2021."

CLP_PC_023311

**FIGURE 2**

**Humanitarian Protection Requests Submitted to Mexican Authorities, 2013–21\***



\* Data for 2021 are through February.

Note: The humanitarian protection requests in this figure are applications for refugee status, which are processed by Mexico's Commission for Refugee Assistance (COMAR), but not those for political asylum, which is granted by the Foreign Ministry. In this report, the authors use the terms "applications for asylum" or "for humanitarian protection" interchangeably, following the English usage, to refer to what the Mexican government would call "applications for refuge."

Source: COMAR, "Solicitudes de Refugio al Cierre de Febrero 2021," accessed March 15, 2021.

In addition to these trends in transit migration and asylum requests, voluntary returns and deportations of Mexicans have shaped the country's migration landscape and policy debates, and required increased attention from Mexico's government institutions. U.S. immigration authorities have made approximately 200,000 returns of Mexicans on average each year since 2015.[15] Reflecting the traditional profile of Mexican migration, each year most returnees are adult men while smaller shares are women (10 percent) and children (6 percent).[16] Many of these returnees are migrants recently apprehended at the U.S.-Mexico border; a smaller share are returned from the U.S. interior after longer stays in the country, some potentially returning to Mexico with U.S.-born children.

*While immigrants from the United States made up two-thirds of the overall immigrant population in Mexico in 2020 ... this U.S.-born immigrant population has grown more slowly than other groups since 2015.*

The intersection of these various migration patterns has directly contributed to the profile of Mexico's growing immigrant population.[17] Between 2015 and 2020, the immigrant population in Mexico grew by 20 percent, from 1 million to 1.2 million (see Table 1), to account for 1 percent of the country's population. While immigrants from the United States made up two-thirds of the overall immigrant population in

---

15   In August 2019, Mexico started to document migrant returns by Canadian immigration authorities via air. Returns from Canada, however, have remained significantly lower than returns from the United States: 12 Mexican migrants were returned from Canada in 2019 and 175 were returned in 2020, compared to 211,000 and 184,000, respectively, from the United States. SEGOB, "Boletín Mensual de Estadísticas Migratorias, 2015-2020," accessed March 15, 2021.

16   SEGOB, "Boletín Mensual de Estadísticas Migratorias, 2015-2020."

17   Andrea Tanco, Ariel G. Ruiz Soto, and Ana Paulina Ornelas Cruz, *Navigating Mexico's New Reality: Challenges Faced by Immigrants and Returnees* (Washington DC: MPI, forthcoming).

CLP_PC_023312

Mexico in 2020—partially due to large numbers of U.S.-born children of Mexican migrants settling in the country when their parents return—this U.S.-born immigrant population has grown more slowly than other groups since 2015.[18] Latin American immigrant groups, primarily from countries with high rates of asylum requests, have grown more quickly. For example, the number of immigrants from Venezuela and Honduras grew by 216 percent and 128 percent, respectively. During this period, the gender breakdown of the immigrant population remained nearly the same.

Children make up a large segment of Mexico's immigrant population, with U.S.-born immigrant children alone accounting for 44 percent of all immigrants in the country as of 2020. The total number of immigrant children has remained relatively steady at 584,000, though their share of the total immigrant population decreased from 58 percent in 2015 to 48 percent in 2020. As some of these children have grown up or left the country, the population of U.S.-born children in Mexico has decreased somewhat—from 551,000 in 2015 to 528,000 in 2020—meaning that young immigrants from other countries (predominately from Latin America) have offset what would otherwise have been a decline in the immigrant child population.[19]

TABLE 1

**Demographics of the Immigrant Population in Mexico, 2015 and 2020**

|  | **2015** | | **2020** | |
|---|---|---|---|---|
|  | Estimate | % of Total | Estimate | % of Total |
| **Total Immigrant Population** | **1,009,000** | **100%** | **1,212,000** | **100%** |
| **Top Countries of Birth** | | | | |
| United States | 739,000 | 73% | 797,000 | 66% |
| Guatemala | 43,000 | 4% | 57,000 | 5% |
| Venezuela | 17,000 | 2% | 53,000 | 4% |
| Colombia | 19,000 | 2% | 36,000 | 3% |
| Honduras | 15,000 | 1% | 5,000 | 3% |
| All others | 177,000 | 18% | 234,000 | 19% |
| **Age** | | | | |
| Under 18 | 584,000 | 58% | 584,000 | 48% |
| **Gender** | | | | |
| Female | 503,000 | 50% | 594,000 | 49% |

Sources: Migration Policy Institute (MPI) analyses of microdata from Mexico's National Institute of Statistics, Geography, and Informatics (INEGI), "Censo de Población y Vivienda 2020," accessed February 12, 2021; Mexico's 2015 Intercensal Survey, the data for which are available via IPUMS International, "IPUMS Online Data Analysis System – Single-Sample Datasets – Mexico 2015," accessed February 12, 2021.

One year into the pandemic, mobility restrictions have contributed to a sharp decline in migration throughout the region.[20] Early signs in 2021 indicate, however, that migration levels could be rising again.

---

18   Selee, Giorguli-Saucedo, Ruiz Soto, and Masferrer, *Investing in the Neighborhood*.

19   MPI analyses of microdata from Mexico's National Institute of Statistics, Geography, and Informatics (INEGI), "Censo de Población y Vivienda 2020," accessed February 12, 2021; Mexico's 2015 Intercensal Survey, the data for which are available via IPUMS International, "IPUMS Online Data Analysis System – Single-Sample Datasets – Mexico 2015," accessed February 12, 2021.

20   Though migration decreased across the region, the demand for human smugglers appears to have remained constant due to the increase in migration controls and health measures that made mobility more difficult. See International Organization for Migration (IOM), *El Tráfico Ilícito de Migrantes en América Central y México en el Contexto de la COVID-19* (San José, Costa Rica: IOM, 2020).

CLP_PC_023313

Still, these restrictions have halted many transit migrants' journey through Mexico, increasing the likelihood that some settle temporarily or permanently in the country.

In light of recent migration trends, it will be important for government institutions to leverage the information available about the characteristics of Mexico's growing immigrant population to plan, restructure, and tailor their limited capacity. As will be presented in the subsections that follow, strengthening operational and institutional capacity in key functions would be an important step toward addressing the most immediate needs of Mexico's immigrants, temporary and transit migrants, and returnees as well as the communities in which they live.

## B.    A New Paradigm: Policy Changes and Institutional Mandates

Mexico's legal framework on migration and its institutions responsible for enforcement and humanitarian protection have evolved over the last five years, primarily in reaction to the irregular and mixed migration trends discussed above, and with the aim of promoting safe, legal, and orderly migration. The framework establishes the INM and COMAR—both under the authority of the Interior Ministry (SEGOB)—as the frontline actors in its migration system. The legal framework also authorizes the recently created National Guard and other auxiliary agencies, including the National System for Integral Family Development (DIF), to support INM and COMAR in carrying out their migration management and humanitarian protection duties.[21] Consequently, these four institutions spearhead the implementation of migration policy on the ground.

Under the administration of President Andrés Manuel López Obrador, however, policy changes and mandates have shifted the institutional landscape, restructured interinstitutional coordination, and directly affected Mexico's capability to manage migration. The four major policy changes and mandates that have resulted in the greatest institutional change thus far are: the deployment of the National Guard to assist INM in migration control operations; a decree shifting primary oversight of migration policies and management from SEGOB to the Foreign Ministry (SRE); the signing of collaboration agreements between SEGOB and the United Nations High Commissioner for Refugees (UNHCR) to support asylum processing in Mexico; and the implementation of legal reforms to end the detention of migrant children and their families.

Following escalating U.S. pressure to contain irregular migration, the López Obrador administration signed a migration cooperation agreement with the U.S. government in June 2019.[22] Under terms negotiated between SRE and U.S. authorities, Mexico agreed to increase migration controls, deploy the National Guard to assist in INM operations, and accept the return of non-Mexican asylum seekers from the United States under MPP, the implementation of which had begun earlier that year. Notably, the agreement marked a departure from the approach to migration taken earlier in the López Obrador administration—a relatively open-doors policy stance focused on issuing humanitarian visas to temporarily adjust the immigration status of irregular migrants in transit—and toward an enforcement-first approach across Mexican territory.

---

21   Ana Paulina Ornelas Cruz and María Jesús Mora, "Institutional and Legal Migratory Framework of the United Mexican States" (working paper, MPI, Washington, DC, prepared February 2021).

22   U.S. Department of State, "Joint Declaration and Supplementary Agreement between the United States and Mexico" (declaration, Washington, DC, June 7, 2019). For the Spanish version of the declaration, see Government of Mexico, "Declaración Conjunta México Estados Unidos" (declaration, Washington, DC, June 7, 2019).

CLP_PC_023314

In addition, INM operational capacity increased significantly as a result of the deployment of the National Guard.

In September 2019, as SRE continued to take a key role shaping migration policy, the administration enacted a decree temporarily shifting the responsibilities for managing migration and formulating policy responses from SEGOB to the Interagency Commission for Comprehensive Assistance in Migration Affairs (Comisión Intersecretarial de Atención Integral en Materia Migratoria), chaired by SRE.[23] The commission is intended as a mechanism to monitor migration in Mexico, particularly those in transit to the United States in light of the U.S.-Mexico agreement. But the shifting of migration responsibilities to the commission ran counter to the legal framework established by Mexico's *Migration Law of 2011*, which assigned responsibility for the design, implementation, and oversight of the country's migration policies to SEGOB.[24] Previously, SEGOB relied on the Advisory Council on Migration Policy (Consejo Consultivo de Política Migratoria), which was created by law in 2012, to "gather requests and consolidate the positionings of various actors to be considered for determining the country's immigration policy."[25] The new commission is comprised of representatives of 16 government agencies,[26] including SEGOB, and its central objective is to ensure the coordination across federal agencies of the design and implementation of policies, programs, and actions related to migration, with a mandate through September 2024.[27] To enact its charter, it has six working groups focused on: the northern border, the southern border, immigrant integration, extracontinental migration, interinstitutional coordination, and unaccompanied children.[28]

During this same period, the López Obrador administration has, through a series of cooperation agreements between SEGOB and UNHCR, presented a new strategy for strengthening humanitarian protection in Mexico. The signing of collaboration agreements in April 2019 and October 2020 opened new channels for UNHCR to provide COMAR direct financial assistance, personnel, and infrastructure, as well as technical training—resources that are helping to build up the asylum agency's institutional capacity.[29] This marks a change from previous cooperation between the Mexican government and UNHCR, which was more limited and less focused on institution building.

---

23   SEGOB, "Decreto por el que se crea la Comisión Intersecretarial de Atención Integral en Materia Migratoria," *Diario Oficial de la Federación*, September 9, 2019.

24   Government of Mexico, *Ley de Migración,* enacted May 25, 2011 and updated January 7, 2021, Article 18.

25   SEGOB, "Acuerdo por el que se crea el Consejo Consultivo de Política Migratoria de la Secretaría de Gobernación," *Diario Oficial de la Federación*, October 26, 2012.

26   According to a September 2019 executive decree, the ministries and agencies that comprise the commission are: SEGOB, the Foreign Ministry (SRE), the Ministry of Security and Citizen Protection, the Ministry of Finance and Public Credit, the Ministry of Welfare, the Ministry of Health, the Ministry of Labor and Social Security, the Ministry of Tourism, the Mexican Agency for International Development Cooperation, COMAR, the Institute for Administration and Valuation of National Assets, the National Institute of Migration (INM), the Tax Administration Service, the National Institute for Women, the Institute for the Administration of Property and Assets, and the National System for Integral Family Development (DIF). It is worth noting that the Ministry of Education is not among these actors, though it is the authority responsible for providing access to education to Mexican returnees and immigrants in Mexico. See SEGOB, *"*Decreto por el que se crea la Comisión Intersecretarial de Atención Integral en Materia Migratoria."

27   SEGOB, *"*Decreto por el que se crea la Comisión Intersecretarial de Atención Integral en Materia Migratoria."

28   Author interview with a senior government official, August 10, 2020.

29   SEGOB, *2 Informe de Labores* (Mexico City: SEGOB, 2020); SEGOB, COMAR, and the United Nations High Commissioner for Refugees (UNHCR), "Convenio Específico de Cooperación entre la Secretaría de Gobernación de los Estado Unidos Mexicanos y la Oficina del Alto Comisionado de las Naciones Unidas para los Refugiados para el Fortalecimiento Institucional de la Coordinación General de la Comisión Mexicana de Ayuda a Refugiados," October 9, 2020.

CLP_PC_023315

Another significant institutional development with important implications for Mexico's humanitarian protection landscape was the passage of a series of hallmark legislative reforms to the country's migration and asylum laws. In September 2020, after years of advocacy from civil-society organizations,[30] the Mexican Congress prohibited the detention of migrant

> *In September 2020, after years of advocacy from civil-society organizations, the Mexican Congress prohibited the detention of migrant children and their adult companions by migration agencies.*

children and their adult companions by migration agencies.[31] Since the law entered force on January 11, 2021, when INM encounters migrant children, it must immediately notify the branch of the Federal Prosecutor's Office for the Protection of Children and Adolescents (PPNA) in the state where the encounter occurred and transfer the children and any accompanying adults to the state's DIF delegation until the PPNA determines what is in the best interest of the child.[32]

The implementation of these reforms has brought additional administrative requirements for INM and significant new responsibilities for DIF and its state delegations. INM must contact the consulate of the minor's country of origin, suspend deportation processes for any adults caring for the child, and issue a provisional humanitarian visa for them, which allows them access to basic services until a determination is made in the child's case.[33] Meanwhile, DIF state delegations have become responsible for conducting intake evaluations, providing housing and social assistance to migrant children and accompanying adults, and coordinating with civil-society organizations working to protect their human rights.

Combined, these four key policy changes and mandates had already set a new migration paradigm in place within the first two years of the López Obrador administration's six-year tenure. With relatively little opposition, but not without controversy (as will be discussed in Section 2.D.), the administration has defended and presented these changes as means to promote safe, legal, and orderly migration.

## C.   *Assessing the Capacity of Mexican Migration Institutions*

At the institutional level, these changes under the López Obrador administration have laid bare the capacity and limitations of Mexico's four main agencies involved in migration enforcement and humanitarian protection. The effects of these policies and mandates have manifested differently across these institutions and led to increases in operational capacity for some more than others. To identify areas where further

---

30   Human Rights Watch, "Puertas cerradas: El fracaso de México en la protección de niños refugiados y migrantes de América Central," updated March 31, 2016.

31   Though the reforms were passed in September, they were published in the federal register in November to take effect in January 2021. See SEGOB, "Decreto por el que se reforman diversos artículos de la Ley de Migración y de la Ley sobre Refugiados, Protección Complementaria y Asilo Político, en materia de Infancia Migrante," *Diario Oficial de la Federación*, November 11, 2020.

32   Asylum Access Mexico, Center for Gender and Refugee Studies, Kids in Need of Defense, Latin America Working Group, Women Refugee Commission, Instituto para las Mujeres en la Migración, and International Detention Coalition, "Implementation of the Mexican Legal Reforms that Prohibit Detention of Accompanied and Unaccompanied Migrant Children," updated March 2021; DIF, "Sistema Nacional DIF ¿Qué hacemos?," accessed February 15, 2021.

33   SEGOB, "Decreto por el que se reforman diversos artículos de la Ley de Migración y de la Ley sobre Refugiados, Protección Complementaria y Asilo Político, en materia de Infancia Migrante."

CLP_PC_023316

expansions of capacity may be merited, the following subsection assesses the existing capacity of INM, the National Guard, COMAR, and DIF.

## The National Institute of Migration

Policy changes under the López Obrador administration have left perhaps the most significant imprint on the capacity and responsibilities of INM, the primary government agency responsible for migration management, control, and services. It managed 65 detention centers and temporary shelters with capacity to house approximately 9,000 migrants as of April 2020, and it employed approximately 4,000 active agents as of October 2019.[34] The INM annual budget had been falling steadily until 2020, when it was raised in light of the increase in mixed migration (see Table 2). For 2021, budget allocations for INM again increased moderately, to 1.6 billion Mexican pesos, but this is still below the levels seen prior to 2018—including in 2014–15, the previous period of heightened migration enforcement.

The majority of INM detention centers were constructed between 2000 and 2010, and they range in holding capacity from less than 20 to more than 1,000 migrants each, according to Mexico's National Human Rights Commission (CNDH).[35] From July through December 2019, INM invested 336 million pesos to rehabilitate the 15 detention centers that housed the largest migrant populations, as part of broader efforts to remodel these premises.[36]

**TABLE 2**

**Budget of Mexico's National Institute of Migration, 2014–21**

| Year | National Institute of Migration Budget |
|------|----------------------------------------|
| 2014 | MX $2,102,000,000 |
| 2015 | MX $1,979,000,000 |
| 2016 | MX $1,810,000,000 |
| 2017 | MX $1,743,000,000 |
| 2018 | MX $1,732,000,000 |
| 2019 | MX $1,331,000,000 |
| 2020 | MX $1,487,000,000 |
| 2021 | MX $1,603,000,000 |

Note: Budget amounts are shown in unadjusted Mexican pesos.
Source: MPI analysis of 2014–21 data from the Mexican Ministry of Finance and Public Credit, "Presupuesto de egresos de la federación: Resumen en clasificación económica por unidad responsable, funcional y programas presupuestarios" (national budget documents, multiple years).

Further steps to raise INM institutional capacity were taken in August 2020, when SEGOB announced a multistep initiative to modernize INM infrastructure and reduce corruption.[37] Among the most important objectives, the initiative seeks to upgrade the agency's processing system to enable it to conduct the majority of its migration services digitally, including storage of applicants' biometric information, and to reduce customer wait times to one day for select documentation services. It also aims to integrate different record systems to create a National Migration Registry to track operations and requests by migrants, immigrants, and Mexican citizens.

---

34  For the latest estimate of detention center capacity, see SEGOB, "Actúa INM con responsabilidad ante la contingencia por COVID-19" (press release, April 26, 2020). Note that 78 percent of the 4,100 active INM agents had passed their confidence exams as of October 2019; see Ministry of Security and Citizen Protection and Executive Secretariat of the National Public Security System, *Consejo Nacional de Seguridad Pública XLV Sesión Ordinaria: Informe de Actividades, 2º Semestre 2019* (Mexico City: Executive Secretariat of the National Public Security System, 2019).

35  Mexico's National Human Rights Commission (CNDH), "Informe especial: Situación de las estaciones migratorias en México, hacia un nuevo modelo alternativo a la detención" (executive summary, CNDH, Mexico City, 2019).

36  In December 2019, Mexico's Agency for International Development Cooperation (AMEXCID) also supported the rehabilitation of ten detention centers using funds from the Infrastructure Fund for Mesoamerican Countries and the Caribbean. See INM, "Invierte INM 336 millones de pesos para rehabilitar las 15 estaciones y estancias migratorias de mayor flujo de personas" (press release, December 9, 2019); Alberto Pradilla, "Gasto en cooperación con Centroamérica fue para rehabilitar centros de detención y trasladar migrantes: ASF," Animal Político, February 22, 2021.

37  SEGOB, "Supervisa secretaria de Gobernación modernización administrativa del INM" (press release, August 14, 2020).

CLP_PC_023317

The same initiative also seeks to reduce corruption at INM, amplifying ongoing efforts to identify and terminate staff and agents found to collaborate with human smugglers, among other offenses. At the same time, INM has created institutional professionalization efforts and invested in agents' capacity, including through trainings and courses that reach several hundred agents each year.[38]

Facing heightened migration levels with limited resources, INM has leveraged interinstitutional efforts to increase its operational capacity. In July 2019, INM launched a temporary voluntary return program for migrants who were enrolled in MPP and were waiting in Ciudad Juárez, Chihuahua, and who wanted to return to Guatemala, El Salvador, or Honduras via bus. The program, which is intended to expand to Tijuana and Mexicali, Baja California, was established with the support of the Foreign Ministry, IOM, Grupos Beta (INM-run groups of government officials who provide assistance to migrants and defend their human rights),[39] and Casa del Migrante (a civil-society shelter).[40]

Yet, the single most important effort to increase INM operational capacity over the last five years has been the authority in gained in 2019 to request support from the newly created National Guard to assist in migration operations. Since then, National Guard support has significantly bolstered INM operational capacity in the field, especially following a period of heightened enforcement in the summer of 2019.

> *The single most important effort to increase INM operational capacity over the last five years has been the authority in gained in 2019 to request support from the newly created National Guard.*

With assistance from the National Guard, INM established 50 migration checkpoints in northern and southern Mexico in August 2019 alone and increased its presence to 90 checkpoints by January 2020. These checkpoints have led to more than 25,000 apprehensions of irregular migrants.[41] Between September 2019 and August 2020, INM also received custody support from the National Guard in nearly 2,500 instances, primarily to transfer irregular migrants between detention centers and to assist with returns. INM also conducted 150 enforcement operations along train routes and stations during the same period with the support of the National Guard, establishing checkpoints to inspect trains and verify migrants' immigration status.[42]

Increases in operational capacity and the support now provided by the National Guard have equipped INM to respond more quickly to unauthorized migration, including containing the movement of migrant caravans during the pandemic. For instance, following reports in October 2020 of a large number of Honduran and Guatemalan migrants planning to travel through the country, INM utilized drones to monitor known migration routes along the Mexico-Guatemala border.[43] INM also deployed 500 agents across the same border in preparation for the arrival of another migrant caravan in January 2021 to verify that only

---

38   Between September 2019 and July 2020, this included four iterations of the Program for Federal Migration agents and 22 capacity-building courses on migrant children and adolescents. See SEGOB, *2 Informe de Labores*.

39   For more information on Grupos Bega, see INM, "Grupos Beta de Protección a Migrantes," updated August 27, 2019.

40   INM, "Inicia Instituto Nacional de Migración Programa Temporal de Retorno Voluntario" (press release, July 2, 2019).

41   SEGOB, *2 Informe de Labores*.

42   *El Universal*, "Viajar en el lomo de 'la bestia' dejó de ser opción," *El Universal*, July 7, 2019; *Excelsior*, "Guardia Nacional asegura a 30 migrantes tras operativo en 'La Bestia'," *Excelsior*, July 7, 2019; SEGOB, *2 Informe de Labores*.

43   Agencia EFE, "México opta por drones para vigilar frontera sur con caravana partida," Agencia EFE, October 5, 2020.

CLP_PC_023318

those with proper documentation entered the country.[44] In the Mexican interior, INM conducted more than 50 enforcement operations along train routes and stations in January and February 2021 alone, resulting in more than 1,000 migrant apprehensions, 30 percent of which were of children.[45]

## The National Guard

While its primary function is to oversee public order and safety, the National Guard was given at its inception in March 2019 the authority to serve as an auxiliary agency to support INM. It cannot perform any immigration control, verification, or review functions independently.[46] But at the explicit request of INM, the National Guard can inspect migration entry and exit documents, guard detention centers and detained migrants, transport migrants, and conduct border and immigration controls.[47] With this authority, the National Guard has played a crucial role in supporting INM enforcement and migration control operations.[48]

Shortly after the United States and Mexico signed the U.S.-Mexico Joint Declaration on migration cooperation in June 2019,[49] the Mexican government deployed 6,500 National Guard troops to the border with Guatemala[50] and an additional 14,000 troops (combined with Army and Navy forces) to the U.S.-Mexico border.[51] Since the summer of 2019, the National Guard has been deployed on numerous occasions to different border crossings to manage influxes of mixed migration, primarily Central American migrants traveling in caravans. By February 2021, there were approximately 7,000 National Guard troops stationed permanently at the Mexico-Guatemala border.[52] It has also conducted migration control operations in the interior, including the southern cities of Ciudad Hidalgo and Tapachula in Chiapas and the northern cities of Piedras Negras in Coahuila and Tijuana in Baja California.

The National Guard's financial and operational capacity has expanded significantly over the last two years. Compared to other government institutions whose budgets have been reduced sharply by austerity measures under the López Obrador administration, funding for the National Guard has increased dramatically: from 6 billion pesos in 2020 to 64 billion pesos in 2021.[53] Although it was intended to be composed of civilian police officers, as of December 2020, 70 percent of the National Guard's approximately 100,000 members had been transferred from the armed forces.[54] Reflecting its leaders' experience in the

---

44  Elio Henríquez, "Despliega Inami 500 agentes en frontera sur ante avance de migrantes," *La Jornada*, January 14, 2021; INM, "Mantiene INM vigilancia en la frontera sur" (press release, January 14, 2021).

45  INM, "Rescata INM a personas migrantes en operativos a trenes de carga" (press release, February 16, 2021).

46  Government of Mexico, *Ley de Migración*, Articles 18 and 96.

47  SEGOB, "Decreto por el que se expide la Ley de la Guardia Nacional," *Diario Oficial de la Federación*, May 05, 2019.

48  The National Guard was established to replace Mexico's Federal Police Force, and it is part of the Ministry of Security and Citizen Protection. For more information, see SEGOB, "Decreto por el que se expide la Ley de la Guardia Nacional."

49  Ruiz Soto, *One Year after the U.S.-Mexico Agreement*.

50  Dave Graham, "México despliega 15,000 efectivos en norte del país, mientras busca frenar migración a EEUU," Reuters, June 24, 2019.

51  Anthony Esposito, "Mexico's New National Guard Was Created to Fight Crime, but Now It's in a Face-Off with Migrants," Reuters, July 7, 2019.

52  Jacobo García, "México militariza la frontera sur ante la llegada de la primera caravana de la era Biden," *El País*, January 18, 2021.

53  The figures cover the budget allocated to the structure and operations of the National Guard. For more details, see Ministry of Finance and Public Credit, "Presupuesto de Egresos de la Federación 2020" (budget tables, January 2020); Ministry of Finance and Public Credit, "Presupuesto de Egresos de la Federación 2021" (budget tables, January 2021).

54  Mary Beth Sheridan, "Losing Control: As Mexico's Security Deteriorates, the Power of the Military Grows," *Washington Post*, December 17, 2020.

CLP_PC_023319

Army and Navy, trainings and workshops primarily draw from models set by these two branches of the military.[55]

## Mexico's Commission for Refugee Assistance

In addition to increasing its enforcement capabilities, the Mexican government has also focused on strengthening COMAR. The agency, which is responsible for receiving and processing requests for humanitarian protection, has seen its capacity quickly expand since 2019. In reaction to a sharp increase in the number of asylum requests that overwhelmed its operational capacity throughout 2019, the López Obrador administration more than doubled COMAR's budget, from 20.8 million pesos in 2019 to 47.4 million pesos in 2020 (see Table 3). Furthermore, the administration intends to integrate Mexico's Southern Border Commission (Comisión de Frontera Sur) into COMAR in 2021, raising COMAR's allocated budget from 44.4 million pesos to 97.4 million pesos once the commission's funds are transferred over. Technical and financial support from UNHCR Mexico has also added significant capacity and training at COMAR, with these resources made available following the signing of collaboration agreements between SEGOB and UNHCR.[56]

TABLE 3

**Budget of Mexico's Commission for Refugee Assistance, 2014–21**

| Year | COMAR Budget |
|------|-------------|
| 2014 | MX $24,800,000 |
| 2015 | MX $26,000,000 |
| 2016 | MX $22,500,000 |
| 2017 | MX $25,400,000 |
| 2018 | MX $25,800,000 |
| 2019 | MX $20,800,000 |
| 2020 | MX $47,400,000 |
| 2021* | MX $97,400,000 |

* COMAR's budget for 2021 includes 53 million pesos transferred from Mexico's Southern Border Commission.
Note: Budget amounts are shown in unadjusted Mexican pesos.
Source: MPI analysis of 2014–21 data from the Mexican Ministry of Finance and Public Credit, "Presupuesto de egresos de la federación."

These significant increases to COMAR's budget, complemented by UNHCR assistance, have magnified its geographical presence and operational capacity. By January 2020, COMAR had increased its presence from four to seven offices across strategic migrant hubs in Mexico: Tapachula and Palenque, Chiapas; Tenosique, Tabasco; Acayucan, Veracruz; Mexico City; and the northern cities of Tijuana, Baja California and Monterrey, Nuevo León.[57] It also added a registration center in Tapachula to augment its intake capacity by 120 requests per day and to provide applicants with a same-day receipt they could use to apply for a temporary humanitarian visa at INM offices while awaiting the resolution of their request for humanitarian protection.[58] COMAR also intends to open two additional offices in Guadalajara, Jalisco and Saltillo, Coahuila in 2021.[59]

COMAR operations have continued during the pandemic, adopting health precautions and new institutional measures to accept and process asylum requests. However, in April 2020 it suspended its 45-day timeline

---

55   Sheridan, "Losing Control."
56   SEGOB, *2 Informe de Labores*.
57   COMAR offices were temporarily established in Palenque, Chiapas; Tijuana, Baja California; and Monterrey, Nuevo León in 2019. By February 2021, the offices in Palenque and Tijuana had become permanent. See SEGOB, "AVISO por el que se da a conocer el domicilio oficial de la Oficina de Representación en Palenque, Chiapas, de la Coordinación General de la Comisión Mexicana de Ayuda a Refugiados," *Diario Oficial de la Federación*, February 10, 2021; SEGOB, "AVISO por el que se da a conocer el domicilio oficial de la Oficina de Representación en Tijuana, Baja California, de la Coordinación General de la Comisión Mexicana de Ayuda a Refugiados," *Diario Oficial de la Federación*, February 10, 2021; COMAR, "COMAR: oficinas, presencia y acciones," updated January 10, 2020.
58   SEGOB, *2 Informe de Labores*.
59   Author interview with Andrés Alfonso Ramírez Silva, COMAR General Coordinator, March 1, 2021.

CLP_PC_023320

for returning a decision on protection requests until further notice, given limited processing capacity. The agency also paused its requirement that asylum seekers provide weekly in-person signatures to certify they remain in the state where they submitted their application.[60]

To reduce growing processing delays and expedite protection determinations, COMAR has also amplified its hiring efforts, with significant UNHCR assistance. In 2021, COMAR intends to employ 175 agents itself, and UNHCR has pledged financial support to help the agency hire nearly 200 additional temporary agents. While hiring remains in progress and could be delayed by the ongoing pandemic, as of March 2021, COMAR employed approximately 140 agents. This is a stark contrast to the 48 agents it employed in 2019.[61]

The López Obrador administration has also invested in efforts to develop internal technical capacity at COMAR. Under the National Plan of Technical Capacity, COMAR offers agents trainings on protection standards, and through the Regional Asylum Capacity Building Initiative, COMAR staff exchange best practices with counterparts from the United States and Canada.[62] Unfortunately, evaluations of these trainings are not publicly available, making it difficult to ascertain their progress.

> *The López Obrador administration has also invested in efforts to develop internal technical capacity at COMAR.*

### The National System for Integral Family Development

DIF is a decentralized public institution responsible for coordinating public assistance efforts among the three government branches, public institutions, and public and private organizations involved in the provision of social assistance services to families.[63] At the national level, DIF coordinates and establishes the operation guidelines to be followed by DIF state and municipal systems.

Even though the federal government allocates annual funds to DIF's national system, some of these funds are channeled to specific national programs or are used to cover a portion of overhead costs at the state and local levels.[64] However, as much as 97 percent of DIF funding comes from state and municipal government budgets.[65]

DIF state and local branches provide essential support services, including educational instruction; day care; legal, psychological, social, and health services; and employment workshops and trainings. They also provide permanent shelter for minors and temporary shelter for elders. The range of services provided by local and state DIF branches, as well as the size of the shelters DIF runs, vary from municipality to municipality. DIF has a presence in all 32 states and in 1,500 of the 2,414 municipalities in Mexico.[66] DIF services are available to all families in the country, including migrants.

60   Ruiz Soto, *One Year after the U.S.-Mexico Agreement.*
61   Author interview with Andrés Alfonso Ramírez Silva, COMAR General Coordinator, March 1, 2021. See also Ruiz Soto, *One Year after the U.S.-Mexico Agreement.*
62   SEGOB, *1 Informe de Labores* (Mexico City: SEGOB, 2019).
63   DIF, "Sistema Nacional DIF ¿Qué hacemos?"
64   Ministry of Finance and Public Credit, "Analíticos del Presupuesto de Egresos de la Federación 2021: Análisis por Unidad Responsable," accessed February 15, 2021.
65   Elieth Blázquez Bonilla, "La asistencia social en México: Una mirada desde el SNDIF," *Ánfora* 24, no. 43 (2017): 189–212; Author interview with Yamileth Herrera Díaz, Director of the Welfare Agency, DIF Municipal Office, Veracruz, February 20, 2021.
66   Blázquez Bonilla, "La asistencia social en México."

CLP_PC_023321

## D.    The Implications of Policy Changes and Gaps to Be Addressed

Despite efforts by the López Obrador administration to address the immediate pressures on the Mexican migration system, and some notable expansions in capacity, the policy changes highlighted above have also created a patchwork of institutional mandates marked by both gaps and areas of overlap. In some areas, recent changes have also prioritized coordination with other agencies or international actors over the development of longer-term, sustainable growth strategies and the enhancement of the in-house capacity of the institutions in the lead on implementing migration policy.

One of the biggest challenges is the lack of clarity of which institution is in charge of formulating migration policy and what the standard process is for doing so. It is unclear how SRE's Interagency Commission for Comprehensive Assistance in Migration and SEGOB's Advisory Council on Migration Policy are to divide policymaking responsibilities, and what the difference is between their mandates in practice.[67] It is similarly unclear how agreements reached during meetings held by SRE's interagency commission translate into budget allocations to execute policy.[68] Another drawback of this new institutional landscape is that SRE's interagency commission excludes representatives from Congress and from federal agencies that are essential to the design and execution of migration policies and programs for different groups of migrants and Mexican returnees.[69] As a result of these overlaps and gaps, there is no single interagency mechanism for setting comprehensive migration policy at the federal level. This, in turn, translates to disjointed and *ad hoc* policy responses by different government entities when external pressures arise.

*As a result of these overlaps and gaps, there is no single interagency mechanism for setting comprehensive migration policy at the federal level.*

The fragmented and reactive nature of migration policymaking at the federal level has a cascade effect on how migration policy is being implemented throughout the country. Since the beginning of its tenure, the López Obrador administration has provided minimal financial and leadership coordination to many existent federal programs, such as the We Are Mexican (Somos Mexicanos) program that provides reception and reintegration support services to returnees. The federal government has also been mostly absent from efforts to coordinate a response plan to support state and local governments on the front lines of managing the influx of migrants that has resulted from U.S. metering policies[70] and MPP. As a result, federal as well as state and local government institutions have been left to address the needs of migrants, receiving communities, and returning Mexican nationals with little federal guidance and budget support.

---

67   Alexandra Haas Paciuc, Elena Sánchez-Montijano, and Roberto Zedillo Ortega, coordinators, *Cohesión Social: Hacia una política de integración de personas en situación de movilidad en México* (Mexico City: Centro de Investigación y Docencia Económicas, 2020).

68   Haas Paciuc, Sánchez-Montijano, and Zedillo Ortega, *Cohesión Social*.

69   Some of the ministries that are not included in SRE's interagency commission are: the Attorney General's Office (FGR); the Ministry of Education; the National Council to Prevent Discrimination; and the National System for the Integral Protection of Children and Adolescents (SIPINNA). See Haas Paciuc, Sánchez-Montijano, and Zedillo Ortega, *Cohesión Social*.

70   "Metering" refers to the practice of limiting the number of asylum seekers who can present themselves at U.S. ports of entry to file a protection claim each day, which has resulted in many waiting in Mexico for days or months for a chance to do so. See Ruiz Soto, *One Year after the U.S.-Mexico Agreement*, 9.

In the absence of robust government support, Mexican returnees generally rely on their own communities, families, and friends to obtain information and access employment and financial support. However, responsibility for providing shelter and basic services to returning Mexicans who lack social networks, as well as to many non-Mexican migrants traveling through the country, falls mostly on a strained network of civil-society organizations. In recent years, the influx of asylum seekers and transit migrants—combined with pandemic-related restrictions—have raised additional hurdles for civil-society organizations in Mexico. The large demand for services has put pressure on their limited financial and material resources, while social-distancing measures have made it more difficult for shelters to deliver in-person services. To address these gaps, international humanitarian and development organizations such as HIAS and Save the Children have expanded their presence in the country.

Beyond fragmented policymaking, the core institutions that oversee the implementation of migration policy face significant challenges enforcing the policies that the administration has enacted in the past two years. Despite the government's push to modernize INM and invest in agents' technical training, INM continues to have capacity limitations on the ground. In certain locations along the U.S.-Mexico border, the agency lacks the required equipment to guard border checkpoints or the necessary staff to process the return of Mexican citizens and other migrants who are expelled by U.S. authorities at the border. Local authorities provide their own resources to support INM operations, even though these tasks are not under their jurisdiction.[71] In addition, interviews with government leaders suggest that staff turnover and shortages are also affecting the quality of the services INM provides. INM agents in regional offices, for instance, are reportedly sometimes unfamiliar with processing or documentation requirements and provide incomplete information to migrants.

Albeit not new, the two central issues that INM faces in addition to capacity constraints are corruption and human rights abuses. From the start of the López Obrador administration in December 2018 through September 2020, INM terminated more than 1,000 staff due to complaints and corruption, including 600 migration agents.[72] Furthermore, the CNDH registered more than 1,000 complaints of human rights violations against the agency in 2020. Since 2009, the CNDH has issued more than 34 recommendations to INM, primarily focused on providing migrants with medical and psychological attention, information about migration processes, due process, food and hygiene supplies, and access to means of communication.[73] The most recently registered human rights violations were related to two migrant deaths in INM detention centers, as well as to overcrowding in these centers during the early stages of the pandemic. Almost all migrants were later released from detention centers to mitigate the risk of the virus spreading in crowded facilities while authorities reviewed the centers' conditions, before resuming migrant detentions in late 2020.[74]

The involvement of the National Guard in supporting INM on migration control operations was meant to free up some of the agency's capacity, but since this involvement, allegations of human rights abuses

---

71   Author interview with local government official, July 2020.

72   Of the 600 INM migration agents, nearly 400 were terminated through anticorruption and confidence measures by December 2019. See *La Razón*, "Entran al país 179 mil migrantes en el año... y a 99.8% lo deportan," *La Razón*, December 30, 2019; SEGOB, "Causan baja del INM mil 48 personas servidoras públicas durante la Cuarta Transformación" (press release, September 20, 2020).

73   Maritza Pérez, "Contra el INM, 1,044 quejas por violación a derechos humanos," *El Economista*, February 11, 2021. For a list of CNDH recommendations for INM and the outcomes, see INM, "Recomendaciones Dirigidas al INM," updated February 11, 2021.

74   SEGOB, "Actúa INM con responsabilidad ante la contingencia por COVID-19," updated April 26, 2020.

CLP_PC_023323

have increased substantially. Advocacy organizations, academics, and representatives of international organizations in the summer of 2019 voiced concerns about a military-trained force assisting in migration-control activities—most notably, the risks associated with National Guard personnel's lack of training and skills on how to assist vulnerable populations.[75] From June to November 2019 alone, the CNDH recorded 32 allegations of human rights abuses committed against migrants by the National Guard, including the use of lethal force against migrant children and women.[76] In October 2020, the CNDH issued its first recommendations to the National Guard over how to address human rights violations and the use of lethal force against migrants traveling in a caravan in January 2020.[77] The recommendations called for the development of an action protocol that prioritizes safeguarding human rights, a continuum to clarify when the use of force is justified, as well as oversight mechanisms to ensure accountability. As it is likely that the National Guard will continue to play a pivotal role in migration enforcement in the years to come, it is essential that policymakers carefully consider such recommendations and work to establish mechanisms that ensure government agents abide by the rule of law and due process while protecting migrants' human rights.

Several stakeholders have also raised concerns that INM's implementation of documentation policies to manage transit and irregular migration has been inconsistent.[78] In some instances, immigration authorities are reportedly issuing exit permits to detained migrants when they are unable to return them to their countries of origin due to a lack of repatriation agreements.[79] In other cases, however, INM is granting them humanitarian visas[80] or using instruments of international protection such as recognition of an individual's statelessness, particularly when dealing with African migrants, without their knowledge or informed consent.[81] These uneven practices are a result of both gaps in the legal framework and negligence on the part of authorities, and they illustrate the mismatch between the legal mechanisms available and the types of migration Mexico is experiencing. As the profile of migrants has become more complex, policymakers must develop a repertoire of policies and guidance that allows immigration authorities to enforce the rule of law and manage migration while respecting migrants' human rights.

---

75   Isabella Gonzalez, "Alertan por uso de GN en temas migrantes," INM, July 3, 2019.

76   Animal Político, "CNDH registra 32 quejas contra Guardia Nacional por presuntas violaciones de derechos," Animal Político, January 9, 2020.

77   Infobae, "CNDH emitió una recomendación a la Guardia Nacional y al INAI por agresiones a personas migrantes en Chiapas," Infobae, October 30, 2020.

78   Author interviews with five nongovernmental experts, July and August 2020.

79   Previously, exit permits issued by INM allowed migrants to exit through any port of entry, but this policy changed after migrants used these permits to attempt to enter the United States. Now, these permits state that the individual must exit through the same border through which they entered.

80   The Visitor Card for Humanitarian Reasons (also known as a humanitarian visa) is granted to foreigners who are victims, aggrieved subjects (passive subjects of criminal behavior), or witnesses of a crime committed in national territory; migrant children and their adult companions, as established under the 2021 reforms on child protection; and those who request political asylum, refugee status, or complementary protection. SEGOB can also grant this status to foreigners who are not part of these categories if they deem there is humanitarian cause or if it is of public interest. Humanitarian causes, per the law, are: when the individuals' life or health is at risk and they must remain in the country; when individuals have custody of a family member for whom they must make medical decisions or tend their corps; or when individuals must look after a family member who is in the country and has a serious medical condition. Foreigners who are visitors for humanitarian reasons may request to renew their migration document as many times as needed until the process has concluded or until the conditions that necessitated their protection status no longer exist. Foreigners under this status are allowed to apply for work authorization. The migration document that grants this status will allow holders multiple entries and exits from Mexican territory. See Government of Mexico, *Ley de Migración*, Article 52.

81   For regional responses to extracontinental migration and their implications, see Jessica Bolter and Caitlyn Yates, *African Migration through Central America* (Washington, DC: MPI, forthcoming).

CLP_PC_023324

Looking at the protection landscape in Mexico, COMAR faces two main challenges: one is the need to address procedural bottlenecks, and the other is the need to develop a long-term strategy for strengthening the institution. In recent years, COMAR has expanded its footprint across the country and improved the quality of its services. Yet, case processing is still surpassing the 45-day timeline established in law. Persistent processing delays are putting at risk asylum seekers who are forced to remain in the state where they submitted their claims, often in southern Mexico where they may face difficult security and socioeconomic conditions. As the number of asylum applications continues to increase, it will be imperative for the agency to speed up the adjudication of claims without compromising the quality of the process. To do so, the agency will require additional resources, including staff, new equipment, and funding to sustain its growth.

> *COMAR faces two main challenges: one is the need to address procedural bottlenecks, and the other is the need to develop a long-term strategy for strengthening the institution.*

Increases in COMAR's funding and technical capacity over the last two years have depended significantly on UNHCR support, with a more limited focus on making the institution self-sustaining in the long term. UNHCR's infrastructure and logistical support, additional personnel, and technical trainings have been vital resources for COMAR, but over-reliance on such external resources is neither sustainable over the long term nor does it a make an organization resilient in the short term. For example, in early 2021, the Mexican Senate is discussing granting protection to internally displaced people (IDPs), a move that would create an additional portfolio of work for COMAR by making it responsible for coordinating interagency efforts and processing IDPs' claims.[82] The challenge for Mexican policymakers and other stakeholders is how to build a resilient protection system that is not overly dependent on humanitarian actors such as UNCHR, and one that will be able to adapt if the government continues to expand its mandate.

Perhaps no other recent example demonstrates more clearly the capacity gaps in Mexico's migration system than the implementation of the 2021 reforms to provide shelter and protection for migrant children and their families, rather than to detain them. Although these reforms are still being rolled out, early signs suggest there is a dearth of coordination among state and local representatives of the PPNA, DIF, and INM delegates. In a February 2021 interview, the head of a local DIF branch in Veracruz mentioned that no working meetings had been held among the three government entities despite multiple requests.[83] Representatives from other states have faced similar hurdles and, as a result, some children and their families have not been channeled appropriately to the protection system.[84]

More broadly, DIF's institutional design and financial structure vis-à-vis its state and local branches raise serious questions about the agency's capacity to carry out its new responsibilities under the 2021 reforms. DIF local branches already operate shelters with limited capacity and provide services based on budget availability, and the expansion of the migrant child and family populations they are to serve requires additional capacity and tailored services. Considering the majority of funding for DIF's state and local

---

82  Mexican Congress, Chamber of Deputies, "Minuta Proyecto de Decreto por el que se expide la ley general para prevenir, atender y reparar integralmente el desplazamiento forzado interno" (draft decree, September 29, 2020).

83  Author interview with Yamileth Herrera Díaz, Director of the Welfare Agency, DIF Municipal Office, Veracruz, February 20, 2021.

84  César Martínez, "Ignoran a familias migrantes," Reforma, February 14, 2021.

CLP_PC_023325

branches is allocated by state and municipal governments, not the federal government, this will significantly affect the demands placed not only on DIF's budget, but also on those of municipal and state governments.

Besides operational and capacity hurdles, there are also major procedural gaps that remain unresolved. For instance, it is unclear what the security protocol is, if any, to verify the relationship between child migrants and their adult companions. There is also no explicit guidance on whether DIF will be the sole entity responsible for the care and custody of unaccompanied child migrants, or if the PPNA is to determine whether conditions in a child's country of origin would allow for safe return.

## E.   Moving beyond Reactive Policymaking

The reactive nature of Mexico's migration policymaking raises serious questions about the capacity of the government to promote safe, legal, and orderly migration over the long term. A mix of forward-looking reforms and *ad hoc* policies have resulted in a patchwork of overlapping mandates that prioritize coordination—for example, in SRE's interagency commission, between INM and the National Guard, and with other actors such as COMAR's work with UNHCR—over sustainable institutional capacity-building efforts. The lack of long-term, sustainable efforts to strengthen the institutions that are supposed to oversee policy changes is having a significant effect on Mexico's migration policy landscape.

As a country of origin, reception, and transit migration, Mexico has an opportunity to reimagine its role as a key actor in regional migration management. Its success in seizing this opportunity will largely depend on its ability to systematize migration policymaking efforts and develop robust and resilient institutions that can make the overall migration system more sustainable.

# 3   Guatemala, Honduras, and El Salvador: Emerging Institutions and Critical Partnerships[85]

While Mexico has become a major transit and destination country for migrants headed northward, the three countries in the northern part of Central America—Guatemala, Honduras, and El Salvador—often called the "Northern Triangle," have increasingly become the principal source countries for emigration in the region. Most of these migrants want to reach the United States, but some are settling in Mexico, and there is a much smaller number heading south to Costa Rica and Panama as well.

Each of these three Central American countries is also becoming a major transit country. This is most notable in the case of Guatemala, the country that migrants from Honduras and El Salvador must cross to travel north, but all three are transit countries for migrants from outside the region, including those from Haiti, Cuba, and countries in South America, Africa, and Asia, who pass through Central America on their way north. And there are small numbers of citizens from other Central American countries (Guatemala,

---

85   This section was researched and written primarily by Luis Argueta and Andrew Selee, with additional input from the report's other authors.

CLP_PC_023326

El Salvador, Honduras, and Nicaragua) who have chosen to settle just across the border in neighboring countries, creating a still very small immigrant and asylum seeker population in each country.

Finally, all three countries are dealing with substantial returns, sometimes voluntary and often through deportation, of their nationals from the United States and Mexico. This raises issues of reception and reintegration for each of these countries, including how to take advantage of the human capital of those who have lived for long periods abroad.

## A. Migration Patterns Shifting Priorities in Central America

Migration to the United States from the Central American countries of Guatemala, Honduras, and El Salvador is hardly new, but it has gone through noticeable changes in recent years. In 2020, the Migration Policy Institute estimates that there were approximately 1.7 million immigrants from El Salvador living in the United States, up from 1.3 million in 2013. During this same period, the number of immigrants from Guatemala rose from 902,000 to an estimated 1.3 million, and the number from Honduras rose from 534,000 to an estimated 940,000 (see Table 4).

El Salvador has the longest and most extensive history of migration to the United States, and Salvadorans account for the largest Central American immigrant group in the United States. Indeed, Salvadorans in the United States make up more than one-fifth of all people born in El Salvador.[86] However, the Guatemalan and

**TABLE 4**

**Immigrants from El Salvador, Guatemala, and Honduras in the United States, 2013 and 2020***

| Country | 2013 | 2020* | Percent Change |
|---|---|---|---|
| El Salvador | 1,252,000 | 1,710,000 | 37% |
| Guatemala | 902,000 | 1,330,000 | 47% |
| Honduras | 534,000 | 940,000 | 76% |

* While data for 2013 are drawn from the U.S. Census Bureau's American Community Survey (ACS), 2020 ACS data are not yet available and MPI has drawn on multiple sources, cited below, to produce these up-to-date estimates.

Sources: Data for 2013 are from the ACS, presented in Jie Zong and Jeanne Batalova, "Central American Immigrants in the United States in 2013," *Migration Information Source*, September 2, 2015. Figures for 2020 are the result of MPI calculations based on population data from the ACS, pooled for 2014–18, and from the 2008 Survey of Income and Program Participation (SIPP), weighted to 2018 unauthorized immigrant population estimates provided by Jennifer Van Hook of The Pennsylvania State University, Population Research Institute; data on emigration from the United States provided by Van Hook; immigration admissions data for FY 2019–21 from U.S. Department of State (DOS), "Table III: Immigrant Visas Issued (by Foreign State of Chargeability or Place of Birth) Fiscal Year 2019" (data tables, n.d.) and DOS, "Monthly Immigrant Visa Issuance Statistics" (data tables, n.d.); refugee arrivals data for FY 2019 from the U.S. Department of Homeland Security (DHS), Office of Immigration Statistics (OIS), "Table 14. Refugee Arrivals by Region and Country of Nationality: Fiscal Years 2017 to 2019," *Yearbook of Immigration Statistics 2019*, updated October 28, 2020; data on U.S.-Mexico border encounters with no confirmed departure (i.e., remaining in United States) for FY 2019 and the first half of FY 2020 from DHS, OIS, "Enforcement Lifecycle Reports: 2020 Enforcement Lifecycle Report—Detailed Appendix Tables" (data tables, December 22, 2020); data on U.S. apprehensions of nationals from El Salvador, Guatemala, and Honduras from U.S. Border Patrol, "U.S. Border Patrol Nationwide Apprehensions by Citizenship and Sector," updated January 2020, and U.S. Customs and Border Protection, "U.S. Border Patrol Southwest Border Apprehensions by Sector Fiscal Year 2020," updated November 19, 2020; data on removals from the U.S. interior from U.S. Immigration and Customs Enforcement (ICE), *U.S. Immigration and Customs Enforcement Fiscal Year 2019 Enforcement and Removal Operations Report* (Washington, DC: ICE, 2019) and ICE, *U.S. Immigration and Customs Enforcement Fiscal Year 2020 Enforcement and Removal Operations Report* (Washington, DC: ICE, 2020); data on Migrant Protection Protocol (MPP) participants for FYs 2019–20 from TRAC Immigration, "Details on MPP (Remain in Mexico) Deportation Proceedings," updated February 2021.

---

86   The population of El Salvador is around 6.4 million people. There are communities of Salvadoran nationals in several other countries, including Canada, Mexico, Spain, Italy, and Belgium, that number from a few thousands to a few tens of thousands, so the total number of Salvadoran-born persons is likely somewhere around 8.2 million, of whom 1.7 million were in the United States in 2020. On the number of Salvadorans in Canada, see Statistics Canada, "NHS Profile, Canada, 2011," updated November 27, 2015. On Spain, see Spanish Labor Force Survey (Encuesta de población activa), "Salvadoreños en España. Padrón municipal 2019, cifras de población," accessed March 1, 2021.

Honduran immigrant populations in the United States have grown at a much faster rate in recent years, as Salvadoran migration has slowed and Guatemalan and Honduran migration has increased dramatically, especially since 2018.

While many immigrants from these countries come to the United States through regular migration channels, they also make up large shares of irregular and mixed migrant arrivals at the U.S. southwest border. In fact, U.S. Customs and Border Protection data show that while Mexicans long accounted for the largest number of apprehensions at the U.S.-Mexico border, they were overtaken by migrants from Honduras, Guatemala, and El Salvador in U.S. fiscal year (FY) 2014 and then again from FY 2016 to FY 2019. Among migrants from these three countries, those from Guatemala and Honduras have each accounted for more apprehensions than those from El Salvador in most years since FY 2008—and considerably more since FY 2018.

FIGURE 3

**U.S. Southwest Border Migrant Apprehensions, by Nationality, Fiscal Year 2008–20**



Note: These data are for U.S. federal government fiscal years, which run from October 1 through September 30.
Source: MPI calculations based on U.S. Border Patrol, "U.S. Border Patrol Apprehensions Nationwide by Citizenship and Sector, FY2007-2019," updated January 2020; U.S. Customs and Border Protection, "U.S. Border Patrol Southwest Border Apprehensions by Sector Fiscal Year 2020," updated November 19, 2020.

As all three of these Central American countries have become major countries of emigration, they have developed more robust policies and institutional structures for engaging with their diasporas. This is most developed in El Salvador, given its long history of migration and the highly organized nature of its diaspora, but such policies and structures are growing in Guatemala and Honduras as well.

CLP_PC_023328

While many migrants from these three countries stay abroad—mostly in the United States—others return to their countries of origin, many as deportees. There is thus a need for services to support their reintegration. A 2020 report by the U.S. Department of Homeland Security notes that of all apprehensions of Central America nationals from 2014 through 2019, 28 percent resulted in the migrants' repatriation to their countries of origin.[87] Considering that there were more than 1.5 million apprehensions of migrants from these three countries in that period, this suggests these countries have received more than 400,000 deported migrants, a significant number to receive and reintegrate. These figures do not include those deported from the interior of the United States, who have often been living abroad for longer periods of time and face more difficult prospects for reintegrating into countries from which they have been absent for many years.

Finally, all three countries have become transit countries for migrants heading north through Central America. Guatemala is the most visible case, since almost all Honduran and Salvadoran migrants headed north travel through its territory. Nonetheless, all three experience transit migration coming from further south, as more migrants from the Caribbean, South America, Africa, and Asia have in recent years sought to reach the United States by coming through the Central American isthmus. In FY 2018, U.S. authorities made approximately 21,000 apprehensions at the U.S.-Mexico border of migrants from countries other than Mexico, Guatemala, Honduras, and El Salvador (see Figure 3 above), representing 5 percent of total apprehensions that year. These apprehensions increased significantly to 77,000 in FY 2019, accounting for more than 9 percent of total apprehensions, and though such apprehensions decreased to 44,000 in FY 2020, they were 11 percent of that year's total. While some of these migrants may have arrived directly in Mexico before traveling to the border,[88] the vast majority likely transited through Central America on their way north. These transit migrants rarely stay for long in El Salvador, Guatemala, or Honduras, sometimes stopping in shelters on their way but rarely setting down roots. Still, their presence constitutes another important part of the changing migration landscape in Central America.

> *All three experience transit migration coming from further south, as more migrants from the Caribbean, South America, Africa, and Asia have in recent years sought to reach the United States by coming through the Central American isthmus.*

---

87   This also means that 72 percent were not repatriated, which suggests that almost three-quarters of Central American migrants apprehended at the border from 2014 to 2019 likely remained in the United States. For further data analysis, see Marc R. Rosenblum and Hongwei Zhang, *Fiscal Year 2020 Enforcement Lifecycle Report* (Washington, DC: U.S. Department of Homeland Security, Office of Immigration Statistics, 2020).

88   There appear to be smuggling networks for Chinese, South Asian, and, to a much smaller degree, Venezuelan migrants that fly people directly to Mexico with a valid tourist visa. Author interviews with multiple current and past Mexican government officials, shelter staff, and nongovernmental organization leaders, July to September 2020.

CLP_PC_023329

## B.  Migration Management Structures: Incipient and Yet to Be Fully Institutionalized

Each of the three countries—Guatemala, Honduras, and El Salvador—has made investments in managing migration, but these are significantly underdeveloped compared to what is needed to address migration through, from, and to each country. Particularly, migration policymaking systems are not fully built out and are subject to change as circumstances shift; migration institutes and agencies are only weakly institutionalized; enforcement has largely been left to the national police and/or military, which have little training in dealing with migrant populations and perform these functions on an *ad hoc* basis; asylum systems remain extremely weak, despite recent attention given to them; labor mobility pathways remain weakly institutionalized; and systems for addressing the reception and reintegration of returning migrants are severely underinvested and uneven across the three countries. Given these weaknesses, nongovernmental and international organizations have stepped in to provide many services for return migrants and for those fleeing violence and persecution, though these organizations are also underfunded.

*There are enormous opportunities to develop a more coherent set of institutions both inside and outside of government to address migration.*

There are enormous opportunities to develop a more coherent set of institutions both inside and outside of government to address migration within these three countries, but the effort to do so has only started. Coordination within governments and among them remains another challenge. In different ways, IOM, UNHCR, and the Central American Integration System (SICA) have each played a role in trying to address this gap, but this too remains a work in progress.

### Institutions for Migration Policymaking

None of the three countries has yet developed effective interagency processes for policymaking on migration.[89] The Guatemalan government has the National Migration Authority (ANM), which meets every three months with a range of cabinet-level actors, convened by the president or vice president, but it does not appear to be the real channel for decision-making on migration policy.[90]

The Honduran government has an interagency task force on migration that is run by the first lady and that was created following the large-scale emigration of unaccompanied minors in 2014. The government has sought to establish a formal migration policymaking system and has consulted extensively within the government and with civil-society and international organizations on this process, but prospects remain uncertain.

---

89  Analyses of legal framework and interagency structure for policymaking are based on in-depth mapping of migration institutions and laws in each country. See María Sol Pikielny, Ana Paulina Ornelas Cruz, and María Jesús Mora, "Institutional and Legal Migratory Framework of the Republic of Guatemala" (working paper, MPI, Washington, DC, prepared February 2021); María Sol Pikielny and María Jesús Mora, "Institutional and Legal Migratory Framework of the Republic of Honduras" (working paper, MPI, Washington, DC, prepared February 2021); María Sol Pikielny and María Jesús Mora, "Institutional and Legal Migratory Framework of the Republic of El Salvador" (working paper, MPI, Washington, DC, prepared February 2021).

90  Author interviews with two Guatemalan government officials and one nongovernmental expert, July and August 2020.

CLP_PC_023330

During the past two or three years, foreign ministries in these countries have taken on much of migration policymaking, according to government officials and nongovernmental experts interviewed for this study. In large part, this has occurred because the primary focus was responding to demands from the U.S. government. In Guatemala, the Interior Ministry played a major role during the prior administration under President Jimmy Morales, while in El Salvador it is the Office of the President that leads migration policymaking in the current Bukele administration. However, in all three countries, foreign ministries have assumed greater direct policymaking roles due to the international nature of agreements around migration, and the need to respond diplomatically. Foreign ministries already had a large role in diaspora relations and in the coordination of migrant returns in most of these countries, especially in El Salvador, which has a long history of engagement with its diaspora. By comparison, the influence of foreign ministries on decision-making around enforcement and asylum appears to be relatively more recent and to have emerged as a response to changes in these countries' relationship with the U.S. government.

## Institutions for Migration Management

Both the Guatemalan and Honduran governments have created autonomous migration institutions to manage migration. In response to growing awareness of the number of unaccompanied minors heading to the United States, Honduras established by presidential decree the National Institute of Migration (INM) in 2014. The Institute replaced a general directorate in the Interior Ministry, and it resulted in significant staff turnover and required the creation of new procedures, protocols, and structures to deal with everything from the production of passports to the issuance of visas.[91]

The Guatemalan Migration Institute (IGM) was only recently set up, in August 2020, based on a migration code published in 2017, and it is still in the process of consolidating its role as an autonomous agency.[92] Governmental and nongovernmental stakeholders interviewed for this study agreed that the IGM's creation was a step in the right direction, but also recognized that it is only now beginning to develop its institutional structure.[93] Unlike the INM in Honduras, which appears to have a broader profile *de facto* in setting policy, the IGM still plays a primarily operational role in migration management at this point in its development, with Guatemala's Interior Ministry and Foreign Ministry taking the lead in setting migration policy.

Instead of an autonomous migration institute, El Salvador has a General Directorate of Migration and Immigration, which works under the Ministry of Justice and Public Security. It is a wholly operational agency and sits fully within the broader ministry, unlike the autonomous institutes in the other two countries (and in Mexico). It is the only migration agency in these three Central American countries that has its own Border Patrol, discussed in the next subsection, which is specifically focused on monitoring irregular crossing points.

---

91   *El Heraldo*, "Gobierno de Honduras crea el Instituto Nacional de Migración," *El Heraldo*, June 30, 2014.

92   Guatemalan Interior Ministry, "Instituto Guatemalteco de Migración inicia funciones después de culminar proceso de transición," updated August 3, 2020.

93   Author interviews with three government officials and one nongovernmental expert, July and August 2020.

CLP_PC_023331

## Border Control and Immigration Enforcement Agencies

The migration agencies in Guatemala and Honduras and the General Directorate of Migration and Immigration in El Salvador have responsibility for controlling and verifying legal entries at official border crossing points. Under the Central American Agreement for Free Mobility (CA-4), citizens from these three countries plus Nicaragua only need to show a legal identification document, not a passport or a visa, to enter the other participating countries. The abolition of visa requirements for citizens of CA-4 countries and the facilitation of transit through expedited documentation both resulted from discussions held by Central American Commission of Migration Directors (OCAM).[94] The Presidential Agreement on CA-4, signed by the presidents of these four countries, set the stage for these developments, but subsequent agreements have created the conditions for more fluid mobility among the countries.

However, as a result of the COVID-19 pandemic, all four CA-4 governments have imposed significant restrictions on border crossings; for example, Guatemala requires migrants to present negative results on a test for the virus at ports of entry. This pandemic-related tightening of borders has also allowed the governments of Guatemala, Honduras, and El Salvador to take a more active role in stopping the movement of large groups of irregular migrants, often traveling in caravans.[95] In the case of Guatemala, the border measures have allowed authorities to return those migrants who entered the country without proof of a negative test result to the country from which they came, where they can reapply for legal entry once they have passed a credible test.[96] This means that the Guatemalan government is not processing these migrants for deportation, but rather is offering them voluntary return.

In practice, this is similar to U.S. expulsions under Title 42—the pandemic-response policy that allows U.S. authorities to rapidly expel migrants who arrive at U.S. borders without authorization to enter, including asylum seekers—even if in the Guatemalan context migrants are officially given the choice between voluntary return and deportation.

*All three countries have also significantly reinforced their border controls between ports of entry during this period.*

All three countries have also significantly reinforced their border controls between ports of entry during this period. In the case of El Salvador, the new Border Patrol, created within the General Directorate of Migration and Immigration in September 2019, has this specific mandate. It brings together staff of the General Directorate along with elements of the Border Police, who operate under the National Police, to patrol *puntos ciegos* (irregular crossing points) along the borders with Honduras and Guatemala. U.S. State Department funding, through the Bureau of International Narcotics and Law Enforcement Affairs (INL), contributed to launching this effort, which involves several hundred officers, but is still a work in progress.[97]

---

94   On the CA-4 agreement, see IOM Northern Triangle of Central America, "Regional Integration," accessed March 1, 2021. This is an informative website that offers background on both the Central American Commission of Migration Directors (OCAM) and the CA-4 agreement.

95   The Guatemalan government's plan to manage the Honduran migrant caravan of January 15, 2021, allowed adult citizens of Honduras, El Salvador, and Nicaragua to enter Guatemala with an identification document (as per the CA-4 agreement) but also required a polymerase chain reaction (PCR) or negative antigen test for the coronavirus. Minors had to present a passport and be accompanied by their parents. On these events, see Kevin Sieff, "US-Bound Caravan Thwarted in Guatemala as Pressures against Migrants Continues," *Washington Post*, January 19, 2021.

96   Based on author communication with a senior Guatemalan government official, February 2020.

97   Nelson Rauda Zablah and John Washington, "El Salvador lanza su Patrulla Fronteriza," *El Faro*, September 15, 2019.

CLP_PC_023332

El Salvador is the only one of these three countries with a specific Border Police (separate from the Border Patrol) that is responsible for legal as well as irregular border crossings and that functions as a unit within the larger National Police. In Guatemala and Honduras, enforcement functions have increasingly fallen to the National Police and the military. This is most noticeable in Guatemala, which sees the largest transit migration and where police and military units have been deployed to deter irregular movements both at the borders and inside the country. IGM agents accompany these efforts, but they do not appear to have the lead in operational decision-making.

The Honduran government has an interinstitutional law enforcement body, known as the National Interinstitutional Force for Security (FUSINA),[98] that operates under the direction of the Honduran Army and has been used at times along the borders to conduct immigration and border enforcement. Created in 2014, FUSINA is comprised of members of the National Police, Army, Attorney General's Office, and intelligence agencies. Although its mission is to fight organized crime and drug trafficking, FUSINA also conducts immigration control operations at border crossings.[99] Additionally, reports suggest FUSINA collects fingerprints and photographs at border crossings as part of the Biometric Data Sharing Program Agreement between the Honduran and U.S. governments.[100] The two countries signed this biometrics agreement on September 27, 2019, two days after signing an Asylum Cooperation Agreement (discussed in the next subsection), as part of a series of negotiated agreements.

These measures for immigration and border enforcement, however, have been *ad hoc* responses to date. The migration agencies involved have limited personnel and/or resources to conduct enforcement operations, while the national police and army are being deployed to take on responsibilities that generally fall outside their mandates. Even FUSINA's involvement represents the expansion of the mission of an interinstitutional group primarily focused on organized crime.

Ensuring that responsibility for border control and immigration enforcement rests with an appropriate and adequately resourced authority will be an important consideration in the future. Achieving this aim is vital both for the effectiveness of these efforts and for ensuring respect for rule of law and humane treatment of civilian populations, including migrant children. And even in El Salvador, the one country that has responded to this challenge by creating a dedicated force to specialize in immigration enforcement, it will be critical to observe whether this force develops both the capacity and the institutional

> *Ensuring that responsibility for border control and immigration enforcement rests with an appropriate and adequately resourced authority will be an important consideration in the future.*

---

98  The Honduran National Interinstitutional Force for Security (FUSINA) "maintains a strong and consistent presence in 115 communities with high levels of gang-related crime. It conducts motorized and foot patrols to identify and capture members of these groups" and "has launched an educational program in schools in order to train children and young people not to get involved with gangs." See Adam Isacson and Sarah Kinosian, "¿Cuáles unidades militares y policiales de Centroamérica reciben la mayor asistencia por parte de Estados Unidos?" Washington Office on Latin America, April 15, 2016.

99  Honduran Ministry of National Defense, "Zonas fronterizas bajo permanente resguardo y protección de FUSINA," updated May 7, 2020.

100  Author interview with Honduran academic, September 2020; U.S. Department of Homeland Security, "DHS Agreements with Guatemala, Honduras, and El Salvador" (fact sheet, U.S. Department of Homeland Security, Washington, DC, 2019).

CLP_PC_023333

structure to perform its responsibilities effectively and according to the standards required by national and international law.

## Asylum and Humanitarian Protection Systems

All three countries have been participating in efforts to strengthen their asylum and refugee protection systems through the UNHCR-sponsored Comprehensive Regional Protection and Solutions Framework (MIRPS) for the Americas.[101] However, none of these countries has a sophisticated or well-developed humanitarian protection system yet.[102]

Each country receives a very small number of asylum applications each year, usually from nationals of neighboring countries. Between July and September 2019, the U.S. government signed Asylum Cooperation Agreements (ACA) with the governments of Guatemala, Honduras, and El Salvador. Under these agreements, the U.S. government could transfer nationals of other countries to these countries, where their asylum claims would be processed through the recipient country's protection system. U.S. authorities sent less than a thousand asylum seekers—579 from Honduras and 360 from El Salvador—to Guatemala under the ACA with that country's government, before such transfers were paused in March 2020 due to the onset of the pandemic.[103] The U.S. government's implementation of Title 42 expulsions (see the border control subsection above) has made it unnecessary to continue using the ACA, since it became easier and less expensive to expel irregular migrants to Mexico. In addition, Guatemalan government officials had expressed considerable reservations in private about the agreement.[104] Meanwhile, the agreements with El Salvador and Honduras were never implemented.

On February 6, 2021, the U.S. State Department announced that it was suspending and terminating the ACAs with the governments of El Salvador, Guatemala, and Honduras.[105] According to the Guatemalan government, only 20 migrants transferred to Guatemala under the ACA had applied for asylum, and none had received it as of the agreement's termination.[106]

While never fully implemented, the agreements shone a spotlight on the weak asylum systems in these three countries and led to renewed attention to developing them further. Interviews suggest that the violence and insecurity that exists in all three countries may make it difficult for migrants in need of

---

101   Honduras and Guatemala joined in 2017, while El Salvador joined in 2019. For additional information, see UNHCR, "Global Compact on Refugees Digital Platform – About the MIRPS," accessed February 24, 2021.

102   Analyses of humanitarian protection systems is based on in-depth mapping of migration institutions and laws in each country, including Pikielny, Ornelas Cruz, and Mora, "Institutional and Legal Migratory Framework of the Republic of Guatemala"; Pikielny and Mora, "Institutional and Legal Migratory Framework of the Republic of Honduras"; Pikielny and Mora, "Institutional and Legal Migratory Framework of the Republic of El Salvador."

103   José de Córdoba and Michelle Hackman, "Biden Withdraws from Trump Agreements to Send Asylum Seekers to Central America," *Wall Street Journal*, February 6, 2021; Sofia Menchu, "Guatemala Suspends Deportation, Asylum Flights from U.S.," Reuters, March 17, 2020.

104   Author interviews with U.S. and Guatemalan government officials, July and August 2020.

105   U.S. Department of State, "Suspending and Terminating the Asylum Cooperative Agreements with the Governments El Salvador, Guatemala, and Honduras" (press release, February 6, 2021),

106   de Córdoba and Hackman, "Biden Withdraws." On January 18, 2021, the U.S. Senate Foreign Relations Committee released a report commissioned by incoming Committee Chairman Bob Menendez (D-N.J.) on the U.S. Asylum Cooperation Agreements with Guatemala, Honduras, and El Salvador. The report said that not a single asylum seeker transferred from the United States had received asylum in Guatemala and called on the Biden administration to terminate the agreements immediately on assuming office. See U.S. Senate Committee on Foreign Relations, "Menendez Publishes New Report Documenting Cruelty, Coercion, and Legal Contortions in Trump Administration's Asylum Agreements" (press release, January 18, 2021).

CLP_PC_023334

protection to consider any of them a safe country of asylum.[107] However, some nationals of other Central American countries do seek protection in these countries, including a small but noticeable influx of Nicaraguan asylum seekers in 2018 and 2019 as that country cracked down on protests. Historically, all three countries have received anywhere from a few dozen to a couple hundred asylum applications per year.[108]

There have been some notable efforts to develop alternate measures for humanitarian protection. Since 2016, UNHCR with logistical support from IOM has operated the Protection Transfer Arrangement (PTA) in these three Central American countries. This has led to the identification of more than 2,000 persons facing persecution and allowed nearly 1,000 of them to be resettled as refugees to other countries (others are awaiting resettlement, some in third countries for their safety in the meantime). This innovative pathway seeks to identify those in the greatest danger and enable them to receive protection without resorting to a potentially dangerous irregular journey through the region to seek asylum.[109]

Several NGOs have also created *ad hoc* protection measures within their own countries. One such effort, led by the San Salvador-based NGO Cristosal, provides relocation and support for those whose lives are in imminent danger in El Salvador and Honduras but who can still safely live elsewhere within the country.[110]

Government agencies charged with asylum have also taken steps to improve their functioning, even if they still have a way to go in each country. In Guatemala, UNHCR and IGM have collaborated to set up the Field Office in Petén (FOPET) to strengthen the presence of protection mechanisms along the migratory route in the departments of Izabal and Petén, used mainly by Honduran migrants.[111] And in February 2021, the IGM created the Department of Recognition of Refugee Status (DRER) to support the work of the National Refugee Commission (CONARE).[112] Due to the pandemic, asylum applicants must request appointments, but they are promised a response within 15 days.[113] To support the newly created DRER, UNHCR has hired and trained for it a professional team of more than 15 psychologists, lawyers, and social workers.[114]

In 2020, the Guatemalan government also launched a new Refugee Identity Card that can be used as proof of work authorization. Originally, this card was issued by the IGM, and cardholders reported difficulties opening a bank account or obtaining a driver's license. Now it is issued by the National Registry of People (RENAP) and is equivalent to the Personal Identity Card (DPI) that citizens have, which is the universally

107  Author interviews with four government officials and two nongovernmental experts across the three countries, July and August 2020.

108  In the case of Guatemala, the numbers oscillated between 220 and 280 in the years between 2016 and 2019. See Marco Integral Regional para la Proteccion y Soluciones (MIRPS), *II Informe Anual del Marco Integral Regional para la Protección y Soluciones (MIRPS) 2019* (Geneva and Washington, DC: UNHCR and Organization of American States, 2019), 84. The numbers were below 100 in both El Salvador and Honduras in 2018 and 2019. See UNHCR, *Ampliar las operaciones en Centroamérica 2019* (Geneva: UNHCR, 2019), 9.

109  UNHCR, "Protection Transfer Arrangement," updated June 2020; Author interviews with current and former government officials and international organization representatives, July to September 2020. For an evaluation of the Protection Transfer Agreement between September 2016 and March 2018, see Emmanuelle Diehl, *Evaluation of Effectiveness of the Protection Transfer Arrangement in Central America* (Geneva: UNHCR, 2018).

110  See Cristosal, "Victim Accompaniment," accessed March 1, 2021; Author interviews with nongovernmental organization and international organization leaders, September 2020.

111  UNHCR, "Guatemala" (fact sheet, February 2017).

112  UNHCR, "UNHCR Welcomes Expansion of Guatemala's Asylum Capacity" (press release, February 10, 2021).

113  José Mazariegos, "Guatemala fortalece atención y protección," *Diario de Centro América*, February 10, 2021.

114  This training included learning about the Migration Code (Decree 44-2016 of the Congress of the Republic), the Guatemalan Migration Institute (IGM), and the essential work of the Department of Recognition of Refugee Status (DRER). See IGM, "Profesionales Fueron Capacitados Para Atender A Solicitantes De Refugio Y Población Refugiada Reconocida En Guatemala" (press release, January 4, 2021).

CLP_PC_023335

accepted and required identification document. The introduction of the Refugee Identity Card was part of the UNHCR campaign "Guatemala opens the door to a new beginning," which seeks to create awareness about refugees in Guatemala.[115]

Similarly, El Salvador has recently taken important steps towards enhancing protection mechanisms, especially in terms of its legal framework and policies for protecting IDPs and other individuals who are forced to flee their homes. An important step was the approval in January 2020 by the Salvadoran Assembly of the *Special Law for the Care and Integral Protection of Victims of Violence in Conditions of Forced Displacement*.[116] The law, which was drafted with technical support from UNHCR, establishes a comprehensive national system that brings together several state institutions to collaborate in the response to and prevention of forced displacement, including the identification and protection of victims.[117] The government is currently putting together the operational mechanisms to implement the law. With proper funding, oversight, and civil-society support, this could have a sizable impact on internal displacement, a precursor of displacement across borders. In one profiling exercise, the Salvadoran government estimated that nearly 72,000 people were displaced within the country between 2006 and 2016, and the actual figure, including the years since 2016, is almost certainly far greater.[118]

> *El Salvador has recently taken important steps towards enhancing protection mechanisms, especially in terms of its legal framework and policies for protecting IDPs.*

In Honduras, where an estimated 247,000 people have been displaced within the country by violence,[119] the National Congress is considering legislation similar to the law passed in El Salvador in 2020.

## Labor Certification and Support Services for Work Abroad

One opportunity that has emerged over the past two years is the possibility of citizens of the three Central American countries accessing legal employment opportunities abroad, mostly in seasonal work. Creating legal pathways for people to move to work may be one of the only effective ways to turn irregular migration into legal movement,[120] and government leaders in the region have started to seize on the possibilities. Among the series of agreements made between the three Central American governments and the United States in 2019 that included the ACAs were a pair of agreements seeking to facilitate legal pathways to temporarily work in the United States; the agreement with Guatemala focused on H-2A visas for agricultural workers, while the agreement with Honduras included both H-2A and H-2B (non-agricultural worker) visas, and both aim to harmonize standards and develop transparent recruitment pipelines to safeguard workers

---

115  UNHCR, "Guatemala abre la puerta a un nuevo comienzo," accessed March 1, 2021.

116  Norma Gutierrez, "El Salvador: Legislative Assembly Passes New Law Protecting Internally Displaced People," U.S. Library of Congress, January 29, 2020.

117  Merlin Delcid, "Aprueban ley para proteger a víctimas de desplazamiento forzado en El Salvador," CNN Español, January 9, 2020.

118  UNHCR, "El Salvador" (fact sheet, January 2021).

119  Joint IDP Profiling Service (JIPS), *Estudio de caracterización de desplazamiento interno en honduras 2004-2018* (Geneva: JIPS, 2019).

120  Selee and Ruiz Soto, *Building a New Regional Migration System*.

CLP_PC_023336

against exploitation.[121] In a separate agreement between the U.S. Department of Labor and El Salvador's Foreign Ministry in February 2020, both governments committed to increase the participation of Salvadoran workers in the H-2A and H-2B visa programs.[122] The Trump administration also briefly expanded the H-2B cap in 2020, with the requirement that 10,000 of the additional visas be granted to nationals of these three Central American countries.[123] However, the H-2B program was later halted in the face of the pandemic-induced economic recession.[124]

Beyond creating the legal framework for labor mobility, another challenge is incentivizing employers to recruit from this expanded pool of workers. The Guatemalan and Salvadoran governments have been exploring ways to attract employer interest in recruiting seasonal workers from their countries. The Guatemalan government has created a database of 34,000 vetted potential agricultural workers and reached out to key employer associations, while the Salvadoran labor minister has met with employers and employer organizations in the United States to promote this possibility.[125]

The Guatemalan government has also been trying to figure out how to help Guatemalan workers obtain the necessary documents to access Mexico's Regional Worker Visa (TVTF), which requires apostilled documentation of an authenticated birth certificate. Currently, the apostilled documentation can be done online but all applicants must travel to Guatemala City to get their birth certificate authenticated. The government hopes to open a new office in Tecún Umán, a Guatemalan city near the Mexican border, as soon as 2021 that can process these requests to lower expenses for those who want to work seasonally in Mexico.[126]

## Efforts to Manage Return Migration and Support Reintegration

Since the unaccompanied minors crisis in 2014, all three countries have invested, to varying degrees, in efforts focused on the return and reintegration of migrants.[127] These efforts have created a more organized way to receive migrants who are deported from the United States and Mexico, offering basic reception services. However, these countries have yet to develop appropriate reintegration services. In all three, official government efforts are supplemented by robust, but underfunded, initiatives from civil-society and international organizations that provide more targeted assistance to returning migrants.

---

121  For the Guatemala H-2A agreement, see Governments of Guatemala and the United States, "Agreement between the United States of America and the Republic of Guatemala concerning a Temporary Agricultural Workers Program," June 30, 2019. For the Honduras H-2A and H-2B agreements, see Governments of Honduras and the United States, "Agreement Concerning the Temporary Agricultural and Non-Agricultural Workers Programs," September 27, 2019. See also U.S. Department of Homeland Security, "DHS Agreements with Guatemala, Honduras, and El Salvador."

122  For the U.S.-El Salvador agreement on H-2A and H-2B visas, see U.S. Embassy in El Salvador, "The United States and El Salvador Sign MOU on Temporary Workers Program" (press release, February 6, 2020).

123  Michelle Hackman, "Trump Administration to Make 35,000 Additional Seasonal Worker Visas Available," *Wall Street Journal*, March 5, 2020.

124  Michael D. Shear and Miriam Jordan, "Trump Suspends Visas Allowing Hundreds of Thousands of Foreigners to Work in the United States," *New York Times*, June 23, 2020.

125  Author interviews with senior Guatemalan and Salvadoran government officials, February 2021 and December 2020, respectively.

126  Author interview with senior Guatemalan government official, August 2020.

127  Ariel G. Ruiz Soto, Rodrigo Dominguez-Villegas, Luis Argueta, and Randy Capps, *Sustainable Reintegration: Strategies to Support Migrants Returning to Mexico and Central America* (Washington, DC: MPI, 2019). See also Michael Clemens, "The Missing Piece in Biden's Plan for Central America: Bilateral Labor Agreements," Center for Global Development, February 9, 2021.

CLP_PC_023337

Notably, the Guatemalan government has an autonomous agency, the National Council for Migrant Affairs (CONAMIGUA), that oversees services for returnees and their families in Guatemala. Created in 2007 by law, CONAMIGUA's executive secretary and deputy secretary are elected directly by Congress for three-year terms.[128] However, the council does not have budget autonomy and depends on the Guatemalan Foreign Ministry for its resources.[129]

CONAMIGUA has had difficulty fulfilling its mandate. Since its beginnings, it has been criticized as a political institution serving a few members of Congress and one that was made redundant by the 2020 creation of IGM, which covers much of its mandate. Diaspora organizations in the United States feel particularly ignored because the institution has no authorization to spend funds outside the country. At the end of April 2020, Congress removed the then executive secretary of CONAMIGUA due to "mismanagement, having no plans to carry out its mandate, and lack of attention to fellow citizens during the COVID-19 health emergency."[130] However, during the nine subsequent months, from May 2020 to February 2021, CONAMIGUA has demonstrated its capacity to effectively meet the needs of returning migrants. With special government funds to address the health crisis, CONAMIGUA negotiated with government institutions and international organizations to establish a reception protocol for returnees that includes the provision of shelter, food, supplies, medical attention, and transportation. It also produced a public awareness campaign, in Spanish and three Maya languages, to combat the stigmatization of returning migrants believed to be infected with the coronavirus. A new executive secretary was elected by Congress in January 2021 and, even with this recent progress, he has said that he will "need to start from scratch."[131]

Additional efforts to institutionalize CONAMIGUA include recommendations to reform the law that created it in 2007. Proposed by a civil-society organization in October 2020, two suggested modifications are to increase CONAMIGUA's budget and include it as a line item in the national budget, making it independent of the Foreign Ministry, and to allow it to incur expenditures outside Guatemala.[132]

In El Salvador, the National Council for the Protection and Development of Migrants and Their Families (CONMIGRANTES) is an autonomous institution of the Foreign Ministry. It was created in 2011 by legislative decree as a new space to include the voice of Salvadoran migrants in the development of policies focused on migrants and their families. CONMIGRANTES is also intended to promote compliance with the law and human rights, coordination, and empowerment of Salvadoran communities abroad at the national level.[133]

Among the key achievements of COMIGRANTES during the past four years have been the establishment of the National Policy for the Protection of Salvadoran Migrants; the increased visibility of CONMIGRANTES among Salvadorans abroad and clarification via national and international media of  the institution's role; and the establishment of cooperation and support agreements to find missing migrants in Mexico and

---

128  The National Council for Migrant Affairs (CONAMIGUA) was created through Congressional Decree 46-2007, promulgated by Government Agreement 106–2009 of the Executive Branch, and it began functions on October 1, 2008. See CONAMIGUA, "Ley del Consejo Nacional de Atención al Migrante," accessesd March 15, 2021.
129  Author interview with senior Guatemalan government official, August 2020.
130  *La Hora*, "Congreso destituye a Carlos Narez de CONAMIGUA," *La Hora*, April 30, 2020.
131  Sergio Morales Rodas, "Secretario de Conamigua: 'Empezaremos desde cero'," *Prensa Libre*, February 19, 2021.
132  CONAMIGUA, "Ley del Consejo Nacional de Atención al Migrante."
133  Salvadoran Legislative Assembly, *Ley Especial para la Protección y Desarrollo de la Persona Migrante Salvadoreña y su Familia*, enacted March 17, 2011.

CLP_PC_023338

the United States.[134] CONMIGRANTES has also worked to strengthen the reception and reintegration of returnees and to establish municipal offices for the care of migrants and their families. Looking ahead, CONMIGRANTES faces the challenge of establishing itself as the autonomous entity it is mandated to be by law. A new executive secretary of CONMIGRANTES was elected in early 2021, and she will preside over the council for a period of four years.[135]

Even before the creation of CONMIGRANTES, El Salvador was the first country in Central America to implement a reception program for returning migrants. The Welcome Home program started in 1998 to provide basic reception services and evolved into the El Salvador is Your Home program in 2017, with expanded services across municipal offices.[136] In its latest iteration, the program's goal is to establish a "mechanism for information and coordination with different actors to provide comprehensive psychosocial care and employment, academic and entrepreneurial opportunities." The program's main challenge is connecting returnees to reintegration services.[137] Using the Single National Immigration Information System—a registration form that allows the government to analyze the demographic profiles and needs of returning migrants—the program was able to register 74,000 returning migrants between November 2015 and March 2018. However, over the same period, the program was only able to connect 5,000 returnees to reintegration services across its six offices, including entrepreneurship opportunities, labor certification, educational programs, and medical attention.

> *Even before the creation of CONMIGRANTES, El Salvador was the first country in Central America to implement a reception program for returning migrants.*

In Honduras, as a response to the large-scale movements of unaccompanied children in 2014, the president declared a humanitarian emergency and created the Migrant Child Joint Task Force.[138] Since then, the task force has evolved and is now the coordinating and decision-making body for issues related to the protection of and assistance to all Honduran migrants. It is made up of 20 official and nongovernmental institutions, including the Directorate for Children, Adolescents, and Family (DINAF).[139] DINAF's mandate is to serve the most vulnerable, including returning migrant children, through its migration program.[140]

Also in 2014, Honduras implemented a new *Law for the Protection of Honduran Migrants and their Families*, with the objective of protecting Honduran migrants abroad and returnees, thereby laying the framework for existing migrant services.[141] To protect Honduran migrants' rights, the law seeks to coordinate interinstitutional and international efforts on migration policymaking and support civil-society organizations for Honduran returnees, among other aims. The law also established an annual Fund of

---

134  Author interviews with a nongovernmental expert, July 2020.
135  Some migrant leaders questioned this election. See Denni Portillo, "Acusan al Gobierno de manipular elección en CONMIGRANTES," *La Prensa Gráfica*, January 12, 2021.
136  Salvadoran Foreign Ministry, "El Salvador es tu casa: Sistema de Servicios Integrales para la Población Salvadoreña Retornada" (presentation, Foreign Ministry, San Salvador, June 14, 2018).
137  Salvadoran Foreign Ministry, "El Salvador es tu casa."
138  Honduran Presidency, "Fuerza de tarea para la niñez migrante," accessed March 1, 2021.
139  National Center for Social Sector Information, "Migrantes Retornados," accessed March 1, 2021.
140  Government of Honduras, "Dirección de Niñez, Adolescencia y Familia," accessed March 1, 2021.
141  Government of Honduras, *Ley de Protección de los Hondureños Migrantes y sus Familiares,* enacted February 15, 2014.

CLP_PC_023339

Solidarity with Honduran Migrants (FOSMIH) to pay for social and employment reintegration programs, as well as to strengthen consular services abroad.[142]

Honduras' National Center for Social Sector Information (CENISS) oversees the Comprehensive System of Assistance for Returned Migrants (SIAMIR), a database with statistical information collected through the Comprehensive File for Returned Migrants (FIM). Using this information, the government identifies the needs of Honduran returnees and presents to them employment possibilities, available trainings, and other forms of support. Returnees complete the FIM at three Centers for Returned Migrant Care (CAMRs) located at the San Pedro Sula airport, in the port city of Omoa, and in the Palmerola Air Base near Comayagua, and at a Center for Adolescent and Family Migrants (CANFM-Belén) in San Pedro Sula, which provide comprehensive assistance to Honduran migrants returned by air, land, or sea.[143]

In addition, there are Municipal Units for the Returnee Care (UMARs) located in the 15 Honduran communities with the highest rates of out-migration. Drawing on data collected about returnees upon their reception, the UMARs seek to provide assistance and follow-up services to returnees, with the goal of supporting their economic and social reintegration into their communities of origin.[144] The success of UMARs in connecting returnees with available services, however, is unclear due to the lack of government data on the outcomes of these efforts.

In all three countries, civil-society organizations—some of them independent and many others tied to the Catholic, Mennonite, or Lutheran Church—fill the gaps left by government in attending to return migrants and helping them reintegrate into local communities.[145] Some of these organizations, such as the Salvadoran Institute of the Migrant (INSAMI) and the Jesuit Network, are well established and offer a range of reintegration supports, including assistance in obtaining needed documents and sometimes referrals for employment. Several organizations have also worked to influence policy discussions, including developing strategies for the financial inclusion of return migrants in the case of INSAMI.[146]

> *In all three countries, civil-society organizations ... fill the gaps left by government in attending to return migrants and helping them reintegrate into local communities.*

Diaspora organizations are another important resource for returning Central American migrants, and some have demonstrated a desire to work together and share experiences. In 2017, the National Commission

---

142  Government of Honduras, *Reglamento para la Administración del Fondo de Solidaridad con el Migrante Hondureño,* enacted February 3, 2018.

143  The Center for Returned Migrant Care (CAMR) in San Pedro Sula receives and serves migrant adults returned by air from anywhere in the world, while the one in Omoa does the same for adults returned by land from Guatemala and Mexico and by sea from Belize. The CAMR-Belén receives and serves families and unaccompanied children returned via air and land. In exceptional cases, the Comayagua CAMR, located at the Palmerola Air Base, receives migrants returned from the United States, including unaccompanied children, adults, and families. See Government of Honduras, "Contribuciones del Estado de Honduras para el Informe sobre los Derechos Humanos de los Migrantes," accessed March 1, 2021.

144  Foro Social de Deuda Externa y Desarrollo de Honduras, *Características Fundamentales para una Reinserción Efectiva de hondureños "TPS" Retornando a Honduras: Recomendaciones de Políticas Públicas* (Washington, DC: Wilson Center, 2019).

145  Author interview with civil-society leaders, July to September 2020. See also Federación Luterana Mundial, "Continua apoyo a migrantes retornados en Olancho" (news release, April 6, 2017).

146  Salvadoran Institute of the Migrant, "Los retornados una población con potencial," accessed March 15, 2021.

CLP_PC_023340

to Support Returnees with Disabilities (CONAMIREDIS) in Honduras, the Alliance for Salvadoran Returnees (ALSARE), and the Association of Guatemalan Returnees (ARG) formed the Regional Alliance of Returned Migrants.[147]

Employment assistance is a central focus of many reintegration programs. For example, Guatemala has programs run by not-for-profit organizations and government institutions—including the Fundación Avina, Te Conecta, and the National Institute of Technical and Professional Formation—to certify the skills of returning migrants, provide training, and help them find work. The nonprofit Te Conecta, for instance, offers counseling, work orientation, computer training, and helps returnees connect with employers, often call centers.[148] The large international aid organization Catholic Relief Services (CRS) also offers labor-market-focused programs and services across the region, including vocational and technical training, seed capital, and programs to develop interpersonal and life skills. In addition, CRS has developed initiatives to combat youth employment and promote social entrepreneurship, including a one-year program that provides job training and mentorship for youth and helps them find employment after graduating from the program.[149] Such initiatives not only help migrants find their feet after return, they also help ensure that local communities benefit from skills returning migrants may have gained abroad.

Some reintegration programs include a focus on entrepreneurship. Examples include the Program to Support Migrants run by the Mennonite Social Action Commission (CASM), which helps youth deported to Honduras learn job skills or how to start a small business. Lutheran World Federation's World Service also has a program that, among other things, aims to help migrants returned to the country launch small businesses.[150]

One limitation of this patchwork of initiatives is that job training and skill-building programs are mainly based in urban areas, while many returning migrants come from rural communities where few such programs exist. There are, however, some examples of successful efforts to provide technical training in rural communities, such as the Guatemalan government's Quédate (Stay) training center in Santa María Visitación, a small community in the Western Highlands.[151] This type of program often targets not only returnees but also at-risk youth who may consider migrating, such as a six-year nutritional and food security program (SEGAMIL) that provides certification in agricultural employment and microloans for entreprenurial projects.[152] Other factors that have limited the growth and reach of reintegration initiatives include limited

---

147  Nyzelle Juliana Donde and Tuíla Botega, "Migrantes retornados con discapacidad y sus luchas por reconocimiento: una mirada desde la Pastoral de Movilidad Humana de Honduras," *REMHU: Revista Interdisciplinar da Mobilidade Humana* 28, no. 60 (2020): 263–70. See also Diario Co Latino, "Migrantes retornados centroamericanos crean Alianza Regional," updated April 26, 2018.

148  Te Conecta, "Quienes Somos," accessed March 9, 2020. See also Ruiz Soto, Dominguez-Villegas, Argueta, and Capps, *Sustainable Reintegration*, 19.

149  Catholic Relief Services, "Lo Que Hacemos," accessed March 15, 2021.

150  Federación Luterana Mundial, "Continua apoyo a migrantes retornados en Olancho."

151  Guatemalan Ministry of Social Welfare (SBS), "Centros de Formación 'Quédate'," accessed March 9, 2020. See also Ruiz Soto, Dominguez-Villegas, Argueta, and Capps, *Sustainable Reintegration*, 18.

152  Guatemalan Ministry of Nutritional and Food Security, "Programa SEGAMIL certificó a 126 promotores agropecuarios comunitarios en Totonicapán," updated August 13, 2018. See also Catholic Relief Services, "La decisión de quedarse hizo una diferencia," accessed March 15, 2021.

CLP_PC_023341

human resources,[153] a lack of public awareness of available services and, in some cases, a lack of public confidence in the government and its programs.[154]

Finally, while existing reintegration efforts are oriented mainly toward labor market reintegration, a more holistic approach is needed—one that attends to the family, community, education, and psychosocial support of returnees. Returning migrants are often stigmatized as "criminals," and this has reached new levels during the pandemic amid fears that they may be carrying the virus.[155]

> *While existing reintegration efforts are oriented mainly toward labor market reintegration, a more holistic approach is needed.*

Returned immigrants may also experience self-stigmatization, and some express desires "to be invisible," refrain from telling others they have lived in the United States, or even that they speak English.[156] The process of developing a sense of belonging takes time, as well as personal and community support. Given these challenges, reintegration programs in these countries that are especially successful often have a strong focus on mental health.[157]

## C.  *The Importance of Interagency Coordination and International Cooperation*

As has been suggested above, one of the missing pieces of a more effective, consolidated migration system in each country is coordination among different parts of government. Policymaking has remained *ad hoc* in most of these Central American countries, shifting between the foreign and interior ministries, migration agencies, and the presidency, depending on the moment and the external pressures that force action. These three countries have yet to develop a sustainable decision-making system that allows stakeholders across the institutional landscape to weigh in on policy and plan for the future.

The one partial exception is Guatemala, which has the ANM, though it does not appear at present to be the primary vehicle for migration discussions or decisions within the government. One careful observer of migration policy in the region noted in an interview that migration institutions and governance structures

---

153  General Directorate for the Protection of Honduran Migrants, "Avances Y Desafíos De La Institucionalidad Alrededor Del Bienestar Del Migrante Hondureño," accessed March 1, 2021.

154  In Honduras, a 2020 public opinion poll found that 83 percent of the population had no confidence in the central government; eight out of ten citizens said they thought corruption was spreading in the central government and that society had more confidence in the church than in state authorities. See Reflection, Research, and Communication Team of the Society of Jesus, "Sondeo de Opinión Publica 2020," accessed March 1, 2021.

155  Juan Montes and Michelle Hackman, "Latin America, Wary of Exported Coronavirus, Voices Concern over U.S. Deportations," *Wall Street Journal,* April 24, 2020; Camille Le Coz and Kathleen Newland, *Rewiring Migrant Returns and Reintegration after the COVID-19 Shock* (Washington, DC: MPI, 2020).

156  Author interview with member of migrant returnee association, September 2020.

157  See Ruiz Soto, Dominguez-Villegas, Argueta, and Capps, *Sustainable Reintegration.* The Salvadoran Institute of the Migrant (INSAMI) has a protocol that starts with the intake interview and is followed up at the medical clinic. The protocol includes referrals to the national health system, as needed. In Guatemala, the Casa del Migrante has a psychologist at the Center for Returnees at the Air Force Terminal for emergency situations and referral for follow-up with in-house psychologists at the Casa del Migrante headquarters. La Red Kat – DESGUA (Desarrollo Sostenible para Guatemala) has a 12-step reintegration program in Quetzaltenango, Guatemala, with limited capacity. SBS children's shelters at both the Air Force Reception Center (where families arrive) and the regular airport reception center (where unaccompanied children arrive), as well as in the two Nuestras Raíces shelters (one in Quetzaltenango and one in Guatemala City), all have psychologists to evaluate new arrivals.

CLP_PC_023342

are "niches that are occupied by the governments in power at their convenience," which prevents their consolidation.[158]

Many migration decisions are also interdependent in the region, which makes finding mechanisms for cooperation among the three governments and with the governments of Mexico and the United States crucial. There appears to be fluid communication on a daily, operational level among the migration institutes in these three Central American countries and with INM in Mexico and the Department of Homeland Security in the United States, especially to sharing information about migrants who may have outstanding warrants or present a threat to national security. However, other aspects of cooperation are still a work in progress.

One opening for broader regional cooperation is on investments to address the root causes of migration. Designed by the Economic Commission for Latin America and the Caribbean (ECLAC), the Comprehensive Development Plan (PDI) for El Salvador, Guatemala, Honduras, and Mexico seeks to overcome structural causes of migration by investing 45 billion dollars over five years in economic development, social well-being, and environmental sustainability.[159] Mexican President López Obrador has committed to providing funds for the three Central American countries to establish two social and employment programs with the goal of curbing irregular migration.[160]

The conference of migration authorities, convened by SICA (a coordinating body among Central American governments), presents one forum where migration institution leaders meet. The Regional Migration Conference, which also includes the United States, Canada, Costa Rica, Panama, and the Dominican Republic and is managed by IOM, constitutes another mechanism that can facilitate reciprocal learning and initial coordinated steps in some areas such as addressing trafficking. Similarly, the MIRPS, managed by UNHCR, is an important framework for developing standards and basic processes to improve humanitarian protection in these countries, though there is a long way to go on this.

IOM and UNHCR, in particular, play large roles in advising governments individually on migration policy and humanitarian protection, respectively, as well as providing resources to help national migration actors carry out their missions. There is even more room for future collaboration through these two UN agencies as El Salvador, Guatemala, and Honduras work to develop more robust institutions for migration policymaking, migration management, enforcement, asylum and protection, legal labor mobility, and support for returning migrants.

---

158  Author interview with a nongovernmental expert, July 2020.

159  Economic Commission for Latin America and the Caribbean (ECLAC), "El Plan de Desarrollo Integral es la llave para atender las causas estructurales de la migración con un enfoque de crecimiento, igualdad y sostenibilidad ambiental," updated September 23, 2020. See also ECLAC, *Hacia un nuevo estilo de desarrollo: Plan de Desarrollo Integral El Salvador-Guatemala-Honduras-Mexico* (Mexico City: ECLAC, 2019).

160  These two programs are: Sowing Life (Sembrando Vida) to provide subsidies and technical training for agricultural workers and tree planters, and Youth Building the Future (Jóvenes Construyendo el Futuro) to provide a work stipend and professional training for youth. The latest reports indicate the Mexican government had invested 886 billion pesos (approximately 43 million dollars) for these programs in El Salvador and Honduras, with more than 11,000 beneficiaries. Because of the presidential elections and the pandemic, Guatemala had yet to receive this investment as of February 2021. See Enrique Hernández, "México beca a 11,184 jóvenes y sembradores de Honduras y El Salvador," *Forbes Centroamérica*, February 8, 2021.

CLP_PC_023343

# 4   Costa Rica and Panama: A Study in Institutional Contrasts for Managing Migration[161]

Unlike in Mexico or other countries in Central America, immigrants make up substantial shares of the population in both Costa Rica and Panama. That proportion is somewhere between 13 percent and 15 percent in Costa Rica, the highest in Latin America and much closer to the figure for the United States (14 percent) than to that of other countries in the region.[162] In Panama, meanwhile, around 4 percent of the population was born abroad.[163] In both cases, these foreign-born populations include a mix of well-off immigrants who have chosen to do business or retire in these countries; a substantial number of refugees and other forced migrants, some of whom have asylum applications pending; and low-skilled migrants in irregular status. Both countries have faced mass migration in recent years because of the political and economic crises in Venezuela and Nicaragua, which have driven large numbers of people to seek refuge in neighboring countries.

*Both countries have faced mass migration in recent years because of the political and economic crises in Venezuela and Nicaragua.*

In institutional terms, Costa Rica and Panama are a study in contrasts. Panama's migration institutions were largely dismantled when the country's security institutions were restructured in the 1990s after the fall of the regime built by one-time strongman General Manuel Noriega, but they were never fully rebuilt. Meanwhile, Costa Rica has some of the most sophisticated migration and humanitarian protection institutions anywhere in the Americas. However, these institutions have come under increasing pressure as the number of migrants and asylum seekers from Nicaragua, Venezuela, Cuba, and, increasingly, El Salvador and Honduras have overwhelmed their capacity.

At the same time, both Panama and Costa Rica are contending with a significant increase in transit migrants from other countries, including Haiti, Cameroon, Congo, Bangladesh, India, and several others, who are trying to reach the United States. They have built an incipient capacity to manage these transit movements, including shelters and systems coordinated with the U.S. government to provide background checks for those passing through, but they are also facing significant numbers of transit migrants who want to skirt these controls, the growing influence of smugglers, and weak capacity to return migrants to their countries

---

161  This section was researched and written primarily by Andrew Selee and Jessica Bolter, with additional input from the report's other authors. MPI consultant María Jesús Mora provided additional research, some of it from her ongoing research on immigration and integration policies in Costa Rica with Diego Chaves, which will be published as: Diego Chaves and María Jesús Mora, *Costa Rican Migration Policy* (Washington, DC: MPI, forthcoming).

162  The Costa Rican government estimated in 2011 that its foreign-born population was 8.9 percent of the total population. Further estimates by the government, in the National Integration Plan published in 2017, suggest that the foreign-born share of the population rose to 13 percent in 2017. Starting in 2018, an additional 80,000 to 100,000 Nicaraguans (or more) migrated to Costa Rica, as will be discussed below, along with migrants from Venezuela, the United States, Colombia, the European Union, and elsewhere, which would suggest that today's foreign-born share of the population is probably more than 14 percent and perhaps closer to 15 percent. For the 2017 and 2011 numbers, see Costa Rican General Directorate of Migration and Immigration, *Plan Nacional de Integración para Costa Rica, 2018-2022* (San José, Costa Rica: General Directorate of Migration and Immigration, 2017), 11–14.

163  United Nations Department of Economic and Social Affairs, Population Division, "International Migrant Stock 2019: Country Profiles," accessed February 15, 2021.

CLP_PC_023344

of origin. The COVID-19 pandemic has further strained efforts to address these issues and created an entirely new set of challenges for migration management.

## A.  Changing Immigration and Asylum Trends

In another difference from other countries in Central America, Costa Rica and Panama have relatively few nationals living abroad. There were only 101,000 Panamanians and 94,000 Costa Ricans living in the United States, the principal destination for migrants from both countries, in 2019.[164] In contrast, both countries have large numbers of immigrants relative to the size of their populations; in 2019, Panama had roughly 185,000 immigrants compared to a total national population of 4.2 million, and Costa Rica had 418,000 immigrants and a total population of 5.0 million.[165]

*In another difference from other countries in Central America, Costa Rica and Panama have relatively few nationals living abroad.*

In the case of Costa Rica, there have been three major sources of immigration. By far the largest, constituting more than three-quarters of all immigrants in Costa Rica, are Nicaraguans, who initially arrived in three major periods: in the 1970s, responding to the repression of the Somoza regime in that country; in the 1980s during the civil war; and in the 1990s during an economic crisis.[166] In addition, there has been ongoing low-level migration between the two countries, some of it seasonal, as Nicaraguans find employment in agriculture, construction, domestic work, and other areas of the Costa Rican economy. Since April 2018, when the government of President Daniel Ortega in Nicaragua began repressing peaceful protests, a new influx of Nicaraguan asylum seekers and migrants has fled to Costa Rica, which is usually estimated to be between 80,000 and 100,000.[167]

Costa Rica has also become a destination of choice for nationals of other countries pursuing a better life or seeking refuge, including, in the 1990s and early 2000s, many Colombians, and more recently, Venezuelans. The Costa Rican government calculated that there were about 27,000 Colombian-born persons in the country in 2017.[168] Meanwhile, international estimates suggest that there are almost 30,000 Venezuelans living in Costa Rica, most of whom have arrived since 2015 and especially since 2017.[169]

---

164  See MPI Migration Data Hub, "Countries of Birth for U.S. Immigrants, 1960-Present," accessed March 12, 2021. The Costa Rican government estimates that 60 percent of Costa Ricans abroad live in the United States, although they put the overall figure of Costa Ricans abroad at 210,000, a slightly higher figure, but still quite a low number compared to some other emigrant populations. See Costa Rican General Directorate of Migration and Immigration, *Diagnóstico del Contexto Migratorio de Costa Rica 2017* ((San José, Costa Rica: General Directorate of Migration and Immigration and IOM, 2017).

165  The World Bank, "Population, Total," accessed March 12, 2021.

166  Costa Rican General Directorate of Migration and Immigration, *Diagnóstico del Contexto Migratorio de Costa Rica 2017*, 13.

167  Andrew Selee and Jessica Bolter, *An Uneven Welcome: Latin American and Caribbean Responses to Venezuelan and Nicaraguan Migration* (Washington, DC: MPI, 2020), 1.

168  Costa Rican General Directorate of Migration and Immigration, *Diagnóstico del Contexto Migratorio de Costa Rica 2017*, 16.

169  The official international estimate is 29,800 as of February 2021, according to the R4V Coordination Platform for Refugees and Migrants from Venezuela, "Response for Venezuelans – RMRP 2020 Dashboard," accessed February 15, 2021. However, a 2020 report by the Organization of American States (OAS) puts the number at more than 40,000. See David Smolansky, *Situación de los Migrantes y Refugiados Venezolanos en Costa Rica* (Washington, DC: OAS, 2020).

CLP_PC_023345

Among the well-off migrants from all over the world who come to live in Costa Rica, a large number are U.S. born. Indeed, U.S.-born immigrants are among the top four foreign-born groups in the country, with an estimated 24,000 U.S.-born persons living in Costa Rica in 2017.[170] Many of them are retirees, entrepreneurs, or employees in international businesses. The country also hosts a significant number of immigrants from the European Union, about 20,000 in 2017.[171]

While Nicaraguan migrants, refugees, and asylum seekers tend to be less well off, many nationals of other countries—including asylum seekers and refugees from Venezuela and Colombia—often come from more educated and sometimes affluent backgrounds. A study of Costa Rica's migration landscape in 2017 notes that while only 7 percent of Nicaraguan immigrants had higher education, compared to 18 percent of the Costa Rican-born population, 53 percent of immigrants from other countries had higher education.[172] However, the most recently arrived Nicaraguans are more well educated than those who arrived in prior periods, including as they do many students and professionals who were involved in the protest movement. One study, published in 2019, estimated that 53 percent of Nicaraguans who arrived since 2018 had at least some college education.[173] Similarly, recent asylum applicants are more educated compared to previous cohorts.[174]

Panama also has a long history as a country of migrants. Indeed, most Panamanians can trace at least some, if not most, of their family roots to one of the many migrations that shaped the country in the 20th century. These include the influx of English-speaking Caribbean immigrants, mostly of African descent, in the early 20th century to build the Panama Canal; immigrants from Europe and Latin America; and, at different points in the last century, large numbers of immigrants from China and the Middle East. Panama's central role in commerce and finance—initially because of the canal but later because of its strategic geographical location and financial laws—has made it a natural crossroads for people from all over the world. During the period when the Panama Canal Zone remained an unincorporated U.S. territory, from 1903 to 1979, thousands of U.S. citizens were drawn to Panama and settled there. In recent years, Panama has also become a preferred destination for U.S. retirees who often buy property and move there.[175]

Estimates of the immigrant population in Panama put it at around 4 percent to 5 percent of the country's 3.9 million people.[176] Slightly more than half of all immigrants are from Colombia and Venezuela,[177] and the remainder come from a variety of other countries, including particularly large numbers from China, the United States, and Nicaragua. Like Costa Rica, Panama has both high- and upper-middle-income labor migrants and retirees, as well as a large number of asylum seekers and low-income labor migrants.

---

170  Costa Rican General Directorate of Migration and Immigration, *Diagnóstico del Contexto Migratorio de Costa Rica 2017*, 16.

171  Costa Rican General Directorate of Migration and Immigration, *Diagnóstico del Contexto Migratorio de Costa Rica 2017*, 16.

172  Costa Rican General Directorate of Migration and Immigration, *Diagnóstico del Contexto Migratorio de Costa Rica 2017*, 24.

173  Elvira Cuadra Lira and Roberto Samcam Ruiz, *De la Represión al Exilio: Nicaragüenses en Costa Rica* (San José, Costa Rica: Fundación Arias para la Paz y Progreso Humano, 2019), 10.

174  Petra Petry and Carlos Salas L., *Estudio sobre el mercado laboral para personas refugiadas y solicitantes de refugio en el Valle Central (San José, Alajuela, Heredia y Cartago), Upala y Los Chiles, Costa Rica* (San José, Costa Rica: HIAS and Escuela de Adminisración de Negocios, 2020), 76.

175  See David Dixon, Julie Murray, and Julia Gelatt, "America's Emigrants: U.S. Retirement Migration to Mexico and Panama," *Migration Information Source*, September 1, 2006.

176  United Nations Department of Economic and Social Affairs, Population Division, "International Migrant Stock 2019."

177  Venezuelans and Colombians together make up 54 percent of the total foreign-born population. Author calculations based on data from the United Nations Department of Economic and Social Affairs, Population Division, "International Migrant Stock 2020 – Destination and Origin," accessed February 15, 2021.

CLP_PC_023346

As in Panama, Colombian migrants arrived in large numbers in the 1990s and early 2000s, and because of family ties and the shared border, some continue to arrive today. The largest recent influx of immigrants, however, has been of Venezuelans. More than 120,000 now live in Panama, making it the country that has received the seventh largest number of Venezuelan migrants and refugees.[178] The number of Nicaraguan migrants who have arrived in Panama has also increased since the crackdown on protests began in 2018, with more than 6,000 applications for asylum as of October 2019.[179]

## B.    *Migration Laws and Institutions*

Migration institutions and policies have been evolving in both countries as immigration has increased in recent years. In the case of Costa Rica, these changes build on a solid foundation of laws, policies, and institutions that have been developed over many decades, while Panama is building its capacity to manage migration on less well-established foundations.

### Costa Rica

Costa Rica's institutional system for managing migration has developed over the years as the country has attracted migration from around the world. Officially, the National Migration Council helps the president set migration policies and includes a wide range of ministers and agency directors whose portfolios touch on migration issues. In reality, the Governance Ministry and the Foreign Ministry play particularly important roles in day-to-day policymaking, with the vice minister of governance as the main point person for migration affairs in the country.[180]

The General Directorate of Migration and Immigration, part of the Governance Ministry, oversees the day-to-day operations of migration management. It is responsible for issuing visas within Costa Rica, while the Consular Service, within the Foreign Ministry, is responsible for the issuance of visas at embassies and consulates abroad.

Within the General Directorate, the Professional Migration Police is tasked with border and interior enforcement, including staffing official border crossing points, managing transit migration, and investigating and dismantling smuggling networks. The Migration Police has its own police academy and career path separate from the National Police.

The General Directorate also includes the Unit of Refugee, Consular, and Restricted Visas, which oversees the asylum process and the issuance of visas to nationals of a specific set of countries from which the government has designated visa applications as requiring further review.[181] The unit staffs the Commission

---

178  For regularly updated figures on Venezuelan nationals living abroad, see R4V Coordination Platform for Refugees and Migrants from Venezuela, "Response for Venezuelans."

179  OAS, "CIDH y su MESENI realizan visita a Panamá para monitorear la situación de personas migrantes y refugiadas nicaragüenses" (press release, October 25, 2019).

180  Analysis of legal framework is based on in-depth mapping of migration institutions and laws in Costa Rica; see María Sol Pikielny and María Jesús Mora, "Institutional and Legal Migratory Framework of the Republic of Costa Rica" (working paper, MPI, Washington, DC, prepared February 2021). See also IOM, *Perfil de gobernanza sobre migración* (Geneva: IOM, 2019).

181  Government of Costa Rica, President of the Republic and Minister of Government and Police and Public Safety, "Reglamento para el otorgamiento de visas restringidas N° 32245," February 22, 2005.

CLP_PC_023347

on Restricted Visas and Refuge, which makes determinations on asylum applications and which includes representatives of the Ministries of Labor, Foreign Affairs, and Governance and Public Security.

Costa Rica also has an Administrative Tribunal of Immigration, an autonomous body made up of three interdisciplinary regular judges and three alternate ones appointed for six-year periods who receive and decide on appeals to asylum and visa decisions. The tribunal is located in and staffed by the Governance Ministry, but its decisions are made by the judges—a model that could hold promise for other countries (re)designing their asylum systems. The tribunal's decisions are the final step in the administrative appeals process, though applicants can appeal tribunal decisions to courts in the judicial system.[182] This is a pioneering system in Latin America as it is the first one designed to solve appeals administratively.[183]

Several other ministries also deal with migration issues, including the Ministries of Labor, Health, and Education and the Costa Rican Social Security Fund. Each of these has designated vice ministers or general directors responsible for coordinating on migration issues.

> *Throughout the 20th century, the Costa Rican state developed relatively strong institutional structures, laws, and policies.*

Costa Rica is one of the few countries in Latin America that has a history of investing in its migration institutions. This is partly because of Costa Rica's long-standing role as a recipient of immigrants and refugees, but it also reflects the greater institutionalization of the state in Costa Rica overall compared to other countries in the region.[184] Throughout the 20th century, the Costa Rican state developed relatively strong institutional structures, laws, and policies, and this process accelerated after the abolition of the military in 1948.

However, today these institutions are under severe stress because of the rapid arrival of around 80,000 to 100,000 Nicaraguans and almost 30,000 Venezuelans, as well as growing numbers of migrants from Cuba, El Salvador, and Honduras, in only a few years. An analysis of government finances suggests that the overall budget of the migration-related agencies went up slightly from 2017 to 2019 but then experienced significant cuts in 2020 and 2021, due to budget tightening measures and then the pandemic-related economic downturn, leaving these agencies considerably less resourced than in recent years.[185] So, while the demand for services, including asylum applications, has expanded substantially, the actual resources available to meet this demand have not kept pace.

---

182  Costa Rican Administrative Tribunal of Immigration, "Legal Nature and Characteristics of the Tribunal," accessed March 3, 2021.

183  Author interviews with Costa Rican government official, August 2019.

184  On the institutionalization of the Costa Rican state in the 20th century, see Jeffery M. Paige, *Coffee and Power: Revolution and the Rise of Democracy in Central America* (Cambridge, MA: Harvard University Press, 1998). See also Hector Perez-Brignoli, *A Brief History of Central America* (Berkeley, CA: University of California Press, 1989).

185  In particular, the budget of the General Directorate of Migration and Immigration decreased from 35 billion colones (roughly USD 58 million) in 2020 to 20.7 billion colones (USD 34 million) in 2021, therefore showing a 41 percent decrease from last year. The Governance Ministry had a decline in resources too, from 61 billion colones (USD 100 million) in 2020 to 43.8 billion colones (USD 72 million) in 2021. The Administrative Tribunal and the Social Migration Fund, which reinvests part of the fees generated by visas and other administrative processes related to migration back into the migration agencies and integration efforts, also saw decreases in funding. Based on figures available from Costa Rica's Treasury Ministry and data shared by the Governance Ministry with MPI in February 2021. See Costa Rican Treasury Ministry, "Ley de Presupuesto 2020," accessed February 15, 2021; Costa Rican Treasury Ministry, "Ley de Presupuesto 2021," accessed February, 2021. There was also a 24 percent decreased in appropriations from 2019 to 2020. See Costa Rican Ministry of the Interior and Police, "Mociones al presupuesto 2021 afectarían servicios al usuario y operatividad del MGP" (news reléase, October 19, 2020).

CLP_PC_023348

The vast majority of asylum applications come from Nicaraguans and Venezuelans who, respectively, constituted 83 percent and 10 percent of all asylum applications in 2018, 80 percent and 6 percent in 2019, and 78 percent and 1 percent in 2020. Meanwhile, the number of asylum applications filed by Hondurans and Salvadorans increased between 2018 and 2019, by 32 percent and 8 percent, respectively.[186]

An overall increase in asylum applications from less than 1,000 in 2013 to 6,000 in 2017 and then further to 28,000 in 2018 and 39,000 in 2019 has made it difficult for the Costa Rican asylum system to process new applications, and it is often taking several months to get applicants the work authorization[187] they can apply for 90 days after filing their application.[188] Moreover, the length of time it takes to get a decision on an asylum application has increased under the heavy caseload, and it now can take as long as two to three years to get an initial decision, and another year or two on appeals.[189] This extended wait period has created incentives for some migrants to submit asylum applications as a way to stay legally in the country for this period, making the asylum process a *de facto* form of temporary status.

> *An overall increase in asylum applications from less than 1,000 in 2013 to 6,000 in 2017 and then further to 28,000 in 2018 and 39,000 in 2019 has made it difficult for the Costa Rican asylum system to process new applications.*

Historically, approval rates have been low for asylum in Costa Rica, and asylum decisions have been based on the five grounds laid out in the 1951 Refugee Convention.[190] However, these rates have increased in recent years, especially in late 2019 and in 2020, rising from less than 10 percent in 2018 to 21 percent in 2019 and almost 50 percent in 2020,[191] with particularly high approval rates for Nicaraguan and Venezuelan nationals. This change appears to reflect, in part, the growing number of Venezuelan and especially Nicaraguan asylum cases under consideration, as these applicants may have stronger cases for protection. The change may also reflect a deliberate policy shift, perhaps influenced by a 2019 decision by the Administrative Tribunal of Immigration which suggested that the Commission on Restricted Visas and Refuge could take into account the Cartagena Declaration, an agreement among Latin American countries to expand the refugee standard to include those fleeing generalized violence and the breakdown of public order. The refugee standard of the Cartagena Declaration has not been incorporated into Costa Rican law, as it has in some other countries, but the tribunal found that it provides a well-established standard for protection in the region, even if not legally binding under Costa Rican law.[192]

---

186  Author calculations based on official statistics shared by the Costa Rican Governance Ministry with MPI, January 2019 through December 2020.

187  Alvaro Botero, *Costa Rica: caracterización y análisis de las políticas en materia de migración internacional y refugiados* (Washington, DC: OAS, 2021), with asylum numbers by year shown on page 29. See also Inter-American Commission on Human Rights (CIDH) and OAS, *Migración forzada de personas nicaragüenses a Costa Rica* (San José, Costa Rica: CIDH and OAS, 2019).

188  Costa Rican Governance Ministry, "Reglamento de Personas Refugiadas," *La Gaceta* Nº 36831-G (November 1, 2011): Article 54.

189  Author interviews with five government officials and nongovernmental experts, July to August 2020. See also Botero, *Costa Rica*.

190  The Costa Rican government is a signatory to the Cartagena Declaration on Refugees, which expands the grounds for the recognition of refugees in the Americas, but unlike most other signatories, it has not incorporated the declaration into its own laws. See Feline Freier and Nicolas Parent, "The Regional Response to Venezuelan Exodus," *Current History* 118, no. 805 (February 2019): 56.

191  MPI calculations based on data provided by the Refugee Unit in December 2020.

192  CIDH and OAS, *Migración forzada de personas nicaragüenses a Costa Rica*, 106; Author interview with a government official, July 2020.

CLP_PC_023349

In October 2020, the Costa Rican presidency issued a resolution making eligible for complementary protection nationals of Cuba, Nicaragua, and Venezuela whose asylum cases are denied. Under this resolution, those granted complementary protection may remain in the country for a renewable period of two years.[193] In doing so, the presidency cited the general protection needs of nationals of those countries, regardless of the validity of their specific asylum claims.

Like the asylum system, the system for issuing seasonal agricultural visas, which primarily exist to facilitate the legal hiring of Nicaraguan workers during peak periods of need for agricultural labor, is facing backlogs. Visits by the Migration Police to large farms during the early months of the pandemic to examine health conditions there unearthed the fact that few employers were using the visas, and that many preferred hiring unauthorized migrants from Nicaragua instead. Subsequently, the government created a process to expedite and decrease the cost of these visas, and officials report a significant expansion in their use since then.[194]

The processing of visas in other categories appears to be working well, according to stakeholders interviewed in this study. However, other integration issues that go beyond the acquisition of legal status remain a challenge. Access to health care, for example, has proved problematic for certain groups of immigrants. While it is universal for all citizens and legal residents, who pay into the Costa Rican Social Security Fund (CCSS), this is not the case for asylum seekers and irregular migrants. UNHCR has reached an agreement to cover some asylum seekers' contributions to CCSS and facilitate their access to care—6,000 in 2020[195] and 10,000 in 2021, prioritizing those with special needs—this number is a fraction of those waiting for asylum decisions.[196] CCSS does, however, cover emergency costs for all people living in the country, regardless of immigration status, as well as the medical costs of all people who are pregnant or under the age of 5. In addition, students between the ages of 6 and 18 can access care through the CCSS as a result of their student status.[197]

In the area of education, there appear to be relatively few issues with registering foreign-born children, compared to the challenges faced in some other countries in the region. Immigrant children are entitled to take part in the country's universal education system, and Costa Rica is one of the few countries in Latin America that specifically waives the requirement that students seeking to enroll must present their prior education credentials for asylum seekers and refugees. It has also issued legislation providing guidelines on how to integrate asylum seekers into the education system.[198]

---

193  General Directorate of Migration and Immigration, "Resolución N° DJUR-0164-10-2020-JM," *La Gaceta – Diario Oficial,* November 12, 2020.

194  Author interviews with two government officials and two nongovernmental experts, July to August 2020; Author interview with a government official, January 2021.

195  Selee and Bolter, *An Uneven Welcome*, 42.

196  Author interviews with a representative of an international organization and a senior government official, August 2020. See also Diego Coto Ramírez, "CCSS y ACNUR firman convenio para asegurar a 10 000 personas solicitantes de refugio o refugiadas," CCSS Noticias, February 11, 2021.

197  Selee and Bolter, *An Uneven Welcome*, 42. See also Alberto Cortés Ramos and Adriana Fernández Calderón, *Universal Coverage? Barriers to Access to Health Care for the Nicaraguan Refugee Population in Costa Rica* (San José, Costa Rica: Universidad de Costa Rica, Centro de Investigación y Estudios Políticos, 2020).

198  IOM, *Perfil de gobernanza sobre*, 9; Costa Rican Ministry of Public Education, "Directriz N° DM- 45-08-2018-MEP" (decree, August 22, 2018).

CLP_PC_023350

Nonetheless, there are larger issues of discrimination against many immigrants, refugees, and asylum seekers in Costa Rica, particularly those from Nicaragua, who are often stigmatized for their origins. Although the most recent arrivals from Nicaragua have higher levels of education, on average, than the Costa Rican population (as discussed in Section 4.A.), the perception of Nicaraguans as less educated and less skilled persists. This type of stigma can become a social mobility barrier, making it harder for immigrants to access jobs in the professional sector.[199] In some cases, discrimination might also result in denial of access health or education, and other forms of employment.[200] The gap this creates between the generous normative framework and the on-the-ground experiences of different groups of immigrants is compounded by a lack of communication between high-ranking officials and the government personnel who directly interact with migrants and refugees but may not be aware of their rights.[201]

## Panama

Panama's experience with immigration and asylum has been quite different. The prior immigration structure, which was closely tied to the government's public security apparatus, was dismantled following the removal of the Noriega regime in 1989, and a new structure never fully replaced it.[202] In recent years, the country has started strengthening its institutional framework for migration management, but this remains woefully deficient in the eyes of most officials and observers.[203]

Officially, the Public Security Ministry proposes migration policy to the president, and the public security minister presides over an Advisory Council on Migration that includes counterparts from other ministries. In practice, the Public Security Ministry appears to set policy independently, and it then delegates implementation to the National Migration Service. The Public Security Ministry also oversees a separate Border Agency, which has responsibility for the country's land borders and is the primary implementer of policies on transit migration. The National Office for Refugee Assistance (ONPAR), Panama's asylum agency, is located in the Governance Ministry, and the National Commission for the Protection of Refugees (CONARE), an interagency body, makes the final decision in asylum cases, for implementation by ONPAR.[204]

In practice, Panamanian migration law is somewhat confusing and deficient compared to the growing number of migrants and asylum seekers in the country. The visa and asylum systems appear to be particularly sclerotic. In the nearly two decades between 1990 and 2019, only 2,467 people received asylum in Panama. This reflects, in part, high denial rates. For example, while 603 requests for asylum were made between January and August 2020,[205] 121 applications were approved[206] and 2,483 applications were denied. The asylum system also faces a considerable backlog. From 2014 to 2019, 28,366 asylum

---

199 See María Jesús Mora, "Upwardly Mobile: Nicaraguans Faring with Stigma in Costa Rica," in *Inquiry: A Journal of Undergraduate Research* XXIV (2020): 54.
200 Chaves and Mora, *Costa Rican Migration Policy*.
201 Chaves and Mora, *Costa Rican Migration Policy*.
202 Author interviews with two government officials and one nongovernmental expert, July and August 2020.
203 This point and some of the following analysis is based on seven interviews with current and former government leaders and experts from international organizations and nongovernmental organizations, as well as a review of other sources cited in this section.
204 Analysis of legal framework is based on in-depth mapping of migration institutions and laws in Panama; see María Sol Pikielny, "Institutional and Legal Migratory Framework of the Republic of Panama" (working paper, MPI, Washington, DC, prepared February 2021).
205 Government of Panama, National Office for Attention to Refugees, "Solicitudes de la Condición de Refugiados 2020," accessed March 1, 2021.
206 Government of Panama, National Office for Attention to Refugees, "Proveído," accessed March 1, 2021.

CLP_PC_023351

applications were filed, and 17,048 remained pending at the end of 2019, according to a study by UNHCR and the Norwegian Refugee Council.[207]

*Almost as many immigrants gained residency through extraordinary measures as through regular visas during this period.*

Between 2010 and 2019, the Panamanian government issued 170,609 resident visas, just slightly less than 19,000 per year on average. At the same time, the Panamanian government has used periodic "extraordinary" legalization measures to provide legal status to irregular migrants. From 2010 to 2019, 138,058 people received temporary or permanent residency through these extraordinary measures, coming out to slightly more than 15,000 per year on average. Venezuelans (51,897) were the largest group to receive legal status through such measures, followed by Colombians (41,000) and Nicaraguans (23,551), and several hundred immigrants each from China, the United States, and Spain.[208] In other words, almost as many immigrants gained residency through extraordinary measures as through regular visas during this period.

These extraordinary measures have historically been used as a work-around for offering legal residency in the absence of ordinary channels for doing so that are common in other countries.[209] The Cortizo administration has tried to limit the use of extraordinary measures and to institutionalize the migration system, and the number of extraordinary visas issued has declined since the administration took office in mid-2019. However, this also presents challenges for those unauthorized migrants still in the country.

Unlike other countries in Latin America, foreign-born individuals in Panama are prohibited from taking part in more than 50 professions in 15 economic sectors,[210] including architecture, engineering, nursing, medicine, law, and pharmacy, prohibitions that have been periodically enacted in legislation since the 1950s. In addition, the labor code stipulates that an employer's workforce can only be at most 15 percent foreign born, and that, officially, employers can only hire foreign-born workers for five years.[211]

Some global companies that operate in Panama under a special fiscal regime, called the SEM (Sede de Empresas Multinacionales, or Headquarters for Multinational Companies), are exempt from these rules and can hire foreign-born talent on both a permanent and temporary basis. Permanent staff hired under this regime can also bring family members with them to Panama and obtain permanent residency after five years (and they are permitted a temporary stay of six months if they terminate their employment before the

---

207  UNHCR and Norwegian Refugee Council (NRC), *Monitoreo de Protección: Panama, Junio – Diciembre 2019* (Geneva and Oslo: UNHCR and NRC, 2020), 3.

208  See the data tables for residency permits and extraordinary regularization processes available on the Panamanian migration statistics website, with breakouts of data for the period 2010–18, 2019, 2020, and January 2021. See National Migration Service of Panama, "Estadísticas," accessed February 15, 2021.

209  This is something that was echoed in author interviews with both current and former officials and nongovernmental experts, July to September 2020.

210  *Forbes*, "Empresarios de Panamá piden abrir mercado laboral a extranjeros calificados," *Forbes*, February 9, 2020. See also Rafael Carles, "Leyes que promueven la mediocridad," *La Estrella de Panamá*, June 16, 2019.

211  Ministry of Labor and Employment Development of the Republic of Panama, "Código de Trabajo No.252" (cabinet decree no. 252, December 30, 1971, amended August 12, 1995).

CLP_PC_023352

five years).[212] Reflecting the popularity of this route, the top subcategory for residency application approvals in 2019 was "multinational company employee."[213]

While Panamanian immigration law, via the SEM category, makes it easy for multinational companies to hire foreign-born personnel, most migrant professionals who do not arrive holding a contract with one of these companies find it difficult to pursue their chosen profession in Panama. As a result, the country has a large number of high-skilled migrants, especially from Venezuela and Colombia, who work in non-professional occupations.[214]

The Cortizo administration and National Assembly had been discussing a modernization of the country's legal architecture on migration in 2019 and early 2020, but this appears to have been derailed by the pandemic, which has shifted policy priorities to dealing with the public-health and economic crises.

## C.    Addressing Transit Migration

Since 2015, the number of migrants passing through the Darién Gap, a vast section of rain forest betweenColombia and Panama, to cross Central America and Mexico and reach the United States has increased, thereby also increasing transit migration through Panama and Costa Rica.[215] Data suggest that Cubans and Haitians have used this route the most since 2015: the 36,000 apprehensions of Haitians and the 31,000 apprehensions of Cubans by Panamanian authorities together made up 65 percent of all apprehensions of migrants crossing through the Darién irregularly between January 2015 and October 2020.[216] Rounding out the top ten migrant groups apprehended are nationals of three Asian countries (Nepal, India, and Bangladesh) and five African countries (Cameroon, the Democratic Republic of Congo, Eritrea, Ghana, and Angola).

*Since 2015, the number of migrants passing through the Darién Gap ... to cross Central America and Mexico and reach the United States has increased.*

This increase in transit migration can be attributed to a range of factors, depending on migrants' nationality. The number of Cubans taking this route spiked between 2014 and 2016 in anticipation of the end of the U.S. policy that put Cubans on a path to permanent residence once they reached U.S. territory.[217] That population tapered off between 2017 and 2019, when adverse economic conditions in Cuba pushed more people to emigrate. Haitian migrants using this route, meanwhile, are mostly engaging in secondary

---

212  See Government of Panama, Sedes de Empresas Multinacionales, "Beneficios," accessed March 1, 2021. According to the official government information availability, "Law No. 41 of 2007, modified by Law 45 of August 10, 2012, establishes several tax incentives, both for the company with a multinational company headquarters license and for the upper-middle-level foreign personnel working in the same."

213  Government of Panama, Migration Panama, "Cuadro No. 4: Permisos de Residencia Según Categoría por Condición, Año 2019,"accessed March 1, 2021.

214  Author interviews with two nongovernmental experts and one government official, July and August 2020.

215  Government of Panama, Migration Panama, "Irregulares Darien 2010-2018," accessed March 1, 2021; Migration Panama, "Irregulares por Darien Diciembre 2019," accessed March 1, 2021; Government of Panama, Migration Panama, "Irregulares por Darien 2020," accessed March 1, 2021.

216  Author calculations based on data from Government of Panama, Migration Panama, "Irregulares Darien 2010-2018"; Government of Panama, Migration Panama, "Irregulares por Darien Diciembre 2019"; Government of Panama, Migration Panama, "Irregulares por Darien 2020."

217  Jessica Bolter, "The Evolving and Diversifying Nature of Migration to the U.S.-Mexico Border," *Migration Information Source*, February 16, 2017.

CLP_PC_023353

migration after initially moving to countries in South America, mainly Brazil and Chile, in the wake of the 2010 earthquake in Haiti. In Brazil, these migrants benefited from the high demand for labor during the construction boom leading up to the 2014 World Cup and the 2016 Olympics. But as those jobs dried up, starting in 2016, Haitians increasingly looked elsewhere and began moving north to the United States.[218]

The reasons for the increases in African and Asian migration through the region are less cut-and-dry. However, the closing off of irregular migration routes to Europe and the desire to join family already living in the United States appear to play a role.[219] These migrants often fly in to Brazil or Ecuador before proceeding north, and research suggests that many Africans do not initially have the United States in mind as a destination but rather migrate north after struggling economically and experiencing racism in Brazil.[220] Notably, increasing transit migration through Panama and Costa Rica in 2018 and 2019 appears to have coincided with the spike in Central American migration in that period, suggesting that word of it being a good time to migrate may have been spreading through the region.

*Those who have serious criminal histories or otherwise pose serious security risks, as determined in collaboration with the U.S. government, are detained and expelled.*

The movement of migrants between the Darién Gap and the southern border of Costa Rica is tightly managed. Migrants who survive the dangerous passage through the Darién are funneled into a process run by the Panamanian government and coordinated with Costa Rica to facilitate transit migration, known as "controlled flow."[221] Migrants are taken to the nearest Panamanian village, where they receive medical exams and vaccinations. They are also subject to biometric security checks that are run through both U.S. and international databases, the results of which are shared with the U.S. Department of Homeland Security.[222] The Panamanian government rarely deports African and Asian migrants, due to the costs and the logistical and political complexities of deporting someone whose country of origin does not have diplomatic representation in Panama.[223] However, those who have serious criminal histories or otherwise pose serious security risks, as determined in collaboration with the U.S. government, are detained and expelled.[224]

After security checks have been completed, migrants can then pay to be transported by charter bus to the northern border with Costa Rica, which admits 100 migrants per day. In both the south and the north of the country, Panama has constructed camps where migrants live temporarily while they wait to be shuttled to the next phase of their journeys.

Once migrants arrive in Costa Rica, they are again subject to security checks and, if they have a serious criminal record, deportation, though this is uncommon because Panama would typically have deported

---

218  Bolter, "Migration to the U.S.-Mexico Border."

219  Bolter and Yates, *African Migration through Central America.*

220  Bolter and Yates, *African Migration through Central America.*

221  Caitlyn Yates, "As More Migrants from Africa and Asia Arrive in Latin America, Governments Seek Orderly and Controlled Pathways," *Migration Information Source*, October 22, 2019. For more on the dangers encountered in the Darién, see El CLIP, "Darién, cuando la muerte es una opción de libertad para los migrantes" (video, YouTube, May 28, 2020).

222  Yates, "As More Migrants from Africa and Asia Arrive."

223  Author interview with a Panamanian government official, July 2020.

224  Author interview with a Panamanian government official, July 2020; Author interview with an expert from an international organization, February 2021.

CLP_PC_023354

such migrants before they could reach Costa Rica, demonstrating the linearity of this route.[225] Following these checks, transit migrants are provided with a special status and released to make their way to the north of the country—about a two-day walk.[226] The country manages two migrant stations, similar to shelters, where migrants can stop to rest and receive services—one in the south and one in the north of the country. These stations, called Temporary Assistance Centers for Migrants (Centros de Atención Temporal para Personas Migrantes, or CATEMs) provide access to basic medical attention, three meals a day, and psychological support.[227] They are meant for stays of up to a couple weeks.

Migrants do not typically need to hire smugglers to pass through Panama and Costa Rica, though they do generally hire them to make their way through the Darién. This is because, once they have made it through the jungle, they do not need to take clandestine routes in either Panama or Costa Rica to avoid authorities or criminal groups. In both countries, this migration generally occurs through the recognized legal channels discussed above. However, some migrants do revert to hiring smugglers once they have passed through the CATEMs in the south of Costa Rica to take them further in their journey, including facilitating their passage through Costa Rica and on into Nicaragua.[228]

## D.   *The Challenge Ahead*

Both Costa Rica and Panama occupy a strategic location in the regional migratory system. On the one hand, they are gateways into the Central American isthmus for many transit migrants from outside the region, including those from Haiti and from African and Asian countries. On the other hand, they are also the chosen destination for many migrants from Nicaragua, Venezuela, Colombia, Cuba, and other countries outside Central America who are seeking refuge, as well as a small but growing number of Salvadorans and Hondurans from inside the region.

The Costa Rican government has long played a major role in providing humanitarian protection in Latin America, taking in asylum seekers from throughout the hemisphere. It is well-placed to continue to enhance these efforts during a period of significant displacement and migration in the region, provided sufficient investments are made in expanding the government's capacity to do so. Panama has less well-developed policies and institutions, but it has also long been a magnet for migrants from around the world, even if the policies to receive them have been *ad hoc*. Today, Panama and Costa Rica will have to be part of any coordinated regional approach that seeks to address humanitarian protection and extracontinental migration in the region.

# 5   Conclusions and Opportunities for the Future

There is some evidence of increasing capacity to manage migration in Mexico and Central America over the last five years. Many of these governments were previously unaccustomed to managing migration in a systematic way (with the notable exception of Costa Rica and, to a lesser extent, Mexico and Panama), so

225  Author interview with an expert from an international organization, January 2021.
226  Author interview with an expert from an international organization, January 2021.
227  Author interview with an expert from an international organization, January 2021.
228  Author conversations with professional migration police on a visit to the Temporary Assistance Centers for Migrants (CATEM) in La Cruz, Costa Rica, August 9, 2019.

CLP_PC_023355

these developments are no small feat. In all of these countries, civil-society and international organizations also play a vital role in managing migration, sometimes advising and supporting the government and at other times filling important gaps not addressed by government efforts.

The greater focus on migration management has come about in part as a reaction to changing realities on the ground, with all of these countries facing significantly larger-scale and more complex migration than in the past. The shift has also been the result of increasing pressure from the U.S. government to do more on regional migration management and some targeted investments made through international organizations, especially IOM and UNHCR, to support this work.

However, despite recent efforts to build institutional capacity, create legal frameworks, and develop policy, the landscape of accomplishments remains uneven across the region. Some governments, such as those in Mexico and Costa Rica, have leveraged their existing migration institutions to improve operational capacity, while other countries, including Guatemala, Honduras, El Salvador, and Panama, remain at earlier stages in this process, with incipient capacity-building efforts.

In many cases, the changes also appear to be misaligned with needs on the ground. The greatest investments have been made in border and immigration enforcement in most countries (although these, too, remain largely *ad hoc* and poorly institutionalized), while many of the greatest needs lie in building legal migration pathways, strengthening mechanisms for humanitarian protection, developing return and reintegration strategies, and building the capacity to make policy decisions in a clear, consistent, and coordinated way. Placing the need to improve enforcement capabilities within the larger framework of strengthening institutional capacity is likely to lead to more sustainable outcomes over time.

In this sense, U.S. pressure has often been a double-edged sword, both getting governments to make needed investments in migration management, but also pushing them to prioritize *ad hoc* responses over long-term institution-building as well as enforcement alone over other needs for capacity development. The opportunity moving forward is to take this newfound focus on migration and channel it into long-term institution-building efforts across the range of policy areas that will enable countries to engage in coordinated regional migration management. In this, U.S. government support for building institution capacity, directly and through international organizations, especially IOM and UNHCR, can play a vital role. Enforcement will, of course, remain a central area of concern, but it needs to be institutionalized and professionalized and set within the broader context of the migration management challenges these countries face.

The migration trends and governance developments explored in this report point to the following opportunities for building institutional capacity in the future:

► **Governments need to develop clear policymaking and decision-making processes to ensure long-term thinking around migration policy.** Increasingly, decisions on migration policy have shifted to the foreign ministries or presidential offices in most of these countries because these issues are seen as being part-and-parcel of the relationship with the U.S. government. However, to build long-term capacity for setting policy and making decisions, governments will need to develop their

CLP_PC_023356

own institutionalized processes that include the range of government agencies that have a stake in migration management. These processes will need to be stable over time to make them sustainable and allow them the capacity to operate independent of changes in government administrations. Designing clear channels for interinstitutional coordination is also critical. In Mexico, for instance, overlapping interinstitutional coordination efforts have produced confusion over institutional responsibilities and, in some cases, widened communication and implementation gaps at the local level. Setting clearly defined responsibilities across agencies thus also remains a crucial task.

► **Governments need to professionalize border and immigration enforcement by deciding which agencies have primary responsibility and then creating transparent policies and protocols for the performance of their duties.** To date, most countries in this region have conducted border and immigration enforcement through *ad hoc* responses, usually coordinated by the national police or the military, with migration agencies playing a supporting function (Costa Rica is again, an exception to this, as is Panama to some extent). The long-term opportunity is to build clear, transparent, and accountable mechanisms for border and immigration enforcement, where the roles and responsibilities of each agency are spelled out in law and/or written policy and publicly discussed. In some countries it may make sense to charge migration institutions with responsibility for border and immigration enforcement; in others, it may make more sense for the national police to assume or continue in this role. But in either case, these responsibilities should be clearly spelled out. The agency or agencies responsible for border and immigration enforcement will need to develop clear policies and training on how to deal with civilian populations, and especially with families and children and with vulnerable groups of migrants, to ensure proper adherence to national and international laws.

► **All countries in the region need to make additional investments in their asylum systems, and most in internal protection mechanisms as well.** Some of the governments in the region have already made investments in strengthening their asylum systems, with the Mexican and Costa Rican governments in particular working to develop robust capacity to handle substantially larger numbers of applicants. However, these systems need to be developed much further in each country, with additional investments and professionalization of the relevant agencies. Across the region, UNCHR has played an important role, both directly with each government and through the MIRPS, in professionalizing asylum systems, but much more needs to happen. In addition, Mexico and El Salvador have legal frameworks for addressing internal displacement, and Honduras has been debating the creation of a similar framework. Much of the work of addressing internal displacement has been carried out by civil-society organizations in each of these countries, but there are huge opportunities to build synergies between emerging government efforts to protect displaced residents and those already developed by civil-society groups. Since many people with humanitarian protection needs move first within their own country before turning to international migration, finding strategies to protect those who do not want to leave their country should be a priority. There are also innovative examples of how governments, civil-society organizations, and international actors can identify those in danger within their countries of origin and in need of international protection before they migrate. These efforts include the Protection Transfer Arrangement, managed by UNHCR; the Central American Minors (CAM) Program; and partnerships between the U.S. government and the asylum systems in Costa Rica, Panama, and Mexico to resettle some people who may be best protected further away from their country of origin.

CLP_PC_023357

▶ **All countries in the region need to develop greater capacity for managing legal migration.** If part of the goal of a regional migration strategy is to turn unauthorized movements into legal ones, considerable capacity for managing legal migration will need to be developed. The Guatemalan government, for example, is already working to create a recruitment pipeline and vetting process for workers who wish to take up seasonal job opportunities abroad, while the Costa Rican government has improved its processes for issuing visas to seasonal agricultural workers. These experiences could provide ideas for future efforts in these and other countries that would benefit from either receiving a well-organized seasonal workforce or from having designated opportunities for resident workers who wish to engage in seasonal work abroad. The IOM has particular expertise in supporting these kinds of labor migration efforts and could be a key partner in developing such opportunities.

▶ **The governments in Guatemala, Honduras, El Salvador, and Mexico have huge opportunities to invest further in return and reintegration programs.** There is enormous demand for comprehensive services that help returning migrants get needed forms of documentation, receive physical and mental health care, access employment opportunities, and re-establish themselves within their communities. To date, all of these countries have made some efforts to do this, but the bulk of these initiatives are still run by NGOs. Expanding on these initiatives should be considered an integral part of regional migration cooperation that allows those who are repatriated or return voluntarily to begin life anew with opportunities for sustainable local reintegration and, over time, reduce at least some pressures for them to migrate again.

As governments in the region have been confronted with changing migration trends—including increases in mixed and transit migration—developing institutional capacity to manage these movements has understandably been a largely internal process, focused on identifying opportunities to address immediate enforcement and humanitarian protection needs. But building a regional migration system that is sustainable, proactive, flexible, and resilient requires an outward-looking approach to bolstering capacity and cross-border collaboration. In spite of the institutional limitations governments in the region face, there appears to be potential to come together and share migration's challenges and opportunities. By taking advantage of this moment, not only can regional governments significantly improve their ability to address current migration issues, they can also better equip themselves to proactively respond to future changes— including by harmonizing investments in efforts to address rule of law, governance, development, and climate-change issues that drive emigration. The U.S. government, alongside its partners in Central America and Mexico, has a strong stake in supporting these developments as part of a new approach to shared responsibility for migration across the region.

*By taking advantage of this moment, not only can regional governments significantly improve their ability to address current migration issues, they can also better equip themselves to proactively respond to future changes.*

CLP_PC_023358

# Appendix. List of National and Regional Stakeholders Interviewed

## *Mexico*

Ana Saiz, Director, Sin Fronteras

Andrés Alfonso Ramírez Silva, General Coordinator, Mexican Commission for Refugee Assistance (COMAR)

Felipe Sánchez Nájera, Coordinator, Human Rights Center at the Ibero-American University

Gretchen Kuhner, Director, Institute for Women in Migration (Instituto para las Mujeres en la Migración)

Hannah Töpler, Founder and Director, INTRARE – La Incubadora de Trabajo para Refugiados y Retornados

Héctor Menchaca, Advisor to the Municipal President of Piedras Negras, Coahuila

Héctor Padilla, Professor at the Autonomous University of Ciudad Juarez and Former Delegate of Migration

Javier Contreras Arriaga, Former Director, Jalisco Institute for Migrants

Jill Anderson, Co-Founder, Otros Dreams en Acción

Kristin Riis Halvorsen, Director, United Nations High Commissioner for Migration (UNHCR) in Tapachula

Mary Galván, Director, Centro Madre Asunta, Tijuana, Baja California

Miguel Ángel Virgilio Aguilar Dorado, Coordinator, Center for Migration Studies at the Migration Policy Unit, Mexican Interior Ministry (SEGOB)

Nadia Troncoso Arriaga, Executive Director, Institute for the Assistance of Priority Populations (IAPP) of the Ministry for Inclusion and Social Welfare, Government of Mexico City

Paulina Olvera Cánez, Director and Founder, Espacio Migrante, Tijuana, Baja California

Salim Ali Modad, Former Coordinator of the Intersectoral Migration Commission, Mexican Foreign Ministry (SRE)

Salva Lacruz, Director of Advocacy, Centro de Derechos Humanos Fray Matías de Córdova A.C., Tapachula, Chiapas

Savitri Arvey, Fellow at the Central America and Mexico Policy Initiative, Robert Strauss Center for International Security and Law, University of Texas at Austin

Yamileth Herrera Díaz, Director of the Welfare Agency, National System for Integral Family Development (DIF) Municipal Office, Veracruz

## *Guatemala*

Alfonso Quiñónez, Guatemalan Ambassador to the United States

Anaeli Torres, Director of Protection, Secretariat of Social Welfare (SBS)

Carlos Eduardo Woltke Martínez, Ombudsman for Migrants, Human Rights Ombudsman's Office (PDH)

CLP_PC_023359

Dirk Bornschein, Coordinator of the Migration and Development Program, Latin American Faculty of Social Sciences (FLACSO) Guatemala

Edgar Villanueva, Co-Executive Director, U.S.-Guatemala Business Council

Eduardo Hernández Recinos, Guatemalan Vice Minister of Foreign Relations

Ely María Zea Wellman, Director of Social Services, Ministry of Social Work of the President's Wife (SOSEP)

Estuardo Sanchez, Protection Officer, United Nations Children's Fund (UNICEF) Guatemala

Guillermo Díaz, General Director, Guatemalan Migration Institute (IGM)

Iván Martínez, Consultant, Fundación Avina

John Briggs, Head of Programming, Catholic Relief Services (CRS) Guatemala

Jonathan Menkos, Executive Director, Central American Institute for Fiscal Studies (ICEFI)

José Andrés Ordóñez, Director and Co-Founder, Te Conecta

José Luis González Miranda, Coordinator, Red Jesuita con Migrantes

Juan Luis Carbajal Tejeda, Executive Secretary of the Human Mobility Pastoral, Episcopal Conference of Guatemala

Julia González Deras, Executive Coordinator, National Roundtable for Migration in Guatemala (MENAMIG)

Justo Solórzano, Chief Child Protection Officer, UNICEF Guatemala

Kelvin Aguilar, Director of Employment, Guatemalan Labor Ministry

Ligia Iveth Hernández Gómez, Congresswoman, Member of the Migrant Commission of the Guatemalan Congress

Oscar Adolfo Padilla Lam, Consul General of Guatemala in Phoenix, Arizona

Paul Townsend, Representative for Guatemala and Mexico, CRS

Pedro Pablo Solares, Columnist and Independent Advisor on Migration Topics

Rita María Elizondo Hernández, Former Deputy Secretary, National Council for Migrant Affairs (CONAMIGUA)

Salvador Juan Ortega Herrera, Board Member, Genesis Empresarial Microfinance

Silvia Raquec, Coordinator of Migration Program, Asociación Pop No'j

## *El Salvador*

César Moisés Rivera Perez, Migration Control Manager, General Directorate of Migration and Immigration

César Ríos, Executive Director, Salvadoran Institute of the Migrant (INSAMI)

Héctor Aquiles Magaña, Former Executive Secretary, National Council for the Protection and Development of Migrants and Their Families (CONMIGRANTES)

Mauricio Gaborit, Professor, Central American University

Mauricio Quijano, Director, Community Development Program, Cristosal

Mauro Verzeletti, Director, Casa del Migrante (El Salvador and Guatemala)

CLP_PC_023360

Pedro Antonio Argumedo Matamoros, Economist, Fundación Salvadoreña para el Desarrollo Económico y Social (FUSADES)

## Honduras

Amelia Frank-Vitale, Doctoral Candidate and Specialist in Latin American Migration, University of Michigan

Carolina Menjivar, Executive Director, Honduran National Institute of Migration

Julia García, Director of Planning and Local Governance, Ministry of the Interior, Justice, and Decentralization

Nyzelle Juliana Dondé, Coordinator, National Human Mobility Pastoral

Sally Valladares, Coordinator, Honduran Observatory of International Migration

## Costa Rica

Alberto Cortés Ramos, Professor, University of Costa Rica

Alonso Soto, Deputy Director, Professional Migration Police

Carlos Torres Salas, Vice Minister of the Interior and Police

Felipe Rivera-Vargas, Senior Project Assistant, International Organization for Migration (IOM) Costa Rica

Gabriela Richard, President of the Migratory Administrative Tribunal

Harold Villegas-Román, Commissioner, Commission on Restricted Visas and Refuge

Melissa Salas Brenes, Director of Migration and Refuge Clinic, University of Costa Rica

Natalia Álvarez, Vice Minister of Labor and Social Security

## Panama

Adriana Rincón, Director, Activados Panamá Foundation

Daniela Arias, Director of International Relations, National Migration Service

Isabel de Saint Malo, Former Vice President of Panama

Jonathan del Rosario, Former Secretary of Public Security

Santiago Paz Noboa, Chief of Mission for Panama, IOM

## Regional

Daisy Corrales, Director, Inter-American Centre for Social Security Studies

Elisabeth Burgess Choi, Product Marketing Manager for Latin America and the Caribbean, Remitly

Gaye Burpee, Former Agriculture Chief, CRS

Giovanni Bassu, Regional Representative for Central America and Cuba, UNHCR

CLP_PC_023361

Jorge Peraza, Chief of Mission for El Salvador, Guatemala, and Honduras, IOM

Mabel Guevara, Technical Advisor for Central America and the Caribbean, CRS

Nat Robinson, Co-Founder and CEO, Leaf Global Fintech

Paulo Murad Saad, Director of the Latin American and Caribbean Demographic Center, Economic
    Commission for Latin America and the Caribbean (ECLAC)

Rick Jones, Former Migration Adviser, CRS

Tori Samples, Co-Founder and CTO, Leaf Global Fintech

CLP_PC_023362

# About the Authors



**ANDREW SELEE**    @SeleeAndrew

Andrew Selee is President of the Migration Policy Institute (MPI). His research focuses on migration globally, with a special emphasis on Latin America and the United States. He is the author and editor of several books, including *Vanishing Frontiers: The Forces Driving Mexico and the United States Together* (PublicAffairs, 2018).

Selee previously worked at the Wilson Center, where he was Director of the Mexico Institute, Vice President for Programs, and Executive Vice President. He also worked on migration and development programs in Tijuana, Mexico for several years and in the U.S. House of Representatives. He received his PhD in policy studies from the University of Maryland; his MA in Latin American studies from the University of California, San Diego; and his BA from Washington University in St. Louis.



**ARIEL G. RUIZ SOTO**    @ruizags

Ariel G. Ruiz Soto is a Policy Analyst at MPI, where he works with the U.S. Immigration Policy Program and manages the Institute's internship program. His research focuses on the impact of U.S. immigration policies on immigrants and other populations, and the interaction between U.S., Mexican, and Central American migration policies. He also analyzes methodological approaches to estimate sociodemographic trends of the unauthorized immigrant population in the United States.

Mr. Ruiz Soto holds a master's degree from the University of Chicago's School of Social Service Administration with an emphasis on immigration policy and service provision, and a bachelor's degree in sociology from Whitman College.



**ANDREA TANCO**    @andreatanco

Andrea Tanco is Strategic Advisor to the President and an Associate Policy Analyst at MPI. In her role as Strategic Advisor, she supports the President on MPI's strategic positioning, institution building, stakeholder engagement, and development of new initiatives. As an Associate Policy Analyst, her research centers on Latin American migration policy, with a special focus on Mexico.

Ms. Tanco joined MPI from the Wilson Center's Mexico Institute, where she developed strategic projects to inform policymakers and the public on the importance of the U.S.-Mexico relationship. She holds a bachelor's degree in government from Smith College and is an alumna of United World Colleges.

CLP_PC_023363



**LUIS ARGUETA**

Luis Argueta is an award-winning Guatemalan American filmmaker known for his multinational immigrant narratives. His coming-of-age film, *The Silence of Neto* (1994), was Guatemala's first Oscar submission. His series of immigration documentaries includes *abUSed: The Postville Raid* (2010), *ABRAZOS* (2014), *The U Turn* (2017), and *Ausencia* (forthcoming). Mr. Argueta has also lectured and served as a consultant and researcher on immigration-related issues.

Mr. Argueta is the only filmmaker to receive the Order of the Quetzal, Guatemala's highest honor, and *The Guardian* has listed him as one of Guatemala's National Living Icons. In 2019, he received the Harris Wofford Global Citizen Award from the National Peace Corps Association, and he has been named 2021–22 Lund-Gill Chair at Dominican University.



**JESSICA BOLTER**          @jessicabolter

Jessica Bolter is an Associate Policy Analyst with the U.S. Immigration Policy Program at MPI. Her research focuses on migration patterns at the U.S.-Mexico border, immigration enforcement, and asylum and refugee issues. She also conducts research on Latin American migration policy, particularly on regional responses to Venezuelan migration and extracontinental migration.

She has interned with MPI, the Capital Area Immigrants' Rights Coalition, the Ohio Commission on Hispanic and Latino Affairs, and the Center for Democracy in the Americas. Ms. Bolter holds a bachelor's degree in American studies and Spanish area studies from Kenyon College, where she focused on relations between the United States and Latin America.

# Acknowledgments

This report was made possible by support from the Ford Foundation and the Carnegie Corporation of New York for Migration Policy Institute (MPI) research on regional migration.

This report is also based on work supported by the U.S. Department of Homeland Security (DHS) under Grant Award Number 17STBTI00001-03-00 (formerly 2015-ST-061-BSH001) through the Borders, Trade, and Immigration Institute (BTI Institute) at the University of Houston. The views and conclusions contained in this document are those of the authors and should not be interpreted as necessarily representing the official policies, either expressed or implied, of DHS. The authors are especially appreciative of Michael Huston for many valuable discussions over the past three years, and of Theophilos Gemelas at the DHS Science and Technology Directorate.

The authors were involved in a separate research project with the International Organization for Migration (IOM) Programa Mesoamérica, which touched on government responses to the COVID-19 pandemic. In some cases, the authors were able to conduct interviews with the same actors for both projects, and they

CLP_PC_023364

greatly appreciate the collaboration of IOM Programa Mesoamérica and of IOM colleagues Alexandra Bonnie, Heydi González, Fabio Jiménez, and Estela Aragón.

Ongoing research by the authors in Mexico and Costa Rica on institutional innovation within the migration and asylum fields, supported by the International Migration Initiative of the Open Society Foundations (OSF), also helped inform some aspects of this report. The authors greatly appreciate the support and insights of Ana Macouzet and Anna Crowley at OSF.

The authors also greatly appreciate the many policymakers, civil-society leaders, and other regional stakeholders interviewed to inform this report. Particular observations are not attributed to individual interviewees, except where specific permission was granted to do so, but all of their insights contributed significantly to the analysis presented here.

Special thanks go to officials at the DHS Office of Policy and the U.S. Department of State Bureau of Western Hemisphere Affairs who early on in this research provided expertise about U.S. policies and conditions in Mexico and Central America. This report also benefited from comments by a wide range of government officials, civil-society leaders, representatives of international organizations, and outside experts from the region during a virtual convening held on March 11–12, 2021.

Finally, the authors express their gratitude to MPI colleagues Randy Capps and Lauren Shaw for reviewing and editing this report; María Jesús Mora, Ana Paulina Ornelas Cruz, and Jordi Amaral, who provided invaluable desk research on existing migration frameworks and institutional capacity in the countries covered in this report; and Michelle Mittelstadt and Julia Yanoff for dissemination and outreach support. Likewise, the authors thank María Sol Pikielny for additional research support and Andrés Estrada Clarke for translating the report.

This report is also available in Spanish: www.migrationpolicy.org/research/cooperacion-regional-migratoria-capacidad-institucional-mexico-centroamerica.

MPI is an independent, nonpartisan policy research organization that adheres to the highest standard of rigor and integrity in its work. All analysis, recommendations, and policy ideas advanced by MPI are solely determined by its researchers.

© 2021 Migration Policy Institute.
All Rights Reserved.

Design: Sara Staedicke, MPI
Layout: Liz Heimann
Photo: © UNHCR/Tito Herrera

No part of this publication may be reproduced or transmitted in any form by any means, electronic or mechanical, including photocopy, or any information storage and retrieval system, without permission from the Migration Policy Institute. A full-text PDF of this document is available for free download from www.migrationpolicy.org. Information for reproducing excerpts from this publication can be found at www.migrationpolicy.org/about/copyright-policy. Inquiries can also be directed to communications@migrationpolicy.org.

Suggested citation: Selee, Andrew, Ariel G. Ruiz Soto, Andrea Tanco, Luis Argueta, and Jessica Bolter. 2021. *Laying the Foundation for Regional Cooperation: Migration Policy and Institutional Capacity in Mexico and Central America.* Washington, DC: Migration Policy Institute.

CLP_PC_023365

The Migration Policy Institute is an independent,
nonpartisan think tank that seeks to improve immigration and integration
policies through authoritative research and analysis, opportunities for
learning and dialogue, and the development of
new ideas to address complex policy questions.



**www.migrationpolicy.org**

1400 16th St NW, Suite 300, Washington, DC 20036
202-266-1940

  

CLP_PC_023366

Case 4:18-cv-06810-JST Document 169-3 Filed 06/05/23 Page 859 of 1047

# Mexico's Asylum System: Good in Theory, Insufficient in Practice

By Arturo Castellanos-Canales | March 15, 2023

On February 23, 2023, the Biden administration published a notice of proposed rulemaking[1] that would severely restrict U.S. asylum eligibility for most migrants crossing the U.S.'s southwest border. Among its provisions, the proposed rule would create a presumption of asylum ineligibility — with limited exceptions — for migrants who travel through a third country unless they apply for and are denied asylum before reaching the United States. Considering that most asylum seekers travel through Mexico to reach the United States, this paper explores Mexico's asylum system to determine whether it is an efficient, functional, and viable alternative for migrants to apply for asylum.

Mexico is a country whose asylum legal framework, in theory, is among the world's most inclusive and protective of asylum seekers. In recent years, Mexico has made significant legislative improvements to adapt to the new hemispheric migration patterns.[2] In addition, around 70% of asylum applications in Mexico are resolved favorably, granting refugee status to most applicants.[3] However, despite the good intentions of Mexican legislators and the high approval rate of asylum applications, the administrative authorities in charge of reviewing asylum applications are underfunded and face a growing number of asylum applications.

In addition, Mexico's economic and demographic circumstances are not ideally positioned to absorb large numbers of refugees. Finally, Mexico itself has systemic problems with gang and gender-based violence, undermining it as a destination country for asylum seekers fleeing gang and gender-based violence.

## Mexico's Asylum System

Skip to content

CLP_PC_023385

3/16/23, 10:32 PM
Case 4:18-cv-06810-JST Document 169-8, Filed 06/05/23 - Page 860 of 1047
Mexico's Asylum System Good in Theory, Insufficient in Practice - National Immigration Forum

1. Travel to Mexico;

2. Apply for asylum before the Mexican Commission for Refugee Help (COMAR); and

3. Wait 45 business days for COMAR to resolve their case.

## Step 1: Travel to Mexico

Except for political figures[4] and family members of refugees — who can apply for asylum abroad[5] — asylum seekers must travel to Mexico to apply for asylum.[6] Once in Mexico, migrants are eligible for asylum regardless of how they enter the country:

1. By commercial flight;

2. By land or sea at ports of entry; or

3. Between ports of entry.

Traveling commercially to Mexico can be fairly easy for nationals of some countries and very difficult for citizens of others.[7] Mexico does not require visas for citizens or permanent residents of the United States, Canada, Japan, the United Kingdom, the European Union, and the Schengen Area. In addition, nationals from any country member of the Pacific Alliance — namely Colombia, Chile, and Peru[8] — as well as Argentina, Australia, Bahamas, Belize, Bolivia, Costa Rica, Hong Kong, Iceland, Israel, Jamaica, Monaco, New Zealand, Panamá, Paraguay, and Uruguay can enter Mexico without a visa.[9] Moreover, individuals with valid visas from the United States, regardless of their nationality, do not require Mexican visas.[10]

Those who do not meet the criteria listed above must obtain a Mexican visa before traveling to Mexico through a commercial flight or cruise. In order to get a Mexican visa, foreign nationals must demonstrate their economic solvency by showing a bank account statement with an average balance of around $3,200 USD over the last three months. [11] They must also show proof of employment, with approximately $1,000 USD monthly earnings for the previous three months.[12]

If migrants are denied Mexican visas, they can travel by land or sea to Mexico — either through ports of entry or between them — and apply for asylum.

## Step 2: Apply for asylum before the Mexican Commission for Refugee Help (COMAR)

Once in Mexico, all migrants can apply for asylum at no cost within 30 days[13] of their arrival at any of

Skip to content

CLP_PC_023386

3/16/23, 10:32 PM
Case 4:18-cv-06810-JST Document 169-3 Filed 06/05/23 Page 861 of 1047
Mexico's Asylum System Good in Theory, Insufficient in Practice - National Immigration Forum

due to their race, religion, nationality, gender, membership of a particular social group, or political
opinion.[16] In addition, asylum seekers are eligible for refuge in Mexico if they demonstrate that their
liberty or life could be placed in danger by armed conflicts, systemic violence, or substantial human
rights violations in their countries of origin.[17] The latter criterion makes Mexico's definition of refugee
one of the most inclusive in the world and in line with the Cartagena Declaration on Refugees.[18]

## Step 3: Wait for COMAR's resolution

Once migrants apply for asylum, COMAR provides applicants with a certificate that demonstrates that
their asylum process is ongoing.[19] COMAR will also assign a Refugee Unique Code (CUR) that will
allow applicants to access all public services, including healthcare and education.[20] With the
certificate and the CUR, asylum seekers can obtain a Visitor Card for Humanitarian Reasons (TVRH),
which allows them to work while the application is processed. [21] As a general rule, COMAR must
complete the asylum process and notify the applicant within 45 business days from the date the
process started.[22] However, due to backlogs related to the Covid-19 pandemic and an increasing
number of asylum applications, some COMAR resolutions are taking up to 100 days.[23]

If COMAR denies asylum, applicants have 15 business days to appeal the decision.[24] If, after the
appeal, COMAR denies asylum again, the agency must consider whether the applicant is eligible for
complementary protection.[25] Complementary protection – equivalent to "withholding from
removal"[26] in the United States – provides relief from deportation to asylum seekers who have failed
in their claim for refugee status but whose lives would be in danger if sent back to their countries of
origin.[27] The status of complementary protection grants access to all public services in the country.

# Rights of Refugees in Mexico

If COMAR grants asylum, the applicant immediately becomes a refugee.[28] Refugees in Mexico[29]
have the right to apply for refugee status for their family members abroad.[30] Even after Mexico
recognizes the refugee status of an individual, they have the right to apply for asylum in another
country. In that case, Mexico suspends their refugee status while the process in a third country is under
consideration. However, that refugee status can resume when they return to Mexico.[31]

## Access to public benefits and right to travel

Refugees in Mexico have the right to access all public benefits, including free healthcare and
education.[32] They also have the right to settle anywhere in the country as long as they notify COMAR

Skip to content

CLP_PC_023387

Case 4:18-cv-06810-JST Document 169-8, Filed 06/05/23 - Page 862 of 1047

## Specific protections for migrant children

Notably, the Mexican asylum framework has specific provisions that protect migrant children, regardless of whether they are unaccompanied or traveling with a legal guardian.[34] All children who arrive in the country as migrants, and their legal guardians, are automatically granted humanitarian parole.[35] Once they are granted humanitarian parole, they can apply for asylum. Mexican law forbids the separation of migrant families when children are involved.[36] Moreover, the law forbids the detention of migrant children for reasons related to their migration status.[37]

# Obstacles to the Asylum Process in Mexico

While the asylum system in Mexico seems easy to navigate on paper, there are multiple obstacles hindering the asylum process in the country:

**There are only 10 locations of COMAR across the country:** Asylum seekers can only apply for asylum before COMAR authorities. However, there are only 10 locations across the country, and most have been overwhelmed by the growing number of petitions in recent years.[38]

**As a general rule, asylum seekers must remain in the state where they filed their asylum application:** Asylum seekers must present themselves every week at the COMAR location where they filed their application. The asylum process automatically ends if the applicant fails to appear before COMAR for two consecutive weeks.[39] Among the many problems derived from the lack of sufficient locations is that many of COMAR's offices are situated in some of the country's poorest states where labor opportunities are scarce. For instance, the busiest COMAR location is the one in Tapachula, Chiapas — Mexico's poorest state, where 76% of the population lives in precarious conditions below the poverty line.[40]

**COMAR is overwhelmed with the growing number of applications it receives:** Between 2014 and 2019, Mexico registered a 5,325% increase in the number of asylum applications — from 1,296 in 2014 to 70,314 in 2019. Asylum applications decreased in 2020 due to the Covid-19 pandemic, falling to 40,914. However, the number skyrocketed in 2021 to 129,791 applications, dipping slightly to 118,478 in 2022.[41] According to recent estimates, COMAR has been expecting a similar number of asylum applications in 2023. However, it is expected that the Biden administration's proposed rule will significantly increase the number of asylum applications filed in Mexico. Because applicants would be required to show an asylum denial in third countries they have transited through, thousands of migrants will presumably file for asylum in Mexico just to receive an initial denial permitting them to head north to the U.S.

Skip to content

CLP_PC_023388

**COMAR is an underfunded agency with a massive backlog:** Due to the increasing number of asylum applications, COMAR's annual budget has increased from $1.1 million USD in 2017[42] to $10.3 million USD in 2023.[43] However, that budget remains insufficient to provide adequate asylum services and handle the massive increase in the number of people applying for asylum. [44]

**Mexico's economic and demographic circumstances are not well-situated to absorb large numbers of refugees:** Mexico has the 15th-largest economy in the world, with a GDP of $1.2 trillion USD.[45] Compared to the United States' $23.3 trillion USD economy, Mexico's capacity to absorb refugees is limited. In addition, unlike America's aging population, Mexico's younger population generates excess workers[46] leading a considerable portion of its population to seek labor opportunities abroad.[47] These realities pose challenges to Mexico as it now attempts to absorb thousands of asylum seekers into its workforce.

**Mexico has a systemic problem of gang and gender-based violence:** Gender-based violence in Mexico is systemic. Over 70% of women in Mexico have experienced gender-based violence, [48] with an average of 6 women being disappeared every day in the country.[49] Moreover, gang violence in Mexico took the lives of over 26,000 people in 2022 in Mexico.[50] Asylum seekers in Mexico have increasingly been victimized by gang violence and are regularly targeted by cartels and other transnational criminal organizations who take advantage of their vulnerability, with scores of those seeking protection being extorted, robbed, assaulted, and even killed.[51] The threat of violence makes Mexico an unsuitable option for many, particularly the thousands of asylum seekers fleeing violence in their countries of origin.

## Conclusion

In recent years, Mexico's asylum system has made significant legislative improvements to adapt to the new hemispheric migration patterns. The country's definition of 'refugee' is among the world's most inclusive, and its asylum agency – COMAR – has made real progress in recent years. As a consequence, the approval rate of asylum applications has improved considerably. However, problems remain – Mexico's asylum system is overwhelmed and underfunded.

Despite some recent strides, Mexico's asylum system is struggling to keep up with the massive uptick in hemispheric migration over the past half-decade, and Mexican economic and demographic numbers pose challenges to absorbing large numbers of asylum seekers. Persistent struggles with domestic violence and gang violence also pose a challenge in serving as refuge for those fleeing similar violence in their countries of origin.

Skip to content

CLP_PC_023389

Across the U.S.-Mexico border, the Biden administration's newly proposed rule that would force many U.S. asylum seekers to first apply for asylum in Mexico will only further strain the Mexican asylum system. The expected new surge of applications would likely overwhelm a system that is already struggling to operate under less-than-optimal conditions. While Mexico's asylum system has demonstrated progress and may eventually serve as an important hemispheric receiving country for those fleeing danger, it currently is not ready for the likely influx of asylum seekers it faces in the coming months and years.

## Sources:

[1] Homeland Security Department and the Executive Office for Immigration Review; Notice of Proposed Rulemaking: Circumvention of Lawful Pathways; Federal Register. February 23, 2023. Available at https://www.federalregister.gov/documents/2023/02/23/2023-03718/circumvention-of-lawful-pathways

[2] See transitory articles of Ley de Migracion. Available at https://www.diputados.gob.mx/LeyesBiblio/pdf/LMigra.pdf

[3] Comisión Mexicana de Ayuda a Refugiados (COMAR); La COMAR en numeros: Estadistica enero 2023. February 16, 2023. Available at https://www.gob.mx/comar/articulos/la-comar-en-numeros-327441?idiom=es

[4] Political asylees are public figures who have a reasonable fear of persecution due to their opinions expressed in their role. See Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 2-I.

[5] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 61.

[6] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 11.

[7] Viajeros en Ruta; Paises que necesitan visa para Mexico; https://www.viajerosenruta.com/paises-necesitan-visa-mexicana/; Last Updated January 4, 2023.

[8] Alianza del Pacifico; Available at https://alianzapacifico.net/

[9] Consulado General de Mexico en Atlanta; Personas exentas de presentacion de visa para viajar a Mexico; Available at https://consulmex.sre.gob.mx/atlanta/index.php/visafee/247-personas-exentas-de-presentacion-de-visa-para-viajar-a-

Skip to content

CLP_PC_023390

3/16/23, 10:32 PM
Case 4:18-cv-06810-JST Document 169-8, Filed 06/05/23 - Page 865 of 1047
Mexico's Asylum System Good in Theory, Insufficient in Practice - National Immigration Forum

[10] Secretaria de Relaciones Exteriores de Mexico; Visas; Available at
https://consulmex.sre.gob.mx/boston/index.php/component/content/article/8-documentos-de-
identidad/62-visas-ingles?Itemid=122; Last Updated March 1, 2023.

[11] Economic Commission for Latin America and the Caribbean (CEPAL); Requisitos para ingresar a
Mexico; Available at
https://conferenciaelac.cepal.org/5/sites/default/files/pages/files/REQUISITOS%20PARA%20INGRI

[12] Economic Commission for Latin America and the Caribbean (CEPAL); Requisitos para ingresar a
Mexico; Available at
https://conferenciaelac.cepal.org/5/sites/default/files/pages/files/REQUISITOS%20PARA%20INGRI

[13] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 18.

[14] COMAR has ten locations in the country: Mexico City, Acayucan in the state of Veracruz, Tenosique
in the state of Tabasco, Tapachula and Palenque in the state of Chiapas, Guadalajara in the state of
Jalisco, Saltillo in the state of Coahuila, Monterrey in the state of Nuevo León, Tijuana in the state of Baja
California and Ciudad Juárez in the State of Chihuahua. *See* UNHCR, Contact COMAR. Available at
https://help.unhcr.org/mexico/en/where-to-seek-help/contacta-a-la-comar/

[15] Comision Mexicana de Ayuda a Refugiados; Available at https://www.gob.mx/comar

[16] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 13, I-II

[17] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 13, III

[18] Cartagena Declaration on Refugees, 1984; UNHCR. Available at https://www.unhcr.org/en-
us/about-us/background/45dc19084/cartagena-declaration-refugees-adopted-colloquium-
international-protection.html

[19] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 22.

[20] UNHCR; How to Apply for Refugee Status in Mexico; Available at
https://help.unhcr.org/mexico/en/como-solicitar-la-condicion-de-refugiado-en-mexico/

[21] Instituto Nacional de Migracion; Cambio a visitante por razones humanitarias; Available at
https://www.gob.mx/tramites/ficha/cambio-a-visitante-por-razones-humanitarias/INM827

[22] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 24.

Skip to content

CLP_PC_023391

[24] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 25.

[25] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 29.

[26] American Immigration Council; The Difference Between Asylum and Withholding of Removal; October 6, 2020. Available at https://www.americanimmigrationcouncil.org/research/asylum-withholding-of-removal#:~:text=Individuals%20who%20have%20been%20banned,United%20States%20and%20wc

[27] Ruma Mandal; Protection Mechanisms Outside of the 1951 Convention ("Complementary Protection"); UNHCR; June 2005; Available at https://www.unhcr.org/435df0aa2.pdf

[28] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 26.

[29] Asylum seekers, refugees, and political asylees are three different concepts under Mexican law. An asylum seeker is a person who has left their country and is seeking protection from persecution and serious human rights violations in another country, but who hasn't yet been legally recognized as a refugee and is waiting to receive a decision on their asylum claim. A refugee is a person whose asylum claim was resolved favorably. Political asylees are public figures who have a reasonable fear of persecution due to their opinions expressed in their role.

[30] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 58.

[31] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 35 BIS.

[32] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 44.

[33] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 49.

[34] Ley de Migracion; Art. 11

[35] Ley de Migracion; Art. 52-V-b

[36] Ley de Migracion; Art. 99

[37] Ley de Migracion; Art. 6

[38] UNHCR; How to Apply for Refugee Status in Mexico; Available at https://help.unhcr.org/mexico/en/como-solicitar-la-condicion-de-refugiado-en-mexico/

[39] Reglamento de la Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 24.

Skip to content

CLP_PC_023392

[40] Consejo Nacional de Evaluacion de la Politica de Desarrollo Social (CONEVAL); Informe de evaluacion y pobreza Chiapas 2020; Available at https://www.coneval.org.mx/coordinacion/entidades/Documents/Informes_de_pobreza_y_evaluac

[41] Diego Badillo; Éxodo a Estados Unidos, sin precedentes, convierte a México en sala de espera de migrantes; El Economista; January 15, 2023. Available at https://www.eleconomista.com.mx/politica/Exodo-a-Estados-Unidos-sin-precedentes-convierte-a-Mexico-en-sala-de-espera-de-migrantes-20230113-0069.html

[42] Dan Kosten; Mexico's Asylum System is Inadequate; National Immigration Forum; October 29, 2019. Available at https://immigrationforum.org/article/mexicos-asylum-system-is-inadequate/

[43] Alejandro Gomez; Presupuesto para Comar este 2023 superará los 196 millones de pesos; Diario del Sur; January 8, 2023. Available at https://www.diariodelsur.com.mx/local/presupuesto-para-comar-este-2023-superara-los-196-millones-de-pesos-9434246.html

[44] Jorge Butron, Comar admite crisis; "nos ven como agencia de viajes", La Razon, January 10, 2023. Available at https://www.razon.com.mx/mexico/comar-admite-crisis-ven-agencia-viajes-513107

[45] Georank; Mexico vs the United States: Economic Indicators Comparison. Available at https://georank.org/economy/mexico/united-states

[46] United Nations Population Fund (UNFPA); Mexico: Population Pyramid; Available at https://www.unfpa.org/data/demographic-dividend/MX

[47] Emma Israel and Jeanne Batalova; Mexican Immigrants in the United States; Migration Policy Institute; November 5, 2020. Available at https://www.migrationpolicy.org/article/mexican-immigrants-united-states-2019

[48] INEGI; Violencia contra las mujeres en Mexico. April 29, 2022. Available at https://www.inegi.org.mx/tablerosestadisticos/vcmm/

[49] Secretaría de Seguridad y Protección Ciudadana; En México desaparecen 6 mujeres por cada día del año; El Economista; April 21, 2022. Available at https://www.eleconomista.com.mx/politica/En-Mexico-desaparecen-6-mujeres-por-dia-del-ano-SSPC-20220420-0166.html

[50] Oscar Lopez; As Mexico's epidemic of violence rages on, authorities seem powerless to stop it; The Guardian; December 8, 2022. Available at https://www.theguardian.com/world/2022/dec/08/as-mexicos-epidemic-of-violence-rages-on-authorities-seem-powerless-to-stop-it

Skip to content

CLP_PC_023393

3/16/23, 10:32 PM
Mexico's Asylum System: Good in Theory, Insufficient in Practice - National Immigration Forum
Case 4:18-cv-06810-JST Document 169-8, Filed 06/05/23 - Page 868 of 1047

[51] Miriam Jordan; Smuggling Migrants at the Border Now a Billion-Dollar Business; New York Times; July 25, 2022. Available at https://www.nytimes.com/2022/07/25/us/migrant-smuggling-evolution.html ★

## Related Topics

Border    Legal Immigration    Refugees/Asylees





September 2022

# Colombia's Support for Venezuelan Migrants and Refugees: President Petro reaffirms commitment to integration, but continued progress requires more international support

**About the Author**

Nate Edwards is a Program Associate at the NYU Center on International Cooperation.

This paper explores the commendable policy efforts made by successive Colombia administrations to pursue economic and social integration of Venezuelan migrants and refugees in the face of crisis. Compared to other humanitarian situations, however, Colombia is notably underfunded. The global community hopes Colombia will provide a new model for migration and refugee response. To do so, it needs more international support.

*"Venezuelans who want to remain in Colombia should enjoy rights, not simply immigration protection, but the right to health, education, childcare, validation of a title…all of this must be established."—Colombian President Gustavo Petro*[1]

There are over six million Venezuelan migrants and refugees globally, more than 1.8 million of whom live in neighboring Colombia.[2,3,4] These individuals have fled a country suffering from years of economic hardship and political strife. And still today, the situation in Venezuela continues to deteriorate leading to projections that emigration will continue, with Colombia receiving an

---

[1] Ahrens, Jan Martínez and Juan Diego Quesada, "Gustavo Petro: "Si fracaso, las tinieblas arrasarán con todo,'" *El País,* June 27, 2022, https://elpais.com/america-colombia/elecciones-presidenciales/2022-06-28/gustavo-petro-si-fracaso-las-tinieblas-arrasaran-con-todo.html.

[2] Interview data used in this article was collected in the Fall of 2020 in collaboration with Lucía Espinal Solórzano, Bren Flanigan, Sami Sternberg, and Xin Tong as part of the course, Migration and Human Development taught by Professor Daniel Naujoks at the School of International and Public Affairs, Columbia University.

[3] UNHCR USA, "Venezuela situation," *UNHCR USA,* https://www.unhcr.org/en-us/venezuela-emergency.html.

[4] Inter-Agency Coordination Platform for Refugees and Migrants from Venezuela, "RMRP 2022 Colombia," December 7, 2021, https://www.r4v.info/en/document/colombia-two-pager.

CLP_PC_023395

outsized proportion of migrants.[5] Just this year, over 753,000 Venezuelans have left home.[6]

Distinct from most migrant and refugee stories in recent years, Colombia has responded to this influx with a suite of policies aimed at integrating Venezuelans, rather than deterring them.[7,8] This has been roundly welcomed by the global migrant and refugee protection communities, which now wait in hope for signs that the Colombia model will not only succeed but prove replicable elsewhere.[9]

That said, Colombia's migration and refugee policy, which the United Nations High Commissioner for Refugees has rightfully lauded as, "the most important humanitarian gesture" in decades,[10] is facing challenges from all sides. Recent years of **escalating border violence, growing poverty and food insecurity, strained social systems, domestic discontent, and heightened xenophobia**—all aggravated by the global pandemic and an unprecedented economic shock—have given rise to a new constellation of hardship. While Colombia has remained committed to its integration policy, it has not received adequate international funding. As the Petro administration settles in, international support is urgently needed both to enable Colombia's sustained commitment to Venezuelan migrants and refugees, and to signal to the world that such a rights-based act of solidarity does not only rely on national efforts but will also garner international backing.

> International support is urgently needed both to enable Colombia's sustained commitment to Venezuelan migrants and refugees, and to signal to the world that such a rights-based act of solidarity does not only rely on national efforts but will also garner international backing

## Colombia's Policy Response

Colombia's commitment to a progressive migration policy response has remained consistent, even as contexts have changed, and presidents have transitioned. The Venezuelan exodus into Colombia began to increase during the Colombian presidency of Juan Manuel Santos (2010-2018). After instituting the Peace Accords that ended decades of conflict with the paramilitary group, the Revolutionary Armed Forces of Colombia—People's Army (FARC), Santos' government turned its attention to expanding regularization pathways for Venezuelan migrants fleeing deteriorating conditions in the north of Venezuela. In 2017, Colombia instituted the Permiso Especial de Permanencia (Special

---

[5] The IMF predicts that the Venezuelan population in Colombia could reach 3.5 million by 2024. International Monetary Fund, "Colombia: 2020 Article IV Consultation-Press Release; Staff Report; and Statement by the Executive Director for Colombia," *International Monetary Fund,* April 16, 2020, https://www.imf.org/en/Publications/CR/Issues/2020/04/16/Colombia-2020-Article-IV-Consultation-Press-Release-Staff-Report-and-Statement-by-the-49331.

[6] Pietsch, Bryan and Hari Raj, "Venezuela refugee crisis similar to Ukraine in size, but not aid," *The Washington Post,* September 4, 2022, https://www.washingtonpost.com/world/2022/09/04/venezuela-refugee-crisis-ukraine-syria.

[7] Hernandez, Camila, "Colombia is pioneering a new model for integrating migrants and refugees, Will it work?" *Atlantic Council*, February 19, 2021, https://www.atlanticcouncil.org/blogs/new-atlanticist/colombia-is-pioneering-a-new-model-for-integrating-migrants-and-refugees-will-it-work/.

[8] (Interview, 2020)

[9] As the director-general of the International Organization for Migration (IOM) put it, Colombia's approach "serves as an example to the world." UNHCR USA, "UNHCR and IOM welcome Colombia decision to regularize Venezuelan refugees," *UNHCR-IOM Joint Press Release,* February 8, 2021, https://www.unhcr.org/en-us/news/press/2021/2/60214cf74/unhcr-iom-welcome-colombias-decision-regularize-venezuelan-refugees-migrants.html.

[10] UNHCR, the UN Refugee Agency Twitter Post, February 8, 2021, https://twitter.com/refugees/status/1358889128578973703?lang=en.

CLP_PC_023396

Permit of Permanence or PEP), which provides two years of regular migration status to Venezuelans while also opening access to the labor market and social services.[11] Not without its limitations, this policy offers a pathway to temporary regular status for migrants and refugees.

In 2018, the presidency transitioned to Iván Duque, who chose to maintain national efforts to prioritize integration, rather than deterrence. A 2019 decision to grant full citizenship to roughly 30,000 children of Venezuelan migrants and refugees born in-country is a key example of Colombia's sustained commitment to integration and social protection.[12] In the same year, the United Nations Development Programme (UNDP) supported the government in developing the Income Generation Strategy for Migrants from Venezuela and Host Communities (IGS).[13] This strategy underpins the country's efforts to create integration pathways through the labor market which also opens access to social services, education, and healthcare.[14] Such a strategy reflects a long-term view on migration policy—recognizing that migrants and citizens alike benefit from facilitated integration rather than ad hoc holdover policy responses.

Alongside PEP and the income generation strategy, Colombia offers an assortment of accompanying programs to fill in gaps in coverage. The Border Mobility Card, for example, enables circular migration patterns for residents who live along the Venezuelan-Colombian border and regularly cross over to purchase food, access medical care, or study.[15] For unsuccessful refugee applicants, there exists a Special Complementary Permanence Permit (PECP), a legal avenue to work and conduct activities in Colombia for 90 days at a time.[16] Meanwhile the Special Permanence Permit for the Promotion of Regularization facilitates employment as a means towards regular status.[17] In addition to these policies, Colombia adopted a COVID-19 six-point plan for supporting Venezuelan migrants that includes COVID-19 health service access, humanitarian corridors, cooperation programs, targeted assistance in high-risk areas, a focus on protecting the most vulnerable groups, and coordination with multi-level government and non-governmental stakeholders.[18]

These initiatives were already notable at a time of rising anti-refugee and anti-migrant sentiments worldwide, and then Colombia went even further. In February 2021, the government expanded regularization pathways via a statute

---

[11] Villamil, Stephanie López and Helen Dempster, "Why Colombia Granted Full Rights to its 1.7 Million Venezuelans, and What Comes Next," January 26, 2021, https://www.cgdev.org/blog/why-colombia-granted-full-rights-its-17-million-venezuelans-and-what-comes-next.

[12] Barchfield, Jenny, "Colombia gives Venezuela newborns a start in life," *UNHCR USA*, October 14, 2019, https://www.unhcr.org/en-us/news/stories/2019/10/5da42be64/colombia-gives-venezuela-newborns-start-life.html.

[13] (Interview, 2020)

[14] (Interview, 2020)

[15] Government of Colombia, n.d. in https://www.unicef.org/lac/media/22271/file/Social_protection_and_Venezuelan_migration.pdf

[16] Ibid.

[17] Ibid.

[18] UNHCR Global Compact on Refugees Digital Platform, "Colombia's 6-point plan for Venezuelan migrants during COVID-19," *UNHCR*, August 12, 2020, https://globalcompactrefugees.org/article/colombias-6-point-plan-venezuelan-migrants-during-covid-19.

CLP_PC_023397

that created ten-year regularization status for existing undocumented Venezuelan migrants, estimated at one million people,[19] called the Estatuto Temporal de Protección para Migrantes Venezolanos (ETPV), and enabled access to formal work and healthcare services.[20,21] This policy also opened a pathway for those with legal status to extend their stay, and still today, it continues to benefit those who enter the country legally until January 31, 2023.[22] The statute has been considered, "perhaps the most generous amnesty program to undocumented immigrants in modern history."[23]

This multilayered migration approach, if successful, will not only benefit Venezuelans who seek haven and opportunity, but also Colombia and its citizens. There is a growing consensus among experts that migrants and refugees constitute an economic benefit, not a burden, when they are included in the social and economic life of their host country.[24] If successful, the strategy could provide a model for progressive, "win-win" migration and refugee policies elsewhere in the world.

> There is a growing consensus among experts that migrants and refugees constitute an economic benefit, not a burden, when they are included in the social and economic life of their host country. If successful, the strategy could provide a model for progressive, "win-win" migration and refugee policies elsewhere in the world

## Challenges to Successful Policy Outcomes

However, the strategy is not a panacea. Colombia faces many entrenched challenges that predate the Venezuelan migration crisis, and now intersect with it. The country is still recovering from decades of conflict with lasting societal divisions, battling high levels of inequality, and struggling in its progress towards holistic political incorporation, to name a few. Such issues are often intricately linked with migration policy, either directly or indirectly (by encompassing migrants in their broader impacts). The strategy is also unlikely to resolve all the challenges facing mobility. **While the current approach provides a strong foundation for successful integration, it needs to be accompanied by equally inclusive and holistic responses in other domains.**

There is reason to think this will happen. President Gustavo Petro, in his first interview to an international newspaper, commented on the importance of ensuring the rights of migrants as well as supporting economic integration and

[19] IRC Press Release, "International funding necessary to support Colombia's policy to welcome Venezuelan migrants, says IRC," *International Rescue Committee/Reliefweb,* April 15, 2021, https://reliefweb.int/report/colombia/international-funding-necessary-support-colombia-s-policy-welcome-venezuelan.
[20] Hernandez, "Colombia is pioneering."
[21] Treisman, Rachel, "Colombia Offers Temporary Legal Status To Nearly 1 Million Venezuelan Migrants," *NPR,* February 9, 2021, https://www.npr.org/2021/02/09/965853031/colombia-offers-temporary-legal-status-to-nearly-1-million-venezuelan-migrants.
[22] Ibid.
[23] Bahar, Dany and Meagan Dooley, "Venezuelan refugees and their receiving communities need funding, not sympathy," *Brookings Institute,* February 26, 2021, https://www.brookings.edu/blog/up-front/2021/02/26/venezuelan-refugees-and-their-receiving-communities-need-funding-not-sympathy/.
[24] Otis, John, "Venezuelan Migrants Providing Crucial Labor in South America," *The Wall Street Journal,* February 23, 2021. https://www.wsj.com/articles/venezuelan-migrants-providing-crucial-labor-in-south-america-11614091553; Bahar, Dany, Meagan Dooley, and Cindy Huang, "Integrating Venezuelans into the Colombia labor market," *Brookings Institution,* December 3, 2018, https://www.brookings.edu/research/integrating-venezuelans-into-the-colombian-labor-market.

CLP_PC_023398

education programs.[25] Upon taking office he has also signaled policy priorities with implicit but important implications for Venezuelans—such as tackling hunger and poverty—as well as explicit policies such as reestablishing diplomatic relations with Venezuela and reopening the border.[26] While commentators have noted an early emphasis on return as part of Petro's migration strategy, which has caused unease, Petro has affirmed a commitment to providing refuge and asylum to those who need it.[27,28]

As the Petro administration looks to institute an ambitious agenda, it will face a range of challenges that hold important implications for the integration of migrants and refugees. Growing pressure on social services, a large internally displaced population requiring more government support, rising food insecurity, informal migration made more perilous by conflict along the Colombian-Venezuelan border, and escalated xenophobia are all challenges that Colombia must grapple with to achieve sustainable integration. International support will be important to help address these, not least to ensure that the new government has the policy and fiscal space to live up to Colombia's continued commitment to migrant and refugee rights.

**Among the key challenges facing the new administration are:**

***Social services are buckling under the pressure of immigration and economic hardship.*** Colombia's economy contracted 6.8 percent in 2020, marking the worst recession in decades, before recovering swiftly in 2021, nearing pre-pandemic levels by June.[29] Still, Colombia is battling a fiscal deficit.[30] It is struggling to fund programs targeting livelihoods, food security, health, education, and protection—programs that are vital amidst competing humanitarian challenges.[31] In 2019, of the 12 percent of Venezuelans in Colombia with any health insurance, 9 percent used subsidized public coverage.[32] In 2020-21, 21 percent of Venezuelan migrants and refugees utilized subsidized coverage.[33] **Finding ways to resource social services at adequate levels and expand coverage will be imperative as**

> Growing pressure on social services, a large internally displaced population requiring more government support, rising food insecurity, informal migration made more perilous by conflict along the Colombian-Venezuelan border, and escalated xenophobia are all challenges that Colombia must overcome to achieve sustainable integration

---

[25] Ahrens and Quesada, "Gustavo Petro."

[26] Ibid.

[27] Gutiérrez  Juliana Gil, "¿Qué pasará con los 2,4 millones de venezolanos en Colombia en el gobierno Petro?" *el Colombiano,* July 19, 2022, https://www.elcolombiano./colombia/migrantes-venezolanos-en-colombia-en-gobierno-de-gustavo-petro-PA18092629; Casas, Sebastián, "Gobierno de Gustavo Petro buscará retorno voluntario de migrantes y refugiados venezolanos," *RCN Radio,* July 14, 2022, https://www.rcnradio.com/politica/gobierno-de-gustavo-petro-buscara-retorno-voluntario-de-migrantes-y-refugiados-venezolanos.

[28] "Política," Gobierno de Gustavo Petro buscará retorno voluntario de venezolanos," *El Tiempo,* July 15, 2022, https://www.elheraldo.co/colombia/agenda-migratoria-ausente-de-las-prioridades-de-petro-934849.

[29] The World Bank, "The World Bank in Colombia," *The World Bank,* https://www.worldbank.org/en/country/colombia/overview.

[30] Ibid.

[31] Graham, Jimmy and Martha Guerrero Ble, "The Impact of COVID-19 on the Economic Inclusion of Venezuelans in Colombia, *Center for Global Development and Refugees International,* October 2020, https://static1.squarespace.com/static/506c8ea1e4b01d9450dd53f5/t/5f997364f4ef540o1a174ff9/1603892069536/impact-of-covid-on-venezuelans-in-colombia.pdf.

[32] Chaves-González, Diego, Jordi Amaral, and María Jesús Mora, "Socioeconomic Integration of Venezuelan Migrants and Refugees," *IOM, DTM, And Migration Policy Institute,* July 2021, https://www.migrationpolicy.org/sites/default/files/publications/mpi-iom_socioeconomic-integration-venezuelans_2021_final.pdf.

[33] Ibid.

CLP_PC_023399

**additional migrants and refugees arrive and obtain regular status, and thus secure access to services.** Meanwhile, Colombian citizens also rely on these systems in increasing numbers due to economic hardship and growing poverty.

*Internal displacement has continued to grow, placing further pressure on social policy to deliver.* In 2016, the government of Colombia signed a peace agreement with the FARC. Despite this, from 2017 to March 2022, the country has continued to witness increases in internally displaced populations (IDPs).[34] In May of 2022, there were 734,375 IDPs currently in Colombia.[35] This places further strain on existing social service systems already enduring limited resources to keep up with growing migrant populations.

*Food insecurity is rising globally, affecting Venezuelan migrants and Colombians alike.* Food insecurity has become ever more pervasive globally as food prices rise, economies struggle, and climate impacts grow.[36] Those most vulnerable are taking the brunt of these changes. 345 million people around the world are food insecure.[37] Over 40 percent of the population in Latin America and the Caribbean experienced moderate to severe food insecurity just last year.[38] Neither Venezuelan migrants nor resident Colombians have escaped this growing global challenge. 50 percent of the Colombian-based Venezuelan migrants reported moderate food insecurity in August of 2021, while 14 percent experienced severe food insecurity.[39] Addressing food insecurity for both citizens and migrants further balloons social service costs. The food crisis is acute and the sooner it can be addressed, the better positioned Colombia will be to prevent compounding crises down the road.

*Informal migration increases risks and limits policy effectiveness.* Border closures do not stop migration from occurring, but rather force migrants to take informal, and often precarious, routes—further exposing themselves to high-risk environments. (This is why international refugee law makes clear that refugees merit protection regardless of how they entered a country). Upon entry to Colombia, integration policy is only as effective as migrants' and refugees' ability to access it. As of January 31, 2021, ten-year regulatory status is only available to new migrants who cross the border legally.[40] Without a secure

---

[34] Operational Data Portal: Refugee Situations, "Desplazamientos Masivos - Enero a marzo 2022," *UNHCR, May 3, 2022,* https://data.unhcr.org/en/documents/details/92416.

[35] Operational Data Portal: Country View, "Colombia Data Portal," *UNHCR,* https://data.unhcr.org/en/country/col.

[36] World Food Programme, "A global food crisis – 2022: A Year of Unprecedented Hunger," *World Food Programme,* https://www.wfp.org/hunger-catastrophe#:~:text=2022%3A%20a%20year%20of%20unprecedented,to%20345%20million%20%2D%20since%202019.

[37] Ibid.

[38] World Food Programme, "In one year, 4 million people were thrust into hunger in Latin America and the Caribbean," *Food and Agricultural Organization of the United Nations,* June 7, 2022, https://www.fao.org/americas/noticias/ver/en/c/1585479.

[39] World Food Programme, "Food Security Update: Venezuelan Migrants in Colombia, Ecuador and Peru," *World Food Programme,* August 2021, https://www.r4v.info/sites/default/files/2021-11/WFP_Remote_Assessment_Migrants_August%202021%2005102021.pdf.

[40] "Colombia/Venezuela: Border Area Abuses by Armed Groups," *Human Rights Watch,* March 28, 2022, https://www.hrw.org/news/2022/03/28/colombia/venezuela-border-area-abuses-armed-groups.

CLP_PC_023400

pathway, migrants are at heightened risk before they even access Colombia's policy benefits. Not to mention, escalations in conflict along the Colombia-Venezuelan border, such as those that took place in early 2022,[41] that further threaten secure migration for those crossing the border informally. President Petro is working with Venezuela to reopen the border.[42] As this occurs, it will be important to ensure that all migrants and refugees, even those who do not arrive via official border crossings, can reach Colombia safely and access the rights and benefits to which they are entitled.

> The international community should support the government in living up to its commitments—but the reality is that Colombia has been starkly under-supported when it comes to humanitarian aid

*Xenophobia has been persistent in civil society and represents a key challenge for social integration.* According to a 2020 poll, only about 20 percent of Colombians approve of the government's approach to migration, and nearly 70 percent view Venezuelan migrants unfavorably, believing (against the evidence)[43] that they raise crime rates and steal jobs.[44] Hate messages and misinformation infiltrated the public discourse following the ten-year regularization statute in 2021.[45] Increasing public spending on migrants is politically harder when xenophobic sentiments are present. As in all countries, xenophobia among segments of the population is a key barrier to social integration. Colombia will need public support to continue its progressive policies and garner international support. **Changing public sentiments and aligning normative support with policy shifts will be critical if Colombia's inclusive migration and refugee policy is to succeed.**

## Inadequate International Support

Colombia is demonstrating a unique commitment to the Global Compact on Refugees and the Global Compact on Migration alike.[46] As discussed above, however, the country is faced with several cross-cutting humanitarian and development challenges. The international community should support the government in living up to its commitments—but the reality is that Colombia has been starkly under-supported when it comes to humanitarian aid.

[41] Ibid.

[42] Polanco, Anggy and Nelson Bocanegra, "Colombia, Venezuela working to coordinate border reopening, minister says," *Reuters,* August 18, 2022, https://www.reuters.com/world/americas/colombia-venezuela-working-coordinate-border-reopening-minister-says-2022-08-18.

[43] Knight, Brian and Ana María Tribín-Uribe, "Immigration and Violent Crime: Evidence from the Colombia-Venezuela Border," *Banco de la Republica Colombia,* 2020, https://repositorio.banrep.gov.co/bitstream/handle/20.500.12134/9880/be_1121.pdf?sequence=1. As the IMF recently found, "the informal labor market has absorbed most migrants, with little evidence of local worker displacement in either the formal or informal sectors," Press Release, "Colombia 2020 Article;" Bahar, Dany, Meagan Dooley, and Andrew Selee, "Venezuelan Migration, Crime, and Misperceptions," *Migration Policy Institute and the Global Economy and Development at Brookings,* September 2020, https://www.brookings.edu/wp-content/uploads/2020/09/migration-crime-latam-eng-final.pdf.

[44] Guzmán, Sergio and Juan Camilo Ponce, "Hate against Venezuelans in Colombia is a ticking time bomb," *Global Americans,* November 10, 2020, https://theglobalamericans.org/2020/11/hate-against-venezuelans-in-colombia-is-a-ticking-time-bomb/.

[45] The Crisis Group, "Hard Times in a Safe Haven: Protecting Venezuelan Migrants in Colombia," *Crisis Group,* August 9, 2022, https://www.crisisgroup.org/latin-america-caribbean/andes/colombia/094-hard-times-safe-haven-protecting-venezuelan-migrants-colombia.

[46] The Global Compact on Refugees (2018) and the Global Compact for Safe, Orderly, and Regular Migration (2018) are international agreements through which signatories affirm their commitment to uphold collective principles for refuge and migration.

CLP_PC_023401

## Underfunded humanitarian appeals

In 2020, the Colombia Humanitarian Response Plan (HRP) only received 15.5 percent of its required funding and the Venezuela HRP only 23.6 percent.[47] Additionally, the Venezuela Regional Response Plan (RRP) was only 47.2 percent funded. [48] During the first year of COVID-19, not only were these plans independently underfunded, but they also received far fewer allocations relative to similar efforts elsewhere in the world. For instance, "while per capita aid for each Syrian refugee has been calculated at USD 3,150, and for each South Sudanese refugee at USD 1,390, each Venezuelan refugee has thus far only been allocated USD 265."[49] While humanitarian appeals were better funded in 2021, Colombia still faces a large funding gap as it responds to ongoing crises. United Nations High Commissioner on Refugees (UNHCR) spokesperson William Spindler recently highlighted that Colombia is "among UNHCR's most underfunded country operations in the world."[50] Now nine months into 2022, Colombia's HRP is still only 23 percent funded, while the Venezuelan Regional Response Plan is only 14 percent funded.[51]

## Limited options for securing additional development assistance

To exacerbate matters, Colombia has limited alternatives to seek support beyond the international donor community. As a middle-income country, Colombia is ineligible for most of the financing for development facilities intended to support crisis-affected communities, as these tend to restrict eligibility to low-income countries. One exception is the World Bank's Global Concessional Financing Facility (GCFF), which provides grants and concessional loans to middle-income countries that host large numbers of refugees (the Bank has a similar program for low-income refugee hosting countries). Colombia became eligible for the GCFF in 2019 and received USD 31.5 million from the fund soon after.

Colombia can, alternatively, access "normal" development support through international financial institutions. The World Bank has been a key resource on this front, providing a total of USD 1.6 billion in financing to Colombia to respond to the Venezuelan migration situation.[52] Much of these funds however, come in the form of loans which add to the country's already high debt levels and servicing costs. Furthermore, while governments routinely take on debt on behalf of their own citizens, doing so on behalf of migrants and refugees is more difficult to sell politically.

Even with these additional funds, Colombia remains resource-constrained. As the second largest hosting country in the world (see *Figure 1*), and facing growing numbers of migrants, an ongoing global health crisis, and universal economic hardship—the need for social spending will continue to increase. As

> While governments routinely take on debt on behalf of their own citizens, doing so on behalf of migrants and refugees is more difficult to sell politically

CLP_PC_023402

new migrants enter the country, whether qualified or unqualified for regulatory status, Colombia's need for greater financial support only grows. To meet the combined needs of Colombians and Venezuelan migrants, the international community must increase its financial support. Without greater international support, dueling crises will worsen causing hardship in the short-run, and ultimately incurring higher costs to remedy in the long-run.

Figure 1: Major Hosting Countries (July 16, 2022)



Türkiye hosted 3.8 million refugees, the largest population worldwide. Colombia was second with more than 1.8 million, including Venezuelans displaced abroad. *Source: UNHCR Global Trends 2021.*

## Conclusion

Colombia is attempting one of the world's most progressive responses to one of the world's largest humanitarian crises. Not to mention, they have stayed the course in the face of political turnover and a global pandemic. This ambitious agenda, however, coexists with several competing and interconnected challenges. Social policy must consider new populations that may not have formal access to already strained social service systems. Rising food insecurity will place additional financial burdens on these systems. Conflict mitigation strategies must account for the impact that border violence has on safe and secure migration pathways. Discourse and narratives about migrants can enable

> Colombia is attempting one of the world's most progressive responses to one of the world's largest humanitarian crises

---

47 UN OCHA Services, "Appeals and response plans 2022," *Financial Tracking Service, UN OCHA Services,* https://fts.unocha.org/appeals/overview/2020.

48 Ibid.

49 Bahar and Dooley, "Venezuelan refugees," in Guzmán, Sergio and Ivonne Marmolejo, "Colombia urgently needs help with the economic integration of Venezuelan immigrants," *Global Americans,* August 11, 2021, https://theglobalamericans.org/2021/08/colombia-urgently-needs-help-with-the-economic-integration-of-venezuelan-immigrants.

50 Pietsch and Raj, "Venezuela refugee."

51 UN OCHA Services, "Appeals."

52 The World Bank, "Supporting Colombia Host Communities and Venezuelan Migrants During the COVID-19 Pandemic," *The World Bank,* October 31, 2021, https://www.worldbank.org/en/results/2021/10/31/supporting-colombian-host-communities-and-venezuelan-migrants-during-the-covid-19-pandemic.

CLP_PC_023403

or disable public buy-in for new policies. Solution to any of these competing challenges must recognize their interdependent nature.

Equally important, without adequate financing there will be no effective or sustainable long-term solution to the Venezuelan migration situation in Colombia. While the economic shocks of COVID-19 have been pervasive, those countries already economically underprivileged have fewer dollars to fall back on, just when they are needed most to support national resilience.

Colombia has made and sustained a historic commitment and is doing the world a public good in the process. If Colombia's migration and refugee strategy is to set a new precedent for integration policy that prioritizes justice for migrants and refugees, then the international community urgently needs to help finance it.

**Acknowledgments**

We are grateful for the support of the C.S. Mott Foundation, the Netherlands Ministry of Foreign Affairs, and the Norwegian Ministry of Foreign Affairs for funding this analysis.

**Center on International Cooperation**
726 Broadway, Suite 543
New York, NY 10003

The Center on International Cooperation is a non-profit research center housed at New York University. Our vision is to advance effective multilateral action to prevent crises and build peace, justice, and inclusion.

**Pathfinders for Peaceful, Just and Inclusive Societies**
726 Broadway, Suite 543
New York, NY 10003

The Pathfinders for Peaceful, Just and Inclusive Societies is a group of countries, international organizations, global partnerships, civil society, and the private sector that work to accelerate the delivery of the SDG targets for peace, justice, and inclusion (SDG16+). Pathfinders is hosted by the NYU Center on International Cooperation.

CLP_PC_023404



# A New   Way Forward: Strengthening the Protection Landscape in Mexico

Rachel Schmidtke (/reports?author=5e7d46f0854e1012be95c57a)  ·  November 12, 2020 (/reports/2020/11/9/a-new-way-forward-strengthening-the-protection-landscape-in-mexico)

## Summary

Mexico plays a unique role in North America as a sending, transit, destination, and return country for many migrants, including asylum seekers and other forcibly displaced people. In recent years, Mexico has increasingly become a destination for asylum seekers. The Mexican asylum system has improved, but for many seeking asylum in Mexico, gaining access to a fair and timely process is still not a guarantee. Mexico's asylum system is generous on paper, but in practice it faces several challenges that undermine its effectiveness. Coupled with these issues is increased pressure from the United States to adopt an enforcement-centered approach to managing migration flows. But as more people turn to Mexico to seek international protection, it is increasingly important for Mexico to provide a more holistic and human-rights-centered approach to migration management, and in particular to focus its attention on improving its international protection system. Strengthening the protection system would serve the dual purpose of providing a more fair and transparent process for asylum seekers and enabling Mexico

CLP_PC_023428

to better manage the increasing number of asylum applications it receives. This is particularly important as migration from Central America and other regions is likely to be the norm for years to come, and trends indicate asylum claims in Mexico will only increase.

Mexico's National Migration Institute (INM) and the Mexican Commission for Refugee Assistance (COMAR) are the two Mexican institutions with key responsibilities for asylum seekers and other migrants. The INM (https://consulmex.sre.gob.mx/reinounido/index.php/es/contenido/75-general-information-on-visas-and-migratory-documents) is the authority in charge of regulating the entry, stay, and exit of foreign and Mexican citizens in Mexico, and the COMAR (https://www.gob.mx/comar) is responsible for processing refugee status recognition applications. Both INM and COMAR can mitigate current and future problems by promptly implementing several improvements that could have lasting impacts. By implementing these fixes, the INM would improve access to asylum for migrants in detention and at airports and improve the issuance of key documents. If implemented, the recommendations we make would also enable COMAR to reduce its backlog and provide better screenings for asylum seekers. Asylum seekers would enjoy improved ability to exercise their economic, social, and cultural rights during their wait for their claims to be resolved. We also offer recommendations designed to enable the UN Refugee Agency (UNCHR) to better meet the goal of assisting the Mexican government through the Comprehensive Regional Protection and Solutions Framework (https://globalcompactrefugees.org/mirps-en) (known as MIRPS by its Spanish acronym), and to enable the United States to be a more effective regional partner as Mexico seeks to provide more effective migration management.

# Background

Mexico's international protection system is generous on paper. Mexico is party to the 1951 Convention Relating to the Status of Refugees, and the Mexican Constitution guarantees the right of people to seek and receive asylum. Mexico also among the governments that adopted the 1984 Cartagena Declaration, which broadened the grounds for asylum. Mexico's 2011 Law of Refugees, Political Asylum, and Complementary Protection (http://www.diputados.gob.mx/LeyesBiblio/pdf/LRPCAP_301014.pdf) provides protection to asylum seekers who meet the requirements of the 1951 Convention or the Cartagena Declaration. In practice, Mexico applies these standards to asylum seekers from certain countries, especially Venezuelans, 98 percent of whom (https://www.jornada.com.mx/2019/03/24/politica/015n1pol) are granted protection. Asylum seekers who are granted refugee status through the COMAR become permanent residents with the right to stay indefinitely, access to employment, healthcare, and education. They can apply for naturalization after four years. If the asylum seeker is not granted refugee status, the person may be granted Complementary Protection due to risk of torture, cruel or inhumane treatment. Complementary Protection provides access to many of the same rights that refugee status entails, save for family reunification.

The asylum process is composed of four to five key stages, outlined below:

CLP_PC_023429

## Simplified Mexican Asylum Procedure

| Asylum request submitted before COMAR or INM within the 30 working days after the entrance to the Mexican territory | Admission of the asylum request and issuance of a Certificate showing the status as asylum seeker (Constancia) | Elegibility Interview | Final Resolution | Appeal Proceedings |
|---|---|---|---|---|
| The exception to this rule applies only in cases where it was **materially impossible** to submit the asylum claim within the 30 days period. | This Constancia is the only document that will prove that the asylum seeker is **engaged in an asylum procedure before COMAR**. | The most relevant stage of the procedure. The elegibility interview analyzes the **reasons why the asylum seeker left his/her country of origin** . | The final resolution can have **one of three results:** **i)** the person is **recognized as refugee** under the 1951 Refugee Convention or the Cartagena Declaration of 1984; | If the final resolution amounts to denial of any type of international protection, the person can choose between filing a **motion before COMAR** for it to to reconsider its decision (Recurso de Revisión) or to file a **lawsuit against COMAR** before a Federal court (Juicio de Nulidad or Juicio de Amparo). |
| In states where there are **no local offices of COMAR**, asylum requests have to be submitted before **INM**, who will submit the claim to the COMAR, and will act a intermediary between COMAR and the asylum seeker during the asylum procedure. | The Constancia is required by INM to grant asylum seekers a **humanitarian visa**, and **a social security number (CURP)**; thus, the Constancia has an instrumental role for the access to **social, economic and cultural rights**. | The final resolution is **based** primarily on the **testimony** given by the asylum seeker during this interview.<br><br>In states where COMAR has **no local offices**, interviews are conducted by **telephone**. | **ii)** the person is granted **Complementary Protection** due to his/her risk of being subject of torture, cruel or inhumane treatment; <br><br>**iii)** no international protection is granted. | If a **detained** person decides to not seek recourse, he/she will be likely **deported**. |

Source: Mexico's 2011 Law of Refugees, Political Asylum, and Complementary Protection

Yet, this system has serious problems that undermine its generosity and effectiveness—challenges that are exacerbated by the severe lack of funding for COMAR. For years, COMAR suffered from a woefully low budget (https://www.reuters.com/article/us-usa-immigration-mexico/mexicos-refugee-agency-turns-to-u-n-amid-asylum-surge-funding-cuts-idUSKCN1SS06N) that contributed to a mounting backlog of unresolved claims. Thankfully, from 2019 to 2020, the Mexican government increased COMAR's budget (https://www.pef.hacienda.gob.mx/work/models/PEF2020/docs/04/r04_afpe.pdf) from 20,843,364 Mexican pesos (roughly $1,010,175 USD) to 47,360,858 pesos (roughly $2,295,348 USD)—an increase of 127.7 percent. However, the budget for 2021 decreased by 14.3 percent (https://www.ppef.hacienda.gob.mx/work/models/PPEF2021/docs/04/r04_reurgfpp.pdf), despite the overwhelming need to increase funding. Coupled with a reduced budget is a growing xenophobia (https://www.youtube.com/watch?v=JBlUmYxasYM) in Mexico, particularly in northern states where the U.S.-imposed Migrant Protection Protocols (https://www.hrw.org/news/2020/01/29/qa-trump-administrations-remain-mexico-program) (MPP) have exacerbated tensions. Even the INM chief is on record making xenophobic comments (https://www.milenio.com/politica/francisco-garduno-asi-sean-de-marte-regresaran-a-su-lugar-de-origen) against migrants. These sentiments influence the political will of the Mexican government to enact reforms.

The United Nations High Commissioner for Refugees (UNHCR) supports the COMAR's work, largely through the Comprehensive Regional Protection and Solutions Framework (https://globalcompactrefugees.org/mirps-en) (or MIRPS), a state-led regional application of the Global Compact on Refugees. In particular, the MIRPS is designed (https://reliefweb.int/report/honduras/what-mirps-comprehensive-regional-protection-solutions-framework-address-forced) to streng the

promote solutions for affected persons, and address the underlying causes of forced displacement by promoting a stable environment that ensures security, economic development, and prosperity. Belize, Costa Rica, El Salvador, Guatemala, Honduras, Mexico, and Panama constitute the members of the MIRPS, and they work together to strengthen protection and develop solutions for refugees, asylum seekers, internally displaced people, and returnees with international protection needs. In Mexico, the MIRPS action plan calls to improve the procedure for the applications for asylum, including the registration phase, attention to specific needs, and the refugee status determination.

It is important to note that Mexico's policy decisions around its migration and international protection systems do not exist in a vacuum; the United States exerts a great deal of pressure and influence on the direction of Mexico's policy choices. In 2019, the United States threatened to impose 5 percent tariffs on all Mexican imports (https://www.reuters.com/article/us-usa-trade-mexico/trump-threatens-more-tariffs-on-mexico-over-part-of-immigration-deal-idUSKCN1TB182) if the Mexican government did not increase its northern border enforcement efforts. Following these threats, the United States and Mexico signed a migration deal (https://www.wilsoncenter.org/article/will-the-us-mexico-migration-deal-work-here-are-the-6-things-you-need-to-know)that would drastically alter the course of Mexico's migration enforcement. The Mexican government deployed thousands of National Guard members to its northern and southern borders. Since the deployment of the National Guard, the number of detained migrants has increased substantially. The following month after the United States and Mexico signed the agreement, the INM held over 30,000 migrants in detention, which is the highest number of detentions (https://www.animalpolitico.com/2019/06/migrantes-record-detenidos-trump/) made in a month in the last 13 years.

The increased enforcement in Mexico has been accompanied by a set of interlocking policies enacted by the United States government to virtually end asylum (https://www.refugeesinternational.org/reports/2020/7/28/a-primer-on-the-trump-administrations-most-ambitious-effort-to-end-asylum) at the U.S.-Mexico border. Taken together, these factors have resulted in a sharp increase in the number of people seeking asylum in Mexico.  In particular, U.S. policies including "metering (https://www.americanimmigrationcouncil.org/research/policies-affecting-asylum-seekers-border)" and the so-called Migrant Protection Protocols (https://www.hrw.org/news/2020/01/29/qa-trump-administrations-remain-mexico-program) (MPP) along Mexico's northern border push many asylum seekers who have had hopes to for asylum in the United States to apply in Mexico instead as they grow tired of long waits in unsafe conditions. In addition, others are applying for asylum in southern states of Mexico as a way to gain safe transit through the country in an increasingly enforcement-heavy environment. And while the number of  asylum claims had grown every year between 2013 and 2019, claims rose far more sharply after the U.S.-Mexico migration deal and implementation of restrictive U.S. policies. According to official statistics, 80 percent of the more than 150,000 asylum requests (https://www.gob.mx/cms/uploads/attachment/file/576939/CIERRE_AGOSTO_2020___01-SEPT_-2020_.pdf) received by COMAR between 2013 and 2020 had been filed within the last three years.

While U.S. actions may have accelerated the increase in asylum claims, other factors have also been at play. More people have been on the move than ever before. Furthermore, many asylum seekers now view Mexico as a viable place to seek asylum, and as conditions worsen in their home countries, Mexico can provide relative safety and prosperity. And although 2020 has seen a reduction of claims due to the pandemic, in 2019 the number reached its historic peak with more than 70,000 claims, which represents an increase of more than 5,000 percent of asylum requests submitted before COMAR since 2013.



Source: COMAR. Official statistics. Retrieved here (https://www.gob.mx/cms/uploads/attachment/file/576939/CIERRE_AGOSTO_2020___01-SEPT_-2020_.pdf).

This increase has placed a significant strain on Mexico's protection system, particularly as funding, staffing, and institutional capacity for this system is inadequate to respond to such high numbers of claims. With a Biden administration starting in January of 2021, there may be new opportunities for both countries to work together on migration reform. Of course, the United Sates must change its current draconian asylum policies, but regardless of the election outcome and subsequent U.S. policies, it is Mexico's best interest to strengthen its asylum system to respond to the increasing number of asylum claims, as people will continue to seek asylum under any circumstances.

The COVID-19 pandemic has also created challenges for asylum seekers looking to access international protection. Although the COMAR continued to accept asylum applications during the COVID-19 pandemic, restrictions on movement severely limited those with international protection concerns from accessing the Mexican asylum system because they could not travel. Now, a new challenge is on the horizon: as borders reopen, more people may seek to cross into Mexico in large numbers to seek asylum or safe transit through the country. Examples of this are already occurring: in September 2020, a caravan (https://www.vice.com/en/article/bv89yz/a-massive-migrant-caravan-headed-for-the-us-just-got-dismantled-in-guatemala) of thousands of people set out from San Pedro Sula with the intention of reaching the United States. Although the caravan was mostly halted in Guatemala, Mexican officials were eager to clamp down (https://www.proceso.com.mx/651113/el-inm-amaga-con-carcel-si-caravana-migrante-ingresa-a-mexico-sin-medidas-sanitarias) on the movement of people to and through the country—particularly considering U.S. pressure and the pandemic.

CLP_PC_023432

COMAR budget cuts, xenophobia, U.S. measures that have compounded Mexican migration challenges, and a likely increase in migration flows in the coming year all create formidable obstacles to progress. But none of these obstacles should stand in the way of a range of improvements that the Mexican government can implement to address the gaps in protection and provide a fair and humane asylum process that upholds the rights of the forcibly displaced.

# Barriers to International Protection

## INSTITUTO NACIONAL DE MIGRACIÓN (INM)

The INM handles enforcement, issues humanitarian visas, and performs a variety of other immigration functions. The INM has offices in all 32 states in Mexico (https://www.gob.mx/inm/acciones-y-programas/horario-y-oficinas-del-inm) and is in charge of receiving asylum requests from asylum seekers in states where the COMAR is not present. In recent years, the INM has come under fire for corruption allegations. In August of 2020, 1,040 INM agents were fired (https://www.eluniversal.com.mx/nacion/seguridad/inami-separan-de-su-cargo-mil-40-servidores-publicos-por-corrupcion) for coercing migrants to pay up to 300 pesos to process their immigration documents. The INM has also been criticized for prohibiting access for civil society organizations (https://www.amnesty.org/en/latest/news/2020/01/mexico-amnistia-exige-claridad-sobre-acceso-ongs-estaciones-migratorias/) in migration stations. In general terms, the INM lacks an independent oversight mechanism to ensure transparency in the agency. Beyond these broad and large-scale problems, Refugees International has specific concerns related to INM practices on detentions and deportations, humanitarian visas, and protection from return.

**Detentions and Deportations:** Migrants in Mexico who fled persecution and violence are often detained in migration stations and deported before they have the option to seek asylum. Not only are would-be asylum seekers detained and often rapidly deported, but reports (https://www.amnesty.org/en/documents/amr41/0492/2019/en/) note that many would-be asylum seekers are at high risk of detention. Asylum seekers who may be arbitrarily detained in the custody of the INM do not have the ability to question the legality of their detention (http://www.diputados.gob.mx/LeyesBiblio/pdf/LRPCAP_301014.pdf)before any other administrative or judicial authority.

Migrants who may qualify for asylum are often unaware they can seek asylum while in detention because INM staff may have failed (https://www.cndh.org.mx/sites/default/files/documentos/2019-11/Informe-Estaciones-Migratorias-2019.pdf) to disclose this option to those detained. In some cases, INM officials have openly discouraged migrants (https://www.amnestyusa.org/reports/overlooked-under-protected-mexicos-deadly-refoulement-of-central-americans-seeking-asylum/) from applying for asylum. Asylum seekers who are detained may grow tired of extended periods in detention and opt to be returned voluntarily to their home countries instead of completing the asylum process through

CLP_PG_023433

detentions rates have reduced during the COVID-19 pandemic because the INM agreed to release migrants for public health reasons, stakeholders disclosed to Refugees International that those deportations that are taking place are occurring more rapidly than before the pandemic, leaving even less time and resources for migrants to apply for asylum.

**Visitor Card for Humanitarian Reasons:** Migrants with a high risk of vulnerability, such as asylum seekers, stateless people, or those who flee because of public-interest or force majeure reasons, are entitled by law to request a "humanitarian visa (https://www.gob.mx/tramites/ficha/regularizacion-migratoria-por-razones-humanitarias/INM791)," whether at a Mexican point of entry or inside Mexican territory. This legal document is viable for six months to one year, and it can be renewed if the reason for its issuance persists beyond its expiration date. The humanitarian visa contains a social security number called CURP, (https://www.gob.mx/tramites/ficha/obtencion-de-la-curp/SEGOB173) for its acronym in Spanish, which facilitates the access to education, public health services, and a formal job in Mexico. Thus, the humanitarian visa has pivotal role in the access of asylum seekers to social, economic, and cultural rights.

Yet, individuals who enter Mexico for the reasons previously mentioned are less likely to receive a humanitarian visa at the border when travelling individually, than those who enter in large groups. In this respect, there are no approval rates, nor official figures of the total of requests of humanitarian visas submitted at the border. However, considering the large amount of Central American people crossing into Mexico and the reasons they flee their countries of origin, it would be expected to find higher figures of humanitarian visas granted at a point of entry. Nonetheless, between 2015 and September 2020 only 0.06 percent of the total registered entries into Mexico were for humanitarian reasons (http://www.politicamigratoria.gob.mx/es/PoliticaMigratoria/Boletines_Estadisticos). Although there has been a notable increase of registered entries for humanitarian reasons since 2019 (http://www.politicamigratoria.gob.mx/es/PoliticaMigratoria/CuadrosBOLETIN?Anual=2019&Secc=1), data suggests this increase is due to the entrance of migrant caravans and Mexican immigration policies to address them. (http://www.gobernacion.gob.mx/work/models/SEGOB/Resource/2909/1/images/MaD184.pdf) In fact, an alarmingly low number of humanitarian visas (http://www.politicamigratoria.gob.mx/es/PoliticaMigratoria/Boletines_Estadisticos) were granted at an entry point in the years where there were not large caravans, suggesting that access to a humanitarian visa at the border is more likely to be guaranteed in contexts of large, collective entries like in the case of caravans. Although the issuance of humanitarian visas in these cases can be regarded as a protective measure since the humanitarian visa facilitates access to government services, migrants with a lower profile face more obstacles when accessing the humanitarian visa at a point of entry, which could also indicate legal and practical barriers in its access, and a lack of protection policies for vulnerable but less prominent migrants.

Furthermore, not all asylum seekers are issued a humanitarian visa. According to Article 52 Section V of the Mexican Immigration Law (http://www.diputados.gob.mx/LeyesBiblio/pdf/LMigra_130420.pdf), asylum seekers engaged in an asylum procedure are entitled to request a humanitarian visa. Although there is

CLP_PC_023434

no official data on the total of requests for a humanitarian visa made by asylum seekers, it calls our attention that the total of humanitarian visas granted between 2015 and September 2020 represents 55 percent of the total of asylum requests (https://www.gob.mx/cms/uploads/attachment/file/576939/CIERRE_AGOSTO_2020_\_01-SEPT_-2020_.pdf) submitted in the same period. The disparity between the humanitarian visas issued and the asylum claims submitted before COMAR certainly would suggest that thousands of asylum seekers have not had access to the humanitarian visa.

 Finally, through interviews with international and local NGO's, Refugees International found that detained asylum seekers are not granted this visa upon release from detention. In these cases, along with the exit permit that allows them to leave the detention center, INM grants them another type of legal permit (https://centroprodh.org.mx/sididh_2_0_alfa/?p=57540) that is not in accordance with the Mexican Immigration Law, and has significantly fewer benefits than the humanitarian visa, such as its short duration (45 days), and its format (a piece of paper rather than a formal card).


**Protection from Return:** For migrants who arrive by air**,** the INM operates a migration station within the Mexico City airport commonly referred to as "La Burbuja (https://www.animalpolitico.com/2020/10/migrante-faarooq-lleva-un-mes-encerrado-aicm/)." If the INM identifies inconsistencies in an individual's paperwork, an INM official will conduct an interview with the migrant to determine if the person is allowed to enter Mexico or be issued a "rechazo"—a (https://www.elimparcial.com/mexico/Aumenta-rechazo-de-extranjeros-que-buscan-ingresar-a-Mexico-20190803-0002.html)rejection, which results in return to their country of departure or to another country where the person would be admitted. A *rechazo* is different from a deportation, since the latter implies entry of the person into Mexican territory, whereas with a *rechazo* the person is not considered to have entered Mexico. According to the Regulations of the Airports Law (http://www.sct.gob.mx/JURE/doc/regl-ley-aeropuertos.pdf), the access to these spaces is restricted, and only authorities and airline officers are allowed to enter. Therefore, oversight of the INM functions in this space is difficult to achieve. As a result, the INM does not need to provide good cause or justification for this interview, which raises concerns about discrimination and arbitrariness. Unless the individual has a network in Mexico that can contest the *rechazo,* migrants are often rapidly returned before having the chance to apply for asylum. In cases where an individual wishes to apply for asylum but is scheduled to be returned, a judge can issue a halt to this return under Mexico's protection law, the Ley de Amparo (http://www.diputados.gob.mx/LeyesBiblio/pdf/LAmp_150618.pdf). Although a judge can halt this return, there is no immediate notification system communicating the judge's ruling to INM officials in the airport. A court representative must physically go to the airport to deliver the paperwork. Lawyers told Refugees International that, in some cases, migrants have been returned before the court representative could deliver the paperwork.

CLP_PC_023435

The COMAR is the agency responsible for resolving asylum claims and determining refugee status. From January 2020 to the end of August 2020, COMAR received 24, 271 asylum requests (https://www.gob.mx/cms/uploads/image/file/603383/CIERRE_AGOSTO_2020___01-SEPT_-2020_.jpg) primarily from Venezuela, Honduras, El Salvador, Guatemala, and Cuba. The COMAR has four offices (https://www.gob.mx/comar/articulos/comar-oficinas-presencia-y-acciones?idiom=es)in Mexico in Tapachula, Tenosique, Acayucan, and Mexico City. The COMAR lacks adequate presence in the country, but recently, has inaugurated several installations in Monterrey, Tijuana, and Palenque, which is a positive step toward providing COMAR services throughout Mexico. However, there are several inconsistencies in COMAR policies and procedures that result in very serious barriers to protection.

**Inadequate screenings:** In states where there is no local COMAR office, a COMAR official will conduct the asylum eligibility interview over the phone (http://cmdpdh.org/wp-content/uploads/2017/05/Anexo1SEGOB_Solicitantes.pdf). Refugees International spoke with several organizations representing asylum seekers who stated that there are no official protocols for conducting phone interviews, so there are few controls or guidelines on where the asylum seeker can conduct the phone interview. Lawyers representing asylum seekers in Mexico told Refugees International that phone interviews were sometimes conducted in public spaces where the asylum seeker has no privacy. Such conditions can make it uncomfortable for the asylum seeker to recount painful or traumatizing events, which may have bearing on their case. Done properly, these interviews can take an hour or more to fully capture the details and reasons the person is seeking asylum. However, according to civil society organizations with which Refugees International spoke, some phone interviews often last less than 30 minutes and are not detailed enough to obtain all the information necessary to make an informed resolution.

Additionally, the COMAR gives little notice to asylum seekers regarding the date and time of their eligibility interview. Several organizations that provide legal representation to asylum seekers noted that often the notice is so short that the asylum seeker does not have time to arrange for their lawyer to attend the interview. This frustrates the asylum seekers right to due process, specifically Article 20 of the Refugee Law, (http://www.diputados.gob.mx/LeyesBiblio/regley/Reg_LRPC.pdf) which allows for a lawyer to accompany the asylum seeker throughout asylum proceedings. These issues are especially problematic because the eligibility interview is the most crucial stage in the asylum process.

**Growing backlog of claims:** Due to a substantial increase in asylum applications, limited staff, and bureaucratic challenges, there is a growing backlog of unresolved asylum claims in Mexico. According to estimates, in January of this year, 63,860 people (https://asylumaccess.org/new-comar-data-shows-over-13000-asylum-applicants-waiting-since-2018/) were waiting for an asylum decision in Mexico and more than 6,000 had been waiting for a decision for over a year. By June 2020, the backlog stood at 35,468 claims (https://www.razon.com.mx/mexico/alistan-fusion-comar-comision-frontera-sur-398716), which

CLP_PC_023436

shows a reduction in the backlog and is good progress that Refugees International welcomes. Despite this progress, Refugees International spoke with lawyers who indicated they represented asylum seekers who had been waiting over two years for COMAR to resolve their claims. This backlog is particularly problematic given the barriers asylum seekers face in accessing work and government services during their waiting periods, such as lack of access to the humanitarian visa and having to remain in states with few work opportunities. Thousands of asylum seekers grow tired of waiting such extended periods and abandon their claims. According to Asylum Access, in 2019, 10,000 (https://asylumaccess.org/new-comar-data-shows-over-13000-asylum-applicants-waiting-since-2018/) asylum seekers abandoned their claims after waiting an average of 164 days.

It is worth noting that for years, the COMAR has applied the Cartagena Declaration to Venezuelans. But it recently began applying these same standards for evaluation to Hondurans and Salvadorans, which is a positive and welcome development. The application of the Cartagena Declaration means that asylum claims from these countries can be evaluated in less time because the criteria for evaluation can be applied quickly and requires less information from the asylum seeker to make a determination.

During the COVID-19 pandemic, the COMAR continues to receive asylum requests. Yet, for cases submitted after March 24, 2020, the agency temporarily suspended its 45-day timeline for processing (https://www.migrationpolicy.org/research/one-year-us-mexico-agreement) until further notice, meaning there is no longer a time limit to process claims. The COMAR has also reduced its in-office staff capacity to process claims. In the COMAR office in Tijuana, for example, only two staff are currently working to process claims. The reduction in staff and the suspension of the 45-day limit adds to the backlog and the time it takes for cases to be resolved.


**Remaining in the state of asylum application:** Under Mexican law, asylum seekers must remain in the state (https://asylumaccess.org/wp-content/uploads/2019/11/Mexican-Asylum-FAQ-for-US-Immigration-Lawyers.pdf) where they submitted their asylum request and are required weekly to sign a form in the state's COMAR or INM office to prove their presence. This restriction places an undue burden on asylum seekers. Most asylum seekers in Mexico apply in southern or northern border states. Southern states like Chiapas (where 60 percent of asylum requests are submitted (https://www.gob.mx/cms/uploads/image/file/603383/CIERRE_AGOSTO_2020___01-SEPT_-2020_.jpg)) have some of the highest poverty rates (https://www.eleconomista.com.mx/estados/Chiapas-el-estado-mas-pobre-del-pais-en-la-ultima-decada-20190807-0010.html) in the country, and there are fewer work opportunities in these states. Mexico's northern states have high rates of violence and crime (https://www.bbc.com/news/world-latin-america-50315470) and a large cartel presence. Asylum seekers are forced to stay in areas where they may not be able to provide for their basic needs, or where they are at higher risk to their personal security.

Asylum seekers cannot apply for asylum in one state and transfer their request to another COMAR office unless they meet several strict requirements for transfer. The COMAR only allows a transfer for security reasons, and asylum seekers need to provide thorough documentation of a security-related incident,

CLP_PC_023437

such as a police report. For many asylum seekers, making a police report in a foreign country is a daunting and difficult process, and they may be afraid of speaking with authorities.

**30-day deadline to apply:** Under Mexican law, an asylum seeker must apply for asylum within 30 days (https://asylumaccess.org/wp-content/uploads/2019/11/Mexican-Asylum-FAQ-for-US-Immigration-Lawyers.pdf) of entering the country or provide justification for not doing so. The COMAR will review the case and determine whether the justification is adequate to allow for the asylum seeker to present their claim. If the COMAR determines there is good cause for missing the deadline, they will issue a waiver to the asylum seeker. Large discrepancies exist in the issuing of waivers: asylum seekers with lawyers are more likely to receive a waiver than those without. If the would-be asylum seeker does not apply within 30 days and does not receive a waiver, Mexico can deport or voluntarily return this individual, despite the individual having international protection concerns.

**Lack of coordination in issuance of key documents.** Once an asylum claim has been submitted, the asylum seeker must be issued a Constancia (https://help.unhcr.org/mexico/como-solicitar-la-condicion-de-refugiado-en-mexico/), an official document that formally certifies the person is an asylum seeker and is following an asylum procedure before COMAR. The *Constancia* also protects the asylum seeker from deportation. Although it does not prove legal status, the INM requires a *Constancia* to issue the humanitarian visa that facilitates the asylum seeker's access to work opportunities, health, and education services.

Despite the current long duration of asylum procedures, lawyers told Refugees International that COMAR is taking months for the issuance of the *Constancia*, leaving asylum seekers without protection against deportation, and hampering their access work, healthcare, and other services. According to some NGO's, the delay in the issuance of the *Constancia* also depends on the capacity of COMAR local offices. In Tapachula, the Constancia is issued within 24 to 48 hours, but in other states the issuance takes much longer. This problem reflects a lack of coordination between COMAR and INM to jointly address the consequences for COMAR of the substantial increase of asylum claims since 2017, as well as the aggravated vulnerability of asylum seekers due to the pandemic.

# Recommendations

## TO THE MEXICAN FEDERAL GOVERNMENT:

- **Establish an external INM oversight committee.** The INM requires meaningful external accountability and oversight mechanisms. An independent oversight committee established by the Mexican federal government could play such a role, with a particular focus on practices that run

afoul of Mexican and international law on protection of asylum seekers. This independent committee would work in conjunction with civil society participation. This oversight should also include a focus on protection of the human rights of all migrants within Mexico.

## TO THE INM:

- **Place communication materials explaining the option to seek asylum in visible areas within migration stations**. Posters, leaflets, and other communication materials are ways to transmit information to detained migrants about their rights to seek asylum. These materials should be translated into most common languages spoken by migrants—French, English, K'iche, and Mam. (https://www.nytimes.com/2019/03/19/us/translators-border-wall-immigration.html)

- **Ensure the humanitarian visa is provided to all asylum seekers and to migrants who meet the criteria to enter Mexico for humanitarian reasons—that is, asylum seekers, stateless people, or those who fled because of public-interest or majeure force reasons.** By providing broader access to this document, more people will be able to obtain much-needed services and reduce their risk of vulnerability. The INM should also adapt the legal and practical requirements to enter Mexico for humanitarian reasons and ensure that those in need of international protection and humanitarian assistance have legal access to Mexican territory.

- **Agree to allow a COMAR official at the migration station inside Mexican airports as recommended in the MIRPS National Plan.** If a COMAR official is present in airport migration stations, individuals with the intention of applying for asylum in Mexico can begin asylum proceedings immediately without risk of being returned.

- **Allow civil society organizations access into detention centers.** Civil society actors should be allowed to visit migration stations to provide legal counsel for detained migrants. This access can help ensure that migrants are aware of their right to seek asylum if they wish, and also can provide greater transparency of INM detention procedures.

## TO THE COMAR:

- **Broaden the criteria for transfer of asylum requests to different states**. The COMAR should permit asylum seekers pursuing livelihood opportunities in states outside the state of asylum application the ability to transfer requests to another state. This can be done by including economic motives as a permissible reason for transfer. The COMAR should also be more flexible in the evidence it accepts justifying a change for security reasons.

- **Allow more flexibility in assessing the 30-day deadline to apply.** For asylum seekers who do not meet the 30-day deadline, the COMAR should allow for more flexibility in its analysis to permit the asylum seeker to present an application

- **Create a protocol for phone interviews with standards based on UNCHR's pandemic criteria** (https://www.refworld.org/docid/5ebe73794.html)**for asylum eligibility interviews**. The COMAR should create an official protocol for phone interviews that is in accordance with the standards that

CLP_PC_023439

UNCHR recommends for in-person asylum eligibility interviews. These criteria should include ensuring the asylum seeker has access to a private space for the interview and that sufficient time is spent to capture the necessary details for the asylum request.

- **Provide sufficient notice before the eligibility interview.** The COMAR must provide at least one week's notice of the eligibility interview so that asylum seekers are able to inform their lawyers and gather the necessary materials they will need for the interview.

- **Improve coordination between the COMAR and INM in issuing *Constancias*** to ensure that the *Constancia* is issued in a timely manner. The COMAR should immediately notify the INM that the *Constancia* has been issued to facilitate the INM's subsequent issuance of the humanitarian visa. The 45-day renewal should also be eliminated, given the length of time asylum requests take to resolve.

- **Early screening for high risk cases.** Asylum seekers from Honduras and El Salvador should receive immediate or early screening at border areas to identify cases where the Cartagena Declaration standards could be easily applied to the case. This would simplify the asylum process, as the eligibility interviews could be done faster, and the criteria more rapidly determined for faster processing in cases where the asylum seeker is high risk and likely to be granted their asylum request.


## TO THE UNHCR:

- **Incorporate the improvements recommended to the INM and the COMAR into the Comprehensive Regional Protection and Solutions Framework (MIRPS) 2021 Annual Plan for Mexico.** The MIRPS annual plan (https://reliefweb.int/sites/reliefweb.int/files/resources/II%20Annual%20Report%20of%20the%20Regional%20Comprehensive%20Protection%20%26%20Solutions%20Framework%20%28MIRPS%29 2019.pdf) sets out the priorities, commitments, and actions for each country to improve their international protections systems. Through the MIRPS, the UNHCR can support the Mexican government in implementing the practical changes outlined in this report with the technical and financial support needed, along with monitoring and evaluation mechanisms, to ensure the action we recommend take place.

- **Continue to work with civil society organizations to provide trainings to the INM.** The UNHCR should also provide regular trainings to INM alongside other civil society organizations on proper procedures for accepting asylum requests in states with no COMAR office, on providing accurate information to detained migrants on applying for asylum, and other asylum-related procedural issues.

CLP_PC_023440

- **Transform U.S. policies on protection and asylum at the U.S. southern border.** As Refugees International has demonstrated in other reports, the U.S. government has sought to end asylum at its southern border as a meaningful option for those fleeing persecution. A transformation of U.S. policy toward respect for the human rights of asylum seekers would have a significant and substantial impact on Mexican domestic policy. While the issues of U.S. domestic policy on asylum are beyond the scope of this report, it is important to recognize their critical importance.

- **Scale up funding to assist in the implementation of these procedural fixes.** The United States can continue to bolster the Mexican immigration system and its support to the MIRPS by providing additional funding for Mexico's asylum system. This funding should not be in lieu of repairing the United States' own asylum system, but rather to complement the transformation of U.S. policies on protection and encourage the responsibility sharing goals of the MIRPS.

- **Roll back pressure campaigns that force Mexico to double down on enforcement.** The United States' influence is unquestionable in Mexico's increased willingness to detain and deport migrants before they have a chance to seek asylum. The United States should work with Mexico as a partner in regional migration management rather than shifting responsibility and blame onto Mexico.

## Conclusion

The international protection system in Mexico has the potential to be generous and fair but is impeded by a range of factors that prevent people with international protection concerns from accessing their rights and benefits. Although funding, political will, the COVID-19 pandemic, and U.S. pressure are considerable challenges to overcome in providing for a fair system, there are several practical changes that the Mexican government can undertake. If the INM and the COMAR undertake these changes, the impact will be extraordinary for the lives of the thousands of people who seek international protection in Mexico.

*Refugees International would like to thank Daniela Gutiérrez Escobedo for her research and writing contributions to this report.*

**Cover Photo:** Dozens of Central American migrants stranded at the Ceibo border crossing between Mexico and Guatemala were taken by the Mexican authorities to detention centers for migrants in Mexico. Photo by Jair Cabrera Torres/Picture alliance via Getty Images.

Tagged: Mexico (/reports/tag/Mexico), U.S.-Mexico Border (/reports/tag/U.S.-Mexico+Border), Rachel Schmidtke (/reports/tag/Rachel+Schmidtke)

CLP_PC_023441

Ⓐ

# Mexico rethinks asylum initiative after controversial US announcement | CNN

Migrants from Venezuela, Cuba, Haiti and Afghanistan wait outside the Mexican Commission for Refugee Assistance (COMAR) in Mexico City on January 24, 2023.

Daniel Cardenas/Anadolu Agency/Getty Images

*CNN*

—

Mexico is rethinking its approach toward asylum seekers after the Biden administration unveiled a controversial new proposal to limit asylum eligibility in the United States.

Mexico's refugee assistance agency, known as COMAR, launched a pilot program in southern Mexico on Monday to explore expediting asylum denials to those it deems likely to travel onward to the US.

The aim is to deter those migrants from accessing temporary documents issued by COMAR while their cases are being evaluated, which they might use to travel north – a common phenomenon, according to COMAR's head Andrés Ramírez.

ADVERTISING

But after the Biden administration announced its proposed new asylum rules on Tuesday, COMAR plans to abandon the strategy and use what it learned from the pilot program to come up with a different solution, Ramírez said.

The US proposal – which has been panned by human rights advocates and immigration experts – largely bars migrants who have not taken a legal pathway and instead traveled through other countries on their way to the US southern border from applying for asylum in the US. It would take effect in May.

CLP_PC_023442

Among its proposed new conditions on eligibility for US asylum: being denied protection in a third country through which they traveled.

Ramírez now worries that accelerating asylum denials could actually increase Mexico's attractiveness as a pit stop for those ultimately aiming to request asylum in the US.

"The new policy that was recently announced [by the United States] changes the whole thing. We need to rethink it," Ramírez said.

Migrant numbers at the US-Mexico border have been on the rise since last year, with increasing numbers of people from Venezuela, Cuba, Nicaragua and Colombia – many fleeing repressive government and stark economic pressures.

## Passing through Mexico

Though the one-week pilot program did not include actually issuing swift denials, it studied behaviors of individuals from nationalities deemed by COMAR most likely to be traveling for economic reasons rather than for international protection – Senegalese and Angolan migrants in particular, according to Ramírez.

By Mexican law, asylum seekers are required to stay in the state where they filed for asylum to see the process through.

Once registered with COMAR, asylum seekers are provided with deportation protection, access to the public health care system and work eligibility.

Ramírez says that his agency recently noticed that many migrants who began the asylum process in the city of Tapachula, in southern Mexico, later abandoned the process. They used a preliminary COMAR document to travel within the country toward its northern border.

"They are abusing the system," said Ramírez. "That shows us that many of these people are not really interested in (Mexico's) refugee

CLP_PC_023443

system and the asylum procedure."

He estimated that in Tapachula, Mexico about 70% of the individuals from countries other than Haiti were abusing the system.

Haitians, he said, have been continuing with the local asylum process there at a higher rate.

## A record number of applications

Mexico has received a surge of asylum applications in recent years, Ramírez says.

In January 2023, nearly 13,000 people signed up to seek asylum in Mexico, according to COMAR data. That's more than double the number of asylum registrations from one year ago in January 2022, the data shows.

If applications continue at this pace, 2023 could be on track to becoming the refugee agency's busiest year ever.

The record for most applications ever was set in 2021, he said, when COMAR received nearly 130,000 asylum applications.

"We were at the risk of collapsing. It was terrible," Ramírez said.

His priority now is to figure out a way to prevent the asylum system in Mexico from being overwhelmed, he says.

After the results of this week's experiment documenting the behaviors of individuals who likely qualified for expedited denials is analyzed, his team will submit proposals with new solutions to combat what they see as abuses of the system – an approach that Ramírez says will ultimately allow COMAR to prioritize asylum seekers who intend to make Mexico home.

"For us it's very important to take care of the asylum system in Mexico," Ramírez said. "If the asylum system is collapsed, then we're

CLP_PC_023444

done."

CLP_PC_023445



# UNHCR
## The UN Refugee Agency

# Ecuador
## Monthly Update
N.9 | November 2022

*Carlos and his family arrived to Ecuador not knowing para-karate would give him a new dream: making it to the Paralympics. Photo: UNHCR/Jaime Giménez*

## Figures at a glance

### Population figures

**74,320** Historical figure of refugees recognized by Ecuador[1]

**59,379** refugees with active cases registered on UNHCR's database[1]

**96%** from neighbouring Colombia

### Our 2022 response in figures

**373,407** people supported as of the end of November 2022

**23,191** people assisted with cash for basic needs and protection

**2,798** people provided with entrepreneurship or business training

**77,091** people received legal guidance & assistance

**7,058** GBV survivors supported

**42,540** people received hygiene kits

**18,006** people supported with emergency shelter



## Operational context

The regularization process continues, with people of all nationalities who entered regularly to Ecuador registering and a significant number of Venezuelans applying for their visa (see page three for detailed updates).

People in need of international and other types of protection continue entering and/or transiting through the country. Colombians fleeing violence in Putumayo remain a concern, especially community leaders without specific networks in Ecuador.

Moreover, while the number of Venezuelans and Colombians on the move is at a steady rate, Ecuadorians moving northward is increasing, with many hoping to reach the United States.

Violence in some parts of the country continues with a series of attacks reported in Esmeraldas, Guayas and Santo Domingo provinces, all refugee-hosting locations. A state of exception and curfews were declared for these provinces in November as a result of this increasing violence which has given Ecuador its highest violent deaths rate so far.

**76.1M required**

**35% funded**
to 8 December 2022

- Tightly earmarked
- Earmarked
- Softly earmarked (indicative allocation)
- Unearmarked (indicative allocation)
- Funding gap (indicative)

For more information on funding, please visit **reporting.unhcr.org/ecuador**

1 Historical figure registered by the government. UNHCR registers active refugee cases in ProGres to end of September 2022.

## Main populations forced to flee hosted by Ecuador

### Venezuelans



Venezuelans continue to lead in numbers of arrivals in Ecuador. 34,799 people entered Ecuador in November, with a daily entry average of 1,160 Venezuelans.

Key figures

**502,200** Venezuelan refugees and migrants in Ecuador[2]

**73%** estimated to be in an irregular status[3]

**42%** estimated to be between 26 and 35 years old[3]

**23%** estimated to have a higher education degree[4]

Main needs

**83%** access to food[3]

**64%** access to housing or shelter[3]

**53%** access to livelihoods or employment[3]



**See** *UNHCR, IOM and partners appeal for US$1.72 billion for refugees and migrants from Venezuela*

The Regional Inter-Agency Coordination Platform for Refugees and Migrants from Venezuela (R4V), co-led by UNHCR, the UN Refugee Agency, and the International Organization for Migration (IOM), launched a regional plan to support the ongoing needs of refugees and migrants from Venezuela throughout Latin America and the Caribbean.

Within this plan, the R4V in Ecuador - GTRM - will convene 71 partners organization in 2023 to respond to the needs of over 519,000 refugees and migrants, requiring a budget of US$300.92 million.

### Colombians

**3,980** Colombians were registered in need of international protection in 2022[2]

**355** were registered in November

Main needs of Colombians in Ecuador

**69%** access to food, housing, clothing[5]

**24%** access to employment and services[5]

**6%** access to documentation[5]

The arrival of Colombians in need of international protection continues, with 3,980 so far in 2022. 355 Colombians sought asylum in the country in November fleeing renewed violence in some parts of their country of origin.

2 According to data estimated by UNHCR and its partners within the Refugee and Migrant Working Group (GTRM, by its acronym in Spanish)
3 Fourth R4V Joint Needs Assessment, www.r4v.info
4 Third R4V Joint Needs Assessment, www.r4v.info
5 2021 Protection Monitoring available at our data portal

CLP_PC_023464

## SPECIAL FOCUS: REGULARIZATION PROCESS

The first phase of registration, which began with Decree 436, is meant to register all Venezuelans and other foreigners as well as to regularize Venezuelans who entered regularly prior to the issuance of the Decree with a VIRTE visa. Registration is also divided in phases: first, Venezuelans who entered regularly beginning on 1 September 2022; second, people of all nationalities as of 16 November 2022; and third, all Venezuelans who entered irregularly beginning on 17 February 2023.

Regularization of Venezuelans who entered regularly began on 1 October, and over 41,000 visa applications had been lodged, over 28,000 visas had been granted and just over 13,000 IDs had been delivered by 16 December.

Registration continues, with over 130,000 people having appointments for their biometric registration and nearly 95,000 people who have a stay certificate, by 16 December 2022.



### Province of residence per VIRTE visa applicant
Source MDI

**134,590** people registered through the official website (source: MDI)

**130,726** people with appointments for biometric registration (source: MDI)

**95,624** people with a stay certificate (source: MDI)

**41,182** VIRTE visa applications (source: MREMH)

**28,888** people with VIRTE visa (source: MREMH)

**11,444** people with appointments to issue ID (source: DIGERCIC)

**13,496** people with ID (source: DIGERCIC)

1 - 100
101 - 500
501 - 1,000
1,001 - 6,354

### Disaggregation by sex and age
Source MDI

Men ⬤   Women ⬤

| | Men | Women |
|---|---|---|
| Older | 1% | 1% |
| Adults | 37% | 43% |
| Children and adolescents | 9% | 9% |

### Last education level achieved
Source MDI

| | |
|---|---|
| High school | 39% |
| Tertiary | 26% |
| Middle school | 15% |
| Elementary | 12% |
| Kindergarden | 5% |
| Higher or doctorate | 2% |

### Support staff financed by UNHCR and IOM for the regularization process
Source MDI

**24** MIES   **70** MREMH   **79** MDI

### Desire to stay
Do you wish to stay in Ecuador permanently (over two years)?
Source MDI

Yes 82%

This infographic was created jointly by UNHCR and IOM, co-leads of the Interagency Working Group for Refugees and Migrants (GTRM) providing technical support to the government in carrying out the regularization process in Ecuador. This infographic was created with information provided by the Ministry of Interior and Ministry of Foreign Affairs and Human Mobility to 16 December 2022.

## DELIVERING PROTECTION

📍 **NATIONAL**

### Refugees, migrants and locals commemorate 16 days of activism



UNHCR and partners in Ecuador carried out more than 100 events around the country to commemorate the 16 days of activism to ends violence against women. Parades, marches, workshops, film screenings and other activities took place to raise awareness and promote action. UNHCR and HIAS developed and launched a regional study about how gender-based violence affects women in human mobility, which is available at www.segurasenmovilidad.org.

Moreover, UNHCR has been strengthening a network of over 850 community leaders and defenders on legal and protection tools to respond to gender-based violence survivors. Finally, more than 2.000 printed products about gender-based violence were delivered at the national level.

📍 **MACHALA, EL ORO**

### UNHCR and Directorate for International Protection continue missions to reach refugees with registration services



In Machala, UNHCR coordinated and accompanied a documentation brigade led by DPIN, where 303 Colombian and Venezuelan asylum seekers were registered. The brigade was supported by UNHCR, HIAS, the Public Defender's Office and NRC, who assisted in registering identity documents and caring for children while their parents completed the paperwork. For the past months, UNHCR has been carrying out brigades to deliver protection to refugees and asylum seekers. More brigades will take place in other cities of the country during the next months.

## PROMOTING ACCESS TO BASIC SERVICES

📍 **LAGO AGRIO**

### Children build organic crops to learn about food security

UNHCR and the Higher Technological Institute Crecermas (ISTEC) held the first workshop to promote a culture of healthy eating and environmental protection for 60 children from 5th and 6th grade studying at Las Americas school. This workshop is part of the innovation project which seeks to teach children about food security while raising awareness on preserving the river.

Students built their own organic crops while learning about the importance of eating organic food and recycling.



📍 **CARCHI & IMBABURA**

### 62 health units have new equipment thanks to the support of UNHCR and KOICA

In Ibarra, UNHCR donated medical equipment to the Ministry of Public Health, including blood-glucose meters, stethoscopes, portable ultrasound machines, stretchers and Doppler machines and others in a supply of 290 items.

This donation will help 62 health units in the provinces of Imbabura and Carchi currently serving more than 16.000 people including refugees, migrants and locals. This donation is part of the project financed by KOICA in Ecuador.



## PROMOTING SOCIOECONOMIC INCLUSION



**See** _New IFC and UNHCR initiative to boost private sector engagement for refugees and their host communities_

The Joint Initiative will promote knowledge sharing to facilitate the engagement of private sector stakeholders in refugee-hosting areas. The initiative will tap into private sector expertise, financing, and innovation to improve the quality of life for those forcibly displaced and their hosts, through job creation, better and affordable services, financing infrastructure, and much-needed capital for small and medium enterprises.

In Ecuador, UNHCR is engaging international financial institutions to boost the socioeconomic inclusion of refugees while leveraging support from the private sector to facilitate a context conducive for local integration. **See more** about UNHCR's work with the private sector in Ecuador.

📍 NATIONAL

## UNHCR and refugee entrepreneurs launch Christmas Catalogue



Thinking about what to give this Christmas to your loved ones?

UNHCR and several refugee and migrant entrepreneur finalized a catalogue containing a wide range of products, from Christmas decorations to stuffed animals, cups and delicous jams.

This catalogue es part of the UN Compra con Propósito (Purchase with a Purpose) initiative, which will make these and amy other products available in partner stores nation-wide soon.

Download the complete catalog and place your order here.

📍 CUENCA

## UNHCR promotes labor inclusion of refugees and other displaced people



UNHCR finalized the hospitality workshop at Selina Hotel with the third group of this formative process. Since the project started, 11 people have finished the process and received international certification allowing them to be hired by Selina and other hotels in Ecuador and around the world. Following these trainings, one Venezuelan woman has been hired by Selina and other have been called for working on high-demand seasons.

📍 TULCÁN

## UNHCR supports local livelihoods fairs



UNHCR delivered 8 tents to the Parish Government of Urbina which will be used to support local livelihood fairs, while HIAS also provided support through the Agronegocios to boost livelihoods for participating families and promote integration among refugees and locals. With these new supplies, more livelihoods fairs are expected to take place in the area.

## CLIMATE ACTION

📍 **GUAYAQUIL & SAN GABRIEL**

### Recycling, Kayaking and parades to boost climate action



Climate change and natural disasters continue to aggravate displacements and prevent integration for refugees in some parts of Ecuador. To address these challenges, UNHCR has been developing and implementing a national strategy to engage refugees and their hosts in climate action. In Isla Trinitaria (Guayaquil), UNHCR, CDH and DELFI foundation began a project focused on creating integration space of 20 refugees and Ecuadorians practicing Kayak and collecting plastics from the Estereo Salado river inlet which has high levels of pollution.

In San Gabriel, the Environmental Protection Directorate of Montúfar with the support of UNHCR and FUDELA, started the "Integrated Solid Waste Management Plan", where 300 Ecuadorians, refugees and migrants learned about environmental preservation.

## PROMOTING PEACEFUL COEXISTENCE

📍 **NATIONAL**

### UNHCR launches Goal Click initiative: Lives of the Displaced through the Lens of Football



Photographic and written series from Goal Click with UNHCR chronicles personal stories from refugees and football's role to help re-anchor lives and open paths to a brighter future.

Goal Click gave each participant a disposable camera to highlight football's role in their lives in several locations in Ecuador.

***Read their stories here.***

📍 **QUITO**

### Around 100 participants joined to brainstorm on how to use art to promote inclusion



UNHCR, the Secretariat of Culture, Cumandá Park and the Camaras a Camaradas Project held the event "Art and Culture for Social Inclusion in Cities". At this event almost 100 artists, community projects participants, representatives of collectives, cultural organizations, civil society, NGOs and public institutions participated in three panels and three roundtables to share their best practices, challenges and commitments to promote inter-institutional collaboration.

📍**MANTA**

### Podcast help counteract violence

After a couple of virtual sessions on communication with communities, 25 community leaders identified information needs of refugees about gender-based violence. Participants registered their testimonies with the aim of creating different podcasts and encourage the population to fight against all forms of violence.



📍 **EL ÁNGEL, CARCHI**

### New Wi-Fi spots facilitate access to on-line services



As part of a connectivity project implemented by UNHCR and the Municipal Government of Espejo since 2020, 19 new Wi-Fi spots were located spread among rural and urban areas, facilitating access to internet. Refugees and locals can now easily enroll in school, start their regularization process, schedule of medical appointments, among other services. This new infrastructure was made possible thanks to funding from KOICA and the Canadian government.



UNHCR Ecuador | Monthly Update | November 2022

**Stories from the field**

# Para- karate gives second chance to shine to Venezuelan in Ecuador

▶ **Learn more about Carlos**

*Carlos Acosta, a Venezuelan refugee, has won in para-karate competitions for his new home Ecuador. Photo: UNHCR/Daniela Pérez Obando*

 **QUITO**

Carlos Acosta is a tireless dreamer. Being in a wheelchair does not impede him from leaving his house to reach them. While preparing his suitcase with sports clothes, this champion smiles with excitement to start practicing a sport in which he is a pioneer in Ecuador: para-karate. He has been practicing this discipline for two years and even though he has already won several national competitions, he still feels that he must practice a lot to qualify for the Paralympic Games.

"I adopted this discipline as motivation and to show Ecuador that as Venezuelans, we can contribute to the country as well," he explains, firmly believing that through sports he can give back to the nation that welcomed him and his family.

Carlos' dedication made him an official athlete of the Ecuadorian Karate Federation; four-time national Para Karate gold medalist representing Pichincha; provincial champion of Pichincha; and gold medalist of the 2022 South American championship representing Ecuador.

He demonstrates that disability is not an obstacle, but a tool that allows him to demonstrate that talents are cultivated, and dreams are fulfilled. **_Read more about Carlos._**

**You can help people like Carlos who had to leave their homes and now dream of rebuilding their lives.** **Donate now.**

## We thank the contributions of our donors

8 December 2022

**_UNHCR Ecuador is grateful for the critical and generous support provided by donors who have contributed with earmarked and unearmarked funding._**

          

          

   

**_UNHCR Ecuador is grateful for the support from private donors._**

 Private donors in Australia, Germany, Japan, Italy
Republic of Korea, Spain, United States

**For more information:** Diana Diaz Rodriguez, Associate Communications Officer *diazdi@unhcr.org* | **For media queries:** *ecuqumedia@unhcr.org*



3/17/23, 9:55 AM
Case 4:18-cv-06810-JST   Document 169-8   Filed 06/05/23   Page 904 of 1047
UNHCR - Number of displaced Nicaraguans in Costa Rica doubles in less than a year



DONATE

DO YOU NEED HELP?

# Number of displaced Nicaraguans in Costa Rica doubles in less than a year

*This is a summary of what was said by UNHCR spokesperson Boris Cheshirkov – to whom quoted text may be attributed – at today's press briefing at the Palais des Nations in Geneva.*

25 March 2022   |  Español   |  Français



We use cookies and other identifiers to help improve your online experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

**Accept**

CLP_PC_023473

A UNHCR staff member assists Nicaraguan asylum seekers in Upala, near Costa Rica's border with Nicaragua. © UNHCR/Kai Odio

The number of Nicaraguan refugees and asylum seekers in Costa Rica has doubled in the last eight months, reaching more than 150,000, according to the latest figures available to UNHCR, the UN Refugee Agency. This represents a full 3 per cent of Costa Rica's total population of five million.

These figures, as of February 2022, confirm more Nicaraguans are currently seeking protection in Costa Rica than all the refugees and asylum seekers combined during Central America's civil wars in the 1980s, when Costa Rica was a sanctuary for those fleeing violence.

UNHCR is concerned that this trend could seriously strain Costa Rica's already stretched asylum system and overwhelm support networks in the country.

The sharp rise in the number of asylum seekers from Nicaragua corresponds with major sociopolitical events in the country, including the November presidential elections.

Nicaraguans are also increasingly seeking protection further afield. During the first two months of 2022, the number of asylum seekers from Nicaragua arriving in Mexico is nearly one-third of the asylum claims by Nicaraguans in all of 2021.

Throughout the COVID-19 pandemic, the Government of Costa Rica has kept its borders open for those seeking international protection.

UNHCR's border monitoring in Costa Rica reveals that many of the new asylum seekers are finding employment in the seasonal coffee harvest. However, their economic security could be compromised once the harvest is over, increasing the pressure on response institutions and UNHCR programmes.

Costa Rica is experiencing a high level of unemployment due to the pandemic-induced economic crisis. In this context, the individual support networks that provide shelter and economic opportunities to Nicaraguans are weakened, increasing the need for support from UNHCR and its partners.

UNHCR supports the Government of Costa Rica and host communities in welcoming asylum seekers and refugees through registration, legal aid, cash assistance, and donations of hygiene and cleaning kits, food and mattresses. It also provides psychosocial support, emergency shelter, vocational training, and activities to promote peaceful coexistence between refugees and the communities that host them.

At a moment when the crisis in Ukraine is making daily headlines, these figures highlight the

We use cookies and other identifiers to help improve your online experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept

CLP_PC_023474

**Media contacts:**

- In San Jose, Diego Perez Damasco, perezdam@unhcr.org, +506 8882 8169
- In Mexico, Sibylla Brodinsky, brodzins@unhcr.org . +52 55 80485054
- In Panama (regional), William Spindler, spindler@unhcr.org, +507 6382-7815
- In Geneva, Boris Cheshirkov, cheshirk@unhcr.org, +41 79 433 7682

| Share on Facebook | Share on Twitter |

# Related news and stories

view more

NEWS RELEASES

## UN Assistant High Commissioner for Refugees calls for joint action to address shifting challenges of mixed movements in the Americas

STORIES

## Former 'nature beginner' is now on the front lines of the fight against climate change

We use cookies and other identifiers to help improve your online experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept

CLP_PC_023475

NEWS RELEASES

## UNHCR's Grandi urges world leaders not to forget displaced people at COP27

STORIES

## To the refugee friend I shared so many adventures with

NEWS RELEASES

## Millions face harm from flooding across West and Central Africa, UNHCR warns

NEWS RELEASES

## UNHCR's Grandi sounds alarm as drought grips Horn of Africa

We use cookies and other identifiers to help improve your online experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept

CLP_PC_023476

Media centre                                    Careers

Refworld                                        Contact us

Privacy policy                                  Data

Report misconduct or abuse                      Terms & conditions of use

Frequently Asked Questions

Sign up for email updates

Follow:

We use cookies and other identifiers to help improve your online
experience. By using our website you are agreeing to this. Read our
privacy policy to find out what cookies are used for and how to
change your settings.

Accept

CLP_PC_023477



**UNHCR**
The UN Refugee Agency

Share this page:   f  y      Q Search      ≡ Menu

* The data for the latest year (2022) is available up until the mid-year, except IDMC data on Internally Displaced People which is available until end-2021.



Dataset
Asylum decisions

Display type
Totals

Population types
All

Year

⦿ Range
○ Custom selection

1951 - 2022*

1951                2022*

Next ↓

Country of Origin
Do not display

Country of Asylum
BZE

**Query permalink**
www.unhcr.org/refugee-statistics/download/?url=D2dAH7   Copy link

**Share**
Facebook   Twitter   Email

**Download**
Query data   All data

Line chart        Bar chart

| Year ↓↑ | Country of Origin | Country of Asylum | Authority | Stage of Procedure | Cases / Persons | Recognized | Complementary protection | Rejected | Other/ clo: |
|---|---|---|---|---|---|---|---|---|---|
| 2000 | - | Belize (BLZ) | G | FI | P | 0 | 0 | 0 | |
| 2001 | - | Belize (BLZ) | G | FI | P | 0 | 0 | 0 | |
| 2002 | - | Belize (BLZ) | U | FI | P | 0 | 0 | 13 | |
| 2003 | - | Belize (BLZ) | G | FI | P | 0 | 0 | 0 | |
| 2004 | - | Belize (BLZ) | G | FI | P | 0 | 0 | 0 | |
| 2005 | - | Belize (BLZ) | G | FI | P | 0 | 0 | 0 | |
| 2006 | - | Belize (BLZ) | G | FI | P | 0 | 0 | 0 | |
| 2009 | - | Belize (BLZ) | G | FI | P | 0 | 5 | 0 | |
| 2010 | - | Belize (BLZ) | G | FA | P | 0 | 0 | 0 | |
| 2012 | - | Belize (BLZ) | G | FI | P | 0 | 0 | 33 | |
| 2013 | - | Belize (BLZ) | J | FI | P | 0 | 0 | 0 | |
| 2013 | - | Belize (BLZ) | G | FI | P | 0 | 0 | 0 | |
| 2014 | - | Belize (BLZ) | J | FI | P | 0 | 0 | 0 | |
| 2015 | - | Belize (BLZ) | J | FI | P | 34 | 0 | 0 | |
| 2018 | - | Belize (BLZ) | G | FI | P | 29 | 0 | 70 | |
| 2019 | - | Belize (BLZ) | G | FI | P | 0 | 0 | 33 | 1,6 |
| 2020 | - | Belize (BLZ) | G | FI | P | 0 | 0 | 0 | |
| 2021 | - | Belize (BLZ) | G | FI | P | 0 | 56 | 15 | |
| 2022* | - | Belize (BLZ) | G | FI | P | 0 | 5 | 27 | |
| | | | | | | 63 | 66 | 191 | 2,C |

CLP_PC_023478



**UNHCR** The UN Refugee Agency

Share this page: f ✆   Q Search   ≡ Menu

**Dataset**

○ Population figures
UNHCR data on displacement.

○ Asylum applications
Asylum claims submitted.

⦿ Asylum decisions
Decisions taken on asylum claims

○ Solutions
Solutions for refugees and IDPs.

○ Internally displaced persons
Internal displacement due to conflict and violence.
(Source: IDMC)

○ Palestine refugees under UNRWA's mandate
Registered Palestine refugees (Source: UNRWA)

**Next ↓**

Display type
Totals

Population types
All

**Year**
1951 - 2022

**Country of Origin**
Do not display

**Country of Asylum**
COL

\* The data for the latest year (2022) is available up until the mid-year, except IDMC data on Internally Displaced People which is available until end-2021.

**Query permalink**

www.unhcr.org/refugee-statistics/download/?url=4PoXr3   Copy link

**Share**   Facebook   Twitter   Email

**Download**   Query data   All data

Line chart   Bar chart

| Year ↓↑ | Country of Origin | Country of Asylum | Authority | Stage of Procedure | Cases / Persons | Recognized | Complementary protection | Rejected |
|---|---|---|---|---|---|---|---|---|
| 2002 | - | Colombia (COL) | U | FI | P | 0 | 0 | 5 |
| 2003 | - | Colombia (COL) | G | FI | P | 5 | 0 | 5 |
| 2003 | - | Colombia (COL) | U | FI | P | 5 | 0 | 0 |
| 2004 | - | Colombia (COL) | G | FI | P | 15 | 0 | 5 |
| 2005 | - | Colombia (COL) | G | AR | P | 0 | 0 | 15 |
| 2005 | - | Colombia (COL) | G | FI | P | 27 | 0 | 35 |
| 2005 | - | Colombia (COL) | U | FI | P | 15 | 0 | 0 |
| 2006 | - | Colombia (COL) | G | AR | P | 0 | 0 | 18 |
| 2006 | - | Colombia (COL) | G | FI | P | 0 | 0 | 22 |
| 2007 | - | Colombia (COL) | G | FI | P | 27 | 0 | 80 |
| 2008 | - | Colombia (COL) | G | AR | P | 0 | 0 | 10 |
| 2008 | - | Colombia (COL) | G | FI | P | 5 | 0 | 89 |
| 2009 | - | Colombia (COL) | G | AR | P | 0 | 0 | 20 |
| 2009 | - | Colombia (COL) | G | FI | P | 31 | 0 | 280 |
| 2010 | - | Colombia (COL) | G | FI | P | 5 | 0 | 21 |
| 2011 | - | Colombia (COL) | G | AR | P | 0 | 0 | 15 |
| 2011 | - | Colombia (COL) | G | FI | P | 5 | 0 | 45 |
| 2012 | - | Colombia (COL) | G | FI | P | 5 | 0 | 53 |
| 2012 | - | Colombia (COL) | G | AR | P | 0 | 0 | 10 |
| 2013 | - | Colombia (COL) | G | FI | P | 5 | 0 | 99 |

CLP_PC_023479



# Refugee Data Finder

Key Indicators | Data Finder | Methodology | Data Insights

* The data for the latest year (2022) is available up until the mid-year, except IDMC data on Internally Displaced People which is available until end-2021.

**Dataset**

○ Population figures
UNHCR data on displacement.

○ Asylum applications
Asylum claims submitted.

● Asylum decisions
Decisions taken on asylum claims.

○ Solutions
Solutions for refugees and IDPs.

○ Internally displaced persons
Internal displacement due to conflict and violence.
(Source: IDMC)

○ Palestine refugees under UNRWA's mandate
Registered Palestine refugees (Source: UNRWA)

**Next ↓**

Display type:
Totals

Population types
All

**Year**
1951 - 2022*

**Country of Origin**
Do not display

**Country of Asylum**
COL

**Query permalink**

www.unhcr.org/refugee-statistics/download/?url#4PoXr3   | Copy link |

**Share**

| Facebook | Twitter | Email |

**Download**

| Query data | All data |

Line chart    Bar chart

| Year ↓↑ | Country of Origin | Country of Asylum | Authority | Stage of Procedure | Cases / Persons | Recognized | Complementary protection | Rejected |
|---|---|---|---|---|---|---|---|---|
| 2013 | - | Colombia (COL) | G | AR | P | 0 | 0 | 19 |
| 2014 | - | Colombia (COL) | G | FI | P | 15 | 0 | 50 |
| 2014 | - | Colombia (COL) | G | AR | P | 0 | 0 | 14 |
| 2015 | - | Colombia (COL) | G | FI | P | 10 | 0 | 74 |
| 2015 | - | Colombia (COL) | G | AR | P | 5 | 0 | 23 |
| 2016 | - | Colombia (COL) | G | FI | P | 35 | 0 | 0 |
| 2016 | - | Colombia (COL) | G | AR | P | 0 | 0 | 5 |
| 2017 | - | Colombia (COL) | G | FI | P | 19 | 0 | 5 |
| 2018 | - | Colombia (COL) | G | FI | P | 37 | 0 | 5 |
| 2019 | - | Colombia (COL) | G | FI | P | 337 | 0 | 0 |
| 2020 | - | Colombia (COL) | G | FI | P | 351 | 0 | 5 |
| 2021 | - | Colombia (COL) | G | FI | P | 550 | 0 | 25 |
| 2022* | - | Colombia (COL) | G | FI | P | 19 | 0 | 0 |
| | | | | | | 1,528 | | 1,052 |

CLP_PC_023480



# UNHCR
The UN Refugee Agency

Share this page: f 🔍 ≡
Search  Menu

Palestine refugees under UNRWA's mandate
○ Registered Palestine refugees (Source: UNRWA)

**Next ↓**

Display type
Totals

Population types
All

**Year**
1951 - 2022*

**Country of Origin**
Do not display

**Country of Asylum**
COS

| Year ↓↑ | Country of Origin | Country of Asylum | Authority | Stage of Procedure | Cases / Persons | Recognized | Complementary protection | Rejected | Otherwise closed |
|---|---|---|---|---|---|---|---|---|---|
| 2000 | - | Costa Rica (CRI) | G | FI | C | 532 | 0 | 60 | 3( |
| 2001 | - | Costa Rica (CRI) | G | FI | C | 2,225 | 0 | 1,592 | 28' |
| 2002 | - | Costa Rica (CRI) | G | FI | P | 2,359 | 2,236 | 1,977 | 45 |
| 2003 | - | Costa Rica (CRI) | G | FI | P | 864 | 974 | 372 | 4 |
| 2004 | - | Costa Rica (CRI) | G | FA | P | 838 | 0 | 572 | ( |
| 2006 | - | Costa Rica (CRI) | G | FA | P | 443 | 0 | 0 | ( |
| 2007 | - | Costa Rica (CRI) | G | FA | P | 181 | 0 | 517 | ( |
| 2008 | - | Costa Rica (CRI) | G | FA | P | 383 | 0 | 624 | ( |
| 2009 | - | Costa Rica (CRI) | G | FA | P | 455 | 0 | 588 | ( |
| 2010 | - | Costa Rica (CRI) | G | FI | P | 150 | 0 | 358 | 68( |
| 2011 | - | Costa Rica (CRI) | G | FI | P | 237 | 0 | 388 | 24( |
| 2012 | - | Costa Rica (CRI) | G | FI | P | 126 | 0 | 327 | 52( |
| 2013 | - | Costa Rica (CRI) | G | FI | P | 116 | 0 | 943 | 81 |
| 2013 | - | Costa Rica (CRI) | G | AR | P | 15 | 0 | 174 | ( |
| 2014 | - | Costa Rica (CRI) | G | FI | P | 151 | 0 | 877 | 49( |
| 2014 | - | Costa Rica (CRI) | G | AR | P | 17 | 0 | 117 | 3: |
| 2015 | - | Costa Rica (CRI) | G | AR | P | 10 | 0 | 42 | 10: |
| 2015 | - | Costa Rica (CRI) | G | FI | P | 254 | 0 | 554 | ( |
| 2016 | - | Costa Rica (CRI) | G | FI | P | 534 | 0 | 2,316 | 1,13( |
| 2016 | - | Costa Rica (CRI) | G | AR | P | 72 | 0 | 503 | 92! |
| | | | | | | 16,982 | 3,210 | 30,539 | 47,61( |

CLP_PC_023481







**Query permalink**

www.unhcr.org/refugee-statistics/download/?url=w0Auu0   Copy link

**Share**

Facebook   Twitter   Email

**Download**

Query data   All data

**Display type**
Total

**Population types**
All

**Year**
1951 - 2022*

**Country of Origin**
Do not display

**Country of Asylum**
GUA

| Year ⬍ | Country of Origin | Country of Asylum | Authority | Stage of Procedure | Cases / Persons | Recognized | Complementary protection | Rejected |
|---|---|---|---|---|---|---|---|---|
| 2000 | - | Guatemala (GTM) | U | FI | P | 15 | 0 | 38 |
| 2001 | - | Guatemala (GTM) | U | FI | P | 15 | 0 | 33 |
| 2002 | - | Guatemala (GTM) | U | FI | P | 5 | 0 | 15 |
| 2003 | - | Guatemala (GTM) | G | FI | P | 0 | 0 | 5 |
| 2004 | - | Guatemala (GTM) | G | FI | P | 0 | 0 | 0 |
| 2005 | - | Guatemala (GTM) | G | FI | P | 5 | 0 | 0 |
| 2006 | - | Guatemala (GTM) | G | FI | P | 5 | 0 | 0 |
| 2007 | - | Guatemala (GTM) | G | FI | P | 0 | 0 | 22 |
| 2008 | - | Guatemala (GTM) | G | FI | P | 5 | 0 | 5 |
| 2009 | - | Guatemala (GTM) | G | FI | P | 0 | 0 | 0 |
| 2010 | - | Guatemala (GTM) | G | FI | P | 5 | 0 | 0 |
| 2011 | - | Guatemala (GTM) | G | FI | P | 5 | 0 | 0 |
| 2012 | - | Guatemala (GTM) | G | FI | P | 15 | 0 | 0 |
| 2013 | - | Guatemala (GTM) | G | FI | P | 5 | 0 | 0 |
| 2014 | - | Guatemala (GTM) | G | FI | P | 15 | 0 | 0 |
| 2015 | - | Guatemala (GTM) | G | FI | P | 62 | 0 | 0 |
| 2016 | - | Guatemala (GTM) | G | FI | P | 72 | 0 | 5 |
| 2017 | - | Guatemala (GTM) | G | FI | P | 60 | 0 | 10 |
| 2018 | - | Guatemala (GTM) | G | FI | P | 20 | 0 | 0 |
| 2019 | - | Guatemala (GTM) | G | FI | P | 33 | 0 | 20 |
| | | | | | | 660 | | 527 |

< Previous   1   2   Next >

CLP_PC_023483











# Refugee Data Finder

Key Indicators Data Finder Methodology Data Insights

Dataset

- Population figures
  UNHCR data on displacement.
- Asylum applications
  Asylum claims submitted.
- (selected) Asylum decisions
  Decisions taken on asylum claims.
- Solutions
  Solutions for refugees and IDPs.
- Internally displaced persons
  Internal displacement due to conflict and violence. (Source: IDMC)
- Palestine refugees under UNRWA's mandate
  Registered Palestine refugees (Source: UNRWA)

Next ↓

Display type
Totals

Population types
All

Year
1951 - 2022*

Country of Origin
Do not display

Country of Asylum
GUA

* The data for the latest year (2022) is available up until the mid-year, except IDMC data on Internally Displaced People which is available until end-2021.

**Query permalink**
www.unhcr.org/refugee-statistics/download/?url=wOAuu0 Copy link

**Share**
Facebook Twitter Email

**Download**
Query data All data

Line chart

Bar chart

| Year | Country of Origin | Country of Asylum | Authority | Stage of Procedure | Cases / Persons | Recognized | Complementary protection | Rejected |
|---|---|---|---|---|---|---|---|---|
| 2020 | - | Guatemala (GTM) | G | FI | P | 137 | 0 | 63 |
| 2021 | - | Guatemala (GTM) | G | FA | P | 38 | 0 | 49 |
| 2022* | - | Guatemala (GTM) | G | FA | P | 143 | 0 | 262 |
| | | | | | | **660** | | **527** |

‹ Previous 1 2 Next ›

| Year ↓↑ | Country of Origin | Country of Asylum | Authority | Stage of Procedure | Cases / Persons | Recognized | Complementary protection | Rejected |
|---|---|---|---|---|---|---|---|---|
| 2000 | - | Honduras (HND) | G | FI | P | 0 | 0 | 12 |
| 2001 | - | Honduras (HND) | G | FI | P | 5 | 0 | 26 |
| 2002 | - | Honduras (HND) | G | FI | P | 10 | 0 | 54 |
| 2003 | - | Honduras (HND) | G | FI | P | 5 | 0 | 46 |
| 2004 | - | Honduras (HND) | G | FI | P | 0 | 0 | 15 |
| 2005 | - | Honduras (HND) | G | FI | P | 10 | 0 | 0 |
| 2006 | - | Honduras (HND) | G | FI | P | 0 | 0 | 25 |
| 2007 | - | Honduras (HND) | G | FI | P | 0 | 0 | 0 |
| 2008 | - | Honduras (HND) | G | FI | P | 5 | 0 | 0 |
| 2009 | - | Honduras (HND) | G | FI | P | 5 | 0 | 0 |
| 2010 | - | Honduras (HND) | G | FI | P | 0 | 0 | 0 |
| 2011 | - | Honduras (HND) | U | FI | P | 5 | 0 | 0 |
| 2012 | - | Honduras (HND) | G | FI | P | 0 | 0 | 0 |
| 2013 | - | Honduras (HND) | G | FI | P | 0 | 0 | 0 |
| 2014 | - | Honduras (HND) | G | FA | P | 15 | 0 | 0 |
| 2015 | - | Honduras (HND) | G | FA | P | 10 | 0 | 0 |
| 2016 | - | Honduras (HND) | G | FA | P | 0 | 0 | 0 |
| 2017 | - | Honduras (HND) | G | FI | P | 10 | 0 | 0 |
| 2018 | - | Honduras (HND) | G | FI | P | 5 | 0 | 0 |
| 2019 | - | Honduras (HND) | G | FI | P | 45 | 0 | 0 |
| | | | | | | 234 | | 178 |

‹ Previous   1   2   Next ›

CLP_PC_023485



UNHCR The UN Refugee Agency

DONATE DO YOU NEED HELP?

Media centre Refworld Data Supply Chain Careers Search Global (EN)

ABOUT US EMERGENCIES WHAT WE DO NEWS AND STORIES OUR PARTNERS GET INVOLVED

# Refugee Data Finder

Key Indicators Data Finder Methodology Data Insights

Dataset

- Population figures
  UNHCR data on displacement.
- Asylum applications
  Asylum claims submitted.
- Asylum decisions
  Decisions taken on asylum claims.
- Solutions
  Solutions for refugees and IDPs.
- Internally displaced persons
  Internal displacement due to conflict and violence. (Source: IDMC)
- Palestine refugees under UNRWA's mandate
  Registered Palestine refugees (Source: UNRWA)

Next

Display type
Totals

Population types
All

Year
1951 - 2022*

Country of Origin
Do not display

Country of Asylum
HON

* The data for the latest year (2022) is available up until the mid-year, except IDMC data on Internally Displaced People which is available until end-2021.

Query permalink
www.unhcr.org/refugee-statistics/download/?url=eu79IV Copy link

Share
Facebook Twitter Email

Download
Query data All data

Line chart Bar chart

| Year | Country of Origin | Country of Asylum | Authority | Stage of Procedure | Cases / Persons | Recognized | Complementary protection | Rejected |
|---|---|---|---|---|---|---|---|---|
| 2020 | - | Honduras (HND) | G | FI | P | 12 | 0 | 0 |
| 2021 | - | Honduras (HND) | G | FI | P | 81 | 0 | 0 |
| 2022* | - | Honduras (HND) | G | FI | P | 11 | 0 | 0 |
| | | | | | | 234 | | 178 |

Previous 1 2 Next

Feedback

© UNHCR 2001-2023

Media centre
Refworld
Privacy policy
Report misconduct or abuse
Frequently Asked Questions

Careers
Contact us
Data
Terms & conditions of use

Sign up for email updates

Follow:

*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528



October 29, 2021

MEMORANDUM TO:     Tae D. Johnson
                   Acting Director
                   U.S. Immigration and Customs Enforcement

                   Troy A. Miller
                   Acting Commissioner
                   U.S. Customs and Border Protection

                   Ur M. Jaddou
                   Director
                   U.S. Citizenship and Immigration Services

                   Robert Silvers
                   Under Secretary
                   Office of Strategy, Policy, and Plans

FROM:              Alejandro N. Mayorkas
                   Secretary

SUBJECT:           **Termination of the Migrant Protection Protocols**

---

On January 25, 2019, then-Secretary of Homeland Security Kirstjen Nielsen issued a memorandum entitled "Policy Guidance for Implementation of the Migrant Protection Protocols." On February 2, 2021, President Biden issued Executive Order (EO) 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border.* In this Executive Order, President Biden directed the Secretary of Homeland Security "to promptly review and determine whether to terminate or modify the program known as the Migrant Protection Protocols." After completing a comprehensive review as directed by EO 14010, I concluded that the Migrant Protection Protocols (MPP) should be terminated and, on June 1, 2021, issued a memorandum to that effect (the "June 1 memo").

1

On August 13, 2021, the U.S. District Court for the Northern District of Texas determined that the June 1 memo was not issued in compliance with the Administrative Procedure Act (APA) because it failed to address all the relevant considerations. *See Texas v. Biden*, No. 2:21-cv-067, 2021 WL 3603341 (N.D. Tex. Aug. 13, 2021). As a result, the District Court vacated the June 1 memo in its entirety and remanded the matter to the Department for further consideration. *Id.* at *27. The District Court additionally ordered DHS to "enforce and implement MPP *in good faith*" until certain conditions are satisfied, including that MPP be "lawfully rescinded in compliance with the APA." *Id.* (emphasis in original). The Department is fully complying with the District Court's order. At the same time, the Department has filed a notice of appeal and continues to vigorously contest several of the District Court's conclusions.

Pursuant to the District Court's remand and in continuing compliance with the President's direction in EO 14010, I have once more assessed whether MPP should be maintained, terminated, or modified in a variety of different ways. In conducting my review, I have studied multiple court decisions, filings, and declarations related to MPP; considered relevant data regarding enrollments in MPP, encounters at the border, and outcomes in removal proceedings; reviewed previous Departmental assessments of MPP, as well as news reports and publicly available sources of information pertaining to conditions in Mexico; met with a broad and diverse array of internal and external stakeholders, including officials from across the federal government working on border management, state and local elected officials from across the border region, border sheriffs and other local law enforcement officials, and representatives from nonprofit organizations providing legal access and humanitarian aid across the southwest border; and considered the impact of other Administration initiatives related to immigration and the southern border. I also examined considerations that the District Court determined were insufficiently addressed in the June 1 memo, including claims that MPP discouraged unlawful border crossings, decreased the filing of non-meritorious asylum claims, and facilitated more timely relief for asylum seekers, as well as predictions that termination of MPP would lead to a border surge, cause the Department to fail to comply with alleged detention obligations under the Immigration and Nationality Act, impose undue costs on states, and put a strain on U.S.-Mexico relations.

After carefully considering the arguments, evidence, and perspectives presented by those who support re-implementation of MPP, those who support terminating the program, and those who have argued for continuing MPP in a modified form, I have determined that MPP should be terminated. In reaching this conclusion, I recognize that MPP likely contributed to reduced migratory flows. But it did so by imposing substantial and unjustifiable human costs on the individuals who were exposed to harm while waiting in Mexico. The Biden-Harris Administration, by contrast, is pursuing a series of policies that disincentivize irregular migration while incentivizing safe, orderly, and humane pathways. These policies—including the ongoing efforts to reform our asylum system and address the root causes of migration in the region—seek to tackle longstanding problems that have plagued our immigration system for decades and achieve systemic change. Once fully implemented, I believe these policies will address migratory flows as effectively, in fact more effectively, while holding true to our nation's values.

To reiterate what the President has stated previously, the United States is a nation with borders and laws that must be enforced. It is also a nation of immigrants. This Administration is, as a result, committed to the twin goals of securing our borders and offering protection to those fleeing persecution and torture. MPP is neither the best, nor the preferred, strategy for achieving

2

either of these goals.  Significant evidence indicates that individuals awaiting their court hearings in Mexico under MPP were subject to extreme violence and insecurity at the hands of transnational criminal organizations that profited by exploiting migrants' vulnerabilities.  It is possible that such humanitarian challenges could be lessened through the expenditure of significant government resources currently allocated to other purposes.  Ultimately, however, the United States has limited ability to ensure the safety and security of those returned to Mexico.  Other significant issues with MPP, including the difficulties in accessing counsel and traveling to courts separated by an international border, are endemic to the program's design.

In reaching my determination, I have carefully considered what I deem to be the strongest argument in favor of retaining MPP: namely, the significant decrease in border encounters following the determination to implement MPP across the southern border.  Of course, correlation does not equal causation and, even here, the evidence is not conclusive.  I have nonetheless presumed, for the sake of this review, that MPP resulted in a significant decrease in irregular border crossings and persons approaching the U.S. border to pursue non-meritorious asylum claims.  I still conclude that the benefits do not justify the costs, particularly given the way in which MPP detracts from other regional and domestic goals, foreign-policy objectives, and domestic policy initiatives that better align with this Administration's values.

Importantly, the effective management of migratory flows requires that we work with our regional partners to address the root causes that drive migrants to leave their countries and to tackle this challenge before it arrives at our border.  This is a shared responsibility of all countries across the region.  MPP distracts from these regional efforts, focusing resources and attention on this singular program rather than on the work that is needed to implement broader and more enduring solutions.

Efforts to implement MPP have played a particularly outsized role in diplomatic engagements with Mexico, diverting attention from more productive efforts to fight transnational criminal and smuggling networks and address the root causes of migration.  This was true under the previous implementation of MPP, and it is even more true today given the shared belief that the program should not be implemented without, at the very least, significant improvements.  Notably, Mexico has made clear that it will not agree to accept those the United States seeks to return to Mexico under MPP unless substantial improvements are made to the program.  But these much-needed efforts to enhance humanitarian protections for those placed in MPP are resource-intensive, exacerbating one of the flaws of the program: the concentration of resources, personnel, and aid efforts on the northern border of Mexico rather than on broader regional assistance efforts that would more effectively and systematically address the problem of irregular migration and better protect our border.

Moreover, the personnel required to adequately screen MPP enrollees to ensure they are not returned to persecution or torture in Mexico, process them for court hearings, and manage their cases pulls resources from other priority efforts, including the ongoing efforts to implement effective, fair, and durable asylum reforms that reduce adjudication delays and tackle the immigration court backlog.  Both the Dedicated Docket, designed so that immigration judges can adjudicate cases within 300 days, and the proposed Asylum Officer Rule, which would transfer the initial responsibility for adjudicating asylum claims from immigration judges to USCIS asylum officers to produce timely and fair decision-making, are expected to yield transformative

3

and lasting changes to the asylum system.  MPP, which can require unproductive, redundant screenings per case given the many different times individuals are returned to Mexico during the pendency of a single removal proceeding, diverts asylum officers and immigration judges away from these priority efforts.  MPP not only undercuts the Administration's ability to implement critically needed and foundational changes to the immigration system, but it also fails to provide the fair process and humanitarian protections that all persons deserve.

Having assessed the benefits and costs of the previous implementation of MPP, including how the program could potentially be improved, I have concluded that there are inherent problems with the program that no amount of resources can sufficiently fix.  Others cannot be addressed without detracting from key Administration priorities and more enduring solutions.

It is, as a result, my judgment that the benefits of MPP are far outweighed by the costs of continuing to use the program on a programmatic basis, in whatever form.  For the reasons detailed more fully in the attached memorandum, the contents of which are adopted and incorporated into the decision contained here, I am hereby terminating MPP.  Effective immediately, I hereby supersede and rescind the June 1 memorandum, Secretary Nielsen's January 25, 2019 memorandum, and any other guidance or other documents prepared by the Department to implement MPP.  The Department will continue complying with the *Texas* injunction requiring good-faith implementation and enforcement of MPP.  But the termination of MPP will be implemented as soon as practicable after a final judicial decision to vacate the *Texas* injunction.

CLP_PC_023694

**Belize**
Belize

*Last Update: Reissued with updates to health information.*

Exercise increased caution in Belize due to **crime**. Some areas have increased risk. Please read the entire Travel Advisory.

**Country Summary**: Violent crime – such as sexual assault, home invasions, armed robberies, and murder – are common even during daylight hours and in tourist areas. A significant portion of violent crime is gang related. Due to high crime, travelers are advised to exercise caution while traveling to the south side of Belize City. Local police lack the resources and training to respond effectively to serious criminal incidents. Most crimes remain unresolved and unprosecuted.

Read the underlined country information page for additional information on travel to Belize.

If you decide to travel to Belize:

Read the Department of State's COVID-19 page before planning any international travel, and read the Embassy COVID-19 page for country-specific COVID-19 information.

- Be aware of your surroundings.
- Avoid walking or driving at night.
- Do not physically resist any robbery attempt.
- Be extra vigilant when visiting banks or ATMs.
- Do not display signs of wealth, such as wearing expensive watches or jewelry.
- Enroll in the Smart Traveler Enrollment Program (STEP) to receive Alerts and make it easier to locate you in an emergency.
- Follow the Department of State on Facebook and Twitter.
- Review the Country Security Report for Belize.
- Prepare a contingency plan for emergency situations. Review the Traveler's Checklist.
- Visit the CDC page for the latest Travel Health Information related to your travel.

**Belize City – Level 3: Reconsider Travel**

U.S. citizens should avoid traveling to Belize City. Historically much of the violent crime in Belize occurs in the Southside of Belize City and is gang related. This area (south of Haulover Creek Canal and continuing south to Fabers Road) does not overlap the typical tourism areas. All visitors

CLP_PC_023726

should maintain an elevated level of due diligence and reduce their exposure to crime-related risks by practicing good safety and security practices.

Embassy Messages    **Alerts**

Weather Alert – U.S. Embassy Belmopan, Belize November 2, 2022    Wed, 02 Nov 2022
Weather Alert – U.S. Embassy Belmopan, Belize November 1, 2022    Wed, 02 Nov 2022
Fact Sheet: Joined by Allies and Partners, the United States Imposes Devastating Costs on Russia    Thu, 24 Feb 2022
Statement by President Biden on Russia's Unprovoked and Unjustified Attack on Ukraine    Thu, 24 Feb 2022

View Alerts and Messages Archive

## Quick Facts

**PASSPORT VALIDITY:**

Length of stay

**BLANK PASSPORT PAGES:**

One page per stamp

**TOURIST VISA REQUIRED:**

Not required for stays of 30 days or less

**VACCINATIONS:**

None

**CURRENCY RESTRICTIONS FOR ENTRY:**

$5,000

**CURRENCY RESTRICTIONS FOR EXIT:**

$5,000

CLP_PC_023727

ALL +/−

## Embassies and Consulates ⊕

## Destination Description ⊕

## Entry, Exit and Visa Requirements ⊕

## Safety and Security ⊖

Belize is rated high for crime and has one of the highest per capita murder rates in the world. Gang members and other criminals use violent means to resolve disputes. Visitors should exercise caution throughout Belize, particularly in the south side of Belize City and remote areas along Belize's borders due to high crime.

**Crime:** Crime may occur anywhere in Belize, and criminals frequently target tourists, including those at resorts and on the roads and river ways. Crime, including sexual assault, armed robbery, and murder remains high and is distributed evenly throughout the country. Sexual harassment and/or assault of persons traveling alone or in small groups have been reported.

Most crimes remain unresolved and unprosecuted. A lack of capacity, resources, and training impedes the ability of local police to effectively investigate crime and apprehend offenders.

Thefts of cash and credit cards happen frequently in some areas of Belize. It is believed several credit card fraud rings are currently active in Belize, particularly in San Pedro.

Scams occur in Belize, especially in resort areas. Tourists, in general, are particularly vulnerable to these crimes, resulting in visitors being pick-pocketed, robbed and/or extorted. See the Department of State and the FBI ⧉ pages for information on scams.

**Victims of Crime:** Report crimes to the local police by dialing 911 and contact the U.S. Embassy at 822-4011. Remember that local authorities are responsible for investigating and prosecuting crimes. While the Embassy stands ready to assist the Belize authorities with any requests for technical assistance, the Embassy is not a law enforcement agency, cannot provide U.S. citizens with protection or investigate crimes against U.S. citizens, and has no jurisdiction to intervene in police or judicial processes. See our

CLP_PC_023728

and has no jurisdiction to intervene in police or judicial processes. See our webpage on help for U.S. victims of crime overseas.

We can:

- help you find appropriate medical care
- assist you in reporting a crime to the police
- contact relatives or friends with your written consent
- explain the local criminal justice process in general terms
- provide a list of local attorneys
- provide our information on victim's compensation programs in the U.S ☐.
- provide an emergency loan for repatriation to the United States and/or limited medical
- support in cases of destitution
- help you find accommodation and help arrange flights home
- replace a stolen or lost passport

**Domestic Violence:** U.S. citizen victims of domestic violence may contact the U.S. Embassy in Belize for assistance.

**Tourism:** The tourism industry is unevenly regulated, and safety inspections for equipment and facilities may not commonly occur. Hazardous areas/activities are not always identified with appropriate signage, and staff may not be trained or certified either by the host government or by recognized authorities in the field. In the event of an injury, appropriate medical treatment is typically available only in/near major cities. First responders are generally unavailable outside of major cities to provide urgent medical treatment. U.S. citizens are encouraged to purchase medical evacuation insurance. See our webpage for more information on insurance providers for overseas coverage.

## Local Laws & Special Circumstances ⊕

## Health ⊕

## Travel and Transportation ⊕

## Fact Sheet

Please see Fact Sheet for this country/area.

CLP_PC_023729

## For additional travel information

- Enroll in the Smart Traveler Enrollment Program (STEP) to receive security messages and make it easier to locate you in an emergency.
- Call us in Washington, D.C. at 1-888-407-4747 (toll-free in the United States and Canada) or 1-202-501-4444 (from all other countries) from 8:00 a.m. to 8:00 p.m., Eastern Standard Time, Monday through Friday (except U.S. federal holidays).
- See the State Department's travel website for the Worldwide Caution and Travel Advisories.
- Follow us on Twitter⧉ and Facebook⧉.
- See traveling safely abroad for useful travel tips.

## International Parental Child Abduction

Belize was cited in the State Department's 2022 Annual Report to Congress on International Child Abduction for demonstrating a pattern of non-compliance with respect to international parental child abduction. Review information about International Parental Child Abduction in Belize. For additional IPCA-related information, please see the International Child Abduction Prevention and Return Act (ICAPRA) report.

Last Updated: February 28, 2023

CLP_PC_023730

# Colombia Travel Advisory

Travel Advisory    Colombia - Level 3:    
January 4, 2023    Reconsider Travel

*Reissued with updates to high-risk areas.*

Reconsider travel due to **crime** and **terrorism**. Exercise increased caution due to **civil unrest** and **kidnapping**. Some areas have increased risk. Read the entire Travel Advisory.

**Do Not Travel to**:

- Arauca, Cauca (excluding Popayán), and Norte de Santander departments due to **crime** and **terrorism**.
- The Colombia-Venezuela border region due to **crime, kidnapping**, and risk of detention when crossing into Venezuela from Colombia.

**Country Summary**: Violent crime, such as homicide, assault, and armed robbery, is widespread. Organized criminal activities, such as extortion, robbery, and kidnapping, are common in some areas.

The National Liberation Army (ELN), Revolutionary Armed Forces of Colombia - People's Army (FARC-EP), and Segunda Marquetalia terrorist organizations continue operating and launching attacks in Colombia. They may attack with little or no warning, targeting tourist locations, transportation hubs, markets/shopping malls, local government facilities, police stations, military facilities, hotels, clubs, restaurants, places of worship, parks, major sporting and cultural events, educational institutions, airports, and other public areas. While terrorists have not specifically targeted U.S. citizens, the attacks could result in unintended victims.

Demonstrations occur regularly throughout the country. Large public demonstrations can take place for a variety of political and economic issues

CLP_PC_023780

for a variety of political and economic issues. Demonstrations can shutdown roads and major highways, often without prior notice or estimated reopening timelines. Road closures may significantly reduce access to public transportation and may disrupt travel both within and between cities. Nationwide protests in 2021 resulted in fatalities and injuries.

U.S. government employees must adhere to the noted restrictions:

- U.S. government employees are not permitted to travel by road between most major cities.

- Colombia's land border areas are off-limits to U.S. government personnel unless specifically authorized.

- U.S. government employees may not use motorcycles

- U.S. government employees may not hail street taxis or use public transportation.

Read the country information page for additional information on travel to Colombia.

If you decide to travel to Colombia:

- Read the Department of State's COVID-19 page before planning any international travel, and read the Embassy COVID-19 page for country-specific COVID-19 information.

- Avoid protest areas and crowds.

- Monitor local media for breaking events and adjust your plans based on new information.

- Keep a low profile.

- Be aware of your surroundings.

- Enroll in the Smart Traveler Enrollment Program (STEP) to receive Alerts and make it easier to locate you in an emergency.

- Follow the Department of State on Facebook ↗ and Twitter ↗.

- Review the Country Security Report for

CLP_PC_023781

- Review the Country Security Report for Colombia.

- Prepare a contingency plan for emergency situations. Review the Traveler's Checklist.

**Arauca, Cauca, and Norte de Santander Departments – Level 4: Do Not Travel**

Violent crime, including armed robbery and homicide, is widespread.

Terrorist groups are active in some parts.

The U.S. government has limited ability to provide emergency services to U.S. citizens as U.S. government-personnel travel to these areas is severely restricted due to security concerns.

**Colombia - Venezuela Border – Level 4: Do Not Travel**
U.S. citizens are advised not to travel to the border of Colombia and Venezuela.  U.S. citizens are at risk of detention when crossing into Venezuela from Colombia. The Colombia-Venezuela border is not clearly marked, and U.S. citizens should not go near the border due to the risk of crossing into Venezuela accidentally. U.S. citizens attempting to enter Venezuela without a visa have been charged with terrorism and other serious crimes and detained for long periods.   For more information, see the Venezuela Travel Advisory.

Visit our website for Travel to High-Risk Areas.

CLP_PC_023782

CLP_PC_023828

# Ecuador Travel Advisory

Travel Advisory
November 4,
2022

Ecuador - Level 2:
Exercise Increased
Caution



*Last Update:  Reissued with updates to security
situation in Guayaquil.*

Exercise increased caution in Ecuador due to **civil
unrest** and **crime**.  Some areas have increased risk.
Read the entire Travel Advisory.

Reconsider travel to:

- Guayaquil **north** of Portete de Tarquí Avenue
  due to **crime**.

Do not travel to:

- Carchi, Sucumbíos, and the northern part of
  Esmeraldas provinces, including Esmeraldas
  city, due to **crime**.
- Guayaquil, **south** of Portete de Tarquí Avenue,
  due to **crime**.

**Country Summary**: Crime is a widespread problem in
Ecuador. Violent crime, such as murder, assault,
express kidnapping, and armed robbery, is common.
Transnational criminal organizations and gangs
operate in Carchi, Sucumbíos, and the northern part of
Esmeraldas provinces, as well as in Guayaquil, south
of Portete de Tarquí Avenue.

Demonstrations occur regularly throughout the
country. Public demonstrations can take place for a
variety of political and economic issues.
Demonstrations can cause the shutdown of local roads
and major highways, often without prior notice or
estimated reopening timelines.  Road closures may
significantly reduce access to public transportation
and airports and may disrupt travel both within and
between cities.

Read the country information page for additional

CLP_PC_023829

Read the country information page for additional information on traveling to Ecuador.

If you decide to travel to Ecuador:

- Read the Department of State's COVID-19 page before planning any international travel, and read the Embassy COVID-19 page for country-specific COVID-19 information.

- Enroll in the Smart Traveler Enrollment Program (STEP) to receive Alerts and make it easier to locate you in an emergency.

- Follow the Department of State on Facebook, Twitter, and Instagram.

- Review the Country Security Report for Ecuador.

- Prepare a contingency plan for emergency situations. Review the Traveler's Checklist.

- Visit the CDC page for the latest Travel Health Information related to your travel.

### Carchi, Sucumbíos, and northern Esmeraldas Provinces – Level 4: Do Not Travel

Transnational crime groups operating in Esmeraldas province have engaged in violent crime and killed local citizens in addition to carrying out bombings targeting Ecuadorian military and law enforcement.

The U.S. government is limited in its ability to provide emergency services to U.S. citizens in the Colombian border area, as U.S. government personnel cannot travel to the provinces of Esmeraldas, Carchi, and Sucumbíos without permission from the Embassy's security office. However, U.S. government personnel are permitted to travel to the northern bank of the Napo River in Sucumbíos, an area approximately four miles wide, and the portion of Esmeraldas province that is south of Esmeraldas city.

### Guayaquil, north of Portete de Tarquí Avenue – Level 3: Reconsider Travel

Transnational criminal groups and local gangs operating in Guayaquil have carried out a series of

CLP_PC_023830

violent crimes in the city, to include several murders, targeted assassinations, armed robberies, bombings, and assaults. Criminals have conducted indiscriminate attacks without warning on public spaces across the city. U.S. government personnel have been directed to exercise extreme caution and maintain increased vigilance when traveling in and around Guayaquil.

**Guayaquil, south of Portete de Tarquí Avenue – Level 4: Do Not Travel**

Due to a sustained high level of violent crime in Guayaquil south of Portete de Tarqí Avenue, U.S. government personnel cannot travel to this area without permission from the Embassy's security office. The U.S. government is limited in its ability to provide emergency services to U.S. citizens in Guayaquil south of Portete de Tarquí Avenue.

Visit our website for Travel to High-Risk Areas.

CLP_PC_023831

## El Salvador
Republic of El Salvador

Reconsider travel to El Salvador due to crime.

... [READ MORE]

---

Embassy Messages   **Alerts**

Information for U.S. Citizens and Lawful Permanent Residents     Mon, 13 Mar 2023

Travel Advisory: El Salvador Updated Travel Advisory- Level 3 (Reconsider Travel)     Mon, 06 Mar 2023

Weather (Volcano) Alert – U.S. Embassy San Salvador, El Salvador (November 28, 2022)     Mon, 28 Nov 2022

Travel Alert – U.S. Embassy San Salvador, El Salvador (November 17, 2022)     Thu, 17 Nov 2022

View Alerts and Messages Archive

---

## Quick Facts

**PASSPORT VALIDITY:**

Passport must be valid at time of entry.

**BLANK PASSPORT PAGES:**

At least one blank page.

**TOURIST VISA REQUIRED:**

A visa is not required for stays under 90 days, but you must purchase a tourist card for 12 USD upon arrival. The card is valid for 90 days. If your U.S. passport shows you were born

**VACCINATIONS:**

None, check recommendation in Health Section.

**CURRENCY RESTRICTIONS FOR ENTRY:**

Currency in excess of 10,000 USD must be declared.

**CURRENCY RESTRICTIONS FOR EXIT:**

Currency in excess of 10,000 USD must be declared.

CLP_PC_023874

passport shows you were born
in El Salvador, you do not need
the tourist card.

ALL **+**/**—**

## Embassies and Consulates                                                    ⊕

## Destination Description                                                      ⊕

## Entry, Exit and Visa Requirements                                            ⊕

## Safety and Security                                                          ⊖

The crime threat level in El Salvador is critical and our Travel
Advisory warns U.S. citizens of the high rates of crime and violence. See
below for additional information on crime.

Dial 911 for emergency assistance in El Salvador.

**Protests:** Demonstrations, sit-ins, and protests may occur at any time or
place, but are most frequent in and around the capital San Salvador. Avoid
demonstrations, because even apparently peaceful ones may turn violent.
Follow local news media reports or contact the U.S. Embassy for up-to-date
information.

**Crime:** El Salvador has a high level of homicides and crimes such as
extortion, assault, and robbery are common.

Typical crimes in El Salvador include extortion, mugging, highway assault,
home invasion, and car theft. Gangs have traditionally controlled a majority
of the space in El Salvador, even if their presence is not visible to outsiders,
and exist by extorting money from businesses, travelers, residents and
others living in or passing through their territory. Non-compliance or
resistance to gang demands often results in violence. This activity can
occur even in wealthy and relatively peaceful areas. Home invasions and/or
burglaries of residences during broad daylight occur in areas of San
Salvador; in some cases, gangs simply expel residents from their homes

CLP_PC_023875

and take over the property for criminal use.  U.S. citizens who visit El Salvador for extended periods may be at higher risk for extortion demands.

El Salvador has tens of thousands of known gang members from several gangs including Mara Salvatrucha (MS-13) and 18th Street (M18). Gang members have been known to frequently engage in violence or use deadly force if resisted. The gangs, or "maras," customarily have concentrated on extortion, violent street crime, carjacking, narcotics and arms trafficking, and murder for hire.  Extortion is a common crime in El Salvador.

Many suspected gang members have been detained since March 27, 2022 under a State of Exception.  Reported crimes have reduced since that time, but crime in El Salvador remains at critical levels.

U.S. Embassy personnel are advised to walk only in known, lit, well-secured locations. Criminals may be active even in popular parks with a security presence.

Exercise caution at all times and practice good personal security procedures throughout your stay.

- Always travel in groups.
- Avoid remote or isolated locations.
- Avoid displaying or carrying valuables in public places.
- Avoid stopping at tourist overlooks, which may be targeted by criminals.
- Never leave passports and other important documents in vehicles.
- In public, remain alert and avoid the use of cell phones and earphones. These reduce your self-awareness and provide easy targets for crimes of opportunity.
- Do not travel on public transportation, especially buses.
- Use only radio-dispatched taxis, taxis stationed in front of major hotels, or internet-based rideshare services.
- Choose banks or ATMs inside secure, guarded areas and remain alert.
- Remain vigilant even in well-known restaurants, hotels, and retailers within San Salvador.
- Credit card cloning and similar fraud can occur; keep your card in sight.
- Be aware of your surroundings when traveling by car. Navigation apps seeking the quickest routes may direct you off safer routes into dangerous areas.
- Drive with your doors locked and windows raised.
- Avoid travel outside of major metropolitan areas after dark and on unpaved roads at all times because of hazardous road conditions and criminal activity.
- Criminals who threaten violence typically use violence without hesitation if victims do not comply instantly. Conversely, the Embassy has no reports of serious injury or worse among victims who comply.

CLP_PC_023876

who comply.

Armed robberies of climbers and hikers in El Salvador's national parks can occur. Engage the services of a local guide certified by the national or local tourist authority when hiking in back-country areas and within the national parks. The tourist police force (POLITUR) provides security and assistance to tourists. Officers are located in 19 tourist destinations. Beware of hikes and guides in locations without an official guide service or police presence, regardless of advice found on the Internet.

A majority of serious crimes in El Salvador are never solved. The Government of El Salvador lacks sufficient resources to properly investigate and prosecute cases and to deter violent crime.

Do not purchase counterfeit and pirated goods, even if they are widely available. Not only are counterfeit goods subject to seizure upon entry in the United States, but if you purchase them, you may also be exposed to legal liability in El Salvador.

**Victims of Crime:** If you or someone you know becomes a victim of crime, report it to the local police by calling 911 and to the U.S. Embassy. Local authorities are responsible for investigating and prosecuting the crime.

The U.S. Embassy can:

- Replace a stolen or lost passport
- Help you find appropriate medical care
- Guide you on how to report a crime to police
- Contact relatives or friends with your written consent
- Explain the local criminal justice process in general terms
- Provide a list of local attorneys
- Provide information on victim's compensation programs in the U.S.
- Provide an emergency loan for repatriation to the United States and/or limited medical support in cases of destitution
- Help you find accommodation and arrange flights home

**Domestic Violence:** U.S. citizen victims of domestic violence may contact the U.S. Embassy for assistance. If you are in immediate danger, call 911.

**Tourism:** The tourism industry is unevenly regulated, and safety inspections for equipment and facilities do not commonly occur. Hazardous areas/activities are not always identified with appropriate signage, and staff may not be trained or certified either by the host government or by recognized authorities in the field. In the event of an injury, appropriate medical treatment is typically available only in/near major cities. First responders are generally unable to access areas outside of major cities and to provide urgent medical treatment. U.S. citizens are encouraged to purchase medical evacuation insurance. See our webpage for more information on insurance providers for overseas coverage.

CLP_PC_023877

**Watersports:** Strong undertows and currents make swimming at El Salvador's Pacific Coast beaches extremely dangerous even for experienced swimmers. Government lifeguards are generally present at most public beaches but are not always present at private beaches. Follow all instructions of any lifeguard, and do not enter the water at any location at which red warning flags are displayed to signify dangerous conditions. In addition, El Salvador's search and rescue capabilities are limited, and access to medical resources in beach areas is inadequate. Carefully assess the potential risks of recreational water activities and consider your physical capabilities and skills. Be aware that drinking alcohol and swimming can be a deadly combination.

## Local Laws & Special Circumstances ⊕

## Health ⊕

## Travel and Transportation ⊕

## Fact Sheet

Please see Fact Sheet for this country/area.

## For additional travel information

- Enroll in the Smart Traveler Enrollment Program (STEP) to receive security messages and make it easier to locate you in an emergency.
- Call us in Washington, D.C. at 1-888-407-4747 (toll-free in the United States and Canada) or 1-202-501-4444 (from all other countries) from 8:00 a.m. to 8:00 p.m., Eastern Standard Time, Monday through Friday (except U.S. federal holidays).
- See the State Department's travel website for the Worldwide Caution and Travel Advisories.
- Follow us on Twitter⧉ and Facebook⧉.
- See traveling safely abroad for useful travel tips.

## International Parental Child Abduction

CLP_PC_023878

Review information about International Parental Child Abduction in El Salvador.  For additional IPCA-related information, please see the International Child Abduction Prevention and Return Act (ICAPRA) report.

Last Updated: October 6, 2022

CLP_PC_023879



Overseas Security Advisory Council
Bureau of Diplomatic Security
U.S. Department of State

8/15/2022 | 📖 Country Security Report

👁 4102 all time - 155 last 7 days

# Guatemala Country Security Report

## Travel Advisory

The current U.S. Department of State Travel Advisory at the date of this report's publication assesses that travelers should reconsider travel to Guatemala due to crime. Review OSAC's report, Understanding the Consular Travel Advisory System.

The Institute for Economics & Peace Global Peace Index 2021 ⧉ ranks Guatemala 111 out of 163 worldwide, rating the country as being at a medium state of peace.

## Crime Environment

The U.S. Department of State has assessed Guatemala City as being a critical-threat location for crime directed at or affecting official U.S. government interests.

The U.S. Department of State has included a Crime "C" Indicator on the Travel Advisory for Guatemala, indicating that there may be widespread violent crime and/or organized crime present in the country, and/or that local law enforcement may have limited ability to respond to serious crimes.

The crime emergency lines in Guatemala are 110 and 120. Review the State Department's Crime Victims Assistance brochure.

### Crime: General Threat

Crime in Guatemala stems from many sources, its impact magnified by corruption, an inadequate justice system, and the prevalence of gang and narcotrafficking activity across the country. The most common crimes against expatriates and foreigners include petty theft and armed robbery.

Be vigilant of surroundings and report any crime incidents promptly to the police. Theft and armed robbery are the most common crimes committed against U.S. travelers. Members of the expatriate community can fall victim to these crimes due to a perceived display of affluence, or by not following sound personal security practices. However, one emerging criminal threat is violence stemming from gang rivalries and extortion occurring in areas controlled by gangs.

A common trend in the commission of armed robberies is the use of motorcycles. Typically, two men on a motorcycle accost the driver of a car or pedestrian and demand valuables and cell phones. Often, a second pair of armed individuals accompany the assailants, functioning as lookouts. If the assailants encounter any resistance, they escalate the situation through extreme violence (e.g., stabbings, shootings). The use of motorcycles allows the assailants to flee quickly; police rarely apprehend them. Additionally, pickpockets and purse-snatchers are active in all cities and tourist sites. Petty criminals frequently target high-traffic tourist areas for petty crime. Markets, national parks, crowded venues, and shopping areas are all major areas of operation for criminals.

Guatemala has historically had one of the highest violent crime rates in Central America. By the end of 2021 the rate was 16.6%, an 8.5% increase over 2020's rate of 15.3%, more than double that of the United States. The police reported 2,839 homicides in 2021, a figure slightly higher than the 2,574 homicides reported for 2020. The number of reported missing persons also increased, with a total of 2,597 reported cases compared to 1,825 the year prior. Note: police do not record crimes as homicides if the victim left the crime scene alive but subsequently died from injuries elsewhere.

Despite the historical downward trend in homicides, Guatemala remains among the most dangerous countries in the world. Endemic poverty, an abundance of weapons, a legacy of societal conflict, and the presence of organized criminal gangs like Barrio 18 (18th Street) and Mara Salvatrucha (MS13) all contribute to violent crime. Guatemala's high murder rate is driven by narcotrafficking activity, gang-related violence, a heavily armed population, and a law enforcement and judicial system unable to hold criminals accountable.

The two primary gangs in Guatemala terrorize businesses and private citizens through targeted extortion attempts. Such crimes are common and affect all sectors of society, with public bus and taxi drivers being the most common victims. However, local small businesses, the U.S. private sector, and local national employees of the U.S. Embassy were all frequent targets. The gangs also target schoolchildren, street vendors, and local residents. Although in recent years the number of reported extortions has increased, most incidents go unreported and there is uncertainty about the true magnitude of the problem. Further complicating the widespread issue of extortion is the presence of persons who imitate gang members to threaten and receive extortion payments, despite not belonging to gangs. Gang members usually punish non-compliant victims with violent assault or murder and victimize their family members as punishment.

Extortion tactics have expanded using social media in recent years. Gang members and imitators will use various types of social media to threaten their targets and receive extortion payments. The police reported 15,293 cases of extortion in 2021, slightly more than the 15,051 in 2020 but less than the 16,733 in 2019.

Home invasions by armed groups continue to occur in upscale neighborhoods. There were 590 reported residential robberies in 2021 compared to 517 in 2020, a 14.1% increase. Generally speaking, crime trended upwards in 2021 as the country emerged from the COVID-19 shutdowns of 2020. Thieves gain access by enticing a resident to open the door for a delivery or rushing in when family or staff open the door. Household staff may also sometimes be complicit in home invasions, acting as insider threats and informants to criminals.

CLP_PC_024105

According to official government crime statistics, sexual assault numbers increased from  275 in 2020 and 295 in 2021. Most reported victims were female. The Embassy believes, however, that the actual number of sexual assaults, including against foreigners, is far greater; cultural stigmas and sporadic police presence in rural areas cause significant underreporting.

The Global Organized Crime Index ⬈ is a tool designed to measure levels of organized crime in a given country and assess its resilience to organized criminal activity. The most recent index ranks Guatemala 23 out of 193 worldwide for criminality, with 1 being the worst possible ranking; and 114 out of 193 worldwide for resilience, with 1 being the best possible ranking.

## Crime: Areas of Concern

Many robberies occur during daylight hours while victims are walking or driving in well-known, well-traveled areas, including markets, public parks, and popular restaurant districts. Even the most upscale residential and commercial areas of Guatemala City (Zones 4, 10, 14, 15, and 16) experience violent crimes in broad daylight. These trends are not isolated to one specific part of the country. No area in Guatemala is immune to crime, including the most popular tourist destinations such as Antigua and Tikal.

Review OSAC's reports, All That You Should Leave Behind, Hotels: The Inns and Outs, Considerations for Hotel Security, and Taking Credit.

## Kidnapping Threat

The U.S. Department of State has not included a Kidnapping "K" Indicator on the Travel Advisory for Guatemala. Review OSAC's reports, Kidnapping: The Basics and Active Shooter and Kidnapping Response Tips.

Kidnappings are not as prevalent in Guatemala in recent years as in the past. Given the complexity of kidnapping and police attention to this type of crime, kidnapping is not as viable a criminal enterprise as extortion. The kidnappings that do occur generally victims who are involved or perceived to be involved with drug trafficking. In these instances, traffickers will use brutal force to extort, kidnap, and kill victims. Some kidnapping groups kill their victims regardless of a paid ransom. In 2021, the police recorded 9 legitimate kidnappings compared to the 15 reported in 2020.

## Drug Crime

The bulk of crimes related to drug trafficking occur near the Mexican border. Guatemalan criminal organizations usurp the territories of more established Mexican cartels, inciting violent standoffs. Narcotraffickers are heavily armed and operate with relative impunity. Limited Guatemalan resources make it difficult to combat narcotrafficking and the violence associated with it.

Although there is widespread trafficking in Guatemala—the Guatemalan government reported the seizure of 11.031kg of cocaine in 2021—most activity does not affect the general populace. There have been instances of homicides near clandestine airfields and areas in Petén near the Mexican border, particularly along CA-13 between La Libertad and El Ceibo. Narcotraffickers tend to avoid confrontation with security forces when unprovoked.

Of particular concern to businesses and landowners in remote regions of Guatemala is the threat of narco-traffickers forcibly seizing land to facilitate the landing and offloading of aircraft transporting large amounts of cocaine. Heavily armed narcotraffickers invade properties, restrain all residents and/or employees, and clear an area to land aircraft. Narcotraffickers then release the families and employees and depart the area after offloading all drugs onto transport vehicles.

Consult with the CIA World Factbook's section on Illicit Drugs ⬈ for country-specific information.

# Terrorism Environment

The U.S. Department of State has assessed Guatemala City as being a low-threat location for terrorism directed at or affecting official U.S. government interests.

The U.S. Department of State has not included a Terrorism "T" Indicator on the Travel Advisory for Guatemala.

The Institute for Economics & Peace Global Terrorism Index 2022 ⬈ ranks Guatemala 93 out of 163 worldwide, rating the country as having no impact from terrorism.

## Terrorism: General Threat

There are no known transnational or domestic terrorist organizations present in Guatemala.

# Political Violence and Civil Unrest Environment

The U.S. Department of State has assessed Guaternala as being a medium-threat location for political violence directed at or affecting official U.S. government interests.

The U.S. Department of State has not included a Civil Unrest "U" Indicator on the Travel Advisory for Guetemala. Civil unrest can develop quickly without prior notice, often interrupting logistics and services. Avoid demonstration activity, as even those planned to remain peaceful have the potential to turn violent.

## Elections/Political Stability

Guatemala is a multiparty constitutional republic. The country last held national and local elections in 2019. International observers considered the presidential election as generally free and fair.

Protests and demonstrations continue to occur regularly, often related to issues such as corruption, pensions, and other government services.

## Protest & Demonstration Activity

 Large demonstrations occur, sometimes with little to no notice, and can cause serious traffic disruptions. Although most demonstrations are peaceful, they can turn violent. The use of roadblocks and/or blocking of public facilities, including airports, may delay or prevent tourists from reaching their destination.

Review OSAC's report, Surviving a Protest.

CLP_PC_024106

## Law Enforcement Concerns: Security Agencies

The Interior Ministry (*Ministerio de Gobernación*) oversees Guatemala's law enforcement forces. Its remit includes law and order, national security, border control, and prison services. The National Defense Ministry oversees the military, which focuses primarily on operations in defense of the country, but the government also uses the army to support the National Civil Police in internal security operations, as permitted by the constitution.

### Police Response

The police lack sufficient personnel and training to accomplish their mission. They suffer from a lack of supplies (e.g., vehicles, fuel, and ammunition) with little improvement from year to year. Often, police investigations fail to result in an arrest, much less a conviction. Apart from impunity, a principal reason that the government is unable to respond to the needs of crime victims, or to prevent crime in the first place, is that the police force significantly lacks training and funding. The average officer should have at least a high school degree (some has much less), has as little as six months of police training before being sent out on the streets, and receives only a small monthly salary. Moreover, the annual police budget is inadequate to support its personnel, vehicles, training, and other infrastructure needs. Although some units have adequate equipment and training, they do not have the capacity to handle multiple taskings or cases at the same time.

## Law Enforcement Concerns: Emergency Contact/Information

Victims of crime should contact the police emergency line 110 or 120; in the event of fire emergencies, call 122 or 123. Tourist groups should request security escorts—security information and escorts are available from the Tourist Assistance Office (PROATUR) of the Guatemalan Tourism Institute (INGUAT).

## Transportation Security

### Road Safety

Drivers in Guatemala will encounter road conditions that differ significantly from those in the U.S., and vary widely across the country, with more development within urban areas. The transportation infrastructure diminishes rapidly as one travels further from the capital. Many city streets have lighting, although often poor, but secondary and rural roads have little to no illumination. Among the risk to motorists are local drivers passing blindly on winding roads, poorly designed surfaces, unmarked hazards, landslides, and precarious temporary highway repairs.

Drivers in Guatemala must remain on the defensive, as the local population only casually observes traffic rules. Drivers frequently ignore speed limits, lane markings, and stop signs. Many drivers do not use their turn signals. Instead, a common custom is for an occupant to stick a hand out the window and wave to indicate a turn or lane change. Drivers often drive at the maximum speed their vehicle can handle. The quality of vehicles on the road ranges from high-end luxury to barely functioning vehicles that would not pass U.S. safety inspections. A lack of proper sidewalks and crosswalks force pedestrians to walk on the roadway or attempt to cross roads, even in heavy traffic.

Motorcycles are the most popular form of transportation in Guatemala; motorcycle operators do not take safety precautions in many cases, weaving in and out of traffic with seemingly little regard for their own safety. It is common to see entire families, including small children, traveling on one motorcycle without any safety equipment. Many people also use motorcycles to transport large cargo. Many motorcyclists do not have functioning lights and can be difficult to see at night.

Cars and trucks often stall or park in the middle of the road. Drivers often place tree branches in the road before a stalled vehicle to warn approaching traffic of a hazard. It is against the law to turn right on red unless otherwise posted, and drivers must yield when entering a traffic circle. Motorists must wear seat belts. It is against the law for drivers to operate cellular phones while driving, although authorities do not enforce this rule.

Motorists commonly drive under the influence of alcohol. Law enforcement will arrest people found driving under the influence of alcohol/drugs, and offenders may serve jail time, but this does not deter the amount of drunk driving taking place in Guatemala. This risk increases further in small towns and rural areas away from population centers. Minor traffic incidents can escalate quickly to violence. Many motorists carry machetes and other weapons, including firearms in their vehicles. Police may detain drivers involved in accidents resulting in injury, holding them in protective custody pending investigation. Such cases require the assistance of private local attorneys

Traffic congestion in urban areas and the highways leading out of the capital is extremely heavy, and severely impacts travel time between destinations. Traffic is often at a standstill for hours at a time; such congestion exacerbates the threat to motorists from armed criminals on motorcycles. Use vehicles with all windows tinted. Criminals often look for drivers using cell phones at night and easily identify their targets due to the illumination of smartphones or tablets.

Emboldened armed robbers sometimes attack vehicles on main roads in broad daylight. Travel on rural roads increases the risk of encountering a criminal roadblock or ambush. Driving outside of urban areas at night is dangerous and not recommended—do not conduct intercity travel after dark. Caravan with at least two cars when traveling outside of Guatemala City. The Inter-American Highway (CA-1) and the road from Guatemala City to the Caribbean coast (CA-9) are especially dangerous due to heavy traffic, including large trucks and trailers, and poorly maintained vehicles that often lack properly functioning lights. The main road to Lake Atitlán via CA-1 and Sololá is safer than the alternative secondary roads near the lake.

In the recent past, armed attacks occurred on roads between Guatemala City and Petén, as well as between Tikal and the Belize border. Plan and research routes prior to departing for your destination. Although many GPS applications work in Guatemala, they may not accurately reflect road conditions. Roads and routes identified on a GPS may be nothing more than a poorly built dirt road accessible only by 4x4 vehicles. GPS applications trying to minimize travel times can also route drivers through gang-controlled neighborhoods.

Travelers must also be aware of the high frequency of demonstrations/protests in Guatemala. Several highly organized groups are capable of drawing thousands of people to support their cause. One of the most common demonstration tactics is the blocking of major routes throughout the country. The most successful groups have blocked up to 30 major routes at once – bringing the country's road network to a standstill. A good resource for updated information regarding traffic concerns throughout Guatemala is PROVIAL, a roadside assistance force that routinely tweets significant issues related to accidents, traffic conditions and road blockades.

There are no roadside assistance clubs in Guatemala. However, PROVIAL patrols most major highways; contact them by calling 1520 from a local phone. Their vehicles are equipped with basic tools and first aid supplies, and their services are free. Police patrol major roadways sporadically and may assist travelers. For roadside assistance, call the police at 110 or 120, or the fire department at 122 or 123. Cellular service covers most areas tourists frequent. Some reports of highway robberies include accusations that police, or assailants dressed as police, have been involved.

For detailed, country-specific road and vehicle safety information, read the World Health Organization's Global Status Report on Road Safety [↗] .

CLP_PC_024107

Review OSAC's reports, Road Safety Abroad, Driving Overseas: Best Practices, and Evasive Driving Techniques; and read the State Department's webpage on driving and road safety abroad.

## Public Transportation Safety

Informal bus lines are the most common mode of public transportation in Guatemala. These bus routes are serviced by brightly colored, poorly maintained, recycled U.S.-style school buses. Driver qualification levels vary, creating an untenable safety situation. Additionally, these bus lines are prime targets for extortions and robberies. Criminals habitually assault and murder bus drivers because of non-compliance with extortion demands. The official U.S. government community in Guatemala is prohibited from using public buses as a means of transportation.

Taxis are also unsafe. Unlicensed taxis and taxi companies serve metropolitan areas. The U.S. government prohibits its personnel present in Guatemala from hailing taxis on the street. Taxi drivers can be targeted for or complicit in criminal activity. Only use pre-arranged and radio-dispatched taxi services.

Uber operates in Guatemala City, Antigua, and some other urban areas. Uber is a reliable source of transportation, and U.S. government personnel may use the service. It is important to note, however, that local taxi operators do not support Uber and have engaged in physical confrontations with Uber drivers. Wait in a secure location for an available Uber; expect the driver to request that a passenger ride in the front seat to mask the appearance of being a car service.

## Aviation Concerns

 La Aurora International Airport (GUA) offers direct flights to/from the United States. On occasion, the airport shuts down temporarily due to severe weather or volcanic activity. However, flights on major commercial airlines face few issues other than delays and re-routing.

GUA is in Zone 13, an area of Guatemala City that suffers from elevated levels of crime. Remain cautious when leaving the airport, as assailants may steal money, passports, or luggage. In some cases, taxi drivers rob travelers of their possessions. Pre-arrange transportation arrangements to and from the airport using pre-screened, vetted transportation services, including Uber. A pre-screened, vetted taxi service is available at the airport. Travelers can hire a vetted driver at the kiosk under the "SAFE" sign. Assailants have worn full/partial police uniforms and have used vehicles that resemble police vehicles, indicating that some elements of the police might be involved.

Small, privately owned aircraft present several safety concerns. Accidents have involved both fixed-wing and rotary-wing aircraft. Maintenance for these aircraft in Guatemala does not meet International Standardization Organization (ISO) requirements. Operators of small aircraft could be poorly trained and inexperienced. U.S. government personnel in Guatemala may not use Guatemalan-owned rotary winged aircraft as a means of travel.

Review OSAC's Report, Security in Transit: Airplanes, Public Transport, and Overnights; and consider the European Union Air Safety List ⧉ .

## Maritime Security

The Government of Guatemala does not regulate or control small watercraft on lakes or rivers. There are no other significant maritime security threats concerning the private sector in Guatemala.

# Personal Identity & Human Rights Concerns

Significant human rights issues include credible reports of unlawful or arbitrary killings; harsh and life-threatening prison conditions; arbitrary arrest and detention; politically motivated reprisals against individuals in another country; serious problems with the independence of the judiciary; serious restrictions on free expression and media, including violence, threats of violence, and unjustified arrests or prosecutions against journalists; substantial interference with the freedom of peaceful assembly and freedom of association, including overly restrictive laws on the organization, funding, or operation of nongovernmental and civil society organizations; serious government corruption; lack of investigation of and accountability for gender-based violence; crimes involving violence or threats of violence targeting persons with disabilities and members of indigenous groups; crimes involving violence or threats of violence targeting LGBTI+ persons; and use of forced labor, including child labor.

## Safety Concerns for Women Travelers

Women should be especially careful when traveling alone throughout Guatemala. Violence against women, including sexual and domestic violence, is widespread and serious. The law establishes penalties of five to eight years for physical, economic, and psychological violence committed against women due to their gender.

The law criminalizes rape of men or women, including spousal rape, and sets penalties between five and 50 years in prison. Police have minimal training or capacity to investigate sexual crimes or assist survivors of such crimes, and the government did not enforce the law effectively. Rape and other sexual offenses remain serious problems.

The judiciary continues to operate a 24-hour court in Guatemala City to offer services related to violence directed toward women, including sexual assault, exploitation, and trafficking of women and children. The judiciary also operates specialized courts for violence against women throughout the country, but not in every department. The Public Ministry maintains a 24-hour victim service center to provide medical, psychosocial, and legal support to victims, including restraining orders for their immediate protection. The ministry also maintains a national alert system for finding disappeared women. Sexual violence remains widespread despite these advances.

Although the constitution establishes the principle of gender equality, stating that all individuals are equal and have the same rights and that men and women enjoy the same opportunities and responsibilities, women, and particularly indigenous women, faced discrimination and were less likely to hold management positions. The law establishes equal pay for women and men in government offices by not allowing differences in pay based on "personal identity" but does not prohibit discrimination based on gender or prohibit sexual harassment in the workplace in the private sector. There are laws that restrict women from working in certain sectors, including in jobs deemed morally inappropriate. The law does not prohibit discrimination in access to credit based on gender.

The Solo Female Travel Safety Index ⧉ combines the experiences of solo female travelers with other reliable indices to award a single rating indicating the relative security female travelers might experience in a given country. The qualitative portion of the index examines risk of scam, theft, and harassment, as well as the country's perceived attitude towards women. As of the date of this report's publication, Guatemala has a score of 2.3 on a scale of 1.0 (safest) to 4.0 (least safe). All solo female travelers are able to share their solo travel experiences by signing up with the Solo Female Travelers portal ⧉ ; the organization draws qualitative data from women traveling solo, depending on active participation and honest information.

CLP_PC_024108

Consider composite scores given to Guatemala by the UN Development Program (UNDP) in its Gender Development Index, measuring the difference between average achievement in three basic dimensions of human development, and Gender Inequality Index, measuring inequality in achievement in reproductive health, empowerment, and the labor market. For more information on gender statistics in Guatemala, see the World Bank's Gender Data Portal.

Review the State Department's webpage for female travelers.

## Safety Concerns for LGBTI+ Travelers

Guatemalan law does not extend specific antidiscrimination protections to LGBTI+ individuals. Efforts to pass laws against discrimination, including a Gender Identity Law, encountered severe opposition among legislators. According to LGBTI+ activists, gay and transgender individuals often experience police abuse. LGBTI+ human rights groups stated, for example, that police regularly engaged in extortion and harassed male and transgender individuals whom they alleged to be sex workers. Disaggregated police data that captures crimes targeting persons who identify as gay or transgender is currently not available. Thus, it is difficult to determine the true severity of this issue.

Extreme violence against LGBTI+ persons remains a persistent issue.The Lambda Association reported that most homicides and general crimes of prejudice against LGBTI+ persons occurred either in the capital or in the regions of Izabal and Jalapa. LGBTI+ groups claimed LGBTI+ women experienced specific forms of discrimination, such as forced marriages and "corrective" rape intended to cause pregnancy, although these incidents were rarely, if ever, reported to authorities.

Lambda and other LGBTI+ organizations report a lack of will on the part of police to fully investigate hate crimes and violence against LGBTI+ persons.

The Equaldex Equality Index measures the status of LGBTI+ rights, laws, and freedoms, as well as public attitudes towards LGBTI+ people around the world. As of this report's publication date, Guatemala has a score of 54/100, ranking 81 out of 198 countries on the index.

Consider information from Destination Pride, a data-driven search platform associated with PFLAG Canada that visualize the world's LGBTQ+ laws, rights, and social sentiment; as well as from ILGA World, a worldwide federation that produces an annual map showing sexual orientation laws from around the world, available in multiple languages.

Review OSAC's report, Supporting LGBT+ Employee Security Abroad, and the State Department's webpage on security for LGBTI travelers.

## Safety Concerns for Travelers with Disabilities

Except for major hotels, some government buildings, and major museums that have access ramps for people with disabilities, most buildings remain inaccessible. Mayan ruins such as Tikal do not provide access for disabled people.

The 2021 Human Rights Report states that people with disabilities experienced violence, harassment, intimidation, and abuses, including incidents incited, perpetrated, or condoned by government officials such as police, medical professionals, and personal attendants and staff at institutions. Persons with disabilities, especially underrepresented groups, experienced higher levels of violence and abuse, including sexual assault.

Review the State Department's webpage on security for travelers with disabilities.

## Safety Concerns for Travelers Based on Race, Religion, & Ethnicity

The government's National Institute of Statistics estimate that indigenous persons from 24 ethnic groups make up 44% of the population. The law provides for equal rights for indigenous persons and obliges the government to recognize, respect, and promote the lifestyles, customs, social organizations, and manner of dress of indigenous persons. The government does not, however, recognize particular indigenous groups as having a special legal status provided by national law.

There are no laws, policies, or state programs that specifically contribute to the reduction of racism, according to international human rights organizations. The constitution provides for protections against discrimination, and the law provides for a penalty of one to three years' imprisonment and a fine of up to 3,000 quetzals ($388) for acts of discrimination. Other legal and material efforts to combat discrimination include litigation instructions for discrimination crimes by the Public Ministry.

The government generally did not effectively enforce laws against discrimination. Of the 12 agreements that make up the Peace Accords signed in 1996, the two in which the government had made the least progress in implementing were those specifically dealing with matters related to indigenous persons: the Agreement on Identity and Rights of Indigenous Peoples and the Agreement on Socioeconomic Aspects and Agrarian Issues.

According to the OHCHR, there was a significant increase in attacks and incidents of defamation and intimidation against indigenous defenders of indigenous land, territory rights, and natural resources.

Review the latest U.S Department of State Report on International Religious Freedom for country-specific information.

Review OSAC's report, Freedom to Practice, and the State Department's webpage on security for faith-based travelers.

## Anti-U.S./Anti-Western Sentiment

There is not significant anti-U.S. or anti-Western sentiment in Guatemala.

## Concerns involving the Rule of Law, Arbitrary Detention, Official Harassment, Corruption &/or Transparency

The law provides criminal penalties for official corruption, but officials frequently engaged in corrupt practices with impunity. Despite numerous allegations of corruption among the legislative and executive branches of the government, few high-profile cases were prosecuted during the year, and anticorruption efforts within the judiciary stalled. Prominent anticorruption prosecutors were fired or removed from significant cases, and corrupt actors threatened independent judges by filing complaints based on spurious charges to strip them of immunity to prosecution.

The law prohibits arbitrary arrest and detention, but there are credible reports of extrajudicial arrests, illegal detentions, and denial of timely access to a magistrate and hearing as required by law. Suspects are entitled to challenge in court the legal basis or arbitrary nature of their detention. There is no compensation for those ruled unlawfully detained.

CLP_PC_024109

The law provides for an independent judiciary. The judicial system generally fails to provide fair or timely trials due to inefficiency, corruption, and intimidation of judges, prosecutors, and witnesses.The Transparency International Corruption Perceptions Index ↗ ranks Guatemala 150 out of 180 worldwide, where 1 means most transparent.

The World Justice Project Rule of Law Index ↗ measures how the rule of law is experienced and perceived worldwide based on surveys in 139 countries and jurisdictions, and is the leading source for original, independent data on the rule of law. The most recent index ranks Guatemala 109 out of 139 worldwide, where 1 means the strongest perceived rule of law.

Communication Issues

The law provides for freedom of expression, including for the press, and the government generally respects this right. The intimidation of, and violence against, journalists results in significant self-censorship.

Independent media are active and express a wide variety of views. Nonetheless, reporters covering organized crime, including its links to corrupt public officials, acknowledge practicing self-censorship due to the danger investigative journalism creates for them and their families. Lower advertising revenue, whether due to the COVID-19 pandemic or as pressure from companies against reports of corruption, has resulted in media outlets becoming less independent.

The government does not restrict or disrupt access to the internet or censor online content, and there are no credible reports that the government monitors private online communications without appropriate legal authority.

Members of the press report receiving pressure, threats, and retribution from public officials and criminal organizations regarding the content of their reporting. Online attacks against independent journalists and media outlets continue. These include hacking journalists' private social media accounts, publishing stolen or falsified personal information, and conducting apparent coordinated attempts to undermine specific journalists and the press. The government takes little action to protect these individuals.

Observers note that net centers, or collections of social media accounts operating from office buildings associated with government information sources, have increased activity, creating fake social media accounts to criticize and defame journalists.

The Reporters Without Borders World Press Freedom Index ↗ ranks Guatemala 124 out of 180 worldwide, where 1 means most freedom.

Review OSAC's report, Lèse Majesté: Watching what you say (and type) abroad.

# Health Concerns

A wide range of medical care is available in Guatemala City, but medical care outside the city is limited. Public hospitals frequently experience serious shortages of basic medicines and equipment. Care in private hospitals is generally adequate for most common illnesses and injuries. Many medical specialists are U.S. trained and certified. Doctors and hospitals often expect immediate cash payment for health services, although most private hospitals accept major U.S. credit cards.

There are some aerial medical evacuation (medevac) services in Guatemala. However, these services are extremely expensive and frequently require payment before rendering service. Serious medical problems requiring hospitalization and/or medical evacuation to the United States can be costly.

Find contact information for available medical services and available air ambulance services on the U.S. Embassy website. The U.S. Department of State strongly recommends purchasing international health insurance before traveling internationally. Review the State Department's webpage on health insurance overseas.

The U.S. Department of State has not included a Health "H" Indicator on the Travel Advisory for Guatemala. Review the U.S. Centers for Disease Control and Prevention's (CDC) country-specific Travel Health Notices ↗ for current health issues that impact traveler health, like disease outbreaks, special events or gatherings, and natural disasters.

See OSAC's Guide to U.S. Government-Assisted Evacuations; review OSAC's reports, The Healthy Way, Shaken: The Don'ts of Alcohol Abroad, Health 101: How to Prepare for Travel, and Fire Safety Abroad; and visit the State Department's webpage on Your Health Abroad for more information.

## Vaccinations

Strongly consider COVID-19 vaccination prior to any travel. Monkeypox has also been found in Guatemala, albeit at low levels.

The Zika Virus is present in Guatemala. Make sure you are up to date on all routine vaccines before every trip. Some of these vaccines include Chickenpox (Varicella), Diphtheria-Tetanus-Pertussis, Flu (influenza), Measles-Mumps-Rubella (MMR), Polio, Hepatitis A, Hepatitis B, Malaria, Typhoid. Consider the Rabies vaccination if a trip will include proximity to wild and stray animals.

Review the CDC Travelers' Health ↗ site for country-specific vaccine recommendations.

## Issues Traveling with Medications

There are no known issues with medications in Guatemala. Many medications requiring prescriptions in the U.S. are available over the counter.

Review OSAC's report, Traveling with Medication.

## Water Quality

Tap and well water are not safe to drink in Guatemala. Only drink from sealed commercial water bottles.

Review OSAC's report, I'm Drinking What in My Water?

## Environmental Hazards

Guatemala is prone to seismic activity, volcanic eruptions, severe and unpredictable weather, and unstable terrain. General information about natural disaster preparedness is available locally from the National Disaster Reduction Coordination Office (CONRED ↗ ) and from the U.S. Federal Emergency Management Agency (FEMA).

CLP_PC_024110

Guatemala is situated on the Motagua/Chixoy-Polochic fault complex, at the convergence of the Caribbean and North American plates. Guatemala has experienced a number of historically significant earthquakes above 7.0.

Guatemala has three active volcanoes: Pacaya, Santiaguito, and Fuego. Pacaya Volcano located about 30 miles south of Guatemala City is an active volcano whose eruption in February 2021 (the first since 2010) resulted in a closure of La Aurora International Airport during late March when a change in wind direction covered the airport in ash and volcanic rock debris. Fuego Volcano, located about 25 miles southwest of Guatemala City, last erupted in 2021. The eruption sent ash plumes thousands of feet into the air although no evacuations were required. Fuego's eruption in 2018, its largest since 1974, included a partial collapse of the crater. As a result, volcanic material reached areas considered safe under existing eruption scenarios. CONRED reports that eruptions of Fuego Volcano and subsequent pyroclastic flows and lahars have caused at least 188 deaths, left 240 people missing, temporarily displaced nearly 13,000 people, and impacted more than 1.7 million more. Since the eruption, the U.S. Government has supplemented Guatemala's effort to assist displaced persons and is helping develop a lahar observation early warning notification system to mitigate the threats of deadly lahar mudslides that often follow volcanic eruptions.

INGUAT organized an active community-based tourism program in San Vicente Pacaya to minimize the risk of armed robbery or mishap on Pacaya. Climbing volcanoes in groups and with a guide is still highly advisable to reduce the risk of assault and to mitigate the dangers of volcanic and weather conditions. Visiting Guatemala's picturesque volcanoes can be dangerous for even experienced climbers. As recently as 2017, six experienced expatriate climbers, accompanied by qualified guides, died due to exposure on the summit of the Acatenango volcano.

Flooding, mudslides, and landslides pose major risks to urban and rural areas alike. Mudslides can easily overcome poor road infrastructure. Drivers must exercise extreme caution and patience during these periods.

## Cybersecurity Concerns

Exercise standard precautions when using public Wi-Fi services in Guatemala.

Review OSAC's reports, Cybersecurity Basics, Best Practices for Maximizing Security on Public Wi-Fi, Traveling Abroad with Mobile Devices, and Guide for Overseas Satellite Phone Usage.

## Counterintelligence Issues

There are no significant counterintelligence issues particular to private-sector operations in Guatemala.

## Other Security Concerns

### Landmines

This country has no known issues with landmines.

### Import/Export Restrictions

Guatemalan customs authorities may enforce strict regulations concerning temporary importation into or export from Guatemala of items such as antiquities and other cultural property.

A country-specific listing of items/goods prohibited from being exported to the country or that are otherwise restricted is available from the U.S. International Trade Agency website⧉ .

### Photography

There are no concerns about photography in Guatemala.

Review OSAC's report, Picture This: Dos and Don'ts for Photography.

### ID Requirements

Guatemala has no unusual identification requirements.

### Critical Infrastructure Concerns

Guatemala has several infrastructure concerns. Basic services, road infrastructure, emergency services, and medical services barely meet the needs of the still-growing population. The government has an extremely limited capacity to respond to chemical/industrial accidents, and small incidents typically go unreported. The government is also very limited in its technical ability to monitor watershed runoff or air pollution from industrial processes, the most controversial being mining.

## OSAC Country Chapters

The Guatemala City Country Chapter is active and meets quarterly.

Contact OSAC's Americas team ✉ with any questions.

## Embassy Contact Information

U.S. Embassy ✉: Avenida Reforma 7-01, Zona 10, Ciudad de Guatemala. Tel: +502-2326-4000; Emergencies: +502-2331-2354. Hours: 0800-1700 Monday-Thursday; 0800-1200 Friday.

## Trustworthy News Sources

- La Prensa Libre ✉
- elPeriódico de Guatemala ✉

CLP_PC_024111

- AP News (Guatemala Page) ✉

## Other Helpful Info

- State Department Country Information
- OSAC Risk Matrix
- OSAC Travelers Toolkit
- State Department Travelers Checklist
- Smart Traveler Enrollment Program (STEP)
- How OSAC Analysts Can Benefit Your Global Security Operations

---

**Attachments**

📄 2022 OSAC CSR Guatemala.pdf  ⤓

---

**Related Content**

← 

📰 Travel Advisory: Guatemala - Level 3 (Reconsider Travel)

7/5/2022 | Report

→ 

---

*The contents of this (U) report in no way represent the policies, views, or attitudes of the United States Department of State, or the United States Government, except as otherwise noted (e.g., travel advisories, public statements). The document was compiled from various open sources and (U) embassy reporting. Please note that all OSAC products are for internal U.S. private sector security purposes only. Publishing or otherwise distributing OSAC-derived information in a manner inconsistent with this policy may result in the discontinuation of OSAC support.*

CLP_PC_024112



An official website of the United States government

<u>Here's how you know</u>

**U.S. Customs and Border Protection**

MENU

**Home** »  **Newsroom** »  **National Media Release** »

CBP Releases January 2023 Monthly Operational Update

---

Newsroom

---

**Accountability and Transparency**

---

**Legal Notices**

---

**Advisories**

---

**Media Releases**

---

**Photo Gallery**

---

**Video Gallery**

---

**Press Officers**

---

**Publications**

---

**Social Media Directory**

---

**Speeches/Statements**

---

**Spotlights**

---

**Stats and Summaries**

---

**COVID-19**

---

**Newsroom**

CLP_PC_024814

# CBP Releases January 2023 Monthly Operational Update

**Release Date:** Fri, 02/10/2023 - 12:00

*Encounters Between Ports of Entry at Lowest Level Since February 2021*

**WASHINGTON** — U.S. Customs and Border Protection released operational statistics today for January 2023, which can be viewed online **here**.

"The January monthly operational update clearly illustrates that new border

enforcement measures are working, with the lowest level of Border Patrol encounters between Ports of Entry since February of 2021," said CBP Acting Commissioner Troy Miller. "Those trends have continued into February, with average encounters of Cubans, Haitians, Nicaraguans, and Venezuelans plummeting."



***CBP Southwest Border Enforcement Numbers for January 2023***

U.S. Border Patrol encounters of individuals who entered the country between Ports of Entry at the southwest border in January 2023 totaled **128,410**, down **42%** from **221,675** in December 2022. This is the lowest month of Border Patrol encounters since February 2021 when encounters began to increase after the most severe impacts of the COVID-19 pandemic on migration.

CBP total encounters in January 2023 were **156,274**, down nearly **40%** from **251,978** in December 2022. This total includes Border Patrol encounters and noncitizens processed at Ports of Entry including individuals who sought an exception to Title 42 based on certain vulnerabilities and scheduled an appointment to present in advance via the CBP One Application.

- Over two-thirds (**69.5%**) of all southwest land border encounters were single adults, with **108,573** encounters in January, a **33% decrease** compared to December.

CLP_PC_024815

- **64,499** encounters, **41.3%** of the total, were processed for expulsion under Title 42. **91,775** encounters were processed under Title 8.
  - **57,589** encounters involving single adults (**53%** of all single adult encounters) were processed for expulsion under Title 42, with **50,984** processed under Title 8 (**47%** of all single adult encounters).

  - **6,779** encounters involving family unit individuals (**17.8%** of all family unit individuals) were processed for expulsion under Title 42, with **31,308** processed under Title 8 (**82.2%** of all family unit individuals).

- In January 2023 there were 39,680 (25%) repeat encounters and 115,226 (74%) unique encounters. The number of unique individuals encountered in January 2023 was 115,226 compared to 216,429 in December 2022, a 47% decrease in the number of unique individuals encountered the prior month.

- Of those, 25% involved individuals who had at least one prior encounter in the previous 12 months, compared to an average one-year re-encounter rate of 14% for FY2014-2019.

Unaccompanied Children

- Encounters of unaccompanied children decreased 23.5 percent, with 9,393 encounters in January compared with 12,283 in December. In January, the average number of unaccompanied children in CBP custody was 334 per day, compared with an average of 570 per day in December.

Family Unit individuals

- Encounters of family unit individuals decreased by **50.1%** from **77,155** in December to **38,087** in January—which is a **56.5%** decrease from the peak of **87,461** in August 2021.

The significant decrease in Border Patrol encounters, well beyond that which is expected based on seasonal trends, is indicative of the success of the measures announced by the Administration on January 5, 2023 expanding safe and orderly lawful processes for migration while applying consequences to those who do not avail themselves of those processes.

During January, **11,637** Cubans, Haitians, Nicaraguans, and Venezuelans (including immediate family members where applicable) were paroled into the country by Office of Field Operations through the parole processes established for Venezuelans in October and expanded to the additional nationalities in January. Arrivals of noncitizens via these processes, which include careful vetting and require a supporter present in the Unites States, are a testament to the benefit of

CLP_PC_024816

these lawful processes in promoting safe and orderly migration while reducing encounters along the Southwest Border.

Encounters of Cubans, Haitians, Nicaraguans, and Venezuelans between ports of entry at the southwest border declined from a 7-day average of 1,231 on the day of the announcement on January 5th, to 59 on January 31—a drop of 95 percent in just over three weeks. Those trends have endured so far through the month of February.  The reduction occurred even as encounters of other noncitizens began to rebound from their typical seasonal drop.

|  | Venezuela / Cuba / Nicaragua | Mexico / N. Central America |
|---|---|---|
| Jan. 2023 | 14,941 | 53,848 |
| % Unique Encounters | 13 % | 47 % |

**Unique Southwest Border Encounters by Select Citizenships**

| SW Border | Cuba | Haiti | Nicaragua | Venezuela | Mexico / N. Central America |
|---|---|---|---|---|---|
| **23-Jan** | 6175 | 2723 | 3232 | 5534 | 53848 |
| **% Unique** | 5% | 2% | 3% | 5% | 47% |
| **22-Dec** | 42183 | 3977 | 34869 | 6052 | 52990 |
| **% Unique** | 19% | 2% | 16% | 3% | 24% |
| **22-Nov** | 34322 | 4018 | 33788 | 6251 | 58970 |
| **% Unique** | 18% | 2% | 17% | 3% | 30% |
| **22-Oct** | 28500 | 5090 | 20652 | 20804 | 61087 |

CLP_PC_024817

| | | | | | |
|---|---|---|---|---|---|
| **% Unique** | 15% | 3% | 11% | 11% | 33% |
| **22-Sep** | 25872 | 4147 | 17936 | 33494 | 58090 |
| **% Unique** | 14% | 2% | 10% | 18% | 32% |
| **Jan chance Since Dec** | -85% | -32% | -91% | -9% | 2% |
| **Dec change Since Nov** | 23% | -1% | 3% | -3% | -10% |
| **Nov change Since Oct** | 20% | -21% | 64% | -70% | -3% |
| **Oct change since Sept** | 10% | 23% | 15% | -38% | 5% |
| **Sep change since Aug** | 37% | -23% | 58% | 33% | 2% |

Note: Unique encounters include persons not previously encountered in the prior 12 months.

Source: Office of Immigration Statistics analysis of CBP data.

- Over two-thirds (**69.5%**) of all southwest land border encounters were single adults, with **108,573** encounters in January, a **33% decrease** compared to December.

- **64,499** encounters, **41.3%** of the total, were processed for expulsion under Title 42. **91,775** encounters were processed under Title 8.
  - **57,589** encounters involving single adults (**53%** of all single adult encounters) were processed for expulsion under Title 42, with **50,984** processed under Title 8 (**47%** of all single adult encounters).

  - **6,779** encounters involving family unit individuals (**17.8%** of all family unit individuals) were processed for expulsion under Title 42, with **31,308** processed under Title 8 (**82.2%** of all family unit individuals).

Unaccompanied Children

- Encounters of unaccompanied children decreased **23.5%**, with **9,393** encounters in January compared with **12,283** in December. In January, the

CLP_PC_024818

Case 4:18-cv-06810-JST Document 169-8 Filed 06/05/23 Page 953 of 1047

average number of unaccompanied children in CBP custody was **334** per day, compared with an average of **570** per day in December.

Family Unit individuals

- Encounters of family unit individuals decreased by **50.1%** from **77,155** in December to **38,087** in January—which is a **56.5%** decrease from the peak of **87,461** in August 2021.

**CBP One App**

In January, CBP processed **21,661** individuals at POEs as exceptions to Title 42 based on an individual vulnerability assessment. This includes **9,902** individuals between January 18 and 31 who scheduled an appointment to present at a POE using the newly available functionality in the CBP One mobile application. While the high demand for these appointments has meant that not all individuals seeking appointments have yet been able to schedule them (individuals commonly waited more than three months in shelters to be considered under the Title 42 exception process before the use of CBP One), the transition of the exceptions process to CBP One allows more open access and has provided immediate benefits in reducing the exploitation of vulnerable persons seeking to present at POEs. Over 20,000 individuals have scheduled an appointment via CBP One and the top nationalities who have done so are Venezuelan and Haitian.

**CBP Nationwide Total Encounters for FY23TD through January: 1,072,400**

- *In January 2023 there were 41,068 (20%) repeat encounters and 125,811 (60%) unique encounters. The number of unique individuals encountered in January 2023 was 125,811 compared to 226,079 in December 2022, a 44% decrease in the number of unique individuals encountered the prior month.*

- *Of those, 20% involved individuals who had at least one prior encounter in the previous 12 months, compared to an average one-year re-encounter rate of 12% for FY2014-2019.*

***Ongoing Migration Management Efforts***

CBP continues to enforce U.S. immigration law and public health authority and apply consequences to those without a legal basis to remain in the United States. Current restrictions at the U.S. border have not changed; single adults and families encountered at the Southwest border will continue to be expelled, where appropriate, under the CDC's Title 42 public health Order. Once the Title 42 public health order is no longer in place, CBP will process all individuals encountered at the border using its longstanding Title 8 authorities.

CLP_PC_024819

Under Title 8, those who attempt to enter the United States without authorization, and who are unable to establish a legal basis to remain in the United States will be quickly removed. Individuals who have been removed under Title 8 are also subject to additional long-term consequences beyond removal from the United States, including bars to future immigration benefits.

DHS has been executing a comprehensive and deliberate strategy to secure our borders and build a safe, orderly, and humane immigration system. The strategy is based on six pillars: surging resources; increasing efficiency to reduce strain on the border; employing an aggressive consequence regime; bolstering the capacity of NGOs and partner with state and local partners; going after cartels and smugglers; and working with our regional partners. This comprehensive plan leverages a whole-of-government approach to prepare for and manage the current and anticipated increases in encounters of noncitizens at our Southwest border. Read more **here**.

### *International Travel and Trade*

One of CBP's core mission objectives is to enhance the nation's economic prosperity, including through the facilitation of lawful trade and travel. CBP continues to protect America's national and economic security by facilitating legitimate trade while rigorously enforcing U.S. customs laws and regulations.

| Count | January 2021 | January 2022 | % January 2022 Change from January 2021 | January 2023 | % January 2023 Change from January 2021 | % January 2023 Change from January 2022 |
|---|---|---|---|---|---|---|
| **Travelers Arriving by Air** | 3,091,548 | 6,220,668 | 101% | 9,981,093 | 223% | 60.5% |
| **Passenger Vehicles Processed at Ports of Entry** | 4,476,588 | 6,080,819 | 35.8% | 7,581,607 | 69.4% | 24.7% |

CLP_PC_024820

| | | | | | | |
|---|---|---|---|---|---|---|
| **Pedestrian Travelers** | 1,981,059 | 3,104,764 | 56.7% | 3,571,448 | 80.3% | 15% |
| **Commercial Trucks** | 1,001,874 | 1,005,114 | 0.3% | 1,053,574 | 5.2% | 4.8% |

Since travel restrictions were eased on November 8, 2021 CBP has processed increased numbers of arriving travelers without any significant delays. The rules allow noncitizen, non-lawful permanent resident travelers seek to enter the United States for non-essential travel via land ports of entry and ferry terminals, provided they are fully vaccinated and have appropriate documentation. The guidelines also allow most non-immigrants (non-U.S. citizens and **other covered persons**) who are fully vaccinated to travel by air to the United States, regardless of the reason for travel.

CBP tracks traveler numbers and wait times and continuously adjusts as needed to make the travel experience more efficient. Travelers can plan by doing the following:

- Have a valid **Western Hemisphere Travel Initiative** document, such as a passport, Trusted Traveler Program card, or Enhanced Tribal Card.

- Possess proof of an approved COVID-19 vaccination as outlined on the **CDC** website.

- Verbally attest to their travel intent and COVID-19 vaccination status.

- Be prepared to present any documents requested by the CBP officer.

***Trade Stats/Seizures – Protecting the American Consumer***

CBP works diligently with the trade community and port operators to ensure that merchandise is cleared as efficiently as possible. CBP works with the trade community to strengthen international supply chains and improve border security. There are several programs by which CBP works with importers, carriers, consolidators, licensed customs brokers, and manufacturers to advance information about the shipments and expedite the inspection process at the ports of entry. CBP is available to conduct exams and is ready and willing to expand hours of operations if necessary to meet the growing demand for imported goods.

In January 2023 alone, CBP processed more than 2.6 million entry summaries valued at more than $265 billion, identifying estimated duties of nearly $7.3 billion to be collected by the U.S. government. In January, trade via the ocean

CLP_PC_024821

environment accounted for more than 44.15 percent of the total import value, followed by air, truck, and rail.

In January 2023, CBP identified 282 shipments valued at more than $69 million for further examination based on the suspected use of forced labor, and which may be subject to a Withhold Release Order, Forced Labor Finding, or the Uyghur Forced Labor Prevention Act's rebuttable presumption, and prohibited importation into the United States under 19 U.S.C. § 1307.

Intellectual property rights violations continue to put America's innovation economy at risk. Trade in counterfeit and pirated goods threaten the competitiveness of U.S. businesses, the livelihoods of American workers, and the health and safety of consumers.

In January 2023, CBP seized 1,514 shipments that contained counterfeit goods valued at more than $186 million.

CBP completed 27 audits that identified $7.7 million in duties and fees owed to the U.S. government, stemming from goods that had been improperly declared in accordance with U.S. trade laws and customs regulations. CBP collected over $7 million of this identified revenue and from previous fiscal years' assignments.

### Drug Seizures

CBP officers, Border Patrol agents, and Air and Marine Operations agents continue to interdict the flow of illicit narcotics across the border. Nationwide, drug seizures (Cocaine, Methamphetamine, Heroin, Fentanyl, and Marijuana) by weight **decreased 8.9%** in January compared to December. Seizures by weight were as follows:

- Cocaine seizures **decreased 49.5%**

- Methamphetamine **decreased 4.1%**

- Heroin seizures **decreased 66.4%**

- Fentanyl seizures **decreased 77%**

Additional CBP drug seizure statistics can be found **here**.

### Agriculture Stats/Seizures – Securing American Agriculture

In January 2023, CBP agriculture specialists helped protect America's agriculture, natural resources, and economic prosperity.

- CBP issued **5,547** emergency action notifications for restricted and prohibited plant and animal products entering the United States.

CLP_PC_024822

- CBP conducted **98,064** positive passenger inspections and issued **1,001** civil penalties and/or violations to the traveling public for failing to declare prohibited agriculture items.

*U.S. Customs and Border Protection is the unified border agency within the Department of Homeland Security charged with the comprehensive management, control, and protection of our nation's borders, combining customs, immigration, border security, and agricultural protection at and between official ports of entry.*

**Tags:** **Agriculture**, **Air and Marine Operations**, **Biometrics**, **Border Security**, **Office of Field Operations**, **Port Security**, **Statistics**, **Trade**, **Trade Enforcement**, **Travel**, **Trusted Traveler**, **U.S. Border Patrol**

**Last Modified: February 10, 2023**

Click 'Share This Page' button to display social media links.

 Share This Page.



## Media Contacts
### Office of Public Affairs

⊘ **(202) 344-1780**

✉ **CBPMEDIARELATIONS**

CLP_PC_024823

# Asylum Processing at the U.S.-Mexico Border: February 2023



**BY STEPHANIE LEUTERT AND CAITLYN YATES**



The University of Texas at Austin

Strauss
C E N T E R
for International Security and Law

CLP_PC_024899

# INTRODUCTION

Since November 2018, the Robert Strauss Center for International Security and Law at the University of Texas at Austin—at times in collaboration with the Center for U.S.-Mexico Studies at the University of California San Diego and the Migration Policy Centre at the European University Institute—has documented asylum processing at U.S. border ports of entry through quarterly reports. These reports began in November 2018 when U.S. Customs and Border Protection (CBP) officers stationed at the international border's dividing line started informing arriving asylum seekers that U.S. ports of entry were full. Simultaneously, CBP officials only accepted a specified number of asylum seekers each day, in a process known as metering. As metering became standardized at U.S. ports of entry, individuals, groups, and government officials began forming waitlists to organize growing queues of asylum seekers in Mexican border cities.[1]

From November 2018 through November 2022, the Robert Strauss Center's quarterly reports documented asylum waitlists in Mexican border cities. During the Covid-19 pandemic, CBP stopped processing asylum claims at ports of entry under a Center for Disease Control's (CDC) regulation referred to as Title 42 authority. This authority allowed Border Patrol agents to immediately expel apprehended individuals of certain nationalities, including asylum seekers, to the nearest Mexican city or to their home countries. It also blocked asylum seekers from making claims at U.S. ports of entry.[2] Under Title 42, many of the asylum waitlists along the border were frozen—meaning that list managers did not allow any new individuals to add their names—or they were dissolved.[3]

Beginning in mid-2022, the United States began processing Title 42 exceptions along the border. These exceptions allowed vulnerable individuals in Mexican border cities to enter the United States and request asylum. However, the number of vulnerable individuals was larger than the number of Title 42 exception slots, which led to Title 42 exception waitlists in certain cities. These lists were similar to the previous metering waitlists. Although, Mexican government entities, civil society organizations, and lawyers all kept different Title 42 exception waitlists, and there were often multiple lists in each city. The Robert Strauss Center's August 2022 and November 2022 asylum processing updates included Title 42 exception waitlists in their official counts of individuals waiting along the border.

On January 12, 2023, CBP implemented a new Title 42 exception process at the border. This process requires asylum seekers to use a mobile application known as CBP One to make a claim at a U.S. port of entry. Through this application, individuals located in Central and Northern Mexico can submit certain biographic information in advance, attest that they meet vulnerability criteria, and schedule an appointment at a U.S. port of entry. Since this process allows asylum seekers to make appointments directly with CBP, list managers dissolved all remaining metering and Title 42 exception waitlists.

Initially, CBP opened two weeks of appointments to fill the first days, and then—a week later—the agency began releasing daily appointments each morning at 9:00 am ET (6:00 am PT). These appointments are for one day at a time and are scheduled two weeks out. Asylum seekers in one area of the border may obtain appointments in other locations. To travel through northern Mexico, individuals with a CBP One appointment can obtain a temporary transit pass from Mexico's National Migration Institute (*Instituto Nacional de Migración*, INM).[4] The CBP One application is currently available in English, Spanish, and Haitian Creole.

CLP_PC_024900

Between January 18, 2023 and January 31, 2023, 9,902 individuals were processed at ports of entry through CBP One application appointments.[5]

In February 2023, not all ports of entry were processing CBP One appointments. Figure 1 shows the status of CBP One applications by city. Green circles indicate cities with CBP One appointments and red circles indicate cities without CBP One appointments.

---

**Figure 1: Ports of Entry Offering CBP One Appointments (February 2023)**

---



*Author's elaboration. Data collected from February 17, 2023 to February 21, 2023.*

The CBP One rollout and switch to asylum appointments has come with a series of challenges. The first are accessibility hurdles, as asylum seekers need to be literate, speak one of the application's three languages, have access to a cell phone with cell or internet service, and have basic knowledge of the new system.[6] If these hurdles are surmounted, the next set of challenges center around the application's registration process, with asylum seekers' reporting crashes, looping error messages, and facial comparison flaws (some of which have been addressed in subsequent application updates).[7] To obtain appointments, civil society organizations have also flagged concerns, such as the early morning release times of new appointments and slow internet at shelters, which prevents asylum seekers' phones from connecting quickly enough to make an appointment. Conversely, this means that individuals with strong Wi-Fi or the ability to pay for SIM cards may be more likely to obtain appointments.

CLP_PC_024901

However, the most pressing issue is the insufficient number of appointments compared to the number of waiting individuals. Each day, many asylum seekers try to obtain an appointment but are unable to secure a spot. This can be a bigger challenge for larger families, particularly in cities with few appointment slots.[8] In an attempt to improve their odds, some families have made decisions to separate themselves into smaller family groups or have sent their children to the United States as unaccompanied minors. Additionally, individuals may attempt to secure appointments in cities beyond where they are living, requiring journeys that can expose them to security risks and added costs.[9]

This report provides an update to asylum processing along the U.S.-Mexico border by focusing on the CBP One appointment process, waiting asylum seekers, and migrant shelters. Overall, asylum seekers continue to face unstable living conditions and security risks in Mexican border cities. Many shelters are full, and along the border, a number of individuals are renting rooms, staying in hotels, or sleeping on the street. In Matamoros, another tent camp has sprung up with thousands of occupants living along the Rio Grande. Certain groups of asylum seekers also continue to experience additional challenges. Civil society organizations report that Black, LGBTQ+, and Indigenous asylum seekers have faced targeted discrimination while waiting in Mexican border cities.

The February 2023 metering update draws on phone and WhatsApp interviews with asylum seekers, government officials, civil society organizations, and legal service providers on both sides of the border from February 17, 2023 through February 21, 2023. It also relies on local news articles to fill in any gaps.

CLP_PC_024902

## Asylum Processing at the Border Waitlists: February 2023

| Mexican City | CBP One Appointments | # of CBP One Appointments | City Conditions |
|---|---|---|---|
| **Matamoros, Tamaulipas** | Open | ~200 people per day | Each day, an estimated 200 individuals cross in Matamoros with Title 42 exception appointments via CBP One. Local civil society organizations estimate that there are around 3,500 to 4,000 people living in the city and attempting to obtain these appointments.[10] An estimated 2,500 people live in a tent camp along the Rio Grande.[11] Most of these individuals are from Venezuela and Haiti, with fewer numbers from Cuba and Nicaragua.<br><br>In late January 2023, a number of asylum seekers from Russia and Ukraine arrived in Matamoros. Unlike other nationalities, these individuals stayed in hotels in Matamoros's city center. By mid-February 2023, these individuals were no longer in the city.<br><br>From January 1, 2023, to January 31, 2023, 5,929 people entered the United States through Matamoros as Title 42 exceptions.[12] |
| **Reynosa, Tamaulipas** | Open | ~120 people per day | In Reynosa, there are around 120 CBP One appointments every day. The city's shelters are full and there are an estimated 5,000 to 9,000 people waiting in the city. Currently the majority of these individuals are from Venezuela and Haiti, with fewer numbers from Mexico (Oaxaca, Guerrero, and Chiapas), Honduras, Guatemala, and El Salvador. Individuals with appointments cross in three shifts: 7:00 am, 9:00 am, and 12:00 pm.[13]<br><br>Black migrants in Reynosa have reported that the CBP One application does not always accept photos of their faces. In response, these individuals set up bright construction lights for taking selfies. However, they noted that this technique did not work for children under the age of six.[14] |

CLP_PC_024903

**Asylum Processing at the Border Waitlists: February 2023 (continued)**

| Mexican City | CBP One Appointments | # of CBP One Appointments | City Conditions |
|---|---|---|---|
| **Reynosa, Tamaulipas** *(continued)* | | | Individuals who have been unable to secure a spot in shelters are renting rooms or waiting directly outside of the port of entry. Local shelter officials estimate that fewer than 10 percent of the migrants waiting in the city have managed to secure an appointment using the CBP One application. <br><br> From January 1, 2023, to January 31, 2023, 4,235 people entered the United States through Reynosa as Title 42 exceptions.[15] |
| **Nuevo Laredo, Tamaulipas** | Open | ~40 people per day | There are approximately 40 CBP One appointments available each day in Nuevo Laredo. <br><br> Over the past month, an increasing number of asylum seekers have arrived in the city. This is partly because Title 42 exception processing has resumed after being suspended in mid-2022.[16] Additionally, many of the individuals arriving in Nuevo Laredo already have CBP One appointments. These people were previously living in another border city or waiting in Mexico City, Guadalajara, or Monterrey.[17] For example, the majority of people at Casa Nazareth are recently arrived individuals with CBP One appointments.[18] Fewer people have been able to successfully obtain appointments while staying at local shelters. In fact, these shelters report that only a handful of their residents were entering the United States via CBP One appointments each week. <br><br> Nuevo Laredo's shelters are not at capacity and civil society organizations estimate that the city has a much smaller migrant population than either Reynosa or Matamoros. The majority of migrants in the city are from Honduras, Haiti, Mexico, Venezuela, and Cuba. <br><br> From January 1, 2023, to January 31, 2023, 606 people entered the United States through Nuevo Laredo as Title 42 exceptions.[19] |

CLP_PC_024904

**Asylum Processing at the Border Waitlists: February 2023 (continued)**

| Mexican City | CBP One Appointments | # of CBP One Appointments | City Conditions |
|---|---|---|---|
| **Piedras Negras, Coahuila** | Open | ~40 people per day | Each day, an estimated 40 individuals cross in Piedras Negras with Title 42 exception appointments via CBP One. This includes people who were waiting in Piedras Negras and Haitians and Venezuelans who are arriving with CBP One appointments after waiting in other cities.<br><br>In Piedras Negras, shelters are completely full. Local officials estimate that there are roughly 900 migrants waiting in shelters with another 1,000 to 1,500 migrants renting rooms, staying in abandoned houses, and sleeping on the streets. Currently, the majority of the migrants in Piedras Negras are from Honduras, Venezuela, Haiti, Ecuador, and Cuba.<br><br>From January 1, 2023, to January 31, 2023, 1,650 people entered the United States through Piedras Negras as Title 42 exceptions.[20] |
| **Ciudad Acuña, Coahuila** | Closed | N/A | There is no Title 42 exception processing via CBP One in Ciudad Acuña.<br><br>Civil Protection (*Protección Civil*) continues to maintain two asylum waitlists—one for single adults and one for families—but the local agency is not adding any new individuals to the lists. Many of the people who were waiting on the two lists are no longer in the city. |
| **Ciudad Juárez, Chihuahua** | Open | ~80 people per day | Each day, an estimated 80 individuals cross in Ciudad Juárez with Title 42 exception appointments via CBP One.<br><br>There are estimated to be more than 2,200 people in Ciudad Juarez's shelters and even more people living outside of these shelters.[21] Most of these individuals are from Venezuela, Nicaragua, Colombia, Guatemala, Ecuador, Peru, and El Salvador. |

CLP_PC_024905

**Asylum Processing at the Border Waitlists: February 2023 (continued)**

| Mexican City | CBP One Appointments | # of CBP One Appointments | City Conditions |
|---|---|---|---|
| **Ciudad Juárez, Chihuahua** *(continued)* | | | On February 8, 2023, a WhatsApp rumor circulated within Ciudad Juárez that suggested CBP had buses waiting across the border to take migrants to Canada. In response, around 1,500 people went to the Rio Grande and 500 people crossed the river and turned themselves in to U.S. authorities. The U.S. National Guard used megaphones to tell the remaining 1,000 migrants on the Mexican side of the Rio Grande that there were no buses nor transport to Canada.[22] The remaining individuals dispersed.<br><br>From January 1, 2023, to January 31, 2023, 2,168 people entered the United States through Ciudad Juárez as Title 42 exceptions.[23] |
| **Agua Prieta, Sonora** | Closed | N/A | There is no Title 42 exception processing via CBP One in Agua Prieta. To date, no one waiting in Agua Prieta's shelter has been able to obtain a CBP One appointment. Most migrants waiting in Agua Prieta are from southern Mexico and Guatemala.<br><br>Agua Prieta also continues to receive between 100 and 150 lateral Title 42 expulsions per day. The city's shelter is at capacity, with people sleeping on the city's streets or renting rooms. At night, the temperature has dipped below freezing, leading to potentially dangerous conditions for migrants expelled into the city without shelter. |
| **Nogales, Sonora** | Open | ~40 people per day | Every day, approximately 40 CBP One appointments are available in Nogales.<br><br>The individuals waiting in Nogales are mostly families from Mexico, particularly from Guerrero. However, there have also been individuals from Haiti who arrive from Reynosa or Matamoros with CBP One appointments. |

CLP_PC_024906

**Asylum Processing at the Border Waitlists: February 2023 (continued)**

| Mexican City | CBP One Appointments | # of CBP One Appointments | City Conditions |
|---|---|---|---|
| **Nogales, Sonora** *(continued)* | | | When the CBP One application first opened two weeks of slots on January 12, 2023 some migrants in Nogales were able to obtain appointments. Since then, the Kino Border Initiative reports that almost none of the individuals receiving their services have successfully obtained an appointment.<br><br>From January 1, 2023, to January 31, 2023, 800 people entered the United States through Nogales as Title 42 exceptions.[24] |
| **San Luis Río Colorado, Sonora** | Closed | N/A | There is no Title 42 exception processing via CBP One in San Luis Río Colorado.<br><br>Since the CBP One appointment process began, only two people from the Casa del Migrante La Divina have been able to obtain appointments in Nogales. The majority of the people attempting to get appointments are from Central America, Cuba, and Mexico. The shelter is now completely open, after being partially closed for almost three years due to Covid-19. |
| **Mexicali, Baja California** | Open | ~20 people per day | In Mexicali, there are approximately 20 CBP One appointments per day. However, shelter officials report that the majority of the individuals obtaining appointments in Mexicali are based in Guadalajara or Mexico City. These people are primarily from Venezuela, Afghanistan, and Haiti.<br><br>Shelters estimate that there are between 1,600 and 1,800 migrants in the city. Most people waiting in the city are from Mexico (Michoacán), Honduras, and El Salvador. All shelters in the city are completely full and individuals who are unable to access shelters are renting rooms and sleeping on the streets. During the past two months, there have been multiple rescues of migrants living without shelter amid extremely cold temperatures.[25] |

CLP_PC_024907

**Asylum Processing at the Border Waitlists: February 2023 (continued)**

| Mexican City | CBP One Appointments | # of CBP One Appointments | City Conditions |
|---|---|---|---|
| **Mexicali, Baja California** *(continued)* | | | From January 1, 2023, to January 31, 2023, 668 people entered the United States through Mexicali as Title 42 exceptions.[26] |
| **Tijuana, Baja California** | Open | ~200 people per day | Each day, an estimated 200 individuals cross with Title 42 exception appointments via CBP One. <br><br> On the first day with open appointments, Tijuana's Office of Migrant Services set up a Wi-Fi zone outside of their offices to provide internet and support to asylum seekers. However, the officials only managed to assist three families before the appointments were all filled.[27] Many of the individuals who received the first appointments were from Russia.[28] <br><br> In January 2023, city officials reported that there were 181 percent more migrants in the city than during the previous month.[29] Many of the new arrivals are from the Mexican states of Michoacán and Guerrero. Shelters in the city continue to be completely full. In recent months, there has been an increase in threats and violence targeting migrants and migrant shelters in Tijuana.[30] <br><br> From January 1, 2023, to January 31, 2023, 5,825 people entered the United States through Tijuana as Title 42 exceptions.[31] |

*\*The numbers should be interpreted as a general range rather than an exact figure.*

CLP_PC_024908

# ENDNOTES

1   Department of Homeland Security Office of the Inspector General, "CBP Has Taken Steps to Limit Processing of Undocumented Aliens at Ports of Entry," October 27, 2020, https://www.oig.dhs.gov/sites/default/files/assets/2020-10/OIG-21-02-Oct20.pdf.

2   U.S. Department of Health and Human Services, "Control of Communicable Diseases; Foreign Quarantine: Suspension of Introduction of Persons Into United States From Designated Foreign Countries or Places for Public Health Purposes," March 24, 2020, https://www.federalregister.gov/documents/2020/03/24/2020.-06238/control-of-communicable-diseases-foreign-quarantine-suspension-of-introduction-of-persons-into.

3   U.S. Department of Health and Human Services, "Control of Communicable Diseases; Foreign Quarantine: Suspension of Introduction of Persons Into United States From Designated Foreign Countries or Places for Public Health Purposes," March 24, 2020, https://www.federalregister.gov/documents/2020/03/24/2020.-06238/control-of-communicable-diseases-foreign-quarantine-suspension-of-introduction-of-persons-into.

4   Reynaldo Lara, "Les dan cita en otra ciudad, migrantes buscan permiso en Ciudad Juárez," *TV Azteca*, February 13, 2023, https://www.tvazteca.com/aztecanoticias/migrantes-permiso-juarez-vcp.

5   U.S. Customs and Border Protection, "CBP Releases January 2023 Monthly Operational Update," February 10, 2023, https://www.cbp.gov/newsroom/national-media-release/cbp-releases-january-2023-monthly-operational-update.

6   Melissa del Bosque, "Facing Bias: CBP's Immigration App Doesn't Recognize Black Faces, Barring Thousands from Seeking Asylum," *The Border Chronicle*, February 7, 2023, https://www.theborderchronicle.com/p/facing-bias-cbps-immigration-app.

7   Taylor Ardrey, "'It's a failure for us': Migrants at the Southern US border are reportedly frustrated with the mobile app that's supposed to speed up asylum appointments," *Business Insider*, January 28, 2023, https://www.businessinsider.com/migrants-frustrated-with-cbp-asylum-appointment-app-2023-1; Melissa del Bosque, "Facing Bias: CBP's Immigration App Doesn't Recognize Black Faces, Barring Thousands from Seeking Asylum," *The Border Chronicle*, February 7, 2023, https://www.theborderchronicle.com/p/facing-bias-cbps-immigration-app.

8   Santiago Caicedo, "Migrant families continue struggling with CBP One app registration," *KRGV*, February 16, 2023, https://www.krgv.com/news/migrant-families-continue-struggling-with-cbp-one-app-registration/.

9   Sandra Sanchez, "CBP One app gives cash-strapped asylum-seekers interviews hundreds of miles away," *Border Report*, January 18, 2023, https://www.borderreport.com/immigration/cbp-one-app-gives-cash-strapped-asylum-seekers-interviews-hundreds-of-miles-away/.

10   Alfredo Guevara, "Con la CBP One disminuye la migracion en Tamaulipas," *El Diario*, February 13, 2023, https://eldiariomx.com/2023/02/13/con-la-cbp-one-disminuye-la-migracion-en-tamaulipas/.

11   Esteban Montaño Vásquez, "Migrantes en Matamoros la vida en suspenso a la espera de un clic," *Newsweek*, February 3, 2023, https://newsweekespanol.com/2023/02/migrantes-matamoros-vida-en-suspenso/.

12   State of Louisiana, et al. v. Centers for Disease Control & Prevention, "Defendants' Monthly Report for the Month of January 2023 Pursuant to the Court's Preliminary Injunction," February 16, 2023.

13   Dolores Cerda, "Se normalizan aplicación CBP One para solicitar asilo político," *Notigape*, February 8, 2023, https://www.notigape.com/se-normalizan-aplicacion-cbp-one-para-solicitar-asilo-politico-/258558.

14   Melissa del Bosque, "Facing Bias: CBP's Immigration App Doesn't Recognize Black Faces, Barring Thousands from Seeking Asylum," *The Border Chronicle*, February 7, 2023, https://www.theborderchronicle.com/p/facing-bias-cbps-immigration-app.

15   State of Louisiana, et al. v. Centers for Disease Control & Prevention, "Defendants' Monthly Report for the Month of January 2023 Pursuant to the Court's Preliminary Injunction," February 16, 2023.

16   Julian Resendiz, "Nuevo Laredo church leaders say most new asylum seekers are Haitians with CBP One appointments," *Border Report*, February 15, 2023, https://www.borderreport.com/immigration/migrant-arrivals-increase-twofold-at-texas-tamaulipas-border/.

17   Gastón Monge, "Aumentan población de migrantes a refugios; la mayoría son de Haití," *En Linea Directa*, February 14, 2023, https://enlineadirecta.info/2023/02/14/aumentan-poblacion-de-migrantes-a-refugios-la-mayoria-son-de-haiti/.

CLP_PC_024909

18   "Casa del Migrante Nazareth envia a cuarentena a los enfermos," *Vox Populi*, February 17, 2023, https://voxpopulinoticias.com.mx/2023/02/casa-del-migrante-nazareth-envia-a-cuarentena-a-los-enfermos/.

19   State of Louisiana, et al. v. Centers for Disease Control & Prevention, "Defendants' Monthly Report for the Month of January 2023 Pursuant to the Court's Preliminary Injunction," February 16, 2023.

20   Ibid.

21   Martín Orquiz, "Pasean a Ken Salazar por lugares de atención a migrantes," *Norte Digital*, February 16, 2023, https://nortedigital.mx/pasean-a-ken-salazar-por-lugares-de-atencion-a-migrantes/.

22   Hérika Martínez Prado, "Juegan falsos rumores con su sueño americano," *El Diario de Juárez*, February 10, 2023, https://diario.mx/juarez/juegan-falsos-rumores-con-su-sueno-americano-20230210-2022725.html.

23   State of Louisiana, et al. v. Centers for Disease Control & Prevention, "Defendants' Monthly Report for the Month of January 2023 Pursuant to the Court's Preliminary Injunction," February 16, 2023.

24   Ibid.

25   Antonio Heras, "Rescatan en zona desértica de Mexicali a tres migrantes sudamericanos," *La Jornada*, January 5, 2023, https://www.jornada.com.mx/notas/2023/01/05/estados/rescatan-en-zona-desertica-de-mexicali-a-tres-migrantes-sudamericanos/.

26   State of Louisiana, et al. v. Centers for Disease Control & Prevention, "Defendants' Monthly Report for the Month of January 2023 Pursuant to the Court's Preliminary Injunction," February 16, 2023.

27   Kate Morrissey, "Asylum seekers in Tijuana are scrambling through mobile app error messages for few appointments into the U.S.," *The San Diego Union-Tribune*, January 22, 2023, https://www.sandiegouniontribune.com/news/immigration/story/2023-01-22/cbp-one-app-asylum-tijuana.

28   Ibid.

29   Cinthya Gómez, "'Creemos que CBP One ha fomentado la migración': Aumenta 181% llegada de migrantes a Tijuana en búsqueda de asilo en EEUU," *Telemundo*, February 1, 2023, https://www.telemundo20.com/noticias/local/creemos-que-cbp-one-ha-fomentado-la-migracion-aumenta-181-llegada-de-migrantes-a-tijuana-en-busqueda-de-asilo-en-eeuu/2275056/.

30   Adam Isacson and Ana Lucia Verduzco, "Tijuana's migrant shelters under increased attack, as the U.S. sends hundreds of migrants per day," Washington Office on Latin America, January 31, 2023, https://www.wola.org/analysis/tijuanas-migrant-shelters-under-increased-attack-as-the-u-s-sends-hundreds-of-migrants-per-day/.

31   State of Louisiana, et al. v. Centers for Disease Control & Prevention, "Defendants' Monthly Report for the Month of January 2023 Pursuant to the Court's Preliminary Injunction," February 16, 2023.

CLP_PC_024910



# SURVIVING DETERRENCE:

## HOW US ASYLUM DETERRENCE POLICIES NORMALIZE GENDER-BASED VIOLENCE

A Report by Oxfam America and the Tahirih Justice Center



CLP_PC_024919

**Oxfam** is an international confederation of 21 organizations, working with its partners and allies, reaching out to millions of people around the world. Together, we tackle inequalities to end poverty and injustice, now and in the long term—for an equal future. For further information visit www.oxfam.org.

**The Tahirih Justice Center** is a national, nonprofit organization that serves immigrant survivors of gender-based violence. Tahirih's interdisciplinary, trauma-informed model of service combines free legal services and social services case management with bridge-building policy advocacy and research-based training and education. Tahirih's programs efficiently and effectively leverage donated professional services from a vast network of attorneys, medical professionals, and other experts to serve as many immigrant survivors as possible. By amplifying the experiences of survivors in communities, courts, and Congress, Tahirih's mission is to create a world in which all people share equal rights and live in safety and with dignity. For further information visit https://www.tahirih.org/.

**Authors:** Sara Duvisac, Research and Policy Advisor, American Council of Learned Societies/Mellon Public Fellow, Oxfam America; and Irena Sullivan, Senior Immigration Policy Counsel, Tahirih Justice Center

CLP_PC_024920

## ACKNOWLEDGEMENTS

The authors would like to thank the numerous service providers who participated in our interviews and took our survey. This research would not have been possible without their tremendously valuable contributions, insights, and analysis. We are grateful to Talia Mills, our research consultant, who led the interview data collection process. We would also like to thank Jessica Addis, Savitri Arvey, Richard Calderone, Casey Carter Swegman, M. Rosario Castro Bernardini, Nick Galasso, Cristina Garcia, Oliver Gottfried, Noah Gottschalk, Namalie Jayasinghe, Diana Kearney, Adriana LopezMartinez, Archi Pyati, Adam Revello, Rebecca Rewald, Jorge Romero, Emma Shaw-Crane, Rachel Sheridan, Patricia Stottlemyer, and Sarah Tuckey for their suggestions and comments for this report. We are grateful for the assistance of Al Otro Lado; Casa Monarca. Humanitarian Aid for Migrants, Refugees and IDPs; Church of the Good Samaritan Shelter;  Espacio Migrante; the Hebrew Immigrant Aid Society; and Human Rights First during the research process.

### Content Warning

Please be aware that this report contains secondhand accounts of sexual violence, torture, kidnapping, assault, harassment, racism, and transphobia that migrants and asylum seekers have faced at the US southern border. These are painful stories of survival that detail trauma and abuse by fellow migrants, organized criminal networks, and state officials, and include accounts of institutional harm and neglect.

## ACRONYMS

| | |
|---|---|
| CBP | US Customs and Border Protection |
| DHS | US Department of Homeland Security |
| DOJ | US Department of Justice |
| DOS | US Department of State |
| EO | Executive Order |
| GBV | Gender-based violence |
| INA | US Immigration and Nationality Act |
| LGBTQI+ | Lesbian, gay, bisexual, transgender, queer, and intersex |
| MPP | Migrant Protection Protocols (also referred to as RMX) |
| PSG | Particular social group |
| RMX | Remain in Mexico (policy and program; also referred to as MPP) |
| UNHCR | United Nations High Commissioner for Refugees |

CLP_PC_024921

# EXECUTIVE SUMMARY

Migrants and asylum seekers often flee unspeakable acts of gender-based violence (GBV) at home such as human trafficking, sexual assault, sexual slavery, kidnapping, harassment, and other trauma. In trying to seek safety in the US, many endure further atrocities and exploitation at the US-Mexico border. Drawing on interviews and surveys of social and legal service providers working at the US southern border, this report documents how migrants and asylum seekers experience gender-based harm in two different but related ways as a consequence of seeking safe haven in the US. This report focuses on the experiences of women, girls, and lesbian, gay, bisexual, transgender, queer, and intersex (LGBTQI+) individuals.

First, we find that US asylum deterrence policies engender conditions that cause GBV to proliferate at the US southern border because:

1)  Border closures and expulsions increasingly force migrants to rely on precarious housing conditions that make them more susceptible to various forms of GBV;

2)  cartels and other organized criminal networks can more easily target migrants when they wait for prolonged periods of time at the border or are routinely expelled while trying to access US asylum and immigration processes; and

3)  survivors of GBV who are fleeing persecutors at home face an increased risk of being found and re-harmed by such persecutors while waiting at the border to access the US asylum process.

The risks of suffering GBV while waiting at the southern US border are compounded for Black migrants who are disproportionately impacted by US deterrence policies and consequently face further anti-Black discrimination from other migrants, criminal networks, and Mexican officials.

Second, the US asylum process is woefully trauma-uninformed and systemically disadvantages and re-traumatizes survivors of GBV who are ultimately able to apply for relief. In implementing policies that are by design punitive and cruel, the very gatekeepers of the asylum process—US Customs and Border Protection (CBP) officers[i]—routinely engage in abusive and even violent conduct in certain cases. We also find that the US asylum legal framework itself denies equal access to protection for survivors by failing to explicitly name gender as a ground of asylum.

We find that the harm that women, girls, and LGBTQI+ individuals suffer on account of their sex, gender identity and expression, and sexual orientation—while both waiting to access, and in the course of applying for, relief—is experienced as an inevitable and normalized consequence of seeking safety in the US. While the Biden administration has recently taken some steps to restore access to asylum at the US border, more must be done to ensure that the US fully abandons its punitive, deterrence-based approach to asylum. We conclude that by choosing this approach, the US is complicit in systemically harming and devaluing the lives of women, girls, and LGBTQI+ individuals desperately seeking access to safe haven through the asylum process as enshrined in US law. As such, the US is repudiating its legal obligations under both domestic US law and the United Nations 1951 Convention and 1967 Protocol Relating to the Status of Refugees. The US is also failing its moral obligations to respect the dignity of all migrants.

---

i  We use the term "CBP" because the vast majority of our interview respondents refer to US officials at the border as "CBP." These officials are most likely Border Patrol agents.

CLP_PC_024922

Rectifying these harms requires the US to reject a punitive deterrence-based paradigm in favor of one that honors the humanity of all. Such a transformation necessitates a significant normative shift in US politics and culture. To help realize this transformative vision, the US government should take the following immediate and significant steps:

1) Discontinue the use of deterrence policies designed to penalize and punish migration. Fully abandoning these policies will help mitigate the conditions that foster widespread GBV in Mexico at the US border and re-traumatization of asylum seekers at the hands of US officials.

In place of deterrence policies, we urge the US government to:

2) Invest in an asylum-seeker-centered model of service provision by establishing Welcome Centers where asylum seekers can access critical legal and humanitarian resources. Access to key trauma-informed resources and information in survivors' native languages promotes protection for survivors while helping to prevent re-traumatization and reduce instances of racial and gender-based harm by US officials.

3) Implement trauma-informed policies and practices within all components of US agencies that interface with migrants and asylum seekers, with a particular focus on US Border Patrol. Implementation must include rigorous trainings on such practices, collaboratively developed with outside experts including survivors, and robust accountability measures for lack of compliance.

4) Eradicate racial bias within all components of US agencies that interface with migrants, with a particular focus on US Border Patrol. Training on agencies' Equity Action Plans must be developed and presented collaboratively with outside experts and those most directly impacted by racial bias. Robust accountability measures for lack of compliance must be imposed.

5) Explicitly recognize gender as a key modality of persecution alongside those already named in the Refugee Convention. The US can do so by amending the Immigration and Nationality Act to name gender as a sixth ground of asylum and as a cognizable particular social group (PSG), and by revising the asylum application accordingly so that survivors are aware of their eligibility for relief.

6) Support alternative pathways for processing asylum seekers; for example, through the Refugee Protection Act's Central American Refugee Program. The program protects survivors of GBV through its designation of Refugees of Special Humanitarian Concern.

7) Align US immigration and asylum policies with US foreign policy goals that seek to reduce GBV and promote women's economic and social empowerment. US foreign policies must mitigate the risk of GBV and economic deprivation that women, girls, and LGBTQI+ migrants experience at the US southern border. The US government must also ensure that bilateral migration agreements include commitments to ensure safe and secure journeys.

# 1. INTRODUCTION

Every day, migrants and asylum seekers who have experienced violence, deprivation, and exploitation arrive at the US southern border. They are, however, often met with hostile US policies that violate their humanity as well as their legal rights. For decades, the primary objective of US immigration and asylum policy has been to deter migrants and asylum seekers from reaching US borders. Widely condemned policies such as family separation, expulsions of asylum seekers via Title 42 of the US Code (Title 42),[2] and forcing asylum seekers to return to Mexico to await their day in court under the Department of Homeland Security's (DHS) so-called "Migrant Protection Protocols" (MPP),[3] also referred to as Remain in Mexico (RMX),[4] are only the most recent and sweeping efforts designed to achieve this objective. Other examples include border walls; increased surveillance; minimal due process; detention of migrants and asylum seekers; prosecution of asylum seekers for unlawful entry; reduced access to benefits such as health care and labor rights; and bilateral agreements with countries of origin or third countries to limit the ability of asylum seekers to reach US borders.[i]

Yet extensive research shows that deterrence policies rarely discourage migration.[ii] Rather, they harm and endanger those whose circumstances at home are so dire that they risk their lives to flee at all costs. For some, these policies can make the journey in pursuit of safety more perilous than the initial threat that prompted them to flee.[iii] For example, a social services provider we interviewed for this report, Alicia,[5] shared the story of a former client, a young mother, who endured gender-based violence (GBV) both in her home country and during her journey to the US-Mexico border in search of safety. Rather than being welcomed with compassion, she encountered a closed border. Despite this, Alicia's client noted that she would endure the severe trauma of her journey all over again for the chance to secure a safe future for her son:

*"I saw an 18-year-old girl who...had experienced significant trauma...She was...sold to men in organized crime back in [her home country]. She made the journey [to the US-Mexico border] by herself with her two-year-old son...She was sexually assaulted several times during that journey... when you saw her, she was just like a shell of a person... And she ended up telling me, 'You know, I don't care. I would do it again...I mean, at least he would have a chance.' That really stuck with me because...they're fleeing violence and impossible situations, so we're the ones that need to do so much better."[6]*

Alicia's client's experience highlights in devasting detail the reality that deterrence policies do not stop migrants and asylum seekers from seeking refuge. It also illustrates the particular trauma and harm that survivors of GBV endure to seek asylum in the US.

---

2   Title 42 U.S.C. Section 265 of the 1944 Public Health and Service Act allows the US government to deny the entry of any individual who poses a danger of introducing communicable diseases into the US. It has been used since the beginning of the COVID-19 pandemic by the US government to exclude and expel migrants seeking asylum at US borders. See https://www.cdc.gov/quarantine/pdf/CDC-Order-Prohibiting-Introduction-of-Persons_Final_3-20-20_3-p.pdf.

3   Pursuant to Section 235(b)(2)(C) of the Immigration and Nationality Act, the US government has implemented the Migrant Protection Protocols (MPP) since 2019 in order to expel or return asylum seekers to Mexico for the duration of their immigration proceedings. The policy is referred to as the "Remain in Mexico" (RIM or RMX) policy by those seeking to highlight how the policy does not in fact offer "protection" to migrants.

4   In this report we refer to Migrant Protection Protocols (MPP) as Remain in Mexico (RMX). However, many of our interview respondents refer to it as "MPP."

5   All names of interviews respondents have been changed to maintain anonymity.

6   Interview 23, April 2022.

CLP_PC_024924



Scene inside the dormitories at the Agape Mission which currently serves as a migrant shelter. Tijuana, Baja California Norte, Mexico. Winter, 2022. Pease note that the data and analysis of this report do not include this shelter. ©*James Rodriguez/Oxfam America.*

US expulsion and other deterrence-driven policies also, as this report demonstrates, actively create conditions that foster GBV at the US southern border and harm and marginalize survivors during the asylum process. Our research uncovers how expulsions under Title 42, "returns" under RMX,[7] and asylum "turnbacks,"[8] including those under the now-defunct metering program, have led to increased exposure to bodily harm and psychological trauma for migrants at the border, including those who have already experienced GBV at home. Second, we find that the US government is directly responsible for causing harm to survivors. The very gatekeepers of the asylum process—US Customs and Border Protection (CBP) officials—routinely engage in conduct that perpetuates institutional harm against asylum seekers. And, for those survivors who manage to overcome these obstacles and apply for asylum in the US, we find that the

asylum application process itself obstructs survivors' access to protection and can re-traumatize them as they seek legal status and safety.

In sum, this report concludes that asylum deterrence measures increase migrants' risk of exposure to GBV at the US-Mexico border, and the lack of a more trauma-informed asylum process harms and disadvantages survivors. The US has a legal and moral obligation to protect the rights and respect the dignity of migrants. Deterrence policies directly conflict with US international human rights obligations and domestic laws[9] by blocking, rather than facilitating, access to the asylum process. Accordingly, the US must reject a deterrence-based framework and replace it with a trauma-informed, equitable, accountable, and service-oriented one for the benefit of all.

---

7  Under RMX, Customs and Border Protection (CBP) officers systematically prohibit asylum seekers from remaining in the US while their asylum claims are pending, instead returning them to Mexico to wait; this is referred to as "return."

8  A "turnback" occurs when US officials block or reject asylum seekers from making an asylum claim at a port of entry along the U.S.-Mexico border. For example, under the metering program, which was rescinded in 2021, turnbacks occurred when US CBP officers, would not accept asylum claims at the port of entry, and instead placed asylum seekers on a waitlist, forcing them to wait in a queue in Mexico to be able to apply. The metering program is only one example of how turnbacks may occur.

9  For example, the 1951 United Nations Convention Relating to the Status of Refugees, the 1967 Protocol, and the US Refugee Act of 1980.

CLP_PC_024925

# 2. OVERALL METHODOLOGY AND STUDY PARAMETERS

Oxfam America and the Tahirih Justice Center jointly produced this report. Our research draws on 30 semi-structured interviews and 34 surveys of social and legal service providers working directly with survivors of GBV on both sides of the US southern border. Research subjects were compensated for their participation.[10] Both the interviews and surveys were anonymized and conducted in English and Spanish; all names of providers found within this report are pseudonyms. The data were collected between January 2022 and May 2022 and apply to conditions at the border and shifts in US policies between 2018 and 2022. A potential limitation of interview and survey data is that they cannot quantitatively capture the total number of migrants who experience the types of harm that the report documents. However, the data do give an indication of the overall prevalence of such harm.

Our methods were grounded in feminist research principles;[11] in particular, with regard to our decision to interview providers who serve survivors rather than survivors themselves. This method minimizes the risks of re-traumatizing survivors during the research process, particularly in light of our limited ability to adequately provide care for them in the event of re-traumatization. In two instances, interviewees, who were paid staff of their organizations, were also migrants themselves, but they did not disclose whether they were survivors of GBV. Consistent with feminist research methodologies, we shared our draft report with a small pool of interview participants and provided an opportunity for them to comment on it. The report is available in Spanish and has been shared with all interview and survey participants who indicated they wanted a copy.

## 2.1 DEFINITIONS

For the purposes of our research, we define GBV as a pernicious and pervasive systemic human rights abuse inflicted because of one's gender identity, gender expression, sexual orientation, and/or sex assigned at birth.[12] There are various forms of GBV, including domestic and intimate partner violence, rape, sexual harm, forced female genital mutilation/cutting, forced intersex genital surgeries, forced marriage, forced sterilization, forced pregnancy, human trafficking, and other forms of physical, sexual, psychological, economic, or sociocultural violence often inflicted as punishment for violating gender norms.[13] Although GBV impacts individuals of all gender identities and sexual orientations, the findings in the report reflect the experiences of women, girls, and lesbian, gay, bisexual, transgender, queer, and intersex (LGBTQI+) individuals, and not cisgender heterosexual men and boys. We define the US-Mexico border as encompassing cities, ports of entry, immigration detention centers, public spaces, shelters, and encampments located within 100 miles of the US-Mexico border in either country. Throughout the report we use the term "migrant" to mean any individual who is travelling from their home country seeking entry into the US. These individuals may or may not intend to claim asylum in the US. We use the term "asylum seekers" when referring to individuals who are specifically seeking to claim asylum (or are currently doing so) in the US.

---

10  Participants in the study were compensated with Amazon (Mexico and US) and Visa gift cards.

11  We drew from the following resource: Oxfam Canada, "Feminist Monitoring, Evaluation, Accountability and Learning" (2021), https://www.oxfam.ca/wp-content/uploads/2020/06/Oxfam-Canada-Feminist-MEAL-Guidance-Note-English.pdf.

12 We base this definition on the one provided by United Nations High Commissioner for Refugees (UNHCR). See UNHCR, "Gender-Based Violence," https://www.unhcr.org/en-us/gender-based-violence.html.

13  This is not an exhaustive list and is based on some of the more prevalent types of GBV that are included in asylum cases.

CLP_PC_024926

## 2.2. INTERVIEW METHODOLOGY

Interview participants included service providers from 17 distinct nonprofit, nongovernmental organizations, 7 of which are based in Mexico, 7 of which operate in both the US and in Mexico, and 3 of which are based exclusively in the US. The 30 providers we interviewed include those who operate shelters and provide psychosocial support, medical services, humanitarian relief, legal assistance, and other social services. The majority work on the Mexican side of the border. Five participating social service organizations indicated that they specifically serve Black migrants, and 6 organizations indicated that they specifically serve LGBTQI+ migrants. Providers work in 15 cities along the border, which encompass towns in the US states of California and Texas and the Mexican states of Baja California, Coahuila, Nuevo Leon, and Tamaulipas.

All interviews but one were conducted by a research consultant fluent in both English and Spanish; the remaining interview was conducted in English by one of the authors. Prior to the start of the interviews, all participants signed informed consent forms detailing their right to: 1) terminate the interview at any time; 2) refuse to answer any question; 3) understand how the data would be used; and 4) review any full quotes that would be used in the study. All research protocols were reviewed by Oxfam America's Safeguarding officer. All interviews were conducted virtually, recorded with participants' written consent, and then transcribed. Interviews were generally 45 minutes to one hour in length. The transcriptions of the interviews were coded by hand and analyzed.

## 2.3. SURVEY METHODOLOGY

We conducted 34 online surveys to augment the interview data and findings. The survey was only open to providers who work with clients who have experienced GBV. We drew upon the initial interview findings to develop the survey questions in order to fill gaps in our research. Namely, given that our interviews were heavily focused on providers in Mexico, most could not speak to the experiences of asylum applicants. As a result, the survey sample includes a larger number of providers who work in the US, and the survey yielded additional data relating to the asylum process itself. Further, the survey sought to gather data on the prevalence of GBV at the border and the prevalence of the dynamics identified in the interview data.[14] That is, survey respondents were asked to rank on a scale of 1–5 (not at all, sometimes, about half the time, frequently, or very frequently) how common it is for their own clients to experience various forms of gendered harm and violence. This includes evaluating the likelihood of harm at the hands of particular types of perpetrators and at certain sites of violence as well as institutional harm in relation to experiences with US immigration officers and the asylum process. Respondents were asked to select rankings based on their direct personal knowledge of trends in their clients' experiences. As noted above, the survey responses were anonymized, and the survey was distributed through email listservs of providers who assist asylum seekers. We had to pause data collection for a few hours due to spamming from respondents not working with migrants. Responses from that time period are excluded from our analysis to ensure that it is not inadvertently based on false data. In the aftermath of the spamming incident, a new link that was password protected was shared over provider listservs, and an additional eight responses were recorded.

---

14 The broad categories of questions included: 1) prevalence of GBV among clients; 2) the forms of GBV that clients most frequently experience, including types of perpetrators and sites of violence; 3) experiences of GBV after expulsion from the US; 4) experiences with CBP officers; and 5) clients' experiences with applying for asylum.

CLP_PC_024927

# 3. US ASYLUM DETERRENCE POLICIES

The US has long imagined itself as a nation that welcomes refugees and immigrants, and as a model human rights champion for the rest of the world to emulate. Yet the US simultaneously implements policies deliberately designed to keep even the most vulnerable individuals out.[15]

The US's asylum deterrence policies contrast sharply with its long-standing commitment to upholding the right to asylum for refugees. By ratifying the 1967 Protocol to the 1951 United Nations Convention Relating to the Status of Refugees (the Refugee Convention), the US acceded to all of the critical provisions of the Convention[16] and passed the Refugee Act of 1980 to implement its obligations under it. By adopting the Convention's refugee definition, the Refugee Act creates the possibility of obtaining legal immigration status and a pathway to citizenship for individuals who cannot return to their home countries due to past persecution or a well-founded fear of future persecution based on race, religion, nationality, political opinion, and membership in a particular social group (PSG).[iv]

However, in both policy and practice, the US falls far short of its domestic and international legal obligations. In addition to forbidding turning away refugees,[17] the Convention prohibits penalizing individuals who enter a country irregularly to seek asylum.[18] It also bars discrimination based on race, religion, or country of origin.[19] Yet, despite these obligations, the US disproportionately incarcerates non-white migrants and asylum seekers as a means of deterrence.[20]

Modern US asylum deterrence policies have evolved out of the racialized efforts of the US government in the 1970s and 1980s to block Black, brown, and Indigenous[21] asylum seekers from entering the US; specifically, Haitians,[v] El Salvadorans, and Guatemalans.[vi] Following substantial non-white migration in the 1980s and early 1990s, the US discriminatory approach to asylum hardened into a broader strategy of deterrence through punitive measures. The 1996 Illegal Immigration Reform and Immigration Responsibility Act pushed more asylum seekers into adversarial immigration courts and established a one-year filing deadline for asylum, with limited exceptions. In 1994, the US Border Patrol expressly adopted "prevention

---

15   Two recent examples being Title 42 and the Remain in Mexico policy.

16   The 1967 Protocol Relating to the Status of Refugees (also known as the Refugee Protocol) incorporated articles 2–34 of the Convention (M. A. Sweeney, S. Shebaya, and D. K Collopy, "Detention as Deterrent: Denying Justice to Immigrants and Asylum Seekers," *Georgetown Immigration Law Journal* 36 [2021]: 292–323).

17   Article 33(1) of the Convention requires that "no Contracting State shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion."

18   Article 31 of the Convention provides that "the Contracting States shall not impose penalties, on account of their illegal entry or presence, on refugees who, coming directly from a territory where their life or freedom was threatened in the sense of article 1, enter or are present in their territory without authorization, provided they present themselves without delay to the authorities and show good cause for their illegal entry or presence

19   Congressional Research Service 2019, pg. 9; quoting US Department of Justice, Immigration and Naturalization Service Asylum Program, History of the United States INS Asylum Officer Corps and Sources of Authority for Asylum Adjudication, September 1999, which states that the Refugee Act intended "to establish a politically and geographically neutral adjudication for both asylum status and refugee status, a standard to be applied equally to all applicants regardless of country of origin."

20   For one example, see J. Loyd and A. Mountz, "The Caribbean Roots of U.S. Migration Policy," *NACLA Report on the Americas* 51:1 (2019): 78–84.

21   We use the term "Indigenous" to refer to individuals from Indigenous groups in Central and South America, who may not speak Spanish as their first language. However, we recognize that many migrants from Central and South America may not self-identify as Indigenous, but rather as part of specific ethnic groups that are marginalized in their country of origin.

CLP_PC_024928

through deterrence"[22] as a fundamental strategic objective, putting to paper a policy that had existed in practice for at least two decades. Further, in 2014, the Obama administration announced that it would increase detention of asylum-seeking families at the southern border, "to deter others from...illegally crossing into the United States."[vii]

The most recent examples of US asylum deterrence policies that are addressed in this report include Title 42 expulsions, implemented in March 2020; RMX, implemented in January 2019; and the metering program,[23] first implemented in 2016 and rescinded in 2021.[24, 25]

Fortunately, RMX was officially terminated in August 2022 pursuant to a court order.[26] Asylum seekers are no longer being enrolled in the program, and those who are already in it are gradually being disenrolled. Unfortunately, however, asylum seekers remain in danger because DHS requires them to wait until their next court appearance to disenroll, which could be weeks or months away.[27] In addition, ongoing litigation over RMX could force—or at least allow—DHS to begin re-enrolling people as soon as October 2022.

As for expulsions under Title 42, children are currently exempt, and families may not be expelled to a country where they fear persecution or torture. In practice, many families who do fear persecution are still being expelled though because DHS requires them to affirmatively volunteer such information when they first encounter a Border Patrol agent. Further, a May 20, 2022 court order requires the Administration to continue Title 42 expulsions unless it issues regulations ending the program following public comment. The administration has yet to begin that process. Expulsions under Title 42 therefore continue; as of July 2022, the total number of expulsions under this policy for fiscal year 2022 have already far exceeded all Title 42 expulsions for fiscal year 2021.

Title 42 expulsions, returns under RMX, and the prior implementation of metering all underscore how policies designed to deter asylum seeking are in effect used as a proxy for border control to limit overall immigration to the US.[viii, ix] As further evidence of the US's most recent efforts to limit immigration writ large, the refugee acceptance ceiling and actual refugee admissions were significantly slashed in fiscal year 2017. While the Biden administration set the ceiling for fiscal year 2022 at 125,000, which is much higher than in previous years, actual admissions continue to fall well below it. And, as noted above, the US has consistently used punitive measures across administrations to deter migration generally, such as minimal due process, incarceration of migrants, and location of detention centers in remote areas where access to counsel is scarce.

There have been racial disparities in the implementation of Title 42 expulsions: in early to mid-2022, a number of asylum seekers from Ukraine and Russia were granted entry into the US while the vast majority of Black, brown, and Indigenous asylum seekers were simultaneously denied entry.[x] Studies also document the disproportionate levels of violence that Black migrants face at the hands of US officials at the US border.[xi] By placing those most vulnerable to harm in Mexico, such as LGBTQI+ asylum seekers, the US's Title 42 expulsion policy leaves them at an even greater risk for violence.[xii] Moreover, recent studies have found that expulsions under Title 42 are associated with a significant number of kidnappings and violent attacks on migrants who have been expelled.[xiii] These reports uncover that the violence migrants face after expulsion includes sexual assault and attacks due to gender identity and/or expression. This report builds on these previous findings to examine how US policies impact GBV at the US-Mexico border and the ways in which US asylum deterrence policies impact those who have previously survived GBV.

---

22  See https://www.hsdl.org/?abstract&did=721845.

23  Metering was a process by which CBP officers stationed at the US-Mexico border placed a daily limit on the processing of asylum seekers by citing a supposed lack of capacity and thereby forced asylum seekers to stay in Mexico for months before beginning the asylum process. CBP began using metering in 2016, and it was expanded border-wide in the summer of 2018. CBP largely suspended the use of metering in 2020 and fully rescinded the policy in 2021. See https://crsreports.congress.gov/product/pdf/LSB/LSB10295.

24  Please see https://refugees.org/wp-content/uploads/2022/03/MPP-TimelineFinal.pdf for a detailed timeline.

25  Other changes in the second iteration of RMX include the requirements that 1) the US provide transportation for program enrollees from ports of entry to shelters; and that 2) a spot in a shelter for migrants is guaranteed.

26  https://time.com/6192726/supreme-court-remain-in-mexico/.

27  https://time.com/6208555/remain-in-mexico-mpp-program-unwind/.

# 4. FINDINGS

## 4.1. HIGH RISK OF EXPOSURE TO GBV AT THE US-MEXICO BORDER

US expulsions, returns, and turnbacks of asylum seekers have exponentially increased the volume of individuals regularly concentrated at the border at any given time. Ninety-two percent of survey respondents have clients who have been expelled under Title 42, while 86 percent have clients who were turned away from the border without being able to make an asylum claim.[28] One estimate suggests that in February 2020, approximately 15,000 people were waiting at the border to begin asylum processes, with some of these individuals already having waited multiple years.[xiv] A recent estimate from April 2022 indicated that between 30,000 to 60,000 migrants were waiting at the US-Mexico border.[xv]

Our data indicate that rates of GBV in border cities in Mexico—where most of our interview respondents work—are very high: respondents estimate that anywhere between 30 percent and 90 percent of their clients experience GBV there. And 75 percent of survey respondents indicate that their clients have faced kidnapping and/or extortion at the border either frequently or about half the time; 68 percent indicate that their clients have been raped and/or sexually assaulted frequently at the border.

While various factors can impact the risk of GBV in any setting, 87 percent of interview respondents (26 out of 30) note that by forcing vulnerable individuals to wait at the border indefinitely, US deterrence policies foster conditions that significantly increase the risk of exposure to GBV. They do so in three specific ways:

1) Border closures[29] and expulsions increasingly force migrants into precarious housing conditions such as severely overcrowded shelters; informal, ad hoc camp settlements; and homelessness. These conditions make migrants more vulnerable to various forms of GBV.

2) Cartels and other organized criminal networks can more easily target migrants for GBV when they wait for prolonged periods of time at the border, are routinely expelled from the US, lack employment opportunities, and also lack secure housing.

3) Waiting at the border in Mexico, rather than being able to access the asylum process within the US, increases the likelihood that persecutors from home whom asylum seekers are fleeing will find and harm them with impunity.

### 4.1.1. OVERCROWDING AND INSECURE LIVING CONDITIONS

As noted above, US policies have closed the border to the majority of asylum seekers for the past three years. As a result, they have had to wait en masse for permission to enter and/or apply for relief for extended periods without access to safe, sustainable housing. According to our survey participants, migrants frequently experience overcrowding in shelters and informal camps, or homelessness after enrollment in RMX or after expulsion from the US under Title 42. Many providers directly tie the existence of the camps and overcrowding at shelters to US policies:

---

28  As a reminder, any time an asylum seeker is denied or blocked from making an asylum claim, it is referred to as a turnback

29  In this section, and throughout the rest of the of the report, we use the term "border closure" to encompass policies that "return" and "turn back" migrants and asylum seekers attempting to enter the US.

CLP_PC_024930

*"[T]hese camps…shouldn't exist; people should be able to go to the port of entry and say, "I would like to apply for asylum," and the person should be allowed to enter the US and be put into immigration proceedings. That's how it's supposed to work. But because of these policies, like metering[30] and Title 42 and MPP,[31] instead people are forced to wait indefinitely in extraordinarily dangerous conditions in order to even have the most basic access to the US asylum system; [they] are forced to be homeless or to live in migrant shelters that are crowded."[32]*

Another respondent further argues that "if the immigration system worked the way it should work, there wouldn't even be shelters."[33]

Approximately 60 percent of interview respondents have clients who have experienced GBV within shelters themselves. Survey respondents, on average, note that their clients have faced GBV at camps, shelters, or public spaces due to homelessness about half the time. Women, girls, and LGBTQI+ individuals, our interviews highlight, are the most vulnerable to GBV in shelters and camps at the hands of other migrants staying there, persecutors from home, and/or members of organized criminal networks. As one respondent reflects:

*"In the case of women, and especially in the case of adolescents and girls, they experience sexual violence by people who are staying in the same shelter or in the same space in the same camp."[34]*

Because shelters are often overcrowded and under-resourced, staff are ill-equipped to ensure that they are safe spaces or to follow up on allegations of abuse. The crowded nature of the shelters, many respondents note, makes it easier for perpetrators of GBV to inflict violence unnoticed:

*"Sometimes there are people in the shelters that are abusers themselves. We've had many reports of children who have been sexually abused in migrant shelters because of the amount of people that are staying there. It can be hard for the people running the shelters to control that sort of thing, and then people are afraid to report it."[35]*

Furthermore, some respondents note that the rapid proliferation of shelters due to the increasing number of migrants waiting at the border has increased concerns about the lack of resources for the oversight of the individuals or organizations that are running them:

---

### Approximately 60 percent of interview respondents have clients who have experienced GBV within shelters.

*"[Shelters] have been overwhelmed in their capacity…[There is a] lack of training for those in charge of the shelters. Some of these [shelters] are born out of people's good will, but there is no preparation, no capacity, no security… which represents a risk in the face of the possible entry of organized crime into these spaces."[36]*

Migrants who cannot find accommodation in shelters may resort to living in informal camp settlements. Close to 30 percent of interview respondents share stories of clients living in camps who experienced GBV. Encampments pose distinct risks for GBV from those posed by shelters, given the additional lack of privacy and increased exposure to the environment and potential new or repeat abusers:

*"All the conditions are in place for gender-based violence to occur in these spaces…Women have to protect themselves from practically everything when they are in a camp…At least in shelters, there is a door that distinguishes one [space] from another one that [may] serve as a safeguard. But in a camp, they are outside; they are susceptible to anyone [entering to] violate them."[37]*

Cartels are also a significant threat for migrants in camps; respondents highlight that cartels often survey camps in order to target migrants:

*"And really, there are very few options for people at their tent camp. It's just…a place that was really dangerous, surveilled by cartels, where people had been kidnapped."[38]*

Additionally, some respondents note that some camps are effectively controlled by cartels, increasing the risk of GBV. Vulnerability to GBV is just as pronounced for those who live in abandoned or derelict buildings or on the streets. Survey respondents, on average, note that clients who have been sexually assaulted have been frequently assaulted in public spaces due to homelessness.

---

30   Although CBP formally rescinded the metering program in 2021, research participants were asked to reflect on the impacts of US immigration and asylum policies over the past five years, which encompassed a range of policies, including metering.

31   As a reminder, MPP refers to Remain in Mexico.

32   Interview 7, February 2022.

33   Interview 6, February 2022. Please note that the original language of the quote is Spanish.

34   Interview 20, March 2022.Please note that the original language of the quote is Spanish.

35   Interview 7, February 2022.

36   Interview 5, March 2022. Please note that the original language of the quote is Spanish.

37   Interview 12, February 2022. Please note that the original language of the quote is Spanish.

38   Interview 7, February 2022.

In these ways, overcrowding at the border exacerbates the risk of experiencing GBV. Although these conditions—namely, insecure housing and the violence it drives—exist in Mexico, US policies play a significant role in fueling them. In fact, migrants experiencing GBV as a result of unsafe housing conditions have had little recourse but to continue to wait in such conditions to gain access to asylum. For example, a provider shares how her client had sought an exemption to expulsion[39] under Title 42 because she had been raped in a shelter by the shelter's owners, only to be denied.[40] A number of providers note that most of their clients who experience sexual assault, rape, and/or harassment rarely report these experiences of violence, citing the apathy of officials in Mexico as the reason. Such experiences have normalized the idea that GBV is inevitable if one hopes to seek asylum. As our data show above, the expectation of experiencing GBV is intimately tied to US policies that expel and close the border to asylum seekers.

## 4.1.2 INCREASED EXPOSURE TO CARTELS

The violence that migrants experience at the hands of cartels has been well documented in previous studies.[xvi] Research conducted between 2018 and 2021 documents the high number of kidnappings of asylum seekers who were expelled under Title 42 or subjected to RMX.[xvii, xviii] Over 40 percent of our interview respondents likewise recount stories of clients targeted by cartels for GBV. In particular, survey respondents on average indicate that members of cartels and/or organized criminal networks are frequently the perpetrators of GBV upon their clients—specifically, sexual assault. To paraphrase an interview participant, the US government hands the cartels their victims because migrants at the border have no other way and are desperate.[41] We detail below how US expulsion and border closure policies make migrants sitting targets for violence by cartels and particularly GBV (kidnapping, trafficking, extortion, and sexual assault).

First, such policies create a large, at-risk population whose location, actions, and vulnerabilities are predictable. Survey respondents on average note that their clients have experienced kidnapping and/or sexual assault within 72 hours after being enrolled in RMX about half the time. Interview respondents note that cartels surveil ports of entry and other locations where migrants are known to be expelled or turned back in order to target them for violence. For example, one respondent, Ana, describes how cartels may easily target migrants returned under RMX:[42]

*"People [subject to the] MPP would be taken to court, and then they'd be released back into Mexico after their court date in the same place at the same time every day. And the cartels have observers all over the place, and so they started catching on to this pattern, and they would just kidnap people upon release out of US custody because those were folks that they thought were most likely to have someone in the US that they can extort for dollars."*[43]

A provision under the Biden administration's second RMX program required that the US transport enrolled individuals from ports of entry to shelters in Mexico and confirm that a shelter will accept them. While this may have helped thwart cartel surveillance of migrants' movements, many of our interview respondents note that their clients continued to be at high risk of violence by cartels because RMX processing was so lengthy. In fact, the provider above, Ana, notes that even under the second, revamped RMX program, many clients who were returned to Mexico or denied entry into the US remained "easy targets for cartels," particularly for sexual assault. For example, as described in the previous section, cartels often surveil informal encampments, increasing risks specifically for women and girls; further, our research indicates that shelters are sites of GBV. Another respondent describes how in 2022, RMX enrollees had to incur enormous costs to travel to the US for their asylum proceedings because renting a car kept them safer from the cartels than taking the bus.

Expulsions under Title 42 are also associated with repeated crossings: prior to Title 42 expulsions in March 2020, only about 7 percent of migrants crossed the border multiple times, which increased to around 27 percent in 2021.[xix] Repeated crossings increase migrants' exposure to violence by cartels and in turn increase the risk of expulsion itself. Asylum seekers in desperate need of safe haven are more likely to attempt to re-cross using more dangerous routes than during previously unsuccessful attempts to cross at ports of entry. Expulsions can be particularly risky for women,[44] especially when carried out in the middle of the night as one respondent, Tina,[45] notes:

*"CBP will expel women at 3 a.m. in one of the most dangerous cities in the world. So, they are completely unprotected. They don't know where they are, and our [US] government just dumps them in the middle of the night...The process of expulsion is really traumatic."*[46]

---

39  Under Title 42, asylum seekers can be granted permission to enter with consideration given to "significant law enforcement,  officer and public safety, humanitarian, and public health interests."
40  Interview 22, April 2022.
41  Interview 4, January 2022.
42  It is likely that Ana is referring here to the implementation of RMX under the Trump administration. However, we were unable to confirm this definitively.
43  Interview 13, February 2022.
44  We use the term "women" to denote all who identify as women.
45  All names have been changed.
46  Interview 22, April 2022.

CLP_PC_024932

## 58 percent of survey respondents note that their clients have frequently or very frequently faced violence because of their sexual orientation or non-cisgender identity while at the border.

Second, many migrants are unable to support themselves at the border because of limited economic opportunities. Migrants awaiting entry into the US often have to live in remote parts of border towns and cities, far from downtown areas where employment opportunities are more plentiful. Extended wait times because of exclusion from the asylum process increase asylum seekers' economic vulnerability as well as their desperation in needing to generate income. As another respondent explains, this often means that women who are in the process of searching for work, or who do have employment but who have to travel for work, face an even greater risk of violence from the cartels, such as sex trafficking:

*"In general, women who are trying to either find work or [who are]…commuting to and from their jobs, [are] exposed…to the risk of being followed. It is already known that in border cities, or at least in Ciudad Juarez, people know how to identify migrants and go after them for extortion, often to kidnap them in order to get what little money they have. They are…very clear targets for certain criminal groups in Mexico, many of which are dedicated exclusively to extorting migrants. And well, women are a more vulnerable target…And if we add to that the issue of sexual violence? I think this is a very big challenge for women: how to survive during the time it takes for the resolution of their [asylum] processes."[47]*

As the respondent states, prolonged wait times to apply for asylum at the border yield a dire economic reality, increasing the risk that women will be targeted by cartels. In addition, the longer they wait, the more isolated they are from any type of stable community, which makes women and LGBTQI+ individuals in particular even more vulnerable to violent crime. Tina, who spoke above about the dangers that expulsions pose, continues, by explaining:

*"[The] MPP is traumatic…It forces women to be unemployed… and vulnerable to organized crime and to just sort of be victims of random crime as well, because they're clearly migrants."*

Moreover, as another respondent notes, the extreme poverty that migrants face while waiting and trying to apply for asylum at the border is violence in and of itself:

*"I have hundreds of messages from women, from single mothers asking me for support for milk, for diapers…So that is violence, that is violence against the person."[48]*

As such, expulsion itself, and the insecure economic and housing conditions that expulsions and border closures engender, not only produce harm in and of themselves, but as discussed above, also increase the risk of migrants being targeted by cartels. News reports indicate that some cartels' primary criminal activities specifically involve extorting migrants.[xx] Our data, in particular, indicate that members of cartels are frequently the preparators of GBV, namely, sexual assault. Although cartel violence is widespread in certain border regions in Mexico, our data indicate that cartel violence against migrants does not occur in a vacuum; it is tied to the border conditions driven by US immigration and asylum deterrence policies.

---

47  Interview 12, February 2022. Please note that the original language of the quote is Spanish.
48  Interview 1, February 2022. Please note that the original language of the quote is Spanish.

**"it's almost like the border is used [as a] conduit for abusers."**

### 4.1.3 INCREASED EXPOSURE TO VIOLENCE FROM PERSECUTORS FROM HOME

Approximately 20 percent of interview respondents and 25 percent of survey respondents indicate that increased wait times at the border mean that women are frequently found and harmed by the persecutors from whom they initially fled in search of safety. As one respondent characterizes the border, "it's almost like the border is used [as a] conduit for abusers."[49] Interviews highlight that one of the consequences of border closure and the virtual elimination of asylum access is that a number of abusers are able to locate and re-traumatize survivors:

*"Well, the biggest barrier right now is Title 42, that people are not able to access the asylum system at all. This directly puts people's lives in danger. There are people whose... abusers have found them at the border, have continued to attack them physically [and] continue[d] to threaten them."[50]*

Several respondents have clients whose abusers found them in shelters or camp settlements as they waited to seek asylum in the US. As noted above and by other respondents, the existing network of shelters dedicated to survivors is under enormous strain and cannot adequately protect clients from abusers. Furthermore, interviews highlight that some women attempt to move from border city to border city to escape abusers, which makes them even more susceptible to violence as they travel. Relatedly, we find that GBV at the hands of partners or family members is common for migrants at the border: our survey respondents, on average, indicate that their clients have experienced GBV in the form of domestic, intimate partner, or other intrafamilial violence frequently. For these survivors, prolonged wait times at the border only further increase the risk of repeated violence by abusers that they have had to travel with.

### 4.1.4 COMPOUNDED RISKS FOR LGBTQI+ MIGRANTS

The risks of experiencing GBV, specifically due to insecure housing and exposure to violence at the hands of cartels at the border, are compounded for LGBTQI+ migrants.[51] LGBTQI+ migrants experience GBV at high rates at the border: 58

percent of survey respondents note that their clients have frequently or very frequently faced violence because of their sexual orientation or non-cisgender identity while at the border. One survey respondent notes that 100 percent of their LGBTQI+ clients have faced sexual violence. All of the providers we interviewed who work with LGBTQI+ migrants note that homophobia and transphobia are prevalent at the border. This environment, coupled with the protracted and uncertain nature of displacement at the border due to US immigration policies, increases the risk of violence for LBGTQI+ migrants.

The discrimination that LGBTQI+ migrants face also increases the difficulty of securing safe housing. Moreover, many interviews highlight the targeting of LGBTQI+ individuals within shelters:

*"We've seen a lot of attacks happening in shelters, especially where, you know, we've seen the attackers making comments like, "I'll teach you how to be a real woman" when they know that the person identifies as lesbian or queer. We've seen many, many trans women get beat up because of their gender identity, and it's extremely dangerous for them to be at the border."[52]*

Our interviews also highlight that transgender clients in particular are at risk for GBV at the border; approximately 65 percent of all interview respondents spoke of the risk of violence that their transgender clients face as they wait to make asylum claims. Interview respondents cite countless examples of transgender clients who are physically assaulted because of their gender identity and state that many are solicited for sex work. Interviews also highlight that LGBTQI+ migrants face many barriers to finding employment, which increases their vulnerability to GBV. Moreover, the interview data indicate that LGBTQI+ migrants face significant harassment by police in border towns in Mexico, further exacerbating their risk of experiencing violence. These factors—housing discrimination, risk of violence in camps and shelters, lack of employment opportunities, and harassment by the police owing to their gender identities and sexual orientations—compound the risks of violence as LGBTQI+ migrants wait to apply for asylum.

In addition, transgender migrants experience GBV as they interact with the US asylum and immigration systems. For example, respondents note that transgender migrants become targets for violence when held in US immigration detention centers together with populations that do not match their gender identities. One respondent further describes how transgender migrants are often placed in isolation because of their gender identity, which negatively affects their mental health:

---

49  Interview 10, March 2022.

50  Interview 7, February 2022.

51  Our data from interviews generally reflect on the experiences of gay, lesbian, queer, and transgender individuals; interviewees did not raise the experiences of non-binary or intersex clients.

52  Interview 7, February 2022.

CLP_PC_024934

*"Detention centers don't have any specific area for trans folks, and they're not very willing to house trans folks with men or with women. And so, they'll just put them in solitary, and they'll be in solitary for the whole time that they're in detention—[for] months at a time—not to mention [lack of] access to hormones [and other] medication."*[53]

As such, LGBTQI+ migrants not only experience significant risk of GBV while they wait at the border, but also once they have entered the US immigration system, as has been documented in other reports.

## 4.1.5 COMPOUNDED RISKS OF GBV FOR BLACK MIGRANTS

Similarly, anti-Blackness at the border can magnify the risks of GBV for Black migrants, particularly for women, girls, and non-cisgender individuals (in particular those from Haiti and West Africa) as they wait in Mexico for the opportunity to apply for asylum in the US. Providers who work with Black clients (approximately 30 percent of our interview respondents) note that Black women and girls are often heavily sexualized and suffer high rates of harassment as they are frequently solicited for sex work. One respondent recounted how the first words her client, a young Black woman, learned in Spanish were "How much?" because of how often men propositioned her for sex work.[54] This young woman's experience reflects the long history, rooted in colonialism, of the hypersexualization of Black women across a variety of different countries.[xii]

Many respondents also note that non-Spanish- and non-English-speaking Black migrants face significant barriers to accessing employment and services, from housing to food to translation. Interview respondents note that the isolation posed by language and cultural barriers can cause harm, particularly for Black women travelling with their persecutors, because they have such limited access to the support they need in order to escape. One provider recalls how a former client from Haiti who was travelling with her abuser was unable to leave him due primarily to language and cultural barriers:

*"I had one very memorable case of a woman who was in an abusive relationship she was trying to flee from. Because she was stuck in Tijuana and not able to cross, [her abuser] had confiscated her passport and all of her documents. It was very clear that he was able to kind of control her in a way that was unique to her vulnerability, that was a product of the geographic situation of her being stuck in Tijuana and reliant on a limited Haitian-[Creole]-speaking community there."*[55]

The risks of GBV for many Black migrants are also compounded because of discrimination in housing and targeting by cartels, similar to the experience of LGBTQI+ migrants. Our data find that Black migrants face significant difficulty securing housing free of harassment and discrimination. Black clients, many providers note, are also easier targets for cartels due to their racial identity and/or skin color. A provider gave the example of one of his clients, a Garifuna woman, who, after being kidnapped and raped by cartel members, lives in added fear because she knows that her skin color makes her status as a migrant more conspicuous. As a result of her experiences at the border as a Black woman, she felt that she had no choice but to have her daughter try to cross into the US without her while she continues to wait for a chance to apply for asylum.

Interviews also highlight that the safety risks for Black migrants posed by insecure housing and cartels are compounded by discrimination at the hands of the Mexican police. Lana, a service provider, shares the particularly harrowing experience of one her clients that underscores the intersectional vulnerability of being Black and bisexual at the border:

*"He was walking on the street in Tijuana one day and some men drove up in a car and asked him, 'Are you looking for work? Are you Haitian?' And he said, 'Yes.' They took him in the car, put a gun to his head, and kidnapped him, taking him to a compound where there were about 10 people in the building. They told him, 'You are going to become a prostitute. This is your job.' They forced him to have sex with all 10 of the people in the house. He was kidnapped and kept in this house for months, where he was forced to have sex with both men and women. He is bisexual, which made him a lot more vulnerable. He was finally able to escape. But he didn't file a police report because he was told that if he filed a police report, the same cartel that kidnapped him would find him because the police worked with the cartel…He had absolutely no access to justice. And now he is just living every single day in fear. He told us that when he is walking down the street in Tijuana and a car slows down, he just sprints because he is afraid of getting kidnapped again."*[56]

---

**"We've seen many, many trans women get beat up because of their gender identity, and it's extremely dangerous for them to be at the border."**

---

53   Interview 13, February 2022

54   Interview 11, February 2022.

55   Interview 28, March 2022.

56   Interview 24, February 2022.

CLP_PC_024935

It is important to understand the violence perpetrated upon Lana's client as the intersection of anti-Blackness and the inhumane conditions at the border exacerbated by US policies. As this report argues, the prevalence of cartels targeting migrants must be understood as a byproduct of US policies that have created a large population of vulnerable migrants, such as the client above, for the cartels to target.

Further, respondents note that Black migrants have an even harder time accessing asylum and are often treated differently than other migrants by US immigration officials. Previous studies also document the violence that Black migrants face at the hands of US immigration officials both at the border[xxiii]—a recent example being the treatment of Haitian migrants in Del Rio, Texas in 2021[xxiv]—and within the immigration system at large.[xxv] In one example, a respondent notes that immigration officials routinely ask for additional identification and documentation from Black migrants as compared to non-Black migrants:

*"I would take people to the border to present to the volunteer who would be registering people to be, you know, part of the waitlist [for metering]...They would routinely, for Black migrants, ask for two forms of identification, whereas with, you know, migrants who are from Central America and not Black...they would just ask for one form of identification."[57]*

By disproportionately expelling or returning Black migrants to Mexico, US policies place them at further risk of GBV at the border—a risk that is then compounded by the significant anti-Black discrimination that they face there.

## 4.2. THE US ASYLUM PROCESS IS COMPLICIT IN MARGINALIZING AND HARMING SURVIVORS OF GBV

Just as US border policies create conditions that increase the risk of GBV for migrants at the US-Mexico border, our research finds that the actual US asylum process is hostile rather than compassionate towards those survivors of GBV who are ultimately able to surmount the obstacles to accessing it. The harm that GBV survivors experience within the US asylum system is indicative of broader harm that US asylum processes engender; providers we spoke to characterize the US asylum system as devoid of "empathy" and as a producer of institutional harm.

In particular, many respondents note that US immigration institutions are not responsive to the specific concerns of women and LGBTQI+ migrants, producing institutional gender-based harm. As another provider sums it up, the US system should be one where "women are heard, [and] where children are listened to and cared for"[58] as a step toward making it more humane. A painful example, shared by a provider recalling a client who had been detained by CBP[59] at the border, highlights the ways in which US officials ignore women's needs. This client, a young woman, was forced by CBP to spend over 72 hours in a cell without access to sanitary items she needed for menstruation while being harassed by a CBP officer:

*"She was held in a holding cell that you're not supposed to be in for more than 72 hours, like right at the border, but she was there for...maybe five days...She was held for significantly longer than she was supposed to be and was only allowed to be in her underwear. She was on her period and was given no menstrual sanitary items—pads, tampons or anything...[She was] forced to sit there cold in her underwear with this one officer that she said she felt like had it out for her...[he would] say really mean things to her and not let her sleep and make her get her little kid up who's only five."[60]*

The harrowing experience of this client is indicative of a system that regularly violates the dignity and safety of asylum seekers, often marginalizing women as well as LGBTQI+ migrants. These violations, as our research demonstrates, produce institutional harm for survivors of GBV seeking asylum in the US. As further described below, survivors frequently face an adversarial system through the intimidation, harassment, and in some cases violent conduct of US immigration officials, as well as through the mechanics of an asylum application process that is woefully and glaringly trauma uninformed.

> **"[Survivors are] telling their stories of... rape and sexual assault, and the [Border Patrol] officers are just grilling them about minor inconsistencies..."**

---

57   Interview 28, March 2022.
58   Interview 1, February 2022. Please note that the original language of the quote is Spanish.
59   See footnote 1.
60   Interview 13, February 2022.

CLP_PC_024936

## 4.2.1. THE ROLE OF US CBP OFFICERS IN DISMISSING, DETERRING, AND HARMING SURVIVORS

A well-established fact about the US asylum system is the arbitrary nature of whether one is granted relief.[xxvi] Our interviews and a number of other studies[xxvii] describe how success often depends on one's port of entry and the jurisdiction where one's asylum case is heard. CBP officers, as gatekeepers to the US asylum process, also hold tremendous discretion in deciding the fate of asylum seekers. Our interview data show how this is particularly problematic and pronounced for survivors of GBV. While survivors at the border must first inform CBP officials that they wish to apply for asylum in order to do so, engaging with CBP can itself re-traumatize them and set them up for failure. Providers also note that CBP officers often decide whether to grant or deny humanitarian parole[61] requests with little explanation or pattern:

*"We really don't understand why CBP approves some people for humanitarian parole and denies others. We have so many clients who are living in such vulnerable conditions and are really living in life-or-death situations, and CBP has rejected their humanitarian parole applications. One of the first cases that I personally worked on was a Haitian man who was HIV-positive with very severe mental health issues. He was experiencing suicidal ideation while living in the Chaparral refugee camp, and his humanitarian parole case was denied."[62]*

Moreover, consistent with the goal of deterrence itself, the behavior of CBP officers toward asylum seekers is often demeaning; a number of respondents recount instances where they ignored or belittled survivors:

*"Yeah, I mean, we've had people who are victims of gender-based violence in Mexico, go to the port of entry and ask immigration officials if they could apply for asylum...[In some cases] immigration officials responded by laughing at the person. I've seen this personally in multiple cases."[63]*

Such behavior by CBP officers not only leaves survivors feeling degraded, but contrary to the dictates of the Refugee Convention, it can also discourage survivors from asking for asylum at all, even upon arriving at the border:

*"She wanted to tell the officer, 'I want to seek asylum. I'm afraid to return to my country.' But the officer made it impossible for her to say that; he did not allow her [to speak], shut her down every single moment and said, 'I am talking, you need to listen to me.'"[64]*

Such behavior also underscores how asylum seekers interact with officers who are not trained to engage with them as survivors of trauma. Alarmingly, there is copious evidence that DHS enforcement agents, including CBP officers, are perpetrators of gender-based violence themselves, including allegations of domestic abuse and sexual harassment of colleagues.[xxviii] Reports also suggest a widespread lack of accountability for abuse perpetuated by CBP officers, including significant bodily harm inflicted upon migrants.[xxix] Relatedly, the use of CBP officers to regulate the entry of asylum seekers poses additional challenges for survivors who have been abused by military, police, or paramilitary forces. For example, one interview respondent describes how a client from Cameroon who had been assaulted by military police could not bring herself to interact with border patrol as a result.

These and countless other examples from previous reports[xxx] illustrate how US policies driven by deterrence both reflect and influence the conduct of CBP officials. In DHS's 2020–2024 fiscal year plans, one of the only references to asylum is a note that the US immigration system remains "vulnerable to fraudulent claims for asylum and refugee status."[xxxi] This focus on deterrence and fraud prevention comes at the cost of protecting vulnerable asylum seekers and affording them basic due process:[65]

*"They [CBP] make it abundantly clear that their job is keeping people out and not to actually do anything to monitor the safety or the well-being of people that are in the border region."[66]*

While the adversarial approach taken by CBP does not deter migration, this approach violates the Refugee Convention by reducing the chances that survivors who have already risked their lives to flee will even begin the asylum application process: 65 percent of survey respondents indicate that their clients have been expelled or turned back frequently or very frequently from the US because CBP officials have not followed required procedures, e.g., allowing asylum seekers to apply for asylum if they indicate a desire to do so. Survey respondents, on average, also indicate that about half the time their clients have not applied for asylum because of intimidation or discouragement by US immigration officials at the border. Providers note that CBP officers are generally unaware of asylum law and proceedings:

*"CBP specifically doesn't really understand asylum law, and so they often don't understand how to place people in proper proceedings. I think that that's also a failure of our system of not having any oversight of CBP...There needs to be a lot more oversight of CBP and training."[67]*

---

61  Humanitarian parole allows an individual to remain in the US temporarily for urgent humanitarian reasons, or to confer a significant public benefit. See https://www.uscis.gov/forms/explore-my-options/humanitarian-parole.

62  Interview 24, February 2022.

63  Interview 7, February 2022

64  Interview 25, February 2022.

65  Recent news reports suggest that border patrol officers may be discarding documents, including passports and birth certificates of migrants that they interact with, which could negatively impact any potential asylum claims. See M. del Bosque, ",," *The Guardian*, May 8, 2022.

66  Interview 29, February 2022.

67  Interview 30, April 2022.

CLP_PC_024937

The lack of trauma-informed training and accountability for the very gatekeepers to the asylum system serves in effect as yet another form of deterrence for survivors—this time, at the back end of their flight from persecution.[68]

## 4.2.2. TRAUMA, GBV, AND THE ASYLUM APPLICATION PROCESS

The United Nations High Commissioner for Refugees (UNHCR), in its "Handbook on the Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees," calls upon states to implement asylum procedures that consider the trauma, fear, and dispossession that many refugees face. It asks states to provide translators and other services and to ensure that refugees interact with state officials who understand human rights commitments. The UNHCR's handbook also acknowledges that asylum seekers may not have access to documentary proof for their claims, and as such it should be the responsibility of the government agent to either try to gather the necessary proof or to ascertain by other means the validity of asylum seekers' claims. In short, asylum seekers are to be given the benefit of the doubt.[69]

The US asylum system, by contrast, takes an inappropriately adversarial approach to asylum seekers. This is particularly evident in how the impacts of trauma are given little-to-no consideration when CBP officials encounter survivors or other officials are required to evaluate their credibility. Over 60 percent of interview respondents observed manifestations of post-traumatic stress disorder in the demeanor and/or conduct of their clients who are GBV survivors. Interview respondents note that as a result of trauma, survivors may need to participate in multiple interviews, and need sufficient time, before they are able to share their stories:

*"Because of the trauma and the shame that is associated with gender-based violence, [clients] are reluctant to admit what's happened to them…A client…who had been raped in Honduras where she was from was so afraid that she didn't*

*want to tell anyone, including the Border Patrol officers that interviewed her…it took many, many hours' worth of interviewing before she felt comfortable enough to talk to us about it as well."[70]*

Due to both acute and/or prolonged trauma, a survivor of GBV may be unable to articulate their need for asylum on the spot in a way that is acceptable to CBP.[71] Their statements may then be taken out of context and unfairly used to discredit them if they try to ask for asylum again in the future.

Our interviews highlight how critical it is for survivors of trauma to receive specialized mental health services to help them process and ultimately articulate what has happened to them, as required in order to fill out the asylum application and orally present their cases in interviews with US asylum officers and during adversarial court proceedings. Many also struggle to build a legal narrative that the US asylum system deems credible because of how trauma impacts memory and compromises one's ability to recall and recount details in a linear, chronological manner.[72] Approximately 60 percent of our interview respondents note that their clients who are survivors of GBV have difficulty gathering evidence and creating coherent timelines to fit inappropriately narrow credibility standards. Interviews highlight that when hearing testimony from survivors, asylum officials may seize upon small discrepancies in details or timelines that, in light of trauma, may have no actual bearing on credibility. As one provider who works with minors explains:

*"The level of trauma [for survivors] is very high because they're telling their stories of gender-based violence, often rape and sexual assault, and the officers are just grilling them about minor inconsistencies…But we see that over and over again with both immigration judges [and] asylum officers who act like our clients are lying or kind of start from a place where they doubt their credibility."[73]*

---

68   See *Zubeda v. Ashcroft*, 333 F.3d 463, 476 (3d. Cir. 2003) (vacating a Board of Immigration Appeals decision based in part on inconsistencies between the asylum testimony and the credible fear interview): "Numerous factors that might make it difficult for an [individual] to articulate his/her circumstances with the degree of consistency one might expect from someone who is neither burdened with the language difficulties, nor haunted by the traumatic memories, that may hamper communication between a government agent in an asylum interview and an asylum seeker."

69   See https://www.unhcr.org/4d93528a9.pdf, in particular Sections 195–205.

70   Interview 7, February 2022.

71   Simply recounting sexual abuse can be traumatic, because in doing so, the victim must "relive the crime mentally and emotionally, leading some to feel as though the sexual assault is recurring." See M. Garvin et al., "Allowing Adult Sexual Assault Victims to Testify at Trial via Live Video Technology" (National Crime Victim Law Institute, Violence Against Women Bulletin at 1–2, September 2011).

72   See J. Chaudhary, "Memory and Its Implications for Asylum Decisions," *Journal of Health & Biomedical Law* 37 (2010): 44–45. Victims of repeated physical or sexual abuse may confuse details of particular incidents such as time or dates of particular assaults. Singh v. Gonzales, 403 F.3d 1081, 1091 (9th Cir. 2005) (citing D. Davis and W. C. Follette, "Foibles of Witness Memory for Traumatic/High Profile Events," *Journal of Air Law and Commerce* 66, no. 4, article 6 [2001]: 1421–1549): see also, e.g., *Fiadjoe v. Att'y Gen.*, 411 F.3d 135, 154 (3d Cir. 2005) ("Trauma … may have a significant impact on the ability to present testimony."). See also, e.g., Dept. of Health and Human Services, SAMSA, "A Treatment Protocol: Trauma-Informed Care in Behavioral Health Services," 61–62 [2014] (common effects of trauma include "exhaustion, confusion, sadness, anxiety, agitation, numbness, dissociation, confusion, physical arousal, and blunted affect"):136 id. at 69 (noting that signs of dissociation include fixed or "glazed" eyes, sudden flattening of affect, long periods of silence, monotone, responses that are not congruent with the present context or situation).

73   Interview 30, April 2022.

CLP_PC_024938

Another example of how trauma impacts credibility for survivors of GBV is the fact that, according to a number of interviewees, many survivors choose not to report violence to their local authorities. Survivors may fear humiliation by police and retaliation from their abusers if they find out. In societies where police routinely ignore such reports, there is little incentive for survivors to come forward and risk the wrath of an enraged abuser determined to inflict punishment.[xxxii] Yet survivors' failure to report violence is often used to discredit them. Lack of reporting, as our interview respondents note, also makes it very difficult for survivors to prove a basic element of asylum: a failure of state protection.[xxxiii]

The process of establishing credibility is also often racialized within the US asylum system. A respondent recalls a case in which a judge did not a believe a Black woman because he felt that her demeanor as a survivor of GBV was different from other, non-Black survivors.[74] For Indigenous clients, language barriers compound challenges to building convincing narratives. Interviewees note that many clients from Central and South America who do not speak Spanish have a hard time accessing appropriate interpreters. The lack of adequate translation services can lead to gaps or inconsistencies in clients' statements during the initial asylum screening process, which can then be used against them during court proceedings.

Given the discretionary power that judges hold in adjudicating asylum cases[xxxiv] and the inadequacy of training on trauma-informed practices, survivors can face significant re-traumatization within the courtroom. This is particularly the case when they lack legal counsel. One interviewee recalls how her client, a young mother from Central America, was derided by the immigration judge for bringing her crying child to the courtroom. The interviewee notes that this left her client unable to effectively share her story with the judge. And for survivors who identify as women, encountering cisgender male officials throughout the asylum process can often create barriers to sharing their stories:

> "She wanted to tell the officer, 'I want to seek asylum. I'm afraid to return to my country.' But the officer made it impossible for her to say that; he did not allow her [to speak], shut her down every single moment."

*"Women who are historically accustomed to being persecuted by men are obviously going to have a very difficult time telling their story, revealing the most important issues that have been traumatic for them to a male judge and to be grilled by a male trial attorney...[The asylum] structure tends to still be very male dominated, which intuitively creates an environment that makes women feel uncomfortable and unsafe."[75]*

In these ways, the US's adversarial asylum system does not account for how trauma impacts asylum seekers—and particularly survivors of GBV—and puts them at a distinct disadvantage at every step of the process.

---

74  Interview 22, April 2022.
75  Interview 22, April 2022.

## 4.2.3 THE US LEGAL FRAMEWORK FOR ASYLUM INHERENTLY DISADVANTAGES SURVIVORS OF GBV

The difficulties survivors face in meaningfully accessing the US asylum system are further exacerbated by the asylum legal framework itself. To win asylum, claimants must prove past persecution or fear of future persecution on account of one or more of the following five categories: race, religion, nationality, membership in a PSG, and/or political opinion. Sex, gender, or GBV are not explicitly named as a basis for asylum. This framework is reflected in the questions claimants are required to answer on the asylum application. Likewise, the questions make no mention of gender-based persecution, and—more importantly—the specific types of harm that this term signifies.  This can create an additional burden on survivors to understand asylum law and how their experience of GBV can be a ground of asylum.  In fact, 62 percent of survey respondents note that their clients who are GBV survivors frequently or very frequently do not apply for asylum because of a lack of familiarity with the complexities of US asylum law and procedures.

On average, respondents in our survey state that survivors frequently have not applied for asylum because of the difficulty of building a narrative—including around GBV—that is responsive to the application questions as currently worded. Of the providers who assist survivors with their applications, many note the difficulty of describing GBV as the basis of the claim. Some providers advise clients to make it a secondary basis because they fear GBV alone will not be enough. Most disturbing—but not surprising—is that our interviewees report that many survivors do not even classify the harm that they have survived as violence at all. Rather, they note that survivors understand their experiences of GBV such as rape and attempted femicide or torture as simply a "normal" part of their lives.[76]

Asylum claims based on GBV are often brought under the PSG ground,  yet interviewees also note the extreme challenge of explaining to judges that survivors can be members of a cognizable PSG. Providers with experience working with clients on asylum cases note that judges can be highly skeptical of the PSG survivors assert. One interviewee shares an example of a specific PSG that a survivor of domestic violence asserted membership in: "women who cannot leave their marriage." The judge found that the abuser was not motivated to abuse

"Sixty-two percent of survey respondents note that their clients who are GBV survivors frequently or very frequently do not apply for asylum because of a lack of familiarity with the complexities of US asylum law...."

the applicant because of her membership in this PSG, but rather that he would indiscriminately abuse all women. The interviewee explains that judges often reject this PSG as too broad when an abuser has a history of abusing other partners. At the same time, this provider notes that judges often see GBV as a personal dispute that happens within the home, and as such, it is not the US's problem to fix. In these cases, a gender-based PSG might be considered too narrow. As a result, this provider notes that women who are political dissidents or former election officials are much likelier to succeed when they bring claims on this basis than those who bring claims on the basis of membership in a gender-based PSG.

By omitting explicit mention of gender, the US asylum framework both reflects and perpetuates a long-standing, culturally entrenched devaluation of women, girls, and non-cisgender individuals among both adjudicators and survivors alike.

Finally, in light of the above, survivors face tremendous obstacles to navigating the asylum process if they do not have legal representation and mental health services. Yet the US does not fund counsel for asylum seekers, and low-cost, or pro bono, legal access is quite limited: 59 percent of survey respondents note that their clients who are survivors of GBV have not applied for asylum frequently or very frequently because of a lack of legal representation. Most survivors need highly specialized, expert legal assistance to develop a compelling gender-based asylum case within a system that does not explicitly name gender as a basis for asylum. In this way, the system they encounter itself reduces their chances of gaining asylum in the US.

---

76   For example, in 2022, a Tahirih client who survived repeated sexual assaults was denied permission to apply for asylum at the US border because she told a Border Patrol officer that she came to the US in search of a better life for her son. She did not know to specify that a better life meant a life free of persecution.

CLP_PC_024940

# 5. POLICY RECOMMENDATIONS AND CONCLUSION

In the US, opposing visions of immigration exist. In one, the US is a land of immigrants and one that welcomes asylum seekers. The other argues for an ethnonationalist state that must protect itself from the "threat" of migrants. Since its inception, US immigration policy has aimed to keep out certain groups of immigrants based mostly on racial identity.  At the same time, the ethnonationalist view of the US has arguably become more mainstream and strident in the past few decades. This report documents the human toll of such a vision, and specifically how it harms women, girls, and LGBTQI+ individuals.

Our findings show how US asylum deterrence policies, as well as the US asylum legal framework and process itself, are complicit in harming and marginalizing survivors of GBV and those most vulnerable to it. These policies normalize GBV as an inevitable consequence of pursuing safe haven in the US. Although our research highlights GBV that occurs in Mexico, our data demonstrate that US policies integrally influence its nature and scope.

First, our data show how policies such as expulsions under Title 42, returns under RMX, and turnbacks contribute to conditions that foster various forms of GBV at the US-Mexico border such as rape, human trafficking, sexual assault, psychological trauma, kidnapping, and other abuses in the following ways:

1)  Expulsions and border closures increasingly force migrants into precarious housing conditions. This increases their vulnerability to violence and harassment because of sex, gender identity and expression, sexual orientation, and racial or ethnic identity.

2)  Cartels and other organized criminal networks can more easily target migrants for GBV when they wait for prolonged periods of time at the border, are routinely expelled from the US, lack employment opportunities, and also lack secure housing.

3)  Prolonged wait times at the border in conjunction with insecure housing make it much easier for perpetrators of GBV to locate and re-harm survivors who have tried to flee persecution at home such as domestic violence and related abuse.

The risks of suffering GBV at the US border are magnified for Black migrants who are disproportionately impacted by hostile US policies and consequently face further anti-Black discrimination and violence at the border.

Second, our report details the ways in which the US asylum system and application process itself can re-traumatize survivors of GBV and impair their ability to fully and fairly present their claims. US Border Patrol officers—as the gatekeepers of the asylum process—routinely engage in abusive and even violent conduct toward survivors in certain cases. We also find that the US asylum legal framework itself denies equal access to protection for survivors by failing to explicitly name gender as a ground of asylum.

To rectify these harms, the US must implement a vastly different system than the one it currently employs. It must be one that is humane and that actively centers the legal rights and dignity of asylum seekers and migrants, rather than one that harms them. This new approach requires a significant normative shift in US politics and public discourse.

CLP_PC_024941

There are, however, concrete steps that the US government can take at the executive and congressional levels to begin to realize such a transformation and to mitigate the harm that current US policies engender. To that end, we urge the US government to take the following actions:

### 1. Abandon the deterrence-based immigration and asylum paradigm.

Extensive research shows that deterrence policies do not actually work to deter migration[xxxix] and needlessly harm migrants and asylum seekers instead, in clear violation of US human rights obligations. To restore compliance, and promote a system that respects the dignity of all migrants, the Biden administration must:

- **Cease the use of policies that require asylum seekers to wait in Mexico before or while applying for relief.** Examples past and present include the metering program, the Migrant Protection Protocols/Remain in Mexico,[77] and expulsions under Title 42.  Specifically, the administration should immediately:

  promulgate regulations terminating the Title 42 expulsions policy consistent with State of Louisiana et al. v. Centers for Disease Control and Prevention, et al.[78] In the interim, consistent with Huisha-Huisha v. Mayorkas[79, 80]  as well as the Immigration and Nationality Act of 1965, DHS should also require all Border Patrol officials to affirmatively ask all migrant families and individuals they encounter in the US who have entered without inspection if they have a fear of return and would like to apply for asylum;

  permit remaining RMX enrollees to disenroll from the program at any US port of entry.

- **Cease the use of new or other existing immigration and asylum deterrence policies.** While ending border closure and expulsion policies is a critical first step toward promoting a more humane asylum system and restoring compliance with US human rights obligations, these policies must not be replaced with new deterrence policies. The US should also abandon use of other policies that harm rather than protect asylum seekers such as detention and prosecution for irregular entry. It is well known that detention produces significant psychological and physical harm.[81] It adversely impacts LGBTQI+ individuals in particular; many experience harassment while in detention because of their sexual orientation and/or gender identities. And transgender individuals who are placed in isolation or with populations that do not match their gender identities face further threats to their physical and mental wellbeing.[xl]

**Our findings show how US asylum deterrence policies, as well as the US asylum legal framework and process itself, are complicit in harming and marginalizing survivors of GBV and those most vulnerable to it. These policies normalize GBV as an inevitable consequence of pursuing safe haven in the US.**

The US Congress should also pass legislation such as the Refugee Protection Act, which would expressly prohibit expulsions and turnbacks of asylum seekers.[82]

### 2. Invest in an asylum-seeker-centered model of service provision.

Legislation establishing and funding "Welcome Centers" for asylum seekers at the border is one potential new pathway toward creating a more humane and service-oriented system that rejects a deterrence-based approach. We propose that at these centers, asylum seekers would receive Know Your Rights information translated into their native languages. They would further receive assistance accessing government-funded and/or other legal counsel, social services, medical, employment, mental health, cultural orientation, transportation, housing, and other auxiliary services as potentially complemented by the DHS Case Management Pilot Program (CMPP).[xli]

We envision that Welcome Center personnel would have experience in trauma-informed, survivor-centered service delivery as defined in recommendation  3 below. Personnel would receive regular, in-person training anchored in compassion, respect, and the fundamental premise that pursuing asylum is a legal right under the Immigration and Nationality Act. Both training curricula and resources provided to asylum seekers would be developed collaboratively with outside experts—including survivors of trauma and practitioners who serve them. Independent monitors would have unrestricted access to Welcome Centers, and personnel performance evaluations would include detailed assessments of compliance with trauma-informed, survivor-centered practices.

---

77  See http://justiceactioncenter.org/wp-content/uploads/2022/08/certified-judgment-RMX.pdf.

78  For an overview see Law360, "*Louisiana et al. v. Centers for Disease Control and Prevention* et al.," https://www.law360.com/cases/624af481d47fb101112b48db/articles.

79  For an overview see ACLU, "*Huisha-Huisha v. Mayorkas*" (2022), https://www.aclu.org/cases/huisha-huisha-v-mayorkas.

80  Oxfam America is a plaintiff in this suit.

81  See for example the following article on the impact of detention on the health of asylum seekers: E. K. Singer, K. Molyneux, K. Kaur, N. Kona, G. S. Malave, and K. A. Baranowski, "The Impact of Immigration Detention on the Health of Asylum Seekers during the COVID-19 Pandemic," SSM - *Qualitative Research in Health* 2 (2022).

82  See Section 135.

CLP_PC_024942

### 3. Fully and meaningfully implement trauma-informed, survivor-centered policies and practices within all US Department of Homeland Security (DHS), Department of Justice (DOJ), and Department of State (DOS) components that interface with migrants and asylum seekers.

Policies should be anchored in compassion, respect, and the fundamental premise that pursuing asylum is a legal right under the Immigration and Nationality Act. According to DOJ, a trauma-informed approach "emphasizes creating services and programs that are sensitive and directly responsive to the trauma that many survivors experience after a violent crime. Trauma-informed care programs identify and limit potential triggers to reduce their re-traumatization and protect their mental and emotional health..."[xiii] DOJ defines a victim/survivor-centered[83] approach as: "[T]he systematic focus on the needs and concerns of a victim to ensure the compassionate and sensitive delivery of services in a nonjudgmental manner...[It] seeks to minimize re-traumatization...by providing the support of victim advocates and service providers."[84]

Trauma-informed and survivor-centered policies that the Biden administration should adopt include:

- **allowing survivors sufficient time to process trauma and access counsel and mental health services before requiring them to present their asylum claims.** Policies that impose accelerated adjudication times for all asylum claims[85] should be rejected;

- **applying credibility standards generously, consistent with UNHCR guidelines on women's refugee status determinations[86] and best practices developed by trauma experts that recognize how trauma impacts the demeanor of survivors and their ability to recount chronological timelines and traumatic details.** For example, during asylum interviews, survivors must be informed of their right to pursue asylum as a principal applicant and not merely as a derivative of their husband or parent. Accurate, culturally competent translation must also be viewed as essential to the adjudication process, and survivors should be permitted to choose the gender of their adjudicator and interpreter.

Comprehensive, up-to-date, ongoing in-person training on policies should be mandatory for all agency personnel. Training curricula should be developed and presented collaboratively with outside experts, including survivors of GBV and practitioners who serve them. Topics should include trauma, gender-based violence, racial discrimination, exploitation of children, and discrimination against LGBTQI+ individuals.

To help ensure that the US Border Patrol in particular complies with trauma-informed and survivor-centered policies:

- **the Biden administration should promulgate regulations requiring that US Border Patrol personnel performance evaluations include detailed, ongoing assessments of compliance and that awarding of annual bonuses is contingent upon compliance.**

The US Congress should:

- **establish independent monitors to oversee US Border Patrol** engagement with all migrants. Monitors should reinforce the fundamental premise that all individuals are entitled to due process in applying for relief as provided in the Immigration and Nationality Act, and that Border Patrol's functions do not include influencing an asylum seeker's decision as to whether to apply. Monitors should document and intervene if they observe any attempt, through threats, coercion, intimidation, antagonism, or any other means, to dissuade an individual from pursuing their legal rights;

- **pass legislation that promotes independent accountability measures.** Examples include:

  **the Investigative Integrity Act.** The Act is designed to "protect the integrity of criminal investigations into use-of-force incidents involving federal employees and to prevent agencies from sidestepping Department of Justice (DOJ) oversight. The Investigative Integrity Act will: (1) Establish Department of Justice (DOJ) primacy over all use-of-force investigations involving federal law enforcement officers; (2) Provide DOJ authority to analyze federal agency patterns and practices of use of force. (DOJ currently only has authority to look at state/local law enforcement patterns and practices); and (3) If a federal employee does interfere with the DOJ investigation, the bill mandates that the Attorney General (AG) consider charging that person with obstruction of justice;"[87]

---

83   We use the term "survivor" to denote individual who has experienced GBV. However, the US DOJ uses the term "victim."

84   This definition is used by the DOJ in the context of human trafficking prosecutions but is equally applicable in the immigration and asylum context: https://www.ovcttac.gov/taskforceguide/eguide/1-understanding-human-trafficking/13-victim-centered-approach/.

85   See Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 Fed. Reg. 18,078 (Mar. 29, 2022), DHS Docket No. USCIS-2021-0012, RIN 1615- AC67; A.G. Order No. 5369-2022, RIN 1125-AB20.

86   UNHCR Guidelines on International Protection, Gender-Related Persecution within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol Relating to the Status of Refugees, Section 68; see also, e.g., Executive Committee of the High Commissioner's Programme, Refugee Women and International Protection No. 64, § (a)(iii) (1990).137

87   See < https://www.congress.gov/bill/117th-congress/senate-bill/1700>

CLP_PC_024943

the Border Accountability, Oversight, and Community Engagement Act. The Act aims to promote accountability by (1) establishing a DHS Commission comprised of representatives from northern and southern border states to help develop policy; (2) establishing the DHS Office of the Ombudsman to address border issues; (3) establishing a CBP border liaison office; (4) mandating certain training and education for CBP; and (5) requiring reports on CBP use of body-worn cameras, use of force policies, and death of migrants while in custody.[88]

## 4. Eradicate racial bias within Department of Justice (DOJ), Department of Homeland Security (DHS), and Department of State (DOS) components that interface with migrants and asylum seekers.

This report and many others document how racial bias continues to shape the development and implementation of US asylum and immigration policies. As this report explains, racial bias can be particularly insidious for women and LGBTQI+ individuals. It is past time for the DOJ, DHS, and DOS to address and rectify the inherent racial bias within US immigration and asylum policies.

DOJ, DHS, and DOS have all issued Equity Action Plans that aim to advance equity, racial justice, civil rights, and equal opportunity for all, including "people of color and others who have been historically underserved, marginalized, and adversely affected by persistent poverty and inequality."[xliii, xliv, xlv] We urge the administration to fully implement the Equity Action Plans. We acknowledge, however, that their implementation cannot mitigate the full force of racial bias in US immigration and asylum policies. Yet it is a critical starting point.

Training curricula for the Equity Action Plans should be developed and presented collaboratively with outside experts, including directly impacted individuals and practitioners who serve them.

To help ensure compliance with the Equity Action Plans, the Biden administration should promulgate regulations requiring that agency personnel performance evaluations include detailed, ongoing assessments of compliance, and that awarding of annual bonuses is contingent upon compliance. Regulations should also require that, pursuant to Section V of DHS's Plan, information about complaint and redress procedures be appended to all immigration forms.

## 5. Explicitly recognize gender as a key modality of persecution in US asylum law.[xlvi]

Survivors of gender-based violence, and particularly those who are indigent and have no access to counsel, face systemic obstacles when applying for asylum. Survivors have no way of knowing that they may qualify when filling out the asylum application because it omits any mention of gender as a basis for relief. This is because gender is not explicitly named in the US Immigration and Nationality Act (INA) as a ground of asylum, nor is it listed in either the INA or implementing regulations as an example of a cognizable PSG. The 1951 Refugee Convention did not explicitly include gender in its definition of a refugee, although UNHCR guidelines allow for gender-based claims to be brought, most often under the PSG ground. Numerous other Convention and Protocol signatories—such as Spain, Sweden, and the Czech Republic—have updated their laws to name gender as either a PSG and/or an independent, sixth ground of asylum.[xlvii, xlviii] It is past time for the US to do the same.

To this end, the US Congress should amend the Immigration and Nationality Act to name gender as a sixth independent ground of asylum and also name gender as an example of a cognizable PSG. In the interim, until the INA is amended, the administration should promulgate regulations that 1) name gender as an example of a cognizable PSG;  2) require that DHS append its pamphlet on GBV[89] to all immigration forms, with links to translated versions; and 3) require that the asylum form specify that gender is an example of a PSG and include a non-exhaustive list of examples of GBV such as domestic violence, forced marriage, and female genital mutilation/cutting.

---

88   See https://www.lujan.senate.gov/newsroom/press-releases/lujan-colleagues-introduce-border-patrol-accountability-legislation/

89   See https://www.dhs.gov/sites/default/files/2022-07/OPS_DHS_GenderBasedViolence_%20ENG.pdf.

CLP_PC_024944

**Despite the administration's stated goal of reducing gender-based violence at home and abroad, and its recognition that economic insecurity increases vulnerability to violence and abuse, in practice, US immigration and asylum policy systematically disenfranchises and endangers women, girls, and LGBTQI+ individuals.**

## 6. Support alternative pathways for processing asylum seekers, such as the Refugee Protection Act Section 206(c)(5)(A).

The US Congress must pass the Refugee Protection Act, which creates a Central American Refugee Program protecting "Refugees of Special Humanitarian Concern."[90] Refugees of Special Humanitarian Concern are those who have suffered or fear persecution in the form of domestic, sexual, or other forms of gender-based violence, including forced marriage and persecution based on sexual orientation or gender identity. The program must include 1) comprehensive outreach to inform the public of its existence; 2) a trauma-informed approach to staff hiring, service delivery, and training; 3) full funding and implementation of the State Department Equity Action Plan; 4 staff performance evaluations that assess compliance with the plan and trauma-informed practices outlined in the training curricula; 5) collaboration in developing training curricula with outside experts—including survivors of trauma and practitioners who serve them—on trauma, gender-based violence, human trafficking, exploitation of children, and racial equity; 6) safety measures that aim to reduce survivors' risk of harm while they wait for their cases to be processed; and 7) independent monitors to oversee proper implementation of the program.

## 7. Align US immigration and asylum policies with US foreign policy goals that seek to reduce gender-based violence and promote women's economic and social empowerment.

In March 2021, President Biden signed an Executive Order (EO) establishing the White House Gender Policy Council (GPC).[i] The EO mandates that the GPC coordinate the federal government's activities related to gender equity and equality, including: 1) to coordinate an "interagency response to gender-based violence at home and abroad;" and 2) to establish a new position—the Special Assistant to the President and Senior Advisor on Gender-Based Violence, tasked with reviewing and updating the 2016 "United States Strategy to Prevent and Respond to Gender-Based Violence Globally."[ii]

Building on this EO, in October 2021 the administration released the first-ever National Strategy on Gender Equity and Equality, which included "Promot[ing] Gender Equity and Fairness in Justice and the Immigration System" as one of its 10 strategic priorities.[iii] In particular, the strategy commits to reducing "vulnerability to abuse and exploitation" while strengthening access to "safety, justice, and asylum and humanitarian relief for immigrants and noncitizens, especially women, girls, and LGBTQI+ individuals," including those who have faced persecution "on the basis of membership in a gender-based group—such as victims of gender-based violence." The strategy also promises to "seek timely adjudication of immigration petitions for survivors of domestic violence, sexual assault, and human trafficking, and other crimes" and to "support humane and trauma-informed practices at the US border."[iii]

Similarly, the administration's foreign policy goals are grounded in the notion that the "full participation of all people—including women and girls—across all aspects of our society is essential to the economic well-being, health, and security of our Nation and of the world."[iv] This is particularly relevant in Central America, where the US has invested heavily in promoting women's empowerment and combatting gender-based violence, both for its own sake and as a means of addressing irregular migration.

Despite the administration's stated goal of reducing gender-based violence at home and abroad, and its recognition that economic insecurity increases vulnerability to violence and abuse, in practice, US immigration and asylum policy systematically disenfranchises and endangers women, girls, and LGBTQI+ individuals. As the accounts in this report demonstrate, the US has a long way to go to live up to these and other commitments on gender equity; in fact, the US is one of only seven countries that has yet to ratify the International Convention on the Elimination of All Forms of Discrimination Against Women (CEDAW).

---

90  See Refugee Protection Act of 2019, https://www.congress.gov/bill/116th-congress/house-bill/5210/text#toc-H22B00371629540SAAA177F47B6CE4C42.



Tents on the courtyard of the Agape Mission which currently serves as a migrant shelter. Tijuana, Baja California Norte, Mexico. Winter, 2022. Pease note that the data and analysis of this report do not include this shelter. ©*James Rodriguez/ Oxfam America.*

While US foreign policies focus on addressing the root causes of migration and supporting gender equality, they must also address the ways in which bilateral[iv, iv] migration agreements that aim to deter migration fuel perilous journeys that increase the risk of GBV. This includes agreements that result in the US abdicating its responsibilities to asylum seekers and in third-party countries enforcing deterrence measures on behalf of the US;[91] this is neither sustainable nor humane. We urge the Biden administration to:

· **include commitments to ensure safe and secure journeys in bilateral migration agreements**. Agreements must be transparent and consistent with US domestic and international human rights obligations;

· **Implement US foreign policies that promote women's economic empowerment, prevent the economic deprivation that women, girls, and LGBTQI+ migrants experience at the US southern border, and mitigate the risk of their exposure to GBV;**

· **fully fund and implement all of the immigration justice-related commitments in the National Strategy on Gender Equity and Equality, particularly improving pathways to safety for GBV survivors.**

The US's racialized, deterrence-based asylum system harms survivors of gender-based violence, and women, girls, and LGBTQI+ individuals in particular. It drives conditions that increase their risk of experiencing GBV at the US southern border. It is imperative and long overdue for the US to change course by implementing policies that align with, rather than violate, its international human rights commitments and moral obligations. We believe that these recommendations will bring the US closer to establishing a more humane and welcoming immigration and asylum system rooted in dignity and respect for all migrants, rather than in dehumanization and xenophobia. If implemented, these recommendations will serve as a critical step toward establishing a system that centers, rather than marginalizes and harms, the most vulnerable. Continuing to use deterrence as the foundation of US migration policies will only inflict further suffering upon large numbers of individuals, including survivors of GBV and other abuses. We urge the adoption of the recommendations in their entirety.

---

91   A recent example is the now-defunct Asylum Cooperation Agreements that the US had with El Salvador, Guatemala, and Honduras that required asylum seekers to seek refuge in those countries before applying for asylum in the US. The US also routinely relies on Mexico's National Guard to deter US-bound migrants from crossing from Mexico's southern border with Guatemala (see *Aljazeera*, "Mexico and US to Launch Plan to Stem Central American Migration," December 1, 2021, https://www.aljazeera.com/news/2021/12/1/mexico-and-us-to-launch-plan-to-stem-central-america-migration.

CLP_PC_024946

# ENDNOTES

i    J. Kent, K. P. Norman, and K. H. Tennis, "Changing Motivations or Capabilities? Migration Deterrence in the Global Context," International Studies Review 22, no. 4 (December 2020): 853–878.

ii    J. Hiskey, A. Córdova, M. Malone, and D. Orcés, "Leaving the Devil You Know: Crime Victimization, US Deterrence Policy, and the Emigration Decision in Central America," *Latin American Research Review* 53, no. 3 (2018): 429–447, doi:10.25222/larr.147.

iii    S. N. Chambers, G. A. Boyce, S. Launius, and A. Dinsmore, "Mortality, Surveillance and the Tertiary 'Funnel Effect' on the US-Mexico Border: A Geospatial Modeling of the Geography of Deterrence," *Journal of Borderlands Studies* 36, no. 3 (2021): 443–468.

iv    American Immigration Council, "Asylum in the United States Fact Sheet," published June 11, 2020, and modified August 16, 2022, https://www.americanimmigrationcouncil.org/research/asylum-united-states; and U.S. Code, https://uscode.house.gov/view.xhtml?req=granuleid%3AUSC-prelim-title8-section1158&num=0&edition=prelim.

v    J. Loyd and A. Mountz, "The Caribbean Roots of U.S. Migration Policy," *NACLA Report on the Americas* 51:1 (2019): 78–84.

vi    S. Gzesh, "Central Americans and Asylum Policy in the Reagan Era" (Migration Policy Institute, 2006).

vii    M. A. Sweeney, S. Shebaya, and D. K Collopy, "Detention as Deterrent: Denying Justice to Immigrants and Asylum Seekers," *Georgetown Immigration Law Journal* 35 (2021): 292–323. See also https://www.theborderchronicle.com/p/cruelty-as-border-policy-the-biden?s=r; https://immigrantjustice.org/staff/blog/newly-released-records-show-abusive-policies-continue-under-guise-deterrence

viii    American Immigration Council, "Rising Border Encounters: An Overview and Analysis" (2021), https://www.americanimmigrationcouncil.org/rising-border-encounters-in-2021.

ix    Ibid.

x    Human Rights First, Haitian Bridge Alliance, and Al Otro Lado, "Extending Title 42 Would Escalate Dangers, Exacerbate Disorder, and Magnify Discrimination" (2021), https://www.humanrightsfirst.org/resource/extending-title-42-would-escalate-dangers-exacerbate-disorder-and-magnify-discrimination.

xi    Robert F. Kennedy Human Rights and the Haitian Bridge Alliance, "Beyond the Bridge: Documented Human Rights Abuses and Civil Rights Violations Against Haitian in the Del Rio, Texas Encampment" (2022), https://rfkhr.imgix.net/asset/Del-Rio-Report.pdf.

xii    Human Rights Watch, "US: LGBT Asylum Seekers in Danger at the Border" (2022), https://www.hrw.org/news/2022/05/31/us-lgbt-asylum-seekers-danger-border.

xiii    Human Rights First and Al Otro Lado, "Two Years of Suffering: Biden Administration Continues Use of Discredited Title 42 Order to Flout Refugee Law" (2022), https://www.humanrightsfirst.org/sites/default/files/TwoYearsofSuffering.pdf.

xiv    American Immigration Council, 2021.

xv    C. E. Schoichet, "We're Expecting a Big Increase in Migrants at the US-Mexico Border. But This Time It Is Different," *CNN*, April 1, 2022, https://www.cnn.com/2022/03/31/politics/border-title-42-whats-next-cec/index.html.

xvi    P. Diaz, "Migrants at US-Mexico Border Must Get Past Cartels Before Long Journey Ends," The Conversation, March 18, 2020, https://theconversation.com/migrants-at-us-mexico-border-must-get-past-cartels-before-their-long-journey-ends-129403.

xvii    S. Leutert, "Migrant Kidnapping in Nuevo Laredo During MPP and Title 42" (Strauss Center for International Security and Law, The University of Texas at Austin and Vecina, 2021), https://www.strausscenter.org/wp-content/uploads/Migrant-Kidnappings-in-Nuevo-Laredo-.pdf.

xviii    Human Rights First and Al Otro Lado, "Two Years of Suffering."

xix    American Immigration Council, 2021.

xx    A. Iacson, "U.S. Migration Policy is Enriching Cartels at the Busiest, and Most Dangerous Part of the US-Mexico Border," *Inter Press Service*, April 5, 2022.

xxi    Human Rights Watch, "Do You See How Much I'm Suffering Here?" Abuse against Transgender Women in US Immigration Detention" (2016).

xxii    A. A. F. Benard, "Colonizing Black Female Bodies within Patriarchal Capitalism: Feminist and Human Rights Perspectives," *Sexualization, Media, & Society* (October–December 2016): 1–11.

xxiii    S. Morley and M. Goss, "There is a Target on Us"—The Impact of Anti-Black Racism on African Migrants at Mexico's Southern Border" (Black Alliance for Just Immigration, 2021), http://baji.org/wp-content/uploads/2021/01/The-Impact-of-Anti-Black-Racism-on-African-Migrants-at-Mexico.pdf .

xxiv    Robert F. Kennedy Human Rights and the Haitian Bridge Alliance, "Beyond the Bridge."

xxv    M. L-G. Sone, "Black Lives Matter. Black Immigrant Lives Matter. Black Asylum Seekers' Lives Matter. Immigration is a Black Issue" (Friends Committee on National Legislation, 2020), https://www.fcnl.org/updates/2020-12/black-lives-matter-black-immigrants-lives-matter-black-asylum-seekers-lives-matter.

xxvi    Center for Gender and Refugee Studies, "Recent TRAC Reports Reinforce the Conclusion that Asylum Decision-Making Remains Arbitrary and Unfair" (2017).

xxvii    Ibid.

xxviii    A. Zagorin and N. Schwellenbach, "Protecting the Predators at DHS: How a Federal Watchdog Suppresses Findings of Sexual Harassment and Domestic Violence" (Project on Government Oversight, April 7, 2022), https://www.pogo.org/investigation/2022/04/protecting-the-predators-at-dhs.

xxix    Southern Border Communities Coalition, "Abuse of Power and Its Consequences" (August 11, 2022), https://www.southernborder.org/border_lens_abuse_of_power_and_its_consequences.

xxx    J. Heyman, D. E. Martinez, and J. Slack, "Why Border Patrol Officers and CBP Officers Should Not Serve as Asylum Officers" (Center for Migration Studies Essays, 2019).

xxxi    Department of Homeland Services, "Department of Homeland Security's Strategic Plan for Fiscal Years 2020–2024," https://www.dhs.gov/publication/department-homeland-securitys-strategic-plan-fiscal-years-2020-2024.

xxxii    See Tahirih Justice Center, "Precarious Protection: How Unsettled Policy and Current Laws Harm Women and Girls Fleeing Persecution" (Tahirih Justice Center, Washington DC, 2009).

xxxiii    Ibid.

xxxiv    Center for Gender and Refugee Studies, 2017.

CLP_PC_024947

xxxv   Tahirih Justice Center, "Ensuring Equal and Enduring Access to Asylum" (2021), https://www.tahirih.org/wp-content/uploads/2021/09/Ensuring-Equal-and-Enduring-Access-to-Asylum-Tahirih-Justice-Center.pdf.

xxxvi   Ibid.

xxxvii   B. Lobo, "Women as a Particular Social Group: A Comparative Assessment of Gender Asylum Claims in the United States and United Kingdom," *Georgetown Immigration Law Journal* 26 (2013): 361.

xxxviii   K. R. Johnson, "The Immigration Laws, And Domestic Race Relations: A 'Magic Mirror' into the Heart of Darkness," *Indiana Law Journal* 73, no. 4, article 2 (fall, 1998): 1111–1159.

xxxix   Hiskey et al., "Leaving the Devil You Know."

xl   Human Rights First, "I'm a Prisoner Here: Biden Administration Policies Lock Up Asylum Seekers" (2022).

xli   Department of Homeland Security, "DHS Case Management Pilot Program," https://www.dhs.gov/dhs-cmpp.

xlii   Office on Violence Against Women, "The Importance of Understanding Trauma Informed Care and Self-Care Victim Service Providers" (2014), https://www.justice.gov/archives/ovw/blog/importance-understanding-trauma-informed-care-and-self-care-victim-service-providers.

xliii   US Department of Homeland Security, "DHS Releases First Ever Action Plan" (2022), https://www.dhs.gov/news/2022/04/14/dhs-releases-first-ever-equity-action-plan.

xliv   US Department of State, "Equity Action Plan" (2022), https://www.state.gov/wp-content/uploads/2022/04/Equity-Action-Plan-Website-04132022.pdf.

xlv   Department of Justice, "Equity Action Plan" (2022), https://www.justice.gov/doj/page/file/1494516/download.

xlvi   Tahirih Justice Center, "Ensuring Equal and Enduring Access."

xlvii   Tahirih Justice Center, "Countries with Asylum/Refugee Laws That Explicitly Protect Those Fleeing Gender-Based Persecution" (2021), https://1ttlls613brjl37btxk4eg60v-wpengine.netdna-ssl.com/wp-content/uploads/2021/04/Appendix-1-List-of-other-countries-with-gender-listed-in-asylum-laws.pdf .

xlviii   Tahirih Justice Center, "Ensuring Equal and Enduring Access."

xlix   The White House, "Executive Order Creating a Comprehensive Regional Framework to Address the Causes of Migration to Manage Migration Throughout North and Central America and to Provide Safe and Orderly Processing" (2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/02/02/executive-order-creating-a-comprehensive-regional-framework-to-address-the-causes-of-migration-to-manage-migration-throughout-north-and-central-america-and-to-provide-safe-and-orderly-processing/.

l   The White House, "Executive Order on Establishment of the White House Gender Policy Council" (2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/03/08/executive-order-on-establishment-of-the-white-house-gender-policy-council/.

li   Ibid.

lii   US Government, "National Strategy on Gender Equity and Equality" (2021), https://www.whitehouse.gov/wp-content/uploads/2021/10/National-Strategy-on-Gender-Equity-and-Equality.pdf.

liii   Ibid.

liv   Ibid.

lv   US Citizenship and Immigration Services and the Executive Office for Immigration, "Review. Implementing Bilateral and Multilateral Asylum Cooperative Agreements Under the Immigration and Nationality Act" (2019),https://www.federalregister.gov/documents/2019/11/19/2019-25137/implementing-bilateral-and-multilateral-asylum-cooperative-agreements-under-the-immigration.

lvi   The White House, "Executive Order Creating a Comprehensive Regional Framework to Address the Causes of Migration to Manage Migration Throughout North and Central America and to Provide Safe and Orderly Processing" (2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/02/02/executive-order-creating-a-comprehensive-regional-framework-to-address-the-causes-of-migration-to-manage-migration-throughout-north-and-central-america-and-to-provide-safe-and-orderly-processing/.

CLP_PC_024948

CLP_PC_024949

**COVER IMAGE:** Scene inside the dormitories at the Agape Mission which currently serves as a migrant shelter. Tijuana, Baja California Norte, Mexico. Winter, 2022. The image was chosen so as to protect the anonymity of its subject. Please note that the data and analysis does of the report does not include the shelter in this image. *©James Rodriguez/Oxfam America.*





**US HEADQUARTERS**
226 CAUSEWAY STREET, 5TH FLOOR
BOSTON, MA 02114-2206
(800) 77-OXFAM

**US POLICY & ADVOCACY**
1101 17TH STREET NW, SUITE 1300
WASHINGTON, DC 20036-4710
(202) 496-1180

info@oxfamamerica.org
oxfamamerica.org

OXFAM IS A GLOBAL MOVEMENT OF PEOPLE WORKING TOGETHER TO END THE INJUSTICE OF POVERTY. WITH 70 YEARS OF EXPERIENCE IN MORE THAN 90 COUNTRIES, OXFAM TAKES ON THE BIG ISSUES THAT KEEP PEOPLE POOR: INEQUALITY, DISCRIMINATION, AND UNEQUAL ACCESS TO RESOURCES INCLUDING FOOD, WATER, AND LAND. WE HELP PEOPLE SAVE LIVES IN DISASTERS, BUILD STRONGER FUTURES FOR THEMSELVES, AND HOLD THE POWERFUL ACCOUNTABLE. JOIN US.

© 2022. Oxfam America Inc. All Rights Reserved. Oxfam America is a registered trademark of Oxfam America Inc., and the Oxfam logo is a registered trademark of Stichting Oxfam International. 2102019

CLP_PC_024950

Case 4:18-cv-06810-JST Document 160-8 Filed 06/05/23 Page 1002 of 1047





Advocacy for Human Rights in the Americas

ENGLISH

*(AP Photo/Sandra Sebastian)*

🖊 **23 MAR 2021 | COMMENTARY**

## Key Issues on Access to Asylum in Mexico, Protections for Migrant Children, and U.S. Cooperation

*The Washington Office on Latin America (WOLA), Asylum Access, and the Institute for Women in Migration (IMUMI) have prepared a summary of the status of access to asylum in Mexico, protections for migrant children, and U.S. cooperation. Here are our key findings:*

**Mexico as a destination country for asylum seekers**

- Asylum requests have increased dramatically in Mexico in recent years. Requests more than doubled between 2015 to 2016 (3,424 to 8,796) and increased by more than 700 percent between 2016 and 2019. More than 125,000 people have requested protection in Mexico since President Lopez Obrador took office in December 2018, including over 13,500 requests in January and February 2021.

- Unlike the United States, Mexico's refugee agency COMAR continued to accept asylum requests during the pandemic, receiving a total of 41,329 requests for 2020. Although COMAR closed its offices for a period during the pandemic, it processed 14,638 cases during the year, providing protection in 79 percent of the cases. The top nationalities receiving protection in Mexico are from Honduras, Venezuela, Cuba, El Salvador and Guatemala although Mexico has also seen an uptick in asylum request from Haitians and other extra-continental migrants.

- Mexico's legal definition of who can qualify for protection is broader than the United States, including "persons who have fled their country because their lives, security or freedom have been threatened by generalized violence, foreign aggression, internal conflicts, massive violation of human rights or other circumstances which have seriously disturbed public order," as well as people persecuted on account of their race, religion, nationality, gender, political opinions or belonging to a particularly social group.

**Obstacles for accessing protection in Mexico**

- While Mexico has improved its reception and processing capacity, asylum seekers continue to face significant obstacles to access protection. This includes a 30 day limit from first entry into the country to request asylum; the requirement to stay in the state where the asylum request was made while it is being processed (with some exceptions for grave security concerns); inadequate access to a humanitarian visa which would enable work authorization and facilitate access to health and education; and long delays in resolving claims.

- Currently, asylum agents from COMAR do not have a presence at the ports of entry. Asylum seekers presenting a claim at the border will generally be detained for at least a few days by Mexico's National Migration Institute (INM). To avoid detention, many asylum seekers try to travel undetected to towns close to the border to present themselves at a COMAR office or shelter. On this journey they are often victims of crimes including kidnapping, sexual assault, and robbery.

- For asylum seekers who are held in detention, lack of services, poor food and healthcare, and overcrowding has resulted in numerous asylum seekers dropping their claims in order to be released. A program to provide alternatives

CLP_PC_025089

to detention, started in 2016, is currently being severely curtailed by the INM.

- Many migrants who are detained by the INM are not adequately informed of their right to seek protection in Mexico. A monitoring mission carried out by the INM's citizen council of migrant detention centers in 2016 found that the primary focus of INM agents is on the detection, detention, and deportation of migrants. The majority of the detainees interviewed at the centers reported never having received information about their right to apply for asylum or that the information was not clear.

## Is Mexico safe for asylum seekers?

- Some parts of Mexico, in particular the several northern border cities where many asylum seekers have been returned or expelled to from the US, are among the most dangerous areas in the world and are not considered safe for asylum seekers. This is particularly the case in the state of Tamaulipas. Mexico's southern border states' proximity to Central America means that agents of persecution may be present there, and asylum seekers may face similar dangers from which they fled from their countries of origin.

- While asylum seekers may be at risk in certain areas, other asylum seekers have been able to successfully integrate. In particular, areas with relatively lower crime rates and more economic opportunities, including several states in central Mexico, can host significant numbers of refugees.

- Support for Mexican institutions, shelters, civil society organizations, and refugee-led organizations that promote sustainable and dignified integration would help expand the spaces in which asylum seekers can live in safety.

## Strengthening Mexico's capacity to receive asylum seekers

- In spite of important measures undertaken during Lopez Obrador's administration, COMAR's resources have not increased sufficiently to meet demand, leading to a backload of cases. While the agency's budget for 2021 is likely to be $4.85 million, more than double its $2.35 million budget for 2020, more investment is needed to address staffing limitations and expand its presence beyond the 8 cities where it currently has offices.

- UNHCR has dramatically expanded its presence in Mexico in recent years and provided important technical and infrastructure support to COMAR. Apart from assisting COMAR, the UNHCR has supported the construction of shelters for asylum seekers and refugees, it provides assistance to civil society organizations offering legal and other services to asylum seekers and cash support for asylum seekers waiting for their claims to be processed, amongst other activities.

## Legal reforms that prohibit detention for migrant children and their families in Mexico

- In January 2021, legal reforms went into effect prohibiting immigration detention for unaccompanied and accompanied migrant children in Mexico. Immigration cases will be resolved according to the best interest of the child to be determined by Child Protection Officers, instead of the INM. Unaccompanied children and children with families should be referred to shelters to await interviews and a resolution that could instruct INM to repatriate the migrants, to refer them to COMAR to apply for refugee status, or to provide immigration documents for residence in Mexico. In some cases, Child Protection Officers will determine that it is in the child's best interest to be reunified with family members in another country.

- The new procedures will help guarantee protection for migrant children, increase access to the asylum system and decrease the use of smugglers and extortion by INM and other authorities in Mexico.

## U.S. cooperation on access to protection in Mexico

- The United States continues to be the largest donor for UNHCR in Mexico, providing an estimated $42 million in assistance in 2020. In the past, additional support to COMAR and international organizations operating in Mexico was provided through the State Department's Bureau of Population, Refugees and Migration. Apart from appropriating additional financial support, and upholding its own international commitments for refugees and asylum seekers, the U.S. government should consider developing procedures with the Mexican government to provide access to protection in the U.S. for individuals who would face persecution in Mexico and unaccompanied children from Central America when the best interest determination is that they should be united with the U.S.-based family members.

- In order to strengthen implementation of the new reforms that prohibit the detention of migrant children, the U.S. government should consider supporting the child protection system in Mexico and work with the Mexican government to create a regional protection system for migrant children.

CLP_PC_025090

Case 4:18-cv-06810-JST   Document 160-8   Filed 06/05/23   Page 1004 of 1047

[U.S. assistance](#) to Mexico's immigration enforcement efforts has primarily focused on [supporting](#) the construction of communications towers in southern Mexico as well as the installation of biometric equipment in all of Mexico's 52 long- and short- term migrant detention centers. No new areas of assistance have been announced since Lopez Obrador took office in December 2018. While in January 2021 the Mexican government [reported](#) it had deployed over 7,300 members of the National Guard to assist in immigration enforcement on the southern and northern borders, the United States is currently not providing any training, equipment, or support to this force and it should refrain from doing so given the militarized nature of the National Guard and [documented cases](#) of abuse against migrants and asylum seekers.

| f SHARE | ▼ TWEET |
|---|---|

**SIGN UP TO GET THE LATEST ON ANALYSIS & POLICY**

SIGN UP



UNITED STATES

**PUTTING THE U.S.–MEXICO 'BORDER CRISIS' NARRATIVE INTO CONTEXT**

17 MAR 21    COMMENTARY

Related Content

**WOLA and Temple Law School Present a New Series of Resources for Asylum Attorneys**

28 FEB 23    NEWS

CLP_PC_025091

# GUATEMALA 2022 HUMAN RIGHTS REPORT

# EXECUTIVE SUMMARY

Guatemala is a multiparty constitutional republic.  The country last held national and local elections in 2019.  Voters elected Alejandro Eduardo Giammattei Falla as president for a four-year term beginning January 2020.  International observers considered the presidential election as generally free and fair.

The National Civil Police, which is overseen by the Ministry of Government and headed by a director general appointed by the minister, is responsible for law enforcement.  The Ministry of National Defense oversees the military, which focuses primarily on operations in defense of the country, but the government also used the army to support the National Civil Police in internal security operations, as permitted by the constitution.  Civilian authorities maintained effective control over the security forces.  There were reports that members of security forces committed some abuses.

Significant human rights issues included credible reports of:  harsh and life-threatening prison conditions; arbitrary arrest and detention; transnational repression against individuals in another country, including threats, harassment, surveillance, coercion, and misuse of international law enforcement tools; serious problems with the independence of the judiciary; serious restrictions on free expression and media, including threats of violence against journalists and unjustified arrests or prosecutions against journalists; serious government corruption; lack of investigation of and accountability for gender-based violence; crimes involving violence or threats of violence targeting members of Indigenous groups; crimes involving violence or threats of violence targeting lesbian, gay, bisexual, transgender, queer, or intersex persons; crimes involving violence or threats of violence targeting persons with disabilities; and significant restrictions on workers' freedom of association, including violence and threats against union leaders.

Impunity, including by high-level officials, continued to be widespread.  Corruption, efforts by organized criminal actors to secure impunity, and

CLP_PC_025128

undermining of anticorruption institutions and the judiciary by corrupt political actors made it difficult for meaningful investigation and prosecution of crimes, including corruption and human rights abuses, involving public officials.

# Section 1. Respect for the Integrity of the Person

## a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were no confirmed reports that the government or its agents committed arbitrary or unlawful killings, but there were killings of activists under suspicious circumstances, and corrupt police were involved with violent criminal organizations responsible for killings (see section 4).

The National Civil Police (PNC) determined three PNC officials (one officer and two investigators) were involved in the criminal organization "Los OAJACA," which was responsible for drug trafficking, contract killings, kidnappings, extortion, illegal firearms sales, and smuggling.  The three officials were all tried and sentenced in July for their involvement in the criminal organization.  The investigation revealed that the PNC officials collaborated with Mynor Fabricio Oajaca Quiroa, leader of the criminal group.  On July 20, Quiroa was sentenced to 256 years and 10 months in prison for multiple counts of murder.

An international human rights organization alleged that at least four members of rural and Indigenous activist groups were killed or died in disputed circumstances between January and June.  Some of the killings appeared to be politically motivated, and all the cases remained under investigation at year's end.  For example, on June 7, in Morales, Izabal, unknown assailants shot and killed Pablo Ramos, a member of the Indigenous activist group the Committee for Rural Development (CODECA), an active participant in a negotiation over land rights in that area.  CODECA representatives alleged that members of a family in conflict with CODECA over land rights arranged for the killing.

The government's prosecution of Jose Mauricio Rodriguez Sanchez continued without resolution.  Rodriguez Sanchez, intelligence chief under then President Rios Montt, was accused of genocide against the Maya Ixil community during the

CLP_PC_025129

country's 36-year internal armed conflict (1960-96). In February 2021 an appellate court ruled that genocide occurred against the Indigenous Maya Ixil people, but the appellate court chose to uphold the ruling in the 2018 trial that acquitted Rodriguez Sanchez of all crimes of genocide. In March 2021 the Public Ministry appealed that ruling to the Supreme Court, but as of September, a final resolution had not been issued.

The Public Ministry moved forward cases of human rights abuses from the internal armed conflict era. In the genocide case of Luis Enrique Mendoza Garcia, operations commander under then President Rios Montt, Judge Silvia de Leon of High-Risk Court C ordered the case to come to public trial. The Public Ministry continued investigation of another case of genocide of the Maya Ixil community from the last months of former President Romeo Lucas Garcia's government (1978-82). Three high-ranking military officers, Cesar Octavio Noguera Argueta, Manuel Callejas y Callejas, and Benedicto Lucas Garcia, were charged in this case. The prosecution continued against Callejas and Lucas; Noguera died in November 2020. In August 2021 Judge Miguel Angel Galvez of High-Risk Court B decided to bring the case to public trial. Callejas and Lucas, in prison since 2016, were both previously convicted of serious crimes in the Molina Theissen case and were serving 58-year prison sentences.

Judge Galvez left the country in November (see section 5), and the judge now handling the case had not taken further action in the Callejas and Lucas cases as of early December. On November 9, an appeals court granted an injunction against Galvez's resolution that ordered to trial retired colonel Jacobo Esdras Salan Sanchez, accused of war crimes in the forced disappearance and execution of political dissidents. In November High Risk Court Judge Claudette Dominguez granted house arrest to former military officer Toribio Acevedo Ramirez, another accused war criminal arrested in May after years as a fugitive.

## b. Disappearance

There were no reports of disappearances during the year by or on behalf of government authorities.

The Public Ministry continued to investigate and prosecute cases of forced

CLP_PC_025130

disappearances from the internal armed conflict period, although at times Attorney General Maria Consuelo Porras stalled progress in cases of genocide and disappearances from that period.

The "Diario Militar" case continued against 14 former government and military members who were accused of crimes against humanity, including forced disappearances in 1983 and 1985 during the 30-year internal armed conflict.  In May 2021 Judge Miguel Angel Galvez issued 17 arrest warrants for individuals materially involved with, or who directly enforced, disappearances, torture, rape, and extrajudicial executions in the Diario Militar case.  On May 6, Galvez ordered the case to be brought to public trial against nine of the individuals.  (See section 5 regarding threats made against Galvez.)  In November an appeals court granted an injunction against Galvez's order for one of the nine, retired colonel Jacobo Esdras Salan Sanchez.

The CREOMPAZ case, named after the Regional Center for UN Peacekeeping Training Institute where a mass burial site for disappeared persons was found, continued for former military officers indicted in 2017 on charges of forced disappearance and crimes against humanity during the internal armed conflict.  The delay in resolving several appeals and recusal motions filed in 2016 prevented the opening of a full trial.  Byron Barrientos and Carlos Garavito remained in custody. Former congressman Edgar Justino Ovalle Maldonado, also charged in the case, remained in hiding after the Supreme Court lifted his immunity from prosecution in 2017.

## c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, and Other Related Abuses

The law prohibits torture and other cruel, inhuman, or degrading treatment or punishment, but there were reported cases of prison officials' negligence that exposed prisoners to violence and degrading conditions.

The Office of the UN High Commissioner for Human Rights (OHCHR) noted that documentation and reporting mechanisms for torture and other cruel, inhuman, or degrading treatment or punishment remained weak, thereby hindering a full understanding of the prevalence of the problem.  International human rights

CLP_PC_025131

organizations also noted that many official complaints cited unsafe and cramped conditions at Federico Mora National Hospital for Mental Health. Most of these complaints remained unresolved.

There were no confirmed reports of impunity in the military; however, public perception was that impunity within the PNC was widespread. The lack of effective mechanisms to investigate abuses and the lack of enforcement and awareness on disciplinary sanctions remained factors contributing to impunity. The PNC approved a strategy run by a high-level PNC working group to strengthen its institutional reputation with a campaign to combat corruption that both investigates PNC officials and publicizes successful cases of rooting out corrupt officers. As of August, the PNC had arrested 50 percent more officers than in the previous year for receiving benefits, abuse of authority, and theft. The PNC removed dozens of officers for various disciplinary reasons, including bribery allegations.

The PNC utilizes three mechanisms to identify and investigate abuses: an anonymous tip line using a landline telephone number, a tip line to receive complaints using a messaging application, and in-person complaints. The PNC Internal Affairs Division conducts surveillance of PNC officers and follows a disciplinary process with an internal tribunal to decide cases. Internal Affairs wiretaps criminal structures found to be working with corrupt PNC officers, but the unit was not authorized to investigate criminal structures within the PNC. The government's main mechanism to rid the PNC of corruption is to remove PNC officers suspected of these abuses, often without investigation or trial. The PNC has a unit devoted to criminal investigation of human rights violations, funded by donor countries, but the unit lacked political and material support.

**Prison and Detention Center Conditions**

Prison conditions were harsh and could be life threatening, with multiple instances of inmates killing other inmates. Sexual assault, inadequate sanitation, poor medical care, and severe overcrowding placed prisoners at significant risk.

**Abusive Physical Conditions:** Prison overcrowding was a problem. As of September, according to prison authorities, there were 21,752 male inmates held in

CLP_PC_025132

facilities designed to hold 7,045 persons, and 2,764 female inmates in facilities designed to hold 937 persons.  There were 518 juvenile inmates in four traditional detention centers and the halfway house, which were designed for a total of 557 inmates.  Despite a reduction in overcrowding, there were still 190 inmates in the Centro Juvenil de Privación de Libertad para Varones juvenile detention facility, designed for 155 individuals.

Physical conditions including sanitation facilities, medical care, ventilation, temperature control, and lighting, were often inadequate.  Prisoners had difficulty obtaining potable water, complained of inadequate food, and often had to pay for additional food.  Illegal drug sales and use were widespread.

Prison officials acknowledged safety and control problems, including escape attempts, gang fights, inability to control the flow of contraband goods into prisons, inmate possession of firearms and grenades, and the fabrication of weapons.  Prisoners conducted criminal activity both inside and outside of prisons.

Media reported that transnational criminal gangs and drug trafficking groups controlled major prisons.  In May authorities transferred 76 inmates, nearly all of whom were gang members, from three different prisons to the Fraijanes II prison on the outskirts of Guatemala City.  Although the leaders of one gang were transported to another facility and separated from one another, the continuation of gang-related and coordinated killings in Fraijanes II suggested gang members were still able to communicate across prisons and organize killings.  In September media reported that four prisoners, all of them members of the same prison gang, died of poisoning by pesticide during a routine lunch service in what analysts stated were most likely targeted killings by a rival gang.

Media and nongovernmental organizations (NGOs) reported women inmates faced physical and sexual abuse.  Women inmates reported unnecessary body searches and verbal abuse by prison guards.  Children younger than age four could live in prison with their mothers, but the penitentiary system provided inadequate food for young children, and many suffered from illness.  Lesbian, gay, bisexual, transgender, queer, and intersex (LGBTQI+) rights groups stated that other prisoners often sexually assaulted LGBTQI+ individuals, and there were insufficient facilities to protect LGBTQI+ individuals in custody.  NGOs claimed

CLP_PC_025133

admittance procedures for LGBTQI+ prisoners were not implemented, noting particular concern regarding procedures for transgender individuals.

**Administration:**  While the law allows prisoners and detainees to submit complaints to judicial authorities without censorship and to request investigation of credible allegations of inhuman conditions, authorities failed to investigate most allegations or to document the results of such investigations.  Reports from inmates indicated that complaints were rarely submitted because corrections officials threatened the inmates if the inmates attempted to submit a complaint.

**Independent Monitoring:**  The government permitted visits by local and international human rights groups, the Organization of American States, public defenders, and religious groups.  The Office of the Human Rights Ombudsman (PDH) and the National Office for the Prevention of Torture, both independent government bodies responsible for ensuring the rights and well-being of prisoners, also periodically visited prison facilities.

## d. Arbitrary Arrest or Detention

The law prohibits arbitrary arrest and detention, but there were credible reports of politically motivated arrests and deliberate denial of timely access to a magistrate and hearing as required by law.  Suspects are entitled to challenge in court the legal basis or arbitrary nature of their detention.  There was no compensation for those found to be unlawfully detained.

### Arrest Procedures and Treatment of Detainees

The law requires presentation of a court-issued warrant to a suspect prior to arrest unless police apprehend a suspect in the act of committing a crime.  Under the law, police may not detain a suspect for more than six hours without bringing the case before a judge.  Authorities did not regularly respect this right.  After arraigning suspects, the prosecutor generally has three months to complete the investigation if the defendant is in pretrial detention and six months to complete the investigation if the defendant is granted house arrest.  The law prohibits the execution of warrants between 6 p.m. and 6 a.m. unless the government has declared a state of siege.  Judges may order house arrest for some suspects.  The law provides for access to lawyers and bail for most crimes.  The government provides legal

CLP_PC_025134

representation for indigent detainees, and detainees have access to family members.  A judge has the discretion to determine whether bail is permissible for pretrial detainees.

**Arbitrary Arrest:**  As of August 31, the PNC Office of Professional Responsibility had received 12 complaints of illegal detention by police, compared with 48 in 2021.  Reports indicated police sometimes ignored writs of habeas corpus in cases of illegal detention, particularly during neighborhood antigang operations.  The number of illegal, or even legal, detentions was difficult to determine, as many lesser arrests ended with the detainees bribing police to release them, even after being detained.

The detention of seven prosecutors and former prosecutors of the Special Prosecution's Office against Impunity (FECI) and the Anticorruption Prosecutor's Office, and of one defense lawyer who represented one of these prosecutors, targeted prosecutors who investigated high-level cases of government corruption.

As one example, in February and March, the Public Ministry arrested numerous anticorruption prosecutors, several of whom had their arraignment hearings delayed for days or weeks while in pretrial detention and the alleged evidence against them kept under seal.  At the same time, information about the handling of their cases was leaked through third-party social media "netcenters" to threaten and intimidate.

Police arrested Virginia Laparra, former chief anticorruption prosecutor in Quetzaltenango, in February for alleged crimes related to her filing an administrative complaint against a judge for leaking confidential information from a case.  Laparra was indicted in March and remained in pretrial detention despite appeals and requests to be allowed to await her trial under house arrest.  In December Laparra was convicted and sentenced to four years in prison.  Domestic human rights and anticorruption activists cited this arrest as an example of the Public Ministry's pattern of harassing anticorruption advocates, and Amnesty International declared Laparra a "prisoner of conscience."

**Pretrial Detention:**  Lengthy pretrial detention was a problem.  As of September 13, prison system records indicated 48 percent of prisoners were in pretrial

CLP_PC_025135

detention, slightly higher than in 2021.  The law establishes a one-year maximum for pretrial detention, regardless of the stage of the criminal proceeding, but the court has the legal authority to extend pretrial detention without limits as necessary.  Authorities regularly held detainees past their legal trial-or-release date.  Lengthy investigations and frequent procedural motions by both defense and prosecution often led to lengthy pretrial detention, delaying trials for months or years.  Former President Otto Perez Molina was in pretrial detention from 2015 due to indictments in corruption cases known as "The Line" and "Co-optation of the State" until his December 2022 conviction.  Perez Molina and Former Vice President Roxana Baldetti were convicted and sentenced to 16 years in prison.

Observers noted the slow pace of investigations and lack of judicial resources hampered efforts to reduce pretrial detention and illegal incarceration.  Authorities did not release some prisoners even after the prisoners completed their full sentences due to the failures of judges to issue the necessary court order or other bureaucratic delays.

## e. Denial of Fair Public Trial

The law provides for an independent judiciary.  The judicial system generally failed to provide fair or timely trials due to inefficiency, corruption, and intimidation of judges.  The Public Ministry, however, rapidly obtained warrants for the arrest of former and current anticorruption prosecutors, just days after receiving legal complaints against them.  Some of these complaints were filed by individuals and organizations with a history of threatening justice officials.  Judges delayed proceedings so that those same anticorruption prosecutors were held in pretrial detention beyond what the law allows.  Civil society representatives cited these actions as evidence of inconsistent application of legal proceedings and political manipulation of the justice system.

Plaintiffs, witnesses, judges, and prosecutors, including judges from the High-Risk Court and prosecutors from the FECI, continued to report threats, intimidation, and surveillance (see section 5 for examples).

On July 7, congress approved a decree law on Constitutional Court membership, which confirmed the appointment of Hector Hugo Perez Aguilera instead of the

CLP_PC_025136

originally elected Gloria Porras, thereby making permanent the removal of Porras, a transparently elected court magistrate. Porras departed the country in April 2021 and remained abroad as of October 2022.

The selection process for the election by congress of 13 Supreme Court and 135 appellate court magistrates continued largely unresolved. The sitting Supreme Court and 269 appellate court judges remained in their positions. In 2019 the Constitutional Court halted the selection process for Supreme Court and appellate court magistrates, ruling that formal evaluation procedures were not followed within the selection committees after a process that suffered widespread manipulation of selection committees by politicians, judicial officials, and other influential citizens.

In February 2020 Public Ministry investigations found that while in prison on corruption charges, Gustavo Alejos, chief of staff under then President Alvaro Colom, accepted at least 20 visits from officials associated with the selection process in his hospital ward in the days before the selection committees provided their lists. The Constitutional Court issued a final ruling in May 2020 requiring removal of candidates associated with Gustavo Alejos and a voice vote for each position in congress, but as of September, congress had not complied with the ruling. The current magistrates were to continue for the third consecutive year in the positions until a new court was elected.

**Trial Procedures**

The constitution provides for the right to a fair and public trial, and the judiciary generally enforced this right, but at times, criminal defendants were denied the right to a fair, timely, and public trial. International and domestic observers considered the number of judges insufficient. Lack of personnel, training, and evidence hampered Public Ministry prosecutors' ability to bring cases to trial.

**Political Prisoners and Detainees**

There were no reports of political prisoners or detainees.

CLP_PC_025137

**Transnational Repression**

The Public Ministry reportedly initiated legal proceedings in Guatemala against former high-level officials who were located outside of Guatemala, including former FECI Head Prosecutor Juan Francisco Sandoval and fellow prosecutors, to harass and repress those former officials.

**Threats, Harassment, Surveillance, and Coercion:**  Former Attorney General Thelma Aldana and her husband, an appellate court magistrate, were under investigation for money laundering in a case that anticorruption organizations characterized as politically motivated.  Thelma Aldana left Guatemala in 2019 after authorities issued an arrest warrant for her.  Aldana had cooperated and worked closely with the UN-backed International Commission Against Corruption in Guatemala during her term as attorney general in 2014-18.

Friends, family, and associates of Sandoval and Aldana who remained in the country, according to reports, suffered from harassment designed to exert pressure on those individuals (see section 1.f.).

**Misuse of International Law Enforcement Tools:**  The Public Ministry announced in December that they had initiated extradition requests for Sandoval and for Aldana; observers considered that these requests were politically motivated.

**Civil Judicial Procedures and Remedies**

Individuals and organizations have access to administrative and judicial remedies to submit lawsuits seeking damages for, or cessation of, a human rights violation or other alleged wrongs.  The judiciary suffered from inefficiencies and a legal system that often permitted spurious complaints.  In one such example, the Supreme Court lifted High-Risk Court Judge Pablo Xitimul's immunity from prosecution and suspended him for abuse of authority against a patrol officer who detained Xitimul at a traffic stop after the officer lodged a complaint against him. Xitimul was the judge responsible for ruling on several emblematic cases of military internal armed conflict-era human rights abuses and corruption.  Civic judicial integrity associations considered the lifting of his immunity over a minor incident to be politically motivated.

CLP_PC_025138

**Property Seizure and Restitution**

Negotiations between the government and families affected by the construction of the Chixoy hydroelectric dam continued but were characterized by observer NGOs as being conducted in bad faith.  As of September, the government had paid approximately 99 percent of the 200 million quetzals ($26 million) in individual reparations to families affected by the dam.  Fifteen cases of reparations remained unresolved.  No progress was made in the collective reparations, including fulfillment of government commitments to community projects and educational and development improvements.  During the dam's construction from 1975-85, more than 400 individuals died, and thousands were displaced.

## f. Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence

The law prohibits such actions, and the government sometimes respected these prohibitions, but there were credible reports of harassment of the families of current and former officials (see section 1.e. for examples).

Leaders of a professional association with influence on government candidate commissions (government-run commissions that have the responsibility for selecting candidates for public positions) reported receiving photographs from anonymous individuals, demonstrating to the leaders that they were being surveilled in their homes and while in public.  The leaders claimed the goal of this surveillance was to intimidate them into not reporting on corruption associated with government candidate commissions and professional associations.

# Section 2. Respect for Civil Liberties

## a. Freedom of Expression, Including for Members of the Press and Other Media

The law provides for freedom of expression, including for members of the press and other media, but the government did not always respect this right.  Intimidation of journalists increased during the year and resulted in significant self-censorship.

**Violence and Harassment:**  Independent media were active and expressed a wide

CLP_PC_025139

variety of views.  Nonetheless, reporters covering organized crime, including its links to corrupt public officials, acknowledged practicing self-censorship due to the danger that investigative journalism created for them and their families.  Many journalists reported being harassed, prosecuted, or having to flee the country after publishing work that was critical of influential citizens.  Members of the press reported receiving pressure, threats, and retribution from public officials and criminal organizations regarding the content of their reporting.  Online attacks against independent journalists and media outlets continued throughout the year. These included hacking journalists' private social media accounts, publishing stolen or falsified personal information, and conducting apparently coordinated attempts to undermine specific journalists and media.

During the first six months of the year, the Journalists Observatory of the Association of Journalists of Guatemala registered 66 abuses of freedom of expression, including violence and restrictions against journalists.  The Unit for the Protection of Human Rights Defenders – Guatemala (UDEFEGUA) registered 51 attacks against journalists and communicators during the same period.

Observers and public complaints noted increased activity by netcenters, which were collections of social media accounts organized to appear as independent individual users but were in fact centrally controlled.  Goals of netcenters were to manipulate discussions, spread misinformation, and threaten persons on the internet.  Netcenters created fake social media accounts, including on Twitter and Facebook, to criticize and defame journalists, judges, prosecutors, and citizens who report on corruption.  Attacks coming from netcenters were crucial in the intimidation of journalists reporting on corruption.

In one example of harassment, an arrest warrant was issued on January 14 against journalist Carlos Choc of the newspaper *Prensa Comunitaria* in Izabal for supposedly instigating violence and physically attacking 13 police officers during a protest against the nickel mine in El Estor, Izabal, in 2021.  Choc reported on the alleged use of tear gas by police in that protest.  Choc also accused Solway Investment Group, the owners of the mine, of operating illegally, damaging the environment, and violating the rights of Indigenous peoples.  On September 13, a judge dropped the charges against Choc.

CLP_PC_025140

On July 29, police arrested Jose Ruben Zamora, the president of daily newspaper *El Periodico*, on charges of money laundering, influence peddling, and extortion. Judge Fredy Orellana indicted Zamora on August 9 and remanded him to pretrial detention until his December 8 preliminary trial hearing.  The Public Ministry froze *El Periodico*'s bank accounts on August 1.  In October the Public Ministry lifted the freeze on some accounts after finding no evidence of wrongdoing by the newspaper, while maintaining the freeze on other accounts.  On August 19, the Public Ministry and PNC agents arrested Flora Silva, *El Periodico*'s financial manager, after a six-hour raid on her residence, without notifying her of the charges against her.  The Public Ministry later issued a press release alleging that Silva conspired with Zamora to launder money.

According to the Washington Office on Latin America, an NGO with a focus on Latin American corruption and human rights, Mayan journalists were subject to harassment and criminal prosecution in the Indigenous territories of the country. Police raided the houses of Indigenous journalists Carlos Choc, Baudilio Choc, and Juan Bautista Xol after those journalists reported on police repression of Indigenous communities opposed to the presence of mines in their territories.

**Censorship or Content Restrictions for Members of the Press and Other Media, Including Online Media:**  Some companies decreased their media advertising to exert pressure on media against reporting corruption, resulting in media outlets becoming less independent.

**Nongovernmental Impact:**  Organized crime exerted influence over media outlets and reporters by frequently threatening individuals for reporting on criminal activities.

**Internet Freedom**

The government did not restrict or disrupt access to the internet or censor online content, and there were no credible reports that the government monitored private online communications without appropriate legal authority.

Human rights defenders, journalists, as well as judges and lawyers on high-profile cases, reported social media attacks, including the hacking of their private social media accounts, publishing of stolen or falsified personal information, publishing

CLP_PC_025141

of photographic surveillance of them and family members, and online defamation and hate speech.  During the first half of the year, UDEFEGUA stated that online trolls were the most common perpetrators of online abuses against human rights defenders, journalists, judges, and prosecutors.  The government took little action to protect the victims of online attacks.

## b. Freedoms of Peaceful Assembly and Association

The constitution provides for the freedoms of peaceful assembly and association, and the government generally respected these rights.  In 2021 a law went into effect requiring by February 2 that all NGOs and foundations register with the Ministry of Government's official Registry of Legal Persons or risk dissolution.

### Freedom of Association

Some NGOs claimed the government used the law to create large, sudden costs for NGOs, such as by requesting surprise audits.  These audits could cost NGOs thousands of dollars in legal and administrative fees.

## c. Freedom of Religion

See the Department of State's *International Religious Freedom Report* at
https://www.state.gov/international-religious-freedom-reports/.

## d. Freedom of Movement and the Right to Leave the Country

The law provides for freedom of internal movement, foreign travel, emigration, and repatriation.  The government generally respected these related rights.

**In-country Movement:**  States of siege or prevention placed limits on freedom of movement.  Therefore, at certain points for up to 30 days, citizens in the affected areas did not have free movement.  For example, on June 8, President Giammattei declared, and congress approved, a state of siege in Ixchiguan y Tajumulco, San Marcos, for 30 days that imposed a curfew from 6 p.m. to 6 a.m., limited large groups of persons from gathering, and suspended some due process rights affecting police detention and interrogation of persons suspected of disturbing the peace. This state of siege was imposed after highly publicized violence between groups of

CLP_PC_025142

local inhabitants fighting over territorial claims.  The state of siege was lifted after 60 days and the President's Commission for Dialogue, the Ministry of Government, and the Presidential Commission on Human Rights entered talks to end the violence.  As of September, the conflict had not been resolved.

## e. Protection of Refugees

The government cooperated with the Office of the UN High Commissioner for Refugees (UNHCR) and other international organizations in providing protection and humanitarian assistance to refugees, returning refugees, and asylum seekers, as well as other persons of concern.

**Access to Asylum:**  The law provides for the granting of asylum or refugee status, and the government established a system for receiving and adjudicating asylum claims to grant refugee status to qualifying individuals.  Identification and referral mechanisms for potential asylum seekers are inadequate, and requirements to travel to Guatemala City for parts of the process continued to limit access.  There were gaps and shortcomings in the procedures for implementing the legal framework.

Asylum claims are processed by the Department of Refugee Status Determination of the Guatemalan Migration Institute.  Recommendations on recognition are formulated by an interministerial process, whose complexity contributed to major delays on final case decisions and an increased backlog.

**Access to Basic Services:**  Documentation for refugees to access government services, including health care, was expensive in some cases and remained time-consuming to complete.  Access to education for refugees was difficult due to the country's onerous requirements for access to formal education, including documentation from the country of origin.

## f. Status and Treatment of Internally Displaced Persons

The government does not officially recognize the existence of internally displaced persons (IDPs) within its borders, except for those displaced by climate change and natural disasters.  Organizations that monitor and support IDPs stated this lack of recognition stifled efforts to manage and address the movement of persons within

CLP_PC_025143

the country displaced due to violence, among other factors, because official statistics did not exist for IDPs.  The government indicated a more open posture to discussing the issue, framed as a matter of vulnerable or "at-risk" communities, but critics claimed this definition did not address the full range of causes and effects of the movement of IDPs.  Women, youth, and LGBTQI+ individuals, as well as Indigenous populations, remained at heightened risk of displacement.

# Section 3. Freedom to Participate in the Political Process

The constitution provides citizens the ability to choose their government in free and fair periodic elections held by secret ballot and based on nearly universal and equal suffrage for those age 18 and older.  Members of the armed forces, police, and incarcerated individuals are not eligible to vote.

## Elections and Political Participation

**Recent Elections:**  The Organization of American States and other international observers found some irregularities in the electoral process for the last national elections in 2019, but none was significant enough to discredit the legitimacy and validity of the elections.  President Giammattei and the elected congressional deputies took office in January 2020 without disturbance.  The Public Ministry continued to investigate allegations of illicit campaign financing in the 2015 elections, including a case against Sandra Torres and the National Unity of Hope Party.  A substitute judge in High-Risk Court A granted Torres house arrest during her pretrial detention; in August 2021 a three-judge appellate panel granted her permission to participate in political activities with her party while under house arrest.  In November High Risk Court judge Claudette Dominguez dismissed the charges against Torres, citing insufficient evidence.

**Participation of Women and Members of Minority Groups:**  No laws limit participation of women or members of minority groups in the political process, and they did, to an extent, participate.  Traditional and cultural practices, discrimination, institutional bias, and difficulty traveling to polling places in rural areas limited participation of women and members of Indigenous groups.

# Section 4. Corruption and Lack of Transparency in

CLP_PC_025144

# Government

The law provides criminal penalties for official corruption, but some officials engaged in corrupt practices with impunity. Despite numerous allegations of corruption in all branches of the government, few high-level cases were investigated during the year, and anticorruption efforts within the judiciary stalled. Prominent anticorruption prosecutors were arrested, fired, or removed from significant cases, and corrupt actors threatened independent judges by filing complaints based on spurious charges to strip the judges of immunity to prosecution.

Between February and May, Attorney General Porras and the Public Ministry issued arrest warrants for at least eight sitting and former anticorruption prosecutors for alleged crimes, including abuse of authority, during their time as prosecutors. The prosecutors were held in provisional and pretrial detention for weeks and faced multiple delays in their arraignment hearings. Foreign governments and international organizations denounced the arrests and called for due process and transparency. Since the July 2021 firing of Juan Francisco Sandoval, the former head of the FECI, at least 20 FECI prosecutors were removed, transferred, or resigned due to fear of reprisal. Several have since gone into exile.

Threats against independent judges weakened anticorruption efforts. Judges who presided over high-profile criminal cases faced continued efforts to strip them of their immunity, the loss of which would expose them to potential prosecution and retaliation for their judicial rulings. In March International Woman of Courage award winner and former High-Risk Court Judge Erika Aifan resigned from her post and left the country after facing multiple threats to her immunity from prosecution filed by corrupt actors.

The Presidential Commission Against Corruption served the function of introducing reforms that promote transparency, but it lacked the mandate to investigate or prosecute corruption cases. Civil society representatives criticized the commission for a perceived lack of independence.

**Corruption:** The UN's International Commission Against Impunity (CICIG)

CLP_PC_025145

brought many corruption cases, but many were overturned during the year.  For example, CICIG had Blanca Aida Stalling Davila removed from the Supreme Court and brought corruption charges against her in 2017.  The case against Stalling stemmed from her alleged attempts to pressure a judge to give a lenient sentence to her son, Otto Molina Stalling, in a 2017 illicit association case.  On June 29, Stalling was found not guilty of influence peddling, and the FECI refused to appeal the not-guilty verdict.  This was one of many examples of FECI director Rafael Curruchiche refusing to appeal decisions that courts made during the year to overturn or dismantle corruption cases originally brought by CICIG.  On September 22, the Supreme Court announced that it would reinstall Stalling as a magistrate in the Supreme Court after the not-guilty verdict.

In some areas of law enforcement, impunity from corruption was a significant problem.  Within the PNC, impunity was evident in the Port, Airports, and Border Points Division (DIPAFRONT), which investigated crimes involving national borders, such as drug trafficking, smuggling, contraband, and evasion of paying taxes by moving money outside the country.

There were several reports of police officers asking for bribes to transport illegal migrants.  Also, persistent allegations of corruption within the PNC, beginning with the PNC academy's hiring procedures, officer promotions, and transfers to favorable positions, affected the credibility of the academy and the PNC overall.

PNC officials reportedly used check points to ask for bribes from citizens to release them from custody; if the citizen had no cash, some police officers took them to an automated teller machine to collect the bribe.

There was impunity of high-level officials from disciplinary or criminal prosecution.  In several instances, when PNC or Public Ministry investigators opened a case against high-level officials, the investigators were subsequently removed or transferred.

Five PNC agents were involved in the drug trafficking organization known as "Los Cardamomeros" operating in Alta Verapaz, Guatemala, Chimaltenango, and Escuintla.  In September police announced they dismantled the gang in which the PNC agents were operating and arrested the five PNC agents, along with six

CLP_PC_025146

civilians, who are all awaiting trial on charges of aggravated robbery and illicit association, among other charges.

On April 27, the Constitutional Court rejected an effort to prosecute Judge Jose Eduardo Cojulun for his alleged connection to a criminal structure in a case known as "Fenix."  Cojulun is accused of obstruction of justice for giving lenient rulings to the alleged leader of a criminal structure that laundered money and stole public funds.  The Fenix case implicated dozens of private- and public-sector actors based on a 2019 investigation by CICIG.

# Section 5. Governmental Posture Towards International and Nongovernmental Investigation of Alleged Abuses of Human Rights

A variety of domestic and international human rights groups generally operated without government restriction, investigating and publishing their findings on human rights cases.  Many of these groups, however, were the subject of harassment and threats, and they faced pressure and attacks from political actors.

**Retribution against Human Rights Defenders (HRDs):**  Several NGOs, human rights workers, and trade unionists reported threats, violence, and intimidation.  An international human rights organization reported four killings of human rights defenders (see section 1.a.), while UDEFEGUA reported 589 threatening messages and other harassment, including some instances of violence and threats of violence, against human rights defenders from January to June, compared with 551 attacks in the same period in 2021.  More than half the attacks they reported were against prosecutors and defense lawyers.  NGOs asserted the government did little to investigate the reports or prevent further incidents.

On February 14, police arrested David Maxena on charges of making threats of violence and illegally occupying land.  Maxena was a Mayan Poqomchi community organizer and leader in the Verapaz Union of Peasant Organizations (UVOC).  He led protests on the displacement of Indigenous peoples and the environmental effects of the Santa Teresa hydroelectric project in Tucuru, Alta Verapaz.  According to an international human rights group, the case against Maxena had irregularities such as a long pretrial detention period (seven months as

CLP_PC_025147

of September), a lack of initial notification of the charges brought against him, and his transfer to areas of prison that were not used for pretrial prisoners.  After Maxena spent seven months in pretrial detention, a judge acquitted Maxena of all charges in October.

NGOs reported the government, political groups, and private entities used threats of legal action as a form of intimidation.  According to UDEFEGUA, from January to June there were at least 70 new judicial cases filed against human rights defenders, compared with 26 for the same period in 2021.  Members of the Foundation against Terrorism (FCT), an NGO known to target anticorruption and human rights defenders, filed both civil and criminal complaints against human rights NGOs and NGOs that sought to create government accountability for human rights abuses during the internal armed conflict.

High Risk Court Judge Miguel Angel Galvez received an increasing number of threats following his assignment to the landmark internal armed conflict-era human rights abuse case known as Diario Militar, which led him to leave the country on November 4 and resign from the court.  The case implicated former military members in cases of forced disappearance and torture during the internal armed conflict (see section 1.b.).  The alleged attacks on Galvez increased after the arrest of Toribio Acevedo Ramirez, a former military member, for Ramirez's alleged participation in the crimes.  The FCT submitted legal complaints against Galvez and attacked Galvez on social media.  The Supreme Court investigated one complaint filed by the FCT in May, taking up the complaint against Galvez almost immediately after it was filed, and the Public Ministry has indicated its intention to seek Galvez's extradition from exile (see section 1.e.).  According to human rights NGOs, the complaint could potentially strip Galvez of immunity and derail the Diario Militar case.

**Government Human Rights Bodies:**  The PDH monitors the human rights set forth in the constitution and reports to congress.  NGOs generally considered the PDH to be an effective institution under director Jordan Rodas, although with limitations in rural areas.  On August 20, a new director, Jose Alejandro Cordova Herrera, took office.

The Congressional Committee on Human Rights drafts and provides guidance on

CLP_PC_025148

legislation regarding human rights.  The law requires that all political parties represented in congress have a representative on the committee.  Some NGOs did not consider the committee to be an effective forum for human rights promotion and protection.

The Secretariat Against Sexual Violence, Exploitation, and Trafficking in Persons is a government body under the authority of the Office of the Vice President.  The secretariat monitors and informs vulnerable populations and government entities on sexual violence, exploitation of children, and trafficking in persons.  The secretariat reported congress withheld some of its funds by exercising line-item approval for all its projects.

In 2020 President Giammattei announced the creation of the Presidential Commission for Peace and Human Rights to replace and unify three institutions: the President's Commission on Human Rights, the Secretariat for Peace, and the Secretariat of Agricultural Affairs.  The new commission's mandate was to promote human rights policy, represent the country in international human rights forums, enact international recommendations on human rights, and oversee the Chixoy reparations, among other responsibilities.  Civil society expressed concern that dissolving the three original institutions would lead to a lack of mechanisms for enacting the recommendations of international forums and for protecting human rights.

The National Reparations Program did not implement full reparation to victims of the internal armed conflict due to regulatory deficiencies that stopped its operations and that had not been resolved since 2020.  The program had many requests for reparations in its archives but had paid only half of them.  Other types of reparations envisioned in the program's charter, such as changes to the national education curriculum and improvement projects for affected communities, were not implemented in most cases.  The governmental agreement that established the continued existence of the National Reparations Program was scheduled to expire in 2023.

CLP_PC_025149

# Section 6. Discrimination and Societal Abuses

## Women

**Rape and Domestic Violence:** The law criminalizes rape of men or women, including spousal rape, and sets penalties between five and 50 years in prison. The law establishes penalties for femicide at 25 to 50 years in prison without the possibility of reducing the sentence; however, femicide remained a significant problem.

Police had minimal training and capacity to investigate sexual crimes or assist survivors of such crimes, and the government did not enforce the law effectively. Rape, other sexual offenses, and gender-based violence remained widespread and serious problems.

The government took steps to combat femicide and gender-based violence. The judiciary operated a 24-hour court in Guatemala City to offer services related to gender-based violence including sexual assault, exploitation, and trafficking of women and children. The judiciary operated specialized courts for gender-based violence throughout the country, but not in every department. The Public Ministry maintained a 24-hour victim service center to provide medical, psychosocial, and legal support to survivors, including issuing restraining orders for their immediate protection. The ministry also maintained a national alert system for finding disappeared women.

The Public Ministry maintained a public website titled "the Women's Observatory," with statistics regarding crimes against women and children. According to that website, 31 percent of criminal complaints as of October were filed for crimes against women and children, and 44 percent of those complaints resulted in investigation and successful resolution of the complaint.

Gender-based violence, including sexual and domestic violence, remained widespread and serious. The law establishes penalties of five to eight years in prison for gender-based violence, including physical, economic, and psychological violence.

On January 24, a High-Risk Court Tribunal of three judges sentenced five former

CLP_PC_025150

militia members to 30 years in prison each for crimes against humanity for involvement in the sexual assaults of 36 Indigenous Achi women in 1981-85 during the internal armed conflict.  The court also mandated that the government provide monetary reparations and other conciliatory measures.  The National Prosecutor General, the cabinet-level federal government office that acted as the legal representative of the government, filed an appeal to prevent the payout of these reparations, and as of year's end, the appeal was not resolved.

Women with disabilities and members of the LGBTQI+ community with disabilities remained at greater risk of being victims of continued sexual violence. Most persons with disabilities, especially women, did not report situations of violence and abuse because the reporting processes were complex and discriminated against them.

**Sexual Harassment:**  Although several laws refer to sexual harassment, no single law, including laws against sexual violence, addresses sexual harassment directly. The law does not prohibit sexual harassment in the private sector workplace. Human rights organizations reported sexual harassment was widespread.

**Reproductive Rights:**  Forced sterilization was purportedly common for persons with disabilities but reporting on these abuses was rare, according to an international human rights organization that tracks disability rights.  There were no official reports during the year of coerced abortion or involuntary sterilization on the part of government authorities.

Cultural, geographic, and linguistic barriers hampered access to reproductive health care, including contraceptives, particularly for Indigenous women in rural areas, where contraceptives were also least likely to be available locally.  The prevalence of modern contraceptive use remained low among Indigenous women compared with all other women, and a lack of culturally sensitive reproductive and maternal health-care service providers deterred some Indigenous women from accessing reproductive health-care services.

The government provided medical services through the Ministry of Health for survivors of sexual violence.  The services provided victims with access to emergency contraceptives and antiviral medicines to prevent sexually transmitted

CLP_PC_025151

diseases and unwanted pregnancy resulting from rape. The ministry also provided some justice services. Many survivors did not seek medical care due to cultural and geographic barriers. Authorities within the justice system commented that on occasion some hospital clinics did not have the required medication in stock to protect rape victims against sexually transmitted diseases or pregnancy.

According to a 2020 report by the Ministry of Health, the maternal mortality rate among Indigenous communities was 156 per 100,000 live births, compared with the national average of 108 per 100,000 live births.

One-half of all the maternal deaths occurred in four departments in the northwest of the country (Huehuetenango, San Marcos, Quiche, and Alta Verapaz), most of them in rural and dispersed areas with high rates of malnutrition, poverty, and concentrated populations of Indigenous persons. From January to May, the Ministry of Health reported that areas with high concentrations of Indigenous peoples had the highest proportion, nearly half, of maternal deaths nationwide. Factors such as the lack of medical services available in their native language for speakers of Indigenous languages and the lack of providers and equipment in remote areas played a role in these deaths.

According to World Bank data in 2020, the fertility rate for adolescents ages 15 to 19 was 64 births per 1,000 women.

A lack of access to menstrual products and the lack of separate boys' and girls' bathrooms in some rural schools continued to negatively affect adolescent girls' access to education in rural areas of the country.

In March the congress approved Decree 22-2022, a law that declares May 19 as the National Day of the Guatemalan Midwife Iyom and Rati't Ak'al in celebration of a prominent Indigenous midwife. The decree also establishes an annual incentive (not a salary) for Indigenous midwives registered with the Ministry of Health. This incentive aims at acknowledging the work of Indigenous midwives and dignifying their work to ensure access to health care for Indigenous women.

**Discrimination:** The constitution establishes the principle of gender equality, stating that all individuals are equal and have the same rights, and that men and women enjoy the same opportunities and responsibilities. Despite this, women,

CLP_PC_025152

and particularly Indigenous women in rural areas, faced discrimination and were less likely to hold management positions.  The law establishes equal pay for women and men in government offices by prohibiting differences in pay based on "personal identity," but the law does not prohibit discrimination based on gender in the private sector.  There are laws that restrict women from working in certain sectors, including in jobs deemed morally inappropriate.  The law does not prohibit gender discrimination in access to credit.  The government did little to enforce gender equality laws effectively.

The law provides for equality between men and women during and after divorce with respect to childcare and financial and housing assistance to the children's caretakers, who are often women.  The PDH reported that fairness between men and women in divorce proceedings had improved in the last 20 years.

## Systemic Racial or Ethnic Violence and Discrimination

There are no laws, policies, or state programs that specifically contribute to the reduction of racism, according to international human rights organizations.  The constitution provides for protections against discrimination based on race or ethnic group, and the law provides for a penalty of one to three years' imprisonment and a fine for acts of discrimination.  Other efforts to combat discrimination included litigation instructions from the Public Ministry for discrimination crimes.

The government generally did not effectively enforce laws against discrimination.

The executive branch lacked a coordinated approach to address poverty and unemployment concentrated mainly in Indigenous and Afro-descendant communities, although there were some government programs directed at the needs of these populations.

## Indigenous Peoples

The government's National Institute of Statistics estimated Indigenous persons from 24 ethnic groups made up 44 percent of the population.  The law provides for equal rights for Indigenous persons and obliges the government to recognize, respect, and promote the lifestyles, customs, traditions, social organizations, and manner of dress of Indigenous persons.  The government does not, however,

CLP_PC_025153

recognize particular Indigenous groups as having a special legal status provided by national law. The law stipulates that the government must consult with Indigenous groups prior to implementing large infrastructure projects in Indigenous territories. Observers indicated the government did not always consult with all affected parties and Indigenous leaders, and activists regularly reported being harassed and threatened for their work.

Indigenous lands were not effectively demarcated, making the legal recognition of titles to the land problematic. Indigenous representatives claimed business and other actors in several regional development projects failed to consult meaningfully with local communities. In some cases, Indigenous communities were not able to participate in decisions affecting the exploitation of resources in their communities, including energy, minerals, timber, rivers, or other natural resources. They also lacked effective mechanisms for dialogue with the state to resolve conflicts.

According to the OHCHR, there was a significant increase in attacks and incidents of defamation and intimidation against Indigenous defenders of Indigenous land, territory rights, and natural resources.

One Indigenous community consultation process over the operation of a silver mine in San Rafael, Santa Rosa, between the Ministry of Energy and Mines and the Xinka community continued, with the Xinka Parliament representing their community. On July 20, representatives of the Xinka community, the Xinka Parliament, and the Ministry of Energy and Mines completed the preconsultation phase of court-ordered consultations in San Rafael, Santa Rosa, with a planned end date of February 2023. The Xinka Parliament initially characterized the process as "workable" but reported in December that the process was stalled due to an impasse over government funding of international environmental studies experts.

Discrimination against Indigenous cultures and customs existed in the health-care system. Civil society organizations of Indigenous midwives in rural areas reported that their services were not recognized by government health-care institutions under the Ministry of Public Health.

In December 2021 the Inter-American Court of Human Rights ruled that the

CLP_PC_025154

government violated its commitments on Indigenous peoples' rights by shutting down four Indigenous community radio stations.  The court ruled that the government should provide several reparation measures.  The court ruled that the government had six months to publish the decision in its official government registry, giving it legal effect; however, as of September the government had not done this.

Indigenous communities were underrepresented in national politics and remained largely outside the political, economic, social, and cultural mainstream.  This was mainly due to limited educational opportunities (contrary to law), limited communication regarding Indigenous rights, and pervasive discrimination.  Government agencies dedicated to supporting Indigenous rights lacked political support.  These factors contributed to disproportionate poverty and malnutrition among most Indigenous populations.

## Children

**Birth Registration:**  Children derive citizenship by birth within the country or from their parents.  Birth registrations were low and discriminated against rural populations where there were few government registry offices or modern health-care facilities.  UNICEF described low birth registration as a "serious problem," and UNHCR reported problems in registering births were especially acute in Indigenous communities due to inadequate government registration and documentation systems.  Lack of registration restricted children's access to some public services and created conditions that could lead to statelessness.

**Education:**  While primary education is free and compulsory through age 15, access was limited in many rural areas.  Education through the secondary level is not obligatory.  International observers noted that in rural communities, boys were prioritized for high school education due to the problems of traveling long distances to school and the perceived value of girls in the home.

**Child Abuse:**  Child abuse remained a serious problem.  A unit under the Office of the Special Prosecutor for Crimes against Children and Adolescents handled child abuse cases.  The Public Ministry has an integrated 24-hour care model providing medical, psychosocial, and legal support to children and adolescent victims of

CLP_PC_025155

violence.

**Child, Early, and Forced Marriage:**  The legal age for marriage is 18.

**Sexual Exploitation of Children:**  The law provides sentences ranging from 13 to 24 years in prison, depending on the victim's age, for engaging in sex with a minor.  The minimum age of consensual sex is 18.  The law defines sexual relations with a minor under age 14 as rape.

The law prohibits child pornography and establishes penalties of six to 10 years in prison for producing, promoting, and selling child pornography, and two to four years' imprisonment for possessing it.  The commercial sexual exploitation of children, including child sex tourism, remained a problem, including in privately run orphanages.

**Displaced Children:**  There were numerous children living on the street or in slums.  Criminals and gangs often recruited street children, many of them victims of domestic abuse, for purposes of theft, extortion, commercial sexual exploitation, transporting contraband, and conducting illegal drug activities.

**Institutionalized Children:**  More than 800 children and adolescents lived in shelters operated by the Secretariat for Social Welfare.  The government lacked clear policies for children with disabilities in residential institutions, leaving accommodations in these cases up to the individual institutions.

Former secretariat Secretary Carlos Rodas and former Deputy Secretary for Protection and Shelter Services Anahi Keller faced criminal charges for murder, abuse of authority, breach of duty, and abuse against minors following the deaths of 41 girls in the 2017 fire at the Hogar Seguro orphanage, which was under the authority of the secretariat.  Both were allowed to await their trial under house arrest.  Public arguments in the case were suspended for the sixth time; as of September 23, the new date for public arguments had not been scheduled.

## Antisemitism

The Jewish population was approximately 1,500 persons.  Jewish community representatives reported no antisemitic incidents as of November.

CLP_PC_025156

## Trafficking in Persons

See the Department of State's *Trafficking in Persons Report* at
https://www.state.gov/trafficking-in-persons-report/.

## Acts of Violence, Criminalization, and Other Abuses Based on Sexual Orientation, Gender Identity or Expression, or Sex Characteristics

**Criminalization:**  There are no laws or de facto discrimination against consensual same-sex sexual conduct between adults.

**Violence against LGBTQI+ Persons:**  Violence against LGBTQI+ persons remained a persistent issue.  According to an annual report from the Lambda Association, there were 21 killings of LGBTQI+ persons from January to September in which the violence could plausibly be linked to the victims' sexual orientation or gender identity.  The Lambda Association also reported that most homicides and general crimes of prejudice against LGBTQI+ persons occurred either in the capital, Guatemala City, or in Izabal.

According to LGBTQI+ activists, gay and transgender individuals often experienced police abuse.  LGBTQI+ human rights groups stated, for example, that police regularly engaged in extortion and harassed male and transgender individuals whom they alleged to be sex workers.

Lambda and other LGBTQI+ organizations reported a lack of will on the part of police to fully investigate hate crimes and violence against LGBTQI+ persons.

On July 2, an assailant shot and killed Nancy Suc, an Indigenous transgender woman who was a member of the Transgender Women Sexual Workers Collective of Trebol.  The assailant was trying to extort Suc, according to press reports and a criminal complaint that Suc filed days before the attack.  Suc's alleged killer was arrested and was awaiting trial, but fellow sex workers continued to be threatened and extorted and claimed Suc's criminal complaint to the Public Ministry reporting the death threats against her was not taken seriously.

Openly gay and HIV-positive congressman Aldo Davila reported that other

CLP_PC_025157

members of congress yelled homophobic comments at him when he attempted to speak during sessions of congress and directed homophobic slurs at him in the halls of congress.

**Discrimination:**  The constitution declares all persons equal under the law and prohibits discrimination by state and nonstate actors based on gender, marital status, or political opinion.  The law does not prohibit discrimination based on sexual orientation, gender expression, or sex characteristics and does not recognize LGBTQI+ individuals, couples, or their families.

The government does not provide or measure sexual diversity or gender identity statistics in its census and does not break down health, education, and other statistics by sexual diversity or gender identity.  Local experts who worked on sexual diversity issues stated the lack of demographic data hampered NGO efforts to analyze and provide effective solutions to problems in the LGBTQI+ community, such as poverty stemming from lack of job opportunities.  Those same experts noted positively that in 2021 the Public Ministry started collecting data on the sexual orientation and gender identity of victims of crime who filed police reports.

LGBTQI+ advocates pointed to structural problems, such as gender identity document requirements and general societal discrimination, that created internal displacement, discrimination, sexual exploitation, and child abuse among members of the LGBTQI+ community.

There was general societal discrimination against LGBTQI+ persons in access to education, health care, employment, and housing.  The government made minimal efforts to address this discrimination.  Local experts on sexual diversity issues said the government did not publish official medical guidance or standards on hormone therapy for gender transition therapies.  Hence, these therapies were unregulated in the private sector and posed risks for transgender persons considering physiological transition therapies.  There were also no publicly provided gender transition therapies in government medical facilities, so individuals had to pay personally for any of these therapies.

**Availability of Legal Gender Recognition:**  Individuals cannot self-identify

CLP_PC_025158

gender for official documents.  Their gender assigned at birth and showing on their birth certificate is their gender on their official documents.  Government-issued national identification cards that are used to access basic services and education resources do not allow transgender persons to receive identification cards with their chosen names or gender identification.  Without identification that reflected the name and gender under which they lived, transgender persons were denied many government services.

**Involuntary or Coercive Medical or Psychological Practices Specifically Targeting LGBTQI+ Individuals:**  LGBTQI+ activists and investigative journalists reported there was an active network of "conversion therapy" centers, mostly located in the interior of the country in rural areas but organized and funded in conjunction with evangelical churches in the capital.  Reports mentioned electroshock therapy for gay men, "corrective" rape for lesbian women, and coerced sex acts for transgender women.

LGBTQI+ groups also claimed lesbian, bisexual, and queer women experienced forced marriages and "corrective" rape intended to cause pregnancy, although these incidents were rarely, if ever, reported to authorities.

Gente Positiva, a HIV-positive advocacy and awareness group, reported that when lesbian women who were victims of "corrective" rape tried to file a legal complaint, the Public Ministry officials receiving the complaint often refused to record the incident if the woman reporting the rape knew the attackers or had drunk alcohol the same day as the rape.  Gente Positiva also reported that the government did not recognize "corrective" rape of lesbian women as an aggravated version of sexual assault or a hate crime; the government considers it the same as rape.

**Restrictions of Freedom of Expression, Association, or Peaceful Assembly:** There were no confirmed or reported restrictions on those speaking out on LGBTQI+ issues.

# Persons with Disabilities

Persons with disabilities were unable to access education, health services, public buildings, and transportation on an equal basis with others.  No law requires such

CLP_PC_025159

access, nor does the law mandate that persons with disabilities have access to information or communications.

Discrimination against persons with disabilities continued to be a problem, with such persons experiencing discrimination based on their specific disability, gender, age, place of residency, and sexual orientation, among other factors.

Persons with disabilities experienced violence, harassment, intimidation, and abuse, including incidents incited, perpetrated, or condoned by attendants and staff at institutions.  Persons with disabilities, especially women and underrepresented groups, experienced high levels of violence and abuse, including sexual assault.

International human rights organizations pointed to the institutionalization of persons with disabilities as a source of harassment and abuse.  They stated that because there is no national strategy for deinstitutionalizing children with disabilities from publicly supported residences and facilities, these children would most likely remain institutionalized.  Children with disabilities with high support requirements were essentially forced to live in institutions due to the lack of policies or funding that would enable them to live in a family household.

Children with disabilities attended school at all levels at a significantly lower rate than other children; most did not attend school at all.  Nongovernmental organizations that advocated for persons with disabilities reported the government violated the right to education for students with disabilities, especially those with intellectual disabilities.  Reports indicated that online learning resources made available to students with disabilities were focused on visually and auditorily impaired students and that few solutions were provided for students with other disabilities.

A report by the NGO Women Enabled International described multiple discriminations faced by Indigenous persons with disabilities.  Discriminatory cultural norms against persons with disabilities, were intensified against Indigenous women with disabilities, increasing the possibility that they would be separated from their children or be forcibly sterilized.

Observers noted little progress was made in access to voting for persons with disabilities.  Voting mechanisms for persons with intellectual disabilities did not

CLP_PC_025160

exist.  Voting in braille existed, but it did not guarantee secret voting.

## Other Societal Violence or Discrimination

On several occasions, vigilante mobs attacked and killed persons suspected of crimes such as rape, kidnapping, theft, or extortion.  The NGO Mutual Support Group reported five persons were killed and 62 injured by vigilante groups from January through August.  The NGO stated these attacks took place mostly in interior departments of the country with weak law enforcement.

Several international human rights organizations reported the continued problem of extralegal forced removal of local Indigenous groups from land and the lack of proper government involvement to ensure that removals were conducted legally. Removals were sometimes conducted by security guards hired by private landowners and sometimes by groups of other local individuals that wanted to take over land.

One such forced removal occurred in La Pilas, Cahabon, Alta Verapaz, on April 5. A group of dozens of residents attempted to remove approximately 15 families in the community of Las Pilas by threatening them with being shot, beatings, and by burning the shelters they live in.  According to a local official of the Human Rights Ombudsman's office, the violence generated by this conflict made police hesitant to respond due to fear for their own safety, as the police were far outnumbered by the assailants.  Members of the displaced community stated that as of September the threats against them continued and the conflict over the land had not ended.

There was conflict in the interior of the country between Indigenous evangelical groups and Indigenous adherents of Mayan spiritual groups.  This friction resulted in violence in one incident on May 16, in Chichipate, Izabal.  Members of the local community government authority illegally detained Mayan spiritual guide Adela Choc Cruz and her adult child, Sandra Tec Choc, and threatened to burn Choc Cruz alive for committing acts of witchcraft against the child of a local evangelical leader.  Community members burned Choc Cruz's house and warded off police that attempted to intervene.  As of September, the Public Ministry had not brought charges against, nor had the police arrested, those accused of the threats against Choc Cruz.

CLP_PC_025161

The law prohibits discrimination based on HIV or AIDS status. Social discrimination and stigma around AIDS and HIV continued to be problematic and contributed to not only the spread of the disease but also mortality rates. Some government authorities required citizens to reveal HIV and AIDS test results to receive certain public benefits, and some employers required similar disclosure to be hired.

Discrimination against LGBTQI+ persons with HIV or AIDS was particularly common and affected access to HIV-prevention programs, especially for transgender individuals.

# Section 7. Worker Rights

## a. Freedom of Association and the Right to Collective Bargaining

The law provides for the right of workers, except for security force members, to form and join trade unions, conduct legal strikes, and bargain collectively. The law, however, places some restrictions on these rights. For example, legal recognition of an industrywide union requires that the membership constitute a majority of the workers in an industry. The law restricts union leadership to citizens. Ministries and businesses are required to negotiate only with the largest union, as determined by annual membership. The law prohibits antiunion discrimination and employer interference in union activities and requires employers to reinstate workers dismissed for organizing union activities. A strike must have the support of the majority of a company's workforce. Workers are not restricted to membership in one union or one industry.

The president and cabinet may suspend any strike deemed gravely prejudicial to the country's essential activities and public services. The government defines essential services more broadly than international standards, thus denying the right to strike to many public workers, such as those working in postal services, transport, and the production, transportation, and distribution of energy. Public employees may address grievances by means of conciliation for collective disputes and arbitration directly through the labor courts. For sectors considered essential, arbitration is compulsory if there is no agreement after 30 days of conciliation.

CLP_PC_025162

The law prohibits employer retaliation against workers engaged in legal strikes.  If authorities do not recognize a strike as legal, employers may suspend or terminate workers for absence without leave.  A factory or business owner is not obligated to negotiate a collective bargaining agreement unless at least 25 percent of workers in the factory or business are union members and request negotiations.  Once a strike occurs, companies are required to close during negotiations.  Strikes were extremely rare, but work stoppages were common.

The government did not effectively enforce the law; threats and violence against trade unionists continued.  The Ministry of Labor has the authority to sanction employers for violating union and collective bargaining rights, but government institutions, such as the Ministry of Labor and the labor courts, did not effectively investigate, prosecute, or punish employers who violated freedom of association and collective bargaining rights.  Procedural hurdles, restrictions on and delays in forming unions, and impunity for employers rejecting or ignoring court orders severely limited freedom of association and collective bargaining.  Penalties were less than those for other laws involving denials of civil rights, such as discrimination.  Labor courts also failed to compel compliance with reinstatement orders, including payment of back wages, for workers illegally dismissed for engaging in union activities, especially in rural areas.

There was a substantial backlog of cases in the labor courts that caused delays of up to five years.  The Public Ministry was ineffective in responding to labor court referrals for criminal prosecution in cases where employers refused to comply with labor court orders.  In the labor inspection system and in the labor courts, employers routinely influenced authorities to favor their interests or simply refused to comply.  According to the Special Prosecutor's Office for Crimes Against Unionists, 70 percent of complaints in 2020 involved persistent employer refusal to comply with judicial orders.  Penalties were rarely successfully applied against violators.

The General Labor Inspectorate reported that it inspected 10 cases of potential violations to the right to form an independent union or collectively bargain.  Worker representatives reported no significant improvement in compliance with the law despite the ministry's authority to sanction employers directly.  These representatives noted that the inspectorate emphasized the collection of fines,

CLP_PC_025163

which went to the labor inspectorate, over remediation of the underlying violations. Lack of information regarding the law's implementation made it difficult to assess its impact on improving labor law enforcement.

The Unit for Crimes against Unionists within the Office of the Special Prosecutor for Human Rights in the Public Ministry was responsible for investigating attacks and threats against union members as well as for noncompliance with judicial orders in labor cases. The government reported an increased budget for the unit, but staffing for the unit remained stagnant, and there were no successful prosecutions this year.

As of November, the Trade Union Permanent Commission for Protection, which was supposed to be convened by the Public Ministry to address problems of antiunion violence, held no meetings. This commission had not held regular meetings since 2018.

According to NGOs, the General Inspectorate of Labor failed to ensure that workers who formed new unions were protected from termination. The inspectorate frequently failed to notify the companies of the formation of the union and the prohibition against firing the founders, or the inspectorate failed to do so within the timeframe required by law. The General Directorate of Labor failed to register unions within the prescribed timeframe. Workers and the Ministry of Labor agreed the procedural manual for registering unions needed to be updated and aligned with the current labor laws.

Workers formed a union at Centexsa S.A. hosiery manufacturing and submitted their registration on February 6 to the Ministry of Labor. The General Directorate of Labor identified minor errors, which the union immediately corrected. The General Directorate of Labor found new errors and forced the union to resubmit documentation three times recognizing official registration. On April 7, the General Directorate of Labor certified the union, well beyond the required 20 days after receiving the request.

The Special Prosecutor's Office for Crimes against Judicial Workers and Unionists reported that from January to August, it received 53 complaints of crimes or offenses against trade unionists and labor activists. From January to August, an

CLP_PC_025164

NGO registered four death threats and six cases of threats and intimidation against trade unionists and labor activists.  One union leader received a death threat over the telephone.  Union leaders from an apparel manufacturing company filed a criminal complaint with the Special Prosecutor's Office alleging threats and intimidation charges; the case remained under investigation.  In that case, authorities provided protection such as police presence and perimeter patrols in the areas surrounding the factory and residences of the affected trade unionists.

Labor rights defenders noted an increase in mass firings, use of force against collective action, and criminalization of worker protest.

Employers routinely resisted attempts to form unions, delayed or only partially complied with agreements from direct negotiations, and ignored judicial rulings requiring the employer to negotiate with recognized unions.  There continued to be credible reports of employers retaliating against workers who tried to exercise their rights.  There were numerous complaints about firings or suspensions alleging employer retaliation for union activity, according to an NGO.  Authorities failed to enforce labor laws and let complaints of retaliation against union members languish.

For example, at Carnes Procesadas, the company fired 45 union members, and despite 31 orders of reinstatement from the courts, refused to obey any of the orders.  The workers remained without employment despite the employer refusing to follow court orders and being found in contempt.

In January a group of workers from an apparel manufacturing company notified global brands for which they manufactured products of their intention to form a union, according to an NGO.  Over the next two days, the company fired nine workers who intended to form a union.  The workers alerted the brands of their dismissal and were reinstated six days later per the request of the brands.  Despite having filed complaints with the General Labor Inspectorate, no inspection was carried out until months later when workers were already reinstated to their work due to the brands' interventions.

## b. Prohibition of Forced or Compulsory Labor

The law prohibits and criminalizes all forms of forced or compulsory labor.  The

CLP_PC_025165

government failed to enforce the law effectively.  Reports persisted of men and women subjected to forced labor in agriculture and domestic service, mostly in the palm oil industry.  Criminal penalties for forced labor range from eight to 18 years' imprisonment and a fine.  The government has specialized police and prosecutors who handle cases of human trafficking, including forced labor.  Local experts reported some prosecutors lacked adequate training.  There were reports of forced child labor in agriculture, production of garments, domestic work, street begging, making corn tortillas, and vending (see section 7.c.).

Also see the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## c. Prohibition of Child Labor and Minimum Age for Employment

See the Department of Labor's *Findings on the Worst Forms of Child Labor* at https://www.dol.gov/agencies/ilab/resources/reports/child-labor/findings/.

## d. Discrimination with Respect to Employment and Occupation

The law explicitly prohibits discrimination with respect to employment or occupation based on race, color, sex, ethnicity, pregnancy status, religion, political opinion, national origin or citizenship, age, and disability.  The government did not effectively enforce the law and related regulations.  Penalties were less severe than those for laws related to civil rights, such as election interference.  Penalties were rarely applied against violators.

Discrimination in employment and occupation occurred.  No provisions in the labor code provide specific protections to gender identity, HIV or AIDS status, or refugee or stateless status.  Anecdotally, wage discrimination based on race and sex occurred often in rural areas.  According to data from a national survey, women's wages represented 73 percent of the men's average wage.  Of the working-age population, 63 percent were economically active; men's participation in the labor force was 86 percent, contrasting with 43 percent for women.

The law does not prohibit sexual harassment in the private-sector workplace.  Human rights organizations reported sexual harassment was widespread (see section 6).  Garifuna and Afro-descendent populations reported their inability to

CLP_PC_025166

obtain work contracts due to their race, increasing their risk of labor exploitation. Unionized workers from the southern coast complained of discriminatory treatment based on gender expression, specifically related to their physical appearance, their way of dressing, and gestural behavior.  These unionized workers indicated that some of these cases had been taken to labor conciliation boards.  Most cases were resolved favorably but without specifically acknowledging discrimination based on sexual orientation or gender identity.

## e. Acceptable Conditions of Work

**Wage and Hour Laws:**  The law sets national minimum wages for agricultural and nonagricultural work and for work in garment factories.  These minimum wages did not meet the minimum food budget for a family of five.

The legal workweek is 48 hours, with at least one paid 24-hour rest period.  The law prohibits workers from working more than 12 hours a day.  The law provides for 12 paid annual holidays and paid vacation of 15 working days after one year's work.  Daily and weekly maximum hour limits do not apply to domestic workers. Time-and-a-half pay is required for overtime work, and the law prohibits excessive compulsory overtime.

The General Labor Inspectorate reported that most inspections were triggered by complaints about benefits and wages.  Other factors contributing to the lack of effective enforcement included employer refusal to permit labor inspectors to enter facilities, employer refusal to provide payroll records and other documentation, and inspectors' lack of follow-up inspections in the face of such refusals.

Trade union leaders and human rights groups reported employers required workers to work overtime without receiving legally mandated premium pay.  Management often manipulated employer-provided transportation to worksites to force employees to work overtime, especially in export-processing zones located in isolated areas with limited transportation alternatives.

Noncompliance with minimum wage provisions in the agricultural and informal sectors was widespread.  Advocacy groups estimated most workers in rural areas who engaged in daylong employment did not receive the wages, benefits, or social security allocations required by law.  Many employers in the agricultural sector

CLP_PC_025167

reportedly conditioned payment of the minimum daily wage on excessive production quotas that workers generally were unable to meet.  To meet the quota, workers believed themselves compelled to work extra hours, sometimes bringing family members, including children, to help with the work.  Because of having to work beyond the maximum allowed hours per day, workers received less than the minimum wage for the day and did not receive the required overtime pay.

Local unions highlighted and protested violations by employers who failed to pay employer and employee contributions to the national social security system despite deducting employee contributions from workers' paychecks.  These violations, particularly common in export and agricultural industries, resulted in limiting or denying employees' access to the public health system and a reduction of workers' pension benefits.

Many employers of domestic servants routinely paid less than minimum wage, failed to register their employees with the Guatemalan Institute of Social Security, and demanded 16-hour days for six or more days a week for live-in staff.

**Occupational Safety and Health:**  The government set occupational safety and health (OSH) standards that were inadequate and outdated.  According to the most recent reports, which were from 2018, the Ministry of Labor reported that occupational accidents were a frequent occurrence in Guatemala City, particularly in the construction and food distribution sectors.  In June five workers from a municipal water company were swept away by rainwater while cleaning an absorption well in Guatemala City.  Two of the workers died.

The law does not provide for the right of workers to remove themselves from situations that endanger health or safety.

**Wage, Hour, and OSH Enforcement:**  The government did not effectively enforce wage, hour, and OSH laws.  Effective enforcement of overtime abuse by employers was undermined by inadequate fines and the reluctance of labor courts to use compulsory measures such as increased fines and referrals to the criminal courts.  Penalties for wage, hour, and OSH violations were less than those for analogous crimes such as negligence.  Penalties were rarely applied against violators.

CLP_PC_025168

Inspectors previously lacked vehicles or fuel to carry out inspections, but the Ministry of Labor obtained additional new vehicles in 2021.

Inspectors have the right to make unannounced inspections.  In some cases, inspectors failed to take effective action to gain access to worksites when employers refused to permit access.  Inspectors were encouraged to seek police assistance as required.  Inspectors have the right to initiate sanctions; any fines collected go to the ministry.

Approximately 43 percent of the labor inspectorate's inspections carried out from January to August were complaint-driven.  Inspections were generally not comprehensive, and if complaint-driven, focused on investigating the alleged violation rather than attempting to maximize limited resources to determine compliance beyond the individual complaint.

Many inspectors performed reviews on paper or administrative duties rather than doing on-site inspections.  Although the labor inspectorate hired seven additional inspectors in 2021, the number of inspectors was insufficient to successfully enforce labor law.  The ministry had 159 labor inspectors and 22 departmental delegates in August.

The ministry had in-person service windows in Guatemala City to receive labor complaints.  During the pandemic, the ministry had closed its offices to the public, and workers were unable to present complaints in person, but in-person service resumed during the year.  The ministry also opened a call center.

Due to inefficient and lengthy court proceedings, the resolution of labor court cases was often delayed, in many instances for several years.  Employers failing to provide a safe workplace were rarely punished, and a law requiring companies with more than 50 employees to provide onsite medical facilities for their workers was not enforced.

**Informal Sector:**  According to National Statistics Institute data, 70.8 percent of the workforce worked in the informal sector and were thus outside the basic protections afforded by labor law.  Women comprised most of the informal sector, with some reports noting women comprised 88 percent of the informal sector in rural areas.  Types of informal work included street and market vendors,

CLP_PC_025169

recyclers and trash pickers, day laborers, and short-term (20 to 30 days) agricultural workers usually hired through recruiters and without a labor contract or direct-hire relationship with the employer.

Informal economy workers were not subject to wage, hour, OSH, or inspection laws.  They were not enrolled in Social Security and had no way to accumulate credits for health care or pension.

CLP_PC_025170