# HONDURAS 2022 HUMAN RIGHTS REPORT

## EXECUTIVE SUMMARY

Honduras is a constitutional, multiparty republic. The most recent national and local elections were held in November 2021. Voters elected Xiomara Castro of the LIBRE Party as president for a four-year term beginning in January. International observers generally recognized the elections as free and fair.

The Honduran National Police maintain internal security and report to the Secretariat of Security. The armed forces, which report to the Secretariat of Defense, are responsible for external security but also exercise some domestic security responsibilities in support of the national police and other civilian authorities. Some larger cities have police forces that operate independently of the national police and report to municipal authorities. The Military Police of Public Order report to military authorities but conduct operations sanctioned by civilian security officials as well as by military leaders. The National Interinstitutional Security Force coordinates the overlapping responsibilities of the National Police, Military Police of Public Order, National Intelligence Directorate, and Public Ministry during interagency operations. Civilian authorities maintained effective control over security forces. There were reports that members of the security forces committed some abuses.

Significant human rights issues included credible reports of: unlawful or arbitrary killings, including extrajudicial killings; torture and cases of cruel, inhuman, or degrading treatment or punishment by government agents; harsh and life-threatening prison conditions; arbitrary arrest or detention; serious restrictions on freedom of expression and media, including threats to media members by criminal elements; serious government corruption; lack of investigation of and accountability for gender-based violence; and crimes involving violence or threats of violence against Indigenous and Afro-descendant communities, and against lesbian, gay, bisexual, transgender, queer, and intersex persons.

The government prosecuted some officials who committed human rights abuses or engaged in corruption, but a weak judicial system and corruption were major

CLP_PC_025171

obstacles to obtaining convictions.

Criminal groups, including local and transnational gangs and narcotics traffickers, were significant perpetrators of violent crimes and committed acts of homicide, torture, kidnapping, extortion, human trafficking, intimidation, and other threats and violence directed against human rights defenders, judicial authorities, lawyers, business community members, journalists, bloggers, women, and other vulnerable populations.  The government investigated and prosecuted some of these crimes, but impunity was widespread.

# Section 1. Respect for the Integrity of the Person

## a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were several reports that the government or its agents committed arbitrary or unlawful killings.  The reported killings took place during law enforcement operations or were linked to criminal activity by government agents.  The Ministry of Security's Directorate of Disciplinary Police Affairs investigated members of the Honduran National Police accused of human rights abuses.  The Office of the Inspector General of the Armed Forces and the Humanitarian Law Directorate investigated and arrested members of the military accused of human rights abuses.

The National Human Rights Commission (CONADEH) reported two arbitrary or unlawful killings by security forces as of August.

On May 31, members of the National Anti-Gang Unit shot and killed Wilson Ariel Pérez Hernández in San Pedro Sula, Cortés Department.  He was allegedly killed while antigang unit officials tried to arrest him for assaulting a police officer at a soccer match on May 29.  On October 17, the Public Ministry charged four unit officials for their involvement in Pérez's killing.

The murder trial of police officer Jarol Rolando Perdomo Sarmiento concluded on October 17.  Perdomo was charged with the February 2021 murder of Keyla Martínez in La Esperanza, Intibucá Department.  The final verdict was pending a constitutional appeal.

CLP_PC_025172

Criminal groups, such as drug traffickers and local and transnational gangs including MS-13 and the 18th Street gang, committed killings, extortion, kidnappings, human trafficking, and intimidation of police, prosecutors, journalists, women, human rights defenders, and others.  Major urban centers and drug trafficking routes experienced the highest rates of violence.

On July 14, alleged members of the MS-13 gang wearing antigang unit uniforms killed Said Lobo Bonilla, son of former President Porfirio Lobo, and three other persons in a targeted attack in Tegucigalpa.  On September 22, the court in a preliminary hearing charged Eber Ezequiel Espinoza and Erick David Macías Rodríguez with quadruple homicide.  Authorities continued to search for the individuals who ordered the homicide.

On January 9, unknown assailants killed Pablo Hernández in San Marcos de Caiquín, Lempira Department.  Hernández had worked to promote Indigenous rights in a variety of roles including as president of the Network of Agroecologists of the Cacique Lempira Biosphere, as a member of the Network of Human Rights Defenders of the Department of Lempira, and as a radio host of the Lenca radio program *Radio Tenan*.  Authorities continued to investigate the incident.

The government continued to prosecute individuals allegedly involved in the 2016 killing of environmental and Indigenous activist Berta Cáceres.  On June 20, the National Tribunal Court sentenced Roberto David Castillo Mejía to more than 22 years in prison for his role as one of the alleged coauthors of her murder.

## b. Disappearance

There were no credible reports of disappearances by or on behalf of government authorities.

## c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, and Other Related Abuses

Although the law prohibits such practices, government officials received complaints and investigated alleged abuses by members of the security forces on the streets and in detention centers.

CLP_PC_025173

CONADEH reported 31 cases of alleged torture or cruel and inhuman treatment by security forces through August, while the Public Ministry received 10 such reports through July. The quasi-governmental National Committee for the Prevention of Torture, Cruel, Inhuman, or Degrading Treatment (CONAPREV) received 28 complaints of the use of torture or cruel and inhuman treatment through September.

On January 13, National Police officials in Trujillo, Colón Department, allegedly detained and tortured Luis Alberto Gutiérrez and Leonard Brown, beating Gutiérrez and Brown in the police station.

Corruption along with a lack of investigative resources and judicial delays led to widespread impunity, including for members of security forces. The Directorate of Disciplinary Police Affairs investigated abuses by police forces. The Office of the Inspector General of the Armed Forces and the Humanitarian Law Directorate investigated abuses by the military. CONADEH received complaints involving human rights abuses and referred them to the Public Ministry for investigation.

**Prison and Detention Center Conditions**

Prison conditions were harsh and at times life threatening due to pervasive gang-related violence and the government's failure to control criminal activity within the prisons. Prisoners suffered from gross overcrowding; insufficient access to food, water, and medical supplies; violence; and alleged abuse by prison officials.

**Abusive Physical Conditions:** Prisoners suffered from severe overcrowding, malnutrition, lack of adequate sanitation and medical care, and, in some prisons, lack of adequate ventilation and lighting. The National Prison Institute reported that as of October 13, the total prison population was 19,619 in 25 prisons and one detention center. According to CONAPREV, the system was designed for approximately 13,000 inmates. Long periods of pretrial detention remained common, with many pretrial detainees held with convicted prisoners. Nearly 46 percent of incarcerated individuals were in pretrial detention.

Authorities did not generally segregate those with tuberculosis or other infectious diseases from the general prison population. There was limited support for persons with mental illnesses or disabilities. CONAPREV reported every prison had a

CLP_PC_025174

functioning health clinic with at least one medical professional, but basic medical supplies and medicines were in short supply throughout the system.  In most prisons, only inmates who purchased bottled water or had water filters in their cells had access to potable water.

The government failed to control pervasive gang-related violence and criminal activity within the prisons.  Many prisons lacked sufficient security personnel.  Many prisoners had access to weapons and other contraband, inmates attacked other inmates with impunity, and inmates and their associates outside prison threatened prison officials and their families.  These conditions contributed to an unstable, dangerous environment in the penitentiary system.  Media reported violent confrontations and killings between gang members in prisons throughout the year.

CONAPREV reported 17 violent deaths in prisons as of September.  On July 4, alleged members of the 18th Street gang killed six fellow gang members at the El Pozo maximum security prison in Ilama, Santa Bárbara Department.

As of September, CONAPREV reported the country's detention center for high-profile suspects and those in need of additional security, including police and military officials, held 29 individuals.  The center, administered by the National Prison Institute, was on a military installation and received some support services from the military.

**Administration:**  The judicial system is legally responsible for monitoring prison conditions and providing for the rights of prisoners.  The government tasks CONAPREV with visiting prisons and making recommendations for protecting the rights of prisoners.  Prisoners can submit complaints through a lawyer that may emerge from an NGO before the Public Ministry.

Media noted that family members often faced long delays or were unable to visit detainees.

**Independent Monitoring:**  The government generally permitted prison visits by independent local and international human rights observers, including the International Committee of the Red Cross.

CLP_PC_025175

**Improvements:**  On March 10, the armed forces officially transferred control of the National Prison Institute to the National Police as part of a government initiative to demilitarize prisons.  Following the transfer, the National Prison Institute reported progress on visitation rights, food nutrition and quality, and potable water access.

## d. Arbitrary Arrest or Detention

The law prohibits arbitrary arrest and detention and provides for the right of any person to challenge the lawfulness of his or her arrest or detention in court.  The Inter-American Commission on Human Rights reported that authorities at times failed to enforce these requirements effectively.

**Arrest Procedures and Treatment of Detainees**

By law, police may make arrests only with a warrant unless they make the arrest during the commission of a crime, there is strong suspicion that a person has committed a crime and might otherwise evade criminal prosecution, or they encounter a person in possession of evidence related to a crime.  The law requires police to inform persons of the grounds for their arrest and bring detainees before a competent judicial authority within 24 hours.  It stipulates that a prosecutor has 24 additional hours to decide if there is probable cause for indictment, whereupon a judge has 24 more hours to decide whether to issue a temporary detention order.  Such an order may be effective for up to six days, after which the judge must hold a pretrial hearing to examine whether there is probable cause to continue pretrial detention.  The law allows bail for persons charged with some felonies and gives prisoners the right of prompt access to family members.  The law allows the release of other suspects pending formal charges, on the condition that they periodically report to authorities, although management of this reporting mechanism was often weak.  The government generally respected these provisions.

Persons suspected of any of 21 specific felonies must remain in custody, pending the conclusion of judicial proceedings against them.  Some judges, however, ruled that such suspects may be released on the condition that they continue to report periodically to authorities.  The law grants prisoners the right to prompt access to a lawyer of their choice and, if indigent, to government-provided counsel, although

CLP_PC_025176

the public defender mechanism was weak, and authorities did not always abide by these requirements.

**Arbitrary Arrest:**  CONADEH reported 33 cases of arbitrary arrest through August.  The Public Ministry reported 11 cases of alleged illegal detention or arbitrary arrest as of September.

On January 19, alleged security force members detained Indigenous community leader Nicolás Rodriguez in Azacualpa, Copán Department, for more than 24 hours before he was released.

**Pretrial Detention:**  Judicial inefficiency, corruption, and insufficient resources delayed proceedings in the criminal justice system, and lengthy pretrial detention was a serious problem.  For crimes with minimum sentences of six years' imprisonment, the law authorizes pretrial detention of up to two years.  The prosecution may request an additional six-month extension, but many detainees remained in pretrial detention much longer, including for more time than the maximum period of incarceration for their alleged crime.  The law does not authorize pretrial detention for crimes with a maximum sentence of five years or less.

The law mandates that authorities release detainees whose cases have not yet come to trial and whose time in pretrial detention already exceeds the maximum prison sentence for their alleged crime.  Nonetheless, many prisoners remained in custody after completing their full sentences, and sometimes even after an acquittal, because officials failed to process their releases expeditiously.

## e. Denial of Fair Public Trial

The law provides for an independent judiciary, but the justice system was poorly staffed, inadequately equipped, often ineffective, and subject to intimidation, corruption, politicization, and patronage.  Low salaries and a lack of internal controls rendered judicial officials susceptible to bribery.  Powerful special interests, including criminal groups, exercised influence on the outcomes of some court proceedings.

CLP_PC_025177

**Trial Procedures**

The law provides for the right to a fair and public trial; however, the judiciary did not always enforce these rights.

Credible observers noted problems in trial procedures, such as a lack of admissible evidence (i.e., prosecution failed to submit sufficient evidence of guilt), judicial corruption, witness intimidation, and an ineffective witness protection program.

**Political Prisoners and Detainees**

There were no reports of political prisoners or detainees.

**Civil Judicial Procedures and Remedies**

The law establishes an independent and impartial judiciary in civil matters, including access to a court to seek damages for human rights violations. Litigants may sue a criminal defendant for damages if authorized by a criminal court. Individuals and organizations may appeal adverse domestic decisions to the Inter-American Human Rights system.

## f. Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence

Although the law generally prohibits such actions, a legal exception allows government authorities to enter a private residence to prevent a crime or in case of another emergency. There were credible complaints that police occasionally failed to obtain the required authorization before entering private homes. As of August, CONADEH had received 35 complaints.

On May 26, National Police officers allegedly entered the home of human rights defender Deninson Escalante in El Palenque, Choluteca Department, without a warrant, searched the house, and beat Escalante's parents, brother, and nephew.

## Section 2. Respect for Civil Liberties

## a. Freedom of Expression, Including for Members of the Press and

CLP_PC_025178

## Other Media

The law provides for freedom of expression, including for members of the press and other media, with some restrictions, and the government generally respected this right.  Although many press outlets were politically aligned, the press and prevailing democratic norms combined to promote freedom of expression, including for members of the media.

The government allocated a budget of 20 million lempiras ($796,000) to operate a protection mechanism for journalists, human rights defenders, and judicial sector operators.  As of August, it provided protection to 11 journalists and 16 social media communicators, among other types of activists and human rights defenders.  Some nongovernmental organizations (NGOs) expressed concern regarding weak implementation of the law, limited resources available to operate the government's protection mechanism, and insufficient training for new personnel after significant personnel turnover during the year.  Civil society organizations criticized the government's failure to investigate threats adequately.

The Honduran National Police's Special Victim's Investigations Unit, formerly known as the Violent Crimes Task Force, investigated crimes against high-profile and particularly vulnerable victims, including journalists as well as judges, lawyers, and members of the lesbian, gay, bisexual, transgender, queer, and intersex (LGBTQI+) community.

**Violence and Harassment:**  On May 26, unknown assailants shot and killed Metro TV journalist Ricardo Ávila in Marcovia, Choluteca Department.  Authorities continued to investigate the incident.  Journalists and other members of civil society reported they were self-censoring due to fear of criticism, harassment, and retribution by the government and its supporters.  Others reported direct acts of intimidation or threats of violence from government officials or supporters for publicly being critical of the government.

**Censorship or Content Restrictions for Members of the Press and Other Media, Including Online Media:**  Media members and NGOs stated the press self-censored due to fear of retaliation from criminal groups, drug trafficking organizations, or corrupt government officials.  The media also engaged in self-

CLP_PC_025179

censorship to avoid losing lucrative advertising contracts with the government.  On September 16, the cabinet approved an executive decree to create a General Directorate of Information and Press under the Ministry of Strategic Planning.  The government noted the decree was to better organize its own public relations efforts and was not intended to monitor or control content.

**Libel/Slander Laws:**  Citizens, including public officials, may initiate criminal proceedings for libel and slander.  No cases were reported during the year.

**Nongovernmental Impact:**  Some journalists and other members of civil society reported threats from members of criminal groups.  It was unclear how many of these threats were related to the victims' professions or activism.  Several anonymous social media sites, possibly linked to political parties, criticized journalists (as well as activists and civil society organizations) who were critical of the government or of opposition party policies.

**Internet Freedom**

The government did not restrict or disrupt access to the internet or censor online content, and there were no credible reports that the government monitored private online communications without appropriate legal authority.

## b. Freedoms of Peaceful Assembly and Association

The constitution provides for the freedoms of peaceful assembly and association, and the government generally respected these rights.

## c. Freedom of Religion

See the Department of State's *International Religious Freedom Report* at https://www.state.gov/religiousfreedomreport/.

## d. Freedom of Movement and the Right to Leave the Country

The law provides for freedom of internal movement, foreign travel, emigration, and repatriation, and the government generally respected these related rights.

**In-country Movement:**  There were areas where authorities could not assure

CLP_PC_025180

freedom of movement because of criminal activity and a lack of significant government presence.

## e. Protection of Refugees

The government cooperated with the Office of the UN High Commissioner for Refugees and other humanitarian organizations in providing protection and assistance to refugees, returning refugees, and asylum seekers, as well as other persons of concern.

**Access to Asylum:**  The law provides for granting asylum or refugee status.  The government had a nascent system to provide legal protection to refugees.  Its operations to receive and process cases relied on substantial support from UNHCR. Its support focused on providing training to officers of the National Institute for Migration, ensuring support to deal with the backlog of asylum claims submitted during the COVID-19 lockdown, and supporting the improvement of reception conditions for asylum seekers.

**Abuse of Migrants and Refugees:**  Transiting migrants, forcibly displaced populations, and asylum seekers with pending cases were vulnerable to abuse and sexual exploitation by criminal organizations.  Women, children, and LGBTQI+ individuals were especially vulnerable to abuse.  Transiting migrants, refugees, and other vulnerable populations continued to face acute security risks in border zones.

## f. Status and Treatment of Internally Displaced Persons

The Internal Displacement Monitoring Center estimated there were approximately 247,000 internally displaced persons (IDPs) due to violence in the country as of 2021.  Gang activity, including attacks on and exploitation of nonmembers, was the primary contributor to violence-related internal displacement.  In addition, the monitoring center estimated approximately 937,000 individuals were forcibly displaced by 2020 natural disasters.  Official data on forced displacement, especially displacement due to violence, was limited in part because gangs controlled many of the neighborhoods where individuals were forced from their homes and communities (see section 6, Displaced Children).  NGOs reported IDPs were at increased risk of victimization and exploitation by criminal groups.

CLP_PC_025181

The government maintained the Interinstitutional Commission for the Protection of Persons Displaced by Violence and created the Directorate for the Protection of Persons Internally Displaced by Violence within the Secretariat of Human Rights. Both the secretariat and the commission focused on developing policies to address IDPs. Additionally, under the Comprehensive Regional Protection and Solutions Framework, with significant support from UNHCR, the Secretariat of Human Rights and Secretariat of External Relations and International Cooperation continued to build capacity to provide services to vulnerable populations, including IDPs, those at risk of forced displacement, refugees, and returned migrants.

Despite incremental progress, government capacities remained relatively nascent and limited.

# Section 3. Freedom to Participate in the Political Process

The law provides citizens the right to choose their government in free and fair periodic elections held by secret ballot and based on nearly universal and equal suffrage. The law does not permit active members of the military or civilian security forces to vote. The constitution prohibits practicing clergy from running for office or participating in political campaigns.

## Elections and Political Participation

**Recent Elections:** In November 2021, Xiomara Castro of the LIBRE Party won a four-year presidential term in elections that were generally considered free, fair, and transparent. Some NGOs and political parties reported irregularities, including late delivery of technology needed to transmit results, late opening of the polls, poll workers with varying degrees of preparation and knowledge of the electoral law and processes, and lack of transparency in campaign financing. International observers acknowledged some of these irregularities but reported they were not systematic and not widespread enough to affect the outcome of the presidential election. Observers noted several significant improvements in transparency procedures, including electoral reforms, an updated voter registry, new national identification cards, and new technologies that included a biometric verification system and a preliminary results transmission system.

CLP_PC_025182

**Participation of Women and Members of Minority Groups:**  No laws limit the participation of women or members of minority groups in the political process, and they did participate.

# Section 4. Corruption and Lack of Transparency in Government

The law provides for criminal penalties for corruption by officials, but authorities did not implement the law effectively, and officials continued to engage in corrupt practices with impunity.  There were numerous reports of government corruption.

On February 2, the National Congress passed a retroactive amnesty law that absolved public officials who worked during the Zelaya Administration (2006-09) of crimes.  As of October, at least 24 defendants used the law to have corruption cases dismissed.

On March 1, the National Congress repealed the Law for the Classification of Public Documents Related to National Security and Defense, better known as the Secrets Law.  Civil society had criticized the law for limiting transparency and allowing officials to use the classification of documents to hide corruption.

**Corruption:**  On June 10, Marco Bográn, former director of INVEST-H, the government entity tasked with making COVID-19 pandemic relief contracts with private firms, was found guilty of aggravated fraud and sentenced to more than 10 years in prison and ordered to pay a fine of 1.475 billion lempiras ($58.7 million).  The court acquitted him of charges of violating official duties and fraud, but the Public Ministry appealed the ruling on July 25.

On September 6, the Public Ministry charged former Minister of National Risk and Contingency Management Gabriel Rubí and two other government officials with fraud and violation of official duties for the nearly six million lempira ($239,000) purchase in 2020 of a mobile hospital and COVID-19 isolation unit that was only a tent.  A lower court provisionally dismissed Rubí's fraud charge on September 20, and the Public Ministry appealed the decision.

Former First Lady Rosa Elena Bonilla de Lobo was found guilty of fraud and misappropriation of public funds during a retrial on March 17.  On September 21,

CLP_PC_025183

the court sentenced her to more than 14 years in prison and ordered her to pay a fine of more than 13 million lempiras ($518,000).

# Section 5. Governmental Posture Towards International and Nongovernmental Investigation of Alleged Abuses of Human Rights

A wide variety of domestic and international human rights groups generally operated without government restriction, investigating and publishing their findings on human rights cases.  Government officials were somewhat cooperative and responsive to their views, but some human rights organizations criticized government officials for lack of access and responsiveness.

**Government Human Rights Bodies:**  A semiautonomous commissioner for human rights, Blanca Izaguirre, served as ombudsperson and investigated complaints of human rights abuses.  NGOs and other civil society groups generally considered the commissioner independent but at times ineffective.  With offices throughout the country, the ombudsperson received cases that otherwise might not have risen to national attention.

The Secretariat of Human Rights served as an advocate for human rights within the government.  The Public Ministry's Office of the Special Prosecutor for Human Rights handled cases involving charges of human rights abuses by government officials.  The Public Ministry also has a Special Prosecutor's Office for the Protection of Human Rights Defenders, Journalists, Social Communicators, and Justice Officials.  There is also a Human Rights Committee in the National Congress.  The Ministries of Security and of Defense both have human rights offices that coordinate human rights-related activities with the Secretariat of Human Rights.

# Section 6. Discrimination and Societal Abuses

## Women

**Rape and Domestic Violence:**  The law criminalizes all forms of rape, including spousal rape.  The government considers rape a crime of public concern, and the

CLP_PC_025184

state prosecutes suspected rapists even if survivors do not press charges.  The penalties for rape range from nine to 13 years' imprisonment.  The law was not effectively enforced, and weak public institutional structures contributed to the inadequate enforcement.

The law does not criminalize domestic violence but provides penalties of up to 12 years in prison for violence against a family member, depending on the severity of the assault and aggravating circumstances.  If a victim's physical injuries do not reach the severity required to categorize the violence as a criminal act, the legal penalty for a first offense is a sentence of one to three months of community service.  Survivors of domestic violence are entitled to certain protective measures, such as removing the abuser from the home and prohibiting the abuser from visiting the victim's work or other frequently visited places.  Abusers caught in the act may be detained for up to 24 hours as a preventive measure.  The law provides a maximum sentence of three years in prison for disobeying a restraining order connected with the crime of violence against a woman.

Civil society groups reported that women often did not report domestic violence or withdrew charges because they feared, or were economically dependent on, the aggressor.  In addition, women experienced delays in accessing justice due to police who failed to process complaints in a timely manner or judicial system officials who deferred scheduling hearings.  The government attempted to enhance its response to domestic violence by elevating the National Women's Institute to a cabinet-level secretariat in March.  Observers noted this effort was insufficient due to inadequate budget allocations, limited or no services in rural areas, absence of or inadequate training about and awareness of domestic violence among police and other authorities, and male-dominant culture and norms.

The government operated six consolidated reporting and support centers in major cities and one mobile unit for the departments of Yoro and Cortés where women could report crimes, seek medical and psychological attention, and receive other services.  These reporting centers were in addition to the 298 government-operated women's offices – one in each municipality – that provided a wide array of services, focusing on education, personal finance, health, social and political participation, environmental stewardship, and prevention of gender-based violence.

CLP_PC_025185

**Sexual Harassment:**  The law criminalizes sexual harassment, including in employment, and stipulates penalties of one to three years in prison and possible suspension of the abusers' professional licenses.  The government did not effectively enforce the law.

**Reproductive Rights:**  There were no reports of coerced abortion or involuntary sterilization on the part of government authorities.

Contraception supplies were limited, as were many other critical medicines, due to the government's dismantling of its public health procurement system in May.  The law prohibits the sale, distribution, and use of emergency contraception for any reason, including by survivors of sexual violence.  The government provided survivors of sexual violence access to other health-care services, such as psychological and social support as well as testing and treatment for sexually transmitted diseases.

In 2019 (most recent data), 94 percent of births were attended by skilled health-care personnel; however, NGOs reported significant gaps in obstetric care, especially in rural areas.  The United Nations reported the adolescent birth rate was 89 births per 1,000 girls ages 15 to 19.  UN human rights experts stated the lack of access to contraception, particularly in rural areas, together with the prohibition of emergency contraception, contributed to a high rate of adolescent pregnancy.

**Discrimination:**  Although the law accords women and men the same legal rights and status, including property rights in divorce cases, many women did not fully enjoy such rights due to barriers in access to justice and lack of information regarding legal protections.  Most women in the workforce engaged in lower-status and lower-paying informal occupations, such as domestic service, without the benefit of legal protections.

## Systemic Racial or Ethnic Violence and Discrimination

The law criminalizes discrimination based on race and ethnicity and includes crimes committed against individuals because of race or ethnicity as aggravating circumstances to increase penalties for criminal offenses.

CONADEH received no reports of racial or ethnic discrimination as of August.

CLP_PC_025186

Nevertheless, observers said social discrimination against racial and ethnic groups persisted, as did physical violence.

On May 1, unknown assailants killed Alonso Salgado, a former member of the neighborhood council of the Río Tinto Garífuna community and a member of the Garífuna rights organization OFRANEH, in Tela, Atlántida Department. Authorities continued to investigate the incident.

The government's National Policy to Combat Racism and Racial Discrimination seeks to promote equality and combat discrimination related to the country's two Afro-descendent and seven Indigenous groups (see below), with a focus on social and political participation; access to education, health care, justice, and employment opportunities; and rights to ancestral lands and natural resources. NGOs reported the government did not effectively combat discrimination or promote equal access to government services and employment opportunities. NGOs also reported the government did not make sufficient efforts to comply with Inter-American Court of Human Rights rulings, specifically cases related to territorial rights for Garífuna communities.

## Indigenous Peoples

In the 2013 census (most recent data), approximately 8.5 percent of the population identified themselves as members of Indigenous communities, but other estimates were higher.  Indigenous groups included the Miskito, Tawahka, Pech, Tolupán, Lenca, Maya-Ch'ortí, and Nahua.  They had limited representation in the national government and consequently little direct input into decisions affecting their lands, cultures, traditions, and the allocation of natural resources.

Indigenous communities continued to report threats and acts of violence against them and against community and environmental activists.  Violence was often rooted in a broader context of conflict over land and natural resources, corruption, lack of transparency and community consultation, other criminal activity, and limited state ability to protect the rights of vulnerable communities.

Ethnic minority rights leaders, international NGOs, and farmworker organizations claimed the government failed to redress actions taken by security forces, government agencies, private individuals, and businesses to dislodge Indigenous

CLP_PC_025187

persons from lands over which they claimed ownership based on land reform law or ancestral land titles.

Persons from Indigenous and Afro-descendant communities continued to experience discrimination in employment, education, housing, and health services. A 2019 Inter-American Commission on Human Rights report noted there were insufficient hospital beds and inadequate supplies at the only hospital that serviced Gracias a Dios Department, home to most of the Miskito community.

## Children

**Birth Registration:**  Children derive citizenship by birth in the country, from the citizenship of their parents, or by naturalization.  Birth registration was provided on a nondiscriminatory basis.  Failure to register resulted in denial of public services, including access to health services or school enrollment.

**Child Abuse:**  The law establishes prison sentences of up to two and one-half years for child abuse.

**Child, Early, and Forced Marriage:**  The minimum legal age of marriage for both boys and girls is 18.

**Sexual Exploitation of Children:**  The commercial sexual exploitation of children, especially in sex trafficking, remained a problem, and the government did not effectively enforce the law.  The country was a destination for child sex tourism, particularly in the tourist area of the Bay Islands.  The legal age of consent is 18.  The law prohibits the use of children younger than 18 for exhibitions or performances of a sexual nature or in the production of pornography.

**Displaced Children:**  Civil society organizations reported that common causes of forced displacement for youth included death threats for failure to pay extortion, attempted recruitment by gangs, witnessing criminal activity by gangs or criminal groups, domestic violence, attempted kidnappings, family members' involvement in drug dealing, victimization by traffickers, rape (including commercial sexual exploitation by gangs), discrimination based on sexual orientation or gender identity, sexual harassment, and discrimination for having a chronic medical condition.

CLP_PC_025188

According to data (most recent available) from the government and UNHCR, more than 247,000 persons were displaced by violence between 2014 and 2018, of whom 43 percent were children and adolescents.

## Antisemitism

The Jewish community numbered approximately 150 members.  There were no reports of antisemitic acts.

## Trafficking in Persons

See the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## Acts of Violence, Criminalization, and Other Abuses Based on Sexual Orientation, Gender Identity or Expression, or Sex Characteristics

**Criminalization:**  No laws exist to criminalize same-sex conduct.

**Violence against LGBTQI+ Persons:**  NGOs reported police or other government agents incited, perpetrated, condoned, or tolerated violence against LGBTQI+ individuals.  Impunity for such crimes was high.  The Public Ministry reported 17 violent deaths of LGBTQI+ persons as of September.  NGOs reported 33 violent deaths as of October and 17 hate crimes against LGBTQI+ persons as of August. On January 10, unknown assailants shot and killed transgender activist Thalía Rodríguez in her home in Tegucigalpa, Francisco Morazán Department. Authorities charged two individuals with her murder, one of whom remained at large.  On December 2, the court found Aarón Jeriel Álvarez Pavón guilty of Rodríguez's murder.  The sentencing hearing was scheduled for January 2023. NGOs reported gangs engaged in "corrective rape" of lesbian or transgender individuals.

**Discrimination:**  The law criminalizes discrimination based on sexual orientation and gender identity characteristics and includes crimes committed against individuals because of their sexual orientation or gender identity as aggravating circumstances to increase penalties for criminal offenses.  Nevertheless,

CLP_PC_025189

discrimination against LGBTQI+ persons throughout society persisted.  As of August, CONADEH received 25 reports of discrimination based on sexual orientation.  Same-sex couples and households headed by same-sex couples are not eligible for the same legal protections available to opposite-sex married couples.

LGBTQI+ rights groups asserted that government agencies and private employers engaged in discriminatory hiring practices.  Transgender women were particularly vulnerable to employment and education discrimination; many could find employment only as sex workers, increasing their vulnerability to violence and extortion.

**Availability of Legal Gender Recognition:**  Transgender persons are prohibited from changing their name and legal gender status.

**Involuntary or Coercive Medical or Psychological Practices Specifically Targeting LGBTQI+ Individuals:**  There were no reports of unnecessary surgeries performed on intersex persons.

**Restrictions of Freedom of Expression, Association, or Peaceful Assembly:** There were no restrictions of freedom of expression, association, or peaceful assembly regarding LGBTQI+ matters or events.

## Persons with Disabilities

The law requires that persons with disabilities have access to buildings, but few buildings were accessible, and the government did not effectively implement laws or programs to provide such access.

According to government estimates, children with disabilities attended school at a lower rate than the general population.  The Institute for National Statistics put net enrollment for primary school at 77 percent in 2021, but the National Center for Social Sector Information stated that in 2020, 43 percent of persons with disabilities received no formal education.

The government has an Office for Persons with Disabilities located within the Ministry of Development and Social Inclusion, but its ability to provide services to persons with disabilities was limited.  Mental-health professionals expressed

CLP_PC_025190

concern regarding social stigma by families and communities against persons with mental disabilities and a lack of access to mental-health care throughout the country.

## Other Societal Violence and Discrimination

Persons with HIV and AIDS continued to be targets of discrimination, and they suffered disproportionately from gender-based violence.

# Section 7. Worker Rights

## a. Freedom of Association and the Right to Collective Bargaining

The law grants workers the right to form and join unions of their choice, bargain collectively, and strike.  It prohibits employer retribution against employees for engaging in trade union activities.  The law places restrictions on these rights, such as requiring that a recognized trade union represent at least 30 workers, prohibiting foreign nationals from holding union offices, and requiring that union officials work in the same substantive area of the business as the workers they represent. The law prohibits members of the armed forces and police, as well as certain other public employees, from forming labor unions.  The Secretariat of Labor and Social Security also requires that union leaders be employed under permanent contracts, limiting the ability of seasonal agricultural workers to exercise their right to freedom of association.

The law requires an employer to begin collective bargaining once workers establish a union, and it specifies that if more than one union exists at a company, the employer must negotiate with the largest.

The law allows only local unions to call strikes, prohibits labor federations and confederations from calling strikes, and requires that a two-thirds majority of both union and nonunion employees at an enterprise approve a strike.  The law prohibits workers from legally striking until direct negotiations and government-accompanied mediation and conciliation have failed.  The Secretariat of Labor has the power to declare a work stoppage illegal and grants employers the ability to discipline employees consistent with their internal regulations, including by firing strikers, if the secretariat rules that a work stoppage is illegal.  In addition, the law

CLP_PC_025191

limits strikes in a wide range of sectors that the government designates as essential services or that it considers would affect the rights of individuals in the larger community to security, health, education, and economic and social well-being.

The law permits workers in public health care, social security, staple food production, and public utilities (municipal sanitation, water, electricity, and telecommunications) to strike if they continue to provide basic services.  The law also requires that public-sector workers involved in the refining, transportation, and distribution of petroleum products submit their grievances to the Secretariat of Labor before striking.  The law permits strikes by workers in export-processing zones and free zones for companies that provide services to industrial parks, but it requires that strikes not impede the operations of other factories in such parks.

The government did not effectively enforce the law.  Employers frequently refused to comply with Secretariat of Labor orders that required them to reinstate workers who had been dismissed for participating in union activities.  Both the Secretariat of Labor and the courts may order a company to reinstate workers, but the secretariat lacked the personnel and transportation resources to verify compliance. By law, the secretariat may fine companies that violate the right to freedom of association.  The law permits fines, and the penalty is commensurate with those for other laws involving denials of civil rights, such as discrimination.  Penalties were sometimes applied against violators, but the failure of the government to collect fines facilitated continued violations.

Workers had difficulty exercising the rights to form and join unions and to engage in collective bargaining.  Public-sector trade unionists raised concerns regarding government interference in trade union activities, including its ignoring or suspending collective agreements and its dismissals of union members and leaders.

Some employers either refused to engage in collective bargaining or made it very difficult to do so.  Some companies also delayed appointing or failed to appoint representatives for required Secretariat of Labor-led mediation, a practice that prolonged the mediation process and impeded the right to strike.  Unions also raised concerns that employers used temporary contracts to prevent unionization and to avoid providing full benefits.

CLP_PC_025192

The government investigated violence and threats of violence against union leaders.  Impunity for such crimes remained high, as was the impunity rate for all types of crime.

The trial on murder charges of Josué Exequiel Martínez, Siriaco Mejía Santos, Francisco López Lazo, and Mario Aníbal López Velásquez began on November 25.  The four were accused of the 2020 killing of Félix Vásquez, leader of the Union of Field Workers, a member of the Lenca community, an environmental activist, and a LIBRE Party candidate for Congress.  The court found the accused guilty of the murder of Vásquez; at year's end a date for sentencing was pending.

Medical personnel held nationwide strikes and protests on March 30, April 20-30, May 31, and in certain regions on October 24.  The purpose of the labor stoppage and demonstrations was to denounce the nonpayment of wages by the Secretariat of Health and other issues.

## b. Prohibition of Forced or Compulsory Labor

The law prohibits and criminalizes all forms of forced labor, but the government did not effectively implement or enforce the law.

Forced labor occurred in street vending, domestic service, the transport of illegal drugs and other illicit goods, other criminal activity, and the informal sector. Victims were primarily impoverished individuals in both rural and urban areas (see section 7.c.).  Children, including from Indigenous and Afro-descendant communities, particularly Miskito boys, were at risk for forced labor in the agriculture, manufacturing, fishing, mining, construction, and hospitality industries.  The law requires prisoners to work at least five hours a day, six days a week.

Also see the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## c. Prohibition of Child Labor and Minimum Age for Employment

See the Department of Labor's *Findings on the Worst Forms of Child Labor* at https://www.dol.gov/agencies/ilab/resources/reports/child-labor/findings/.

CLP_PC_025193

## d. Discrimination with Respect to Employment and Occupation

The law prohibits employment discrimination based on gender, age, sexual orientation, gender identity, political opinion or affiliation, marital status, race or ethnicity, national origin, language, place of residence, religion, family or economic situation, disability, or health, including HIV or AIDS status.  The law prohibits employers from requiring pregnancy tests as a prerequisite for employment.  The law states that a woman's employment should be appropriate to her physical state and capacity.  There were no reports of this law being used to limit women's employment.

The government did not effectively enforce these laws and regulations.  Although penalties include prison sentences of up to two years and fines, they were not sufficient to deter violations.  They were, however, commensurate with penalties for violating laws related to civil rights, such as election interference.  Penalties were sometimes applied against violators.

The law criminalizes sexual harassment, including in employment.  Violators face penalties of one to three years in prison and possible suspension of their professional licenses, but the government did not effectively enforce the law.

Many employers discriminated against women.  The Secretariat of Labor posted job opportunity announcements that specified a gender requirement.  Most women in the workforce engaged in lower-status and lower-paying informal occupations, such as domestic service, without the benefit of legal protections.  Persons with disabilities, Indigenous and Afro-descendant persons, LGBTQI+ persons, and persons with HIV or AIDS also faced discrimination in employment and occupation (also see section 6).

## e. Acceptable Conditions of Work

**Wage and Hour Laws:**  There are 45 categories of monthly minimum wage, based on the industry and the size of a company's workforce; minimum wages were above the poverty line.  The law does not cover domestic workers, the vast majority of whom were women.

The law applies equally to citizens and foreigners, regardless of gender, and

CLP_PC_025194

prescribes a maximum eight-hour shift per day for most workers, a 44-hour workweek, and at least one 24-hour rest period for every six days of work.  It also provides for paid national holidays and annual leave.  The law requires overtime pay, bans excessive compulsory overtime, limits overtime to four hours a day for a maximum workday of 12 hours, and prohibits the practice of requiring workers to complete work quotas before leaving their place of employment.  On April 28, the National Congress repealed the 2014 hourly wage law, thus bringing all employees under the national labor code and eliminating the previous differences in labor benefits between hourly, temporary, and permanent employees.  The repeal went into effect on June 28.

In some industries, including agriculture, domestic service, and security, employers did not respect maternity rights or pay minimum wage, overtime, or vacation.  In these sectors, employers frequently paid workers for the standard 44-hour workweek irrespective of any additional hours they worked.  In the security and domestic service sectors, workers were frequently forced to work more than 60 hours per week but paid only for 44 hours.  Employers frequently penalized agricultural workers for taking legally authorized days off.  Employers paid the minimum wage inconsistently in other sectors.

**Occupational Safety and Health:**  Occupational safety and health (OSH) standards are appropriate for the main industries in the country, and OSH experts actively identified unsafe conditions, including lack of personal protective equipment against COVID-19, in addition to responding to workers' OSH complaints.  There was no information available on any major industrial accidents.  By law, workers may remove themselves from situations that endanger their health or safety without jeopardizing continued employment.  Under the inspection law, the Secretariat of Labor has the authority to temporarily shut down workplaces where there is an imminent danger of fatalities.

**Wage, Hour, and OSH Enforcement:**  The Secretariat of Labor is responsible for enforcing wage, hour, and OSH laws, but it did so inconsistently and ineffectively.  Enforcement of OSH standards was particularly weak in the construction, garment assembly, and agricultural sectors, as well as in the informal economy.  Penalties for violations of OSH law were commensurate with penalties for similar crimes but rarely applied against violators and rarely collected.

CLP_PC_025195

Civil society continued to raise problems with minimum wage violations, highlighting agricultural companies in the south as frequent violators. The law permits fines for wage and hour violations; these were commensurate with the penalties for similar crimes, such as fraud. The government sometimes applied penalties against violators, but failure to collect fines facilitated continued labor code wage and hour violations. The Secretariat of Labor had an insufficient number of inspectors to enforce the wage, hour, and OSH laws effectively. As of August, inspectors conducted 14,221 total inspections, compared with 8,846 total inspections for the same period in 2021. Inspectors have the authority to make unannounced inspections and initiate sanctions.

While all formal workers are entitled to social security, there were reports that both public- and private-sector employers failed to pay into the social security system. The Secretariat of Labor may levy a fine against companies that fail to pay social security obligations, but the amount was not sufficient to deter violations.

**Informal Sector:**  Most workers were in the informal sector. According to 2021 Secretariat of Labor figures, approximately 75 percent of workers worked in the informal economy, equivalent to approximately 2.7 million persons, while a 2020 UN Development Program report estimated that 82 percent of workers were part of the informal economy. According to the report, informal workers played a large role in nearly every industry, including agriculture and fishing; mining; manufacturing; utilities; construction; wholesale, retail, hotels, and restaurants; transport and storage; and personal services. These workers are not covered by the contributory social security system and are not protected by the labor code.

CLP_PC_025196

Hon. Merrick Garland Attorney General
Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530

Hon. Alejandro Mayorkas
Secretary
U.S. Department of Homeland Security
(DHS)
3801 Nebraska Avenue, NW
Washington, DC 20016

David Neal, Director
Executive Office for Immigration Review
U.S. Department of Justice (DOJ)

Ur Jaddou, Director
U.S. Citizenship and Immigration Services
(USCIS)
DHS

Lauren Alder Reid, Assistant Director
Office of Policy
Executive Office for Immigration Review
DOJ

Daniel Delgado, Acting Director,
Border and Immigration Policy,
Office of Strategy, Policy, and Plans,
DHS

Richard Revesz, Administrator
Office of Information & Regulatory Affairs
(OIRA)
Office of Management and Budget (OMB)
Executive Office of the President

March 1, 2023

**Re:** **Request to Provide a Minimum of 60 days for Public Comment in Response to the Department of Homeland Security (DHS), United States Citizenship and Immigration Services (USCIS), and Department of Justice (DOJ) Executive Office for Immigration Review (EOIR) (the Departments) Joint Notice of Proposed Rulemaking (NPRM): Circumvention of Lawful Pathways**

Dear Attorney General Garland, Secretary Mayorkas, Director Neal, Director Jaddou, Assistant Director Reid, Acting Director Delgado, and Mr. Revesz:

We, the undersigned 172 national, state, and local organizations, write to urge the Departments to allow at least 60 days for public comment on the above referenced NPRM. We make this request due to the length and complexity of the 153-page proposed rule and the critical interests it implicates. As explained below, the Departments have no basis for merely providing a

CLP_PC_025280

truncated comment period. A robust comment period is particularly important given the devastating impact of this NPRM.

As President Biden recognized upon taking office, Executive Order 12866 governs the regulatory process and requires agencies to "afford the public a meaningful opportunity to comment on any proposed regulation, which in most cases should include a comment period of *not less than 60 days*." Executive Order 13563 likewise directs agencies to "...afford the public a meaningful opportunity to comment through the Internet on any proposed regulation, with a comment period that should generally be *at least 60 days*." 60 days is the minimum, with some courts referencing 90 days as the "usual" length period for comments. Nevertheless, the Departments proceed with a 30-day comment period, citing their plan to "move as expeditiously as possible" to implement this rule prior to the termination of Title 42 expulsions. Their haste also indicates their intent to predetermine the outcome of this notice-and-comment period, rather than afford a meaningful opportunity to impacted stakeholders.

There is no compelling reason to truncate the public comment period by half or two thirds, and thereby deprive stakeholders of a meaningful opportunity to weigh in on the vast changes proposed in this rule.  Rather, the highly technical, nuanced, legal and policy issues the NPRM addresses — and, above all, the severe human cost it is certain to inflict — illustrate why a minimum of 60 days must be allowed for the public to file comments in response to the rule. Despite this, the Departments have provided no plausible justification for providing only 30 days for public comment.

The Departments explain this expedited time frame by citing the expected termination date for Title 42 by May 11, when the COVID-19 public health emergency will expire. They cite the possibility of increased encounters of asylum seekers who have waited for processing and lament that DHS lacks the resources to prepare for this increase. They thus propose a rule that would result in the summary returns of many asylum seekers, rather than offer them the process they require under domestic and international law.

There is little merit to the Departments' alarm regarding the impending end of Title 42; the Departments have known this policy had an expiration date since the moment President Biden took office. Indeed, the Biden administration has faced significant pressure to end the Trump-era Title 42 policy since its inauguration, fielding letters from scores of epidemiologists and medical experts, more than 100 members of Congress, as well as civil, human, and refugee rights organizations urging the program's end. This pressure extended to senior Biden administration officials, who proceeded to resign in protest of the Biden administration's continued use of Title 42.

Importantly, the Departments are relying on the impending expiration date of the Title 42 policy

to truncate the comment period *even though the Biden administration itself formally sought to end the Title 42 policy nearly one full year ago.* In April 2022, the Centers for Disease Control and Prevention announced its plan to do away with this Trump-era policy which it deemed "no longer necessary." DHS' Customs and Border Protection (CBP), the highest funded federal law enforcement agency in the nation, began to prepare for the end of Title 42 since April 2022 and received $14.8 billion in the December 2022 omnibus appropriations package — significantly more than the President's budget request. In addition to its own preparations to end Title 42 months ago, the administration has faced the prospected end of Title 42 as it fought back litigation from asylum seeking families who have challenged the legality of Title 42 for years.

In sum, the Biden administration has faced pressure to end Title 42 from the day it took office, sought to end it nearly a year ago, has prepared for its end and received boosted funding from Congress while facing years of litigation challenging the legality of this expulsion policy, and now anticipates its predictable demise once the public health emergency lapses on May 11, 2023. To claim, as the Departments do, that they now face an "urgent and extreme situation" appears hyperbolic at best — and disingenuous at worst. This cannot justify truncating the comment period and rushing towards the finalization of a rule of this magnitude.

This rule has vast implications on all stages of asylum processing, imposing new and complex requirements on asylum seekers before they reach the border, during their initial fear screening, as well as during immigration court review. The rule implicates substantive areas in domestic asylum law as well as U.S. obligations under the 1967 Protocol Relating to the Status of Refugees and the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment (CAT).

Recycling prior Trump bans, this rule would foreclose asylum access to people via unprecedented new requirements during their fear screenings, while in CBP detention, without access to counsel, and with limited linguistic and legal access to understand the complex rules they must navigate. The proposed rule further codifies the usage of a CBP app that has proven to be chaotic, nearly inaccessible for Black asylum seekers, and altogether disastrous for its own purported goal of orderly processing at ports of entry.

The Departments engineered this rule to adversely impact large numbers of asylum seekers and "decrease the number of asylum grants," resulting in a five-year bar for people returned to harm. In other words, the implications of this proposed rule are potentially deadly for countless asylum seekers, including children. The human cost is beyond measure and demands the most careful research, analysis, and public consultation. It is highly inappropriate to afford the public a mere 30 days to comment on a proposal that violates domestic laws and international obligations on its face.

3

To honor the public's right to a meaningful and fair opportunity to respond to the NPRM, consistent with the Executive Orders cited above and the spirit and intent of the Administrative Procedure Act, a comment period of *a minimum* of 60 days must be provided.

Please contact Azadeh Erfani at [aerfani@heartlandalliance.org](mailto:aerfani@heartlandalliance.org) with any questions or concerns, and we look forward to your prompt response.

Sincerely,

<u>National</u>
The Advocates for Human Rights
African Communities Together (ACT)
African Human Rights Coalition
Alianza Americas
America's Voice
American Immigration Lawyers Association
Americans for Immigrant Justice
Amnesty International USA
Asian Americans Advancing Justice | AAJC
Asian Pacific Institute on Gender-Based Violence
ASISTA Immigration Assistance
Asylum Seeker Advocacy Project (ASAP)
The Black Alliance for Just Immigration (BAJI)
Border Kindness
Boston University School of Law, Immigrants' Rights and Human Trafficking Program
Bridges Faith Initiative
Capital Area Immigrants' Rights (CAIR) Coalition
CASA
Catholic Legal Immigration Network, Inc.
Center for Gender & Refugee Studies
Center for Law and Social Policy
Center for Popular Democracy
Center for Victims of Torture
Children's HealthWatch
The Children's Partnership
Church World Service
Civil Rights Education and Enforcement Center
Communities United for Status & Protection (CUSP)
Community Change Action

4

Comunidad Maya Pixan Ixim
Congregation of Our Lady of Charity of the Good Shepherd, U.S. Provinces
Cooperative Baptist Fellowship
Disciples Immigration Legal Counsel
Electronic Privacy Information Center (EPIC)
Esperanza United
Fight for the Future
FIRM Action
First Focus on Children
Franciscan Action Network
Freedom Network USA
Friends Committee on National Legislation
Futures Without Violence
Government Information Watch
Haitian Bridge Alliance
Harvard Immigration and Refugee Clinical Program
HIAS
Hope Border Institute
Human Rights First
Immigration Center for Women and Children
Immigration Equality
The Immigration Hub
Immigration Law & Justice Network
Immigrant Legal Resource Center
Innovation Law Lab
Institute for Justice and Democracy in Haiti
International Refugee Assistance Project (IRAP)
Japanese American Citizens League
Justice Action Center
Justice for Migrant Women
Justice in Motion
Kids in Need of Defense
Kino Border Initiative
Latin America Working Group (LAWG)
Lawyers for Good Government
MPower Change
Maryknoll Office for Global Concerns
Mennonite Central Committee U.S.
MomsRising/MamásConPoder
Muslim Advocates

NAKASEC
National Advocacy Center of the Sisters of the Good Shepherd
National Coalition Against Domestic Violence
The National Domestic Violence Hotline
National Education Association
National Immigrant Justice Center
National Immigration Law Center
The National Immigration Project (NIPNLG)
National Network for Immigrant and Refugee Rights
National Network to End Domestic Violence
National Partnership for New Americans
NETWORK Lobby for Catholic Social Justice
Never Again Action
Oxfam America
Refugees International
Sakhi For South Asian Women
Save the Children
Sisters of Mercy of the Americas Justice Team
South Asian Americans Leading Together (SAALT)
Southern Border Communities Coalition
Southern Poverty Law Center
Sunita Jain Anti-Trafficking Policy Initiative , Loyola Law School
Tahirih Justice Center
Taylor Levy Law
T'ruah
UndocuBlack Network
Unitarian Universalist Association
Unitarian Universalist Service Committee
USAHello
U.S. Committee for Refugees and Immigrants (USCRI)
VECINA
Washington Office on Latin America
We Are All America
#WelcomeWithDignity campaign for asylum rights
Welcoming America
Witness at the Border
Women's Refugee Commission
Young Center for Immigrant Children's Rights

CLP_PC_025285

<u>State</u>

Advocates for Basic Legal Equality

Alabama Coalition for Immigrant Justice

Aldea - The People's Justice Center

Al Otro Lado

Catholic Charities Community Services, Immigrant & Refugee Services, NY

Center for Safety & Change

Central Washington Justice For Our Neighbors

The Children's Partnership

Coalition for Humane Immigrant Rights (CHIRLA)

Colorado Children's Campaign

Daya Inc.

Fellowship Southwest

Florence Immigrant & Refugee Rights Project

Honest Law Group

Hope Border Institute

Immigrant ARC

Immigrant Legal Advocacy Project

Immigrant Legal Center

Iowa Migrant Movement for Justice

Just Neighbors

Legal Aid Justice Center

Make the Road Nevada

Make the Road New York

Mariposa Legal, Program of COMMON Foundation

Michigan Immigrant Rights Center

Mobilization for Justice, Inc.

New York Immigration Coalition

Oasis Legal Services

OneAmerica

Our Children Oregon

Rocky Mountain Immigrant Advocacy Network

Safe Passage Project

Sanctuary for Families

Surveillance Technology Oversight Project

Tennessee Justice for Our Neighbors

Texas Civil Rights Project

Wind of the Spirit Immigrant Resource Center

CLP_PC_025286

Local

American Gateways

Arizona Justice for Our Neighbors

Ayuda

Bhutanese Community Association of Pittsburgh (BCAP)

Central American Minors Working Group

Central American Legal Assistance

Central American Resource Center of Northern CA - CARECEN SF

Cleveland Jobs with Justice

DC Dorothy Day Catholic Worker House

Galveston-Houston Immigrant Representation Project (GHIRP)

The Healing Trust

Houston Immigration Legal Services Collaborative

Human Rights Initiative Of North Texas

Immigrant Defenders Law Center

Indivisible Brooklyn

Jewish Activists for Immigration Justice of Western MA

Jewish Family Service of San Diego

Justice for Our Neighbors El Paso

Justice For Our Neighbors North Central Texas

The Legal Aid Society (New York)

The Legal Project

New Sanctuary Movement of Philadelphia

New York Justice for Our Neighbors

Queens Defenders

Rockland Immigration Coalition

Student Clinic for Immigrant Justice

Westchester Jewish Coalition for Immigration

Womankind

Case 4:18-cv-06810-JST  Document 169-9  Filed 06/05/23  Page 35 of 1030

☰     *The San Diego Union-Tribune*     SUBSCRIBE     LOG IN     🔍

IMMIGRATION

# Asylum seekers in Tijuana are scrambling through mobile app error messages for few appointments into the U.S.



A Tijuana official assists a migrant woman with the CBP One app at Palacio Municipal on the first morning that the mobile application was available for migrants. (Alejandro Tamayo/The San Diego Union-Tribune)

CBP One is the new and only way for asylum seekers to request to enter the United States through official ports of entry, but not everyone has been able to use it successfully

BY KATE MORRISSEY

CLP_PC_025454

Case 4:18-cv-06810-JST Document 169-9 Filed 06/05/23 Page 36 of 1030

TIJUANA — On a recent morning, a woman from central Mexico held a phone up to her face outside of the Tijuana municipal building and took a picture. It was the first day that a U.S. government phone app offered port of entry appointments to migrants hoping to request asylum.

Error, the app said.

A city official rushed to help her. Together, they took another photo close to her face. Error again.

The official moved her to spot where the splotchy shadows from the trees didn't reach her face. They took another picture. Another error.

The woman's experience was similar to that of many migrants across the city who have been trying to use the app, called CBP One, now the only way to walk into a port of entry to request protection in the United States. The facial recognition technology used to submit a photo to the app has been particularly prone to error since it launched on Jan. 12, and it is one of many issues that migrants and their advocates have noted since the app's rollout.

CLP_PC_025455



During an event to pay tribute to the victims of the 2010 earthquake in Haiti, Jean Jeef Nelson of Haitian Bridge Alliance shares information about the CBP One app. (Alejandro Tamayo/The San Diego Union-Tribune)

CBP One is part of a series of border policy changes that continue to shift the United States away from the international norm of migrants being allowed to apply for asylum once they're on the soil of the country where they plan to seek protection. Many of these changes, including CBP One, have meant that those with more resources have easier access to asylum screenings while many of the most vulnerable cases are left out.

Lack of reliable Internet and limited digital savvy, as well as language barriers, are among the issues that are already separating who can get appointments in the new process and who cannot.

The application is now the only way for migrants to request exemptions to Title 42, a policy that blocks asylum seekers and other undocumented migrants from coming onto U.S. soil and instructs border officials to expel those who do so without

CLP_PC_025456

San Diego Union-Tribune

permission, skipping the generally legally-required screening to see if they qualify for protection.

The exemptions are supposed to be for particularly vulnerable migrants, such as those who have immediate medical or safety concerns while waiting in Mexico. Asylum seekers have to attest that they meet at least one vulnerability category when they submit their applications, but they do not know until they get to CBP at the port of entry whether they will be accepted.

## No more appointments



A Tijuana official shows information about the CBP One application to a woman from Michoacán. (Alejandro Tamayo/The San Diego Union-Tribune)

On the first day that migrants could request appointments in the CBP One app, Tijuana's Office of Migrant Services set up a Wi-Fi zone outside of the municipal

CLP_PC_025457

Case 4:18-cv-06810-JST Document 169-9 Filed 06/05/23 Page 39 of 1030

building with officials ready to help migrants submit their information to Customs and Border Protection.

A small number of migrants found the support tent, and officials walked them through the process. Officials even took their height and weight measurements to be as accurate as possible.

By mid-afternoon, the officials had managed to finish the process for three families, a total of nine people, according to Enrique Lucero, the head of the office.

But the appointments quickly filled.

A 22-year-old woman who had fled the Mexican state of Michoacán started the process with city officials that morning, but by the time they had gotten the application to accept photos for her and all of her three children, there were no more appointments, she said.

Over a week later, she still hadn't been able to book one. She said that in the shelter where she's staying, the app moves very slowly, likely a result of poor Internet quality.

CLP_PC_025458



The city of Tijuana has turned the Unidad Deportiva Reforma, a sports complex, into a temporary migrant shelter. (Alejandro Tamayo/The San Diego Union-Tribune)

When it launched the app as a way for migrants to request entry, CBP said that it would offer two weeks of appointments at a time. That means that every morning at 6 a.m., one more day of appointments opens up.

There are 200 appointments per day at the San Ysidro Port of Entry, according to CBP. The agency declined to say how many were available borderwide.

Further complicating matters, as appointments on the app filled up, some migrants only saw available slots at far away ports of entry, according to Marcos Tamariz, deputy head of mission in Mexico for Doctors Without Borders. That meant that some of the Tijuana appointments were booked by migrants in Matamoros, a city on the eastern end of the border across from Brownsville, Texas.

CLP_PC_025459

Case 4:18-cv-06810-JST Document 169-9 Filed 06/05/23 Page 41 of 1030

Routes along the border from Matamoros to Tijuana are among the most dangerous in Mexico, he said, "so asking them to move from one place to another is not as easy as it seems."

"There is lots of frustration behind this and not sufficient guidance or information that would allow people to make the best decision," he said.

## Inequity and Internet



A child plays with a plastic toy outside the migrant shelter at Templo Embajadores de Jesus. His mother fled Michoacán with him to request asylum in the United States. (Alejandro Tamayo/The San Diego Union-Tribune)

The use of the app, especially when coupled with the quick disappearance of appointments, has led to disparities.

CLP_PC_025460

People who have weak Internet connections struggle to get the app to work. While the city of Tijuana reinforced the Wi-Fi network at a city-run shelter it opened up late last year to receive expelled Venezuelans, migrants in other shelters or on the street often have little access to reliable Internet. Some don't have cellphones.

The first appointments offered by the app were Thursday.

On that morning, the Union-Tribune observed mostly groups of Russians showing up for appointments as migrants arrived at El Chaparral plaza on the south side of the port of entry and walked up to the special entrance for CBP One processing.

Russian asylum seekers tend to have the financial resources to stay in hotels in Tijuana rather than shelters, meaning they have access to better Internet.

As the Russians walked by, a man, his wife and four children who had recently fled Michoacán sat on the sidewalk. The man held two phones, trying to navigate the app. The first several pages were in English.

Once he managed to get past those, he still struggled even though the rest of the app was in Spanish. After missing the link to create an account for several minutes, he finally managed to input an email address. He waited for the confirmation email, but it never came. He tried again, still no email. It was not clear what the man needed to do differently.

That same day, at Templo Embajadores de Jesus migrant shelter, where well over 1,000 migrants are waiting to request asylum in the United States, only one of the people interviewed by the Union-Tribune had heard of the app — and only because she had been at the city building.

The shelter had had more immediate issues to deal with besides the app. The rains that flooded much of San Diego and Tijuana shortly after the app's launch had

CLP_PC_025461

Case 4:18-cv-06810-JST Document 169-9 Filed 06/05/23 Page 43 of 1030

destroyed the road leading up to the canyon shelter.



Recent rains washed over the main road leading to the migrant shelter at Templo Embajadores de Jesús, destroying water pipes and cutting off vehicle access to the shelter. (Alejandro Tamayo/The San Diego Union-Tribune)

Those storms also created more difficult conditions for the migrants waiting inside. New arrivals to the Embajadores shelter sleep on mats on the floor until beds open up. They shared stories of the building flooding, soaking them and their bedding. Many had gotten sick as a result.

Since then, none of those interviewed by the Union-Tribune have succeeded in booking appointments. They try every morning at 6 a.m., but it is always full.

The app is even more complicated for those who don't speak English or Spanish. Even though Haitians are one of the nationalities recently included in expulsions, the app is not available in Haitian Creole.

CLP_PC_025462

"We are already seeing rampant misinformation and scams around this program, and the lack of equity around language access is opening yet another avenue for the exploitation of Haitian migrants who are left confused, frustrated and in limbo," said Guerline Jozef, executive director of Haitian Bridge Alliance. "We are extremely disappointed that once again the system continues to fail Black migrants in search of protection."

Erika Pinheiro, executive director of legal services nonprofit Al Otro Lado, said she was concerned about reports from migrants in Tijuana that those with darker skin, including both Black and Indigenous migrants, were having a particularly hard time getting the photo portion of the app to work.

Studies of facial recognition software have shown that the technology tends to have more errors when screening these demographic groups.

## Expelled and waiting

CLP_PC_025463



Jesús, an asylum seeker from Cuba who was recently expelled, is hoping to enter the United States soon through a CBP One appointment. (Alejandro Tamayo/The San Diego Union-Tribune)

Jesús, a Cuban man who asked not to be fully identified because of his ongoing vulnerable situation, is waiting anxiously for his CBP One appointment.

Jesús fled Cuba in December and was expelled from the United States in early January.

He left because of government surveillance and harassment and the effect that had on his business fixing washing machines, he said.

"I'll summarize it in one sentence — there is no freedom," he said of Cuba. "There is no freedom for anything."

He said Border Patrol agents made him throw away his belongings except for his documents when they apprehended him after he crossed in the Mexicali area. Then

CLP_PC_025464

Case 4:18-cv-06810-JST Document 169-9 Filed 06/05/23 Page 46 of 1030

they put him on a bus and, without telling him where he was going, sent him to the border where he was expelled to Tijuana.

"My world fell," he said in Spanish. "I made so many sacrifices. To be returned is something really hard."

He's been staying at the shelter run by the city of Tijuana converted from a sports complex. He filled out the CBP One application on the first morning it was available, he said, and was able to get an appointment. His friend who tried later in the day was not.

Still, he's fearful that CBP could reject him.

*Los Angeles Times staff writer Andrea Castillo contributed to this report.*

 Kate Morrissey

Copyright © 2023, The San Diego Union-Tribune | CA Notice of Collection | Do Not Sell or Share My Personal Information

CLP_PC_025465

# Congress of the United States

## House of Representatives

### Washington, DC 20515-1304

March 13, 2023

The Honorable Alejandro Mayorkas
Department of Homeland Security
300 7th St. SW
Washington, DC 20024

Dear Secretary Mayorkas,

We write to express our serious concerns over this administration's recently announced initiatives that drastically restrict the rights of asylum-seekers at the U.S.-Mexico border, to call on the Department of Homeland Security (DHS) to uphold its obligations under domestic and international law, and to urge you to take immediate steps to resolve the serious equity and accessibility issues migrants are facing when trying to use the CBP One mobile application as the sole means of seeking asylum at southwest border land Ports of Entries (POEs).

First, we urge DHS and the Department of Justice to reverse course on the proposed rule published on February 23, 2023 that would ban most migrants from asylum protection in the United States. If implemented, the rule would create a presumption of asylum ineligibility for individuals who did not apply for, and/or did not receive a denial of, protection in a transit country, and for those who entered between ports of entry at the southern border or attempted to enter at a port of entry without a previously scheduled appointment through the CBP One mobile application. The standard for asylum is well-established under U.S. and international law, and does not discriminate based on manner of entry or immigration status. We are deeply concerned that establishing a higher standard for asylum for people unable to seek and be denied protection in a third country or to obtain an appointment through a mobile application would circumvent this statutory scheme and undermine the fundamental right to asylum, violating the letter and spirit of the law. The administration should withdraw this rule and pursue rational policies that ensure pathways to asylum for all migrants arriving at the southern border

Second, while we recognize the administration's efforts to provide convenient, orderly and lawful pathways to migration at the southern border, we advise you to both diversify methods to achieve this goal beyond the CBP One mobile application and to increase accessibility and usability of this app. DHS announced that individuals seeking to enter the United States under exemptions to Title 42 at southern land POEs should use CBP One to submit information prior to their arrival and schedule appointments starting on January 12, 2023. Since then, our offices have received numerous reports of unusability, inaccessibility, and inequity that have already resulted in grave harm to asylum seekers.

**Create an alternative pathway to present at POEs.** According to DHS Guidance, asylum seekers or others seeking humanitarian protection cannot be required to submit advance information in order to be processed at a southwest Border land POE.[1] However, the app is now a requirement to access the Title 42 exemption process (and, in the future, asylum processing at ports of entry), a photo is required from all migrants, and NGOs may no longer provide help with pre-submittal of information, which must come from an individual's smartphone.[2]

Under both U.S. and international law, an appointment is not required to seek asylum. For as long as Title 42 has been enforced, CBP has allowed certain vulnerable asylum seekers to seek exemption from the policy and enter the United States. As it stands today, CBP One requires attestation to direct harm in Mexico and provides no pathway for asylum-seekers escaping harm in their home countries including due to group membership status such as sexual orientation, gender identity, religious belief, or race.

Additionally, many migrants are either unable to access the CBP One app, or, if they are able to log in to the app, are unable to access appointments due to their extremely limited availability. Many migrants do not have access to high-speed internet or high-end technology such as the smartphones with specific capabilities required to download the CBP One application.[3] Further, our offices have received numerous reports of appointment slots being filled within seconds of their release at 8:00 am each morning, creating grave concerns about the safety of individuals who are particularly vulnerable or facing medical emergencies or other crises.

We urge you to take all steps possible to ensure that people seeking asylum at POEs are provided access in accordance with U.S. refugee law and are not turned away when they have not used, or been able to use, CBP One to make an appointment. With Title 42 in effect, we also urge you to follow CBP's written commitment to make admissibility and processing determinations on a case-by-case basis at the POE, and ensure that port directors and CBP officers retain discretion to prioritize processing of migrants based on need, medical emergency, vulnerability, or other humanitarian factors for which we owe them a statutory duty, in order to ensure individuals who

---

1 *Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry*, U.S. Customs and Border Protection (Nov. 1, 2021),https://www.cbp.gov/sites/default/files/assets/documents/2021-Nov/CBP-mgmt-processing-non-citizens-swb-lpoes-signed-Memo-11.1.2021-508.pdf. Indeed, A 2021 information collection notice assured that the use of CBP One as "voluntary," saying photos would only be required from those migrants that "choose to provide advance information," and that, even upon full roll-out of the application, NGOs would still be able to help individuals with the process that needed it. https://www.federalregister.gov/documents/2021/09/28/2021-20988/collection-of-advance-information-from-certain-undocumented-individuals-on-the-land-border.
2 *Supra*, note 1.
3 CBP One Mobile Application, U.S. Customs and Border Protection, *NEW: Submit Advance Information and Schedule an Appointment Capability for Non-Citizens without Appropriate Travel Documents*, https://www.cbp.gov/about/mobile-apps-directory/cbpone.

are unable to secure appointments via CBP One are able to apply for exemption and seek asylum.

**Make Critical Changes to App Procedures.** We also advise you to immediately increase the accessibility and usability of the app by addressing the following issues.

**Keep all families together.** The current process for submitting information and scheduling appointments in CBP One makes it all but impossible for a family to get a block of appointments together, as each family member must book an appointment and appointment blocks are not set aside for families, leading to de facto priority for single adults. Attestation to harm in the third country of Mexico also presents families with a heightened standard that does not align with the vulnerabilities under Title 42.

**Make migration processing technology accessible.** CBP One requires high levels of technological literacy, and its interface is only available in English, Spanish, and Haitian Creole languages, leaving asylum seekers that read and write in other languages unable to use it or forced to pay high fees to third parties for paper instructions in their native language. We urge you to immediately add simple instructions to the application while making it accessible in other common languages read and written by asylum seekers presenting at the ports, using recent historical data to prioritize the order of translation efforts. We also urge you to address accessibility issues for asylum seekers who lack literacy in any language, require help due to disability, or are blind.

**Cease reliance on third-party photograph comparison technology.** CBP One requires users to submit photos as part of the information entry process and the facial comparison technology it has used is far more likely to misidentify people of color, children, and transgender migrants. Some migrants, particularly those with darker skin tones, have reported that CBP One rejects required photos, delaying or rejecting their applications. Similarly, there have been many problems associated with capturing images of babies and small children. Transgender migrants may present differently at the border than they did at the time of photo capture, leading to problems at the POE. We recommend ceasing use of the photo comparison tool until and unless the technology can be used equitably and to ensure vulnerable groups can seek Title 42 exemptions, even if their faces are not recognized by CBP One's facial comparison technology.

Families traveling thousands of miles to seek safety abroad are entitled to dignity and respect when they arrive at our border. While technology can be helpful to facilitate processing, it should never be used to create a tiered system that treats groups differently according to economic status, gender identity, age, language, nationality, or race.

We ask that the administration develop alternative pathways to apply for Title 42 exemption appointments immediately, while rapidly disseminating concise and accessible information about

both how to use the app and the availability of alternative methods for individuals who do not have access to the application. We believe these measures are essential to ensure that CBP One meets the balance between efficiency, access, and transparency for asylum-seekers approaching our southwest border.

Thank you for your attention to this urgent matter, and we look forward to your response.

Sincerely,

Jesús G. "Chuy" García
Member of Congress

Raúl M. Grijalva
Member of Congress

Eleanor Holmes Norton
Member of Congress

Juan Vargas
Member of Congress

Adriano Espaillat
Member of Congress

Cori Bush
Member of Congress

Nydia M. Velázquez
Member of Congress

Tony Cárdenas
Member of Congress

Jamaal Bowman, Ed.D.
Member of Congress

Sylvia R. Garcia
Member of Congress

James P. McGovern
Member of Congress

CLP_PC_025480

Barbara Lee
Member of Congress

Rashida Tlaib
Member of Congress

Joaquin Castro
Member of Congress

David J. Trone
Member of Congress

Sara Jacobs
Member of Congress

Nanette Diaz Barragán
Member of Congress

Becca Balint
Member of Congress

Alexandria Ocasio-Cortez
Member of Congress

Grace F. Napolitano
Member of Congress

Jimmy Gomez
Member of Congress

Robert Garcia
Member of Congress

Suzanne Bonamici
Member of Congress

Grace Meng
Member of Congress

Valerie P. Foushee
Member of Congress

Rick Larsen
Member of Congress

Veronica Escobar
Member of Congress

Delia C. Ramirez
Member of Congress

Mary Gay Scanlon
Member of Congress

Greg Casar
Member of Congress

Jan Schakowsky
Member of Congress

Yvette D. Clarke
Member of Congress

J. Luis Correa
Member of Congress

Linda T. Sánchez
Member of Congress

Nikema Williams
Member of Congress

EDWARD J. MARKEY
MASSACHUSETTS

COMMITTEES:
ENVIRONMENT AND PUBLIC WORKS
CHAIR:
SUBCOMMITTEE ON CLEAN AIR, CLIMATE, AND
NUCLEAR SAFETY
HEALTH, EDUCATION, LABOR, AND PENSIONS
CHAIR:
SUBCOMMITTEE ON PRIMARY HEALTH AND
RETIREMENT SECURITY
COMMERCE, SCIENCE, AND TRANSPORTATION
SMALL BUSINESS AND ENTREPRENEURSHIP
CHAIR:
U.S. SENATE CLIMATE CHANGE TASK FORCE

SUITE SD–255
DIRKSEN BUILDING
WASHINGTON, DC 20510–2107
202–224–2742

975 JFK FEDERAL BUILDING
15 NEW SUDBURY STREET
BOSTON, MA 02203
617–565–8519

1550 MAIN STREET, 4TH FLOOR
SPRINGFIELD, MA 01103
413–785–4610

# United States Senate

February 21, 2023

The Honorable Alejandro Mayorkas
Secretary of Homeland Security
U.S. Department of Homeland Security
3801 Nebraska Avenue, NW
Washington, DC 20016

Dear Secretary Mayorkas,

I write to urge the Department of Homeland Security (DHS) to cease using the CBP One mobile application, which DHS recently made a requirement for migrants seeking asylum in the United States at the southern border. Under the new DHS policy, those asylum seekers must now use the CBP One app to submit biometric information and schedule appointments to present themselves at certain points of entry (POEs).[1] This expanded use of the CBP One app raises troubling issues of inequitable access to — and impermissible limits on — asylum, and has been plagued by significant technical problems and privacy concerns. DHS should shelve the CBP One app immediately.

I appreciate that, through the expanded use of the CBP One app — initially launched in October 2020 with limited functionality—the Biden administration intended to ensure the safe and orderly processing of noncitizens at POEs. But requiring asylum seekers to use a virtual platform accessible only with a smartphone effectively denies to indigent migrants their legally protected right to seek asylum.[2] Those fleeing dangerous conditions often lack access to technology, including smartphones and the internet access required to download and use the CBP One app.[3]

Furthermore, even migrants with the resources and know-how to obtain and use this technology must schedule an appointment at, and travel to, one of only eight POEs participating in the CBP One app's expanded rollout—out of 328 POEs nationwide.[4] Advocates report that migrants in

---

[1] *DHS Continues to Prepare for End of Title 42: Announces New Border Enforcement Measures and Additional Safe and Orderly Processes*, Dep't of Homeland Security (Jan. 5, 2023), https://www.dhs.gov/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-new-border-enforcement-measures-and.

[2] CBP One Mobile Application, U.S. Customs and Border Protection, *NEW: Submit Advance Information and Schedule an Appointment Capability for Non-Citizens without Appropriate Travel Documents*, https://www.cbp.gov/about/mobile-apps-directory/cbpone.

[3] *Id.*

[4] *DHS Continues to Prepare for End of Title 42: Announces New Border Enforcement Measures and Additional Safe and Orderly Processes*, Dep't of Homeland Security (Jan. 5, 2023), https://www.dhs.gov/news/2023/01/05/dhs-

The Honorable Alejandro Mayorkas
Page **2** of **4**

Reynoso and Matamoros, Mexico were given appointments for asylum in Tijuana, some 1,500 miles away.[5] Technology can facilitate asylum processing, but we cannot allow it to create a tiered system that treats asylum seekers differently based on their economic status — including the ability to pay for travel — language, nationality, or race.

According to reports, the app also was not ready for its expanded use, could not handle the volume of applicants, and frequently did not work.[6] One user described how she "would create an account, go through several more steps and the app would then restart to step one, a seemingly endless cycle."[7]

Additionally, the use of the CBP One app to collect biometric information raises privacy concerns and poses unique threats to immigrant communities. According to DHS, the CBP One app uses facial comparison and cloud technology to collect, store, and process data — including biometric and geolocation information — on asylum seekers before they enter the United States.[8] But this technology is fraught with serious problems. An analysis of face recognition software tools conducted by the National Institute of Standards and Technology (NIST) found that "one-to-one matching . . . saw higher rates of false positives for Asian and African American faces relative to images of Caucasians," up to a factor of 100 times.[9] It therefore comes as no surprise that CBP One has reportedly rejected photos from some migrants — particularly those with dark complexions — delaying or rejecting their applications and requiring them to start the arduous process all over again.[10] Accuracy issues aside, government collection of biometric data is extremely problematic because it is highly invasive and invites serious privacy violations.

The use of geolocation tracking and cloud storage also raises surveillance concerns. These features allow the government to identify and track migrants' movements without their knowledge or consent. Communities of color are systematically subjected to over-policing. The proliferation of biometric surveillance tools is therefore likely to disproportionately infringe on the privacy of individuals in Black, Brown, and immigrant communities.

Last, but certainly not least, the CBP One app promotes the false notion that, in order to seek asylum in the United States, an appointment is required. It is not, under either U.S. or international law. Indeed, according to DHS guidance from November 2021, "asylum seekers or

---

continues-prepare-end-title-42-announces-new-border-enforcement-measures-and; *At Ports of Entry*, U.S. Customs and Border Protection, https://www.cbp.gov/border-security/ports-entry.

[5] Sandra Sanchez, *CBP One app gives cash-strapped asylum-seekers interviews hundreds of miles away* (Jan. 18, 2023), https://www.borderreport.com/immigration/cbp-one-app-gives-cash-strapped-asylum-seekers-interviews-hundreds-of-miles-away/.

[6] Regina Yurrita, *Asylum seekers met with issues from new CBP One app*, CBS8 (Feb. 1, 2023), https://www.cbs8.com/article/news/local/asylum-seekers-met-with-issues-from-cbp-one-app/509-5f69579c-05e1-4999-a7a9-720eab0cc680.

[7] *Id.*

[8] *Privacy Impact Assessment for CBP One*, Dep't of Homeland Security (Feb. 19, 2021), https://www.dhs.gov/sites/default/files/2023-01/privacy-pia-cbp068-cbpmobileapplication-jan2023.pdf.

[9] National Institute of Standards and Technology, *NIST Study Evaluates Effects of Race, Age, Sex on Face Recognition Software* (Dec. 19, 2019), https://www.nist.gov/news-events/news/2019/12/nist-study-evaluates-effects-race-age-sex-face-recognition-software.

[10] Suzanne Monyak, *Migrants grapple with government app to make asylum appointments,* RollCall (Jan. 31, 2023), https://rollcall.com/2023/01/31/migrants-grapple-with-government-app-to-make-asylum-appointments/.

The Honorable Alejandro Mayorkas
Page **3** of **4**

others seeking humanitarian protection cannot be required to submit advance information in order to be processed at a Southwest Border land POE."[11] Disturbingly, requiring asylum seekers to remain in Mexico and await their appointments mirrors "metering" efforts under the Trump administration.[12] And those awaiting their appointments can face dangerous conditions, In January, a 17-year old Cuban boy awaiting his scheduled CBP One appointment in Monterrey, Mexico was fatally shot, underscoring the dangers facing asylum seekers.[13]

Currently, the CBP One app is required for asylum seekers requesting an exception from Title 42; after Title 42 restrictions are lifted, its use will be greatly expanded.[14] This carries profound long-term implications for the U.S. immigration system. In order to help us better understand current and future issues surrounding the CBP One app, please provide written answers to the following questions by March 10, 2023:

1. Will DHS commit to permanently cease using the CBP One application to screen asylum applicants? If not, why not, and will DHS at least temporarily stop using it until DHS can remove any biometric technology and geolocation functionality and fix the app's technical issues?
2. Will DHS ensure that there is an alternative means for migrants to seek asylum at the southern border, one that does not require an app or internet access? Currently, are asylum seekers who lack a smartphone or internet access — and therefore cannot schedule an appointment through CBP One — turned back when they present themselves at a POE?
3. How is DHS preventing the CBP One app from discriminating against applicants of color, including the app's rejecting photos of applicants with darker complexions?
4. What assistance, if any, is DHS providing to asylum seekers whose photos are rejected, or who receive error messages or experience other technical problems with CBP One? Can migrants seeking asylum at the southern border still exercise that right without using the CBP One app?
5. Before CBP One's expanded rollout, was the application tested to screen for technology glitches or failures? If not, why not?
6. Before CBP One's expanded rollout, were civil society or nongovernmental organizations consulted? If not, why not?
7. Why are only eight POEs participating in CBP One? How and why did DHS decide on this number and the specific locations?
8. How many appointments does DHS make available each day through the CBP One app?

---

[11] *Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry*, U.S. Customs and Border Protection (Nov. 1, 2021), https://www.cbp.gov/sites/default/files/assets/documents/2021-Nov/CBP-mgmt-processing-non-citizens-swb-lpoes-signed-Memo-11.1.2021-508.pdf
[12] *Metering and Asylum Turnbacks*, American Immigration Council (Mar. 8, 2021), https://www.americanimmigrationcouncil.org/research/metering-and-asylum-turnbacks.
[13] Press Release, *Teenager Killed While Waiting in Mexico to Seek Asylum in the United States*, Young Center for Immigrant Children's Rights (Jan. 26, 2023), https://www.theyoungcenter.org/media-press-releases/2023/1/26/teenager-killed-while-waiting-in-mexico-to-seek-asylum-in-the-united-states.
[14] *DHS Continues to Prepare for End of Title 42: Announces New Border Enforcement Measures and Additional Safe and Orderly Processes*, Dep't of Homeland Security (Jan. 5, 2023), https://www.dhs.gov/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-new-border-enforcement-measures-and.

The Honorable Alejandro Mayorkas
Page **4** of **4**

9.  In what geographic areas does the CBP One application work and how was this decided?
10. How is DHS working with Mexico to ensure the safety of individuals who must travel in order to present themselves at one of the eight participating POEs?
11. The CBP One app is available only in English, Spanish, and Haitian Creole languages. This makes the app inaccessible to asylum seekers who speak a different language. How did DHS decide on these three languages? What options are available for asylum seekers using the CBP One app who don't speak those three languages?
12. What steps is DHS taking to prevent exploitation of asylum seekers through clone apps or scam attempts? How is DHS defending against misinformation around the CBP One app?
13. How is DHS safeguarding biometric and geolocation information obtained through use of the CBP One App? How is DHS ensuring that this information cannot be misused? Has CBP shared any personal information collected by the CBP One App with any other government agencies or law enforcement entities? If so please describe that sharing in detail.

Rather than mandating use of an app that is inaccessible to many migrants, and violates both their privacy and international law, DHS should instead implement a compassionate, lawful, and human-rights centered approach for those seeking asylum in the United States.

Thank you for your attention to this urgent matter, and I look forward to your response.

Sincerely,

_____
Edward J. Markey
United States Senator



The only women-founded,
women-led nonprofit newsroom in Arizona.
Your donation directly supports community-centered journalism that helps you take action.
Donate now

LUMINARIA
Lighting the path so you can take action
Support Us
About us | Quiénes somos Membership Seed Funder Circle Newsletters Jobs
TOPICS Equity Education Environment Community Voting

EQUITY

# Glitchy CBP One app turning volunteers into Geek Squad support for asylum-seekers in Nogales

*The app is now the only way for people seeking asylum outside the U.S. to make an appointment for a claim*

by John Washington
March 20, 2023

Twitter Facebook

Lidia is an Indigenous Mam woman from Oaxaca. She's seeking asylum for safety with her children, and tries to take a required photo using the CPB One app during a training session at the the Kino Border Initiative site in Nogales, Sonora on Friday, Feb. 3, 2023. She tried the federal government's CBP One app dozens of times and was met with an error message each time. Credit: Michael McKisson

NOGALES, México — Lidia is frowning at the smartphone screen. The face staring back at her, a blonde-haired woman wearing a Carhartt beanie and heavy mascara around her large blue eyes, is modeling how asylum-seekers should position their faces on the federal government's CBP One mobile app.

"Captura de Rostro," the message above the blonde woman's face reads. "Face Capture," followed by "Touch anywhere to continue."

AZ Luminaria stories delivered to your inbox
Enter your email
Subscribe

Lidia is an Indigenous Mam woman from Oaxaca. Mam are a Mayan people who speak the Mam language primarily in Guatemala and in the states of southern México. She touches the screen of her phone, where the blonde-woman's face is, and tries to take a selfie.

"Error," the screen responds.

"I don't look like her," Lidia says, repositioning herself to try to catch more light from the window. "Maybe that's the problem."

Lidia is short, hardly 5-feet tall, has round cheeks, dark brown hair. She helps her little girl climb into the chair next to her.

Lidia is one of more than two dozen asylum-seekers who, on a recent Friday in early February, are attending a troubleshooting workshop in Nogales, Sonora. Migrant-rights volunteers have been hosting the crash courses around a long card table in a large room with a whiteboard.

Currently, the app is the only way for asylum-seekers outside the United States to gain an exemption and make an appointment at a port of entry to levy an asylum claim. Nogales is the only port in Arizona where asylum-seekers can make an appointment, which concentrates asylum-seekers in a city where they have few resources or people to depend on.

Gia Del Pino leads a class training people migrating for safety at the Kino Border Initiative to use the CBP One app in Nogales, Sonora on Friday, Feb. 3, 2023. Credit: Michael McKisson

In the closed-in patio visible through a wall of windows, volunteers are finishing cleaning up and eating a late breakfast. In the classroom, other volunteers are helping people navigate their legal and human rights via a flawed Custom and Border Protection app.

For years, the number of people coming to the United States to seek asylum has been rising.

In March of 2020, the Trump administration invoked an antiquated public health code, known as Title 42, to automatically expel anyone crossing the U.S. border without authorization. Since then, the overwhelming majority of people coming to or crossing the U.S.-México border to seek humanitarian protection have been blocked or pushed back.

The move was the culmination of years of efforts to limit asylum, turning various sites in northern México into de facto refugee camps.

AZ Luminaria stories delivered to your inbox
Enter your email
Subscribe

To mitigate the crisis, the Kino Border Initiative, or KBI, which has been assisting migrants in northern Sonora for decades, offering a safe space, beds, food, medical assistance, as well as some legal and social services, expanded its role and capacity. Now volunteers also assist the new population of people blocked from seeking safety, dealing with the precarity of northern México, and unable to return to their home states or countries.

KBI holds twice-weekly workshops, basically asylum-seeker Geek Squad sessions, says Gia Del Pino, the organization's director of communications.

Kino Border Initiative communications director, Gia Del Pino, listens as people migrating explain the challenges of using the U.S. Customs and Border Protection's CBP One app during a training session in Nogales, Sonora on Friday, Feb. 3, 2023. Credit: Michael McKisson

CBP One, purported to help streamline access to claiming asylum, uses facial recognition software to compare the faces of people seeking asylum with their other identity documents. It also runs their faces through a terrorist and national security database.

The problem? The technology seems unable to recognize many faces, especially when people have darker skin tones or Indigenous features — when they don't look like the blonde model on the screen's background.

Advocates are finding that Black asylum-seekers, from Haiti and African countries, or elsewhere, face greater bias using the app, as the algorithm doesn't recognize their skin tone.

Lidia and all other asylum-seekers in this article — all of whom fear persecution in their home countries and insecurity and danger in northern México — are only identified by their first names.

Critics argue that long-standing legal complications, discrimination and other hurdles to gaining asylum have now been compounded by the Biden administration's new app mandate.

Faltering facial recognition technology is only one of a host of complaints asylum-seekers and advocates have enumerated about the app. It also needs a strong signal or Wi-Fi to work and requires two-factor authentication. That's a problem for less wealthy or less tech-literate people without emails. And it is only available in three languages — English, Spanish, and, as of recently and after criticism from Haitian migrants, Haitian Creole.

Rafael, right, and his son Marcelo attempt to schedule a meeting time with representatives from the US Customs and Border Protection agency through their CBP One app during a training session hosted by the Kino Border Initiative in Nogales, Sonora on Friday, Feb. 3, 2023. They are fleeing political unrest in Peru. Credit: Michael McKisson

All of that puts what was once a straightforward, though harrowing and legally difficult, act for asylum-seekers behind a technological wall. Human-rights advocates argue that the process of fleeing to the border and asking for asylum protection is now derailed by an app that's endangering lives as people worry at their phones and languish in northern México.

The app has been around for years, but was recently updated as part of a series of new initiatives by the Biden administration.

Ports of entry were closed to asylum-seekers because of the Title 42 public health order. After multiple lawsuits and missed expiration dates, the measure could end in May, as the federal government reviews public comments on new asylum regulations and moves to terminate the COVID-19 national and public health order.

The app, according to a Jan. 12 Department of Homelands Security announcement, was meant to "reduce wait times and help ensure safe, orderly, and streamlined processing."

But as Lidia and many others testify, the app is having the opposite effect: one more tool used by the U.S. government to deny asylum and push impoverished and endangered migrants away from U.S. territory.

Eleanor Acer, Director, Refugee Protection, Human Rights First, said in a recent press call that the Biden administration is effectively "advancing the Trump administration's agenda."

"Neither U.S. or international law requires access to technology in order to be able to exercise your human rights to seek asylum," Acer said. "There's no question that the CBP One app should not be, legally, morally, or otherwise, the only way in which people can access asylum in the United States."

A March 13 letter from 35 members of Congress, including Raúl Grijalva, D-Ariz., addressed to DHS Secretary Alejandro Mayorkas cites their offices having "received numerous reports of inusability, inaccessibility, and inequity that have already resulted in grave harm to asylum-seekers" because of reliance on the CBP One app.

In the KBI workshop in Sonora, less than a mile from the U.S. border, Lidia repositions herself, tries to find better light from the window, and again faces the blonde model.

Lidia explains that she doesn't know how to read very much, having only attended one year of school. She is struggling to figure out not just how to take and upload her photo, but how to complete all the other portions of the app that would allow her to present at the U.S.-México border.

People seeking asylum are required to use the newly launched CBP One app to take their photo as one step in the process. Photo taken at the Kino Border Initiative in Nogales, Sonora on Friday, Feb. 3, 2023. Credit: Michael McKisson

"I have to figure it out," she says, looking at her kids. "More than anything it's for them."

Her two children, 6 and 4, are playing in chairs next to her. Lidia explains that violence in her small community in Chiapas has forced teachers to abandon the local school. Shootouts became common, and she was scared not only that she'd be unable to give her kids an education, but that she'd be unable to keep them alive.

After a weeks-long bus journey to the U.S.-México border, the biggest obstacle she now faces is a phone app.

## Blocking Asylum

Since the passage of the Refugee Act in 1980, which brought U.S. law into line with protocols first established in the 1951 United Nations Refugee Convention, anybody who is inside the United States, no matter how they arrived, or who shows up at the U.S. border, was given a chance to apply for asylum.

While there have long been exceptions to who may be granted asylum, and in practice the policy discriminated against certain nationalities, the principle of offering protection to those who needed it was unquestioned. That began to markedly change during the Trump administration when White House and the Department of Homeland Security officials made concerted efforts to restrict both asylum and refugee procedures.

In the two months since the Biden administration announced its overhaul of the system for seeking asylum, which is pending possible changes that would not go into effect until May, policymakers and national and international lawyers have been talking with people on the ground.

They're trying to assess how the rollout of CBP One for asylum-seekers is already causing turmoil. They hear stories from people like the volunteer Geek Squad at KBI in Nogales trying to help migrants like Lidia and her children secure their safety, rights and navigate a technological nightmare.

The CBP One App is part of a multipronged strategy the Biden administration is implementing in attempts to reduce the numbers of migrants, mostly asylum-seekers, arriving at the U.S. southern border.

Other efforts include a policy that permits as many as 30,000 people from Venezuela, Cuba, Haiti, and Nicaragua to be paroled into the U.S. every month, at the same time that 30,000 from each country can be immediately expelled into México. The program has expanded from last fall when it initially applied only to Venezuelans, and which was, in turn, modeled on a similar program for Ukrainians. Parole is only temporary, not a pathway to citizenship, and does not let those who qualify to bring family members over as well.

On Feb. 21, the Biden administration announced its most restrictive measures, which would deny asylum to people who passed through another country without seeking protection there first and penalize them if they cross the border without authorization. The penalization directly contravenes existing U.S. law, which states that any migrant "who is physically present in the United States," regardless of status or where they are, may apply for asylum.

In the text of the proposed new regulation, which is up for public comment and is scheduled to go into effect in May, the CBP One app is described as "an innovative mechanism for noncitizens to schedule a time to arrive at ports of entry."

People may provide feedback on the proposed regulation through March 27.

The new rule would expand the use of the app, as most asylum-seekers outside of the United States would need to use the app to request protection.

"Use of this app protects migrants from having to wait in long lines of unknown duration at the ports of entry, and enables the ports of entry to manage the flows in a safe and efficient manner," according to the text of the new rule.

While the rule claims that the app is "creating efficiencies" in asylum processing, the administration also acknowledges that they are "aware of concerns regarding the accessibility" of the app.

They also note that there may be exceptions to the requirement to use the app, as long as the asylum-seeker "demonstrates by a preponderance of the evidence that it was not possible to access or use the CBP One app due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle."

CBP officials did not respond to detailed questions about the inaccessibility of the app.

The proposed asylum regulations are "a death sentence for the poor, Indigenous, LGBTQ+, African, and other communities who don't have the luxury of buying a direct ticket to the United States," said Bilal Askaryar, interim campaign manager of the #WelcomeWithDignity campaign.

Social worker Yennilka Hernandez helps a person migrating navigate the CPB One app during a training session hosted by the Kino Border Initiative in Nogales, Sonora on Friday, Feb. 3, 2023. Credit: Michael McKisson

## 'What do I do?'

The facial-recognition software that Lidia and others are contending with is only a small part of the problem with CBP One. "The app is very glitchy," says Gia, the KBI spokesperson.

Erika Pinheiro, the executive director of Al Otro Lado, a migrant rights organization based in Tijuana, echoed Gia's sentiment: "You have to go through multiple screens and it just keeps on crashing."

At the KBI workshop, one man, José, from the state of Guerrero, holds out his phone to explain that his Google Chrome operating system kept wanting to fill in the boxes itself, but when he gave it permission to do so, it wouldn't, and when he denied it permission, it just asked again.

"What do I do?" José asks his neighbor, Rafael, an asylum-seeker from Peru. Rafael shows him his own phone, which was displaying the message: "The code sent is invalid."

Another man, his voice pitched with desperation, says. "I don't even have an email."

Gia is standing at the head of the series of tables around which two dozen men and women, along with a few children, are thumb-stumbling on their phones.

women, along with a few children, are thumb-stumbling on their phones.

“Is anybody else trying to figure out how to get an email?” she asks.

Six hands go up.

“Does anybody else have problems simply putting in their email”?

Eight hands.

“Anybody have trouble understanding what the app is asking you?”

Five hands.

“Anyone struggling to take a photo?”

Nine hands.

“The application no está bien hecha,” Gia says. It’s not well-built.

She suggests trying to close it and restart, but admits that doing so will require you to fill out everything again. With the patience and equanimity of a schoolteacher, after further general announcements and answers, Gia begins a series of circles around the tables, leaning over shoulders, swiping across screens, and trying to answer and troubleshoot specific issues.

A person migrating attempts to take a photo of her son using the CPB One app during a training session hosted by the Kino Border Initiative in Nogales, Sonora on Friday, Feb. 3, 2023. People migrating for safety have struggled to use the app because of various bugs and frequent crashing. Credit: Michael McKisson

## ‘Virtual border walls’

“There’s things that we anticipated that are even worse than what we thought, especially the racially-disparate access,” said Erika, from Al Otro Lado.

Asylum-seekers from Haiti face particular difficulties. When the app was first expanded in January to be used by asylum-seekers, it didn’t have an option for Haitian Creole speakers. As of March 16, the app’s Haitian Creole website is a nearly illegible word jumble. It’s not the only instance of CBP websites not being accessible to Haitians.

Laura Wagner, the Haitian Creole Team Lead at Respond Crisis Translation, said that some of CBP’s websites are clearly just using Google translation services.

“Haitian migrants are faced not only with glitchy web platforms that don’t work well, display error messages in English, and often fail to recognize people with darker skin,” Wagner said, “but also with poorly-translated Kreyòl — when those websites or platforms are translated at all.”

Jean Jeef Nelson, a case manager for Haitian Bridge Alliance, explained that even when the Haitian Creole translations do work on the app, they only do so for the first steps of trying to book an appointment. Then the app switches back to English or Spanish. All of the error messages, he noted, are in English.

“We have folks who are illiterate who were compelled to pay as much as $500 dollars for help filling out the app,” Nelson said, describing the situation with Haitian asylum-seekers in Tijuana.

Jake Wiener, an attorney at Electronic Privacy Information Center, or EPIC, a DC-based organization that focuses on privacy and freedom of expression, worries that “an app that functions poorly can deter people from applying for asylum or spread mistrust of programs that are designed to protect and benefit asylum-seekers.”

When CBP pushes migrants to use an app like CBP One, they are asking migrants to trust them to handle their data safely and use it responsibly.

Jake worries about the new technology “creating virtual border walls.”

“Any tech should be used to solve real problems and improve access to services,” Jake added, “not to expand surveillance and discourage migrants.”

Reliance on new technology can be frustrating for anyone. When it’s a matter of life or death, the frustration takes on a new dimension.

“It can also be traumatizing to have your family’s safety come down to luck with an app,” said Chelsea Sachau, managing attorney of the Florence Immigrant & Refugee Rights Project’s Border Action Team.

“Many of the people we serve have told us they feel powerless to protect their kids and families when they aren’t able to get an appointment despite trying every morning.”

Kino Border Initiative staff member Gia Del Pino helps people navigate the CPB One app during a training session hosted by the Kino Border Initiative in Nogales, Sonora on Friday, Feb. 3, 2023. People migrating for safety have struggled to use the app because of various bugs and frequent crashing. Credit: Michael McKisson

## Dangers for asylum-seekers in México

The problems asylum-seekers are facing with the app are more than just technical. The app’s failures have repercussions beyond the frustration familiar to anyone who deals with modern technology.

Asylum-seekers are, by definition, fleeing for their lives. And while many of them may have left the most pressing dangers far behind them — in South America, the Caribbean, or elsewhere — northern México has repeatedly proven itself to be dangerous, even deadly, for migrants.

Over the past years, as successive U.S. administrations have sought to block asylum-seekers from accessing U.S. territory, various organizations have extensively documented a host of abuses against migrants, including intimidation, extortion, kidnapping, rape, enslavement, and murder.

Omar, 22, has been struggling with the CBP One app for a month. He is terrified of what may become of him.

Originally from El Salvador, Omar was forced to flee after a gang in his hometown gave him an ultimatum: either join their ranks, or, they said to him, “we’ll deal with you.”

He knew what *dealing with him* meant: almost certain death. So he and his family collected all the money they could, about $700 dollars, and he headed north.

Soon after crossing the border from Guatemala into México, he says he was kidnapped by armed men in police uniforms. He suspects they were not actual police officers, but isn’t sure. After three days of threats, and watching a fellow migrant beaten to the precipice of death, he escaped.

His travails in México were not over.

As he continued north by bus, he was robbed by police, who forced him to pay a bribe to continue traveling. And once he arrived in Nogales, a group of young men, recognizing that he wasn’t a local, told him he’d have to start paying a fee to live in Nogales.

A few days after first trying to schedule his appointment on the app and find safety across the border, with no luck, his cellphone broke. That meant he was out of the game for nearly two weeks as he struggled to raise the money to buy a new phone. He eventually got a Samsung Galaxy S10e, which cost him more than $300.

After staying for a bit more than a week at the KBI shelter, Omar was now sharing a small apartment, and had even landed a job. But after more than a month of struggling with the app, he still hasn’t found an appointment.

Omar says that he’s dealing with discrimination in Nogales. He’s paid less at the laundromat than his coworkers who are Mexican, and he’s scared to ask for more. With hundreds of publicized cases of asylum-seekers being extorted, kidnapped, or murdered, he’s trying as much as possible to maintain a low profile.

“I’m scared something will happen to me here. I wasn’t going to stay in El Salvador to die, and I don’t want to stay here and die either,” Omar says.

People migrating for safety use scraps of papers to write down important pieces of information when filling out the required information in the CPB One app during a training session hosted by the Kino Border Initiative in Nogales, Sonora on Friday, Feb. 3, 2023. Credit: Michael McKisson

## ‘I want to cry’

“The stress is killing us,” says Rafael, another asylum seeker from Peru. He continues fussing at his phone, showing screen-grabs of error messages. He holds the phone up and a CBP seal, ringed by a blue line continuously circling.

“No carga, no carga, no carga, no carga, no carga,” Rafael says, complaining about the app not loading.

“It’s like they’re making fun of us,” he says. And then adds, “I want to cry.”

A man next to Rafael has a torn off bit of a candy box with his email and password scratched onto it. He’s quiet and patiently waiting for help.

Another man was standing against a wall for at least twenty minutes, staring at the blonde woman’s face and trying to break through the facial recognition: “No me sale,” he says. It’s not coming out.

Omar says, “I remember when Biden, before he became president, said he’d help migrants, but he’s doing the opposite.”

“Just give us a chance,” he says, getting choked up behind his mask. “We’re not coming because we want to, but we have to, it’s our destiny. We’re not trying to do anything bad, we just want to live.”

He pulls his cap down low, trying to hide his tears. That’s the constant predicament asylum-seekers in northern México deal with: hide or blend in so as not to become targets of crime at the same time they need to make their faces visible to a CBP algorithm that, in many cases, refuses to recognize them.

Related

Despite Border Patrol leader’s promise to stop, Congress members call out agents still confiscating Sikh asylum-seekers’ turbans

Whistleblowers say Arizona Border Patrol practice of trashing Sikh turbans is widespread

Border Patrol has new orders not to trash Sikh turbans but isn’t sharing guidance publicly, advocates say

TAGGED: instagram

JOHN WASHINGTON

John Washington is an investigative journalist based in Tucson with a focus on immigration and borders, as well as criminal justice and literature. His first book, "The Dispossessed: A Story of Asylum… More by John Washington

© 2023 AZ Luminaria. Proudly powered by Newspack by Automattic

Privacy policy







## U.S. Customs and Border Protection (CBP) Encounters
Nationwide, Southwest Land Border,
and Northern Land Border Encounters by Fiscal Year (FY)

| Choose Region | FY | Component | Area of Responsibility |
|---|---|---|---|
| Southwest Land Border | All | All | All |

| Demographic | Citizenship | Title of Authority | State |
|---|---|---|---|
| All | All | All | All |

FY    ■ 2020    ■ 2021    ■ 2022    ■ 2023 (FYTD)    **Reset Filters**

### FY Southwest Land Border Encounters by Month



|  | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | **Total** |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2023 (FYTD) | 231,260 | 234,930 | 251,995 | 156,770 | 154,998 | | | | | | | | **1,029,953** |
| 2022 | 164,837 | 174,845 | 179,253 | 154,874 | 166,010 | 222,574 | 235,785 | 241,136 | 207,834 | 200,162 | 204,087 | 227,547 | **2,378,944** |
| 2021 | 71,929 | 72,113 | 73,994 | 78,414 | 101,099 | 173,277 | 178,795 | 180,597 | 189,034 | 213,593 | 209,840 | 192,001 | **1,734,686** |
| 2020 | 45,139 | 42,643 | 40,565 | 36,585 | 36,687 | 34,460 | 17,106 | 23,237 | 33,049 | 40,929 | 50,014 | 57,674 | **458,088** |

### FY Comparison by Demographic

| Single Adults | FMUA | UC / Single Minors | Accompanied Minors |
|---|---|---|---|
| 2020: 353,168 | 2020: 70,994 | 2020: 33,239 | 2020: 687 |
| 2021: 1,105,925 | 2021: 479,728 | 2021: 146,925 | 2021: 2,108 |
| 2022: 1,663,278 | 2022: 560,646 | 2022: 152,057 | 2022: 2,963 |
| 2023 (FYTD): 699,482 | 2023 (FYTD): 271,597 | 2023 (FYTD): 57,673 | 2023 (FYTD): 1,201 |

**Source:** USBP and OFO official year end reporting for FY20-FY22; USBP and OFO month end reporting for FY23 to date. Data is current as of 3/3/2023.
..



**U.S. Customs and Border Protection (CBP) Encounters**
Nationwide, Southwest Land Border,
and Northern Land Border Encounters by Fiscal Year (FY)

| Choose Region | FY | Component | Area of Responsibility |
|---|---|---|---|
| Southwest Land Border | All | All | All |

| Demographic | Citizenship | Title of Authority | State |
|---|---|---|---|
| UC / Single Minors | All | All | All |

FY      🟧 2020      🟦 2021      🟧 2022      ⬛ 2023 (FYTD)      Reset Filters



### FY Southwest Land Border Encounters by Month

|  | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2023 (FYTD) | 12,015 | 13,127 | 12,279 | 9,382 | 10,870 | | | | | | | | **57,673** |
| 2022 | 12,783 | 13,929 | 11,878 | 8,748 | 11,979 | 14,137 | 12,169 | 14,675 | 15,250 | 13,268 | 11,341 | 11,900 | **152,057** |
| 2021 | 4,810 | 4,591 | 4,965 | 5,820 | 9,402 | 18,870 | 17,067 | 14,052 | 15,230 | 18,954 | 18,806 | 14,358 | **146,925** |
| 2020 | 3,201 | 3,677 | 3,639 | 3,076 | 3,490 | 3,221 | 741 | 1,008 | 1,691 | 2,509 | 3,103 | 3,883 | **33,239** |

### FY Comparison by Demographic



**Source:** USBP and OFO official year end reporting for FY20-FY22; USBP and OFO month end reporting for FY23 to date. Data is current as of 3/3/2023.
..

CLP_PC_025574



**U.S. Customs and Border Protection (CBP) Encounters**
Nationwide, Southwest Land Border,
and Northern Land Border Encounters by Fiscal Year (FY)

| Choose Region | FY | Component | Area of Responsibility |
|---|---|---|---|
| Southwest Land Border | All | All | All |

| Demographic | Citizenship | Title of Authority | State |
|---|---|---|---|
| All | CUBA | All | All |

FY    ■ 2020    ■ 2021    ■ 2022    ■ 2023 (FYTD)    Reset Filters



### FY Southwest Land Border Encounters by Month

|  | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2023 (FYTD) | 28,845 | 34,710 | 42,653 | 6,433 | 753 | | | | | | | | **113,394** |
| 2022 | 5,896 | 6,605 | 7,986 | 9,721 | 16,557 | 32,153 | 34,839 | 25,643 | 16,172 | 20,098 | 19,060 | 26,178 | **220,908** |
| 2021 | 1,679 | 1,590 | 2,067 | 1,899 | 3,848 | 5,700 | 3,288 | 2,664 | 3,072 | 3,559 | 4,496 | 4,812 | **38,674** |
| 2020 | 1,843 | 1,182 | 949 | 655 | 596 | 432 | 164 | 535 | 947 | 1,567 | 2,181 | 2,359 | **13,410** |



### FY Comparison by Demographic

| Single Adults | FMUA | UC / Single Minors | Accompanied Minors |
|---|---|---|---|
| 2020: 11,907 / 2021: 31,088 / 2022: 168,286 / 2023 (FYTD): 80,134 | 2020: 1,437 / 2021: 7,552 / 2022: 51,652 / 2023 (FYTD): 32,111 | 2020: 57 / 2021: 32 / 2022: 966 / 2023 (FYTD): 1,146 | 2020: 9 / 2021: 2 / 2022: 4 / 2023 (FYTD): 3 |

**Source:** USBP and OFO official year end reporting for FY20-FY22; USBP and OFO month end reporting for FY23 to date. Data is current as of 3/3/2023.

..

CLP_PC_025575



**U.S. Customs and Border Protection (CBP) Encounters**
Nationwide, Southwest Land Border,
and Northern Land Border Encounters by Fiscal Year (FY)

| Choose Region | FY | Component | Area of Responsibility |
|---|---|---|---|
| Southwest Land Border | All | All | All |

| Demographic | Citizenship | Title of Authority | State |
|---|---|---|---|
| All | HAITI | All | All |

FY   ■ 2020   ■ 2021   ■ 2022   ■ 2023 (FYTD)   Reset Filters

## FY Southwest Land Border Encounters by Month



| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2023 (FYTD) | 6,718 | 5,472 | 5,138 | 3,174 | 7,430 | | | | | | | | **27,932** |
| 2022 | 908 | 1,022 | 7,144 | 3,372 | 1,877 | 2,171 | 5,739 | 10,514 | 4,069 | 5,380 | 6,551 | 5,163 | **53,910** |
| 2021 | 593 | 97 | 237 | 1,718 | 827 | 3,084 | 1,250 | 2,817 | 5,904 | 5,521 | 7,569 | 17,638 | **47,255** |
| 2020 | 230 | 459 | 657 | 490 | 839 | 586 | 20 | 8 | 154 | 155 | 55 | 882 | **4,535** |

## FY Comparison by Demographic



**Source:** USBP and OFO official year end reporting for FY20-FY22; USBP and OFO month end reporting for FY23 to date. Data is current as of 3/3/2023.
..

CLP_PC_025576

SW Land Border Encounters: Nicaragua



**U.S. Customs and Border Protection (CBP) Encounters**
Nationwide, Southwest Land Border,
and Northern Land Border Encounters by Fiscal Year (FY)

U.S. Customs and
Border Protection

| Choose Region | FY | Component | Area of Responsibility |
|---|---|---|---|
| Southwest Land Border | All | All | All |

| Demographic | Citizenship | Title of Authority | State |
|---|---|---|---|
| All | NICARAGUA | All | All |

FY  ■ 2020   ■ 2021   ■ 2022   ■ 2023 (FYTD)    Reset Filters

## FY Southwest Land Border Encounters by Month



| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2023 (FYTD) | 20,916 | 34,242 | 35,387 | 3,377 | 639 | | | | | | | | 94,561 |
| 2022 | 9,255 | 13,627 | 15,297 | 11,564 | 13,296 | 16,017 | 12,565 | 19,034 | 11,200 | 12,073 | 11,749 | 18,199 | 163,876 |
| 2021 | 256 | 387 | 640 | 534 | 706 | 1,930 | 3,074 | 4,414 | 7,435 | 13,456 | 9,979 | 7,298 | 50,109 |
| 2020 | 348 | 313 | 304 | 218 | 209 | 215 | 89 | 70 | 97 | 110 | 126 | 192 | 2,291 |

## FY Comparison by Demographic



**Source:** USBP and OFO official year end reporting for FY20-FY22; USBP and OFO month end reporting for FY23 to date. Data is current as of 3/3/2023.

CLP_PC_025577

SW Land Border Encounters: Venezuela (total)



**U.S. Customs and Border Protection (CBP) Encounters**
Nationwide, Southwest Land Border,
and Northern Land Border Encounters by Fiscal Year (FY)

| Choose Region | FY | Component | Area of Responsibility |
|---|---|---|---|
| Southwest Land Border | All | All | All |

| Demographic | Citizenship | Title of Authority | State |
|---|---|---|---|
| All | VENEZUELA | All | All |



FY   ■ 2020   ■ 2021   ■ 2022   ■ 2023 (FYTD)   **Reset Filters**

## FY Southwest Land Border Encounters by Month



| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2023 (FYTD) | 22,037 | 7,955 | 8,166 | 9,100 | 5,559 | | | | | | | | **52,817** |
| 2022 | 13,416 | 20,388 | 24,801 | 22,779 | 3,073 | 4,053 | 4,107 | 5,088 | 13,199 | 17,647 | 25,361 | 33,804 | **187,716** |
| 2021 | 143 | 184 | 206 | 295 | 913 | 2,566 | 6,048 | 7,499 | 7,583 | 6,126 | 6,301 | 10,814 | **48,678** |
| 2020 | 728 | 588 | 693 | 243 | 206 | 166 | 9 | 10 | 13 | 36 | 49 | 46 | **2,787** |

## FY Comparison by Demographic

| | Single Adults | | | | FMUA | | | | UC / Single Minors | | | | Accompanied Minors | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2020 | 2021 | 2022 | 2023 (FYTD) | 2020 | 2021 | 2022 | 2023 (FYTD) | 2020 | 2021 | 2022 | 2023 (FYTD) | 2020 | 2021 | 2022 | 2023 (FYTD) |
| | 878 | 26,041 | 120,208 | 32,642 | 1,875 | 22,302 | 66,343 | 19,642 | 22 | 315 | 1,139 | 500 | 12 | 20 | 26 | 33 |

**Source:** USBP and OFO official year end reporting for FY20-FY22; USBP and OFO month end reporting for FY23 to date. Data is current as of 3/3/2023.
..

SW Land Border Encounters: Venezuela (USBP)



**U.S. Customs and Border Protection (CBP) Encounters**
Nationwide, Southwest Land Border,
and Northern Land Border Encounters by Fiscal Year (FY)

| Choose Region | FY | Component | Area of Responsibility |
|---|---|---|---|
| Southwest Land Border | All | U.S. Border Patrol | All |

| Demographic | Citizenship | Title of Authority | State |
|---|---|---|---|
| All | VENEZUELA | All | All |

FY   ■ 2020   ■ 2021   ■ 2022   ■ 2023 (FYTD)   **Reset Filters**

## FY Southwest Land Border Encounters by Month



| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2023 (FYTD) | 21,822 | 6,745 | 6,182 | 2,346 | 1,451 | | | | | | | | **38,546** |
| 2022 | 13,396 | 20,349 | 24,764 | 22,748 | 3,065 | 4,031 | 4,075 | 5,064 | 13,141 | 17,602 | 25,302 | 33,749 | **187,286** |
| 2021 | 134 | 171 | 192 | 284 | 892 | 2,356 | 5,850 | 7,386 | 7,467 | 6,018 | 6,211 | 10,791 | **47,752** |
| 2020 | 205 | 105 | 399 | 139 | 132 | 100 | 9 | 8 | 12 | 36 | 45 | 37 | **1,227** |

## FY Comparison by Demographic



**Source:** USBP and OFO official year end reporting for FY20-FY22; USBP and OFO month end reporting for FY23 to date. Data is current as of 3/3/2023.
..



**U.S. Customs and Border Protection (CBP) Encounters**
Nationwide, Southwest Land Border,
and Northern Land Border Encounters by Fiscal Year (FY)

| Choose Region | FY | | Component | Area of Responsibility |
|---|---|---|---|---|
| Southwest Land Border | All | | Office of Field Operations | All |

| Demographic | Citizenship | Title of Authority | State |
|---|---|---|---|
| All | VENEZUELA | All | All |

FY    ■ 2020    ■ 2021    ■ 2022    ■ 2023 (FYTD)    **Reset Filters**

## FY Southwest Land Border Encounters by Month



| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2023 (FYTD) | 215 | 1,210 | 1,984 | 6,754 | 4,108 | | | | | | | | **14,271** |
| 2022 | 20 | 39 | 37 | 31 | 8 | 22 | 32 | 24 | 58 | 45 | 59 | 55 | **430** |
| 2021 | 9 | 13 | 14 | 11 | 21 | 210 | 198 | 113 | 116 | 108 | 90 | 23 | **926** |
| 2020 | 523 | 483 | 294 | 104 | 74 | 66 | | 2 | 1 | | 4 | 9 | **1,560** |

## FY Comparison by Demographic



**Source:** USBP and OFO official year end reporting for FY20-FY22; USBP and OFO month end reporting for FY23 to date. Data is current as of 3/3/2023.
..

CLP_PC_025580



### U.S. Customs and Border Protection (CBP) Encounters
Nationwide, Southwest Land Border,
and Northern Land Border Encounters by Fiscal Year (FY)

| Choose Region | FY | Component | Area of Responsibility |
|---|---|---|---|
| Southwest Land Border | All | All | All |

| Demographic | Citizenship | Title of Authority | State |
|---|---|---|---|
| All | Multiple values | All | All |

FY    🟧 2020    🟦 2021    🟧 2022    ⬛ 2023 (FYTD)    **Reset Filters**

## FY Southwest Land Border Encounters by Month



| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2023 (FYTD) | 152,744 | 152,551 | 160,651 | 134,686 | 140,617 | | | | | | | | **741,249** |
| 2022 | 135,362 | 133,203 | 124,025 | 107,438 | 131,207 | 168,180 | 178,535 | 180,857 | 163,194 | 144,964 | 141,366 | 144,203 | **1,752,534** |
| 2021 | 69,258 | 69,855 | 70,844 | 73,968 | 94,805 | 159,997 | 165,135 | 163,203 | 165,040 | 184,931 | 181,495 | 151,439 | **1,549,970** |
| 2020 | 41,990 | 40,101 | 37,962 | 34,979 | 34,837 | 33,061 | 16,824 | 22,614 | 31,838 | 39,061 | 47,603 | 54,195 | **435,065** |

## FY Comparison by Demographic



**Source:** USBP and OFO official year end reporting for FY20-FY22; USBP and OFO month end reporting for FY23 to date. Data is current as of 3/3/2023.
..

CLP_PC_025581



**U.S. Customs and Border Protection (CBP) Encounters**
Nationwide, Southwest Land Border,
and Northern Land Border Encounters by Fiscal Year (FY)

| | | | |
|---|---|---|---|
| Choose Region | FY | Component | Area of Responsibility |
| Southwest Land Border | All | Office of Field Operations | All |
| | | | |
| Demographic | Citizenship | Title of Authority | State |
| All | Multiple values | All | All |

FY   ■ 2020   ■ 2021   ■ 2022   ■ 2023 (FYTD)   **Reset Filters**

## FY Southwest Land Border Encounters by Month



| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2023 (FYTD) | 19,532 | 20,771 | 23,148 | 17,684 | 13,790 | | | | | | | | **94,925** |
| 2022 | 5,680 | 7,706 | 8,535 | 6,831 | 6,633 | 11,041 | 30,941 | 13,767 | 11,265 | 13,199 | 15,801 | 14,862 | **146,261** |
| 2021 | 2,866 | 2,919 | 2,808 | 3,062 | 3,387 | 3,797 | 4,838 | 7,652 | 9,910 | 12,158 | 12,243 | 6,388 | **72,028** |
| 2020 | 7,639 | 7,715 | 6,941 | 6,978 | 6,258 | 3,809 | 918 | 1,624 | 2,182 | 2,354 | 2,696 | 2,867 | **51,981** |

## FY Comparison by Demographic



**Source:** USBP and OFO official year end reporting for FY20-FY22; USBP and OFO month end reporting for FY23 to date. Data is current as of 3/3/2023.
..

CLP_PC_025582





**U.S. Customs and Border Protection (CBP) Encounters**
Nationwide, Southwest Land Border,
and Northern Land Border Encounters by Fiscal Year (FY)

| Choose Region | FY | Component | Area of Responsibility |
|---|---|---|---|
| Southwest Land Border | All | U.S. Border Patrol | All |

| Demographic | Citizenship | Title of Authority | State |
|---|---|---|---|
| All | Multiple values | All | All |

FY    ▮ 2020    ▮ 2021    ▮ 2022    ▮ 2023 (FYTD)    **Reset Filters**



## FY Southwest Land Border Encounters by Month



| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2023 (FYTD) | 133,212 | 131,780 | 137,503 | 117,002 | 126,827 | | | | | | | | **646,324** |
| 2022 | 129,682 | 125,497 | 115,490 | 100,607 | 124,574 | 157,139 | 147,594 | 167,090 | 151,929 | 131,765 | 125,565 | 129,341 | **1,606,273** |
| 2021 | 66,392 | 66,936 | 68,036 | 70,906 | 91,418 | 156,200 | 160,297 | 155,551 | 155,130 | 172,773 | 169,252 | 145,051 | **1,477,942** |
| 2020 | 34,351 | 32,386 | 31,021 | 28,001 | 28,579 | 29,252 | 15,906 | 20,990 | 29,656 | 36,707 | 44,907 | 51,328 | **383,084** |

## FY Comparison by Demographic



**Source:** USBP and OFO official year end reporting for FY20-FY22; USBP and OFO month end reporting for FY23 to date. Data is current as of 3/3/2023.
..

CLP_PC_025583



U.S. Customs and Border Protection

## U.S. Customs and Border Protection (CBP) Encounters
Nationwide, Southwest Land Border,
and Northern Land Border Encounters by Fiscal Year (FY)

Choose Region: Southwest Land Border
FY: All
Component: U.S. Border Patrol
Area of Responsibility: All

Demographic: All
Citizenship: Multiple values
Title of Authority: All
State: All

FY: 2020 | 2021 | 2022 | 2023 (FYTD)

Reset Filters

## FY Southwest Land Border Encounters by Month

| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2023 (FYTD) | 155,034 | 138,525 | 143,685 | 119,348 | 128,278 | | | | | | | | **684,870** |
| 2022 | 143,078 | 145,846 | 140,254 | 123,355 | 127,639 | 161,170 | 151,669 | 172,154 | 165,070 | 149,367 | 150,867 | 163,090 | **1,793,559** |
| 2021 | 66,526 | 67,107 | 68,228 | 71,190 | 92,310 | 158,556 | 166,147 | 162,937 | 162,597 | 178,791 | 175,463 | 155,842 | **1,525,694** |
| 2020 | 34,556 | 32,491 | 31,420 | 28,140 | 28,711 | 29,352 | 15,915 | 20,998 | 29,668 | 36,743 | 44,952 | 51,365 | **384,311** |

## FY Comparison by Demographic

**Source:** USBP and OFO official year end reporting for FY20-FY22; USBP and OFO month end reporting for FY23 to date. Data is current as of 3/3/2023.
..



**U.S. Customs and Border Protection (CBP) Encounters**
Nationwide, Southwest Land Border,
and Northern Land Border Encounters by Fiscal Year (FY)

| | | | |
|---|---|---|---|
| Choose Region | FY | Component | Area of Responsibility |
| Southwest Land Border | All | U.S. Border Patrol | All |
| | | | |
| Demographic | Citizenship | Title of Authority | State |
| All | Multiple values | All | All |

FY   ■ 2020   ■ 2021   ■ 2022   ■ 2023 (FYTD)     **Reset Filters**

### FY Southwest Land Border Encounters by Month



| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | **Total** |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2023 (FYTD) | 71,649 | 75,650 | 84,190 | 11,911 | 2,050 | | | | | | | | **245,450** |
| 2022 | 29,431 | 41,518 | 55,112 | 47,270 | 34,596 | 54,042 | 55,910 | 57,280 | 40,470 | 50,069 | 56,209 | 78,256 | **600,163** |
| 2021 | 2,640 | 2,233 | 3,105 | 4,410 | 6,225 | 13,016 | 13,402 | 17,103 | 23,519 | 27,885 | 27,262 | 40,464 | **181,264** |
| 2020 | 1,051 | 1,138 | 1,832 | 1,204 | 1,498 | 1,137 | 276 | 603 | 1,180 | 1,829 | 2,376 | 3,443 | **17,567** |

### FY Comparison by Demographic



**Source:** USBP and OFO official year end reporting for FY20-FY22; USBP and OFO month end reporting for FY23 to date. Data is current as of 3/3/2023.
..

SW Land Border Encounters: Cuba, Haiti, Nicaragua (USBP)



**U.S. Customs and Border Protection (CBP) Encounters**
Nationwide, Southwest Land Border,
and Northern Land Border Encounters by Fiscal Year (FY)

U.S. Customs and
Border Protection

| Choose Region | FY | Component | Area of Responsibility |
|---|---|---|---|
| Southwest Land Border | All | U.S. Border Patrol | All |

| Demographic | Citizenship | Title of Authority | State |
|---|---|---|---|
| All | Multiple values | All | All |

FY    ■ 2020    ■ 2021    ■ 2022    ■ 2023 (FYTD)    **Reset Filters**



### FY Southwest Land Border Encounters by Month



| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2023 (FYTD) | 49,827 | 68,905 | 78,008 | 9,565 | 599 | | | | | | | | **206,904** |
| 2022 | 16,035 | 21,169 | 30,348 | 24,522 | 31,531 | 50,011 | 51,835 | 52,216 | 27,329 | 32,467 | 30,907 | 44,507 | **412,877** |
| 2021 | 2,506 | 2,062 | 2,913 | 4,126 | 5,333 | 10,660 | 7,552 | 9,717 | 16,052 | 21,867 | 21,051 | 29,673 | **133,512** |
| 2020 | 846 | 1,033 | 1,433 | 1,065 | 1,366 | 1,037 | 267 | 595 | 1,168 | 1,793 | 2,331 | 3,406 | **16,340** |

### FY Comparison by Demographic



**Source:** USBP and OFO official year end reporting for FY20-FY22; USBP and OFO month end reporting for FY23 to date. Data is current as of 3/3/2023.
..

SW Land Border Encounters: All Citizenships Excluding Cuba, Haiti, Nicaragua (USBP)



### U.S. Customs and Border Protection (CBP) Encounters
Nationwide, Southwest Land Border,
and Northern Land Border Encounters by Fiscal Year (FY)

| Choose Region | FY | Component | Area of Responsibility |
|---|---|---|---|
| Southwest Land Border | All | U.S. Border Patrol | All |

| Demographic | Citizenship | Title of Authority | State |
|---|---|---|---|
| All | Multiple values | All | All |

FY   ■ 2020   ■ 2021   ■ 2022   ■ 2023 (FYTD)    **Reset Filters**

## FY Southwest Land Border Encounters by Month



| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2023 (FYTD) | 155,034 | 138,525 | 143,685 | 119,348 | 128,278 | | | | | | | | **684,870** |
| 2022 | 143,078 | 145,846 | 140,254 | 123,355 | 127,639 | 161,170 | 151,669 | 172,154 | 165,070 | 149,367 | 150,867 | 163,090 | **1,793,559** |
| 2021 | 66,526 | 67,107 | 68,228 | 71,190 | 92,310 | 158,556 | 166,147 | 162,937 | 162,597 | 178,791 | 175,463 | 155,842 | **1,525,694** |
| 2020 | 34,556 | 32,491 | 31,420 | 28,140 | 28,711 | 29,352 | 15,915 | 20,998 | 29,668 | 36,743 | 44,952 | 51,365 | **384,311** |

## FY Comparison by Demographic



**Source:** USBP and OFO official year end reporting for FY20-FY22; USBP and OFO month end reporting for FY23 to date. Data is current as of 3/3/2023.
..

CLP_PC_025587

SW Land Border Encounters: Cuba, Haiti, Nicaragua, Venezuela (OFO)



**U.S. Customs and Border Protection (CBP) Encounters**
Nationwide, Southwest Land Border,
and Northern Land Border Encounters by Fiscal Year (FY)

| Choose Region | FY | Component | Area of Responsibility |
|---|---|---|---|
| Southwest Land Border | All | Office of Field Operations | All |

| Demographic | Citizenship | Title of Authority | State |
|---|---|---|---|
| All | Multiple values | All | All |

FY   ■ 2020   ■ 2021   ■ 2022   ■ 2023 (FYTD)    **Reset Filters**

## FY Southwest Land Border Encounters by Month



|  | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2023 (FYTD) | 6,867 | 6,729 | 7,154 | 10,173 | 12,331 | | | | | | | | **43,254** |
| 2022 | 44 | 124 | 116 | 166 | 207 | 352 | 1,340 | 2,999 | 4,170 | 5,129 | 6,512 | 5,088 | **26,247** |
| 2021 | 31 | 25 | 45 | 36 | 69 | 264 | 258 | 291 | 475 | 777 | 1,083 | 98 | **3,452** |
| 2020 | 2,098 | 1,404 | 771 | 402 | 352 | 262 | 6 | 20 | 31 | 39 | 35 | 36 | **5,456** |

## FY Comparison by Demographic



**Source:** USBP and OFO official year end reporting for FY20-FY22; USBP and OFO month end reporting for FY23 to date. Data is current as of 3/3/2023.
..

CLP_PC_025588

SW Land Border Encounters: Peru, Colombia, Ecuador (USBP)



**U.S. Customs and Border Protection (CBP) Encounters**
Nationwide, Southwest Land Border,
and Northern Land Border Encounters by Fiscal Year (FY)

| Choose Region | FY | Component | Area of Responsibility |
|---|---|---|---|
| Southwest Land Border | All | U.S. Border Patrol | All |

| Demographic | Citizenship | Title of Authority | State |
|---|---|---|---|
| All | Multiple values | All | All |

FY    ■ 2020    ■ 2021    ■ 2022    ■ 2023 (FYTD)    **Reset Filters**

## FY Southwest Land Border Encounters by Month



| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | **Total** |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2023 (FYTD) | 155,034 | 138,525 | 143,685 | 119,348 | 128,278 | | | | | | | | **684,870** |
| 2022 | 143,078 | 145,846 | 140,254 | 123,355 | 127,639 | 161,170 | 151,669 | 172,154 | 165,070 | 149,367 | 150,867 | 163,090 | **1,793,559** |
| 2021 | 66,526 | 67,107 | 68,228 | 71,190 | 92,310 | 158,556 | 166,147 | 162,937 | 162,597 | 178,791 | 175,463 | 155,842 | **1,525,694** |
| 2020 | 34,556 | 32,491 | 31,420 | 28,140 | 28,711 | 29,352 | 15,915 | 20,998 | 29,668 | 36,743 | 44,952 | 51,365 | **384,311** |

## FY Comparison by Demographic



**Source:** USBP and OFO official year end reporting for FY20-FY22; USBP and OFO month end reporting for FY23 to date. Data is current as of 3/3/2023.
..



**U.S. Customs and Border Protection (CBP) Encounters**
Nationwide, Southwest Land Border,
and Northern Land Border Encounters by Fiscal Year (FY)

| Choose Region | FY | Component | Area of Responsibility |
|---|---|---|---|
| Southwest Land Border | All | All | All |

| Demographic | Citizenship | Title of Authority | State |
|---|---|---|---|
| All | Multiple values | All | All |

FY   ▬ 2020   ▬ 2021   ▬ 2022   ▬ 2023 (FYTD)   **Reset Filters**

## FY Southwest Land Border Encounters by Month



| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2023 (FYTD) | 78,516 | 82,379 | 91,344 | 22,084 | 14,381 | | | | | | | | **288,704** |
| 2022 | 29,475 | 41,642 | 55,228 | 47,436 | 34,803 | 54,394 | 57,250 | 60,279 | 44,640 | 55,198 | 62,721 | 83,344 | **626,410** |
| 2021 | 2,671 | 2,258 | 3,150 | 4,446 | 6,294 | 13,280 | 13,660 | 17,394 | 23,994 | 28,662 | 28,345 | 40,562 | **184,716** |
| 2020 | 3,149 | 2,542 | 2,603 | 1,606 | 1,850 | 1,399 | 282 | 623 | 1,211 | 1,868 | 2,411 | 3,479 | **23,023** |

## FY Comparison by Demographic



**Source:** USBP and OFO official year end reporting for FY20-FY22; USBP and OFO month end reporting for FY23 to date. Data is current as of 3/3/2023.
..

# EXPERT DECLARATION OF DR. ERIC HERSHBERG

I, Eric Hershberg, under penalty of perjury declare that the following information is true and correct:

1. This comprehensive declaration explains the conditions that are causing families and individuals to flee Guatemala as well as the conditions that non-Guatemalan asylum seekers would face upon removal to Guatemala under the Asylum Cooperative Agreement. The "Findings" are organized into six sections. Sections I through II address overall country conditions regarding levels of violence in the country, the presence of transnational gangs, and the modus operandi of the gangs and organized criminal actors. Section III concerns the persecution of migrants within the country. Section IV through VI, address the inadequacies of state protection of the population and the lack of resources available to assist migrants in Guatemala.

2. I am a recognized expert on, among other things, the interplay between various forms of violence in Guatemala and the resulting emigration of youth, families, and other Guatemalan citizens targeted by transnational street gangs and organized crime groups and unprotected by the state. I have been credentialed as an expert and have submitted approximately sixty affidavits supporting asylum claims on behalf of petitioners from Guatemala and neighboring Central American countries, including El Salvador and Honduras.

## Professional Qualifications

3. I hold a PhD in political science (1989) from the University of Wisconsin, Madison.

4. I am currently employed as Director of the Center for Latin American & Latino Studies (CLALS) and Professor of Government at American University in Washington, DC. From 2007 to 2009, I was Professor of Political Science and Director of Latin American Studies at Simon Fraser University (SFU) in Canada. Prior to these appointments, I served as the Program Director overseeing Latin American initiatives at the Social Science Research Council in New York City for fifteen years. In addition to my professorships at SFU and American, I have taught at Columbia University, New York University, Princeton University, the University of Wisconsin-Madison and Southern Illinois University. I have also served as a consultant to many development and education agencies, including the Ford Foundation, the Rockefeller Brothers Fund, the World Bank, and the Swedish International Development Agency.

5. In my capacity as a professor and director of Latin American and Latino Studies at American University, I work closely with scholars, think tanks, and policy makers in understanding human rights conditions in various countries in Latin America. Among other topics, my current research projects include an analysis of social exclusion and state failure in contemporary Central America. Over the past twenty-five years I have traveled frequently to Guatemala, both to conduct research and to meet with academic colleagues and officials from various government and international development agencies. I have a deep understanding of the social, economic and political factors that determine the realities faced by the diverse

1

CLP_PC_026149

segments of Guatemalan society. Under my supervision, American University has recently completed a multiyear, Department of Justice-funded study on the transnational criminal MS-13 gang, which has a substantial presence in Guatemala. In January 2020, CLALS published an exhaustive report on the work of the United Nations-sponsored International Commission Against Impunity in Guatemala (CICIG) and the troubling implications for accountability and democratic governance of the government's disbanding the commission.[1]

6. I have published extensively on the comparative politics of Latin America and the politics of development. I have authored over forty peer-reviewed articles and book chapters, and I have edited a dozen academic volumes. Other non-peer-reviewed publications total over sixty. In addition, I have co-authored study of the circumstances driving the surge of unaccompanied child migrants from Central America to the United States, which I published in November 2014.[2] Issues raised in that study were among the foci of a September 2018 academic seminar at which I was an invited participant at the Universidad Rafael Landívar, in Guatemala City, and I again discussed these issues with Guatemalan scholars and think tank officials during a three-day visit in January, 2020.

## Summary of Findings

7. Guatemala cannot provide the protection and resources to afford even minimal levels of safety and well-being of asylum seekers sent to the country under the Asylum Cooperative Agreement. The country suffers from high levels of violence, which particularly impact vulnerable groups of women, the LGBTQ community, indigenous people, and human rights leaders.[3] The country has long been plagued with corruption at all levels of government, which has prevented the state from providing basic services and protections to its own citizens.[4] Moreover, economic and political conditions leave much of the Guatemalan population underemployed, undernourished, poorly housed and underprotected by state agencies. These factors explain why more than two million Guatemalan citizens have fled the country over the past quarter century, and underscore how extraordinarily implausible it is to suppose that the country is in condition to accommodate asylum seekers from third countries.

8. Migrants relocated to Guatemala will be especially vulnerable to serious harm. Deposited into a country with extraordinary levels of violence and a dysfunctional state, they are unlikely to have access to local family and social networks that provide some degree of protection to longstanding residents. Nor will they have nuanced understanding of the

---

[1] Charles T. Call and Jeffrey Hallock, "¿Una iniciativa demasiado exitosa? El legado y las lecciones de la Comisión Internacional contra la Impunidad en Guatemala", (*Center for Latin American and Latino Studies*, January 2020), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3516753#%23

[2] Dennis Stinchcomb and Eric Hershberg, "Unaccompanied Migrant Children from Central America: Context, Causes, and Responses" (Working Paper Series No. 7, American University Center for Latin American & Latino Studies, Washington, DC, November 2014), https://ssrn.com/abstract=2524001.

[3] Adriana Beltran, "Guatemala is No Safe Third Country: Why the Asylum Deal is a Mistake", (*Foreign Affairs*, September 25, 2019), https://www.foreignaffairs.com/articles/guatemala/2019-09-25/guatemala-no-safe-third-country

[4] *Id.*

CLP_PC_026150

landscape in which criminal gangs and drug trafficking organizations operate throughout much of the national territory, or the degree to which illicit actors interact with local populations and state authorities with whom they are often allied.

**Findings**

### I.     Epidemic Homicide Rates

9.  High levels of societal violence carried out by street gangs and organized crime groups, often in alliance with state security forces and quasi-state actors such as the Security Commissions, have earned Guatemala the distinction of being one of the most dangerous countries in the world. The U.S. Department of State rates the level of violent crime in the country as "critical," citing an abundance of weapons, a legacy of societal violence, and weak law enforcement and judicial systems as key contributing factors.[5]

10. Since peaking in 2009, Guatemala's homicide rate has been on the decline. However, despite falling to 26.1 per 100,000 inhabitants in 2017, the country's murder rate is still nearly five times the global average and is the sixth highest in the Western Hemisphere, surpassed only by neighboring El Salvador and Honduras, and by Venezuela, Jamaica, and Brazil.[6] Guatemala ended 2018 with a homicide rate of 22.4 per 100,000 people, a slight decrease from 2017, but still a remarkable rate.[7] Moreover, the Guatemalan non-profit group Diálogos has expressed serious doubts about the reliability of homicide statistics kept by the national police.[8] This echoes similar findings by *Insight Crime* – a journalism foundation dedicated to investigating organized crime in Latin America –which found crime records handled by a "creaky, antiquated 20th century bureaucratic machine" that frequently loses data crucial for solving, tracking, and analyzing criminal behavior.[9]

11. A recent study from Vanderbilt University found that "the toll of insecurity on daily life in Central America is widespread and significant," with the behavioral impact of insecurity in the Northern Triangle region of Guatemala, Honduras, and El Salvador most strongly felt in

---

[5] U.S. Department of State, Overseas Security Advisory Council, "Guatemala 2018 Crime & Safety Report" (May 9, 2018), https://www.osac.gov/pages/ContentReportDetails.aspx?cid=24030.

[6] Tristan Clavel, "InSight Crime's 2017 Homicide Round-Up" (January 19, 2018),

https://www.insightcrime.org/news/analysis/2017-homicide-round-up; Claire McEvoy and Gergely Hideg, *Global Violent Deaths 2017: Time to Decide* (December 2017), http://www.smallarmssurvey.org/fileadmin/docs/U-Reports/SAS-Report-GVD2017.pdf.

[7] Chris Dalby and Camilo Carranza, "InSight Crime's 2018 Homicide Round-up", (*InSight Crime*, January 2019), https://www.insightcrime.org/news/analysis/insight-crime-2018-homicide-roundup/

[8] Tristan Clavel, "Report Analyzes Guatemala's Shaky Murder Data, Urges Improvements" (*InSight Crime*, August 18, 2017), https://www.insightcrime.org/news/brief/report-analyzes-guatemala-shaky-murder-data-urges-improvements.

[9] Steven Dudley, "Homicides in Guatemala: Collecting the Data (*InSightCrime*, April 20, 2017), http://www.insightcrime.org/investigations/homicides-in-guatemala-collecting-the-data.

CLP_PC_026151

terms of economic activity.[10] The study, which was funded by the United States Agency for International Development, ranked Guatemalans second among Central Americans in "crime avoidance behavior"; nearly half of those surveyed reported avoiding public transportation or purchasing consumer goods for fear of crime, while nearly a third kept their children from school and over two-thirds kept them from playing in the streets.[11]

12. Homicides in Guatemala rarely go punished, with Amnesty International reporting that less than 4 percent of homicide cases result in the conviction of those responsible.[12] Amnesty International adds that this number is even lower when the victim is female.

13. The drug trade through Guatemala has been accompanied by increased levels of violence. Roughly 90% of the cocaine consumed in the United States passes through Guatemala, which has created a territorial battle between rival drug trafficking organizations (DTOs), often connected to Mexican and Colombian cartels, to stake out claims to the transit corridors.[13] These territorial disputes have led to the murders of rivals as well as innocent civilians caught in the crossfire.

14. In addition to violence perpetuated by the gangs and DTOs, the country has become overwhelmed with routine instances of vigilantism in vulnerable neighborhoods. Roughly two thirds of Guatemala's adult male population carry firearms, which has facilitated the killing of suspected criminals by civilians in areas that are underserved by security forces.[14]

## II. Transnational Gangs in the Northern Triangle

### Guatemala

15. The high rates of violence in Guatemala predate the expansion of street gangs over the past 20 years. Under a succession of military governments during the 1970s and 1980s, genocidal levels of violence were carried out in rural, primarily indigenous areas, with urban areas also experiencing high levels of state repression in response to political opposition and sporadic guerrilla resistance.[15] By the time that the Peace Accords were signed in 1996, ending 36

---

[10] Jonathan Hiske, "Violence and Migration in Central America" (*AmericasBarometer Insights*, 2014), https://www.vanderbilt.edu/lapop/insights/IO901en.pdf

[11] *Id*. at 4–7.

[12] Amnesty International, "Why does Guatemala have one of the highest rates of femicides in the world?" (Amnesty International, 2019), https://www.amnestyusa.org/why-does-guatemala-have-one-of-the-highest-rates-of-femicide-in-the-world/

[13] InSight Crime, "Guatemala Elites and Organized Crime", (InSight Crime, 2016), https://www.justice.gov/eoir/file/889611/download

[14] *Id.* at 12

[15] International Crisis Group, "Mafia of the Poor: Gang Violence and Extortion in Central America," Crisis Group Latin America Report No 62 (April 6, 2017) at 2, https://d2071andvip0wj.cloudfront.net/062-mafia-of-the-poor_0.pdf.

CLP_PC_026152

years of conflict, state violence had left an estimated 200,000 Guatemalans dead and 40,000 displaced (mostly to Mexico and the United States).[16]

16. During the war, criminal organizations with clear linkages to state security forces took advantage of the weakened state to operate human and drug smuggling operations near border crossings, unpopulated jungles, and ports.[17] These criminal groups were of secondary concern to the government and they often provided services to both sides in the conflict – including the military and police forces who became deeply intertwined with organized crime.[18]

17. The protracted conflict in Guatemala not only contributed to rising levels of violence, but also poverty and malnutrition.[19] Today, roughly 60% of Guatemalans live below the country's national poverty line.[20] Poverty and chronic malnutrition drove rural to urban migration – which resulted in overcrowding of urban areas that lack both the infrastructure needed to support population growth and potential employment opportunities that could provide livelihoods for the influx of urban dwellers.[21] All these factors contributed to the rise of street gangs, which take advantage of hungry and poor populations to expand their criminal activities and recruit new members into their ranks.[22]

18. The two major rival gangs in Guatemala (and the region) are Mara Salvatrucha (MS-13) and Barrio 18 (variably referred to as Mara 18, M-18, and 18th Street).[23] MS-13 and Barrio 18 both originated among Central American immigrant communities in Los Angeles during the 1980s, and they have cells operating from Central America to Canada, as well as in Spain and Italy.[24] The gangs spread to Central America and Mexico largely as a result of U.S. immigration enforcement measures passed in the 1990s, which increased the number of criminal charges for which foreign-born persons could be deported.[25]

---

[16] Id.

[17] InSight Crime, "Guatemala Profile", (InSight Crime, November 2017), https://www.insightcrime.org/guatemala-organized-crime-news/guatemala/#History

[18] Id.

[19] Id.

[20] Amelia Cheatham, " Central America's Turbulent Northern Triangle", (*Council on Foreign Relations*, October 2019), https://www.cfr.org/backgrounder/central-americas-turbulent-northern-triangle

[21] Id.

[22] InSight Crime, *supra*, note 17

[23] U.S. Department of State, Overseas Security Advisory Council, "Guatemala 2019 Crime & Safety Report" (United States Department of State, 2019), https://www.osac.gov/Content/Report/ff459385-017d-4ff2-8a02-15f4aec15a69.

[24] InSight Crime and American University's Center for Latin American and Latino Studies (CLALS), *MS-13 in the Americas: How the World's Most Notorious Gang Defies Logic, Resists Destruction* at 3 (February 2018), https://www.insightcrime.org/wp-content/uploads/2018/02/MS13-in-the-Americas-InSight-Crime-English.pdf; "Barrio 18" (*InsightCrime*, January 13, 2017), https://www.insightcrime.org/el-salvador-organized-crime-news/barrio-18-profile/.

[25] *Id*.

5

19. In 2012, the United Nations Office on Drugs and Crime calculated the total number of gang members in Guatemala at around 22,000;[26] the Guatemalan government has tallied approximately 19,000.[27] Additionally, the National Civil Police estimate that there are 30,000 gang sympathizers, or individuals who are complicit in their criminal activities, in Guatemala.[28]

20. These gangs, as well as drug trafficking organizations (DTOs), have demonstrated a capacity to challenge the Guatemalan state directly. Several mayors with personal links to the DTOs or who oversaw towns along smuggling routes have been murdered in recent years, including two in the opening months of 2017.[29] In 2018, Mayor Julio Alberto Enriquez Sanchez of Zacapa was found killed in his vehicle from a suspected ambush by local narcotraffickers.[30] In 2019, there were two instances of mayoral candidates being murdered; the first being Marvin Peña in February, and then later Luis Xol in August.[31] In March of 2017, incarcerated members of Barrio 18 incited a prison riot, demanding the transfer of 200 prisoners to their facility and better living conditions. When officials put down the riot, gang members launched nine attacks against police stations around the country.[32]

### El Salvador & Honduras

21. The surge of gang and DTO related violence, which impacts innocent civilians on a daily basis, is not unique to Guatemala. El Salvador and Honduras experience similar levels of violence and crippled states who struggle to combat the spread of the gangs.

22. An estimated 60,000 Salvadorans are members of the two major rival gangs in El Salvador MS-13 and Barrio 18.[33] The number of gang members in El Salvador exceeds the

---

[26] United Nations Office on Drugs and Crime (UNODC), *Transnational Organized Crime in Central American and the Caribbean: A Threat Assessment* at 29 (September 2012), https://www.unodc.org/documents/data-and-analysis/Studies/TOC_Central_America_and_the_Caribbean_english.pdf.

[27] Mariela Castañón, "Informe: Hay 19 mil pandilleros en el país; sin opciones de reinserción" (*La Hora*, December 1, 2014), http://lahora.gt/informe-hay-19-mil-pandilleros-en-el-pais-sin-opciones-de-reinsercion/.

[28] Guatemala Human Rights Commission, "Gangs in Guatemala", (GHRC, 2018), https://www.ghrc-usa.org/Publications/GangFactSheet.pdf

[29] David Gagne, "Drug Groups Suspected in Murders of Guatemalan Mayors" (*InSight Crime*, February 2, 2017), https://www.insightcrime.org/news/brief/drug-groups-suspected-murders-guatemala-mayors/.

[30] AP, "Guatemala mayor slain in ambush" (AP News, March 17, 2018), https://www.apnews.com/a978f40f36554cd384e5f5fb2dc311a9

[31] Irving Escobar and Carlos Álvarez, "Matan a candidato proclamado por Fuerza para alcalde de Tiquisate" *(Prensa Libre*, February 12, 2019), https://www.prensalibre.com/guatemala/politica/matan-a-candidato-proclamado-por-fuerza-para-alcalde-de-tiquisate/; Dony Stewart and  Óscar García, "Luis Xol, alcalde electo de Lívingston, y su hermana son ultimados a balazos", (*Prensa Libre*, August 29, 2019), https://www.prensalibre.com/guatemala/politica/luis-xol-alcalde-electo-de-livingston-es-ultimado-a-balazos/

[32] David Gagne, "Barrio 18 Members Arrested in Series of Attacks on Guatemala Police" (*InSightCrime*, March 21, 2017), http://www.insightcrime.org/news-briefs/barrio-18-members-arrested-series-attacks-guatemala-police.

CLP_PC_026154

approximately 52,000 Salvadoran police and military officers — not including the estimated 500,000 people in the gangs' social support base, which includes both active collaborators and ordinary citizens indirectly related to these groups, but not necessarily supporting them. In Honduras, government officials estimate that in 2019 there were roughly 40,000 active members in either MS-13 or Barrio 18 within the country.[34]

**Modus Operandi of Gangs in the Northern Triangle**

23. The two largest gangs in Guatemala, Honduras and El Salvador — the Northern Triangle of Central America — are MS-13 and Barrio 18, which operate in a similar manner and with various degrees of coordination throughout the region. In asserting their dominion over territory, these gangs often take the view that they own not just the streets but the people as well; they believe in turn that they have the right to force others to help in their illicit activities.[35] The gangs are involved in criminal activities such as murder-for-hire, drug distribution, prostitution, kidnapping and, especially, extortion.[36]

24. Both gangs are involved in a diverse array of criminal activities such as extortion, drug distribution to local markets, car theft and resale, murder-for-hire, kidnapping, prostitution, human smuggling and trafficking, money laundering, and bribery.[37] The International Crisis Group describes the gangs in the Northern Triangle countries as "organisations that coerce, threaten and kill to produce a menial subsistence for their members."[38]

25. Gang "ownership" of a particular territory involves effective governance of these zones. As rival gangs and government security forces vie for control of contested territories, municipalities become pockmarked with invisible borders that separate one gang's territory from another. These borders are dynamic and frequently change as a result of inter-gang violence.[39] An individual who inadvertently crosses from one gang's territory into another's could be denied entry, beaten, or killed.[40] As a result, freedom of movement is greatly restricted, limiting where people live and whether they attend school, work, access justice, and seek medical care.[41] Outsiders of any kind—whether native Guatemalans or asylum

---

[35] UNODC, *supra*, note 26

[36] *Id*.

[37] Héctor Silva Ávalos, "Political Mafias Helped Empower Gangs, says El Salvador Security Expert" (January 24, 2019), https://www.insightcrime.org/news/analysis/el-salvador-political-mafias/; *InSight Crime* and CLALS, *supra*, note 24 at 39–47.

[38] International Crisis Group, supra, note 15 at 2

[39] Oscar Martínez, *Living Within the Boundaries of El Salvador's Gang 'War'* InSight Crime (Jan. 7, 2016), *https://www.insightcrime.org/news/analysis/living-within-the-boundaries-of-el-salvador-gang-war/.*

[40] U.S. Dep't of State, El Salvador 2016 Human Rights Report, 16 (2017), https://www.state.gov/documents/organization/265798.pdf.

[41] Internal Displacement Monitoring Center, "El Salvador: figure analysis – displacement related to conflict and violence", (*IDMC*, January 2019), http://www.internal-displacement.org/sites/default/files/2019-05/GRID%202019%20-%20Conflict%20Figure%20Analysis%20-%20EL%20SALVADOR.pdf

CLP_PC_026155

seekers from other countries—trying to navigate this territorial landscape to find housing, employment, or schools face extraordinary risks to life and limb.

26. The strict territorial mandates set by the gangs make it increasingly difficult for people to move from one part of a city to another – let alone from one region of the country or a neighboring country. The U.S. Department of State draws out the degree and sophistication of the gangs' territorial control by noting that authority over in-country movement is effectively ceded to the gangs:

> The major gangs controlled their own territory. Gang members did not allow persons living in another gang's-controlled area to enter their territory, even when travelling in public transportation. Gangs forced persons to present identification cards (containing their addresses) to determine their residence. If gang members discovered that a person lived in a rival gang's territory, that person risked being killed, beaten, or not allowed to enter the territory.[42]

> In addition, rival gangs are known to force victims to provide access to their cellphones to further assess who they are and whether they might be affiliated with rival gangs or security forces.

27. It is common practice for gangs to seek retribution from both their opponents as well as their opponents' family members. Gang threats do not lose validity over time; rather, gangs are likely to pass down knowledge of their enemies, thereby ensuring that death threats are never neutralized.[43] The UNHCR emphasizes the permanency of gangs' threats in areas of the world with notable gang populations, such as Central America. It states, "[O]nce an individual has been targeted, the gravity of the threat does not diminish over time."[44]

28. Among gang members, threats can rise to the level of providing the "*luz verde*" or "green-lighting" of an individual; by gang edicts, an individual who has been green-lighted must be executed on sight by any gang member who comes in contact with him/her. If a gang member fails to carry this order through, he in turn is also green-lighted. Such orders extend across the country and the region, and have been enforced transnationally as well. It is worth noting, too, that helping or assisting an individual who has been green-lighted by the gang can be dangerous for non-gang affiliates as well, which discourages local police and community members from intervening on the individual's behalf. This, in turn, further isolates those who have been identified as interfering in gang business.

29. Even if an individual from Honduras or El Salvador were granted asylum in Guatemala due to persecution by the MS-13 or Barrio 18 in their home country, it is reasonable that the gang

---

[42] U.S. Department of State, "El Salvador 2017 Human Rights Report," https://www.justice.gov/sites/default/files/pages/attachments/2018/04/24/dos-hrr_2017_el_salvador.pdf

[43] Michael Boulton, *Living in a World of Violence: An Introduction to the Gang Phenomenon* at 16 (United Nations High Commissioner for Refugees Legal and Protection Policy Research Series, 2011), http://www.unhcr.org/4e3269629.pdf.

[44] *Id.*

8

CLP_PC_026156

would learn of their presence in the country due to networks of communication utilized by gangs. These include linking with and communicating with other gang cliques in Guatemala, Honduras, and El Salvador as well as, in some cases, the capacity to access state security databases. Regardless, the UNHCR finds that "[g]iven the geographical size of many of the Central American countries affected by the *maras*, there is often no internal flight alternative for those wishing to flee."[45]

30. Efforts by individuals or families targeted by a gang to relocate within or between Northern Triangle countries to flee gang persecution risk further antagonizing the gang. Per the 2011 UNHCR Report on areas of the world with notable gang populations, such as Central America, gangs interpret "fleeing to avoid future persecution…as insubordination and challenges to the authority of the gang. These actions are normally met with a violent and punitive response."[46]

### III.     Vulnerability of Migrants

31. Individuals sent to Guatemala under the Asylum Cooperative Agreement are particularly vulnerable to gang violence. First, these individuals may lack sufficient knowledge of Guatemalan communities to be able to safely navigate from one gang-controlled neighborhood to another without suffering serious harm or death. Second, amidst the endemic poverty, an individual's wealth—or perceived wealth—does not go unnoticed and frequently makes an individual a target for extortion. Gangs frequently target returned Guatemalan migrants as reliable sources of extortion payments, based on the assumption that returnees have accumulated substantial financial resources while residing in the U.S., and it is reasonable to believe the gangs will target asylum seekers sent to Guatemala in a similar manner.[47]

32. Many of the criminal structures that are prompting Hondurans and Salvadorans to flee to the United States are present within Guatemala. It is probable that using their vast communication networks, gangs and criminal organizations in one country would easily find people seeking asylum in Guatemala.[48]

### IV.     Lack of State Protection

33. Because of the entrenched symbiotic relationships between organized criminal groups and corrupt state officials at every scale of government, in many cases it is difficult, if not impossible, to distinguish between the operations and interests of the two. Too often, any attempt to disaggregate one from the other in essence forces a false dichotomy that obscures the true power and reach of organized criminal groups. It is these murky relationships, and the

---

[45] *Id*. at 17.

[46] *Id*. at 17.

[47] *Id*. at 17-18

[48] Sergio Morales Rodas, "Hondureños y salvadoreños que huyen de su país estarán igual de vulnerables en Guatemala", (*Prensa Libre*, July 30, 2019), https://www.prensalibre.com/guatemala/migrantes/hondurenos-y-salvadorenos-estaran-igual-de-vulnerables-en-guatemala/

CLP_PC_026157

extraordinary influence and power it allows drug-trafficking organizations and other criminal groups, that put victims of gang violence in such grave danger. Some analysts estimate that somewhere between 30 to 80% of the national police force is in the pay of narco-traffickers and other organized criminal groups.[49]

34. Guatemala suffers from an almost complete lack of protection by the police and the judiciary due to pervasive corruption of security institutions, which have been penetrated by both transnational criminal gangs and domestic criminal networks that routinely resort to violence to sustain their activities. The U.S. Department of State has recognized that Guatemala suffers from widespread institutional corruption, particularly in the police and judicial sectors.[50] Police are absent from many of the most violence-ridden zones of the country, and in areas where there is a police presence, the underpaid and poorly trained police and security forces are frequently in league with criminal organizations. Local officials are widely reported to accept payments in exchange for conceding authority to criminal networks that they ought to be policing.

35. Public confidence in local law enforcement has eroded as a result, and many in Guatemala choose not to report crimes to the police because they know the crime will go uninvestigated, for fear of retaliation by the perpetrators, or for fear of victimization at the hands of security forces.[51] According to Guatemala's Minister of the Interior, more than 1,000 police officers were removed from duty between 2012 and 2014 for crimes including kidnapping and extortion.[52] A recent nationwide operation targeting extortion networks led to the arrest of an army colonel, tasked with combatting organized crime, for laundering money on behalf of MS-13, as well as a police commissioner for leaking operational information about the gang.[53] It is widely understood, however, that the overwhelming majority of cases of police abuse remain unreported, and that fewer still are prosecuted, suggesting that the degree of impunity is extraordinary.

36. Even when complaints are filed, investigation and prosecution are unlikely to follow. In April 2017, the head of the United Nations-sponsored International Commission Against

---

[49] See Fontes, Anthony et al. *El impacto de las politicas de drogas en los carceles de Guatemala.* (*The impact of drug policy in Guatemalan prisons*) Open Society Foundations and the Social Science Research Council, in cooperation with the Guatemalan Presidential Drug Policy Commission. (forthcoming), pg. 28 *and* in-person interview conducted by Fontes in Guatemala City, Guatemala on 3/12/2016 with former chief of Guatemala's anti-drug unit who for reasons of security chooses to remain anonymous.

[50] U.S. Department of State, "Country Reports on Human Rights Practices for 2017: Guatemala" (2018), http://www.state.gov/j/drl/rls/hrrpt/humanrightsreport/index.htm?year=2017&dlid=277335.

[51] Dennis Stinchcomb and Eric Hershberg, *supra*, note 2.

[52] José Elías, "Las extorciones tiñen de sangre Guatemala y ponen freno al desarrollo" (El País, August 15, 2014), http://internacional.elpais.com/internacional/2014/08/15/actualidad /1408057388_234326.html.

[53] Felipe Puerta, "Arrest of Colonel With MS-13 Ties Reveals Sophisticated Gang Tactics" (*InSight Crime*, April 24, 2018), https://www.insightcrime.org/news/brief/arrest-colonel-ms13-ties-reveals-sophisticated-gang-tactics/.

CLP_PC_026158

Impunity in Guatemala (CICIG) reported that 97 percent of crimes there go unpunished.[54] The U.S. Department of State has recognized that in Guatemala impunity is widespread, with corruption and inadequate investigation making prosecution of gangs difficult.[55] Indeed the Attorney General's office, which acts as the prosecuting office in Guatemala, is only present in just over ten percent of the country's municipalities, highlighting the disparities in the state's reach.[56] Furthermore, the judicial system is inadequate because it has "failed to provide fair or timely trials due to inefficiency, corruption, insufficient personnel, and intimidation of judges, prosecutors, and witnesses."[57]

37. Police officers throughout the Northern Triangle have faced retaliation from gang members in the form of violence against them and their family, resulting in the use of balaclava masks to conceal their identities.[58] In recent years, police officers from all three countries tasked with combatting the gangs have had to flee abroad in search of protection due to the high levels of risk associated with being a police officer in a gang-controlled area.[59] Héctor Silva Ávalos, a journalist and researcher, confirmed that Central American gang members receive more respect within the gang if they kill a police officer, using "death as exchange currency".[60]

38. Corruption and impunity have pervaded the highest levels of the Guatemalan government, undermining efforts to strengthen government institutions and weaken the influence of organized crime. Between 2017 and 2019, President Jimmy Morales attempted to block investigations by the Attorney General's office and the CICIG into accusations of illegal campaign financing leveled against his administration and political party. In 2017, Morales tried unsuccessfully to expel the commissioner of the CICIG, and his allies in Congress passed a so-called "impunity pact" shielding political elites from graft-related prosecution, relenting only under significant public pressure. In April 2018, new accusations against Morales prompted him in turn to accuse the Attorney General's Office and the CICIG of abusing its authority, after 12 years of operation, CICIG was shut down on September 3, 2019 following President Morales' refusal to renew the mandate of the United Nations backed commission.[61]

---

[54] Jessica Gramajo, "La impunidad supera el 97% en Guatemala" (*Prensa Libre*, April 3, 2017), http://www.prensalibre.com/guatemala/politica/la-impunidad-supera-el-97-en-guatemala.

[55] U.S. Department of State, *supra*, note 53

[56] Jessica Gramajo, *supra*, note 57

[57] U.S. Department of State, *supra*, note 53

[58] International Crisis Group, "Life Under Gang Rule in El Salvador", (International Crisis Group, November 26, 2018), https://www.crisisgroup.org/latin-america-caribbean/central-america/el-salvador/life-under-gang-rule-el-salvador

[59] Kevin Sieff, "It's so dangerous to police MS-13 in El Salvador that officers are fleeing the country" (*Washington Post*, March 3, 2019), https://beta.washingtonpost.com/world/the_americas/its-so-dangerous-to-police-ms-13-in-el-salvador-that-officers-are-fleeing-the-country/2019/03/03/e897dbaa-2287-11e9-b5b4-1d18dfb7b084_story.html

[60] *Id.*

[61] Jeff Abbott, "Guatemala's CICIG: UN-backed anti-corruption body shuts its doors", (*Aljazeera*, September 2, 2019), https://www.aljazeera.com/news/2019/09/guatemala-cicig-backed-anti-corruption-body-shuts-doors-190903132411201.html

CLP_PC_026159

39. Without this independent investigative body, corruption and impunity are likely to flourish in Guatemala. The recently elected president of Guatemala, Alejandro Giammattei, inaugurated on Jan. 14, 2020, was himself at the center of a CICIG case in 2010, when he was prosecuted for his alleged involvement in extrajudicial executions while serving as the head of the Guatemalan prison system.[62]

40. The rate of crimes that go unpunished in Guatemala averaged 94 percent in the past decade, with the rate jumping to 97.6 percent in 2018.[63] Corruption crimes in Guatemala saw the highest rate of impunity at almost 99 percent.[64] Considering that Guatemalan citizens themselves experience little to no state or institutional support and protection, it is unlikely that an adequate level of protection could be provided to asylum seekers sent to Guatemala under a Safe Third Country Agreement. In a recent poll, only 18 percent of the Guatemalan people agreed with the safe third country agreement, with the opposition citing the lack of basic infrastructure and state power Guatemala currently experiences as proof that Guatemala cannot fulfill the requirements to be a safe third country.[65]

## V.    Economic Misery in Guatemala

41. More than half (59%) of the Guatemalan population lives in poverty, with 23% in extreme poverty.[66] More than a third of Guatemalan children are deemed by international agencies as undernourished, and much of the population lacks access to even the most basic of health services. Among Guatemalans who are employed, it is reported that the vast majority earn wages that are insufficient to meet a family's basic needs.[67]

42. According to Habitat for Humanity, the current housing deficit in Guatemala is over 1.8 million homes, and the problem will continue as not enough homes are being built to accommodate the population.[68] The Central Housing Association Guatemala Chapter notes that without serious reforms, the housing market will not meet the needs of the public, with

---

[62] Claire Parker, "Four things to know about Guatemala's new president-elect", (*The Washington Post*, August 12, 2019), https://www.washingtonpost.com/world/2019/08/12/four-things-know-about-guatemalas-new-president-elect/

[63] Parker Asmann, "Guatemala Impunity Report Shows Limits of Anti-Graft Body", (*InSight Crime*, June 2019), https://www.insightcrime.org/news/brief/guatemala-impunity-report-limits-anti-graft-body/

[64] *Id.*

[65] Adriana Beltran, *supra*, note 3

[66] *Id*.

[67] Maria Veraza, "Poverty, Unemployment, violence drive Guatemalan emigration", (AP News, October 26, 2018), https://apnews.com/0b7f28a8ab5645e58fb2d708d27e3adf

[68] Habitat for Humanity, "Country Profile: Guatemala" (Habitat for Humanity, 2019), https://www.habitatforhumanity.org.uk/country/guatemala/

CLP_PC_026160

the perceived negative impact being an increase in precarious settlements in urban areas.[69] A large influx of asylum seekers would only worsen the housing crisis within Guatemala.

43. The housing crisis is further burdened by the fact that only 54% of Guatemalans have access to proper sanitation services.[70] The rest of the population uses poorly constructed latrines or lacks sewage systems altogether, with waste not being disposed of properly or treated - which is of major concern for health and human safety.

## VI.     Lack of Resources for Asylum Seekers

44. In addition to the dismal economic conditions and the housing crisis that Guatemala is currently facing, the country's asylum system is not prepared or capable of handling the volume of asylum petitioners that could be sent to the country. The United Nations High Commissioner for Refugees for Central America has estimated that at its best operating efficiency Guatemala currently has the capacity to process about 200 asylum requests per year, given that there are only 12 national staff members working in the national migration office, with only three asylum interview officers.[71]

45. In 2018, an estimated 50,000 Hondurans and Salvadorans applied for asylum in the United States.[72] Guatemala would be incapable of handling a flow of asylum seekers anywhere remotely near this volume given its primitive asylum system. In addition, the United States State Department has stated explicitly, as recently as 2018, that the Guatemalan asylum system is inadequate in identifying and referring potential asylum seekers, putting asylum seekers at risk of deportation back to their countries of persecution.[73] There have been no meaningful changes to the country's asylum system in the one year since the United States State Department reached this conclusion.

46. Government-run migrant reception services in Guatemala have centered around Guatemalan deportees. The services have been limited, but in recent years have begun to expand capacities for receiving returning unaccompanied children and families.[74] Many of the returning migrants are from rural communities where economic opportunities are lacking,

---

[69] Central Housing Association Guatemala Chapter, "Guatemala and the Housing Deficit", (Central America Data, 2015), https://www.centralamericadata.com/en/article/home/Guatemala_and_the_Housing_Shortage

[70] Habitat for Humanity, "More than Houses: Guatemala", (*Habitat for Humanity*, 2019), https://www.habitatguate.org/eng/mas-que-casas/

[71] UNHCR, "Guatemala Factsheet" (*UNHCR*, April 2019), http://www.globalcrrf.org/wp-content/uploads/2019/05/Fact-Sheet-Guatemala-Final-April-2019.pdf; Human Rights First, "Is Guatemala Safe for Refugees and Asylum Seekers?" (*Human Rights First*, July 1, 2019), https://www.humanrightsfirst.org/resource/guatemala-safe-refugees-and-asylum-seekers

[72] *Id*.

[73] U.S. Department of State, "Guatemala 2018 Human Rights Report", (*United States Department of State*, 2018), https://www.state.gov/wp-content/uploads/2019/03/GUATEMALA-2018.pdf at 13

[74] Ariel Ruiz Soto, Rodrigo Dominguez-Villegas, Luis Argueta, and Randy Capps "Sustainable Reintegration Strategies to Support Migrants Returning to Mexico and Central America", (*Migration Policy Institute*, January 2019), https://www.migrationpolicy.org/sites/default/files/publications/MPI-ReceptionReintegration-FinalWeb.pdf

CLP_PC_026161

prompting them to want to stay in urban areas.[75] However, these are the same urban areas that have increasingly been taken over by street gangs obsessed with territorial control, and the government has not established long-term shelters or places for adult migrants to stay protected. Asylum seekers are likely to face the same limitations in integrating into Guatemala.

47. Deported Guatemalans have stated that they have been unable to receive reintegration services and protections because high levels of violence impede their ability to access services.[76] Some returned migrants have reported that they feel more unsafe upon returning to Guatemala.[77] Asylum seekers abandoned in Guatemala would face even greater vulnerability to violence, which would further impede their ability to access whatever minimal services and protections might theoretically be on offer. Asylum seekers from other regions will also be at risk of violence as they will be marked as outsiders by the gangs who control the neighborhoods in Guatemala. If they are unfamiliar with the territorial control of gangs, they risk violent retaliation if they unknowingly enter into an area controlled by a different gang than the neighborhood they live in.

**Conclusions**

48. Based on my understanding of the current country conditions in Guatemala, including the high levels of violence, the territorial reach of transnational gangs, lack of state protection, and lack of jobs, shelter basic services and integration resources for migrants, it is my professional opinion that potential asylum seekers would be at high risk of substantial danger if sent to Guatemala under the Asylum Cooperative Agreement.

49. The challenges of limited economic opportunities, high levels of insecurity and violence, and distrust of government institutions which have motivated so many people to flee from neighboring countries of Honduras and El Salvador, are also present within Guatemala.[78]

50. A large number of the Honduran and Salvadoran asylum seekers who would be sent to Guatemala are fleeing from the same gangs that have taken up a large presence in Guatemala. It is reasonable to believe that MS-13 or Barrio 18 in Honduras and El Salvador would be able to track down someone in Guatemala, given the interconnectedness of the gangs and their extensive communication systems.

51. The Guatemalan government's inability to provide for the needs and protection of its own citizens, demonstrating its inability to provide the minimum standard of protection needed for asylum seekers and refugees. The Guatemalan asylum system has been criticized for

---

[75] *Id*. at 18

[76] Ariel Ruiz Soto, Rodrigo Dominguez-Villegas, Luis Argueta, and Randy Capps, *supra*, note 77 at 24

[77] *Id*. at 24

[78] *Id*. at 24

CLP_PC_026162

being insufficiently developed to handle an influx of asylum seekers, which is evidenced by the severely understaffed asylum office.[79]

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed in the District of Columbia, on January 20, 2020.

Eric Hershberg

---

[79] Zolan Kanno-Youngs, "Mexican Asylum Seekers Could Now Be Deported to Guatemala", (*The New York Times*, January 6, 2020), https://www.nytimes.com/2020/01/06/us/politics/mexican-asylum-seekers-guatemala.html

CLP_PC_026163

# ERIC HERSHBERG
## Curriculum vita, June, 2019

OFFICE:

Director, Center for Latin American and Latino Studies
Professor of Government
American University
4400 Massachusetts Ave., NW
Washington, DC  20016
Tel. 202-885-6172

HOME:

2264 Cathedral Ave., NW
Washington, DC  20008
Tel. 202-270-5421
e-mail: hershber@american.edu

## Table of Contents

CREDENTIALS AND APPOINTMENTS ........................................................................ 2

PUBLICATIONS .......................................................................................................... 3

TEACHING ................................................................................................................. 11

UNIVERSITY SERVICE ............................................................................................. 13

EXTERNAL SERVICE ................................................................................................ 15

Editorial ..................................................................................................................... 15

Institutional ............................................................................................................... 15

    Evaluations ............................................................................................................ 15

    Governance ............................................................................................................ 16

    Consulting .............................................................................................................. 17

    Public Service ........................................................................................................ 17

GRANTS AND FUNDRAISING ................................................................................... 18

LECTURES AND CONFERENCE PRESENTATIONS (Selected, 1991--) ........................ 22

MEDIA INTERVENTIONS (2007--) ............................................................................ 37

CLP_PC_026164

# CREDENTIALS AND APPOINTMENTS

**EDUCATION**

Ph.D., Political Science, University of Wisconsin-Madison

M.A., Political Science, University of Wisconsin-Madison

B.A., Spanish and French, Indiana University-Bloomington

**LANGUAGES**

| | |
|---|---|
| English and Spanish | Fluent written, spoken, and reading |
| French | Fluent spoken and reading |
| Portuguese | Fluent reading, communicate with ease |

**APPOINTMENTS**

Director, American University Center for Latin American and Latino Studies, 2010-

Prof. of Government, American University, 2010-

Prof. of Political Science and Director of Latin American Studies, Simon Fraser University (2007-09)

President, Latin American Studies Association (2007-09)

Vice President, Latin American Studies Association (2006-07)

Senior Advisor, Social Science Research Council (2005-07)

Program Director, Social Science Research Council (1990-2005)

Adjunct Professor, The New School (Spring 2006)

Adjunct Assoc. Professor, Columbia University School of International and Public Affairs (1999-2006)

Affiliated Researcher, International Organization for Knowledge Economy and Development (IKED), Malmo, Sweden 2003-2005 (in residence August-September 2004)

Visiting Prof., Princeton University, Dept. of Politics, Inst. of Intl & Regional Studies (2003-04)

Senior Research Fellow, Institute of Latin American Studies, Columbia University (1997-2006)

Visiting Assistant Professor, Dept. of Political Science, New York University (Spring 1994)

Assistant Professor, Dept. of Political Science, Southern Illinois University (1989-90)

CLP_PC_026165

# PUBLICATIONS

## PEER REVIEWED PUBLICATIONS

*A New Chapter in US-Cuba Relations: Economic, Political and Social Implications*, co-edited with
William M. LeoGrande. New York: Palgrave Macmillan, 2016.

"Introduction: US-Cuba Diplomatic Rapprochement and Washington's Relations with Latin America," in
Eric Hershberg and William M. LeoGrande, eds., *A New Chapter in US-Cuba Relations:
Economic, Political and Social Implications*. New York: Palgrave Macmillan, 2016.

Conclusion: Keys to Assessing Progress toward Establishing Normal Relations between the United States
and Cuba," in Eric Hershberg and William M. LeoGrande, eds., *A New Chapter in US-Cuba
Relations: Economic, Political and Social Implications*. New York: Palgrave Macmillan, 2016.

"The Impact of the Global Financial Crisis in Latin America: Economic and Political Determinants," in
Carol Wise, Saori Katada and Leslie Elliott Armijo, eds., *Unexpected Outcomes: How Emerging
Economies Survived the Global Financial Crisis*. Washington, DC: Brookings Institution, 2015.

Foreword, in Oliver Stuenkel and Matthew M. Taylor, eds. *Brazil and the International Liberal Order*.
New York: Palgrave Macmillan, 2015.

"Prologo" in Alejandro Foxley and Barbara Stallings, eds., *Economias Latinoamericanas:Como Avanzar
Mas Alla del Ingreso Medio.* Santiago, Chile: CIEPLAN, 2014.

"El hemisferio en transformación: regionalismos, multilateralismo y políticas exteriores en un entorno
cambiante," co-authored with Andres Serbin and Tullo Vigevani in *Pensamiento Propio*  Vol 39,
No. 1. Spring 2014.

"Washington and the Hemispheric Order: Explanations for Continuity and Change," (with Phillip J.
Brenner) in *Pensamiento Propio, V*ol 39, No. 1. Spring 2014.

"Hemisferio Americano em Transformaçao: Relaçoes Internacionais, Multilateralismo e Perspectivas das
Relaçoes Interamericanas," co-authored with Andres Serbin and Tullo Vigevani, "Hemisferio em
Transformaçao" *Lua Nova*  n. 90. 2013 (Special Journal Issue ISSN 0102-6445).

"Washington e a ordem hemisferica," co-authored with Philip Brenner, in "Hemisferio em
Transformaçao"        *Lua Nova*  n. 90. 2013 (Special Journal Issue ISSN 0102-6445).

"Cuba: An Economy Careening Forward, Destination Unknown," Foreword to *Economic Transformation
in Cuba*, edited by Claes Brundenius and Ricardo Torres. London: Springer, 2013.

*New Institutions for Participatory Democracy in Latin America: Voice and Consequence*, co-edited with
Maxwell A. Cameron and Kenneth Sharpe.  New York: Palgrave-MacMillan, 2012.  (Spanish
edition: *Instituciones nuevas para la participación democrática en América Latina: voz y
consecuencia*. Mexico City: FLACSO, 2012).

Translation of three lengthy chapters (approximately 40,000 words) of C.I. Degregori: *How Difficult it is*

3

CLP_PC_026166

*to be God: Shining Path's Politics of War in Peru, 1980-1999*. Madison: University of Wisconsin Press, 2012.

"Colombia Policy Under the Obama Administration: Sustaining an Inherited Paradigm," with Anne Gillman. <u>*Pensamiento Propio*</u> (Buenos Aires) No. 31 (Jan.-April 2010), pp. 77-102.

*Latin America's Left Turns: Politics, Policies and Trajectories of Change*, co-edited, with Maxwell A. Cameron. Lynne Rienner Publishers, 2010.

"Latin America's Left Turns: A Tour D'Horizon" with Jon Beasley-Murray and Maxwell A. Cameron, in Cameron and Hershberg, eds., 2010.

 "Latin America's Lefts: The Impact of the External Environment," in Cameron and Hershberg, eds., 2010.

"Democracy in Latin America: A Review of Recent Literature." *Canadian Journal of Latin American and Caribbean Studies*, (summer, 2009 – published summer 2010).

"Paradoxical Inequalities in Latin America," prologue to Paul Gootenberg and Luis Reygadas, eds., *Durable Inequalities in Latin America*. Durham: Duke University Press (2010).

"Latin America's Left Turns: an Introduction" with Jon Beasley-Murray and Maxwell A. Cameron. *Third World Quarterly*, (March 2009, special issue co-edited with Cameron).

"América Latina fragmentada: Economía y empleo en la era de la globalización," *Nueva Sociedad*. No. 214, 2008 (March-April), pp. 152-161.

"Globalization and Labor: Reflections on Contemporary Latin America," *International Labor and Working Class History*, No. 72, Fall 2007, pp. 164-172.

"Democracy Promotion in Latin America," *Democracy and Society*, Vol. 4, Issue 2 (Spring 2007).

"Opening the Ivory Tower to Business:  University Industry Linkages in Asia," Special Issue of *World Development*, co-edited and with introductory essay written with Shahid Yusuf and Kaoru Nabeshima (2007).

*Turning the Tide?  Latin America After Neoliberalism.* Volume co-editor, with Fred Rosen.  New York: The New Press (2006).

"Turning the Tide? The Quest for Social Justice in Latin America," in Hershberg and Rosen, eds.

*State and Society in Conflict: Comparative Perspective on Andean Crises*, co-edited with Paul W. Drake. Pittsburgh: University of Pittsburgh Press (2006).

"The Crisis of State-Society Relations in Post-1980s Andes," (with Paul W. Drake) in Drake and Hershberg, eds., (2006).

"Technocrats, Citizens and Second Generation Reforms: Considerations on Colombia's Andean

4

Malaise," in Drake and Hershberg, eds. (2006).

*Memorias militares: visiones en disputa en dictadura y democracia*, co-edited with Felipe Aguero. Madrid: Siglo XXI (2005).
.
 "Las Fuerzas Armadas y las memorias de la represión en el Cono Sur," in Hershberg and Aguero, eds., (2005).

Keys to Latin America's Security: Economic Development and State Strengthening (with Juan Carlos Moreno Brid), *University of Wisconsin-Milwaukee Occasional Paper 94*. (May 2005).

"Global Restructuring, Knowledge and Learning" in *Voprosy Ekonomiki* (*Issues in Economics*—in Russian). Moscow (August, 2004).

*Critical Views of September 11: Analyses from Around the World*, co-editor, with Kevin W. Moore. New York: The New Press (2002)

"Place, Perspective and Power: Interpreting September 11," co-author, with Kevin W. Moore, in Hershberg and Moore, eds., (2002).

"Change and Continuity in Hemispheric Affairs: Latin America after September 11," (with Francisco Gutierrez and Monica Hirst), in Hershberg and Moore, eds., (2002).

"Development: Economic and Social Dimensions," in Paul Baltes and Neil Smelser, eds., *The International Encyclopedia of Social and Behavioral Sciences*. Vol. 6, London: Elsevier (2001).

*Economic Governance and Flexible Production in East Asia*, (volume co-edited with Frederic Deyo and Richard F. Doner). Lanham, MD: Rowman and Littlefield Publishers (2001).

"Conclusion: Network Governance, Flexibility and Development Amid Crisis" (with Frederic Deyo and Richard F. Doner) in Deyo, Doner and Hershberg, eds. (2001).

"Sector privado, democracia y desarrollo: Los empresarios y las transiciones en Chile," in Amparo Menéndez Carrión and Alfredo Joignant, eds. *La Caja de Pandora: el retorno de las transiciones en Chile*. Santiago: Planeta (1999).

"Flexible Production and Political Decentralization in the Developing World: Elective Affinities in the Pursuit of Competitiveness?" (with Richard F. Doner), Vol. 33, No. 4 (1999), *Studies in Comparative International Development*. (Abbreviated version in Portuguese, published in Nadya Araujo Guimarães and Scott Martin, eds., *Competividade: Atores e Instituçoes Locais.* Sao Paulo: Editora SENAC, 2001.)

"Democracy, and its Discontents: Extending Political Citizenship in Latin America," in Howard Handelman and Mark Tessler, eds. *Democracy and Its Limits: Lessons from Asia, Latin America and the Middle East.* Notre Dame: Notre Dame University Press (1999).

"From Cold War Origins to a Model for Academic Internationalization: Latin American Studies at a Crossroads," *Dispositio/n* Vol. 22, Issue 50, 1999. (University of Michigan Press).

CLP_PC_026168

"Market-Oriented Development and State-Society Relations in Contemporary Spain and Chile," in Douglass Chalmers, et. al., *The New Politics of Inequality in Latin America*. Oxford University Press (1997).

"Democratic Transition and Social Democracy in Spain," in *PROKLA, Periodical of Critical Social Science* (Berlin, in German), Issue 105, Vol. 26, No. 3 (December, 1996).

*Constructing Democracy: Human Rights, Citizenship and Society in Latin America*, coedited with Elizabeth Jelin. Boulder, CO: Westview Press (1996).

*Construir la democracia: derechos humanos, ciudadanía y sociedad en América Latina.* (Spanish version of *Constructing Democracy...)* Caracas: Nueva Sociedad, 1996. (Portuguese version published by the Editorial da Universidade de Sao Paulo, Brazil, 2007).

"Human Rights and the Construction of Democracy," with Elizabeth Jelin, in Elizabeth Jelin and Eric Hershberg, eds. (1996).

"Convergent Developments, Diversity and Change: Visions of Human Rights" (with Elizabeth Jelin) in Elizabeth Jelin and Eric Hershberg, eds. (1996).

**NON-PEER REVIEWED PUBLICATIONS**

**American University Latin America Blog (www.aulablog.net) entries**
"Puerto Rico: A Mess with Structural Causes," (with F. Armstrong) August 14, 2019
"New Leadership in El Salvador: Breaking from the Past?," J;u 15, 2019
"Venezuela: Washington Trying to Tighten the Noose," April 11, 2019
"Venezuela: A Test of U.S. Hegemony in Latin America," Jan. 31, 2019
"Nicaragua: Might Trump See Opportunity?" (with F. Armstrong), Aug. 7, 2018)
"Summit of the Americas: Awkward Agenda, Dim Prospects," Feb. 6, 2018
"Honduras: Hernandez Stealing an Election, Too?" (with F. Armstrong), Dec. 4, 2017.
"U.S. Immigration Policy: Not Just Getting Rid of 'Bad Hombres'," (with F. Armstrong and D. Stinchcomb) Feb. 27, 2017
"U.S.-Mexico Tensions: Harbinger for Latin America?" (with F. Armstrong), Jan. 31, 2017
"Deciding Asylum: Challenges Remain as Claims Soar" (with D. Stinchcomb), Jan. 19, 2017
"2017: Happy New Year in Latin America?" (with F. Armstrong), Jan. 4, 2017
"What Comes After TPP?" (with F. Armstrong), Nov. 22, 2016
"The Cataclysm that the Latino Vote Couldn't Stop," Nov. 10, 2016
"U.S. Elections: Latino Voters Lost in the Noise?" (with F. Armstrong), Oct.20, 2016
"El Salvador: Dealing with the New Reality of Violence," Sept. 26, 2016
"How Sustainable are Latin America's Advances on Poverty and Inequality?" June 3, 2016
"Political Upheaval in South America," May 26, 2016
"Trumping GOP Resistance to Rapprochement with Cuba" May 21, 2016
"U.S. Colombia: Launching "Peace Colombia," Feb. 8, 2016
"What Does Macri's Win Mean for Latin American's Left Turns?" (with F. Armstrong), Dec. 2, 2015
"Puerto Ricans in Florida: Swing Constituency in a Swing State" (with F. Armstrong), Sept. 21, 2015
"Is a CICIH the Answer to Honduras' Crisis? Co-authored with F. Armstrong, Sept. 15, 2015
"Guatemala's Crisis is not Over" Sept. 3, 2015
"Dilma, and Brazil, in Crisis" August 24, 2015

6

CLP_PC_026169

"Can Republicans Close Their Gap with Latinos (with Rob Albro), August 18 2015
"Remittances and Sustainable Community Development in Latin America" (with A. Bell), Aug. 4, 2015
"OAS: Almagro's Challenge, co-authored with Fulton Armstrong, July 27, 2015
"Mexico Elections: Successful Balloting, Mixed Results" (with F. Armstrong), June 11, 2015
"Peru: The Shuffling Continues" with Fulton Armstrong, May 11, 2015)
"The Summit of the Americas: Important Progress," with Aaron Bell, April 13, 2015
"Implications of Normalization of U.S.-Cuban Relations", April 2, 2015
"Central American Minors: Headed Home?" with D. Stinchcomb, March 26, 2015
"Venezuela: Crossing the Line" with Fulton Armstrong, February 23, 2015
"Elite Power and State Strength: A Timely Focus of Academic Studies," February 5, 2015
"Cuba Welcomes Normalization, but only on its Own Terms" January 26 2015
"Executive Underreach: Migrants on the Edges of Reform" (with D. Stinchcomb) Dec. 11, 2014
"Social Science that Matters: Perez Sainz on Latin America's Inequalities" Dec. 4, 2014
"Unaccompanied Migrant Children from Central America: Context and Causes" Nov. 20, 2014.
"Elections in the US: Latino Vote not Decisive" co-authored with Fulton Armstrong, Nov. 7, 2014
"Brazil: Implications of Dilma's Victory" co-authored with Matthew M. Taylor, October 27, 2014
"Elections in Brazil" co-authored with Luciano Melo, Oct. 10, 2014
"Who Will Attend the Presidential Summit?" co-authored with Fulton Armstrong, Oct. 2, 2014
"Sanctions on Venezuela: Why?" co-authored with Fulton Armstrong, August 16, 2014
"Colombia: Four More Years of Santos" June 16, 2014
"Trans-Pacific Partnership: A Framework for U.S.-Latin America Relations?" May 22, 2014
"Downsides of Decentralization: Lessons from Peru" May 5, 2014
"Obama's Deportation Debacle" co-authored with Dennis Stinchcomb, April 23, 2014
"ALBA Governments and Presidential Succession" March 21, 2014
"Cuban Infrastructure and Brazilian State Capitalism: The Port of Mariel" February 20, 2014
"Chile Elections: Bachelet's Partial Victory" co-authored with Maribel Vásquez, Nov. 22, 2013
"The September 11 Coup in Chile: Global Ramifications" Sept. 17, 2013
"Ben Kohl: The Loss of a Scholar Activist who Taught About Bolivia" August 12, 2013
"US-Cuba: Time to End the Visa Charade" June 4, 2013
"Chavismo Wins a Battle but the Tide May Have Turned" April 23, 2013
"Venezuela: a New Start?" co-authored with Fulton Armstrong, March 6, 2013
"The Overlooked Dimension of US Immigration Reform" March 4, 2013
"Is Chairman Menendez the Right US Signal for Latin America?" co-authored with William M.
  LeoGrande, Feb. 15, 2013

"Country Conditions in Central America and Asylum Decision-Making (co-authored with Jayesh Rathod
       and Dennis Stinchcomb), *CLALS Working Paper Series* No. 15. Center for Latin American and
       Latino Studies, 2017.

"Political Economy of Colombia and Ecuador." Bibliographic review essay, *Handbook of Latin
American        Studies*. Washington, DC: Library of Congress, Vol. 71, (2016).

"Opening to Cuba Before There Was an Opening to Cuba: Reflections on Two Decades of Work at the
       SSRC," (with Stanley Katz), *Items: Insights from the Social Sciences,* June 7, 2016.

"What's Left of the Republican Party? A Dialogue with Eric Hershberg," (*Josep Colomer's
       Political Science blog*), May 8, 2016

CLP_PC_026170

"Obama's Visits: Late is Better than Never," (*Coordinadora Regional de Investigaciones Economicas y Sociales* blog), 2016

"Violence and Community Capabilities: Insights for Building Safe and Inclusive Cities in Central America." (with Daniel Esser et al.),CLALS Working Paper Series No. 8, Nov. 2015.

"North-South Relations in the Western Hemisphere: The Shifting Distribution of Sovereignty in the 21st Century," (co-authored with Sebastian Bitar), (unpublished paper).

"Unaccompanied Migrant Children from Central America: Context, Causes and Responses," (with Dennis Stinchcomb). *Center for Latin American and Latino Studies (CLALS) Working Paper 7* (2014).

"Political Economy of Colombia and Ecuador." Bibliographic review essay (co-authored with A. Ruddle), *Handbook of Latin American Studies*. Washington, DC: Library of Congress, Vol. 69, (2014).

"Las Elites de Centro América y la Trampa de Ingresos Medios," invited comment in *Lente Fiscal*. Instituto Centroamericano de Estudios Fiscales, Guatemala City, (February, 2014).

"Lo Que Chávez se Llevó," (with Maxwell Cameron) in *Poder 360*. Lima, Perú. (2013).

"Political Economy of Colombia and Ecuador." Bibliographic review essay, *Handbook of Latin American Studies*. Washington, DC: Library of Congress, Vol. 67 (2012).

"Salvaging a Revolution: Cuba at a Crossroad," guest editor and introductory essay, "Salvaging a Revolution?" *NACLA Report on the Americas*, Vol. 44, No. 4 (July – August, 2011).

"Latin American Studies Programs in the 21st Century U.S. University. *LASA Forum* (Fall 2010, Vol. XLI, No.4).

"Political Economy of Colombia and Ecuador." Bibliographic review essay, *Handbook of Latin American Studies*. Washington, DC: Library of Congress, Vol. 65 (2009).

"Comparative Perspectives on Institutional Origins and Evolution," preface to Richard F. Doner, ed., *Explaining Institutional Innovation: Case Studies from Latin America and Asia*. New York: Social Science Research Council, 2010.

"The Funes Government and El Salvador's Opportunity," introduction to NACLA *Report on the Americas* devoted to El Salvador (guest co-editor). Nov-Dec. 2009.

*LASA Forum*, edited six issues, 2008-2009, scholarly debates on "Inequalities" and "On the Profession."

"Waiting For a Bus to Somewhere: Reflections on Change in Cuba." Social Science Research Council Web Forum on Change in Cuba (April, 2008). ([www.ssrc.org/changeincuba](www.ssrc.org/changeincuba))

"Human Rights and Accountability in the Southern Cone," in Cynthia Arnson and Jose Raul Perales, eds. *The New Left and Democratic Governance in Latin America*. Washington, DC: The Woodrow Wilson International Center for Scholars (2007).

CLP_PC_026171

"Political Economy of Colombia and Ecuador." Bibliographic review essay, *Handbook of Latin American Studies*. Washington, DC: Library of Congress, Vol. 63 (2007).

*The Consejo Latinoamericano de Ciencias Sociales (CLACSO): An Evaluation*, (with Rodrigo Arocena and Rosemary Thorp). Stockholm: SIDA (2005).

"The Political Economy of Development: Trends in Latin American Studies." Contribution to a Dossier on "Studies of Latin America From Latin America and the Caribbean," *LASA Forum*, Vol. XXXVI, No. 3 (Fall 2005).

*The Development Imperative: Toward a People-Centered Approach*, co-edited with Christy Thornton, Social Science Research Council, 2005.

"Global Restructuring, Knowledge and Learning: Notes on Industrial Upgrading and Development." *American University of Paris Working Paper Series*, No. 15, 2004 (October).

"Political Economy of Colombia and Ecuador." Bibliographic review essay, *Handbook of Latin American Studies*. Washington, DC: Library of Congress, Vol. 61 (2005).

"Hacia un Consenso Centroamericano." *Revista Virtual de Economía Centroamericana*, Guatemala: ASIES, Vol. 2 (January, 2004).

Guest editor, special issue of *NACLA Report on the Americas*, "Beyond the Washington Consensus," (November, 2003).

"Latin America's Crossroads," in *NACLA Report on the Americas* (Nov. 2003).

Prefacio to Carlos Ivan Degregori, ed. *Luchas por las memorias de la represion en Peru*. Instituto de Estudios Peruanos, Lima (2003).

"Why Argentina Crashed, and is Still Crashing," in *NACLA Report on the Americas* (August, 2002).

"Who Crashed Argentina?" in *Connections to the Americas*. Minneapolis (March, 2002).

"Governance in Colombia: A Time for Rethinking Priorities." Consultant report, (25,000 words) commissioned by the World Bank (July, 2001).

"Collective Memory of Repression in Latin America's Southern Cone." *Items*. Vol. 53, No. 1 (March 1999).

"Trends in Funding for Graduate Student Field Research in Comparative Politics: Evidence from a Review of SSRC Fellowship Programs," with Kenton Worcester, *APSA-CP Newsletter*, Summer 1999, pp. 25-29.

"Expanding U.S.-Cuban Scholarly Relations," with Rachel Price. *LASA Forum*, Vol. XXX, No. 2 (Summer, 1999).

"The Social Sciences in Latin America" in *World Social Science Report*. (Unsigned essay). Paris: UNESCO. (1999).

9

CLP_PC_026172

"Industrial Upgrading: Workshop Notes." *Items*. Vol. 52, No. 1 (March 1998).

"Prólogo: Centroamerica en restructuración" (with Rafael Menjívar), in Juan Pablo Pérez Sainz, et. al., *Centroamerica en restructuración*. 3 vols. San José: FLACSO-Costa Rica (1998).

"Is Latin America the Future of Eastern Europe?" with Melvin Croan, Lawrence Graham, David Ost and Thomas Skidmore, in *Problems of Communism* (June, 1992).

"Toward an Agenda for Comparative and Transnational Research," *Items* (Summer, 1992).

"Environmentalism and the Poor," with Juan Martínez-Alier, *Items* (Spring, 1992).

## BOOK REVIEWS

"The Obama Doctrine in the Americas," *International Affairs*. Vol. 93, No. 1 (January 2017)

Eduardo Dargent, *Technocracy and Democracy in Latin America*. Cambridge University Press, 2014. Reviewed for *Apuntes* (Apuntes, 77, pp. 193-193, 2016).

Ignacio Walker, *Democracy in Latin America: Between Hope and Despair, Notre Dame, Notre Dame University Press*. Reviewed for *The Americas: A Quarterly Review of Latin American History*. Vol. 71(2), pp. 374-375 (October 2014).

Laura Macdonald and Arne Ruekert, *Post-Neoliberalism in the Americas*, Routledge, 2009, reviewed for *Times Higher Education*, (London). 2009.

"Vamos Bien?: The Cuban Revolution at 50," *London Review of Books*, May 29, 2009.

Caroline F. Levander and Robert S. Levine, eds., *Hemispheric American Studies*, New Brunswick: Rutgers University Press, 2008, reviewed for *Journal of American History* (2008).

Merilee Grindle and Pilar Domingo, eds., *Proclaiming Revolution: Bolivia in Comparative Perspective*. Institute of Latin American Studies, David Rockefeller Center for Latin American Studies, 2003 reviewed in *Canadian Journal of Latin American and Caribbean Studies*. Vol. 30, No 59&60 (Winter 2005).

David Collier and Ruth Berins Collier, *Shaping the Political Arena*. Notre Dame: Notre Dame University Press, reviewed in *Canadian Journal of Latin American and Caribbean Studies*. Vol. 29, No. 57&58 (2004).

Christopher Chase-Dunn, Susanne Jonas and Nelson Amaro, (eds.), *Globalization on the Ground: Post bellum Guatemalan Democracy and Development*, in *Latin American Politics and Society*. (Fall 2002).

Louis Perez, Jr., *Becoming Cuban* (University of North Carolina Press) in *Lingua Franca*, "Breakthrough Books" section (April, 2001).

10

CLP_PC_026173

Victor Perez Diaz, *Spain at the Crossroads: Civil Society, Politics and the Rule of Law* (Harvard University Press) in *Political Science Quarterly* (Summer 2000).

Sonia Alvarez, E. Dagnino and A. Escobar, eds., *Cultures of Politics, Politics of Cultures: Revisioning Latin American Social Movements* (Westview Press, 1998) in *American Anthropologist* (Dec. 1999).

Lucy Taylor, *Citizenship, Participation and Democracy: Changing Dynamics in Chile and Argentina*. (St. Martin's Press, 1998) in *Journal of Interamerican Studies and World Affairs* (Winter 1998).

Michael Peter Smith and Luis Eduardo Guarnizo, eds., *Transnationalism from Below* (Transaction Publishers, 1998), in *Political Science Quarterly* (Summer 1999).

Unarmed or Disarmed, Jorge Castañeda's *Utopia Unarmed*. *New Politics* (December 1994).

Benjamin Martin, *The Agony of Modernization:  Labor and Industrialization in Spain*. in *Hispanic American Historical Review* (November 1993).

Richard Gunther (ed.), *Elites and Democratic Consolidation in Latin America and Southern Europe* (Cambridge University Press, 1992), in *Hispanic American Historical Review* (May 1993).

## TEACHING

### COURSES TAUGHT

Political Economy of Development in Latin America and Asia (Fall 2019)
Political Economy of Development in the Global South (American University, 2017, 2019)
Political Economy of Inequality in the Global South (American University, 2015)
Introduction to Comparative Politics (American University, 2012, 2013, 2018)
Political Economy of Inequality in Latin America (American University, 2012)
Social and Political Change in Latin America (Simon Fraser University, 2007, 2009)
Introduction to Latin American Issues (Simon Fraser University, 2007, 2008)
Comparative Development Experience (The New School, 2006)
Globalization and Politics (Princeton University, 2004)
Development Policy Workshop (Columbia University, 2003, 2004, 2005, 2006)
Labor in the Global Economy (Columbia University, 1999, 2000, 2001, 2002)
Development Policy Analysis (Columbia University, 1999, 2000, 2001, 2005)
Contemporary Spain (New York University, 1994)
Politics of Western Europe (Southern Illinois University, 1989, 1990)
Politics of Latin America (Southern Illinois University, 1989, 1990)
Introduction to Politics (Southern Illinois University, 1990)
Introduction to Comparative Politics (University of Wisconsin-Madison, 1988, 1989)
Introduction to Central America and Mexico (University of Wisconsin-Madison, 1988)

CLP_PC_026174

Intro to Comparative Politics; Intro to Political Thought, Teaching Asst, (UW-Madison, 1985-88)

**THESIS SUPERVISION**

Dania Al-Awadi, Department of Government, American University, 2017 – Present

Luciano Melo, Department of Government, American University, 2014 – Present

Emma Fawcett, School of International Service, American University, (chair, Ph.D. defended July 2016).

Dawn Farthing, School of International Service, American University, "Globalization and Resistance in Latin America: Communities and Extractive Industries." (MA thesis defended November 2012).

Hayley Jones, School of International Studies, Simon Fraser University, "Conditional Cash Transfer Programs and Inequality in Latin America," (MA thesis defended April 2011).

Michael Toal, Latin American Studies Program, Simon Fraser University, "Transnational Solidarity Networks and the Peace Movement in Colombia," (MA thesis defended May 27, 2010).

Valerie Duquette, Latin American Studies Program, Simon Fraser University, Political Decentralization and Participatory Budgeting in Lima, Peru: Analysis from a Gender Perspective. (MA thesis defended Nov. 2009).

Julie Stevens, School of International Studies, Simon Fraser University, "Canadian Mining Companies and Corporate Social Responsibility in Latin America." (MA paper defended August 2009).

Mel Bricker, School of International Studies, Simon Fraser University, "Democracy and Inequality in Latin America" (MA paper defended August 2009).

Santiago Anria, Latin American Studies Program, Simon Fraser University, The MAS: Informal Structure in Urban Bolivia. (M.A. thesis defended April 2009).

Catherine Craven, Latin American Studies Program, Simon Fraser University, Garifuna Youth and Community Development in Honduras. (MA thesis defended April 2009).

Chelsey Branch, School of International Studies, Simon Fraser University, "Conditional Cash Transfers and Poverty Relief in Latin America." (MA paper defended August 2008).

Lorenza Gallia, Latin American Studies Program, Simon Fraser University, "The Recuperated Factories of Argentina." (MA thesis defended October 2007).

**THESIS COMMITTEES**

Marcela Torres, Department of Government, American University. Ph.D. dissertation committee. (defended December, 2016).

12

CLP_PC_026175

Maya Barak, Dept. of Justice, Law and Criminology, American University, Ph.D. dissertation committee.
(defended July, 2016).

Aaron Bell, Department of History, American University, Ph.D. dissertation committee. (defended May
2015).

Jason Tockman, University of British Columbia, Department of Political Science, Ph.D. thesis on
Bolivia's Indigenous Autonomies. (defended October 2014).

Sebastian Bitar, School of International Service, American University, Ph.D. dissertation committee.
(defended 2014).

Luis Moncayo, Latin American Studies Program, Simon Fraser University, M.A. thesis on sustainable
food systems in Bolivia, (defended December 2009).

Ashley Buncic, Department of Political Science, Simon Fraser University, M.A. thesis on "Sustainable
Tourism in the Dominican Republic," Second Supervisor, (defended December 2008).

Robert Huish, Department of Geography, Simon Fraser University, Ph.D. thesis on "Cuba's Latin
American School of Medicine," External Reader, (defended May 2008).

Julie Stewart, Dept. of Sociology, New York University, "To Help or to Harm: How transnational
ties shape communities in post-war Guatemala," (Ph.D. thesis defended June 2006).

LaDawn Haglund, Dept. of Sociology, New York University, "Democracy and the Privatization of
Utilities: Costa Rica and El Salvador." (Ph.D. thesis defended July 2005).


## UNIVERSITY SERVICE

**AMERICAN UNIVERSITY**

Chair, AU Ad-hoc Advisory Committee on Research and Centers, (Academic year 2019-20)

Sub-Committee Member, American University Strategic Plan Development (2018)

Award Recipient: 2018 American University Award for Contributions to Fostering Collaborative
Scholarship

Committee Chair, School of Public Affairs Dean Search Committee (2017)

Committee Member, William M. LeoGrande Prize Committee (2014-17)

Committee Member, Search Committee for Faculty Director of CCPS (2016)

Delivered a book lecture, A New Chapter in U.S.-Cuba Relations, SIS Alumni (2016)

Search Committee for Senior Government Department faculty and Director of the Center for

13

CLP_PC_026176

Congressional and Presidential Studies (2015-16 and 2016-17)

Dean of School of Public Affairs Committee on Excellence and High Impact Research (2014-15)

Provost's Advisory Committee on High Impact Research (academic year 2013-14)

Faculty Research Grant Ad hoc Review Committee (February 2014)

Provost's Task Force on Recruitment of International M.A. students (2012)

Strategic Plan Advisory Process Site Visit Committee, School of Public Affairs (2012)

Campus-wide committee for accreditation review; sub-committee on "New Technologies" (2012)

Committee Chair, William M. LeoGrande Prize Committee (2012-13)

Search Committee, Multi-year faculty appointment in Brazilian Portuguese and Culture (2013)

Search Committee for Director of Sponsored Programs (Spring 2012)

Advisory Committee for development of campus-wide work in the field of Metropolitan Studies (2012)

Department of Government Merit Review Committee (2012)

Search Committee for tenure track faculty position in the Comparative and Regional Studies division of the School of International Service (Fall 2011)

"Funding Collaborative Research Programs," panel presentation at the School of International Service Retreat, (September, 2010)

**SIMON FRASER UNIVERSITY**

Dept. of Political Science Renewal Committee

Dept. of Political Science Comparative Politics Committee, Chair

Dept. of Political Science Appointments Committee

World Literature Program Tenure and Promotion Committee

Dean's Committee to Assess the Language Training Institute

Pacific Century Graduate Fellowship Competition, Proposal Review

SSHRC M.A. Awards Committee

Campus-wide International Working Group, Member

14

CLP_PC_026177

Organizing Committee, SSHRC Research Workshop on Health Inequalities

# EXTERNAL SERVICE

## EDITORIAL

Editorial Review Board Member, CEBRAP, *Novos Estudos CEBRAP*, Sao Paulo, Brazil, Appointed. (2016-2017)

Editorial Committee, *Apuntes*, peer-reviewed journal of the Universidad del Pacífico, Lima, Perú, 2014 -.

Editorial Advisory Committee, Pensamiento Propio, Journal of the Consejo Regional de Investigación y Estudios Sociales, Buenos Aires, (2007 -- )

Editorial Advisory Committee, Canadian Journal of Latin American and Caribbean Studies, (2007--2010)

International Editorial Board, Revista Centroamericana de Ciencias Sociales, FLACSO, 2004 – 2007

Member, Editorial Advisory Board, Connections to the Americas, Minneapolis (1999-2006).

Contributing Editor, Political Economy in Colombia. Handbook of Latin American Studies (Library of Congress).

Manuscript Review: Overseas Development Council (1994); Oxford University Press (1995); Journal of Economic Development (1997); Identities: Global Studies in Culture and Power (1999); UN Economic Commission for Latin America and the Caribbean (1999); World Politics (1999; 2009); Comparative Politics (1999; 2009); Latin American Research Review (2003; 2007); Canadian Journal of Latin American and Caribbean Studies (2003; 2007); the New Press (2003); University of Alabama Press (2004); Revista Centroamericana de Ciencias Sociales (2005); Blackwell Publishers (2006); Columbia University Press (2007); Temple University Press (2008); Revista de Ciencia Política (2009); Latin American Politics and Society (2009; 2013; 2015; 2018); Pensamiento Propio (2010; 2012); University of Calgary Press (2011; 2015); Journal of International Relations and Development (2012); Palgrave-Macmillan (2012; 2016); Taylor and Francis Publishers (2013; 2015; 2018); Apuntes: Revista de Ciencias Sociales (2014); Third World Quarterly (2016); International Affairs (2016); University of Wisconsin Press (2016); Routledge (2017; 2019); Cambridge University Press (2017); International Journal of Human Rights (2018).

## INSTITUTIONAL EVALUATIONS

Program for Centers of Excellence in Science and Technology, Ministry of Science and Technology, Government of Chile, program evaluations, Dec. 2013; September, 2016; November 2018-May 2019, Dec. 2019

15

CLP_PC_026178

Evaluation of candidacy for Ted Hencken for promotion to Full Professor, Baruch College (2016)

German Institute for Global and Area Studies, Hamburg, Germany. Participated in external evaluation
team, October, 2014.

Program for Centers of Excellence in Science and Technology, Ministry of Science and Technology,
Government of Chile, proposal review, Fall 2010; July, 2014; Sept. 2016.

Evaluation of candidacy for Paul Gootenberg as Distinguished Professor (Stonybrook University, 2012)

Evaluation of candidacy for Benjamin Kohl for promotion to Full Professor, Temple University (2012)

Evaluation of candidacy for Kimberly Theidon for promotion with tenure (Harvard University, 2012)

International Planned Parenthood Federation, member, fact finding delegation to assess aid programs for
reproductive health in Peru (May, 2010); subsequent Capitol Hill briefings with Congressional
staff and members of Congress (Jan. 2011)

Evaluation of candidacy for Shawn Greene for promotion with tenure (Indiana University, 2010)

Ontario Council of Colleges and Universities, External Reviewer of Latin American Studies Program at
University of Guelph (June, 2008)

Ad-hoc Tenure Review Committee, Department of Government, Harvard University (Dec. 2007)

Chair, Evaluation team to review programs and activities of the Latin American Council of Social
Sciences, (CLACSO), commissioned by the Swedish International Development Agency (SIDA)
and the Norwegian Agency for Development (NORAD) (Spring, 2005)

Selection Committee, Research Grants for Central American Institutions (ASIES, Guatemala), 2004

Program Evaluator, Latin American Studies, University of Wisconsin-Milwaukee (2003).

Selection Committee, LASA Labor Section Award for the Best Manuscripts in Latin American Labor
Studies (2002)

Selection Committee, Rockefeller Foundation Fellowships on "Cultural Aspects of Regional Integration
in Mercosur," IDES, Buenos Aires (2000).

Selection Committee, Rockefeller Foundation Fellowships on "Globalization and Culture in the Andes,"
Instituto de Estudios Peruanos, Lima (1999).

Proposal Review, U.S. Institute of Peace (1993); U.S.-Mexico Foundation for Science (1996); SSRC
MacArthur Foundation Program on Global Security and Cooperation (2004).

**GOVERNANCE**

Board of Directors, InSight Crime, Bogotá, Colombia (2012 --)

16

CLP_PC_026179

Board of Directors, Central American Institute for Research on Development (INCIDE), San Salvador, El Salvador, 2014 – 2017

Social Science Research Council, Member, SSRC Working Group on Cuba, 2010 –

Advisory Board, Library of Congress, for the *Handbook of Latin American Studies* (2008--2017).

Advisory Committee, University of British Columbia program on Andean Democracy (2008- 2010)

Latin American Studies Association, Chair, LASA-Mellon Program Committee (2008-13)

Canadian Business Council for the Americas, Board member (2007 -- 2010)

International Advisory Group, Ford Foundation program to support Central American Social Science (2006).

Steering Committee, International Forum for Development (2003-04)

Program Committee, SUNY-Stony Brook Program Rockefeller Foundation Humanities Institute Residential Fellowships on Inequalities in Latin America (2002—2005)

Program Advisory Board, Project Spera, San Francisco-based Civic Education Initiative, (2002-07)

Board of Directors, North American Congress on Latin America (NACLA) (1996-2011); Chair (1999-2010).

Member, Scientific and Technical Advisory Committee, and Coordinator, Social Science Proposal Review, U.S.-Mexico Foundation for Science (1993-1996).

Member, Latin American Studies Association (LASA) Task Forces on Labor (1993); Scholarly Relations with Spain (1991-1994); and Scholarly Resources (1994-1996).

**CONSULTING**

Centra Technology, Western Hemisphere Board of Advisors, 2017-2019

Rockefeller Brothers Fund, advising Board on potential avenues for philanthropy in Latin America (2016)

National Intelligence Council, preparation and presentation of a 40 page study of the future of North America to inform the NIC Global Trends study (2016)

Gerson Lehrman Group, research on contemporary Cuban affairs (2006).

World Bank, Governance and Policy Reform, Colombia (July 2002).

Consultant to the Latin American Studies Planning Committee, School of International Studies and College of Arts and Sciences, University of Miami (1998).

17

CLP_PC_026180

**PUBLIC SERVICE**

Expert Declarations, Asylum cases in United States District Courts of Maryland and Virginia, and
numerous immigration courts around the United States and Canada (roughly 100 country
condition reports on El Salvador, Guatemala and Honduras, from 2012-2020).

# GRANTS AND FUNDRAISING

**FELLOWSHIPS**

Faculty Research Support Grant, American University Office of the Provost, for research on "Household
Characteristics and School Integration of Central American Youth," ($15,000, 2017).

Presidential Research Grant ($10,000) and Directors Research Grants ($5,000, $5,000 and $5,000),
Simon Fraser University (2007-09).

Laporte Fellow, Dept. of Politics, Princeton University; Visiting Research Fellowship, Princeton Institute
for International and Regional Studies (2003).

Princeton Institute for International and Regional Studies (PIIRS), $300,000 institutional support for a
2004-07 project on "Paradoxical Inequalities in Latin America," co-directed with Jeremy
Adelman.

American Association for the Advancement of Science, Science Fellow (2000-2001, Award declined).

Southern Illinois University Graduate School Summer Research Fellowship (1990).

Fulbright Lectureship, University of Port Au Prince, Haiti (1989, Award declined).

Tinker Foundation Pre-dissertation field work grant, University of Wisconsin-Madison (1986).

University of Wisconsin-Madison Campus-wide Award for Excellence in Teaching (1985).

University of Wisconsin-Madison, Pol. Science Dept. Distinguished Teaching Award (1985).

**INSTITUTIONAL GRANTS** (approximately $12 million)

**American University Center for Latin American and Latino Studies (over $5 million 2010-19)1**

Center for Gender and Refugee Studies, University of California Hastongs College of Law, for written
materials on asylum requests for Central Americans fleeing violence, $10,000 (2019-20200

Multiple Foundations, for research on Lessons Learned from Anti-Impunity Commissions in Latin
America, $75,000 (2019)

Henry Luce Foundation, for research on Religion and Environmentally-Induced Migration in Latin

18

CLP_PC_026181

America and the Caribbean, $300,000 (2019)

Open Society Foundations, for research on Prospects for an International Commission against Corruption and Impunity in El Salvador, $60,000 (2018)

Department of State, for a project on transnational criminal organizations and the state in Argentina, Brazil and Paraguay, $450,000 (2018)

UNICEF, for a program or orientation sessions for senior staff assigned to Latin American and Caribbean offices (sequence of fixed service contracts, estimated value $50,000 over three years) (2018).

Department of State, for a project on illicit wildlife and timber trafficking in Latin America, $350,000 (2017)

Open Society Foundations, for research on the Mission Against Impunity and Corruption in Honduras, $100,000 (2017)

Christopher Reynolds Foundation, for project on "Central American Refugee Assistance," $5,000 (2017).

University of Houston / Department of Homeland Security, for research on "The Impact of Central American Child Migration on U.S. Communities," $100,000 (2016).

National Science Foundation, for research on "Country Conditions in Central America and Decision-Making on Asylum Claims," $35,000 (2016).

American University Provost Office, for research on "School Enrollment and Retention of Central American Migrant Youth in the DC Metro Area," $15,600 (2015).

Henry Luce Foundation, for research on Religion and Climate Change, $450,000 (2015).

Sphere Consulting, for a study of television news coverage in Venezuela, $94,000 October, 2014.

Ford Foundation, for preparation of a report on factors driving migration to the U.S. of unaccompanied minors from Central America, $20,000 (2014)

National Institute of Justice, for research on Latino Gangs in Washington, Los Angeles and San Salvador, $671,000 (2013)

Henry Luce Foundation, for research on Religion and Conflict in Latin America, $300,000 (2013)

Inter-American Development Bank, for research on Emergent Issues and Challenges for Latin American and Caribbean Economies, $450,000 (2013)

International Development Research Centre (Canada) and FLACSO-Costa Rica, for a project on Social Exclusion and Violence in Central America, $50,000 (2013)

Christopher Reynolds Foundation, for Cuba Initiatives, $190,000 (total from grants awarded in 2010; 2011, 2013, 2015)

19

CLP_PC_026182

Tinker Foundation, for a Graduate Student Field Research Program, $30,000 (2010-2013).

Ford Foundation, for a research program on Central American Elites, $452,000 (2011-2013)

Open Society Foundations, for multi-media projects $50,000 (2012)

U.S. State Department, for research on organized crime in Colombia, $99,000 (2012)

Swedish Foundation for Human Rights, for a workshop on gender and sexuality in law school curricula, $7,000 (2012)

Open Society Foundations, for research fellows program $100,000 (2012)

Tinker Foundation, general support $10,000 (2012)

Henry Luce Foundation, for a program on religion and violence in Latin America, $375,000 (2011)

Open Society Institute, for a project on organized crime in Latin America, $25,000 (2010)

**Latin American Studies Association ($500,000)**

Andrew W. Mellon Foundation, for support of a series of Mellon-LASA Workshops, $500,000 (2008)

**Simon Fraser University ($32,000)**

Social Science and Humanities Research Council (Canada), Aid to Research Workshops, $22,000 grant in support of an April 2008 workshop at Simon Fraser University on "Latin America's Left Turns: Parties, Movements and Policies."

Association of University and Colleges of Canada (AUCC) award for graduate student research on decentralization in Peru, $10,000 (2008)

**Social Science Research Council (principal investigator only, approx. $5.8 million 1992-2006))**

The Chiang Ching-kuo Foundation for International Scholarly Exchange, for a conference on Economic Governance and Flexible Production in East Asia," $25,000 (1996)

The Ford Foundation, to establish at the SSRC the Interim Secretariat of the International Forum for Development, $265,000 (2003)

-------- design and conduct a training workshop in Hanoi for participants in the worldwide International Fellowship Program, $98,400 (2001)

-------- a program of support for Libraries and Archives in Cuba, $800,000 (2001, 2003, 2006)

-------- workshops and publications on Cultural Studies in the Americas, $270,000, (2000).

CLP_PC_026183

-------- training workshops in Cuba on International Cooperation, and research on social capital and
economic networks, $165,000 (2000)

-------- a research and training program devoted to "Collective Memory of Repression and Processes of
Democratization in Latin America's Southern Cone," $800,000 (1998)

-------- continuation of research and training on Collective Memory of Repression, $375,000, (2000)

-------- a series of workshops in Cuba on International Cooperation and Research Funding, $150,000
(1998)

------- a research and training program devoted to "Restructuring Central American Polities and
Economies," $230,000 (1996)

------- a program of workshops to train junior social scientists in Central America and the Caribbean,
$250,000 (1994)

------- foster hemispheric collaboration in social sciences, $36,000 (1991)

William and Flora Hewlett Foundation, for Latin America-related programs, $150,000 (1998).

Inter-American Development Bank (INTAL-IDB), to support workshops and publications on Income
Inequality in the Caribbean $40,000 (2000).

John D. and Catherine T. MacArthur Foundation, to support an SSRC-ACLS working group on academic
exchanges between North America and Cuba, $450,000 (1996-2000).

------- a research project on Environmentalism and the Poor, $31,000 (1992).

North Atlantic Treaty Organization (NATO), for a research workshop on "Industrial Upgrading in
Transitional Economies," $52,000 (1999).

Organization of American States (OAS), for a research network on "Industrial Upgrading and Equity in
Central America," $65,000 (2000).

Pew Charitable Trusts, for academic conferences, policy seminars and publications on Economic
Liberalization and Democratic Consolidation, $200,000 (1993).

Christopher Reynolds Foundation, to support an SSRC-ACLS working group on academic exchanges
between North America and Cuba, $630,000 (multiple grants, 1997- 2006).

-------- two workshops on economic reform in Cuba, two grants totaling $70,000 (2000).

-------- organize study by Cuban economists in China and other transitional economies, $180,000
(multiple grants, 2001- 06).

Rockefeller Foundation, to support programs on "Collective Memory and Repression" in Peru and
elsewhere in Latin America, $132,000 (2000).

21

CLP_PC_026184

------- for a program to link researchers concerned with reconfiguration of cultural boundaries in the Americas, in the context of migration and urban change, $200,000 (2002).

------- to launch an effort to restore the papers of Ernest Hemingway in Cuba, $75,000 (2002).

UNESCO, for a series of seminars devoted to the state of the social sciences in the developing world, $32,000 (1998).

United States Institute of Peace, for a conference on Economic Liberalization and Democratic Consolidation, $30,000 (1992).

The World Bank, to prepare a report on Governance in Colombia, $20,000 (2001).

The World Bank, for research on University-Industry Linkages in Asia, $35,000 (2004).


## LECTURES AND CONFERENCE PRESENTATIONS (Selected, 1991—2018)

"US policy toward Cuba as part of an overall US strategy toward Latin America," presentation at the meeting of the Center for International Policy, Havana, Cuba, December 16, 2019

"US policy and Venezuela" presentation at a seminar in the Foreign Ministry of Spain, November 21, 2019

" Democracy and Civil Society in Central America" Lecture at the Universidad de Oriente, San Miguel, El Salvador, June 21, 2019

"Social Justice in 21st Century Latin America: threats and opportunities," Roundtable discussion participant, Latin American Studies Association, Boston. (May 24, 2019)

"Institutional Reforms in the 21st Century: Toward Higher Quality Democracies," Panel discussant, Latin American Studies Association, Boston. (May 25, 2019)

The Role of Business in Fostering Inclusive Neighborhoods, panel discussion leader, Greater Washington Hispanic Chamber of Commerce Annual Business Expo, March 28, 2019

"Challenges of Economic Reforms in Latin America," Inaugural Lecture for the Masters Program      in Public Policy, Escola Nacional d'Administracao Publica, Brasilia, March 14, 2019

"Considerations on the Cuban Economy," presentation on a panel devoted to Cuba in 2019, American University, January 22, 2019.

"Cuba-US Security Cooperation," Panel Moderator, ISRI, Havana, Cuba, Dec. 14, 2019.

"Latin American Studies at IU and Beyond," panel presentation at the conference on International Education at the Crossroads, Indiana University, October 29, 2018

CLP_PC_026185

"Community Integration of Recent Central American Immigrants: Insights from the Washington, DC, Metropolitan Area," presentation at the 2nd Annual Metropolis North American Migration Policy Forum, Mexico City, September 27, 2018

"Lejos del buen vecino: consecuencias de la belicosidad Trumpiana para los ciudadanos y las sociedades centroamericanas." Presentation at the Centro de Investigacion y Docencia Economica, Mexico City (Sept. 26, 2018)

"Lejos del buen vecino: consecuencias de la belicosidad Trumpiana para los ciudadanos y las sociedades centroamericanas." Presentation at the 2nd Annual Semana Cientifica, Universidad Rafael Landivar, Guatemala City (Sept. 24, 2018)

"Lejos del buen vecino: consecuencias de la belicosidad Trumpiana para los ciudadanos y las sociedades centroamericanas." Keynote presentation at a seminar convened by the Facultad Latinoamericana de Ciencias Sociales, San Jose, Costa Rica (July 12, 2018)

"Community Integration of Recent Central American Immigrants in Washington, DC, Houston and the Carolinas," public presentation at AU's Washington College of Law (June 27, 2018)

"The Mission Against Corruption and Impunity in Honduras: A Two Year Report" panelist at an American University event in Tegucigalpa, Honduras (June 21, 2018)

"Community Integration of Recent Central American Immigrants in Washington, DC, Houston and the Carolinas," presentation to the Immigration Legal Services Coalition, Houston, TX (June 7, 2018)

"Integration of Central American immigrants in U.S. communities," lecture delivered at UNITEC, Tegucigalpa, Honduras (March 16, 2018)

"American Pullback and Canadian Opportunities in Latin America," Invited lecture for diplomats, Dept of Foreign Affairs and Trade, Canadian Embassy, Washington. (January 22, 2018)

Democracies Amidst Headwinds, workshop discussion participant, workshop on Opportunities and Challengees in Latin America Through 2018. National Intelligence Council, (Dec. 11, 2017).

"Integration of Central American immigrants in U.S. communities," lecture delivered at Border, Trade and Immigration Institute conference, Washington, DC (Dec. 4, 2017).

"Central American Refugees and U.S. Asylum Shortcomings," Webinar presented by the Care and Protection of Children Network (CPC), Columbia University Mailman School of Public Health (October, 2017)

Panel discussion leader, "Structural and Institutional Underpinnings of Varieties of Democracy in Latin America," Democracy Assessment in Latin America, Estado de la Nacion and University of British Columbia, San Jose, Costa Rica. (May 5, 2017)

Panel discussion leader, "Revisiting Economic Reforms in Cuba," Latin American Studies Association,

CLP_PC_026186

Lima, Peru. (May 1, 2017)

Lecture, "Drivers of Bilateral U.S.-Cuba Relations," AU (April 25, 2017)

Lecture, "The Political Economy of Reforms in Cuba," AU (April 4, 2017)

Featured speaker in 2-hour session of training program for Central American youth leaders, "The Political Economy of Central America until 1980," Development and Democracy in Central America, INCIDE, San Salvador, El Salvador, by skype. (March 31, 2017)

Invited participant in two-day seminar, The Liberal Arts Confront Globalization, NYU Abu Dhabi, Abu Dhabi, United Arab Emirates. (March 14, 2017)

Panel discussion participant, "US-Latin American relations in a changing environment," The New World Order and Latin America, CRIES, Panama (via skype). Scope: International. (March 6, 2017)

Talk, "Pre-trip introduction to Cuban issues -- class guest lecture," School of Education course on education in Cuba, AU School of Education. (February 1, 2017)

Panel discussion participant, "Trends in Central America," 2017 Trends in Latin America, National Intelligence Council, McLean Virginia. Scope: National. (January 23, 2017)

Panel discussion participant, "Immigration and Border Issues under a Trump administration," Teach, Teach-in sponsored by AU Faculty Senate: Organize, Engage: Contemporary Politics and the Future, presentation on immigration and social justice issues (January 18, 2017)

Talk, "The Impact of Political Trends in Latin America on US-Cuban Relations during 2016," US-Cuba Relations, ISRI, Havana, Cuba. (December 15, 2016)

Talk, "Latin America's Left Turns: Domestic and External Sources of Sustainability," Left Behind: Latin America after the Left Turns, Simon Fraser University and Univ of British Columbia, Vancouver. Scope: (December 5, 2016)

Panel discussion leader, Discussant, O'Rourke, M., Hershberg, E., Lawless, J., Leighley, J., Nelson, C. J., Post Election: AU Expert Forum, Center for Congressional and Presidential Studies, Mary Graydon. (November 10, 2016)

Panel discussion leader, Briefing: Central American politics and security, Central Intelligence Agency. (June 13, 2016)

Paper presentation, "North America's Future Scenarios 2020 and 2035," North America Future Scenarios, National Intelligence Council, Mexico City. (July 11, 2016)

Paper presentation, The Power of the Re-set Button: Impacts of Rapprochement with Cuba for US-Latin American Relations," Latin American Studies Association, New York. (May 30, 2016)

Panel discussant, Alternative Futures for the United States, Centra Technologies. (May 23, 2016)

24

Lecture, "Elite power and social change in Central America," Public Policies and Governance in Central America, PRISMA, San Salvador (via skype). (May 20, 2016)

Lecture, "The Current Political Context in Central America," Public Policies and Governance in Central America, PRISMA, San Salvador (via skype). (May 19, 2016)

Panel discussion participant, "Domestic and International Factors Driving US Policy Toward Cuba," Trends in US-Cuba Relations, CRIES, Mexico City (via skype). (April 13, 2016)

Panel discussion participant, "The Left Turn in El Salvador," Conference on "Political Change in Latin America: Challenges to the Left Turn," Tulane University, New Orleans. (April 12, 2016)

Lecture, "Latin American and Latino Studies: Institutional and Intellectual Configurations and Tensions," Conference on Latin American and Latino Studies of the Global South, University of Richmond. (March 25, 2016)

Lectures, "Democracy and Development: Latin American Experiences" and "Democracy and Development: Theoretical Perspectives," Latin American Summer Graduate Program in Development, Universidad de la Republica, Montevideo, Uruguay. (March 17-18, 2016)

Panel discussant, "Central American Immigrant Youth: Who are they, where are they, and what are their needs?" NIH Conference on Children and Migration, University of Texas-Austin. Scope: (February 25, 2016)

Panel discussant, "U.S. Cuba diplomatic rapprochement in regional context," U.S. Cuba  Relations: A View from Washington, CIPI/ISRI, Havana, Cuba. (December 17, 2015)

"The Power of the Re-set Button: How the Obama Administration's Opening to Cuba has Impacted Relations with Latin America," paper presented at a conference on Cuba in U.S. Foreign Policy, CIPI/ISRI, Havana, Cuba. (December 14, 2015)

"Trajectories of Change Forecast for Latin America," paper presented at a Global Trends Project workshop, Centra Technologies, Arlington, VA. (November 18, 2015)

Lecture, "Why Central American Youth Flee," Rockefeller Brothers Fund, New York City. (October 16, 2015)

"The Migration of Unaccompanied Children and Families from Central America: Causes, Consequences and Advocacy Responses," conference presentation at Columbia University Mailman School of Public Health, New York City (October 15, 2015).

"Governance Challenges in Latin America," paper presentation at on Conference on Political Trends in the      Western Hemisphere, Centra Technologies, Arlington, VA, (Sept. 28, 2015).

"Fiscal Pacts for Development: Building Modern Democratic States Through Fiscal Pacts," presentation on a panel at the 10th Anniversary conference of the Instituto Centroamericano de Estudios Fiscales, Guatemala City (August 28, 2015)

"Technocracy and Democracy in Latin America" commentator on a panel devoted to a 2014 book

25

published by Cambridge University Press. Annual meeting of REPAL, Montevideo (July 8, 2015).

"Domestic consequences of US attempts to normalize relations with Cuba," lecture delivered at Universidad Andina Simon Bolivar, Quito, Ecuador. (April 29, 2015).

"Prospects for US-Cuba diplomatic normalization," panelist at Universidas Andina Simon Bolivar/Friedrich Ebert Foundation, Quito, Ecuador. (April 28, 2015).

"Obama and Latin America," lecture delivered at Universidad Andina Simon Bolivar and Friedrich Ebert Foundation, Quito, Ecuador. (April 27, 2015).

"The Changing contours of regionalism in the Americas," panelist at a CRIES-sponsored workshop, Panama City, Panama (via skype). (April 9, 2015).

"Unaccompanied Child Migrants, Context, Causes and Legal Relief," paper presented at Immigration Law Clinic, Columbia University Law School, New York. (March 23, 2015).

"Political Implications of Fiscal Trends in South America," presented at Economic Tendencies in South America, Social Science Research Council, New York. (March 11, 2015).

"US Political Dynamics and Cuba's Relations with Latin America," panelist at a workshop on the Impact of the Incorporation of Cuba in the Inter-American system, CRIES/Ministry of Foreign Relations of Chile, Santiago, Chile (via skype). (March 9, 2015).

"Latinos and the Democratic Party," panelist at a workshop sponsored by AU College Democrats, American University, Washington. (February 28, 2015).

"Unaccompanied Child Migrants: Context, Causes and Legal Relief," paper presentation at Immigration Law Clinic, Cadwalader (corporate law firm), New York City. (February 25, 2015).

"The Agenda for the Latin American left," panelist at El Futuro de las Izquierdas en Centroamerica, INCIDE, San Salvador, El Salvador. (February 20, 2015).

"Reconfiguration of Elites and Power in Central America: An Overview of a multi-year Research Program," lecture at Elites and Power in Central America, AU/ICEFI/Univ Rafael Landivar, Guatemala City. (February 19, 2015).

"The Left and Latin American Politics," Guest speaker in an undergraduate course at George Washington University, (February 12, 2015).

"Immigration Policy during the Obama years: introduction to a panel," American University Latino Public Affairs Forum, American University. (January 14, 2015).

"U.S. Cuba Policy during the Final Years of the Obama Administration," Lecture presented at a conference on US-Cuba Relations, Higher Institute for the Study of International Relations, Foreign Ministry of Cuba, Havana, Cuba. (December 15, 2014).

"Institutions and Interests Shaping US Policy Toward Latin America," presentation at the Argentine

CLP_PC_026189

Foreign Ministry's Diplomatic Academy (Dec. 10, 2014).

"US Latin America Relations During the Remainder of the Obama Administration," presentation at the
Fundacion Nueva Mayoria, co-sponsored by Universidad de San Andres and the Centro
Argentino de Relaciones Internacionales (CARI), Buenos Aires, Argentina (Dec. 10, 2014).

"Emergent Economic Development Challenges in Latin America," presentation at a book launch at the
Corporacion de Investigaciones para America Latina (CIEPLAN), Santiago, Chile (Dec. 11
2014).

"Unaccompanied Central American Migrant Children and Families: Drivers of Migration and Strategies
for Protecting Migrant Rights." Paper presentations (with Dennis Stinchcomb) at four locations in
Los Angeles: the University of Southern California, California State University Northridge;
CARECEN and Esperanza Immigrant Rights Coalition. Los Angeles, CA (Nov. 19-20) and at the
Kay Spiritual Center of American University (Dec. 4, 2014) and the Institute for Migration and
Refugee Policy, Buenos Aires, Argentina (Dec. 9).

"US-Latin American relations," guest lecture, Washington Semester Program, AU, Nov. 18, 2014.

"The Latin American Left and US-Latin American Relations" guest lecture on US-Latin American
Relations at American Univ. School of International Service, Washington, DC. (October 2014).

Unaccompanied Central American Migrant Children and Families: Drivers of Migration and Strategies
for Protecting Migrant Rights" Panel discussion leader, Advocacy for Migrant Children and
Families Conference, American University and "The Door", New York City, NY. (September
22).

Panel discussion participant at Cuba and the 2015 Summit of the Americas Conference, sponsored by
American University and University of Ottawa, Ottawa, Canada.  September 2014).

"Political Economy of Taxation in Latin America" panel discussant, Latin American Political Economy
Network, Santiago, Chile. (June 2014).

"US-Cuba Relations and the Influence of Latin American Governments" Panel discussion participant,
CRIES/ITAM America Latina y Cuba: el rol de Mexico ante los nuevos desafios de la dinamica
hemisferica Conference, Mexico City, Mexico. (June 2014)

"Inequality, Structural Transformations and External Shocks" Panel discussion participant, Thirty Years
of Democracy in Latin America Conference, Rockefeller Brothers Foundation and the New
School, Pocantico, NY. (May 2014).

"Cultural Industries and Comparative Advantages" Panel discussion participant, Cultural and Creative
Industries Conference, Broward County Cultural Affairs Office, Ft. Lauderdale, FL. (May 2014).

"The U.S. and Central American Elections" Keynote speaker, Elections in Central America Conference,
INCIDE, San Salvador, El Salvador. (April 2014).

"Findings of an AU Research Program" Panel discussion participant, Elites and Power in Central
America" San Salvador, El Salvador. (April 2014).

27

CLP_PC_026190

"Shifting Configurations of Power in Latin American International Relations" Guest lecture, George Washington University, Washington, DC. (March 2014)

"Multilateralization as a Mechanism for Normalizing US-Cuba Relations (in Spanish)" Panel discussion participant, El rol de Brasil, Colombia y Mexico frente a las relaciones Cuba-Estados Unidos, University of Javeriana, Bogata, Colombia. (March 2014).

"The Reconfiguration of Elites and Power in Central America" Paper presented at Mid-Atlantic Council on Latin American Studies, Rutgers University, New Brunswick, New Jersey. (March 2014).

"The Republican Party's Latino Problem" Panel discussion leader, American University, Washington, DC. (March 2014).

"The Role of Minorities in U.S. Politics," invited lecture delivered to a State Department-sponsored international delegation.  Institute for International Education, Washington, DC. (Jan. 2014).

"Washington and the Hemispheric Order: Explanations for Continuity Amid Change," Paper presented at a conference on US-Cuba Relations, Higher Institute for the Study of International Relations, Foreign Ministry of Cuba, Havana, Cuba. (December 2013).

"The Chilean Coup as a Critical Juncture for Politics in Southern Europe and South America," presentation for a panel on Global Ramifications of the Sept 11 Chilean Coup, 40 Years Later. American University (September 2013).

"The Reconfiguration of Elites and Power in Central America," lecture delivered (by Skype) to InSight Crime workshop on "Elites and Organized Crime in Central America," Managua, Nicaragua. (Sept. 2013).

Discussant, seminar on Latin American Relations with Cuba, Conflict Prevention and Peace Forum and Norwegian Dept of International Affairs, United Nations, New York City (June 2013).

Panel participant, Political Parties and the New Social Contract, Latin American Studies Association, Washington, DC.  (June 2013).

"Elites and Power in Central America," paper presented at the Latin American Studies Association, Washington, DC (May 2013).

Discussant, Hemisphere in Flux: New Roles, Institutions and Agendas in Hemispheric Relations, Latin American Studies Association, Washington, DC (May 2013).

Panel presentation, "New Institutions for Participatory Democracy in Latin America."  Latin American Studies Association, Washington, DC (May 2013).

Discussant, panel on Accountability and Transparency in Latin America, National Endowment for Democracy, Washington, DC. (April, 2013).

"Challenges to Economic Innovation in Cuba: Lessons from Around the World." Conference presentation, University of Havana, Havana, Cuba (April 2013).

CLP_PC_026191

"Cuba's Economic Reforms in Context," guest lecture, Colorado College (April 2013).

Cuba-U.S. Relations: The Potential Role of Latin American Governments in Breaking a 50 Year Impasse, panel presentation, Latin American Regional Council for Economic and Social Research (CRIES), Buenos Aires, Argentina (March 2013).

The Rise of Brazil and Future Challenges, presentation for a panel on Brazil and India as Emerging Powers, National Association of Public Administration, Washington, DC. (March 2013).

 "Brazil the Rising Superpower: Implications for the United States," panel presentation at the Center for National Policy, Washington, DC (December 2012).

"Washington and the Hemispheric Order: Explanations for Continuity Amidst Change," paper (co-authored with Phillip Brenner" presented at a workshop on Hemispheric Affairs, Sao Paulo, Brazil (Nov. 2012), and at a workshop on the future of U.S.-Cuba Relations, Havana, Cuba (Dec. 2012).

"Analytic Approaches to the Study of Elites in Central America," Skype presentation to a workshop on Elites and Organized Crime sponsored by InSight Crime, Medellin, Colombia (November, 2012), and conference presentation at the AU-FLACSO workshop on the Reconfiguration of Elites in Central America, San Jose, Costa Rica (November, 2012).

"Latinos and the 2012 Election Results," contribution to a Nov. 8 panel discussion of the 2012 Election, Center for Congressional and Presidential Studies, American University.

"Rapid Rebound: Economic and Political Determinants of Financial Crisis Impacts in Latin America," paper presented at the University of Southern California workshop on "Rapid Rebound" in the Global South (July 2012).

"The 2012 Election and the Role of the U.S. in the World: Implications for Latin America," Lecture delivered at the Universidad Estadual de Sao Paulo, Sao Paulo, Brazil (July 2012).

"Democracy in the Andes," panel discussant, Latin American Studies Association meeting, San Francisco (May 2012).

Post-Neoliberal Development Strategies in South America, Paper presented at the Latin American Studies Association San Francisco (May 2012).

Discussant, panel on "Latin America's Entangled Inequalities," Latin American Studies Association, San Francisco (May 2012).

Post-Neoliberal Development Strategies in South America, Paper presented at the Midwest Political Science Association, Chicago (April 2012).

Protest, Mobilization and Democracy in Latin America, Session chair, Midwest Political Science Association (April 2012).

The Impact of the Global Financial Crisis in Latin America: Economic and Political Determinants, paper

29

CLP_PC_026192

presented at the International Studies Association, San Diego, CA (April 2012).

Regionalism and Hemispheric Affairs, panel discussant, International Studies Association, San Diego, CA. (April 2012).

North-South Relations in the Western Hemisphere: The Shifting Distribution of Sovereignty in the 21 Century, paper presented at the Mid-Atlantic Council on Latin American Studies, Washington, DC (March 2012).

Striving for Modernity: Development Strategies and Democracy in Post-Neoliberal South America, lecture delivered at the University of Southern California, Los Angeles (November 2011).

"Crafting Latin American Studies Programs for the 21st Century," keynote address at the "Futures Conference" convened by Johns Hopkins University, Baltimore, MD. (November, 2011)

"Latin America's Left Turns," guest lecture in a graduate course on Latin American Politics, American University (Nov. 2011)

"North-South Relations in the Western Hemisphere: The Shifting Distribution of Sovereignty in the 21st Century," (with Sebastian Bitar), paper presented at the annual meeting of ANPOCS, Caxambu, Brazil (October, 2011).

"The Cuban Economy After the Party Congress," presentation to foundation officers at the Synergos Institute, New York City (September, 2011).

"2011 Elections in Latin America: Implications for Democracy and Human Rights," American University (September, 2011).

"The Cuban Economy After the Party Congress," and "Social Policy in Cuba," panel commentator, conference on the contemporary Cuban economy, Oslo, Norway (June 2011).

"Notes on the Impact of the Crisis in Latin America," paper presented at an International Studies Association sponsored workshop, Montreal (March 2011).

"The Impact of Migration on Sending Communities in Latin America," guest lecture in a course on immigration policy, University of Maryland (February, 2011).

"Hemisphere in Flux: Inter-American Relations and Foreign Policies in the Americas," lecture presented to graduate students in the American University Washington Semester Program (February 2011).

"Development and Distribution in Latin America," panel presentation at George Mason University, Fairfax, Virginia. (February 2011).

"U.S. Brazil Policy in the Wake of the Mid-Term Elections," panel presentation at the Centro Argentino de Relaciones Exteriores," Buenos Aires (December, 2010).

"Emerging Approaches to the Study of Development and Democracy in South America," panel presentation at the Universidad Nacional de San Martin, Buenos Aires (December, 2010).

30

CLP_PC_026193

"Pensando el Caribe desde los Estados Unidos: Divergencias entre la academia y la oficialidad," keynote lecture delivered at the conference on the contemporary Caribbean sponsored by the University of Havana, Havana, Cuba. (December, 2010).

"Brazil Rising: Implications for South America," lecture presented in the Table Talk series, Kay Spiritual Center, American University, (September, 2010).

Desarrollo y democracia en Suramérica: Agendas para el siglo XXI," lecture presented at the Universidad del Pacífico (Lima, Peru) and the Universidad Central, Bogota, Colombia (July 2010).

"Enfrentando las desigualdades en América Latina: Políticas y Practicas en la Época pos-neoliberal," lecture presented at the Instituto de Estudios Peruanos, Lima, Peru (June 2010).

"Latin American Studies for the 21st Century," lecture presented at the conference marking the 20th anniversary of the establishment of Latin American and Caribbean Studies at the University of Maryland (April 2010).

"One Year of the Funes Administration in El Salvador," panel presentation at Meridian House, Washington DC (March 2010).

"Brazilian Exceptionalism and Latin America," respondent to a paper by Leslie Bethell, Woodrow Wilson Center for International Scholars, Washington DC (February 2010).

"The State of Democracy in the Andes," presentation at George Washington University, Washington, D.C. (October 2009).

"The Latin American Studies Association and Contemporary Scholarship," lecture presented at Indiana University (March 2009) and the University of Victoria, Victoria, British Columbia. (April 2009).

"The International Context and Development Strategies of the Latin American Left," lecture presented at the University of Washington, Seattle (November 2008,) and at American University (March 2009).

"The International Context and Development Strategies for Latin America" paper presented at meeting of the Canadian Association of Latin American and Caribbean Studies, Vancouver (June 2008).

"Latin America's Pink Tide: Implications for State Capacity and Development Strategies," keynote address delivered at a conference on Latin American Development, University of Aalborg, Denmark (May 2008).

"Latin America's Insecurities: Reflections on Violence and Social Exclusion," discussion paper presented at a University of Calgary workshop on "Arms Violence and Politics in Latin America" (April 2008).

Social Exclusion and Violence in Latin America, lecture delivered at Glenbow Museum, Calgary (April 2008).

Area Studies in American Universities: Perspectives of a Latin Americanist, lecture delivered at Emory

31

CLP_PC_026194

University, Atlanta, GA (October 2007).

"Unprecedented Autonomy: South America's Relations with the United States." Presentation for a panel on "Empire and Dissent," Latin American Studies Association Congress, Montreal (Sept. 2007).

"Latin America's Left Turn," lecture delivered to the World Affairs Council of Juneau, Alaska (May 2007).

Political Economy Research on Latin America: Trends and Characteristics North and South, public lecture delivered at the Universidad Andina Simon Bolivar, Quito, Ecuador (November, 2006).

Human Rights and Accountability in the Southern Cone, workshop presentation, Woodrow Wilson Center for Scholars, Washington (November, 2006).

The Production and Consumption of Social Science: Reflections on the History of the Social Science Research Council, keynote presentation at the 40th Anniversary conference at the Research Policy Institute, University of Lund, Sweden (September, 2006).

Bolivia's Election and the Latin American Left, Panel Discussant, Yale University (February 2006).

The Politics of Inequality, Panel Discussant, Stonybrook University (December, 2005).

Potential and Pitfalls of an Americas Study Programs, Workshop participant, University of Toronto (October, 2005).

Technocrats and Citizens: Policy-making in Colombia during the 1990s, lecture delivered at the University of Toronto (October, 2005).

University-Industry Linkages: European Experiences, panel discussant, World Bank-CMI Workshop on University-Industry Linkages in Europe and North America, Cambridge, U.K. (September 2005).

"Political and Economic Dimensions of Andean Crises," lecture presented at the Yale Latin American Studies Program Summer Institute for Teachers, (July, 2005).

University-Industry Linkages and Innovation in East Asia, panel discussant, World Bank/SSRC Workshop, National University of Singapore (May, 2005).

"Industrial Upgrading in Developing Countries: Social and Environmental Implications," Distinguished Open Lecture Series, University of the West Indies, St. Augustine Campus, Port of Spain, Trinidad and Tobago (February 2005).

"Public Policy Research in Latin America," presentation delivered at a Mellon Foundation workshop on scholarly resources and Latin American Studies (February, 2005).

"Globalization and Labor in Developing Countries," panel discussant, Watson Institute for International Studies. Brown University (December, 2004).

"Central America in the World Economy," keynote lecture, Conference on Structural Transformations in Central America, Guatemala City (November, 2004).

CLP_PC_026195

"Crises in the Andes: Comparative Perspectives," lecture delivered at the Kellogg Institute, Notre Dame University (November, 2004).

"Collective Memory of Repression in the Southern Cone," lecture delivered at Indiana University Bloomington (November, 2004).

"Violence and Human Rights in Latin America," panel presentation, University of Michigan-Ann Arbor (November, 2004).

"Labor and Globalization in Latin America," panel discussant, workshop on Globalization and Labor. Las Vegas (October, 2004).

"Paradoxical Inequalities," with Jeremy Adelman, co-authored paper presented at LASA, Las Vegas (October, 2004).

Institutional and Knowledge-based Underpinnings of Industrial Upgrading in Latin America, lecture at American University in Paris (September, 2004).

"Beyond the Washington Consensus," lecture, Vassar College (April, 2004).

"Persistent Inequalities in Latin America," commentator, Princeton-Oxford workshop (November 2003).

"Re-defining Security in Contemporary Latin America: Development and Citizenship as the Foundation for a Post-neoliberal order," paper presented at the UW-Milwaukee conference on "Rethinking Global Security" (April 2003).

"Economic Dimensions of Contemporary Andean Crises," presentation to the Council on Foreign Relations Commission on "US Andean Policy" (April, 2003).

"Historical and Structural Roots of Crises in the Andes," paper (co-authored with Paul Drake) different versions presented at the Latin American Studies Association meeting (Dallas, March 2003), Columbia University (Feb. 2003), and Princeton University (November 2003); earlier versions presented at workshops at University of North Carolina-Chapel Hill, and FLACSO- Ecuador, Quito (September and October, 2001).

"Global Restructuring, Knowledge and Learning: Preliminary Notes on Upgrading and Development in Cuba and Beyond," paper presented in different versions at a MOST-UNESCO conference, Havana, Cuba (October 2002), at the Higher Institute of Economics, Moscow, Russia (Nov. 2002), and at the Annual Conference on Development and Change, Antigua, Guatemala (July 2003).

"Latin Americanism Sans Political Science?" paper presented at a Conference on the New Latin Americanism and Cultural Studies, University of Manchester, U.K. (June 2002).

"Industrial Upgrading, Equity and Development," lecture delivered at a forum sponsored by the Centro Nacional de Alta Tecnología (CENAT), San Jose, Costa Rica (June 2002).

"North-South or South-South: Challenges for Latin American Area Studies," colloquium/conference

CLP_PC_026196

presentations at SUNY-Binghamton (April, 2002), Dartmouth College (May 2002), Syracuse University (Nov. 2002), Northeast Council of Latin American Studies, Hanover, NH (Oct. 2003).

Lecture: "Democracy and Civil Society in Latin America," Inter-American Democracy Network conference on "Participation, Democracy and Civil Society," Washington DC (Nov., 2001).

Discussant, panel on "Higher Education in Latin America," Latin American Studies Association (LASA) Congress, Washington, DC (September 2001).

Discussant, panel on "Collective Memory of Repression in the Southern Cone and Peru," LASA Congress, Washington, DC (September 2001).

"Industrial Upgrading, Employment and Equity in Costa Rica: an Emerging Cluster in Electronics and Software?" paper (co-authored with Jorge Monge) presented at a workshop organized by the SSRC and the Latin American Faculty of Social Sciences, FLACSO-Costa Rica, San Jose (March 2001).

"Pacted Transitions, Civil Society and the Phenomenon of Desencanto," lecture at the King Juan Carlos Center, New York University (November 2000).

"Changes in Enterprise Structure and Consequences for Latin American Labor," research memorandum presented at a workshop of the SSRC and the Latin American Faculty of Social Sciences, FLACSO-Costa Rica, San Jose (July, 2000).

"Industrial Upgrading and Equity in Central America: an agenda for research on semi-conductors and software industries in Costa Rica," paper (co-authored with Jorge Monge) presented at a workshop organized by Columbia University and the University of Puerto Rico, San Juan (August, 2000).

Panelist, workshop on "The Crisis of the University in the Americas," sponsored by the North American Congress on Latin America (NACLA), Columbia University (April 2000).

"Human Rights Policies and Political Conflict in post-transition Chile," presentation at an SSRC fellows workshop, La Lucila, Argentina (March, 2000).

Panelist, session on "The Future of Regional Studies," Northeast Council on Latin American Studies, Yale University (October, 1999).

"Globalization and Labor in Latin America," seminar presentation at the Fashion Institute of Technology, New York City (September, 1999) and at the Columbia University School of Social Work (Spring 2001).

"Globalizacion y las ciencias sociales," seminar presentation to the doctoral program in Latin American societies, Universidad Arcis, Santiago, Chile (June 1999).

"Flexible Production and Decentralization in the Developing World," SUNY-Stony Brook, Department of Sociology colloquium (May 1999).

Discussant, panel on "Economic Reform and Social Welfare Policy," LASA Congress, Chicago

34

(September 1998).

Panelist, Special Presidential Session, on "The Future of Regional Studies," LASA Congress, Chicago (September 1998).

"Legacies of Authoritarianism and the Travails of Latin American Democracies," conference presentation, Di Tella and Columbia University workshop, Buenos Aires (August 1998).

"Regional Studies and the Disciplines," seminar presentation; Department of Political Science and International Studies Institute, University of California-Berkeley (April 1998).

Panel discussant, conference on "Violence in Contemporary Latin America," New School for Social Research (April 1998).

"Trends in International and Area Studies," conference presentation, American Association of Colleges and Universities annual meeting, Washington, DC (January, 1998).

"Democracy and its Discontents in Latin America," seminar presentation, Princeton University (December, 1997).

Panel discussant, conference on Political Effects of Unemployment in Southern Europe, Princeton University (November, 1997).

"Latin American Studies and International Studies in Transition," seminar presentation, State University of New York at Stony Brook (October 1997).

"Economic Governance and Flexible Production in East Asia and Latin America: Challenges of Cross-regional Comparisons," seminar presentation, Federal University of Rio de Janeiro (September, 1997).

Discussant, panel on "Spatial Dimensions of Economic Restructuring and Labor Organization," American Political Science Association Meeting (APSA), Washington, DC (Aug. 1997).

"Political Science and the Debate over the Future of Regional Studies," roundtable presentation, APSA, Washington, DC (August 1997).

"Democracy and its Discontents: Obstacles to the Extension of Political Citizenship in Contemporary Latin America," paper presented at the University of Wisconsin-Milwaukee conference on "Democracy and its Limits" (May, 1997).

Constructing Democracy: Human Rights, Citizenship and Society in Latin America (with Elizabeth Jelin), seminar presentation, Columbia University (October, 1996).

Flexible Production and Political Decentralization in the Developing World (with Richard F. Doner), paper presented at the Annual Meeting of APSA, San Francisco (Sept. 1996).

Democratic Transition and Social Democracy in Spain: Reflections on the Construction of Ideal Types, presentation at a seminar sponsored by the European Studies Program and the Department of Political Science, Princeton University (May, 1996).

35

CLP_PC_026198

International Factors and Processes of Democratization, Presentation at a workshop sponsored by the Program on Peace and Cooperation, New School For Social Research (December, 1995).

Economic Governance and Flexible Production in the Developing World, Presentation at the Annual Meeting of the Association of Post-Graduate Programs in the Social Sciences, Caxambu, Brazil (Nov. 1994).

Economic Liberalization, Popular Representation and the Future of Social Democracy: Notes on Experiences in Spain and Chile. Paper presented at an SSRC-sponsored conference, Warsaw, Poland (September, 1994).

Social Democracy and Economic Liberalization, presentation at a roundtable at the Nucleo de Estudos Politicos, Universidade de Sao Paulo, Brazil (June 1994).

Globalization, Society and Alternative Trajectories of Development, Presentation at the Annual Conference of Learned Societies of Canada, Calgary (June 1994).

Latin Americanism' and the Social Sciences, keynote address presented at a conference on Latin Americanism and Cultural Politics. Duke University (March, 1994).

The Triple Crisis of Democracy in Contemporary Spain, roundtable discussion, Institute for West European Studies, Columbia University (March 1994).

State Reform and Social Welfare in Latin America, discussant, Latin American Studies Association, Atlanta (March 1994).

Economic Liberalization and Popular Representation in Contemporary Spain and Chile, paper presented at the XVIIIth Meeting of LASA, Atlanta (March 1994) and at a conference on Inequality and New Forms of Popular Sector Representation, Columbia University (March 1994).

Socialism, Democracy and the Market in Contemporary Chile: Implications for Political Theory, discussion paper presented at the Annual Meeting of the Midwest Modern Language Association, Minneapolis (November, 1993).

Discussant, panel on Democratic Consolidation in Latin America and Southern Europe. Northeast Political Science Association, Newark (November, 1993).

Reconfiguring State and Society: Social and Political Consequences of Neo-Liberalism in Latin America, discussion paper presented at a conference on Political and Economic Restructuring, University of California-Berkeley (April, 1993).

Discussant, panel on Western Conditionality and Reform in Latin America, conference on the International Dimensions of Liberalization and Democratization, Overseas Development Council, Washington, D.C. (April, 1993).

Workers and the State in Twentieth Century Spain: Notes on the Colliers' Critical Junctures Model, paper presented at LASA (LASA). Los Angeles (September 1992).

CLP_PC_026199

Discussant, panel on Economic Reform and Democracy in Latin America and Southern Europe, LASA.
      Los Angeles (September 1992).

Discussant, panel on The End of the Cold War and Third World Development, conference on The New
      International Context of Development, UW-Madison (May, 1992).

The Spanish Model and the Future of Eastern Europe. Discussion piece presented at the Annual Meeting
      of the American Assoc. of Slavic Studies, Miami (Nov. 1991).

Notes on the Crisis of Communism in Spain:  Is There Any Alternative (on the) Left? paper presented at
      the Annual Meeting of the APSA, Washington (September, 1991).

Myth and Reality: Is Spanish Policy in Latin America Really Different?, paper presented at the XVI
      Meeting of LASA, Washington (April 1991).


## MEDIA INTERVENTIONS (2011--)

NBC interview,El Salvador June 17 2019
TeleSur, 20 minute interview on prospects for an AMLO presidency in Mexico, Dec. 10, 2018
NBC Universal, interview on "the migrant caravan," Nov.26, 2018
Arizona Republic, cited in article on immigrant family separation, July 10, 2018
CQ Researcher, interviewed for an article on anti-impunity efforts in Central America, July 6, 2018
Univision, interview regarding Central American immigrant youth, May 17, 2018
US News and World Report, interview about political protests in Nicaragua, May 8, 2018
Univision, interview regarding qualifications of Colombian presidential candidate Duque, May 8, 2018
La Vanguardia, interview with Barcelona daily on trends in Latin American democracy, April 20, 2018
Jamaican national radio, panel discussion about Cuban political leadership transition, April 18, 2018
Carta Capital, Brazilian bi-weekly magazine, interview on Cuban political leadership, April 14, 2018
BBC Mundo, Impact of US corporate tax cuts on Latin American economies, Dec. 20, 2017
Peruvian National Television, interview on Trump administration and democracy (May 2, 2017)
Fox Business, e-mail interview regarding Trump administration claims about border control and illicit drug
      traffic, April 27, 2017
Washington Post, Interview with video documentary journalists about topics and approaches to investigative
      reporting in Honduras, April 13, 2017
Harpers, Interview with editor re Latin America-related items for "Harpers Index" (March 8, 2017)
El Mercurio, Interview with leading daily in Chile regarding impact of Trump administration immigration
      orders, February 21, 2017
Christian Science Monitor, Interview on U.S. sanctions against Venezuelan Vice President, February 14,
      2017
El Mercurio, Interview with leading daily in Chile regarding courts blocking Trump administration
      immigration decrees, February 4, 2017
Telesur, TV Interview on implications of the Trump administration with Latin America's leading television
      journalist, January 19, 2017
Associated Press, Interview for story on impact of Fidel Castro's death on US-Cuban relations, November 29,
      2016
Thomson Reuters, Interview on implications of Obama administration designees to attend Fidel Castro's

CLP_PC_026200

funeral, November 29, 2016

Daily signal, Interviewed and quoted for story on impact of Fidel Castro's death on US-Cuban relations, November 28, 2016

CNN en espanol, Panelist for discussion of impact of Fidel Castro's death on US-Cuban relations, November 28, 2016

Telesur, Interview on Latinos and the US election after the 3rd Presidential Debate, October 20, 2016

Fox News Latino, Interview on Ecuadoran government cutting internet connection of Julian Assange, October 18, 2016

Telesur, 20 min. on-camera talk show interview on US elections and implications for Latin America September 7, 2016

Agence France Presse, interview re Latin American perception of US presidential campaign, Sept. 7, 2016

La Vanguardia, interview re Latin American perception of US presidential campaign, Sept. 7, 2016

Associated Press, Interview regarding Latinos, the 2016 election, the Trump candidacy and the Trump visit to Mexico, September 1, 2016

De Standaard, Interview on President Obama's trip to Cuba and Argentina, March 21, 2016

NTN-24 TV Interview on Latino impact on Super Tuesday primary elections, Feb. 29, 2016

Latin Pulse, interview on contemporary Latin America, aired on multiple programs during January, 2016

Telesur TV, on camera interview re meeting of Presidents Obama and Castro at the UN, Sept. 29, 2015

TV Azteca, on camera interview on opening of US and Cuban embassies, Aug. 17, 2015

CBS News, on camera interview on opening of US and Cuban embassies, Aug. 14, 2015

Christian Science Monitor, interview on Latinos and the Republican Party, August 5, 2015

Fox News Latino, interview on U.S.-Venezuela relations, August 3, 2015

Deutsch Welle, interview on opening of embassies in Havana and Washington, July 14, 2015

National Press Club, Release of AU Report on Media Coverage in Venezuela, May 19, 2015.

BC1 TV. British Columbia broadcasting 4 minute interview on US policies toward Cuba, April 16, 2015.

New York Times. Interview and quoted in articles re: US-Latin America policies, April 11, 2015.

Southern California Public Broadcasting, Radio, interview on the Summit of the Americas, April 9, 2015.

Bloomberg news, Interview about the Summit of the Americas (article subsequently appeared in Washington Post and other outlets, April 8, 2015.

Hearst, TV. Interview about the Summit of the Americas; aired on ABC television channels, April 10.

Bloomberg News, interview regarding the upcoming Summit of the Americas, March 30, 2015.

Semana, Magazine. interview with leading Colombian weekly magazine concerning US -Cuba relations and the Summit of the Americas, March 30, 2015.

TeleSur, English, TV. on camera interview regarding the third round of talks between US and Cuban officials pursuing re-established diplomatic relations, March 16, 2015.

Voice of America in Spanish, TV. On camera interview on House vote to reverse Executive actions on immigration policy, January 14, 2015.

Op-ed (with Jayesh Rathod) "The Case for Protected Status for Central American Migrants," in *Roll Call* Dec. 24, 2014.

Interviews related to the Dec. 18, 2014 announcement of normalization of US-Cuba Relations (selected list) Caijing Magazine, Beijing (Dec. 21); Newsmax, (Dec. 18); Isto E Magazine, Sao Paulo, Brazil. (Dec. 18); BBC News (Dec 17, 2014); New York Times, (Dec. 17, 18 and 19, 2014); National Public Radio, Chicago. (Dec.17); Latin Pulse podcast (Dec. 26, aired Jan. 2, 2015).

Interview and published excerpts, La Tercera newspaper (Santiago Chile) on Detroit's Future After Bankruptcy (published Dec. 11, 2014 as "el futuro de Detroit esta en duda").

Interview, WMAL radio, re: Obama administration executive action on immigration policy Nov. 13, 2014.

Interview, Corporation for Public Broadcasting "Great Decisions", for special magazine show on

CLP_PC_026201

contemporary Brazil, to be aired in January 2015. September 9, 2014.

Interview, Notimex, July 27 story on unaccompanied Central American migrants. July 25, 2014.

Interview, Christian Science Monitor, response to President Obama meeting with three Central American Presidents to discuss migration. July, 24, 2014. Quotes published July 25.

Interview, LA Times, response to President Obama meeting with three Central American Presidents to discuss migration. July, 24, 2014.

Interview and quoted, Bloomberg News, coverage of unaccompanied Central American minors arriving in the US. July, 16, 2014.

Interview, National Review, interview regarding how Hondurans in the US are responding to a growing influx of unaccompanied minors from their country. July 15, 2014.

Interview, El Mundo, lengthy newspaper interview for major daily in San Salvador, El Salvador. April 15, 2014.

Quoted, Diario Latino (San Salvador), story on AU research program and launch of a new think tank in El Salvador. April 10, 2014.

Quoted. La Prensa Grafica, story on AU research program and launch of a new think tank in El Salvador. April 9, 2014.

Interview, Main TV station in El Salvador, one-hour talk/interview on elites and power in El Salvador

Interview, C-SPAN live-streamed coverage of CLALS panels on Republican Party's Latino Problem. March 7, 2014.

Quoted, To Vima newspaper, Athens (Greece), U.S.-Cuba Relations, December 12, 2013.

Interview, BBC Brazil, Venezuelan regional election results, December 12, 2013.

Interview, El Mercurio (Chile), interview on Latino vote in the U.S. election. October 18, 2012.

Interview, Al Jazeera-English, 10-minute television segment on the 40th anniversary of the military coup in Chile, its origins, and similarities with military intervention in Egyptian politics. Sept. 13, 2013.

Interviewed, Radio France International, on diplomatic consequences of revelations that the US National Security Agency had tapped the e-mails of Brazilian and Mexican presidents Sept 3, 2013.

Quoted, BBC in print, on Obama at summit of Central American Presidents, May 9, 2013.

Interview, La Vanguardia newspaper, Barcelona, on contemporary Latin American affairs, April 22, 2013.

Quoted, BBC in print, story on Latin American governments' responses to contested election in Venezuela, April 18, 2013.

Interview, Associated Press, regarding Presidential election in Venezuela, April 12, 2013.

Interview, Canadian television (CTV), on Chavez funeral and political developments in Venezuela, March 9, 2013.

Quoted, Christian Science Monitor, in article on Hugo Chavez funeral and imagery, March 8, 2013.

Quoted, Le Soleil (Quebec) Newspaper, in article about Venezuelan politics after Chavez, March 6, 2013.

Interview, Latin Pulse, Radio, on Venezuela after the death of Hugo Chavez, March 8, 2013.

Interview, BBC World Radio, live report on the death of Hugo Chavez, March 6, 2013.

Quoted, Fox News Latino, in story on the death of Hugo Chavez, March 5, 2013.

Quoted, ABC News/Univision, in article about Venezuelan subsidies for heating bills for the poor in the U.S., March 3, 2013.

Interview, Univision/ABC TV, for story on Venezuela February 28, 2013.

Interview, El Universal (Caracas, Venezuela), for story on U.S. budget sequestration, Feb. 25, 2013.

Quoted, El Faro, on-line newspaper (El Salvador) in story on US politics and immigration reform (Feb. 2013).

Quoted, BBC Latino, in article on Republican response to state of the union and implications for Latino vote, Feb. 13, 2013.

Quoted, BBC Latino, in article on State of the Union address and implications for Latinos, Feb. 12, 2013.

CLP_PC_026202

Quoted, BBC Mundo (BBC Spanish), quotes in Wm. Marquez on the 2nd U.S. presidential debate. October 17, 2012.

Interview, Canadian Television, 5 minute interview on Venezuela's presidential election results. October 8, 2012.

Interview, Correiro Braziliense (Brasilia, Brazil), with reporter covering the October 7 Presidential election in Venezuela. October 7, 2012.

Quoted, BBC Mundo (on Latinos and the US election), August 29, 2012

Interview, BBC World (Spanish language version), concerning Latino voter satisfaction with Obama administration and anticipate role in 2012 election. July 30, 2012.

Interview, Television News Show (El Salvador, for story on Washington's response to El Salvador's constitutional crisis. Broadcast live. July 18, 2012.

Interview, national television channel (El Salvador). One hour panelist on "Central American elites and political change," July 16, 2012.

Interview, LINK TV, extended segment on the presidential impeachment in Paraguay (July 5, 2012).

Panelist on an episode of "Inside Story" (Al-Jazeera English) devoted to Mexico's election (July 2, 2012).

Letter to the editor, New York Times, (on the impact of deportations) June 29, 2012.

_____, Security implications of July 2012 Mexican elections, June 26, 2012.

Interview on Mexico's election, CCTV, June 25, 2012.

Interview, Al-Jazeera English, on ramification of presidential impeachment in Paraguay, June 22, 2012.

Interview, Univision television, on Obama administration deportation policies, June 15, 2012.

Interview, 90 minute panel on Latin American affairs, China Radio International (Beijing), April 22, 2012.

Quoted, Miami Herald and Christian Science Monitor (on the Summit of the Americas), April 15, 2012.

Quoted, Wall Street Journal (on the Summit of the Americas), April 12, 2012.

Interview, LINK TV, 2 ten-minute segments, on contemporary Cuba and on 2011 elections in Latin America. (March 2012).

Interview with reporter from "Embassy," a Canadian foreign policy weekly, for a story on Canada's Americas Strategy and its implications for Canada-Latin America relations, July 22, 2011.

Interview, "Detrás de la noticias" RTV, 15 minute interview on International Affairs in the Western hemisphere." July 22, 2011.

Interview, The Riz Kan Show, Al Jazeera-English. Half hour live television segment on "Cuba's Evolution." April 20, 2011.

CLP_PC_026203

<u>Declaration of Claudia Paz y Paz Bailey</u>

I, Claudia Paz y Paz Bailey, make the following declaration based on my personal knowledge and declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge.

<u>Background</u>

1. I was born in 1966 in Guatemala City, Guatemala. In 1992, I earned my law degree from Rafael Landivar University in Guatemala and in 2006, I earned my doctorate in Human Rights and Criminal Law from Salamanca University in Spain. In 2015, I was awarded an honorary doctorate in law by Georgetown University in the United States.

2. I gained the majority of my professional experience specializing in criminal law and justice issues in Guatemala. I served as a judge in the department of Sacatepequez from 1991 to 1992. From 1993 to 1995 I worked with the United Nations High Commissioner for Refugees (UNHCR) as the director of legal services where I was responsible for processing requests for refugee status given that Guatemala did not have a national asylum system at that time. In 1994, I founded the Institute for Comparative Criminal Studies of Guatemala, to promote restorative justice and protect human rights during criminal proceedings. In parallel, I worked with the UN Mission on Historical Clarification. In 2002, I assumed the direction of the Institute for Comparative Criminal Studies and served as professor in criminal law at San Carlos University. In 2008, I accepted a position to direct the master's program in criminal procedure at Rafael Landivar University, a role I held until 2010. From December 2010 until May 2014, I served as Attorney General of Guatemala.

3. As Attorney General of Guatemala, I worked against corruption in my country. My office brought charges and collected evidence against numerous high ranking government officials, including former President Effrain Rios Montt, as well as the structures that enabled the taking of public funds for personal benefit. We also rigorously prosecuted leaders of organized criminal groups. Additionally, I reorganized the Office of the Attorney General, creating a special division dedicated to human trafficking in order to more efficiently combat those crimes. In 2013, I was nominated for the Nobel Peace Prize based on my leadership as Attorney General.

4. In recent years, I have expanded my professional activities in the international sphere. Beginning in 2014, I have been part of the Group of Independent Experts tasked by the Inter-American Commission on Human Rights with investigating the disappearance of 43 students in Ayotzinapa, Mexico, and in 2018, I was part of the Group of International Experts assigned to investigate violence in Nicaragua in the wake of mass protests. I also served as a senior fellow at the Washington Office on Latin America from 2016 to 2017. From 2017 to 2019, I was the Secretary for Multidimensional Security at the Organization of American States. As of 2019, I am the Director of the

CLP_PC_026234

Mesoamerica Program at the Center for Justice and International Law, a regional organization dedicated to defending human rights, in San Jose, Costa Rica.

Purpose of the Declaration

5. The present declaration reflects my professional opinion of Guatemala's asylum system with respect to the recent agreement signed between the United States and my country which, as I understand, has resulted in the transfer of persons seeking asylum in the United States to Guatemala so that they might seek that international protection in Guatemala. This declaration is based on my direct knowledge of the Guatemalan context and particularly the functioning of Guatemalan government institutions, including the asylum system, as well as my familiarity with corruption and other systemic issues that plague the rule of law in Guatemala. Additionally, in the preparation of this declaration, I have reviewed the laws and regulations relevant to asylum, as well as pertinent publications on this subject.

Guatemalan Asylum System

6. Asylum in Guatemala has been historically neglected by the government. In 1983 Guatemala ratified the 1951 Refugee Convention and its 1967 Protocol, but did not establish any mechanisms to give effect to those international obligations. Although the right to seek asylum is guaranteed by the Constitution, which dates to 1985 and was amended in 1993, there was no effort to bring these issues into national law until 2001. Although the asylum system was functional for a number of years, it was effectively suspended after the adoption of the Migration Code in 2016, and new implementing regulations were not adopted until 2019. Consequently, between October 2016 and March 2019, there was no regulatory framework to apply for asylum in Guatemala and the processing of all claims under the new framework was put on hold, leading to temporary suspensions of asylum processing[1]. The fact that Guatemala allowed many years to pass before creating a national asylum system and that it very recently allowed the system to be temporarily suspended for multiple years reflects the lack of importance that government agencies and officials place on this issue. This confirms that the international obligation to maintain an effective system for claiming refugee status has not been and currently is not a priority for the Guatemalan government.

7. Guatemala's asylum system is also immature and inexperienced. The country has received very few requests for asylum throughout its history and consequently has very little experience evaluating those requests. UNHCR reports that from 2002 through 2017 a total of 868 requests had been

---

[1] Procurador de Derechos Humanos de Guatemala. *Informe Anual Circunstanciado de Actividades y de la Situación de los Derechos Humanos* (Annual Report on Activities and the Human Rights Situation), p. 273, 2018.

CLP_PC_026235

presented, and that more than half of those requests were presented between 2014 to 2017.[2] This means that the Guatemalan agencies in charge of reviewing these requests have had very little time to develop their criteria for interpreting and applying the refugee definition in line with international law and very limited exposure to the factual scenarios presented in asylum cases. This translates to lessened capacity to resolve asylum requests which are often fact-intensive exercises that require a weighing of testimony and any other evidence, and the application of complex legal standards. Additionally, the fact that new institutions and laws came into effect in 2019 with the recent regulatory reform means that those officials responsible for implementing the law have had a very limited amount of experience with these new frameworks and very little technical expertise.

8. The newness of the asylum system in Guatemala also means that there is a lack of jurisprudence, administrative precedent or other specific guidelines to standardize the interpretation of asylum laws. It is very clear from the experience of the US and other developed asylum systems in the region that the interpretation of the refugee definition is a very complex legal task that can produce widely differing results. Issues such as credibility, the severity of harm that amounts of persecution and the definition of particular social groups are fundamental to asylum eligibility and must be standardized across an asylum system in order to guarantee that similar cases reach similar results. However, beyond the regulations that give effect to the asylum system, there are no other sources of domestic law or guidance on how to interpret these issues. This can produce drastically disparate results on asylum applications.

9. In addition to these institutional deficiencies, there are important barriers in terms of access to the procedure. For example, the 2019 regulation establishes that applications for asylum can be presented at a migration checkpoint, such as those in border areas. Recently, however, with the crossing of migrant caravans through Guatemala, it became clear that there was no identification mechanism being employed by the Guatemalan authorities in order to screen for individuals in need of international protection. Instead, at Guatemala's southern border, uniformed U.S. immigration agents have assisted Guatemalan officials with breaking up caravan groups and facilitating their expulsion from the country, without ever providing information or orientation about the possibility of applying for asylum in Guatemala.[3] Within Guatemala, there is little to no awareness of the asylum procedures amongst government agencies and very little technical capacity even within the Guatemalan Migration Institute, making it effectively impossible that these

---

[2] UNHCR and the Government of Guatemala. *Sistema Nacional de Protección de Refugiados en Guatemala: Segunda edición* (National System for Refugee Protection in Guatemala: Second Edition), p. 2, 2018.

[3] *See* The Guardian. 'US agents aid in Guatemalan crackdown on hundreds of migrants headed north', January 16, 2020; Reuters. 'U.S. agents at Guatemala checkpoints see holes in border security', November 1, 2019.

CLP_PC_026236

agencies can orient migrants in the country about the possibility of seeking asylum. This is compounded by the fact that the transfer of functions and budgetary resources from the prior Migration Directorate to its successor Migration Institute has been slow and incomplete. At the end of 2019, the Guatemalan Migration Institute still did not have its own budget[4]. I understand that Guatemalan government agents have dissuaded individuals who request information about asylum from applying in my country and that, in some cases, the screening of asylum seekers is conducted by civil society organizations without any participation by the government. Additionally, as I will discuss below, migrants are extremely vulnerable to violence, extortion and other abuses in Guatemala. This context is inherently coercive and impedes that asylum seekers in Guatemala can freely decide whether or not to solicit international protection in that country. Taken together, the lack of access to the procedure and these conditions effectively prevent voluntary and informed decisions as to the presentation of an asylum application.

10. There are also structural deficiencies in the asylum law and regulations which undermine due process rights. After an asylum application has been received by the Guatemalan Migration Institute, the National Commission for Refugees (CONARE, by its Spanish acronym) conducts an interview and evaluates the application, making a recommendation to the National Migration Authority, which ultimately issues the eligibility decision. Under this framework, the decision maker has no interaction with the asylum seeker which seriously undermines the due process right to be heard. Moreover, the same National Migrant Authority is responsible for reviewing appeals from adverse eligibility determinations made in the first instance. The procedures do not contemplate the possibility of independent or impartial review, as the same agency that decided to deny the request is tasked with reviewing its own decision. While theoretically an asylum seeker could have recourse to the constitutional remedy of an *amparo*, similar to an injunction, in order to challenge an adverse refugee status decision, this is a general remedy for administrative actions that has hardly been applied to immigration-related issues. Consequently, it is unclear what criteria the courts would apply to decide whether to issue an *amparo* and if such decision would suspend a deportation. It is, however, highly likely that only highly sophisticated asylum seekers or those with access to counsel, would be able to access the *amparo* remedy.

11. CONARE has little to no independence from the National Migration Authority. Prior to the 2016 Migration Code and the subsequent regulatory reforms, CONARE was the entity responsible for deciding requests for the recognition of refugee status. Within its non-voting members, UNHCR could participate

---

[4] Procurador de los Derechos Humanos de Guatemala. *Informe Anual Circunstanciado de Actividades y de la Situación de los Derechos Humanos* (Annual Report on Activities and the Human Rights Situation), p. 305, 2019.

CLP_PC_026237

to voice its position with respect to asylum applications. Following the change in law, however, CONARE now only makes recommendations to the newly formed National Migration Authority which makes a final decision. However, the National Migration Authority now includes the Vice President of Guatemala amongst its members and excludes UNHCR from systematically voicing its observations in individual cases. This suggests that decision-making in asylum cases has become more politicized.

12. The Guatemalan asylum system is also inefficient and has generated a tremendous backlog of cases pending resolution. According to the Office of the Human Rights Ombudsman for Guatemala (*Procurador de Derechos Humanos*, in Spanish, or PDH) at the end of 2019 there were 632 asylum applications pending resolution[5]. When considered against the figure of 494 new asylum applications presented in 2019, it becomes clear that the system is not capable of attending to the relatively low number of applications that it receives annually, even in the absence of the recent agreement with the United States. This inefficiency is due in part to the fact that the CONARE does not operate on a full-time basis, but instead utilizes at least two sessions each month to carry out its responsibilities[6].

13. The backlog of cases before the Guatemalan asylum system contributes to prolonged processing times. Although the 2016 Migration Code (Article 189) establishes that the processing of applications should not take more than 90 days, the reality is different. Recent information from reported by the PDH indicate that more than 172 asylum seekers have been awaiting a decision on their applications since 2017[7]. Additionally, civil society organizations have denounced the failure to decide cases of LGBTI asylum seekers since 2018[8].

14. Additionally, neither the Migration Code or the Regulation guarantees the right to legal assistance in refugee status determination procedures, despite the fact such assistance is required under international law as a critical component of due process rights. In practice, the government does not provide for free legal representation in asylum processes. Unlike in the United States or in other countries with developed asylum systems, there is a complete lack of specialized civil society organizations in Guatemala with the technical and human capacity to fill this uncovered need. The absence of specialized organizations is consistent with the fact that there have historically been relatively few cases presented to the Guatemalan asylum system.

---

[5] Procurador de los Derechos Humanos de Guatemala. *Defensoría de las Personas Migrantes* (Office for the Defense of Migrants). Presentation – 2019.
[6] Government of the Republic of Guatemala. *Acuerdo de Autoridad Migratoria Nacional* (Agreement of National Migratory Authority)*, No. 02-2019.* Art. 16, 2019.
[7] Procurador de los Derechos Humanos de Guatemala. *Informe Anual Circunstanciado de Actividades y de la Situación de los Derechos Humanos* (Annual Report on Activities and the Human Rights Situation), p. 332, 2019.
[8] *Id.*

CLP_PC_026238

15. The administrative detention of asylum seekers is also a concern, given the lack of screening measures and the credible reports of the use of immigration detention in the country. A 2013 report from the International Detention Coalition (IDC) demonstrates that immigration authorities in Guatemala systematically apply detention measures, including in some cases, to asylum seekers.[9] This reflects the lack of individualized determination procedures as required by international law and suggests that individuals in need of international protection might suffer arbitrary detention in Guatemala.

16. Additionally, official statistics from 2019 reflect that in that year, a total of 26 applications for asylum were approved, suggesting a low asylum grant rate[10]. This raises concerns as to the quality of the interpretation of the refugee definition by the Guatemalan asylum institutions, and highlights the effects of the lack of official guidance as well as of the absence of organizations that can provide legal representation.

17. Moreover, despite having been urged by the Inter-American Commission on Human Rights to bring the Migration Code in line with international law, the Guatemalan law retains a provision (Article 50) which establishes sanctions for irregular entry into Guatemala, including return to country of origin. This provision, however, makes no exception for refugees and suggests the possibility of *refoulement* in violation of international law.

18. As a structural matter, the failure of the Guatemalan state to publish information on the functioning of its asylum system and readily available statistics undermines the transparency of the process as well as the opportunity to refine refugee processing in the country. There is a total lack of quantitative data concerning the number of applications denied and the corresponding processing times as qualitative data regarding the basis for denying applications for refugee status as well as of the criteria applied when those denials are reviewed. Similarly, there is a lack of clear and accessible information about how to access asylum, particular at border offices.[11] This has rendered the asylum system invisible in public debates and discourse and has exacerbated other structural problems around the asylum system.

Vulnerability of asylum seekers in Guatemala

19. Other conditions in Guatemala make it difficult for asylum seekers to access protection in the country, including the inability of the Guatemalan state to provide humanitarian assistance to cover basic needs. Guatemala is plagued

---

[9] International Detention Coalition. *¿Qué esperamos del futuro? Detención migratoria y alternativas a la detención en las Américas* (What do we hope for the future? Immigration Detention and Alternatives to Detention in the Americas), 2017.

[10] Government of the Republic of Guatemala. *Informe Anual (Cuantitativo) – Refugio,* (Annual report (Quantitative) – Asylum. 2019.

[11] Procurador de los Derechos Humanos de Guatemala. *Informe Anual Circunstanciado de Actividades y de la Situación de los Derechos Humanos* (Annual Report on Activities and the Human Rights Situation), p. 332-33, 2019.

CLP_PC_026239

by severe social exclusion, poverty, malnutrition, unemployment, social conflict and public insecurity, factors which prevent Guatemala from providing for its own nationals. One reflection of this reality are the increased statistics of Guatemalan's who flee or migrate to other countries. According to UNHCR statistics, more than 34,000 Guatemalans presented asylum applications in other countries in 2018[12]. The problem is further exacerbated by the obligation to attend to the needs of Guatemalan nationals returned to the country through deportation or similar procedures in the United States and in Mexico. From these two countries, Guatemala received more than 100,000 of its own nationals returned during the year, thus creating significant demand for the limited resources of Guatemala's reintegration programs.

20. The context of perpetual instability also prevents the possibility of genuine international protection for asylum seekers in Guatemala, particularly for those from Honduras and El Salvador. Guatemala suffers from high rates of violence and extortion, due in large part to the presence of narcotrafficking organizations, particularly in border areas, as well as gangs that control urban neighborhoods. In this context, gender-based violence is particularly rampant, given that many of these groups use this form of violence in order to demonstrate control or power. Combined with high levels of corruption and structural impunity, it is practically impossible for ordinary Guatemalans to avoid the effects of these conditions. Asylum seekers that lack social networks and stable housing are even more vulnerable to these conditions, given the complete lack of measures taken by the Guatemalan state to guarantee their security.

21. Given that Guatemala has largely been a country of origin and of transit for forced migration flows, there is a total absence of a host country culture. The structural problems facing the Guatemalan economy have engendered precarious conditions throughout the country, making it likely that the increased presence of asylum seekers in the country will provoke xenophobic reactions from already excluded sectors of the population. Examples of this were seen in Guatemala City and in the northern border town of Tecun Uman following the government's response to migrant caravan's passing through the country. In January 2019, for example, a civilian group in Tecun Uman launched a campaign to expel the migrants from the municipality, throwing rocks and forcing vulnerable Central Americans across the border into Mexico. Beyond the populace, the government lacks programs that effectively promote the integration of asylum seekers and refugees into their communities.

22. Overall, Guatemala has addressed migration issues, including asylum, from a security and militarization perspective, and has sought to control and contain migrants and persons in need of international protection. Complaints

---

[12] UNHCR. Global Trends – Forced Displacement in 2018, p. 45.

CLP_PC_026240

from asylum seekers of government agents dissuading them from applying for asylum in Guatemala reflects that any training that these officers receive is insufficient. There continues to be a widespread lack of awareness of international protection issues and obligations, which in practice translates into a series of formal and informal obstacles to accessing international protection in the country.

<u>Structural Problems within Guatemala</u>

23. A number of structural issues should be borne in mind when considering how the Guatemalan asylum system operates. A context of weakened government institutions plagued by corruption and constant threats to judicial independence in the country create a situation in which government officials are rarely held accountable for abuses of power or for failing to fulfill their obligations.   The pervasive corruption and impunity which has been documented by the International Commission against Impunity in Guatemala (CICIG, by its Spanish acronym), a joint initiative of the United Nations and the Guatemalan government established in 2006. Together with Guatemalan prosecutors, the CICIG initiated investigations leading to the indictment of over 660 individuals and 400 convictions, uncovering 70 secret criminal structures linked to politicians, business leaders and members of the military. Additionally, the CICIG documented the presence of illicit networks in the Guatemalan congress, and had taken steps towards overcoming executive impunity in order to investigate Guatemalan President Jimmy Morales on charges of illicit campaign financing prior to being shut down on September 3, 2019 following the unilateral decision of Guatemalan government. Since then, many former CICIG members and those who collaborated with the mechanism have suffered harassment and threats.[13]

24. The deteriorated state of the rule of law in Guatemala is further evidenced by the systemic weaknesses in the official protection agencies. In 2018, the national police force (*Policía Nacional Civil*, or PNC) was seriously debilitated when the executive unilaterally demoted more than 100 members, including directors, subdirectors and officers, some with more than 20 years of experience, without offering any justification. Additionally, Guatemalan human rights organizations have decried that former members of the military have been integrated into the civilian PNC, in direct contradiction of the Guatemalan Peace Agreement and the Plan of the Alliance for Prosperity. The weakness of the civil protection forces is further evidenced by the September 5, 2019 declaration of a state of emergency for 22 municipalities, thereby suspending constitutional guarantees and empowering Guatemala's military forces to carry out civil police functions. A similar state of exception was declared by Guatemala's current president in January and February

---

[13] *See* AP News. Face of Guatemala's anti-corruption fight faces threats. November 25, 2019.

CLP_PC_026241

2020. The lack of a functioning civilian police force in Guatemala leaves asylum seekers with nowhere to turn when faced with violence.

25. The weakening of the rule of law in Guatemala is also evident in the blatant violations of the separation of powers. Judicial independence has been threatened by unfounded criminal investigations launched against at least 22 high profile judges, while those justices of the Guatemalan Constitutional Court that have ruled against the current administration have been publicly condemned and subjected to criminal proceedings as a form of harassment. As proof of this situation, 5 judges of the Constitutional Court and four judges of the high-risk tribunals, dedicated to hearing cases of extreme sensitivity, have been granted precautionary measures by the Inter-American Court on Human Rights. This context makes it extremely difficult for executive excesses to be held in check or for judicial decisions to be independently reviewed.

26. This crisis of judicial independence was exacerbated by the signing of the asylum agreement between Guatemala and the United States. When the Guatemalan government began to negotiate with the United States, a number of different lawsuits were filed in order to prevent the signing of a Safe Third Country agreement. In July 2019, the Constitutional Court issued an *amparo provisional*, similar to a temporary restraining order, preventing the Guatemalan executive from agreeing to the designation of Guatemala as a Safe Third country without the authorization of Congress. In its decision, the Constitutional Court explicitly affirmed that it was the exclusive competence of the legislative branch to adopt such an agreement. This judgment gave rise to accusations by the President and his party members in Congress that Constitutional Court judges were destabilizing the country, blaming them for any suffering that the Guatemalan people would endure as a result of the negotiations with the United States. Additionally, the Guatemalan executive disregarded the *amparo* and on July 26, 2019, signed the agreement with the United States, stripping the Constitutional Court of subject matter jurisdiction to consider the preventative remedy that the plaintiffs had requested. Nonetheless, in a press release on September 10, 2019, the Constitutional Court publicly reiterated the executive's obligation to exhaust the legal requirements for the adoption of the agreement to be deemed valid, referencing the articles of the Guatemalan constitution which refer to the functions of the legislature. The fact that the Guatemalan government has begun implementing this agreement without having ensured its ratification by Congress is further evidence of the political instability and corruption in the country, and demonstrates that Guatemala has not taken the actions required to ensure that it can implement the agreement in accordance with Guatemalan law.

27. Civil society has also been undermined in Guatemala through recent reforms to the law governing non-governmental organizations (NGO). Adopted in

CLP_PC_026242

early 2020, the law imposes new restrictions on NGO registration and limits on the types and forms of activities that these organizations can carry out. In particular, it allows for the executive branch to invalidate the registration of NGOs whose acts are contrary to 'public order', thereby opening the door to an arbitrary use of this authority to control political dissidence. There are serious concerns amongst Guatemalan civil society groups that this law could impede the work of the few faith-based initiatives and NGOs currently attending to migrants and asylum seekers in the country. The law has been condemned by the United Nations and by the Inter-American Commission on Human Rights and is simply one more manifestation of the distance between international human rights standards and the reality in Guatemala.

Conclusions

28. The information presented above indicates a series of structural deficiencies within the Guatemalan asylum system that are likely to be exacerbated by the application of the recent agreement signed with the United States. Insofar as that agreement with lead to additional demands on the Guatemalan asylum system, I believe that asylum seekers will face many limitations, procedural and substantive, on their human rights.

29. From my experience as Attorney General, I know that expanding operational capacity of government institutions is important but it is not sufficient to ensure that the results of government processes are in line with human rights. Having additional staff at the Office of the Attorney General helped us to strengthen our work, but we also needed to have a more proactive investigation strategy with an agenda that reflected a commitment to guaranteeing human rights. In the same way, I believe that the Guatemalan asylum system would need much more than just additional staff in order to guarantee the rights of those asylum seekers who are transferred to Guatemala.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

Executed on 26 February 2020 in San Jose, Costa Rica.

Claudia Paz y Paz Bailey

CLP_PC_026243

*Claudia Paz y Paz Bailey*

# Curriculum Vitae

### 1. Personal Information

| | |
|---|---|
| Full name: | Claudia Paz y Paz Bailey |
| Place and date of birth: | Guatemala, 7 June 1966 |
| Nationality: | Guatemalan |
| Profession: | Attorney and notary |
| License number: | 4298 |
| Number of years of professional experience: | 26 years |

### 2. Contact information

| | |
|---|---|
| Email: | clauspaz@hotmail.com |
| Telephone: | 506-2280-7473, Ext. 13 |
| Address: | Center for Justice and International Law 225 metros Sur y 75 metros Este del Centro Cultural Mexicano, Los Yoses, San José, Costa Rica; Postal Box (441-2010) |

### 3. Academic degrees earned:

| | |
|---|---|
| Bachelor's Degree: | **Bachelors in Social and Juridical Sciences Lawyer and Notary** Rafael Landívar University, Guatemala, 1992 |
| Doctorate: | **Doctor in Human Rights and Criminal Law** Salamanca University, Salamanca, Spain 21 December 2006 |
| | **Doctorate *Honoris Causa*** Georgetown University, May 2015 |
| Others: | **Salamanca University Degree** Salamanca University Salamanca, Spain, 16 December 1998 **Research Aptitude** Salamanca University Salamanca, Spain, 10 June 1999 |

1

CLP_PC_026244

Claudia Paz y Paz Bailey

4. **International Experience**

– **Member of the Interdisciplinary Group of Independent Experts** for the Ayotzinapa in Mexico, named by the Inter-American Commission on Human Rights, March 2015 to April 2016

– **Secretary for Multidimensional Security of the Organization of American States, OAS,** March 2017 to June 2018.

– **Member of the Interdisciplinary Group of Independent Experts** for Nicaragua named by the Inter-American Commission on Human Rights, July 2018 to December 2018

5. **Professional Experience - Justice Sector**

- **Attorney General of the Republic of Guatemala,** December 2010 to May 2014

- **Justice of the Peace,** for the Municipality of Sumpango, in the Department of Sacatepéquez from 15 February 1991 until 27 May 1992.

6. **Professional Experience - Attorney**

- **Judicial Advisor** at the Office of Human Rights of the Archbishopric of Guatemala, October 1992 to October 1994.

- **National Researcher, Commission for Historical Clarification**, CEH, UNOPS, from 9 February 1998 to 16 November 1998.

- Expert before the **Inter-American Commission on Human Rights**, in various cases.

- Member of the drafting commission of the draft Penal Code, San Carlos University of Guatemala and Supreme Court of Justice of Guatemala from 2007 to 2009.

- Professional practice as an attorney from May 1992 to 2010, litigating criminal and constitutional cases before the national justice system and before the Inter-American System on Human Rights.

7. **Positions in Non-Governmental Organizations**

- Director for the Center for Justice and International Law, Program for Central America and Mexico, San Jose, Costa Rica, from 2019 to present.

2

CLP_PC_026245

*Claudia Paz y Paz Bailey*

- Coordinator of the Program for Democratization and Strengthening of the Rule of Law in Central America, under the auspices of the Organization Inter-Ecclesiastical for International Development Cooperation (ICCO), from 2009 to 2010.

- Coordinator of the master's program in Criminal Procedure at the Rafael Landivar University, from August 2008 to 2010.

- **Executive Director** for the Institute of Comparative Studies in Criminal Sciences in Guatemala from January 2002 to 31 August 2008.

- Director of the Legal Services Office of the United Nations High Commissioner for Refugees (UNHCR), from October 1994 to November 1995.


- **Senior Fellow** for the Washington Office on Latin America (WOLA) August 2016 to February 2017.


8. **University and Agency Instruction**

- **Resident Academic** at Georgetown University, School of Law and Institute for Women, Peace and Security, August 2014 to July 2016.

- Rafael Landívar University, Professor for the master's in criminal procedure for courses on the Constitution, System of Guarantees, Adversarial Criminal Procedure, and International Criminal Law, from 5 August 2008 to 29 April 2010.

- San Carlos University of Guatemala; Professor in the master's in Criminal Law, for couress on International Criminal Law, Criminal Policy and Monographic Course on the crime of homicide, from 2002 to 2008

- Rafael Landívar University, Professor for the bachelor's degree in law at the School of Social and Juridical sciences and in the courses on Criminal Law I and II from 2005 to 2007 and the course on the Phenomenon of Violence: Some theoretical elements, in August 1998.

- Instructor in the "Program for Complementary education" in the National School for the Public Prosecutor's Office in the Dominican Republic, directed at prosecutor's from the Office of the Public Prosecutor of the Dominican Republic, Santo Domingo, 2009.


9. **Publication**

- Book "Criminal Law and Freedom of the Press", ILANUD, San Jose, Costa Rica, 1992. Co-author. Criminal Law.

- Book: "Human Rights, Children, and Adolescents Deprived of Liberty", ILANUD and ICCPG, Guatemala, 1993. Co-author. Human rights, Criminal law y Juvenile justice.

3

CLP_PC_026246

*Claudia Paz y Paz Bailey*

- Article: "Criminal law as a mechanism to protect human rights", Edited by the IX Congress of Criminal Law Students, Salamanca University, Spain, 1997, Co-author. Human rights and criminal law.

- Book: "Military Justice", Myrna Mack Foundation, Guatemala, 1998. Co-author. Criminal law.

- Article. "The Criminal Protection of the Peoples", Revista Pena y Estado, INCECIP, Argentina, 1998, Author: Criminal law.

- Article: "The codification of violations of fundamental human rights and the facts fo violence linked with the armed conflict", Revista Justicia Penal y Sociedad; ICCPG; Guatemala, 1998, Author. Criminal Law.

- "Assessment of Local Conflict in Post-War Guatemala", ICCPG, Guatemala, 2001, Coordinator: Human rights

- Manual: "Criminal Procedure Manual", ICCPG, Guatemala, 2003, Co-author. Criminal procedure, criminal law.

- Book: Guatemala: Gender and Reparations for Human Rights Violations,inn What Happend to the Women? Gender and Reparations for Human rights Violations ed. Ruth Rubio-Marín New York: Social Science Research Council, 2006. Co-author. Gender, Reparations, Human Rights. http://www.ictj.org/en/research/projects/gender/country-cases/1821.html

- Rights. "For being a woman. Analysis of judicial system responses to cases of violence against women", ICCPG, Guatemala, 2007, Co-author; Criminal law.

- Training module. "Dejudicializing Measures", Institute for Public Criminal Defense; Guatemala, 2006, Author, Criminal procedure.

- Book: "The new sexual violence regulation in Guatemala, ICCPG; Guatemala, 2010; Co-author, criminal law.

- Book: "Transforming the Justice System in Guatemala", Georgetown University, 2016.

## 10. Academic Merits

- Scholarship issued by the Spanish Agency for International Cooperation to conduct doctoral studies at the University of Salamanca, awarded in September 1995.

- Renewal of the scholarship issued by the Spanish Agency for International Cooperation to finalize the doctoral thesis at the University of Salamanca, awarded in April 1997.

-

4

CLP_PC_026247

*Claudia Paz y Paz Bailey*

&ndash; Scholarship for independent studies in security sciences at the University of Salamanca from 1998 to 2000.

&ndash; Recognition "CUM LAUDE" in doctoral studies at the University of Salamanca, December 2006.

## 11. Distinctions

- Newsweek: Honored in December 2011 as one of the bravest women in the world.

- Forbes Magazine: Named in August 2012 as one of the women who is changing the world through public policy, as a result of the fight against organized crime and the increased number of prosecutions and convictions.

- Newsweek: In March 2013, distinguished amongst 125 women impacting the world for efforts linked to combating organized crime.

- Named Woman of the Year by the magazine Contra Poder, Guatemala, 4 January 2014

- Nominated for the Nobel Peace Prize 2013.

## 12. Prizes

- Stephen J. Solarz prize, awarded by The International Crisis Group in honor of commitment in the fight against impunity and the re-establishment of justice in Guatemala, awarded 16 December 2011.

- Prize "Abogados de Atocha", awarded by the Council of the Lawyer's Association of Atocha, Spain in recognition of the efforts to promote democracy, freedom and justice, awarded 24 January 2012.

- Diskin Prize from OXFAM-LASA awarded by the Association of Latin American Studies, for integrating academia and activism, awarded 23 May 2012.

- Judith Lee Stronach Derechos Humanos prize, awarded by the Center for Justice and Accountability, awarded in 2013.

- Dean's Prize for achieving advances in women in peace and security, awarded by the Edmund A. Walsh School of Foreign Affairs at Georgetown University, issued 20 February 2013.

- Cross of Honor of Saint Raymond of Penafort, awarded by the Ministry of Justice of Spain, issued 23 June 2013.

5

CLP_PC_026248

*Claudia Paz y Paz Bailey*

- Commendation the Order of Isabel la Católica, awarded by Juan Carlos I, King of Spain, 23 July 2013.

- "Commendatore Cross of Merit" awarded by the Federal Republic of Germany, March 2014.

- Latin Voice prize from vital voice y Global Caribbean Leadership Prize, awarded in June 2014.

- WOLA Human Rights Prize, awarded in November 2014.

- Litigation Section, *American Bar Association*, International Human Rights Prize, July 2015.

- "Civil Courage Prize", awarded by the Train Foundation, New York, 2015.

6

CLP_PC_026249

Case 4:18-cv-06810-JST Document 169-9 Filed 06/05/23 Page 148 of 1030



**Deportation with a Layover**

    DONATE NOW

May 19, 2020

# Deportation with a Layover
### Failure of Protection under the US-Guatemala Asylum Cooperative Agreement

**Available In**  English  Español



Two asylum seekers, one from El Salvador, one from Honduras, wait inside a migrant house in Guatemala City after being sent to Guatemala from the United States on Tuesday, December 3, 2019, under an "asylum cooperative agreement" between the two countries. © 2019 AP Photo/Oliverde Ros

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept      **Other options**

CLP_PC_026308


  
Guatemala without allowing them to lodge asylum claims in the United States, but also leaves them without access to effective protection in Guatemala. As a result, they are effectively compelled to abandon their asylum claims, and some who have a well-founded fear of persecution appear to be returning to their home countries where they are at real risk of serious harm.

Guatemala does not meet the standard required in US law for a "safe third country" – the ability to provide "access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection."[1] Guatemala's asylum system is hamstrung by a limited legal framework that only allows high level officials to approve claims, which causes massive bottlenecks in a system that has only recently begun to function at all. At the end of March 2020 there was a backlog of 713 cases,[2] including every one of the few asylum applicants among ACA transferees;[3] the interministerial committee that decides asylum cases had not met from the time Covid-19 restrictions went into place in mid-March through the time of writing this report in late April.[4]

Prior to the suspension of the ACA on March 16, 2020, local nongovernmental partners for the UN High Commissioner for Refugees (UNHCR) had interviewed a portion of the people transferred under the ACA and found that about two-thirds of those interviewed had international protection concerns. [5] However, only a small proportion of those who expressed fear of return to their home countries applied for asylum in Guatemala, UNHCR said. Many also told UNHCR's partners they were unwilling to stay in Guatemala, citing their inability to support themselves there, distrust of the authorities, and Guatemala's proximity to their home countries, fearing that their persecutors could still reach them.[6]

Refugees International and Human Rights Watch conducted research on the impact of the ACA in Guatemala in February 2020, investigating the vulnerabilities of transferees and the lack of support for them in Guatemala, as well as their access to the Guatemalan asylum system and its capacity to provide protection to those needing it.

All 30 of the ACA transferees Refugees International and Human Rights Watch interviewed described abusive conditions at the US border, including receiving inedible frozen food, having no access to showers for several days at a time, being unable to sleep because lights were constantly left on, being

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our **privacy policy** to find out what cookies are used for and how to change your settings.

CLP_PC_026309

3/13/23, 8:04 PM
Deportation with a Layover: Failure of Protection under the US-Guatemala Asylum Cooperative Agreement | HRW



Deportation with a Layover

   DONATE NOW

to support their claims of fear of return.

The ACA transferees also gave accounts showing that their registration and processing at the Guatemalan airport was inadequate, lacking in both humanitarian reception care and access to information. Transferees, including small children, waited hours on the tarmac with no food, water, or adequate medical attention.[7] The actual registration process took a cursory two-to-three minutes, during which transferees were not provided any information regarding what would happen to them in Guatemala.[8]

Transferees under the ACA were thrust into a high-pressure situation in which they lacked adequate time and resources to make truly informed, voluntary choices about what to do. Once transferees were registered at the airport, they had 72 hours to make the decision about whether they would remain in Guatemala, return to the countries they fled, or try to find refuge elsewhere.[9] The Guatemalan government's 72-hour time limit is arbitrary and coercive, giving transferees insufficient time to make such monumental decisions.

Only one person out of the 30 people subject to the ACA interviewed by Refugees International and Human Rights Watch said they were applying for asylum in Guatemala. Several said they had no family or support networks in Guatemala and that they feared for their safety in Guatemala. Many indicated they would return to El Salvador and Honduras despite continuing to express a fear of persecution there.

The United States transferred 939 Honduran and Salvadoran asylum seekers, the vast majority of them women and children, to Guatemala under the US-Guatemala ACA between November 21, 2019 and March 16, 2020.[10] Only 20 of the 939 transferees – about 2 percent – applied for asylum in Guatemala even though many of them had well-founded fears of persecution in their home countries.[11]

Our interviews indicate that the ACA has been implemented in a way that effectively compels transferees to abandon their claims. In Guatemala, transferees have an unreasonably short time frame to make a decision whether to apply for asylum in Guatemala, which has a cumbersome and ineffectual

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our **privacy policy** to find out what cookies are used for and how to change your settings.

CLP_PC_026310

Case 4:18-cv-06810-JST Document 169-9 Filed 06/05/23 Page 151 of 1030



**Deportation with a Layover**

     DONATE NOW

obligations by not examining the asylum claims of asylum seekers it is forcibly sending to Guatemala.

Transfers under the ACA were temporarily suspended in mid-March in response to the Covid-19 pandemic.[12] Refugees International and Human Rights Watch call on the US and Guatemalan governments to rescind the Guatemalan ACA completely, rather than plan for its resumption. The United States should also halt plans to begin transferring asylum seekers to El Salvador and Honduras under asylum cooperative agreements that have been signed but are not yet implemented.[13]

## Related Content



May 19, 2020  |  News Release

### US: Abusive Transfers of Asylum Seekers to Guatemala

Agreement Denies Hondurans, Salvadorans Effective Protection

## Methodology

In February 2020, Human Rights Watch and Refugees International interviewed 30 Hondurans and Salvadorans whom the United States had removed or "transferred" to Guatemala under the ACA. The interviews began when the policy was still new, but also when transfers under the policy hit their peak.

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our **privacy policy** to find out what cookies are used for and how to change your settings.

CLP_PC_026311



Deportation with a Layover

      DONATE NOW

interview at any time. The interviews were conducted in Spanish by three female researchers. To protect confidentiality, pseudonyms are used for all interview subjects.

Additional interviews and conversations were held with nongovernmental service providers, UN agencies, academics, lawyers, and shelter workers. Researchers also interviewed officials in Guatemala's Office of the Human Rights Ombudsman.

On April 16, 2020, Human Rights Watch and Refugees International sent letters to the acting secretary of the US Department of Homeland Security, the acting commissioner of Customs and Border Protection, and the director of Guatemala's Institute for Migration to share our findings and recommendations and to give them the opportunity to respond. As of the time this report went to press, we had not received a response.

---

# Background

## Safe Third Country Agreements vs. Asylum Cooperative Agreements

Beginning in the late 1980s, several European countries, the United States, and Canada began signing bilateral or multilateral agreements and adopting domestic laws to enable countries with comparable asylum standards and procedures to transfer asylum seekers to countries designated as "safe" where they would be guaranteed access to full and fair examination of claims for international protection. Many, but not all, of the agreements required the asylum seeker to have first transited through the designated safe third country, as they have been based generally on the principle of country of first safe

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our **privacy policy** to find out what cookies are used for and how to change your settings.

CLP_PC_026312



**Deportation with a Layover**

   DONATE NOW

· An individual assessment of the appropriateness of the transfer, subject to procedural safeguards, prior to transfer;

· Access to fair and efficient procedures for the determination of refugee status and/or other forms of international protection;

· Treatment during reception in accordance with accepted international standards;

· Access to health, education, and basic services;

· Identification and assistance for persons with specific needs, including operating on the principle of the best interests of the child; and

· For those recognized as being in need of international protection, the granting of asylum and/or access to a durable solution."[16]

The ACA agreements involve countries with highly dissimilar standards, procedures, and capacity; lack transparency and UNHCR monitoring; allow for the transfer of asylum seekers to countries they never transited through on their way to the United States (such as Mexicans to Guatemala or Guatemalans to Honduras or El Salvador); and provide minimalistic screenings at the US border that do not provide asylum seekers a meaningful opportunity to challenge the finding that they are subject to transfer.[17]

## A Bad-Faith Deal

In a letter to the US Congress in late 2017, US President Donald Trump outlined several policies that would limit access to asylum at the southern border of the United States, including "expand[ing] the ability to return asylum seekers to safe third countries."[18] Safe third country designations are usually based on an assessment that the country in question has an asylum system that is functioning according to international standards and that will not place asylum seekers and refugees at risk of

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our **privacy policy** to find out what cookies are used for and how to change your settings.

CLP_PC_026313



**Deportation with a Layover**

   DONATE NOW

In late May 2019, the secretary of the US Department of Homeland Security (DHS) met with the director of the Guatemalan Institute for Migration (IGM), who requested a "five-year bar" on readmission for those transferred from the United States to Guatemala (or transferees) under a possible agreement, presumably in an effort to deter transferees from attempting to return to the United States.[22] Tens of thousands of asylum seekers had left Guatemala, or transited through Guatemala, on their way to the United States in the previous year. When, in mid-June 2019, the Trump administration publicized negotiations over the US-Guatemala agreement, it was well aware (from an assessment done by the US embassy in Guatemala) that Guatemala was "among the most dangerous countries in the world" and that a backlog of a few hundred cases existed in Guatemala's very rudimentary asylum system.[23]

Initially, the agreement faced opposition from the Office of the Human Rights Ombudsman in Guatemala and from four former Guatemalan foreign ministers who filed a complaint with the Constitutional Court to stop the president from implementing the agreement, stating that it was a "certain and imminent threat"[24] and would violate the human rights of asylum seekers.[25] On July 14, the Guatemalan Constitutional Court issued a preliminary injunction against the president proceeding with the ACA unless he followed constitutional procedures for entering international agreements, which might require Guatemalan congressional authorization.[26]

On July 15, a day after the injunction, the Trump administration attempted to implement a unilateral policy that barred anyone from seeking asylum at the US border if they had transited through a third country without seeking asylum there.[27] On July 23, a federal court halted this policy.[28] The Trump administration next threatened Guatemala with tariffs unless it agreed to the asylum agreement.[29] Three days later, on July 26, the two countries signed an agreement providing for the transfer from the United States to Guatemala of asylum seekers from any country except Guatemala.[30]

President Morales filed a motion with the Guatemalan Constitutional Court asking it to lift the preliminary injunction on the agreement.[31] In September 2019, the Guatemalan Constitutional Court rescinded the injunction and left open the possibility that outgoing Morales could enter the ACA

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our **privacy policy** to find out what cookies are used for and how to change your settings.

CLP_PC_026314

3/13/23, 8:04 PM          Deportation with a Layover: The Failure of Protection under the US-Guatemala Asylum Cooperative Agreement | HRW

Case 4:18-cv-06810-JST  Document 169-9  Filed 06/05/23  Page 155 of 1030



Deportation with a Layover

       DONATE NOW

decisions on asylum cases and lack of access to social services and work,[35] the US Attorney General certified that Guatemala qualified as a safe third country with full and fair access to asylum as required by the US Immigration and Nationality Act.[36]

DHS and the US Department of Justice (DOJ) then published an interim final rule (hereafter, "the rule") allowing for the implementation of ACAs not only with Guatemala, but also with El Salvador and Honduras, framing them as attempts to "share the burden" of protection between the United States and the three Central American countries.[37] In practice the ACAs will shift the responsibility of protection to countries significantly less able to bear it. Supplementary information accompanying the published rule makes clear that a principal motivation for the ACAs is to "reduce the flow" of asylum seekers to the United States as quickly as possible.[38] The ACA with Guatemala was the first Central American agreement to be implemented; transfers began in late November 2019.

Besides the agreements with the Central American governments, the United States' only other asylum transfer agreement is its "safe third country agreement" with Canada, which has a robust asylum system. The US-Canada agreement provides an exception for asylum seekers with close family members in the United States, acknowledging the UNHCR's conclusion that the choices of asylum seekers as to their country of refuge "should as far as possible be taken into account" especially when the asylum seeker has "a connection or close link" with that country.[39] The US-Canada agreement also includes a provision inviting the UNHCR to monitor its implementation to ensure its consistency with international refugee law.[40] In contrast, the ACA with Guatemala fails to adopt any such exception or oversight. Though the ACA implementation plans from the summer of 2019 indicated that the UNHCR would be running a "care center" in Guatemala for transferees, no such center has been established.[41] Indeed, UNHCR has expressed "serious concern" that the ACA "could result in the transfer of highly vulnerable individuals to countries where they may face life-threatening dangers."[42]

Negotiations over the agreement and its expanding implementation have been shrouded in secrecy. Only the main text of the agreement is available to the public, while the annexes containing additional terms of the agreement remain secret to the public to this day.[43] Former President Morales hid the agreement in its entirety not only from government institutions and the media, but also from civil

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our **privacy policy** to find out what cookies are used for and how to change your settings.

CLP_PC_026315



**Deportation with a Layover**

   DONATE NOW

At the height of transfers in early February 2020, Refugees International and Human Rights Watch investigated the policy to assess its impact on asylum seekers sent to Guatemala.

## Mistreatment at the US Border

Until the Guatemalan ACA was suspended because of the Covid-19 pandemic, it established a process for transferring asylum seekers to Guatemala from US custody.

In violation of its own procedural standards, US Customs and Border Protection (CBP) detained ACA transferees at the US border in February 2020 for much longer than the 72-hour limit outlined by DHS policy without adequate access to food, bedding, showers, and medical care.[46] The 30 people Refugees International and Human Rights Watch interviewed said that CBP detained them, many with their young children, for between 7 and 20 days in El Paso or McAllen and Donna, Texas, before their transfer to Guatemala. All described receiving inedible frozen food, having no access to showers for several days at a time, being unable to sleep because lights were constantly left on, being denied medical care, and being subjected to insults and degrading treatment while in custody:

· In denying a request for a blanket for a two-year-old child who had fallen ill with the flu in detention, an officer told her 19-year-old Salvadoran mother, "If I give you a blanket, I will have to give them to everyone."[47]

· One woman from El Salvador said that her 4-year-old son vomited and had diarrhea from eating almost exclusively chips for 10 days because he refused to eat burritos that were frozen.[48]

· When the detergent CBP used to wash asylum seekers' clothes gave a Honduran teenager a terrible rash, the guard told him that he must be "allergic to washing himself."[49]

· One Honduran woman said an agent mocked her detained children's cries.[50]

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

CLP_PC_026316

3/13/23, 8:04 PM                    Deportation with a Layover: The Failure of Protection under the US-Guatemala Asylum Cooperative... | HRW

Case 4:18-cv-06810-JST   Document 169-9   Filed 06/05/23   Page 157 of 1030



**Deportation with a Layover**

     DONATE NOW

The rule implementing the ACA provides for only "threshold" screening by United States Citizenship and Immigration Services (USCIS) asylum officers to determine whether the asylum seekers can be subject to the agreement.[55] The rule does not provide asylum seekers with even a "minimal consultation period" before the screening.[56] All transferees interviewed by Refugees International and Human Rights Watch said that while detained by CBP, they were denied meaningful access to an attorney and only allowed to make between one and three rushed, non-private phone calls:

·   A Salvadoran man said that a DHS official told him, "There is no asylum," and, "There are no Central Americans allowed into the United States."[57]

·   A 20-year-old Honduran woman said that CBP agents told her the United States "wasn't giving asylum anymore," and that she had to choose between being sent to Honduras or Guatemala.[58]

·   One woman showed Refugees International pictures of her bruises from where her domestic partner had physically assaulted and beaten her in El Salvador,[59] and another woman showed Refugees International copies of a Salvadoran court order detailing her domestic abuse.[60] Both women said US officials at the border refused to let them present these as evidence to support claims of fear of return to El Salvador.

·   A 20-year-old Salvadoran man said agents told him that he had to choose between calling an attorney or family, and gave him only two-to-five minutes to talk.[61]

·   A Honduran man said a US border official told him he would be released from detention in the United States sooner if he accepted transfer to Guatemala under the ACA rather than deportation to Honduras.[62]

With the exception of the Honduran man just mentioned, all the transferees we interviewed said they were afraid to return to El Salvador or Honduras, and that they were never given an opportunity to seek asylum in the United States or to explain why they fled their home countries.

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our **privacy policy** to find out what cookies are used for and how to change your settings.

CLP_PC_026317

Case 4:18-cv-06810-JST Document 169-9 Filed 06/05/23 Page 158 of 1030



**Deportation with a Layover**

   DONATE NOW

subject to removal to Guatemala under the ACA.

A brief by the asylum officer's union in litigation against the ACA asserts: "The ACA Rule reflects a dramatic departure from longstanding refugee screening processes and a stark re-interpretation of the asylum officer's role."[63]

Under the rule, DHS officers do not ask asylum seekers being considered for removal to Guatemala whether they fear persecution or torture in that country.[64] Rather, the migrant is supposed to be provided a "written notice" in the form of a document – or "tear sheet" – stating that if the applicant fears removal to that country due to the likelihood of torture or persecution on the basis of a protected ground, the applicant should affirmatively state such fear.[65]

But asylum officers did not provide transferees with written notice that they should raise the issue of fear of return to Guatemala.[66] Fourteen transferees Refugees International interviewed who were held at a CBP tent facility in Donna, Texas, in early February said they never even received this tear sheet. They received only three documents – a Notice and Order of Expedited Removal (Form I-860), a Notice to Alien Ordered Removed/Departure Verification (Form I-296), and a US-Guatemala Asylum Cooperation Agreement Threshold Screening Assessment Notice. The threshold screening notice says only that "you were interviewed by a DHS asylum officer" who determined "you are subject to removal to Guatemala under the US-Guatemala Asylum Cooperative Agreement for consideration of your asylum or other protection claims." Without access to a lawyer or an English translation to explain this, it is not surprising that all of those Refugees International interviewed were under the impression that they could apply for asylum in the United States from Guatemala.

Ten of the transferees interviewed by Human Rights Watch and Refugees International received an additional Spanish language explanation of the ACA that notified them of the need to affirmatively express fear of return to Guatemala and that, if transferred under the agreement, they could no longer seek protection in the United States but only in Guatemala. However, asylum seekers often said they did not understand its meaning. This is a violation of the instruction to asylum officers that they ensure all those subject to the ACA understood the contents of the tear sheet.[67]

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

CLP_PC_026318

3/13/23, 8:04 PM
Deportation with a Layover: Failure of Protection under the US-Guatemala Asylum Cooperative Agreement | HRW

HUMAN
RIGHTS
WATCH

Deportation with a Layover

   DONATE NOW

were being transferred within the United States and were not aware that they were being flown to Guatemala until they arrived there.[71]

According to the rule implementing the ACA, even when an asylum seeker affirmatively expresses fear of removal to Guatemala, the resulting secondary interview requires that the asylum seeker demonstrate that it is "more likely than not" that they will face persecution or torture in Guatemala, an evidentiary standard significantly higher than the one applied in normal credible fear interviews.[72] Without adequate time to prepare or access to counsel, it is functionally almost impossible for asylum seekers to prevail in the interviews.

Only one person Refugees International interviewed, a 22-year-old pregnant Salvadoran woman, was given a second phone interview because she told the asylum officer that she did not want to be sent to Guatemala because she was pregnant and feared she would be detained there and have difficulty accessing healthcare. She had already been detained in Mexico on her way to the US border. But, she said, the second interview was almost identical to the first and she was found subject to removal under the ACA.[73] Only one person to whom Human Rights Watch spoke, a 20-year-old Salvadoran man, was given a second interview, but he said the officer did not ask him for details about why he was afraid to go to Guatemala.[74] Under USCIS guidance for implementing the ACA rule, asylum officers cannot make a finding that future persecution in Guatemala is "more likely than not" based solely on evidence of past persecution there.[75]

A Refugees International interview with one transferee encapsulates the poor treatment, lack of due process, and arbitrary placement in the ACA at the border. "Jorge C.," a former police officer from Honduras, said that CBP officials at the border "threw away" documents he had brought with him from Honduras. He said that these papers proved he was a witness in a case against gang members who would kill him if he returned home. US Department of State reports that show that police officers are often intimidated and targeted by gangs in Honduras support Jorge's account.[76] His wife and child had already fled to the United States and applied for asylum based upon the threats directed against him.

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our **privacy policy** to find out what cookies are used for and how to change your settings.

CLP_PC_026319

3/13/23, 8:04 PM     Deportation with a Layover: Failure of Protection under the US-Guatemala Asylum Cooperative Agreement | HRW

Case 4:18-cv-06810-JST  Document 169-9  Filed 06/05/23  Page 160 of 1030



HUMAN
RIGHTS
WATCH                **Deportation with a Layover**                      DONATE NOW

United States and his role in combating gangs in Honduras – an effort the US government supports.
[79]

Instead, like many of the adults sent to Guatemala from the Donna facility, Jorge was shackled at the waist, wrist, and ankles for the 12-hour transfer despite CBP transport standards that mandate humane use of restraints.[80] He told us that he fears remaining in Guatemala, where he is sure gang members can find him, and he remains uncertain where or how he can find safety.[81]

## The ACA Process in Guatemala

Until the ACA was suspended due to the Covid-19 pandemic, transferees under the ACA were thrust into a tragic situation in which they lack adequate time and resources to make a truly informed, voluntary choice about what to do. ACA transferees were flown to La Aurora Airport in Guatemala City, typically on the same plane with Guatemalan nationals who were also being deported.[82] They disembarked from the plane at the Guatemalan Air Force hangar.

Transferees, including small children, waited hours on the tarmac with no food, water, or adequate medical attention.[83] The actual registration process itself took two-to-three minutes, during which transferees were not provided any information regarding what will happen to them in Guatemala.[84] Until the suspension of the ACA, representatives from the Institute of Migration and the Foreign Relations Ministry registered the ACA transferees.

The Guatemalan Office of the Human Rights Ombudsman, an independent government office charged with investigating human rights violations in the country, monitors the registration process.[85]

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our **privacy policy** to find out what cookies are used for and how to change your settings.

CLP_PC_026320

Case 4:18-cv-06810-JST  Document 169-9  Filed 06/05/23  Page 161 of 1030



**Deportation with a Layover**                         DONATE NOW

Nicaragua.[87]

It was only after the ACA transferees were taken to civil society organizations, Refugio de la Niñez (Children's Refuge) and Casa del Migrante, that they were given their first meal and access to psychologists and social workers.[88] Only then did they receive any humanitarian attention or information regarding their status in Guatemala.

At Refugio de la Niñez, a lawyer gave a rights orientation to the transferees and explained their options. The lawyer informed them that they had 72 hours to decide whether to ask for asylum or temporary residence in Guatemala or be returned to their country of origin. In the orientation Refugees International witnessed, all transferees expressed dismay upon being told they could not apply for asylum in the United States. For most, if not all of the transferees, this was the first time they learned they were not going to be allowed to lodge asylum claims in the United States. Transferees cried out in frustration, "They [CBP officers] lied to us," and "They didn't tell us that we couldn't go back." Despite their disappointment at receiving this information, some transferees stated that the first time in the process they felt they were being "treated like human beings" was when they arrived at Refugio de la Niñez.[89]

Once ACA transferees finished at Refugio de la Niñez, they were taken to the church-run Casa del Migrante, one of the few shelters in Guatemala and the only one available to ACA transferees.[90] Despite having only 50 beds,[91] Casa del Migrante sometimes shelters more, including migrants from many countries in transit through Guatemala, members of caravans,[92] and some deported Guatemalans. Before the Covid-19 suspension of the ACA, Casa del Migrante provided them basic humanitarian care and gave them the opportunity to speak with lawyers from Refugio de la Niñez and Pastoral de Movilidad Humana (Pastoral for Human Mobility), another church-run organization that provides legal support.[93] During their stay for up to 72 hours at Casa del Migrante, they had to make a decision among the following three options:

1.   Apply for asylum in Guatemala: Lawyers from Refugio de la Niñez and Pastoral de Movilidad Humana provide information on how to apply for asylum in Guatemala and how the process works.[94]

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our **privacy policy** to find out what cookies are used for and how to change your settings.

CLP_PC_026321

Case 4:18-cv-06810-JST   Document 169-9   Filed 06/05/23   Page 162 of 1030



**Deportation with a Layover**

     DONATE NOW

Once the 72 hours passed, the transferees who did not wish to stay in Guatemala typically returned to their home country or migrated to another country. Although Refugees International researchers have stayed in touch with two ACA transferees who returned to their home country, El Salvador, and one who went to Mexico, there is no general monitoring of those who returned to their home countries without assistance.

Despite their limited resources, the task of caring for ACA transferees falls solely on civil society organizations. Refugio de la Niñez and Casa del Migrante both have mandates that extend beyond assisting ACA transferees. Refugio de la Niñez operates in 15 offices throughout the country,[97] providing protection for people in transit, assists non-ACA asylum seekers with their asylum claims and assists the government in finding cases of child trafficking.[98] They receive very little government funding for their work and rely mostly on private funders.[99] Casa del Migrante hosts a variety of populations, but they are a church-run organization and rely on donations to carry out their work.[100] The more people transferred to Guatemala under ACA, the more likely it is that civil society will have to divert limited resources away from other marginalized groups to take care of ACA transferees, given the transferees' extreme vulnerability and the lack of government support.

The Guatemalan government provides no money to civil society organizations to care for ACA transferees.[101] The constitutional provision under which Morales signed the ACA without congressional approval required that the agreement not entail additional expenses for the government – any agreement involving additional expenses would have, as the Constitutional Court warned in its preliminary injunction, required the legislature to approve it."[102] Then-acting head of USCIS Ken Cuccinelli, however, indicated that the Guatemalan government would be responsible for taking care of arriving transferees, including costs.[103] The US government is giving money to the Guatemalan government to prevent irregular migration, although it is unclear that any of this money is to be used for the ACA.[104] The publicly available text of the agreement does not stipulate who, in fact, should assume financial responsibility for the transferees. Article 8, section 5, states: "Nothing in this Agreement shall be construed in such a way as to oblige the Parties to disburse or obligate funds."[105] This has allowed the Guatemalan and US governments to shirk any financial responsibility for the

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our **privacy policy** to find out what cookies are used for and how to change your settings.

CLP_PC_026322



**Deportation with a Layover**

   DONATE NOW

implementation of the ACA, the US government learned that Casa del Migrante had only one room for families.[106] And yet, as of March 16, 2020, of the 939 asylum seekers from Honduras and El Salvador DHS sent to Guatemala, 75 percent were women and children.[107] DHS has also transferred LGBT (lesbian, gay, bisexual and transgender) individuals to Guatemala under the ACA, according to research conducted by Refugees International and Human Rights Watch, as well as reporting by Buzzfeed News. [108]

## Women and Girls

Gender-based violence, including violence against women and girls and violence on the grounds of sexual orientation and gender identity, is prevalent in Guatemala, El Salvador, and Honduras.[109] Abuse of women and girls in Guatemala, El Salvador, and Honduras is endemic, rooted deeply in social norms and exacerbated by generalized violence and impunity in these countries.[110] Despite some reform efforts in Guatemala, such as specialized women's courts and dedicated units in the Attorney General's Office, formidable obstacles remain for women seeking police protection, investigation, or justice through the courts. Guatemala has among the highest rates of gender-related murder of women or girls in the world when counting the number of women murdered for reasons of their sex per 100,000,[111] yet less than six percent of female homicides result in a conviction in the country.[112] Sexual and domestic violence "remain widespread and serious," according to the US Department of State.[113]

"Jane L.," an ACA transferee from El Salvador, shared pictures with Refugees International documenting the injuries her partner caused her. Although she had gone to the police to report her partner and six of his family members and then spent three months testifying in court, her case was never resolved. The US government is aware of the particular dangers such victims face in El Salvador, the US Department of State noting in a recent report: "Laws against domestic violence remained poorly enforced, and violence against women, including domestic violence, remained a widespread and serious problem" in El Salvador.[114] After Jane was transferred from the US border to Guatemala under the ACA, she did not think it would be safe for her to return to El Salvador or remain in Guatemala. She

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

CLP_PC_026323



**Deportation with a Layover**

   DONATE NOW

least two gay men and one transgender woman were transferred to Guatemala under the ACA. According to Lambda, an LGBT rights organization based in Guatemala City, the number of LGBT transferees is probably much higher, since LGBT asylum seekers are often afraid to identify themselves. [116]

The Guatemalan migration code states that migrants should not be discriminated against on the basis of sex or sexual orientation but contains no explicit protections on the grounds of gender identity.[117] Guatemalan law has no non-discrimination provision to protect people from violence based on gender identity and sexual orientation in accessing employment, housing, health care, and public or private services.[118] According to Lambda Director Carlos Valdez, LGBT asylum seekers often experience discrimination in Guatemala.[119] In research conducted in 2019 and 2020, Human Rights Watch found that LGBT people in Guatemala, some of whom had fled the country as a result of violence, had suffered from domestic violence, gang violence based both on sexual orientation and gender identity, as well as increased vulnerability to violence from members of the public and police.[120]

"Josue M." fled Honduras after being assaulted and receiving death threats for being gay.[121] Shortly after US authorities sent Josue to Guatemala under the ACA, a group of homophobic men threatened and pursued him. Josue sustained multiple injuries to his face and body when he fell trying to escape them, according to immigration attorney Linda Corchado. Josue told Corchado he did not feel safe remaining in Guatemala and that he could not return to Honduras.[122]

## Victims of Gang Violence

ACA transferees who have been targeted by gangs in their home countries of Honduras and El Salvador (which may also include women, girls, and LGBT people) have good reason to believe that they are not safe in Guatemala, as many of the same gangs have a presence in the country and maintain links across borders.[123] High levels of impunity in Guatemala mean that criminal organizations could target asylum seekers without being held to account and that victims cannot expect to access justice or protection.[124] Shelter operators in Guatemala City working with asylum seekers subjected to the ACA

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our **privacy policy** to find out what cookies are used for and how to change your settings.

CLP_PC_026324


  
risk of persecution or torture as in their home countries. For example, "Yana E." fled Honduras with her two-year-old daughter after a gang brutally murdered her husband. She showed Refugees International his death certificate. When Yana asked for asylum at the US border, an official told her that the United States "wasn't giving asylum anymore." She was transferred to Guatemala under the ACA despite having no family or friends in Guatemala. She said that she felt unsafe in Guatemala because she said the gang knew where she was and had since received a threatening video message from the same people who murdered her husband.[126]

Human Rights Watch spoke to a woman and her two sons (17 and 11) from Honduras. Because of a series of threats against them by gangs, they had moved to different places within Honduras four times. At the last place they lived, the woman said, she was told to pay a "war tax" every Thursday. When the gang gave her a note saying they would kidnap her younger son from school unless she paid, she decided to travel to the United States to ask for asylum. She said they could not return to their home country, but she said she knew no one in Guatemala and could not support her children there. She said she did not know what to do next.[127]

## Trauma and Stress

A staff member at Refugio de la Niñez described the whole process of the ACA – from the experience at the US border, to the flight and reception at the airport, to the 72-hour time limit – as "a series of deceptions and intimidations" that break down people who already have "extremely complicated protection needs." He emphasized the need to "return people's dignity."[128]

According to psychologist Sucely Donis, who works with migrants at Casa del Migrante, the ACA creates a seemingly never-ending "circle of violence" in which asylum seekers are in a constant state of mental stress and never have the opportunity to pause and decompress in a safe environment.[129] She has noticed a significant difference between the psychological responses of migrants and asylum seekers who are in transit on their way north versus the asylum seekers sent to Guatemala under the ACA. "People in transit [northward] are more prepared to deal with the things they may face because

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

CLP_PC_026325

3/13/23, 8:04 PM
Case 4:18-cv-06810-JST Document 169-9 Filed 06/05/23 Page 166 of 1030
Deportation with a Layover | Failure of Protection under the US-Guatemala Asylum Cooperative Agreement | HRW


  

disorder and chronic stress, as well as physical illnesses – respiratory infections, headaches, palpitations – that she said are in part physical manifestations of that stress. Meanwhile, children in the shelter are showing signs of anxiety, aggression, and arrested development. "We are destroying a generation," she said.

Many of the ACA transferees interviewed by Human Rights Watch and Refugees International were young adults between 18 and 20 years old, separated from parents in the United States, at heightened risk of being targets of gangs, and experiencing increased difficulty making decisions. A 20-year-old Salvadoran woman told Human Rights Watch that her mind was "completely worn out" (*desgaste*) by CBP detention. In Guatemala City where she knew nobody, she said she did not know what she was going to do – she was fearful of persecution should she return to El Salvador and separated from her family in the United States.[130]

"Freddie G.," a 19-year-old Honduran, told Refugees International he was in a complete panic. Freddie's mother abandoned the family when he was four and his father later left for the United States, leaving his sister, brother, and him in the care of their grandmother, now ill and infirm. A gang leader kidnapped his sister and kept her as "his woman" until she managed to escape and flee to the United States. In response, the gang tried to recruit his brother and then mutilated his brother's legs with a machete. Next, the gang members came after Freddie, blaming him for the sister's escape and robbing him. Freddie sought help from his employer to no avail; the gang leader found him and severely beat him, prompting him to flee to the United States. Freddie said that he felt panicked and spent much of his time crying at the crowded shelter in Guatemala, where he could not sleep or eat knowing that he had only three days to figure out what to do – fearing persecution in Honduras, knowing no one in Guatemala, and having his entire family in the United States seeking asylum for the same reasons that he needed to. Freddie was desperate for help from a psychologist and a lawyer, but neither were available to provide him services beyond initial consultations in Guatemala. He could not understand why the lawyer his father found for him in the United States could not help him apply for asylum there.
[131]

Like Freddie G., several transferees had immediate relatives living in the United States pursuing asylum

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our **privacy policy** to find out what cookies are used for and how to change your settings.

CLP_PC_026326

3/13/23, 8:04 PM
Deportation with a Layover | Failure of Protection under the US-Guatemala Asylum Cooperative Agreement | HRW

Case 4:18-cv-06810-JST   Document 169-9   Filed 06/05/23   Page 167 of 1030



**Deportation with a Layover**

     DONATE NOW

Most asylum seekers Refugees International and Human Rights Watch interviewed indicated that they considered Guatemala to be no different than their home countries in terms of safety and opportunity. Indeed, many transferees noted that in their home countries they at least understood the context and had social networks that they could rely on. Few found remaining in Guatemala to be a feasible option because it is a dangerous and poor country where they lack familial or social ties.

Prior to the suspension of the ACA, UNHCR's local nongovernmental partners had interviewed a portion of the people transferred under the ACA and found that about two-thirds of those interviewed had international protection concerns.[133] However, only a small proportion of those who expressed fear of return to their home countries applied for asylum in Guatemala, UNHCR said. Many also told UNHCR's partner they were unwilling to stay in Guatemala, citing their inability to sustain themselves there, distrust of the authorities, and proximity to their home countries, fearing that their persecutors could still reach them.[134]

Guatemala has not historically been a country of destination for many asylum seekers; it only began to receive a few claims in 2002.[135] It received fewer than 50 new asylum claims per year from 2002-2014. [136] In June 2019, a US embassy cable reported that the Guatemalan Institute for Migration (IGM) had not processed any asylum cases in more than a year while the Rules of Procedure for Refugee Status were being drafted, and that from March 2019 through the time of writing that cable, the National Migration Authority, which is the only authorized body to make refugee status decisions, had not met. [137]

The US embassy's June 2019 cable reported that the Office of International Migration Relations (ORMI), a specialized unit in IGM for the processing of asylum claims, had a staff of three caseworkers, three investigators, and one supervisor.[138] The US embassy estimated that ORMI had capacity to process 100 to 150 claims per year at a time when the backlog stood at about 400. Nine months after the US embassy cable, at the end of March 2020, the backlog had grown to 713 cases, an increase of 78 percent.[139]

At the time of the writing of this report, late April 2020, the National Migration Authority that decides

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our **privacy policy** to find out what cookies are used for and how to change your settings.

CLP_PC_026327



**Deportation with a Layover**

    DONATE NOW

decided by the National Migration Authority, a committee comprised of the Vice President; the Ministers of Foreign Affairs, Social Development, Labor and Social Welfare, and the Interior; the Director of the Guatemalan Institute of Migration; and the Executive Secretary of the Migrant Assistance Council of Guatemala. None of these members, including the Vice President, can delegate this responsibility.[142] The result is bottlenecks in the system that can only be addressed by changing the Guatemalan Migration Code – no amount of support or technical capacity can remedy this problem.[143]

The lack of technical capacity is also of serious concern. People seeking asylum must file an application with the ORMI,[144] which then forwards it for review by the National Refugee Commission (CONARE), an advisory body that examines applications and issues recommendations, opinions, and suggestions.[145] The CONARE is a technical working group whose members are appointed by various government ministries, but it does not employ asylum lawyers or persons trained in international asylum law.[146] While the General Director of Migration and a representative from UNHCR, who has this expertise, are also members of CONARE, they participate solely in an advisory capacity and neither one has the authority to provide final recommendations regarding refugee status.[147] The United States has signed a Memorandum of Understanding with UNHCR to build up the capacity of the Guatemalan asylum system,[148] but problems with lack of relevant expertise in CONARE persist. [149]

Asylum seekers in Guatemala also face difficulties sustaining themselves while their claims are pending and the government has done little to help them.[150] Although asylum seekers have the right to work, it is difficult for them to find formal employment using the "refugee ID" that the government provides them as many employers do not recognize it as valid; also, Guatemalan labor laws cap at 10 percent the number of foreign workers that employers may hire.[151] Starting in 2017, the National Registry of Persons (RENAP) took over the responsibility of issuing an ID card for asylum seekers, refugees, and temporary residents that looks more like the ID cards that citizens use.[152] But the process of applying for the new ID card – with fees to RENAP, the Migration Directorate, notaries, and other personnel – is cost-prohibitive for many people.[153] To make matters worse, an informed observer reported that RENAP has not been consistently issuing the new IDs for asylum seekers and refugees as required by

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our **privacy policy** to find out what cookies are used for and how to change your settings.

CLP_PC_026328

3/13/23, 8:04 PM
Deportation with a Layover: Failure of Protection under the US-Guatemala Asylum Cooperative ... | HRW

HUMAN
RIGHTS
WATCH

Deportation with a Layover

DONATE NOW

Case 4:18-cv-06810-JST Document 169-9 Filed 06/05/23 Page 169 of 1030

seekers in a catch-22 situation; they need employment to receive many services, but employers will not hire them, so they cannot obtain health insurance and struggle to access needed care. Many ACA transferees arrive with children, some with very young children,[158] creating another barrier to access work as childcare options are quite limited.

From November 2019 through March 16, 2020, only 20 of the 939 people transferred to Guatemala under the ACA had applied for asylum despite that many more of them were likely to have well-founded fears of persecution in their home countries, as indicated in the interviews by UNHCR's local partners, cited above,[159] by the fact that nearly three times the number who formally lodged asylum claims initially indicated to the Guatemalan Air Force an interest in applying for asylum,[160] and in interviews conducted by Human Rights Watch and Refugees International.[161]

Given the insufficiencies of the Guatemalan asylum system, the non-viability of temporary residency, and the 72-hour deadline to decide, many transferred asylum seekers feel compelled to return to their home countries. To return home, transferees can enroll in the International Organization for Migration (IOM)'s Assisted Voluntary Return Program (AVR) or return to their home countries using their own resources. However, IOM assisted in the repatriation of only 44 of the more than 900 transferees.[162] It declined to facilitate the return of 7 of the 51 transferees because of protection concerns.[163]

Only one person out of the 30 people subject to the ACA interviewed by Refugees International and Human Rights Watch at Casa del Migrante said they were applying for asylum in Guatemala. Several said they had no family or support networks in Guatemala and that they feared for their safety in Guatemala. Many indicated they would return to El Salvador and Honduras despite continuing to express their fear of persecution there:

·   A 33-year-old Salvadoran woman said that, though she feared her former partner would harm her, "I don't know what else I can do" but return to El Salvador.[164]

·   A woman said that she felt she had no alternative but to return to Honduras because she had no place to stay and no means to support herself and her baby in Guatemala. She said she feared attack in

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our **privacy policy** to find out what cookies are used for and how to change your settings.

CLP_PC_026329





Deportation with a Layover

DONATE NOW

# Recommendations

## To the US Government (Department of Homeland Security and Department of Justice)

· Terminate the ACA with Guatemala, halt plans to begin transferring asylum seekers under the ACA with Honduras, and do not implement the ACA with El Salvador;

· Remove the five-year bar to entry into the United States for persons subjected to any asylum cooperative agreements;

· Allow asylum seekers who are or were subject to the Guatemala ACA to restart their asylum claims in the United States;

· Disclose the number of individuals subjected to the Guatemala ACA and a breakdown of this number by nationality, gender, age, and port of entry or Border Patrol Sector through which the individual was initially processed; the number of individuals who expressed fear of being sent to a third country under an ACA and were provided a non-refoulement interview; and the pass rate of those interviews.

## To the Congress of the United States

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

CLP_PC_026330






## To the Guatemalan Government

- Terminate the ACA with the United States, or, at least, do not resume acceptance of ACA transfers, which have been suspended because of the Covid-19 pandemic;

- Release the annexes of the agreement publicly and allow the Guatemalan Congress to review and determine whether the agreement should be signed;

- Revise the Guatemalan Legal Code to allow the National Migration Authority to delegate asylum determination decisions to individuals trained in international asylum law;

- Continue to work with UNHCR to improve the capacity of the asylum system.

## Acknowledgements

This report was researched and written by Yael Schacher, senior advocate, and Rachel Schmidtke, advocate, with Refugees International, and Ariana Sawyer, US border researcher in the US Program at Human Rights Watch. The report was edited by Hardin Lang, vice president for programs at Refugees International and Bill Frelick, director of the Refugee and Migrant Rights Division at Human Rights Watch. Eric Schwartz, president of Refugees International, reviewed the report. Human Rights Watch reviewers of the report were Grace Meng, senior researcher, US Program; Tamara Taraciuk Broner, acting deputy director, Americas Division; Michael Bochenek, senior counsel, Children's Rights

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

CLP_PC_026331

**Deportation with a Layover**          DONATE NOW

would also like to thank Leonel Dubon, director at Refugio de la Niñez; Father Mauro Verzeletti, director of the Casa del Migrante; and Gabriela Mundo, director of international relations at the Office of the Human Rights Ombudsman.

Region / Country   **Guatemala, United States, Immigration**

## Protecting Rights, Saving Lives

**Human Rights Watch defends the rights of people in close to 100 countries worldwide, spotlighting abuses and bringing perpetrators to justice**

**DONATE NOW**



## Get Updates On Rights Issues From Around The Globe

Enter an email address

Get the Daily Brief     Get The Week in Rights

Connect With Us

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our **privacy policy** to find out what cookies are used for and how to change your settings.

CLP_PC_026332



Deportation with a Layover

    DONATE NOW

**Human Rights Watch |** 350 Fifth Avenue, 34th Floor | New York, NY 10118-3299 USA | **t** 1.212.290.4700

**Human Rights Watch** is a 501(C)(3) nonprofit registered in the US under EIN: 13-2875808

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

CLP_PC_026333



**REFUGEES
INTERNATIONAL**

# HARMFUL RETURNS

## THE COMPOUNDED VULNERABILITIES OF RETURNED GUATEMALANS IN THE TIME OF COVID-19

### Yael Schacher and Rachel Schmidtke

FIELD REPORT | JUNE 2020

CLC_RC_026341

Cover Photo: Migrants, part of a group of 76 Guatemalans deported from the United States, wear face masks as a preventive measure against the novel coronavirus COVID-19 as they board a bus upon landing at the Air Force base in Guatemala City on May 4, 2020. (Photo by Johan OR-DONEZ / AFP via Getty Images).

CLP_PC_026342

# CONTENTS

## 4   SUMMARY AND RECOMMENDATIONS

## 8   BACKGROUND

Pre-COVID 19 Policy Changes in the United States

Pre-COVID Policy Changes in Mexico

U.S. and Mexico Deportation Policy Changes under COVID-19

## 17   PROTECTION CONCERNS IN GUATEMALA UPON RETURN

Crime

Discrimination and Mistreatment of Women and Indigenous Groups

Increased Vulnerability for Children

## 23   SOCIOECONOMIC BARRIERS TO INTEGRATION

Barriers to Economic Integration

Health Care

## 25   COMPOUNDED CHALLENGES DURING THE COVID-19 PANDEMIC

## 26   CONCLUSION

CLP_PC_026343

# SUMMARY

In recent years, the United States and Mexico have taken a series of steps that make it easier to return Guatemalans back to their home country. These steps include policies and programs related to detention, deportation, and limits in asylum, such as the Remain in Mexico program (officially called the Migrant Protection Protocols or MPP by its acronym). These measures force home many Guatemalans with valid refugee claims who are at risk of persecution upon return. Others have legitimate fears for their security and safety when they get home because return-ees are at greater risk of becoming targets of violence and extortion. Once back, Guatemalans often struggle to reintegrate. They face unique challenges in earning a livelihood; and women, indigenous groups, and children face particular barriers to accessing many basic public ser-vices. Also, health care is lacking, particularly for psychological or specialized services.

Deportations and returns carried out in the midst of the COVID-19 pandemic compound these challenges and contribute to the spread of the virus. Indeed, at the end of April 2020, deport-ees from the United States made up nearly 20 percent of the 500 coronavirus cases in Gua-temala and, as of early June, deportees continue to test positive for COVID-19 upon arrival in Guatemala despite having clean bill of health documents from the United States.[1]

In the United States, the administration has responded to the pandemic by insisting on contin-ued detention of asylum seekers by Immigration and Customs Enforcement (ICE) rather than using alternatives that would allow for social distancing.[2] On May 24, 2020, a 34-year-old Gua-temalan man was the second detainee to die from COVID-19 in ICE custody.[3] The United States is also making it more difficult for unaccompanied children in the care of the Office of Refugee Resettlement (ORR) to unite with relatives already in the country. In addition, the administration has expanded its efforts to deport children to Guatemala—both children in the custody of the ORR or those who have just crossed the border and been picked up by Customs and Border Protection (CBP).[4]

Since late March, under the claimed authority of Title 42 of the Public Health Safety Act, CBP has expelled Guatemalan asylum seekers to Mexico without any fear screening. Singling out asylum seekers in this way is neither justified nor necessary for public health; an alternative

---

1.  Camilo Montoya-Galvez, "'Exporting the Virus: Migrants Deported by U.S. Make up 20% of Guatemala's Coronavirus Cas-es," CBS News, April 27, 2020, https://www.cbsnews.com/news/deported-migrants-guatemala-coronavirus-cases/; Monique O. Madan and Jacqueline Charles, "ICE Has Been Testing Migrants before Deportation. But How It's Doing So Is Problematic.," Miami Herald, May 29, 2020, https://www.miamiherald.com/news/local/immigration/article243054631.html.

2.  "The Real Alternatives to Detention," Justice for Immigrants, United States Conference of Catholic Bishops, June 2019, https://justiceforimmigrants.org/what-we-are-working-on/immigrant-detention/real-alternatives-detention/.

3.  Camilo Montoya-Galvez, "Second Immigrant Dies of Coronavirus Complications While in ICE Custody," CBS News, May 25, 2020, https://www.cbsnews.com/news/second-immigrant-dies-of-coronavirus-complications-while-in-ice-custody/.

4.  Camilo Montoya-Galvez, "'The table below (in Spanish) by the Guatemalan government shows that while the number of children deported with their parents has declined since January, deportations of unaccompanied minors increased signifi-cantly in March"
Twitter, April 1, 2020, https://twitter.com/camiloreports/status/1245379977396322307; Molly O'Toole, "Under Trump Policy, U.S. Plays Custody Keep-Away with Migrant Children," Los Angeles Times, May 18, 2020, https://www.latimes.com/politics/sto-ry/2020-05-18/unaccompanied-migrant-kids-deportations-coronavirus;
Lomi Kriel, "The Trump Administration Is Rushing Deportations of Migrant Children During Coronavirus," ProPublica, May 18, 2020, https://www.propublica.org/article/the-trump-administration-is-rushing-deportations-of-migrant-children-during-coro-navirus; Caitlin Dickerson and Kirk Semple, "U.S. Deported Thousands Amid Covid-19 Outbreak. Some Proved to Be Sick," The New York Times, April 18, 2020, https://www.nytimes.com/2020/04/18/us/deportations-guatemala.html.
Camillo Montoyo-Galvez, "The U.S. gave her refuge from gangs. But her 13- year old daughter was expelled under Trump's new border policy," CBS News, June 10, 2020, https://www.cbsnews.com/news/13-year-old-daughter-refugee-expelled-trump-new-border-policy/

CLP_PC_026344

safe screening process could be adopted at the border.[5] Before invoking Title 42 authority, CBP placed thousands of asylum-seeking Guatemalans in the MPP program, and they continue to live in dangerous and poor conditions in northern Mexico.[6] Health care workers in Tijuana, Ciudad Juarez, and Matamoros warn that conditions for asylum seekers waiting there will make an outbreak of COVID-19 a "public health disaster."[7] This disaster could be averted through parole of those in MPP to homes of family and friends in the United States, a circumstance that would be available to the vast majority of them, and allowing for social distancing, quarantine, and isolation.[8]

Mexico has worked to reduce the number of people in detention during the pandemic; as of May 27, 2020, 234 migrants remained in detention across Mexico's 65 migration detention centers.[9] Although the number of detained migrants has been greatly reduced since March, Mexico has returned nearly 5,000 Central Americans to their home countries since the pandemic began.[10] Four adolescents deported from Mexico had tested positive for COVID-19 as of May 20, but the number of deportees could be higher because it is difficult to track these cases, given that many Guatemalans return through informal channels, frequently after being bused from the north and abandoned near the Guatemalan border.[11]

In Guatemala, the government has focused its efforts on providing some basic reception services for deportees and other returnees. However, it has struggled to provide meaningful reintegration programs. The pandemic has exacerbated the impact of this failure. If a returnee has been exposed to COVID-19 or is COVID-19 positive upon arrival, there are few if any health care services to treat them, nor is there adequate shelter to allow for either quarantine or isolation.

Guatemalans deported during the pandemic arrive home to face rising levels of food insecurity and a stagnant economy further hobbled by border closures and movement restrictions. Adults and children alike face stigma and a growing risk of violent attack as fear and misinformation about the disease continue to spread. A senior UN aid official in Guatemala recently observed

5.  Yael Schacher and Chris Beyrer, "Expelling Asylum Seekers Is Not the Answer: U.S. Border Policy in the Time of COVID-19," Refugees International, April 27, 2020, https://www.refugeesinternational.org/reports/2020/4/26/expelling-asylum-seekers-is-not-the-answer-us-border-policy-in-the-time-of-covid-19; Ruthie Epstein and Shaw Drake, "How to Co-Opt a Pandemic to Ban Asylum," American Civil Liberties Union, May 20, 2020, https://www.aclu.org/news/immigrants-rights/how-to-co-opt-a-pandemic-to-ban-asylum/.; "Public Health Measures to Safely Manage Asylum Seekers and Children at the Border," Human Rights First, May 15, 2020, https://www.humanrightsfirst.org/resource/public-health-measures-safely-manage-asylum-seekers-and-children-border.

6.  "Deportation and Disease: Central America's COVID-19 Dilemmas," International Crisis Group, April 28, 2020, https://www.crisisgroup.org/latin-america-caribbean/central-america/guatemala/deportation-and-disease-central-americas-covid-19-dilemmas; Kennji Kizuka, Eleanor Acer, and Rebecca Gendelman, "Pandemic as Pretext: Trump Administration Exploits COVID-19, Expels Asylum Seekers and Children to Escalating Danger," Human Rights First, May 13, 2020, https://www.humanrightsfirst.org/resource/pandemic-pretext-trump-administration-exploits-covid-19-expels-asylum-seekers-and-children

7.  Julia Ainsley, "As COVID-19 Looms, Conditions for Migrants Stalled at U.S. Border Are a 'Disaster in the Making,'" NBCNews.com, May 12, 2020, https://www.nbcnews.com/politics/immigration/covid-19-looms-conditions-migrants-stalled-u-s-border-are-n1204506.

8.  An October 2019 study of 607 asylum seekers subject to the Remain in Mexico program found that nearly 92 percent had family or close friends in the United States; Tom K. Wong and Vanessa Ceceña, "Seeking Asylum: Part 2," US Immigration Policy Center, October 29, 2019, https://usipc.ucsd.edu/publications/usipc-seeking-asylum-part-2-final.pdf.

9.  INM, "Da seguimiento a las medidas cautelares emitidas por @CNDH," Twitter, May 29, 2020, 8:15 p.m., https://twitter.com/INAMI_mx/status/1266523701467475968.

10.  "México Ha Deportado a Cerca De 5 Mil Centroamericanos Durante La Pandemia," Conexión Migrante," Voz de America, May 19, 2020, https://conexionmigrante.com/2020-/05-19/mexico-deportaciones-5000-centroamericanos-durante-pandemia/.

11.  "Interview with Rosi Siu, Asylum Access Mexico in Tenosique, Tabasco," Asylum Access, May 13, 2020, https://asylumaccess.org/asylum-in-a-pandemic-refugio-en-una-pandemia-tenosique-tabasco/.

CLP_PC_026345

that "many communities are rejecting returnees because they fear being infected." Indeed, even those returnees who test negative for COVID-19 have been violently attacked.[12]

Refugees International has called for testing before deportation, and the Guatemalan government has required evidence of such testing from the United States. However, U.S. authorities are not conducting comprehensive and effective testing, and deportees continue to test positive upon arrival in Guatemala.[13] This situation puts additional strain on the Guatemalan government and civil society, which already lack an adequate response.

# RECOMMENDATIONS

## To the United States Government:

- Release from detention all Guatemalans who have passed their credible fear interviews or are at a higher risk of succumbing to COVID-19 owing to age or pre-existing medical conditions.

- Release Guatemalan unaccompanied children from the custody of the ORR into the care of sponsors in the United States.

- Ensure that Guatemalans seeking asylum and humanitarian protection at the border are afforded access to screenings as required under domestic and international law.

- Guatemalans in the Remain in Mexico (MPP) program should be paroled to friends and family in the United States to await their asylum hearings. Guatemalans in MPP who have been "deported in absentia" after returning to Guatemala should be able to reopen their cases.

- Institute a temporary moratorium on deportations to Guatemala during the pandemic.

- Fund reintegration programs for returned Guatemalans, including efforts to remove barriers to economic integration, providing loans and job trainings, and offering additional support for women and indigenous groups. This funding should also support efforts to contain and mitigate the coronavirus pandemic, such as providing medical equipment and cash transfer programs.

## To the Mexican Government:

- Institute a temporary moratorium on voluntary returns and deportations to Guatemala during the pandemic. Once the pandemic eases, coordinate with the Guatemalan gov-

12. Adolfo Flores, "Guatemalans Deported from the US Are Being Threatened with Violence at Home over Coronavirus Fears," BuzzFeed News, May 1, 2020, https://www.buzzfeednews.com/article/adolfoflores/guatemala-us-deportees-threats-coronavirus.

13. "US deportation flights to Guatemala resume," The Washington Post, June 9, 2020, https://www.washingtonpost.com/world/the_americas/us-deportation-flights-to-guatemala-resume/2020/06/09/e24acbe2-aab0-11ea-a43b-be9f6494a87d_story.html.

Jonathan Blitzer, "The Trump Administration's Deportation Policy Is Spreading the Coronavirus," New Yorker, May 13, 2020, https://www.newyorker.com/news/daily-comment/the-trump-administrations-deportation-policy-is-spreading-the-coronavirus.

CLP_PC_026346

ernment to ensure that returns are conducted through regular routes, with proper health checks before return.

- The Mexican National Migration Institute should properly screen those Guatemalans who arrive at the Mexico-Guatemala border for international protection and allow those who wish to do so to apply with the Mexican Commission for Refugee Assistance (COMAR).

- End the detention of migrant and refugee children in immigration facilities in accordance with Mexican law and invest in additional open-door shelter options for migrant and refugee children. Train immigration and child welfare officials to provide child-friendly information about their right to seek asylum. In determining where it may be in the child's "best interest" to reside, Mexican child protection officials should consider the United States as a possible destination.

### To the Guatemalan Government:

- Provide proper shelters for returned Guatemalans to quarantine upon arrival and ensure that they have access to necessities such as food, water, and sufficient space to maintain a safe distance from others.

- Conduct multilingual information campaigns in Mayan languages and Spanish to combat stigma directed at deportees released from coronavirus quarantine. Coordinate with return-ee organizations to provide social support and community reintegration.

- Work with international humanitarian, civil society, and church organizations to provide emergency support services to vulnerable Guatemalans, including returnees. These ser-vices should include measures to mitigate the impacts of the pandemic. Look to the best practices of cash-based transfer programs, food distribution, and mobile clinics that other countries in the region are implementing.

- Strengthen reintegration programs for Guatemalan deportees and returnees that include targeted services for women, girls, and indigenous groups. Work with civil society organiza-tions with experience in reintegration to build from their best practices and include pro-grams tailored to returnees' culture, gender, and location.

CLP_RC_026347



# BACKGROUND

Deportations from the United States and Mexico to Guatemala have increased over the past decade, but recent policy changes make it easier for these countries to deport people quickly, often without proper screening regarding their protection needs. In 2019, the United States deported nearly 55,000[14] Guatemalans to Guatemala. Mexico and the United States voluntarily returned 96,740[15] people the same year.

## Pre-COVID 19 Policy Changes in the United States

Since 2014, the United States has responded to increased forced migration of children and families from Guatemala (as well as El Salvador and Honduras) with a strategy of deterrence through detention.[16] Yet the Obama administration also created the Central American Minors program to allow parents in the United States to apply to bring their children to the United States as refugees.[17]

---

14.  Jeff Abbott, "U.S. Deportations of Guatemalans Doubled over Past Decade," Reuters, January 3, 2020, https://www.reuters.com/article/us-usa-immigration-guatemala/u-s-deportations-of-guatemalans-doubled-over-past-decade-idUSKBN1Z223M; U.S. Immigration and Customs Enforcement (website), "U.S. Immigration and Customs Enforcement Fiscal Year 2019 Enforcement and Removal Operations Report," n.d., accessed June 7, 2020, https://www.ice.gov/sites/default/files/documents/Document/2019/eroReportFY2019.pdf.
15.  IOM; "Guatemala," Iniciativa de Gestión de Información de Movilidad Humana en el Triángulo Norte (International Organization for Migration), accessed June 4, 2020, https://mic.iom.int/webntmi/guatemala/.
16.  Dora Schriro, "Weeping in the Playtime of Others: The Obama Administration's Failed Reform of ICE Family Detention Practices," Journal on Migration and Human Security 5, no. 2 (2017): 452–480, https://doi.org/10.1177/233150241700500212.
17.  U.S. Citizenship and Immigration Services (USCIS) (website), "In-Country Refugee/Parole Processing for Minors in Honduras, El Salvador and Guatemala (Central American Minors — CAM)," November 15, 2017, https://www.uscis.gov/CAM.

CLP_PC_026348

# RESEARCH OVERVIEW

Refugees International traveled to Guatemala in February of 2020 to assess the protection landscape for deportees and returnees from the United States and Mexico. The team traveled to Quetzaltenango, Salcajá, and Guatemala City. They interviewed Guatemalan asylum seekers and migrants who were deported or returned from the United States or Mexico. The team also interviewed staff of various returnee organizations and of local and international NGOs as well as U.S. and Guatemalan government representatives.

**Family separation and detention of children:** The Trump administration canceled this program in 2017, began prosecuting relatives who paid smugglers to bring children to the United States, and then initiated its "zero tolerance policy," which led to the arrest of parents who crossed the border without authorization and separating them from any children who had accompanied them. Some deported Guatemalan parents have been reunited with their children, whereas other families remain separated to this day.[18] The Trump administration also implemented several policies that dramatically increased the detention of Central American children under deteriorating conditions.[19] Between late 2018 and early 2019, five Guatemalan children died in Customs and Border Protection (CBP) custody,

whereas there had been no child deaths in CBP custody in the previous decade.[20]

**Limiting protection for unaccompanied children:** In 2019, CBP apprehended more unaccompanied children (30,000) from Guatemala than any other country. These children were sent by CBP to the Office of Refugee Resettlement (ORR), where they are supposed to receive services, seek asylum via a child-appropriate interview, and be placed in the least restrictive setting (as mandated by the Trafficking Victims Reauthorization Act). However, information-sharing policies between ORR and the U.S. Department of Homeland Security (DHS) and policy changes relating to filing claims for relief inhibited the placement of children

---

18.  "First Separated Parents Returning from Guatemala to U.S. as Part of Court Order," Kids in Need of Defense, news release, January 22, 2020, https://supportkind.org/press-releases/first-separated-parents-returning-from-guatemala-to-u-s-as-part-of-court-order/; Kevin Sieff, "They Were One of the First Families Separated at the Border. Two and a Half Years Later, They're Still Apart," Washington Post, February 17, 2020, https://www.washingtonpost.com/world/the_americas/they-were-one-of-the-first-families-separated-at-the-border-two-and-a-half-years-later-theyre-still-apart/2020/02/17/38594c98-4152-11ea-99c7-1dfd4241a2fe_story.html.

19.  Christopher Sherman, Martha Mendoza, and Garance Burke, "US Held Record Number of Migrant Children in Custody in 2019," Associated Press, November 12, 2019, https://apnews.com/015702afdb4d4fbf85cf5070cd2c6824; Caitlin Dickerson, "'There Is a Stench': Soiled Clothes and No Baths for Migrant Children at a Texas Center," New York Times, June 21, 2019, https://www.nytimes.com/2019/06/21/us/migrant-children-border-soap.html; Jonathan Blitzer, "To Free Detained Children, Immigrant Families Are Forced to Risk Everything," New Yorker, October 16, 2018, https://www.newyorker.com/news/dispatch/to-free-detained-children-immigrant-families-are-forced-to-risk-everything; "No Home for Children: US Government Detention of Children at Homestead Facility Cruel and Unlawful," Amnesty International USA, July 17, 2019, https://www.amnestyusa.org/reports/no-home-for-children-us-government-detention-of-children-at-homestead-facility-cruel-and-unlawful/.

20.  "After Six Deaths, Is DHS Doing Enough to Ensure the Health and Safety of Children in Their Care?" America's Voice, news release, January 14, 2020, https://americasvoice.org/press_releases/after-six-deaths-is-dhs-doing-enough-to-ensure-the-health-and-safety-of-children-in-their-care/.

CLP_PC_026349



This mural in Quetzaltenango depicts
Claudia Patricia Gómez González, a 19
year old woman from nearby San Juan
Ostuncalco, who was shot dead by a Border
Patrol agent on May 28, 2018 after she
crossed the U.S. border near Laredo, Texas.
Photo by: Refugees International.

CLP_PC_026350

with relatives and made it more difficult for them to succeed in their applications for protection. Upon turning 18, children were transferred from ORR to Immigration and Customs Enforcement (ICE) custody.[21] Rather than remain in detention to fight their cases, some young people requested "voluntary departure," which does not carry the mandatory 10-year bar from future admissibility to the United States that deportation requires.[22] In late 2019, the Trump administration also began a program to speed unaccompanied minors through immigration courts to rapidly deport them before they were released to sponsors in the United States.[23]

**Increased barriers to asylum:** Under the Trump administration, DHS's policy of refusing to parole asylum seekers who passed credible fear screenings—instead keeping them detained for months or even years waiting for immigration court hearings—has led many Guatemalan asylum seekers to abandon their claims.[24] Further, decisions by Attorney General Sessions and Barr have narrowed asylum eligibility for those fleeing gang or domestic violence, or violence directed toward family members. As Refugees International has indicated in other reports, these decisions by the Attorneys General overturned rulings by the Justice Department's own Board of Immigration Appeals and have been opposed by some federal courts.[25] The AG decisions have resulted in a dramatic drop in asylum grant rates for Guatemalans.[26] In 2019, the administration further barred asylum seeking by those who transit a third country. These policies have led to increasing returns and deportations of Guatemalans at great risk of harm.

**Migrant Protection Protocols:** Also in 2019, in the face of increasing numbers of asylum-seeking Central American families at the southern border, the administration initiated its Remain in Mexico—officially, the Migration Protection Protocols (MPP)—policy, requiring these families to wait in Mexico for months while their cases proceed through the U.S. immigration courts. Of the almost 16,000 Guatemalans in the MPP program in May 2020, less than 600 have been able to secure legal representation, thus making it

---

21.  "Lawsuit against Homeland Security Says New Asylum Policy Violates Child Immigrants' Rights," Kids in Need of Defense, press release, July 8, 2019, https://supportkind.org/press-releases/homeland-security-lawsuit/;
"Resources on Special Immigrant Juvenile Status," Special Immigrant Juvenile Status (Catholic Legal Immigration Network (CLINIC), April 7, 2020, https://cliniclegal.org/resources/childrens-issues/special-immigrant-juvenile-status; "The ORR and DHS Information-Sharing Agreement and its Consequences," Justice for Immigrants, United States Conference of Catholic Bishops, October 3, 2019, https://justiceforimmigrants.org/what-we-are-working-on/unaccompanied-children/orr-and-dhs-information-sharing-agreement-its-consequences/; Hannah Dreier, "Trust and Consequences," Washington Post, February 15, 2020, https://www.washingtonpost.com/graphics/2020/national/immigration-therapy-reports-ice/.
22.  There is nothing truly voluntary about that provision; the leaving is mandatory; Nicholas Novy, "The Problem of Coerced Consent: When Voluntary Departure Isn't So Voluntary," Kansas Law Review 68, no. 2 (2019): 315–349.
23.  Golden McCarthy, "The Fast-Tracking of Detained Unaccompanied Children to Deportation," Florence Immigrant and Refugee Rights Project, January 28, 2020, https://docs.house.gov/meetings/JU/JU01/20200129/110402/HHRG-116-JU01-20200129-SD012.pdf.
24.  Laura Riviera and Dan Werner, "No End in Sight: Why Migrants Give Up on Their U.S. Immigration Cases," Southern Poverty Law Center, 2018, https://www.splcenter.org/sites/default/files/leg_ijp_no_end_in_sight_2018_final_web.pdf.
25.  "Report Card: The Trump Administration's Performance on Refugee and Humanitarian Protection," Refugees International, June 20, 2018, https://www.refugeesinternational.org/reports/2018/6/19/report-card-on-the-trump-administrations-performance-on-refugee-and-humanitarian-protection; The Attorney General's narrowing of the standard also conflicts with determinations of the United Nations High Commissioner for Refugees. See "Guidance Note on Refugee Claims Relating to Victims of Organized Gangs," United Nations High Commissioner for Refugees, March 2010, https://www.refworld.org/pdfid/4bb21fa02.pdf;
Chiara Cardoletti-Carroll, Alice Farmer, and Leslie E Velez, eds., "Women on the Run," United Nations High Commissioner for Refugees, October 2015, https://www.unhcr.org/en-us/publications/operations/5630f24c6/women-run.html.
26.  "Fact Sheet: Grant Rates Plummet as Trump Administration Dismantles U.S. Asylum System, Blocks and Deports Refugees," Human Rights First, June 2020, https://www.humanrightsfirst.org/sites/default/files/AdministrationDismantlingUSAsylumSystem.pdf.

CLP_PC_026351

very difficult for them to succeed in court.[27] Many Guatemalan families, especially indigenous language speakers, have found conditions in northern Mexico too dangerous and difficult to survive (especially the lack access to food, shelter, work, and services), and have felt forced to abandon their cases. As one Guatemalan mother told an immigration judge in El Paso, "Over there (in Guatemala), if they do something to me, my children have somewhere to go. Over here (in Mexico), they have nothing if something happens to me."[28] The Remain in Mexico program has also led to the separation of many Guatemalan families,[29] with some family members in the United States and others waiting in Mexico or returned to Guatemala.[30]

**PACR:** In late 2019, the Trump administration initiated a new program called Prompt Asylum Claim Review (PACR) to fast track the deportation of Central American asylum seekers. Before PACR, asylum seekers at the border typically were transferred from CBP to ICE custody, where they might consult with counsel before their interviews with asylum officers. Under PACR, asylum seekers are held exclusively in CBP custody (where conditions are poor and they cannot access supporting evidence) and have limited access to counsel before their asylum interviews.[31] Within 10 days of crossing the U.S.-Mexico border, asylum-seeking Guatemalans whose claims are summarily denied have been deported back to Guatemala through this program.

**Cuts to development and anti-corruption initiatives:** Beyond border and deportation policy, U.S. foreign policy toward Guatemala since 2018 has focused on forcing the Guatemalan government to stop migration rather than supporting humanitarian and civil society efforts to address the violence, impunity, corruption, and poverty pushing Guatemalans to migrate.[32] This focus was evident in the Trump administration's effort to under-

27.  "Details on MPP (Remain in Mexico) Deportation Proceedings," TRAC Immigration, May 2020, https://trac.syr.edu/phptools/immigration/mpp/.

28.  Robert Moore, "Guatemalan Family First to Be Deported from U.S. in Trump ...," Borderzine: Reporting Across Fronteras, May 10, 2019, https://borderzine.com/2019/05/guatemalan-family-first-to-be-deported-from-u-s-in-trumps-remain-in-mexico-program/.

29.  Daniella Silva, "Migrant Families Are Being Separated under Remain-in-Mexico Policy, Complaint Alleges," NBCNews, August 20, 2019, https://www.nbcnews.com/news/latino/migrant-families-are-being-separated-under-remain-mexico-policy-complaint-n1044466; Adolfo Flores, "Asylum-Seekers Keep Getting Sent Back To Mexico Without Their Children Based On Unreliable Information" BuzzFeed News, December 26, 2019, https://www.buzzfeednews.com/article/adolfoflores/asylum-seekers-families-separated-bad-info; "New Report Reveals Danger of 'Remain in Mexico' Including New Cases of Family Separation, Confiscated Identity Documents, New Inhumane CBP Custody Tents," Women's Refugee Commission press release, May 16, 2019, https://www.womensrefugeecommission.org/press-releases/new-report-reveals-danger-of-remain-in-mexico-including-new-cases-of-family-separation-confiscated-identity-documents-new-inhumane-cbp-custody-tents/; Priscilla Alvarez, "At Least 350 Children of Migrant Families Forced to Remain in Mexico Have Crossed over Alone to US," CNN, January 24, 2020, https://www.cnn.com/2020/01/24/politics/migrant-children-remain-in-mexico/index.html; "Forced Apart: How the 'Remain in Mexico' Policy Places Children in Danger and Separates Families," Kids in Need of Defense, February 24, 2020, https://supportkind.org/wp-content/uploads/2020/02/MPP-KIND-2.24updated-003.pdf.

30.  At least one federal court objected to DHS sending a Guatemalan child to wait in Mexico with her father rather than uniting her mother in the United States. E.O.H.C.; M.S.H.S., a minor child v. Secretary DHS et. al. (19-2927, U.S. Court of Appeals for the Third Circuit, February 13, 2020), https://www2.ca3.uscourts.gov/opinarch/192927p.pdf.

31.  Robert Moore, "Trump Administration Testing Rapid Asylum Review, Deportation Process in Texas," Washington Post, https://www.washingtonpost.com/immigration/trump-administration-testing-rapid-asylum-review-deportation-process-in-texas/2019/10/24/caa91a62-f5d8-11e9-a285-882a8e386a96_story.html;

"Policies Affecting Asylum Seekers at the Border," American Immigration Council, January 29, 2020, https://www.americanimmigrationcouncil.org/research/policies-affecting-asylum-seekers-border.

32.  "LAWG Strongly Condemns Administration's Abrupt & Irrational Announcement to Cut Aid to Central America & Punish Refugees for Seeking Protection," Latin America Working Group, press release, April 1, 2019, https://www.lawg.org/press-release-lawg-strongly-condemns-administrations-abrupt-irrational-announcement-to-cut-aid-to-central-america-punish-refugees-for-seeking-protection/;

"As Central America Aid Resumes, the U.S.'s Return of Refugees and Immigrants May Undermine Impact," Kids in Need of Defense, press release, April 29, 2020, https://supportkind.org/press-releases/as-central-america-aid-resumes-the-u-s-s-return-

CLR_PG_026352

mine the International Commission against Impunity in Guatemala (CICIG), the UN agency effectively combatting government corruption in that country.[33] It is also evident in the U.S. State Department's reorientation of programs from the U.S. Agency for International Development (USAID) and Bureau of International Narcotics and Law Enforcement Affairs toward migration prevention,[34] and its insistence that foreign aid is contingent on implementing an asylum cooperative agreement (ACA) with the United States.[35] Honduran and Salvadoran asylum seekers returned under an ACA in early 2020 filled the only migrant shelter in Guatemala City, making it unable to accommodate Guatemalan returnees.

## Pre-COVID Policy Changes in Mexico

**Strict enforcement and inhumane detention:** Since 2014, Mexico has been increasing its enforcement capacity on its southern border with Belize and Guatemala.[36]

Although Andrés Manuel López Obrador began his presidency with a welcoming stance toward migrants,[37] policies quickly shifted toward stricter enforcement, particularly after tariff threats from the United States in the summer of 2019.[38] The Mexican government's stance was that it wanted to end the drivers of migration, and it even launched a development program with Guatemala, Honduras, and El Salvador.[39] However, these initiatives have done little to stem the flow of migrants, and the government has moved its focus toward enforcement. The Mexican government has legislated significant policy shifts, militarizing the southern border with the deployment of the National Guard,[40] issuing regulations that prohibit bus companies from selling tickets to undocumented migrants, and using force to keep immigrant caravans from entering the country. The Mexican National Migration Institute (INM) holds migrants and asylum seekers in "prison-like" enclosed settings with overcrowded facilities, food scarcity, and a lack of proper hygiene.[41] Migrants

of-refugees-and-immigrants-may-undermine-impact/.

33.  Colum Lynch, "Corrupt Guatemalans' GOP Lifeline," Foreign Policy, February 5, 2019, https://foreignpolicy.com/2019/02/05/trump-republican-lawmakers-weaken-u-n-anti-corruption-commission-guatemala-jimmy-morales-white-house-putin/.

34.  This reorientation is evident in the responses of Kirsten D. Madison, Assistant Secretary of the Bureau of Narcotics and Law Enforcement Affairs, to questions by members of Senate Foreign Relations Committee at a September 25, 2019 hearing on the migration crisis at the U.S. border: U.S. Policy in Mexico and Central America: Ensuring Effective Policies to Address the Crisis at the Border: United States Senate Committee on Foreign Relations, Hearing before the United States Senate Committee on Foreign Relations, September 25, 2019, https://www.foreign.senate.gov/hearings/us-policy-in-mexico-and-central-america-ensuring-effective-policies-to-address-the-crisis-at-the-border.

35.  Michael R. Pompeo, "United States Continues U.S. Foreign Assistance for El Salvador, Guatemala, and Honduras—United States Department of State," U.S. Department of State, press statement, April 13, 2020, https://www.state.gov/united-states-continues-u-s-foreign-assistance-for-el-salvador-guatemala-and-honduras/.

36.  Clay Boggs, "Mexico's Southern Border Plan: More Deportations and Widespread Human Rights Violations," Washington Office on Latin America (WOLA), March 19, 2015, https://www.wola.org/analysis/mexicos-southern-border-plan-more-deportations-and-widespread-human-rights-violations/.

37.  Jeff Ernst and Kirk Semple, "Mexico Moves to Encourage Caravan Migrants to Stay and Work," New York Times, January 25, 2019, https://www.nytimes.com/2019/01/25/world/americas/migrant-caravan-honduras-mexico.html.

38.  Stephanie Eschenbacher, Miguel Angel Lopez, and Roberta Rampton, "Mexico Expects Relief on U.S. Tariff Threat as Migrant Flows Drop," Reuters, September 6, 2019, https://www.reuters.com/article/us-usa-immigration-mexico/mexico-expects-relief-on-u-s-tariff-threat-as-migrant-flows-drop-idUSKCN1VR1KC.

39.  "The Comprehensive Development Plan Is an Innovative Proposal that Addresses the Structural Causes of Migration, With a Focus on Growth, Equality and Environmental Sustainability," United Nations Economic Commission for Latin America and the Caribbean (ECLAC), press release, January 15, 2020, https://www.cepal.org/en/pressreleases/comprehensive-development-plan-innovative-proposal-addresses-structural-causes.

40.  "México Refuerza La Presencia De La Guardia Nacional En La Frontera Sur Para Frenar La Migración," Agencia EFE, July 4, 2019, https://www.efe.com/efe/usa/mexico/mexico-refuerza-la-presencia-de-guardia-nacional-en-frontera-sur-para-frenar-migracion/50000100-4015529.

41.  "Overcrowding, Abuse Seen at Mexico Migrant Detention Center," Associated Press; NBCNews.com, June 17, 2019,

CLP_PC_026353

have been detained for extended periods, including children and other vulnerable groups.[42]

**Rapid deportation of children:** Many Guatemalan children who migrate north for survival (fleeing extortion, poverty, and violence) or to reunite with parents do not make it to the United States. Instead, they are blocked from accessing U.S. ports or detained further south in Mexico and rapidly deported without a substantive evaluation of their best interests or the dangers they could face upon return. Civil society organizations that monitor the human rights situation of migrants and refugees in Tapachula reported that about 50 unaccompanied children who traveled with the January 2019 caravan were detained by migration officials and deported within 24 hours. Even if INM turns children over to the Mexican child welfare agency, they receive little help in applying for asylum, and most best-interest determinations do not consider the option of placing children with relatives in the United States.[43]

**Lack of funding for Mexico's asylum system:** Mexico has adopted a broader refugee definition than the United States and grants a higher percentage of asylum applications.[44] The overall 2019 asylum grant rates averaged 71 percent, according to the Mexican Commission for Refugee Assistance (COMAR), but

for Guatemalans this number is much lower, at only 34 percent. In comparison, the rate for Venezuelans was 99 percent.[45] The restrictionist policies of the United States have directly affected the Mexican asylum system, contributing to a significant rise in asylum claims in the last few years. The capacity of the Mexican system is limited. It has not provided a commensurate budgetary increase to process the applications. COMAR is severely under-resourced—approximately 48 protection staff decided the cases of up to 80,000 asylum seekers in 2019.[46]

**Increased deportations and "voluntary returns":** Although Mexico's asylum system is more generous than that of the United States, its apprehension and return numbers have been on the rise since June 2019.[47] According to Mexican government data, deportations from Mexico to Guatemala appear low because the INM uses ambiguous terminology to describe enforcement actions. "Assisted returns" of Central Americans are, in fact, deportations and not voluntary at all.[48] Many Guatemalans who flee serious harm have been dissuaded from pursuing their legitimate asylum claims in Mexico because of detention conditions and discouragement by officials there. In Mexico, Guatemalans are often returned before they have the chance to make asylum claims.[49]

https://www.nbcnews.com/news/latino/overcrowding-abuse-seen-mexico-migrant-detention-center-n1018231.
42. The shelter for unaccompanied children in Quetzaltenango Guatemala told Refugees International in an interview that some children were detained for 20 to 30 days in Mexico.
43. "The Invisible Wall: Obstacles to Protection for Unaccompanied Migrant Children Along Mexico's Southern Border," Kids in Need of Defense, July 26, 2019, https://supportkind.org/wp-content/uploads/2019/11/Tapachula-report-FINAL-7-26-19-002.pdf; "Blocked from Safety: Unaccompanied Children Along the U.S.-Mexico Border," Kids in Need of Defense, April 29, 2019, https://supportkind.org/wp-content/uploads/2019/06/Blocked-From-Safety-KIND-Border-Report-FINAL.pdf.
44. Asylum Access, "Mexican Asylum System for U.S. Immigration Lawyers FAQ," November 2019, https://asylumaccess.org/wp-content/uploads/2019/11/Mexican-Asylum-FAQ-for-US-Immigration-Lawyers.pdf.
45. "Mexican Asylum System."
46. Asylum Access, "Mexican Asylum System."
47. Boletín Estadístico Anual 2020, Secretaria de Gobernación, Mexico, http://www.politicamigratoria.gob.mx/es/PoliticaMigratoria/CuadrosBOLETIN?Anual=2020&Secc=.3.
48. Carrie Kahn, "Migrants In Mexico Face Crackdown, But Officials Say They're Being 'Rescued,'" National Public Radio, January 29, 2020, https://www.npr.org/2020/01/29/800385857/migrants-in-mexico-face-crackdown-but-officials-say-theyre-being-rescued.
49. "Overlooked, Under-Protected: Mexico's Deadly Refoulement of Central Americans Seeking Asylum," Amnesty International, January 2018, https://www.amnestyusa.org/reports/overlooked-under-protected-mexicos-deadly-refoulement-of-central-americans-seeking-asylum/.

CLP_PC_026354

While in Guatemala in February, Refugees International interviewed recently returned asylum seekers who had first-hand experience with changing U.S. and Mexican enforcement policies. Marco (a pseudonym) told us of having fled his hometown in Peten in June 2019, fearful of violent retribution against him and his pregnant wife after her family reported a theft to the police. Upon reaching the U.S. border, Marco was placed in the Remain in Mexico program and his wife was allowed to pursue her case from within the United States. After three weeks of living on the streets of Juarez, Marco went to Campeche to find work. On his way back to Juarez to report for his November hearing, INM detained him. INM did not give him his MPP paperwork when they released him from Villa Hermosa. "I couldn't travel north, and my only option was to go home," Marco said. He took a bus to Peten. "I haven't seen my wife and son."

## U.S. and Mexico Deportation Policy Changes under COVID-19

Since the March 20, 2020 order by the Centers for Disease Control and Prevention invoking Title 42 of the Public Health Safety Act, CBP has been refusing to accept protection requests and expelling asylum seekers at the U.S. southern border, including Guatemalans. The order allows DHS to return asylum seekers—including children—to Mexico or deport them directly to their home countries without any real screening regarding the dangers they would face.[50] Guatemalans expelled by CBP are just pushed into Mexico and left there with no support or help from Mexican officials. CBP is expelling rather than referring unaccompanied Central American minors to the care of the ORR within the Department of Health and Human Services as required by the Trafficking Victims Protection Reauthorization Act.[51] Also, fewer Guatemalan children are being released by the ORR to sponsors in the United States; instead, they are being deported; 417 minors were deported from the United States to Guatemala between March and early May.[52]

Many other Guatemalan migrants are in a panicked limbo. Those in ICE custody awaiting deportation worry that they will be infected in detention or be quarantined upon return.[53] ICE has begun to ask asylum-seeking parents currently detained with their children in family detention centers to give up custody in exchange for the children's release from detention.[54] Guatemalans in the Remain in Mexico program are waiting in desperate circumstances.[55] In April, Refugees International spoke with Martin, a Guatemalan

---

50.  "Indefinite Suspension of Protections for Asylum Seekers and Unaccompanied Children Under May 19, 2020 Order by the Centers for Disease Control and Prevention," Refugees International, Advocacy Letter, May 27, 2020, https://www.refugeesinternational.org/reports/2020/5/27/indefinite-suspension-of-protections-for-asylum-seekers-and-unaccompanied-children-under-may-19-2020-order-by-the-centers-for-disease-control-and-prevention.

51.  Camilo Montoya-Galvez, "U.S. Suspends Protections for Migrant Kids at Border, Expelling Hundreds amid Pandemic," CBS News, May 7, 2020, https://www.cbsnews.com/news/coronavirus-immigration-migrant-children-protections-border/. ; Hamed Aleaziz, "A 16-Year-Old Boy Is Suing The Trump Administration, Claiming It's Using The Pandemic As An Excuse To Deport Him," Buzzfeed News, June 10, 2020, https://www.buzzfeednews.com/article/hamedaleaziz/trump-admin-coronavirus-deport-children-asylum-lawsuit

52.  "Citing Coronavirus, U.S. Won't Release Migrant Kids," Los Angeles Times, May 12, 2020, https://www.latimes.com/politics/story/2020-05-12/trump-officials-coronavirus-refuse-releasing-migrant-kids.

53.  Adolfo Flores, "Guatemalan Immigrants Are Caught Between ICE Detention or Deportation. Either Way, They Fear Getting COVID-19," Buzzfeed News, April 30, 2020, https://www.buzzfeednews.com/article/adolfoflores/coronavirus-immigrants-guatemala-deported-ice-jail-covid19.

54.  Camilo Montoya-Galvez, "ICE Asked Migrant Parents Whether They Wished to Be Separated from their Children, Agency Tells Court," CBS News, May 17, 2020, https://www.cbsnews.com/news/ice-asked-migrant-parents-whether-they-wished-to-be-separated-from-their-children-agency-tells-court/.

55.  Kera Mallory Falk, "Asylum Seekers in Mexico Worry about Waiting Longer in Dangerous Conditions Due to COVID-19," Houston Public Media, April 28, 2020, https://www.houstonpublicmedia.org/articles/news/politics/immigration/2020/04/28/368196/asylum-seekers-in-mexico-worry-about-waiting-longer-in-dangerous-conditions-due-to-covid-19/.

CLP_PC_026355

asylum seeker in the program, who was waiting for his El Paso court hearing in Juarez while living in a house with 15 others and with little access to food. Martin's situation is not untypical of the thousands of asylum seekers who must wait for months in northern Mexico without security, means of support, or adequate protection from COVID-19.[56] Out of desperation, many of these asylum seekers in the Remain in Mexico program, as well those being expelled, are trying to enter to the United States undetected via remote and perilous routes.[57]

In May, even when the Guatemalan government suspended flights in response to the arrival of returnees who tested positive for COVID-19, it continued to accept flights of unaccompanied minors and families and individuals that the United States claimed tested negative. Many of these individuals nonetheless tested positive upon arrival in Guatemala.[58] In June, Guatemala resumed acceptance of flights with less than 50 people aboard.[59]

Guatemala called on the Mexican government to halt deportations in early March, but assisted returns continue, as do unregulated voluntary returns. Since the pandemic began, Mexico has returned nearly 5,000 Central Americans back to their home countries.[60] Mexican officials only take deportees' temperatures but do not test for COVID-19.[61] The number of people who returned of their own accord is likely far higher. As of May 20, four adolescents deported from Mexico tested positive for COVID-19.[62] On June 15, 40 Guatemalan migrants were deported from Mexico.[63] However, migration experts in Guatemala state that there are many voluntary returns from Mexico who do not pass through authorized border points. Recent reports claim that Mexican officials have even encouraged Central Americans to return home via irregular routes.[64] Many people are returning to their communities and not being quarantined.[65] For example, Salvadoran and Honduran migrants are passing through Guatemala on their way back home without any screenings.

Although deportations continue, Guatemalans can still seek asylum in Mexico during the pandemic; there are limitations, however. COMAR briefly halted accepting applications in March but has resumed accepting and processing claims. Hundreds of people are applying each week despite the pandemic, attesting to the fact that those fleeing persecution have

56.  Jasmine Aguilera, "Many Asylum Seekers in Mexico Can't Get U.S. Court Hearings Until 2021. A Coronavirus Outbreak Could 'Devastate' Them," Time, May 19, 2020, https://time.com/5830807/asylum-seekers-coronavirus-mpp/.

57.  Camilo Montoyo-Galvez, "U.S. Ramps Up Mass Expulsions of Migrants as Border Crossings Rise," CBS News, June 13, 2020, https://www.cbsnews.com/news/us-ramps-up-mass-expulsions-migrants-border-crossings-rise-coronavirus-restrictions/.

58.  Sonia Perez D., "More Guatemalans Deported from US Test Positive for Virus," Associated Press, May 18, 2020, https://ap-news.com/a16adc250c399aaa3a360c44de26c877; Madan and Charles, "ICE Has Been Testing Migrants before Deportation"; Sonia Perez D., "Guatemala President Fumes over Infected Deportees from US," Associated Press, May 21, 2020, https://ap-news.com/6d7909336525780f3b21f10a7928cb04.

59.  "U.S. Resumes Deportation Flights to Guatemala," Time, June 10, 2020, https://time.com/5851118/guatemala-deporta-tions-u-s-immigration/.

60.  INM,"INM da seguimiento a las medidas cautelares."

61.  Paula Dupraz-Dobias, "Coronavirus in Guatemala Compounds a Long List of Problems," The New Humanitarian, May 4, 2020, https://www.thenewhumanitarian.org/feature/2020/05/04/coronavirus-Guatemala-violence-drought-poverty.

62.  Sofia Menchu, "Cuatro Adolescentes Guatemaltecos Dan Positivo a Coronavirus Tras Ser Deportados de México," Reu-ters, May 7, 2020, https://lta.reuters.com/articulo/salud-coronavirus-guatemala-inmigracion-idLTAKBN22J395.

63.  https://twitter.com/palabrasdeabajo/status/1272712839954944002?s=20

64.  Maria Verza, Elliot Spagat, and Astrid Galvan, "EEUU y México Cierran Paso a Solicitantes Asilo por COVID-19," Associat-ed Press, April 9, 2020, https://apnews.com/44ccc46fb18944b5b80ce5953f061b2d.

65.  Marcos González Díaz, "Coronavirus en Guatemala: Los Contagios de Covid-19 Entre Migrantes Que Llevaron Al País a Suspender los Vuelos de Deportados Desde EE.UU," BBC News Mundo, April 21, 2020, https://www.bbc.com/mundo/noti-cias-america-latina-52364025.

CLR_PC_026356

no choice but to cross a border to seek refuge. [66] Unfortunately, COMAR's hours are inconsistent, and it is issuing only a limited number of the identification cards needed for access to health care.[67]

Upon return to Guatemalan, deportees and returnees face heightened levels of poverty and food insecurity.[68] As one indigenous teenager rapidly deported from the U.S. border said, "I didn't get the opportunity to say why I was coming" and how "we owe a big debt."[69] By early June, Guatemala's public hospitals were overwhelmed by COVID-19 cases,[70] and flooding from a tropical storm was causing extensive displacement within the country.

# PROTECTION CONCERNS IN GUATEMALA UPON RETURN

Guatemalans who fled violence, crime, and persecution, and were unable to receive international protection, may face the same or exacerbated protection concerns upon return. Other Guatemalans may have legitimate fears for their security and safety when they go home because returnees are at greater risk of being targets of violence and extortion. Although there are government and civil soci-

ety organizations that provide integration and support services for returnees, offering protection against crime, violence, gender-based violence, and discrimination is outside of the mandate of these organizations. Corruption, high levels of violence and extortion, and a lack of accountability in government and institutions all contribute to a fragile protection ecosystem that often does not afford returnees the ability to reintegrate safely. These challenges are only compounded during the pandemic.

## Crime

Guatemalans migrate to Mexico and the United States for a complex mix of reasons, but crime and insecurity often play an important role in their decision to leave.[71] Returning to Guatemala can amplify vulnerability to crime; extortionists, gang members, and narco-traffickers target returned Guatemalans because criminals perceive them to have money due to their ability to migrate and their time spent working abroad.

Returned Guatemalans are especially vulnerable to crimes at the airport because gang presence is more prevalent in Guatemala City than in other areas of the country.[72] Deportees from the United States stand out; most arrive without shoelaces and carrying plastic bags given to them while in CBP custody. Exiting the airport is chaotic— the presence of many taxis, buses, money exchangers, and families of returned often

66.  "Death Threats Drive Refugees to Flee Coronavirus Lockdown," Relief Web, UN High Commissioner for Refugees, April 28, 2020, https://reliefweb.int/report/mexico/death-threats-drive-refugees-flee-coronavirus-lockdown.

67.  "Interview with Rosi Siu."

68.  Jeff Abbott, "Guatemala's White Flags Indicate Pandemic's Deadly Side Effect: Hunger," The Guardian, May 22, 2020, https://www.theguardian.com/global-development/2020/may/22/guatemala-white-flags-hunger-coronavirus.

69.  Camilo Montoya-Galvez, "Citing Coronavirus, the U.S. Is Swiftly Deporting Unaccompanied Migrant Children," CBS News, March 30, 2020, https://www.cbsnews.com/news/coronavirus-us-swiftly-deporting-unaccompanied-migrant-children-citing-covid-19/.

70.  Elsa Coronado, "Zulma Calderón, PDH: 'El 90 % De Los Pacientes Con COVID Nunca Debieron Ser Hospitalizados,'" Plaza Publica, May 30, 2020, https://plazapublica.com.gt/content/zulma-calderon-pdh-el-90-de-los-pacientes-con-covid-nunca-debieron-ser-hospitalizados.

71.  "Salienda Adelante: Why Migrants Risk It All," Creative Associates International, accessed June 8, 2020, http://www.creativeassociatesinternational.com/wp-content/uploads/2019/09/Migration-Study-Brief.pdf.

72.  Chris Dalby, "Gang Presence in Guatemala City," InSight Crime, April 26, 2019, https://www.insightcrime.org/investigations/extortion-gang-presence-in-guatemala-city/.

CLP_PC_026357

cause crimes to go unnoticed. Outside of the airport, the Guatemalan government provides transport to the north and south bus terminals for leaving Guatemala City. Both terminals are in areas of the city with elevated crime rates.[73] Returned Guatemalans must pay for their bus fare; returnees described to Refugees International that those who have no money to get back to their hometowns have to beg on the street.[74]

The risks do not abate once returned Guatemalans arrive in their hometowns. Refugees International spoke with one Guatemalan who returned to his town and attempted to start a business. He was robbed repeatedly, extorted, and threatened. He claimed the extortionists targeted him because they knew he had returned from the United States with money. Stories like this one are not unique; Refugees International spoke with multiple individuals and organizations about the pervasiveness of extortion. In Guatemala City, one returnee organization had to move several returned Guatemalans because their businesses were being extorted. Extortion is one of the most prevalent crimes in Guatemala.[75] Gangs commit some of it, but a growing number of extortions originate in prisons,[76] revealing just how little control the police system has over this crime—or their complicity in it. Low-level corruption and impunity make it difficult to report crimes or receive justice. In 2018, Guatemala had a 97.6 percent impunity rate for all crimes.[77] In 2017, Guatemalans filed nearly 8,400 extortion complaints, but the courts handed down fewer than 700 convictions.[78]

Most Guatemalans cite corruption as the major challenge confronting the governance of their country. For years, CICIG, a unique joint UN-Guatemalan mechanism, made significant headway in battling government corruption. In 2019, however, then-President Jimmy Morales dissolved the CICIG with help from the Trump administration, which withdrew support for the initiative. The ousting of CICIG marked a downward turn in government accountability and any confidence the Guatemalan people may have had that things would get better.

## Discrimination and Mistreatment of Women and Indigenous Groups

Most Guatemalans who migrate to the United States and Mexico are from the western highlands area of the country[79] where the largest populations of indigenous people live.[80] The Guatemalan government and mainstream society systematically exclude indigenous people in Guatemala. 79 percent of indigenous people live in poverty and 40 percent of them are in extreme poverty.[81] One-third of the rural population faces food insecurity.[82] Guatemalans who have left farming commu-

---

73.  Dalby, "Gang Presence in Guatemala City."

74.  Refugees International interviewed a deportee who begged for days before getting enough money to board a bus north.

75.  "Study: Over 63,000 Victims of Extortion in Guatemala," teleSUR English, June 28, 2019, https://www.telesurenglish.net/news/Study-Reports-Over-63000-Victims-of-Extortion-in-Guatemala-20190628-0018.html.

76.  Phoebe Studdert-Kennedy, "Half of Extortion Calls in Guatemala Are Made from One Prison," InSight Crime, December 30, 2019, https://insightcrime.org/news/brief/extortion-calls-guatemala-prison/.

77.  "Sistema Integrado De Justicia" (CICIG), accessed June 4, 2020, https://www.cicig.org/wp-content/uploads/2019/06/Presentacion_GIZ_SIJ_2019.pdf.

78.  Tristan Clavel, "Copycat Extortionists: Guatemala's Criminal Chancers," Insight Crime, April 30, 2019, https://www.insight-crime.org/investigations/copycat-extortionists-guatemalas-criminal-chancers/

79.  Clavel, "Copycat Extortionists."

80.  Clavel, Copycat Extortionists."

81.  "World Factbook: Guatemala," Central Intelligence Agency, accessed June 5, 2020, https://www.cia.gov/library/publications/the-world-factbook/geos/print_gt.html.

82.  "WFP Guatemala Country Brief, December 2019—Guatemala," ReliefWeb, World Food Programme, February 6, 2020, https://reliefweb.int/report/guatemala/wfp-guatemala-country-brief-december-2019.

CLP_PG_026358

nities say that they "barely eat" at home.[83] Returned indigenous migrants cite additional barriers to reintegration in their communities, such as loss of cultural practices, restructuring of community dynamics,[84] and loss of language.[85]

Although Mayan languages are a cornerstone of their culture, they are also a basis for exclusion from public and social services. For example, at the unaccompanied minors' shelter in Quetzaltenango, counselors provide psychological services in Spanish, but many children who return and desperately need counseling speak Mam, Ki'ché, or other Mayan languages. Organizations like Asociación IDEI[86] provide volunteers who speak Mayan languages to facilitate counseling, but they are not a solution for a lack of indigenous psychologists, social workers, doctors, and other professionals.

Indigenous communities are disproportionately excluded from social services and access to the rule of law, and also are disproportionately victims of human rights violations.[87] Because of this discrimination, deported and returned indigenous people are less likely to receive social support from the government or help from the state if they are victims of crime.[88] Asociación Pop No'j[89] and Colectivo Vida Digna[90] are returnee organizations that provide reintegration services for returned indigenous Guatemalans while considering their cultural heritage, language, and community roles. These support services are critical for returned indigenous migrants but have limited reach compared to the number of indigenous deportees and returnees who arrive each day.[91]

Women and girls also face discrimination and violence in Guatemala. Although Guatemalan law establishes the principle of gender equality and criminalizes discrimination,[92] Guatemala has the highest gender inequality index in the region.[93] Women experience soaring rates of sexual violence,[94] exclusion from political and economic participation,[95] and rigid gender norms[96] that can prevent them from engaging in certain types of work or attending school. In 2017, gender-based violence (GBV) was the most reported crime, which overwhelmed the Guatemalan courts' ability to provide justice to women who experience GBV as there were not enough prosecutors

---

83.  Nomaan Merchant and Sonia Perez D., "Trump Ramps Up Expulsions of Migrant Youth, Citing Virus," Associated Press, May 13, 2020, https://apnews.com/b64523bed9c1ed15c6185b37896bd586.

84.  According to interviews conducted with Asociación Pop No'j.

85.  According to interviews conducted with Colectivo Vida Digna and Asociación IDEI.

86.  Asociación IDEI (website), accessed June 8, 2020, https://www.asociacionidei.org/.

87.  Maria Martin, "Killings Of Guatemala's Indigenous Activists Raise Specter Of Human Rights Crisis," National Public Radio, January 22, 2019, https://www.npr.org/2019/01/22/685505116/killings-of-guatemalas-indigenous-activists-raise-specter-of-human-rights-crisis.

88.  "2018 Country Reports on Human Rights Practices: Guatemala," U.S. Department of State, Section 6., Discrimination, Societal Abuses, and Trafficking in Persons, April 29, 2019, https://www.state.gov/reports/2018-country-reports-on-human-rights-practices/guatemala/.

89.  "Misión," Asociación Pop No'j (website), accessed June 8, 2020, https://www.asociacionpopnoj.org/mision/.

90.  "A Dignified Life in Guatemala," Vida Digna ,2017, https://www.vidadignaguatemala.org/.

91.  Lizbeth Gramajo Bauer, "'Otra Vez a Lo Mismo'": Migración De Retorno y Procesos De Reintegración En El Altiplano Occidental De Guatemala (Guatemala: Universidad Rafael Landívar, Editorial Cara Parens, 2019), p. 51; states that between 2008 and 2018, nearly 300,00 Guatemalans were deported to the western highlands of Guatemala.

92.  Gramajo Bauer, "'Otra Vez a Lo Mismo.'"

93.  Priscila Molina, "WFP Guatemala Country Brief," World Food Programme, December 2019, https://docs.wfp.org/api/documents/WFP-0000112440/download/?_ga=2.61276972.1660492243.1587577490-1861731502.1587577490.

94.  "2019 Country Reports on Human Rights Practices: Guatemala," U.S. Department of State, accessed June 5, 2020, https://www.state.gov/reports/2019-country-reports-on-human-rights-practices/guatemala/.

95.  "2019 Country Reports on Human Rights Practices: Guatemala."

96.  Ana Landa Ugarte, Elizabeth Salazar, Magali Quintana, and Raul Molina Herrera, "USAID/Guatemala Gender Analysis Final Report September 2018," USAID, September 14, 2018, https://banyanglobal.com/wp-content/uploads/2018/10/USAID-Guatemala-Gender-Analysis-Final-Report.pdf.

CLP_PC_026359

to handle the high caseload.[97] Indigenous women experience intersectional discrimination for their ethnicity and gender. Women and girls who left Guatemala because of violence and gender discrimination find it difficult to reintegrate safely into Guatemalan society because of these pervasive structural barriers.

In Quetzaltenango, Refugees International spoke with Maria, an indigenous woman with little formal education who was a victim of domestic violence perpetrated by her partner. After her sister migrated to the United States, Maria started a small business weaving traditional Mayan clothing. Like many of those with relatives in the United States and successful small businesses, Maria was targeted repeatedly for extortion. The extortion escalated to kidnapping when her adolescent daughter was held for ransom. After her release, the extortion calls continued, the police were of no help, and two women in her town were abducted and never returned. For these reasons, Maria and her children left Guatemala to seek asylum in the United States in early 2019. Maria's eldest daughter was allowed into the United States to make an asylum claim, but the U.S. government placed Maria and her two younger children in the MPP program in Tijuana. After a man threatened Maria and her children, they felt too unsafe to wait there, and so abandoned their asylum claim and returned to Guatemala. Although Maria's return appeared voluntary, she left Tijuana because of insecurity and a sense of fear for her and her children's safety. Back in Guatemala, she still feels unsafe and has had to change her phone number and address to avoid threats. She is a target for crime because of her gender and being a returnee with a successful weaving business. She worries daily that her estranged and abusive ex-husband will find out where she lives, and that she will have nowhere to turn if he finds her. She cannot reunite with her older daughter in the United States and lives in fear that something will happen to her and her younger children in Guatemala, or that her ex-husband will find and hurt her.

## Increased Vulnerability for Children

Over the last decade, the number of Guatemalan children deported from the United States and Mexico has increased nine-fold. The vast majority are indigenous youth from communities in the highlands and along the Mexican-Guatemalan border. Their average age is 14.5 years old. Most left Guatemala for survival (fleeing extortion, poverty, and violence), and a significant percentage traveled north to reunite with family in the United States.[98]

Children returned to Guatemala from the United States and Mexico by plane are bused by the Guatemalan Secretariat of Social Welfare from the airport in Guatemala City to a nearby government-run shelter, where they are screened by social workers and picked up by guardians. Those not picked up become wards of the state. Refugio de La Ninez, a shelter, helps in cases involving children who cannot be returned to abusive homes and those involving returned pregnant teens or young mothers. Asociación Pop No'j conducts follow-up visits with families of returned children, providing them with funds for necessities and counseling. This follow-up is crucial because of a rise in suicide among this population of returnees.

Children deported from southern Mexico are bused to Casa Raices, a shelter in

---

97. "Situation of Human Rights in Guatemala," Inter-American Commission on Human Rights, December 31, 2017, https://www.oas.org/en/iachr/reports/pdfs/Guatemala2017-en.pdf.
98. Introduction, Lauren Heidbrink, Migranthood: Youth in a New Era of Deportation (Stanford, CA: Stanford University Press, 2020).

CLP_RC_026360



Maria and her younger daughter walking through the main square in Salcajá. Photo by Refugees International.

CLP_PC_026361



Casa Nuestras Raices is one of only two government run shelters operated by the Secretariat of Social Welfare for returned unaccompanied minors in Guatemala. This shelter in Quetzaltenango receives children deported from Mexico by land. Photo by: Refugees International.

Quazteltnango, where their parents pick them up. In February 2020, Casa Raices received about 100 children, mostly 15- and 16-year-olds, on two buses each week. Many of the children are traumatized or sick from having spent a month or more in detention in Mexico, deprived of sufficient showers and food. The director of social work at the shelter told Refugees International that about 30 percent of returnees had parents in the United States and 10 percent had been neglected, abandoned, or abused.

Some children also are unable to return to school. The Guatemalan Education Ministry has passed a regulation allowing returned children to reenter school at any time. How-ever, under-resourced local schools often do not have enough spaces to accommodate all children, especially in the western highlands.[99] Few teenagers see the benefit of finishing high school, given the lack of attainable jobs and higher education in Guatemala.[100] Some returned Guatemalan children received public high school education for free in the United States and face the disappointment that school may no longer be an option in Guatemala.[101]

Many children with parents in the United States return to live with their extended families. Although returnees who receive remittances from parents in the United States may have a higher standard of living compared to

99.  Karen Musalo and Pablo Ceriani Cernadas, Childhood and Migration in Central and North America: Causes, Policies, Practices and Challenges (San Francisco, CA: University of California Hastings College of the Law, Center for Gender & Refugee Studies, 2015). P. 155-6 https://cgrs.uchastings.edu/sites/default/files/Childhood_Migration_HumanRights_FullBook_English.pdf
100. Alejandra Argueta et al., "The Realities of Returning Home: Youth Repatriation in Guatemala" (Wilson Center Latin America Program, June 2015), p. 23-25, https://www.wilsoncenter.org/sites/default/files/media/documents/publication/Guatemala%20Repatriation_June%202015-%20FINAL.pdf.
101.  ibid, Lizbeth Gramajo Bauer, p. 86

CLP_RC_026362

those not receiving them, returnee children may re-migrate because they want more than financial help—they want to be with their parents.

# SOCIOECONOMIC BARRIERS TO INTEGRATION

Protection concerns are typically accompanied by socioeconomic constraints that all Guatemalan returnees face. Government services aimed at assisting returned Guatemalans focus heavily on reception, not reintegration services.[102] Returned Guatemalans face a myriad of challenges upon return, and each experience is unique. Yet before the COVID-19 pandemic, returned Guatemalans typically faced barriers to economic integration and health services, and lacked family support. These challenges have been compounded during the pandemic.

## Barriers to Economic Integration

Migrants often take out loans for paying smugglers to take them through Mexico to the United States.[103] Many turn to high-interest loans from unregulated actors, such as moneylenders and cooperatives, and use land, homes, vehicles, or goods as collateral.[104] If they return, they may come back with significant debt and limited options to pay it off.[105] Organizations that work to provide services to returned indigenous Guatemalans in the western highlands told Refugees International that debt increases the chances of re-migrating because deportees in debt can pay it off through a higher-paying job in the United States.[106]

Finding a job can be very difficult upon return.[107] Several organizations facilitate labor market integration for returnees in Guatemala City and the highlands. Multistakeholder initiatives such as Guate te Incluye provide skills trainings and certifications to migrants who gained technical skills abroad, such as culinary services or construction. They also link returned Guatemalans to jobs in the private sector. In addition, Guate te Incluye works to provide loans to returned migrants because it is difficult for them to get a formal loan to start a business. Such loans are especially important because there are no legal services available to help returnees recover property left in the United States. Many returnees quickly sell off their property at low prices before leaving and have little capital upon arrival in Guatemala. Other organizations like Te Conecta connect returned Guatemalans to meaningful job opportunities, which can take anywhere from a few weeks to months, depending on the skills and language level of the returned

---

102.  The Guatemalan Migration Institute (IGM for its acronym in Spanish) registers deportees arriving by air from Mexico and the United States in Guatemala City and Tecun Uman for returnees arriving via land from Mexico. In Guatemala City, the IGM transports families and children to shelters operated by the Secretary of Social Welfare (SBS), which provides psychological support, shelter, humanitarian care, and medical screenings. The SBS also receives unaccompanied minors from Mexico in Quetzaltenango and provides similar services to those in Guatemala City. Single adults who arrive in Guatemala City can access limited government services, such as a cursory medical screening at the airport, an arrival orientation, and transport to bus terminals for migrants not from Guatemala City.

103.  Kevin Sieff, "The Migrant Debt Cycle," The Washington Post, November 4, 2019, https://www.washingtonpost.com/world/2019/11/04/migrant-debt-cycle/?arc404=true.

104.  Lauren Heidbrink, "The Coercive Power of Debt: Migration and Deportation of Guatemalan Indigenous Youth," The Journal of Latin American and Caribbean Anthropology 24, no. 1 (March 2019): pp. 263–281, https://doi.org/10.1111/jlca.12385.

105.  Heidbrink, "Coercive Power of Debt."

106.  Corroborated in Lizbeth Gramajo Bauer, "Otra Vez lo Mismo."

107.  Gramajo Bauer, "'Otra Vez a Lo Mismo.'"

CLP_PC_026363

migrant. Employers are sometimes hesitant to hire returned migrants because they fear the latter will migrate again;[108] this perception can negatively affect migrants' job search.

Organizations providing support can increase returned Guatemalans' chances of overcoming barriers to work. These organizations are few, however, and suffer from resource constraints that limit their scope and effectiveness. There is no shelter where returned Guatemalans can stay while looking for work in Guatemala City. Though Te Connecta works with government partners, it does very little to help returnees find work. "I don't know what CONAMIGUA (Consejo National de Atencion al Migrante de Guatemala) does and I never heard of any returnee getting a job at the Labor Ministry," a Te Conecta representative said.

USAID has set up "stay here" centers in Guatemala City and elsewhere to promote reintegration of returned Guatemalan teens,[109] but a large number of young returnees fall through the cracks. At the airport in Guatemala City, Refugees International met Jaime, a young man in his early twenties who had lived in Oklahoma with his family for more than a decade, although they arrived in the United States too late for him to qualify for Deferred Action for Childhood Arrivals (DACA). He had been arrested for unpaid parking tickets, transferred to ICE custody, and granted voluntary departure. He did not know anyone in Guatemala City.

## Health Care

Poor-quality health care is a less common but nevertheless significant reason some Guatemalans migrate and, according to Asociación Pop No'j, is a determining factor in preventing re-migration. The health care of poor and indigenous Guatemalans is the worst in the hemisphere because of limited resources, infrastructure, personnel, and inadequate supplies of medicines and materials.[110]

Refugees International spoke with Martin, a returned Guatemalan, whose reasons for migrating included worries about the health of his son Juan, who had lost vision in one eye following a head injury. Juan went to a reputable hospital[111] in Guatemala City and underwent two operations, but his injury required specialized care not available in Guatemala. Martin and Juan left to go to the United States and, like Maria who fled because of crime, were also placed in the MPP program. They returned to Guatemala because of the dire shelter conditions in Mexico but went back to Juarez to attend their court date.

Furthermore, migration introduces health issues that persist upon return. Sexual assault, robbery, kidnapping, and abuse sadly are all too commonplace for many migrants who travel through Mexico.[112] The need for mental health care upon return is essential, but the psychological support services nongovernmental organizations provide are not a replacement for long-term care.[113] Asociación IDEI reported a case of a

108.  According to an interview with Te Conecta, February 2020.
109.  Kevin Sieff, "The Stay Here Center," The Washington Post, April 19, 2019, https://www.washingtonpost.com/news/world/wp/2019/04/19/feature/this-school-aims-to-keep-young-guatemalans-from-migrating-they-dont-know-its-funded-by-the-u-s-government/.
110.  "Guatemala: Health and Nutrition," USAID, USAID, August 30, 2019, https://www.usaid.gov/guatemala/health-nutrition.
111.  Benemérito Comité Prociegos y Sordos, "Prevención de la Ceguera," accessed June 9, 2020, https://www.prociegosysordos.org.gt/.
112.  Salil Shetty, "Most Dangerous Journey: What Central American Migrants Face When They Try to Cross the Border," Amnesty International USA, February 20, 2014, https://www.amnestyusa.org/most-dangerous-journey-what-central-american-migrants-face-when-they-try-to-cross-the-border/.
113.  "Mental Health: Central American Refugee Health Profile," Centers for Disease Control and Prevention, U.S. Department

CLP_RC_026364

boy who was trafficked and sexually abused during his travel to the United States. He contracted HIV because of the abuse he endured. He now lives with intense stigma because of the nature of his abuse and the virus he contracted. He needs HIV treatment and counseling to process the prior trauma and current stigma, but access to treatment in Guatemala is low—only 43 percent[114] of HIV-positive people in Guatemala are on antiretroviral treatment.

# COMPOUNDED CHALLENGES DURING THE COVID-19 PANDEMIC

The COVID-19 pandemic poses unprecedented and urgent concerns for returning Guatemalans, and exacerbates the existing vulnerabilities laid out in the previous section.

Guatemala has confirmed 10,272 cases of COVID-19, [115] 186 of which are Guatemalans deported by the United States.[116] The country is ill equipped to handle a rise in COVID-19 cases, and many gaps can be seen in the government response to date.
For all Guatemalans, and especially those returning, a major vulnerability during the

lockdown is an inability to cope with the financial burden.[117] As social distancing continues, Guatemalans who work in the informal economy and in agriculture and temporary work, will be affected negatively, like many returning to the country. Although the Guatemalan Congress approved an emergency stimulus of 1,000 quetzals (roughly $130) and food boxes to roughly 2 million people, as of May 22, many poor Guatemalans say they still have not received any support.[118]

The World Bank predicts that even more Guatemalans will fall into poverty.[119] Returned Guatemalans already encounter difficulties in finding work, and the pandemic will extend this job insecurity for a longer period. Reporting from Guatemala shows the suffering already underway. Guatemalans across the country hang flags outside their windows in different colors to signal they need help. White flags mean hunger; red is for medicine; black, yellow, or blue means that a woman, child, or elderly person is in danger of violence.[120]

For rural and indigenous communities, the impact could be much worse. Although the Guatemalan government is promoting hand washing campaigns, the message falls flat for rural and indigenous Guatemalans who do not have necessities like potable water.[121] It is encouraging that the government has translated these campaigns into Mayan languages so indigenous communities have access to information, but deep inequalities in access

of Health and Human Services, January 25, 2017, https://www.cdc.gov/immigrantrefugeehealth/profiles/central-american/health-information/mental-health/index.html.

114.  "Guatemala," UNAIDS, December 8, 2016, https://www.unaids.org/en/regionscountries/countries/guatemala.

115.  Coronavirus Resource Center, John Hopkins University. Accessed June 16, 2020. https://coronavirus.jhu.edu/map.html

116.  "U.S. Resumes Deportation Flights to Guatemala," Time, June 10, 2020, https://time.com/5851118/guatemala-deportations-u-s-immigration/

117.  Asociación Pop No'j, "El Grupo Articulador de la Sociedad Civil en Materia Migratoria de Guatemala, Organizaciones Sociales y Personas Individuales ante la Deportación de Estados Unidos de Migrantes durante la Propagación del COVID-19," March 26, 2020, https://www.asociacionpopnoj.org/el-grupo-articulador-de-la-sociedad-civil-en-materia-migratoria-de-guatemala-organizaciones-sociales-y-personas-individuales-ante-la-deportacion-desde-estados-unidos-y-mexico-de-personas-migrantes-du/.

118.  Abbott, "White Flags."

119.  Abbott, "White Flags."

120.  Abbott, "White Flags."

121.  Abbott, "White Flags."

CLP_PC_026365

to necessities still prevail. Throughout Guatemala, the availability of hospital beds and equipment,[122] and the number of physicians, is low.[123] Some indigenous people worry that their understaffed health centers will not be prepared for the virus.[124] Food insecurity is also a challenge in rural areas; the World Food Program predicts the number of food insecure people in the world will double under COVID-19.[125] This staggering increase could be true for Guatemala as well.

Women who live in a situation of domestic violence are in more danger during this time. Rates of violence against women are on the rise in Latin America,[126] and economic stressors and limited freedom of movement will affect levels of violence.

For deported Guatemalans who have arrived on flights carrying a person tested positive for COVID-19, the Guatemalan government has failed to provide suitable places for them to quarantine. The government has isolated Guatemalans exposed to the virus in places without adequate support for social distancing or humanitarian care. In April 2020, the government  placed roughly 234 Guatemalan deportees in quarantine in the Ramiro de

Leon Carpio sports complex, a few blocks from the Guatemala City airport.[127] Other returned Guatemalans have been isolated in the Guatemalan airport.[128] The Guatemalan government is hospitalizing patients who are sick with the virus, even if they do not have serious symptoms.[129] The Guatemalan Human Rights Ombudsman's office states that this policy is contributing to a near collapse of hospital systems in the country.[130]

The stigma associated with deportation has intensified and worsened now that many returned Guatemalans have tested positive for COVID-19. In Quetzaltenango, community members have threatened to burn deportees[131] who they believed were infected with COVID-19. Returned Guatemalans cited fear of discrimination or violence following quarantine.[132]

## CONCLUSION

During the COVID -19 crisis, the United States and Mexico should institute a temporary moratorium on deportations and returns,

122.  Arturo Wallace, "Coronavirus: Qué Capacidad Tienen Realmente Los Países De América Latina Para Hacer Frente a La Epidemia De Covid-19," BBC News Mundo, March 23, 2020, https://www.bbc.com/mundo/noticias-america-latina-51916767.
123.  "Healthcare Access and Conditions in Guatemala, Honduras, and El Salvador," Centers for Disease Control and Prevention, U.S. Department of Health & Human Services, January 25, 2017, https://www.cdc.gov/immigrantrefugeehealth/profiles/central-american/healthcare-diet/index.html;
Jeff Abbott, "Fears Grip Guatemala's Indigenous Groups as Coronavirus Sets In," Al Jazeera, April 16, 2020, https://www.aljazeera.com/news/2020/04/fears-grip-guatemala-indigenous-groups-coronavirus-sets-200416165256449.html.
124.  Abbott, "Fears."
125.  "COVID-19 Will Double Number of People Facing Food Crises Unless Swift Action Is Taken," World Food Programme, April 21, 2020, https://www.wfp.org/news/covid-19-will-double-number-people-facing-food-crises-unless-swift-action-taken.
126.  Megan Janetsky, "Violence against Women Up Amid Latin America COVID-19 Lockdowns," Al Jazeera, April 20, 2020, https://www.aljazeera.com/indepth/features/violence-women-surges-latam-coronavirus-quarantines-200420020748668.html.
127.  Sofia Menchu, "Deported from U.S., Guatemalans Fear Infection in Mass Quarantine," Reuters, April 18, 2020, https://uk.reuters.com/article/uk-health-coronavirus-guatemala-idUKKBN2200WW.
128.  David Toro Escobar, "3 guatemaltecos deportados de Texas el pasado lunes dieron positivo por #Covid_19 según datos de Eduardo Woltke defensor de la PDH," Twitter, April 15, 2020, 9:51 a.m., https://twitter.com/DavidToroEscob1/status/1250421607048155139.
129.  Coronado, "Zulma Calderon."
130.  Coronado, "Zulma Calderon."
131.  Telemundo, "Terrible: Amenazan Con Quemar a Decenas De Deportados En Guatemala," Telemundo 52, April 16, 2020, https://www.telemundo52.com/fotosyvideos/terrible-amenazan-con-quemar-a-decenas-de-deportados-en-guatemala/2072196/.
132.  Jeff Abbott, "Unwelcomed in US—and at Home: Deported Guatemalans Face Threats," Al Jazeera, April 27, 2020, https://www.aljazeera.com/news/2020/04/unwelcomed-home-deported-guatemalans-face-threats-200427143917256.html.

CLP_RC_026366

eliminate barriers Guatemalans face in seeking asylum, and ensure that children and adults are not unnecessarily detained. The Guatemalan government should seek to ease the vulnerabilities of deportees by providing them with more comprehensive reintegration services and access to proper safeguards during the pandemic.

But Mexican and U.S. policies jeopardizing the safety of Guatemalans long precede the COVID-19 crisis. And, on June 15, 2020 the Trump administration proposed a regulation that would make it all but impossible for Guatemalan fleeing domestic violence or attempted recruitment or extortion by gangs to gain refuge in the United States long after pandemic recedes. The rule explicitly denies eligibility for asylum to those who pass through a third country or claim they fear being specifically targeted for persecution in Guatemala because they are returnees from the United States.[133]

Policies that address protection needs rather than exacerbate them require humanity, political will, and flexibility to achieve. Now more than ever, policymakers must ensure that Guatemalans fleeing harm have access to refuge in the United States and Mexico and that Guatemalan returnees have access to safety, healthcare, and economic opportunity.

---

133. "Procedures for Asylum and Witholding of Removal; Credible Fear and Reasonable Fear Review," Federal Register, 85.115, June 15, 2020, 36279, https://www.federalregister.gov/documents/2020/06/15/2020-12575/procedures-for-asylum-and-with-holding-of-removal-credible-fear-and-reasonable-fear-review.

CLP_PC_026367

CLP_PC_026368

CLP_PC_026369

CLP_PC_026370

# ABOUT THE AUTHORS

**YAEL SCHACHER** is the senior U.S. advocate at Refugees International, where she focuses on U.S. asylum, U.S. refugee admissions, temporary protected status, and humanitarian visas. Follow her on Twitter: @YaelSchacher.

**RACHEL SCHMIDTKE** is the advocate for Latin America at Refugees International. Follow her on Twitter: @r_schmidtke.

# ABOUT REFUGEES INTERNATIONAL

Refugees International advocates for lifesaving assistance and protection for displaced people and promotes solutions to displacement crises around the world. We do not accept any government or UN funding, ensuring the independence and credibility of our work.

CLP_PC_026371



1800 M Street NW
Suite 405N
Washington, DC 20036

Phone: (202) 828 0110
Fax: (202) 828 0819
Email: ri@refintl.org

Twitter: @RefugeesIntl
Instagram: @RefugeesIntl
Facebook: Refugees International

CLP_PC_026372

Justsecurity.org

# Biden's Embrace of Trump's Transit Ban Violates US Legal and Moral Refugee Obligations

by Karen Musalo
*February 8, 2023*

The Biden administration is poised to resurrect a Trump-era policy, the transit ban, which in its most recent form was repeatedly struck down by the courts as unlawful. The new transit ban, the subject of a notice of proposed rulemaking, would create a "rebuttable presumption of asylum ineligibility" for individuals arriving at the southern border who have not sought "protection in a country through which they traveled" on their journey, "unless they meet exceptions that will be specified." The announcement of the imminent policy change drew quick condemnation in a letter from members of Congress, as well as in separate letters from faith-based and civil rights and human rights organizations.

The new transit ban would violate the United States' protection obligations to refugees, which are long-standing and solidly based in both international and domestic law. The United States acceded in 1968 to the Refugee Protocol, which incorporates the substantive provisions of the 1951 Refugee Convention. With congressional passage of the Refugee Act in 1980, the United States aligned its federal immigration statute with the provisions of the Refugee Convention and Protocol. The cornerstone of both international and domestic law is the principle of non-refoulement, the prohibition against returning refugees to any country where their lives or freedom would be threatened.

Although the U.S. refugee statute does permit the denial of asylum to those who pass through a "safe third country" en route to the United States and do not apply for protection there, the law sets forth two non-negotiable requirements – the country of transit must not be one where the asylum seeker's life or freedom would be threatened on account of their race, religion, nationality, membership in a particular social group, or

CLP_PC_029159

political opinion, and the asylum seeker must have access to a "full and fair" procedure for determining claims to protection. (The United States must also have a formal agreement with the third country.)  These conditions are not met in the countries most asylum seekers travel through on their way to the United States.

The Biden administration will undoubtedly argue that because the proposed rule imposes only a rebuttable presumption instead of an outright prohibition, it is distinguishable from Trump's legal ban and will pass legal muster. But the facts on the ground do not support even a presumption of safety and access to a full and fair procedure.

Furthermore, if the presumption of ineligibility is applied during credible fear screening interviews at the border, as part of the deeply flawed expedited removal process, it will be very difficult for asylum seekers to clear the hurdle it presents. The majority of asylum seekers navigate expedited removal without an attorney, and do not possess detailed knowledge of human rights conditions and asylum procedures in each of the countries they transited in order to make the case that they qualify for an exception. The United Nations High Commissioner for Refugees (UNHCR) has specifically recommended that "exclusion" decisions, which would include decisions such as those made on the applicability of the transit ban, not be made in accelerated procedures such as expedited removal.

All migrants arriving at the southern border have transited Mexico, and depending on their country of origin and route, they may have traveled through Guatemala, El Salvador, Honduras, Nicaragua, Costa Rica, or Panama before arriving to Mexico. With the possible exception of Costa Rica, none of these countries of transit offer the safety or access to a refugee protection system which would justify imposition of the ban.

Pervasive violence against migrants in Mexico, carried out by state as well as non-state actors, has been well-documented. The most recent U.S. State Department country conditions report noted the "targeting and victimization" of migrants, and in striking down the Trump transit ban in July 2020, the Ninth Circuit Court of Appeals cited the high levels of violence, including sexual violence, against asylum seekers in Mexico.

CLP_PC_029160

Even if Mexico were safe, which it is not, U.S. policies, such as Title 42, have overwhelmed its refugee system, preventing meaningful access to a "full and fair" procedure. A little over a decade ago – in 2011 – a  total of 752 claims for refugee protection were lodged; in 2021 the number had soared to over 130,000. Funding has not kept pace, and the Mexican Commission for Refugee Assistance (COMAR) lacks resources for its core operations.

The four Central American countries south of Mexico – Guatemala, El Salvador, Honduras, and Nicaragua – are even less able to pass the safe third country test. Significant human rights abuses, including extrajudicial killings, torture, and disappearances, prevail at high levels in each country. Honduras, El Salvador, and Guatemala have the highest rates of femicides (gender-motivated killings) in the world, as well as extreme violence against LGBTQ+ individuals, while the brutal suppression of political opponents to the authoritarian regime in Nicaragua is well-documented.

Furthermore, not one of the four countries has anything approaching an adequate refugee protection system. Guatemala's system has been described as "inadequate" and cumbersome, and El Salvador's as having "major regulatory and operational gaps." The system in Honduras is "nascent," and those individuals who try to access it, especially women, children, and LGBTQ+ individuals, are especially vulnerable to abuse and sexual exploitation. Nicaragua is even more of an outlier, having ceased any cooperation with the UNHCR; in 2015 it suspended meetings of its refugee determination body, the National Commission for Refugees.

This leaves Costa Rica, a country with a population of five million, and Panama, a country of four million, as remaining countries of transit for the majority of asylum seekers arriving to the United States. Although they have human rights records far superior to any of the countries discussed above, access to protection is complicated by the unique circumstances in each.

Costa Rica, with its admirable human rights record, well-established asylum framework, and history of welcoming refugees, has long been viewed as a destination country for those seeking protection. In recent years, however, it has been swamped by claims for protection; in 2021 and 2022, it was among the top four countries globally for asylum

CLP_PC_029161

claims registered. In the beginning of 2022, the UNHCR reported just under 1.44 million asylum seekers in the United States — a country of 332 million — and 204,730 applications in Costa Rica, a country of 5 million; in other words, Costa Rica is already taking approximately 10 times as many refugees per capita as the United States. The rising numbers have overwhelmed Costa Rica's systems, resulting in delays, difficulty accessing protection, and a rise in "xenophobic, racist, and discriminatory" attitudes. This has also led to the adoption of restrictive asylum policies, including its own "safe third country" ban, and rules that limit the right to work and freedom of movement.

In contrast to Costa Rica, a country of destination, Panama has been seen as a country of transit. Migrants enter via the Isthmus of Darién, which straddles the border of Panama and Colombia. They then travel north on the infamously dangerous route known as the Darién Gap. Panama has also experienced a dramatic rise in numbers. In the seven years from 2013 to 2020, just over 100,000 migrants entered Panama through the Darién, while in 2021 alone, the number rose to 140,000.

Panama has a refugee protection system, but the process is difficult to access. The country applies its refugee laws in an extremely narrow manner, leading Panama to have an asylum approval rate of only 1 percent, and a record of having only granted asylum to 2,500 refugees since it began hearing claims. In-country experts consider refugee status to be "the single most difficult pathway" to obtain legal status in Panama. Even those who are recognized as refugees find it difficult to integrate due to laws which prohibit non-citizens from a broad range of professions. Human rights groups have proposed and advocated for migration reform so that ultimately Panama can become a "safe harbor for . . . refugees." However, that day has yet to arrive.

The Biden administration could be forgiven if it were totally unaware of the conditions in the countries of transit – which are either patently unsafe, or beyond capacity.  But lack of knowledge is not the case, making the administration's actions all the more deplorable. With the planned implementation of his own version of a transit ban, Biden stands willing to outsource U.S. protection obligations to countries such as Costa Rica, which are already overwhelmed by a disproportionately high rate of asylum applications per capita, or in the alternative, to return those fleeing persecution to situations as violent as those they have fled.

But beyond the legal folly of resurrecting the ban is the shame that this administration should feel when it repudiates its international and domestic obligations, tries to offload its responsibilities to smaller countries with far less resources, and abandons not only refugees seeking protection, but its own moral high ground. One can only hope that the Biden administration will heed the call of lawmakers, faith leaders, and community groups to reconsider its plan to impose a transit ban. If it does not, it can anticipate a sustained critique throughout the notice and comment period, and beyond.

*IMAGE: US President Joe Biden speaks with El Paso Mayor Oscar Leeser as he visits the US-Mexico border in El Paso, Texas, on January 8, 2023. (Photo by JIM WATSON/AFP via Getty Images)*

## About the Author(s)

### Karen Musalo

Karen Musalo (@KarenMusalo) is a law professor and founding director of the Center for Gender & Refugee Studies at the University of California, Law, San Francisco. She is the principal author of "Refugee Law and Policy: A Comparative and International Approach," and has litigated major landmark cases in gender asylum over the past 25 years, including as lead counsel in Matter of Kasinga and Matter of R-A- and co-counsel in Matter of A-B- and Matter of A-C-A-A-.

CLP_PC_029163



**U.S. Citizenship and Immigration Services**

**Refugee, Asylum and Int'l Operations Research Unit**

# Guatemala: Treatment of Non-Guatemalan Migrants
## November 15, 2019

*Do you have any information on the treatment of non-Guatemalan migrants in Guatemala?*

This query originated from Asylum Headquarters, RAIO, USCIS.

For this response, per the request of Asylum Headquarters, relevant text from Spanish-language sources has been translated into English.

The following sources discuss the treatment of non-Guatemalan migrants in Guatemala:

- Trump wants border-bound asylum seekers to find refuge in Guatemala instead. Guatemala isn't ready., The Washington Post, Aug. 16, 2019.

- Paradoxes of Protection: Compassionate Repression at the Mexico–Guatemala Border, Journal on Migration and Human Security, 2019, Vol. 7(3), p. 62-78 (in particular, see p. 69-70, 74).

- Informe Anual Circunstanciado de Actividades y de la Situación de los Derechos Humanos 2018 [Annual Report of Actions and Situation of Human Rights 2018], Procurador de los Derechos Humanos [Guatemala's Human Rights Ombudsman], Jan. 2019. (see "Migrants in Transit through Guatemala," p. 292-294; "Migrants in Guatemala as a Destination Country," p.294-297; "Refugees" p.297-299).

**Migrants in Transit through Guatemala**

The Guatemalan State has visualized the migrant population from another region as a problem that threatens national security. They have also faced communication barriers for speaking languages other than Spanish or English; the application of arbitrary criteria to allow them to enter Guatemalan territory by representatives of the Guatemalan Institute of Migration applied especially to people of extra-continental origin (Congo, Cameroon, India, among others); institutional abandonment to find themselves stranded in the international area of Aurora International Airport; in some cases, there are not even consulates of their countries in Guatemala; actions to prevent them from accessing shelter, among others.

Among the situations that have afflicted Central American migrants are abuses and mistreatment by the PNC [National Civil Police]; extortion, theft, and assault by migratory authorities; lack of information on the possibility of accessing the processes of international protection according to their needs; discrimination and



**Refugee, Asylum and
Int'l Operations
Research Unit**

stigmatization due to origin and belonging to the LGBTI community; kidnapping;
extortion, as well as victims of trafficking. […]

During the institutional intervention, several risk factors during the route and in the
shelters, especially for children and adolescents, were identified; lack of capacity
of the State to attend to the migration population in transit; the absence of the work
that the migration authorities must carry out under the Code of Migration was
notorious, as well as that of other state actors related to the issue; repressive actions
by security forces were observed.  On the other hand, the assistance from civil
organizations, particularly individuals and even companies, was essential for the
humanitarian assistance. (p.292-294)

- Situation of Human Rights in Guatemala, Inter-American Commission on Human Rights
  (IACHR), Dec. 31, 2017 (see p.123, paragraph 235).

- Concluding observations on the second periodic report of Guatemala, UN Committee on
  Migrant Workers, May 2, 2019.

- Country Reports on Human Rights Practices for 2018 – Guatemala, U.S. Department of
  State, Mar. 2019.

- Concluding observations on the seventh periodic report of Guatemala, UN Committee
  against Torture, Dec. 26, 2018 (see p. 11, paragraph 34).

- Annual report of the United Nations High Commissioner for Human Rights on the activities
  of the Office of the High Commissioner in Guatemala, OHCHR, Feb. 9, 2018 (see p.8,
  paragraph 36).

- Migrantes hondureños baleados en el Periférico: no sabemos por qué nos atacaron [Honduran
  migrants shot on the Periférico: we don't know why they attacked us], Prensa Libre (Guat.),
  Apr. 20, 2019.

  The Honduran migrants who were attacked while traveling as a group on April 11
  on the Peripheral Ring try to recover, not only from their physical injuries, but also
  emotionally.  They agree on one thing: they have no idea why they were shot. […]

  The migrant even denies the version given by some neighbors and merchants in the
  area that they would have been confused with criminals since, at the time of the
  attack, he says, none of the group talked or tried to approach someone, they simply
  walked along the Peripheral. […]

  The migrants were part of a group of approximately one thousands Hondurans who
  had left by caravan from San Pedro Sula on April 9. […]

  Of the group of 10 who were attacked on the Peripheral Ring, the four who were
  wounded were taken to the San Juan de Dios General Hospital, of which, last

CLP_RC_029448



U.S. Citizenship
and Immigration
Services

**Refugee, Asylum and
Int'l Operations
Research Unit**

Saturday, Evin Javier Maradiaga Cartagena, 19, who was shot twice in the head
and had already been declared brain dead, died.

Selvin Alexis Carranza Erazo and José Andrés De la O Padilla have already left,
while Rony Saul Padilla is conscious, out of danger, and recovering.

- [Se Enfrentan Migrantes Contra Civiles los Corren del Centro de Tecún Umán](#) [Migrants Face
Off Against Civilians in the Center of Tecún Umán], El Orbe (Mex.), Jan. 29, 2019.

    In the last hours, Guatemalan citizens faced off with blows, sticks, and stones
    against migrants from the caravan that were in the central park of Tecún Umán, in
    Guatemalan territory, human rights organizations even confirmed that there were
    gunshots, but no victims. […]

    However, the productive sectors, chambers, schools, civil organizations and
    representatives of society, from both Guatemala and Chiapas, had denounced for
    just over a month that the arrival of the migrants at the border with Mexico was
    causing severe damage to the economy and ungovernability.

    Given this, dozens of established businesses reinforced their premises with bars and
    metal doors, in addition to forming watch groups made up of merchants. Citizen
    claims and warnings of an impending civil confrontation were heard. Even the
    major of Tecún Umán, Erick Zúñiga, had asked the migrants to take refuge in the
    soccer stadium that qualified as a temporary shelter, but they ignored him.

    Desperate because they assure that the economic damage from the presence of
    migrants is several million dollars a day, Guatemalan society decided to act on its
    own.

    The formed a large contingent, east of the city, and marched to the center of the
    city. On their way, they expressed slogans in which they demanded that the
    migrants leave.

    The confrontation was inevitable. Dozens of young migrants covered their faces
    with rags and shirts, took stones, sticks, and other objects and threw them at the at
    the citizen march, which responded in the same manner, with the authorities unable
    to do anything.

    However, the society group was advancing and won the pitched battle. Migrants
    fled    towards the "Rodolfo Robles" International Bridge to try to enter the
    national territory by    force. […]

    Derived from all this, the Office of the Human Rights Ombudsman reported at night
    that the Delegates of that body verify the situation in the central park of Tecún

CLP_RC_029449
USCIS000093



**U.S. Citizenship
and Immigration
Services**

**Refugee, Asylum and
Int'l Operations
Research Unit**

Umán, "where residents evicted migrants from the location and told them that they can only stay in the shelter in the stadium."

Meanwhile, 15 human rights and civil defense organizations in Mexico, Central America, and other regions issued a document on Monday night expressing their repudiation of the violence that occurred in this community.

Headed by the Collective of Observation and Monitoring of Human Rights in southeastern Mexico, they explained that the protest (in the confrontation) was led by a group called Ayutlecos Unidos, which from social media had summoned the population to remove the migrants from that municipality.

In addition, they call them "shits" and used slogans like "No more Hondurans in Ayutla"; "Hondurans out of Ayutla"; or "For an Ayutla healthy and clean from shits."

They confirmed that "firearms were shot, although we do not report any victims of gunshot wounds.  The Mexican authority has let all people through and the agents have quickly installed fences to block the passage of the aggressor group."

The document is signed by the Office in Latin America and the Caribbean of the American Friends Service; the Digna Ochoa Human Rights Center; the Minverva Bello Center for the Rights of Victims of Violence; Initiatives for Human Development; Doctors of the World; Jesuit Networks with Migrants; Mesoamerican Voices, among others.

▪ [Vecinos de Ayutla, San Marcos expulsan a migrantes hondureños y salvadoreños y se lían a golpes](#) [Residents of Ayutla, San Marcos, expel Honduran and Salvadoran migrants and hit them], Prensa Libre (Guat.), Jan. 27, 2019.

Residents of the border town of Ayutla, San Marcos, expelled from the central park Honduran and Salvadoran migrants that were affecting the order and beauty of that town, they [the residents] reported.

Following this action, which occurred at about 14.45 [2:45 p.m.], on Sunday, Jan. 27, 2019, there was a confrontation between neighbors and migrants on the Rodolfo Robles international border bridge, toward which some migrants who were resisting leaving ran. […]

Today, some migrants crossed into Mexican territory through the Suchiate River, others by the Rodolfo Robles border bridge, while others went to a shelter enabled to provide them aid. […]

CLP_RC_029450
USCIS000044



U.S. Citizenship
and Immigration
Services

Refugee, Asylum and
Int'l Operations
Research Unit

The Human Rights Ombudsman, Jordán Rojas, reiterated his call to the Guatemalan immigration authority to address this situation, since during the mass exodus of migrants they [the Government] have not provided humanitarian assistance.

"By not providing any kind of humanitarian assistance and attention to immigrants, the authorities risk creating a humanitarian rights crisis for both the migrants and the population of Ayutla", said the Ombudsman.

Thousands of migrants, mostly Hondurans and Salvadorans, have passed through Ayutla in recent months, where the population initially gave assistance and food to the travelers.

- Fuerte rechazo de guatemaltecos a acuerdo para recibir migrantes [Guatemalans Strongly Reject Agreement to Receive Migrants], Prensa Libre (Guat.), Aug. 8, 2019.

The Encuesta Libre [The Free Survey], prepared by ProDatos company for Prensa Libre, confirmed what multiple voices of Guatemalan civil society have stated: that there's a rejection to the immigration agreement signed between the U.S. and Guatemala on July 26, which states that Honduran and Salvadoran migrants fleeing violence would be received in the country and given refuge.

82% of the respondents – eight out of 10 – said they do not agree that the government should accept migrants from other countries to await authorization to enter the U.S., which shows a strong rejection of the agreement signed between the Minister of the Interior of Guatemala Enrique Degenhart, and the Homeland Security Secretary Kevin McAleenan, in the White House. […]

Among the factors that critics oppose of this agreement are that Guatemala did not receive much benefit from the negotiation.

Although the government calls the signing of an agreement an achievement that would grant more work visas in the agricultural sector, those who oppose [the agreement] say that this program already existed and demand to see a specific number of those who would benefit from this, because the agreement does not specify a number.

Another criticism is that little information has been disclosed and that currently there is no certainty of who would finance the agreement; [and] it also points out that Guatemala does not have the conditions to offer security to those fleeing violence in their countries of origin nor does it have an economy robust enough to offer employment and welfare to migrants from other countries.

CLP_RC_029451
USCIS000045



**U.S. Citizenship and Immigration Services**

**Refugee, Asylum and Int'l Operations Research Unit**

In fact, Guatemala as well as El Salvador and Honduras share very similar economic and security indicators, and some of those indicators related to poverty and extreme poverty are actually better in the southern neighboring countries. […]

Father Juan Luis Carbajal, executive secretary of the Pastoral [Catholic Church's Pastoral on Human Mobility], is confident that the result of the survey is due to the people's lack of knowledge on what a safe third country means and it is not due to feelings of rejection against migrants.

Carbajal added that the lack of information about the agreement and the secrecy in which it was negotiated could contribute to Guatemalans rejecting the possibility of having the country receive Honduran and Salvadoran migrants, and said that citizens reject it because they know that [the country has] does not have the conditions to assist their own people, nor the political will to resolve the asylum cases pending at the Institute for National Migration.

"We are concerned that there are negative behaviors – against migrants – if we are not going to replicate the same attitudes of some Americans and Mexicans against Central Americans, that we are going to replicate those feelings of xenophobia," said the priest.

Danilo Rivera, an analyst at the Central American Institute for Social Studies and Development, agreed that the rejection is due to the lack of knowledge about the agreement and because people think that the thousands of migrants who crossed the country in caravans who would settle in Guatemala.

Accordingly, the expert explains that if Guatemalans are aware that there are not sufficient conditions for development and life for themselves, they adopt a defensive stance against the possibility of having taken away the little they have.

"Guatemalan people are supportive; but there is a big difference between supporting the caravans so they can continue their journey and the idea that they are staying in Guatemala," says Rivera, who believes that Guatemalans take into account what their future conditions will be like.

- [Rechazo a los migrantes: "pizcas de xenofobia recorren nuestro ADN"](#) [Rejection of migrants: "bits of xenophobia run through our DNA"], Con Criterio (Guat.), Jul. 17, 2019.

  Herika Velazquez, a Venezuelan who has been living with her husband and three children for 10 years in Guatemala, comments on her experience in the country:

  "I have been well received by the Guatemalan people: they have been very kind. But it really hurts to know that there is a lot of xenophobia; there are countries where some sectors of the society do not approve of our presence there, but this is

CLP_RC_029452
USCIS00043



**Refugee, Asylum and
Int'l Operations
Research Unit**

not the case of Guatemala. We have not felt discrimination here and I say that most Venezuelans agree with me.  There may be cases [of discrimination], but they are very isolated."

A Jewish community that used to dress in their tunics, spoke another language and had different customs than those of the local community were less fortunate. They were expelled from San Juan La Laguna, Sololá, in 2014. That year, the community council held an assembly to demand Mayor Rodolfo Pérez suspend basic services [utilities] to the Jewish community and he accepted. One of the foreigners narrated this bad experience.

"We were in a very dangerous situation. They cut off our water and electricity, and said that the next phase was to kill us. We only want to live in peace and make this city of benefit for us and for the whole country."

For that decision, the mayor was sentence to a one-year commutable sentence. […]

[Father José Luis Carvajal] expresses that the recent movement of Central American migrants exposed the tolerance level the Guatemalans have:

"These caravans brought out the best, but also the worst of many. [They exposed] things from harsh discourses full of xenophobia to great displays of solidarity and compassion."

[Father] Carvajal believes that many –even the political systems – are taking advantage of the need for opportunities these groups have:

"Surely, sowing fear has been a tool for immigration control and containment. It is a strategy intended to eliminate migration."

Last Monday, the Totonicapán department hospital issued a document in which they pointed out that the mass migration crossing the country has generated a rise in extortions, robberies, and [criminal] acts that make the population of that department vulnerable.

In the document, the hospital leadership expressed that they were focusing their priorities on the population. In addition, they reported that security systems would be strengthened [and] that everyone must present their DPIs to get access into the hospital.

José Luis Arrola, an advisor to the hospital, recognized it was an error and clarified [that]:

CLP_RC_029453
USCIS000072



**Refugee, Asylum and Int'l Operations Research Unit**

"Everyone who comes in here will have the right to health care [protected]; everyone will be treated."

The hospital's letter prompted delegates from the Office of the Human Rights Ombudsman to request a report on the circumstances from the authorities.

- [El ombudsman de Guatemala lamenta la "indiferencia" de Morales ante la crisis migrante](#) [Guatemala's ombudsman regrets Morales' "indifference" to the migrant crisis], Agencia EFE, Dec. 19, 2018.

   The Guatemalan Human Rights Ombudsman, Jordán Rodas, lamented the "indifference" and "little solidarity" shown by President Jimmy Morales towards Honduran and Salvadoran migrant caravans who crossed Guatemalan territory in October and November. During the presentation of the Report on the Actions of the Office of the Human Rights Prosecutor on the Transit of Honduran and Salvadoran Migrants, October and November 2018, Rodas said that both Morales and Chancellor Sandra Jovel "closed their eyes to the reality the migrants are facing." He attested that in Guatemala, "sometimes people have an outdated mentality over security set back into the 1970s and 1980s, which contrasts with the "reality" because "migration is not a security issue."

   [Rodas] criticized the lack of "humanitarian approach" to migrant caravans, which is a "pending issue" because "it seems that the appropriate government agencies have no empathy." Those responsible for overseeing Guatemala's migration [system] "were totally insensitive to this human drama" which is the result – he insisted – of "the forgetting of history, corruption, poverty, exclusion, that forced our Central American brothers to migrate." […]

   On the other hand, Deputy Attorney General Miriam Roquel highlighted that the findings of the report "demonstrated" that the General Directorate of Migration lacks the "processes to formulate immigration regulations" and that there is "no education strategy in place for this area."

   She also warned that Guatemala does not have the "adequate conditions" for a "contingency plan," beyond those in place for those affected by natural disasters.

The following sources discuss the treatment of migrants in Guatemala, Guatemala's asylum system, and/or assessments of Guatemala's capacity to handle an influx of migrants:

- [Guatemala Is No Safe Third Country: Why the Asylum Deal Is a Mistake](#), Foreign Affairs, Sep. 25, 2019.

- [Guatemala must strengthen asylum system to be safe third country, UNHCR says](#), Devex, Aug. 21, 2019.

- ['Safe third country'? Guatemalans are not convinced](#), America Magazine, Aug. 1, 2019.

CLP_RC_029454
USCIS000098



**U.S. Citizenship
and Immigration
Services**

**Refugee, Asylum and
Int'l Operations
Research Unit**

- [A 'Safe' Third-Country Agreement With Guatemala Could Be Dangerous](#), Forbes, Jul. 15, 2019.

- [Guatemala seen as ill-prepared to absorb US-bound refugees](#), Associated Press, Jul. 12, 2019.

- [US-Guatemala Asylum Deal Advances Without UN Refugee Agency](#), VOA News, Jul. 12, 2019.

- [Is Guatemala Safe for Refugees and Asylum Seekers?](#), Human Rights First, Jul. 1, 2019.

- [Migration, violence, and safety among migrant sex workers: A qualitative study in two Guatemalan communities](#), Culture, Health & Sexuality, Vol. 18, 2016.

Finally, one source mentioned gang members moving among the Northern Triangle countries.  Here are a few more sources that discuss that issue:

- [Pandilleros de El Salvador son capturados en Guatemala](#) [Gang Members from El Salvador are Captured in Guatemala], VOA Noticias, Aug. 26, 2019.

  Since mid-July, according to the National Civil Police's data, there has been a rise in apprehensions of suspected Salvadoran gang members in Guatemala. In a month, they have apprehended 10 alleged members of cliques (gangs) of Barrio 18 and the Mara Salvatrucha. […]

  The three departments where the apprehensions have been reported are Jutiapa, Chimaltenango and Chiquimula.

  The Ministry of Defense has deployed army soldiers to the border zones to neutralize and combat drug and illegal arms trafficking, as well as the entry of criminal groups. [..]

  According to security expert Lizando Acuña, the migration of gang members is a result of the Salvadoran President Nayib Bukele's Anti-Gang Plan. To counteract this action, he says that the government should know how these groups operate, because they are based on a hierarchy; the gangs' leadership will not migrate because they will not leave the territorial control they have in their countries.

  In his words: "They exchange communication and have to, in some way, also enter into the countries to coordinate their work. They don't improvise; on the contrary, they have an organization of some sort."[…]

- [Guatemalan police arrest powerful Salvadoran gang leader](#), Reuters, Apr. 11, 2017.

- [CentAm Officials Raise Alert Over Cross-border Gang Movements](#), InSight Crime, May 5, 2016.

- ['El Salvador Gang Members Flee to Honduras, Guatemala'](#), InSight Crime, Apr. 28, 2015.

CLP_RC_029455
USCIS000499



**Refugee, Asylum and
Int'l Operations
Research Unit**

This response was prepared after researching publicly accessible information currently available to the RAIO Research Unit within time constraints. This response is not, and does not purport to be, conclusive as to the merit of any particular claim to refugee status or asylum.

CLP_RC_029456
USCIS000

| | |
|---|---|
| From: | Salcedo, Viviana |
| To: | Mazzochi, Sarah |
| Subject: | Fwd: Asylum staffing in NCA countries |
| Date: | Friday, October 4, 2019 2:21:11 PM |

Here you go!

Get Outlook for iOS

---

**From:** Katie Tobin ████████████

**Sent:** Tuesday, October 1, 2019 11:01 AM

**To:** Salcedo, Viviana

**Subject:** Asylum staffing in NCA countries

Hi Viviana,

I thought this info may be of interest to you too, especially with your meeting with USCIS today…

Cheers,

Katie

---

**From:** Giovanni Bassu ████████████

**Sent:** Monday, September 30, 2019 3:38 PM

**To:** Coine, Glenn ████████████

**Cc:** Samuelson, Andrea L ████████████; Chiara Cardoletti-Carroll ████████████;
Katie Tobin ████████████

**Subject:** RE: URGENT PRM request for information

Dear Glenn

This is what we know, although the question of budget is not easy for us to check.

- Guatemala:
  - Currently, the Office of International Migration Relations has a team of 7 full-time employees. Before the month of February there were only 4, the 3 additional people have been integrated in the last few months. The CONARE has 4 officials (one of them from the National Migration Institute (IGM)). The Migration Authority is composed of 9 institutions in total, 4 of which are attending the CONARE meetings .

We do not have information on the National Migration Authority or the National Refugee Commission annual budgets

- El Salvador:
  - CODER does not have its own budget, nor does it have staff dedicated exclusively to tasks of the organization. They are employees of the Ministry of Foreign Affairs whose duties include those related to the CODER

- Honduras:
  - The National Migration Institute, Human Rights Management has a team of 12 employees (amongst which 3 people are eligibility officers, and 1 staff is dedicated to collecting COI).
  - The Commission for the Analysis, Revision, and Dictum on the Status of Refugees is composed of 3 members of the Ministry of Justice, Governance and Decentralization and 3 members of the INM. Additionally, 2 eligibility officers assist the human rights manager in the presentation of cases during the commission.
  - We do not have information on their annual budgets

Best

Giovani

CLP_PC_029466
DHSFF1254



# UNPROTECTED

## GENDER-BASED VIOLENCE AGAINST VENEZUELAN REFUGEE WOMEN IN COLOMBIA AND PERU



AMNESTY
INTERNATIONAL

CLP_PC_029603

Amnesty International is a movement of 10 million people which mobilizes the humanity in everyone and campaigns for change so we can all enjoy our human rights.

Our vision is of a world where those in power keep their promises, respect international law and are held to account.

We are independent of any government, political ideology, economic interest or religion and are funded mainly by our membership and individual donations.

We believe that acting in solidarity and compassion with people everywhere can change our societies for the better.



© Amnesty International 2020

Except where otherwise noted, content in this document is licensed under a Crea-tive Commons (attribution, non-commercial, no derivatives, international 4.0) licence.

https://creativecommons.org/licenses/by-nc-nd/4.0/legalcode

For more information please visit the permissions page on our website: www.amnesty.org

Where material is attributed to a copyright owner other than Amnesty International this

material is not subject to the Creative Commons licence.

First published in 2020
by Amnesty International Ltd
Peter Benenson House, 1 Easton Street
London WC1X 0DW, UK

Index: AMR 01/5675/2022
Original language: Spanish

*Cover photo:*
*© Fernanda Pineda*
*Cover design:*
*© Sergio Ortiz*

**amnesty.org**



CLP_PC_029604

# CONTENTS

| | |
|---|---|
| **1. EXECUTIVE SUMMARY** | **5** |
| **2. METHODOLOGY** | **9** |
| **3. BACKGROUND** | **11** |
| **4. VIOLENCE: MULTIPLE AND OMNIPRESENT** | **14** |
| 4.1 IN PUBLIC SPACES | 17 |
| 4.2 INTIMATE PARTNER VIOLENCE | 20 |
| 4.3 AT WORK | 22 |
| **5. DIFFICULTIES IN ACCESSING INTERNATIONAL PROTECTION AND REGULARIZING** | |
| **MIGRATION STATUS** | **29** |
| 5.1 ACCESS TO INTERNATIONAL PROTECTION | 29 |
| 5.2 OBSTACLES LINKED TO MIGRATION REGULARIZATION PROCESSES | 30 |
| 5.2.1 IN COLOMBIA | 30 |
| 5.2.2 IN PERU | 31 |
| 5.3 LACK OF INFORMATION | 34 |
| **6. AUTHORITIES' RESPONSES: FAILURES, LACK OF PROTECTION AND MORE VIOLENCE** | **36** |
| 6.1 BARRIERS TO ACCESS TO JUSTICE. | 38 |
| 6.1.1 LACK OF INFORMATION ABOUT CARE PATHWAYS | 38 |
| 6.1.2 IRREGULAR MIGRATION STATUS | 40 |
| 6.1.3 AAUTHORITIES' LACK OF KNOWLEDGE OF THE APPLICABLE REGULATIONS | 41 |
| 6.1.4 DISCRIMINATION AND COMPOUND STEREOTYPING | 42 |
| 6.1.5 INSUFFICIENT EFFECTIVE PROTECTION MEASURES | 43 |
| 6.1.6 INADEQUATE DATA COLLECTION | 46 |
| 6.2 OBSTACLES TO REPORTING VIOLENCE AT WORK | 48 |
| 6.3 OBSTACLES TO ACCESS TO HEALTH SERVICES | 50 |
| 6.4 OTHER STRUCTURAL OBSTACLES | 52 |
| **7. CONCLUSIONS AND RECOMMENDATIONS** | **54** |

# GLOSSARY

| DEFINITION |
| --- |
| Centros de Emergencia Mujer (Women's Emergency Centres, Peru) are specialized and free public services that provide comprehensive and multidisciplinary care for victims of violence against women and members of their family. |
| The Committee on the Elimination of Discrimination against Women is a body composed of independent experts which monitors the implementation of the Convention on the Elimination of All Forms of Discrimination against Women. |
| Cisgender people are individuals whose gender expression and/or gender identity accords with conventional expectations based on the physical sex they were assigned at birth. In broad terms, cisgender is the opposite of transgender. |
| Carné de Permiso Temporal de Permanencia (Temporary residence pe mits, Peru) |
| Intersectional discrimination is when discrimination on different grounds operates together to produce a compounded or distinct disadvantage. |
| These are stereotypes that discriminate against women on multiple grounds, not only because of gender, but also because of age, nationality and/or sexual orientation, among other factors. |
| Gender stereotypes are generalized views or preconceptions about attributes or characteristics, or the roles that are or ought to be possessed by, or performed by, people of different genders (for example, women and men). |
| Gender identity refers to each person's deeply felt internal and individual experience of gender. This may or may not correspond with the sex assigned at birth. |
| Ministerio de la Mujer (Ministry for Women's Affairs, Peru) |
| In this report, the term "woman" is used as a general category to refer to both cisgender and transgender women, unless there are reasons to disaggregate the information. In such cases, the term "trans woman" is used. |

CLP_PC_029606

| | |
|---|---|
| **REFUGEE** | A refugee is someone outside their country of nationality or habitual residence who is unable or unwilling to return to that country owing to a well-founded fear of persecution (as defined in the 1951 Geneva Convention) and someone who has fled their country because their lives, safety or freedom have been threatened by generalized violence, foreign aggression, internal conflicts, massive violations of human rights or other circumstances which have seriously disturbed public order (as extended by the Cartagena Declaration |
| **PPT** | Permiso de Protección Temporal (Temporary Protection Status, Colombia) |
| **AURORA PROGRAMME** | National Programme for the Prevention and Eradication of Violence against Women and Members of their Family (Peru) |
| **SIVIGE** | Sistema Integrado de Información sobre Violencias de Género (Comprehensive Information System on Gender-Based Violence, Colombia) |
| **SIVIGILA** | Sistema Nacional de Vigilancia en Salud Pública (National Public Health Monitoring System, Colombia) |
| **TRANSGENDER** | Transgender refers to individuals whose gender identity does not correspond to the biological sex assigned to them at birth. A transgender woman is a woman who was assigned "male" at birth but has a female gender identity; a transgender man is a man who was assigned "female" at birth but has a male gender identity. Not all transgender individuals identify as male or female; transgender can include members of third genders, as well as individuals who identify as more than one gender or no gender at all. Transgender individuals may, or may not, have had sex reassignment. |
| **HUMAN TRAFFICKING** | Human trafficking or trafficking in persons is defined in the UN Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children (also known as the Trafficking in Persons Protocol) which sets out the internationally accepted definition of trafficking: "the recruitment, transportation, transfer, harbouring or receipt of persons, by means of the threat or use of force or other forms of coercion, of abduction, of fraud, of deception, of the abuse of power or of a position of vulnerability or of the giving or receiving of payments or benefits to achieve the consent of a person having control over another person, for the purpose of exploitation." <br><br> Trafficking in human beings for sexual exploitation is not the same as sex work. |
| **GENDER BASED VIOLENCE** | Gender-based violence is violence directed against a person or which affects them disproportionately because of their gender or sex. Gender-based violence can take multiple forms and is found in all contexts where people interact. |

# 1. EXECUTIVE SUMMARY

> **"We are a population at risk, we did not come here for pleasure or on a whim, we came here to escape from a regime that does not allow us to live a decent life… because if you work it's in order to be able to have a decent livelihood. We came here looking for a better future. To be respected as women... But it seems that... you don't want us here."** Mariela, a Venezuelan woman in Colombia

Mariela was forced to leave Venezuela in 2018 because of the lack of access to food, education and healthcare for herself and her children and the high levels of inflation in the country. For her, as for many refugee and migrant women, the decision to leave was not an easy one and when she arrived in Colombia and later Peru, the two main host countries for Venezuelan refugees, she faced various forms of gender-based violence. Mariela told Amnesty International about the different abuses she has experienced in Colombia as a Venezuelan woman.

UN Women has described gender-based violence in Latin America as "the shadow pandemic".[1] For refugee and migrant women, their migration status increases the risks they face, exposing them to gender-based violence on the migration route and in the cities in which they decide to settle. Despite high levels of under-reporting, existing data show that gender-based violence against refugee women has increased in recent years in Colombia and Peru, the two countries that are the focus of Amnesty International's research in this report. The number of reported cases has risen in Colombia from 2,430 to 4,165 between 2018 and 2020[2], and in Peru from 1,384 in 2019 to 1,818 in 2021.[3]

Xenophobia and myths about the security issues caused by migration in cities; prejudices related to the perceived sexuality of women (branded as people who "steal husbands" or as sex workers); changes in gender roles in partner or family relationships during the migration process; and the challenge to pre-established gender roles in society, are some of the underlying causes of violence against Venezuelan women.

## Violence in all spaces

As Amnesty International has documented, violence occurs in all contexts. Women are repeatedly subjected to attacks and sexual violence in public spaces, both in the host cities where they live and along the migration route. Irregular border crossings are spaces where Venezuelan refugee women experience violence by organized armed groups, while some are recruited in Venezuela for the purpose of labour or sexual exploitation.

As regards the workplace, it is per se a violent space for Venezuelan refugee women in both countries. Venezuelan women face compound stereotypes in their search for decent work, denied the opportunity to access work because they are Venezuelan, as well as discriminatory factors such as age. In the absence of support networks, childcare spaces for their young children and real opportunities for inclusion in the workforce in decent conditions, many Venezuelan women are forced to resort to work in the informal sector, as street vendors, often with their children in tow, where they are exposed to various forms of violence and labour exploitation, including being co-opted for work for the purpose of sexual exploitation. Given this precarious work context, some women have chosen to engage in sex work. Compound stereotypes also create an environment in which Venezuelan women experience gender-based violence in the workplace when they do manage to access one.

---

1 UN Women, *The Shadow Pandemic: Violence against women during COVID-19*, https://www.unwomen.org/en/news/in-focus/in-focus-gender-equality-in-covid-19-response/violence-against-women-during-covid-19
2 Colombian Ministry of Health, National Observatory on Gender-Based Violence, https://www.sispro.gov.co/observatorios/onviolencias-genero/Paginas/home.aspx (filter: General indicators and Venezuelan women), (Spanish only).
3 Figures from the Women's Emergency Centre (Centro Emergencia Mujer, CEM) records on sexual violence, for the years 2019, 2020 and 2021. Cases of sexual violence – Rape, indecent assault, sexual harassment and sexual assault in public places, https://portalestadistico.aurora.gob.pe/formas-de-la-violencia-2019/ and CEM records (Spanish only).

CLP_PC_029608

## Absence of state protection

Although both countries have legal frameworks designed to address and punish gender-based violence, Amnesty International believes that the Colombian and Peruvian states are major absences when it comes to guaranteeing, protecting and respecting in practice the rights to a life free of violence for Venezuelan refugee women and access to justice for women survivors of gender-based violence. The organization's research reveals that Venezuelan women refugees do not have effective access to international protection and migration regularization processes because many do not receive information on this from the states. This creates a first and significant obstacle to the protection of their rights.

Furthermore, Venezuelan women face multiple obstacles in accessing justice and health services without discrimination. The general perception of widespread impunity and a lack of effectiveness in the way the justice systems function in general – both for their nationals and foreign nationals – are factors that discourage many women from reporting gender-based violence in both countries. But Venezuelan refugee women also face specific challenges: the fact that their migration status is not regularized leads them to believe that they do not have the same rights as the rest of the population and that, therefore, they cannot turn to institutions to demand these rights, or that if they do so, they would risk being deported to Venezuela. Added to this is the gap in access to information on care pathways for survivors of gender-based violence; Venezuelan women report that they do not know what these are, which institution to go to or what mechanisms exist.

Officials responsible for providing services for survivors of gender-based violence are not aware of the rights and needs of refugee and migrant women in terms of access to existing pathways and protection measures. In addition, on many occasions they have internalized compound stereotypes, in which male violence is combined with xenophobic prejudices against Venezuelans. This results not only in a denial of access to justice for these women, but also in new forms of violence and discrimination against them by those who have a duty to support and protect them.

Amnesty International identified other shortcomings in state responses in both countries, such as the lack of availability of and access to temporary shelters for survivors of gender-based violence, which particularly affects Venezuelan women, who do not have support networks, and the failure to collect adequate statistical information that would facilitate the development of public policies that address the differentiated impact of these forms of violence on Venezuelan women.

In addition, the absence of effective campaigns to challenge the compound stereotypes that foster this violence, and so prevent it, contributes to and exacerbates the continuing violence against Venezuelan women in these countries.

As regards healthcare services, in Colombia and Peru the law establishes that, in the case of survivors of gender-based violence, these services fall under the category of emergency services, so no one can be denied them. However, Amnesty International found that, in practice, the absence of a clear definition by healthcare systems of what is considered an emergency in cases of gender-based violence, including sexual violence, results in frontline public officials interpreting it in different ways, which restricts Venezuelan refugee women's access to health services.

Amnesty International calls on the Colombian and Peruvian authorities to take measures to ensure that all women can enjoy a life free from violence and free from discrimination on the basis of gender, nationality, migration status or any other grounds. In the case of Venezuelan refugee women, this requires immediate measures to challenge the entrenched compound stereotypes that foster and perpetuate violations of their human rights.

## KEY RECOMMENDATIONS TO THE STATES

### ACCESS TO INTERNATIONAL PROTECTION

- Ensure effective access to asylum procedures without discrimination for all those in need of international protection.

- Strengthen and expand the dissemination of information to Venezuelan women on access to international protection and other forms of migration regularization. This information should be accompanied by strategies and messages aimed at addressing and avoiding the fear that those approaching the authorities to initiate proceedings could risk detention and deportation to Venezuela.

- Implement, or strengthen training programmes, with a human rights perspective, for public officials, in particular those working in the police, public prosecution, migration and health services, on access to international protection and other forms of migratory regularization and the rights of refugees and migrants.

### ACCESS TO JUSTICE

- Implement mass information campaigns on care pathways to address cases of gender-based violence, that include dissemination strategies that have previously been consulted with women, including refugee and migrant women, in order to enable women in situations of greater risk in particular to be reached.

- Ensure that all institutions that care for survivors of gender-based violence, including the police, public prosecution service and migration and health institutions, have robust protocols for providing support, incorporating an intersectionality perspective and the obligation of non-discrimination, in cases of gender-based violence that address the particular care needs of refugee women and migrant survivors of gender-based violence.

- Provide appropriate, systematic, mandatory, initial and ongoing training to all public officials providing services for survivors of gender-based violence, such as staff from the police, public prosecution, migration and health services, on the prevention and detection of gender-based violence, gender equality and intersectional discrimination. In addition to raising awareness of women's rights, including the rights of trans people and those who engage in sex work, and existing care pathways, these programmes should aim to actively challenge prejudices regarding gender stereotypes and myths around gender-based violence among public officials and must address, from the perspective of intersectionality and the obligation of non-discrimination, the particular care needs of refugee and migrant women survivors of gender-based violence.

- Conduct thorough, impartial and independent investigations into all acts of violence against women, including rape and other forms of sexual violence, and ensure that investigations incorporate a gender perspective.

- Ensure that institutions responsible for providing services in cases of gender-based violence, both at the national and local levels, have sufficient resources to implement effective protection measures for women survivors of gender-based violence that are accessible to women regardless of their migration status. In particular, ensure that there are temporary shelters with sufficient capacity.

- Consider establishing care and self-care policies for front-line officials in the justice and health services, implemented and coordinated by the state institutions involved in addressing the needs of survivors of gender-based violence.

### ADDRESSING AND PREVENTING GENDER-BASED VIOLENCE

- Improve inter-agency coordination in responses to gender-based violence, in particular focusing on addressing the needs of refugee and migrant women.

- Improve data collection on gender-based violence by recording statistical data on victims, disaggregated by sex, gender, gender identity, sexual orientation, age, disability, relationship between the abuser and the victim, and the victim's migration status and ethnic minority heritage, and en-

sure that the data are regularly reviewed and used to inform policy development, resource alloca-
tion and other measures to prevent and address sexual and other types of gender-based violence.

- Improve inter-institutional coordination in responding to gender-based violence, especially re-
garding refugee and migrant women.

- Address the underlying causes, structural inequalities and compound gender stereotypes, na-
tionality and migration status that perpetuate violence against Venezuelan women, ensuring that
measures to prevent gender-based violence include policies for the care of children and the elder-
ly; access to decent employment, taking into account a focus on the socio-economic integration
of refugee and migrant women; and social and community integration programmes at the local
level, that stimulate and strengthen support networks for refugee and migrant women, women
heads of families and caregivers.

## ACCESS TO HEALTH

- Take measures to ensure comprehensive healthcare for women survivors of gender-based violence,
regardless of their migration status, in particular ensuring that:

- Care is not conditional on the filing of a complaint, in law or in practice;

- All health needs resulting from gender-based violence are categorized as emergency healthcare
and that there are clear protocols for medium- and long-term physical and emotional care; and

- That care incorporates psychological first aid and psychosocial support programmes for survivors
of gender-based violence (women and close family that may be affected, children and other de-
pendents).

## COMBATING STIGMA AND DISCRIMINATION

- Ensure that all authorities, including those at the highest level, refrain from using language that
stigmatizes, abuses, vilifies or discriminates against Venezuelans.

- Design and implement awareness-raising campaigns for the general public aimed at combating
stereotypes and xenophobia regarding Venezuelans, including composite gender stereotypes in-
cluding those that foster the hypersexualization of Venezuelan women.

- In particular, adopt without delay effective measures to combat the different forms of gender-based
violence at work, both in the formal and informal sectors of the economy, with particular empha-
sis on discrimination on the basis of gender, gender identity, nationality and migration status.

- Ensure that everyone, including Venezuelan women and trans people, have access to education
and decent employment options in order to prevent anyone from having to rely on the sale of sex-
ual services in sex work as a means of survival because of poverty or discrimination.

## TO INTERNATIONAL COOPERATION

- Adequately finance the humanitarian response to the mass exodus of Venezuelans from their
country, ensuring the sustainability of the responses implemented for women survivors of gen-
der-based violence.

- Promote the strengthening of state responses to gender-based violence, ensuring that technical
assistance or other cooperation programmes include eliciting commitments from authorities and
allocating financial resources to fulfil their obligations to prevent, punish and eradicate gen-
der-based violence.

# 2. METHODOLOGY

This report is based on extensive research carried out during the first half of 2022 with field work carried out virtually and in person in both countries. In Peru, researchers visited the cities of Lima and Tumbes during the last week of March. In Colombia, researchers visited the cities of Bogotá, Cúcuta and the municipality of Soacha during the last week of March and the first week of April.

Amnesty International conducted 45 research interviews and coordinated seven focus groups with Venezuelan refugee women. The research team heard the experiences of 63 Venezuelan refugee women: 40 in Colombia and 23 in Peru. In order to protect and safeguard the confidentiality of the refugee women interviewed during the research, their names have been changed. The research team also held meetings with Venezuelan women's organizations, civil society organizations in Colombia and Peru and international agencies, such as the United Nations High Commissioner for Refugees (UNHCR), the International Office for Migration (IOM), UN Women and the United Nations Population Fund (UNFPA). Fifteen meetings were also held with state institutions.

Amnesty International reviewed a significant number of documents and statistical reports from humanitarian agencies, academic research, research conducted by non-governmental organizations, press articles and institutional statistical sources in Colombia and Peru. In addition, it made 17 requests for access to public information, six to the Peruvian authorities and 11 to Colombian public institutions. At the time of writing, six replies had been received from Peru and five from Colombia.

The research team reviewed national legislation and other official documents. In addition, it carried out an extensive review of international human rights standards and reports produced by the international and the inter-American systems for the protection of human rights related to women's rights, gender-based violence and the situation of migrants.

The results of this research were shared on 29 April 2022 with all the national and international organizations who participated in the research process.

Amnesty International wishes to express its deep gratitude to each of the Venezuelan refugee women who shared their stories, as well as to civil society organizations in Lima, Bogotá and Cúcuta; to the Venezuelan refugee organizations in the host cities; to the communities of Soacha and Engativá for the open spaces in which to carry out the fieldwork for this research; to the humanitarian agencies in Colombia and Peru; and to the authorities in both countries whom it met.

CLP_PC_029612

# VENEZUELAN PEOPLE IN PERU AND COLOMBIA – MAY 2022

From a total of over 6.1 million, approx. 5.08 million Venezuelan refugees in Latin America and the Caribbean:



CLP_PC_029613

# 3. BACKGROUND

By May 2022, according to the Interagency Coordination Platform for Venezuelan Refugees and Migrants (Plataforma de Coordinación Interagencial para Refugiados y Migrantes de Venezuela, R4V), more than 6 million Venezuelans had left their country because of massive human rights violations.[4] Of these, more than 5 million are currently in a Latin American country. In line with the broad definition of who is a refugee set out in the Cartagena Declaration, Amnesty International considers that Venezuelans who have left their country because of such massive human rights violations are in need of international protection and have the right to apply for recognition of their refugee status. The countries hosting the largest number of Venezuelan refugees are Colombia (1.84 million people), Peru (1.29 million people) and Ecuador (513,900 people).[5] According to the statistics consulted, women account for 50% of refugees in Colombia and 58% of those in Peru.[6]



### Number of Venezuelan people living outside their country
Numbers to April 2022

| | |
|---|---|
| TOTAL | 6'113,473 |
| Ecuador | 513,903 |
| Peru | 1'286,464 |
| Colombia | 1'842,390 |

Figure 1: Produced by Amnesty International, source: https://www.r4v.info/es/refugiadosymigrantes (accessed May 2022).

*Figure 1*

While it is true that the largest exodus of people from Venezuela took place between 2016 and the beginning of 2020 (about 4,110,079 people)[7], refugees are continuing to leave Venezuela every day. Many enter at irregular crossing points along the extensive borders with Colombia and the other neighbouring countries.

---

4 Amnesty International, *Urgent measures: Venezuelans need international protection*, (AMR 01/9019/2018), https://www.amnesty.org/en/documents/amr01/9019/2018/en/ and *Venezuela: Unattended health rights crisis is forcing thousands to flee, News, 9 March 2018*, https://www.amnesty.org/en/latest/news/2018/03/venezuela-unattended-health-rights-crisis-is-forcing-thousands-to-flee/
5 R4V Platform, *Refugees and Migrants from Venezuela*, updated 5 May 2022, https://www.r4v.info/en/refugeeandmigrants  accessed on 24 May 2022.
6 In 2020, 50.2% of Venezuelans in Colombia were women (1.13 million people). DANE, *Nota estadística Población migrante venezolana en Colombia, un panorama con enfoque de género, 2021*, https://www.dane.gov.co/files/investigaciones/notas-estadisticas/jul-2021-nota-estadistica-poblacion-migrante-venezolana-panorama-con-enfoque-de-genero.pdf. In the same year, CARE reported that 58% of Venezuelans in Peru were women.and CARE, *Una emergencia desigual: Análisis Rápido de Género sobre la Crisis de Refugiados y Migrantes en Colombia, Ecuador, Perú y Venezuela, June 2020*, https://www.r4v.info/document/una-emergencia-desigual-analisis-rapido-de-genero-sobre-la-crisis-de-refugiados-y
7 R4V Platform, *Refugees and Migrants from Venezuela*, 5 May 2022, https://www.r4v.info/en/refugeeandmigrants

CLP_PC_029614

Colombia has been characterized both as a country of transit and a country of residence for many people from Venezuela. In response, the Colombian authorities have made some efforts to identify and regularize the status of Venezuelans, establishing different programmes and regularization mechanisms – the Special Residence Permit (Permiso Especial de Permanencia) in 2018 and the Temporary Protection Statute (Estatuto Temporal de Protección) in 2021 – aimed at facilitating the regularization of the situation of Venezuelans in Colombian territory.[8]

The armed conflicts in Colombia that are continuing, despite the signing of the Peace Agreement in 2016 between the state and the FARC-EP guerrillas, increase the risks faced by Venezuelan refugees, especially women, who arrive in the country after experiencing violence and human rights violations, either at irregular border crossings or in different areas of the country.

Peru is the country with the second largest number of Venezuelans. To respond to this situation, in addition to the existing asylum procedure, the government has created a regularization programme known as Temporary Residence Permits (Carné de Permiso Temporal de Permanencia). However, the mass arrival of Venezuelans triggered a change in migration policy and national and international organizations have highlighted the tendency of the Peruvian authorities, starting in 2018, to create obstacles to people seeking to enter the country at regular migration points by demanding a humanitarian visa or stating that they must request and wait for refugee status outside Peruvian territory.[9]

> **"Although the borders were closed, this has not meant that the flow has actually decreased. What we have are people who are unregistered and have no possibility of regularizing their situation, and we do not know where they are or what violations they may have experienced. It's quite complex."** Peruvian official

The mass arrival of Venezuelans in Colombia and Peru has been accompanied by high levels of stigmatization and xenophobia towards Venezuelans, frequently accused of and, without evidence, held to be responsible for crime, as part of political strategies to exploit fear and insecurity. This narrative has even been deployed by senior officials. In Peru, the 2021 presidential election campaign was marked by intense stigmatization of Venezuelans in the country.[10] In Colombia, in the same year, in Bogotá, the creation of a special security force unit was proposed to combat crimes committed by foreign migrants.[11]

The first mass flows of people from Venezuela were composed mostly of men (for example, 63% of those in Peru), many of them professionals or with some economic options that enabled them to settle in the host countries. However, according to various sources consulted, the proportion of Venezuelan refugee women has increased from 47% to 50% since 2017[12] and in cases such as Peru it has gone from 47% to 58%.[13] Several factors contribute to the feminization of the migratory flow, including family reunification or the search for opportunities to access healthcare,[14] education and food for their children or elderly people in their care, not available in Venezuela.[15] In these cases, women do not travel alone, but as caregivers for other people who accompany them along the migration routes and once settled in the host cities. For example, family connections were the reasons why some 55% of Venezuelan refugee women who arrived in Colombia in 2020 left Venezuela. A gender analysis indicates that this is linked to the care responsibilities associated with the roles assigned to women.

---

8 For more on Temporary Protection Status, see https://www.migracioncolombia.gov.co/visibles (Spanish only).

9 Amnesty International, Peru: In search of safety: Peru turns its back on people fleeing Venezuela, (AMR 46/1675/2020), https://www.amnesty.org/en/documents/amr46/1675/2020/en/

10 Amnesty International, Perú: Comunicación al Comité de Protección de los Derechos de Todos los Trabajadores Migratorios de las Naciones Unidas previa a su 34a sesión, (AMR 46/5238/2022), https://www.amnesty.org/es/documents/amr46/5238/2022/es/

11 El País, 'La alcaldesa de Bogotá agita la xenofobia al proponer un comando especial contra migrantes criminales', 19 August 2022, https://elpais.com/internacional/2021-08-19/la-alcaldesa-de-bogota-agita-la-xenofobia-al-proponer-un-comando-especial-contra-migrantes-criminales.html

12 National Administrative Department of Statistics (DANE), Nota Estadística, Migración en Colombia, un panorama con enfoque de género, 2021, https://www.dane.gov.co/files/investigaciones/notas-estadisticas/jul-2021-nota-estadistica-poblacion-migrante-venezolana-panorama-con-enfoque-de-genero.pdf ; Barómetro de Xenofobia, Mujeres migrantes: hipersexualización y machismo online at: http://barometrodexenofobia.org/publicaciones/ accessed May 2022; and CARE, Una emergencia desigual: Análisis Rápido de Género sobre la Crisis de Refugiados y Migrantes en Colombia, Ecuador, Perú y Venezuela, June 2020.

13 CARE, Una emergencia desigual: Análisis Rápido de Género sobre la Crisis de Refugiados y Migrantes en Colombia, Ecuador, Perú y Venezuela, June 2020.

14 Amnesty International, 'Venezuela: Unattended health rights crisis is forcing thousands to flee', press release, 8 March 2018, https://www.amnesty.org/en/latest/news/2018/03/venezuela-unattended-health-rights-crisis-is-forcing-thousands-to-flee/

15 Statements by Venezuelan refugee women, Focus Group 2, Cúcuta, 1 April 2022. See also: Red Clamor, Pies para que te tengo, November 2020, https://www.r4v.info/es/document/informe-red-clamor-pies-para-que-te-tengo-noviembre-2020-es accessed May 2022.

On the other hand, refugee women who still have family in Venezuela are not only the main bread-winners for their family during the migration process, but also for those who have remained in their country of origin.[16]

It is important to note that there are high rates of gender-based violence against women in both transit and host countries. In Colombia, the Comprehensive System on Gender-Based Violence (Sistema Integrado de Violencias de Género, SIVIGE)[17] reported a total of 122,758 cases throughout the country in 2020. Of these, 58,904 involved physical violence; 31,635 sexual violence; 18,967 neglect and desertion; and 9,782 psychological violence. Of this total number of cases, 78% of the survivors were women.[18]

In Peru, the Aurora Programme,[19] via the Women's Emergency Centres (Centros de Emergencia Mujer, CEM), recorded 114,495 cases of gender-based violence in 2020. Of these cases, 97,926, or 85.5%, of survivors were women. The cases disaggregated according to the type of violence were: 55,995 cases of psychological violence; 44,125 cases of physical violence; 13,843 cases of sexual violence; and 532 cases of economic violence.[20]



## Cases of gender-based violence handled during 2020

Colombia
Peru

Physical Violence: 58,904 (Colombia), 44,125 (Peru)
Sexual Violence: 31,635 (Colombia), 13,843 (Peru)
Psychological Violence: 9,782 (Colombia), 55,995 (Peru)

Figure 2: Produced by Amnesty International, sources: Figures from CEM records, for the years 2019, 2020 and 2021. https://portalestadistico.aurora.gob.pe/formas-de-la-violencia-2019/ and the Colombian Ministry of Health National Observatory on Gender Violence, General Indicators https://www.sispro.gov.co/observatorios/onviolenciasgenero/Paginas/home.aspx) accessed April 2022 (Spanish only).

*Figure 2*

As this report shows, refugee women in Venezuela experience sexual violence and gender-based violence, in addition to robbery, extortion, threats, attacks, forced labour, killings, kidnappings, recruitment by armed groups and enforced disappearance. There have also been incidents where their companions or the people they care for, including their children,[21] have been targeted, both during the migratory journey and in the places where they settle.

---

16 DANE, Nota Estadística, Migración en Colombia, un panorama con enfoque de género, 2021,     https://www.dane.gov.co/files/investigaciones/notas-estadisticas/jul-2021-nota-estadistica-poblacion-migrante-venezolana-panorama-con-enfoque-de-genero.pdf and HIAS, UN Women, Mujeres en movilidad humana y violencia basada en género, Ecuador, 2020, https://www.r4v.info/sites/default/files/2021-07/ONU_Mujeres_HIAS_Diagnóstico_VBG_Mujeres_Movilidad_Humana.pdf accessed May 2022.
17 Among the types of violence that SIVIGE classifies as gender-based violence are: physical violence, psychological violence, sexual violence and neglect and desertion. For more information, see Colombian Ministry of Health National Observatory on Gender-Based Violence at https://www.sispro.gov.co/observatorios/onviolenciasgenero/Paginas/home.aspx (filter General Indicators) accessed April 2022 (Spanish only).
18 Colombian Ministry of Health, National Observatory on Gender-Based Violence, https://www.sispro.gov.co/observatorios/onviolenciasgenero/Paginas/home.aspx (filter General Indicators) accessed April 2022 (Spanish only).
19 The purpose of the National Programme for the Prevention and Eradication of Violence against Women and Members of the Family - AURORA is to design and implement at the national level actions and policies for the care, prevention and support of people affected by family and sexual violence, thus contributing to improving the quality of life of the population.
20 Aurora Programme, https://portalestadistico.aurora.gob.pe/compendios/ ; see 2020 compendium (Spanish only).
21 UNDP, Reinventarse sobre la marcha: Mujeres refugiadas y migrantes de Venezuela:
Un estudio de sus condiciones y accesos a medios de vida en Colombia, Ecuador y Perú, with the support of the R4V Protection Section, published in April 2022, with figures for 2019.

CLP_PC_029616

# 4. VIOLENCE: MULTIPLE AND OMNIPRESENT

## VIOLENCE FACED BY VENEZUELAN WOMEN IN COLOMBIA AND PERU

**1** IN PUBLIC SPACES

**a** In host cities

**b** Along migration routes

**Types of violence:** harassment, sexual violence, risk of labour exploitation, sexual exploitation, trafficking of persons.





**2** IN A RELATIONSHIP

By a partner or former partner, Venezuelan or from the host country.

**Types of violence:** psychological, physical, economic and sexual violence.

**3** IN THE WORKPLACE

Difficulties in accessing employment, pushing them to the informal sector. If they find a job, **They usually do not have written contracts or social benefits, and work long hours without days off.**

**Tipos de violencia:** harassment, physical or sexual violence, risks of labour exploitation, sexual exploitation, trafficking in persons.



CLP_PC_029617

In countries with already high rates of gender-based violence, violence against Venezuelan refugee women manifests itself in various spaces and in multiple forms: physical violence, sexual harassment, sexual violence and psychological violence; all violence that occurs in the public space, in the family and in the workplace.

Despite the fact that Colombia has SIVIGE, an inter-institutional effort aimed at managing information about gender-based violence[22], consolidated public data is only available up to 2020. The available figures show that violence against Venezuelan refugee women in Colombia has grown exponentially since 2017, when 166 cases were registered, reaching 4,165 cases reported in 2020 (see Figure 3).



*Figure 3*

According to SIVIGE, 80.89% of cases of violence against Venezuelan women occurred in the home, 11.5% in the street and 7.6% in other spaces.[23] Figure 4 indicates the types of violence reported.



*Figure 4*

---

22 For more information, see https://www.sispro.gov.co/observatorios/onviolenciasgenero/Paginas/home.aspx accessed between January and May 2022 (Spanish only).
23 Colombian Ministry of Health National Observatory on Gender-Based Violence https://www.sispro.gov.co/observatorios/onviolencias-genero/Paginas/home.aspx (filter General indicators) accessed in April 2022 (Spanish only).

CLP_PC_029618

In Peru, the National Programme for the Prevention and Eradication of Violence against Women and Members of the Family (Programa Nacional para la Prevención y Erradicación de la Violencia contra las Mujeres e Integrantes del Grupo Familiar, AURORA)[24] provides disaggregated information on foreign nationals who access CEM services. According to these figures, between 2019 and 2021 about 70% of foreign nationals who accessed CEM services were Venezuelan women, and the number of cases has tripled, going from 250 in 2017, to 759 in 2018, to 2,022 in 2019.[25]

Between 2019 and 2021, the dynamics changed (see Figure 5). The fall in the number of cases in 2020 is linked to the restrictions on transit and movement adopted by governments in response to the Covid-19 pandemic. However, the number of cases reported by phone through the helpline Línea 100, which provides information and advice on gender-based violence, went from 119,786 in 2019 to 235,791 in 2020, an increase of 98%.[26] Unfortunately, these figures are not disaggregated by the nationality of the women complainants.

The CEM reported that it provided services to foreign women 681 times between January and March 2022, which suggests that the demand for support services from Venezuelan refugee women continues to increase.[27] Unfortunately, although the year-by-year figures are disaggregated by type of violence, they also do not contain data corresponding to the nationality of the survivor.



*Figure 5*

The increase in the number of cases reported in both countries coincides with the growth of the Venezuelan refugee population in both Colombia and Peru since 2018.[28] However, the figures recorded are very low in relation to the percentage of Venezuelan women in each country. For Colombia, the 4,165 cases represent just 0.45% of Venezuelan women who are estimated to live in the country. For Peru, the figure is even lower and the 1,102 cases registered by the CEM represent 0.12% of the Venezuelan female population in the country.

These considerations and figures would seem to indicate significant under-reporting of cases of refugee women users of prevention and support programmes in Colombia and Peru. This is also indicative of the challenges faced by Venezuelan women in accessing existing state care pathways. As an illustration, below is a comparison of the cases of sexual violence recorded by the Aurora Programme between 2019 and 2021.

---

24  The purpose of the National Programme for the Prevention and Eradication of Violence against Women and Members of the Family - AURORA is to design and implement at the national level actions and policies for the care, prevention and support of people affected by family and sexual violence, thus contributing to improving the quality of life of the population.

25  Aurora Programme, see https://portalestadistico.aurora.gob.pe/tipos-de-poblacion-2021/ and https://portalestadistico.aurora.gob.pe/tipos-de poblacion-2018/ (Spanish only).

26  Aurora Programme, figures updated as of April 2022, https://www.mimp.gob.pe/omep/estadisticas-atencion-a-la-violencia.php (Spanish only).

27  Aurora Programme, see https://portalestadistico.aurora.gob.pe/tipos-de-poblacion-2022/

28  Colombian Observatory for Women, Boletín Especial, La violencia contra las mujeres migrantes: una frontera por superar, https://observatoriomujeres.gov.co/archivos/publicaciones/Publicacion_187.pdf?TSPD_101_R0=08394a21d4ab2000ec37f50b-5f5813ab42910e63e4a85a02641e186c863c8e25db3d73a547347e780874d4ea471430006ee3730751812f4c6a3425c7af1f02b-80f868a1cad4b1ab18d133e6a792f22dc7278720c2a8eae590cc5c522b227007c accessed May 2022.

CLP_PC_029619



Figure 6

# 4.1 IN PUBLIC SPACES

### In host cities

Sources consulted by Amnesty International agree that violence against women in public spaces is widespread and manifests itself both against nationals, Peruvian and Colombian women, and against refugee women, including Venezuelan women.[29] One of the women interviewed said: "There is a lot of violence here in Peru, there is a lot of violence. Against Venezuelan as well as Peruvian women, it's not only us Venezuelan women who experience violence. Peruvian women also experience a lot of violence, a lot of abuse."[30]

However, the same sources agree that violence against Venezuelan women manifests itself in a different way because of stereotypes related to their bodies and sexuality, exposing them to harassment, violence and even to being the victims of human trafficking, and hindering their social integration in host cities.[31] Amnesty International found that refugee women face multiple forms of gender-based violence in public spaces in both countries: in the streets, in squares, in markets and in shops. In Colombia, women also reported violence along the different migration routes. The data available for Colombia show that 24.1% of women have experienced discrimination or have been unfairly treated because they are Venezuelan refugees. Of these, 58.8% said that they had experienced such violence in the streets.[32]

This violence combines stereotypes associated not only with their nationality, but also with the fact that they are women and how society believes that they dress, behave and speak as well as with the perceived sexuality of Venezuelan women. These stereotypes, by undermining their worth and dignity, increase the risk of violence, and can lead to verbal assault, psychological violence, harassment and sexual violence.

> "They said that we came here to be homewreckers, that we were all prostitutes. So even though that's far from the case, they blame all of us, saying that we're homewreckers, that we're a bad influence, that we're useless, and why don't we go back to our own country, that there's nothing for us here. Colombians have done a long list of things to me so my experience here has not been a very good one." Estefanía, a Venezuelan woman in Colombia

---

29 Interviews with various international officials in Colombia and Peru between March and April 2022; interview with a Venezuelan woman, Lima, 20 March 2022; Focus Group 1, Lima, 21 March 2022; and interview with a Venezuelan woman, 23 March 2022.

30 Statement by a Venezuelan woman, Focus Group 1, Lima, 21 March 2022.

31 Colombian Observatory for Women, Boletín Especial, La violencia contra las mujeres migrantes: una frontera por superar; Barómetro de Xenofobia, Boletín #1 - Hipersexualización y machismo online, http://barometrodexenofobia.org/publicaciones/ accessed May 2022. University of the Pacific, UNHCR, analysis of media coverage of refugees and migrants, at https://www.acnur.org/60b84fe84.pdf (Spanish only).

32 National Administrative Department of Statistics (DANE), Pulse Migration Survey, at https://www.dane.gov.co/index.php/estadisticas-por-tema/demografia-y-poblacion/encuesta-pulso-de-la-migracion-epm accessed April 2022 (Spanish only).

The image of Venezuelan women, associated with stereotypes of hypersexualization, and in some cases linking them without evidence to criminality, exposes and subjects women to unsafe scenarios, both in work and in social relationships.[33] The information and statements gathered also reveal prejudices in the host communities that see refugee women as "stealing husbands" and homewreckers, which has at times resulted in violence against them by women in the host countries.

> **"More than anything, it's women, these comments are directed from one woman to another, it's like 'they come here, they hate me, they prostitute themselves'. Let's not deny it, there are women who do, but it is out of necessity, because they can't get work."** Daniela, a Venezuelan woman in Colombia

These images that objectify and hypersexualize refugee women encourage discrimination and xenophobia both on the migration routes and in the host cities, exacerbating their situation of vulnerability and the risks of labour and sexual exploitation and creating significant obstacles to their integration.[34]

Among the types of violence identified in public spaces is **sexual violence**. Although this affects all Venezuelan refugee women, Venezuelan trans women are in a particularly vulnerable situation because of their gender identity, since they transgress entrenched patriarchal and male gender roles in societies such as Colombia and Peru.[35]

It should be borne in mind that the discrimination and exclusion to which some transgender women in particular are subjected results in their having reduced job opportunities, driving them look for night-time work, including sex work, and so exposing them to situations of greater risk. This was the case for Alicia, who experienced attempted sexual assaults as she was leaving a bar in Lima where she worked. One night after leaving work, Alicia took a motorcycle taxi and the driver, who had followed her a few days earlier, started to take her on a different route and tried to assault her. Alicia defended herself by fleeing the scene.

Another statement highlights how sexual violence is an everyday fact in the lives of refugee women:

> **"I have been exposed to attempted rape twice here in Lima… and the attempted rapes were in the street, also the police wouldn't accept my complaint because 'what was I doing running in the streets at 6.30 in the morning'… The second attempt was January 2020, I remember, I was running again, I run a lot. I am a very active person, I really like to do sports and I run in the morning before I go to work. It happened near my home too, where I've always lived… I still live in the same place and I constantly have the same fear of coming across the same person. The second time… this time it was a little more in your face because that gentleman chased me with his penis out of his pants. I was running, he was running after me and nobody was doing anything and I didn't understand why nobody was doing anything. I went again to the police station, the same station, and said that there was a person with his private parts exposed chasing the women in the park. Honestly, I saved myself because I jumped over a fence and when he jumped I turned around. It really was because of that, like he didn't expect me to turn and face him."** Mariana, a Venezuelan woman in Peru

- **On migration routes**

Venezuelan refugee women face significant risks to their lives and physical integrity along the entire migration route. Amnesty International received information about cases of physical and sexual violence against women all along the route as they headed to the host cities.[36]

---

33 University of the Pacific, UNHCR, analysis of media coverage of refugees and migrants.

34 R4V Protection Section.

35 Caribe Afirmativo, Perfiles migratorios de la comunidad LGBTIQ+ Conectando caminos por los derechos, https://caribeafirmativo. lgbt/wp-content/uploads/2022/05/PERFILES-MIGRATORIOS.pdf accessed May 2022.

36 Interviews with international officials in Colombia and Peru, between March and April 2022. See also: Red Clamor, Pies para que te tengo, 2020, https://www.acnur.org/publications/pub_prot/5fad5e624/pies-para-que-tengo-testimonios-de-personas-venezolanas-refugiadas-y-migrantes.html accessed April 2022.

CLP_PC_029621

According to the statements received, Venezuelan women travel in fear and with the constant threat of being targeted for different forms of gender-based violence by men in transit countries, for example being forced to have sex in order to access transport or experiencing harassment and/or sexual violence at unofficial border crossings.[37] According to information received by international organizations, Venezuelan women also experience violence, including sexual violence, from those in the group they are walking along with when they join groups of men in search of safety on the journey.[38]

The evidence gathered shows that gender-based violence also occurs at irregular border crossings. At some irregular crossings, also called "trochas" (shortcuts), refugees may be exposed to multiple forms of violence[39], including assault and sexual violence and the risk of being trafficked for sexual exploitation.



↑  *Border Perú - Ecuador. Copyright Fernanda Pineda/Amnesty International.*

## VIOLENCE BY NON-STATE ARMED GROUPS IN COLOMBIA: "DOUBLE JEOPARDY" ("DOBLES AFECTACIONES")

The concept of "double jeopardy" refers to the situation of an individual or a group of Venezuelan people, at risk on two grounds simultaneously: because of their status as people on the move and because of a context of violence, such as the armed conflicts that Colombia is experiencing. Amnesty International received information and statements about Venezulan women in "double jeopardy" in Colombia.[40] The presence in Colombia of various non-state armed groups, many of them installed in areas along the borders with Venezuela, Peru and Ecuador, creates additional risks for Venezuelan women, adding to the violence directed at them because they are women on the move. Venezuelan refugee women are victims of gender-based violence by organized armed groups.[41]

---

37 See Red Clamor, *Pies para que te tengo*, 2020
38 Interview with an international organization, Colombia, March 2022.
39 Interview with civil society organisation in Colombia, 1 April 2022. See also,  Red Clamor *Pies para que te tengo. OBSERVATORY*
40 Interviews with international officials, Colombia, March 2022 and interview with a Venezuelan woman, Cúcuta, 31 March 2022.
41 Interviews with international officials, Colombia, March 2022 and interview with a Venezuelan woman, Cúcuta, 31 March 2022. See also Alianza por la Solidaridad, *Impacto de la Violencia Basada en Género (VBG), en las Mujeres Migrantes/Desplazadas y su Acceso al Sistema de Protección, Justicia y Reparación en Colombia*, November 2021,
https://www.alianzaporlasolidaridad.org/casos/impacto-de-la-violencia-basada-en-genero-en-las-mujeres-migrantes-desplazadas-en-colombia accessed May 2022 and UN Women, *Mujeres, Violencia y Frontera*, 2018,
https://lac.unwomen.org/sites/default/files/Field%20Office%20Americas/Documentos/Publicaciones/2019/12/Mujeres%20violencia%20frontera.pdf accessed May 2022.

CLP_PC_029622

Representatives of international organizations and civil society stated that there are cases of gender-based violence in border areas such as Norte de Santander, Santander, Nariño, Cauca, areas of Colombia where coca crops and drug trafficking and micro-trafficking corridors are prevalent.[42] The lack of economic opportunities for Venezuelan refugees means that some people opt for coca planting and harvesting work. Women face high risks of being recruited into trafficking for sexual exploitation. "They take women 'recruited' for unpaid domestic. work. In border areas what happens is that there are cis and trans [Venezuelan] women looking for work and they recruit them to work on 'ranches'[43] and they find that these are trafficking networks for the purpose of sexual exploitation", said one of the people interviewed. [44]

This is what happened to Stella, a Venezuelan refugee woman who was persuaded by a Venezuelan friend to cross the border and go to work on coca "farms":

"I left everything there, my son, my mother and my whole family in Venezuela and I emigrated here, I didn't know where to go, I knew nothing about these places and I arrived in a guerrilla zone. When I arrived in that area there were lots of Venezuelan and Colombian people... I didn't really know anything, not even what the types of plants were. . .

... When night fell I rode on an animal, a donkey, for four hours to reach the farm. When I arrived at that farm it was terrible, I didn't even know who was there, whether it was the army or the guerrillas. I was worried because I didn't know what the score was. They came every day: giving me panela, and I don't know what else.

... In Cúcuta, I didn't experience what happened there. Here thank God they didn't say, 'no, sell your body'. Here, I was never told that. If I did it, it was of my own free will, they never told me to or pointed a gun at me. But, there [on the farm] there were much worse things."

Stella, a Venezuelan woman in Colombia

# 4.2 INTIMATE PARTNER VIOLENCE

Violence in the family, where the alleged perpetrator is the victim's partner or former partner, is the most prevalent form of violence in the lives of Colombian and Peruvian women, as well as of Venezuelan refugee women. It can take the form of psychological, physical, economic and sexual violence.

Although in Peru, it is only possible to access figures on violence perpetrated by the intimate partner or ex-partner of foreign women in general, the information available and the statements gathered indicate that intimate partner violence against Venezuelan refugee women has increased in both Colombia and Peru.[45] In Colombia, during 2020, 80.89% of cases of gender-based violence against Venezuelan refugee women reported by SIVIGE occurred in the home.[46] The figures show an increase in violence in this area, from 75% in 2018.

---

42 Interviews with officials, Colombia, 2022; statement, Colombia, 31 March 2022; Red Clamor, Pies para que te tengo, November 2020; and Alianza por la Solidaridad, Impacto de la Violencia Basada en Género (VBG), en las Mujeres Migrantes/Desplazadas y su Acceso al Sistema de Protección, Justicia y Reparación en Colombia, November 2021.
43 Places where people live and work in rural areas.
44 Interview with an international official, Colombia, March 2022.
45 Interviews with international officials in Colombia and Peru, between March and April 2022 and interview with civil society organization in Peru, 21 March 2022.
46 11.5% of cases of violence occurred in public places and 7.6% in other locations. Colombian Ministry of Health National Observatory on Gender-Based Violence, https://www.sispro.gov.co/observatorios/onviolenciasgenero/Paginas/home.aspx (filter General indicators, Venezuelan women, year 2020) accessed April 2022 (Spanish only).



*Figure 7*

The cases documented during the research for this report indicate that violence in the domestic sphere is exacerbated by vulnerable situation of refugee women: namely, the lack of support networks and spaces to care for children under five and subsequent difficulties enrolling them in school, coupled with limited economic options and difficulty in finding decent work in the formal sector in countries with a large informal sector. Finally, the lack of job opportunities means they are obliged to care for their children in the home and to become economically dependent, which in some cases escalates from control to violence.

In both countries, the statements gathered show that intimate partner violence can come from partners or former partners, from nationals of the host countries as well as Venezuelans. According to the women Amnesty International interviewed: "Now violence by Venezuelan men is normalizing, something that was not always the case in Venezuela."[47]

Among the factors that help explain the increase in intimate partner violence by Venezuelan men are the prevalence of macho cultures and the normalization of violence in society, as well as the "new family reconfigurations"[48] during the migration process that in some cases result in changes in relationships and roles within the family. For example, women who go out to work in places of high public exposure; women who in Venezuela took care of the home but who in the host cities must do paid work outside the home; or women who in Venezuela had paid work but in the host cities have to work as carers in the home while their partner works outside the home.[49]

Several interviewees reported cases of gender-based violence by Venezuelan men to Amnesty International.

> **"In the case of Venezuelans, they are men who feel more 'empowered' here in Colombia because they are the ones who are working and the woman, if she came with children and has two or more, cannot leave the home, this triggers Venezuelan men's machismo… There are even many women who say: 'How long does the activity last? I have to leave quickly because my husband is waiting for me' or 'lend me the phone because I have to tell my husband', or 'lend me the phone to send a photo so my husband knows that I am here', that's the level they are reduced to".** Micaela, a Venezuelan woman in Colombia

Researchers also documented cases where male partners who are nationals of the host country abused their relationship of power and made refugee women feel that they do not have rights in the host country[50], "they make them believe that they do not have rights because they are migrants… they take away their passports to take advantage and subjugate them", said one interviewee.[51]

---

47 Statements, Focus Groups 1 and 2, Lima, Peru, 21 and 22 March 2022.
48 "Nuevas reconfiguraciones familiares", CARE, Una emergencia desigual: Análisis Rápido de Género sobre la Crisis de Refugiados y Migrantes en Colombia, Ecuador, Perú y Venezuela, June 2020.
49 Interviews with international organizations in Colombia, 31 March 2022; interviews with national organizations in Peru, 21 March 2022; and Focus Group 2, Peru, 22 March 2022.
50 Colombian Observatory for Women, Boletín Especial, La violencia contra las mujeres migrantes: una frontera por superar.
51 Interviews with national and international organizations in Colombia and Peru, March 2022.

> " It's not easy, living like this, they control everything, they suffocate you, they control the way you dress, who you talk to, who you call. They forbid you a lot of things. They're very ready with their fists. For the least reason, they'll raise their fists and hit you. They use very offensive language, I think as far as psychological violence is concerned they can be really absolutely scathing, they really can. For them, insulting you, offending you, is natural. "

*Camila, venezuelan woman in Peru*

### • Leaving the aggressor: almost impossible for Venezuelan women without resources or support

According to the information gathered, the majority of refugees from Venezuela face precarious economic circumstances in the host cities.[52] For women, this comes on top of other pre-existing situations of vulnerability. Often, they arrive in unfamiliar places, without support networks and with children to care for. In these contexts, in addition to physical and psychological violence, many suffer patrimonial and economic violence from their partner who is the "sole" breadwinner for the family. For example, Sandra, who currently lives with her husband in Bogotá, told Amnesty International: "He gives me 4 dollars a day and I have to try to manage on that, sometimes he doesn't give any money, for example, when he gets angry and leaves."[53]

The difficulties women face breaking the cycle of violence and moving away from their abusers have been widely documented. For Amnesty International, economic violence, coupled with women's lack of employment or job insecurity, the absence of childcare and insufficient temporary shelters (see Chapter 6), make it even more difficult for Venezuelan women in Colombia and Peru to leave their partners to protect their lives. One humanitarian worker pointed out, for example, that a Venezuelan woman, when asked why she did not report the violence, replied: "I have nowhere to go. They told me that there are not enough shelters."[54]

# 4.3 AT WORK

The work environment is one of the spaces where the Venezuelan women interviewed expressed facing significant levels of informality and violence. Sources consulted and civil society organizations in both countries believe that the situation of economic precariousness, the lack of regularization of their migration status and the lack of access to training programmes and economic empowerment measures because they cannot regularize their migration status, force Venezuelan women in Colombia and Peru to work in the informal sector where they do not have any protection against the violence targeted against them.[55]

In both Colombia and Peru, a large number of people work in the informal sector. In Colombia, between December 2021 and February 2022, 48% of working-age people were employed in the informal sector, 42.7% of this total were women.[56] In Peru, in 2021, the percentage of people working in the informal sector reached 76%[57], but this information does not disaggregate the percentage of women.

In Colombia, a Pulse Migration Survey by the National Administrative Department of Statistics (Departamento Administrativo Nacional de Estadística, DANE) indicates that 82% of Venezuelan women in the active workforce said they had difficulties in obtaining paid work. Of these, only 16% had a written contract, compared to 84% who said they have a verbal contract.[58]

In Peru, the Office of the General Superintendent for Migration (Superintendencia General de Migraciones) has registered 566,707 adult women foreign nationals in the country. Of these, 74% are Venezuelan refugee women. According to the same source, 29% of foreign women are in paid work,

52 In Colombia, 87% of refugee and migrant women are living in socioeconomic strata 1, 2 and 3; Colombian Observatory for Women, Boletín Especial, La violencia contra las mujeres migrantes: una frontera por superar.
53 Interview with a Venezuelan refugee woman, Colombia, 28 March 2022.
54 Interview with an international organization, Colombia, March 2022.
55 Colombian Observatory for Women, Boletín Especial, La violencia contra las mujeres migrantes: una frontera por superar.
56 DANE, Nearly 1.8 million Peruvians joined the informal work sector in 2021, https://www.dane.gov.co/index.php/estadisticas-por-tema/mercado-laboral/empleo-informal-y-seguridad-social#:~:text=La%20propor-ci%C3%B3n%20de%20ocupados%20informales,metropolitanas%20fue%2044%2C6%25 accessed 2022 (Spanish only).
57 Gestion, 'Cerca de 1.8 millones de peruanos entraron a la informalidad laboral el 2021', 15 March 2022 https://gestion.pe/econo-mia/management-empleo/cerca-de-18-millones-de-peruanos-entraron-a-la-informalidad-laboral-el-2021-informalidad-laboral-inei-tra-bajo-sin-derechos-sociales-noticia/
58 DANE, Pulse Migration Survey, https://www.dane.gov.co/index.php/estadisticas-por-tema/demografia-y-poblacion/encuesta-pul-so-de-la-migracion-epm accessed April 2022 (Spanish only).



↑ 👁 *Commercial Establishments in Tumbes, Perú. Coyright: Fernanda Pineda/Amnesty International.*

34% work on an unpaid basis and in 37% of cases their employment status could not be determined. It should be noted that 22% of the women completed secondary education and 18% completed technical or higher education.[59]

In both countries, refugees face barriers to accessing opportunities for decent working conditions. In Colombia, for example, Venezuelan women identified lack of work permits as the main barrier, followed by lack of experience, discrimination and lack of access to information on job offers.[60] Several women commented that their first job option was as a street vendor selling coffee, arepas or candy, or recycling.[61] Faced with job insecurity, some women also choose to engage in sex work. Informal work increases the risks of being exposed to various forms of violence and labour exploitation, including being co-opted for work in restaurants and bars for the purpose of sexual exploitation.[62] The information and testimonies gathered suggest that in Colombia and Peru, the work environment for Venezuelan women is per se violent.

Xenophobia is another obstacle preventing Venezuelan women from accessing decent work and one of the main reasons why they face violence in the workplace. [63] Some Venezuelan refugee women said that, despite having regular migration status, it is still very difficult to get a decent job that allows them to escape economic precariousness, due to xenophobia and the lack of job opportunities: "she is 37 years old and has gotten into companies and everything, and right now she is in one, but she is employed by the day" said one of the mothers of a Venezuelan woman based in Colombia.[64]

Venezuelan women often face xenophobia or compound stereotypes when they look for work. Both the sources consulted and the statements gathered indicate that they are denied the opportunity to access work because they are Venezuelan.[65] This is compounded by discrimination on other grounds, such as age. This was the case for Liz, who is 60 years old:

---

59 Office of the National Superintendent for Migration, *Contexto de le feminización de la migración en el Perú, respuesta y estrategias estatales para alcanzar la integración*, March 2022. Document provided in an interview with the Superintendent' Office on 23 March 2022.
60 DANE, *Pulse Migration Survey*,
https://www.dane.gov.co/index.php/estadisticas-por-tema/demografia-y-poblacion/encuesta-pulso-de-la-migracion-epm accessed April 2022.
61 Interview with Venezuelan refugee woman, Lima, 20 March 2022, and Focus Group 2, Cúcuta, 1 April 2022.
62 Interview with international officials, Colombia, March 2022. See also Ombudsperson's Office, Early Warning 50-20, Norte de Santander, 22 November 2020, and Colombian Observatory for Women, *Boletín Especial, La violencia contra las mujeres migrantes: una frontera por superar*.
63 Colombian Observatory for Women, *Boletín Especial, La violencia contra las mujeres migrantes: una frontera por superar* and interview with DeJusticia, Colombia, March 2022.
64 Casual employment on a day-to-day basis.
65 Colombian Observatory for Women, *Boletín Especial, La violencia contra las mujeres migrantes: una frontera por superar*; interview with DeJusticia, Colombia, March 2022; statements, Focus Group 1, Lima, 21 March 2022; and statements, Focus Group , Engativá, Colombia.

> "It happened to me, when I arrived, I said, I'm going to look for work, I'm going to work, even if it's selling coffee, I saw that they were looking for staff in bakeries, I went to several places. The first thing they asked about was my nationality, of course because of my accent: 'No, no, we don't hire Venezuelans here' I was told outright. At another place, 'how old are you?', 'no, go home and look after the youngsters'. I went out several times and said, 'wow, it's going to be hard for me to find a job'. That was one of the hurdles for me, a big one. When I came, I was working and here I cannot get a job, that's impossible. Those are the first things, age and nationality, they already label you with that and then what do you do. I'd like to be independent, to have a space for me, my privacy but I have no way of being able to afford that."
>
> Liz, a Venezuelan woman in Colombia

Potential employers stigmatize, discriminate or even assault Venezuelan women, based on gender stereotypes and their hypersexualization, which are widespread in Colombian and Peruvian societies. Venezuelan women often receive comments that reduce their job opportunities to sex work: "Why look for work if you can go to the street to work," one of the women interviewed reported having heard. Another woman interviewed responded to a question of what obstacles they face when looking for employment by saying: "Here the issue is work, employment for migrants, because that is what Venezuelans are, they ask you for sexual services in order to give you a job. It's shocking."

In this context, Venezuelan refugee women face unrelenting sexual harassment in the workplace. Camila shared her experience, when she arrived in Lima, of a boss who constantly harassed her during the three months she worked with him, even fearing for her life when she realized that the man kept a gun in one of his desk drawers:

> "I arrived with a job offer that ended in threats and harassment and when I realized I was at risk, I didn't care that I wasn't being paid, but I wanted to, sort of melt away. And so... that was how I started out. I went on, I took a job in the informal sector so as not to be stuck there. But I arrived in what appeared to be a good position. I arrived with a job offer, with a wonderful dream salary, but by the third month, it started: 'look, I don't need staff, I want you, I want to be with you...' and I kept saying, no, no, until he got a bit aggressive and I said I can't do this anymore. My head was telling me that the gun was in the drawer [of the boss, who was harassing her]." Jenny, a Venezuelan woman in Peru

Refugee women who manage to find work in the formal sector are not immune to violations of their labour rights and difficult working conditions. The lack of a written employment contract, social benefits, pay not in line with the law, long working hours and no rest days, were some of the persistent trends identified in both countries during this research.[66]

> " In many businesses here there are abuses, my daughter worked in a shop and also had to go to the Ministry of Labour and the woman said: 'no, she was not hired by me', and she didn't want to pay her for the months she worked there, she went to the police, because she was being abused, the hours they imposed, they disrespect, they exploit Venezuelans a lot. Working hours when they are not even given the time to eat, working straight through as if they were not human beings, as if they didn't have a family. "
>
> Liz, a Venezuelan woman in Colombia

### Obstacles to access to decent work: "That's what they told us: 'I have no one to look after the children'"[67]

Another barrier to accessing work identified by women is that they continue to shoulder a disproportionate amount of the responsibility for childcare because of the prevailing gender roles both in their country of origin and in the host country. This intensifies when they leave their countries.[68] The study

---

66 DANE, Pulse Migration Survey,
https://www.dane.gov.co/index.php/estadisticas-por-tema/demografia-y-poblacion/encuesta-pulso-de-la-migracion-epm accessed April 2022.
67 DeJusticia interview, Colombia, March 2022.
68 Colombian Observatory for Women, Boletín Especial, La violencia contra las mujeres migrantes: una frontera por superar.

Labour Dynamics of Venezuelan Migrant Women in Colombia (Dinámicas laborales de las mujeres migrantes venezolanas en Colombia) found that Venezuelan refugee women have a higher (unpaid) workload in the home than Colombian women. According to this study, 46.7% of Venezuelan migrant women in work and 53.1% of those not in work[69] stated that they spent at least 20 hours[70] a week on childcare compared to 35.3% and 30.6% of employed and unemployed Colombian women.[71]

Because of the lack of support networks and state childcare policies, Venezuelan refugee women have no one to take care of their children. Often, given their economic insecurity, the conditions of poverty they face in the host cities and the lack of family support networks, it is women who are left to look after the children while their partners are at work, making it difficult in practice for them to access the labour market and job training programmes.[72] For single mothers it is even more difficult to get a job to meet the needs of the family as they have no reliable childcare networks.

Faced with this complex situation, many women choose to take their children with them when they go out to work as street vendors, where they face being offered money for sex, raped, assaulted and discriminated against. Other women "decide" (having no alternative) to leave their children alone at home or take them along when on the streets begging, exposing them to a greater risk of discrimination, abuse and violence. Particularly in Colombia, there is a widespread fear among Venezuelan refugee women that, in either of the above two scenarios the Colombian authorities will intervene to take away the children [73] and put them in the Administrative Process for the Restoration of Rights (Proceso Administrativo de Restitución de Derechos).[74]

"They are also very fearful of the Colombian Family Welfare Institute [Instituto Colombiano de Bienestar Familiar, ICBF]. The ICBF is an institution that migrant families are very afraid of, afraid they'll have their children taken away from them. So then they... decide not to go out looking for formal work, but rather to work in the informal sector, so they sell food, they sell coffee, so that they can take the children to the work with them." Interview with DeJusticia

In addition, according to the information received, the majority of Venezuelan refugee women face greater barriers in accessing government training programmes and economic empowerment measures because of the obstacles to regularizing their migration status[75] coupled with the lack of support networks for childcare.

The sources consulted also indicated that one of the difficulties faced by women in accessing and attending all stages of training programmes or certification of competencies is again related to care responsibilities.[76]

"Some programmes have included nurseries, spaces that ensure women can attend. However, when they do manage to access employment, after a month or two women resign because they have no one to take responsibility for childcare, and their wages are not enough to enable them to pay a childminder. So... well, that has a big impact on the effectiveness of these programmes. This obviously restricts women's participation in the labour market." Interview with DeJusticia

---

69 Inactive and unemployed
70 19.6 hours for those in work and 26.4 hours for those not in work.
71 CUSO Internacional, Dinámicas laborales de las mujeres migrantes venezolanas en Colombia, December 2021,  accessed May 2022. See also Colombian Observatory for Women, Boletín Especial, La violencia contra las mujeres migrantes: una frontera por superar.
72 DeJusticia interview, Colombia, March 2022.
73 PARD figures indicate that there are more than 10,900 Venezuelan children in Colombia. This figure has been increasing since 2017, which coincides with the mass arrival of Venezuelans in Colombia, reaching 3,609 children during 2021,
https://public.tableau.com/app/profile/anal.tica.institucional.icbf/viz/EstadisticasMigrantesICBF_16198291803590/INDICE?publish=yes accessed March 2022.
74 DeJusticia interview, Colombia, March 2022; Focus Group , Soacha, Colombia, March 2022; and interview with Colombian officials, April 2022.
75 DeJusticia interview, Colombia, March 2022 and DANE, Pulse Migration Survey,
https://www.dane.gov.co/index.php/estadisticas-por-tema/demografia-y-poblacion/encuesta-pulso-de-la-migracion-epm accessed April 2022.
76 DeJusticia interview, Colombia, March 2022.

### LOOKING FOR WORK – THE EXPERIENCE OF VENEZUELAN TRANS WOMEN

For LGBTI people the migration process is usually characterized by systematic and structural violence from the moment they make the decision to leave their countries of origin to the process of social integration in the cities in which they settle.[77] In addition to the discrimination they already experience because of the lack of acceptance of their sexual orientation and gender identity, they also face xenophobia from people in host countries, often including public officials and members of the police forces responsible for their security.[78]

This was the case for Alicia, a trans woman and with a career as a communications professional in Venezuela. Alicia left Venezuela and settled in Lima where she tried to look for work in her professional field, but that has not proved possible owing to the obstacles she faces not only because she is a trans woman but because of her nationality: job offers at salaries lower than those offered to nationals of the host country and health and safety conditions that could put her at risk of gender-based violence are affecting her emotional state and her life project as regards work.



↑ 👁 Copyright: Fernanda Pineda/Amnesty International

"The worst discrimination I have experienced in particular, and my colleagues and trans colleagues have talked about this, is the difficulty in accessing a decent job. The fact that your external physical appearance suggests to them that you do not have cognitive abilities to be able to do the job and they simply refuse to hire you. I mean, I've gone where it says they're looking for a woman and my CV is way above what they are asking for and they say, 'We've already filled the post', but I've told cisgender friends, 'ask them', and they say, 'bring your CV' and I've gone in and said 'Well, didn't you just tell me the job was filled?' I mean, that's how obvious it is. I have had cases where, if they pay someone from here 30 soles for a 12-hour job, they give me 14 soles for 15 hours or they want to pay me 10 or 12 soles and I have taken the work because I had to. And many times I have done everything that I have been told, cleaning this, cleaning the roof, collecting cardboard boxes; I have worked in markets cleaning the roofs, collecting merchandise, cleaning some horrible places that smell of cat urine, in conditions that you cannot imagine and many times they have not even paid me in full, because they know that nobody will protect me, 'I will not pay you', period. Or else they say, 'sales were down today, I won't pay you'. And sometimes I have worked just for bread and coffee, what they call here the 'lunch', that is a snack in the afternoon, just for that, sometimes I have worked for food. It has been very, very, very hard to be here all these years and feel that you've lost your life and left it behind after you worked, went to university, that you have two careers, that you put so much so much of your heart into this life." Laura, a Venezuelan woman in Peru

---

77 Caribe Afirmativo, Perfiles migratorios de la comunidad LGBTIQ+ Conectando caminos por los derechos, https://caribeafirmativo.lgbt/wp-content/uploads/2022/05/PERFILES-MIGRATORIOS.pdf accessed March 2022.
78 OAS and R4V Platform report shows the impact of COVID-19 on specific groups of Venezuelan refugees and migrants, p71. En https://www.r4v.info/en/news/oas-and-r4v-platform-report-shows-impact-covid-19-specific-groups-venezuelan-refugees-and#:~:text=Access%20to%20health%20care%3A%20Refugees,as%20a%20source%20of%20infection

CLP_PC_029629

## HUMAN TRAFFICKING



↑ 👁 *Copyright: Fernanda Pineda/ Amnesty International*

Amnesty International is concerned about the shortcomings of state responses to gender-based violence in Colombia and Peru, while the lack of state intervention can also leave women fleeing Venezuela at greater risk of exploitation and human trafficking.

Amnesty International found that the precarious conditions in which they are living, the lack of a support networks in the host country, linked to the need to work and the pressing need for family income not only for those in the country where they are living but also for their families in Venezuela, push many Venezuelan women to accept "the promise of high salaries with the income they need"[79] or "the offer of any kind of work".[80]

According to the information received, women from Venezuela have been contacted to work in various cities in Colombia and Peru. In some cases, it was Venezuelan people who contacted the women and offered them job opportunities: "The fact that you do not have a support network means that your fellow nationals become your support network and you trust them, Venezuelan networks have been identified."[81] This was confirmed by the cases documented by Amnesty International.[82]

Amnesty International received information regarding cases of exploitation and trafficking where women were recruited with their children, who were also direct victims of trafficking for begging purposes, "forced labour" on the street and even sexual exploitation.[83] An example of this is the case of 30-year-old Andrea who was brought from Venezuela to Peru to work in a family home. Andrea's family was contacted by a couple who came to her house to convince Andrea's mother that they should take her seven-year-old son to Peru and they would take care of him.

Andrea described how she and her mother refused, but instead they convinced Andrea to travel to Peru with them and her two daughters to work in the home and get a diagnosis and medical treatment for her leg problems (related to diabetes, which at the time was undiagnosed). Andrea spent two years locked up the family's home doing housework while her health deteriorated and she gradually lost her sight. In addition to mistreating her and her daughters, the couple began to take her daughters for weeks to "work" outside the home, saying they were selling sweets on the street.[84]

---

79 Interview with civil society organization in Peru, March 2022 and interview with international officials February and March 2022.
80 "La promesa de alta rentabilidad con un ingreso salarial que necesitan" o "cualquier tipo de oferta laboral"; Colombian Ministry of the Interior, cited in Judgment T-236 of 2021 of the Constitutional Court of Colombia.
81 Interview with international officials March 2022.
82 Interview, Lima, Peru, 20 March 2022 and Focus Group 1, Cúcuta, 29 March 2022.
83 Interview with civil society organization in Peru, March 2022 and interview with woman survivor, March 2022.
84 Interview with survivor in Lima, 20 and 22 March 2022.

"I came from Venezuela practically backpacking, with my daughters and a couple, the man was Colombian and the woman was Venezuelan [from my neighbourhood]. They made promises that they never kept. They promised me that they would help me. I arrived from Venezuela with my feet already swollen, I could hardly walk and they said that they were going to help me here with medicines and medical care and that when I got better, I could become independent, but it was a lie. They knew what they were bringing me here for.

They knew that with my daughters they were going to make money here. And the month after I got here, they started to take the girls, they told me that they were artisans, that they made bracelets, but it was a lie, I never saw them making anything. Actually, then I knew what they were taking them for. They took them begging, selling candy. They took them to the provinces, then to some villages, they took them to sell, to beg and with that they made a lot of money...

Trafficking in people is when they don't let you go outside, they beat you, they make you work, they don't pay you, they exploit you, they take your children, they put them to work, to beg, they exploit them just like they do you. I never received a peso from them, not a single one, nothing." Andrea, a Venezuelan woman in Peru.

In early 2022, theOffice of the Public Prosecutor's Victim and Witness Assistance Unit (Unidad de Asistencia a Víctimas y Testigos, UDAVIT) rescued Andrea and took her to a shelter under protection. Andrea said during the interview that despite having a Peruvian foreigners permit (carné de extran-jería peruano) and telling the authorities she felt safer in Peru, they informed her that she would be deported to Venezuela.[85] According to the information received months later by the organization, Andrea finally consented to be returned to her country.

In Colombia, in October 2021, for the first time, the Constitutional Court issued a fundamental ruling for the protection of victims of trafficking in the country. In this decision, the Court upheld the rights of Yolanda, a Venezuelan woman victim of trafficking who had not been properly identified as a victim of trafficking or protected by the Colombian authorities, and her family and ordered the authorities to adopt structural measures, such implementing training for officials on identifying and supporting victims of trafficking and investigating and punishing those responsible.[86]

The Court emphasized the importance of adopting an intersectional approach in these cases, and recognized that Venezuelan people, in the context of mass migratory flows, are at greater risk of being victims of trafficking:

The Venezuelan migrant population is exposed to a greater risk of becoming victims of the crime of trafficking, because they experience conditions of extreme poverty; are abandoned by the state; and have an irregular migration status, which exposes them to situations of exploitation; this cannot be assess on the basis of the level of reported cases due to the barriers that prevent this from being identified and brought to the attention of the authorities." Constitutional Court of Colombia[87]

The 1951 Convention relating to the Status of Refugees and its 1967 Protocol, to which Colombia and Peru are state parties, are the main legal instruments for the protection of refugees throughout

---

85 Interview with survivor in Lima, 20 and 22 March 2022.
86 In this case, Yolanda received support from the organization Women's Link Worldwide in navigating the justice system. See Women's Link Worldwide, 'In a historic decision, the Constitutional Court of Colombia orders improvements to the country's system of protections for victims of trafficking in human beings', 11 October 2021, https://www.womenslinkworldwide.org/en/news-and-publications/press-room/in-a-historic-decision-the-constitutional-court-of-colombia-orders-improvements-to-the-country-s-system-of-protections-for-victims-of-trafficking-in-human-beings
87 "la población migrante de Venezuela está expuesta a un riesgo mayor de ser víctima del delito de trata, pues padece unas condiciones de pobreza extrema, abandono estatal y condiciones migratorias irregulares que la expone a padecer situaciones de explotación, lo que no puede determinarse por el índice de casos denunciados debido a las barreras que impiden identificarlo y ponerlo en conocimiento de las autoridades"; Constitutional Court of Colombia, Judgment T-236 of 2021.

# 5. DIFFICULTIES IN ACCESSING INTERNATIONAL PROTECTION AND REGULARIZING MIGRATION STATUS

the world. The 1984 Cartagena Declaration, a regional protection instrument, broadens the definition of a refugee to include "persons who have fled their country because their lives, safety or freedom have been threatened by generalized violence, foreign aggression, internal conflicts, massive violation of human rights or other circumstances which have seriously disturbed public order."[88] Colombia and Peru have incorporated this definition into their legislation.[89]

The Venezuelan women interviewed expressed a pressing need to regularize their migratory situation, including access to refugee status. Amnesty International found, however, that Venezuelan people continue to face significant obstacles to regularizing their status, either through recognition of their refugee status or through other migration regularization channels or programmes.

## 5.1 ACCESS TO INTERNATIONAL PROTECTION

In Colombia, international protection is regulated by the Single Regulatory Decree of the Foreign Relations Administrative Sector (Decreto Único Reglamentario del Sector Administrativo de Relaciones Exteriores, Decree 1067 of 2015). This states that the Advisory Commission for the Determination of Refugee Status (Comisión asesora para la determinación de la condición de refugiado, CONARE) is responsible for receiving, processing and examining applications for recognition of refugee status. Individuals may apply to the migration authorities for refugee status at the time of entry into the country at migration points, or, once inside the country, within two months of their entry into the country, via the Ministry of Foreign Affairs.

In Peru, Law 27.891 on Refugees (2002) and its regulations govern international protection. The Ministry of Foreign Affairs Permanent Ad Hoc Commission on Refugees (Comisión Permanente Ad Hoc para los Refugiados del Ministerio de Relaciones Exteriores) is the body responsible for receiving, investigating, processing and deciding on applications for refugee recognition. An application for recognition of refugee status may be submitted before the expiry of a person's temporary stay in Peru, or, if they do not have legal authorization to enter or stay, within a period not exceeding 30 days from the date of entry into Peruvian territory, unless there are, in the opinion of the Special Commission for Refugees, reasons to justify an exception to this.

The number of applications for international protection submitted by Venezuelans in Colombia is low. As of 30 June 2021, the authorities had received 31,400 applications for asylum[90] and recognized 1,300.[91]

According to information received by Amnesty International, the low number of asylum applications may be related to the limited access to existing information about this procedure. The absence of a time limit

---

88 Cartagena Declaration on Refugees, 22 November 1984
89 Colombia incorporated the definition of refugee set out in the Cartagena Declaration in Decree 1067 of 2015, article 2.2.3.1.1.1., (b). Peru incorporated this definition in Law No. 27.891 of 20 December 2002 - Refugee Law, Article 3 (b).
90 R4V Platform, Total Pending Asylum Claims per Country, accessed April 2022.
91 R4V platform, Recognized refugees from Venezuela, accessed April 2022.

CLP_PC_029632

by which the Ministry of Foreign Affairs must issue its response;[92] the fact that people cannot work during this time, when they are issued a safe-conduct permit; and the inherent risk of losing refugee status in the event of returning to Venezuela, are other factors indicated in the interviews as discouraging people from submitting an asylum application.

This last factor seems to be common in both countries. In Peru, of the 531,000 refugee applications submitted[93] only 4,100 have been approved by the authorities.[94] Amnesty International has expressed concern about failings in the handling and reception of asylum applications since 2020.[95] Despite the fact that the number of people recognized as refugees is higher than in Colombia, the authorities affirm that, faced with the question "do you know that recognition of refugee status means that you cannot return to your country of origin? Do you consent to this, in the hypothetical event that you are granted refugee status?", most people say no, that they want to return.[96]

Faced with this, the Peruvian authorities have stated that they opt for other alternatives to allow Venezuelan people to remain in the country: Humanitarian Migration Status (Calidad Migratoria Humanitaria[97]). This status is granted by the Ministry of Foreign Affairs to people who are in the process of applying for refugee status,[98] "based on humanitarian criteria, for the time being for Venezuelan individuals who have applied for refugee status." This status allows asylum seekers to regularize their stay in Peru and obtain a foreigner's permit, work formally or start a business and access health services. Humanitarian Migration Status authorizes a person the right to remain in the country for 183 days and is renewable, as long as the conditions of vulnerability for which it was granted persist.[99] As of March 2022, the Ministry of Foreign Affairs reported having granted only 61,000 instances of humanitarian migration status.[100]

# 5.2 OBSTACLES LINKED TO MIGRATION REGULARIZATION PROCESSES

## 5.2.1 IN COLOMBIA



↑ 👁 copyright: Engativá, Bogotá. Transport Terminal. Copyright: Fernanda Pineda/Amnesty International

---

92 Decree 1067 of 2015 does not set out a timeframe for the process of recognizing a refugee.
93 R4V Platform, Total Pending Asylum Claims per Country, accessed April 2022.
94 R4V platform, Recognized refugees from Venezuela, as of 31 December 2021, accessed April 2022.
95 Amnesty International, Perú: Comunicación al Comité de Protección de los Derechos de Todos los Trabajadores Migratorios de las Naciones Unidas previa a su 34a sesión, 23 February 2022 (Index: AMR 46/5238/2022), (Spanish only).
96 Interview with public official in Peru, 18 March 2022.
97 Ministerial Resolution No.207-2021-RE of 15 June 2021.
98 Interview with public official in Peru, 18 March 2022.
99 UNHCR, Perú, La calidad humanitaria, https://help.unhcr.org/peru/cmh/#:~:text=La%20Calidad%20Migratoria%20Humanitaria%2C%20como,como%20del%20carn%C3%A9%20son%20gratuitos (Spanish only).
100 Interview with a public official in Peru, 18 March 2022; interview with a public official in Peru, 23 March 2022; and response to the Request for Information, Ministry of Foreign Affairs, Peru.

In 2018, faced with mass arrivals of people from Venezuela, the Colombian government created the Special Permit to Remain (Permiso Especial de Permanencia, PEP) with the aim of establishing an initial register of Venezuelan refugees that would enable identity documents to be issued and give people access to basic services and job opportunities. At that time, in order to obtain a PEP, Venezuelan refugees needed to have entered through one of the authorized border points; that is, to have their passport stamped.

In 2021, Temporary Protection Status (PPT) was introduced for Venezuelans as an alternative to regularization for the 1,840,000 or so Venezuelan refugees in Colombia,[101] replacing the PEP. The PPT and PEP differ in a number of ways, and perhaps the most important difference is that, unlike the PEP, the PPT is available to all Venezuelans who entered Colombian territory up to 31 January 2021, whether on a regular or irregular basis.

One of the complications identified regarding access to the PPT lies in demonstrating that the "irregular" entry took place before this date. However, it is possible to present supporting evidence, such as the enrolment of children in school, a receipt, a medical examination or some document or record showing that the person entered the country before the set date. People who arrived in Colombia after 31 January 2021 must have entered through formal border posts and have stamped a passport to access the PPT. According to the available information, as of 26 May 2022, 1,207,403 PPTs had been approved.[102]

Venezuelan women face a number of challenges in obtaining a PPT. The first is associated with the presenting evidence. Given that many have entered without passing through an official border crossing, live in precarious conditions, are unable to enrol their children in the education system, and only approach health services for emergencies, it is not possible for them to present a document proving that they entered the country before 31 January 2021.

Amnesty International also found that the difficulties Venezuelan women face in accessing electronic media and the internet are also an obstacle to their engaging in the PPT process. Liz, a 60-year-old Venezuelan woman, said Amnesty International was also able to document that, while the PPT allows trans people to obtain documents that reflect their gender identity, in practice to do so they must carry out additional procedures that increase costs and therefore limit effective access to this document.[103]

## 5.2.2 IN PERÚ

It is estimated that there are approximately 1,290,000 Venezuelans in Peru.[104] The Peruvian legal framework has created two migratory regularization programmes: the Temporary Residence Permit (Permiso Temporal de Permanencia, PTP), between 2017 and 2019, and since 2020 the Temporary Residence Permit Card (Carné de Permiso Temporal de Permanencia, CPP), which in practice work in the same way and provide for the same rights.

It should be noted that both exclude the right to access to healthcare,[105] specifically impacting the health and sexual and reproductive health of Venezuelan refugee women and limiting their access to primary health services for those who are survivors of gender-based violence. The CPP is in identity document issued by the Office of the National Superintendent for Migration (Superintendencia Nacional de Migraciones), through which Venezuelans – regardless of whether or not they have regularized their status – can obtain a permit to stay for one year. "This temporary permit cannot be renewed, nor requested a second time", so before the expiry date, the person must go through another process regarding migration status.[106] According to information from the Office of the Superintendent for Migration, between 9 July 2021 and 5 June 2022, 174,726 CPPs were granted to Venezuelans.[107]

In addition to these two programmes, there is also special migration residence status, migration status due to vulnerability and, as already mentioned, humanitarian migration status. These three types of migration status enable refugees to obtain a Foreigners' Card (Carné de Extranjería), which is the only document that allows them to access social insurance.[108]

101 R4V, R4V Latin America and the Caribbean, Venezuelan Refugees and Migrants in the Region - April 2022, accessed April 2022.
102 Migración Colombia, Visibles, Estatuto Temporal de Protección, https://www.migracioncolombia.gov.co/visibles
103 Amnesty International, Between invisibility and discrimination: Venezuelan LGBTIQ+ refugees in Colombia and Peru, 20 June 2022.
104 R4V, R4V Latin America and the Caribbean, Venezuelan Refugees and Migrants in the Region - April 2022, accessed April 2022.
105 Interview with civil society organization in Peru, 22 March 2022; Interview with public official in Peru, 23 March 2022.
106 "Este permiso temporal no puede ser renovado, ni solicitado una segunda vez"; documentation handed over during the interview with the Office of the Superintendent of Migration, Peru, 23 March 2022. For more information see https://help.unhcr.org/peru/cpp/ accessed May 2022 (Spanish only).
107 Figures from the Office of the Superintendent for Migration.
108 Interview with civil society organization in Peru, 22 March 2022. Interview with public official in Peru, 23 March 2022.

CLP_PC_029634

With regard to *humanitarian migration status*[109], although Amnesty International welcomes this measure, the interviews showed that there is a lack of a clear and institutionalized protocol or guidelines on its implementation to enable women survivors of gender-based violence to access this migration status through formal channels.



↑ 👁 *National Centre for Attention at the Border, Tumbes, Peru. Copyright: Fernanda Pineda/Amnesty International*

Special migration residence status is the process by which most people who obtain PTPs regularized their status. This status grants the right of residence for a year, the possibility of working, studying, opening bank accounts, accessing health services and accessing social programmes and services.[110]

Special migration status due to vulnerability is granted to foreigners in Peru "when they are in a situation in which they lack protection or risk not being able to access the full exercise of their fundamental rights."[111] Being a survivor of gender-based violence[112] is one of the circumstances recognized when foreign women can

---

109 *Humanitarian Migratory Status is a residence status granted by the Ministry of Foreign Affairs based on humanitarian criteria for Venezuelan nationals who have applied for refugee status, and for those who do not meet the conditions to be recognised as refugees, who are in a situation of high vulnerability and who have not been involved in the commission of crimes. It allows employment or self-employed work in order to start a business. This migratory status authorises a residence of 183 calendar days and is extendable as long as the conditions of vulnerability for which this residence was granted persist.*
110 *Documents provided by a public official, interview on 23 March 2022.*
111 *"cuando se encuentran en estado de desprotección o riesgo de no acceder al ejercicio pleno de sus derechos fundamentales". Title X of the Regulation of Legislative Decree No. 1350 sets out specific regulations regarding foreign persons in a vulnerable situation. Article 226 states that foreign nationals in vulnerable situations are those in a situation in which they lack protection or risk not being able to access the full exercise of their fundamental rights in the country. Likewise, article 227 defines foreign nationals in vulnerable situations as those who are:*
*(a) Victims of domestic and sexual violence*
*(b) Victims of trafficking in persons and smuggling of migrants*
*(c) In an irregular migration status*
*(q) Others that require protection in view of the impact on or serious threat to their fundamental rights. https://www.defensoria.gob.pe/wp-content/uploads/2021/10/Informe-Violencia-contra-mujeres-migrantes.pdf (Spanish only).*
112 *Article 230 of the Regulation establishes several obligations regarding documents and/or temporary permits to remain in the country, exemption from requirements for certain procedures, the granting of extensions of deadlines and exemption from fines, and the granting of special migration status, among other aspects:*
*230.1. The Migration Authorities will issue the documents and/or temporary residence permits to foreign nationals in a vulnerable situation, following an expert report from a specialist organizational unit; measures that include the granting of extensions and exemption from fines and procedural rights set out in the current migration regulations or others, which enable the special circumstances of each specific case to be taken into consideration.*
*230.2. In cases of situations of vulnerability, MIGRATIONS may grant exemptions regarding presenting the requirements set out in procedures set out in the current migration regulations or others, subject to a report from a relevant specialist unit.*
*230.3. MIGRATIONS may grant special migration status exceptionally to foreign nationals in a situation of extreme vulnerability, allowing them to remain in circumstances not covered by other forms of migration status, a status that will be granted after a report from the relevant specialist body.*

CLP_PC_029635

access this migration protection measure. The migration law states that public officials, both in the Women's Emergency Centres and in police stations, have the duty to inform women about this option, regardless of the migration status in which they find themselves – regular or irregular. Between 2019 and 2021, the Office of the Superintendent for Migration approved 2,070 applications for special migration status due to vulnerability, of which 897 were to Venezuelan refugee women and 963 to Venezuelan men.[113] However, this institution indicated that it did not have information on how many were granted for gender-based violence.

In response to a request for information disaggregated by each of the grounds set out for granting special migration status due to vulnerability, the Office of the Superintendent stated that it did not have this information.[114] For this reason, it was not possible to determine how many of the 2,070 were awarded for gender-based violence. Although this measure represents the possibility of comprehensive protection for refugee women survivors of gender-based violence, Amnesty International has identified several challenges to accessing it.

Amnesty International welcomes the recent creation of the Protocol for the Care and Referral of Migrants in Vulnerable Situations (Protocolo de Atención y Derivación de personas migrantes en situación de vulnerabilidad),[115] which provides a pathway that migration officials can apply in cases where women are victims of violence. This pathway can start when they are directly approached about a case, which they must refer to the Aurora Programme focal point or to the CEM covering their jurisdiction. A case can also be referred by the CEM or the police. As will be explained later (Chapter 6), among the obstacles identified to obtaining special migration status due to vulnerability, are the lack of knowledge and implementation, by frontline officials of both the CEM, the police and Migrations, of appropriate referral and advice to refugee women survivors, as provided for in the Protocol. Another factor is the economic precariousness experienced by most women, which means they have to go out each day to earn the means of subsistence, which means they do not have the time or energy necessary to deal with the justice services.

Amnesty International has also identified that the multiplicity of migration documents in Peru, which already complicates access to regularization, is exacerbated by the lack of knowledge among officials regarding the institutions involved in the care pathway for women survivors of violence. In both family police stations and the CEM, officials are not aware that foreign women have the right to access this migration status if they are victims of violence, regardless of their documentation.

In addition, officials responsible for providing primary care to women survivors are unaware of the migration status that these women can access. This results in officials not providing women survivors with this information or confusing this with other forms of migration status. This gap was confirmed by the statements of the Venezuelan women interviewed who stated that they were not informed at any time about this possibility of regularizing their status.[116]

> **"I asked the question because I understand that because I am in this situation of vulnerability and because I am an asylum seeker, I should have gone for a foreigner's card for vulnerability, but they didn't tell me about this. I asked the two lawyers at the CEM [Women's Emergency Centre] and they didn't tell me this."** Ana, a Venezuelan woman in Peru

Likewise, interviews with officials from different public institutions[117] revealed that officials from the CEM, the police and migrations' officers exercised a certain degree of discretion regarding whether or not survivors needed to file a formal complaint to access special migration status due to vulnerability or if a social assessment carried out in the CEM by a social worker was sufficient. Another difficulty faced by women survivors of gender-based violence who opt for special migration status is the length and delays of the Office of the Superintendent for Migration processes. According to the sources consulted,[118] this is an ad hoc procedure and therefore requires verification by the immigration authorities, for which they request reports from the authorities in the place where the case was registered: the police, CEM and/or hospital. At present, this process can take more than six months.[119]

---

113 Response to information request, Office of the Superintendent for Migration of Peru, 11 April 2022.
114 Response to information request, Office of the Superintendent for Migration of Peru, 11 April 2022.
115 Office of the Superintendent for Migration, Protocol on the Care and Referral of Migrants in Situations of Vulnerability, 2021, https://cdn.www.gob.pe/uploads/document/file/2037073/%20ANEXO%20I.pdf (Spanish only).
116 Statements from Focus Groups 1, 2 and 3, Lima, Peru, held between 21 and 23 March 2022.
117 Interview with public official, Peru, 23 March 2022; interview with Aurora Programme, Peru, 23 March 2022; interview with public official, Peru, 23 March 2022; interview with public official, Peru, 24 March 2022; and interview with civil society organization, Peru, 22 March 2022.
118 Interview with public official, Peru, 22 March 2022; interview with public official, Peru, 23 March 2022; and interview with public official, Peru, 23 March 2022.
119 Interview with member of civil society, Peru, 22 March 2022.

CLP_PC_029636

Finally, according to the information received, the limited duration of special migration status, for one year, also represents an obstacle to the protection of the rights of foreign women survivors of gender-based violence. According to the law, at the end of this period, the authorities must reassess whether the vulnerability remains in order to decide on whether to renew their document and this can lead to instances of revictimization. Once the state of vulnerability has ended or the issue has been resolved – with or without a complaint – migration status will cease to be extended, leaving women again in a situation where they lack protection[120] if they do not know about other regularization mechanisms.

# 5.3 LACK OF INFORMATION

Amnesty International found that, in both countries, Venezuelan women in general do not have information about the processes for applying for international protection and regularizing their migration status.

In Colombia, Venezuelan women who have been in the country for more than five years said they did not know about the pathways for regularizing their status and had not had access to the PEP. Women also described having difficulties in accessing information because they lacked access to the internet or social media, which is where information is commonly shared.[121] With regard to the PPT, many said that they had received information and had been able to register thanks to the advice or assistance of national civil society organizations or international organizations.[122] Amnesty International requested a meeting with Migration Unit of the Colombian Ministry of Foreign Affairs, but did not receive a response.

Similarly, Amnesty International was able to observe the important work carried out by civil society organizations in Peru, in particular organizations run by Venezuelan women, to ensure access to information for refugee women survivors of violence. The assistance and support, including legal and psychological support, provided by these organizations[123] are filling gaps and lack of information on support pathways offered by the Peruvian state.



↑ ◉ *San Miguel, Lima. Children and youth registration day with RENIEC and AAPREH, March 2022.*
*Copyright: Fernanda Pineda/ Amnesty International*

120 Interview with Aurora Programme, Peru, 23 March 2022.
121 Focus Group 1, Engativá, Colombia, 28 March 2022.
122 Focus Group 1, Cúcuta and Focus Group 2, Cúcuta, 1 April 2022.
123 Focus Groups 1, 2, 3 held in Lima, 21, 22 and 23 March 2022

CLP_PC_029637

Amnesty International's research highlighted the role of national and international organizations in providing information, awareness, support and advice to women survivors of gender-based violence in Colombia and Peru. This should not, however, obscure the fact that the Colombian and Peruvian authorities have a responsibility to inform refugees adequately of their right to access and receive information on the processes for obtaining recognition of their refugee status and regularization.[124]

As will be explained below, this right is closely linked to the possibility of having valid migration status, which, in turn, is essential today for Venezuelan women to be able to fully enjoy all their rights, in particular when accessing justice and healthcare pathways.

---

124 IACHR, Due Process in Procedures for the Determination of Refugee Status and Statelessness and the Granting of Complementary Protection, OEA/Ser.L/V/II, Doc. 255, 5 August 2020, paras 201 to 205; IACHR, Resolution 04/19, Inter-American Principles on the Human Rights of All Migrants, Refugees, Stateless Persons and Victims of Human Trafficking, San Salvador, 7 December 2019, Section XII, Principle 57. 185; and Brazil Declaration and Plan of Action ("A Framework for Cooperation and Regional Solidarity to Strengthen the International Protection of Refugees, Displaced and Stateless Persons in Latin America and the Caribbean"), Brasilia, 3 December 2014, Chapter Two, p. 11.

# 6. AUTHORITIES' RESPONSES: FAILURES, LACK OF PROTECTION AND MORE VIOLENCE

**STATE OBLIGATIONS FOR THE PROTECTION OF VENEZUELAN WOMEN'S RIGHTS**

To respect, protect and guarantee the human rights of all persons present in its territory, without any discrimination.

| INTERNATIONAL PROTECTION FOR VENEZUELANS | PROTECTION AGAINST GENDER-BASED VIOLENCE |
|---|---|
| **To inform about processes for accessing the recognition** of the status of refugee and migratory regularization. | **To ensure a life free of violence:** prevention, investigation, prosecution, conviction, and reparation. |
| **To guarantee effective access to the processes of recognition** of refugee status and migratory regularization. | **To ensure** effective and non-discriminatory **access to justice and protection services** in cases of gender-based violence. |
| **States cannot return asylum-seekers or refugees to the country from which they have fled** or where they are at risk of grave human rights violations. (Non Refoulement) | **To act with due diligence:** have protection standards and prevention policies, and ensure their effective implementation with sufficient resources. |
|  | **To strengthen institutions** for an adequate and comprehensive response to gender-based violence free of stereotypes. |

Under the international treaties and instruments for the protection of human rights to which they are party, Colombia and Peru have an obligation to *respect, protect and fulfil*[125] the human rights of all those present in their territory, without discrimination of any kind, including on grounds such as gender, economic status, nationality or migration status.[126]

With regard to women's right to a life free from violence, the obligation to respect means that state authorities must refrain from performing, sponsoring or condoning any practice, policy or measure that violates this right.[127] The obligation to protect this right requires states to prevent it from being violated by other individuals. The authorities have a duty to protect people from violence and to take all necessary measures to prevent violence and to ensure that effective investigations are conducted into acts of gender-based violence, that those responsible are duly prosecuted and punished, and that victims receive reparation.[128]

The Inter-American Court of Human Rights has incorporated this into the duty of states to act with due diligence and has established that there is an enhanced due diligence obligation in cases of gender-based violence. According to the Court, states must "have an appropriate legal framework of protection that is enforced effectively, and prevention policies and practices that allow effective measures to be taken in response to complaints." In addition, the prevention strategy must be comprehensive; that is, states must prevent risk factors and simultaneously strengthen their institutions to provide an effective response. In addition, the Inter-American Court has determined that when there is a situation or context of widespread violence against women, states have a strict obligation to prevent, investigate, prosecute, punish and ensure reparation.[129]

Under international human rights law, all authorities of a state have an obligation to respect and observe the international standards by which the state has agreed to be bound, in particular the human rights of women.[130]

---

125 Human Rights Committee, *General Comment 31, The Nature of the General Legal Obligation Imposed on States Parties to the Covenant, Eightieth session,* UN Doc. HRI/GEN/1/Rev.7 at 225 (2004) and CEDAW Committee, *General Recommendation 28 on the core obligations of States parties under article 2 of the Convention on the Elimination of All Forms of Discrimination against Women,* CEDAW/C/GC/28 (2010), https://undocs.org/Home/Mobile?FinalSymbol=CEDAW%2FC%2FGC%2F28&Language=E&DeviceType=Desktop&LangRequested=False

126 Article 2 of the International Covenant on Civil and Political Rights and Article 1 of the American Convention on Human Rights.

127 CEDAW Committee, *General Recommendation 28 on the core obligations of States parties under article 2 of the Convention on the Elimination of All Forms of Discrimination against Women,* CEDAW/C/GC/28 (2010), para. 37.

128 Inter-American Court, *Case of Véliz Franco et al. v. Guatemala, Preliminary Objections, Merits, Reparations and Costs, Judgment of 19 May 2014* and *Case of Vicky Hernández et al. v. Honduras, Merits, Reparations and Costs, Judgment of 26 March 2021,* https://www.corteidh.or.cr/docs/casos/articulos/seriec_277_ing.pdf and https://www.corteidh.or.cr/docs/casos/articulos/seriec_422_ing.pdf

129 The Inter-American Court of Human Rights has affirmed that states also have a general obligation established in the American Convention, an obligation reinforced since the Convention of Belém do Pará came into force. See Inter-American Court, *Case of González et al. ("Cotton Field") v. Mexico, Preliminary Objections, Merits, Reparations and Costs, Judgment of 16 November 2009, Series C No. 205,* https://www.corteidh.or.cr/docs/casos/articulos/seriec_205_ing.pdf and *Case of Velásquez Paiz et al. v. Guatemala, Preliminary Objections, Merits, Reparations and Costs, Judgment of 19 November 2015,* https://www.corteidh.or.cr/docs/casos/articulos/seriec_307_ing.pdf

130 Human Rights Committee, *General Comment 31, The Nature of the General Legal Obligation Imposed on States Parties to the Covenant, Eightieth session,* UN Doc. HRI/GEN/1/Rev.7 at 225 (2004). para. 4. https://tbinternet.ohchr.org/_layouts/15/treatybodyexternal/Download.aspx?symbolno=CCPR%2fC%2f21%2fRev.1%2fAdd.13&La

## 6.1 BARRIERS TO ACCESS TO JUSTICE

**OBSTACLES FACED BY VENEZUELAN WOMEN VICTIMS OF GENDER-BASED VIOLENCE (GBV) IN COLOMBIA AND PERU:**



Insufficient dissemination of information on care pathways in cases of GBV.



Authorities lack knowledge of relevant legislation and protocols.



Fear of reporting because of having an irregular immigration status.



Discrimination and stereotypes: authorities revictimize, blame and discriminate.



Insufficient protection measures for women.





Flaws in the systematization of statistical information on GBV for Venezuelan women.



Insufficient measures to eradicate xenophobia and eliminate GBV.

The right to access to justice has been developed by the Inter-American human rights system in its interpretation of access to an effective recourse and judicial protection provided for in article 25 of the American Convention on Human Rights. Access to justice includes both the availability of information on victims' rights and available remedies and access to effective formal remedies; and to processes and support pathways.[131]

---

131  UN. Basic Principles and Guidelines on the Right to a Remedy and Reparation for Victims of Gross Violations of International Human Rights Law and Serious Violations of International Humanitarian Law Resolution  60/147 adopted by the General Assembly on 16 December 2005; Titles VII and VIII In:
https://www.ohchr.org/en/instruments-mechanisms/instruments/basic-principles-and-guidelines-right-remedy-and-reparation

CLP_PC_029641

Colombia and Peru have made progress in implementing some mechanisms for the prevention and punishment of violence against women and have specialized regulatory frameworks to prevent and punish it, as well as specialized care pathways and protocols for women victims of various forms of violence.[132] However, according to information gathered by Amnesty International, in practice, significant challenges remain in both countries in addressing, investigating, prosecuting and punishing cases of gender-based violence. These include limited presence of the judiciary in rural areas and geographic, linguistic and economic barriers to women's equal access to justice. In addition, Venezuelan women are not aware of their rights and of the legal remedies available to them; the persistence of gender stereotypes that are deeply rooted in Colombian and Peruvian society and are replicated in the justice system; and the low level of criminal prosecutions for gender-based violence. These obstacles have also been noted by the Committee on the Elimination of Discrimination against Women (CEDAW Committee), which has highlighted the greater impact of these obstacles on women living in rural areas, as well as on women in situations of vulnerability, such as asylum seekers and migrants.[133]

In both Colombia and Peru, the widespread perception of impunity and the ineffectiveness of the justice systems discourage many women from reporting gender-based violence.



**FIGURES**

According to the Report on Violence against Women by Corporación Sisma Mujer in Colombia, in 2021, 82.92% of complaints of domestic violence were under investigation stage, which indicates a high level of impunity as only 16.09% of these cases reached trial and only 0.8% resulted someone receiving a sentence. In relation to sex crimes, during the same period, the report found that 88.19% of cases of sex crimes against women were under investigation. Only 6.85% of cases reached trial and in only 0.13% sentencing.

The Peruvian Ombudsperson's Office, in a statement on the pressing need for effective action by the justice system to address an increase in cases of feminicide, noted that in 2020 only 6 out of 138 cases of feminicide (that is, 4%) resulted in convictions for the crime of feminicide. [134]

Amnesty International requested information from the Colombian and Peruvian governments on the number of convictions and acquittals for crimes related to various forms of gender-based violence. At the time of writing, no such information had been received.

These same perceptions are shared by Venezuelan women, who consider that in most cases it is not worth making a complaint because they will not get an effective response from the state or obtain any form of reparation, since women who are nationals of the host countries do not obtain this either.[135]

**"There is a very high level of impunity regarding the law and I doubt that anyone will resort to wasting their time there because we have seen that even for TV stars, very famous women here, who have gone through a lot of serious violence, the guy still remains at liberty, he is free, walking around, and they don't dare seek justice."**
Laura, a Venezuelan woman in Peru

132  In Colombia, Law 1257 of 2008 (4 December 2008) sets out measures to prevent and punish forms of violence and discrimination against women; Law 1761 of 2005 (6 July 2015) establishes feminicide as a specific offence; Law 294 of 1996 establishes measures to prevent and eradicate domestic violence; Law 1010 of 2006 sets out measures to prevent and punish harassment at work, and the care pathway for victims of domestic violence and gender-based violence and guidelines on how the Attorney General's Office should respond to people with diverse sexual orientation and gender. In Peru, there are: Law 30364, the Law to Prevent, Eradicate and Punish All Forms of Violence against Women and Members of the Group, Law; and 27942, on the prevention and punishment of sexual harassment, with a core Protocol on joint action in the field of comprehensive care and protection against violence against women and members of the family aimed at strengthening inter-institutional action and coordination in providing comprehensive care services, and a Protocol for the Investigation of Crimes of Feminicide, incorporating a gender perspective, among other instruments.
133  CEDAW Committee, Concluding observations on the ninth periodic report of Peru, 2022, https://tbinternet.ohchr.org/_layouts/15/treatybodyexternal/Download.aspx?symbolno=CEDAW%2fC%2fPER%2fCO%2f9&Lang=en and of Colombia, 2019, Https://tbinternet.ohchr.org/_layouts/15/treatybodyexternal/Download.aspx?symbolno=CEDAW%2fC%2fCOL%2fCO%2f9&Lang=en
134  Corporación Sisma Mujer, March 2022, https://www.sismamujer.org/wp-content/uploads/2022/03/VF-Boletin-8M-2022-1.pdf (Spanish only). Peruvian Ombudsperson's office, 'Defensoría del Pueblo de Perú, urge una actuación efectiva del sistema de justicia frente a aumento de casos de feminicidio', March 2021, : https://www.defensoria.gob.pe/defensoria-del-pueblo-urge-una-actuacion-efectiva-del-sistema-de-justicia-frente-a-aumento-de-casos-de-feminicidio/
135  Interview with a Venezuelan woman, Peru, March 2022; Focus Group 3, Lima 23 March 2022; Focus Group, Cúcuta, Colombia, 31 March 2022; and interview with a Venezuelan woman, Cúcuta, 31 March 2022.

CLP_PC_029642

However, in Colombia and Peru, Venezuelan survivors of gender-based violence face additional and specific obstacles in getting effective access to justice.

## 6.1.2 LACK OF INFORMATION ABOUT CARE PATHWAYS

There have been institutional efforts in Colombia and Peru[136] to disseminate and provide guidance to survivors of gender-based violence on existing care pathways, such as setting up hotlines. However, one of the first obstacles that women identify in accessing care pathways is that they do not know about them; they do not know which institution to go to or what mechanisms are available.[137]

Civil society organizations reported that, despite some isolated efforts by institutions in Colombia and Peru to disseminate and provide advice on care pathways for survivors of gender-based violence, a strategic plan has not yet been developed to ensure that existing regulations and care pathways reach Venezuelan refugee survivors of gender-based violence.[138]

In Colombia, the refugee women interviewed stressed that, although in recent times they have managed to have greater access to information, this was thanks to the work of international organizations, international cooperation agencies and civil society organizations, not to an effort by the state authorities.[139]

In addition to the lack of information, refugee women said that what sometimes prevents them from approaching institutions is the idea that they do not have the same rights as people in the host countries and therefore cannot claim their rights from institutions.[140] In this context, women perceive the public security and justice system as remote from their situation.

> " I didn't know, I didn't have any information, I thought that we migrants, as we didn't have documents or anything, the institutions in Colombia couldn't help us. The other thing is that I listened to what other Colombian people said, that we did not have many rights and that we could not make a complaint. "
>
> *Jazmín, Venezuelan woman in Colombia*

According to sources interviewed, this perception among Venezuelan people is reinforced by the treatment they have received by some public authorities, who describe Venezuelans as "illegals with no rights".[141] This type of statement is part of a context of xenophobic attitudes against Venezuelan people fed by political discourses, both in Colombia and Peru, which are discussed later in this report.[142]

---

136 Colombia has a 24/7 information and advice hotline for victims of gender-based violence that covers the whole country (Line 155 and the purple line for psycho-social care and advice covering Bogotá). Peru has a free 100 telephone line providing information, advice, counselling and emotional support and referral for victims of family or sexual violence.
137 Focus Group 1, Peru, 21 March 2022; Focus Group 2, Peru, 22 March 2022; Focus Group 3 Peru, 23 March 2022; and Focus Group in, Cúcuta, Colombia, 31 March 2022.
138 Interview with civil society organization, Colombia, 30 March 2022; response from the Colombian Ministry of Justice to Amnesty International's right of petition of 18 April 2022, from the Attorney General's Office, 19 April 2022.
139 Focus Group, Cúcuta, Colombia, 31 March 2022; Focal Group, Soacha, Colombia, 29 March 2022; and interview with a Venezuelan woman, Soacha, 29 March 202
140 Focus Groups 1, 2 and 3, 21, 22 and 23 March 2022 and Focus Group, Cúcuta, Colombia, 1 April 2022.
141 Interview with an international organization, Peru, March 2022.
142 Barómetro de xenofobia, Boletín mensual # 15-2021 Colombia, Boletín mensual #7 – 2021 Perú.

CLP_PC_029643



**CARE PATHWAYS FOR SURVIVORS OF GENDER-BASED VIOLENCE BY COUNTRY**

| PERU | COLOMBIA |
|---|---|

**HOW TO REPORT GENDER BASED VIOLENCE?**

**At:**

| | |
|---|---|
| • Police stations | • Attorney General's Office through citizen service centers: URI, SAU, CAIVAS and CAVIF |
| • Family courts | • Family police stations |
| • Public prosecutors | • National Police (municipal, departmental and CAI stations) |
| • Women's Emergency Center (in the main police stations of the districts of Lima) | |

**In order to report violence:**

• It is not necessary to have signs of abuse, violence can be psychological too.

| | |
|---|---|
| • It does not require an ID, an immigration card, or a regular immigration status. | • It does not require a valid ID or have regular immigration status. |

• It can be presented in writing or verbally.

• You can report as a survivor, or as anyone who knows the situation of violence.

• It is not necessary to report with a lawyer.

| | |
|---|---|
| • If you are denied care or discriminated against, you can report it to the Ombudsperson's Office | • If you are denied care or discriminated against, you can report it to the Ombudsperson's Office or Personeria. |

**WHAT MEASURES OF PROTECTION CAN I ASK FOR?**

| | |
|---|---|
| • Protection (to avoid contact with the aggressor), psychological attention and legal support regardless of nationality or immigration status. | • Protective measures (e.g. to avoid contact with the aggressor): must be taken within 4 hours of the request. |
| • Healthcare, protection and justice services, even without an ID. | • Care measures: temporary shelter, food and transport services. |
| • If there is a situation of vulnerability, the reports issued by the Women's Emergency Center can help to regularize the immigration status. | • Stabilization measures: help to overcome conditions of vulnerability. |
| • If the complaint leads to protection measures, you can access the special migratory status: "Resident by vulnerability". | • Protective measures related to minors. |
| | • Special protection measures for victims of the armed conflict. |

## 6.1.3 IRREGULAR MIGRATION STATUS

Difficulties in accessing international protection and other regularization processes have an immediate impact on access to justice for Venezuelan women survivors of gender-based violence. Many women who do not have regularized migration status are afraid to go to the relevant institutions to make a complaint, because they fear being deported to Venezuela.[143]

Not having regularized migration status exacerbates the power inequality between Venezuelan refugee women and their abusers if the latter have Colombian or Peruvian nationality and can constitute a means of putting pressure on them to prevent them from reporting gender-based violence. Claudia, a 36-year-old Venezuelan woman who came to Peru to work for a TV programmer and was sexually harassed by her boss, explained why she did not report it:

> **"I didn't try to get paid. I wasn't waiting for anything from that office. Everything was left there and I didn't dare to report it because he is a fairly powerful person, a public person... he has power. And I was... I was undocumented."** Claudia, a Venezuelan woman in Peru

---

[143]  Interview with public official, Cúcuta, Colombia, 31 March 2022; and interview with civil society organization, Peru, 25 March 2022.

CLP_PC_029644

Amnesty International documented how the economic precariousness in which women find them-selves, linked to the lack of migration documentation, is another element that inhibits Venezuelan women from accessing care pathways because they have to focus their efforts and energies on the priority of meeting the basic needs of everyday life, rather than thinking about receiving care or filing a complaint. The women interviewed commented that they often do not have the resources or time to go to the authorities and follow long and draining processes. Amnesty International is particularly concerned that, in both countries, informal employment, poor working conditions and low wages of refugee and migrant women do not allow them to allocate resources and time to approach institutions and demand protection of their right to a life free from violence.

> **"There are too many requirements and apart from that they make you waste a lot of time and for us time is work, we depend on time, if we don't work one day, we don't eat the next day. They don't treat us well."** Ángeles, a Venezuelan woman in Colombia

Amnesty International believes that the lack of information about care pathways and existing mecha-nisms, the lack of knowledge about their rights, fear and the widespread perception of impunity, and the precarious situation in which Venezuelan survivors of gender-based violence find themselves con-stitute very real barriers preventing Venezuelan refugee women in Colombia and Peru from accessing care pathways. The difficulties are exacerbated for women in an irregular migration situation.

These factors have an impact on the under-reporting of cases to the respective authorities. In turn, under-reporting prevents Colombia and Peru from assessing the true scale of the phenomenon of gen-der-based violence towards refugee women and, therefore, adopting appropriate policies and allocating sufficient resources to adequately address this problem.

These barriers also increase the risk of this violence continuing or even escalating. Unable to go to the authorities to make a complaint and obtain protective measures, women survivors of gender-based vio-lence can become victims of feminicide. In 2021, the Colombian Femicides Observatory (Observatorio de Feminicidios en Colombia) reported that of 622 feminicides recorded in 2021, 45 were of Venezue-lan refugee women.[144] The Peruvian Ombudsperson's Office reported that a total of 196 feminicides were recorded in 2019 and 2020, of which eight were of Venezuelan women.[145]

## 6.1.4 AUTHORITIES' LACK OF KNOWLEDGE OF THE APPLICABLE REGULATIONS

On other occasions, it is officials' lack of knowledge about existing pathways and protection measures that is a barrier to foreign women survivors of violence accessing protection measures.

The regulations in force in Colombia and Peru state that there is no restriction on nationals or foreign nationals filing a complaint in cases of gender-based violence.[146] In other words, according to the laws applicable in these countries, Venezuelan women survivors of gender-based violence can file a com-plaint without the need to present a foreigners' identity card.

However, Amnesty International found that in practice lack of documentation is one of the barriers cited by the authorities who do not know the law. According to several statements received, in both countries the authorities require women to provide documentation of their migration status in order to receive their complaints.[147]

---

144 Colombian Femicides Observatory, Boletín mensual de feminicidios, March 2022, https://observatoriofeminicidioscolombia.org/attachments/article/483/Bolet%C3%ADn%20Mas%20nos%20queremos%20Colombia%20marzo%202022_.pdf
145  Peruvian Ombudsman's Office, Informe Violencia basada en género contra mujeres migrantes en el Perú, Documento de trabajo 002-2021, https://peru.unfpa.org/sites/default/files/pub-pdf/informe_-_violencia_contra_mujeres_migrantes.pdf
146 In Peru, see Law 30364, the Law to Prevent, Punish and Eradicate Violence against Women and Members of the Family and the Core Protocol for Joint Action on comprehensive care and protection from violence against women and members of the family group, https://observatorioviolencia.pe/wp-content/uploads/2019/06/Protocolo-de-base-conjunta-contra-la-violencia-anexo_r.pdf  (Spanish only) and in Colombia, Law 1257 (2008) setting out standards on raising awareness, preventing and punishing forms of violence and discrimination against women  Law 1257 applies to nationals and foreigners in accordance with the considerations of Decree 4796 of 2011 - sixth recital, which states: "its purpose is the adoption of norms that guarantee a life free of violence for all women". Article. 100 of the Constitution also states that "Foreigners shall enjoy in Colombia the same civil rights granted to Colombians".
147  Interview with international organization, Peru, March 2022; interview with public official, Tumbes, Peru, 24 March 2022; interview with public official, Peru, 21 March 2022; interview with international organizations, Colombia, March 2022; and interview with interna-tional organizations, Cúcuta, Colombia, 31 March 2022.

CLP_PC_029645

Women indicated that public officials do not know or are not familiar with the type of temporary documentation granted to them during the regularization process and as a result officials sometimes refuse to accept the complaint because survivors cannot provide the documents that the officials know about or require in practice.[148]

> "I approached the police; I live near to a police station. I was in the process of moving from a PTP to a Foreigners' Card. I only had the decision about the change in my migration status, I didn't have the physical card as yet, but I was waiting for Migrations to approve the regularization. And the police told me that they couldn't accept my complaint because my PTP seemed to have expired in the system. I explained that it had certainly expired, but that I had a document that confirmed that I was applying to Migrations for a change in migration status, which I could do, and in addition, my passport was valid. Even so, they didn't want to take the complaint." Mariana, a Venezuelan woman in Peru

In the case of transgender women, these difficulties are compounded by the fact that the authorities refuse to receive a complaint when their documentation reflects a gender identity different from that which the person expresses or identifies with.[149]

## 6.1.5 DISCRIMINATION AND COMPOUND STEREOTYPING

Human rights protection mechanisms, both of the international system and the inter-American system, have established that one of the central factors limiting access to justice for women survivors of gender-based violence, in general, is the persistence of views based on gender stereotypes held by officials responsible for administering support and protection processes.[150] According to various sources interviewed in Colombia and Peru, views based on gender stereotypes are widespread among public officials involved in the processes of providing care and protection to these women.

A common denominator in the shortcomings of state responses when women come forward to seek protection measures is that officials seek to minimize the reported violence, which leads to refusal to adopt effective measures that can really protect women from gender-based violence. For example, a Venezuelan woman in Peru received the following response from the police: "but you're going to go back to him aren't you?", or "you're going to go back to him, right?", "look, this is difficult, but there's a solution to everything, with help or psychological therapy you will be alright, you have your family, you have your friends, are you sure you're not planning to go back to him?". The woman interviewee told Amnesty International that with this type of response: "They don't help you, they don't help you be safe."[151]

Another Venezuelan woman, who was the victim of attempted sexual assault while she was exercising by an individual who chased her with his pants down and his penis exposed, reported that, at the time she filed the complaint, the police asked her what she was doing running alone at six in the morning. In addition, the policeman told her that what she was reporting was not a reason to file a formal complaint: "because a person chased you like that, it doesn't mean there was any kind of aggression, because he was not doing anything to you, he was not touching you or causing an impact." These types of responses reflect a profound lack of understanding of the problem of sexual violence; the Inter-American Court of Human Rights has established that sexual violence does not always involve physical contact.[152] In this particular case, the policeman ended up telling the woman survivor that he would not accept the complaint because she was a foreigner, "but if she were Peruvian, maybe he would have."[153]

148  Interview with international organizations, Colombia, March 2022; interview with International Organizations, Cúcuta; Colombia, 31 March 2022; interview with international organizations, Peru, March 2022; interview with public official, Tumbes, Peru, 24 March 2022; and interview with public official, Peru, 21 March 2022.
149  Interview with public official, Peru, 21 March 2022; interview with public official, Colombia, 30 March 2022; and interview with civil society organization, Colombia, 30 March 2022.
150  CEDAW Committee, General Recommendation 33: General recommendation on women's access to justice, CEDAW/C/GC/33, 3 August 2015, https://tbinternet.ohchr.org/_layouts/15/treatybodyexternal/Download.aspx?symbolno=CEDAW/C/GC/33&Lang=en and Inter-American Court, González et al. ("Cotton Field") v. Mexico, Preliminary Objection, Merits, Reparations and Costs, Judgment of 16 November 2009, and Case of Velásquez
151  Statement by a Venezuelan woman interviewed in Focus Group 3 VSX Lima, Peru, 23 March 2022.
152  Inter-American Court, Case of the Miguel Castro Castro Prison v. Peru, Merits, Reparations and Costs, Judgment of 25 November 2006.
153  Statement by a Venezuelan woman interviewed in Focus Group 3 VSX Lima, Peru, 23 March 2022

Other practices that leave women survivors of gender-based violence totally unprotected were also identified in Colombia. Amnesty International was told by a refugee woman who was assaulted by her partner that the family police station initiated a conciliation process with her attacker. The CEDAW Committee recommends that alternative procedures such as conciliation and mediation should not be used in cases of gender-based violence against women.[154] This is because these procedures run the risk of ignoring unequal power relations between men and women in these situations and leaving women survivors without protection, in addition to perpetuating the idea that violence against women is a private matter, not very serious and open to reconciliation.

The statements gathered show that, in the particular case of Venezuelan women in Colombia and Peru, the complaints processes and the search for protection measures were intersected by the existence of compound gender stereotypes among the public officials in charge of supporting them, that is to say, stereotypes based not only on issues of gender, which affect women in general, but also in particular on the fact that they are Venezuelan women.

> **"You go to report, as I did. I went to the police station the first time and I'll never forget the policeman's expression. He looked me up and down and said, 'Veneca' [a derogatory term for a Venezuelan woman]."** Carmen, a Venezuelan woman in Peru.

The statements gathered by Amnesty International also highlighted stereotypes that blame Venezuelan refugee women for being responsible for provoking the aggressor's violent reaction and, therefore, that they should deal with it on their own, without state protection. A Venezuelan woman who tried to report her husband to the police in Colombia was told that "they couldn't look for him... 'you're Venezuelan, so you must have liked what he was about because you came and had another child'."[155] The police response was that if her assailant arrived at the house, she should call them. Faced with this, the woman told Amnesty International: "first, I have no cell phone and second, call the police when there is only one unit in the village, by the time the first one arrived, he would have killed and buried me and taken my daughter." Another Venezuelan woman who had filed a complaint against her attacker and who called the police because the attacker was nearby and armed received the following response: "ah... you are the Venezuelan, I'm sure you must be really hot because he is here looking for you."[156] This type of response also reflects the hypersexualization of Venezuelan women which portrays them as desirable and always available sexually,[157] but not worthy of protection.



### VENEZUELAN TRANS WOMEN

The IACHR, in its report, Violence against Lesbian, Gay, Bisexual, Trans and Intersex Persons in the Americas, noted that LGBTI people who are victims of gender-based violence face additional obstacles in accessing justice for specific reasons related to their gender identity or sexual orientation.[158] Sources interviewed by Amnesty International noted that Venezuelan trans women as well as LGBTI people face obstacles and discrimination related to their gender identity when trying to report gender-based violence committed against them.[159] For example, their complaints are often dismissed outright and they can even experience mistreatment or mockery of their gender identity by state agents.[160] This situation was corroborated by Venezuelan trans refugee women interviewed in the context of this research in both countries.[161]

---

154 CEDAW Committee General Recommendation 33 recommends that states ensure that cases of violence against women, including domestic violence, are under no circumstances referred to any alternative dispute resolution procedure; CEDAW Committee; General Recommendation 33, Access to justice, CEDAW/C/GC/33, para. 58 c); General Recommendation 35 of the CEDAW Committee provides that states parties must ensure that gender-based violence against women is not mandatorily referred to alternative dispute resolution procedures, including mediation and conciliation. It also states that: "The use of these procedures should be strictly regulated and allowed only when a previous evaluation by a specialised team ensures the free and informed consent by the affected victim/survivor and that there are no indicators of further risks for the victim/survivor or their family members." CEDAW Committee; General Recommendation 35 on gender-based violence against women, updating general Recommendation 19, CEDAW/C/GC/35, 26 July 2017, para 32 (b), https://tbinternet.ohchr.org/_layouts/15/treatybodyexternal/Download.aspx?symbolno=CEDAW/C/GC/35&Lang=e
155 Statement of a Venezuelan woman, Focus Group 1, Cúcuta.
156 Statement of a Venezuelan woman, Focus Group 1 Cúcuta, Colombia, 31 March 2022.
157 Statement by a Venezuelan woman, Focus Group 1, different forms of violence, Lima, Peru, 21 March 2022.
158 IACHR, Violence against Lesbian, Gay, Bisexual, Trans and Intersex Persons in the Americas, 2015 http://www.oas.org/en/iachr/reports/pdfs/violencelgbtipersons.pdf
159 Interview with civil society organization, Peru, March 2022 and interview with DeJusticia, Colombia, March 2022.
160 Interview with a Venezuelan woman, Peru, 23 March 2022 and interview with a Venezuelan woman, Cúcuta, Colombia, 31 March 2022.
161 Interview with a Venezuelan woman, 23 March 2022, and interview with a Venezuelan woman, Cúcuta, Colombia, 31 March 2022.

"I lived with my cousin in Chosica... in the Chosica police station I was in practice abused again making the complaint because the authorities didn't take me seriously, because I am trans. Rather they made fun of me; they took a long time; I left there feeling really despondent and it was quite a painful experience. They began to make fun of me, saying things like 'yours is coming' as if I was looking for someone or I was someone's wife or someone's husband or whatever gender they wanted to use. 'Someone will be along soon, it's not your turn, no it's not yours' as if they were passing around a hot potato, but no one wanted to deal with me. My complaint was not considered, so they didn't even take the time to write it down. I felt like it was my fault." Laura, a Venezuelan woman in Peru.

When they seek protection measures, they also face discrimination. A transgender woman sex worker assaulted in the street told Amnesty International that the staff of the Cúcuta Attorney General's Office in Colombia suggested as a protection measure that she cut her hair and "dress like a man".[162] Amnesty International finds these forms of direct discrimination by the authorities very worrying, because they not only violate the right of trans women to access justice and perpetuate impunity, but they leave women unprotected and therefore more exposed to further attacks or reprisals for having tried to lodge a complaint.

The examples cited show that gender and nationality stereotypes negatively influenced the responses of officials to Venezuelan refugee women survivors of gender-based violence, resulting in their being denied their right of access to justice. The human rights protection mechanisms of the international and regional systems have pointed out that gender and compound stereotypes in the justice system constitute a form of discrimination, and that their application in the area of criminal law has far-reaching consequences,[163] such as compromising the fairness of judicial proceedings, shifting responsibility onto victims and discharging the accused, questioning the credibility of victims' testimony and preventing women from having access to real and effective protection measures.[164] In Peru and Colombia discrimination on the basis of sexual orientation, sex and nationality is a breach of the law. When committed by public officials, in both countries, this crime can be considered an aggravating factor carrying heavier punishment.[165] However, a recent study by Plan International revealed that the majority of Venezuelan women in Peru do not know that they can make a complaint against those administering justice if they do not fulfil their functions.[166]

Amnesty International believes that the authorities' lack of knowledge, including the practice of requiring very specific immigration documentation before accepting complaints, as well as the presence of compound gender stereotypes (gender, nationality and gender identity), highlight the urgent need to strengthen the processes for raising awareness and appropriate and continuous training for officials responsible for receiving and dealing with complaints and to guarantee the protection of survivors of gender-based violence in Colombia and Peru. This challenge has been pointed out by the CEDAW Committee in its concluding observations on Colombia and Peru[167] and was even acknowledged by the authorities interviewed by Amnesty International, who accepted that much work still needs to be done on issues of training and awareness raising on how to support foreign survivors of gender-based violence.[168]

---

162  Interview with a Venezuelan woman, Cúcuta, Colombia, 1 April 2022.

163  CEDAW Committee, General Recommendation 33 on women's access to justice, CEDAW/C/GC/33, 3 August 2015; Inter-American Court, Case of González et al ("Cotton Field") v. Mexico, Judgment of 16 November 2009; ESCR Committee, General Comment 16 on The equal right of men and women to the enjoyment of all economic, social and cultural rights (art. 3 of the International Covenant on Economic, Social and Cultural Rights), E/C.12/2005/4, 11 August 2005.

164  See CEDAW Committee, Communication No. 18/2009, Karen Tayag Vertido v. Philippines, CEDAW/C/46/D/18/2008, 16 July 2010, https://juris.ohchr.org/Search/Details/1700 and CEDAW Committee, Communication No. 47/2012, Angela González Carreño v. Spain, CEDAW/C/58/D/47/2012, 16 July 2014, https://juris.ohchr.org/Search/Details/1878

165  Law 1482 of 2011 (Colombia), https://www.funcionpublica.gov.co/eva/gestornormativo/norma_pdf.php?i=44932 and Law 28867 (Peru) amending article 323 of the Criminal Code, https://www.mimp.gob.pe/adultomayor/archivos/Ley28867.pdf (Spanish only).

166  Plan International, Estudio sobre violencia basada en género hacia las mujeres migrantes y/o refugiadas en los países receptores de Perú y Ecuador, p. 70, https://plan-international.org/uploads/sites/56/2022/05/Estudio_VBG_Peru_-_Ecuador-1.pdf

167  See CEDAW Committee, Concluding observations on the ninth periodic report of Peru (2022), https://tbinternet.ohchr.org/_layouts/15/treatybodyexternal/Download.aspx?symbolno=CEDAW%2fC%2fPER%2fCO%2f9&Lang=e and of Colombia (2019) https://tbinternet.ohchr.org/_layouts/15/treatybodyexternal/Download.aspx?symbolno=CEDAW%2fC%2fCOL%2fCO%2f9&Lang=en

168  Interview with public official, Peru, 21 March 2022; interview with public official, Tumbes, Peru, 24 March 2022; interview with public official, Colombia, 30 March 2022; and interview with public official, Cúcuta, Colombia, 1 April 2022.

> **"We actually believe that, in all reports, and also other relevant initiatives, what we always try to emphasize and highlight is the need for each institution to periodically and adequately train its officials about the issue of providing assistance to women victims of violence, not only intimate partner violence but all manifestations of violence".** Public official, Peru

According to sources interviewed, another issue of concern in Peru regarding the training and aware-ness of public officials is the high turnover of personnel and, therefore, the fact that new officials enter the service who do not have the necessary training.[169] Sources consulted in both countries also highlighted the need to provide psychological support and self-care measures for frontline staff who provide assistance to women survivors of gender-based violence.[170]

> **"In the police stations the officials are dealing with cases of violence for a week, they are trained and next week you they are replaced by new officials. They are not permanent staff, doing the same work. New staff arrive knowing little or nothing about the issue of violence"** Public official, Peru

Sources consulted have pointed out other factors preventing institutions from providing an adequate response to gender-based violence affecting Venezuelan women in particular, such as the lack of coor-dination between the different institutions involved in their protection in both countries[171] and the lack of resources and supplies provided to police officers, for example, in Peru.[172]

## 6.1.6 INSUFFICIENT EFFECTIVE PROTECTION MEASURES

The Inter-American Commission on Human Rights (IACHR) has established that States must ensure that judicial, administrative, political or other remedies for women and girls who have been subjected to gender-based violence, such as restraining orders and shelters, are women-centered, available, ac-cessible, acceptable, take age and gender into account and adequately address the rights and needs of the victims/survivors. [173]

Amnesty International found that another gap in protection for survivors of gender-based violence in Colombia and Peru is women's lack of access to temporary shelters.

Although in both Colombia and Peru, the law states that all women victims of gender-based violence must have access to a shelter when they are in a situation of moderate or severe risk [174](Peru) or a spe-cial situation of risk (Colombia),  according to the sources interviewed, shelters do not have sufficient capacity to guarantee the geographical coverage and quality of the facilities needed to meet the high demand for places from victims of gender-based violence. According to international standards, there should be at least one shelter/refuge place for every 10,000 inhabitants, providing safe emergency ac-commodation, qualified counselling and assistance in finding long-term accommodation.[175] These fa-cilities must be accessible and adequately staffed and funded in order to reach victims proactively.[176]

---

169  Interview with public official. Peru, 24 March 2022, and interview with a public official, Peru, 21 March 2022.
170  Interview with a public official, Colombia, 30 March 2022 and Plan International, Estudio sobre violencia basada en género hacia las mujeres migrantes y/o refugiadas en los países receptores de Perú y Ecuador.
171  UNFPA and Peruvian Ombudsperson's Office, Violencia basada en género contra mujeres migrantes en el Perú, October 2021, https://www.defensoria.gob.pe/wp-content/uploads/2021/10/Informe-Violencia-contra-mujeres-migrantes.pdf and interview with an in-ternational organization in Colombia, May 2022.
172  Plan International, Estudio sobre violencia basada en género hacia las mujeres migrantes y/o refugiadas en los países receptores de Perú y Ecuador
173  IACHR, Violence and Discrimination against Women and Girls: Best Practices and Challenges in Latin America and the Caribbean, OEA/Ser.L/V/II.Doc. 233, para. 116, 14 November 2019, para. 145, http://www.oas.org/en/iachr/reports/pdfs/ViolenceWomenGirls.pdf
174  See Colombia, Decree 4796 of 2011 (20 December) partially regulating articles 8, 9, 13 and 19 of Law 1257 of 2008, Https://www.funcionpublica.gov.co/eva/gestornormativo/norma_pdf.php?i=45079 and Peru, Core Protocol for Joint Action in the field of comprehensive care and protection from violence against women and members of the family (Peru),
https://observatorioviolencia.pe/wp-content/uploads/2019/06/Protocolo-de-base-conjunta-contra-la-violencia-anexo_r.pdf  (Spanish only).
175  UN Women, Handbook for Legislation on Violence against Women, p. 29,
https://www.unwomen.org/en/digital-library/publications/2012/12/handbook-for-legislation-on-violence-against-women
176  Council of Europe Convention on preventing and combating violence against women and domestic violence (Istanbul Convention), Article 23.

CLP_PC_029649



↑ ◉ *Women's shelter, Colombia. Copyright: Fernanda Pineda/ Amnesty International*

According to information received by Amnesty International, in Lima, Peru, there are two shelters run by the Metropolitan Municipality of Lima and seven run by the Ministry for Women's Affairs, (MIMP)[177] for a population of more than 10,004,000 inhabitants. In the border department of Norte de Santander, Colombia, there are only two shelters at present, funded through international cooperation, although the departmental government plans to create more.[178]

Amnesty International found that lack of sufficient shelters means many women and LGBTI refugees are denied their right to be protected through access to temporary safe refuge as survivors of gender-based violence.[179] This situation would seem to be even more critical for Venezuelan women and people living in poverty and without family and social support networks, and without opportunities to access decent and adequate housing, for whom shelters are the only option for finding a place of safety.

Additionally, according to sources interviewed, in Peru, protection measures can only be accessed by making a complaint to the relevant authorities.[180] This situation is worrying because, as noted above, there are many obstacles that prevent Venezuelan women survivors of gender-based violence from filing complaints.

On the other hand, the authorities in Colombia and Peru indicated to Amnesty International that the lack of a respectful approach regarding the rights of the LGBTI people in state specialized shelters for women, either through specialized shelters for this group or by providing safe spaces for trans women, is another of the gaps identified in relation to protection measures.[181]

## 6.1.7 INADEQUATE DATA COLLECTION

Amnesty International noted the difficulty, both in Peru and in Colombia, of obtaining quality information on complaints for acts of gender-based violence filed with the relevant authorities: CEM; the SIVIGILA system, SIVIGE, the police, the Public Prosecutor's Office and the Attorney General's Office.

177  Peruvian Ombudsperson's Office,
https://www.defensoria.gob.pe/deunevez.portadas/wp-content/uploads/2019/08/Supervisi%c3%b3n-Hogares-de-Refugio-Temporal-2019-Defensor%c3%ada-del-Pueblo.pdf (Spanish only).
178  Interview with international organization, Peru, March 2022, and interview with civil society organization, Peru, 21 March 2022.
179  Interviews with international officials, Peru, March 2022; interview with civil society organization, Peru, 21 March 2022; interview with international organizations, Colombia, March 2022; and interview with public official, Cúcuta, 1 April 2022.
180  Interview with civil society organization, Peru, March 2022.
181  Interview with public official, Peru, 23 March 2022, and interview with public official, Cúcuta, 1 April 2022.

Despite having information provided by the Peruvian Public Prosecutor's Office and the Colombian Attorney General's Office, in some cases, this was not disaggregated by the nationality of the women victims/survivors.

In both countries, there are records of primary care for women survivors. However, in Colombia, the Comprehensive Information System on Gender-Based Violence uses data from SIVIGE, which was last updated in 2020. The National Public Health Monitoring System (SIVIGILA) does contain indicators developed solely for gender-based violence against Venezuelans,[182] but these are not consistent with the figures for the general indicators in the same system, which disaggregate the data according to Colombian and Venezuelan nationals, as the following table illustrates:



Figure 8

In Peru, the Aurora Programme has a register of cases dealt with by the Women's Emergency Centres. Although this contains data updated to March 2022, information submitted by foreign nationals and shows percentages by nationality, the figures are not disaggregated by violence and nationality, so it is not possible to identify the number of Venezuelan women who have been victims of sexual, physical or psychological violence.

The lack of up-to-date information, disaggregated by nationality, as well as by the gender identity or sexual orientation of the victims is worrying, since the failure to record this information contributes to the invisibility and under-reporting of the problem of gender-based violence against women and refugees. This in turn prevents public authorities at all levels in both countries from designing effective and adequate responses to the problem.

# 6.2 OBSTACLES TO REPORTING VIOLENCE AT WORK

States have an obligation to monitor the fulfilment of workers' rights, both in formal and informal settings. This obligation requires that they identify where the greatest number of possible violations of labour rights take place in order to make more strategic inspections. In the case of Venezuelan refugee women, the countries' inspectorates should carry out enhanced monitoring to verify compliance with their labour rights.[183]

In both Peru and Colombia there are two routes for reporting bullying and sexual harassment at work. A criminal procedure, whose legal framework is the Criminal Law to Prevent and Punish Sexual Harassment at Work, in Peru, and Law 1257 of 2008 and Law 599 of 2000 (Criminal Code) in Colombia.[184]

---

182 Colombian Ministry of Health National Observatory on Gender-Based Violence, https://www.sispro.gov.co/observatorios/onviolenciasgenero/Paginas/home.aspx (filter by Gender Violence Indicators, Venezuelan population) (Spanish only).

183 International Labour Organization (ILO), Convention on Violence and Harassment, 2019 (No. 190). https://www.ilo.org/dyn/normlex/en/f?p=NORMLEXPUB:12100:0::NO::P12100_ILO_CODE:C190 and Convention on Labour Inspection, 1947, (No. 81), https://www.ilo.org/dyn/normlex/en/f?p=NORMLEXPUB:12100:0::NO::P12100_ILO_CODE:C081 and CEDAW Committee General Recommendation 26 on women migrant workers, paras 23 and 26, https://www2.ohchr.org/english/bodies/cedaw/docs/gr_26_on_women_migrant_workers_en.pdf

184 Criminal Law to Prevent and Punish Sexual Harassment at Work (Peru) and Law 1257 of 2008 and Law 599 of 2000 (Colombia).

Under the latter two laws, women victims of bullying and sexual harassment working in the formal and informal sector can lodge a complaint with the competent criminal authorities.

Additionally, in both countries under the labour laws, there are mechanisms to promote, oversee and monitor compliance with labour and occupational safety provisions. In Peru, it is the Office of the National Superintendent for Workplace Monitoring (Superintendencia Nacional de Fiscalización Laboral) and in Colombia, it is the Employee Relations Committees (Comités de Convivencia Laboral), which are responsible for receiving and processing complaints filed regarding situations that could constitute workplace harassment. Amnesty International identified, for example, that existing mechanisms under labour laws in both countries to report bullying and sexual harassment at work are accessible only to those working in the formal economy, de facto excluding thousands of informal workers, many of them foreign women, including Venezuelans, exposed to gender-based violence in the workplace.

The evidence gathered shows that Venezuelan women do not approach the authorities to report gender-based violence in the workplace.[185] Amnesty International identified several obstacles that prevent refugee women from reporting this violence, which are closely associated with the precariousness of their economic and employment situation. The majority of the women interviewed work in the informal sector of the economy, because, among other things, they do not have regularized migration status and face discrimination when seeking to access decent work. This, in turn, puts them in a situation where there is a greater risk of gender-based violence.

According to the statements obtained, another of the elements that inhibit Venezuelan refugee women from reporting workplace violence is the fear of suffering reprisals and in particular losing their source of income should they initiate a legal case, given that dismissal is the most common reaction in these types of cases.[186]

> **"My granddaughter got together with a partner who is Colombian… It has been difficult because she has an intimate relationship with the owner of the place where she works. So a lot of the time, the workplace is not separate from the personal and when they have had personal problems the first thing he does is sack her, he has done that about three times. She's been working for him since 2018, no holiday, no bonus, nothing and every time he gets annoyed, he kicks her out."**
> Carolina, a Venezuelan woman in Colombia.

One woman told Amnesty International that she experienced workplace harassment and discrimination because she is Venezuelan but decided not to report it for fear of losing her job: "I think I also didn't report it because I was too afraid of losing my job, and I held out until the end so I wouldn't lose my job."[187]

As with violence in the family, the lack of resources of their own and limited job opportunities prevent women from reporting gender-based violence in the workplace. Amnesty International notes with concern that, in practice, challenges remain to ensuring that existing complaints mechanisms are accessible and effective in protecting the rights of Venezuelan women survivors of gender-based violence in the workplace and that they take into account the additional challenges they face due to their gender, migration status and nationality.[188]

The plans and strategies of the Colombian and Peruvian labour authorities must be strengthened to ensure that Venezuelan women are better able to report gender-based violence in the workplace and prevent reprisals for filing complaints. This is a challenge identified by the authorities interviewed in Peru.[189]

---

185 Interview with a Venezuelan woman in Colombia, 30 March 2022; interview with a Venezuelan woman in Soacha, Colombia, 30 March 2020; and statements by Venezuelan women in Focus Group 1, Lima, 21 March 2022.
186 Interview with a Venezuelan woman in Colombia, 30 March 2022; interview with a Venezuelan woman in Soacha, Colombia, 30 March 2020; and statements by Venezuelan women in Focus Group 1, Lima, 21 March 2022.
187 Statement by a Venezuelan woman, Focus Group 1, Peru, 21 March 2022.
188 CEDAW Committee General Recommendation 26 on women migrant workers sets out states' obligation to establish adequate legal remedies and complaints mechanisms and put in place easily accessible dispute resolution mechanisms, protecting both documented and undocumented women migrant workers from discrimination or sexual exploitation and abuse.
189 Interview with a public official, Peru, March 2022.

The above is based on states' obligation, established in the CEDAW Convention, to react actively against any form of discriminatory violence[190] and to adopt comprehensive responses taking into account that gender-based violence impacts women in a different way because it is related to other factors, in this case their migratory situation.[191] In particular, the CEDAW Committee noted that states should implement adequate legal complaints mechanisms and easily accessible dispute resolution mechanisms to protect all women migrant workers, including undocumented women migrant workers, from discrimination and sexual exploitation and abuse.[192]

# 6.3 OBSTACLES TO ACCESS TO HEALTH SERVICES

In Colombia and Peru, laws recognize the right of survivors of gender-based violence to comprehensive healthcare[193] and the care pathways established by the authorities include care for survivors of gender-based violence (physical, psychological and sexual and reproductive healthcare) regardless of their migration status.[194] In both countries, the policy considers healthcare services for women and survivors of gender-based violence, including sexual violence, to fall under the category of emergency services, and therefore they cannot be denied to anyone.[195]

Healthcare services for victims of gender-based violence are essential to meet their physical, emotional and security needs during initial interventions, as well as to ensure that the necessary evidence is gathered for the investigation. The information provided by various health professionals in both medicine and psychology, in the context of state responses to gender-based violence, is essential to identify the impact of various inter-related forms of discrimination and survivors' respective needs, as well as the measures that need to be established to ensure access to justice. In both countries, the care pathways for survivors of sexual violence state that providing care within 72 hours is crucial to prevent sexually transmitted infections and/or forced pregnancies as a result of sexual violence.[196]

However, Amnesty International found that, in practice, one of the main obstacles faced by Venezuelan refugee women in accessing healthcare services is the lack of a clear definition for frontline public officials of what is considered an emergency in cases of victims of gender-based violence, including sexual violence.[197]According to civil society organizations interviewed, there are no common or clear criteria that set out that certain services related to gender-based violence should be considered as an emergency. In Peru, although initial emergency care should be given to any woman victim of gender-based violence, follow-up and subsequent care is conditional on women having regularized their status and having access to the Comprehensive Health System.[198] In Colombia, the problem is that people who do not have regular migration status cannot join the health system and that means that the only care to which they are entitled is care that is considered emergency care.[199] For example, information was received that psychological care services and non-emergency contraception are not considered to be emergency services.[200]

---

190  CEDAW Committee General Recommendation 28 on article 2 of the CEDAW Convention states that: "States parties have an obligation not to cause discrimination against women through acts or omissions; they are further obliged to react actively against discrimination against women, regardless of whether such acts or omissions are perpetrated by the State or by private actors. Discrimination can occur through the failure of States to take necessary legislative measures to ensure the full realization of women's rights, the failure to adopt national policies aimed at achieving equality between women and men and the failure to enforce relevant laws. Likewise, States parties have an international responsibility to create and continuously improve statistical databases and the analysis of all forms of discrimination against women in general and against women belonging to specific vulnerable groups in particular" (para. 10), https://www.refworld.org/docid/4d467ea72.html

191  CEDAW Committee, General Recommendation 35 on gender-based violence against women, updating general Recommendation 19, CEDAW/C/GC/35, 26 July 2017, para. 12.
https://tbinternet.ohchr.org/Treaties/CEDAW/Shared%20Documents/1_Global/CEDAW_C_GC_35_8267_E.pdf

192  CEDAW Committee, General Recommendation 26 on women migrant workers, para. 26, https://www2.ohchr.org/english/bodies/cedaw/docs/gr_26_on_women_migrant_workers_en.pdf

193  Article 8 of Law 1257 (2008) on the rights of victims of violence in Colombia and Law No. 30364 in Peru which recognizes the rights to comprehensive care and recovery regarding the physical and mental health of victims of violence against women and members of the family

194  See Ruta de Atención para víctimas de Violencia Intrafamiliar y Violencia Basada en Género, Colombia, http://centrodedocumentacion.prosperidadsocial.gov.co/2021/Micrositio/Prevencion-de-la-Violencia/Infografias/Ruta_de_Atencion.pdf and outline of procedure for Law No. 30364 to Prevent, Punish and Eradicate Violence against Women and Members of the Family", Peru, https://www.mimp.gob.pe/webs/mimp/ley30364/pdf/esquema-ley-30364_2016_22-04-16.pdf (Spanish only).

195  In Colombia, Law 1257 (2008) and the Protocol and Guidance on Comprehensive Healthcare for Victims of Sexual Violence and Resolution 2021, which updates the Protocol on Healthcare for Victims of Sexual Violence in Colombia, and Law No. 30364 in Peru, Core Protocol on Joint Action on comprehensive care and protection from violence against women and members of the family, and Specialist Health Standard No. 164-MINSA/2020/DGIESP.

196  Protocol and Guidance on Comprehensive Healthcare for Victims of Sexual Violence and Resolution 2021, which updates the Protocol on Healthcare for Victims of Sexual Violence in Colombia, and Specialist Health Standard No. 164-MINSA/2020/DGIESP in Peru.

197  Interview with civil society organization, Peru, March 2022 and interview with members of civil society, Colombia, March 2022.

198  Interview with a public official, Peru, 21 March 2022.

199  Interview with civil society organization, Colombia, 30 March 2022.

200  Interview with civil society organization, Colombia, 30 March 2022, and interview with members of civil society, Colombia, March 2022.

CLP_PC_029653

According to the information received, Venezuelan refugee women survivors of gender-based violence are not receiving adequate and ongoing psychological care from institutions in either country. In best case scenarios, this group of women survivors of gender-based violence receive this type of care through civil society organizations.[201]



↑ 👁 Copyright: Fernanda Pineda/ Amnesty International

Another obstacle identified in Peru is that healthcare services for women survivors of gender-based violence are, in practice, conditional on the woman having previously lodged a complaint.[202] This means that a woman who is unable or unwilling to report violence out of fear or other factors would not have access to healthcare services.

The CEDAW Committee has established that states must ensure that all protection and support measures and services to women's victims/survivors of gender-based violence respect and strengthen their autonomy" and are "provided irrespective of women's residence status and their ability or willingness to cooperate in proceedings against the alleged perpetrator."[203] Additionally, the Inter-American Court of Human Rights has established that physical integrity is directly and immediately linked to healthcare and that the lack of adequate medical care may lead to a violation of Article 5.1 of the American Convention. Therefore, making healthcare for women survivors of gender-based violence conditional on the existence of a prior complaint can lead to a violation of their rights to physical integrity, to health and to live a life free from violence.[204] The current situation has a different negative impact on Venezuelan women given the fear they have of reporting violence because of the factors mentioned earlier in this report.

In Colombia, filing a complaint is not a requirement for accessing healthcare services.[205] However, according to the information received, in practice, health professionals often inform the relevant authorities when women report having been victims of sexual violence, without necessarily obtaining the woman's consent. Amnesty International believes that survivors should receive all the information and support they need to report gender-based violence, but that it is their decision whether or not a report

---

201  Focus Group 2 in Cúcuta, Colombia, 31 March 2022.
202  Interview with international organization, Peru, March 2022.
203  CEDAW Committee, General Recommendation 35 on gender-based violence against women, updating general Recommendation 19, CEDAW/C/GC/35, 26 July 2017.
204  Inter-American Court, Case of Suárez Peralta v. Ecuador, Preliminary Objections, Merits, Reparations and Costs, Judgment of 21 May 2013, para. 130.
205  Colombian Ministry of Health and Social Protection, resolution number of 2021 updating the Protocol on Healthcare for Victims of Sexual Violence, https://consultorsalud.com/wp-content/uploads/2020/12/Actualizacion-Protocolo-de-Atencion-en-salud-para-Victimas-de-Violencia-Sexual.pdf (Spanish only) and interview with civil society organization, Colombia, 30 March 2022.

is made, and not a legal requirement or a practice by health professionals or others who come into contact with survivors.[206]

Finally, another challenge in accessing healthcare faced by women survivors of gender-based violence is that healthcare services in both countries are conditional on the resources having been allocated and being available. Therefore, in certain rural regions or municipalities such services are extremely limited and this constitutes another barrier for Venezuelan survivors of gender-based violence in these areas, who are generally living in an economically precarious situation and do not have the resources themselves to access health services.[207]

# 6.4 OTHER STRUCTURAL OBSTACLES

States have an obligation to combat the compound gender stereotypes that underpin violence and discrimination against women[208] and to undertake actions to transform discriminatory sociocultural attitudes, structures and patterns, through social and civic campaigns that promote "changing socio-cultural patterns" and "transforming social perceptions and gender-based stereotypes".[209]

Although Colombia and Peru have made some efforts to combat xenophobia against Venezuelans through widespread awareness-raising initiatives and campaigns, the information gathered, for example the Report Balance and proposed initiatives to combat xenophobia in Colombia,[210] show that these campaigns have had very little impact and have not effectively contributed to the dismantling of stereotypes, nor have they translated into the prevention of violence against refugee women.

Throughout this research, Amnesty International found that compound gender and nationality stereotypes about Venezuelans remain deeply entrenched. As discussed above, they are one of the root causes giving rise to violence and discrimination against Venezuelan women in all areas, as well as one of the main obstacles that prevent refugee women survivors of gender-based violence from accessing protection measures and justice.[211]

Amnesty International was particularly concerned about the persistence of such stereotypes, despite the recommendations of treaty bodies. The Committee on the Rights of Migrant Workers recommended in 2020 that Colombia enhance its policies to eliminate discriminatory stereotypes and make progress in education for the prevention of xenophobia at all educational levels.[212]

Amnesty International would also highlight that the lack of access to decent work; the difficulties in accessing economic and social benefits as informal workers and economic empowerment measures (financing and training programmes); and bearing disproportionate responsibility for childcare in the absence of support networks and difficulties in accessing care policies, are other barriers that prevent Venezuelan refugee women from reporting and obtaining protection from gender-based violence.

The Convention on the Elimination of All Forms of Discrimination against Women (CEDAW) sets out states' obligation to prevent discrimination against women on the grounds of maternity and to ensure the realization of their right to work, encouraging the provision of the necessary supportive social services to enable parents to combine family obligations with work responsibilities by encouraging the creation and development of a network of childcare services. The Committee on Economic, Social and Cultural Rights (ESCR Committee) has stated that: "Intersectional discrimination and the lack of an approach that takes into account the needs of women throughout their life-cycle leads to an accumulation of disadvantages that adversely affect the right to fair and satisfactory working conditions and other rights".[213] In response to this, the Committee has set out the obligation of states to take specific measures to address traditional gender roles, as well as other structural obstacles that perpetuate tra-

---

206  World Health Organization, Responding to intimate partner violence and sexual violence against women WHO clinical and policy guideline, https://apps.who.int/iris/bitstream/handle/10665/85240/9789241548595_eng.pdf
207  Interview with civil society organization, Colombia, 30 March 2022, and interview with civil society organization, 30 March 2022.
208  Article 5 CEDAW and Article 8 Convention on the Rights of Persons with Disabilities.
209  Article 8 of the Inter-American Convention on the Prevention, Punishment and Eradication of Violence against Women "Convention of Belém Do Pará".
210  Friedrich Ebert Stiftung, Balance y propuestas en torno a iniciativas para combatir la xenofobia en Colombia 2021 en http://library.fes.de/pdf-files/bueros/kolumbien/17329.pdf
211  Colombian Observatory for Women, Boletín Especial, La violencia contra las mujeres migrantes: una frontera por superar; interview with civil society organizations, Colombia, March 2022; statements, Focus Group 1, Lima, 21 March 2022; and statements, Focus Group, Engativá, Colombia.
212  Committee on the Protection of the Rights of All Migrant Workers and Members of Their Families Concluding observations on the third periodic report of Colombia, CMW/C/COL/CO/3, 27 January 2020, para. 26.
213  Committee on ESCR, General comment No. 23 (2016) on the right to just and favourable conditions of work (article 7 of the International Covenant on Economic, Social and Cultural Rights), para 47 a, in https://digitallibrary.un.org/record/1312521#record-files-collapse-header

ditional gender roles, such as childcare in the workplace and flexible working arrangements to promote equal working conditions in practice.

Amnesty International believes that these measures are essential to address the structural inequality that prevents women, especially Venezuelan women, from breaking down the dynamics of violence they face at home and at work.

In addition, according to the information received, in the few cases where they do have access to training and job guidance from other agencies, women continue to be encouraged to enter sex-segregated sectors of work with lower social value and economic recognition, despite the fact that the ESCR Committee noted the duty of states to pay special attention to and address the issue of occupational segregation based on sex as an indispensable part of guaranteeing the right to fair and decent working conditions for women workers.

CLP_PC_029656

# 7. CONCLUSIONS AND RECOMMENDATIONS

Women in Latin America and the Caribbean are victims of multiple and systematic forms of violence. In the case of Venezuelan women, who have had to leave their country because of the grave human rights crisis or persecution to protect their lives in other countries of the region, such as Colombia or Peru, their nationality and often irregular migration status are additional sources of discrimination and violence. For trans women, their sexual orientation or diverse gender identity are other additional factors. Throughout whole process of departure and travel as well as in these host countries, Venezuelan women face multiple forms of gender-based violence in the different spaces where they live and pass through: in the public, domestic and work spheres.

Amnesty International believes that the lack of access to international protection and other migration regularization processes is one of the first obstacles to the full enjoyment of human rights faced by Venezuelan refugee women survivors of gender-based violence. Among the main barriers to accessing regular migration status are the lack of access to information about the regularization and international protection processes, the complexity of these processes, and the barriers set up by countries to limit the mass entry of people, as well Venezuelan refugee women's lack of economic and technological resources to access these processes, in particular to access justice and health services, among others.

Although Colombia and Peru have laws to prevent and punish gender-based violence against women and protocols and/or specialized care pathways for survivors of gender-based violence, Amnesty International found that there are serious challenges to achieving effective implementation. In addition to the obstacles that women in general face when reporting gender-based violence in Colombia and Peru, among the main barriers identified for access to justice for Venezuelan women is the lack of access to information on care pathways and existing mechanisms; a lack of knowledge about their rights and/or the perception that they do not have the same rights to file a complaint and to protection mechanisms as nationals of the host countries; the fear of being detained or deported; and their precarious economic situation, which prevents them from devoting the time and energy required to access the justice system.

Amnesty International also noted with concern that gender and nationality stereotypes regarding Venezuelan refugee women are being used by officials to justify denying them access to justice when they attempt to file a complaint or seek protection measures, perpetuating violence and discrimination against them. In addition, it found that officials do not know the applicable regulations and require, for example, that women submit certain identity documents before accepting their complaint, despite the fact that the regulations do not require this. There are not enough temporary protection shelters for survivors of gender-based violence, despite the fact that these protection measures are crucial for Venezuelan women who do not have support networks in Colombia and Peru. In addition, Amnesty International considers that there are serious gaps in the collection of information on gender-based violence against refugee and migrant women in both countries, which prevents the adoption of adequate measures to address it.

In relation to access to health, while health services for women and survivors of gender-based violence, including sexual violence, fall under the category of emergency services in Colombia and Peru, the lack of a clear definition of what is considered an emergency in cases of gender-based violence acts as an obstacle to adequate and comprehensive care for refugee women, such as Venezuelan women. This is in addition to the requirement for women to file a criminal complaint to access health services, despite the fact that the legislation does not require this to access care, in addition to the series of previously listed barriers to access to justice services. Amnesty International also identified other difficulties in accessing health services beyond emergency services, particularly psychological care.

The multiple forms of gender-based violence faced by Venezuelan women survivors of such violence in Colombia and Peru outlined in this report, coupled with the lack of access to migration regularization processes and the obstacles they face in accessing health and justice services, are extremely grave and in breach of the obligations of both states to prevent gender-based violence against women without discrimination, including Venezuelan women, and to respect, protect and guarantee their right to live a life free of violence. In response, Amnesty International makes the following recommendations to the Colombian and Peruvian authorities and regarding international cooperation.

## RECOMMENDATIONS TO THE STATES

### ACCESS TO INTERNATIONAL PROTECTION

• Ensure effective access to asylum procedures without discrimination for all those in need of international protection.

• Strengthen and expand the dissemination of information to Venezuelan women on access to international protection and other forms of migration regularization. This information should be accompanied by strategies and messages aimed at addressing and avoiding the fear that those approaching the authorities to initiate proceedings could risk detention and deportation to Venezuela.

• Implement, or strengthen training programmes, with a human rights perspective, for public officials, in particular those working in the police, public prosecution, migration and health services, on access to international protection and other forms of migratory regularization and the rights of refugees and migrants.

### ACCESS TO JUSTICE

• Implement mass information campaigns on care pathways to address cases of gender-based violence, that include dissemination strategies that have previously been consulted with women, including refugee and migrant women, in order to enable women in situations of greater risk in particular to be reached.

• Ensure that all institutions that care for survivors of gender-based violence, including the police, public prosecution service and migration and health institutions, have robust protocols for providing support, incorporating an intersectionality perspective and the obligation of non-discrimination, in cases of gender-based violence that address the particular care needs of refugee women and migrant survivors of gender-based violence.

• Provide appropriate, systematic, mandatory, initial and ongoing training to all public officials providing services for survivors of gender-based violence, such as staff from the police, public prosecution, migration and health services, on the prevention and detection of gender-based violence, gender equality and intersectional discrimination. In addition to raising awareness of women's rights, including the rights of trans people and those who engage in sex work, and existing care pathways, these programmes should aim to actively challenge prejudices regarding gender stereotypes and myths around gender-based violence among public officials and must address, from the perspective of intersectionality and the obligation of non-discrimination, the particular care needs of refugee and migrant women survivors of gender-based violence.

• Conduct thorough, impartial and independent investigations into all acts of violence against women, including rape and other forms of sexual violence, and ensure that investigations incorporate a gender perspective.

• Ensure that institutions responsible for providing services in cases of gender-based violence, both at the national and local levels, have sufficient resources to implement effective protection measures for women survivors of gender-based violence that are accessible to women regardless of their migration status. In particular, ensure that there are temporary shelters with sufficient capacity.

• Consider establishing care and self-care policies for front-line officials in the justice and health services, implemented and coordinated by the state institutions involved in addressing the needs of survivors of gender-based violence.

### ADDRESSING AND PREVENTING GENDER-BASED VIOLENCE

• Improve inter-agency coordination in responses to gender-based violence, in particular focusing on addressing the needs of refugee and migrant women.

• Improve data collection on gender-based violence by recording statistical data on victims, disaggregated by sex, gender, gender identity, sexual orientation, age, disability, relationship between the abuser and the victim, and the victim's migration status and ethnic minority heritage, and ensure that the data are regularly reviewed and used to inform policy development, resource allocation and other measures to prevent and address sexual and other types of gender-based violence.

• Improve inter-institutional coordination in responding to gender-based violence, especially regarding refugee and migrant women.

• Address the underlying causes, structural inequalities and compound gender stereotypes, nationality and migration status that perpetuate violence against Venezuelan women, ensuring that measures to prevent gender-based violence include policies for the care of children and the elderly; access to decent employment, taking into account a focus on the socio-economic integration of refugee and migrant women; and social and community integration programmes at the local level, that stimulate and strengthen support networks for refugee and migrant women, women heads of families and caregivers.

## ACCESS TO HEALTH

• Take measures to ensure comprehensive healthcare for women survivors of gender-based violence, regardless of their migration status, in particular ensuring that:

• Care is not conditional on the filing of a complaint, in law or in practice;

• All health needs resulting from gender-based violence are categorized as emergency healthcare and that there are clear protocols for medium- and long-term physical and emotional care; and

• That care incorporates psychological first aid and psychosocial support programmes for survivors of gender-based violence (women and close family that may be affected, children and other dependents).

## COMBATING STIGMA AND DISCRIMINATION

• Ensure that all authorities, including those at the highest level, refrain from using language that stigmatizes, abuses, vilifies or discriminates against Venezuelans.

• Design and implement awareness-raising campaigns for the general public aimed at combating stereotypes and xenophobia regarding Venezuelans, including composite gender stereotypes including those that foster the hypersexualization of Venezuelan women.

• In particular, adopt without delay effective measures to combat the different forms of gender-based violence at work, both in the formal and informal sectors of the economy, with particular emphasis on discrimination on the basis of gender, gender identity, nationality and migration status.

• Ensure that everyone, including Venezuelan women and trans people, have access to education and decent employment options in order to prevent anyone from having to rely on the sale of sexual services in sex work as a means of survival because of poverty or discrimination.

## TRAFFICKING

• Implement measures to prevent, suppress and punish human trafficking for the purpose of sexual exploitation.

## REGARDING INTERNATIONAL COOPERATION

• Adequately finance the humanitarian response to the mass exodus of Venezuelans from their country, ensuring the sustainability of the responses implemented for women survivors of gender-based violence.

• Promote the strengthening of state responses to gender-based violence, ensuring that technical assistance or other cooperation programmes include eliciting commitments from authorities and allocating financial resources to fulfil their obligations to prevent, punish and eradicate gender-based violence.

# AMNESTY INTERNATIONAL IS A GLOBAL MOVEMENT FOR HUMAN RIGHTS. WHEN INJUSTICE HAPPENS TO ONE PERSON, IT MATTERS TO US ALL.

## CONTACT US

 info@amnesty.org

 +44 (0)20 7413 5500

## JOIN THE CONVERSATION

 www.facebook.com/AmnistiaAmericas

 @AmnistiaOnline

# UNPROTECTED

## GENDER-BASED VIOLENCE AGAINST VENEZUELAN REFUGEE WOMEN IN COLOMBIA AND PERU

In Colombia and Peru, the two main receiving countries for Venezuelan refugees in the Americas region, Venezuelan women face multiple forms of violence in public spaces, at home and at work. Despite this, they are denied access to justice and health services because of stereotypes related to their gender, nationality and gender identity, among other factors, which also mean they experience new forms of violence and discrimination when they try to file a complaint. For many, the lack of regular migration status and information about their rights exacerbates these difficulties. This report outlines how the Colombian and Peruvian authorities are failing to guarantee Venezuelan women's rights to a life free from violence and discrimination.

ÍINDEX: AMR 01/5675/2022
JULY 2022
ORIGINAL LANGUAGE: SPANISH

**amnesty.org**



CLP_PC_029661



**MAY 31, 2022**

# US: LGBT Asylum Seekers in Danger at the Border

Biden Should Immediately Safeguard At-Risk Groups, Restore Asylum Access
Published in



**Ari Sawyer**

US Border Researcher, US Program

🐦 **AriMSawyer**

(Ciudad Juárez) – Lesbian, gay, bisexual and transgender (LGBT) people and other asylum seekers fleeing persecution in their home countries experience abusive and dangerous conditions in Mexico when not allowed to cross the border to seek asylum, Human Rights Watch said today.

Two policies implemented by the administration of former President Donald J. Trump – the Migrant Protection Protocols, commonly known as "Remain in Mexico," and the Title 42 summary expulsion policy – continue to be used under the Biden administration to block access to the asylum system for most people who try to cross into



At a rally in Tijuana, Mexico, people hold placards reading "Stand for Asylum" and "Stop Title 42 Now." The US policy often called "Title 42" allows border agents to expel people summarily to Mexico or their countries of origin with no opportunity to apply for asylum.

© 2022 Aimee Melo/picture-alliance/dpa/AP Images

the US to seek safety. This includes people at a greater risk of harm in Mexico because of their particular conditions or identities, including gender identity or expression, disability, and age who should be entitled to an exception from expulsion. US authorities should stop sending asylum seekers to Mexico or expelling them to their countries of origin and should quickly process people waiting at the border to seek asylum who are at particular risk of abuse.

CLP_PC_029700

"The United States should restore access to asylum for all, but so long as Biden is blocked from doing so, he should at the very least immediately use existing exceptions for at-risk asylum seekers, including LGBT people," said Ari Sawyer, US border researcher at Human Rights Watch. "Continuing to summarily expel LGBT and HIV-positive asylum seekers to Mexico or their country of origin places their lives at serious risk."

US government protocols include exceptions for asylum seekers at a greater risk, and President Joe Biden has promised US agents will apply them. But border agents have broad discretion to grant or deny exceptions, and there are no clear consequences for agents who fail to do so or checks to ensure that exceptions are being handled properly, Human Rights Watch found.

Despite a recognition by the US Department of Homeland Security (DHS) that LGBT people may face "increased risk of harm in Mexico due to their sexual orientation or gender identity," Human Rights Watch documented cases in which border officials returned LGBT asylum seekers, including those with HIV, to Mexico under both abusive anti-asylum policies.

Human Rights Watch conducted 29 interviews with asylum seekers, migrants' rights groups, and United Nations agency officials in April and May 2022, in person and by phone, in Ciudad Juárez and Mexico City, and in El Paso, Texas. Human Rights Watch undertook research in coordination with Casa de Colores, a US-Mexican organization working to provide shelter and legal services to LGBT asylum seekers.

LGBT asylum seekers told Human Rights Watch they had been expelled even after expressing their fear of returning and telling border agents they identified as LGBT, had HIV, or had experienced abuse related to their gender identity, gender expression, or sexual orientation. They also described serious abuse during their journeys to the border, including by Mexican officials.

One woman interviewed fled to the United States from Honduras, where she previously faced targeted violence for living openly as a lesbian woman, including one incident when someone cut her face, leaving a large scar. Near the US border, people she believed to be members of a Mexican cartel kidnapped her and forcibly took nude photos of her.

She said that when she explained to US border officials that she was a lesbian seeking asylum from Honduras and that she had also experienced abuse in Mexico, agents laughed at her. She said one agent told her, "I don't care what's happening to you." She was expelled to Honduras, and immediately fled again to the US border, this time afraid to seek asylum for fear of being returned to Honduras again.

Previous Human Rights Watch research has highlighted the risk of illegal and arbitrary arrest, torture, extrajudicial execution, sexual assault, and enforced disappearance for LGBT people in Central America.

Although the Biden administration has moved to terminate both Title 42 and Remain in Mexico, several US state officials have filed suits in federal court, resulting in orders to keep the programs in place during ongoing

CLP_PO_029701

litigation.

A federal district court judge has temporarily blocked the Biden administration from ending the expulsion policy, which was first issued at the start of the Covid-19 pandemic against the recommendation of top public health experts. There is no evidence that people seeking asylum pose a public health threat to the United States, and the expulsion policy cannot be justified on public health grounds.

Though the initial Title 42 was issued without "notice and comment" procedures, allowing a period for the public to comment, the judge found that the Biden administration should have gone through these administrative consultation processes to end Title 42. Some US lawmakers have proposed legislation that would keep summary expulsions in place until pandemic public health measures are terminated.

Asylum seekers and other migrants sent to Mexico are often unable to support themselves or access basic services such as shelter, food, water, safe transportation, or health care, and have no meaningful recourse for abuses from criminal cartels or Mexican authorities. In the Mexican state of Tamaulipas, Human Rights Watch found that asylum seekers and other migrants are systematically targeted for kidnapping, extortion, rape, and other violence, by both government officials and criminals.

LGBT people constitute one particularly at-risk group of asylum seekers, among others, including people with disabilities and chronic health conditions, Black and Indigenous asylum seekers, asylum seekers who do not speak Spanish as a first language, and families traveling with children.

LGBT asylum seekers and asylum seekers with HIV described additional discrimination and abuse as well as barriers to accessing essential services, including life-saving antiretroviral therapy and gender-affirming health care, services that include medical and mental health services, continuation of hormonal treatment, and other services for transgender and nonbinary people that are crucial to their health and well-being.

## National Institute of Migration Response to HRW 5.31.22

Human Rights Watch asked Mexico's National Migration Institute for more information on allegations made against immigration agents. The agency responded on May 31 and said they were unaware of any reports of such abuses, were not able to investigate them, and that the Mexican constitution prohibits such behavior.

The United States has an obligation to protect refugees from returning to a threat of persecution, ill-treatment, and threats to life and safety, Human Rights Watch said. President Biden should ensure that the United States complies with its domestic and international legal obligations to respect the right to seek asylum.

"LGBTQ+ and HIV-positive asylum seekers face grave risks to their health and safety from the time they flee their countries, often after years of targeted abuse, to when they arrive at the US border," said Susana Coreas,

CLP_PC_029702

director of Casa de Colores. "Biden has rightly committed to protecting LGBTQ+ refugees. He should follow through on that promise and ensure all asylum seekers are welcomed with dignity at the border."

**Abuse at the US Border**

Human Rights Watch spoke with 20 LGBT asylum seekers in Ciudad Juárez, Mexico, who hoped to cross into the United States and be allowed to seek protection. Nearly all reported they were not approaching the border or trying to ask US officials for asylum because they feared they would be expelled to Mexico or their country of origin. They said they preferred to wait for the Biden administration to restore access to asylum or for legal aid to make a request for exemption from the expulsion policy. Four asylum seekers reported that they had previously been expelled to Mexico or their country of origin without an asylum screening.

When Adolfo H. and Gerardo C., a gay couple fleeing Cuba and El Salvador, respectively, who like others interviewed are not identified by their real names for their protection, tried to seek asylum at the US border in February 2022, they were expelled by US Customs and Border Protection (CBP) agents to Mexico. They had previously experienced extortion several times by Mexican immigration agents, who stopped them at various points along their journey and demanded payment to continue. At the time, they were not yet married. US officials told the couple that Adolfo could stay and seek asylum in the United States because he is from Cuba but that his partner would be expelled, even though border officials had the authority to allow both men in. Instead, they gave them the option of being separated or of being expelled together. They said that while they were in custody, US officials told them to stop holding hands or touching one another. Faced with the prospect of being separated again, they got married in Mexico, hoping that given another chance, they would be allowed to seek asylum together.

- José M., a gay man who fled death threats in Honduras based on his sexual orientation, said he had tried to cross the border in March 2021. He was afraid to stay in Mexico, where he said he has experienced extortion and violence at the hands of Mexican police and discrimination at shelters. On his way to the border, Mexican immigration agents stopped the bus he was on and made everyone get off, he said, forcing each migrant to pay a bribe of about US$25 each or be expelled from the country. He also said that because of his gender expression and sexual orientation, some shelters did not allow him to stay there, leaving him to sleep on the streets. In Ciudad Juarez, the shelter operators told him it was a sin to be gay and said that if he and other LGBT asylum seekers didn't go to religious service, they would be forced to leave. He said he had told US border officials that he is gay and that he was afraid to be sent to Mexico, but hours later CBP agents sent him to Mexico. Before expelling him, US officials made him throw away everything he had, including the few clothes he had. US border agents typically throw away migrants' possessions, including items such as medicine, baby blankets, important identity documents, documents needed to prove an asylum claim, and memorabilia that hold sentimental value, claiming the practice is for health and safety reasons.

CLP_PC_029703

The Biden administration has also recently placed some LGBT people in the Remain in Mexico program, officials with the International Organization of Migration (IOM) told Human Rights Watch, sending them to Ciudad Juárez despite the exemption for LGBT people and others at particular risk of abuse. IOM operates a shelter for newly expelled or returned asylum seekers to test them for Covid-19 and provide quarantine before they move on to other shelters. IOM officials said LGBT asylum seekers had been sent to Mexico even after they explicitly told US border agents about their gender identity or sexual orientation.

**Abuses in Country of Origin**

LGBT asylum seekers interviewed reported serious abuses in their countries of origin, including rape, assault, death threats, extortion, and forced disappearances or killings of romantic partners and friends.

- Juan C., a transgender man, fled Honduras after he received death threats related to his gender identity and activism in an LGBT rights organization. He said that several LGBT people he has known have been killed or disappeared there. He said that the police detained him without charges on several occasions. In 2021, two men raped him and his girlfriend after saying, "Who is the man and who is the woman in the relationship?" and saying that the couple were transgender and lesbian only because they had not had sex with a man. "They said, 'We are going to make you women,'" Juan said.
- Eduardo O., a gay man from Honduras, said he fled the country shortly after gang members beat his romantic partner to death. Gang members had previously threatened to kill Eduardo. Then in June 2021, the same gang members attacked him and his partner while they were together. While Eduardo was able to escape, he said, his partner could not. He said he reported his partner's murder to the police, who did not investigate.
- Kayla R., a transgender woman from Guatemala, said she had to flee and seek asylum after the gangs who were extorting the business where she worked beat her when she and the store owner couldn't pay, leaving prominent scars on her face. On another occasion, gang members beat her in the street while using anti-LGBT slurs. They left a large gash and scar on her head.

**Discrimination and Abuse in Mexico**

Human Rights Watch also documented serious abuse and discrimination against LGBT asylum seekers in Mexico. Several LGBT asylum seekers said that Mexican immigration agents, police, and National Guard soldiers targeted them for extortion. Other asylum seekers experienced kidnapping, sexual assault, robbery, and other physical violence by both Mexican government officials and criminals.

- Brenda F., a transgender woman, fled El Salvador in 2017 after gang members who wanted her to sell drugs beat and threatened to kill her. After applying for protection and living for a few years in Mexico, she said she was riding a bus from Monterrey to Matamoros in the Mexican state of Tamaulipas in May 2020 when, at a checkpoint, immigration agents pulled her off the bus and took her into an office about

CLP_PC_029704

3/15/23, 4:16 PM
Case 4:18-cv-06810-JST   Document 169-9   Filed 06/05/23   Page 287 of 1030
Submission to the Senate Homeland Security and Border

25 meters away. While another immigration agent stood watch outside the office, the agent questioned her about her destination and reason for traveling, she showed him an order from a doctor for laboratory tests. He accused her of lying and of wanting to cross into the United States and grabbed his genitalia, saying if she wouldn't "give me what I want," he could have two police officers expel her to Guatemala. Afterward, he told her that if she reported him, he had already taken a photo of her identification and would come after her. She said she knows other trans women who have experienced sexual assault at the hands of Mexican immigration agents.

- Mariana L., a lesbian woman who fled Honduras in 2021, said she was kidnapped for ransom in January 2021 and held for over a week near the US-Mexico border by people she believed to be cartel members. They took her to a house in Reynosa, Tamaulipas, where she saw several other kidnapped migrants. She said they stole her passport and forcibly photographed her naked until her sister managed to pay a ransom of US$3,000. Her kidnappers would hit her to make her cry when they called her sister for the ransom money.

- When Erika L., a lesbian woman, and Samuel B. and Martin G., gay brothers from El Salvador, arrived at the Mexico-Guatemala border in January 2022, a group of men kidnapped them. On the Mexican side of the border, the men raped Erika while beating her friends and forcing them to watch. They went to the Mexican Commission for Refugee Assistance (COMAR), Mexico's refugee authority, in Tapachula, Chiapas, where they applied for asylum in Mexico. COMAR gave them a document confirming that they were in the process of seeking asylum in Mexico, giving them legal status in Mexico. An immigration agent apprehended them outside the COMAR office as they left. When he saw their application documents, he tore them up, saying they were meaningless and sent them to a detention center. They were released and then took a bus to the US-Mexico border. They said Mexican immigration agents periodically stopped the bus and boarded it to extort them and other migrants, saying they had to pay if they wanted to continue their journey to the US border.

- Kayla R., the transgender woman who fled Guatemala, said that in July 2021 Mexican state police in Piedras Negras robbed her and beat her with batons so badly that she was ultimately hospitalized and vomited blood. The police detained her and another transgender woman she was traveling with for two days without food and water and then turned them over to immigration agents, who sent them to an immigration detention facility. There, she said, a Mexican immigration agent told her she should report the crime, which would make her eligible for a one-year humanitarian visa, giving her legal status in Mexico. She said she would like to do so, and that the agent took down her information but never gave her any paperwork or began any immigration process. Instead, after she reported the crime, Mexican immigration agents returned her to Guatemala, where she had experienced brutal violence. She immediately fled again. While she was making her way back to the US border in March 2022, criminals threatened her with a machete and robbed her.

CLP_PC_029705

Six asylum seekers and migrant rights workers reported that some of the shelters in Ciudad Juárez that accepted LGBT asylum seekers subjected them to discriminatory treatment, including the shelter where LGBT asylum seekers were forced to go to Christian religious services. Shelters in Ciudad Juárez are at capacity, meaning they would be homeless if they did not agree to go to the service. Some migrant shelters in Ciudad Juárez would not accept LGBT asylum seekers at all, migrant rights workers there said.

Accessing lifesaving health care for asylum seekers with HIV or other chronic illnesses was also difficult, asylum seekers said. All five HIV-positive asylum seekers interviewed, and one asylum seeker with diabetes and hypertension, said they had gone periods ranging from a few weeks to four months, without their necessary medication because they did not have any money or support.

- Mari R., a transgender woman who is HIV positive and who fled Honduras after she refused to sell drugs for a gang whose members had raped and threatened to kill her, went without her antiretroviral medication in Mexico for four months. In April, with the support of Derechos Humanos Integrales en Acción (DHIA), a local migrant rights organization, she was finally able to see a doctor, who told her that her condition had significantly worsened. The day after Human Rights Watch spoke to her, she was hospitalized.

Four transgender asylum seekers, as well as IOM officials and a local trans rights organization called Red Solidaria Trans, said that transgender asylum seekers have not had access to gender-affirming health care in Ciudad Juárez.

- Brenda F., a transgender woman who fled after facing an attempted gang recruitment and death threats in El Salvador, said she had previously been taking hormones but that in Ciudad Juárez, she has not been able to access to gender-affirming hormone care, though she has repeatedly tried. "They always say they don't offer that care, they can't, or they don't know how," she said. Transgender people who take hormones to develop secondary sex characteristics consistent with their gender identity and expression experience a reversal of these physical traits when hormone therapy is stopped, which can cause distress among other symptoms. Brenda said she hasn't had access to hormone care since October 2021 and that she is suffering from depression as a result. "I have asked for help getting my hormones and they have said they don't offer that kind of support here [in Ciudad Juárez]," she said. "We are suffering marginalization in that way – hormone treatment is necessary, and they are denying us."

## Recommendations

### To the Biden Administration

- Continue and redouble efforts to end the Remain in Mexico program and Title 42 summary expulsions, including by initiating a "notice and comment" rulemaking process to end Title 42.

CLP_PC_029706

- While these abusive policies remain in place, ensure that border agents do not to return at-risk asylum seekers under the Remain in Mexico program or expel them under the Title 42 summary expulsion policy. People at particular risk of harm include LGBT asylum seekers; those with HIV, disabilities, and chronic health conditions; Black and Indigenous asylum seekers; those who do not speak Spanish as a first language; and families traveling with children.

- Take immediate steps to parole into the United States all LGBT asylum seekers and other asylum seekers at particular risk of harm who have previously been subjected to the Remain in Mexico program or the Title 42 summary expulsion policy.

- Review regulations, Board of Immigration Appeals and Attorney General decisions, and policies and other guidance, rescinding or amending as appropriate to ensure consistency with the right to seek asylum and the right to protection from return to harm or threat of harm as defined in the Refugee Convention, the Convention against Torture, and the International Covenant on Civil and Political Rights.

- Continue to increase the number of appropriately trained personnel – asylum officers, doctors, child-care specialists, mental health services professionals and other first responders – at the border using funds currently allocated toward immigration enforcement and detention.

- Beyond initial screening of migrants, transfer humanitarian reception, including migrant processing and asylum functions, from CBP to a separate government agency, such as the Federal Emergency Management Agency (FEMA), or groups with trauma-informed training and whose mission is to perform humanitarian services.

- Take steps to ensure that LGBT asylum seekers and asylum seekers with HIV feel safe enough to self-identify while in the custody of CBP, including by ensuring that US officials affirmatively explain a policy of nondiscrimination and ask each migrant if they would like to share their gender identity and sexual orientation.

- Investigate and discipline US border agents who wrongfully send LGBT asylum seekers and other particularly at-risk asylum seekers to Mexico or their countries of origin.

- Work with Mexico and other governments to implement a holistic regional plan for access to protection and safe and dignified migration.

**To the US Congress**

- Reject proposed legislation introduced by Sens. James Lankford (R-Oklahoma) and Kyrsten Sinema (D-Arizona) to keep Title 42 in place until after the government's Covid-19 emergency declaration is terminated.

- Enact legislation to end the Title 42 summary expulsion and Remain in Mexico policies.

**To the Mexican Government**

CLP_PC_029707

- End the practice of accepting non-Mexican nationals sent to Mexico by US authorities under the Remain in Mexico and Title 42 summary expulsion policies.

- Investigate abuses by Mexican immigration agents, including reports of extortion at immigration checkpoints, and take disciplinary action against any found to have been involved in such conduct.

- Ensure that Mexican immigration agents do not expel people who may need international protection without due process and screening for fear of return to potential harm.

# Related Content

US Immigration Enforcement and US Obligations Under the International Convention on the Elimination of Racial Discrimination (ICERD) Leaders of Human Rights Groups Urge Biden to Safeguard Asylum Access in the US US Will Protect Cameroonians from Dangerous Deportations Asylum Seekers Face Real Harm from US Border Policy
"They Treat You Like You Are Worthless"
"Like I'm Drowning"

Region / Country

- Mexico
- United States
- Immigration

Topic

- LGBT Rights
- Refugees and Migrants
- Asylum Seekers

**Source URL:** *https://www.hrw.org/news/2022/05/31/us-lgbt-asylum-seekers-danger-border*

CLP_PC_029708




<div style="background:#B22;color:#fff;padding:10px">

# Stuck in Uncertainty and Exposed to Violence:
# The Impact of US and Mexican Migration Policies
# on Women Seeking Protection in 2021

</div>

## Introduction

In 2021, policies on both sides of the US-Mexico border negatively affected women seeking protection. As we head into 2022, marking the first year of the Biden administration, Trump-era restrictive policies remain in place at the US-Mexico border, exacerbating the situation for women forced to wait at Mexico's northern border for the opportunity to seek asylum in the US. In addition, under pressure from the Biden administration, the Mexican government continues to intensify enforcement to deter migrants and individuals seeking protection at Mexico's southern border, worsening the situation for women stuck there.

In the fall of 2021, the Instituto para las Mujeres en la Migración (IMUMI) and the Women's Refugee Commission (WRC) monitored events and carried out interviews with women seeking protection to understand the challenges and the dangers they face in Mexico.[1] This report outlines those challenges and provides recommendations for the US and Mexican governments.

## US Policies in 2021

Early on, the Biden administration committed to building a fair, orderly, and humane immigration system and reversing illegal Trump-era policies that endangered the lives of people seeking protection at the US-Mexico border. In its first few months in office, it made positive strides on several promises, including creating initiatives to provide reparative justice for those harmed by Trump-era policies. In February 2021, President Biden created the Interagency Task Force on the Reunification of Families to reunify the nearly 4,000 children who were separated from their parents under Trump's "zero tolerance" policy, which aimed to criminally prosecute all migrants crossing into the US between ports of entry. That month, the administration also announced the creation of a process—in collaboration with international organizations, regional task forces, and local NGOs—that would allow individuals returned to Mexico under the Trump-era "Remain in Mexico" (RMX) policy to return to the US and continue their immigration cases in the US rather than continuing to wait in Mexico. It also reversed the Trump-era legal decisions that made it nearly impossible for survivors of domestic and gang violence to qualify for asylum.

In addition, the administration's strategies included a focus on protection and a gender lens. In summer 2021, the administration launched a whole-of-government blueprint of strategies to reform the US immigration system. One of the strategies that aimed to address the root causes of migration in Central

---

[1] This report draws on interviews from IMUMI and WRC, cases from IMUMI's legal clinic, as well as media reports and research publications. IMUMI interviewed women in shelters in Mexico City between September and December 2021. On November 2, 2021, WRC staff visited two shelters in Mexico City and interviewed individuals from Haiti, Venezuela, El Salvador, Guatemala, and other countries. On December 3, 2021, WRC staff visited two migrant shelters in Tijuana and interviewed individuals from Mexico, Honduras, El Salvador, Guatemala, Cameroon, and other countries. IMUMI and WRC obtained informed consent from all individuals interviewed.

CLP_PC_029738

Stuck in Uncertainty and Exposed to Violence:
The Impact of US and Mexican Migration Policies
on Women Seeking Protection in 2021




America included a pillar "to combat sexual, gender-based, and domestic violence."[2] Another strategy laid out a comprehensive approach to regional migration management. Yet, in practice, the Biden administration has largely focused on enforcement and deterrence in its engagement with countries in the region. Notably, it reportedly has requested that the Mexican government sign a "safe third country" agreement, requiring most non-Mexican individuals to first seek protection in Mexico before requesting asylum in the US.

The Biden administration's positive actions and strategies have been profoundly overshadowed by its failure to restore access to asylum at the border, including at ports of entry, for most arriving migrants and people seeking asylum. In December 2021, the Biden administration announced the reinstatement (pursuant to a court order) and expansion of RMX[3] and extended the Trump-era Title 42 CDC public health order that summarily blocks and expels people from the US-Mexico border, often repeatedly, to danger in Mexico and countries of origin. Since President Biden took office, people have been expelled more than 1.1 million times, including more than 187,000 expulsions of parents and children,[4] who were denied the opportunity to seek protection. In August 2021, the administration began expulsion flights to southern Mexico, where Mexican authorities forcibly returned people across the border to Guatemala or sent them on buses to Honduras, in an act of chain refoulement.[5] In clear violation of non-refoulement, the Biden administration also sent individuals on Title 42 expulsion flights directly to back to Haiti, Guatemala, Honduras, and other countries of origin, without screening them for risk of harm upon return or otherwise providing them an opportunity to seek protection.

## Mexican Policies in 2021

Over the course of 2021, under pressure from the White House, the Mexican government took a number of measures to step up its immigration enforcement to deter migrants and asylum seekers from accessing protection at the US-Mexico border. In 2021, authorities from Mexico's National Migration Institute (INM) worked with the Mexican National Guard and security forces to carry out a record number of migrant apprehensions; approximately 30 percent of those apprehended were women, and 27 percent were children. These figures include families and unaccompanied children who were initially apprehended by INM or the National Guard and then referred to state or civil-society shelters, a requirement of Mexico's new children protection reform implemented in 2021. The reform requires that after referral, the protection offices determine the child's best interests, whether that means deportation, remaining in Mexico with humanitarian legal status, or being reunited with family in another country. While this reform is a big step

---

2 In addition to its immigration blueprint, in November 2021, the administration launched the first National Strategy on Gender Equity and Equality. Through this whole-of-government approach, the administration committed to work to build "a fair and humane immigration system that welcomes immigrants [and] keeps families together" and create improved protection pathways for those fleeing persecution, including victims of gender-based violence.

3  The restart of Remain in Mexico was pursuant to a court order; however, prior to the ruling in early August 2021, the Biden administration reportedly was already considering implementing a supposedly more "humane" version of RMX. In August 2021, a Texas judge ordered the administration to restore RMX "in good faith." The administration appealed that order and issued a new memo terminating RMX in October 2021. The Biden administration has committed to ending RMX eventually, but said that it planned to comply with the court's order to restart RMX. In the new iteration, the administration expanded the program to all non-Mexicans from the Western Hemisphere.

4  This includes Customs and Border Protection Title 42 expulsion statistics from February to December 2021.

5  The principle of non-refoulement in international law prohibits countries that are receiving asylum seekers from removing them or returning them to a country where there is reason to believe that they would be at risk of irreparable harm or human rights violations. Chain refoulement occurs when individuals are sent back to a country that will not protect people from the onward transfer in violation of non-refoulement. In this case, the US expelled asylum seekers back to southern Mexico by plane and the Mexican government bussed them to Guatemala. This occurred with Guatemalan, Salvadoran, and Honduran nationals in 2021.

CLP_PC_029739

Stuck in Uncertainty and Exposed to Violence:
The Impact of US and Mexican Migration Policies
on Women Seeking Protection in 2021




forward for the rights of families and children, implementation across Mexico has been uneven[6] and many challenges remain, including the need for better funding and training to ensure the best interests of children are consistently upheld.

The Andrés Manuel Lopez Obrador administration also took greater measures to restrict travel by migrants and individuals seeking protection, pushing many people to hire smugglers and risk dangerous travel routes. It also created new travel regulations requiring proof of immigration status to purchase a bus ticket, leading to discrimination and racial profiling of both migrants in transit and Mexicans, especially Indigenous and Afro-descendent Mexicans. In addition, the US requested that the Mexican government put into place new travel requirements to make it more difficult for the citizens of countries who have been arriving at the US southern border in high numbers to transit through Mexico. Since August 2021, the Mexican government announced new requirements that Ecuadorians, Brazilians, and Venezuelans, some of whom are fleeing danger, acquire a visa to travel to Mexico as tourists. Mexican immigration authorities also stepped up restrictive tactics at Mexican airports, where they denied entry to a record 72,895 foreigners in 2021, more than double the number of denials in 2019 (31,008). Officials at airports turned around individuals aiming to seek protection in Mexico, who were unlawfully denied the opportunity to present their claim to COMAR (Mexico's agency responsible for asylum processing and adjudications) and instead detained in isolation for weeks. Furthermore, Mexico continued to coordinate with the US on the Biden administration's expulsions under Title 42, agreeing to receive expelled individuals from Guatemala, Honduras, and El Salvador, and worked with the Biden administration to re-implement and expand RMX.

Meanwhile, as Mexican authorities increased enforcement and US restrictive policies persisted, last year Mexico became one of the top destinations worldwide for individuals seeking protection. In 2021, COMAR received a historic high of 131,448 applications, with women representing 41 percent of applicants[7] and children representing 24 percent. This record number of applicants is an 87 percent increase from the prior high of 70,351 applications in 2019. Underfunded despite the critical need, COMAR has been unable to keep up with the increase in claims, leaving many people in southern Mexico—where the vast majority submit their applications[8]—to wait for decisions on their protection claims in precarious conditions for months or even up to two years in some cases. Mexican refugee law requires that applicants remain in the jurisdiction where they applied throughout the adjudication process, which prevents individuals applying for protection from reuniting with family and community networks in safer regions of the country with better employment opportunities.

***Note that the following section of the report contains graphic descriptions of sexual violence.***

## The Impact of US and Mexican Policies on Women

Taken together, the US and Mexican governments' policies and practices forced women seeking protection to wait for extended periods, often in precarious and dangerous circumstances, at Mexico's northern and southern borders. Throughout 2021, IMUMI and WRC carried out interviews with women and monitored events to understand the challenges and dangers they were facing.

---

6  There has been less progress in some Mexican states on the reform implementation than others due to a lack of training, funding, and political will of local authorities. As a result, despite the reform, some children may continue to be detained by immigration authorities or deported without a proper best interest determination. In fall 2021, a panel featuring IMUMI and other civil society organizations discussed some of the challenges with implementation.

7  Since 2016, women have represented approximately 40 percent of applicants to COMAR.

8  Approximately 68 percent of applications were filed in the state of Chiapas and 5 percent in Tabasco.

CLP_PC_029740

Stuck in Uncertainty and Exposed to Violence:
The Impact of US and Mexican Migration Policies
on Women Seeking Protection in 2021



1. **Women seeking protection experience violence in Mexico that exacerbates prior traumas that forced them to flee their countries of origin in the first place.** A 2015 UN report found that approximately 60 percent of surveyed women seeking asylum from Honduras, Guatemala, and El Salvador were fleeing gender-based violence, which includes any form of sexual, physical, mental, and economic harm directed at an individual due to their gender. A recent 2021 report by Kids in Need of Defense (KIND) found that violence against women in Central America drastically increased during the COVID-19 pandemic due to lockdowns that confined women with their perpetrators and to gangs gaining greater control over local communities.

   The violence that women seeking protection experience in transit in Mexico and while waiting at Mexico's northern border cities—including kidnapping, rape, trafficking, and other forms of harassment—compounds their previous traumatic experiences. For example, a Guatemalan woman, Liliana,[9] shared with IMUMI that after fleeing from a violent relationship with her husband who served in the military, she was kidnapped by a group of men in Tijuana. While she was being held by her kidnappers, she heard the men making arrangements on the phone to sexually exploit her. This experience was so traumatizing that after Liliana was released, she decided to travel to Mexico City to seek asylum while staying in a safe shelter instead of waiting to request asylum at the US-Mexico border.

2. **Women seeking protection do not feel safe in Mexico's southern and northern border cities and worry that they can be tracked down by their persecutors.** IMUMI documented various cases of Central American women who have been tracked down by their perpetrators in Mexico. A Guatemalan woman, Cristina, traveling with her husband and three children, described to WRC staff the "terror of being forced to wait in Tijuana where our persecutors can find us." In southern Mexico, a Honduran woman, Sara, described to IMUMI that she and her family were kidnapped by members of the Mara Salvatrucha gang. After Sara fled Honduras, one of the perpetrators found her in Tapachula, Chiapas, forcing her and her family to flee to another city and give up their asylum claim in Mexico.

3. **Women seeking protection are subjected to violent gender-based crimes in Mexico, including rape and sexual assault, and face heightened barriers to report these crimes and receive support services.** Women who are returned to Mexico alone or with their families experience many types of violent attacks. A 2017 Doctors Without Borders survey found that 31.4 percent of women seeking protection had been abused during their transit through Mexico. Some women are kidnapped and raped by their captors, often in front of their children. Many assaults involve Mexican authorities. A Honduran woman, Jessica, in the Mexico City detention center described to IMUMI how she and a friend were detained by the National Guard in Ciudad Juarez after being expelled from the US. The agents sexually abused both women, who remained in detention in Ciudad Juarez for two months before being transferred to the Mexico City detention center. The women were deported from Mexico before they had the chance to file a complaint against the agents.

   In another case documented by IMUMI, a Honduran woman was offered a job in Chiapas, Mexico, that turned out to be a ploy to traffic her. After six months of being routinely sexually abused, she escaped, but despite her reporting the crime, authorities did not protect her or investigate the crime, forcing her to leave the state and look for protection on her own.

   Many sexual violence crimes are not reported or investigated in Mexico. According to the National Survey for Urban Public Security, between July and December 2020, 98.6 percent of sexual crimes were

---

9   All names have been changed to protect the privacy of the women interviewed.

CLP_PC_029741

Stuck in Uncertainty and Exposed to Violence:
The Impact of US and Mexican Migration Policies
on Women Seeking Protection in 2021




not reported or not investigated. Women who lack migration status and those detained face additional risks of being the victim of a sexual crime and heightened barriers to accessing justice and support services, including psychological support and medical care.

4. **Women seeking protection are separated from their children as a result of restrictive policies**. In some cases, parents are victims of crimes, such as kidnapping, and their children are left alone to cross to safety into the US. Several months after being returned to Mexico, Sandra, a Black woman from Honduras, went to look for a job in downtown Piedras Negras, where she was kidnapped and held for three days. Her four children crossed the border on their own because they did not know what had happened to their mother and were frightened. In other cases, due to the danger in Mexican border cities, coupled with US policies preventing many families and adults from seeking asylum, parents are forced to make the heartbreaking decision to send their children alone to safety in the US.

5. **Women continue to wait in squalid conditions in Mexican northern and southern border cities.** Limited shelter capacity in Mexico's northern border cities has left many women sleeping on the streets and in precarious conditions, including at the informal tent encampments in Tijuana and Reynosa. WRC staff spoke with a Honduran woman, Eleana, in Tijuana who tried to secure accommodations in Tijuana shelters after being expelled from the US, but was turned away due to limited capacity. She was forced to stay in squalid conditions in a house far away from the city center. A mere 15 days after Eleana and her family attempted to seek protection after crossing into the US and were expelled by Border Patrol to the streets of Tijuana, a rabid dog attacked and killed her 20-month-old toddler. In Tapachula, Chiapas, women asylum seekers and their families waited months for their Mexican asylum cases to be resolved while living in shelters, rented rooms on the outskirts of the city, or camped in the city's central plaza, with limited access to bathrooms or showers.

6. **Women seeking protection struggle to find child care and enroll their children in school in Mexico.** According to Mexican law, all children—regardless of their immigration status—should be able to enroll in public school. However, many barriers to enrollment in schools remain, such as discrimination and misinformation from local school administrators. One woman, Karina, recounted to WRC how she had not been able to enroll her two young children in local public schools because administrators (falsely) told her she would have to pay a sizable enrollment fee for each child. Women asylum seekers in Tapachula, Chiapas, told IMUMI that some schools require certified translations of birth certificates and vaccination records, making it impossible to enroll their children as they either do not have the documents, or cannot afford to have them translated.

Child care responsibilities and barriers enrolling children in school made it difficult for women to find part- or full-time work, while they wait to access asylum in the US or in Mexico. A number of women expressed to WRC fear of leaving their children alone due to the dangers in border cities, and worries over being unable to support themselves and their families since they could not work.

7. **Women seeking protection struggle to access vital health services, including reproductive health services.** Mexico's 2011 Migration Law guarantees access to health services to people regardless of their immigration status in Mexico. Despite this, pregnant people expelled to Mexico by US authorities under Title 42 have been turned away by local hospitals and denied medical care. A Salvadoran woman, Brenda, told WRC she was denied prenatal care in Tijuana, where local hospital workers told her, "We can't help you because you aren't Mexican." A Honduran woman, Marina, represented by IMUMI, was turned away from a public hospital because she did not have the required documents to prove financial

5

CLP_PC_029742

Case 4:18-cv-06810-JST   Document 169-9   Filed 06/05/23   Page 296 of 1030

Stuck in Uncertainty and Exposed to Violence:
The Impact of US and Mexican Migration Policies
on Women Seeking Protection in 2021

 

need. A lawyer resolved the situation, but shared with IMUMI that almost all of her clients require legal assistance to access basic reproductive health services in Mexico.

8. **LGBTQI+, Black, Indigenous, and non-Spanish speaking women seeking protection face additional dangers in Mexico.** In particular, Black asylum seekers face anti-Black racism, discrimination, and targeting from Mexican authorities. Several Haitian asylum seekers in Mexico City told WRC that they did not even try to look for employment opportunities because of the discrimination they were certain they would face by employers. Restrictive US border policies force individuals to wait in Mexico where they often are vulnerable to the same risks, discrimination, and dangers that they fled in their countries of origin. For example, Laura, a trans woman who fled Honduras due to death threats and her house being burned down, told WRC she was threatened at gunpoint by Mexican authorities during her journey to Tijuana. She did not feel safe in Mexico and struggled to secure housing due to discrimination. A Guatemalan asylum seeker in Mexico City, Karen, described to IMUMI staff that a teacher discriminated against her daughter for being "darker" and wearing Indigenous clothing.

9. **Due to Mexico's increased enforcement and travel restrictions, women seeking protection are forced to look for ways to evade immigration and military checkpoints by traveling in caravans for safety or relying on smugglers.** In 2021, the situation was particularly harrowing in Tapachula, Chiapas, where 89,668 asylum seekers (approximately 68 percent of all applicants) awaited adjudication of their protection claims. Many families attempted to move from Tapachula to other cities with better job opportunities and safer conditions. However, INM and National Guard checkpoints and increased enforcement in southern Mexico made transit difficult.

   One Honduran woman, Veronica, told IMUMI that she and her family decided to join a migrant caravan in August 2021. INM officials stopped them, told them that the letter proving their pending asylum application was not valid, and tore up the documents. When she tried to film the incident with her telephone, agents took it away from her. During a press conference in September 2021, a Haitian woman in Tapachula described how Haitians are racially profiled by Mexican authorities and removed from buses. "We can barely get around Tapachula even though we are asylum seekers with a letter from COMAR. It is practically impossible to get on a bus to go to another city without paying smugglers a fee to get through the checkpoints."

   In the bus terminals in Tapachula and throughout Mexico, private bus companies began checking immigration status as a prerequisite for buying a bus ticket. Two women in the Mexico City detention center told IMUMI in September 2021 that they had been detained in a Mexico City bus station even though they had letters proving their immigration status.[10]

10. **Women seeking protection are subjected to use of force and violence by Mexican and US authorities.** In August 2021, Mexican immigration authorities and the Mexican National Guard were filmed kicking migrants, violently pushing women and children into vehicles, and threatening family separation as tactics to break up large groups. In one video, a woman who had been detained could be seen screaming that she had been separated from her two-year-old son during the raid. While she screamed and tried to get out of the INM van, an agent could be seen pushing her on the breasts back into the van. In October 2021, a Haitian woman was found dead along a highway in Chiapas. Her clothes had

---

10  Since bus ticket agents have neither the authority nor the training to verify immigration status, they have begun sending anyone they deem suspicious to talk to INM officials stationed in the bus stations, who would then detain the individual.

CLP_PC_029743

Stuck in Uncertainty and Exposed to Violence:
The Impact of US and Mexican Migration Policies
on Women Seeking Protection in 2021



been removed and she had been raped and strangled. Four municipal police officers were detained in relation to the crime. In September 2021, armed US Border Patrol agents in Del Rio, Texas were photographed abusing Black migrant families and driving them back across the border to Mexico.

**Many women seeking protection who transit through Mexico are subjected to more than one of the above risks during their stay, which often lasts months or even years due to restrictive policies**. A Honduran woman, Mariana, recounted to IMUMI her misfortunes over the past two years waiting in Mexico, and how the Biden administration's policies—following on the Trump administration's attacks on the asylum system—have resulted in her ongoing inability to seek asylum in the US:

*"I fled Honduras with my two children in 2019 because my husband beat us and he was involved in a criminal gang that protected him. After several months in Mexico, we arrived at the US-Mexico border to request protection and we were sent back under [Remain in Mexico] through Nuevo Laredo. Since I had my two small children, we made our way to Monterrey, Mexico [a city several hours to the south], where we were living on the street. I was raped and became pregnant.*

*"A kind Mexican woman took us in and allowed us to live with her until the baby was born in October 2020. My kids didn't go to school in all of 2020. I still had a dream to live with my sister in the US and be safe, but things were really difficult. Then in April 2021, I learned that I could sign up for the [RMX wind-down process] even though I had never had my hearing, so I signed up for Conecta.[11] I got help to register my baby so he would have a birth certificate. Then I got an email stating that Conecta had closed and that I would have to wait again.*

*"I don't understand what I am supposed to do, where I am supposed to go. I have been trying for two years to follow the rules, but my kids are two years older now, I have a baby, and I don't know what to do. I can't go back to Honduras, I am afraid to be in Mexico, and I'm not allowed to request protection at the border. I feel lost."*

## Conclusion and Recommendations

Both President Biden and President Andrés Manuel López Obrador recognize that many women are fleeing gender-based violence and persecution in their countries of origin and need access to protection in both countries. IMUMI and WRC are deeply concerned about practices by both governments that normalize human rights violations, including the violation of the right to request asylum. Instead of restrictive policies and enforcement actions that put women and children seeking protection in harm's way, the US and Mexican governments should strengthen asylum systems in both countries and broaden complementary pathways for protection. We urge the Biden and López Obrador administrations to implement the following recommendations to ensure that the rights of women—including the right to access protection—are upheld.

---

11  Conecta was a web platform run by the United Nations High Commissioner for Refugees (UNHCR) where individuals who were subjected to the first iteration of RMX could enroll to access the RMX wind-down process and continue their immigration cases within the US. This platform was operational between February and August 2021. It was suspended due to the court order regarding the reinstatement of RMX.

CLP_PC_029744

Stuck in Uncertainty and Exposed to Violence:
The Impact of US and Mexican Migration Policies
on Women Seeking Protection in 2021




Case 4:18-cv-06810-JST   Document 169-9   Filed 06/05/23   Page 298 of 1030

## Recommendations for the Biden administration

» End the use of Title 42 to expel adults and families to Mexico and their countries of origin via land expulsions and expulsion flights.

» Restore access to asylum at ports of entry, so that individuals can approach a port of entry and request protection and other relief from inside the United States.

» Refrain from pressuring Mexico to increase enforcement by immigration and security forces or implementing new visa restrictions for nationalities arriving in large numbers. Focus the Collaborative Migration Management Strategy (CMMS) on expanding access to protection in the region and complementary pathways to protection, without sacrificing access to asylum at the US southern border.

» Reverse the expansion and stop further implementation of RMX.

» Release monthly Customs and Border Protection (CBP) data that is disaggregated by gender on encounters, expulsions, returns under RMX, and other statistics relating to US asylum processing.

## Recommendations for the Mexican government

» Allocate adequate funding to COMAR to decrease wait times, open more offices, and hire additional protection officers.

» Reform the Mexican Refugee Law to allow people to continue their asylum procedures from different parts of the country where they have family and community networks, better employment opportunities, and safer conditions.

» Ensure that women who have suffered or who remain in danger of violence in Mexico have access to relocation programs and services where they can safely wait for their asylum process.

» Expedite humanitarian visitor cards for asylum seekers, victims and witnesses of crimes, migrant children, and other vulnerable populations.

» Refuse to collaborate with the US government on the implementation of policies such as Title 42 and RMX that violate US, Mexican, and international law.[12]

» Eliminate the use of the National Guard and all armed forces in migration enforcement in compliance with the Mexican Constitution and international law.

» Eliminate unconstitutional internal enforcement revisions and checkpoints that result in illegal racial profiling.

» Rescind the provision that requires foreigners to show proof of migration status to purchase a bus ticket in Mexico.

» Ensure access to public education for all migrant and refugee children.

» Ensure access to health services for migrant and refugee women and girls, especially reproductive health services.

---

12  Mexican organizations have pending litigation and complaints with the National Human Rights Commission against the bus travel restrictions, Mexico's participation in Remain in Mexico 1.0 and Remain in Mexico 2.0, Mexico´s implementation of internal Title 42 expulsion flights, discriminatory enforcement practices at internal checkpoints, and the participation of the National Guard in migration enforcement. For additional information about the lawsuits: 1. RMX 1.0 (Instituto para las Mujeres en la Migración (IMUMI), A.C. vs. SEGOB, SRE, INM, INMUJERES) - Mexican Supreme Court - 302/2020. 2. RMX2 – Mexico City District Court - exp. 1887/2021 3. Tit. 42 Expulsions – Mexico City Circuit Court - 153/2021. 4. Bus Travel Migration Status Restriction - Mexico City District Court - 1647/21 5. Discriminatory Migration Enforcement Practices - Mexican Supreme Court (E, A y J VM vs. INM, Cámara de Diputados y otros) - - 275/2019 6. National Guard Participation in Migration Enforcement – (Gretchen Louise Kuhner Vs. Congreso de la Unión y Presidente de los Estados Unidos Mexicanos), Mexican Supreme Court, 73/2020.

CLP_PC_029745

Stuck in Uncertainty and Exposed to Violence:
The Impact of US and Mexican Migration Policies
on Women Seeking Protection in 2021

 

» Increase access to housing for asylum seekers through ongoing support to civil society shelters, including safe spaces for vulnerable groups such as women, families, and LGTBQI+ individuals.

## Additional resources

» Analysis of Gender Violence: Women Seeking International Protection in Mexico, IMUMI, 2021.
» Asylum Denied: Remain in Mexico 2.0, Women's Refugee Commission, 2021.
» Dual Crises: Gender-Based Violence and Inequality Facing Children and Women During the COVID-19 Pandemic in El Salvador, Guatemala, and Honduras, KIND, 2021.
» Pathways to Justice: Gender-Based Violence and the Rule of Law, Wilson Center, 2021.
» Center for Gender and Refugee Studies (CGRS) Publications.

_____

This report was written by Gretchen Kuhner of the Instituto para las Mujeres en la Migración (IMUMI) and Savitri Arvey of the Women's Refugee Commission (WRC). It was reviewed by Katharina Obser, Ursela Ojeda, and Dale Busher from WRC. Patricia Arroyo reviewed statistics, Sara Velasco helped with fact checking, and Miriam Gonzalez reviewed the Spanish translation on behalf of IMUMI. It was edited by Joanna Kuebler and Diana Quick from WRC, and designed by Diana Quick.

IMUMI and WRC extend deep thanks to the women who generously shared their time and experiences, as well as the migrant shelters and organizations that provided information and facilitated the interviews with women.

This report was made possible by the generous support of the Open Society Foundations.

For additional information, please contact Gretchen Kuhner, director, IMUMI (gretchenk@imumi.org) or Savitri Arvey, policy advisor, WRC (SavitriA@wrcommission.org).

**Women's Refugee Commission**
The Women's Refugee Commission (WRC) improves the lives and protects the rights of women, children, and youth who have been displaced by conflict and crisis. We research their needs, identify solutions, and advocate for programs and policies to strengthen their resilience and drive change in humanitarian practice. Since our founding in 1989, we have been a leading expert on the needs of refugee women, children, and youth and the policies that can protect and empower them. womensrefugeecommission.org.

**IMUMI**
The Institute for Women in Migration, AC (IMUMI) is a civil society organization based in Mexico City that promotes the rights of women and their families in migration. IMUMI provides legal support to women and their families, collaborates with civil society organizations, academic institutions, and government bodies to ensure issues relevant to women are included in regional migration policy. imumi.org.

February 2022

CLP_PC_029746



**Memo: Impacts of U.S. and Mexican migration enforcement on migrant and refugee rights in Mexico**
*September 2021*

Current U.S. and Mexican migration enforcement policies violate migrant and refugee rights in contravention of commitments both governments have made to protect migrants and refugees and their responsibilities under domestic and international law to respect people's right to seek protection.

While the Biden Administration's proposed "Collaborative Migration Management Strategy" (CMMS) aims to promote "safe, orderly and humane migration," the current violations of migrant and refugee rights in Mexico, supported and fueled by U.S. policies, demonstrate an enforcement-centric approach, not a focus on expanding access to protection in Mexico and the region, one of the priorities in the CMMS. Far from deterring migration, current U.S. and Mexican enforcement policies are exacerbating the situation of people fleeing their home countries by returning them to danger, denying them the right to seek refuge, and fueling a vicious cycle in which they have no choice but to migrate again, often following dangerous, clandestine routes. Recent human rights violations committed by Mexican migration enforcement and security forces also highlight a broader, concerning pattern of impunity and abuse within these institutions.

The following is a summary of migrant and refugee rights violations in Mexico documented by civil society organizations and journalists from August 2021 through the present. Human rights violations include the denial of the right to seek protection by U.S. and Mexican governments from the U.S.-Mexico border through arrival in Guatemala via Title 42 and Mexican government expulsions from within Mexico; violation of non-refoulement; excessive use of force and attacks against human rights defenders and journalists by Mexican migration and law enforcement and security forces; family separation and abuses of migrant children; and the systematic detention, deportation and expulsion of asylum seekers and refugees with documents authorizing their status in Mexico.

**Table of contents**
1. U.S. Title 42 expulsion flights to southern Mexico fueling chain refoulement
   - Violation of human rights from arrival to Mexico's southern border to Guatemala
   - Continued expulsions to Guatemala following intergovernmental meetings
2. Mexican government violation of migrant and refugee rights
   - Expulsions from Mexico's interior
   - Detention and deportation of asylum seekers and refugees
   - Excessive use of force and other human rights violations committed against large groups of migrants by Mexican migration enforcement and security forces
   - Family separation and abuses against migrant children
   - Intimidation of human rights defenders and journalists
3. Impacts of rights violations on migration patterns to the United States
4. Recommendations to the U.S. Government

CLP_PC_029747

1. **U.S. Title 42 expulsion flights to southern Mexico fueling chain refoulement**

The Title 42 CDC border order that was implemented by the Trump Administration in March 2020 and most recently renewed by the Biden Administration on August 2nd represents a continuous violation of the right to seek asylum, as it leads to the expulsion of people arriving at the U.S.-Mexico border without access to the U.S. asylum system. **This situation has now been greatly aggravated as the United States began expulsion flights of Hondurans, Guatemalans, Salvadorans, some Nicaraguans, and other nationalities, to southern Mexico on Aug. 5th.** Civil society organizations have documented the arrival of at least 35 flights between Aug. 5th and Aug. 31st to two cities in southern Mexico: Villahermosa, state of Tabasco (19 flights) and Tapachula, state of Chiapas (16 flights) with flights happening virtually every weekday.[ii] The vast majority of these flights departed from McAllen, Texas.[iii]

*Violation of human rights from arrival to Mexico's southern border to Guatemala*
Organizations and journalists have documented how people flown to southern Mexico on these Title 42 flights from the U.S.-Mexico border are taken from the airports to locations along the Mexico-Guatemala border. **At no point throughout this process, from their expulsion at the U.S.-Mexico border to their expulsion into Guatemala, do people have any chance to request asylum with U.S. or Mexican authorities or to have any contact with civil society or international organizations.** There is no formal registration of people expelled upon their arrival to the airports in southern Mexico. They are taken directly off the planes, placed onto National Migration Institute (INM) buses and driven to points along the border with Guatemala while being escorted by the Mexican National Guard. In the case of the flights to Tapachula, the buses make their way to El Carmen, and in the case of the flights to Villahermosa, the buses reach El Ceibo. Both are remote and dangerous areas prone to organized crime and where there are few to no civil society organizations present. It has been difficult for organizations to document the impact of Title 42 expulsions arriving in El Carmen, Guatemala due to the lack of organizations present there. Only a few organizations from Tapachula have been able to make it to El Carmen to document the arrival of INM buses. They noted the presence of organized crime there as an additional challenge in their documentation of this area.[iv] Organizations with staff in El Ceibo have also reported security incidents and a high presence of organized crime. Organizations have documented the arrival of buses as late as 9pm both to El Ceibo and El Carmen.[v] People on these buses have included adults, families, and children, including very young children. Once people are taken off the buses at the Mexican border processing stations or the foot of pedestrian bridges, they are surrounded by INM and National Guard agents and forced to cross into Guatemala. Organizations report that they are actively blocked from approaching migrants on the Mexican side of the Mexico-Guatemala border by INM and National Guard agents.[vi]

**People are left to fend for themselves upon arriving in Guatemalan territory and reported feeling desperate and having to figure out how to travel to their next destination without any means.[vii]** The Guatemalan Migration Institute received over 6,000 people at El Ceibo from January through Sept. 12th, including Guatemalans, Hondurans, Salvadorans, Nicaraguans, as well as migrants from the Dominican Republic, Belize, Venezuela, Colombia, Haiti, Senegal and even one U.S. citizen.[viii] From Aug. 22nd-Aug. 29th alone, 2,061 people were registered as being expelled to El Ceibo, including 54 children.[ix] The only migrant shelter in El Ceibo, Guatemala, which has a capacity for 30 people, has been overwhelmed due to these expulsions, receiving as many as 100 people per day.[x] In August, the Guatemalan government stated that it had not received notification from the Mexican or U.S. governments regarding individuals being expelled into its territory.[xi]

*Continued expulsions to Guatemala following intergovernmental meetings*
On Sept. 2, 2021, after meetings between the Guatemalan, Mexican, and U.S. governments, the Guatemalan Migration Institute announced that the Mexican government would leave Guatemalans in

2

a different border town, Tecún Umán, and that it would bus Central Americans directly to the borders of each country.[xii] They also stated that expulsions to El Ceibo would continue for another thirty days through September. As a part of these talks, the Guatemalan foreign minister stated that Guatemala would receive Guatemalans by air and Hondurans by land, only at the El Ceibo border point.[xiii] From there, the Guatemalan government would work with the Mexican government to return Hondurans by bus to Corinto, Honduras.[xiv] The U.S. government announced that it would return Guatemalans by air to the Guatemala City airport.[xv] According to civil society documentation, there has been one flight each weekday of Title 42 expulsions to Guatemala City from the U.S.-Mexico border since Sept. 2nd.[xvi]

**It remains unclear what practice the U.S. and Mexican governments will follow with Title 42 expulsions in the longer term.** Following Sept. 2nd, civil society organizations documented the arrival of INM buses from the Villahermosa airport to the El Ceibo border point with individuals mixed together on the same bus from the U.S.-Mexico border and from the interior of Mexico, including Guatemalans, Hondurans, Nicaraguans and Salvadorans.[xvii] Many adults and families reported not knowing where they had been taken and one woman even mentioned she had been told she was going to Houston only to find herself in Guatemala.[xviii] People were forced off the buses to cross by foot into Guatemala and once in Guatemala placed on other INM buses. It was unclear why INM buses were directing operations in Guatemala. The destination of the buses was presumed to be Corinto, Honduras, but it was not confirmed.

**Since the Title 42 expulsion flights started, organizations have reported a complete lack of precautions being taken for the pandemic.** It is unclear if individuals are tested for COVID-19 prior to boarding expulsion flights at the U.S.-Mexico border or upon their arrival in southern Mexico or Guatemala, raising the possibility that the virus is being spread through these expulsion flights. The few staff of organizations in El Ceibo have reported feeling ill and testing positive for COVID-19. Shelters in southern Mexico are limiting the entry of new migrants or are in the process of closing due to the pandemic, which will place migrants in an even more precarious situation.[xix]

The UN Refugee Agency and three other UN agencies expressed concern with this practice of expulsions to southern Mexico under Title 42 as they increase the risk of chain refoulement, through pushbacks by successive countries, of vulnerable people in danger.[xx] The clearest example is the case of any Central Americans with asylum claims who are returned directly to their country of feared persecution through this chain of expulsion, or refoulement. Other people seeking protection are physically prevented from making asylum claims and exposed to further danger either in Guatemala or on whatever routes they must take from the areas in which they are abandoned. **The lack of transparency by the U.S. and Mexican governments around the Title 42 expulsion flights is fueling not only cases of chain refoulement but also resulting in uncertainty as to where the U.S. and Mexican government are sending people with protection needs.**

2. **Mexican government violation of migrant and refugee rights**

*Expulsions from Mexico's interior*
Mexican organizations have also identified flights arriving in southern Mexico from Mexico's interior. These flights carry people who have been expelled from the United States to northern Mexico as well as people detained within Mexico. For example, Mexican organizations documented one of these flight routes as beginning with individuals expelled from the United States being detained by the INM in Nogales, Sonora, Mexico.[xxi] From there, land transfers were made to Hermosillo, Sonora, and then people were transported by air to Tapachula, Chiapas.[xxii] Other routes are unclear.

3

*Detention and deportation of asylum seekers and refugees*
There are also deportation flights operated by Mexico from Mexico to Honduras, Guatemala and El Salvador. From May 1st until Aug. 31st, there were 64 likely deportations by plane from Mexico, primarily from Reynosa and Monterrey to Honduras (40), Guatemala (21), and El Salvador (3).[xxiii]

**Recent attempts by migrants in Chiapas to relocate further north[xxiv] follow days of migrants protesting excessive delays in the processing of asylum requests with Mexico's refugee agency (COMAR) in Tapachula, and the increasing detention and expulsion of individuals with authorization to remain in Mexico, such as asylum seekers and refugees.[xxv]** Asylum seekers from Haiti, Central America, Venezuela and other countries reported waiting anywhere from three months to two years for responses to their asylum applications, though COMAR is supposed to issue a response within 45 business days. Conditions in Tapachula are inhumane: asylum seekers lack access to shelter, food, and employment. Currently, individuals are receiving appointments with COMAR for asylum claims as late as January and February 2022.[xxvi] This situation is reflective of Mexico's overburdened asylum system which through August 2021 has received over 77,000 asylum applications, already surpassing its record total from 2019.[xxvii] 55,000 of those applications were received in COMAR's Tapachula office. Approximately 19,000 of these were from Haitians.[xxviii]

**Organizations have documented INM agents denying people's request to seek asylum at locations within Mexico's interior, along the Mexico-Guatemala border, and within cities like Tapachula and Villahermosa.[xxix]** While the denial of the right to seek asylum by INM agents is not a new practice, it is particularly concerning now given the uptick in the Mexican government's expulsions and deportations of migrants from the interior and the border. Organizations received testimonies from individuals who had been denied the right to seek asylum within Mexico's detention centers including being laughed at, prohibited phone calls, and told it is no longer possible to request asylum in Mexico.[xxx] Many were then later expelled to Guatemala. Other migrants reported having documents authorizing their asylum process or refugee status confiscated and destroyed by INM agents before being expelled into Guatemala.[xxxi] Organizations documented the illegal detention and deportation of individuals with documentation authorizing their stay in Mexico, confirming refugee status, or visas and paperwork from the COMAR indicating the start of their asylum process.[xxxii]

*Excessive use of force and other human rights violations committed against large groups of migrants by Mexican migration enforcement and security forces*
Starting on August 28, 2021, at least 5 large groups of hundreds of migrants – mainly Haitians, as well as Central Americans, Cubans, and Venezuelans – departed Tapachula, Chiapas, seeking to arrive at places outside of the state of Chiapas where they could find employment opportunities and resources to live a dignified life.

**Migrants traveling in these groups have systematically been met with violence and excessive use of force.** The INM, National Guard, and Mexican army are using anti-riot gear and vehicles to intercept these migrant groups, disperse them, and detain their members, which include families, young children, pregnant women, as well as many individuals – such as refugees – who, according to the law, are allowed to leave the state of Chiapas.[xxxiii] Civil society organizations have documented inhumane enforcement operations where migrants are insulted,[xxxiv] dragged,[xxxv] beaten[xxxvi] – including with anti-riot shields and canes – and chased[xxxvii] for hours.

**Civil society organizations have also received testimonies from individuals in the large mobilizations stating that they had been expelled following detention in Mexico, some even with documents authorizing their status in Mexico.** Some had crossed back into Tapachula and after finding a difficult situation there, joined the mobilizations. Haitian migrants in the mobilizations were among the migrants who had been expelled from Mexico's interior into Guatemala or who had been

4

protesting conditions in Tapachula.[xxxviii] Following the latest operation on Sunday, Sept. 5th, many individuals detained in the mobilizations were expelled via different points along the Mexico-Guatemala border.[xxxix] Raids and operations by INM and National Guard agents within Tapachula and along the highways from Tapachula have continued in the days following the mobilizations, and agents continue to stop migrants even with documents authorizing their status in Mexico. Under Mexican law, asylum seekers must remain in the Mexican state where they sought asylum until their claim is resolved, and yet despite asylum seekers remaining in the Mexican state of Chiapas where they began their asylum claim, they were still detained by INM and the National Guard.[xl]

### Family separation and abuses against migrant children
These operations have resulted in injuries, trauma, and arbitrary detentions of children.[xli] UNICEF has expressed concern about the situation of children and youth traveling in southern Mexico, reporting situations of family separation, dehydration, and lack of services available for them.[xlii] **The INM is reportedly detaining children and teenagers and separating families as a coercion strategy and has expelled migrants detained during these enforcement operations to Guatemala without following any legal procedures.[xliii]**

### Intimidation of human rights defenders and journalists
Mexican authorities have also harassed and intimidated journalists[xliv] and human rights defenders documenting these abuses and providing humanitarian assistance to migrants.[xlv]

**Three United Nations agencies manifested their concern over the excessive force used against migrants and reports of intimidation of human rights defenders and reminded the Mexican government to respect the human rights of migrants and asylum seekers.[xlvi]** Although two INM agents were fired for their actions towards migrants during these mobilizations,[xlvii] authorities have not announced investigations into other allegations of abuse. Civil society organizations have long noted how the INM operates without transparency or accountability and have expressed similar concerns about the National Guard which was established in 2019.[xlviii] On September 7th, President Lopez Obrador backed Mexico's migration enforcement agencies during his morning press conference[xlix] a clear indication that Mexico will continue to disregard the right to seek asylum and focus on "stopping all migration" – a stated goal of the army at Mexico's southern border[l] despite this not falling under its mandate and despite the systematic violation of human rights.

3. **Impacts of rights violations on migration patterns to the United States**

The cumulative result of the practices mentioned above is that U.S. and Mexican authorities are seeking not only to expel and block migration to the United States but are essentially externalizing the U.S. border to southern Mexico and seeking to obstruct movement within Mexican territory, even of people with valid migration documents in Mexico.

**These policies will not have a positive or sustainable impact on migration management in the region, including on arrivals to the U.S.-Mexico border.** Past cycles of crackdowns and border externalization dating from at least 2014 show that, despite cyclical dips in the number of migrant arrivals, people fleeing their countries will not be convinced to turn back and stay at home by such policies. Forcibly displaced migrants will largely be forced to seek alternative routes to their destinations, disproportionately making use of clandestine routes and/or turning to smugglers, which also leaves them exposed to violent criminals who prey on them.[li] These policies will send a clear message to migrants and asylum seekers that Mexico is an unwelcoming country whose authorities must be avoided at all costs, obstructing Mexico's potential to play an active role in regional protection and migration management.

CLP_PC_029751

**It is unrealistic to think that people desperately seeking to escape or to save their children's lives from contexts of persecution, corruption, climate change, or extreme poverty can be physically beaten back and trapped in a small area of Mexico's southern border indefinitely.** Even without analyzing the human rights impacts of this approach, it does not offer solutions to the immediate needs of this population, ranging from physical protection to access to work. Testimonies collected by civil society organizations have demonstrated that individuals expelled in remote areas will cross borders again and attempt to seek safety and a dignified life wherever possible.

**Adequately addressing these migration patterns requires recognizing the right to seek asylum, so that asylum seekers can present themselves to authorities and receive a decision the first time they request protection, rather than having to make multiple trips and crossing attempts.** Second, many people who may not fall within the traditional definition of an asylee (persecution based on a set number of grounds) nonetheless find themselves forced to migrate in practice. In the face of this reality, offering the asylum system in Mexico as the only path to a regular migration status is inefficient as a matter of asylum policy and insufficient as an integral migration management strategy. As civil society organizations have advocated in Mexico, other paths to a status that allows migrants to work are needed, as well as permission for migrants to relocate away from Mexico's southern border.[lii] Failing to recognize and address these immediate needs, regardless of positive actions to address the longer-term root causes of migration, will fail to stem a growing humanitarian crisis in southern Mexico and the rest of the region.

4. **Recommendations to the U.S. Government**
- Comply with the federal court's preliminary injunction halting the implementation of Title 42 for families in *Huisha-Huisha v. Mayorkas* and rescind the CDC Title 42 order entirely, immediately halting unlawful expulsions at the border, lateral expulsion flights, and expulsion flights to southern Mexico, Guatemala, Haiti, or any other country.
- Avoid any reinstatement of the Remain in Mexico (MPP) policy and instead issue a new termination memo and continue processing individuals previously subjected to MPP into the United States.
- Restore access to asylum and orderly and humane processing of people at ports of entry, avoiding metering or other forms of "queue management."
- Halt the recently reimplemented expedited removal process at the border and subsequent removal flights of families. Expedited removal at the border lacks transparency, access to legal orientations and appropriate interpretation services, due process, judicial review, and relies on often poorly performed fear assessment by individual CBP Officers.
- Refrain from pressuring the governments of Mexico and other countries in the region to deter migration and entering into agreements with them to deny people the right to seek asylum, including via expulsions to southern Mexico or their home country, and instead work with those governments to implement humanitarian processing of refugees, including from their home countries via the Central America Minors (CAM) program and Protection Transfer Agreement (PTA), and uphold the right of individuals to seek protection under international law where they feel safe.
- Encourage Mexican authorities to dialogue with international and civil society organizations to find humanitarian solutions and protection mechanisms for the processing of asylum seekers and migrants entering Mexico that do not violate Mexican asylum and migration law, and that include alternatives to detention, regularization mechanisms, and facilitating asylum seekers' relocation to other states within Mexico while their cases are being processed.

CLP_PC_029752

- Support international bodies and civil society organizations in their work to increase access to asylum in Mexico (including by building the capacity of migrant shelters, expanding access to legal assistance for asylum claims, and providing asylum seekers with temporary cash assistance during the processing of their claims). Priority areas of cooperation, directly or through international bodies, should include: expanding COMAR staff capacity to reduce the current backlog and expedite processing times; ensuring COMAR presence at border points of entry and airports; training COMAR asylum officers in best practices for interviewing applicants - including children, women, families, and LGBTQI+ populations - and processing applications; fostering language access initiatives for non-Spanish-speaking applicants, including for Haitians and Indigenous applicants; providing anti-Blackness bias and discrimination training to COMAR and INM officials; training INM officials on effective screening for protection concerns for the migrants it detains; facilitating alternatives to detention; and expanding relocation and integration initiatives that bring asylum seekers from Mexico's southern border to safer cities that offer better employment options.

- Support Mexico's child protection entities such as the National System on Child Protection (SIPINNA), the National Child Welfare Agency (SNDIF), and federal and local child protection offices (*procuradurías de protección*) to ensure that the rights of migrant children are protected and best interest determinations are carried out so as to guarantee meaningful protection.

- Encourage Mexican authorities to make meaningful enforcement reforms, remove barriers to asylum access, and allocate sufficient funding for its asylum system. U.S. support should move towards increasing accountability and curtailing corruption within Mexico's National Migration Institute as well as withdrawing the participation of the National Guard in immigration enforcement within Mexico. As long as the National Guard is primarily military in nature, there should be no U.S. support for the force in the form of funding, training or equipment.

- Encourage Mexican authorities to investigate and prosecute human rights violations committed by security forces, law enforcement, and INM agents against migrants, human rights defenders, and journalists, including during the mobilizations in August 2021. Refrain from providing U.S. support in the form of training, funding, or equipment to rights-violating entities.

---

[i] National Security Council. "Collaborative Migration Management Strategy." July 2021. https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf

[ii] Cartwright, Tom. Witness at the Border. "ICE Air Expulsion Flights of Guatemalans, Hondurans, and Salvadorans to Southern Mexico." September 4, 2021. https://witnessattheborder.org/posts/9421

[iii] Ibid.

[iv] Documentation provided by the Colectivo de Observación y Monitoreo de Derechos Humanos en el Sureste Mexicano (will be referred to as "Colectivo") and CHIRLA International Program

[v] Documentation provided by the Colectivo and CHIRLA International Program

[vi] Documentation provided by the Colectivo and CHIRLA International Program

[vii] Pradilla, Alberto. *Animal Político*. "'Queríamos pedir asilo, pero no nos dejaron hablar': Así operan los vuelos de EU para expulsar centroamericanos por Chiapas". 8 de septiembre de 2021. https://www.animalpolitico.com/2021/09/asi-operan-vuelos-eu-expulsar-centroamericanos-chiapas/; Documentation provided by the Colectivo and CHIRLA International Program

[viii] @MinexGuatemala. *Minex* Guatemala. "Conferencia de Prensa: Acuerdos en relación con el retorno de personas migrantes". 13 de septiembre de 2021. https://www.facebook.com/MinexGuatemala/videos/987942588718696

[ix] *Human Rights Watch*. "Mexico: Mass Expulsion of Asylum Seekers to Guatemala." September 8, 2021. https://www.hrw.org/news/2021/09/08/mexico-mass-expulsion-asylum-seekers-guatemala

[x] Sieff, Kevin. *The Washington Post*. "Mexico has pushed hundreds of migrants expelled from the U.S. on to Guatemala," August 10, 2021. https://www.washingtonpost.com/world/2021/08/10/mexico-deport-guatemala/

[xi] Gobierno de Guatemala. "Comunicado de prensa". 17 de agosto de 2021. https://www.minex.gob.gt/noticias/Noticia.aspx?id=29530

CLP_PC_029753

xii @PublinewsGT. *Publinews Guatemala*. September 2, 2021. https://twitter.com/PublinewsGT/status/1433501513385664519; *Instituto Guatemalteco de Migración*. "Autoridades De Migración Y SVET Se Reúnen Para Abordar La Situación Migratoria En El Ceibo." 3 de septiembre del 2021. http://igm.gob.gt/autoridades-de-migracion-y-svet-se-reunen-para-abordar-la-situacion-migratoria-en-el-ceibo/; Menchu, Sofia. *Reuters*. "After U.S. meeting, Guatemala sees end to remote border deportations." September 2, 2021. https://www.reuters.com/world/americas/after-us-meeting-guatemala-sees-end-to-remote-border-deportations-2021-09-02/

xiii @MinexGuatemala. *Minex* Guatemala. "Conferencia de Prensa: Acuerdos en relación con el retorno de personas migrantes". 13 de septiembre de 2021. https://www.facebook.com/MinexGuatemala/videos/987942588718696

xiv Ibid.

xv @MinexGuatemala. *Minex* Guatemala. "Conferencia de Prensa: Acuerdos en relación con el retorno de personas migrantes". 13 de septiembre de 2021. https://www.facebook.com/MinexGuatemala/videos/987942588718696

xvi Cartwright, Tom. Witness at the Border. "ICE Air Expulsion Flights of Guatemalans, Hondurans, and Salvadorans to Southern Mexico." September 4, 2021. https://witnessattheborder.org/posts/9421

xvii Information provided by Asylum Access Mexico staff following on the ground documentation

xviii Ibid

xix Information provided by Asylum Access Mexico staff following on the ground documentation

xx UNHCR. "UNHCR concerned over U.S. expulsion flights under COVID-19 asylum restrictions." August 11, 2021. https://www.unhcr.org/news/press/2021/8/6113dfc14/unhcr-concerned-expulsion-flights-under-covid-19-asylum-restrictions.html#_ga=2.71647444.618518140.1630440545-1114205791.1630440545; UNHCR. "Agencias de la ONU expresan preocupación frente al deterioro de las condiciones humanitarias de las personas migrantes y solicitantes de asilo en las fronteras norte y sur de México". 11 de agosto de 2021. https://www.acnur.org/es-mx/noticias/press/2021/8/61143e084/agencias-de-la-onu-expresan-preocupacion-frente-al-deterioro-de-las-condiciones.html

xxi *Comunicado*. "Las expulsiones vía aérea y terrestre de personas migrantes hacia Guatemala,". 25 de agosto de 2021. http://caravanamigrante.ibero.mx/uploads/monitoreos_pdf/2f350d46dcafe1092e48c0530cf6046d.pdf

xxii Ibid.

xxiii "Mexico Likely Deportation Flights on Magnicharters to Northern Triangle Countries." August 31, 2021. https://static1.squarespace.com/static/5e221cacff87ba2d2833cf54/t/61343685093fa65431b5ebd3/1630811781731/MX_TO_NOTRI_PDF.pdf

xxiv Isacson, Adam. WOLA. "Weekly U.S.-Mexico Border Update." September 3, 2021. https://www.wola.org/2021/09/weekly-border-update-mexico-pushes-back-asylum-seekers-attempting-leave-remain-mexicos-awkward-restart/

xxv *Aljazeera*. "'We can't survive': Migrants in Mexico protest slow asylum system." August 28, 2021. https://www.aljazeera.com/news/2021/8/28/we-cant-survive-migrants-in-mexico-protest-slow-asylum-system

xxvi Documentation provided by the Colectivo and CHIRLA International Program

xxvii @AndresRSilva_. Ramírez, Andrés. September 1, 2021. https://twitter.com/AndresRSilva_/status/1433110892581986305

xxviii @AndresRSilva_. Ramírez, Andrés. September 1, 2021. https://twitter.com/AndresRSilva_/status/1433145536819908610

xxix @AsylumAccessMx. Asylum Access Mexico. September 6, 2021. https://twitter.com/AsylumAccessMX/status/1434986856572194820?s=20

xxx Information provided by Asylum Access Mexico staff following on the ground documentation and Colectivo

xxxi Documentation provided by Colectivo, CHIRLA International Program; *Human Rights Watch*. "Mexico: Mass Expulsion of Asylum Seekers to Guatemala." September 8, 2021. https://www.hrw.org/news/2021/09/08/mexico-mass-expulsion-asylum-seekers-guatemala

xxxii *Colectivo de Observación y Monitoreo de Derechos Humanos en el SE mexicano*. "Caravana exige respeto a sus derechos humanos,". 28 de agosto de 2021. http://caravanamigrante.ibero.mx/uploads/monitoreos_pdf/a0a920ae02164f0dffb680d0b3450257.pdf; CHIRLA International Program

xxxiii *Colectivo de Observación y Monitoreo de Derechos Humanos en el SE mexicano*. "Se suma nuevo grupo a la caravana desde Tapachula,". 30 y 31 de agosto de 2021. http://caravanamigrante.ibero.mx/uploads/monitoreos_pdf/b964f8589f114658d7231486cb097481.pdf

xxxiv @polotuits. September 6, 2021. https://twitter.com/polotuits/status/1434910159558565891

xxxv @isain. Mandujano, Isaín. August 31, 2021. https://twitter.com/isain/status/1432799207375708161

xxxvi @adams_needle. Needle, Adams. September 8, 2021. https://twitter.com/search?q=migrantes%20migrantes%20%20&src=typed_query&f=video

xxxvii @Pajaropolitico. *Animal Político*. September 2, 2021. https://twitter.com/Pajaropolitico/status/1433487636803489798

xxxviii Pradilla, Alberto. *Animal Político*. "Policías locales de Chiapas encierran a familias haitianas y las entregan al INM, que las expulsa a Guatemala" 7 de septiembre de 2021. https://www.animalpolitico.com/2021/09/policias-locales-chiapas-encierran-familias-haitianas-inm-guatemala/

xxxix Documentation provided by the Colectivo and CHIRLA International Program

xl *Aljazeera*. "'We can't survive': Migrants in Mexico protest slow asylum system." August 28, 2021. https://www.aljazeera.com/news/2021/8/28/we-cant-survive-migrants-in-mexico-protest-slow-asylum-system

CLP_PC_029754

[xli] *Colectivo de Observación y Monitoreo de Derechos Humanos en el SE Mexicano*. "Se suma nuevo grupo a la caravana desde Tapachula,". 28 de agosto de 2021.
http://caravanamigrante.ibero.mx/uploads/monitoreos_pdf/b964f8589f114658d7231486cb097481.pdf

[xlii] *Naciones Unidas México*. "Alerta UNICEF por niñas y niños migrantes viajando solos". 2 de septiembre de 2021.
https://www.onu.org.mx/alerta-unicef-por-ninas-y-ninos-migrantes-viajando-solos/

[xliii] *Colectivo de Observación y Monitoreo de Derechos Humanos en el SE Mexicano*. "Más de ocho horas de operativos y redada en Huixtla sobre mujeres, niñas, niños, familias y hombres que se desplazan forzadamente". 5 de septiembre de 2021.
http://caravanamigrante.ibero.mx/uploads/monitoreos_pdf/d7f2a176039c92e41521d41d262f9133.pdf

[xliv] *Animal Político*. "Otro operativo agrede y amenaza a migrantes, activistas y periodistas en Mapastepec, Chiapas". 1 de septiembre de 2021. https://www.animalpolitico.com/2021/09/otro-operativo-agrede-amenaza-migrantes-periodistas-mapastepec-chiapas/

[xlv] *Colectivo de Observación y Monitoreo de Derechos Humanos en el SE mexicano*. "Personas migrantes y solicitantes de refugio y periodista fueron heridas,". 2 de septiembre de 2021.
http://caravanamigrante.ibero.mx/uploads/monitoreos_pdf/6e690fa357bb473499b1968cf6996ead.pdf

[xlvi] UNHCR. "ACNUR, OIM y ONUDH llaman a respetar los estándares internacionales en el uso de la fuerza". 31 de agosto de 2021. https://www.acnur.org/es-mx/noticias/press/2021/8/612e49a04/acnur-oim-y-onudh-llaman-a-respetar-los-estandares-internacionales-en-el.html

[xlvii] Secretaría de Gobernación. Gobierno de México. "INM suspende de sus funciones a dos agentes federales". 30 de agosto de 2021. https://www.gob.mx/segob/prensa/inm-suspende-de-sus-funciones-a-dos-agentes-federales?idiom=es

[xlviii] Torres, Pamela. *Sin Fronteras*. "Al abuso de poder del INM". 31 de agosto de 2021. https://sinfronteras.org.mx/alto-al-abuso-de-poder-del-inm/

[xlix] @Pajaropolitico. *Animal Político*. September 7, 2021. https://twitter.com/Pajaropolitico/status/1435236495112249347

[l] *Debate*. "¿México quiere acabar con el sueño americano? El objetivo del Ejército es detener a todos los migrantes". 27 de agosto de 2021. https://www.debate.com.mx/migracion/Mexico-quiere-acabar-con-el-sueno-americano-El-objetivo-del-Ejercito-es-detener-a-todos-los-migrantes-20210827-0084.html

[li] Meyer, Maureen. Isacson, Adam. WOLA. "The 'Wall' Before the Wall." December 2019. https://www.wola.org/wp-content/uploads/2019/12/Southern-Border-Report-EXECUTIVE-SUMMARY-2019.pdf

[lii] *IMUMI*. "Gobierno mexicano necesita implementar solución para protección de personas migrantes haitianas". 2 de septiembre de 2021. https://imumi.org/2021/09/02/gobierno-mexicano-necesita-implementar-solucion-para-la-proteccion-de-personas-migrantes-haitianas/

CLP_PC_029755

Trump allies target DeSantis     Ted Lasso's last season?     Honda recall     March Madness news & results

U.S. News     World New



Trump allies target DeSantis    Ted Lasso's last season?    Honda recall    March Madness news & results

By MOISES CASTILLO and CHRISTOPHER SHERMAN

U.S. News    World New

   

SAN JOSE, Costa Rica (AP) — After four years of trying to continue his studies in Nicaragua, Elton Rivera finally reached the same conclusion as thousands of his countrymen. The government shuttered his university, its director told him he was going into exile and warned that the police were coming for Rivera too.

Rivera surveyed the various safe houses he had used after his arrest in 2018 and realized that no one who had sheltered him was left. "The only option is to go to Costa Rica, which is what I have closest and where I have the most contacts," he said. He snuck out of Nicaragua along a trail over a mountain in February and was soon on a bus to San Jose.

Rivera immediately sought asylum. The Costa Rican government gave him an appointment to formalize his request — in 2030.

Since the summer of 2021, when Nicaragua President Daniel Ortega locked up dozens of political opponents ahead of November's presidential elections, Nicaraguans have been seeking asylum in Costa Rica at the highest levels since Nicaragua's political crisis exploded in April 2018.

The exodus of Nicaraguans fleeing political repression has neighboring Costa Rica's asylum system teetering under the weight of applications that exceed even the 1980s when civil wars ravaged Central America.

Asylum seekers now account for 4% of Costa Rica's population. Despite having only 5 million citizens, Costa Rica trailed only the United States, Germany and Mexico in the number of asylum applications it received last year, according to the United Nations High Commissioner for Refugees.

CLP_PC_030102

Costa Rica struggles to absorb migrants fleeing Nicaragua's unrest...

Trump allies target DeSantis    Ted Lasso's last season?    Honda recall    March Madness news & results

U.S. News    World New

The asylum seekers are added pressure for the new administration of President Rodrigo Chaves who is trying to jump-start an economy hit hard by the COVID-19 pandemic.

"That has been an incredible increase," said Allan Rodríguez, deputy director of Costa Rica's immigration agency, which also oversees the asylum system. "It has put the capacities of the administration to the test. It has made us reinvent ourselves not only in the reception process, but also in how to resolve this issue."

Rodríguez said that the system has been bolstered in terms of its ability to take asylum applications -- the U.N. refugee agency contracted 50 people to help -- but that remaining challenges include resolving the cases quickly and integrating asylees into Costa Rican society.

Rivera, 28, was in the final year of studying medicine at Nicaragua's largest public university and not particularly interested in politics when protests broke out in April 2018 in response to changes to the social security system. Senior citizens who took to the streets were roughed up by police, so university students came out in support of the pensioners.



CLP_PC_030103

Trump allies target DeSantis    Ted Lasso's last season?    Honda recall    March Madness news & results

**U.S. News    World New**



Nicaraguans wait for their first interviews in their application for asylum outside the Refugee Service Center in San Jose, Costa Rica, Monday, Aug. 29, 2022. (AP Photo/Moises Castillo)

Rivera went to do his rounds at a hospital the next day and saw wounded students flooding in. On the second day of protests, police beat him and tossed him in a filthy cell for six hours before releasing him. The arrest made him a leader among other medical students, which eventually got him expelled.

He later enrolled in a private university as a political science major because it did not have a medical school and was a few classes short of finishing his degree when Ortega's government shut down the school, and a number of other private universities in February.

Rivera is now trying to continue his studies outside Nicaragua. Even with his asylum appointment eight years off, he said: "I've been calm about it because I know the quantity of Nicaraguans there are here and Costa Rica is a very small country."

CLP_PC_030104

Trump allies target DeSantis    Ted Lasso's last season?    Honda recall    March Madness news & results

U.S. News    World New

Xaviera Molina, 27, has already been granted asylum because she left Nicaragua in one of
the early waves in July 2018.

Molina, a marketing major, was a single mother at the time in the second year of her
degree track. She had never been involved in activism, but when students expanded the
protest against Ortega's government she got involved, first distributing food and then
helping provide medical care to wounded students.



N... n Xaviera Molina, center, who was granted asylum in Costa Rica, listens to Ruth Blass Lopez who is applying for
asy... at a diner that serves traditional Nicaraguan food ownd by a Nicaraguan asylum-seeker in San Jose, Costa Rica, Friday,
Aug. 26, 2022. (AP Photo/Moises Castillo)

CLP_PC_030105

Trump allies target DeSantis      Ted Lasso's last season?      Honda recall      March Madness news & results

throughout Nicaragua. Molina went into hiding and then decided she had to leave the

U.S. News      World New

Molina fled across the border to Costa Rica in July 2018, requested asylum and received it last October. She went 1 ½ years without seeing her daughter who remained with her parents in Nicaragua.

She said the process was slow, but she was able to work, opened her own catering business and brought her daughter to Costa Rica.

"I know people who have been here four years like me and they still haven't accepted that they have to stay," Molina said. "They still haven't bought a bed because they feel like at any moment they're going to go back."

This March, U.S. Homeland Security Secretary Alejandro Mayorkas met with officials in Costa Rica. The Biden administration was interested in seeing Costa Rica and Mexico, two countries with relatively robust asylum systems, continue taking as many asylum seekers as possible.

ADVERTISEMENT

In his State of the Union Address that month, Biden said, "We're securing commitments and supporting partners in South and Central America to host more refugees and secure their own borders."

...go Pérez, a spokesman for the U.N. High Commissioner for Refugees in Costa Rica, said that with the COVID-19 pandemic, Costa Rica's asylum system no longer "has the same capacity to absorb or integrate (asylum seekers), including in the labor market."

CLP_PC_030106

Trump allies target DeSantis    Ted Lasso's last season?    Honda recall    March Madness news & results

U.S. News    World New

process and finally how many are ultimately recognized," Nuñez said.

Now some worry that the years-long wait for an appointment is leading more Nicaraguans to look north -- to Mexico or the United States -- than at any point in their country's four-plus year political crisis.

Through July of this year, 5,335 Nicaraguans have sought asylum in Mexico, four times as many as all of 2021. In many cases, applying for asylum in Mexico is just a way for asylum seekers to reach the U.S. border.

ADVERTISEMENT



Last year, U.S. border agents encountered Nicaraguans more than 50,000 times at the southwest border. Through the first 10 months of the 2022 fiscal year, they have encountered Nicaraguans 134,000 times.

For most however, Costa Rica remains the top choice for Nicaraguans seeking safety, due ts proximity, familiarity and possible existing family ties.

CLP_PC_030107

Trump allies target DeSantis    Ted Lasso's last season?    Honda recall    March Madness news & results

U.S. News    World New



Nicaraguan Wilmer Ramos, sitting, shares corn tortillas with a teammate before they play in a preparation tournament before the start of the local baseball league at Sabana Park in San Jose, Costa Rica, Sunday, Aug. 28, 2022. The number of players for the local league in Costa Rica has increased since Nicaraguans began seeking asylum at the highest levels since their country's political crisis exploded in April 2018. (AP Photo/Moises Castillo)



CLP_PC_030108

Trump allies target DeSantis     Ted Lasso's last season?     Honda recall     March Madness news & results

U.S. News     World New



Nicaraguan baseball player for the local Mets team waits to bat in a preparation game against La Carpio ahead of baseball season at Sabana Park in San Jose, Costa Rica, Sunday, Aug. 28, 2022. (AP Photo/Moises Castillo)



CLP_PC_030109

Trump allies target DeSantis    Ted Lasso's last season?    Honda recall    March Madness news & results

U.S. News    World New



Nicaraguans hold a baseball tournament ahead of the regular season at Sabana Park in San Jose, Costa Rica, Sunday, Aug. 28, 2022. (AP Photo/Moises Castillo)

Still, it can be a difficult transition. Costa Rica is more expensive. Nicaraguans forced to flee quickly are not able to take much with them; professional certifications do not transfer; it takes time to determine what grade children should enter in a different education system.

Three months after applying for asylum, applicants can begin working legally. But many said that some employers do not recognize the government-issued card identifying them as asylum seekers. Others have managed to open small businesses, but say they are not eligible for loans.

CLP_PC_030110

Case 4:18-cv-06810-JST Document 169-9 Filed 06/05/23 Page 319 of 1030

U.S. News    World New

Rivera is trying to make the best of it. He founded an organization called Bridges for Nicaraguan Students, which aims to help exiled students find ways to continue their studies.

Soon Rivera will travel to Romania to resume his medical studies, but he doesn't plan to stop his political activism.

When he had decided to leave Nicaragua, Rivera remembers thinking: "I'm going to bother them more there, continue talking there, keep raising my voice there."



CLP_PC_030111



U.S. News    World New

A Nicaraguan family arrives to a Catholic church where the United Nations High Commissioner for Refugees (UNHCR) has set up a field office to assist people applying for asylum in San Jose, Costa Rica, Monday, Aug. 29, 2022. (AP Photo/Moises Castillo)

—

Sherman reported from Mexico City. AP videojournalist Berny Araya in San Jose contributed to this report.

ADVERTISEMENT



May Like                                                                    by Taboola

CLP_PC_030112



March 27, 2023
Submitted via: https://www.regulations.gov.

Daniel Delgado
Acting Director, Border and Immigration Policy
Office of Strategy, Policy, and Plans, U.S. Department of Homeland Security

Lauren Alder Reid
Assistant Director, Office of Policy,
Executive Office for Immigration Review, U.S. Department of Justice

Re: Comment on the Proposed Rule by the Department of Homeland Security (DHS) and the
Executive Office for Immigration Review (EOIR) on Circumvention of Lawful Pathways, CIS
No. 2736-22; Docket No: USCIS 2022-0016; A.G. Order No. 5605-2023

      I submit this comment as an historian of United States asylum law and procedures and as
Director for the Americas and Europe at Refugees International, an independent
non-governmental organization that advocates for lifesaving assistance, human rights, and
protection for displaced people. Over the past five years, I have published several academic
articles and research reports on the history of U.S. asylum law and policy, their relationship to
international law, and approaches to effectively sharing the responsibility to protect refugees. I
have witnessed and monitored access to asylum and protection pathways at the U.S.-Mexico
border and, with my colleagues at Refugees International and partner organizations, in other
countries in the region, including Colombia, Costa Rica, Guatemala, and Mexico.

In light of the tremendous numbers of forcibly displaced people in the hemisphere and around
the world, Refugees International supports the creation of additional legal pathways to the United
States as a supplement to—rather than as a substitute for—access to asylum at the U.S.-Mexico
border. U.S. and international refugee law require universal access to asylum and uniform
procedures for the consideration of asylum claims regardless of nationality and mode of transit or
entry, which also do not serve as proxies for the merits of claims. Denying eligibility for asylum
to those who transit other countries or enter between ports of entry not only will lead to
refoulement but also undermines the ability of other countries to handle the many asylum claims
they already have. Indeed, many of the features of the proposed rule undermine the rule's own
stated goals, and reveal that it will do more to undermine overall access to protection in the
Americas than bolster it. For these reasons, further elaborated below, Refugees International
urges the agencies to withdraw the proposed rule (hereafter referred to as NPRM).

    **1)  The Proposed Rule violates U.S. law.**

The United States acceded to the UN Protocol  to the 1951 Convention Relating to the Status of
Refugees in 1968 but, for the next dozen years, U.S. law did not comply with the Convention.

The United States lacked a clear procedure whereby people could seek asylum during exclusion proceedings and, if a person in deportation proceedings proved they would be persecuted for their political opinions if returned to their home country, the Attorney General could still deport the person as a matter of discretion. The Refugee Act of 1980 changed this.The law was intended not only to ensure that the United States abided by the Convention's prohibition on non-refoulement. As I have argued elsewhere and as has been recently affirmed in federal court, the Refugee Act of 1980 was also a Congressional mandate to create uniform procedures for the handling of asylum claims whether a person arrived at a land border or airport, whether a person did or did not have documentation, whether a person asked for asylum after crossing a land border without authorization or at a port or entry.[1] Congress did this because lack of uniformity in the handling of claims led, in the 1970s, to discrimination based on nationality and race. This will likewise be the effect of the proposed rule's barring of access to asylum to those who do not make use of a parole process or the CBP One app to make an appointment at a port of entry. Parole programs are only available to people from certain nationalities who have passports and sponsors in the United States and who have not recently entered unauthorized into Mexico or Panama. CBP One is not universally accessible—it is only available in a few languages to people with certain types of phones and wifi—and it is unclear how an asylum seeker would prove to an officer that they could not get an appointment using it so as to be eligible for asylum at the border. (It is also unclear how asylum seekers would prove to CBP officers that that they were facing an imminent threat of rape or were a victim of a severe form of trafficking to be excepted from ineligibility). This NPRM creates different rules for people at the southern border without documents and for people who arrive in airports with visas, reverting back to the lack of uniformity that existed before 1980. The NPRM insists that, despite establishing a broad presumption of ineligibility that will preclude access to the asylum system for many asylum seekers, it is compliant with the UN Refugee Convention because these asylum seekers would continue to be eligible for withholding of removal. But withholding of removal offers less robust protection and has a more onerous standard of proof than the "well founded fear" standard in the Convention. To comply with the Convention, the United States must have a uniform and fair procedure to determine eligibility for refugee status as defined in Article 1 of the Refugee Convention and incorporated in the 1980 Refugee Act.

When Congress amended the asylum statute in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), it reaffirmed its prior explicit authorization of access to asylum for anyone "who is physically present in the United States or who arrives in the United States," "whether or not" they arrive "at a designated port of arrival." In 1995, the year before passing IIRIRA, Congress considered and rejected an amendment which would have barred asylum to those who, "before arriving at the United States, passed through another country"—and even then, only if "the Secretary of State ha[d] identified [the transit country] as providing asylum or safe haven to refugees."[2] Instead, in IIRIRA Congress mandated that a person was barred from asylum eligibility when coming from a country with which the United States had a safe third country agreement or when the asylum seeker had been firmly resettled in a third country. 8 U.S.C. §1158(d)(5)(B) provides that the administration may not issue

---

[1] Brief of Amicus Curiae Refugees International and Yael Schacher, *Immigration Defenders Law Center et. al. v. Chad Wolf et. al.* (District Court for the Central District of California, 2020); Decision by Judge Bernal, *Immigration Defenders Law Center et. al. v. Mayorkas et. al.,* (District Court for the Central District of California, 2023).
[2] H.R. 2182, 104th Cong. § 1(a) (1995).

regulations that are inconsistent with these provisions. When the agencies promulgated regulations in 1997 to implement IIRIRA, they included the provision that an individual "asylum application may be denied in the discretion of the Attorney General if the alien can be removed to a third country which has offered resettlement and in which the alien would not face harm or persecution."[3]

The NPRM, at 88 Fed. Reg. 11735-11741, nonetheless argues that Congress gave the agencies the authority to presume ineligible for asylum all people who come to the southwest border after transiting through other countries where they have not been rejected for asylum and who ask for asylum after crossing between ports of entry or at a port of entry without a CBP One appointment. The NPRM does this by making a few unconvincing arguments. First it claims that the "text and the structure" of IIRIRA—namely that section 1158 splits asylum applications and eligibility into two subsections—indicate that Congress meant to have whole categories of asylum seekers apply for asylum for no purpose since they could never be granted asylum, i.e, Congress called for the creation of an application process to nowhere and wanted the agencies to spend their time rejecting applications by people ineligible for asylum. This argument not only, in the words of Judge Richard Paez, "borders on absurdity."[4] It also does not seem to be made in good faith given the emphasis throughout the NPRM on the need to improve the efficiency of the asylum system.

Indeed, the agencies also argue that, because they have the discretionary authority to consider transit through third countries and manner of entry in adjudicating *individual* asylum cases, Congress meant to give them the authority to do this "across a category of similarly situated" asylum seekers in the name of the "overall efficiency of the system" and to "encourage other countries in the region to share in the protection of migrants" (88 FR 11737). In administering the bars on asylum eligibility detailed in the NPRM, the agencies will not assess whether the individual asylum seeker could safely stay in a transit country and effectively secure protection there. They will not assess the merits of an individual asylum claim, but instead assume the claim is less meritorious because the claimant did not seek asylum in a transit country. (Even if, for example, the asylum seeker had a close relative in the United States.) This approach to asylum fundamentally clashes with the case-by-case asylum adjudication system delineated by Congress in the Refugee Act of 1980, IIRIRA, and the Real ID Act of 2005. Departure from this approach and authority to handle categories of asylum seekers in a certain way must be explicitly articulated by Congress, as it did in 1996 not only in establishing the one year asylum application filing deadline but also when it mandated that all people forced to abort a pregnancy or to undergo involuntary sterilization, or persecuted for failure or refusal to undergo such a procedure, would be considered to have been persecuted on account of political opinion.

---

[3] 62 Fed. Reg. 10342.
[4] "Explicitly authorizing a refugee to file an asylum application because he arrived between ports of entry and then summarily denying the application for the same reason borders on absurdity. The consequences of denial at the application or eligibility stage are, to a refugee, the same. Had Congress intended to allow DOJ and DHS to override this provision, it could have said so in…the statutory provisions governing asylum applications. And Congress signaled its desire that any eligibility limitations be consistent with application requirements; limitations promulgated under the eligibility subsection of the statute must be consistent with this section—meaning the entirety of section 1158—not just consistent with this subsection." (East Bay Sanctuary Covenant et. al. v. Biden et.al., 993 F.3d 640 (9th Circuit, 2021) 43-44.)

As discussed below, it is truly questionable whether the NPRM's utilitarian and foreign policy (rather than human rights) approach to asylum will lead, as is assumed in the NPRM, to increased overall access to protection in the hemisphere, to "increasing the percentage of meritorious claims that are considered" by the agencies, and (in some way not specified) to advancement of the "broader public interest" (88 Fed Reg 11737).

2) **The Proposed Rule does not accurately portray conditions for migrants and access to asylum in other countries in the region.**

Refugees International has done extensive recent reporting on the experiences of migrants in the Americas, especially in Peru, moving from Colombia to Panama through the Darien Gap, in Costa Rica, Guatemala, and Mexico. Though these countries have made commitments to humanely manage migration by signing the L.A. Declaration, migrants traveling through them over the past few months have experienced rising insecurity, xenophobia, and human-rights violating migration enforcement measures. Further, as former leaders of Costa Rica and Colombia have written, access to protection in other countries will only be undermined by the proposed rule's cutting off access to protection in the United States and sending asylum seekers into orbit throughout the hemisphere.[5] This proposed rule is shifting responsibility for protection to other countries that may just follow the United States' lead, leading to chain refoulement rather than increased protection.

The NPRM notes that every country in the hemisphere has seen large increases in migration and that countries like Colombia and Peru are hosts to millions of Venezuelans. It also asserts that imposition of Title 42 upon, and the creation of parole programs for, Venezuelans, Cubans, Haitians, and Nicaraguans, effectively reduced encounters at the U.S. border and "changed migratory patterns" (88 Fed. Reg. 11711). But, 50,000 migrants crossed the Darien Gap in January and February of 2023, five times the number in the first two months of 2022, and an increasing percentage of them were Haitians and Ecuadorans.[6] The NPRM lauds Ecuador and Peru for providing temporary permits to asylum seekers. But a lack of long-term integration and increasing political instability and insecurity there have made it harder for displaced people to access work and services there and has driven them to migrate, along with Peruvians and Ecuadorans as well.[7] None of these individuals, currently traveling through the Darien Gap and northward without visas, will be eligible to apply for parole programs.

The NPRM's assertion that Mexico "is the third highest recipient of asylum claims in the world" says nothing about how Mexico is handling these claims and whether it is a safe country to which to return asylum seekers (88 Fed. Reg. 11720). As the Refugees International report on the

---

[5] Juan Manuel Santos, "Time for the Americas tp step up (afain) on migration" *El Pais*, March 6, 2023, https://english.elpais.com/opinion/2023-03-06/time-for-the-americas-to-step-up-again-on-migration.html
Carlos Alvarado Quesada, "What Biden's deeply troubling asylum limit means for the economy," *The Hill*, March 8, 2023, https://thehill.com/opinion/immigration/3889578-what-bidens-deeply-troubling-asylum-limit-means-for-the-economy/

[6] Evan Dyer, "Migrant numbers at jungle crossing point to a record-breaking year for irregular migration in North America," CBC, March 19, 2023, https://www.cbc.ca/news/politics/migrants-panama-darien-gap-haiti-1.6783199
[2] https://efectococuyo.com/venezuela-migrante/la-incertidumbre-nunca-se-va-asi-viven-los-venezolanos-la-crisis-que-sacude-el-peru/

CLP_PC_030640

Mexican asylum system cited in the NPRM (footnote 147) points out, Mexico applies the Cartagena standard to some nationalities and not others, particularly Haitians who spent 2021 and 2022 in precarious limbo.[8] On several trips to Mexico over the last year, I have spoken to dozens of migrants (from El Salvador, Honduras, Haiti, Nicaragua and Venezuela) who have fallen prey to gang violence in Ciudad Juarez and Reynosa and to dozens of others who have been terribly mistreated by Mexican police and immigration authorities in many different parts of the country – from Tapachula to Coahuila. Xenophobia and anti-immigrant sentiment has only worsened in Mexico since U.S. Homeland Security Secretary Alejandro Mayorkas recognized the "extreme violence and insecurity" experienced by migrants and asylum seekers during the Remain in Mexico program.[9] Underfunded and already overwhelmed by asylum applications, the Mexican Commission for Refugee Assistance (COMAR) is worried about the impact of the new rule on the Mexican asylum system. Once the new regulation goes into effect, will thousands of asylum seekers put forward weak claims in Mexico in order to be rejected and so eligible for asylum in the United States?[10] What kind of documentation will Mexico immigration authorities give all the asylum seekers the United States will deport to Mexico via expedited removal? Will it be possible for them to formally work in Mexico, almost impossible for them to do now? Will Mexico bus these asylum seekers to the south or send them to their home countries as it has done with those expelled under Title 42? The United States making secret agreements with Mexico to accept deported Cubans, Haitians, Nicaraguans, and Venezuelans with no concern about what happens to them after deportation does not comply with the non-refoulement obligation of the UN Refugee Convention.

The NPRM lauds progress that Guatemala has made to improve its asylum system over the last two years. Having visited Guatemala with Refugees International colleagues and spoken to representatives of the UN Refugee Agency (UNHCR) and to migrants there in early 2020 and late 2022, I question the extent of this progress.[11] Salvadorans sent from the U.S. border under the previous administration's "asylum cooperative agreement" and Venezuelan families migrating northward in October 2022 could not find safety in Guatemala and were at risk of refoulement. Indeed, the rule of law situation in Guatemala has deteriorated over the last year, during which Guatemalan migration authorities barred 15,593 Venezuelans from entering from

[8]Yael Schacher and Rachel Schmidtke, "Pushed into the Shadows: Mexico's Reception of Haitian Migrants," Refugees International,  April 28, 2022,
https://www.refugeesinternational.org/reports/2022/4/25/pushed-into-the-shadows-mexicos-reception-of-haitian-migrants
[9]Termination of the Migrant Protection Protocols, October 29, 2021,
https://www.dhs.gov/sites/default/files/2022-01/21_1029_mpp-termination-memo.pdf
[10] Rosa Flores, "Mexico Rethinks asylum initiative after controversial U.S. announcement," CNN, Feb. 24, 2023,
https://www.cnn.com/2023/02/24/americas/mexico-asylum-policy-intl-latam/index.html; see also:
https://twitter.com/giolepri/status/1629874741204127745?s=48&t=bnPnoVLl6sJblKyIuK3Pgg
https://twitter.com/andresrsilva_/status/1629903734225481729?s=48&t=LCanSKQ_XTQAov0OGKsFeg
[11] Ariana Sawyer, Yael Schacher, and Rachel Schmidtke, "Deportation with a Layover: Failure of Protection under the U.S.-Guatemala Asylum Cooperative Agreement," May 19, 2020,
https://www.refugeesinternational.org/reports/2020/5/8/deportation-with-a-layover-failure-of-protection-under-the-us-guatemala-asylum-cooperative-agreement
Rachel Schmitdke, " Pushbacks of Venezuelans on the Guatemalan Border,"  October 31, 2022, Refugees International,
https://www.refugeesinternational.org/reports/2022/10/31/refugees-international-eyewitness-pushbacks-of-venezuelans-on-the-guatemalan-border

CLP_PC_030641

Honduras.[12] Meanwhile, there are only 708 refugees and 1,472 asylum claims in Guatemala, where high level officials, including the Vice President, still need to approve every claim.[13]

The NPRM presents a very partial picture of the situation in Costa Rica, which, since November 2022, has been adopting stricter asylum and migration deterrence policies, pointing to U.S. policies as the reason for doing so.[14] The Costa Rican government issued a decree stipulating that, if an asylum seeker transited another country, their claim would be deemed inadmissible unless the asylum seeker had evidence of inability to apply.[15] Costa Rica also no longer automatically provides work permits to asylum seekers and requires that people apply for asylum within one month of arriving. These measures limit asylum seekers' right to work and push them into precarious working situations. According to Refugees International partner organization the Institute on LGBTQI Migration and Refuge for Central America, the decree ignores the different needs and socioeconomic realities of LGBTQI+ refugee applicants and has been accompanied with a resurgence of xenophobic and discriminatory discourse about migrants and asylum seekers.[16]

### 3) The Proposed Rule is premised on assumptions and minimal proof.

The NPRM argues it must make migrants arriving at the border ineligible for asylum because most of those who pass credible fear screenings and who cross between ports of entry mostly do not have meritorious claims. No data is provided by the NPRM to prove the latter. The statistics cited in the NPRM (https://www.justice.gov/eoir/page/file/1062976/download) only show that there is a backlog of claims; that of adjudicated claims, the asylum grant rate is higher than the denial rate; and that the rate of people who have failed to apply for asylum after passing credible fear has halved since 2013. There is no system in place to ensure that those who arrive in the United States through the parole programs or through CBP One have credible asylum claims, let alone that they are more likely to be granted asylum on the merits. Simply making people who cross between ports of entry ineligible for asylum will not raise asylum grant rates or even necessarily lessen the work of the immigration courts and asylum office, which, as the NPRM concedes, will still need to spend "significant additional time" assessing whether claimants meet the three exceptions to presumed ineligibility and, if not, the reasonable fear standard (88 Fed. Reg. 11744). A surer way to close the gap between those who pass credible fear and those granted asylum would be to provide asylum seekers access to counsel and to clarify the standard

---

[12] Roman Gressier, "Guatemala, Crossroads of the Venezuelan Exodus, El Faro, Feb. 27, 2023, https://elfaro.net/en/202302/centroamerica/26709/Guatemala-Crossroads-of-the-Venezuelan-Exodus.htm
[13] https://data.unhcr.org/fr/documents/details/96323
[14] Alonso Martínez, "Rodrigo Chaves: Costa Rica cambiará reglas para pedir asilo político por falta de ayuda internacional" [Rodrigo Chaves: Costa Rica to change rules for requesting political asylum due to lack of international aid], *Delfino*, November 16, 2022, https://delfino.cr/2022/11/rodrigo-chaves-costa-rica-cambiara-reglas-para-pedir-asilo-politico-por-falta-de-ayuda-internacional.
[15] http://www.pgrweb.go.cr/scij/Busqueda/Normativa/Normas/nrm_texto_completo.aspx?param1=NRTC&param2=1&nValor1=1&nValor2=98356&nValor3=133735&strTipM=TC&lResultado=2&nValor4=1&strSelect=sel
[16] Statement From IRCA CASABIERTA and Refugees International Regarding the Recent Executive Decrees 43809-Mgp/43810-Mgp, December 28, 2022, https://www.refugeesinternational.org/reports/2022/12/28/statement-from-irca-casabierta-and-refugees-international-regarding-the-recent-executive-decrees-43809-mgp43810-mgp

that should be used to adjudicate claims of persecution based upon membership in a particular social group. The best way to reduce the fiscal strain on states and localities receiving asylum seekers is to more promptly authorize asylum seekers to work so that they can support themselves and pay taxes. It is also worth pointing out that the average time it takes to adjudicate asylum claims—4 years—is identical to the average time it takes for the United States to process refugees through the United States Refugee Admissions Program. To make refugee adjudication fairer and faster, the United States must clarify and make uniform the standards it uses to adjudicate claims and invest in increased staffing and other resources for adjudication.

The proposed rule's primary goal is to address a predicted surge in migrants at the border in the spring of 2023 and to combat reliance on smuggling. The rule assumes that, in the spring of 2023, the existence of legal pathways will keep encounters low. But, as mentioned above, legal pathways are not available to all asylum seekers. The demand for CBP One appointments vastly outstrips supply and, as of February 2023, Refugees International's discussions with port officers and migrants in El Paso indicated that sending advance information to CBP through the app did not increase processing speed through ports of entry. If the legal pathways could sufficiently and less expensively serve all those who need to seek asylum, there would be no need to bar asylum seeking between ports of entry as no asylum seeker would pay a smuggler for what was so readily accessible and less dangerous. The "stick" of the bar not only penalizes asylum seekers in a way that is contrary to U.S. and international law but also betrays the reality that the legal pathways are not, in fact, true substitutes for access to asylum at the border. For Ukrainians, the United States offered only carrots, but for the mostly Black and brown asylum seekers at the border, carrots and sticks.

Last, the proposed rule claims it will not separate families. But the NPRM exempts unaccompanied minors and not their families from presumed ineligibility for asylum if they cross between ports of entry. Limiting those fleeing harm to withholding of removal or Convention Against Torture (CAT) protection will result in family separation because neither of these forms of protection provide derivative status. If only one member of a family is granted withholding or CAT, the rest of the family will be ordered removed or will be unable to come to the United States.

Overall, the NPRM re-orients the processing of asylum claims at the southwest border away from a uniform approach geared to providing refuge to individuals that meet the asylum standard. The regulation will have a disparate impact on certain nationalities and minorities and does the opposite of leading by humanitarian example in the hemisphere. Refugees International, like many Americans, believes the public interest is best served when the United States adheres to its own and international refugee law and champions human rights. For these reasons, Refugees International recommends that the rule be withdrawn.

Yael Schacher
Director for the Americas and Europe
Refugees International
yael@refugeesinternational.org

# PUBLIC SUBMISSION

**As of:** May 08, 2023
**Received:** March 27, 2023
**Status:** Posted
**Posted:** March 29, 2023
**Tracking No.** lfr-d1te-2rku
**Comments Due:** March 27, 2023
**Submission Type:** Web

**Docket:** USCIS-2022-0016
Circumvention of Lawful Pathways

**Comment On:** USCIS-2022-0016-0001
Circumvention of Lawful Pathways

**Document:** USCIS-2022-0016-12310
Comment Submitted by FWD.us

---

## Submitter Information

**Email:** andrew@fwd.us
**Organization:** FWD.us

---

## General Comment

FWD.us respectfully submits the attached public comment. In summary, FWD.us believes this proposed policy, which would effectively deny the vast majority of people seeking safety at our borders from applying for asylum—even though it is their legal right under U.S. and international law—is dangerous, inhumane, and antithetical to U.S. immigration policy, and to our principles as a nation, and we urge the administration to withdraw the proposal. Please refer to the PDF attachment for our full comment.

---

## Attachments

FWD.us Public Comment re__Circumvention of Lawful Pathways_ NPRM - FINAL

CLP_PC_030665



---

March 27, 2023

*Submitted via www.regulations.gov*

Daniel Delgado
Acting Director, Border and Immigration Policy, Office of Strategy, Policy, and Plans
U.S. Department of Homeland Security
5900 Capital Gateway Drive
Camp Springs, MD 20746

Lauren Alder Reid
Assistant Director, Office of Policy
Executive Office for Immigration Review
Department of Justice
5107 Leesburg Pike
Falls Church, VA 22041

**Re:    Docket No. USCIS 2022-0016 and A.G. Order No. 5605–2023, "Circumvention of Lawful Pathways"**

Dear Acting Director Delgado, Assistant Director Reid, and all relevant parties:

FWD.us submits this response to the request of the Department of Homeland Security (DHS) and Department of Justice (DOJ) for comments on the respective notices of proposed rulemaking (NPRMs), "Circumvention of Lawful Pathways."

FWD.us represents a community of business leaders, policy experts, and advocates, including many individuals whose lives and futures are directly impacted by these policies, and we are dedicated to improving immigration laws, policies, and processes in the United States. We are an advocacy organization started by key leaders in the tech and business community who want to strengthen the United States through meaningful bipartisan immigration reform. We believe our country is stronger when all of us have the opportunity to live up to our full potential, which means ensuring that our nation's immigration laws and policies are administered effectively, and that legal immigration options are accessible to everyone who qualifies, including the legal right to apply for asylum.

FWD.us has spent the last decade advocating for immigration reform, and we have had the opportunity to work closely alongside many frontline organizers, service providers, allies, and directly-impacted individuals. Our team includes numerous policy and operations experts with invaluable experience working in government, advocacy and organizing, research, policy, and direct service in support of immigrant communities. Organizationally, FWD.us has worked closely on resourcing frontline organizations[1] to direct funding and resources to support organizations serving individuals and families impacted by the brutal "zero tolerance" and family separation policies.

FWD.us has also published original research and storytelling about the impact of disastrous asylum policies implemented by the previous administration. In 2020, we published a report detailing the deep and long lasting harm of the Trump Administration's anti-immigrant policies[2], and in 2021 we partnered with the National Immigrant Justice Center to document the far-reaching harm of illegal externalization and offshoring practices among affluent nations throughout the world, which prevented countless people from reaching their borders to seek safety and asylum.[3] Throughout, we have worked closely with fearless directly impacted individuals who have bravely shared their stories, illustrating how human lives are devastated—and too often lost—to these harmful policies.[4]

We have also done extensive research on the critical contributions immigrants, including individuals seeking asylum, make to the United States, including to our economy and our workforce. For example, FWD.us analysis shows[5] that individuals in the asylum process who are working with employment authorization contribute about $11 billion to the economy each year, along with $2 billion in federal, state, and local taxes, and are helping fill open jobs in a workforce struggling with persistent labor shortages, which helps reduce inflationary pressures.[6]

All of this work helps FWD.us understand the importance of robust legal pathways and accessible humanitarian pathways for individuals and families to be able to seek safety, relief, and protection in the United States. It also makes clear to us that this proposed policy, which would effectively deny the vast majority of people seeking safety at our borders from applying for asylum—even though it is their legal right under U.S. and international law—is dangerous, inhumane, and antithetical to U.S. immigration policy, and to our principles as a nation.

---

[1] "FWD.us Education Fund Launches National Dignity for Families Fund," May 18, 2021, FWD.us; https://www.fwd.us/news/fwd-us-education-fund-launches-national-dignity-for-families-fund.
[2] "Tearing Families Apart: The Impact of Trump's Immigration Agenda," September 29, 2020, FWD.us; https://www.fwd.us/news/the-impact-of-trumps-immigration-agenda.
[3] "Pushing Back Protection: How Offshoring and Externalization Imperil the Right to Asylum," August 3, 2021; National Immigrant Justice Center and FWD.us; https://www.fwd.us/news/offshoring-asylum.
[4] For example: "A Family Separated at the Border Fighting to Stay Together," April 14, 2021, FWD.us; https://www.fwd.us/news/family-separated-mpp.
[5] "Pathways to Citizenship," FWD.us, June 14, 2021, https://www.fwd.us/news/pathway-to-citizenship.
[6] "Improving Immigration to Reduce Inflation," FWD.us, https://www.fwd.us/news/immigration-inflation.

CLP_PC_030667

We understand that the administration claims the rule is justified because "the number of migrants expected to travel without authorization to the United States" following the lifting of the Title 42 public health order "is expected to increase significantly, to a level that risks undermining the Departments'' continued ability to safely, effectively, and humanely enforce and administer U.S. immigration law, including the asylum system…" However, we do not believe this proposed solution will solve those challenges, and we believe it would in fact greatly infringe on human rights and in fact drive up unauthorized entries, while causing more chaos and human suffering.

**Rather than this sort of large scale disqualification measure, the United States should create a modern system of Western Hemisphere migration—built upon new, working, safe, and legal immigration avenues. That means building a refugee and parole system for the Western Hemisphere where people can apply while in their countries of origin, avenues so that people can come temporarily to work or for longer term employment, and clearing green card backlogs so that people can reunite with family who are citizens and residents.**

We respectfully submit this comment in strong opposition to the proposed rule, and urge the administration to abandon this proposal; or, if it is committed to forcing the policy onward, to include additional exceptions and accommodations that will help shield the most vulnerable populations from the chaos and suffering this proposal would all but certainly create.

1.  **The NPRM contradicts the letter and spirit of the United States' longstanding refugee policies and international agreements**

Immigration law in the United States explicitly defines who qualifies as a refugee, including individuals eligible to apply for asylum, and the process for doing so. These laws build on international agreement  about the rights and treatment of refugees, which have been in place for more than 50 years. We believe the NPRM proposes a policy that directly contradicts a plain reading of these foundational agreements and the U.S. laws that carry them out.

The United States' commitment to accepting and welcoming refugees and people seeking asylum is anchored by long-standing international agreements established in the aftermath of World War II, when the international community came together to agree on the principle that safe countries had a responsibility to offer refuge to—and should not turn away—people fleeing extreme violence and oppression. Notably, this included Jewish refugees fleeing the atrocities of the Holocaust, many of whom *were* turned away prior to the existence of these agreements, forcing them back to territories where they faced near-certain death. In 1951, the United Nations adopted the Convention Relating to the Status of Refugees,[7] which included a detailed set of agreements describing the rights held by refugees and the responsibilities of how other countries must treat

---

[7] "Convention and Protocol Relating to the Status of Refugees," UNHCR; https://www.unhcr.org/en-us/3b66c2aa10.

them. The only amendment to this agreement was the passage of the 1967 Protocol,[8] which the United States became party to and that clarified that there were no time or geographic restrictions on who qualifies as a refugee. Today, almost 150 countries are party to the Convention or its 1967 Protocol.[9]

For the United States, this treaty constituted a deliberate departure from the exclusionary immigration policies the U.S. had maintained through World War II. Specifically, the Immigration Act of 1924[10] formalized entry bans on the basis of nationality and imposed new quotas—and bans—on immigration from certain countries. Further, in the years that followed, the United States closed its doors to hundreds of thousands of Jewish refugees fleeing the horrors of the Holocaust.[11] Tragically, the U.S. even went so far as to turn away Jewish children, families, and adults arriving at our borders because they were ostensibly perceived as a threat.[12] The United States' approval of the UN Convention was a commitment to move away from these dangerous externalization policies that pushed refugees to their deaths; that commitment formed the basis for Congress to pass multiple pieces of legislation related to the humane and proper treatment of refugees[13] in the years that followed, including the Refugee Act of 1980, which clarified the process by which the U.S. accepted people seeking refuge, and increased the annual number of refugee admissions. [14]

*The NPRM would violate the three core principles of long-standing international agreements on refugee rights and processes*

At minimum, the proposed asylum ban would infringe on the rights of refugees as detailed in the 1951 agreement, its 1967 Protocol, and the United States' Refugee Act of 1980. Without question, this proposal undermines the spirit of what the international community and the United States itself affirmed in these historic agreements.

---

[8] "Convention and Protocol Relating to the Status of Refugees."

[9] "The 1951 Refugee Convention," UNHCR; https://www.unhcr.org/en-us/1951-refugee-convention.html.

[10] "Historical Highlights: The Immigration Act of 1924," United States House of Representatives; https://history.house.gov/Historical-Highlights/1901-1950/The-Immigration-Act-of-1924.

[11] "How Many Refugees Came to the United States from 1933-1945?," United States Holocaust Museum; https://exhibitions.ushmm.org/americans-and-the-holocaust/how-many-refugees-came-to-the-united-states-from-1933-1945.

[12] "Voyage of the St. Louis," United States Holocaust Museum, https://encyclopedia.ushmm.org/content/en/article/voyage-of-the-st-louis; Daniel A. Gross, "The U.S. Government Turned Away Thousands of Jewish Refugees, Fearing That They Were Nazi Spies," November 18. 2015, *Smithsonian Magazine*, https://www.smithsonianmag.com/history/us-government-turned-away-thousands-jewish-refugees-fearing-they-were-nazi-spies-180957324; Sarah Stillman, "When Deportation is a Death Sentence," January 15, 2018, *The New Yorker*, https://www.newyorker.com/magazine/2018/01/15/when-deportation-is-a-death-sentence.

[13] "Refugee Timeline," U.S. Citizenship and Immigration Services; https://www.uscis.gov/about-us/our-history/history-office-and-library/featured-stories-from-the-uscis-history-office-and-library/refugee-timeline.

[14] "Refugee Act of 1980," 1980, Pub. L. 96-212, https://www.govinfo.gov/content/pkg/STATUTE-94/pdf/STATUTE-94-Pg102.pdf.

CLP_PC_030669

In an introductory note to the Convention published in 2010, the Office of the United Nations High Commissioner for Refugees (UNHCR) explains that the Convention is "both a status and rights-based instrument and is underpinned by a number of fundamental principles, most notably **non-discrimination, non-penalization and non-refoulement**."[15] If implemented, the proposed asylum ban would directly contradict these principles.

The principle of non-discrimination should ensure that access to the asylum process is uniform, regardless of the applicant. However, the proposed asylum ban introduces a number of discriminatory factors:

For one, the ban is only being applied to individuals arriving at the southern U.S. border, so it would be applied disproportionately to certain individuals arriving from certain countries, which is in itself inherently discriminatory. The policy applies a second layer of discrimination by explicitly applying the ban if people seeking asylum have not "avail[ed] themselves of lawful, safe, and orderly pathways into the United States," when many of the existing avenues described in the NPRM clearly restrict individuals coming from specific countries from utilizing them.

Further, requiring applicants to register for appointments through the CBP One mobile application discriminatorily restricts access only to individuals who have a compatible computer device and access to reliable internet within range of the U.S. southern border. It disadvantages individuals who are not fluent in the few languages the app supports, family units who have more information to fill out and are therefore much less likely to secure an appointment slot, and, very notably, people whose skin color is too dark to be recognized by the app's detection technology, to name only a few.[16]

The policy described in the NPRM would also violate the 1951 Refugee Convention's principle of non-punishment. The Convention prescribes that:

> *The Contracting States shall not impose penalties, on account of their illegal entry or presence, on refugees who, coming directly from a territory where their life or freedom was threatened in the sense of article 1, enter or are present in their territory without authorization, provided they present themselves without delay to the authorities and show good cause for their illegal entry or presence.*[17]

---

[15] "Convention and Protocol Relating to the Status of Refugees.".
[16] See, for example, a letter sent from Senator Markey to the leadership of the Department of Homeland Security on February 21, 2023, detailing the application's discriminatory impacts and urging the agency to abandon or revise its requirements for the app's usage.
https://www.markey.senate.gov/imo/media/doc/senator_markey_letter_to_dhs_on_cbp_one_app_-_february_2023.pdf.
[17] "Convention and Protocol Relating to the Status of Refugees."

5

In fact, this proposed policy would explicitly contradict this provision in the Convention by prohibiting individuals from applying for asylum based solely on account of how they arrived to the U.S. (e.g., arriving at the southern border after traveling through another country, by not availing themselves of the CBP One app, etc.), even before any consideration of the specifics of their claim. And, if they are apprehended between ports of entry and do not qualify for an exception, the new policy would actively impose penalties on people just for trying to apply for asylum; individuals who are removed under expedited removal are generally prohibited from reentering the United States, even through legal channels, for at least five years.[18] So individuals who are seeking asylum who present themselves to authorities and make claims of credible fear will be denied and punished, solely on account of their "illegal entry or presence"—an obvious violation of the Convention.

We are gravely concerned that this proposal would also violate the principle of "non-refoulement" by forcing vulnerable people to return to places where their lives and freedom would be endangered. The Convention states, "no Contracting State shall expel or return ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." However, the proposed asylum ban would directly return individuals to unsafe conditions, and potentially the very country and similar if not the same conditions from which they fled. And because the NPRM describes a process in which the "presumption of ineligibility" is applied *before* an individual can make their claim of credible fear, based solely on *how* they arrived and made their claim, their removal would be ordered without full consideration of the conditions they are trying to escape or the danger they may face if returned. In the very least, this expedited and restricted process greatly increases the chances that vulnerable people will be returned to life-threatening danger.

*United States immigration law is inarguably clear about the right and eligibility to apply for asylum*

U.S. immigration law includes an explicit definition of who is eligible to apply for asylum in the United States. The first subsection of 8 USC 1158 is titled "Authority to Apply for Asylum," and states:

> *Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United*

---

[18] 8 USC 1182(a)(9)(A),
https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1182&num=0&edition=prelim.

CLP_PC_030671

> *States waters), irrespective of such alien's status, may apply for asylum in accordance*
> *with this section or, where applicable, section 1225(b) of this title.[19]*

There are some exceptions[20], but **none** of these exceptions is related to the *manner* in which an individual arrives to the United States, or where they make their claim. In fact, the very first words of the statute affirm that "any individual who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival)..." is eligible to apply.

The proposed policy would significantly narrow and restrict the eligibility criteria beyond what Congress established, a fact that is obscured by the "presumption" concept described in the NPRM. The NPRM describes how the new policy would impose a "presumption of ineligibility" on individuals seeking asylum if the individuals did not use certain procedures to apply for asylum. This suggests that the *manner* in which an individual seeks asylum might indicate that they are *likely* to be ineligible for asylum.

But of course the approved manners for applying that are detailed in this proposal are not related in any way to existing eligibility criteria for asylum. Nothing in the existing immigration statute *requires* individuals to make an appointment at a port of entry, or to apply and be denied in a country on the way to the U.S. And in fact, those laws *explicitly* authorize individuals to apply even if they are in the U.S. without authorization. So there is no reason a border officer should "presume" that an individual is "ineligible" for asylum merely because they did not make that appointment.

In this way, the proposal would create new, additional eligibility requirements for asylum, beyond what Congress has defined, and *then* assign a presumption of ineligibility based on the new requirements it has established.

The contradiction between U.S. and international law is obvious in a plain reading of the agreements and the law, and for those reasons we urge the administration to abandon this proposal.[21]

---

[19] 8 USC 1158, https://uscode.house.gov/view.xhtml?req=granuleid%3AUSC-prelim-title8-section1158&num=0&edition=prelim.

[20] Including for individuals who can safely be removed to another country or has firmly resettled in another country, who wait more than one year to file an application, or if they have had a previous asylum application denied, along with specific prohibitions for individuals convicted of or suspected to have committed certain crimes, or who might be a danger to the United States.

[21] While the statute does say that "The Attorney General shall establish a procedure for the consideration of asylum applications filed under subsection (a)," this is explicitly limited to asylum applications filed under the broad description of individuals who have the "authority to apply for asylum" under subsection (a), which describes "Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status." However, the new policy does not follow

2.  **The NPRM directly undermines its own intended goal of establishing order and lawful processes**

The NPRM opens with a detailed explanation of shifting migration trends, with particular emphasis on the increasing number of individuals arriving at the southern U.S. border who subsequently file an application for asylum. DHS argues that this proposed rule is needed because "such a high rate of migration risks overwhelming the Departments' ability to effectively process, detain, and remove, as appropriate, the migrants encountered." The proposal goes on to explain that the proposed rule would "account for the lawful, safe, and orderly means for noncitizens to enter the United States to seek asylum and other forms of protection."

However, it is clear that the outcome of the proposed rule will only be to reduce the number of people who are actually able to apply for asylum in the first place. In the executive summary, the NPRM laments that, "in the absence of policy changes included in the proposed rule, most people processed for expedited removal under Title 8 will likely establish credible fear and remain in the United States for the foreseeable future despite the fact that many of them will not ultimately be granted asylum."

The problem, as the NPRM states it, is that too many people *will qualify* to apply for asylum—so the solution appears to be to simply disqualify them from applying in the first place.

This appears to be a badly misguided calculation that order will somehow emerge on its own if fewer people are allowed to seek protection in the first place—there is no affirmative step to establish process or promote order. History has not borne this out; the proposed asylum ban represents the embodiment of a deterrence-only solution.

In fact, the proposed rule imposes new limitations on existing avenues that will likely create *more* chaos and suffering at the border and beyond. For example, the NPRM requires the presumption of ineligibility be applied to an individual if they traveled through other countries without completing a full asylum process on their way to the U.S. border. Fulfilling this requirement would be impossible in many cases, and in attempting to do so, vulnerable asylum seekers would be forced to expose themselves and their families to dangerous conditions, abuse, and harm. The truth is that there is often no realistic way for people to have even had the opportunity to request safe and legal protections in countries along the migratory route. Many nations through which asylum seekers are forced to travel have governments that are themselves responsible for, or complicit in, widespread human rights violations against people seeking asylum. Neighboring countries throughout the region often do not have anywhere near the

---

from subsection (a), but instead *limits* subsection (a), adding additional restrictions on who has the authority to apply for asylum. 8 USC 1158(b)(1)(A).

capacity, including the staff and resources,[22] to provide adequate protections in line with what is required under international law and pre-existing agreements. Discriminating against people seeking asylum who could not do so in countries along their journey to the U.S. is a draconian and cruel policy, and this terrible burden will fall disproportionately on Black, Brown, and Indigenous people, exacerbating existing racial disparities and compounding a long history of racist treatment baked into the U.S.' immigration policies.

If they manage to make it to the U.S. border, the proposed rule would require individuals who want to enter the U.S. to apply for asylum to secure an appointment at a port of entry using the CBP One app. However, examples and analysis of CBP One's current usage show its serious limitations and the very real consequences that these limitations already have for individuals trying to apply for relief. For one, the number of appointments available are extremely limited, with some ports offering only a few dozen appointments each day, while thousands of individuals wait in unsafe conditions for a chance to apply.[23] Requiring all applicants to register on CBP One, and forcing them to wait outside the U.S. until their appointment, is essentially reinstating the "metering" policy[24]—which a district court deemed illegal in 2021—that had required individuals seeking asylum to remain in Mexico until they had reached their turn on a waiting list to enter and apply.[25] The CBP One application process only changes the mode from paper waiting lists to a mobile app, but it is still very clearly an attempt to institute metering.

The CBP One application also faces numerous limitations and challenges that raise serious concerns about whether it is finished, functioning, and fully adequate to handle the magnitude of the task assigned to it, and to capably manage the constant volume of thousands of requests from people seeking asylum who must attempt to use it, likely while in desperate circumstances. Journalists and advocates have documented a plethora of issues facing individuals who are currently attempting to use CBP One to secure appointments at the border.[26] Problems include

---

[22] "Cruelty, Coercion, and Legal Conditions: The Trump Administration's Unsafe Asylum Cooperative Agreements with Guatemala, Honduras, and El Salvador," January 18, 2021, https://www.foreign.senate.gov/imo/media/doc/Cruelty,%20Coercion,%20and%20Legal%20Contortions%20--%20SFRC%20Democratic%20Staff%20Report.pdf.

[23] Stephanie Leutert and Caitlyn Yates, "Asylum Processing at the U.S.-Mexico Border: February 2023," Strauss Center for International Security and Law, University of Texas at Austin; https://www.strausscenter.org/wp-content/uploads/Feb_2023_Asylum_Processing.pdf.

[24] The Obama Administration first utilized metering to control the arrivals of Haitians requesting asylum at the southern border; the scope and usage of the practice was significantly expanded under the Trump Administration. See "Pushing Back Protection: How Offshoring and Externalization Imperil the Right to Asylum."

[25] "The Department of Homeland Security's 'Metering' Policy: Legal Issues," Congressional Research Service, March 8, 2022; https://crsreports.congress.gov/product/pdf/LSB/LSB10295.

[26] See, for example, Melissa Del Bosque, "Facial recognition bias frustrates Black asylum applicants to US, advocates say," February 8, 2023, *The Guardian*, https://www.theguardian.com/us-news/2023/feb/08/us-immigration-cbp-one-app-facial-recognition-bias; Santiago Caicedo, "Migrant families continue struggling with CBP One app registration," February 16, 2023, *KRGV*, https://www.krgv.com/news/migrant-families-continue-struggling-with-cbp-one-app-registration; Arelis R. Hernández, "Desperate migrants seeking asylum face a new hurdle: Technology," March 11, 2023, *The Washington Post*, https://www.nytimes.com/2023/03/10/us/politics/migrants-asylum-biden-mexico.html; Miriam Jordan, "Biden

technical issues like freezing and glitches, as well as accessibility issues like limited language availability and the app's continued failures to properly identify children and people with darker skin tones, resulting in a particularly harmful impact on Black asylum seekers.[27]

The CBP One app also has the capability to use geolocation to determine where an individual is located when accessing the app. If this geolocation prevents individuals from making appointments until they are within a certain distance from the U.S. border, they will have no choice but to make the dangerous journey to the United States before they can even begin the 'lawful' process.[28]

All of these restrictions only address when and where individuals are able to file their applications; they do nothing to ensure there is a safe, legal avenue that would allow them to bypass the journey to the southern U.S. border, nor does it do anything to create humane and orderly conditions for them while they wait to apply, nor does it address the logistical limitations that prevent immigration officials from effectively processing asylum-seekers at ports of entry today.[29] While the policy might falsely allow the administration to claim there is "order" at ports of entry by keeping large numbers of people beyond U.S. borders, the reality will certainly be more chaos and human suffering among people who are pursuing their legal right to seek asylum.

3.   **The NPRM will expose people seeking protection, including families, to separation, abuse, and harm**

The well-documented brutal and often deadly consequences of metering, as well as other externalization programs[30] (like the Migrant Protection Protocols), make evident the kind of chaos and harm that replicating those policies would create.[31]

---

Administration Announces New Border Crackdown," February 21, 2023, *The New York Times*, https://www.nytimes.com/2023/02/21/us/biden-asylum-rules.html; Jack Herrera, "Fleeing for Your Life? There's An App for That," March 2, 2023, *Texas Monthly,*
https://www.texasmonthly.com/news-politics/cbp-app-asylum-biden-administration; Adam Shaw, "Biden administration's 'CBP One' app to manage migration plagued by low store ratings, tech issues," March 2, 2023, *Fox News*,
https://www.foxnews.com/politics/biden-administrations-cbp-one-app-to-manage-migration-plagued-by-low-store-ratings-tech-issues;
[27] Melissa Del Bosque,"Facial recognition bias frustrates Black asylum applicants to US, advocates say."
[28] According to a CBP fact sheet, the app is currently only accessible for individuals "in Central and Northern Mexico." "Fact Sheet: Using CBP One™ to Schedule an Appointment," CBP,
https://www.cbp.gov/sites/default/files/assets/documents/2023-Jan/CBP%20One%20Fact%20Sheet_English_0.pdf.
[29] For more, see "What Does a Secure Border Look Like?", December 27, 2022, the American Immigration Lawyers Association, https://www.aila.org/advo-media/aila-policy-briefs/policy-brief-what-does-a-secure-border-look-like.
[30] For more, see "Pushing Back Protection: How Offshoring and Externalization Imperil the Right to Asylum," August 3, 2021, National Immigrant Justice Center and FWD.us, https://www.fwd.us/news/offshoring-asylum.
[31] "U.S. Asylum and Border Policies Resulting in Human Rights Violations," March 1, 2022, Human Rights First, https://humanrightsfirst.org/library/u-s-asylum-and-border-policies-resulting-in-human-rights-violations. For a

While the NPRM claims the new requirements would "reduc[e] reliance on human smuggling networks that exploit migrants for financial gain," the new limitations on access to asylum could actually benefit smugglers by increasing demand for their services.

Immigration policy experts have long argued that expanding safe and legal immigration avenues can reduce incentives for individuals to enter the U.S. without authorization, and that the inverse is also true: restricting legal immigration avenues will almost certainly contribute to more unauthorized migration.[32] In fact, the proposed rule establishes itself on this same presumption, arguing that providing "lawful, safe, and orderly pathways into the United States" would reduce incentives to rely on smugglers to enter the U.S. without authorization. But this proposal posits a harmful deterrence-only approach that merely restricts access to existing lawful pathways, and which imposes harsh penalties on individuals who do not apply the way the government prefers.

If vulnerable people seeking protection are unable to access the existing legal avenue to apply at a port of entry—because they did not previously apply for asylum, or they cannot secure an appointment on the app—they are likely to turn to "coyotes" and smugglers to help them enter the U.S. *in between* ports of entry. During the Trump Administration, as their new deterrence-only policies were rolled out, the share of apprehensions made in between ports of entry increased.[33] On the other hand, as the proposed rule painstakingly details, the creation of new, additional, expanded pathways for certain populations (e.g. Ukrainians, Venezuelans, etc.) has led to decreases in the number of individuals from those countries who are encountered in between ports of entry.

Alarmingly, these restrictive policies could also separate even more families if parents decide to send their children alone in the hopes of enabling their children to have a better chance of accessing the asylum process. Even though the NPRM states that DHS does not expect family separation to occur, journalists and advocates have documented that it has been happening already,[34] and the NPRM offers no explanation why this would not continue or how this would be alleviated if the process is expanded.

---

specific example, see "A family separated at the border fighting to stay together," April 14, 2021, FWD.us, https://www.fwd.us/news/family-separated-mpp.
[32] See, for example, Douglas S. Massey, Jorge Durand, and Karen A. Pren, "Why Border Enforcement Backfired," March 2016, *AJS*, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5049707/pdf/nihms787599.pdf; or David Bier, "Legal Immigration Will Resolve America's Real Border Problems," August 20, 2019, Cato Institute, https://www.cato.org/publications/policy-analysis/legal-immigration-will-resolve-americas-real-border-problems#introduction.
[33] FWD.us analysis of CBP data on Southwest Land Border Encounters, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters.
[34] Sandra Sanchez, "Parents sending migrant children alone across border into South Texas," February 16, 2023, *Border Report*, https://www.borderreport.com/immigration/parents-sending-migrant-children-alone-across-border-into-south-texas.

CLP_PC_030676

Individuals who attempt to navigate the proposed application process would likely be forced to wait in dangerous conditions in certain regions of Mexico where local challenges are compounded as they struggle to bear the burden created by U.S. policies. As noted above, there are currently far fewer appointment spots available at each port of entry than there are people waiting to enter. For example, local experts estimate that there are more than 10,000 individuals seeking relief waiting in cities in the Mexican state of Tamaulipas—a state for which the U.S. State Department has issued a "do not travel" warning, its highest advisory level, due to the risk of kidnapping and crime[35]—yet fewer than 400 CBP One appointments are being made available daily. This means that approximately 25 people are competing for every 1 appointment spot[36] in a region that the U.S. government formally notes has a "greater likelihood of life-threatening risks," and advises U.S. citizens to "leave as soon as it is safe to do so."

Policies that force people to wait in dangerous regions for months or even years for their opportunity to access protections drive widespread human rights abuses, including violence, kidnapping, and discrimination, and particularly so against Black, Brown, and Indigenous people. In a 2022 report, Human Rights First had tracked "1,544 publicly reported cases of kidnappings, murder, torture, rape and other violent attacks against people returned to Mexico" during the two years MPP was in use by the Trump Administration.[37]

Black migrants, refugees, and asylum seekers have faced uniquely and particularly dangerous and deadly conditions when subjected to dangerous policies like metering, the Migrant Protection Protocols, and Title 42. According to a shadow report[38] to the Committee on the Elimination of Racial Discrimination focused on anti-Black discrimination against non-U.S. citizens, Black asylum seekers trapped in Mexico because of policies just like those described in the NPRM "faced particular risks [due to their] their race and nationality, and were particularly targeted for violence, including kidnappings."

In this NPRM, the administration is proposing forcing thousands of people fleeing extreme violence and persecution, including children and families, to endure these conditions for months or even years.

**4.  Despite the NPRM's characterization, seeking asylum from within the United States is lawful**

---

[35] "Mexico Travel Advisory," October 5, 2022, U.S. Department of State,
https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/mexico-travel-advisory.html.
[36] "Asylum Processing at the U.S.-Mexico Border."
[37] "U.S. Asylum and Border Policies Resulting in Human Rights Violations."
[38] "Shadow Report to the Committee on the Elimination of Racial Discrimination," August 30, 2022, submitted by the Black Alliance for Just Immigration, Haitian Bridge Alliance, Human Rights First, the Refugee and Immigrant Center for Education and Legal Services, and Robert F. Kennedy Human Rights,
https://rfkhr.imgix.net/asset/US-Coalition_anti-Black-Discrimination-in-Immigration__CERD-Report_072222.pdf.

CLP_PC_030677

The title of the NPRM, "Circumvention of Lawful Pathways," establishes the characterization that individuals who are subject to the "presumption of ineligibility" have somehow ignored or attempted to bypass an existing, available lawful pathway for the relief they seek.

Of course, this directly contradicts the fact that applying for asylum, even after entering between ports of entry, **is lawful**. U.S. immigration law plainly states that individuals are eligible to apply for asylum "whether or not at a designated port of arrival" and "irrespective of such [individual's] status."[39]

The NPRM references the existence of numerous legal pathways, including the parole programs for Ukrainians, Venezuelans, and the new program for Cubans, Haitians, and Nicaraguans, as evidence that individuals have legal alternatives to seek relief. But these parole programs are relatively narrow in scope, and they are not a substitute for a fair and functioning asylum process open to *all* people seeking asylum. Only individuals from certain countries who have a sponsor in the U.S. and who have documentation and approval to travel to the U.S. can qualify, and there are numerical limits on the number of individuals admitted. Most asylum-seekers are not from these countries, and they would not meet the other strict eligibility requirements. Additionally, even for the asylum seekers from countries eligible for the parole pathways, the pathways do not account for the people who cannot access them for a variety of reasons, and specifically not for those whose lives are in immediate danger and who are forced to leave their home with a moment's notice. Surely, the U.S. cannot and should not punish people fleeing war, environmental disaster, political instability, persecution, and other extreme and life-threatening violence merely because they didn't have time to access this process.

The NPRM explains how the parole programs have paired dedicated pathways for those who qualify with consequences at the border for those who do not avail themselves of the new pathways. However, the obvious, critical distinction between these parole programs and the NPRM is that the proposed asylum ban does not establish or provide a safe and orderly alternative. Instead, the NPRM forces large numbers of people to arrive at the border before they can even begin to access the limited legal pathway, inevitably restricting access to most people for long periods of time.

The parole programs are also facing significant legal threats, and could be suspended by court order or administrative action at any time.[40] If that were to happen, it would further undermine

---

[39] 8 USC 1158(a),
https://uscode.house.gov/view.xhtml?req=granuleid%3AUSC-prelim-title8-section1158&num=0&edition=prelim.
[40] The recently announced CHNV parole programs have been challenged by 21 states who argue that the programs were improperly implemented and go beyond parole authority. See "Texas v. DHS (TX Parole) - District Court," Justice Action Center, https://litigationtracker.justiceactioncenter.org/cases/texas-v-dhs-tx-parole-district-court. Additionally, at the time we drafted our comment, a federal judge in Florida had ruled against the Biden Administration's use of parole and alternatives to detention for certain individuals arriving at the southern border.

the administration's argument that there exist sufficient legal channels to justify these kinds of limitations.

One inevitable and particularly shameful consequence of the proposed policy will be that more individuals who seek asylum without following the new, complicated procedures may end up barred from entering the U.S. for many years. <u>That's because individuals who cannot overcome the "presumption of ineligibility" will have their credible fear claims denied, and they will be subject to expedited removal.</u> One harmful consequence of expedited removal is that the individual is prohibited from entering the U.S.—even through legal channels—for at least five years.[41] This is a perverse punishment that will be imposed on vulnerable people whose only "crime" was not being able to make an appointment on an app.

### 5.   The NPRM contradicts President Biden's promises and policies on asylum

The administration should abandon this proposal because it contradicts the President's long-standing promises to build a more humane and orderly immigration system, as well as  the Administration's official policies on immigration.

As a candidate, President Biden directly criticized these exact policy approaches—many of which were pursued by then-President Trump's Administration—multiple times. For example, during one presidential debate, President Biden criticized President Trump's asylum policy, saying:

> *This is the first President in the history of the United States of America that anybody seeking asylum has to do it in another country. That's never happened before. That's never happened before in our country. You come to the United States and you make your case. That's how you seek asylum, based on the following premise, why I deserve it under American law. They're sitting in squalor on the other side of the river.[42]*

On his campaign website, President Biden sharply criticized the Trump Administration for "drastically restrict[ing] access to asylum in the U.S., including imposing additional restrictions on anyone traveling through Mexico or Guatemala," and for its metering policy, stating::

> *Trump's disastrous policy of "metering" — limiting the number of asylum applications accepted each day — forces people seeking asylum to wait on the streets in often*

---

Gary Fineout, "Federal judge, siding with Florida, blasts Biden administration on immigration," March 8, 2023, *Politico*, https://www.politico.com/news/2023/03/08/florida-immigration-desantis-moody-biden-00086153.
[41] 8 USC 1182(a)(9)(A).
[42] "Debate transcript: Trump, Biden final presidential debate moderated by Kristen Welker," October 23, 2020, *USA Today*, https://www.usatoday.com/story/news/politics/elections/2020/10/23/debate-transcript-trump-biden-final-presidential-debate-nashville/3740152001.

CLP_PC_030679

> *dangerous Mexican border towns for weeks before they are permitted to apply. It has*
> *created a horrifying ecosystem of violence and exploitation, with cartels kidnapping,*
> *violently assaulting, and extorting migrants.[43]*

Within his first month in office, President Biden issued an executive order to lay out his administration's vision for handling migration and asylum issues at the U.S.' southern border.[44] In the first section, the order describes "a multi-pronged approach toward managing migration throughout North and Central America that reflects the Nation's highest values," which would include steps to "enhance lawful pathways for migration to this country and [to] restore and strengthen our own asylum system, which has been badly damaged by policies enacted over the last 4 years that contravened our values and caused needless human suffering."

Unfortunately, the Biden Administration's proposed asylum ban would replicate the exact same policies that President Biden has previously so forcefully and accurately decried and promised many times to end.

6. **If the Biden Administration insists on pursuing this dangerous policy, it must work to mitigate harm and expand lawful avenues that would effectively relieve pressure on our asylum system**

Today there are nearly 90 million people forcibly displaced throughout the world, fleeing persecution and some of the most devastating wars and natural disasters of our time.[45] Despite new commitments and legislation established in the years following World War II, the United States has been increasingly implementing policies that restrict access to asylum and turn vulnerable people and families away from safety. Rather than continuing down this current path of expelling adults and children, and potentially deporting people to life-threatening danger, the United States should return to and uphold those laws and commitments, and lead other nations in fiercely protecting these human rights.

For all of the reasons outlined above, the Biden Administration should rescind the NPRM and lead by example to create a safe, orderly, and humane immigration system that can effectively deal with forced migration. The implementation of this proposal would be a disastrous misstep, causing great harm and infringing on human rights—including the U.S. and international right to

---

[43] "The Biden Plan for Securing Our Values as a Nation of Immigrants," JoeBiden.com, https://joebiden.com/immigration.
[44] "Executive Order on Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border," February 2, 2021, The White House, https://www.whitehouse.gov/briefing-room/presidential-actions/2021/02/02/executive-order-creating-a-comprehensive-regional-framework-to-address-the-causes-of-migration-to-manage-migration-throughout-north-and-central-america-and-to-provide-safe-and-orderly-processing/.
[45] "Figures at a Glance," June 16, 2022, UNHCR, https://www.unhcr.org/en-us/figures-at-a-glance.html.

CLP_PC_030680

seek asylum—with few, if any, benefits. We understand that the administration faces serious challenges at the southern border, but we also understand there are rights and principles—legal and moral—that cannot be compromised. The administration has obligations to Americans, to the international community, and to those seeking relief that it must uphold. This proposal would force the United States to violate those obligations, repeatedly and materially, and therefore it should be abandoned.

The U.S. cannot hope to capably implement humane, orderly asylum and migration policy through the lens of political crisis management. We should prioritize creating an orderly, humane, and effective system in the U.S. that sets an example for the rest of the world.

Rather than restricting access to the right to seek asylum, the Biden Administration should strive to deliver on the President's promises to create a safe, orderly, and humane immigration system that can effectively deal with the reality that thousands of people will be forced to flee violence and natural disasters to save their own lives and the lives of their children and families, and that many of them will inevitably arrive at the U.S.' southern border to seek relief. In addition to strengthening asylum processing at our borders, we need to build on, not undermine, successful safe and legal pathways for people to come to the United States for refuge, such as the parole pathways. Implementing smart migration policy also means utilizing executive authority, where appropriate, to increase protections for migrants, to boost capacity for the overburdened asylum and immigration court systems by ensuring adequate staff and resources, and to establish additional safe legal pathways so individuals seeking relief have genuine and meaningful alternatives to entering between ports of entry.

As the administration notes throughout this proposal, no single nation can provide a complete solution to the migration trends emerging in the Western Hemisphere. But we must recognize, too, that the United States of America has a unique legacy of welcoming and protecting people seeking safety, and as such, we have a singularly important role to play in offering a strong example to other countries. If America shuts its borders to vulnerable people, what should we expect our neighbors to do? The U.S. must lead in creating pathways and establishing order by creating real, accessible, legal processes.

**If the Biden Administration chooses to ignore the strong public outcry and implement this disastrous policy, we urge you to at least consider specific concerns submitted by experts, practitioners, service providers, and a broad swath of the American people during this comment process, and make significant changes to mitigate the harm of this rule and ensure that the most vulnerable people seeking relief are not subjected to its harshest penalties.**

We urge the administration to abandon the requirement that an individual have fully completed an asylum process in another country to be exempt from the presumption of ineligibility, and include additional exemptions for individuals who, in light of their circumstances and the conditions of the countries in which they traveled, were not able to or chose not to seek asylum in the countries through which they traveled (if, for example, they were not aware of their options, they were ineligible or unable to apply, they were in a vulnerable or dangerous situation while traveling through, no permanent humanitarian pathways exist in the country, etc).

We also strongly recommend making additional refinements to the language used to describe grounds for exceptions and rebuttals to the presumption of ineligibility, to ensure that individuals seeking asylum and asylum officers enforcing the proposed rule understand clearly exactly who is subject to this presumption.

For example, the administration should expand and clarify descriptions of "exceptionally compelling circumstances" and "imminent and extreme threats" that would allow applicants to rebut the presumption of ineligibility. The current descriptions use vague terms that have varied corollaries throughout immigration law. The administration should also establish a defined process to determine if individuals are subject to the presumption, including requiring officers to proactively ask and document answers to specific questions. The administration should also provide additional details and examples of situations in which an individual might be exempt, so applicants can better determine for themselves if they would be subject to the presumption.

The idea of having a functioning appointment system to promote efficient port-of-entry processing is promising, and we urge the administration to consider ways to expand access to this system. Primarily, the administration should abandon the geofencing requirement that limits access to CBP One, and instead follow the model of the existing parole processes, which allow individuals to schedule appointments and secure travel authorization and assistance *before* heading to the border, and to ensure that ways of assigning appointment slots are fair and protected against manipulation.[46]

We also urge the administration to explore how current successful programs can be replicated or expanded, such as expanding the use of private sponsorship models and humanitarian parole programs like the Ukrainian and CHNV processes to provide avenues for the diverse populations arriving at the border to seek relief today. This could include establishing new pathways for employment, particularly in shortage industries where admitting workers for a temporary period could help close critical employment gaps, and expanding existing pathways for employment like the H-2A and H-2B programs.

---

[46] Stephania Corpi Arnaud, "Once a ticket scalpers' tool, auto clickers now help migrants enter the U.S.," February 23, 2023, *Rest of World*, https://restofworld.org/2023/auto-clicker-migrants-us-mexico.

Finally, we believe that the application of the presumption of ineligibility should end when the proposed rule is no longer in effect. The administration proposes applying the new policy to individuals who are still in the asylum process even after the rule is terminated. As the NPRM notes, however, the asylum process can take many years. It would be deeply unfair to hold asylum applicants to this higher standard years after they began their process, or to hold them accountable for being able to document the very specific and narrow reasons they should have been exempted from the presumption—or should be found to have rebutted the presumption based on hardships they were experiencing just prior to the date they crossed the border—many years prior. Punishing asylum applicants many years into the future does nothing to promote an orderly process today, and will inevitably compound the challenges and barriers that people seeking asylum face as they work to establish a normal life in a new country.

**In conclusion, FWD.us reiterates its strong opposition to the NPRM, because it is in clear violation of international treaties and U.S. immigration law; because it would create greater chaos at the border; because it would further expose vulnerable people and families to separation, abuse, and extreme harm; and because it contradicts President Biden's promises and policies to create a more humane, orderly, and functioning immigration system. We urge the Biden Administration to abandon this proposed asylum ban; if it will not, we strongly urge you to consider ways to shield the most vulnerable people from the proposal's harshest consequences.**

Respectfully submitted,

Todd Schulte
President
On behalf of FWD.us



# HUMAN RIGHTS STAIN, PUBLIC HEALTH FARCE

## Evasion of Asylum Law and Title 42 Abuse Must End— and Never Be Revived

December 2022

CLP_PC_030900

## Introduction

For nearly two years, the Biden administration has wielded the Trump administration's Title 42 policy to block people from seeking asylum at official ports of entry, expel to grave dangers asylum seekers and migrants who cross the border, and evade the due process and refugee protection provisions of U.S. immigration and asylum law. Though efforts to force continuation of this cruel and counterproductive policy continue, after a federal district court in Washington DC vacated it in November for violating U.S. law, it is scheduled to end on December 21, 2022.

The misuse of Title 42 has been a public health, border management and human rights fiasco. Human Rights First has, as of the date this report was issued, tracked over 13,480 reports of murder, torture, kidnapping, rape, and other violent attacks on migrants and asylum seekers blocked in or expelled to Mexico under Title 42 since President Biden took office. It is a staggering number that will continue to mount every day that Title 42 or similar policies that evade refugee law are in place.

The Centers for Disease Control and Prevention (CDC) attempted to end the Title 42 policy in May 2022, but in the wake of a court order issued by a federal judge in Louisiana forcing the policy's continuation in a case brought by state attorneys general aligned with the former Trump administration, the Department of Homeland Security (DHS) continued to use it. In October 2022, in a disturbing step backwards, the Biden administration announced it would expand use of the policy to expel Venezuelans seeking refuge at the southern U.S. border without allowing them to apply for asylum, attempting to justify this abrogation of asylum law by pairing it with a limited parole program available to some Venezuelans. Since then, DHS has expelled thousands of Venezuelans to dangerous conditions in Mexico where they are also at risk of *refoulement, i.e.* illegal return, to persecution in Venezuela. In response to the October parole announcement, the U.N. Refugee Agency (UNHCR), IOM and UNICEF immediately warned that such efforts "cannot come at the expense of the fundamental human right to seek asylum."

The targeted, expanded use of Title 42 against Venezuelans again confirms that this policy has no basis in public health. As medical and public health experts have repeatedly affirmed and recently-revealed Congressional testimony of a top CDC scientist confirms, the Title 42 policy has no scientific basis. It was adopted at the behest of Stephen Miller and other Trump administration officials as yet another discriminatory effort to restrict immigration and block asylum. As leading epidemiologists and public health experts warned President Biden in November, the continued and expanded use of Title 42 is "a travesty" that manipulates, misuses and undermines trust in public health, and "feeds and propagates racially-based tropes that falsely paint migrants as vectors of disease, fostering stigma and heightening the vulnerability of already marginalized groups in a manner that is antithetical to the tenets of good public health practice."

CLP_PC_030901

Some members of Congress have attempted to force continuation of Title 42 or a similar suspension of asylum at the border – a codification of failed Trump policy that would eviscerate U.S. refugee law and subvert international refugee law globally. At the same time, the Biden administration is considering replacing Title 42 with other inhumane Trump policies or versions of them, including an asylum transit ban – an illegal policy that, when in effect, turned refugees away to danger and deprived other refugees of a path to family reunification, stability and citizenship, as Human Rights First detailed in a 2020 report.

Senior Biden administration officials are reportedly planning to impose other harsh policies as Title 42 ends, as well as use the notorious migrant detention center at Guantánamo Bay or other third country detention facilities to hold Haitians interdicted at sea. The United States recently returned 180 men, women and children – who had attempted to reach safety in the United States by boat – to Haiti despite multiple U.N. authorities' calls for states to halt returns to Haiti given the life-threatening conditions there.

A ruling by the U.S. Court of Appeals for the D.C. Circuit that took effect in May 2022 prohibits DHS from using Title 42 to return asylum-seeking families "to places where they will be persecuted or tortured." As the policy's scheduled end date approaches, DHS retains clear authority, consistent with the various court rulings, to except individuals from Title 42. It also remains obligated under U.S. refugee law and binding treaty commitments, and a November D.C. Circuit Court decision, not to return anyone—family, adult, or child—to persecution or torture, consistent with the legal rationale of the D.C. Circuit Court. In his November ruling concluding that the Title 42 policy violated the Administrative Procedure Act, the D.C. District Court judge who vacated the Title 42 policy cited Human Rights First's prior research documenting violent attacks against people impacted by the policy and emphasized the "harms Plaintiffs face if summarily expelled to countries [where] they may be persecuted or tortured" as well as the earlier finding by the Court of Appeals for the D.C. Circuit that "the record is replete with stomach-churning evidence of death, torture, and rape." The Trump-aligned state attorneys general who initiated the Louisiana litigation are now seeking to intervene in the separate case before the D.C. District Court and also seeking to stay that court's November ruling requiring the Title 42 policy to end on December 21. Their stay request is now pending before the D.C. Circuit Court after the District Court denied it.

It is far past time to end this illegal, inhumane, and ineffective policy and all attempts to force its continuation. After nearly two years in office, the Biden administration should institute a more effective and humanitarian response to the reception, identification, and processing of refugees seeking protection in the United States – a response that upholds U.S. refugee and immigration laws, as Human Rights First has outlined in its recommendation papers. The Biden administration should not replace one failed and illegal Trump policy with another by embracing, supporting or employing the ineffective, inhumane, xenophobic and racist immigration policies of the prior administration.

This report is based on in-person interviews Human Rights First conducted with asylum seekers in Tijuana in September 2022 and Ciudad Juárez in December 2022; and interviews by telephone and in-person with attorneys, other humanitarian workers, and additional asylum seekers in Mexico conducted from October to December 2022; reports of attacks drawn from an ongoing

survey of asylum seekers in Mexico conducted by Al Otro Lado between mid-June and early November 2022; open-source information identified by students from the University of California Network for Human Rights and Digital Fact Finding (Berkeley, Santa Cruz, Los Angeles); review of U.S. government data; and media and other human rights reporting.

Human Rights First published prior research on the Title 42 policy in June 2022, April 2022 (with Al Otro Lado and Haitian Bridge Alliance), March 2022, February 2022, January 2022, December 2021, November 2021 (with Florence Immigrant and Refugee Rights Project), October 2021, August 2021, July 2021 (with Hope Border Institute), June 2021, May 2021 (with RAICES and Interfaith Welcome Coalition), April 2021 (with Al Otro Lado and Haitian Bridge Alliance), December 2020, and May 2020.

## Key Findings

- **The use of the Trump-initiated Title 42 policy over the nearly two years since President Biden took office, its forced continuation through court order, and its recent expansion by the administration have inflicted terrible human rights abuses.** Human Rights First has tracked 13,480 reports of murder, kidnapping, rape, torture, and other violent attacks against people blocked in or expelled to Mexico due to Title 42 since January 2021. These numbers are likely just the tip of the iceberg as many victims have not spoken with investigators, journalists, or attorneys. Some recent examples include: Mexican officers kidnapped a Guatemalan family with two young children after DHS expelled them to Nuevo Laredo, and turned them over to a cartel that held them hostage for three months and tortured them; a Honduran asylum seeker and her four-year-old daughter were kidnapped, the daughter beaten and the mother raped in front of her daughter as they waited in Tijuana due to Title 42; a 13-year-old girl was nearly abducted at gunpoint in Juárez after her family fled political persecution in Venezuela but was expelled under Title 42; and a Guatemalan lesbian trans woman was raped by Mexican police in Piedras Negras after CBP turned her away from protection at the Eagle Pass port of entry. Black and Indigenous asylum seekers continue to be targets of bias-motivated violence and discrimination while stranded in Mexico.

- **The Biden administration's expansion of Title 42 to Venezuelans in October 2022 has denied thousands access to the U.S. asylum process in flagrant violation of U.S. refugee law. The expansion has stranded adults, families, and children in dangerous Mexican border cities where they are targets of kidnapping, torture, and brutal attacks. It has subjected others to onward *refoulement* to persecution and torture. It has also separated many families.** In some cases, this expansion has resulted in the separation of married couples and the delivery of mothers, wives, teenage daughters, and other family members to grave dangers in Mexico. CBP has subjected many Venezuelans to "lateral expulsions," transporting them to areas far from where they entered the United States and to locations where they have no knowledge of the specific dangers or local refugee shelters. In many cases, asylum seekers appear to have been transported to cities that lack shelter capacity.

- **Mexican asylum seekers fleeing persecution and torture have been trapped in or expelled by CBP to the very country they are trying to flee without access to the U.S. asylum process in violation of U.S. law and non-refoulement legal obligations**. They include: a woman who was decapitated by the cartel that had threatened her after DHS, citing Title 42, would not let her

seek asylum; a lesbian women who had suffered multiple attacks, rape, and threats due to her sexual orientation and was refused the right to seek asylum at the San Ysidro port of entry; a gay man who had suffered beatings, sexual assaults, and an attempted kidnapping due to his sexual orientation and was turned away from asylum at the El Paso port of entry; and an Indigenous woman who had been attacked by police, threatened, and her family members murdered for her activism defending her Indigenous community was turned away from seeking asylum with her three children at the San Ysidro port of entry in September 2022 and subsequently suffered sexual abuse by Mexican police.

- **Faith-based, humanitarian, and legal workers assisting asylum seekers stranded in Mexico by the Title 42 policy face acute and mounting threats and attacks from violent cartels that exercise widespread control over territory in Mexico.** Recent threats and attacks include the June 2022 kidnapping and November 2022 threats against a Baptist pastor in Nuevo Laredo, the armed raiding of a shelter in Ciudad Juarez in late November 2022, the forced closure of a Nuevo Laredo shelter after threats demanding that the shelter pay a "protection fee," and the robbery at gunpoint of a staff member of a legal organization in a Tijuana plaza near the San Ysidro port of entry while the staff member accompanied asylum seekers instructed by CBP to appear at 6 a.m. to be processed for a Title 42 exemption.

- **CBP and Border Patrol officers continue to use Title 42 to expel migrants and asylum seekers in ways that make them even more vulnerable to harm in Mexico and undermine their ability to seek asylum in the United States** – including by sometimes expelling asylum seekers in the middle of the night, depriving them of necessary medical care, or taking their passports or other identity documents, religious items, medical items, or other documents necessary for their asylum cases. Many were expelled to deplorable conditions without secure housing, leaving some sleeping on the streets. Mexican authorities transported some expelled Venezuelans to other parts of Mexico, abandoning them in cities where migrant shelters are full beyond capacity.

- **The Title 42 policy has continued to inflict disorder at the border, triggering multiple border crossings, artificially inflating CBP border statistics,** pushing dangerous crossings away from ports of entry, and facilitating exploitation. With Title 42 spurring dangerous attempts to cross into the United States outside of ports of entry, at least 853 asylum seekers and migrants have died in border crossings in FY 2022, making it the deadliest year since the U.S. government began record keeping on border crossing deaths in 1998.

---

**Recommendations**

- **Congress:** Reject any efforts to codify or legislatively extend the Title 42 policy or similar policies that suspend refugee law or improperly block refugees from seeking asylum, direct sufficient appropriations for asylum adjudications and to community-based, non-profit organizations providing temporary housing, transportation, and other assistance to people seeking refuge at the border, and continue to conduct oversight of the disorder and human rights abuses caused by the Title 42 policy and any similar policies that deny access to asylum.

- **Biden Administration:** Take all steps to ensure a final end to the Title 42 policy, restore compliance with U.S. refugee law and treaties, continue to request appropriations to conduct timely asylum adjudications and address backlogs, oppose any efforts to force continuation or resurrection of the Title 42 policy or similar policies, and reject any proposals to replace Title 42 with other policies that block, ban or prevent refugees from seeking asylum in the United States and/or turn them away to danger. Never again use an actual or purported pathway to the U.S. as an excuse to evade refugee law or abrogate the right to seek asylum.

- **Department of Homeland Security:** As Title 42 ends, uphold U.S. refugee law at U.S. ports of entry and along the border, ramp up asylum adjudication capacity and end attempts to replace it with other illegal and inhumane Trump-era policies, and during the time Title 42 is still in place, take all legally available actions to restore asylum access at and between ports of entry and mitigate the harms of Title 42, including through the use of exceptions to Title 42 and by affirmatively screening individuals subjected to Title 42 for fear of return to persecution and torture, as U.S. law and international treaty obligations require.

- **Centers for Disease Control and Prevention:** Publicly identify steps to ensure public health authority is never again misused to evade refugee law and endanger the lives and safety of people seeking protection, and if the Title 42 policy should be prolonged yet again, take any additional steps necessary to help ensure its firm and final termination.

- **The Government of Mexico**: End cooperation with U.S. policies that violate international law and/or result in human rights violations, and take steps to end Mexican police and other officers' perpetration of and complicity or acquiescence in attacks, extortions, kidnappings, rape and other harms inflicted on migrants and asylum seekers.

---

**Title 42 expansion returns Venezuelans fleeing persecution and humanitarian catastrophe to danger, deplorable conditions**

On October 12, 2022, the Biden administration announced it would expand the use of Title 42 to expel Venezuelans to Mexico, through a "New Migration Enforcement Process," pairing the expansion with a new limited humanitarian parole program that would enable some Venezuelans to enter the United States. The parole program's requirements actually preclude many refugees from accessing it, including due to its identification, sponsorship, and airline ticket purchase requirements, as well as its numerical limitations. The Hope Border Institute, which interviewed expelled asylum seekers in October, concluded that the program "left no path for relief for the people in the most vulnerable situations" and left thousands of Venezuelans in Mexico "in a cruel state of limbo."

While UNHCR and other U.N. agencies welcomed efforts to provide safe pathways for displaced persons, they warned that such pathways "cannot come at the expense of the fundamental human right to seek asylum." In their statement, these U.N. authorities specifically reminded the United States that: "**Access to safe territory for asylum seekers is a cornerstone of the 1951 Refugee Convention and of international refugee law. We remain concerned by asylum restrictions that are inconsistent with international law standards, including those imposed through Title 42 public health action, and reiterate the call for their urgent termination.**" Days after the Biden administration's decision to expand Title 42 to expel Venezuelans seeking U.S.

asylum, CBP again acknowledged in an October 21, 2022 statement that recent arrivals at the southern border included "an increased number of asylum seekers fleeing [the] authoritarian regime[] in Venezuela."

Venezuelans expelled to or blocked in Mexico due to Title 42's expanded use are now stranded in highly dangerous Mexican border cities as well as other locations in Mexico that lack capacity to safely accommodate them. Many are also at risk of onward *refoulement* – illegal return - to persecution and torture, with some Venezuelans pushed across the border into Guatemala and others flown directly back to Venezuela by Mexican authorities. Title 42 expulsions of Venezuelans by DHS are also separating families at the border.

The expanded use of Title 42 has already resulted in thousands of Venezuelans expelled to Mexico without access to the U.S. asylum process. Between October 12 and mid-November 2022, more than 8,000 Venezuelans were expelled by DHS to Mexico. As of November 7, more than 2,100 Venezuelans had been expelled to Ciudad Juárez alone since the policy was expanded less than a month prior. Human Rights First researchers interviewed multiple sources who indicated that around December 1, 2022, DHS in the El Paso region began conducting lateral expulsions of Venezuelans to Matamoros and other cities and appeared to have halted direct expulsions to Ciudad Juárez.

As it has wielded Title 42 to expel Venezuelans to Mexico, CBP has separated some families at the border and turned away mothers, daughters, wives, partners, and other family members to danger in Mexico. For example:

- **In October 2022, DHS released Miguel Peñaranda, a Venezuelan man, and his 18-year-old stepson into the United States but expelled to Mexico Peñaranda's wife, Heyllyn Yepez, and his 18-year-old stepdaughter.** The family members, who had entered the United States in El Paso, were separated and flown to other parts of the border within Texas: Peñaranda and his stepson were flown to Brownsville, where they were released, while Yepez and her daughter were flown to Laredo, where they were expelled at the border and then bused to Acapulco, Mexico. Yepez told *The New York Times*, **"I never, ever could have imagined this happening…How can they do this to families? It's so inhuman."**

- **DHS separated a Venezuelan family of four in October 2022, releasing the father and son into the United States to pursue their asylum claims while expelling the mother and daughter to Mexico under Title 42,** according to a migrant shelter director in Austin, Texas.

- **A young Venezuelan woman was separated from her mother at the border in October 2022, and while she was processed into the United States, her mother was expelled to Mexico,** according to a migrant shelter director in Austin, Texas.

- **DHS has separated numerous Venezuelan married couples since October 2022.** A woman who was returned to Ciudad Juárez without her husband in October 2022 told *Reuters*, "I am alone in a country where I have no one to help me. He was my only companion, my only help, my only support."

- **In October 2022, DHS expelled a mother to Mexico while her 20-year-old son was permitted to seek asylum in the United States.**

- **DHS separated** Luis Alexander Bonilla **from his mother, sister, and nine-year-old nephew at the border, detained Bonilla for 11 days, and expelled him to Tijuana, Mexico in October 2022.** Bonilla told Milenio his mother had been expelled to Ciudad Juárez, Mexico. Two weeks after the family had entered the United States, Bonilla was unaware of the whereabouts of his sister and nephew.

Venezuelans who are stranded after expulsion or are unable to seek asylum at ports of entry due to Title 42's continuation face grave dangers in Mexico. As UNHCR, IOM and UNICEF publicly warned the United States after it announced this Title 42 expansion in October, "[m]any people subject to this measure since its implementation in March 2020 have been sent to border communities with significant security challenges, limited support networks and inadequate shelter capacities, making their return to Mexico both dangerous and unsustainable." Many Venezuelan asylum seekers have already been targeted by cartels and corrupt officials in Mexico for kidnappings and other violent attacks in the wake of this Title 42 expansion. Some recent examples include:

- **In November 2022, a Venezuelan police investigator fleeing death threats for investigating cases of disappeared people was assaulted and robbed by armed men who bashed his head with the back of a gun, ordered him off the bus he was riding near Ciudad Juárez, and tried to kidnap him.** He managed to escape, but when he arrived in Ciudad Juárez, police stopped him and stole his money. The man told Human Rights First he is terrified to stay in Juárez, where he remains stranded due to Title 42, because the cartel hunting him in Venezuela also operates there.

- **In November 2022, a gay Venezuelan man was sexually assaulted and robbed in the public plaza where he had been sleeping in Ciudad Juárez.** The man told Human Rights First that he had been staying in a makeshift tent encampment near the El Paso port of entry while blocked from seeking U.S. asylum due to Title 42. After Mexican authorities forced him to leave the encampment, he moved to the plaza where he was then attacked.

- **A 13-year-old girl was nearly abducted at gunpoint in Juárez after her parents and sibling, who had fled political persecution in Venezuela, were denied the right to seek asylum and expelled to danger in Mexico in November 2022 by CBP under the Title 42 Venezuelan expansion.** They were detained by CBP for 10 days without blankets or access to showers. A CBP officer told them "You should have stayed in your country," confiscated and kept their documents, and lied to the family, telling them they were being transferred to a U.S. shelter only to then laugh at them as they were instead subjected to a lateral expulsion and sent to Sonora. The family made their way back to Juárez only to face the attempted abduction and a cartel shooting outside their shelter, as the mother explained to Human Rights First researchers.

- **A Venezuelan family with two young daughters stranded in Mexico due to Title 42 was** kidnapped **from a hotel in Ciudad Juárez by two hooded, armed men.** The family had been waiting for an opportunity to seek asylum in the United States. The kidnappers held the family captive for 12 days until their relatives were forced to pay a $30,000 ransom.

The U.S. government's expulsion of Venezuelans to Mexico violates U.S. *non-refoulement* legal obligations not only by exposing them to serious harm in Mexico but also because returned individuals are at high risk of onward or so-called chain *refoulement* to countries where they would face persecution or torture. Mexican officials ordered some expelled Venezuelans to

depart Mexico through the southern border within 15 days, while others were provided Mexican migration documents (*forma migratoria múltiple* or FMM) leaving them with temporary status in Mexico for reportedly as little as one week in some cases.

Expelled Venezuelans are at risk of detention and potential deportation by Mexican authorities without access to the asylum process in Mexico. For instance, a video posted online in October 2022 appears to show hundreds of Venezuelans and other nationals detained in a Mexican National Migration Institute (*Instituto Nacional de Migración* or INM) facility near the U.S.-Mexico border, reporting they had been held in crowded, unsanitary conditions for weeks. Venezuelans, as well as other asylum seekers and migrants in Mexico often report that Mexican police and other government officials routinely extort them by threatening them with deportation. In Ciudad Juárez, Mexican National Guard officers have reportedly entered hotels where Venezuelans are staying, demanded their documents, and detained those without valid visas, according to a witness account in a video posted to social media.

In early November 2022, INM began flying some Venezuelans, who supposedly agreed to be repatriated, directly to Venezuela – though there is no indication that any international or independent authorities observed these returns to confirm that they were voluntary. Concerningly, displaced Venezuelans transiting through Mexico reported in October 2022 that Mexican migration officials forced them to sign false documentation stating that they had voluntarily requested to leave Mexico through the southern border to Guatemala. In late September 2022, just prior to the Title 42 expansion, hundreds of Venezuelans were reportedly deceived by Mexican authorities into boarding buses that transported them to the land border with Guatemala. These incidents reflect a well-documented history of failures by Mexican immigration officers to inform detained migrants of their right to seek asylum and failure to forward their requests to the Mexican asylum agency.

Displaced Venezuelans in Guatemala may face further chain expulsion. In 2022, with support from the U.S. government, Guatemalan authorities expelled more than 9,000 Venezuelans across the border into Honduras without consistently administering protection screenings.

Many Venezuelans expelled by DHS to Mexico have been stranded in deplorable conditions without secure housing, leaving some sleeping on the streets. Mexican authorities have transported some expelled Venezuelans to other parts of Mexico, abandoning them in cities where migrant shelters are full beyond capacity. For instance:

- **DHS has expelled hundreds of Venezuelans to Tijuana since October 2022, including some who were flown from the Texas border and expelled to Tijuana without being provided any information about what was happening to them.** Mexican immigration officers also reportedly abandoned at a bus station in Tijuana 60 Venezuelans whom DHS had expelled. With Tijuana shelters full, some spent several nights sleeping on the ground. A fitness center was later prepared to provide temporary shelter for 300 Venezuelans expelled to Tijuana from the United States.

- **On a Saturday in October 2022, Mexican migration officers bused approximately 100 displaced Venezuelans whom DHS had expelled to Mexico City, abandoning them without food, accommodation, or basic support outside an office of the Comisión Mexicana de Ayuda a Refugiados (COMAR), the Mexican refugee assistance agency, which was closed for the weekend.** As of December 2022, migrant shelters in Mexico City are full beyond their capacity as Venezuelans expelled from the United States continue to be bused there, resulting in hundreds sleeping in city streets. Shelters are operating at double capacity with many sleeping on mattresses in common spaces, according to Gretchen Kuhner, director of the *Instituto para las Mujeres en la Migración* (IMUMI). Kuhner said IMUMI and other nonprofit organizations in

Mexico City have had to provide food, shelter, medications, and other supplies to Venezuelans arriving in the city.

- **The Mexican government has bused at least 600 Venezuelans whom DHS had expelled from the United States to the central Mexican city of Hermosillo, where shelters struggling to meet their needs are requesting food and clothing donations.** Those bused to Hermosillo include 24-year-old Juan Carlos García, who reported that he could not afford to travel to Mexico City to reunite with his relatives, from whom DHS separated him at the border.

- **Thousands of Venezuelans, including many who had been expelled from the United States under Title 42, have been sleeping in dangerous conditions in makeshift tent encampments.** Approximately 12,000 migrants and asylum seekers, most of whom are Venezuelan, have been sleeping in a makeshift tent encampment on a muddy sports field in San Pedro Tapanatepec in Oaxaca state, Mexico. In Ciudad Juárez, in November 2022, as many as a thousand Venezuelans were staying in a tent encampment on the Rio Grande near the El Paso port of entry, where temperatures had dropped below freezing and many fell ill. In November 2022, members of an organized criminal group attempted to kidnap residents of the encampment, rt thm into separate lines for men, women, and families, and instructed them to enter nearby vehicles, but the kidnappers retreated when law enforcement intervened. Ciudad Juárez government officials cleared the camp in late November 2022, citing safety concerns.

The Hope Border Institute in El Paso concluded based on its interviews with asylum seekers and migrants that the expanded expulsions of Venezuelans "separated family units and placed individuals, including vulnerable people such as young children, single mothers and elderly people on the streets, lacking access to food, shelter and medical support."

---

**Court-ordered Title 42 continuation condemns asylum seekers and migrants expelled to or blocked in Mexico to grave dangers**

The continued implementation of Title 42 is causing mounting human rights abuses against asylum seekers and migrants blocked in or expelled to Mexico. Individuals and families who are expelled or blocked from protection due to Title 42 are targeted for attacks in Mexico by corrupt officials as well as powerful cartels that exercise control throughout the border region and profit from kidnapping, torturing, and extorting asylum seekers turned away by the United States. These attacks often target asylum seekers and other migrants on account of their race, gender, sexual orientation, gender identity, and nationality. Black and Indigenous asylum seekers continue to be targets of bias-motivated violence and discrimination while stranded in or transiting through Mexico.

**As of the date this report was published in December 2022, Human Rights First has tracked at least 13,480 reports of murder, kidnapping, rape, torture, and other violent attacks against people blocked in or expelled to Mexico due to Title 42 since January 2021.** This count is likely just the tip of the iceberg since many asylum seekers have not spoken with investigators, journalists, or attorneys. Some recent attacks on people stranded in or expelled to Mexico due to Title 42's court-ordered continuation and recent expansion by DHS include:

- **Ibrahima Gueye, a 39-year-old Senegalese man, was shot and killed in a Tijuana park in broad daylight on October 18, 2022.** Police believe Gueye, who was carrying a backpack with clothing and personal belongings, was attacked by members of the violent "de la Castillo" group, which is engaged in criminal migrant smuggling in the area. With asylum seekers unable to approach ports of entry to request asylum, some have attempted to cross into the United States, unaware of danger from violent groups that control access to the border.

- **In October 2022, a Guatemalan lesbian trans woman was violently raped by Mexican police officers in Piedras Negras soon after CBP officers turned her away from protection at the Eagle Pass port of entry.** The woman reported to Al Otro Lado that she had sought protection due to her gender and sexual orientation.

- **A Haitian asylum seeker, whom DHS had previously expelled to Haiti under Title 42, was robbed at gunpoint in Tijuana in summer 2022 while unable to seek U.S. asylum at a port of entry due to the continuation of Title 42.** The armed assailants pulled the man's pants down and groped him looking for money, according to his cousin, another asylum seeker who spoke with Human Rights First.

- **A Guatemalan woman and her four-year-old son were kidnapped in Nogales and held captive for four days after DHS expelled them under Title 42. The family had sought U.S. protection to escape threats from the son's father.** The man who kidnapped the family had approached them offering help after DHS expelled them to Nogales, where they had no support and were unfamiliar with the area, according to Kino Border Initiative, who spoke with the woman in July 2022.

- **Mexican immigration (INM) officers kidnapped and turned over to the Zetas cartel a Guatemalan family with two young children after DHS expelled them to Nuevo Laredo.  The cartel held the family hostage for three months, tortured them, and extorted their relatives.** The mother told Kino Border Initiative in July 2022 that the family had watched as their captors killed other migrants who attempted to escape.

- **An Indigenous Guatemalan woman and her three young children were kidnapped and extorted after CBP officers turned them away from asylum protection at the Nogales port of entry.** The woman told Kino Border Initiative in September 2022 that after the family was expelled, a woman approached them offering to bring them to a free shelter, but instead led them to a house where they were held captive for ransom.

- **In August 2022, a Salvadoran woman and her two children were held captive for hours by members of an armed group who forced them to strip and robbed them of all their belongings, including their clothing, shoes, and water.** The family had been attempting to enter the United States near Calexico to seek asylum when the armed group approached them. "They were asking their boss what to do with us...I thought they were going to kill us," the woman told Human Rights First.

- **Juárez police sexually assaulted a Honduran mother and her four-year-old daughter after the family was blocked from seeking protection in Ciudad Juárez in August 2022, then turned**

**them over to cartel members who held the family captive for 22 days, raped the mother in front of the daughter, and physically attacked the daughter.** The mother reported the incident to Al Otro Lado.

With Title 42 still in place, Mexican asylum seekers fleeing persecution and torture are trapped in or expelled by DHS to the very country they are trying to flee without access to the U.S. asylum process in violation of U.S. law and non-refoulement legal obligations. Mexican asylum seekers stranded in Mexico or turned away from U.S. protection due to Title 42 have been brutally attacked and threatened, including:

- **A young asylum-seeking woman was decapitated by cartel members who had previously threatened her in southern Mexico after DHS turned her and her children away and would not allow them to seek asylum at a port of entry, citing Title 42.** The woman's brother-in-law, who is also seeking asylum, told Human Rights First in September 2022 that the family had been unable to find space in Tijuana shelters and after spending several nights in the streets, had no choice but to return to their hometown where they had been threatened.

- **In late October 2022, DHS used Title 42 to turn away a transgender woman from southern Mexico who had sought protection at a port of entry near Tijuana, Mexico, after an assailant had tried to kill her.** She reported to Al Otro Lado that she had suffered violence and discrimination based on her gender and sexual orientation, including multiple rapes, in Mexico.

- **A trans woman from the south of Mexico and her Indigenous partner remain stranded in Ciudad Juárez after fleeing death threats based on their race, gender, and sexual orientation by a criminal group who disappeared the woman's gay cousin and warned her not to look for him.** The woman told Human Rights First, "I am harassed every day of my life. I am afraid to go outside. There is so much hate. Even churches won't help us."

- **A woman from Michoacán who travelled to the Calexico port of entry in August 2022 with her infant and her younger brothers, ages 10 and 13, was threatened by cartel members after DHS officers turned them away due to Title 42.** The cartel members shot and killed the woman's husband in front of the family while they were eating lunch together, then threatened the woman after she reported the murder to police. The family had attempted to seek asylum at the Calexico port of entry, but U.S. officers turned them away because of Title 42. The woman told Human Rights First they fled to another city after receiving messages from neighbors warning them that the cartel members who had threatened them knew they were in Mexicali.

- **A Mexican lesbian woman who had suffered multiple attacks in her hometown due to her sexual orientation, including being kidnapped, raped, and threatened with death by police officers, was turned away from asylum protection at the San Ysidro port of entry in October 2022.** The woman reported her experience to Al Otro Lado.

- **A gay man from southern Mexico who had suffered beatings, sexual assaults, and an attempted kidnapping in his hometown due to his sexual orientation was turned away from**

**asylum at the El Paso port of entry in October 2022.** The man reported to Al Otro Lado that the people threatening him had killed his nephew to intimidate him.

- **A Mexican family of five was nearly kidnapped after DHS turned them away from seeking asylum at the San Ysidro port of entry in November of 2022.** The mother reported to Al Otro Lado that her husband and son had been kidnapped, beaten, and held for ransom in their home state in southern Mexico. After the expulsion, the family continued to receive death threats.

- **An Indigenous Triqui woman from Oaxaca who had been beaten by police, threatened, and her family members murdered for her activism defending her Indigenous community was turned away from seeking asylum with her three children at the San Ysidro port of entry in September 2022 in Tijuana.** She shared with Al Otro Lado that after the family was turned away, she was sexually abused by Mexican police in Tijuana.

The broad reach of cartels and other organized criminal groups in Mexico, which often have ties to government authorities (including Mexican military collusion with cartels that was recently confirmed by data leaks), can make relocation within Mexico impossible for Mexicans fleeing persecution and torture. For instance, at least three Mexican asylum seekers reported to Kino Border Initiative in October 2022 that the organized criminal groups persecuting them had pursued them to multiple cities within the country where they had moved in an attempt to escape these threats, confirming the national reach of these organizations.

In addition, humanitarian, faith, and legal workers assisting asylum seekers stranded in Mexico continue to face threats, as Human Rights First has previously documented, including:

- **In June 2022, cartel members kidnapped Baptist Pastor Lorenzo Ortiz, who has long provided humanitarian aid to asylum seekers in Nuevo Laredo and Monterrey, including those expelled or blocked under Title 42.** In July 2022, the U.N. Special Rapporteur on human rights defenders condemned the kidnapping, indicating that the cartel who kidnapped Ortiz accused him of stealing their business and refused to believe he aids migrants free of charge. The Special Rapporteur said, "Ortiz's case shows the extraordinary risk that human rights defenders run to provide basic support in the region. This is not an acceptable state of affairs." In November 2022, the Special Rapporteur continued to express grave concern that Pastor Ortiz was being "threatened, surveilled and harassed for his work in defence of the rights of migrants," and that asylum seekers and migrants "in his shelters are being abducted, harassed and extorted, with the alleged acquiescence of local police."

- **Another shelter in Nuevo Laredo was forced to shut down after a violent cartel demanded the shelter pay a "protection fee,"** according to a migrant who had been staying there and who reported the incident to Kino Border Initiative in October 2022. The migrant said that when the shelter closed, their family and other shelter residents were forced onto Nuevo Laredo streets, where members of a cartel photographed and threatened them.

- **In August 2022, an Al Otro Lado staff member was robbed at gunpoint in Tijuana in a plaza near the San Ysidro port of entry while accompanying asylum seekers who had been**

instructed by CBP to appear at the port at 6 a.m. to be processed under an exception to Title 42.

- **Members of organized criminal groups have threatened numerous staff and residents of several Tijuana shelters, including Ágape Misión Mundial and Espacio Migrante, in connection with their work assisting migrants with the Title 42 exemption process.** In November 2022, Embajada Migrante, a migrant shelter in Tijuana, was forced to close due to threats by members of an organized criminal group. A director of Embajada Migrante told EFE that members of an organized criminal group that controls the area have been harassing shelter staff for months, and at one point forcibly entered the shelter at night, demanding $200 from each of the migrants as a fee for crossing the border.

- **In November 2022, members of a violent cartel attacked a migrant shelter in Ciudad Juárez, plowing down its gate with a truck.** The cartel members forced the migrants to line up against a wall and ordered them to turn over their cell phones. The cartel retreated after realizing the space was a faith-based migrant shelter.

---

**Triggering Multiple Crossings, Artificially Inflating CBP's Border Encounters Statistics**

The continued and now expanded use of Title 42 is, while in place, trampling on U.S. refugee and immigration laws, preventing them from being upheld, prolonging disorder at the border, and inflating Customs and Border Protection (CBP) encounter statistics due to repeat entry attempts. Due to Title 42, the percentage of individuals who have attempted to repeatedly cross the southern border has increased, according to government data. Information released by CBP shows that in FY 2019 repeat crossings made up 7 percent of Border Patrol encounters, but with Title 42 in place since March 2020, repeated crossings rose to 27 percent of Border Patrol encounters in FY 2021, were 22 percent in August 2022 and 19 percent in September and October 2022 (the last months with data available).

Repeat crossings triggered by Title 42 expulsions have artificially inflated CBP's border apprehension statistics. CBP has concluded that the number of border encounters "was partly driven by high recidivism rates (repeat encounters) among individuals processed under the CDC's Title 42 public health authorities, meaning the actual number of unique individuals attempting to cross the border was substantially lower than total encounters." For example, in September 2022, government data shows that at least 43,000 encounters with Border Patrol were with individuals who had crossed the border multiple times, such that CBP acknowledged that its encounters statistics "overstate the number of unique individuals arriving at the border." Recent analysis by Syracuse University's Transactional Records Access Clearinghouse emphasizes the need for more accurate CBP data on repeat entry attempts. The American Immigration Council estimates that there were over 1.2 million repeat border encounters from August 2021 to September 2022 with Title 42 in place – inflating CBP's border apprehension data.

**Pushing dangerous crossings, resulting in record deaths as asylum remains blocked at ports of entry**

As Title 42 continues to block asylum at ports of entry, tens of thousands of migrants and asylum seekers are waiting in border cities for the opportunity to enter the United States through a limited exemption process. The exemption process requires nonprofit organizations and service providers, including migrant shelters, to refer migrants and asylum seekers with particular vulnerabilities in Mexico to DHS for consideration for Title 42 exemptions. Border cities in Mexico lack capacity to serve the thousands of migrants and asylum seekers stranded in Mexico awaiting the opportunity to request Title 42 exemptions. For example, shelters are full beyond capacity in Reynosa, forcing many migrants and asylum seekers to sleep in tent encampments or on the streets, often in sweltering heat or freezing temperatures. In September 2022, Haitian migrants frustrated by the slow Title 42 exemption process protested outside Reynosa shelters. Likewise, small tent encampments have emerged outside shelters in Tijuana, where tens of thousands of migrants and asylum seekers remain stranded as they await the opportunity to request Title 42 exemptions.

For people seeking refuge from persecution, the denial of access to asylum at U.S. ports of entry leaves them stranded in dangerous border cities and pushes some to attempt risky and sometimes life-threatening border crossings.  These crossings result in severe injuries, dehydration, starvation, and drownings as well as kidnappings and other violent attacks by cartels and organized criminal groups that control border crossings. At least 853 asylum seekers and migrants have died in border crossings in FY 2022, making it the deadliest year since the U.S. government began tracking and recording border crossing deaths in 1998. The true number of deaths is likely much higher, as Border Patrol only counts deaths of individuals the agency identifies.

Some of the people who have died or were seriously injured while attempting to cross the U.S.-Mexico border to reach refuge in the United States include:

- **Dozens of migrants and asylum seekers have drowned since July 2022 attempting to cross the Rio Grande to enter Texas from the Mexican state of Chihuahua.** They include a five-year-old Guatemalan girl who drowned after a strong current ripped the girl from her mother's arms in August 2022, a 3-year-old boy who died in August 2022, nine individuals whose bodies were recovered on a single day in September 2022, and 12 people whose bodies were recovered on a single day in July 2022. Eagle Pass fire chief Manuel Mello said, "it's basically a drowning a day that you're seeing."

- **Twenty-two migrants and asylum seekers have drowned in the river and in the agricultural canals of the El Paso, Texas region in 2022 while attempting to cross the U.S.-Mexico border.** They include a young Colombian man whose body was recovered from the Rio Bravo in Reynosa, Mexico in November 2022.

- **In December 2022, a Russian man and another migrant drowned in the Pacific Ocean while attempting to swim across the U.S. border from Tijuana.**

- **In August 2022, Mexican brothers Carlos Enrique Mendoza and Edgar Mendoza died from dehydration, and were found with their bodies embracing,** in the Arizona desert after a criminal smuggling organization abandoned them.

- **A Guatemalan asylum seeker fleeing death threats in his country who had previously been expelled under Title 42 was hospitalized after he became lost in the desert in the Arizona border region as he attempted to seek U.S. protection** for the second time in September 2022. He was expelled again after recovering, according to Kino Border Initiative.

- **In December 2022, an Indian man and his 3-year-old son died after falling off the border wall** attempting to enter the United States from Tijuana, Mexico. An Indian woman also fell off the border wall and sustained injuries.

**CBP misconduct exacerbates danger for people subjected to Title 42**

CBP and Border Patrol officers continue to use Title 42 to expel migrants and asylum seekers in ways that increase their vulnerability to danger and violent crime in Mexico. Some Border Patrol agents have failed to provide medical attention to people with injuries, carried out Title 42 expulsions in the middle of the night, and expelled migrants and asylum seekers without their personal belongings. These practices exacerbate the risks migrants and asylums seekers face in Mexico after expulsion.

For example, CBP has endangered the lives of migrants at the Arizona border by carrying out expulsions in the middle of the night. Kino Border Initiative reported that CBP expelled at least sixteen migrants and asylum seekers to Nogales between the nighttime hours of 12:00 and 3:00 a.m. in August 2022. The organization also reported that some migrants were expelled in the rain, at times when shelters and services were closed, and had to sleep in the streets. After these CBP expulsions, some migrants were then robbed by Mexican police and other individuals. Those expelled at night include a Mexican mother and daughter fleeing sexual violence, who were expelled to Nogales at 3:00 am in August 2022.

CBP also continues to separate families subjected to Title 42 expulsions. In addition to the many examples of Venezuelan family separations detailed in a previous section, CBP separated a Mexican family fleeing death threats by cartel members in Guerrero who burned their house and killed a relative. CBP allowed the mother and younger brother to seek U.S. asylum but expelled the 18-year-old sister to Ciudad Juárez alone, according to a shelter director who assisted the young woman.

In its research, Human Rights First heard numerous accounts of instances where Border Patrol and CBP agents engaged in abusive conduct or failed to provide necessary medical attention for migrants and asylum seekers with serious medical conditions or injuries before expelling them to Mexico, including:

- **Border Patrol agents refused to provide medical attention to a woman who was eight months pregnant and who requested aid for complications with her pregnancy.** The woman

told Kino Border Initiative in October 2022 that she had requested a medical examination on three occasions while in Border Patrol custody after she had not felt the baby move in hours, but Border Patrol officers expelled her to Nogales, Mexico without allowing her to see a doctor. The following morning, the woman experienced severe pain and went to a hospital, where she learned the baby had died.

- **In July 2022, a Border Patrol officer beat an asylum seeker who requested water in the Arizona desert and told him "if you want water, go it in your own country,"** The man told Kino Border Initiative that the officer had shoved his face into the ground, kicked him repeatedly, and stood on the back of his head, causing the man to bleed and lose consciousness. Officers eventually took the man to the hospital after repeated requests but expelled him to Mexico without any of his medical paperwork. He said, ***"I'm trying to escape death in my country, only to nearly die here [in the US]."***

- **Border Patrol agents denied medical attention to a migrant who was stung on his hip by a venomous scorpion and was having difficulty breathing.** A Border Patrol agent told him to "sit down and be quiet" when he asked for medical attention for the sting. He was only brought to the emergency room and provided an anti-venom shot many hours later, after his condition had worsened while he waited in a holding cell. The man told Kino Border Initiative in October 2022 that Border Patrol agents later expelled the man to Mexico without returning his personal belongings.

- **Border Patrol agents ignored the pleas for medical attention of a man who had been severely beaten by members of an organized criminal group before seeking U.S. protection.** The man told Kino Border Initiative in October 2022 that Border Patrol agents expelled him to Mexico without providing medical attention and instructed him to ask Mexican authorities for help for his injuries.

CBP and Border Patrol officers also seize and fail to return migrants' personal property. In October 2022, ACLU of Arizona and other nonprofit organizations assisting migrants at the Arizona border sent a letter expressing concern about the practice to CBP Commissioner Chris Magnus. They wrote: "Border Patrol agents in Arizona are forcing migrants they apprehend to discard all their belongings into on-site dumpsters, the only exceptions being a single layer of clothing and certain items that can fit into a 7-by-7-inch plastic bag…The mass dispossession of migrants' belongings by Border Patrol agents is not new, yet the problem has now reached unprecedented levels of magnitude and severity." Personal belongings migrants have been forced to discard include "**items of religious, sentimental, medical, and legal significance.**" The letter indicates that in some cases, Border Patrol has provided claim tickets that would supposedly enable migrants to reclaim seized belongings, but the agency expelled those individuals to Mexico under Title 42 without providing them an opportunity to reclaim their property.

In November 2022, members of Congress Bennie Thompson, Joaquin Castro, Raúl Grijalva and Nanette Barragán requested that the Government Accountability Office "conduct a review of [CBP's] activities, policies, and procedures regarding the handling of personal property belonging to individuals in its custody."

During the course of its research, Human Rights First also heard reports of CBP and Border Patrol taking personal possessions from asylum seekers or migrants, or forcing them to discard passports, religious items, money, and other essential personal items. For example:

- **Several Venezuelan asylum seekers told Human Rights First in December 2022 that CBP expelled them without their personal possessions.** One family was expelled in November 2022 without any of the documents they had brought that were critical to their asylum case, including identification documents, birth certificates, and evidence for their asylum cases.

- **In October 2022, CBP expelled dozens of migrants and asylum seekers, including many Venezuelans, to Tijuana without any of their personal possessions, including their passports and clothing.** Nicole Ramos, Al Otro Lado's Border Rights Project director, said Al Otro Lado has had to purchase clothes and other basic supplies for individuals whose personal belongings had been seized by CBP.

- **At least thirty migrants and asylum seekers have reported to Kino Border Initiative that Border Patrol or CBP destroyed or failed to return their personal possessions from September to November 2022.** One man said Border Patrol agents confiscated his cash, a diamond ring his father had given him, a bible, the keys to his home, his cell phone with all his contacts, and his identity documents, including his birth certificate.

- **Another person reported to Kino Border Initiative that Border Patrol officers seized the SIM card from his cell phone, pocketed the cash and credit cards from his wallet, and tore up his birth certificate in front of him.** Another individual observed a Border Patrol agent rip up $3,000 pesos from a migrant they had apprehended. The officer said, "this is trash, this is of no value to you here" before disposing of the ripped bills in a trash can.

**Expansive use of Title 42 further undermines specious public health rationale, violates U.S. refugee obligations**

The increasingly expansive use of Title 42 and the calls to further prolong its use as a tool – albeit an ineffective and counterproductive one – for border management have completely undermined the already flimsy pretense that the Title 42 policy is justified on public health grounds. Indeed, Marty Cetron, the director of the CDC's Division of Global Migration and Quarantine, told congressional investigators in May 2022 that the CDC order issued by the Trump administration to expel asylum seekers and migrants under Title 42 "did not originate from CDC." It has long been confirmed that the White House pressured the CDC to issue the order after the CDC's medical experts objected to its lack of justification as a public health measure. Cetron noted that he had refused to sign the CDC order, asked to be "excused" from the policy, and warned of the "significant harms" that could arise from its use. In addressing a statement he had reportedly made to colleagues at the time, Cetron confirmed to congressional investigators that this statement was consistent with some of his concerns about the order: "**to use public health authority that has never, ever been used this way, it's to keep Hispanics out of the country and it's wrong**."

The Biden administration's decision to expand use of Title 42 to Venezuelans, which was clearly a decision based on migration management considerations, was additional confirmation that the

CLP_PC_030917

policy has nothing to do with public health. Following the announcement of this expansion, which made no mention of public health in the context of Title 42 expulsions and repeatedly described the expansion as part of a migration management strategy, leading epidemiologists and public health experts wrote to President Biden emphasizing that the continued and expanded use of Title 42 is a "travesty" and that the Biden administration was "manipulating and misusing public health to advance immigration control objectives."

Not only has DHS expanded its misuse of Title 42 public health authority by adding a new nationality to its expulsion list, but some DHS officers appear to be using the supposed public health policy to expel people who have been in the United States for weeks or years, evading the (minimal but critical) due process protections of U.S. immigration law. Some DHS officers have used Title 42 as cover to expel individuals who have long resided in the United States to Mexico without due process, in some instances in coordination with Texas state officers. For example:

- **In 2022 DHS expelled to Mexico a young Honduran man who had been living in the United States for nine years and had a pending immigration court hearing in Houston, Texas scheduled for December 2022, as his attorney reported to Human Rights First.** After being expelled to Mexico, the man was beaten by Mexican police officers, kidnapped by a cartel, and threatened at gunpoint. He was only able to reenter the United States with assistance from his attorney.

- **DHS also expelled a middle-aged Mexican man who had been in the United States for at least several weeks after a Texas state sheriff pulled over the trailer truck he was driving in a small Texas town in July 2022.** The sheriff demanded to see the man's permit to drive the truck, which he produced, and then asked for his work permit, which the man did not have. The sheriff detained the man in an isolated area where the man was provided no opportunity to speak with U.S. officials or to make any phone calls before DHS expelled him to Mexico, according to Kino Border Initiative.

The U.S. government is also using Title 42 to expel asylum seekers and migrants to Mexico after they have been arrested, jailed for weeks or months, and subjected to state prosecution under Texas' illegal Operation Lone Star. These prosecutions violate Article 31 of the Refugee Convention which generally prohibits the penalization of asylum seekers for their entry or presence in a country to seek refugee protection. DHS's expulsion of asylum seekers subject to Operation Lone Star also interferes with their ability to defend themselves against pending state criminal charges and to challenge abusive and discriminatory treatment by state and local authorities. Examples of these wrongful expulsions include:

- **In August 2022, DHS expelled to Honduras a 22-year-old Honduran asylum seeker who had spent three weeks in Texas state custody after he was charged with criminal trespass under Operation Lonestar.** The young man had posted bond so that he could be released to challenge the criminal charges against him, but Texas authorities immediately turned him over to CBP upon release from custody. Though the man was visibly distressed and expressed his fear of returning to Honduras on multiple occasions, DHS expelled him to Honduras, where he remains in hiding from individuals who threatened his life, according to a South Texas legal services provider.

- **The same legal services office assisted two other Honduran individuals whom DHS expelled to Mexico under Title 42 after they had spent two months in Texas state custody on pending criminal charges under Operation Lonestar, which were dismissed.**

The expansive and expanded misuse of Title 42 is additional confirmation that the Title 42 policy has nothing to do with public health but has instead been wielded to punish people for migrating or for exercising their human right to seek asylum from persecution.

**Acknowledgements**

This report was written and researched by Julia Neusner, Kennji Kizuka, Eleanor Acer, Ana Ortega and Alejandra Aguilar Ruiz. Rebecca Gendelman, Ruby Ritchin, Robyn Barnard, Licha Nyiendo, and Jim Bernfield contributed edits to the report. Camille Chabot, Crystal Choi, Rosie Foulds, Lauren Good, Leslie Herrera, Hannah Ismael, Akif Khan, Diana Padilla Legaspi, Ana Linares, Valeria Gerber Mariscal, Chris Mathrua, Neeka Mirpour, Samantha Navarrete, Semantha Norris, Ivette Orozco, Jemma Paradise, Ashley Quezada, Kathleen Quinn, Rachel Raps, Gwenyth Rodriguez, Cole Seither, and Syeda Shagufta of the University of California Network for Human Rights and Digital Fact Finding (Berkeley, Santa Cruz, Los Angeles) contributed additional research for this report. Our thanks to the many colleagues, including those from Al Otro Lado, Las Americas Immigrant Advocacy Center, Hope Border Institute, Immigrant Defenders Law Center, Instituto para las Mujeres en la Migración, Kino Border Initiative, UC Hastings Center for Gender and Refugee Studies, and other attorneys, law firms, and service providers who provided case examples and assisted in referring asylum seekers for interview. Human Rights First thanks the donors and foundations who provide invaluable support for the organization's research on access to asylum and representation of asylum seekers. We thank the numerous asylum seekers who bravely shared their stories in hopes of bettering the system for all those who seek protection and refuge in the United States.

**Mission Statement**

Human Rights First works to create a just world in which every person's intrinsic human rights are respected and protected, to build societies that value and invest in all their people. To reach that goal demands assisting victims of injustice, bringing perpetrators of abuse to justice, and building institutions that ensure universal rights.

Human Rights First is a nonprofit, nonpartisan international human rights organization based in Los Angeles, New York, and Washington D.C.

© 2022 Human Rights First All Rights Reserved.

This report is available online at humanrightsfirst.org

CLP_PC_030920

# PUBLIC SUBMISSION

<div style="border:1px solid black">

**As of:** May 08, 2023
**Received:** March 27, 2023
**Status:** Posted
**Posted:** March 29, 2023
**Tracking No.** lfr-hkpg-167b
**Comments Due:** March 27, 2023
**Submission Type:** Web

</div>

**Docket:** USCIS-2022-0016
Circumvention of Lawful Pathways

**Comment On:** USCIS-2022-0016-0001
Circumvention of Lawful Pathways

**Document:** USCIS-2022-0016-12343
Comment Submitted by American Gateways

---

## Submitter Information

**Email:** ednay@americangateways.org
**Organization:** American Gateways

---

## General Comment

March 27, 2023

American Gateways respectfully submits the attached comments in response to the Notice of Proposed Rulemaking regarding Circumvention of Lawful Pathways, which was published by U.S. Citizenship and Immigration Services, the Department of Homeland Security; and the Executive Office for Immigration Review, Department of Justice on February 23, 2023 (RIN 1615-AC83 / 1125-AB26 / USCIS Docket No. 2022-0016 / A.G. Order No. 5605-2023).

Thank you for the opportunity to submit comments. Please do not hesitate to contact me via phone at 512-279-0879 or via email at Ednay@americangateways.org to provide further information.

Sincerely,

Edna Yang
Co-Executive Director
American Gateways

---

## Attachments

American Gateways Comments to Proposed Rule - Circumvention of Lawful Pathways

**Comments Submitted by American Gateways RE: Joint Notice of Proposed Rulemaking (NPRM) by U.S. Citizenship and Immigration Services, Department of Homeland Security; the Executive Office for Immigration Review, Department of Justice: Circumvention of Lawful Pathways; RIN 1615-AC83 / 1125-AB26 / USCIS Docket No. 2022-0016/ A.G. Order No. 5605-2023 (published in the Federal Register on February 23, 2023).**

American Gateways provides much needed legal representation for indigent immigrants in Central Texas. Our mission is to champion the dignity and human rights of immigrants, refugees, and survivors of persecution, torture, conflict, and human trafficking through exceptional legal services at low or no cost, education, and advocacy. Our agency began in 1987 as the Political Asylum Project of Austin and was founded to provide legal representation to Central American immigrants fleeing persecution and seeking asylum in the United States. Over the past thirty-three years, American Gateways has become an indispensable legal services provider for low-income asylum seekers and immigrants in Central Texas.

American Gateways opposes the notice of proposed rulemaking regarding Circumvention of Lawful Pathways (the "Proposed Rule"), published by the Department of Homeland Security (DHS) and Department of Justice (DOJ) (collectively, the "Departments") on February 23, 2023, and requests that the Departments promptly rescind the Proposed Rule. American Gateways describes below how some of the proposed changes will impact our organization and our clients, and the reasons for our opposition. Omission of any proposed change from these comments should not be interpreted as tacit approval. American Gateways opposes all aspects of the Proposed Rule that would erode the due process rights of asylum seekers or otherwise impede—in any way—the ability of individuals who have suffered persecution to access humanitarian protection in the United States. At the same time, American Gateways expresses heightened concern regarding the disproportionate harms that will befall certain asylum seekers—namely, detained and *pro se* asylum seekers—if the Proposed Rule is not withdrawn. The Departments propose to implement a presumption of ineligibility for asylum upon certain noncitizens arriving at the U.S. southern border who (1) did not seek asylum in a country of transit or (2) did not obtain an appointment to present at the border using a mobile phone application known as "CBP One." The proposed changes will prevent current and future asylum seekers from accessing protection they merit under domestic and international law, result in the return of many asylum seekers to harm, without allowing them their legal right to seek protection under the asylum law. The proposed rule also leaves others in the United States without stable protection. Rather than "align with the [Immigration and Nationality Act] and Congress's general intent to create an asylum and protection system that adjudicates claims both expeditiously and fairly," 88 Fed. Reg. 11704, 11746, the Proposed Rule would only result in lower rates of representation, poorly prepared filings, due process violations, higher denial rates, and the more rapid deportation of refugees back to the persecution from which they fled.

## I.     GENERAL COMMENTS

### A. The shortened comment period does not provide adequate time for meaningful participation in the rulemaking process.

CLP_PC_031497

Although the Administrative Procedures Act ("APA") does not prescribe a minimum time period for comments, agencies must afford interested persons a reasonable and meaningful opportunity to participate in the rulemaking process. *See* 5 U.S.C. § 553(c) ("After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments. . . ."). Furthermore, Executive Order 12866 provides that the public's opportunity to comment "in most cases should include a comment period of not less than 60 days." Exec. Order No. 12866, 58 Fed. Reg. 51735, 51740 (Oct. 4, 1993). Despite having had the Proposed Rule "reviewed . . . as a 'significant regulatory action' under . . . Executive Order [13563]," 88 Fed. Reg. 11704, 11748, the Departments have deviated from the customary 60-day comment period, instead allowing the public only 30 days to submit comments to the Proposed Rule.

American Gateways objects to the shortened 30-day comment period. As discussed herein, the Proposed Rule contains several substantial changes to regulations governing asylum and withholding of removal that would have a detrimental impact on immigrants seeking asylum and other forms of humanitarian protection.[1] For example, the Proposed Rule would introduce a new condition on asylum eligibility, in the form of a presumption of ineligibility for asylum for certain noncitizens who enter the United States at the southwest land border, thereby rendering it more difficult for asylum seekers to meet the conditions for asylum eligibility. The Proposed Rule would only allow noncitizens to rebut this presumption if they are able to demonstrate "exceptionally compelling circumstances by a preponderance of the evidence," a heightened evidentiary burden that is very difficult to meet and will likely impose unduly harsh consequences on *pro se* asylum seekers. The public should be afforded adequate time to meaningfully consider and respond to the complex revisions proposed by the Department.

The Departments have offered no fitting justification for shortening the comment period. The Departments' sole proffered defense is that they are issuing the Proposed Rule with this 30-day comment period "because they seek to be in a position to finalize the proposed rule, as appropriate, before the Title 42 Public Health Order is lifted."[2] 88 Fed. Reg. 11704, 11708. While the Departments cite the termination of the Title 42 policy in May 2023 as a justification to curtail the public's right to comment on the proposed rule, this reasoning is specious especially given that the administration itself sought to formally end Title 42 nearly a year ago and has had ample time to prepare for the end of the policy. The lack of sufficient explanation for shortening the comment period signals that the Departments have improperly prejudged the issues and intend to implement the Proposed Rule without having provided interested persons with a *meaningful* opportunity to participate. At the same time, the shortened comment period suggests that the Departments desire

---

[1] American Gateways uses the term "asylum seekers" throughout these comments to refer to individuals seeking asylum, as well as those seeking statutory withholding of removal or withholding under the Convention Against Torture.

[2] The Departments argue that the "lifting of the Order could occur as a result of several different litigation and policy developments, including the vacatur of the preliminary injunction entered in *Louisiana v. CDC*, No. 22–cv–885, 2022 WL 1604901 (W.D. La. May 20, 2022), *appeal pending*, No. 22–30303 (5th Cir.); the lifting of the stay entered by the Supreme Court in *Arizona v. Mayorkas*, No. 22A544, 2022 WL 17957850 (U.S. Dec. 27, 2022); or 'the expiration of the Secretary of HHS' declaration that COVID–19 constitutes a public health emergency,' 86 FR at 42829." 88 Fed. Reg. 11704, 11708. The Departments further argue that "[t]he termination of the Secretary of HHS' declaration that COVID–19 constitutes a public health emergency is expected to occur on May 11, 2023," based on a recent announcement of such intent by the Executive Office of the President's Office of Management and Budget. *Id.*

2

not to improve the efficiency or quality of procedures governing asylum and withholding of removal, but to push through their divisive political agenda in disregard of public comments.

American Gateways therefore respectfully requests that, if the Proposed Rule is not withdrawn, the comment period be extended for at least an additional 30 days consistent with Executive Order 12866.

**B.  The Proposed Rule fails to engage in a cost/benefit analysis, as required by law.**

Executive Orders 12866 and 13563 require agencies to assess all costs and benefits of regulatory changes, including both quantifiable and qualitative factors, and choose the regulatory alternative that maximizes net benefits.[3] The Departments acknowledge that the Office of Information and Regulatory Affairs of the Office of Management and Budget ("OMB") has "reviewed" the Proposed Rule as a "significant regulatory action" within the meaning of Executive Order 12866. 88 Fed. Reg. 11704, 11748. Yet, the Proposed Rule contains no meaningful assessment of costs, benefits, and regulatory alternatives. Instead, the Departments list a single purported cost to migrants of the Proposed Rule—briefly noting that ineligibility for asylum under the presumptive condition "would entail a loss of the benefits of asylum, although [such migrants] would continue to be eligible for statutory withholding of removal and withholding under the CAT," *id.* at 11748— and a cost to the Departments, noting that the Proposed Rule "would require additional time for asylum officers, during fear screenings, to inquire into the applicability of the presumption and whether the presumption has been rebutted," *id.*

The Departments cannot discharge their obligation to fully assess costs and benefits of the proposed regulatory changes by simply disregarding the real harms that would flow from the Proposed Rule, especially for detained and *pro se* asylum seekers. Moreover, the Department's evident implication that a new presumption of asylum ineligibility for noncitizens who did not seek asylum in a country of transit or did not obtain an appointment to present at the border will have virtually *no* further impact on asylum seekers beyond their loss of a path to citizenship and inability to petition for certain family members to join them in the United States is absurd. Most *pro se* asylum seekers struggle to understand and adequately prepare for asylum application procedures, and they would face significant challenges retaining counsel or even *pro se* legal assistance when faced with the significantly increased likelihood of expedited removal. Furthermore, given the speed at which expedited removal takes place, there is rarely an opportunity to collect evidence or even merely consult with an attorney, family member, or friend before the decision is made.

Agencies may "propose or adopt a regulation only upon a reasoned determination that the benefits of the intended regulation justify its costs." Exec. Order No. 12866 § 1(b)(6) (1993). Rather than engage in a cost-benefit analysis, as the law requires, the Departments simply assert that a

---

[3]    *See* Exec. Order No. 12866 § 1(b)(6) (1993), https://www.archives.gov/files/federal-register/executive-orders/pdf/12866.pdf ("Each agency shall assess both the costs and the benefits of the intended regulation and, recognizing that some costs and benefits are difficult to quantify, propose or adopt a regulation only upon a reasoned determination that the benefits of the intended regulation justify its costs."); Exec. Order No. 13563, https://obamawhitehouse.archives.gov/the-press-office/2011/01/18/executive-order-13563-improving-regulation-and-regulatory-review (supplementing and reaffirming the mandate in Executive Order 12866 that agencies "must take into account benefits and costs, both quantitative and qualitative" when implementing regulations).

CLP_PC_031499

presumption of asylum ineligibility for certain noncitizens will present benefits in the form of "improved relationships with, and enhanced opportunities to coordinate with and benefit from the migration policies of, regional neighbors; large-scale reductions in strains on limited national resources; preservation of the Departments' continued ability to safely, humanely, and effectively enforce and administer the immigration laws; and a reduction in the role of exploitative transnational criminal organizations and smugglers." 88 Fed. Reg. 11704, 11748. But this listing of purported benefits improperly discounts obvious costs to the Proposed Rule. Executive Orders cannot be so easily circumvented. Indeed, the Proposed Rule would effectively operate as an asylum ban for individuals based on factors that do not relate to their fear of return and would result in asylum denials for all who are unable to establish that they qualify for the extremely limited exceptions to the presumption of asylum ineligibility. Its use in expedited removal will require asylum seekers—many of whom have suffered persecution and violence and undergone a harrowing journey to reach safety—to prove that the rule does not apply to them in a credible fear interview shortly after arrival in the United States, while detained and with little to no access to counsel, likely without knowledge of how the rule works or what they need to prove.

American Gateways acknowledges that the Proposed Rule is only at the public comment stage of the rule-making process. However, the Departments' utter failure to consider a host of relevant factors and indifference toward the harmful impact their proposal would have on individuals seeking humanitarian protection are incurable deficiencies. If the Departments were to consider all aspects of the issue, as they are required to do under Executive Orders 12866 and 13563, they cannot possibly conclude that any purported benefits of the Proposed Rule outweigh its tremendous costs. Rather than push forward with a proposal that is doomed for judicial invalidation, the Departments should rescind the Proposed Rule.

### C. The Proposed Rule, if made final, would violate the Administrative Procedure Act.

Under the Administrative Procedure Act (APA) (5 U.S.C. §§ 551-559), courts are authorized to "hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right . . . ." 5 U.S.C. § 706(2)(A)-(C). The Proposed Rule contravenes or is otherwise inconsistent with several provisions of the governing statute, infringes upon due process rights, is not the product of reasoned decision-making, and is otherwise arbitrary and capricious. If implemented in its current form, the Proposed Rule would be subject to judicial invalidation on multiple grounds.

For example, several provisions of the Proposed Rule are contrary to constitutional rights because they infringe upon the due process rights of asylum seekers. The presumption of asylum ineligibility, coupled with the high burden asylum seekers must meet to show they can overcome this presumption—i.e., by showing they sought asylum in a country of transit, or obtained an appointment to present at the border using CBP One—would substantially interfere with asylum seekers' ability to obtain counsel and a full and fair hearing on their claims for relief. Throughout its comments, American Gateways highlights some of the constitutional violations that would flow from the Proposed Rule.

4

Additionally, the Proposed Rule, as well as the separate provisions thereof, is arbitrary and capricious. The arbitrary-and-capricious standard requires that an agency "examine the relevant data and articulate a satisfactory explanation for its action, including a 'rational connection between the facts and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). When reviewing an agency's proffered explanation, courts "must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Id.* at 43 (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)). Further, courts require that an agency provide the "essential facts upon which the administrative decision was based," *United States v. Dierckman*, 201 F.3d 915, 926 (7th Cir. 2000) (quoting *Bagdonas v. Dep't of Treasury*, 93 F.3d 422, 426 (7th Cir. 1996)), and explain the justification for its determinations with actual evidence beyond a "conclusory statement," *Allied-Signal, Inc. v. Nuclear Reg. Comm'n*, 988 F.2d 146, 152 (D.C. Cir. 1993). In general, an agency decision is arbitrary and capricious

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* In other words, agency actions are subject to invalidation where an agency fails to adequately explain its decision, fails to consider relevant factors, including the policy effects of its decisions, fails to adequately explain illogical actions, or reaches a conclusion that contradicts the underlying record. What counts as "relevant" is context specific, but the U.S. Supreme Court has previously instructed that agency decision-making on immigration matters "must use an approach that is tied to the purposes of the immigration laws or the appropriate operation of the immigration system." *Judulang v. Holder*, 565 U.S. 42, 132 S. Ct. 476, 478 (2011).

Here, the Departments propose a rule that is so plainly contrary to the "purposes of the immigration laws" and the "appropriate operation of the immigration system" that it is necessarily arbitrary and capricious. The Departments claim that the Proposed Rule is "designed to improve the overall functioning of the immigration system and to improve processing of asylum applications." 88 Fed. Reg. 11704, 11736. The Departments do not sufficiently explain how any of the proposed changes—which will largely vet out meritorious claims and harm asylum seekers, without resulting in greater efficiency—support these stated purposes (which are, at best, conclusory). Moreover, the Departments entirely fail to consider several important aspects of the problems they claim to address, and they do not balance concerns of adjudicatory efficiency and deterrence against the rights of individuals seeking humanitarian protection or the country's international obligations to afford such protection.

For example, the Departments propose a new presumption of asylum ineligibility for noncitizens who enter the country from the southern border and who (1) did not apply for and receive a formal denial of protection in a transit country; and (2) entered between ports of entry at the southern border or entered at a port of entry without a previously scheduled appointment through the CBP One mobile application, subject to extremely limited exceptions. Although the Departments

5

loosely suggest that this procedure would be both desirable and necessary in order to more effectively screen out unmeritorious (*i.e.*, frivolous) claims and alleviate burdens on immigration court dockets, they do not actually pinpoint any interests that would be furthered by denying asylum applicants the right to a hearing. Even if this presumption would enhance efficiency (which it will not), the Departments also completely fail to consider that allowing the summary denial of asylum applications will result in the deportation of thousands of refugees entitled to protection under domestic and international law. The Departments make no attempt to explain how the proposed process comports with fundamental notions of fairness or the constitutional and statutory right to a full and fair hearing. The Departments also fail to adequately evaluate the impacts of this provision on *pro se* applicants, detained applicants, and other particularly vulnerable groups. In essence, the Departments propose to penalize asylum seekers for their lack of familiarity with U.S. immigration law. There is no basis in U.S. tradition or law for imposing such harsh sanctions absent evidence of knowingly fraudulent conduct. The Departments offer no effective explanation for this change in policy, no explanation for how the policy will conserve resources, and no assessment of its devastating implications, particularly for asylum seekers who could be rendered permanently ineligible for any benefits under the INA simply because they cannot afford to retain an attorney to help them articulate their claim—or do not have enough time to do so, given the severe restrictions placed upon them by the application of this new presumption at the credible fear interview stage.

### D. If the Proposed Rule is not withdrawn, it should not have any retroactive applicability.

The Proposed Rule is wholly silent on the issue of retroactive applicability. To avoid any doubt concerning the retroactive applicability of the Proposed Rule, the Departments should at the very least make an affirmative pronouncement that the Proposed Rule will definitively not apply retroactively. Indeed, if the Proposed Rule becomes final and effective, it should not apply to anyone whose latest entry into the United States was prior to the effective date(s) of the rule. Alternatively, any final rule should specifically identify the individuals and claims to which the Proposed Rule, and any provisions thereof, would apply.

Section 551 of the Administrative Procedures Act (APA) sets forth clear standards for rulemaking. According to subsection 5, "'rule making' means agency process for formulating, amending, or repealing a rule," 5 U.S.C. § 551(5), which is what the Departments seek to do. Subsection 4, however, requires that any such rulemaking have a future effect. The APA defines a "rule" to mean "the whole or a part of an agency statement of general or particular applicability and *future effect* designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4) (emphasis added). "The only plausible reading of the italicized phrase is that rules have legal consequences only for the future." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 216 (1988). This meaning is bolstered by the remainder of the definition, which goes on to say that a rule "includes the approval or prescription *for the future* of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing." 5 U.S.C. § 551(4) (emphasis added). Indeed, the government's own authority on interpretation of the APA—the *Attorney General's Manual on the*

CLP_PC_031502

*Administrative Procedure Act*[4] (a guide given great weight by courts and used by agencies in adjusting their procedures to the requirements of the APA)—notes that "'rule' includes agency statements not only of general applicability but also those of particular applicability applying either to a class or to a single person. In either case, they must be of *future effect*, implementing or prescribing future law."[5]

Simply put, "[r]etroactivity is not favored in the law." *Bowen*, 488 U.S. at 208. "Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." *Id.*; *see also Criger v. Becton*, 902 F.2d 1348, 1353 (8th Cir. 1990) ("[L]aws are to have prospective effect only, unless the law-making entity has indicated otherwise."). Retroactivity is disfavored because the due process clause "protects the interests in fair notice and repose that may be compromised by retroactive legislation." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 266 (1994); *Hem v. Maurer*, 458 F.3d 1185, 1190 (10th Cir. 2006). "It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings." *Reno v. Flores*, 507 U.S. 292 (1993) (citing *Yamataya v. Fisher*, 189 U.S. 86, 100-01 (1903) ("[T]his Court has never held, nor must we now be understood as holding, that administrative officers, when executing the provisions of a statute involving the liberty of persons, may disregard the fundamental principles that inhere in 'due process of law' as understood at the time of the adoption of the Constitution.")). "[A]liens who have once passed through our gates, *even illegally*, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law." *F.L.B. v. Lynch*, 180 F. Supp. 3d 811, 819 (W.D. Wash. 2016) (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953)).

Retroactivity will necessarily infringe upon due process rights if the Proposed Rule, or any provision thereof, is applied to claims of asylum seekers whose latest entry into the United States was before the effective date(s) of the proposed changes. The Supreme Court has repeatedly warned against retroactive legislation, because it would "impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf*, 511 U.S. at 280. If the result of legislation "attaches new legal consequences to events completed before its enactment[,]" courts should be guided by "familiar considerations of fair notice, reasonable reliance, and settled expectations." *Id.* at 269-70. This same principle must be followed here.

Consistent with addressing due process concerns, the Departments should specify that *the Proposed Rule does not have any retroactive effect*. As the Departments admit, in FY 2022, EOIR hired 104 Immigration Judges for a total of 634 and completed a record 312,486 cases. Yet the number of cases pending before the immigration courts has risen to nearly 1.8 million, as the courts were unable to keep pace with the incoming volume. 88 Fed. Reg. 11704, 11715. Applying the Proposed Rule to pending claims would jeopardize the safety and security of nearly two million people, whose cases would be thrown into a state of uncertainty. Such uncertainty would, without doubt, increase the burden on immigration courts and judges as asylum seekers and their representatives attempt to reconcile the effects of the new rules on their own cases. Moreover, applying the Proposed Rule to those who last entered the United States prior to the effective date(s)

---

4   Tom C. Clark, U.S. Dep't of Justice, *Attorney General's Manual on the Administrative Procedure Act* (photo. reprint 1973) (1947), https://archive.org/details/AttorneyGeneralsManualOnTheAdministrativeProcedureActOf1947.
    5   *Id.* at 13.

CLP_PC_031503

would undermine reliance interests and add to the uncertainty while the inevitable litigation pends. At the very least, the Departments should specify to whom each of the new provisions would apply so that all individuals who might be impacted by the Proposed Rule are on notice of the Departments' intentions and can, as appropriate, challenge any attempt at retroactive application.

## II.    SPECIFIC COMMENTS

### A.  The Proposed Rule's introduction of a presumption of asylum ineligibility for certain noncitizens emphasizes efficiency at the expense of due process.

American Gateways acknowledges that Immigration Courts are faced with a tremendous backlog of cases and that the Departments endeavor to increase the speed and efficiency of proceedings. Yet, in several respects, the Proposed Rule prioritizes efficiency over fairness, thereby threatening the due process rights of asylum seekers.

"'It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings.'" *Demore v. Kim*, 538 U.S. 510, 523 (2003) (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)). Indeed, for over a century, the Supreme Court has repeatedly affirmed that the "Due Process Clause applies to all persons within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 679 (2001). As early as 1896, the Court held that due process rights applied to an individual detained for unauthorized entry into the United States. *See Wong Wing v. United States*, 163 U.S. 228, 238 (1896). Less than a decade later, the Court reaffirmed that immigrants in removal proceedings are guaranteed due process rights, including the right "to be heard upon the questions involving [the] right to be and remain in the United States." *Yamataya v. Fisher*, 189 U.S. 86, 101 (1903); *see also Mathews v. Diaz*, 426 U.S. 67, 77 (1976) (Fifth Amendment protects all persons "from deprivation of life, liberty, or property without due process of law") (citations omitted); *Plyler v. Doe*, 457 U.S. 202, 210 (1982) (same).

It is similarly well settled that due process requires: (1) notice and (2) an opportunity to be heard. *See, e.g.*, *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950) ("'The fundamental requisite of due process of law is the opportunity to be heard.' This right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest.") (internal citations omitted). In the immigration context, due process requires that "[a]n alien who faces deportation is entitled to a full and fair hearing of his claims." *Agyeman v. INS*, 296 F.3d 871, 877 (9th Cir. 2002) (internal quotation marks and citation omitted); *see also Colmenar v. INS,* 210 F.3d 967, 971 (9th Cir. 2000) ("[A]n alien who faces deportation is entitled to a full and fair hearing of [her] claims and a reasonable opportunity to present evidence on [her] behalf."); *Bah v. Keisler*, 249 F. App'x 876, 879 (2d Cir. 2007) ("Due process in the asylum context requires that an applicant receive a full and fair hearing that provides a meaningful opportunity to be heard.") (citing *Li Hua Lin v. U.S. Dep't of Justice*, 453 F.3d 99, 104-05 (2d Cir. 2006)); *Cano-Merida v. INS*, 311 F.3d 960, 964 (9th Cir. 2002) (failure to allow the petitioner to present oral testimony constitutes a denial of right to due process).

The civil rather than criminal nature of removal proceedings does not diminish this due process right:

CLP_PC_031504

Though deportation is not technically a criminal proceeding, it visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom. That deportation is a penalty . . . cannot be doubted. Meticulous care must be exercised lest the procedure by which he is deprived of that liberty not meet the essential standards of fairness.

*Bridges v. Wixon*, 326 U.S. 135, 154 (1945). Procedural due process rights have also animated statutory rights that apply to immigration proceedings. Section 240 of the Immigration and Nationality Act (INA) delineates the contours of a fair hearing and enumerates the rights that apply to persons in removal proceedings. The INA provides that an "Immigration Judge shall administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses." 8 U.S.C. § 1229a(b)(1). Moreover, "the alien shall have a reasonable opportunity to examine the evidence against the alien, to present evidence on the alien's own behalf, and to cross-examine the witnesses presented by the Government." *Id*. § 1229a(b)(4)(B). The INA's implementing regulations also require a hearing. The BIA has acknowledged that "[a]t a minimum, . . . the regulations require that an applicant for asylum and withholding take the stand, be placed under oath, and be questioned as to whether the information in the written application is complete and correct." *Matter of Fefe*, 20 I. & N. Dec. 116, 118 (BIA 1989).

It is critical that asylum seekers be given an opportunity to understand the procedure they are facing, to obtain counsel, and to present all evidence in support of their claim in a full merits hearing. Under the Proposed Rule, asylum seekers could be deported without an asylum hearing if they do not pass their fear screenings. *See generally* 88 Fed. Reg. 11704, 11724-25. The Proposed Rule will be implemented during the expedited removal process, where asylum seekers are swiftly deported without a day in court if they do not pass their fear screenings. *Id.* ("Although the rebuttable presumption would apply to any noncitizen who is described in proposed 8 CFR 208.33(a)(1), it would most frequently be relevant for noncitizens who are subject to expedited removal under section 235(b)(1) of the INA, 8 U.S.C. 1225(b)(1).").

During the threshold fear interview, asylum seekers will be required to show that the ban does not apply to them or, if it does, that they can rebut the presumption of ineligibility by proving they fall within one of the Rule's exceptions. *Id.* This will be impossible for many given that these screenings typically occur over the phone while asylum seekers are detained, with little or no access to counsel. Language barriers, abusive and dangerous conditions of confinement, acute trauma, and lack of knowledge of the requirements of this complex rule would make it extremely challenging for asylum seekers to overcome this ban in preliminary screenings. Many would be unable to prove to an asylum officer that they should not be banned from the right to apply for asylum by the rule. Those who cannot rebut the presumption will then be forced to meet a "more likely than not" standard just to be able to present a claim to lesser protections in the form of withholding of removal or CAT protection. *Id.*

For those forced to undergo this credible fear screening while in detention, the obstacles to due process are so high as to render success unachievable for most, regardless of the merits of their asylum claim. Asylum seekers will be forced through their fear interviews while in government

9

custody in notoriously difficult and abusive conditions,[6] without prior knowledge as to the rule's details or workings, and only a few hours or days away from the dangers and horrors of their flight. Even if legal service providers are able to obtain the ability to provide brief orientation or consultation services prior to a credible fear interview, there will be no meaningful access to representation for asylum seekers navigating this complex process.

The severe consequences asylum seekers would face as a result of implementation of the Proposed Rule's presumption of asylum ineligibility, especially at the expedited removal stage, cannot be understated. American Gateways has witnessed the problems with credible fear interviews firsthand. Indeed, American Gateways has observed several credible fear interview denials where the asylum officer did not follow the law, cut off the applicant's answers to questions, mocked the applicant, or had an interpreter in a language the applicant did not fully understand. Given the reality that Immigration Judges routinely rubberstamp asylum officers' determinations, there is an unacceptable chance that justice will be miscarried. Further, while asylum applicants who reach the Immigration Judge review stage have a right to counsel, Immigration Judges often limit the participation of legal counsel at the review hearing. Often, Immigration Judges do not allow attorneys to ask additional clarifying questions or make legal arguments to support asylum seekers' claims. Most Immigration Judge reviews last less than five minutes, and in many instances the Immigration Judges do not ask for any clarification or additional testimony from applicants.

For example, Ms. C was a detained asylum seeker who was fleeing persecution based on the murder of her husband who was a police officer. He was targeted because he was a police officer who investigated gang activity. After he was killed, Ms. C began to receive threats and was attacked. She fled because she feared that she would be killed if she remained in her home country. She was given a negative credible fear interview finding. She requested an Immigration Judge review. The review before the Immigration Judge took minutes. He affirmed the decision of the asylum officer. American Gateways intervened and requested a reinterview for Ms. C based on the legal error in the asylum officer's decision and the cursory and insufficient review by the Immigration Judge. The Asylum Office granted Ms. C an additional interview where she was represented by American Gateways. She was interviewed for nearly two hours and her attorney was able to provide legal arguments on her behalf. Because of this additional advocacy and

---

6 *See, e.g.*, Catherine E. Shoichet, "The Death Toll in ICE Custody Is the Highest It's Been in 15 Years," CNN, September 30, 2020, https:// www.cnn.com/2020/09/30/us/ice-deaths-detention-2020/index.html; Joel Rose, "ACLU Calls on DHS to Close ICE Detention Centers, Citing High Cost of Empty Beds," NPR, April 28, 2021, https://www.npr.org/2021/04/28/991679868/aclu-calls-on-dhs-toclose-ice-detention-centers-citing-high-cost-of-empty-beds; Laura Wilson, "Violence Against Women and Girls in ICE Custody," Global Rights for Women, September 21, 2020, https://globalrightsforwomen.org/featured/violence-against-women-and-girlsice-custody; Caitlin Dickerson, Seth Freed Wessler, and Miriam Jordan, "Immigrants Say They Were Pressured into Unneeded Surgeries," New York Times, September 29, 2020, https://www.nytimes.com/2020/09/29/us/ice-hysterectomies-surgeries-georgia. html; Ian Urbina, "The Capricious Use of Solitary Confinement against Detained Immigrants," Atlantic, September 6, 2019, https:// www.theatlantic.com/politics/archive/2019/09/ice-uses-solitary-confinement-among-detained-immigrants/597433; and Noah Lanard, "Guards Pepper-Spray Protesting Asylum Seekers at an ICE Detention Center," Mother Jones, June 25, 2020, https://www. motherjones.com/politics/2020/06/guards-pepper-spray-protesting-asylum-seekers-at-an-ice-detention-center.

CLP_PC_031506

representation, the Asylum Office overturned its initial decision in Ms. C's credible fear interview and allowed her to move forward with her asylum claim.

In another instance, a detained American Gateways client was given a negative credible fear interview determination for lack of nexus between her feared harm and a protected ground. Due to American Gateways' representation during the request for review by an Immigration Judge, the client was able to prove up nexus on at least two protected grounds and was issued a notice to appear. She ultimately prevailed in her case. In several other instances, American Gateways' attorneys have helped clients overcome adverse credibility findings during their interview that were largely the result of poor interpretation, false assumptions, or missed questions. In other instances, American Gateways' staff have been able to overturn negative credible fear interview determinations where the asylum officer did not evaluate the applicant for eligibility for protection under the Convention Against Torture.

These due process violations would be magnified if the administration pursues its reported plan to conduct credible fear interviews within days of asylum seekers' arrival in Customs and Border Protection (CBP) custody, where dire conditions and lack of access to counsel would exacerbate the due process nightmare. The Trump administration similarly conducted credible fear interviews in CBP custody through the Prompt Asylum Claim Review (PACR) and Humanitarian Asylum Review Process (HARP) programs, which the Biden administration ended.[7] Resurrecting this policy and imposing the asylum ban in these fear screenings would be a due process fiasco.

Asylum seekers detained in CBP custody have frequently reported[8] being provided insufficient or inedible food and water; lack of access to showers and other basic hygiene; and inability to sleep because of overcrowding, lack of adequate bedding, cold conditions, and lights that are kept on all night. For asylum seekers subjected to PACR and HARP, positive credible fear determinations plummeted[9]: according to a January 2021 United States Government Accountability Office report,

---

7 "Executive Order on Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border." The White House. The United States Government, February 4, 2021. https://www.whitehouse.gov/briefing-room/presidential-actions/2021/02/02/executive-order-creating-a-comprehensive-regional-framework-to-address-the-causes-of-migration-to-manage-migration-throughout-north-and-central-america-and-to-provide-safe-and-orderly-processing/.

8 *See, e.g.,* Human Rights Watch. "'They Treat You Like You Are Worthless': Internal DHS Reports on Abuses by US Border Officials." Human Rights Watch, 21 Oct. 2021, https://www.hrw.org/report/2021/10/21/they-treat-you-you-are-worthless/internal-dhs-reports-abuses-us-border-officials; Human Rights First. "Family Detention at Berks County Residential Center." Human Rights First, 1 Dec. 2022, https://humanrightsfirst.org/wp-content/uploads/2022/12/Final-Berks-Factsheet-12.1.2022_FINAL-1.pdf; Human Rights Watch. "'The Freezer' Abusive Conditions for Women and Children in US Immigration Holding Cells." Human Rights Watch, 28 Feb. 2018, https://www.hrw.org/report/2018/02/28/freezer/abusive-conditions-women-and-children-us-immigration-holding-cells.

9 Human Rights First. "A Pretense of Protection: The Dangerous Impact of the U.S. 'Remain in Mexico' Policy." Human Rights First, Jan. 2023, https://humanrightsfirst.org/wp-content/uploads/2023/01/PretenseofProtection-21.pdf.

CLP_PC_031507

only 18 percent of individuals in PACR and 30 percent in HARP passed their screenings, as shown in the figure below.[10]



**Outcomes of Screenings Under Expedited Fear Screening Pilot Programs, October 2019 through March 2020 (as of August 11, 2020)**

Expedited Fear Screening Programs combined

| 69% | 23% | 9% |

Prompt Asylum Claim Review | Humanitarian Asylum Review Process

| 73% | 18% | 9% |  | 62% | 30% | 9% |

■ Negative   ■ Positive   □ Administrative closure (e.g. withdrawals)

Source: GAO analysis of USCIS data.  |  GAO-21-144

Note: Percentages do not total 100 due to rounding.

United States Government Accountability Office [11]

This is compared to 40 percent nationwide (excluding HARP and PACR) during the same period.[12]

The following examples from the American Gateways experience highlight the impacts of detention on asylum seekers and the ways in which the Proposed Rule would lead to magnified due process violations for detained asylum seekers in particular:

- American Gateways has worked with a number of indigenous Kichwa speakers from Ecuador at the Hutto detention center. After months of difficulty in locating an interpreter that the detained women needed, American Gateways was able to locate **one** interpreter who speaks the correct dialect, which the women could understand. Coordinating a time when the interpreter is available that also corresponds to the rigid schedule at the detention center (so as not to conflict with numerous counts and other meetings at the facility) has often been difficult. Many of these women have family and community support in the U.S. and would be able to find representation and interpretation services much more easily if they were not detained and each of these women are asylum seekers who have suffered a great deal of trauma. Detention has exacerbated their trauma and also made them feel more isolated, due to the inability to communicate effectively with American Gateways, with ICE, with the Asylum Office, and with the Immigration Court.

- American Gateways represented an unaccompanied minor, Miss K, from Sierra Leone who had been incorrectly placed in adult detention at Hutto. She was 17 years old and spoke only Krio. Finding an appropriate interpreter was incredibly difficult and it also became clear that ICE and the contractors at the detention center were communicating (or attempting to communicate) with her in English despite the fact that she did not understand English. Several medical authorizations and other documents were explained to Miss K in English. Despite not understanding what she was signing, she did so out of fear. Once American Gateways was able to obtain a Krio interpreter (of which there are very limited

---

10 U.S. Government Accountability Office. "Central America: Regional Development Plan Includes Strategies to Address Migration, but Implementation Challenges Remain." GAO-21-144, U.S. Government Accountability Office, Feb. 2021, https://www.gao.gov/assets/gao-21-144.pdf.

11 *Id.*

12 *Id.*

CLP_PC_031508

numbers), American Gateways was able to review the documents she signed with her and discovered that she did not understand that she had consented to medical procedures, including a dental exam. Detention made communicating with Miss K more difficult because there were limited options for Krio interpreters. American Gateways had to prepare her asylum case via a phone interpreter when that interpreter was available. She should have been released, and correctly identified as an unaccompanied minor thus limiting her detention, but the language barrier was something that prevented this in the first place.

- American Gateways became very involved in the asylum cases of several women from East Africa because Immigration Judges were requiring proof of female genital mutilation (FGM) in order to grant these women asylum. However, the medical staff at Hutto would not perform the exams needed to prove FGM. American Gateways had to coordinate with an outside clinic and ICE to get the exams performed, but this proved to be burdensome. Detention only creates substantial barriers to these types of efforts, and *pro se* respondents would have little to no chance of prevailing on FGM-based claims when detention facilities refuse access to necessary medical exams.

Detention thus severely raises the hurdles asylum seekers already face in obtaining legal counsel, locating interpreters who speak the asylum seeker's language or dialect, or even collecting any other resources—such as documents or medical proof—that could assist the asylum seeker with overcoming the presumption of asylum ineligibility during credible fear screenings. It is undeniable that these barriers raise grave due process concerns under the Fifth Amendment.

Furthermore, American Gateways emphasizes that the Proposed Rule fails to recognize the significant due process concerns raised by the various parole processes that have already been implemented and from which the Departments claim to draw "lessons" in drafting the Proposed Rule—*i.e.*, the Uniting for Ukraine ("U4U") and Venezuela parole processes, as well as the processes for Cubans, Haitians, and Nicaraguans, under which DHS imposed new consequences for those who cross the border without authorization in the form of returns to Mexico. 88 Fed. Reg. 11704, 11706. These parole programs have been criticized as allowing only small numbers of migrants into the United States, and having a disproportionately negative impact on low-income individuals who may not be able to find sponsors as required under the programs. For example, up to 30,000 "qualifying nationals" per month from Cuba, Nicaragua, Haiti and Venezuela have been allowed "to reside legally in the United States for up to two years and to receive permission to work here during that period" pursuant to the parole process created for migrants of those nationalities.[13] But as the Departments themselves acknowledge, the number of *daily* encounters prior to announcement of these processes was 928 for Cuban, Haitian, and Nicaraguan nationals alone, and over 1,100 for Venezuelan nationals—on average more than *740,220 per year*, or *61,685 per month*. *See* 88 Fed. Reg. 11704, 11706. Moreover, the parole process for Haitians

---

13 Lavers, M. K. (2023, January 6). *Advocacy groups criticize new Biden immigration policies*. Washington Blade: LGBTQ News, Politics, LGBTQ Rights, Gay News. https://www.washingtonblade.com/2023/01/05/advocacy-groups-criticize-new-biden-immigration-policies/.

CLP_PC_031509

ignores the fact that Haiti lacks a functioning government, creating severe obstacles for Haitian migrants attempting to obtain passports in the first instance.[14]

### B.  The Proposed Rule's exceptions to the "rebuttable presumption" will be impossible to navigate for *pro se* asylum seekers.

The Proposed Rule creates a complex system to bypass the rebuttable presumption, which includes demonstrating by the "preponderance of the evidence" that "exceptionally compelling circumstances exist." 88 Fed. Reg. 11704, 11723. The Proposed Rule specifically lists a number of "per se grounds for rebuttal" of the presumption: acute medical emergency, imminent and extreme threat to life or safety (such as rape, kidnapping, torture, or murder), and satisfying the legal definition of a "victim of a severe form of tracking in persons." *Id.*

Navigating this added layer to our already complex asylum system will be particularly problematic given the application of the rebuttable presumption to the credible fear interview stage. Under this Proposed Rule, the asylum officer determines whether the asylum seeker has rebutted this presumption. *Id.* at 11724 ("For each noncitizen referred to an asylum officer for a credible fear interview, the asylum officer would first determine if the noncitizen is covered by and fails to rebut the presumption of ineligibility"). If they have not, they receive a negative fear determination for their asylum claim. *Id.* The asylum officer will then determine whether the asylum seeker established a "reasonable possibility" of persecution or torture—a standard that is higher than the credible fear standard and more difficult to meet.[15] They will likely navigate this rebuttable presumption alone, as asylum seekers very rarely have attorney representation at this stage.

Asylum seekers face a difficult time obtaining representation for their initial asylum office "hearing." Legal representation rates among noncitizens in removal proceedings generally are low. As of 2016, only 37% of individuals appearing before immigration courts secured legal representation.[16] Immigrants in detention were the least likely to obtain representation—only 14% had legal counsel.[17] Access to counsel is often outcome-determinative. Represented detainees are ten-and a-half times more likely than their *pro se* counterparts to win their cases.[18] The disparities are similarly high for asylum seekers (both detained and non-detained). In Fiscal Year (FY) 2020,

---

14 "Passport rush blamed on US policy stalls adoptions in Haiti." Associated Press, February 10, 2023, https://apnews.com/article/biden-politics-united-states-government-caribbean-haiti-f98a84e03e56e2702fb6880ec1825f0f (noting that the "U.S. policy change has unleashed a rush for passports at Haiti's main immigration office," and that "the ensuing demand for Haitian passports has overwhelmed Haiti's passport office in the capital, Port-au-Prince, where people with appointments cannot squeeze through the aggressive crowd or secure new appointments.").

15  American Immigration Council. "Asylum in the United States." Accessed March 26, 2023. https://www.americanimmigrationcouncil.org/research/asylum-united-states.

16 Ingrid Eagly & Steven Shafer, *Access To Counsel In Immigration Court*, Am. Immigration Council (Sept. 28, 2016), https://www.americanimmigrationcouncil.org/research/access-counsel-immigration-court.

17 Eagly, https://www.americanimmigrationcouncil.org/research/access-counsel-immigration-court. Since 2000, representation rates for detained individuals have ranged between roughly 10% and 30%. According to some estimates, the rates leveled off between 2015 and 2017 at about 30%. *See* TRAC Immigration, *Who Is Represented in Immigration Court?* (Oct. 16, 2017), https://trac.syr.edu/immigration/reports/485/.

18 Eagly, https://www.americanimmigrationcouncil.org/research/access-counsel-immigration-court.

CLP_PC_031510

the overall asylum denial rate rose for the eighth straight year to 71.6%.[19] The denial rate for unrepresented asylum seekers was a staggering 82.3% (versus 68.9% for represented asylum seekers).[20] During the first quarter of FY 2020, less than 27% of asylum requests were granted in immigration court—a 36.6% decline from FY 2016.[21] The asylum grant rate for Central American migrants has declined even more steeply to 13.3%—a 50% decline from FY 2016.[22] For those caged in detention facilities, where myriad barriers frustrate efforts to access counsel and basic legal information, circumstances are even more dire. Because noncitizens appearing before immigration courts have no right to government-appointed counsel, *pro se* respondents must often confront the complex process of drafting filings, filling out forms, and presenting arguments to a judge with little to no legal, technical, or linguistic guidance. As a result, thousands of detained immigrations without legal representation rely on legal services organizations like American Gateways for *pro se* legal assistance.

Furthermore, even if they somehow proceed past the credible fear interview stage to a full asylum adjudication, *pro se* respondents face significant challenges in appearing before immigration courts without counsel. Most individuals in removal proceedings do not speak English and have little, if any, familiarity with U.S. immigration law, which courts have described as "a maze of hyper-technical statutes and regulations that engender waste, delay, and confusion," including among immigration lawyers.[23] Applications for relief must be submitted in English, or they will be deemed abandoned and the respondent ordered removed. Without the assistance of counsel, few individuals—many of whom are torture or trauma survivors who suffer from post-traumatic stress disorder or other mental health ailments—can successfully complete required legal forms, much less complete them within the required time constraints. Given this, it is imperative that asylum seekers be given an opportunity to obtain counsel and present all evidence in support of their claims in full merits hearings before Immigration Judges.

The Biden administration faces a very real challenge at the southern border. This region is where the most vulnerable asylum seekers arrive, including those who do not have access to a plane ticket to fly to the United States through the newly established parole programs. However, the Proposed Rule is not the answer to these challenges. This Proposed Rule adds unnecessary complexity to

---

19   TRAC   Immigration,   *Asylum   Denial   Rates   Continue   To   Climb*   (Oct.   28,   2020), https://trac.syr.edu/immigration/reports/630/ (asylum was granted in just 26.3% of cases; in an additional 2.1% of cases, some other form of relief (e.g., statutory withholding of removal or withholding of removal under CAT) was granted when asylum itself was denied); *see also* TRAC Immigration, *Record Number of Asylum Cases in FY 2019* (Jan. 8, 2020), https://trac.syr.edu/immigration/reports/588/ (reporting asylum denial rate of 69% in FY 2019).

20 TRAC Immigration, *Asylum Denial Rates Continue to Climb*, *supra* note 19. Between FY 2019 and FY 2020, the percentage of unrepresented asylum seekers increased from 15.6% to 20%. *Id.* This decrease in representation is one of several factors that have contributed to the increase in denial rates.

21 Human Rights First, *Grant Rates Plummet As Trump Administration Dismantles U.S. Asylum System, Blocks and   Deports   Refugees*,   Fact   Sheet,   2   (June   2020), https://www.humanrightsfirst.org/sites/default/files/AdministrationDismantlingUSAsylumSystem.pdf. USCIS has not released data for the first quarter of FY 2020. As of FY 2019, the asylum grant rate for affirmative asylum claims adjudicated before USCIS was 30.7%—a decline of 28.8% since FY 2016. *Id.*

22 *Id.* at 1; *see also* TRAC Immigration, *Asylum Denial Rates Continue to Climb*, *supra* note 19 (reporting that denial rates for asylum seekers from Honduras, Guatemala, and El Salvador in FY 2020 were 87.3%, 85.8%, and 85%, respectively).

23 *Drax v. Reno*, 338 F.3d 98, 99 (2d Cir. 2003).

CLP_PC_031511

the asylum process that will become insurmountable barriers to asylum, especially to those who do not have legal counsel.

### C. The Proposed Rule's presumption of asylum ineligibility would disparately harm black, brown, and indigenous asylum seekers.

The Proposed Rule discriminates against asylum seekers based on manner of entry and transit and will have a racially disparate impact on asylum seekers from Africa, the Caribbean, and Latin America. The proposed ban, which applies only to people who seek protection at the southern border, will disproportionately harm people of color who do not have the resources or ability to arrive in the United States by plane.

The United States and other countries employ visa regimes to prevent low income people of color from reaching their countries' territories to seek asylum while often allowing access to people from wealthier and predominantly white nations.[24] Imposing a ban on refugees seeking safety at the southwest border will, like the Trump third-country transit ban, disproportionately harm people of color who must undertake an often difficult and dangerous journey to arrive in the United States by way of the southern border. During the period that the Trump transit ban was implemented, immigration court asylum denial rates skyrocketed for many Black, Brown, and Indigenous asylum seekers requesting safety at the southern border.[25] For instance, asylum grant rates declined by 45 percent for Cameroonian asylum applicants, 32.4 percent for Cubans, 29.9 percent for Venezuelans, 17 percent for Eritreans, 12.9 percent for Hondurans, 12 percent for Congolese (DRC), and 7.7 percent for Guatemalans from December 2019 to March 2020, compared to the year before the third-country transit asylum ban began to affect refugee claims, according to data analyzed by Syracuse University's Transactional Records Access Clearinghouse.

Additionally, as discussed below, requiring asylum seekers to use CBP One to seek asylum at the border disparately harms Black asylum seekers due to racial bias in its facial recognition technology[26] and is inaccessible to many Indigenous, African, and other asylum seekers due to language barriers. This proposed asylum ban will significantly thwart the Biden administration's stated commitment to racial justice and equity.[27]

The ban also builds in nationality-based discrimination in access to asylum, as it largely bans asylum for people who do not enter the United States via limited parole initiatives or previously scheduled appointments at ports of entry while simultaneously only affording limited access to

---

24 Women's Refugee Commission. "Visa Regimes: A Threat to Migrants' Access to Safety and Asylum." June 2022. Accessed March 26, 2023. https://www.womensrefugeecommission.org/wp-content/uploads/2022/06/Visa-Regimes-A-Threat-to-Migrants-Access-to-Safety-and-Asylum.pdf.

25 Human Rights First. "The Asylum Ban: Ending the Ban and Protecting Asylum Seekers." January 2023. Accessed March 26, 2023. https://humanrightsfirst.org/wp-content/uploads/2023/01/AsylumBanFactsheet_final2.pdf.

26 Melissa del Bosque, "Facial recognition bias frustrates Black asylum applicants to US, advocates say," *The Guardian*, February 8, 2023.

27 "Executive Order on Further Advancing Racial Equity and Support for Underserved Communities Through The Federal Government," EO 13985, February 16, 2023, https://www.whitehouse.gov/briefing-room/presidential-actions/2023/02/16/executive-order-on-further-advancing-racial-equity-and-support-for-underserved-communities-through-the-federal-government/ (accessed March 26, 2023).

CLP_PC_031512

parole initiatives for certain nationalities.[28] For instance, while there are currently limited parole initiatives for some nationalities, there are no similar parole initiatives for people from Guatemala, Honduras, and El Salvador—and recent reporting has indicated the Biden administration plans to wield the asylum ban against these nationalities.[29]

### D. The Proposed Rule's presumption of asylum ineligibility raises concerns regarding domestic and international refugee and asylum law obligations.

As a signatory to the 1967 Protocol of the 1951 Convention Relating to the Status of Refugees (the "1967 Protocol"),[30] the United States has obligations under international law to afford protections to individuals who have a well-founded fear of being persecuted in their home country. Furthermore, when Congress passed the Refugee Act in 1980, thereby incorporating those obligations into domestic law, it made its intentions abundantly clear: The purpose was to enforce the "historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands."[31]

The Proposed Rule, in its totality, contravenes this congressional intent and U.S. law governing asylum access, expedited removal procedures, and prohibitions on the return of refugees to persecution and torture. In purporting to protect the United States from asylum seekers, the Proposed Rule turns the presumption in favor of extending protections to asylum seekers on its head. The Departments' attempt to dismantle the asylum system is unlawful and indefensible.

As a historical matter, the United States played a lead role in drafting the Refugee Convention in the aftermath of World War II. By later acceding to the Refugee Protocol, the United States promised to abide by the Convention's legal requirements. These requirements include non-discriminatory access to asylum, the prohibition against returning refugees to persecution, and the prohibition against imposing improper penalties on people seeking refugee protection based on manner of entry. The U.N. Refugee Agency (UNHCR) previously warned, with respect to the Trump administration's entry and transit bans, that such asylum bans are not consistent with fundamental protections of refugee law, including the right to seek asylum, the principle of non-refoulement, and the prohibition against penalties for irregular entry. By denying asylum where an individual has not used certain limited migration pathways, the Proposed Rule attempts to unlawfully use the existence of lawful pathways as a justification to deny access to asylum at the

---

28 Human Rights Watch. "Biden's New Plan No Help for Desperate Venezuelan Refugees." Human Rights Watch, 28 Oct. 2022, https://www.hrw.org/news/2022/10/28/bidens-new-plan-no-help-desperate-venezuelan-refugees.

29 NBC News. "Biden to block migrants with Trump-era Stephen Miller tactic." NBC News, 8 Mar. 2022, https://www.nbcnews.com/politics/immigration/biden-block-migrants-trump-era-stephen-miller-tactic-rcna71282.

30 The 1967 Protocol incorporates Articles 2 through 34 of the 1951 Refugee Convention, making those provisions binding on countries that have acceded to the 1967 Protocol, including countries like the United States that have not acceded to the Convention itself. See Protocol Relating to the Status of Refugees, Jan. 31, 1967, 606 U.N.T.S. 267, https://www.refworld.org/docid/3ae6b3ae4.html (hereinafter the 1967 Protocol); Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 137, https://www.refworld.org/docid/3be01b964.html (hereinafter the 1951 Refugee Convention).

31 Refugee Act of 1980, § 101(a), Pub. L. No. 96–212, 94 Stat. 102 (1980) (hereinafter the 1980 Refugee Act).

CLP_PC_031513

border.[32] UNHCR, IOM, and UNICEF recently warned that the provision of safe pathways "cannot come at the expense of the fundamental human right to seek asylum."[33]

Furthermore, the Refugee Act of 1980, which incorporated these principles of the 1967 Protocol into domestic U.S. law, provides any person arriving at a U.S. border the right to seek asylum, regardless of the person's status or manner of entry. Specifically, 8 U.S.C. 1158 provides that people may apply for asylum regardless of manner of entry into the United States. It also delineates limited exceptions where an asylum seeker may be denied asylum based on travel through another country, but these restrictions only apply where an individual was "firmly resettled" in another country (defined to mean the person was eligible for or received permanent legal status in that country) or if the U.S. has a formal "safe third country" agreement with a country where refugees would be safe from persecution and have access to fair asylum procedures. The statute prohibits the administration from issuing restrictions on asylum that are inconsistent with these provisions. 8 U.S.C. 1231 codified the prohibition against returning refugees to countries where they face persecution.

But the central function of this Proposed Rule is to limit asylum eligibility at the southern border based on a person's manner of entry or transit, their ability to access technology, and/or the number of appointments that DHS decides to make available on a given day. The presumption of asylum ineligibility that arises from this function directly contravenes the principle of non-discriminatory asylum access codified by the 1980 Refugee Act. The Proposed Rule, which conditions access to asylum on manner of entry and transit, would result in the return of refugees to danger and unequivocally contravenes these provisions of U.S. law.

Indeed, this central premise of the Rule recalls similar bans issued by the Trump administration, which were repeatedly struck down by federal courts.[34] During the time it was in place, the Trump-era rule that banned asylum seekers based on their manner of transit resulted in migrants with strong claims to asylum being rapidly deported to their persecutors, and separated countless families when refugees barred from asylum under the rule obtained lesser protections that did not allow them to apply for family members abroad. These harms will inevitably recur under the Proposed Rule.

---

32 *See generally* Comment on the Proposed Rule by the Department of Homeland Security (DHS) and the Executive Office for Immigration Review (EOIR) on Circumvention of Lawful Pathways | Human Rights Watch. "Comment on the Proposed Rule by the Department of Homeland Security (DHS) and the Executive Office for Immigration Review (EOIR) on Circumvention of Lawful Pathways," March 24, 2023. https://www.hrw.org/news/2023/03/24/comment-proposed-rule-department-homeland-security-dhs-and-executive-office.

33 "UNHCR, IOM and UNICEF Welcome New Pathways for Regular Entry to the US, Reiterate Concern over Restrictions on Access to Asylum," Joint statement by UNHCR, IOM, and UNICEF, October 14, 2022, https://www.unhcr.org/en-us/news/press/2022/10/63497be44/unhcr-iom-and-unicef-welcome-new-pathways-for-regular-entry-to-the-us-reiterate.html (accessed March 26, 2023).

34 *O.A. et al. v. Donald J. Trump et al.* and *S.M.S.R. et al. v. Donald J. Trump et al.*, No. 1:18-cv-02718-RDM, Memorandum Opinion, (D.D.C. Aug. 2, 2019), https://www.caircoalition.org/sites/default/files/Memo%20Opinion%20Dkt.%2092.pdf (accessed March 26, 2023); *Capital Area Immigrants' Rights Coal. v. Trump*, Civil Action No. 19-2117 (TJK) and Civil Action No. 19-2530 (TJK), (D.D.C. June 30, 2020), https://casetext.com/case/capital-area-immigrants-rights-coal-v-trump (accessed March 26, 2023); *East Bay v. Barr*, No. 19-cv-04073-JST, (N.D. Cal. February 16, 2021), https://www.aclu.org/cases/east-bay-v-barr?document=pi-order (accessed March 26, 2023).

CLP_PC_031514

The Proposed Rule also violates specific congressional intent concerning asylum seekers. In 1996, Congress created the expedited removal process through the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA). Under this process, asylum seekers placed in expedited removal who establish a credible fear of persecution must be referred for full asylum adjudications. The Proposed Rule attempts to unlawfully circumvent the credible fear screening standard established by Congress, which was intended to be a low screening threshold. The government is required to refer asylum seekers in expedited removal for full asylum adjudications if they can show a "significant possibility" that they could establish asylum eligibility in a full hearing. The Proposed Rule attempts to eviscerate this standard by *first* requiring asylum seekers to prove to an asylum officer by a preponderance of evidence that they can rebut the presumption of asylum ineligibility, and *then* requiring those who cannot overcome the presumption to meet a higher fear standard before being permitted to seek protection. This provision is inconsistent with U.S. law.

In addition, the Proposed Rule violates the Refugee Convention's prohibition against imposing improper penalties on asylum seekers based on their irregular entry into the country of refuge. The Departments explicitly note that the asylum ban would inflict "consequences" on people seeking asylum—a blatant attempt to punish people based on their manner of entry into the United States. These consequences could include the denial of access to asylum, deportation to harm, family separation, and deprivation of a path to naturalization. With respect to the Trump administration's entry ban, UNHCR has stated that "[n]either the 1951 Convention nor the 1967 Protocol permits parties to condition access to asylum procedures on regular entry."[35]

The Proposed Rule's implementation of a presumption of asylum ineligibility for many noncitizens entering the U.S. from the southern border violates these key provisions of U.S. law and treaty commitments. Indeed, similar Trump administration asylum bans targeting refugees at the border based on manner of entry and transit were vacated and enjoined by federal courts for violating these provisions of U.S. law, as discussed throughout these comments. In 2021, when the Biden administration first considered adopting an asylum ban, legal counsel for the White House warned that it could be struck down as illegal for the same reason that federal courts struck down the Trump administration bans. Nonetheless, the Departments have decided to proceed with this patently illegal policy.[36]

Finally, the Proposed Rule will, in effect, shift to other countries the responsibility for adjudicating asylum claims, providing appropriate reception arrangements, and granting international

---

35 *See generally* Comment on the Proposed Rule by the Department of Homeland Security (DHS) and the Executive Office for Immigration Review (EOIR) on Circumvention of Lawful Pathways | Human Rights Watch. "Comment on the Proposed Rule by the Department of Homeland Security (DHS) and the Executive Office for Immigration Review (EOIR) on Circumvention of Lawful Pathways," March 24, 2023. https://www.hrw.org/news/2023/03/24/comment-proposed-rule-department-homeland-security-dhs-and-executive-office.

36 Camilo Montoya-Galvez, "U.S. Officials Clashed over Asylum Restriction, and Its Legality, Before Biden Proposed It," *CBS News*, March 1, 2023, https://www.cbsnews.com/news/immigration-biden-asylum-restrictions-legality/ (accessed March 26, 2023).

CLP_PC_031515

protection.[37] This is true regardless of whether the individual is pursuing protection in the United States. The Proposed Rule would have a potential significant negative impact on those individuals, particularly in cases where they lack a reasonable connection or link to those States but do have one to the United States.[38]

The Proposed Rule's conditionality based on transit vitiates the right to seek asylum and the core principle of non-refoulement.[39] First, such conditionality amounts to a unilateral, de facto transfer of responsibility for adjudication to another state without the necessary safeguards in place, and second, the conditionality goes beyond the exhaustive exclusion framework contemplated in the 1951 Convention and its 1967 Protocol.[40]

Asylum seekers should ordinarily be processed in the state in which they seek asylum.[41] As a limited exception to this general rule, states may enter into an agreement with another state to facilitate the transfer of asylum seekers.[42] While international law does not prevent states from entering into responsibility-sharing arrangements which allocate responsibility for adjudicating asylum claims between them, it does require protections to ensure that the individual's rights are upheld.[43] Any transfer of people who may be in need of international protection from one country to another must ensure that asylum seekers receive the protection guaranteed to them by the 1951 Convention, including but not limited to, the protection from refoulement articulated in Article 33.[44]

   **E.   The Proposed Rule's presumption of asylum ineligibility for asylum seekers who did not obtain an appointment to present at the border using CBP One raises equal access concerns.**

The Proposed Rule introduces an entirely new concept into the U.S. asylum system—it renders asylum at the southern border contingent on migrants' ability to access and properly utilize a mobile phone app prior to their arrival. All asylum seekers attempting to enter the United States between ports of entry and those arriving at ports who are subject to the new transit grounds of ineligibility will be ineligible for asylum unless they made an advance appointment to present at the port of entry using the CBP One app.

Requiring access to technology to secure asylum access fails to account for gaps in technology, language access, and economic disparities between groups of migrants attempting to use the app while fleeing harm. The result will be an asylum system that leaves behind those with fewer resources, often those in the greatest need.

---

37 *See generally* United Nations High Commissioner for Refugees (UNHCR), "Comments of the United Nations High Commissioner for Refugees on the Proposed Rule: Circumvention of Lawful Pathways" (20 March 2023), accessed March 26, 2023, https://www.refworld.org/pdfid/6417e6674.pdf.

38 *Id.*
39 *Id.*
40 *Id.*
41 *Id.*
42 *Id.*
43 *Id.*
44 *Id.*

CLP_PC_031516

Furthermore, the CBP One app in its limited roll-out has already proven extremely flawed: users have reported frequent glitches and appointments that fill up before they can access them; and the facial recognition technology is racially disparate in application, often rejecting photos of migrants with darker skin.[45]

CBP One is an extremely flawed government tool for requesting an appointment at a port of entry and is inaccessible to many asylum seekers due to financial, language, technological, and other barriers. It clearly discriminates against Black and Indigenous asylum seekers, and has very limited appointment slots such that requiring asylum seekers to use the application essentially turns asylum access into a lottery. The Proposed Rule attempts to establish CBP One as the only mechanism to request asylum at the southern border and seeks to punish those who cannot wait indefinitely in danger while they attempt to schedule an appointment.

The rule requires asylum seekers at the southwest border to schedule appointments through the CBP One app and would generally deny asylum to refugees who arrive at a border port of entry without a previously scheduled appointment and were not denied protection in a transit country. CBP One is impossible for **many asylum seekers to access or use,**[46] including those who do not have the resources to obtain a smartphone, access to Wi-Fi, or the ability to navigate the app. The app is not available in most languages—including Indigenous languages—and all error messages are in English, effectively barring many asylum seekers from using the app. It also disparately harms **Black asylum seekers**[47] due to racial bias in its facial recognition technology, which has **prevented** many from obtaining an appointment. Asylum seekers who can access and navigate the app are still often unable to schedule appointments due to extremely limited slots and are forced to remain in dangerous conditions indefinitely. Requiring asylum seekers to use CBP One at the southwest border also raises concerns that the system will be used for **illegal metering** (based not on wait time but on luck, technology skills, or resources to secure an appointment—turning asylum access in effect into a lottery).

Requiring asylum seekers to schedule an appointment through CBP One has already resulted in horrific violence and death, including the murder of a 17-year-old Cuban child in Mexico who was required to wait weeks for an appointment.[48]

> **F. If the Proposed Rule is to apply at all, it should not apply at the credible fear interview stage; asylum seekers should be given the opportunity to have an asylum hearing before the Immigration Judge.**

---

[45] Herrera, J., Solomon, D., Articles, V., Holley, P., Cantu, R., Hooks, C., Hardy, M., Oldershausen, S. V., Scudder, C., Sharpe, P., Ross, R., O'Neal, S., & McCarthy, W. (2023, March 2). *Fleeing for Your Life? There's An App for That.* Texas Monthly. https://www.texasmonthly.com/news-politics/cbp-app-asylum-biden-administration/.

[46] Leutert, Stephanie, and Caitlyn Yates. "Asylum Processing at the U.S.-Mexico Border: February 2023." *Strauss Center for International Security and Law.* The University of Texas at Austin, February 2023. https://www.strausscenter.org/wp-content/uploads/Feb_2023_Asylum_Processing.pdf.

[47] Bosque, Melissa del. "Facial Recognition Bias Frustrates Black Asylum Applicants to US, Advocates Say." the Guardian, February 8, 2023. https://www.theguardian.com/us-news/2023/feb/08/us-immigration-cbp-one-app-facial-recognition-bias.

[48] Herrera, Jack, Dan Solomon, View Articles, Peter Holley, Ryan Cantu, Christopher Hooks, Michael Hardy, et al. "Fleeing for Your Life? There's An App for That." Texas Monthly, March 2, 2023. https://www.texasmonthly.com/news-politics/cbp-app-asylum-biden-administration/.

CLP_PC_031517

The asylum ban would apply in the fundamentally flawed expedited removal process as well as in full asylum adjudications before USCIS and the immigration court. As mentioned above, expedited removal is the process that allows the U.S. government to deport people arriving at the border without ever seeing an Immigration Judge if they do not express fear or do not pass a "credible fear" screening interview where they must show a significant possibility that they could establish asylum eligibility in a full hearing.

In expedited removal, asylum seekers covered by the Proposed Rule would be required to gather the evidence and arguments necessary to "rebut the presumption of ineligibility" (in other words, prove they fall within one of the few exceptions to the rule). Those who fail to do so would be automatically subject to a higher screening standard (in violation of 8 U.S. Code § 1225 governing credible fear interviews) and would face deportation to danger if they cannot pass the screening. Even those who do pass would be subject to the presumption of ineligibility in an immigration hearing and if barred from asylum would only be eligible for lesser forms of protection known as Withholding of Removal or Convention Against Torture (CAT) protection. These protections do not provide a pathway to citizenship, are subject to revocation at any time, and do not allow people to petition for their spouses and children.

The Proposed Rule will also apply to immigrants in full asylum hearings before USCIS and the immigration court. In these proceedings, asylum seekers would be denied asylum if they cannot rebut the presumption of ineligibility, resulting in the deportation of many refugees and leaving others with only lesser forms of protection available to them.

Asylum seekers who are banned by the rule during their credible fear interviews would have to meet a heightened screening standard in order to access immigration court hearings and would be subject to deportation if they cannot pass the screening. As discussed above, the Proposed Rule's attempt to illegally elevate the credible fear standard established by Congress violates the statute and congressional intent in setting a low screening threshold.

Even when an applicant who applies for asylum affirmatively is able to develop a full evidentiary record before an asylum officer, it is still extremely difficult to prevail on meritorious claims. For detained applicants, it is even harder to prevail on a meritorious claim before an asylum officer. Detained applicants are much more likely to be unrepresented and rarely have the ability to develop evidence before the asylum officer. In these cases, it is even more critical that applicants have the opportunity to present their claims at a full evidentiary hearing before an Immigration Judge.

Ultimately, to ensure that asylum seekers due process rights are protected, they must receive full hearings in front of Immigration Judges—not just a *de novo* record review. Eliminating the full hearing does not properly balance efficiency and fairness considerations especially, as noted above, for detained and other *pro se* litigants. If the Departments want to increase efficiency, then they should place all applicants in Section 240 removal proceedings instead of expedited removal proceedings, which are only compounding the existing backlog of cases. Placing applicants whose defensive asylum applications are denied by USCIS into full Section 240 proceedings will also remedy the disparate treatment of defensive cases and affirmative cases, the latter of which are referred to Immigration Court for a full hearing if denied by USCIS.

CLP_PC_031518

# PUBLIC SUBMISSION

As of: May 08, 2023
Received: March 27, 2023
Status: Posted
Posted: March 29, 2023
Tracking No. lfr-hz7a-tqf8
Comments Due: March 27, 2023
Submission Type: API

Docket: USCIS-2022-0016
Circumvention of Lawful Pathways

Comment On: USCIS-2022-0016-0001
Circumvention of Lawful Pathways

Document: USCIS-2022-0016-12344
Comment Submitted by Florence Immigrant & Refugee Rights Project

## Submitter Information

Email: lstjohn@firrp.org
Organization: Florence Immigrant & Refugee Rights Project

## General Comment

See attached file(s)

## Attachments

2023-03-27-FINAL_Transit Ban FIRRP Comment



March 27, 2023

*Submitted via: https://www.regulations.gov.*

Daniel Delgado                     Lauren Alder Reid
Acting Director                     Assistant Director,
Border and Immigration Policy       Office of Policy, EOIR
Office of Strategy, Policy, and Plans   U.S. Department of Justice
U.S. Department of Homeland Security    telephone (703) 305-0289
telephone (202) 447-3459

**Re: Comment on the Proposed Rule by the <u>Department</u> of <u>Homeland Security</u> (DHS) and the <u>Executive Office for Immigration Review</u> (EOIR) on** Circumvention of Lawful Pathways, CIS No. 2736-22; Docket No: USCIS 2022-0016; A.G. Order No. 5605-2023

Dear Acting Director Daniel Delgado and Assistant Director Lauren Alder Reid;

The Florence Immigrant & Refugee Rights Project (Florence Project) respectfully submits this comment in response to the Department of Homeland Security (DHS) and Department of Justice (DOJ)'s proposed rule – which, given that seeking asylum is indeed a legal and protected pathway, is somewhat disingenuously titled "Circumvention of Lawful Pathways" – and hereafter referred to as the "proposed rule," that was published in the Federal Register on February 23, 2023. The proposed rule would change the face of asylum as we know it, directly contravening clear statutory language mandating that any non-citizen who is physically present in the U.S. or arrives in the U.S., *whether or not at a designated port of arrival and irrespective of the noncitizen's status*, may apply for asylum. This proposed rule would presumptively bar many refugees from critical asylum protection in the United States, certain to result in the unlawful refoulement of people fleeing persecution and violence. It also will force many people fleeing persecution and violence to try to remain in unsafe conditions in countries with dysfunctional and ineffective asylum systems and will deprive refugees who otherwise would have been eligible for asylum of their right and ability to reunite with their families and have access to a path to citizenship in the U.S

The proposed rule is a new version of similar asylum and transit bans promulgated under the Trump administration that were repeatedly struck down by federal courts as unlawful. The Florence Project strongly urges the agencies to withdraw this proposed rule in its entirety and stop pursuing border and asylum policies that seek to circumvent U.S. law and treaty obligations to refugees, particularly those like this proposed rule that will disproportionately discriminate against Black, Brown, and Indigenous asylum seekers at our southern border. The administration should instead uphold its promise to rescind Trump administration entry and transit bans in their entirety, uphold refugee law, and restore full access to asylum at the border. This must include ensuring fair and humane asylum adjudications by ending the reliance on and proposed expansion of expedited removal procedures and properly funding USCIS to conduct full and fair

1

CLP_PC_031520

adjudications as well as legal service providers and NGOs who provide welcoming services to support refugees as they move through the legal process.

## I.   Florence Project Is Well-Positioned to Offer Meaningful Feedback on the Many Harms of This Proposed Rule

The Florence Project is a 501(c)(3) non-profit organization that provides free legal and social services to the thousands of adults and children detained in immigration custody in Arizona on any given day. The Florence Project was founded in 1989 to provide free legal services to asylum seekers and other migrants in a remote immigration detention center in Florence, Arizona where people had no meaningful access to counsel. We have expanded significantly since that time and now provide free legal and social services to thousands of detained adults and unaccompanied children throughout Arizona. This includes providing services to thousands of people seeking asylum, withholding of removal, and Convention Against Torture protections each year, including hundreds of individuals who are going through the expedited removal credible fear or a reasonable fear screening process.

Additionally, in 2017, the Florence Project partnered with the Kino Border Initiative ("KBI"), a binational organization, to provide legal services to asylum seekers at the U.S.-Mexico border. Through that partnership, the Florence Project's Border Action Team now provides regular group and individual legal orientations and representation to asylum seekers in Heroica Nogales, Sonora, Mexico (hereafter referred to as Nogales, Sonora), just across the border from the Port of Entry into Nogales, Arizona. As the only 501(c)(3) non-profit organization in Arizona dedicated to providing free legal and social services to people in immigration detention, our vision is to ensure that every person facing removal proceedings has access to counsel, understands their rights under the law, and is treated fairly and humanely.

In 2021, the Florence Project provided legal case assistance over 4,000 times and provided over 8,600 legal educational packets to adults detained in Arizona. Our services include legal orientation services to detained pro se asylum seekers in Eloy and Florence to empower them to represent themselves in bond and removal proceedings. In 2021, our attorneys also represented 249 adults before the EOIR, including 115 people who were appointed counsel after an Immigration Judge found them incompetent to represent themselves pursuant to *Franco-Gonzalez v. Holder*. Our Border Action Team provided legal orientations to 2,600 people passing through KBI's humanitarian aid center in Nogales, Mexico; these services directly impacted 4,200 people when considering the accompanying family members. Finally, in 2021, our Social Service Team provided lifesaving social services to 628 people.

## II.   The 30-Day Comment Period Provides Insufficient Time to Comment on the Rule

Providing only 30 days for the public to comment on the proposed rule effectively denies the public the right to meaningfully engage in the notice and comment process, forcing both organizations and individuals to quickly draft comments under extreme and unnecessary time-pressure. This dramatically abbreviated comment window is not

in keeping with the notice and comment rulemaking procedures required by the Administrative Procedure Act.

In particular, the 30-day-window for comments for this proposed rule is insufficient given the sheer size and sweeping scope of the proposed rule as well as the fact that the rule, if enacted, would deny many people access to asylum in violation of U.S. law and international law. On March 1, 2023, 172 organizations, including the Florence Project, wrote to the agencies urging them to provide at least 60 days to comment on the complex 153-page rule that would have enormous implications for asylum access at the border and in USCIS and immigration court asylum proceedings. That request was summarily denied in a scant two-page letter dated March 14, 2023, that merely reiterated that the abbreviated comment period was "because the Departments seek to be in a position to finalize the proposed rule, as appropriate, before the Title 42 public health Order is lifted" without engaging with any of the substance of the organizational letter that noted the myriad flaws with that analysis.

As addressed more fully in the organizations' March 1, 2023 letter, the government's alleged rationale for the expedited comment window – the expected termination Title 42 – is specious. The organizations' March 1, 2023 letter specifically noted the many flaws with the Government's alleged rationale for the expedited timeframe, given that the Biden administration has long been aware that the emergency public health measure would end at some point, vowed to end it themselves both before and upon coming into office, and indeed formally sought to end the policy themselves nearly a full year ago in April 2022. Moreover, the administration has received significant Congressional appropriations to prepare for this policy's inevitable, eventual demise. To now claim the impending end of Title 42 as an emergency that outweighs the public's right to meaningfully engage in notice and comment on a sweeping rule that directly contravenes U.S. law and would fundamentally alter the entire asylum process is hyperbolic at best and disingenuous at worst.

Moreover, the language quoted above from the Government's letter declining to extend the deadline clearly indicates the administration's intention to finalize and issue some version of this proposed rule prior to May 11, 2023, regardless of the results of this comment period. This is particularly troubling because we seek full rescission of this proposed rule in its entirety. As addressed more below, it is contrary to U.S. law and treaty obligations, as is evidenced by numerous federal court rulings vacating and enjoining strikingly similar Trump administration asylum bans targeting refugees at the border based on manner of entry and transit because they violated key provisions of U.S. law. The administration's language clearly indicates that, regardless of the findings of this comment period, some version of this proposed rule will likely be implemented by May 11, 2023, and further evidences that this abbreviated comment window is not in keeping with the concept of meaningful notice and comment required by the Administrative Procedure Act.

The abbreviated 30-day comment period also goes against established practice and guidance. Executive Orders 12866 and 13563 state that agencies should generally provide at least 60 days for the public to comment on proposed regulations. A minimum of 60 days in this case is especially critical given the proposed rule's attempt to ban

asylum for many refugees in violation of U.S. law and international commitments, which would result in the refoulement of many people to persecution, torture, and death.

Providing a 30-day comment period for the proposed asylum ban is reminiscent of Trump administration practices, when agencies routinely provided 30-day comment periods on sweeping asylum rules, leaving the public little time to meaningfully assess and respond to proposed rules. Indeed, the extent of the damage and suffering that the proposed regulation would cause is difficult to quantify, especially in the short 30-day period that the Departments have proffered for the public to comment on the proposed regulation. The Florence Project is the sole 501(c)(3) organization providing exclusively pro bono services to the thousands of adults and children detained in Arizona. In Mexico, our small team of four staff members is inundated with work, explaining the constantly shifting information and systems to asylum seekers stranded at the border, who are confused, in danger, and confronting frustrating and challenging new technological barriers. The abbreviated comment period has strained our resources as we have struggled to fit our analysis of and response to the proposed rule in with our already overwhelming workload. This has impacted our ability to gather additional supporting client case examples from prior transit bans, interview asylum seeking clients stranded at the border, provide robust and complete references to relevant articles, reports, and other documentary evidence in support of our positions, and otherwise limited our ability to fully address several major areas of concern in the rule.

### III.    The Proposed Rule Violates U.S. Law and Treaty Obligations

The proposed rule directly contravenes U.S. law governing asylum access, expedited removal procedures, and prohibitions on the return of refugees to persecution and torture. Additionally, it violates U.S. international treaty obligations as it directly contravenes several key provisions of the Refugee Protocol, to which the U.S. acceded, including the mandate that States provide non-discriminatory access to asylum, the prohibition against returning refugees to persecution, and the prohibition against imposing improper penalties on people seeking refugee protection based on manner of entry.

### a.   The Proposed Rule Directly Violates U.S. Law

The Refugee Act of 1980 incorporated key principles from the Refugee Convention of 1951 directly and unequivocally into U.S. law at 8 U.S.C. §1158. The proposed rule contravenes several key aspects of U.S. asylum law.

First, 8 U.S.C. §1158 specifically provides that people may apply for asylum *regardless of manner of entry* into the United States. However, by creating a presumption of ineligibility for asylum precisely based on one's manner of entry, this proposed rule directly contravenes this fundamental principle of U.S. asylum law. The rule is explicit that this presumption is conceptualized as a new consequence – a penalty – for those who do not avail themselves of the new alternative processes and nonetheless crossed the Southwest border without authorization. This presumptive elimination of asylum access based on manner of entry into the U.S. as a penalty for the unauthorized entry is in direct violation of U.S. law. While the proposed rule acknowledges federal court

rulings that support this reading of the statute, it merely states that it disagrees with the federal court's reading, splitting hairs between the right to apply for asylum regardless of manner of entry as compared with actually being eligible for asylum. However, the right to apply for protection where that form of relief is all but foreclosed to you is no right at all.

The proposed rule's procedure placing the burden on asylum seekers to rebut this presumption of ineligibility for asylum does not save the proposed rule. The proposed rule makes it incumbent on the asylum seeker to prove by a preponderance of the evidence – a heightened standard of proof – that an exception or rebuttal of the presumption against asylum eligibility should apply. However, as discussed in more detail below, as a practical matter it will often be extraordinarily difficult, if not impossible, for migrants to obtain the necessary evidence and explain their situation sufficiently to obtain exemptions or rebut the presumption. The proposed rule puts the burden on those who are most vulnerable to gather evidence and make complex factual and legal claims when they are often actively in harm's way. When, inevitably, individuals are unable to meet these exacting requirements, the proposed rule will result in refoulement of refugees in violation of U.S. law at 8 U.S.C. §1231, which codified the prohibition from our treaty obligations against returning refugees to countries where they face persecution.

Second, the transit ban portions of the proposed rule also run afoul of clear provisions of U.S. law. 8 U.S.C. §1158 delineates specific limited exceptions where an asylum seeker may be denied asylum based on travel through another country. These restrictions only apply where an individual was "firmly resettled" in another country (defined to mean the person was eligible for or received permanent legal status in that country) or if the U.S. has a formal "safe third country" agreement with a country where refugees would be safe from persecution and have access to fair asylum procedures. The statute prohibits the administration from issuing restrictions on asylum that are inconsistent with these provisions. Moreover, under the common canon of statutory construction, *expressio unius est exclusio alterius*, Congress's inclusion of these specific circumstances in which transit through a third country before seeking asylum in the U.S. disqualifies a person from asylum implies the exclusion of other scenarios, like those proposed in this rule, in which transit can permissibly be used to bar individuals from asylum. Had Congress intended the agencies to be allowed to presumptively bar asylum access to anyone who ever passed through any third country without seeking asylum in that third country, no matter the circumstances or ability of that country to provide the person with protection, it could and would have said that. It did not. This proposed rule, thus, directly contravenes these aspects of U.S. law and clear Congressional intent.

Third, the proposed rule attempts to unlawfully circumvent the credible fear screening standard established by Congress. In 1996, Congress created the expedited removal process through the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA). In establishing the standards and procedures for expedited removal and credible fear screenings, Congress purposefully designed initial credible fear screenings to be a low screening threshold that would then grant applicants the right to full asylum proceedings. Indeed, Congress explicitly rejected various heightened standards that

were proposed and instead mandated that asylum seekers placed in expedited removal who passed the purposefully low screening threshold of credible fear of persecution must be referred for full asylum adjudications.

Thus, under the law, the government must refer asylum seekers in expedited removal for full asylum adjudications if they can show a "significant possibility" that they could establish asylum eligibility in a full hearing. However, the proposed rule attempts to eviscerate this standard in at least two ways: first, by requiring asylum seekers to prove to an asylum officer by a preponderance of evidence that they can rebut the presumption of asylum ineligibility, and second, by requiring those who cannot overcome the presumption to meet a higher fear standard before being permitted to seek protection. This scheme is completely at odds with U.S. law.

The proposed asylum ban violates these key provisions of U.S. law and treaty commitments. Indeed, similar Trump administration asylum bans targeting refugees at the border based on manner of entry and transit were repeatedly struck down by federal courts as unlawful. The Trump administration's transit ban, which was in effect for a year before it was vacated, inflicted enormous damage including deportation of refugees to harm, separation of families, and prolonged detention. Florence Project staff directly witnessed and reported numerous instances of harm under the prior transit bans, some of which were included in the linked report. We see little reason to believe that the limited exceptions envisioned in this proposed rule would resolve the greater underlying problems with imposing presumptive bars to asylum in violation of U.S. law.

For example, we had one client, "Angel"[1], during the Trump transit ban who was a transgender woman from Guatemala. She was denied asylum exclusively based on the transit ban, after she crossed Mexico to seek protection in the U.S. Though she was ultimately granted withholding of removal, because Angel was banned from asylum she faced months of detention in ICE custody in dangerous conditions, a heightened burden of proof before both the Asylum Office and Immigration Judge, and ultimately was only able to acquire a form of relief that was less protective and did not provide a path to citizenship. She will forever be denied certain rights because of the transit ban.

Clients like Angel will face the same obstacles under this proposed rule as Angel did under the Trump transit ban. Indeed, because Mexico is considered one of the most dangerous countries to be a transgendered woman, it would be neither reasonable nor safe to ask such a person to seek asylum from Mexican authorities, nor would it be reasonable or safe to ask them to wait patiently in Mexico to navigate the CBP One application with all of its many flaws to obtain an appointment to present. The proposed rule's limited exceptions, for example that based on "an imminent and extreme threat of rape, kidnapping, torture, or murder" is so narrowly formulated that effectively no one will be able to establish this exception as it "cannot be speculative, based on general concerns about safety, or based on a prior threat that no longer poses an immediate threat." Effectively, this exception only protects those who are literally running from their persecutors directly to the border and, even then, those people will only qualify for an exception if they can prove, by a preponderance of the evidence and not based on

---

[1] All names provided in this comment are pseudonyms to protect our clients' privacy.

speculation, that the threat was sufficiently grave to qualify – i.e. rape, kidnapping, torture, or murder.

Thus, the practical effect of the proposed rule would be effectively identical to the harms suffered by people wrongfully denied access to asylum under the Trump bans. It will be used to deny refugees asylum, blocking and rapidly deporting many asylum seekers without access to asylum hearings in expanded expedited removal where there is little to no access to counsel and no time to help someone meaningfully understand their rights and burdens under the proposed rule. The alleged saving grace of the exceptions is mere window dressing as the exceptions and opportunities to rebut the presumption are so narrowly tailored that few people will, as a practical matter, be able to meet their burdens to establish asylum eligibility by a preponderance of the evidence. As a result, the proposed rule will inevitably result in the same horrific harms as the prior Trump transit and entry bans. Indeed, in 2021, when the Biden administration first considered adopting an asylum ban, legal counsel for the White House warned that it could be struck down as illegal for the same reason that federal courts struck down the Trump administration bans. Nonetheless, the agencies have decided to proceed with this patently illegal policy.

For these reasons, the proposed rule should be withdrawn in its entirety.

### b. The Proposed Rule Contravenes Key Provisions of the Refugee Convention and Protocol Including the Fundamental Right of Non-Refoulment

The adoption of this proposed rule would also fly in the face of the requirements of the Refugee Convention of 1951 and the Refugee Protocol. Following the horrors of World War II, the United States played a lead role in drafting the Refugee Convention and then later adopted and consented to the Refugee Protocol, thereby promising to abide by the Convention's legal requirements. However, this proposed rule runs afoul of various fundamental requirements of the Refugee Convention and Protocol, including providing non-discriminatory access to asylum, the prohibition against returning refugees to persecution, and the prohibition against imposing improper penalties on people seeking refugee protection based on manner of entry.

The Departments are surely aware of these foundational defects, as the very conceptualization of bans based merely on transit through third countries (not formally identified as Safe Third Countries) and manner of entry run contrary to both the letter and spirit of the Convention and Protocol. Indeed, the U.N. Refugee Agency (UNHCR) previously warned, with respect to the Trump administration's entry and transit bans, that such asylum bans are not consistent with fundamental protections of refugee law, including the right to seek asylum, the principle of non-refoulement, and the prohibition against penalties for irregular entry. They have reiterated those concerns with regard to this proposed rule. Nonetheless, the administration is moving forward with the proposed rule despite clear indications that it is unlawful and contrary to international law norms.

The proposed rule contravenes the Refugee Convention and Protocol in several major ways.

First, by denying asylum to anyone who fails to follow specific limited migration pathways, the proposed rule attempts to unlawfully use the mere existence of some lawful pathways as a justification to deny access to asylum at the border. To be clear, the creation of some additional, limited lawful pathways for entry for some people, while laudable, in no way changes the United States' obligation to follow its own laws and the Refugee Convention's clear prohibition against penalizing asylum seekers for their manner of entry.

Indeed, the Refugee Convention explicitly acknowledges that the seeking of asylum can require refugees to breach immigration rules and not follow the limited legal pathways that exist. However, by creating a presumptive bar to asylum for any person who enters the U.S. in a manner other than through the CBP One application, this rule directly contravenes that mandate. Placing the burden on refugees to establish exceptions to this presumption does not obviate the fact that this procedure clearly penalizes asylum seekers for their manner of entry and thus contravenes the plain language and intent of the Refugee Convention. The administration must take heed of the experts' warning, including that of UNHCR, IOM, and UNICEF who have warned that the provision of safe pathways "cannot come at the expense of the fundamental human right to seek asylum." Yet, that is precisely what this proposed rule seeks to do.

Second, the proposed rule also violates the Refugee Convention's prohibition against imposing improper penalties on asylum seekers based on their irregular entry into the country of refuge. The agencies explicitly note that the asylum ban would inflict "consequences" on people seeking asylum – a blatant attempt to punish people based on their manner of entry into the United States. These consequences could include the denial of access to asylum, deportation to harm, family separation, and deprivation of a path to naturalization. With respect to the Trump administration's entry ban, UNHCR has stated that "[n]either the 1951 Convention nor the 1967 Protocol permits parties to condition access to asylum procedures on regular entry."

Third, the proposed rule will lead to refoulement of many asylum seekers. The principle of non-refoulement is the cornerstone of the Refugee Convention and Protocol, yet by creating sweeping presumptions of asylum ineligibility, this proposed rule creates a framework that would significantly undermine the principle of non-refoulement. The limited exceptions established in the proposed rule are insufficient to protect against non-refoulement. First, as addressed above with the example of Angel, effectively very few people will be able to access the exceptions or successfully rebut the presumption as a practical matter because the grounds for exception or rebuttal are extremely narrow, and they place a heightened burden on the asylum-seeker to demonstrate the existence of a grounds for exception/rebuttal. Many individuals will face refoulement simply because they sought protection when, in some government agent's discretion, the risk was not imminent enough, or because they failed to flee with their evidence in hand.

Additionally, it bears noting that withholding of removal is not an acceptable substitute protection against non-refoulement both because the heightened standard of proof applied does not offer protection in keeping with U.S. obligations to honor all parts of the 1951 Convention and because the benefits of withholding are substantially narrower

than those for asylum. As such, withholding is an insufficient substitute under international standards applying to non-refoulement and asylum.

Fourth, the proposed rule violates the Refugee Convention's foundational principle of non-discrimination in access to asylum. It does this in several notable ways. The proposed rule privileges limited alternative pathways to legal entry to the U.S. for individuals from some countries while not creating viable alternative pathways for others. Yet, recent reporting has indicated the Biden administration plans to wield the asylum ban against individuals from countries where no such parole initiatives exist, such as those from Guatemala, Honduras, and El Salvador. Thus, the proposed rule subjects all asylum seekers to the same draconian bars to asylum regardless of whether an alternative viable pathway exists.

Indeed, the language of the proposed rule touts the successes of programs like Uniting for Ukraine and the Venezuelan parole process that was later expanded to Cubans, Haitians, and Nicaraguans (hereafter referred to as the CHNV parole program) that created limited pathways to parole for only citizens of those countries. By their very nature, programs like these discriminate between countries whose citizens the U.S. deems worthy of alternative legal pathways and those it does not. Additionally, while the creation of additional pathways for parole is in many ways laudable, it is no replacement for asylum. These new legal pathways discriminate against the most vulnerable because it is only viable for those who have the privilege of: being able to wait in their home country; having connections that allow them to identify a fiscal sponsor in the U.S. with lawful status in the U.S.; being able to obtain necessary travel documents, including passports from a government that may well be persecuting them; and having the financial means to purchase air fare directly to the U.S. The reality is that many of those who are most susceptible to violence and most vulnerable will be utterly unable to meet all these requirements, and therefore will be forced to still travel to the U.S./Mexico border to access asylum. Basing the elimination of asylum as a legal pathway to enter the United States for such individuals on the creation of these separate programs fundamentally fails to appreciate the critical differences between the populations served by the parole programs and other asylum seekers.

Also, as addressed in further detail below, the proposed rule's reliance on the CBP One smartphone application introduces numerous levels of potential discrimination particularly in terms of language access and the technology's limitations on recognizing those with darker skin for photo and biometric requirements.

Finally, because the proposed ban only applies to people who seek protection at the southern border, will disproportionately harm people of color who do not have the resources or ability to arrive in the United States by plane.  The U.S. visa regimes predominantly privilege individuals traveling from majority white nations, leaving those from countries in Africa, the Caribbean, South and Central America often with few options but to undertake an often difficult and dangerous journey to arrive in the United States by way of the southern border. During the period that the Trump transit ban was implemented, immigration court asylum denial rates skyrocketed for many Black, Brown, and Indigenous asylum seekers requesting safety at the southern border. For instance, asylum grant rates declined by 45 percent for Cameroonian asylum applicants,

32.4 percent for Cubans, 29.9 percent for Venezuelans, 17 percent for Eritreans, 12.9 percent for Hondurans, 12 percent for Congolese (DRC), and 7.7 percent for Guatemalans from December 2019 to March 2020, compared to the year before the third-country transit asylum ban began to affect refugee claims, according to data analyzed by Syracuse University's Transactional Records Access Clearinghouse. This is in many ways the predictable and unavoidable impact of any rule, like the proposed rule, that penalizes those who do not have the privilege of being from countries whose citizens can more readily obtain travel visas to the U.S.

This proposed asylum ban will significantly increase systemic and structural discrimination in the U.S. immigration system, undermining the credibility of the Biden administration's stated commitment to racial justice and equity.

For these reasons, the proposed rule should be rescinded in its entirety.

IV.     **The Proposed Rule's Reliance on the CBPOne Application as the Sole Gateway for Asylum Access at the Border is Misguided, Particularly as CBPOne is Riddled With Problems Including Accessibility, Discrimination, Efficiency and Safety.**

The CBPOne application was introduced to improve efficiency in border processing, but any asylum system that relies solely on this flawed technology cannot justly and adequately process asylum seekers.  The application has already proven to have significant flaws, yet the proposed rule relies upon it as the sole access point for asylum. Under the proposed rule, asylum seekers at the border are required to schedule an appointment through CBPOne. Any asylum seeker who arrives at a port of entry without a scheduled appointment will likely be denied and forced to wait in violent and unsafe conditions until they find a smartphone, a secure WiFi connection, and eventually are able to secure one of an extremely limited number of appointments.  The reliance of the proposed rule upon this app will result in asylum seekers being unlawfully turned away, often to the very countries where their lives were at risk. The application's flaws have also already resulted in discriminatory access to asylum, including racial bias in facial recognition and limited language access. Advocates have raised these concerns to the government since the application's original rollout. The proposed rule's attempt to utilize the application as a singular asylum processing point is even more egregious due to the government's awareness of the serious flaws and discrimination present.

a.   **Many Asylum Seekers Lack Access to Technology and WiFi**

CBP One has proven challenging for asylum seekers to access, especially those who cannot afford a smartphone or do not have the technological experience to navigate one. Given that many asylum seekers are fleeing situations of poverty in addition to violence, it is an unreasonable hurdle for many to obtain a smartphone. Victor Yanez, Director of Migrant Services at our partner the Kino Border Initiative (KBI) in Nogales, Sonora, estimates that 3 out of every 10 migrants they encounter has to purchase a new cellphone in order to access CBPOne. A smartphone that can access the application can

cost $3,000 - $5,000 pesos in Mexico ($163 - $271 USD), the equivalent of ten days' work.  The real cost is much higher, however, when you factor in the cost of food and shelter while a person attempts to find work to raise the money for the phone – those ten days can stretch to weeks when a migrant must juggle basic survival needs with purchasing a smartphone. To make matters worse, both Florence Project staff and our partners at the Kino Border Initiation have observed that certain features of the app, including facial recognition, operate better on brand-new, more expensive devices. For migrants waiting in Nogales, Sonora while trying to obtain an appointment, KBI has tried to support by providing food and shelter so they can save money for a phone. The organization has also tried to gather donations of smartphones for asylum seekers to use, but only a few phones have been donated. Absent the needed donations, KBI has encouraged the community of asylum seekers to share their phones with one another to help schedule appointments. While asylum seekers are trying to support one another in this manner, it is clear from this information that it is erroneous to assume asylum seekers arrive at the border with a smartphone and unreasonable for the proposed rule to rely upon this assumption.

Additionally, while the proposed rule cites to an extremely limited survey of how many people at one port of entry on one day had smart phones as evidence of the prevalence of smartphone ownership to justify reliance on the CBPOne app, the mere possession of a smartphone does not guarantee people access to CBPOne. First, because the application requires certain bandwidth and other technological features, not all smartphones are actually able to access the CBPOne app. Second, the mere possession of a smartphone does not obviate the significant barriers that remain for individuals with limited literacy or who speak languages in which CBPOne is not provided.

It is also a large hurdle for migrants trapped at the border to obtain a secure WiFi connection. The information being input into CBPOne contains personally identifiable information, which could be a safety risk for asylum seekers if the WiFi connection they are on is not private. Seeking out a WiFi connection can also put asylum seekers at risk if they are forced to leave a secure location and go out into public. Additionally, some shelters have limitations on hours and spaces in which migrants may access their phones which can force some migrants to have to decide between having safe shelter for the night or being able to access the app. Ultimately, as has been documented, not being able to access a smartphone or a wifi connection could lengthen their journey through unsafe areas and delay asylum seekers' opportunity to submit their fear claim.

### b. CBPOne Is Discriminatory In Terms of Both Language Access and Literacy Concerns

In addition to the technological access barriers, there are serious language access barriers with CBPOne. The app is currently only available in a limited number of languages that does not include the Indigenous languages many of our clients speak. Additionally, key advisals regarding the terms and conditions of use and the repercussions of fraud or willful misrepresentation are provided exclusively in English. The discriminatory impact of language access in the use of the CBPOne app came into stark relief on January 5, 2023, when the Departments announced a limited parole program for Cubans, Haitians, and Nicaraguans premised on use of the app, yet

somewhat remarkably did not provide access in any language commonly spoken in Haiti. Indeed, CBPOne was not available in Haitian Creole until late January, causing unfair delays for a specific language group and nationality. Asylum processing must be equitable and accessible to all and cannot unfairly discriminate against specific countries or language groups. Moreover, most, if not all, error messages in the CBPOne application are in English only, discriminating against anyone who does not have at least a basic grasp of English to decipher those error messages.

The Florence Project Border Action Team has submitted requests on behalf of five different families who speak indigenous languages, and those requests have been pending for nearly four weeks at the time of comment submission. Without assistance from an NGO like the Florence Project, these families would have no mechanism to access the CBPOne app because it is simply unavailable in languages that they speak. In order to get the information necessary to properly make a request on behalf of an indigenous family, our team must spend an estimated 3 to 4 hours with each family and an independent interpreter. Our staff members must review current border policy, asylum basics, the unaccompanied minor process in case of family separation, and the substance of their fear claim. We have submitted requests on behalf of five families (totaling 12 people, including minor children) so far and have five more indigenous families (totaling 28 persons, including minor children) scheduled for the coming week. In total, these 40 persons speak six different indigenous languages from southern Mexico and Guatemala. This is yet another example of the government offsetting the work of asylum processing to nongovernmental organizations such as our own and requires a large amount of time and resources.

Another glaring issue is requiring literacy to obtain an appointment to express a fear claim.  Many asylum seekers have not had the opportunity to attend formal schooling or otherwise have very limited literacy. The issue of literacy combined with language access creates an even bigger problem – many indigenous language speakers cannot read in their language nor in Spanish, and literacy among indigenous language speakers drops to only the 20th or 30th percentile. Therefore, translating the app into new languages does not resolve the issue of access and any proposed system that effectively requires literacy as a prerequisite for the person seeking protection is doomed to failure. An asylum system that relies on CBPOne or any other app as a singular point of entry into processing will unfairly discriminate against certain groups and will rely upon nongovernmental organizations to do the labor of helping asylum seekers submit valid fear claims.

c. **CBPOne, Like Most Facial Recognition Software, is Racially Discriminatory**

The CBPOne App has demonstrated racial bias in the facial recognition technology it relies upon. The reliance on this app is inherently harmful to Black asylum seekers who have been prevented from scheduling an appointment due to the flawed technology. The facial recognition feature has been unable to process images with a darker skin tone, effectively blocking Black migrants from access to our asylum system. Black asylum seekers are already more vulnerable while waiting for an appointment in Mexico, with widespread reports of harassment, racially targeted violence, and abuse by Mexican

CLP_PC_031531

authorities. In yet another example of nongovernmental organizations working overtime to compensate for the flaws of the government's system, some advocacy groups have brought in construction lights to brighten the faces of asylum seekers so the app will recognize them. In Nogales, while we have not had to bring in construction lights, we routinely witness the additional difficulties faced by migrants with darker skin tones in getting the app to recognize and detect their faces and we have witnessed people holding the phone to their faces for 15 minutes before the app was able to recognize their features. This is difficult, but not insurmountable when it comes to adults, but can pose even greater hurdles when dealing with children.

The proposed rule's plan to utilize CBPOne as a singular access point for asylum seekers when the government is aware of the inherent racial bias of the app is discriminatory and unjust. It works in direct opposition to the Biden administration's stated commitment to advance racial equity. The United States asylum system must be equitable and accessible to all, regardless of race. The proposed rule cannot achieve that while relying upon an app that has clear, unresolved racial bias.

### d. CBPOne Requires Asylum Seekers to Obtain Unnecessary Information That They May Not Have Access To

While DHS maintains that CBPOne only requires asylum seekers to provide basic biographical information, there are many presumptions about what information is considered "basic". In reality, this results in certain groups of asylum seekers being privileged over others. One of the required fields for asylum seekers to complete in the CBPOne application is their height and weight. While this may be standard practice within the U.S., it is not universal knowledge, particularly for asylum seekers from more remote communities that lack access to medical care or other agencies where they may have been able to weigh and measure themselves. To wit, KBI estimates that approximately 70% of the asylum seekers who were displaced in its' shelter in the Fall of 2022 had never had access to a primary care doctor. Therefore, when the CBP One application became publicly accessible for the Title 42 exemptions process, KBI has had to place two different scales as well as a height ruler on the wall so that migrants can measure and weigh themselves. Florence Project staff witness persons routinely using these devices in order to complete the CBPOne requisite information. However, if an asylum seeker does not have access to an NGO such as KBI, and they do not know their height and weight, they would not be able to complete the CBPOne application. This means they would first have to seek out a medical clinic or other system by which they could weigh and measure themselves. Access to asylum should not be predicated on this information that can be – and is still – routinely gathered by CBP officers at the Port of Entry.

### e. Reliance on CBPOne as the Sole Access Point to Asylum Causes Delays That Force Asylum Seekers to Wait in Unsafe Conditions

While CBPOne's implementation was intended to expedite processing, the reliance on it as the singular way to obtain an appointment causes delays and leaves people in danger.

For example, a 17-year-old Cuban child was murdered in Mexico while waiting for an appointment. Unfortunately, we have also seen such a tragic result in Nogales, Sonora as well. Another legal service provider in Nogales, Sonora represented a young man who – in addition to fleeing harm in his country of origin and seeking asylum with his family – was suffering organ failure. The legal service provider had escalated the case to the Tucson Office of Field Operations (OFO), requesting that the man receive an urgent exemption from Title 42 and/or humanitarian parole. The legal service provider explained to Tucson OFO that, due to the exigent circumstances, the family could not wait even more weeks or months for an appointment via the CBP One application. Tucson OFO failed to address their request, and sadly the young man died.

Additionally, over-reliance on the app as the sole access point for asylum forces many people to expose themselves to further danger when they are only able to obtain an appointment at a distant port of entry. This is what happened to one Venezuelan family who were kidnapped, tortured and extorted during a 1,200 mile journey to another port after there was no appointment available where they were. Their kidnappers threatened to murder them if they did not cross. When they were apprehended, they informed Border Patrol about the threat to their life but were expelled back to unsafe conditions in Mexico.

Many of the asylum seekers we serve in Nogales, Sonora who do not yet have a scheduled appointment are ultimately unable to obtain an appointment to present at the Nogales Port of Entry and instead must travel to one of the other ports of entry that are hundreds of miles away. This is deeply concerning, as the Sonora state is designated by the U.S. State Department as one in which people should "reconsider travel due to crime and kidnapping." The U.S. State Department recognizes that Sonora is a key location used by the international drug trade and human trafficking networks. Violent crime is widespread. And, U.S. government employees are prohibited from traveling within large parts of Sonora, yet, these are the very highways and routes that asylum seekers must travel to access ports of entry along the Texas/Mexico border. Moreover, in other parts of Sonora, U.S. government employees are only permitted to travel directly into certain cities, but are not permitted to go outside of the city limits due to the aforementioned dangers of kidnapping and crime. Yet, the highways in the northern and western parts of the state that are outside the city limits of many of the named cities in Sonora are the exact highways that asylum seekers must travel to access ports of entry along the California/Mexico border.

Moreover, the time and efficiency savings of the CBPOne app are dramatically overstated. In fact, after an asylum seeker requests an appointment via CBPOne, they still have to fill out paperwork containing much of the same biometric and biographical information at their appointment. As recently as last week, our Border Action Team staff members saw the form and confirmed that it is the exact same information as the CBP One app gathers.  Because some of the information provided can change over time, it must be checked against the information originally provided in the app. As such, the CBPOne process is actually slower than having applicants provide their biographical information one time, whenever they are encountered and processed by border officials be that at a port of entry or otherwise.  This most neatly aligns with what is clearly contemplated in U.S. asylum law and with international norms.

### f.   Delays in Access Disproportionately Harm Vulnerable Groups

By requiring people at the southwest border to use CBP One, the proposed rule would leave many vulnerable asylum seekers in grave danger, including LGBTQI+ asylum seekers, women, and survivors of gender-based violence. Asylum seekers unable to secure appointments through the CBP One app will be forced to remain indefinitely at the border in dangerous conditions, often with no access to safe housing or stable income as they continue to try to make an appointment. These conditions increase the likelihood that they will be targeted for violence by cartels, traffickers, and the abusers from which they initially fled. Many LGBTQI+ asylum seekers and families and other vulnerable populations have already been unable to secure appointments through CBPOne, leaving them in extreme danger.

To the extent that this rule is designed to prevent people from entering at places other than ports of entry, there will inevitably be significant delays in obtaining appointments through CBPOne. Just as the exemption process under Title 42 has led to delays of several weeks or months to gain an opportunity to enter, we can expect the same issues to arise with CBPOne appointments under Title 8 processing. Over the past three years, Florence Project staff have witnessed how excessive delays in processing has consistently led to those who are most vulnerable to harm feeling they have no other option but to risk attempting to enter without inspection, despite or without knowledge of the consequences, out of desperation in face of harm in Mexico. Such was the case for "Belen," a lesbian woman from Guatemala who faced threats of harm and unsafe conditions while in Nogales due to her sexual orientation. Desperate in the face of this harm, she attempted to cross through the desert, but was raped repeatedly, left to die, and then expelled by Border Patrol officials back to face additional harm in Mexico.

Indeed, for many LGBTQI+ individuals, even a short delay at the border can result in extreme violence. Such was the case for "Santiago," a young man who had fled his home state in Mexico because of threats he received because of his sexual orientation. Despite being a Mexican citizen seeking asylum, he was subject to Title 42 and required an exemption to seek asylum in the U.S. After being displaced for only a few weeks, Santiago was brutally attacked and raped by two men while running an errand in Nogales, Sonora. As Santiago and Belen's cases show, even short delays in allowing asylum seekers to request protection can have serious harmful impacts on particularly vulnerable populations.

### V.   The Proposed Rule Does Not Fix What is Broken in the U.S. Asylum System, But Instead Leans Into the Worst of That Broken System in Ways That Ensure Massive Rights Violations.

The proposed rule cites to the significant asylum backlogs and change in migratory flows as key rationalizations for the changes it proposes. While backlogs and undue delay in the asylum system are undoubtedly challenges, this proposed rule improperly shifts the burden of the United States' failure to properly fund and design a functional asylum system onto the individuals seeking protection. The proposed rule's primary

means of resolving these issues is to presumptively deny people the right to seek asylum. This response is based in large part on statistics comparing disparities between how many people pass a credible fear interview and how many acutally win asylum. However, this analysis fails to account for the fact that the credible fear interview was purposefully designed as a low threshold to avoid wrongfully turning potential refugees away and fails to account for the complexity of asylum law which contributes greatly to both delayed adjudication and disparity in ultimate grant rates. For example, the jurisprudence on what constitutes a viable particular social group in U.S. asylum law for victims of gender based violence has been the subject of substantial and often conflicting litigation for nearly fifteen years, with numerous contradictory BIA and Attorney General decisions issued on the topic. For many asylum seekers caught in this cycle of changing law, their success or failure before the agencies after the CFI had little to do with the merits or lack thereof of their individual case, but with the changing legal landscape in which they found themselves. The Biden administration has recognized the need for clarity around aspects of asylum law like this one, but has thus far failed to propose rule changes that would provide such clarity. Yet, troublingly, we now we have this proposed rule being moved through on an expedited timeframe that will presumptively deny people access to asylum as a way to manage migration flows and backlogs. This leans into the most broken aspects of our asylum system and improperly places the burden for our systemic failures on asylum seekers.

### a. The Proposed Rule Will Result in People Being Refouled in Violation of Law

As addressed above, the proposed rule would lead to the deportation of refugees to countries where they are at risk of persecution and torture in direct violation of the U.S. obligation of non-refoulement. The proposed rule creates a difficult to overcome presumption against asylum eligibility for refugees based on their manner of entry and/or the travel through third countries – factors that have nothing to do with the person's underlying fear claim. As such, factors that are ultimately irrelevant to individuals' fear claims will nonetheless be the sole reason why some individuals are denied asylum and ordered removed. This is in direct violation of the fundamental principle of non-refoulement.

Under the Trump administration's iteration of the transit ban, Florence Project worked with clients who were improperly refouled to countries where they faced violence and persecution after failing to meet the heightened standards for reasonable fear and withholding that they were held to. As is well-documented by Human Rights First, such refoulement was a regular occurrence under the Trump administration's transit ban and included a Honduran family who were attacked after the mother participated in political protests; a Venezuelan opposition journalist and her one-year-old child; Cuban and Nicaraguan political activists targeted by their governments for their political opinions; a gay Honduran asylum seeker who was threatened and assaulted by both the policy and the public for his sexual orientation; and a gay Nicaraguan asylum seeker living with HIV who experienced severe abuse and death threats on account of his sexual orientation, HIV status, and political opinion.

In one case, Florence Project represented a woman, "Maria," who had been a police officer in her native Nicaragua, but began facing persecution by her fellow officers when they learned she had voted against President Ortega. Other police badly beat her at a political protest and threatened to disappear her if she failed to return to duty and arrest those opposed to President Ortega. Denied access to asylum as the result of the Trump transit ban, both the Asylum Officer and Immigration Judge agreed that her facts did not meet the heightened threshold for withholding of removal or protection under the Convention Against Torture – a more likely than not instead of a 10% likelihood of persecution – and federal courts ultimately found that they had no jurisdiction to review the propriety of that determination. As such, as a direct result of the transit ban, she was improperly subject to refoulement to Nicaragua.

### b. The Proposed Rule Attempts to Eviscerate Critical Safeguards in the Expedited Removal Process

The proposed rule places yet more limitations on asylum access, building upon expanded expedited removal procedures and fast-track credible and reasonable fear screenings, that will exclude the most vulnerable populations from seeking protection in the United States. On March 13, 2023, the Florence Project joined 93 other civil, human, and immigrant rights groups to decry this administration's enhancement of expedited removal and the asylum processing rule. Of particular concern, is this administration's planned tactic to remove more people by placing "fast-tracked asylum screenings withing Customs and Border Protection (CBP) detention facilities." Under similar Trump administration programs, PACR and HARP, asylum screenings conducting in the CBP facilities showed a nearly 69% decrease in positive credible fear findings. These interviews are for many asylum seekers their sole opportunity to explain their reasons for seeking protection in the United States. CBP conditions, and warp speed credible fear screenings are unsuitable for an asylum seeker to meaningfully request asylum under our laws.

First, the proposed rule, further erodes access to protections that the INA ensures asylum seekers will receive in the name of expeditious processing at a time of exigent circumstances. However, exigent circumstances cannot justify widespread violations of due process.  In addition to implementing the proposed rule's transit and entry bans during the credible fear process, the proposed rule disposes of critical safeguards for asylum seekers who receive negative credible fear determinations. First, the proposed rule seeks to curtail asylum seekers' access to immigration court review of any negative credible or reasonable fear determination. Second, the rule eliminates asylum seeker's long-standing right to request USCIS to reconsider previous negative fear findings. The administration's push to accelerate credible fear screenings requires more – not fewer – procedural protections for erroneous determinations, yet the proposed rule does just the opposite.

The proposed rule further narrows the scope of who gets IJ review over their negative credible fear determinations, limiting access to that review for only those who affirmatively request review and not those who refuse to sign or indicate if they would like review. However, based on the Florence Project's experience, this proposal will unwittingly limit review on some of the most vulnerable individuals' cases as we have

time and again observed cases where people who "refused to indicate" if they wanted an IJ review were in fact suffering from serious mental health conditions or were experiencing significant language barriers that the asylum officer did not catch or appreciate and such that they did not understand what they were being asked to sign. Moreover, the level of trauma and fear asylum seekers experience, especially communicating their persecution for the first time, heightens the likelihood of communication barriers and incomplete information provided at these interviews. The high stakes of the credible and reasonable fear process require automatic procedural protections, especially in the rushed system the administration envisions. Instead, this proposed rule unravels decades of regulatory protection to the review process by mandating that only an affirmative statement requesting a review is enough to trigger the review process.

Credible and reasonable review hearings are necessary to ensure the integrity of the asylum screening process. On average, over a twenty-five-year period, immigration judges have reversed around twenty-five percent of negative credible fear findings. The proposed rule's affirmative request requirement mirrors the Trump administration's December 11, 2020 rule. This rule, commonly referred to as the "death to asylum rule," similarly deprived asylum seekers access to credible fear review hearings, by requiring asylum seekers to affirmatively request immigration court review of any negative findings. The Trump administration responded to critics of the provision by emphasizing the need to lessen the burden on the immigration court and reasonableness to require an affirmative request.

On May 31, 2022, the Biden administration reversed the affirmative request requirement in its asylum processing rule. In reversing the Trump administration regulation, the agencies explained that "treating any refusal or failure to elect review as a request for IJ review, rather than as a declination of such review, is fairer and better accounts for the range of explanations for a noncitizen's failure to seek review." The agencies' reversion to the Trump-era requirement for asylum seekers to affirmatively request IJ review of a negative fear determination shows that this rule prioritizes efficiency over fairness.  This has wide ranging consequences for asylum seekers who may not fully grasp the role of the IJ review in credible fear proceedings.

It is critical that the agencies' err on the side of referring cases for more review hearings, rather than fewer. It is *reasonable* that an asylum seeker will find the phrasing, question, and concept of an IJ review hearing confusing in the initial stages of the proceeding. Referring cases that are not affirmatively ***declined*** provides critical safeguards to ensure these asylum seekers are not unfairly punished for their confusion. Given the high, life or death stakes of the credible fear process, every effort to ensure access to procedural protections like review hearings, is essential to protecting the integrity and credibility of the U.S. asylum system. More importantly, erring on the side of "yes" ensures that asylum seekers genuinely confused or unsure about the IJ review process will have access to potentially life-saving protections that the INA ensures. Language barriers, interpretation issues, mental health concerns, and simply the trauma left by persecution and torture, can impact an asylum seeker's ability to perfectly say "yes" to an IJ review.

Second, the proposed rule seeks to eliminate decades of procedural protections for asylum seekers at the USCIS level by eliminating an asylum seeker's ability to request USCIS reconsideration of negative credible fearing determinations. The agencies seek to entirely bar asylum seekers from requesting that USCIS reconsider negative credible fear findings in their protection claims. Instead, the agency limits the power to seek reconsideration to USCIS alone and its *sua sponte* authority. However, it is unclear under the rule, when or how USCIS would *sua sponte* reconsider a negative fear finding. Thus, as a practical matter, if the proposed rule were to go into effect, the reconsideration safeguard for asylum seekers would no longer exists as a meaningly protection from wrongful expedited removal. The departure from longstanding protections could bar hundreds of credible fear claims, who received wrongful negative findings.

This administration has cited to the number of people saved from wrongful removal in its asylum processing rule. Between FY 2019 to FY 2021, USCIS reconsideration of erroneous negative credible fear determinations saved at least 569 asylum seekers from deportation to persecution or torture without an opportunity to apply for asylum.

The asylum processing rule already almost gutted asylum seekers' right to request reconsideration of erroneous credible fear findings, limiting requests to those filed seven days after an IJ review hearing and giving asylum seekers at best a total of around 14 days from the negative findings to petition USCIS for reconsideration. The amount of time is insufficient considering that many asylum seekers are held in remote immigration detention centers, with limited access to counsel and support to defend their claim. The rule also limited an asylum seeker to one request – which is unreasonable considering the volatility of asylum law. The rapidly evolving caselaw and changing circumstances of applicants may require additional requests depending on each applicant's unique circumstances.

However, instead of addressing the significant deficiencies in the asylum processing rule, the agencies now attempts to outright bans asylum seekers from making any reconsideration requests to USCIS. Similar to requiring asylum seekers affirmatively request IJ review hearings, the agencies further erode meaning safeguards in expedited removal. Many asylum seeker with meritorious claims will carry this burden, potentially with their lives, as they are wrongfully removed from the United States.

The real life consequences of these issues are seen in cases like that of Aalim. Aalim was initially held in an isolated detention facility in Pearsall, Texas where he had his CFI. The process was not explained to him clearly and the interpreter at his CFI interview often said that the interpreter did not understand what Aalim was trying to say, causing Aalim to doubt the accuracy of the interpretation. Without counsel, Aalim did not know how to express his concerns about the process and the asylum office issued a negative CFI decision. Aalim went through the IJ review process unrepresented, confused, and unable to submit evidence on his behalf and was later transferred to Arizona where he was able to secure representation from Florence Project staff for his RFR, months after the IJ had affirmed his CFI's negative finding. Due to multiple transfers, Aalim lost possession of pertinent documents including his CFI transcript. This experience is common and under the proposed rule, someone like Aalim

would likely have less likelihood of even getting an IJ review, because it depends on him understanding his obligation to request such a review affirmatively despite translation issues, and would have no chance of obtaining a reinterview request at all. Under the proposed rule, a refugee like Aalim would be refouled.

### c. Exceptions Do Not Cure What is Broken and Unlawful in this Proposed Rule

The proposed rule relies on several very narrow exceptions to the presumption against asylum based on transit countries or manner of entry in an attempt to distinguish this rule from previous transit and entry bans initiated by the Trump administration that were subsequently found to be unlawful. However, the limited exceptions giving rise to an opportunity to rebut are both facially insufficient to save the rule and, as a practical matter, will help few if any asylum seekers.

First, the single exemption that is likely to have widespread impact is the exemption for unaccompanied children removing them entirely from the scope of the proposed rule. However, as documented by various outlets, that reality is one of several factors that mean that this proposed rule will result in significant instances of family separation.

Second, under the proposed rule individuals who can demonstrate by a preponderance of the evidence that it was not possible to access or use the CBP One app due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacles may be exempted from the asylum ban. However, the proposed rule leaves a great deal to the exercise of discretion by individual border agents and gives little guidance to officials who will need to make these calls for what should constitute preponderance of the evidence in cases such as these. This is a cause for significant concern because border patrol has a decidedly spotty history of providing meaningful language access in peoples' best languages. In our own practice, we routinely see critical border interviews conducted in Spanish, such as those that produce the I-213 and I-867 A and B, where the individual interviewed in reality speaks little to no Spanish. Given this track record, there is little reason to have confidence in CBP's ability to adequately screen for and exempt people from the application of the presumption due to language or literacy barriers. Moreover, the lack of guidance on what constitutes a preponderance of the evidence also undermines individual migrants and NGO efforts to understand what is actually required to rebut the presumption and how to obtain such evidence. What does seem clear is that someone's word, even if credible, will rarely be enough alone to satisfy this requirement and, as such, the proposed rule will result in the improper refoulement of many asylum seekers.

Third, the preponderance of the evidence standard being applied to persons seeking an exemption from the asylum ban due to exigent circumstances will be nearly impossible for asylum seeker to meet due to the inherent nature of said circumstances. Someone who was previously kidnapped or raped while displaced in Mexico would not be able to pass the preponderance of evidence threshold either because they likely have no physical evidence to proffer and/or because we anticipate DHS or USCIS officers using their discretion to find that the threat to their safety no longer exists because the asylum seeker survived the rape or kidnapping and escaped that area. To be clear, we anticipate

this response, because throughout various border closures including Title 42 and Migrant Protection Protocol, we routinely saw border officers return individuals to Mexico despite having recently escaped violence and kidnapping, determining that such harm was either no longer imminent or too speculative to warrant an exception. The narrowly tailored language of the proposed rule envisions evidentiary standards that defies the reality of most displaced asylum seekers. The nature of kidnapping means kidnapping victims often do not have any sort of direct proof – they are held hostage, without access to their belongings and typically have no way to document the kidnapping occurred outside of their own testimony. Likewise, requiring victims of rape or other physical or sexual violence to provide additional evidence of the harm suffered is not only highly burdensome, but extremely revictimizing. This requirement would effectively require a rape or other violence victim who is homeless in Mexico due to U.S. border policies to first seek out medical attention in Mexico – which is incredibly difficult, costly, and fraught with discrimination, even towards other Mexicans let alone non-Mexican nationals who have no legal status nor healthcare coverage in Mexico - and then submit themselves to a potentially invasive examination just to corroborate that they suffered physical or sexual assault. The reality is that few, if any, asylum seekers will be able to satisfy the heightened burden to establish the extremely narrow grounds for exception to the rule.

Fourth, the proposed rule also creates an opportunity to rebut the presumption of asylum ineligibility in cases where the individual can establish by a preponderance of the evidence that they sought, but were formally denied asylum or other protection in a country through which the noncitizen traveled. This is an extremely narrow exception that will leave asylum seekers in unsafe conditions seeking protection in places where they may face many of the same forms of persecution they fled in their home country.

Such would be the case for people like Angel, whose case is described above, a transgender woman from Guatemala who transited through Mexico to seek asylum in the U.S. at the time of the Trump administration's transit ban. Because Mexico is one of the most dangerous countries for transgender women, it would do Angel and people like her no good to seek protection in that country. Yet, under the language of the rule, this alone would not be sufficient reason for Angel to have failed to apply for protection in Mexico. Instead, she would have to perversely have to wait patiently in danger Mexico to navigate the CBP One application with all of its many flaws or until something sufficiently egregious occurred that it qualified her for the other limited exception based on "an imminent and extreme threat of rape, kidnapping, torture, or murder" – an exception so purposefully narrowly drawn that effectively no one will be able to establish this exception as it "cannot be speculative, based on general concerns about safety, or based on a prior threat that no longer poses an immediate threat."

Additionally, this aspect of the proposed rule fails to account for the many ways in which asylum systems in the Americas fail asylum seekers. This includes, for example, Mexico's asylum system refusing to even allow some Black migrants to begin the process of seeking asylum or delaying the processing of asylum applications for Black refugees. Such individuals would be unable to rebut the presumption because they never had a final adjudication and denial of their claim, but were *de facto* denied pre-emptively in a variety of less-formal ways.

<u>Fifth</u>, it is not mere speculation that the exceptions offered those who can demonstrate "exceptionally compelling circumstances" such as "an imminent and extreme threat of rape, kidnapping, torture, or murder" or "an acute medical emergency" would be interpreted very narrowly by border agents. Indeed, the Florence Project has already <u>experienced</u> this firsthand in recent years, when we have elevated urgent humanitarian situations to the Tucson OFO via requests for exemption from Title 42 and/or requests for humanitarian parole. From August 2021 through early December 2021, the Florence Project submitted twenty (20) requests for humanitarian parole on behalf of cases with clearly demonstrated need, including severe medical problems, high-risk pregnancy, and LGBQT+ individuals with significant safety concerns. Nineteen (19) of the twenty requests were ignored entirely, and the one response the Florence Project received provided no articulated reasons for why the request was denied nor what factors had been considered on the "case-by-case basis" as mandated under the regulations.

Likewise, the experience of one of our partner organizations in Nogales demonstrates this sad reality to be true. In that case, a young man who – in addition to fleeing harm in his country of origin and seeking asylum with his family – was suffering organ failure had his case escalated to the Tucson Office of Field Operations (OFO), requesting that the man receive an urgent exemption from Title 42 and/or humanitarian parole. Despite explaining that the exigent medical circumstances meant the family could not wait for processing through the CBPOne app, their request went unanswered and, sadly, the young man passed away while awaiting a response.

<u>Finally</u>, as was demonstrated by the first time a transit ban like this was in place, border officers, asylum officers, and immigration judges understand the clear subtext of deterrence that is the foundation of this proposed rule and are quick to err on the side of denial.

For example, in the case of Maria, despite having been beaten and threatened with enforced disappearance from her fellow police officers because of her political opinion in Nicaragua, both the asylum officer and Immigration Judge summarily concluded that she had not shown a reasonable probability of persecution or torture in Nicaragua. The federal courts lacked jurisdiction to review the merits of that analysis. This demonstrates how individuals with strong, facially valid claims will also be swept up by the proposed rule with little to no recourse to correct erroneous decisions.

Additionally, the lack of training – or perhaps the natural confusion that occurs when the proposed rule is at direct cross-purposes with the clear statutory language and Congressional intent – results in poor screening of applicants to determine whether they have applied for asylum in a transit country. In the last iteration, there were inconsistencies that led to uneven and unjust results for asylum seekers. Due to the serious nature of an asylum claim, a mistake in screening can lead to unnecessary detention or worse, refoulment to the dangers they were fleeing.

For example, "Pedro" fled from Nicaragua with his wife and sister. When the family crossed into Mexico, they spoke to Mexican immigration officials and applied for humanitarian visas and asylum. Pedro and his family members tried to hire a private

lawyer, who extorted money from them. They found the process confusing and rushed because they did not receive adequate information from the authorities nor the attorney. Neither Pedro nor his family members understood what they had applied for. They received temporary, one-year humanitarian visas in Mexico, but did not get asylum. Later, they presented at a Port of Entry to request asylum in the United States. The transit ban was applied, but the family members were all referred to an Immigration Judge for withholding only. However, the judge failed to screen Pedro and his sister's cases appropriately to identify that they had applied for asylum in Mexico. A few clarifying questions would have shown that they indeed had applied and were denied asylum in Mexico and were thus not subject to the Transit Ban. The IJ wrongly applied the Transit Ban and denied their asylum applications. Even worse, the same IJ failed to properly screen the wife for eligibility and blamed her for her confusion over whether she had applied for asylum in Mexico or not, ultimately finding that she was not credible. The lack of consistency in screening for Transit Ban applicability resulted in months of unnecessary detention and hardship for a family that was not even supposed to be subject to it. If the new Transit Ban is implemented, we will see the same poor screening, understanding, and implementation across EOIR thus unfairly impacting thousands.

### VI.     Asylum Seekers are Unsafe in Transit Countries, Without Access to Meaningful Protection

The United States law has requirements for safe third country agreements, yet the proposed rule would require many refugees to request asylum in transit countries that do not meet those requirements. Indeed, many of the transit countries have the same unsafe conditions of the countries the refugees are fleeing from. The Florence Project collected over 70 unique stories of unsafe conditions in third countries from asylum seekers arriving at the border.  This number is particularly striking because of the limited 30-day time frame our team had to collect said stories, and because they come from a singular port of entry (Nogales).

Mexico, for example, would be considered a transit country for anyone requesting asylum at our southern border who is not a Mexican national. Migrants and asylum seekers have already been stranded in unsafe conditions in Mexico for the past three years due to Title 42. In that time period alone, there have been over 13,000 reported attacks against asylum seekers and refugees. Due to inequitable access to a fair asylum system, the proposed rule's demand that refugees request asylum in Mexico could risk their deportation back to danger.

For example, "Eduardo", his wife and their two children were kidnapped while travelling through Mexico. The family sought help and information from Mexican immigration authorities, who instructed the family to go to a shelter in Nuevo Laredo. When the family arrived to that shelter, they were held hostage and separated. While in captivity, the family faced threats and abuse. Afraid for their lives, Eduardo told their kidnappers that they wanted to leave the "shelter". The people holding them hostage responded that, in order to leave, they would have to pay the exorbitant amount of 15,000 Mexican pesos (approximately $816.00 U.S. dollars) per person. For a family of

four, this amounted to 60,000 Mexican pesos (approximately $3,267 U.S. dollars). The family encountered both authorities and shelter services in a third country, yet still experienced violence and extortion.

Reports of the lack of security for asylum seekers in Mexico have been widespread for decades, so the government should be well aware that Mexico cannot serve as a safe transit country. In 2015, "Wilmer" was in Mexico after fleeing Guatemala due to fear. He was able to obtain a humanitarian visa for transit purposes only, with no permanent status conferred. While in Mexico, he was assaulted by Mexican immigration officials. The officials undressed him, stole his belongings, and left him naked and alone. He was later deported from Mexico back to danger.

El Salvador, Honduras, and Guatemala also do not have safe third country agreements with the U.S., nor do they have asylum systems that would meet the requirements for one. These countries are unsafe for many asylum seekers passing through them, especially for women, LGBTQIA+ people, and Black migrants. Members of vulnerable groups are at risk of violence due to the same immutable characteristics that they were persecuted for in their home country. Even when victims of gender-based violence are granted asylum in these countries, there is ample evidence that they receive insufficient protection from further harm.

"Adolfo", a Cuban man, encountered violence and harm in several different transit countries before making it to the United States border. First, he was abused by military officials in Panama and moved on to Nicaragua out of fear. There, he was robbed and fled to Guatemala. In Guatemala, he faced extortion by the police and was unable to find safety. He then moved to Mexico, where he was the victim of fraud by a lawyer selling a permit with no validity. He travelled through four transit countries and was unsafe in each of them.

The countries of transit that asylum seekers pass through to reach the southern border of the United States are highly dangerous for women and LGBTQIA+ asylum seekers. However, we have encountered numerous reports of members of these vulnerable groups being refused at the U.S. border or expelled back to unsafe conditions without their asylum claim being heard. "Miriam" fled for her life from Guatemala and was kidnapped in Mexico while 36 weeks pregnant. She managed to escape her kidnappers and, in the process of escaping, was unknowingly driven into the United States without inspection. When she encountered U.S. immigration officials, she was expelled back to Mexico where her kidnappers remained. "Juana", a lesbian woman from Guatemala, fled her country after experiencing persecution due to her sexuality. She was denied entry after seeking asylum at the Tijuana port of entry. Desperate to find safety, she entered the United States but faced severe dehydration in the desert. Fearing for her life, she called 911. At the hospital, she expressed fear of return to her home country due to her identity as a lesbian. Juana asked for help numerous times. Despite her fear of return home due to past persecution, no official would speak to her to hear her claim. After just a few hours at the hospital, she was placed on a bus and expelled back to Mexico.

"Estefania" is a trans woman from Guatemala who left her home country fearing for her life due to her gender identify. She requested asylum in Mexico and was told by

authorities that they would not help. Estefania reported that the Mexican police gathered a number of trans women, beat them, stole their belongings and deported them back to danger. One of the trans women was murdered a short time after being returned to Guatemala. Estefania was forced into sex work upon her return.

These stories serve to highlight the serious danger asylum seekers face in transit countries, danger that the proposed rule will only serve to heighten. Lengthening the amount of time that asylum seekers must spend in unsafe transit countries exposes them risk of further harm, violence, and even death. From a legal standpoint, the asylum systems in the countries highlighted cannot sufficiently process claims for the number of asylum seekers flowing through them and provide just outcomes. The proposed rule not only circumvents the law in forcing refugees to seek asylum in these countries, but it will also have grave moral consequences.

### VII.   Proposed Rule Would Fuel Family Separation

The proposed rule will fuel family separation in a number of critical ways.

#### a.   The Proposed Rule's Reliance on the Availability of Other Forms of Legal Relief Disregards That Those Forms of Relief Will Force Families Apart

Without meaningful access to asylum, many refugees will be left to hope for legal relief in the forms of Withholding of Removal and/or protection under the Convention Against Torture. Besides the fact that Withholding of Removal does not afford the same protections as asylum, it also would force more families apart.

Withholding of Removal does not confer permanent status or a path to citizenship, which leaves the person in constant legal limbo under threat of deportation. Because these are refugees with credible fear claims, a permanent order of removal means that at any time they could be deported back to the countries where their lives were threatened or persecuted. This form of legal relief also does not allow refugees to petition for family members or travel internationally, leaving them permanently separated from loved ones who remain in other countries.

Moreover, under Withholding of Removal, families are unable to request that their cases be adjudicated together like they would be able to do with asylum cases. When cases move through the legal system separately, they are more likely to have uneven results for different family members.  Families can easily be separated when some members are deported back to danger while others win protection from removal. The family members that remain in the U.S. in this case are left with no ability to petition for their family members or to reunify with them through travel.

The proposed rule would not be the first transit ban implemented in the United States, and the stories of families who faced permanent separation under the Trump administration's transit ban should serve as a warning of the harm that the proposed rule could cause.

### b. CBPOne Implementation Has Already Resulted In Family Separation

The scheduling feature of the CBPOne application makes it difficult and in many ways discriminates against families trying to schedule an appointment to present together. This is a matter of basic logistics in that the more people you have to schedule in, the harder it will be to get them all scheduled for the same day. Limited informal exceptions allowing people to present as a family so long as one member had an appointment have been discontinued. As a result, families are faced with the impossible choice between separating or keeping their children in dangerous conditions. Some families have already been separated as a result.

The Florence Project Border Action Team has already encountered families facing this unimaginable situation. In one instance, a family of four, two parents and two children, created different profiles on the CBPOne Application in order to apply for Title 42 exemptions. The family was informed that other families had success when only one family member scheduled the appointment, and that officers at the border were allowing entire family units to enter the United States. When one of the members of this family was successful in obtaining an appointment for himself, he and his family traveled to Nogales, MX to present at the border. When they arrived and presented themselves, they were informed that only the family member who obtained the appointment could come. The officer turned away his wife and two children and told them they could not continue. As a result, the family had to decide whether to remain together in violent, unsafe conditions or to separate and allow one family member to move forward. Their difficult situation is the result of unclear information and poor application design. The proposed rule is contributing to a harrowing history of families being separated by the United States immigration system.

### VIII.   Conclusion

For all of the reasons stated above, the proposed rule is in direct contravention of U.S. asylum law and international treaties. It should be withdrawn in its entirety. The Florence Project welcomes the opportunity to provide additional comments if the timeframe is extended and is equally open to discussing this Comment with you further.

Submitted on behalf of the Florence Immigrant & Refugee Rights Project on March 27, 2023, by


_____/s/_____
Laura St. John
Legal Director
Florence Immigrant & Refugee Rights Project

# PUBLIC SUBMISSION

**As of:** May 08, 2023
**Received:** March 27, 2023
**Status:** Posted
**Posted:** March 30, 2023
**Tracking No.** lfr-i39v-nipe
**Comments Due:** March 27, 2023
**Submission Type:** Web

**Docket:** USCIS-2022-0016
Circumvention of Lawful Pathways

**Comment On:** USCIS-2022-0016-0001
Circumvention of Lawful Pathways

**Document:** USCIS-2022-0016-12535
Comment Submitted by Taylor Levy Law

## Submitter Information

**Email:** taylorlevylaw@gmail.com
**Organization:** Taylor Levy Law

## General Comment

Please see attached comment.

## Attachments

Taylor Levy NPRM Comment

March 27, 2023

*Submitted via https://www.regulations.gov/commenton/USCIS-2022-0016-0001*

| | |
|---|---|
| Lauren Alder Reid, Assistant Director | Daniel Delgado, Acting Director |
| Office of Policy | Border and Immigration Policy, |
| Executive Office for Immigration Review, | Office of Strategy, Policy, and Plans, |
| Department of Justice | U.S. Department of Homeland Security |
| Falls Church, VA | Washington, D.C. |

**RE:    Comments in Opposition to the Joint Notice of Proposed Rulemaking entitled** *Circumvention of Lawful Pathways;* **RIN: 1125-AB26 / 1615-AC83 / Docket No: USCIS 2022-0016 / A.G. Order No. 5605-2023**

Dear Assistant Director Reid and Acting Director Delgado:

I am submitting the following comments to the Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (USCIS), and the Department of Justice (DOJ), Executive Office for Immigration Review (EOIR) ("the agencies") in response and opposition to the above-referenced Notice of Proposed Rulemaking ("NPRM" or "the Rule") issued by the agencies on February 23, 2023. I strongly oppose the Proposed Rule, which will prevent current and future asylum seekers from accessing protection they merit under domestic and international law, result in the return of many refugees to harm, and leave others in the United States without stable protection. I urge EOIR and DHS to withdraw the Rule in its entirety and ensure that a full and fair asylum system is made accessible to all those who seek refuge in the United States.

I am an immigration attorney and consultant who has worked for years to protect the rights of people seeking asylum at the southern border. As part of my work, I have represented and provide legal information to thousands of individuals and families who were subject to the "Remain in Mexico" program, Title 42, and PACR/HARP. I have extensive experience working with people held in immigration detention—including in Family Detention—and with people placed in expedited removal and subjected to credible fear interviews and so-called "non-refoulement" interviews, and I have a deep understanding of how the expedited removal process works on the ground and of the numerous serious problems with that process. Currently, I mentor attorneys who represent people seeking asylum at the border, and in that capacity, I have attempted to resolve many problems with the CBP One app.

**Concerns regarding the CBP One app and making asylum access contingent on access to technology**

The proposed Rule introduces an entirely new concept into the U.S. asylum system – it renders asylum at the southern border contingent on peoples' ability to access and properly utilize a mobile phone app prior to their arrival. All people attempting to enter the United States to seek asylum will be ineligible for asylum unless they made an advance appointment to present at the port of entry using the CBP One app.

Requiring access to technology to secure asylum access fails to account for gaps in technology, language access, and economic disparities between groups of migrants attempting to use the app while fleeing harm. The result will be an asylum system that leaves behind those with fewer resources, often those in the greatest need.

On the technology side, the CBP One app does not work on all smartphones. For example, it does not work on Huawei brand cellphones from China, where are very common in Mexico and Central America. Other people have found that the app will not work on their phones because their device is too old and their operating system is too out of date. I have heard from multiple partners that the app seems to work better on cellular data versus on Wi-Fi, meaning that individuals need to use a resource they pay for (data) instead of Wi-Fi they could potentially access for free. And, the app is quite data-intensive, making it expensive for people to use. In addition, border areas do not always have high-speed data access, even for those individuals who are able to buy data plans.

The CBP One app requires two-factor identification when logging in. Most people opt to do the two-factor process via text message. But it is not made clear to users that in order to use the text message option, they must have a Mexican cell phone number and SIM card. Many individuals have purchased a plan that allows them to use their third-country phone in Mexico for data purposes (primarily used to access alternate messaging platforms such as WhatsApp, Messenger, and Telegram) but does not change their phone number. As a result, they cannot receive SMS messages on their phones, so the code they need to use for two-factor authentication never arrives.

While there are other options for the two-factor authentication, they are not very practical for most users. The first requires a physical security key device, the second requires that they download and use a separate app, and the last provides a set of 10 one-time-use codes made up of around 12 letters and numbers. The user is required to save and keep track of those codes and enter a new one each time they use the app, which becomes an onerous task considering that users must log-in to the CBP One app on a daily basis to try and secure limited appointments.

Beyond these threshold access issues, the CBP One app in its limited roll-out has already proven extremely flawed[1]: users have reported[2] frequent glitches and appointments that fill up before they can access them; and the facial recognition technology is racially disparate in application, often rejecting photos[3] of migrants with darker skin.

As part of my work, I have (with the assistance of partners) made and maintained user guides intended to help people in migration navigate the process of using the CBP One app[4]. These guides have become very popular teaching tools for assisting migrants with using the app among nongovernmental organizations operating in Mexico, and can be directly-accessed by migrants using hyperlinks that are shared widely on WhatsApp, Telegram, and other social media and updated when possible based on user-feedback. While the following statistics likely undercount the true distribution of the guides considering that some users share the PDFs directly rather than using the hyperlinks, my TinyURL dashboard reports the following click rates as on March 27, 2023:

|                | Total Human Clicks |
|----------------|--------------------|
| Spanish        | >10,000            |
| Haitian Kreyol | >4,200             |
| Russian        | >1,600             |
| English        | 954                |

**Top Referrer Sources for Spanish CBP One Guide**



---

[1] *See* Raul Pinto, "CBP One Is Riddled With Flaws That Make the App Inaccessible to Many Asylum Seekers," IMMIGRATION IMPACT (February 28, 2023), available at https://immigrationimpact.com/2023/02/28/cbp-one-app-flaws-asylum-seekers/.

[2] *See* Kate Morrissey, "Asylum seekers in Tijuana are scrambling through mobile app error messages for few appointments into the U.S.," THE SAN DIEGO UNION-TRIBUNE (January 22, 2023), available at https://www.sandiegouniontribune.com/news/immigration/story/2023-01-22/cbp-one-app-asylum-tijuana.

[3] *See* Melissa del Bosque, "Facial recognition bias frustrates Black asylum applicants to US, advocates say," THE GUARDIAN (February 8, 2023), available at https://www.theguardian.com/us-news/2023/feb/08/us-immigration-cbp-one-app-facial-recognition-bias.

[4] These guides are attached and are also available at:
https://tinyurl.com/CBPOneENGLISH
https://tinyurl.com/CBPOneESPANOL
https://tinyurl.com/CBPOneKreyol
https://tinyurl.com/CBPOneRUSSIAN

The widespread use of my guides demonstrates that there is a serious amount of confusion among migrants regarding how to use CBP One, and that the official guides produced by DHS are insufficient.

In making my CBP One Guides, I have also discovered a number of language-related issues with the process. In order to use the app, individuals have to first make an account on the website login.gov. This website is only available in English, Spanish, and French, even though the CBP One app is available in English, Spanish, and Creole. This makes the entire process very difficult for speakers of other languages who are also attempting to seek asylum at the southern border, including Russians, Ukrainians, and Afghans.

Additionally, the existing translated versions login.gov are inconsistent. For example, while using the website in French, one screen had information that was partially in French and partially in Spanish.



This section is properly translated into French.

This button is translated into Spanish instead of French.

There are also translation issues on the app itself. For example, when users must select their primary language, the drop-down menu options are only in English, meaning users must select

"Spanish" instead of "Espanol," "Creole" instead of "Kreyol," and "French" instead of "Francais," etc. Similarly, users must use drop-down menus to enter their gender, hair color, eye color, and marital status. When using the app in Spanish or Kreyol, the drop-down options provided to answer these questions are all only in English, and this "glitch" has still not been fixed, despite months of complaints:

### SCREENSHOTS TAKEN MARCH 27, 2023 FROM CBP ONE APP



Other questions are unnecessarily vague and difficult for people to answer. Users are asked whether they have a "travel document" but are not given any explanation of what documents this would include. Users are asked for their "Country of Residence" but are unsure if this means lawful residence, domicile, or current physical location. Under the section for Emergency Contact information, users are asked to fill in a blank box only with the word "Description." There is no further guidance; presumably this is meant for users to describe their relationship to their Emergency Contact, but even attorneys such as myself are confused as to what the question is asking.

The limited language options on offer make this app difficult or impossible to access for large groups of people in migration. One large group of individuals that this applies to is indigenous people from Guatemala who often speak little to no Spanish. Literacy is a significant obstacle to using this app as well. I have worked with numerous clients with limited to no literacy. They have learned to navigate using a cell phone but use it exclusively to send voice messages (or in the case of deaf individuals, video messages) over apps such as WhatsApp, Messenger, and Telegram. However, the CBP One app requires a high level of literacy and is not a practical option for these individuals. I also recently consulted with an attorney who was trying to assist an elderly Russian asylum seeker. Although the client had a phone, the combination of the language barrier and age-related technology struggles made it impossible for her to use the app.

The photo requirement of the CBP One app is difficult to use and buggy. Users are required to take their own picture every morning and the picture is checked for what is called "liveness" and for "comparison" to their previously provided picture. Users frequently receive an error message that the picture they provide is not the same person that registered for the app even though this is incorrect. People with darker skin tones consistently have the most difficult time getting this feature to work. Individuals have to be in very good light and sometimes have to try a variety of different lighting set ups or backgrounds. Some clients have found that the app only registers them as being the right person if they are wearing the exact same shirt they wore when the first picture was taken. Until recently, it was almost impossible for young children to use this feature because they did not register sufficient "liveness." Although I have heard that "liveness" is no longer being required for children five and under, people continue to have difficulties.

I have heard of numerous instances of people being charged by someone in Mexico promising to "teach" them how to use the CBP One app. Private attorneys, fake attorney "*notarios*," and other individuals have been charging anywhere from $250 to $2000 (US dollars) for this service. In practice, often all they do is send a YouTube tutorial about the app. I also heard of individuals attempting to sell the guides I created along with other advocates, even though this guide is intended to be free. The fact that these services exist, and people are willing to pay for them, demonstrates that the app is not user-friendly and people do not feel able to use it without assistance. There are also numerous instances of fraudulent appointment notices, where individuals

receive an email telling them that they have received an appointment but are required to pay a certain amount in order to attend the appointment.

To the extent that people are able to successfully navigate all of these obstacles and use the app as intended, they frequently find that the app crashes due to too many people attempting to access it. The available appointments fill up within around two minutes every morning. There simply is not enough capacity available to meet the need.

**Challenges faced by asylum-seekers while waiting in Mexico**

The many issues with the CBP One app in practice mean that asylum seekers are forced to wait in Mexico for an extended time while they attempt to get an appointment. I have extensive experience working with individuals forced to wait in Mexico under past policies, including the Migrant Protection Protocols, metering, and Title 42. In my experience, Mexico is horrifically unsafe for migrants.

Migrant families are extremely vulnerable in Mexico because, among other things, they are routinely (1) targeted for kidnapping, rape, trafficking, and extortion; (2) denied medical care even for serious illnesses; (3) displaced, homeless, and often forced to sleep on the street or in a plaza; (4) discriminated, harassed, and attacked based on race, gender, and sexual orientation; (5) assaulted by a combination of police and private actors; and (6) prevented from accessing basic services and legal protection due to language barriers.

Between 20 and 40 percent of my own clients faced kidnapping or attempted kidnapping while in Mexico. In addition, for the past several years, I have consulted with other attorneys on one to two migrant kidnappings in Mexico every week. My colleagues now recognize me as an expert in how to handle kidnapping situations. It is that common. <u>I have heard of numerous instances of people who are finally able to get an appointment through CBP One being kidnapped on the way to the bridge.</u>

One of my female clients from El Salvador, who had been expelled three times under Title 42, was kidnapped by two men who put a wet rag over her mouth, causing her to lose consciousness. When she awoke, she was alone, mostly naked, dumped in the desert, and had been raped. She walked until she found a woman who gave her pants and some money for a bus ride. My client went to the municipal police to report the rape, and the police officers told her that they were not going to accept her complaint because she was a migrant and "migrants liked to be raped." She later realized that she was pregnant as a result of the rape and went to the public hospital for prenatal care. At the hospital, a doctor, without informing my client or obtaining her consent, forcibly induced an abortion. As a Christian, my client does not believe in abortion and wanted to keep her baby, who was innocent, despite being the product of rape.

That client's trauma was severe but not unique. I also represented a Black Honduran mother and her 7-year-old son—they were kidnapped in Reynosa, and the mother was severely beaten and raped in front of her son. When she sought help, Mexican police officers refused to help her and instead taunted her, asking her how much she would charge to give them a turn. Since this trauma, the 7-year-old became extremely depressed and has frequently told his mother that he wants to die.

Another client told me that she was "lucky," because even though the kidnappers gang-raped her repeatedly, they always did it in a separate room so that her 8-year-old daughter and 6-year-old son did not have to watch.

Kidnappers target migrants in hopes of extracting ransom from family and friends in the U.S. Migrants, particularly Black migrants and other racial minorities, are readily identified based on their appearance and their proximity to the border.

Children are sometimes ripped from the arms of their mothers and fathers and pulled into the kidnappers' vehicles. Oftentimes migrant families run from these kidnappers trying to escape, resulting in family separation where some members escape while others are not so lucky. In some cases, the family members who survived the attempted kidnapping never again hear from their missing family members.

I also represented a Honduran mother, father, and their children, ages eight and one. The mother was kidnapped and held for a month before finally being released after her family in the United States paid a ransom. Later, the father was approached by the cartel in Nuevo Laredo who demanded that he work for them. He refused, and they beat him so badly that they broke his hip and told him that he was going to have to start working for him once he healed. The family was so terrified that they hid in the migrant shelter rather than try to seek medical care; as a result, the father can no longer walk unassisted.

In another case, a mother and her two sons—including one who has severe autism and is nonverbal—were kidnapped for three weeks after being expelled into Mexico. The family had fled their home country after the children's father was murdered.

I also worked with a family of four that included a nine-month-pregnant mother, a father, and two children ages four and nine. The family originally sought asylum in the Reynosa area, only to be expelled under Title 42. During their second attempt to seek safety, the family was accosted by cartel members. The young children made it across the river (thereby becoming unintentional unaccompanied minors), but the mother and father were kidnapped, separated, and brutalized. Eventually, the mother was released when she went into labor, and her baby was born with severe complications.

Policies that force people to wait in Mexico have resulted in more dangerous crossings. Prior to Title 42, I had rarely witnessed or learned of families attempting to climb over the border wall, but now, this has become a more common occurrence for desperate families. I worked with a family who attempted to jump over the border wall and the two children fell off; one broke their leg and the other was seriously injured.

Many of the families I have worked with have had serious medical conditions and they are unable to access appropriate medical care in Mexico. They reported going to the public hospitals to seek emergency treatment (as officially required under Mexican law) only to be denied care because of their status as migrants. My clients' untreated medical conditions have included cerebral palsy, seizures resulting from brain injuries suffered during beatings, brain tumor, vaginal infection, skin rashes, hernias, fainting, heart problems, diabetes, high blood pressure, asthma, anxiety, depression, suicidality, diarrhea, serious weight-loss, bed-wetting, gallstones, kidney stones, pediatric liver disease, anemia, ovarian cysts, spina bifada, hyperthyroidism, blood disease, autism, epilepsy, and scoliosis.

I represented a Honduran family whose one-year-old baby was denied emergency medical attention when he stopped breathing. The baby has Down's Syndrome and a heart murmur. The family sought help at a public Mexican hospital and was told explicitly that they were denied care because they were foreigners.

My clients frequently reported being harmed by Mexican law enforcement. Many families report being robbed, bribed, kidnapped, beaten, and sexually assaulted by Mexican police. I have heard of numerous instances of people who are finally able to get an appointment through CBP One being assaulted by Mexican police officers when trying to travel to the bridge for their appointments.

**The new rule will lead to an increase in family separation**

Given the dangerous conditions in Mexico, the continued use of policies that keep people in migration in Mexico has forced parents to make heart-wrenching decisions to send their children to the United States alone, not knowing when (or if) they would ever see each other again. We are already seeing families deciding to "self-separate" and send their children to the United States as unaccompanied minors because they have been unable to get appointments to present at the Ports of Entry using CBP One. Because the new rule does not apply to minors, it is likely to have the same impact and lead to increased family separation as families make the difficult decision to send their children across the border alone for their own safety.

I have witnessed the desperation that has forced parents to send their children unaccompanied to the border, because the Biden administration will accept only unaccompanied minors and not

families under Title 42. Parents believe that is their only option. I have heard parents say, "*no me queda de otra*" ("I have no other option").

For example, I worked with an indigenous mother with limited Spanish fluency who tried to seek asylum with her eight-year-old daughter. Immediately upon expulsion, the family was pursued by masked men with guns. The mother told her daughter to run, and the child was able to narrowly escape while the mother was abducted. The daughter ended up in the custody of the Office of Refugee Resettlement ("ORR")—deeply traumatized—and thinking for over a month that her mother had been killed.

Another one of my clients was the mother of a nine-year-old boy fleeing forced gang recruitment in Honduras. After an attempted kidnapping in Mexico, the child's mother sent him alone to the U.S, where he was languishing in ORR custody with no viable sponsor and about to be placed in long-term foster care.

**Compromised due process and access to counsel**

The proposed Rule will be implemented during the expedited removal process, where asylum seekers are swiftly deported without a day in court if they do not pass their fear screenings. During the threshold fear interview, asylum seekers will be required to show that the ban does not apply to them or, if it does, that they can rebut the presumption of ineligibility by proving they fall within one of the Rule's exceptions. Those who cannot rebut the presumption will then be forced to meet a "more likely than not" standard just to be able to present a claim to lesser protections in the form of withholding of removal or CAT protection.

For those forced to undergo this screening while in detention[5], the obstacles to due process are so high as to render success unachievable for most, regardless of the merits of their asylum claim. Asylum seekers will be forced through their fear interviews while in government custody in notoriously difficult[6] and abusive[7] conditions, without prior knowledge as to the Rule's details or workings, and only a few hours or days away from the dangers and horrors of their flight. Even if legal service providers are able to obtain the ability to provide brief orientation or consultation

---

[5] *See* Azadeh Erfani, National Immigrant Justice Center, "Explainer: Biden Administration Plans for Rapid Deportation of Asylum Seekers Detained at the Border" (January 26, 2023), available at https://immigrantjustice.org/staff/blog/explainer-biden-administration-plans-rapid-deportation-asylum-seekers-detained-border.

[6] *See* American Immigration Council, "Challenging Unconstitutional Conditions in CBP Detention Facilities" (June 8, 2015), available at https://www.americanimmigrationcouncil.org/litigation/challenging-unconstitutional-conditions-cbp-detention-facilities.

[7] Human Rights Watch, "They Treat You Like You Are Worthless" (October 21, 2021), available at https://www.hrw.org/report/2021/10/21/they-treat-you-you-are-worthless/internal-dhs-reports-abuses-us-border-officials.

services prior to a credible fear interview, there will be no meaningful access to representation for refugees navigating this complex process.

Over the course of my career, I have worked or consulted on hundreds, if not over a thousand, cases of individuals in expedited removal, particularly those of people in the Credible Fear process. The problems I have encountered will only be made worse by the proposed changes.

In my experience, Credible Fear Interviews (CFIs) are typically conducted telephonically with telephonic interpretation. The phone connection is often poor and, although the client may be in a private room, there is often a lot of noise and commotion in the passageways that can be distracting.

I have also encountered numerous problems with interpretation during these interviews. The Spanish interpreters typically have a background in Mexican Spanish and are unfamiliar with Central American variations and slang. For example the term, "*me hizo bully*" in Central America refers to a severe beating, but is almost always translated as "bullying." The term "*violacion*," meaning rape, is often translated as the more generic "violation." And for individuals from the LGBT community, interpreters often soften the language used by persecutors when translating into English. One common example is the term "*marimacha*," which interpreters will translate as "tomboy" but really means "dyke." Clients, potentially in any language, also get confused when officers ask them about harm from government "officials" or "agents." Clients will often understand this to mean "politicians" and do not realize it also includes police. This will sometimes result in negative credibility findings and/or Asylum Officers and Immigration Judges thinking that they were being deceptive when they initially denied suffering harm perpetrated by government "officials," but later bring up having suffered harm at the hands of the police.

Outside of the Spanish language issues, Portuguese interpreters from Portugal will often claim to speak Brazilian Portuguese when in fact the client patently cannot understand them. The contract interpreters used by DHS have a financial interest in continuing their assignment, so they will insist on pushing forward even if the client or attorney requests a change of interpreter.

Detained families face additional challenges. Parents are often required to have their children with them throughout the interview. These is extremely distracting as their children may cry, get upset, or otherwise require their parent's attention during the interview. I have worked with mothers who had to breastfeed during their interviews. In addition to these distractions, parents are often seeking asylum due to issues they do not want to discuss in front of their children, such as sexual assault, domestic violence, and/or death threats. This forces them to choose between traumatizing their children by saying these things to the Asylum Officer or not providing enough information to accurately assess their claims. When there is childcare available, it is often provided by a DHS agent or other government official and is not very child-friendly. Parents then worry about having left their children with someone who may not be safe, which is also a distraction.

Representing clients in the CFI process is extremely difficult logistically. More than anything this is because the Asylum Office refuses to preschedule the interviews or in any way consult with the attorney before scheduling them. Instead, they call the attorney as the interview is about to begin and with no warning (including on Saturdays and outside of business hours as asylum officers may be located in a different time zone than the attorney). Assuming the attorney is available to answer the call, the only option is to drop what they are doing and do the interview, which will typically last three to four hours (the longest I have ever attended lasted eight hours). If the attorney misses the call, the asylum officer will typically strongly pressure the client to go forward without their attorney. As a result, I know a significant number of private attorneys who no longer accept these cases for representation at all. The simply cannot guarantee that they will be available when the interview is going to take place.

I have trained hundreds of attorneys on representing clients for CFIs. I always warn them that the Asylum Officer will get very frustrated if the attorney talks too much in the interview as they consider the attorney's presence at the interview to be only a courtesy. I tell attorneys that they can safely speak up only around three times in the interview before the Officer loses patience, so they should save these interjections for the most egregious issues. The Officer will also usually allow the attorney to make a closing statement of approximately two minutes at the end of the interview. Interestingly, although attorneys only speak a very small amount, in my experience pro se clients' have CFIs that are only about half as long, indicating that the Officers are not as thorough in these cases.

Recent statistics published by TRAC[8] reflect that around 25% of Credible Fear decisions get overturned and that the number of initial decisions overturned has risen sharply over the past several years. The process is so flawed that in my experience, if there is an attorney available to jump in and assist the client in getting the negative decision overturned, they are relatively successful in doing so. The problem, of course, is that it is difficult to find an attorney on the tight timeline available to do this.

I have routinely witnessed that past changes to the asylum process have further impeded access to counsel and I have no doubt that the new rule changes have the same impact. Virtually no private attorneys would accept cases under the "Prompt Asylum Claim Review" and "Humanitarian Asylum Review Process" (PACR/HARP) policy, because all the issues explained above are compounded when CFIs take place in CBP custody, rather than ICE custody. Immigration attorneys have virtually no access to their clients being held in CBP custody and oftentimes feel like they cannot meet their ethical obligations in providing competent representation under these circumstances. It is already so incredibly difficult to represent clients in the expedited

---

[8] TRAC Immigration, "Immigration Judge Decisions Overturning Asylum Officer Findings in Credible Fear Cases" (March 14, 2023), available at https://trac.syr.edu/reports/712/.

CLP_PC_031906

removal/credible fear process that any additional barrier leads to a dramatic decrease in the attorneys willing to take the cases.

Thank you for considering these comments in response and opposition to this NPRM, and please contact me at taylorlevylaw@gmail.com to provide any additional information you might need.  I look forward to your response.

Taylor Levy
Taylor Levy Law
taylorlevylaw@gmail.com
www.taylorlevylaw.com

# PUBLIC SUBMISSION

**As of:** May 08, 2023
**Received:** March 27, 2023
**Status:** Posted
**Posted:** March 30, 2023
**Tracking No.** lfr-j5r1-xuou
**Comments Due:** March 27, 2023
**Submission Type:** Web

**Docket:** USCIS-2022-0016
Circumvention of Lawful Pathways

**Comment On:** USCIS-2022-0016-0001
Circumvention of Lawful Pathways

**Document:** USCIS-2022-0016-12543
Comment Submitted by Black Immigrant Bail Fund, Cameroon Advocacy Network, Haitian Bridge Alliance, and Robert F. Kennedy Human Rights

---

## Submitter Information

**Email:** dtse@haitianbridge.org
**Organization:** Black Immigrant Bail Fund, Cameroon Advocacy Network, Haitian Bridge Alliance, and Robert F. Kennedy Human Rights

---

## General Comment

The Black Immigrant Bail Fund, Cameroon Advocacy Network, Haitian Bridge Alliance, and Robert F. Kennedy Human Rights jointly submit the below comment in response to the notice of proposed rulemaking titled "Circumvention of Lawful Pathways," published in the Federal Register on February 22, 2023.
The proposed rule would disproportionately deny Black asylum seekers a meaningful opportunity to apply for legal protection from persecution by imposing new presumptions against asylum eligibility and heightened standards for asylum pre-application screenings. In doing so, the proposed rule subjects Black asylum seekers to race-based discrimination, in violation of federal and international law. The below signed organizations therefore recommend that the proposed rule be withdrawn in its entirety. (ATTACHED)

---

## Attachments

Comment of Haitian Bridge Alliance_ Cameroon Advocacy Network_Black Immigrant Bond Fund_and Robert F. Kennedy Human Rights on Proposed Rule_ Circumvention of Lawful Pathways 88 FR 11704

   

**Comment of Black Immigrant Bail Fund, Cameroon Advocacy Network, Haitian Bridge Alliance, and Robert F. Kennedy Human Rights on Proposed Rule, "Circumvention of Lawful Pathways," 88 FR 11704**

Submitted March 27, 2023 via Federal Rulemaking Portal at www.regulations.gov

DHS Docket Number USCIS 2022-0016

I. Introduction                                                                                          2

II. The Proposed Rule Significantly Restricts Access to Asylum.                                          2

III. DHS Disproportionately Prevents Black People from Accessing Legal Protection.                      4

IV. The Proposed Rule Violates the Human Rights of Black People to Seek Protection from
Persecution and Torture.                                                                                  6

    A. The CBP One Appointment Scheduling Application Denies Black People Equal Access to
Legal Protection.                                                                                         7

    B. Transit Countries Deny Black People Meaningful Access to Legal Protection.                     8

    C. Expanded Pathways for Parole do not Adequately Replace Access to Asylum for Black
Immigrants.                                                                                              10

    D. The Proposed Rule Violates International Law Prohibiting Racial Discrimination.               12

V. The Proposed Rule and Comment Timeline Adversely Impact Signatory Organizations.                     13

VI. Conclusion                                                                                           16

The Black Immigrant Bail Fund, Cameroon Advocacy Network, Haitian Bridge Alliance, and Robert F. Kennedy Human Rights jointly submit the below comment in response to the notice of proposed rulemaking titled "Circumvention of Lawful Pathways," published in the Federal Register on February 22, 2023. The proposed rule would disproportionately deny Black asylum seekers a meaningful opportunity to apply for legal protection from persecution by imposing new presumptions against asylum eligibility and heightened standards for asylum pre-application screenings. In doing so, the proposed rule subjects Black asylum seekers to race-based

CLP_PC_032291

discrimination, in violation of federal and international law. The below signed organizations therefore recommend that the proposed rule be withdrawn in its entirety.

## I.    Introduction

Black people seeking legal protection at the United States border face significant negative disparities in treatment and approval rates in comparison to all noncitizens. The proposed rule would worsen race-based differential treatment by disqualifying Black people from asylum, subjecting them to even higher rates of detention, deportation, and *refoulement* (forcible return of refugees) to persecution, torture, and other serious harm.

This comment proceeds in four parts. First, it briefly describes proposed changes to current asylum-screening procedures that would significantly restrict the ability of Black people to apply for asylum. Second, it describes how increased restrictions on legal protection recently adopted have had the purpose and effect of denying Black asylum seekers the human right to apply for asylum. Third, it explains how the proposed rule would have a disparate impact on Black asylum seekers, subjecting them to serious harm, including *refoulement* to persecution, torture, and death. Finally, it describes how the commenting organizations will be negatively affected by the proposed rule.

## II.    The Proposed Rule Significantly Restricts Access to Asylum.

The proposed rule would disqualify from asylum the majority of individuals who request protection from the United States, including individuals from majority-Black countries who travel through Mexico to the U.S. border. It would "establish a rebuttable presumption that certain noncitizens . . . are ineligible for asylum, if they traveled through a country other than their country of citizenship, nationality, or, if stateless, last habitual residence. . . ."[1] The proposed rule therefore presumptively disqualifies from asylum all noncitizens requesting protection at the southern border other than Mexican nationals, and it creates a disparate system that favors those arriving directly to the United States by commercial air. Air routes are not available to most Black individuals who intend to seek asylum because of the long and dangerous distances needed to travel and the difficulty in getting travel visas for citizens of Black-majority countries. The presumption against asylum eligibility applies whether a noncitizen is in removal proceedings and applies for asylum defensively or whether she affirmatively applies for asylum before the United States Citizenship and Immigration Services (USCIS).[2]

In three circumstances, the presumption would not apply. Noncitizens retain their statutory right to apply for asylum if they:

---

[1] Circumvention of Lawful Pathways, 88 Fed. Reg. 11,704, 11,707 (Feb. 23, 2023) (revising 8 C.F.R. § 1208).
[2] *Id.*

(1) receive pre-authorization to travel to the United States to seek parole pursuant to a DHS-approved parole process;

(2) present at a port of entry at a pre-scheduled time through the use of the web-based application CBP [Customs and Border Protection] One or if they demonstrate that the application for scheduling was not possible to access or use; or

(3) apply for, and are denied in a final decision, asylum or other protection in a country through which they traveled.[3]

The high bar to demonstrate that CBP One is inaccessible or unusable met only in "a narrow set of cases in which it was truly not possible for the noncitizen to access or use the DHS system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle."[4]

The presumption can only be rebutted if a noncitizen, immediately upon entry at the border, shows "exceptionally compelling circumstances by a preponderance of the evidence."[5] Only three scenarios explicitly meet the "exceptionally compelling" bar. A noncitizen rebuts the presumption when she:

(1) has an acute medical emergency;

(2) faces an imminent and extreme threat to life or safety, including rape, kidnapping, torture, or murder; or

(3) is a ''victim of a severe form of trafficking in persons'' as defined elsewhere in U.S. law.[6]

The presumption may also be rebutted by "other exceptionally compelling circumstances," in the discretion of the screening officer.[7] The proposed rule provides no standards to prevent an officer's arbitrary decision making or the abuse of discretion, including due to race-based bias, explicit or implicit.

As a practical matter, the proposed rule also elevates the pre-application standard for humanitarian protection. Under current law, an individual arriving at the border is not automatically granted the right to apply for asylum. Instead, she must first pass a credible fear interview, where she bears the burden of showing a "significant possibility of establishing eligibility for asylum."[8] If she does not meet this burden, she is immediately deported.[9] The rule is clear that where a noncitizen is subject to the asylum ban presumption, she must meet a higher

---

[3] *Id.*
[4] *Id.* at 11,723 n.173.
[5] *Id.* at 11,723.
[6] *Id.*
[7] *Id.*
[8] *Id.* at 11,725 (referencing 8 U.S.C. § 1225(b)(1)(B)(v)).
[9] *Id.*

pre-application burden to show "a reasonable possibility of persecution or torture."[10] If she does not, she will be immediately deported, even where there is evidence of a significant possibility of race-based or other persecution.

## III.  DHS Disproportionately Prevents Black People from Accessing Legal Protection.

The proposed rule will exacerbate the already-existing disproportionate disqualification of Black people from legal protection at the U.S.-Mexico border. This section describes recent and longstanding asylum restriction policies that either explicitly target or disproportionately harm Black people.

Black immigrants have long suffered the brunt of harsh immigration policies designed to deter Black people from accessing their human right to apply for asylum.[11] Explicit anti-Haitian immigration policies adopted by the United States include mass denial of asylum applications without individualized consideration,[12] offshore detention at Guantánamo Bay,[13] and creation of the world's first HIV-positive internment camp.[14]

Federal courts have also recognized the explicit anti-Black and anti-Haitian roots of metering, a recent restriction on legal protection that, while formally disavowed, continues in practice. Metering denies the right to apply for asylum by "limit[ing] the number of asylum seekers who [are] processed each day at designated ports of entry along the U.S. southern border."[15] The United States first adopted the policy "[i]n response to the increase in Haitian migration in 2016,"[16] directing border agents to turn back Haitians who had crossed the border and to stop those who had not with orders to return at a later, often unspecified time.[17] Black asylum seekers who were turned back to Mexico report facing targeted violence from police and gangs, including kidnapping, rape, robbery, beatings, extortion, and threats.[18] In September 2021, a federal court

---

[10] *Id.*

[11] *See* HAITIAN BRIDGE ALLIANCE & ROBERT F. KENNEDY HUMAN RIGHTS, BEYOND THE BRIDGE: DOCUMENTED HUMAN RIGHTS ABUSES AND CIVIL RIGHTS VIOLATIONS AGAINST HAITIAN MIGRANTS IN THE DEL RIO, TEXAS ENCAMPMENT (2022), https://rfkhr.imgix.net/asset/Del-Rio-Report.pdf [hereinafter *Beyond the Bridge*] (describing history of explicit anti-Haitian immigration policies adopted from the 1970s onward, including denial of asylum applications without individualized consideration, offshore detention at Guantánamo Bay, and creation of the world's first HIV-internment camp).

[12] *Id.* at 48-49 & n.270.

[13] *Id.* at 16.

[14] *Id.*

[15] HILLEL R. SMITH, CONG. RESEARCH SERV., LSB10295, THE DEPARTMENT OF HOMELAND SECURITY'S "METERING" POLICY: LEGAL ISSUES 1 (2022), https://crsreports.congress.gov/product/pdf/LSB/LSB10295.

[16] *Al Otro Lado, Inc. v. Mayorkas*, No. 17-CV-02366-BAS-KSC, 2021 WL 3931890, at *2 (S.D. Cal. Sept. 2, 2021).

[17] *Id.*

[18] HUMAN RIGHTS FIRST & HAITIAN BRIDGE ALLIANCE, BIDEN ADMINISTRATION'S DANGEROUS HAITIAN EXPULSION STRATEGY ESCALATES THE U.S. HISTORY OF ILLEGAL AND DISCRIMINATORY MISTREATMENT OF HAITIANS SEEKING SAFETY IN THE UNITED STATES 3 (2021). https://humanrightsfirst.org/wp-content/uploads/2022/09/BidenAdministrationDangerousHaitianExpulsionStrategy.pdf

CLP_PC_032294

enjoined metering for violating the due process right to apply for asylum.[19] But metering continues in the form of "exception waitlists" to Title 42, the 2020 policy of immediate expulsion of asylum seekers "without allowing them to apply for asylum or seek relief from removal to a place where they will face persecution."[20] In mid-2022, the United States began to process exceptions to Title 42 expulsion at the southern border. As the number of individuals seeking exceptions increased, waitlists proliferated.[21] Black asylum seekers reported being blocked from waitlists due to anti-Black discrimination and lack of interpretation services.[22]

Metering is not the only policy to be recognized by a federal court as motivated by anti-Black bias. When the United States terminated Temporary Protected Status for Haitians in 2017, a federal court enjoined the rescission after finding it was likely "based on race and/or national origin/ethnicity against non-white immigrants in general and Haitians in particular."[23] Pending federal lawsuits examine evidence of race-based asylum deterrence policies practiced against Haitian and Black asylum seekers, who in the fall of 2021 were penned into open-air encampments, cut off from legal and humanitarian aid, and pushed across the border by U.S. agents on horseback at Del Rio, Texas.[24]

DHS also uses longstanding asylum screening procedures to disproportionately reject asylum claims of Black immigrants. Under current credible fear interview procedures, asylum seekers from Black-majority countries including Burkina Faso, Cameroon, the Dominican Republic, Ghana, Mauritania, and Senegal receive negative credibility findings in their initial credible fear interview at rates double to quadruple times the global average.[25] Positive credible fear interview determinations for Haitians are persistently lower than average over multi-year periods, in some years by almost half.[26]

Black immigrants permitted to apply for asylum report discriminatory treatment in immigration court removal proceedings, including denials of adequate interpretation, lack of

---

[19] *Al Otro Lado*, 2021 WL 3931890, at *20.

[20] *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 726 (D.C. Cir. 2022).

[21] STEPHANIE LEUTERT & CAITLYN YEATS, UNIV. OF TEX. AT AUSTIN STRAUSS CTR. FOR INT'L SEC. & LAW, ASYLUM PROCESSING AT THE U.S.-MEXICO BORDER: FEBRUARY 2023, https://www.strausscenter.org/wp-content/uploads/Feb_2023_Asylum_Processing.pdf.

[22] Black Alliance for Just Immigration et al., *Shadow Report to the Committee on the Elimination of Racial Discrimination (CERD): Anti-Black Discrimination Against Non-citizens and Ongoing Violations of International Protections for Migrants, Refugees, and Asylum Seekers of African Descent* 10 (Aug. 2022) [hereinafter Shadow Report], https://humanrightsfirst.org/wp-content/uploads/2022/09/US-Coalition_anti-Black-Discrimination-in-Immigration__CERD-Report_072222.pdf (citing statistics from FY2020).

[23] *Saget v. Trump*, 375 F. Supp. 3d 280, 374 (E.D.N.Y. 2019) (finding "both direct and circumstantial evidence a discriminatory purpose of removing non-white immigrants from the United States was a motivating factor behind the decision to terminate TPS for Haiti").

[24] *See* Compl. ¶¶ 66-78, *Haitian Bridge All. v. Biden,* No. 1:21-cv-03317 (D.D.C Dec. 20, 2021).

[25] Shadow Report, *supra* note 22, at 10.

[26] *Id.* at 11.

CLP_PC_032295

access to counsel, intentionally rushed proceedings, and adjudicator bias.[27] Over a 20-year period ending in FY2021, DHS denied 82 percent of asylum applications from Haitians, the second highest rate of denials of any nationality.[28] Adjudicator bias occurs across nationalities for majority-Black countries, leading to legal errors in screening interviews, failures to grant opportunity to respond, mishandling of evidence, and errors of fact finding.[29] Immigration judges have ordered detained Black asylum seekers removed due to their inability to fill the forms in English or minor inconsistencies due to poor translation.[30]

Black asylum seekers are also more likely to face abusive immigration detention, including solitary confinement at a rate six times higher than non-Black people,[31] and overrepresentation in family detention,[32] a policy currently being reconsidered by the Biden administration.[33] Black people represented more than half of all detained individuals in family detention in 2020.[34] More than 3 out of 4 immigrants in detention are not represented by counsel.[35] And people in detention prevail without representation in only 3 percent of cases.[36]

---

[27] *Id.* at 1.

[28] Syracuse University, Transactional Records Access Clearinghouse (TRAC), *The Impact of Nationality, Language, Gender and Age on Asylum Success* (Dec. 7, 2021), https://trac.syr.edu/immigration/reports/668/.

[29] Human Rights Watch, '*How Can You Throw Us Back?' Asylum Seekers Abused in the US and Deported to Harm in Cameroon* (Feb. 2022), https://www.hrw.org/sites/default/files/media_2022/03/us_cameroon0222_web.pdf, 114 - 43 [hereinafter "*How Can You Throw Us Back?*"] (describing the due process issues black immigrants face in the U.S. Immigration Court system including issues of dismissed errors in screening interviews, failure to grant opportunity to respond, mishandling evidence, and error of fact finding).

[30] *See id.* at103-07 (identifying lack of interpretation as contributing to erroneous negative fear determinations and deportations of Cameroonian asylum seekers); *see also Grievance Letter to USCIS, ICE, EOIR Re: "Detained Asylum Seekers Deprived of Due Process in Expedited Removal Process"* (June 30, 2021), https://www.splcenter.org/sites/default/files/detained_asylum_seeker_grievance_letter_30_june_2021.pdf; Human Rights First, '*I'm a Prisoner Here': Biden Administration Policies Lock Up Asylum Seekers* 35, 37-38 (Apr. 2022), https://www.humanrightsfirst.org/sites/default/files/I%27maPrisonerHere.pdf (documenting flawed credible fear interviews with inadequate interpretation as contributing to negative fear determinations and deportations of Cameroonian asylum seekers).

[31] Konrad Franco, Caitlin Patler, & Keramet Reiter, *Punishing Status and the Punishment Status Quo: Solitary Confinement in US Immigration Prisons, 2013-2017* (Apr. 2020), https://osf.io/preprints/socarxiv/zdy7f/.

[32] RAICES, *Black, Pregnant, Detained* (Mar. 4, 2021), https://www.youtube.com/watch?v=2NDto_YVo1Y(noting that in 2020 Black people were more than half of all detained at Karnes County Family Residential Center in Texas and all of those detained at Berks Family Residential Center in Pennsylvania).

[33] Eileen Sullivan & Zolan Kanno-Youngs, *U.S. Is Said to Consider Reinstating Detention of Migrant Families*, N.Y. TIMES (Mar. 6, 2023), https://tinyurl.com/974txkdm.

[34] Compl. ¶ 49, *Haitian Bridge All.  v. Biden,* No. 1:21-cv-03317 (D.D.C  Dec. 20, 2021).

[35] TRAC, *Details on Deportation Proceedings in Immigration Court (through February 2019)*, https://trac.syr.edu/phptools/immigration/ntahist/ (field selections:Immigration Court State: All; Custody: Detained; Represented: Not Represented).

[36] Robert A. Katzman, *Study Group on Immigrant Representation: The First Decade,* 87 FORDHAM L. REV. 485, 486 (2018), https://ir.lawnet.fordham.edu/cgi/viewcontent.cgi?article=5549&context=flr.

CLP_PC_032296

Collectively, current asylum restrictions and longstanding policies disproportionately harm Black people, denying them meaningful access to humanitarian protection owed under international and domestic law. The proposed rule will only exacerbate this grave injustice.

IV.     **The Proposed Rule Violates the Human Rights of Black People to Seek Protection from Persecution and Torture.**

Though facially race-neutral, the proposed rule would have a particularly harsh effect on Black asylum seekers. This section explains how the proposed rule would deepen existing race-based disparities in asylum screening procedures, depriving Black people in particular of meaningful access to asylum. It draws from secondary sources and in-person interviews with Black asylum seekers conducted in March 2023 at the U.S. Mexico border in Tijuana, Mexico by a team of researchers and lawyers, including individuals from the Haitian Bridge Alliance.[37] These accounts highlight elements of the proposed rule—including some already in practice—that work to deny Black people meaningful access to asylum, including mandatory electronic scheduling for border appointments to seek asylum, transit country asylum application requirements, and a humanitarian parole program that is an inadequate substitute for humanitarian protection.

A.   **The CBP One Appointment Scheduling Application Denies Black People Equal Access to Humanitarian Protection.**

The proposed rule creates a presumption against asylum eligibility unless an individual uses the smartphone application CBP One to pre-schedule an appointment at a U.S. port of entry to request asylum.[38] First, many asylum seekers from African countries such as Guinea, Togo, Ghana, and Mauritania reported not knowing about CBP One. Without community or the ability to speak Spanish, African asylum seekers are isolated and vulnerable to smugglers who promise to take them across. Moreover, numerous reports from asylum seekers at the border describe serious flaws with CBP One, including unreliable software, connectivity issues, and failure to register darker skin tones.

Asylum seekers report that the CBP One application repeatedly crashes or freezes. Common issues with application crashing included freezing just before an individual could take their photo, freezing on the calendar slot page, and the application shutting down before

---

[37] *See* Center for Gender & Refugee Studies, Haitian Bridge Alliance & Hastings to Haiti Partnership, *Making a Mockery of Asylum: The Proposed Asylum Ban, Relying on the CBP One App for Access to Ports of Entry, Will Separate Families and Deny Protection* (Mar. 27, 2023) (report compiling information from interview with 194 individuals and family units living in shelters or other informal housing arrangements in Tijuana regarding their experiences using the CBP One app as well as protections unavailable to them in Mexico and other transit countries en route to the United States).

[38] 88 Fed. Reg. at 11719.

CLP_PC_032297

individuals could add family member information.[39] Some of these issues might be remedied given sufficient access to broadband capacity and a newer smartphone.

But the reality on the ground is that Black migrants have very little resources to purchase or access a newer smartphone or a broadband internet connection. Many have undertaken significant risks and long journeys through South and Central America to reach the U.S.-Mexico border, including traveling the notorious Darien Gap, a remote and dangerous jungle region between Colombia and Panama.[40] During this journey, Black migrants are often subject to robbery, rape, physical assault, and family separation, resulting not only in trauma, but in loss or destruction of personal possessions like smartphones and separation from family members with technical literacy.[41] Those arriving in Mexico also report robbery and assault while waiting to apply for asylum at the U.S. border, resulting in stolen or destroyed smartphones.[42] Moreover, because CBP One requires a newer smartphone with up-to-date software in order to function properly (indeed the application itself requires frequent updates to be used), Black migrants who cannot afford the latest phones or technology face de facto exclusion from the asylum application process.

CBP One also uses facial recognition software that excludes black skin tones.[43] Research on skin-type bias in commercial artificial intelligence systems shows that facial recognition software exhibits significant racial biases. One study found that facial analysis software has an error rate of 0.8 percent for light-skinned men compared to 34.7 percent for dark-skinned women.[44] Individuals interviewed at the border affirm difficulties with photo uploads. Almost all dark-skinned individuals interviewed reported an inability to move past the photo confirmation page because CBP One refused to recognize their face.[45] Others reported that the short confirmation window at the calendar stage for taking photos made it impossible to capture entire families, especially those with small children, before all calendar spots had disappeared.[46]

---

[39] *See* Center for Gender & Refugee Studies et al., *supra* n. 37 at 6-8.

[40] Laurence Blair, *Risking it all: migrants brave Darien Gap in pursuit of the American dream*, THE GUARDIAN (Apr. 28, 2022), https://www.theguardian.com/global-development/2022/apr/28/risking-it-all-migrants-brave-darien-gap-in-pursuit-of-the-american-dream

[41] *Id.*

[42] Human Rights Watch, *Mexico: Rampant Abuses Against Asylum Seekers* (2021), https://www.hrw.org/news/2021/09/21/mexico-rampant-abuses-against-asylum-seekers.

[43] Melissa del Bosque, *Facial Recognition Bias Frustrates Black Asylum Applicants to US, Advocates Say,* THE GUARDIAN (Feb. 8, 2023) https://www.theguardian.com/us-news/2023/feb/08/us-immigration-cbp-one-app-facial-recognition-bias.

[44] *See* JOY BUOLAMWINI & TIMNIT GEBRU, *GENDER SHADES: INTERSECTIONAL ACCURACY DISPARITIES IN COMMERCIAL GENDER CLASSIFICATION,* 81 PROC. IN MACHINE LEARNING RES. 1 (2018), http://proceedings.mlr.press/v81/buolamwini18a/buolamwini18a.pdf

[45] *See* Center for Gender & Refugee Studies et al., *supra* n. 37 at 7.

[46] *Id.*

CLP_PC_032298

**B.  Transit Countries Deny Black People Meaningful Access to Legal Protection.**

The proposed rule creates a presumption against asylum eligibility unless an individual first applies for and receives a final denial of an application for asylum in a country through which she traveled before reaching the United States.[47] But countries in the Americas deny Black people meaningful access to legal protection due to anti-Black racism and underdeveloped asylum systems.

Anti-Black racism is a significant problem in countries throughout the Americas, where Black asylum seekers face violence and discrimination from criminal organizations and local authorities. Black immigrants and other individuals who have fled their home countries due to persecution are subjected to similar abuses in transit countries.[48] As simply put by a recent World Bank report, "Latin America is, in fact, the most violent region in the world, and Afrodescendants are the main victims."[49] Costa Rican First Vice President Espy Campbell Barr acknowledges the "context of systemic racism against Afro-descendants . . . enclosed within the political, economic, social, and cultural system" across Central and South America.[50]

In this context, police violence against Black people is common in states throughout the region.[51] In Brazil, 75% of people killed by police are Black.[52] Surveillance, hostile treatment in public spaces, and abuse from security forces are commonly reported by Black people throughout Latin American states.[53] The Inter-American Commission on Human Rights describes Afro-descendants in Latin America as vulnerable to "double victimization," both excluded from police protection from crime and more likely to be victimized by institutionalized violence, including unfair judicial treatment.[54] And in Mexico, a state that all Black people must pass through to request asylum at the U.S. border, asylum seekers of African descent have reported targeted

---

[47] 88 Fed. Reg. at 11,740.

[48] *See, e.g.*, Human Rights Watch, *Mexico: Abuses against asylum seekers at US border* (2021), https://www.hrw.org/news/2021/03/05/mexico-abuses-against-asylum-seekers-us-border.

[49] WORLD BANK GROUP, AFRO-DESCENDANTS IN LATIN AMERICA 67 https://openknowledge.worldbank.org/entities/publication/a3b5c6a3-6b2d-52ad-a560-7f4817b235ca (citing Laura Chioda, *Stop the Violence in Latin America: A Look at Prevention from Cradle to Adulthood, Latin American Development Forum* (2017)).

[50] PAN AM. HEALTH ORG., AFRO-DESCENDANTS IN LATIN AMERICAN COUNTRIES LIVE IN STARKLY UNEQUAL CONDITIONS THAT IMPACT HEALTH AND WELL-BEING, PAHO STUDY SHOWS (2021), https://www.paho.org/en/news/3-12-2021-afro-descendants-latin-american-countries-live-starkly-unequal-conditions-impact.

[51] BRUNO CARVALHO, *LATIN AMERICA IS READY FOR A BLACK LIVES MATTER RECKONING,* N.Y. TIMES (June 29, 2020), https://www.nytimes.com/2020/06/29/opinion/latin-america-racism-police.html.

[52] *Id.*

[53] WORLD BANK GROUP, AFRO-DESCENDANTS IN LATIN AMERICA, *supra* note 47, at 68 (citing Inter-American Commission on Human Rights, *The Situation of People of African Descent in the Americas* (2011)).

[54] *Id.*

CLP_PC_032299

violence and racial discrimination after being turned away from the U.S. border when requesting protection.[55]

Violence is not the only factor impeding Black people's meaningful access to humanitarian protection in Latin America. The region's overtaxed, underdeveloped asylum systems also make it infeasible for Black asylum seekers to apply for asylum and receive protection in these countries. From 2017 to 2022, there were nearly 1.7 million pending asylum applications to states in all nations of the Americas, excluding the United States and Canada.[56] Of that number, only 24,503 received a final decision to grant or deny protection: a 1.4% decision rate.[57] In the face of such abysmal processing rates, United Nations officials acknowledge that "[n]ational asylum systems [in Latin America have] collapsed due to an exponential increase in the number of asylum applications . . . and a lack of human and financial resources.[58] Researchers describe a Latin American asylum system that is plagued by a "sense of arbitrary application."[59] These asylum systems are also "largely symbolic, [given that] states across the region are reluctant to invest in [them], leading to low state capacity that hinders the application of the law."[60]

To give just two examples, Costa Rica, one of the countries in the region touted by the proposed rule for offering better refugee protections for people fleeing persecution, is tightening its asylum policies in the face of an overwhelmed system.[61] As it stands, more than nine out of ten refugees in Costa Rica are from Nicaragua, leaving little capacity for migrants from majority-Black countries to seek protection.[62] And Mexico, the one country that all migrants must pass

---

[55] Human Rights Watch, *US: Asylum Seekers Returned to Uncertainty, Danger in Mexico* (July 2, 2019), https://www.hrw.org/news/2019/07/02/us-asylum-seekers-returned-uncertainty-danger-mexico.

[56] United Nations High Commissioner on Refugees (UNHCR), *Refugee Data Finder*, https://www.unhcr.org/refugee-statistics/download/?url=Jz2Flp.

[57] *Id.* (returning results of 76,894 decisions issued; 52,481 listed as "otherwise closed").

[58] Juan Ignacio Mondelli, *Reshaping Asylum in Latin America as a Response to Large-Scale Mixed Movements: A Decade of Progress and Challenges (2009-2019)*, at 4 (Dec. 1, 2020) https://www.unhcr.org/people-forced-to-flee-book/wp-content/uploads/sites/137/2021/10/Juan-Mondelli_Reshaping-Asylum-in-Latin-America-as-a-Response-to-Large-Scale-Mixed-Movements.pdf.

[59] Omar Hammoud Gallego, *Here to stay: Latin America must face up to the reality of long-term Venezuelan migration*, LONDON SCHOOL ECON. & POLITICAL SCIENCE BLOGS (Apr. 13, 2021), https://blogs.lse.ac.uk/latamcaribbean/2021/04/13/here-to-stay-latin-america-must-face-up-to-the-reality-of-long-term-venezuelan-migration/.

[60] Luisa Feline Freier & Omar Hammoud Gallego, *Symbolic refugee protection: why Latin America passed progressive refugee laws never meant to use*, LONDON SCHOOL ECON. & POLITICAL SCIENCE BLOGS (Oct. 6, 2022) https://blogs.lse.ac.uk/latamcaribbean/2022/10/06/refugee-protection-latin-america-refugee-laws-never-used/.

[61] Javier Cordoba, *Costa Rica tightens overwhelmed asylum system*, ASSOC. PRESS (Dec. 14, 2022), https://apnews.com/article/latin-america-mexico-caribbean-germany-costa-rica-0e2db787358228fe308023ba259d1d3f ("Despite having only 5 million citizens, the Central American country [Costa Rica] trailed only the United States, Germany and Mexico in the number of asylum applications it received last year, according to the United Nations High Commissioner for Refugees.").

[62] Moises Castillo & Christopher Sherman, *Fleeing Nicaraguans Strain Costa Rica's Asylum System, ASSOC. PRESS* (Sept. 2, 2022), https://apnews.com/article/covid-health-elections-presidential-caribbean-52044748d15dbbb6ca706c66cc7459a5.

CLP_PC_032300

through, now receives the world's third highest number of asylum applications.[63] Since 2014 the overwhelmed Mexican asylum system has experienced a 5325% increase in asylum applications,[64] vastly outpacing the country's ability to adjudicate applications in a fair and timely manner. Under-resourced and overwhelmed asylum systems, mixed with a lack of language capacity and anti-Black racism, generally results in stalled or poor outcomes for Black asylum seekers, including Haitians.[65]

### C. Expanded Pathways for Parole do not Adequately Replace Access to Asylum for Black Immigrants.

The proposed rule posits the recent expansion of parole programs for certain nationalities as an alternative to seeking asylum.[66] But parole is a poor substitute for meaningful access to humanitarian protection for Black immigrants. The parole requirements filter immigrants based on wealth, social connections, and ability to wait safely for approval while in the country of origin—not humanitarian need for protection from persecution. Moreover, the circumstances surrounding the creation of the new parole programs evince the government's intention to discriminate against Black asylum seekers.

Given key differences in the populations between asylum seekers and those most likely to benefit from the parole program for Cubans, Haitians, Nicaraguans, and Venezuelas, expanded pathways for parole must supplement, not replace, access to asylum. These parole programs require an applicant to secure a financial sponsor in the United States, transmit biographic and application information to the Department of Homeland Security both through an online application and the CBP One application, and secure travel to a United States port of entry, presumably with a valid foreign passport.[67] But individuals who merit asylum, by definition, are fleeing dangerous conditions in their home countries, and often are doing so urgently, due to actual harm or the imminent threat of persecution. With safety and lives at immediate risk, they do not have the luxury of remaining in their home countries for processing of a parole application. On the run from persecution, they are unable to reliably communicate with a U.S.-based sponsor. They

---

[63] Daina Beth Solomon & Lizbeth Diaz, *Mexico seeks to curb 'abuse' of asylum system by migrants who do not plan to stay,* REUTERS (Feb. 13, 2023), https://www.reuters.com/world/americas/mexico-seeks-curb-abuse-asylum-system-by-migrants-who-do-not-plan-stay-2023-02-13/.

[64] Diego Badillo, *Exodo a Estados Unidos, sin precedentes, convierty a Mexico en sala de espera de migrantes*, EL ECONOMISTA (Jan. 15, 2023), https://www.eleconomista.com.mx/politica/Exodo-a-Estados-Unidos-sin-precedentes-convierte-a-Mexico-en-sala-de-espera-de-migrantes-20230113-0069.html.

[65] Instituto para las Mujeres en la Migración & Haitian Bridge Alliance & Center for Gender and Refugee Studies, *A Journey of Hope: Haitian Women's Migration to Tapachula, Mexico* (2021), https://www.google.com/url?q=https://imumi.org/wp-content/uploads/2021/01/A-Journey-of-Hope-Haitian-Womens-Migration-to-Tapachula-Mexico.-Executive-Summary.pdf&sa=D&source=docs&ust=1679963550084290&usg=AOvVaw2IVFla5OimdDyoi95Vbm_F

[66] 88 Fed. Reg. 11,704, 11,711-12.

[67] USCIS, *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, https://www.uscis.gov/CHNV.

CLP_PC_032301

also risk serious harm if contacting their government, the persecuting agent, for necessary travel documents like a passport.

The parole programs also favor persons with the financial means to wait safely in their home countries, purchase flights to the United States, and leverage social connections to a U.S.-based financial sponsor. Those most in need of humanitarian protection are most likely to be disqualified for parole because they have already left their countries due to risk of persecution or torture. On the move in search of safety, they are also less likely to have either the discretionary funds needed for travel or a reliable communication with a U.S. financial sponsor.

Even if granted, the temporary nature of parole leaves Black immigrants in a state of instability. Parole is valid only for a limited period of time, with renewal availability uncertain.[68] It is also subject to revocation depending on the political winds, lacking the regulatory protections that asylum has against sudden rescission.[69] Individuals granted parole still face uncertainty about their safety, due to risk of deportation back to a home country where they would again face persecution once the parole period expires.

Finally, there is strong evidence of government intent to discriminate against Black asylum seekers given the contrast in features between newly created parole programs for Cubans, Haitians, Nicaraguans, and Venezuelans and the distinct program created for Ukrainians. As an initial matter, the commenters support expanded immigration pathways such as parole. But when responding to a significant humanitarian crisis, it is possible to successfully pair expanded parole with access to asylum. The government knows this, because it has already done so for immigrants from the majority-white country of Ukraine. Between March and May 2022, the United States paroled nearly all of the more than 23,000 Ukrainians who arrived at the southern border at ports of entry, granting them full access to asylum procedures.[70] Only 0.6% of Ukrainians were immediately expelled.[71] In contrast, when describing the new parole programs created for immigrants from countries with a majority or significant Black population,[72] the Notice of

---

[68] 88 Fed. Reg. 11,704, 11,718 (specifying that parole is valid for an initial 2-year period).

[69] 8 CFR § 208.24 (mandating procedural protections against sudden asylum revocation).

[70] TRAC, *Ukrainians at the US-Mexico Border: Seeking Admission at US Ports of Entry by Nationality* (May 17, 2022), https://trac.syr.edu/immigration/reports/683/.

[71] US Customs and Border Protection, *Nationwide Encounters*, https://www.cbp.gov/newsroom/stats/nationwide-encounters (expulsion statistics).

[72] Given the socially constructed nature of race and differences between nations in how racial categories are constructed, exact demographic figures of national racial makeup are elusive. Sources estimate that 95% of Haitians are Black; between 35 to 62 percent of Cubans are Afro-descendant; 55% of Venezuelans are of African or mixed-African descent; and at least 9% of Nicaraguans are Black, concentrated mainly on the Caribbean coast, though "many if not most western Nicaraguans had African ancestry" (Victoria Gonzalez Rivera, *Why My Nicaraguan Father Did Not "See" His Blackness*, HAVANA TIMES (June 16, 2020), https://havanatimes.org/opinion/why-my-nicaraguan-father-did-not-see-his-blackness/). *See* Embassy of the Republic of Haiti, Washington D.C., *Haiti at a Glance*, https://www.haiti.org/haiti-at-a-glance/; Maria Luisa Paul, *"A powder keg about to explode": Long marginalized Afro Cubans at forefront of island's unrest*, WASH. POST (July 19, 2021),

Proposed Rulemaking emphasizes "that the incentive structure created by [parole] processes relies on the availability of an immediate consequence": the refusal of access to asylum to those who present at the U.S. border in the manner utilized by most Ukranians and the expansion of expedited removal.[73]

The proposed rule comes within a recent historical context of explicitly anti-Haitian immigration policies. It would expand to other countries features of the newly created parole programs for Cubans, Haitians, Nicaraguans, and Venezuelans that have a disparate impact on Black asylum seekers—a fact the government knows, given several months of observation since those programs were initiated. And it would expand and codify a difference in treatment of people seeking humanitarian protection under the parole programs for Ukrainians versus other nationalities with majority or significant Black populations. Under the circumstances of the proposed rule's creation, a strong inference of intent to discriminate against Black asylum seekers arises.

### D. The Proposed Rule Violates Domestic and International Law Prohibiting Racial Discrimination.

The proposed rule's harmful and disparate impact on Black people violates human rights law prohibiting racial discrimination in treaties that the United States has ratified. Both the International Convention on the Elimination of all Forms of Racial Discrimination (CERD) and the International Convention on Civil and Political Rights (ICCPR) prohibit racial discrimination of the type the proposed rule would institutionalize.

Under CERD, the United States pledges to eliminate,

> any distinction, exclusion, restriction or preference based on race, colour, descent, or national or ethnic origin which has the purpose or effect of nullifying or impairing the recognition, enjoyment or exercise, on an equal footing, of human rights and fundamental freedoms in the political, economic, social, cultural or any other field of public life.[74]

This pledge carries affirmative duties to "take effective measures to review governmental, national and local policies, and to amend, rescind or nullify any laws and regulations which have the effect

---

https://www.washingtonpost.com/world/2021/07/19/cuba-protests-afro-cubans/; Instituto Nacional de Estadistica, *XIV Censo Nacional de Poblacion y Vivienda* 29 (May 2014), http://www.ine.gob.ve/documentos/Demografia/CensodePoblacionyVivienda/pdf/nacional.pdf; CIA, *The World Factbook: Nicaragua* (Mar. 22, 2023), https://www.cia.gov/the-world-factbook/countries/nicaragua/.

[73]  88 Fed. Reg. 11,704, 11,731.

[74] International Convention on the Elimination of All Forms of Racial Discrimination, Dec. 21, 1965, 660 U.N.T.S. 195, art. 1 [hereinafter CERD].

CLP_PC_032303

of creating or perpetuating racial discrimination wherever it exists."[75] It also obligates the United States to rescind facially neutral policies that have a disparate impact on racial minorities.[76] In this sense, the United States' CERD obligations accord with U.S. constitutional law. At a minimum, both prohibit intentional racial discrimination, which may be inferred where a facially neutral law creates otherwise inexplicable racial disparities.[77]

Similarly, ICCPR guarantees the right to protection against racial discrimination in law.[78] It also protects against racial discrimination with regards to other rights contained in the Convention.[79] Those rights implicated by the proposed rule include the right to life and its protection against non-refoulement[80] and the right to a fair procedure in assessing protection against non-refoulement.[81]

As discussed above, the proposed rule imposes significant burdens on Black asylum seekers that, collectively, deprive them of a meaningful opportunity to seek protection against refoulement. The proposed rule's disparate impact on Black asylum seekers violates international human rights treaties to which the United States is bound, as well as domestic constitutional and statutory obligations.[82] It should therefore be withdrawn in its entirety.

---

[75] CERD art. 2.

[76] *See generally* Audrey Daniel, *The Intent Doctrine and CERD: How the United States Fails to Meet Its International Obligations in Racial Discrimination Jurisprudence* at 270-71 (discussing evidence of CERD framers' intent to prohibit disparate impact) (citing NATAN LERNER, THE U.N. CONVENTION ON THE ELIMINATION OF ALL FORMS OF RACIAL DISCRIMINATION 1 (Sijthoff & Noordhoff 1980), https://core.ac.uk/download/pdf/232972364.pdf).

[77] *See Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977) ("Determining whether invidious discriminatory purpose exists demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."); *Casteneda v. Partida*, 430 U.S. 482 n.13 (1977) ("If a disparity is sufficiently large, then it is unlikely that it is due solely to chance or accident, and, in the absence of evidence to the contrary, one must conclude that racial or other class-related factors entered into the selection process); *see also International Convention on the Elimination of All Forms of Racial Discrimination: Hearing Before the Comm. on Foreign Rel.*, *103d Cong., 2d Sess.* (1994) (discussion of the Acting Secretary of the Department of State in support of CERD ratification, stating that actions having an "unjustifiable disparate impact" included unnecessary actions that caused significant statistical disparities).

[78] International Covenant on Civil and Political Rights, Mar. 23, 1976, 999 U.N.T.S. 171, art. 21 [hereinafter ICCPR].

[79] ICCPR art. 2(1).

[80] Santhosh Persaud, *Protecting refugees and asylum seekers under the International Covenant on Civil and Political Rights* (Nov. 2006), at 7 https://www.unhcr.org/en-us/research/working/4552f0d82/protecting-refugees-asylum-seekers-under-international-covenant-civil-political.html ( "It suffices here to state that the right to life under Article 6 (1) enjoys protection under a duty of non-refoulement.").

[81] *Id.* at 10 ("All asylum-seekers, whose claim is assessed by states' authorities, therefore enjoy guarantees under Article 13.").

[82] Given the limited 30-day comment period, a full legal analysis of the international and domestic legal norms that the proposed rule violates is outside the scope of this comment. However, commenters note that the proposed rule would also violate, at a minimum, provisions of the Immigration and Nationality Act, Administrative Procedures Act, and U.S. constitutional law guaranteeing individuals the right to apply for asylum; provisions of domestic civil rights and constitutional law guaranteeing access to due process; and provisions of domestic civil rights and constitutional law guaranteeing equal protection of the law and protection against racial discrimination.

CLP_PC_032304

## V.    The Proposed Rule and Comment Timeline Adversely Impact Signatory Organizations.

The Rule's proposed changes are all but certain to adversely impact the undersigned organizations. First, the undersigned organizations object to the limited 30-day comment period imposed by this Rule.  In this timeline we have not been able to provide complete details about the ways in which Black migrants face discrimination and abuse in the countries singled out as purported safe-havens by the proposed rule. We have also been unable to provide significant details about how we expect this proposed rule will function in real-life credible fear interviews, information that we believe would be relevant to demonstrating the absence of fairness in the rule's proposal.

More importantly, the proposed rule would harm the asylum seekers that the undersigned organizations seek to serve. Many Black asylum seekers will not be able to access the United States at all because they will not pass a credible fear interview under the heightened standard imposed by the proposed rule. This fact will make it harder—if not impossible—for the undersigned organizations to provide legal and social services to this community. In addition, the undersigned organizations will have to significantly increase or modify their services on the Mexico side of the U.S.-Mexico Border. The proposed rule also frustrates another key component of the undersigned organizations respective missions. As organizations we collectively seek to empower Black immigrants to vindicate their human rights under U.S. and international law, including the right to seek asylum.  Below is a discussion of the impact of the rule on each signatory organization.

### A.  Haitian Bridge Alliance

The Haitian Bridge Alliance (HBA), also known as "The BRIDGE," is a 501(c)(3) grassroots nonprofit community organization that advocates for fair and humane immigration policies and provides migrants and immigrants with humanitarian, legal, and social services, with a particular focus on Black people, the Haitian community, women and girls, LGBTQIA+ individuals, and survivors of torture and other human rights abuses. HBA's main office is in San Diego, California, and it has office presences in Tijuana and Tapachula, Mexico.

To fulfill its mission, HBA staff regularly visits border areas in Tijuana, Mexico/San Diego, California; Cuidad Juarez/El Paso; Reynosa, Mexico/McAllen, Texas; and Matamoros, Mexico/Brownsville, Texas. HBA works regularly with civil society partners in those locations to serve Haitian and other Black people in mobility who are trying to access legal protection from the United States and/or enter the United States. HBA regularly brings delegations of lawyers, doctors, and other volunteers to the border. The delegations provide Know Your Rights trainings and conduct interviews with individuals and family units to identify systemic issues uniquely affecting Black migrants to advocate locally, nationally, and internationally for fair and just immigration policies.

For example, in March 2023, HBA and the Center for Gender & Refugee Studies visited Tijuana, Mexico where they conducted Know Your Rights trainings and interviewed 194 individuals and family units. The interviews focused on how the Biden administration policy and proposed rule would affect the ability to seek asylum in the United States.

Since 2020, HBA has operated a legal department with a small staff of attorneys who provide direct representation to people on U.S. immigration matters, including representation for people in DHS ICE detention, people facing removal proceedings before the Executive Office of Immigration Review, and people filing applications for immigration benefits to USCIS. HBA receives funding from the State of California for its direct representation of people in California on immigration matters and provides limited pro bono representation before EOIR for people in jurisdictions other than California.

In 2022, HBA's legal department and humanitarian department partnered with civil society coalitions to work with migrant communities on the U.S.-Mexico border and DHS to facilitate advocacy for and application of humanitarian exceptions to the U.S. Title 42 Policy. Through that work, HBA developed close relationships with Black migrant communities on the border and their service providers and continues to work with those groups on facilitating access to legal protections, working to troubleshoot and advocate around issues people are facing using DHS's CBP One App, and the Biden Humanitarian Parole Program. HBA is currently working with Welcome.US to facilitate sponsorship connections between Haitians and sponsors in the U.S. under the Biden Parole Program.

HBA regularly works with individuals and family units who have transited through ten or more States in the Americas in order to seek relief in the United States. In October 2022, HBA led a delegation of lawyers, academics, and humanitarian workers to visit Panama to investigate the human rights situation of people while transiting through the Americas.

1. The proposed rule's impact on Haitian Bridge Alliance

If this rule is implemented, HBA anticipates having to shift operations, create new programs, secure new funding, and hire additional staff in order to fulfill our mission of serving migrant communities at the border. HBA anticipates having to dramatically expand its deportation defense and detention work, devise new Know Your Rights programs so that people attempting to enter the United States understand the new law and also receive adequate preparation for Credible Fear Interviews, and expand its humanitarian department to assist people's use of CBP One, and applications for the Biden Parole Program, and accessing medical exceptions. HBA also anticipates needing to expand its work providing language access and translation services for people on the border and in the United States.

HBA anticipates that DHS will continue to disparately deny protection and relief to Black applicants under U.S. and international law during its credible fear interview processes, expelling,

CLP_PC_032306

removing, and/or deporting people we serve into danger, or barring people from seeking relief they are entitled to seek under international refugee law, international human rights law, and jus-cogens norms of international law.

### B.  Cameroon Advocacy Network

The Cameroon Advocacy Network is a coalition of organizations and activists across the United States and Cameroon, advocating for the freedom and dignity of Cameroonians seeking asylum in the United States. We stand in solidarity with all Black immigrants fighting for liberation. Founded and led by Cameroonians in the diaspora in coalition with immigration and human rights activists and advocacy organizations, we are uniquely situated to champion the freedom and dignity of Cameroonians, center the issues of black migrants, and build our communities to thrive.

### C.  Black Immigration Bail Fund

The Black Immigrant Bail Fund (BIBF) is a national collaborative project of the Haitian Bridge Alliance (HBA) and the African Bureau for Immigration and Social Affairs (ABISA). BIBF was founded on June 19, 2020, to combat the racism and unusual and cruel punishments faced by black migrants seeking asylum in the United States. This project provides free assistance and relief to black immigrants pursuing liberation and justice. Since its founding,  BIBF has received over 350 applications from detained migrants and bond requests reaching over $2.5 million in need.

### D.  Robert F. Kennedy Human Rights

Robert F. Kennedy Human Rights (RFK Human Rights) is a nonpartisan, not-for-profit organization that has worked to realize Robert F. Kennedy's dream of a more just and peaceful world since 1968. The U.S. Advocacy and Litigation Program at RFK Human Rights partners with grassroots organizations to seek accountability for human rights abuses in the U.S. criminal legal and immigration systems and to promote fairness, equity, and dignity for all people whose lives are touched by those systems.

RFK Human Rights also works to protect the human right to apply for protection from persecution and torture by empowering asylum seekers arriving to the United States with the knowledge and resources needed to vindicate their rights under domestic and international law. The U.S. Advocacy and Litigation Program sends monthly delegations to U.S. immigration detention centers, providing Know Your Rights presentations on how to access federal courts to asylum seekers and others. It also represents detained asylum seekers seeking relief from medical neglect, prolonged detention, and denials of due process in asylum screening procedures.

CLP_PC_032307

## VI.    Conclusion

The proposed rule is the latest in a long line of asylum and immigration restrictions that inflict particular harm on Black people. Its implementation will deny Black asylum seekers protection from persecution and torture. It should be withdrawn in its entirety.

Respectfully,

Daniel Tse
Co-Founder, Cameroon Advocacy Network


Comm'r Seydi Sarr,
Co-Founder, Black Immigrant Bail Fund


Erik Crew,
Staff Attorney, Haitian Bridge Alliance


Anthony Enriquez,
Vice President, U.S. Advocacy and Litigation, Robert F. Kennedy Human Rights


Enclosed: Appendices A and B

18

**Appendix A**

CLP_PC_032309

  

## Making a Mockery of Asylum: The Proposed Asylum Ban, Relying on the CBP One App for Access to Ports of Entry, Will Separate Families and Deny Protection

*March 27, 2023*

Since passage of the 1980 Refugee Act, individuals fleeing persecution and torture have been legally authorized to seek asylum protection at the U.S.-Mexico border at or between official ports of entry (POEs). Recognizing that asylum seekers often leave their homes in haste with nothing but the proverbial shirt on their back, U.S. domestic law—in conformity with treaty obligations—does not penalize individuals for not having proper entry documents. On this point, the asylum statute is clear: any noncitizen "who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival...), irrespective of [their] status, may apply for asylum." 8 U.S.C. § 1158(a)(1). The Refugee Convention, to which U.S. law conforms, is equally unequivocal, prohibiting states from imposing penalties on refugees for their manner of entry. Article 31(1). Moreover, U.S. law does not require asylum seekers to make an advanced appointment to make their claim for protection. Nor does it require they apply for protection in a transit country without ensuring that country is capable of providing safe haven.

For the last three years, starting with the Trump administration and continuing with President Biden, the U.S.-Mexico border has been closed to asylum seekers under the pretext of the COVID-19 pandemic (through a policy known as Title 42). During its tenure, Title 42 has caused untold harms and death, forcing hundreds of thousands of asylum seekers to wait at the border for months and even years in vulnerable and violent conditions, only to expel most of them back to the very dangers they escaped to countries such as Haiti and Cameroon with no fear screening whatsoever. A series of other draconian measures further attempted to deter individuals from exercising their legal right to seek asylum even prior to Title 42. While these policies may have reduced the numbers of individuals seeking protection at the U.S.-Mexico border, it has not resolved the root causes of refugee flight—instead only offshoring the suffering to our neighbors to the south.

With Title 42's impending end, scheduled for May 11, 2023, the Biden administration recently announced a proposed rule to restrict asylum. Misleadingly called the Circumvention of Lawful Pathways rule, the proposed rule makes a mockery of asylum by all but eliminating critical pathways to safety in the United States. If adopted in its current form, the rule would

CLP_PC_032310

bar individuals and families from seeking asylum at the U.S.-Mexico border if they traveled through Mexico or another country and did not apply for, and receive a denial of, asylum there. This restriction is predicated neither on the actual safety of asylum seekers nor on those countries' capacity to hear asylum seekers' claims. It is, rather, a thinly veiled attempt at total deterrence, and yet another abrogation of the United States' duty to those fleeing harm.

One of the only exceptions to the ban—which has nothing to do with the individual's claim for protection—is having made an appointment on a newly released smartphone app, CBP One. But, as described herein, making an appointment on CBP One sits out of reach for most asylum seekers languishing in northern Mexico border towns. Beyond requiring access to a smartphone and adequate Wi-Fi or cell service, the app has been riddled with tech glitches since its inception. The administration has done little to nothing to ensure that the affected communities can navigate the app; the factsheet on the Department of Homeland Security's website is wholly inadequate. Families have been forced to separate to obtain one of a very limited number of appointment slots. And many suffer harms in Mexico while they wait.

The information in this report was compiled from interviews conducted by students from the University of California College of the Law, San Francisco's Haiti Justice Partnership, in collaboration with attorneys and advocates from the Center for Gender & Refugee Studies (CGRS), the Haitian Bridge Alliance (HBA), and the École Supérieure Catholique de Droit de Jérémie (ESCDROJ). Over the course of four days—March 4-5 and 11-12, 2023—the delegation spoke with 194 individuals and family units living in shelters or other informal housing arrangements in Tijuana regarding their experiences using the app as well as protections (un)available to them in Mexico and other transit countries en route to the United States.

All names have been changed in this report to protect the identity of the interviewees.

**Table of Contents**

I.   **The CBP One App is Too Flawed to Fix** ...................................................................3
   A.  **Limited Appointments Cause Stress and Confusion** ....................................3
   B.  **Families are Forced to Separate to Exercise Their Rights** .........................4
   C.  **Limited Language Access** ....................................................................................6
   D.  **Individuals Face a Glitchy App** .........................................................................6
      1.  Geolocation inaccuracies..........................................................................7
      2.  Photo confirmation issues.........................................................................7
      3.  Freezing and other system errors.............................................................7
   E.  **Mexican Asylum Seekers Have Little Hope of Escaping Danger** ...............9
II.  **Asylum Seekers Have Not Been Able to Find Safety in Transit Countries** .................10
III. **The U.S. Should Withdraw the Proposed Rule and Restore Asylum** ..........................12
IV.  **Appendix**.................................................................................................................13

CLP_PC_032311

## I.   The CBP One App is Too Flawed to Fix

### A.  Limited Appointments Cause Stress and Confusion

In the proposed rule, the administration cynically claims that asylum seekers can avoid the ban by adhering to "legal pathways" by taking advantage of a special parole program for certain nationalities, or by making an appointment on the CBP One app. Using this language, the administration distorts the law, implying it is unlawful to seek asylum by approaching a POE without proper documents or entering outside a POE. Neither international nor domestic law imposes such conditions on seeking protection; and these so-called "legal pathways" are unavailable to the vast majority of asylum seekers, as documented throughout this report. Most of those interviewed had been attempting to schedule an appointment for one month or longer since registering on the app.

First, many individuals do not know about or qualify for the parole program, because they are not nationals of a beneficiary country or they do not have a valid passport or sponsor in the United States. Or even if they might qualify, they cannot wait safely in Mexico for their parole applications to be adjudicated.

And second, the focus of this report, successfully scheduling an appointment on CBP One in advance entails complying with a litany of insurmountable requirements. Asylum seekers must have a smartphone; they must have high-speed data access; they must be able to read and understand the language the app is offered in (indeed, illiterate and elderly asylum seekers are unable to access protection alone); and they must also possess a degree of tech literacy to navigate a poorly designed app by virtually any metric. Perhaps most importantly, in addition to the above, asylum seekers require a stroke of luck to secure one of the extremely limited appointments that by all accounts go within minutes of opening each morning. The delegation spoke with hundreds of people over the course of four days, very few of whom were able to secure an appointment.



CLP_PC_032312

> **The *Perez* Family:** A family of four fled Cuba due to political persecution. The mother, *Ignacia*, was diagnosed with stage three cervical cancer while en route to the United States. The family successfully scheduled an appointment via the app, but was kidnapped in Mexico and held for one month, so missed the appointment. *Ignacia* was beaten and repeatedly raped while they were held. Their twin seven-year-olds are suffering from panic attacks and are having difficulty sleeping due to the trauma they have experienced. Despite daily attempts, they have been unable to successfully schedule again due to technical issues and the paucity of appointments. There is no mechanism for this family to notify the U.S. government of their circumstances to reschedule either within or outside the app. The family was recently forced to leave the shelter where they were staying due to capacity issues and was sleeping in the street until a non-profit offered to pay for a hotel room temporarily. Multiple doctors have told *Ignacia* that they cannot treat her in Mexico; the family is afraid she will die while waiting to seek asylum in the United States.

### B.  Families are Forced to Separate to Exercise Their Rights

The CBP One app offers a limited number of appointments for individuals each day, and when it first launched evidently even fewer that could accommodate families. So, many families interviewed made the difficult decision to separate, leaving spouses alone with children in Tijuana. Of the 157 families interviewed, at least 18 specifically reported that their families had separated because of the CBP One app (and many more were contemplating the same). For those that stayed behind in Tijuana, they expressed an overarching fear that they would never obtain an appointment and safely reunite with their families in the United States.

Many interviewees shared stories of initial confusion using the app. The CBP One app, for instance, failed to make clear that for an entire family to cross, all members must be included under one individual's profile. As such, if a parent obtained an appointment but did not include other family members, they would learn at the border that they could not cross together. Officers consistently told parents that they had the "option" of leaving their children behind, sending their children across the border unaccompanied, or attempting to get another appointment together.



Interviewed families shared frustration that they had been shut out of any opportunity to secure an appointment with all family members included in one profile. Often, family members could get one or two individual appointments, but never enough for their whole family. As

CLP_PC_032313

a result, many interviewees decided to separate out of desperation, sending some family members ahead, while their spouses stayed in Tijuana with their children.

For separated families, those who remained in Tijuana continue to face difficulty obtaining an appointment and feared for their safety. Even when families divided into smaller groups, interviewees shared that they still could not get appointments, despite trying at the early hours of every morning for over a month. Those families in Tijuana were considering sending their children ahead unaccompanied anyway to remove them from danger.

Here are stories of some of the families who separated to improve their chances of entry:

- The *Pierre* family from Haiti—one of the few able to successfully schedule an appointment—presented at the border with their appointment notice that did not list their three-year-old child. A border officer welcomed them with three unenviable options: send one parent through, forgo the appointment altogether, or leave the child behind in Mexico. The family had yet to reschedule after several weeks.

- *Louis* shared that his family, from Haiti, was unable to secure an appointment for himself, his wife, and his young daughter. While languishing in Tijuana, his wife's health deteriorated, and she desperately needed medical attention that was not available there. When they learned that it was easier to get appointments for individuals, they successfully secured an appointment for her. *Louis*'s wife entered the United States but is currently alone in a hospital. *Louis* continues to try to get an appointment for himself and his daughter so that he can take care of his wife, but he has not been successful.

- *Emmanuel's* Haitian family was unable to get an appointment that accommodated his entire family through the app. Because his wife is pregnant, she was able to work with an organization to help her cross the border with one of their children while he stayed behind with their other child. *Emmanuel* successfully got an appointment, only learning at the border that he needed to have his child included on the app, so he had to relinquish the appointment.

- *Esther* was unable to get an appointment for herself, her husband, and their two children. Instead, her husband successfully obtained an appointment for himself and entered the United States. Now, *Esther*, from Haiti, is alone with her children in Tijuana. She is very concerned for her family's safety and worries that the program will end before she can reunite her family in the United States.

CLP_PC_032314

- *Angeline*, a Haitian woman, is at a shelter in Tijuana with her three-year-old autistic child. She and her husband decided to separate in the hopes it would be easier for her and the child to get an appointment for two instead of three. Her husband entered using CBP One and she has yet to be successful with the app.



### C.  Limited Language Access

The app is currently only available in English, Spanish, and Haitian Creole. Although the Haitian Creole version—which notably was not available for several weeks after the app first launched—indicates it is also in "French," delegation members observed this is not the case and no French version exists. While certain words overlap between the languages, they are completely distinct.

> *Agnes* fled Togo after her sisters died from complications as a result of female genital cutting and her uncle threatened her with the same fate. She never learned to read and write because patriarchal norms denied many girls an education. While making the treacherous journey through the notorious Darién Gap, she was sexually assaulted on multiple occasions. Some fellow travelers took her under their wing and helped her reach Tijuana where she is now renting a small room in a temporary housing complex with help from extended family in the United States. When researchers met Agnes, she had yet to download the CBP One app on her phone because she is illiterate. Since getting set up on the app, she has tried to schedule an appointment daily to no avail and continues to report confusion at the error messages she cannot read.

### D.  Individuals Face a Glitchy App

Whether individuals attempted to secure appointments alone or with their families, nearly all interviewees encountered problems with the app. From faulty facial recognition to constant glitches, CBP One is riddled with software issues that block individuals from attempting to get appointments on a daily basis.

6

CLP_PC_032315

### 1. Geolocation inaccuracies

At least one individual reported that the app would not schedule an appointment because they were not close enough to the border. However, they were in Tijuana at the time they tried to make the appointment.

### 2. Photo confirmation issues

To confirm a selected appointment, individuals must take a photo to secure their calendar slot. Because the CBP One app requires photo confirmation at the calendar stage, families struggle to take pictures of all family members within the short confirmation window. Not only is it challenging to get the app to accept photos of all family members, but families also reported waking their young children up as early as one o'clock in the morning to do so. By the time everyone had taken a photo, all of the calendar slots were taken.

In addition to these difficulties, the app's facial recognition software often does not recognize dark skinned people. Many interviewees were unable to get past the photo confirmation stage because the app failed to recognize their faces. Individuals had to make multiple attempts to get the app to accept their photos, which frequently were never accepted. As a result of the delay, they would lose their opportunity to get an appointment for the day.

### 3. Freezing and other system errors

The CBP One app suffers from a variety of software issues that prevent individuals from using the app. Nearly all interviewees reported that the app freezes at various stages of the process, shutting them out during the short time period within which they can attempt to get an appointment before all the available slots are filled. In an attempt to circumvent the constant system errors they experienced, interviewees shared that they have uninstalled and reinstalled the app, updated the app, or removed all other apps from their phone aside from the CBP One app. Despite this, the software issues persist.



7

CLP_PC_032316

Some common issues encountered with CBP One included:



- The app froze just before an individual could take their photo. Typically, a spinning wheel appeared on the page, preventing them from progressing further.

- The app froze on the calendar slot page. A large CBP logo appeared on top of the calendar, preventing individuals from selecting the calendar date and continuing to use the app.

- The app froze entirely, without the CBP logo blocking the calendar, but individuals still could not progress to confirm an appointment.

- The app prevented families from adding their family members under one profile. Parents could add their own information, but the app would freeze or shut down after they did so, preventing them from adding their children and progressing further in the appointment process.



Overall, because pervasive system errors with the CBP One app were not resolved before launching, it fails to serve its stated purpose of enabling individuals at the border to effectively apply for daily appointments.

Moreover, the app seemed to work better for people with higher quality smartphones and strong internet connectivity. Several Haitian interviewees were using new phones when they finally received an appointment, and others had tried up to six different phones before they could secure an appointment. Some interviewees who obtained appointments had spent upwards of $500 on their phones, thus creating a system that privileges those with more resources, all but shutting out those who cannot afford a new phone or strong internet.



8

CLP_PC_032317

### E.   Mexican Asylum Seekers Have Little Hope of Escaping Danger

Mexican nationals will presumably not be subject to the proposed transit bar if adopted because they have not transited through a third country en route to the United States. In practice, however, it is unclear if they will have the ability to even present at a POE without a CBP One appointment even after Title 42 lifts. In the meantime, U.S. policy blatantly violates their right to seek asylum by requiring them to wait in the very country from which they are claiming persecution. Several individuals interviewed had incorrectly been told that the app was not available to Mexicans, and a great deal of confusion persists.

The delegation spoke with 86 Mexican individuals or families, each story more harrowing than the last. Here are just a few examples:

- *Esteban* and his wife and kids fled Michoacan because the cartel wanted *Esteban*'s brother to work for them. When his brother refused, the cartel killed the brother, cut off his limbs, sent the body back to the family in a suitcase, and then burned down the family home. They have been waiting at the border since November 2022.

- *Malena* escaped Michoacan with her two-year-old daughter and father-in-law after cartels disappeared her husband and mother-in-law. They are hiding in a shelter attempting to secure a CBP One appointment.

- *Guadalupe* fled Guerrero several months ago after cartels kidnapped her son and threatened to kill her next. She had yet to even download the CBP One app when interviewed because she is living in a rented room without any means of community or basic support.

- *David* and *Yesenia* fled Michoacan after a criminal organization shot *David*, who had been working as a police officer. They have yet to be able to schedule an appointment; the shelter where they were staying is on the outskirts of Tijuana with weak cell service.

- *Jaime* was captured and beaten when he was unable to pay a cartel's extortion fee on his vegetable business. He fled Michoacan with his wife, *Alma*, and their seven-year-old daughter. *Alma* and their daughter have been threatened while staying at a shelter in Tijuana.

CLP_PC_032318

## II.   Asylum Seekers Have Not Been Able to Find Safety in Transit Countries

The proposed rule would create a "rebuttable presumption of asylum ineligibility" for individuals who do not seek and receive a denial of asylum in at least one country they pass through to reach the U.S.-Mexico border unless they meet the requirements of the administration's new parole programs, manage to secure a CBP One appointment, or meet one of three extremely narrow exceptions. DHS insists that the rule promotes "lawful, safe, and orderly pathways" for those wishing to enter the United States. However, it will put individuals and families in continued danger by ignoring the safety of the countries they pass through and their capacity to process asylum claims.

Only two individuals interviewed had received asylum denials—one in French Guyana and the other in Mexico. The experience of *Ramón*, for instance, highlights the difficulty of seeking asylum in Mexico. He left Haiti after being attacked for participating in anti-corruption protests. In 2022, he began the lengthy process of applying for asylum in Mexico. Despite the Mexican Commission for Refugee Assistance (COMAR) policy of reaching decisions within 45 to 100 business days, a surge in applicants has overwhelmed the agency. In 2021, it received more than 130,000 applications but only processed 38,005. With limited staff to handle this growing demand, the situation has become increasingly challenging. *Ramón* has now been waiting more than four months for a decision on his asylum application and, struggling to find a job, he faces destitution. People reported facing similar insecurity accessing protection in other transit countries.

In sharp contrast to the Biden administration's message of safety for immigrants, Mexico has seen an alarming surge in violent crime rates. In 2021, the homicide rate rose to 28 homicides per 100,000, and over 6,000 immigrants were violently attacked. Unfortunately, asylum seekers in Mexico are often targeted and subjected to discrimination by drug cartels and other criminal actors, as well as by Mexican authorities, including the police and migration officials. Not surprisingly, *Adelina*'s family (from Honduras) was kidnapped in Tapachula, and the police took all of her money, while *Mayra* (from Guatemala) was subjected to unwanted touching by Mexican authorities. Despite feeling scared and unsafe, both women must continue waiting in Mexico while trying to obtain one of the limited appointments through the CBP One app.

CLP_PC_032319

> ***Roseline*** was journalist in Haiti with a radio show dedicated to denouncing the rampant crime throughout the country. Threatened with her life, she was forced to flee. Educated, with mastery in three languages, *Roseline* tried to apply for protection in Chile but was overwhelmed by the confusing process and eventually gave up. She came to Mexico with someone who she thought was her friend, but he attacked her and tried to rape her, so she had to flee again. She and her three-year-old son were homeless at the time of interview with nowhere to go (though they were secured a place at a local shelter later that day). *Roseline* had attempted to secure a CBP One appointment every day. She once received an appointment in Mexicali, but border officials turned her away for unclear reasons having to do with the CBP One app.

The following accounts further illustrate the dangers for asylum seekers in Mexico and other transit countries and why applying for asylum in those countries is simply not an option for most:

- The *Perez* family, mentioned above, like many others is too afraid to apply or wait for their asylum claim to be adjudicated in Mexico. A politically connected cartel kidnapped the family in southern Mexico, repeatedly raped the mother, and—before releasing them on a ransom—threatened to kill them should they report anything to the authorities. They are now living in hiding in Tijuana awaiting reunification with family in the United States.

- The *Morales* family, a mother and her thirteen-year-old son, continue to feel unsafe in Mexico after fleeing Honduras. The mother ran a market and owned her own home and car. When she refused the cartel's demands that her son sell drugs, the cartel attacked her, destroyed her vehicle, and tried to kidnap her son. After Honduran authorities refused to get involved, the family fled. The mother did not apply for protection in Guatemala because the same cartel was also active there. Shortly after arriving in Mexico, she received an anonymous call: an unidentified man told her he knew that she and her son were in Mexico. The family is living in isolation in a Tijuana shelter out of fear.

- The *Cortez* family, a mother and three young sons, fled El Salvador when the mother was unable to pay a weekly extortion fee to the cartel from her food and vegetable business. The cartel threatened to kill her or kidnap one of her sons. The mother is scared to stay in Mexico for fear of being found by members of the same cartel.

CLP_PC_032320

- *Sandra* fled Honduras with her daughter after her husband was murdered. In Mexico, the family was kidnapped and held for fifteen days during which time the kidnappers subjected her to a brutal beating.

## III.   The U.S. Should Withdraw the Proposed Rule and Restore Asylum

The stories contained in this report are not unique. Several news outlets and community based organizations have reported on these same or similar issues at other locations across the southwest border since release of the CBP One app on January 12, 2023. Members of Congress have called on the administration to resolve the issues. The dangers in transit countries facing asylum seekers who reach the United States have also been well documented.

The proposed rule betrays the promises the Biden administration made in one of its first Executive Orders on asylum and in the 2022 Los Angeles Declaration on Migration and Protection to ensure protections for those in need. The rule will block from asylum individuals who undoubtedly face persecution, torture, and even death. The administration should withdraw the rule, end Title 42, and restore access to asylum at the U.S.-Mexico border.

## Acknowledgments

This report was authored principally by CGRS Law Clerk and UC Law student Peter Habib with authorial contributions by CGRS Legal Director Blaine Bookey and UC Law SF students Kelsey Anderson, Sam Dodson, Jessica Gillespie, and Keari Platt. Other members of the delegation included: UC Law SF students Jess McPeake, Tuesday Rose Thornton, Becky Vaughan, Nick Wiley and Jake Zarone and ESCDROJ Professor Yvon Janvier. The delegation thanks HBA Legal Director Nicole Phillips and CGRS Director of Litigation Melissa Crow for their comments and extends its appreciation to HBA staff Jeef Nelson and Vivianne Petite Frere for logistical support and Jeremie Dupin for interpretation.

CLP_PC_032321

## IV.    Appendix

**Summary of Interviews with Asylum Seekers in Tijuana, Mexico from March 4-5 and 11-12, 2023**



Of the 194 interviews conducted in Tijuana, Mexico, the vast majority of interviewees were either Haitian or Mexican. As shown below, these two groups comprised nearly 80% of all asylum seekers interviewed. The delegation also spoke with a significant number of Hondurans over the four days during which interviews were conducted.

As described above, families are especially impacted by the ongoing volatility and inhumanity of U.S. border policy. The vast majority—at least 81%—of those interviewed were travelling as a family, seeking safety in the United States. While all asylum seekers are adversely impacted by the Biden's administration's existing policies and proposed rule, families and parents of young children remain particularly vulnerable— forced to make choices that no parent should have to make.



13

CLP_PC_032322

## Families Forced to Separate



Many of the families interviewed experienced the "choice" of splitting their family apart in order to increase their chances of obtaining one of the scarce CBP One appointments. At least 11% of those with whom the delegation spoke made the difficult choice to separate and send some family member(s) into the United States while the other remained in Mexico.

Of the 194 interviews conducted, very few had successfully scheduled an upcoming appointment on CBP One. At the time of interview, 97% of families and 92% of individuals had no forthcoming appointment. Of the few who had successfully scheduled an appointment, several noted that their luck in successfully scheduling an appointment only came when they bought a new smart phone.



14

CLP_PC_032323

**Appendix B**

CLP_PC_032324

United States of America

Shadow Report to the Committee on the Elimination of Racial Discrimination (CERD)

107th Session

(08 – 30 August 2022)

Anti-Black discrimination against non-citizens and ongoing violations of international protections for migrants, refugees, and asylum seekers of African descent

Submitted by:

Black Alliance for Just Immigration (BAJI)

Haitian Bridge Alliance (HBA)

Human Rights First (HRF)

The Refugee and Immigrant Center for Education and Legal Services (RAICES)

Robert F. Kennedy Human Rights (RFK Human Rights)

Endorsed by:

Communities United for Status and Protection (CUSP)

Institute for Justice & Democracy in Haiti (IJDH)

CLP_PC_032325

## I.      Introduction

This Shadow Report is submitted for the combined tenth, eleventh, and twelfth periodic review of the United States ("US") by the Committee on the Elimination of Racial Discrimination ("Committee"). The Report provides selected research and analysis focusing on US immigration and refugee laws, regulations, policies, and practices that subject Black non-citizens to racially discriminatory treatment in violation of the International Convention on the Elimination of All Forms of Racial Discrimination ("Convention"). It is not a comprehensive account of all forms of discrimination in the United States against migrants, refugees, and asylum seekers. We thank the Committee for the opportunity to share this information and its consideration of the actions we recommend to address these serious violations.

## II.     Executive Summary

1.      The United States government subjects Black non-citizens—migrants, refugees, and asylum seekers—to ongoing racist and xenophobic treatment under its laws, regulations, policies, and practices, in contravention of the Convention, which prohibits discrimination against all persons under its jurisdiction, including non-citizens on the basis of race and national origin.[1]

2.      Since the Committee last reviewed the US in 2014, the US government has implemented a series of policies at the border, including metering, the Migrant Protection Protocols, and Title 42 policies, with devastating and disparate impact on Black migrants, refugees, and asylum seekers. They have resulted in myriad human rights violations, have prevented many people eligible for refugee protection from seeking or receiving asylum in the US, and have been used to carry out summary pushbacks and expulsions of asylum seekers in direct violation of *non-refoulement jus cogens* obligations. Since 2020, thousands of Haitians, including asylum seekers, have been disparately targeted for expulsion under the Title 42 policy to a deepening security and humanitarian crisis in Haiti without an opportunity to apply for asylum protection.

3.      The shocking, discriminatory, and excessive use of force by US immigration officers in September 2021 against Haitian migrants attempting to seek refuge in the United States near Del Rio, Texas, is another emblematic manifestation of the US's attempts to deter Haitians from seeking asylum in the US and the systematic discrimination Black people, citizen or non-citizen, face in the US.

4.      Unable to seek asylum in the United States due to these policies at the border, unable to return to their home countries due to persecution and other life-threatening conditions, and unable to firmly settle elsewhere in the Americas because of discriminatory policies and treatment, many Haitians have been stuck for years in the US-Mexico border region in dangerous, cartel-controlled territories in Mexico where they also face pervasive anti-Black discrimination. US policies have added to the dangers displaced people face as they are forced to undertake more dangerous migration routes, as formal and informal US agreements with countries in the Americas result in new restrictions, closed borders, and other measures that increasingly restrict access to asylum protection throughout the region.

5.      Black migrants who manage to arrive in the US face disparate treatment and a racially discriminatory immigration system. This includes racial profiling in immigration enforcement actions; excessive force, medical neglect, and other discriminatory treatment by US personnel in immigration detention; prolonged and arbitrary detention, including the imposition of higher bonds on Black migrants; inadequate access to legal information, legal counsel or proper interpretation in detention; low rates of successful asylum screenings and approval rates for individuals from Black-majority countries from which many refugees are seeking international protection; and racially disparate rates of deportation.

6.      The anti-Black animus behind policies adopted by the former Trump administration was made evident in statements reportedly made by President Donald Trump denigrating African and Haitian countries and their people. Some of these illegal practices from the prior administration—including Title 42 expulsions—continue. But discriminatory government policies and practices to deter Black refugees and

1

immigrants from coming to the US are not new.[2] Contemporary efforts to target, interdict, detain, and block Haitian refugees span back to at least the 1970s.[3] As some commentators have remarked, "[w]e are in a moment that is strikingly reminiscent of the early 1980s, when fear and hatred of Haitians was used to justify the reinstitution and expansion of immigration detention."[4]

7.      This Shadow Report summarizes the US's legal framework and details some of the myriad, recent violations of the rights of Black migrants, refugees, and asylum seekers in the US. The Report recommends steps the US should take to comply with its obligations under the CERD.

## II.      United States of America: International and Domestic Legal Framework and Practice

8.      The US Constitution creates a three-part governmental system composed of an executive, legislative, and judicial branch. The executive and legislative branch are elected by a federated network of localities, and the judicial branch is composed of executive branch appointments who must be confirmed by the legislative branch.[5] The executive branch is empowered to make and enter into treaties on behalf of the US; though under the Constitution, the legislative branch must also accede to treaties in order for them to take domestic effect.[6] Courts and localities are bound by treaties once given effect.[7]

9.      The legislative branch is responsible for creating laws regarding naturalization and citizenship; the executive branch is responsible for enforcement; and the judicial branch is responsible for adjudicating cases and controversies related to citizenship.[8] The following set of international treaties and State legislation create the framework prohibiting discrimination against non-citizens on the basis of race or national origin.

### A.   International Convention on the Elimination of All Forms of Racial Discrimination

10.     The United States signed the Convention on the Elimination of All Forms of Racial Discrimination in 1966, amid a mass movement for human rights for people of African descent, but the legislature did not accede to the treaty until 1994—and with significant reservations. The reservations contradict the Convention's definition of racism by claiming that disparate impact is not enough to establish a claim of racial discrimination.[9] The reservations deny the duty of the State to regulate hate speech and racist propaganda and deny the duty of the State to regulate private racist conduct. The reservations make the Convention non-self-executing—claiming that the provisions in US law already guarantee adequate protections against racism—and so no person, citizen or non-citizen, can assert a claim or access judicial remedies based on the Convention.

11.     Further, as shown in its most recent report to the Committee, the US asserts that discrimination towards non-citizens is not regulated by the Convention, even though this Committee had made clear that, under the Convention, States have a duty to guarantee the human rights of all persons, either citizen or non; preserve their right to due process; and "[e]nsure that immigration policies do not have the effect of discriminating against persons on the basis of race, colour, descent, or national or ethnic origin."[10]

### B.   Durban Declaration and Programme of Action (DDPA)

12.     The United States has not endorsed or applied the Durban Declaration and Programme of Action, the global community's most clear commitment to ending racism, because it objects to two sets of statements in the Declaration.[11] The DDPA aptly warned in 2001, however, that "racism is gaining ground" and that "contemporary forms and manifestations of racism and xenophobia are striving to regain political, moral, and even legal recognition, including through the platforms of some political parties and organizations and the dissemination through communication technologies of ideas based on the notion of racial superiority."[12] It named "xenophobia against non-nationals, particularly migrants, refugees and asylum-seekers" as "one of the main sources of contemporary racism."[13] Its substantive provisions regarding State's duties to address these issues, along with its recommendations, remain essential to States' compliance with CERD.

CLP_PC_032327

### C. 1967 Protocol relating to the Status of Refugees

13.     In 1968, the United States became a party to the 1967 Protocol relating to the Status of Refugees and thus the substantive framework of the 1951 Refugee Convention.[14] The treaty prohibits governments from imposing penalties on refugees who entered without inspection in search of asylum if they present themselves to immigration authorities without delay.[15]

### D. Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT)

14.     In 1994, the US acceded to the CAT,[16] which prohibits States from returning any individual to a country where it is more likely than not that she would face torture.[17]

### E. International Covenant on Civil and Political Rights (ICCPR)

15.     The United States ratified the ICCPR in 1992,[18] which confirms the right to liberty and security of persons and prohibits detention that is unreasonable, unnecessary, disproportionate, or otherwise arbitrary.[19]

### F. US Domestic Framework

16.     The original US naturalization laws restricted citizenship to "white persons"[20] and rendered people of African descent non-citizens, capable of being owned as property, forced into involuntary servitude, traded, separated from families, tortured, and unable to access the courts or seek justice for crimes perpetrated against them.[21] Following a brutal civil war in the mid-19th Century, the United States amended its constitution to provide citizenship to all people born in the US—thus granting citizenship to all people of African descent born in the US who had previously been denied.[22] Shortly thereafter, the legislative branch amended its original naturalization laws to allow for people of African descent to seek citizenship if they did not already have it, though people of Asian descent were still barred until 1952.[23]

(1) Immigration and Nationality Act (INA)

17.     In 1952, the United States synthesized its various provisions into one act entitled the Immigration and Nationality Act (INA). In 1965, amidst the Civil Rights Movement, the legislature amended the INA to lift a racial quota system that had in effect limited non-citizens of African descent from seeking US citizenship. Though the basic structure of US law towards non-citizens seeking legal status in the United States has remained unaltered since the 1965 INA, the US has since passed laws that dramatically expanded the State's authority to deport non-citizens on the basis of contact with the State's criminal justice system.[24]

18.     Under the INA, "any alien who is physically present in the United States or who arrives in the United States (whether or not it is at a port of arrival), irrespective of the alien's status may apply for asylum."[25]

(2) 1980 Refugee Act

19.     The US created domestic legislation on asylees and refugees following its accession to the 1967 Protocol with the 1980 Refugee Act, which included a provision barring the removal of individuals who meet the refugee definition under US law.[26]

(3) Title 42 Policy

20.     At the onset of the COVID-19 pandemic, the US executive branch in March 2020 invoked a little-known provision, 42 USC §§ 265, 268 in its Public Health Service Act, which allows for the suspension of the introduction of non-citizens where there is "the existence of any communicable disease in a foreign

CLP_PC_032328

country" and "there is serious danger of the introduction of such disease into the United States." [27] The policy has been used even against non-citizens attempting to seek asylum who have no safe place where they could be returned and violates US immigration statutes, its international obligations of *non-refoulement*. [28] Public health experts—including US government experts—have consistently dismissed Title 42 as a public health measure. [29] Instead, the policy is better explained as part of an initiative by Trump administration officials with established white supremacist ties, [30] to limit immigration through every available tool, [31] in order to preserve white racial hegemony in the United States.

### III.   Racist, anti-immigrant hate speech by officials informs US policies

21.   Former President Trump's overt racism towards African, Haitian and other immigrants was on full display when in January 2018, he reportedly asked, "Why are we having all these people from shithole countries come here?" in reference to Haiti and other countries designated for Temporary Protected Status (TPS), and remarked, "Why do we need more Haitians? . . . Take them out."[32] President Trump also reportedly expressed a preference for immigrants from European and Asian countries, underlying concerns that the prior administration's immigration policies were animated by a racial hierarchy that sought to target and block Black migrants from the US. [33]

22.   A few weeks earlier, on November 20, 2017, the US Department of Homeland Security ("DHS") had announced the termination of TPS for Haiti. [34] The termination decision was later enjoined by a federal court, which found the termination likely politically motivated and "based on race and/or national origin/ethnicity against non-white immigrants in general and Haitians in particular."[35]

23.   In recent months, local, state, and federal elected officials have repeatedly used rhetoric associated with the white supremacist "great replacement" conspiracy theory to characterize refugees and migrants arriving at the border, including many Haitians, as an "invasion" of the US. [36] In response to these "invasion" claims, in July 2022, the state of Texas issued an order authorizing state police and National Guard troops to make warrantless arrests of individuals suspected of unauthorized entry or other federal offenses and "return" them to Customs and Border Protection ("CBP") officials at border ports of entry. [37] Such arrests are likely to disparately impact Black and Brown communities in the US perceived by such officials as unauthorized migrants. [38] This "invasion" language also echoes statements used by extremists in the US to justify attacks on racial and religious minority communities, including the mass murder of ten Black people at a grocery store in Buffalo, NY in 2022. [39]

24.   Such statements and actions by government officials targeting Black migrants violate Article 4(c), which prohibits public authorities from promoting or inciting racial discrimination, including based on claims of racial superiority, and Articles 2(1)(a)-(c), which obligate States to eliminate policies that perpetuate racial discrimination, ensure all public authorities act consistently with this obligation, and prohibit government support or defense of racial discrimination by any persons or organizations.

### IV.   Situation of non-citizens, including migrants, refugees and asylum seekers (CERD arts. 2, 4, 5, and 6)

#### A.   Excessive use of force by Customs and Border Protection (CBP) personnel and lack of accountability for violent, disparate and discriminatory mistreatment of Haitian migrants seeking asylum near Del Rio, Texas

25.   From approximately September 9 to 25, 2021, at least 15,000 Haitians, along with hundreds of other nationals, were held in a makeshift CBP encampment near the Del Rio International Bridge in Texas after they crossed the US-Mexico border. Many had crossed there to seek asylum because US ports of entry remained closed due to the Title 42 policy (discussed below). The US government responded with militarized force, [40] imposing restrictions on movement within and out of the encampment that was blocked

4

off using shoulder-height fences constructed of chicken wire and abutted the Rio Grande River. Texas state police troopers were stationed across the river's northern bank, while Mexican state police and officers from Mexico's National Migration Institute (INM) lined the southern bank. Because the US government effectively prevented individuals from leaving the encampment, it rendered them unable to care for themselves and owed them a duty of care, including to provide basic human necessities, which it failed to adequately meet.[41] As a result, people trapped within the encampment were subjected to hunger, dehydration, and other inhumane conditions as they awaited processing by CBP.

(1)  Violence and threats by US immigration officers

26.     As captured in part by photographs that shocked the national consciousness,[42] heavily armed and mounted US Border Patrol agents subjected migrants in the Del Rio encampment, who were overwhelmingly Black Haitian people, to physical violence, verbal threats, and other acts of intimidation.

- One of those viral photographs depicted a Haitian asylum seeker, Mirard Joseph, being attacked by a CBP officer on horseback.[43] Like many Haitians at Del Rio, Mr. Joseph was crossing the Rio Grande to bring food back to his wife and child when he was surrounded by CBP officers on horseback, who used their split reins to lash at him and attempted to drag him back into the river. Mr. Joseph, a plaintiff in the class action lawsuit, *HBA v. Biden* described the encounter as "the most humiliating experience of my life."[44]

- Multiple people from the Del Rio encampment also experienced and witnessed CBP officers on horseback chasing down and trampling Haitian migrants attempting to cross the Rio Grande. One Haitian man brought his eight-year-old son to the riverbank to bathe when mounted officers chased down a group of migrants gathered by the river.[45] As his son attempted to run away from the CBP officers on horseback, he fell—was nearly trampled by the horse—and suffered cuts and bruises to his eye and legs. The man described the "moment of terror" when he saw his young son fall to the ground, "I thought my son would be killed, right there in front of me."[46] Terrified and traumatized, they fled the encampment that night.

- Another Haitian couple, who was also shoved by CBP officers in Del Rio, said, "When we were crossing the river by the bridge, we were met by CBP agents. Some of them were on horses, some were on foot. As I was trying to cross with my pregnant girlfriend they shoved us. She was shoved and fell to the ground. I don't speak English well, but I tried to tell the agents that my girlfriend was pregnant. I tried to say it in Spanish. But they continued to abuse us and they kept shoving us across the river."[47]

- One Haitian man was attempting to cross the Rio Grande and return to the encampment with food for himself and others when a CBP officer dismounted from his horse and deliberately cut the rope the man was using to navigate the deep water and strong river current.[48] As the officer threw the severed rope into the river,, several other Haitians attempting to cross fell into the river and struggled to swim.[49] The officer shouted that they could not return to the American side of the border. This man also witnessed CBP personnel hit and push Haitians closer to the river bank back into the water.

27.     CBP officers used racial slurs against the overwhelmingly Black migrants who were in the Del Rio encampment. One example, captured on video, includes a mounted officer shouting at a group of migrants: "This is why your country's shit, because you use your women for this."[50] The officer then reared his horse and directed it towards a group of children. Among those who experienced or witnessed CBP officer's chasing migrants on horseback, the majority reported that those officers shouted threats to fleeing Haitian migrants, ordering them to "go back to Mexico."[51]

28.     This combination of physical violence, verbal threats and intimidation by CBP personnel created an overwhelming and constant state of terror for Haitians trapped by CBP in the Del Rio encampment, , as well as actual harm to their safety. Authorities also restricted legal service organizations from entering the encampment, resulting in the lack of access to legal resources in Haitian Kreyol for asylum seekers. DHS's refusal to allow attorneys to access the encampment also prevented them from interviewing survivors and

5

witnesses in order to document the misconduct of DHS personnel. Many witnesses crucial to an investigation of CBP's conduct at Del Rio were immediately expelled by DHS to Haiti under Title 42.[52] To expel many of the nearly 15,000 Haitian migrants from the Del Rio camp, the US government authorized a first-of-its-kind "emergency" contract with a private prison company for deportation flights to Haiti. The contract was authorized to be entered into without full and fair competition and ultimately cost nearly 1900% more per flight than the average cost of a deportation flight.[53]

29.     The government should have taken measures to guarantee equal protection based on race for Black migrants under Articles 2 and 5 and to protect against violence or bodily harm under Article 5(b).

(2)  Inhumane and degrading conditions, lack of medical attention

30.     Haitian migrants trapped in the Del Rio encampment reported extremely limited access to food and water. Most reported being given one water bottle heated by the sun and a piece of bread daily. Food suitable for infants and small children was not provided, even though an estimated 40% of those in the encampment were children.[54] Some individuals were forced to drink from the Rio Grande, which is not potable. This lack of clean drinking water caused many in the encampment to get sick, including gastrointestinal illness, particularly children. Many individuals who did not receive food or water, especially pregnant women, fainted from lack of nutrition or dehydration. A majority of individuals interviewed in the migrant shelter in the Mexican city of Acuña on September 25, 2021, reported that they were forced to return to Mexico because they experienced extreme hunger after up to six days of being deprived access to food and water.[55]

31.     Haitians trapped in the encampment reported have to wait until nightfall to travel to Mexico for rations and supplies. As one Haitian asylum seeker described, "We were starving and they weren't giving us any food. People would give money to those who were willing to risk the journey across the river to Mexico. As more soldiers came to the river, people had to try to cross at night away from the soldiers to avoid being caught."[56] Those who attempted to cross into Mexico in search of food and water faced a variety of risks: drowning in the dangerous Rio Grande,[57] being stopped by CBP officers, and being prevented from returning to the encampment by Mexican and US border officials, which could lead to separation from their families and other loved ones.

32.     CBP did not provide those trapped in the encampment access to showers or running water. Instead, people had to bathe in the Rio Grande, where they were exposed to disease-causing bacteria. CBP installed only about 50 portable toilets within the camp for over 15,000 people.[58] CBP personnel failed to meet the basic shelter needs of migrants and refused to provide beds, cots, blankets, tents, or shelter of any kind. Those trapped in Del Rio were exposed to the elements, including triple digit temperatures, dirt, and dust.[59]

33.     CBP also failed to attend to the medical needs of migrants in the encampment, including the many infants, children, and pregnant and otherwise vulnerable people.[60] Many reported that CBP personnel denied their requests for medical care, telling them to "go back to Mexico." For example, a Haitian man traveling with his wife and two-year-old daughter described how his daughter became very sick with gastrointestinal and respiratory issues from the dust.[61] She was vomiting frequently, had a high fever, and visible difficulty breathing. Despite the man's pleading and repeated requests for help, CBP personnel denied the child's medical treatment.

34.     One newborn infant almost died after being held in the encampment for several days. He survived only after Haitian Bridge Alliance advocated for him to be airlifted to a hospital in San Antonio, Texas, where specialists provided life-saving medical treatment.[62] One Haitian woman described, "I witnessed pregnant women going into labor taken in to give birth and then sent back under the bridge without further access to healthcare. And that was really heartbreaking for me."[63] An individual reported that after a pregnant Haitian asylum seeker went into labor, US officials took the woman out of the encampment, but returned her and her newborn to the encampment hours after delivery.[64]

6

35.     These inhumane conditions in CBP custody and lack of access to food, water, housing, and medical care in order to deter Haitian migrants from seeking asylum violated Article 5(b), and (e)(iii) and (iv).

(3) Lack of Accountability

36.     Since the events of September 2021,  calls for accountability for the actions of DHS at Del Rio have come from: members of Congress; [65] the Inter-American Commission on Human Rights;[66] joint United Nations agencies[67] and experts,[68] including UNHCR.[69] President Biden condemned CBP's treatment of Haitian migrants as "outrageous"[70] and DHS Secretary Alejandro Mayorkas stated that the images from Del Rio "painfully conjured up the worst elements of our nation's ongoing battle against systemic racism."[71] On September 22, 2021,  Secretary Mayorkas pledged that an internal investigation of the events at Del Rio would "be completed in days, not weeks."[72]

37.     After *ten months*, on July 8, 2022, CBP released the findings of its investigation on the treatment of Haitian and other Black migrants at Del Rio. In a report of 511 pages, CBP focused on only *30 minutes* of the events in Del Rio,[73] Instead of comprehensively investigating the humanitarian crisis that occurred over the span of at least 16 days.[74] The report's authors interviewed journalists and law enforcement, but not a single Haitian migrant, though counsel for several Haitians offered their testimony.

38.     The CBP investigation concluded that CBP officers took commands from Texas state police to "use[] force or the threat of force" to drive Haitians seeking asylum into the Rio Grande.[75] The report also found that one CBP officer "acted in an unprofessional manner" by yelling comments related to a migrant's national origin and sex.[76] Ultimately, the report concluded that "despite the actions taken by the [CBP officers] during this incident, there was no evidence found during this investigation to suggest any migrant was ultimately forced to return to Mexico or denied entry into the United States."[77] As a result of the investigation, four CBP officers are facing discipline and have been moved to administrative positions. But DHS has announced no policy changes or findings related to its treatment of Black migrants as a group.

39.     Haitian Bridge Alliance and counsel to *HBA v. Biden* had offered to provide Haitian migrants for testimony. The failure to interview them and include their testimony undermines the credibility of the report as it consequently fails to some of the mistreatment and abuse inflicted on Black asylum seekers and migrants at Del Rio. To seek accountability and lasting change, advocates have filed a class action lawsuit in federal court,[78] a civil rights complaint with the DHS Office for Civil Rights and Civil Liberties (CRCL),[79] and 32 information requests through the US Freedom of Information Act and the Texas Public Information Act.[80] All remain pending.

40.     In June 2022, news media reported that CBP officers were trading a commemorative coin celebrating the terrorizing of Black migrants at Del Rio by agents on horseback.[81] The coin showed an image of a Haitian migrant being grabbed at by a CBP agent wielding horse reigns as a whip. It was emblazoned with the words "You will be returned."

41.     The violent response of the US government to 15,000 Haitian and other Black asylum seekers contrasts with the welcome reception to white Ukrainians only months later. As of June 2022, the US government was on track to welcome 100,000 Ukrainians since authorizing their entry into the US through a specialized program in March 2022.[82]

42.      The US government's extraordinary use of militarized force, exceptional expulsion flights, and denial of food, water, and medical care to Black asylum seekers, especially when contrasted with its accommodating behavior toward white asylum seekers months later, violates Articles 2(1)(a), prohibiting the State from engaging in any act or practice of racial discrimination against persons or groups, and 2(1)(b), by which States agree to engage in no act or practice for racial discrimination. against persons or groups of persons and not to sponsor, defend or support racial discrimination by any persons or organizations. Such actions also violate Article 4(c), which prohibit national public authorities (CBP and DHS, which oversees CBP) from promoting or inciting racial discrimination. CBP's self-serving, deficient investigation findings,

CLP_PC_032332

and the lack of access to justice though various administration and other complaints demonstrate lack of equal treatment before the "tribunals and other organs of administrative justice" by CBP and DHS under Article 5(a), as well as "just and adequate reparation or satisfaction for a damage suffered as a result of discrimination" under Article 6.

**B. Deportation of undocumented non-citizens under Title 42 policies, particularly Haitians *en masse*, without access to fair and efficient asylum procedures, legal representation, language, knowledge, and non-refoulement**

43.    Since March 2020, DHS has used the Title 42 policy[83] to block asylum at US ports of entry and to expel migrants and asylum seekers to Mexico or their countries of persecution without access to the US asylum system or refugee protection screenings.[84] US Department of State top legal expert, Harold Koh, resigned in October 2021, after concluding that the use of Title 42 to expel people seeking protection, "especially migrants fleeing from Haiti," is "illegal and inhumane."[85] In May 2022, the Biden administration terminated the order implementing the Title 42 policy, but it remains in place under court order pending appeal in the case.[86]

44.    DHS has disproportionately targeted Haitians for expulsion to their home country under Title 42, blocking Haitian asylum seekers from exercising their right to seek protection in the US and returning families and individuals to a deepening security crisis and life-threatening humanitarian conditions in Haiti.[87] In May 2022, the UN High Commissioner for Human Rights observed that "armed violence has reached unimaginable and intolerable levels in Haiti."[88] Yet, DHS has continued to target Haitian migrants for expulsions. In May 2022, for example, "Haitians represented about 6% of the migrants crossing the border with Mexico but occupied 60% of expulsion flights."[89] US government data shows that Title 42 has been employed to expel at least 22,000 Haitians from the US.[90] These expulsions have resulted in family separations with some family members expelled to Haiti while others are permitted to apply for protection under the US asylum system.[91]

45.    DHS has also detained for days or weeks prior to expulsion many of those expelled to Haiti in inhumane conditions, where they have been subjected to racist abuse,[92] and transported expelled people in shackles on flights to Haiti.[93] DHS officers frequently refuse to tell those being expelled where they are being taken and, in some cases, lie that flights are destined for elsewhere in the United States.[94]

46.    Haiti is not able to safely receive or protect people expelled through Title 42. As expelled Haitians disembark US deportation flights sick, handcuffed, hungry, traumatized, and disoriented, they find themselves in a "humanitarian nightmare," including widespread gang violence, an ongoing political crisis following assassination of Haiti's President Jovenel Moïse, food insecurity, a health system "on the brink of collapse," and devastation following a recent earthquake.[95] As Human Rights Watch concluded in a recent report, "Returns to Haiti are life-threatening now, and will continue to be so, until security conditions in Haiti improve...Haiti is experiencing a dire security situation, including loss of government control over strategic areas to the hands of dangerous armed gangs, widely believed to be financed by politicians and to have police officers on their payroll. Violence has worsened an already severe humanitarian crisis."[96]

47.    In stark contrast to the treatment of Haitian and other Black, Brown and Indigenous asylum seekers under Title 42, who continue to be largely blocked from seeking asylum at land border ports of entry, DHS provided near universal exceptions to Title 42 for Ukrainians. Between March and May 2022, DHS processed more than 98.9 % of the more than 23,000 Ukrainians who arrived at the southern US border at ports of entry - nearly all were granted parole and not placed in removal proceedings[97] and only 0.6% subjected to Title 42.[98] In comparison, with ports of entry largely blocked to other asylum seekers, only 23.5% of the 18,000 Haitians encountered along the southern border in that same period were able to present at ports of entry and 26.3% were subjected to Title 42,[99] a rate more than 40 times higher than Ukrainians.

CLP_PC_032333

48.     In addition, Black migrants and asylum seekers, including thousands of Haitians, blocked in and returned to Mexico face grave violence, discrimination, and life-threatening denials of access to medical care and other vital services.[100] Surveys in 2021 of Haitians blocked from US asylum protection due to Title 42 found that 61% reported being the victim of a crime while in Mexico, including kidnapping, rape, and robbery.[101] Researchers have tracked more than 10,000[102] reports of rape, torture, kidnapping and other violent attacks on asylum seekers and migrants blocked in or expelled to Mexico due to Title 42, including the May 2022 murder of Jocelyn Anselme, a 34-year-old Haitian asylum seeker, who was killed in Tijuana while blocked from seeking asylum due to Title 42.[103] In addition, Mexican authorities have targeted Black migrants for abuse with nearly 20% of Haitian asylum seekers in the northern Mexican border region reporting that Mexican police subjected them to beatings, extortion, and other threats.[104] Cartels and gangs also target Black migrants for various crimes such as kidnapping because they stand out as migrants based on their skin color. Black LGBTQ asylum seekers from Jamaica and other countries who have been stranded in Mexico due to Title 42 face dual racist and homophobic violence and discrimination.[105]

49.     In general, because CBP does not consistently record information on the race of individuals subjected to the Title 42 policy, the racially disparate impact of policy is not fully known.[106]

50.     The targeted application and expulsion of Haitians under Title 42 violates *inter alia* Article 2(1)(I), requiring that the State rescind policies that perpetuate racial discrimination, and the right guaranteed by Article 5(b) to security of person and protection from violence or bodily harm.

   **C.   Other policies with a disparate and discriminatory impact on Black undocumented non-citizens that block them from entering US or result in their deportation without access to fair and efficient asylum procedures, legal representation, language, knowledge, and non-refoulement**

      (1)  Metering & "Remain in Mexico"

51.     A 2016 policy known as "metering" was implemented under the Obama administration in response to an increase in Haitians seeking asylum at US ports of entry.[107] Under the metering policy, which the Trump administration expanded along the entire southern US border in 2018,[108] CBP officers intentionally reduced processing of asylum claims at ports of entry, returning most asylum seekers back to Mexico without processing their asylum claims. Those turned away were forced to wait in dangerous Mexican border cities, many under the control of cartels, for an opportunity to request protection.

52.     Black asylum seekers forced to wait in Mexico faced particular risks because of their race and nationality, and were particularly targeted for violence, including kidnappings.[109] Black asylum seekers also frequently reported that anti-Black discrimination and lack of interpretation services blocked or delayed them from placing their names on informal lists of asylum seekers in Mexico that developed as a result of metering at many ports of entry.[110] In 2020, a US federal court found the metering policy violates US law.[111] In November 2021, the Biden administration rescinded the Trump administration's metering directives but did not prohibit the use of metering in future.[112]

53.     Beginning in 2019, the Trump administration used the Migrant Protection Protocols,[113] commonly referred to as Remain in Mexico (RMX), to force asylum seekers and migrants to await US immigration court proceedings in dangerous border regions of Mexico. Families, children and individuals returned to Mexico were targeted for grave violence, including murder, torture, rape, kidnapping and other attacks.[114] Afro-descendent asylum seekers from Central and South America[115] faced targeted anti-Black violence and discrimination upon their forced return to Mexico.[116] Subjected to these dangers, stranded in deplorable living conditions, and largely cut off from US immigration attorneys, RMX also created nearly insurmountable obstacles to the fair adjudication of asylum cases.[117] In June 2022, the US Supreme Court ruled that the Biden administration did not violate US procedural law in terminating the RMX policy. [118]

9

54.     Blocking and returning Black asylum seekers to targeted violence in Mexico violates *inter alia* Article 2(1)(c), requiring that the State rescind policies that perpetuate racial discrimination, and the right guaranteed by Article 5(b) to security of person and protection from violence or bodily harm.

(2) Expedited removal, removal proceedings, and third country transit ban

55.     Under the expedited removal process,[119] US immigration officers may order the deportation of certain non-citizens charged with inadmissibility without an immigration court hearing. Credible fear screenings, which Congress intended to apply "a low screening standard,"[120] are supposed to ensure that people seeking refugee protection in the US have an opportunity to apply for asylum and are not summarily deported to persecution or torture. However, these screenings are inherently flawed,[121] resulting in erroneous negative determinations and deportations of refugees without access to the asylum process[122] with a disparate impact on Black asylum seekers.[123] DHS's failure to provide adequate interpretation to asylum seekers who speak so-called "rare" languages disparately impacts many people from African countries seeking refugee protection in the US. Asylum officers and immigration judges push these asylum seekers to proceed in languages they do not speak fluently resulting in an inability to express themselves and erroneous negative fear findings.[124] In addition, information about the credible fear process is often provided to detained asylum seekers only in English and Spanish, leaving many African and Haitian asylum seekers who speak other languages unable to understand the purpose and nature of the screening interview.[125]

56.     Following attempts by the Trump administration to alter the credible fear standard including heightening credibility requirements,[126] DHS increasingly found asylum seekers lacked credibility and therefore could not establish a credible fear of persecution. This trend had a disproportionate impact on many asylum seekers from Black-majority countries (see Table 1 below).[127] In Fiscal Year (FY) 2020, asylum seekers from Sub-Saharan Africa were deemed not credible in 8.5% of credible fear interviews, over 37% more often than on average for all nationalities that year. Asylum seekers from Black-majority countries including Burkina Faso, Cameroon, the Dominican Republic, Ghana, Mauritania, and Senegal had some of the highest negative credibility finding rates.  This data further confirms concerns raised about implicit racial and other bias in credibility determinations in US asylum adjudications.[128]

**Table 1: Asylum Seekers from Black-Majority Countries Saw a Significant, Disproportionate Rise in Negative Credibility Findings as a Percentage of Credible Fear Determinations**

| Country | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 |
|---|---|---|---|---|---|
| **Average All Countries** | 0.4% | 0.5% | 1.1% | 2.8% | 6.2% |
| **Burkina Faso** | 0.0% | 0.0% | 0.0% | 7.7% | 16.7% |
| **Cameroon** | 0.5% | 0.8% | 0.0% | 2.9% | 9.9% |
| **Dominican Republic** | 0.6% | 0.0% | 0.0% | 1.0% | 11.6% |
| **Ghana** | 0.7% | 0.7% | 6.3% | 4.3% | 11.4% |
| **Mauritania** | 0.0% | 0.0% | 0.0% | 0.0% | 13.2% |

CLP_PC_032335

| Senegal | 1.2% | 2.9% | 0.0% | 0.0% | 28.6% |
|---|---|---|---|---|---|

57.     As a result of inadequate interpretation, lack of access to counsel, and limited understanding of country conditions by officers carrying out credible fear interviews, many Haitian asylum seekers subjected to expedited removal have long been unfairly determined not to have credible fears of persecution. Recent government data[129] shows that positive credible fear determination rates for Haitian asylum seekers have remained significantly below average since at least FY 2016 (see table and chart below), Between mid-January 2021 and May 2021, during the first months of the Biden administration, positive credible fear determination rates for Haitian asylum seekers fell further to 36.5%, nearly half the average 70% positive rate for all other asylum seekers in that period.[130] These low rates have persisted despite the US government's acknowledgment in 2021 that Haiti is experiencing "a deteriorating political crisis, violence, and a staggering increase in human rights abuses."[131]

**Table 2: Positive Credible Fear Rates for Haitian Asylum Seekers Have Declined Significantly Since Fiscal Year 2016 But Have Been Persistently Lower Than for Asylum Seekers from Other Countries**

|  | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 (through May) |
|---|---|---|---|---|---|---|
| **Haiti** | 65.2% | 71.4% | 75.5% | 48.2% | 33.8% | 44.6% |
| **Average – Other Nationalities** | 88.8% | 88.0% | 89.0% | 82.3% | 44.4% | 69.9% |



CLP_PC_032336

58.     Black asylum seekers also face disparate treatment in immigration court removal proceedings, including denials of adequate interpretation, lack of access to counsel, intentionally rushed proceedings, and adjudicator bias, which result in wrongful denials of asylum and, in some cases, deportation to persecution and torture. Many Black asylum seekers, particularly those subjected to detention, have been denied fair asylum proceedings and wrongly ordered deported as a result of apparent adjudicator bias, cherry-picking of evidence, adverse credibility determinations, factual and other errors.[132] Asylum seekers subjected to detention are not provided translation services to fill out asylum applications; yet, immigration judges have ordered detained Black asylum seekers removed due to their inability to complete the asylum application in English or minor inconsistencies from relying on other detained persons to translate the application.[133]

59.     ICE's efforts, in some instances, to block attorney access to detention centers and general lack of access to legal services, have also resulted in wrongful denials of asylum, including misunderstanding by Haitians about the right to seek "asylum" due to government failures to provide legal information in Kreyol.[134] In November 2021, at least 45 Haitians detained at Torrance County Detention Facility in New Mexico were prevented from exercising basic legal rights such as retaining or communicating with legal counsel; obtaining basic information about their rights through group legal presentations; or gathering evidence and preparing to present their claims for relief in removal proceedings.[135]

60.     Between FY 2001 and FY 2021, Haitian asylum seekers had the second highest asylum denial rate of any nationality at 82%.[136] In 2021, DHS pushed detained Haitian asylum seekers through removal proceedings on an even more expedited and unfair timeline while other asylum seekers languished in the same detention center.[137] Many Black asylum seekers, particularly those subjected to detention, have been denied fair asylum proceedings and wrongly ordered deported as a result of apparent adjudicator bias, cherry-picking of evidence, adverse credibility determinations, factual and other errors.[138]

61.     During the Trump administration, while security situation declined in Cameroon, Cameroonian asylum seekers were increasingly subjected to immigration detention, where, as a result, they were far less likely to obtain counsel and to receive asylum than non-detained Cameroonian asylum seekers.[139] The US asylum grant rate for Cameroonians decreased by 24% from FY 2019 to FY 2020, followed by a surge of deportations to Cameroon in late 2020.[140] Human Rights Watch documented persecution and serious human rights violations against Cameroonians after their forced return including arbitrary arrest and detention,[141] rape, torture and other physical abuse,[142] extortion, unfair prosecutions, confiscation of national identity documents, and abuses against family members. Perpetrators included members of the police and armed forces; prison wardens and guards; and other unidentified officials. State agents targeted many deportees for harm, persecution, or threats because of their deportation, their known or assumed act of seeking asylum in the US, and their actual or imputed opposition to the government.

62.     In addition, the Trump administration used the third-country transit asylum ban[143] to deny–with very limited exceptions–asylum to refugees. The ban disproportionately impacted Black asylum seekers from the Caribbean and Africa, who had passed through several a third-countries *en route* to the United States. As intended, the ban left refugees in legal limbo with only limited protection afforded by "withholding of removal" and cut off from family stranded abroad.[144] This illegal provision, which was vacated by court order in June 2020 and then enjoined in February 2021 after the Trump administration resurrected the rule, resulted in steep declines in both positive credible fear determinations and asylum grants for many asylum seekers, including individuals from Cameroon, the Democratic Republic of Congo, and Eritrea, who had sought protection at the southern US border.[145]

63.     The discriminatory treatment and disparate outcomes Black asylum seekers continue to face under the US expedited and regular removal processes and suffered due to the third-country transit ban violate the right under Article 5(a) to equal treatment before tribunals and all other organs administering justice and the obligation under Article 2(1)(c) to amend or rescind laws and regulations that perpetuate racial discrimination.

CLP_PC_032337

### D.  Criminalization of Black immigrants

64.      On January 20, 2021, President Biden promised to "pursue a comprehensive approach to advancing equity for all, including people of color and others who have been historically underserved, marginalized, and adversely affected by persistent poverty and inequality." However, eighteen months later, the Biden administration has failed to keep its promise to uphold racial equity as its enforcement priorities fail to disentangle the systemic racism of the criminal and immigration enforcement systems that have resulted in disproportionate deportation rates of Black immigrants.[146] An estimated 76% of Black immigrants who were deported were deported because of prior contact with the US criminal enforcement system, whereas only half of all non-Black immigrants are deported because of such prior contact.[147] This disparity in immigration enforcement is due in part to the often negative disparate outcomes Black immigrants face within various social and economic structures in the US, including the country's mass criminalization of African Americans.[148]

65.      Black immigrants account for nearly 12% of the US's Black population[149] and 7.2% of the 22 million foreign-born individuals in the US who are non-citizens.[150] However, more than one out of every five non-citizens facing deportation on criminal grounds before US immigration courts is Black. Violence and racism pervade US policing and court systems with disparate impact on Black immigrants, who – like Black people in America generally - are disproportionately stopped, searched, arrested, and killed by the police.

### E.  Black non-citizens are more likely to suffer prolonged and arbitrary immigration detention

66.      Under Article 5(a) of CERD, the United States has an obligation to ensure "The right to equal treatment before the tribunals and all other organs administering justice" for all, without distinction as to race, color, or national or ethnic origin. Similarly, under Article 4(c), the US "[s]hall not permit public authorities or public institutions, national or local, to promote or incite racial discrimination." Data gathered by immigrant rights and human rights NGOs shows that Black migrants are detained for longer periods than non-Black migrants and are less likely to be released from detention on bond or parole than non-Black migrants.[151] This disparate treatment faced by Black migrants and migrants from African countries both in immigration detention and when seeking release on bond demonstrates that the United States has not met these commitments in its immigration system.

67.      In 2019, the average migrant in US Immigration and Customs Enforcement (ICE) custody spent 55 days in detention,[152] though evidence suggests that Black migrants are held for significantly longer. For instance, Human Rights Watch interviewed 41 Cameroonian asylum seekers who had been deported between 2018 and 2020, and found that all but one were detained for prolonged periods ranging from one to three years.[153] The length of detention among the group averaged 17 months – much higher than the 55-day average.[154] In 2022, Human Rights First found that since President Biden took office, ICE detained asylum seekers from Black-majority countries on average 27% longer than asylum seekers from non-Black countries among those for whom Human Rights First was able to track detention length.[155]

68.      A study by Tulane Law School's Immigration Clinic found that 57% of all detained immigrants who filed *habeas corpus* petitions in the Western District of Louisiana between January 1, 2010 and July 31, 2020 were Black.[156] At the time of filing their *habeas* petitions, the migrants had been detained on average for 13 months and faced continued detention if their petitions were unsuccessful.[157]

69.      Sylvester Owino, a Kenyan asylum seeker spent ten years in immigration detention at Otay Mesa Detention Center in California before securing his release.[158] Similarly, three Rwandan men spent nearly a decade in immigration detention in Farmville, Virginia.[159] Although these cases may be outliers, they reflect the extended durations that Black asylum seekers spend in detention, in some cases simply because they continue to pursue immigration relief.[160]

13

CLP_PC_032338

70.     Immigration Judges and ICE disproportionately deny Black immigrants release on bond or parole and impose higher bond amounts. The Southern Poverty Law Center ("SPLC") found that Cameroonians are two-and-a-half times more likely "to have their paroles denied by the New Orleans ICE Field Office than similarly situated applicants from non-African countries."[161] Similarly, when comparing hundreds of release requests made between September 2019 and May 2020, by detained Cubans, Venezuelans, Cameroonians, and Eritreans, SPLC found that "non-Africans had grant rates roughly twice as high."[162] Immigration court data received by Human Rights First reflects that immigration judges were over 27% more likely to deny bond to Haitian asylum seekers compared to other nationalities in Fiscal Year 2021 (through mid-August).[163]

71.     When Black migrants are offered bond, they often must pay higher rates. Based on data collected by Refugee and Immigrant Center for Education and Legal Studies ("RAICES")'s bail fund, the average bond paid across all nationalities between June 2018 and June 2020, was $10,500.[164] Haitian asylum seekers, however, were issued bonds at an average of $16,700 (54% higher).[165] Data obtained by Human Rights First shows that the average immigration court bond for Haitian asylum seekers in Fiscal Year 2021 (through mid-August) was double the average bond for other asylum seekers.[166]

72.     Some ICE officers appear to intentionally facilitate release of non-Black migrants over the release of Black migrants. African asylum seekers detained at the Winn Correctional Center in Louisiana told Human Rights First that ICE disproportionately denied parole to detained migrants from African nations: "A Congolese asylum seeker who had been detained for months, reported that an ICE officer claimed that African asylum seekers were less likely to be released because they are 'inferior.' . . . A Senegalese asylum seeker imprisoned for five months at Winn said, "I see Africans detained eight, nine, ten months. I've never seen other nationalities detained that long."[167] An African asylum seeker detained at Adelanto ICE Processing Center in California reported that ICE imposed discriminatory requirements for release on Black asylum seekers, demanding extensive documentation that non-Black asylum seekers were not asked to produce.[168] Similarly, in fall 2021, an ICE officer stated that ICE had been instructed to release Cubans, Nicaraguans, and Venezuelans to create additional detention bed space while ICE was detained large numbers of Haitians at the same facility.[169] This guidance appeared designed to enable and prioritize the detention of Black asylum seekers and migrants from Haiti.

## F.   Black migrants were over-represented in family detention

73.     ICE has operated several family detention centers throughout the United States (as of July 2022 these facilities are not currently being used to detain families). During the Covid-19 pandemic, Black migrant families were disproportionately represented in these facilities.[170] In the three months prior to the pandemic, RAICES observed that 29% of the families detained at the Karnes County Family Residential Center in Texas were Haitian.[171] As the pandemic progressed, ICE released a number of non-Black families from Karnes but kept the Haitian families, and the share of Haitian families detained there increased to 44% of the total population.[172] RAICES noted, "The US has consistently detained more Haitian families in 2020 than any other nationality."[173]

74.     RAICES found that 56% of all families held at Karnes in 2020 came from majority-Black countries, including 220 families from Haiti, 25 from Angola, 22 from the Democratic Republic of Congo, 6 from Ghana, 4 from Congo, 2 from Cameroon, 2 from Sierra Leone, 1 from Benin, 1 from Burkina Faso, and 1 from Nigeria.[174]

75.     At Berks Family Residential Center, another ICE detention center formerly used to jail families, the entire detained population in July 2020, came from Black-majority countries.[175] At that point, ICE had released most of the population due to the Covid-19 pandemic, but continued to detain four Haitian families and two families from other African nations – and no one else.[176] The majority of the children detained were infants.[177] No employee at the facility spoke Haitian Kreyol, creating a significant language barrier that

14

prevented many detainees from receiving necessary medical care.[178] The Haitian families had been detained upwards of 125 days, with their detention likely to continue.[179]

76.      At the South Texas Family Residential Center in Dilley, Texas, the detained population comprised 66 families in July 2020.[180] On average, the families had spent 244 days in detention.[181] Black migrants made up 15 percent of the detained population at the Dilley, a lower, but still significant, percentage than at the other two family detention centers (from Haiti, the DRC, Angola, and Ghana).[182]

### G.   Racist excessive force, abuse, and retaliation against Cameroonian and other Black migrants in US immigration detention centers

77.      Cameroonians in ICE custody have been organizing for years to protest mistreatment and inhumane conditions in detention facilities, particularly those under the jurisdiction of the New Orleans, Louisiana ICE Field Office Area of Responsibility.[183] In response, ICE and its contractors retaliated against Cameroonian protestors with solitary confinement, physical abuse, separating and transferring organizers to different facilities, and unlawful deportation of organizers and participants to Cameroon. From 2020 to 2022, at least nine complaints were filed with DHS's Office for Civil Rights and Civil Liberties and at least three lawsuits filed in US courts on behalf of Cameroonians and other Africans who reported abuse and excessive force, anti-Black discrimination, and other mistreatment in ICE detention and during deportation.

- An August 2020 complaint filed against Pine Prairie ICE Processing Center in Louisiana by a group of Black, majority Cameroonian, asylum seekers details how ICE officers deployed excessive force against 45 peaceful protestors participating in a hunger strike and subjected them to retaliatory, punitive solitary confinement without access to medical treatment and with limited access to hygiene and potable water. [184]

- An October 2020 a complaint filed against Adams County Correctional Center in Mississippi alleges that ICE officers coerced and tortured eight Cameroonian men into signing stipulated orders of removal.[185] One individual testified that ICE official "pressed my neck into the floor. I said, 'Please, I can't breathe.' I lost my blood circulation. Then they took me inside with my hands at my back where there were no cameras."[186] Another individual described that "when they [ICE officers] arrived, they pepper sprayed me in the eyes and [an ICE official] strangled me almost to the point of death. I kept telling him, 'I can't breathe.' I almost died. I was coughing so much after and my throat still hurts a lot. I can't see well still from the pepper spray. As a result of the physical violence, they were able to forcibly obtain my fingerprint on the document."[187] Despite public outcry[188] and demands for accountability from members of Congress,[189] at least five of the Adams County complainants were deported to Cameroon.

- In November 2020, a complaint filed against Jackson Parish Correctional Center in Louisiana on behalf of six Cameroonians alleges ICE officials tortured Cameroonians and forced their fingerprinting to obtain their assent to be deported.[190] At least four of the Jackson Parish complainants were subsequently deported to Cameroon. Similarly, a February 2021 complaint against Winn Correction Center in Louisiana also documented the use of torture to force Cameroonians to sign deportation documents.[191]

- A July 2021 complaint filed against Pine Prairie ICE Processing Center and Allen Parish Public Safety Complex in Louisiana on behalf of four Black, African complainants. details a pattern of inhumane, criminal, and racially discriminatory practices at the facilities including: the denial of basic necessities including potable water to Black immigrants; threatened lethal force against Black immigrants in ICE custody; threatened Black immigrants with punitive solitary confinement in retaliation for peacefully expressing their rights and for their support of the Black Lives Matter movement; and ignored written grievances related to racial tensions between detention officials and detained immigrants. [192]

78.      Although the vast majority of abuses against Cameroonians in detention are concentrated in NOLA ICE AOR facilities, this pattern of anti-Black violence is also evident in other facilities:

CLP_PC_032340

- A December 2020 a CRCL complaint[193] and federal lawsuit[194] were filed against Butler County Jail in Ohio on behalf of a Cameroonian man who was threatened and brutally beaten in detention. The plaintiff in that lawsuit was deported to Cameroon.

- In October 2021, advocates filed a complaint against ICE on behalf of three Cameroonians and two other Africans subjected to painful and prolonged placement in the full-body restraint device known as the "WRAP" before and during deportation flights to Cameroon in October and November 2020.[195] According to the complaint, ICE agents immobilized the men with the WRAP, applying it on top of five-point shackles, binding their legs together, and cinching them up at a 45-degree angle, in some cases for hours, which left them screaming in pain. The tremendous physical and psychological harm inflicted by the WRAP was amplified by underlying medical conditions. To date, CRCL has not released results from the investigations of the abuses committed against Cameroonians.

79.     Black detained non-citizens have suffered similarly horrendous anti-Black abuses and disparate treatment in immigration detention. An asylum seeker from an African country reported to Human Rights First that staff at the Adelanto ICE Processing Center chopped off her long, braided hair in July 2021 and cut off the braided hair of multiple Haitian women with whom she was detained, claiming that it was standard "procedure" for hair worn in braids or locks.[196]

80.     An attorney reported in May 2021 that she heard a guard at the Winn Correctional Center state "Fuck Black people" and violently shoved a Cameroonian man to the ground after he and another Cameroonian man asked facility guards to wear masks during the pandemic, according to a complaint filed with CRCL.[197] As a result of his injuries, the man needed to use a wheelchair for mobility.[198] The attorney witnessed an ICE supervisory officer at Winn comment "now we can't lynch them" while watching detained men cut down trees.[199]

81.     In April 2021, an officer told a Black immigrant who was folding laundry while detained under ICE custody at the Baker County Sheriff's Office in Florida that the way he was shaking out the laundry was like how "you and your family got whipped back in the day, according to a report published by Human Rights First."[200]

82.     Black immigrants are six times more likely to be sent to solitary confinement than other detained populations, according to a study that analyzed the use of solitary confinement in immigration detention from 2013 to 2017.[201] An asylum seeker from an African country reported to Human Rights First that in May 2021 he suffered abuse in solitary confinement in the medical unit at the Winn Correctional Center, including being held naked in a cold cell without a bed for five days. [202] He only received a medical gown to wear during limited outdoor recreation periods. He had to sleep on the floor of the cell for five days and only received a sheet to place on the ground on the second day.[203]

83.     Pine Prairie Correctional Facility in Louisiana has used solitary confinement as retaliation to punish non-citizens who speak out against the conditions of their confinement and for exercising their fundamental rights, including the right to protest and free speech.[204] In August of 2020, a group of Black asylum seekers participated in a peaceful hunger strike in protest of the conditions of their confinement, their indefinite detention, their racist treatment, blanket parole denials, and Pine Prairie's inadequate response to the Covid-19 pandemic.[205] ICE officers in full riot gear then rounded up all 45 hunger strikers and took them to the solitary confinement unit, "Echo," where they reportedly faced punitive conditions including little to no recreational time, no access to tablets, no access to television or recreational reading materials, limited access to showers and hygiene materials, limited access to potable drinking water, no access to the law library, and limited legal call access.[206]

84.     Prolonged use of solitary confinement is recognized as a form of torture under international law,[207] yet in June 2021, a complaint was filed against Pine Prairie alleging a systemic pattern of the implementation of punitive solitary confinement against Black immigrants in detention.[208]

CLP_PC_032341

85.     The disparate and discriminatory violence, abuse, and retaliation by ICE officers against Cameroonian and other Black immigrants subjected to immigration detention violates Article 5(b)'s guarantee of the "right to security of person and protection by the State against violence or bodily harm, whether inflicted by government officials or by any individual group or institution."

### H.   Medical neglect, life-threatening conditions in immigration detention centers

86.     Black detained non-citizens suffer from substantial medical neglect while in immigration detention, particularly Black women. For example, the treatment of Black women and young children from Haiti and African countries detained at Karnes County Family Residential Center in Texas reflected a pattern of discriminatory practices and deliberate indifference related to prenatal, maternal, gynecological, and pediatric medical needs, prompting a CRCL complaint in March 2021,[209] which continues to go unanswered.

87.     Only months before, reports about ICE prisons in Georgia unveiled a pattern of criminal medical negligence including subjecting women, many of them Black, to forced hysterectomies.[210] Black non-citizens detained at Krome Detention Center in Florida reported in October 2021 that their medical illnesses were not being treated.[211]

88.     On February 24, 2020, about 80 Cameroonian women staged a sit-in inside the T. Don Hutto detention center in Taylor, Texas to protest medical neglect, including the refusal to provide critical surgeries, medical treatment, and their indefinite confinement as they waited on their asylum cases.[212] In response to the protest, ICE suspended visitation and blocked access to legal representation and community members who could help bring attention to the medical abuses.[213]

89.     The Covid-19 pandemic has exacerbated systematic deficits in medical care in immigration detention and disproportionately impacted Black migrants. For example, as of this submission, ICE reports that the Stewart Detention Center (SDC) has surpassed 1,695 confirmed cases of Covid-19 since February 2020,[214] and four people who were detained at SDC died due to related complications.[215] As highlighted by a CRCL complaint in August 2021, medically vulnerable individuals denied release at SDC are disproportionately Black.[216] The finding mirrors the overrepresentation of Black non-citizens facing deportation in immigration court based on criminal grounds. It also mirrors the disproportionate impact of Covid-19 on Black immigrant communities across the US.

90.     This medical neglect results in a hostile and dangerous environment and makes it significantly more difficult to find legal representation and resources, and have a fair chance of presenting an asylum claim. Providing disparate and inadequate access to medical care for Black immigrants subjected to immigration detention violates Article 5(e)(iv), which guarantees the right to public health care services.

### I.   Intersectionality and regionality: effects of systematic targeting of some racial and ethnic groups of non-citizens: history of anti-Haitian immigration policies

91.     The horrifying events at Del Rio, targeted use of Title 42 expulsions, the imposition of metering, among other illegal practices, are part of a longstanding history of racist, exclusionary US policies that have often targeted Haitians.[217] This sordid history lends context to the events of Del Rio in September 2021, and other policies and practices explained in this Report that have resulted in injustice, pain and suffering, and loss of life of Black immigrants, refugees, and asylum seekers.

92.     In 1978, the US created a policy dubbed the "Haitian Program," which jailed arriving Haitians and universally denied their asylum claims despite the known atrocities being committed by the Duvalier regime at the time.[218] The Haitian Program was struck down by a Florida federal court, which held the US government systematically discriminated against Haitian asylum seekers.[219] The US quickly implemented a new policy requiring detention without an opportunity to post bail. While appearing facially neutral on its face, statistics confirmed the policy's selective application to Haitians and discovery sought in a legal challenge to the policy showed that the government was using the policy to continue its "Haitian

17

CLP_PC_032342

Program"[220] and deter Haitian asylum seekers. At the time, a then-Deputy Attorney General acknowledged the policy could create an appearance of "concentration camps" filled with Black people. A federal court of appeals held that the selective application of the policy to Haitians violated equal protection, particularly in light of the government's history of discriminatory policies against Haitians.[221]

93.     During the 1980s and 1990s, the US began an aggressive interdiction policy to intercept Haitians at sea and return them to Haiti.[222] The policy was designed to prevent Haitian migrants from reaching US soil, where they could request access to the US asylum process and to evade US *non-refoulement* obligations.[223] From 1981 to 1991, only *twenty-eight* out of over 25,000 interdicted Haitians were allowed to enter the United States to seek relief.[224] While the Haitian interdiction policy was in place, the US singled out Haitian migrants for detention at Guantanamo Bay. At the height of this policy, at least 12,000 Haitians were held at the US base.[225]

94.     More recently, the Biden administration has continued to return Haitians interdicted at sea to Haiti, despite escalating violence and political instability, with over 6,100 Haitians returned in FY 2021.[226]

### J.   Externalization of US border control exposes migrants to harm and rights violations

95.     The efforts of the US and other countries to impose and press for policies and practices that prevent people from crossing borders and reaching the US to seek asylum, undermine the right to seek asylum, put refugees at risk of *refoulement*, and have pushed displaced Black migrants from Africa and the Caribbean to increasingly dangerous migration routes.[227] As the Special Rapporteur on Contemporary Forms of Racism, Racial Discrimination, Xenophobia and Related Intolerance observed, "the racist and xenophobic politics of the United States are enforced even beyond the territories of that country because they are outsourced for enforcement by Mexican and other officials long before refugees and migrants even approach the US border."[228]

96.     In 2019, the Trump administration pressured Mexico into an agreement to prevent migrants from reaching the US border.[229] The Biden administration has continued to push the Mexican government to heavily regulate travel to and within Mexico to prevent migrants from reaching the US.[230] Black migrants trapped in Mexico as a result of enforcement actions by Mexican migration officials have faced the brunt of the country's hardline approach, including serious human rights abuses by Mexican authorities and months-long waits in inhumane conditions in southern Mexico.[231] In one shocking case, four Mexican police officers were arrested for the murder of a Haitian woman, who had been detained by the officers in southern Mexico in October 2021.[232] Haitian and other Black asylum seekers are also at risk of *refoulement*. Mexican migration authorities have deported Haitian asylum-seeking to Haiti.[233] In addition, Mexican authorities have racially profiled and illegally deported Afro-descendent Mexican citizens.[234]

97.     With increased migration controls imposed in Mexico at the behest of the US, more migrants have been pushed to cross through Panama.[235]  As Haitian Bridge Alliance recently document Black migrant women and girls transiting the country have been subjected to a sharp uptick in sexual assaults, in addition to reported killings and other serious human rights abuses.[236]

98.     Due to racism and xenophobia, Black migrants are often unable to find refuge throughout the region. A 2021 Amnesty International briefing on Haitian migrants found that countries in the Americas are "limiting access to international protection and failing to shield Haitians from a range of human rights violations in host countries, including detention and unlawful pushbacks, extortion, anti-black racism, abuses including gender-based violence by armed groups, and destitution."[237]

99.     Whereas the Durban Declaration and Programme of Action recognizes that "that interregional and intraregional migration has increased as a result of globalization, in particular from the South to the North, and stress that policies towards migration should not be based on racism, racial discrimination, xenophobia and related intolerance"[238] and calls on States to collaborate "at the national, regional and international levels to prevent, combat and eliminate all forms of trafficking in women and children, in particular girls,"[239] the

CLP_PC_032343

US continues to externalize its border controls to deter migrants, refugees, and asylum seekers from reaching its borders rather than ensure the enjoyment of their rights under the Convention and other international human rights treaties and instruments.[240]

100.    The resulting disparate and discriminatory treatment of Black migrants in the Americas contravenes Article 2(1)(c), which requires states to amend or rescind policies that perpetuate racial discrimination.


## V.    Recommendations

CERD Article 2(2) requires that State Parties, "when the circumstances so warrant, take, in the social, economic, cultural and other fields, special and concrete measures to ensure the adequate development and protection of certain racial groups or individuals belonging to them, for the purpose of guaranteeing them the full and equal enjoyment of human rights and fundamental freedoms." This report demonstrates that the circumstances "so warrant" the US to take the following measures regarding Black migrants, refugees, and asylum seekers:

**Measures on racist and anti-immigrant hate speech and propaganda**:

1.  Condemn racist "invasion" and "replacement" rhetoric publicly, forcefully, and across State institutions and offices, particularly when deployed by elected and other public authorities.

**Measures on US refugee law and immigration policy**:

2.  Undertake a systemic review of asylum and immigration policies, including all detention, interdiction, and interception policies implemented during this and prior administrations, to ensure that policies that are perpetuating racial discrimination towards Black people are identified and fully and permanently rescinded.
3.  Take all available steps to restore access to asylum at the southern border, including at ports of entry, and halt all expulsions under Title 42, including to Haiti. Allow migrants crossing the border to make their claims for asylum and other protections in non-adversarial interview settings while retaining the guarantee of a hearing before an immigration judge, and ensure access to effective legal representation, language-accessible information, interpretation in their primary language, timely access to supporting evidentiary documents, and time to prepare.
4.  Reject any attempt to codify the Title 42 policy, Remain in Mexico, metering, or any other policy that blocks access to refugee and refoulement protections guaranteed under international law.
5.  Review and reconsider its use of expedited removal, particularly in light of the racially disparate outcomes faced by African, Haitian, and other asylum seekers from Black-majority countries.
6.  Fully rescind the third-country transit asylum ban and issue/rely on credible fear lesson plans that comply with US law, regulations, and treaty obligations.
7.  Stop all expulsions and deportations to Haiti, Cameroon, and other countries facing extraordinary circumstances of violence, where return would put their nationals at serious risk of harm.

**Measures on immigration detention**:
8.  Stop criminalization and mass detention of asylum seekers and migrants. Avoid/end unnecessary, disproportionate or otherwise arbitrary detention, with detention only employed as a measure of last resort and not in a discriminatory manner or as a penalty for unlawful entry or presence. End all prosecutions for 'illegal entry' and 'illegal re-entry.'

CLP_PC_032344

9. Conduct a systematic review of health care provision in immigration detention, including disparate racial treatment and outcomes, and to take remedial steps to ensure adequate and equitable care for all persons subjected to detention.

10. Provide the Committee information on the status of, and outcomes to any investigations into, complaints and other allegations of violence and abuse, medical neglect, and other mistreatment of Black migrants in US immigration detention.

**Measures on equitable access to justice**:

11. Provide access to legal remedies to migrants for hate crimes and other civil rights violations against them, including investigation and prosecution.

12. Establish an independent commission of inquiry, such as the US House Select Committee on the January 6 Attack, to thoroughly review the actions of CBP and its officers at Del Rio in September 2021, including through interviews with Haitians who experienced or witnessed abuse and mistreatment.

13. Swiftly coordinate with civil society groups to create an expeditious and organized process by which all individuals subjected to RMX have a meaningful opportunity to pursue their asylum claims from the safety of the US, including those issued removal orders under the flawed policy.

14. Provide access to competent Haitian Kreyol interpretation in all interviews and proceedings with Haitian asylum seekers, including CBP and Border Patrol interviews, credible fear, asylum adjudications, and any interactions in Coast Guard or other US custody. Also provide competent interpretation for "rare" African and Indigenous languages, as appropriate. Stop pushing asylum seekers to proceed in languages other than their primary language.

**Measures on data, analysis, and dissemination**:

15. Provide the Committee and the public with data on US immigration detention of asylum seekers and other migrants for the period under consideration, disaggregated by nationality, race, gender, age, family-status, and other demographic factors, including the average length of detention, whether release was authorized on parole, and whether a bond was imposed and its amount. Currently, agencies record and release data only disaggregated by nationality and not by race, resulting in systematic undercounting of Black individuals from non-majority Black countries. This undercounting obfuscates the full extent to which the U.S. government engages in policies and practices that disproportionately harm Black immigrants and frustrates CERD review efforts.

16. Systematically study the impact of implicit and other racial bias in immigration adjudications, including credible fear interviews, and provide appropriate training to all adjudicators, including asylum officers and immigration judges.

17. Record and disclose necessary statistics to determine the full extent of the racially disparate impact of Title 42 and other policies implemented to block asylum at the border.

**Regional and international measures**:

18. Ensure that US bilateral and regional policies, agreements, arrangements, requests and engagements uphold the right to seek asylum, human rights treaties, the Refugee Convention, and their non-discrimination provisions. The US should halt any efforts to press Mexico and other countries to force migrants to apply for asylum in countries they travel through to reach the US, as opposed to providing the opportunity to access asylum and respecting their choices. Effort to require refugees to apply for asylum in a transit country will endanger those who will not be safe in such countries, and subverts US and international refugee law to the extent aimed at preventing people from seeking US asylum.

CLP_PC_032345

19. Publicly adopt and implement the Durban Declaration and Programme of Action (DDPA).
20. Reengage US executive, legislative, and judicial processes to provide transitional justice regarding slavery, colonialism and neocolonial imperialism to address root causes of displacement, as called for by the DDPA and recently affirmed by the High Commissioner for Human rights.
21. Use US leverage in multilateral financial institutions to accelerate the menu of options to promote economic and social development listed at paragraph 158 of the DDPA, to satisfy the right to development and address root causes of displacement.

---

[1] International Convention on the Elimination of All Forms of Racial Discrimination (hereinafter "CERD"), 660 U.N.T.S. 195, *entered into force* Jan. 4, 1969, art 1(3).

[2] *See, e.g.*, Kat Murdza and Walter Ewing, Ph.D., *The Legacy of Racism within the US Border Patrol*, American Immigration Council (2021), https://www.americanimmigrationcouncil.org/research/legacy-racism-within-us-border-patrol.

[3] *See, e.g.*, Fabiola Cineas, *Why America Keeps Turning Its Back on Haitian Migrants*, Vox (Sept. 24, 2021, 2:40 PM), https://www.vox.com/22689472/haitian-migrants-asylum-history-violence (describing how "every presidential administration since the 1970s has treated Haitians differently than other migrant groups, rejecting asylum claims, holding them longer in detention, and making it harder for them to settle down in safety.").

[4] Ibram X. Kendi, *The Day Shithole Entered the Presidential Lexicon* (Jan. 13, 2019), https://www.theatlantic.com/politics/archive/2019/01/shithole-countries/580054/.

[5] U.S. Const. art. I, § 1, § 2, cl. 1; U.S. Const. art. II, § 1, cl. 1-2, § 2, cl. 2; U.S. Const. art. III, § 1.

[6] U.S. Const. art. II, § 2, cl. 2.

[7] U.S. Const. art. III, § 2, cl. 1; U.S. Const. art. VI, cl. 2.

[8] U.S. Const. art. I, § 8, cl. 4; U.S. Const. art. II, § 3; U.S. Const. art. III, § 2, cl. 1.

[9] *See* Maya K. Watson, The United States' Hollow Commitment to Eradicating Global Racial Discrimination, American Bar Association's Human Rights Magazine (Jan. 6, 2020), https://www.americanbar.org/groups/crsj/publications/human_rights_magazine_home/black-to-the-future-part-ii/the-united-states--hollow-commitment-to-eradicating-global-racia/.

[10] CERD et al., *General recommendation XXX on discrimination against non-citizens,* UN Doc. CERD/GEC/7502/E (2005), https://tbinternet.ohchr.org/_layouts/15/treatybodyexternal/Download.aspx?symbolno=INT%2fCERD%2fGEC%2f7502&Lang=en, at ¶ 1-5, 9.

[11] CERD et al., *Combined tenth to twelfth periodic reports submitted by the United States of America under article 9 of the Convention, due in 2017*, UN Doc. CERD/C/USA/10-12 (Dec. 20, 2021), https://tbinternet.ohchr.org/_layouts/15/treatybodyexternal/Download.aspx?symbolno=CERD%2fC%2fUSA%2f10-12&Lang=en, at ¶ 138-140.

[12] United Nations, Durban Declaration and Plan of Action, Adopted at the World Conference Against Racism, Racial Discrimination, Xenophobia and Related Violence (Sept. 8, 2001), https://www.un.org/WCAR/durban.pdf [DDPA] supra note 2, at 8, ¶ 27.

[13] *Id.* at 7, ¶ 16.

[14] The Refugee Convention by virtue of the Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, *entered into force* 4 October 1967.

[15] Convention Relating to the Status of Refugees, 28 July 1951, 189 U.N.T.S 137.

[16] The Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (the "Torture Convention"),10 Dec. 1984, General Assembly resolution 39/46 *entered into force* 26 June 1987.

[17] Implementation of the Convention Against Torture, 8 CFR § 208.18.

[18] International Covenant on Civil and Political Rights, General Assembly resolution 2200A (XXI) (December 16, 1966).

[19] U.N. Human Rights Committee, "General comment No. 35 on Article 9, Liberty and security of person," CCPR/C/GC/35, (October 2014), https://www.ohchr.org/en/documents/general-comments-and-recommendations/general-comment-no-35-article-9-liberty-and-security.

[20] Immigration and Naturalization Act of 1795

CLP_PC_032346

[21] *See, e.g.,* Ariela Gross & Alejandro de la Fuente, Citizenship once meant whiteness. Here's how that changed., Washington Post (July 18, 2019), https://www.washingtonpost.com/outlook/2019/07/18/citizenship-once-meant-whiteness-heres-how-that-changed/.

[22] Martha Jones, *How the 14th Amendment's Promise of Birthright Citizenship Redefined America*, TIME (July 9, 2018), https://time.com/5324440/14th-amendment-meaning-150-anniversary/.

[23] Immigration and Nationality Act of 1870; Immigration and Nationality Act of 1952; *see also, id.*

[24] *See, e.g.,* Alina Das, *Inclusive Immigrant Justice: Racial Animus and the Origins of Crime-Based Deportation*, 52 U.C. Davis L. Rev. (2018), https://lawreview.law.ucdavis.edu/issues/52/1/Symposium/52-1_Das.pdf.

[25] Immigration and Nationality Act of 1965, § 101(a)(42); 8 USC. § 1101(a)(42)(A) (defining "Refugee," "Immigration," and "Nationality.")

[26] INA § 241(b)(3); 8 USC. § 1231(b)(3).

[27] *See* Order Suspending the Right to Introduce Certain Persons from Countries where a Quarantinable Communicable Disease Exists, 85 Fed. Reg. 65,806 (Oct. 13, 2020).

[28] *See, e.g.,* Lucas Guttentag, *Coronavirus Border Expulsions: CDC's Assault on Asylum Seekers and Unaccompanied Minors*, Just Security (Apr. 13, 2020), https://www.justsecurity.org/69640/coronavirus-border-expulsions-cdcs-assault-on-asylum-seekers-and-unaccompanied-minors/.

[29] *See, e.g.,* Anne G. Beckett, et al., *Misusing Public Health as a Pretext to End Asylum — Title 42*, New England Journal of Medicine (Apr. 21, 2022), https://www.nejm.org/doi/full/10.1056/NEJMp2200274.

[30] Southern Poverty Law Center, *Stephen Miller's Affinity for White Nationalism Revealed in Leaked Emails,* November 12, 2019), https://www.splcenter.org/hatewatch/2019/11/12/stephen-millers-affinity-white-nationalism-revealed-leaked-emails

[31] Brian Concannon, *Why is Biden preserving Miller's racist immigration policy?,* Al-Jazeera (October 21, 2021), https://www.aljazeera.com/opinions/2021/10/26/why-is-biden-preserving-millers-racist-immigration-policy

[32] *See* Kendi *supra* note 4.

[33] *Id.*

[34] US Dep't of Homeland Security, "Termination of the Designation of Haiti for Temporary Protected Status," 83 FR 2648 (Jan. 18, 2018).

[35] *Saget v. Trump*, 345 F. Supp. 3d 287, 303 (E.D.N.Y. 2018); *Saget v. Trump*, 375 F. Supp. 3d 280, 374 (E.D.N.Y. 2019) (holding that "[b]ased on the facts on this record…there is both direct and circumstantial evidence a discriminatory purpose of removing non-white immigrants from the United States was a motivating factor behind the decision to terminate TPS for Haiti.").

[36] *See, e.g.,* Adam Shaw, *House Republicans back Texas counties' 'invasion' declaration in response to border crisis*, Fox News (July 6, 2022), https://www.foxnews.com/politics/house-republicans-back-texas-counties-invasion-declaration-response-border-crisis.

[37] Governor of the State of Texas, Executive Order, GA 1, "Relating to returning illegal immigrants to the border," (July 7, 2022), https://gov.texas.gov/uploads/files/press/EO-GA-41.pdf.

[38] Adrian Carrasquillo, *Abbott Border Order Sparks Fears of 'Invasion' Rhetoric, Racial Profiling*, Newsweek (July 13, 2022), https://www.newsweek.com/abbott-border-order-sparks-fears-invasion-rhetoric-racial-profiling-1724037.

[39] *See, e.g.,* Benjamin Wermund, *Ted Cruz doubles down on 'invasion' rhetoric espoused by accused Buffalo shooter*, Houston Chronicle (May 18, 2022), https://www.houstonchronicle.com/politics/texas/article/Ted-Cruz-doubles-down-on-invasion-rhetoric-17181675.php.

[40] CBP closed the Del Rio International Bridge and immediately blockaded the surrounding areas overnight, on September 17th, 2021. In addition to CBP, the overwhelming law enforcement presence included units of Texas State Troopers, the Texas National Guard, the Texas Department of Public Safety (DPS), at the direction of Governor Greg Abbott. The National Guard blockaded two encampment entrances. These military and law enforcement agencies jointly maintained a shift schedule. Dozens of state trooper vans entered and exited the camp at different points in the day. Military-grade, armored Humvees and other vehicles waited poised at approximately every 100 feet along the US-Mexico border for at least two miles surrounding the encampment, reinforcing a razor wire-topped chain-linked fence along its perimeter. On Saturday, September 18th, construction workers added additional barriers on the roads surrounding the encampment. Likewise, droves of law enforcement vehicles patrolled the city of Del Rio down N Main Street and Veterans Boulevard. *See* Sarah Decker et. al, *Beyond the Bridge: Documented Human Rights Abuses and Civil Rights Violations against Haitian Migrants in the Del Rio, Texas Encampment* (2022), https://rfkhr.imgix.net/asset/Del-Rio-Report.pdf [hereinafter "*Beyond the Bridge*"].

22

CLP_PC_032347

[41] The US government has an affirmative duty to provide for an individual's basic human needs when they "take[] that person into [their] custody and hold[] him there against his will," thereby creating a "special relationship" with that individual. *DeShaney v. Winnebago Cnty. Svcs.*, 489 US 189, 199-200 (1989). When the government "so restrains an individual's liberty that it renders him unable to care for himself," it assumes responsibility for that individual's safety and well-being. *Id.* at 200. As one Haitian woman explained, "After a few days of us being there… [the water] became very dangerous to cross. There were soldiers on horses standing in front of the river telling people they were not allowed to go back and forth. I couldn't leave the camp, especially not with my son because he was only four years old. To try to get past the water and the soldiers was impossible." *Id.*  (citing phone interview by RFK Human Rights lawyer with Haitian individual (March 18, 2022)).

[42] Eileen Sullivan & Zolan Kanno-Youngs, *Images of Border Patrol's Treatment of Haitian Migrants Prompt Outrage*, The New York Times (Sept. 21, 2021), https://www.nytimes.com/2021/09/21/us/politics/haitians-border-patrolphotos.html (capturing US CBP agents on horseback using whips against unarmed Haitian asylum seekers to force them back to Mexico).

[43] Jasmine Aguilera & Harold Isaac, *A Haitian Man's Brutal Experience With US Border Agents Sparked Outrage. Now He's Telling His Story*, TIME (March 16, 2022), https://time.com/6144970/mirard-joseph-haitian-migrants-del-rio-border/.

[44] *See* Complaint at ¶ 4, *Haitian Bridge Alliance v. Biden*, No. 1:21-CV-03317 (D.D.C.) (filed Dec. 20, 2021), *available at* https://int.nyt.com/data/documenttools/hba-v-biden/a8106eacd7c45afe/full.pdf.

[45] *See Beyond the Bridge supra* note 40 (citing in-person interview by RFK Human Rights lawyer with Haitian individual in Acuña, Mexico (Sept. 25, 2021).

[46] *Id.*

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] Footage reported by Al Jazeera, *Haitian migrants undeterred as US begins removal flights* (Sept. 20, 2021), https://www.youtube.com/watch?v=UTFnKJqcPks.

[51] *Beyond the Bridge supra* note 40 at 32.

[52] On or around September 23, DHS dismantled the encampment while individuals were still inside, using demolition vehicles to bulldoze entire sections of the camp. They forced groups of people onto buses for expulsion, often expelling them in shackles, causing grave harm during the deportation flight. In the resulting series of mass expulsion flights to Haiti, ICE officials expelled vulnerable Haitians, including at least one mother with a days-old-infant *born in the United States*. By September 25th, DHS had emptied and cleared the camp, erasing all remaining evidence of the abusive conditions in which it had held thousands.

[53] U.S. Immigration and Customs Enforcement, Office of Acquisition Management, *Justification for Other than Full and Fair Competition* (Sept. 28, 2021), https://www.quixote.org/wp-content/uploads/2021/10/HaitianEmergencyFlightsJA-21-00378-Final9-27-2021.pdf. This "emergency" contract was to provide 88 expulsion flights to Haiti for a total cost of $15,758,960.00. That is approximately $179,079.09 per flight. In 2015, the Department of Homeland Security's Office of the Inspector General reported that "ICE Air pays, on average, $8,419 per flight hour for charter flights regardless of the number of passengers on the plane." University of Washington Center for Human Rights, *Hidden in Plain Sight: ICE Air and the Machinery of Mass Deportation*, (Apr. 23, 2019), https://jsis.washington.edu/humanrights/2019/04/23/ice-air/#:~:text=In%202015%2C%20the%20Department%20of,companies%20to%20run%20the%20flights. Accounting for inflation, an average ICE Air flight would cost $9,625.04 in 2021.

[54] *See* Complaint at ¶ 76, *Haitian Bridge Alliance v. Biden*, *supra* note 44. As alleged in *Haitian Bridge Alliance v. Biden*, the under-resourced intake site at Del Rio reflected the White House and DHS's steadfast refusal to organize any appropriate infrastructure to address the anticipated arrival of thousands of Haitian migrants, even as Del Rio Sector personnel continued to report a lack of processing capacity.

[55] In the final days of the encampment, CBP permitted the World Central Kitchen Relief Team, a non-governmental organization, to access the camp and to begin coordinating the distribution of hot meals, baby food, and diapers in partnership with local restaurants in the Del Rio area. Despite the presence of World Central Kitchen, several migrants described a continuing lack of access to food and water, indicating problems with food distribution within the encampment. By the time World Central Kitchen was able to scale its operations to provide adequate food, DHS had already started clearing the encampment.

CLP_PC_032348

[56] *See Beyond the Bridge supra* note 40 (citing phone interview by RFK Human Rights lawyer with Haitian individual (March 15, 2022)).

[57] The unpredictable, rising water level of the Rio Grande made crossing the river extremely dangerous. Many individuals from the Del Rio encampment reported that they believed that the US government was responsible for the sudden changes in water level in the Rio Grande and that the US was "somehow controlling the water level" and "releasing the water on migrants attempting to cross back into the US" The bi-national International Boundary and Water Commission (IBWC) manages the water in the Rio Grande and executes water releases from the Amistad Dam upstream from Del Rio as requested by the Texas Water Master and the Mexican counterpart in the Del Rio sector. Efforts to confirm whether US authorities requested water releases in response to the presence of migrants remains unconfirmed. Researchers are seeking to obtain this information via Freedom of Information Act and Texas Public Information Act requests.

[58] *Beyond the Bridge supra* note 40 at 29.

[59] Many were forced to attempt to create shelters using reeds from the riverbank, pieces of cardboard, clothing, and sheets brought on their journey. While very few individuals had their own tents, most were forced to sleep directly on the ground, often in the dirt. Those who were held adjacent to the Del Rio International Bridge rather than under it were exposed to direct sun and extreme heat throughout the day, with temperatures reaching over 100 degrees Fahrenheit. The weather conditions and helicopters hovering over the encampment repeatedly kicked up dirt and dust that resulted in widespread health conditions among those trapped in the camp, including skin rashes, severe respiratory problems, and eye infections. *See Beyond the Bridge supra* note 40.

[60] As described above, many Haitians in Del Rio were forced to bathe in and drink from the Rio Grande. This in turn caused severe gastrointestinal issues, as migrants were exposed to disease-causing bacteria in the river's water supply. In addition, the CBP helicopters circling low adjacent to the bridge kicked up dust and dirt, causing migrants, including infants and young children, to develop severe respiratory problems, skin rashes, and eye infections. The lack of shelter in the encampment also left individuals exposed to extreme temperature changes, including blazing heat during the day and steep temperature drops at night, contributing to illness. Because CBP failed to provide adequate food and water—and blocked migrants from securing food and water in Acuña—many individuals reported fainting in the camp or suffering other medical consequences from severe malnutrition and dehydration. *See Beyond the Bridge supra* note 40.

[61] Another Haitian asylum seeker described how when his one-year-old daughter developed a high fever and respiratory issues, he begged US personnel to provide medical care. When US personnel refused, he carried his daughter across the Rio Grande at night, in order to avoid detection by CBP patrolling the river, where she was urgently admitted to a hospital in Acuña and provided life-saving medical treatment, including IV antibiotics. *See Beyond the Bridge supra* note 40 (citing in-person interview by RFK Human Rights lawyer with Haitian individual in Acuña, Mexico (Sept. 25, 2021)).

[62] *Id.* (citing in-person interview and observation by HBA caseworker with Haitian individual in Del Rio, Texas (Sept. 19-25, 2021)).

[63] *Id.* (citing in-person interview by HBA case worker with Haitian individual in Del Rio, Texas (Sept. 23, 2021)).

[64] *Id.*

[65] Rafael Bernal, *Exclusive: Two Black Caucus members call on DHS to stop expulsions to Haiti*, The Hill (Mar. 16, 2022), https://thehill.com/latino/598462-exclusive-two-black-caucus-members-call-on-dhs-to-stop-expulsions-to-haiti; Eileen Sullivan, *Congressional Democrats Ask Biden to Review Treatment of Black Migrants*," The New York Times*, (Feb. 16, 2022), https://www.nytimes.com/2022/02/16/us/politics/biden-immigration-haiti.html; Rep. Ayanna Pressley & Rep. Nydia Velazquez, *Congressional letter calling for end of Haitian Deportations* (Sept. 16, 2021), https://pressley.house.gov/sites/pressley.house.gov/files/Pressley-Velazquez%20Halt%20Haitian%20Deportation%20Letter.pdf.

[66] *See* IACHR, Resolution No.2/2021, Protection of Haitians in Human Mobility: Inter-American Solidarity (Oct. 24, 2021), https://www.oas.org/en/iachr/decisions/pdf/2021/Res-2-21-en.pdf (urging "the States of the Americas to adopt an integral, immediate, effective, and lasting response to ensure the rights of Haitian persons in international human mobility"); OAS, *Press Release: IACHR Issues Resolution on the Protection of Haitians in Mobility Contexts* (Nov. 30, 2021), https://www.oas.org/en/iachr/jsForm/?File=/en/iachr/media_center/preleases/2021/319.asp (promoting the resolution).

[67] IOM, *UN Agencies Call for Protection Measures and a Comprehensive Regional Approach for Haitians on the Move* (Sept. 20, 2021), https://www.iom.int/news/un-agencies-call-protection-measures-and-comprehensive-

24

regional-approach-haitians-move (calling on states "to refrain from expelling Haitians without proper assessment of their individual protection needs, to uphold the fundamental human rights of Haitians on the move, and to offer protection mechanisms or other legal stay arrangements for more effective access to regular migration pathways").

[68] OAS, *IACHR and UN's Special Rapporteur Condemn Excessive Use of Force and Deportations of Migrants from Haiti at the United States' Southern Border* (Oct. 4, 2021), https://www.oas.org/en/IACHR/jsForm/?File=/en/iachr/media_center/PReleases/2021/260.asp.

[69] Stephanie Nebehay, *US expulsions of Haitians may violate international law - UN refugee boss*, Reuters (Sept. 21, 2021), https://www.reuters.com/world/americas/un-concerned-us-pushbacks-migrants-who-may-need-asylum-2021-09-21/.

[70] Annika Kim Constantino, *Biden Condemns Border Patrol Agents' Treatment Of Haitian Migrants, Vows They Will Face Consequences,* CNBC (Sept. 24, 2021), https://www.cnbc.com/2021/09/24/biden-condemns-border-patroltreatment-of-haitian-migrants-in-del-rio.html.

[71] Katie Rogers and Michael D. Shear, *Biden Condemns Border Patrol Treatment of Haitian Migrants as Expulsions Continue*, The New York Times (Sept. 24, 2021), https://www.nytimes.com/2021/09/24/us/politics/biden-border-patrolhaitian-migrants.html.

[72] Kevin Johnson, *DHS vows to have findings within 'days' in investigation of Border Patrol's treatment of Haitian migrants*, USA Today (Sept. 22, 2021), https://www.usatoday.com/story/news/politics/2021/09/22/photos-border-patrol-using-horse-reins-whips-prompts-dhs-probe/5812845001/.

[73] Customs and Border Protection, Office of Professional Responsibility, *Report of Investigation 202112280* 2 (2022), https://www.cbp.gov/sites/default/files/assets/documents/2022-Jul/202112280-cbp-closing-report-public-redacted-final.pdf [hereinafter "CBP Report"].

[74] *Id.* (qualifying that "[t]his report focuses on the investigation carried out by OPR into an incident that lasted approximately 30 minutes, and took place on Sunday, September 19, 2021.").

[75] *Id.* at 5 (stating in part, "Hey! You use your women? This is why your country's shit, you use your women for this."). Investigators found that this same agent "acted in an unsafe manner" by "pursuing the individual he had yelled at along the river's edge forcing his horse to narrowly maneuver around a small child on a slanted concrete ramp."

[76] *Id.* at 5 (reporting an agent that stated "Hey! You use your women? This is why your country's shit, you use your women for this."). Investigators found that this same agent "acted in an unsafe manner" by "pursuing the individual he had yelled at along the river's edge forcing his horse to narrowly maneuver around a small child on a slanted concrete ramp."

[77] *Id.* at 5.

[78]  *See* Complaint, *Haitian Bridge Alliance v. Biden*, *supra* note 44.

[79] Haitian Bridge Alliance, et al., Civil Rights and Civil Liberties Complaint, *Re: DHS Rights Violations in Del Rio, Texas* (Sept. 24, 2021), available at https://www.hrw.org/sites/default/files/media_2021/10/CRCL%20Complaint%20on%20Del%20Rio%2009-24-21.pdf.

[80] *See, e.g.*, Rafael Bernal, *Black immigrant groups file FOIA requests over treatment of Haitians*, The Hill (Oct. 1, 2021), https://thehill.com/policy/national-security/574956-black-immigrant-groups-file-foia-requests-over-treatment-of-haitians.

[81] Jacqueline Charles and Michael Wilner, *Border Agents Circulate Coin Memorializing Treatment of Haitian Migrants in Del Rio, Texas*, Seattle Times (June 14, 2022), https://www.seattletimes.com/nation-world/border-officers-circulate-coin-memorializing-treatment-of-haitian-migrants-in-del-rio-texas/.

[82] Washington Post Editorial Board, *The US Door Swings Open to Ukrainians*, Washington Post (June 22, 2022), https://www.washingtonpost.com/opinions/2022/06/22/united-states-ukraine-refugee-program/.

[83] *See, e.g.*, US Department of Health and Human Services, Centers for Disease Control and Prevention, "Order Suspending the Right to Introduce Certain Persons from Countries where a Quarantinable Communicable Disease Exists" (Aug. 2 2021), https://www.cdc.gov/coronavirus/2019-ncov/downloads/CDC-Order-Suspending-Right-to-Introduce-_Final_8-2-21.pdf.

[84] *See, e.g.*, Haitian Bridge Alliance, Human Rights First & Al Otro Lado, *Failure to Protect: Biden Administration Continues Illegal Trump Policy to Block and Expel Asylum Seekers to Danger* (Apr. 2021), https://www.humanrightsfirst.org/resource/failure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum.

CLP_PC_032350

[85] Harold Koh, *Re: Ending Title 42 return flights to countries of origin, particularly Haiti* (Oct. 2, 2021), *available* at https://www.politico.com/f/?id=0000017c-4c4a-dddc-a77e-4ddbf3ae0000.

[86] US Department of Health and Human Services, Centers for Disease Control and Prevention, *Public Health Determination and Order Regarding the Right to Introduce Certain Persons from Countries where a Quarantinable Communicable Disease Exists, Centers for Disease Control and Prevention* (Apr 1, 2022) https://www.cdc.gov/coronavirus/2019-ncov/cdcresponse/Final-CDC-Order-Prohibiting-Introduction-of-Pesons.pdf; *Louisiana v. Centers for Disease Control and Prevention*, No. 22-CV-00885 (W.D. LA, May 5, 2022), https://www.courthousenews.com/wpcontent/uploads/2022/05/order-granting-injunction-against-ending-use-of-title-42.pdf.

[87] *See* Human Rights Watch, *Haitians Being Returned to a Country in Chaos* (Mar. 24, 2022), https://www.hrw.org/news/2022/03/24/haitians-being-returned-country-chaos.

[88] U.N. Office of the High Commissioner for Human Rights, *Haiti: Bachelet deeply disturbed by human rights impact of deteriorating security situation in Port-au-Prince* (May 17, 2022), https://www.ohchr.org/en/press-releases/2022/05/haiti-bachelet-deeply-disturbed-human-rights-impact-deteriorating-security.

[89] Eileen Sullivan, *US Accelerated Expulsions of Haitian Migrants in May*, The New York Times (June 9, 2022), https://www.nytimes.com/2022/06/09/us/politics/haiti-migrants-biden.html.

[90] US Customs and Border Protection, "Nationwide Encounters," https://www.cbp.gov/newsroom/stats/nationwide-encounters (last accessed July 11, 2022). This data does not capture, however, the full number of expulsions of individuals to Haiti given children born to Haitian parents in third countries are likely not counted as Haitian for purposes of Title 42 expulsions; Nacho Vega, *Crisis migratoria: EE. UU. Deporta a 30 niños brasileños a Haití*, Noticias RGV (Sept. 28, 2021), https://noticiasrtv.com/crisis-migratoria-ee-uu-deporta-a-30-ninos-brasilenos-a-haiti/ (noting at least 30 Brazilian children and 182 Chilean children were expelled with their parents to Haiti on expulsion flights in September 2021).

[91] Human Rights First, *A Shameful Record: Biden Administration's Use of Trump Policies Endangers People Seeking Asylum* (Jan 13., 2022), https://www.humanrightsfirst.org/resource/shameful-record-biden-administration-s-use-trump-policies-endangers-people-seeking-asylum.

[92] Human Rights First, *'Illegal and Inhumane': Biden Administration Continues Embrace of Trump Title 42 Policy as Attacks on People Seeking Refuge Mount* (Oct. 21, 2021), https://www.humanrightsfirst.org/resource/illegal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks, p.7.

[93] Harold Isaac and Catherine Porter, *Haiti Protests Mass US Deportation of Migrants to Country in Crisis*, New York Times (Sept. 19, 2021), https://www.nytimes.com/2021/09/19/world/americas/us-haitian-deportation.html.

[94] Catherine Porter, *Deported by US, Haitians Are in Shock: 'I Don't Know This Country',* New York Times (Sept. 20, 2021), https://www.nytimes.com/2021/09/20/world/americas/deported-haitians-shocked.html.

[95] *See* Amnesty International, Center for Gender & Refugee Crisis, Global Justice Clinic, Haitian Bridge Alliance, Refugees International, Fezo Fwontalye Jano Sikse, and Service Jesuite aux Migrants, *Stop US Deportations and Abuse Against Haitains On The Move: An Urgent Step Towards Created Just Policies for Haitians*, (Dec. 15, 2021), https://cgrs.uchastings.edu/sites/default/files/Haiti%20T42%20Factsheet%20Dec.%202021.pdf.

[96] Human Rights Watch, *Haitians Being Returned to a Country in Chaos* (Mar. 24, 2022), https://www.hrw.org/news/2022/03/24/haitians-being-returned-country-chaos.

[97] Syracuse University Transactional Records Access Clearing House, *Ukrainians at the US-Mexico Border: Seeking Admission at US Ports of Entry by Nationality*, (May 17, 2022), https://trac.syr.edu/immigration/reports/683/.

[98] US Customs and Border Protection, "Nationwide Encounters," https://www.cbp.gov/newsroom/stats/nationwide-encounters (last accessed July 11, 2022).

[99] *Id.*

[100] *See* Hastings to Haiti Partnership, Haitian Bridge Alliance, Center for Gender & Refugee Studies, *Protection Delayed is Protection Denied: Factsheet on Title 42 Expulsions, Haitian Asylum Seekers in Tijuana, and the US Government's Ongoing Evasion of Duty* (Apr. 7, 2022), https://cgrs.uchastings.edu/sites/default/files/Tijuana%20Factsheet_2022.04.07%20FINAL%20v2_0.pdf.

[101] Haitian Bridge Alliance, Human Rights First & Al Otro Lado, *Failure to Protect: Biden Administration Continues Illegal Trump Policy to Block and Expel Asylum Seekers to Danger* (Apr. 2021),

26

https://www.humanrightsfirst.org/resource/failure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum, p.8.

[102] Human Rights First, *Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021* (June 16, 2022), https://www.humanrightsfirst.org/sites/default/files/AttacksonAsylumSeekersBlockedExpelledReturnedtoMexicoSinceJanuary2021.6.16.2022.pdf.

[103] Kate Morissey, *For Haitian Migrants Waiting in Tijuana Brings Fear, Discrimination, Even Death*, Los Angeles Times (June 12, 2022), https://www.latimes.com/world-nation/story/2022-06-12/haitian-migrants-tijuana.

[104] Human Rights First, *Human Rights Travesty: Biden Administration Embrace of Trump Asylum Expulsion Policy Endangers Lives, Wreaks Havoc* (Aug. 2021), https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers, p.8.

[105] Kate Morisey, *Jamaican asylum seekers in Tijuana facing racism, homophobia while they wait*, San Diego Union Tribune, (Jan. 3, 2022), https://www.sandiegouniontribune.com/news/immigration/story/2022-01-03/jamaican-asylum-seekers-tijuana-racism-homophobia.

[106] *See, e.g.*,US Border Patrol, "Nationwide Title 42 Encounters, January 21, 2021 through May 12, 2021" obtained through Freedom of Information Act Request by Human Rights First,   https://www.humanrightsfirst.org/file/2021-090728usbpspreadsheettxlsx (showing that officials failed to record the race of the individual in over 99.3 percent of more than 361,000 recorded encounters where Border Patrol used Title 42 to expel migrants and asylum seekers).

[107] Human Rights First and Haitian Bridge Alliance, *Biden Administration's Dangerous Haitian Expulsion Strategy Escalates the US History of Illegal and Discriminatory Mistreatment of Haitians Seeking Safety in the United States*, (Sept. 2021), https://www.humanrightsfirst.org/sites/default/files/BidenAdministrationDangerousHaitianExpulsionStrategy.pdf.

[108] US Dep't of Homeland Security, Office of Inspector General, *OIG-21-22, CBP Has Taken Steps to Limit Processing of Undocumented Aliens at Ports of Entry*, (Oct. 27, 2020), https://www.oig.dhs.gov/sites/default/files/assets/2020-10/OIG-21-02-Oct20.pdf.

[109]  Julia Neusner, *'We Need Someone to See Us': To Save Lives, the Biden Administration Should Quickly Restore Refugee Protection* (Jan. 13, 2021), https://www.humanrightsfirst.org/blog/we-need-someone-see-us-save-lives-biden-administration-should-quickly-restore-refugee.

[110] See, e.g., Black Alliance for Just Immigration (BAJI) & Instituto para las Mujeres en la Migración (IMUMI) , *'There is a Target on Us' The Impact of Anti-Black Racism on African Migrants at Mexico's Southern Border* (2021), https://imumi.org/attachments/2020/The-Impact-of-Anti-Black-Racism-on-African-Migrants-at-Mexico.pdf, p.35 (herein after "*'There is a Target on Us'*".

[111] See, *Al Otro Lado, Inc. v. Wolf*, Case No.: 17-cv-02366-BAS-KSC (S.D. Cal. Aug. 6, 2020).

[112] US Customs and Border Protection, *Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry* (Nov. 1, 2021), https://www.cbp.gov/sites/default/files/assets/documents/2021-Nov/CBP-mgmt-processing-non-citizens-swb-lpoes-signed-Memo-11.1.2021-508.pdf.

[113] US Department of Homeland Security, *Policy Guidance for Implementation of the Migrant Protection Protocols* (Jan 25, 2019),  https://www.dhs.gov/sites/default/files/publications/19_0129_OPA_migrant-protection-protocols-policy-guidance.pdf.

[114] Human Rights First, *Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols"* (Feb. 19, 2021), https://www.humanrightsfirst.org/sites/default/files/PubliclyReportedMPPAttacks2.19.2021.pdf (documenting 1544 reports of attacks on individuals returned to Mexico under RMX.

[115] Julia Neusner, *'We Need Someone to See Us': To Save Lives, the Biden Administration Should Quickly Restore Refugee Protection* (Jan. 13, 2021), https://www.humanrightsfirst.org/blog/we-need-someone-see-us-save-lives-biden-administration-should-quickly-restore-refugee.

[116]  *See 'There is a Target on Us' supra* note 110.

[117] *See* Brief of NGOs and Law School Clinics, *Mayorkas v. Innovation Law Lab*, No. 19-1212 (Jan. 22, 2021), https://www.supremecourt.gov/DocketPDF/19/19-1212/166993/20210122134915608_19-1212%20HRF%20NILC%20Amicus%20Brief%20Final.pdf (noting that "[n]inety-seven percent of individuals in [RMX] whose cases have been decided did not have an attorney" and that "[a] mere 4.1 percent of [RMX] cases completed with an in-person decision (i.e., excluding in absentia decisions) were successful.").

[118] *Biden v. Texas*, No. 21–954 (June 30, 2022), https://www.supremecourt.gov/opinions/21pdf/21-954_7l48.pdf.

27

[119] 8 USC § 1225.

[120] 142 Cong. Rec. 136, at S11491-S11492 (Sept. 27, 1996).

[121] *See, e.g.*, US Commission on International Religious Freedom, *Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal* (2016), https://www.uscirf.gov/sites/default/files/Barriers%20To%20Protection.pdf.

[122] *See, e.g.*, Frances Madeson, *A Persecuted Father Deported to Haiti Fights to Reunite With His Family in US*, Truthout (Feb. 18, 2022), https://truthout.org/articles/a-persecuted-father-deported-to-haiti-fights-to-reunite-with-his-family-in-us/ (documenting Haitian political activist deported after flawed expedited removal to Haiti where he suffered further brutal violence).

[123] Records from the USCIS Asylum Office, which also adjudicates affirmative asylum applications, also reveal disproportionate drops in asylum grant rates for individuals from Sub-Saharan Africa and the Caribbean as well as South Asia and Central/South America during the Trump administration. Human Rights First, *USCIS Records Reveal Systemic Disparities in Asylum Decisions*, (May 18, 2022), https://www.humanrightsfirst.org/resource/uscis-records-reveal-systemic-disparities-asylum-decisions.

[124] *See Grievance Letter to USCIS, ICE, EOIR Re: "Detained Asylum Seekers Deprived of Due Process in Expedited Removal Process"* (June 30, 2021),
https://www.splcenter.org/sites/default/files/detained_asylum_seeker_grievance_letter_30_june_2021.pdf;
Human Rights First, *'I'm a Prisoner Here': Biden Administration Policies Lock Up Asylum Seekers* (April 2022),
https://www.humanrightsfirst.org/sites/default/files/I%27maPrisonerHere.pdf, pp. 35, 37 - 38 (herein after *'I'm a Prisoner Here'*)(documenting flawed credible fear interviews with inadequate interpretation resulting in negative determinations for Angolan, Guinean, Ivorian, and Somali asylum seekers); Frances Madeson, *US Officials Outrageously Claim Black Men Fleeing Slavery Lack "Credible Fear,"* Truthout (Nov. 17, 2021),
https://truthout.org/articles/us-officials-outrageously-claim-black-men-fleeing-slavery-lack-credible-fear/; *see also* Human Rights Watch, *'How Can You Throw Us Back?' Asylum Seekers Abused in the US and Deported to Harm in Cameroon*, (Feb. 2022), https://www.hrw.org/sites/default/files/media_2022/03/us_cameroon0222_web.pdf, pp.103 - 07 (herein after *'How Can You Throw Us Back?'*)(identifying lack of interpretation as contributing to erroneous negative fear determinations and deportations of Cameroonian asylum seekers).

[125] Haitian Bridge Alliance, UndocuBlack Network, & Quixote Center, *The Invisible Wall: Title 42 and its Impact on Haitian Migrants* (March 2021), https://www.quixote.org/wp-content/uploads/2021/03/The-Invisible-Wall.pdf; Human Rights First, *'I'm a Prisoner Here': Biden Administration Policies Lock Up Asylum Seekers* (April 2022), https://www.humanrightsfirst.org/sites/default/files/I%27maPrisonerHere.pdf, p. 39.

[126] US Citizenship & Immigration Services (USCIS), *2019 Asylum Officer Lesson Plan* (Apr. 30, 2019), https://www.uscis.gov/sites/default/files/document/lesson-plans/Credible_Fear_of_Persecution_and_Torture_Determinations.pdf; USCIS, *2019 Asylum Officer Lesson Plan* (Sep. 24, 2019), https://refugeerights.org/wp-content/uploads/2021/08/Sept.-2019-Lesson-Plan.pdf.

[127] USCIS credible and reasonable fear determinations - FY 2016 to FY 2021 (through May 2021) received via Freedom of Information Act Request by Human Rights First,
https://www.humanrightsfirst.org/file/cow2021001887-cfandrfdataxlsx.

[128] *Brief of Public Justice Center et al., B.C. v Attorney General, Nos. 19-1408 and 20-2078* (Aug. 31, 2020), http://www.publicjustice.org/wp-content/uploads/2021/11/AS-FILED-B.C.-v.-Barr-PJC-BAJI-CAIR-Dolores-Street-Amicus-Curiae-Brief-8.31.2020-FINAL.pdf (discussing implicit bias in immigration judge adjudication in case of Cameroonian asylum seeker denied relief based on adverse credibility finding).

[129] USCIS credible and reasonable fear determinations - FY 2016 to FY 2021 (through May 2021) received via Freedom of Information Act Request by Human Rights First,
https://www.humanrightsfirst.org/file/cow2021001887-cfandrfdataxlsx.

[130] *Id.*

[131] US Dep't of Homeland Security, "Designation of Haiti for Temporary Protected Status," 86 FR 41863 (Aug 3, 2021), https://www.govinfo.gov/content/pkg/FR-2021-08-03/pdf/2021-16481.pdf.

[132] *'How Can You Throw Us Back?' supra* note 124, at pp.114-43.

[133] *'I'm a Prisoner Here' supra* note 124, at pp. 31-32.

[134] ACLU of New Mexico et al., *Complaint Re: "Severe Violations of Due Process and Inhumane Conditions at Torrance County Detention Facility"* (Nov. 23, 2021),
https://www.americanimmigrationcouncil.org/sites/default/files/research/compla1.pdf; Innovation Law Lab et al., *Complaint Re: "Re: Access to legal services for Haitian immigrants at Torrance County Detention Facility"* (Nov. 5, 2021), https://innovationlawlab.org/media/TorranceLetter_11.5.21.pdf.

CLP_PC_032353

[135] *See CRCL Complaint Letter from Innovation Law Lab et al. to Juan Acosta, Field Office Dir., ICE et al.* (Nov. 5, 2021), https://innovationlawlab.org/media/TorranceLetter_11.5.21.pdf.

[136] Syracuse University, Transactional Records Access Clearinghouse,
*The Impact of Nationality, Language, Gender and Age on Asylum Success* (Dec. 7, 2021),
https://trac.syr.edu/immigration/reports/668/.

[137] Innovation Law Lab et al., *Complaint Re: "Re: Access to legal services for Haitian immigrants at Torrance County Detention Facility"* (Nov. 5, 2021), https://innovationlawlab.org/media/TorranceLetter_11.5.21.pdf.

[138] *How Can You Throw Us Back?' supra* note 124 at pp.114-43.

[139] *How Can You Throw Us Back?' supra* note 124 at pp.69-96, 111-12; Human Rights First, *Cameroonian Asylum Seekers Increasingly Detained, Denied Asylum Under Trump Administration* (Nov. 6, 2020),
https://www.humanrightsfirst.org/resource/cameroonian-asylum-seekers-increasingly-detained-denied-asylum-under-trump-administration.

[140] According to Transactional Records Access Clearinghouse (TRAC) data immigration courts granted asylum or other relief to 273 out of 334 Cameroonians (82%) in FY21, 997 out of 1,605 (62%) in FY20, and 706 out of 862 (82%) in FY19. However, these statistics also show the number of asylum decisions was far fewer in FY21 than FY20, potentially reflecting reduced access to asylum at the US southern border (where many Cameroonians in recent years have requested asylum) due to the Title 42 policy. *See* TRAC, "Asylum Decisions," https://trac.syr.edu/phptools/immigration/asylum/. *See also* UNHCR, *UNHCR chief calls on US to end COVID-19 asylum restrictions at the Mexico border* (May 20, 2021), https://news.un.org/en/story/2021/05/1092352.

[141] Human Rights Watch found that government forces detained or imprisoned at least 39 Cameroonians after their US deportation, though the true number may be higher. This includes 31 people deported in October or November 2020 and eight people deported in 2019. *How Can You Throw Us Back?' supra* note 124.

[142] Human Rights Watch documented 13 cases of torture, rape, or other abuse or assault by Cameroonian state agents (police, gendarmes, military, or prison staff) of people deported from the United States. *See How Can You Throw Us Back?' supra* note 124.

[143] US Dep't of Homeland Security & Executive Office for Immigration Review, "Asylum Eligibility and Procedural Modifications," 84 FR 33829 (July 16, 2019).

[144] Human Rights First, *Asylum Denied, Families Divided: Trump Administration's Illegal Third-Country Transit Ban* (July 2020),
https://www.humanrightsfirst.org/sites/default/files/AsylumDeniedFamiliesDivided.pdf.

[145] *Id.*; *How Can You Throw Us Back?' supra* note 124 at pp.109-11

[146] *See* BAJI, The State of Black Immigrants (2020), http://baji.org/wp-content/uploads/2020/03/sobi-fullreport-jan22.pdf.

[147] *See* BAJI & NYU Law Immigrant Rights Clinic, *The State of Black Immigrants Pt. II: Black Immigrants in The Mass Criminalization System* (2020), https://baji.org/wp-content/uploads/2020/03/sobi-fullreport-jan22.pdf, at 21 (describing how "[b]lack immigrants are more likely than immigrants overall to be deported on criminal versus immigration grounds of removability" and how, for example "[i]n FY 2013, more than three quarters of Black immigrants were removed on criminal grounds, in contrast to less than half of immigrants overall.").

[148] *See* The Georgetown University Law Center Federal Legislation Clinic & The UndocuBlack Network, *Life on Hold: Black Immigrations & the Promise of Liberation Refugee Immigration Fairness* (June 2021),
https://trayinc.cld.bz/Georgetown-Law-UBN-Life-on-Hold.

[149] IRC Analysis of US Census Bureau, *American Community Survey, 2014 ACS 1-Year PUMS*. Data available for download at http://factfinder.census.gov/bkmk/navigation/1.0/en/d_dataset:ACS_14_1YR/d_product_type:PUMS.

[150] US Census Bureau, American Community Survey, 2014 1-Year Estimates, Tables S0201 and B050O3B.

[151] As noted by BAJI, "federal immigration origin data is categorized by country of origin rather than by race." BAJI & NYU Law Immigrant Rights Clinic, *The State of Black Immigrants Pt. II: Black Immigrants in The Mass Criminalization System* (2020), https://baji.org/wp-content/uploads/2020/03/sobi-fullreport-jan22.pdf. As a result, complete data on race in immigration detention is unavailable. Thus, this section refers to nationality rather than race and considers Black immigrants to be those from majority-Black countries in Africa and the Caribbean. This is both over-inclusive because "not every immigrant in the United States from a country in Africa or the Caribbean is of African heritage, nor does every individual of African heritage self-identify as Black," and under-inclusive "because it fails to include Black immigrants . . . from countries outside of Africa and the Caribbean." *Id.*

CLP_PC_032354

[152] American Immigration Council, *Immigration Detention in The United States By Agency* (Jan. 2020), https://www.americanimmigrationcouncil.org/sites/default/files/research/immigration_detention_in_the_united_stat es_by_agency.pdf.

[153] *How Can You Throw Us Back?' supra* note 124 at 69. The one interviewed asylum seeker who was detained for a shorter period of time (five months) was released for medical reasons and was subsequently deported. *Id.* at 74.

[154] *Id.* at 69.

[155] *'I'm a Prisoner Here' supra* note 124 at 20.

[156] Tulane University Law School Immigration Rights Clinic, *No End in Sight: Prolonged And Punitive Detention Of Immigrants In Louisiana* (May 2021), https://law.tulane.edu/sites/law.tulane.edu/files/TLS%20No%20End%20In%20Sight%20Single%20Pages%20FINA L.pdf, p. 9.

[157] *Id.* at 8.

[158] Andrea Castillo, *With or without criminal records, some immigrants spend many years in detention*, Los Angeles Times (Nov. 12, 2018), https://www.latimes.com/local/lanow/la-me-immigrant-detainees-20181112-story.html.

[159] Josh Gerstein, *'That's Just Insane': Australia's Secret Deal to Take in Rwandan Guerrillas From the US*, POLITICO (May 15, 2019), https://www.politico.com/magazine/story/2019/05/15/australia-elections-rwanda-prisoners-refugee-swap-us-226875/.

[160] *See* Castillo, *supra* note 158.

[161] *Letter from Cameroon American Council, Freedom for Immigrants, ISLA, and Southern Poverty Law Center, to Joseph V. Cuffari, Inspector General, US Dep't Homeland Sec., and Cameron Quinn, Officer, Civ. Rts. & Civ. Lib., US Dep't Homeland Sec.* (Aug. 26, 2020), https://www.splcenter.org/sites/default/files/8.26.20_crcl_letter.pdf.

[162] Molly O'Toole & Andrea Castillo, *'Betrayed' Black asylum seekers say Trump administration is ramping up deportations by force and fraud*, Los Angeles Times (Nov. 27, 2020), https://www.latimes.com/politics/story/2020-11-27/black-asylym-seekers-trump-officials-push-deportations.

[163] Human Rights First, *supra* at 29.

[164] RAICES, *Black Immigrant Lives are Under Attack* (July 22, 2020), https://www.raicestexas.org/2020/07/22/black-immigrant-lives-are-under-attack/?ms=em20220426_rollout_video_bidenvtx&emci=254fb2d4-a0c5-ec11-997e-281878b83d8a&emdi=8325dfb9-a2c5-ec11-997e-281878b83d8a.

[165] *Id.*

[166] *See 'I'm a Prisoner Here' supra* note 124, at 29.

[167] *Id.* at 22.

[168] *Id.* at 22-23.

[169] *Id.* at 22.

[170] U.S. Immigrations and Customs Enforcement (ICE), "Detention Management," https://www.ice.gov/detain/detention-management.

[171] *Black Immigrant Lives are Under Attack*, *supra* note 164.

[172] *Id.*

[173] *Id.*

[174] RAICES, *Black, Pregnant, Detained* (Mar. 4, 2021), https://www.raicestexas.org/2021/03/04/pregnant-and-detained/?ms=em20220426_rollout_video_bidenvtx&emci=254fb2d4-a0c5-ec11-997e-281878b83d8a&emdi=8325dfb9-a2c5-ec11-997e-281878b83d8a. RAICES also notes, disturbingly, "[a]t the same time that Karnes' demographics shifted to majority-black, RAICES noted that ICE ended its policy against detaining pregnant women and infants under one year of age. As a result, multiple pregnant women and babies suffered from incarceration at Karnes during the COVID-19 pandemic." *Id.*

[175] RAICES & Haitian Bridge Alliance, *Black Immigrants in Family Detention - Live Stream* (July 23, 2020), https://www.facebook.com/100064456043882/videos/1711275342385292.

[176] *Id.*

[177] *Id.*

[178] *Id.*

[179] *Id.*

[180] *Id.*

[181] *Id.*

[182] *Id.*

CLP_PC_032355

[183] ACLU of Louisiana Foundation et al., *Complaint Re: Unchecked Human Rights and Civil Rights Abuses Systemic within the New Orleans ICE Field Office Area of Responsibility* (Dec. 20, 2021), https://static1.squarespace.com/static/5a33042eb078691c386e7bce/t/61c0b47c15319f67d4045ca3/1640019069450/12%3A20%3A21+DHS+NOLA+ICE+Investigation+Follow-Up+Letter+%282%29.pdf (detailing the unchecked human rights and civil rights abuses systemic within the the NOLA ICE AOR, including an "abusive and racially discriminatory pattern of treatment, unlawful conduct, and lack of oversight and accountability.").

[184] *Letter from Cameroon American Council et al. supra* note 161 https://www.splcenter.org/sites/default/files/8.26.20_crcl_letter.pdf.

[185] Southern Poverty Law Center et. al, *Complaint Re: Immigration and Customs Enforcement Officers' Use of Torture to Coerce Immigrants Into Signing Immigration Documents at Adams County Correctional Facility* (Oct. 7, 2020), https://static1.squarespace.com/static/5a33042eb078691c386e7bce/t/5f7f17f39e044f47175204fb/1602164723244/Re+CRCL+Complaint+ICE%27s+Use+of+Torture+to+Coerce+Immigrants+to+Sign+Immigration+Documents+at+Adams+County+Correctional+Facility.pdf.

[186] *Id.* (detailing testimony of D.F. interviewed on Oct. 2, 2020).

[187] *Id.* (detailing testimony of B.J. interviewed on Sept. 30, 2020).

[188] Lauren Seibert, *A Cry for Cameroon: How the United States Failed Refugees*, The Progressive Magazine (Mar. 26, 2022), https://progressive.org/latest/cry-for-cameroon-seibert-220326/; Kate Morrissey, *Despite public outcry, many Cameroonians and Congolese deported on a flight*, San Diego Union-Tribune (Oct. 15, 2020), https://www.sandiegouniontribune.com/news/immigration/story/2020-10-15/cameroon-congolese-deported.

[189] Joquin Castro, Twitter (Oct. 13, 2020), https://twitter.com/JoaquinCastrotx/status/1316117172708691969.

[190] Freedom for Immigrants et al., *Complaint Re: U.S. Immigration and Customs Enforcement (ICE)'s Pattern of Torture in Signing of Deportation Documents for Cameroonian Migrants* (Nov. 5, 2020), https://www.splcenter.org/sites/default/files/crcl_complaint_ice_s_pattern_of_torture_in_signing_of_deportation_documents_for_cameroonian_migrants.pdf.

[191] Freedom for Immigrants et al., *Complaint Re: U.S. Immigration and Customs Enforcement Torture in Signing of Deportation Documents for Cameroonian Migrants at Winn Correctional Center, Louisiana* (Feb. 1, 2021), https://static1.squarespace.com/static/5a33042eb078691c386e7bce/t/6019dd452f75af0a17bec824/1612307782021/Redacted_CRCL_Complaint_Winn.pdf.

[192] Southern Poverty Law Center, *Letter Re: Call for U.S. Immigration and Customs Enforcement (ICE) to End Contracts due to Abusive, Inhumane, Criminal, and Racially Discriminatory Practices at Pine Prairie ICE Processing Center and Allen Parish Public Safety Complex, Louisiana* (July 28, 2021), https://www.splcenter.org/sites/default/files/28_july_2021_complaint_and_call_to_close_pine_prairie_and_allen_parish.pdf.

[193] Zachary Sanders, Esq. et al., *Complaint Re: Call for an Immediate Halt to and Investigation of Detention, Violence, Repression and Racism Against Somali and All Immigrant Detainees and Asylum Seekers at Butler County Jail in Hamilton, Ohio* (Dec. 14, 2020), http://ohioimmigrant.org/wp-content/uploads/2012/CRCL-Complaint-Dec-2020-REDACTED.pdf.

[194] *Bayong and Adem v. County of Butler, Ohio et al.*, Case No. 1:20-cv-989 (Dec. 8, 2020), *available at* http://ohioimmigrant/wp-content/uploads/2020/12/Butler-County-Jail-Complaint-With-Exhibits-12-8-20.pdf.

[195] African Communities Together et al., *RE: Complaint Regarding ICE's Use of The WRAP as a Restraint Device* (Oct. 13, 2021), https://static1.squarespace.com/static/5701c3253c44d887e796b6e2/t/6166d47647aa3a692d4b1be0/1634129028823/CRCL+Complaint+Regarding+The+WRAP_Final.pdf.

[196] *See 'I'm a Prisoner Here' supra* note 124,at 48.

[197] Southern Poverty Law Center, *Letter Re: Call for Cancellation of Winn Correctional Center Contract and Investigation into the New Orleans ICE Field Office* (June 2021), *available at* https://drive.google.com/file/d/1NMWCXhOwUDE2e15RXfQ2ep9F69Zl-rva/view.

[198] *Id.*

[199] *Id.*

[200] *See 'I'm a Prisoner Here' supra* note 124,at 46.

[201] Konrad Franco, Caitlin Patler, & Keramet Reiter, *Punishing Status and the Punishment Status Quo: Solitary Confinement in US Immigration Prisons, 2013-2017*, SocArXiv (April 2020), https://osf.io/preprints/socarxiv/zdy7f/.

31

[202] *See 'I'm a Prisoner Here' supra* note 124,at 47.

[203] *Id.*

[204] Robert F. Kennedy Human Rights et al., *Complaint Re: Call for Immediate Investigation into Immigration and Customs Enforcement Officers' Use of Punitive Solitary Confinement as a Response to the COVID-19 Pandemic and Other Public Health* Crisesat 12–13, 21 (June 21, 2021), https://rfkhumanrights.org/assets/documents/RFK-Human-Rights-Pine-Prairie-DHS-Complaint.pdf.

[205] *Id.* at 2.

[206] *Id.*

[207] Specifically, the United Nations Revised Standard Minimum Rules for the Treatment of Incarcerated People, known as the "Mandela Rules," identify the use of solitary confinement beyond 15 days as a form of cruel, inhumane, and degrading treatment that rises to the level of torture. Thus, when solitary confinement is used as a punitive measure by way of segregating and targeting particular individuals, due to their identity, their challenge of authority, or other arbitrary reason, in violation of the domestic minimum standards, then that State-sponsored conduct may rise to the level of torture. *See United Nations Standard Minimum Rules for the Treatment of Prisoners* (the Nelson Mandela Rules), adopted by the General Assembly on 17 December 2015.

[208] *See* Robert F. Kennedy Human Rights et al. supra at note 200.

[209] *See* RAICES et al., *Complaint RE: Discriminatory Practices and Deliberate Indifference Related to the Prenatal, Maternal, Gynecological, and Pediatric Medical Needs of Detained Black Women and Young Children at the Karnes County Family Residential Center* (Mar. 3, 2021), https://www.raicestexas.org/wp-content/uploads/2021/03/Redacted-Complaint-regarding-Inadequate-Medical-Care-of-Black-Pregnant-Women-and-Infants-at-Karnes.pdf, at 2.

[210] Project South et al., *Complaint Re: Lack of Medical Care, Unsafe Work Practices, and Absence of Adequate Protection Against COVID-19 for Detained Immigrants and Employees Alike at the Irwin County Detention Center* (Sept. 14, 2020), https://projectsouth.org/wp-content/uploads/2020/09/OIG-ICDC-Complaint-1.pdf, at 2.

[211] UndocuBlack Network et al., *Complaint Re: COVID-19 Negligence, Sexual Assault, Retaliation, Verbal Abuse, Religious Discrimination, Anti-Blackness, and Deplorable Conditions at Krome North Services Processing Center in Miami, Florida* (Oct. 6, 2021), https://static1.squarespace.com/static/5a33042eb078691c386e7bce/t/615defe5e76a986c1af29d7a/1633546214397/Multi-Individual+CRCL+Anti-Blackness+and+Other+Abuse+of+Black+immigrants+at+Krome+Oct+2021.pdf, at 8.

[212] *A cry for help: a letter from Cameroonian women detained at T. Don Hutto*, Grassroots Leadership (March 6 2020), https://grassrootsleadership.org/blog/2020/03/cry-help-letter-cameroonian-women-detained-t-don-hutto.

[213] *Id.*

[214] *See* "COVID-19 ICE Detainee Statistics by Facility," https://www.ice.gov/coronavirus#citations.

[215] *See* Jeremy Redmon & Alan Judd, *A week after warning, ICE detainee dies from COVID-19, The Atlanta Journal-Constitution* (Sept. 21, 2020), https://www.ajc.com/news/third-ice-detainee-dies-from-covid-19-in-southwest-georgia/LE3CHB24HFDWBBHADYHZEB5EMY/.

[216] Southern Poverty Law Center et al., *Complaint Re: Complaint for violations of civil, constitutional, and disability rights of medically vulnerable individuals at Stewart Detention Center* (Aug. 30, 2021), https://www.splcenter.org/sites/default/files/august_crcl_complaint.pdf, at 4.

[217] *See Cineas supra* note 3*.*

[218] *See* Carl Lindskoog, *Violence and Racism Against Haitian Migrants Was Never Limited to Agents on Horseback*, Washington Post (Sept. 30, 2021), https://www.washingtonpost.com/outlook/2021/10/02/violence-racism-against-haitian-migrants-was-never-limited-to-horseback-riders/.

[219] See *Haitian Refugee Center v. Civiletti*, 503 F. Supp. 442, 450 (S.D. Fla. 1980) ("This case involves thousands of [B]lack Haitian nationals, the brutality of their government, and the prejudice of ours.").

[220] *Jean v. Nelson*, 711 F.2d 1455, 1493 (11th Cir. 1983), *on reh'g*, 727 F.2d 957 (11th Cir. 1984), *aff'd*, 472 US 846 (1985).

[221] *Id.*

[222] *See Pushing Back Protection: How Offshoring and Externalization Imperil the Right to Asylum*, National Immigrant Justice Center and FWD.us, 6 (2021), https://immigrantjustice.org/sites/default/files/content-type/commentary-item/documents/2021-09/Offshoring%20Asylum%20Report_Chapter4.pdf.

32

[223] *See* Complaint at ¶ 47, *Haitian Bridge Alliance v. Biden*, No. 1:21-CV-03317 (D.D.C.) (filed Dec. 20, 2021), https://int.nyt.com/data/documenttools/hba-v-biden/a8106eacd7c45afe/full.pdf.

[224] *Id.*

[225] *Id.* at 48

[226] US Coast Guard, *Multimedia Release: Coast Guard repatriates 98 people to Haiti*, (June 29, 2022), https://content.govdelivery.com/accounts/USDHSCG/bulletins/31e0c18.

[227] *See* S. Priya Morley et al., *A Journey of Hope: Haitian Women's Migration to Tapachula, Mexico* (2021), https://imumi.org/attachments/2020/A-Journey-of-Hope-Haitian-Womens-Migration-to%20Tapachula.pdf; S. Priya Morley et al., *"There is a Target on Us" – The Impact of Anti-Black Racism on African Migrants at Mexico's Southern Border* (2021); *see also* Caitlyn Yates, *A Case Study in the Outsourcing of US Border Control*, Lawfare (Apr. 11, 2019), https://www.lawfareblog.com/case-study-outsourcing-us-border-control.

[228] E. Tendayi Achiume, *Foreward* in S. Priya Morely et al., *A Journey of Hope: Haitian Women's Migration to Tapachula, Mexico* (2021), https://imumi.org/attachments/2020/A-Journey-of-Hope-Haitian-Womens-Migration-to%20-Tapachula.pdf.

[229] *Joint Declaration and Supplementary Agreement Between the UNITED STATES OF AMERICA and MEXICO*, (June 7, 2019), https://www.state.gov/wp-content/uploads/2019/09/19-607-Mexico-Migration-and-Refugees.pdf; *see International Organizations Denounce that Proposed National Guard Model in Mexico Violates International Law*, WOLA (February 21, 2019), https://www.wola.org/2019/02/mexico-national-guard-violates-international-law/; Maureen Meyer & Adan Isacson, *The "Wall" Before the Wall: Mexico's Crackdown on Migration at its Southern Border*, WOLA (Dec. 17, 2019), https://www.wola.org/analysis/mexico-southern-border-report/; Ribando Seelke, Clare, *Mexico's Immigration Control Efforts*, *Congressional Research Service*, (3 January 2022.) https://sgp.fas.org/crs/row/IF10215.pdf.

[230] Tyler Mattiace, *Mexico Cannot Solve the US Border Crisis*, *Dallas Morning News* (May 24, 2022), https://www.dallasnews.com/opinion/commentary/2021/05/23/mexico-cannot-solve-the-us-border-crisis/; *US Vice President Calls for Immigration Effort With Mexico*, VOA News (May 7, 2021), https://www.voanews.com/a/usa_us-vice-president-calls-immigration-effort-mexico/6205565.html.

[231] Human Rights Watch, *Mexico: Asylum Seekers Face Abuses at Southern Border*, (June 6, 2022), https://www.hrw.org/news/2022/06/06/mexico-asylum-seekers-face-abuses-southern-border; *see supra* note 227.

[232] *Detuvieron a cuatro policías por la muerte de una migrante haitiana en Chiapas*, InfoBae (Nov. 26, 2021), https://www.infobae.com/america/mexico/2021/11/26/detuvieron-a-cuatro-policias-por-la-muerte-de-una-migrante-haitiana-en-chiapas/.

[233] *See* Refugees International, *Pushed into the Shadows: Mexico's Reception of Haitian Migrants*, (Apr. 28, 2022), https://www.refugeesinternational.org/reports/2022/4/25/pushed-into-the-shadows-mexicos-reception-of-haitian-migrants.

[234] Tanya Duarte, et al., *'Because of the Color of My Skin and the Way I Speak Spanish': The INM's Detention and Deportation of Indigenous and Afro-Descendant Mexicans*, (July 2020), https://imumi.org/wp-content/uploads/2020/11/The-INMs-Detention-and-Deportation-of-Indigenous-and-AfroDescendant-Mexicans.pdf.

[235] Lizabelt Avila and Maureen Meyer, *Beyond the US-Mexico Border: Migration Trends in the Americas, Explained*, (May 26, 2022), https://www.wola.org/analysis/beyond-the-u-s-mexico-border-migration-trends-in-the-americas-explained/.

[236] *See* Haitian Bridge Alliance, *Violence against Black Migrant Women in the Darién Gap (CEDAW Articles 1, 2, 3, 5, 6, 12, 15)* (Jan. 12, 2022), https://tbinternet.ohchr.org/_layouts/15/treatybodyexternal/Download.aspx?symbolno=INT%2fCEDAW%2fCSS%2fPAN%2f47481&Lang=en; *See* CEDAW, *Concluding observations on the eighth periodic report of Panama*, UN Doc. CEDAW/C/PAN/CO/8 (Feb. 24, 2022), https://tbinternet.ohchr.org/_layouts/15/treatybodyexternal/Download.aspx?symbolno=CEDAW%2fC%2fPAN%2fCO%2f8&Lang=en.

[237] *See* Amnesty International, *Not Safe Anywhere: Haitians on the move need urgent international protection* (Oct. 2021), https://www.amnestyusa.org/wp-content/uploads/2021/10/Not-Safe-Anywhere-Haitians-need-urgent-international-protection-READY-FOR-PUBLISHING1.pdf.

[238] DDPA, at ¶ 12.

[239] DDPA, at ¶ 64.

[240] *See* Erik Crew & Nicole Phillips, *Report on 20th anniversary of the Durban Declaration and Programme of Action: Response to call for input issued by the UN's Special Rapporteur on contemporary forms of racism, racial*

CLP_PC_032358

*discrimination, xenophobia and related intolerance*, Haitian Bridge Alliance (Aug. 16, 2021),
http://www.ijdh.org/wp-content/uploads/2021/10/Haitian-Bridge-Alliance-IJDH-Bertha-Submission-to-the-UN-
Rapporteur-August-2021-1.pdf.

34

CLP_PC_032359

# PUBLIC SUBMISSION

**As of:** May 08, 2023
**Received:** March 27, 2023
**Status:** Posted
**Posted:** March 30, 2023
**Tracking No.** lfr-j7wv-bnya
**Comments Due:** March 27, 2023
**Submission Type:** Web

**Docket:** USCIS-2022-0016
Circumvention of Lawful Pathways

**Comment On:** USCIS-2022-0016-0001
Circumvention of Lawful Pathways

**Document:** USCIS-2022-0016-12544
Comment Submitted by Immigrant Defenders Law Center

## Submitter Information

**Email:** MCargioli@immdef.org
**Organization:** Immigrant Defenders Law Center

## General Comment

See attached file(s)

## Attachments

Immigrant Defenders Law Center Comments on the Proposed Rule by DHS and DOJ EOIR on Circumvention of Lawful Pathways FINAL

**March 27, 2023**

*Submitted via:* *https://www.regulations.gov*.

Daniel Delgado                                    Lauren Alder Reid
Acting Director                                    Assistant Director,
Border and Immigration Policy          Office of Policy, EOIR
Office of Strategy, Policy, and Plans    U.S. Department of Justice
U.S. Department of Homeland Security  telephone (703) 305-0289
telephone (202) 447-3459

**Re: Comment on the Proposed Rule by the <u>Department of Homeland Security</u> (DHS) and the <u>Department of Justice's Executive Office for Immigration Review</u> (EOIR) on Circumvention of Lawful Pathways, CIS No. 2736-22; Docket No. USCIS 2022-0016; A.G. Order No. 5605-2023**

Dear Acting Director Daniel Delgado and Assistant Director Lauren Alder Reid:

Immigrant Defenders Law Center (ImmDef) submits this public comment in response to the Department of Homeland Security (DHS)'s and Department of Justice (DOJ)'s proposed rule published in the Federal Register on February 23, 2023.[1] The proposed rule would trap asylum seekers in dangerous parts of Mexico for prolonged periods of time, bar many refugees from asylum protection in the United States, separate families, and deprive refugees of the ability to reunite with their families, loved ones, and sponsors. The proposed rule is akin to the Trump administration's cruel asylum bans that were previously found unlawful by the federal courts.

The proposed ban severely restricts access to asylum for many refugees from all over the world in need of safety and protection in the United States. It discriminates against poor, low-income, disabled, Black, Brown, and Indigenous asylum seekers. It fails to comply with U.S. law and international treaty obligations to refugees and will cause mental and physical harm to refugee individuals and their families, including those with vulnerable children. ImmDef strongly urges the agencies to withdraw the proposed inhumane asylum ban rule. Instead, the Biden administration should adhere to U.S. and international asylum law, restore full access to asylum at U.S. ports of entry, implement a humane asylum processing system at the southern border that does not rely on CBP One, provide access to counsel to all asylum seekers, and ensure the just adjudication of asylum cases. The administration should increase funding for shelters that welcome refugees at the United States southern border and in the interior of the United States,

---

[1] Circumvention of Lawful Pathways (unpublished proposed rule accessed Feb. 21, 2023), Federal Register, *available at* https://www.federalregister.gov/public-inspection/2023-03718/circumvention-of-lawful-pathways, (hereafter "Proposed Rule" or "Asylum Ban Rule") https://public-inspection.federalregister.gov/2023-03718.pdf

CLP_PC_032361

increase funding to hire more asylum officers and immigration judges, end the use of CBP One, end the use of expedited removal, increase the annual allocation for refugee resettlement, and refrain from detaining asylum seekers, including families.

**Immigrant Defenders Law Center and Its Interest in the Proposed Rule**

Immigrant Defenders Law Center (ImmDef) is a nonprofit organization incorporated in California and based in Los Angeles—with additional offices in Riverside, San Diego, and Santa Ana—that serves immigrants and asylum seekers throughout Southern California. ImmDef's mission is to provide universal representation to all immigrants in need of legal assistance so that no immigrant is forced to face removal proceedings without an attorney. ImmDef manages several programs, including the Children's Representation Program; the National Qualified Representative Program; Community Defense Projects to provide removal defense in Los Angeles, Santa Ana, Long Beach, and the Inland Empire; and the Cross-Border Initiative.

ImmDef established its Cross-Border Initiative in response to the Migrant Protection Protocols (MPP, also known as "Remain in Mexico") program, which forced asylum seekers to remain in Mexico while their cases were pending in U.S. immigration courts. To represent asylum seekers subjected to MPP, ImmDef provided counsel to individuals in the San Diego immigration court and engaged in cross-border travel and communication to prepare MPP removal cases and provide community education services to refugees. ImmDef diverted funds from its programs to create new infrastructure, hire staff, and develop materials for the Cross Border Initiative. The Biden administration ended the MPP program in June 2022.

In 2020, the Trump administration implemented Title 42 under a public health pretext, closing the southern U.S. border to asylum seekers. Title 42 has remained in place for three years and there have been over one million expulsions of migrants to either Mexico or to their countries of origin. Due to Title 42, the Cross Border Initiative continued providing community education programs, such as Know-Your-Rights presentations in Tijuana, Mexico. Only when MPP ended was ImmDef's San Diego office able to fully return to providing removal defense work for detainees at Otay Mesa Detention Center and limited representation work for detainees at Imperial Regional Detention Facility.

Based on our experience providing direct legal services to those subjected to MPP, as well as providing legal consultations to those expelled under Title 42 and obtaining humanitarian parole for some of them, we know that the proposed asylum ban rule would divert vast resources away from ImmDef's primary goal of providing removal defense legal services and toward addressing the urgent needs of asylum seekers at the U.S. southern border wrongfully excluded from requesting protection. ImmDef's San Diego office will have to take fewer removal defense cases from detainees at Otay Mesa Detention Center and would need to focus instead on responding to inquiries from human rights organizations and attorneys throughout the United States about the status of asylum at the U.S. southern border, provide consultations to asylum seekers stranded in Tijuana, and engage in more community education events in Tijuana such as clinics to assist refugees with completing the CBP One application.

2

**The 30-Day Public Comment Period Provides Insufficient Time for the Public and Impacted Individuals to Comment on the Restrictive Asylum Ban Rule**

The Biden administration has provided only a limited time of 30 days to address the proposed asylum ban rule, a rule that has drastic implications for asylum seekers at the southern U.S. border to whom we provide legal services. The Administrative Procedure Act requires that agencies provide a meaningful time for the public to comment on sweeping proposed rules. Here, the administration has not provided sufficient time for the public to fully review the proposed rule and to determine the full extent of its consequences. Nor has the Biden administration provided sufficient time to seek out and obtain comments from those who would be directly impacted by the proposed asylum ban rule.

On March 1, 2023, ImmDef and 171 organizations wrote to your agencies urging them to provide at least 60 days to comment on the complex 153-page asylum ban rule.[2] On March 14, 2023, the U.S. Department of Justice Executive Office for Immigration Review responded to the letter merely stating that the Biden administration does not intend to extend the comment period. No explanation was given for the denial of the request for an extension of the comment period by any amount of time.

The administration is deviating from the optimal time the public is permitted to comment on regulations, as well as restricting the time for impacted asylum seekers and organizations who serve asylum seekers and refugees to adequately respond to the proposed rule. Executive Order 13563 states that prior to a notice of proposed rulemaking, an agency where possible should seek views from those potentially subject to the rule."[3] Executive Orders 12866[4] and 13563 state that agencies should generally provide at least 60 days for the public to comment on proposed regulations. A minimum of 60 days is especially vital as to this proposed rule given the rule's attempt to limit access to the asylum process for many refugees, in violation of U.S. law and our international commitments, thereby returning many to discrimination, false imprisonment, physical and mental harm, violence, torture, or even death. While the agencies cite the upcoming termination of the Title 42 policy on May 11, 2023, as justification to limit the public's right to comment on the proposed rule, this reasoning is unfounded because the Biden administration sought to end Title 42 almost one year ago. The administration has also publicly stated that it has prepared for the end of Title 42 and has issued a memorandum with information on its plans. In a memorandum dated December 13, 2022, Secretary Mayorkas states, "Since the launch of the Southwest Border Coordination Center in February, DHS has led a whole-of-government plan to

---

[2] Erfani, Azadeh, et al.,"Request to Provide a Minimum of 60 days for Public Comment in Response to the Department of Homeland Security (DHS), United States Citizenship and Immigration Services (USCIS), and Department of Justice (DOJ) Executive Office for Immigration Review (EOIR) (the Departments) Joint Notice of Proposed Rulemaking (NPRM): Circumvention of Lawful Pathways", March 1, 2023, *available at* www.immigrantjustice.org, https://immigrantjustice.org/sites/default/files/content-type/commentary-item/documents/2023-03/Biden%20Asylum%20Ban%20-%20Extension%20letter%20to%2030-days%20comment%20period%20FINAL.pdf, last accessed March 23, 2023.

[3] President Barack Obama, "Improving Regulation and Regulatory Review," Office of the Federal Register, National Archives and Records Administration, Executive Order 13563 of January 18, 2011.

[4] President William Clinton, Regulatory Planning and Review, (58 FR 51735; October 4, 1993).

CLP_PC_032363

prepare for and manage increased encounters of noncitizens at our southwest border. "[5] Thus, the administration has had ample time to prepare for the end of the Title 42 policy.

A 30-day comment period has proven to be insufficient time for our organization to collect information from our staff about their experience assisting refugees with obtaining appointments using CBP One, the app the proposed rule requires be used to schedule appointments. On January 24, 2023, ImmDef Executive Director Lindsay Toczylowski, Directing Attorney of Policy and Advocacy Margaret Cargioli, Directing Attorney Melissa Shepard, and Managing Attorney Paulina Reyes went to two shelters, Pro Amore Dei and Borderline Crisis Center, in Tijuana, Mexico, to give community education presentations. On March 1, 2023, Lindsay Toczylowski and twelve ImmDef staff members traveled to Tijuana, Mexico, to conduct a Know-Your-Rights (KYR) presentation at Borderline Crisis shelter and a CBP One clinic at Espacio Migrante shelter. There were several problems with the CBP One application, which will be explained in further detail below. Given more time, we would have attempted to conduct interviews of all staff members who attended the Tijuana KYRs and clinics to obtain their feedback. Also, we would have endeavored to contact asylum seekers at shelters in Tijuana who would be impacted by the proposed asylum ban rule to better inform ourselves of the challenges asylum seekers continue to encounter with the CBP One application process, as well as inquire about the other ways the proposed rule would affect asylum seekers in Mexico. With more time before the deadline to comment on the proposed rule, we also would have attempted to meet with shelters in Mexico serving refugees to determine how the proposed rule might impact their work.

**The Proposed Asylum Ban Rule Violates U.S. and International Law**

The asylum ban would lead to the deportation of refugees to countries where they are at risk of discrimination, mental and physical harm, persecution, torture, and death. Pursuant to Section 208 of the Immigration and Nationality Act (INA), codified at 8 U.S.C. § 1158, a non-U.S. national physically present in the United States or who arrives in the United States (whether or not at a designated U.S. port of entry) may apply for asylum. Asylum is a humanitarian form of relief available to individuals and families who have suffered persecution or have a fear of future persecution due to at least one of the following grounds: race, religion, nationality, membership in a particular social group, or political opinion. The statute at 8 U.S.C. 1231 codified the prohibition against returning refugees to countries where they may face persecution. The proposed rule contravenes these provisions of U.S. law.

The proposed rule creates a presumption of asylum ineligibility for individuals who 1) did not apply for and receive a formal denial of protection in a transit country; and 2) entered between ports of entry at the southern border or entered at a port of entry without a previously scheduled appointment through the CBP One mobile application, subject to extremely limited exceptions.

The proposed rule violates U.S. law, which ensures the ability to request asylum regardless of the manner of entry or transit and prohibits restrictions on asylum that are inconsistent with

---

[5] DHS, Statement by Secretary Mayorkas on Planning for End of Title 42 at 1. (Dec. 13, 2022) Statement by Secretary Mayorkas on Planning for End of Title 42 | Homeland Security (dhs.gov)

4

CLP_PC_032364

provisions in the U.S. asylum statute.[6] It further violates U.S. and international law because it exposes refugees to harm by removing them to countries where they face persecution and by trapping asylum seekers in Mexico where many are victims of horrendous crimes.

The proposed asylum ban is similar to the Trump administration asylum bans that barred certain asylum seekers at the border based on their manner of entry and transit. The bans were vacated and enjoined by federal courts for violating U.S. law.

Immigrant Defenders Law Center's Cross Border Initiative program performs a key role in advising, assisting, advocating for, and representing people who are seeking asylum at the southern U.S. border. ImmDef believes in the right to asylum and understands the dangers refugees encounter when traveling through Mexico and through other countries or on their way to Mexico.

ImmDef established its Cross Border Initiative program in 2019 at the outset of the Migrant Protection Protocols. We represent refugees who have been robbed, raped, tortured, kidnapped by cartels, or extorted by Mexican authorities, among other atrocities. One family we represented had been kidnapped by a cartel and was forced to watch them torture migrants who challenged their authority. Because harsh border immigration policies were implemented by the Trump administration and continued by the Biden administration, ImmDef has periodically provided vital information to supplement reports by Human Rights First on the danger and harms migrants face in Mexico.[7]


**The Proposed Asylum Ban Would Disparately Harm Black, Brown, and Indigenous Asylum Seekers**

The proposed rule also discriminates against asylum seekers based on their manner of entry and transit and will have a racially disparate impact on asylum seekers from Africa, the Caribbean, and Latin America. The proposed ban, which applies only to people who seek protection at the southern United States border, will disproportionately harm people of color who do not have the resources or ability to travel to the United States by air.

The United States and other countries, including Mexico, use visa requirements to prevent people from reaching their countries' territories to request asylum, while often allowing access to people from wealthier and predominantly white nations.[8] Imposing a ban on refugees seeking safety in the United States via the southern U.S. border will, like the Trump administration's third-country transit ban, disproportionately harm people of color who must undertake a dangerous journey to arrive in the United States from the south.

---

[6] U.S. Congress (1964) United States Code: Immigration and Nationality, 8 USC 1158 (a) (1)
[7] Human Rights First, "A Shameful Record: Biden Administration's Use of Trump's Policies Endangers People Seeking Asylum (January 2022), *available at* www.humanrightsfirst.org, https://humanrightsfirst.org/wp-content/uploads/2022/09/ShamefulRecord.pdf, last accessed on March 23, 2023.
[8] Women's Refugee Commission, "Visa Regimes: A Threat to Migrants' Access to Safety and Asylum," www.womensrefugeecommission.org, last accessed on March 23, 2023.

CLP_PC_032365

CBP One disparately harms Black asylum seekers due to racial bias in its facial recognition technology and is inaccessible to many Indigenous, African, and other asylum seekers due to language barriers. Immigrant Defenders Law Center has assisted asylum seekers in Mexico who are not able to register with CBP One because they are Black or Brown. On March 1, 2023, two ImmDef staff tried for twenty minutes to capture the photo of an asylum seeker with a darker complexion to no avail.

 [9]

Immigrant Defender Law Center is co-facilitator of the legal sub-group of the California Welcoming Task Force. The California Welcoming Task Force is a bi-national coalition of organizations working together to welcome asylum seekers with dignity. Since the launch of the government's program requiring individuals to submit CBP One application requests in order to be considered for an exemption under Title 42, there have been several discussions about the challenges created by the CBP One application, including the problems Black migrants are encountering with the image capturing requirement of the CBP One application.

**The Proposed Asylum Ban Would Disparately Harm Poor and Low-Income Refugees**

The proposed rule is targeting people fleeing persecution who enter the United States at the southern U.S. border. Many refugees are poor or low-income and cannot afford to travel by air to the United States. Hence, they risk their lives to make a treacherous journey by foot through Mexico to seek protection in the United States.

The requirement to register through the CBP One app to request asylum in the United States also targets poor and low-income asylum seekers. Flaws with the app force asylum seekers to make many attempts to register. ImmDef Attorney Karina Ramos met with a Haitian man during ImmDef's March 2023 clinic in Tijuana. He was not able to register for the CBP One app because he had not been able to buy more time on his phone's SIM card. The only money he had in his pocket, he said, was enough for the bus ride back to his shelter. This man was effectively denied the opportunity to request asylum because he could not afford to use his phone to make an appointment. Our nation's asylum laws should not create a wealth test for obtaining protection from persecution.

---

[9] Immigrant Defenders Law Center, Immigrant Defenders Law Center photo from a legal clinic at Espacio Migrante in Tijuana, Mexico on March 1, 2023.

CLP_PC_032366

**Requiring Asylum Seekers to Use the CBP One Application Denies Asylum Access to the Most Vulnerable Refugees**

The proposed rule requires asylum seekers at the southern U.S. border to schedule appointments through the CBP One app. Access to our asylum system would be denied to refugees who arrive at a border port of entry without a previously scheduled appointment and who were not denied protection in a country through which they transited.

CBP One has proven to be an extremely faulty tool to request an appointment at U.S. ports of entry. There are financial, language, technological, and other barriers, making the application an unjust means to obtain protection in the United States. It discriminates against Black, Brown, and Indigenous asylum seekers and has limited appointments. Many asylum seekers do not have the financial resources to obtain a smartphone or are unable to navigate the application itself even when they do. The application is not available in all languages—it is currently only available in English, Spanish, and Haitian Creole—including Indigenous languages, and all error messages are in English, preventing those with limited English capacity from understanding what has gone wrong. As mentioned above, it also disparately harms Black and Brown asylum seekers due to racial bias in its face capturing technology.

By requiring people at the southwest border to use CBP One, the proposed rule would place many vulnerable asylum seekers in grave danger, including LGBTQI+ asylum seekers, children, women, and survivors of gender-based violence. LGBTQ+ asylum seekers endure discrimination and abuse in Mexico.[10] Immigrant Defenders Law Center represented an LGBTQ+ individual stranded in Mexico under MPP who was targeted and raped based on her sexual orientation. Migrant children are also extremely vulnerable to kidnapping in Mexico.

 [11]

---

[10] Human Rights Watch, US LGBT Asylum Seekers In Danger At the Border: Biden Should Immediately Safeguard At-Risk Groups, Restore Asylum Access, (May 31, 2022), *available at* https://www.hrw.org/news/2022/05/31/us-lgbt-asylum-seekers-danger-border.

[11] Immigrant Defenders Law Center, Photo taken at Pro Amore Dei Shelter, February 6, 2023, at Immigrant Defenders Law Center's Know Your Rights presentation to advise asylum seekers about the CBP One requirement under an exemption process to Title 42 to request asylum in the United States.

CLP_PC_032367



[12]

As ImmDef's staff has learned firsthand, the CBP One app is riddled with errors.



[13]

On January 24, 2023, ImmDef's Executive Director Lindsay Toczylowski and three ImmDef staff members went to two shelters in Tijuana--Pro Amore Dei and Borderline Crisis Center--to provide community education presentations. Out of about two hundred people at the Pro Amore Dei shelter, only two had been able to obtain a CBP One appointment on their own. At Borderline Crisis Center, several people told ImmDef staff that they were not able to get appointments, despite multiple attempts.

On February 6, 2023, ImmDef staff were in Tijuana, Mexico, at two shelters to assist with the CBP One application. At the Pro Amore Dei shelter, out of 150 families, not one had successfully made an appointment via the CBP One app. Many refugees could not understand the error messages because those error messages were in English, even for those trying to make appointments using the Spanish version of application. Attorney Lindsay Toczylowski spent hours translating error messages for people desperately trying to make appointments. Several people asked Attorney Toczylowski if they can seek an exception to using CBP One because they

---

[12] Immigrant Defenders Law Center, Photo taken at Espacio Migrante Shelter, March 1, 2023, at Immigrant Defenders Law Center's clinic to assist asylum seekers with completing the CBP One application.
[13] Immigrant Defenders Law Center, Photo taken on February 6, 2023, at Espacio Migrante Shelter in Tijuana, Mexico at ImmDef's clinic to assist asylum seekers with completing the CBP One application.

CLP_PC_032368



are not safe in Tijuana. A mother told her about being trafficked with tears in her eyes and a baby on her hip. Many people at the shelter were waking up before dawn to try to get appointments, with no luck. Many people got an error message in English saying, "Time Slot Full." Some never even got that far because the application glitches and they could not get past the initial screen. In some cases, when people selected "Spanish" as their preferred language an error message appeared in English. Attorney Toczylowski met a 72-year-old woman who was confused and could not access the application at all on her cracked phone.

14

On March 1, 2023, twelve ImmDef staff members traveled to Tijuana, Mexico, to assist refugees with CBP One registration and to provide legal information. The ImmDef team members provided community education presentations at Borderline Crisis Center and a legal clinic at Espacio Migrante. ImmDef served people who fled Haiti, Bangladesh, Honduras, Venezuela, Cuba, and Mexico, among others. Migrant shelters in Tijuana have been helping families from various other countries as well, including Cameroon, Ivory Coast, and Russia.



Over 150 people, including families with children, attended the legal clinic to seek guidance on obtaining an appointment using the CBP One app. The CBP One app is mired with problems. It is only available in Spanish, English, and Haitian Creole leaving indigenous language speakers and people from most parts of the world without any means to seek an exception to Title 42.

15

---

14 Immigrant Defenders Law Center, Photo taken by Immigrant Defenders Law Center on February 6, 2023, at Pro Amore Dei depicting a glitch that asylum seekers were getting on their cell phones as they attempted to register for CBP One. ImmDef was providing a Know-Your-Rights presentation to asylum seekers to explain the CBP One requirement to asylum seekers as an exemption process to Title 42 in order to request asylum in the United States.
15 Immigrant Defender Law Center, Photo taken on February 6, 2023, at Pro Amore Dei shelter in Tijuana, Mexico where ImmDef was providing a legal clinic to assist asylum seekers with completing the CBP One application.

9

The ImmDef team observed in real time the CBP One app glitching, freezing, and breaking down. Families were unable to obtain appointments together when the app would not let them make an appointment on the same day. The Biden administration has made the CBP One process onerous and inequitable. As we have said before, and it remains true, there is very little justice to be found in the chaotic situation our government has created for migrants at the border.



Mickey Donovan, Legal Services Director at ImmDef, said it was an "absolutely gutting experience. One of the great privileges of being an attorney is to be able to educate people on their rights and empower them with knowledge so that they can at least understand their options and the processes before them. It was so demoralizing to have person after person come up to you and ask for help, and all we could do is offer sympathy, suggest redownloading the app (which didn't help) and wish them luck."

Oscar Huezo, Staff Attorney at ImmDef, met with ten people who all shared frustrations with the CBP One application. Many of those issues arose in the attempted scheduling of an appointment. Although they logged in at 6:00 a.m., the application was already bereft of any available appointments. Many relayed that they had been trying for weeks, and some stated that they had been trying for months. There were about six people who managed to select an appointment time, but they never received a confirmation email. They took a screenshot of the appointment time they were given, but when they arrived for that appointment at the U.S. port of entry, CBP told them they could not assist them because they did not have the confirmation email. Even

---

[16] Immigrant Defenders Law Center, Photo by Immigrant Defenders Law Center taken on February 6, 2023, at Pro Amore Dei shelter. This is one of several error messages ImmDef staff witnessed on that day while providing legal information to asylum seekers at the shelter.

CLP_PC_032370

when some managed to select their appointment date and time, the application limited the appointments to one single date and one time slot, and many applicants were trying to get that same appointment slot.

Attorney Huezo also met with a couple of people who stated that the application said they could not request an appointment because they were not near the POE, even though their actual location, as determined by the appl, showed they were located near the POE. They lived about 30 minutes away and had to drive to the area every day at 5:00 a.m. in the morning to try and schedule an appointment, often unsuccessfully because of the location issue.

Attorney Huezo met with two separate individuals who could not get past the authentication portion of the application because it would glitch and go back to the log in screen every time, they were asked to enter the code sent to their phone number. One of them had already bought two new cell phones to try and rectify the issue but even a new cell phone did not help. Attorney Huezo tried to help one of them delete and reinstall the application several times and it still did not work.

Attorney Huezo also got complaints about the photograph portion of the application. Many people were saying there was an update to the application where it asks for two photographs: once when you prepare the application and a second photo when you try to make the appointment. They claimed that it was often difficult to take the photographs, and even when they managed to take someone's photo, the appointment was no longer available.

ImmDef Staff Attorney Kiana Ajir stated that she could "sense and see the desperation and frustration in people's faces when they explained that their CBP One Application either did not work, kept crashing, or would not let them schedule an appointment." Several individuals told Attorney Ajir that they even purchased new phones for the sole purpose of scheduling the interview and, even then, they were unable to get to the appointment page. Some individuals had already completed the application but were not clear about whether that meant they had scheduled an interview with CBP. Other refugees needed help filling out the application. There were several times when filling out online forms that the application would crash or show "error" messages on the screen.

Many people Attorney Ajir helped could not even get past the facial recognition phase of the application, as their face was not being captured by the camera. Refugees told her that they would wake up every several hours through the night to check for appointments and could not find any available slots. Furthermore, when individuals wanted to add their family members to the application, their family members would need to be physically present with them at the time of filling out the application because of the facial recognition feature. Many refugees did not know that each family member must fill out the application and did not bring their family members with them to our legal clinic, resulting in them not being able to finalize the online application. Many others were waiting to be approved for an interview in hopes that they could join their family members in the United States.

CLP_PC_032371

**The Proposed Asylum Ban Rule Would Separate Refugee Families**

Like the Title 42 policy and other policies that block, ban, and deny asylum to refugees, this proposed rule would fuel family separations at the border. The administration's use of the CBP One app and denial of access to asylum for people who cannot schedule appointments through the app has already forced families to separate.[17] Families unable to secure CBP One app appointments together as a family unit have made the excruciating choice to send their children across the border alone to protect them from harm in Mexico.

ImmDef Managing Attorney Karina Ramos participated in a legal clinic held by ImmDef at Espacio Migrante shelter in Tijuana, Mexico. She met with families who were concerned about not getting appointments on the same day to enter the United States together. Families are in distress about what to do if one family member obtains a CBP One appointment prior to the rest of their family members. It causes some families to separate, which compounds the trauma they are already enduring as refugees.

Attorney Ramos met with a Guatemalan woman who had secured an appointment for herself but not for her toddler. The woman arrived at her appointment to be processed with her toddler but was told by CBP that only she could be processed. She was forced to remain in Mexico to try to re-register with her toddler. Attorney Ramos also met with another family from Honduras: a mother and father with a child who had been counseled that they could not register together because they were not married. They registered separately and while his partner and child secured appointments, the father had not been able to get a CBP One appointment. It was "wrenching" for Attorney Ramos to see them trying to decide whether the family should separate or try to re-register as a family and risk being stuck in Mexico for an unknown period.

Attorney Ramos met with a family consisting of a grandmother, her daughter who has a disability, and her daughter's two children. They had registered separately for CBP One appointments. The grandmother and toddler were registered together while the older child was registered with her mom. The mother needs help walking, so the older child needed to help her if they made it into the United States. They were questioning whether this was the right decision because the grandmother and toddler might not get an appointment for a long time, leaving them stranded in Mexico and separated from their loved ones.

**The Proposed Asylum Ban Traps Asylum Seekers in Danger**

The proposed asylum ban rule would have an insidious and devastating impact on the lives of asylum seekers stranded in Mexico waiting to be processed into the United States to seek asylum.

---

[17] Leutert, Stefanie and Caitlin Yates, The University of Texas at Austin, Strauss Center for International Security and Law, Asylum Processing at the U.S. Southern Border: February 2023, *available at* https://www.strausscenter.org/wp-content/uploads/Feb_2023_Asylum_Processing.pdf

CLP_PC_032372

The proposed asylum ban would require refugees to make an appointment using the CBP One app while in certain parts of Mexico closest to the U.S. border. Because the CBP One app is already in use, asylum seekers have been waiting at the U.S.-Mexico border for weeks trying to obtain an appointment. While they wait for appointments, they are trapped in some of the most dangerous cities and towns in the world, such as Tijuana. Forcing asylum seekers to remain in Mexico while they wait to seek asylum in the U.S. has caused harm to asylum seekers. Even the Secretary of Homeland Security has recognized the dangers that asylum seekers face while stranded at the U.S.-Mexico border. As stated by Secretary Alejandro Mayorkas in the Termination of the Migrant Protection Protocols memo dated October 29, 2021, MPP was a catastrophic policy and had to end as it was "…imposing substantial and unjustifiable human costs on the individuals who were exposed to harm while waiting in Mexico."[18]

In Mexico, asylum seekers and refugees face life-threatening violence, often from cartel members or even directly from the Mexican authorities. There have been over 13,000 attacks reported against asylum seekers and migrants stranded in Mexico under the Title 42 policy over the past two years alone.[19] Trapping asylum seekers in Mexico also exposes them to kidnapping.[20] Kidnappings of asylum seekers forced to remain in Mexico for prolonged periods of time were common under the Remain in Mexico program. In 2021, we provided counsel to a family enrolled in MPP whose two-year-old child was almost kidnapped when the family went to buy diapers. Fortunately, the child's father was able to hold on to his son, and the men drove off. The father reported the attempted kidnapping to the police, but the police officer simply told them not be out that late at night with a child because it is not safe. This happened only weeks after they were forced to leave a shelter because they had been there for about a year and could no longer stay at the temporary shelter.

Aside from kidnappings, asylum seekers wanting to exercise their right to request asylum in the United States Are often victims of other horrendous crimes. Since 2019, ImmDef attorneys have given consultations to hundreds of asylum seekers in Tijuana and Mexicali in Mexico. Asylum seekers have recounted stories of extortion by police and other Mexican officials, sexual harassment, rape, torture, and the attempted kidnapping of children. In Mexico, LGBTQ+ and Black refugees are discriminated against and harassed, and they are often victims of physical violence.

For instance, ImmDef assisted a Honduran family enrolled in MPP. In January and February 2021, the mom was threatened by her ex-partner who is member of the MS-13 gang. Her ex-partner told her the gang was looking for her in Mexico. Her ex-partner threatened to kill her and kidnap her 4-year-old son so that he could be raised to become a member of his gang.

ImmDef advised a pregnant Guatemalan woman stranded in Mexico because she could not enter the United States due to the Title 42 border closure. She fled persecution by gangs in Guatemala.

---

[18] DHS, Termination of the Migrant Protection Protocols DHS, at 2 (Oct. 29, 2021), *available at* https://www.dhs.gov/sites/default/files/2022-01/21_1029_mpp-termination-memo.pdf

[19] Human Rights First, "Title 42: Human Rights Stain, Public Health Farce" (Dec. 16, 2022); *available at* https://humanrightsfirst.org/library/title-42-human-rights-stain-public-health-farce/

[20] Jordan, Miriam, New York Times, 'I'm Kidnapped': A Father's Nightmare on the Border (Dec. 21, 2019), *available at* https://www.nytimes.com/2019/12/21/us/border-migrants-kidnapping-mexico.html

CLP_PC_032373

The gang had found her twice in Mexico, and she only narrowly escaped each time. Meanwhile, the gang had located her partner in Tijuana and beat him.

Discrimination and ill treatment of Black migrants in Mexico is also well-documented.[21] There have been incidents of hate crimes against Black asylum seekers throughout the implementation of the MPP and Title 42 policies under both the Trump and Biden administrations.[22] ImmDef represented a Black asylum seeker enrolled in MPP during the Trump administration who was falsely imprisoned and extorted by Mexican authorities, and harassed by local authorities in Tijuana due to his race.

LGBTQ+ migrants also suffer from appalling crimes in Mexico.[23] As reported by Human Rights First, LGBTQ+ asylum seekers who were blocked from entering the United States or expelled back to Mexico under Title 42 faced "grave harms."[24] Immigrant Defenders Law Center represented an Afro Cuban LGBTQ+ asylum seeker who was enrolled in MPP during the Biden administration and who, as she waited for her MPP hearings, was persecuted due to her sexual orientation by Mexican police.

**The Proposed Asylum Ban Will Result in Due Process Violations**

The proposed ban would result in serious due process violations, particularly as it would expand the use of expedited removal unless an asylum seeker passes a credible fear screening. With limited access to counsel and facing harsh conditions in detention centers, it would be extremely hard for asylum seekers to provide the details necessary to prove that the proposed asylum ban does not apply in their case and then pass a credible fear interview.

Access to counsel while in CBP custody is extremely rare, and CBP often restricts access to counsel for those held in border patrol stations. For example, in March 2022, ImmDef Attorney Margaret Cargioli attempted to speak with her Russian asylum-seeking client while her client was being held in CBP Custody. Attorney Cargioli was speaking with her client when the call was interrupted by a CBP officer who cut off  communication between Attorney Cargioli and her client. Attorney Cargioli was not able to contact her client while her client was detained in CBP custody where her client was held for approximately five days.

---

[21] Morrisey, Kate, San Diego Union Tribune, "Jamaican Asylum Seekers in Tijuana Facing Racism, Homophobia While They Wait", (Jan.3, 2022), *available at* https://www.sandiegouniontribune.com/news/immigration/story/2022-01-03/jamaican-asylum-seekers-tijuana-racism-homophobia

[22] The Black Alliance for Just Immigration, "There Is a Target on Us: The Impact of Anti-Black Racism on African Migrants at Mexico's Southern Border," January 2021, *available at* https://baji.org/wp-content/uploads/2021/01/The-Impact-of-Anti-Black-Racism-on-African-Migrants-at-Mexico.pdf.

[23] Lopez, Oscar, Reuters, "Mexico Sees Deadliest Year for LGBT+ people in five years, (May 15, 2020), *available at* https://www.reuters.com/article/us-mexico-lgbt-murders-trfn/mexico-sees-deadliest-year-for-lgbt-people-in-five-years-idUSKBN22R37Y

[24] Garcia, Teadoro, Human Rights First, "LGBTQ Asylum Seekers Still Facing Grave Danger Due to Title 42"(Aug. 12, 2022), *available at* https://humanrightsfirst.org/library/lgbtq-asylum-seekers-still-facing-grave-dangers-due-to-title-42/

CLP_PC_032374

In December 2019, Attorney Cargioli located her MPP client whose case had been terminated by an immigration judge at Chula Vista Border Patrol Station after searching for his whereabouts for about 18 days. Attorney Cargioli called to confirm that she could meet with her client in person. An official at the station confirmed that she could meet with her client, and Attorney Cargioli told them that she would visit her client the next day. A couple of hours after Attorney Cargioli had confirmed the visit, she received a call from the border patrol station that her client had to be transferred to Arizona. He was taken to a detention center in Arizona that day.

Asylum seekers who are banned by the rule during their credible fear interviews would have to meet a heightened screening standard in order to access immigration court hearings and would be subject to deportation if they cannot pass the screening. As discussed above, the proposed rule's attempt to illegally elevate the credible fear standard established by Congress violates the statute and congressional intent in setting a low screening threshold.

Detention conditions along the border are also notoriously inhumane. Asylum seekers detained in CBP custody have reported being provided insufficient or inedible food and water; lack of access to showers and other basic hygiene; and inability to sleep because of overcrowding, lack of adequate bedding, frigid conditions, and lights that are kept on all night.[25]

In 2021, ImmDef's Detained Youth Empowerment Program provided Know-Your-Rights presentations and conducted legal screenings for 2,356 unaccompanied children, many of whom were detained in CBP custody for more than the statutorily mandated 72-hour limit. Many were denied food, water, and medical care. And of those children that ImmDef encountered, 85 reported verbal harassment or abuse, 24 reported physical abuse, and two reported sexual abuse. In March 2020, Attorney Cargioli represented a family in CBP custody that had been held for days without access to a shower. One of the young children was ill and the parent was very concerned about the child's well-being. Instead of releasing the family from detention after an immigration judge terminated their Migrant Protection Protocol case, CBP kept the family in one border patrol station and then transferred them to another border patrol station. The migrant family contact a family member who was able to call an attorney who then referred the matter to ImmDef. It is extremely rare for people detained at border patrol stations to have the ability to contact family and attorneys.

## Conclusion

The proposed rule is illegal, inhumane, and discriminatory. The United States has the resources to implement a more humane asylum system at the southern U.S. border. Like the Trump administration's entry and transit bans, this proposed asylum ban will effectively deport refugees to places where they will suffer persecution and possible torture while also separating families. The proposed rule requires asylum seekers to use a deficient mobile app that discriminates based on access to resources, language skills, and an ability to wait indefinitely for an appointment slot, cutting off asylum access for many of the most vulnerable asylum seekers.

---

[25] Human Rights Watch, "They Treat You Like You Are Worthless: Internal DHS Reports of Abuses By U.S. Border Officials, (Oct. 2021), *available at* https://www.hrw.org/report/2021/10/21/they-treat-you-you-are-worthless/internal-dhs-reports-abuses-us-border-officials.

CLP_PC_032375

Immigrant Defenders Law Center calls on the administration to withdraw this proposed rule in its entirety. The Biden Administration must stop punishing migrants arriving at the southern U.S. border and instead allocate resources toward restoring a humane asylum processing system.

CLP_PC_032376

# MEXICO 2022 HUMAN RIGHTS REPORT

## EXECUTIVE SUMMARY

Mexico is a multiparty federal republic with an elected president and bicameral legislature.  Andrés Manuel López Obrador of the MORENA party won the presidential election in generally free and fair multiparty elections in 2018.  In the June 2021 midterm elections, citizens voted for all members of the Chamber of Deputies, 15 governors, state legislators, and mayors across the country.  The elections were generally free and fair.

The National Guard and state and municipal police are responsible for enforcing the law and maintaining order.  The National Guard, which began operations in 2019, is a largely military institution reporting to the Secretariat of National Defense.  In 2019 the government disbanded the Federal Police, and in 2020 all remaining assets and personnel transferred to the National Guard.  A 2022 constitutional amendment grants the president the authority to continue to use the armed forces for internal security through 2028.  Personnel seconded from the military form the majority of the National Guard.  The National Guard was formally transferred to the Secretariat of National Defense on September 16, effectively making it a branch of the military.  The Secretariat of National Defense and Secretariat of the Navy also play a role in domestic security, particularly in combating criminal groups.  The National Migration Institute, under the authority of the Interior Secretariat, is responsible for enforcing migration law.  Although authorities generally maintained effective control over the security forces, there were instances in which security force elements acted independently of civilian control.  There were reports that members of security forces committed some abuses.

Significant human rights issues included credible reports of:  unlawful or arbitrary killings by police, military, and other governmental officials; forced disappearance by government agents; torture or cruel, inhuman, degrading treatment or punishment by security forces; harsh and life-threatening prison conditions; arbitrary arrest or detention; restrictions on free expression and media, including violence against journalists; serious acts of government corruption; insufficient

CLP_PC_032428

investigation of and accountability for gender-based violence, including domestic or intimate partner violence; crimes involving violence or threats of violence targeting lesbian, gay, bisexual, transgender, queer, or intersex persons; and crimes involving violence or threats of violence targeting persons with disabilities.

Impunity and extremely low rates of prosecution remained a problem for all crimes, including human rights abuses and corruption.  There were reports some government agents were complicit with international criminal gangs, and prosecution and conviction rates were low for these abuses.

Criminal elements, including local and transnational gangs and narcotics traffickers, were significant perpetrators of violent crimes and committed acts of homicide, torture, kidnapping, extortion, human trafficking, bribery, intimidation, and other threats, resulting in high levels of violence and exploitation.  The government investigated and prosecuted some of these crimes, but the majority remained uninvestigated and unprosecuted.

# Section 1. Respect for the Integrity of the Person

## a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were several reports that government entities or their agents committed arbitrary or unlawful killings, often with impunity.  The National Human Rights Commission (CNDH) is responsible for independently investigating security force abuses, including killings, and may issue nonbinding recommendations for prosecution.  State human rights commissions investigate state and municipal police forces and may issue similar recommendations.  State and federal prosecutors are independent of the executive branch and have the final authority to investigate and prosecute security force abuses.

In April National Guard members killed student Yael Ignacio Rangel and wounded Alejandra Carrillo Franco after opening fire on the students' vehicle in Irapuato, Guanajuato, when the driver failed to heed a traffic stop.  Guanajuato Governor Diego Sinhué Rodríguez Vallejo characterized the killing as involving disproportionate force.  One officer was charged, and another was in pretrial

CLP_PC_032429

detention.

On August 31, Secretariat of National Defense (SEDENA) officers killed Heidi Mariana Pérez, age four, and wounded her brother Kevin Pérez in Nuevo Laredo, Tamaulipas, when they fired at the vehicle in which the children were traveling. Their mother, Cristina Araceli Pérez, said SEDENA tried to persuade the family to accept financial compensation in exchange for dropping the charges against the officers.

CNDH reported assailants killed 11 human rights defenders from January to August.  On January 27, unknown attackers assassinated human rights defender Ana Luisa Garduño, who was seeking justice for the killing of her daughter, Ana Karen Huicochea, in Temixco, Morelos (see also section 6, Indigenous Peoples). Criminal groups, especially drug cartels and gangs, were implicated in numerous killings, acting with impunity and at times in collusion with corrupt federal, state, local, and security officials.  On June 20, members of a criminal group killed two Jesuit priests and a tour guide in Cerocahui, Chihuahua, after the priests tried to provide first aid to the tour guide, whom the cartel members had pursued into a church.  The perpetrators removed the priests' and tour guide's bodies, which were discovered three days later.  Criminals also made two other individuals disappear during the incident, presumably by killing them.  Authorities arrested 17 persons linked to the killings but as of October 20 had not arrested the individuals who allegedly ordered the killings.

## b. Disappearance

There were reports of numerous forced disappearances by criminal groups, sometimes with allegations of collusion with authorities.  Investigations, prosecutions, and convictions of forced disappearance crimes were rare. Disappearances remained a persistent problem throughout the country, especially in areas with high levels of cartel- or gang-related violence.

Federal and state databases tracking disappearances were incomplete and had data-sharing problems; forensic systems were highly fragmented between the local, state, and federal levels, and the volume of unsolved cases was far greater than the forensic systems were capable of handling.  In its data collection, the government

CLP_PC_032430

often merged statistics on forcibly disappeared persons with missing persons not suspected of being victims of forced disappearance, making it difficult to compile accurate statistics on the extent of the problem.

As of October 31, the Prosecutor General's Office reported 2,344 federal investigations underway into disappearances involving approximately 3,930 persons.  Nongovernmental organizations (NGOs) and family members of disappeared persons alleged prosecutors undercounted the actual number of cases.

According to the National Search Commission (CNB), which coordinates state and federal search efforts, as of December 2, there were 108,521 missing or disappeared persons in the country.  An estimated 90 percent of disappearances occurred after January 1, 2006, according to search collectives and advocacy groups familiar with the database.  Civil society groups reported there were approximately 15,000 disappearances not linked to precise dates.  The highest number of cases on record occurred during the year, with 9,684 reported missing or disappeared, up from 9,624 reported in 2021.  As of December 30, the states of Mexico City (2,455), Nuevo Leon (2,441), and Veracruz, (1,557) reported the most disappearances.

The government made efforts to prevent, investigate, and punish acts of forced disappearance involving government agents.  From January to August 17, CNDH received seven complaints accusing government agents of forced disappearances, including three against the army and three against the Attorney General's Office.  In April 2021, authorities arrested 30 marines and charged them with forced disappearances in Nuevo Laredo, Tamaulipas, in 2018.  As of July, 19 marines had been exonerated and 11 were awaiting trial.  In July the head of the human rights unit of the Secretariat of the Navy apologized to families of the victims, marking the first time the armed forces apologized for committing forced disappearances.  In January the Interior Secretariat's Undersecretary for Human rights, Alejandro Encinas, publicly apologized to the family of Ch'ol Indigenous group member Antonio González Méndez, who was forcibly disappeared in Chiapas in 1999.

On August 18, Undersecretary Encinas released a report confirming that the 2014 disappearances of 43 students from the Ayotzinapa Rural Teachers' College in Iguala, Guerrero, was a "state" crime.  The report found various local, state, and

CLP_PC_032431

federal officials – by commission or omission – were involved in carrying out or covering up crimes in conjunction with the atrocities.  On August 19, the Office of the Attorney General arrested former Attorney General Jesús Murillo Karam on charges of forced disappearances, negligence, and obstruction of justice and issued arrest warrants for 83 suspects.  On January 15, authorities arrested suspect Mateo "N" for his alleged involvement in the disappearances of the 43 students as well as his participation in criminal group activities.  On August 26, Encinas alleged that General José Rodríguez Pérez ordered the assassination of six students who were being kept in a warehouse, citing anonymous calls made during the incident to the state's crime tip line.  Victims' relatives and civil society representatives said the commission's August 18 report showed political will to advance the investigation and punish the perpetrators, but they expressed doubt whether there was sufficient evidence to secure convictions.  As of June 2021, authorities had identified the remains of only three students.

In March the Interdisciplinary Group of Independent Experts (GIEI), appointed by the Inter-American Commission on Human Rights (IACHR), presented its third report on Ayotzinapa.  The GIEI asserted the armed forces knew of the attack as it happened, failed to protect evidence at the alleged crime scene, and refused to provide crucial information during the investigations of the 43 students who disappeared.  The GIEI found videos of navy officers manipulating the Cocula dump where the government claimed the 43 students' bodies had been abandoned, six hours before the Attorney General's Office secured it.  The GIEI also documented the armed forces' use of torture in the investigation and frequent surveillance of the students, families, human rights groups, and the GIEI.

As of October 2021, the Special Unit for the Investigation and Litigation of the Ayotzinapa case (UEILCA) had arrested more than 80 suspects, including army Captain José Martínez Crespo, Iguala municipal police Chief Felipe Flores Velázquez, and Iguala municipal police officer Francisco Salgado Valladares.  The government continued to pursue the extradition of Tomás Zerón from Israel, although Mexico and Israel do not have an extradition agreement.  Zerón led the investigation of the case through the former criminal investigation unit in the Attorney General's Office when the students were disappeared and faced an outstanding warrant on charges including torturing alleged perpetrators to force

CLP_PC_032432

confessions, conducting forced disappearances, altering the crime scene, manipulating evidence, and failing to perform his duties.  In addition to the Zerón warrant, UEILCA issued 12 warrants and made 10 arrests for investigative irregularities, such as torture and obstruction of justice.  In August former special prosecutor and UEILCA lead attorney Omar Gómez Trejo resigned, citing differences with Attorney General Alejandro Gertz Manero over the credibility of the evidence linking former Attorney General Jesús Murillo Karam to the 43 Ayotzinapa students' disappearances and the arrest warrants UEILCA issued for members of the military.

Civil society and families of the disappeared said the government's actions to prevent and respond to disappearances were largely inadequate to address the scale of the problem.  State search committees often lacked the capacity to fulfill their mandate, according to NGOs.

The CNB reported between December 2018 and November 2021, they carried out 3,335 exhumations.  The CNB reported authorities identified 1,336 bodies and returned 1,019 to their families.  In June authorities reported they had recovered 165 bone fragments and 11 pieces of possible forensic evidence from Cuauhtemoc, Chihuahua.

## c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, and Other Related Abuses

Federal law prohibits torture or cruel, inhuman, or degrading treatment or punishment, as well as the admission of confessions obtained through illicit means as evidence in court.  Despite these prohibitions, there were reports of security forces torturing suspects.

Between January and August 17, CNDH registered 32 complaints of torture and 94 for arbitrary detention.  Of these complaints, 43 were against members of the National Guard, 37 in the Prosecutor General's Office, 24 against SEDENA, and 17 against the Secretariat of the Navy (SEMAR).  Between January and August, there were an additional 120 complaints of cruel, inhuman, or degrading treatment.  The abuses were reportedly committed by personnel in the Secretariat of Security, National Guard, Attorney General's Office, SEDENA, and National Migration

CLP_PC_032433

Institute.

There were accusations of sexual abuse committed by authorities during arrest and detention.  In June the Interior Secretariat published a report entitled *National Diagnostic of Sexual Torture Committed Against Incarcerated Women in Mexico*, which revealed 79 percent of the women interviewed had experienced some form of torture while imprisoned.  Of these, 44 percent were subjected to acts of sexual torture.  According to the report, police investigators and other police personnel committed the majority of these crimes.

On July 20, former Puebla Governor Mario Marín lost a motion requesting conditional release while awaiting trial for the torture of journalist Lydia Cacho, who exposed Marín and several business leaders' involvement in a child sex trafficking ring in 2005.

Impunity for torture was prevalent among the security forces.  NGOs said authorities failed to investigate torture allegations adequately.  As of October 31, the Prosecutor General's Office was investigating 3,040 torture-related inquiries under the previous inquisitorial legal system (initiated prior to the 2016 transition to an accusatorial system) and 818 investigations under the accusatorial system.  According to the NGO Mexican Commission for the Defense and Promotion of Human Rights, from 2006 to 2020, federal authorities issued three sentences for torture and received 27 complaints.

There is no single independent oversight mechanism to review police actions, but many federal and state security and justice sector institutions have internal affairs units providing internal supervision and promoting best practices for transparency and accountability.  The government's National Council of Norms and Labor Competencies certified law enforcement internal affairs investigators and created standard internal affairs training to promote transparency and accountability.  Most internal affairs units, however, were insufficiently staffed and funded, according to observers.  SEDENA and SEMAR have human rights units to create protocols, provide training, and investigate allegations of abuses.  The armed forces operated a military justice system to hold human rights abusers accountable.

CLP_PC_032434

**Prison and Detention Center Conditions**

Conditions in prisons and detention centers were often harsh and life threatening.

**Abusive Physical Conditions:**  According to the 2021 National Survey for Incarcerated Persons, there were 220,500 inmates, of which 94 percent were men, as of July 2021.  The Federal Prison System reported 288 state and federal facilities with a designed capacity for 217,064.  According to Legal Assistance for Human Rights (Asilegal), prisons were grossly overcrowded.  On October 3, the Security Secretariat for the State of Mexico reported the state's penitentiary system was at 147 percent of capacity.

According to the CNDH 2021 *National Diagnostic of Penitentiary Supervision* study, 44 of 233 prisons had self-government structures in which inmates carried out staff functions.  In March the CNDH National Prevention Mechanism for Torture (MNPT) visited 27 prisons and assessed self-government structures subjected inmates to extortion, attacks, and inhuman treatment.  Criminal groups reportedly continued to oversee illicit activities from within penitentiary walls, and rival drug cartel members often fought in prison.  An August clash between cartel groups in Ciudad Juárez resulted in killings of two prisoners and 20 injured.  The confrontation spilled into the city, killing nine civilians.

According to civil society groups, migrants at some detention centers faced abuse when commingled with gang members and other criminals.  In October the Institute of Migration reported the immediate closure of the Cupapé detention center in Chiapa de Corzo, Chiapas, due to unsanitary conditions, after CNDH visited the facility.  In November 2021, NGOs said their legal defense activities and monitoring of detention conditions were systematically hindered due to threats and harassment.  In some cases, NGO access to migratory detention centers was blocked as well.  Civil society organizations said individuals in migratory detention reported cases of abuse (threats, degrading treatment, no access to information, human rights violations); negligence (spoiled food, bad conditions in general); and repeated incidents of torture (sensory deprivation, deprivation of vital needs, difficulty sleeping due to lights being on full time); and family separation.  These conditions resulted in anxiety, depression, and posttraumatic stress disorder.

CLP_PC_032435

**Administration:**  Authorities did not always conduct investigations into credible allegations of mistreatment.

**Independent Monitoring:**  The government permitted independent monitoring of prison conditions by the International Committee of the Red Cross, CNDH, and state human rights commissions.

## d. Arbitrary Arrest or Detention

Federal law prohibits arbitrary arrest and detention and provides for the right of any person to challenge the lawfulness of his or her arrest or detention in court; however, the government sometimes failed to observe these requirements.

**Arrest Procedures and Treatment of Detainees**

The constitution allows any person to arrest another if the crime is committed in his or her presence.  A warrant for arrest is not required if an official has direct evidence regarding a person's involvement in a crime, such as having witnessed the commission of a crime.  In a 2018 report, the domestic think tank Mexico Evalua determined that 90 percent of all arrests fell under this category.  Bail is available for most crimes, except 22 crimes including violent offenses, and crimes involving criminal groups.  In most cases, the law requires detainees to appear before a judge for a custody hearing within 48 hours of arrest, during which authorities must produce sufficient evidence to justify continued detention.  This requirement was not followed in all cases, particularly in remote areas of the country.  In cases involving criminal groups, the law allows authorities to hold suspects up to 96 hours before requiring them to seek judicial review.

The procedure known in Spanish as *arraigo* (a constitutionally permitted form of pretrial detention employed during the investigative phase of a criminal case before probable cause is fully established), allows, with a judge's approval, for certain suspects to be detained prior to filing formal charges.  Following the introduction of the accusatorial justice system, however, there was a significant reduction in the number of persons detained in this manner, falling from more than 1,900 in 2011 to 25 in 2022.  An additional February 2021 reform mandates pretrial detention for femicides (see section 6).

CLP_PC_032436

Some detainees complained of a lack of access to family members and to counsel after police held persons in isolation for several days and made arrests arbitrarily without a warrant.  Police occasionally failed to provide impoverished detainees access to counsel during arrests and investigations as provided for by law, although the right to public defense during trial was generally respected.  Authorities held some detainees under house arrest.

**Arbitrary Arrest:**  Allegations of arbitrary detentions occurred throughout the year.  The IACHR, the UN Working Group on Arbitrary Detention, and NGOs expressed concerns regarding arbitrary detention and the potential for it to lead to other human rights abuses.  Between January and August 17, CNDH recorded 94 complaints of arbitrary detention.

On May 29, municipal police in Chiapas arbitrarily arrested human rights defender Manuel Sántiz Cruz without notifying him of the reason for his detention.  On June 5, Aguascalientes municipal police detained deputy Isaac Montoya and other persons during state-level elections.  On June 27, Oaxaca municipal police reportedly detained transgender Indigenous woman Lizeth Mendoza for alleged robbery.  Police cut her hair and forced her to wear men's clothes.  She was released on July 2 for lack of evidence.

**Pretrial Detention:**  Lengthy pretrial detention was a problem, and authorities did not always promptly release those detained unlawfully.  The law provides time limits and conditions on pretrial detention, but federal authorities sometimes failed to comply with them since caseloads far exceeded the capacity of the federal judicial system.  Abuses of time limits on pretrial detention were endemic in state judicial systems.  On November 24, the Supreme Court eliminated automatic pretrial detention for fraud and tax crimes.  Activists claimed the decision did not go far enough to protect habeas corpus rights, but local legal experts noted the decision could hinder the government's ability to curb financial crimes.  The UN Office of the High Commissioner for Human Rights (OHCHR) documented cases in the states of Mexico and Chiapas in which detainees remained in pretrial detention for more than 12 years.  A 2019 constitutional reform increased the number of crimes for which pretrial detention is mandatory and bail is not available, including armed robbery, electoral crimes, fuel theft, and weapons possession.  An additional February 2021 reform mandated pretrial detention for

CLP_PC_032437

femicides, sexual violence against minors, forced disappearances, and corruption. As a result, the number of pretrial detainees had increased 25 percent since 2018, and pretrial detainees comprised 42 percent of all prisoners, according to National Statistical Institute (INEGI) figures.  INEGI reported pretrial detainees increased by 8 percent from 2020 to 2021.

On July 18, a Mexico State judge ruled Verónica Razo would remain in pretrial detention for kidnapping and participating in criminal group activities, after 11 years awaiting trial.  The UN Working Group on Arbitrary Detention called for her release, and the Federal Defense Public Institute said police "sexually tortured" her and forced her to plead guilty.  Brenda Quevedo Cruz remained in prison as of December 12, despite a 2020 announcement by authorities they would release her. Quevedo Cruz had been in prison for alleged organized crime and kidnapping of Hugo Alberto Wallace without trial since 2007.

## e. Denial of Fair Public Trial

Although the constitution and law provide for an independent judiciary, court decisions were susceptible to improper influence by both private and public entities, particularly at the state and local level, as well as by transnational criminal organizations.  Authorities sometimes failed to respect court orders, and arrest warrants were sometimes ignored, consistent with the lack of judicial independence and rule of law throughout the legal system.  Across the criminal justice system, many actors lacked the necessary training and capacity to carry out their duties fairly and consistently in line with the principle of equal justice.

**Trial Procedures**

The law provides for the right to a fair and public trial, and the judiciary generally enforced the right.

Defendants have the right to an attorney of their choice at all stages of criminal proceedings.  By law, attorneys are required to meet professional qualifications to represent a defendant.  Not all public defenders were qualified, however, and often the state public defender system was understaffed.  According to the Center for Economic Research and Teaching, most criminal suspects did not receive representation until after their first custody hearing, thus making individuals

CLP_PC_032438

vulnerable to coercion to sign false statements prior to appearing before a judge.

Defendants have the right to free assistance of an interpreter, if needed, although interpretation and translation services for Indigenous languages were not always available. According to the Indigenous Professional Center for Advice, Advocacy and Translation, Indigenous defendants who did not speak Spanish sometimes were unaware of the status of their cases and were convicted without fully understanding the documents they were instructed to sign.

**Political Prisoners and Detainees**

There were no reports of political prisoners or detainees.

**Civil Judicial Procedures and Remedies**

Citizens have access to an independent judiciary in civil matters to seek civil remedies for human rights abuses. For a plaintiff to secure damages against a defendant, authorities first must find the defendant guilty in a criminal case, a significant barrier due to the relatively low number of criminal convictions.

## f. Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence

The law prohibits arbitrary or unlawful interference with privacy, family, home, or correspondence and requires search warrants. There were some complaints of illegal searches or illegal destruction of private property. By law the government may collect biometric data from migrants.

# Section 2. Respect for Civil Liberties

## a. Freedom of Expression, Including for Members of the Press and Other Media

The law provides for freedom of expression, including for members of the press and other media, and the government generally respected this right. Most newspapers, television stations, and radio stations were privately owned. The government had minimal presence in the ownership of news media but remained a

CLP_PC_032439

significant source of advertising revenue for many media organizations, which at times influenced coverage.  Media monopolies, especially in small markets, at times constrained freedom of expression.

**Freedom of Expression:**  Independent media were active and expressed a wide variety of views without restriction but often self-censored due to fear of reprisals from government officials and transnational criminal organizations.  Journalists could criticize the government and discuss matters of general interest with no restrictions.  Politicians, including President López Obrador, publicly discredited and criticized such journalists to present them as biased, partisan, and corrupt.

Official discrediting of press workers worsened beginning in June 2021, when authorities introduced the regular inclusion of a "Who's Who in Lies" section to the president's morning press conference to expose journalists who allegedly reported fake news.  On February 1, the special rapporteur for freedom of expression for the IACHR said President López Obrador should suspend this segment of his morning conference given the escalation of violence against journalists.

**Violence and Harassment:**  Journalists were killed or subjected to physical and cyberattacks, harassment, and intimidation (especially by state agents and transnational criminal organizations) in response to their reporting.  This limited media's ability to investigate and report, since many of the reporters who were killed covered crime, corruption, and local politics.  High levels of impunity, including for killings or attacks on journalists, resulted in self-censorship and reduced freedom of expression and the press.  The government's National Protection Mechanism (NPM) aimed to provide a measure of protection for journalists and human rights defenders at risk, issue protection recommendations to corresponding authorities at state and municipal levels, and increase coordination among federal, state, and local authorities.  The NPM provided panic buttons, bodyguards, and temporary relocation to journalists and human rights defenders.

In August the Committee to Protect Journalists reported 15 journalists had been killed since the beginning of the year, with 11 of the killings linked to the journalists' work.  According to civil society actors, at least 15 journalists were killed as of September 6:  José Luis Gamboa Arenas, Sheila Johana García, and

CLP_PC_032440

Yessenia Mollinedo Falconi (Veracruz); Margarito Martínez Esquivel and Lourdes
Maldonado (Baja California); Roberto Toledo and Armando Linares (Michoacán);
Jorde Camero and Juan Arjón López (Sonora); Heber López (Oaxaca); Juan Carlos
Muñiz (Zacatecas); Luis Enrique Ramírez Ramo (Sinaloa); Antonio de la Cruz
(Tamaulipas); Ernesto Méndez (Guanajuato); and Fredid Román (Guerrero).

The NGO Article 19 registered 331 attacks against journalists from January to
June; approximately half the cases were against journalists who covered corruption
and politics.

In February President López Obrador promised to address impunity for journalist
killings, and beginning in March, the undersecretary for citizen security started
presenting a weekly "zero impunity report" during the daily press conferences.  As
of August 18, authorities had detained 29 suspects and charged 21 in connection
with the killing of 12 journalists.

In Chiapas journalists Juan de Dios García and María de Jesús Peters were
reportedly forced to flee the country due to death threats.  García and Peters, who
covered migration in their reporting for 30 years and collaborated with several
international media outlets, allegedly received repeated threats from individuals
claiming to be part of a cartel.  During the year, the threats reportedly escalated to
death threats against them and their daughter.  In May they fled to the United
States through the Reporters Without Borders Temporary Reception Program for
Latin American Journalists and subsequently took refuge in Spain.

The Interior Secretariat registered 632 verbal and physical attacks against
journalists between 2012 and 2021, 47 percent of which the secretariat attributed to
public servants.  The most common aggressions were intimidation and harassment,
followed by threats and physical attacks, according to civil society groups.  In
December 2021, the civil society group Communication and Information on
Women reported there were 642 attacks against women journalists between
December 2018 and December 22, 2021.  The most common attacks women
suffered were intimidation, harassment, threats, and discreditation.

Between 2017 and June, the Office of the Special Prosecutor for Crimes against
Journalists, a unit in the Prosecutor General's Office, charged 185 persons with

CLP_PC_032441

crimes against journalists.  For example, in February the office issued three arrest warrants in the case of the 2020 killing of Juan Nelcio Espinoza, an independent journalist in Piedras Negras, Coahuila, who died while in police custody.

Digital media journalists covering stories such as crime, corruption, and human rights violations experienced physical violence and online abuse.  Online discrimination, harassment, and threats were problems particularly for women journalists and politicians, as well as any individual and organizations advocating for women's rights.

**Censorship or Content Restrictions for Members of the Press and Other Media, Including Online Media:**  Human rights groups reported that some state and local governments censored media.  Journalists reported altering their coverage due to a lack of government protection, attacks against members of media and newsrooms, and threats or retributions against their families, among other reasons. There were reports of journalists practicing self-censorship due to threats from criminal groups and government officials.

Freedom of expression advocacy groups reported the government, despite reductions in its advertising budgets, continued to have a strong financial impact and influence on the largest media companies.  According to advocacy groups, no information was available concerning the criteria through which the government chooses media outlets for public advertising.

On April 11, the Yucatan State Prosecutor's Office threatened six media outlets with fines and arrests if they did not remove stories regarding corruption of local public officials.

**Libel/Slander Laws:**  There are no federal criminal laws against defamation, libel, or slander; however, nine states have criminal laws regarding these three acts.  In four states, the crimes of defamation and libel are prosecuted, with penalties ranging from three days to five years in prison and fines for committing defamation or slander, both considered "crimes against honor."  Slander is punishable under the criminal laws of five states, with sentences ranging from three months to six years in prison and fines.  Twenty-five states have laws protecting authorities from alleged insults.  Five states have laws that restrict the

CLP_PC_032442

publishing of political caricatures or "memes" but seldom enforced them.  In addition to criminal libel and defamation laws, civil law defines "moral damage" as similar to defamation concerning harm to a person's "feelings, affections, beliefs, dignity, honor, reputation, and privacy," according to the NGO Committee to Protect Journalists.

A 2016 Supreme Court ruling removed the cap on fines for moral damages, leaving journalists vulnerable to exorbitant fines.  In 2019 a Mexico City court ordered academic Sergio Aguayo, a columnist of the daily newspaper *Reforma* and human rights defender under the NPM, to pay a fine of 10 million pesos ($500,000) in moral damages to former Coahuila Governor Humberto Moreira.  On February 17, Moreira sued Aguayo again for defamation.  On March 16, the Supreme Court cancelled the fine.  According to civil society representatives, libel and defamation proceedings averaged three cases per month.  The Puebla state government sued the news outlet *E-Consulta* seven times due to its reporting.

**Nongovernmental Impact:**  Criminal groups exercised grave influence over media outlets and reporters, threatening individuals who published critical views of criminal groups.  Concerns persisted regarding criminal groups' use of physical violence in retaliation for information posted online, which exposed journalists, bloggers, and social media users to the same level of violence faced by traditional journalists.  For example, journalists in Nogales, Sonora, said they were aware of unspoken red lines in covering organized crime and that crossing lines, such as mentioning the name of an alleged assailant, could result in personal harm.  A civil society organization documented at least 42 attacks by criminal organizations against journalists and assessed at least 15 of the 19 journalist killings in 2021 and the first six months in 2022 were possibly linked to criminal groups.

On February 10, gunmen killed Heber López Vásquez, founder of the news site *NotificiasWeb*, in Oaxaca.  He worked primarily on highlighting government corruption, and on February 9, he published a report regarding Arminda Espinosa Cartas, a municipal officer from Salina Cruz, whom he accused of corruption and coercing votes.  Richard N. Espinosa, Arminda's brother, was arrested in connection with the killing.

In July CNDH issued a recommendation to Interior Secretariat and Oaxaca

CLP_PC_032443

authorities to provide comprehensive reparations and psychosocial attention for damages to the family of journalist Gustavo Sánchez Cabrera.  CNDH stated that authorities had failed to protect Sánchez, who had been enrolled in the NPM following an attempt on his life in 2020 until his June 2021 killing by unidentified individuals.  The threat against journalists by criminal groups was particularly high in the states of Guerrero, Sonora, Veracruz, and Michoacán.  On February 21, the MNPT documented that journalist Héctor Valdez received death threats and beatings for reporting on inmates' prison conditions.

**Internet Freedom**

The government did not restrict or disrupt access to the internet or block or filter online content.

According to Freedom House, state and nonstate actors increasingly used legal threats and other methods to pressure social media platforms, web-hosting providers, and individual users to remove content.  Article 19 recorded 29 removals of journalistic content in 2021; nearly 60 percent of the affected content addressed corruption or politics.  In April a Yucatán judge ordered six online outlets to remove their reporting on alleged corruption by a former government official and the related revocation of her pension.  The order gave the outlets 24 hours to comply and threatened fines and arrests of up to 36 hours for noncompliance.

NGOs alleged that provisions in laws threatened the privacy of internet users by forcing telecommunication companies to retain data for two years, providing real-time geolocation data to police, and allowing authorities to obtain metadata from private communications companies without a court order.  While the Supreme Court upheld the provisions, it noted the need for authorities to obtain a judicial warrant to access user metadata.

Twitter users posted threats against journalists who asked difficult questions of government officials during press engagements and in some cases disseminated the journalists' identities and media outlets and made veiled threats.

CLP_PC_032444

**Restrictions on Academic Freedom and Cultural Events**

There were no government restrictions on academic freedom or cultural events, but civil society reported that harassment and intimidation of academic institutions by the federal government increased.

## b. Freedoms of Peaceful Assembly and Association

The law provides for the freedoms of peaceful assembly and association, and the government generally respected these rights, with some exceptions.  Twelve states have laws restricting public demonstrations.  There were reports of security forces using excessive force against demonstrators.  Government failures to investigate and prosecute attacks on protesters and human rights defenders resulted in impunity for these crimes, consistent with high impunity rates for all crimes. Amnesty International and other NGOs reported that acts of excessive use of force and arbitrary detention occurred against women protesters, especially those protesting gender-based violence.

In May police reportedly beat lesbian, gay, bisexual, transgender, queer, and intersex (LGBTQI+) protesters demanding marriage equality in Toluca, state of Mexico.  Journalists covering the protest were also injured.  On June 10 in Querétaro, police allegedly and arbitrarily detained environmental supporters gathering in protest of water privatization.

## c. Freedom of Religion

See the Department of State's *International Religious Freedom Report* at https://www.state.gov/religiousfreedomreport/.

## d. Freedom of Movement and the Right to Leave the Country

Federal law provides for freedom of internal movement, foreign travel, emigration, and repatriation, and the government generally respected these related rights.

**In-country Movement:**  In May the Supreme Court overturned a legal provision that allowed immigration agents to stop anyone and demand proof of their legal status.  The court declared the existing immigration law violates the constitutional

CLP_PC_032445

rights to equality and nondiscrimination, since it had a disproportionate impact on Indigenous and Afro-Mexican persons.  It also found the law violates the constitutional right to freedom of movement.

There were numerous instances of armed groups limiting the movements of migrants, including by threats and acts of kidnapping, extortion, and homicide.  Criminal groups dominated migrant smuggling operations and often kidnapped, threatened, and extorted migrants to pay a fee for facilitating northbound travel.

## e. Protection of Refugees

The government cooperated with the Office of the UN High Commissioner for Refugees (UNHCR), International Organization for Migration, and other humanitarian organizations in providing protection and assistance to refugees, asylum seekers, and other persons of concern.

**Access to Asylum:**  Federal law provides for granting asylum, refugee status, or complementary protection to those fleeing persecution or facing possible threats to their life, security, or liberty in their country of origin; this right was generally respected.  The government has an established procedure for determining refugee status and providing protections.  The government worked with UNHCR to improve access to refugee status determinations, to improve shelter and reception conditions for vulnerable migrants and asylum applicants and support local integration programs (including access to school, work, and other social services) for those approved for refugee and complementary protection status.

**Abuse of Migrants and Refugees:**  The press, international organizations, and NGOs reported targeting and victimization of migrants and asylum seekers by criminal groups and in some cases by police, immigration officers, and customs officials, including at land borders and airports.  There were numerous instances of criminal armed groups extorting, threatening, or kidnapping asylum seekers and other migrants.  In many parts of the country, human smuggling organizations wielded significant power, and media alleged frequent collusion among local authorities.  There were credible reports of gender-based violence against migrants while migrating in and through the country.  There were also credible reports of recognized asylum seekers being denied movement across the country and

CLP_PC_032446

detained by migration authorities.  Civil society groups reported migration authorities did not provide information regarding access to request asylum and migratory regularization and, in some cases, dissuaded migrants from pursuing such alternatives.  Rather, they encouraged migrants to accept voluntary return to their countries of origin.

The government did not detain migrating children and generally exempted accompanying adults from detention to preserve family unity.  Between January and June, children constituted 15 percent of irregular migrant flows identified by authorities; 26 percent of the children were unaccompanied.  Child protection authorities lacked sufficient capacity to shelter and process migrant children and families, and the government announced efforts to strengthen infrastructure for migrating children.  Between September 2021 and June, the National System for Integral Family Development transferred 1.57 billion pesos ($78.5 million) to 28 states to strengthen their capacity to respond to child migration.

The government increased efforts to target human smuggling organizations with limited results.  In July the Prosecutor Attorney General's Office arrested five alleged smugglers in Nuevo León.  Authorities accused the suspects of smuggling 81 migrants, of whom 19 were minors.

Obstacles to accessing international protection related most closely to capacity limitations and lack of coordination between the relevant agencies, as opposed to official government policy.  The Interior Secretariat reaffirmed its commitment to protect refugee applicants even as the country experienced an unprecedented number of applicants.

The MNPT issued precautionary measures calling on the Institute of Migration and National Guard authorities to protect two migrants whom immigration agents tortured in migratory stations.  In April MNPT representatives toured the migratory station in Guadalupe, Nuevo León, where they learned of a Honduran who was tortured by migratory authorities after trying to escape.  In June the MNPT received a report from the NGO Asylum Access indicating a Honduran migrant was tortured by immigration and National Guard agents in a migratory station in Piedras Negras, Coahuila.

CLP_PC_032447

## f. Status and Treatment of Internally Displaced Persons

The NGO Mexican Commission for the Defense and Promotion of Human Rights identified nine incidents between January and May of mass forced internal displacement (defined as the displacement of at least 10 families or 50 individuals) due to violence.  Violence by criminal groups often prompted the incidents, which took place in 10 states and displaced 250,000 to 380,000 persons, according to NGOs and government data.  Land conflicts, social and ethnic violence, or local political disputes also caused significant displacement.  Forced internal displacement disproportionately affected Indigenous communities.

The government, in conjunction with international organizations, made efforts to promote the safe, voluntary return, resettlement, or local integration of internally displaced persons (IDPs).  The COVID-19 pandemic generated additional risks and exacerbated IDP vulnerabilities, including overcrowding in shelters and difficulty accessing food, basic health care, and education.  IDPs represented 40 percent of all migrant shelter residents in Ciudad Juárez.  Most reported fleeing violence in their home states of Zacatecas, Michoacán, and Guerrero.  The National Institute for Indigenous People (INPI) had a program to assist displaced Indigenous and Afro-Mexican women.

Three states have state-level IDP laws, but the country does not have a federal internal displacement law, which created problems in resource allocation and interagency governmental coordination.  There were reports state, federal, and local authorities made little progress in assisting the local integration of IDPs waiting to cross into the United States.  Civil society representatives assessed there were no known efforts to promote the voluntary return of IDPs to states with high levels of violence due to security concerns.  On September 9, UN Special Rapporteur for the Human Rights of Internally Displaced Persons Cecilia Jimenez Damary recognized some advances at the federal and state level but called for action in approving the proposal for the General Law to Prevent, Assist, and Comprehensively Repair Internal Forced Displacement, stalled in the Senate since 2020, and for allocating resources to prevent displacement, assist victims, and create durable solutions.

In January approximately 3,000 residents in Tepalcatepec, Michoacán, were

CLP_PC_032448

displaced after alleged attacks the Cartel Jalisco Nueva Generación carried out using explosives against rival Cartel Unidos.

In March approximately 45 families (240 persons) returned to their homes in Zihuaquio, Guerrero, after being forcibly displaced in 2020 due to activities and violence of the Jalisco cartel.

# Section 3. Freedom to Participate in the Political Process

Federal law provides citizens the ability to choose their government through free and fair periodic elections held by secret ballot and based on universal and equal suffrage.

## Elections and Political Participation

**Recent Elections:**  International observers considered the 2021 midterm elections (legislative, gubernatorial, and local) to be generally free and fair, with only minor reports of irregularities.  Local commentators pointed to the electoral authorities' quick and transparent publishing of results as increasing citizen trust in the electoral and democratic system.  The midterm elections, the largest in the country's history due to the record number of more than 20,000 offices up for election, had a 52 percent turnout, a record for a nonpresidential election.  In June six states with a combined population of approximately 12 million held gubernatorial elections in a process observers considered to be generally free and fair, with the ruling coalition winning in four and the opposition in two.

On April 10, citizens participated in a presidential recall election, with voters deciding whether President López Obrador should remain in office or step down before the end of his six-year term.  Turnout was low, with only 17 percent of registered voters participating, and therefore was not legally binding (40 percent turnout was required).  Close to 92 percent of those who participated voted in favor of López Obrador remaining in office until the end of his term.

**Political Parties and Political Participation:**  For the 2021 electoral process, the National Electoral Institute (INE) established the Three Out of Three Against Violence initiative, which required candidates to declare any history of domestic violence, sexual offenses, or failure to pay alimony.  The INE requested

CLP_PC_032449

information from all states, reviewed a sample of 1,177 of the 6,962 federal deputy candidates, and canceled the registration of three candidates for filing false reports.

During the midterm electoral season (September 2020 to June 2021), assailants killed 36 candidates and 64 politicians.  The rate of aggression against political figures during the election cycle was on par with the 2018 election, one of the most violent political periods in recent history.  The states where the most political violence occurred were Veracruz, followed by Guerrero and Guanajuato. Municipal candidates and challengers seeking to oust incumbents were the most common victims of political violence, with victims spread across the political spectrum.  Security experts said government candidate protection programs, which did not cover all those eligible, had a negligible impact on curbing political violence.  The 2022 gubernatorial elections in six states, however, saw a drop in violence against political figures.  Consulting firm Etellekt registered 85 aggressions against candidates in these six states but no killing of candidates – marking the first election period without candidate homicides since 2007.

**Participation of Women and Members of Minority Groups:**  No laws limit the participation of women or members of minority groups in the political process, and they did participate.  The law provides for the right of Indigenous persons to elect representatives to local office according to "uses and customs" law (see section 6, Indigenous Peoples) rather than federal and state electoral law.

INE announced it received 219 complaints of gender-based political violence related to the electoral process between April 2020 and August 2022, a 367 percent increase from the 47 complaints it received during the 2017-18 electoral process. The INE sanctioned 184 persons for gender-based political violence.  Penalties ranged from monetary fines to the cancellation of candidacies.

# Section 4. Corruption and Lack of Transparency in Government

The law provides criminal penalties for corruption by officials, and the government took steps to increase its legal authority to pursue these crimes.  There were numerous reports of government corruption.

CLP_PC_032450

**Corruption:**  In June the Federal Commission for the Protection against Sanitary Risks (COFEPRIS) authorities reported President López Obrador ordered the navy to investigate allegations against COFEPRIS officials for corrupt operations awarding pharmaceutical bids alleged to have occurred in September 2021. Following a months-long corruption investigation into the commission's practices, authorities detained and charged 32 officials.

In June the United States extradited former Chihuahua Governor César Duarte. Duarte was arrested in Florida in 2020 pursuant to a Mexican extradition request on charges he diverted millions of dollars in public funds.  On June 6, a judge ordered his pretrial detention for one year while investigations continued.

In June after media reports and civil society investigations, the Secretariat of Public Administration announced the Attorney General's Office had opened 22 investigations into alleged fraud on the part of the Mexican Food Security Agency under the Secretariat for Agriculture and Rural Development from 2019 to 2021, consisting of illegal contracts, "phantom" payrolls, simulated purchases of agricultural products, sale of products to private companies below the minimum purchase value, and the illegal purchase of stocks with government funds. According to media reports, the alleged fraud could reach $500 million.

Former Nuevo León Governor Jaime "El Bronco" Rodríguez Calderón was placed under house arrest in June for alleged participation in a scheme to divert public funds and force public servants to collect signatures for his failed 2018 presidential run.

## Section 5. Governmental Posture Towards International and Nongovernmental Investigation of Alleged Abuses of Human Rights

A variety of domestic and international human rights groups generally operated without government restriction, investigating and publishing their findings on human rights cases.  Government officials were mostly cooperative and responsive, with the president and cabinet officials meeting with human rights organizations, such as OHCHR, IACHR, and CNDH.  Some NGOs alleged individuals who organized campaigns to discredit human rights defenders at times

CLP_PC_032451

acted with tacit support from government officials.

**Retribution against Human Rights Defenders:**  President López Obrador chastised civil society groups at the morning press conferences he hosted daily. Civil society groups took legal actions against the construction of the Mayan Train, citing a lack of environmental and cultural assessments.  In response on July 19, López Obrador called them "corrupt and pseudo environmental defenders."

**Government Human Rights Bodies:**  CNDH is a semiautonomous federal agency funded by the legislature to monitor and act on human rights abuses.  CNDH may call on government authorities to impose administrative sanctions or pursue criminal charges against officials, but it is not authorized to impose penalties or legal sanctions.  Civil society groups questioned CNDH's independence, citing CNDH president Rosario Piedra's close ties to President López Obrador.  They noted CNDH failed to speak out regarding pressing concerns such as the role of the military in public security activities.

All states have their own human rights commissions.  The state commissions are funded by state legislatures and are semiautonomous.  Some civil society groups, however, asserted that state commissions were subservient to the state executive branch.  State commissions do not have uniform reporting requirements, making it difficult to compare state data and therefore compile nationwide statistics.  CNDH may take on cases from state-level commissions if it receives a complaint that the state commission did not adequately investigate the case.

# Section 6. Discrimination and Societal Abuses

## Women

**Rape and Domestic Violence:**  Federal law criminalizes the rape of men and women, including spousal rape, and conviction carries penalties of up to 20 years' imprisonment.  Spousal rape is criminalized in 26 of the 32 states.  There were high rates of impunity for these crimes, consistent with high impunity rates for all crimes.  According to the Interior Ministry's most recent data (2019), only 2 percent of women who were victims of violence received help.  Of all cases of domestic violence, only 5 percent were prosecuted and only 1 percent resulted in

CLP_PC_032452

convictions.

Federal law prohibits domestic violence and stipulates penalties for conviction of between six months' and four years' imprisonment.  The law includes media and digital violence as a form of violence against women.  Of the 32 states, 29 stipulate similar penalties, although sentences were often more lenient.  Federal law criminalizes spousal abuse.  State and municipal laws addressing domestic violence largely failed to meet the required federal standards and often were unenforced.

According to an INEGI 2021 survey, 40 percent of women age 15 and older reported having experienced physical violence at the hands of their current or most recent partner, and 23 percent reported having experienced sexual violence in the last 12 months.  The increase in domestic violence cases that began during the start of the COVID-19 pandemic continued during the year, according to the watchdog group Nosotros Tenemos Otros Datos (We Have Other Data).

Femicide is a federal offense punishable by 40 to 70 years in prison.  It is also a criminal offense in all states.  The Executive Secretariat of the National Public Security System reported more than 1,900 killings of women, including 858 femicides from January to November.

On April 21, authorities found the body of Debanhi Escobar in an uncovered motel cistern in Monterrey, Nuevo León, nine days after she went missing.  The Nuevo León Prosecutor General's Office fired two prosecutors working on the case for "omissions and errors" in their work, raising additional questions regarding the actual cause of death.  A long series of femicides and the discovery of Escobar's body triggered protests throughout the country on April 24 as hundreds of persons gathered in different locations nationwide to demand justice for victims of femicide and disappearances.

On May 21, gender-based violence activist and lawyer Cecilia Monzón was killed in Cholula, Puebla.  In April Monzón filed for alimony at the state attorney general's office against former Puebla Secretary of the Interior Javier López Zavala, with whom she had a son.  The day before her death, she publicly criticized the state attorney general's office for not processing the motion.

CLP_PC_032453

Authorities arrested Zavala and three other alleged coconspirators for femicide. As of December 31, the four were awaiting trial.

The 911 hotline received 230,488 calls reporting incidents of violence against women from January to August, an increase of 20 percent over the same months in 2021. The National Shelter Network reported it assisted more than 19,700 women and children between January and July, a 15 percent increase from 2021. Between January to July, the National Database for Information on Cases of Violence Against Women reported 77,778 cases of violence against women.

The National Commission to Prevent and Eradicate Violence against Women is responsible for leading government programs to combat domestic violence. In addition to shelters, women's external assistance centers provided services including legal, psychological, and protective; however, the number of cases far surpassed institutional capacity. Legal experts explained the country lacked sufficient psychological and anthropological experts to issue the appropriate expert reports that judges require in femicide and domestic violence cases. According to multiple NGOs, due to COVID-19's impact on the economy, funding sources for women's shelters, including for Indigenous women, were insufficient. Federal funding assisted the operation of more than 69 shelters, external attention centers, emergency houses, and transition houses. NGOs operated 85 percent of the facilities, and government organizations operated the remaining 15 percent.

**Sexual Harassment:** Federal law prohibits sexual harassment and provides for fines from 250 to 5,000 times the minimum daily wage, but the law was not effectively enforced. Of the 32 states, 24 criminalize sexual harassment, and all states have provisions for punishment when the perpetrator is in a position of power. According to the National Women's Institute, the federal institution charged with directing national policy on equal opportunity for men and women, sexual harassment in the workplace was a significant problem.

**Reproductive Rights:** There were no confirmed reports of coerced abortion or involuntary sterilization on the part of government authorities.

CNDH observed recurrent cases of obstetric violence during childbirth in the forms of neglect and physical abuse, sometimes with serious consequences on women's

CLP_PC_032454

sexual and reproductive health.  In 2021 CNDH issued nine recommendations to improve or address the denial of health services, including physical and psychological abuse, performance of risky procedures, and inadequate neonatal evaluation, diagnosis, and treatment for diseases.

Federal authorities supported access to contraceptive methods, including for the purpose of family planning, but states' efforts varied widely.  Barriers to accessing contraceptives stemmed from lack of knowledge, poverty, lack of access to health services, and sexual violence from family members, strangers, or friends.  A 2017 Institute for Health Metrics and Evaluation study on the use of contraceptives in Chiapas (the poorest state) found that older women were less likely to use family planning methods (13 percent of women age 35 and older, versus 18 percent of women age 20 to 34), while 23 percent of Indigenous women opposed birth control for religious, cultural, or social reasons.  A CNDH diagnostic conducted of incarcerated women during the year found women in prison had little access to gynecological attention and contraceptives.  CNDH reported that health providers had little accessible information on reproduction for women with disabilities.

The National Population Council (CONAPO) said that in 2021 there were 373,661 pregnancies in women younger than age 19 (30 percent above 2020), of which 8,874 were in girls age 14 or younger.  CONAPO reported 68 per 1,000 adolescent birth rates between the ages of 15 and 19.  Authorities attributed high adolescent birth rates to low economic status, social inequities, school dropout, low usage of contraceptives, sexual abuse, and teenage marriages.  Sometimes family members arranged marriages for girls younger than 18.

Government health service providers in 21 states noted they were obligated by law to offer sexual and reproductive emergency health services for survivors of sexual violence within 120 hours of the sexual assault.  According to CNDH, the states that did not require government health service providers to offer emergency contraception services were Aguacalientes, Baja California Sur, Chiapas, Chihuahua, Durango, Guerrero, Michoacán, Sonora, Tlaxcala, Yucatán, and Zacatecas.  Emergency contraception and postexposure prophylaxis for the HIV virus were available, including for survivors of sexual assault.  Nevertheless, women nationwide faced obstacles to accessing emergency services due to health providers' personal objections to emergency contraception or misunderstanding of

CLP_PC_032455

their legal obligations to provide services.

Factors associated with maternal deaths included parents with lower levels of education, poor hospital infrastructure and human capacity, and lack of access to maternity care, especially for pregnant women living in rural areas. Southern states reported the lowest access to skilled health care during pregnancy due to geographic, financial, and cultural barriers. In rural areas in 2019, the cause of most maternal deaths was obstetric hemorrhage. On October 12, the first National Survey for Menstrual Management presented its findings on 3,000 menstruating persons ages 12 to 70 in Aguascalientes, Michoacán, Oaxaca, Puebla, and Tamaulipas. The report pointed out the main barriers to menstrual health were stigma, lack of sanitation, and access to information. It found 69 percent of menstruating persons had little or no information when they got their first period and 15 percent lacked access to menstrual products.

**Discrimination:**  The law provides women the same legal status and rights as men and "equal pay for equal work performed in equal jobs, hours of work, and conditions of efficiency."  The law establishes penalties for discrimination based on gender, race, ethnicity, color, religion, language, pregnancy, political belief, or any other nature that violates human dignity.  The government did not enforce the law effectively.  Women tended to earn substantially less than men did for the same work.  Women were more likely to experience discrimination in wages, working hours, and benefits.  Afro-Mexican and Indigenous women reported structural inequality in their daily lives.

According to the 2017 National Survey on Discrimination, 30 percent of women said they experienced discrimination because of their gender.  Approximately 54 percent of women reported they were denied access to social programs, and 55 percent were reportedly denied medical attention or medication.  The 2021 CNDH Household Survey reported 65 percent of men and 72 percent of women participants experienced discrimination due to their gender.  Unmarried same-sex partners were not allowed to register partners to receive social benefits from the Mexican Social Security Institute.

CLP_PC_032456

## Systemic Racial or Ethnic Violence and Discrimination

The constitution prohibits discrimination based on ethnicity, and a federal law prohibits all forms of discrimination.  Nonetheless, discrimination was common against racial and ethnic minorities, including Black, Afro-Mexican, and Indigenous groups.  All states have additional laws against discrimination.  A 2019 constitutional reform recognizes Afro-Mexicans as an ethnic group.  The government did not enforce the law effectively.

According to a 2021 report by the National Council to Prevent Discrimination (CONAPRED), in Mexico City dark-skinned individuals experienced the most discrimination, followed by Indigenous peoples.

INEGI reported that 2 percent of the population (2.5 million) self-identified as Afro-Mexican.  CONAPRED's 2017 national survey on discrimination found 58 percent of Afro-Mexicans and 65 percent of Indigenous persons considered their rights were respected "little or not at all."  The survey also reported 22 percent of persons said they would not share a household with an Afro-Mexican.  The survey reported that persons with darker skin completed 6.5 years of schooling, while those with white skin completed 10 years.  A report from the Black Alliance for Just Immigration found black migrants faced widespread racial discrimination from individuals and authorities, particularly in accessing employment and services.  Black migrants reported migration authorities detained Black migrants for longer periods than other migrants.

## Indigenous Peoples

The constitution provides Indigenous persons the right to self-determination, autonomy, and education.  Most Indigenous persons lived in marginalized communities, and the COVID-19 pandemic disproportionally affected these communities, according to the OHCHR.  Conflicts arose from the interpretation of Indigenous communities' self-governing "normative systems."  Uses and customs laws apply traditional practices to resolve disputes, choose local officials, and collect taxes, with limited federal or state government involvement.  Communities and NGOs representing Indigenous groups criticized the government for failing to consult Indigenous communities adequately when making decisions regarding

CLP_PC_032457

extractive industry and natural resource development projects on Indigenous lands. CNDH and INPI maintained a human rights program to inform and assist members of Indigenous communities.  INPI implemented justice plans for Indigenous communities to exercise self-determination and establish norms to counter historic marginalization.  In June INPI hosted a regional assembly in Chihuahua with 50 Indigenous communities to discuss agrarian and environmental issues.

CNDH reported Indigenous women were among the most vulnerable groups in society.  They often experienced racism and discrimination and were frequently victims of violence.  Due at least in part to their lack of Spanish language proficiency, Indigenous persons generally had limited access to health care, education services, and legal means to seek justice.  In April the NGO Christian Solidarity Worldwide published a report that documented various freedom of religion or belief abuses faced by Indigenous women, in particular, including forced participation in religious majority activities, barriers to pursuing justice, and denial of access to government benefit programs and basic services.

During the COVID-19 pandemic, Indigenous persons faced additional hardships in accessing educational services.  Due to low internet penetration and television ownership in Indigenous communities, distance learning was often inaccessible. Additionally, some Indigenous students did not receive the breakfasts and lunches normally included in the full-time school meal program, according to a UNESCO study.

In mid-July the government resumed construction of the Mayan Train, a dual cargo-passenger railroad to cross the Yucatán Peninsula through Indigenous lands, citing a November 2021 decree deeming all public infrastructure to be a matter of national security, which limited the ability of civil society and Indigenous groups to use legal avenues to halt the project.  Several Indigenous communities had brought legal actions to oppose the construction, many of which were dismissed or denied.

On February 5 and March 10, a state judge sentenced Indigenous human rights defender Kenia Hernández Montalbán to 10 years in prison for robbery in 2021 and to 11 years in prison for damaging a tollbooth during a protest in 2020, respectively.  Civil society groups said the allegations were false.  Hernández, an

CLP_PC_032458

Indigenous people and women's rights defender, was reportedly detained in 2020 without a warrant on false charges of aggravated robbery; in April 2021, it was reported that her health deteriorated due to conditions in the maximum-security prison where she was held.  Hernández, an Indigenous lawyer of the Amuzga people, worked with the Zapata Vive Libertarian Collective on land rights, specifically protesting extraction contracts and working for those affected by extraction companies' activities.

On May 8, authorities found Lorena Chantzin Paxacuasingo and Marcos Campos Ahuejote, members of the Indigenous and Popular Council of Guerrero-Emiliano Zapata (Cipog-EZ), dead in Chilapa, Guerrero.  Cipog-EZ members said the criminal group Los Ardillos was responsible for the deaths.

There were no developments in the case of the July 2021 killing of Simon Pedro Pérez López, a human rights activist and member of the Las Abejas de Acteal civil society organization, in Chiapas.

## Children

**Birth Registration:**  Children derive citizenship both by birth within the country's territory and from their parents.  Citizens generally registered the births of newborns with local authorities.  Birth registration was provided on a nondiscriminatory basis.  Failure to register births could result in the denial of public services such as education or health care.

**Child Abuse:**  The law provides for protection against child abuse.  There were numerous reports of child abuse.  The National Program for the Integral Protection of Children and Adolescents, mandated by law, is responsible for coordinating the protection of children's rights at all levels of government.

**Child, Early, and Forced Marriage:**  The legal minimum marriage age is 18. Enforcement, however, was inconsistent across the states.  With a judge's consent, children may marry at younger ages.

**Sexual Exploitation of Children:**  The law prohibits the commercial sexual exploitation of children, and authorities generally enforced the law.  Nonetheless, NGOs and media reported occurrences of sexual exploitation of minors, including

CLP_PC_032459

child sex tourism in resort towns and northern border areas.  Authorities estimated 21,000 children were kidnapped annually for sexual exploitation.  A 2021 penal code reform eliminated the statute of limitations for sexual crimes against minors, including child pornography distribution, child sex tourism, corruption of minors, pederasty, sexual abuse, and rape.

**Institutionalized Children:**  Civil society groups expressed concern regarding abuse of children with mental and physical disabilities in orphanages, migrant centers, and care facilities.  During the year, the MNPT visited children's institutions and found they lacked protocols for reporting mistreatment and mechanisms for supervision.

## Antisemitism

The 58,876 person Jewish community (according to the 2020 INEGI survey) experienced low levels of antisemitism.  On January 18, during an online university class, a teacher joked about the death of Jews in the Holocaust, comparing them to a pizza in an oven.  The university dismissed the teacher and publicly apologized.

Jewish community representatives reported good cooperation with the government and other religious and civil society organizations in addressing rare instances of antisemitic acts.

## Trafficking in Persons

See the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## Acts of Violence, Criminalization, and Other Abuses Based on Sexual Orientation, Gender Identity or Expression, or Sex Characteristics

**Criminalization:**  No laws criminalize same-sex sexual conduct.

**Violence against LGBTQI+ Persons:**  There were reports the government did not always investigate and punish those complicit in abuses against LGBTQI+ persons,

CLP_PC_032460

especially outside Mexico City.  Civil society groups claimed police routinely subjected LGBTQI+ persons to mistreatment while in custody.

There were eight hate-crime homicides and six forced disappearances committed against the LGBTQI+ community in the first eight months, according to the National Observatory of Crimes Against LGBTQI+ persons.

On August 4, the court sentenced soldiers to 23 years in prison for the 2020 killing of Naomi Nicole, a transgender woman.  The civil society group Letter S noted that in the LGBTQI+ community, transgender women were most likely to be victims of a hate crime.  In 2021 Letter S documented the killing of 55 transgender women, 12 more cases than in 2020.

According to CONAPRED, the most frequent forms of aggression LGBTQI+ persons experienced were verbal violence, denial of entry, services and rights, and killings.

**Discrimination:**  Federal law prohibits discrimination against LGBTQI+ individuals.  A Mexico City municipal law provides increased penalties for hate crimes based on sexual orientation and gender identity.  On October 25, same-sex marriage became legal nationwide when Tamaulipas, Guerrero, and Tabasco joined other states in approving marriage equality.

A 2019 CNDH poll found six of every 10 members of the LGBTQI+ community reported experiencing discrimination in the past 12 months, and more than half were targeted with hate speech and physical aggression.  From January to July 30, CONAPRED registered 27 reports of discrimination against LGBTQI+ persons, of which seven were against public servants.

**Availability of Legal Gender Recognition:**  Twenty states permit adult individuals to update names and gender markers via a simple administrative process.  In January, for the first time, the Secretariat of Foreign Affairs issued transgender birth certificates for citizens living abroad.  In February Guanajuato issued the first nonbinary birth certificate nationwide.  In August 2021, the Mexico City congress approved a reform allowing LGBTQI+ children 12 years and older to legally change their gender on their birth certificate.

CLP_PC_032461

**Involuntary or Coercive Medical or Psychological Practices Specifically Targeting LGBTQI+ Individuals:**  Eleven states ban so-called conversion therapy practices.

According to INEGI, 14 percent of transgender persons and 10 percent of lesbian, gay, and bisexual persons were subjected to so-called conversion therapy practices. Civil society organizations reported that, as part of the treatment process, LGBTQI+ persons undergoing so-called conversion therapy practices were often isolated, beaten, given electroshocks, and made to undergo hormone or steroid therapies, among other actions.

Medically unnecessary surgeries and treatment continued to be done on infants and children born with sex characteristics that did not align with either a typical male or female body.  A recent study by the National Council to Prevent Discrimination and the organization Brujula Intersexual found that four of 10 persons who had undergone such surgery reported it was done without their consent.

**Restrictions of Freedom of Expression, Association, or Peaceful Assembly:** There were no reports of restrictions on freedom of expression, association, or peaceful assembly related to LGBTQI+ issues.

## Persons with Disabilities

Public buildings and facilities often did not comply with the law requiring access for persons with disabilities.  Federal law prohibits discrimination against persons with physical, sensory, intellectual, and mental disabilities.  The government did not effectively enforce the law.

The education system provided education for students with disabilities nationwide. Nevertheless, only 2 percent of schoolteachers in the country were trained to teach children with disabilities, according to the civil society organization Yo También. Children with disabilities attended school at a lower rate than those without disabilities.

The law requires the Secretariat of Health to promote the creation of long-term institutions for persons with disabilities in distress, and the Secretariat of Social Development must establish specialized institutions to care for, protect, and house

CLP_PC_032462

poor, neglected, or marginalized persons with disabilities.  NGOs reported authorities had not implemented programs for community integration.

Abuses occurred in institutions and care facilities housing persons with mental disabilities, including those for children.  Abuses included the use of physical and chemical restraints; physical and sexual abuse; human trafficking, including forced labor; disappearance; and the illegal adoption of institutionalized children.  Persons with disabilities were vulnerable to abuse from staff members, other patients, or guests at facilities where there was inadequate supervision.  Documentation supporting the identity and origin of those staying in the facilities was lacking, and access to justice was limited, according to NGOs.  NGOs reported no changes in the mental health system to create community services or any efforts by authorities to have independent experts monitor human rights abuses in psychiatric institutions.

Institutionalized persons with disabilities often lacked adequate medical care and rehabilitation services, privacy, and clothing.  They often ate, slept, and bathed in unhygienic conditions.

Voting centers for federal elections were generally accessible for persons with disabilities, and ballots were available with a braille overlay for federal elections in Mexico City, but these services were inconsistently available for local elections elsewhere in the country.

In July human rights defender Luz Raquel Padilla was allegedly sprayed with alcohol and set on fire in Zapopan, Jalisco, after reporting threats from her neighbors due to her autistic son's loudness.  Padilla died from severe burns a few days following the incident.

## Other Societal Violence or Discrimination

The Catholic Multimedia Center reported that criminal groups harassed priests and other religious leaders in some parts of the country and subjected them to extortion, death threats, and intimidation.  In June a gunman shot and killed tour guide Pedro Palma and Jesuit priests Javier Campos Morales and Joaquín César Mora Salazar inside a church in Cerocahui, Chihuahua, after the priests allegedly provided safe haven to a man fleeing gunmen.  Government officials stated that the

CLP_PC_032463

harassment of Catholic priests and evangelical Protestant pastors reflected high levels of generalized violence throughout the country and not targeted attacks based on religious faith.

According to Christian Solidarity Worldwide, Catholic-majority communities sometimes discriminated, harassed, threatened, displaced, denied basic services, and destroyed the property of individuals who left Catholicism or belonged to other faith communities.  In January in San Pedro Chimaltepec, Oaxaca, local authorities freed 15 evangelicals previously jailed in December for refusing to financially contribute to and participate in Catholic religious celebrations. Authorities forced each individual to pay a fine of 5,000 pesos ($250) and expelled five of the evangelicals from the community.  On July 27, media reported two evangelical families were expelled from San Andrés Larriánzar municipality for refusing to pay for a Catholic festivity and were fined 200,000 pesos ($10,000).

# Section 7. Worker Rights

## a. Freedom of Association and the Right to Collective Bargaining

The government continued efforts to provide for the right of workers to form and join independent unions, collectively bargain, and conduct legal strikes.  The government continued to strengthen freedom of association protections, promote union democracy, and improve the ability of workers to bargain collectively.

Government efforts focused on implementation of the 2019 labor law reform that transformed the labor justice system.  The reforms provide workers with the right to freely elect union representatives and approve or reject collective bargaining agreements through a secret ballot process before the agreements are registered. The reforms prevent the registration of collective bargaining agreements that nonrepresentative unions often negotiated and signed without the knowledge of workers and undermined genuine collective bargaining.  The reforms call for the creation of independent labor courts to replace the Conciliation and Arbitration Boards (CABs) that favored corporatist nonrepresentative unions in the resolution of disputes and facilitated the registration of protection contracts.  The reforms also establish an expedited and more transparent judicial process for unions to obtain collective bargaining rights.

CLP_PC_032464

In addition to a more impartial and streamlined judicial process for labor disputes, the reforms transfer the registration of unions and collective bargaining agreements from the CABs to a new independent Federal Center for Conciliation and Labor Registration (Federal Center).  The Federal Center also carries out mandatory pre-judicial conciliations at the federal level, with local conciliation centers performing the same function at the state level.

The government was implementing the reforms to effectively enforce the law in three phases, opening new federal and local labor courts, the Federal Center, and local conciliation centers in each state over the course of three years starting in 2020.  As of October 3, new institutions were operating in all 32 states.

The reforms also require unions to amend their bylaws to ensure union democracy and gender equity in their leadership.  As of March, 96 percent of the 2,057 active unions under federal jurisdiction had amended their bylaws, but only 48 percent of 14,370 active unions under local jurisdiction had amended their bylaws.  In November 2021 the Federal Center continued to oversee a verification process, called the "legitimization process," which requires unions to organize a secret ballot vote for workers to approve or reject existing collective bargaining agreements by May 1, 2023.  The legitimization process is governed by a Federal Center protocol published in April 2021.

As of September, 7,077 collective bargaining agreements had undergone the legitimization process, which represented less than 1 percent of the total number of agreements.  In July the Secretariat for Labor and Social Welfare hired 54 new labor inspectors to support the Federal Center's verification of legitimization votes, but concerns remained the government may not have the capacity to respond to a potential surge in legitimization requests prior to the May 1, 2023, deadline.  The Federal Center, however, estimated only 10 to 15 percent of total collective bargaining agreements required legitimization because worksites had closed, work had concluded, or the collective bargaining agreement was a protection contract held by a nonrepresentative union that would not request a legitimization vote.

In August the Federal Center published new union democracy guidelines to help guide the work of the center in overseeing union democracy votes, in addition to legitimization votes, and set out the role and responsibilities of unions and

CLP_PC_032465

employers during such votes.  For example, the guidelines clarify that the Federal Center may order corrective action to prevent or remediate violations such as intimidation, coercion, or misinformation that may impede a free and fair election, including providing the necessary information to workers and ordering the suspension of the vote.  The guidelines also discuss the role of external observers in union democracy votes.

Federal labor law requires a minimum of 20 workers to form a union.  To receive government recognition, unions and their leaders must file for registration with the Federal Center.

The Federal Center and the new federal labor courts are designed to handle all matters related to labor disputes.  CABs ceased receiving new cases upon the start of phase three of labor reform implementation on October 3 but continued efforts to resolve their backlogs of cases, which the secretary of labor reported numbered 1.5 million as of October.

By law a union may call for a strike or bargain collectively in accordance with its own statutes.  Under the labor reform, to negotiate a collective bargaining agreement, the union must first obtain a certificate of representativeness from the Federal Center demonstrating it has support from at least 30 percent of workers to be covered by the agreement, or 50 percent plus one if there is a competing union. Before a strike may take place, a union must file a "notice to strike" with the appropriate labor court.  Workers, the employer, or an interested third party may request the court rule on the legality of the strike, which may find the strike illegal. In June 2021 the Supreme Court issued a unanimous decision confirming that a legal challenge to union representation cannot proceed while a legal strike is in effect.  This decision prevented a mining company mine in Sombrerete, Zacatecas from breaking a Mineros Union strike by promoting a protectionist union through a court challenge.

Between November 2020 and June, workers presented 59,428 individual conciliation requests, of which 36,051 cases resulted in conciliation agreement.  Of those, 14,830 were agreements facilitated by the Federal Center, and 21,221 were agreements ratified by the center after the parties came to an agreement directly. The Federal Center also received 1,049 conciliation requests related to collective

CLP_PC_032466

labor disputes and reached 502 agreements.

Federal labor law prohibits antiunion discrimination and prohibits employers from intervening in union affairs or interfering with union activities, including through implicit or explicit reprisals against workers.  The law allows for the reinstatement of workers if the court finds the employer fired the worker without just cause and the worker requests reinstatement; however, the law also exempts broad categories of employees from this protection, including so-called trusted employees and workers in the job for less than one year.

The government's failure to enforce labor laws left workers with little recourse for violations of freedom of association, poor working conditions, and other labor provisions in states that had not yet implemented the new labor justice model. Penalties for these violations were commensurate with similar violations of civil rights.  Penalties were rarely applied against violators.

According to several NGOs and unions, many workers faced violence and intimidation perpetrated by protection union leaders and employers supporting them, as well as other workers, union leaders, and vigilantes hired by a company to suppress opposition to an existing union in bargaining-rights elections.  Some employers attempted to influence these elections through the illegal hiring of temporary or fake employees immediately prior to the election to vote for the company-controlled union.

In February the Federal Center oversaw a workers' vote at the General Motors plant in Silao, Guanajuato, to decide which of four unions would represent workers in collective bargaining negotiations.  The National Independent Union of Workers in the Automotive Industry (SINTTIA) won in a free and secret vote, and in May workers at the plant voted overwhelmingly to approve a new collective bargaining agreement SINTTIA negotiated.  The new collective bargaining agreement included a significant wage raise and increased worker voice in determining production activities.  Since July 2020, labor officials had reviewed cases of alleged denial of freedom of association and collective bargaining rights at five facilities as part of the United States-Mexico-Canada Agreement's Rapid Response Mechanism, including three cases raised in 2022, which were resolved and resulted in the reinstatement of workers with backpay, recognition of an independent union

CLP_PC_032467

as the legitimate representative of workers, or both.

## b. Prohibition of Forced or Compulsory Labor

The constitution and law prohibit and criminalizes all forms of forced or compulsory labor, but the government did not effectively enforce the law. While penalties for conviction of forced labor were commensurate with those for similar crimes, very few cases were successfully prosecuted.

Forced labor persisted in the domestic service, child-care, manufacturing, mining, food-processing, construction, tourism, begging, street-vending, leather-goods production, and agriculture sectors, especially in the production of chili peppers and tomatoes. Criminal groups forced Mexican and foreign adults and children to engage in illicit activities, including as assassins, lookouts, and in the production, transportation, and sale of drugs. Women and children were subjected to domestic servitude. Unaccompanied children, Indigenous persons, persons with disabilities, LGBTQI+ persons, asylum seekers and migrants, IDPs, informal-sector workers, and children in gang-controlled territories were the most vulnerable to forced labor. Many workers were compelled into forced labor through debt bondage, fraudulent recruitment, threats of violence, or nonpayment of wages by recruiters and employers.

Day laborers and their children were the primary victims of forced and child labor in the agricultural sector, particularly in the production of chili peppers and tomatoes. In 2019, the most recent data available, INEGI reported that of the persons employed in agriculture, only 57 percent received payment for their work, and of the persons receiving payment, 83 percent were day laborers earning on average approximately one minimum wage per day. Indigenous persons in isolated regions reported incidents of forced labor in which cartel members forced them to perform illicit activities or face death. Minors were recruited or forced by cartels to smuggle persons, drugs, or other goods into the United States. Migrants were also recruited by criminal organizations to conduct illicit activities.

Criminal groups became increasingly involved in the illegal timber trade in Chihuahua, which accounted for 70 percent of the wood consumed in the country. Drug traffickers involved in illegal logging recruited and kidnapped Indigenous

CLP_PC_032468

persons and children in isolated or displaced communities, withheld their wages, forced them to conduct illicit activities, and often threatened death if they tried to leave.

Also see the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## c. Prohibition of Child Labor and Minimum Age for Employment

See the Department of Labor's *Findings on the Worst Forms of Child Labor* at https://www.dol.gov/agencies/ilab/resources/reports/child-labor/findings/.

## d. Discrimination with Respect to Employment and Occupation

The constitution and law prohibit discrimination with respect to employment or occupation. Federal law specifically proscribes discrimination based on ethnicity, nationality, gender, age, disability, social status, health, religion, immigration status, political opinion, sexual preference, marital status, or pregnancy. The government did not effectively enforce the law or regulations. The law mandates that all discrimination cases, including sexual harassment, bypass formerly mandatory conciliation, and proceed directly to the labor courts.

Penalties for violations of the law were commensurate with those for other similar laws. Penalties were sometimes applied against violators.

Discrimination in employment or occupation occurred against women, Indigenous groups, persons with disabilities, LGBTQI+ individuals, and migrant workers. According to a 2017 INEGI survey, the most recent information available, 12 percent of women were illegally asked to take a pregnancy test as a prerequisite to being hired. In 2021, according to the Organization for Economic Cooperation and Development, the median salary for full-time female employees was 12.5 percent less than that of full-time male employees. Only 7.5 percent of the members of the executive boards of publicly traded domestic companies were women, and men held 64 percent of managerial positions throughout the country. Job announcements specifying desired gender, age, marital status, and parental status were common. INEGI reported in 2017 that 23 percent of working women experienced violence in the workplace within the past 12 months and that 6 percent

CLP_PC_032469

experienced sexual violence.  The government approved the *National Work and Employment Program for People with Disabilities 2021-2024*, aimed at strengthening labor inclusion of persons with disabilities and supporting the employment of persons with disabilities in decent work.

## e. Acceptable Conditions of Work

**Wage and Hour Laws:**  The tripartite National Minimum Wage Commission is responsible for establishing minimum salaries.  The minimum wage was above the estimated monthly poverty line's monetary level.  Most formal-sector workers (70 percent) received between one and three times the minimum wage.

Federal law sets six eight-hour days and 48 hours per week as the legal workweek. Any work of more than eight hours in a day is considered overtime, for which a worker is to receive double pay.  After accumulating nine hours of overtime in a week, a worker earns triple the hourly wage.  The law prohibits compulsory overtime.  The law provides for eight paid public holidays and one week of paid annual leave after completing one year of work.

According to labor rights NGOs, employers in all sectors sometimes used the illegal "hours bank" approach – requiring long hours when the workload is heavy and cutting down hours when it is light – to avoid compensating workers for overtime.  This was a common practice in the maquiladora sector, in which employers forced workers to take leave at low moments in the production cycle and obliged them to work in peak seasons, including the Christmas holiday period, without the corresponding triple pay mandated by law for voluntary overtime on national holidays.

News reports indicated poor working conditions in some factories.  These included low wages, contentious labor management, long work hours, unjustified dismissals, a lack of social security benefits, unsafe workplaces, and no freedom of association.  Many women working in the industry reported suffering some form of abuse.

Many companies evaded taxes and social security payments by employing workers through subcontracting regimes or by submitting falsified payroll records to the Mexican Social Security Institute.  An April 2021 reform to the labor law bans

CLP_PC_032470

subcontracting of personnel for core or main economic activities in the public and private sectors.  Subcontracting is allowed if it is used to perform specialized services unrelated to the main economic activity of businesses or public institutions.  According to the Mexican Social Security Institute, because of the law, 2.7 million workers of the 4.6 million subcontractors moved from formal subcontracting status to a formal direct employment status.  Approximately 23 percent of informal workers (6.8 million persons) were employed by formal businesses or organizations but paid in cash off the books to evade taxes and social security payments.

Observers from grassroots labor rights groups, international NGOs, and multinational apparel brands reported that employers in export-oriented supply chains increasingly used hiring methods that lessened job security.  For example, manufacturers commonly hired workers on one- to three-month contracts and then waited a period of days before rehiring them on new short-term contracts to avoid paying severance and to prevent workers from accruing seniority.  This practice violated federal law and restricted workers' rights to freedom of association and collective bargaining.  Observers noted that it also increased the likelihood of work-related illness and injury.  Outsourcing practices made it difficult for workers to identify their legally registered employer, thus limiting their ability to seek redress of labor grievances.

Citizens hoping to obtain temporary, legal employment in the United States and other countries frequently paid recruiters hundreds or thousands of dollars in prohibitive fees to secure jobs, and many prospective workers were promised jobs that did not exist.  The government rarely investigated cases of alleged abusive and fraudulent recruitment practices.  Although the law requires entities recruiting for overseas employment to register with the Secretariat of Labor and Social Welfare, only a handful of recruiters complied.

The situation of agricultural workers remained particularly precarious, with similar patterns of exploitation throughout the sector.  Labor recruiters enticed families to work during harvests with verbal promises of decent wages and a good standard of living.  Rather than receiving daily wages once a week, as mandated by law, day laborers had to meet certain harvest quotas to receive the promised wage.  Wages were illegally withheld until the end of the harvest to ensure workers did not leave.

CLP_PC_032471

Civil society organizations alleged that workers were prohibited from leaving by threats of violence or by nonpayment of wages.  Workers had to buy food and other items at the company store at high markups, at times leaving them with no money at the end of the harvest after settling debts.  Civil society groups reported families living in inhuman conditions, with inadequate and cramped housing, no access to clean water or bathrooms, insufficient food, and without medical care. With no access to schools or childcare, many workers took their children to work in the fields.

**Occupational Safety and Health:**  The law requires employers to observe occupational safety and health (OSH) regulations appropriate for the main industries, issued jointly by the Labor Secretariat and Institute for Social Security. Legally mandated joint management and labor committees set standards and are responsible for overseeing workplace standards in plants and offices.  Individual employees or unions may complain directly to inspectors or safety and health officials.  By law, workers may remove themselves from situations that endanger health or safety without jeopardy to their employment.  According to data from the Mexican Social Security Institute, in 2021 there were 305,646 workplace accidents, resulting in 613 deaths.

**Wage, Hour, and OSH Enforcement:**  In 2021 the Labor Secretariat reported conducting labor inspections in 35,098 work centers nationwide.  On June 13, the secretariat published the Inspection Program to carry out a roadmap to inspect the most vulnerable sectors.  Civil society organizations, however, reported the number of labor inspections was not sufficient to secure compliance.  There were 471 labor inspectors to cover the entire country, significantly less than what the International Labor Organization considers sufficient for the workforce.  Criminal cases related to such violations were rarely carried out.  Penalties for violations regarding hours and minimum wage were commensurate with those for other similar laws but were rarely enforced.

In 2021 the Labor Secretariat implemented a new voluntary reporting system that allows formally registered businesses to enroll and self-identify as compliant with the program's requirements related to working conditions.  Registered businesses deemed to be complying according to documentation submitted are exempt from routine labor inspections for one year, although this does not prevent the Labor

CLP_PC_032472

Secretariat from conducting compliant-based labor inspections in these businesses.

The Labor Secretariat has the authority to order labor inspections at any time in the event of labor law violations, imminent risk to employees, or workplace accidents. Penalties for law violations regarding occupational safety and health regulations were commensurate with those for other similar laws but were rarely enforced. The federal labor inspectorate conducted an estimated 35,000 labor inspections in formally registered businesses in 2021 but did not conduct inspections in the informal sector.

**Informal Sector:**  According to INEGI, informal workers represented 56 percent of total workers in the country.  There were no labor inspections in the informal sector, leaving informal workers with no labor law protection.  Informal workers were in every sector of the economy, with agriculture as the sector with the greatest number of informal workers (87 percent).  In some areas, such as near the northern border, informal employment could pay more than formal employment in the manufacturing sector.  Informal workers lacked access to social protection mechanisms such as health care and retirement benefits.

CLP_PC_032473



*Protecting Immigrant*
*Women and Girls*
*Fleeing Violence*

March 27, 2023

*Submitted via:* [https://www.regulations.gov](https://www.regulations.gov).

Daniel Delgado
Acting Director
Border and Immigration Policy
Office of Strategy, Policy, and Plans
U.S. Department of Homeland Security

Lauren Alder Reid
Assistant Director
Office of Policy
Executive Office for Immigration Review
U.S. Department of Justice

**Re: Comment in Response to Notice of Proposed Rulemaking:
Circumvention of Lawful Pathways, CIS No. 2736-22; Docket No. USCIS
2022-0016; A.G. Order No. 5605-2023**

Dear Acting Director Daniel Delgado and Assistant Director Lauren Alder Reid,

The Tahirih Justice Center ("Tahirih") submits this comment[1] in response to the
Notice of Proposed Rulemaking on the Circumvention of Lawful Pathways
(NPRM or "Proposed Rule") published by the Department of Homeland Security
(DHS) and Department of Justice (DOJ)'s (collectively, "the Departments") in the
Federal Register on February 23, 2023, that would ban many eligible survivors of
gender-based and other violence from asylum protection in the United States.

Tahirih is the largest multicity direct services and policy advocacy organization
specializing in assisting immigrant survivors of gender-based violence. In five
cities across the country, Tahirih offers legal and social services to women, girls,
and other immigrants fleeing all forms of gender-based violence, including human
trafficking, forced labor, domestic violence, rape and sexual assault, and female
genital mutilation/cutting ("FGM/C"). Since its beginning in 1997, Tahirih has
provided free legal assistance to more than 31,000 individuals, many of whom
have experienced the significant psychological and neurobiological effects of
trauma. Through direct legal and social services, policy advocacy, and training
and education, Tahirih protects immigrant survivors and promotes a world where
they can live in safety and dignity.

**San Francisco Bay Area**
881 Sneath Lane
Suite 115
San Bruno, CA 94066
Tel: 650-270-2100
Fax: 650-466-0006
SFBayArea@tahirih.org
www.tahirih.org

---

[1] All sources cited shall be incorporated into the administrative record as if set forth fully herein.

CLP-PC-032709

Since its founding, Tahirih has also served as an expert resource for the media, Congress, policymakers, and others on immigration remedies for survivors fleeing gender-based violence. *See, e.g.*, Tahirih Justice Center, *Tahirih in the News*;[2] Tahirih Justice Center, *Congressional Testimony*;[3] Tahirih Justice Center, *Comments*.[4]

The current Proposed Rule recycles previous misguided efforts to deter vulnerable survivors from seeking asylum within the United States by imposing restrictions that bear no relation to the merits of an asylum claim. This latest version of an "asylum ban" forecloses meaningful access to asylum for survivors of gender-based and other violence seeking safety and security at all stages of their journeys. Further, it violates U.S. and international law, which unequivocally allows people to seek asylum regardless of their pathway to the United States. The Tahirih Justice Center strongly urges the Departments to withdraw the Proposed Rule in its entirety.[5]

## I.    The Proposed Rule Will Have Serious Detrimental Effects on Vulnerable Migrants, Especially Survivors of Gender-Based Violence.

The Proposed Rule imposes a series of barriers to asylum access that will prevent most asylum seekers from levying their claims. Every survivor of gender-based and other violence will face monumental challenges to the fair consideration of her asylum case under the proposed scheme. After fleeing domestic violence, sexual assault, human trafficking, or forced marriage, she is expected to seek asylum in unsafe countries that lack functioning asylum systems, as explained in Section I.B. Upon reaching the U.S. southern border, she must use a flawed and failing smartphone app to schedule an appointment to make her asylum claim, as explained in Section I.C. When she faces an agent or officer, she must—without access to counsel and likely while detained—prove that she qualifies for an exception to the rebuttable presumption that she is not eligible for asylum, as explained in Section I.D. If she is unsuccessful, she must satisfy an elevated standard of proof showing fear of return to her country of origin, as explained in Section I.E. If she is unable to satisfy that unfairly heightened standard, she must affirmatively seek what little opportunity for review remains to her—likely still without sufficient time to prepare her claim or consult with counsel, as explained in Section I.F. If she fails to run this gauntlet of draconian conditions, she will be deemed ineligible for essential relief despite her meritorious asylum claim and promptly removed from the United States—directly back into the hands of her persecutors.

---

[2]  *See* https://www.tahirih.org/news-media/latest-updates/?tab=tahirih-in-the-news.

[3]  *See* https://www.tahirih.org/news-media/publications/?_publication_categories=congressional-testimony.

[4]  *See* https://www.tahirih.org/news-media/publications/?_publication_categories=comments.

[5]  The preamble suggests that this Proposed Rule rescinds the third country transit ban and the asylum entry ban. *See* 88 Fed. Reg. at 11,727-28. Tahirih welcomes the rescission of both illegal and unjust rules. As written, however, the Proposed Rule does not effect a rescission of any rule. Tahirih advocates for the unambiguous, long-overdue rescission of these two unconscionable rules.

2

The devastating result of the application of these constraints to survivors of gender-based and other violence is that many people who legally qualify for asylum—and who cannot find safety outside U.S. borders—will be excluded from the U.S. asylum system. Tahirih submits that this outcome is in direct opposition to the "best interests of the United States." 88 Fed. Reg. 11,704, 11,741 (Feb. 23, 2023). The moral authority of the United States derives from its longstanding commitment to protect the vulnerable, however they enter the country. *See, e.g.*, Refugee Act of 1980 § 101, P.L. 96-212, 94 Stat. 102. Abandoning these survivors—who risk everything to seek safety and security—based on an inability to satisfy arbitrary conditions compromises the moral standing of the United States on the world stage.[6] The assertion to the contrary subverts the paramount interest in protection of the vulnerable in favor of compliance with meritless, near-insurmountable conditions on eligibility for survivors fleeing violence.

## A.  Immigrant Survivors of Gender-Based Violence Are Particularly Vulnerable, and the Prevalence of Gender-Based Violence Is Growing.

Survivors of gender-based violence are particularly vulnerable as they flee to safety. At the same time, the prevalence of gender-based violence continues to surge, as this administration acknowledges. These rules will work serious injustice by turning a blind eye to the challenges faced by survivors and erecting further barriers to their journey to safety. The Proposed Rule violates the administration's moral and legal obligations to consider its impact on vulnerable populations.

Tahirih clients are survivors of violence in countries and cultures around the world. They have survived rape, severe and routine beatings, FGM/C, and attempted femicide. They have been trafficked for profit, subjected to slavery, and coerced into relationships with men who use violence—sexual, verbal, emotional, and physical abuse—to establish power over them. They have been subject to acid attacks and attempted murder as a matter of family "honor." Escaping such persecution often entails sudden decisions to flee in haste, making it impossible to prepare or plan. Faced with a narrow window of opportunity to flee, a survivor often has no chance to collect personal belongings such as a mobile phone, identity documents, police reports, or hospital records.

Sonia[*] endured many years of abuse by her husband, who routinely beat and sexually assaulted her, hid and destroyed her religious texts, and prevented her

---

[6] In November, the administration echoed this moral imperative, explaining that "as is too often the case, women and girls from historically marginalized communities—including people of color, people with disabilities, and people who identify as LGBTQI+—are disproportionately affected [by gender-based violence]. We must recommit ourselves to ending violence against women and girls in all their diversity—*wherever and whenever* it occurs. Ending this scourge is a moral imperative, and it is in our strategic interest to strengthen security and stability for us all. When women are safe and fully integrated into their societies, everyone does better." Statement by President Joe Biden on the Occasion of International Day for the Elimination of Violence Against Women (Nov. 23, 2022) (emphasis added), available at: Statement by President Joe Biden on the Occasion of International Day for the Elimination of Violence Against Women | The White House.

[*] Names have been changed for privacy and confidentiality.

CLP_PC_032711

from attending her place of worship. After a heinous incident in which her husband strangled her to near unconsciousness and sexually assaulted her in front of her young son, Sonia picked up her small child—and nothing else—and ran out the door of her house, never to return. She made her way to the United States, where she was granted asylum.

Gender-based violence in all of its forms involves a unique set of common characteristics that leave survivors of such violence uniquely vulnerable.[7] That set of characteristics includes (i) persecution at the hands of family members, communities, and other non-state or state actors; (ii) severe ostracization and searing social stigmas; (iii) disbelief of survivors; (iv) internalized shame; (v) the inability to disclose gender-based violence to or in the presence of children or male family members; (vi) the absence or nonenforcement of laws to protect survivors; (vii) laws permitting gender-based discrimination or violence; (viii) cultural acceptance of gender-based violence; (ix) barriers to medical or mental health treatment for survivors; (x) forced dependence or unequal caretaking responsibilities; (xi) multiple victimization and revictimization; and (xii) ongoing gender-based violence even after a survivor reaches the United States.

The COVID-19 pandemic caused a sharp rise in gender-based violence, even in countries where such violence existed at epidemic levels before the onset of COVID-19.[8] It is no surprise then, that in August 2022 DHS-Office of Immigration Statistics (OIS) reported that the "number of women and girls encountered at the border in 2021 reached a historic high."[9]

As DHS-OIS explained, "increases in female migration may indicate that people are fleeing gender-based violence in their home countries, which has larger implications about stability and about potential policy approaches to mitigate such migration." DHS-OIS Aug. 2022 Rep. at 9-10. Prior to the publication of the Proposed Rule, DHS was aware of the growing trend in

---

[7]  *See generally* UNFPA, *Against My Will: Defying the Practices That Harm Women and Girls and Undermine Equality* (2020), https://www.unfpa.org/sites/default/files/pub-pdf/UNFPA_PUB_2020_EN_State_of_World_Population.pdf.

[8]  *See, e.g.*, Int'l Rescue Comm., *IRC data shows an increase in reports of gender-based violence across Latin America* (June 9, 2020), available at: https://www.rescue.org/press-release/irc-data-shows-increase-reports-gender-based-violence-across-latin-america; Nat'l Task Force to End Domestic Violence, *Fast Facts: Survivors of Domestic and Sexual Violence are at Heightened Risk Now, and Will Remain So Long After the Current Crisis*, available at https://static1.squarespace.com/static/57d7477b9de4bb8b14256cf4/t/5e9dc0e935d08275a98b9925/1587396842687/NTF+Fact+Sheet.DV-SA+survivors+and+the+COVID19+crisis.pdf; Refugees Int'l, *Exacerbating the Other Epidemic: How COVID-19 Is Increasing Violence Against Women and Girls* (Aug. 4, 2020), available at: https://www.refugeesinternational.org/reports/2020/7/31/exacerbating-the-other-epidemic-how-covid-19-is-increasing-violence-against-displaced-women-and-girls; *see also* Tahirih Justice Center, *The Impact of COVID-19 on Immigrant Survivors of Gender-Based Violence* (Mar. 23, 2020) (describing similar dynamics in the United States), available at: https://www.tahirih.org/wp-content/uploads/2020/03/Impact-of-Social-Distancing-on-Immigrant-Survivors-of-Gender-Based-Violence_Final-March-23-2020.pdf

[9]  Dep't of Homeland Sec. Office of Immigration Statistics, *Fiscal Year 2021 Southwest Border Enforcement Report* (Aug. 2022) ("DHS-OIS Aug. 2022 Rep."), at 9, available at: https://www.dhs.gov/sites/default/files/2022-09/2022_0818_plcy_southwest_border_enforcement_report_fy_2021.pdf

4

gender-based violence and the special needs of this survivor population, yet it made no effort to consider the impact of the Proposed Rule on this vulnerable group or address the differing needs of these asylum seekers in the NPRM.

### B.   Transited Countries Are Unable to Provide Safe Haven or Workable Asylum Systems.

Upon flight with little notice or opportunity to plan, a survivor must endure a journey through dangerous and unfamiliar countries to reach safety in the United States. The Proposed Rule asserts that Mexico, Guatemala, and other countries provide potential safe havens for asylum seekers outside the United States, even as it acknowledges that these nations "are the origin for sizable numbers of asylum seekers in the region." 88 Fed. Reg. at 11,721. But the NPRM ignores overwhelming evidence that these countries fail to keep their own citizens safe, provide only cumbersome and ineffectual asylum systems, and cannot address the basic needs—especially safety—of asylum seekers. Particularly for those fleeing gender-based violence, countries transited on the way to the United States cannot provide safety pending the asylum process, which is ineffectual in any event.[10]

> Rose,* a survivor of brutal domestic violence in Honduras, attempted to come to the U.S. via Mexico to escape her abusive partner. While traveling through Mexico, she was kidnapped by a cartel that trafficked human organs, sequestered for months, forced to work, and raped. When she was finally able to escape, she fled to the U.S. where she has applied for asylum.

### 1.   Guatemala

Guatemala is not a viable option for asylum seekers fleeing gender-based and other violence. In a dangerous environment rife with violence against women and LGBTQIA+ populations, the Guatemalan Migration Institute (IGM) manages a deeply dysfunctional and ineffectual asylum system.

> Mariana* was kidnapped and sex trafficked in Guatemala. Police officers were among the men with whom she was forced to have sex. She was eventually sold to another group of traffickers in Mexico where police officers and government officials were again among her perpetrators. She was forced into pregnancy, and

---

[10]  In this comment, Tahirih discusses the lack of safety and adequate asylum processes in Mexico and Guatemala, two of the countries named as alternatives to the United States. With additional time, Tahirih would address the accuracy of the Departments' claims that other countries cited in the preamble, including Belize, Costa Rica, Colombia, and Ecuador, manage functioning asylum systems capable of providing safe refuge to persecuted immigrants seeking safe haven. Tahirih also notes that some countries commonly transited by overland asylum seekers, including Honduras and El Salvador, are not even addressed in the Proposed Rule—an omission tantamount to an admission that these countries are neither safe nor capable of fairly processing asylum applications in any meaningful volume.

CLP_PC_032713

her traffickers threatened to sell her baby at birth.  She escaped to the United States just days before giving birth.

Guatemala cannot provide safety for survivors of gender-based violence; in fact, it "remains among the most dangerous countries in the world."[11] Guatemala reports alarmingly high rates of violent crime, including femicide, sexual assault, and other gender-based violence.[12] Sexual assaults increased year over year from 2020 to 2021.[13] Laws against gender-based crimes are not effectively enforced, and rape and other sexual offenses are rampant.[14] Police receive minimal training to investigate sexual crimes or to support survivors of gender-based crimes.[15]

Extreme violence against people who identify as LGBTQIA+ is widespread.[16] In the first half of 2021, 17 LGBTQIA+ people were killed in hate crimes.[17] Forced marriages and "corrective rape," intended to cause pregnancy, are perpetrated with impunity against people identifying as LGBTQIA+.[18] Police abuse of LGBTQIA+ people is rampant, contributing to low reporting rates.[19] Other prevalent human rights abuses include violence targeting people with disabilities and indigenous people.[20]

In Guatemala, human traffickers target women, children, and LGBTQIA+ people, particularly those from other Latin American countries.[21] LGBTQIA+ people are at particular risk of exploitation for sex trafficking in Guatemala.[22]

---

[11]  U.S. Department of State Overseas Security Advisory Council, *Guatemala Country Security Report* (Aug. 15, 2022) ("*2022 DOS Guatemala Security Report*"), available at: https://www.osac.gov/Content/Report/2013f384-296b-4394-bfcb-1c9c40b9c7df

[12]  U.S. Department of State Bureau of Consular Affairs, *Guatemala Travel Advisory* (Mar. 1, 2023), available at: https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/guatemala-travel-advisory.html

[13]  *2022 DOS Guatemala Security Report*.

[14] U.S. Department of State Bureau of Democracy, Human Rights and Labor, *2021 Country Reports on Human Rights Practices: Guatemala* ("*2021 DOS Guatemala Human Rights Report*"), at 24, available at: https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/guatemala/

[15]      *Id.* at 24.

[16]      *2022 DOS Guatemala Security Report*.

[17]      *2021 DOS Guatemala Human Rights Report*, at 34-5.

[18]      *Id.* at 35.

[19]      *2022 DOS Guatemala Security Report*.

[20]      *2021 DOS Guatemala Human Rights Report*, at 1.

[21]      U.S. Department of State Office to Monitor and Combat Trafficking in Persons, *2022 Trafficking in Persons Report: Guatemala* ("*2022 DOS Guatemala Trafficking Report*"), available at: https://www.state.gov/reports/2022-trafficking-in-persons-report/guatemala/

[22]      *Id.*

CLP_PC_032714

Guatemala cannot provide meaningful safety to survivors of gender-based violence. Even if a survivor could live in Guatemala in safety, she faces a very low chance of access to asylum there. Although a law makes asylum available and a process has been established for accessing it,[23] the process is so murky and rife with delays as to render it meaningless.

The administration's own report highlights serious flaws in the circuitous process, which requires representatives from four ministerial entities to approve an asylum application.[24] Of 486 asylum applications filed in 2020, only 29 were adjudicated by October of that year.[25] The administration notes that Guatemala received more than 1,000 asylum applications in 2021, which is more than double the number of any previous year.[26] But it glaringly omits any adjudication rate for this increased number of applications. Increased reliance on this unproven process all but assures that it will be unable to absorb increases in application volume and will result in delays of justice for applicants.

Similarly, the Proposed Rule asserts improvements in Guatemala's rates of asylum processing, but it mischaracterizes the actual numbers. 88 Fed. Reg. at 11,722. The NPRM says that IGM received 300 applications in the first three months of 2022, and "granted asylum to 590 individuals." 88 Fed. Reg. at 11,722. But in the first three months of 2022, IGM granted only 54 asylum applications.[27] The figure of 590 refers to the total number of asylees who have ever been granted status in Guatemala[28]—a number that hardly inspires confidence in IGM's ability to process the high number of people who may be required to apply for status there should this Proposed Rule be implemented.

The woeful rates of asylum application processing are especially important when viewed in the context of the danger faced in Guatemala. Asylum seekers who must apply in Guatemala or lose eligibility in the United States—even though they know they cannot be safe in Guatemala—will be required to wait in extremely risky conditions while a poorly functioning system slogs through a glut of applications.

## 2.     Mexico

---

[23]     *2021 DOS Guatemala Human Rights Report*, at 18.

[24]     *Id.*

[25]     *Id.*

[26]     The White House Briefing Room, *Fact Sheet: Update on the Collaborative Migration Management Strategy* (Apr. 20, 2022), available at: https://www.whitehouse.gov/briefing-room/statements-releases/2022/04/20/fact-sheet-update-on-the-collaborative-migration-management-strategy/

[27]     Instituto Guatemalteco de Migracion, Información Sobre Personas Solicitantes y Refugiadas en Guatemala, Enero 2002-Marzo 2022 (Mar. 2022) ("2022 IGM Report"), available at: https://igm.gob.gt/wp-content/uploads/2022/04/Informe-con-Graficos-Marzo-2022.pdf

[28]     *Id.*

CLP_PC_032715

Like Guatemala, Mexico fails to offer a safe environment where survivors of gender-based violence can seek asylum. Asylum seekers in Mexico—the country through which everyone approaching the southern border must transit—"are (1) subject to violence and abuse from third parties and government officials, (2) denied their rights under Mexican and international law, and (3) wrongly returned to countries from which they fled persecution."[29] Mexico is, in other words, not safe. In a moment of candor, the government has conceded as much: Deputy Assistant Attorney General Scott Stewart admitted at oral argument in federal court that migrants who seek to transit Mexico might be subject to "murders" or other violence.[30]

The Proposed Rule improperly ignores the unrebuttable evidence that asylum seekers in the United States are applying for relief in the first *safe* country in which they arrive.

> Dania* fled Peru to protect herself and her teenage daughter from gender-based violence. In Mexico, a group of men identified themselves as immigration officials and called Dania by her name. They kidnapped her and her two children, held them captive, extorted them, and physically and sexually abused them. Dania is now seeking asylum in the United States.

> Serena* is a survivor of incestual sexual violence who fled Honduras, her country of origin. In Mexico, a member of the MS-13 gang, who was traveling with her group of migrants, sexually assaulted and threatened to kill her. While Serena traveled through Mexico, she was detained by Mexican immigration officials, but she was not offered any protection or opportunity to seek legal status in Mexico. After her release a few days later, she continued to the U.S., where she is seeking asylum.

Notwithstanding the Proposed Rule's contention that Mexico "has made notable strides in strengthening access" to asylum and other protections, "receiv[ing] nearly 130,000 asylum applications" in 2021, 88 Fed. Reg. at 11,721, the Director of the Mexican Refugee Assistance Commission (COMAR) characterizes his own asylum system as "overwhelmed."[31] The application volume has increased 100-fold over ten years,[32] leaving the system rife with

---

[29] *E. Bay Sanctuary Covenant v. Barr*, 385 F. Supp. 3d 922, 955 (N.D. Cal. 2019); *see also id.* at 951-5 (canvassing the record evidence).

[30] *CAIR Coalition v. Trump*, D.D.C. No. No. 19-cv-2117 (July 22, 2019) (oral argument on plaintiffs' motion for a temporary restraining order).

[31] Daina Beth Solomon and Lizbeth Diaz, *Mexico seeks to curb 'abuse' of asylum system by migrants who do not plan to stay*, Reuters (Feb. 13, 2023), available at: https://www.reuters.com/world/americas/mexico-seeks-curb-abuse-asylum-system-by-migrants-who-do-not-plan-stay-2023-02-13/

[32] Stephanie Brewer, Lesly Tejada, and Maureen Meyer, *Struggling to Survive: the Situation of Asylum Seekers in Tapachula, Mexico* (June 2022), WOLA at 6, available at: https://www.wola.org/wp-content/uploads/2022/06/FINAL-Struggling-to-Survive-Asylum-Seekers-in-Tapachula.pdf

CLP_PC_032716

protracted delays[33] and "at risk of collapsing."[34] The Proposed Rule touts an infusion of "aid for humanitarian and development assistance for refugees and vulnerable migrants across the hemisphere" and claims that Mexico's tremendous increase in asylum application receipts reflects "dividends from these efforts."  88 Fed. Reg. at 11,720. But COMAR's annual budget remained "essentially stable from 2021 to 2022 despite skyrocketing levels of asylum claims."[35] Given that COMAR faces an enormous volume of applications with virtually no increase in resources, it is no surprise the system is "near breakdown."[36]

Mexico's protracted and draconian asylum system does nothing to make the process accessible for asylum seekers, especially those surviving gender-based violence. Mexico imposes a draconian thirty-day deadline to file an asylum application, a near-impossible hurdle, particularly for those who have survived the trauma of violence and are fleeing in fear.[37] Survivors require time to adequately build sufficient trust and process trauma in order to present a coherent story without overwhelming retraumatization. A thirty-day deadline ignores trauma-informed practice and compounds the harm to survivors.

Further, Mexico's asylum process also prohibits applicants from moving among states, deeming applications abandoned in the event of relocation. Many applicants are subjected to indefinite detention, compounding trauma, and many others are confined to the city of Tapachula, near the Guatemala border, until their applications are decided.[38] Tapachula lacks sufficient resources to support this migrant population, leaving many without basic needs including shelter and food and vulnerable to violence and exploitation.[39] Women, children, and survivors of gender-based violence face heightened risk due to exploitation, violence, and lack of police protection.[40] These severe limitations on movement and resources retraumatize those who have survived intrafamily violence, stalking, and other gender-based violence.

---

[33]  *Id.* at 1.

[34]  Rosa Flores, CNN, *Mexico rethinks Asylum initiative after controversial US announcement*, CNN, available at: https://www.cnn.com/2023/02/24/americas/mexico-asylum-policy-intl-latam/index.html

[35]  *Struggling to Survive* at 15 (citing COMAR's annual budget, which can be viewed at line N00 of the Ministry of the Interior's annual budget, available at: https://www.pef.hacienda.gob.mx/work/models/aVbnZty0/PEF2022/kgp8l9cM/docs/04/r04_aae.pdf  (2022) and https://www.pef.hacienda.gob.mx/work/models/PEF2021/docs/04/r04_aae.pdf  (2021)).

[36]  Daina Beth Solomon and Lizbeth Diaz, *Mexico seeks to curb 'abuse' of asylum system by migrants who do not plan to stay*, Reuters (Feb. 13, 2023), available at: https://www.reuters.com/world/americas/mexico-seeks-curb-abuse-asylum-system-by-migrants-who-do-not-plan-stay-2023-02-13/

[37]  UNHCR Help Mexico, *How to Apply for Refugee Status in Mexico*, available at: https://help.unhcr.org/mexico/en/como-solicitar-la-condicion-de-refugiado-en-mexico/

[38]  *Struggling to Survive* at 9.

[39]  *Id.* at 10.

[40]  *Id.* at 2.

9

> Sonia*, who escaped her abusive husband in Guatemala with just her child in her
> arms, reported that even if she had been eligible for asylum in Mexico, she could
> not have been safe there. She was confident that her husband would track her
> down in Mexico, kidnap her, and force her to return to Guatemala, where he
> would continue to harm and possibly kill her.

As a general matter, the serious dangers associated with waiting in Mexico are well documented
and admitted by myriad groups including this administration itself. Just days before the filing of
this comment, the State Department published its 2022 Country Report on Human Rights
Practices: Mexico, which notes the severe risks faced by migrants in Mexico, particularly asylum
seekers and survivors of gender-based violence.[41] "[P]olice, immigration officers, and customs
officials" target and victimize asylum seekers.[42] Criminal groups extort, threaten, and kidnap
asylum seekers.[43] Local authorities collude with human smuggling organizations.[44] Asylum
seekers are subjected to gender-based violence, domestic servitude, forced labor, restrictions
against movement, and detention.[45] Migration authorities often dissuade migrants from seeking
asylum and other types of migratory regularization.[46]

Among arrested and detained women, 79 percent of women had been tortured by police
personnel during their incarceration.[47] "Of these, 44 percent were subject to acts of sexual
torture."[48]

Violence against women is prevalent, with 40 percent of women reporting recent physical
domestic violence and 23 percent reporting sexual violence within the last year.[49] The prevalence
of domestic violence continues to worsen.[50] Only two percent of women who survived violence
received help.[51]

---

[41] U.S. Department of State Bureau of Democracy, Human Rights and Labor, *2022 Country Reports on Human
Rights Practices: Mexico* ("*2022 DOS Mexico Human Rights Report*"), available at:
https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/mexico/.

[42] *Id.* at 19.

[43] *Id.*

[44] *Id.*

[45] *Id.* at 19-20, 41.

[46] *Id.* at 20.

[47] *Id.* at 7.

[48] *Id.* at 7.

[49] *Id.* at 26.

[50] *Id.* at 26.

[51] *Id.* at 25.

CLP_PC_032718

Gender-based violence also seriously endangers the LGBTQIA+ community. Police mistreat people who are LGBTQIA+ in detention.[52] The government does not routinely investigate or punish abuses against people who are LGBTQIA+.[53] Hate crimes target people who are LGBTQIA+, particularly transgender women, with impunity.[54]

Against this backdrop, two U.S. government policies have already exposed migrants to serious danger in Mexico while they wait to bring their asylum claims: the Title 42 policy of rapid expulsions of asylum seekers and other migrants, and the now-terminated Remain in Mexico ("Migrant Protection Protocols") program. These two programs have laid bare the serious risks associated with stranding vulnerable migrants at the U.S. southern border without reasonable access to asylum processing.

During Remain in Mexico, asylum seekers reported kidnapping, rape, and other violence when they were forced to return to Mexico to await processing.[55] This administration noted the program's "endemic flaws" and "unjustifiable human costs,"[56] and that enrollees "lack[ed] . . . stable access to housing, income, and safety."[57] In the first two years of this administration, asylum seekers excluded from the U.S. under Title 42 reported more than 13,400 incidents of "kidnapping, torture, rape, and other brutal attacks."[58]

These reports only begin to capture the violence and danger rampant in Mexico for those whom the government has already forced to wait for an opportunity to seek asylum in the United States. The Proposed Rule works a serious injustice in requiring that survivors attempt to avail themselves of a malfunctioning asylum system in Mexico—and become targets for further violence while they do so.

---

[52] *Id.* at 34.

[53] *Id.* at 33-34.

[54] *Id.* at 34.

[55] Julia Neusner & Kennji Kuzika, *Fatally Flawed: "Remain in Mexico" Policy Should Never Be Revived*, Human Rights First (Sept. 13, 2022), https://humanrightsfirst.org/library/fatally-flawed-remain-in-mexico-policy-should-never-be-revived/

[56] Department of Homeland Security, *DHS Statement on U.S. District Court's Decision Regarding MPP* (Aug. 8, 2022), https://www.dhs.gov/news/2022/08/08/dhs-statement-us-district-courts-decision-regarding-mpp

[57] Alejandro D. Mayorkas, *Memorandum: Termination of the Migration Protection Protocols Program* (June 1, 2021), Department of Homeland Security at 4, available at: https://www.dhs.gov/sites/default/files/2022-02/21_0601_termination_of_mpp_program.pdf .

[58] Human Rights First, *Biden Administration Use and Expansion of Trump Policy to Ban People Seeking Asylum Endangers Lives, Tramples Human Rights* (Jan. 5, 2023), available at: https://humanrightsfirst.org/library/biden-administration-use-and-expansion-of-trump-policy-to-ban-people-seeking-asylum-endangers-lives-tramples-human-rights/; *see generally* Human Rights First, *Human Rights Stain, Public Health Farce: Evasion of Asylum Law and Title 42 Abuse Must End—and Never Be Revived* (Dec. 2022), available at: https://humanrightsfirst.org/wp-content/uploads/2022/12/HumanRightsStainPublicHealthFarce-1.pdf.

11

CLP_PC_032719

### C.  The CBP One App Is Ineffectual, Illegally Imposes Metering, and Causes Delays Resulting in Increased Danger and Harm.

The Proposed Rule imposes an unreasonable requirement that asylum seekers who cannot prove an asylum denial in a country of transit must schedule an appointment at a port of entry. This requirement, resting on use of the deeply flawed and biased CBP One app, severely disadvantages those fleeing gender-based violence. The app is deeply flawed, countenances bias, and requires access to and familiarity with technology. The severe restriction in the number of available appointments effectively imposes an unlawful metering requirement. Finally, the requirement to wait long periods to schedule an appointment to enter the U.S. knowingly exposes survivors to further violence and danger.

#### 1.   The App Is Inaccessible and Error-Ridden

Those who flee domestic violence, stalking, and other gender-based violence often travel without a phone because of fear of continued stalking, haste in flight, or lack of resources. Some survivors flee in the midst of a final life-threatening violent incident, without the chance to collect even essential belongings, such as a mobile phone. Some survivors know their persecutors can track their movements and hunt them down if they keep a cell phone. Many shelters, especially those over-taxed and under-resourced shelters near the U.S. southern border, lack reliable internet access. Requiring access to a smartphone and a stable internet connection severely disadvantages survivors of violence.

Moreover, the technical flaws and unreliability of the CBP One app are well established. Many individuals spend hours attempting to register with the app, only to have the system terminate the process without warning, requiring them to restart the process.[59] Others struggle to provide a photograph from which the app can discern their facial features—resulting in a disparate impact on people of color.[60] The app is available in only a limited number of languages, including no indigenous languages.[61] And use of the app requires such extensive technical knowledge and involves a process so arcane that one advocate has created a manual more than sixty pages long guiding applicants in its use.

---

[59] Kate Morrissey, *Asylum seekers in Tijuana are scrambling through mobile app error messages for few appointments into the U.S.*, The San Diego Union-Tribune (Jan. 22, 2023), available at: https://www.sandiegouniontribune.com/news/immigration/story/2023-01-22/cbp-one-app-asylum-tijuana; John Washington, *Glitchy CBP One app turning volunteers into Geek Squad support for asylum-seekers in Nogales*, Arizona Luminaria (Mar. 20, 2023), available at: https://azluminaria.org/2023/03/20/glitchy-cbp-one-app-turning-volunteers-into-geek-squad-support-for-asylum-seekers-in-nogales/

[60] *Id.*; *see also* Melissa del Bosque, *Facial Recognition Bias Frustrates Black Asylum Applicants to US, Advocates Say*, The Guardian (Feb. 8, 2023), available at: Facial recognition bias frustrates Black asylum applicants to US, advocates say | US immigration | The Guardian

[61] Rachel Sheridan, *CBP One App May Do More Harm Than Good for Survivors of Gender-Based Violence*, Tahirih Justice Center (Mar. 15, 2023), available at: https://www.tahirih.org/news/cbp-one-app-may-do-more-harm-than-good-for-survivors-of-gender-based-violence/

12

The Departments acknowledge "concerns regarding the accessibility of the CBP One app," 88 Fed. Reg. at 11,720, but they offer no meaningful recourse for those adversely affected. The exceptions to the requirement to use the app—for those who face language barriers, illiteracy, significant technical failure, or other ongoing and serious obstacles—lack clarity and are insufficient to address these concerns. There is no guidance clarifying what might constitute "significant technical failure" or "other ongoing and serious obstacle," leaving a troubling amount of discretion to officers conducting credible fear interviews. There is no exception for survivors who lack smartphones—and the app is not available on any other hardware such as a laptop or kiosk. These exceptions are also logistically vague, engendering serious questions of when, where, and under what standard seekers of asylum must prove they meet an exception and deserve consideration for asylum.

### 2.    The App Imposes an Illegal Metering Scheme

The Departments disingenuously claim that the app will "significantly increase the number of individuals, including those who may be seeking asylum, that CBP can process at land border ports of entry." 88 Fed. Reg. at 11,719. But to date the app has been used only to severely curtail the number of people who can present their asylum claims at a port of entry—effectively imposing an unlawful metering scheme. CBP acknowledged that as of March 15, 2023, "not all individuals seeking appointments have yet been able to schedule them" via the CBP One app, despite the app having been in operation for months.[62]

The number of appointments provided does not approach the demand, with the result that the app imposes an unlawful metering scheme much like the ones federal courts have previously deemed illegal. For an extended discussion, *see* Section II.A.2. *infra*.

### 3.    Use of the App and Its Associated Wait Times Expose Survivors to Increased Risk

Finally, survivors of gender-based violence are at increased risk of continued danger from their persecutors as they wait in Mexico for an opportunity to present themselves at a port of entry. Oxfam America and Tahirih Justice Center, *Surviving Deterrence: How US Asylum Deterrence Policies Normalize Gender-Based Violence*, at 14 (2022) (hereinafter "*Surviving Deterrence*").[63] Some service providers report that the border serves as a "conduit for abusers," where persecutors can track down and harm those who have escaped, compounding their trauma because they are required to wait for a chance to present their asylum claim. *Id*. Moreover, women, girls, LGBTQIA+ migrants, and Black migrants are all at elevated risk of continued or

---

[62] U.S. Customs and Border Protection, *CBP Releases February 2023 Monthly Operational Update* (Mar. 15, 2023), available at: https://www.cbp.gov/newsroom/national-media-release/cbp-releases-february-2023-monthly-operational-update

[63] Oxfam America and Tahirih Justice Center, *Surviving Deterrence: How US Asylum Deterrence Policies Normalize Gender-Based Violence*, at 2 (2022) (hereinafter "*Surviving Deterrence*"), available at: https://www.tahirih.org/wp-content/uploads/2022/10/Oxfam_Tahirih_Surviving-Deterrence_English_2022.pdf

CLP_PC_032721

new gender-based violence while waiting at the border. *Id*. For example, sixty-eight percent of the service providers surveyed indicated that their clients had been raped and/or sexually assaulted frequently at the border. *Id*. The measures imposed by this rule thus expose vulnerable migrants to continued increased risk of harm.

It is the height of injustice to impose a presumption of ineligibility for asylum against those who are at highest risk when they comply with the conditions required to escape that presumption. In that way, the Proposed Rule creates a cruel Sophie's choice for survivors: they can endure increasing danger to comply with one of the Proposed Rule's unreasonable preconditions, or they can accept a presumption that they cannot seek the relief they so clearly deserve.

### D. The "Exceptionally Compelling Circumstances" Required to Rebut the Presumption of Ineligibility for Asylum Are Insufficient to Protect Vulnerable Survivors

Further complicating an already complex scheme, the Proposed Rule creates narrow categories of "exceptionally compelling circumstances" that may be used to rebut the presumption against ineligibility. If a migrant can prove by a preponderance of the evidence that, at the time of entry, she or a family member with whom she is traveling faces an acute medical emergency, faces an imminent and extreme threat to life or safety, or is a victim of a severe form of trafficking, she can rebut the presumption and preserve her opportunity to seek asylum. But these grounds for rebuttal are unclear, narrow, legally complex, and fail to adequately protect those fleeing harm.

The exceptionally compelling circumstances are vague regarding the contours and standards of the exceptions, the forum in which a survivor will be expected to establish such circumstances, and the modicum of proof required. No definitions are provided for "acute medical emergency" or "imminent and extreme threat to life or safety," leaving an inordinate amount of discretion to the official making the determination. The definition of "victim of a severe form of trafficking" is highly technical and requires a thorough analysis of several components usually (in the T nonimmigrant status context, from which the definition derives) completed after review of a complete application package, including extensive supporting evidence and briefing prepared by legal counsel. A survivor presenting at the border under the circumstances described above is unlikely to be able to meet this complex standard.

Border officials have repeatedly failed to faithfully execute existing screening requirements. Complicating the analysis further will only result in erroneous decision-making.

> Simone,* a survivor of brutal domestic violence in Mexico, presented at a port of entry in Texas but was turned away without being asked why she had come to the U.S., whether she needed assistance, or whether she required communication in her best language.

> Aretha,* who had survived sexual violence in Guatemala, was detained upon presenting at a port of entry, but was never asked why she had fled her country or if she required assistance. She was never given a credible fear interview.

14

The practical use of these grounds for rebuttal are deeply problematic and fail to adequately protect survivors. As a concrete example, the identical exception for "victims of severe forms of trafficking" included in the prior transit ban was "essentially insurmountable" because it was "rarely used and narrowly applied."[64]  Similarly, the limitations on the "imminent and extreme threat to life and safety" basis for rebuttal swallow the exception itself. While the generalized danger to survivors in border areas is both extreme and irrefutable (*see* Section I.B. above), the Proposed Rule emphasizes that "the threat cannot be speculative, based on generalized concerns about safety, or based on a prior threat that no longer poses an immediate threat." 88 Fed. Reg. at 11,707 n.27.  Proving a specific threat may be near impossible, as individualized threats are frequently made orally and in person, not in writing and amenable to proof in a formalized setting—and are usually directly followed by the harm itself. By requiring proof of an imminent and extreme threat in a country known to be unable to prevent violence, the Proposed Rule is *designed* to expose migrants to continued harm.

Further, it is the height of irony that a survivor of violence must prove additional risk or harm in order to prove that she is eligible for asylum. In fact, the exceptionally compelling circumstances appear to require a showing that the survivor is *doubly* eligible—first, on the basis of her underlying persecution, and again on the basis of her qualification for one of the exceptionally compelling circumstances.

### E.  The Improper Elevated Standard of "Reasonable Fear" Is Applied to the Most Disadvantaged.

As discussed above, the special vulnerabilities of survivors of gender-based violence make them likely to be unable to use the app to make an appointment or meet an exception, provide proof of denial of asylum in a transited country, or rebut the presumption by showing exceptionally compelling circumstances. Yet these survivors—who have suffered genuine persecution and truly fear return to their countries of origin—will, as a direct result of their own survivorship, be subjected to an elevated standard of fear review. At the same time, survivors are among the most poorly equipped to prove they meet these requirements or satisfy a higher standard of fear. Due to the crippling impact of trauma, pervasive social stigmas, and accompanying fear of reporting gender-based violence, particularly to government officials, it is highly unlikely that survivors will be able to sufficiently (1) disclose key, required elements of their claims; or (2) gather and provide objective documentation or proof to be able to corroborate such claims by a preponderance of the evidence.[65]

---

[64]  Human Rights First, *Asylum Denied, Families Divided: Trump Administration's Illegal Third-Country Transit Ban* (July 2020) (providing an example of a 16-year-old victim of trafficking to whom an officer nevertheless applied the transit ban because the trafficking did not occur during the victim's flight), available at: https://humanrightsfirst.org/wp-content/uploads/2022/10/AsylumDeniedFamiliesDivided.pdf.

[65] U.S. Commission on International Religious Freedom (USCIRF), *Asylum Seekers in Expedited Removal* (Feb. 8, 2005), available at: https://www.uscirf.gov/reports-briefs/special-reports/report-asylum-seekers-in-expedited-

15

Notwithstanding the severe disadvantages for survivors to prove their eligibility for asylum, the standard is elevated for this vulnerable group. A survivor who cannot satisfy the conditions, prove she qualifies for an exception, or rebut the presumption is subject to a far higher reasonable fear standard of review, where the same challenges that triggered this standard will again plague her attempt to satisfy it—even though the reason she is subjected to this higher standard is her very experience of trauma and violence.

### 1.   <u>Trauma Impacts a Survivor's Ability to Coherently and Compellingly Present an Asylum Claim</u>

The asylum seekers at issue here—to whom this discompassionate rule would apply—are survivors of violence in countries and cultures around the world. Finding the courage to escape that violence—often in haste and without warning, as described above—does not mean escaping the associated trauma. Like survivors of other traumatic events—war, hurricanes, criminal attacks—immigrant survivors of gender-based violence are marked by that trauma in ways both visible and invisible. For those who successfully make their way to the U.S. border to seek asylum or other relief based on such persecution, that trauma is likely to be, if anything, sharpened by a dangerous journey, fear of the asylum process, fear of being returned to their conditions of persecution, and fear of border officials.

Tahirih knows from its decades of experience working with survivors of gender-based violence that survivors, and other people seeking asylum, have undergone severe trauma.[66] Even the Departments have recognized this fact.[67] Rates of post-traumatic stress disorder, depression, anxiety, and other mental health challenges occur in far higher rates among people seeking asylum than the general population.[68] And the simple fact of trauma has several well-understood, well-established effects that deeply affect survivors' ability to navigate any asylum system—let alone one stacked against survivors.

---

removal; *see also Surviving Deterrence*, at 18 ("Due to both acute and/or prolonged trauma, a survivor of GBV may be unable to articulate their need for asylum on the spot in a way that is acceptable to CBP.").

[66] *See, e.g.*, Stuart L. Lustig, *Symptoms of Trauma Among Political Asylum Applicants: Don't Be Fooled*, 31 Hastings Int'l & Comp. L. Rev. 725, 726, 728 (2008); U.S. Dep't of Justice, Office on Violence Against Women, *The Importance of Understanding Trauma-Informed Care and Self-Care for Victim Service Providers* (July 30, 2014) ("*Trauma-Informed Care*").

[67] *Id.; see also USCIS RIAO Directorate – Officer Training: Interviewing Survivors of Torture and Other Severe Trauma* (Dec. 20, 2019), available at: https://www.uscis.gov/sites/default/files/document/foia/Interviewing_-_Survivors_of_Torture_LP_RAIO.pdf

[68] *See* U.N. High Comm'r for Refugees (UNHCR), *Refugee Resettlement: An International Handbook to Guide Reception and Integration*, at 233 (2002), available at: https://www.unhcr.org/3d98623a4.html

CLP_PC_032724

As an initial matter, trauma has serious effects on memory.[69] The result is that many trauma survivors suffer from an "impairment of recall" as a result of the trauma.[70] Memory problems can cause confusion around "details of particular incidents," especially times, dates, and "which specific actions occurred on which specific occasion."[71]And survivors may also have difficulty identifying details that those who have not experienced trauma would view as central. To take a well-known example, many survivors are unable to identify the person who inflicted violence or torture on them, often because their minds were focused on other, more immediately salient details—such as the presence or use of a weapon.[72]

In addition to its effects on memory, trauma has severe emotional consequences.[73] The recollection of trauma can also be emotionally overwhelming, especially when survivors recount their experiences. Doing so effectively retraumatizes a survivor by forcing her to "relive the

---

[69] Severe stress—which is routinely occasioned by traumatic events—can "inhibit processing of and memory for peripheral details." Deborah Davis & William C. Follette, *Foibles of Witness Memory for Traumatic/High Profile Events*, 66 J. Air L. & Com. 1421, 1455-56 (2001). Moreover, traumatic experiences "are often stored in the memory as sensations or emotional states" that are not immediately recorded as personal narratives. Evert Bloemen et al., *Psychological and Psychiatric Aspects of Recounting Traumatic Events by Asylum Seekers*, Care Full 62, 74 (2006). Traumatic memories may therefore be available only "as isolated, nonverbal, sensory, motor, and emotional fragments." *Id.*

[70] Michael Kagan, *Is Truth in the Eye of the Beholder? Objective Credibility Assessment in Refugee Status Determination*, 17 Geo. Immigration L.J. 367, 388 (2003) (quoting Juliet Cohen, *Questions of Credibility: Omissions, Discrepancies and Errors of Recall in the Testimony of Asylum Seekers*, 13 Int'l J. Refugee L. 293, 298, 308 (2001)); Jessica Chaudhary, *Memory and Its Implications for Asylum Decisions*, 6 J. Health & Biomedical L. 37, 44-45 (2010). Such loss of memory can take the form of broad "psychogenic amnesia," or "loss of memory caused by psychological trauma." Davis & Follette, *supra*, at 1462. It can also manifest as much more narrow memory loss that goes only to "selected components of the traumatic event." *Id.* at 1462-63.

[71] Davis & Follette, *supra*, at 1514; *see* J. Douglas Bremner, *Traumatic Stress: Effects on the Brain*, 8 Dialogues Clinical Neuroscience 445, 448-49 (2006). Dates are particularly problematic, because human brains are skilled at recalling relative sequences of events but not exact dates. *See* Cohen, *supra*; Melanie A. Conroy, *Real Bias: How Real ID's Credibility and Corroboration Requirements Impair Sexual Minority Asylum Applicants*, 24 Berkeley J. Gender L. & Just. 1, 37 (2009); Carol M. Suzuki, *Unpacking Pandora's Box: Innovative Techniques for Effectively Counseling Asylum Applicants Suffering from Post-Traumatic Stress Disorder*, 4 Hastings Race & Poverty L.J. 235, 257 (2007).

[72] Davis & Follette, *supra*, at 1457.

[73] T. K. Logan et al., *Understanding Human Trafficking in the United States*, 10 Trauma, Violence, & Abuse 3, 16 (January 2009). Trauma can, for instance, lead to avoidance and dissociation. Maureen E. Cummins, *Post-Traumatic Stress Disorder and Asylum: Why Procedural Safeguards Are Necessary*, 29 J. Contemp. Health L. & Pol'y 283, 289 (2013).

CLP_PC_032725

crime mentally and emotionally, leading some to feel as though the sexual assault is recurring."[74] Indeed, sometimes just "remembering constitutes new trauma."[75]

These effects of trauma are uniformly severe, but individual responses to trauma are not uniform.[76] Despite this variation, the effects of trauma generally lead to two results that have great significance for the asylum process. The first is that it is difficult for survivors to tell their story. The effects of trauma on memory naturally contribute to this problem, given that a "difficulty in information processing and in the logical, verbal reconstruction and description of the memory is at the very core of trauma reactions."[77] A person who was tortured, for instance, may be left with memories of "the sensory data from the traumatic event—the sights, sounds, smells, and bodily sensations—but without the linguistic narrative structure that gives a person's ordinary memories a sense of logical and chronological coherence."[78]

The emotional effects of trauma also significantly impede survivors' ability to recount events. Detachment can "make it difficult for people to coherently communicate what they have survived."[79] And being emotionally overwhelmed can lead survivors to appear "ambivalent in telling their stories of abuse" or to "minimize[ ] the seriousness of the abuse."[80] Indeed, survivors of gender-based persecution who manage to flee in pursuit of safe haven often cannot meaningfully recount their stories in meaningful detail until and unless they receive medical, mental health, and other services.  And even when they can, survivors of sexual and other severe

---

[74] Meg Garvin et al., *Allowing Adult Sexual Assault Victims to Testify at Trial via Live Video Technology*, Nat'l Crime Victim Law Institute, Violence Against Women Bulletin at 1-2 (Sept. 2011) (internal quotation marks and alteration omitted); Gangsei & Deutsch, *supra*, at 86; Piwowarczyk, *supra*, at 157; Mosley, *supra*, at 321; Stephen Paskey, *Telling Refugee Stories: Trauma, Credibility, and the Adversarial Adjudication of Claims for Asylum*, 56 Santa Clara L. Rev. 457, 486 (2016).

[75] Conroy, *supra*, at 35 (emphasis added).

[76] *See* U.S. Dep't of Health & Hum. Servs., Substance Abuse & Mental Health Servs. Admin., *A Treatment Improvement Protocol (TIP) Series No. 57, Trauma-Informed Care in Behavioral Health Services* 61 (2014) ("Trauma-Informed Care"), available at:  https://store.samhsa.gov/sites/default/files/d7/priv/sma14-4816.pdf; Heather J. Clawson et al., U.S. Dep't of Health & Hum. Servs., *Treating the Hidden Wounds: Trauma Treatment and Mental Health Recovery for Victims of Human Trafficking* 1 (2008), available at: https://aspe.hhs.gov/system/files/pdf/75356/ib.pdf.

[77] Bloemen, *supra*, at 78.

[78] Paskey, *supra*, at 487; *see* Davis & Follette, *supra*, at 1459; Epstein & Goodman, *supra*, at 411; Mosley, *supra*, at 326; Hannah Rogers et al., *The Importance of Looking Credible: the Impact of the Behavioural Sequelae of Post-Traumatic Stress Disorder on the Credibility of Asylum Seekers*, 21 Psych., Crime & L. 139, 140 (2015).

[79] Kagan, *supra*, at 396.

[80] Catrina Brown, *Women's Narratives of Trauma: (Re)storying Uncertainty, Minimization, and Self-Blame*, 3 Narrative Works 1, 11-12, 17 (2013).

18

trauma may need "second and subsequent interviews ... in order to establish trust and to obtain all necessary information."[81]

The second, equally straightforward result is that many trauma survivors will behave in ways that untrained people may read as indicating a lack of credibility. As shown above, trauma will lead to apparent inconsistencies as survivors become able to recount additional details over time. Trauma can also lead survivors to dissociate, or to be nervous, passive, unable to make eye contact, or reluctant to speak, and it also affects their cadence, affect, and tone.[82] Trauma can cause survivors to "hesitate," "waver," or seem uncertain when describing traumatic experiences.[83] Survivors can also appear mechanical or unemotional as they do so.[84]

These factors can and do affect survivors' ability to tell their stories, and they are especially important in the fear interview at the border when trauma is likely to be freshest and the asylum seeker at her most vulnerable. Survivors arriving at the border are ill equipped to effectively communicate with immigration officials due to profound traumatization, hunger, exhaustion, lack of understanding of our legal process, and language and cultural barriers. They might still be suffering acute physical effects of violence in addition to emotional trauma. With no time to collect their thoughts, it is highly inappropriate to expect them to meet newly restrictive standards of proof and presumptions.

Yet the Proposed Rule bans survivors who have not been denied asylum in a third country nor scheduled an appointment, unless they qualify for an exception or rebut the ban with proof of exceptionally compelling circumstances. Survivors in this common situation will need to meet a far higher standard of proof to be eligible only for withholding of removal or protection under the U.N. Convention Against Torture. Both escaping the rebuttable presumption and satisfying the reasonable fear standard require a clear understanding of complex asylum laws and regulations, the capacity to formulate and express a legal theory, and the wherewithal to summon, organize, and express the relevant facts—all with virtually no access to counsel and likely while in detention. Many of those who qualify for an exception, or a rebuttal of the presumption, or for asylum even under the higher reasonable fear standard, will be unable to prove their eligibility to an officer.

The question of proof is further complicated by the many difficulties survivors face in gathering and providing objective documentation or evidence to corroborate their claims by a preponderance of the evidence. Access to corroborating evidence to support their claims is very

---

[81] UNHCR, *Guidelines on International Protection: Gender-Related Persecution within the context of Article 1A(2) of the 1951 Convention and/or Its 1967 Protocol relating to the Status of Refugees* 9 (May 2, 2002) ("*Gender Guidelines*"), available at: https://www.unhcr.org/3d58ddef4.pdf.

[82] *See, e.g.*, *Trauma-Informed* 61-62, 69; Conroy, *supra*, at 34; Kagan, *supra*, at 396.

[83] Paskey, *supra*, at 484, 489; Scheppele, *supra*, at 126-27.

[84] *See* Linda Piwowarczyk, *Seeking Asylum: A Mental Health Perspective*, 16 Geo. Immigr. L.J. 155, 157-58 (2001); Lustig, *supra*, at 726.

CLP_PC_032727

limited. In "gender-related claims, the usual types of evidence used in other refugee claims may not be readily available. Statistical data or reports on the incidence of sexual violence may not be available, due to under-reporting of cases, or lack of prosecution."[85] The formidable obstacles survivors already face in seeking safety have only been amplified by the global pandemic.[86]

The second irrefutable fact faced by survivors for which the Departments must account is that. There are at least four reasons that survivors' corroborating evidence is largely elusive. *First*, given the desperate circumstances under which they flee their homes in pursuit of a safe haven, survivors do not stop to gather paperwork. And even if they did so, they would need a sophisticated understanding of the U.S. asylum system to understand what documents would be helpful.

*Second*, just as trauma makes it effectively impossible for survivors to tell full and coherent stories, it also severely interferes with survivors' ability to carry out even the basic administrative tasks needed in order to obtain evidence.[87] Further, the trauma associated with reviewing evidence of violence can prevent survivors from fully documenting their cases. For example, the abusive intimate partner of Marya,* Tahirih's client, had their daughter killed. Overwhelmed with grief, Marya could not bring herself to view the photographs of her daughter's deceased body and would not permit their submission as evidence in support of her asylum case.

*Third*, it is well established that external actors often bar survivors from retaining or gathering corroborating evidence. Human traffickers and people who commit domestic violence notoriously prevent survivors from holding bank accounts, purchasing bus passes, or even obtaining library cards—all potential sources of evidence in other types of cases. People who perpetrate domestic violence also routinely prevent survivors from seeking medical and law enforcement assistance, eliminating the initial creation of evidence. People who abuse survivors often confiscate documents ranging from passports to personal correspondence to further manipulate, isolate, and punish survivors and prevent them from escaping or seeking help. A

---

[85] UNHCR, *Guidelines on International Protection No. 1: Gender-Related Persecution Within the Context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol Relating to the Status of Refugees*, U.N. Doc. HCR/GIP/02/01, at 10 (2002) (UNHCR *Gender Guidelines*), available at: https://www.unhcr.org/3d58ddef4.pdf .

[86] *See, e.g.*, Rená Cutlip-Mason, *For Immigrant Survivors, the Coronavirus Pandemic is Life-Threatening in Other Ways*, Ms. Magazine (Apr. 14, 2020), available at: https://msmagazine.com/2020/04/14/for-immigrant-survivors-the-coronavirus-pandemic-is-life-threatening-in-other-ways/; Tahirih Justice Center, *The Impact of COVID-19 on Immigrant Survivors of Gender-Based Violence* (Mar. 23, 2020), available at: https://www.tahirih.org/wp-content/uploads/2020/03/Impact-of-Social-Distancing-on-Immigrant-Survivors-of-Gender-Based-Violence_Final-March-23-2020.pdf

[87] *See, e.g.*, Tahirih Justice Center, *Precarious Protection: How Unsettled Policy and Current Laws Harm Women and Girls Fleeing Persecution* (Oct. 2009), available at: https://www.tahirih.org/wp-content/uploads/2009/10/Precarious-Protection_Tahirih-Justice-Center.pdf

CLP_PC_032728

survivor might thus have to risk her safety trying to retain or regain control over her own documents and other belongings that could serve as key evidence in her case.[88]

*Fourth*, although expert evidence is likely to be available in the United States and not in the control of those from whom a survivor is fleeing, survivors and other people seeking asylum are typically in no position to gather for that type of evidence. Indeed, people seeking asylum are unlikely to know what expert evidence is, much less that it is frequently helpful in immigration cases; what kinds of expert evidence, such as country-conditions evidence and psychological evaluations, are most useful; or where to find experts. And even if survivors somehow had all of that knowledge, communication and payment would remain effectively insurmountable obstacles. The result is that survivors are exceptionally unlikely to be able to procure expert evidence until they have retained counsel, built a relationship of trust with counsel, and sufficiently processed trauma to be able to relay their experiences to counsel. All of that takes significant amounts of time—as does the process of counsel then finding relevant experts and securing reports, declarations, and the like.

In short, as noted by UNHCR, in "gender-related claims, the usual types of evidence used in other refugee claims may not be as readily available. Statistical data or reports on the incidence of sexual violence may not be available, due to under-reporting of cases, or lack of prosecution."[89] Thus, "cases in which an applicant can provide" documentary "evidence of all of his statements will be the exception rather than the rule."[90]

Taken together with the effects of trauma, the general unavailability of documentary evidence means that the very people who have suffered the worst persecution are often the *least* able to present evidence, be it oral or written, in support of their claims that they qualify for an

---

[88] *See, e.g.*, Anne L. Ganley, *Health Resource Manual* 37 (2018); Rachel Louise Snyder, *No Visible Bruises: What We Don't Know About Domestic Violence Can Kill Us* (2019) ("*No Visible Bruises*"); Margaret E. Adams & Jacquelyn Campbell, *Being Undocumented & Intimate Partner Violence (IPV): Multiple Vulnerabilities Through the Lens of Feminist Intersectionality*, 11 Women's Health & Urb. Life 15, 21-24 (2012); Misty Wilson Borkowski, *Battered, Broken, Bruised, or Abandoned: Domestic Strife Presents Foreign Nationals Access to Immigration Relief*, 31 U. Ark. Little Rock L. Rev. 567, 569 (2009); Nat'l Domestic Violence Hotline, *Abuse and Immigrants*, available at: https://www.thehotline.org/is-this-abuse/abuse-and-immigrants-2; Edna Erez & Nawal Ammar, *Violence Against Immigrant Women and Systemic Responses: An Exploratory Study* (2003); available at: https://www.ncjrs.gov/pdffiles1/nij/grants/202561.pdf; Memorandum from Paul Virtue, General Counsel, Immigration & Naturalization Service (Oct. 16, 1998), at 7-8, available at: https://asistahelp.org/wp-content/uploads/2018/10/Virtue-Memo-on-Any-Credible-Evidence-Standard-and-Extreme-Hardship.pdf; Edna Erez et al., *Intersection of Immigration and Domestic Violence: Voices of Battered Immigrant Women*, 4 Feminist Criminology 32, 46-47 (2009); Immigration & Customs Enforcement, *Information for Victims of Human Trafficking* (2016), available at: https://www.ice.gov/sites/default/files/documents/Document/2017/brochureHtVictims.pdf; National Sexual Violence Resource Center, *Assisting Trafficking Victims: A Guide for Victim Advocates* 2 (2012). available at: https://www.nsvrc.org/sites/default/files/publications_nsvrc_guides_human-trafficking-victim-advocates.pdf.

[89] UNHCR, *Gender Guidelines* at 10, available at: https://www.unhcr.org/3d58ddef4.pdf .

[90] UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* § 196 (1979).

21

CLP_PC_032729

exception or for exceptionally compelling circumstances or meet an elevated reasonable fear standard.

$\qquad$ 2. $\qquad$ The Heightened Reasonable Fear Standard Is Inappropriate to Apply to Survivors.

For all of these reasons, application of a reasonable fear standard to survivors of gender-based and other violence serves only to expedite the return of survivors to harm despite the fact that they are in greatest need of protection. The Departments previously admitted that the heightened reasonable fear standard is not appropriately imposed against survivors and other asylum seekers in an earlier rulemaking. Yet with this Proposed Rule the Departments impose exactly that approach, irrationally reversing their own previous admissions that such a standard undermines congressional intent, is inefficient, is ineffective at screening out non-meritorious claims, and does not adequately protect against *refoulement*.

Congress imposed a standard that those in expedited removal proceedings show a "significant possibility" that they would be subject to persecution if returned to their country of origin. INA § 235(b)(1)(B)(v). This longstanding rule was abrogated briefly by a series of rules promulgated by the previous administration, later deemed unlawful, and—until now—abandoned by the current administration. *See* "Asylum Eligibility and Procedural Modifications,'" 84 Fed. Reg. 33,829 (July 16, 2019) ("Third Country Transit Bar IFR"), *vacated by Capital Area Immigrants' Rights Coal. v. Trump*, 471 F. Supp. 3d 25, 45–57 (D.D.C. 2020); "Asylum Eligibility and Procedural Modifications," 85 Fed. Reg. 82,260 (Dec. 17, 2020) ("TCT Bar Rule"), *preliminarily enjoined by E. Bay Sanctuary Covenant v. Barr*, 519 F. Supp. 3d 663, 668 (N.D. Cal. Feb. 2021); "Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review," 85 Fed. Reg. 80,274 (Dec. 11, 2020) ("Global Asylum rule"), *preliminarily enjoined by Pangea Legal Servs. v. DHS*, 512 F. Supp. 3d 966, 977 (N.D. Cal. 2021) ("*Pangea II*"); "Security Bars and Processing," 85 Fed. Reg. 84,160 (Dec. 23, 2020) ("Security Bars Rule"), *delayed by* "Security Bars and Processing; Delay of Effective Date," 86 Fed. Reg. 73,615 (Dec. 28, 2021).

Since the promulgation of and rulings against those rules, this administration has distanced itself from the unjust "reasonable possibility" standard and returned to "defining 'credible fear of persecution' as 'a significant possibility, taking into account the credibility of the statements made by the [noncitizen] in support of the [noncitizen's] claim and such other facts as are known to the [asylum] officer, that the [noncitizen] can establish eligibility for asylum under section 208 of the Act or for withholding of removal under section 241(b)(3) of the Act.'" 87 Fed. Reg. at 18,084. The Departments provide no good reason for this change.

Application of a consistent "significant possibility" standard for those in expedited removal proceedings promotes efficiency at a time when the Departments are underfunded, understaffed, and facing significant backlogs. *See* 87 Fed. Reg. at 18,091 ("[K]eeping one standard in screening for asylum, statutory withholding, and CAT protection better promotes an efficient credible fear screening process."). In the Departments' recent view, elevating the standard in some situations "defeat[s] their intended purpose, and complicates and extends the initial

22

screening process." 87 Fed. Reg. at 18,092. "In the Departments' view, the delays associated with complicating and extending every credible fear interview likely outweigh any efficiencies gained by potential earlier detection of individuals who may be barred from or ineligible for certain types of protection." 87 Fed. Reg. at 18,092. Here, as with those previous, now-abandoned rules, "[the] additional time spent developing the record when the higher reasonable fear standard applied decreased the efficiency of the screening interviews themselves and complicated the analysis asylum officers were required to perform, thus contributing to the overall lengthening of the entire process." 87 Fed. Reg. at 18,092. Efficiencies were also lost based on the time required for supervisory review, training, quality assurance, development and delivery of guidance and training, monitoring, review, and advice. 87 Fed. Reg. 18,092.  In other words, no efficiencies were gained by imposition of a reasonable fear standard, and instead, Congressional intent was "undermined." 87 Fed. Reg. at 18,092.

More importantly, "based on the Departments' experience, . . . no evidence has been identified that this approach resulted in more successful screening out of nonmeritorious claims while ensuring the United States complied with its nonrefoulement obligations." 87 Fed. Reg. at 18,092. As the Departments themselves acknowledge, the "congressionally intended purpose" of the fear screening is "a fail-safe to minimize the risk of refoulement," 87 Fed. Reg. at 18,093, and the "significant possibility" standard is essential to protect against that risk. The Departments themselves recognized the inadequacy of the "reasonable possibility" approach and made the reasoned choice to abandon it. There is no justification to now reinstate it and risk violating the U.S.'s legal and moral obligation of nonrefoulement.

## F.  The Proposed Rule Severely Curtails Meaningful Review.

Late in this asylum process that is already heavily stacked against survivors, should a survivor fail to receive a positive fear determination, the Proposed Rule requires a survivor to affirmatively request immigration court review and fully eliminates the possibility to request USCIS reconsideration of the fear determination. These provisions remove essential protections for survivors who are traumatized, unfamiliar with the U.S. legal system, and lack meaningful access to counsel.

Meaningful review of the fear determination is essential to protect the rights of survivors and other asylum seekers. A survivor facing trauma, language barriers, and often lacking access to counsel is unlikely to possess sufficient familiarity with the legal system to understand and request the right to review—or the consequences of failing to do so. In the context of the rapid asylum processing system underway at select locations since May 2022, NGOs have observed serious failures to provide asylum seekers with notice of their right to request reconsideration or opportunity to do so, with the result that many asylum seekers miss the draconian seven-day deadline and are subject to *refoulement* in violation of their rights. By eliminating even that restricted opportunity for a request for reconsideration, and severely curtailing availability of immigration court review to those who affirmatively request it, the Departments assure that many survivors who might be able to better show their eligibility for asylum will lose that opportunity.

23

Even if review by an immigration judge is properly requested, the promise of *de novo* review by an immigration judge is hollow in practice. Although the Proposed Rule guarantees a clean slate for a survivor who seeks review at EOIR, *see* 88 Fed. Reg. at 11,752 (proposed § 1208.33(c)(1)), in practice immigration judges routinely defer to the findings and conclusions found in credible fear interview notes. This is true whether the conclusion of the credible fear interview is negative or positive; when the facts presented in immigration court vary from those noted in the fear interview, in many cases immigration judges draw adverse conclusions about an asylum seeker's credibility, deeming the notes valid and accurate even where their reliability is plausibly challenged. True *de novo* review is rarely granted, and this asserted protection is, more often than not, meaningless.

The requirement to affirmatively request immigration court review and the removal of the request for reconsideration together severely limit a survivor's access to due process. Without them, the risk of *refoulement* skyrockets.

### G. Withholding of Removal and CAT Protection Provide Inadequate Protection for Survivors.

For survivors banned from seeking asylum under this Proposed Rule, the remaining availability of withholding of removal and relief under the U.N. Convention Against Torture (CAT) is inadequate to ensure their and their families' full protection from harm. But these types of status are both harder to prove and provide fewer benefits, leaving survivors with even fewer tools to rebuild their lives.

Withholding of removal and relief under the Convention Against Torture have stricter legal standards and are therefore more difficult to prove. Those who would otherwise be granted asylum but are foreclosed from that relief because of the Proposed Rule will have to satisfy a higher burden of proof for withholding of removal—despite all of the challenges they face to proving their claim as a result of their survivorship. *See* Sections I.A-F supra.

Survivors accorded withholding of removal or relief under the CAT will remain at grave risk of return to persecution. These types of status provides no path to U.S. citizenship and render applicants subject to deportation at any time with minimal procedural protections—leaving survivors without the security and stability they need in order to fully heal from trauma. Holders of these types of status also lack many benefits provided to asylees, including the ability to apply for legal permanent residency, longer-term employment authorization leading to job stability, and access to U.S. travel documents. Without these benefits, survivors remain in limbo and struggle to build a secure and stable life.

> Denise's* partner became abusive after she had her first child, striking her with a belt, kicking her, and hitting her in the head. Her abuser forced her to travel to the United States from Guatemala, and she was ordered removed *in absentia*. Her partner then forced Denise to return to Guatemala by threatening to permanently separate her from her children. After she returned, the abuse continued, and Denise tried to seek help unsuccessfully from the police. She fled to the United

CLP_PC_032732

States and was granted withholding of removal. If Denise had been granted asylum, she would have been able to include her children as dependents on her application and build a stable life for her family in the U.S. Instead, she has been separated from her children for many years.

When Talia* was fifteen years old in Honduras, her aunt sold her to a man 25 years her senior. He treated her like a prisoner, abusing her physically and sexually for ten years and forcing her into two pregnancies. Talia's captor was arrested, but the charges against him were dismissed. He threatened to kill Talia if she ever reported him again. Talia finally escaped but when she arrived at the U.S. port of entry, CBP failed to ask her if she wanted to apply for asylum as required by law. Talia was given an expedited removal order, returned to Honduras, lived in hiding for several months, and fled again. Because of her expedited removal order, Talia was no longer eligible for asylum. She satisfied the higher legal threshold for withholding of removal and her case was granted, but her feelings of insecurity continue. Talia has been separated from her two children for many years.

In 2013, Sonora* fled severe physical and sexual abuse from her husband in Honduras. At the U.S. border, CBP neglected to ask if she had a fear of return, and she was removed through the expedited removal process. Her husband continued to abuse her upon her return to Honduras. She reported his abuse to the police, but they failed to protect her. She fled again in 2015, this time taking her young daughter with her. She applied for and was granted withholding of removal in 2018; her daughter was granted asylum and is now a legal permanent resident. Sonora's withholding status requires her to renew her employment authorization regularly, with lengthy wait times often exceeding the automatic renewal interval. The lapses in valid work authorization threaten her job security as well as her continued driver's license. She has no valid travel documents. She lives with the fear that she could lose her legal status in the U.S. at any time, preventing her from counting on a secure future with her daughter.

<p style="text-align:center">*      *      *</p>

In sum, at every step of a survivor's journey to safety, the Proposed Rule will "systemically harm[] and devalu[e] the lives of women, girls, and LGBTQIA+ individuals desperately seeking access to safe haven through the asylum process as enshrined in U.S. law."  Oxfam America and Tahirih Justice Center, *Surviving Deterrence: How US Asylum Deterrence Policies Normalize Gender-Based Violence*, at 2 (2022) (hereinafter "*Surviving Deterrence*").  In doing so, not only does the United States "fail its moral obligations to respect the dignity of all migrants," but it also "repudiat[es] its legal obligations under both domestic U.S. law and the United Nations 1951 Convention and 1967 Protocol Relating to the Status of Refugees." *Id*.

## II.    The Proposed Rule Violates Domestic and International Law.

<p style="text-align:center">25</p>

The NPRM violates domestic and international law in numerous ways. First, it exceeds the authority given to the executive branch by Congress in the Immigration and Nationality Act ("INA").  Second, it is arbitrary and capricious in violation of the Administrative Procedure Act ("APA").  Third, it directly contradicts U.S. commitments under the 1951 United Nations Refugee Convention and 1967 Protocol that specifically shield refugees from punishment for "irregular entry." Finally, it also violates the constitutional guarantees of equal protection and due process.

### A.   The Proposed Rule Is Not a Valid Exercise of Authority Under Title 8.

The Proposed Rule exceeds the authority given to the Departments by Congress in the Immigration and Nationality Act ("INA"). In the NPRM, the Departments assert that their authority to issue the Proposed Rule rests on the provision in the INA allowing the executive branch to "establish additional limitations and conditions . . . under which an [individual] shall be eligible for asylum." 8 U.S.C. § 1158(b)(2)(C). Those limitations and conditions, however, must be "consistent with" the other provisions of § 1158. *Id.*

### 1.   Method of Entry

In 8 U.S.C. § 1158(a), Congress enshrined U.S. asylum law by explicitly declaring that:

> Any [individual] who is physically present in the United States or who arrives in the United States (*whether or not at a designated port of arrival* and including [a noncitizen] who is brought to the United States after having been interdicted in international or United States waters), irrespective of such [individual's] status, may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title.

8 U.S.C. § 1158(a)(1) (emphasis added). Far from being consistent with the statute, however, the Proposed Rule directly contradicts § 1158(a)(1). The parenthetical language in that section specifies that an individual may apply for asylum "whether or not" she arrived "at a designated port of arrival . . . ." § 1158(a)(1). Congress therefore made clear than an individual's method of arrival in the United States does not affect her eligibility for asylum. In direct contrast, however, the Proposed Rule will subject most asylum seekers to a presumption of ineligibility if they did not arrive at a designated port of arrival.

The Departments proffer the farcical argument that the Proposed Rule is consistent with 8 U.S.C. § 1158(a)(1) because asylum seekers would still be permitted to *apply* for asylum, even though they would not be *granted* asylum due to the ineligibility presumption for failure to arrive at a designated port of entry. 88 Fed. Reg. at 11,735. To support their assertion, the Departments point to Congress's structuring of the statute at 8 U.S.C. § 1158(b)(1)(A) and the exceptions at § 1158(b)(2) to argue that there is nothing inconsistent in allowing an application to be made while simultaneously precluding a grant of asylum on the basis of that same application. This argument misses the important distinctions that (1) those exceptions were codified into the statute by

CLP_PC_032734

Congress; and (2) the Proposed Rule's POE language directly contradicts specific language to the contrary in the statute. Here, the Departments proffer a Proposed Rule containing a presumption of ineligibility for asylum based on a non-POE entry ban that is in direct conflict with the statutory language in 8 U.S.C. § 1158(a)(1).

2.     Duty of Inspection

Additionally, under the Proposed Rule, it is not sufficient that the asylum seeker present at a port of entry, but rather they must first use the CBP One app to schedule *and wait* for an appointment to present themselves at a port of entry, or suffer the consequences of the asylum ineligibility presumption. *See* Section I.C., *supra*. Such a requirement, however, conflicts with the inspection requirement in 8 U.S.C. § 1225(a)(3) requiring that all applicants for admission "shall be inspected by immigration officers."

"Under a straightforward reading of the statutes, a noncitizen must do two things for inspection and referral to be triggered: first, arrive at a POE, which prompts inspection (8 U.S.C. § 1225(a)(1), (3)) and second, indicate an intention to apply for asylum, which prompts referral (8 U.S.C. § 1225(b)(1)(A)(ii)). At each stage, once arriving asylum seekers satisfy their end of the bargain, immigration officers must satisfy theirs." *Al Otro Lado*, 2021 U.S. Distr. LEXIS 167128, at *56 (Sept. 2, 2021), citing *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 774 (9th Cir. 2018).  By barring survivors from seeking asylum when they arrive at a POE, simply because they did not use the CBP One app or did not prove to the officer's satisfaction that they met one of the exceptions for app use, the Proposed Rule illegally conflicts with Congress's mandate that all applicants for admission be inspected by immigration officers. Not all asylum seekers can safely wait days or longer on the dangerous southern border for a CBP One app appointment to become available.

> Defendants, by turning away immigrants at POEs who are lawfully seeking admission into the United States, sending them to shelters in Mexico, and requiring them to make their way back to the POE at least a second time to access asylum, create additional, logistical barriers to entry that contravene the attempt of [Illegal Immigration Reform and Immigration Responsibility Act of 1996] to put all those not lawfully admitted "on equal footing." *Id*. (See OIG Report at 7, 14 (noting that implementation of queue management in 2018 and creation of other "barriers to ports of entry" created incentive to cross illegally).

*Id.* With the CBP One app, the number of appointments provided does not approach the demand, and thus the app imposes an unlawful metering scheme that federal courts have deemed illegal previously. In *Al Otro Lado v. McAleenan*, the District Court for the Southern District of California unambiguously held that the U.S. statutes requiring inspection and referral apply to

27

asylum seekers arriving at ports of entry and remaining outside the United States.[91] In multiple decisions, federal courts have held that metering—akin to the limits on entry imposed by the limited number of appointments available via the CBP One app—unlawfully withholds the Departments' duties of inspection and referral of asylum seekers.[92] Those rules are substantively indistinct from the Proposed Rule—which fails for the same reasons.

### B.  The Proposed Rule Violates the APA.

In addition to violating U.S. law, the Proposed Rule is arbitrary and capricious in violation of the APA.

###### 1.  The Proposed Rule has a disproportionate impact, lack of nexus, and high risk of unfair harm.

*First*, the Proposed Rule is arbitrary and capricious because it has the disproportionate, unacknowledged, undefended, and indefensible effect on women, girls, and LGBTQIA+ individuals fleeing gender-based violence, as discussed further in Section I above.  This disproportionate impact is even further compounded for Black women, girls, and LGBTQIA+ individuals fleeing gender-based violence. *See, e.g., Surviving Deterrence* at 2, 15-16; *see also* U.S. State Dep't, *Mexico 2022 Human Rights Report*, at 30 (Mar. 20, 2023).[93]

*Second,* the Proposed Rule is arbitrary and capricious because it imposes an arbitrary punishment on the very individuals whom the asylum laws were intended to protect and who will be least capable of meeting the strict requirements of the new rule.

Despite meeting the requirements of the U.S. asylum laws, women and LGBTQIA+ individuals, including those asylum seekers traveling with their children, will be most at risk of being unfairly punished by this rule. As discussed above, the harms of metering will disproportionately impact them, in part, because (a) they will be more likely to be subjected to gender-based violence while

---

[91]  *Al Otro Lado v. McAleenan*, 394 F. Supp. 3d 1168, 1198-1205 (S.D. Cal. 2019); *see also Al Otro Lado v. Wolf*, 952 F.3d 999, 1011-13 (9th Cir. 2020) (noting this statutory analysis "has considerable force" and "is likely correct").

[92]  *Al Otro Lado v. Mayorkas*, 2021 U.S. Distr. LEXIS 167128, at *56; *see also E. Bay Sanctuary Covenant v. Trump*, 993 F.3d at 675.

[93]  ASISTA & Ujima, Inc: The National Center on Violence Against Women in the Black Community, *Practice Advisory: Anti-Blackness and Immigrant Survivors of Gender-Based Violence* (Feb. 2023) ("When we apply an analysis that considers the interaction of a Black immigrant survivor's multiple identities, we see that Black immigrant survivors may experience several obstacles to relief due to society's harmful treatment of their multiple identities.").

28

waiting for appointments at the border,[94] and (b) they will be the least likely to have sufficient access to the CBP One app for the variety of reasons discussed above in Section I.C.

*Third,* the Proposed Rule is arbitrary and capricious because the Departments wholly failed to consider an important aspect of current migration: women and LGBTQIA+ individuals, including those asylum seekers traveling with their children, who are fleeing gender-based violence.[95]  In August 2022, DHS acknowledged that the "rising number of women and the shift from single adults to children and families present different processing needs and policy responses. Humanitarian concerns and legal protections make processing children and families in immigration proceedings much more complex and resource intensive than processing single adults."  DHS-OIS Report at 9.  Despite DHS-OIS's acknowledgement that the high number of women fleeing violence would require different policy responses, the NPRM fails to include *any* discussion about the impact of the Proposed Rule on women, girls, or LGBTQIA+ individuals fleeing gender-based violence.  This aspect is important because mitigation policies based on punishment and deterrence will not prevent asylum seekers from crossing the border but will have a disparate, unfair impact on survivors.[96] The Proposed Rule will perpetuate conditions that cause gender-based violence to proliferate at the southern land border and creates an unfair system that will disadvantage and re-traumatize survivors fleeing gender-based violence. *See Surviving Deterrence* at 2.

For many, fleeing to the United States is not a choice, but a matter of survival.  As a result, the statements in the NPRM regarding deterrence will not apply to them.  But they will feel the unjust pain of the Departments' chosen punishment acutely.

2.   The Proposed Rule relies on unsupported assumptions and rationales.

a.   The NPRM rests wholly on the unsupported assumption that an alarming critical "surge" in migration will occur post-Title 42.

The NPRM states that the purpose of the Proposed Rule is to "address the surge in migration that, in the absence of this rule, is anticipated to follow the lifting of the Title 42 public health Order . . . ." 88 Fed. Reg. at 11,727. The Departments have proffered the sudden "surge"

---

[94] *See Surviving Deterrence* at 10 ("Our data indicate that rates of GBV in border cities in Mexico . . . are very high: respondents estimate that anywhere between 30 percent and 90 percent of their clients experience GBV there. And 75 percent of survey respondents indicate that their clients have faced kidnapping and/or extortion at the border either frequently or about half the time; 68 percent indicate that their clients have been raped and/or sexually assaulted frequently at the border. While various factors can impact the risk of GBV in any setting, 87 percent of interview respondents (26 out of 30) note that by forcing vulnerable individuals to wait at the border indefinitely, US deterrence policies foster conditions that significantly increase the risk of exposure to GBV.").

[95] *See, e.g., Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (explaining that a rule is arbitrary and capricious if the agency failed to consider an important aspect of the issue).

[96] *See Surviving Deterrence* at 22 (citing J. Hiskey, A. Córdova, M. Malone, and D. Orcés, "Leaving the Devil You Know: Crime Victimization, US Deterrence Policy, and the Emigration Decision in Central America," Latin American Research Review 53, no. 3 (2018): 429–447, doi:10.25222/larr.147).

CLP_PC_032737

justification repeatedly over the past 4-5 years, using panicky language while simultaneously ignoring the fact that any alleged surge could, in part, be a response to the attempted suppression of normal migration due to immigration policies, such as Title 42 and Remain in Mexico. *Compare* 88 Fed. Reg. at 11,727 *with* 84 Fed. Reg. at 33,840 (2019) ("The United States has experienced an overwhelming surge in the number of non-Mexican [migrants] crossing the southern border and seeking asylum.").

*First*, the NPRM admits that the suggested "surge" numbers are unreliable at best.[97]

*Second*, the NPRM then couples this unsupported alarmist "surge" assumption with the assumption that quickly removing individuals can "reduce migratory flows – whereas, conversely, the inability or failure to do so risks yielding increased flows." 88 Fed. Reg. 11,713. The NPRM points to Figure 3, which depicts the average daily encounters of Guatemalan and Honduran Nationals in 2021 declining from August 2021 to November 2021. But this ignores the typical seasonality of migration, which generally shows declining migration numbers from August to December. *See, e.g.,* DHS-OIS 2022 Rep. at 4 ("For decades, encounter numbers routinely peaked in the spring and declined from late summer through winter.").

Despite the NPRM's urgent warning statement that instability is fueling "the highest levels of migration since World War II," DHS-OIS recently reported that the number of entries between official ports of arrival was higher two decades ago than it has been in recent years. *See, e.g.,* DHS-OIS 2022 Report at 3 (explaining that, for 2021, "the number of estimated entries without inspection was lower than any year in 2000–2010 and only one-third as high as the estimates for 2000–2006 (1.9 million/year)"); *see also* 84 Fed. Reg. at 33,838 (2019).

The NPRM attempts to justify the Proposed Rule's punishment of legitimate asylum seekers by stating that the Departments are only applying the presumption due to these "emergent circumstances . . . ."  88 Fed. Reg. at 11,737.

> b. The Proposed Rule is arbitrary and capricious because it relies on the unsupported assumption that it will reduce human smuggling.

Based on circular reasoning, the Departments assert that the Proposed Rule will lead to a reduction in the numbers of migrants who seek to cross the southern land border without authorization.  But there is no evidence that the punishments in the Proposed Rule will deter asylum seekers from crossing the border or decrease incidents of human smuggling.  Rather, human smuggling is, like the alleged surge, a problem of the U.S. government's own making

---

[97] 88 Fed. Reg. at 11,705 n.11 ("The complexity of international migration limits the Department's ability to precisely project border encounters under the best of circumstances. The current period is characterized by *greater than usual uncertainty* due to ongoing changes in the major migration source countries (i.e., the shift from Mexico and Northern Central America to new countries of origin, discussed further below), the growing impact of climate change on migration, political instability in several source countries, the evolving recovery from the COVID pandemic, and uncertainty generated by border-related litigation, among other factors.").

CLP_PC_032738

based on metering policies that hold asylum seekers in Mexico rather than promptly addressing them.

The CBP One app is a classic example of this type of metering policy, as discussed further above in Sections I.C. and II.A.2.  Under metering practices and policies, such as the required usage of the flawed CBP One app, the government unlawfully forces asylum seekers to wait in dangerous Mexican border cities until they can secure an appointment. *See, e.g., Al Otro Lado v. McAleenan*, 2019 U.S. Dist. LEXIS 126173 (S.D. Cal. July 29, 2019). This dangerous and illegal wait then exacerbates border crossings between ports as a result. For example, DHS-OIG described precisely this phenomenon in a 2020 report:

> In 2018, as surges of [noncitizens] sought asylum in the United States, the DHS Secretary and CBP leadership urged asylum seekers to come to ports of entry to be processed. However, DHS and CBP took actions to reduce the number of asylum seekers CBP processed daily. Under the INA, the U.S. Government must process all those who are physically in the United States and express fear of persecution in their home country or an intention to seek asylum. The law does not set limits as to the number of asylum seekers the Government can or must process. Nevertheless, the Secretary and CBP have effectively limited access for [noncitizens] wishing to claim asylum in the United States, sometimes without notice to the public. As a result, the numbers of asylum seekers in Queue Management lines grew. As the lines grew and asylum seekers were redirected to other ports, some [noncitizens] attempted to enter the United States illegally, exacerbating the very problem DHS sought to solve.[98]

Despite acknowledging that suppressing entries at ports has consistently resulted in increased entries between ports, the Departments rely on this reasoning to support the Proposed Rule now. Such circular reasoning is irrational. In other words, the Departments argue that they will be able to significantly expand processing noncitizens at the border, but only if the deterrence measures in the Proposed Rule have an impact on the number of migrants seeking asylum.

> CBP expects to process multiple times more individuals on average per day using CBP One. This significant expansion of processing noncitizens at land border ports of entry, including those who may be seeking asylum, would ensure that a safe and orderly process exists for such noncitizens. Notably, however, the level of resources required to expand port of entry processing in this way would only be feasible if, as DHS projects, encounters at the border are driven down by the application of a consequence for not taking advantage of the expanded range of procedures in partner countries or the United States.[99]

---

[98] DHS Office of Inspector General, OIG-21-02 (Oct. 27, 2020), available at: https://www.oig.dhs.gov/sites/default/files/assets/2020-10/OIG-21-02-Oct20.pdf

[99] 88 Fed. Reg. at 11,729.

31

As discussed in Section I.B. above, the prevalence of gender-based violence in Mexico means that women, girls, and LGBTQIA+ asylum seekers are extremely vulnerable to violence at the border. The NPRM ignores them entirely, however. The one true purpose of the NPRM—one that it pursues regardless of the cost to survivors fleeing gender-based violence—is to attempt to diminish the number of asylum seekers who ask for relief from the United States without regard to the merit of their claims.

> c.   The Proposed Rule is based on unsupported and dangerous assumptions about the meritoriousness of asylum seekers' claims.

The Proposed Rule is based on the repeated unsupported assumption that the so-called "lawful pathways condition is expected to increase asylum processing efficiency by increasing to some degree the percentage of meritorious asylum claims that are considered."  88 Fed. Reg. at 11,737. Indeed, this assumption in turn rests on the following two unsupported and baseless assumptions: (1) the "understanding that many individuals who avail themselves of the credible fear process do not have meritorious claims," and (2) that those who would enter between POEs and decline to seek third country protection are "less likely to have a well-founded fear of persecution than those individuals who do avail themselves of an available lawful opportunity."  *Id.*

The NPRM then admits that the Departments recognize these are flawed assumptions (*e.g.*, "Of course, the Departments recognize it will *not* be the case for all noncitizens who do not avail themselves of alternative options in other countries or lawful pathways to enter the United States that they would not be found to have meritorious asylum claims.").  *Id.*  The Departments should not base the entirety of the Proposed Rule on such flawed and unsupported assumptions.

*First*, the Departments erroneously assume throughout the NPRM that individuals must not have had a meritorious asylum claim if they passed a credible fear interview but were not granted asylum in the end. This faulty view ignores the reality that numerous factors – beyond merit – impact whether an asylum seeker's case is granted ultimately, including but not limited to the availability of counsel and whether the asylum applicant is represented throughout the process, the availability of experts, constantly changing regulations and standards in the asylum realm, which immigration judge decides their case,[100] and lengthy backlogs in the system, which can have an impact on the availability of witnesses, evidence, and other proof.[101]

---

[100]   TRAC, *Judge-by-Judge Asylum Decisions in Immigration Courts FY 2017-22* (Oct. 26, 2022), https://trac.syr.edu/immigration/reports/judge2022/

[101] Notably, despite leaning heavily on the number of positive credible fear interviews, the NPRM also ignores the significant fact that IJ decisions over the past 25 years have overturned an average of 25% of asylum seekers' initial negative credible fear determinations.  *See* TRAC, Immigration Judge Decisions Overturning Asylum Officer Findings in Credible Fear Cases (3/14/23), available at: https://trac.syr.edu/reports/712/

CLP_PC_032740

For example, representation by counsel is critical to a survivor's chance of success on the merits.[102]  The availability of counsel might depend on the time and place of an asylum seeker's interview. Interviews held shortly after the credible fear interview will not give survivors a chance to find free or affordable counsel, because the demand for counsel greatly exceeds the supply. Similarly, interviews held while survivors are in detention make it much more difficult to be able to find counsel.[103]  Likewise, interviews held at the southern border, as opposed to a survivor's intended destination in the United States, also make finding counsel more difficult, because supply and demand issues are exacerbated at the border.

*Second,* the NPRM rests on the major erroneous and unsupported assumption that those who would enter between POEs and decline to seek third country protection are "less likely to have a well-founded fear of persecution than those individuals" who are able to register and wait indefinitely at the border for an appointment using the CBP One app. The Departments offer nothing to support this harmful assumption—because there is nothing to offer. In fact, for survivors fleeing gender-based violence, the opposite is typically true. Thus, while the Departments will likely argue that this is a rule of equal application that does not bar any particular class of asylum applicants from seeking relief due to the nature of the harm the applicant has suffered or the applicant's race or membership in a particular social group, the reality is that the Proposed Rule is anything but equal in its application of harm to women and LGBTQIA+ survivors fleeing gender-based violence.

The NPRM admits that "the costs of the proposed rule are borne primarily by migrants," including migrants with meritorious asylum claims "who would be made ineligible for asylum under the presumptive condition" established by the rule.  88 Fed. Reg. at 11,748.  Tellingly, the NPRM also states that "[s]ome of these benefits would accrue to migrants *who wish* to pursue safe, orderly, lawful pathways and processes, such as the ability to schedule a time to apply for admission at a port of entry, whose ability to present their claim might otherwise be hampered by the severe strain that a further surge in irregular migration would impose on the Departments." *Id.* (emphasis added). This statement ignores the circumstances of one of the fastest growing group of asylum seekers: women and LGBTQIA+ individuals.  For these extremely vulnerable groups of asylum seekers, the choice between the so-called "safe, orderly, lawful pathways and

---

[102]  TRAC, *Asylum Decisions*, available at: https://trac.syr.edu/phptools/immigration/asylum/; Congressional Research Service (CRS), *U.S. Immigration Courts: Access to Counsel in Removal Proceedings and Legal Access Programs* (July 6, 2022), available at: 3 (congress.gov); Eagly & Shafer, *Access to Counsel in Immigration Court* (Sept. 28, 2016), available at: https://www.americanimmigrationcouncil.org/research/access-counsel-immigration-court; Sabrineh Ardalan, *Access to Justice for Asylum Seekers: Developing an Effective Model of Holistic Asylum Representation*, 48 U. Mich. J. L. Reform 1001 (2015), available at: https://repository.law.umich.edu/cgi/viewcontent.cgi?article=1141&context=mjlr.

[103]  *See* TRAC, *Asylum Decisions*; Eagly & Shafer, *supra*; Maria Benevento, *Legal representation for detained migrants hindered by access issues*, Nat'l Catholic Reporter (Dec. 2018), available at: https://www.ncronline.org/news/justice/legal-representation-detained-migrants-hindered-access-issues; Niskanen Center, *Legal Representation for Asylum Seekers: An Overlooked Area of Reform for a System in Crisis* (Aug. 2021), available at: https://www.niskanencenter.org/legal-representation-for-asylum-seekers-an-overlooked-area-of-reform-for-a-system-in-crisis/

CLP_PC_032741

processes," such as waiting indefinitely at the dangerous border in Mexico or applying for asylum in a country that has continuously proven it cannot and will not protect people like you, is a matter of life and death; in other words, there is no real "choice." The Proposed Rule will not provide vulnerable migrants fleeing gender-based violence with a meaningful and realistic opportunity to seek protection.[104]

### C. The Proposed Rule Would Disparately Harm Women, Girls, and LGBTQIA+ Asylum Seekers.

In addition to violating federal and international law, the Proposed Rule violates the constitutional guarantee of equal protection. There can be no question that enforcement of the Proposed Rule would disproportionately impact women, girls, and LGBTQIA+ people who are survivors of gender-based violence, particularly survivors who are Black, Brown, or Indigenous,[105] and expose them to additional persecution. The available evidence clearly shows that the COVID-19 pandemic has caused a sharp rise in gender-based violence—even in countries where such violence existed at epidemic levels before the onset of COVID-19.[106]

As discussed in Section I above, DHS failed to address this data, the fact that different policy approaches would be needed to help survivors fleeing gender-based violence, and the resulting disparate harm that women, girls, and LGBTQIA+ would suffer under the proposed rule. Yet the

---

[104] *See* Section I.A-C. above. As noted above in Section I.D., the Proposed Rule's exceptions also fail to protect survivors of gender-based violence from harm. The "imminent and extreme threat to life or safety" language has long-failed women seeking protection, particularly where the word "imminent" is interpreted as synonymous with immediate, because more vulnerable groups cannot afford to wait until the attack is right in front of them, for instance.  The "imminence" requirement has long been a source of inequity for women fleeing violence due to the power dynamic. For instance, in a different context, survivors of repeated, brutal domestic violence have encountered difficulty proving that they were acting in self-defense where proof of an "imminent" threat is required to assert the defense. Where the violence is repeated, the power dynamic is imbalanced, and PTSD or other trauma shapes the survivor's response to threats, a different lens must be applied to the meaning of "imminent" when working with survivors of gender-based violence. In sum, the "imminent" threat proof requirement here will likely fail to protect survivors fleeing gender-based violence and the imbalanced power structure will once again harm them by making them ineligible for asylum, despite the merits of their claim.

[105] *See Surviving Deterrence*, at 9.

[106] *See, e.g.*, Int'l Rescue Comm., *IRC data shows an increase in reports of gender-based violence across Latin America* (June 9, 2020), available at: https://www.rescue.org/press-release/irc-data-shows-increase-reports-gender-based-violence-across-latin-america; Nat'l Task Force to End Domestic Violence, *Fast Facts: Survivors of Domestic and Sexual Violence are at Heightened Risk Now, and Will Remain So Long After the Current Crisis*, available at: https://static1.squarespace.com/static/57d7477b9de4bb8b14256cf4/t/5e9dc0e935d08275a98b9925/1587396842687/NTF+Fact+Sheet.DV-SA+survivors+and+the+COVID19+crisis.pdf; Refugees Int'l, *Exacerbating the Other Epidemic: How COVID-19 Is Increasing Violence Against Women and Girls* (Aug. 4, 2020), available at: https://www.refugeesinternational.org/reports/2020/7/31/exacerbating-the-other-epidemic-how-covid-19-is-increasing-violence-against-displaced-women-and-girls; *see also* Tahirih Justice Center, *The Impact of COVID-19 on Immigrant Survivors of Gender-Based Violence* (Mar. 23, 2020), available at: https://www.tahirih.org/wp-content/uploads/2020/03/Impact-of-Social-Distancing-on-Immigrant-Survivors-of-Gender-Based-Violence_Final-March-23-2020.pdf; *see also* DHS-OIS Aug. 2022 Rep. at 2.

34

Rule proposes no rational explanation linking this disproportionate impact on women, girls, and LGBTQIA+ individuals to a legitimate government policy.[107]

### III.    The NPRM Provided Insufficient Time for Public Comment.

DHS and DOJ have provided insufficient time for public comment, and it has done so without justification. The NPRM proposes drastic and sweeping changes to the asylum process—but the public has been given a mere 30 days to respond. At least 60 days are needed for the public to submit thorough, considered comments on a rule with such sweeping consequences. The only justification for the shortened comment period is the impending termination of the illegal Title 42 policy—a policy that has been on the verge of ending since the start of this administration's tenure in January 2021 and the termination of which was scheduled by the same administration now claiming to be hamstrung by its own brief timeline. 88 Fed. Reg. at 11,708.

The NPRM includes significant substantive and procedural changes to rules governing several stages of the asylum application process administered by two Departments; its lengthy preamble makes numerous unsupported or conflicting assumptions and assertions regarding migration at the southern U.S. border, many of which are belied by respected research and the administration's own previous statements. Had the Departments provided an appropriate period for public comment, Tahirih would have included in this comment a number of additional points, arguments, and resources, including but not limited to a thorough refutation of the error-ridden assumptions embedded in the Proposed Rule, such as misapprehensions about the safety and availability of asylum processing in transited countries. With additional time, Tahirih would also have had the opportunity to gather additional firsthand client accounts of the various adverse impacts of the Proposed Rule. The limits of time and staffing—just two full-time employees who also carry a significant number of additional responsibilities—have prevented this fulsome review and comment. Thus, these comments do not—and cannot—represent Tahirih's full response to the rule. And they do not, because they cannot, include all of the analysis and evidence that Tahirih would have provided if given at least 60 days to respond to the rule. The Departments' decision not to provide more than 30 days for comment has therefore impaired Tahirih's opportunity and ability to comment on the rules.

The six weeks remaining between the deadline for submission of comments on this NPRM and the end of the Title 42 policy is similarly insufficient. As of the date of filing of the instant comment, 11,374 comments have been filed, and the notice and comment period has not yet closed. It defies credulity to assert that the Departments have the capacity to review, consider, and respond to all comments in the abbreviated timeframe anticipated.

The abbreviated timeframe for comment combined with the shortened timeframe before promulgation of the final rule on or before May 11 can hardly be said to satisfy the requirement for public opportunity to participate in rulemaking provided for in the Administrative Procedure Act.

---

[107] *See Craig v. Boren*, 429 U.S. 190, 197 (1976).

35

## IV.   Conclusion

For the reasons stated above, Tahirih Justice Center strongly urges the Departments to withdraw the proposed rule in its entirety.

Sincerely,

Rachel Sheridan
Senior Litigation Counsel
Tahirih Justice Center

36

# PUBLIC SUBMISSION

**As of:** May 08, 2023
**Received:** March 27, 2023
**Status:** Posted
**Posted:** March 30, 2023
**Tracking No.** lfr-jet7-brlh
**Comments Due:** March 27, 2023
**Submission Type:** Web

**Docket:** USCIS-2022-0016
Circumvention of Lawful Pathways

**Comment On:** USCIS-2022-0016-0001
Circumvention of Lawful Pathways

**Document:** USCIS-2022-0016-12547
Comment Submitted by Young Center for Immigrant Children's Rights

## Submitter Information

**Email:** jliu@theyoungcenter.org
**Organization:** Young Center for Immigrant Children's Rights

## General Comment

The Young Center for Immigrant Children's Rights (Young Center) writes to comment on the above-referenced proposed rule, titled "Circumvention of Lawful Pathways," published on February 23, 2023, by the U.S. Department of Homeland Security (DHS) and the Executive Office for Immigration Review (EOIR), U.S. Department of Justice (DOJ).

The Young Center serves as the federally-appointed independent Child Advocate, akin to best interests guardian ad litem, for trafficking victims and other vulnerable unaccompanied children in government custody, as authorized by the Trafficking Victims Protection Reauthorization Act (TVPRA). The Young Center is the only organization authorized by ORR to serve in that capacity. The role of the Child Advocate is to advocate for the best interests of the child. A child's best interests are determined by considering the child's safety, expressed wishes, right to family integrity, liberty, developmental needs, and identity. Since 2004, ORR has appointed Young Center Child Advocates for thousands of unaccompanied children in ORR custody, many of whom are seeking asylum and/or another form of legal protection in the United States. In the past few years, we have been increasingly appointed to children who have been separated from their family as a result of harmful immigration policies that deny or limit access to asylum at the southern border of the U.S.

At the Young Center, we understand the particular vulnerability of immigrant children who have fled unimaginable violence or threats in their countries. They have traveled hundreds if not thousands of miles to the United States. Some travel to the border alone, while others travel with family or in the company of strangers. Regardless, they are all entitled under U.S. law to seek the protection of asylum. And they are all children and should be treated as children. We are gravely concerned that the proposed rule will jeopardize the safety and well-being of immigrant children by undermining their right to seek asylum, and by forcing their return to persecution in violation of U.S. law, and basic principles of child welfare and human decency.

The proposed rule would deny many children, families, and adults the right to seek asylum at the southern border if they transited through a third country, with very limited exceptions. As a result, children in families—

CLP_PC_032745

including those who have legitimate claims that they have been persecuted in or fear persecution upon return to their country of origin—will be denied the right to ask for asylum simply because of the route they took to the United States, a factor that is often not under children's control. This would result in children being returned to danger and persecution in violation of immigration laws enacted by Congress and contained in international treaties, and which reflect basic principles of child welfare and human decency.

In addition, the rule would fuel harmful family separations that have already been occurring due to the U.S. government's immigration policies. The harm these forced separations cause to the health and wellbeing of immigrant children and their families is well-established. The proposed rule follows on the heels of the Biden Administration's announcement in January 2023 of a host of border policies, including this proposed rule, that threaten to eviscerate the ability of most asylum-seekers, including children in families and other vulnerable individuals, from being able to seek protection in the United States.

As an initial matter, we object to the agency's unfair and unrealistic 30-day timeframe in which to submit a comment regarding this proposed rule. The proposed rule threatens to bar access to asylum for many, if not most, families and adults seeking protection at the U.S. southern border. Given the sweeping changes proposed in the rule and the enormous consequences for the safety and health of many, a comment period of at least 60 days would have been appropriate for the public to have adequate time to consider and to fully address the impact that the rule would have on the immigration system.

Due to the shortened comment period, we have not been able to cover every aspect of the proposed rule. We submit these comments to address specifically the far-reaching effects this rule would have on children and families who seek protection at the U.S. southern border and the particular harm to immigrant children, both unaccompanied and those in families. For the reasons including but not limited to those that follow, DHS and DOJ should immediately withdraw the proposed rule in its entirety and instead dedicate their efforts to ensuring a robust asylum system and immigration policies and procedures that protect all children and are tailored to the specific needs and vulnerabilities of children.

# Attachments

2023_03_27 Young Center Comment



www.theyoungcenter.org
Chicago, IL | Harlingen, TX | Houston, TX | Los Angeles, CA
New York, NY | Phoenix, AZ | San Antonio, TX | Washington, DC

*Submitted via www.regulations.gov*

Daniel Delgado, Acting Director
Border and Immigration Policy, Office of Strategy, Policy, and Plans
U.S. Department of Homeland Security

Lauren Alder Reid, Assistant Director
Office of Policy
Executive Office for Immigration Review

March 27, 2023

**Re:    DHS RIN 1615-AC83/EOIR RIN 1125-AB26 or DHS Docket No. USCIS 2022-
0016/A.G. Order No. 5605-2023 Comments in Opposition to Proposed Rule:
Circumvention of Lawful Pathways**

Dear Acting Director Delgado and Assistant Director Reid,

The Young Center for Immigrant Children's Rights (Young Center) writes to comment on the
above-referenced proposed rule, titled "Circumvention of Lawful Pathways," published on
February 23, 2023, by the U.S. Department of Homeland Security (DHS) and the Executive Office
for Immigration Review (EOIR), U.S. Department of Justice (DOJ).[1]

The Young Center serves as the federally-appointed independent Child Advocate, akin to best
interests guardian ad litem, for trafficking victims and other vulnerable unaccompanied children
in government custody, as authorized by the Trafficking Victims Protection Reauthorization Act
(TVPRA).[2] The Young Center is the only organization authorized by ORR to serve in that capacity.
The role of the Child Advocate is to advocate for the best interests of the child. A child's best
interests are determined by considering the child's safety, expressed wishes, right to family
integrity, liberty, developmental needs, and identity. Since 2004, ORR has appointed Young
Center Child Advocates for thousands of unaccompanied children in ORR custody, many of whom
are seeking asylum and/or another form of legal protection in the United States. In the past few
years, we have been increasingly appointed to children who have been separated from their family
as a result of harmful immigration policies that deny or limit access to asylum at the southern
border of the U.S.

At the Young Center, we understand the particular vulnerability of immigrant children who have
fled unimaginable violence or threats in their countries. They have traveled hundreds if not
thousands of miles to the United States. Some travel to the border alone, while others travel with
family or in the company of strangers. Regardless, they are all entitled under U.S. law to seek the

---

[1] *See* 88 Fed. Reg. 11704 (Feb. 23, 2023).
[2] William Wilberforce Trafficking Victims Protection Reauthorization Act, 8 U.S.C. § 1232(c)(6)(A)
(hereafter TVPRA).

1

CLP_PC_032747



www.theyoungcenter.org
Chicago, IL | Harlingen, TX | Houston, TX | Los Angeles, CA
New York, NY | Phoenix, AZ | San Antonio, TX | Washington, DC

protection of asylum.[3] And they are all children and should be treated as children. We are gravely concerned that the proposed rule will jeopardize the safety and well-being of immigrant children by undermining their right to seek asylum, and by forcing their return to persecution in violation of U.S. law, and basic principles of child welfare and human decency.

The proposed rule would deny many children, families, and adults the right to seek asylum at the southern border if they transited through a third country, with very limited exceptions. As a result, children in families—including those who have legitimate claims that they have been persecuted in or fear persecution upon return to their country of origin—will be denied the right to ask for asylum simply because of the route they took to the United States, a factor that is often not under children's control. This would result in children being returned to danger and persecution in violation of immigration laws enacted by Congress and contained in international treaties, and which reflect basic principles of child welfare and human decency.

In addition, the rule would fuel harmful family separations that have already been occurring due to the U.S. government's immigration policies. The harm these forced separations cause to the health and wellbeing of immigrant children and their families is well-established. The proposed rule follows on the heels of the Biden Administration's announcement in January 2023 of a host of border policies, including this proposed rule, that threaten to eviscerate the ability of most asylum-seekers, including children in families and other vulnerable individuals, from being able to seek protection in the United States.[4]

As an initial matter, we object to the agency's unfair and unrealistic 30-day timeframe in which to submit a comment regarding this proposed rule. The proposed rule threatens to bar access to asylum for many, if not most, families and adults seeking protection at the U.S. southern border. Given the sweeping changes proposed in the rule and the enormous consequences for the safety and health of many, a comment period of at least 60 days would have been appropriate for the public to have adequate time to consider and to fully address the impact that the rule would have on the immigration system.

Due to the shortened comment period, we have not been able to cover every aspect of the proposed rule. We submit these comments to address specifically the far-reaching effects this rule would have on children and families who seek protection at the U.S. southern border and the particular harm to immigrant children, both unaccompanied and those in families. For the reasons including but not limited to those that follow, DHS and DOJ should immediately withdraw the proposed rule in its entirety and instead dedicate their efforts to ensuring a robust asylum system and immigration policies and procedures that protect all children and are tailored to the specific needs and vulnerabilities of children.

---

[3] *See* 8 U.S.C. § 1158(a)(1).
[4] *See* The White House, *FACT SHEET: Biden-Harris Administration Announces New Border Enforcement Actions (Jan. 5, 2023)*, https://www.whitehouse.gov/briefing-room/statements-releases/2023/01/05/fact-sheet-biden-harris-administration-announces-new-border-enforcement-actions/.

2



www.theyoungcenter.org
Chicago, IL | Harlingen, TX | Houston, TX | Los Angeles, CA
New York, NY | Phoenix, AZ | San Antonio, TX | Washington, DC

I.      **The proposed rule undermines children's safety and well-being—their best interests—by denying children and families the right to apply for asylum**

The proposed rule would deny access to asylum for many children in violation of their rights under U.S. and international asylum law. Although the proposed rule would not apply to unaccompanied children, it would apply to families seeking protection at the southern border, which includes children traveling as part of families. Tens of thousands of children, including infants, have been expelled under Title 42. Data show that as of May 2022, CBP had expelled over 30,000 children ages 3 and under to Mexican border cities.[5]

The U.S. asylum system was first codified in statute through the Refugee Act of 1980, which amended the Immigration and Nationality Act. The Refugee Act established a right to apply for asylum for "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival…), irrespective of such alien's status"[6] and created a "broad class of refugees who are eligible for a discretionary grant of asylum."[7] By acceding to the 1967 Protocol Relating to the Status of Refugees,[8] which binds parties to the United Nations Convention Relating to the Status of Refugees,[9] the United States obligated itself to develop and interpret U.S. refugee law in a manner that complies with the Protocol's principle of *non-refoulement*—the commitment not to return refugees to a country where they will face persecution on protected grounds.[10]

Children's right to seek asylum finds even greater protection in U.S. law. The complicated nature of asylum—having to show past persecution or fear of future persecution based on particular grounds—has required various aspects of substantive asylum law to be examined with a child-sensitive lens.[11] U.S. case law and guidance have required decision makers to contemplate certain

---

[5] Children Thrive Action Network, *Children and Families Must Have Access to Asylum* (Sept. 2022), https://childrenthriveaction.org/wp-content/uploads/2022/09/Title-42-Factsheet-1.pdf.
[6] 8 U.S.C. § 1158(a)(1).
[7] *See I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 424 (1987).
[8] Protocol Relating to the Status of Refugees, Oct. 4, 1967, 606 U.N.T.S. 267.
[9] Convention Relating to the Status of Refugees, July 28, 1951, 140 U.N.T.S. 1954.
[10] Immigr. Def. Project & Harvard Immigr. & Refugee Clinical Program, *Misapplication of the Particularly Serious Crime Bar to Deny Refugees Protection from Removal to Countries Where Their Life or Freedom is Threatened* 11 (Fall 2019), https://www.immigrantdefenseproject.org/wp-content/uploads/IDP_Harvard_Report_FINAL.pdf (arguing that the U.S. Constitution and Supreme Court case law make clear that federal law must be interpreted to follow the U.S.'s treaty obligations, including the Refugee Convention's non-refoulement mandate and its limited exception).
[11] Ctr. for Gender & Refugee Stud., *Children's Asylum Claims: CGRS Practice Advisory* 11, 18 (Mar. 2015), https://cgrs.uchastings.edu/sites/default/files/CGRS_Child_Asylum_Advisory_3-31-2015_FINAL.pdf , https://cgrs.uchastings.edu/sites/default/files/CGRS_Child_Asylum_Advisory_3-31-2015_FINAL.pdf (listing gender, family membership, domestic relationships, mental illness, childhood at the time of persecution, and others as immutable and fundamental characteristics).

3

CLP_PC_032749



www.theyoungcenter.org
Chicago, IL | Harlingen, TX | Houston, TX | Los Angeles, CA
New York, NY | Phoenix, AZ | San Antonio, TX | Washington, DC

considerations when examining the elements of asylum in children's cases.[12]

The United States is a signatory to the United Nations Convention on the Rights of the Child (CRC)[13] and is therefore obligated "to refrain from acts that would defeat the object and purpose of the Convention."[14] The CRC protects the rights of children seeking asylum and explicitly states that those protections apply to all children, "whether unaccompanied or accompanied by his or her parents or by any other person."[15] Expounding on those rights, the U.N. Committee on the Rights of the Child has stated that States are required to "set up a functioning asylum system" in which "[a]sylum-seeking children, including those who are unaccompanied or separated, shall enjoy access to asylum procedures and other complementary mechanisms providing international protection."[16]

The CRC represents virtually unanimous consensus that "[i]n all actions concerning children… the best interests of the child shall be a primary consideration."[17] The U.N. Committee on the Rights of the Child, along with the UN Committee on the Protection of the Rights of All Migrant Workers, has explicitly stated that States are required to "conduct a best-interests determination in cases that could lead to the expulsion of migrant families due to their migration status, in order to evaluate the impact of deportation on children's rights and development, including their mental health."[18] Over the past several decades, Congress has incorporated the best interests standard into

---

[12] *See, e.g,, Mendoza-Pablo v. Holder*, 667 F.3d 1308, 1313 (9th Cir. 2012) (holding that "an infant can be the victim of persecution, even though he has no present recollection of the events that constituted his persecution"); *Liu v. Ashcroft*, 380 F.3d 307, 314 (7th Cir. 2004) ("age can be a critical factor in the adjudication of asylum claims and may bear heavily on the question of whether an applicant was persecuted or whether she holds a well-founded fear of future persecution"); *Abay v. Ashcroft*, 368 F.3d 634, 640 (6th Cir. 2004) (overturning immigration judge's finding that nine-year-old applicant had not adequately expressed fear of future persecution and noting that "very young children may be incapable of expressing fear to the same degree or with the same level of detail as an adult").

[13] Convention on the Rights of the Child, Nov. 20, 1989, 1577 U.N.T.S. 3 [hereinafter CRC].

[14] U.S. Citizenship & Immigr. Serv., U.S. Dep't of Homeland Sec., *RAIO Combined Training Program: Children's Claims* § 2.2 (2019), https://www.uscis.gov/sites/default/files/document/foia/Childrens_Claims_LP_RAIO.pdf; Vienna Convention on the Law of Treaties, art. 18, May 23, 1969, 1155 U.N.T.S. 331.

[15] CRC, art. 22.

[16] U.N. Comm. on the Rts. of the Child, *General Comment No. 6 (2005): Treatment of Unaccompanied and Separated Children Outside Their Country of Origin*, ¶¶ 66, 74, U.N. Doc. CRC/GC/2005/6 (Sept. 1, 2005), https://www.refworld.org/docid/42dd174b4.html.

[17] Convention on the Rights of the Child, art. 3, Nov. 20, 1989, 1577 U.N.T.S. 3 [hereinafter CRC]. Every nation in the world but the United States has ratified the Convention on the Rights of the Child. The United States is a signatory. *See* U.N. Treaty Collection, Convention on the Rights of the Child, https://treaties.un.org/Pages/ViewDetails.aspx?src=IND&mtdsg_no=IV-11&chapter=4 (containing depository information).

[18] U.N. Comm. on the Rights. of the Child and U.N. Comm. on the Protection of the Rights of All Migrant Workers and Members of Their Families, *Joint General Comment No. 3 (2017) of the Comm. on the Protection of the Rights of All Migrant Workers and Members of Their Families and No. 22 (2017) of*

4



www.theyoungcenter.org
Chicago, IL | Harlingen, TX | Houston, TX | Los Angeles, CA
New York, NY | Phoenix, AZ | San Antonio, TX | Washington, DC

multiple aspects of immigration law, notably through Special Immigrant Juvenile Status, which is granted by U.S. Citizenship and Immigration Services (USCIS) only after a finding that return to the country of origin is not in a child's best interests.[19] Moreover, U.S. family and child welfare law recognizes the "best interests of the child" principle, with all 50 states, the District of Columbia, American Samoa, Guam, the Northern Mariana Islands, Puerto Rico, and the U.S. Virgin Islands requiring consideration of a child's best interests in decisions about the child's custody, placement, and other critical life issues.[20] While the "best interests of the child" principle has no single definition under U.S. law, it consistently encompasses the child's health, safety, and protection as significant factors.[21] Resettlement through asylum, to the extent it will prevent serious risks to a child's safety and health, is generally in the best interests of the child.[22]

The U.N. Committee on the Rights of the Child has made clear that the best interests standard under the CRC, in addition to being a substantive right, is a "rule of procedure":

> Whenever a decision is to be made that will affect a specific child, an identified group of children or children in general, the decision-making process must include an evaluation of the possible impact (positive or negative) of the decision on the child or children concerned. Assessing and determining the best interests of the child require procedural guarantees.[23]

In the context of international migration, the Committee has stated that States are required to "ensure that any decision to return a child to his or her country of origin is based on evidentiary considerations on a case-by-case basis and pursuant to a procedure with appropriate due process safeguards, including a robust individual assessment and determination of the best-interests of the

---

*the Committee on the Rights of the Child on the general principles regarding the human rights of children in the context of international migration*, ¶ 32(g), U.N. Doc. CMW/C/GC/3-CRC/C/GC/22 (Nov. 16, 2017), https://www.refworld.org/docid/5a1293a24.html [hereinafter *Joint General Comment No. 3*].

[19] 8 U.S.C. § 1101(a)(27)(J).

[20] Child Welfare Information Gateway, Children's Bureau, Admin. for Children and Families, U.S. Dep't of Health and Human Serv., *Determining the best interests of the child* 1 (2020), https://www.childwelfare.gov/pubpdfs/best_interest.pdf.

[21] *See, e.g., id.*, at 2 (identifying the "health, safety and/or protection of the child" as a "guiding principle of best interests determinations"). *See also* Subcomm. on Best Interests, Interagency Working Grp. on Unaccompanied and Separated Children, *Framework for Considering the Best Interests of Unaccompanied Children* 5 (2016), https://www.law.georgetown.edu/human-rights-institute/wp-content/uploads/sites/7/2017/07/Best-Interests-Framework.pdf.

[22] *See* United Nations High Comm'r for Refugees, *UNHCR Guidelines on Determining the Best Interest of the Child* 70 (May 2008), https://www.unhcr.org/en-us/protection/children/4566b16b2/unhcr-guidelines-determining-best-interests-child.html.

[23] U.N. Comm. on the Rts. of the Child, *General Comment No. 14 on the Right of the Child to Have His or Her Best Interests Taken as a Primary Consideration (art. 3, para. 1)*, ¶ 6, U.N. Doc. CRC/C/GC/14 (May 29, 2013), https://www2.ohchr.org/english/bodies/crc/docs/gc/crc_c_gc_14_eng.pdf [hereinafter *General Comment No. 14*].

5

CLP_PC_032751



www.theyoungcenter.org
Chicago, IL | Harlingen, TX | Houston, TX | Los Angeles, CA
New York, NY | Phoenix, AZ | San Antonio, TX | Washington, DC

child."[24] It has further stated that "[c]onsiderations such as those relating to general migration control cannot override best-interests considerations."

The proposed rule directly contravenes the United States' legal obligations to asylum-seekers and its specific obligations to child asylum-seekers as a matter of both substance and procedure. Rather than ensure that children can exercise their right to apply for asylum, the proposed rule would make it nearly impossible for children to ask for and receive asylum. The proposed rule would impose barriers to asylum in the United States that are breathtaking in scope, such as forcing those seeking safety to wait in dangerous conditions in Mexico and an overlapping web of policies that preclude asylum eligibility for countless migrants simply because of their transit path or whether they were able to schedule an appointment, among a limited number of appointments, on a cell phone app.[25] By eliminating the possibility of asylum for children in families who enter the United States through the southern border and who in many cases have been successful in obtaining legal relief when they have the time and resources to be meaningfully heard, the rule would guarantee that many children and families will be returned to danger, persecution, and harm.

Contrary to the robust individualized, case-by-case assessment required under the CRC before a child asylum seeker is returned to their country of origin, the proposed rule significantly limits individualized consideration of the cases of children in families. Instead, the proposed rule mandates a presumption of ineligibility for asylum based on certain categorical requirements and standards—many of which are outside the children's control—with narrow exceptions. Moreover, as discussed below, the proposed rule fails to ensure due process and instead eliminates the basic procedural safeguards of the expedited removal process so that for many, there will be no meaningful opportunity to be heard on their claims for protection.

Rather than advance the best interests of children, the proposed rule completely fails to account for the specific needs and vulnerabilities of children in families. For instance, denying children the ability to seek asylum based on the route they traveled to the U.S. border to enter the United States not only violates existing law, which extends them that explicit protection, but ignores the realities of childhood. Children who travel with adults are subject to the decision-making of those adults— including when, where and how they will cross the U.S. border. Those adults may be well-intended parents or adult family members. But children also cross borders under the control of smugglers or traffickers. It would be both illogical and contrary to public policy to penalize children—to deny them the opportunity to seek asylum, and to potentially return them to persecution or other dangerous situations—for decisions that were not their own (and in particular, for decisions that

---

[24] *Joint General Comment No. 3*, ¶ 33.

[25] The National Immigrant Justice Center maintains a frequently updated timeline providing details of each of the asylum bans and other policies issued and implemented by the government that undermine asylum access. *See* Nat'l Immigr. Just. Ctr., *Asylum-seekers & Refugees*, https://www.immigrantjustice.org/issues/asylum-seekers-refugees (last visited March 22, 2023). For more information on the harms and rights abuses inherent in the Migrant Protection Protocols, or "Return-to-Mexico" program, *see* Hum. Rts. First, *Delivered to Danger: Illegal Remain in Mexico Policy Imperils Asylum Seekers' Lives and Denies Due Process* (Aug. 2019), https://humanrightsfirst.org/wp-content/uploads/2022/10/Delivered-to-Danger-August-2019-.pdf.

CLP_PC_032752



www.theyoungcenter.org
Chicago, IL | Harlingen, TX | Houston, TX | Los Angeles, CA
New York, NY | Phoenix, AZ | San Antonio, TX | Washington, DC

are often made in haste, under stress, or under other extremely difficult circumstances), regarding which countries to transit through and how to ask for protection from the United States. The United States should not restrict asylum for children but should instead continue to follow and build upon federal and international protections regarding children's right to seek asylum.

## II.    The proposed rule denies children in families a full and fair opportunity to be heard on their claims for protection and thereby fails to ensure due process

Children have unique needs and vulnerabilities and face particular challenges to their meaningful participation in immigration proceedings. These unique needs, vulnerabilities, and challenges make it necessary for the U.S. immigration system to employ child-sensitive considerations and heightened procedural protections in order to ensure due process. Both EOIR and USCIS recognize that children (and their cases) are distinct from adults and therefore, their cases require consideration of children's unique needs and vulnerabilities. EOIR guidance recognizes that, "[i]mmigration cases involving children are complicated and implicate sensitive issues beyond those encountered in adult cases."[26] The Board of Immigration Appeals has acknowledged that a respondent's young age can affect their participation in immigration proceedings, such that additional procedural protections may be necessary.[27] Likewise, USCIS guidance recognizes that "children's needs are different from adults due to their developmental needs, their dependence, including in legal matters, and their vulnerability to harm" so that governmental actions toward children must be tailored accordingly.[28]

The importance of ensuring children have an opportunity to be heard and understood appears in both domestic and international law. The CRC recognizes, for all children who are "capable of forming their own views," "the right to express those views freely in all matters affecting the child."[29] In furtherance of this right, the CRC mandates that children be "provided the opportunity to be heard in any judicial and administrative proceedings affecting the child, either directly, or through a representative or an appropriate body[.]"[30] In expounding upon these rights, the U.N. Committee on the Rights of the Child has explained that "[c]hildren who come to a country…as refugees are in a particularly vulnerable situation" and that "[c]hildren may have their own migration projects and migration-driving factors, and policies and decisions cannot be effective and appropriate without their participation."[31] Accordingly, the Committee states that it is critical for States "to fully implement [children's] right to express their views on all aspects of…immigration

---

[26] Off. of the Chief Immigration Judge, Exec. Off. for Immigration Review, U.S. Dep't of Justice, Operating Policies and Procedures Memorandum 17-03: Guidelines for Immigration Court Cases Involving Juveniles, Including Unaccompanied Alien Children 2 (2017), https://www.justice.gov/eoir/file/oppm17-03/download.

[27] *See, e.g.*, In re A-D-, AXXX XXX 526 (BIA May 22, 2017) (noting that brain development continues to develop into the early 20s, and that age may be a factor in excusing respondents from asylum filing deadline).

[28] *USCIS RAIO Training on Children's Claims*, *supra n*. 14, § 2.4.2.

[29] CRC, Art. 12, para. 1

[30] CRC, Art. 12, para. 2.

[31] *General Comment No. 12*, para. 123; *Joint General Comment No. 3*, para. 35.

7



www.theyoungcenter.org
Chicago, IL | Harlingen, TX | Houston, TX | Los Angeles, CA
New York, NY | Phoenix, AZ | San Antonio, TX | Washington, DC

and asylum proceedings…In the case of an asylum claim, the child must…have the opportunity to present her or his reasons leading to the asylum claim."[32] As part of their obligation to guarantee this right, States must provide children with all relevant information on their rights, the services available, and the immigration and asylum processes and their outcomes, "in the child's own language in a timely manner, in a child-sensitive and age-appropriate manner, in order to make their voice heard and to be given due weight in the proceedings."[33] Moreover, "[a] guardian or adviser should be appointed, free of charge."[34]

Rather than ensure these or other additional procedural safeguards to ensure that children have a full and fair opportunity to be heard on their claims for asylum, the proposed rule does exactly the opposite. Like the Trump Administration's transit ban, the proposed rule's restrictions on asylum are located in the expedited removal process, in which asylum-seekers would be deported without an asylum hearing if they do not pass their fear screenings. Asylum-seekers would be required to show that the presumption of ineligibility for asylum does not apply to them or that they can rebut the presumption of ineligibility, which will be impossible for many given that these screenings typically occur over the phone while asylum-seekers are detained, with little to no access to counsel.

Due process violations under the current expedited removal process are well-documented.[35] DHS has deported asylum-seekers without providing them with credible fear interviews or removal hearings before immigration judges, even though they stated that they fear return, in violation of their rights under U.S. law.[36] Most asylum-seekers can not find an attorney to assist them with their credible fear interviews, and access to legal representation is very limited. Moreover, asylum officers have regularly conducted credible fear interviews in languages that asylum-seekers do not fluently speak. These issues have resulted in widespread, erroneous negative credible fear determinations.[37]

Instead of addressing these due process deficiencies in the existing expedited removal process, the proposed rule would gut even the basic procedural safeguards of the expedited removal process—which are already inadequate to ensure due process for adults, let alone children—and severely limit asylum-seekers' ability to present and be heard on their claims. As a result, the vast majority will likely receive negative determinations and will be deported within a matter of days. As with other expedited processes implemented by this Administration and past Administrations that permit asylum-seekers only a short period of time to make their claims for protection, the procedures under the proposed rule completely fail to account for the specific needs and

---

[32] *General Comment No. 12*, para. 123.
[33] *Id*.
[34] *Id*.
[35] *See*, *e.g.*, Human Rights First, *Pretense of Protection: Biden Administration and Congress Should Avoid Exacerbating Expedited Removal Deficiencies* (2022), https://humanrightsfirst.org/wp-content/uploads/2023/01/PretenseofProtection-21.pdf.
[36] *Id*.
[37] *Id*.

8



vulnerabilities of children, particularly asylum-seeking children, who often require additional time to prepare their cases and retain legal counsel.

Earlier this month, the Young Center and First Focus on Children published a report titled *Fast Not Fair: How Expedited Processes Harm Immigrant Children Seeking Protection*, which describes how expedited processes deny children and families a full and fair opportunity to be heard on their claims for protection and increase the risk that children will be returned to danger and persecution.[38] As explained in the report, expedited processes prioritize speed over fairness in considering children's asylum cases. They ignore the reality that children are different from adults, and their claims for protection therefore require both time and specialized care in both their preparation and adjudication. Expedited processes inherently lack this time and care, and lack specialized procedural or substantive protections for children. They therefore increase the risk that children with legitimate claims for protections will be denied relief and returned to danger.

> A. <u>The proposed rule's expedited timeframes and inadequate procedures for processing asylum claims fail to consider the unique needs of children</u>

Children in immigration proceedings warrant heightened procedural protections to ensure they have a fair opportunity to be heard. Children are developmentally distinct from adults, with research showing that children's brains continue to develop well into their twenties.[39] Children process, recall, and communicate information differently, as perception, memory, recall, and other capacities develop with age; even older children vary in cognitive abilities.[40] Cultural and linguistic differences may further hinder communication and comprehension as a child is interviewed.[41] Children also need time to build trust in the professionals who advocate for them and to understand the adversarial system in which their asylum claim will be adjudicated.

Despite the capacity limitations inherent in children's ongoing intellectual, social, and emotional development, children are held to the same high bars for asylum and other humanitarian relief as adults. Current U.S. laws, regulations, and processes governing asylum adjudications are

---

[38] Young Center for Immigrant Children's Rights and First Focus on Children, *Fast Not Fair: How Expedited Processes Harm Immigrant Children Seeking Protection,* (Feb. 2023), https://www.theyoungcenter.org/fastnotfair.

[39] Sara B. Johnson, Robert W. Blum, and Jay N. Giedd, *Adolescent Maturity and the Brain: The Promise and Pitfalls of Neuroscience Research in Adolescent Health Policy*, 45 J. OF ADOLESCENT HEALTH 216 (2009), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2892678/. *See also* In re A-D-, AXXX XXX 526 (BIA May 22, 2017) (noting that brain development continues to develop into the early 20s, and that age may be a factor in excusing respondents from asylum filing deadline); *USCIS RAIO Combined Training on Children's Claims, supra* n. 15, § 2.4.2 ("children's needs are different from adults due to their developmental needs, their dependence, including in legal matters, and their vulnerability to harm").

[40] Chris Newlin et al., *Child Forensic Interviewing: Best Practices*, Juvenile Justice Bulletin, Office of Juvenile Justice and Delinquency Prevention, U.S. Dep't of Justice, 3-4 (Sept. 2015), https://ojjdp.ojp.gov/sites/g/files/xyckuh176/files/pubs/248749.pdf.

[41] TRAC Immigration, *The Impact of Nationality, Language, Gender and Age on Asylum Success* (Dec. 7, 2021), https://trac.syr.edu/immigration/reports/668/ (finding that asylum-seekers in U.S. immigration courts during the last two decades came from over 200 countries and spoke over 400 different languages).

9



www.theyoungcenter.org
Chicago, IL | Harlingen, TX | Houston, TX | Los Angeles, CA
New York, NY | Phoenix, AZ | San Antonio, TX | Washington, DC

exceedingly complicated, and winning asylum is difficult for all applicants, most especially for children. Asylum-seekers bear the burden of establishing their eligibility for asylum[42] in the face of a complex web of laws and regulations, without the benefit of appointed counsel.[43] Despite their age and stage of development, children also must show they have suffered persecution or will suffer persecution based on a protected ground—many without a lawyer to represent them and while still in detention. Moreover, claims for asylum are time- and labor-intensive, placing demands on children that they are likely to be unequipped to meet in the short term. For example, a forensic evaluation of a child's medical or psychological history often provides essential evidence for a meritorious asylum claim, but obtaining these services, especially pro bono, often entails wait times of many months.

In addition, a child's ability to establish eligibility for asylum or other forms of protection for which they may be eligible often depends on individual and institutional actors whom children do not control. Because children are neither financially nor emotionally self-sufficient, asylum-seeking children are dependent upon others to facilitate their participation in a legal system designed for adults. They must depend on the support of parents or other adult caregivers and on scarce free or low-cost resources for legal, medical, and educational services. Even if ready to pursue relief, a child may be unable to influence adults or institutions on whom progress or preparation depends. For children whose cases are tied to that of their parents, these child-specific considerations are rarely taken into account.

By fast-tracking the asylum cases of families with children, and limiting children's opportunity to be heard and present evidence, the proposed rule deprives children of fair and adequate examination of their asylum claims and places a huge—and in many cases, insurmountable—barrier to a vital protection for children that is already difficult to obtain. While it is critical that children's cases be adjudicated as efficiently as possible, it should not be at the expense of ensuring that children have a full and fair opportunity to be heard according to the specific and unique needs of each child.

      B.  <u>The proposed rule fails to account for how a history of trauma affects a child's navigation of immigration proceedings</u>

Many immigrant children, particularly those who seek asylum, have suffered trafficking, abuse, or other violence from events that occurred in their countries of origin, during their migration journey, or upon arriving in the United States.[44] In particular, child migration from Central America is

---

[42] 8 U.S.C. § 1158(b)(1)(B)(i); 8 C.F.R. § 1240.8(d).

[43] *See* Lauren Villagran, Daniel Connolly & Aaron Montes, *Asylum Seekers in U.S. Face Years of Waiting, Little Chance of Winning Their Cases*, USA TODAY, (Sept. 25, 2019), https://www.usatoday.com/in-depth/news/nation/2019/09/23/immigration-court-asylum-seekers-what-to-expect/2026541001/.

[44] Emily M. Cohodes et al., *Migration-related trauma and mental health among migrant children emigrating from Mexico and Central America to the United States: Effects on developmental neurobiology and implications for policy*, 63 DEVELOPMENTAL PSYCHOLOGY 1, 4 (2021), http://candlab.yale.edu/sites/default/files/publications/Cohodes_etal_2021_DP.pdf.

CLP_PC_032756



www.theyoungcenter.org
Chicago, IL | Harlingen, TX | Houston, TX | Los Angeles, CA
New York, NY | Phoenix, AZ | San Antonio, TX | Washington, DC

frequently connected to gang violence, the erosion of human rights, violence in the home, and other grave danger in their countries of origin.[45] The resulting trauma histories, and often compounded trauma, exacerbate the gap that a child must bridge to participate in preparing a legal defense against removal.

A trauma history can affect a child's ability or willingness to provide information about past incidents.[46] Children who have experienced trauma may have piecemeal or nonlinear memories of the harm they suffered, making it time-consuming to develop and corroborate their claims.[47] It often takes time for them to talk about their experiences. For many children, it is only after release from government detention or after they have had time to settle and adjust to life in the U.S. with trusted adults that they are able to talk about the harm they faced in their home country. For many, the asylum process is the first time they ever discuss their experiences, and it is a process that requires time and patience, both to ensure a full understanding of their story and to avoid a process that inflicts additional and unnecessary harm on a child.

By forcing a child to address traumatic facts without appropriate support in order to meet a predetermined timeline rather than one that accounts for the child's age, development, and trauma history, expedited processes ignore the significant impact of trauma on children and the ways in which trauma can delay a child's ability to assist their attorneys in preparing their cases, and ultimately obstruct decision makers in the fact-finding process.

C. The proposed rule denies children and families the time they need to find and consult with counsel and adequately prepare their asylum cases

The proposed rule would mandate a fast-tracked process for processing asylum claims, likely within a matter of days and while asylum-seekers are detained, conditions that would make it extremely difficult for asylum-seekers to be able to have any opportunity to consult with an attorney, let alone have meaningful representation to prepare for their interviews. Yet, for children, access to legal representation is critical to ensuring that their stories and expressed wishes are effectively communicated and understood in their immigration proceedings. Access to counsel is also essential for children and families to be able to navigate the immigration system, its complicated legal procedures, and the various legal and evidentiary standards to obtain relief. It is unreasonable to expect any person, especially a child, to understand the complexities of U.S. asylum law and lay out every element of their claim by themselves without representation.

Data from the Biden Administration's Dedicated Docket program, which sets a goal of issuing decisions in asylum cases before immigration court within an expedited timeframe of 300 days

---

[45] U.N. High Comm'r for Refugees, *Children on the Run: Unaccompanied Children Leaving Central America and Mexico and the Need for International Protection* 9-11 (2016), https://www.unhcr.org/en-us/about-us/background/56fc266f4/children-on-the-run-full-report.html.

[46] *Child forensic interviewing*, *supra* n. 40, at 5. *See also USCIS RAIO Combined Training Program*, *supra* n. 14, at § 6 ("Child asylum applicants may be less forthcoming than adults and may hesitate to talk about past experiences in order not to relive their trauma").

[47] *Child forensic interviewing*, *supra* n. 40, at 5.

11



www.theyoungcenter.org
Chicago, IL | Harlingen, TX | Houston, TX | Los Angeles, CA
New York, NY | Phoenix, AZ | San Antonio, TX | Washington, DC

from their initial hearing, illustrates the vital importance of access to counsel in ensuring due process for children and families in immigration proceedings. Consistent with prior research demonstrating the critical impact of legal representation on the ability of asylum-seekers, particularly children, to obtain legal relief in immigration proceedings,[48] the inability to obtain legal representation has made it extremely difficult for families on the Dedicated Docket to win legal relief. Only 7% of cases on the Dedicated Docket that were closed in 2022 were granted asylum, compared with 52% of cases in regular proceedings.[49] Moreover, data analyzed by Syracuse University's Transactional Records Access Clearinghouse shows that only 4.7% of those ordered deported during the first 7 months of the Dedicated Docket had legal representation.[50] On the other hand, of the mere 13 people granted asylum during that same time period, all had legal representation.[51] Similarly, a UCLA report analyzing data for the Dedicated Docket in Los Angeles found that most of the families ordered removed in absentia did not have representation, while the vast majority of those families who were able to file applications for asylum or were able to get their cases transferred to a regular docket were represented.[52]

Given that families in the Dedicated Docket program have faced difficulties in finding counsel and preparing their cases within a 300-day timeframe while they are released, it is very likely that the vast majority of asylum-seekers subject to the procedures and requirements in this proposed rule will not have access to counsel prior to or during their fear screenings. In addition, asylum-seekers will suffer language barriers, abusive and dangerous conditions of detention, and acute trauma. All of these factors will make it extremely challenging for asylum-seekers to overcome the presumption of ineligibility in their preliminary screenings. Indeed, without an attorney, it is likely that most asylum-seekers will not even know the requirements of this complex rule or what they will have to show during their screenings. For children, these barriers and hurdles will only be amplified.

Moreover, the due process violations under this proposed rule will be magnified if the Biden Administration pursues its reported plan[53] to conduct credible fear interviews within days of asylum-seekers' arrival in Customs and Border Protection (CBP) custody, where dire conditions and lack of access to counsel would exacerbate deficiencies in due process. The Trump

[48] *See, e.g.*, TRAC Immigration, *Representation Makes Fourteen-Fold Difference in Outcome: Immigration Court "Women with Children" Cases* (July 15, 2015), https://trac.syr.edu/immigration/reports/396/.
[49] TRAC Immigration, *A National Assessment of the Biden Administration's Dedicated Docket Initiative* (Dec. 6, 2022), https://trac.syr.edu/reports/704/.
[50] TRAC Immigration, *Unrepresented Families Seeking Asylum on "Dedicated Docket" Ordered Deported by Immigration Courts* (Jan. 13, 2022), https://trac.syr.edu/immigration/reports/674/.
[51] *Id.*
[52] Center for Immigration Law and Policy, UCLA School of Law, *The Biden Administration's Dedicated Docket: Inside Los Angeles' Accelerated Court Hearings for Families Seeking Asylum* 8-9 (May 2022), https://law.ucla.edu/sites/default/files/PDFs/Center_for_Immigration_Law_and_Policy/Dedicated_Docket_in_LA_Report_FINAL_05.22.pdf.
[53] Ted Hesson & Kristina Cooke, *Biden Moving to Restart Trump-era Rapid Asylum Screenings at U.S.-Mexico Border – Sources*, Reuters (Jan. 26, 2023), https://www.reuters.com/world/us/biden-moving-restart-trump-era-rapid-asylum-screenings-us-mexico-border-sources-2023-01-26/

CLP_PC_032758



www.theyoungcenter.org
Chicago, IL | Harlingen, TX | Houston, TX | Los Angeles, CA
New York, NY | Phoenix, AZ | San Antonio, TX | Washington, DC

Administration similarly conducted credible fear interviews in CBP custody through the Prompt Asylum Claim Review (PACR) and Humanitarian Asylum Review Process (HARP) programs,[54] which the Biden administration ended.[55] A 2021 investigation by the DHS Office of Inspector General found that under PACR and HARP, CBP provided inadequate access to phones and private space for individuals to consult with legal representatives and to participate in asylum officer screening interviews and immigration court proceedings.[56] Moreover, the government failed to provide legal orientation programs to detained asylum-seekers, and detainees lacked access to pens or paper, avenues to conduct legal research, and the ability to keep any documents with them.[57] Given these conditions, it is not surprising that positive credible fear determinations vastly decreased, with only 18 percent of individuals in PACR and 30 percent in HARP passing their screenings, compared to 40 percent nationwide (excluding HARP and PACR) during the same period.[58] The proposed rule does not account for or remedy any of these failings in past expedited processes.

D. The proposed rule would deprive children of the ability to pursue independent claims for asylum

By law, children may assert independent asylum claims, separate and distinct from the claims of their parents and guardians.[59] As with expedited removal, the proposed rule would deny children in families the opportunity to make a claim for protection independent of their parent or legal guardian. A report on expedited removal by the U.S. Commission for International Religious Freedom found that children under 14 arriving with parents had few opportunities to make an independent claim for protection, as border patrol agents question only the parent on behalf of the child.[60] When asked about scenarios where children might have a claim independent from their parent or legal guardian, "border patrol agents responded . . . that they were confident that, since the child had made it to the safety of the United States, s/he would voice any concerns s/he had,"[61] despite the fact that border patrol agents are uniformed, armed government officials whom children and families encounter right after they have ended an arduous journey, often after fleeing persecution by government officials in their countries of origin or countries of transit.

---

[54] Off. of Inspector Gen., U.S. Dep't of Homeland Sec., *DHS Has Not Effectively Implemented the Prompt Asylum Pilot Programs* 5 (2021), https://www.oig.dhs.gov/sites/default/files/assets/2021-01/OIG-21-16-Jan21.pdf.

[55] Exec. Order No. 14010, 86 Fed. Reg. 8267 (Feb. 2, 2021), https://www.govinfo.gov/content/pkg/FR-2021-02-05/pdf/2021-02561.pdf.

[56] *DHS Has Not Effectively Implemented the Prompt Asylum Pilot Programs*, *supra* n. 54, at 17.

[57] *Id.*, at 19.

[58] *Pretense of Protection*, *supra* n. 35, at 23.

[59] 8 C.F.R. §§ 1208.3, 1208.13.

[60] Elizabeth Cassidy and Tiffany Lynch, *Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal, U.S. Commission on International Religious Freedom* 30 (2016), https://www.uscirf.gov/sites/default/files/Barriers%20To%20Protection.pdf.

[61] *Id.*

13



www.theyoungcenter.org
Chicago, IL | Harlingen, TX | Houston, TX | Los Angeles, CA
New York, NY | Phoenix, AZ | San Antonio, TX | Washington, DC

Similarly, the UCLA report on the Dedicated Docket program found that families subjected to the Dedicated Docket in Los Angeles were unaware that children could make a separate claim for relief, and that few children were able to pursue independent claims.[62] In some cases, judges have even encouraged families to consolidate their claims, failing to consider the possibility that children may have independent claims. Border officials, asylum officers, and judges frequently fail to appreciate that children may have separate claims for relief that involve sensitive information that a child may be unable to disclose in the presence of their parents or guardians. Because the expedited removal process typically lacks personnel trained in child development and trauma, as well as child-appropriate, private spaces, it is particularly ill-equipped to ensure that children are able to articulate separate claims for protection.

### III.   The detention of children and families is inhumane and should not be employed as part of the implementation of this rule or any other immigration policies

To the extent that DHS is considering implementing this proposed rule in conjunction with an expansion or resurrection of the government's practice of detaining families in ICE or CBP facilities, the Young Center urges this Administration to honor its promise and commitment to end the detention of immigrant families.[63] Family detention is inhumane and has been widely condemned by human rights organizations and medical experts. The American Academy of Pediatrics has explicitly stated that DHS should discontinue the use of family detention due to the impact of detention on the health of children and families.[64] It has further recommended that "[p]rocessing of children and family units should occur in a child friendly manner, taking place outside current CBP processing centers or conducted by child welfare professionals, to provide conditions that emphasize the health and well-being of children and families at this critical stage of immigration proceedings."[65] In 2016, DHS Secretary Jeh Johnson formed an ICE Advisory Committee on Family Residential Centers, to which the Young Center's Policy Director at the time was appointed; after one year of investigation, the Committee recommended that "DHS's immigration enforcement practices "operationalize the presumption that detention is generally neither appropriate nor necessary for families—and that detention or the separation of families for purposes of immigration enforcement or management are never in the best interest of children."[66]

The deleterious effects of detention on the health and well-being of children is well-established. Detention can "have a serious, long-lasting impact on children's psychological well-being. The persistent stress, despair, and uncertainty of detention—even when it's just for a few weeks—

---

[62] *Inside Los Angeles' Accelerated Court Hearings for Families Seeking Asylum*, *supra* n. 52, at 15.

[63] Colleen Long and  Elliott Spagat, *In reversal, Biden weighs detaining migrant families*, AP NEWS (Mar. 7, 2023),  https://apnews.com/article/immigration-migrant-families-detention-border-biden-0909546c3984ae439b376d02c40ac7ff.

[64] Julie M. Linton et al., American Academy of Pediatrics Counsel on Community Pediatrics, *Detention of Immigrant Children*, 139 PEDIATRICS 1, 8 (2017).

[65] *Id*., at 8-9.

[66] ICE Advisory Committee on Family Residential Centers, *Report of the ICE Advisory Committee on Family Residential Centers* (Oct. 7, 2016), https://www.ice.gov/sites/default/files/documents/Report/2016/acfrc-report-final-102016.pdf.

CLP_PC_032760



compromises young children's intellectual, cognitive, emotional, and social development" and "raises the risk of recurrent and distressing memories, nightmares, dissociative reactions, prolonged psychological distress, and negative alterations in cognition."[67] When older children are detained, they "may experience a sense of hopelessness and futility and can have trouble sleeping or concentrating. As a response to their hopelessness and anger, some young people harm themselves."[68] For young people who have fled their countries due to threats and violence, "detention may serve to continue their experience of being treated unfairly or unjustly, as well as their perception that life is unsafe, uncertain, unstable, and unpredictable."[69] Detention essentially returns an asylum-seeking child "to the state of existential panic that [they] experienced when subjected to the human rights violations or persecution which led [them] to flee [their] country of origin."[70]

Studies of detained families have found that detained "[p]arents exhibited depression, anxiety, loss of locus of control, and a sense of powerlessness and hopelessness."[71] Moreover, "[p]arents often faced difficulty parenting their children and subsequently experienced strained parent–child relationships."[72] Detention itself undermines parental authority and capacity to respond to their children's needs. The strain is exacerbated when parents suffer mental health problems while in detention.[73]

Poor and even appalling detention conditions in CBP and ICE facilities have been well-documented. In a 2022 study of women who had been detained at the Berks Detention Center, which had previously been used to detain immigrant families, detainees reported widespread mistreatment by ICE and CBP employees and horrid conditions in CBP facilities, including insufficient or inedible food and water; lack of access to showers and other basic hygiene; and inability to sleep because of overcrowding, lack of adequate bedding, cold conditions, and lights that are kept on all night.[74] Similar conditions were reported by detained children in complaints filed by four legal organizations based on interviews with over 26,000 unaccompanied children who had been detained in CBP custody.[75] Despite a recent settlement agreement in *Flores* mandating the federal government to comply with specific custodial conditions and procedures for

---

[67] Luis H. Zayas, *Immigration Enforcement Practices Harm Refugee Children and Citizen-Children*, 38 ZERO TO THREE 20, 22 (2018).

[68] Int'l Detention Coalition, *Captured Childhood* 53 (2012), https://idcoalition.org/wp-content/uploads/2016/01/Captured-Childhood.pdf.

[69] *Id.* at 50.

[70] *Id*. at 54.

[71] *Detention of Immigrant Children*, *supra* n. 64, at 6.

[72] *Id*.

[73] *Id.; see also* Sarah Mares, *The Mental Health of Children and Parents Detained on Christmas Island: Secondary Analysis of an Australian Human Rights Commission Data Set*, 18 HEALTH & HUMAN RIGHTS 292 (2016), https://pubmed.ncbi.nlm.nih.gov/28559688/.

[74] Human Rights First, *Biden Administration Detains Women Seeking Safety and Separates Them From Their Families* (2022), https://humanrightsfirst.org/wp-content/uploads/2022/12/Final-Berks-Factsheet-12.1.2022_FINAL-1.pdf.

[75] Anna Flagg and Julia Preston, "*No Place for A Child,*" THE MARSHALL PROJECT (Jun. 16, 2022), https://www.themarshallproject.org/2022/06/16/no-place-for-a-child.

15



www.theyoungcenter.org
Chicago, IL | Harlingen, TX | Houston, TX | Los Angeles, CA
New York, NY | Phoenix, AZ | San Antonio, TX | Washington, DC

immigrant children (including children in families) in federal government custody, a January 2023 report filed by the Juvenile Care Monitor in that case found that children in families detained in CBP facilities in El Paso and the Rio Grande Valley continue to experience overcrowding and protracted periods of detention, as well as "a lack of child-friendly amenities, activities, and caregiving personnel."[76]

## IV. The proposed rule would undermine children's best interests by fueling family separations

Like other policies that have barred access to asylum for migrants at the border such as the Remain in Mexico policy and Title 42, the proposed rule would fuel family separation by forcing parents to "choose" between remaining with their children in dangerous conditions or separating from them in hopes that the children will find safety if they approach the border unaccompanied. During the Remain in Mexico policy and under Title 42, Young Center Child Advocates have been appointed to children whose parents or other family members made the heartbreaking decision to separate from a child, because of harmful immigration policies that deny access to asylum at the border to families and adults.[77] According to data provided in response to a FOIA request, more than 12,000 children in fiscal year 2021 entered the U.S. as unaccompanied children after previously being expelled under Title 42, typically with their parents.[78] The pressure to separate is especially intense for the most vulnerable, such as those who fear persecution in Mexico or who find themselves without enough food or medicine to care for their children. Violence is a real concern for families subjected to Title 42, under which many families have faced kidnapping, rape, and assault.[79]

Young Center Child Advocates working with children who suffered separation from their families have witnessed firsthand the deep emotional harm and trauma of separations at the border and the

---

[76] Juvenile Care Monitor Report at 50, *Flores v. Garland*, No. 85-cv-04544-DMG-AGR, ECF No. 1326, (C.D. Cal. Jan. 30, 2023).

[77] *See*, *e.g.*, Young Center for Immigrant Children' Rights, *Family Separation is Not Over: How the Trump Administration Continues to Separate Children from Their Parents to Serve Its Political Ends* 13-14 (2020), https://bit.ly/YoungCenterFamilySeparationIsNotOver; Young Center for Immigrant Children's Rights, *Two Years of Family Separation and Violence: Why Title 42 Must End Immediately* 25-27 (Mar. 2020), https://www.theyoungcenter.org/stories/2022/3/20/two-years-of-family-separation-and-violence-why-title-42-must-end-immediately.

[78] Camilo Montoya-Galvez, *Immigrant Children Reentered U.S. Border Custody in 2021 After Being Expelled*, CBS NEWS, (May 20, 2022), https://www.cbsnews.com/news/immigration-migrant-children-us-border-custody-unaccompanied-minors-2021/.

[79] Human Rights First, Human Rights Stain, *Public Health Farce: Evasion of Asylum Law and Title 42 Abuse Must End—and Never Be Revived* 4 (Dec. 2022), https://humanrightsfirst.org/wp-content/uploads/2022/12/HumanRightsStainPublicHealthFarce-1.pdf (tracking of 13,480 reports of murder, kidnapping, rape, torture, and other violent attacks against people blocked in or expelled to Mexico due to Title 42 since January 2021).

16



long-term effects on children.[80] The American Academy of Pediatrics has stated that "the most fundamental adaptational mechanism for any child is a secure relationship with a safe, stable, nurturing adult who is continuous over time in the child's life[,] usually the child's parent or caregiver but can involve extended family and biological or fictive kin."[81] "[T]he caregiver's proximity and responsivity to the child's needs and reflection of the child's emotional experience" are central to a child's development of an attachment relationship to their caregiver.[82] Supportive caregivers provide children with a sense of safety and security, serving as a critical buffer and a protective factor for children in stressful and difficult situations.[83] Mental health experts have found that caregiver presence and relationships when children are exposed to migration-related stress may effectively mitigate the negative effects of this exposure.[84]

Given the buffering role that a relationship and proximity with parents or caregivers serves for a child, child health and medical experts have recognized that a child's separation from parents is a deeply traumatizing experience and can carry significant physical and emotional consequences well beyond the period of separation.[85] The American Psychological Association has raised grave concerns that the sudden and unexpected separation of a child from their parent can cause severe emotional trauma, noting that "the longer that parents and children are separated, the greater the reported symptoms of anxiety and depression are for children."[86] A past President of the American Academy of Pediatrics cautions: "[H]ighly stressful experiences, like family separation, can cause irreparable harm, disrupting a child's brain architecture and affecting his or her short- and long-term health. This type of prolonged exposure to serious stress—known as toxic stress—can carry

---

[80] *See, e.g.*, Brief for Amici Curiae Young Center for Immigrant Children's Rights, KIND, et al. at 25-27, *Texas v. Biden*, No. 21-10806 (N.D. Tex. Sept. 27, 2021), https://static1.squarespace.com/static/597ab5f3bebafb0a625aaf45/t/61531cee91a6897acaf74c12/1632836847044/2021_09_27_00516031522+Amicus+Brief.pdf.

[81] Heather Forkey et al., American Academy of Pediatrics Council on Foster Care, Adoption, and Kinship Care, Council on Community Pediatrics, Council on Child Abuse and Neglect, Committee on Psychosocial Aspects of Child and Family Health, *Trauma-Informed Care*, 148 PEDIATRICS 1, 3 (2021), https://publications.aap.org/pediatrics/article/148/2/e2021052580/179745/Trauma-Informed-Care.

[82] K.L. Edyburn et al, Seeking safety and humanity in the harshest immigration climate in a generation: A review of the literature on the effects of separation and detention on migrant and asylum-seeking children and families in the United States during the Trump administration, 34 SOCIAL POLICY REPORT 1, 17 (2021), https://srcd.onlinelibrary.wiley.com/doi/full/10.1002/sop2.12.

[83] *Trauma-Informed Care*, *supra* n. 81, at 6.

[84] *Migration-related trauma*, *supra* n. 44, at 1, 4.

[85] Letter to Department of Homeland Security Secretary Kirstjen M. Nielsen, Renewed Appeal from Experts in Child Welfare, Juvenile Justice and Child Development to Halt the Separation of Children from Parents at the Border (June 7, 2018) (a letter from over 200 child-centered organizations opposed to family separation on the grounds that it "disrupts the parent-child relationship and puts children at increased risk for both physical and mental illness" even after reunification), https://www.childrensdefense.org/wp-content/uploads/2018/08/child-welfare-juvenile.pdf.

[86] *See* Letter to Former Department of Homeland Security Secretary John F. Kelly, AMERICAN PSYCHOLOGICAL ASSOC. (Apr. 5, 2017), http://www.apa.org/advocacy/immigration/separating-families.pdf.

17



www.theyoungcenter.org
Chicago, IL | Harlingen, TX | Houston, TX | Los Angeles, CA
New York, NY | Phoenix, AZ | San Antonio, TX | Washington, DC

lifelong consequences for children."[87] The World Health Organization agrees: "Parent-child separation has a direct and immediate impact on a child's physical, cognitive, mental and emotional well-being."[88]

The negative impact on a child's health and well-being due to family separation does not end once a child is reunited with their family. Mental health experts have found that "threatened or actual separation from caregivers constitutes a major traumatic exposure that is associated with behavioral and psychological difficulties for children both immediately following and for years following separation."[89] Even after reunification, children may endure life-long psychological and health damage like experiencing symptoms of post-traumatic stress disorder.[90] Research has shown that migrant children separated from their family for even a short period of time can develop psychological trauma and long-term mental health risks.[91]

In addition to fueling family separations, the proposed rule would also prevent reunification of families, including children, who do not travel to the border together. Exceptions in the proposed rule that promote family unity where refugee families travel to the United States together will not prevent the separation of families where spouses and children remain abroad. Asylum-seekers banned from asylum protection under the rule would have to establish eligibility for Withholding of Removal or protection under CAT to obtain protection from deportation. However, those who are able to meet the higher threshold and granted these lesser forms of protection would be left in permanent limbo, under constant threat of deportation and separated from their spouses, children, and other family members whom they had to leave behind. Unlike asylum, these forms of relief do not confer permanent status or a path to citizenship, do not allow people to petition for their spouses and children, do not permit people to travel abroad, and leave people with a permanent removal order, subject to deportation at any time.

---

[87] Colleen Kraft, American Academy of Pediatrics, *Statement Opposing Separation of Children and Parents at the Border* (May 8, 2018), https://www.aap.org/en-us/about-the-aap/aap-press-room/Pages/StatementOpposingSeparationofChildrenandParents.aspx.

[88] Catherine Jan et al., *Improving the Health and Well-Being of Children of Migrant Workers*, BULLETIN OF THE WORLD HEALTH ORG. 850, 850 (2017), http://www.who.int/bulletin/volumes/95/12/17-196329.pdf.

[89] *Migration-related trauma*, *supra* n. 44, at 4.

[90] Claudio J. Perez, *How U.S. Policy Has Failed Immigrant Children: Family Separation in the Obama and Trump Eras*, Am. Bar Ass'n (Mar. 10, 2021), https://www.americanbar.org/groups/family_law/publications/family-law-quarterly/volume-54/issue-1/how-us-policy-has-failed-immigrant-children-family-separation-the-obama-and-trump-eras/; *see also Oversight of the Customs and Border Protection's Response to the Smuggling of Persons at the Southern Border: Hearing Before the Senate Comm. on the Judiciary*, 116th Cong. (2019) (testimony of Julie Linton, American Academy of Pediatrics).

[91] Sarah A. MacLean et al., *Characterization of the mental health of immigrant children separated from their mothers at the U.S.–Mexico border*, 286 PSYCHIATRY RESEARCH 1, 2 (2019), https://projectlifeline.us/wp-content/uploads/2020/09/Mental-Health-of-Separated-Migrant-Children.pdf.

CLP_PC_032764



www.theyoungcenter.org
Chicago, IL | Harlingen, TX | Houston, TX | Los Angeles, CA
New York, NY | Phoenix, AZ | San Antonio, TX | Washington, DC

As a result, many asylum-seekers who should be granted asylum under U.S. law will languish in the United States in legal limbo, indefinitely separated from spouses and/or children who remain abroad in danger. The Trump administration's transit ban similarly left many families separated by barring asylum-seekers from asylum and leaving them with the inadequate protection of withholding of removal. Like the Trump transit ban, this asylum ban would leave families indefinitely separated.

## V.   Requiring asylum-seekers to schedule appointments to access ports of entry through the CBP One app is unfair and contravenes asylum law

The proposed rule requires asylum-seekers at the southern border to schedule appointments through the CBP One app and would generally deny asylum to asylum-seekers who arrive at a border port of entry without a previously scheduled appointment and were not denied protection in a transit country. However, CBP One is impossible for many asylum-seekers to access or use.

### A.   The proposed rule would rely on technology that fails most asylum-seekers

Many asylum-seekers do not have the resources to obtain a smartphone.[92] Even if an individual or family has access to a smartphone, their phones may not have adequate memory or battery life, or they may not have access to charging stations or reliable wifi.[93] Others may not have the literacy or technological skills to be able to use and navigate a smartphone or the app. Some individuals with disabilities also face barriers and challenges in accessing smartphones that prevent them from being able to use CBP One.

Additionally, the app is not available in most languages, including Indigenous languages, and all error messages are in English, barring many asylum-seekers from being able to use the app.[94] The app has also disparately harmed Black asylum-seekers due to racial bias in its facial recognition technology, which has prevented many from obtaining an appointment.[95] Requiring asylum-seekers to use CBP One at the southern border also raises concerns that the system will be used for illegal metering, based not on wait time but on luck, technology skills, or resources to secure

---

[92] Stephanie Leutert and Caitlyn Yates, Univ. of Texas at Austin Strauss Center for International Security and Law, *Asylum Processing at the U.S.-Mexico Border: February 2023* (Feb. 2023), https://www.strausscenter.org/wp-content/uploads/Feb_2023_Asylum_Processing.pdf.

[93] *Id.* Partner organizations at the southern border have also reported to the Young Center that another issue in accessing CBP One has been that some asylum-seekers have a certain brand of smartphone – Huawei – that does not support the app.

[94] Melissa del Bosque, *Facial recognition bias frustrates Black asylum applicants to US, advocates say,* THE GUARDIAN, (February 8, 2023), https://www.theguardian.com/us-news/2023/feb/08/us-immigration-cbp-one-app-facial-recognition-bias.

[95] Arelis R. Hernández, *Desperate Migrants Seeking Asylum Face a New Hurdle: Technology,* WASHINGTON POST, (March 11, 2023), https://www.washingtonpost.com/nation/2023/03/11/asylum-seekers-mexico-border-app/; *Asylum Processing at the U.S.-Mexico Border: February 2023*, *supra* n. 92.

CLP_PC_032765



www.theyoungcenter.org
Chicago, IL | Harlingen, TX | Houston, TX | Los Angeles, CA
New York, NY | Phoenix, AZ | San Antonio, TX | Washington, DC

an appointment, which would effectively turn asylum access into a lottery that favors those with more wealth, resources, and privilege.[96]

In addition to CBP One's failure to ensure fair and equitable access, asylum-seekers have reported experiencing numerous glitches and technical problems, such as system outages, error messages, or lags due to too many individuals trying to schedule appointments at the same time.[97] The app's requirement that families take live photos of all family members, including children, has created another barrier for use of the app. Because the app has required that the individual in the photo have their eyes open (and not blinking), parents using the app have reported that it has been extremely difficult to submit photos for infants and young children.

Asylum-seekers who can access and navigate the app are still often unable to schedule appointments due to extremely limited slots.[98] The limited slots are particularly punitive for families, who are being required by DHS to schedule separate appointments for each member of the family, including children. It is extremely difficult for families of 3 or more individuals to schedule back-to-back appointments on the app. Without appointments for each member of the family, CBP has refused to allow family members without appointments, including children, to enter at ports of entry for Title 42 exemption screenings.[99]

### B. The proposed rule's CBP One requirement would leave particularly vulnerable migrants in danger for even longer periods

By requiring asylum-seekers at the southern border to schedule appointments through CBP One, the proposed rule would leave many vulnerable asylum-seekers, including those who are children, with disabilities, Black, Indigenous, and/or LGBTQ, in grave danger. Asylum-seekers unable to secure appointments through the CBP One app will be forced to remain indefinitely at the border in dangerous conditions, often with no access to safe housing or stable income as they continue to try to make an appointment. These conditions increase the likelihood that they will be targeted for violence by cartels, traffickers, and the abusers from which they initially fled. Indeed, requiring asylum-seekers to schedule an appointment through CBP One has already resulted in horrific violence and death, including the murder of a 17-year-old Cuban child in Mexico who was required to wait weeks for an appointment.[100]

---

[96] Order, *Al Otro Lado v. Mayorkas*, No. 3:17-cv-02366-BAS-KSC, ECF No. 742 (S.D. Cal. Sept. 2, 2021).
[97] Andrea Castillo, *Asylum Seekers Face Decision to Split up Families or Wait Indefinitely Under New Border Policy,* LOS ANGELES TIMES, (Feb. 24, 2023) https://www.latimes.com/politics/story/2023-02-24/asylum-seeking-families-consider-separation-shortage-mobile-app-appointments.
[98] *Desperate Migrants Seeking Asylum Face a New Hurdle*, *supra* n. 95.
[99] *Id.*; *Asylum Seekers Face Decision to Split up Families or Wait Indefinitely*, *supra* n. 97.
[100] *Joven Migrante Cubano, Asesinado a Tiros en un Hotel en Mexico: Estaba a la Espera de Llegar a EEUU* ("Young Cuban Migrant Shot to Death in a Mexican Hotel: While Awaiting Entry to the U.S."), UNIVISION, (Jan. 23, 2023), https://www.univision.com/local/miami-wltv/joven-migrante-cubano-asesinado-a-tiros-en-un-hotel-en-mexico-estaba-a-la-espera-de-llegar-a-eeuu-video.

20



www.theyoungcenter.org
Chicago, IL | Harlingen, TX | Houston, TX | Los Angeles, CA
New York, NY | Phoenix, AZ | San Antonio, TX | Washington, DC

While migrants in Mexico generally face xenophobic discrimination and abuse, Black immigrants are particularly vulnerable to racist harassment and violence in Mexico.[101] Mexican police have specifically targeted Black migrants for abuse and violence.[102] A 2021 survey found that nearly 20 percent of Haitian asylum-seekers in the northern Mexican border region reported being subject to beatings, extortion, and threats by Mexican police.[103] Mexican immigration officials routinely target Afro-Mexicans and Black migrants at immigration checkpoints.[104] Cartels and gangs also target Black migrants for various crimes such as kidnapping because they stand out as migrants based on their skin color. Black LGBTQ asylum-seekers from Jamaica and other countries have reported both racist and anti-LGBTQ violence and discrimination.[105]

Similarly, Indigenous people migrating through Mexico are also targeted for racist and xenophobic violence.[106] Indigenous women are also targeted for sexual assault and rape.[107] Both Black and Indigenous migrants report pervasive discrimination and barriers in accessing public and health services, particularly if they do not speak Spanish.[108]

Individuals with disabilities, including children, also face discrimination and barriers in accessing services and support in Mexico. A 2020 report by Disability Rights International documented "severe and pervasive human rights violations against children and adults with disabilities in Mexico[,]" including "[v]iolence, sexual abuse, forced sterilization, forced abortion, and trafficking for labor or sex."[109] In 2019, Human Rights Watch found that "the Mexican government

---

[101] https://cronkitenews.azpbs.org/2022/07/27/tapachula-mexico-black-migrants-see-racism-dead-end/
[102] S. Priya Morley et al., *"There is a Target on Us" – The Impact of Mexico's Anti-Black Racism on African Migrants at Mexico's Southern Border* 17 (2021), https://www.immigrationresearch.org/system/files/The-Impact-of-Anti-Black-Racism-on-African-Migrants-at-Mexico.pdf;.
[103] Human Rights First, *Human Rights Travesty: Biden Administration Embrace of Trump Asylum Expulsion Policy Endangers Lives, Wreaks Havoc* 8 (Aug. 2021), https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers.
[104] *"There is a Target on Us"*, *supra* n. 102, at 18.
[105] Kate Morisey, *Jamaican asylum seekers in Tijuana facing racism, homophobia while they wait*, San Diego Union Tribune, (Jan. 3, 2022), https://www.sandiegouniontribune.com/news/immigration/story/2022-01-03/jamaican-asylum-seekers-tijuana-racism-homophobia.
[106] René Kladzyk, Maria Ramos Pacheco and Veronica Martinez, *Indigenous Diaspora: Leaving Home and the Journey Across Mexico*, El Paso Times, (May 12, 2021), https://www.elpasotimes.com/story/news/2021/05/10/texas-immigration-indigenous-diaspora-leaving-home-and-journey-across-mexico/5004360001/.
[107] *Id*.
[108] *Id*.; Shahid Meighan, *Black Migrants See Nothing in Tapachula but Racism and a Dead End*, Cronkite News, (July 27, 2022), https://cronkitenews.azpbs.org/2022/07/27/tapachula-mexico-black-migrants-see-racism-dead-end/.
[109] Laurie Ahern et al., Disability Rights International, *Crimes Against Humanity: Decades of Violence and Abuse in Mexican Institutions for Children and Adults with Disabilities* 6 (2020), https://www.driadvocacy.org/wp-content/uploads/Mexico-2020-ENG-web.pdf.

21



www.theyoungcenter.org
Chicago, IL | Harlingen, TX | Houston, TX | Los Angeles, CA
New York, NY | Phoenix, AZ | San Antonio, TX | Washington, DC

does not have a proper system in place there to screen and identify asylum-seekers with disabilities and chronic health conditions" and that "authorities have not ensured physical accessibility in shelters."[110]

C.   The proposed rule's CBP One requirement would lead to family separation, and the inequities of this requirement cannot be remedied

Given the significant risk of harm, violence, discrimination, and persecution against children in Mexico, the CBP One requirement in this proposed rule would fuel further family separations at the southern border, as with the Title 42 policy and other U.S. government policies that have blocked access to asylum. The problems for families with scheduling appointments through the app has already forced families to separate. Families unable to secure CBP One app appointments together as a family unit have made the impossible choice to send their children across the border alone to protect them from harm in Mexican border regions.[111] The Young Center is aware of one egregious case in which a family presented themselves at a port of entry, and a CBP officer forcibly separated the father from his children when the father explained that he did not have appointments for the entire family. The children were transferred to ORR custody, and the father was left without any information on how to be reunified with his children even though the family was attempting to comply with the opaque process created under CBP One.

At the Young Center, we have spoken with families in Mexico who have been unable to get appointments through CBP One for their entire family unit. These families have expressed a wide gamut of emotions – frustration, distress, anxiety, confusion, and fear – as they weigh impossible decisions that no families should have to make to be safe. In our experience, CBP One has already created confusion and chaos at the border, and the proposed rule would only exacerbate this situation. Moreover, even correcting so-called "technical" problems with the app—including but by no means limited to ensuring that the app functions in all languages spoken by asylum-seekers; offers accommodations such as oral instructions for asylum-seekers with disabilities or who are unable to read; facilitates appointments by families; offers sufficient appointments to all asylum-seekers; and eliminates the racial bias demonstrated in the current app—would not resolve the fundamental problem of limiting asylum access only to migrants who are able to afford both the technology and access to wifi necessary to use the program. Those flaws cannot be remedied and will remain a permanent barrier to fair implementation of the proposed rule.

---

[110] Human Rights Watch, *Mexico: Risks at Border for Those With Disabilities* (Oct. 29, 2019), https://www.hrw.org/news/2019/10/29/mexico-risks-border-those-disabilities.

[111] *Asylum Seekers Face Decision to Split up Families or Wait Indefinitely*, *supra* n. 97.; Valerie Gonzalez, *Families Consider Separation to Seek Asylum as They Face Limited Appointments Through CBP App*, The Monitor, (Feb. 21, 2023), https://myrgv.com/local-news/2023/02/21/families-consider-separation-to-seek-asylum-as-they-face-limited-appointments-through-cbp-app/; Daina Beth Solomon and Ted Hesson, *Struggling with U.S. Asylum App, Migrant Families Split at Border*, Reuters, (Feb. 27, 2023), https://www.reuters.com/world/us/struggling-with-us-asylum-app-migrant-families-split-border-2023-02-27/.

CLP_PC_032768



www.theyoungcenter.org
Chicago, IL | Harlingen, TX | Houston, TX | Los Angeles, CA
New York, NY | Phoenix, AZ | San Antonio, TX | Washington, DC

VI.   **By targeting asylum-seekers at the U.S. southern border, the proposed rule is discriminatory and would disproportionately harm Latinx, Indigenous, Black, and LGBTQ asylum-seekers, including many children**

The proposed rule, which applies only to people who seek protection at the southern border, will disproportionately harm Black, Indigenous, and Latinx people, who represent the vast majority of asylum-seekers seeking protection at the southern border.[112] Many Black, Indigenous, and Latinx children and families will be barred from accessing asylum after fleeing danger and violence and making difficult and dangerous journeys, over days, weeks, and even months, to arrive at the southern border. During the period that the Trump Administration's transit ban was implemented, immigration court asylum denial rates surged for many Black, Brown, and Indigenous asylum-seekers requesting safety at the southern border.[113] For instance, asylum grant rates declined by 45 percent for Cameroonian asylum applicants, 32.4 percent for Cubans, 29.9 percent for Venezuelans, 17 percent for Eritreans, 12.9 percent for Hondurans, 12 percent for Congolese (DRC), and 7.7 percent for Guatemalans from December 2019 to March 2020, compared to the year before the third-country transit asylum ban began to affect refugee claims, according to data analyzed by Syracuse University's Transactional Records Access Clearinghouse.[114]

Moreover, the presumption of ineligibility and heightened standards which asylum-seekers will be required to meet for withholding of removal and CAT protection under this proposed rule will open the door for greater racial bias and disparities in fear screenings. During the Trump Administration, as a result of attempts to alter the credible fear standard by heightening credibility requirements which are susceptible to subjective, racial and other biases, DHS officers increasingly issued negative credible fear determinations based on a purported lack of credibility.[115] A 2021 Report by Human Rights First found that between 2016 and 2020, negative credible determinations rose by 1450 percent, and that this increase fell disproportionately on non-European asylum-seekers.[116] The percentage of negative CFI determinations rose most steeply for asylum-seekers from the Caribbean, Central and South America, the Middle East/North Africa and Sub-Saharan Africa, while asylum-seekers from Europe experienced the lowest increase.[117]

The proposed rule also perpetuates nationality-based discrimination in access to asylum, as it largely bans asylum for people who do not enter the United States via limited parole initiatives or previously scheduled appointments at ports of entry while simultaneously only affording limited access to parole initiatives for certain nationalities. For instance, while there are currently limited parole initiatives for some nationalities, there are no similar parole initiatives for people from Guatemala, Honduras, and El Salvador.

---

[112] Adam Isacson, *Migration, Country by Country, at the U.S. -Mexico Border,* WOLA, (Nov. 23, 2022), https://www.wola.org/2022/11/migration-country-by-country-at-the-u-s-mexico-border/.
[113] Human Rights First, *Biden Administration Plan to Resurrect Asylum Ban Advances Trump Agenda* 4 (2023), https://humanrightsfirst.org/wp-content/uploads/2023/01/AsylumBanFactsheet_final2.pdf.
[114] *Id.*, at 4-5.
[115] *Pretense of Protection*, *supra* n. 35, at 30-31.
[116] *Id.*, at 31.
[117] *Id.*

CLP_PC_032769



www.theyoungcenter.org
Chicago, IL | Harlingen, TX | Houston, TX | Los Angeles, CA
New York, NY | Phoenix, AZ | San Antonio, TX | Washington, DC

The risk of danger, violence, persecution, and even death to asylum-seeking children and families that would be caused by the sweeping restrictions on asylum access imposed by this proposed rule can not be overstated. The persecution, violence, and other human rights conditions causing refugees to flee these countries have been well-documented in the US. government's own reports, as well as by international human rights organizations.[118] For instance, in 2021, in designating Haitians in the United States for Temporary Protected Status, DHS stated that Haiti is "currently grappling with a deteriorating political crisis, violence, and a staggering increase in human rights abuses[,]" including "reported arbitrary arrests and detentions."[119] Government reports for Guatemala in 2020 and 2021 documented widespread violence against women, trafficking in persons, violent attacks against LGBTQ persons, and gang recruitment of displaced children.[120] In 2022, Human Rights Watch reported significant human rights abuses in El Salvador, including the forcible recruitment of children and sexual abuse of women, girls, and LGBTQ people.[121]

LGBTQ+ refugees including children fleeing these countries would also be disparately impacted by the proposed rule. LGBTQ+ identities are criminalized and face high rates of violence in Central America and the Caribbean.[122] Parents of LGBTQ+ children who experience bullying and abuse in school receive inadequate support from government agencies.[123] Due to widespread anti-LGBTQ+ sentiment, LGBTQ+ children and their families who flee persecution in their countries of origin encounter police violence in their search for safety in neighboring countries and face systemic barriers to essential services they need to survive.[124] In Mexico, LGBTQ+ youth have experienced high incidents of discrimination and reported high rates of suicidal ideation, according

---

[118] *Pretense of Protection*, *supra* n. 35, at 25-27, 28-30.

[119] USCIS, DHS, Designation of Haiti for Temporary Protected Status, 86 Fed. Reg. 41864 (Aug. 3, 3032), https://www.govinfo.gov/content/pkg/FR-2021-08-03/pdf/2021-16481.pdf.

[120] *Pretense of Protection*, *supra* n. 35, at 30.

[121] *World Report 2022: El Salvador*, HUMAN RIGHTS WATCH (last accessed Mar. 26, 2023), https://www.hrw.org/world-report/2022/country-chapters/el-salvador.

[122] Human Rights Watch, *"Every Day I Live in Fear": Violence and Discrimination Against LGBT People in El Salvador, Guatemala, and Honduras, and Obstacles to Asylum in the United States* (Oct. 7, 2020) https://www.hrw.org/report/2020/10/07/every-day-i-live-fear/violence-and-discrimination-against-lgbt-people-el-salvador; Human Rights Watch, *"I Have to Leave to Be Me": Discriminatory Laws Against LGBT People in the Eastern Caribbean* (March 21, 2018), https://www.hrw.org/report/2018/03/21/i-have-leave-be-me/discriminatory-laws-against-lgbt-people-eastern-caribbean.

[123] Daniel Politi, *Mothers of LGBTQ Children Join Forces in Latin America*, AP NEWS, (Nov. 20, 2022), https://apnews.com/article/religion-violence-caribbean-discrimination-gay-rights-b7d7c8c728a7978ab541faf0f9972217.

[124] Diana Baptista, *In Mexico, Displaced LGBTQ+ People Push for Equal, Safe Jobs*, OPENLY NEWS, (Dec. 12, 2022), https://www.openlynews.com/i/?id=ad53f28a-1ee6-4ac3-84e8-492a760a184d; Oscar Lopez, *LGBT+ Migrants Face Abuse in Mexican Border City: Activists*, REUTERS, (Nov. 14, 2018), https://www.reuters.com/article/us-mexico-lgbt-migrants/lgbt-migrants-face-abuse-in-mexican-border-city-activists-idUSKCN1NJ1MV.

CLP_PC_032770



to the Mexican National Council to Prevent Discrimination.[125] Transgender and Gender-Non-Conforming youth have been disproportionately targeted and experience the highest rates of police violence and self-harm.[126]

### VII.    Conclusion

As a federal court recently stated in litigation challenging harm caused to asylum-seekers as a result of the U.S. government's Remain in Mexico policies, **"Although a grant of asylum is discretionary, the right to apply is not."**[127] United States and international law codify the right of children to seek asylum and have begun to create procedures to ensure fair access to that protection. Barring children in families from seeking asylum would roll back decades of work and undermine children's right to seek safety and protection in clear contravention of U.S. law and the best interests of children. The Young Center opposes the adoption of any rule that bars or in any way limits children's access to legal relief that protects their safety and well-being, significantly risks returning them to danger and violence, and fails to treat children as children. We strongly urge DHS and DOJ to rescind the proposed rule in its entirety.

Respectfully,

Jane Liu
Director of Policy and Litigation
Young Center for Immigrant Children's Rights

jliu@theyoungcenter.org

---

[125] Shawna Chen and Oriana Gonzalez, *Trevor Project Expands Digital Crisis Services to LGBTQ Youth in Mexico*, AXIOS, (Mar. 9, 2022), https://www.axios.com/2022/03/09/lgbtq-youth-mexico-trevor-project, citing Consejo Nacional para Prevenir la Discriminacion, *Encuesta sobre Discriminacion por Motivos de Orientacion Sexual e Identidad de Genero* (National Council for the Prevention of Discrimination, *Study on Discrimination on the Basis of Sexual Orientation and Gender Identity*) (2018), https://www.conapred.org.mx/userfiles/files/Presentacioon_ENDOSIG_16_05_2019.pdf.
[126] Transgender Law Center and Cornell University Law School LGBT Clinic, *Report on Human Rights Conditions of Transgender Women in Mexico*, (May 2016), https://transgenderlawcenter.org/wp-content/uploads/2016/05/CountryConditionsReport-FINAL.pdf.
[127] Order (1) Granting in Part and Denying in Part Defendants' Motion to Dismiss (Dkt. No. 189); and (2) Granting Plaintiffs' Motion for Class Certification (Dkt. No. 205) in Chambers at 7, *Immigrant Defs. L. Ctr. v. Mayorkas*, No. 2:20-cv-09893-JGB-SHK, ECF No. 261 (C.D. Cal. Mar. 15, 2023).

25

# PUBLIC SUBMISSION

**As of:** May 08, 2023
**Received:** March 27, 2023
**Status:** Posted
**Posted:** March 30, 2023
**Tracking No.** lfr-l9yp-h9xl
**Comments Due:** March 27, 2023
**Submission Type:** Web

**Docket:** USCIS-2022-0016
Circumvention of Lawful Pathways

**Comment On:** USCIS-2022-0016-0001
Circumvention of Lawful Pathways

**Document:** USCIS-2022-0016-12565
Comment Submitted by Texas Civil Rights Project

## Submitter Information

**Email:** KVargas@texascivilrightsproject.org
**Government Agency Type:** State
**Government Agency:** Texas Civil Rights Project

## General Comment

See attached file(s)

## Attachments

Texas Civil Rights Project - Comments in Opposition to the Joint Notice of Proposed Rulemaking entitled Circumvention of Lawful Pathways

CLP_PC_032967



Oficina Legal del Pueblo Unido, Inc.
P.O. Box 219
Alamo, TX 78516
(956) 787-8171
texascivilrightsproject.org

March 27, 2023

***Via Electronic Submission***
Lauren Alder Reid, Assistant Director
Office of Policy
Executive Office for Immigration Review, Department of Justice
Falls Church, VA

Daniel Delgado, Acting Director
Border and Immigration Policy,
Office of Strategy, Policy, and Plans,
U.S. Department of Homeland Security
Washington, D.C.

**RE: Comments in Opposition to the Joint Notice of Proposed Rulemaking entitled** *Circumvention of Lawful Pathways;* **RIN: 1125-AB26 / 1615-AC83** **/ Docket No: USCIS 2022-0016 / A.G. Order No. 5605-2023**

Dear Assistant Director Reid and Acting Director Delgado:

The Texas Civil Rights Project (TCRP)[1] submits this comment to the Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (USCIS), and the Department of Justice (DOJ), Executive Office for Immigration Review (EOIR) ("the Departments") in response and opposition to the above-referenced Joint Notice of Proposed Rulemaking ("NPRM" or "the Rule") issued by the agencies on February 23, 2023. This Rule will deny current and future asylum seekers from accessing protections under U.S. federal and international law, will result in the return of many refugees to harm, will leave others in the United States without stable protection, and will lead to family separations. A fair and equitable asylum system must be available for all those seeking refuge in this country – and this Rule denies them one.  TCRP urges the Departments to rescind the Rule in its entirety.

The Texas Civil Rights Project is a 501(c)(3) legal advocacy organization with offices across Texas. TCRP is dedicated to defending the rights and dignity of all those in Texas in the courtroom, in partnership with our communities, and with meaningful policy changes. Since our founding in 1990, TCRP has fought for the rights of immigrants. We are lawyers and advocates for Texas communities, boldly serving the movement for equality and justice.

More specifically, TCRP's Beyond Borders Program is dedicated to advancing human dignity, protecting freedom of movement, and advocating on behalf of Texas border communities, in

---

[1] *See About TCRP*, TEXASCIVILRIGHTS.ORG (2019), https://txcivilrights.org/about-us/.

1

CLP_PC_032968



Oficina Legal del Pueblo Unido, Inc.
P.O. Box 219
Alamo, TX 78516
(956) 787-8171
texascivilrightsproject.org

particular immigrants. As U.S. border policies have changed dramatically in the last years, and continue to do so, TCRP has been at the forefront of protecting the right to seek asylum. During the height of the family separation crisis in 2018, TCRP intervened on behalf of asylum seekers and separated families, and we continue to work with them in the aftermath of their separation.

In January 2021, TCRP, along with the ACLU and other partner organizations, sued the Biden Administration on behalf of families subject to expulsion and denied asylum under Title 42.[2] As part of this litigation, TCRP conducted hundreds of intakes with asylum-seeking families, and we continue advocating for justice inside and outside the courts.

Because of our continued presence on the Texas – Mexico border and our on-the-ground work with asylum seekers, we have firsthand accounts of the harms caused along our border due to faults in our immigration system, especially when deterrence-based policies are implemented. This Rule, which is in line with the understood "foundation shift" that happened under the Trump Administration, makes denying access to our asylum system the status quo.[3] The Rule's central function of deterrence illustrates this Administration's continued adoption of a policy approach that is contrary to this Administration's previously stated ideals – and whose "entire focus and the entire concept of controlling the border means reducing numbers."[4]  TCRP urges the Departments to rescind this Rule and instead focus on policies whose central function is to ensure access to a dignified asylum process.

## I.     TCRP objects to the limited comment period for the Rule.

The Executive Orders[5] governing the regulatory process require federal agencies to "afford the public a meaningful opportunity to comment on any proposed regulation, which in most cases should include a comment period of *not less than 60 days*." In this case, however, the agencies

---

[2] *See Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022); *Ord. Suspending Introduction of Certain Persons from Countries Where a Quarantinable Communicable Disease Exists*, 85 Fed. Reg. 201 (Oct. 16, 2020), https://www.cdc.gov/quarantine/pdf/CDC-Order-Prohibiting-Introduction-of-Persons_Final_3-20-20_3-p.pdf. The Trump Administration relied on 42 U.S.C. § 265 to close the border and restrict immigration access, citing a public health emergency in light of the COVID-19 pandemic.
[3] Hamed Aleaziz, *News Analysis: Why the border may 'never go back to what it was before Trump,'* L.A. TIMES (Mar. 2, 2023), https://www.latimes.com/politics/story/2023-03-02/biden-asylum-proposal-trump.
[4] *Id.*
[5] *See Exec. Order No. 12866*, 58 Fed. Reg. 190, Sec. 6(a)(2) (Sept. 30, 1993), https://www.archives.gov/files/federal-register/executive-orders/pdf/12866.pdf; *Exec. Order No. 13563*, 76 Fed. Reg. 14, Sec. 2(b) (Jan. 18, 2011), https://www.reginfo.gov/public/jsp/Utilities/EO_13563.pdf.

CLP_PC_032969



Oficina Legal del Pueblo Unido, Inc.
P.O. Box 219
Alamo, TX 78516
(956) 787-8171
texascivilrightsproject.org

have provided only 30 days for the public to provide comment, and they have done so over the objection of more than 170 national, state, and local organizations.[6]

There is no compelling reason to shorten the minimum prescribed public comment period by 30 days. There is also no justification for denying an extension of the 30-day comment period requested by the 172 national, state, and local expert organizations who outlined the harms in providing only a 30-day comment period to this Rule.[7]  The justification provided in the Rule and in your denial letter largely relies on the Administration's anticipation of the end of the Title 42 policy on May 11, when the COVID-19 public health emergency will expire. This justification makes little sense, however, given that the Biden administration itself tried to end the Title 42 policy nearly one full year ago, in April 2022,[8] and DHS announced publicly its efforts to prepare for the policy's end that same month.[9]

The end of Title 42 is no surprise, and because this Rule proposes sweeping changes to asylum law, it warrants a full comment period to consider its varied implications – especially in light of other restrictive immigration measures continued, reinstated, or adopted by this Administration. The 30 days provided are not enough time for TCRP to provide a thorough public comment on a Rule that will ensconce new restrictions in our asylum system and will cause inevitable harm to real individuals.

TCRP has staff located throughout the Rio Grande Valley, along the Texas – Mexico border and our team has a strong presence in the Hidalgo – Reynosa and Brownsville – Matamoros area, home to two of the top three ports of entry processing the largest number of people under CBP One.[10] Our team is heavily involved in coalition work with direct service providers and other humanitarian organizations working directly with asylum seekers in Mexico. With additional time, even the minimum 60 days required for a public comment, TCRP would have been able to submit on the ground testimonies pertaining to asylum seekers' experiences with CBP One, especially families and Black and Indigenous asylum seekers, who have been uniquely disadvantaged by DHS' reliance on an app.

---

[6] Azadeh Erfani, *172 Organizations Call For Extension On Public Comment Period For Proposed Asylum Ban,* NAT'L IMMIGRANT JUST. CENTER (Mar. 1, 2023), https://immigrantjustice.org/staff/blog/172-organizations-call-extension-public-comment-period-proposed-asylum-ban.
[7] *Id.*
[8] *CDC Public Health Determination and Termination of Title 42 Order*, CENTERS FOR DISEASE CONTROL AND PREVENTION (Apr. 1, 2022), https://www.cdc.gov/media/releases/2022/s0401-title-42.html.
[9] *Statement of U.S. Customs and Border Prot. Comm'r Chris Magnus Concerning Title 42*, U.S. CUSTOMS AND BORDER PROT. (Apr. 4, 2022), https://www.cbp.gov/newsroom/speeches-and-statements/statement-us-customs-and-border-protection-commissioner-chris.
[10] Defendants' Monthly Report for the Month of January 2023 Pursuant to the Court's Preliminary Injunction at 6, *Louisiana v. CDC*, 603 F.Supp.3d 406 (W.D. La. 2022).

CLP_PC_032970

Oficina Legal del Pueblo Unido, Inc.
P.O. Box 219
Alamo, TX 78516
(956) 787-8171
texascivilrightsproject.org

With additional time, TCRP would have been able to submit testimonies regarding the most recent experiences of harm and violence encountered by asylum seekers in the countries where they will now be expected to seek asylum – harms that will continue to be extended as they wait to confirm appointments through an app.

With time, TCRP would have also documented asylum seekers' ability to seek asylum in any of the applicable third countries through which they may have traveled, especially Mexico – including whether they would be safe in that country, how accessible that country's asylum system was to them, and whether they had any knowledge of or support in accessing that country's system. Our years of experience tell us the answer to those questions would likely be no.

With the minimum required comment period, TCRP would have developed a more thorough analysis of this Rule's harm in requiring individuals to undergo asylum screenings while in CBP custody. The implementation of the Rule mirrors the Trump Administration's PACR and HARP programs. Having been on the ground during PACR/HARP, and having directly advocated for individuals forced to seek asylum under these programs while in CBP custody, with additional time, TCRP would have more thoroughly elaborated on the unique harms in undergoing asylum processing in CBP custody.

## II.      Asylum should not be contingent on access to technology.

The central function of this proposed Rule is to limit asylum eligibility at the southern border in various ways, but most central here, via an asylum seeker's access to technology. The proposed Rule conditions asylum, among other things, on people's ability to effectively access and use the CBP One application—a flawed mobile app through which individuals will be required to schedule appointments prior to presenting at a port of entry.

This Rule relies on a number of faulty assumptions regarding asylum seekers and technology. This Rule disadvantages the most vulnerable populations including families, Black and Indigenous asylum seekers, the most economically disadvantaged asylum seekers, and those who flee their home without the luxury of time or forethought (as tends to happen when an individual experiences persecution). Thus, the exclusion of any vulnerable population from our asylum system, especially due to their inability to successfully access technology, is contrary to the principle of non-discriminatory asylum access codified by the Refugee Act of 1980.

Furthermore, denying an asylum seeker access to our asylum system due to technicalities will directly place many in harm's way, in regions that have been proven dangerous. Inevitably, many

CLP_PC_032971

Oficina Legal del Pueblo Unido, Inc.
P.O. Box 219
Alamo, TX 78516
(956) 787-8171
texascivilrightsproject.org

asylum seekers will have to wait in Mexico – either while registering for CBP One, as well as confirming and then waiting for one of the few available appointments – the pattern that we have seen play out for months under CBP One's Title 42 processing. And while asylum seekers have had to wait for an appointment in Mexico using the current glitch-y CBP One system, they have been robbed, assaulted, extorted, kidnapped, and killed.[11]

Since President Biden took office in January 2021, Human Rights First has tracked more than 13,480 reports of violent attacks on individuals blocked in or expelled to Mexico, including murder, kidnapping and rape.[12] Even U.S. citizens are not immune from the violence endemic to Mexican border towns,[13] while asylum seekers are expected to wait for weeks, months, or years in those same dangerous conditions. Many of the families with whom we have spoken in the Reynosa and Matamoros areas have been forced to seek shelter in open air encampments patrolled and preyed upon by cartels; they have suffered from lack of medical care, and have traveled with minors at risk for human trafficking. These asylum seekers have shared their experiences of having their children kidnapped, trafficked, threatened, and physically and sexually assaulted – and these threats continue every day they are denied access to our asylum system. Adults also reported being robbed, extorted, threatened, and being subjected to physical and sexual violence. These families have witnessed people disappear or die, both at home and in Mexico. This Rule incorrectly assumes that an asylum seeker has the time and safety necessary to register themselves and their family, and also confirm an appointment.

As noted above, this Rule's reliance on access to technology inherently creates inequitable access to our asylum system and places asylum seekers in direct danger – and no technological updates will change that.

### a. Asylum seekers do not have equitable access to technology.

Currently, CBP One is used throughout the southwest border to process Title 42 exemptions and, even in this limited roll out, the app has already proven extremely flawed.[14] Since its inception,

---

[11] Jack Herrera, "*Fleeing For Your Life? There's An App For That*." TEX. MONTHLY (Mar. 2, 2023), https://www.texasmonthly.com/news-politics/cbp-app-asylum-biden-administration.
[12] Julia Neusner, Kennji Kizuka, & Eleanor Acer, *Evasion of Asylum Law and Title 42 Abuse Must End – and Never Be Revived*, HUM. RTS. FIRST (Dec. 15, 2022), https://humanrightsfirst.org/library/human-rights-stain-public-health-farce/.
[13] Natalie Kitroeff, Maria Abi-Habib, Jack Nicas & Jacey Fortin, *A Trip to Mexico Ends in a Kidnapping and the Deaths of 2 Americans*, THE N.Y. TIMES (Mar. 7, 2023), https://www.nytimes.com/2023/03/07/world/americas/americans-kidnapped-mexico.html.
[14] Raul Pinto, *CBP One Is Riddled With Flaws That Make the App Inaccessible to Many Asylum Seekers,* IMMIGR. IMPACT (Feb. 28, 2023), https://immigrationimpact.com/2023/02/28/cbp-one-app-flaws-asylum-seekers/?emci=c9fe0b55-bcb7-ed11-a8e0-00224832e811&emdi=43e52f43-37b8-ed11-a8e0-00224832e811&ceid=10978806.

CLP_PC_032972



Oficina Legal del Pueblo Unido, Inc.
P.O. Box 219
Alamo, TX 78516
(956) 787-8171
texascivilrightsproject.org

TCRP has been working with our on the ground partners to monitor and advocate against CBP One's harms, especially as evidenced in the Hidalgo port of entry, and the Brownsville port of entry – which processes the largest exemption numbers.[15]

Through this monitoring, we have identified many systemic issues already present with the CBP One App – and these harms have been most evidenced in the most vulnerable populations. Reliance on CBP One for Title 42 exemptions has resulted in the most economically disadvantaged populations being excluded from the exemption process. For example, this Rule assumes all individuals have access to a cell phone to use the app, but we have systematically come across asylum seekers who do not have cell phones or whose cell phones are somehow incompatible with the CBP One app – like those with older phones or phones from manufacturers not used in the U.S. These individuals have asked to borrow phones from other asylum seekers to create their separate accounts – but this is difficult because those asylum seekers who do own compatible phones are constantly on the app trying to secure the elusive appointments themselves.

Through its current usage, we have seen economic disadvantages further impact all asylum seekers – including those who have cell phones compatible with the app – a problem which will continue through implementation of this Rule because the inequities persist. Having a cell phone does not, on its own, mean that an individual has wifi connectivity or cell phone minutes. Most asylum seekers do not have cell phone plans like we do in the U.S. – in fact, most countries from which asylum seekers originate do not have access to unlimited talking or data plans. Most asylum seekers TCRP has encountered at the busy Hidalgo and Brownsville ports only have access to purchasing a finite number of cell phone minutes or data usage at a time. Many times, they are forced to spend what little money they have to ensure cell phone connectivity instead of food or medication. The data usage they buy is  usually used up in one day because asylum seekers will stay on the app all day long, refreshing the app – hoping that new appointments will show up in case there is a cancellation. All of the above assumes that asylum seekers are in an area where they actually have a stable cell service, which is spotty across Mexico and especially along the Texas – Mexico border.

Furthermore, access to wifi is similarly tenuous and expensive, and individuals are faced with the choice of having to spend limited money on wifi or other basic needs. Connectivity issues have already led to the exploitation of these vulnerable individuals in many instances – most recently, individuals in Mexico charged asylum seekers a thousand dollars for access to stable wifi to register and confirm appointments via CBP One – and exploitation like this is par for the course when deterrence measures are in place. Since CBP One's inception, the Departments have stated

---

[15] *supra*, n.10.

CLP_PC_032973



Oficina Legal del Pueblo Unido, Inc.
P.O. Box 219
Alamo, TX 78516
(956) 787-8171
texascivilrightsproject.org

there will be a desktop version of the CBP One app available for asylum seekers. However, a desktop version of the app will not solve these basic accessibility issues and further lends itself to asylum seekers being preyed upon to access this technology.

This Rule also assumes that individuals have some awareness of how to navigate apps, but as we have witnessed with CBP One, many of the asylum seekers have no knowledge on how to use the app and have relied on advocates to successfully register and/or confirm appointments for them. Even those individuals who are somewhat tech savvy have also had problems navigating the app and confirming appointments – especially due to the app's frequent and new technical glitches. A general unfamiliarity with app usage has further restricted many individuals' willingness to lend their cell phones to other individuals, which in the past has led to glitches and to the cell phone owner's CBP One application being deleted due to this lack of technological savvy.

To bridge this technological gap, our partners on the ground have had to teach individuals how to navigate the CBP One app, which has proven to be cumbersome and ripe with new glitches that appear daily. Our partners have had to support asylum seekers in registering themselves, their families, and with confirming appointments. However, advocates on the ground are limited and are not always able to assist the many individuals in need of support. Because of this pronounced need, many advocates, TCRP included, have put together training materials for individuals trying to access this app.[16] As part of this work, advocates are continually identifying, troubleshooting, and reporting new glitches in the app, as well as addressing external harms created by the required use of this app.

However, training materials and advocate support cannot fix the overall economic disadvantages impacting individuals' ability to access our immigration system. They do not resolve the technological divide that is inherent among economically marginalized populations, they do not resolve the fact that the app is only available in a few languages also inaccessible to many vulnerable individuals, and they do not address the literacy gaps that exist within economically disadvantaged individuals – all of which will impermissibly impact a person's ability to use the app and access our asylum system.

Further evidence of the particular harm technology-based requirements impose on particularly vulnerable individuals was presented on the first day of CBP One processing at the Brownsville port of entry. When it initially launched for Title 42 processing, the app was only available in English and Spanish – leaving out a large percentage of vulnerable populations who have no access

---

[16] *Know Your Rights*, TEX. CIV. RIGHTS PROJECT, https://www.txborderrights.org/english (last visited Mar. 23, 2023).

CLP_PC_032974



Oficina Legal del Pueblo Unido, Inc.
P.O. Box 219
Alamo, TX 78516
(956) 787-8171
texascivilrightsproject.org

to English or Spanish. This led to many Black and Indigenous asylum seekers in line at the port of entry who did not have CBP One appointments, and, many were confused and unaware that CBP One even existed – they simply saw many of their fellow asylum seekers in line. Although the app later became available in Kreyol, that doesn't cure the initial inequity and exclusion experienced by these individuals or any subsequent harm – nor does it remedy the harms still being enacted due to ongoing exclusion. The app continues to be inaccessible to many indigenous language speakers, as well as many others, given that CBP One is available only in a handful of languages. Just asylum reforms would consider these baseline factors and provide protections ensuring the most vulnerable are safe. However, reforms like this Rule have instead focused on creating punitive systems that prioritize removals and "efficiency" over humane treatment and due process.

### b. *CBP One's tech problems demonstrate that access to asylum should not be conditioned on access to technology.*

Even those with access to the app encounter a whole host of new problems once they have access. Users have reported[17] frequent glitches, including new glitches that pop up daily. These glitches prevent asylum seekers from completing their or their family's registration and prevent them from confirming one of the few available appointments. Even in Brownsville, the port of entry with the most available appointments per day, one day missed in confirming an appointment translates to at least a few extra weeks in Mexico – assuming the individual is later able to confirm appointments.

As noted, new glitches pop up in the app frequently, sometimes daily. These glitches result in error messages and in the app crashing, freezing or timing out for people – leading to failed registrations and failed appointment confirmations. Individuals accessing the app in Reynosa and Matamoros have also had frequent issues with the app's geolocation technology. In these two regions, many asylum seekers are forced to live in open air encampments right along Mexico's northern border with the U.S., but the app's geolocation technology frequently erroneously tags their location as being in the U.S. or somehow being outside of the geographic range permitted by the app. This problem has been a constant since the app's inception and continues to be a problem today, as evidenced by the screenshot of error messages received by asylum seekers just days before the deadline for filing of this comment.

---

[17] Kate Morrissey, *Asylum seekers in Tijuana are scrambling through mobile app error messages for few appointments into the U.S.*, THE SAN DIEGO UNION-TRIBUNE (Jan. 22, 2023), https://www.sandiegouniontribune.com/news/immigration/story/2023-01-22/cbp-one-app-asylum-tijuana.

CLP_PC_032975



Oficina Legal del Pueblo Unido, Inc.
P.O. Box 219
Alamo, TX 78516
(956) 787-8171
texascivilrightsproject.org

| **Cannot be programmed** | **SUBMITTED – NOT SCHEDULED** |
|---|---|
| You are too close to the Mexico border to schedule an appointment at the port of entry. | Don't forget to check back later for available timeslots to present at the port of entry! |





These technological problems are not just concerning in terms of access, they also put asylum seekers through a stressful process that leads to deflated hopes at the end of every single day that these individuals and their families are unable to confirm an appointment.

Some recent examples of glitches we've encountered include problems with the photograph requirements of the app. Through various stages of CBP One's use for Title 42 exemptions, asylum seekers have had to take various versions of either a "live" photograph or submit a regular photograph to register in the app, access the app, and/or confirm appointments. New and emerging problems with the photograph requirements are constant.

CLP_PC_032976



Oficina Legal del Pueblo Unido, Inc.
P.O. Box 219
Alamo, TX 78516
(956) 787-8171
texascivilrightsproject.org

Since its inception, asylum seekers have had difficulty taking a photo that is acceptable to the app. For example, even when asylum seekers were successful in registering for the app, the app has required that a separate photo be captured in order for that individual to access the app and/or confirm appointments. However, there have been numerous instances where the app prevented an asylum seeker from even logging on – translating to delays in being able to confirm an appointment and seek safety. Many of the asylum seekers in Reynosa and Matamoros, and throughout the U.S. – Mexico border, live in open-air encampments with minimal light or cell and wifi connectivity. The app has consistently failed to capture the asylum seeker because there is not enough lighting where the asylum seekers is standing – but they have no access to appropriate lighting. This restricts their ability to access the app to certain daylight hours. However, we also identified difficulties with asylum seekers' photos being captured appropriately during cloudy days – where the CBP One app did not "recognize" the asylum seeker trying to access their account, or did not recognize an asylum seeker trying to register for an account. Again, these delays result in individuals being unable to register or confirm appointments, leading to longer waiting times in dangerous conditions.

The problems with CBP One's photo capturing technology are far more common for individuals with darker skin tones, especially Black asylum seekers.[18] Technology requiring forms of facial identification has proven to be inherently flawed and biased and should not be used for "serious decisions that have such major consequences on people's lives."[19] Along the U.S. – Mexico border, it is common for Black and other darker-skinned asylum seekers to spend hours trying to capture a photograph acceptable to the app. This has led to an economic burden and exclusion, as many have to continually pay for cellular data and/or wifi in order to connect to CBP One. This additional time spent also means time and days lost to not being able to get an appointment for themselves or their families – which translates to additional weeks of having to remain in dangerous conditions in Mexico.

Another recent issue, illustrative of the many varied issues that routinely pop up – the CBP One app failed to recognize asylum seekers trying to access their account unless they were wearing the exact shirt they wore when they first registered with CBP One. Although this problem appeared to be momentary, it is indicative of the many issues within the app that drive inequity. Fortunately, in this case, these asylum seekers still had access to the clothes they wore when they registered for the app, but not all do. Many individuals' clothes are stolen or taken/thrown by the Mexican government if they clear out asylum seekers encampments. Many other asylum seekers are

---

[18] Bernd Debusmann Jr., *At US border, tech issues plague new migrant applications*, BBC NEWS (Mar. 8, 2023), https://www.bbc.com/news/world-us-canada-64814095.
[19] *Id.*

CLP_PC_032977



Oficina Legal del Pueblo Unido, Inc.
P.O. Box 219
Alamo, TX 78516
(956) 787-8171
texascivilrightsproject.org

kidnapped or harmed in other ways that cause them to lose their clothing or the phones they use for CBP One.

Furthermore, because of these many varied issues, requiring the use of CBP One to access asylum will lead to asylum seekers being targeted for fraud. Asylum seekers have already received fraudulent emails supposedly confirming appointments, and requiring payments as part of the process. These fraudulent emails look official and advocates have had to confirm directly with CBP whether the information contained therein is true or not.  Instances of fraud will continue because the Rule does not address the underlying problems already identified under CBP One.



With regards to the application sent via electronic mail, we are notifying [NAME], of the following communication, requiring the following payment amounts:

$1,000 USD Thursday 23 of March 2023

$950 USD Thursday 23 of March 2023


It is important to note that this communication was granted based on your good character as a person not nationalized within United States territory.

This communication requires strict compliance please comply and notify.

CLP_PC_032978



Oficina Legal del Pueblo Unido, Inc.
P.O. Box 219
Alamo, TX 78516
(956) 787-8171
texascivilrightsproject.org

c. *Reliance on technology like CBP One leads to separation of families.*

The use of CBP One for Title 42 processing has led to families being separated. First, the app's photo requirements have proven difficult for families, many of whom have been unable to capture an acceptable photograph of their children in the app, especially newborn or young children. This has led to delays in families being able to register themselves and their children, which then leads to further delays in their scheduling and confirming appointments, which leads to them being in Mexico longer under dangerous conditions.

The Rule states the Departments have determined that implementation of the "proposed rule would not impose a negative impact on family well-being or the autonomy of the family as an institution."[20] CBP One has already shown the Departments that this statement is inaccurate. In the Reynosa and Matamoros areas, which feed into the Hidalgo and Brownsville ports of entry, many families have been forced to separate in order to access our immigration system. Unable to complete registration or confirm appointments, these families – fearing for their children's safety and lives in Mexico – conclude that having their children present alone at the port of entry or otherwise cross the border alone is a safer option than having them continue to wait in Mexico.

In trying to secure CBP One appointments, families face a unique disadvantage. If an asylum seeker passes the first test and successfully registers every family member under one lead family member, they still face the challenge of having to secure appointments for every single member – as is required by CBP One for Title 42 exemptions, and as will be required under the Rule. However, because there are not enough appointments available to meet the demand, securing an appointment for a family of four or five (or more) members, as required by the Rule, is sometimes impossible. And, this Rule does not guarantee that the Departments will ensure enough appointment availability at all times to meet demand. So, as has happened during CBP One's use during the Title 42 exemption process, families have struggled, and will continue to struggle in order to obtain the required appointments for each family member. This, coupled with the constant threat of violence they face in Mexico, has led to families sending their children across, or in some cases, children making that impossible decision on their own to avoid their parents having to decide. These families' separations were the predicate for them to access our asylum system under CBP One – a trend that will inevitably continue due to this Rule's technology and appointment-based requirements.

---

[20] Circumvention of Lawful Pathways, 88 Fed. Reg. 11704, 11749 (proposed Feb. 23, 2023)(to be codified at 8 C.F.R. pt. 208).

CLP_PC_032979



Oficina Legal del Pueblo Unido, Inc.
P.O. Box 219
Alamo, TX 78516
(956) 787-8171
texascivilrightsproject.org



Furthermore, although the rule offers possibilities for an asylum seeker subject to the Rule to not be separated from their family – the Rule itself does not guarantee family unity. In addition to the family separation risks inherent in simply trying to access an app-based asylum system, asylum seekers face additional family separation risks once within the asylum system set out by the Rule. Asylum seekers subject to the Rule who are unable to rebut the presumption, but who are ultimately successful in Convention Against Torture (CAT) or Withholding of Removal claims, would be unable to bring their families simply because they lacked access to this technology. Reliance on CBP One will absolutely lead to permanent family separations, as well as families stranded in harm's way.

Again, the inequity and tech problems encountered through the CBP One app are aggravated by the fact that there are simply not enough appointments to meet the need – and that is likely to continue with this Rule. Not having enough appointments inherently creates inequity because experience has shown that an individual's inability to confirm an appointment has been due to factors beyond their control – economic disadvantage, language ability, race, disability, being targeted in transit and/or in Mexico due to immutable characteristics, or being part of a family. These are the exact factors that warrant asylum protections under domestic and international law.

### III.   Recent history shows the Rule's implementation will lead to due process violations and other harms.

As written, the Rule requires asylum seekers to go through its new asylum processing while in CBP custody – a practice first implemented by the Trump Administration under the Prompt Asylum Claim Review (PACR) and Humanitarian Asylum Review Process (HARP). By requiring this, the Departments are not only further entrenching this Trump era shift, but are also ignoring the long history of documented CBP abuse. Abuses by CBP officers, horrific conditions of

13



Oficina Legal del Pueblo Unido, Inc.
P.O. Box 219
Alamo, TX 78516
(956) 787-8171
texascivilrightsproject.org

detention in CBP jails, CBP's overall lack of accountability, and asylum seeker's lack of access to counsel,[21] are the norms underlying the operationalization of this Rule.

For those forced to undergo this screening while in detention, the obstacles to due process are so high as to render success unachievable for most, regardless of the merits of their asylum claim. In its review of PACR/HARP, the Department of Homeland Security Office of Inspector General noted that PACR/HARP are inconsistent with CBP detention standards and design.[22] The Government Accountability Office also issued reports highly critical of PACR/HARP, and included data showing that before PACR/HARP, 74% of individuals passed an initial asylum screening interview, compared to 19-29% who passed under PACR/HARP.[23] In a system where reducing the number of people is the priority, the Departments may laud these decreased passage rates, but the cost of this decrease is borne by real human beings with valid asylum claims who were denied an opportunity because their lives are not the policy priority.

Under the Rule, asylum seekers will be forced to have their fear interviews while in government custody in notoriously difficult[24] and abusive[25] conditions, with no prior knowledge as to the Rule's details or workings, and without ever having spoken to an attorney. CBP is notorious for denying asylum seekers access to attorneys, and also specifically denying attorneys access to asylum seekers.[26]

Data revealed in a congressional hearing showed that out of more than 4,700 asylum seekers placed into PACR and HARP, just 31 people managed to get a lawyer.[27] During PACR/HARP, TCRP attorneys were able to speak with only a handful of asylum seekers – all of whom underwent their credible fear interview without access to an attorney, and all of whom required medical attention. During our attempts to intervene on their behalf, TCRP experienced many obstacles in representing and even just speaking with our detained clients placed in the program. TCRP was only able to speak with asylum seekers over the phone, and we experienced difficulties in coordinating calls.

---

[21] *"They Treat You Like You Are Worthless" Internal DHS Reports of Abuses by US Border Officials*, HUM. RTS. WATCH (Oct. 21, 2021), https://www.hrw.org/report/2021/10/21/they-treat-you-are-worthless/internal-dhs-reports-abuses-us-border-officials#_ftn53.
[22] *See* DHS OIG, *DHS Has Not Effectively Implemented the Prompt Asylum Pilot Programs*, OIG-21-16 (2021), https://www.oig.dhs.gov/sites/default/files/assets/2021-01/OIG-21-16-Jan21.pdf.
[23] Am. Immigr. Council, *Asylum Is In Danger After Court Upholds Rushed Screening Process at the Border*, IMMIGR. IMPACT (Dec. 14, 2020), https://immigrationimpact.com/2020/12/14/asylum-pacr-harp-court-decision/.
[24] *Challenging Unconstitutional Conditions in CBP Detention Facilities*, AM. IMMIGR. COUNCIL, https://www.americanimmigrationcouncil.org/litigation/challenging-unconstitutional-conditions-cbp-detention-facilities (last visited Mar. 26, 2023).
[25] *supra*, n. 21.
[26] *Id.*
[27] *supra*, n. 22.

14

CLP_PC_032981



Oficina Legal del Pueblo Unido, Inc.
P.O. Box 219
Alamo, TX 78516
(956) 787-8171
texascivilrightsproject.org

Furthermore, asylum seekers confirmed they were uncomfortable detailing certain parts of their experience (as necessary for their asylum claims) over the phone because CBP officers, or other asylum seekers, were within hearing distance. In a few occasions, asylum seekers noted that CBP officers were standing immediately next to them as they were attempting to have confidential conversations with their attorneys, and the asylum seekers felt intimidated. As previously noted, instances of abuse are not uncommon for CBP officers, and yet these same officers will be the only ones with access to asylum seekers while they're undergoing the Rule's processes.

This Rule's prioritization of efficiency means that the number of individuals with access to our asylum system will plummet. But, TCRP's experience on the ground tells us what those numbers mean. Those are asylum seekers with valid claims who were simply unable to navigate the bureaucracy. They included indigenous people fleeing persecution, as well as individuals fleeing political and religious persecution – including a mother and her young child, a sexual abuse survivor, who fled their home due to persecution experienced for speaking up against sexual violence against children. All of them were deported under PACR/HARP while TCRP attorneys attempted to intervene on their behalf – an example of the cost of "efficiency."

The harms of this Rule will be further exacerbated because the Rule provides no guarantees that it will not be coupled with other harmful policies, like this Administration's fast tracked asylum screenings[28] or the Interim Final Rule.[29] On the contrary, it is likely that many individuals will be submitted to the Kafkaesque interplay of these punitive policies, further leading to individuals with valid asylum claims being denied access to our system and sent to harm's way.

## IV.    Conclusion

TCRP strongly opposes the proposed Rule because it violates the existing statutory framework and mandate of the Departments to protect and provide a fair process to asylum seekers. Our goal should be to uphold and  strengthen our asylum laws and truly offer protection for those seeking refuge. President Biden's Executive Order No. 14012 underscored our supposed character as a "nation of opportunity and welcome."[30] To ensure we are a nation of welcome, we should readily

---

[28] *Human Rights First Condemns Administration Plan to Fast-Track Asylum Screenings*, HUM. RTS. FIRST (Jan. 27, 2023), https://humanrightsfirst.org/library/human-rights-first-condemns-administration-plan-to-fast-track-asylum-screenings/.

[29] Rebecca Gendelman, *Rushed Timelines, Inadequate Access to Legal Representation Impede Meaningful Opportunity to Seek Asylum Under New Asylum Processing Rule*, HUM. RTS. FIRST (Oct. 21, 2022), https://humanrightsfirst.org/library/rushed-timelines-inadequate-access-to-legal-representation-impede-meaningful-opportunity-to-seek-asylum-under-new-asylum-processing-rule/.

[30] *See Exec. Ord. No. 14012*, 86 Fed. Reg. 23, 8277 (Feb. 2, 2021) (stating "it is essential to ensure that our laws and policies encourage full participation by immigrants . . ." and "that immigration processes and other benefits are delivered effectively and efficiently). *But see* Julia Neusner & Kennji Kizuka, *A Shameful Record: Biden Admin.'s Use of Trump Policies Endangers People Seeking Asylum*, HUM. RTS. FIRST (Jan. 13, 2022),

CLP_PC_032982



Oficina Legal del Pueblo Unido, Inc.
P.O. Box 219
Alamo, TX 78516
(956) 787-8171
texascivilrightsproject.org

receive those who have fled persecution and violence. The Departments should immediately rescind this Rule.

Thank you for considering these comments in response and opposition to this Rule.

Sincerely,

/s/ Karla Marisol Vargas
Karla Marisol Vargas
Senior Attorney
(956) 787-8171 ext. 128
kvargas@texascivilrightsproject.org

/s/ Kassandra Gonzalez
Kassandra Gonzalez
Staff Attorney
(512) 474-5073 ext. 182
kassandra@texascivilrightsproject.org

/s/ Denisse Molina
Denisse Molina
Community Outreach Coordinator
denisse@texascivilrightsproject.org

TEXAS CIVIL RIGHTS PROJECT
P. O. Box 219
Alamo, Texas 78516
(956) 787-8171

---

https://humanrightsfirst.org/library/a-shameful-record-biden-administrations-use-of-trump-policies-endangers-people-seeking-asylum/.

16

CLP_PC_032983

# PUBLIC SUBMISSION

**As of:** May 08, 2023
**Received:** March 27, 2023
**Status:** Posted
**Posted:** March 30, 2023
**Tracking No.** lfr-lf0v-gl1y
**Comments Due:** March 27, 2023
**Submission Type:** Web

**Docket:** USCIS-2022-0016
Circumvention of Lawful Pathways

**Comment On:** USCIS-2022-0016-0001
Circumvention of Lawful Pathways

**Document:** USCIS-2022-0016-12568
Comment Submitted by Frente Accion Latinx de Minnesota (FALM)

## Submitter Information

**Email:** Ana.PottratzAcosta@mitchellhamline.edu
**Organization:** Frente Accion Latinx de Minnesota (FALM)

## General Comment

Please accept the attached letter comment submitted by Frente Accion Latinx de Minnesota (FALM). Letter comment by FALM authored by Mitchell Hamline Health Law Clinic (FALM Coalition Member) and is joined by 27 individual and organizational signatories.

## Attachments

FALM Letter Comment to Proposed Asylum Regulations - FINAL



March 27, 2023

Merrick Garland
Attorney General
U.S. Department of Justice

Alejandro Mayorkas
Secretary of Homeland Security
Department of Homeland Security

<div align="center">

**RE:    Comment to Proposed DHS/DOJ Regulation**
***Circumvention of Lawful Pathways*, 88 FR 11704**

</div>

Dear Attorney General Garland and Secretary Mayorkas:

Please accept this letter, submitted by Frente Accion Latinx de Minnesota (FALM), as a comment to the proposed regulation by the U.S. Department of Homeland Security (DHS) and U.S. Department of Justice (DOJ), *Circumvention of Lawful Pathways*, published in the Federal Register at 88 FR 11704 on February 23, 2023. FALM, the organization submitting this comment to the proposed DHS/DOJ regulation, is a medical-legal coalition comprised of medical professionals and healthcare providers, immigration lawyers and legal services organizations and community organizations. FALM, as an umbrella medical-legal coalition group, is engaged in various activities to eliminate structural barriers negatively impacting health outcomes for immigrants and other marginalized communities. FALM's activities have included one-day medical-legal clinics, providing legal consultations and healthcare services to community members in the Twin Cities and Greater Minnesota, co-hosting a medical-legal symposium, *La Triste Frontera,* raising awareness of medical-legal issues at the U.S. border, and advocacy to support law and policy advancing health equity.

As a Medical-Legal Coalition, FALM envisions and works towards creating a society where all individuals achieve their highest potential for health. FALM opposes the proposed DHS/DOJ regulation in its entirety because it runs counter to this goal. The proposed rule negatively affects the health of asylum seekers, a vulnerable population fleeing harmful conditions and if put into place as proposed, this rule will put both the health and lives of asylum seekers at grave risk. Accordingly, FALM submits this comment in opposition to the proposed DHS/DOJ regulations

<div align="center">1</div>

due to their harmful impact to health and safety of asylum seekers and urges DHS and DOJ to withdraw the proposed rule in its entirety.

**A.  The Proposed Rule Places Asylum Seekers in Dangerous and Vulnerable Situations.**

The proposed rule imposes significant procedural and logistical barriers on asylum seekers requesting asylum at a port of entry, namely by requiring asylum seekers to make an appointment using the CBP One Smartphone App before they are allowed to request asylum at a port of entry.[1] Additionally, the proposed rule imposes draconian penalties on asylum seekers apprehended by Customs and Border Protection (CBP) Agents after unlawfully entering the U.S. between points of entry. Penalties for asylum seekers apprehended after unlawfully entering the U.S. include being deemed presumptively ineligible for asylum if the asylum seeker travelled through a third country enroute to the U.S. and streamlined procedures making it easier for the U.S. government to quickly deport asylum seekers through expedited removal.[2]

While this letter will focus on how the proposed DHS/DOJ rule will negatively impact the health and safety of asylum seekers, as a legal matter, the proposed rule marks a significant departure from past policy of admitting individuals fleeing harm and processing their asylum claims, regardless of their manner of entry. Furthermore, the changes proposed under the rule are contrary to both domestic[3] and international law[4], which impose a legal obligation on the U.S. government to offer refuge to those fleeing harm[5] and prohibit punishing asylum seekers for their manner of entry[6] or returning them to a country where they would suffer harm.[7] The proposed rule's attempt to skirt our country's legal and moral obligation to admit and process the asylum claims of those fleeing persecution is reason enough to discard the proposed rule in its entirety.

---

[1] 88 FR 11704, 11719
[2] 88 FR 11704, 11742-11748
[3] *See generally,* Refugee Act of 1980
[4] 1951 Refugee Convention; 1967 Protocol Relating to the Status of Refugees (The United States, while not a signatory to the 1951 Refugee Convention, signed on to become a party to the 1967 Protocol Relating to the Status of Refugees on November 1, 1968. The 1967 Protocol included all of the obligations contained in the 1951 Refugee Convention and eliminated the temporal and geographic limitations contained in the original agreement so that the 1951 Refugee Convention would apply universally.)
[5] *See,* supra note 3 and 4.
[6] *See,* 8 USC § 1158(a)(1), INA § 208 (a)(1) (Any alien who is physically present in the United States or who arrives in the United States (**whether or not at a designated port of arrival** and including an alien who is brought to the United States after having been interdicted in international or United States waters), **irrespective of such alien's status**, may apply for asylum in accordance with this section)
[7] 1951 Refugee Convention, Article 33 (The principle of *non-refoulement* is found in Article 33 of the 1951 Refugee Convention, which states: *no Contracting State shall expel or return ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his [or her] life or freedom would be threatened on account of his [or her] race, religion, nationality, membership of a particular social group or political opinion*)

CLP_PC_032997

Additionally, as a practical matter, the barriers imposed by the proposed DHS/DOJ rule restricting access to asylum will place asylum seekers in desperate situations, ultimately forcing them to choose between two bad options which will place their health and safety at risk:

- Attempting to enter the U.S. at dangerous areas along the U.S./Mexico border to avoid detection and apprehension by CBP; or
- Remaining in dangerous conditions in Mexico indefinitely while attempting to schedule an appointment through the CBP One App to request asylum at a port of entry.

1. **The Proposed DHS/DOJ Rule will Force Asylum Seekers to Cross at Dangerous Points Along the Border, Likely Resulting in Serious Injury or Death for Many who Attempt to Cross into the U.S.**

Many asylum seekers facing life threatening situations in Northern Mexico will choose to make the harrowing trek into the U.S. crossing an ocean, river, or desert between ports of entry out of desperation to reach safety inside the U.S. This choice has become even more perilous for asylum seekers over the past three years since the March 2020 implementation of the Title 42 policy. Under Title 42, a policy implemented on public health grounds at the start of the COVID-19 pandemic, DHS is allowed to summarily expel and return most asylum seekers appearing at ports of entry or apprehended between ports of entry before they have the opportunity to request asylum.[8] Unlike the past, when asylum seekers unlawfully crossing into the U.S. between ports of entry would voluntarily turn themselves in to CBP officers to request asylum, many asylum seekers now chose to cross at more dangerous points along the border to evade detection by CBP and avoid summarily expulsion back to Mexico or their home country under Title 42. With increased enforcement along the southern border, more migrants have attempted to enter the U.S. along the northern border with Canada, which has also resulted in fatalities when individuals were exposed to the harsh elements while attempting to cross in the winter. Because Title 42 has pushed asylum seekers to cross the border at more dangerous points to evade detection, there has been a significant increase in migrant deaths over the past three years. Both FY2021 and FY2022 set a record for most migrant deaths on the southern border in a single year, with over 560 deaths in FY2021 and over 800 deaths in FY2022.[9] The total number of migrant fatalities is even higher when it includes those who died while attempting to cross via the northern border.

Because the proposed DHS/DOJ rule imposes severe penalties on asylum seekers who are apprehended after entering unlawfully between ports of entry, it will continue to place asylum seekers in a position where they are forced to take these risks, often with dangerous or fatal consequences.

---

[8] *Fact Sheet: A Guide to Title 42 Expulsions at the Border,* American Immigration Council, May 2022, https://www.americanimmigrationcouncil.org/sites/default/files/research/title_42_expulsions_at_the_border_0.pdf
[9] J. Rose, M. Penaloza, *Migrant Deaths at the U.S.-Mexico Border hit a Record High, in Part due to Drownings,* NPR, September 29, 2022, https://www.npr.org/2022/09/29/1125638107/migrant-deaths-us-mexico-border-record-drownings

CLP_PC_032998

i.  **The number of drowning deaths while crossing the Rio Grande has steadily increased over the years.**

Many migrants who enter the U.S. between ports of entry along the U.S-Mexico border do so by crossing the Rio Grande, a river that serves as a natural land border spanning approximately 1,000 miles between Mexico and Texas. Crossing the Rio Grande places migrants in a particularly dangerous situations where they face serious injury or death. The riverbed is uneven, and the currents are unpredictable, particularly in the darkness of night when many migrants cross to evade detection by CBP. Yet, families, many with little children in tow, take this risk – hoping to reach safety and achieve the quintessential American Dream.

While access to appointments to seek asylum at ports of entry continues to be severely restricted and backlogged, migrants facing harm in Mexico are often left with no choice but to undertake this perilous journey at dangerous points along the Rio Grande to evade CBP detection. These migrants are also vulnerable to cartels and smugglers, as most points along the river where people can cross without being apprehended by CBP are controlled by "coyote" smugglers who charge a high fee before allowing a migrant to cross over to the U.S. Groups of migrants with access to minimal resources and at the mercy of coyotes often use flimsy floatation devices not made to withstand strong river currents or support the large number of people on them. It is not uncommon for as many as 9 or 10 people to clamber on to a small inflatable raft or for multiple people to hang on to a pool noodle for dear life as they attempt to cross the Rio Grande. The few lucky migrants who manage to successfully make it across the Rio Grande report being dragged underwater by the currents, with their feet touching the bottom of the river, as the top of their head is submerged below the surface. They got cramps, their arms were tired, and they went into shock. Often, migrants sustain serious injuries while crossing the river which requires medical intervention.

For others, crossing the Rio Grande led to fatal results. Of note, on September 2, 2022, nine migrants drown while attempting to cross the Rio Grande near Eagle Pass, Texas and another thirty-seven migrants need to be rescued after being swept downstream by the current.[10] In news reports covering the nine drowning deaths, Manuel Mello, the Eagle Pass Fire Chief, reported drownings deaths had become an everyday occurrence near that section of the border, typically with as many as one drowning death per day and sometimes more.[11] Should the proposed DHS/DOJ regulation be implemented as written, it will likely result in more drowning deaths as desperate asylum seekers attempt to cross the Rio Grande to seek safety in the U.S.

ii.  **Crossing the ocean is a perilous gamble.**

Earlier this month, on March 12, 2023, the US witnessed one of the deadliest maritime border crossing incidents in its history when two smuggling boats capsized in the Pacific Ocean

---

[10] D. Montgomery & M. Jordan, *Nine Migrants Drown as Dozens are Swept Down Rio Grande,* New York Times September 2, 2022, https://www.nytimes.com/2022/09/02/us/migrants-rio-grande-texas.html

[11] Id.

CLP_PC_032999

near La Jolla, California, roughly 35 miles from the US Mexico border.[12] There were eight confirmed drowning deaths from this incident and authorities were uncertain if there were more fatalities whose bodies could not be retrieved from the ocean.

At a news conference covering the March 12, 2023 drowning deaths near La Jolla, Coast Guard Captain James Spitler remarked that there had been a 771% increase in human smuggling in the Pacific Ocean near the border between Mexico and Southern California since 2017. This increase coincides with increased enforcement and measures blocking access to asylum along the border in Southern California during the Trump Administration, which included metering[13] (a practice limiting the number of individuals allowed to seek asylum each day at ports of entry), the Migrant Protection Protocols (MPP) or "Remain in Mexico" program[14], and Title 42. Captain Spitler also noted that since 2021, there had been 23 confirmed migrant drowning deaths at sea and that the total number of drowning deaths was likely higher.[15]

### iii.   Crossing the desert involves battling the harsh terrain and triple digit temperatures, resulting in a number of fatalities.

In addition to crossing into the U.S. by water, many asylum seekers attempt to evade detection by crossing into the U.S. through the desert in New Mexico, Arizona and California. Crossing into the U.S. through the desert is especially dangerous for migrants during the summer, with average daily highs in Southern Arizona of over 100 degrees. The dangers migrants face crossing the border through the desert are only expected to worsen as the summer months in Arizona grow hotter due to climate change.[16] Additionally, to avoid detection and expulsion into Mexico under Title 42, migrants have begun crossing into the U.S. at remote parts of the desert typically five miles or further from the nearest road, over mountain ranges and other inhospitable terrain.[17]

Because of the dangers of this perilous journey across the desert, many migrants suffer from dehydration, heat stroke or even death when attempting to the enter the U.S. through the desert. Before even reaching the U.S./Mexico border, many migrants may have been forced by smugglers to walk for days or weeks via dangerous routes in Mexico and Central America.[18] Dehydrated or injured migrants are often unable to complete their journey and are left behind by smugglers to die in the desert. Between October 1999 and December 2021, the nonprofit

---

[12] K. Kucher, A. Riggins, M. Hamilton, *8 Reported Dead After 2 Suspected Smuggling Boats Crash at Black's Beach in San Diego*, Los Angeles Times, March 12, 2023, https://www.latimes.com/california/story/2023-03-12/8-reported-dead-after-2-suspected-smuggling-boats-crash-at-blacks-beach-in-san-diego

[13] *Fact Sheet: Metering and Asylum Turnbacks*, American Immigration Council, March 2021, https://www.americanimmigrationcouncil.org/sites/default/files/research/metering_and_asylum_turnbacks_0.pdf

[14] *Fact Sheet: The Migrant Protection Protocols,* American Immigration Council, January 2022, https://www.americanimmigrationcouncil.org/sites/default/files/research/the_migrant_protection_protocols_0.pdf

[15] Los Angeles Times, *supra* note 12

[16] C. Prendergast, A. Devoid, *Migrant Deaths: A Crisis Deepens in the Desert,* Arizona Daily Star, December 2, 2021, https://humaneborders.org/migrant-deaths-a-crisis-deepens-in-the-desert/

[17] Id.

[18] Id.

CLP_PC_033000

organization, Humane Borders, reported nearly 4,000 deaths had occurred in the Arizona desert, with 239 deaths in 2020 and 222 deaths between January and September of 2021.[19] These fatalities will likely continue if the proposed DHS/DOJ rule is implemented as currently drafted.

### iv.   Increased Crossings Along the Northern Border Where Migrants are Exposed to the Harsh Winter Elements

While the total number of migrants who attempt to enter the U.S. across the northern border is significantly lower compared to the southern border, both U.S. and Canadian officials have noted a significant increase in attempted crossings into the U.S. through Canada.[20] Entering the U.S. across the northern border presents its own hazards, particularly for migrants who attempt to cross into the U.S. from Canada during the frigid winter months, with average temperatures below freezing.

Like border crossings across dangerous terrain at the southern border, the increase in migrant border crossing at the northern border has resulted in several fatalities. On January 19, 2022, the Royal Canadian Mounted Police found the bodies of four people, including an infant and one teenage boy, roughly seven miles from the U.S. border with Minnesota, in the Canadian Province of Manitoba. The four people, later identified as migrants from India attempting to cross into the U.S., died of exposure and hypothermia when they were travelling on foot, in a blizzard with temperatures of minus-31 degrees Fahrenheit.[21] More recently, there were reports of additional fatalities near the northern border. These included the death of a Haitian citizen in December 2022 who was found in Quebec, near Champlain, New York, and a Mexican man whose frozen body was found in February 2023 in rural Vermont, near the Canadian border.[22]

### v.   Death by Drowning, Heat Stroke and Hypothermia, in Medical Terms

As a coalition organization with members who are physicians and other medical professionals, FALM wishes to underscore the horrific nature of the deaths, in medical terms, suffered by asylum seekers attempting to cross the border via the ocean, river or desert.

For those who perished while attempted to cross the Pacific Ocean or Rio Grande, the cause of death is drowning. When a person drowns, the brain senses hypoxia (i.e., oxygen deprivation) and triggers a series of nervous system reactions in an attempt to preserve life. The water pressure when a person is submerged under water is so great that it causes their chest cavity to fill with fluid, putting pressure on the heart and preventing it from pumping blood effectively. Their airways close off as their head goes underwater, making it difficult to breathe naturally. Without

---

[19] Id.

[20] FY2022 (Oct. 2021-Sept 2022) saw a total of 109,535 encounters by CBP at the Northern Land Border, marking a significant increase from FY2021 (Oct 2020-Sept 2021), where only 27,180 encounters were reported. *See,* U.S. Customs and Border Protection, Nationwide Encounters, https://www.cbp.gov/newsroom/stats/nationwide-encounters

[21] A. Coletta, *Florida Man Arrested After 4 People, Including Infant and Teenage Boy, Found Dead Near U.S.-Canada Border,* Washington Post, January 20, 2022, https://www.washingtonpost.com/world/2022/01/20/canada-border-migrant-death/

[22] *U.S. Northern Border Immigrant Death Highlights Crossing Spike,* Associated Press, February 26, 2023, https://www.voanews.com/a/us-northern-border-immigrant-death-highlights-crossing-spike/6977624.html

CLP_PC_033001

air or oxygen, hypoxia sets in quickly, causing brain damage and death.[23] To think that children as young as a few months old are being sent to their watery graves in this manner is appalling to say the least.

Death by heat stroke, suffered by migrants who attempt to cross through the desert, is equally horrific. Migrants who cross the border through the desert are ravaged by extreme temperatures – the sweltering heat of the day and bitter cold at night. With not enough potable drinking water available, they are often severely dehydrated. Dehydration starts as dry mouth. Dry mouth turns to dry heaving. The veins constrict and muscles begin to cramp. The body will stop sweating and begin seizing - signs of heat stroke. When a heat stroke occurs, body temperature can rise to 106 degrees or higher within 10 to 15 minutes. As the body's internal temperature continues to rise above 110 degrees, the body's cells to break down and the sheaths of blood vessels begin leaking, causing hemorrhaging throughout the body and multi-system organ failure, effectively boiling to death in their own body.[24]

Those who died from hypothermia while attempting to cross the northern border also suffered a painful death. Death from hypothermia occurs when your body loses heat faster than it can produce heat, causing the body's internal temperature to plunge. The first symptom of hypothermia is shivering, when the body begins to shake in an attempt to warm itself. As the body's internal temperature drops, which can happen in a matter of minutes when exposed to sub-zero temperatures, the heart, nervous system, and other organs are not able to work properly. Eventually, a person's heart will stop beating and they will die.[25]

Should the proposed DHS/DOJ rule go into effect as written, it is certain to result in more people suffering unimaginably painful deaths, spending their final moments on earth in agony.

B. **The proposed DHS/DOJ rule, creating a rebuttable presumption of ineligibility for asylum for the majority of migrants who enter unlawfully between ports of entry, will disproportionately harm those most in need of protection.**

One especially punitive provision in the proposed DHS/DOJ regulation is the asylum transit ban language, imposing a rebuttable presumption of ineligibility for asylum for any migrant apprehended by CBP after unlawful entry if they did not seek asylum or protection in any third country, they travelled through enroute to the U.S. This rebuttable presumption of ineligibility for asylum, if implemented, will severely restrict access to asylum and effectively punish the most vulnerable who are left with no choice but to cross the border unlawfully to reach safety in the U.S. DHS and DOJ have argued that the proposed rule does include safeguards to rebut the presumption of ineligibility for asylum, for example, if the asylum seeker can demonstrate by preponderance of the evidence, they were unable to access the CBP One App to make an

---

[23] *The Science of Drowning: What Happens to the Body Underwater?,* American Academy of CPR and First Aid, https://www.onlinecprcertification.net/blog/the-science-of-drowning-what-happens-to-the-body-underwater/
[24] A. Ragsdale, P. Stark, *What it Feels Like to Die From Heatstroke,* Outside, June 18, 2019, https://www.outsideonline.com/health/wellness/heat-stroke-signs-symptoms/
[25] *Hypothermia: Overview,* The Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/hypothermia/symptoms-causes/syc-20352682#:~:text=When%20your%20body%20temperature%20drops,or%20immersion%20in%20in%20cold%20water.

CLP_PC_033002

appointment. However, rebutting the presumption of ineligibility for asylum under the rule is a technically complex process that will be extremely difficult for asylum seekers to navigate without the assistance of a lawyer.

Additionally, asylum seekers who are survivors of trauma will face additional challenges rebutting and overcoming the presumption of ineligibility for asylum. Asylum seekers often have experienced significant trauma and have complex physical and mental health needs that should be treated with medical care. Asylum status, if granted, is a form of lawful status granting the right to stay in the U.S. indefinitely, with a path to permanent residence and citizenship, and entitlement to government funded healthcare programs, like Medicaid.  By eliminating the possibility of even being allowed to apply for asylum for most applicants, a form of status that grants access to healthcare benefits, the proposed rule denies access to crucial health services (leading to untreated mental health needs and trauma), increased emergency service use, lower immunization rates, and increased likelihood of deportation, resulting in re-traumatization and worsening of health problems.

The Proposed Rule also perpetuates uncertainty for asylum seekers and exacerbates their trauma and mental anguish. Migrants seeking asylum often are fleeing traumatic experiences stemming from past persecution that forced them to flee their home country and seek asylum in the U.S. In fact, one of the requirements for seeking asylum in the United States is that the individual must demonstrate a well-founded fear of persecution if forced to return, which is typically established by showing they suffered past persecution in their home country.[26] The Proposed Rule will compound the trauma and vulnerabilities that asylum seekers already face by punishing them, denying them access to asylum and deporting them back to the harm that caused them to flee and seek safety in the U.S. in the first place.

## C. Requiring asylum seekers to schedule an appointment through the CBP One Smartphone App before they can seek asylum will result in catastrophic health consequences.

Under the proposed DHS/DOJ rule, asylum seekers are required to secure an appointment through the CBP One App before being allowed to request asylum at a port of entry. For a number of reasons, this requirement is impractical and will deny many seeking protection on the southern border access to asylum.

This requirement under the proposed rule is incredibly burdensome and requires asylum seekers to have access to a smartphone and reliable internet to download the CBP One App. Assuming they have access to a smartphone and are able to download the CBP One App and register, the asylum seeker must then attempt to schedule an appointment through the app's glitchy, often impossibly difficult lottery-based scheduling process. As a result, thousands of people will be trapped waiting for weeks or months at a time in dangerous conditions in Northern Mexico while they try to navigate the CBP One App, schedule an appointment, and then wait for said appointment to take place. It is unknown how many appointments are available each day. Advocates estimate that in camps in Reynosa and Matamoros, there are as many as 10,000 migrants at any given time competing for likely fewer than 500 appointments made available in

---

[26] *See* 8 U.S.C. § 1158(b), INA § 208(b)

CLP_PC_033003

those cities each day.[27] According to a CBP official, 200,000 profiles had been created on the app. Of those 200,000 profiles, only 35,000 profiles had scheduled appointments as of Feb 22.[28] While the number of active users is unknown, it is evident many who have created a profile have not been able to successfully schedule an appointment and remain waiting indefinitely for their chance to request asylum at a port of entry in dangerous conditions in Northern Mexico with no safe or healthy housing.

From a medical perspective, the proposed CBP One App appointment requirement is concerning for a number of reasons. First, the health dangers and harm resulting from acts of violence, rape, and murder that many asylum seekers are subjected to in Northern Mexico while waiting for an appointment are inherent. Second, the lottery process is indifferent toward, (and in many cases disadvantages) the most vulnerable, including those with medical needs seeking protection through asylum. Third, the impact of CBP One's "Liveness Check" facial recognition technology has a discriminatory impact on Black people and indigenous or mestizo people with dark skin, which causes additional harms to the mental and physical health of asylum seekers most likely to face discrimination. Fourth, the dangerous circumstances, violence, and uncertainty asylum seekers will endure while waiting to for an open slot through the CBP One App will have significant mental and physical health implications, especially for adolescents.

i. **The frequent crime, violence, rape, and murder asylum seekers are exposed and susceptible to while waiting in dangerous areas near the border in Northern Mexico are an obvious threat to the health and safety asylum seekers.**

The border communities in Northern Mexico are not safe for asylum seekers to stay while waiting to secure an appointment to request asylum through the CBP One App. On March 3, 2023, four U.S. citizens visiting Mexico for medial tourism were kidnapped by armed men connected to the cartels in Matamoros, Mexico (directly across the border from McAllen, Texas) because the gunman reportedly mistook them for Haitian drug traffickers.[29] Unfortunately, two of the four were murdered and another victim of the kidnapping suffered serious injuries.[30] Asylum seekers are especially vulnerable in border towns where they are regularly victims of murders, shootings, rapes, extortions, kidnappings, and human trafficking. They are often targeted on account of their race, nationality, refugee status, sexual orientation, gender identity, and other factors.[31] Migrants waiting for an asylum appointment, particularly Black and dark-skinned migrants, are also at risk of deportation by Mexican migration officers from Instituto Nacional de Migracion (INM), Mexico's immigration enforcement agency. Further, "Mexican police, immigration officers, and other government authorities continue to be responsible, often in collusion with cartels, for brutal

[27] B. Wermond, E. Trovall, *Biden's New CBP One App Panned for Trapping Asylum Seekers in Daily Lottery System,* Houston Chronicle, February 26, 2023, https://www.houstonchronicle.com/politics/texas/article/users-pan-bidens-new-cbp-one-app-asylum-seekers-17796732.php
[28] Id.
[29] M. Halpert, W. Grant, *Two Dead, Two Alive After Americans Kidnapped in Mexico,* BBC, March 8, 2023, https://www.bbc.com/news/world-latin-america-64878721
[30] Id.
[31] Barred at the Border: Wait "Lists" Leave Asylum Seekers in Peril at Texas Ports of Entry, Human Rights First, April 2019, https://humanrightsfirst.org/wp-content/uploads/2022/10/BARRED_AT_THE_BORDER.pdf

CLP_PC_033004

attacks on migrants and asylum seekers after they are returned to, or while they are passing through Mexico."[32]

## ii.   The CBP One App disadvantages the most vulnerable people.

The proposed rule includes exceptions for those who can't access the app because of technical issues, illiteracy, no access to a phone, or language barriers. There are also exceptions for unaccompanied children and those with serious medical conditions. However, the individual bears the burden of proving by preponderance of the evidence (i.e., greater than a 50% chance) that they were unable to use the app, and it is unclear how officers would judge whether a person has established they meet an exception. Further, families with young children and infants, the elderly, and pregnant women are given no priority when scheduling appointments or exemptions from the CBP One App appointment requirement. Instead of a triage system that prioritizes appointments based on need and vulnerability, the CBP One App appointment scheduling process is a lottery where securing an appointment seems to be a matter of luck or chance. In fact, it tends to disadvantage the most vulnerable groups such as children and infants travelling with a parent, elderly people, and people with disabilities, and those in poverty who cannot afford a smartphone or access to the internet.

a.   Pregnant women and families with children are disadvantaged by the CBP One App scheduling process.

Pregnant women nearing their due dates have the same chance of getting an appointment as the thousands of other asylum seekers attempting to secure a slot from the excessively limited pool. The proposed rule also imposes difficulty on children and their parents because it requires each child to have a separate appointment versus allowing family units to schedule a single appointment to request asylum together. This has proven challenging given the surplus of people seeking appointments, and the deficiency in appointment slots available each day. Further, the CBP One App requires facial recognition for young children (and at one point required it for infants) before the app will allow an appointment to be scheduled on behalf of the child. For anyone who has interacted with a toddler or young child, it is clear that requiring a young child to sit still on command to complete a facial recognition "liveness check" is before being allowed to use an app which is their only legal avenue to request asylum is inherently unreasonable. There is also at least one report of facial software rejecting an identical twin mistakenly receiving it as an already-existing user.[33]

---

[32] Id.

[33] N. Miroff, *How Biden Officials aim to use a Mobile App to cut Illegal U.S. Entries,* Washington Post, February 20, 2023, https://www.washingtonpost.com/immigration/2023/02/20/cbpone-boder-app-biden-migrants/

CLP_PC_033005

b. People with disabilities, elderly people, those living in poverty, and people who speak languages other than English, Spanish, or (recently) Haitian Creole, are disadvantaged by the CBP One App Process.

The accessibility of the CBP One App for users with disabilities is questionable at best. There is at least one report of a person who was blind having difficulty accessing the app.[34] Many people have reported difficulty understanding and using the complicated app. Only those who can read and write in Spanish, English, or Haitian Creole are able to use the app since these are the only language options the CBP One App provides. Further, the most isolated and economically distressed are left with no means to request an appointment because they do not have a smartphone. Similarly, many struggle accessing the CBP One App and securing an appointment with outdated phones and bad Wi-Fi connections. In practice, the people in the gravest danger with the least resources have and will continue to be excluded from the opportunity to seek asylum because of the CBP One App requirement.[35]

### iii. The CBP One App's "Liveness Check" facial recognition discriminates against Black people and people with dark skin, which perpetuates racism and carries negative health ramifications.

The CBP One App has excluded thousands of people from the asylum process based on the color of their skin. There are numerous reports that the CBP One "liveness check" requirement routinely rejects the photos of Black and dark-skinned migrants, leaving these individuals with no recourse to access asylum appointments at ports of entry. At least one study found that facial recognition technology encounters its greatest rates of error for Black women.[36] Another study found facial recognition has an error rate of over 30% for women with darker skin tones.[37]

It is now well-established that racism is a Public Health issue. Whether intentional or not, the CBP One App, especially the "Liveness" facial recognition requirement, has a discriminatory impact on asylum seekers based on the color of their skin and darkness of their complexions. These asylum seekers have already experienced racial discrimination, which comes with health implications.

Racism is linked with higher stress, which can result in high blood pressure, weakened immune system, and other long-term health effects. (*See more discussion about stress' impact on health in Section iv, below*). A recent study found physiological functioning in midlife and sleep is impaired in people of color who have experienced unfair discrimination over their lifetime.[38] Another recent

---

[34] Houston Chronicle, *supra* note 27

[35] Washington Post, *supra* note 33

[36] *NIST Study Evaluates Effects of Race, Age, Sex on Facial Recognition Software,* National Institute of Standards and Technology, U.S. Department of Commerce, December 19, 2019, https://www.nist.gov/news-events/news/2019/12/nist-study-evaluates-effects-race-age-sex-face-recognition-software

[37] A. Najibi, *Racial Discrimination in Face Recognition Technology,* Harvard University, October 24, 2020, https://sitn.hms.harvard.edu/flash/2020/racial-discrimination-in-face-recognition-technology/

[38] A.D. Ong, D.R. Williams, *Lifetime Discrimination, Global Sleep Quality, and Inflammation Burden in Multi-Ethnic Sample of Middle-Aged Adults,* American Psychological Association, 2019, https://psycnet.apa.org/doiLanding?doi=10.1037%2Fcdp0000233

CLP_PC_033006

research review found associations between reports of racial discrimination, and physical and mental health conditions.[39] These conditions included cardiovascular disease, coronary artery calcification, mental health disorders, obesity, hypertension, alcohol use and misuse, poor sleep, cortisol dysregulation, engagement in high-risk behaviors, and inflammation.[40] Inability to access asylum protections because of the immutable characteristic of being Black or having dark skin preventing proper use of the necessary CBP One App is a severe form of racism that could exacerbate racial health disparities.

iv. **Asylum seekers waiting to schedule an appointment through the CBP One App experience uncertainty, stress, trauma, adverse childhood experiences, sexual and physical abuse, and inadequate housing. All these hardships negatively impact health.**

In addition to the discriminatory impact of the CBP One App appointment requirement described in the previous section above, this requirement will cause many additional harms negatively impacting health outcomes.

a. The CBP One App appointment process makes many asylum seekers experience uncertainty and stress.

Asylum seekers desperately waiting in Northern Mexico for weeks or months to secure an asylum appointment live in a perpetual state of uncertainty over their futures. This uncertainty caused by not knowing if or when they will be able to secure an appointment through CBP One App is likely a long-term stressor that may negatively impact health for years to come. Further, an asylum seeker's stress is compounded by the stress of living in dangerous conditions where crimes, violence, robberies, kidnappings, rapes, and threats against migrants are common.

This is especially troubling since asylum seekers have typically already endured trauma from past persecution they suffered, which forms the basis of their asylum claims. "Before being forced to flee, refugees may experience imprisonment, torture, loss of property, malnutrition, physical assault, extreme fear, rape and loss of livelihood."[41] Those who have experienced persecution or economic distress in their home country, and the resulting trauma from these incidents, need timely access to assistance from medical and mental health professionals. At the very least, they need to be in a more secure and safe environment versus the extreme danger they face while vulnerably waiting "in limbo" near the border. Tortured refugees have significant challenges for emotional and sometimes physical healing that must be carefully assessed and treated[42] and this healing cannot begin until asylum seekers reach safety and stability inside the U.S.

---

[39] D.R. Williams, J.A. Lawrence, B.A. Davis, *Racism and Health: Evidence and Needed Research*, Annual Review of Public Health, April 2019, https://www.annualreviews.org/doi/pdf/10.1146/annurev-publhealth-040218-043750

[40] *What are the Effects of Racism on Health and Mental Health?*, Medical News Today, last reviewed on December 14, 2022, https://www.medicalnewstoday.com/articles/effects-of-racism#summary

[41] *Traumatic Experiences of Refugees*, Refugee Health Technical Assistance Center
https://refugeehealthta.org/physical-mental-health/mental-health/adult-mental-health/traumatic-experiences-of-refugees/

[42] Id.

CLP_PC_033007

Uncertainty is often referred to as a trigger for several negative mental health outcomes, such as stress and anxiety.[43] When a person perceives a threat, or otherwise feels stressed, their adrenaline and cortisol levels rise. These hormones can cause blood pressure and heart rate to spike. If the stressors are always present, or a person feels constantly under attack, their fight-or-flight reaction stays turned on and they risk "overexposure to cortisol and other stress hormones."[44] "The long-term activation of the stress response system… can disrupt almost all the body's processes. This puts an asylum seeker with long-term stress activation at increased risk of many health problems: Anxiety; Depression; Digestive problems; Headaches; Muscle tension and pain; Heart Disease, Heart Attack, High Blood Pressure and Stroke; Sleep problems; Weight gain; Memory and concentration impairment." [45]

   b.   The Children forced to wait for a CBP One App appointment slot are vulnerable to adverse childhood experiences (ACE) and other potential health concerns.

As discussed in Section ii, thousands of children are waiting in these torturous conditions to secure an asylum appointment through the CBP One App. The impact that inadequate housing, exposure to violence, chronic stress, physical and sexual abuse has on a child's health, cannot be understated. Lourdes Gonzalez houses at-risk asylum seekers in the border state of Tamaulipas, Mexico and reports tending to sexually assaulted children and bandages these victims' wounds of violence.[46] A mother waiting at the border, Cardona, said (through tears) that she and her family were stuck in "The most dangerous place on the continent. Kids can't play outside because of gunshots. Taxi drivers help kidnap people. We had to sleep on the streets for days before finding a shelter." [47]

Lifelong health outcomes, such as chronic disease and mental disorders, are linked to adverse childhood experiences (ACES). Youth exposed to violence (whether as direct witness, victim, or hearing about the crime) are at risk for poor long-term behavioral and mental health outcomes. These outcomes include anxiety, depression, and post-traumatic stress disorder.[48] People with higher ACE burdens have increased risk of heart disease, cancer, substance abuse, depression, impaired social relationships, aggression, and risk-taking behavior, compared to those with lower ACE burdens.[49] Therefore, children stuck waiting in dangerous areas of Northern

---

[43] A. Massazza, H. Kienzler, S. Al-Mitwalli, N. Tamimi & R. Giacaman, *The Association Between Uncertainty and Mental Health: A Scoping Review of the Quantitative Literature*, Journal of Mental Health, January 11, 2022, https://www.tandfonline.com/doi/full/10.1080/09638237.2021.2022620

[44] *Chronic Stress Puts Your Health at Risk,* Mayo Clinic, July 8, 2021, https://www.mayoclinic.org/healthy-lifestyle/stress-management/in-depth/stress/art-20046037

[45] Id.; *See also,* A. Aly, *The Effects of Stress on the Heart,* MedStar Health, February 21, 2021, https://www.medstarhealth.org/blog/heart-and-stress

[46] A. Hernandez, *Desperate Migrants Seeking Asylum Face a New Hurdle: Technology*, Washington Post, March 11, 2023, https://www.washingtonpost.com/nation/2023/03/11/asylum-seekers-mexico-border-app/

[47] Id.

[48] S. Monnat, R. Chandler, *Long Term Health Consequences of Adverse Childhood Experiences,* Socio Q, September 2015, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4617302/

[49] J. Shonkoff, D. Phillips, *From Neurons to Neighborhoods: The Science of Early Childhood Development,* U.S. National Research Council and Institutes of Medicine Committee on Integrating the Science of Early Childhood Development, 2000, https://pubmed.ncbi.nlm.nih.gov/25077268/

CLP_PC_033008

Mexico are at heightened risk for adverse childhood experiences, and consequently, a plethora of potential resulting health issues for the rest of their lives.

    c. <u>Asylum seekers' vulnerability to sexual and physical abuse and assault while waiting for a CBP One App appointment involves serious health risks.</u>

As discussed in Section i, asylum seekers are targeted by cartels for crimes of violence, including rape, shootings, kidnapping, sexual and physical assault, and murder. The CDC recognizes sexual violence as "a serious public health problem" that "profoundly impacts lifelong health, opportunity, and well-being."[50] At least one study has found that people who were exposed to gun violence fatalities experienced relatively higher levels of depression and suicidal ideation than those not exposed.[51]

Physical or sexual abuse during a person's childhood is associated with increased risk of mental illness, suicide attempts and suicidal ideation, substance abuse, obesity, sexually transmitted infections, risky sexual behavior, and chronic diseases such as arthritis, ulcers, and migraines. Roughly half of people with bipolar disorder have experienced sexual assault. Additionally, "sexual assault is associated with shortened telomere lengths, which is a sign of cellular stress and aging."[52]

    d. <u>Asylum Seekers are forced to wait in unsafe, unhealthy housing, which contributes to adverse health outcomes.</u>

Every day, thousands of asylum seekers experience homelessness and are forced to sleep on the streets in border towns. A home that lacks safety, shelter, or privacy is not healthy housing. Asylum seekers living and sleeping in the streets of Northern Mexico are experiencing the opposite of healthy housing. A lack of healthy housing contributes to adverse health outcomes, including: "asthma morbidity, tuberculosis, and developmental delay." Heat waves in summer months are also a threat to asylum seekers' health. An inability to keep cool during extreme hot weather or to keep warm during cold weather can lead to serious illness and even death. The fact that some children cannot play outside because of gunshots and other dangers also raises obvious health concerns as children need exercise, fresh air, and light. Lack of light is related to depression.[53]

---

[50] *Fast Facts: Preventing Sexual Violence,* Center for Disease Control and Prevention (CDC), last reviewed June 22, 2022, https://www.cdc.gov/violenceprevention/sexualviolence/fastfact.html
[51] *Social Determinants of Health Summaries: Crime and Violence,* Office of Disease Prevention and Health Promotion, U.S. Department of Health and Human Services, https://health.gov/healthypeople/priority-areas/social-determinants-health/literature-summaries/crime-and-violence
[52] X. Li, J. Wang, J. Zhou, P. Huang, J. Li, The *Association Between Post-Traumatic Stress Disorder and Shorter Telomere Length: A Systematic Review and Meta-Analysis*, Journal of Affective Disorders, Volume 218, Pgs. 322-326, 2017, https://www.sciencedirect.com/science/article/abs/pii/S0165032716317621
[53] Office of the Surgeon General (US), *The Connection Between Health and Homes,* The Surgeon General's Call to Action to Promote Healthy Homes, 2009, https://www.ncbi.nlm.nih.gov/books/NBK44199/

CLP_PC_033009

**D. Conclusion**

      The proposed DHS/DOJ rule, as written, will result in serious and substantial harm to asylum seekers. These harms include placing their personal safety at risk by attempting to enter the U.S. across dangerous conditions via the ocean, river or dessert, and the continuous threats to safety and resulting harm to physical and mental health while attempting to secure an appointment through the CBP One App.

      As a Medical-Legal Coalition group working toward achieving health equity for immigrants and marginalized communities, FALM, together with the other undersigned individuals and organizations, oppose the proposed rule in its entirety because of the unjust health consequences that will result from its implementation. Furthermore, FALM encourages DHS and DOJ to work toward alternative solutions to guarantee all fleeing persecution are able to exercise their legal right to apply for asylum and be welcomed with dignity.

  Sincerely,


**Frente Accion Latinx de Minnesota (FALM)**

Dr. Miguel Fiol, Founder and Coordinator of FALM


**Lead Authors of FALM Letter Comment:**

Ana Pottratz Acosta
Associate Professor of Law

Kathleen Moccio
Adjunct Professor

Jayashree Venkateswaran
Certified Student Attorney

Kelsi Nusbaum
Certified Student Attorney

**MHSL Health Law Clinic**
**Mitchell Hamline School of Law**
FALM Coalition Member Organization

CLP_PC_033010

Submitted Together with the Following Undersigned <u>Individuals</u> and <u>Organizations</u>:

## Organizational Signatories:

Jovita Morales, Leader
**Minnesota Immigrant Movement**

Pablo Tapia, Executive Director
**Asemblea de Derechos Civiles**

Emilia Gonzales Avalos, Executive Director
**Unidos MN**

Francisco Segovia, Executive Director
**COPAL MN**

Ma Elena Gutierrez, Director
**Fe y Justicia MN**

Gregory King, President of Board of Directors
**MN Interfaith Coalition on Immigration**

Beth Gendler, Executive Director
**Jewish Community Action**

Nicole Donoso, Democracy and Policy Organizer
**Voices for Racial Justice**

Sarah Brenes, Executive Director
**University of Minnesota Binger Center for New Americans**

Mirella Ceja-Orozco, Co-Executive Director
**Minnesota Freedom Fund**

Eileen Crespo, MD, President
**Minnesota Chapter of American Academy of Pediatrics**

Mirella Ceja-Orozco, Chapter Chair
**American Immigration Lawyers Association (AILA), Minnesota-Dakotas Chapter**

Barbara Colombo, Director and Professor of Law
**Mitchell Hamline Health Law Institute**

T. Anansi Wilson, Founding Director and Associate Professor of Law
**Mitchell Hamine Center for the Study of Black Life and the Law**

Joanna Woolman, Director and Professor of Law
**Mitchell Hamline Institute to Transform Child Protection**

Angelique EagleWoman, Director and Professor of Law
**Mitchell Hamline Native American Law and Sovereignty (NALS) Institute**

Sharon Press, Director and Professor of Law
**Mitchell Hamline Dispute Resolution Institute**

CLP_PC_033011

**Individual Signatories:**

**Dr. Haitham Hussein**
Associate Professor of Neurology, University of Minnesota

**Dr. Jonathan Kirsch, MD**
Associate Professor of Medicine, University of Minnesota

**Kimberly Clinch**
Mobile Health Coordinator, University of Minnesota

**Virgil Wiebe**
Professor of Law, University of St. Thomas Interprofessional Center (affiliation for identification purposes only)

**Sia Xiong**
Senior Policy Analyst, Ramsey County (MN)

**Diana Hernandez Hernandez**
Member, Minnesota Immigrant Rights Action Committee (MIRAC)

**Courtney Hoselton**
Member of UMN Community Health Advisory Board

**Dr. Allison G. Ho, MD**

**Dr. Sheldon Berkowitz, MD, FAAP**

**Dr. Jessica Hane, MD**

CLP_PC_033012

# PUBLIC SUBMISSION

**As of:** May 08, 2023
**Received:** March 27, 2023
**Status:** Posted
**Posted:** March 30, 2023
**Tracking No.** lfr-nmr8-klkt
**Comments Due:** March 27, 2023
**Submission Type:** Web

**Docket:** USCIS-2022-0016
Circumvention of Lawful Pathways

**Comment On:** USCIS-2022-0016-0001
Circumvention of Lawful Pathways

**Document:** USCIS-2022-0016-12589
Comment Submitted by Las Americas Immigrant Advocacy Center

---

## Submitter Information

**Email:** mgeorgevich@heartlandalliance.org
**Organization:** Las Americas Immigrant Advocacy Center

---

## General Comment

Las Americas Immigrant Advocacy Center (Las Americas, LAIAC, or we) submits this comment in response to the Department of Homeland Security (DHS) and Department of Justice (DOJ)'s proposed rule published in the Federal Register on February 23, 2023, Circumvention of Lawful Pathways, CIS No. 2736-22; Docket No: USCIS 2022-0016; A.G. Order No. 5605-2023. For the reasons articulated in the attached comment, Las Americas calls on the Administration to immediately reject these rules.

---

## Attachments

Las Americas Comment - Circumvention of Lawful Pathways - DHS and DOJ - FINAL - 3.27_signed

CLP_PC_033167



1500 E. Yandell Dr. El Paso, TX 79902
P: (915) 544-5126 | F: (915) 544-4041
www.las-americas.org

*Submitted via: https://www.regulations.gov.*

Daniel Delgado
Acting Director
Border and Immigration Policy
Office of Strategy, Policy, and Plans
U.S. Department of Homeland Security
Telephone: (202) 447-3459

Lauren Alder Reid
Assistant Director,
Office of Policy, EOIR
U.S. Department of Justice
Telephone: (703) 305-0289

**Re: Comment on the Proposed Rule by the <u>Department</u> of <u>Homeland Security</u> (DHS) and the <u>Executive Office for Immigration Review</u> (EOIR) on Circumvention of Lawful Pathways, CIS No. 2736-22; Docket No: USCIS 2022-0016; A.G. Order No. 5605-2023**

Dear Acting Director Daniel Delgado and Assistant Director Lauren Alder Reid;

Las Americas Immigrant Advocacy Center (Las Americas, LAIAC, or we) submits this comment in response to the Department of Homeland Security (DHS) and Department of Justice (DOJ)'s proposed rule published in the Federal Register on February 23, 2023, that would ban thousands of refugees from asylum protection in the United States and deprive them of the ability to reunite with their families and pursue a path to citizenship in this country. Upon a close read of the proposed rule and its intended application, we find that the new rule operates similarly to the asylum bans promulgated by the Trump administration in 2018 and 2019 that were repeatedly struck down by federal courts as unlawful. As the details below will underscore, we ask that the Departments bring themselves into compliance with U.S. immigration law by withdrawing the proposed rule and working together with advocacy organizations instead to create human-centered and effective asylum and border crossing case management that legitimately provides migrants a meaningful and realistic opportunity to seek protection.

CLP_PC_033168

Summary of concerns and recommendations

The proposed rule amounts to an asylum ban that cuts off access to asylum for many refugees at the southern border, discriminates against Black, Brown, and Indigenous asylum seekers, and circumvents U.S. law and treaty obligations to refugees. Las Americas strongly urges the agencies to withdraw the proposed rule in its entirety and stop pursuing asylum bans that both advance the Trump administration's agenda and have been welcomed by anti-immigrant hate groups.[1] The administration should instead uphold campaign promises to abide by refugee law and restore full access to asylum at ports of entry, ensuring fair and humane asylum adjudications. Given the egregious and illegal consequences that would result from implementation of this proposed rule, we recommend that the Administration rescind all entry and transit bans, and abandon reliance on the CBP One application. We also urge the Departments to cease to pursue regulatory changes that would limit or eradicate the screening role of the credible fear interview (CFI) process, including all rules seeking to impose higher burdens on the applicant, and access to agency review and counsel during the CFI process.

It is fundamental to a working, fair, and equitable asylum system that individuals fleeing harm be allowed to apply for in-country protection regardless of where they come from or how they reach United States territory. **Rather than focus tax-payer expenditures on how to block the largest number of individuals from meaningful access to the asylum process, DHS should apply funding to: bolster the number of asylum officers, provide more training for these asylum officers using materials developed in accordance with existing immigration laws, create processing times that allow for meaningful access to counsel during the application and adjudication process, increase the scale, pace, and geographic scope of refugee processing and resettlement, and work with non-governmental organizations to design and facilitate a detention-free immigration adjudication system.**

The proposed rule relies on numbers that do not tell the entire story of the situation at the U.S.-Mexico border. Rather than creating a measured, fair, and accessible asylum system consistent with U.S. international commitments and federal law, this proposed rule expands reliance on expedited removal—a harmful process that denies access to asylum to many individuals with bona fide claims. In doing so, the rule attempts to justify measuring the success of the U.S. asylum process by seeking to achieve a significant reduction in the number of individuals granted asylum, and attempts to reach this goal via arbitrary bureaucratic roadblocks irrelevant to the asylum seeker's actual circumstances. For example, this rule erroneously suggests that most

---

[1] Michael Capuano, Federation for American Immigration Reform (FAIR), *Embattled Biden Administration Finally Figures Out Asylum Can't Be a Free-for-All* (Dec. 5, 2022), https://www.fairus.org/blog/2022/12/05/embattled-biden-administration-finally-figures-out-asylum-cant-be-free-all.

CLP_PC_033169

people removed by U.S. border patrol entering via the U.S.-Mexico border have unmeritorious asylum claims. The proposed rule similarly claims that CBP One can serve as a safeguard to capture anyone who falls through the cracks and is incorrectly blocked from asylum. These assumptions are both dangerous and false: Even one person forcibly returned to their home countries who is later killed, tortured or persecuted again, is one too many. Moreover, as evidence below shows, limiting entry at the southern border to CBP One users is untenable because the system is open to fraud and abuse by the very same criminal organizations this rule purports to protect migrants from.

To offer just one example of the types of failures of the existing border system and dangers that will be exacerbated under the proposed rule, Las Americas worked with one young woman who was deported under an expedited removal order and later gang raped by the very attackers she told DHS about in her credible fear interview. She later returned to the United States and was granted withholding of removal. Had her claim been correctly reviewed and asylum afforded to her from the start, she would not have been subjected to such violence. In other words, the risk of wrongful exclusion from asylum access already exists, particularly within the expedited removal system; the proposed rule will increase that error many times over.

Assuming that it is an acceptable risk to return persons seeking protection to the places causing them harm ignores the United States' direct role in the dysfunction of the U.S.-Mexico Border. It is the continued use immigration as a political tool and the continued implementation of temporary, piece-meal immigration policies at fault for the bottleneck of asylum seekers seeking entry at our border, and not the fault of the migrants themselves. For example the creation of nationality-specific parole programs, the ongoing use of Title 42, the use of metering, and even the substantive changes to asylum law are all examples of how the United States continues to change the landscape at the U.S.-Mexico border in ways that exacerbate, rather than resolve, the challenges that exist in that region.

Separately, the proposed rule relies on incorrect assumptions about the merits of protection cases for individuals coming to the United States and seeking asylum. For example, we have one client, B., who married a U.S. Citizen after she passed a credible fear interview. As a result of her marriage, her removal proceedings were dismissed to afford her the opportunity to adjust status through her marriage. The fact of her dismissal from proceedings does not diminish her asylum eligibility, it merely means she had multiple pathways to safety available to her and the immigration court agreed that family reunification was a better alternative than continuing with asylum. This kind of use of discretion by immigration judges is a common example of alternate tools available to afford both (a) efficient use of government resources and (b) access to a pathway to safety for vulnerable populations. Alarmingly, the proposed rule incorrectly assumes the result in B.'s case is evidence that she entered the U.S. without a bona fide asylum claim and

therefore does not merit access to U.S. territory. **This is an egregious error on the part of the Biden Administration at best, and a willful misrepresentation of the facts at worst.**

**For these reasons, and as further expanded on below, Las Americas calls on the Administration to immediately reject these rules. Separately, we urge that — if the proposed rule does go forward — the timeline for a sunset be much, much shorter. A timeline closer to 90 days or six months would be sufficient to address any purported influx of applicants waiting at the U.S.-Mexico border for the end of Title 42.**

I.   <u>**Las Americas Immigrant Advocacy Center and its Interest in the Issues Presented by the Proposed Rule**</u>

Las Americas is a non-profit legal services organization based in El Paso, Texas. The organization and its staff are dedicated to serving the legal needs of vulnerable immigrants and other persons on the move, including refugees and asylum seekers. Our attorneys and staff commit every day to provide legal representation to those who otherwise would not be able to afford it and who otherwise would not be likely to access the pathways to safety they are seeking. After seeing firsthand the use of U.S. immigration policy to implement U.S. immigration law in the physical territory of Mexico, we also incorporated an arm of our organization in Ciudad Juarez, Mexico to reach those migrants and asylum seekers impacted by the Migrant Protection Protocols, Title 42, PACR/HARP, and other metering and ban-like policies.

Our mission is to provide immigration counseling and legal services to immigrants detained by the U.S. government in and around west Texas and New Mexico, including by representing individuals through their CFI and reasonable fear interview (RFI) process. We also assist them with accessing humanitarian parole via exceptions to the Title 42 process and access to CBP One, and we provide legal information presentations centered on clarifying the purpose and consequences of documents received upon crossing the border. We separately provide ongoing legal representation for individuals fighting deportation outside of detention, including those who are victims of crimes in the United States. To make this work successful, in Juarez our team has partnered with Consejo Estatal de Población (COESPO) — a regional branch of Mexican government —  to provide free legal education targeted at helping persons seeking humanitarian protection in their attempts to access the CBP One program and to provide direct assistance with particularly vulnerable individuals and families unable to navigate the application on their own, even after finding limited access to wifi networks in the city.

As a border city, the El Paso community's success is tied closely to federal immigration policy — we are intimately aware of the continuous push factors drawing vulnerable people to the U.S. border and the traumatic conditions they face as they brave the journey to our physical borders.

CLP_PC_033171

Despite this knowledge, and in fact because of it, we strongly oppose proposed rules that stand to limit access to protection for individuals who have fled dangerous persecution and torture in their home countries and who seek refuge in the United States.

## II.   The 30-Day Comment Period Provides Insufficient Time to Comment on the Rule

Las Americas agrees with the more than 170 organizations that submitted a letter requesting that the comment period be longer than 30 days.[2] "The human cost [of this rule] is beyond measure and demands the most careful research, analysis, and public consultation. It is highly inappropriate to afford the public a mere 30 days to comment on a proposal that violates domestic laws and international obligations on its face."[3]

These proposed changes require careful consideration and evaluation of their impact on people seeking asylum. Doing so further requires considering a range of possibilities that may arise under this proposed new system and how those possibilities might fluctuate from one administration to the next.[4] The timeframe for this NPRM does not afford us the time and opportunity to dedicate the resources and expertise needed for such careful review. Our failure to comment on every feature of this NPRM or to provide more concrete examples and supporting data is not a tacit endorsement; it simply means we lacked the resources to respond within the time allotted to every single issue we see ingrained in the language of the rule.

For example, with more time, Las Americas would have been able to provide additional specific examples of how the proposed rule is very likely to impact individuals with meritorious asylum claims who are wrongfully denied protection as a result of not having an attorney assist them with their credible and reasonable fear interviews or with their appeals of negative credible fear findings; we also would have been able to provide more details regarding the serious impact of utilizing CBP One as the sole means of accessing the border. With more time, Las Americas could also provide more information about negative fear findings and the consequences of

---

[2] *See* National Immigrant Justice Center, *172 Organizations Call for Extension on Public Comment Period For Proposed Asylum Ban* (Mar. 1, 2023),
https://immigrantjustice.org/staff/blog/172-organizations-call-extension-public-comment-period-proposed-asylum-ban.
[3] *Id.*
[4] This Rule proposes to "sunset" upon 24 months with the possibility of indefinite extension, making it more likely than not that this change would straddle the next Presidential term. Dep't of Homeland Security & Executive Office for Immigration Review, *Circumvention of Lawful Pathways*, 88 Fed. Reg. 11704, 11726, RIN 1125–AB26 (Feb. 23, 2023). Though Las Americas believes the rule should be rejected in its entirety, we separately urge that — if the proposed rule does go forward — the timeline for a sunset be much, much shorter. A timeline closer to 90 days or six months would be sufficient to address any purported influx of applicants waiting at the U.S.-Mexico border for the end of Title 42.

CLP_PC_033172

subsequent deportations. This information would further exemplify why the rule is inherently misguided and misinformed, and that its reliance on data without context is a flawed justification for doing away with due process measures designed to give vulnerable and traumatized persons a fair chance at seeking protection in the United States.

## III.     Requiring Refugees at the Southwest Border to Use CBP One Denies Asylum Access to the Most Vulnerable Refugees

The proposed Rule's reliance on the CBP One app is especially concerning to Las Americas. In the short time that the app has been in use for individuals who are asylum seekers seeking an exemption under Title 42, Las Americas has observed that its use results in discrimination against people of color, especially Black, Brown, and Indigenous people. It is also prohibitively difficult to use for people who have older or cheaper cell phones, and it forces longer wait times on families. The use of the app forces NGOs like Las Americas to spend resources helping people use the app rather than putting those resources toward assisting asylum seekers with CFI's, reviews of negative determinations, and representation in immigration court.

The proposed rule also relies on faulty assumptions about access to functional smartphones by people seeking asylum in the United States, citing the CBP One app's use with Venezuelan people seeking entry to the United States, and CBP encounters with migrants who have made it to the United States.[5] Specifically, the proposed rule incorrectly extrapolates that because most individuals who are encountered by CBP have a smartphone, they should be able to use the application. That is inaccurate. In Las Americas' experience many people lose or have their phones stolen en route to the United States, and for the ones who arrive at the border with it in their possession the phone often does not function at the level needed to use CBP One.[6] That is because the phones tend to have no service and access to reliable internet in the area is limited.

The Departments rely on these inaccurate assumptions to create an unworkable system. It requires people to wait outside the United States for an indeterminate amount of time until they are able to get the app to function properly. It alternatively requires that a person who was not able to use the app show by a "preponderance of the evidence that it was not possible to access or use the CBP One app due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle."[7] However, in our experience, people who are unable to use the app are also unlikely to be able to meet this burden of proof to show that they could not use the app.

---

[5] Circumvention of Lawful Pathways, 88 Fed. Reg. 11704, 11719 (Feb. 23, 2023).
[6] See, e.g., Raul Pinto, IMMIGRATION IMPACT, *CBP One Is Riddled With Flaws That Make the App Inaccessible to Many Asylum Seekers* (Feb. 28, 2023)
https://immigrationimpact.com/2023/02/28/cbp-one-app-flaws-asylum-seekers/.
[7] 88 Fed. Reg. at 11720.

CLP_PC_033173

Our organization's experience assisting individuals with the CBP One app over the last two months highlights its many shortcomings and should be analyzed by the Departments and weighed seriously against any perceived benefits of "reducing" the number of individuals seeking asylum at the U.S.-Mexico border. Ignoring reality on the ground will not lead to fruitful results.

Through our work with COESPO, we see about 100 people per day waiting in line for access to services that are available to migrants stranded on the Mexico side of the U.S. border. People are waiting for wifi-enabled safe spaces for families to use to try to register the application on their phones, loaner phones supporting the technology required by the app, information about the legal implications of using the application to make an appointment, information about the legal implications of entering the United States via a Title 42 exception, and individualized legal advice for families separated or otherwise stranded at the border.

In theory, the app should immediately show a scheduled date for the applicant to cross the border as soon as the applicant has registered. This is not the case: Appointments fill up early each day.[8] After registering, migrants have to go back into the app on a daily basis and keep checking every day until they can find an open appointment for them to cross the border.[9] LAIAC knows of migrants who have waited in Mexicali and Ciudad Juarez, Mexico, for weeks — sometimes months — trying to get an appointment. Sometimes, migrants who are able to travel between border cities can access appointments much faster.[10] This generates additional frustration and mistrust, leading migrants to rely on people who fraudulently charge money for appointments or who fill out the app with incorrect information, which can cause the applicants to face credibility issues down the line. Overall, even for technically savvy or educated migrants, the CBP One process comes across as arbitrary and confusing, which undermines trust in the integrity of the U.S. asylum system overall.

The system is even more obscure and difficult to access for particularly vulnerable migrants. First, because the app is available in English, Spanish, and Haitian Creole only,[11] it particularly inhibits speakers of indigenous languages, asylum seekers who only speak a little Spanish, or those who speak less common languages or dialects by requiring these individuals to spend many more hours with the app and in search of translation assistance. Even for applicants who speak Creole, they must first create an account through login.gov, which is only available in French,

---

[8] Jack Herrera, *Fleeing for Your Life? There's An App for That.*, Texas Monthly (Mar. 2, 2023) https://www.texasmonthly.com/news-politics/cbp-app-asylum-biden-administration/.

[9] Stephanie Leutert & Caitlyn Yates, Robert Strauss Center for International Security and Law, Asylum Processing at the U.S.-Mexico Border, 1-3 (Feb. 2023) https://www.strausscenter.org/publications/asylum-processing-at-the-u-s-mexico-border-february-2023/.

[10] *Id.* at 3.

[11] *Id.* at 2-3.

Spanish, and English. Once a login.gov account is created, the initial registration page for CBP One is only available in English, meaning that an applicant must agree to a long page of terms and conditions about the privacy of their information — *in English* — before they can get to the portions of the app that are translated. Most importantly, when entering information into the app, all answers must be in English. So even Spanish and Haitian Creole speakers need assistance filling in their answers to the app's forms.

Because it can take up to a week to find interpretation for the indigenous languages, it is difficult to access translation of the questions, and even more difficult to be able to translate responses to the questions. These questions and answers must be entered before applicants are able to request an appointment at a port of entry. Our staff has put many resources over the last two months toward helping people try to get appointments. Attorneys, caseworkers, and other aid workers conduct interviews with the people who speak indigenous or rare languages, using interpreters to gather the information the app requires. In our experience, the appointment slots are usually filled by 8:00 A.M., Mountain Time, each day. Because it takes more time to enter the information using interpreters, people who speak languages other than English, especially languages other than Spanish and Haitian Creole, find it very difficult to obtain an appointment using CBP One.

The use of the app to administer the Venezuelan parole program is not a good indicator of how it will work with people from countries that are not as wealthy or educated. In our experience, the Venezuelan population generally has better access to newer phones, thus enabling them to have easier access to appointments through CBP One. And many Venezuelan migrants had sufficient technological experience and expertise to be able to fill out the applications and navigate the app quickly without significant assistance. Venezuelan migrants are more likely to have a college degree and are often younger than immigrants from other countries.[12] In our experience, non-Venezuelan migrants require more assistance with the app, especially those who are older or less educated.

When looking at all of the migrants we have worked with, the CBP One app often requires cell phone capabilities that theirs don't have. Some brands of cell phones, such as Huawei, fail to load the app effectively, and for those who are able to load it, frequent and mandatory updates are often required. Many people do not have the required operating system or memory for the CBP One app to function properly on their phone. So when they try to register for an appointment through the app, the system kicks them out before they are able to complete the process. As mentioned above, by the time people have traveled all the way to the border, their cell phones are already very damaged (if not already stolen from them), and their touch screen

---

[12] Ari Hoffman & Jeanne Batalova, *Venezuelan Immigrants in the United States*, Migration Policy Inst. (Feb. 15, 2023) https://www.migrationpolicy.org/article/venezuelan-immigrants-united-states.

capability does not match what is necessary to answer the questionnaire in the app. As a result, it can be difficult to take, save, then upload the photograph of the traveler. Once a technical issue arises, individuals are forced to start the registration process all over again from the beginning.

Additionally, not all migrants have economic resources to pay for roaming data on their cell phone. It often falls to people assisting migrants to share data from their personal cell phones so that people can access the CBP One app. About two weeks ago, the Mexican government offices started sharing the internet so that migrants could access the app. But there are often capacity restrictions, and the wifi reception is not always accessible throughout this specific Mexican government building.

In our experience, the CBP One process is equally untenable for families, as well. First, the sign up process is cumbersome and time-consuming because each individual family member is required to submit their own application. Second, families often have trouble finding an appointment time before the slots fill up because their appointment cannot be scheduled unless there are enough slots for every member of the family available.  Because the appointments fill up in a matter of minutes, it is often impossible for a family to submit multiple applications fast enough. This results in families waiting in Mexico for longer periods, and puts them in danger of harm. For example, we worked with one family that had two disabled children. They were unable to stay in the shelter they had found and in the meantime, the CBP One appointments kept filling up before they could get an appointment. After some weeks, the family reported to LAIAC staff that they went directly to CBP to request that they be allowed to pursue asylum without the app. They were denied entry and told they had to use the app, which meant they ended up forced to wait longer in Mexico in unstable conditions without access to healthcare for their children. In another instance, a family of seven from Venezuela, traveling with a disabled father, has been attempting to access an appointment with CBP One for two months and as of March 27, 2023, are still waiting.

Las Americas' data shows that when put in this situation, most families have not been able to present and enter via CBP One because of how long it is taking to actually get an appointment. When we raised this issue with CBP earlier this month (March 2023), we were told this is not a technical issue or an error on the part of CBP, but rather evidence of fraudulent appointments created by criminal groups to lure information and funds from asylum seekers seeking entry to the United States. **In other words, though the government touts CBP One as a means of avoiding dangerous exploitation en route to the United States, it is well aware that the very app that it created to do so is creating yet another avenue for such exploitation.** When presented with this concerning pattern in March 2023, CBP did not offer any alternative methods for individuals subjected to fraud in Mexico to find relief other than to continue trying to get an appointment via the app.

CLP_PC_033176

In fact, it is nearly impossible for a family to predict how long they will need to wait for appointments through CBP One - we have seen some families wait more than four weeks once they are actually able to make it through to the end of the application and complete registration. However, the wait time overall is neither predictable or reliable. That uncertainty creates additional stress and difficulty. Some families have tried to speed up the process by registering with the app more than once. For example, they will create a family account and an individual account. Or they will send their children alone ahead of them.[13] Others will register just one member of the family and then be denied entry when they show up with their family members — Las Americas encountered at least one single mother traveling with her 12-year old son who was denied entry by CBP after she showed up to her appointment with the child, stating it was because she did not register her son with CBP One. This occurs despite the fact that all ports of entries are equipped and well-trained on running in-person processing of families and had done so without the use of CBP One up until January 2023.

Once families obtain appointments, they are not always guaranteed the ability to cross the border. We have heard from families who have been turned back from the border, even though they are on time for a valid appointment. In other circumstances, we have also come across people who are granted appointments at a different port of entry far from where they are physically located, despite the app's purported use of geolocational technology. As a result, these individuals are forced to risk travel within Mexico, leaving them exposed to dangerous highway routes where migrants face a significant risk of violence and extortion by gangs and cartels within Mexico. Mexican authorities do not consistently issue and renew temporary humanitarian visas (known in Mexico as "FMMs") to migrants, despite the fact that these visas are required to access bus and airline travel.

When encountering particularly vulnerable families impacted by CBP One, Las Americas has attempted to work with the El Paso port of entry authorities to find a solution, however these efforts have not proved successful. Officers at the port of entry in El Paso often refuse to exercise their discretion to grant port parole in a reasonable manner, even under the Title 42 policy. We have attempted to flag at least two separate cases to CBP Port authority via email in which we explained that there were exceptional circumstances interrupting our clients' access to CBP One. In one case, we raised that our client had been kidnapped in Juarez. In another case, our client had an infant living with a serious disability, and as a result, the app was unable to recognize the child's face. In both cases, CBP refused entry on the basis that DHS policy requires all access to

---

[13] This practice of sending children ahead represents another way in which the proposed rule exacerbates a problem that it is purporting to solve. The proposed rule exempts unaccompanied children from the presumptions against asylum access, but in doing so the Departments are asking families to make the impossible choice of deciding to enter together using the app, which will expose them to danger as they wait and might be impossible in the end, or sending children along alone so that they can access protection faster while parents struggle to navigate the app.

CLP_PC_033177

ports be done via the app. These are examples of the sorts of unreviewable (and erroneous) exercises of discretion that will become the norm for anyone trying to invoke an exception to the proposed rule's requirement to use CBP One.

The overall result is that large groups of people must wait in Mexico for extended periods of time, left in precarious positions and unable to plan ahead as to how long their wait will be and what resources they need. This wait will force them to rely on limited and often over-encumbered migrant spaces. Every person forced to wait in Mexico is faced with a risk of kidnapping, exploitation by criminal groups and government officials looking to exploit their desperation, as well as other issues caused by living in temporary conditions without security. And each day that a person waits puts them at further risk for kidnapping. Criminal elements in Mexico will kidnap people and hold them for ransom, draining already limited resources and putting lives in danger. Many of the conditions that led people to flee their homes are replicated at the border. Las Americas has observed domestic abuse victims being abused again, while waiting to be allowed to enter the United States. And some clients of Las Americas were robbed in broad daylight by Mexican police officers while they were in Juarez. Forcing people to wait before entering the United States only increases their vulnerability and the likelihood that they will face the same persecution from which they are fleeing.

The fact that the proposed rule seems to contemplate the use of the CBP One app earlier in an individual's migration journey, i.e. from locations other than the U.S.-Mexico border, will not alleviate the risk of violence that migrants face. For one thing, at least at the moment, the app seems to only function within Mexico. Even though the proposed rule seems to contemplate expanding access, successful use of the app would require a person to show up at a specified time and date at the border for their appointment, a task that would not be possible for someone making an appointment before completing their journey to the border. Further, even if such issues could be resolved, expecting people to use the CBP One app from locations other than the U.S. border means that when technical issues using the app inevitably arise, migrants will not have access to U.S.-based organizations like Las Americas to help them troubleshoot that process.

Additionally, we commonly see asylum seekers with health problems that make it even more untenable for them to wait in Mexico, particularly when they are forced to live in shelters, in camps, or on the street. All of these situations serve to exacerbate pre-existing conditions such as asthma, cerebral palsy, leukemia and other cancers, and other serious illnesses, including mental health concerns related to trauma experienced on the journey north. Access to medical care on the Mexican side of the border is limited for migrants. While community organizations help migrants access initial consultations with doctors, in most cases, these are general check-ups. When a referral to a specialist is necessary, access to that specialist is either cost-prohibitive, unavailable in the area, or not available to non-residents. In most situations, migrants are not

afforded access to the medicine they need. The wait times at the border make it more likely that people living with illnesses will run out of life-saving medications and be unable to access refills.

The CBP One app has consistently excluded many of the most vulnerable asylum seekers fleeing persecution, whom the United States has a legal obligation to protect. Migrants who do not speak one of the languages available on the app, migrants who are not cell phone savvy, do not have data or wifi sufficient to apply, who do not have smartphones, who may not read or write, who have to apply for an entire family, and who may have physical or mental health limitations are just some of the people that this rule will knowingly exclude. The Departments seek to propose a rule that "appropriately provides migrants a meaningful and realistic opportunity to seek protection" and yet if this rule goes into effect, it will only provide a small number of **certain** migrants that opportunity, and will *exclude* many others entirely from ever even initiating the asylum. The Departments will no doubt then measure the putative success of this program based on the number of people who do use the app, once again failing to account for those excluded from the process entirely, rather than measuring fair, sustainable, and equitable access and adjudication.

IV.    **Resurrecting Illegal Policies Used By the Last Administration to Ban Asylum Seekers will separate families and unfairly deny protection to meritorious asylum claims**

The proposed rule is a new iteration of similar asylum bans the Trump administration attempted to advance. Those bans, which similarly barred refugees from asylum protection based on manner of entry and transit, were repeatedly struck down by federal courts as unlawful.[14] The Trump administration's transit ban, which was in effect for a year before it was vacated, inflicted enormous damage including deportation of refugees to harm, separation of families, and prolonged detention. This proposed rule would similarly deny refugees access to asylum by blocking access to the system entirely for some and rapidly deporting others  without access to asylum hearings, resulting in the same horrific harms.

Despite the Biden administration's attempts to distinguish its proposed rule from the previous administration's, it would similarly operate as an asylum ban for refugees based on factors that do not relate to their fear of return and would result in asylum denials for all who are unable to establish that they qualify for the extremely limited exceptions. Its use in expedited removal will require asylum seekers — many of whom have suffered persecution and violence and underwent

---

[14] *See O.A. v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019) *appeal pending sub nom O.A. v. Biden*, No. 19-5272 (D.C. Cir.) (vacating prior rule); *East Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094, 1121 (N.D. Cal. 2018) *affirmed by East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640 (9th Cir. 2021) (enjoining rule); *see also Al Otro Lado, Inc. v. Mayorkas*, No. 17-CV-02366-BAS-KSC, 2021 WL 3931890, at *20 (S.D. Cal. Sept. 2, 2021) (enjoining the practice of metering for violating the due process rights of those subject to the policy).

CLP_PC_033179

a harrowing journey to reach safety — to prove that the rule does not apply to them in a credible fear interview shortly after arrival in the United States, while detained and with little to no access to counsel, likely without knowledge of how the rule works or what they need to prove.

Las Americas had multiple clients who were denied asylum because of the Trump administration's asylum bans. **Two of our clients were granted withholding of removal under the INA, with the IJ recognizing that they *could have been granted asylum* absent the Trump administration's asylum bans.** As a result, they had a higher burden of proof in establishing their need for protection, were limited to temporary protection (withholding can be withdrawn if a judge determines that conditions have changed in their country of origin), had no pathway to lawful permanent residency, and their family members were not able to follow-to-join them. After the Trump bans were enjoined by courts, we were able to file motions to reopen and obtain a grant of asylum with the IJ who had granted both of them withholding of removal. They were both ultimately granted asylum solely because the rules were no longer enforceable.

With legal representation, T. succeeded in proving by a preponderance of the evidence that he would be persecuted for his political opinion if returned to his native Cuba. In his grant of withholding of removal, the Immigration Judge stated that he would have granted asylum but for the policy in place by the prior administration. T.'s wife and daughter remain in Cuba and were denied the opportunity to follow-to-join because of this.

B., a Honduran woman, applied for asylum because she was persecuted in her native Honduras for being lesbian. She had no family or sponsor in the United States and would not have been able to apply through any parole program like the CHNV program. With legal representation, B. succeeded in proving by a preponderance of the evidence that she was persecuted by the general population and also not protected by the State on account of her sexual orientation. In his grant of withholding of removal, the Immigration Judge stated that he would have granted her asylum but for the policy in place denying access to asylum to those who entered the United States without inspection in order to ask for protection. B. did not feel safe in Mexico either on account of her sexual orientation, so she was unable to seek asylum there.

We believe we would be able to present more case examples similar to the above if given more time to respond to the proposed rule. The modest changes in between the Trump administration's transit ban and this proposed ban are not sufficient and, and the limit to withholding of removal will continue to cause significant harm to refugees and the organizations that serve them.

First, withholding removal comes with a removal order and allows the government to remove a person to a third country. Additionally, there is no pathway to citizenship, and recipients must apply annually for work authorization, an application that is subject to frequent delays in adjudication. These factors mean that even people like T. and B. who are able to win withholding

CLP_PC_033180

cases will face long-term limbo that is incompatible with the United States' obligations to allow refugees a path to permanence and resettlement in this country.

Second, withholding of removal causes family separation. In the ordinary course, a person who receives withholding of removal cannot petition for their family members to be considered as derivatives on their applications. And they likewise cannot travel abroad, even to a third country, to visit or reunite with family members. Though Las Americas welcomes the fact that the proposed rule contemplates an exception for family unity that would allow an immigration judge to essentially convert a grant of withholding into a grant of asylum to enable family unity, that exception will not ameliorate the problems associated with a limited grant of withholding. We and other organizations like us will still have to submit applications for would-be derivatives on an asylum case because the proposed rule's family unity exception would apply only at the end of proceedings. We would also have to expend resources continuing to help applicants who have withholding of removal to comply with supervision requirements that they might face and to apply annually for work authorization. And in states like Texas, where a valid work authorization is required for a driver's license, our clients would face ongoing perpetual harm from being relegated to withholding status and forced to live as second-class refugees.

And most fundamentally, requiring people to meet the higher standard that applies to withholding applications means that many people will be deported to persecution and torture because, even though they could have met the well-founded fear standard contemplated by law, they cannot satisfy the higher burden for demonstrating eligibility for withholding of removal.

## V.   The Proposed Rule Eviscerates Critical Safeguards in the Expedited Removal Process

In addition to imposing an asylum ban during the credible fear process, the proposed rule would eliminate critical safeguards for asylum seekers who receive negative credible fear determinations because they are barred under the rule. It would 1) deprive asylum seekers of the right to immigration court review of negative credible fear determinations where they do not affirmatively request review and 2) eliminate asylum seekers' ability to request USCIS reconsideration of negative credible fear determinations. These changes would apply to all asylum seekers banned under the rule and would accelerate their wrongful deportation to harm.

The proposed rule would change existing regulations to deny asylum seekers immigration court review of negative credible fear determinations if they do not affirmatively request review. This provision would apply to asylum seekers issued negative credible fear determinations due to the asylum ban. Immigration court review of negative credible fear determinations is a crucial safeguard guaranteed by statute; from Fiscal Years 2018 to 2021, for instance, over a quarter of negative credible fear determinations were reversed through immigration court review. In its

CLP_PC_033181

December 11, 2020, omnibus asylum rule known by advocates as the "death to asylum" rule, the Trump administration previously imposed a similar hurdle,[15] depriving asylum seekers of immigration court review of credible fear decisions where they did not affirmatively request it. The Biden administration rightly reversed this change in the May 31, 2022, interim final rule on asylum processing. There the agencies explained that "treating any refusal or failure to elect review as a request for IJ review, rather than as a declination of such review, is fairer and better accounts for the range of explanations for a noncitizen's failure to seek review." Despite the agencies' conclusion less than a year ago, they now seek to deprive asylum seekers of the right to immigration court review where they do not affirmatively request it. The proposed rule offers no reasoned justification for this abrupt about face.

Requiring asylum seekers to affirmatively request review of negative credible fear determinations creates an additional hurdle for asylum seekers, the vast majority of whom are unrepresented, while they navigate an already convoluted process that carries potentially deadly consequences of removal to persecution or torture. In a system that is most often confusing to an unrepresented migrant and serves to deny access to justice more times than it serves to afford protection, expecting migrants to understand that they have to "affirmatively" request judicial review is unreasonable and shows a concerted effort to reduce due process protections for asylum seekers. Due to language, education, time in custody, and other barriers, asylum seekers may not understand this requirement to affirmatively request immigration court review.

Las Americas has some examples of successful requests for reconsideration (RFRs) and IJ reviews, which demonstrate the absolute necessity of access to counsel and the importance of maintaining access to these safeguards. In our experience, non-English speaking individuals may not share enough information during CFIs for multiple reasons that have nothing to do with the merits of their cases. First, they often have no knowledge of how the U.S. asylum system works and what information they need to share to demonstrate their eligibility to be considered for asylum. Further, those who are fleeing countries where they were threatened by people in uniform often have trouble sharing personal information with people in uniform, like those who are conducting CFI's. This information would provide additional context to the data that the Rule relies on. For example, the lack of access to counsel and the procedural barriers already in place operate to deprive migrants of a legitimate opportunity to state their case. Contrary to the proposed rule's theory that RFRs are a waste of resources because so few are granted, the experiences of Las Americas' clients demonstrate that so few are granted because migrants

---

[15] Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 Fed. Reg. 80274 (proposed Dec. 11, 2020) https://www.federalregister.gov/documents/2020/12/11/2020-26875/procedures-for-asylum-and-withholding-of-removal-credible-fear-and-reasonable-fear-review.

CLP_PC_033182

cannot adequately state their fear in the initial interview nor can they access assistance with the appeal process.

Expedited removal denies migrants a meaningful opportunity to explain their fear of returning to their country of origin. Many migrants who flee persecution and violence are not aware of the exact requirements of U.S. asylum law and do not know that they have to state their fear immediately to a uniformed official in order to avoid being deported under expedited removal. At the CFI phase, very few people are prepared to tell their story or understand the consequences of the CFI process. Furthermore, there are plentiful procedural problems with how CFIs are conducted that prevent people with meritorious claims from telling their story. For example, in the Torrance County Detention Facility, CFIs are conducted over the phone in crowded, non-confidential spaces, where asylum seekers must risk their stories being used against them by other people in the detention center with them if they share everything in the interview.

Las Americas has seen countless situations where access to immigration court review was critical to saving our clients from unlawful removal. For example, Y. is a gay man from Senegal, a country that criminalizes same-sex sexual conduct. He was held in a private prison in the United States, was routinely shackled, and consistently felt very unsafe. Y. had spent his entire life working very hard to hide his sexual orientation from his family — and most importantly — from government officials. As a result, when Y. was asked about his fear of returning to Senegal by government officials while he was in jail, he did not feel safe disclosing his sexual orientation and fear of return. This reality is common for claims based on sexual-orientation based harm and other forms of sexual abuse.[16] He failed his credible fear interview. Las Americas met with him before he was removed, and, after multiple meetings with him, he finally felt safe disclosing the true reason he fled Senegal. Las Americas assisted him with requesting reconsideration of the denial. If not for Las Americas' legal representation and the time to compile and file the RFR, he would have returned to danger and persecution on account of his sexual orientation.

Another client, R. from Haiti, eventually received protection under the Convention Against Torture ("CAT") after initially receiving a negative credible fear finding. The asylum officer failed to consider country conditions that demonstrated people in R.'s situation are regularly detained and tortured upon deportation to Haiti. The IJ, as often occurs, deferred to the asylum officer's findings without meaningfully reviewing them. With his attorney's assistance, R. was able to file a RFR and have those initial decisions reversed. Without access to the RFR process, R. would likely be facing torturous conditions in Haiti today.

---

[16] *See, e.g.*, *Moab v. Gonzales*, 500 F. 3d 656 (7th Cir. 2007) (reluctance to disclose sexual orientation at CFI); *Paramasamy v. Ashcroft*, 295 F.3d 1047, 1052–53 (9th Cir. 2002) (failure to mention a sexual assault at a credible fear interview "cannot reasonably be characterized as an inconsistency").

CLP_PC_033183

It is just as important that people have access to IJ review without barriers like requiring an affirmative request. Las Americas sees CFI denials for complex legal reasons that our clients do not understand, and therefore, don't realize are erroneous. For example, S. was found not to have a credible fear based on the horrific domestic violence she experienced after the asylum officer failed to consider multiple plausible particular social groups ("PSGs"). The PSG analysis is often too complicated for a pro se individual to understand, and therefore, S. needed to have the assistance of a lawyer to even know that the officer had erred. Similarly, O. was originally denied credible fear after the asylum officer wrongly applied the reasonable fear standard. Because they had the assistance of Las Americas, O. and S. are now released from ICE custody and pursuing asylum. Without automatic review, it is not clear these clients would have gotten to have an IJ review at all.

The proposed rule also attempts to entirely eliminate asylum seekers' longstanding right to submit requests to USCIS to reconsider erroneous negative credible fear determinations if they are barred under the rule. This safeguard has, for decades, shielded many refugees from deportation to persecution and torture. According to data provided with the Asylum Processing Interim Final Rule establishing asylum merits interviews, between FY 2019 to FY 2021, USCIS reconsideration of erroneous negative credible fear determinations saved at least 569 asylum seekers from deportation to persecution or torture without an opportunity to apply for asylum.

In the Asylum Processing Interim Final Rule, the agencies imposed severe limitations on asylum seekers' ability to submit requests for reconsideration of negative credible fear determinations, setting an unworkable seven-day deadline for submitting a request for reconsideration (following immigration judge review, which must happen within seven days of the fear determination) and limiting asylum seekers to a single request. Advocates and attorneys have condemned these new restrictions, which have barred asylum seekers issued erroneous negative credible fear determinations from obtaining reconsideration due to draconian temporal and numerical restrictions.[17] UNHCR has opposed elimination of this safeguard and warned that it may increase the risk of refoulement.[18] Rather than fully restoring the right to request reconsideration, the agencies now seek to eliminate it completely for asylum seekers who are determined during their credible fear screenings to be banned under the proposed rule. This provision would prevent many asylum seekers wrongly found to be banned under the rule from subsequently presenting evidence to USCIS that they should have been exempted or qualified for an exception, which

---

[17] Rebecca Gendelman, Human Rights First, *Pretense of Protection: Biden Administration and Congress Should Avoid Exacerbating Expedited Removal Deficiencies* (Aug. 3, 2022) https://humanrightsfirst.org/library/pretense-of-protection-biden-administration-and-congress-should-avoid-exacerbating-expedited-removal-deficiencies/.

[18] *See* United Nations High Commissioner on Refugees (UNHCR), Comment on Proposed Rule on Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers (Oct. 20, 2021), https://www.regulations.gov/comment/USCIS-2021-0012-5192.

CLP_PC_033184

would especially harm unrepresented asylum seekers rushed through the credible fear process without any meaningful opportunity to present their claim.

In Las Americas' experience, RFRs — like the CFIs that precede them — are often denied for reasons that have nothing to do with the validity of the underlying protection claim. Low RFR grant rates are attributable to procedural barriers that serve to prevent adjudicators from even evaluating the merits of the applicant's fear of return. For example, one staff member at Las Americas submitted a RFR for a Haitian Creole speaker with a mental disability and a strong political asylum claim. The Houston Asylum Office denied the RFR without even considering the merits, because it was submitted over seven calendar days after the IJ affirmed the decision. This was a procedural denial, not a merits one. And creating further barriers based on procedural denials will only cause more meritorious claims to be denied unjustly.

Additionally, many asylum seekers falling under this rule will be denied access to asylum and will be subject to the higher standard of a reasonable fear interview. The statute requires that asylum claims be adjudicated at the CFI stage under a "significant possibility" standard.[19] The proposed rule elevates that standard by requiring applicants to actually establish, at their credible fear interview, that they *are* eligible for asylum. The Rule states that if the "asylum officer where to *find* that a noncitizen is ineligible for asylum" due to the bar, "a negative credible fear determination would be entered as to asylum."[20] The officer would *not*—as required by statute— assess the applicability of the eligibility bar and its exceptions under the significant possibility screening standard. Only "where the lawful pathways condition does not apply at all or the asylum officer determines that the noncitizen qualifies for an exception or has rebutted the presumption of its application" that "the asylum officer would apply the 'significant possibility' standard" to assess the remaining aspects of asylum eligibility.[21] This higher burden cannot stand.

Evidence readily available and already in the public record shows why the higher burden imposed by this rule will make it impermissibly challenging for applicants to prevail at a CFI. Most of these asylum seekers are *pro se*, with no legal representation or even access to a legal orientation. The arduous journey to the U.S. border often eliminates the possibility of providing documentary evidence at this preliminary stage – migrants we have worked with often report documents lost or stolen on their journey. Moreover, trauma as a result of past persecution and

---

[19] Circumvention of Lawful Pathways, 88 Fed. Reg. 11704, 11725 (Feb. 23, 2023) (referencing 8 U.S.C. § 1225(b)(1)(B)(v)).

[20] *Id.* at 11725, 11746 (emphasis added).

[21] *Id.* at 11746; *see also, e.g., id.* at 11752 (same for immigration judge review of negative credible fear determination).

CLP_PC_033185

the journey itself often interferes with memory and ability to explain their history.[22] Finally, use of detention prevents access to outside sources of evidence or support for their claims, including organizations like ours, access to friends and family, and access to medical professionals including therapists and psychologists. Yet, in spite of these challenges, the proposed rule proposes impermissibly heightening the standard for credible fear interviews.

***Historically, as the NPRM recognizes, Congressional intent has always been that there be few barriers to establish the right to seek asylum in the United States,*** hence why the CFI standard has required little from asylum seekers given the early stage of the asylum process.[23] Yet, despite recognizing Congress's intent, the proposed rule's effect is to subvert that intent and turn the credible fear process into the actual adjudication of the underlying asylum claim.

## VI.    The Proposed Rule Would Leave Refugee Families Separated, Deprive Refugees of a Path to Citizenship

Refugees banned from asylum protection under the rule would have to establish eligibility for withholding of removal or protection under CAT to obtain protection from deportation. As discussed above, those who are otherwise eligible for asylum but are unable to meet the higher threshold to establish eligibility for withholding of removal or CAT protection would be deported, while many granted these lesser forms of protection would be left in permanent limbo, separated from families, and under constant threat of deportation. Unlike asylum, these forms of relief do not confer permanent status or a path to citizenship, do not allow people to petition for their spouses and children, do not permit people to travel abroad, and leave people with a permanent removal order, subject to deportation at any time.

One Las Americas client who received withholding of removal, a young indigenous woman from Guatemala, is worried she will not ever see her parents again. Were she to travel to see them — even to a country other than Guatemala — she would be barred from returning to the United States for ten years and subject to summary removal if she returned. This family separation is a significant hardship for her and her parents.

As a result, many refugees like her who should be granted asylum under U.S. law will languish in the United States in legal limbo, indefinitely separated from spouses and/or children who

---

[22] Human Rights Watch, *Pretense of Protection: Biden Administration and Congress Should Avoid Exacerbating Expedited Removal Deficiencies*, 18-22 (Aug. 2022), https://humanrightsfirst.org/library/pretense-of-protection-biden-administration-and-congress-should-avoid-exacerbating-expedited-removal-deficiencies/ (citing further evidence of this proposition).
[23] *See, e.g.*, H.R. Rep. No. 104-469, pt. 1, at 158 (1995) (explaining that under the significant possibility standard imposed by Congress, "there should be no danger that [a noncitizen] with a genuine asylum claim will be returned to persecution").

CLP_PC_033186

remain abroad in danger. The Trump administration's transit ban similarly left many refugee families separated by barring refugees from asylum and leaving them with the inadequate protection of withholding of removal.

## Conclusion

The proposed rule is illegal, inhumane, and discriminatory. Like the Trump administration's entry and transit bans, this asylum ban will deport refugees to persecution and torture and separate families without ever having a chance to present their claim and request for protection. The proposed rule also requires asylum seekers at the border to use a discriminatory and deficient mobile app that is contingent on resources and ability to use smartphones, language skills, and an ability to wait indefinitely for an appointment slot, cutting off asylum access for many of the most vulnerable asylum seekers.

Las Americas Immigrant Advocacy Center calls on the administration to withdraw this rule in its entirety, stop punishing migrants arriving at the U.S. southern border, and instead allocate resources toward building more humane asylum processing and fair adjudications.

*On behalf of Las Americas Immigrant Advocacy Center:*

**Jennifer Babaie, Director of Advocacy and Legal Services**
*jenniferbabaie@las-americas.org*

***Heidi Cerneka**, Staff Attorney*
*heidicerneka@las-americas.org*



**AL OTRO LADO**

**March 27, 2023**

*Submitted via: https://www.regulations.gov*

Daniel Delgado
Acting Director, Border and Immigration Policy
Office of Strategy, Policy, and Plans
U.S. Department of Homeland Security

Lauren Alder Reid
Assistant Director
Office of Policy, EOIR
U.S. Department of Justice

**Re: Comment on the Proposed Rule by the Department of Homeland Security (DHS) and the Executive Office for Immigration Review (EOIR) on Circumvention of Lawful Pathways, 88 Fed. Reg. 11704 (February 23, 2023); DHS Docket No: USCIS 2022-0016; A.G. Order No. 5605-2023**

Al Otro Lado submits this comment in response to the proposed rule published in the Federal Register on February 23, 2023, which would prevent vulnerable individuals and families at the southern border from accessing the U.S. asylum system. Al Otro Lado calls on the Department of Homeland Security ("DHS") and the Executive Office for Immigration Review ("EOIR") to withdraw this proposed rule in its entirety.

The rule, if adopted, would violate both U.S. law and our obligations under international treaties, and would replicate one of our greatest moral failings as a nation. In 1938, the United States government turned away the MS St. Louis from the coast of Florida, refusing to let the ship filled with Jewish refugees find safety ashore. After being turned away by Cuba and Canada, the ship was forced to return to Europe, where one-third of

1



**AL OTRO LADO**

those passengers died in the Holocaust.[1] Their deaths were preventable, and the responsibility for those deaths lies with us, the United States. Today, we experience the tragedy of the MS St. Louis daily at our southern border, where asylum seekers are routinely turned away from the port-of-entry door in border cities and expelled back to danger border wide.

The proposed rule hearkens back to a time where we as a nation did not blink an eye in turning away thousands of individuals and families fleeing certain death, despite the fact that we have often said "never again." Rather than restoring and strengthening the U.S. asylum system as promised,[2] the Biden administration is instead proposing a return to previous unlawful policies including metering, the Trump administration's asylum transit ban and its attempt to restrict asylum applications to ports of entry. Aside from being illegal on its face, the proposed rule is discriminatory and raises significant due process concerns. It would have a disproportionately negative impact on Black, Brown and Indigenous asylum seekers from countries where no options exist to apply for a visa or parole to enter the United States by air, and who do not speak the languages offered on the CBP One app. It would also have a disparate impact on poor and medically vulnerable asylum seekers.

Al Otro Lado is a binational non-profit organization that provides holistic legal and humanitarian support to asylum seekers in the U.S. and Mexico through a multidisciplinary, client-centered, harm reduction-based practice. We provide direct, free legal services on both sides of the US-Mexico border and beyond, and engage in advocacy and impact litigation to challenge border policies and law enforcement practices that limit or violate the right to seek asylum. Through our work at the southern border, we have witnessed the devastating impacts of restrictive asylum policies like metering and the Trump asylum ban. Most recently, we have worked with hundreds of asylum seekers who have struggled to secure appointments using the CBP One app.

---

[1] Mike Lanchin, *SS St Louis: The ship of Jewish refugees nobody wanted*, BBC, (May 13, 2014) ("On 13 May 1939, more than 900 Jews fled Germany aboard a luxury cruise liner, the SS St Louis. They hoped to reach Cuba and then travel to the US - but were turned away in Havana and forced to return to Europe, where more than 250 were killed by the Nazis."), https://www.bbc.com/news/magazine-27373131.

[2] Exec. Order No. 14010, 86 Fed. Reg. 8267 (Feb. 5, 2021) ("[T]he United States will enhance lawful pathways for migration to this country and will restore and strengthen our own asylum system, which has been badly damaged by policies enacted over the last 4 years that contravened our values and caused needless human suffering.").

CLP_PC_033340



**AL OTRO LADO**

If implemented, this rule will cause significant harm to Al Otro Lado as an organization, as substantial resources will be diverted towards helping those affected by the policy to have a fair chance at exercising their legal right to apply for asylum.

As explained in further detail below, 1) because of new burdens the proposed rule places on asylum seekers, each case will require more resources, which will decrease the total number of cases Al Otro Lado can handle; 2) Al Otro Lado staff will spend significant time helping migrants navigate the CBP One app, time that would otherwise be spent supporting clients with applications for asylum and other forms of immigration relief; 3) many people will have to satisfy a higher standard to pass their credible fear interview ("CFI"), requiring additional time and resources; and 4) Al Otro Lado attorneys will need to file stand-alone requests for family members because the family unity exception is not assured.

We oppose the proposed rule for the following reasons:

I. **The proposed rule contradicts the letter and spirit of U.S. and international laws on the right to seek asylum.**

Under U.S. asylum law, a person may apply for asylum regardless of manner of entry into the country.[3] The proposed rule bars those who enter the U.S. between ports of entry from asylum eligibility, except in very narrow circumstances. Individuals who request asylum after entering the country between ports of entry are often those who find themselves in immediate danger and are most desperate to find safety. Shutting them out of the asylum system, with only very narrow exceptions, is cruel and unlawful.

The proposed rule also violates Article 31 of the 1951 Refugee Convention, which prohibits contracting states from imposing penalties on refugees based on their

---

[3] 8 U.S.C. 1158(a)(1) ("Any alien who is physically present in the United States or who arrives in the United States *whether or not at a designated port of arrival* and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum…" (emphasis added).

CLP_PC_033341



**AL OTRO LADO**

manner of entry into the country.[4] It is difficult to imagine a greater penalty than being barred from applying for asylum, which for many people is the only form of relief from deportation to a country where they risk serious harm or death.

The proposed rule further violates the UN Convention on the Rights of the Child, to which the U.S. is a signatory, and the International Convention on the Elimination of All Forms of Racial Discrimination ("ICERD") to which the United States is a party.

Article 22 of the Convention on the Rights of the Child provides that a child seeking refugee status or who is considered a refugee shall receive appropriate protection and humanitarian assistance. By limiting asylum eligibility for individuals who entered the United States between ports of entry, including children, the proposed rule fails to provide the protections and assistance required under this provision of the Convention, thus violating the rights of children seeking asylum. This is especially true in light of the fact that children traveling with their families have no choice in how they arrive at the border.

Further, the proposed rule may result in children being separated from their families, in violation of Article 9 of the Convention on the Rights of the Child, which requires that children not be separated from their parents against their will, except when competent authorities subject to judicial review determine, in accordance with applicable law and procedures, that such separation is necessary for the best interests of the child.

The proposed rule essentially presumes that individuals who enter the U.S. between ports of entry are ineligible for asylum, which disproportionately affects refugees who may be forced to irregularly enter the country due to dire circumstances and who come from predominantly non-white countries where few options exist to obtain visas to travel to the U.S. As such, the rule violates the principles of non-discrimination and equal treatment enshrined in the ICERD. The proposed rule violates Article 2, which requires states to condemn racial discrimination and take effective measures to prevent

---

[4] Convention relating to the Status of Refugees (189 U.N.T.S. 150, entered into force April 22, 1954). United Nations. 1951 ("The Contracting States shall not impose penalties, on account of their illegal entry or presence, on refugees who, coming directly from a territory where their life or freedom was threatened in the sense of article 1, enter or are present in their territory without authorization, provided they present themselves without delay to the authorities and show good cause for their illegal entry or presence.").

CLP_PC_033342



**AL OTRO LADO**

and eliminate it; and Article 5, which requires states to ensure the right to equal treatment before tribunals and all other organs administering justice. By limiting asylum eligibility based on the mode of entry into the United States, the proposed rule creates a distinction that disproportionately affects Black, Brown, and Indigenous individuals who may be seeking asylum due to their race, ethnicity, nationality, or membership in a particular social group. This means that these individuals will be denied access to legal remedies and protection, which undermines the right to equal treatment before the courts, as enshrined in Article 5 of the ICERD.

The rule will leave many people who would otherwise qualify for asylum with more limited forms of relief, such as withholding of removal and protection under the Convention Against Torture ("CAT"). Unlike asylum, withholding of removal and CAT protection do not offer a path to permanent residency and do not allow for family reunification. The proposed rule includes a narrow and insufficient exception to promote family unity. In cases where a principal applicant qualifies for withholding of removal and would be granted asylum but for the presumption in the proposed rule, and an accompanying spouse and/or children would not independently qualify for asylum or other relief from removal, the presumption will be rebutted as an "exceptionally compelling circumstance." This exception applies only to immediate family members who traveled to the U.S. with the principal applicant, and does nothing to help spouses and children who are left in dangerous situations in their home country.

Further, the proposed rule imposes a higher "reasonable possibility" standard at the credible fear stage rather than the lower "significant possibility" standard mandated by Congress.

A significant portion of Al Otro Lado's clients will be directly harmed by this rule. Asylum seekers who are forced to enter the country between ports of entry, usually due to dangerous conditions and lack of resources in Mexico, will find themselves presumptively barred from asylum despite meeting the refugee definition. The attorneys in our San Diego and Los Angeles offices will have the more difficult job of helping clients meet the higher evidentiary standards for withholding of removal and CAT. Organizational resources will be diverted toward creating reasonable fear preparation materials for the detained populations we serve in southern California.

CLP_PC_033343



**AL OTRO LADO**

II.   **Many people with meritorious asylum claims will be shut out of the asylum process despite having no meaningful way to access the lawful pathways[5] to the U.S. identified in the proposed rule.**

The proposed rule creates an overly burdensome "rebuttable presumption" that an asylum seeker is generally ineligible for asylum unless the person either 1) entered the U.S. through an established parole program; 2) presented at a port of entry at a pre-arranged appointment time scheduled through the CBP One app; or 3) applied for and was denied asylum in another country they traveled through prior to arriving in the U.S. For a large percentage of asylum seekers, meeting any one of these prerequisites is unrealistic, exceedingly difficult without the assistance of an attorney, or downright impossible.

   A.   **Most of the asylum seekers at the southern border are not eligible to enter the U.S. through one of the established humanitarian parole programs.**

Although the established humanitarian parole pathways for entering the U.S. by plane provide a means for some people fleeing their countries to avoid dangerous journeys across the Darien Gap, Central America, and Mexico, these programs are unfortunately unavailable to most of the population Al Otro Lado serves and to most of the asylum seekers arriving at the U.S.-Mexico border. A large percentage of Al Otro Lado's clients are from Honduras, Guatemala, El Salvador and Mexico,[6] and thus do not qualify for the currently available programs. Al Otro Lado also serves asylum seekers from African, Middle Eastern, and South Asian countries, who are also foreclosed from this process.[7]

In addition, these programs are inaccessible to many asylum seekers from Venezuela, Nicaragua, Haiti and Cuba, including people who cannot obtain passports or sponsors in the U.S. with sufficient funds to provide housing and ongoing support. Others may

---

[5] Presenting at the border is a lawful pathway under 8 U.S.C. § 1158 & 1225, as affirmed by the S.D. Cal. decision in *Al Otro Lado v. Mayorkas*.
[6] Since 2021, over 36,000 asylum seekers from Mexico and Central America filled out Al Otro Lado's online survey request for services.
[7] From 2022 to the present, Al Otro Lado has worked with asylum seekers from Afghanistan, Angola, Bangladesh, Burkina Faso, Cameroon, Côte d'Ivoire, Ethiopia, Ghana, Iran, Iraq, Mali, Nigeria, Syria, Togo, Turkey, and Yemen.

CLP_PC_033344



**AL OTRO LADO**

be unable to pay for airfare to the U.S. Even people who do have the requisite travel documents, sponsorship, and the economic ability to pay for a flight may be unable to wait long enough in their home countries to be approved. Many of our clients are forced to flee suddenly, often picking up and leaving immediately following a targeted attack.

Sara*[8], a young woman from Nicaragua, was forced to flee after being jailed and beaten for participating in student protests. She was unable to apply for a passport before escaping and eventually making it to the U.S.-Mexico border. Besides not having the time to apply and wait for a passport, refugees fleeing authoritarian regimes are often denied passports for political reasons or are too afraid to apply.  In the case of Nicaragua, Al Otro Lado has received multiple reports of people who were denied passports by the Nicaraguan government based on their political opinion. Political dissidents like Sara often fear engaging with members of their government when that government regularly targets and kills people like them. The parole program thus would have been unavailable to Sara, even though she is from one of the approved countries and is likely to ultimately prevail in her asylum case.

A family of seven from Nicaragua was also forced to flee the country's brutal dictatorship after repeated, targeted attacks. Both parents and one of the adult sons were abducted at different times by paramilitary forces and detained in inhumane conditions because of their political activities. The family members had to escape their country at different times, fearing for their lives and unsure if the others had survived. When the last son, Jonathan* finally made it out of Nicaragua, he had been in political prison for nearly two years. He fled with almost nothing, making his way alone through Central America and Mexico.

In Tijuana, he found a makeshift migrant camp without proper sanitation, surveilled by cartel members, and had no other option but to sleep on the street. There, he met another family from Nicaragua who had recently experienced beatings and a kidnapping in Mexico. Fearing for their lives and with no opportunity to seek asylum because of the Title 42 border closure, they entered the U.S. between ports of entry. An immigration judge has since granted Jonathan asylum, and he now lives with his family in California. Jonathan and his family members could not have waited for their

---

[8] All client names have been changed to retain their privacy, and all names used here are pseudonyms.

CLP_PC_033345



**AL OTRO LADO**

parole applications to be processed, even if they had had the requisite resources and connections in the U.S. If the proposed rule had been in effect when he entered the U.S., his manner of entry would have given rise to a presumption of ineligibility for asylum despite having a well-founded fear of persecution based on political opinion in Nicaragua.

### B. Requiring asylum seekers to use the CBP One app to preserve eligibility for asylum violates U.S. asylum law.

Under the proposed rule, asylum seekers will be required to download the CBP One application on their phones, register themselves and their families, and secure a timeslot when they will be permitted to present at port of entry in order to seek asylum. This requirement is an extension of the illegal metering system that was in place prior to Title 42, in which asylum seekers were forced to put their names on a list and wait for weeks, months, or indefinitely in dangerous border cities for the chance to present themselves to Customs and Border Protection ("CBP") and seek asylum. As with prior iterations of metering, asylum seekers using the CBP One app are often forced to wait for prolonged periods to secure an appointment. Many are unable to get an appointment at all due to lack of reliable internet, not having a new enough or the correct type of smartphone to meet the application's system operating requirements, unresolved technical errors within the app, language barriers, lack of literacy, visual disabilities, and certain medical conditions that make it impossible to take the live photo required by the app.

Although the proposed rule affords a nominal exception for people unable to use CBP One, the onus is on the asylum seeker to prove they were unable to access the app. It will be extremely difficult for the asylum seeker to meet this undue burden, especially for those who are illiterate, detained, linguistically isolated, and/or unrepresented by an attorney.

#### 1. CBP One excludes linguistically isolated asylum seekers

Since the CBP One app became the primary mechanism for asylum seekers to request entry into the U.S. in early 2023, our clients have encountered numerous barriers to

CLP_PC_033346



**AL OTRO LADO**

access. The app is currently available only in English, Spanish, and partially in Haitian Kreyol,[9] leaving out the many asylum speakers who are not fluent in those languages.

One such asylum seeker is an Ethiopian woman, Adina* who sought Al Otro Lado's services in Tijuana. She was forced to flee Ethiopia due to the civil war, where most of her family was killed and her village was destroyed. In her journey to try to find safety, she was sexually assaulted. Adina only speaks Amharic, making it impossible for her to use the CBP One app on her own. When she attempted to contact the CBP One help email address, the auto response was in English. When she managed to find assistance translating the app, she still received error messages when she tried to take her live photo on the app, a requirement for registering and scheduling appointments. It is also not possible for her to receive translation/interpretation assistance daily in search of an appointment.

Similarly, an Indigenous Triqui-speaking family from Mexico was unable to use CBP One due to illiteracy and language barriers. When the family approached CBP officers at the San Ysidro port of entry to seek asylum, they were turned away and ridiculed. They are currently staying at a crowded migrant shelter in a dangerous area of Tijuana without viable prospects for securing an appointment on the app.

In addition, Al Otro Lado staff have worked with Arabic, French, Farsi, Russian, Portuguese, Nahuatl, Garifuna, Miskito, Mixteco, Turkish, and Tzotzil speakers who have been unable to use CBP One due to language barriers.

## 2. Technical glitches cause indefinite delays for asylum seekers stuck in dangerous conditions.

Many of the families and individuals Al Otro Lado works with have been trying unsuccessfully for months to get an appointment through CBP One, instead receiving error messages at each attempt. Monica*, an asylum seeker from Honduras, tried dozens of times to schedule an appointment on CBP One, but received an error message in English saying that she was not in close proximity to the border, despite

---

[9] The CBP One application requires the creation of a Login.gov account before being able to request an appointment. The Login.gov site is not currently translated into Haitian Kreyol.

CLP_PC_033347



**AL OTRO LADO**

being in Piedras Negras, Mexico, a town that borders Eagle Pass, Texas. Having been the victim of acts of violence at the border, she is especially vulnerable in Mexico.

In late March 2023, dozens of asylum seekers residing in local migrant shelters here in Tijuana reported receiving the same error code, indicating they cannot proceed in the app unless they are close to the border, despite the fact that some of these same migrants are quite literally standing next to the border wall while trying to make their appointments through the CBP One system.

Jean*, a Haitian asylum seeker in his mid-50s has been trying for over one month to secure an appointment for himself and his family through CBP One. He had been working a low-paying job in Tijuana to make ends meet, but quit his job in order to be able to login to the app during the early morning hours each day when new appointment slots are published to the general public. Despite his best efforts, Jean has not been able to get an appointment and does not understand why he has been receiving error messages. A CBP email address purporting to offer support with CBP One exists, but the automated response is completely in English.

Carlos*, an Indigenous Garifuna-speaking asylum seeker from Honduras reported several technical difficulties using CBP One. First, he was locked out of the app after registering because he did not receive a code needed to re-enter. When he was finally able to login, the app froze. When he tried again, there were no available appointments. As a Black Indigenous migrant, Carlos has experienced racial discrimination at the border and is in a particularly precarious situation as he awaits an opportunity to apply for asylum in the United States.

An Iranian asylum seeker named Farhad* was unable to use the app after his smart phone was stolen. He was able to get an older used phone as a replacement, but that phone was too old and the operating system insufficient to support the app, even with the most recent updates.

The CBP One app has also caused issues for people who did manage to get appointments, but who were not able to present at the designated time. This problem has affected people who were kidnapped in Mexico or detained by Mexican immigration officials ("INM"), despite having a printout of the CBP One appointment

CLP_PC_033348



**AL OTRO LADO**

confirmation. These asylum seekers who missed their appointments due to reasons beyond their control found themselves locked out of the system or unable to obtain a new appointment.

In late March 2023, we also heard several reports of Venezuelans who had appointments confirmed on CBP One, went to the appointments, were interviewed by CBP, and were then returned to Mexico. They were provided with no information about how to appeal that decision, no way to proceed within the app, and no alternate means of requesting asylum.

Some of the most vulnerable asylum seekers, including those without access to smartphones, are at the greatest disadvantage. Among the groups of asylum seekers who do not have access to cell phones are the victims of domestic violence currently in hiding in Tijuana at one of the state's confidential women's shelter locations, where cellphones are not permitted in order to protect the security of all the women residents, most of whom are fleeing violent and powerful ex-partners, including members of the police, armed forces, and organized crime. Al Otro Lado has worked with various women at this shelter over the last 12 months, and under the current system of CBP One, the asylum process is completely closed off to them.

These are just a handful of examples of the dozens of tech-related complaints Al Otro Lado has received from asylum seekers attempting to navigate CBP One. The requirement that asylum seekers use CBP One puts people with the fewest resources and those without technological know-how at a disadvantage. While people with newer phones, who have good internet connections, and are tech savvy may be able to navigate the app, others are left out of the process entirely, unable to seek asylum and stuck in limbo. The Department of Homeland Security has also not created any type of comprehensive guide to assist users in navigating the app or in understanding how to address the technical errors they might receive.

### 3. The way spots fill up on CBP One disadvantages larger families and promotes family separation.

Each day the available appointment slots on CBP One are assigned on a first come, first served basis and are filled almost instantly. Because there are limited spots

CLP_PC_033349



**AL OTRO LADO**

available each day, families with more members are less likely to complete the process to secure an appointment before all spots are filled. As a result, many family groups have reported being denied an appointment each day simply because all spots have already been taken, despite their repeated attempts to access them in the morning as soon as the appointments go live. One Honduran family of four had been trying for six weeks without success and ultimately decided to try breaking into two groups, with one parent going with one child and the other parent going with the other child. Because getting an appointment through CBP One is so difficult and unpredictable, the family fears they could be separated for a long time if one group gets an appointment long before the other. They decided to separate though, because waiting much longer in such dangerous and resource-poor conditions at the border was untenable.

### 4. The live photo requirement discriminates against Black asylum seekers and people with disabilities.

Several asylum seekers have reported problems with the live photo requirement of the CBP One process to Al Otro Lado staff. A Cameroonian asylum seeker who fled her country's civil war tried multiple times to secure an appointment in CBP One for herself and her young daughter. The live photo feature of the app would not recognize her face, meaning that she could not continue with the process. A Haitian asylum seeker reported a similar issue for his 4-year-old daughter—the app would not recognize the child's face despite multiple attempts. This is an issue that Black migrants have been facing border wide.

In addition, the live photo requirement has been a huge barrier for asylum seekers with disabilities. Mayra*, a single mother of two young children from El Salvador, who is also blind and relies on her nine-year-old son to get around, has been unable to navigate the app, even with help from people at a migrant shelter. CBP One will not recognize her face because she is unable to open her eyes all the way, resulting from a chemical burn in her youth. Because of her disability, Mayra has been prevented from securing an appointment through the app and remains shut out of the U.S. asylum system. We have also received reports from the parents of children with autism being unable to sit still long enough to take a live photo that the app can recognize.

CLP_PC_033350



**AL OTRO LADO**

Al Otro Lado's staff have now spent countless hours trying to explain to people how to use CBP One and requesting exemptions for people unable to use the app. This is time that could otherwise be spent assisting clients with applications for work permits, asylum, and other forms of immigration relief. Instead, many of our team members are spending significant time helping people gain access to the U.S. asylum system at the most basic level, a process made unnecessarily difficult and frustrating through the required use of the CBP One app.

> **C. Applying for asylum in a third country and waiting for a denial is not a safe or realistic option for the vast majority of asylum seekers who ultimately arrive at the southern border.**

Under the proposed rule, asylum seekers are exempt from the presumption of asylum eligibility if they can demonstrate that they applied for and were denied asylum in a third country. This portion of the rule hearkens back to the Trump administration's previous asylum transit ban, which a federal court struck down in 2021. It is unfair and unrealistic to expect asylum seekers to seek refuge in areas that are often dangerous and lack meaningful protections for refugees. The primary countries that migrants pass through before reaching the southern border are almost universally refugee-producing countries themselves. They are rarely safe places for asylum seekers to stay and do not have robust asylum systems.[10]

Nearly all of Al Otro Lado's non-Mexican asylum seeking clients spent some time in Mexico or another third country before seeking asylum in the U.S. The majority report being victims of crimes in Mexico and/or other transit countries, most commonly assault, kidnapping, extortion and robbery.

---

[10] *See* The Center for Justice and International Law and American University, International Human Rights Law Clinic, *Asylum In Mesoamerica: Accessing International Protection In Mexico And Guatemala* (2021), p. 25: "In practice, refugees instead face rampant discrimination, violations of their rights, and mistreatment, including torture. Even with documentation, refugees are unable to receive the benefits they are entitled to by law. Mexican authorities ignore the documentation and refuse to acknowledge refugees' rights, both willfully and due to ignorance." (internal citations omitted). https://www.wcl.american.edu/academics/experientialedu/clinical/news/ihrlc-and-cejil-publish-report-asylum-in-mesoamerica/

CLP_PC_033351



**AL OTRO LADO**

In Mexico in particular, asylum seekers (both those seeking asylum in Mexico and those intending to seek asylum in the U.S.) face constant discrimination and danger. Al Otro Lado has spoken to dozens if not hundreds of asylum seekers who were denied access to healthcare in Mexico solely on the basis of nationality. It is common for public hospitals throughout Mexico to ask for proof of immigration status before agreeing to provide treatment.

In terms of dangers faced in Mexico, asylum seekers are frequent targets of exploitation both by organized criminal groups and by corrupt government officials. Al Otro Lado received reports of asylum seekers in Coahuila being picked up by state police who then threatened to turn them over to immigration officials for deportation if they refused to pay a bribe. Mexican police were found to have participated in a mass killing of 13 Guatemalan migrants in 2021. Last year there were multiple shootings and attacks at migrant shelters in Tijuana, causing migrant families to fear for their lives as they waited for a chance to apply for asylum in the U.S.

The U.S. State Department Travel Advisory for Mexico urges U.S. citizens not to travel to, or to reconsider travel to several Mexican border states due to crime and kidnapping. These warnings advise against travel to the Mexican states of Tamaulipas, Baja California, Chihuahua, and Sonora, where the border cities of Matamoros, Nuevo Laredo, Reynosa, Tijuana, Mexicali, Juarez, and Nogales are located. With this travel advisory in place for U.S. citizens, it is nonsensical to expect asylum seekers from other countries to find safety in Mexico.

The State Department's 2022 Trafficking in Persons Report identifies persons with mental and physical disabilities, asylum seekers, and LGBTQ+ individuals as among those most vulnerable to trafficking in Mexico. Yet despite these warnings from the State Department, these are the same cities and regions where the Department of Homeland Security would have asylum seekers wait. Many of these asylum seekers are women with children and LGBTQ+ persons—i.e. those who are most at risk of being assaulted, raped, kidnapped, and sold to human traffickers and/or murdered.

Targeted violence is far from limited to Mexico's border regions. One of Al Otro Lado's clients, Estefanía*, fled Honduras after being persecuted because of her LGBTQ+ identity. She and her family were subjected to violence soon after arriving in Mexico

14

CLP_PC_033352



**AL OTRO LADO**

when cartel members kidnapped and held them for six days. During that time the family was blindfolded, forced to strip naked, and kept without food or water. Estefanía was the victim of a brutal rape when one of the cartel members found her LGBTQ+ flag and stated that he wanted to "teach her to be straight." Unfortunately, stories like this are all too common among migrants traveling in Mexico.

Al Otro Lado's clients have also reported being targeted in other countries before arriving in Mexico. One Nicaraguan asylum seeker initially fled to Honduras where she started a new life and found a partner. She and her partner were forced to flee, however, after witnessing a murder by gang members, and being threatened with death.

Another client from Honduras, Ofelia*, was deported to Guatemala with her young daughters under the Trump administration's 2019 agreement with Guatemala. Guatemalan immigration officers told the family they had three options: receive assistance to return to Honduras, undergo a two-year process to seek asylum, or leave Guatemala within seventy-two hours. Returning to Honduras was not an option for Ofelia because powerful cartel members were actively pursuing her. She also knew that Guatemala would not provide a safe haven because of its proximity to Honduras and its own drug and gang crisis. Ofelia's fears about the dangers in Guatemala are well-documented. Human Rights Watch has reported rampant human rights violations in Guatemala, as well as a slow and dysfunctional asylum system. Applying for asylum in Guatemala is simply not a viable option for most migrants in the region.

Our staff hear first-hand accounts of violence inflicted on migrants in Mexico and other transit countries on a daily basis. Given what we know about the reality of the conditions and risks for asylum seekers in these countries, we strongly oppose this proposed revival of the Trump transit ban.

One of Al Otro Lado's clients remains negatively affected by the Trump asylum ban. Liliana* is a survivor of repeated rape, imprisonment, sexual assault, threats of death and physical assault by gang members and law enforcement. She arrived at the San Ysidro port of entry to seek asylum in April 2019. Liliana was subjected to metering and remained in Mexico while waiting for the opportunity to seek asylum until her number was finally called in August 2019. She was taken into custody and detained at the

CLP_PC_033353



**AL OTRO LADO**

Adelanto Detention Center. The immigration judge ("IJ") granted withholding of removal and stated that, had she not been subject to the 8 C.F.R. § 208.13(c)(4) "Third Country Transit Bar," she would have been granted asylum because she had established past persecution on account of a protected ground and has a well-founded fear of future persecution. Liliana did not, however, apply for asylum in a third country.

She appealed the denial of asylum in her case, which has been pending since December 2019. Without asylee status and its attendant benefits, she has been unable to obtain stable work authorization or a path to lawful permanent residence. The delay has caused her to suffer instability and prevented her from making long-term plans for her life. We fear that the proposed rule will leave many more people with meritorious asylum claims with the lesser protections of withholding of removal and CAT. Still worse, some people with valid asylum claims will be deported because they fail to meet the higher evidentiary standards required to receive a grant of withholding of removal or CAT protection.

### III. The presumption of asylum ineligibility can be rebutted only in narrow and extreme circumstances.

The proposed rule outlines three extreme situations that would allow an asylum applicant to rebut the presumption of asylum ineligibility. First, the presumption can be rebutted if the applicant or an immediate family member experienced an acute medical emergency. Second, the applicant can overcome the presumption if they can show that they were the victim of a severe form of human trafficking. Third, if the applicant can prove there was imminent risk to life or safety at the border, they may also rebut the presumption. Finally, there is a carveout for other "exceptionally compelling circumstances." These overly narrow and vague provisions are woefully insufficient to provide a fair opportunity to seek asylum in the United States for those who were unable to meet one of the exceptions to the proposed rule.

The burden is on the asylum seeker to show by a "preponderance of the evidence" that one of these circumstances applies, a very difficult feat, especially for someone in immigration detention and/or a *pro se* applicant. People who have medical emergencies may not be able to obtain medical records or may have those records lost or stolen. Victims of trafficking may lack corroborating evidence to the satisfaction of

CLP_PC_033354



**AL OTRO LADO**

an IJ or asylum officer ("AO"). Even if medical records are available, IJs and AOs are not medical professionals and cannot be expected to decide what constitutes an acute medical emergency.

Over the last two years, Al Otro Lado has worked with hundreds of asylum seekers border wide who applied for Title 42 exemptions based on urgent medical conditions and imminent risk in Mexico. CBP denied many of these requests without explanation. Among those denied were an HIV+ Haitian man living in a tent camp, a child with severe cerebral palsy and developmental delays, a ten-year-old boy whose leg was amputated following a motor vehicle accident, and a family that was being actively and publicly pursued by cartel members. All had extensive documentation of their conditions, including hospital records, photos, and letters from trained medical professionals. In these cases and many, many others, DHS officers determined that the circumstances were not exigent enough to warrant an exemption to Title 42 and an opportunity to seek asylum. We are very concerned that, should the proposed rule go into effect, asylum will be foreclosed to individuals who are forced to cross the border between ports of entry for similar reasons and without other viable options.

In March 2023, Al Otro Lado submitted a request to CBP for a sick child with severe autism who was experiencing seizures and persistent vomiting to have a Title 42 exemption appointment outside of the CBP One process. The child's mother has been unable to secure an appointment through CBP One. Originally from Honduras, the family does not qualify for any of the established parole programs. They are unhoused and getting more and more desperate to find safety and access to medical care. If a family like this, having exhausted other options, enters the U.S. between ports of entry, they may be found ineligible for asylum despite their desperate need for protection.

### IV.     The rule will result in prolonged and permanent family separation.

With many victims of persecution suddenly ineligible for asylum because of the proposed rule, there will likely be an increase in people granted withholding of removal, who otherwise would have qualified for asylum. People with withholding of removal are not permitted to petition for immediate relatives abroad. This lack of options for family reunification means that spouses and children will be left in dangerous conditions in their countries of origin, as the family unity exception to the proposed rule does not

17



**AL OTRO LADO**

apply to family members outside the United States. A parent who is forced to flee alone and ultimately finds safety in the U.S. may be permanently separated from their children and spouse in their home country simply because they have withholding of removal rather than asylum.

A Cameroonian man named Peter* was granted withholding of removal at a Louisiana detention center in 2019 but was denied asylum because he did not apply for asylum in any of the countries he passed through before arriving in the U.S. As a result, he has been unable to bring his wife and young son to join him. This expanded withholding/CAT-only posture will lead to more families being separated indefinitely.

**V.    The rule will strip away critical due process protections for asylum seekers.**

Under the proposed rule, the administration seeks to eliminate two important safeguards during the credible fear process: 1) automatic IJ review of negative credible fear determinations and 2) an asylum seeker's right to submit a request for reconsideration ("RFR") with the asylum office after an IJ has affirmed a negative credible fear determination. If the rule goes into effect, asylum seekers will have to affirmatively request IJ review and will no longer have the opportunity to ask for review from USCIS. Removing these safeguards will inevitably result in an increase in deportations to countries where asylum seekers have a credible fear of return.

The Departments now contend that requiring an affirmative request for IJ review provides sufficient fairness for migrants subject to the rule, a striking reversal of the administration's previous position. In May 2022, the Biden administration rescinded a similar Trump-era regulation requiring asylum seekers to affirmatively request IJ review, noting that: "treating any refusal or failure to elect review as a request for IJ review, rather than as a declination of such review, is fairer and better accounts for the range of explanations for a noncitizen's failure to seek review." The administration's conclusion last year demonstrates a better understanding of the realities facing asylum seekers in the complicated and confusing credible fear process. The return to the Trump-era approach will harm some of the most vulnerable asylum seekers, including those who are illiterate, linguistically isolated, or suffering the ongoing effects of trauma.

CLP_PC_033356



**AL OTRO LADO**

Al Otro Lado staff have advised hundreds of detained individuals about their rights during the credible fear process. From this experience, we have seen firsthand how difficult it can be for detained individuals to understand their rights. In one case, Manuela* an Indigenous asylum seeker from Guatemala believed she had received a positive credible fear determination when the asylum officer had in fact given her a negative one. The result had been explained to her in Spanish, not her first or preferred language. Because Manuela mistakenly believed that she had a positive credible fear determination, she would have not known to request IJ review. An IJ later vacated the asylum officer's decision, giving Manuela the opportunity to apply for asylum. Without automatic IJ review, this linguistically isolated asylum seeker almost certainly would have been deported.

In addition to IJ review, RFRs are an important due process protection to prevent wrongful deportation in cases where an asylum officer and an IJ erroneously make a negative credible fear determination. According to data provided in the proposed rule, RFRs resulted in 569 reversals of negative credible fear determinations between FY 2019 and FY 2021. Although the administration contends that this is a small number in relation to the total number of RFRs submitted to USCIS, it is highly significant. Five-hundred-sixty-nine people were saved from deportation to a country where there is a significant possibility they would face serious harm or death. For those individuals and their families, the RFR process provided a necessary lifeline against *refoulement*.

Al Otro Lado attorneys have submitted RFRs for clients facing deportation to countries governed by oppressive regimes including Iran, Cuba and gang-controlled Honduras. Tania*, an asylum seeker from Honduras was made partially deaf in a terrorist bombing and had difficulty hearing the judge and translator during IJ review. The IJ affirmed a negative credible fear determination despite evidence that she had been persecuted in Honduras because of her work for a political party. USCIS found her to have a credible fear of return to Honduras when the agency reconsidered her case. Without the RFR process, Tania would have been wrongfully deported to a country where she faced persecution.

VI.    **Temporary work visas are not a substitute for asylum.**

CLP_PC_033357



**AL OTRO LADO**

In outlining justifications for the proposed rule, DHS and EOIR reiterate the Biden administration's goal of creating more legal pathways for migrants to arrive in the U.S. without making dangerous journeys across land borders. One means of achieving that goal is an increase in H-2 temporary work visas for Central Americans. Although the guest worker program can offer benefits to workers and their families, it is no substitute for asylum.

Asylum seekers are often forced to flee at a moment's notice, in direct response to a violent event, or to a credible threat of violence. An asylum seeker in immediate danger may not realistically be able to wait for a visa to be approved in their home country. The guest worker visa process is slow, often taking several months, precious time that an asylum seeker in immediate danger does not have.

Further, the temporary work visas are only available to able-bodied individuals who have the strength and stamina to work long hours, often in grueling conditions. They offer no relief to people with disabilities or certain medical conditions, but who are nevertheless in need of protection from harm in their home countries. Protection from persecution should not hinge on the physical strength of the applicant, and indeed it is often those with the least strength and physical ability to protect themselves who are in the most need of protection from persecution.

Moreover, asylum offers a permanent, rather than a temporary solution. An asylum grantee can apply for work authorization and family reunification, and has an immediate path to permanent residency. Given the protracted nature of the violence that often leads to displacement from Central America, asylees may not be able to safely return to their home countries for years, if ever. Guest workers, in contrast, may only stay in the U.S. temporarily and have no option to apply for permanent residency or bring family members. Thus, while creating additional lawful pathways for Central Americans to come to the U.S. is laudable, the expansion of the guest worker program is not an excuse for taking a hatchet to the asylum system.

## VII.   Conclusion

If implemented, the proposed rule will result in death—that is what happens when you deport tens of thousands of refugees back to the countries from which they fled,

CLP_PC_033358



**AL OTRO LADO**

places where they faced daily persecution and lived under constant threat. This rule will also leave thousands of refugees in the U.S. without stable protections. It unfairly discriminates against Black, Brown and Indigenous asylum seekers and disadvantages some of the poorest and most medically vulnerable migrants. Moreover, the proposed rule is merely an attempt to circumvent the government's legal obligation to process asylum seekers at a port of entry. The government's bad faith attempts to evade accountability have once again created a situation where civil society organizations, such as Al Otro Lado, must divert finite resources to ensure that asylum seekers have some semblance of access to the US asylum system. For these reasons, Al Otro Lado strongly opposes the proposed rule and urges the Departments to fully withdraw it.

21

# ASYLUM IN MESOAMERICA

## ACCESSING INTERNATIONAL PROTECTION IN MEXICO AND GUATEMALA







CLP_PC_033392

I. Introduction

II. Availability of International Protection in Mexico
    A. Overview of the Mexico Legal System for International Protection
        1. Legal Framework
        2. Applying for Refugee Status
        3. Detention
        4. Protection-Seeker Rights and Implementation Inadequacies
            a. Confidentiality, Documentation, and Access to Legal
              Representation
            b. Family Unity and Access to Benefits, Education,
              and Employment
    B. Systemic Barriers to Asylum and Refugee Status
        1. Limited application of the Cartagena Declaration
        2. Backlog of Cases before the COMAR
        3. Additional Barriers for Child Protection-Seekers
        4. Discrimination in Access to Rights
        5. Restrictions on Residence and Movement
        6. Violence and Torture Against Protection-Seekers, Human
            Rights Activists, and Journalists
    C. Conclusion

III. Availability of International Protection in Guatemala
    A. Overview of the Guatemalan System for International Protection
        1. Applicable Legal Framework
        2. Procedures for Accessing Refugee Status
    B. Refugee and Protection-Seeker Rights: Assessing Barriers
      to International Protection
        1. Access to Refugee Application Process
        2. Right to Identity Documents and Right to Travel
        3. Right to Work and to Non-discrimination
        4. Confidentiality, Access to Counsel, and Interpretation
        5. Temporary Care and Shelter, Detention, and Non-Refoulement
        6. Right to Education and Family Reunification
        7. Deterioration of the Rule of Law
    C. Conclusion

IV. Overall Conclusions

2

## About the Authors

**The Center for Justice and International Law (CEJIL)** is an international non-governmental organization specialized in the use of international human rights law. CEJIL along with partner organizations, represents victims of human rights violations in the Americas, and takes cases to the Inter-American Commission and the Inter-American Court of Human Rights so that damages can be repaired and policy or legal reforms can be carried out so these violations do not occur again. CEJIL meets, discuss, generates and shares information in order to raise awareness about endemic human rights problems and finds solutions, with the goal of fostering the creation of public policies that respect human rights throughout the region.

**The International Human Rights Law Clinic ("IHRLC")** is one of twelve law clinics within the Clinical Program at the American University, Washington College of Law. IHRLC offers student attorneys the opportunity to represent non-U.S. citizens and organizations working to defend the human rights of non-U.S. citizens in a broad range of settings, including regional and international bodies, U.S. federal and state courts, and immigration court. The collaboration with the co-author in producing this report exemplifies IHRLC's commitment to giving students the opportunity to represent non-U.S. citizens and non-profit organizations working to defend the human rights of foreign nationals in the U.S. and abroad.

## Acknowledgements

This report is a collaborative effort of CEJIL and IHRLC. The following IHRLC students contributed substantially to this report: Lucia Canton, Raymond Navarro, Juliana Carvajal Yepes, Andrew Johnson, Amanda Grau, Jaclyn Lahr, Lauren LaVare, and Alexis Rossetti. Professors Anita Sinha, Director of the IHRLC, Anne Schaufele, IHRLC Practitioner-in-Residence, and Lindsay M. Harris, Visiting Professor with the IHRLC in Fall 2020, supervised these students and along with Gabriela Oviedo-Perhavec and Kavita Kapur, staff of CEJIL, who made significant contributions to this report.

The team adapted to the unprecedented challenges of COVID-19 to bring this research to the public at a critical time. We hope that this report is a resource to those who seek to understand the asylum systems of Mexico and Guatemala, and use it to lend support to migrants in need of protection.

# I. Introduction

The Asylum in Mesoamerica Report ("Report") is a dynamic resource that investigates the practical availability of international protection to refugees and protection-seekers in Mexico and Guatemala. It outlines the legal framework for asylum in both countries[1] to show the current reality of accessing international protection including the law itself, barriers to access, and day-to-day experiences of individuals within these systems. The importance of understanding these realities has increased exponentially due to rapidly evolving migration policies and ongoing humanitarian crises. This Report adds context to the existing knowledge of the asylum frameworks in Mexico and Guatemala by presenting the current legal framework in each country in conjunction with the actual experiences of protection seekers and stakeholders.

In 1951, the Convention Relating to the Status of Refugees (hereinafter the 1951 Convention) established international protection for any person:

"who, owing to well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country."[2]

Although the application of the 1951 Convention was expanded through the adoption of the 1967 Protocol, the original definition has remained the same.[3] The 1951 Convention and subsequent 1967 Protocol codified norms around the protection of those escaping persecution. It created the international legal framework that signatories must follow to enact domestic laws that comply with the minimum protection guaranteed to non-citizen persons seeking protection within their borders.

Regional initiatives in the Americas complemented these international legal developments to respond to the specific refugee flows in the region.[4] In the Americas, by 1984 a majority of states adopted the Cartagena Declaration.[5] The Cartagena Declaration expanded the 1951 Convention definition of a refugee:

---

[1] While the concept of asylum can be broadly defined, in this Report we use the term  to refer to the granting of international protection to refugees. In that sense, "asylum systems" refers to the sets of procedures established in order to process claims for international protection. For a detailed discussion of asylum, see the Institution of Asylum, and its Recognition as a Human Right under the Inter-American System of Protection. Advisory Opinion OC-25/18, Inter-Am. Ct. H.R. (ser. A.) No. 25, May 30, 2018.

[2] Convention Relating to the Status of Refugees, July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 150 [hereinafter Refugee Convention].

[3] Id.

[4] See e.g., Organization of American States, American Convention on Human Rights, Nov. 22, 1969, O.A.S.T.S. No. 36, 1144 U.N.T.S. 123, https://www.cidh.oas.org/basicos/english/basic3.american%20convention.htm.

[5] Cartagena Declaration on Refugees, Refugee Legal Aid Information, https://www.refugeelegalaidinformation.org/cartagena-declaration-refugees

CLP_PC_033395

"...refugees persons [are those] who have fled their country because their lives, safety or freedom have been threatened by generalized violence, foreign aggression, internal conflicts, massive violation of human rights or other circumstances which have seriously disturbed public order."[6]

The Inter-American system has developed jurisprudence on state obligations to protection seekers under both the 1951 Convention and the Cartagena Declaration. For example, the "right to seek and receive asylum" has been interpreted by the Inter-American Court of Human Rights to require states to recognize refugee status defined by the United Nations instruments, like the 1951 Convention, and asylum as set out by regional conventions.[7] The Court understands the right to asylum extends to all persons that fall within the Cartagena Declaration's expanded definition.[8]

There are an estimated 26 million refugees globally.[9] The profile of migrants accessing asylum systems in the Americas continues to change, partly due to an adaptation of new migration policies across the globe.[10] Mexico's proximity to Honduras, El Salvador, and Guatemala, commonly referred to as the "Northern Triangle," makes it an increasingly critical country of asylum for persons fleeing violence.[11] The new Administration in the United States is making changes at its U.S.-Mexico border, including revoking regional agreements that have impacted migration flows in the region.[12]

The Guatemalan asylum system has become increasingly important given the changing regional cooperative agreements and anticipated change in migration flows. Compared to Mexico, there is a relative lack of information on effectiveness of Guatemala's asylum system as a whole. The changing migration flows in and through Guatemala are exposing new details about its capacity to process asylum claims.

---

[6]Compare Cartagena Declaration on Refugees, Colloquium on the International Protection of Refugees in Central America, Mexico and Panama, Nov. 22, 1984 [hereinafter Cartagena Declaration],  with

Refugee Convention, supra note 2. See also, Marissa Esthimer, Protecting the Forcibly Displaced: Latin America's Evolving Refugee and Asylum Framework, Migration Policy Institute (Jan. 14, 2016), https://www.migrationpolicy.org/article/protecting-forcibly-displaced-latin-america-evolving-refugee-and-asylum-framework.

[7]The Institution of Asylum, and its Recognition as a Human Right under the Inter-American System of Protection, supra note 1, para. 132.

[8]Id.

[9]Amnesty Int'l, Refugees, Asylum-seekers and Migrants, https://www.amnesty.org/en/what-we-do/refugees-asylum-seekers-and-migrants/.

[10]Caitlyn Yates, As More Migrants from Africa and Asia Arrive in Latin America, Governments Seek Orderly and Controlled Pathways, Migration Policy Institute (Oct. 22, 2019), https://www.migrationpolicy.org/article/extracontinental-migrants-latin-america.

[11]Helen Kerwin, The Mexican Asylum System in Regional Context, 33 Md. J. Int'l L. 290, 291-292 (2018), https://digitalcommons.law.umaryland.edu/mjil/vol33/iss1/13; see also, UN High Commissioner for Refugees (UNHCR), Children on the Run: Unaccompanied Children Leaving Central America and Mexico and the need for International Protection  (Mar. 13 2014), https://www.unhcr.org/en-us/about-us/background/56fc266f4/children-on-the-run-full-.

[12]Exec. Order No. 14010: Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border, 86 Fed. Reg. 8,267 (Feb. 2, 2021), http://www.gpo.gov/fdsys/browse/collection.action?collectionCode=FR

CLP_PC_033396

The COVID-19 global pandemic has heightened the already high risks protection seekers face. The Inter-American Commission on Human Rights ("Commission" or "IACHR") raised concerns early on in the pandemic about the state responses to the public health crisis disproportionately effecting migrants and protection seekers, especially in conjunction with the Trump administration's highly restrictive Migrant Protection Protocols (MPP, or the "Remain in Mexico" policy).[13] In its adopted measures for human rights during the pandemic, the Commission flags that all responses to the pandemic must conform with general principles of international law and the Inter-American human rights standards.[14] State responses to the pandemic have created new barriers to protection-seekers. In many cases, state responses have created new or more onerous barriers with dire consequences for protection seekers.[15]

In this context, the asylum systems in Mexico and Guatemala have become increasingly critical to the rest of the region. In early 2019, the U.S. implemented the MPP, which required protection-seekers to wait for the adjudication of their U.S. asylum claims while physically in Mexico.[16] MPP has been criticized as a violation of the international refugee protection framework.[17] Protection-seekers also contend with Safe Third Country Agreements (ACAs).[18] For example, the ACA signed between the U.S. and Guatemala allowed the U.S. to transfer protection seekers arriving at the U.S. border to Guatemala to seek asylum there instead.[19]

In light of all of these changes, this Report closely examines the Mexican and Guatemalan asylum systems. Our objective is to provide a holistic overview of the asylum systems each of these states.  Part II of this Report discusses the availability of international protection in Mexico. It also walks through the legal process for protection seekers and details the human rights abuses that result from deficiencies in the Mexican system. Part II describes the conditions in prolonged detention and the rights protection-seekers are promised, but are often denied, in the Mexican system. Lastly, it reviews the

---

[13]Press Release, Inter-Am. Comm'n H.R. (IACHR). The IACHR urges States to protect the human rights of migrants, refugees and displaced persons in the face of the COVID-19 pandemic (Apr. 17, 2020), http://www.oas.org/en/iachr/media_center/PReleases/2020/077.asp.
[14]Inter-Am. Comm'n H.R Res. 1/2020. (Apr. 10, 2020), https://www.oas.org/en/iachr/decisions/pdf/Resolution-1-20-en.pdf
[15]Marcia Vera Espinoza, Gisela P. Zapata, Luciana Gandini, Mobility in Immobility: Latin American Migrants Trapped Amid COVID-19, Open Democracy (May 26, 2020), https://www.opendemocracy.net/en/democraciaabierta/mobility-immobility-latin-american-migrants-trapped-amid-covid-19/.
[16]Press Release, U.S. Dep't of Homeland Sec., Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration (Dec. 20, 2018), https://www.dhs.gov/news/2018/12/20/secretary-nielsen-announces-historic-action-confront-illegal-immigration;  See also, Vanessa Ceceña, Service Committee , Dismantling Asylum: A Year Into the Migrant Protection Protocols, American Friends, 23-24 (Jan. 2020), https://www.afsc.org/sites/default/files/documents/MPP_Final_Jan2020-300hi.pdf.
[17]See, e.g., Press Release, Am. Civil Liberties Union (ACLU), Groups File Lawsuit Against Trump Policy that Forces the Return of Asylum Seekers to Mexico (Feb. 14, 2019), https://www.aclu.org/press-releases/groups-file-lawsuit-against-trump-policy-forces-return-asylum-seekers-mexico; see also, Press Release, UNHCR, UNHCR Deeply Concerned About New U.S. Asylum Restrictions, (July 15, 2019), https://www.unhcr.org/news/press/2019/7/5d2cdf114/unhcr-deeply-concerned-new-asylum-restrictions.html.
[18]Susan Gzesh, "Safe Third Country" Agreements with Mexico and Guatemala Would Be Unlawful, Just Security (July 15, 2019), https://www.justsecurity.org/64918/safe-third-country-agreements-with-mexico-and-guatemala-would-be-unlawful/.
[19]Agreement Between the United States of America and the Government of the Republic of Guatemala on Cooperation Regarding the Examination of Protection Claims, Guat.-U.S., at July 26, 2019, T.I.A.S. 19-1115.; see, e.g., U.S. Dep't of Homeland Sec., Fact Sheet: DHS Agreements with Guatemala, Honduras, and El Salvador, (Oct. 28, 2019), https://www.dhs.gov/sites/default/files/publications/19_1028_opa_factsheet-northern-central-america-agreements_v2.pdf

CLP_PC_033397

systemic barriers protection-seekers face in Mexico when applying for refugee status and  resident status. Part III  addresses the same topics as in Part II, but in the context of the Guatemalan system.. Finally, Part IV offers summary conclusions on the overall availability of internationalprotection in Mexico and Guatemala, and offers recommendations to strengthen the asylum systems in both countries.

This Report's methodology combines research with qualitative data. To contextualize the legal frameworks for protection-seekers in Mexico and Guatemala, the research teams conducted interviews with persons who have either applied for and or been granted asylum, or who attempted to seek asylum, in the two countries. The teams also interviewed experts,  both government or non-governmental organization (NGO) staff who work with protection seekers.  Originally, the interviews in Guatemala were to take place as part of a fieldwork study., COVID-19 made fieldwork not feasible, and the research teams pivoted to conducted interviews virtually, identifying interviewees through referrals from CEJIL's contacts.  Some of the interviewees' identities have been altered for their protection.

## II. Availability of International Protection in Mexico

Mexico has a detailed legal asylum framework on paper, but various practical issues hinder protection-seekers' ability to access the rights granted by the law. As of the publication of this Report, Mexico continues to struggle to improve access to asylum within its borders. The reality in Mexico shows that the legal framework struggles to support the changing flows of protection-seekers and refugees. The state's response to the COVID-19 pandemic has decreased the processing capacity of asylum claims and closed migrant shelters, contributing to protection seekers as frequent targets of violent crime and extortion.[20] On the ground, incidents of racism and xenophobia against migrants has risen to affect almost half of the migrant population.[21] The population of protection seekers in Mexico includes those who are attempting to enter the U.S. to seek asylum but have been returned to their countries of origin or forced to remain in Mexico.

Section A describes in detail the Mexican international protection system, the rights afforded to protection seekers, the inconsistencies and gaps in implementation, and

[20]Laura Gottesdiener & Lizbeth Diaz, In Mexico, Shuttered Shelters Hit Migrants As Pandemic Rages, Reuters, (Jan. 4, 2021), https://www.reuters.com/article/us-usa-immigration-mexico-coronavirus/in-mexico-shuttered-shelters-hit-migrants-as-pandemic-rages-idUSKBN2991CX
[21]Trends in the Impact of COVID-19 on Refugees and Migrants in Guatemala and Mexico, Mixed Migration Centre (Feb. 2021), https://mixedmigration.org/wp-content/uploads/2021/02/161_trends_impact_COVID-19_Guatemala_Mexico.pdf.

CLP_PC_033398

the harm protection seekers experience as a result. Section B describes systemic barriers to asylum or refugee status in Mexico, and the ramifications experienced by protection-seekers. Section C draws overall conclusions based on Mexico's failure to adequately implement its own international protection system.

## A. Overview of the Mexican System for International Protection

Beginning in 1984, the Mexican government and the United Nations High Commissioner for Refugees(UNHCR,or ACNUR by its Spanish acronym) have worked together to meet the needs of refugees.[22] The UNHCR has been involved with Mexico's asylum system in various capacities over the years, but most recently it supported Mexico's participation in the Comprehensive Refugee Response Framework (CRRF, orMIRPS by its Spanish acronym).[23] Mexico's participation in these initiatives helped develop its current legal framework. In 2000, Mexico acceded to the 1951 Convention and the 1967 Protocol, with certain reservations and an interpretive declaration.[24] Currently, Mexico's reservations to Articles 17 (2) (a-c)[25], 26 and 31.2[26] of the 1951 Convention remain in effect.[27]

Similarly, the interpretive declaration with respect to both Article 1 of 1951 Convention and Article 1 of the 1967 Protocol remains in effect today.[28] Beginning in 2011, the Mexican government announced constitutional reforms that Mexican officials said, "represent[ed] the broadest expansion of rights since the adoption of the current Constitution."[29] According to the Inter-American Commission on Human Rights, these reforms operated to "rais[e] to the constitutional level all human rights norms contained in treaties signed by the Mexican State."[30]

---

[22]Global Report 2000 Mexico, UNHCR , 439 (June 30, 2000).

[23]UNHCR, MIRPS: Comprehensive Regional Protection and Solutions Framework (2017), https://www.acnur.org/5b50db084.pdf; see also, Rachel Schmidtke, A New Way Forward: Strengthening the Protection Landscape in Mexico, Refugees International (Nov. 12, 2020), https://www.refugeesinternational.org/reports/2020/11/9/a-new-way-forward-strengthening-the-protection-landscape-in-mexico? (noting that UNHCR primarily supports COMAR through the MIRPS initiative).

[24]UNHCR, Submission by the United Nations High Commissioner for Refugees for the Office of the High Commissioner for Human Rights' Compilation Report - Universal Periodic Review: 3rd Cycle, 31st Session Mexico (July, 2018), https://www.ohchr.org/EN/HRBodies/UPR/Pages/UPRMXUNContributionsS31.aspx.

[25]Refugee Convention, supra note 2, Reservations (reservation against the automatic extension of work permit obligations to refugees meeting either 17 (2) (a), 17 (2) (b) or, 17 (2) (c)).

[26]Id. (Reserving the right to assign, in contemplation of its National legislation, the residence of refugees within its territory and to establish the condition for moving within that territory).

[27]See also, UNHCR, Mexico Withdraws Reservations to Refugee and Stateless Conventions (Feb. 11, 2014), https://www.unhcr.org/en-us/news/briefing/2014/2/52fa05e79/mexico-withdraws-reservations-refugee-statelessness-conventions.html (commending the withdrawal of Mexico's original reservations to article 32 of the Refugee Convention and article 31 of the 1954 Convention Relating to the Status of Stateless Persons).

[28]Refugee Convention, supra note 2, Reservations ("It will always be the task of the Government of Mexico to determine and grant, in accordance with its legal provisions in force, refugee status, without prejudice to the definition of a refugee provided for under article 1 of the Convention and article 1 of its Protocol.").

[29]Inter-Am. Comm'sn H.R. The Human Rights Situation in Mexico. OEA/Ser.L/V/II, Doc. 44/15. Dec. 31, 2015, para.75.

[30]Id.

CLP_PC_033399

There are two agencies who implement the country's international protection framework: the National Institute of Migration (Instituto Nacional de Migración, or INM), and the Mexican Commission for Refugees, als (Comisión Mexicana de Ayuda a Refugiados, or COMAR). The INM is the federal body responsible for border operations migration documents and flows, both regular and irregular.[31] COMAR is responsible for the processing of applications requesting recognition of refugee status.[32]

COMAR has offices in the following cities: Mexico City, Acayucan, Tenosique, Tapachula, Monterrey, Palenque, and Tijuana.[33] The INM has an additional 32 offices, one in every state, across the country.[34] Adiscussion of these agencies and the barriers to access is detailed later in this report.



Author: Comisión Mexicana de Ayuda a Refugiados

The following sections provide an overview of the asylum system in Mexico, including the legal framework, the procedures and processes for accessing asylum, and potential obstacles or gaps in accessing asylum protection.

[31]Amnesty Int'l., Mexico: Overlooked, Underprotected: Mexico's Deadly Refoulement of Central Americans Seeking Asylum (Jan. 23, 2018), https://www.refworld.org/docid/5a69e3c34.html.
[32]Schmidtke, supra note 23.
[33]UNHCR, COMAR Contact,https://help.unhcr.org/mexico/en/where-to-seek-help/contacta-a-la-comar/
[34]Schmidtke, supra note 23;  see also, Instituto Nacional de Migración [INM], Horario y Oficinas del INM, Gobierno de México (Jan. 6, 2019) (Mex.), https://www.gob.mx/inm/acciones-y-programas/horario-y-oficinas-del-inm;

CLP_PC_033400

## 1. Legal Framework

The Mexican Constitution guarantees the right to seek and receive asylum.[35] It specifies that the recognition of refugee status shall be conducted in accordance with international treaties while statutes regulate its application and exceptions.[36] The Migration Act (Ley de Migración), adopted in 2011 and amended in 2020, is the operational foundation of Mexico's current asylum system.[37] The 2011 Law on Refugees, Complementary Protection and Political Asylum (hereinafter "2011 Migration Act") is the main source of domestic law which provides for international protection.[38]

The 2011 Migration Act was modified by a series of amendments in 2014[39] and in 2020, and together with its accompanying regulations, it now contains specific criteria and norms that govern access to international protection.[40] The 2014 General Law on the Rights of Children and Adolescents establishes additional guarantees related to the principle of non-refoulement, protections for the best interests of children, and due process in migration-related procedures.[41]

The 2011 Migratory Act's Article 13 establishes three categories of eligibility for refugee status:

(1) those who, having a well-founded fear of persecution based on race, religion, nationality, gender, membership in a particular social group or political opinions, are outside of their country of nationality (or in the case of stateless persons, of their country of habitual residence) and cannot, or due to said fears, are unwilling to avail themselves of the protection of that country;[42]

---

[35] Constitución Política de los Estados Unidos Mexicanos, CPEUM, Diario Oficial de la Federación [DOF] 05-02-1917, últimas reformas DOF 28-05-2021, art. 11, para. 2, (Mex.), http://www.diputados.gob.mx/LeyesBiblio/pdf_mov/Constitucion_Politica.pdf.
[36] Id.
[37] Ley de Migración [Migratory Act], Diario Oficial de la Federación [DOF] 25-05-2011, art. 6-15 (Mex.), f, http://www.diputados.gob.mx/LeyesBiblio/ref/lmigra/LMigra_orig_25may11.pdf, translated in Federal Official Gazette, Secretaria de Gobernación ( May 25, 2011), https://www.albany.edu/~rk289758/documents/Ley_de_Migracion_en_Ingles.pdf; Decreto por el que se Reforma el Artículo 93 de la Ley de Migración [Reform of article 93 of the Immigration Law, Diario Oficial de la Federación [DOF] 13-04-2020 (Mex.), https://www.dof.gob.mx/nota_detalle.php?codigo=5591525&fecha=13/04/2020..
[38] Ley Sobre Refugiados, Protección Complementaria y Asilo Político [Law on Refugees, Complementary Protection and Political Asylum], Diario Oficial de la Federación [DOF] 27-10-2011, última reforma publicada DOF 30-10-2014 (Mex.), https://www.gob.mx/cms/uploads/attachment/file/211049/08_Ley_sobre_Refugiados__Protecci_n_Complementaria_y_Asilo_Pol_tico.pdf translated in Global Regulation, Law on Refugees, Complementary Protection and Political Asylum (Oct. 30, 2014), https://www.global-regulation.com/translation/mexico/560381/law-on-refugees%252c-complementary-protection-and-political-asylum.html
[39] Id.
[40] Id.
[41] Ley General de los Derechos de Niñas, Niños, y Adolescentes [LGDNNA] [General Law of the Rights of Children and Youth], Diario Oficial de la Federación [DOF] 04-12-2014, última reforma publicada DOF 20-06-2018, https://perma.cc/BLR4-6PX3; see also, United Nations Children's Fund (UNICEF), Annual Report 2014, https://www.unicef.org/about/annualreport/files/Mexico_Annual_Report_2014.pdf (noting UNICEF worked with Mexican officials to ensure the law complied with international standards).
[42] Law on Refugees, Complementary Protection and Political Asylum art. 13 (Mex.); see also, Reglamento de la Ley Sobre Refugiados y Protección Complementaria [Regulations of the Law on Refugees, Complementary Protection and Political Asylum] art. 4. I-VI, Diario Oficial de la Federación [DOF] 21-02-2012 (Mex.) http://www.diputados.gob.mx/LeyesBiblio/regley/Reg_LRPC.pdf

CLP_PC_033401

(2) those who have fled from their country of origin because their lives, security or liberty have been threatened by generalized violence, foreign aggression, internal conflict, massive violation of human rights, or other circumstances which have seriously disturbed public order;[43]

(3) those who, due to circumstances that have arisen in their country of origin, or activities in which they have participated, during their time in Mexican territory, have a well-founded fear of persecution on account of race, religion, nationality, gender, membership in a particular social group or political opinion, or whose life, security or liberty could be threatened by generalized violence, foreign aggression, internal conflicts, massive violation of human rights or other circumstances which have seriously disturbed public order.[44]

Article 13 incorporates the international law definition of refugee into Mexico's domestic law[45] It separately specifies the availability of protection for refugees sur place, those who have become refugees after arriving in Mexico, and simultaneously expands the bases for eligibility beyond the 1951 Refugee Convention.[46] For example, Article 13 adds gender as an independent basis for seeking asylum.[47] This provision also incorporates the Cartagena Declaration's expanded definition of a refugee, converting it into a binding domestic legal obligation in Mexico.[48]

The regulations  implementing asylum access clarify which forms of persecution may give rise to an asylum claim in Mexico.[49] Primarily, a well-founded fear of persecution must be based on acts or facts that constitute violations of fundamental human rights, whether because of their nature or their recurrence.[50] They may include but are not limited to:

1.  Acts of physical or psychological violence, sexual violence;

---

[43]Id.

[44]Id.

[45]Kerwin, supra note 11, at 293-294; see also, UNHCR, UNHCR Welcomes New Refugee Law in Mexico, January 28, 2011, https://www.unhcr.org/en-us/news/briefing/2011/1/4d42bdf19/unhcr-welcomes-new-refugee-law-mexico.html. (affirming that the 2011 Law on Refugees, Complementary Protection, and Political Asylum is compliant with international standards).

[46]Law on Refugees, Complementary Protection and Political Asylum, art. 13 (Mex.); see also, UNHCR, Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of refugee, para. 94-96, HCR/IP/4/ENG/REV.1., https://www.unhcr.org/4d93528a9.pdf  (defining sur place refugee claims).

[47]Compare Law on Refugees, Complementary Protection and Political Asylum, art. 13 (III) (Mex.), (including gender as a basis for supporting persecution claims), with, Refugee Convention, supra note 2, art. 1(2) (defining only race, religion, nationality, membership of a particular social group or political opinion as the bases for persecution claims).

[48]Law on Refugees, Complementary Protection and Political Asylum, art. 13 (III) (Mex.), (adopting expanded definition seen in Cartagena Declaration); see also, Kerwin, supra note 11, at 294-295. (noting there is no legal difference between refugees recognized under the 1951 Convention and the Cartegna Declaration).

[49]Regulations of the Law on Refugees, Complementary Protection and Political Asylum, art. 6 (Mex.).

[50]Id. art. 5.

CLP_PC_033402

2. Legislative, administrative, or judicial measures that have either an apparent or practical discriminatory effect;

3. Being prosecuted or penalized in a disproportionate or seriously discriminatory manner;

4. Denial of judicial protection that creates unduly severe or highly discriminatory penalties; or

5. A series of concurrent measures that constitute persecution.[51]

The regulations do not require the facts forming the basis for an application for protection be based on the applicant's personal experiences.[52] As one example, beginning in 2016, COMAR began to use the Cartagena Declaration's "massive violations of human rights" subsection as the basis for recognition of Venezuelan refugee claims.[53]

The 2011 Migratory Act differentiates between the granting of refugee status, governed by Article 13,[54] and political asylum, regulated by other provisions of that same law.[55] Political asylum in this instance refers to:

Protection granted by the Mexican State to a foreigner who it considers is persecuted for political motives or crimes, or for common crimes that are connected to political motives, whose life, liberty, or security is in danger. The protection may be requested by diplomatic or territorial channels.[56]

As a result, in Mexican law and practice, the term "asylum" refers to this concept of political asylum, defined in Article 2 (I) of the 2011 Migratory Act, and is not used to refer to those who seek or acquire protection as refugees, which is defined in Article 13 (I-III) of the same law.[57]

Article 15 of the same law establishes the Ministry of the Interior (Secretaría de Gobernación) as the governing body over applications for refugee status.[58] It requires that the Ministry seeks the opinion of the Ministry of External Relations in all cases prior to making the final refugee status determination.[59]

---

[51] Id. art. 6.
[52] Id. art. 5.
[53] Kerwin, supra note 11, at 295.
[54] Law on Refugees, Complementary Protection and Political Asylum art. 13 (I-III) (Mex.).
[55] Id. art. 2 (I).
[56] Id.; see also, Centro por la Justicia y el Derecho Internacional (CEJIL). 1.Ficha Técnica Sobre El Derecho a Buscar y Recibir Asilo, https://www.cejil.org/sites/default/files/ficha1.pdf    https://acnur.org/fileadmin/Documentos/BDL/2017/11216.pdf   (explaining   that   "asylum" previously was only used to reference political or diplomatic asylum whereas political refugee referred to the the protection granted to a person within the State's territory).
[57] Law on Refugees, Complementary Protection and Political Asylum art. 2 (I) (Mex.).; id. art. 13 (I-III).
[58] Id. art. 15.
[59] Id. art.15 (1).

CLP_PC_033403

Article 16 governs the granting of a separate category of international protection known as "complementary protection."[60] Complementary protection is granted when the definition laid out in Article 28 is met:

Those who do not enter within the categories established in Article 13 [refugee status], but who require protection in order to avoid being returned to the territory of another country where their life is in danger or where there are well-founded reasons to believe that they would be in danger of being submitted to torture or other cruel, inhuman or degrading treatment or punishment.[61]

A person who is granted refugee status or complementary protection becomes a permanent resident in Mexico.[62] In the cases of both refugee status and complementary protection, Mexican law places certain limits based on the underlying basis of protection. Specifically, persons who are seeking refugee status are barred from the protection if they have:

1.  Committed crimes against peace, genocide, crimes against humanity or war crimes, as defined in international law;

2. Committed a serious crime outside of Mexico, before entering the country; or

3. Those who have committed acts contrary to the purposes and principles of the United Nations are barred from accessing these protected statuses.[63]

Along similar lines, a person who has already been granted complementary protection can only have that protection withdrawn in two cases:

1.  In cases where the individual conceals or falsifies information provided; or

2. If the circumstances which motivates the grant of complementary protection disappear.[64]

The law also contains various scenarios that terminate refugee status.[65] The same provisions obligate refugees and beneficiaries of complementary protection to inform the Ministry of the Interior of any intent to return to their country of origin.[66]

---

[60]Id. art. 16 (1-IV).
[61]Id. art. 28.
[62]Id. art. 48.
[63]Id. art. 27.
[64]Id. art. 32.
[65]Id. art. 51.
[66]Id. art. 51.

17

Among these scenarios, Article 33 of the 2011 Migratory Law terminates refugee status when changed circumstances in the country of origin defeat the previously established element of fear to return to one's country of origin.[67] Even in the case of changed circumstances, the applicant can overcome the withdrawal procedure by demonstrating they should maintain their protected status based on the gravity of the past persecution or because they can reestablish a well-founded fear of persecution despite the changed circumstances.[68]

If a refugee commits any crimes or acts while residing in Mexico that would bar their access to the protected status upon entry, their status may be rescinded.[69] With respect to recission, the Mexican authorities may annul a decision to recognize an individual as a refugee where there is reliable evidence that the applicant hid or falsified information in their initial application and where if the falsified information had been known at the time of adjudication, it would have led to the denial of that application.[70]

Mexican law also provides for suspension of these protected statuses in cases where an individual leaves the country. If the beneficiary of either refugee protection or complementary protection leaves Mexico and seeks asylum or similar status in another country, the Mexican authorities may suspend their protected status in Mexico.[71]

Notably, Mexican law guarantees refugee protection to those recognized as refugees by another country but who were unable to enjoy effective protection in that country.[72] If an individual, recognized as a refugee by another country, enters Mexico irregularly, the Mexican authorities must conduct an analysis of whether or not that person had access to effective protection in the country that recognized them as a refugee.[73] If the Mexican authorities determine there was effective protection available, that refugee would be ordered to depart Mexico but has the right to appeal that decision within fifteen days.[74]

---

[67] Id. art. 33 (I).
[68] Id. art. 33.
[69] Id. art. 34.
[70] Id. art. 35.
[71] Id. art. 35.
[72] Id. art. 46.
[73] Id. art. 46.
[74] Id. art. 47.

CLP_PC_033405

## 2. Applying for Refugee Status and Asylum

Every foreign person in the national territory has the right to seek recognition as a refugee, which must be submitted to COMAR or INM. The right can only be asserted within thirty days of entering the country.[75]

COMAR is the primary agency mandated to implement Mexico's refugee response.[76] It was created through a presidential decree in 1980; combining representation from multiple sections of government.[77] By statute, COMAR has about three months to analyze each application for refugee status and if the application is denied, may take an additional two weeks to assess whether the applicant qualifies for complementary protection.[78] COMAR's asylum officers are responsible for the review of these applications.[79]

Applicants may also file with the relevant offices of the INM.[80] The INM is a decentralized part of the federal administration whose mission is to protect the rights of migrants and foreigners.[81] Regardless of which office the individual files their application with, applications must be submitted within thirty days, counted from the date of entry into the country.[82] With respect to sur place claims for protection, the thirty-day period is counted from the date that the applicant learns of the facts that renders them eligible for such status.[83] If the applicant is unable to present the application in the relevant time period, then the time will run from when it became "materially possible" to submit the application to either authority.[84]

However, filing through COMAR or INM is fraught with procedural deficiencies.  Merely accessing a COMAR office is a  barrier for protection seekers.[85] Given that COMAR offices are only in a handful of states, so claims outside of those areas have to be initially presented to the INM.  From there, they are transferred to the COMAR Mexico City office or adjudicated by mobile field units.[86] This slows down application processing for

---

[75]Procedimiento para ser Reconocido come Refugiado en México, Comisión Mexicana de Ayuda a Refugiados (COMAR),  (Feb. 29, 2016), https://www.gob.mx/comar/acciones-y-programas/procedimiento-para-ser-reconocido-como-refugiado-en-mexico.

[76]Schmidtke, supra note 23.

[77]La Creacion de COMAR, COMAR, http://www.comar.gob.mx/es/COMAR/La_creacion_de_la_COMAR (last visited Sept. 8, 2021).

[78]Reglamento de la Ley de Migración [Regulations of the Immigration Law] art. 45, Diario Oficial de la Federación [DOF] 28-09-2012, últimas reformas DOF 23-05-2014. (Mex.); see also, Sergio Alejandro Rea Granados, "Retos Actuales en la Implementación de la Ley Sobre Refugiados y Protección Complementaria En México: Identificación, Admisión y Acceso Al Procedimiento de Asilo," [Current Challenges in the Implementation of the Law on Refugees and Complementary Protection in Mexico: Identification, Admission, and Access to the Asylum Procedure] Anuario Mexicano de Derecho Internacional, vol. XVI, pp. 373–400 (2016), https://www.sciencedirect.com/science/article/pii/S1870465417300119.

[79]Marco Normativo en Materia de Refugiados, COMAR Gobierno de México, http://www.gob.mx/comar/documentos/marco-juridico-en-materia-de-refugiados (consultado en Sept. 11, 2021).

[80]Procedimiento para ser Reconocido como Refugiado en México, COMAR Gobierno de México, https://www.gob.mx/comar/acciones-y-programas/procedimiento-para-ser-reconocido-como-refugiado-en-mexico (consultado en  Sept. 11, 2021).

[81]¿Qué  Hacemos?, INM Gobierno de México, https://www.gob.mx/inm/que-hacemos (consultado en Sept. 11, 2021).

[82]Law on Refugees, Complementary Protection and Political Asylum art. 18; see also, Guia del proceso de solicitud de refugio en COMAR, COMAR Gobierno de México,  https://www.gob.mx/comar/es/videos/guia-del-proceso-de-solicitud-de-refugio-en-comar (last visited Sept. 11, 2021).

[83]Law on Refugees, Complementary Protection and Political Asylum art. 18 (Mex.).

[84]Id.; see also Regulations of the Law on Refugees, Complementary Protection and Political Asylum art. 19 (Mex.).

[85]Kerwin, supra note 11, at 293-295.

[86]See id. at 297-299.

CLP_PC_033406

refugee status.[87] Unless they are lucky enough to be located near a COMAR office, applicants must have their eligibility interviews by telephone, making it challenging for an applicant to effectively address complex case issues.[88]

INM officials, a critical component of check-ins and receiving and transmitting documents, regularly provide erroneous legal advice to protection-seekers because of lack of training.[89] As an immigration enforcement agency, INM's role is inherently prejudiced.[90] Its agents refuse to initiate refugee status determination procedures or process humanitarian visa requests for applicants.[91] Worse still, NGOs report that INM officials deceitfully inform applicants that they must be physically present at a COMAR office to be recognized as a refugee.[92]

The law also recognizes the possibility for verbal requests for refugee status, including with the assistance of an interpreter, if necessary, in the event that a written application is impossible.[93] However, verbal requests for recognition of refugee status and all related manifestations by the applicant must be recorded in a written record.[94] The written application for asylum, typically submitted while in detention, must state the reasons for the application with complete and true identifying information and supporting evidence.[95]

If there are derivative beneficiaries, the application should include documentary evidence of the family relationship.[96] In the case of children under eighteen, the applicant must demonstrate the family link by presenting birth certificates.[97] The applicant may submit supporting evidence at any point before the Ministry of the Interior issues its decision.[98] Additionally, the applicant may refuse to request the cooperation of their country of origin, including requesting the certification or legalization of documents by those authorities.[99]

---

[87] Asylum Access, Mexican Asylum System for U.S. Immigration Lawyers FAQ, (2019), https://asylumaccess.org/wp-content/uploads/2019/11/Mexican-Asylum-FAQ-for-US-Immigration-Lawyers.pdf.
[88] Alto Comisionado de las Naciones Unidas para los Refugiados (ACNUR), Diagnóstico sobre el acceso al procedimiento para el reconocimiento de la condición de refugiado en Mexico, 36 (2014), https://www.acnur.org/fileadmin/Documentos/Publicaciones/2015/9898.pdf.
[89] Id.
[90] Amnesty Int'l, supra note, at 8.
[91] Sin Fronteras, Evolución y Retos del Asilo en México 59 (2016), https://sinfronteras.org.mx/wp-content/uploads/2018/12/InformeAsilo_2016_WEB_02.pdf.
[92] ACNUR, supra note 89, p. 35-37.
[93] Law on Refugees, Complementary Protection and Political Asylum art. 18 (Mex); see also, Regulations of the Law on Refugees, Complementary Protection and Political Asylum art. 17 (Mex.) (adding that if someone is unable to submit their application in written form then they are entitled to a competent public servant who will function as an interpreter or translator).
[94] Law on Refugees, Complementary Protection and Political Asylum art. 18 (Mex).
[95] Id. Art. 23.
[96] Id. Art. 12.
[97] Id.
[98] Id. Art. 23.
[99] Id. Art. 57.

CLP_PC_033407

Once a written application is filed, the applicant proceeds to an interview.[100] The initial interview takes place upon submission of the application, and requires the principal and derivative applicants to the reasons for requesting protection and other qualifying information.[101]

The second interview is a more detailed personal interview with the applicant, who may be accompanied by a legal representative.[102] The purpose of the interview is to gather information that facilitates the analysis of the application.[103] During the interview, the Ministry of the Interior considers the social and cultural context of the applicant's origins, as well as his or her age, gender, and other particular circumstances.[104] The law provides for access to a interpreter as well as other specialists necessary to facilitate communication with the applicant in cases in which that support is necessary.[105]

There are serious due process concerns with the interview process. Some are recorded, but it is far more common for COMAR officials to merely review the interview notes they take themselves.[106] Officers rely on memory, rather than a transcript, as the basis for their final decision.[107] COMAR regularly performs interviews just a few days before the forty-five day window for adjudication runs out, leading experts to believe that COMAR is reaching its eligibility decisions largely on the basis of the intake forms, rather than on the interviews themselves.[108]

According to the 2011 Migratory Act, the Ministry of the Interior must issue an individualized, reasoned and justified decisions within forty-five days of receiving the application.[109] That period may be renewed once, for an additional forty-five days, if:

1.  There is a lack of information of facts that the application is based on;

2.  A lack of translators or other specialists to facilitate communication with the applicant;

3.  The impossibility of conducting interviews due to the health of the applicant;

---

[100]Id. Art. 41; Regulations of the Law on Refugees, Complementary Protection and Political Asylum art 27.
[101]ACNUR, ¿Como solicitar ser refugiado en
Mexico?, https://help.unhcr.org/mexico/como-solicitar-la-condicion-de-refugiado-en-mexico/ (consultado en Sept. 8, 2021).
[102]Law on Refugees, Complementary Protection and Political Asylum art. 21.
[103]Id. art. 23.
[104]Id.
[105]Law on Refugees, Complementary Protection and Political Asylum art. 29 (Mex.); Regulations of the Law on Refugees, Complementary Protection and Political Asylum art. 27 (Mex.).
[106]Kerwin, supra note 11, at 301.
[107]Id.
[108]Id..
[109]Law on Refugees, Complementary Protection and Political Asylum art. 45.

CLP_PC_033408

4. Request by the applicant to provide additional information that supports the application; or

5. Any other circumstance caused by chance or force majeur that makes it impossible for the Ministry of the Interior to adequately conduct the procedure.[110]

The Migration Act requires that the decision must be communicated to the applicant in writing and the authorities should ensure that the applicant understands the decision.[111] However, as this Report details infra section 3, this is rarely the case in practice.

Additionally, if the relevant authorities determine that the applicant does not meet the definition of a refugee, they must evaluate the case for eligibility for complementary protection.[112] A decision to grant complementary protection should be communicated in the same decision reached in the refugee status determination procedure.[113] In this sense, it is the government's burden to analyze all the potential grounds for protection and to issue a well-reasoned decision explaining the rationale for a grant or denial of any individual petition in a manner the applicant can understand.[114]

As part of its evaluation of each application, the relevant authorities must request information from the Ministry of External Relations as to the prevailing conditions in the country of origin, as well as other information from other government agencies.[115] However, the Ministry of External Relations and other relevant agencies have only fifteen days to respond, and their failure to do so is construed as a lack of opinion or information.[116]

If the decision is favorable to the applicant, the Ministry of the Interior issues the migration document that regularizes the status of the applicant.[117] It automatically confers to the individual the status of permanent resident.[118] If the application is denied, the individual has fifteen days from receiving the notice of the decision to present an administrative appeal.[119] If an appeal for review is granted, COMAR has ninety calendar days to adjudicate the appeal.[120] If COMAR denies the appeal, the applicant has the right to present a judicial appeal before a judge.[121]

---

[110]Id. Art. 24.
[111]Id. Art. 25.
[112]Id. Art. 29.
[113]Id. Art. 30.
[114]Asylum Access, Mexican Asylum System for U.S. Immigration Lawyers FAQ, (2019), https://asylumaccess.org/wp-content/uploads/2019/11/Mexican-Asylum-FAQ-for-US-Immigration-Lawyers.pdf, supra note 87, at 2.
[115]Law on Refugees, Complementary Protection and Political Asylum art. 24.
[116]Id.
[117]Id. art. 25.
[118]Id.
[119]Id.
[120]ACNUR, supra note 102.
[121]Id.

CLP_PC_033409

Throughout the determination process, the applicant may proceed pro se or with legal representation.[122] The application for refugee status is free of charge.[123] While in typical circumstances adjudication of protection claims is an individual process, Mexican law permits the Ministry of the Interior to make group determination of refugee status in cases of the arrival en masse of a group of persons where it concludes the entire group meets the requirements of the status.[124]

While the application is pending, the applicant must physically appear before a COMAR office on a weekly basis to sign a register which serves to guarantee that they remain in the locality where the procedure was initiated.[125] If an applicant fails to appear for two consecutive weeks, the application is considered abandoned.[126]

---

[122]Law on Refugees, Complementary Protection and Political Asylum art. 21 (Mex.).
[123]Id.Art. 18.
[124]Id. Art. 26.
[125]Id. Art. 21.
[126]Id.

*The IACHR interviewed Sam, an asylum seeker who fled his African home with the help of a friend. His name has been changed to protect his identity. Sam reported that without knowing Spanish, it was practically impossible to seek asylum in Mexico so he crossed into the United States. Detained for three and a half months in Mexico, he lived in a small, crowded room with other detainees. The room had no sunlight or bed to sleep on. Sam and the others slept on the cold tile floor. Mexican authorities did not provide soap, toothbrushes, toothpaste, or medication. There was no running water. Just one toilet stood in the middle of the room. Detainees could not shower. African detainees were frequently discriminated against. Guards laughed at them for their race and ethnicity. They forced detainees listen to long speeches in Spanish, and if detainees fell asleep, they were regularly hit.*

*"No one there knew what was happening," Sam said. "It was like the world has forgotten you. The day they released me I wasn't aware, I had given up because I had seen people [detainees] there for one year, one year and a half, two years. Along [the way to the United States border] I have seen a lot of people die, a fellow [African] who had two kids died at the border. I've seen many people die. So, if you make it and you are safe from what is happening in your country, then you just have to appreciate it."*

*SOURCE: Telephone Interview with an anonymous protection-seeker from an African country, Nov. 9, 2020 (on file with authors).*

## 3. Detention

In Mexico, all people without regular immigration status are automatically detained, as stated in the 2011 Migration Law.[127] The law technically limits initial detention of persons without regular status to fifteen working days,[128] which can be extended to sixty working days.[129] The vast majority of people are detained for months or years, however, in a blatant disregard for the law.[130] Even children are detained, despite the fact that in November 2020 Mexico reformed its legislation and prohibited the detention of children.[131]

---

[127] Migratory Act, art. 68 (Mex.).

[128] Id. Ch. VI, Art. 111.

[129] Id.

[130] Human Rights First, Dangerous Territory: Mexico Still Not Safe for Refugees, 5 (July, 2017), https://www.humanrightsfirst.org/sites/default/files/HRF-Mexico-Asylum-System-rep.pdf.

[131] Press Release, UNHCR, Welcomes Mexico´s reforms to protect rights of child refugees and asylum-seekers, Jan. 15, 2021, https://www.unhcr.org/news/press/2021/1/6001cf0b2ed/unhcr-welcomes-mexicos-reforms-protect-rights-child-refugees-asylum-seekers.html;    see also, Colectivo de Observación y Monitoreo de Derechos Humanos en el Sureste Méxicano. Hacinamiento y detención illegal de niñas, niños y adolescentes y sus familias: verdaderos resultados de los "operativos humanitarios" en la frontera sur de México coordinados por el INM, Caravana Migrante, (Marzo 26, 2021), http://caravanamigrante.ibero.mx/uploads/monitoreos_pdf/4cbe93d90dad8cab02b8cc38862c4a66.pdf

CLP_PC_033411

The INM's detention policy, "is an automatic measure not properly justified in individual cases based on necessity and reasonableness."[132] As a result, detention is arbitrary under international law because, according to the UNHCR, a person is not officially charged and there are no legal safeguards in place.[133] The Law on Refugees, Complementary Protection and Political Asylum expressly instructs that the Ministry of the Interior should only adopt strictly necessary detention measures in each case, yet widespread detention exists.[134]

In 2017, the United Nations Committee on the Protection of the Rights of All Migrant Workers and Members of their Families noted that migrants are not sufficiently informed of the grounds for their detention or their rights and available remedies.[135] The Committee emphasized concern that migrants who seek available remedies may be indefinitely detained as a result, despite Mexico's legal prohibitions on indefinite detention of migrants.[136]

The United Nations Working Group on Arbitrary Detention observed that any complaint could lead to the prolongation of the detention and reprisals by migration officials.[137] These circumstances added to the failure of the Mexican authorities to respect the basic principles that govern the detention of migrants, constitute arbitrary detentions and affect the right to seek asylum.[138]

Persons who are detained in an immigration detention center (Estación Migratoria) can verbally express their intention to request protection to the facility's authorities, who usually are INM officials.[139] However, Human Rights First reported that detention in Mexico is used to punish people who request protection and deter people who express fear of returning to their country from applying at all.[140]

---

[132]UN Committee on the Protection of the Rights of all Migrant Workers and Members of their Families (UN CMW), Concluding observations on the 3rd periodic report of Mexico, para. 39, U.N. Doc. CMW/C/MEX/CO/3 (2017),

[133]UNHCR, Committee Against Torture Reviews the Report of Mexico (Apr. 26, 2019), https://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=24528&LangID=E.

[134]Law on Refugees, Complementary Protection and Political Asylum art. 20.

[135]UN CMW, supra note 133; see also, Consejo Ciudadano del Intstituto de Migración, Personas en Detención Migratoria en México, Misión de Monitoreo de Estaciones Migratorias y Estancias Provisionales del Instituto Nacional de Migración, p. 10-12 (Julio, 2017) https://tbinternet.ohchr.org/Treaties/CESCR/Shared%20Documents/MEX/INT_CESCR_CSS_MEX_28755_S.pdf

[136]UN CMW, supra note 133; see also Press Release, Asylum Access, El Instituto Nacional de Migración Restinge el Acceso al Programa "Alternativas al Alojamiento" y Criminaliza a las Personas Solicitantes de Asilo (Feb. 12, 2021), https://asylumaccess.org/el-instituto-nacional-de-migracion-restringe-el-acceso-al-programa-alternativas-al-alojamiento-y-criminaliza-a-las-personas-solicitantes-de-asilo/.

[137]UN Human Rights Council, Working Group on Arbitrary Detention, Opinion N. 54/2019 concerning José de la Paz Ferman Cruz y Aren Boyazhyan (México), para. 151, UN Doc. UN A/HRC/WGAD/2019/54 (2020).

[138]Id. para. 150, 153, 155.

[139]Law on Refugees, Complementary Protection and Political Asylum art. 21, para. 3 (Mex.) (whichever authority has knowledge of a request for refugee status must immediately notify by writing the Secretary of Foreign Relations); see also, Kerwin, supra note 11, at 298.

[140]Human Rights First, supra note 131; see also Centro de Derechos Humanos Fray Matías de Córdoba AC, et al, Derechos Cautivos: La situación de las personas migrantes y sujetas a protección internacional en los centros de detención migratoria: siete experiencias de monitoreo desde la sociedad civil90-91, 111 (2015), https://sinfronteras.org.mx/docs/inf/inf-derechos-cautivos.pdf.

CLP_PC_033412

Immigration officials abuse detainees to dissuade them from claiming asylum or refugee status or convince them to accept voluntary deportation.[141] Those who pursue asylum or refugee claims while in custody are held for months or longer.[142] Further, if a protection-seeker tries to appeal an unfavorable decision, the lack of protections against indefinite detention in that specific instance creates a legal loophole.[143]

Protection-seekers detained by Mexican immigration officers prior to filing an asylum or refugee application must pursue their protection cases while they are detained in migration centers. One human rights monitor explained that those held in Estaciones Migratorias essentially have two choices: to "agree" to deportation, or remain detained in atrocious conditions.[144] INM reported in September 2019 that it was busing dozens of protection-seekers over 1,000 miles to Tapachula, near the Guatemalan border, essentially cutting them off from U.S. legal aid.[145]

Beyond prolonged detention, protection-seekers in these facilities face a range of abuses, including overcrowding and lack of medical care. After interviewing 50 detained migrants, a 2015 study by the Coalition Against Torture and Impunity (CCTI) found 94 percent suffered abuse while detained.[146] In April of 2019, the UN Committee Against Torture again expressed concerns about endemic torture in Mexican detention facilities.[147] Detention center conditions often rise to the level of cruel, inhuman, and degrading treatment.[148] Facilities are wildly overcrowded – in a visit to a center in Chiapas, Edgar Corzo Sosa, Rapporteur for Migrant Issues at the National Human Rights Commission, documented that 400 detainees were being held in a space meant for 80.[149]

Since the COVID-19 pandemic, the situation has only grown more dire.[150] Detainee protests, some violent,  broke out in March 2020 in five detention centers against overcrowding and unhygienic conditions that put them at risk of contracting the virus.[151]

---

[141] Kerwin, supra note 11, at 307-308.

[142] Human Rights First supra note 131, at 2.

[143] UN, Concluding observations on the seventh periodic report of Mexico, UN Doc. UN CAT/C/MEX/CO/7, (2019).

[144] Human Rights First, supra note 143.

[145] Human Rights First, Orders From Above: Massive Human Rights Abuses Under Trump Administration Return to Mexico Policy, 14 (Oct. 2019) https://www.humanrightsfirst.org/sites/default/files/hrfordersfromabove.pdf.

[146] Human Rights First, supra note 143.

[147] UNHCR, Committee Against Torture Reviews the Report of Mexico, (Apr. 26, 2019), https://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=24528&LangID=E.

[148] UN – CMW, supra note 133, para. 41.

[149] Overflowing Toilets, Bedbugs and High Heat: Inside Mexico's Migrant Detention Centers, N.Y. Times (Aug. 3, 2019), https://www.nytimes.com/2019/08/03/world/americas/mexico-migration-conditions.html

[150] Mexico, Global Detention Project (June 3, 2020), https://www.globaldetentionproject.org/countries/americas/mexico.

[151] Human Rights Watch, Mexico: Free Detained Migrants Amid Pandemic, (Apr. 14, 2020), https://www.hrw.org/news/2020/04/14/mexico-free-detained-migrants-amid-pandemic; Frida Sanchez, Migrantes prenden fuego en albergue; hay 9 lesionados, La Razon (Abril 04, 2020), https://www.razon.com.mx/estados/para-evitar-deportacion-migrantes-se-amotinan-en-refugio-de-piedras-negras/.

CLP_PC_033413

In response, INM began releasing people and abandoning them at the closed Guatemalan border.[152] In April 2021, Mexico, the United States, Guatemala, and Honduras signed bi-lateral agreements to increase the militarized security at the borders to prevent migration.[153]

Article 6 of the 2011 Migratory Law establishes protection from refoulement for refugees, protection-seekers, and beneficiaries of complementary protection.[154] Specifically, it provides that no asylum-seeker or refugee can be rejected at the border or returned to the territory of another country where their life would be at risk or where they would be in danger of being tortured, or subjected to cruel, inhuman, or degrading treatment or punishment.[155]

Despite non-refoulement requirements, the 2011 Migratory law appears to exclude the use of a protection claim as a defense to avoid deportation or other adverse immigration consequences.[156] Article 21 states that the presentation for a request for refugee status does not eliminate the legal effects of measures that were decided prior to the application.[157] This could lead to the removal of an individual who is entitled to protection.

The INM is required to guarantee Mexico's obligation of non-refoulement by identifying, referring, and avoiding the deportation of individuals who may need international protection in Mexico.[158] However, because INM is an immigration enforcement agency, protection-seekers fear being detained and deported when approaching an INM official.[159]

---

[152] Human Rights Watch, supra note 152.
[153] Biden Strikes International Deal in Bid to Stop Migrants Reaching US Border, The Guardian, Apr. 12, 2021, https://www.theguardian.com/us-news/2021/apr/12/biden-migration-security-deal-mexico-guatemala-honduras.
[154] Law on Refugees, Complementary Protection and Political Asylum art. 6 (Mex.).
[155] Id.; see also, Refugee Convention, supra note 2, art. 33 (principles of non-refoulement).
[156] Law on Refugees, Complementary Protection and Political Asylum (Mex.).
[157] Id. art. 21.
[158] Kerwin, supra note 11, at 307.
[159] ACNUR, supra note 89.

CLP_PC_033414

## 4. Protection-Seeker Rights

Under the 2011 Migratory Law, applicants hold temporary visitor status while their asylum or refugee applications are pending.[160] With a certificate confirming that the application for protection is under review, known as a Constancia,[161] the applicant may separately request the status of temporary visitor for humanitarian reasons. The law requires that all applicants for refugee status and their dependents are provided with a document confirming that their application is in process.[162] While all protection-seekers are eligible for this status, it is not automatic and is only valid for up to one year, subject to renewal.[163]

Persons recognized as refugees or granted complementary protection in Mexico are granted permanent residence in Mexico.[164] Additionally, those recognized as refugees or granted complementary protection are exempt from paying any official fees related to immigration applications and services.[165] Finally, Article 86 on the 2011 Migratory Law provides a path to citizenship.[166] To start the naturalization process, applicants must be at least eighteen years old and have been permanent residents for either two years, if a national of Latin America or the Iberian peninsula, or five years, if a national of any other country.[167]

### a. Confidentiality, Documentation, and Access to Legal Representation

The 2011 Migratory Law provides that once an application has been filed, no authority can provide information about or notify the diplomatic or consular authorities of the applicant's country of origin.[168] The only exception to this rule is when the applicant expressly consents to the Mexican authorities making such contact.[169]

If a protection-seeker is granted refugee status, the Ministry of the Interior is supposed to issue documentation that regularizes the status of the applicant.[170]

---

[160]Law on Refugees, Complementary Protection and Political Asylum art. 73.
[161]UNHCR, How to Apply for Refugee Status in Mexico, https://help.unhcr.org/mexico/en/como-solicitar-la-condicion-de-refugiado-en-mexico/ (last visited Sept.8, 2021).
[162]Law on Refugees, Complementary Protection and Political Asylum art. 22; Schmidtke, supra note 23,
[163]UNHCR, supra note 162.
[164]Law on Refugees, Complementary Protection and Political Asylum art. 48 (Mex.).
[165]Id. art. 50.
[166]Regulations of the Law on Refugees, Complementary Protection and Political Asylum art. 86 (Mex.).
[167]ACNUR, Derechos de las personas solicitantes de la condición de refugiado, refugiadas y con protección complementaria en Mexico, https://static.help.unhcr.org/wp-content/uploads/sites/22/2019/05/22155818/Tarjetas-de-Derechos_Full.pdf#_ga=2.176590885.1634933011.1595094641-37990067.1594137525.
[168]Law on Refugees, Complementary Protection and Political Asylum art.21 (Mex.).
[169]Id.
[170]Id. Art. 25.

CLP_PC_033415

This document automatically confers to the individual the status of permanent resident.[171] With documentation, those with refugee status are, by law, conferred the same rights as Mexican citizens.[172]

In practice, refugees instead face rampant discrimination, violations of their rights, and mistreatment, including torture.[173] Even with documentation, refugees are unable to receive the benefits they are entitled to by law. Mexican authorities ignore the documentation and refuse to acknowledge refugees' rights, both willfully and due to ignorance. In many cases, authorities do not recognize COMAR-issued documents.[174] For instance, when seeking education, many institutions do not accept COMAR documents and instead require school documents from the refugee's country of origin.[175]

Moreover, for 90 days, protection-seekers also have access to health care and can enroll in the public health insurance policy without documentation.[176] However, if the government fails to issue documentation within those 90 days, then refugees must go without healthcare, even if they were granted legal status.[177] The same thing occurs to refugees with legal status, who are denied access to the appropriate documentation (a Unique Population Registry Code or Clave Única de Registro de Población- CURP).[178]

Protection-seekers in Mexico have the right to receive information on the relevant procedures and the rights involved in the process.[179] According to Article 19 of the 2011 Migratory Law, the information should be clear, timely, and free of charge.[180] Mexico does not provide free legal representation to individuals in migration-related procedures, leaving migrants to navigate the complex system on their own.[181]

Some might be fortunate enough to be represented by one of the few NGOs that provide legal assistance to protection-seekers or, even more rarely, benefit from the assistance of their consulates.[182]

---

[171]Id.
[172]Id. Art. 44.
[173]U.N. Special Rapporteur on Torture, Center of Hum. Rts. Fray Matías de Córdova, Migration Aff. Programme Iberoamerican Univ., Social and Institutional Justification of Torture and Ill-Treatment in Immigration Detention Centres in Mexico, Special Rapporteur on Turoture and Other Cruel, Inhuman or Degrading Treatment or Punishment, 6, (June, 2020), https://www.ohchr.org/Documents/Issues/Torture/Call/NGOs/CDHFMC.pdf.
[174]Nancy Pérez García, Los Retos de la Población Refugiada en México, Sin Fronteras, (Marzo 23, 2017), https://english.sinfronteras.org.mx/los-retos-de-la-poblacion-refugiada-en-mexico/
[175]Id.
[176]ACNUR, supra note 89.
[177]Reglamento de la Ley General de Salud en Materia de Protección Social en Salud [Regulations of the General Health Law Regarding Social Protection], Diario Oficial de la Federación [DOF] 05-04-2004, última reforma publicada DOF 17-12-2014, Art. 42 (Mex.),http://www.diputados.gob.mx/LeyesBiblio/regley/Reg_LGS_MPSS_171214.pdf.
[177]Id.
[178]ACNUR, supra note 89.
[179]Law on Refugees, Complementary Protection and Political Asylum art.19 (Mex.).
[180]Id.
[181]Rea Granados, supra note 79.
[182]Id.

CLP_PC_033416

Although protection applicants have the right to be accompanied by legal representation during eligibility interviews, they are sometimes told when scheduling their interviews that they cannot be accompanied by counsel.[183]

The 2011 Migratory Law does guarantee that the applicant, even if detained in an Estación Migratoria, should have guaranteed access to communication with their legal representative if they have one.[184] If the applicant is detained but does not have legal representation, the Ministry of Interior must guarantee that the person can communicate with a trusted individual.[185]

Attorneys, however, reported being unable to access detained clients.[186] Burdensome procedures for recognizing legal representation before COMAR and INM prevent attorneys from visiting their clients or appearing during clients' first asylum or refugee interviews.[187]

### b. Family Unity and Access to Benefits, Education, and Employment

Mexican law guarantees family unity in multiple provisions. The 2011 Migratory Law's Article 9 guarantees protection of the organization and development of the family during the application for refugee status.[188] Additionally, Article 12 establishes derivative refugee status for:

The spouse, common-law partner, children, blood relatives up to the fourth degree of the principal applicant, and blood relatives up to the second degree of the spouse or common-law partner of the principal applicant, provided that these persons are economically dependent on the principal applicant.[189]

Such derivative refugee status is available when the eligible relatives are present in Mexican territory and when there is documentary proof of the family relationship and dependence.[190] In the absence of such documentary evidence, the law provides for the review of alternative forms of proof including the declaration of the principal applicant.[191] Additionally, the law establishes that Mexican authorities may authorize entry of derivative relatives into the country if the person holding refugee status demonstrates the capacity to economically support their relatives.[192]

---

[183]Alejandra Macías Delgadillo, Personas Solicitantes de Asilo y Refugiadas, Sin Fronteras 19, (Nov. 2012), https://sinfronteras.org.mx/wp-content/uploads/2018/12/Personas-solicitantes-de-asilo-y-refugiadas.-La-figura-en-México..pdf.
[184]Id. art. 21.
[185]Id.
[186]Human Rights First, supra note 131, at. 7.
[187]Id.
[188]Law on Refugees, Complementary Protection and Political Asylum art. 9 (Mex.).
[189]Id. Art. 12.
[190]Id.
[191]Id.
[192]Id. Art. 58.

CLP_PC_033417

The 2011 Migratory Law establishes institutional assistance available to persons during the refugee status determination procedure.[193] Institutional assistance includes integration support, identity and travel documentation, job training, health services, family reunification support, and the ability to naturalize.[194] Article 20 states that the Ministry of the Interior must make that assistance available to support applicants that require special attention, namely:

Children and adolescents, pregnant women, the elderly, disabled persons, persons with chronic illnesses, victims of serious abuse, and any other person who might be considered to be in a situation of vulnerability according to relevant law.[195]

The 2011 Migratory Law establishes that refugees should enjoy the same rights and guarantees enjoyed by Mexican citizens, established in the Mexican Constitution along with human rights agreements ratified by Mexico.[196] Specifically, Article 44 provides that refugees should receive support from public institutions:

To exercise and received respect of their rights, receive health services, receive education and, where relevant, recognition of their right to education, the right to work in any legal activity permitted by the relevant laws the right to obtain an identity and travel document issued by the Ministry of External Relations, to request family reunification, and to obtain a document that confirms the permanent resident status.[197]

Although the law grants the same rights to refugees and asylees as Mexican citizens, they rarely reap the benefits of those protections. In June 2020, OHCHR noted that both the United Nations and the Inter-American Human Rights system reported rampant discrimination, human rights violations, and ill-treatment, including torture,of migrants and refugees in Mexico.[198]

For instance, although protection-seekers are legally entitled to work permits,[199] they rarely exercise this right because they do not know that they have that right and permits are difficult to access.[200] Moreover, COMAR does not regularly inform applicants about organizations that provide employment assistance to refugees.[201]

---

[193]Id. Art. 44, Art. 54-58.
[194]Coordinación General de la Comisión Mexicana de Ayuda a Refugiados, Asistencia Institucional, COMAR Secretaría de Gobierno, 1-3. (access Sept. 11, 2021).
[195]Law on Refugees, Complementary Protection and Political Asylum art. 20.
[196]d. Art. 44.
[197]Id.
[198]U.N. Special Rapporteur on Torture et al.,., supra note 175
[199]Migratory Act (Mex.).
[200]ACNUR, supra note 89.
[201]Id.

CLP_PC_033418

In order to obtain and maintain their work permits, protection seekers must take time out of their days to wait in line for weekly check-ins with COMAR or the INM. This severely limits the options for stable and well-paid work; these individuals cannot maintain a regular schedule without the risk of abandoning their requests for refugee status.[202] After obtaining documentation, protection-seekers face employers who are unfamiliar with refugee identity documents and work authorization and discriminate them upon their status.[203]

There are also language barriers that afftect protection-seekers' ability to access benefits, education, and employment. Many to do not speak Spanish fluently – some speak Indigenous languages, Haitian Creole, or come from African or Asian countries.[204] The asylum and refugee process must be conducted in a language the protection-seeker understands, but this requirement is routinely ignored and interpreters are rarely provided.[205]

With respect to access to health care, although the Regulations to the Health Law enable any person to enroll in the public health insurance policy without the need to present documentation, this coverage is limited to 90 days.[206] After 90 days, if the government fails to issue the needed documents, the protection-seeker will go without medical care.[207] Identity and travel documents the Ministry of External Relations issues or the immigration form are supposed to demonstrate regular immigration status, but are ignored.[208] COMAR-issued documentation is not recognized by many educational institutions, making it difficult for refugees to register for and pursue education.[209] In addition, refugees are often told that they must bring school documents from their countries of origin, which are impossible to obtain because they fled persecution and left them behind.[210]

Additionally, access to other rights, benefits, and services is hindered by local and federal public administration bodies or other service entities, such as banks, that are unfamiliar with immigration-related identity documents.[211]

---

[202]Id.
[203]Macías Delgadillo, supra note 183, at 20.
[204]Asylum Access, supra note 88, at 6.
[205]Id.
[206]Regulations of the General Health Law Regarding Social Protection, art. 42 (Mex.).
[207]Id.
[208]Macías Delgadillo, supra note 183, at 20.
[209]Pérez García, supra note 176.
[210]Id.
[211]Kerwin, supra note 11, at 290.

CLP_PC_033419

## B. Systemic Barriers to Asylum and Refugee Status

### 1. Limited Application of the Cartagena Declaration

As discussed in supra part II.A.1, the expanded definition of a refugee contained in the Cartagena Declaration has been incorporated into Mexican law.[212] In practice, however, access to protection based on these criteria is only available once authorities make a determination regarding conditions in a refugee's country of origin.[213] For example, the Mexican government indicated to UNHCR that it will apply the Cartagena Definition to all Honduran and Salvadoran protection-seekers. This implies prima facie recognition that these countries are plagued by generalized violence or massive human rights violations. Ostensibly, this would allow individuals from either country to immediately access protection if they demonstrate: (1) their nationality; (2) that they fled because of violence or human rights violations; and (3) that they are not subject to grounds for exclusion.[214] In reality, accessing protection under the Cartagena Declaration has been far more complicated.

The system for determining the safety of origin countries is biased and results in harmful decisions. The UN Committee on the Rights of Migrant Workers expressed deep concern at the increased removal rates of persons from El Salvador, Guatemala and Honduras .[215] Migrants are coerced into accepting voluntary deportation under threats of prolonged detention and abuse.[216] They frequently do not have access to legal assistance or adequate information.[217] There are no other alternative paths to regularization, which leads to many applicants abandoning their pursuit of refugee status.[218] In reality, accessing protection under the Cartagena Declaration has been far more complicated.The Committee also noted that return measures are "ordered without proper investigation of the possible risks to the person's life and physical integrity in the country of origin."[219] COMAR adjudicators often deny asylum on the erroneous assumption that individuals can safely relocate within their home countries, such as Honduras or El Salvador, to avoid persecutors.[220]

---

[212]See generally, Cartagena Declaration on Refugees, supra note 5 (reporting that Mexico was the first country to incorporate the Cartagena Declaration into domestic law).

[213]Kerwin, supra note 11, at 290.

[214]Asylum Access, supra note 88. The Mexican government has indicated to the United Nations High Commissioner for Refugees (UNHCR) that it will apply the definition in the Cartagena Declaration to all Honduran and Salvadoran asylum seekers. This implies a prima facie recognition that these countries are plagued by widespread violence and massive human rights violations. Therefore, an asylum seeker from these countries need only show. (i) that they are from that country. (ii) that they left their country due to violence or human rights violations and (iii) that they were not excluded for committing serious crime or human rights violations in their country of origin.

[215]UN CMW, supra note 133, para. 43.

[216]Kerwin, supra note 11, at 308.

[217]UN CMW, supra note 222.

[218]Id.

[219]Id.

[220]Human Rights First, supra note 131, at. 7.

CLP_PC_033420

Additionally, in the analysis of the merits, COMAR repeatedly fails to take into account the expanded definition of a refugee in the Cartagena Declaration, despite the provision's inclusion in the domestic legal framework.[221] Other documented due process shortcomings include telephonic instead of face-to-face interviews, failing to conduct interviews of family members, conducting studies of the country of origin through unofficial sources, and a lack of qualified interpreters.[222]

Civil society and international organizations' advocacy prompted the Mexican government to establish a program facilitating the release of protection-seekers from detention centers to civil society shelters. Between July 2016 and December 2017, over 1,900 protection-seekers benefited from this program, according to the UNHCR.[223] However, the authorities have very few efforts to comply with this program. These create uncertainty and protection gaps for detainees and the organizations accompanying them.[224]

## 2. Backlog of Cases before the COMAR

The Mexican government introduced the refugee protection system administered and adjudicated by COMAR in 2011.[225] The number of petitions presented annually since then has increased by more than 1,000 percent, from 752 in 2011.[226] to 14,596 in 2017, fueling concerns about growing backlogs.[227] Protection requests exploded to 66,915 in 2019.[228] and, in just the first three months of 2020, there were almost 17,800 new asylum claims,[229] further exacerbating the detention crisis, discussed in Section II.A.3.

COMAR's extremely limited geographic reach is accompanied by insufficient staff to respond to protection applications[230] Until late 2016, there were fewer than 20 COMAR officials in Mexico.[231] Now, there are reportedly between 30 and 40 officials who adjudicate asylum cases[232] In 2017, the UN provided funding to allow COMAR to hire 29 new staff members, but the rapidly increasing caseload means the agency continues to lack sufficient resources to handle the volume of cases.[233]

---

[221]Sin Fronteras, supra note 92., at 19.
[222]Id.
[223]UNHCR, supra note 24., at 5.
[224]Id.
[225]Kerwin, supra note 11, at 290.
[226]Id, at 300-301.
[227]Comisión Nacional de los Derechos Humanos (CNDH), Press Release: La CNDH hace un llamado urgente al gobierno federal ante el posible colapso del sistema de protección a refugiados en Mexico [CNDH urgently calls on the federal government given the possible collapse of the refugee protection system in Mexico], (Feb. 25, 2018), hhttp://www.cndh.org.mx/sites/all/doc/Comunicados/2018/Com_2018_046.pdf.
[228]The migratory phenomenon that the country is going through caused an increase of 125.8 percent in refugee applications, since in 2018 26,631 applications were received from people for refugee status, while at the end of 2019 they totaled 66,915. See Silvia Arellano, En 2019, peticiones de refugio aumentaron 182% por crisis migratoria: Comar, Milenio, (Jan. 1, 2021), https://www.milenio.com/politica/crisis-migratoria-solicitudes-asilo-aumentaron-2019-comar.
[229]UNHCR. Despite Pandemic Restrictions, People Fleeing Violence and Persecution Continue to Seek Asylum in Mexico, (Apr. 28, 2020), https://www.unhcr.org/en-us/news/briefing/2020/4/5ea7dc144/despite-pandemic-restrictions-people-fleeing-violence-persecution-continue.html.
[230]Kerwin, supra note 11, at 308.
[231]Id.
[232]Id.
[233]Human Rights First, supra note 131, at 6.

CLP_PC_033421

In October 2017, COMAR took the unprecedented step of stopping all asylum and refugee applications due to the lack of resources.[234] Protection-seekers were banned from applying for safety in Mexico for over a year.[235] The Mexican Commission for the Defense and Protection of Human Rights (CMDPDH), a human rights NGO, filed a lawsuit against COMAR for suspending its terms.[236] In April 2018, a judge ruled that Mexico was violating its own constitution by failing to comply with international commitments to migrant protection and that COMAR was ordered to resume accepting applications immediately.[237]

Because of budgetary restrictions, COMAR cannot hire or train the needed staff to expeditiously and thoroughly review applications in line with Mexican law.[238] COMAR officials are overworked. At the end of October 2019, there were 63,860 applicants awaiting determinations of refugee status.[239] Of that total, 13,089 had applied in 2018 and were still waiting for a decision.[240] Between January 2018 and October 2019, approximately 10,000 applicants abandoned their requests for protection after waiting an average of 164 days without receiving a final decision.[241] This is due to myriad reasons, such as prolonged detention, threats of indefinite detention, and abuse.[242] By March 2020, there were 17,202 solicitations for refugee status in Mexico, approximately 5,300 more than the same time in March 2019.[243]

---

[234] Dan Kosten, Mexico´s Asylum System is Inadequate, National Immigration Forum (Oct. 28, 2019), https://immigrationforum.org/article/mexicos-asylum-system-is-inadequate/.
[235] Id.
[236] Carlos Heras Rodriguez, América Latina, El difícil refugio en México, El Salto Diario, (June 18, 2018), https://www.elsaltodiario.com/america-latina/el-dificil-refugio-en-mexico.
[237] Id.
[238] Asylum Access supra note 88, at 7.
[239] Asylum Access, Press Release: Cifras nuevas de la COMAR demuestran que hay más de 13.000 solicitantes de asilo esperando decisiones desde 2018 (Jan.8, 2020), https://asylumaccess.org/cifras-nuevas-de-la-comar-demuestran-que-hay-mas-de-13-000-solicitantes-de-asilo-esperando-decisiones-desde-2018/.
[240] Id.
[241] Id.
[242] Kerwin, supra note 11, at 311.
[243] COMAR, Estadísticas de solicitantes de la condición de refugiado en México, Gobierno de México (Apr. 1, 2020), https://www.gob.mx/comar/articulos/estadisticas-de-solicitantes-de-la-condicion-de-refugiado-en-mexico.

## 3. Additional Barriers for Child Protection-Seekers[244]

The detention of children contradicts Mexico's National Child Rights Law, which prohibits the detention of  unaccompanied and accompanied migrant children.[245] International agencies, nonetheless, have confirmed the routine administrative detention of child migrants in Mexico.[246] Many children are referred to detention centers (Estaciones Migratorias) or to closed shelter environments that effectively constitute detention.[247] In fact, detention of migrant children and adolescents in Mexico increased by 900 percent between 2011 and 2016, according to the UN Committee on  Migrant Workers.[248]

In November 2020, Mexican Congress approved a reform to prohibit immigration detention for children.[249] This reform went into effect on January 11, 2021 but its implementation during the COVID-19 pandemic has been problematic and confusing.[250] In practice, children continue to be detained in closed shelters until they are forcibly returned to their countries of origin.[251]

INM officials who apprehend unaccompanied children frequently fail to fulfill their duty to inform them of their right to apply for protection.[252] Officials do not treat children's verbal requests for protection as sufficient requests for the recognition of refugee status.[253] The INM has Child Protection Officers (Oficiales de Prorección a la Infancia - OPI) responsible for examining a child's potential protection claims and carrying out trained assessments of children's best interests.[254] However, most immigrant children never come into contact with OPIs while they are detained,[255] in part because OPIs are overworked and not adequately trained in explaining the legal process to or otherwise supporting traumatized children.[256]

---

[244]The term is used to refer to both child refugees and asylum seekers.

[245]Reglamento de la Ley General de los Derechos de Niñas, Niños y Adolescentes, Diario Oficial de la Federación, [DOF] 02-12-2015, art. 111. (Mex.),  http://www.dof.gob.mx/nota_detalle.php?codigo=5418303&fecha=02/12/2015.

[246]Human Rights First, supra note 131, at 9.

[247]Amnesty Int'l., Pushed Into Harm´s Way: forced return of unaccompanied migrant children to danger by the USA and Mexico, 9 (June 11, 2021), https://www.amnestyusa.org/wp-content/uploads/2021/06/PUSHED-INTO-HARMS-WAY.pdf.

[248]UN CMW, supra note 133, at para. 37.

[249]UNHCR, supra note 132.

[250]Institute for Women in Migration (MUMI) et al. Implementation of the Mexican Legal Reforms that Prohibit Detention of Accompanied and Unaccompanied Migrant Children (Mar. 2021), https://imumi.org/wp-content/uploads/2021/03/Asylum-migrant-children-march-2021.pdf.

[251]Amnesty Int'l., supra note 255.

[252]Rea Granados, supra note 79, at  383-386.

[253]Id.

[254]Id.

[255]Id.

[256]Georgetown Law Human Rights Institute, The Cost of Stemming the Tide: How Immigration Enforcement Practices in Southern Mexico Limit Migrant Children's Access to International Protection 55 (Apr. 13, 2015), https://www.law.georgetown.edu/human-rights-institute/wp-content/uploads/sites/7/2017/07/HRI-Fact-Finding-Report-Stemming-the-Tide-Web-PDF_English.pdf.

CLP_PC_033423

Another challenge with the best interest determinations (BIDs) of children has to do with the structure of the INM itself. The law places OPIs within INM, the agency in charge of immigration enforcement. This means the agency focuses more on detention and deportation than the actual needs of children, distorting the OPI's neutrality and capacity to conduct BIDs with impartiality.[257]

Even if a child is properly screened, they do not always explain in detail why they left their countries of origin, especially if they do not know that OPIs are different from INM agents.[258] Children are traumatized from being detained, asstudies show that detained children in custody have an increased risk of developing depression, post-traumatic stress disorder, and anxiety disorders because of detention.[259] Further, children are unable to adequately focus or process information provided to them or answer questions asked of them,[260] therefore simply not understanding what they are told.[261]

The consistent lack of legal advice and other assistance for children seeking protection leaves these kids to navigate the Mexican protection system themselves.[262] Few children are fortunate enough to be represented by one of the few NGOs providing legal assistance to protection-seekers.[263] The application and resolution processes for refugee status are not designed to be child-friendly, putting these traumatized children in an impossible situation.[264]

Migrant children should be transferred to shelters operated by the National System for Integral Family Development (Desarrollo Integral de la Familia - DIF), but instead routinely  are being held in detention centers.[265] This requirement can be circumvented only when no space is available in any nearby federal, state, or local DIF shelter or if children are accompanied and are to stay in detention at the Estación Migratoria with family members.[266] In practice, however, detention in an Estación Migratoria is usually the first response.

---

[257] Id.
[258] Rea Granados, supra note 79.
[259] Julie M. Linton, Marsha Griffin, and Alan J. Shapiro, Detention of Immigrant Children, Pediatrics, 139,  (May 2017), https://doi.org/10.1542/peds.2017-0483; Sarah Mares, Mental Health Consequences of Detaining Children and Families Who Seek Asylum: A  Scoping Review, European Child & Adolescent Psychiatry(September 2020), https://doi.org/10.1007/s00787-020-01629-x.
[260] Georgetown Law Human Rights Institute, supra note 256.
[261] Id.
[262] Human Rights Watch, Closed Doors: Mexico´s Failure to Protect Central American Refugee and Migrant Children 71-78 (Mar. 31, 2016), https://www.hrw.org/es/report/2016/03/31/puertas-cerradas/el-fracaso-de-mexico-en-la-proteccion-de-ninos-refugiados-y.
[263] Georgetown Law Human Rights Institute, supra note 256.
[264] Id.
[265] Human Rights Watch, supra note 270, at 80.
[266] Georgetown Law Human Rights Institute, supra note 256.

CLP_PC_033424

Children also report that INM officials tell them that applying for protections will result in their detention being prolonged while their cases are being evaluated.[267] Human rights organizations documented instances in which children and parents decided not to submit an application, or withdrew their ongoing evaluations, to avoid remaining in custody.[268]

While in INM facilities or DIF centers, children are denied freedom of movement  and do not attend school.[269] Although children are guaranteed the right to rest, play, and engage in  activities under the UN Convention on the Rights of the Child, detained migrant children are these denied opportunities.[270] Detention centers do not meet minimum space and conditions requirements to ensure safe environments for children.[271] Time for outdoor recreation is restricted, and in many cases not allowed at all.[272]

## 4. Discrimination in Access to Rights

The UN Committee on Migrant Workers noted "reports of increasing xenophobia in social and institutional contexts" in September 2017 leading to discrimination against migrants and protection-seekers.[273] In June 2020, OHCHR noted that both the United Nations and the Inter-American Human Rights system reported rampant discrimination, human rights violations, and ill-treatment, including torture, of migrants and refugees in Mexico.[274] This discrimination is visible in the difficulties that many protection-seekers face when trying to exercise their rights as guaranteed by Mexican law.

When a vulnerable applicant has been provisionally admitted into Mexico or is being held in an Estación Migratoria, the Ministry of the Interior must analyze which measures would best serve the applicant, in conformity with the specifics of each case.[275] With regard to children and adolescents, there should be a best interest of the child determination.[276]

---

[267]Id. at 49.
[268]Id., at 61-63.
[269]Georgetown Law Human Rights Institute, supra note 256.
[270]Consejo Ciudadano del Instituto Nacional de Migración, Personas en Detención Migratoria en México: Misión de Monitoreo de Estaciones Migratorias y Estancias Provisionales del Instituto Nacional de Migración 140 (July 2017),  https://www.gob.mx/cms/uploads/attachment/file/281218/CCINM-Informe_Final_Monitoreo.pdf.
[271]Id.
[272]Id. at 141
[273]UN  CMW, supra note 133, at para. 25.
[274]U.N. Special Rapporteur on Torture et al., supra note 175.
[275]Law on Refugees, Complementary Protection and Political Asylum art. 20 (Mex.).
[276]Id.

CLP_PC_033425

In practice, these laws do little to protect vulnerable groups. To avoid detention, almost all women and LGBTQI+ people enter Mexico by avoiding migration paths that avoid the inspection and apprehension by immigration officials.[277] The routes include  towns that  often are remote, exposing them to high risks of assault and sexual and gender-based violence.[278]

The UNHCR found that migrant, asylum-seeking, and refugee women are vulnerable to violence in Mexico because of their national origin and legal status, despite the protection framework.[279] Irregular migration status reduces access to services and justice. Public health and immigration authorities tend to be unaware of the rights that asylum-seeking and refugee women and girls are entitled to in Mexico.[280]

## 5. Restrictions on Residence and Movement

The 2011 Migratory Law authorizes the Ministry of the Interior to restrict the residence of applicants for protection, refugees or those granted complementary protection.[281]

Protection-seekers are provided a temporary document that confirms their application is pending. According to the COMAR, that document is valid for 45 business days and indicates the Mexican state that the applicant must remain in while their status is determined.[282] Protection-seekers are barred from leaving the Mexican state in which they presented their application without authorization from COMAR or until they receive a positive adjudication of their application.[283]

Authorization for transfer of an application within Mexico is generally only permitted for personal safety reasons or with proof of relation to a family member in another part of the country who can demonstrate the ability to financially support the applicant.[284] Because most applications for protection are presented along the southern and northern borders, this restrictive policy often forces vulnerable applicants to remain in situations where they are exposed to risks.[285]

---

[277]UNHCR, supra note 24, at 4.
[278]Id.
[279]Id.
[280]Id.
[281]Law on Refugees, Complementary Protection and Political Asylum art. 49 (Mex.).
[282]Id.
[283]Kerwin, supra note 11, at 310.
[284]Id.
[285]Asylum Access, supra note 88, at 5.

CLP_PC_033426

The southern border region is economically poor, has poor infrastructure, and fewer job opportunities than the rest of the country.[286] There is also a significant Central American gang presence along with other agents of persecution in the southern states.[287] The northern border states are plagued by violent crime, kidnappings, and drug cartels.[288] In both parts of Mexico, with a significant backlog of case adjudiciation, protection-seekers face prolonged dangerous and even unlivable living conditions.[289]

## 6. Violence and Torture Against Protection-Seekers, Human Rights Activists, and Journalists

The Human Rights Committee 2019 Concluding Observations Report documented numerous severe risks for migrants and protection-seekers in Mexico.[290] Overall, a continued rise in the rates of homicide and extrajudicial killings place everyone  at heightened risk.[291] For migrants specifically, the Committee found credible reports of migrants, especially those with irregular status, being subjected to torture, serious physical abuse, enforced disappearances, extortion, trafficking, and murder.[292]

The Los Angeles Times reported on a 35-year-old Salvadoran man who was brutally murdered in December 2019 while waiting in Tijuana for an outcome in his U.S. asylum case.[293] Trapped in the city for over seven months because of the U.S. Migrant Protection Protocols (MPP), the man and his family told U.S. officials repeatedly that they were not safe in Tijuana, but were sent back anyway. In the first six months of 2019, reported kidnappings in Ciudad Juárez rose by one hundred percent.[294] In late July 2019, a Cuban protection-seeker was stabbed to death in the city as they waited, per the U.S. metering policy, to be among the limited number of people allowed into the United States each day.[295] Their were names listed among thousands of others on a metering list. While this type of violence against migrants in Mexico is not new, the region's new migration patterns and policies raise the stakes for protection-seekers in Mexico.[296]

---

[286] Id.

[287] Id.

[288] Id.

[289] Id.

[290] Human Rights Committee, Concluding Observations on the sixth periodic report of Mexico, U.N. Doc. UN CCPR/C/MEX/CO/6, para. 32 (2019).

[291] Id., at para.18.

[292] Id., at para 32.

[293] Wendy Fry, Central American Migrant Who Sought U.S. Asylum Slain in Tijuana, Los Angeles Times, (Dec. 12, 2019), https://www.latimes.com/california/story/2019-12-12/attorney-central-american-in-mpp-program-murdered-in-tijuana.

[294] Human Rights First, Delivered to Danger: Illegal Remain in Mexico Policy Imperils Asylum Seekers' Lives and Denies Due Process 1 (Aug. 2019), https://www.humanrightsfirst.org/sites/default/files/Delivered-to-Danger-August-2019%20.pdf.

[295] The Center for U.S. Mexican Studies & The Strauss Center for International Security Law, Metering & Covid-19, at 3 (Apr. 2020), https://usmex.ucsd.edu/_files/MeteringCovid-19.pdf.

[296] See U.N. Human Rights Committee, supra note 298; Special Rapporteur on Extrajudicial, Summary or Arbitrary Executions, Christof Heyns, Mission to Mexico, U.N. Doc. A/HRC/26/36/Add.1, para. 72, 74 (Apr. 28, 2014); see also Mexico Travel Advisory, U.S. Dept. of State (Sept. 8, 2020) (advising U.S. citizens to not travel to Colima, Guerrero, Michoacán, Sinaloa, or Tamaulipas states due to crime).

CLP_PC_033427

The Mexican judicial system has not been able to overcome the "twin crises of atrocity and impunity."[297]

Migrant shelters and populations remain primary targets for the highly organized criminal organizations operating in Mexico and across the Mexico-U.S. border.[298] TWhen attacked, migrants are afraid to bring cases to the police and when they do, they lack access to legal representation.[299] As an example, the UNHCR credits the low reporting of violence against women, despite the reality that 7 out of every 10 migrant women are survivors of violence, on the lack of access to legal representation.[300]

Protection-seekers in Mexico face acute risks of murder, kidnapping, disappearance, sexual assault, trafficking,  and other grave abuses.[301] They are targeted not only due to their inherent vulnerabilities as refugees and migrants, but also because of  their nationality, race, gender, sexual orientation, and gender identity.[302] In 2017, Mexico's National Commission on Human Rights (Comisión Nacional de los Derechos Humanos – CNDH) issued a report on mass graves in Mexico, which documented 312 registered deaths and disappearances of migrants in 2017.[303]

In 2019, the Human Rights Committee expressed concern about the numerous assaults and fatal attacks on human rights defenders and journalists.[304] Just the year before, Amnesty International reported that 75% of INM detainees were not informed of their right to seek asylum.[305] Amnesty International surveyed nearly 300 persons who had been detained by INM field agents,  and found only 10 cases where protection-seekerswere properly informed of their rights.[306]

---

[297]Open Society Justice Initiative, Corruption That Kills: Why Mexico Needs an International Mechanism to Combat Impunity 52 (2018), https://www.justiceinitiative.org/uploads/5071ab37-003f-46b1-9e1f-700bbdae34a3/corruption-that-kills-en-20180502.pdf.
[298]Id, at 44.
[299]Human Rights First, Marking One Year of the Horrific "Remain in Mexico" Policy- Over 800 Violent Attacks on Asylum-Seekers (Jan. 22, 2020), https://www.humanrightsfirst.org/press-release/marking-one-year-horrific-remain-mexico-policy-over-800-violent-attacks-asylum-seekers.
[300]UNHCR, supra note 24, at 4.
[301]Human Rights First, supra note 131, at 3.
[302]Id. at 2.
[303]Id. at 3.
[304]UN Concluding observations on the seventh periodic report of Mexico, Doc. UN CAT/C/MEX/CO/7, (2019). para. 62.
[305]Amnesty Int'l, Mexico: Overlooked, Underprotected: Mexico's Deadly Refoulement of Central Americans Seeking Asylum (Jan.2018)5,23, https://www.refworld.org/docid/5a69e3c34.html.
[306]Id. at 10, 23

The UN Committee on Migrant Workers expressed in 2017 its particular concern about violations of the rights of migrant activists.[307] They reported that this sub-group "are subjected to violence and threats by organized crime groups and trafficking networks, sometimes in collusion with the authorities" Immigration officials, including government and private security forces that handle migration control activities, themselves reportedly harassed and attempted to delegitimize the work of these activists.[308]

In a September 2019 report, Frontline Defenders, Red TDT and PRAMI described more than 40 instances in Mexico of harassment, threats, or violent acts against migrant shelters or against human rights defenders working with migrants.[309] The report describes multiple cases of false imprisonment of migrant rights defenders, such as Irineo Mujica, who was arrested and falsely accused of human trafficking in Pueblo Sin Fronteras, Mexico.[310] After his release due to lack of evidence, his case was appealed, and the INM and National Guard attempted to detain him in order to prevent him from appearing for his appeal hearing.[311] In August 2019, two armed men threatened him at his home.[312] Mujica was also the victim of attempted arson of his home and vehicle in Tijuana.[313] Moreover, the report describes dozens more attacks and threats against migrant defenders and the shelters protecting them, showing how prevalent an issue migrant defender safety is in Mexico.[314]

## C. Conclusion

Though robust on its face, Mexico's legal framework fails to achieve its goals to protect protection-seekers and other vulnerable migrants in every way. Although the laws are on the books, they are consistently ignored by Mexican officials, whether purposefully or ignorantly. Systemic barriers further bar access to the legal protections that are supposedly guaranteed. The reality facing protection-seekers includes the risk of enforced disappearances, intimidation, militarized borders, inhumane and prolonged detention, and deportation back to countries where their lives are at risk. Mexico continuously fails to mitigate these dangers and abuses.

The challenge Mexico faces is giving meaningful effect to asylum and refugee laws. Changing migration and the global COVID-19 pandemic, in addition to humanitarian crises in the Americas and across the world, mean that asylum and international protection are more critical than ever. Mexico potentially can provide this protection, but so far has chronically underperformed to protect protection-seekers and other vulnerable migrants within its borders.

---

[307]U.N. CMW, supra note 133, at para. 43.
[308]Id.
[309]Frontline Defenders, Red TDT & PRAMI, Defenders Beyond Borders: Migrant Rights Defenders Under Attack in Central America, Mexico & the United States 25 (Sept. 2019), https://www.frontlinedefenders.org/sites/default/files/frontline_defenders_mexico_english_v2.pdf.
[310]Id.
[311]Id.
[312]Id.
[313]Id., at 26.
[314]Id., at 19-33.

CLP_PC_033429

## III.  Availability of International Protection in Guatemala

Guatemala is bound by both its domestic legislation and international agreements with respect to migrant protection-seekers. In 2016, the Congress of the Republic of Guatemala restructured Guatemala's asylum legal framework through Decreto No. 44-2016 – Código de Migración. In 2019, the National Migration Authority issued implementing regulations.[315] The new law and regulations streamlined the process for applying for refugee status and other forms of international protection, and explicitly outlined the rights and protections afforded to protection-seekers.[316] Protection-seekers, however, still face a number of barriers to obtaining refugee status. The new laws, while an improvement, still contain a number of gaps, including insufficient due process protections.[317] Additionally, protection-seekers face lengthy bureaucratic delays, lack of access to government documentation, harassment by police officers, uninformed and underqualified immigration officials, and risk of detention.[318]

---

[315]Decreto No. 44-2016 – Código de Migración [Immigration Code], Diario de Centro America [DCA] 18-10-2016 (Guat.), formato PDF, https://igm.gob.gt/wp-content/uploads/2017/09/CODIGO-MIGRACION-DTO-44-2016.pdf; Acuerdo de Autoridad Migratoria Nacional No. 2-2019 - Reglamento de Procedimiento para la protección, determinación y reconocimiento del estatuto del refugiado en el Estado de Guatemala [Regulation No. 2-2019], 2019 (Guat.), https://igm.gob.gt/wp-content/uploads/2017/09/ACUERDO-2-2019-Reglamento-Refugiado-1.pdf; Acuerdo de Autoridad Migratoria Nacional No. 7-2019 – Reglamento General del Código de Migración [Regulation No. 7-2019], 2019 (Guat.), https://igm.gob.gt/wp-content/uploads/2017/09/ACUERDO-AMN-7-2019_Plantilla.pdf.
[316]See infra Part III.A.3. The Guatemalan Immigration Code identifies asylum seekers as applicants for refugee status. For simplicity, we refer to those applying for refugee status as protection-seekers.
[317]See infra Part III.B.5.
[318]See infra Part III.B.

CLP_PC_033430

*They are not protected at all. The institutions that need to address the issues and pass rules or regulations related to asylum are not doing that. Asylum seekers are pretty unprotected.*[319]

*Mr. Carlos Eduardo Woltke Martínez,*
*Ombudsman for Migrants within the Human Rights Ombudsman*

## A. Overview of the Guatemalan System for International Protection

## 1. Applicable Legal Framework

The Guatemalan Constitution recognizes an individual's right to seek asylum in Guatemala and guarantees non-refoulment from persecution.[320] The Guatemalan Constitution also establishes the preeminence of international human rights treaties over domestic law. [321] Guatemala acceded to the 1951 Convention on the Status of Refugees and the 1967 Protocol Relating to the Status of Refugees in September 1983.[322] Guatemala initially made reservations to the 1951 Convention and its Protocol,[323] but in 2007, Guatemala withdrew its reservations.[324]

Guatemala is also a party to the Cartagena Declaration on Refugees of 1984, which it ratified on September 14, 2001.[325] Through legislation, Guatemala adopted the definition of refugee stated in the Cartagena Declaration, a broader definition than the 1951 Convention and its Protocol.[326] In 2016, the Guatemalan Congress passed into law the current Migration Code, Decree Number 44-2016, but the implementing regulations were not adopted until 2019.[327] The series of regulations, or *acuerdos*, interpret and provide guidance on the functions of the various administrative bodies and procedures to implement and ensure the rights established in the Migration Code.[328]

---

[319]Interview with Carlos Eduardo Woltke Martínez, the Guatemalan Ombudsman for Migrants within the Human Rights Ombudsman ("Procurado de los Derechos Humanos"), Nov. 16, 2020, source on file with the authors.

[320]Constitución Política de la República de Guatemala [Guatemalan Constitution], 1985, reformada por Acuerdo legislativo No. 18-93 del 17-11-1993, art. 27 https://www.oas.org/dil/esp/Constitucion_Guatemala.pdf.

[321]Guatemalan Constitution, art. 46, (Guat.).

[322]UNHCR, States Parties to the 1951 Convention relating to the Status of Refugees and the 1967 Protocol 3 (2015), https://www.unhcr.org/protect/PROTECTION/3b73b0d63.pdf; see also UNHCR, UNHCR Submission on Guatemala: UPR 28th Session, March 2017 [hereinafter UNHCR Submission on Guatemala] https://www.refworld.org/docid/5a12ae190.html.

[323]Id.

[324]In a communication received on April 26, 2007, the Government of the Republic of Guatemala notified the Secretary-General that it has decided to withdraw the reservation and declaration made upon accession to the Convention. Id.

[325]Ministerio de Relaciones Exteriores, Acuerdo Gubernativo No. 383-2001 - Reglamento para la Protección y Determinación del Estatuto de Refugiado en el Territorio del Estado de Guatemala, Sept. 14, 2001 (Guat.), https://www.acnur.org/fileadmin/Documentos/BDL/2002/1410.pdf; Inter-American Comm'n H.R., Human Rights of Migrants, Refugees, Stateless Persons, Victims of Human Trafficking and Internally Displaced Persons: Norms and Standards of the Inter-American Human Rights System, IACHR Doc. 46/15, 51 (2015) [hereinafter IACHR 2015 Report].

[326]UNHCR Submission on Guatemala, supra note 333, at 1; see also IACHR 2015 Report, supra note 336, at 49.

[327]Immigration Code (Guat.); Regulation No. 2-2019 (Guat.);  Regulation No. 7-2019 (Guat.).

[328]See generally id.

CLP_PC_033431

National Migration Authority Agreement No. 2-2019 (Regulation No. 2-2019) set forth the rules and procedures for refugee recognition in Guatemala.[329]

The 2016 Migration Code restructured the immigration system by creating three bodies: the National Migration Authority (AMN), the Guatemalan Institute of Migration (IGM), and the National Council of Attention to the Migrant of Guatemala.[330] The AMN has the authority to enact immigration policy, while the IGM is responsible for implementing the policies and regulations promulgated by the AMN.[331] Importantly, the AMN has the sole authority to decide applications for refugee status.[332] The 2016 Migration Code authorized the AMN to create the National Commission for Refugees (la Comisión Nacional para Refugiados, or CONARE), which is an advisory body to the AMN and completes initial investigations of applications for refugee status, extensions of refugee status, and  refugee status terminations.[333] The CONARE then issues opinions and recommendations to the AMN regarding the ultimate decision on refugee status, extension, or cessation.[334] Importantly, in early 2021, Guatemala with the support of the UNHCR, created a new office within the IGM called the Refugee Status Recognition Department (DRER by its Spanish acronym) with the aim of  increasing Guatemala's capacity to process refugee applications and support refugees while their applications are pending.[335]

---

[329] See Regulation No. 2-2019, art. 1 (Guat.).

[330] Immigration Code, art. 113 (Guat.).

[331] Id. at art. 114.

[332] Id at art. 117, 177. (the AMN is comprised of Guatemala's: Vice President;  Ministers of Foreign Affairs, Social Development, Labor and Social Welfare, and the Interior; the Director of the Guatemalan Institute of Migration; and the Executive Secretary of the Migrant Assistance Council of Guatemala);  Refugees Int'l & Human Rights Watch, Deportation with a Layover: Failure of Protection under the U.S.–Guatemala Asylum Cooperative Agreement (May 2020), https://static1.squarespace.com/static/506c8ea1e4b01d9450dd53f5/t/5ec3f0b370656c62ed 7daa24/1589899466780/Guatemala+ACA+Report+-+May+2020+-+FINAL.pdf.

[333] Immigration Code, art. 177 (Guat.); Regulation No. 2-2019, art. 14 (Guat.).

[334] Id.

[335] UNHCR. UNHCR Welcomes Expansion of Guatemala's Asylum Capacity (Feb. 10, 2021), https://www.unhcr.org/en-us/news/ press/2021/2/6023f7d918/unhcr-welcomes-expansion-guatemalas-asylum-capacity.html.

CLP_PC_033432

*Figure 2: Guatemalan Immigration Agencies (per the 2016 Migration Code & accompanying acuerdos)*



Article 4 of Regulation No. 2-2019 defines three categories of persons who may request refugee status:

a. Any person who, due to well-founded fears of being persecuted for reasons of race, religion, nationality, membership of a certain social group or political opinions, is in the country and cannot, or because of said fears, does not want to avail themselves of the protection of the country of their nationality;

b. Whoever fled his [or her] country because his [or her] life, security or freedom has been threatened by generalized violence, foreign aggression, internal conflicts, massive violation of human rights or other circumstances that have seriously disturbed public order;

c. Whoever suffers from persecution through sexual violence or other forms of gender or sexual orientation persecution that results from human rights violations contained in international agreements to which the State of Guatemala is a party.[336]

---

[336]Regulation No. 2-2019, art. 4 (Guat.).

CLP_PC_033433

The 2019 regulation defines "refugee status" as the "[e]xtraordinary migratory status" of a foreign person who, in accordance with the 2016 Migration Code, is recognized as a refugee by the AMN.[337] Further, refugee status and refugee applicant status are "extendable" to the spouse and relatives of the applicant or refugee.[338] "Well-founded fear" is defined as the events amounting to persecution that, because of their nature or frequency, would or could put the life, safety, or freedom of the person at risk.[339]

Those who have committed war crimes or crimes against humanity cannot be granted refugee status.[340] Neither can those who have committed "particularly serious crime[s]" outside of Guatemala, those who seek refugee status to evade prosecution in another country, or those who are "guilty of acts contrary to the purposes and principles of the United Nations" be granted refugee status.[341]

Refugee status is not permanent in Guatemala, and the 2016 Migration Code details the circumstances in which a refugee can have their status revoked. Immigration authorities can seek the termination of refugee status when a refugee does one of the following: Voluntarily renounces one's refugee status; voluntarily accepts the protection of one's country of origin; voluntarily recovers one's lost nationality; voluntarily acquires a new refugee status or nationality and claims the protection of the country of that new refugee status or nationality; voluntarily establishes oneself in the country of persecution or feared persecution; or is unable to continue claiming the protection of Guatemala because of changed circumstances in the country of origin.[342] In all circumstances, the CONARE will investigate the reasons for possible cessation of refugee status.[343] However, a refugee is only entitled to a hearing for the potential loss of status under changed circumstances in the country of origin.[344] Even then, a refugee is not entitled to be present for a ruling by the CONARE.[345] Should the AMN (or the CONARE in situations of cessation due to changed circumstances) declare the termination of one's refugee status, the person has 30 days to regularize their immigration status or leave the country.[346]

---

[337] Id. art. 2(j).
[338] Id. A refugee or applicant for refugee status must formally apply for the extension of status to his or her spouse or relatives. Regulation No. 2-2019, art. 26 (Guat.).
[339] Id. art. 2(i).
[340] Immigration Code, art. 47(a) (Guat.).
[341] Id. art. 47(b)-(c); Regulation No. 2-2019 (Guat.) has clarified that the exclusion of a foreigner for refugee status due to the above prohibitions does not extend to the foreigner's family members. Regulation No. 2-2019, art. 5 (Guat.).
[342] Id. art. 184.
[343] Id., arts. 22-23.
[344] Immigration Code, art. 184(f) (Guat.); Regulation No. 2-2019, art. 23 (Guat.).
[345] Regulation No. 2-2019, art. 23(b) (Guat.).
[346] Id., , art. 24 .

CLP_PC_033434

Separate from an application for refugee status, migrants may enter Guatemala for humanitarian reasons and apply for "extraordinary immigration status of permanence for humanitarian reasons."[347] The duration of such status depends on the circumstances for seeking humanitarian protection and will last until the humanitarian need ends.[348]

As a result of seeking refugee or humanitarian status, migrants can be granted one of three "permanence statuses:" Provisional permanence status; special care permanence status; or humanitarian stay status.[349] These three "permanence statuses" provide legal status for protection-seekers, but they are limited in their duration. A fourth status, temporary residence status, is only available to unaccompanied children and those granted refugee status, and is valid for up to five years, providing more stability.[350]

| Provisional Permanence Status | Special Care Permanence Status | Humanitarian Stay Status | Temporary Residence Status |
|---|---|---|---|
| •Available to asylum seekers with pending refugee status applications.<br><br>•Valid for 30 days, renewable. | •Available to vulnerable migrants (e.g., victims of torture, trafficking, sexual violence).<br><br>•Duration of status determined on a case-by-case basis. | •Available to migrants seeking safety in Guatemala for humanitarian reasons (e.g., fleeing natural disaster or armed conflict).<br><br>•Valid for duration of humanitarian crisis. | •Available to unaccompanied children upon submitting an application for refugee status and to adults granted refugee status.<br><br>•Valid for up to five years. |

Applicants for refugee status are provided provisional permanence either upon formal request from a Guatemalan government authority or upon proof of one's formal request for refugee status.[351] Provisional permanence is valid for 30 days and is renewable.[352] Migrants eligible for special care permanence status are: Victims of torture, human trafficking, or sexual violence; unaccompanied children; and the elderly or those living with mental illness.[353] The duration of the status is dependent on the specific circumstances of the migrant and the decision of a judge or the adjudicating authority.[354] Migrants who meet one of the categories of humanitarian reasons will be granted humanitarian stay status, which is only valid for as long as the humanitarian reason is a present concern.[355]

---

[347] Regulation No. 7-2019 (Guat.); Immigration Code, art. 85 (Guat.).
[348] Id. arts. 22, 55 (Guat.); the Immigration Code lists circumstances that are considered humanitarian reasons. Immigration Code, art. 68 (Guat.).
[349] Immigration Code, art. 81 (Guat.).
[350] Immigration Code, art. 48 (Guat.); Regulation No. 7-2019, arts. 50, 83 (Guat.); see Regulation No. 2-2019, art. 17(1)(d) (Guat.).
[351] Regulation No. 7-2019, art. 53 (Guat.); Immigration Code, art. 82 (Guat.).
[352] Immigration Code, art. 82 (Guat.).
[353] Id. art. 83.
[354] Regulation No. 7-2019, art. 54 (Guat.).
[355] Immigration Code, art. 85 (Guat.); Regulation No. 7-2019, art. 55 (Guat.).

CLP_PC_033435

Once granted refugee status, adult refugees are provided temporary residence status, which is valid for up to five years.[356] Unaccompanied children who request refugee status are automatically granted temporary residence status upon submitting a formal application.[357] The regulations have no clarity about what happens after the initial time granted expires. However, the 2016 Law states that a person can apply for permanent residence status when "they have been temporary residents for a period equal to or greater than five years."[358] Applicants for refugee status are provided provisional permanence either upon formal request from a Guatemalan government authority or upon proof of one's formal request for refugee status.[359]

## 2. Procedures for Accessing Refugee Status

To access international protection in Guatemala, an applicant must request refugee status verbally or in writing at any Immigration Control post,[360] or once in the country at the Sub-Directorate of Attention and Protection of Fundamental Rights of Migrants within the IGM.[361] The requests received by these authorities must be immediately transferred in writing to the CONARE.[362] Once it receives a request, the CONARE must inform the applicant how to submit a formal application for refugee status, and the CONARE must make the application form available to the applicant.[363] Practice reveals that while the regulations provide the CONARE with the authority to investigate applications for refugee status, the Office of International Migratory Relations (ORMI), a specialized unit within the IGM, is actually the authority that processes applications and conducts initial interviews.[364] After completing an initial investigation, ORMI forwards the case to the CONARE for further consideration.[365] According to a recent annual report published through the Comprehensive Regional Protection and Solutions Framework (MIRPS by its Spanish acronym), the newly-created Refugee Status Recognition Department absorbs the functions of ORMI and aims to improve processing and resolution of refugee applications.[366]

---

[356] Immigration Code, art. 48 (Guat.); Regulation No. 7-2019, art. 50 (Guat.).

[357] Immigration Code, art. 83 (Guat.); Regulation No. 2-2019, art. 17(1)(d) (Guat.).

[358] Immigration Code, art. 78 (a) (Guat.).

[359] Id.  78 (d) .

[360] Immigration Control posts are stations located primarily along Guatemala's border to process migrants.

[361] Regulation No. 2-2019, art. 17(1) (Guat.).

[362] Id.

[363] Id.

[364] Georgetown Law Human Rights Institute. Supra note 256.

[365] Id.

[366] MIRPS, III Annual Report of the Comprehensive Regional Protection and Solutions Framework: Implementing the Global Compact on Refugees in Central America and Mexico 32, (2020), https://www.refworld.org.es/cgi-bin/texis/vtx/rwmain/opendocpdf.pdf?reldoc=y&docid=5fcf9e8d4.  [hereinafter MIRPS Annual Report].

Application submitted to the IGM

Application forwarded to CONARE for individual interview and further investigation

ORMI begins initial investigation

When submitting the application form, protection-seekers must state the reasons for seeking refugee status and leaving their home country, and applicants may include identity documents and any evidence relevant to their claim.[367] Once the application has been formalized, the CONARE must immediately begin investigating and notify the Sub-Directorate of Attention and Protection of Fundamental Rights of Migrants, which, through its Refugee Applicant Assistance Unit, will issue the provisional residence permit indicating 30=day provisional permanence status.[368] Upon receipt of the formal application, the CONARE must schedule the applicant's eligibility interview within fifteen days of receipt of the application.[369] Should the applicant not appear for his or her interview, the application will officially be considered abandoned once six months have passed and the applicant has not contacted CONARE.[370]

*We knew it because a relative told us we had the requirements to apply for asylum . . . We contacted the ACNUR and El Refugio de la Ninez to find out what we needed to do.[371]*

*Miguel, Salvadoran granted refugee status in Guatemala*

The eligibility interview must be conducted individually, recorded with audio and video equipment, and in the presence of a psychologist who will submit a psychological evaluation following the interview.[372] The interviews are conducted in Spanish, and an interpreter will be provided if needed.[373]

---

[367]Regulations 2-2019, art. 17(1)(b) (Guat.).
[368]Id., , arts. 17(1) , 17(3); Acuerdo de Autoridad Migratoria Nacional No. 8-2019 [Regulation No. 8-2019], art. 271. See generally UNHCR, Help Guatemala: Apply for Refugee Status,  https://help.unhcr.org/guatemala/solicitando-la-condicion-de-refugiado/solicitar-la-condicion-de-refugiado/  (outlining the steps to apply for refugee status). Unaccompanied children will be granted temporary residence rather than the provisional residence permit. Regulation No. 2-2019, art. 17(1)(d). (Guat.).
[369]Regulation No. 2-2019, art. 17(1)(e) (Guat.).
[370]Id., , art. 20.
[371]Interview with a protection-seeker in Guatemala who had successfully received refugee status,(Feb. 8, 2021).
[372]Regulation No. 2-2019, art. 17(2) (Guat.). According to an interview with Carlos Eduardo Woltke Martínez, the Guatemalan Ombudsman for Migrants, psychologists are not currently permitted in the individual interviews because of concern for maintaining the confidentiality of the applicant and their refugee status application. Interview with Carlos Eduardo Woltke Martínez, supra note 330.
[373]Regulation No. 2-2019, art. 17(2) (Guat.).

CLP_PC_033437

Throughout the interview process, the CONARE support staff must provide specialized care,[374] particularly to unaccompanied children.[375]

After the interview has been completed and the investigation finalized, the CONARE has 30 days to issue a recommendation to the AMN.[376] UThe AMN will then issue a final decision either recognizing or denying refugee status.[377]

If the application is denied, the applicant has a right to appeal within ten days after receiving the ANM's decision.[378] The appeal is processed directly by the AMN, which must render a decision on the appeal within five days.[379] Should the AMN ultimately refuse the request for refugee status, the UN High Commissioner for Refugees (UNHCR) may request that the applicant be granted a reasonable period of stay in Guatemala while the applicant seeks admission to another country.[380] The AMN must ultimately agree to this.[381] Absent a UNHCR request for a reasonable period of stay, the applicant must regularize their immigration status.[382]

## B. Refugee and Protection-Seeker Rights: Assessing Barriers to International Protection

The 2016 Migration Code enumerates the rights guaranteed to all foreigners, as well as rights afforded specifically to international protection seekers, refugees, unaccompanied children, and other special populations, including pregnant women and the elderly. The 2016 Migration Code recognizes the right of applicants for refugee status to equality before the law and guarantees that they will "enjoy all the rights and obligations set forth in Guatemalan legislation . . . as well as those recognized and guaranteed in international treaties and conventions ratified by the State of Guatemala."[383] The identity documents provided to applicants for refugee status should enable them to access necessary government services, including education and health services.[384]

---

[374] While specialized care is not specifically defined in the regulations, with regard to unaccompanied children, they should be cared for by immigration personnel who have specific training in the rights and treatment of children. Regulation No. 7-2019, arts. 97(b), 101 (Guat.).
[375] Regulation No. 2-2019, art. 17(2) (Guat.).
[376] Id. at art. 17(3).
[377] Id. at art. 17(4) .
[378] Id. at art. 18; Immigration Code, art. 182 .
[379] Regulation No. 2-2019, art. 18.
[380] Immigration Code, art. 183 .
[381] Id.
[382] Regulation No. 2-2019, art. 18.
[383] Immigration Code, art. 51.
[384] Id. at arts. 53, 100.

CLP_PC_033438

Furthermore, those granted temporary resident status, including unaccompanied children and those granted refugee status, are guaranteed access to the rights that accompany their status, including the freedom of movement, access to health care, access to education, access to justice and legal counsel, and other fundamental rights found in both national legislation and international law.[385]

These and other rights discussed below are formally conferred to protection-seeekers in Guatemala, but the reality is that migrants  face systematic human rights violations and barriers when attempting to access their rights.

The Guatemalan government is not adequately implementing the present legal protection framework for migrants, leaving asylum seekers vulnerable to human rights abuses and without adequate protection. Furthermore, Guatemala lacks the infrastructure and sociopolitical power to protect its own citizens, let alone protection-seekers from other countries. Guatemala has been labeled "among the most dangerous countries in the world" and struggles with high levels of impunity and corruption.[386] As a result of these barriers and the socio-economic conditions of Guatemala, few protection-seekers attempt to seek protection in Guatemala. Of those refugee status applications that are submitted, only a limited number are resolved. This section describes the rights that should be afforded to protection-seekers and the limitations and repercussions created by systemic barriers and legal gaps.

## 1. Access to Refugee Application Process

Interviews with protection-seekers, service providers, and experts in migration in Guatemala reveal that the processes established by the 2019 regulations meant to make refugee status more accessible largely are not being implemented or followed. While protection-seekers  technically can apply for refugee status at anydesignated port of entry, Guatemalan border agents and migration officers are not equipped with the knowledge, resources, funding, and infrastructure to support those seeking refugee status.[387] Mr. Carlos Eduardo Woltke Martínez, the Guatemalan Ombudsman for Migrants, stated that immigration officers are "the main obstacle" for protection-seekers.[388] He explained that "people seeking refugee status encounter officials who instead of processing their claims erect barriers to their seeking protection.

---

[385]Immigration Code, art. 48 (Guat.).
[386]Human Rights First, Is Guatemala Safe for Refugees and Asylum Seekers? 2 (2019), https://www.humanrightsfirst.org/sites/default/files/GUATEMALA_SAFE_THIRD.pdf.
[387]Procurador de los Derechos Humanos de Guatemala, Informe Anual Circunstanciado de Actividades y de la Situación de los Derechos Humanos y Resumen Ejecutivo 332-333 (2019), https://www.pdh.org.gt/documentos/informes/informes-anuales/3859-informe-anual-circunstanciado-pdh-2019/file.html.
[388]Interview with Carlos Eduardo Woltke Martínez, supra note 330.

CLP_PC_033439

Because border agents are unfamiliar with the IGM or the proper procedures to assist protection-seekers,[389] those seeking refugee status distrust immigration authorities at the border.[390] Mr. Woltke Martínez explained that officials "will intentionally hide [or] not provide information," and immigration officials prevent migrants attempting to enter Guatemala from even submitting an application for protection."[391] As a result, many protection-seekers prefer to make a request for international protection in Guatemala City rather than at the border.[392] The UNHCR has found that Guatemala's mechanisms for identifying and referring protection-seekers for refugee assessments are inadequate and leave them at risk of deportation back to their countries of persecution.[393]

Once a protection-seeker submits an application for refugee status, flaws in Guatemala's refugee application process continue to reveal themselves. While the regulations provide that a refugee applicant is to have one interview scheduled within 15 days of receipt of the application, refugee applicants interviewed for this Report described being subjected to three to five interviews over several months; some were conducted via phone, most were conducted in person in the capital in Guatemala City.[394] Requiring multiple interviews creates substantial barriers for refugee applicants, particularly those who live far from the capital. Refugee applicants reported having to ride a bus for at least fourteen hours one-way to reach the capital for their interviews.[395] Such travel may be cost prohibitive for some protection-seekers, and the hours spent traveling may conflict with refugee applicants' ability to maintain employment.

In addition to the refugee application process being difficult to access, the adjudication process is flawed. Guatemala lacks qualified adjudicators working in the CONARE to determine claims and make recommendations to the AMN.[396] The CONARE's members are appointed, and there is no requirement that they have practice or otherwise have knowledge of asylum and refugee law.[397] The CONARE also includes the General Director of Migration and a representative from the UNHRC, but they only maintain advisory roles without the authority to make a decision on refugee status, despite their expertise.[398]

---

[389] Comisión Pastoral de Movilidad Humana de la Conferencia Episcopal de Guatemala et al, Informe País de Sociedad Civil y Academia en Guatemala sobre Avances y Desafíos en la Protección Internacional,10  (May 2014), https://movilidadhumana.com/informe-sobre-avances-y-desafios-en-la-proteccion-internacional/#_ftn7.
[390] Id. at 11. See also, Refugees Int'l & Human Rights Watch, supra note 343, at 40.
[391] Interview with Carlos Eduardo Woltke Martínez, supra note 330.
[392] Id.
[393] Refugees Int'l & Human Rights First, supra note 343, at 41-42.
[394] Telephone Interview with Anonymous Salvadoran man seeking asylum in Guatemala, International Human Rights Law Clinic (Jan. 27, 2021).
[395] Id.
[396] Refugees Int'l & Human Rights Watch, supra note 343, at 42.
[397] Id.
[398] Id.

Mr. Woltke Martínez further explained that those appointed to the CONARE are appointed for the wrong reasons and that they subsequently do not have the sufficient knowledge or expertise to adequately serve in their positions.[399]

The CONARE is required to meet at least once a month to facilitate the adjudication of refugee status applications, yet this is not the present practice.[400] The CONARE has waited, at times, nine months to meet and resolve any refugee status applications.[401] In the past two years, "minimal to no asylum claims" have been resolved.[402] From January 2018 to November 2018, 262 refugee status applications were filed in Guatemala and only twenty were resolved.[403] As of October 2019, 374 applications for refugee status in total were received: 26 were granted, 20 were denied, and 328 are still pending.[404] At the end of March 2020, the backlog of pending cases had grown to 713 cases.[405]

The office that initially processes refugee applications (ORMI, now the Departamenteo de Reconocimiento del Estatus de Refugiado [DRER]), also lacks sufficient staff for the number of applications it receives. As of 2019, the unit had only 3 caseworkers, 3 investigators, and 1 supervisor who have to process 100 to 150 claims per year, despite an over 700-case backlog.[406] Due to the limited number of officials processing applications, applicants may wait several years.[407]

Mr. Woltke Martínez explained that the institutions Guatemala has developed to protect applicants for refugee status are neither addressing their issues, nor are they attempting to pass rules or regulations to improve the situation.[408] Protection-seekers become frustrated with the process and may decide to return to their country of origin.[409] While there is hope that the newly formed DRER will increase Guatemala's capacity to process refugee status applications with the support of qualified staff familiar with the refugee application procedures, there is still a lack of expertise within the decision-making bodies, the CONARE and the AMN.

As described above, after an asylum application has been received by the DRER, the CONARE evaluates the application and makes a recommendation to the AMN, which ultimately issues the eligibility decision. Within this process, the decision maker has no interaction with the protection-seeker.[410]

---

[399]Interview with Carlos Eduardo Woltke Martínez, supra note 330.
[400]Comisión Pastoral de Movilidad Humana de la Conferencia Episcopal de Guatemala, supra note 401, at 5.
[401]Id.
[402]Georgetown Law Human Rights Institute, supra note 375, at 74.
[403]Human Rights First, supra note 397.
[404]Procurador de los Derechos Humanos de Guatemala, supra note 398, at 333.
[405]Refugees Int'l & Human Rights Watch, supra note 343 at, 41.
[406]Id.
[407]Interview with Carlos Eduardo Woltke Martínez, supra note 330.
[408]Id.
[409]Id.
[410]See Georgetown Law Human Rights Institute, supra note 256, at 60-62.

CLP_PC_033441

This significantly undermines protection-seekers' due process right to be heard.[411] Moreover, the same agency that makes the eligibility decisions, the AMN, is responsible for reviewing appeals from adverse determinations.[412] The regulations do not provide judicial review of denials of refugee status.[413]

## 2. Right to Identity Documents and Right to Travel

Persons who have formalized an application for refugee status have a right to an identity document in order to access social services.[414] Applicants are specifically entitled to a certificate issued by the IGM, which confirms that the application for refugee status is pending.[415] This certificate can be used as an official identification document in Guatemala, and it must be renewed every 30 days in person at the capital.[416] However, since the COVID-19 pandemic, the Guatemalan Government has created an online system through which a person can renew the certificate as an identity document.[417] A person with provisional residence status, i.e. those with formalized applications for refugee status, may also use their passports as their official identity document.[418]

Despite the implementation of an online system, refugee applicants describe barriers to receiving their refugee applicant identity documents. In order to apply for a permanent residence status, those applying for temporary residence, including those granted refugee status, are required to pay expensive fees, making it cost-prohibitive for marginalized asylum-seekers.[419] Further, there have been reports that National Registry of Persons (RENAP) does not consistently issue the new identification cards to protection-seekers or refugees as required.[420] Due to delays in processing identity document renewals, protection-seekers report receiving their renewed documents with only 15 days of validity left before they have to renew them again.[421] Without this documentation, refugees and asylum-seekers are prevented from accessing job opportunities, free public education, health care, bank services, legal processes, and more.[422]

---

[411]Id.
[412]Immigration Code, art. 177, 182-83 (Guat.).
[413]An asylum seeker could try to appeal the decision of the AMN to the Guatemalan Constitutional Court to seek an injunction, but this remedy is not typically applied to immigration decisions. See Georgetown Law Human Rights Institute, supra note 375, at 60.
[414]Immigration Code, art. 53 (Guat.).
[415]Id. at art.101(b).
[416]Id. at arts. 82, 101; Interview with Carlos Eduardo Woltke Martínez, supra note 330.
[417]Id.
[418]Immigration Code, art. 101 (Guat.).
[419]Application fees for permanent residence status can range between $200-300 U.S. dollars. See Georgetown Law Human Rights Institute, supra note 375, at 73.
[420]Refugees Int'l & Human Rights Watch, supra note 343, at 42; UNHCR, Sistema Nacional de Protección de Refugiados en Guatemala, Segunda Edición9 (2018), https://www.acnur.org/op/op_fs/5b3e64214/informe-del-sistema-de-proteccion-en-guatemala-segunda-edicion.html.
[421]Interview with protection-seeker granted refugee status in Guatemala (Feb. 8, 2021).
[422]Comisión Pastoral de Movilidad Humana de la Conferencia Episcopal de Guatemala, supra note 401, at 5.

CLP_PC_033442

Mr. Woltke Martínez explained that the biggest problem with the documentation provided to refugee status applicants is that police do not accept the form as an ID document when they stop protection-seekers, and police officers may then require the payment of a "bribe."[423] If a bribe is not provided, the protection-seeker is taken to the police station and immigration officials are called. Once immigration officials confirm that the protection-seeker's application is pending, the protection-seeker is allowed to leave, but he or she is left with more stress and a risk of economic uncertainty.[424]

*I entered the country legally in my vehicle and was fleeing the violence in my country. When we entered the country, we had issues with the police. They were saying that I was smuggling people with me . . . . An example is one of my sisters, who didn't have my last name, so we had problems with her. . . .*

*The threats from the police were that they said they were going to destroy the vehicle, move us to different (separate) cities, and were also going to call a judge. All to pressure us to give them money. That's why I paid them 2,000 pesos so they allow us to go into the country.[425]*

*Guillermo, Salvadoran granted refugee status in Guatemala*

In general, the 2016 Migration Code recognizes one's rights to emigrate or immigrate, and those entering, leaving, or transiting through the country must do so in compliance with national legislation.[426] Those who have pending refugee status or other international protections applications cannot leave the country without first providing adequate justification to the IGM.[427] Should the applicant leave the national territory without appropriate authorization, the application will be considered abandoned.[428] Those recognized as refugees have the right to travel outside of Guatemalan territory, but only after requesting a special travel document from the IGM that is valid for a period of two years for one exit and one re-entry.[429]

---

[423] Interview with Carlos Eduardo Woltke Martínez, supra note 330.
[424] Id.
[425] Interview with protection-seeker granted refugee status in Guatemala (Jan. 27, 2021).
[426] Immigration Code, art. 1 (Guat.).
[427] Immigration Code, art. 89 (Guat.).
[428] Regulation No. 7-2019, art. 28 (Guat.).
[429] Immigration Code, arts. 93 (Guat.), 104; Regulation No. 7-2019, art. 84 (Guat.).

CLP_PC_033443

Additionally, refugees may not travel back to the country of alleged persecution.[430] Leaving the national territory of Guatemala without the special travel document will result in refugees losing their refugee status.[431]

### 3. Right to Work and to Non-Discrimination

Like the barriers faced to obtaining refugee identity documents, work permits are equally difficult to obtain. Once Regulation No. 2-2019 entered into force, the government created a new work permit for refugee applicants. The work permit is valid for six months and "is renewable upon completion of the minimum requirements."[432] The work permit is obtained from the Ministry of Labor and Social Security (MINTRAB) without any cost.[433] The process, however, is arguably unnecessarily complicated. Protection-seekers must express their interest in a work permit to the IGM at the time of the interview, and the applicant must then fill out a form the IGM provides.[434] The IGM will then issue documentation confirming the status of the refugee status application.[435] The applicant must subsequently submit this information to the MINTRAB, which in turn decides whether to issue the authorization.[436]

Despite having the right to work, a lack of identification documents prevents many protection-seekers from securing employment.[437] According to the law, the CONARE should issue documentation that would allow protection-seekers to obtain the work permit, but that is not current practice.[438] The Ombudsman's office shares "it's kind of a vicious circle because refugee applicants do not have identification, they are not able to apply for the work permit, they cannot access criminal background check, and other things you need ID to start the process or apply for other benefits.".[439] When interviewed, an Salvadoran woman with a pending application for refugee status talked about the impossible situation the limited validity of her temporary ID and work permit puts her and her family in.[440] She shared that the process provides a very limited window, at times only eight days, in which a refugee applicant can secure the proper documentation and transportation to Guatemala City to apply for a work permit.[441]

---

[430]Regulation No. 2-2019, art. 7 (Guat.).

[431]Id.

[432]UNHCR, Guatemala: An overview of how the Global Compact on Refugees is being turned into action in Guatemala, Global Compact on Refugees (Feb. 11, 2021), https://globalcompactrefugees.org/article/guatemala. The regulations do not specify how the work permits must be renewed or what are considered the "minimum requirements." The Ministry of Labor and Social Security (MINTRAB) only has specific guidelines for those already granted refugee status; refugees must simply submit a written request from the ministry and provide a copy of their refugee identity card, See Requirements to Apply for a Work Permit for Foreigners, Part. C, https://www.mintrabajo.gob.gt/images/Servicios/DGE/Permisos_de_Trabajo_para_Extranjeros/Requisitossolicitudespermisos.pdf.

[433]UNHCR, supra note 379.

[434]Id.

[435]Id.

[436]Id.

[437]Georgetown Law Human Rights Institute, supra note 375, at 72.

[438]UNHCR, supra note 433.

[439]Interview with Carlos Eduardo Woltke Martínez, supra note 330.

[440]Telephone Interview with Anonymous Salvadoran woman seeking asylum in Guatemala, International Human Rights Law Clinic (Feb. 1, 2021).

[441]Id.

CLP_PC_033444

If a migrant is successful in submitting a work permit, there is then a very long delay in its processing.[442] As a result, it is difficult for protection-seekers to obtain a work permit.

Migrants who are unable to obtain a work permit resort to working in less-favorable jobs with employers who are willing to pay them under the table. When interviewed, a Salvadoran man with a pending refugee status application reported that he was trapped working in a position that took him deep into the Guatemalan rainforest, where he works for weeks without phone or internet access.[443] The isolated nature of his job makes it hard to pursue an application for a work permit, keeping him trapped in his current job.

Migrants are at particular risk for abusive working conditions and forced labor due to the difficulty in accessing the legal labor market. Even if they do obtain a permit, employers do not recognize its validity,[444] and protection-seekers are discriminated against within the labor force for their foreign status.[445] Guatemala's Labor Code caps a business's foreign workforce at ten percent.[446] Working conditions are generally precarious in the country, and labor rights are inadequately enforced.[447] Moreover, protection-seekers are often unaware of their employment rights, which has resulted in abuses by employers, including employers failing to comply with benefits such as access to social security.[448] Under the 2016 Migration Code, all migrants have the right to be free from discrimination based on race, color, nationality, sex, sexual orientation, language, religion or belief, political or other opinion, marital status, birth, or any other personal characteristic.[449] The Government of Guatemala also has an affirmative obligation to protect, without discrimination, the life, liberty, and personal integrity of foreigners and migrants within Guatemalan territory.[450]

---

[442] It is worth noting that in light of the COVID-19 pandemic, in August 2020 the Ministry of Labour and Social Welfare suspended the expiration date of work permits for foreigners in the country. MIRPS Annual Report, supra note 377, at 31.

[443] Telephone Interview with Anonymous Salvadoran man seeking asylum in Guatemala, International Human Rights Law Clinic (Jan. 22, 2021).

[444] Refugees Int'l & Human Rights Watch, supra note 343, at 42.

[445] Asylum Access, El Derecho al Trabajo de las Personas Solicitantes de Asilo Refugiadas en América Latina y el Caribe  37-38 (June 2018), https://asylumaccess.org/wp-content/uploads/2019/07/Derechos-Laborales-Refugiadas-en-America-Latina-y-el-Caribe-final-ESP.pdf,

[446] Id.; Refugees Int'l & Human Rights Watch, supra note 457.

[447] Id. See U.S. Department of State, Guatemala Human Rights Report 24 (2019), https://www.state.gov/wp-content/uploads/2020/02/GUATEMALA-2019-HUMAN-RIGHTS-REPORT.pdf.

[448] Id.

[449] Immigration Code, art. 9 (Guat.).

[450] Id. at art. 10.

CLP_PC_033445

However, Guatemalan law does not have specific provisions for protecting people from violence based on gender identity or sexual orientation or from discrimination in employment, housing, or access to public and private services.[451] LGBTQI+ protection-seekers therefore experience violence, discrimination, and harassment from both Guatemalan nationals and the police.[452] Transgender protection-seekers are particularly subject to discrimination, especially within the legal framework, as transgender people cannot change their gender markers on legal documents, and transgender crime victims report that they are misgendered and unrecognized by police.[453] Additionally, in the midst of the COVID-19 pandemic, migrants in Guatemala faced increased stigma, particularly those returned from the United States, because return to Guatemala was seen to be connected with transmission of COVID-19.[454]

> *A thing that happens when you're living in another country and they realize you're from another country is that they look at you differently and treat you differently. But the thing is I came here to have another life, not because we're here to do something bad we're just here to have a better life. Regular people, not government officials, that you meet treat you differently.[455]*
>
> *Guillermo, Salvadoran granted refugee status in Guatemala*

## 4. Confidentiality, Access to Counsel, and Interpretation

The 2016 Migration Code and accompanying regulation enshrines the right of confidentiality for refugee status applicants and those granted refugee status.[456] The State guarantees that applications, when they are being processed, are kept confidential to protect applicants' life and freedom.[457] The law requires particular care to keep confidential the information of vulnerable migrants, such as unaccompanied children.[458] Applicants for refugee status are also guaranteed the right to legal assistance and interpretation throughout the entire application process, including during the individual interview.[459]

---

[451] Refugees Int'l & Human Rights Watch, supra note 343, at 32-33.
[452] Id.
[453] Human Rights Watch, "Every Day I Live in Fear": Violence and Discrimination Against LGBT People in El Salvador, Guatemala, and Honduras, and Obstacles to Asylum in the United States, 52-55 (Oct. 2020), https://www.hrw.org/sites/default/files/media_2020/10/centralamerica_lgbt1020_web.pdf.
[454] UN Human Rights Council, Annual Report of the United Nations High Commissioner for Human Rights: Situation of Human Rights in Guatemala, Doc. UN A/HRC/46/74, para. 22 (2021).
[455] Interview with protection-seeker granted refugee status in Guatemala, supra note 438.
[456] Immigration Code, art. 52; Regulation No. 2-2019, art. 3.
[457] Immigration Code, art. 181.
[458] Id. at art. 170(8).
[459] Id. at art. 180; Regulation No 2-2019, art. 17(2).

CLP_PC_033446

While protection-seekers have a right to counsel, in practice they do not have meaningful access to legal assistance.[460] This limits their ability to fully understand the asylum process and steps needed to support their case.[461] The Guatemalan government has identified counsel as unnecessary in the application process.[462] Further, while Guatemalan law provides a right to legal assistance and language interpretation throughout the refugee status application process,[463] these rights are not afforded in practice.[464] The General Directorate of Migration asserts that legal counsel may be present during interviews and throughout the refugee application process, but lawyers from the Pastoral de Movilidad Humana report that they have not been allowed to appear on behalf of their clients until their appeal.[465]

If an appeal is denied, the adjudicating agency provides a form decision letter with no additional rational or judicial reasoning.[466] Protection-seekers face the majority of the process, including interviews, alone.[467] Overall, there is a lack of  legal safeguards for refugees and protection-seekers. Failure to provide, implement, or enforce legal safeguards plays a major role in deterring and preventing protection-seekers from filing an application with the proper authorities.[468] If refugees and protection-seekers cannot access counsel or obtain information in their native language, it may be impossible for them to follow the proper procedures to be released from detention, renew their refugee identity document or work permit, or complete the process to apply for asylum.

> *We did not have a lawyer help us submit the application for asylum. A lawyer from El Refugio de la Niñez did help explain what we needed to do. In that organization there are lawyers, psychologists, and social workers. But our family did not work with the psychologists or the social workers. . . . We did not have a lawyer with us when we travelled to the capital for our interview but we did have one present at the interview closer to where we are living now.*[469]
>
> *Maria, Salvadoran Protection-Seeker in Guatemala*

---

[460]The Georgetown Law Human Rights Institute, Dead Ends: No Path to Protection for Asylum Seekers Under the Guatemala Asylum Cooperative Agreement, 65-66  (June  2020),  https://www.law.georgetown.edu/human-rights-institute/wp-content/uploads/sites/7/2020/06/Dead-Ends-Report_web.pdf.
[461]Id.
[462]Id.
[463]Immigration Code, art. 180; Regulation No 2-2019, art. 17(2).
[464]Georgetown Law Human Rights Institute, supra note 375, at 66.
[465]Id.
[466]Id.
[467]Id.
[468]See generally Refugees Int'l & Human Rights Watch, supra note 343.
[469]Telephone Interview with Anonymous Salvadoran woman seeking asylum in Guatemala, International Human Rights Law Clinic (Feb. 1, 2021).

CLP_PC_033447

## 5. Temporary Care and Shelter, Detention, and Non-Refoulement

Protection-seekers have a right to temporary shelter and care.[470] The Sub-directorate of Attention and Protection of Fundamental Rights of Migrants, within the IGM, is responsible for the operation and monitoring of migrant care centers.[471] Shelter and Temporary Migrant Care Centers (CACTMI by their Spanish acronym) must be available for those seeking international protection, although the shelter may only be available for a 48-hour period.[472]

Despite having a right to temporary care and shelter, refugees and protection-seekers who enter or stay in Guatemala without authorization may be subject to a fine, deportation, or expulsion.[473] Such measures are authorized by the 2016 Migration Code and regulations,[474] illustrating a discrepancy within the Code. International agreements to which Guatemala is a party require protection-seekers arriving without authorization to be provided shelter and to not be penalized for entering unauthorized.[475]

In practice, protection-seekers are only given housing through NGOs.. The consortium of organizations that can provide housing can only assist 500 people a year compared to the 1800 estimated cases that require humanitarian assistance.[476] In reality, however, those who arrive at the airport without authorization are told to board a return flight, and if they refuse, they are detained.[477] Refugees and asylum-seekers who do receive housing are placed in accommodation centers (centros de albergue), which include old hotels and naval bases.[478]

The Migration Code is silent on migration detention, creating a legal framework that allows asylum-seekers to be detained indefinitely until their cases are decided, and it does not have any procedures in place for reviewing detention measures.[479] Therefore, even if the refugee or protection-seeker is not a danger to the community, there is no review process to release the migrant once they are detained.

---

[470] Immigration Code, art. 71.
[471] Regulation No. 7-2019, art. 91.
[472] Id. at art. 94.
[473] Global Detention Project, Guatemala Issues Related to Immigration Detention, Submission to the UN Committee against Torture 72 Session (Nov.– Dec. 2021), submitted  June 2021, https://www.globaldetentionproject.org/wp-content/uploads/2021/06/GDP-Submission-to-the-UN-Committee-against-Torture-Guatemala.pdf.
[474] Immigration Code, art. 50; Regulation No. 7-2019, art. 14 ("Foreigners who fail to comply with the entry requirements to the national territory will be rejected.").
[475] Id. at art. 71; Refugee Convention, supra note 2, art. 31.
[476] Georgetown Law Human Rights Institute, supra note 375, at 70.
[477] Interview with Carlos Eduardo Woltke Martínez, supra note 330.
[478] Global Detention Project, Immigration Detention in Guatemala 4,9 (Feb. 2016), https://www.globaldetentionproject.org/wp-content/uploads/2016/06/guatemala_immigration_detention_profile.pdf . According to statistics from 2015, the most common nationalities of refugees and asylum-seekers detained were El Salvador, Honduras, and Nicaragua.
[479] See Immigration Code, art. 186 (providing that the National Civil Police is the authority that detains people and that people cannot be detained at immigration posts.)

CLP_PC_033448

While the Criminal Procedure Code outlines the process by which a person can be placed in preventive detention, including a review of the person's risk of flight or danger to the community,[480] preventive detention is used excessively in Guatemala, and detainees are often held longer than the statutorily mandated maximum.[481] Additionally, protection-seekers who are detained pending the resolution of their application for refugee status may not be subject to the protections of the Criminal Procedure Code because those who violate the Migration Code are not subject to criminalization.[482]

Mr. Woltke Martínez, the Guatemalan Ombudsman for Migrants within the Human Rights Ombudsman, reports that police officers do not recognize refugee applicant documents as proper identity documents, and they have been known to physically discard the refugee applicant documents and detain protection-seekers temporarily to verify their status  by calling immigration officials.[483] Mr. Woltke Martínez noted that "they are not detained for a long time or permanently," and that despite police harassing protection-seekers and potentially destroying their documents, their applications for refugee status are not impacted.[484] Mr. Woltke Martínez explains:

Where we saw some longer detention is at the border when they are detained [under] administrative detention. [i.e. detention only for the purpose of an administrative proceeding]. While they are detained, they seek to apply for refugee status [or] protection status. In that situation, until they ask for a judicial decision, they have to wait in detention, and it takes a long time. Mostly people being detained at the border are coming in from the international airport.[485]

Current data regarding the present situation of detained migrants is not publicly available. The most recent statistics from 2015 report that there were 563 immigration detainees.[486] Reports of overcrowding are common in Guatemala's detention facilities that leads to unsanitary and dangerous conditions for detainees.[487]

[480]See Decree No. 10-2019 - Amendments to Decree No. 51-92 of the Congress of the Republic, Code of Criminal Procedure arts. 259-68.
[481]UN Committee Against Torture, Concluding observations on the seventh periodic report of Guatemala, Doc. UN CAT/C/GTM/CO/7 (2018) para. 18.
[482]Immigration Code, art. 64.
[483]Interview with Carlos Eduardo Woltke Martínez, supra note 330.
[484]Id.
[485]Id.
[486]Global Detention Project, Guatemala Immigration Detention Data Profile, Global Immigration Detention , (2020), https://www.globaldetentionproject.org/wp-content/uploads/2020/11/Guatemala-Detention-Data-Profile-2020.pdf.
[487]UN Committee Against Torture, Concluding observations on the seventh periodic report of Guatemala, Doc. UN CAT/C/GTM/CO/7, para. 24 (2018).

CLP_PC_033449

Article 46 of the 2016 Migration Code enshrines the right to non-refoulement. A refugee applicant therefore cannot be returned to the country of origin when there is a "well-founded reason" that a person's life, physical safety, and freedom would be seriously endangered should the person be returned.[488] Guatemala is bound to a similar standard under the 1951 Convention on the Status of Refugees to not return refugees to any country where their life or liberty be threatened because of their "race, religion, nationality, membership of a particular social group or political opinion."[489] Additionally, before a person who has had their application for refugee status denied is returned, Guatemala must guarantee that the Office of the United Nations High Commissioner for Refugees (UNHCR) is aware of that person's situation.[490]

The legal protections against non-refoulement, however, are not adequately enforced. The U.S. embassy in Guatemala reported in 2019 that Guatemala "does not provide sufficient safeguards against refoulement."[491] Between November  21, 2019, and March 16, 2020, while the Asylum Cooperative Agreement (ACA) between the United States and Guatemala was in effect, 939 protection-seekers from El Salvador and Honduras were deported from the United States to Guatemala to seek protection there.[492] Those transferred pursuant to the ACA reported having only 72 hours to decide whether to remain in Guatemala or leave the country.[493] Of the 939 transferred protection-seekers, only 20 pursued an application for refugee status in Guatemala because their fear of persecution  and lack of economic opportunities in Guatemala.[494]

In early 2021, Central American migrants primarily from Honduras began their journey to the United States to seek safety and escape life-threatening poverty. Instead of being permitted to continue to Mexico into the United States, the migrants were met with violence and force at the hands of Guatemalan police and security forces.[495] The immigration chief was reported as saying "we invite you to return to your country of origin, you will not pass."[496] In a matter of days, 2,300 migrants had been returned to Honduras.[497] This mass deportation deprived migrants of their right to individualized review and likely led to violations of the prohibition on non-refoulement. Migrants who may have wanted to seek asylum in Guatemala rather than be returned to Honduras did not have that chance.

---

[488] Immigration Code, art. 46.
[489] Refugee Convention, supra note 2, art. 34.
[490] Immigration Code, art. 46.
[491] The U.S. Sent Central American Asylum Seekers to Guatemala to Seek Refuge. None Were Granted Asylum, Report Says, The Washington Post (Jan. 16, 2021), https://www.washingtonpost.com/world/the_americas/asylum-migrants-trump-guatemala/2021/01/15/aeae4b84-56bc-11eb-a08b-f1381ef3d207_story.html.
[492] UN Human Rights Council, supra note 467, para. 44.
[493] Refugees Int'l & Human Rights Watch, supra note 343, at 25.
[494] UN Human Rights Council, supra note 505.
[495] BBC News, Migrant Caravan: Guatemala Blocks Thousands Bound for US, (Jan. 18, 2021), https://www.bbc.com/news/world-latin-america-55699540.
[496] Global Detention Project, Guatemala: Overview, (Jan. 18, 2021), https://www.globaldetentionproject.org/countries/americas/guatemala.
[497] Large Migrant Caravan Dissolves in Guatemala, AP News (Jan. 19, 2021), https://apnews.com/article/joe-biden-honduras-gangs-coronavirus-pandemic-immigration-c381b8ac9f22291188a403b7bbeb1d51.

Guatemala's increasingly hardline approach against migrants and protection-seekers is a result of pressure from the U.S. government to reduce the influx of migrants presenting at the U.S. southern border.[498] Ahead of the first "caravan" of migrants in 2021, Guatemala declared a state of emergency to deploy thousands of soldiers to the borders of Honduras and El Salvador. This state of emergency was reportedly the first used to curb migrants and protection-seekers from accessing the country.[499]

## 6. Right to Education and Family Reunification

Any foreign person, including applicants for refugee status and refugees, have the right to education "within the national educational system and the higher education system."[500] According to the UNHCR, not having the necessary educational certificates or identity documents should not be a barrier to accessing education.[501] However, the regulations require that refugee status applicants submit their special identity document provided by the IGM in order to access educational institutions.[502] If an applicant for refugee status is in a shelter or temporary care facility, the facility must ensure that the applicant has access to specialized care and education.[503]

The Constitution of Guatemala guarantees that the State will protect the family's social, economic, and legal rights.[504] The 2016 Migration Code broadly recognizes the right of foreigners to settle in Guatemala to form or reunify their families.[505] Furthermore, migrants specifically have the right to stay with their families at all times and should only be separated under extremely exceptional circumstances for administrative reasons.[506] Should families arrive in the national territory without proper authorization, the government must follow the principle of family reunification and the Deputy Director of Attention and Protection of Fundamental Rights of Migrants must provide appropriate care and follow-up.[507] When migrants are held in temporary care shelters, they may request the assistance of the IGM to contact family abroad.[508] Family reunification is defined in the regulation as the principle that ensures that unaccompanied children or children separated from their families be reunited with their parents, guardian, or "whoever exercises custody."[509]

---

[498]Jeff Abbott, Guatemala Takes a Hard Line Against Migrants–With US Support, The Nation(Feb. 16, 2021), https://www.thenation.com/article/world/migrants-immigration-guatemala-mexico/.
[499]Id.
[500]Immigration Code, art. 7 (Guat.).
[501]UNHCR supra note 379.
[502]Regulation No. 2-219, art. 9 (Guat.).
[503]Regulation No 7-2019, art. 101 (Guat.).
[504]Constitution of Guatemala, art. 47 (1985, rev. 1993) (Guat.).
[505]Immigration Code, art. 4 (Guat.).
[506]=Id. at art. 15 (Guat.); see also UNHCR, supra note 379 (explaining that applicants for refugee status have a right to be reunified with their spouses, common law partners, and family members "within the degrees of the law").
[507]Immigration Code, art. 71(d) (Guat.).
[508]Id. at  art. 19.
[509]Regulation No. 2-2019, art. 2(g) (Guat.).

CLP_PC_033451

When working with unaccompanied children, authorities must use all available means to ensure they are reunited with their parents or guardians, whether that occurs in Guatemala or in the child's country of origin, unless it is in the best interest of the child to maintain separation.[510]

## 7. Deterioration of the Rule of Law

Guatemalan officials are rarely held accountable for abuses of power or for failing to fulfill their obligations. Between 2012 and 2017, 247 sanctions against corrupt officials were filed by the Public Prosecutor's Unit Against Corruption.[511] Widespread corruption has been enabled by weak government institutions and constant threats to judicial independence.[512]

The International Commission against Impunity (CICIG, by its Spanish acronym) in Guatemala documented this corruption and attendant impunity. The CICIG was a joint initiative of the United Nations and the Guatemalan government established in 2006.[513] Together with Guatemalan prosecutors, the CICIG initiated investigations leading to the indictment of over 660 individuals and 400 convictions, uncovering 70 secret criminal structures linked to politicians, business leaders, and members of the military.[514] Additionally, the CICIG documented the presence of illicit networks in the Guatemalan congress and took steps to overcome executive impunity.[515] This included steps to investigate Guatemalan President Jimmy Morales on charges of illicit campaign financing prior to the CICIG being shut down on September 3, 2019, following the unilateral decision of Guatemalan government.[516]

Additionally, on September 4, 2019, the government declared a state of siege for twenty-two municipalities, thereby suspending constitutional guarantees and empowering Guatemala's military forces to carry out civil police functions.[517] A similar state of siege was declared by Guatemala's current president in May of 2020, affecting three municipalities.[518]

---

[510] Immigration Code, art. 170(3) (Guat.).
[511] World Politics Review, In Guatemala, Corruption is at the Heart of An Escalating Political Crisis, (July 23, 2020), https://www.worldpoliticsreview.com/trend-lines/28937/in-guatemala-corruption-is-at-the-heart-of-an-escalating-political-crisis; IAHCR, Situation of Human Rights in Guatemala,  OEA/Ser.L/V/II., Doc. 208/17 (Dec. 31, 2017), http://www.oas.org/en/iachr/reports/pdfs/Guatemala2017-en.pdf.
[512] IAHCR, Situation of Human Rights in Guatemala,  OEA/Ser.L/V/II., Doc. 208/17 (Dec. 31, 2017), http://www.oas.org/en/iachr/reports/pdfs/Guatemala2017-en.pdf.
[513] IAHCR, supra note 524.
[514] Id.
[515] Id., para. 56-58.
[516] See Face of Guatemala's anti-corruption fight faces threats, AP News (Nov. 25, 2019), https://apnews.com/article/business-arrests-jimmy-morales-guatemala-guatemala-city-763a102ceac5081a1fd6a868cad6b503.
[517] See Guatemala Declares State of Emergency After Soldier Ambush, AP News (Sept. 7, 2019), https://apnews.com/article/8d7ec8f5af2c497ca9432f4f99a466ff.
[518] Network in Solidarity with the People of Guatemala (NISGUA), NISGUA denounces the State of Siege in three municipalities in Sololá (June 29, 2020), https://nisgua.org/denounces-state-of-siege-solola/

CLP_PC_033452

The lack of a functioning civilian police force, and one that is actively hostile toward applicants for refugee status, leaves protection-seekers with nowhere to turn when they experience violence.[519]

Guatemala also does not have clear separation of powers. Judicial independence has been threatened by unfounded criminal investigations launched against at least twenty-two high profile judges, while justices of the Guatemalan Constitutional Court who ruled against former President Morales' administration have been publicly condemned and subjected to criminal proceedings as a form of harassment.[520] Five judges of the Constitutional Court and four judges of the high-risk tribunals, dedicated to hearing cases of extreme sensitivity, have been granted precautionary measures by the Inter-American Commission on Human Rights as a result of these investigations.[521] This context makes it extremely difficult for prosecutorial abuses to be held in check or for judicial decisions to be independently reviewed. A weakened rule of law has consequences for protection-seekers, both within the refugee application process and as people living under the "protection" of the Guatemalan legal framework.[522]

Moreover, refugees and protection-seekers in Guatemala are particularly vulnerable to violence. This is heavily connected to lack of economic support.[523] The Guatemalan government does not provide protection-seekers with help obtaining food, shelter, or employment.[524] Further, although applying for asylum is free, refugees must pay for permanent residency.[525] Protection-seekers who lack social networks are even more vulnerable to these conditions. This coupled with widespread xenophobia against refugees and migrants has left these populations extremely vulnerable.[526]

---

[519]See supra text accompanying notes 467-68, 490-91.
[520]International Legal Assistance Consortium, A Window of Opportunity: Support to the Rule of Law in Guatemala, 27-29 (2020), https://ilacnet.org/wp-content/uploads/2020/03/ILAC-Guatemala-report-2020_web.pdf.
[521]Id.
[522]Georgetown Law Human Rights Institute, supra note 375, at70. ("Additionally, Guatemala struggles with malnutrition and inequality. One child out of two is malnourished. The Guatemalan Ministry of Public Health and Social Assistance communicated that they did not have the capacity to help all the people seeking the services they provide, such as medicine, mental health services, and primary care.")
[523]Id.
[524]Id.
[525]Id.
[526]Id.

CLP_PC_033453

Guatemala is one of the most dangerous countries in the world.[527] High rates of violence occur due in large part to the presence of narcotrafficking and gang organizations.[528] This is particularly true in border towns and urban neighborhoods.[529] Police and the judicial system are unable to control gang violence.[530] Transnational criminal organizations (gangs or "maras") and narcotrafficking organizations specifically commit acts of gender-based violence to demonstrate control or power over their territories.[531] Combined with high levels of corruption and structural impunity, it is practically impossible for ordinary Guatemalans to avoid the effects of these conditions, let alone vulnerable protection-seekers.[532]

## C. Conclusion

Guatemalan law and the international agreements to which Guatemala is a party outline specific and necessary protections for applicants for refugee status. While the 2016 Migration Code and accompanying regulations helped enshrine important rights for protection-seekers, there are still existing gaps in the current legal framework, and government officials are not complying with or effectively implementing the new laws and regulations.

Protection-seekers are often not given a meaningful opportunity to complete the process for obtaining refugee status, and are often not afforded the fundamental legal safeguards of legal assistance and language access throughout the application process. Protection-seekers face risk of detention, harassment from police, barriers to accessing social services and employment, and violence from gangs and other criminal organizations. The burden of ensuring protection-seekers have access to rights and services often rests on nonprofits rather than the government. The Guatemalan government must do more to ensure the rights afforded to refugee status applicants on paper are actually provided in practice.

[527] Overseas Security Advisory Council (OSAC), Guatemala 2020 Crime & Safety Report, (Mar. 31, 2020), https://www.osac.gov/Country/Guatemala/Content/Detail/Report/d8c492ad-b604-457b-bd8f-18550eec1ff2#:~:text=Guatemala's%20homicide%20rate%20peaked%20at,3%2C578%20homicides%20reported%20for%202019.
[528] Id.
[529] Id.
[530] Georgetown Law Human Rights Institute, supra note 256, at 73-74: "There is further a severe lack of access to justice; for example, impunity numbers are as high as 98% for sexual violence. Broadly, it is understood that if you report a police officer or a drug dealer they will target you or your family. And even when victims dare to report crimes, they are faced with a highly corrupt judicial system. In Guatemala, nobody has access to justice unless they have money to pay the lawyers or if they have an organization helping them.".
[531] World Politics Review, supra note 524; IAHCR, supra note 524.
[532] Id.

# IV. Overall Conclusions

The information contained in this Report demonstrates significant limitations on access to international protection in Mexico and Guatemala and signals the extreme vulnerability in which protection-seekers and refugees find themselves in both countries.

Although Mexico's international protection laws may appear robust on paper, the reality of their implementation reveals that many individuals in need of protection are not able to obtain protection. The systematic detention of asylum-seekers, the lack of awareness on the part of government officials, the insufficient mechanisms for the identification of persons with protection needs, and the overwhelming backlog facing the under-resourced COMAR render Mexico's asylum system unfair and inefficient. At the same time, the practice of expulsions and coerced returns combined with the exposure of asylum-seekers to violence and abuse, including at the hands of state agents, prevents Mexico from offering effective protection to these persons.

Similarly, Guatemala's underdeveloped asylum system is characterized by a grossly insufficient ability to process protection-seekers, a lack of technical expertise, and a variety of due process violations. Taken together with the risk of deportation as a result of irregular entry and the widespread insecurity that protection-seekers face in Guatemala,  it is clear that protection-seekers cannot access effective protection in Guatemala. As a result of the deficient asylum system in Guatemala and the multiple challenges to  protection-seekers' security and safety in the country, Guatemala's ability to offer effective international protection is severely undermined.

Because the United States placed the pressure on Guatemala and Mexico to reduce migration flows across its border, the Biden Administration can play an active role in encouraging the Guatemalan and Mexican governments to respect the rights of migrants and protection-seekers. The following can help  strengthen the asylum system in Mexico and Guatemala:

• Encourage the Mexican and Guatemala government to pass a reform to abolish mandatory detention and create alternatives to incarceration. The detention must be subject to periodic review and appropriate judicial oversight. Also, establish that all other options to detention must consider the best interest of children and family situation of migrants and protection seekers.

• Provide training to immigration authorities about the rights of migrants and protection-seekers. Authorities must cease to use detention as a way to discourage protection-seeker from applying for asylum and prevent committing acts contrary to the principle of non-refoulement.

CLP_PC_033455

- Provide information to all protection-seekers on their right to seek asylum and the asylum procedure to guarantee adequate access to the asylum process and remove barriers to submitting applications, as the short time that protection-seekers have to present their application.  In addition, provide financial and technical support to COMAR and CONARE to expand its presence along with the country and to improve its capacity to adequate interview protection-seekers.

- Guarantee access to identity documents to protection-seekers to allow them to access to employment and labor rights. Also, create and enable access to programs providing  housing and food assistance to protection-seekers.

- Strengthen the access to justice mechanism for migrants and protection-seekers victims of human rights violations.

CLP_PC_033456





CLP_PC_033457

# EL SALVADOR 2022 HUMAN RIGHTS REPORT

## EXECUTIVE SUMMARY

El Salvador is a constitutional multiparty republic with a democratically elected government.  In 2019 voters elected Nayib Bukele as president for a five-year term.  The election was generally free and fair, according to international observers.  Municipal and legislative elections took place in February 2021 and also were considered largely free and fair by observers.

The National Civilian Police, overseen by the Ministry of Justice and Public Security, is responsible for maintaining public security.  The Ministry of Defense is responsible for maintaining national security.  Although the constitution separates public security and military functions, it allows the president to use the armed forces "in exceptional circumstances" to maintain internal peace and public security "when all other measures have been exhausted."  The military is responsible for securing international borders and conducting joint patrols with the civilian police.  Civilian authorities maintained effective control over security forces.  There were reports that members of the security forces committed abuses.

On March 27, the Legislative Assembly declared a state of exception in response to the dramatic rise in homicides committed by gangs over the weekend of March 25-27.  Under the state of exception, which must be renewed monthly, security forces were empowered to arrest anyone suspected of belonging to a gang or providing support to gangs.  In addition, the state of exception suspended the rights to be informed immediately of the reason for detention, to legal defense during initial investigations, to privacy in conversations and correspondence, and to freedom of association.  Numerous reports of arbitrary arrests, invasion of homes, unfair judicial procedures, and deaths of detainees followed the declaration.  More than 52,000 persons were arrested in the first six months of the state of exception, leading to allegations of overcrowding and inhuman treatment in the prisons.

Significant human rights issues included credible reports of:  unlawful or arbitrary killings, forced disappearances; torture and cruel, inhuman, or degrading treatment or punishment by security forces; harsh and life-threatening prison conditions;

CLP_PC_034188

arbitrary arrest and detention; serious problems with the independence of the judiciary; arbitrary or unlawful interference with privacy; serious restrictions on free expression and media, including censorship and threats to enforce criminal laws to limit expression; serious government corruption; lack of investigation and accountability for gender-based violence; significant barriers to accessing sexual and reproductive health services; and crimes involving violence against lesbian, gay, bisexual, transgender, queer, and intersex individuals.

Impunity persisted in the security forces, other executive branch offices, and justice system.  In some cases, authorities investigated and prosecuted persons accused of committing crimes and human rights abuses.

Criminal groups, including local and transnational gangs and narcotics traffickers, were significant perpetrators of violent crimes.  They committed killings, acts of extortion, kidnapping, human trafficking, intimidation, and other threats and violence.  They directed these acts against police, judicial authorities, the business community, journalists, women, and members of vulnerable populations. Authorities investigated and prosecuted such actions.

# Section 1. Respect for the Integrity of the Person

## a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were reports that the government or its agents committed arbitrary or unlawful killings, largely stemming from deaths of detainees while in prison during the state of exception.  The Attorney General's Office investigates whether security force killings were justifiable and pursues prosecutions.  The National Civilian Police (PNC) reported that as of August, no police officers had been accused of homicide.

On August 15, the Human Rights Ombudsman's Office (PDDH) stated it had opened 28 investigations of prisoner deaths during the state of exception.  Human Rights Ombudsman Apolonio Tobar said the investigations were based on complaints from persons who attributed the deaths of their relatives to the state of exception.  The investigations aimed to examine the culpabilities of the Attorney

CLP_PC_034189

General's Office and if prisoners were victims of neglect or murder while in government custody (see section 1.d.).  On August 26, the daily newspaper *La Prensa Gráfica* reported that 73 detainees died in prison following the start of the state of exception.  Government officials stated they were investigating all deaths in prison to determine if they were committed by government authorities but that, to date, they had not identified any such cases.

## b. Disappearance

Under the state of exception, there were regular reports that security and law enforcement officials arrested persons and did not inform their families of their whereabouts.  On May 31, Cristosal, a human rights group, reported that of the 808 complaints the organization documented during the first two months of the state of exception, 65 percent involved cases in which the whereabouts of the arrestees were unknown.

Media and human rights groups reported that nongovernment-related disappearances, which they and the families of those disappeared attributed to gang violence, continued to occur on a regular basis.  The government reported varying numbers of disappearances and sporadically declined to provide media with numbers and additional data on disappearances, often claiming the statistics were classified.  The PNC reported 255 disappearances from January to August.  In May, however, the PNC declared to *La Prensa Gráfica* there were 577 reports of missing persons between January and the end of May.  In October the Institute of Legal Medicine (IML), the forensics department under the Supreme Court, reported that only 129 persons had been reported missing from January to September.  On May 19, the international division of the Swiss Broadcasting Society reported the leading forensic expert in the Prosecutor's Office had acknowledged on several occasions that if a person spent more than eight days missing, there was a high probability the person had been killed and buried in a clandestine grave.

On May 16, officials from the Attorney General's Office and PNC told family members of the disappeared they had suspended investigations into disappearances because they were prioritizing activities supporting the state of exception.

CLP_PC_034190

## c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, and Other Related Abuses

The law prohibits such practices, but there were credible reports that government officials employed them at times.  Media and civil society allegations of abuse and mistreatment by police and prison guards significantly increased after the introduction of the state of exception in March.

The PNC reported that by August 1, it had registered 24 complaints of police officer misconduct.  In contrast, from January to July, the Office of the Inspector General of Public Security reported it had received 50 complaints of physical abuse, two complaints of sexual abuses, and four complaints of sexual harassment by police officers.  The PDDH reported it had received nine complaints of cruel, inhuman, or degrading treatment; 58 cases of maltreatment; and 15 complaints of disproportionate use of force by PNC officers from January to July.  In the same period, the PDDH received one complaint of torture; three complaints of cruel, inhuman or degrading treatment; six complaints of maltreatment; and one complaint of disproportionate use of force by the armed forces.

On August 22, the PDDH reported it had received more than 400 complaints of possible abuses during the state of exception.  Ombudsman Tobar provided results of the PDDH investigations of complaints received in the first month of the state of exception in the San Salvador and Cuscatlán Districts.  Tobar said the PDDH did not find human rights abuses in 95 percent of the 173 complaints from San Salvador and did not find culpability by officials in any of the 73 cases in Cuscatlán.  The PDDH did not visit prisons to verify prison conditions or prisoner treatment until 107 days after the start of the state of exception, and in November the PDDH announced prison officials had once again denied them access.

Human rights organizations also received complaints of abuse and mistreatment by police and prison guards.  On August 10, the University Observatory of Human Rights (OUDH) reported it had received reports of 28 cases of maltreatment, 12 cases of disproportionate use of force, seven cases of cruel treatment, and six cases of intimidation.  All the reported cases occurred during the state of exception.  OUDH coordinator general Danilo Flores alleged the complaints attested to the existence of torture.  The OUDH highlighted the case of a boy, age 14, who was

CLP_PC_034191

detained in police holding cells where security officers allegedly submerged his face in water and squeezed his fingers with pincers to force him to admit that he belonged to a gang.  He also claimed he was placed in a cell with gang members who beat him.  He was vomiting blood when he was eventually released.  After his release, he reported being harassed by police officers in his home.  He eventually left the country to avoid further police harassment.

On April 4, *La Prensa Gráfica* reported a man died after his arrest on March 30 in El Refugio, Ahuachapan.  The IML stated that the cause of death was severe blunt chest trauma and that he had other injuries to his eyes, knees, and shoulders.  Witnesses to the arrest said they saw PNC officers beat him during the arrest, demanding that he confess to being a gang member.  The PNC declared he received his injuries from other inmates after he was transferred to Izalco Prison.

On May 2, Human Rights Watch and Cristosal reported they had obtained first-hand information on 34 cases of abuse by police.  The organizations interviewed victims, their family members, lawyers, and civil society organizations and analyzed medical reports, photographs, and documents to corroborate the information from the interviews.  Witnesses alleged they saw security forces beating persons while making arrests and threating family members of the detained persons with arrest if they did not "stop asking questions."  In one documented case, a man, age 21, was arrested on April 3 and held incommunicado.  On April 19, a hospital informed his family that he had died of "hypertension" and "sudden death."  No autopsy was performed, however, and photographs of his body showed injuries.

The judiciary continued prosecuting several cases from the civil war against members of the armed forces.  The judge in the 1981 El Mozote massacre case heard witness testimony, and the judge in the case of the killings of four Dutch journalists ordered the arrest of several high-ranking defendants.  The government, however, continued to deny expert witnesses access to military archives to determine criminal responsibility for the El Mozote massacre, in defiance of a 2020 judicial order.

Impunity was a problem in the PNC and armed forces.  Factors contributing to impunity included politicization and corruption.  The government provided annual

CLP_PC_034192

training to military units to diminish gross abuses of human rights, such as the training provided to the Marine Infantry Battalion by the navy's legal unit on the need to respect human rights.

## Prison and Detention Center Conditions

Prison conditions worsened during the state of exception.  The number of prisoners more than doubled within several months of the beginning of the state of exception, leading to allegations of gross overcrowding, inadequate sanitary conditions, food shortages, a lack of medical services in prison facilities, and physical attacks.

**Abusive Physical Conditions:**  According to the OUDH, prisons were at 119 percent of capacity prior to the state of exception but became more crowded as the number of detainees doubled.  By May, more than 71,000 detainees were being held in a penitentiary system designed for 30,000.  Released prisoners confirmed overcrowding was severe, with 80 prisoners held in cells built for 12 and insufficient room to lie down.  On March 28, Director of Penitentiaries Osiris Luna stated prisoners would have only two meals per day, after President Bukele ordered food rationing due to the arrival of additional inmates.  A released prisoner reported he received four ounces of rice and one tortilla per day.  From the start of the state of exception, the government frequently advertised on social media the overcrowded conditions and lack of adequate food in the prisons as appropriate treatment for gang members.

Men and women were kept separately (see section 6, Children, for detention and imprisonment of children).  While the worst conditions were reported in the men's prisons, the domestic social organization Passionist Social Service reported that unsanitary conditions existed in detention centers for women and children.

In April Human Rights Ombudsman Tobar stated his office had investigated complaints of arbitrary detention during the state of exception and concluded detainees had not suffered treatment beyond what was allowed by law.  In June the ombudsman visited a PNC detention facility, along with the director of penitentiaries and the minister of justice and public security.  After the visit, the PDDH released a report and a series of videos of the visit, but media outlets and

CLP_PC_034193

human rights organizations noted the ombudsman made no mention of the more than 50 deaths of prisoners during the state of exception, most of them occurring in Mariona Prison.  Following the release of the videos, critics alleged that Tobar was no longer an independent defender of human rights.  In October Tobar's term ended and the Legislative Assembly elected Raquel Caballero de Guevara as the new ombudsperson.  In November her office reported she had been denied access to prisons to verify conditions.

In November the Attorney General's Office announced it was investigating 90 prison deaths, consistent with the growing count of deaths in prison kept by newspapers and human rights organizations.  On August 26, *La Prensa Gráfica* reported that 73 detainees had died in prison since the beginning of the state of exception.  The newspaper cited an IML report that 35 of the detainees died from causes such as strangulation, blunt force trauma, or other causes that could indicate torture or mistreatment while in detention.  The IML determined an additional 22 detainees died due to inadequate medical care while in prison.  Many families of prisoners reported that prison authorities refused to accept medicine that they brought, with some of those prisoners later dying.  Another 12 inmates died from "undetermined causes," and the newspaper confirmed reports of four more inmate deaths after the IML report was published.  Several of the few detainees who were released reported that guards regularly beat detainees.

Gangs remained prevalent in prisons, and the PDDH reported that prisoners were divided into groups composed of gang members, gang collaborators, and those with no gang connections.

**Administration:**  The PDDH has the authority to investigate allegations of abusive conditions in prison.  The PDDH stated it had opened investigations into allegations of abuse or abusive conditions but not completed the investigations by year's end.  Although by law the PDDH should have free and immediate access to prisons, all prison visits were suspended in March 2020.  Ombudsman Tobar, with other government officials, visited prisons twice during the year.

**Independent Monitoring:**  The government suspended visits to prisons in March 2020 due to the COVID-19 pandemic.  The suspension continued as of October, long after the government lifted all other pandemic-related restrictions.  The

CLP_PC_034194

suspension of visits to prisons included most institutional inspections, visits by international organizations, nongovernmental organizations (NGOs), churches, and others.

## d. Arbitrary Arrest or Detention

The constitution prohibits arbitrary arrests, and the law provides for the right of a person to challenge the lawfulness of his or her arrest or detention in court. With the introduction of the state of exception in March, the government did not always observe these requirements.

### Arrest Procedures and Treatment of Detainees

The constitution requires a written warrant for arrest except in cases where an individual is caught in the act of committing a crime. Prior to the state of exception, authorities generally apprehended persons with warrants issued by a judge and based on evidence, although this was frequently ignored when allegations of gang membership arose. Police generally informed detainees promptly of charges against them. The state of exception decree suspended the right to legal defense, as well as the requirement that persons be informed the reason of their arrest at the time of their detention, and it increased the number of days an individual could be held in detention before being formally charged.

The language of the state of exception decree did not detail changes to enforcement procedures, but in practice, security forces were no longer required to have warrants prior to making arrests or entering homes to make arrests. Because the decree also suspended the right to legal counsel, law enforcement agents did not wait for suspects to obtain counsel before questioning them. Although the law permits release on bail for detainees who are unlikely to flee or whose release would not impede the investigation of the case, most detainees under the state of exception were not released on bail.

The state of exception increased the number of days that a suspect could be held in detention before being formally charged in court from three days to 15. This extension, in addition to the sharp increase in the number of detainees, overwhelmed the court system. To process the increase, judges held mass pretrial detention hearings for up to 300 detainees at the same time. Public defenders

CLP_PC_034195

responsible for representing the detainees reported being overwhelmed as their case load increased from 50 cases per month to 95 cases per day.  One public defender told the digital newspaper *El Faro* that it was nearly impossible to mount an effective defense and that he had been unable to secure an alternative to pretrial detention in any of his cases.

The state of exception allowed detainees to be held for the first 15 days without any notification to family members, and local news outlets reported that even after 15 days, some families received no information.  Family members of those detained frequently waited for days in large temporary encampments outside of prisons in hopes of receiving information regarding the location and condition of the detainee.

**Arbitrary Arrest:**  As of July 27, the PDDH reported 283 complaints of arbitrary or illegal detention, compared with 25 from January to August 2021.  Of the total, 247 involved detentions by police officers and 36 by soldiers.

Civil society entities also received complaints from the public regarding arbitrary arrests during the state of exception.  As of August, the OUDH received reports of 1,673 cases of arbitrary arrests, and Cristosal reported that as of November 28, it received 3,139 complaints that persons were deprived of their rights during the state of exception, of which 97 percent involved arbitrary arrests.  The specific grounds for complaints most frequently noted were that detainees were not given the reasons for their arrests, not presented with a warrant for arrest, and not given information regarding where or when they would have an initial judicial hearing.  Government officials, however, claimed that arrests under the state of exception were not arbitrary.  They stated the government had a database of more than 76,000 known gang members and arrests largely had been based on that database or other credible intelligence that a suspect was a gang member.

In the first months of the state of exception, police and military raided low-income and rural neighborhoods and carried out mass arrests.  Local news sources and human rights groups alleged security forces frequently arrested persons for gang membership based solely on anonymous denunciations through a government hotline, for having tattoos, or for having any prior contact with the criminal justice system.  *El Faro* gained access to court records for 690 individuals arrested under

CLP_PC_034196

the state of exception for gang membership and found that 60 were arrested on ambiguous criteria such as having a "suspicious appearance" or being nervous.

The Salvadoran Police Workers Movement, a police union, received more than 20 complaints from police officers of being pressured to give false testimony to incriminate detainees and to reach a daily quota of arrests.  The union also documented 50 cases in which agents refused to make arrests because they considered them arbitrary.  On June 10, the founder of the union was arrested and held for four days on charges of "apologizing for crime," which other members of the union denounced as reprisal by the police leadership for his public complaints (see section 7.d.).  All charges against him were eventually dropped.

**Pretrial Detention:**  Lengthy pretrial detention was a significant problem, exacerbated by the state of exception.  COVID-19 pandemic closures had already severely delayed trial and hearing dates, and the sharp increase in cases during the state of exception further delayed cases.  In November the Attorney General's Office reported that of the more than 57,000 persons arrested under the state of exception, approximately 2,000 had been released.  *La Prensa Gráfica* reported that as of October 26, the Attorney General's Office had officially presented charges against 50,197 of those arrested.

The court system was slow to respond to habeas corpus petitions filed by those challenging their detention under the state of exception.  The NGO Legal and Anti-Corruption Advisory Office reported that 1,825 habeas corpus petitions had been filed before the Supreme Court of Justice from the beginning of the state of exception until August 28.  Of these, only eight had been granted a hearing.

## e. Denial of Fair Public Trial

Although the constitution provides for an independent judiciary, the government did not respect judicial independence and sought to increase control of the judiciary.

Legislation passed in August 2021 forced all judges older than age 60 or with 30 years of experience to retire, giving the Bukele-appointed Supreme Court the right to name their replacements.  Previously, in May 2021, the Legislative Assembly had dismissed all five magistrates of the Constitutional Chamber of the Supreme

CLP_PC_034197

Court of Justice and replaced them with judges loyal to the Bukele administration. The move was widely criticized by human rights groups and legal experts as unconstitutional.  Many legal experts saw these acts as steps to further cement the executive branch's control over the nominally independent judiciary.

As of August 31, the PDDH received 112 complaints of a lack of a fair public trial, compared with 65 such complaints from January to August 2021.

**Trial Procedures**

The law provides for the right to a fair and public trial, but the state of exception suspended portions of these rights.  For example, the right to be informed promptly of charges was suspended, and other rights were not always respected.

The law allows for trials for gang membership charges to proceed without the defendants' physical presence, although with defense counsel participating in person.  Virtual trials often involved group hearings before a judge, with defense lawyers in the courtroom but defendants appearing by video, unable to consult with their defense lawyers in real time.  This practice continued with state of exception arrests, with many defendants tried virtually en masse, unable to hear the proceedings because of technical problems, complicated by the number of participants.

According to the OUDH, the demand for public defenders exceeded the capacity of the Public Defender's Office.  Since many judicial hearings during the state of exception occurred en masse with hundreds of defendants at the same time, defendant could not properly exercise the right to defense.  As a result, even if the Attorney General's Office failed to provide sufficient evidence demonstrating that defendants were affiliated with a gang, judges ordered defendants to remain in detention for six months.

In a June 3 statement on the state of exception, the Inter-American Commission on Human Rights reminded the government of its "international obligation to ensure judicial guarantees, due process, and access to a remedy for respect for rights and freedoms whose suspension is not authorized by international human rights law." The commission condemned the practice of holding judicial hearings for up to 500 persons simultaneously, without allowing defendants to plead their individual

CLP_PC_034198

cases.  Likewise, the commission reported that the Office of the General Defender of the Republic did not have the capacity to handle all the cases in its remit.

Legal experts identified overall problems with the legal system outside of the state of exception, pointing to an overreliance on witness testimony, as opposed to the use of forensic or other scientific evidence.

**Political Prisoners and Detainees**

There were reports of political detainees.  Media questioned the legitimacy of the detentions.  The detainees were generally subjected to the same harsh prison conditions as convicted prisoners.  Only one political detainee received visits from his family.

As of November, Ernesto Muyshondt, former mayor of San Salvador and prominent opposition politician, remained in detention following his June 2021 arrest, awaiting the conclusion of investigations and trial; no trial date was set.  In January he filed a complaint to the courts stating that his rights had been violated by two prison guards.  On June 6, the Eighth Investigating Court of San Salvador rejected a request for house arrest, which he had made due to health problems. Muyshondt told media he had been near death three times while in detention and recovered only when prison officials took him to a hospital outside the prison.  He also said that while imprisoned, he was beaten, tied up, and photographed half naked and while sleeping.  Muyshondt was arrested for misappropriation of tax withholdings to the detriment of the Public Treasury while mayor and also for electoral fraud and illicit associations for allegedly negotiating with gangs in exchange for votes in the 2015 legislative elections.

Three former Farabundo Marti National Liberation Front party officials, charged in July 2021 with money laundering and illicit enrichment, remained in detention. Defenders of the three claimed they were detained for political reasons, while the government asserted the charges against them were legitimate.  Investigations of the case continued.

**Civil Judicial Procedures and Remedies**

The law allows litigants to submit civil lawsuits seeking damages for, as well as

CLP_PC_034199

cessation of, human rights abuses.  Domestic court orders generally were enforced, except in cases involving political prisoners.  Most attorneys pursued criminal prosecution and later requested civil compensation.  Courts were insufficiently independent, however, to provide effective civil remedies for human rights abuses.

## f. Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence

The constitution prohibits such actions, but there were allegations the government tracked journalists, members of NGOs, and political opponents and collected information from private messages on their cell phones.  On February 1, the Legislative Assembly passed legislation expanding the government's ability to do so.  Under the state of exception, reports of security forces entering homes without warrants increased.

On January 12, *El Faro* published the results of an analysis by the international NGO Citizen Lab and Access Now.  The analysis, certified by Amnesty International, detailed conclusive evidence that from September to December 2021, the iPhones of 35 journalists and civil society actors were infiltrated by the Pegasus spyware created by NSO Group, an Israeli firm.  Targets included journalists working at media outlets *El Faro*, *Gato Encerrado*, *La Prensa Gráfica*, *Revista Digital*, *Disruptiva*, *Diario El Mundo*, *El Diario de Hoy*, and staff at several NGOs, including Fundación DTJ and Cristosal.  The report also said the targets remained under constant digital surveillance from at least June 29, 2020, to November 23, 2021.  Two-thirds of *El Faro*'s staff were surveilled with the spyware, which occurred during the period they worked on major events in national politics in 2020 and 2021.  The analysis also discovered conclusive evidence of extractions of information from cell phones of 11 *El Faro* employees.  Experts said Pegasus allows for the extraction of anything stored in a mobile phone, including photographs, conversations, audio files, and contacts.  The report did not rule out the theft of information from other brands of cell phones.

On March 16, the Inter-American Commission on Human Rights held a hearing on the Pegasus spyware hacks in the country, calling them a "vertiginous deterioration of press freedom."  Aside from the Citizen Lab and Access Now investigation, multiple representatives from other media outlets and NGOs reported receiving

CLP_PC_034200

warnings from Apple that their phones may have been penetrated by Pegasus, indicating that the spying likely went beyond the *El Faro* journalists.  NSO Group confirmed that it licenses the Pegasus software only to national governments.

On February 1, the Legislative Assembly approved five changes to the criminal code regarding computer crimes.  These authorize the Attorney General's Office to carry out "undercover digital operations that are necessary" without a court order; establishes "digital undercover agents" to surveil "digital documents, electronic messages, images, videos, data, and any type of information that is received or transmitted through information and communication technologies or through any electronic device"; and conduct wiretaps in either criminal or civil investigations with no mention of restrictions on scope or duration of the surveillance and no oversight.  The Inter American Press Association condemned the changes, saying they had "serious implications for freedom of the press," as they were "official reprisal measures against journalism."

The state of exception did not formally suspend the legal requirement for police to obtain a warrant before entering a home.  As of June 3, however, The Foundation of Studies for the Application of Law reported that of the 170 persons who registered complaints regarding the state of exception with them, 35 percent claimed law enforcement agents entered their homes without a warrant.

# Section 2. Respect for Civil Liberties

## a. Freedom of Expression, Including for Members of the Press and Other Media

The constitution provides for freedom of expression, including for members of the press and other media, although the government passed a law in April that increases legal liability for journalists reporting on gangs.  The law permits the executive branch to use the emergency broadcasting service to take control of all broadcast and cable networks temporarily to televise political programming.

**Freedom of Expression:**  On April 5, the Legislative Assembly amended the criminal code to allow a 10- to 15-year prison sentence for anyone convicted of creating, reproducing, or transmitting any visual content (texts, images, graffiti, or

CLP_PC_034201

other forms of visual expression) that relates to gangs (see section 1.f.).  The government claimed the legislation was designed to prevent persons from relaying gang messages to the public and noted that no journalists had been arrested under the law; nonetheless, media and NGOs noted it effectively prohibits reporting on gang-related issues.

On August 28, Luis Alexander Rivas Samayoa, also known by his Twitter handle "The Commissioner," was arrested after he questioned on Twitter the president's brother's use of the president's security detail.  Karim Bukele was sightseeing on a beach with the detail in attendance when Rivas Samayoa posted a photograph of the security detail and his criticism.  Agents from the Division of Protection of Important Persons approached Rivas Samayoa after he posted the tweet, confiscated his and his family's cell phones, and took them to a police station to await the inspection of their phones, where Rivas Samayoa was arrested.  His colleague, Mario Gómez, said Rivas Samayoa was guilty only of questioning the use of government resources to protect a relative of the president, and he added that he was working with Rivas Samayoa and international media to monitor scams through the government's Chivo Wallet bitcoin app.  After being released on September 5, Rivas Samayoa was immediately rearrested on different charges, which police did not specify.  As of November, Rivas Samayoa remained in jail pending trial.

**Violence and Harassment:**  As of August, the PDDH reported that two journalists had filed cases reporting violence or harassment.  On May 3, APES released a report detailing the harassment and restrictions that journalists faced.  From January to April, the APES Center for Monitoring Attacks on Journalists recorded 39 cases of journalists reporting harassment, threats, and digital attacks.  The center also said journalists faced forced displacement due to persecution, defamation, and lack of security guarantees by government institutions.

On April 19, Ernesto Castro, the president of the Legislative Assembly, denounced Juan Martínez, an anthropologist and journalist who covered gang violence, during a televised session of the Legislative Assembly.  Castro stated that Martínez "confessed that he spent a year living with them (gang members) and he felt safe. And now that they are putting terrorists in jail, he feels insecure in this country."

CLP_PC_034202

On March 29, a photojournalist from the newspaper *El Diario de Hoy* was detained after photographing an air force installation in Colonia Santa Lucía, Ilopango. Soldiers made him kneel on the ground, restrained him, and forced him to delete photographs from his camera. According to the photojournalist, the soldiers restrained him despite the fact that he identified himself and presented his press credentials.

On August 15, *El País*, a Spanish newspaper, published an article in which a Salvadoran journalist, Bryan Avelar, said he sought asylum in Mexico after persons close to President Bukele accused him of having a brother in a gang. Avelar said that he did not have a brother and believed the Bukele loyalists spread rumors about him to portray him as a gang-affiliated criminal instead of a journalist. He left the country because he feared that officials were preparing a warrant for his arrest.

**Censorship or Content Restrictions for Members of the Press and Other Media, including Online Media:** Criminal code amendments passed on April 5 specifically forbid radio, television, and print and digital media outlets from reproducing or transmitting messages or statements originating or presumably originating from criminal groups. The legislation imposes prison sentences of up to 15 years. Marcela Pineda, a legislator for the governing Nuevas Ideas political party, declared that journalists interviewing gang members would be committing a crime and that journalists would be considered to be acting as spokespersons for the gangs by broadcasting their message and allowing them to "generate terrorism in the population." Local and international press freedom organizations criticized the law and said it amounted to media censorship. The Association of Journalists of El Salvador (APES) condemned the law as "a new tool to criminalize journalism." The Committee to Protect Journalists said the amended law "sets a truly dangerous precedent."

On October 18, APES reported that 10 journalists had fled the country. The director of the organization cited the amended law as a driving factor behind their departure.

**Nongovernmental Impact:** APES noted journalists who reported on gangs and narcotics trafficking were subject to kidnappings, threats, and intimidation from

CLP_PC_034203

criminal groups.  Observers reported that gangs also charged print media companies to distribute in communities where they operated, costing media outlets as much as 20 percent of their revenues.

**Internet Freedom**

The government did not restrict or disrupt access to the internet or censor online content.  There were credible reports that the government monitored private online communications without appropriate legal authority.  In an attempt to legalize this activity (see section 1.f.), the government amended the law to give it increased authority to monitor the internet and online platforms.

## b. Freedoms of Peaceful Assembly and Association

The constitution provides for the freedoms of peaceful assembly and association, but these freedoms were temporarily suspended under the state of exception.  The March 27 declaration of a state of exception suspended the rights to peaceful assembly and association, except in the case of meetings or associations for religious, cultural, economic, or sporting purposes.

On August 16, the government restored the freedom of association.

**Freedom of Peaceful Assembly**

On April 28, Minister of Labor Rolando Castro stated that anyone participating in the Labor Day protest march on May 1 would be imprisoned for violating the prohibition against assembly during the state of exception.  Castro added that participants of the march would be labeled criminals and gang defenders and arrested.  In response to his comments, many labor unions did not participate in the march, fearing arrest of their members.  Others chose to march despite the warnings, and most were allowed to peacefully assemble despite Castro's warnings.

## c. Freedom of Religion

See the Department of State's *International Religious Freedom Report* at https://www.state.gov/religiousfreedomreport/.

CLP_PC_034204

## d. Freedom of Movement and the Right to Leave the Country

The constitution provides for freedom of internal movement, foreign travel, emigration, and repatriation.  In many areas, the government could not assure freedom of movement due to criminal gang activity.  Under the state of exception, security forces restricted movement around and into certain, mostly low-income, neighborhoods with a history of gang activity.

**In-country Movement:**  Prior to the implementation of the state of exception, major gangs controlled access to their specific territories.  Gang members did not allow persons living in another gang's area to enter their territory, even when travelling via public transportation.  Gangs forced persons to present government-issued identification cards (which contain a person's address) to determine their residence.  If gang members discovered that a person lived in a rival gang's territory, that person risked being killed, beaten, or denied entry to the territory.  Bus companies paid bribes to operate within gang territories, often paying numerous fees for the different areas in which they operated.  As gang activity decreased under the state of exception, freedom of movement increased.

Although the text of the decree of the state of exception did not mention restrictions on movement, President Bukele warned a day before its approval that the measure included focused and temporary closures in some areas.  Starting on March 28, security forces regulated entry to and exit from low-income communities with a high level of gang activity.  Police checked residents' identification documents and allowed passage only to persons whose documents showed they resided in the communities.

## e. Protection of Refugees

The government cooperated with the Office of the UN High Commissioner for Refugees and other humanitarian organizations in providing protection and some assistance to refugees, returning refugees, or asylum seekers, as well as other persons of concern, although this was often difficult in gang-controlled neighborhoods.

**Access to Asylum:**  The law provides for granting asylum or refugee status, and

CLP_PC_034205

the government has established a system for providing protection to refugees, but it has major regulatory and operational gaps.  The Commission for the Refugee Status is responsible for refugee status determinations but does not have its own budget.  The legal framework requires persons with international protection needs to file their claim within five days of entering the country.  The criteria for case decisions are unclear, and the appeals process is also decided by the commission.

## f. Status and Treatment of Internally Displaced Persons

The Internal Displacement Monitoring Center estimated there were 175,000 new internally displaced persons due to violence in 2021 (most recent data available), noting the causes included threats, extortion, and killings perpetrated by criminal gangs.  The center reported 550 internally displaced persons due to floods in 2021.

# Section 3. Freedom to Participate in the Political Process

The constitution provides citizens the ability to choose their government in free and fair periodic elections held by secret ballot and based on universal and equal suffrage.

## Elections and Political Participation

**Recent Elections:**  The most recent legislative and municipal elections occurred in February 2021.  Nuevas Ideas, the party affiliated with President Bukele, won 56 of 84 seats in the Legislative Assembly and 152 of 262 mayorships.  The elections were generally considered free and fair; the election reports published by the Organization of American States and the EU electoral mission noted the elections generally met international standards.

**Participation of Women and Members of Minority Groups:**  No laws limit participation of women or members of minority groups in the political process, and they did participate.  Some transgender persons, however, reported difficulties registering to vote and voting because their gender identities did not match the gender stated on their identification cards (see section 6, Acts of Violence, Criminalization, and Other Abuse Based on Sexual Orientation, Gender Identity or Expression, or Sex Characteristics).

CLP_PC_034206

# Section 4. Corruption and Lack of Transparency in Government

The law provides criminal penalties for corruption by officials.  Although the Supreme Court investigated corruption in the executive and judicial branches and referred some cases to the Attorney General's Office for possible criminal indictment, allegations of corruption and impunity persisted.  In addition, most cases prosecuted by the Attorney General's Office were against former officials of previous governments, despite reports of corruption among sitting officials.

As of July 22, the Government Ethics Tribunal reported it had opened 148 administrative proceedings against 214 public officials.  The tribunal imposed sanctions in 37 cases and referred 22 cases to the Attorney General's Office.

**Corruption:**  On May 17, *El Faro* published an interview with a spokesperson for the Mara Salvatrucha-13 (MS-13) gang, who said the Bukele administration had negotiated a secret truce with the gang at the beginning of Bukele's term in office in exchange for political support.  *El Faro* also obtained recordings of conversations between the gangs and Director for Social Cohesion Carlos Marroquin about the alleged deal, in which he also mentioned the involvement of President Bukele and Director of Penitentiaries Osiris Luna Meza.  According to the spokesperson, the gangs agreed to dramatically reduce the number of homicides in the country in exchange for several demands, including government protection for certain gang leaders against extradition to the United States, better treatment for gang members in prison, and payments from the government.  The MS-13 spokesperson told the reporter that the truce ended in March when the government arrested leaders of the gang after luring them to a meeting.

On May 23, the Government Ethics Tribunal fined the mayor of Apopa, Jennifer Esmeralda Juárez García, a member of the Nuevas Ideas party, $1,095 for hiring her cousin to work in the mayor's office.  In June the tribunal fined the mayor of Antiguo Cuscatlán, Milagro Navas, $3,000 for authorizing institutional fuel vouchers for $5,330 to private vehicles owned by the mayor and her daughter in 2017.

On June 20, *El Faro* reported that two weeks before his appointment as attorney

CLP_PC_034207

general, Rodolfo Delgado signed a consulting services agreement with the government on behalf of his family business, owned by his mother.  The business provided consulting services on preventing money laundering to the Transmission Company of El Salvador, a government company under the Hydroelectric Executive Commission of the Lempa River.  Delgado became attorney general on May 1, 2021, and the contract remained in force until December 22, 2021. Between April and December 2021, the government company paid more than $45,000 to Delgado's mother.

On August 16, the First Sentencing Court sentenced Miguel Menendez "Mecafé," former president of the government-operated convention center and close friend of former President Funes, to eight years in prison for money laundering.  The Attorney General's Office proved that "Mecafé" received an airplane from Guatemalan businessman Jaime Ramón Aparicio Mejía, owner of Serdelco S.A., a construction company, in exchange for influencing the Funes administration to award an eight-million-dollar contract in 2013 to the company for the San Isidro Bridge construction project.

## Section 5. Governmental Posture Towards International and Nongovernmental Investigation of Alleged Abuses of Human Rights

A variety of domestic and international human rights groups generally operated without government restriction, investigating and publishing their findings on human rights cases.  Government officials were somewhat cooperative but rarely responsive to their views.

President Bukele and his supporters made disparaging remarks regarding national and international human rights groups on social media.  For example, on June 11, after the PNC successfully discovered an MS-13 arsenal and dismantled a gang encampment, President Bukele tweeted that international organizations and NGOs sponsored the evolution of gangs into guerilla groups and that international organizations and NGOs gave gangs "legal, media, political, and financial coverage."

**Government Human Rights Bodies:**  The principal human rights investigative

CLP_PC_034208

and monitoring body is the autonomous PDDH, whose ombudsperson is nominated by the Legislative Assembly for a three-year term.  The PDDH has a constitutional duty to investigate human rights abuses and defend human rights conventions in the country.  Apolonio Tobar served as human rights ombudsperson from October 2019 until October 2022, when Raquel Caballero de Guevara was appointed to replace him.  NGOs believed the PDDH was not fully independent or effective.

# Section 6. Discrimination and Societal Abuses

## Women

**Rape and Domestic Violence:**  The law criminalizes rape of men or women, and the law may apply to spousal rape, at the judge's discretion.  The law requires the Attorney General's Office to prosecute rape cases whether or not the victim presses charges, and does not permit the survivor to withdraw the charge.  The penalty for rape is generally imprisonment for six to 10 years.  Laws against rape were not effectively enforced.

As of June 30, the PDDH received 15 complaints of femicide.  On August 19, *La Prensa Gráfica* reported that femicide convictions decreased to 54 between June 1, 2021, and May 31, 2022, compared with 164 convictions between June 1, 2020, and May 31, 2021.

In June Hugo Ernesto Osorio Chávez, a former PNC officer, was sentenced to 70 years in prison for murdering two women who came to his house looking for a relative in May 2021.  The officer was also accused of numerous other femicides and other homicides after police found the bodies of approximately 40 persons, mostly women and girls, in his back yard in May 2021.

The law prohibits domestic violence and generally provides for sentences ranging from one to three years in prison, although some forms of domestic violence carry higher penalties.  The law also permits restraining orders against offenders.  The law against domestic violence was poorly enforced, and violence against women, including domestic violence, remained a widespread and serious problem.

In September the domestic NGO Feminist Network Against Violence Against Women reported that courts convicted suspects in only 712 cases of the 11,867

CLP_PC_034209

complaints of gender-based violence filed with police in the first half of 2021.  The Feminist Network believed the high level of gender-based violence and low conviction rates was due to fear of aggressors, normalization of violence, a lack of understanding regarding victims' rights, impunity for aggressors, and an overall patriarchal system.

On August 1, an armed forces colonel was arrested for statutory rape of two girls.  The colonel allegedly brought the girls to his quarters at the Armed Forces Logistical Support Command on August 1, gave them intoxicating beverages, and had sexual relations with them.

On March 14, the Second Criminal Chamber of San Salvador sentenced Magistrate Eduardo Jaime Escalante Díaz to 10 years in prison for sexually assaulting a girl, age 10, in Ilopango.  The case was initially dismissed in 2019, but public pressure on social media led to the reopening of the case.

**Sexual Harassment:**  The law prohibits sexual harassment and establishes sentences of five to eight years' imprisonment for the crime.  Courts also may impose fines in cases in which the perpetrator held a position of trust or authority over the victim.  By law employers must create and implement programs to prevent sexual harassment.  The government, however, did not enforce the law effectively.

On July 23, city council members from Guadalupe, San Vicente, introduced a petition to temporarily suspend the mayor, José Ernesto Renderos Pineda, for sexual harassment.  The mayor, however, concluded the session before the council could vote on the petition.  The alleged victim explained she started working at mayor's office in May 2021 and the harassment began a month later.

**Reproductive Rights:**  There were no reports of coerced abortion or involuntary sterilization on the part of government authorities.

The law bans abortion under all circumstances.  Civil society advocates expressed concern that the ban led to the wrongful incarceration of women who suffered severe pregnancy complications, including miscarriages.  On May 9, a judge sentenced a woman to 30 years in prison for aggravated homicide after she suffered a miscarriage.  According to the Citizen Group for the Decriminalization

CLP_PC_034210

of Abortion, the woman had an obstetric emergency but did not receive adequate medical care to prevent miscarriage.  The woman was held in pretrial detention for two years before her conviction for abortion.  This was the first conviction in the country after the Inter-American Court of Human Rights ruled against the country in March 2021 for the death of another woman who died while serving a 30-year sentence for abortion.  On June 29, a woman, age 21, was sentenced to 50 years in prison for aggravated homicide after she suffered an obstetric emergency.

Access to sexual and reproductive health services was hampered by restrictive abortion laws, lack of access to contraceptives, and a lack of reproductive education.  In December 2021, UN experts noted that there was "a systemic practice of discrimination against women who suffer obstetric emergencies or pregnancy losses."  On July 21, the organization Las Dignas presented the results of a study on contraception access carried out in two rural districts.  It found that 20 percent of the population studied had an active sex life but did not use contraceptives, for reasons including dangerous or difficult conditions that prevented travel to health centers, not having required parental authorization for minors to obtain contraceptives, and lack of availability of contraceptives in health centers.

**Discrimination:**  The constitution grants women and men the same legal status in family, religious, personal status, and nationality law.  There were no reports of discrimination in marriage, divorce, child custody, education, and judicial processes.  The law also provides equal rights for men and women in the areas of property rights, inheritance, employment, access to credit, business ownership, and housing.  Women, however, faced discrimination in employment and occupation. The law establishes sentences of one to three years in prison for public officials who deny a person's civil rights based on gender and six months to two years for employers convicted of discriminating against women in the workplace, but employees generally did not report such discriminations due to fear of employer reprisals.

## Systemic Racial or Ethnic Violence and Discrimination

There are several laws to protect members of racial or ethnic minorities or groups from violence and discrimination.  The government did not enforce the laws

CLP_PC_034211

effectively, and the administration took no action to implement a 2018 policy designed to focus on the inclusion of ethnic groups in all social and economic aspects.  Systemic racial discrimination existed towards Afro-descendent persons and Indigenous groups.  The government did not recognize Indigenous persons or the Afro-descendent community in the most recent population census (2007).

## Indigenous Peoples

The constitution recognizes Indigenous peoples and states the government will adopt policies to maintain and develop the ethnic and cultural identity, world view, values, and spirituality of Indigenous peoples.  The law provides for the preservation of languages and archeological sites.  The municipalities of Cacaopera and Yucuaiquin, in the eastern part of the country, have special laws to recognize their Indigenous cultural heritage.

Although the law provides for Indigenous groups to participate in decision making on issues that affect their rights, it does not include the right to be consulted regarding development and other projects envisioned on Indigenous land, nor does it provide Indigenous groups the right to share in revenue from exploitation of natural resources on historically Indigenous lands.  The government did not demarcate any lands as belonging to Indigenous communities.  Because few Indigenous persons possessed title to land, opportunities for bank loans and other forms of credit were limited.

On March 10, members of the Salvadoran Indigenous Coordinating Council said relations between the Indigenous communities and the government had deteriorated since 2019.  They noted that although the Ministry of Culture was responsible for executing a national plan of action for Indigenous communities, it had not implemented any programs focused on Indigenous communities. Indigenous communities were omitted from the Ministry of Education program that delivered computers to school children.  Most Indigenous communities did not have access to the internet, and some did not have access to electricity.  Council representatives also said gangs extorted a share of the crops from some Indigenous communities or forced them from their land.

On August 16, the Constitutional Chamber allowed a claim to proceed against the

CLP_PC_034212

Attorney General's Office for failing to investigate the death of three Indigenous persons during "The Massacre of 1932."  The court stated that the Attorney General's Office failed to take the "necessary steps to determine the circumstances" related to the case in the years since the incident occurred, and that the Attorney General's Office never initiated an investigation "despite the historical significance for the country, since it involved the disappearance and death of thousands of victims belonging to the different Indigenous peoples in the country."  Conversely, the court dismissed the same plaintiff's claim against the armed forces in the same incident.

## Children

**Birth Registration:**  Children derive citizenship by birth within the country or from citizen parents.  The law requires parents to register a child within 15 days of birth or pay a small fine.  Birth registration was provided on a nondiscriminatory basis.  Failure to register may result in denial of school enrollment.

**Child Abuse:**  Child abuse remained a serious and widespread problem.  The law gives children the right to petition the government without parental consent.  Penalties for child abuse include losing custody of the child and three to 26 years' imprisonment, depending on the nature of the abuse.

**Child, Early, and Forced Marriage:**  The legal minimum age for marriage is 18.  The law bans child marriage to prevent child abusers from avoiding imprisonment by marrying their underage victims, and the law likewise bans exceptions to child marriage in cases where the child is pregnant.

**Sexual Exploitation of Children:**  Child sex trafficking is prohibited by law.  Prison sentences stipulate imprisonment of 16 to 20 years.

The minimum age for consensual sex is 18.  The law classifies statutory rape as sexual relations with anyone younger than age 18 and includes sentences of four to 13 years' imprisonment.

The law prohibits paying anyone younger than age 18 for sexual services.  The law prohibits participating in, facilitating, or purchasing materials containing child pornography and provides for prison sentences of up to 16 years.  Despite these

CLP_PC_034213

provisions, sexual exploitation of children remained a problem.  The government did not enforce the law effectively.

**Institutionalized Children:**  In March legislators approved reforms to the juvenile criminal code to establish prison sentences for minors convicted of serious crimes committed while belonging to gangs.  Such crimes include homicide, extortion, kidnapping, rape, sexual assault, and aggravated robbery.  The previous code did not apply prison sentences to juveniles ages 12 to 18 for committing serious crimes.  Under the reforms, minors 16 or older could be sentenced up to 20 years in prison, and minors 12 to 15 could face up to 10 years in prison.

On July 27, the Salvadoran Institute of Child Development reported the number of minors ages 12 to 17 in detention increased from 247 in 2021 to 1,373, largely due to enforcement actions under the state of exception.

## Antisemitism

The Jewish community totaled approximately 150 persons.  There were no reports of antisemitic acts.

## Trafficking in Persons

See the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## Acts of Violence, Criminalization, and Other Abuses Based on Sexual Orientation, Gender Identity or Expression, or Sex Characteristics

**Criminalization:**  Laws do not criminalize consensual same-sex conduct between adults or cross-dressing.

**Violence against LGBTQI+ Persons:**  Violence against lesbian, gay, bisexual, transgender, queer, and intersex (LGBTQI+) persons was widespread.  The law allows for higher sentences for crimes committed on the basis of sex, gender identity, and gender expression, among other categories.

CLP_PC_034214

On May 17, the Solidarity Association to Promote Human Development reported that the situation of transgender women and men worsened during the state of exception, due to security force and gang violence.  Comcavis Trans reported in August that it had received 20 complaints from transgender individuals regarding their treatment by security forces during the state of exception, including allegations of illegal detention, abuse of power, and physical aggression.

**Discrimination:**  Discrimination against LGBTQI+ persons was widespread.  On February 4, Comcavis Trans and the Organization for Salvadoran Women for Peace presented the results of a study of discrimination and violence against the LGBTQI+ community that reported 65 percent of individuals interviewed claimed to have been victims of discrimination by municipal security agents.  A Human Rights Watch report published in February found that transgender persons regularly faced discrimination in health care, employment, banking, and voting.

On April 26, the PNC arrested Kendra and Dayana, two transgender women from Metapán, Santa Ana, as part of law enforcement actions under the state of exception.  On the day of the arrest, police posted a photograph of them on Facebook and Twitter in which both were identified by their male names, not the names they used, and shown with exposed torsos.  The post received numerous antitransgender comments.  Transgender men arrested during the state of exception also reported police forced them to expose their torsos.

**Availability of Legal Gender Recognition:**  On February 23, the Supreme Court ruled that discrimination based on gender identity is unconstitutional and gave the Legislative Assembly one year to create a procedure allowing transgender persons to change their identity documents to reflect their gender.  As of November, the Legislative Assembly had not taken any steps to create such a procedure.

**Involuntary or Coercive Medical or Psychological Practices Specifically Targeting LGBTQI+ Individuals:**  There were no reports of the practice of so-called conversion therapy targeting LGBTQI+ individuals.

**Restrictions of Freedom of Expression, Association, or Peaceful Assembly:**  There were no restrictions on freedom of expression or association.

On June 25, LGBTQI+ activists noted the Bukele administration had failed to

CLP_PC_034215

provide police to protect marchers during the Pride parade in the past two years, although the parade drew more 20,000 participants in a society that was at times violent towards the LGBTQI+ community.  The PNC regularly provided protection for other marches, as part of its mandate to guarantee public order.

## Persons with Disabilities

The law prohibits discrimination against persons with physical, sensory, intellectual, and mental disabilities, but the government did not enforce these laws. Persons with disabilities did not have access to education, health services, public buildings, or transportation on an equal basis with others.  Persons with disabilities faced discrimination in employment and occupation.  No formal system existed for filing a discrimination complaint based on disability.

The National Council for Comprehensive Attention to Persons with Disability (CONAIPD), composed of representatives from multiple government entities, is the agency responsible for protecting the rights of persons with a disability, but it lacked enforcement power.  According to a CONAIPD representative, the government did not effectively enforce legal requirements for access to buildings, information, and communications for persons with disabilities.  Few access ramps or provisions for the mobility of persons with disabilities existed.

Disability advocates said that children with disabilities faced access problems in school, including a lack of ramps and other accommodations.  The government provided little support for schools to include accommodations, and there were few teachers trained to teach students with disabilities.

On March 25, the Without Limits Association reported on discrimination faced by children with disabilities in the public education system.  Many schools in the country did not admit disabled children due to lack of adequate facilities to accommodate disabilities.  The law obliges public-sector institutions to allocate a part of their budget to provide for inclusion of persons with disabilities.  According to Without Limits, the Ministry of Education did not comply with the law.

Persons with disabilities also faced discrimination in the public health-care system. Women with disabilities were often instructed by their doctors to use birth control to avoid having children, believing that the women would bear children with

CLP_PC_034216

disabilities.

CONAIPD said there was no mechanism to verify compliance with the law requiring businesses and nongovernment agencies to hire one person with disabilities for every 25 hires. CONAIPD reported employers frequently fired persons who acquired disabilities and would not consider persons with disabilities for work for which they qualified.

## Other Societal Violence or Discrimination

Although the law prohibits discrimination based on HIV or AIDS status, Entre Amigos, an NGO that worked on issues concerning LGBTQI+ persons, reported HIV-related discrimination was widespread. As of June 30, the PDDH had not received any complaint for cases of discrimination against persons with HIV or AIDS.

# Section 7. Worker Rights

## a. Freedom of Association and the Right to Collective Bargaining

The law provides for the right of most workers to form and join independent unions, to strike, and to bargain collectively, but the government did not enforce these rights. Unions experienced lengthy delays in processing their credentials with the Ministry of Labor, some waiting nine months or longer. Without credentials, unions may not engage in collective bargaining or participate in tripartite entities that govern worker-related issues such as setting a minimum wage, health care, and housing. According to media reports and union representatives, the minister of labor rewarded unions loyal to him and his party with expedited credentials and punished unions critical of the government by delaying their certifications.

The law prohibits antiunion discrimination, although it does not require reinstatement of workers fired for union activity. Military personnel, national police, judges, and high-level public officers may not form or join unions. Workers in private security firms may not form or join unions. The labor code does not cover public-sector workers and municipal workers, whose wages and terms of employment are regulated by the 1961 civil service law. Only citizens

CLP_PC_034217

may serve on unions' executive committees. The labor code also bars individuals from holding membership in more than one trade union. Unions must meet certain requirements to register, including having a minimum membership of 35 individuals. If the Ministry of Labor denies registration, the law prohibits any attempt to organize for up to six months following the denial.

Collective bargaining is strictly regulated. Unions representing fewer than 51 percent of the workers in an enterprise do not have the right to bargain, even on behalf of their own members. Provisions of the law allow either party to a collective bargaining agreement, under some conditions, to seek to change its provisions after one year in force. Employees of most public institutions do not have the right to bargain collectively, and for those that do, collective bargaining agreements are subject to the approval of the employing ministry before they go into force.

The law contains cumbersome and complex procedures for conducting a legal strike. The law does not recognize the right to strike for public and municipal employees or for workers in essential services. The law does not specify which services meet this definition, and courts therefore applied this provision on a case-by-case basis. The law requires that 30 percent of all workers in an enterprise must support a strike for it to be legal and that 51 percent must support the strike before all workers are bound by the decision to strike. Unions may strike only to obtain or modify a collective bargaining agreement or to protect the common professional interests of the workers. Unions must engage in negotiation, mediation, and arbitration processes before striking, although many unions often skipped or expedited these steps. Workers at times engaged in strikes that did not meet legal requirements. The law provides no way for workers to appeal a government decision declaring a strike illegal.

The law specifies 30 reasons for which an employer may terminate a worker's contract without triggering any additional responsibilities, including consistent negligence, leaking private company information, or committing immoral acts while on duty. An employer may legally suspend workers, including due to an economic downturn or market conditions. If an employer illegally dismisses a worker, the law requires the employer to pay the equivalent of 30 days of basic salary for each year of service, in lieu of requiring employers to reinstate them.

CLP_PC_034218

The government did not effectively enforce the laws on freedom of association and the right to collective bargaining, and penalties were not commensurate with those for other laws involving denials of civil rights, such as discrimination.  Penalties were rarely applied against violators.  Judicial procedures were subject to lengthy delays and appeals.  According to union representatives, the government inconsistently enforced labor rights for a wide range of workers, and enforcement was dependent upon the political affiliations of their labor unions.  Unions reported that their members frequently faced violence or threats of violence and that viable legal recourse against such violence was unavailable.  Gang activity made it difficult for workers, who continued to be harassed and exposed to violence, to exercise their union activities freely.

Although many unions were aligned with political parties, they functioned independently from the government and political parties.

On April 28, Minister of Labor Castro stated that he would consider any Labor Day demonstrators to be defending gang members.  In the event, the demonstrations were largely peaceful and without arrests (see section 2.b., Freedom of Assembly).

## b. Prohibition of Forced or Compulsory Labor

The law prohibits all forms of forced or compulsory labor.  The government generally did not effectively enforce such laws.  The Ministry of Labor did not report on forced labor.  Children and adults were exposed to forced begging, domestic work, agricultural labor, construction, textile industry, and street work. Adults from neighboring countries were forced to work in construction, domestic work, and other informal sector jobs, sometimes under threat of physical violence. Gangs subjected children to forced labor in illicit activities, including selling or transporting drugs and committing homicides.

Also see the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## c. Prohibition of Child Labor and Minimum Age for Employment

See the Department of Labor's *Findings on the Worst Forms of Child Labor* at

CLP_PC_034219

https://www.dol.gov/agencies/ilab/resources/reports/child-labor/findings/.

## d. Discrimination with Respect to Employment and Occupation

The constitution, labor laws, and state regulations prohibit discrimination based on age, race, color, sex, religion, political opinion, national origin (except in cases determined to protect local workers), social origin, gender, disability, language, or HIV-positive status.  The government did not effectively enforce the laws and regulations, and penalties were not commensurate to laws related to civil rights, such as election interference.  Penalties were sometimes applied against violators.  Although the Supreme Court of Justice ruled that gender identity was a protected class, the government did not enforce this.

Discrimination in employment and occupation occurred based on age, gender, disability, and sexual orientation or gender identity (see section 6).  According to the Ministry of Labor, migrant workers have the same rights as citizens, but the ministry did not effectively protect their rights.

The law prohibits establishing an upper age limit for job applications, using age as a cause to dismiss an employee, or forcing an employee to retire due to age.  The law was not enforced.

Although the law provides for equal pay between men and women, women did not receive equal pay.  In July 2021, the United Nations reported that women made 18 percent less than men in the same jobs.

Persons with disabilities faced discrimination in employment and occupation (see section 6).  On March 7, the Network of Survivors and Persons with Disabilities Foundation said that women with disabilities faced discrimination when seeking employment in public institutions, including through the Ministry of Labor's Job Placement Program.  The foundation highlighted that the Special Law on Inclusion of Persons with Disabilities was never implemented or enforced.  The Association of Blind Women added that companies preferred to pay fines instead of employing workers with disabilities.

Although the law prohibits forcing an employee to retire due to age, on May 11, the Legislative Assembly approved the Special Law for the Retirement and

CLP_PC_034220

Granting of Economic Compensation, which provides financial compensation to employees age 60 or older in the National Civilian Police and the National Academy of Public Security who were forced to retire in March by order of the minister of security.  The minister signed the order on March 30, and the employees were forced to retire the next day, without compensation.  The order affected approximately 3,000 workers across various law enforcement bodies.

## e. Acceptable Conditions of Work

**Wage and Hour Laws:**  The government sets the minimum wage, which varies by sector; all were above poverty income levels.  The Ministry of Labor is responsible for enforcement of wage and hour laws.  The law sets a maximum normal workweek of 44 hours – limited to no more than six days per week and to no more than eight hours per day – but allows overtime, which is to be paid at double the usual hourly wage.  The law mandates that full-time employees receive pay for an eight-hour day of rest in addition to the 44-hour normal workweek.  The law provides that employers pay double time for work on designated annual holidays, a Christmas bonus based on the time of service of the employee, and 15 days of paid annual leave.  The law prohibits compulsory overtime for all workers other than domestic employees, such as maids and gardeners, who are obligated to work on holidays if their employer makes this request.  In such cases, they are entitled to double pay.

**Occupational Safety and Health:**  The Ministry of Labor is responsible for setting and enforcing occupational safety and health (OSH) standards, and the law establishes a tripartite committee to review these standards.  The law requires employers to take steps to meet OSH requirements in the workplace, including providing proper equipment and training and a violence-free environment.  The law promotes occupational safety awareness, training, and worker participation in OSH matters.  The laws were appropriate for the main industries.

In some cases, the country's high crime rate undermined acceptable conditions of work as well as workers' psychological and physical health.  Some workers, such as bus drivers, bill collectors, messengers, and teachers in high-risk areas, reported being subject to extortion by and death threats from gang members.  The reports decreased following the advent of the state of exception.

CLP_PC_034221

Workers may legally remove themselves from situations that endanger health or safety without jeopardy to their employment.  One police officer reported being arrested due to complaints he made regarding the conditions of work under the state of exception.  On June 10, Jorge Alberto Vásquez Panameño, one of the founders of the Movement of Police Workers, was summoned to a meeting where the PNC Internal Affairs Commission and PNC Director Mauricio Chicas were waiting to carry out his arrest.  He was told his arrest was because he shared images on WhatsApp of the exhaustion experienced by police officers during the state of exception.  Police union representatives claimed he was detained in retaliation for denouncing the abuses suffered by PNC police officers such as suspension of time off, lack of payment, insufficient supplies to carry out work, and forced retirement of officers 60 years of age or above.  He was released four days later, and all charges were dropped.

**Wage, Hour, and OSH Enforcement:**  The government did not adequately enforce wage, hour, or OSH laws and regulations.  Penalties were not commensurate with those for similar crimes, such as fraud, and were not consistently applied against violators.  Some companies reportedly found it more cost effective to pay fines than comply with the law.

The government trained inspectors on legal standards.  The number of inspectors was insufficient to deter violations.  Inspectors did not have the authority to initiate unannounced inspections or sanctions.  Inspections were scheduled according to a calendar set by the Inspections Directorate or to verify a complaint, and labor inspectors notified companies prior to their arrival.  Allegations of corruption among labor inspectors continued.

The Ministry of Labor received complaints regarding failure to pay overtime, minimum wage violations, unpaid salaries, and the illegal withholding of benefits (including social security and pension funds).  Reports of overtime and wage violations occurred in several sectors.  According to the ministry, employers in the agricultural sector routinely violated the laws requiring annual bonuses, vacation days, and rest days.  Women in domestic service faced exploitation, mistreatment, verbal abuse, threats, sexual harassment, and generally poor work conditions.  Workers in the textile industry reportedly experienced violations of wage, hour, and safety laws.  According to the Women Transforming Association, certain

CLP_PC_034222

apparel companies violated women's rights through occupational-health violations and unpaid overtime.

**Informal Sector:**  The informal sector represented almost 75 percent of the economy.  Workers in the informal sector, including children, were not protected by labor laws, and their workplaces were not inspected by the Ministry of Labor.

CLP_PC_034223

# COLOMBIA 2022 HUMAN RIGHTS REPORT

## EXECUTIVE SUMMARY

Colombia is a constitutional, multiparty republic. Presidential and legislative elections were held in 2022. Voters elected Gustavo Petro president in a second round of elections that observers considered free and fair and the most peaceful in decades. President Petro was inaugurated on August 7.

The Colombian National Police force is responsible for internal law enforcement and is under the jurisdiction of the Ministry of Defense. The Migration Directorate, part of the Ministry of Foreign Affairs, is the immigration authority. The Colombian National Police shares law enforcement investigatory duties with the Attorney General's Corps of Technical Investigators. In addition to its responsibility to defend the country against external threats, the army shares limited responsibility for law enforcement and maintenance of order within the country. For example, military units sometimes provided logistical support and security for criminal investigators to collect evidence in high-conflict or remote areas. Civilian authorities generally maintained effective control over security forces. There were reports that members of the security forces committed some abuses.

Significant human rights issues included credible reports of: unlawful or arbitrary killings; torture and arbitrary detention by government security forces and armed groups; serious abuses in a conflict; criminalization of libel; serious government corruption; violence against and forced displacement of Afro-Colombian and Indigenous persons; violence against lesbian, gay, bisexual, transgender, queer, and intersex persons; and killings of and other violence against trade unionists.

The government generally took steps to investigate, prosecute, and punish officials who committed human rights abuses, although most cases experienced long delays. Many investigations included cases stemming from throughout the armed conflict in the country starting in the 1960s. The government generally implemented laws criminalizing official corruption.

CLP_PC_034224

Armed groups, including dissidents of the former Revolutionary Armed Forces of Colombia, National Liberation Army, and drug-trafficking gangs, continued to operate.  Armed groups, as well as narcotics traffickers, were reported as significant perpetrators of human rights abuses and violent crimes, including acts of extrajudicial and unlawful killings, extortion, and other abuses or crimes, such as kidnapping, torture, human trafficking, bombings, restrictions on freedom of movement, sexual violence, unlawful recruitment and use of child soldiers, and threats of violence against journalists, women, human rights defenders, and religious leaders.  The government generally investigated these actions and prosecuted those responsible.

# Section 1. Respect for the Integrity of the Person

## a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were reports that the government or its agents committed arbitrary or unlawful killings.  According to the nongovernmental organization (NGO) Temblores, from January 1 through August 31, there were 18 homicides of civilians by police.  According to the NGO Center for Research and Education of the Populace (CINEP), from January 1 through June 30, there were 21 intentional homicides committed by the military.

On July 25, in the municipality of Sampues, Sucre Department, three men were allegedly abused and subsequently died in police custody.  Ten police officers were arrested by the Attorney General's Office on suspicion of involvement in these three homicides.  The National Police and the Attorney General's Office reported that they opened investigations into all allegations of police violence and excessive use of force.  NGOs and other entities continued to request investigations of allegations.

As of August 25, the Inspector General's Office reported 351 disciplinary investigations of police for alleged human rights abuses committed in the context of the 2021 national protests.  Of these cases, 341 cases were in the investigation stage and 10 cases were in trial, pending disciplinary decisions.

CLP_PC_034225

As of August, the Attorney General's Office reported it had opened 20 investigations against 24 police officers for alleged homicides committed during the 2021 protests. Charges included homicide, torture, kidnapping, and inflicting personal injuries, among other crimes. As of August, the Attorney General's Office reported there had not been any convictions of police officers for crimes committed in the national protests. Authorities disciplined police officers for excessive use of force during the 2021 protests.

Illegal armed groups, including the National Liberation Army (ELN), committed numerous unlawful killings, in some cases politically motivated, and usually in areas without a strong government presence (see section 1.g.).

Investigations of past killings proceeded, albeit slowly due to the high workload of judges, prosecutors, and law enforcement investigators. From January 1 through August 1, the Attorney General's Office registered five new cases of alleged aggravated homicide by state agents. During the same period, authorities reported that they obtained sentences against 11 members of the security forces for cases that took place in prior years.

Efforts continued to hold officials accountable in so-called false-positive extrajudicial killings during which, per court records, 6,402 civilians were killed and falsely presented as guerrilla combatants from 2002 to 2008. The Special Jurisdiction for Peace (JEP) was the transitional justice tribunal created by the 2016 peace accord to investigate serious crimes committed during the 52-year internal armed conflict with the Revolutionary Armed Forces of Colombia (FARC). The JEP continued to promote reconciliation and to take steps to hold accountable the perpetrators of violence during the armed conflict. As of October 1, the JEP reported that 3,482 members of the armed forces voluntarily accepted JEP jurisdiction for legal proceedings related to false positives, and that 508 members gave testimony in the false-positives case known as "overarching case 03."

On April 26-27, as part of its effort to establish truth, reconciliation, and nonrepetition of prior actions, the JEP facilitated the first "recognition of responsibility" event in Ocana, Norte de Santander. At the event, 10 members of the army, including a general and four colonels, as well as a third-party civilian,

CLP_PC_034226

recognized their responsibility for extrajudicial killings and forced disappearances and apologized to victims' families.  The persons testifying included members of Brigade 30, Mobile Brigade 15, and Infantry Battalion 15 ("General Francisco de Paula Santander"), indicted in 2021 for 120 extrajudicial killings.

In JEP proceedings on July 18-19, 12 members of Artillery Battalion Number Two ("La Popa"), which the JEP charged with committing 127 extrajudicial killings in Cesar and La Guajira between 2002 and 2005, publicly acknowledged responsibility for extrajudicial killings.  These 12 persons participated in a ceremony with victims' families and leaders of the Kanukuamo and Wiwa Indigenous communities they targeted.  Three additional individuals indicted in conjunction with the killings declined to accept responsibility and were to face adversarial prosecution, including retired colonels Publio Hernan Mejia Gutierrez and Juan Carlos Figueroa Suarez.

On July 25, the JEP indicted 22 members of the army as well as one former intelligence official and two civilians for 303 false-positive killings in Casanare. Among those indicted were former leaders of Brigade 16, including retired General Henry William Torres Escalante.  On July 27, the JEP indicted 10 former members of the army, including three colonels, for disappearances and extrajudicial killings in Dabeiba and Ituango (Antioquia).  Those implicated belonged to the Counter-guerrilla Battalion 26 ("Arhuacos"), Counter-guerrilla Battalion 79 ("Hernando Combita Salazar"), and Mobile Brigade 11.  The JEP reported that the testimony of 24 former soldiers and officers to the JEP implicated retired army commander General Mario Montoya Uribe in relation to the false-positive cases.  In his testimony in September, Montoya denied responsibility for the false-positive killings.

As of August 30, the Attorney General's Office reported that since 2008 the government convicted 1,438 members of the security forces in cases related to false-positive cases, one more than in 2021.  Many of those convicted in the ordinary and military justice systems were granted conditional release from prisons and military detention centers upon agreeing to submit to the jurisdiction of the JEP.  The military justice system developed a protocol to monitor the whereabouts of prisoners on conditional release; it was responsible for reporting any anomalies to the JEP for appropriate action.

CLP_PC_034227

The Attorney General's Office reported that as of August 1, there were open investigations of eight retired and active-duty generals related to false-positive killings.  The Attorney General's Office also reported that as of August 31, there were 2,408 open investigations related to false-positive killings or other extrajudicial killings, of which 2,028 investigations were at the investigation stage and 414 investigations had gone to trial.

Human rights organizations, victims, and government investigators accused some members of government security forces of collaborating with or tolerating the activities of criminal gangs, which included some former paramilitary members. According to the Attorney General's Office, between January and August 31, four police officials were formally accused of having ties with illegal armed groups.

The UN Office of the High Commissioner for Human Rights (OHCHR) reported that between January 1 and June 30, it received 114 allegations of homicides of human rights defenders.  Of those allegations, 67 remained under review, 22 deaths had been confirmed as being related to the individual's actions defending human rights, and 25 cases had been determined to be inconclusive.  The OHCHR reported that three victims were Afro-Colombians and eight were Indigenous. According to the OHCHR, 1,116 human rights defenders and social leaders received death threats in 2021.  The OHCHR reported an increase in threats against human rights defenders during the electoral period in the first half of the year.  On October 28, the ombudsman announced that 157 homicides of social leaders occurred through end of September.  NGOs using different methodologies and definitions reported differing numbers of homicides of social leaders and human rights defenders, which often included environmental activists.  The NGO Indepaz reported 144 homicides of social leaders through October 12.

According to the Attorney General's Office, in the cases related to more than 1,000 killings of human rights defenders from January 2016 to August 2022, the government obtained 109 convictions.  The motives for the killings varied, and it was often difficult to determine the primary motive in individual cases.  For example, on June 8, armed groups killed Jesusita Moreno Mosquera in Cali, Valle de Cauca.  Mosquera was a human rights defender from the department of Choco. She also advocated for environmental rights and opposed the presence of armed groups in her community.  She had previously notified authorities about receiving

CLP_PC_034228

threats from armed groups.  Police immediately opened an investigation into the killing.

The government's Commission of the Timely Action Plan for Prevention and Protection for Human Rights Defenders, Social and Communal Leaders, and Journalists worked to investigate and prevent attacks against social leaders and human rights defenders.  Four units – an elite Colombian National Police (CNP) corps, a specialized subdirectorate of the National Protection Unit (NPU), a special investigation unit of the Attorney General's Office responsible for dismantling criminal organizations and enterprises, and a unified command post – shared responsibility for protecting human rights defenders from attacks and investigating and prosecuting these cases.

By law the Attorney General's Office is the primary entity responsible for investigating allegations of human rights abuses committed by security forces, except for conflict-related crimes, which are under the jurisdiction of the JEP (see section 1.c. for additional information regarding investigations and impunity).

## b. Disappearance

According to the Attorney General's Office, there were no formal complaints of forced disappearance from January 1 through August 1.  The Office of the Ombudsman reported receiving notifications of 121 cases of forced displacement from January 1 through August 31.  As of August 25, the National Institute of Forensic and Legal Medicine registered 34,420 cases of forced disappearance since the beginning of the country's armed conflict in the early 1960s.  Of those cases, the National Institute of Forensic and Legal medicine registered 1,012 cases between January 1 and August 25.  According to the Attorney General's Office, as of August, there were no convictions in connection with forced disappearances.

The Special Unit for the Search for Disappeared Persons, launched in 2018, continued to investigate disappearances that occurred during the conflict.  The Search Unit reported that as of June 30 it had helped locate seven missing persons and recover 506 bodies of victims of forced disappearance related to the conflict.  The Truth Commission reported 121,768 persons were victims of forced disappearance during the conflict.

CLP_PC_034229

On April 7, the JEP stated that state agents and paramilitaries killed or disappeared 5,733 candidates and other persons affiliated with the leftwing political party Union Patriotica (Patriotic Union) between 1984 and 2016 (see section 3).

The JEP proceedings in the false-positives case involved forced disappearances in addition to extrajudicial killings (see section 1.a. above).

## c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, and Other Related Abuses

Although the law prohibits such practices, there were reports government officials used these methods of abuse. CINEP reported that through August, security forces were allegedly involved in eight cases of abuse and inhuman treatment involving 12 victims. Members of the military and police accused of torture generally were tried in civilian rather than military courts. The NGO Temblores reported that police beat and sexually assaulted demonstrators in 17 cases between January 1 and May 31. The Attorney General's Office and the Inspector General's Office stated they launched internal investigations of all allegations of excessive use of force.

The Attorney General's Office reported it convicted no members of the military or police of torture between January and August 1. Investigations into torture allegations continued, however. The Attorney General's Office reported they formally charged 43 police and 27 members of the military for alleged acts of torture, 31 cases of which took place in previous years.

CINEP reported criminal organizations and armed groups were responsible for three documented cases of torture involving three victims through June 30.

According to NGOs monitoring prison conditions, there were numerous allegations of sexual and physical violence committed by guards and other inmates, including gender-based violence.

The Attorney General's Office is the primary entity responsible for investigating allegations of human rights abuses committed by security forces, except for conflict-related crimes, which are within the jurisdiction of the JEP. The JEP continued investigations in its seven prioritized thematic cases focusing on

CLP_PC_034230

incidents within a certain region, incidents by specific actors, and incidents against certain categories of victims.

The government made improvements in investigating and trying abuse cases, but claims of impunity for security force members continued. This was due in some cases to obstruction of justice and opacity in the process by which cases were investigated and prosecuted in the military justice system. Some NGOs complained that military investigators, not members of the Attorney General's Office, were sometimes the first responders in cases of deaths resulting from actions of security forces. Some NGOs cautioned that this situation may bias investigations against finding possibly illegal conduct by security forces. Inadequate protection of witnesses and investigators, delay tactics by defense attorneys, the judiciary's failure to exert appropriate controls over dockets and case progress, and inadequate coordination among government entities that sometimes allowed statutes of limitations to expire, resulting in a defendant's release from jail before trial, were also significant obstacles.

Transition to a new system of military justice continued slowly. The military did not develop a strategy for recruiting, hiring, or training the investigators, crime scene technicians, or forensic specialists required under the new accusatory system. As a result, the military justice system did not exercise criminal investigative authority; all new criminal investigation duties were conducted by judicial police investigators from the CNP and the Attorney General's Corps of Technical Investigators.

**Prison and Detention Center Conditions**

Most conditions in prisons and detention centers were harsh and life threatening due to overcrowding, inadequate sanitary conditions, poor health care, and lack of other basic services. Poor training of officials remained a problem throughout the prison system.

**Abusive Physical Conditions:** Overcrowding existed in both men's and women's prisons. The National Prison Institute (INPEC), which operated the national prisons and oversaw the jails, estimated the prisons and jails were approximately 20 percent over capacity. The law dictates that local governments are responsible

CLP_PC_034231

for funding and operating pretrial detention facilities.  The law prohibits holding pretrial detainees with convicted prisoners, but often this law was not followed.  The Superior Judiciary Council stated the maximum time a person may remain in judicial detention facilities is three days.  The same rules apply to jails located inside police stations.  Police, local governments, and prison authorities often violated this guidance.

The practice of preventive detention, in combination with inefficiencies in the judicial system, resulted in overcrowding.  Physical abuse by prison guards, prisoner-on-prisoner violence, and authorities' failure to maintain control were problems.  INPEC's Office of Disciplinary Control investigated allegations that some prison guards routinely used excessive force and treated inmates brutally.  Between January 1 and August 20, INPEC reported 36 new disciplinary investigations against prison guards for physical abuse and inflicting personal injuries.  Additionally, the Inspector General's Office reported that between January 1 and August 25, officials opened 21 disciplinary investigations related to cases of abuse against inmates and persons under temporary detention, in which 11 INPEC guards and 15 police officers were involved.

INPEC reported 221 deaths in prisons, jails, pretrial detention facilities, and other detention centers through August 20.  Eight deaths were caused by fights, 60 were due to accidents, and one death was due to intoxication.  Of the 60 accidental deaths, 52 stemmed from a June 27 fire in the prison of Tulua, Valle de Cauca, during a fight between inmates.  Inmates alleged INPEC guards were negligent in their response to the fire.

Many prisoners faced difficulties receiving adequate medical care.  Nutrition and water quality were poor and contributed to the overall poor health of many inmates.  Inmates stated authorities routinely rationed water in many facilities; officials attributed this practice to city water shortages.

INPEC's physical structures were generally in poor repair.  The Inspector General's Office noted some facilities had poor ventilation and overtaxed sanitary systems.  Prisoners in some cold, high-altitude facilities complained of inadequate blankets and warm clothing, while prisoners in tropical facilities complained that overcrowding and insufficient ventilation contributed to high temperatures in

CLP_PC_034232

prison cells.  Some prisoners slept on floors without mattresses, while others shared cots in overcrowded cells.

**Administration:**  Authorities investigated credible prisoner complaints of mistreatment and inhuman conditions, including complaints of prison guards soliciting bribes from inmates.  Some prisoners asserted the investigations were slow.  INPEC required a three-day notice before granting consular access.  Some NGOs complained that authorities denied them access to visit prisoners without adequate explanation.

**Independent Monitoring:**  The government permitted independent monitoring of prison conditions by local and international human rights groups.

## d. Arbitrary Arrest or Detention

The law prohibits arbitrary arrest and detention and provides for the right of any person to challenge the lawfulness of his or her arrest or detention in court.  There were allegations, however, that authorities detained citizens arbitrarily.  The NGO Temblores reported 76 cases of arbitrary detention by police involving 145 victims.  NGO CINEP reported six cases of arbitrary detention by the army with 14 victims, and seven cases of arbitrary detention by the Attorney General's Office with 41 victims.

### Arrest Procedures and Treatment of Detainees

To ensure the detention is valid, officials must bring detained persons before a judge within 36 hours of arrest, bring formal charges within 30 days, and start a trial within 90 days of the initial detention.  Public defenders contracted by the Office of the Ombudsman assisted indigent defendants but were overloaded with cases.  Detainees received prompt access to legal counsel and family members, as provided by law.  Bail was generally available except for serious crimes such as murder, rebellion, or narcotics trafficking.  Authorities generally respected these rights.

**Arbitrary Arrest:**  Even though the law prohibits arbitrary arrest and detention, this law was not always respected.  NGOs described some arrests as arbitrary detentions.  These included arrests based allegedly on tips from informants of

CLP_PC_034233

persons linked to guerrilla activities, detentions by members of security forces without judicial orders, detentions based on administrative authority, detentions during military operations or at roadblocks, large-scale detentions, and detentions of persons who were "exercising their fundamental rights."  Multiple NGOs alleged that police misused a temporary protection mechanism to arbitrarily detain protestors.

**Pretrial Detention:**  The judicial process moved slowly, and the civilian judicial system suffered from a significant backlog of cases, which led to large numbers of pretrial detainees.  Approximately 25 percent of prison detainees were in pretrial detention.  The failure of many jail supervisors to keep mandatory detention records or follow notification procedures made it difficult to account for all detainees.  In some cases, detainees were released without a trial because they had already served more than one-third of the maximum sentence for their charges.  Civil society groups complained that authorities subjected some community leaders to extended pretrial detention.

## e. Denial of Fair Public Trial

The law provides for an independent judiciary, and the government generally respected judicial independence and impartiality.  Much of the judicial system was overburdened and inefficient.  Subornation, corruption, and the intimidation of judges, prosecutors, and witnesses hindered the independence of the judiciary.

**Trial Procedures**

The law provides for the right to a fair and public trial, and the judiciary generally enforced this right.  The government began implementing an accusatory system of justice in 2005, but the use of delay tactics by defense lawyers, prosecutors' heavy caseloads, and other negative factors diminished the efficiencies and other benefits of adopting the accusatory system.  Under the accusatory system, the prosecutor presents an accusation and evidence before an impartial judge at an oral, public trial.

Crimes committed before 2005 are processed under the prior written inquisitorial system in which the prosecutor investigates, determines evidence, and makes a finding of guilt or innocence.  In those cases, the prosecutor presents evidence and

CLP_PC_034234

the finding of guilt or innocence to a judge who then ratifies or rejects the finding.

In the military justice system, military judges preside over courts-martial. Counsel may represent the accused and call witnesses, but most factfinding takes place during the investigative stage. Military trial judges are required to issue rulings within eight days of a court-martial hearing. Representatives of the civilian Inspector General's Office are required to be present at a court-martial.

Criminal procedure within the military justice system includes elements of the inquisitorial and accusatory systems.

**Political Prisoners and Detainees**

The government declared it did not hold political prisoners; nevertheless, authorities held some members of human rights advocacy groups on charges of conspiracy, rebellion, or terrorism, which the groups described as government harassment of human rights advocates. According to INPEC, the government held 115 persons on charges of rebellion or of aiding and promoting insurgency and convicted 38 of them. The government provided the International Committee of the Red Cross with regular access to these prisoners.

**Civil Judicial Procedures and Remedies**

Citizens and organizations may sue a government agent or entity in the Administrative Court of Litigation for damages resulting from a human rights violation. Although critics complained of delays in the process, the court generally was considered impartial and effective. Cases involving violations of an individual's human rights may be submitted through petitions by individuals or organizations to the Inter-American Commission on Human Rights, which in turn may submit the case to the Inter-American Court of Human Rights. The Inter-American Court of Human Rights may order civil remedies, including fair compensation to the injured individual.

**Property Seizure and Restitution**

The law provides a legal basis for assistance and reparations to victims of the conflict, including victims of government abuses, but the government

CLP_PC_034235

acknowledged that the pace of restitution was slow.

The Land Restitution Unit, a semiautonomous entity in the Ministry of Agriculture, is responsible for returning land to displaced victims of conflict.

## f. Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence

The law prohibits such actions, but there were allegations that the government sometimes failed to respect these prohibitions. Government authorities generally need a judicial order to intercept mail or email or to monitor telephone conversations, including in prisons. Government intelligence agencies investigating terrorist organizations sometimes monitored telephone conversations without judicial authorization; the law bars evidence obtained in this manner from being used in court.

NGOs continued to accuse domestic intelligence or security entities of illegally monitoring lawyers and human rights defenders.

## g. Conflict-related Abuses

The government and the FARC, formerly the country's largest guerrilla insurgency group, continued to implement the 2016 peace accord. In 2017 the FARC completed its disarmament, and as of July nearly 13,000 former members were engaged in reincorporation activities, including the formation of a political party. An estimated 800 to 1,500 FARC dissidents did not participate in the peace process from the outset. As of October, NGOs estimated FARC dissident numbers had grown to approximately 5,200 due to new recruitment and some former combatants who returned to arms. A significant percentage of FARC dissidents were unarmed members of support networks that facilitated illicit economies. Some members of the FARC who participated in the peace process alleged the government had not fully complied with its commitments, including ensuring the security of demobilized former combatants or facilitating their reintegration. The government alleged the FARC had not met its full commitments to cooperate on counternarcotics efforts and other peace accord commitments.

Following the signing of the 2016 peace accord, three transitional justice

CLP_PC_034236

mechanisms were established and were operational throughout the year: the Commission for the Clarification of Truth, Coexistence, and Nonrepetition (the Truth Commission); the Special Unit for the Search for Disappeared Persons; and the JEP.

On February 18, the JEP announced that it would open three new thematic cases in addition to the seven original cases. These included an overarching thematic case concerning serious crimes committed by the former FARC; an overarching thematic case concerning serious crimes committed by the armed forces or other state agents on their own or in partnership with third-party civilians or paramilitaries; and an overarching thematic case covering crimes committed against ethnic communities. The Truth Commission issued its final report and recommendations on June 28. The report documented significant human rights violations committed by government institutions and illegal armed groups during the conflict, with a disproportionate impact on Afro-Colombian, Indigenous, and other racial and ethnic minority communities.

The ELN continued to commit crimes and acts of terror throughout the country, including bombings, violence against civilian populations, and violent attacks against military and police facilities. Illegal armed groups and drug gangs, such as the Clan del Golfo, also continued to operate.

For example, after announcing on February 22 a series of planned attacks, which the ELN said were aimed to draw attention to President Duque's "poor governance," the ELN conducted 65 attacks in 66 municipalities across 11 departments from February 23 to February 26. According to the Investigation and Accusation Unit of the JEP, one civilian, a social leader, was killed. The campaign included 18 terrorist attacks on electrical and highway infrastructure, bomb threats, 10 burnt vehicles, and explosive devices left in streets. Seven communities reported that the ELN had blocked streets and building access in their towns; 23 transport terminals suspended operations as a result. The ELN marked buildings with graffiti and raised its flag in different cities. According to online media outlet *InsightCrime*, the 65 incidents in this strike surpassed the 27 attacks carried out during a similar strike by the ELN in 2020.

**Killings:** The military was accused of some killings, some of which military

CLP_PC_034237

officials stated were "military mistakes" (see section 1.a.).  In other cases, military officials stated they believed the victim was fighting on behalf of an armed group, while community members stated the victim was not a combatant.  On March 28, in Puerto Leguizamo, Putumayo Department, near the border with Ecuador, the army carried out a military operation intended to target FARC dissidents involved in drug trafficking.  The operation left 11 persons dead.  The Attorney General's Office and the Inspector General's Office were conducting criminal and disciplinary investigations.

Armed groups, notably the ELN, FARC dissidents, and the Clan del Golfo, committed unlawful killings, primarily in areas with illicit economic activities and without a strong government presence.  The government reported that between January 1 and July 31, armed groups allegedly killed 98 members of state security forces, including 40 police officers, and wounded 512 other members.  Government officials stated that most of the violence was related to narcotics trafficking enterprises.

Independent observers raised concerns that inadequate security guarantees facilitated the killing of former FARC militants.  According to the UN Verification Mission (UNVM), 37 former FARC combatants had been killed by September 26, bringing the total to 342 homicides of former combatants since the 2016 accord.  The United Nations reported the collective security of former combatants was threatened by the actions of illegal armed groups.  The UNVM reported that emergency protection requests had increased from 144 requests in 2021 to 150 from January through August.

The ELN, FARC dissidents, and other groups continued to lay land mines.  According to the High Commissioner for Peace, three persons were killed and 71 wounded between January 1 and September 29 as the result of improvised explosive devices and land mines.

**Abductions:**  Criminal organizations, FARC dissidents, the ELN, and common criminals continued to kidnap persons.  According to the Ministry of Defense, there were 75 kidnappings from January 1 to July 31.  Seventeen of the kidnappings were attributed to the ELN, and the remainder were attributed to other organized armed groups.  On July 13 in a rural area of Tame, Arauca Department,

CLP_PC_034238

the ELN kidnapped 11 persons, including a former FARC combatant, Indigenous persons, and poor farmers.  In August, after the presidential inauguration, the ELN released 15 persons, including five members of the military and one police officer whom they had kidnapped during the year.

Between January 1 and July 31, the Ministry of Defense reported that the armed forces and police released 38 hostages from captivity.  The ministry also reported that between January 1 and July 31, four victims of kidnapping died while in captivity.  As of August 10, the Attorney General's Office reported seven convictions for kidnapping.

Efforts continued to hold accountable those responsible for pre-peace-accord abductions.  In June members of the secretariat of the former FARC publicly acknowledged their responsibility for war crimes and crimes against humanity involving kidnapping and hostage-taking during the armed conflict, as well as for other gross violations of human rights committed in the context of such abductions, including torture and disappearances.  They shared a stage with, and apologized to, their victims.  The JEP assessed that 21,396 persons in total were victims of FARC violence.

**Physical Abuse, Punishment, and Torture:**  From January through August, CINEP reported the ELN and criminal organizations were responsible for four documented cases of serious abuse that included seven victims.

**Child Soldiers:**  Illegal armed groups and criminal organizations continued to forcibly recruit and use child soldiers for armed conflict and exploit them in forced labor and sex trafficking.

**Other Conflict-related Abuse:**  Reports of other human rights abuses occurred in the context of the conflict and narcotics trafficking.  Drug traffickers and armed groups continued to displace predominantly poor and rural populations (see section 2.f., Status and Treatment of Internally Displaced Persons).  Armed groups, particularly in the departments of Cauca, Choco, Cordoba, Narino, and Norte de Santander, exploited children, including Venezuelan, Indigenous, and Afro-Colombian youth, in human trafficking by forcibly recruiting them to serve as combatants and informants, to harvest illicit crops, and to be exploited in sex

CLP_PC_034239

trafficking.

# Section 2. Respect for Civil Liberties

## a. Freedom of Expression, Including for Members of the Press and Other Media

The law provides for freedom of expression, including for members of the press and other media, and the government generally respected this right. NGOs and journalists alleged increased harassment and threats from state officials, including police, during coverage of the nationwide protests. Violence and harassment, as well as the criminalization of libel, inhibited freedom of the press. The government frequently influenced the press, in part through its large advertising budgets. The independent media were active and expressed a wide variety of views without restriction.

**Violence and Harassment:** According to the domestic NGO Fundacion para la Libertad de Prensa (FLIP), from January 1 to September 2, there were 385 incidents of violence and harassment against journalists, and six journalists were illegally detained. In the same period, FLIP reported 139 threats against journalists, some involving more than one target. These threats were made by both governmental and nongovernmental actors.

According to FLIP, the electoral period between January and July was the most violent for journalists and the traditional media in the last 10 years. During this period, FLIP reported that journalists were victims of threats and stigmatization from politicians. For example, President Petro called columnist David Ghitis from *Noticiero RCN* a "neonazi." During the presidential inauguration, journalists from *Revista Semana* and *Noticiero RCN* were called "fascists" by a group of inauguration attendees, according to media reports.

From January 1 through August 1, the Attorney General's Office investigated 20 cases of homicide of journalists and obtained four convictions. These included cases from prior years. It reported no investigations involving alleged threats or harassment against journalists.

On August 28, two journalists, Dilia Contreras and Leiner Montero, were killed

CLP_PC_034240

while covering a religious festival in Magdalena Department. According to FLIP investigations, Montero had previously received threats. FLIP asked the Attorney General's Office to investigate the killings as crimes targeting journalists. Four days after the killings, Magdalena authorities captured a man accused of participating in the killing of the two journalists, but authorities were investigating whether the incident was related to their profession as journalists.

As of September 1, the NPU provided protection services to 162 journalists, including new protection measures issued this year for 15 journalists. Some NGOs raised concerns regarding perceived shortcomings in the NPU, such as delays in granting protection and the appropriateness of measures for addressing specific threats.

On October 16, Rafael Moreno Garavito became the third journalist killed in the year following an attack in Montelibano, Cordoba.

**Censorship or Content Restrictions for Members of the Press and Other Media, including Online Media:** FLIP alleged some journalists practiced self-censorship due to fear of being sued under libel laws or of being physically attacked, mostly by nongovernment actors. FLIP asserted the high degree of impunity for those who committed aggressions against journalists was a factor in self-censorship. In addition, individuals living in high-violence areas practiced self-censorship due to their fear of attacks.

**Libel/Slander Laws:** By law, slander and libel are crimes. The government did not use prosecution to prevent media outlets from criticizing government policies or public officials. Political candidates, businesspersons, and others, however, publicly threatened to sue journalists for expressing opinions, alleging defamation or libel. FLIP reported that through September 6, there were five cases of judicial harassment affecting journalists.

**Nongovernmental Impact:** Members of armed groups inhibited freedom of expression by intimidating, threatening, kidnapping, and killing journalists. National and international NGOs reported media regularly practiced self-censorship because of threats of violence from armed groups.

CLP_PC_034241

**Internet Freedom**

The government reported it did not restrict or disrupt access to the internet or censor online content, including during the national protests. Internet service providers, however, reported the social networking site Tumblr was temporarily blocked by "order of the competent authorities" in January. The reason for the block was unclear, and inquiries made by civil society groups to the government were not successful in gaining further clarity.

## b. Freedoms of Peaceful Assembly and Association

The law provides for the freedoms of peaceful assembly and association, but the government did not always respect these rights.

**Freedom of Peaceful Assembly**

Protesters and NGOs continued to allege that police used excessive force to curb demonstrations during the 2021 nationwide protests. Some of the protests were violent, including attacks on police and police stations, looting, and burning government buildings and public transportation. Protesters also erected thousands of roadblocks, impeding the delivery of food, supplies, and emergency services.

From January 1 to August 1, the Attorney General's Office reported that 20 members of the police were under active investigation for alleged homicide during the 2021 protests. The attorney general also charged an additional 24 members of the security forces with crimes related to the protests.

**Freedom of Association**

The law provides for the freedom of association, and the government generally respected this right. Freedom of association was limited, however, by threats and acts of violence committed by armed groups against NGOs, Indigenous groups, and labor unions.

Although the government does not prohibit membership in most political organizations, membership in organizations that engaged in rebellion against the government, espoused violence, or carried out acts of violence, such as the FARC, the ELN, and other armed groups, was against the law.

CLP_PC_034242

## c. Freedom of Religion

See the Department of State's *International Religious Freedom Report* at
https://www.state.gov/religiousfreedomreport/.

## d. Freedom of Movement and the Right to Leave the Country

The law provides for freedom of internal movement, foreign travel, emigration, and repatriation. The government generally respected these related rights, although there were exceptions. Military operations and insecurity in certain rural areas restricted freedom of movement.

**In-country Movement:** The government required asylum seekers and individuals without regularized migration status to have a *salvoconducto* (safe passage document) to travel throughout the country; however, humanitarian legal assistance organizations reported extensive delays in receiving these documents. Armed groups established checkpoints on rural roads and set their own curfews, which restricted movement and expanded the groups' territorial control.

International and civil society organizations reported that armed groups restricted movement of rural communities through roadblocks, curfews, car bombs at egress routes, and improvised explosive devices in areas where illicit crop cultivation and narcotics trafficking persisted. By July, according to the UN Office for the Coordination of Humanitarian Affairs (OCHA), 69,000 persons lived in communities that suffered restricted movement due to armed incidents and geographical factors, limiting their access to essential goods and services.

## e. Protection of Refugees

The government cooperated with the Office of the UN High Commissioner for Refugees (UNHCR) and other humanitarian organizations in providing protection and assistance to internally displaced persons, refugees, returning refugees, or asylum seekers, as well as other persons of concern.

**Access to Asylum:** The law provides for the granting of asylum or refugee status, and the government has established a system for providing long-term protection to refugees.

CLP_PC_034243

While the government generally provided access to the asylum process for persons who requested international protection, many opted for alternative migration status such as Temporary Protective Status. The government continued to grant citizenship to Venezuelan children born in Colombia on or after August 19, 2015.

**Temporary Protection:** The law allows a 10-year Temporary Protective Status. The status provides a pathway to legal residence. Officials reported one million persons were in the process of obtaining the status, while an additional 1.5 million Venezuelans were eligible to request the status. The status allowed authorities to identify Venezuelans with temporary status; grant Venezuelans formal access to work, health, and education; and facilitate participation in the national COVID-19 vaccination plan.

## f. Status and Treatment of Internally Displaced Persons

There were approximately 6.7 million internally displaced persons (IDPs) living in the country after 1985, largely because of the armed conflict and continuing violence in rural areas. Threats posed by armed groups created internal displacement in remote areas as well as urban settings. After the 2016 peace accord, FARC withdrawal resulted in a struggle for control by other armed groups, causing violence and additional internal displacement.

The government, international organizations, and civil society groups identified various factors causing displacement, including threats, extortion, and physical, psychological, and sexual violence by armed groups against civilian populations, particularly against women and girls. Other causes of displacement included competition and armed confrontation among and within armed groups for resources and territorial control; confrontations between security forces, guerrillas, and criminal gangs; and forced recruitment of children or threats of forced recruitment. Drug trafficking, illegal mining, and large-scale commercial ventures in rural areas also contributed to displacement.

Local institutions in many areas lacked the capacity to protect the rights of and provide public services to IDPs and communities at risk of displacement. Consequently, the government continued to struggle to provide adequate protection and humanitarian assistance to newly displaced populations.

CLP_PC_034244

OCHA reported that 42,800 persons were affected in 105 displacement events between January and September.  Departments with the highest rate of mass displacements included Antioquia, Cauca, Choco, Narino, and Norte de Santander.

The Victims' Unit maintained the Single Victims Registry as mandated by law. Despite improvements in the government registration system, IDPs experienced delays in receiving responses to their displacement claims due to a large backlog of claims built up during several months, lack of the unit's presence in rural areas, and other constraints.  Government policy provided for an appeal process in the case of refusals of displacement claims.

The ELN and other armed groups continued to use force, intimidation, and disinformation to discourage IDPs from registering with the government. International organizations and civil society expressed concern regarding urban displacement caused by violent territorial disputes between criminal gangs, some of which had links to larger criminal and narcotics trafficking groups.

The Victims' Unit cited extortion, forced recruitment by armed groups, killings, and physical and sexual violence as the primary causes of intraurban displacement. UNHCR reported that displacement disproportionately affected Indigenous and Afro-Colombian groups.

The NGO National Association of Displaced Afro-descendants (AFRODES) stated that threats and violence against Afro-Colombian leaders and communities continued to cause high levels of forced displacement, especially in the Pacific coast region.  AFRODES and other local NGOs expressed concern that large-scale economic projects, such as agriculture and mining, contributed to displacement in their communities.

By law, 52 government agencies share responsibility for assisting registered IDPs. Dozens of international organizations; international NGOs; domestic nonprofit groups; and multilateral organizations, including the International Organization for Migration, World Food Program, International Committee of the Red Cross, UNHCR, and Colombian Red Cross, coordinated with the government to provide emergency relief and long-term assistance to displaced populations.

International organizations and NGOs remained concerned regarding the slow and

CLP_PC_034245

insufficient institutional response to displacement.  Insecurity in communities affected by the conflict, including areas in the departments of Antioquia, Cauca, Choco, Narino, and Norte de Santander, often delayed national and international aid organizations from reaching newly displaced populations.  International organizations and civil society reported that a lack of local capacity to accept registrations in high-displacement areas often delayed assistance to persons displaced individually or in smaller groups.  Humanitarian organizations attributed the delays to a variety of factors, including lack of personnel, funding, declaration forms, and training.  As a result, NGOs took additional measures to provide humanitarian assistance to recently displaced individuals.  Many IDPs continued to live in poverty in unhygienic conditions and with limited access to health care, education, shelter, and employment.  Following the COVID-19 pandemic, some humanitarian organizations continued health promotion education and the distribution of hygiene supplies.

## Section 3. Freedom to Participate in the Political Process

The law provides citizens the ability to choose their government through free and fair periodic elections held by secret ballot and based on nearly universal suffrage. Active-duty members of the armed forces and police may neither vote nor participate in the political process.  Civilian public employees are eligible to vote, and they may participate in partisan politics but only during the four months immediately preceding a national election.

### Elections and Political Participation

**Recent Elections:**  Legislative and presidential elections were held in March and May, respectively.  Because no presidential candidate won more than 50 percent of the vote in the first round, the country held a second round of voting in June, resulting in the election of Gustavo Petro.  Observers, including teams from foreign embassies, the Organization of American States, and leading domestic watchdog Electoral Observation Mission, considered the elections free and fair.

**Political Parties and Political Participation:**  Criminal gangs, FARC dissidents, and the ELN continued to threaten and kill government officials (see section 1.g.). As of June 30, the NPU, under the Ministry of Interior, was providing protection to

CLP_PC_034246

255 mayors, 16 governors, and 435 other persons, including members of departmental assemblies, council members, judges, municipal human rights officers, and other officials related to national human rights policies. By decree, the CNP's protection program and the NPU share responsibility for protecting municipal and district mayors. On April 7, the JEP ruled that state agents, including military intelligence officers, as well as paramilitaries acting in concert with state agents, killed or disappeared 5,733 candidates and other persons affiliated with the leftwing political party Union Patriotica in a "generalized, systematic" effort to debilitate the party between 1984 and 2016.

**Participation of Women and Members of Minority Groups:**  No laws limit the participation of women or members of minority groups in the political process, and they did participate.

# Section 4. Corruption and Lack of Transparency in Government

The law provides criminal penalties for official corruption, and the government generally implemented these laws effectively, although officials sometimes engaged in corrupt practices without punishment. There were numerous reports of government corruption during the year, particularly at the local level. Revenues from transnational organized crime, including drug trafficking, exacerbated corruption.

**Corruption:**  In August, press reports alleged that government officials abused their positions to steal hundreds of millions of dollars in peace accord implementation funds meant for some of the country's poorest, most violent, and least governed territories. An investigation by journalists estimated that approximately 12 percent of the 2021 peace resources, estimated at 500 billion pesos ($115 million) and meant for infrastructure projects, was lost to bribes and kickbacks.

# Section 5. Governmental Posture Towards International and Nongovernmental Investigation of Alleged Abuses of Human

CLP_PC_034247

# Rights

A wide variety of domestic and international human rights groups generally operated without government restriction, investigating and publishing their findings on human rights cases. Government officials were typically cooperative and willing to listen to the concerns of local human rights groups.

**Retribution Against Human Rights Defenders:** UN Special Rapporteur on the Situation of Human Rights Defenders Mary Lawlor expressed concern with the killing on January 14 of Breiner David Cucuname, age 14 human rights and environmental defender, which took place in a rural area of Cauca Department, located in the southwest of the country. Cucuname was shot in an ambush while on patrol with the unarmed Indigenous Guard, an organization that sought to protect Indigenous communities and land. Indigenous authorities condemned the attack and blamed the dissidents of the FARC. Former President Ivan Duque publicly denounced the attack (see also section 6, Indigenous Peoples).

Several human rights-focused NGOs reported receiving threats in the form of emails, mail, telephone calls, false obituaries, and objects related to death, such as coffins and funeral bouquets. The government often condemned the threats and called on the Attorney General's Office to investigate them. On June 7, the JEP issued a statement condemning threats against an NGO representing victims of forced displacement, in particular the unauthorized entry into its offices by an armed individual. Some activists claimed the government did not take the threats seriously, given the delayed responses in risk assessments following previous threats and attacks and slow implementation of the subsequent recommendations.

The government announced progress in the investigations into attacks and killings of human rights defenders, but there were no convictions in cases of threats against human rights defenders during the year. (See section 1.a. for additional information.)

As of June, the NPU provided protection to more than 8,091 individuals. Among the protected persons were 3,595 human rights defenders and social leaders.

**Government Human Rights Bodies:** The ombudsperson is independent, submits

CLP_PC_034248

an annual report to the House of Representatives, and has responsibility for providing for the promotion and exercise of human rights. According to human rights groups, underfunding of the Ombudsperson's Office limited the office's ability to monitor abuses effectively. The ombudsperson, as well as members of the ombudsperson's regional offices, received threats from armed groups through pamphlets, email, and violent actions. The Ombudsperson's Office regularly issued alerts for areas it assessed as at risk of conflict. The government was often slow to implement the recommendations in the alerts.

The National System for Human Rights and International Humanitarian Law – led by a commission of 21 senior government officials, including the vice president – designed, implemented, and evaluated the government's policies on human rights and international humanitarian law. The Office of the Presidential Advisor for Human Rights coordinated national human rights policy and actions taken by the government to promote or protect human rights.

Both the Senate and House of Representatives have human rights committees that served as forums for discussion of human rights problems.

# Section 6. Discrimination and Societal Abuses

## Women

**Rape and Domestic Violence:**  Although prohibited by law, rape of men or women, including spousal rape, remained a serious problem. The law provides for sentences ranging from eight to 30 years' imprisonment for violent sexual assault. For acts of spousal sexual violence, the law mandates prison sentences of six months to two years. By law, femicide is punishable with penalties of 21 to 50 years in prison, longer than the minimum sentence of 13 years for homicide. The law augments both imprisonment and fines if a crime causes "transitory or permanent physical disfigurement," such as in the case of acid attacks, which have a penalty of up to 50 years in prison. The government did not always enforce the law effectively.

Violence against women, as well as impunity for perpetrators, was a problem. Members of armed groups continued to rape and sexually abuse women and

CLP_PC_034249

children.  The law requires the government to provide immediate protection to survivors of domestic violence from further physical or psychological abuse.

The interagency Sexual Assault Investigative Unit in Bogota focuses on investigating sexual assault cases.  The Ministry of Defense continued implementing its protocol for managing cases of sexual violence and harassment involving members of the military.  The District Secretariat of Women in Bogota and the Ombudsperson's Office offered free legal aid for survivors of gender violence and organized courses to teach officials how to treat survivors respectfully.

**Female Genital Mutilation/Cutting (FGM/C):**  The law prohibits FGM/C, but isolated incidents were reported in several Indigenous communities in different parts of the country.  Two-thirds of women from the Embera community had undergone FGM/C, according to the UN Population Fund.  The Ministry of Health reported FGM/C cases occurring in Choco and Cauca Departments affecting girls as young as age nine days.  Indigenous leaders stated that FGM/C continued to be a problem, with local officials confirming a high level of underreporting on a regional and national scale.

**Sexual Harassment:**  The law provides measures to deter and punish harassment in the workplace such as sexual harassment, verbal abuse or derision, aggression, and discrimination.  The government did not always enforce the law effectively.  The Attorney General's Office and Prosecutor's Office opened numerous cases against members of the military forces and police for rape, abuse, and sexual harassment of women, Afro-Colombian and Indigenous leaders, and members of the lesbian, gay, bisexual, transgender, queer, and intersex (LGBTQI+) community.  Nonetheless, NGOs reported sexual harassment remained a pervasive and underreported problem in workplaces and in public.

**Reproductive Rights:**  There were no reports of coerced abortion or involuntary sterilization on the part of government authorities.  The law, however, allows the involuntary surgical sterilization in certain cases of children with cognitive and psychosocial disabilities.  The Truth Commission's final report released on June 28 acknowledged that the internal armed conflict involved "reproductive violence."  This included forced contraception and abortions for adult women combatants and

CLP_PC_034250

minor girls illegally recruited into armed groups.

Contraception was widely available. The government provided access to sexual and reproductive services, and emergency contraception was available for survivors of sexual violence, including survivors of conflict-related sexual violence. Emergency contraception was also available as part of family planning methods.

**Discrimination:** Although women have the same legal rights as men, discrimination against women persisted. The Office of the Advisor for the Equality of Women had primary responsibility for combating discrimination against women, but advocacy groups reported that the office remained seriously underfunded and was not always effective. The government continued its national public policy promoting gender equity.

## Systemic Racial or Ethnic Violence and Discrimination

According to the 2018 national census, approximately one-fifth of the country's population self-identified as Afro-Colombian or Indigenous, and approximately 9.3 percent of the population described themselves as being of African descent. A 2011 UN report estimated Afro-Colombians were 15 to 20 percent of the population, while human rights groups and Afro-Colombian organizations estimated the proportion to be 20 to 25 percent.

Afro-Colombians and Indigenous individuals are entitled to all constitutional rights and protections, but they faced significant economic and social discrimination. According to a 2016 UN report, 32 percent of the country's population lived below the poverty line, but in Choco, the department with the highest percentage of Afro-Colombian residents, 79 percent of residents lived below the poverty line. NGOs and the OHCHR reported that Afro-Colombian and Indigenous communities continued to be disproportionately affected by illicit economic activities in territories with weak governments. According to the Truth Commission's final report, 39.6 percent of Afro-Colombian individuals were affected by the armed conflict. The NGO CODHES reported 19,168 Afro-Colombian communities were affected by forced displacements between January and July.

The government continued a policy to promote equal opportunity for Black, Afro-

CLP_PC_034251

Colombian, Palenquera, and Raizal populations. The Petro administration acknowledged that prior government policies disproportionally excluded Afro-Colombian, Indigenous, and ethnic communities from opportunities for health, education, and economic growth. The Ministry of Interior provided technical advice and funding for social projects proposed by Afro-Colombian communities. As part of the implementation of the 2016 peace accord, the government's various agencies took steps to implement development programs aimed at Afro-Colombian, Indigenous, and ethnic communities.

## Indigenous Peoples

Despite special legal protections and government assistance programs, Indigenous persons continued to suffer discrimination and lacked access to basic services. Indigenous communities were often among the poorest in the country and had the highest age-specific mortality rates.

The law gives special recognition to the fundamental rights of Indigenous persons, who made up approximately 4.4 percent of the population. The law requires the government to consult beforehand with Indigenous groups regarding governmental actions that could affect them.

The law gives Indigenous groups perpetual rights to their ancestral lands but Indigenous groups, neighboring landowners, and the government often disputed the demarcation of those lands. Indigenous groups operated 842 reservations, accounting for approximately 28 percent of the country's land area. Armed groups often violently contested Indigenous land ownership and recruited Indigenous children to join their ranks.

The law provides for special criminal and civil jurisdictions based on traditional community laws within Indigenous territories. Legal proceedings in these jurisdictions were subject to manipulation and often rendered punishments more lenient than those imposed by civilian state courts.

Some Indigenous groups continued to assert they were not able to participate adequately in decisions affecting their lands. The constitution provides for a "prior consultation" mechanism for Indigenous communities, but it does not require the government to obtain the consent of those communities in all cases. Indigenous

CLP_PC_034252

communities such as the Wayuu community in La Guajira protested private and government entities that developed projects on Wayuu territories without consulting the Indigenous communities.  The government stated that it consulted with Indigenous leaders when possible before entering Indigenous lands but that for security reasons, the government could not provide advance notice of most military operations, especially when in pursuit of enemy combatants.

According to the Truth Commission's final report in June, 25.2 percent of Indigenous communities had been affected by the armed conflict.

Killings of members and leaders of Indigenous groups continued.  In the first half of the year, the UN's High Commissioner for Human Rights reported the homicide of nine male Indigenous human rights defenders.  The ombudsperson reported on October 28 that 32 Indigenous leaders were killed through September 30.  In July unidentified armed men allegedly linked to illegal armed groups shot and killed Maria Veronica Pai Cabeza, an Indigenous woman, in Narino.

UN Special Rapporteur on the Situation of Human Rights Defenders Mary Lawlor expressed concern with the killing of human rights and environmental defender Breiner David Cucuname, as well as abductions of young leaders (see also section 5, Retribution Against Human Rights Defenders (HRDs)).  Activists and political analysts noted increasing killings of and threats to Indigenous leaders, many of whom were environmental activists.  The NGO CODES reported that 11,023 Indigenous communities had suffered from forced displacement between January and September.  The United Nations received reports of an increasing number of children and adolescents, including many girls, being recruited by illegal armed groups.

Ethnic Wayuu children continued to die of malnutrition.  According to a 2015 government survey, 77 percent of Indigenous households in the department of La Guajira, where the largest number of Wayuu lived, were food insecure.  Many of these communities lacked access to health-care facilities, sanitary and hygiene products, and clean water.  Poor economic conditions also made health-related isolation recommendations difficult due to overcrowded housing.

CLP_PC_034253

## Children

**Birth Registration:**  In most cases, citizenship was derived by birth within the country's territory.  Birth registration was provided on a nondiscriminatory basis. Most births were registered immediately.  If a birth is not registered within one month, parents may be fined and denied public services.

**Child Abuse:**  Child abuse was a serious problem.  The Colombian Family Welfare Institute (ICBF) provided psychosocial, legal, and medical care to victims.

**Child, Early, and Forced Marriage:**  Marriage is legal at age 18.  Boys older than 14 and girls older than 12 may marry with the consent of their parents. According to UNICEF, 5 percent of girls were married before age 15 and 23 percent were married before age 18.  The ICBF assisted with 11,146 cases of sexual abuse of a minor; 84 of these cases were for early marriage.

**Sexual Exploitation of Children:**  Sexual exploitation of children remained a problem.  The law prohibits sexual exploitation of a minor or facilitating the sexual exploitation of a minor and stipulates a penalty of 14 to 25 years in prison. Penalties are more severe for perpetrators who are family members of the victim and for cases of forced marriage.  Penalties exist for sexual exploitation by armed groups, sex tourism, and commercial sexual exploitation.  The law prohibits pornography using children younger than 18 and stipulates a penalty of 10 to 20 years in prison and a fine for violations.  The minimum age for consensual sex is 14.  The penalty for sexual activity with a child younger than 14 ranges from nine to 13 years in prison.  The government generally enforced the law.

The Attorney General's Office reported that most of the investigations opened during the year into the sexual abuse of minors involved children under age 14.

On May 6, in Barrancabermeja, Santander, a woman was arrested and charged with aggravated sexual exploitation of a minor for exploitation of her age 13 granddaughter, who was under her custody.  A man involved in this case was also arrested and charged with commercial sexual exploitation of children and sexually violating a minor.

On May 22, in the municipality of Sevilla, Valle del Cauca, a woman was arrested

CLP_PC_034254

for recruiting young women between 2016 and 2017 from the country's "coffee belt" region using fraudulent employment opportunities to later exploit these women into sex trafficking in China.

## Antisemitism

The Jewish community, with an estimated 5,000 members, continued to report instances of antisemitic graffiti near synagogues, as well as antisemitic comments on social media.

## Trafficking in Persons

See the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## Acts of Violence, Criminalization, and Other Abuses Based on Sexual Orientation, Gender Identity or Expression, or Sex Characteristics

**Criminalization:**  Consensual same-sex conduct between adults is legal.

**Violence Against LGBTQI+ Persons:**  There were reports of societal abuse, discrimination, and sexual assault of LGBTQI+ persons.  There were allegations of police violence based on sexual orientation.  The NGO Colombia Diversa reported 41 homicides of LGBTQI+ persons between January 1 and July 30.  The organization highlighted that six of these homicides were of LGBTQI+ rights movement leaders.

On July 30, a group of women harassed and assaulted a same-sex couple in the park, claiming their public kissing was inappropriate.  Local officials stated they were investigating the incident.

As of August, the Attorney General's Office reported 50 open investigations into excessive use of force by military or police against LGBTQI+ persons.  On October 27, the Attorney General's Office announced the adoption of the first protocol for investigating crimes against LGBTQI+ victims.

CLP_PC_034255

**Discrimination:** The law prohibits discrimination by state and nonstate actors based on sexual orientation and gender identity or expression. From January 1 to October, Colombia Diversa received 62 requests for support in cases of discrimination based on sexual orientation in employment, housing, health, and access to education.

NGOs reported that within the LGBTQI+ community, transgender individuals faced significant discrimination in accessing public services. According to Foundation Group of Action and Support for People with Trans Life Experience (in Spanish, Fundacion GAAT), in addition to the bullying and discrimination they faced in public, transgender individuals had difficulty accessing formal jobs, health services, including mental health support, and education. Only four out of 100 transgender individuals had formal jobs, according to Fundacion GAAT. The organization reported that delays for transgender individuals in receiving updated identification documents posed specific challenges for employment.

The country suffers from high rates of impunity for crimes against LGBTQI+ persons, especially against transgender individuals. Investigators and police often mislabeled the gender identities of victims and improperly interviewed LGBTQI+ victims, leading to intentional and unintentional intimidation. LGBTQI+ NGOs noted it was common for police either in conversation or their reports to identify transgender victims as "a man disguised as a woman" or vice versa.

**Availability of Legal Gender Recognition:** Transgender individuals cited barriers to public services when health-care providers or police refused to accept their government-issued identification. Some transgender individuals stated it was difficult to change their gender designation on national identity documents and that transgender individuals whose identity cards listed them as male were required to show proof they had performed mandatory military service or obtained the necessary waivers from that service.

The country recognizes male, female, transgender, or nonbinary markers as the gender in legal identification documents. NGOs, such as Caribe Afirmativo, highlighted that updating a gender designation was difficult due to the financial costs associated with acquiring the underlying documents, such as birth certificates and updated medical documents.

CLP_PC_034256

**Involuntary or Coercive Medical or Psychological Practices Specifically Targeting LGBTQI+ Individuals:** NGOs claimed transgender individuals, particularly transgender men, were often sexually assaulted in so-called corrective rape. The NGO Fundacion GAAT estimated that approximately 20 percent of LGBTQI+ persons had been a victim of conversion therapy. A university study estimated that the majority of those experiencing conversion therapy received it from a religious figure or a medical provider. Data for victims of conversion therapy did not exist because conversion therapy is not considered as a crime and the practice is not legally regulated in the country.

**Restrictions of Freedom of Expression, Association, or Peaceful Assembly:** No restrictions exist on the freedom of expression, association, or peaceful assembly of LGBTQI+ persons.

## Persons with Disabilities

The law prohibits arbitrary restriction on the full exercise of the rights of persons with disabilities or harassment of persons with disabilities; however, enforcement was rare. The law prohibits discrimination against persons with physical and mental disabilities but does not explicitly prohibit discrimination against persons with sensory or intellectual disabilities. No law mandates access to information and telecommunications for persons with disabilities. The law recognizes that persons 18 years of age and older with disabilities have full legal capacity.

In 2013, the State Council ordered all public offices to be accessible to persons with disabilities and to include requirements for accessibility when granting licenses for construction and occupancy. The government reported progress during the year at both the national and municipal level, including accessibility adaptations at ports, airports, and other mass transport terminals.

The Office of the Presidential Advisor for Human Rights and the Human Rights Directorate at the Ministry of Interior were responsible for protecting the rights of persons with disabilities. The government made efforts to improve and address disability issues, including providing training to increase awareness about persons with disabilities, providing training on legal obligations, increasing student quotas at universities for persons with disabilities, and providing legal and tax incentives

CLP_PC_034257

for employers to hire persons with disabilities.

According to the NGO Somos Defensores, government authorities seldom enforced laws providing rights for individuals with disabilities. Access of persons with disabilities to education, health services, public buildings, and transportation was generally not on an equal basis with other persons.

Although children with disabilities attended school at all grade levels, advocates noted most teachers and schools were neither trained nor equipped to successfully educate children with disabilities. Advocacy groups also stated children with disabilities entered the education system later than children without disabilities and dropped out at higher rates. Persons with disabilities were unemployed at a much higher rate than the general population.

## Other Societal Violence or Discrimination

There were confirmed reports of societal violence or discrimination against persons with HIV and AIDS. In its most recent demographic and health survey (2015), the government reported that 78 percent of the respondents indicated discriminatory attitudes towards persons with HIV and AIDS, reflecting low levels of social acceptance throughout the country.

# Section 7. Worker Rights

## a. Freedom of Association and the Right to Collective Bargaining

The law provides for the right of workers to form and join unions, bargain collectively, and conduct legal strikes. The law prohibits antiunion discrimination. Members of associated workers' cooperatives, however, are not allowed to form unions, since the law recognizes members of a cooperative as owners. The law also prohibits members of the armed forces and police from forming or joining unions.

The law provides for automatic recognition of unions that obtain 25 signatures from potential members and that comply with a registration process. The law provides for associated workers' cooperatives, collective pacts, and union contracts. Under collective pacts, employers may negotiate accords on pay and

CLP_PC_034258

labor conditions with workers in workplaces where no union is present or where a union represents less than one-third of employees. Law and regulations prohibit the use of workers' cooperatives and collective pacts to undermine the right to organize and bargain collectively, including by extending better conditions to nonunion workers through such pacts.

Through a union contract, a company may contract a union, at times formed explicitly for this purpose, for a specific job or work; the union then in essence serves as an employer for its members. Workers who belong to a union that has a union contract with a company do not have a direct employment relationship with either the company or the union. Labor disputes for workers under a union contract may be decided through an arbitration panel, as opposed to deciding in labor courts, if both parties agree. Prohibited practices include an employer impeding workers' rights to strike, meet, or otherwise associate, and extending better conditions to members of collective pacts than to union members.

Before conducting a strike, unions must follow prescribed legal procedures, including entering into a conversation period with the employer, presenting a list of demands, and gaining majority approval in the union for a strike. The law limits strikes to periods of contract negotiations or collective bargaining. The law allows employers to fire trade unionists who participate in strikes or work stoppages ruled illegal by the courts.

The government has the authority to fine labor rights violators. The law stipulates that offenders repeatedly misusing workers' cooperatives or other labor-contracting mechanisms shall receive the maximum penalty and may be subject to losing their legal status to operate. Employers who engage in antiunion practices may also be imprisoned for up to five years, although government officials acknowledged a fine was more likely than imprisonment. Penalties are commensurate with penalties prescribed for other violations regarding denials of civil rights, such as discrimination.

Government enforcement of applicable laws was inconsistent. Penalties were rarely applied against violators. The government did not fully implement a new system for fine collection that would ensure timely and regular collection of fines related to these protections. Despite steps by the Ministry of Labor to strengthen

CLP_PC_034259

its labor law inspection system, the government did not establish a consistent, robust national strategy to protect freedom of association and collective bargaining. Structural challenges adversely affected prosecutions, which resulted in a continued high degree of impunity for violators of these rights, including in cases of threats and violence against unionists.

The government continued to reach labor formalization agreements with firms engaged in abusive subcontracting or that had labor conflict during the year. Most of the agreements resulted in direct employment contracts, and a few were indefinite term contracts. Through August 30, the vice minister of labor relations and inspections reported 2,102 workers benefited from 46 such formalization agreements in various sectors, including commerce, agriculture, health, and transport, a significant increase from the previous year.

Labor rights groups expressed concern that previously signed formalization agreements were not sufficiently monitored by the ministry to ensure their enforcement. The Ministry of Labor's Special Investigations Unit, which is part of the labor inspectorate, has the authority to investigate and impose sanctions. The vice minister of labor relations and inspections decided on a case-by-case basis whether to assign the unit or the regional inspectors to investigate a particular worksite or review a particular case. The unit was reportedly overburdened with cases, resulting in delays responding to union requests for review.

Field-based inspections by the Ministry of Labor for abusive subcontracting in the five priority sectors of palm oil, sugar, ports, mines, and cut flowers were infrequent. Critics claimed inspections lacked necessary rigor, assessed fines were not collected, and abusive subcontracting continued. Through August 30, there were no new fines assessed for abusive subcontracting or freedom of association violations in the five priority sectors. The government continued to engage in regular meetings with unions and civil society groups on these and related issues.

The Ministry of Labor continued to train labor inspectors through a virtual training campus to identify abusive subcontracting and antiunion conduct, among other violations. It also implemented methods, including contract and process maps, as strategic planning tools to prioritize interventions. The ministry continued to employ a telephone- and internet-based complaint mechanism to report alleged

CLP_PC_034260

labor violations.  Union members complained that the systems did not allow citizens to register anonymous complaints and that registered complaints did not result in any government action.

Violence, threats, harassment, and other practices against trade unionists continued to affect the exercise of the right to freedom of association and collective bargaining.  The tripartite Interinstitutional Commission for the Promotion and Protection of the Human Rights of Workers did not meet in the year.  The commission was led by the Ministry of Interior with participation by the government, organized labor groups, and the business community.

Judicial police, the Technical Investigation Body, and prosecutors investigating criminal cases of threats and killings are required to determine during the initial phase of an investigation whether a victim was an active or retired union member or was actively engaged in union formation and organization, but it was unclear whether they did so.  It could take several months to transfer cases from regional field offices of the Attorney General's Office to the Attorney General's Human Rights Directorate.  Cases are transferred only with the approval of the attorney general in response to direct requests, instead of automatically.

The government continued to include in its protection program labor activists engaged in efforts to form a union, as well as former unionists under threat because of their past activities.  As of June 30, the NPU was providing protection to 253 trade union leaders or members, a decrease from the prior year.  Between January 1 and August 31, the NPU processed 280 risk assessments of union leaders or members; 94 of those individuals were assessed as facing an "extraordinary threat," and the NPU provided protection to them.  The NPU reported that the average time needed to implement protection measures upon completion of a risk analysis was 62 days in regular cases.

In cases of unionist killings from previous years, the pace of investigations and convictions remained slow, and high rates of impunity continued, although the attorney general made progress in sentencing.  The Attorney General's Office reported receiving 254 cases of homicide of unionists between 2011 and August 15, 2022.  The Attorney General's Office reported advancements in 45 percent of its open cases.

CLP_PC_034261

On September 10, armed actors killed Sibares Lamprea Vargas, secretary of administrative affairs of the Oil Workers Union (*Union Sindical Obrera*) in Barrancabermeja. Labor groups stated more needed to be done to address impunity for perpetrators of violence and threats against trade unionists. The National Union School (ENS), a labor rights NGO and think tank, reported 10 trade unionists were killed through August, seven of whom were members of the Colombian Federation of Educators. The ENS and other labor groups stated that focusing on killings alone masked the true nature and scope of the violence against labor activists. Labor groups noted that in some regions, nonlethal violations continued to increase. Through August, the ENS reported 55 death threats, three abductions, and two cases of harassment.

The government and employers generally respected freedom of association and collective bargaining, but unions cited multiple instances in which companies fired employees who formed or sought to form new unions. Some employers continued to use temporary contracts, temporary service agencies, and other forms of subcontracting, including cooperatives, to limit worker rights and protections. Labor confederations and NGOs reported that business owners in several sectors used "simplified stock corporations" (SASs), union contracts, foundations, or temporary-service agencies in attempts to circumvent legal restrictions on cooperatives. In some cases, the SAS had little or no control over the conditions of employment. The Ministry of Labor stated that an SAS, like any corporate structure, may be fined for labor violations. Labor confederations and NGOs reported these enforcement actions did not address the scope of abusive subcontracting and illegal labor intermediation.

The port workers' labor union reported Buenaventura port operators engaged in abusive subcontracting through SASs and that Ministry of Labor inspections and adjudication of cases at the Buenaventura port were ineffective in safeguarding the rights to freedom of association and collective bargaining.

## b. Prohibition of Forced or Compulsory Labor

The law prohibits all forms of forced or compulsory labor. The government did not effectively enforce the law in all cases, and there were reports that such practices occurred. The International Labor Organization noted the law permits

CLP_PC_034262

military conscripts to be compelled to undertake work beyond that of a military nature, such as activities to protect the environment or natural resources.

There were reports ELN guerrillas, FARC dissidents, and criminal gangs used forced labor, including forced child labor, in coca cultivation and illegal mining in areas outside government control, and used forced criminality, such as extortion, in urban areas.

Forced begging and forced labor in other sectors, including mining, agriculture (especially near the coffee belt and in floriculture), cattle herding, crop harvesting, forced recruitment by armed persons, and domestic servitude, remained a serious problem. Afro-Colombians, Indigenous persons, Venezuelan migrants, and inhabitants of marginalized urban areas were at the highest risk of forced labor, domestic servitude, forced begging, and forced recruitment. Authorities did not make efforts to investigate cases or increase inspections of forced labor. There was impunity for forced labor, and unidentified victims remained without protection in critical sectors such as agriculture, coffee production, floriculture, and extractive industries.

Also see the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## c. Prohibition of Child Labor and Minimum Age for Employment

See the Department of Labor's *Findings on the Worst Forms of Child Labor* at https://www.dol.gov/agencies/ilab/resources/reports/child-labor/findings.

## d. Discrimination with Respect to Employment and Occupation

The law prohibits discrimination with respect to employment or occupation based on race, ethnicity, sex, religion, political preference, national origin or citizenship, gender, disability, age, language, sexual orientation or gender identity, HIV-positive status or infection with other communicable diseases, or social status. Complaints of quid pro quo sexual harassment were filed with criminal courts, not with the Ministry of Labor. There are legal restrictions against women being employed in the construction sector. The government did not effectively enforce the law in all cases. Penalties were not commensurate with laws related to civil

CLP_PC_034263

rights, such as election interference. Penalties were rarely applied against violators.

Unemployment disproportionately affected women, who faced hiring discrimination and received salaries that generally were not commensurate with their education and experience. Media reported that, on average, women earned 12 percent less than men for the same work. In a previous year, a senior government official estimated that 85 percent of persons with disabilities were unemployed. Afro-Colombian labor unions reported discrimination in the port sector.

## e. Acceptable Conditions of Work

**Wage and Hour Laws:** The legal minimum monthly wage is approximately twice the amount of the poverty line; however, almost half of the total workforce earned less than the minimum wage.

The law provides for a regular workweek of 48 hours and a minimum rest period of eight hours within the week. Exceptions to this may be granted by the Ministry of Labor and were frequently granted in the mining sector. The law stipulates that workers receive premium compensation for nighttime work, hours worked in excess of 48 per week, and work performed on Sundays. The law permits compulsory overtime only in exceptional cases where the work is considered essential for the company's functioning.

**Occupational Safety and Health:** The law provides for workers' occupational safety and health (OSH) in the formal sector. The legal standards were generally up to date and appropriate for the main formal industries. The law does not cover informal-sector workers, including many mining and agricultural workers. In general, the law protects workers' rights to remove themselves from situations that endanger health or safety without jeopardy to their employment, although some violations of this right were reported during the year. In cases of formal grievances, authorities generally protected employees in this situation.

Nonunion workers, particularly those in the agricultural and port sectors, reportedly worked under hazardous conditions because they feared losing their jobs through subcontracting mechanisms or informal arrangements if they reported abuses. Some unionized workers who alleged they suffered on-the-job injuries

CLP_PC_034264

complained that companies illegally fired them in retaliation for filing workers compensation claims. Only the courts may order reinstatement, and workers complained the courts were backlogged, slow, and corrupt. The Ministry of Labor may punish a company found to have broken the law in this way, but it does not offer other guarantees to workers.

According to the National Mining Agency, as of June a total of 55 workers died in 32 accidents in mines, the majority due to explosions, poisoned atmosphere, cave-ins, and floods. The National Mining Agency reported this number was similar to deaths as of June 2021.

Security forces reported that armed actors, including FARC dissidents, the ELN, and organized-crime groups, engaged in illegal mining of gold, coal, coltan, nickel, copper, and other minerals. Illegal mines, which lacked safety precautions, were particularly common in the departments of Antioquia, Boyaca, Choco, Cundinamarca, and Valle del Cauca.

**Wage, Hour, and OSH Enforcement:** The Ministry of Labor is required to enforce labor laws in the formal sector, including wage, hour, and OSH regulations, through periodic inspections by labor inspectors. The government did not effectively enforce the laws in all cases. Inspectors have the authority to perform unannounced inspections and may also initiate sanction procedures, including after opening investigations. The number of inspectors was insufficient to enforce the law effectively. Penalties are commensurate with those for negligence and fraud but were applied rarely to violators. Unionists stated that more fines needed to be collected to cause a reduction in wage and hour violations and occupational safety and health problems.

In January, the Ministry of Labor received authorization to hire an additional 355 labor inspectors. Through the end of August, 287 of these positions had been filled. Labor unions alleged a lack of transparency and nepotism in the ministry's efforts to fill the positions. As of September, the ministry employed 40 percent of the ministry's estimated 1,250 inspectors under temporary contracts.

**Informal Sector:** Workers in the informal sector, including part-time workers, are protected by wage, hour, and occupational safety and health laws, but the

CLP_PC_034265

government did not effectively enforce these laws in the informal sector. Eligibility to enroll and pay into the traditional social security system, which includes health and pension plans, is conditioned on earning the legal minimum monthly wage, a condition that half of all workers do not meet.

A 2021 Constitutional Court decision regarding National Development Plan provisions allows workers who earn less than the legal minimum monthly wage – often because of part-time, informal, or own-account work – to contribute to a new parallel "social protection floor" system. The decision requires the government to legislate these reforms by 2023. The government continued to implement the existing National Development Plan, as required by the court's decision, but had not legislated the reforms. Labor unions complained the new social protection floor system allows employers to move full-time workers into part-time positions with adverse effects on worker rights.

The national statistical service reported that from May through August, 58 percent of all laborers worked in the informal sector. The government continued to support complementary social security programs to increase the employability of extremely poor individuals, displaced persons, and the elderly.

CLP_PC_034266

# ECUADOR 2022 HUMAN RIGHTS REPORT

## EXECUTIVE SUMMARY

Ecuador is a constitutional, multiparty republic with an elected president and unicameral legislature.  In April 2021, voters elected President Guillermo Lasso Mendoza from a center-right alliance of the Creating Opportunities Movement, the Social Christian Party, and other selected members of the National Assembly in elections that observers deemed free and fair.

The National Police maintains internal security and law enforcement and is under the authority of the Ministry of Interior.  The military is under the authority of the Ministry of Defense.  Police and military forces share responsibility for border enforcement, with the military also having limited domestic security responsibilities.  The military may complement police operations to maintain and control public order when expressly mandated.  Migration officers are civilians and report to the Ministry of Interior.  Civilian authorities maintained effective control over the security forces.  There were reports that members of the security forces committed some abuses.

Social and Indigenous movements' opposition to government economic policies led to widespread street protests and a shutdown of major city roads and provincial highways that lasted for 18 days in June, the most protracted protests in the country's history.  Protest leaders ended the demonstrations on June 30 after reaching a peace agreement with the government that addressed some of their demands and agreeing to a 90-day dialogue period to resolve remaining matters.  The protests paralyzed the country, significantly disrupting economic activity and medical services.  Attacks by nongovernmental armed groups against security forces during the protests, and police and military responses to those attacks and protests, resulted in deaths and injuries among security forces and civilians.

Significant human rights issues included credible reports of:  torture and abuse by police officers and prison guards; harsh and life-threatening prison conditions; serious restrictions on freedom of expression and media, including violence against journalists and the existence of criminal libel laws; serious government corruption;

CLP_PC_034267

lack of investigation of and accountability for violence against women and children; and restrictions on workers' freedom of association.

The government took steps to investigate and prosecute officials who committed human rights abuses or engaged in corruption.

Members of criminal gangs in prisons committed acts of torture and killed their rivals during prison disturbances.  There were incidents of violence and threats of violence against politicians, journalists, prosecutors, and judges likely perpetrated by nongovernment actors.  Members of society engaged in crimes involving violence or threats of violence targeting lesbian, gay, bisexual, transgender, queer, or intersex persons.  The government investigated these crimes, and prosecutions were pending.

# Section 1. Respect for the Integrity of the Person

## a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were no reports that the government or its agents committed arbitrary or unlawful killings.  Human rights organizations, however, blamed excessive force by security forces for the deaths of some of the six protesters who died during the June demonstrations.  Ministry of Interior officials indicated the causes of death of at least two protesters were due to "circumstance or accident" and had no direct relation with security force actions.  Several national and international human rights organizations reported Byron Guatatuca Vargas was killed by a tear gas canister fired at close range, penetrating his skull.  Government officials stated Guatatuca died from handling explosives.  On June 22, the Attorney General's Office opened an ex officio investigation of the case.  The Internal Affairs Unit of the National Police investigates police killings and refers cases to the Attorney General's Office to pursue prosecutions.

On November 23, the Ombudsman's Office presented its report and concluded security forces used "disproportionate force during the social protests."  According to the report, the most serious abuses were the deaths of eight persons, including an armed forces officer.  The report also called for the creation of a truth commission

CLP_PC_034268

to foster reconciliation and reparation to victims and victims' families.

On January 19, a court sentenced police officer Wilson Santiago Olmedo to three years and four months in prison for the crime of "exceeding the limits [of the use of force] in the execution of an act of service."  In June 2021, Olmedo killed two armed assailants as they attacked their victim during an attempted robbery in Riobamba while Olmedo was off duty.  The court also ordered him to pay the equivalent of 10 minimum wages and $10,000 to the victims' families as compensation.  On August 25, a Chimborazo court accepted an appeal from the Attorney General's Office, which argued the original sentence did not correspond to sentencing guidelines, and increased his prison sentence to 13 years.

Police attributed a large part of the country's homicide rate to increased drug trafficking and conflicts among drug gangs fighting over trafficking routes.  On August 14, media outlets and law enforcement authorities reported a bomb attack in the Cristo del Consuelo neighborhood in Guayaquil killed five persons, injured 17 others, and destroyed seven houses.  On November 1-6, gangs orchestrated simultaneous attacks on police and public places in five cities in response to government plans to transfer prisoners to break up gang monopolies in Litoral Prison, the country's largest.  The violence resulted in at least nine fatalities, including of five police officers, and at least 29 explosions, 17 shooting events, and eight unexploded ordnances in public places.  The government attributed the attacks to drug gangs and stated criminal groups had "declared war on the State." Following the August and November attacks, President Lasso declared "states of exception" establishing a police-military task force to combat gang-related crime in targeted cities and provinces and also allowing security forces to use proportional force depending on the threat.

## b. Disappearance

There were no reports of disappearances by or on behalf of government authorities.

On February 17, a court ratified the nine-year prison sentence given to former intelligence director Pablo Romero for the 2012 kidnapping in Colombia of opposition legislator Fernando Balda.  In 2020, the National Court of Justice found Romero guilty of planning the abduction at the order of then President Rafael

CLP_PC_034269

Correa, who was also indicted but fled to Belgium.  By law, Romero may file an appeal but had not done so as of August 25.

On January 28, the country's representative to the Inter-American Court of Human Rights accepted the state's responsibility for the forced disappearance in Quito in 1990 of writer César Gustavo Garzón Guzmán.  In October 2021, the court condemned the state for Garzón's forced disappearance.  The court ordered the government to perform, within a reasonable time and with utmost diligence, an investigation to identify, prosecute, and punish those responsible for the crime. The agents responsible for Garzón's disappearance remained unknown.

## c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, and Other Related Abuses

While the law prohibits torture and similar forms of intimidation and punishment, there were credible reports police officers and prison guards tortured and abused suspects and prisoners.

Human rights activists reported that as of August 23, officials had not investigated claims alleging police kidnappings, torture, or other forms of degrading treatment during police interrogations related to the October 2019 protests.  Human rights advocates said the Attorney General's Office continued to investigate alleged crimes against humanity in the protests that involved former President Lenin Moreno, former Minister of Defense Oswaldo Jarrin, and former Minister of Government Maria Paula Romo.  Police stated their actions were aimed at restoring public order and did not result in human rights abuses.

As of August 25, the judiciary had not set a date for the retrial of 37 police officers sentenced in November 2021 to 106 days in prison each for excessive use of force in a 2016 operation to confiscate contraband from inmates in Turi Prison.  The defendants appealed the ruling, and in 2020 an Azuay court annulled the 2021 trial and ordered a retrial.

While the law does not protect officials who commit human rights abuses, human rights nongovernmental organizations (NGOs) and others reported that the lack of prosecutions of police officers who allegedly used excessive force against

CLP_PC_034270

demonstrators during the October 2019 protests could be interpreted as impunity.

The Internal Affairs Unit of the National Police investigates whether police killings are justifiable and can refer cases to the Attorney General's Office to pursue prosecutions.  An intelligence branch within the military has a role similar to the police internal affairs unit.  The law states the Attorney General's Office must be involved in all human rights abuse investigations, including unlawful killings and forced disappearances.  Human rights defenders reported the National Police Internal Affairs Unit and Attorney General's Office often failed to conduct adequate investigations, noting for example that follow-up on abuse claims was hindered by high staff turnover in the Internal Affairs Unit.

On August 6, the legislature passed the Organic Law that Regulates the Legitimate Use of Force.  The law provides a legal framework to guide the actions of the National Police, armed forces, and Penitentiary Security and Surveillance Corps (prison guards) and regulates the specific circumstances in which the use of force is allowed during peaceful demonstrations or social protests to ensure respect for human rights.  Broadly, the law makes the use of force a "last resort" self-defense measure and requires security forces to abide by internationally recognized use-of-force principles such as legality, necessity, proportionality, and accountability.  It also explicitly authorizes the military to support the police and prison guards to control prison riots during declared states of exception and obligates the government to provide lawyers to defend police accused of using excessive force while carrying out their duties.

## Prison and Detention Center Conditions

Prison conditions were harsh and life threatening due to gross overcrowding, gang violence, official corruption, food shortages, and inadequate sanitary conditions and medical care.

**Abusive Physical Conditions:**  Prisons continued to be overcrowded, although the government reported a significant drop in the overcrowding rate.  According to the National Service of Comprehensive Attention to Adults Deprived of Liberty and Adolescent Offenders, in 2021 the rate was 27 percent, compared with 8 percent as of August 8.

CLP_PC_034271

Access to and quality of food, potable and hot water, heating, sanitation, and medical care were inadequate.  Officials confirmed inmates did not have safe and permanent access to nutritious food.  An NGO reported authorities sometimes kept prisoners confined in cells for long periods without an opportunity for movement, exercise, or use of showers or sanitary facilities.  An NGO reported that prison officials, including medical staff, often failed to adequately screen and segregate prisoners with mental and physical disabilities from the rest of the prison population.

Prison officials and human rights organizations agreed most violent deaths in prisons were linked to rivalries among criminal gangs with links to drug cartels. Fighting between drug-trafficking gangs in prisons led to 96 violent deaths through July 31.  As of July, the prison death rate was notably lower than in 2021 (337 total deaths), although more than twice the rate in 2020 (51 total deaths).  On May 9, a clash between drug gangs in a Santo Domingo prison left at least 44 dead. Authorities attributed the violence to overcrowding and the recent transfer into the prison of inmates from a rival gang.  NGOs reported that criminal organizations operating within and without prisons intimidated prison staff while on and off duty, and inmates enlisted visitors and prison staff to smuggle contraband, including weapons, into prisons.

**Administration:**  Authorities sometimes conducted investigations of credible allegations of mistreatment in prisons.

Human rights organizations continued to report that visitors faced degrading treatment during check-in at prison facilities, including the removal of clothing and illumination of genitalia by flashlights while being forced to jump naked.

**Independent Monitoring:**  Civil society representatives continued to report restrictions to monitoring by independent NGO observers.  According to the NGO Permanent Committee for the Defense of Human Rights, authorities failed to respond to many independent observers' requests to visit prisons.  The NGO also noted restrictions to visits from the Ombudsman's Office and from the Inter-American Commission on Human Rights.

**Improvements:**  On November 28, 1,360 new prison guards and 100 new

CLP_PC_034272

education inspectors graduated from training to reinforce prison security and education programs in 36 prisons nationwide.

## d. Arbitrary Arrest or Detention

The law prohibits arbitrary arrest and detention and provides for the right of any person to challenge the lawfulness of his or her arrest or detention in court, but there were reports provincial and local authorities did not always observe these provisions.  According to NGOs, illegal detentions continued to occur.

**Arrest Procedures and Treatment of Detainees**

The law requires authorities to issue specific written arrest orders prior to detention, and a judge must charge a suspect with a specific criminal offense within 24 hours of arrest.  NGOs stated judges frequently did not determine a specific criminal offense, particularly for arrests of protesters.  Authorities generally observed the time limit for charging a suspect, although in some provinces initial detention was often considerably longer.

Detainees have a constitutional right to an attorney.  Those without financial means to pay for an attorney have the right to request a court-appointed attorney from the Public Defender's Office.  Although court-appointed defenders were available, the number of cases and limited time to prepare for the defense continued to present a disadvantage to defendants using a public defender during trials.

The law entitles detainees to prompt visits by lawyers and family members, but NGOs continued to report delays depending on the circumstances and the willingness of local courts and prison guards to enforce the law.

**Arbitrary Arrest:**  Media outlets and human rights organizations reported more than 150 arbitrary detentions of protesters during the June demonstrations, claiming that authorities failed to communicate the reasons for arrests and prevented lawyers from communicating with detainees.

Human rights organizations and activists reported the arbitrary detention in Cotopaxi on June 14 of Indigenous leader Leonidas Iza during the social protests that started on June 13.  According to human rights organizations, Iza was held

CLP_PC_034273

incommunicado for nearly 15 hours without being notified of the reason for his detention.  He was also transported from his home province of Cotopaxi to the province of Pichincha, where he was detained.  On June 15, a judge ordered a charging process against Iza for allegedly paralyzing public services during the social protest; the court also ordered his release, directed him to report periodically to the Attorney General's Office, and forbade him to leave the country.  On August 18, a judge granted Iza a special permit to travel to Brazil to attend an Inter-American Human Rights Court hearing concerning the rights of Indigenous persons.  A judge dismissed the case against Iza on September 26.

**Pretrial Detention:**  Corruption and general judicial inefficiency caused trial delays.  The length of pretrial detention did not usually exceed the maximum sentence for the alleged crime.

## e. Denial of Fair Public Trial

While the constitution provides for an independent judiciary, outside pressure and corruption impaired the judicial process.  Legal experts, bar associations, and NGOs reported on the susceptibility of the judiciary to bribes for favorable decisions and faster resolution of cases.

The Judicial Council is the only government authority empowered to remove corrupt judges, but it encountered resistance when attempting to remove some judges.  In December 2021, the Constitutional Court heard a request by a judges' association that reported irregularities in a 2019 removal process.  That year, the Judicial Council sought to remove 23 of 36 judges who were deemed not to have met the minimum evaluation qualification threshold and replace them with temporary judges from lower courts.  The court case followed the council's February 2021 appointment of 11 permanent replacement judges.  The court affirmed the council's decision but also ordered the government to compensate the removed judges.  In March 2022, the council announced a public call to appoint six more permanent judges and 11 acting judges.  As of August 25, the government had not compensated the removed judges.

Three members of the Judicial Council and its former president faced a highly politicized impeachment trial in the legislature due to alleged "breach of duties."

CLP_PC_034274

A group of legislators aligned with former President Rafael Correa accused the four individuals of irregularities in the evaluation and removal of judges in 2019 and in the process that replaced those judges.  On October 13, the legislature voted to dismiss the impeachment trial against council members.

On May 20, the Judicial Council suspended National Court of Justice president Ivan Saquicela due to alleged "gross negligence" for delaying processing the request to Belgium for former President Rafael Correa's extradition.

Local media reported organized criminal groups attacked a judge and four public prosecutors during the year.  On May 5, prosecutor Victor Hugo Alcivar was seriously injured in an apparent attempt on his life in Santo Domingo.  On May 25, prosecutor Luz Marina Delgado and her assistant were shot and killed in Manta.  Delgado led a money-laundering investigation into the spouse of a drug trafficker.  On July 28, Guayas prosecutor César Peña's car was hit by gunfire but he was uninjured.  On August 15, prosecutor Federico Estrella was shot and killed in Los Rios.  Estrella worked for the only office in Babahoyo that investigates violent deaths and drug-related cases.  On August 25, judge Nelson Patricio Yánez was killed in Lago Agrio.  The Attorney General's Office was investigating these crimes.

**Trial Procedures**

The law provides for the right to a fair and public trial, and the judiciary generally enforced this right.  While defendants have the right to free assistance from an interpreter, some defendants complained of the lack of an interpreter at court hearings, that this in turn made preparation of a defense problematic for non-Spanish speakers, and that the quality of translators was poor and caused problems when working with public defenders.

Judges reportedly rendered decisions more quickly or more slowly due to media and political pressure or fear in some cases.  There were reported delays of up to one year in scheduling some trials.  Prisoners reported lengthy delays in setting dates for preliminary hearings after their cases reached a higher court.

CLP_PC_034275

**Political Prisoners and Detainees**

There were no reports of political prisoners or detainees.

**Amnesty:**  On March 10, the National Assembly granted amnesty to 268 persons who participated in the October 2019 social protests.  On March 29, the government appealed the amnesty's constitutionality to the Constitutional Court; the appeal was pending as of November 15.

**Civil Judicial Procedures and Remedies**

Civil courts and the Administrative Conflicts Tribunal, generally considered independent and impartial, handle lawsuits seeking damages for, or the immediate cessation of, human rights abuses.  Individuals and organizations may appeal decisions domestically and to regional human rights bodies.

## f. Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence

The law prohibits such actions, and there were no reports the government failed to respect these prohibitions.

# Section 2. Respect for Civil Liberties

## a. Freedom of Expression, Including for Members of the Press and Other Media

The constitution provides for freedom of expression, including for members of the press and other media, but laws restrict this right.

**Freedom of Expression:**  The law prohibits persons from using "discrediting expressions," treated as a misdemeanor with a 15- to 30-day prison term.  There were no reports the government invoked this law to restrict freedom of expression.

**Violence and Harassment:**  Local government authorities and criminal organizations committed acts of violence and harassment against journalists. Fundamedios journalist Paul Zamora reported receiving an anonymous death threat against himself and his family in a letter dropped at his front door on July 14.

CLP_PC_034276

Zamora filed a complaint with the Attorney General's Office and was awaiting a response as of December 7. At least two other journalists reported receiving anonymous death threats related to their work via messaging platforms and anonymized telephone calls.

**Censorship or Content Restrictions for Members of the Press and Other Media, Including Online Media:** There were significant restrictions on media freedom. Journalists and NGOs said certain politicians and political parties continued to use the "press as enemy" trope and accuse the media of being "corrupt" and "liars." Media watchdog Fundamedios said the government had not made substantial progress on freedom of expression rights, noting both the lack of progress on investigating and prosecuting high-profile past abuses and ongoing abuses.

The law limits media's ability to provide election coverage during the official campaign period, with no coverage allowed in the final 48 hours preceding a national election. A Constitutional Court ruling affirmed the right of the press to conduct interviews and file special reports on candidates and issues during the campaign period, but the ruling left in place restrictions on "direct or indirect" promotion of candidates or specific political views.

Fundamedios reported a case in which a Ministry of Education official called a school principal giving a live interview to a local media outlet in Cuenca on January 7 and forced him to abruptly suspend his participation.

Fundamedios reported several journalists practiced self-censorship when covering the June protests after protesters sought out and attacked journalists from specific outlets they perceived as "progovernment" (see Nongovernmental Impact below). Some journalists subsequently denied their press affiliation as a form of self-protection, while others began reporting from rooftops or from the inside of vehicles.

On July 21, the legislature approved a communications law reform described by Fundamedios as containing "extreme violations of freedom of expression and press." The bill restored the government's capacity to sanction and control media and journalists, ultimately, according to Fundamedios, authorizing censorship. The

CLP_PC_034277

bill eliminated protections for media expression of "opinion," protecting only media rights to provide "information."  The legislature's version also granted the government the right to decide which information was "true" or "false."  After extensive consultation with civil society and journalists, President Lasso issued a partial veto on August 24 and referred other sections of the bill that he deemed unconstitutional to the Constitutional Court for review.  On October 3, the Constitutional Court accepted most of the president's objections, including on the elimination of protections for expressing "opinion" and on governmental determination of "truthful" or "false" information.  The bill was returned to the legislature, where the relevant committee drafted a new bill to take into account the Constitutional Court's ruling.  On October 20, after the legislature's failure to accept or override the president's August 24 veto of other provisions, those changes entered into force.

As of September 1, the bidding process for the allocation of FM radio and broadcast television frequencies, announced in 2020, remained stalled.  Fundamedios and other groups had criticized the Agency for the Regulation and Control of Telecommunications-administered bidding process as lacking transparency and allowing two particular bidders to accumulate a disproportionate number of frequencies.  In addition, Fundamedios claimed a June report from the Comptroller General's Office on the most recent tender for frequency concessions pointed to irregularities committed by telecommunications agency officials.

**Libel/Slander Laws:**  Libel and slander are criminal offenses under the law, with penalties of up to three years in prison, plus fines.  The law assigns responsibility to media owners as well as journalists, who are liable for opinion pieces or statements by reporters or others, including readers, using their media platforms.  Monitoring organizations reported the national government did not prosecute journalists for libel during the year.  Organizations reported seven cases, however, in which politicians initiated legal proceedings against journalists.

On August 2, Guayaquil Mayor Cynthia Viteri filed a slander complaint against the newspaper *Diario Expreso* and journalists who investigated her family circle.  Viteri also delivered a speech criticizing the newspaper and journalists investigating her family.

CLP_PC_034278

**Nongovernmental Impact:** Unknown persons not presumed connected with authorities conducted attacks, often fatal, against journalists in July and August. Domestic and international media rights groups reported a gunman shot and killed journalist Mike Cabrera in the coastal city of Portoviejo on July 24. On August 10, two gunmen shot and killed journalist Gerardo Delgado in the coastal city of Manta. Police later detained two suspected gunmen, one of whom said that he was paid $2,000 to kill Delgado. Prior to the attack, Delgado posted videos regarding crime and neighborhood news on a Facebook page that he founded called Ola Manta TV. The journalist was well known in Manta and had publicly announced his plans to run for city council in the 2023 local elections. As of August 22, the Attorney General's Office continued investigating the crime to determine if the perpetrators were connected to criminal groups.

During the June social protests, Fundamedios registered 164 acts of violence against media outlets and reported 242 journalists were attacked. This was an increase in violence toward media compared with the mass protests in October 2019, when the NGO registered 182 attacks against journalists. In June, Fundamedios noted increased violent speech from protesters who characterized the media as the "enemy" and targeted journalists from specific outlets alleged to be more favorable to the government, including Ecuavisa and Teleamazonas.

In February, a Guayas court convicted and sentenced to prison six individuals for killing television presenter Efrain Ruales in January 2021. In April, four of the individuals appealed the court's decision. Authorities began a trial in May against a seventh suspect. An underage suspect was under investigation but remained under house arrest with police protection.

**Actions to Expand Freedom of Expression, Including for Members of the Media:** On May 18, the government's Communications Council launched a Protocol of Action Against Aggressions Toward Communication Workers. At the event, Communications Council president Jeannine Cruz emphasized the importance of "protecting the voices of journalists." According to media organizations, the council also helped journalists refer attacks against them to the Attorney General's Office.

CLP_PC_034279

**Internet Freedom**

The government did not restrict or disrupt access to the internet or censor online content, and there were no credible reports that the government monitored private online communications without appropriate legal authority.

A government regulation requires that internet service providers comply with all information requests from the superintendent of telecommunications, allowing access to client Internet Protocol (IP) addresses and information without a judicial order.  The law holds a media outlet responsible for online comments from readers if the outlet has no established mechanisms for commenters to register their personal data (including national identification number) or no system to delete offensive comments.  The law also prohibits media from using information obtained from social media unless they verify the author of the information.

As of September 6, the government had not issued regulations for the application of the 2021 Personal Data Protection Law and had not appointed a data protection superintendent.  Media watchdog groups such as Fundamedios had largely praised the law for establishing high standards for data and privacy protection while protecting freedom of expression.

## b. Freedoms of Peaceful Assembly and Association

The law provides for the freedoms of peaceful assembly and association, and the government generally respected these rights, although authorities imposed some restrictions during the street protests in June and at other times.

The government declared six states of exception throughout the year due to rising crime, violent social protests, and illegal mining.  The related executive decrees included restrictions on freedom of assembly and association.  The Constitutional Court may determine the legality of a state of exception or limit its scope and duration.  The court suspended the June state of exception when the protests ended on June 30, arguing that the situation had "changed substantially" and the government had not fully justified the validity of the measure after protests ended.

CLP_PC_034280

## Freedom of Peaceful Assembly

The law provides for freedom of peaceful assembly, and the government generally respected this right.  Public rallies require prior government permits, which authorities usually granted.

The Ombudsman's Office continued to investigate alleged police repression during March 8 demonstrations commemorating International Women's Day.  Participants and media outlets denounced police abuses against women, children, and journalists during the demonstrations.  Police allegedly used tear gas and pepper spray and shot pressurized liquid at close range at participants.  In some cases, women reported that police hit them with clubs or other items.  Police also blocked streets in downtown Quito with shields, horses, and motorcycles to prevent protesters from reaching the main square where the presidential palace is located.  The National Assembly's Constitutional Guarantees and Human Rights Committee also continued to investigate reported abuses during the march.

Human rights organizations claimed security forces committed human rights violations and abuses during the June protests, which in many cases also involved violence on the part of protesters.  Amnesty International reported harassment, excessive use of force, and arbitrary arrests, in addition to mistreatment and criminalization of demonstrators, journalists, and human rights defenders.  The Alliance for Human Rights, comprising 14 human rights national and local organizations, reported police and military repression resulted in six deaths, 335 injured protesters, 155 detentions, and 77 human rights abuses.  As of July 6, the Attorney General's Office opened 403 investigations related to the protests, of which 369 were in the investigation phase and 34 in the charging phase.

## Freedom of Association

The law provides for freedom of association, and the government generally respected this right.  Civil society representatives noted some policies enacted during the Correa administration remained in place and could enable the government to dissolve independent organizations for poorly defined reasons.

CLP_PC_034281

## c. Freedom of Religion

See the Department of State's *International Religious Freedom Report* at https://www.state.gov/religiousfreedomreport/.

## d. Freedom of Movement and the Right to Leave the Country

The law provides for freedom of internal movement, foreign travel, emigration, and repatriation, and the government generally respected these related rights.

## e. Protection of Refugees

The government cooperated with the Office of the UN High Commissioner for Refugees, the International Organization for Migration, and other humanitarian organizations in providing protection and assistance to refugees, returning refugees, asylum seekers, and other vulnerable persons of concern.  In addition, the human mobility law codifies protections granted to migrants in the constitution, advances the protection of refugees and asylum seekers, and provides for nonrefoulement, noncriminalization of irregular migration, and equal treatment before the law for migrants.

**Access to Asylum:**  The law provides for the granting of asylum or refugee status, and the government has established a system for providing protection to refugees.

**Abuse of Migrants and Refugees:**  Migrants and refugees, especially women, children, and lesbian, gay, bisexual, transgender, queer, and intersex (LGBTQI+) individuals, sometimes experienced sexual and gender-based violence and human trafficking, according to UN agencies and local NGOs.  Authorities reported an increase in forced labor, sex trafficking, and the forced recruitment of migrants and refugees into criminal activity, such as drug trafficking and robbery, on the northern and southern borders, particularly by transnational criminal organizations and criminal groups that also operated in Colombia.  Migrant and refugee arrivals at irregular crossings amid continued border closures complicated the government's ability to address and prevent abuses against migrants and refugees.

**Access to Basic Services:**  The law provides for protection and access to health care, education, and other services to all individuals irrespective of their migration

CLP_PC_034282

status.  Nonetheless, some Venezuelan migrant and refugee children remained out of the school system, according to official government statistics.  According to NGOs, barriers to the enrollment and retention of refugee and migrant children in school included a lack of information regarding the right to access to education, hidden costs of schooling such as uniforms, lack of classroom space, and, in some instances, xenophobic attitudes towards Venezuelans.  According to UN agencies and NGOs, refugees encountered discrimination in employment and housing.  Recognized refugees received national identification cards that facilitated access to education, employment, banking, and other public services; however, refugees and migrants reported that at times employers did not recognize government-issued documents that establish their right to work.

**Durable Solutions:**  The government accepted refugees for resettlement and offered naturalization to refugees but recognized very small numbers of Venezuelan refugees.  Discrimination and limited access to formal employment and housing affected refugees' ability to assimilate into the local population.

**Temporary Protection:**  On September 1, the Ministry of Interior opened the registration process to Venezuelan migrants who entered the country regularly, as well as all unaccompanied minors, regardless of nationality or migration status.  Registration for an estimated 100,000 non-Venezuelans who entered the country regularly opened on November 16.  Registration for an estimated 350,000 Venezuelans who entered the country irregularly was scheduled to open on February 16, 2023.  Registration produces a certificate, which acts as a temporary residence permit and protects the holder from deportation on migration-related grounds or from incurring migration-related fines while the regularization process is underway.  Registration, scheduled to continue through 2025, must be completed before an applicant can start the regularization process to receive a visa.  Those who complete registration and receive a registration certificate may apply for a temporary residency visa from the Ministry of Foreign Affairs.

# Section 3. Freedom to Participate in the Political Process

The law provides citizens the ability to choose their government in free and fair periodic elections held by secret ballot and based on universal and equal suffrage.

CLP_PC_034283

## Elections and Political Participation

**Recent Elections:**  In nationwide elections held in February 2021, citizens elected the president and vice president, 137 National Assembly members, and five representatives to the Andean Parliament.  Creating Opportunities Party candidate Guillermo Lasso Mendoza defeated Union for Hope opponent Andres Arauz Galarza in an April presidential runoff election.  International observers from the Organization of American States, Inter-American Union of Electoral Organisms, and accredited diplomatic missions concluded the electoral process was orderly and peaceful, and they did not note any significant incidents.

**Participation of Women and Members of Minority Groups:**  No laws limit participation of women or members of minority groups in the political process, and they did participate.

Social media harassment of women politicians and candidates continued.  The NGO Participación Ciudadana found 9,960 derogatory tweets against 33 sampled women in politics and government in a study of tweets posted between December 2019 and July 31, 2021.  According to the study, 79 percent of derogatory tweets contained messaging dealing with the objectification of women and perceived roles of women in society.

# Section 4. Corruption and Lack of Transparency in Government

The law provides criminal penalties for corruption by officials, and the government took steps to implement the law effectively.  There were numerous reports of government corruption throughout the year.

**Corruption:**  The government launched or continued multiple investigations, judicial proceedings, and legislative audits of officials accused of corruption related to state contracts and commercial endeavors that reached the highest levels of government.

On July 28, the Attorney General's Office raided the Cotopaxi prefecture offices and arrested Prefect Jorge Guamán and eight other government officials on

CLP_PC_034284

corruption charges. Guamán allegedly received millions of dollars in kickbacks in exchange for prefecture contracts and positions in the prefecture. The investigation continued as of August 31.

High-profile prosecutions and investigations continued of alleged public-health sector corruption at the national, provincial, and municipal levels during the COVID-19 crisis. In August, the trial of former Ecuadorian Institute of Social Security (IESS) board president Paul Granda and two former IESS hospital managers on organized crime charges began. Granda was also accused of irregularities in medical supply acquisition contracts during the COVID-19 emergency.

On April 21, the president of the National Court initiated the extradition process of former President Rafael Correa, wanted by the government for his alleged participation in the Sobornos (bribes) corruption scheme that illicitly financed Correa's Alianza PAIS party in exchange for public contracts from 2012 to 2016. On April 22, the Belgian government confirmed it had granted asylum to the former president and his family. On May 6, Belgium rejected Ecuador's extradition request.

On August 5, judge Banny Molina granted what legal experts termed a "dubious" habeas corpus to former Vice President Jorge Glas, Daniel Salcedo, and Christian Araujo after Molina judged the prisoners' rights to health and safety had been violated. Glas had been imprisoned since his 2017 conviction on bribery and corruption charges. Salcedo had been serving a 13-year sentence for embezzlement, while Araujo had been serving a 13-year sentence for murder. The government identified irregularities in the review, including that Molina acted without jurisdiction or competence, and appealed the decision. On August 10, a judge ordered an investigation of Molina, citing malfeasance, and placed him under house arrest. A judge overturned Molina's decision to grant Glas, Salcedo, and Araujo habeas corpus on August 26, and they remained in prison as of September 1.

## Section 5. Governmental Posture Towards International and Nongovernmental Investigation of Alleged Abuses of Human

CLP_PC_034285

## Rights

A number of domestic and international human rights groups generally operated without government restriction, investigating and publishing their findings on human rights cases.  Government officials were often cooperative and responsive to their views.  A human rights organization reported some cases in which the government was reluctant to cooperate with local human rights NGOs while they conducted investigations.

**Retribution Against Human Rights Defenders:**  On July 28, Amnesty International said that NGO Amazon Frontlines lawyer and human rights activist Lina Maria Espinosa received death threats while she provided legal support to the Indigenous communities that participated in the June protests.

**Government Human Rights Bodies:**  The Ombudsman's Office is an administratively and financially independent body focused on human rights and subordinate to the Transparency and Social Control branch of government.  The Ombudsman's Office regularly presented cases to the Public Prosecutor's Office.  Human rights groups generally viewed the Ombudsman's Office as independent and effective.

## Section 6. Discrimination and Societal Abuses

### Women

**Rape and Domestic Violence:**  The law criminalizes rape of men or women, including spousal and intimate partner rape, and domestic violence.  The government enforced the law, although victims were sometimes reluctant to report these crimes.  Rape is punishable with penalties of up to 22 years in prison.  The law includes spousal rape under crimes against sexual and reproductive integrity.  The penalty for rape where death occurred is 22 to 26 years' imprisonment.  Domestic violence is punishable with penalties ranging from four days to seven years in prison and a substantial fine for "damages, pain, and suffering," depending on the severity of the crime.  Penalties for physical, psychological, and sexual violence were enforced.

CLP_PC_034286

According to local experts, reporting rapes and other forms of violence continued to be a traumatic process, particularly for female minors.  For example, a rape victim must file a complaint at the Public Prosecutor's Office and submit to gynecological evaluations akin to rape kits administered by medical experts.  Many individuals did not report cases of rape and sexual assault due to fear of retribution from the perpetrator and social stigma.

The law provides for reparations to victims of gender-based violence.  The law defines rape, including spousal rape or incest, forced prostitution, sexual harassment, and other analogous practices, as forms of sexual violence.  It also entitles victims to immediate protective measures designed to prevent or stop violence, such as police surveillance, placement in shelters, and awareness programs for the victim and family.  These measures were generally enforced.

According to human rights organizations, victims were generally reluctant to press domestic violence charges.  Judges lacked specialized training for dealing with gender-based violence, and the court system was insufficiently staffed to deal with the caseload.  Rights organizations also reported local protection-board officials at times discouraged victims from reporting their aggressors.

In June, the Attorney General's Office, in cooperation with the Judicial Council, National Police, Human Rights Secretariat, and other relevant offices, launched an interactive tool to unify national femicide statistics.  As of September 11, the Attorney General's Office reported 61 femicides, on track to exceed the 70 total femicides in 2021.  As of October 25, the Attorney General's Office reported the judiciary had not issued sentences in any of the 61 cases.  The NGO Latin American Association for Alternative Development counted 206 women killed (under any circumstances) through September 3.  The difference between statistics was due to a broader definition of "femicide" used by the association and civil society groups that reported to it.

On September 11, Lieutenant Coronel German Caceres, a senior police officer, allegedly killed his spouse, Maria Belen Bernal, on the campus of the police academy in Quito.  Authorities found the victim's remains on September 21, buried on the slope of a volcano near the academy.  The autopsy revealed the cause of death was asphyxiation by strangulation.  Investigators questioned Caceres on

CLP_PC_034287

September 14 and then released him.  Caceres disappeared soon afterwards and remained at large as of October 25.  An investigation of the killing was underway.

**Sexual Harassment:**  The law criminalizes sexual harassment and provides for penalties of one to five years in prison.  The law defines sexual harassment and other analogous practices as forms of sexual violence and mandates that judges prohibit contact between the aggressor and the victim to prevent revictimization and intimidation, and the law was generally enforced.  Despite the legal prohibition of sexual harassment and government implementation of the law, women's rights organizations said that victims tended not to report alleged harassment and that harassment remained common in public spaces.

**Reproductive Rights:**  There were no reports of coerced abortion or involuntary sterilization on the part of government authorities.

Some women's rights activists complained that a lack of comprehensive sex education limited individuals' ability to manage their reproductive health and that ineffective distribution of birth control reduced access to contraception. Emergency contraception was available as part of methods for family planning; however, the Roman Catholic Church's stance against contraceptive use and social stigma discouraged women from seeking family planning services.

A 2019 study found income status affected equity in sexual and reproductive health access and outcomes, with low income and rural individuals having significantly less access.  UN agencies reported that vulnerable populations, including Afro-Ecuadorians, Indigenous groups, rural inhabitants, LGBTQI+ individuals, persons with disabilities, HIV-positive persons, and migrants faced, limited access and discrimination regarding the provision of reproductive health services.

CARE International observed there was less access to sexual and reproductive health resources for survivors of sexual violence than in previous years, and specifically, a lack of availability of emergency contraception as part of the clinical management of rape.  International organizations said public hospitals were still restocking emergency contraception materials after a drop in national stock levels during the pandemic, caused by the government's focus on pandemic-related

CLP_PC_034288

issues.

In 2021, Secretary of Human Rights Bernarda Ordóñez stated 70 percent of girls ages 10 to 14 who became pregnant were most likely sexually violated. Ordóñez added that many of these adolescents also suffered from sexually transmitted diseases, urinary tract infections, and other health complications.

While the law prohibits discrimination against girls who become mothers, NGOs reported some faced discrimination and subsequently left school. A lack of resources also resulted in young mothers discontinuing their education to pursue work.

**Discrimination:** The constitution affords women the same legal status and rights as men. Nevertheless, discrimination against women was prevalent, particularly with respect to economic opportunities for older women and for those in the lower economic strata. Women continued to face wage disparities compared with men. NGOs said women also faced discrimination in job recruitment, housing access, and some judicial proceedings, namely, in reporting and filing charges in cases of alleged sexual abuse.

## Systemic Racial or Ethnic Violence and Discrimination

The constitution declares the state to be plurinational and affirms the principle of nonviolence and nondiscrimination by recognizing the rights of Indigenous, Afro-Ecuadorian, and Montubio (an independent ethnic group of persons with a mixture of Afro-Ecuadorian, Indigenous, and Spanish ancestry) communities. It also mandates affirmative action policies to provide for the representation of minorities. NGOs and civil society representatives said those provisions were not effectively enforced.

Citing official data for 2021, media reported Indigenous, Afro-Ecuadorian, and Montubio populations experienced the highest poverty rates in the country. Among those populations, the most affected were Indigenous children, followed by Montubio girls.

Afro-Ecuadorians, who accounted for approximately 7 percent of the population, according to the most recent census (2010), suffered pervasive discrimination,

CLP_PC_034289

particularly regarding educational and economic opportunity.  Afro-Ecuadorian organizations noted that, despite the absence of official discrimination, societal discrimination and stereotyping in media continued to result in barriers to employment, education, and housing.  A national gender survey published in 2019 found Afro-Ecuadorian women were particularly vulnerable to gender-based violence and harassment based on racial, gender, and sexual stereotypes.

Attorney General Diana Salazar reported that on January 18, she received derogatory messages referencing her Afro-Ecuadorian ethnicity during a virtual meeting.

## Indigenous Peoples

There were isolated reports of restrictions on Indigenous persons and their institutions in decisions affecting their property or way of life.

The law provides Indigenous persons the same civil and political rights as other citizens.  The constitution recognizes Kichwa and Shuar as "official languages of intercultural relations."  The constitution obligates the state to consult local communities and Indigenous persons prior to initiation of projects on their lands through a process that is free, informed, and culturally appropriate, although Indigenous peoples' organizations noted public- and private-sector actors often ignored prior consultation.  Despite the legal obligation, the government had yet to pass a national community consultation law.

The constitution also allows Indigenous persons to participate in the economic benefits that natural resource extraction projects may bring and to receive compensation for any damages that result.  In the case of environmental damage, the law mandates immediate corrective government action and full restitution from the responsible company, although some Indigenous organizations asserted a lack of consultation and remedial action.  The law recognizes the rights of Indigenous communities to hold property communally, although the titling process remained incomplete in parts of the country.

A February 4 Constitutional Court ruling recognized the right of Indigenous communities to have the final decision over oil, mining, and other extractive projects that affect their lands.  The ruling stems from the A'i Kofan community of

CLP_PC_034290

Sinangoe's 2018 lawsuit seeking the annulment of 52 gold-mining concessions granted by the government along the community's most important river. Considering numerous violations of the right to prior consultation, the Constitutional Court selected this case to establish a precedent requiring the government to obtain the consent of the affected communities before undertaking oil, mining, or other extractive plans or projects, based on Indigenous persons' rights to self-determination.  The court also indicated in its ruling that reparation measures "are mandatory and immediately enforceable."

## Children

**Birth Registration:**  Citizenship is acquired through birth in the country, birth to an Ecuadorian mother or father abroad, or by naturalization.  Birth registration was provided on a nondiscriminatory basis.  According to UNICEF, families with limited economic resources, especially in rural areas and in the northern border provinces, continued to show registration rates significantly lower than those of other groups, which led to a national 10 percent nonregistration rate.  The main causes were the long distances that families had to travel to register their children and the lack of information available for parents that demonstrated the importance of registration.  Government teams occasionally traveled to remote rural areas to register families and persons with disabilities.  While the law prohibits schools from requesting civil registration documents for enrollment, some (mostly public) schools continued to require them.  Other government services, including welfare payments and free primary health care, require some form of identification.  Migrant children were particularly affected by this requirement, which prevented adequate access to these services.

**Education:**  The lack of schools in some areas specifically affected Indigenous and refugee and migrant children, who must travel long distances to attend school.

**Child Abuse:**  The law criminalizes child abuse and provides penalties of 30 days to 26 years in prison, depending on the severity of the abuse.

According to UNICEF, citing a 2019 national survey, more than 45 percent among adolescents between 15 and 17 years of age had suffered sexual violence in their lifetime.  In 2020, the UN Human Rights Council study revealed that most of the

CLP_PC_034291

gender-based violence against children and adolescents occurred in the family environment and that the aggressors were relatives and persons close to the family (65 percent) or linked with the education system (17 percent).

Bullying remained a problem in schools and increasingly occurred on social media. In April 2021, reforms to the Intercultural Education Law took effect, aiming to prevent and combat digital sexual violence and strengthen the fight against cybercrimes by making online bullying punishable.  Despite regulations, media outlets covered several cases of bullying and cyberbullying that were reported to the Attorney General's Office, which had not responded to them a year or more after receiving the report.

**Child, Early, and Forced Marriage:**  The legal marriage age is 18.  There were reports of early and forced marriage in rural and poor areas.  According to UNICEF and Plan International, poor girls and adolescents were at higher risk of child, early, or forced marriage.  Both agencies also identified cases in which the girls' parents promoted early marriages to improve their social and economic status.  This practice commonly led to other social problems such as gender-based violence, early pregnancy, leaving school prematurely, and unemployment.

**Sexual Exploitation of Children:**  The age of consent is 14.  The law prohibits sexual exploitation of children, including child pornography, with penalties of 22 to 26 years' imprisonment.  The penalty for human trafficking, including child sex trafficking, is 13 to 16 years in prison.  Authorities did not criminalize all forms of child sex trafficking.  The criminal code requires proof of force, fraud, or coercion as essential elements of a trafficking crime, neglecting to recognize that anyone younger than age 18 is unable to provide informed consent.

Child sex trafficking remained a problem, despite government enforcement efforts. Between January and June, the Attorney General's Office registered 53 reports of different forms of trafficking in persons, of which 93 percent involved children.

**Infanticide, including Infanticide of Children with Disabilities:**  UNICEF and media outlets reported a case of infanticide of a baby age seven months in April in Ibarra.  A provincial judge ordered pretrial detention for the three suspects in the crime.

CLP_PC_034292

**Displaced Children:**  Humanitarian organizations expressed concern that an increasing number of unaccompanied refugee and migrant children entered the country via irregular crossings.  International organizations remained concerned unaccompanied children and adolescents were vulnerable to harassment, exploitation, and trafficking by criminal groups.  Under a presidential decree issued on June 1, unaccompanied migrant children have access to regularized migration status (see section 2.e.).

## Antisemitism

There is a small Jewish community, including an estimated 450 individuals in Quito, 40 individuals in Guayaquil, and 10 individuals elsewhere in the country.  The Jewish community reported no attacks or aggression as of August 13.

## Trafficking in Persons

See the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## Acts of Violence, Criminalization, and Other Abuses Based on Sexual Orientation, Gender Identity or Expression, or Sex Characteristics

**Criminalization:**  No laws exist to criminalize same-sex conduct or gender identity or expression.

**Violence against LGBTQI+ Persons:**  LGBTQI+ organizations reported the killing of two LGBTQI+ individuals in January, one in Guayaquil and the other in the province of Cotopaxi.  The NGO Silueta X characterized both deaths as transfemicides, defined as killings of transgender women by individuals motivated by antitransgender bias.  The digital news outlet *GK* said one of the victim's relatives reported the killing to the Attorney General's Office but did not receive a response.  LGBTQI+ organizations claimed government institutions in general failed to properly register and categorize violent acts against the LGBTQI+ community, leading to underreporting.  LGBTQI+ groups claimed police and prosecutors did not thoroughly investigate deaths of LGBTQI+ individuals,

CLP_PC_034293

including when there was suspicion that the killing was motivated by anti-LGBTQI+ bias.  The NGO Fundación Ecuatoriana Equidad, a sexual health and LGBTQI+ advocacy group, cited police and prosecutors' lax attitude and the lack of technical capacity and knowledge about LGBTQI+ individuals to explain insufficient investigations into crimes committed against LGBTQI+ persons.

**Discrimination:**  The constitution includes the principle of nondiscrimination with respect to gender identity or sexual orientation.  The law prohibits discrimination based on sexual orientation and gender identity.  The law also prohibits hate crimes, but LGBTQI+ activists asserted that since the legal codification of hate crimes in 2008, there had been no hate crime convictions for crimes against LGBTQI+ persons.  LGBTQI+ persons continued to suffer discrimination from both public and private entities, particularly in education, employment, and access to health care.  LGBTQI+ organizations reported transgender persons suffered more discrimination because they were more visible.

LGBTQI+ persons continued to report that the government sometimes denied them equal access to formal education.  Fundación Ecuatoriana Equidad indicated the government did not comprehensively apply policy provisions to prevent and combat discrimination.  LGBTQI+ students, particularly transgender students, sometimes were discouraged from attending classes and were more susceptible to bullying in schools.  Human rights activists argued the Ministry of Education and school administrators were slow to respond to complaints regarding harassment, discrimination, or abuse against LGBTQI+ persons.

LGBTQI+ persons involved in the commercial sex trade reported abusive situations, extortion, and mistreatment by security forces.

In December 2021, the navy publicly apologized to Diocles Daniel García Zambrano for committing a discriminatory act by discharging him based on his sexual orientation without respecting the guarantees of due process.  The navy assumed responsibility for the act and pledged not to discriminate based on sexual orientation, whether real or perceived, of all persons entering active service.

**Availability of Legal Gender Recognition:**  The law prohibits changing gender on identity documents for LGBTQI+ persons younger than 18, even with parental

CLP_PC_034294

consent.  As of August 17, a decision remained pending in a case before the Constitutional Court to determine the age at which transgender underage individuals may change their identity information.

On May 5, the Constitutional Court ruled that the Office of the Civil Registry may change an individual's sex on record at the person's request without requesting any additional documents.  An LGBTQI+ organization reported that despite the ruling, the Office of the Civil Registry had not yet implemented the ruling.  The court also ordered the National Assembly to "discuss and approve a bill to regulate the procedure for changing the sex of transgender persons."  The legislature's Constitutional Guarantees and Human Rights Committee members began drafting a law in July.

**Involuntary or Coercive Medical or Psychological Practices Specifically Targeting LGBTQI+ Individuals:**  An LGBTQI+ organization reported the existence of clandestine private treatment centers confining LGBTQI+ persons against their will to "cure" or "dehomosexualize" them despite the illegality of such treatment.  LGBTQI+ organizations reported that the practice persisted under the guise of religious or "wellness" retreats or drug addiction treatment centers. According to one LGBTQI+ organization, the Ministry of Public Health had some success in identifying and closing such institutions.  Another LGBTQI+ organization claimed the Attorney General's Office had not taken any action against the individuals who ran these establishments.

According to the advocacy NGO Dialogo Diverso, many individuals confined to the "clinics" were afraid to report the activity because in most cases their own family members forced them into the "treatments."  LGBTQI+ organizations also reported relatives took LGBTQI+ persons to neighboring countries, where clinics reportedly used violent treatments, including rape, to attempt to change LGBTQI+ persons' sexual orientation.

Additionally, an intersex organization reported infants and children born with nonbinary sex characteristics were subjected to unnecessary irreversible genital surgeries in an attempt to "normalize" their gender appearance.

**Restrictions of Freedom of Expression, Association, or Peaceful Assembly:**

CLP_PC_034295

An LGBTQI+ organization claimed that despite the law protecting freedom of expression, major television networks systematically censored LGBTQI+ individuals and granted more space to conservative views.

## Persons with Disabilities

The law prohibits discrimination against persons with physical, sensory, intellectual, and mental disabilities.  The law stipulates persons with disabilities have the right to health care and health insurance; to employment and job security; to education, including programs for scholarships and student loans; and to access buildings, transport, and communications.  The government did not fully enforce its provisions.

By law, children with disabilities may attend specialized schools, but all educational establishments must accommodate students with disabilities.  An advocacy NGO for persons with disabilities said nonspecialized institutions lacked the capacity and staff to accommodate the range of disabilities.  The NGO said children with disabilities attended primary and secondary education at similar rates to other children, but they attended higher education at lower rates due to a lack of access to quality support and accessible infrastructure.  According to the NGO, the lack of interagency coordination especially in the public sector hampered the possibility for persons with disabilities to transit smoothly from high school to universities or technical institutions and then to an independent life.

The law requires that 4 percent of employees in all public and private enterprises with more than 25 employees be persons with disabilities, and it gives the Ombudsman's Office responsibility for following up on alleged violations of the rights of persons with disabilities, stipulating fines and punishments for lack of compliance.  As of 2021, 52 percent of enterprises complied with the law, 3 percent fewer than in 2020.

## Other Societal Violence or Discrimination

Fundación Ecuatoriana Equidad said that although HIV-positive individuals were registered with the social security system, diagnosis, follow-up testing, and treatment continued to be inadequate due to perceived poor management by the

CLP_PC_034296

Ministry of Health and general corruption.

Although Ministry of Labor regulations prohibit discrimination against hiring HIV-positive individuals and bans HIV tests as entry requirements for a job, LGBTQI+ organizations argued many employers continued requiring tests.

# Section 7. Worker Rights

## a. Freedom of Association and the Right to Collective Bargaining

The law, with some exceptions, provides for certain rights of workers to form and join trade unions of their choice, to bargain collectively, and to strike.  The law requires a minimum of 30 workers for the creation of an association, work committee, or labor union, regardless of the total number of employees in the workplace.  The law does not allow foreign citizens to serve as trade union officers.

The law prohibits the dismissal of union members from the moment a union notifies the labor inspector of its general assembly.  Employers are not required to reinstate workers fired for union activity but are required to pay such workers compensation and a fine of one year's annual salary for everyone wrongfully dismissed.  Individual workers still employed may take complaints against employers to the Labor Inspection Office.  Individuals no longer employed may take their complaints to courts charged with protecting labor rights.

Unions may take complaints to a tripartite arbitration board established to hear their complaints.  Despite the legal obligation to begin mediation within 48 hours of issuing a complaint, these procedures often were subject to lengthy delays because the Ministry of Labor lacked the skills and staff to address all arbitration requests and appeals.  Private-sector representatives alleged that boards exhibited conscious bias in favor of employees.

All private employers with unionized employees are required to negotiate collectively when the union so requests.

Ministerial resolutions allow for the use of certain types of labor contracts, with specific provisions for the flower, palm, fishing, livestock, and construction

CLP_PC_034297

sectors.  Unions alleged these could be used to undermine the right to organize. For example, employers may refuse to renew a short-term or temporary contract to a worker who is attempting to organize a union, or they may outsource workers to prevent collective bargaining.  The Ministry of Labor denied registration of a gig workers union,

The right for workers to organize at a sectoral level was recognized by the courts but not was not always implemented.  In May 2021, a provincial court ordered that the Ministry of Labor recognize the Trade Union Association of Agricultural Banana Workers and Peasants (ASTAC) as a sector-wide union for banana workers, and the court tasked the Ombudsman's Office with monitoring the decision's implementation.  This decision followed requests by the International Labor Organization (ILO) to permit sector-wide union organizing in compliance with international labor standards.  On January 11, the ministry recognized ASTAC as a sector-wide union but failed to comply with other provisions of the court's decision, including the issuance of implementing regulations for collective bargaining at the sectoral level and guaranteeing the right of future sector-wide unionization.  ASTAC representatives affirmed that without implementing regulations, their right to collective bargaining was limited.  The union submitted its case to the Inter-American Commission on Human Rights in August.

The law provides for the right of private-sector employees to strike and conduct three-day solidarity strikes or boycotts on behalf of employees in other industries. The law also establishes, however, that before most strikes, collective labor disputes must be referred to courts of conciliation and arbitration.

The law requires a 10- to 20-day "cooling-off" period from the time a strike is declared before it can take effect.  During this time, workers and employers must agree on how many workers are needed to ensure a minimum level of service; at least 20 percent of the workforce must continue to work to provide essential services.  The law provides the employer may contract substitute personnel only when striking workers refuse to send the number of workers required to provide the minimum necessary services.  Contracting substitute personnel was effectively impossible, however, as the law does not provide for time-limited, seasonal, hourly, or part-time contracts.

CLP_PC_034298

The law prohibits formation of unions and restricts the right to collective bargaining and striking of public-sector workers in a long list of "strategic sectors," including environmental sanitation, education, justice, social security, electrical energy, hydrocarbon production, fuel processing, transport and distribution, public transportation, and postal service and telecommunications sectors, which exceeds the ILO standard for essential services.  Workers in these sectors attempting to strike may face charges with penalties of two to five years' imprisonment.  The government effectively enforced the law on "strategic sectors."

All unions in the public sector fall under the Confederation of Public Servants.  Although most public-sector workers also maintained membership in labor-sector associations, the law does not allow such associations to bargain collectively or to strike.  The law specifies that only the private sector may engage in collective bargaining.

The government did not effectively enforce all applicable law.  Penalties were commensurate with those for other laws involving denial of civil rights, such as discrimination.  Penalties were rarely applied against violators.

Employers did not always respect freedom of association and collective bargaining, and labor rights advocacy groups said that influential business interests tied to local officials sometimes used criminal proceedings to restrict workers' right to unionize.  It was estimated that approximately 3 percent of the total workforce was unionized, with the number of public and private unions registered by the Ministry of Labor decreasing by half since 2017.

Unions reported the Ministry of Labor delayed unions' requests to update their boards of directors, which led to delayed registration.  Labor unions and associations reported difficulties and delays in registering unions in the ministry due to excessive and ever-changing requirements – sometimes not stated in the regulations – and ministry staff shortages.

There were several cases in which the leaders of new unions were fired by their employers while the former were awaiting ministry registration.  Even if a court supported a union's registration efforts, dismissed leaders were entitled only to compensation, not reinstatement, which undermined the union's ability to form.  In

CLP_PC_034299

addition, dismissed union leaders cannot turn to the Ministry of Labor but must go through the courts.  Javier Burgos was elected ASTAC secretary general in 2011, but ASTAC did not receive its registration until 2021, and Burgos was fired in November 2021.  Although illegally fired, Burgos was not able to obtain severance as he could not afford the court procedure.

Independent union leaders alleged that at least two unions were controlled by the government and thus received preferential treatment in administrative processes as well as invitations to roundtables to discuss labor policies.

## b. Prohibition of Forced or Compulsory Labor

The law prohibits and criminalizes all forms of forced or compulsory labor, including all forms of labor exploitation.  The government did not effectively enforce the law.  Limited presence in parts of the country and inadequate victim services hampered the effectiveness of police and prosecutors.  NGOs and media outlets continued to report that children were victims of human trafficking in forced criminality, particularly drug trafficking and robbery.

Reports of forced labor by children (see section 7.c.) and women persisted.  Observers most frequently reported women as victims of domestic servitude.  In 2021, police arrested 65 suspected traffickers.  Authorities prosecuted 47 individuals in 17 trafficking cases and convicted and sentenced 13 traffickers.  In 2021, the government identified 51 victims of human trafficking and aided some through witness protection services, shelter placement, and repatriation.

Indigenous and Afro-Ecuadorians, Venezuelan migrants, and Colombian refugees (see section 7.d.) were particularly vulnerable to forced labor and human trafficking.  Traffickers often recruited children from impoverished Indigenous families with false promises of employment; these children were then forced to beg or to work as domestic servants, in sweatshops, or as street and commercial vendors within the country or in other South American countries.

Local men, women, and children were exploited in forced labor in domestic service; forced begging; on banana, hemp, and palm plantations; street vending; illegal mining; and other areas of the informal economy.  According to international organizations, income loss due to the economic crisis caused by

CLP_PC_034300

COVID-19 increased the vulnerability of at-risk groups to human trafficking, particularly migrants and those working in the informal sector.

Men, women, and children were exploited in forced labor abroad, including in the United States and other South American countries, particularly Chile and Colombia.

Also see the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## c. Prohibition of Child Labor and Minimum Age for Employment

See the Department of Labor's *Findings on the Worst Forms of Child Labor* at https://www.dol.gov/agencies/ilab/resources/reports/child-labor/findings/.

## d. Discrimination with Respect to Employment and Occupation

The law and regulations prohibit employment discrimination on the grounds of race, religion, national origin, sex (including pregnancy), ethnicity, gender, disability, language, age, sexual orientation or gender identity, migratory condition, HIV or other communicable disease status, or socioeconomic status. The government did not effectively enforce these laws and regulations. Penalties were commensurate with laws related to civil rights, such as election interference, but were rarely applied against violators. An NGO reported that Ministry of Labor representatives were frequently unprepared for administrative cases regarding discrimination based on sexual orientation or gender identity due to a lack of familiarity with LGBTQI+ issues.

Employment discrimination against women was prevalent (see also section 6), particularly with respect to older women and the poor. According to union leaders, employers continued to assign women heavier workloads, forcing them to "clean up" workstations afterhours, especially in the agricultural sector. A workers' association alleged this also occurred in a textile factory where women regularly worked overtime and did not receive minimum wage. Official statistics showed that in June the average monthly income for an employed man was 19 percent higher than for an employed woman.

CLP_PC_034301

Afro-Ecuadorians reported that employers often profiled them based on their job application photographs and racial stereotypes.

Migrants faced abuses such as overtime work without due pay, especially in the growing digital platform sector.  According to a union, 80 percent of digital platform workers were migrants.

Indigenous and LGBTQI+ individuals as well as persons with disabilities also experienced employment discrimination.

## e. Acceptable Conditions of Work

**Wage and Hour Laws:**  The law provides for a minimum monthly wage, which was above the poverty income level.  The law limits the standard work period to 40 hours a week, eight hours a day, with two consecutive days of rest per week. Miners are limited to six hours a day and may work only one additional hour a day with premium pay.  Overtime is limited to no more than four hours a day and a total of 12 hours a week.  Mandatory overtime is prohibited.  Different regulations regarding schedule and vacations apply to live-in domestic workers.  The law mandates prison terms for employers who do not register domestic workers with the Social Security Administration.

A law on COVID-19's impact allows employers and employees to enter into force majeure agreements, although the dismissal of an employee is permitted only if the business ceased operations permanently.  The law also permits employers to reduce working hours and salaries by up to 50 and 45 percent, respectively, by signing "emergency contracts" with their employees to prevent job losses.  Citing government data, media reported that as of June 20, companies had enrolled 111,826 workers under "emergency contracts"; most were in the agriculture, manufacturing, and trade sectors.  Unions and labor organizations said the law enabled precarious work conditions, reduced wages below the minimum wage, and allowed unfair dismissals without due compensation because of employers' leverage over employees desperate to keep their jobs during the COVID-19 economic slowdown.  In December 2021, the Constitutional Court declared the force majeure provision unconstitutional, arguing it was "incompatible with the right to legal certainty recognized in the Constitution."  In June, the National

CLP_PC_034302

Assembly approved a partial repeal of the law, but the president vetoed the repeal on July 20, which prevents the legislature from addressing it for a one-year period. Labor unions filed a lawsuit with the Constitutional Court the same month challenging other provisions in the law.

Labor leaders and NGOs said there were no specific sectors with a concentration of alleged violations of wage, hour, or overtime laws.  They reported that the number of complaints against public and private companies in the service, agricultural, and manufacturing sectors, however, was rising because of perceived unfair dismissals, mostly under "emergency contracts" as provided in the COVID-19 law.  They said that women and young workers were sometimes vulnerable to wage exploitation in the informal sector, and that domestic and service-sector workers sometimes had to accept conditions including unpaid or underpaid overtime.

**Occupational Safety and Health:**  The law provides for the health and safety of workers and outlines occupational safety and health (OSH) standards, which are current and appropriate for the country's main industries.  Authorities may conduct labor inspections by appointment, after a worker complaint, or through unannounced visits.  If a worker requests an inspection and a Ministry of Labor inspector confirms a workplace hazard, the inspector then may close the workplace.  Labor inspections generally occurred because of complaints, not as a preventive measure.  In some cases, violations were remedied, but other cases were subjected to legal challenges that delayed changes for months.

Workers in the formal sector could generally remove themselves from situations that endangered health or safety without jeopardy to their employment, and authorities effectively protected employees in this situation.  Labor representatives from the agricultural sector said they registered cases in which employers forced workers to return to the plantations shortly after fumigations took place, risking illness or bodily harm.  There were no reported deaths due to fumigation practices, in large part, according to union leaders, because doctors were afraid to sign any document confirming a direct link to pesticide exposure.

In July 2021, the Labor Ministry issued guidelines for the progressive return to work activities in the public and private sectors.  Due to a COVID-19 surge in mid-year, the Emergency Operations Committee ordered a reduction in in-person work

CLP_PC_034303

by public officials.  The committee instructed public institutions to issue internal regulations to determine positions eligible for optional telework.  The ministry prioritized telework for pregnant and nursing women, persons with disabilities, persons with catastrophic diseases and their caregivers, and senior workers.

**Wage, Hour, and OSH Enforcement:**  The Ministry of Labor is responsible for enforcement of wage, hour, and OSH laws.  The government did not effectively enforce the laws.  Inspectors have the authority to make unannounced inspections. The ministry issues fines for wage and hour law and OSH violations.  Penalties were commensurate with those for similar crimes, such as fraud or negligence, but were rarely applied to violators.  The government's 117 total reported labor inspectors in 2021 were fewer than ILO standards recommend for the country's population and labor force size.  The ministry continued its enforcement reforms by increasing the number of workers protected by contracts and minimum wage standards and eligible for social security benefits.

**Informal Sector:**  Wage, hour, and OSH regulations and standards were not applied to part-time workers or those in the informal sector, which employed 52 percent of the working population as of July.  These workers were not registered in the social security system nor eligible to receive other legally mandated benefits.

OSH problems were more prevalent in the informal sector.  The law singles out the health and safety of miners, but the government did not enforce safety rules in informal, often illegal, small-scale mines (frequently linked to local community leaders and organized criminal groups), which made up the vast majority of mining enterprises.  Migrants and refugees were particularly vulnerable to hazardous and exploitative working conditions.  According to media and labor associations, local organizations reported complaints of Venezuelans receiving below the minimum wage, particularly in the informal sector.  Gig workers reported conditions that did not follow wage, hour, and safety laws.

CLP_PC_034304

# AP

## Online system to seek asylum in US is quickly overwhelmed

By ELLIOT SPAGAT January 28, 2023



A migrant from Michoacan, Mexico, uses the CBPOne app Tuesday, Jan. 24, 2023, in Tijuana, Mexico. A mobile app for migrants to seek asylum in the United States has been oversaturated since it was introduced this month in one of several major changes to the government's response to unprecedented migration flows. Hoping to get lucky when a new appointments are made available daily, migrants are increasingly frustrated by a variety of error messages. (AP Photo/Gregory Bull)

TIJUANA, Mexico (AP) — Hours before sunrise, migrants at one of Mexico's largest shelters wake up and go online, hoping to secure an appointment to try to seek asylum in the U.S. The daily ritual resembles a race for concert tickets when online sales begin for a major act, as about 100 people glide their thumbs over phone screens.

New appointments are available each day at 6 a.m., but migrants find themselves stymied by error messages from the U.S. government's CBPOne mobile app that's been overloaded since the Biden administration introduced it Jan. 12.

Many can't log in; others are able to enter their information and select a date, only to have the screen freeze at final confirmation. Some get a message saying they must be near a U.S. crossing, despite being in Mexico's largest border city.

At Embajadores de Jesus in Tijuana, only two of more than 1,000 migrants got appointments in the first two weeks, says director Gustavo Banda.

"We're going to continue trying, but it's a failure for us," Erlin Rodriguez of Honduras said after another fruitless run at an appointment for him, his wife and their two children one Sunday before dawn. "There's no hope."

Mareni Montiel of Mexico was elated to select a date and time for her two children — then didn't get a confirmation code. "Now I'm back to zero," said Montiel, 32, who has been waiting four months at the shelter, where the sound of roosters fill the crisp morning air at the end of a rough, dirt road.

CBPOne replaced an opaque patchwork of exemptions to a public health order known as Title 42 under which the U.S. government has denied migrants' rights to claim asylum since March 2020. People who have come from other countries find themselves in Mexico waiting for an exemption or policy change — unless they try to cross illegally into the U.S.

If it succeeds, CBPOne could be used by asylum-seekers even if Title 42 is lifted as a safe, orderly alternative to illegal entry, which reached the highest level ever recorded in the U.S. in December. It could also discourage large camps on Mexico's side of the border, where migrants cling to unrealistic hopes.

But a range of complaints have surfaced:

— Applications are available in English and Spanish only, languages many of the migrants don't speak. Guerline Jozef, executive director of the Haitian Bridge Alliance, said authorities failed to take "the most basic fact into account: the national language of Haiti is Haitian Creole." U.S. Customs and Border Protection says it plans a Creole version in February; it has not announced other languages.

Some migrants, particularly with darker skin, say the app is rejecting required photos, blocking or delaying applications. CBP says it is aware of some technical issues, especially when new

appointments are made available, but that users' phones may also contribute. It says a live photo is required for each login as a security measure.

The issue has hit Haitians hardest, said Felicia Rangel-Samponaro, director of The Sidewalk School, which assists migrants in Reynosa and Matamoros, across from Texas' Rio Grande Valley. Previously, about 80% of migrants admitted to seek asylum in the area were Haitian, Rangel-Samponaro said. On Friday, she counted 10 Black people among 270 admitted in Matamoros.

"We brought construction lights pointed at your face," she said. "Those pictures were still not able to go through. ... They can't get past the picture part."

— A requirement that migrants apply in northern and central Mexico doesn't always work. CBP notes the app won't work right if the locator function is switched off. It's also trying to determine if signals are bouncing off U.S. phone towers.

But not only is the app failing to recognize that some people are at the border, applicants outside the region have been able to circumvent the location requirement by using virtual private networks. The agency said it has found a fix for that and is updating the system.

— Some advocates are disappointed that there is no explicit special consideration for LGBTQ applicants. Migrants are asked if they have a physical or mental illness, disability, pregnancy, lack housing, face a threat of harm, or are under 21 years old or over 70.

Still, LGBTQ migrants are not disqualified. At Casa de Luz, a Tijuana shelter for about 50 LGBTQ migrants, four quickly got appointments. A transgender woman from El Salvador said she didn't check any boxes when asked about specific vulnerabilities.

The U.S. began blocking asylum-seekers under President Donald Trump on the grounds of preventing the spread of COVID-19, though Title 42 is not applied uniformly and many deemed vulnerable are exempted.

Starting in President Joe Biden's first year in office until last week, CBP arranged exemptions through advocates, churches, attorneys and migrant shelters, without publicly identifying them or saying how many slots were available. The arrangement prompted allegations of favoritism and corruption. In December, CBP severed ties with one group that was charging Russians.

For CBPOne to work, enough people must get appointments to discourage crossing the border illegally, said Leon Fresco, an immigration attorney and former aide to Senate Majority Leader Chuck Schumer, a Democrat.

"If these appointments start dragging out to two or three or four months, it's going to be much harder to keep it going," he said. "If people aren't getting through, they won't use the program."

CBP, which schedules appointments up to two weeks out, declines to say how many people are getting in. But Enrique Lucero, director of migrant affairs for the city of Tijuana, said U.S.

authorities are accepting 200 daily in San Diego, the largest border crossing. That's about the same as the previous system but well below the number of Ukrainians processed after Russia's invasion last year.

Josue Miranda, 30, has been staying at Embajadores de Jesus for five months and prefers the old system of working through advocacy groups. The shelter compiled an internal waiting list that moved slowly but allowed him to know where he stood. Banda, the shelter director, said 100 were getting selected every week.

Miranda packed his suitcases for him, his wife and their three children, believing his turn was imminent until the new online portal was introduced. Now, the Salvadoran migrant has no idea when, or if, his chance will come. Still, he plans to keep trying through CBPOne.

"The problem is that the system is saturated and it's chaos," he said after another morning of failed attempts.

CLP_PC_034912

Fiscal Year 2020 Refugees and Asylees
Annual Flow Report

March 8, 2022

OFFICE OF IMMIGRATION STATISTICS

Ryan Baugh



CLP_PC_039827

The United States provides protection to certain persons who have been persecuted or have a well-founded fear of persecution through two programs: a refugee program for persons outside the United States and their eligible relatives, and an asylum program for persons physically present or arriving in the United States and their eligible relatives.[1] The *2020 Refugee and Asylees Annual Flow Report*, authored by the Office of Immigration Statistics (OIS) in the Department of Homeland Security (DHS), presents information on persons admitted to the United States as refugees, those who applied for asylum in the United States, and those granted asylum in the United States in Fiscal Year (FY) 2020.[2,3]

## Summary

A total of 11,840 persons were admitted to the United States as refugees during 2020, including 5,142 as principal refugees and 6,698 as derivative refugees.[4] The leading countries of nationality for refugees admitted during this period were the Democratic Republic of the Congo (Congo), Burma, and Ukraine. The United States provided protection to an additional 31,429 individuals who were granted affirmative or defensive asylum during 2020,[5] including 16,864 individuals who were granted asylum affirmatively by DHS,[6] and 14,565 individuals who were granted asylum defensively by the U.S. Department of Justice (DOJ). An additional 1,530 individuals received derivative asylum or refugee status while residing in the United States based on a relative's refugee or asylum grant,[7] and 2,528 individuals who approved for derivative asylum abroad and were issued travel documents that allow their travel to the United States.[8] The leading countries of nationality for persons granted either affirmative or defensive asylum were the People's Republic of China (China), Venezuela, and El Salvador.

---

[1] Additionally, U.S. law bars removing individuals to a country where their "life or freedom would be threatened ... because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." INA § 241(b)(3)(A); 8 U.S.C. 1231(b)(3)(A). This is known as statutory withholding of removal. See 8 CFR § 208.16(a)-(b). Pursuant to the Convention Against Torture, the United States is obligated to provide protection to individuals where there are substantial grounds to believe they would be in danger of being subjected to torture. Individuals may seek withholding or deferral of removal under the regulations implementing the Convention Against Torture. See 8 CFR §§ 208.13(c)(1), 208.16, 208.17.

[2] In this report, a year refers to a fiscal year (October 1 to September 30).

[3] The *2020 Yearbook of Immigration Statistics* and other OIS reports contain additional context. Not all numbers reported are contained in this report's tables.

[4] Refugee data in this report may differ slightly from numbers reported by the Department of State (DOS). DOS refugee numbers include Amerasians (children born in Cambodia, Korea, Laos, Thailand, or Vietnam after December 31, 1950, and before October 22, 1982, and fathered by a U.S. citizen), whereas DHS reports Amerasians as lawful permanent residents.

[5] These asylum grants were based upon a principal asylum applicant's application, which may also include an accompanying spouse and unmarried children under 21 years of age. They do not include individuals who were approved for follow-to-join asylum status while residing in the United States or abroad.

[6] Affirmative asylum data for fiscal year 2020 were retrieved by OIS in December 2020. Data in this report may differ slightly from fiscal year-end 2020 numbers retrieved and reported at different times by DHS's U.S. Citizenship and Immigration Services (USCIS) Asylum Division.

[7] Of these, 1,490 were based on a relative's asylum grant, and 40 were based on a relative's refugee grant.

[8] OIS does not currently collect data on how many of those issued travel documents reach the United States and actually receive asylum.

CLP_PC_039828

2020 Applications Processing and Admissions Disruptions

President Trump did not sign the Presidential Determination on Refugee Admissions until November 2019, so no refugees at all could be admitted in October 2019, the first month of the new Fiscal Year. Refugee admissions and asylum applications and grants in 2020 were also affected by the Covid-19 pandemic and policy changes related to attempts to limit its spread, including travel restrictions and temporary closures of U.S. Citizenship and Immigration Services (USCIS) offices to in-person services to the public. USCIS field and asylum offices were closed to the public from March 18 through June 3, 2020 and reopened to the public in phases starting June 4, 2020 during which time asylum offices instituted in-office video conferencing interviews. Thus, refugee admissions dropped 98 percent between February and April 2020 and remained at historic lows through July before rebounding to levels similar to those observed in 2019 in the last two months of the fiscal year; and affirmative asylum grants fell 63 percent between February and April 2020 and then remained near historic lows through the end of the fiscal year (Figure 1).

Figure 1.
Refugee Arrivals and Affirmative Asylum Grants by Month:
Fiscal Years 2018 to 2020



Source: OIS analysis of DOS and DOJ data.

DEFINING "REFUGEE" AND "ASYLUM" STATUS

To be eligible for refugee or asylum status, a principal applicant must meet the definition of a refugee set forth in section 101(a)(42) of the Immigration and Nationality Act (INA), which states in part that a refugee is a person who is unable or unwilling to return to his or her country of nationality because of persecution or a well-founded fear of persecution on account of race,

CLP_PC_039829

religion, nationality, membership in a particular social group, or political opinion.[9] Applicants for refugee status are outside the United States, whereas applicants seeking asylum are either within the United States or arriving at a U.S. port of entry (POE).

The INA also generally requires that a person must be outside their country of nationality or country of last habitual residence to qualify as a refugee unless the person has no nationality or is considered "stateless"; but it grants the President authority to designate countries for "in-country processing," allowing people to be processed for refugee status within their own countries. On November 1, 2019, President Trump re-designated eligible persons in Cuba, Eurasia, the Baltics, Iraq, Honduras, Guatemala, and El Salvador for in-country processing. In-country processing is also authorized for extraordinary individual protection cases for which resettlement consideration is requested by a U.S. Ambassador in any location.

## REFUGEES

### History of U.S. Refugee Resettlement

The United States has a long history of refugee resettlement. The Displaced Persons Act of 1948 was passed to address the migration crisis in Europe resulting from World War II, wherein millions of people had been forcibly displaced from their home countries and could not return. By 1952, the United States had admitted over 400,000 displaced people under the Act. The United States extended its commitments to refugee resettlement through legislation including the Refugee Relief Act of 1953 and the Fair Share Refugee Act of 1960. The Attorney General has also exercised parole authority to bring large groups of persons into the country for humanitarian reasons, including over 38,000 Hungarian nationals beginning in 1956 and over a million people from the Indochinese Peninsula beginning in 1975.

Obligations of the United States under the 1967 United Nations Protocol relating to the Status of Refugees (to which the United States acceded in 1968) generally prohibit the United States from returning a refugee to a country where their life or freedom would be threatened on account of a protected ground. The Refugee Act of 1980 amended the INA to bring U.S. law into greater accord with U.S. obligations under the Protocol, which broadened the scope of the 1951 United Nations Convention Relating to the Status of Refugees beyond protection just for refugees arising from events occurring in Europe before January 1, 1951. The Act also established formal refugee and asylum programs.

### Refugee Admissions Ceiling

Under the INA, the President establishes an overall refugee admissions ceiling and has typically set regional allocations before the beginning of each fiscal year following "appropriate

---

[9] Congress expanded this definition in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, providing that persons who have been forced to abort a pregnancy or undergo involuntary sterilization or who have been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program shall be deemed to have been persecuted on account of political opinion.

4

consultation" with Congress.[10] In 2020, the refugee ceiling was set at 18,000—its lowest level since the inception of the program in 1980. Additionally, the President did not sign the Presidential Determination on Refugee Admissions until November 2019, so no refugees could be admitted in the first month of the new Fiscal Year.

Refugee admissions ceilings in 2020 were based on six admission categories rather than world geographic regional allotments as in previous years (Table 1). Admissions were available to those persecuted or with a well-founded fear of persecution on account of religion; certain religious minorities in the former Soviet Union and Iran; certain Iraqis associated with the United States; nationals or residents of El Salvador, Guatemala, or Honduras; those referred by a U.S. embassy; those seeking reunification with family members in the United States admitted as refugees or granted asylum status; and those located in Australia, Nauru, or Papua New Guinea granted admission pursuant to an arrangement between the United States and Australia.

Table 1.
Proposed and Actual Refugee Admissions by Regions: Fiscal Years 2018 to 2020

| Region | 2018 | | 2019 | | 2020 | |
|---|---|---|---|---|---|---|
| | Ceiling | Admissions | Ceiling | Admissions | Ceiling | Admissions |
| Total | 45,000 | 22,405 | 30,000 | 29,916 | 18,000 | 11,840 |
| Africa | 19,000 | 10,459 | 11,000 | 16,366 | X | 4,171 |
| East Asia | 5,000 | 3,582 | 4,000 | 4,946 | X | 2,131 |
| Europe/Central Asia | 2,000 | 3,612 | 3,000 | 4,994 | X | 2,578 |
| Latin America/Caribbean | 1,500 | 955 | 3,000 | 809 | X | 948 |
| Near East/South Asia | 17,500 | 3,797 | 9,000 | 2,801 | X | 2,012 |
| Unallocated Reserve | - | - | - | - | X | - |

- Represents zero.
X Not applicable.
Notes: Ceiling and admission numbers reflect revisions made each fiscal year.  FY 2018 and 2019 data in this table are based on the nationality of the principal applicant. In FY 2020, Refugee Admissions ceilings were based on Admission Category and not by Region/Country of Chargeability. Based on the terms of a settlement in Doe et al. v. Trump et al., No. 17-0178 (W.D. Wash), certain refugee applicants that arrive in FY 2020 and any future fiscal years are counted toward the FY 2018 refugee admissions ceiling. In 2020, the number of such applicants was 26.
Source: OIS analysis of DOS data.

## Refugee Eligibility Requirements

To qualify for refugee status, a principal applicant must: (1) be of special humanitarian concern to the United States; (2) meet the refugee definition as set forth in section 101(a)(42) of the INA; (3) be admissible under the INA (or be granted a waiver of inadmissibility); (4) not be firmly resettled in any foreign country; and (5) merit a favorable exercise of discretion. Derivative refugees need not meet all these eligibility requirements, but they must be admissible to the United States and demonstrate a relationship as the spouse or child of a principal refugee

---

[10] In many cases, an unallocated reserve is also designated which can be used in any region if the need arises and only after notification to Congress.

5

applicant or an admitted refugee. Any person who has ordered, incited, assisted, or otherwise participated in the persecution of another on account of race, religion, nationality, membership in a particular social group, or political opinion is ineligible for refugee status, including as a derivative refugee.

## Refugee Application Process

The U.S. Refugee Admissions Program (USRAP) establishes processing priorities that identify individuals and groups who are of special humanitarian concern to the United States and who are eligible for refugee resettlement consideration. The priority categories are (P-1)—individuals referred by the United Nations High Commission on Refugees (UNHCR), a U.S. Embassy, or certain non-governmental organizations (NGOs); (P-2)—groups of special humanitarian concern; and (P-3)—family reunification cases. In 2020, unusually, the United States only accepted referrals from UNHCR in the categories listed above. Once principal refugee applicants are referred or granted access to USRAP under any of these priorities, they still must meet all other eligibility criteria, including meriting a favorable exercise of discretion. Upon referral, a Resettlement Support Center, working under a cooperative agreement with Department of State (DOS), conducts pre-screening interviews with the applicants. A USCIS officer then interviews applicants and accompanying derivatives to determine eligibility for resettlement in the United States. Multiple security checks must be completed before an application for refugee classification is approved. Additionally, applicants must also undergo a medical exam.

Individuals who are approved for refugee classification are assigned to a resettlement agency (sponsor) that assists with housing, employment, and other services upon arrival. The International Organization for Migration (IOM) arranges the refugee's travel to the United States. After arrival, refugees are authorized to work and may request documentation to travel outside the United States.

The spouse and unmarried children under the age of 21 of a principal refugee may obtain refugee status as an accompanying or follow-to-join derivative.[11] Accompanying derivatives may enter the United States with the principal refugee or within 4 months after the principal refugee's admission.[12] A spouse or child who joins the principal refugee more than 4 months after admission to the United States is a follow-to-join derivative. Principal refugees may petition for follow-to-join benefits for their qualifying derivatives within 2 years of the refugee's admission to the United States; the principal and the derivative refugee relative's relationship must have existed at the time of the principal's admission into the United States, at the time of filing for accompanying or follow-to-join benefits, and at the time of the relative's subsequent admission.

---

[11] Children may include those age 21 or over who are covered by provisions in the Child Status Protection Act, Pub. L. No. 107-208 (Aug. 6, 2002). A derivative child must be unmarried prior to the refugee's admission to the United States, when the Form I-730 Refugee/Asylee Relative Petition is filed, and at the time of the child's subsequent admission.
[12] In practice, most accompanying derivative refugees enter the United States with the principal refugee.

6

Principal refugees must file Form I-730, *Refugee/Asylee Relative Petition*,[13] for each qualifying follow-to-join derivative family member, who may be located abroad or in the United States. These beneficiaries are not required to demonstrate an independent refugee claim. Once a principal's I-730 has been approved for an individual located abroad, there are no time constraints placed upon that derivative relative's travel to the United States, provided that (1) the principal's status has not been revoked; (2) the relationship of the derivative to the principal is unchanged; and (3) in the case of a child, the child is unmarried at the time of admission.

## DATA

All refugee data presented in this report are from the Worldwide Refugee Admissions Processing System (WRAPS) of the Bureau of Population, Refugees, and Migration of DOS.

## TRENDS AND CHARACTERISTICS OF REFUGEES

Since the inception of the program in 1980, the United States has accepted more than 3.7 million refugees and asylees. In 2020, the United States admitted 11,840 refugees, a 60 percent decrease from the 29,916 refugees admitted in the previous year. At a high level, the trend in refugee admissions has gone through three periods since reaching its peak under the current legal framework at 122,066 in 1990 (Figure 2). Admissions generally declined during the 1990s, as the refugee program's focus shifted to more diverse populations across the world. Admissions reached a low point in 2002, due in part to security procedures and changes to admission requirements after September 11, 2001. Refugee admissions reached a post-2001 peak of 84,989 in 2016 under the Obama administration, the highest number in 17 years. More recently, the Trump administration reduced the refugee ceiling during each of its four years and implemented new refugee vetting and screening procedures, contributing to a decrease in admission since 2017.

---

[13] The petition is used to file for relatives of refugees and asylees. The USRAP program handles only *refugee* follow-to-join petitions, which are counted within the annual refugee ceiling. Asylum follow-to-join petitions are processed by USCIS and are not counted in the annual admission ceilings.

7

Figure 2.
Refugee Admissions and Proposed Ceilings to the United States:
Fiscal Years 1990 to 2020



Source: OIS analysis of DOS data.

### Category of Admission

In 2020, most refugees were admitted under P-1 processing (47 percent)—individuals referred by the UNHCR, a U.S. Embassy, or certain NGOs—and P-2 processing (49 percent)—groups of special humanitarian concern (Table 2). P-3 processing (family reunification cases) constituted 0.7 percent of refugees admitted and follow-to-join refugee beneficiaries made up 2.7 percent of refugees admitted. Principal refugees accounted for 5,142 (43 percent) of the 11,840 refugees admitted to the United States in 2020, while accompanying spouses and dependent children represented 12 and 44 percent, respectively.[14]

---

[14] Numbers in the Principal Applicant category previously included siblings, parents, and other dependents, who are now reported as Dependents. In addition, a small number of follow-to-join children are listed as principal applicants rather than children in WRAPS, and are therefore counted as principal applicants in OIS data.

8

Table 2.
Refugee Arrivals by Relationship to Principal Applicant and Case Priority:
Fiscal Years 2018 to 2020

| Category of admission and case priority | 2018 | | 2019 | | 2020 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| **RELATIONSHIP TO PRINCIPAL APPLICANT** | | | | | | |
| Total | 22,405 | 100.0 | 29,916 | 100.0 | 11,840 | 100.0 |
| Principal Applicant | 8,863 | 39.6 | 12,291 | 41.1 | 5,142 | 43.4 |
| Dependents | 13,542 | 60.4 | 17,625 | 58.9 | 6,698 | 56.6 |
| Spouse | 2,842 | 12.7 | 3,262 | 10.9 | 1,455 | 12.3 |
| Child | 10,563 | 47.1 | 14,211 | 47.5 | 5,186 | 43.8 |
| Siblings, parents, and other | 137 | 0.6 | 152 | 0.5 | 57 | 0.5 |
| **CASE PRIORITY** | | | | | | |
| Total | 22,405 | 100.0 | 29,916 | 100.0 | 11,840 | 100.0 |
| Priority 1 | 12,001 | 53.6 | 16,744 | 56.0 | 5,613 | 47.4 |
| Priority 2 | 9,592 | 42.8 | 12,393 | 41.4 | 5,820 | 49.2 |
| Priority 3 | 95 | 0.4 | 224 | 0.7 | 83 | 0.7 |
| Follow-to-join beneficiaries | 717 | 3.2 | 555 | 1.9 | 324 | 2.7 |

Note: Numbers in the Principal Applicant category previously included siblings, parents, and other dependents, who are now reported as Dependents.
Source: OIS analysis of DOS data.

## Country of Nationality

In 2020, the leading countries of nationality for individuals admitted as refugees were Congo (24 percent), Burma (18 percent), Ukraine (16 percent), Afghanistan (5.1 percent), and Iraq (4.6 percent) (Table 3). These countries made up 68 percent of total refugee admissions in 2020, similar to their share in 2018 but down from 80 percent in 2019.

Since the inception of the refugee program, the nationalities of refugees admitted to the United States have changed as U.S. policies evolved and new conflicts around the world arose. Over the last ten years, the United States has admitted just over half a million refugees from around the world. Twenty-one percent have been from Burma, 17 percent from Iraq, 13 percent from the Congo, and 12 percent from Bhutan (Figure 3).

9

Table 3.
Refugee Arrivals by Country of Nationality: Fiscal Years 2018 to 2020
(Ranked by 2020 country of nationality)

| Country of nationality | 2018 | | 2019 | | 2020 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total | 22,405 | 100.0 | 29,916 | 100.0 | 11,840 | 100.0 |
| Congo, Democratic Republic | 7,841 | 35.0 | 12,875 | 43.0 | 2,863 | 24.2 |
| Burma | 3,525 | 15.7 | 4,928 | 16.5 | 2,112 | 17.8 |
| Ukraine | 2,637 | 11.8 | 4,432 | 14.8 | 1,935 | 16.3 |
| Afghanistan | 802 | 3.6 | 1,197 | 4.0 | 603 | 5.1 |
| Iraq | 140 | 0.6 | 462 | 1.5 | 541 | 4.6 |
| Syria | 62 | 0.3 | 560 | 1.9 | 486 | 4.1 |
| Eritrea | 1,260 | 5.6 | 1,750 | 5.8 | 475 | 4.0 |
| El Salvador | 724 | 3.2 | 311 | 1.0 | 362 | 3.1 |
| Moldova | 197 | 0.9 | 116 | 0.4 | 352 | 3.0 |
| Sudan | 74 | 0.3 | 376 | 1.3 | 258 | 2.2 |
| All other countries, including unknown | 5,143 | 23.0 | 2,909 | 9.7 | 1,853 | 15.7 |

Source: OIS analysis of DOS data.

Figure 3.
Refugee Arrivals by Top Country of Nationality: Fiscal Years 2011 to 2020



Source: OIS analysis of DOS data.

Age, Sex, and Marital Status

Three-quarters of refugees admitted to the United States in 2020 were under 35 years of age, and two out of five were children under 18 years old (Table 4). Refugees tend to be relatively younger than the native-born population, with a median age of 23 years for those arriving in

CLP_PC_039836

2020, compared to a median age of 36 years for the native-born population.[15] Refugee median age varies widely by region and country of birth: refugees from Africa had the lowest median age of 20 years, while those from the Near East/South Asia and Europe had the highest median age of 26. Slightly more male than female refugees were admitted in 2020, and 50 percent of adults were married at arrival, compared to 47 percent in 2019.

Table 4.
Refugee Arrivals by Age, Sex, and Marital Status: Fiscal Years 2018 to 2020

| Characteristic | 2018 | | 2019 | | 2020 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| **AGE** | | | | | | |
| Total | 22,405 | 100.0 | 29,916 | 100.0 | 11,840 | 100.0 |
| 0 to 17 years | 9,901 | 44.2 | 13,107 | 43.8 | 4,808 | 40.6 |
| 18 to 24 years | 3,418 | 15.3 | 4,286 | 14.3 | 1,584 | 13.4 |
| 25 to 34 years | 3,816 | 17.0 | 5,795 | 19.4 | 2,504 | 21.1 |
| 35 to 44 years | 2,447 | 10.9 | 3,212 | 10.7 | 1,426 | 12.0 |
| 45 to 54 years | 1,480 | 6.6 | 1,669 | 5.6 | 756 | 6.4 |
| 55 to 64 years | 767 | 3.4 | 1,139 | 3.8 | 484 | 4.1 |
| 65 years and over | 576 | 2.6 | 708 | 2.4 | 278 | 2.3 |
| **SEX** | | | | | | |
| Total | 22,405 | 100.0 | 29,916 | 100.0 | 11,840 | 100.0 |
| Female | 11,099 | 49.5 | 14,651 | 49.0 | 5,700 | 48.1 |
| Male | 11,306 | 50.5 | 15,265 | 51.0 | 6,140 | 51.9 |
| **MARITAL STATUS** | | | | | | |
| Total | 22,405 | 100.0 | 29,916 | 100.0 | 11,840 | 100.0 |
| Married | 6,891 | 30.8 | 7,770 | 26.0 | 3,493 | 29.5 |
| Single[1] | 14,405 | 64.3 | 20,828 | 69.6 | 7,873 | 66.5 |
| Other[2] | 1,109 | 4.9 | 1,318 | 4.4 | 474 | 4.0 |

[1] Includes persons who were engaged and not yet married.
[2] Includes persons who were divorced, separated, widowed, or of unknown marital status.
Source: OIS analysis of DOS data.

## State of Initial Resettlement

In 2020, more than half of admitted refugees (56 percent) were resettled in the top ten resettling states (Table 5). California, Washington, and Texas resettled the most refugees (10, 9.4, and 7.6 percent of admitted refugees, respectively), and Washington, Idaho, and Kentucky resettled the most refugees per capita, each resettling between 10 and 15 refugees per 100,000 population (Figure 4). Majorities of refugees resettling in Kentucky and Idaho were from Congo (68 and 52 percent, respectively), while the majority of those settling in Washington were from Ukraine (64 percent).

---

[15] Calculated from the 2020 March Current Population Survey as downloaded from *IPUMS-CPS, University of Minnesota, www.ipums.org.*

CLP_PC_039837

Table 5.
Refugee Arrivals by State of Residence: Fiscal Years 2018 to 2020
(Ranked by 2020 state of residence)

| State of residence | 2018 | | 2019 | | 2020 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total | 22,405 | 100.0 | 29,916 | 100.0 | 11,840 | 100.0 |
| California | 1,362 | 6.1 | 1,841 | 6.2 | 1,192 | 10.1 |
| Washington | 1,537 | 6.9 | 1,945 | 6.5 | 1,116 | 9.4 |
| Texas | 1,669 | 7.4 | 2,433 | 8.1 | 905 | 7.6 |
| New York | 1,281 | 5.7 | 1,845 | 6.2 | 626 | 5.3 |
| Michigan | 651 | 2.9 | 1,146 | 3.8 | 493 | 4.2 |
| Kentucky | 896 | 4.0 | 1,421 | 4.7 | 476 | 4.0 |
| North Carolina | 934 | 4.2 | 1,255 | 4.2 | 469 | 4.0 |
| Pennsylvania | 906 | 4.0 | 1,088 | 3.6 | 448 | 3.8 |
| Arizona | 998 | 4.5 | 1,216 | 4.1 | 444 | 3.8 |
| Ohio | 1,408 | 6.3 | 1,426 | 4.8 | 427 | 3.6 |
| Other | 10,763 | 48.0 | 14,300 | 47.8 | 5,244 | 44.3 |

Source: OIS analysis of DOS data.

Figure 4.
Per Capita Refugee Resettlement by State of Residence: Fiscal Year 2020



Source: OIS analysis of DOS and Census Bureau data.

Lawful Permanent Residence and Naturalization of Refugees

CLP_PC_039838

One year after being admitted to the United States, refugees are statutorily required to apply for lawful permanent resident (LPR) status. Of those arriving as refugees between 2000 and 2018, 97 percent gained LPR status by the end of 2020.[16] Refugees granted LPR status may apply for naturalization 5 years after their admission as refugees. Refugees have some of the highest naturalization rates of all immigrants: of the approximately 640,000 adults who obtained LPR status from 2000 to 2014 based on prior admission as a refugee, 49 percent naturalized within 5 years and 58 percent did so within 6 years.[17, 18]

ASYLEES

Filing of Claims

Generally, any foreign national physically present in the United States or arriving at a POE may seek asylum regardless of immigration status. Those seeking asylum must apply within 1 year from the date of last arrival or establish that an exception applies based on changed or extraordinary circumstances.[19] Principal applicants obtain asylum in one of two ways: affirmatively through a USCIS asylum officer or defensively in removal proceedings before an immigration judge of DOJ's Executive Office for Immigration Review (EOIR). An individual applies for asylum by filing Form I-589, *Application for Asylum and for Withholding of Removal*.

Spouses and unmarried children under the age of 21 who are not included in the principal's grant of asylum may obtain derivative asylum status.[20] A principal asylee may petition for follow-to-join benefits for qualifying derivatives within 2 years after they were granted asylum, as long as the relationship between the principal and their spouse and/or child existed on the date the principal was granted asylum. In practice, the vast majority of derivative asylum status beneficiaries receive follow-to-join benefits.

The principal asylee must file an I-730 for each qualifying family member, who may be located abroad or in the United States. Once an I-730 is approved for an individual located abroad, there are no time constraints placed upon the derivative relative's travel to the United States, as long as (1) the principal's status has not been revoked; (2) the relationship of the derivative to the

---

[16] Although the majority of refugees apply for LPR status 1 year after admission, due to operational and other factors, processing time can vary widely for those who apply.

[17] In comparison, the 11.6 million non-refugee adult immigrants who obtained LPR status from 2000 to 2014 had 5- and 6-year naturalization rates of 12 and 28 percent, respectively. The data were restricted to immigrants who were 18 years of age and older when LPR status was obtained. More recent cohorts, with less time spent in LPR status, tend to have lower cumulative naturalization rates.

[18] For more discussion of refugee naturalization see Mossaad N., Ferwerda J., Lawrence D., Weinstein J. M., Hainmueller J., Determinants of refugee naturalization in the United States. Proceedings of the National Academy of Sciences U.S.A. 115, 9175–9180 (2018).

[19] Unaccompanied noncitizen children are not subject to the 1-year fling requirement. INA § 208(a) (2)(E); 8 U.S.C. 1158(a)(2)(E).

[20] See reference to Child Status Protection Act, n. 9, *supra*.

13

principal is unchanged; and (3) in the case of a child, the child is unmarried at the time of admission.

CLP_PC_039840

## Adjudication of Claims

The USCIS Asylum Division adjudicates claims and may grant asylum directly through the affirmative asylum process. Asylum officers conduct interviews to determine asylum eligibility using an applicant's testimony, information on Form I-589, any accompanying evidence provided by the applicant, and material provided by DOS, other USCIS offices, or other credible sources. The asylum applicant must meet the definition of a refugee, be credible considering the totality of the circumstances and all relevant factors, and not be barred from obtaining asylum. If the officer finds that the applicant satisfies the eligibility requirements, then the officer determines whether the application warrants a grant of asylum as a matter of discretion. Individuals may be barred for previously committing certain crimes, posing a national security threat, engaging in the persecution of others, or firmly resettling in another country before coming to the United States.

If applicants with a valid immigration status (e.g., a foreign student) fail to establish eligibility for asylum, USCIS denies the application, and the applicant remains in his or her valid status. If applicants are not in a valid status and are found ineligible for asylum, USCIS places these applicants in removal proceedings before an EOIR immigration judge, where the application is considered anew.[21]

Individuals who have not previously filed for asylum may apply defensively after being placed in removal proceedings by immigration enforcement officials because they are unlawfully present, are in violation of their status, or were apprehended while attempting to enter the United States. Defensive applicants apply for asylum directly with EOIR. During the proceedings, an immigration judge may grant asylum or deny the asylum application and issue a removal order if the noncitizen does not qualify for any other forms of relief. Defensive and affirmative applicants may appeal an EOIR denial to the Board of Immigration Appeals and, if unsuccessful there, may seek further review by a U.S. Court of Appeals, and finally the U.S. Supreme Court.

Follow-to-join asylum beneficiaries are not required to demonstrate a persecution claim because their status is derived from the principal asylee. Beneficiaries in the United States at the time of application are granted derivative asylum immediately upon the approval of their I-730 petitions. Beneficiaries abroad at the time of application are granted derivative asylum when admitted into the United States at a POE.

## Lawful Permanent Residence and Citizenship

One year after being granted asylum, asylees are eligible to apply for LPR status, as are their qualifying family members who meet the eligibility criteria. If LPR status is approved, the

---

[21] OIS tallies all asylum grants from an immigration judge as defensive grants, regardless of whether they first applied affirmatively.

CLP_PC_039841

asylee's "resident since" date is rolled back to one year prior to the LPR approval date. Asylees who have become LPRs may apply for naturalization 5 years after their "residence since" date.[22]

## DATA

The affirmative asylee data presented in this report were obtained from Global, a cloud-based platform of USCIS that has replaced the Refugees, Asylum, and Parole System (RAPS) mainframe system for storing affirmative asylee data.[23]

Defensive asylee data were obtained from EOIR. Follow-to-join asylum derivative data for people residing outside the United States at the time of their admission were obtained from the Case and Activity Management for International Operations (CAMINO) system of USCIS and the Consular Consolidated Database (CCD) of DOS. These data reflect travel documents issued, not admissions. Follow-to-join data for people residing within the United States at the time of the approval of their I-730 petition were obtained from the USCIS Computer-Linked Application Information Management System (CLAIMS).

## TRENDS AND CHARACTERISTICS OF ASYLEES

### Asylum Filings

Affirmative asylum filings with USCIS decreased by 4.1 percent from 97,192 applications in 2019 to 93,224 in 2020.[24] Venezuelan applications made up 24 percent of total applications in 2020, despite dropping 10 percent from 2019, and Chinese applications made up 10 percent of total applications in 2020. The next-highest numbers of affirmative applications in 2020 came from Guatemalan (9.0 percent), Honduran (6.4 percent), and El Salvadoran (5.8 percent) nationals (Table 6a). Unaccompanied children from Central America's Northern Triangle countries (El Salvador, Guatemala, and Honduras) accounted for 91 percent of all unaccompanied child asylum applications in 2020 and made up the 37 percent of affirmative asylum applications from these three countries.[25]

The total number of defensive asylum applications filed with EOIR decreased for the first time in several years, dropping 11 percent from a peak of 213,307 in 2019 to 189,838 in 2020.[26] Similar to the last couple of years, the largest numbers of applications lodged with the courts were from

---

[22] In other words, asylees may count a maximum of 1 year of their time in asylum status toward the required 5 years of permanent residence for naturalization eligibility purposes.

[23] The migration from RAPS to Global caused slight changes in historical numbers.

[24] These include principal applicants only. There were an additional 48,523 dependents.

[25] Unaccompanied children, unlike other populations, can apply affirmatively before a USCIS asylum officer after being placed into removal proceedings. See INA § 208(b)(3)(C); 8 U.S.C. 1158(b)(3)(C)..

[26] EOIR has recently changed its methodology in reporting affirmative asylum cases referred from USCIS. Instead of using the court application date as they do for defensive asylum cases, EOIR now reports on affirmative cases based on the date of the initial asylum application filing with USCIS. This change may result in a slight difference in historical numbers, and OIS has updated the data reported here and in the Yearbook of Immigration Statistics for 2015 – 2020.

16

citizens of the Northern Triangle countries (99,112) and Mexico (20,713) (Table 6b). These four countries made up 63 percent of defensive asylum applications filed with EOIR.

Table 6a.
Affirmative Asylum Cases Filed (USCIS) by Country of Nationality:
Fiscal Years 2018 to 2020
(Ranked by 2020 country of nationality)

| Country | 2018 | | 2019 | | 2020 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total | 106,193 | 100.0 | 97,192 | 100.0 | 93,224 | 100.0 |
| Venezuela | 28,429 | 26.8 | 25,224 | 26.0 | 22,586 | 24.2 |
| China, People's Republic | 8,196 | 7.7 | 9,663 | 9.9 | 9,656 | 10.4 |
| Guatemala | 10,196 | 9.6 | 9,717 | 10.0 | 8,361 | 9.0 |
| Honduras | 6,143 | 5.8 | 5,622 | 5.8 | 6,008 | 6.4 |
| El Salvador | 9,145 | 8.6 | 5,970 | 6.1 | 5,404 | 5.8 |
| Haiti | 2,959 | 2.8 | 3,281 | 3.4 | 5,008 | 5.4 |
| Mexico | 6,620 | 6.2 | 4,600 | 4.7 | 4,005 | 4.3 |
| Colombia | 2,574 | 2.4 | 2,897 | 3.0 | 3,676 | 3.9 |
| India | 2,912 | 2.7 | 2,965 | 3.1 | 3,117 | 3.3 |
| Nigeria | 3,323 | 3.1 | 2,769 | 2.8 | 2,302 | 2.5 |
| All Other Nations | 25,696 | 24.2 | 24,484 | 25.2 | 23,101 | 24.8 |

Source: OIS analysis of DHS data.

Table 6b.
Defensive Asylum Cases Received (EOIR) by Country of Nationality:
Fiscal Years 2018 to 2020
(Ranked by 2020 country of nationality)

| Country | 2018 | | 2019 | | 2020 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| TOTAL | 164,062 | 100.0 | 213,307 | 100.0 | 189,838 | 100.0 |
| Guatemala | 27,139 | 16.5 | 42,035 | 19.7 | 40,508 | 21.3 |
| Honduras | 22,168 | 13.5 | 32,198 | 15.1 | 33,398 | 17.6 |
| El Salvador | 32,426 | 19.8 | 30,229 | 14.2 | 25,206 | 13.3 |
| Mexico | 24,826 | 15.1 | 30,598 | 14.3 | 20,713 | 10.9 |
| Cuba | 1,160 | 0.7 | 5,523 | 2.6 | 11,427 | 6.0 |
| Venezuela | 5,279 | 3.2 | 11,695 | 5.5 | 11,213 | 5.9 |
| India | 7,856 | 4.8 | 11,091 | 5.2 | 5,449 | 2.9 |
| China, People's Republic | 8,103 | 4.9 | 6,904 | 3.2 | 4,683 | 2.5 |
| Ecuador | 4,051 | 2.5 | 4,477 | 2.1 | 4,319 | 2.3 |
| Nicaragua | 735 | 0.4 | 3,908 | 1.8 | 4,178 | 2.2 |
| unknown | 30,319 | 18.5 | 34,649 | 16.2 | 28,744 | 15.1 |

Note: Case receipts include affirmative claims that arrive at EOIR after being placed in proceedings.
Source: Source: OIS analysis of DOJ data.

## Asylum Grants

CLP_PC_039843

The total number of persons granted asylum in the United States decreased 32 percent from 46,130 in 2019 to 31,429 in 2020. USCIS granted asylum affirmatively to 16,864 people in 2020, a decrease of 38 percent from 2019; and EOIR immigration judges granted defensive asylum to 14,565 people in 2020, a decrease of 23 percent from 2019 but an increase of 10 percent from 2018 (Figure 5).

Figure 5.
Annual Grants of Affirmative and Defensive Asylum: 1990 to 2020



Note: Data exclude follow-to-join asylees.
Source: OIS analysis of DHS and DOJ data.

## Country of Nationality

The three leading countries of nationality of persons granted affirmative or defensive asylum in 2018, 2019, and 2020 were China (15 percent in 2020), Venezuela (13 percent), and El Salvador (6.4 percent) (Table 7). Nationals of these three countries accounted for 35 percent of all persons granted asylum, down from 38 percent in 2019 and 41 percent in 2018. Of the top ten countries of nationality, only Cuba increased between 2019 and 2020, rising 72 percent, while India experienced the greatest proportional decrease (41 percent), followed by El Salvador and Venezuela (37 percent each). Among the top ten countries of nationality, asylum grants for nationals of Central America's Northern Triangle countries (El Salvador, Guatemala, and Honduras) and India have increasingly come from defensive cases rather than affirmative cases in the last few years, while Venezuelan asylum grants have remained mostly affirmative, and grants to Chinese nationals have remained fairly evenly split between defensive and affirmative.

The leading countries of nationality for persons granted affirmative asylum were Venezuela (20 percent), China (17 percent), Turkey (9.3 percent), and Egypt (7.9 percent) (Table 8). Fifty-four percent of those granted asylum affirmatively in 2020 were nationals of these countries.

CLP_PC_039844

The leading countries of nationality for persons granted defensive asylum were China (13 percent), El Salvador (12 percent), Guatemala (10 percent), and Cuba (8.4 percent) (Table 9). Forty-three percent of those granted asylum defensively in 2020 were nationals of these countries.

The leading countries of nationality for follow-to-join asylees authorized for travel to the United States in 2020 were India (14 percent), China (13 percent), Eritrea (11 percent), and Turkey (6.8 percent) (Table 10). Nationals of these four countries accounted for 44 percent of all follow-to-join derivative relatives issued travel documents allowing their travel to the United States. Additionally, 1,530 individuals were approved for derivative asylum or refugee status while residing in the United States based on a relative's refugee or asylum grant.[27]

Table 7.
Individuals Granted Asylum Affirmatively or Defensively by Country of Nationality: Fiscal Years 2018 to 2020
(Ranked by 2020 country of nationality)

| Country | 2018 | | 2019 | | 2020 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total | 37,511 | 100.0 | 46,130 | 100.0 | 31,429 | 100.0 |
| China, People's Republic | 6,798 | 18.1 | 7,448 | 16.1 | 4,804 | 15.3 |
| Venezuela | 5,824 | 15.5 | 6,701 | 14.5 | 4,239 | 13.5 |
| El Salvador | 2,914 | 7.8 | 3,195 | 6.9 | 2,012 | 6.4 |
| Guatemala | 2,319 | 6.2 | 2,585 | 5.6 | 1,876 | 6.0 |
| Turkey | 501 | 1.3 | 1,774 | 3.8 | 1,622 | 5.2 |
| Egypt | 1,565 | 4.2 | 2,271 | 4.9 | 1,444 | 4.6 |
| India | 1,302 | 3.5 | 2,256 | 4.9 | 1,337 | 4.3 |
| Honduras | 1,996 | 5.3 | 1,815 | 3.9 | 1,269 | 4.0 |
| Cuba | 163 | 0.4 | 721 | 1.6 | 1,242 | 4.0 |
| Mexico | 1,346 | 3.6 | 1,585 | 3.4 | 1,207 | 3.8 |
| All other countries, including unknown | 12,783 | 34.1 | 15,779 | 34.2 | 10,377 | 33.0 |

Note: Data exclude follow-to-join asylees.
Source: Source: OIS analysis of DHS and DOJ data.

[27] 1,490 derivative asylum grants were based on an asylee relative petition and 40 were based on a refugee family petition.

CLP_PC_039845

Table 8.

Individuals Granted Asylum Affirmatively by Country of Nationality: Fiscal Years 2018 to 2020
(Ranked by 2020 country of nationality)

| Country | 2018 | | 2019 | | 2020 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total | 24,317 | 100.0 | 27,226 | 100.0 | 16,864 | 100.0 |
| Venezuela | 5,701 | 23.4 | 6,200 | 22.8 | 3,349 | 19.9 |
| China, People's Republic | 3,750 | 15.4 | 3,989 | 14.7 | 2,855 | 16.9 |
| Turkey | 475 | 2.0 | 1,714 | 6.3 | 1,568 | 9.3 |
| Egypt | 1,401 | 5.8 | 2,125 | 7.8 | 1,336 | 7.9 |
| Russia | 756 | 3.1 | 1,097 | 4.0 | 741 | 4.4 |
| Mexico | 715 | 2.9 | 783 | 2.9 | 490 | 2.9 |
| Guatemala | 1,303 | 5.4 | 1,041 | 3.8 | 441 | 2.6 |
| Nigeria | 452 | 1.9 | 764 | 2.8 | 411 | 2.4 |
| El Salvador | 1,141 | 4.7 | 875 | 3.2 | 291 | 1.7 |
| Syria | 545 | 2.2 | 501 | 1.8 | 286 | 1.7 |
| All other countries, including unknown | 8,078 | 33.2 | 8,137 | 29.9 | 5,096 | 30.2 |

Note: Data exclude follow-to-join asylees.
Source: OIS analysis of DHS data.

Table 9.

Individuals Granted Asylum Defensively by Country of Nationality: Fiscal Years 2018 to 2020
(Ranked by 2020 country of nationality)

| Country | 2018 | | 2019 | | 2020 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total | 13,194 | 100.0 | 18,904 | 100.0 | 14,565 | 100.0 |
| China, People's Republic | 3,048 | 23.1 | 3,459 | 18.3 | 1,949 | 13.4 |
| El Salvador | 1,773 | 13.4 | 2,320 | 12.3 | 1,721 | 11.8 |
| Guatemala | 1,016 | 7.7 | 1,544 | 8.2 | 1,435 | 9.9 |
| Cuba | 161 | 1.2 | 711 | 3.8 | 1,226 | 8.4 |
| India | 951 | 7.2 | 1,927 | 10.2 | 1,179 | 8.1 |
| Honduras | 1,181 | 9.0 | 1,291 | 6.8 | 1,013 | 7.0 |
| Venezuela | 123 | 0.9 | 501 | 2.7 | 890 | 6.1 |
| Mexico | 631 | 4.8 | 802 | 4.2 | 717 | 4.9 |
| Cameroon | 312 | 2.4 | 659 | 3.5 | 591 | 4.1 |
| Nicaragua | 35 | 0.3 | 357 | 1.9 | 364 | 2.5 |
| All other countries, including unknown | 3,963 | 30.0 | 5,333 | 28.2 | 3,480 | 23.9 |

Note: Data exclude follow-to-join asylees.
Source: OIS analysis of DOJ data.

20

CLP_PC_039846

Table 10.
Follow-to-join Asylee Travel Documents Issued by Country of Nationality:
Fiscal Years 2018 to 2020
(Ranked by 2020 country of nationality)

| Country | 2018 | | 2019 | | 2020 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total | 6,107 | 100.0 | 6,253 | 100.0 | 2,528 | 100.0 |
| India | 526 | 8.6 | 610 | 9.8 | 342 | 13.5 |
| China, People's Republic | 1,625 | 26.6 | 1,478 | 23.6 | 327 | 12.9 |
| Eritrea | 199 | 3.3 | 503 | 8.0 | 266 | 10.5 |
| Turkey | 15 | 0.2 | 126 | 2.0 | 171 | 6.8 |
| Guatemala | 371 | 6.1 | 334 | 5.3 | 127 | 5.0 |
| Egypt | 132 | 2.2 | 226 | 3.6 | 113 | 4.5 |
| Ethiopia | 287 | 4.7 | 190 | 3.0 | 98 | 3.9 |
| El Salvador | 335 | 5.5 | 169 | 2.7 | 84 | 3.3 |
| Nepal | 466 | 7.6 | 277 | 4.4 | 76 | 3.0 |
| Syria | 87 | 1.4 | 140 | 2.2 | 60 | 2.4 |
| All other countries, including unknown | 2,064 | 33.8 | 2,200 | 35.2 | 864 | 34.2 |

Source: OIS analysis of DHS and DOS data.

## Age, Sex, and Marital Status

In 2020, 61 percent of persons granted affirmative asylum were between the ages of 18 and 44 (Table 11). The median age of asylees has increased in recent years from a low of 24 years old in 2017 to 32 years in 2020, closer to the median age of the native-born population (36 years). Fifty-one percent were male, and 58 percent of adults were married. Just over half (52 percent) of follow-to-join beneficiaries were under the age of 18. The median age of follow-to-join beneficiaries was 17 years (Table 12). Data on marital status are not available for this group.

## State of Residence

In 2020, the leading states of residence for individuals granted asylum affirmatively were California (34 percent), New Jersey (9.5 percent), and Florida (9.3 percent) (Table 13). More than half (52 percent) of individuals granted affirmative asylum in 2020 resided in these three states. Per capita, the leading areas include New Jersey and California, with approximately 17 and 14 recipients per 100,000 residents, respectively.

State of residence data are not available for defensive or follow-to-join asylees.

CLP_PC_039847

Table 11.
Individuals Granted Asylum Affirmatively by Age, Sex, and Marital Status:
Fiscal Years 2018 to 2020

| Characteristic | 2018 | | 2019 | | 2020 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| **AGE** | | | | | | |
| Total | 24,317 | 100.0 | 27,226 | 100.0 | 16,864 | 100.0 |
| 0 to 17 years | 5,677 | 23.3 | 6,019 | 22.1 | 3,515 | 20.8 |
| 18 to 24 years | 3,883 | 16.0 | 3,768 | 13.8 | 1,982 | 11.8 |
| 25 to 34 years | 6,333 | 26.0 | 6,977 | 25.6 | 4,235 | 25.1 |
| 35 to 44 years | 5,172 | 21.3 | 6,284 | 23.1 | 4,102 | 24.3 |
| 45 to 54 years | 2,286 | 9.4 | 2,878 | 10.6 | 2,072 | 12.3 |
| 55 to 64 years | 700 | 2.9 | 1,001 | 3.7 | 733 | 4.3 |
| 65 and over | 266 | 1.1 | 299 | 1.1 | 225 | 1.3 |
| **Sex** | | | | | | |
| Total | 24,317 | 100.0 | 27,226* | 100.0 | 16,864 | 100.0 |
| Female | 11,925 | 49.0 | 13,340 | 49.0 | 8,241 | 48.9 |
| Male | 12,392 | 51.0 | 13,884 | 51.0 | 8,623 | 51.1 |
| **MARITAL STATUS** | | | | | | |
| Total | 24,317 | 100.0 | 27,226 | 100.0 | 16,864 | 100.0 |
| Married | 9,684 | 39.8 | 11,617 | 42.7 | 7,738 | 45.9 |
| Single | 13,541 | 55.7 | 14,232 | 52.3 | 8,218 | 48.7 |
| Other** | 1,092 | 4.5 | 1,377 | 5.1 | 908 | 5.4 |

- Represents zero or rounds to zero.
* Includes 2 persons of unknown sex.
** Includes persons who were divorced, separated, widowed, or of unknown marital status.
Note: Data exclude follow-to-join asylees.
Source: OIS analysis of DHS data.

CLP_PC_039848

Table 12.
Follow-to-join Asylee Travel Documents Issued by Age and Sex:
Fiscal Years 2018 to 2020

| Characteristic | 2018 | | 2019 | | 2020 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| **AGE** | | | | | | |
| Total | 6,107 | 100.0 | 6,253 | 100.0 | 2,528 | 100.0 |
| 0 to 17 years | 3,174 | 52.0 | 3,056 | 48.9 | 1,307 | 51.7 |
| 18 to 24 years | 1,135 | 18.6 | 1,199 | 19.2 | 448 | 17.7 |
| 25 to 34 years | 645 | 10.6 | 646 | 10.3 | 274 | 10.8 |
| 35 to 44 years | 610 | 10.0 | 677 | 10.8 | 288 | 11.4 |
| 45 to 54 years | 396 | 6.5 | 471 | 7.5 | 155 | 6.1 |
| 55 to 64 years | 132 | 2.2 | 172 | 2.8 | 43 | 1.7 |
| 65 and over | 15 | 0.2 | 32 | 0.5 | 13 | 0.5 |
| **SEX** | | | | | | |
| Total | 6,107 | 100.0 | 6,253 | 100.0 | 2,528 | 100.0 |
| Female | 3,364 | 55.1 | 3,311 | 53.0 | 1,363 | 53.9 |
| Male | 2,737 | 44.8 | 2,910 | 46.5 | 1,135 | 44.9 |
| Unknown | 6 | 0.1 | 32 | 0.5 | 30 | 1.2 |

Source: OIS analysis of DHS and DOS data.

Table 13.
Individuals Granted Asylum Affirmatively by State of Residence: Fiscal Years 2018 to 2020
(Ranked by 2020 state of residence)

| State of residence | 2018 | | 2019 | | 2020 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total | 24,317 | 100.0 | 27,226 | 100.0 | 16,864 | 100.0 |
| California | 8,092 | 33.3 | 9,205 | 33.8 | 5,656 | 33.5 |
| New Jersey | 1,340 | 5.5 | 2,544 | 9.3 | 1,609 | 9.5 |
| Florida | 3,069 | 12.6 | 2,469 | 9.1 | 1,563 | 9.3 |
| Texas | 1,583 | 6.5 | 1,798 | 6.6 | 916 | 5.4 |
| Illinois | 890 | 3.7 | 1,454 | 5.3 | 868 | 5.1 |
| New York | 2,021 | 8.3 | 2,125 | 7.8 | 841 | 5.0 |
| Pennsylvania | 567 | 2.3 | 773 | 2.8 | 451 | 2.7 |
| Ohio | 245 | 1.0 | 643 | 2.4 | 441 | 2.6 |
| Indiana | 287 | 1.2 | 650 | 2.4 | 418 | 2.5 |
| Washington | 394 | 1.6 | 484 | 1.8 | 334 | 2.0 |
| Other | 5,829 | 24.0 | 5,081 | 18.7 | 3,767 | 22.3 |

Note: Data exclude follow-to-join asylees.
Source: OIS analysis of DHS data.

## Naturalization of Asylees

Eighty-three percent of those granted affirmative asylum from 2009 to 2018 gained LPR status
by the end of 2020. Similar to refugees, asylees have some of the highest naturalization rates of

23

all immigrants. Of the almost 525,000 adults who obtained LPR status from 2000 to 2014 based on the prior grant of asylum (affirmative or defensive), 56 percent naturalized within 6 years.[28]

FOR MORE INFORMATION Visit the Office of Immigration Statistics web page at http://www.dhs.gov/immigration-statistics.

Breakout text box:

DHS and DOJ published an interim final rule on July 16, 2019 to add a new bar to eligibility for asylum for a noncitizen who enters or attempts to enter the United States across the Southern Border, but who transited through a third country *en route* to the United States and did not apply for protection there. A court ordered the Departments to cease implementation of the interim final rule in June 2020. A total of 6,911 noncitizens were subject to the bar in Fiscal Year 2019,[29] and 18,247 were subject to the bar in Fiscal Year 2020. Of the 18,247 individuals subject to the bar in 2020, 344 were exempted from the bar because they were victims of severe trafficking or applied for protection in a third country. As of May 6, 2021, another 6,672 individuals subject to the asylum bar in 2020 had established eligibility to apply for statutory withholding of removal or protection under the Convention Against Torture.

In addition, the United States signed Asylum Cooperative Agreements (ACAs) in 2019 with Guatemala, Honduras, and El Salvador. In general, these ACAs allowed DHS to transfer asylum claimants to one of these three countries (other than the country of the noncitizen's nationality) to seek protection there. The agreement with Guatemala was operational between November 21, 2019 and March 16, 2020 and resulted in 61 removal flights with a total of 948 individual removals to Guatemala. Agreements with El Salvador and Honduras were never implemented as a result of the COVID-19 pandemic.

Consistent with Executive Order 14010, "Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border," issued on February 2, 2021, on February 6, 2021, the Secretary of State announced the suspension of all three ACAs. DOS terminated the U.S.-Guatemala ACA in early May 2021 and terminated the other two ACAs in early August 2021.

---

[28] The data were restricted to individuals who were at least 18 years old when LPR status was obtained. More recent cohorts, with less time spent in LPR status, tend to have lower cumulative naturalization rates.
[29] This updates previously published information. In 2019, 77 were exempted from the bar because they were victims of severe trafficking or applied for protection in a third country. As of January 29, 2021, another 4,049 individuals subject to the asylum bar in 2019 had established eligibility to apply for statutory withholding of removal or protection under the Convention Against Torture.

24





**Comment of Black Immigrant Bail Fund, Cameroon Advocacy Network, Haitian Bridge Alliance, and Robert F. Kennedy Human Rights on Proposed Rule, "Circumvention of Lawful Pathways," 88 FR 11704**

Submitted March 27, 2023 via Federal Rulemaking Portal at www.regulations.gov

DHS Docket Number USCIS 2022-0016

I. Introduction                                                                                          2

II. The Proposed Rule Significantly Restricts Access to Asylum.                                           2

III. DHS Disproportionately Prevents Black People from Accessing Legal Protection.                       4

IV. The Proposed Rule Violates the Human Rights of Black People to Seek Protection from
Persecution and Torture.                                                                                 6

   A. The CBP One Appointment Scheduling Application Denies Black People Equal Access to
   Legal Protection.                                                                                     7

   B. Transit Countries Deny Black People Meaningful Access to Legal Protection.                         8

   C. Expanded Pathways for Parole do not Adequately Replace Access to Asylum for Black
   Immigrants.                                                                                          10

   D. The Proposed Rule Violates International Law Prohibiting Racial Discrimination.                   12

V. The Proposed Rule and Comment Timeline Adversely Impact Signatory Organizations.                     13

VI. Conclusion                                                                                          16

The Black Immigrant Bail Fund, Cameroon Advocacy Network, Haitian Bridge Alliance, and Robert F. Kennedy Human Rights jointly submit the below comment in response to the notice of proposed rulemaking titled "Circumvention of Lawful Pathways," published in the Federal Register on February 22, 2023. The proposed rule would disproportionately deny Black asylum seekers a meaningful opportunity to apply for legal protection from persecution by imposing new presumptions against asylum eligibility and heightened standards for asylum pre-application screenings. In doing so, the proposed rule subjects Black asylum seekers to race-based

CLP_PC_069077

discrimination, in violation of federal and international law. The below signed organizations therefore recommend that the proposed rule be withdrawn in its entirety.

## I.   Introduction

Black people seeking legal protection at the United States border face significant negative disparities in treatment and approval rates in comparison to all noncitizens. The proposed rule would worsen race-based differential treatment by disqualifying Black people from asylum, subjecting them to even higher rates of detention, deportation, and *refoulement* (forcible return of refugees) to persecution, torture, and other serious harm.

This comment proceeds in four parts. First, it briefly describes proposed changes to current asylum-screening procedures that would significantly restrict the ability of Black people to apply for asylum. Second, it describes how increased restrictions on legal protection recently adopted have had the purpose and effect of denying Black asylum seekers the human right to apply for asylum. Third, it explains how the proposed rule would have a disparate impact on Black asylum seekers, subjecting them to serious harm, including *refoulement* to persecution, torture, and death. Finally, it describes how the commenting organizations will be negatively affected by the proposed rule.

## II.   The Proposed Rule Significantly Restricts Access to Asylum.

The proposed rule would disqualify from asylum the majority of individuals who request protection from the United States, including individuals from majority-Black countries who travel through Mexico to the U.S. border. It would "establish a rebuttable presumption that certain noncitizens . . . are ineligible for asylum, if they traveled through a country other than their country of citizenship, nationality, or, if stateless, last habitual residence. . . ."[1] The proposed rule therefore presumptively disqualifies from asylum all noncitizens requesting protection at the southern border other than Mexican nationals, and it creates a disparate system that favors those arriving directly to the United States by commercial air. Air routes are not available to most Black individuals who intend to seek asylum because of the long and dangerous distances needed to travel and the difficulty in getting travel visas for citizens of Black-majority countries. The presumption against asylum eligibility applies whether a noncitizen is in removal proceedings and applies for asylum defensively or whether she affirmatively applies for asylum before the United States Citizenship and Immigration Services (USCIS).[2]

In three circumstances, the presumption would not apply. Noncitizens retain their statutory right to apply for asylum if they:

---

[1] Circumvention of Lawful Pathways, 88 Fed. Reg. 11,704, 11,707 (Feb. 23, 2023) (revising 8 C.F.R. § 1208).

[2] *Id.*

CLP_PC_069078

(1) receive pre-authorization to travel to the United States to seek parole pursuant to a DHS-approved parole process;

(2) present at a port of entry at a pre-scheduled time through the use of the web-based application CBP [Customs and Border Protection] One or if they demonstrate that the application for scheduling was not possible to access or use; or

(3) apply for, and are denied in a final decision, asylum or other protection in a country through which they traveled.[3]

The high bar to demonstrate that CBP One is inaccessible or unusable met only in "a narrow set of cases in which it was truly not possible for the noncitizen to access or use the DHS system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle."[4]

The presumption can only be rebutted if a noncitizen, immediately upon entry at the border, shows "exceptionally compelling circumstances by a preponderance of the evidence."[5] Only three scenarios explicitly meet the "exceptionally compelling" bar. A noncitizen rebuts the presumption when she:

(1) has an acute medical emergency;

(2) faces an imminent and extreme threat to life or safety, including rape, kidnapping, torture, or murder; or

(3) is a ''victim of a severe form of trafficking in persons'' as defined elsewhere in U.S. law.[6]

The presumption may also be rebutted by "other exceptionally compelling circumstances," in the discretion of the screening officer.[7] The proposed rule provides no standards to prevent an officer's arbitrary decision making or the abuse of discretion, including due to race-based bias, explicit or implicit.

As a practical matter, the proposed rule also elevates the pre-application standard for humanitarian protection. Under current law, an individual arriving at the border is not automatically granted the right to apply for asylum. Instead, she must first pass a credible fear interview, where she bears the burden of showing a "significant possibility of establishing eligibility for asylum."[8] If she does not meet this burden, she is immediately deported.[9] The rule is clear that where a noncitizen is subject to the asylum ban presumption, she must meet a higher

---

[3] Id.

[4] Id. at 11,723 n.173.

[5] Id. at 11,723.

[6] Id.

[7] Id.

[8] Id. at 11,725 (referencing 8 U.S.C. § 1225(b)(1)(B)(v)).

[9] Id.

CLP_PC_069079

pre-application burden to show "a reasonable possibility of persecution or torture."[10] If she does not, she will be immediately deported, even where there is evidence of a significant possibility of race-based or other persecution.

### III.    DHS Disproportionately Prevents Black People from Accessing Legal Protection.

The proposed rule will exacerbate the already-existing disproportionate disqualification of Black people from legal protection at the U.S.-Mexico border. This section describes recent and longstanding asylum restriction policies that either explicitly target or disproportionately harm Black people.

Black immigrants have long suffered the brunt of harsh immigration policies designed to deter Black people from accessing their human right to apply for asylum.[11] Explicit anti-Haitian immigration policies adopted by the United States include mass denial of asylum applications without individualized consideration,[12] offshore detention at Guantánamo Bay,[13] and creation of the world's first HIV-positive internment camp.[14]

Federal courts have also recognized the explicit anti-Black and anti-Haitian roots of metering, a recent restriction on legal protection that, while formally disavowed, continues in practice. Metering denies the right to apply for asylum by "limit[ing] the number of asylum seekers who [are] processed each day at designated ports of entry along the U.S. southern border."[15] The United States first adopted the policy "[i]n response to the increase in Haitian migration in 2016,"[16] directing border agents to turn back Haitians who had crossed the border and to stop those who had not with orders to return at a later, often unspecified time.[17] Black asylum seekers who were turned back to Mexico report facing targeted violence from police and gangs, including kidnapping, rape, robbery, beatings, extortion, and threats.[18] In September 2021, a federal court

---

[10] *Id.*

[11] *See* HAITIAN BRIDGE ALLIANCE & ROBERT F. KENNEDY HUMAN RIGHTS, BEYOND THE BRIDGE: DOCUMENTED HUMAN RIGHTS ABUSES AND CIVIL RIGHTS VIOLATIONS AGAINST HAITIAN MIGRANTS IN THE DEL RIO, TEXAS ENCAMPMENT (2022), https://rfkhr.imgix.net/asset/Del-Rio-Report.pdf [hereinafter *Beyond the Bridge*] (describing history of explicit anti-Haitian immigration policies adopted from the 1970s onward, including denial of asylum applications without individualized consideration, offshore detention at Guantánamo Bay, and creation of the world's first HIV-internment camp).

[12] *Id.* at 48-49 & n.270.

[13] *Id.* at 16.

[14] *Id.*

[15] HILLEL R. SMITH, CONG. RESEARCH SERV., LSB10295, THE DEPARTMENT OF HOMELAND SECURITY'S "METERING" POLICY: LEGAL ISSUES 1 (2022), https://crsreports.congress.gov/product/pdf/LSB/LSB10295.

[16] *Al Otro Lado, Inc. v. Mayorkas*, No. 17-CV-02366-BAS-KSC, 2021 WL 3931890, at *2 (S.D. Cal. Sept. 2, 2021).

[17] *Id.*

[18] HUMAN RIGHTS FIRST & HAITIAN BRIDGE ALLIANCE, BIDEN ADMINISTRATION'S DANGEROUS HAITIAN EXPULSION STRATEGY ESCALATES THE U.S. HISTORY OF ILLEGAL AND DISCRIMINATORY MISTREATMENT OF HAITIANS SEEKING SAFETY IN THE UNITED STATES 3 (2021). https://humanrightsfirst.org/wp-content/uploads/2022/09/BidenAdministrationDangerousHaitianExpulsionStrategy.pdf

CLP_PC_069080

enjoined metering for violating the due process right to apply for asylum.[19] But metering continues in the form of "exception waitlists" to Title 42, the 2020 policy of immediate expulsion of asylum seekers "without allowing them to apply for asylum or seek relief from removal to a place where they will face persecution."[20] In mid-2022, the United States began to process exceptions to Title 42 expulsion at the southern border. As the number of individuals seeking exceptions increased, waitlists proliferated.[21] Black asylum seekers reported being blocked from waitlists due to anti-Black discrimination and lack of interpretation services.[22]

Metering is not the only policy to be recognized by a federal court as motivated by anti-Black bias. When the United States terminated Temporary Protected Status for Haitians in 2017, a federal court enjoined the rescission after finding it was likely "based on race and/or national origin/ethnicity against non-white immigrants in general and Haitians in particular."[23] Pending federal lawsuits examine evidence of race-based asylum deterrence policies practiced against Haitian and Black asylum seekers, who in the fall of 2021 were penned into open-air encampments, cut off from legal and humanitarian aid, and pushed across the border by U.S. agents on horseback at Del Rio, Texas.[24]

DHS also uses longstanding asylum screening procedures to disproportionately reject asylum claims of Black immigrants. Under current credible fear interview procedures, asylum seekers from Black-majority countries including Burkina Faso, Cameroon, the Dominican Republic, Ghana, Mauritania, and Senegal receive negative credibility findings in their initial credible fear interview at rates double to quadruple times the global average.[25] Positive credible fear interview determinations for Haitians are persistently lower than average over multi-year periods, in some years by almost half.[26]

Black immigrants permitted to apply for asylum report discriminatory treatment in immigration court removal proceedings, including denials of adequate interpretation, lack of

---

[19] *Al Otro Lado*, 2021 WL 3931890, at *20.
[20] *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 726 (D.C. Cir. 2022).
[21] STEPHANIE LEUTERT & CAITLYN YEATS, UNIV. OF TEX. AT AUSTIN STRAUSS CTR. FOR INT'L SEC. & LAW, ASYLUM PROCESSING AT THE U.S.-MEXICO BORDER: FEBRUARY 2023, https://www.strausscenter.org/wp-content/uploads/Feb_2023_Asylum_Processing.pdf.
[22] Black Alliance for Just Immigration et al., *Shadow Report to the Committee on the Elimination of Racial Discrimination (CERD): Anti-Black Discrimination Against Non-citizens and Ongoing Violations of International Protections for Migrants, Refugees, and Asylum Seekers of African Descent* 10 (Aug. 2022) [hereinafter Shadow Report], https://humanrightsfirst.org/wp-content/uploads/2022/09/US-Coalition_anti-Black-Discrimination-in-Immigration__CERD-Report_072222.pdf (citing statistics from FY2020).
[23] *Saget v. Trump*, 375 F. Supp. 3d 280, 374 (E.D.N.Y. 2019) (finding "both direct and circumstantial evidence a discriminatory purpose of removing non-white immigrants from the United States was a motivating factor behind the decision to terminate TPS for Haiti").
[24] *See* Compl. ¶¶ 66-78, *Haitian Bridge All. v. Biden,* No. 1:21-cv-03317 (D.D.C  Dec. 20, 2021).
[25] Shadow Report, *supra* note 22, at 10.
[26] *Id.* at 11.

CLP_PC_069081

access to counsel, intentionally rushed proceedings, and adjudicator bias.[27] Over a 20-year period ending in FY2021, DHS denied 82 percent of asylum applications from Haitians, the second highest rate of denials of any nationality.[28] Adjudicator bias occurs across nationalities for majority-Black countries, leading to legal errors in screening interviews, failures to grant opportunity to respond, mishandling of evidence, and errors of fact finding.[29] Immigration judges have ordered detained Black asylum seekers removed due to their inability to fill the forms in English or minor inconsistencies due to poor translation.[30]

Black asylum seekers are also more likely to face abusive immigration detention, including solitary confinement at a rate six times higher than non-Black people,[31] and overrepresentation in family detention,[32] a policy currently being reconsidered by the Biden administration.[33] Black people represented more than half of all detained individuals in family detention in 2020.[34] More than 3 out of 4 immigrants in detention are not represented by counsel.[35] And people in detention prevail without representation in only 3 percent of cases.[36]

---

[27] *Id.* at 1.

[28] Syracuse University, Transactional Records Access Clearinghouse (TRAC), *The Impact of Nationality, Language, Gender and Age on Asylum Success* (Dec. 7, 2021), https://trac.syr.edu/immigration/reports/668/.

[29] Human Rights Watch, '*How Can You Throw Us Back?' Asylum Seekers Abused in the US and Deported to Harm in Cameroon* (Feb. 2022), https://www.hrw.org/sites/default/files/media_2022/03/us_cameroon0222_web.pdf, 114 - 43 [hereinafter "*How Can You Throw Us Back?*"] (describing the due process issues black immigrants face in the U.S. Immigration Court system including issues of dismissed errors in screening interviews, failure to grant opportunity to respond, mishandling evidence, and error of fact finding).

[30] *See id.* at103-07 (identifying lack of interpretation as contributing to erroneous negative fear determinations and deportations of Cameroonian asylum seekers); *see also Grievance Letter to USCIS, ICE, EOIR Re: "Detained Asylum Seekers Deprived of Due Process in Expedited Removal Process"* (June 30, 2021), https://www.splcenter.org/sites/default/files/detained_asylum_seeker_grievance_letter_30_june_2021.pdf; Human Rights First, '*I'm a Prisoner Here': Biden Administration Policies Lock Up Asylum Seekers* 35, 37-38 (Apr. 2022), https://www.humanrightsfirst.org/sites/default/files/I%27maPrisonerHere.pdf (documenting flawed credible fear interviews with inadequate interpretation as contributing to negative fear determinations and deportations of Cameroonian asylum seekers).

[31] Konrad Franco, Caitlin Patler, & Keramet Reiter, *Punishing Status and the Punishment Status Quo: Solitary Confinement in US Immigration Prisons, 2013-2017* (Apr. 2020), https://osf.io/preprints/socarxiv/zdy7f/.

[32] RAICES, *Black, Pregnant, Detained* (Mar. 4, 2021), https://www.youtube.com/watch?v=2NDto_YVo1Y(noting that in 2020 Black people were more than half of all detained at Karnes County Family Residential Center in Texas and all of those detained at Berks Family Residential Center in Pennsylvania).

[33] Eileen Sullivan & Zolan Kanno-Youngs, *U.S. Is Said to Consider Reinstating Detention of Migrant Families*, N.Y. TIMES (Mar. 6, 2023), https://tinyurl.com/974txkdm.

[34] Compl. ¶ 49, *Haitian Bridge All.  v. Biden,* No. 1:21-cv-03317 (D.D.C  Dec. 20, 2021).

[35] TRAC, *Details on Deportation Proceedings in Immigration Court (through February 2019)*, https://trac.syr.edu/phptools/immigration/ntahist/ (field selections:Immigration Court State: All; Custody: Detained; Represented: Not Represented).

[36] Robert A. Katzman, *Study Group on Immigrant Representation: The First Decade,* 87 FORDHAM L. REV. 485, 486 (2018), https://ir.lawnet.fordham.edu/cgi/viewcontent.cgi?article=5549&context=flr.

CLP_PC_069082

Collectively, current asylum restrictions and longstanding policies disproportionately harm Black people, denying them meaningful access to humanitarian protection owed under international and domestic law. The proposed rule will only exacerbate this grave injustice.

## IV. The Proposed Rule Violates the Human Rights of Black People to Seek Protection from Persecution and Torture.

Though facially race-neutral, the proposed rule would have a particularly harsh effect on Black asylum seekers. This section explains how the proposed rule would deepen existing race-based disparities in asylum screening procedures, depriving Black people in particular of meaningful access to asylum. It draws from secondary sources and in-person interviews with Black asylum seekers conducted in March 2023 at the U.S. Mexico border in Tijuana, Mexico by a team of researchers and lawyers, including individuals from the Haitian Bridge Alliance.[37] These accounts highlight elements of the proposed rule—including some already in practice—that work to deny Black people meaningful access to asylum, including mandatory electronic scheduling for border appointments to seek asylum, transit country asylum application requirements, and a humanitarian parole program that is an inadequate substitute for humanitarian protection.

### A. The CBP One Appointment Scheduling Application Denies Black People Equal Access to Humanitarian Protection.

The proposed rule creates a presumption against asylum eligibility unless an individual uses the smartphone application CBP One to pre-schedule an appointment at a U.S. port of entry to request asylum.[38] First, many asylum seekers from African countries such as Guinea, Togo, Ghana, and Mauritania reported not knowing about CBP One. Without community or the ability to speak Spanish, African asylum seekers are isolated and vulnerable to smugglers who promise to take them across. Moreover, numerous reports from asylum seekers at the border describe serious flaws with CBP One, including unreliable software, connectivity issues, and failure to register darker skin tones.

Asylum seekers report that the CBP One application repeatedly crashes or freezes. Common issues with application crashing included freezing just before an individual could take their photo, freezing on the calendar slot page, and the application shutting down before

---

[37] *See* Center for Gender & Refugee Studies, Haitian Bridge Alliance & Hastings to Haiti Partnership, *Making a Mockery of Asylum: The Proposed Asylum Ban, Relying on the CBP One App for Access to Ports of Entry, Will Separate Families and Deny Protection* (Mar. 27, 2023) (report compiling information from interview with 194 individuals and family units living in shelters or other informal housing arrangements in Tijuana regarding their experiences using the CBP One app as well as protections unavailable to them in Mexico and other transit countries en route to the United States).

[38] 88 Fed. Reg. at 11719.

CLP_PC_069083

individuals could add family member information.[39] Some of these issues might be remedied given sufficient access to broadband capacity and a newer smartphone.

But the reality on the ground is that Black migrants have very little resources to purchase or access a newer smartphone or a broadband internet connection. Many have undertaken significant risks and long journeys through South and Central America to reach the U.S.-Mexico border, including traveling the notorious Darien Gap, a remote and dangerous jungle region between Colombia and Panama.[40] During this journey, Black migrants are often subject to robbery, rape, physical assault, and family separation, resulting not only in trauma, but in loss or destruction of personal possessions like smartphones and separation from family members with technical literacy.[41] Those arriving in Mexico also report robbery and assault while waiting to apply for asylum at the U.S. border, resulting in stolen or destroyed smartphones.[42] Moreover, because CBP One requires a newer smartphone with up-to-date software in order to function properly (indeed the application itself requires frequent updates to be used), Black migrants who cannot afford the latest phones or technology face de facto exclusion from the asylum application process.

CBP One also uses facial recognition software that excludes black skin tones.[43] Research on skin-type bias in commercial artificial intelligence systems shows that facial recognition software exhibits significant racial biases. One study found that facial analysis software has an error rate of 0.8 percent for light-skinned men compared to 34.7 percent for dark-skinned women.[44] Individuals interviewed at the border affirm difficulties with photo uploads. Almost all dark-skinned individuals interviewed reported an inability to move past the photo confirmation page because CBP One refused to recognize their face.[45] Others reported that the short confirmation window at the calendar stage for taking photos made it impossible to capture entire families, especially those with small children, before all calendar spots had disappeared.[46]

---

[39] *See* Center for Gender & Refugee Studies et al., *supra* n. 37 at 6-8.

[40] Laurence Blair, *Risking it all: migrants brave Darien Gap in pursuit of the American dream*, THE GUARDIAN (Apr. 28, 2022), https://www.theguardian.com/global-development/2022/apr/28/risking-it-all-migrants-brave-darien-gap-in-pursuit-of-the-american-dream

[41] *Id.*

[42] Human Rights Watch, *Mexico: Rampant Abuses Against Asylum Seekers* (2021), https://www.hrw.org/news/2021/09/21/mexico-rampant-abuses-against-asylum-seekers.

[43] Melissa del Bosque, *Facial Recognition Bias Frustrates Black Asylum Applicants to US, Advocates Say,* THE GUARDIAN (Feb. 8, 2023) https://www.theguardian.com/us-news/2023/feb/08/us-immigration-cbp-one-app-facial-recognition-bias.

[44] *See* JOY BUOLAMWINI & TIMNIT GEBRU, *GENDER SHADES: INTERSECTIONAL ACCURACY DISPARITIES IN COMMERCIAL GENDER CLASSIFICATION,* 81 PROC. IN MACHINE LEARNING RES. 1 (2018), http://proceedings.mlr.press/v81/buolamwini18a/buolamwini18a.pdf

[45] *See* Center for Gender & Refugee Studies et al., *supra* n. 37 at 7.

[46] *Id.*

CLP_PC_069084

**B. Transit Countries Deny Black People Meaningful Access to Legal Protection.**

The proposed rule creates a presumption against asylum eligibility unless an individual first applies for and receives a final denial of an application for asylum in a country through which she traveled before reaching the United States.[47] But countries in the Americas deny Black people meaningful access to legal protection due to anti-Black racism and underdeveloped asylum systems.

Anti-Black racism is a significant problem in countries throughout the Americas, where Black asylum seekers face violence and discrimination from criminal organizations and local authorities. Black immigrants and other individuals who have fled their home countries due to persecution are subjected to similar abuses in transit countries.[48] As simply put by a recent World Bank report, "Latin America is, in fact, the most violent region in the world, and Afrodescendants are the main victims."[49] Costa Rican First Vice President Espy Campbell Barr acknowledges the "context of systemic racism against Afro-descendants . . . enclosed within the political, economic, social, and cultural system" across Central and South America.[50]

In this context, police violence against Black people is common in states throughout the region.[51] In Brazil, 75% of people killed by police are Black.[52] Surveillance, hostile treatment in public spaces, and abuse from security forces are commonly reported by Black people throughout Latin American states.[53] The Inter-American Commission on Human Rights describes Afro-descendants in Latin America as vulnerable to "double victimization," both excluded from police protection from crime and more likely to be victimized by institutionalized violence, including unfair judicial treatment.[54] And in Mexico, a state that all Black people must pass through to request asylum at the U.S. border, asylum seekers of African descent have reported targeted

---

[47] 88 Fed. Reg. at 11,740.

[48] *See, e.g.*, Human Rights Watch, *Mexico: Abuses against asylum seekers at US border* (2021), https://www.hrw.org/news/2021/03/05/mexico-abuses-against-asylum-seekers-us-border.

[49] WORLD BANK GROUP, AFRO-DESCENDANTS IN LATIN AMERICA 67 https://openknowledge.worldbank.org/entities/publication/a3b5c6a3-6b2d-52ad-a560-7f4817b235ca (citing Laura Chioda, *Stop the Violence in Latin America: A Look at Prevention from Cradle to Adulthood, Latin American Development Forum* (2017)).

[50] PAN AM. HEALTH ORG., AFRO-DESCENDANTS IN LATIN AMERICAN COUNTRIES LIVE IN STARKLY UNEQUAL CONDITIONS THAT IMPACT HEALTH AND WELL-BEING, PAHO STUDY SHOWS (2021), https://www.paho.org/en/news/3-12-2021-afro-descendants-latin-american-countries-live-starkly-unequal-conditions-impact.

[51] BRUNO CARVALHO, *LATIN AMERICA IS READY FOR A BLACK LIVES MATTER RECKONING,* N.Y. TIMES (June 29, 2020), https://www.nytimes.com/2020/06/29/opinion/latin-america-racism-police.html.

[52] *Id.*

[53] WORLD BANK GROUP, AFRO-DESCENDANTS IN LATIN AMERICA, *supra* note 47, at 68 (citing Inter-American Commission on Human Rights, *The Situation of People of African Descent in the Americas* (2011)).

[54] *Id.*

CLP_PC_069085

violence and racial discrimination after being turned away from the U.S. border when requesting protection.[55]

Violence is not the only factor impeding Black people's meaningful access to humanitarian protection in Latin America. The region's overtaxed, underdeveloped asylum systems also make it infeasible for Black asylum seekers to apply for asylum and receive protection in these countries. From 2017 to 2022, there were nearly 1.7 million pending asylum applications to states in all nations of the Americas, excluding the United States and Canada.[56] Of that number, only 24,503 received a final decision to grant or deny protection: a 1.4% decision rate.[57] In the face of such abysmal processing rates, United Nations officials acknowledge that "[n]ational asylum systems [in Latin America have] collapsed due to an exponential increase in the number of asylum applications . . . and a lack of human and financial resources.[58] Researchers describe a Latin American asylum system that is plagued by a "sense of arbitrary application."[59] These asylum systems are also "largely symbolic, [given that] states across the region are reluctant to invest in [them], leading to low state capacity that hinders the application of the law."[60]

To give just two examples, Costa Rica, one of the countries in the region touted by the proposed rule for offering better refugee protections for people fleeing persecution, is tightening its asylum policies in the face of an overwhelmed system.[61] As it stands, more than nine out of ten refugees in Costa Rica are from Nicaragua, leaving little capacity for migrants from majority-Black countries to seek protection.[62] And Mexico, the one country that all migrants must pass

---

[55] Human Rights Watch, *US: Asylum Seekers Returned to Uncertainty, Danger in Mexico* (July 2, 2019), https://www.hrw.org/news/2019/07/02/us-asylum-seekers-returned-uncertainty-danger-mexico.

[56] United Nations High Commissioner on Refugees (UNHCR), *Refugee Data Finder*, https://www.unhcr.org/refugee-statistics/download/?url=Jz2Flp.

[57] *Id.* (returning results of 76,894 decisions issued; 52,481 listed as "otherwise closed").

[58] Juan Ignacio Mondelli, *Reshaping Asylum in Latin America as a Response to Large-Scale Mixed Movements: A Decade of Progress and Challenges (2009-2019)*, at 4 (Dec. 1, 2020) https://www.unhcr.org/people-forced-to-flee-book/wp-content/uploads/sites/137/2021/10/Juan-Mondelli_Reshaping-Asylum-in-Latin-America-as-a-Response-to-Large-Scale-Mixed-Movements.pdf.

[59] Omar Hammoud Gallego, *Here to stay: Latin America must face up to the reality of long-term Venezuelan migration*, LONDON SCHOOL ECON. & POLITICAL SCIENCE BLOGS (Apr. 13, 2021), https://blogs.lse.ac.uk/latamcaribbean/2021/04/13/here-to-stay-latin-america-must-face-up-to-the-reality-of-long-term-venezuelan-migration/.

[60]Luisa Feline Freier & Omar Hammoud Gallego, *Symbolic refugee protection: why Latin America passed progressive refugee laws never meant to use*, LONDON SCHOOL ECON. & POLITICAL SCIENCE BLOGS (Oct. 6, 2022) https://blogs.lse.ac.uk/latamcaribbean/2022/10/06/refugee-protection-latin-america-refugee-laws-never-used/.

[61] Javier Cordoba, *Costa Rica tightens overwhelmed asylum system*, ASSOC. PRESS (Dec. 14, 2022), https://apnews.com/article/latin-america-mexico-caribbean-germany-costa-rica-0e2db787358228fe308023ba259d1d3f ("Despite having only 5 million citizens, the Central American country [Costa Rica] trailed only the United States, Germany and Mexico in the number of asylum applications it received last year, according to the United Nations High Commissioner for Refugees.").

[62] Moises Castillo & Christopher Sherman, *Fleeing Nicaraguans Strain Costa Rica's Asylum System, ASSOC. PRESS* (Sept. 2, 2022), https://apnews.com/article/covid-health-elections-presidential-caribbean-52044748d15dbbb6ca706c66cc7459a5.

CLP_PC_069086

through, now receives the world's third highest number of asylum applications.[63] Since 2014 the overwhelmed Mexican asylum system has experienced a 5325% increase in asylum applications,[64] vastly outpacing the country's ability to adjudicate applications in a fair and timely manner. Under-resourced and overwhelmed asylum systems, mixed with a lack of language capacity and anti-Black racism, generally results in stalled or poor outcomes for Black asylum seekers, including Haitians.[65]

### C.  Expanded Pathways for Parole do not Adequately Replace Access to Asylum for Black Immigrants.

The proposed rule posits the recent expansion of parole programs for certain nationalities as an alternative to seeking asylum.[66] But parole is a poor substitute for meaningful access to humanitarian protection for Black immigrants. The parole requirements filter immigrants based on wealth, social connections, and ability to wait safely for approval while in the country of origin— not humanitarian need for protection from persecution. Moreover, the circumstances surrounding the creation of the new parole programs evince the government's intention to discriminate against Black asylum seekers.

Given key differences in the populations between asylum seekers and those most likely to benefit from the parole program for Cubans, Haitians, Nicaraguans, and Venezuelas, expanded pathways for parole must supplement, not replace, access to asylum. These parole programs require an applicant to secure a financial sponsor in the United States, transmit biographic and application information to the Department of Homeland Security both through an online application and the CBP One application, and secure travel to a United States port of entry, presumably with a valid foreign passport.[67] But individuals who merit asylum, by definition, are fleeing dangerous conditions in their home countries, and often are doing so urgently, due to actual harm or the imminent threat of persecution. With safety and lives at immediate risk, they do not have the luxury of remaining in their home countries for processing of a parole application. On the run from persecution, they are unable to reliably communicate with a U.S.-based sponsor. They

---

[63] Daina Beth Solomon & Lizbeth Diaz, *Mexico seeks to curb 'abuse' of asylum system by migrants who do not plan to stay,* REUTERS (Feb. 13, 2023), https://www.reuters.com/world/americas/mexico-seeks-curb-abuse-asylum-system-by-migrants-who-do-not-plan-stay-2023-02-13/.

[64] Diego Badillo, *Exodo a Estados Unidos, sin precedentes, convierty a Mexico en sala de espera de migrantes*, EL ECONOMISTA (Jan. 15, 2023), https://www.eleconomista.com.mx/politica/Exodo-a-Estados-Unidos-sin-precedentes-convierte-a-Mexico-en-sala-de-espera-de-migrantes-20230113-0069.html.

[65] Instituto para las Mujeres en la Migración & Haitian Bridge Alliance & Center for Gender and Refugee Studies, *A Journey of Hope: Haitian Women's Migration to Tapachula, Mexico* (2021), https://www.google.com/url?q=https://imumi.org/wp-content/uploads/2021/01/A-Journey-of-Hope-Haitian-Womens-Migration-to-Tapachula-Mexico.-Executive-Summary.pdf&sa=D&source=docs&ust=1679963550084290&usg=AOvVaw2IVFla5OimdDyoi95Vbm_F

[66] 88 Fed. Reg. 11,704, 11,711-12.

[67] USCIS, *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, https://www.uscis.gov/CHNV.

CLP_PC_069087

also risk serious harm if contacting their government, the persecuting agent, for necessary travel documents like a passport.

The parole programs also favor persons with the financial means to wait safely in their home countries, purchase flights to the United States, and leverage social connections to a U.S.-based financial sponsor. Those most in need of humanitarian protection are most likely to be disqualified for parole because they have already left their countries due to risk of persecution or torture. On the move in search of safety, they are also less likely to have either the discretionary funds needed for travel or a reliable communication with a U.S. financial sponsor.

Even if granted, the temporary nature of parole leaves Black immigrants in a state of instability. Parole is valid only for a limited period of time, with renewal availability uncertain.[68] It is also subject to revocation depending on the political winds, lacking the regulatory protections that asylum has against sudden rescission.[69] Individuals granted parole still face uncertainty about their safety, due to risk of deportation back to a home country where they would again face persecution once the parole period expires.

Finally, there is strong evidence of government intent to discriminate against Black asylum seekers given the contrast in features between newly created parole programs for Cubans, Haitians, Nicaraguans, and Venezuelans and the distinct program created for Ukrainians. As an initial matter, the commenters support expanded immigration pathways such as parole. But when responding to a significant humanitarian crisis, it is possible to successfully pair expanded parole with access to asylum. The government knows this, because it has already done so for immigrants from the majority-white country of Ukraine. Between March and May 2022, the United States paroled nearly all of the more than 23,000 Ukrainians who arrived at the southern border at ports of entry, granting them full access to asylum procedures.[70] Only 0.6% of Ukrainians were immediately expelled.[71] In contrast, when describing the new parole programs created for immigrants from countries with a majority or significant Black population,[72] the Notice of

---

[68] 88 Fed. Reg. 11,704, 11,718 (specifying that parole is valid for an initial 2-year period).

[69] 8 CFR § 208.24 (mandating procedural protections against sudden asylum revocation).

[70] TRAC, *Ukrainians at the US-Mexico Border: Seeking Admission at US Ports of Entry by Nationality* (May 17, 2022), https://trac.syr.edu/immigration/reports/683/.

[71] US Customs and Border Protection, *Nationwide Encounters*, https://www.cbp.gov/newsroom/stats/nationwide-encounters (expulsion statistics).

[72] Given the socially constructed nature of race and differences between nations in how racial categories are constructed, exact demographic figures of national racial makeup are elusive. Sources estimate that 95% of Haitians are Black; between 35 to 62 percent of Cubans are Afro-descendant; 55% of Venezuelans are of African or mixed-African descent; and at least 9% of Nicaraguans are Black, concentrated mainly on the Caribbean coast, though "many if not most western Nicaraguans had African ancestry" (Victoria Gonzalez Rivera, *Why My Nicaraguan Father Did Not "See" His Blackness*, HAVANA TIMES (June 16, 2020), https://havanatimes.org/opinion/why-my-nicaraguan-father-did-not-see-his-blackness/). *See* Embassy of the Republic of Haiti, Washington D.C., *Haiti at a Glance*, https://www.haiti.org/haiti-at-a-glance/; Maria Luisa Paul, *"A powder keg about to explode": Long marginalized Afro Cubans at forefront of island's unrest*, WASH. POST (July 19, 2021),

CLP_PC_069088

Proposed Rulemaking emphasizes "that the incentive structure created by [parole] processes relies on the availability of an immediate consequence": the refusal of access to asylum to those who present at the U.S. border in the manner utilized by most Ukranians and the expansion of expedited removal.[73]

The proposed rule comes within a recent historical context of explicitly anti-Haitian immigration policies. It would expand to other countries features of the newly created parole programs for Cubans, Haitians, Nicaraguans, and Venezuelans that have a disparate impact on Black asylum seekers—a fact the government knows, given several months of observation since those programs were initiated. And it would expand and codify a difference in treatment of people seeking humanitarian protection under the parole programs for Ukrainians versus other nationalities with majority or significant Black populations. Under the circumstances of the proposed rule's creation, a strong inference of intent to discriminate against Black asylum seekers arises.

### D. The Proposed Rule Violates Domestic and International Law Prohibiting Racial Discrimination.

The proposed rule's harmful and disparate impact on Black people violates human rights law prohibiting racial discrimination in treaties that the United States has ratified. Both the International Convention on the Elimination of all Forms of Racial Discrimination (CERD) and the International Convention on Civil and Political Rights (ICCPR) prohibit racial discrimination of the type the proposed rule would institutionalize.

Under CERD, the United States pledges to eliminate,

> any distinction, exclusion, restriction or preference based on race, colour, descent, or national or ethnic origin which has the purpose or effect of nullifying or impairing the recognition, enjoyment or exercise, on an equal footing, of human rights and fundamental freedoms in the political, economic, social, cultural or any other field of public life.[74]

This pledge carries affirmative duties to "take effective measures to review governmental, national and local policies, and to amend, rescind or nullify any laws and regulations which have the effect

---

https://www.washingtonpost.com/world/2021/07/19/cuba-protests-afro-cubans/; Instituto Nacional de Estadistica, *XIV Censo Nacional de Poblacion y Vivienda* 29 (May 2014), http://www.ine.gob.ve/documentos/Demografia/CensodePoblacionyVivienda/pdf/nacional.pdf; CIA, *The World Factbook: Nicaragua* (Mar. 22, 2023), https://www.cia.gov/the-world-factbook/countries/nicaragua/.

[73] 88 Fed. Reg. 11,704, 11,731.

[74] International Convention on the Elimination of All Forms of Racial Discrimination, Dec. 21, 1965, 660 U.N.T.S. 195, art. 1 [hereinafter CERD].

CLP_PC_069089

of creating or perpetuating racial discrimination wherever it exists."[75] It also obligates the United States to rescind facially neutral policies that have a disparate impact on racial minorities.[76] In this sense, the United States' CERD obligations accord with U.S. constitutional law. At a minimum, both prohibit intentional racial discrimination, which may be inferred where a facially neutral law creates otherwise inexplicable racial disparities.[77]

Similarly, ICCPR guarantees the right to protection against racial discrimination in law.[78] It also protects against racial discrimination with regards to other rights contained in the Convention.[79] Those rights implicated by the proposed rule include the right to life and its protection against non-refoulement[80] and the right to a fair procedure in assessing protection against non-refoulement.[81]

As discussed above, the proposed rule imposes significant burdens on Black asylum seekers that, collectively, deprive them of a meaningful opportunity to seek protection against refoulement. The proposed rule's disparate impact on Black asylum seekers violates international human rights treaties to which the United States is bound, as well as domestic constitutional and statutory obligations.[82] It should therefore be withdrawn in its entirety.

---

[75] CERD art. 2.

[76] *See generally* Audrey Daniel, *The Intent Doctrine and CERD: How the United States Fails to Meet Its International Obligations in Racial Discrimination Jurisprudence* at 270-71 (discussing evidence of CERD framers' intent to prohibit disparate impact) (citing NATAN LERNER, THE U.N. CONVENTION ON THE ELIMINATION OF ALL FORMS OF RACIAL DISCRIMINATION 1 (Sijthoff & Noordhoff 1980), https://core.ac.uk/download/pdf/232972364.pdf).

[77] *See Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977) ("Determining whether invidious discriminatory purpose exists demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."); *Casteneda v. Partida*, 430 U.S. 482 n.13 (1977) ("If a disparity is sufficiently large, then it is unlikely that it is due solely to chance or accident, and, in the absence of evidence to the contrary, one must conclude that racial or other class-related factors entered into the selection process); *see also International Convention on the Elimination of All Forms of Racial Discrimination: Hearing Before the Comm. on Foreign Rel.*, *103d Cong., 2d Sess.* (1994) (discussion of the Acting Secretary of the Department of State in support of CERD ratification, stating that actions having an "unjustifiable disparate impact" included unnecessary actions that caused significant statistical disparities).

[78] International Covenant on Civil and Political Rights, Mar. 23, 1976, 999 U.N.T.S. 171, art. 21 [hereinafter ICCPR].

[79] ICCPR art. 2(1).

[80] Santhosh Persaud, *Protecting refugees and asylum seekers under the International Covenant on Civil and Political Rights* (Nov. 2006), at 7 https://www.unhcr.org/en-us/research/working/4552f0d82/protecting-refugees-asylum-seekers-under-international-covenant-civil-political.html ( "It suffices here to state that the right to life under Article 6 (1) enjoys protection under a duty of non-refoulement.").

[81] *Id.* at 10 ("All asylum-seekers, whose claim is assessed by states' authorities, therefore enjoy guarantees under Article 13.").

[82] Given the limited 30-day comment period, a full legal analysis of the international and domestic legal norms that the proposed rule violates is outside the scope of this comment. However, commenters note that the proposed rule would also violate, at a minimum, provisions of the Immigration and Nationality Act, Administrative Procedures Act, and U.S. constitutional law guaranteeing individuals the right to apply for asylum; provisions of domestic civil rights and constitutional law guaranteeing access to due process; and provisions of domestic civil rights and constitutional law guaranteeing equal protection of the law and protection against racial discrimination.

CLP_PC_069090

**V.     The Proposed Rule and Comment Timeline Adversely Impact Signatory Organizations.**

The Rule's proposed changes are all but certain to adversely impact the undersigned organizations. First, the undersigned organizations object to the limited 30-day comment period imposed by this Rule.  In this timeline we have not been able to provide complete details about the ways in which Black migrants face discrimination and abuse in the countries singled out as purported safe-havens by the proposed rule. We have also been unable to provide significant details about how we expect this proposed rule will function in real-life credible fear interviews, information that we believe would be relevant to demonstrating the absence of fairness in the rule's proposal.

More importantly, the proposed rule would harm the asylum seekers that the undersigned organizations seek to serve. Many Black asylum seekers will not be able to access the United States at all because they will not pass a credible fear interview under the heightened standard imposed by the proposed rule. This fact will make it harder—if not impossible—for the undersigned organizations to provide legal and social services to this community. In addition, the undersigned organizations will have to significantly increase or modify their services on the Mexico side of the U.S.-Mexico Border. The proposed rule also frustrates another key component of the undersigned organizations respective missions. As organizations we collectively seek to empower Black immigrants to vindicate their human rights under U.S. and international law, including the right to seek asylum.  Below is a discussion of the impact of the rule on each signatory organization.

**A.  Haitian Bridge Alliance**

The Haitian Bridge Alliance (HBA), also known as "The BRIDGE," is a 501(c)(3) grassroots nonprofit community organization that advocates for fair and humane immigration policies and provides migrants and immigrants with humanitarian, legal, and social services, with a particular focus on Black people, the Haitian community, women and girls, LGBTQIA+ individuals, and survivors of torture and other human rights abuses. HBA's main office is in San Diego, California, and it has office presences in Tijuana and Tapachula, Mexico.

To fulfill its mission, HBA staff regularly visits border areas in Tijuana, Mexico/San Diego, California; Cuidad Juarez/El Paso; Reynosa, Mexico/McAllen, Texas; and Matamoros, Mexico/Brownsville, Texas. HBA works regularly with civil society partners in those locations to serve Haitian and other Black people in mobility who are trying to access legal protection from the United States and/or enter the United States. HBA regularly brings delegations of lawyers, doctors, and other volunteers to the border. The delegations provide Know Your Rights trainings and conduct interviews with individuals and family units to identify systemic issues uniquely affecting Black migrants to advocate locally, nationally, and internationally for fair and just immigration policies.

CLP_PC_069091

For example, in March 2023, HBA and the Center for Gender & Refugee Studies visited Tijuana, Mexico where they conducted Know Your Rights trainings and interviewed 194 individuals and family units. The interviews focused on how the Biden administration policy and proposed rule would affect the ability to seek asylum in the United States.

Since 2020, HBA has operated a legal department with a small staff of attorneys who provide direct representation to people on U.S. immigration matters, including representation for people in DHS ICE detention, people facing removal proceedings before the Executive Office of Immigration Review, and people filing applications for immigration benefits to USCIS. HBA receives funding from the State of California for its direct representation of people in California on immigration matters and provides limited pro bono representation before EOIR for people in jurisdictions other than California.

In 2022, HBA's legal department and humanitarian department partnered with civil society coalitions to work with migrant communities on the U.S.-Mexico border and DHS to facilitate advocacy for and application of humanitarian exceptions to the U.S. Title 42 Policy. Through that work, HBA developed close relationships with Black migrant communities on the border and their service providers and continues to work with those groups on facilitating access to legal protections, working to troubleshoot and advocate around issues people are facing using DHS's CBP One App, and the Biden Humanitarian Parole Program. HBA is currently working with Welcome.US to facilitate sponsorship connections between Haitians and sponsors in the U.S. under the Biden Parole Program.

HBA regularly works with individuals and family units who have transited through ten or more States in the Americas in order to seek relief in the United States. In October 2022, HBA led a delegation of lawyers, academics, and humanitarian workers to visit Panama to investigate the human rights situation of people while transiting through the Americas.

1. The proposed rule's impact on Haitian Bridge Alliance

If this rule is implemented, HBA anticipates having to shift operations, create new programs, secure new funding, and hire additional staff in order to fulfill our mission of serving migrant communities at the border. HBA anticipates having to dramatically expand its deportation defense and detention work, devise new Know Your Rights programs so that people attempting to enter the United States understand the new law and also receive adequate preparation for Credible Fear Interviews, and expand its humanitarian department to assist people's use of CBP One, and applications for the Biden Parole Program, and accessing medical exceptions. HBA also anticipates needing to expand its work providing language access and translation services for people on the border and in the United States.

HBA anticipates that DHS will continue to disparately deny protection and relief to Black applicants under U.S. and international law during its credible fear interview processes, expelling,

removing, and/or deporting people we serve into danger, or barring people from seeking relief they are entitled to seek under international refugee law, international human rights law, and jus-cogens norms of international law.

### B.  Cameroon Advocacy Network

The Cameroon Advocacy Network is a coalition of organizations and activists across the United States and Cameroon, advocating for the freedom and dignity of Cameroonians seeking asylum in the United States. We stand in solidarity with all Black immigrants fighting for liberation. Founded and led by Cameroonians in the diaspora in coalition with immigration and human rights activists and advocacy organizations, we are uniquely situated to champion the freedom and dignity of Cameroonians, center the issues of black migrants, and build our communities to thrive.

### C.  Black Immigration Bail Fund

The Black Immigrant Bail Fund (BIBF) is a national collaborative project of the Haitian Bridge Alliance (HBA) and the African Bureau for Immigration and Social Affairs (ABISA). BIBF was founded on June 19, 2020, to combat the racism and unusual and cruel punishments faced by black migrants seeking asylum in the United States. This project provides free assistance and relief to black immigrants pursuing liberation and justice. Since its founding, BIBF has received over 350 applications from detained migrants and bond requests reaching over $2.5 million in need.

### D.  Robert F. Kennedy Human Rights

Robert F. Kennedy Human Rights (RFK Human Rights) is a nonpartisan, not-for-profit organization that has worked to realize Robert F. Kennedy's dream of a more just and peaceful world since 1968. The U.S. Advocacy and Litigation Program at RFK Human Rights partners with grassroots organizations to seek accountability for human rights abuses in the U.S. criminal legal and immigration systems and to promote fairness, equity, and dignity for all people whose lives are touched by those systems.

RFK Human Rights also works to protect the human right to apply for protection from persecution and torture by empowering asylum seekers arriving to the United States with the knowledge and resources needed to vindicate their rights under domestic and international law. The U.S. Advocacy and Litigation Program sends monthly delegations to U.S. immigration detention centers, providing Know Your Rights presentations on how to access federal courts to asylum seekers and others. It also represents detained asylum seekers seeking relief from medical neglect, prolonged detention, and denials of due process in asylum screening procedures.

CLP_PC_069093

## VI.      Conclusion

The proposed rule is the latest in a long line of asylum and immigration restrictions that inflict particular harm on Black people. Its implementation will deny Black asylum seekers protection from persecution and torture. It should be withdrawn in its entirety.

Respectfully,

Daniel Tse
Co-Founder, Cameroon Advocacy Network


Comm'r Seydi Sarr,
Co-Founder, Black Immigrant Bail Fund


Erik Crew,
Staff Attorney, Haitian Bridge Alliance


Anthony Enriquez,
Vice President, U.S. Advocacy and Litigation, Robert F. Kennedy Human Rights


Enclosed: Appendices A and B

18

**Appendix A**

CLP_PC_069095

  

**Making a Mockery of Asylum: The Proposed Asylum Ban, Relying on the CBP One App for Access to Ports of Entry, Will Separate Families and Deny Protection**

*March 27, 2023*

Since passage of the 1980 Refugee Act, individuals fleeing persecution and torture have been legally authorized to seek asylum protection at the U.S.-Mexico border at or between official ports of entry (POEs). Recognizing that asylum seekers often leave their homes in haste with nothing but the proverbial shirt on their back, U.S. domestic law—in conformity with treaty obligations—does not penalize individuals for not having proper entry documents. On this point, the asylum statute is clear: any noncitizen "who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival…), irrespective of [their] status, may apply for asylum." 8 U.S.C. § 1158(a)(1). The Refugee Convention, to which U.S. law conforms, is equally unequivocal, prohibiting states from imposing penalties on refugees for their manner of entry. Article 31(1). Moreover, U.S. law does not require asylum seekers to make an advanced appointment to make their claim for protection. Nor does it require they apply for protection in a transit country without ensuring that country is capable of providing safe haven.

For the last three years, starting with the Trump administration and continuing with President Biden, the U.S.-Mexico border has been closed to asylum seekers under the pretext of the COVID-19 pandemic (through a policy known as Title 42). During its tenure, Title 42 has caused untold harms and death, forcing hundreds of thousands of asylum seekers to wait at the border for months and even years in vulnerable and violent conditions, only to expel most of them back to the very dangers they escaped to countries such as Haiti and Cameroon with no fear screening whatsoever. A series of other draconian measures further attempted to deter individuals from exercising their legal right to seek asylum even prior to Title 42. While these policies may have reduced the numbers of individuals seeking protection at the U.S.-Mexico border, it has not resolved the root causes of refugee flight—instead only offshoring the suffering to our neighbors to the south.

With Title 42's impending end, scheduled for May 11, 2023, the Biden administration recently announced a proposed rule to restrict asylum. Misleadingly called the Circumvention of Lawful Pathways rule, the proposed rule makes a mockery of asylum by all but eliminating critical pathways to safety in the United States. If adopted in its current form, the rule would

CLP_PC_069096

bar individuals and families from seeking asylum at the U.S.-Mexico border if they traveled through Mexico or another country and did not apply for, and receive a denial of, asylum there. This restriction is predicated neither on the actual safety of asylum seekers nor on those countries' capacity to hear asylum seekers' claims. It is, rather, a thinly veiled attempt at total deterrence, and yet another abrogation of the United States' duty to those fleeing harm.

One of the only exceptions to the ban—which has nothing to do with the individual's claim for protection—is having made an appointment on a newly released smartphone app, CBP One. But, as described herein, making an appointment on CBP One sits out of reach for most asylum seekers languishing in northern Mexico border towns. Beyond requiring access to a smartphone and adequate Wi-Fi or cell service, the app has been riddled with tech glitches since its inception. The administration has done little to nothing to ensure that the affected communities can navigate the app; the factsheet on the Department of Homeland Security's website is wholly inadequate. Families have been forced to separate to obtain one of a very limited number of appointment slots. And many suffer harms in Mexico while they wait.

The information in this report was compiled from interviews conducted by students from the University of California College of the Law, San Francisco's Haiti Justice Partnership, in collaboration with attorneys and advocates from the Center for Gender & Refugee Studies (CGRS), the Haitian Bridge Alliance (HBA), and the École Supérieure Catholique de Droit de Jérémie (ESCDROJ). Over the course of four days—March 4-5 and 11-12, 2023—the delegation spoke with 194 individuals and family units living in shelters or other informal housing arrangements in Tijuana regarding their experiences using the app as well as protections (un)available to them in Mexico and other transit countries en route to the United States.

All names have been changed in this report to protect the identity of the interviewees.

**Table of Contents**

I.    **The CBP One App is Too Flawed to Fix** ............................................................3
  A.  **Limited Appointments Cause Stress and Confusion** ....................................3
  B.  **Families are Forced to Separate to Exercise Their Rights** .........................4
  C.  **Limited Language Access** .............................................................................6
  D.  **Individuals Face a Glitchy App** ...................................................................6
    1.  Geolocation inaccuracies..........................................................................7
    2.  Photo confirmation issues.........................................................................7
    3.  Freezing and other system errors.............................................................7
  E.  **Mexican Asylum Seekers Have Little Hope of Escaping Danger** ...............9
II.   **Asylum Seekers Have Not Been Able to Find Safety in Transit Countries** .................10
III.  **The U.S. Should Withdraw the Proposed Rule and Restore Asylum** .........................12
IV.  **Appendix**.............................................................................................................13

CLP_PC_069097

## I.   The CBP One App is Too Flawed to Fix

### A.  Limited Appointments Cause Stress and Confusion

In the proposed rule, the administration cynically claims that asylum seekers can avoid the ban by adhering to "legal pathways" by taking advantage of a special parole program for certain nationalities, or by making an appointment on the CBP One app. Using this language, the administration distorts the law, implying it is unlawful to seek asylum by approaching a POE without proper documents or entering outside a POE. Neither international nor domestic law imposes such conditions on seeking protection; and these so-called "legal pathways" are unavailable to the vast majority of asylum seekers, as documented throughout this report. Most of those interviewed had been attempting to schedule an appointment for one month or longer since registering on the app.

First, many individuals do not know about or qualify for the parole program, because they are not nationals of a beneficiary country or they do not have a valid passport or sponsor in the United States. Or even if they might qualify, they cannot wait safely in Mexico for their parole applications to be adjudicated.

And second, the focus of this report, successfully scheduling an appointment on CBP One in advance entails complying with a litany of insurmountable requirements. Asylum seekers must have a smartphone; they must have high-speed data access; they must be able to read and understand the language the app is offered in (indeed, illiterate and elderly asylum seekers are unable to access protection alone); and they must also possess a degree of tech literacy to navigate a poorly designed app by virtually any metric. Perhaps most importantly, in addition to the above, asylum seekers require a stroke of luck to secure one of the extremely limited appointments that by all accounts go within minutes of opening each morning. The delegation spoke with hundreds of people over the course of four days, very few of whom were able to secure an appointment.



CLP_PC_069098

> **The *Perez* Family:** A family of four fled Cuba due to political persecution. The mother, *Ignacia*, was diagnosed with stage three cervical cancer while en route to the United States. The family successfully scheduled an appointment via the app, but was kidnapped in Mexico and held for one month, so missed the appointment. *Ignacia* was beaten and repeatedly raped while they were held. Their twin seven-year-olds are suffering from panic attacks and are having difficulty sleeping due to the trauma they have experienced. Despite daily attempts, they have been unable to successfully schedule again due to technical issues and the paucity of appointments. There is no mechanism for this family to notify the U.S. government of their circumstances to reschedule either within or outside the app. The family was recently forced to leave the shelter where they were staying due to capacity issues and was sleeping in the street until a non-profit offered to pay for a hotel room temporarily. Multiple doctors have told *Ignacia* that they cannot treat her in Mexico; the family is afraid she will die while waiting to seek asylum in the United States.

### B.  Families are Forced to Separate to Exercise Their Rights

The CBP One app offers a limited number of appointments for individuals each day, and when it first launched evidently even fewer that could accommodate families. So, many families interviewed made the difficult decision to separate, leaving spouses alone with children in Tijuana. Of the 157 families interviewed, at least 18 specifically reported that their families had separated because of the CBP One app (and many more were contemplating the same). For those that stayed behind in Tijuana, they expressed an overarching fear that they would never obtain an appointment and safely reunite with their families in the United States.

Many interviewees shared stories of initial confusion using the app. The CBP One app, for instance, failed to make clear that for an entire family to cross, all members must be included under one individual's profile. As such, if a parent obtained an appointment but did not include other family members, they would learn at the border that they could not cross together. Officers consistently told parents that they had the "option" of leaving their children behind, sending their children across the border unaccompanied, or attempting to get another appointment together.



Interviewed families shared frustration that they had been shut out of any opportunity to secure an appointment with all family members included in one profile. Often, family members could get one or two individual appointments, but never enough for their whole family. As

CLP_PC_069099

a result, many interviewees decided to separate out of desperation, sending some family members ahead, while their spouses stayed in Tijuana with their children.

For separated families, those who remained in Tijuana continue to face difficulty obtaining an appointment and feared for their safety. Even when families divided into smaller groups, interviewees shared that they still could not get appointments, despite trying at the early hours of every morning for over a month. Those families in Tijuana were considering sending their children ahead unaccompanied anyway to remove them from danger.

Here are stories of some of the families who separated to improve their chances of entry:

- The *Pierre* family from Haiti—one of the few able to successfully schedule an appointment—presented at the border with their appointment notice that did not list their three-year-old child. A border officer welcomed them with three unenviable options: send one parent through, forgo the appointment altogether, or leave the child behind in Mexico. The family had yet to reschedule after several weeks.

- *Louis* shared that his family, from Haiti, was unable to secure an appointment for himself, his wife, and his young daughter. While languishing in Tijuana, his wife's health deteriorated, and she desperately needed medical attention that was not available there. When they learned that it was easier to get appointments for individuals, they successfully secured an appointment for her. *Louis*'s wife entered the United States but is currently alone in a hospital. *Louis* continues to try to get an appointment for himself and his daughter so that he can take care of his wife, but he has not been successful.

- *Emmanuel's* Haitian family was unable to get an appointment that accommodated his entire family through the app. Because his wife is pregnant, she was able to work with an organization to help her cross the border with one of their children while he stayed behind with their other child. *Emmanuel* successfully got an appointment, only learning at the border that he needed to have his child included on the app, so he had to relinquish the appointment.

- *Esther* was unable to get an appointment for herself, her husband, and their two children. Instead, her husband successfully obtained an appointment for himself and entered the United States. Now, *Esther*, from Haiti, is alone with her children in Tijuana. She is very concerned for her family's safety and worries that the program will end before she can reunite her family in the United States.

5

CLP_PC_069100

- *Angeline*, a Haitian woman, is at a shelter in Tijuana with her three-year-old autistic child. She and her husband decided to separate in the hopes it would be easier for her and the child to get an appointment for two instead of three. Her husband entered using CBP One and she has yet to be successful with the app.



### C.   Limited Language Access

The app is currently only available in English, Spanish, and Haitian Creole. Although the Haitian Creole version—which notably was not available for several weeks after the app first launched—indicates it is also in "French," delegation members observed this is not the case and no French version exists. While certain words overlap between the languages, they are completely distinct.

> **Agnes** fled Togo after her sisters died from complications as a result of female genital cutting and her uncle threatened her with the same fate. She never learned to read and write because patriarchal norms denied many girls an education. While making the treacherous journey through the notorious Darién Gap, she was sexually assaulted on multiple occasions. Some fellow travelers took her under their wing and helped her reach Tijuana where she is now renting a small room in a temporary housing complex with help from extended family in the United States. When researchers met Agnes, she had yet to download the CBP One app on her phone because she is illiterate. Since getting set up on the app, she has tried to schedule an appointment daily to no avail and continues to report confusion at the error messages she cannot read.

### D.   Individuals Face a Glitchy App

Whether individuals attempted to secure appointments alone or with their families, nearly all interviewees encountered problems with the app. From faulty facial recognition to constant glitches, CBP One is riddled with software issues that block individuals from attempting to get appointments on a daily basis.

6

### 1.   Geolocation inaccuracies

At least one individual reported that the app would not schedule an appointment because they were not close enough to the border. However, they were in Tijuana at the time they tried to make the appointment.

### 2.   Photo confirmation issues

To confirm a selected appointment, individuals must take a photo to secure their calendar slot. Because the CBP One app requires photo confirmation at the calendar stage, families struggle to take pictures of all family members within the short confirmation window. Not only is it challenging to get the app to accept photos of all family members, but families also reported waking their young children up as early as one o'clock in the morning to do so. By the time everyone had taken a photo, all of the calendar slots were taken.

In addition to these difficulties, the app's facial recognition software often does not recognize dark skinned people. Many interviewees were unable to get past the photo confirmation stage because the app failed to recognize their faces. Individuals had to make multiple attempts to get the app to accept their photos, which frequently were never accepted. As a result of the delay, they would lose their opportunity to get an appointment for the day.

### 3.   Freezing and other system errors

The CBP One app suffers from a variety of software issues that prevent individuals from using the app. Nearly all interviewees reported that the app freezes at various stages of the process, shutting them out during the short time period within which they can attempt to get an appointment before all the available slots are filled. In an attempt to circumvent the constant system errors they experienced, interviewees shared that they have uninstalled and reinstalled the app, updated the app, or removed all other apps from their phone aside from the CBP One app. Despite this, the software issues persist.



CLP_PC_069102

Some common issues encountered with CBP One included:



- The app froze just before an individual could take their photo. Typically, a spinning wheel appeared on the page, preventing them from progressing further.

- The app froze on the calendar slot page. A large CBP logo appeared on top of the calendar, preventing individuals from selecting the calendar date and continuing to use the app.

- The app froze entirely, without the CBP logo blocking the calendar, but individuals still could not progress to confirm an appointment.

- The app prevented families from adding their family members under one profile. Parents could add their own information, but the app would freeze or shut down after they did so, preventing them from adding their children and progressing further in the appointment process.



Overall, because pervasive system errors with the CBP One app were not resolved before launching, it fails to serve its stated purpose of enabling individuals at the border to effectively apply for daily appointments.

Moreover, the app seemed to work better for people with higher quality smartphones and strong internet connectivity. Several Haitian interviewees were using new phones when they finally received an appointment, and others had tried up to six different phones before they could secure an appointment. Some interviewees who obtained appointments had spent upwards of $500 on their phones, thus creating a system that privileges those with more resources, all but shutting out those who cannot afford a new phone or strong internet.



CLP_PC_069103

### E.   Mexican Asylum Seekers Have Little Hope of Escaping Danger

Mexican nationals will presumably not be subject to the proposed transit bar if adopted because they have not transited through a third country en route to the United States. In practice, however, it is unclear if they will have the ability to even present at a POE without a CBP One appointment even after Title 42 lifts. In the meantime, U.S. policy blatantly violates their right to seek asylum by requiring them to wait in the very country from which they are claiming persecution. Several individuals interviewed had incorrectly been told that the app was not available to Mexicans, and a great deal of confusion persists.

The delegation spoke with 86 Mexican individuals or families, each story more harrowing than the last. Here are just a few examples:

- *Esteban* and his wife and kids fled Michoacan because the cartel wanted *Esteban*'s brother to work for them. When his brother refused, the cartel killed the brother, cut off his limbs, sent the body back to the family in a suitcase, and then burned down the family home. They have been waiting at the border since November 2022.

- *Malena* escaped Michoacan with her two-year-old daughter and father-in-law after cartels disappeared her husband and mother-in-law. They are hiding in a shelter attempting to secure a CBP One appointment.

- *Guadalupe* fled Guerrero several months ago after cartels kidnapped her son and threatened to kill her next. She had yet to even download the CBP One app when interviewed because she is living in a rented room without any means of community or basic support.

- *David* and *Yesenia* fled Michoacan after a criminal organization shot *David*, who had been working as a police officer. They have yet to be able to schedule an appointment; the shelter where they were staying is on the outskirts of Tijuana with weak cell service.

- *Jaime* was captured and beaten when he was unable to pay a cartel's extortion fee on his vegetable business. He fled Michoacan with his wife, *Alma*, and their seven-year-old daughter. *Alma* and their daughter have been threatened while staying at a shelter in Tijuana.

CLP_PC_069104

## II.   Asylum Seekers Have Not Been Able to Find Safety in Transit Countries

The proposed rule would create a "rebuttable presumption of asylum ineligibility" for individuals who do not seek and receive a denial of asylum in at least one country they pass through to reach the U.S.-Mexico border unless they meet the requirements of the administration's new parole programs, manage to secure a CBP One appointment, or meet one of three extremely narrow exceptions. DHS insists that the rule promotes "lawful, safe, and orderly pathways" for those wishing to enter the United States. However, it will put individuals and families in continued danger by ignoring the safety of the countries they pass through and their capacity to process asylum claims.

Only two individuals interviewed had received asylum denials—one in French Guyana and the other in Mexico. The experience of *Ramón*, for instance, highlights the difficulty of seeking asylum in Mexico. He left Haiti after being attacked for participating in anti-corruption protests. In 2022, he began the lengthy process of applying for asylum in Mexico. Despite the Mexican Commission for Refugee Assistance (COMAR) policy of reaching decisions within 45 to 100 business days, a surge in applicants has overwhelmed the agency. In 2021, it received more than 130,000 applications but only processed 38,005. With limited staff to handle this growing demand, the situation has become increasingly challenging. *Ramón* has now been waiting more than four months for a decision on his asylum application and, struggling to find a job, he faces destitution. People reported facing similar insecurity accessing protection in other transit countries.

In sharp contrast to the Biden administration's message of safety for immigrants, Mexico has seen an alarming surge in violent crime rates. In 2021, the homicide rate rose to 28 homicides per 100,000, and over 6,000 immigrants were violently attacked. Unfortunately, asylum seekers in Mexico are often targeted and subjected to discrimination by drug cartels and other criminal actors, as well as by Mexican authorities, including the police and migration officials. Not surprisingly, *Adelina*'s family (from Honduras) was kidnapped in Tapachula, and the police took all of her money, while *Mayra* (from Guatemala) was subjected to unwanted touching by Mexican authorities. Despite feeling scared and unsafe, both women must continue waiting in Mexico while trying to obtain one of the limited appointments through the CBP One app.

CLP_PC_069105

> ***Roseline*** was journalist in Haiti with a radio show dedicated to denouncing the rampant crime throughout the country. Threatened with her life, she was forced to flee. Educated, with mastery in three languages, *Roseline* tried to apply for protection in Chile but was overwhelmed by the confusing process and eventually gave up. She came to Mexico with someone who she thought was her friend, but he attacked her and tried to rape her, so she had to flee again. She and her three-year-old son were homeless at the time of interview with nowhere to go (though they were secured a place at a local shelter later that day). *Roseline* had attempted to secure a CBP One appointment every day. She once received an appointment in Mexicali, but border officials turned her away for unclear reasons having to do with the CBP One app.

The following accounts further illustrate the dangers for asylum seekers in Mexico and other transit countries and why applying for asylum in those countries is simply not an option for most:

- The *Perez* family, mentioned above, like many others is too afraid to apply or wait for their asylum claim to be adjudicated in Mexico. A politically connected cartel kidnapped the family in southern Mexico, repeatedly raped the mother, and—before releasing them on a ransom—threatened to kill them should they report anything to the authorities. They are now living in hiding in Tijuana awaiting reunification with family in the United States.

- The *Morales* family, a mother and her thirteen-year-old son, continue to feel unsafe in Mexico after fleeing Honduras. The mother ran a market and owned her own home and car. When she refused the cartel's demands that her son sell drugs, the cartel attacked her, destroyed her vehicle, and tried to kidnap her son. After Honduran authorities refused to get involved, the family fled. The mother did not apply for protection in Guatemala because the same cartel was also active there. Shortly after arriving in Mexico, she received an anonymous call: an unidentified man told her he knew that she and her son were in Mexico. The family is living in isolation in a Tijuana shelter out of fear.

- The *Cortez* family, a mother and three young sons, fled El Salvador when the mother was unable to pay a weekly extortion fee to the cartel from her food and vegetable business. The cartel threatened to kill her or kidnap one of her sons. The mother is scared to stay in Mexico for fear of being found by members of the same cartel.

CLP_PC_069106

- *Sandra* fled Honduras with her daughter after her husband was murdered. In Mexico, the family was kidnapped and held for fifteen days during which time the kidnappers subjected her to a brutal beating.

## III.    The U.S. Should Withdraw the Proposed Rule and Restore Asylum

The stories contained in this report are not unique. Several news outlets and community based organizations have reported on these same or similar issues at other locations across the southwest border since release of the CBP One app on January 12, 2023. Members of Congress have called on the administration to resolve the issues. The dangers in transit countries facing asylum seekers who reach the United States have also been well documented.

The proposed rule betrays the promises the Biden administration made in one of its first Executive Orders on asylum and in the 2022 Los Angeles Declaration on Migration and Protection to ensure protections for those in need. The rule will block from asylum individuals who undoubtedly face persecution, torture, and even death. The administration should withdraw the rule, end Title 42, and restore access to asylum at the U.S.-Mexico border.

## Acknowledgments

This report was authored principally by CGRS Law Clerk and UC Law student Peter Habib with authorial contributions by CGRS Legal Director Blaine Bookey and UC Law SF students Kelsey Anderson, Sam Dodson, Jessica Gillespie, and Keari Platt. Other members of the delegation included: UC Law SF students Jess McPeake, Tuesday Rose Thornton, Becky Vaughan, Nick Wiley and Jake Zarone and ESCDROJ Professor Yvon Janvier. The delegation thanks HBA Legal Director Nicole Phillips and CGRS Director of Litigation Melissa Crow for their comments and extends its appreciation to HBA staff Jeef Nelson and Vivianne Petite Frere for logistical support and Jeremie Dupin for interpretation.

CLP_PC_069107

## IV.   Appendix

**Summary of Interviews with Asylum Seekers in Tijuana, Mexico from March 4-5 and 11-12, 2023**



Of the 194 interviews conducted in Tijuana, Mexico, the vast majority of interviewees were either Haitian or Mexican. As shown below, these two groups comprised nearly 80% of all asylum seekers interviewed. The delegation also spoke with a significant number of Hondurans over the four days during which interviews were conducted.

As described above, families are especially impacted by the ongoing volatility and inhumanity of U.S. border policy. The vast majority—at least 81%—of those interviewed were travelling as a family, seeking safety in the United States. While all asylum seekers are adversely impacted by the Biden's administration's existing policies and proposed rule, families and parents of young children remain particularly vulnerable— forced to make choices that no parent should have to make.



CLP_PC_069108



## Families Forced to Separate



Many of the families interviewed experienced the "choice" of splitting their family apart in order to increase their chances of obtaining one of the scarce CBP One appointments. At least 11% of those with whom the delegation spoke made the difficult choice to separate and send some family member(s) into the United States while the other remained in Mexico.

Of the 194 interviews conducted, very few had successfully scheduled an upcoming appointment on CBP One. At the time of interview, 97% of families and 92% of individuals had no forthcoming appointment. Of the few who had successfully scheduled an appointment, several noted that their luck in successfully scheduling an appointment only came when they bought a new smart phone.



14

CLP_PC_069109

**Appendix B**

CLP_PC_069110

United States of America

Shadow Report to the Committee on the Elimination of Racial Discrimination (CERD)

107th Session

(08 – 30 August 2022)

Anti-Black discrimination against non-citizens and ongoing violations of international protections for migrants, refugees, and asylum seekers of African descent

Submitted by:

Black Alliance for Just Immigration (BAJI)

Haitian Bridge Alliance (HBA)

Human Rights First (HRF)

The Refugee and Immigrant Center for Education and Legal Services (RAICES)

Robert F. Kennedy Human Rights (RFK Human Rights)

Endorsed by:

Communities United for Status and Protection (CUSP)

Institute for Justice & Democracy in Haiti (IJDH)

## I.       Introduction

This Shadow Report is submitted for the combined tenth, eleventh, and twelfth periodic review of the United States ("US") by the Committee on the Elimination of Racial Discrimination ("Committee"). The Report provides selected research and analysis focusing on US immigration and refugee laws, regulations, policies, and practices that subject Black non-citizens to racially discriminatory treatment in violation of the International Convention on the Elimination of All Forms of Racial Discrimination ("Convention"). It is not a comprehensive account of all forms of discrimination in the United States against migrants, refugees, and asylum seekers. We thank the Committee for the opportunity to share this information and its consideration of the actions we recommend to address these serious violations.

## II.      Executive Summary

1.       The United States government subjects Black non-citizens—migrants, refugees, and asylum seekers—to ongoing racist and xenophobic treatment under its laws, regulations, policies, and practices, in contravention of the Convention, which prohibits discrimination against all persons under its jurisdiction, including non-citizens on the basis of race and national origin.[1]

2.       Since the Committee last reviewed the US in 2014, the US government has implemented a series of policies at the border, including metering, the Migrant Protection Protocols, and Title 42 policies, with devastating and disparate impact on Black migrants, refugees, and asylum seekers. They have resulted in myriad human rights violations, have prevented many people eligible for refugee protection from seeking or receiving asylum in the US, and have been used to carry out summary pushbacks and expulsions of asylum seekers in direct violation of *non-refoulement jus cogens* obligations. Since 2020, thousands of Haitians, including asylum seekers, have been disparately targeted for expulsion under the Title 42 policy to a deepening security and humanitarian crisis in Haiti without an opportunity to apply for asylum protection.

3.       The shocking, discriminatory, and excessive use of force by US immigration officers in September 2021 against Haitian migrants attempting to seek refuge in the United States near Del Rio, Texas, is another emblematic manifestation of the US's attempts to deter Haitians from seeking asylum in the US and the systematic discrimination Black people, citizen or non-citizen, face in the US.

4.       Unable to seek asylum in the United States due to these policies at the border, unable to return to their home countries due to persecution and other life-threatening conditions, and unable to firmly settle elsewhere in the Americas because of discriminatory policies and treatment, many Haitians have been stuck for years in the US-Mexico border region in dangerous, cartel-controlled territories in Mexico where they also face pervasive anti-Black discrimination. US policies have added to the dangers displaced people face as they are forced to undertake more dangerous migration routes, as formal and informal US agreements with countries in the Americas result in new restrictions, closed borders, and other measures that increasingly restrict access to asylum protection throughout the region.

5.       Black migrants who manage to arrive in the US face disparate treatment and a racially discriminatory immigration system. This includes racial profiling in immigration enforcement actions; excessive force, medical neglect, and other discriminatory treatment by US personnel in immigration detention; prolonged and arbitrary detention, including the imposition of higher bonds on Black migrants; inadequate access to legal information, legal counsel or proper interpretation in detention; low rates of successful asylum screenings and approval rates for individuals from Black-majority countries from which many refugees are seeking international protection; and racially disparate rates of deportation.

6.       The anti-Black animus behind policies adopted by the former Trump administration was made evident in statements reportedly made by President Donald Trump denigrating African and Haitian countries and their people. Some of these illegal practices from the prior administration—including Title 42 expulsions—continue. But discriminatory government policies and practices to deter Black refugees and

1

CLP_PC_069112

immigrants from coming to the US are not new.[2] Contemporary efforts to target, interdict, detain, and block Haitian refugees span back to at least the 1970s.[3] As some commentators have remarked, "[w]e are in a moment that is strikingly reminiscent of the early 1980s, when fear and hatred of Haitians was used to justify the reinstitution and expansion of immigration detention."[4]

7.        This Shadow Report summarizes the US's legal framework and details some of the myriad, recent violations of the rights of Black migrants, refugees, and asylum seekers in the US. The Report recommends steps the US should take to comply with its obligations under the CERD.

## II.       United States of America: International and Domestic Legal Framework and Practice

8.        The US Constitution creates a three-part governmental system composed of an executive, legislative, and judicial branch. The executive and legislative branch are elected by a federated network of localities, and the judicial branch is composed of executive branch appointments who must be confirmed by the legislative branch.[5] The executive branch is empowered to make and enter into treaties on behalf of the US; though under the Constitution, the legislative branch must also accede to treaties in order for them to take domestic effect.[6] Courts and localities are bound by treaties once given effect.[7]

9.        The legislative branch is responsible for creating laws regarding naturalization and citizenship; the executive branch is responsible for enforcement; and the judicial branch is responsible for adjudicating cases and controversies related to citizenship.[8] The following set of international treaties and State legislation create the framework prohibiting discrimination against non-citizens on the basis of race or national origin.

### A.   International Convention on the Elimination of All Forms of Racial Discrimination

10.      The United States signed the Convention on the Elimination of All Forms of Racial Discrimination in 1966, amid a mass movement for human rights for people of African descent, but the legislature did not accede to the treaty until 1994—and with significant reservations. The reservations contradict the Convention's definition of racism by claiming that disparate impact is not enough to establish a claim of racial discrimination.[9] The reservations deny the duty of the State to regulate hate speech and racist propaganda and deny the duty of the State to regulate private racist conduct. The reservations make the Convention non-self-executing—claiming that the provisions in US law already guarantee adequate protections against racism—and so no person, citizen or non-citizen, can assert a claim or access judicial remedies based on the Convention.

11.      Further, as shown in its most recent report to the Committee, the US asserts that discrimination towards non-citizens is not regulated by the Convention, even though this Committee had made clear that, under the Convention, States have a duty to guarantee the human rights of all persons, either citizen or non; preserve their right to due process; and "[e]nsure that immigration policies do not have the effect of discriminating against persons on the basis of race, colour, descent, or national or ethnic origin."[10]

### B.   Durban Declaration and Programme of Action (DDPA)

12.      The United States has not endorsed or applied the Durban Declaration and Programme of Action, the global community's most clear commitment to ending racism, because it objects to two sets of statements in the Declaration.[11] The DDPA aptly warned in 2001, however, that "racism is gaining ground" and that "contemporary forms and manifestations of racism and xenophobia are striving to regain political, moral, and even legal recognition, including through the platforms of some political parties and organizations and the dissemination through communication technologies of ideas based on the notion of racial superiority."[12] It named "xenophobia against non-nationals, particularly migrants, refugees and asylum-seekers" as "one of the main sources of contemporary racism."[13] Its substantive provisions regarding State's duties to address these issues, along with its recommendations, remain essential to States' compliance with CERD.

2

CLP_PC_069113

### C. 1967 Protocol relating to the Status of Refugees

13.     In 1968, the United States became a party to the 1967 Protocol relating to the Status of Refugees and thus the substantive framework of the 1951 Refugee Convention.[14] The treaty prohibits governments from imposing penalties on refugees who entered without inspection in search of asylum if they present themselves to immigration authorities without delay.[15]

### D. Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT)

14.     In 1994, the US acceded to the CAT,[16] which prohibits States from returning any individual to a country where it is more likely than not that she would face torture.[17]

### E. International Covenant on Civil and Political Rights (ICCPR)

15.     The United States ratified the ICCPR in 1992,[18] which confirms the right to liberty and security of persons and prohibits detention that is unreasonable, unnecessary, disproportionate, or otherwise arbitrary.[19]

### F. US Domestic Framework

16.     The original US naturalization laws restricted citizenship to "white persons"[20] and rendered people of African descent non-citizens, capable of being owned as property, forced into involuntary servitude, traded, separated from families, tortured, and unable to access the courts or seek justice for crimes perpetrated against them.[21] Following a brutal civil war in the mid-19th Century, the United States amended its constitution to provide citizenship to all people born in the US—thus granting citizenship to all people of African descent born in the US who had previously been denied.[22] Shortly thereafter, the legislative branch amended its original naturalization laws to allow for people of African descent to seek citizenship if they did not already have it, though people of Asian descent were still barred until 1952.[23]

(1) Immigration and Nationality Act (INA)

17.     In 1952, the United States synthesized its various provisions into one act entitled the Immigration and Nationality Act (INA). In 1965, amidst the Civil Rights Movement, the legislature amended the INA to lift a racial quota system that had in effect limited non-citizens of African descent from seeking US citizenship. Though the basic structure of US law towards non-citizens seeking legal status in the United States has remained unaltered since the 1965 INA, the US has since passed laws that dramatically expanded the State's authority to deport non-citizens on the basis of contact with the State's criminal justice system.[24]
18.     Under the INA, "any alien who is physically present in the United States or who arrives in the United States (whether or not it is at a port of arrival), irrespective of the alien's status may apply for asylum."[25]

(2) 1980 Refugee Act

19.     The US created domestic legislation on asylees and refugees following its accession to the 1967 Protocol with the 1980 Refugee Act, which included a provision barring the removal of individuals who meet the refugee definition under US law.[26]

(3) Title 42 Policy

20.     At the onset of the COVID-19 pandemic, the US executive branch in March 2020 invoked a little-known provision, 42 USC §§ 265, 268 in its Public Health Service Act, which allows for the suspension of the introduction of non-citizens where there is "the existence of any communicable disease in a foreign

3

country" and "there is serious danger of the introduction of such disease into the United States."[27] The policy has been used even against non-citizens attempting to seek asylum who have no safe place where they could be returned and violates US immigration statutes, its international obligations of *non-refoulement*.[28] Public health experts—including US government experts—have consistently dismissed Title 42 as a public health measure.[29] Instead, the policy is better explained as part of an initiative by Trump administration officials with established white supremacist ties,[30] to limit immigration through every available tool,[31] in order to preserve white racial hegemony in the United States.

### III.   Racist, anti-immigrant hate speech by officials informs US policies

21.     Former President Trump's overt racism towards African, Haitian and other immigrants was on full display when in January 2018, he reportedly asked, "Why are we having all these people from shithole countries come here?" in reference to Haiti and other countries designated for Temporary Protected Status (TPS), and remarked, "Why do we need more Haitians? . . . Take them out."[32] President Trump also reportedly expressed a preference for immigrants from European and Asian countries, underlying concerns that the prior administration's immigration policies were animated by a racial hierarchy that sought to target and block Black migrants from the US.[33]

22.     A few weeks earlier, on November 20, 2017, the US Department of Homeland Security ("DHS") had announced the termination of TPS for Haiti.[34] The termination decision was later enjoined by a federal court, which found the termination likely politically motivated and "based on race and/or national origin/ethnicity against non-white immigrants in general and Haitians in particular."[35]

23.     In recent months, local, state, and federal elected officials have repeatedly used rhetoric associated with the white supremacist "great replacement" conspiracy theory to characterize refugees and migrants arriving at the border, including many Haitians, as an "invasion" of the US.[36] In response to these "invasion" claims, in July 2022, the state of Texas issued an order authorizing state police and National Guard troops to make warrantless arrests of individuals suspected of unauthorized entry or other federal offenses and "return" them to Customs and Border Protection ("CBP") officials at border ports of entry.[37] Such arrests are likely to disparately impact Black and Brown communities in the US perceived by such officials as unauthorized migrants.[38] This "invasion" language also echoes statements used by extremists in the US to justify attacks on racial and religious minority communities, including the mass murder of ten Black people at a grocery store in Buffalo, NY in 2022.[39]

24.     Such statements and actions by government officials targeting Black migrants violate Article 4(c), which prohibits public authorities from promoting or inciting racial discrimination, including based on claims of racial superiority, and Articles 2(1)(a)-(c), which obligate States to eliminate policies that perpetuate racial discrimination, ensure all public authorities act consistently with this obligation, and prohibit government support or defense of racial discrimination by any persons or organizations.

### IV.   Situation of non-citizens, including migrants, refugees and asylum seekers (CERD arts. 2, 4, 5, and 6)

#### A.   Excessive use of force by Customs and Border Protection (CBP) personnel and lack of accountability for violent, disparate and discriminatory mistreatment of Haitian migrants seeking asylum near Del Rio, Texas

25.     From approximately September 9 to 25, 2021, at least 15,000 Haitians, along with hundreds of other nationals, were held in a makeshift CBP encampment near the Del Rio International Bridge in Texas after they crossed the US-Mexico border. Many had crossed there to seek asylum because US ports of entry remained closed due to the Title 42 policy (discussed below). The US government responded with militarized force,[40] imposing restrictions on movement within and out of the encampment that was blocked

CLP_PC_069115

off using shoulder-height fences constructed of chicken wire and abutted the Rio Grande River. Texas state police troopers were stationed across the river's northern bank, while Mexican state police and officers from Mexico's National Migration Institute (INM) lined the southern bank. Because the US government effectively prevented individuals from leaving the encampment, it rendered them unable to care for themselves and owed them a duty of care, including to provide basic human necessities, which it failed to adequately meet.[41] As a result, people trapped within the encampment were subjected to hunger, dehydration, and other inhumane conditions as they awaited processing by CBP.

    (1)  Violence and threats by US immigration officers

26.    As captured in part by photographs that shocked the national consciousness,[42] heavily armed and mounted US Border Patrol agents subjected migrants in the Del Rio encampment, who were overwhelmingly Black Haitian people, to physical violence, verbal threats, and other acts of intimidation.

- One of those viral photographs depicted a Haitian asylum seeker, Mirard Joseph, being attacked by a CBP officer on horseback.[43] Like many Haitians at Del Rio, Mr. Joseph was crossing the Rio Grande to bring food back to his wife and children when he was surrounded by CBP officers on horseback, who used their split reins to lash at him and attempted to drag him back into the river. Mr. Joseph, a plaintiff in the class action lawsuit, *HBA v. Biden* described the encounter as "the most humiliating experience of my life."[44]

- Multiple people from the Del Rio encampment also experienced and witnessed CBP officers on horseback chasing down and trampling Haitian migrants attempting to cross the Rio Grande. One Haitian man brought his eight-year-old son to the riverbank to bathe when mounted officers chased down a group of migrants gathered by the river.[45] As his son attempted to run away from the CBP officers on horseback, he fell—was nearly trampled by the horse—and suffered cuts and bruises to his eye and legs. The man described the "moment of terror" when he saw his young son fall to the ground, "I thought my son would be killed, right there in front of me."[46] Terrified and traumatized, they fled the encampment that night.

- Another Haitian couple, who was also shoved by CBP officers in Del Rio, said, "When we were crossing the river by the bridge, we were met by CBP agents. Some of them were on horses, some were on foot. As I was trying to cross with my pregnant girlfriend they shoved us. She was shoved and fell to the ground. I don't speak English well, but I tried to tell the agents that my girlfriend was pregnant. I tried to say it in Spanish. But they continued to abuse us and they kept shoving us across the river."[47]

- One Haitian man was attempting to cross the Rio Grande and return to the encampment with food for himself and others when a CBP officer dismounted from his horse and deliberately cut the rope the man was using to navigate the deep water and strong river current.[48] As the officer threw the severed rope into the river,, several other Haitians attempting to cross fell into the river and struggled to swim.[49] The officer shouted that they could not return to the American side of the border. This man also witnessed CBP personnel hit and push Haitians closer to the river bank back into the water.

27.    CBP officers used racial slurs against the overwhelmingly Black migrants who were in the Del Rio encampment. One example, captured on video, includes a mounted officer shouting at a group of migrants: "This is why your country's shit, because you use your women for this."[50] The officer then reared his horse and directed it towards a group of children. Among those who experienced or witnessed CBP officer's chasing migrants on horseback, the majority reported that those officers shouted threats to fleeing Haitian migrants, ordering them to "go back to Mexico."[51]

28.    This combination of physical violence, verbal threats and intimidation by CBP personnel created an overwhelming and constant state of terror for Haitians trapped by CBP in the Del Rio encampment, , as well as actual harm to their safety. Authorities also restricted legal service organizations from entering the encampment, resulting in the lack of access to legal resources in Haitian Kreyol for asylum seekers. DHS's refusal to allow attorneys to access the encampment also prevented them from interviewing survivors and

CLP_PC_069116

witnesses in order to document the misconduct of DHS personnel. Many witnesses crucial to an investigation of CBP's conduct at Del Rio were immediately expelled by DHS to Haiti under Title 42.[52] To expel many of the nearly 15,000 Haitian migrants from the Del Rio camp, the US government authorized a first-of-its-kind "emergency" contract with a private prison company for deportation flights to Haiti. The contract was authorized to be entered into without full and fair competition and ultimately cost nearly 1900% more per flight than the average cost of a deportation flight.[53]

29.     The government should have taken measures to guarantee equal protection based on race for Black migrants under Articles 2 and 5 and to protect against violence or bodily harm under Article 5(b).

(2) Inhumane and degrading conditions, lack of medical attention

30.     Haitian migrants trapped in the Del Rio encampment reported extremely limited access to food and water. Most reported being given one water bottle heated by the sun and a piece of bread daily. Food suitable for infants and small children was not provided, even though an estimated 40% of those in the encampment were children.[54] Some individuals were forced to drink from the Rio Grande, which is not potable. This lack of clean drinking water caused many in the encampment to get sick, including gastrointestinal illness, particularly children. Many individuals who did not receive food or water, especially pregnant women, fainted from lack of nutrition or dehydration. A majority of individuals interviewed in the migrant shelter in the Mexican city of Acuña on September 25, 2021, reported that they were forced to return to Mexico because they experienced extreme hunger after up to six days of being deprived access to food and water.[55]

31.     Haitians trapped in the encampment reported have to wait until nightfall to travel to Mexico for rations and supplies. As one Haitian asylum seeker described, "We were starving and they weren't giving us any food. People would give money to those who were willing to risk the journey across the river to Mexico. As more soldiers came to the river, people had to try to cross at night away from the soldiers to avoid being caught."[56] Those who attempted to cross into Mexico in search of food and water faced a variety of risks: drowning in the dangerous Rio Grande,[57] being stopped by CBP officers, and being prevented from returning to the encampment by Mexican and US border officials, which could lead to separation from their families and other loved ones.

32.     CBP did not provide those trapped in the encampment access to showers or running water. Instead, people had to bathe in the Rio Grande, where they were exposed to disease-causing bacteria. CBP installed only about 50 portable toilets within the camp for over 15,000 people.[58] CBP personnel failed to meet the basic shelter needs of migrants and refused to provide beds, cots, blankets, tents, or shelter of any kind. Those trapped in Del Rio were exposed to the elements, including triple digit temperatures, dirt, and dust.[59]

33.     CBP also failed to attend to the medical needs of migrants in the encampment, including the many infants, children, and pregnant and otherwise vulnerable people.[60] Many reported that CBP personnel denied their requests for medical care, telling them to "go back to Mexico." For example, a Haitian man traveling with his wife and two-year-old daughter described how his daughter became very sick with gastrointestinal and respiratory issues from the dust.[61] She was vomiting frequently, had a high fever, and visible difficulty breathing. Despite the man's pleading and repeated requests for help, CBP personnel denied the child's medical treatment.

34.     One newborn infant almost died after being held in the encampment for several days. He survived only after Haitian Bridge Alliance advocated for him to be airlifted to a hospital in San Antonio, Texas, where specialists provided life-saving medical treatment.[62] One Haitian woman described, "I witnessed pregnant women going into labor taken in to give birth and then sent back under the bridge without further access to healthcare. And that was really heartbreaking for me."[63] An individual reported that after a pregnant Haitian asylum seeker went into labor, US officials took the woman out of the encampment, but returned her and her newborn to the encampment hours after delivery.[64]

CLP_PC_069117

35.     These inhumane conditions in CBP custody and lack of access to food, water, housing, and medical care in order to deter Haitian migrants from seeking asylum violated Article 5(b), and (e)(iii) and (iv).

(3) Lack of Accountability

36.     Since the events of September 2021,  calls for accountability for the actions of DHS at Del Rio have come from: members of Congress;[65] the Inter-American Commission on Human Rights;[66] joint United Nations agencies[67] and experts,[68] including UNHCR.[69] President Biden condemned CBP's treatment of Haitian migrants as "outrageous"[70] and DHS Secretary Alejandro Mayorkas stated that the images from Del Rio "painfully conjured up the worst elements of our nation's ongoing battle against systemic racism."[71] On September 22, 2021,  Secretary Mayorkas pledged that an internal investigation of the events at Del Rio would "be completed in days, not weeks."[72]

37.     After *ten months*, on July 8, 2022, CBP released the findings of its investigation on the treatment of Haitian and other Black migrants at Del Rio. In a report of 511 pages, CBP focused on only *30 minutes* of the events in Del Rio,[73] Instead of comprehensively investigating the humanitarian crisis that occurred over the span of at least 16 days.[74] The report's authors interviewed journalists and law enforcement, but not a single Haitian migrant, though counsel for several Haitians offered their testimony.

38.     The CBP investigation concluded that CBP officers took commands from Texas state police to "use[] force or the threat of force" to drive Haitians seeking asylum into the Rio Grande.[75] The report also found that one CBP officer "acted in an unprofessional manner" by yelling comments related to a migrant's national origin and sex.[76] Ultimately, the report concluded that "despite the actions taken by the [CBP officers] during this incident, there was no evidence found during this investigation to suggest any migrant was ultimately forced to return to Mexico or denied entry into the United States."[77] As a result of the investigation, four CBP officers are facing discipline and have been moved to administrative positions. But DHS has announced no policy changes or findings related to its treatment of Black migrants as a group.

39.     Haitian Bridge Alliance and counsel to *HBA v. Biden* had offered to provide Haitian migrants for testimony. The failure to interview them and include their testimony undermines the credibility of the report as it consequently fails to some of the mistreatment and abuse inflicted on Black asylum seekers and migrants at Del Rio. To seek accountability and lasting change, advocates have filed a class action lawsuit in federal court,[78] a civil rights complaint with the DHS Office for Civil Rights and Civil Liberties (CRCL),[79] and 32 information requests through the US Freedom of Information Act and the Texas Public Information Act.[80] All remain pending.

40.     In June 2022, news media reported that CBP officers were trading a commemorative coin celebrating the terrorizing of Black migrants at Del Rio by agents on horseback.[81] The coin showed an image of a Haitian migrant being grabbed at by a CBP agent wielding horse reigns as a whip. It was emblazoned with the words "You will be returned."

41.     The violent response of the US government to 15,000 Haitian and other Black asylum seekers contrasts with the welcome reception to white Ukrainians only months later. As of June 2022, the US government was on track to welcome 100,000 Ukrainians since authorizing their entry into the US through a specialized program in March 2022.[82]

42.      The US government's extraordinary use of militarized force, exceptional expulsion flights, and denial of food, water, and medical care to Black asylum seekers, especially when contrasted with its accommodating behavior toward white asylum seekers months later, violates Articles 2(1)(a), prohibiting the State from engaging in any act or practice of racial discrimination against persons or groups, and 2(1)(b), by which States agree to engage in no act or practice for racial discrimination. against persons or groups of persons and not to sponsor, defend or support racial discrimination by any persons or organizations. Such actions also violate Article 4(c), which prohibit national public authorities (CBP and DHS, which oversees CBP) from promoting or inciting racial discrimination. CBP's self-serving, deficient investigation findings,

7

and the lack of access to justice though various administration and other complaints demonstrate lack of equal treatment before the "tribunals and other organs of administrative justice" by CBP and DHS under Article 5(a), as well as "just and adequate reparation or satisfaction for a damage suffered as a result of discrimination" under Article 6.

**B. Deportation of undocumented non-citizens under Title 42 policies, particularly Haitians *en masse*, without access to fair and efficient asylum procedures, legal representation, language, knowledge, and non-refoulement**

43. Since March 2020, DHS has used the Title 42 policy[83] to block asylum at US ports of entry and to expel migrants and asylum seekers to Mexico or their countries of persecution without access to the US asylum system or refugee protection screenings.[84] US Department of State top legal expert, Harold Koh, resigned in October 2021, after concluding that the use of Title 42 to expel people seeking protection, "especially migrants fleeing from Haiti," is "illegal and inhumane."[85] In May 2022, the Biden administration terminated the order implementing the Title 42 policy, but it remains in place under court order pending appeal in the case.[86]

44. DHS has disproportionately targeted Haitians for expulsion to their home country under Title 42, blocking Haitian asylum seekers from exercising their right to seek protection in the US and returning families and individuals to a deepening security crisis and life-threatening humanitarian conditions in Haiti.[87] In May 2022, the UN High Commissioner for Human Rights observed that "armed violence has reached unimaginable and intolerable levels in Haiti."[88] Yet, DHS has continued to target Haitian migrants for expulsions. In May 2022, for example, "Haitians represented about 6% of the migrants crossing the border with Mexico but occupied 60% of expulsion flights."[89] US government data shows that Title 42 has been employed to expel at least 22,000 Haitians from the US.[90] These expulsions have resulted in family separations with some family members expelled to Haiti while others are permitted to apply for protection under the US asylum system.[91]

45. DHS has also detained for days or weeks prior to expulsion many of those expelled to Haiti in inhumane conditions, where they have been subjected to racist abuse,[92] and transported expelled people in shackles on flights to Haiti.[93] DHS officers frequently refuse to tell those being expelled where they are being taken and, in some cases, lie that flights are destined for elsewhere in the United States.[94]

46. Haiti is not able to safely receive or protect people expelled through Title 42. As expelled Haitians disembark US deportation flights sick, handcuffed, hungry, traumatized, and disoriented, they find themselves in a "humanitarian nightmare," including widespread gang violence, an ongoing political crisis following assassination of Haiti's President Jovenel Moïse, food insecurity, a health system "on the brink of collapse," and devastation following a recent earthquake.[95] As Human Rights Watch concluded in a recent report, "Returns to Haiti are life-threatening now, and will continue to be so, until security conditions in Haiti improve...Haiti is experiencing a dire security situation, including loss of government control over strategic areas to the hands of dangerous armed gangs, widely believed to be financed by politicians and to have police officers on their payroll. Violence has worsened an already severe humanitarian crisis."[96]

47. In stark contrast to the treatment of Haitian and other Black, Brown and Indigenous asylum seekers under Title 42, who continue to be largely blocked from seeking asylum at land border ports of entry, DHS provided near universal exceptions to Title 42 for Ukrainians. Between March and May 2022, DHS processed more than 98.9 % of the more than 23,000 Ukrainians who arrived at the southern US border at ports of entry - nearly all were granted parole and not placed in removal proceedings[97] and only 0.6% subjected to Title 42.[98] In comparison, with ports of entry largely blocked to other asylum seekers, only 23.5% of the 18,000 Haitians encountered along the southern border in that same period were able to present at ports of entry and 26.3% were subjected to Title 42,[99] a rate more than 40 times higher than Ukrainians.

CLP_PC_069119

48.     In addition, Black migrants and asylum seekers, including thousands of Haitians, blocked in and returned to Mexico face grave violence, discrimination, and life-threatening denials of access to medical care and other vital services.[100] Surveys in 2021 of Haitians blocked from US asylum protection due to Title 42 found that 61% reported being the victim of a crime while in Mexico, including kidnapping, rape, and robbery.[101] Researchers have tracked more than 10,000[102] reports of rape, torture, kidnapping and other violent attacks on asylum seekers and migrants blocked in or expelled to Mexico due to Title 42, including the May 2022 murder of Jocelyn Anselme, a 34-year-old Haitian asylum seeker, who was killed in Tijuana while blocked from seeking asylum due to Title 42.[103] In addition, Mexican authorities have targeted Black migrants for abuse with nearly 20% of Haitian asylum seekers in the northern Mexican border region reporting that Mexican police subjected them to beatings, extortion, and other threats.[104] Cartels and gangs also target Black migrants for various crimes such as kidnapping because they stand out as migrants based on their skin color. Black LGBTQ asylum seekers from Jamaica and other countries who have been stranded in Mexico due to Title 42 face dual racist and homophobic violence and discrimination.[105]

49.     In general, because CBP does not consistently record information on the race of individuals subjected to the Title 42 policy, the racially disparate impact of policy is not fully known.[106]

50.     The targeted application and expulsion of Haitians under Title 42 violates *inter alia* Article 2(1)(I), requiring that the State rescind policies that perpetuate racial discrimination, and the right guaranteed by Article 5(b) to security of person and protection from violence or bodily harm.

   **C.   Other policies with a disparate and discriminatory impact on Black undocumented non-citizens that block them from entering US or result in their deportation without access to fair and efficient asylum procedures, legal representation, language, knowledge, and non-refoulement**

        (1)   Metering & "Remain in Mexico"

51.     A 2016 policy known as "metering" was implemented under the Obama administration in response to an increase in Haitians seeking asylum at US ports of entry.[107] Under the metering policy, which the Trump administration expanded along the entire southern US border in 2018,[108] CBP officers intentionally reduced processing of asylum claims at ports of entry, returning most asylum seekers back to Mexico without processing their asylum claims. Those turned away were forced to wait in dangerous Mexican border cities, many under the control of cartels, for an opportunity to request protection.

52.     Black asylum seekers forced to wait in Mexico faced particular risks because of their race and nationality, and were particularly targeted for violence, including kidnappings.[109] Black asylum seekers also frequently reported that anti-Black discrimination and lack of interpretation services blocked or delayed them from placing their names on informal lists of asylum seekers in Mexico that developed as a result of metering at many ports of entry.[110] In 2020, a US federal court found the metering policy violates US law.[111] In November 2021, the Biden administration rescinded the Trump administration's metering directives but did not prohibit the use of metering in future.[112]

53.     Beginning in 2019, the Trump administration used the Migrant Protection Protocols,[113] commonly referred to as Remain in Mexico (RMX), to force asylum seekers and migrants to await US immigration court proceedings in dangerous border regions of Mexico. Families, children and individuals returned to Mexico were targeted for grave violence, including murder, torture, rape, kidnapping and other attacks.[114] Afro-descendent asylum seekers from Central and South America[115] faced targeted anti-Black violence and discrimination upon their forced return to Mexico.[116] Subjected to these dangers, stranded in deplorable living conditions, and largely cut off from US immigration attorneys, RMX also created nearly insurmountable obstacles to the fair adjudication of asylum cases.[117] In June 2022, the US Supreme Court ruled that the Biden administration did not violate US procedural law in terminating the RMX policy.[118]

9

54.    Blocking and returning Black asylum seekers to targeted violence in Mexico violates *inter alia* Article 2(1)(c), requiring that the State rescind policies that perpetuate racial discrimination, and the right guaranteed by Article 5(b) to security of person and protection from violence or bodily harm.

(2)   Expedited removal, removal proceedings, and third country transit ban

55.    Under the expedited removal process,[119] US immigration officers may order the deportation of certain non-citizens charged with inadmissibility without an immigration court hearing. Credible fear screenings, which Congress intended to apply "a low screening standard,"[120] are supposed to ensure that people seeking refugee protection in the US have an opportunity to apply for asylum and are not summarily deported to persecution or torture. However, these screenings are inherently flawed,[121] resulting in erroneous negative determinations and deportations of refugees without access to the asylum process[122] with a disparate impact on Black asylum seekers.[123] DHS's failure to provide adequate interpretation to asylum seekers who speak so-called "rare" languages disparately impacts many people from African countries seeking refugee protection in the US. Asylum officers and immigration judges push these asylum seekers to proceed in languages they do not speak fluently resulting in an inability to express themselves and erroneous negative fear findings.[124] In addition, information about the credible fear process is often provided to detained asylum seekers only in English and Spanish, leaving many African and Haitian asylum seekers who speak other languages unable to understand the purpose and nature of the screening interview.[125]

56.    Following attempts by the Trump administration to alter the credible fear standard including heightening credibility requirements,[126] DHS increasingly found asylum seekers lacked credibility and therefore could not establish a credible fear of persecution. This trend had a disproportionate impact on many asylum seekers from Black-majority countries (see Table 1 below).[127] In Fiscal Year (FY) 2020, asylum seekers from Sub-Saharan Africa were deemed not credible in 8.5% of credible fear interviews, over 37% more often than on average for all nationalities that year. Asylum seekers from Black-majority countries including Burkina Faso, Cameroon, the Dominican Republic, Ghana, Mauritania, and Senegal had some of the highest negative credibility finding rates.  This data further confirms concerns raised about implicit racial and other bias in credibility determinations in US asylum adjudications.[128]

**Table 1: Asylum Seekers from Black-Majority Countries Saw a Significant, Disproportionate Rise in Negative Credibility Findings as a Percentage of Credible Fear Determinations**

| Country | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 |
|---|---|---|---|---|---|
| **Average All Countries** | 0.4% | 0.5% | 1.1% | 2.8% | 6.2% |
| **Burkina Faso** | 0.0% | 0.0% | 0.0% | 7.7% | 16.7% |
| **Cameroon** | 0.5% | 0.8% | 0.0% | 2.9% | 9.9% |
| **Dominican Republic** | 0.6% | 0.0% | 0.0% | 1.0% | 11.6% |
| **Ghana** | 0.7% | 0.7% | 6.3% | 4.3% | 11.4% |
| **Mauritania** | 0.0% | 0.0% | 0.0% | 0.0% | 13.2% |

CLP_PC_069121

| Senegal | 1.2% | 2.9% | 0.0% | 0.0% | 28.6% |
|---|---|---|---|---|---|

57.     As a result of inadequate interpretation, lack of access to counsel, and limited understanding of country conditions by officers carrying out credible fear interviews, many Haitian asylum seekers subjected to expedited removal have long been unfairly determined not to have credible fears of persecution. Recent government data[129] shows that positive credible fear determination rates for Haitian asylum seekers have remained significantly below average since at least FY 2016 (see table and chart below), Between mid-January 2021 and May 2021, during the first months of the Biden administration, positive credible fear determination rates for Haitian asylum seekers fell further to 36.5%, nearly half the average 70% positive rate for all other asylum seekers in that period.[130] These low rates have persisted despite the US government's acknowledgment in 2021 that Haiti is experiencing "a deteriorating political crisis, violence, and a staggering increase in human rights abuses."[131]

**Table 2: Positive Credible Fear Rates for Haitian Asylum Seekers Have Declined Significantly Since Fiscal Year 2016 But Have Been Persistently Lower Than for Asylum Seekers from Other Countries**

|  | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 (through May) |
|---|---|---|---|---|---|---|
| **Haiti** | 65.2% | 71.4% | 75.5% | 48.2% | 33.8% | 44.6% |
| **Average – Other Nationalities** | 88.8% | 88.0% | 89.0% | 82.3% | 44.4% | 69.9% |



CLP_PC_069122

58.     Black asylum seekers also face disparate treatment in immigration court removal proceedings, including denials of adequate interpretation, lack of access to counsel, intentionally rushed proceedings, and adjudicator bias, which result in wrongful denials of asylum and, in some cases, deportation to persecution and torture. Many Black asylum seekers, particularly those subjected to detention, have been denied fair asylum proceedings and wrongly ordered deported as a result of apparent adjudicator bias, cherry-picking of evidence, adverse credibility determinations, factual and other errors.[132] Asylum seekers subjected to detention are not provided translation services to fill out asylum applications; yet, immigration judges have ordered detained Black asylum seekers removed due to their inability to complete the asylum application in English or minor inconsistencies from relying on other detained persons to translate the application.[133]

59.     ICE's efforts, in some instances, to block attorney access to detention centers and general lack of access to legal services, have also resulted in wrongful denials of asylum, including misunderstanding by Haitians about the right to seek "asylum" due to government failures to provide legal information in Kreyol.[134] In November 2021, at least 45 Haitians detained at Torrance County Detention Facility in New Mexico were prevented from exercising basic legal rights such as retaining or communicating with legal counsel; obtaining basic information about their rights through group legal presentations; or gathering evidence and preparing to present their claims for relief in removal proceedings.[135]

60.     Between FY 2001 and FY 2021, Haitian asylum seekers had the second highest asylum denial rate of any nationality at 82%.[136] In 2021, DHS pushed detained Haitian asylum seekers through removal proceedings on an even more expedited and unfair timeline while other asylum seekers languished in the same detention center.[137] Many Black asylum seekers, particularly those subjected to detention, have been denied fair asylum proceedings and wrongly ordered deported as a result of apparent adjudicator bias, cherry-picking of evidence, adverse credibility determinations, factual and other errors.[138]

61.     During the Trump administration, while security situation declined in Cameroon, Cameroonian asylum seekers were increasingly subjected to immigration detention, where, as a result, they were far less likely to obtain counsel and to receive asylum than non-detained Cameroonian asylum seekers.[139] The US asylum grant rate for Cameroonians decreased by 24% from FY 2019 to FY 2020, followed by a surge of deportations to Cameroon in late 2020.[140] Human Rights Watch documented persecution and serious human rights violations against Cameroonians after their forced return including arbitrary arrest and detention,[141] rape, torture and other physical abuse,[142] extortion, unfair prosecutions, confiscation of national identity documents, and abuses against family members. Perpetrators included members of the police and armed forces; prison wardens and guards; and other unidentified officials. State agents targeted many deportees for harm, persecution, or threats because of their deportation, their known or assumed act of seeking asylum in the US, and their actual or imputed opposition to the government.

62.     In addition, the Trump administration used the third-country transit asylum ban[143] to deny–with very limited exceptions–asylum to refugees. The ban disproportionately impacted Black asylum seekers from the Caribbean and Africa, who had passed through several a third-countries *en route* to the United States. As intended, the ban left refugees in legal limbo with only limited protection afforded by "withholding of removal" and cut off from family stranded abroad.[144] This illegal provision, which was vacated by court order in June 2020 and then enjoined in February 2021 after the Trump administration resurrected the rule, resulted in steep declines in both positive credible fear determinations and asylum grants for many asylum seekers, including individuals from Cameroon, the Democratic Republic of Congo, and Eritrea, who had sought protection at the southern US border.[145]

63.     The discriminatory treatment and disparate outcomes Black asylum seekers continue to face under the US expedited and regular removal processes and suffered due to the third-country transit ban violate the right under Article 5(a) to equal treatment before tribunals and all other organs administering justice and the obligation under Article 2(1)(c) to amend or rescind laws and regulations that perpetuate racial discrimination.

CLP_PC_069123

### D. Criminalization of Black immigrants

64.     On January 20, 2021, President Biden promised to "pursue a comprehensive approach to advancing equity for all, including people of color and others who have been historically underserved, marginalized, and adversely affected by persistent poverty and inequality." However, eighteen months later, the Biden administration has failed to keep its promise to uphold racial equity as its enforcement priorities fail to disentangle the systemic racism of the criminal and immigration enforcement systems that have resulted in disproportionate deportation rates of Black immigrants.[146] An estimated 76% of Black immigrants who were deported were deported because of prior contact with the US criminal enforcement system, whereas only half of all non-Black immigrants are deported because of such prior contact.[147] This disparity in immigration enforcement is due in part to the often negative disparate outcomes Black immigrants face within various social and economic structures in the US, including the country's mass criminalization of African Americans.[148]

65.     Black immigrants account for nearly 12% of the US's Black population[149] and 7.2% of the 22 million foreign-born individuals in the US who are non-citizens.[150] However, more than one out of every five non-citizens facing deportation on criminal grounds before US immigration courts is Black. Violence and racism pervade US policing and court systems with disparate impact on Black immigrants, who – like Black people in America generally - are disproportionately stopped, searched, arrested, and killed by the police.

### E. Black non-citizens are more likely to suffer prolonged and arbitrary immigration detention

66.     Under Article 5(a) of CERD, the United States has an obligation to ensure "The right to equal treatment before the tribunals and all other organs administering justice" for all, without distinction as to race, color, or national or ethnic origin. Similarly, under Article 4(c), the US "[s]hall not permit public authorities or public institutions, national or local, to promote or incite racial discrimination." Data gathered by immigrant rights and human rights NGOs shows that Black migrants are detained for longer periods than non-Black migrants and are less likely to be released from detention on bond or parole than non-Black migrants.[151] This disparate treatment faced by Black migrants and migrants from African countries both in immigration detention and when seeking release on bond demonstrates that the United States has not met these commitments in its immigration system.

67.     In 2019, the average migrant in US Immigration and Customs Enforcement (ICE) custody spent 55 days in detention,[152] though evidence suggests that Black migrants are held for significantly longer. For instance, Human Rights Watch interviewed 41 Cameroonian asylum seekers who had been deported between 2018 and 2020, and found that all but one were detained for prolonged periods ranging from one to three years.[153] The length of detention among the group averaged 17 months – much higher than the 55-day average.[154] In 2022, Human Rights First found that since President Biden took office, ICE detained asylum seekers from Black-majority countries on average 27% longer than asylum seekers from non-Black countries among those for whom Human Rights First was able to track detention length.[155]

68.     A study by Tulane Law School's Immigration Clinic found that 57% of all detained immigrants who filed *habeas corpus* petitions in the Western District of Louisiana between January 1, 2010 and July 31, 2020 were Black.[156] At the time of filing their *habeas* petitions, the migrants had been detained on average for 13 months and faced continued detention if their petitions were unsuccessful.[157]

69.     Sylvester Owino, a Kenyan asylum seeker spent nearly ten years in immigration detention at Otay Mesa Detention Center in California before securing his release.[158] Similarly, three Rwandan men spent nearly a decade in immigration detention in Farmville, Virginia.[159] Although these cases may be outliers, they reflect the extended durations that Black asylum seekers spend in detention, in some cases simply because they continue to pursue immigration relief.[160]

CLP_PC_069124

70.     Immigration Judges and ICE disproportionately deny Black immigrants release on bond or parole and impose higher bond amounts. The Southern Poverty Law Center ("SPLC") found that Cameroonians are two-and-a-half times more likely "to have their paroles denied by the New Orleans ICE Field Office than similarly situated applicants from non-African countries."[161] Similarly, when comparing hundreds of release requests made between September 2019 and May 2020, by detained Cubans, Venezuelans, Cameroonians, and Eritreans, SPLC found that "non-Africans had grant rates roughly twice as high."[162] Immigration court data received by Human Rights First reflects that immigration judges were over 27% more likely to deny bond to Haitian asylum seekers compared to other nationalities in Fiscal Year 2021 (through mid-August).[163]

71.     When Black migrants are offered bond, they often must pay higher rates. Based on data collected by Refugee and Immigrant Center for Education and Legal Studies ("RAICES")'s bond fund, the average bond paid across all nationalities between June 2018 and June 2020, was $10,500.[164] Haitian asylum seekers, however, were issued bonds at an average of $16,700 (54% higher).[165] Data obtained by Human Rights First shows that the average immigration court bond for Haitian asylum seekers in Fiscal Year 2021 (through mid-August) was double the average bond for other asylum seekers.[166]

72.     Some ICE officers appear to intentionally facilitate release of non-Black migrants over the release of Black migrants. African asylum seekers detained at the Winn Correctional Center in Louisiana told Human Rights First that ICE disproportionately denied parole to detained migrants from African nations: "A Congolese asylum seeker who had been detained for months, reported that an ICE officer claimed that African asylum seekers were less likely to be released because they are 'inferior.' . . . A Senegalese asylum seeker imprisoned for five months at Winn said, "I see Africans detained eight, nine, ten months. I've never seen other nationalities detained that long."[167] An African asylum seeker detained at Adelanto ICE Processing Center in California reported that ICE imposed discriminatory requirements for release on Black asylum seekers, demanding extensive documentation that non-Black asylum seekers were not asked to produce.[168] Similarly, in fall 2021, an ICE officer stated that ICE had been instructed to release Cubans, Nicaraguans, and Venezuelans to create additional detention bed space while ICE was detained large numbers of Haitians at the same facility.[169] This guidance appeared designed to enable and prioritize the detention of Black asylum seekers and migrants from Haiti.

### F.   Black migrants were over-represented in family detention

73.     ICE has operated several family detention centers throughout the United States (as of July 2022 these facilities are not currently being used to detain families). During the Covid-19 pandemic, Black migrant families were disproportionately represented in these facilities.[170] In the three months prior to the pandemic, RAICES observed that 29% of the families detained at the Karnes County Family Residential Center in Texas were Haitian.[171] As the pandemic progressed, ICE released a number of non-Black families from Karnes but kept the Haitian families, and the share of Haitian families detained there increased to 44% of the total population.[172] RAICES noted, "The US has consistently detained more Haitian families in 2020 than any other nationality."[173]

74.     RAICES found that 56% of all families held at Karnes in 2020 came from majority-Black countries, including 220 families from Haiti, 25 from Angola, 22 from the Democratic Republic of Congo, 6 from Ghana, 4 from Congo, 2 from Cameroon, 2 from Sierra Leone, 1 from Benin, 1 from Burkina Faso, and 1 from Nigeria.[174]

75.     At Berks Family Residential Center, another ICE detention center formerly used to jail families, the entire detained population in July 2020, came from Black-majority countries.[175] At that point, ICE had released most of the population due to the Covid-19 pandemic, but continued to detain four Haitian families and two families from other African nations – and no one else.[176] The majority of the children detained were infants.[177] No employee at the facility spoke Haitian Kreyol, creating a significant language barrier that

14

prevented many detainees from receiving necessary medical care.[178] The Haitian families had been detained upwards of 125 days, with their detention likely to continue.[179]

76.    At the South Texas Family Residential Center in Dilley, Texas, the detained population comprised 66 families in July 2020.[180] On average, the families had spent 244 days in detention.[181] Black migrants made up 15 percent of the detained population at the Dilley, a lower, but still significant, percentage than at the other two family detention centers (from Haiti, the DRC, Angola, and Ghana).[182]

### G.   Racist excessive force, abuse, and retaliation against Cameroonian and other Black migrants in US immigration detention centers

77.    Cameroonians in ICE custody have been organizing for years to protest mistreatment and inhumane conditions in detention facilities, particularly those under the jurisdiction of the New Orleans, Louisiana ICE Field Office Area of Responsibility.[183] In response, ICE and its contractors retaliated against Cameroonian protestors with solitary confinement, physical abuse, separating and transferring organizers to different facilities, and unlawful deportation of organizers and participants to Cameroon. From 2020 to 2022, at least nine complaints were filed with DHS's Office for Civil Rights and Civil Liberties and at least three lawsuits filed in US courts on behalf of Cameroonians and other Africans who reported abuse and excessive force, anti-Black discrimination, and other mistreatment in ICE detention and during deportation.

- An August 2020 complaint filed against Pine Prairie ICE Processing Center in Louisiana by a group of Black, majority Cameroonian, asylum seekers details how ICE officers deployed excessive force against 45 peaceful protestors participating in a hunger strike and subjected them to retaliatory, punitive solitary confinement without access to medical treatment and with limited access to hygiene and potable water. [184]

- An October 2020 a complaint filed against Adams County Correctional Center in Mississippi alleges that ICE officers coerced and tortured eight Cameroonian men into signing stipulated orders of removal.[185] One individual testified that ICE official "pressed my neck into the floor. I said, 'Please, I can't breathe.' I lost my blood circulation. Then they took me inside with my hands at my back where there were no cameras."[186] Another individual described that "when they [ICE officers] arrived, they pepper sprayed me in the eyes and [an ICE official] strangled me almost to the point of death. I kept telling him, 'I can't breathe.' I almost died. I was coughing so much after and my throat still hurts a lot. I can't see well still from the pepper spray. As a result of the physical violence, they were able to forcibly obtain my fingerprint on the document."[187] Despite public outcry[188] and demands for accountability from members of Congress,[189] at least five of the Adams County complainants were deported to Cameroon.

- In November 2020, a complaint filed against Jackson Parish Correctional Center in Louisiana on behalf of six Cameroonians alleges ICE officials tortured Cameroonians and forced their fingerprinting to obtain their assent to be deported.[190] At least four of the Jackson Parish complainants were subsequently deported to Cameroon. Similarly, a February 2021 complaint against Winn Correction Center in Louisiana also documented the use of torture to force Cameroonians to sign deportation documents.[191]

- A July 2021 complaint filed against Pine Prairie ICE Processing Center and Allen Parish Public Safety Complex in Louisiana on behalf of four Black, African complainants. details a pattern of inhumane, criminal, and racially discriminatory practices at the facilities including: the denial of basic necessities including potable water to Black immigrants; threatened lethal force against Black immigrants in ICE custody; threatened Black immigrants with punitive solitary confinement in retaliation for peacefully expressing their rights and for their support of the Black Lives Matter movement; and ignored written grievances related to racial tensions between detention officials and detained immigrants. [192]

78.    Although the vast majority of abuses against Cameroonians in detention are concentrated in NOLA ICE AOR facilities, this pattern of anti-Black violence is also evident in other facilities:

15

- A December 2020 a CRCL complaint[193] and federal lawsuit[194] were filed against Butler County Jail in Ohio on behalf of a Cameroonian man who was threatened and brutally beaten in detention. The plaintiff in that lawsuit was deported to Cameroon.

- In October 2021, advocates filed a complaint against ICE on behalf of three Cameroonians and two other Africans subjected to painful and prolonged placement in the full-body restraint device known as the "WRAP" before and during deportation flights to Cameroon in October and November 2020.[195] According to the complaint, ICE agents immobilized the men with the WRAP, applying it on top of five-point shackles, binding their legs together, and cinching them up at a 45-degree angle, in some cases for hours, which left them screaming in pain. The tremendous physical and psychological harm inflicted by the WRAP was amplified by underlying medical conditions. To date, CRCL has not released results from the investigations of the abuses committed against Cameroonians.

79.     Black detained non-citizens have suffered similarly horrendous anti-Black abuses and disparate treatment in immigration detention. An asylum seeker from an African country reported to Human Rights First that staff at the Adelanto ICE Processing Center chopped off her long, braided hair in July 2021 and cut off the braided hair of multiple Haitian women with whom she was detained, claiming that it was standard "procedure" for hair worn in braids or locks.[196]

80.     An attorney reported in May 2021 that she heard a guard at the Winn Correctional Center state "Fuck Black people" and violently shoved a Cameroonian man to the ground after he and another Cameroonian man asked facility guards to wear masks during the pandemic, according to a complaint filed with CRCL.[197] As a result of his injuries, the man needed to use a wheelchair for mobility.[198] The attorney witnessed an ICE supervisory officer at Winn comment "now we can't lynch them" while watching detained men cut down trees.[199]

81.     In April 2021, an officer told a Black immigrant who was folding laundry while detained under ICE custody at the Baker County Sheriff's Office in Florida that the way he was shaking out the laundry was like how "you and your family got whipped back in the day, according to a report published by Human Rights First."[200]

82.     Black immigrants are six times more likely to be sent to solitary confinement than other detained populations, according to a study that analyzed the use of solitary confinement in immigration detention from 2013 to 2017.[201] An asylum seeker from an African country reported to Human Rights First that in May 2021 he suffered abuse in solitary confinement in the medical unit at the Winn Correctional Center, including being held naked in a cold cell without a bed for five days.[202] He only received a medical gown to wear during limited outdoor recreation periods. He had to sleep on the floor of the cell for five days and only received a sheet to place on the ground on the second day.[203]

83.     Pine Prairie Correctional Facility in Louisiana has used solitary confinement as retaliation to punish non-citizens who speak out against the conditions of their confinement and for exercising their fundamental rights, including the right to protest and free speech.[204] In August of 2020, a group of Black asylum seekers participated in a peaceful hunger strike in protest of the conditions of their confinement, their indefinite detention, their racist treatment, blanket parole denials, and Pine Prairie's inadequate response to the Covid-19 pandemic.[205] ICE officers in full riot gear then rounded up all 45 hunger strikers and took them to the solitary confinement unit, "Echo," where they reportedly faced punitive conditions including little to no recreational time, no access to tablets, no access to television or recreational reading materials, limited access to showers and hygiene materials, limited access to potable drinking water, no access to the law library, and limited legal call access.[206]

84.     Prolonged use of solitary confinement is recognized as a form of torture under international law,[207] yet in June 2021, a complaint was filed against Pine Prairie alleging a systemic pattern of the implementation of punitive solitary confinement against Black immigrants in detention.[208]

CLP_PC_069127

85.     The disparate and discriminatory violence, abuse, and retaliation by ICE officers against Cameroonian and other Black immigrants subjected to immigration detention violates Article 5(b)'s guarantee of the "right to security of person and protection by the State against violence or bodily harm, whether inflicted by government officials or by any individual group or institution."

### H.  Medical neglect, life-threatening conditions in immigration detention centers

86.     Black detained non-citizens suffer from substantial medical neglect while in immigration detention, particularly Black women. For example, the treatment of Black women and young children from Haiti and African countries detained at Karnes County Family Residential Center in Texas reflected a pattern of discriminatory practices and deliberate indifference related to prenatal, maternal, gynecological, and pediatric medical needs, prompting a CRCL complaint in March 2021,[209] which continues to go unanswered.

87.     Only months before, reports about ICE prisons in Georgia unveiled a pattern of criminal medical negligence including subjecting women, many of them Black, to forced hysterectomies.[210] Black non-citizens detained at Krome Detention Center in Florida reported in October 2021 that their medical illnesses were not being treated.[211]

88.     On February 24, 2020, about 80 Cameroonian women staged a sit-in inside the T. Don Hutto detention center in Taylor, Texas to protest medical neglect, including the refusal to provide critical surgeries, medical treatment, and their indefinite confinement as they waited on their asylum cases.[212] In response to the protest, ICE suspended visitation and blocked access to legal representation and community members who could help bring attention to the medical abuses.[213]

89.     The Covid-19 pandemic has exacerbated systematic deficits in medical care in immigration detention and disproportionately impacted Black migrants. For example, as of this submission, ICE reports that the Stewart Detention Center (SDC) has surpassed 1,695 confirmed cases of Covid-19 since February 2020,[214] and four people who were detained at SDC died due to related complications.[215] As highlighted by a CRCL complaint in August 2021, medically vulnerable individuals denied release at SDC are disproportionately Black.[216] The finding mirrors the overrepresentation of Black non-citizens facing deportation in immigration court based on criminal grounds. It also mirrors the disproportionate impact of Covid-19 on Black immigrant communities across the US.

90.     This medical neglect results in a hostile and dangerous environment and makes it significantly more difficult to find legal representation and resources, and have a fair chance of presenting an asylum claim. Providing disparate and inadequate access to medical care for Black immigrants subjected to immigration detention violates Article 5(e)(iv), which guarantees the right to public health care services.

### I.  Intersectionality and regionality: effects of systematic targeting of some racial and ethnic groups of non-citizens: history of anti-Haitian immigration policies

91.     The horrifying events at Del Rio, targeted use of Title 42 expulsions, the imposition of metering, among other illegal practices, are part of a longstanding history of racist, exclusionary US policies that have often targeted Haitians.[217] This sordid history lends context to the events of Del Rio in September 2021, and other policies and practices explained in this Report that have resulted in injustice, pain and suffering, and loss of life of Black immigrants, refugees, and asylum seekers.

92.     In 1978, the US created a policy dubbed the "Haitian Program," which jailed arriving Haitians and universally denied their asylum claims despite the known atrocities being committed by the Duvalier regime at the time.[218] The Haitian Program was struck down by a Florida federal court, which held the US government systematically discriminated against Haitian asylum seekers.[219] The US quickly implemented a new policy requiring detention without an opportunity to post bail. While appearing facially neutral on its face, statistics confirmed the policy's selective application to Haitians and discovery sought in a legal challenge to the policy showed that the government was using the policy to continue its "Haitian

17

Program"[220] and deter Haitian asylum seekers. At the time, a then-Deputy Attorney General acknowledged the policy could create an appearance of "concentration camps" filled with Black people. A federal court of appeals held that the selective application of the policy to Haitians violated equal protection, particularly in light of the government's history of discriminatory policies against Haitians.[221]

93.     During the 1980s and 1990s, the US began an aggressive interdiction policy to intercept Haitians at sea and return them to Haiti.[222] The policy was designed to prevent Haitian migrants from reaching US soil, where they could request access to the US asylum process and to evade US *non-refoulement* obligations.[223] From 1981 to 1991, only *twenty-eight* out of over 25,000 interdicted Haitians were allowed to enter the United States to seek relief.[224] While the Haitian interdiction policy was in place, the US singled out Haitian migrants for detention at Guantanamo Bay. At the height of this policy, at least 12,000 Haitians were held at the US base.[225]

94.     More recently, the Biden administration has continued to return Haitians interdicted at sea to Haiti, despite escalating violence and political instability, with over 6,100 Haitians returned in FY 2021.[226]

### J.   Externalization of US border control exposes migrants to harm and rights violations

95.     The efforts of the US and other countries to impose and press for policies and practices that prevent people from crossing borders and reaching the US to seek asylum, undermine the right to seek asylum, put refugees at risk of *refoulement*, and have pushed displaced Black migrants from Africa and the Caribbean to increasingly dangerous migration routes.[227] As the Special Rapporteur on Contemporary Forms of Racism, Racial Discrimination, Xenophobia and Related Intolerance observed, "the racist and xenophobic politics of the United States are enforced even beyond the territories of that country because they are outsourced for enforcement by Mexican and other officials long before refugees and migrants even approach the US border."[228]

96.     In 2019, the Trump administration pressured Mexico into an agreement to prevent migrants from reaching the US border.[229] The Biden administration has continued to push the Mexican government to heavily regulate travel to and within Mexico to prevent migrants from reaching the US.[230] Black migrants trapped in Mexico as a result of enforcement actions by Mexican migration officials have faced the brunt of the country's hardline approach, including serious human rights abuses by Mexican authorities and months-long waits in inhumane conditions in southern Mexico.[231] In one shocking case, four Mexican police officers were arrested for the murder of a Haitian woman, who had been detained by the officers in southern Mexico in October 2021.[232] Haitian and other Black asylum seekers are also at risk of *refoulement*. Mexican migration authorities have deported Haitian asylum-seeking to Haiti.[233] In addition, Mexican authorities have racially profiled and illegally deported Afro-descendent Mexican citizens.[234]

97.     With increased migration controls imposed in Mexico at the behest of the US, more migrants have been pushed to cross through Panama.[235] As Haitian Bridge Alliance recently document Black migrant women and girls transiting the country have been subjected to a sharp uptick in sexual assaults, in addition to reported killings and other serious human rights abuses.[236]

98.     Due to racism and xenophobia, Black migrants are often unable to find refuge throughout the region. A 2021 Amnesty International briefing on Haitian migrants found that countries in the Americas are "limiting access to international protection and failing to shield Haitians from a range of human rights violations in host countries, including detention and unlawful pushbacks, extortion, anti-black racism, abuses including gender-based violence by armed groups, and destitution."[237]

99.     Whereas the Durban Declaration and Programme of Action recognizes that "that interregional and intraregional migration has increased as a result of globalization, in particular from the South to the North, and stress that policies towards migration should not be based on racism, racial discrimination, xenophobia and related intolerance"[238] and calls on States to collaborate "at the national, regional and international levels to prevent, combat and eliminate all forms of trafficking in women and children, in particular girls,"[239] the

CLP_PC_069129

US continues to externalize its border controls to deter migrants, refugees, and asylum seekers from reaching its borders rather than ensure the enjoyment of their rights under the Convention and other international human rights treaties and instruments.[240]

100.    The resulting disparate and discriminatory treatment of Black migrants in the Americas contravenes Article 2(1)(c), which requires states to amend or rescind policies that perpetuate racial discrimination.


## V.    Recommendations

CERD Article 2(2) requires that State Parties, "when the circumstances so warrant, take, in the social, economic, cultural and other fields, special and concrete measures to ensure the adequate development and protection of certain racial groups or individuals belonging to them, for the purpose of guaranteeing them the full and equal enjoyment of human rights and fundamental freedoms." This report demonstrates that the circumstances "so warrant" the US to take the following measures regarding Black migrants, refugees, and asylum seekers:

**Measures on racist and anti-immigrant hate speech and propaganda**:

1.  Condemn racist "invasion" and "replacement" rhetoric publicly, forcefully, and across State institutions and offices, particularly when deployed by elected and other public authorities.

**Measures on US refugee law and immigration policy**:

2.  Undertake a systemic review of asylum and immigration policies, including all detention, interdiction, and interception policies implemented during this and prior administrations, to ensure that policies that are perpetuating racial discrimination towards Black people are identified and fully and permanently rescinded.
3.  Take all available steps to restore access to asylum at the southern border, including at ports of entry, and halt all expulsions under Title 42, including to Haiti. Allow migrants crossing the border to make their claims for asylum and other protections in non-adversarial interview settings while retaining the guarantee of a hearing before an immigration judge, and ensure access to effective legal representation, language-accessible information, interpretation in their primary language, timely access to supporting evidentiary documents, and time to prepare.
4.  Reject any attempt to codify the Title 42 policy, Remain in Mexico, metering, or any other policy that blocks access to refugee and refoulement protections guaranteed under international law.
5.  Review and reconsider its use of expedited removal, particularly in light of the racially disparate outcomes faced by African, Haitian, and other asylum seekers from Black-majority countries.
6.  Fully rescind the third-country transit asylum ban and issue/rely on credible fear lesson plans that comply with US law, regulations, and treaty obligations.
7.  Stop all expulsions and deportations to Haiti, Cameroon, and other countries facing extraordinary circumstances of violence, where return would put their nationals at serious risk of harm.

**Measures on immigration detention**:

8.  Stop criminalization and mass detention of asylum seekers and migrants. Avoid/end unnecessary, disproportionate or otherwise arbitrary detention, with detention only employed as a measure of last resort and not in a discriminatory manner or as a penalty for unlawful entry or presence. End all prosecutions for 'illegal entry' and 'illegal re-entry.'

CLP_PC_069130

9. Conduct a systematic review of health care provision in immigration detention, including disparate racial treatment and outcomes, and to take remedial steps to ensure adequate and equitable care for all persons subjected to detention.

10. Provide the Committee information on the status of, and outcomes to any investigations into, complaints and other allegations of violence and abuse, medical neglect, and other mistreatment of Black migrants in US immigration detention.

**Measures on equitable access to justice**:

11. Provide access to legal remedies to migrants for hate crimes and other civil rights violations against them, including investigation and prosecution.

12. Establish an independent commission of inquiry, such as the US House Select Committee on the January 6 Attack, to thoroughly review the actions of CBP and its officers at Del Rio in September 2021, including through interviews with Haitians who experienced or witnessed abuse and mistreatment.

13. Swiftly coordinate with civil society groups to create an expeditious and organized process by which all individuals subjected to RMX have a meaningful opportunity to pursue their asylum claims from the safety of the US, including those issued removal orders under the flawed policy.

14. Provide access to competent Haitian Kreyol interpretation in all interviews and proceedings with Haitian asylum seekers, including CBP and Border Patrol interviews, credible fear, asylum adjudications, and any interactions in Coast Guard or other US custody. Also provide competent interpretation for "rare" African and Indigenous languages, as appropriate. Stop pushing asylum seekers to proceed in languages other than their primary language.

**Measures on data, analysis, and dissemination**:

15. Provide the Committee and the public with data on US immigration detention of asylum seekers and other migrants for the period under consideration, disaggregated by nationality, race, gender, age, family-status, and other demographic factors, including the average length of detention, whether release was authorized on parole, and whether a bond was imposed and its amount. Currently, agencies record and release data only disaggregated by nationality and not by race, resulting in systematic undercounting of Black individuals from non-majority Black countries. This undercounting obfuscates the full extent to which the U.S. government engages in policies and practices that disproportionately harm Black immigrants and frustrates CERD review efforts.

16. Systematically study the impact of implicit and other racial bias in immigration adjudications, including credible fear interviews, and provide appropriate training to all adjudicators, including asylum officers and immigration judges.

17. Record and disclose necessary statistics to determine the full extent of the racially disparate impact of Title 42 and other policies implemented to block asylum at the border.

**Regional and international measures**:

18. Ensure that US bilateral and regional policies, agreements, arrangements, requests and engagements uphold the right to seek asylum, human rights treaties, the Refugee Convention, and their non-discrimination provisions. The US should halt any efforts to press Mexico and other countries to force migrants to apply for asylum in countries they travel through to reach the US, as opposed to providing the opportunity to access asylum and respecting their choices. Effort to require refugees to apply for asylum in a transit country will endanger those who will not be safe in such countries, and subverts US and international refugee law to the extent aimed at preventing people from seeking US asylum.

CLP_PC_069131

19. Publicly adopt and implement the Durban Declaration and Programme of Action (DDPA).
20. Reengage US executive, legislative, and judicial processes to provide transitional justice regarding slavery, colonialism and neocolonial imperialism to address root causes of displacement, as called for by the DDPA and recently affirmed by the High Commissioner for Human rights.
21. Use US leverage in multilateral financial institutions to accelerate the menu of options to promote economic and social development listed at paragraph 158 of the DDPA, to satisfy the right to development and address root causes of displacement.

---

[1] International Convention on the Elimination of All Forms of Racial Discrimination (hereinafter "CERD"), 660 U.N.T.S. 195, *entered into force* Jan. 4, 1969, art 1(3).

[2] *See, e.g.*, Kat Murdza and Walter Ewing, Ph.D., *The Legacy of Racism within the US Border Patrol*, American Immigration Council (2021), https://www.americanimmigrationcouncil.org/research/legacy-racism-within-us-border-patrol.

[3] *See, e.g.*, Fabiola Cineas, *Why America Keeps Turning Its Back on Haitian Migrants*, Vox (Sept. 24, 2021, 2:40 PM), https://www.vox.com/22689472/haitian-migrants-asylum-history-violence (describing how "every presidential administration since the 1970s has treated Haitians differently than other migrant groups, rejecting asylum claims, holding them longer in detention, and making it harder for them to settle down in safety.").

[4] Ibram X. Kendi, *The Day Shithole Entered the Presidential Lexicon* (Jan. 13, 2019), https://www.theatlantic.com/politics/archive/2019/01/shithole-countries/580054/.

[5] U.S. Const. art. I, § 1, § 2, cl. 1; U.S. Const. art. II, § 1, cl. 1-2, § 2, cl. 2; U.S. Const. art. III, § 1.

[6] U.S. Const. art. II, § 2, cl. 2.

[7] U.S. Const. art. III, § 2, cl. 1; U.S. Const. art. VI, cl. 2.

[8] U.S. Const. art. I, § 8, cl. 4; U.S. Const. art. II, § 3; U.S. Const. art. III, § 2, cl. 1.

[9] *See* Maya K. Watson, The United States' Hollow Commitment to Eradicating Global Racial Discrimination, American Bar Association's Human Rights Magazine (Jan. 6, 2020), https://www.americanbar.org/groups/crsj/publications/human_rights_magazine_home/black-to-the-future-part-ii/the-united-states--hollow-commitment-to-eradicating-global-racia/.

[10] CERD et al., *General recommendation XXX on discrimination against non-citizens,* UN Doc. CERD/GEC/7502/E (2005), https://tbinternet.ohchr.org/_layouts/15/treatybodyexternal/Download.aspx?symbolno=INT%2fCERD%2fGEC%2f7502&Lang=en, at ¶ 1-5, 9.

[11] CERD et al., *Combined tenth to twelfth periodic reports submitted by the United States of America under article 9 of the Convention, due in 2017*, UN Doc. CERD/C/USA/10-12 (Dec. 20, 2021), https://tbinternet.ohchr.org/_layouts/15/treatybodyexternal/Download.aspx?symbolno=CERD%2fC%2fUSA%2f10-12&Lang=en, at ¶ 138-140.

[12] United Nations, Durban Declaration and Plan of Action, Adopted at the World Conference Against Racism, Racial Discrimination, Xenophobia and Related Violence (Sept. 8, 2001), https://www.un.org/WCAR/durban.pdf [DDPA] supra note 2, at 8, ¶ 27.

[13] *Id.* at 7, ¶ 16.

[14] The Refugee Convention by virtue of the Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, *entered into force* 4 October 1967.

[15] Convention Relating to the Status of Refugees, 28 July 1951, 189 U.N.T.S 137.

[16] The Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (the "Torture Convention"),10 Dec. 1984, General Assembly resolution 39/46 *entered into force* 26 June 1987.

[17] Implementation of the Convention Against Torture, 8 CFR § 208.18.

[18] International Covenant on Civil and Political Rights, General Assembly resolution 2200A (XXI) (December 16, 1966).

[19] U.N. Human Rights Committee, "General comment No. 35 on Article 9, Liberty and security of person," CCPR/C/GC/35, (October 2014), https://www.ohchr.org/en/documents/general-comments-and-recommendations/general-comment-no-35-article-9-liberty-and-security.

[20] Immigration and Naturalization Act of 1795

21

CLP_PC_069132

[21] *See, e.g.,* Ariela Gross & Alejandro de la Fuente, Citizenship once meant whiteness. Here's how that changed., Washington Post (July 18, 2019), https://www.washingtonpost.com/outlook/2019/07/18/citizenship-once-meant-whiteness-heres-how-that-changed/.

[22] Martha Jones, *How the 14th Amendment's Promise of Birthright Citizenship Redefined America*, TIME (July 9, 2018), https://time.com/5324440/14th-amendment-meaning-150-anniversary/.

[23] Immigration and Nationality Act of 1870; Immigration and Nationality Act of 1952; *see also, id.*

[24] *See, e.g.,* Alina Das, *Inclusive Immigrant Justice: Racial Animus and the Origins of Crime-Based Deportation*, 52 U.C. Davis L. Rev. (2018), https://lawreview.law.ucdavis.edu/issues/52/1/Symposium/52-1_Das.pdf.

[25] Immigration and Nationality Act of 1965, § 101(a)(42); 8 USC. § 1101(a)(42)(A) (defining "Refugee," "Immigration," and "Nationality.")

[26] INA § 241(b)(3); 8 USC. § 1231(b)(3).

[27] *See* Order Suspending the Right to Introduce Certain Persons from Countries where a Quarantinable Communicable Disease Exists, 85 Fed. Reg. 65,806 (Oct. 13, 2020).

[28] *See, e.g.,* Lucas Guttentag, *Coronavirus Border Expulsions: CDC's Assault on Asylum Seekers and Unaccompanied Minors*, Just Security (Apr. 13, 2020), https://www.justsecurity.org/69640/coronavirus-border-expulsions-cdcs-assault-on-asylum-seekers-and-unaccompanied-minors/.

[29] *See, e.g.,* Anne G. Beckett, et al., *Misusing Public Health as a Pretext to End Asylum — Title 42*, New England Journal of Medicine (Apr. 21, 2022), https://www.nejm.org/doi/full/10.1056/NEJMp2200274.

[30] Southern Poverty Law Center, *Stephen Miller's Affinity for White Nationalism Revealed in Leaked Emails*, November 12, 2019), https://www.splcenter.org/hatewatch/2019/11/12/stephen-millers-affinity-white-nationalism-revealed-leaked-emails

[31] Brian Concannon, *Why is Biden preserving Miller's racist immigration policy?*, Al-Jazeera (October 21, 2021), https://www.aljazeera.com/opinions/2021/10/26/why-is-biden-preserving-millers-racist-immigration-policy

[32] *See* Kendi *supra* note 4.

[33] *Id.*

[34] US Dep't of Homeland Security, "Termination of the Designation of Haiti for Temporary Protected Status," 83 FR 2648 (Jan. 18, 2018).

[35] *Saget v. Trump*, 345 F. Supp. 3d 287, 303 (E.D.N.Y. 2018); *Saget v. Trump*, 375 F. Supp. 3d 280, 374 (E.D.N.Y. 2019) (holding that "[b]ased on the facts on this record…there is both direct and circumstantial evidence a discriminatory purpose of removing non-white immigrants from the United States was a motivating factor behind the decision to terminate TPS for Haiti.").

[36] *See, e.g.,* Adam Shaw, *House Republicans back Texas counties' 'invasion' declaration in response to border crisis*, Fox News (July 6, 2022), https://www.foxnews.com/politics/house-republicans-back-texas-counties-invasion-declaration-response-border-crisis.

[37] Governor of the State of Texas, Executive Order, GA 1, "Relating to returning illegal immigrants to the border," (July 7, 2022), https://gov.texas.gov/uploads/files/press/EO-GA-41.pdf.

[38] Adrian Carrasquillo, *Abbott Border Order Sparks Fears of 'Invasion' Rhetoric, Racial Profiling*, Newsweek (July 13, 2022), https://www.newsweek.com/abbott-border-order-sparks-fears-invasion-rhetoric-racial-profiling-1724037.

[39] *See, e.g.,* Benjamin Wermund, *Ted Cruz doubles down on 'invasion' rhetoric espoused by accused Buffalo shooter*, Houston Chronicle (May 18, 2022), https://www.houstonchronicle.com/politics/texas/article/Ted-Cruz-doubles-down-on-invasion-rhetoric-17181675.php.

[40] CBP closed the Del Rio International Bridge and immediately blockaded the surrounding areas overnight, on September 17th, 2021. In addition to CBP, the overwhelming law enforcement presence included units of Texas State Troopers, the Texas National Guard, the Texas Department of Public Safety (DPS), at the direction of Governor Greg Abbott. The National Guard blockaded two encampment entrances. These military and law enforcement agencies jointly maintained a shift schedule. Dozens of state trooper vans entered and exited the camp at different points in the day. Military-grade, armored Humvees and other vehicles waited poised at approximately every 100 feet along the US-Mexico border for at least two miles surrounding the encampment, reinforcing a razor wire-topped chain-linked fence along its perimeter. On Saturday, September 18th, construction workers added additional barriers on the roads surrounding the encampment. Likewise, droves of law enforcement vehicles patrolled the city of Del Rio down N Main Street and Veterans Boulevard. *See* Sarah Decker et. al, *Beyond the Bridge: Documented Human Rights Abuses and Civil Rights Violations against Haitian Migrants in the Del Rio, Texas Encampment* (2022), https://rfkhr.imgix.net/asset/Del-Rio-Report.pdf [hereinafter "*Beyond the Bridge*"].

CLP_PC_069133

[41] The US government has an affirmative duty to provide for an individual's basic human needs when they "take[] that person into [their] custody and hold[] him there against his will," thereby creating a "special relationship" with that individual. *DeShaney v. Winnebago Cnty. Svcs.*, 489 US 189, 199-200 (1989). When the government "so restrains an individual's liberty that it renders him unable to care for himself," it assumes responsibility for that individual's safety and well-being. *Id.* at 200. As one Haitian woman explained, "After a few days of us being there… [the water] became very dangerous to cross. There were soldiers on horses standing in front of the river telling people they were not allowed to go back and forth. I couldn't leave the camp, especially not with my son because he was only four years old. To try to get past the water and the soldiers was impossible." *Id.*  (citing phone interview by RFK Human Rights lawyer with Haitian individual (March 18, 2022)).

[42] Eileen Sullivan & Zolan Kanno-Youngs, *Images of Border Patrol's Treatment of Haitian Migrants Prompt Outrage*, The New York Times (Sept. 21, 2021), https://www.nytimes.com/2021/09/21/us/politics/haitians-border-patrolphotos.html (capturing US CBP agents on horseback using whips against unarmed Haitian asylum seekers to force them back to Mexico).

[43] Jasmine Aguilera & Harold Isaac, *A Haitian Man's Brutal Experience With US Border Agents Sparked Outrage. Now He's Telling His Story*, TIME (March 16, 2022), https://time.com/6144970/mirard-joseph-haitian-migrants-del-rio-border/.

[44] *See* Complaint at ¶ 4, *Haitian Bridge Alliance v. Biden*, No. 1:21-CV-03317 (D.D.C.) (filed Dec. 20, 2021), *available at* https://int.nyt.com/data/documenttools/hba-v-biden/a8106eacd7c45afe/full.pdf.

[45] *See Beyond the Bridge supra* note 40 (citing in-person interview by RFK Human Rights lawyer with Haitian individual in Acuña, Mexico (Sept. 25, 2021).

[46] *Id.*

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] Footage reported by Al Jazeera, *Haitian migrants undeterred as US begins removal flights* (Sept. 20, 2021), https://www.youtube.com/watch?v=UTFnKJqcPks.

[51] *Beyond the Bridge supra* note 40 at 32.

[52] On or around September 23, DHS dismantled the encampment while individuals were still inside, using demolition vehicles to bulldoze entire sections of the camp. They forced groups of people onto buses for expulsion, often expelling them in shackles, causing grave harm during the deportation flight. In the resulting series of mass expulsion flights to Haiti, ICE officials expelled vulnerable Haitians, including at least one mother with a days-old-infant *born in the United States*. By September 25th, DHS had emptied and cleared the camp, erasing all remaining evidence of the abusive conditions in which it had held thousands.

[53] U.S. Immigration and Customs Enforcement, Office of Acquisition Management, *Justification for Other than Full and Fair Competition* (Sept. 28, 2021), https://www.quixote.org/wp-content/uploads/2021/10/HaitianEmergencyFlightsJA-21-00378-Final9-27-2021.pdf. This "emergency" contract was to provide 88 expulsion flights to Haiti for a total cost of $15,758,960.00. That is approximately $179,079.09 per flight. In 2015, the Department of Homeland Security's Office of the Inspector General reported that "ICE Air pays, on average, $8,419 per flight hour for charter flights regardless of the number of passengers on the plane." University of Washington Center for Human Rights, *Hidden in Plain Sight: ICE Air and the Machinery of Mass Deportation*, (Apr. 23, 2019), https://jsis.washington.edu/humanrights/2019/04/23/ice-air/#:~:text=In%202015%2C%20the%20Department%20of,companies%20to%20run%20the%20flights. Accounting for inflation, an average ICE Air flight would cost $9,625.04 in 2021.

[54] *See* Complaint at ¶ 76, *Haitian Bridge Alliance v. Biden*, *supra* note 44. As alleged in *Haitian Bridge Alliance v. Biden*, the under-resourced intake site at Del Rio reflected the White House and DHS's steadfast refusal to organize any appropriate infrastructure to address the anticipated arrival of thousands of Haitian migrants, even as Del Rio Sector personnel continued to report a lack of processing capacity.

[55] In the final days of the encampment, CBP permitted the World Central Kitchen Relief Team, a non-governmental organization, to access the camp and to begin coordinating the distribution of hot meals, baby food, and diapers in partnership with local restaurants in the Del Rio area. Despite the presence of World Central Kitchen, several migrants described a continuing lack of access to food and water, indicating problems with food distribution within the encampment. By the time World Central Kitchen was able to scale its operations to provide adequate food, DHS had already started clearing the encampment.

CLP_PC_069134

[56] *See Beyond the Bridge supra* note 40 (citing phone interview by RFK Human Rights lawyer with Haitian individual (March 15, 2022)).

[57] The unpredictable, rising water level of the Rio Grande made crossing the river extremely dangerous. Many individuals from the Del Rio encampment reported that they believed that the US government was responsible for the sudden changes in water level in the Rio Grande and that the US was "somehow controlling the water level" and "releasing the water on migrants attempting to cross back into the US" The bi-national International Boundary and Water Commission (IBWC) manages the water in the Rio Grande and executes water releases from the Amistad Dam upstream from Del Rio as requested by the Texas Water Master and the Mexican counterpart in the Del Rio sector. Efforts to confirm whether US authorities requested water releases in response to the presence of migrants remains unconfirmed. Researchers are seeking to obtain this information via Freedom of Information Act and Texas Public Information Act requests.

[58] *Beyond the Bridge supra* note 40 at 29.

[59] Many were forced to attempt to create shelters using reeds from the riverbank, pieces of cardboard, clothing, and sheets brought on their journey. While very few individuals had their own tents, most were forced to sleep directly on the ground, often in the dirt. Those who were held adjacent to the Del Rio International Bridge rather than under it were exposed to direct sun and extreme heat throughout the day, with temperatures reaching over 100 degrees Fahrenheit. The weather conditions and helicopters hovering over the encampment repeatedly kicked up dirt and dust that resulted in widespread health conditions among those trapped in the camp, including skin rashes, severe respiratory problems, and eye infections. *See Beyond the Bridge supra* note 40.

[60] As described above, many Haitians in Del Rio were forced to bathe in and drink from the Rio Grande. This in turn caused severe gastrointestinal issues, as migrants were exposed to disease-causing bacteria in the river's water supply. In addition, the CBP helicopters circling low adjacent to the bridge kicked up dust and dirt, causing migrants, including infants and young children, to develop severe respiratory problems, skin rashes, and eye infections. The lack of shelter in the encampment also left individuals exposed to extreme temperature changes, including blazing heat during the day and steep temperature drops at night, contributing to illness. Because CBP failed to provide adequate food and water—and blocked migrants from securing food and water in Acuña—many individuals reported fainting in the camp or suffering other medical consequences from severe malnutrition and dehydration. *See Beyond the Bridge supra* note 40.

[61] Another Haitian asylum seeker described how when his one-year-old daughter developed a high fever and respiratory issues, he begged US personnel to provide medical care. When US personnel refused, he carried his daughter across the Rio Grande at night, in order to avoid detection by CBP patrolling the river, where she was urgently admitted to a hospital in Acuña and provided life-saving medical treatment, including IV antibiotics. *See Beyond the Bridge supra* note 40 (citing in-person interview by RFK Human Rights lawyer with Haitian individual in Acuña, Mexico (Sept. 25, 2021)).

[62] *Id.* (citing in-person interview and observation by HBA caseworker with Haitian individual in Del Rio, Texas (Sept. 19-25, 2021)).

[63] *Id.* (citing in-person interview by HBA case worker with Haitian individual in Del Rio, Texas (Sept. 23, 2021)).

[64] *Id.*

[65] Rafael Bernal, *Exclusive: Two Black Caucus members call on DHS to stop expulsions to Haiti*, The Hill (Mar. 16, 2022), https://thehill.com/latino/598462-exclusive-two-black-caucus-members-call-on-dhs-to-stop-expulsions-to-haiti; Eileen Sullivan, *Congressional Democrats Ask Biden to Review Treatment of Black Migrants*," The New York Times, (Feb. 16, 2022), https://www.nytimes.com/2022/02/16/us/politics/biden-immigration-haiti.html; Rep. Ayanna Pressley & Rep. Nydia Velazquez, *Congressional letter calling for end of Haitian Deportations* (Sept. 16, 2021), https://pressley.house.gov/sites/pressley.house.gov/files/Pressley-Velazquez%20Halt%20Haitian%20Deportation%20Letter.pdf.

[66] *See* IACHR, Resolution No.2/2021, Protection of Haitians in Human Mobility: Inter-American Solidarity (Oct. 24, 2021), https://www.oas.org/en/iachr/decisions/pdf/2021/Res-2-21-en.pdf (urging "the States of the Americas to adopt an integral, immediate, effective, and lasting response to ensure the rights of Haitian persons in international human mobility"); OAS, *Press Release: IACHR Issues Resolution on the Protection of Haitians in Mobility Contexts* (Nov. 30, 2021), https://www.oas.org/en/iachr/jsForm/?File=/en/iachr/media_center/preleases/2021/319.asp (promoting the resolution).

[67] IOM, *UN Agencies Call for Protection Measures and a Comprehensive Regional Approach for Haitians on the Move* (Sept. 20, 2021), https://www.iom.int/news/un-agencies-call-protection-measures-and-comprehensive-

CLP_PC_069135

regional-approach-haitians-move (calling on states "to refrain from expelling Haitians without proper assessment of their individual protection needs, to uphold the fundamental human rights of Haitians on the move, and to offer protection mechanisms or other legal stay arrangements for more effective access to regular migration pathways").
[68] OAS, *IACHR and UN's Special Rapporteur Condemn Excessive Use of Force and Deportations of Migrants from Haiti at the United States' Southern Border* (Oct. 4, 2021),
https://www.oas.org/en/IACHR/jsForm/?File=/en/iachr/media_center/PReleases/2021/260.asp.
[69] Stephanie Nebehay, *US expulsions of Haitians may violate international law - UN refugee boss*, Reuters (Sept. 21, 2021), https://www.reuters.com/world/americas/un-concerned-us-pushbacks-migrants-who-may-need-asylum-2021-09-21/.
[70] Annika Kim Constantino, *Biden Condemns Border Patrol Agents' Treatment Of Haitian Migrants, Vows They Will Face Consequences,* CNBC (Sept. 24, 2021), https://www.cnbc.com/2021/09/24/biden-condemns-border-patroltreatment-of-haitian-migrants-in-del-rio.html.
[71] Katie Rogers and Michael D. Shear, *Biden Condemns Border Patrol Treatment of Haitian Migrants as Expulsions Continue*, The New York Times (Sept. 24, 2021), https://www.nytimes.com/2021/09/24/us/politics/biden-border-patrolhaitian-migrants.html.
[72] Kevin Johnson, *DHS vows to have findings within 'days' in investigation of Border Patrol's treatment of Haitian migrants*, USA Today (Sept. 22, 2021),
https://www.usatoday.com/story/news/politics/2021/09/22/photos-border-patrol-using-horse-reins-whips-prompts-dhs-probe/5812845001/.
[73] Customs and Border Protection, Office of Professional Responsibility, *Report of Investigation 202112280* 2 (2022), https://www.cbp.gov/sites/default/files/assets/documents/2022-Jul/202112280-cbp-closing-report-public-redacted-final.pdf [hereinafter "CBP Report"].
[74] *Id.* (qualifying that "[t]his report focuses on the investigation carried out by OPR into an incident that lasted approximately 30 minutes, and took place on Sunday, September 19, 2021.").
[75] *Id.* at 5 (stating in part, "Hey! You use your women? This is why your country's shit, you use your women for this."). Investigators found that this same agent "acted in an unsafe manner" by "pursuing the individual he had yelled at along the river's edge forcing his horse to narrowly maneuver around a small child on a slanted concrete ramp."
[76] *Id.* at 5 (reporting an agent that stated "Hey! You use your women? This is why your country's shit, you use your women for this."). Investigators found that this same agent "acted in an unsafe manner" by "pursuing the individual he had yelled at along the river's edge forcing his horse to narrowly maneuver around a small child on a slanted concrete ramp."
[77] *Id.* at 5.
[78]  *See* Complaint, *Haitian Bridge Alliance v. Biden*, *supra* note 44.
[79] Haitian Bridge Alliance, et al., Civil Rights and Civil Liberties Complaint, *Re: DHS Rights Violations in Del Rio, Texas* (Sept. 24, 2021), available at
https://www.hrw.org/sites/default/files/media_2021/10/CRCL%20Complaint%20on%20Del%20Rio%2009-24-21.pdf.
[80] *See, e.g.*, Rafael Bernal, *Black immigrant groups file FOIA requests over treatment of Haitians*, The Hill (Oct. 1, 2021), https://thehill.com/policy/national-security/574956-black-immigrant-groups-file-foia-requests-over-treatment-of-haitians.
[81] Jacqueline Charles and Michael Wilner, *Border Agents Circulate Coin Memorializing Treatment of Haitian Migrants in Del Rio, Texas*, Seattle Times (June 14, 2022), https://www.seattletimes.com/nation-world/border-officers-circulate-coin-memorializing-treatment-of-haitian-migrants-in-del-rio-texas/.
[82] Washington Post Editorial Board, *The US Door Swings Open to Ukrainians*, Washington Post (June 22, 2022), https://www.washingtonpost.com/opinions/2022/06/22/united-states-ukraine-refugee-program/.
[83] *See, e.g.*, US Department of Health and Human Services, Centers for Disease Control and Prevention, "Order Suspending the Right to Introduce Certain Persons from Countries where a Quarantinable Communicable Disease Exists" (Aug. 2 2021), https://www.cdc.gov/coronavirus/2019-ncov/downloads/CDC-Order-Suspending-Right-to-Introduce-_Final_8-2-21.pdf.
[84] *See, e.g.*, Haitian Bridge Alliance, Human Rights First & Al Otro Lado, *Failure to Protect: Biden Administration Continues Illegal Trump Policy to Block and Expel Asylum Seekers to Danger* (Apr. 2021), https://www.humanrightsfirst.org/resource/failure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum.

CLP_PC_069136

[85] Harold Koh, *Re: Ending Title 42 return flights to countries of origin, particularly Haiti* (Oct. 2, 2021), *available at* https://www.politico.com/f/?id=0000017c-4c4a-dddc-a77e-4ddbf3ae0000.

[86] US Department of Health and Human Services, Centers for Disease Control and Prevention, *Public Health Determination and Order Regarding the Right to Introduce Certain Persons from Countries where a Quarantinable Communicable Disease Exists, Centers for Disease Control and Prevention* (Apr 1, 2022)
https://www.cdc.gov/coronavirus/2019-ncov/cdcresponse/Final-CDC-Order-Prohibiting-Introduction-of-Pesons.pdf; *Louisiana v. Centers for Disease Control and Prevention*, No. 22-CV-00885 (W.D. LA, May 5, 2022),
https://www.courthousenews.com/wpcontent/uploads/2022/05/order-granting-injunction-against-ending-use-of-title-42.pdf.

[87] *See* Human Rights Watch, *Haitians Being Returned to a Country in Chaos* (Mar. 24, 2022),
https://www.hrw.org/news/2022/03/24/haitians-being-returned-country-chaos.

[88] U.N. Office of the High Commissioner for Human Rights, *Haiti: Bachelet deeply disturbed by human rights impact of deteriorating security situation in Port-au-Prince* (May 17, 2022), https://www.ohchr.org/en/press-releases/2022/05/haiti-bachelet-deeply-disturbed-human-rights-impact-deteriorating-security.

[89] Eileen Sullivan, *US Accelerated Expulsions of Haitian Migrants in May*, The New York Times (June 9, 2022),
https://www.nytimes.com/2022/06/09/us/politics/haiti-migrants-biden.html.

[90] US Customs and Border Protection, "Nationwide Encounters," https://www.cbp.gov/newsroom/stats/nationwide-encounters (last accessed July 11, 2022). This data does not capture, however, the full number of expulsions of individuals to Haiti given children born to Haitian parents in third countries are likely not counted as Haitian for purposes of Title 42 expulsions; Nacho Vega, *Crisis migratoria: EE. UU. Deporta a 30 niños brasileños a Haití*, Noticias RGV (Sept. 28, 2021), https://noticiasrtv.com/crisis-migratoria-ee-uu-deporta-a-30-ninos-brasilenos-a-haiti/ (noting at least 30 Brazilian children and 182 Chilean children were expelled with their parents to Haiti on expulsion flights in September 2021).

[91] Human Rights First, *A Shameful Record: Biden Administration's Use of Trump Policies Endangers People Seeking Asylum* (Jan 13., 2022), https://www.humanrightsfirst.org/resource/shameful-record-biden-administration-s-use-trump-policies-endangers-people-seeking-asylum.

[92] Human Rights First, *'Illegal and Inhumane': Biden Administration Continues Embrace of Trump Title 42 Policy as Attacks on People Seeking Refuge Mount* (Oct. 21, 2021), https://www.humanrightsfirst.org/resource/illegal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks, p.7.

[93] Harold Isaac and Catherine Porter, *Haiti Protests Mass US Deportation of Migrants to Country in Crisis*, New York Times (Sept. 19, 2021),
https://www.nytimes.com/2021/09/19/world/americas/us-haitian-deportation.html.

[94] Catherine Porter, *Deported by US, Haitians Are in Shock: 'I Don't Know This Country',* New York Times (Sept. 20, 2021),
https://www.nytimes.com/2021/09/20/world/americas/deported-haitians-shocked.html.

[95] *See* Amnesty International, Center for Gender & Refugee Crisis, Global Justice Clinic, Haitian Bridge Alliance, Refugees International, Fezo Fwontalye Jano Sikse, and Service Jesuite aux Migrants, *Stop US Deportations and Abuse Against Haitains On The Move: An Urgent Step Towards Created Just Policies for Haitians*, (Dec. 15, 2021), https://cgrs.uchastings.edu/sites/default/files/Haiti%20T42%20Factsheet%20Dec.%202021.pdf.

[96] Human Rights Watch, *Haitians Being Returned to a Country in Chaos* (Mar. 24, 2022),
https://www.hrw.org/news/2022/03/24/haitians-being-returned-country-chaos.

[97] Syracuse University Transactional Records Access Clearing House, *Ukrainians at the US-Mexico Border: Seeking Admission at US Ports of Entry by Nationality*, (May 17, 2022),
https://trac.syr.edu/immigration/reports/683/.

[98] US Customs and Border Protection, "Nationwide Encounters," https://www.cbp.gov/newsroom/stats/nationwide-encounters (last accessed July 11, 2022).

[99] *Id.*

[100] *See* Hastings to Haiti Partnership, Haitian Bridge Alliance, Center for Gender & Refugee Studies, *Protection Delayed is Protection Denied: Factsheet on Title 42 Expulsions, Haitian Asylum Seekers in Tijuana, and the US Government's Ongoing Evasion of Duty* (Apr. 7, 2022),
https://cgrs.uchastings.edu/sites/default/files/Tijuana%20Factsheet_2022.04.07%20FINAL%20v2_0.pdf.

[101] Haitian Bridge Alliance, Human Rights First & Al Otro Lado, *Failure to Protect: Biden Administration Continues Illegal Trump Policy to Block and Expel Asylum Seekers to Danger* (Apr. 2021),

CLP_PC_069137

https://www.humanrightsfirst.org/resource/failure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum, p.8.

[102] Human Rights First, *Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021* (June 16, 2022), https://www.humanrightsfirst.org/sites/default/files/AttacksonAsylumSeekersBlockedExpelledReturnedtoMexicoSinceJanuary2021.6.16.2022.pdf.

[103] Kate Morissey, *For Haitian Migrants Waiting in Tijuana Brings Fear, Discrimination, Even Death*, Los Angeles Times (June 12, 2022), https://www.latimes.com/world-nation/story/2022-06-12/haitian-migrants-tijuana.

[104] Human Rights First, *Human Rights Travesty: Biden Administration Embrace of Trump Asylum Expulsion Policy Endangers Lives, Wreaks Havoc* (Aug. 2021), https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers, p.8.

[105] Kate Morisey, *Jamaican asylum seekers in Tijuana facing racism, homophobia while they wait*, San Diego Union Tribune, (Jan. 3, 2022), https://www.sandiegouniontribune.com/news/immigration/story/2022-01-03/jamaican-asylum-seekers-tijuana-racism-homophobia.

[106] *See, e.g.*,US Border Patrol, "Nationwide Title 42 Encounters, January 21, 2021 through May 12, 2021" obtained through Freedom of Information Act Request by Human Rights First,   https://www.humanrightsfirst.org/file/2021-090728usbpspreadsheetxlsx (showing that officials failed to record the race of the individual in over 99.3 percent of more than 361,000 recorded encounters where Border Patrol used Title 42 to expel migrants and asylum seekers).

[107] Human Rights First and Haitian Bridge Alliance, *Biden Administration's Dangerous Haitian Expulsion Strategy Escalates the US History of Illegal and Discriminatory Mistreatment of Haitians Seeking Safety in the United States*, (Sept. 2021), https://www.humanrightsfirst.org/sites/default/files/BidenAdministrationDangerousHaitianExpulsionStrategy.pdf.

[108] US Dep't of Homeland Security, Office of Inspector General, *OIG-21-22, CBP Has Taken Steps to Limit Processing of Undocumented Aliens at Ports of Entry*, (Oct. 27, 2020), https://www.oig.dhs.gov/sites/default/files/assets/2020-10/OIG-21-02-Oct20.pdf.

[109]  Julia Neusner, *'We Need Someone to See Us': To Save Lives, the Biden Administration Should Quickly Restore Refugee Protection* (Jan. 13, 2021), https://www.humanrightsfirst.org/blog/we-need-someone-see-us-save-lives-biden-administration-should-quickly-restore-refugee.

[110] See, e.g., Black Alliance for Just Immigration (BAJI) & Instituto para las Mujeres en la Migración (IMUMI) , *'There is a Target on Us' The Impact of Anti-Black Racism on African Migrants at Mexico's Southern Border* (2021), https://imumi.org/attachments/2020/The-Impact-of-Anti-Black-Racism-on-African-Migrants-at-Mexico.pdf, p.35 (herein after "*'There is a Target on Us'*".

[111] See, *Al Otro Lado, Inc. v. Wolf*, Case No.: 17-cv-02366-BAS-KSC (S.D. Cal. Aug. 6, 2020).

[112] US Customs and Border Protection, *Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry* (Nov. 1, 2021), https://www.cbp.gov/sites/default/files/assets/documents/2021-Nov/CBP-mgmt-processing-non-citizens-swb-lpoes-signed-Memo-11.1.2021-508.pdf.

[113] US Department of Homeland Security, *Policy Guidance for Implementation of the Migrant Protection Protocols* (Jan 25, 2019),  https://www.dhs.gov/sites/default/files/publications/19_0129_OPA_migrant-protection-protocols-policy-guidance.pdf.

[114] Human Rights First, *Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols"* (Feb. 19, 2021), https://www.humanrightsfirst.org/sites/default/files/PubliclyReportedMPPAttacks2.19.2021.pdf (documenting 1544 reports of attacks on individuals returned to Mexico under RMX.

[115] Julia Neusner, *'We Need Someone to See Us': To Save Lives, the Biden Administration Should Quickly Restore Refugee Protection* (Jan. 13, 2021), https://www.humanrightsfirst.org/blog/we-need-someone-see-us-save-lives-biden-administration-should-quickly-restore-refugee.

[116]  *See 'There is a Target on Us' supra* note 110.

[117] *See* Brief of NGOs and Law School Clinics, *Mayorkas v. Innovation Law Lab*, No. 19-1212 (Jan. 22, 2021), https://www.supremecourt.gov/DocketPDF/19/19-1212/166993/20210122134915608_19-1212%20HRF%20NILC%20Amicus%20Brief%20Final.pdf (noting that "[n]inety-seven percent of individuals in [RMX] whose cases have been decided did not have an attorney" and that "[a] mere 4.1 percent of [RMX] cases completed with an in-person decision (i.e., excluding in absentia decisions) were successful.").

[118] *Biden v. Texas*, No. 21–954 (June 30, 2022), https://www.supremecourt.gov/opinions/21pdf/21-954_7l48.pdf.

27

[119] 8 USC § 1225.

[120] 142 Cong. Rec. 136, at S11491-S11492 (Sept. 27, 1996).

[121] *See, e.g.*, US Commission on International Religious Freedom, *Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal* (2016), https://www.uscirf.gov/sites/default/files/Barriers%20To%20Protection.pdf.

[122] *See, e.g.*, Frances Madeson, *A Persecuted Father Deported to Haiti Fights to Reunite With His Family in US*, Truthout (Feb. 18, 2022), https://truthout.org/articles/a-persecuted-father-deported-to-haiti-fights-to-reunite-with-his-family-in-us/ (documenting Haitian political activist deported after flawed expedited removal to Haiti where he suffered further brutal violence).

[123] Records from the USCIS Asylum Office, which also adjudicates affirmative asylum applications, also reveal disproportionate drops in asylum grant rates for individuals from Sub-Saharan Africa and the Caribbean as well as South Asia and Central/South America during the Trump administration. Human Rights First, *USCIS Records Reveal Systemic Disparities in Asylum Decisions*, (May 18, 2022), https://www.humanrightsfirst.org/resource/uscis-records-reveal-systemic-disparities-asylum-decisions.

[124] *See Grievance Letter to USCIS, ICE, EOIR Re: "Detained Asylum Seekers Deprived of Due Process in Expedited Removal Process"* (June 30, 2021),
https://www.splcenter.org/sites/default/files/detained_asylum_seeker_grievance_letter_30_june_2021.pdf;
Human Rights First, *'I'm a Prisoner Here': Biden Administration Policies Lock Up Asylum Seekers* (April 2022), https://www.humanrightsfirst.org/sites/default/files/I%27maPrisonerHere.pdf, pp. 35, 37 - 38 (herein after *'I'm a Prisoner Here'*)(documenting flawed credible fear interviews with inadequate interpretation resulting in negative determinations for Angolan, Guinean, Ivorian, and Somali asylum seekers); Frances Madeson, *US Officials Outrageously Claim Black Men Fleeing Slavery Lack "Credible Fear,"* Truthout (Nov. 17, 2021),
https://truthout.org/articles/us-officials-outrageously-claim-black-men-fleeing-slavery-lack-credible-fear/; *see also* Human Rights Watch, *'How Can You Throw Us Back?' Asylum Seekers Abused in the US and Deported to Harm in Cameroon*, (Feb. 2022), https://www.hrw.org/sites/default/files/media_2022/03/us_cameroon0222_web.pdf, pp.103 - 07 (herein after *'How Can You Throw Us Back?'*)(identifying lack of interpretation as contributing to erroneous negative fear determinations and deportations of Cameroonian asylum seekers).

[125] Haitian Bridge Alliance, UndocuBlack Network, & Quixote Center, *The Invisible Wall: Title 42 and its Impact on Haitian Migrants* (March 2021), https://www.quixote.org/wp-content/uploads/2021/03/The-Invisible-Wall.pdf; Human Rights First, *'I'm a Prisoner Here': Biden Administration Policies Lock Up Asylum Seekers* (April 2022), https://www.humanrightsfirst.org/sites/default/files/I%27maPrisonerHere.pdf, p. 39.

[126] US Citizenship & Immigration Services (USCIS), *2019 Asylum Officer Lesson Plan* (Apr. 30, 2019), https://www.uscis.gov/sites/default/files/document/lesson-plans/Credible_Fear_of_Persecution_and_Torture_Determinations.pdf; USCIS, *2019 Asylum Officer Lesson Plan* (Sep. 24, 2019), https://refugeerights.org/wp-content/uploads/2021/08/Sept.-2019-Lesson-Plan.pdf.

[127] USCIS credible and reasonable fear determinations - FY 2016 to FY 2021 (through May 2021) received via Freedom of Information Act Request by Human Rights First,
https://www.humanrightsfirst.org/file/cow2021001887-cfandrfdataxlsx.

[128] *Brief of Public Justice Center et al., B.C. v Attorney General, Nos. 19-1408 and 20-2078* (Aug. 31, 2020), http://www.publicjustice.org/wp-content/uploads/2021/11/AS-FILED-B.C.-v.-Barr-PJC-BAJI-CAIR-Dolores-Street-Amicus-Curiae-Brief-8.31.2020-FINAL.pdf (discussing implicit bias in immigration judge adjudication in case of Cameroonian asylum seeker denied relief based on adverse credibility finding).

[129] USCIS credible and reasonable fear determinations - FY 2016 to FY 2021 (through May 2021) received via Freedom of Information Act Request by Human Rights First,
https://www.humanrightsfirst.org/file/cow2021001887-cfandrfdataxlsx.

[130] *Id.*

[131] US Dep't of Homeland Security, "Designation of Haiti for Temporary Protected Status," 86 FR 41863 (Aug 3, 2021), https://www.govinfo.gov/content/pkg/FR-2021-08-03/pdf/2021-16481.pdf.

[132] *'How Can You Throw Us Back?' supra* note 124, at pp.114-43.

[133] *'I'm a Prisoner Here' supra* note 124, at pp. 31-32.

[134] ACLU of New Mexico et al., *Complaint Re: "Severe Violations of Due Process and Inhumane Conditions at Torrance County Detention Facility"* (Nov. 23, 2021),
https://www.americanimmigrationcouncil.org/sites/default/files/research/compla1.pdf; Innovation Law Lab et al., *Complaint Re: "Re: Access to legal services for Haitian immigrants at Torrance County Detention Facility"* (Nov. 5, 2021), https://innovationlawlab.org/media/TorranceLetter_11.5.21.pdf.

CLP_PC_069139

[135] *See CRCL Complaint Letter from Innovation Law Lab et al. to Juan Acosta, Field Office Dir., ICE et al.* (Nov. 5, 2021), https://innovationlawlab.org/media/TorranceLetter_11.5.21.pdf.

[136] Syracuse University, Transactional Records Access Clearinghouse,
*The Impact of Nationality, Language, Gender and Age on Asylum Success* (Dec. 7, 2021),
https://trac.syr.edu/immigration/reports/668/.

[137] Innovation Law Lab et al., *Complaint Re: "Re: Access to legal services for Haitian immigrants at Torrance County Detention Facility"* (Nov. 5, 2021), https://innovationlawlab.org/media/TorranceLetter_11.5.21.pdf.

[138] *How Can You Throw Us Back?' supra* note 124 at pp.114-43.

[139] *How Can You Throw Us Back?' supra* note 124 at pp.69-96, 111-12; Human Rights First, *Cameroonian Asylum Seekers Increasingly Detained, Denied Asylum Under Trump Administration* (Nov. 6, 2020), https://www.humanrightsfirst.org/resource/cameroonian-asylum-seekers-increasingly-detained-denied-asylum-under-trump-administration.

[140] According to Transactional Records Access Clearinghouse (TRAC) data immigration courts granted asylum or other relief to 273 out of 334 Cameroonians (82%) in FY21, 997 out of 1,605 (62%) in FY20, and 706 out of 862 (82%) in FY19. However, these statistics also show the number of asylum decisions was far fewer in FY21 than FY20, potentially reflecting reduced access to asylum at the US southern border (where many Cameroonians in recent years have requested asylum) due to the Title 42 policy. *See* TRAC, "Asylum Decisions," https://trac.syr.edu/phptools/immigration/asylum/. *See also* UNHCR, *UNHCR chief calls on US to end COVID-19 asylum restrictions at the Mexico border* (May 20, 2021), https://news.un.org/en/story/2021/05/1092352.

[141] Human Rights Watch found that government forces detained or imprisoned at least 39 Cameroonians after their US deportation, though the true number may be higher. This includes 31 people deported in October or November 2020 and eight people deported in 2019. *How Can You Throw Us Back?' supra* note 124.

[142] Human Rights Watch documented 13 cases of torture, rape, or other abuse or assault by Cameroonian state agents (police, gendarmes, military, or prison staff) of people deported from the United States. *See How Can You Throw Us Back?' supra* note 124.

[143] US Dep't of Homeland Security & Executive Office for Immigration Review, "Asylum Eligibility and Procedural Modifications," 84 FR 33829 (July 16, 2019).

[144] Human Rights First, *Asylum Denied, Families Divided: Trump Administration's Illegal Third-Country Transit Ban* (July 2020), https://www.humanrightsfirst.org/sites/default/files/AsylumDeniedFamiliesDivided.pdf.

[145] *Id.*; *How Can You Throw Us Back?' supra* note 124 at pp.109-11

[146] *See* BAJI, The State of Black Immigrants (2020), http://baji.org/wp-content/uploads/2020/03/sobi-fullreport-jan22.pdf.

[147] *See* BAJI & NYU Law Immigrant Rights Clinic, *The State of Black Immigrants Pt. II: Black Immigrants in The Mass Criminalization System* (2020), https://baji.org/wp-content/uploads/2020/03/sobi-fullreport-jan22.pdf, at 21 ( describing how "[b]lack immigrants are more likely than immigrants overall to be deported on criminal versus immigration grounds of removability" and how, for example "[i]n FY 2013, more than three quarters of Black immigrants were removed on criminal grounds, in contrast to less than half of immigrants overall.").

[148] *See* The Georgetown University Law Center Federal Legislation Clinic & The UndocuBlack Network, *Life on Hold: Black Immigrations & the Promise of Liberation Refugee Immigration Fairness* (June 2021), https://trayinc.cld.bz/Georgetown-Law-UBN-Life-on-Hold.

[149] IRC Analysis of US Census Bureau, *American Community Survey, 2014 ACS 1-Year PUMS*. Data available for download at http://factfinder.census.gov/bkmk/navigation/1.0/en/d_dataset:ACS_14_1YR/d_product_type:PUMS.

[150] US Census Bureau, American Community Survey, 2014 1-Year Estimates, Tables S0201 and B050O3B.

[151] As noted by BAJI, "federal immigration origin data is categorized by country of origin rather than by race." BAJI & NYU Law Immigrant Rights Clinic, *The State of Black Immigrants Pt. II: Black Immigrants in The Mass Criminalization System* (2020), https://baji.org/wp-content/uploads/2020/03/sobi-fullreport-jan22.pdf. As a result, complete data on race in immigration detention is unavailable. Thus, this section refers to nationality rather than race and considers Black immigrants to be those from majority-Black countries in Africa and the Caribbean. This is both over-inclusive because "not every immigrant in the United States from a country in Africa or the Caribbean is of African heritage, nor does every individual of African heritage self-identify as Black," and under-inclusive "because it fails to include Black immigrants . . . from countries outside of Africa and the Caribbean." *Id.*

CLP_PC_069140

[152] American Immigration Council, *Immigration Detention in The United States By Agency* (Jan. 2020), https://www.americanimmigrationcouncil.org/sites/default/files/research/immigration_detention_in_the_united_states_by_agency.pdf.

[153] *How Can You Throw Us Back?' supra* note 124 at 69. The one interviewed asylum seeker who was detained for a shorter period of time (five months) was released for medical reasons and was subsequently deported. *Id.* at 74.

[154] *Id.* at 69.

[155] *'I'm a Prisoner Here' supra* note 124 at 20.

[156] Tulane University Law School Immigration Rights Clinic, *No End in Sight: Prolonged And Punitive Detention Of Immigrants In Louisiana* (May 2021), https://law.tulane.edu/sites/law.tulane.edu/files/TLS%20No%20End%20In%20Sight%20Single%20Pages%20FINAL.pdf, p. 9.

[157] *Id.* at 8.

[158] Andrea Castillo, *With or without criminal records, some immigrants spend many years in detention*, Los Angeles Times (Nov. 12, 2018), https://www.latimes.com/local/lanow/la-me-immigrant-detainees-20181112-story.html.

[159] Josh Gerstein, *'That's Just Insane': Australia's Secret Deal to Take in Rwandan Guerrillas From the US*, POLITICO (May 15, 2019), https://www.politico.com/magazine/story/2019/05/15/australia-elections-rwanda-prisoners-refugee-swap-us-226875/.

[160] *See* Castillo, *supra* note 158.

[161] *Letter from Cameroon American Council, Freedom for Immigrants, ISLA, and Southern Poverty Law Center, to Joseph V. Cuffari, Inspector General, US Dep't Homeland Sec., and Cameron Quinn, Officer, Civ. Rts. & Civ. Lib., US Dep't Homeland Sec.* (Aug. 26, 2020), https://www.splcenter.org/sites/default/files/8.26.20_crcl_letter.pdf.

[162] Molly O'Toole & Andrea Castillo, *'Betrayed' Black asylum seekers say Trump administration is ramping up deportations by force and fraud*, Los Angeles Times (Nov. 27, 2020), https://www.latimes.com/politics/story/2020-11-27/black-asylum-seekers-trump-officials-push-deportations.

[163] Human Rights First, *supra* at 29.

[164] RAICES, *Black Immigrant Lives are Under Attack* (July 22, 2020), https://www.raicestexas.org/2020/07/22/black-immigrant-lives-are-under-attack/?ms=em20220426_rollout_video_bidenvtx&emci=254fb2d4-a0c5-ec11-997e-281878b83d8a&emdi=8325dfb9-a2c5-ec11-997e-281878b83d8a.

[165] *Id.*

[166] *See 'I'm a Prisoner Here' supra* note 124, at 29.

[167] *Id.* at 22.

[168] *Id.* at 22-23.

[169] *Id.* at 22.

[170] U.S. Immigrations and Customs Enforcement (ICE), "Detention Management," https://www.ice.gov/detain/detention-management.

[171] *Black Immigrant Lives are Under Attack*, *supra* note 164.

[172] *Id.*

[173] *Id.*

[174] RAICES, *Black, Pregnant, Detained* (Mar. 4, 2021), https://www.raicestexas.org/2021/03/04/pregnant-and-detained/?ms=em20220426_rollout_video_bidenvtx&emci=254fb2d4-a0c5-ec11-997e-281878b83d8a&emdi=8325dfb9-a2c5-ec11-997e-281878b83d8a. RAICES also notes, disturbingly, "[a]t the same time that Karnes' demographics shifted to majority-black, RAICES noted that ICE ended its policy against detaining pregnant women and infants under one year of age. As a result, multiple pregnant women and babies suffered from incarceration at Karnes during the COVID-19 pandemic." *Id.*

[175] RAICES & Haitian Bridge Alliance, *Black Immigrants in Family Detention - Live Stream* (July 23, 2020), https://www.facebook.com/100064456043882/videos/1711275342385292.

[176] *Id.*

[177] *Id.*

[178] *Id.*

[179] *Id.*

[180] *Id.*

[181] *Id.*

[182] *Id.*

CLP_PC_069141

[183] ACLU of Louisiana Foundation et al., *Complaint Re: Unchecked Human Rights and Civil Rights Abuses Systemic within the New Orleans ICE Field Office Area of Responsibility* (Dec. 20, 2021), https://static1.squarespace.com/static/5a33042eb078691c386e7bce/t/61c0b47c15319f67d4045ca3/1640019069450/12%3A20%3A21+DHS+NOLA+ICE+Investigation+Follow-Up+Letter+%282%29.pdf (detailing the unchecked human rights and civil rights abuses systemic within the the NOLA ICE AOR, including an "abusive and racially discriminatory pattern of treatment, unlawful conduct, and lack of oversight and accountability.").

[184] *Letter from Cameroon American Council et al. supra* note 161 https://www.splcenter.org/sites/default/files/8.26.20_crcl_letter.pdf.

[185] Southern Poverty Law Center et. al, *Complaint Re: Immigration and Customs Enforcement Officers' Use of Torture to Coerce Immigrants Into Signing Immigration Documents at Adams County Correctional Facility* (Oct. 7, 2020), https://static1.squarespace.com/static/5a33042eb078691c386e7bce/t/5f7f17f39e044f47175204fb/1602164723244/Re+CRCL+Complaint+ICE%27s+Use+of+Torture+to+Coerce+Immigrants+to+Sign+Immigration+Documents+at+Adams+County+Correctional+Facility.pdf.

[186] *Id.* (detailing testimony of D.F. interviewed on Oct. 2, 2020).

[187] *Id.* (detailing testimony of B.J. interviewed on Sept. 30, 2020).

[188] Lauren Seibert, *A Cry for Cameroon: How the United States Failed Refugees*, The Progressive Magazine (Mar. 26, 2022), https://progressive.org/latest/cry-for-cameroon-seibert-220326/; Kate Morrissey, *Despite public outcry, many Cameroonians and Congolese deported on a flight*, San Diego Union-Tribune (Oct. 15, 2020), https://www.sandiegouniontribune.com/news/immigration/story/2020-10-15/cameroon-congolese-deported.

[189] Joquin Castro, Twitter (Oct. 13, 2020), https://twitter.com/JoaquinCastrotx/status/1316117172708691969.

[190] Freedom for Immigrants et al., *Complaint Re: U.S. Immigration and Customs Enforcement (ICE)'s Pattern of Torture in Signing of Deportation Documents for Cameroonian Migrants* (Nov. 5, 2020), https://www.splcenter.org/sites/default/files/crcl_complaint_ice_s_pattern_of_torture_in_signing_of_deportation_documents_for_cameroonian_migrants.pdf.

[191] Freedom for Immigrants et al., *Complaint Re: U.S. Immigration and Customs Enforcement Torture in Signing of Deportation Documents for Cameroonian Migrants at Winn Correctional Center, Louisiana* (Feb. 1, 2021), https://static1.squarespace.com/static/5a33042eb078691c386e7bce/t/6019dd452f75af0a17bec824/1612307782021/Redacted_CRCL_Complaint_Winn.pdf.

[192] Southern Poverty Law Center, *Letter Re: Call for U.S. Immigration and Customs Enforcement (ICE) to End Contracts due to Abusive, Inhumane, Criminal, and Racially Discriminatory Practices at Pine Prairie ICE Processing Center and Allen Parish Public Safety Complex, Louisiana* (July 28, 2021), https://www.splcenter.org/sites/default/files/28_july_2021_complaint_and_call_to_close_pine_prairie_and_allen_parish.pdf.

[193] Zachary Sanders, Esq. et al., *Complaint Re: Call for an Immediate Halt to and Investigation of Detention, Violence, Repression and Racism Against Somali and All Immigrant Detainees and Asylum Seekers at Butler County Jail in Hamilton, Ohio* (Dec. 14, 2020), http://ohioimmigrant.org/wp-content/uploads/2020/12/CRCL-Complaint-Dec-2020-REDACTED.pdf.

[194] *Bayong and Adem v. County of Butler, Ohio et al.*, Case No. 1:20-cv-989 (Dec. 8, 2020), *available at* http://ohioimmigrant.org/wp-content/uploads/2020/12/Butler-County-Jail-Complaint-With-Exhibits-12-8-20.pdf.

[195] African Communities Together et al., *RE: Complaint Regarding ICE's Use of The WRAP as a Restraint Device* (Oct. 13, 2021), https://static1.squarespace.com/static/5701c3253c44d887e796b6e2/t/6166d47647aa3a692d4b1be0/1634129028823/CRCL+Complaint+Regarding+The+WRAP_Final.pdf.

[196] *See 'I'm a Prisoner Here' supra* note 124,at 48.

[197] Southern Poverty Law Center, *Letter Re: Call for Cancellation of Winn Correctional Center Contract and Investigation into the New Orleans ICE Field Office* (June 2021), *available at* https://drive.google.com/file/d/1NMWCXhOwUDE2e15RXfQ2ep9F69Zl-rva/view.

[198] *Id.*

[199] *Id.*

[200] *See 'I'm a Prisoner Here' supra* note 124,at 46.

[201] Konrad Franco, Caitlin Patler, & Keramet Reiter, *Punishing Status and the Punishment Status Quo: Solitary Confinement in US Immigration Prisons, 2013-2017*, SocArXiv (April 2020), https://osf.io/preprints/socarxiv/zdy7f/.

CLP_PC_069142

[202] *See 'I'm a Prisoner Here' supra* note 124,at 47.

[203] *Id.*

[204] Robert F. Kennedy Human Rights et al., *Complaint Re: Call for Immediate Investigation into Immigration and Customs Enforcement Officers' Use of Punitive Solitary Confinement as a Response to the COVID-19 Pandemic and Other Public Health* Crisesat 12–13, 21 (June 21, 2021), https://rfkhumanrights.org/assets/documents/RFK-Human-Rights-Pine-Prairie-DHS-Complaint.pdf.

[205] *Id.* at 2.

[206] *Id.*

[207] Specifically, the United Nations Revised Standard Minimum Rules for the Treatment of Incarcerated People, known as the "Mandela Rules," identify the use of solitary confinement beyond 15 days as a form of cruel, inhumane, and degrading treatment that rises to the level of torture. Thus, when solitary confinement is used as a punitive measure by way of segregating and targeting particular individuals, due to their identity, their challenge of authority, or other arbitrary reason, in violation of the domestic minimum standards, then that State-sponsored conduct may rise to the level of torture. *See United Nations Standard Minimum Rules for the Treatment of Prisoners* (the Nelson Mandela Rules), adopted by the General Assembly on 17 December 2015.

[208] *See* Robert F. Kennedy Human Rights et al. supra at note 200.

[209] *See* RAICES et al., *Complaint RE: Discriminatory Practices and Deliberate Indifference Related to the Prenatal, Maternal, Gynecological, and Pediatric Medical Needs of Detained Black Women and Young Children at the Karnes County Family Residential Center* (Mar. 3, 2021), https://www.raicestexas.org/wp-content/uploads/2021/03/Redacted-Complaint-regarding-Inadequate-Medical-Care-of-Black-Pregnant-Women-and-Infants-at-Karnes.pdf, at 2.

[210] Project South et al., *Complaint Re: Lack of Medical Care, Unsafe Work Practices, and Absence of Adequate Protection Against COVID-19 for Detained Immigrants and Employees Alike at the Irwin County Detention Center* (Sept. 14, 2020), https://projectsouth.org/wp-content/uploads/2020/09/OIG-ICDC-Complaint-1.pdf, at 2.

[211] UndocuBlack Network et al., *Complaint Re: COVID-19 Negligence, Sexual Assault, Retaliation, Verbal Abuse, Religious Discrimination, Anti-Blackness, and Deplorable Conditions at Krome North Services Processing Center in Miami, Florida* (Oct. 6, 2021), https://static1.squarespace.com/static/5a33042eb078691c386e7bce/t/615defe5e76a986c1af29d7a/1633546214397/Multi-Individual+CRCL+Anti-Blackness+and+Other+Abuse+of+Black+immigrants+at+Krome+Oct+2021.pdf, at 8.

[212] *A cry for help: a letter from Cameroonian women detained at T. Don Hutto*, Grassroots Leadership (March 6 2020), https://grassrootsleadership.org/blog/2020/03/cry-help-letter-cameroonian-women-detained-t-don-hutto.

[213] *Id.*

[214] *See* "COVID-19 ICE Detainee Statistics by Facility," https://www.ice.gov/coronavirus#citations.

[215] *See* Jeremy Redmon & Alan Judd, *A week after warning, ICE detainee dies from COVID-19, The Atlanta Journal-Constitution* (Sept. 21, 2020), https://www.ajc.com/news/third-ice-detainee-dies-from-covid-19-in-southwest-georgia/LE3CHB24HFDWBBHADYHZEB5EMY/.

[216] Southern Poverty Law Center et al., *Complaint Re: Complaint for violations of civil, constitutional, and disability rights of medically vulnerable individuals at Stewart Detention Center* (Aug. 30, 2021), https://www.splcenter.org/sites/default/files/august_crcl_complaint.pdf, at 4.

[217] *See Cineas supra* note 3*.*

[218] *See* Carl Lindskoog, *Violence and Racism Against Haitian Migrants Was Never Limited to Agents on Horseback*, Washington Post (Sept. 30, 2021), https://www.washingtonpost.com/outlook/2021/10/02/violence-racism-against-haitian-migrants-was-never-limited-horseback-riders/.

[219] See *Haitian Refugee Center v. Civiletti*, 503 F. Supp. 442, 450 (S.D. Fla. 1980) ("This case involves thousands of [B]lack Haitian nationals, the brutality of their government, and the prejudice of ours.").

[220] *Jean v. Nelson*, 711 F.2d 1455, 1493 (11th Cir. 1983), *on reh'g*, 727 F.2d 957 (11th Cir. 1984), *aff'd*, 472 US 846 (1985).

[221] *Id.*

[222] *See Pushing Back Protection: How Offshoring and Externalization Imperil the Right to Asylum*, National Immigrant Justice Center and FWD.us, 6 (2021), https://immigrantjustice.org/sites/default/files/content-type/commentary-item/documents/2021-09/Offshoring%20Asylum%20Report_Chapter4.pdf.

CLP_PC_069143

[223] *See* Complaint at ¶ 47, *Haitian Bridge Alliance v. Biden*, No. 1:21-CV-03317 (D.D.C.) (filed Dec. 20, 2021), https://int.nyt.com/data/documenttools/hba-v-biden/a8106eacd7c45afe/full.pdf.

[224] *Id.*

[225] *Id.* at 48

[226] US Coast Guard, *Multimedia Release: Coast Guard repatriates 98 people to Haiti*, (June 29, 2022), https://content.govdelivery.com/accounts/USDHSCG/bulletins/31e0c18.

[227] *See* S. Priya Morley et al., *A Journey of Hope: Haitian Women's Migration to Tapachula, Mexico* (2021), https://imumi.org/attachments/2020/A-Journey-of-Hope-Haitian-Womens-Migration-to%20Tapachula.pdf; S. Priya Morley et al., *"There is a Target on Us" – The Impact of Anti-Black Racism on African Migrants at Mexico's Southern Border* (2021); *see also* Caitlyn Yates, *A Case Study in the Outsourcing of US Border Control*, Lawfare (Apr. 11, 2019), https://www.lawfareblog.com/case-study-outsourcing-us-border-control.

[228] E. Tendayi Achiume, *Foreward* in S. Priya Morely et al., *A Journey of Hope: Haitian Women's Migration to Tapachula, Mexico* (2021), https://imumi.org/attachments/2020/A-Journey-of-Hope-Haitian-Womens-Migration-to%20-Tapachula.pdf.

[229] *Joint Declaration and Supplementary Agreement Between the UNITED STATES OF AMERICA and MEXICO*, (June 7, 2019), https://www.state.gov/wp-content/uploads/2019/09/19-607-Mexico-Migration-and-Refugees.pdf; *see International Organizations Denounce that Proposed National Guard Model in Mexico Violates International Law*, WOLA (February 21, 2019), https://www.wola.org/2019/02/mexico-national-guard-violates-international-law/; Maureen Meyer & Adan Isacson, *The "Wall" Before the Wall: Mexico's Crackdown on Migration at its Southern Border*, WOLA (Dec. 17, 2019), https://www.wola.org/analysis/mexico-southern-border-report/; Ribando Seelke, Clare, *Mexico's Immigration Control Efforts*, *Congressional Research Service*, (3 January 2022.) https://sgp.fas.org/crs/row/IF10215.pdf.

[230] Tyler Mattiace, *Mexico Cannot Solve the US Border Crisis*, *Dallas Morning News* (May 24, 2022), https://www.dallasnews.com/opinion/commentary/2021/05/23/mexico-cannot-solve-the-us-border-crisis/; *US Vice President Calls for Immigration Effort With Mexico*, VOA News (May 7, 2021), https://www.voanews.com/a/usa_us-vice-president-calls-immigration-effort-mexico/6205565.html.

[231] Human Rights Watch, *Mexico: Asylum Seekers Face Abuses at Southern Border*, (June 6, 2022), https://www.hrw.org/news/2022/06/06/mexico-asylum-seekers-face-abuses-southern-border; *see supra* note 227.

[232] *Detuvieron a cuatro policías por la muerte de una migrante haitiana en Chiapas*, InfoBae (Nov. 26, 2021), https://www.infobae.com/america/mexico/2021/11/26/detuvieron-a-cuatro-policias-por-la-muerte-de-una-migrante-haitiana-en-chiapas/.

[233] *See* Refugees International, *Pushed into the Shadows: Mexico's Reception of Haitian Migrants*, (Apr. 28, 2022), https://www.refugeesinternational.org/reports/2022/4/25/pushed-into-the-shadows-mexicos-reception-of-haitian-migrants.

[234] Tanya Duarte, et al., *'Because of the Color of My Skin and the Way I Speak Spanish': The INM's Detention and Deportation of Indigenous and Afro-Descendant Mexicans*, (July 2020), https://imumi.org/wp-content/uploads/2020/11/The-INMs-Detention-and-Deportation-of-Indigenous-and-AfroDescendant-Mexicans.pdf.

[235] Lizabelt Avila and Maureen Meyer, *Beyond the US-Mexico Border: Migration Trends in the Americas, Explained*, (May 26, 2022), https://www.wola.org/analysis/beyond-the-u-s-mexico-border-migration-trends-in-the-americas-explained/.

[236] *See* Haitian Bridge Alliance, *Violence against Black Migrant Women in the Darién Gap (CEDAW Articles 1, 2, 3, 5, 6, 12, 15)* (Jan. 12, 2022), https://tbinternet.ohchr.org/_layouts/15/treatybodyexternal/Download.aspx?symbolno=INT%2fCEDAW%2fCSS%2fPAN%2f47481&Lang=en; *See* CEDAW, *Concluding observations on the eighth periodic report of Panama*, UN Doc. CEDAW/C/PAN/CO/8 (Feb. 24, 2022), https://tbinternet.ohchr.org/_layouts/15/treatybodyexternal/Download.aspx?symbolno=CEDAW%2fC%2fPAN%2fCO%2f8&Lang=en.

[237] *See* Amnesty International, *Not Safe Anywhere: Haitians on the move need urgent international protection* (Oct. 2021), https://www.amnestyusa.org/wp-content/uploads/2021/10/Not-Safe-Anywhere-Haitians-need-urgent-international-protection-READY-FOR-PUBLISHING1.pdf.

[238] DDPA, at ¶ 12.

[239] DDPA, at ¶ 64.

[240] *See* Erik Crew & Nicole Phillips, *Report on 20th anniversary of the Durban Declaration and Programme of Action: Response to call for input issued by the UN's Special Rapporteur on contemporary forms of racism, racial*

CLP_PC_069144

*discrimination, xenophobia and related intolerance*, Haitian Bridge Alliance (Aug. 16, 2021), http://www.ijdh.org/wp-content/uploads/2021/10/Haitian-Bridge-Alliance-IJDH-Bertha-Submission-to-the-UN-Rapporteur-August-2021-1.pdf.

CLP_PC_069145

**human rights** *first*

American ideals. Universal values.

MARCH 2022

# Two Years of Suffering: Biden Administration Continues Use of Discredited Title 42 Order to Flout Refugee Law

For two years, the U.S. government has illegally blocked and expelled people seeking refuge at the southern U.S. border despite U.S. laws and treaties created to protect them. Since March 20, 2020, the U.S. Department of Homeland Security (DHS) has used orders from the Centers for Disease Control and Prevention (CDC), purportedly issued under Title 42 of U.S. law, to prevent asylum seekers from requesting U.S. asylum and returning thousands to persecution, torture, and other horrific violence. In March 2022, the U.S. Court of Appeals for the D.C. Circuit found that the use of Title 42 to expel people to places where they would face persecution or torture is likely illegal, violating U.S. refugee laws and international treaty obligations.

The grave human rights abuses faced by people turned away under Title 42 continue to mount every day that U.S. officials allow this policy's use to evade refugee law. Human Rights First has now tracked **at least 9,886 kidnappings, torture, rape, and other violent attacks on people blocked in or expelled to Mexico due to the Title 42 policy under the Biden administration – a new record of suffering.**

Flouting refugee protection laws as a response to the COVID-19 pandemic is not and never was justified as a public health measure. Initially issued by the CDC under orders from senior Trump administration officials and despite objections by CDC experts, the Biden administration has continued the policy for migration policy and/or political reasons, according to various reports. CDC Director Dr. Rochelle Walensky re-issued a new version of the Title 42 order in August 2021, and has subsequently repeatedly extended it. The CDC must review whether to continue, modify, or end the Title 42 order by March 30, 2022.

Epidemiologists and medical experts have exhaustively established that Title 42 does not protect public health, and in fact exacerbates the spread of COVID-19. The claimed public health justification for the Title 42 order has become even more transparently unjustified as the administration lifts other pandemic-related international travel restrictions and with mask mandates lifted in all 50 U.S. states. In March 2022, the CDC partially terminated the Title 42 order as to unaccompanied children following a federal court ruling that would have compelled the resumption of expulsions of unaccompanied children. In a notice explaining the decision, the CDC cited declining COVID-19 cases nationwide, including in communities along the U.S.-Mexico border, increased vaccination rates in the United States and countries of origin, and widespread availability of COVID-19 testing and other mitigation measures at facilities receiving migrants. Despite these factors applying equally to all people seeking refuge in the United States, the CDC has so far disingenuously maintained the Title 42 order to expel families and adults.

At this shameful second anniversary of the Title 42 policy, the Biden administration continues to illegally turn away asylum seekers without access to the U.S. asylum system. It is carrying out dangerous expulsions to countries refugees have fled, including: El Salvador, Guatemala, Haiti, Honduras, and Mexico, as well as expelling some Venezuelans to Colombia. The Title 42 policy discriminatorily targets Haitian and other Black asylum seekers, spurs disorder at the border, undermines security, and separates families. While some Ukrainians fleeing the Russian invasion have been allowed to cross into the United States at southern border ports of entry, Customs and Border Protection (CBP) continues to cite Title 42 to illegally block others and to discriminatorily turn away many asylum seekers of other nationalities and races who have often been waiting for months or years in danger in Mexico to seek U.S. asylum protection.

The Biden administration must immediately end this disastrous policy and restart the asylum processes required under U.S. law along the border, including at ports of entry, as Human Rights First has

CLP_PC_075945

recommended. In recent weeks, dozens of members of Congress have publicly called for an end to the Title 42 policy with Senate leadership condemning the Biden administration's decision to continuing sending asylum seekers "back to persecution and torture" as "wrong." The United States has the capacity to welcome people seeking refuge. Many faith- and community-based organizations along the border and throughout the United States are standing by ready to assist the families, adults, and children seeking refuge.

This factsheet updates prior research on the Title 42 policy by Human Rights First in February 2022, January 2022, December 2021, November 2021 (with Florence Immigrant and Refugee Rights Project), October 2021, August 2021, July 2021 (with Hope Border Institute), June 2021, May 2021 (with RAICES and Interfaith Welcome Coalition), April 2021 (with Al Otro Lado and Haitian Bridge Alliance), December 2020, and May 2020.

### Exposing Blocked and Expelled Asylum Seekers to Grave Danger in Mexico

Turning asylum seekers away under Title 42 to grave dangers in Mexico and other countries of persecution has resulted in horrific, mounting human rights abuses. Between January 21, 2021 and March 15, 2022, Human Rights First has tracked at least 9,886 kidnappings, torture, rape, and other violent attacks on people blocked in or expelled to Mexico due to the Title 42 policy under the Biden administration. This tally includes incidents published in media, interviews of asylum seekers by Human Rights First, information from attorneys and humanitarian services providers at the border, as well as more than 7,000 incidents of violent attacks against migrants and asylum seekers stranded in Mexico that were reported through the ongoing electronic survey conducted by Al Otro Lado between February 2021 and March 2022.

Cartels and other organized criminal groups in Mexico have adapted their criminal enterprises to profit from kidnapping stranded asylum seekers and migrants, targeting them on the basis of their race, nationality, gender, sexual orientation, and/or other characteristics, including those perceived to have U.S. family members to extort. They include:

- A Nicaraguan family of six with two young daughters who were kidnapped in Reynosa in March 2022 remain in captivity pending payment of a $30,000 ransom demanded by the abductors.

- A Honduran woman in Piedras Negras reported in February 2022 to Al Otro Lado that she had been kidnapped for six days, separating her from her 15-year-old son and 11-year-old daughter.

- Kidnappers abducted and tortured a pregnant Nicaraguan woman, Claudia Castro Andino, and her husband the day they were set to attempt to enter the United States in late February 2022. The woman was so severely beaten that she lost her baby. The couple remain in captivity. Castro Andino's husband sent an audio recording begging the family to meet the kidnappers demand for a $15,000 ransom: "If we don't pay, they're going to kill us." Castro Andino pled, "mommy, don't let me die."

Mexican government authorities, including police, national guard, and immigration officials, regularly fail to investigate or prevent attacks and are often complicit in this violence. Mexican migration officials collude with cartels that target asylum seekers for kidnapping and extorsion. In January 2022, a member of an organized criminal group in Ciudad Juárez told *Business Insider* that they pay Mexican migration officials $100 per migrant handed over to the group to hold captive and collect ransoms. Mexican authorities also frequently extort migrants and asylum seekers, often threatening them with deportation. Recent attacks by Mexican police and migration officers on asylum seekers blocked in or expelled to Mexico due to Title 42 include:

- An LGBTQ asylum seeker stranded due to Title 42 in Ciudad Acuña reported through the Al Otro Lado survey in late February 2022 that police had stopped her and a female friend who were holding hands on the street, robbed, and groped them, threatening to rape them saying it would "take the lesbian out of them."

CLP_PC_075946

- A Honduran man blocked from seeking asylum because of Title 42 reported to the Al Otro Lado survey in January 2022 that Mexican migration officials in Reynosa sold him and his wife to a cartel for $500 each and that cartel members raped his wife.

- A migrant woman told the Kino Border Initiative in February 2022 that a Mexican police officer in Sonora threatened to take her children if she refused to pay the extortion he demanded. Kino Border Initiative has noted that "extortions are so commonplace that migrants will no longer report them to us. When asked specifically if they've been extorted by Mexican authorities, some have answered, 'oh, yes, but that's just one of the things that happens.'"

Migrants and asylum seekers in Mexico frequently avoid reporting attacks to police because such information has been shared by Mexican government authorities to the very brutal cartels targeting them. For example:

- In February 2022, a man attempted to kidnap children from a shelter in Tijuana, after the children's location was apparently shared with the would-be kidnapper by Mexican police following their mother's report to the police of threats by her husband.

Citing Title 42, the Biden administration continues to block and expel asylum seekers, including Ukrainians, to the highly dangerous city of Nuevo Laredo, where the U.S. Department of State has warned that "violent crime, such as murder, armed robbery, carjacking, kidnapping, extortion, and sexual assault, is common." In mid-March 2022, a cartel that exercises significant control in the region exchanged gunfire with Mexican authorities across the city, detonated grenades, and set 18-wheeler trucks ablaze on major highways, causing the U.S. government to shut down international bridges, temporarily close the U.S. consulate, and advise U.S. citizens in Nuevo Laredo to shelter in place. A researcher with the Washington Office on Latin America (WOLA), Adam Isacson, who had visited Nuevo Laredo days prior in early March 2022 reported that cartel members wait on the Mexico-side of the Laredo port of entry to immediately kidnap asylum seekers and migrants after they are expelled by DHS and that cartel vehicles patrol the border vicinity. A humanitarian aid worker told Isacson that DHS had expelled to Nuevo Laredo a migrant woman even though she had previously been kidnapped and repeatedly sexually abused in captivity.

Trapped by Title 42 in Mexico, asylum seekers also face inherently dangerous and horrendous conditions without safe housing, adequate medical care, or sufficient food. A Guatemalan woman reported in February 2022 through the Al Otro Lado survey that she was forced to give birth in the bathroom of a shelter in Ciudad Juárez after doctors refused to provide her medical attention. Many asylum seekers have been forced to sleep in highly dangerous informal tent encampments in border cities subject to violent attacks, kidnapping, and extortion by the criminal organizations that control them. As of March 2022, approximately 2,000 people are waiting in the Reynosa encampment—many for more than six months—for the opportunity to request U.S. protection, according to Isacson from WOLA. He observed unsanitary conditions in the crowded camp, including unclean, overused portable toilets and waterlogged tents from rainfall. Migrants and asylum seekers told Isacson that kidnappings from the encampment and surrounding area are so common that most never leave the encampment. **In February 2022, the Tamaulipas State Human Rights Commission announced that it is investigating multiple reports of sexual violence against young girls in the Reynosa tent encampment.**

## Targeting Haitian and Other Black Asylum Seekers

The Title 42 policy continues to have a disparate racial impact on Black asylum seekers and migrants. In a February 2022 letter, more than 100 members of Congress expressed concern over the Biden administration's treatment of Black migrants and asylum seekers, noting "Black migrants continue to face disparate and often inhumane treatment at every stage of the immigration enforcement process" and imploring the administration to "undo the United States' draconian immigration policies . . . such as the use of

Title 42, that circumvent our humanitarian obligations." U.S. civil rights groups have repeatedly called on the Biden administration to end the Title 42 policy, halt "deportation flights to Haiti," and ensure "those seeking safety at our borders must be granted their legally assured chance to seek asylum."

Haitian and other Black asylum seekers blocked in and/or expelled to Mexico continue to face widespread anti-Black violence and discrimination. Some recent incidents of violence targeting Black asylum seekers blocked in Mexico due to Title 42 include:

- In late January 2022, a Haitian woman in Matamoros reported to Al Otro Lado that Mexican police threatened to kill her and her five-year-old daughter, beat her husband, and stole the family's money. The police left the wounded man on the street and dumped the woman and her daughter in another city at night.

- A Black transgender asylum seeker reported through the Al Otro Lado survey in late January 2022 that Mexican police officers beat, robbed, and raped him, and jailed him for three days without food.

- Asylum seekers from the Afro-Honduran Garifuna ethnic group reported to the Al Otro Lado survey multiple incidents of kidnappings and racist attacks by Mexican police while stranded in Mexico due to Title 42 including, a Garifuna Honduran man who recounted that he was nearly kidnapped in Piedras Negras and that police had attacked and racially abused him.

Since January 2021, DHS has removed more than 20,000 Haitians on at least 208 expulsion and deportation flights to Haiti. In March 2022, members of the Congressional Black Caucus called on the Biden administration to "Stop deporting and expelling people to Haiti. Now." The families and adults expelled under Title 42 are being sent to life-threatening insecurity in Haiti without the fear screenings required by Congress and despite DHS having designated the country for Temporary Protected Status as "Haiti is grappling with a deteriorating political crisis, violence, and a staggering increase in human rights abuses."

- In March 2022, DHS appeared to have used Title 42 to expelled more than 300 Haitians who arrived at the Florida coast after a hazardous journey by boat – many of whom had fled due to "Haiti's surge in kidnappings and gang-related violence."

Those expelled to Haiti under the Biden administration face unimaginable horrors. For example,

- In January 2022, Daniel, a Haitian asylum seeker expelled by DHS in September 2021, suffered brutal politically motivated attacks in Haiti, including being beaten with metal batons and wooden sticks.

## Spurring Disorder, Pushing Deadly Crossings

The Biden administration's use of the Title 42 policy is spurring disorder at the border. Expulsions drive repeat crossings and inflate the total number of border encounters. Due to Title 42, the percentage of individuals who have attempted to repeatedly cross the southern border has jumped by over 385 percent from 7 percent in fiscal year (FY) 2019 to 27 percent in FY 2022, according to government data. Policies that block access to asylum at U.S. ports of entry push asylum seekers unable to access protection at official border posts to undertake dangerous crossings away from ports, as reports by the DHS Office of Inspector General have confirmed. For example, with the continued use of these counterproductive and illegal policies, Cuban, Haitian, Venezuelan, and other asylum seekers, who largely sought asylum at ports of entry, are now overwhelmingly crossing between ports of entry, according to government data analyzed by Human Rights First.

At least 650 migrants and asylum seekers died crossing the U.S.-Mexico border in 2021, making it **the deadliest year since the International Organization for Migration began recording migrant deaths in 2014.** These crossings often involve crossing harsh terrain, swimming across hazardous rivers, and trekking

CLP_PC_075948

through deserts in sweltering heat. Recent deaths recorded of people attempting to cross the border to seek safety in the United States include an Ecuadoran woman fleeing gender-based violence who died crossing the desert to seek U.S. protection with her three-year-old daughter. Additionally, numerous migrants and asylum seekers, including young children, have drowned attempting to cross rivers with dangerous currents at the U.S. border.

- In January 2022, a **seven-year-old Venezuelan girl drowned** in the Rio Grande attempting to enter the United States with her mother near Ciudad Acuña. A Honduran man drowned attempting to cross the same river in February 2022.

- In March 2022, María Angélica, **a four-year-old Nicaraguan girl, drowned attempting to cross the Rio Grande.** The child was swept away by a strong current, according to her mother. Mexican migration officers also found the body of another child, whose mother remains missing, in the Rio Grande near Ciudad Acuña in March 2022.

Unable to request asylum at U.S. ports of entry due to Title 42, many people seeking protection have no choice but to seek transit through cartels and other criminal groups that exercise control over U.S.-Mexico border regions. These organizations charge exorbitant amounts to approach the border, violently attack people who attempt to cross without paying, and abuse, torture, and extort people seeking U.S. asylum.

- A Salvadoran asylum seeker reported to Al Otro Lado in January 2022 that when she attempted to cross the border near Piedras Negras with a group of other asylum seekers, men kidnapped the woman and her four-year-old daughter separating them from the woman's nine-year-old son who managed to reach safety in the United States.

- The Kino Border Initiative reports that in Nogales "organized crime has become so protective of the business they have made from the border closure that they have begun watching the ports of entry . . . and harassing migrants who attempt to be processed there."

## Separating Families, Endangering Children

The Biden administration's continued use of Title 42 to block and expel asylum seekers is leading to family separations and endangering children. In some cases, DHS has returned families members alone to Mexico or separated families and returned them to different parts of Mexico. For example:

- In February 2022 DHS separated a Honduran grandfather from his two grandchildren, expelling the grandfather to Nogales rather than allowing him to seek protection with his grandchildren, who remained in the United States, according to Kino Border Initiative.

- Kino Border Initiative also assisted a woman whom DHS expelled without her daughters after the family crossed the border and approached CBP officers. The woman told Kino: "My daughters only have me. If something happens to me, I have no idea what's going to happen to them."

DHS continues to illegally expel some unaccompanied children to danger in Mexico under Title 42 where cartels and other criminal organizations often target children for kidnappings and trafficking. For example, the Florence Project has documented numerous cases of attacks against children near ports of entry in Arizona. In addition, in March 2022, two Central American boys were kidnapped in Ciudad Juárez and held captive for a month before they managed to escape. Unaccompanied children have been exempt from the Title 42 order (which was fully terminated with respect to unaccompanied children in March 2022) since November 2020 following a court order blocking their expulsion and a subsequent policy change. However:

- In February 2022, Border Patrol expelled a 17-year-old boy who told Kino Border Initiative that agents had "repeatedly told him to shut up and say his real age" when he told them he was 17.

- Kino Border Initiative assisted another 17-year-old boy in February 2022 whom Border Patrol expelled alone to Mexico, separating him from his younger brother. The agents accused the boy of presenting a fake birth certificate and threatened him with a 10-year prison sentence "if he didn't say his real age."

## Failing to Manage Arrivals

The United States has capacity to manage arrivals of people seeking refuge. The number of people encountered at the southern border (*i.e.* not counting repeat crossings caused by Title 42 expulsions) has declined by 26 percent since August 2021 (from 156,000 to 116,000 in February 2022). And southern border ports of entry continue to process only a small and now declining number of inadmissible individuals, including asylum seekers. Since August 2021, processing at southern border ports has dropped by 49 percent (from 13,326 to 6,841 in February 2022). These numbers remain *well below* monthly processing during the Obama administration when CBP processed 20,524 people at southern border ports of entry in October 2016, for example. U.S. ports of entry have subsequently received significant funding to upgrade and expand capacity (both in infrastructure and staffing) but have consistently processed far fewer individuals.

The Title 42 policy undermines U.S. credibility, global standing, and respect for international law, at the same time as the U.S. government asks other countries to welcome refugees while it simultaneously turns away asylum seekers in violation of refugee law. In the United States, refugees and asylum seekers are less than one-half of one percent of the population. By contrast, in Turkey, which hosts the largest refugee population in the world, the proportion of refugees to the total population is ten times higher than the United States. In three weeks in February and March 2022, Poland took in more than 1.9 million Ukrainian refugees, which is about the same number of individuals encountered at the U.S. southern border in the entirety of fiscal year 2021. UNHCR estimates that Colombia, whose total population is less than one-sixth that of the United States, is hosting 2.4 million Venezuelans displaced abroad. More than 1.5 million refugees reside in Uganda making it one of the top five refugee-hosting countries.

## Violating U.S. Law, Treaty Obligations

Using the Title 42 policy to return people to places where they face persecution and torture violates U.S. refugee law and treaty obligations as former and current U.S. government officials, federal courts, the United Nations High Commissioner for Refugees, the Inter-American Commission on Human Rights, the Special Rapporteur on the Human Rights of Migrants, and the DHS Office for Civil Rights and Civil Liberties have all concluded. In March 2022, the U.S. Court of Appeals for the D.C. Circuit held that the Title 42 policy is likely illegal and that the US. government "cannot expel [asylum seekers] to places where they will be persecuted or tortured." Members of Congress have repeatedly called on the Biden administration to end its use of Title 42 – a policy U.S. Senator Chuck Schumer has described as "a cynical effort by the Trump administration to use the pandemic as justification for expelling vulnerable migrants seeking refuge in this country." The United Nations High Commissioner for Refugees urged the United States in May 2021 to "swiftly lift the public health-related asylum restrictions that remain in effect at the border and to restore access to asylum for the people whose lives depend on it, in line with international legal and human rights obligations."

CLP_PC_075950

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 2/16/2021 | threats | | A Honduran woman and her 4-year-old son, who had been returned to Mexico under MPP, were threatened by her ex-partner who is member of MS-13 in January and February 2021. He told her the gang is looking for her in Mexico. He threatened to kill her and kidnap her son. In late February 2021, CBP denied the family parole and refused to provide them an MPP fear of Mexico screening interview. | Human Rights First communication with Margaret Cargioli, Immigrant Defenders Law Center |
| 2/16/2021 | attempted kidnapping, assault | 2 | In February 2021, an asylum-seeking family returned to Mexico under MPP were attacked while buying diapers by men who tried to kidnap their 2-year-old child. The father managed to hold on to the son, and the kidnappers drove off. The father went to report the kidnapping to the police, but an officer told them not be out that late at night. | Human Rights First communication with Margaret Cargioli, Immigrant Defenders Law Center |
| 2/26/2021 | kidnapping | 3 | DHS expelled a Guatemalan woman and her son to Ciudad Juarez in mid-February 2021, where they had been kidnapped soon after arriving in early February. They had been held in a house for days without food or water. | Human Rights First interview with asylum seeker |
| 3/5/2021 | kidnapping | 2 | Un niño y su madre fueron privados de la libertad en el campamento migrante instalado en las inmediaciones del cruce fronterizo El Chaparral, acusó José Luis Pérez Canchola, director de Atención al Migrante en el ayuntamiento de Tijuana. | https://www.milenio.com/estados/reportan-secuestro-mujer-hijo-migrantes-campamento-tijuana |
| 3/22/2021 | kidnapping, rape | 1 | A woman expelled by DHS to Reynosa in February 2021, "who had tried to take a taxi to a friend's house [was] kidnapped and raped." | https://www.latimes.com/world-nation/story/2021-03-22/hundreds-of-migrants-cross-this-stretch-of-the-rio-grande-nightly |
| 3/23/2021 | assault, robbery | 1 | A Honduran asylum seeker who has been blocked in Tijuana with his family for months unable to seek protection at the port of entry was assault and robbed in Tijuana in February 2021. | Human Rights First interview with asylum seeker |
| 3/23/2021 | assault | 1 | A Haitian asylum seeker blocked from seeking asylum due to the Title 42 policy reported that he had been assaulted by a group of Mexican men in late January 2021. The men asked him for money and when he told them that he was a migrant and had no work, they beat him. | Human Rights First interview with asylum seeker |
| 3/23/2021 | assault | 3 | Dos menores de edad y un adulto, que viajaban como migrantes, resultaron heridos tras una agresión a balazos en la entrada a la ciudad de Reynosa, Tamaulipas, cuando iban de aventón en una camioneta. | https://www.excelsior.com.mx/nacional/atacan-a-balazos-a-migrantes-en-reynosa/1439435 |
| 3/26/2021 | kidnapping | 4 | DHS expelled a Salvadoran asylum-seeking family with two little girls to Tijuana after they crossed the border near Reynosa to seek asylum even though the family had previously been kidnapped in Mexico in early March 2021. The kidnappers threatened to kill the children and sell their organs, if they failed to pay the ransom demanded. | Human Rights First interview with asylum seeker |
| 3/27/2021 | kidnapping | 37 | Policías Estatales de Tamaulipas rescataron a 37 migrantes en Matamoros, que llevaban secuestrados 15 días. Entre los rescatados se encuentran 30 adultos y 7 niños, cuyas nacionalidades no fueron especificadas aunque todas son diferentes. | https://www.reporteindigo.com/reporte/rescatan-a-37-migrantes-secuestrados-en-tamaulipas/ |
| 4/2/2021 | threat, robbery | 1 | A Haitian asylum seeker in the Tijuana tent encampment waiting for asylum processing to be restored at U.S. ports of entry reported that in late March 2021, a man threatened to hit with a rock and tried to steal a backpack of his personal belongings. | Human Rights First interview with asylum seeker |
| 4/3/2021 | assault | 1 | A Honduran asylum seeker in the Tijuana tent encampment waiting for asylum processing to be restored at U.S. ports of entry reported that Mexican men he'd believed to be gang members had asked him to sell drugs in the camp and had beat him up when he refused. | Human Rights First interview with asylum seeker |
| 4/5/2021 | threats | 1 | An African asylum seeker in the Tijuana tent encampment waiting for asylum processing to be restored at U.S. ports of entry reported that in response to the African asylum seeker speaking out about racism against Black migrants in the camp, a Mexican man took pictures of him and made threatening remarks to him on several occasions. | Human Rights First interview with asylum seeker |
| 4/6/2021 | threats | 1 | A Honduran asylum seeker in the Tijuana tent encampment waiting for asylum processing to be restored at U.S. ports of entry reported that Mexican men he'd believed to be gang members threatened him multiple times; telling him they had "eyes on him," to "watch his back," and warning him not to talk to anyone outside the camp. | Human Rights First interview with asylum seeker |
| 4/8/2021 | kidnapping | 1 | Denuncia migrante de origen centroamericano secuestro de polleros en PN. Escapó de una casa de seguridad que polleros tienen en la zona centro de Piedras Negras | https://www.facebook.com/565075333903260/posts/113737935667285 2 |

CLP_PC_076248

CLP_PC_076249

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 4/8/2021 | rape, kidnapping, assault, extortion | 423 | Asylum seekers from Colombia, Cuba, El Salvador, Guatemala, Haiti, Jamaica, Nicaragua, Peru, Venezuela, and Yemen blocked from seeking U.S. asylum due to Title 42 reported having been the victim of an attack or attempted attack in Mexico in the last month in a survey by Al Otro Lado conducted between February 21 and April 8, 2021. | Human Rights First review of Al Otro Lado survey data |
| 4/8/2021 | kidnapping, threats | 2 | A Honduran asylum seeker and her 6-year-old child were expelled to Mexico by CBP in March 2021 even though the family had been kidnapped in Mexico in early March 2021. They managed to escape the kidnappers but were pursued by a man in a car after the escaped who threatened to kill them. | Human Rights First interview with asylum seeker |
| 4/9/2021 | kidnapping | 2 | Wilton and his mother, Meylin, 30, crossed the border into Texas last month to seek asylum after fleeing their native Nicaragua. But they were immediately sent back to Mexico under Title 42, a pandemic-era policy that expels migrants who cross the border without allowing them to apply for protection. Hours after being expelled to northern Mexico, they were kidnapped, according to Misael Obregon, Meylin's brother, who lives in Miami. Misael received a call from the kidnappers. They wanted $10,000 to release Meylin and Wilton. "They threaten to hurt them both, or worse," Misael Obregon said. "These people are capable of anything." Misael could come up with only $5,000. He sent the cash through a money transfer company. The kidnappers agreed to release Wilton, but not his mother. The smugglers then abandoned Wilton after leading him across the border, leaving him to wander through the arid farmland of South Texas looking for assistance, until he found the Border Patrol agent who recorded his encounter with the boy. Meylin remains in the custody of kidnappers. She called Misael Obregon on Friday morning, crying after seeing the video of her bleary-eyed son. The Nicaraguan government on Friday identified Wilton as being the boy in the video, but it did not mention the kidnapping. It said Nicaraguan police had interviewed the boy's father, who confirmed that Meylin had told him in their last conversation that she and Wilton were preparing to cross the border together because they were "in danger." | https://www.washingtonpost.com/world/2021/04/09/migrant-boy-found-wandering-alone-texas-had-been-deported-kidnapped/ |
| 4/18/2021 | threats | 1 | In one recent case, a man who turned up at the shelter said he had been pressured by drug traffickers to carry a load across the border. "The drug cartel was trying to force him to carry drugs, and he refused," Williams said. "He wanted to give the Border Patrol information." According to Williams, the man was told that would take too much time because it involved filing a police report. He was expelled. | https://theintercept.com/2021/04/18/biden-border-patrol-asylum-title-42/ |
| 4/18/2021 | assault, robbery, threats | 1 | Esmerelda was not a new arrival. She and her family came to Nogales in November 2019, fleeing violence and persecution in their home state of Guerrero... In the past couple months, a mafia has assaulted her husband twice, she told me, robbing him, stealing his phone, telling him that if speaks up he will be murdered. | https://theintercept.com/2021/04/18/biden-border-patrol-asylum-title-42/ |
| 4/20/2021 | kidnapping | 3 | Nine- and fourteen-year-old Honduran children were kidnapped with their asylum-seeking mother in Monterrey in March 2021 after CBP expelled them three times since December 2020. The family had relocated to Monterrey in hope of finding assistance while they waited to be able to seek asylum in the United States. Instead, they were kidnapped, held for ransom for days with other kidnapping victims who appeared to have been drugged, and eventually released near the border. Border Patrol agents, who found the family near McAllen, detained them for four days before transferring them to California where they were expelled to danger for a fourth time. | https://www.humanrightsfirst.org/resource/failure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | kidnapping | 1 | In February 2021, a Guatemalan woman who had been expelled by CBP to Mexicali after attempting to seek asylum was raped in Tijuana. The woman, who was fleeing severe domestic violence with her six-year-old daughter, had relocated to Tijuana to attempt to seek asylum at the San Ysidro port of entry, which she found closed to asylum seekers due to the Trump and Biden administrations' misuse of Title 42. The woman reported to Human Rights First that Border Patrol agents told her that "the new president isn't taking anyone" and that she should present herself "legally" even though ports of entry were, and remain, closed to asylum seekers in violation of U.S. law, which guarantees access to asylum to individuals who cross the border away from a port of entry. | https://www.humanrightsfirst.org/resource/failure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | rape | 3 | In late February 2021, a Guatemalan family with a six-year-old child was abducted at a bus station in Piedras Negras shortly after Border Patrol agents expelled them to Mexico. They were held by their captors for five days while their family members in Guatemala and the United States were extorted. The couple had fled Guatemala with their child after the husband was attacked and nearly killed, according to an academic researcher who spoke with Human Rights First. | https://www.humanrightsfirst.org/resource/failure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |

CLP_PC_076250

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 4/20/2021 | kidnapping, assault | 3 | In February 2021, a Honduran man and two other expelled migrants were abducted at gunpoint, forced into a cemetery, and attacked immediately after the Border Patrol expelled them to Nogales at 11pm. According to Kino Border Initiative, the men were searching for shelter for the night when they were attacked. They had been expelled by the Border Patrol with a group of more than 40 people from Central America and Mexico. | https://www.humanrightsfirst.org/resource/fail ure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | kidnapping | 1 | Multiple asylum seekers reported that a woman flown from Texas and expelled to Mexico was kidnapped in March 2021 just outside of a shelter in Tijuana housing hundreds of expelled families. The pastor running the shelter has instructed families not to leave the shelter for their safety. | https://www.humanrightsfirst.org/resource/fail ure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | kidnapping | 2 | CBP expelled a 15-year-old Guatemalan boy and his asylum-seeking mother to Ciudad Juarez where they had been kidnapped in February 2021. The woman told Human Rights First researchers that when she tried to explain the danger she faced, U.S. immigration officers told her that they didn't care because "the president is not giving political asylum to anyone." CBP expelled the family to dangerous Ciudad Juárez at night during a snowstorm after they were held in CBP custody for days without food or water. | https://www.humanrightsfirst.org/resource/fail ure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | kidnapping, assault | 1 | A Honduran asylum seeker was expelled by CBP to Mexico in March 2021 even though he had just been kidnapped in Piedras Negras by masked men who brutally beat, drugged, and threatened him with decapitation. Two Honduran migrants were also abducted and beaten along with the man. One of them sought protection in the United States days after being released by the kidnappers, but was expelled by CBP according to an academic researcher who spoke with Human Rights First. | https://www.humanrightsfirst.org/resource/fail ure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | kidnapping | 5 | In April 2021, CBP expelled a Honduran asylum-seeking family, including three children under the age of five, to Mexico even though they had been abducted in Reynosa by Mexican police officers who sold them to a cartel. While being held for ransom, a cartel member held a gun to the mother's head and demanded phone numbers of family members to pay the ransom. | https://www.humanrightsfirst.org/resource/fail ure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | kidnapping | 4 | In late March 2021, CBP expelled a Honduran asylum-seeking family with five- and six-year-old children to Tijuana where one of the men who kidnapped them in Reynosa has been prolling outside of their shelter. The family fears that a woman who had been kidnapped with them has been abducted again after she disappeared days after they were expelled together. They are terrified to leave the shelter. | https://www.humanrightsfirst.org/resource/fail ure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | kidnapping, robbery | 1 | In March 2021, Border Patrol expelled a Honduran asylum seeker at 2 a.m. even though he explained that he had been kidnapped and robbed in Mexicali after CBP turned him away from requesting asylum at the port of entry. The man had fled Honduras after authorities violently attacked him and tried to yank out his eye for filming illegal government acts. Border Patrol agents threw out the evidence he had brought with him in support of his asylum claim, according to Kino Border Initiative. | https://www.humanrightsfirst.org/resource/fail ure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | kidnapping, rape, torture | 1 | In February 2021, a young woman who was kidnapped in Mexico, held hostage for weeks, repeatedly raped and tortured by her captors, trafficked into the United States, and then dumped in Phoenix, was not found to have a fear of Mexico under the Title 42 torture screening. CBP expelled the woman to Mexico after she was taken to a hospital for evaluation of the sexual trauma she suffered, according to the Florence Immigrant and Refugee Rights Project. | https://www.humanrightsfirst.org/resource/fail ure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | assault, threats | 1 | A Guatemalan asylum seeker who has been blocked from requesting asylum at a U.S. port of entry was attacked while pregnant in Tijuana in January and February 2021 by the gang that threatened to kill and dismember her in Guatemala if she refused their sexual demands. The woman narrowly escaped the gang while they ransacked the place in Tijuana where she had been staying and beat her partner, who subsequently disappeared, according to Margaret Cargioli, a lawyer with the Immigrant Defenders Law Center. The woman suffered a miscarriage in March 2021 because she was too terrified to leave her home to seek prenatal care after the attack. | https://www.humanrightsfirst.org/resource/fail ure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | assault | 2 | In March 2021, a group of Jamaican LGBT asylum seekers in Tijuana were attacked while being thrown out of a restaurant; one man had his face cut with a broken bottle. In addition, an LGBT Jamaican man was assaulted in Cancun in front of his 8-year-old son. Both attacks were motivated by anti-LGBTQ and anti-Black prejudice. | https://www.humanrightsfirst.org/resource/fail ure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 4/20/2021 | kidnapping | 1 | CBP expelled an 18-year-old Salvadoran asylum seeker, who attempted to cross into the United States after twice being kidnapped in Mexico, after he fell from the border wall and suffered a severe back injury. The young man was expelled in the middle of the night to dangerous Ciudad Juárez in a hospital nightgown, barely ambulatory, and in pain after spinal surgery. His mother and brother, who had also been kidnapped twice in Mexico, were separated from him and expelled to Mexico, leaving the young man alone in hospital, according to his lawyer Kenneth Mayeaux. | https://www.humanrightsfirst.org/resource/fail ure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | kidnapping | 8 | In April 2021, multiple asylum seekers informed Human Rights First that members of a violent gang that operates throughout Central America and Mexico forcibly abducted at least 8 individuals from the encampment in recent days, including some pulled from their tents at night. They remain missing. | https://www.humanrightsfirst.org/resource/fail ure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | kidnapping | 4 | A Mexican asylum seeker told Human Rights First that she witnessed a group of men kidnap a Salvadoran woman and her three children near the tent encampment in mid-March 2021. | https://www.humanrightsfirst.org/resource/fail ure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | attempted kidnapping | 1 | A Salvadoran asylum seeker reported that in March 2021, her daughter was nearly kidnapped from the Tijuana encampment by a man who grabbed the girl and ran several blocks before the girl's uncle could stop him. | https://www.humanrightsfirst.org/resource/fail ure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | assault | 1 | In February 2021, a man with a baton severely beat a Haitian asylum seeker in Tijuana in front of Mexican police, who did not intervene, according to a Haitian asylum seeker who witnessed the incident. She told Human Rights First: "We felt like we couldn't say anything because we don't have any power here and we were afraid for our own lives. Haitians are targeted here . . . the police don't care. We have to protect ourselves and look out for one another." | https://www.humanrightsfirst.org/resource/fail ure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | assault | 1 | In February 2021, a pregnant asylum seeker was brutally beaten by a Mexican official in retaliation for having filed a complaint against him for an immigration scam and suffered a miscarriage as a result of the attack. | https://www.humanrightsfirst.org/resource/fail ure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | threats | 1 | In January 2021, a Haitian asylum seeker in Tijuana who confronted a hotel owner about money stolen from his room was threatened at gunpoint by the owner's son, a Mexican police officer. | https://www.humanrightsfirst.org/resource/fail ure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/21/2021 | kidnapping | 1 | Teresa, a Honduran woman, was kidnapped after DHS expelled her to Nuevo Laredo. The Mexican immigration officers who received Teresa turned her over to a cartel, who held her for ransom. | https://www.breitbart.com/border/2021/04/21 /exclusive-mexican-immigration-office-turned-me-over-to-a-cartel-says-migrant/ |
| 4/21/2021 | kidnapping | 25 | Agentes de la unidad especializada en el combate al secuestro de la fiscalía de justicia del Estado de Tamaulipas,  rescataron a una 25 personas migrantes entre ellos ocho menores de edad. | https://www.krgv.com/news/rescatan-a-25-migrantes-secuestrados-en-reynosa-tamaulipas/ |
| 4/23/2021 | kidnapping | 1 | La madre hondureña Patricia Estrada, radicada en Estados Unidos, denunció este viernes el secuestro de su hijo de 25 años en Nuevo Laredo, México. Detalló que los captores le solicitan 10 mil dólares (224 mil lempiras), los cuales no tiene, que serían entregados en dos pagos. | https://proceso.hn/madre-hondurena-denuncia secuestro-de-hijo-en-mexico-piden-10-mil-para-su-liberacion/ |
| 4/27/2021 | kidnapping | 3 | One Honduran woman who reached the U.S. with her husband and one-year-old daughter was sent to Nuevo Laredo on April 6 under Title 42, and kidnapped the same day. "My daughter cried all night long and I think that's what saved us," she wrote in a text message. "They asked us if we had family in the U.S. and we said no. At 7 a.m. they let us go and dropped us off in front of the shelter. We are terrified of leaving here." | https://www.vice.com/en/article/k78abz/biden-is-still-sending-thousands-of-migrants-back-to-dangerous-border-cities-and-kidnappers |
| 4/27/2021 | kidnapping, extorsion | 4 | Desde que fue habilitado el gimnasio Kiki Romero como albergue migrante el pasado 5 de abril, se han reportado cuatro personas migrantes que sufrieron secuestro y extorsión por parte de los llamados "polleros" antes de llegar al albergue, a quienes les pidieron sumas de dinero para dejarlos en libertad. | https://www.elsoldemexico.com.mx/republica/ sociedad/migrantes-sufren-extorsiones-y-secuestros-por-polleros-en-juarez-noticias-ciudad-juarez-coronavirus-chihuahua-6647749.html |

CLP_PC_076251

CLP_PC_076252

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 4/29/2021 | attempted kidnapping | 4 | Two Central American asylum-seeking migrant families including two young children were kidnapped while traveling by van from Ciudad Juarez to Tijuana, along with two service providers who were guiding them. They managed to escape their kidnappers. Another Salvadoran asylum seeker who was staying at the same Tijuana shelter told Human Rights First that the families had recalled the traumatic kidnapping incident to her after they had arrived there. | Human Rights First interview with asylum seeker |
| 4/29/2021 | kidnapping | 2 | Suspected gang members kidnapped two families from their tents in the Tijuana encampment near the San Ysidro port of entry, where some 2000 migrants and asylum seekers blocked from requesting U.S. protection due to Title 42 had been living, according to a Honduran asylum seeker living in the tent encampment who witnessed the kidnappings. | Human Rights First interview with asylum seeker |
| 4/29/2021 | kidnapping | 1 | On March 26, an advocate was contacted by a family member of a pregnant woman who was expelled under Title 42 with her 4-year-old son to Nuevo Laredo. Upon being expelled, they were kidnapped by one of the cartels in the area that was extorting their family member for over $20,000. The family reported that the 4-year-old had a fever and was vomiting for several days while they were kidnapped. | https://www.latimes.com/politics/story/2021-04-28/biden-title-42-policy-fueling-kidnappings-of-migrant-families-at-border-and-extortion-of-u-s-relatives |
| 4/29/2021 | assault | 2 | A Honduran asylum seeker told Human Rights First that on the night of April 28, 2021, suspected gang members set fire to the tent of a family they had specifically targeted in the Tijuana encampment near the San Ysidro port of entry, where some 2000 migrants and asylum seekers blocked from requesting U.S. protection due to Title 42 are living, and that nearby residents evacuated their tents and ran from the encampment in a panic. | Human Rights First interview with asylum seeker |
| 4/29/2021 | assault | 1 | A Central American child was assaulted outside the San Ysidro port of entry in Tijuana. A witness told Human Rights First that the child had been part of a group of asylum seekers and migrants protesting Title 42 border closures at the port of entry, and that the assailant was a vendor in the area. The video shows the man punching the child. | Video shared with Human Rights First by asylum seeker; https://zetatijuana.com/2021/05/comerciantes-de-la-linea-atacan-a-migrantes-que-se-plantaron-en-san-ysidro/ |
| 5/1/2021 | kidnapping | 9 | Un total de nueve migrantes que estaban secuestrados y encerrados en una casa de la colonia Insurgentes fueron rescatados por elementos de la Policía de Investigación, quienes detuvieron a dos mujeres que los custodiaban, reportó la Agencia Estatal de Investigaciones (AEI). | https://diario.mx/juarez/rescatan-a-9-migrantes-secuestrados-20210430-1789881.html |
| 5/3/2021 | kidnapping | 2 | Un niño y su madre fueron privados de la libertad en el campamento migrante instalado en las inmediaciones del cruce fronterizo El Chaparral. | https://www.milenio.com/estados/reportan-secuestro-mujer-hijo-migrantes-campamento-tijuana |
| 5/8/2021 | kidnapping | 17 | Fueron rescatados 17 migrantes procedentes de diferentes nacionalidades, que se encontraban secuestrados por presuntos narcos del Cártel del Golfo (CDG) quienes les exigían $2,000 dólares mientras los retenían en un domicilio en el municipio de Reynosa en el estado fronterizo de Tamaulipas en México. | https://laopinion.com/2021/05/08/rescatan-a-17-migrantes-secuestrados-por-cartel-del-golfo-les-pedian-2000-dolares-para-liberarlos/ |
| 5/10/2021 | kidnapping | 5 | Cinco migrantes estuvieron encerrados en una casa por casi dos semanas en Tamaulipas, ya que las personas que los llevarían a Estados Unidos, les pedían 8 mil dólares para cruzarlos y si no pagaban, serían entregados a integrantes de la delincuencia organizada. | https://www.milenio.com/policia/tamaulipas-migrantes-secuestrados-exigen-dinero-liberarlos |
| 5/12/2021 | kidnapping, assault, robbery | 3 | Dos de las cinco niñas inmigrantes que aparecieron solas cerca de la frontera sur de estados unidos el pasado domingo, habrían sido secuestradas en México junto a su madre y tuvieron que pagar miles de dólares para ser liberadas antes de lograr pasar hacia EEUU...Los encerraron en un cuarto sin ropa y les daban de latigazos...el rescate costó alrededor de 3,000 dólares y, una vez libre, Daisy decidió cruzar hacia EEUU, pero relató que en la frontera encontraron a policía que, a punta de pistola, le quitaron todo el dinero que llevaba. | https://www.univision.com/noticias/inmigracion/dos-de-las-cinco-ninas-que-aparecieron-en-la-frontera-habian-sido-secuestradas |
| 5/13/2021 | kidnapping | 4 | A family with two young daughters that had been expelled to Tijuana after crossing into Texas in March 2021 was kidnapped in Tijuana in April 2021 by armed men who lined them up against a wall and told them they'd have to pay $1000 to be released. The family managed to escape when a police officer approached. | Human Rights First communication with asylum seeker |
| 5/15/2021 | kidnapping | 22 | La Policía Estatal rescatan a 22 migrantes secuestrados en Tamaulipas. | https://www.elmanana.com/rescatan-a-22-migrantes-secuestrados-en-vivienda-autoridades-delitos-investigan/5346257 |

CLP_PC_076253

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 5/17/2021 | kidnapping | 2 | Maribel shares a tent in Reynosa's main square with her teenage son and 10 other people. She left El Salvador to prevent her son from being recruited by criminal gangs. But her nightmare caught up with her at a hotel in Reynosa a few weeks ago. "We were kidnapped for five days. They took our phones and the money we had," she said. They were locked up in a house in one of the city's more humble neighborhoods along with about 90 other migrants, all Central Americans. | https://www.nbcnews.com/news/latino/kidnapping-onerous-fees-central-americans-returned-mexico-are-targets-rcna929 |
| 5/17/2021 | kidnapping, sexual assault | 3 | One family — a mother, father and their 12-year-old son from Honduras — recently came to Sister Horan for help. They said that a gang recently held them for ransom in a dark room for hours. The mother was sexually assaulted. | https://www.pri.org/stories/2021-05-17/many-asylum-seekers-are-returned-us-mexico-border-under-title-42-advocates-call |
| 5/18/2021 | kidnapping, assault | 4 | Two Honduran fathers and their young sons were expelled to Ciudad Juarez on the night of March 14, 2021. With churches and service providers closed for the night, they wandered the streets looking for a place to stay. A man who offered them a room kidnapped and assaulted them, and demanded $2000 ransom from their families for their release. | Human Rights First interview with asylum seeker |
| 5/18/2021 | kidnapping | 1 | Desde Honduras, una madre suplica a los secuestradores de su hijo en México que no lo lastimen y les pide un tiempo para pagar los 3,000 dólares que solicitaron a cambio de su liberación. | https://www.telemundo.com/noticias/noticias-telemundo-mediodia/inmigracion/video/les-pido-que-me-lo-regresen-con-vida-el-drama-de-la-madre-de-un-migrante-secuestrado-en-tmvo9828421 |
| 5/18/2021 | kidnapping | 1 | "Me decía que 'la señora' me iba a dar cuello", recuerda "Alejandro", un migrante mexicano originario de Guerrero, quien la semana pasada llegó a Ciudad Juárez en busca de asilo político en Estados Unidos, pero fue interceptado en la central camionera y secuestrado durante tres días. | https://www.eldiariodechihuahua.mx/estado/me-decia-que-la-senora-me-iba-a-dar-cuello-narra-migrante-como-lo-secuestraron-en-juarez-20210518-1796317.html |
| 5/18/2021 | kidnapping | 1 | Maribel, también salvadoreña y de 47 años, se refugia en la misma plaza junto a su hijo adolescente. Comparten una carpa con otras 10 personas. Salió de El Salvador para evitar que su hijo fuera reclutado por las pandillas criminales. Pero su pesadilla la alcanzó cuando estaban en un hotel de la misma ciudad, Reynosa, unas semanas atrás. "Fuimos secuestrados durante cinco días. Nos quitaron los teléfonos y el dinero que llevábamos", asegura. | https://www.telemundo.com/noticias/noticias-telemundo/inmigracion/secuestros-de-3000-coyotes-que-se-aprovechan-y-violaciones-los-traficantes-abusan-de-los-tmna3882927 |
| 5/19/2021 | assault | 1 | A Haitian man living in the Tijuana encampment near the San Ysidro port of entry, where some 2000 migrants and asylum seekers blocked from requesting U.S. protection due to Title 42 are living, was attacked by men who hit him repeatedly, knocking him onto a tent and destroying it. While he was on the ground, one of the attackers attempted to strike his head with a large rock, but the Haitian man moved out of the way in time to avoid being hit, according to a Honduran asylum seeker who witnessed the attack. | Human Rights First interview with asylum seeker |
| 5/19/2021 | kidnapping | 3 | "El grupo de padres lleva más de una semana caminando en medio del monte con el objetivo de volverse a reunir con las pequeñas que fueron abandonadas en un rancho en Texas. Los inmigrantes aseguran que fueron secuestrados luego de que sus hijas atravesaron la frontera. 'A las niñas las cruzaron primero y luego el balsero regresó por nosotros, pero ya nos tenían agarrados del lado mexicano', contó Daisy Sánchez, la madre de las dos menores guatemaltecas de 5 años y 11 meses." | https://www.univision.com/shows/noticiero-univision/es-algo-muy-dificil-el-drama-que-viven-los-padres-de-cuatro-de-las-cinco-ninas-abandonadas-en-la-frontera-video |
| 5/21/2021 | kidnapping | 2 | "Griselda a 23-year-old woman traveling with her 5-year-old daughter left Guatemala where she was extorted by gangs that demanded part of her paycheck for allowing her to work at a grocery store. She refused. They threatened to kidnap her young daughter . . . In Mexico, she encountered the very same thing she was running away from. She said she was kidnapped by cartel gangs posing as police and was given three days to pay $6,000 or they threatened to kill her. Her family back in Guatemala had to scramble to get the money to free her." | https://www.nbcdfw.com/news/local/migrants-turned-away-at-el-paso-border-due-to-covid-19-concerns/2658893/ |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 6/1/2021 | kidnapping, attempted, kidnapping, forced disappearance, human trafficking | 7 | At least 10 migrants and asylum seekers interviewed in Ciudad Juárez in March 2021 were victims of violent crimes in Mexico. "On May 25, Anna and her 7-year-old son, Walter, sat sobbing on the curb. Anna and Walter, of El Salvador, had once again been caught by the Border Patrol trying to enter the U.S. undetected, and they feared a repeat of what happened the last time they were caught. In April, U.S. border agents had sent them back into the Mexican city of Nuevo Laredo, where, Anna said, they were kidnapped and held for $10,000 ransom." | https://sinmexico.org/wp-content/uploads/2021/11/Juarez_2021.pdf |
| 6/2/2021 | kidnapping | 2 | A trans woman from Honduras was sexually assaulted and then stalked and threatened with death by the attacker in Chiapas in May 2021. She had fled Honduras due to physical and verbal abuse on the basis of her sexual orientation and gender identity. | https://www.nbcnews.com/politics/immigratio n/under-biden-crossing-u-s-border-has-become-lottery-migrants-n1269263 |
| 6/2/2021 | sexual assault | 1 | A LGBTQ asylum seeker from Honduras was kidnapped in Nuevo Laredo in February 2021 after fleeing discrimination in his home country. He was held captive at gunpoint for 15 days with 23 other kidnapped people. He was forced to call his father at gunpoint and tell his father to pay a ransom. | Human Rights First phone interview with asylum seeker |
| 6/3/2021 | kidnapping | 1 | A trans woman from Guatemala was assaulted and robbed in Piedras Negras in April 2021 while waiting for U.S. asylum processing to resume. | Human Rights First phone interview with asylum seeker |
| 6/4/2021 | assault, robbery | 1 | In May 2021, a gay Honduran man who had fled death threats in his home country escaped a kidnapping attempt in a park in Piedras Negras, Mexico. The Honduran asylum seeker  had been walking in a park when a man pulled his car up to him and demanded that the Honduran man get into his car and provide sexual services. When the Honduran man refused, the assailant jumped out of the car and grabbed him from behind, stabbing him in the arm, and tried to force him into the car. | Human Rights First interview with asylum seeker |
| 6/7/2021 | assault, attempted kidnapping | 1 | A Honduran trans asylum seeker, who'd fled Honduras after she was attacked by the gang for her sexual orientation and her brother was beheaded, was raped multiple times in Mexico in Nuevo Laredo and Piedras Negras. In Piedras Negras, she was kidnapped and raped in May 2021 and had to escape her kidnappers by jumping out a window. She landed on a cactus plant and got thorns stuck all over her body. | Human Rights First phone interview with asylum seeker |
| 6/7/2021 | kidnapping, rape | 1 | In April 2021, an 18-year-old trans woman from El Salvador who'd fled death threats in her home country was assaulted and robbed in a border city by men who told her they'd planned to "disappear" her. The woman managed to escape and remained in the same city as her assailants, blocked from requesting U.S. asylum due to Title 42 and terrified to leave her shelter. | Human Rights First phone interview with asylum seeker |
| 6/7/2021 | kidnapping, assault, rape, threats | 1 | An Indigenous Guatemalan transgender woman who had been trafficked for sexual exploitation was raped by Mexican police in Tijuana in early 2021 after having waited nearly a year to request U.S. asylum. | Human Rights First communication with Nicole Ramos, attorney at Al Otro Lado |
| 6/7/2021 | rape | 1 | In late May 2021, a Mexican lesbian couple was attacked and beaten for their sexual orientation while waiting in Tijuana for U.S. asylum processing to resume. | Human Rights First communication with Hollie Webb, attorney at Al Otro Lado |
| 6/7/2021 | assault | 1 | Felicia Rangel-Samponaro runs Sidewalk School, a nonprofit that offers classroom instruction for asylum-seeking children in six cities across the border. She said two weeks ago at least six people were kidnapped from the plaza. Gang members "come into the plaza," Rangel-Samponaro said. "They drag a person away. You hear the person screaming for help. Everyone stands around and watches, which is understandable. No one wants to die." | https://www.nbcnews.com/news/latino/vp-harris-visits-mexico-city-migrant-tent-camp-grows-border-town-rcna1145 |
| 6/8/2021 | kidnapping | 6 | A woman fleeing with her seven-year-old daughter from violence in Honduras attempted to cross into the U.S. and ask for asylum several times. The first few times, she was hastily returned to Nogales, Sonora. On her final attempt, she and her daughter were kidnapped by their smuggler and held and tortured for over two weeks until her family could pay their ransom. | |
| 6/10/2021 | kidnapping | 2 | | Communication from Kino Border Initiative |

CLP_PC_076254

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 6/10/2021 | kidnapping | 1 | In Mexico, with nowhere to go and few funds, she slept on the street and was kidnapped, according to a request to the U.S. government for a humanitarian exception to the order seen by Reuters. The kidnappers wanted to extort money from her family, Jasibi said.  Jasibi - who asked Reuters not to publish her surname for fear of reprisals - called migrant advocate Ariana Sawyer at Human Rights Watch daily to check on her application for the exemption. But when Sawyer tried to call her last month with the good news that she would be allowed into the United States, she couldn't reach her – Jasibi had been kidnapped again. | https://www.reuters.com/world/americas/brui sed-by-border-politics-some-biden-officials-cling-trump-restrictions-2021-06-10/ |
| 6/10/2021 | kidnapping | 140 | Un total de 140 migrantes, entre ellos cuatro menores, fueron rescatados este miércoles de una vivienda de Ciudad Juárez, México, donde estaban secuestrados y hacinados en cuartos de madera. Los migrantes proceden, en su mayoría, del Triángulo Norte de Centroamérica: Guatemala, El Salvador y Honduras, según informó la Agencia Efe. | https://www.univision.com/noticias/inmigracio n/rescatan-en-mexico-a-140-migrantes-centroamericanos-secuestrados |
| 6/11/2021 | rape, sexual assault, kidnapping, human trafficking, armed robbery, beatings | 2,314 | Asylum seekers from Colombia, Cuba, El Salvador, Guatemala, Haiti, Nicaragua, Peru, and Venezuela blocked from seeking U.S. asylum due to Title 42 reported having been the victim of a violent attack or attempted attack in Mexico in the last month in an ongoing electronic survey conducted by Al Otro Lado. | Human Rights First review survey data received by Al Otro Lado between April 9 and June 11, 2021. |
| 6/13/2021 | kidnapping | 249 | Como fue previamente reportado, el primer resguardo sucedió en pasado miércoles 9 de junio, 240 personas fueron encontradas en una carpintería ubicada en las calles Caballos y Potros de la colonia Felipe Ángeles, entre ellas 99 originarias de Guatemala, 17 de Nicaragua, 1 de El Salvador, 6 de Ecuador, 5 de Honduras y 2 mexicanos. De este grupo de migrantes, 117 son hombres, 12 mujeres y 11 menores de edad, quienes iba a ser ingresados de manera ilegal al vecino país por presuntos "polleros". Ese mismo día, se realizó la segunda intervención, en donde se localizaron a 66 migrantes de Honduras, Guatemala y Ecuador en una vivienda ubicada en el cruce de las calles Sinaloa y Cananea, en la colonia Ampliación Frontera." | https://www.elheraldodechihuahua.com.mx/lo cal/juarez/rescatan-en-juarez-a-249-migrantes-secuestrados-noticias-de-ciudad-juarez-chihuahua-inseguridad-delincuencia-policiaca-6837679.html |
| 6/13/2021 | kidnapping, assault | 2 | "Rubi and her husband, Jorge left Honduras with their daughters in October after shuttering their business because they could not afford to pay taxes to gangs...she brought with her the death certificates of her murdered brothers, who were persecuted by criminal gangs, she said, to bolster their protection request. Their disappointment at the Eagle Pass, Tex., port of entry in January motivated the family to swim across the swift currents of the Rio Grande a few days later from Piedras Negras, Mexico. Rubi's two daughters, 9 and 5, made it. But as her husband came to help her, she was overtaken by attackers. He was beaten. Cartel members held Rubi for ransom for days, she said, but no one in her family had money to pay for her captors. She went into labor shortly after her release. The birth was difficult and the baby was born with birth defects and an intestinal inflammation." | https://www.washingtonpost.com/immigration /fewer-migrant-families-being-expelled-at-border-under-title-42-but-critics-still-push-for-its-end/2021/06/13/422c702c-c7cc-11eb-81b1-34796c7393af_story.html |
| 6/14/2021 | kidnapping | 4 | "Familiares de cuatro hondureños de una misma familia que buscaban llegar a Estados Unidos (EEUU) fueron secuestrados por grupos criminales en México, según denunciaron familiares de los migrantes." | https://proceso.hn/cuatro-miembros-de-una-misma-familia-secuestrados-en-mexico-denuncian-sus-familiares/ |
| 6/14/2021 | attempted kidnapping | 5 | A Honduran family waiting in Nuevo Laredo for U.S. asylum processing to resume was kidnapped by a cartel and managed to escape. | Human Rights First interview with asylum seeker |
| 6/17/2021 | rape | 1 | An Indigenous Guatemalan transgender woman who had been trafficked for sexual exploitation was raped by Mexican police in Tijuana in early 2021 after having waited nearly a year to request U.S. asylum. | Human Rights First communication with Las Americas Immigrant Advocacy Center |
| 6/24/2021 | kidnapping | 20 | "la Secretaría de Seguridad Pública de Tamaulipas realizó en Río Bravo la liberación de 20 personas en condición de migrante que se hallaban en una casa de seguridad. De las 20 personas, 15 son de Honduras y cinco de México, uno del Estado de México, dos de Guerrero y dos de Tabasco. Entre los migrantes había una mujer y una menor de 2 años." | https://www.excelsior.com.mx/nacional/rescat an-a-20-migrantes-en-rio-bravo-tamaulipas/1456534 |
| 7/1/2021 | assault | 1 | A Mexican man fleeing gang threats was attacked and beaten in Tijuana in June 2021 by someone who grabbed him from inside a taquería while he was waiting with his family for the opportunity to request U.S. asylum. | Human Rights First interview with asylum seeker |

CLP_PC_076255

CLP_PC_076256

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 7/4/2021 | kidnapping | 53 | "Este sábado fueron rescatadas 53 personas indocumentadas en la colonia Rancho Anapra, Ciudad Juárez, en el estado de Chihuahua. Dentro de estas personas se encontraban dos menores de edad." | https://www.infobae.com/america/mexico/2021/07/04/en-chihuahua-rescataron-a-53-migrantes-centroamericanosque-estaban-secuestrados/ |
| 7/4/2021 | kidnapping | 24 | "El rescate de los migrantes, se realizó tras un operativo derribado a un llamado al teléfono comunitario de la Estación de Policía del Distrito Valle, en donde reportaron que en una vivienda ubicada en el cruce de las calles Cordillera de Taurus y Monte Aragón, se encontraban encerrados varias personas de origen centroamericano. Al llegar, los agentes localizaron a 24 personas de origen hondureño, siendo 15 adultos y nueve adolescentes, quienes manifestaron tener varios días alojados en dicho sitio a la espera de ser internados de manera ilegal al vecino país." | https://www.elsoldeparral.com.mx/local/rescatan-24-migrantes-secuestrados-en-juarez-noticias-polleros-inseguridad-frontera-6924248.html |
| 7/8/2021 | kidnapping, attempted rape | 26 | A Central American asylum seeker and her six-year-old son had nowhere to sleep when DHS expelled them to Ciudad Juárez in April 2021. A man waiting near the port of entry who offered them a ride and place to stay for the night instead imprisoned them for two weeks and attempted to rape the woman. The family has been hiding for weeks at a migrant shelter in the city after managing to escape through a bathroom window in the house where they were held with other abducted women. | https://www.humanrightsfirst.org/sites/default/files/DisorderlyandInhumane.pdf |
| 7/8/2021 | kidnapping | (counted in Human Rights First/Hope Border Institute report total) | Armed men kidnapped a Honduran asylum seeker and her seven-year-old daughter just blocks from the port of entry while they were searching for a place to sleep for the night just after DHS expelled them via a lateral expulsion flight, discussed below, in April 2021. Mexican migration officials at the State Population Council (COESPO) of Chihuahua had told the woman that shelters were full and that the family had to find housing on their own. Held captive for two months in a house with dozens of other kidnapping victims, the woman and her daughter survived on potatoes and eggs. They managed to escape while being transported to another location but remain in danger in a Juárez migrant shelter, experiencing nightmares and difficulty sleeping due to the trauma they suffered. | https://www.humanrightsfirst.org/sites/default/files/DisorderlyandInhumane.pdf |
| 7/8/2021 | kidnapping | (counted in Human Rights First/Hope Border Institute report total) | In June 2021, DHS expelled a Salvadoran woman and her two children immediately after they had escaped from kidnappers who had forcibly held them for 10 days, extorted her sister for thousands of dollars, and fired shots at the family as they ran away. U.S. immigration officers mocked the woman as she begged them not to return the family to Ciudad Juárez just hours after they crossed the border to ask for protection in the United States. On their return, Mexican immigration officers robbed the woman of her cell phone, and her sister continues to receive threatening messages from the kidnappers. | https://www.humanrightsfirst.org/sites/default/files/DisorderlyandInhumane.pdf |
| 7/8/2021 | kidnapping | (counted in Human Rights First/Hope Border Institute report total) | An Indigenous Guatemalan woman from the Q'eqchi' community was held with her two young children in a hielera (freezing-cold cell) for three days after they crossed the border near Reynosa before U.S. immigration officials expelled them via lateral flight to Ciudad Juárez in April 2021. The woman's husband and 4-year-old daughter were kidnapped in Nuevo Laredo and held for ransom for more than a month. | https://www.humanrightsfirst.org/sites/default/files/DisorderlyandInhumane.pdf |
| 7/8/2021 | assault | (counted in Human Rights First/Hope Border Institute report total) | A Guatemalan asylum seeker who was transferred with her eight-year-old daughter from Yuma, Arizona to El Paso for expulsion in March 2021 was subsequently beaten and abused in Ciudad Juárez. | https://www.humanrightsfirst.org/sites/default/files/DisorderlyandInhumane.pdf |
| 7/14/2021 | assault, robbery | 1 | A Honduran woman fleeing domestic violence in Honduras to seek U.S. asylum was robbed and assaulted on a train near Piedras Negras in March 2021 | Human Rights First telephonic interview with asylum seeker. |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 7/15/2021 | kidnapping | 1 | "She says that after being kidnapped on the streets of Reynosa, Tamaulipas, in late February, the days started to blur together. Estefani's 8-year-old daughter Ashly was able to run away while men snatched Estefani off the streets—that much Estefani knew—but while the 27-year-old from El Salvador was held, she didn't know that Ashly had crossed the border into the U.S., where the government classified her as an unaccompanied minor along with thousands of other children and teens who have been processed into the U.S. since the start of the Biden Administration." | https://time.com/6073384/title-42-expel-mexico-kidnapping/ |
| 7/16/2021 | kidnapping | 4 | Antonia Machado González se mantiene postrada en una cama desde que se enteró que su hijo Julio Ampié Machado fue secuestrado presuntamente por un cártel en México, junto a su esposa y sus dos hijos, desde hace más de una semana, mientras intentaba buscar asilo en Estados Unidos. Julio Ampié fue secuestrado el 3 de junio en la ciudad fronteriza de Reynosa, en México cuando pretendía llegar a Estados Unidos de forma irregular a pedir asilo. Según relatan los familiares, unos hombres irrumpieron en el apartamento donde esperaban ser cruzados al país vecino. | https://100noticias.ni/nacionales/108796-secuestros-nicaraguenses-nueva-oleada-migratoria/ |
| 7/19/2021 | kidnapping, threats | 1 | A Honduran man traveling alone was kidnapped in Monterrey in June 2021. His family in Honduras sold all their belongings to pay the ransom. When he was released, the kidnappers told him they'd kill him if they saw him again. | Human Rights First telephonic interview with asylum seeker. |
| 7/20/2021 | assault, robbery | 3 | A Honduran family was assaulted and robbed by an armed man in Tijuana in May 2021 while awaiting the opportunity to request US asylum. | Human Rights First telephonic interview with asylum seeker. |
| 7/20/2021 | kidnapping | 31 | "Dos personas fueron detenidas luego que Carabineros rescatara a 31 ciudadanos extranjeros, entre los que había 8 menores de edad, que se encontraban secuestrados en un domicilio en Pozo Almonte, en la Región de Tarapacá." | https://www.t13.cl/noticia/nacional/rescatan-migrantes-secuestrados-domicilio-pozo-almonte-20-07-2021 |
| 7/22/2021 | kidnapping | 37 | "En Tamaulipas se han liberado a 141 migrantes, se han rescatado a 37 personas privadas de su libertad y se han asegurado media tonelada de mariguana, cocaína, piedra y metanfetamina." | https://www.milenio.com/policia/tamaulipas-rescatan-141-migrantes-liberan-37-personas-secuestro |
| 7/26/2021 | kidnapping | 2 | A Honduran mother and her 9-year-old son were kidnapped in Reynosa in June 2021 and held for 10 days until the mother's sister paid ransom. | Human Rights First telephonic interview with asylum seeker. |
| 7/27/2021 | kidnapping | 43 | "En Chihuahua, fueron rescatados 43 centroamericanos que estaban presuntamente secuestrados en un domicilio ubicado en el municipio de Aldama. La Unidad de Secuestros de la Agencia Estatal de Investigación (AEI) realizó un operativo en el lugar, donde encontró a 38 hombres y cinco mujeres, entre ellos cuatro menores." | https://www.milenio.com/estados/en-chihuahua-rescatan-a-43-migrantes-secuestrados |
| 7/28/2021 | kidnapping | 3 | Three Mexican migrants intending to enter the United States were kidnapped and held hostage in Mexicali | https://www.elimparcial.com/mexicali/policiaca/Imputaran-secuestro-agravado-a-involucrados-en-caso-de-militar-20210727-0028.html |
| 7/29/2021 | kidnapping | 15 | "La Fiscalía General de Justicia del Estado (FGJE) de Tamaulipas a través de la Unidad Especializada en el Combate al Secuestro (UECS) realizó el rescate de 15 migrantes procedentes de Centroamérica, así lo informó la dependencia por medio de un comunicado este jueves 29 de julio." | https://www.infobae.com/america/mexico/2021/07/29/en-condiciones-deplorables-fiscalia-de-tamaulipas-rescato-a-15-migrantes-en-reynosa/ |
| 7/29/2021 | kidnapping | 1 | "Su huida al norte empezó en autobús para cruzar hasta Honduras y luego a Guatemala. Luego caminó tres días por las vías del tren con sus pies ampollados, hasta llegar a México, donde fue secuestrado por narcotraficantes. Tras pagar un rescate de 6.500 dólares que pusieron sus familiares, fue liberado tres días después. Cruzó el Río Bravo, que separa a Estados Unidos de México, y se entregó a la Patrulla Fronteriza en junio diciendo que quería pedir asilo." | https://www.latimes.com/espanol/eeuu/articulo/2021-07-29/perseguidos-nicaraguenses-huyen-eeuu-migrantes |
| 8/1/2021 | kidnapping | 18 | "A casi mes y medio de la presunta desaparición de 18 migrantes haitianos en Tampico, el Comité Ciudadano en Defensa de los Naturalizados y Afromexicanos teme hayan caído en manos de la delincuencia de Tamaulipas." | https://www.milenio.com/policia/haitianos-desaparecidos-en-tampico-pueden-estar-secuestrados |
| 8/4/2021 | kidnapping | 4 | A Nicaraguan family of four, intending to request U.S. asylum, was kidnapped in Reynosa and held for 29 days until they paid a $30,000 ransom | https://www.laprensa.com.ni/2021/08/04/nacionales/2860496-yo-tuve-ideas-de-escaparme-el-relato-de-la-familia-nica-que-viajaba-hacia-estados-unidos-y-fue-secuestrada |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 8/5/2021 | kidnapping | 3 | "Rescatan a mujer y dos menores hondureños de un domicilio en Reynosa." | https://www.hoytamaulipas.net/notas/464770/Rescatan-a-mujer-y-dos-menores-migrantes-de-un-domicilio-en-Reynosa.html |
| 8/6/2021 | kidnapping | 1 | "A su paso por México, Barralaga fue secuestrado. Así fue como conoció a José. Para que los liberaran, sus familiares en Estados Unidos tuvieron que pagar alrededor de 5,000 dólares por cada uno. Y aun así, cuenta el tío, tuvieron que escapar después de más de tres meses de captividad pues los secuestradores no los dejaban ir." | https://www.telemundo.com/noticias/noticias-telemundo/inmigracion/este-inmigrante-escapo-de-la-miseria-en-honduras-y-de-sus-secuestradores-en-mexico-pero-la-tmna39004662rid=linknoticias |
| 8/7/2021 | kidnapping | 1 | "En redes sociales circula un video que muestra a un migrante (todo indica sudamericano) quien fue secuestrado presuntamente por narcotraficantes del Cártel del Noreste (CDN) en el municipio de Nuevo Laredo en el estado de Tamaulipas en México." | https://www.msn.com/es-us/noticias/estados-unidos/video-c%C3%A1rtel-del-noreste-secuestra-a-migrante-tienes-que-pagar-7-000-d%C3%B3lares-si-quieres-ver-a-tu-hermano-vivo/ar-AAN1oJ22amp%3Bocid=iehp |
| 8/10/2021 | kidnapping | 1 | "A Honduran asylum seeker was kidnapped in Monterrey and held captive for four days in July 2021." | Human Rights First telephonic interview with asylum seeker. |
| 8/12/2021 | assault | 2 | "After moving to Nogales in October 2020, my client and his partner were constantly taunted for being gay by a group of men who regularly hung out outside a convenience store located near their home. In February 2021, the same group of men donned ski masks and chased after my client, who narrowly escaped into a nearby taxi." | https://www.aclu.org/legal-document/declaration-chelsea-sachau |
| 8/12/2021 | kidnapping, rape | 2 | "In February 2021 a Honduran woman and her young daughter were kidnapped immediately after DHS expelled her to Reynosa by armed men who grabbed them from the street, covered the mother's face with a black hat, and forced them into a car. The mother was raped multiple times in captivity and begged the kidnappers not to harm her daughter, who was released a month before the mother managed to escape. The mother did not know where her daughter was until a U.S. shelter eventually contacted her." | https://www.aclu.org/legal-document/declaration-savitri-arvey/ Human Rights First communication with Savitri Arvey, a lawyer with the Women's Refugee Commission. |
| 8/19/2021 | kidnapping | 2 | "In February 2021, a Salvadoran mother and her eight-year-old daughter were expelled to Reynosa after attempting to seek asylum. Armed, masked men immediately pursued the family as they tried to run away. The mother was abducted, but the child managed to escape and eventually enter the United States, where she remained in ORR custody, deeply traumatized and believing for more than a month that her mother had been killed." | Human Rights First communication with Kate Lincoln-Goldfinch, an attorney assisting the family. |
| 8/12/2021 | kidnapping | (Counted in Al Otro Lado survey data above) | "In Reynosa, one of our clients who had previously tried to seek asylum at the border but who was expelled under Title 42 was kidnapped shortly thereafter with her young son. The mother and child were held for days without food until they finally escaped." | https://www.aclu.org/legal-document/declaration-erika-pinheiro |
| 8/12/2021 | kidnapping | (Counted in Al Otro Lado survey data above) | "In Nuevo Laredo, a client was waiting to be able to cross with her U.S. citizen daughter when they were kidnapped by armed men while walking down the street. The men took them to a house, shaved their heads, and beat them severely. The U.S. citizen daughter's face was slashed with a knife on both sides. She lost so much blood from her injuries that she had to be hospitalized. " | https://www.aclu.org/legal-document/declaration-erika-pinheiro |
| 8/12/2021 | rape, extortion | 2 | "In one case received by our organization, a mother and her 5-year-old daughter were expelled to Mexico from the United States after fleeing sexual assault and domestic violence in Guatemala. After being expelled to Ciudad Juarez this mother was raped. The family also faced ongoing extortion and death threats from smugglers in Mexico following their expulsion." | https://www.aclu.org/legal-document/declaration-linda-rivas |
| 8/11/2021 | kidnapping, rape | 2 | "I represented a Black Honduran family consisting of a mother and her 8-year-old daughter and 6-year-old son. The family was kidnapped in Mexico. The mother told me that she was "lucky" because even though the kidnappers gang-raped her repeatedly, they always did it in a separate room so that her children did not have to watch." | https://www.aclu.org/legal-document/declaration-taylor-levy |

CLP_PC_076258

CLP_PC_076259

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 8/11/2021 | kidnapping, assault | 2 | "I represented a Hinduran mother, father, and children ages 8 and 1. The mother was kidnapped and held for month before finally being released after her family in the U.S. paid a ransom. Later, the father was approached by the cartel in Nuevo Laredo who demanded that he work for them. He refused, and they beat him so badly that they broke his hip and told him that he was going to have to start working for him once he healed. The family was so terrified by this threat that they hid out in the migrant shelter rather than taking the father to the hospital; as such, he can no longer walk unassisted." | https://www.aclu.org/legal-document/declaration-taylor-levy |
| 8/11/2021 | kidnapping | 3 | "I represented a father, mother, and their 6-year-old child seeking asylum from Honduras. They were kidnapped in Mexico and the mother was raped by the kidnappers. They also threatened to rape the 6-year-old, but stopped just before the actual rape." | https://www.aclu.org/legal-document/declaration-taylor-levy |
| 8/11/2021 | kidnapping | 4 | "I represented a Honduran family consisting of a mother, father, and children ages 12 and 1. The family had been kidnapped and brutalized on three occasions by the same cartel. After escaping, they went to a migrant shelter in Nuevo Laredo. The cartel arrived at the shelter looking for them, and the pastors were able to help them narrowly-escape through a back door." | https://www.aclu.org/legal-document/declaration-taylor-levy |
| 8/11/2021 | kidnapping | 1 | "I represented a father, mother, and their 12 and 11-year-old children seeking asylum from Honduras. The father was kidnapped by the cartel one day while he was working in Mexico. He was eventually able to escape, but lost part of his hand during the escape." | https://www.aclu.org/legal-document/declaration-taylor-levy |
| 8/11/2021 | kidnapping | 2 | "Another client family, consisting of a mother and her seven-year-old son from El Salvador, were expelled into Mexico on several occasions trying to seek asylum in the United States. On their final attempt, they were kidnapped immediately upon expulsion to Nuevo Laredo and held for eightdays while their family gathered the money to pay their ransom. The mother reported that her son did not eat anything during the entire kidnapping and was deeply traumatized." | https://www.aclu.org/legal-document/declaration-taylor-levy |
| 8/11/2021 | attempted kidnapping | 1 | "...'They crossed the river, but U.S. officials sent them straight back under Title 42, despite the grandmother's frailty. The grandmother fell gravely ill back in Reynosa, but the family, like so many other migrants, had a very hard time getting her admitted to a hospital given the local anti-migrant sentiments. She died shortly thereafter. C suffered a kidnapping attempt while she was with her mother at the hospital." | https://www.aclu.org/legal-document/declaration-jennifer-k-harbury |
| 8/11/2021 | kidnapping, robbery | 1 | "...'She fled north and tried to cross to Texas but was immediately sent back under Title 42 by U.S. officials. Mexican immigration officials stole $500 from her as she returned. She then tried to take a taxi at the foot of the bridge, but the driver kidnapped her. When she ran, he dragged her back by her hair, but she was later able to escape and make it to a shelter. Her shoulder then became badly infected, putting her life at risk." | https://www.aclu.org/legal-document/declaration-jennifer-k-harbury |
| 8/11/2021 | murder | 1 | "A mother ("A") tried to save her young daughter when the gangs arrived to rape her.  The gangs beat A and kidnapped the girl, who did not return for nearly a year. When the mother received still more threats, she fled north with her mentally disabled 15-year-old son. The son had the functional development of a 5-year-old. The trip was terrifying. The family tried twice to cross the river, but U.S. officials sent them back both times under Title 42. In Reynosa, the mother realized she could not keep her son safe from the endless kidnappings and assaults going on around her.  If she tried to cross with her son again, they would both be sent back. If she crossed alone, he would be sent to her family in the United States because Title 42 did not apply to unaccompanied minors. Like so many other desperate parents, she finally sent him across again, this time on his own. He was found dead shortly thereafter. Initial reports suggest torture and mutilation. Based on my experience, I suspect the gangs approached the boat in which he was a passenger and asked for "claves," or passwords each traveler gets once they have paid the proper crossing "fees" to the gangs. If anyone attempts to cross without such payment, they are killed. Had the gangs asked this young man for his password, he would have been unable to answer and therefore killed." | https://www.aclu.org/legal-document/declaration-jennifer-k-harbury |
| 8/11/2021 | assault, rape | 1 | "A young Trans woman ("F") went through hellish persecution in her homeland. The gangs beat her so severely that she fled in early 2019. She made it to Reynosa, but U.S. officials sent her back under the MPP program. F tried to go back to the border for her immigration court appointment in Laredo, but the local gangs pulled over the bus and dragged everyone off. Eventually she got away, but she had missed her hearing. A few months ago, she tried again to cross the Rio Grande but was sent back to Mexico. This time the gangs beat her and raped her. Worse yet, she now has HIV from her assailants." | https://www.aclu.org/legal-document/declaration-jennifer-k-harbury |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 8/17/2021 | rape, sexual assault, kidnapping, human trafficking, armed robbery, beatings | 2,511 | Asylum seekers from Cameroon, Colombia, Cuba, El Salvador, Guatemala, Haiti, Jamaica, Nicaragua, Peru, Venezuela and other countries who were expelled or blocked from seeking U.S. asylum due to Title 42 reported having been the victim of a violent attack or attempted attack in Mexico in the last month in an ongoing electronic survey conducted by Al Otro Lado. | Human Rights First review of survey data received by Al Otro Lado between June 12 and August 17, 2021. |
| 8/18/2021 | kidnapping | 7 | Un grupo de secuestradores autodenominado "Cartel del noroeste" se grabó exigiendo el rescate de guatemaltecos secuestrados en su intento de llegar a Estados Unidos. En el video, los plagiarios exigen US$7 mil a cambio de liberar a seis guatemaltecos y un hondureño, a quienes tienen encañonados con armas de fuego. | https://diariohoydexela.com/mundo/las-imagenes-de-guatemaltecos-secuestrados/ |
| 8/19/2021 | kidnapping | 2 | "La madre y las esposas de dos jóvenes hondureños clamaron este jueves por ayuda para lograr liberar a sus hijos, secuestrados en México por bandas criminales cuando ellos buscaban cruzar tierras aztecas en su ruta hacia los Estados Unidos." | https://proceso.hn/denuncian-secuestro-de-otros-dos-hondurenos-en-mexico/ |
| 8/20/2021 | attempted kidnapping | 1 | We had a Guatemalan client that we assisted in entering the US via the Huisha process back in April. Our client was a single mother, and she had previously been expelled from the United States. During the expulsion she had been followed by a man who attempted to kidnap her and force her into sexual slavery, but she was able to get away from him, thankfully. | Human Rights First communication with Ella Rawls, Attorney with Arizona Justice for our Neighbors |
| 8/20/2021 | kidnapping | 4 | In March 2021, a family of four fleeing Honduras after experiencing attempted kidnappings and death threats were immediately expelled to Mexico after attempting to seek safety in the U.S. Once returned to Mexico, a taxi driver kidnapped the family and held them in a secluded house. After managing to escape, the family stayed at an encampment in a plaza in Reynosa where the family feared for their young daughters' safety due to threats of sexual violence. Men, including police officers, would photograph their daughters— a typical tactic used by human traffickers. | Human Rights First communication with Karla Vargas, an attorney with the Texas Civil Rights Project. |
| 8/20/2021 | attempted beatings, threats | 1 | In May 2021, a 22-year-old asylum seeker who fled Guatemala after facing intense discrimination based on his sexuality was immediately expelled to Mexico after attempting to seek safety in the U.S. Once in Mexico, he faced ongoing death threats, homophobic slurs and attempted beatings. His sexuality made him a target for the cartel and other criminal entities. | Human Rights First communication with Karla Vargas, an attorney with the Texas Civil Rights Project. |
| 8/20/2021 | threats, extortion | 2 | In March 2021, a 38-year-old mother and her 8-year-old daughter were expelled after attempting to seek safety in the US because they received threats against their lives and threats to kidnap the daughter. Once in Mexico, they were targeted for extortion and were stalked by men in vehicles— a typical tactic used by human traffickers. | Human Rights First communication with Karla Vargas, an attorney with the Texas Civil Rights Project. |
| 8/21/2021 | kidnapping, extortion | 15 | "El pasado lunes 16 de agosto, dos mujeres y un menor de 10 meses fueron liberados, tras permanecer privados de su libertad desde principios de este mes en un auto hotel ubicado sobre la autopista Córdoba-Orizaba...Un día después (el martes 17), 12 migrantes procedentes de Cuba y Haití fueron rescatados en la zona rural de Coatzacoalcos por elementos de Protección Civil, denunciaron ser víctimas de extorsión y abusos por parte de elementos policíacos, quienes los despojaron del dinero que traían consigo para intentar cruzar la frontera con Estados Unidos." | https://veracuz.lasillarota.com/estados/sur-de-veracruz-zona-mas-peligrosa-para-migrantes-en-veracruz/551887 |
| 8/23/2021 | kidnapping, assault | 1 | A Cameroonian asylum seeker, who was kidnapped in Cancun, beaten, and nearly raped by her abductors, is currently stranded in Reynosa. Because of the Biden administration's expulsion policy, she is blocked from seeking asylum at the Hidalgo port of entry. | https://www.humanrightsfirst.org/resource/hu man-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | assault, extortion | 1 | A gay Haitian asylum seeker was assaulted and extorted in Tijuana while waiting for the opportunity to request U.S. asylum. The man became severely depressed and attempted suicide in July 2021. As of mid-August 2021, he remains in danger in Tijuana. | https://www.humanrightsfirst.org/resource/hu man-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |

CLP_PC_076260

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

CLP_PC_076261

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 8/23/2021 | attempted kidnapping | 1 | A Venezuelan man who was forced to flee Venezuela after refusing orders to harm protestors is waiting in dangerous Nuevo Laredo to request asylum at the Laredo port of entry after CBP officers turned him away in early August 2021. The man was nearly kidnapped at the Nuevo Laredo bus terminal when he arrived in the city. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | assault | 2 | Unable to find a shelter to assist them, a Honduran asylum-seeking couple are sleeping on a riverbank near Piedras Negras hiding from the men who kidnapped them and hoping for a chance to request protection in the United States. In August 2021, the couple were released by kidnappers who beat them so severely that the woman suffered a miscarriage. In addition, Coahuila state police robbed the couple of their belongings. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | assault | 1 | A teenage Mexican asylum seeker, who was turned away with her family by CBP officers at the San Ysidro port of entry in July 2021, was assaulted by a group of men in the Tijuana tent encampment. The girl and her family had fled deaths threats in Michoacan. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | rape, assault | 1 | A lesbian asylum seeker who has been sleeping on the streets in Ciudad Acuña with her partner waiting to request asylum at the Del Rio port of entry told Human Rights First researchers in August 2021 that she has been raped and repeatedly attacked in Mexico. The young woman's broken arm was still in a cast and bruises visible on her face from an attack in which men beat her to steal the sweets she sells on the street to survive. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | attempted kidnapping, rape | 3 | A Honduran woman, her husband, and brother-in-law remain trapped in Ciudad Acuña where they have suffered repeated kidnapping attempts, unable to request U.S. protection. On one occasion in June 2021, they were forced to jump into a river to escape kidnappers. In addition, the woman was raped in Monterrey while in transit to seek asylum. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | robbery, attempted kidnapping | 1 | In July 2021, a Guatemalan man stranded with his 7-year-old child at the tent encampment in Reynosa hoping to seek U.S. asylum was assaulted, robbed, and nearly kidnapped when he went to a store to purchase medicine for his sick child. An armed man assaulted the asylum seeker and forced him into a car. The kidnappers released the man when they learned his son was ill, but the family remains in danger in Reynosa. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 1 | A Honduran asylum seeker has been waiting for months in danger to seek U.S. protection after she was kidnapped and trafficked in Mexico. The abductors trafficked her for sexual exploitation and showed her graphic videos of migrants being tortured to intimidate her. The woman managed to escape in April 2021 but remains in hiding in a shelter, terrified to go outside. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 2 | In July 2021, armed, hooded men kidnapped a 13-year-old Honduran boy and his asylum-seeking mother in Reynosa and kept them captive for three days without food until family members paid a ransom. The traumatized boy has nightmares and has been unable to sleep. The family remains in danger in Reynosa, where they are living in a tent in the encampment. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 2 | A Honduran asylum seeker stranded in Ciudad Acuña waiting for an opportunity to request asylum has been repeatedly kidnapped in Mexico. In early August 2021, he was kidnapped in Piedras Negras and jumped from a moving car to escape. He took a bus to Ciudad Acuña to avoid the kidnappers, but police officers dragged him off the bus to extort him, pulled him by his hair, and hit him in the face causing him to lose several teeth. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping, assault | 1 | A 13-year-old Honduran boy and his asylum-seeking mother, who were kidnapped in Reynosa in April 2021, are homeless in Piedras Negras waiting to request U.S. asylum. The family was held captive in horrendous conditions, sleeping the floor and barely fed for two months while desperate family members gathered ransom money. The kidnappers threatened to traffic the son, if they failed to pay. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 3 | A Salvadoran couple and their adult daughter who were repeatedly kidnapped in Mexico are trapped in the encampment near the San Ysidro port of entry. The family fled El Salvador after a gang that control large parts of the country raped and beat the daughter, causing her to suffer a miscarriage, according to attorney Luis Gonzalez with Jewish Family Service of San Diego. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping, assault | 5 | A Honduran family with three children was kidnapped and severely beaten immediately after DHS expelled them to Nuevo Laredo in June 2021. Shortly after they managed to escape, the family witnessed people they believed to be gang members drag a boy from a house and shoot him in the street. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |

CLP_PC_076262

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 8/23/2021 | kidnapping | (Counted in Al Otro Lado survey data above) | In July 2021, CBP expelled a Honduran asylum seeker in the middle of the night to Nuevo Laredo, where gang members immediately kidnapped him and forced his family to pay a ransom. Shortly after his release a cartel kidnapped him again. He remains missing and his family has not heard from him since, according to the migrant legal services organization Al Otro Lado. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 2 | In June 2021, an indigenous Honduran asylum seeker and his six-year-old son were kidnapped immediately after DHS expelled them to Reynosa. The kidnappers separated the family and trafficked the father for labor. When they were released, they again sought U.S. protection in the Rio Grande Valley, but this time DHS transferred them by bus for expulsion in Nuevo Laredo, where they narrowly escaped another kidnapping attempt, according to Taylor Levy, an attorney assisting the family. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | assault | 1 | In August 2021, a Salvadoran man told Human Rights First that after Border Patrol agents expelled him to Piedras Negras at midnight he was threatened and attacked. With migrant shelters closed by the city, he was forced to sleep in an abandoned house, but men – one armed with a bat – threatened to beat him and other stranded migrants, if they didn't leave. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | attempted kidnapping, assault | 2 | A Honduran father and son seeking U.S. asylum were shot during a kidnapping attempt after DHS expelled them to Reynosa in April 2021. The father suffered multiple bullet wounds, including a bullet that became lodged in his arm for months while he was unable to access medical care in Mexico, according to Karla Vargas, an attorney with the Texas Civil Rights Project. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping, assault | 1 | In June 2021, CBP officers turned away a Guatemalan man who tried to request protection at the international bridge to the Laredo port of entry even though he was covered in blood from having been tortured by the cartel that abducted him. The man had been held for days and repeatedly beaten by a cartel because he could not provide the phone number of a family member in the United States to extort. The man told Human Rights First, "If I return to my country, I'll be killed. If I stay here, I'll be killed. I want an opportunity, for someone to consider my case." | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping, rape | 2 | A Central American mother fleeing gang threats was expelled to Reynosa in spring 2021 with her minor daughter, who has an intellectual disability, even though they had been kidnapped in Mexico and the mother raped. After escaping the family crossed the Rio Grande to ask for U.S. protection but were immediately expelled, according to Jennifer Harbury, an attorney assisting the family. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 1 | In July 2021, Border Patrol agents expelled a Honduran asylum seeker to Mexico just one day after he received surgery for injuries he suffered while escaping a kidnapping in Piedras Negras. The man was pushed from the train he climbed aboard to escape the kidnappers who held and beat him for days. He explained to Border Patrol agents who took him to a hospital for surgery on his severely broken leg that he had fled a near-fatal beating by the gang extorting his clothing business in Honduras as well as the abduction in Mexico, but they returned him to Mexico in a hospital gown, barely able to walk with his leg in a heavy brace. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 1 | DHS twice expelled a Honduran asylum seeker to Mexico even though he had been kidnapped near Reynosa in March 2021 by a cartel that continues to hold his mother five months later. The man escaped the kidnappers but continues to receive videos and photos of his mother being tortured by her captors who are demanding a $10,000 ransom. The man told Human Rights First that cartel members are searching for him in Reynosa and that he fears that they will kill him for escaping. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping, extortion | 1 | In August 2021, an LGBT Venezuelan asylum seeker who had been kidnapped in Nuevo Laredo managed to enter the Laredo port of entry and attempted to request protection but was immediately turned back to Mexico by CBP officers. The day before attempting to seek protection, he had been kidnapped and extorted by a taxi driver while trying to find a place to stay. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping, rape | 1 | In February 2021, DHS expelled a young Honduran woman who had been kidnapped in Mexico, held captive for weeks and repeatedly raped, and abandoned by her traffickers in Arizona. After she was treated in a US hospital for her injuries, the woman was expelled to Nogales, Mexico, according to Chelsea Sachau, an Equal Justice Works Fellow with the Florence Immigrant & Refugee Rights Project. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 8/23/2021 | kidnapping | 1 | In late May 2021, DHS expelled a 23-year-old Honduran asylum seeker who was seven-months pregnant after escaping kidnappers who planned to sell her unborn child. The kidnappers had told her that "newborns are extremely expensive in Mexico." The woman was malnourished in captivity and experienced severe bleeding that made her fear for the health of her unborn child, according to Karla Vargas, an attorney with the Texas Civil Rights Project. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 3 | In July 2021, a Mexican asylum seeker from Michoacán and two Nicaraguan asylum seekers disappeared from the shelter where they were staying in Tijuana while waiting for the opportunity to request U.S. asylum. All three men had been traveling alone. Another asylum seeker staying at the shelter reported concerns that the men had been kidnapped by Mexican cartel members. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 1 | In June 2021, a transgender Honduran woman blocked from requesting protection was kidnapped in Tijuana by a man who had promised her a place to stay. He locked her inside a house with other captive migrants for two days before she managed to escape out of a window. As of July 2021 she was hiding at a Tijuana shelter, terrified to go outside for fear of reencountering the kidnapper, according to Emem Maurus, a lawyer with the Transgender Law Center. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | assault | 2 | In August 2021, a Honduran woman stranded in Ciudad Acuña unable to request protection was offered shelter by a man who violently beat her after she and her 11-year-old son moved in with him. The man forced the child to watch as he attacked his mother, including beating her with a machete. They eventually managed to escape and sought help at a shelter. The shelter supervisor told Human Rights First that this man had previously convinced other desperate migrant women to move in with him and then abused them as well. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 2 | An asylum-seeking mother and her 15-year-old son were kidnapped almost immediately after being expelled by DHS to Reynosa. They were forced into a van at gunpoint where they were held for two weeks, denied food, and threatened with being killed, until family members paid ransom. According to the woman's attorney, Taylor Levy, the woman has developed severe anxiety and panic attacks as a result. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 2 | Asylum seekers at a shelter in Nuevo Laredo told Human Rights First in August 2021 that a family apparently attempting to reach the shelter had been kidnapped just outside the shelter's security wall. They reported hearing the screams of children as the family was abducted. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 2 | Asylum seekers at a local government-run shelter in Ciudad Acuña reported that a family had been forced into a car outside the shelter in early August 2021. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | robbery, assault | 2 | A Honduran woman fleeing domestic violence with her eight-year-old son was repeatedly abused by her employer in August 2021 after being expelled by DHS to Reynosa and accepting an offer to work and live with a local family out of desperation. After suffering abuse at the hands of the employer, she escaped to live in the encampment, where she and her son remain in danger. The mother and son had been previously robbed of all their belongings in Mexico before they requested U.S. protection. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 23 | Two Nicaraguan women reported that 23 Nicaraguan asylum seekers who had been traveling with them were kidnapped in Reynosa in July 2021. Police at a checkpoint handed the group, which included the women's partners, over to a cartel extorting family members in the United States for ransom. Some of the group remain kidnapped, while at least one of the kidnapped asylum seekers has gone missing after his family paid ransom to secure his release. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | assault | 5 | Mexican police officers attacked a group of five Jamaican LGBTQ asylum seekers in downtown Tijuana in June 2021. They threw three of the asylum seekers to the ground and tased one of them. The asylum seekers reported that the police targeted them because of their race, sexual orientation, and gender identity, according to Emem Maurus, a lawyer with the Transgender Law Center. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | assault | 1 | In Ciudad Acuña, Coahuila state police beat an Afro-Honduran asylum seeker, who had been expelled to Mexico by DHS, so severely that he is now blind in one eye. He said that the officers hit him in the head with a branch and stole all of his belongings. He did not attempt to report the incident to authorities for fear of further retaliation. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |

CLP_PC_076263

CLP_PC_076264

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 8/23/2021 | kidnapping, rape | 2 | Reynosa police refused to help a Black Honduran mother and her seven-year-old son after the family was kidnapped and the mother severely beaten and raped in spring 2021 in Reynosa. Instead, police taunted the mother, asking how much she would charge them for sex, according to Taylor Levy, an attorney assisting the family. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | assault | 1 | In May 2021, Mexican police detained and beat a 16-year-old Salvadoran boy for more than ten hours in Saltillo, Coahuila. His mother told Human Rights First that the officers beat and robbed him. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | assault, robbery | 1 | In August 2021, Coahuila police assaulted and robbed a Honduran woman who was waiting in Piedras Negras for an opportunity to request U.S. asylum. When she told the officers she would report them, they said, "that won't get you anything here. We are the law." | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | robbery, threats | 2 | In August 2021, Mexican police robbed and threatened a Guatemalan family outside a grocery store in Reynosa. The family is afraid to return to the store to buy medicine for their sick child for fear of encountering the police again. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | assault | 1 | A Honduran asylum seeker expelled to Ciudad Acuña by DHS was beaten by Coahuila state police in early August 2021. The man still had a bruise on his forearm a week after being pistol whipped by officers who had stopped him as he walked to a store to buy food just blocks from the shelter where he is staying. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 1 | A Honduran woman remains separated from her eight-year-old daughter, who crossed alone into the United States after the woman was kidnapped following the family's expulsion by DHS to Reynosa. The woman, who was fleeing death threats after witnessing a murder in Honduras, had left her daughter with a friend to beg for money to buy food when she was kidnapped just steps from the encampment in Reynosa. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | armed threats, extortion | 1 | A Honduran woman sent her nine-year-old son across the border alone after the family was threatened at gunpoint by the owners of the house in Ciudad Acuña where they had rented a room. The owners asked for phone numbers of their U.S. family members in order to extort them and tried to prevent the family from leaving. After they managed to escape, the woman sent her son to the United States to protect him from harm and fled to Piedras Negras, where she was sleeping on the street as of August 2021. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | assault, robbery | 1 | A pregnant Afro-Honduran woman decided to send her six-year-old son across the border alone after DHS expelled the family in April 2021. The woman spent months in Monterrey waiting for the opportunity to request U.S. asylum and reunite with her son. Mexican police violently raided and robbed the apartment she shared with other migrants on multiple occasions. She suffered a miscarriage due to the stress of her living conditions and her son was deeply traumatized by the separation, according to Taylor Levy, an attorney assisting the family. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | robbery, attempted kidnapping | 2 | After DHS expelled a Central American family seeking U.S. protection twice in April 2021, the family decided to send their minor son, a human trafficking survivor, across the border alone to protect him from violent crime in Ciudad Juárez, where the adult family members were robbed by Mexican police officers and narrowly escaped a kidnapping attempt. After crossing alone, the child experienced severe psychological trauma in ORR custody worrying about his family's safety, according to Taylor Levy, an attorney assisting the family. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | attempted kidnapping | 2 | A Honduran mother sent her nine-year-old son, who had fled forcible gang recruitment in Honduras, over the border alone after the family narrowly escaped a kidnapping attempt in Mexico. As of August 2021, the boy remained in ORR custody without a sponsor, soon to be transferred to foster care, according to Taylor Levy. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | assault, threats | 1 | Fearing for her teenage son's life, a Honduran mother sent him along across the border in May 2021 after gang members in Monterrey threatened, beat, and robbed him. The family had previously been turned away when they attempted to request asylum at the Eagle Pass port of entry, and relocated to Monterrey in search of work while they waited for U.S. asylum processing to resume. For months after the attack, gang members continued to appear outside the place where the family was staying in Monterrey, where the mother remains in danger. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 8/23/2021 | kidnapping | (counted in Al Otro Lado survey data above) | A Mexican asylum seeker remains missing after he attempted to cross the border between ports of entry in April 2021 because CBP turned him away from requesting asylum at the San Ysidro port of entry. His family told Al Otro Lado that they not heard from him since he attempted to cross the border and believe he was likely kidnapped by a cartel. | https://www.humanrightsfirst.org/resource/hu man-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | assault | 2 | In June 2021, men armed with a bat and knives waiting near the border attacked a Honduran couple as they attempted to cross the border in Piedras Negras to request asylum — beating the husband with a bat and stabbing the wife in the stomach. The couple had fled attacks and death threats by gangs in Honduras and the woman had previously suffered a miscarriage on the traumatic trip through Mexico. | https://www.humanrightsfirst.org/resource/hu man-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping, assault | 3 | Kidnappers waiting near the border in Ciudad Acuña abducted a Honduran woman and her two young children in May 2021 as they approached the U.S. border to seek protection in the United States. The kidnappers beat and robbed the woman but released the family after they were unable to extort any of her family members to extort. The woman had previously survived an attack by gang members in Honduras that left her with a fractured skull. | https://www.humanrightsfirst.org/resource/hu man-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping, assault, robbery | (counted in Al Otro Lado survey data above) | In August 2021, Mexican immigration officials deported a Honduran asylum seeker to Guatemala. The man and his family had been approved for an exemption to the expulsion policy after having been kidnapped, assaulted, and robbed in Mexico. But Mexican immigration officials stopped and detained him in Ciudad del Carmen as he was traveling to join his family in Tijuana, where they were scheduled for an exemption appointment on August 19, according to Ginger Cline, an attorney with Al Otro Lado. | https://www.humanrightsfirst.org/resource/hu man-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 2 | In August 2021, asylum seekers in Nogales, Mexico attempting to request U.S. asylum were tricked into entering the vehicles of kidnappers promising to drive them to the Kino Border Initiative, which was helping asylum seekers access exemptions, according to accounts related to the Kino Border Initiative. | https://www.humanrightsfirst.org/resource/hu man-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | attempted kidnapping | 1 | A Mexican woman told the Kino Border Initiative that people pretending to be her attorneys arranged a meeting to discuss the asylum process, but when she and her son arrived at the arranged location, a group of men attempted to kidnap her son. | https://www.humanrightsfirst.org/resource/hu man-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping, sexual assault | 3 | A Mexican family that had been approved for an exemption from the expulsion policy was kidnapped by a taxi driver who was supposed to drive them from their shelter to the Brownsville port of entry for their parole appointment in August 2021. The driver sexually assaulted the mother, who has epilepsy and other serious medical issues, in front of her two young sons, then abandoned the family on a road far outside of Matamoros, according to Charlene D'Cruz, an attorney assisting the family. | https://www.humanrightsfirst.org/resource/hu man-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | attempted kidnapping, threats | 3 | A Guatemalan asylum seeker told Human Rights First that when she intervened to stop the kidnapping of a young boy and his father, a man threatened to come back and cut her and her child into pieces. | https://www.humanrightsfirst.org/resource/hu man-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | assault, threats | 1 | Another asylum seeker said that in July 2021 a man who has been harassing and threatening her tried to set her tent on fire while she slept inside. | https://www.humanrightsfirst.org/resource/hu man-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 2 | A traumatized nine-year-old Honduran boy who was kidnapped with his mother and held captive in horrendous conditions for 10 days is suffering from the poor conditions in the encampment and has become lethargic and malnourished. His mother, who has an ovarian cyst, was in severe pain, but as of July 2021, neither could access medical care in Reynosa. | https://www.humanrightsfirst.org/resource/hu man-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping, assault | (counted in Al Otro Lado survey data above) | According to Al Otro Lado, the burn and stab wounds of a Central American asylum seeker, who had been kidnapped and tortured, became infected due to poor sanitation and lack of medical treatment in the encampment in spring 2021. | https://www.humanrightsfirst.org/resource/hu man-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |

CLP_PC_076265

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 8/23/2021 | kidnapping | 1 | In April 2021, DHS expelled a 38-week pregnant woman diagnosed with multiple infections who had fled Guatemala after her abusive partner severely beat her to try to abort her pregnancy. The woman had entered the United States to ask for protection immediately after escaping armed traffickers who had kidnapped her in Nogales and held her captive for 10 days without enough to eat. Border Patrol agents transported her to an Arizona hospital where she had a contraction, which the doctor determined had been triggered by stress. He also diagnosed her with a urinary and a vaginal infection. The woman provided details about her traumatic kidnapping during a highly limited Title 42 fear screening, but DHS expelled her to Mexico. She gave birth several days later to a sick child who nearly died in the hospital, according to Chelsea Sachau, a fellow with the Florence Immigrant & Refugee Rights Project. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 9/2/2021 | abuse | 1 | Un médico calificador de Nogales, Sonora, fue denunciado ante la Fiscalía General de Justicia del Estado (FGJE) por el delito de abusos deshonestos en contra de un migrante Centroamericano, de 24 años de edad. | https://eldiariodesonora.com.mx/notas.php?nota=170414 |
| 9/3/2021 | kidnapping | 2 | Honduran migrant Lesly Pineda, a factory worker, said she and her 11-year-old son Joan were kidnapped with eight other migrants in July and released only after she paid a $2,000 ransom. | https://www.latimes.com/world-nation/story/2021-09-03/biden-vowed-to-close-a-border-migrant-camp-then-under-his-watch-a-worse-one-emerged |
| 9/3/2021 | kidnapping | 1 | Torres and the half a dozen migrants in his group were rescued by Border Patrol agents, who later expelled them to Reynosa, he said. He had crossed the border after being kidnapped at a local shop where he had gone to buy food and was held with scores of others for a month until he paid $4,000 ransom. | https://www.latimes.com/world-nation/story/2021-09-03/biden-vowed-to-close-a-border-migrant-camp-then-under-his-watch-a-worse-one-emerged |
| 9/7/2021 | kidnapping | 489 | En el norte del país, en Ciudad Camargo, estado de Tamaulipas, el 5 de septiembre, autoridades federales rescataron a 162 migrantes que estuvieron abandonados durante cinco días, sin alimentos, en una bodega. . . . En Cadereyta, estado de Nuevo León, el 31 de agosto de 2021, el INM y policías estatales "rescataron a 327 personas migrantes, entre ellos, 120 menores de edad que permanecían hacinados y en condiciones insalubres al interior de una casa de seguridad", según informó el canciller. | https://actualidad.rt.com/actualidad/403151-mexico-anunciar-rescate-750-migrantes-centroamericanos |
| 9/11/2021 | kidnapping | 6 | "Rescatan de un taxi a seis migrantes secuestrados." | https://www.elmanana.com/rescatan-de-un-taxi-a-6-migrantes-secuestrados/5418719 |
| 9/13/2021 | rape, sexual assault, kidnapping, human trafficking, armed robbery, beatings | 363 | Asylum seekers from Cameroon, Colombia, Cuba, El Salvador, Guatemala, Haiti, Honduras, Nicaragua, and Venezuela who were expelled or blocked from seeking U.S. asylum due to Title 42 reported having been the victim of a violent attack or attempted attack in Mexico in the last month in an ongoing electronic survey conducted by Al Otro Lado. | Human Rights First review of survey data received by Al Otro Lado between August 18 and September 13, 2021. |
| 9/16/2021 | extortion | 4 | A Salvadoran asylum-seeking family was extorted by police in Tijuana who threatened them with deportation in August 2021. The same officers stopped the family and asked them for money on 5 separate occasions. | HRF communication with asylum seeker |
| 9/16/2021 | kidnapping | 1 | A Honduran man was kidnapped in Reynosa in May 2021 while awaiting the opportunity to request U.S. asylum. | HRF communication with asylum seeker |
| 9/16/2021 | attempted kidnapping | 2 | "Carolina (pseudonym) and her family fled southern Mexico and arrived in Nogales recently after a criminal group murdered two boys in their town, one of whom was a friend of Carolina's brother. After the murders, armed people entered Carolina's home and kidnapped her brother. She still hasn't heard anything from or about him. She continues receiving threatening phone calls, even after having changed her phone number. When they arrived in Nogales, they got into a taxi and soon noticed that the driver was not taking them where he was supposed to and was asking them intrusive questions. They managed to escape the taxi and called another one that took them to Kino." | Kino Border Initiative report |
| 9/16/2021 | threats | 3 | "A woman and her two children decided to leave their home to escape her abusive partner, whom she had just learned was involved in organized crime. She fled first to Tijuana, but noticed she was being followed by a mysterious car. Her partner sent her a message saying he had people everywhere following her. She quickly fled Tijuana and came to Nogales. On their first night in a local shelter, she saw a man standing outside the door of the shelter all night, and the shelter staff did not know who he was. She is afraid to stay in Nogales." | Kino Border Initiative report |

CITP_PC_076266

CLP_PC_076267

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 9/20/2021 | kidnapping | 2 | "Chihuahua.- Dos personas migrantes de 14 y 15 años de edad, fueron rescatados por agentes de seguridad pública estatal y municipal, de los captores adultos los cuales son de origen extranjero." | https://diario.mx/estado/rescatan-a-dos-menores-migrantes-secuestrados-por-hondurenos-20210920-1843378.html |
| 9/20/2021 | kidnapping | 3 | "El reporte de migrantes privados de la libertad, movilizó a elementos policiacos quienes confirmaron la situación y sitaron el domicilio donde estaban las victimas. Trascendió que tres migrantes, al parecer de nacionalidad guatemalteca, fueron secuestrados desde la semana pasada y los tenian en casa de lámina y cartón. Dos de las victimas eran menores de 14 años de edad." | http://tiempo.com.mx/noticia/rescatan_a_tres_migrantes_secuestrados_tras_operativo_en_l_a_aeropuerto_noticias_chihuahua/ |
| 9/21/2021 | kidnapping, torture | 1 | An Ecuadoran man was kidnapped in Ciudad Juarez after the U.S. government expelled him under Title 42. The kidnappers sent family members a video of the man blindfolded with his hands and feet bound while someone holds a knife to the man's face. After the Ecuadoran man's family sent ransom money, they never heard from the kidnappers or the Ecuadoran man again and he remains missing. | https://www.elcomercio.com/actualidad/seguri dad/testimonio-azuayo-secuestrado-frontera-eeuu-mexico.html |
| 9/24/2021 | kidnapping | 1 | Ecuadoran migrant Jose Luis Palate, 42, father of 2, disappeared in May 2021 after informing his family he intended to cross the U.S.-Mexico border near Ciudad Juarez. As of September 2021 he remains missing. | https://lanoticias.com/noticias/jose-luis-palate-migrante-desaparecido-frontera-mexico-estados-unidos/ |
| 9/27/2021 | kidnapping | 340 | 340 migrants, including 17 minors, who had been kidnapped and held captive in Chihuahua, Mexico were rescued by police on September 17, 2021. | https://lasillarota.com/estados/esto-suenan-algunos-de-los-340-migrantes-secuestrados-en-chihuahua/564724 |
| 9/27/2021 | kidnapping | 1 | "La fiscalía de Distrito Zona Norte obtuvo una vinculación a proceso dictada en contra de Roberto M. A., quien fue detenido en términos de la flagrancia como probable responsable del secuestro de una mujer [ecuatoriana] cometido la tarde del pasado 14 de septiembre en Ciudad Juárez." | http://puentelibre.mx/noticia/vinculacion_proc eso_secuestro_migrante_ecuador_ciudad_juar ez/ |
| 9/28/2021 | kidnapping | 2 | "That is what happened to Jorge Geovanni Diaz and his son hours after they were expelled from the U.S. to Tamaulipas...First, an armed group entered a warehouse where the coyotes kept them. "They attacked 182 people, they took us to the mountains, and there we were kidnapped for a month and 14 days," Diaz said. Once his family spent $6,000 and Diaz managed to get out, he fell into the hands of the taxi driver who had to return him to the Reynosa bus station. "They were connected to the taxi driver. They traded me to another cartel in Matamoros," he said. He suffered a double kidnapping and had to pay $6,000 more." | https://www.nbcnews.com/news/latino/migran ts-returned-mexico-describe-horror-kidnappings-torture-rape-rcna2300 |
| 9/28/2021 | kidnapping | 2 | "Months ago, during a sudden downpour, a Honduran man and his son disappeared [from the Reynosa tent encampment]. 'A man said that when he came out of the bathroom, he saw a truck stop, a man get out, pull them in and take them away,'" | https://www.nbcnews.com/news/latino/migran ts-returned-mexico-describe-horror-kidnappings-torture-rape-rcna2300 |
| 9/29/2021 | kidnapping | 2 | David Sanabria huyó de Honduras después de que lo perdió todo tras el paso de los huracanes Iota y Eta, pero nunca se imaginó que en su camino a Estados Unidos el coyote lo entregaría al crimen organizado en Reynosa, Tamaulipas. Aquí su historia | https://www.telemundo.com/shows/hoy-dia/crimen-y-violencia/video/puro-machete-los-desmembraban-dice-un-migrante-que-sobrevivio-un-secuestro-en-mexico-tmvo10139046 |
| 9/30/2021 | kidnapping, assault | 2 | "...Del otro lado de la línea, unos hombres le dijeron que tenían retenidos a su hermano David, de 32 años, y a su sobrina Ximena, de 4. Si quería volver a verlos con vida debía enviarles 7 mil 500 dólares en un plazo de ocho días...Cada vez que Denis decía que no tenía dinero, David se ganaba una golpiza. La niña, según el papá, lloraba al verle sangrando en el piso. David cuenta que cuando se cumplía el plazo y nadie pagaba los rescates de sus compañeros migrantes, los asesinaban ahí mismo, a un lado del campamento." | https://www.heraldousa.com/migracion/2021/ 9/30/secuestros-multiacciones-este-es-el-infierno-que-viven-los-migrantes-en-camino-eu-8920.html |
| 10/1/2021 | kidnapping | 1 | "Un migrante fue secuestrado por personas desconocidas y sus familiares fueron extorsionados con engaños de que había cruzado la frontera y estaba en Phoenix, Arizona, cuando era privado de su libertad en una vivienda de la colonia Romanza de esta ciudad." | https://www.expreso.com.mx/seccion/sonora/ 358210-levantan-a-un-migrante-y-extorsionan-a-su-familia-en-nogales.html |
| 10/1/2021 | sexual assault | 2 | "Reports of sexual assault on young girls at the encampment reached Pastor Hector Silva, who allows migrant families living at the plaza to move into Senda de Vida when room is available." | https://myrgv.com/featured/2021/10/01/lights-out-electricity-shut-down-at-reynosa-migrant-encampment/ |
| 10/2/2021 | kidnapping | 2 | "Dos migrantes michoacanos fueron liberados en un operativo policíaco realizado en una casa de seguridad de Tijuana donde se logró la captura de cuatro secuestradores, entre ellos un adolescente." | https://www.jornada.com.mx/notas/2021/10/0 2/estados/liberan-a-migrantes-michoacanos-secuestrados-en-baja-california/ |

CLP_PC_076268

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 10/2/2021 | kidnapping | 3 | "La Fiscalía de Distrito Zona Centro obtuvo la vinculación a proceso de dos hombres originarios de Honduras acusados por el delito de secuestro agravado, cometido en perjuicio de tres inmigrantes de nacionalidad guatemalteca y hondureña, uno de ellos menor de edad." | https://www.elheraldodechihuahua.com.mx/po liciaca/hondurenos-secuestraron-a-tres-migrantes-y-pedian-20-mil-dolares-extorsion-secuestro-migracion-vinculados-a-proceso-7286687.html |
| 10/4/2021 | kidnapping | 13 | "Autoridades mexicanas buscan a 13 migrantes que habrían desaparecido cerca de la frontera con Estados Unidos, después de haber sido retenidos por traficantes de personas, informó este lunes en un comunicado la fiscalía del estado norteño mexicano de Chihuahua." | https://www.eleconomista.com.mx/politica/Au toridades-mexicanas-buscan-a-13-migrantes-cerca-de-frontera-con-Estados-Unidos-20211004-0129.html |
| 10/6/2021 | Kidnapping | 1 | A Salvadoran migrant, Luis David "N", was held hostage and tortured in Mexicali by kidnappers demanding ransom from his family. He managed to escape. | https://www.elimparcial.com/mexicali/policiac a/Rescatan-a-migrante-salvadoreno-secuestrado-20211006-0025.html |
| 10/7/2021 | kidnapping | 5 | "Cinco extranjeros en estado de migrante fueron rescatados en la ciudad de Reynosa, Tamaulipas, por elementos de la policía estatal y en la acción detuvieron a dos individuos que los llevaban secuestrados." | https://www.excelsior.com.mx/nacional/libera n-a-cinco-migrantes-nicaraguenses-secuestrados-en-reynosa/1475840 |
| 10/7/2021 | kidnapping, robbery | 1 | I.B. is a 35-year-old man from Ghana. He fled his home after an armed criminal group entered his home and murdered his uncle; I.B. had previously reported the criminal group to the police. I.B. fled to South America, ultimately journeying to Mexico. In Mexico, I.B. was kidnapped and held for three days. Mexican police have stopped and searched I.B. on two occasions and have stolen his wallet. I.B. has had difficulty finding a job in Mexico on account of his race and nationality, and he has been the victim of racist comments. | https://www.humanrightsfirst.org/sites/default /files/PrecautionaryMeasuresRequestUnitedSta tesTitle42.pdf |
| 10/7/2021 | kidnapping | 4 | N.I.C.B. is a 34-year-old mother from El Salvador. 10 N.I.C.B. fled gang violence in El Salvador with her husband, J.I.B.B., and two children, K.I.B.C., who is 12 years old, and A.E.B.C., who is 8 years old. Gang members threatened to kill her and her family, and they beat her and her husband. In March 2021, the family tried to enter the United States from Reynosa, Mexico, to seek asylum. When they encountered U.S. officials at the border, the officials called N.I.C.B., her husband, and her children "a bunch of criminals." The officials expelled the family into Mexico in the middle of the night. They were kidnapped almost immediately after and kept in a locked storage room with insufficient food for 20 days. The kidnappers sexually harassed N.I.C.B. constantly. | https://www.humanrightsfirst.org/sites/default /files/PrecautionaryMeasuresRequestUnitedSta tesTitle42.pdf |
| 10/7/2021 | assault, attempted kidnapping | 3 | N.M.M.M. is a 35-year-old mother from Guatemala.11 She fled Guatemala with her 11-year-old son, C.A.M.M. and four-year-old daughter, D.L.M.M., due to threats made against her family by organized criminal gangs. N.M.M.M. has been the victim of crime in Mexico as well. Three men broke into the home where she was staying and assaulted her. Her son was the victim of an attempted kidnapping. | https://www.humanrightsfirst.org/sites/default /files/PrecautionaryMeasuresRequestUnitedSta tesTitle42.pdf |
| 10/9/2021 | kidnapping | 1 | He never intended to leave El Salvador -- he lived "peacefully" in his home country and even had his own business. But everything changed for Martin when he was raped. "I am from the LGBTQ community, I am gay," Martin said. "And in my country, I suffered discrimination and violent because of that. "So, at that moment I had no choice but to take the savings I had and try to flee to a more liberal place, where they don't push you aside, where they don't see you badly." He left El Salvador on 5 March and managed to make it to Monterrey, Mexico -- but his plans quickly disintegrated. He tried to cross into the United States on three separate occasions. Each time, he was sent to Reynosa in Mexico. "Then the last time, I was kidnapped as I was leaving the bridge," Martin said. "Someone told me that he could help me, made me get into a car and took me to a house where they locked me up for several days. | https://www.pinknews.co.uk/2021/10/09/el-salvador-doctors-without-borders-gay-refugee/ |
| 10/14/2021 | kidnapping | 3 | The vehicle in which four migrants and their alleged smuggler were traveling from Chihuahua City to Juarez was cut off by two other cars. A shooting in which the driver died, and a Honduran was injured, ensued; the assailants commandeered the migrants and drove away with them, according to the reports. | https://www.borderreport.com/hot-topics/border-crime/expert-worries-mexican-gangs-may-be-stealing-each-others-human-cargo-putting-migrant-lives-at-risk/ |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 10/21/2021 | kidnapping | 1 | In mid-October 2021, DHS expelled a Honduran asylum seeker who had sought protection near McAllen, Texas immediately after escaping kidnappers who had abducted him outside a grocery store in Reynosa, Mexico while he was buying tortillas and avocados for his wife. DHS turned him over to Mexican immigration authorities, who flew him to Villahermosa then bused him into Guatemala, where he remains stranded. He told Human Rights First he is sick with fear and desperate for reunite with his wife, who is still in the Reynosa tent encampment where the couple had been waiting together for U.S. asylum processing to resume at the port of entry. | https://www.humanrightsfirst.org/resource/file gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | kidnapping | 1 | A young Honduran woman who attempted to request asylum at a U.S. port of entry in July 2021 was kidnapped immediately after DHS turned her away. Members of a criminal organization who repeatedly raped her and trafficked her for sexual exploitation for three months, according to a humanitarian aid worker assisting her. She remains in danger in Mexico. | https://www.humanrightsfirst.org/resource/file gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | kidnapping, torture | 2 | A Central American couple blocked from seeking asylum at a U.S. port of entry was kidnapped and tortured in Tijuana in summer 2021. The kidnappers raped the wife repeatedly, beat the husband, and demanded ransom from their family members. The couple managed to escape but remains in danger in Tijuana as of mid-October 2021, when Human Rights First last spoke with them. | https://www.humanrightsfirst.org/resource/file gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | assault | 2 | A 13-year-old Honduran girl and her asylum-seeking father were assaulted and robbed by gang members after DHS expelled them under Title 42. The family was forced to hide in a mountainous area for several days afraid of encountering the kidnappers who targeted them and other migrants on a train. They remain in danger in Mexico, according to Shoshana Kushner, an attorney with Immigrant Defenders Law Center. | https://www.humanrightsfirst.org/resource/file gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | attempted kidnapping | 2 | Armed men tried to kidnap a Guatemalan asylum seeker and his three-year-old daughter immediately after DHS expelled them to a Mexican border city in August 2021. The family managed to escape, but others who had been expelled with them did not, according to a humanitarian aid worker assisting the family. | https://www.humanrightsfirst.org/resource/file gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/19/2021 | kidnapping | 1 | A 59-year-old asylum-seeking grandmother from Honduras was kidnapped soon after DHS expelled her to Piedras Negras in summer 2021. When Human Rights First researchers last spoke to her in October 2021, she remained in danger in Mexico unable to request asylum. | https://www.humanrightsfirst.org/resource/file gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | rape, kidnapping | 1 | An unaccompanied child who was unable to access the U.S. asylum process due to Title 42 was raped and kidnapped from the hostel where she was waiting to request protection by men who told her they were going to kill her, according to Las Americas Immigrant Advocacy Center. | https://www.humanrightsfirst.org/resource/file gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | rape | 1 | An asylum seeker fleeing gender-based violence as was raped at gunpoint in front of her son, causing her to develop an infection, after DHS expelled her under Title 42. She remains in danger in Mexico, according to Las Americas Immigrant Advocacy Center. | https://www.humanrightsfirst.org/resource/file gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | kidnapping, rape | 1 | An INM officer kidnapped and raped a Honduran asylum-seeking woman near the border in Ciudad Juarez and sold her to a cartel that held her captive. Though she managed to escape, the woman has been unable to request U.S. asylum due to the Title 42 policy and remains in danger in Mexico, terrified the cartel members, who have photos of her, will find her again, according to Las Americas Immigrant Advocacy Center. | https://www.humanrightsfirst.org/resource/file gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | robbery | 3 | Three Nicaraguan political dissidents, whom DHS twice expelled to Mexico in August 2021, have been strip-searched and robbed by Mexican government officials on multiple occasions. In mid-August 2021, DHS turned them over to INM officers who verbally abused them and deprived them of food in detention, forced them to strip naked, and stole their money and valuables. In late August 2021, Mexican police boarded a bus that the three were riding near the border with Yuma, Arizona, forced them off the bus, strip-searched them, adn stole their money. The dissidents remain in danger in Mexico, unable to access the U.S. asylum process, according to Anais Catalina, an advocate assisting them. | https://www.humanrightsfirst.org/resource/file gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |

CLP_PC_076269

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 10/21/2021 | rape | 1 | INM officers extorted and raped a Honduran asylum seeking woman immediately after the U.S. government expelled her to Reynosa in August 2021. She told Human Rights First that INM officers demanded payment from her and the others with whom she was expelled, threatening them with deportation, then locked the women in a separate room, forced them to remove their clothes, and raped them. "We did what they asked of us out of fear because they threatened to turn us over to a human trafficking network," she said. | https://www.humanrightsfirst.org/resource/ille gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | kidnapping | 3 | An INM officer in Tijuana kidnapped a Honduran family of three who had made multiple attempts to request U.S. asylum. The officer offered the family a ride then held them at gunpoint demanding money and information about U.S. family members. The officer handed the family over to men who held them captive, sexually abused and beat them so severely that one family member lost consciousness. They managed to escape but remain in danger in Mexico, according to Las Americas Immigrant Advocacy Center. | https://www.humanrightsfirst.org/resource/ille gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | extortion | 3 | Since August 2021, police officers in Tijuana have repeatedly extorted and threatened a Salvadoran asylum-seeking family blocked from seeking U.S. protection because of Title 42. The family told Human Rights First that they are terrified of encountering the officers, who have also threatened to deport them. | https://www.humanrightsfirst.org/resource/ille gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | rape, sexual assault, beatings | (counted in Al Otro Lado survey data above) | In September and October 2021, CBP has denied more than 15 humanitarian parole requests submitted by Al Otro Lado on behalf of its clients to the Del Rio, Eagle Pass, and San Ysidro ports of entry. These requests include: a Honduran woman who was raped by Mexican police, sex trafficked, and forced to work in massage parlor; a Central American asylum seeker who was beaten by Mexican police … Mexican LGBTQ+ siblings who were sexually assaulted …. | https://www.humanrightsfirst.org/resource/ille gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | kidnapping | 1 | A Mexican asylum-seeking woman committed suicide in October 2021 while stranded in Tijuana, unable to request U.S. asylum due to Title 42. Desperate for protection from cartels that had kidnapped, beaten, and tortured her in southern Mexico, the woman had attempted to cross the U.S. border between ports of entry twice, but was kidnapped near the border both times, according to Nicole Ramos, an attorney with Al Otro Lado. | https://www.humanrightsfirst.org/resource/ille gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | rape | 1 | A Central American child was raped in the Reynosa tent encampment in September 2021, according to Charlene D'Cruz, an attorney with Lawyers for Good Government. | https://www.humanrightsfirst.org/resource/ille gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | rape | 1 | A 14-year-old girl was raped in the Tijuana tent encampment in summer 2021. A Honduran asylum seeker who witnessed the rape told Human Rights First she had to flee the encampment because of further threats by the rapist. | https://www.humanrightsfirst.org/resource/ille gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | beating, attempted kidnapping | 3 | In late July 2021, armed men broke into the Tijuana shelter where a Honduran family was staying, beat the family, and attempted to kidnap the children. The family had fled death threats in Honduras by gang members who had violently raped the pregnant mother, causing her to miscarry. The family escaped but found that other shelters in Tijuana were full. They are now paying to rent a room and told Human Rights First they are terrified to go outside for fear of encountering the kidnappers. | https://www.humanrightsfirst.org/resource/ille gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | kidnapping | 1 | An asylum-seeking woman from Honduras was denied medical attention in Matamoros after injuring her leg escaping kidnappers and contracting gangrene that was so severe that a bone in her leg was visible. A doctor at a volunteer-run clinic had informed the woman that her leg would need to be amputated as she would die, but a hospital in Matamoros turned her away, claiming they lacked sufficient bedspace, according to Charlene D'Cruz, an attorney with Lawyers for Good Government. | https://www.humanrightsfirst.org/resource/ille gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/27/2021 | kidnapping | 4 | Cuatro ciudadanos nicaragüenses fueron secuestrados por supuestos integrantes de la organización criminal Los Zetas en México. Los nicas pretendían cruzar la frontera con los Estados Unidos. Según información de medios oficialistas los nicas son originarios del municipio de Corinto, en Chinandega. | https://radio-corporacion.com/blog/archivos/119723/cuatro-nicaraguenses-secuestrados-por-organizacion-criminal-los-zetas/ |

CLP_PC_076270

CLP_PC_076271

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 10/28/2021 | threats, assault | 3 | One family from Honduras arrived at KBI recently after attempting to unsuccessfully cross the border between Reynosa and McAllen. They were being followed by gang members in Honduras and could no longer stay. The mother and daughter were expelled separately from the father, and the father was beaten and robbed by alleged agents of Mexican immigration when he was expelled back into Reynosa. He was later threatened by the local mafia for walking in the wrong area. The family fled into southern Mexico because it was too dangerous for them to wait at the border. While they were there, they received threats from local organized crime and had to move again. They arrived in Nogales hoping to be able to stay safe here. They do not have the option to return, as they recently received news that the father's mother had been killed in Honduras after they had escaped, and several other family members had been threatened. | Communication from Kino Border Initiative |
| 10/31/2021 | kidnapping | 25 | Mexican military personnel liberated 25 kidnapped migrants from a house in Matamoros. | https://www.hoytamaulipas.net/notas/474405/Rescatan-a-25-migrantes-en-Matamoros.html |
| 11/8/2021 | kidnapping | 4 | In spring 2021, armed men kidnapped a group of Honduran women and children who had been waiting in Nogales for the opportunity to request U.S. asylum, forcing them into cars. One mother and her three-year-old daughter managed to escape and ran into a convenience store. Someone in the store escorted the family to a taxi, but the kidnappers followed the family until they arrived at the Kino Border Initiative office. | https://www.humanrightsfirst.org/sites/default/files/BorderRestrictionsLift%2CBlockingAsylumSeekersContinues.pdf |
| 11/8/2021 | kidnapping, assault | 1 | A Guatemalan asylum-seeker was kidnapped soon after DHS expelled him and his seven-year-old daughter near the Lukeville port of entry at night in spring 2021. When the man went to buy food for his daughter, four men covered his face with a cloth, beat him, and held him captive for 15 days, during which time his daughter was forced to enter the United States alone. | https://www.humanrightsfirst.org/sites/default/files/BorderRestrictionsLift%2CBlockingAsylumSeekersContinues.pdf |
| 11/8/2021 | attempted kidnapping, assault | 5 | A Mexican asylum-seeking family with three young daughters, ages eight, five, and two, who remain blocked from protection due to Title 42, narrowly escaped an attempted kidnapping in Nogales in October 2021. Three men dressed in black in a truck rushed the family, threatening to take the children. The mother and children managed to flee to a hotel while the father fought off the attackers, sustaining neck and back injuries for which he required hospital treatment. | https://www.humanrightsfirst.org/sites/default/files/BorderRestrictionsLift%2CBlockingAsylumSeekersContinues.pdf |
| 11/8/2021 | kidnapping, assault | 1 | In fall 2021, for instance, an asylum-seeking teenage child told Florence Project that members of an organized criminal group had kidnapped and tortured him near Nogales. | https://www.humanrightsfirst.org/sites/default/files/BorderRestrictionsLift%2CBlockingAsylumSeekersContinues.pdf |
| 11/8/2021 | assault, robbery | 2 | Florence Project has also assisted several Mexican teenagers who had been assaulted, beaten, and robbed in Nogales after CBP officers turned them away from the port of entry. | https://www.humanrightsfirst.org/sites/default/files/BorderRestrictionsLift%2CBlockingAsylumSeekersContinues.pdf |
| 11/9/2021 | kidnapping | 49 | El Instituto Nacional de Migración Reynosa, de México, informó que rescataron a 49 migrantes secuestrados. Estaban en una casa a ocho kilómetros (km) de EE.UU. La Marina de México informó que localizó el lugar del secuestro gracias a una denuncia anónima. Había tres menores. | https://twitter.com/Sanchezmendieta/status/1458141287941492737 |
| 11/12/2021 | kidnapping | 2 | Cada segundo que pasa, incrementa la angustia en la familia Pravia Ruiz en la ciudad de Matagalpa, Nicaragua, porque Flor de María Pravia Ruiz y su sobrino Lesther Daniel Mejía Pravia, dos matagalpinos que están secuestrados en México y sus captores dieron un plazo de 72 horas, que vence este sábado 13 de noviembre, para que les envíen 13,000 dólares para liberarlos. | https://mosaicocsi.com/angustia-por-matagalpinos-secuestrados-en-mexico/ |
| 11/15/2021 | kidnapping, assault | 1 | Fabiola del Socorro Picado Cruz, a Nicaraguan woman, was kidnapped and held for ransom in Reynosa | https://www.facebook.com/1139797803451371/posts/430756748667437 |
| 11/17/2021 | kidnapping | 54 | En Nogales, Sonora, una denuncia anónima permitió rescatar a medio centenar de migrantes originarios de Honduras, Guatemala y Nicaragua. En total fueron 54 los migrantes rescatados. | https://noticieros.televisa.com/ultimas-noticias/rescatan-migrantes-centroamericanos-secuestrados-en-nogales-sonora/ |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 11/18/2021 | kidnapping | 2 | Policías de Investigación adscritos a la Fiscalía de Distrito Zona Norte, llevaron a cabo un operativo para rescatar a dos personas originarias de Guatemala que supuestamente estaban privadas de la libertad, en una vivienda de la colonia Galeana | https://diario.mx/juarez/liberan-a-migrantes-secuestrados-y-torturados-en-la-galeana-arrestan-a-dos-20211118-1863976.html ; https://actualidad.rt.com/actualidad/410836-policia-mexicana-rescata-ciudad-juarez-migrantes-secuestrados |
| 11/18/2021 | rape | 1 | A mother and her daughter fled El Salvador after being abused by a public official. When the mother reported the crimes, her abuser attempted to imprison her, but she managed to escape and flee the country. With no access to asylum at ports of entry, she attempted to cross without inspection between Reynosa, Tamaulipas and McAllen, Texas so that she could turn herself in to immigration agents and request asylum while in their custody. She was kidnapped by her smugglers, held for several days without food, and raped before she was rescued by police. She managed to cross into the U.S. where she attempted to request asylum but was ignored. She was expelled into Nogales, Sonora and had no social support, putting her and her daughter in a state of homelessness while they waited for the border to open. | Communication from Kino Border Initiative |
| 11/19/2021 | kidnapping | 27 | Rescatan a 27 migrantes secuestrados en un hotel de Ciudad Juárez | https://www.telemundo.com/noticias/noticias-telemundo-en-la-noche/inmigracion/video/rescatan-27-migrantes-secuestrados-en-un-hotel-de-ciudad-juarez-tmvo10300754 |
| 11/19/2021 | kidnapping | 12 | Policías municipales de Ciudad Juárez y agentes de la Fiscalía de Chihuahua rescataron a 12 migrantes las últimas 24 horas, incluidas dos mujeres y un menor de edad, en tres operativos distintos en un hotel, una casa de seguridad y en la zona desértica entre los municipios del Valle de Juárez y Ojinaga colindante al río Bravo. | https://www.jornada.com.mx/notas/2021/11/19/estados/rescatan-a-12-migrantes-en-tres-operativos-en-chihuahua/ |
| 11/20/2021 | kidnapping | 3 | Ana Gabriela Nicaragua Lopez, a Nicaraguan political dissident, was kidnapped with her husband and son by the Cartel de Juarez. | https://noticieros.televisa.com/ultimas-noticias/liberan-a-opositora-de-nicaragua-secuestrada-en-mexico/ |
| 11/21/2021 | kidnapping, extortion | 12 | Julio Ampié, who had been a political prisoner in Nicaragua, was kidnapped in Reynosa with his wife and two children in July 2021. INM had previously extorted him for $600 in El Guasuale. Mexican police entered the hotel room where they were staying in Reynosa, loaded them into a van, and brought them to a small house where there were more migrants, then sold them to a cartel for $3,000. In October 2021, 7 Nicaraguan victims, including Gerlenis Jimenez and Maria Teresa Delgadillo, were freed after $70,000 of ransom was paid to the kidnappers. Melvin Francisco Martinez was kidnapped at the end of August 2021 and managed to escape after 10 days. | https://www.laprensa.com.ni/2021/11/21/suplemento/la-prensa-domingo/2913189-nicas-secuestrados-cuando-el-sueno-americano-se-convierte-en-pesadilla |
| 11/22/2021 | kidnapping | 5 | Al arribar al lugar del reporte, escucharon gritos de auxilio de varias personas provenientes de una de las habitaciones de la casa; procedieron al rescate de cinco indocumentados, quienes manifestaron que los propietarios de la vivienda los tenían privados de su libertad desde hacía más de cinco días, por lo que fueron resguardados y puestos a salvo. | https://diario.mx/juarez/liberan-a-migrantes-secuestrados-20211121-1865181.html |
| 12/3/2021 | kidnapping | 3 | Tras un reporte de personas privadas de su libertad en un domicilio ubicado en el cruce de las calles Isla Jasu y Ramón Aranda, en la colonia Chihuahua, elementos policíacos arribaron al lugar. Al llegar los oficiales escucharon gritos de ayuda provenientes del domicilio, por lo que de inmediato ingresaron y encontraron a tres hombres quienes argumentaron ser migrantes y que tenían una semana retenidos en contra de su voluntad en dicho inmueble, por dos sujetos, los cuales les pidieron dinero a sus familiares a cambio de su libertad, acumulando un total de 15 mil dólares. | https://www.arnoticias.com.mx/pub/287347utm_source=dlvr.it&utm_medium=twitter |
| 12/3/2021 | kidnapping | 2 | La Policía Municipal de Tijuana detuvo a Eduardo "N", pollero que mantuvo secuestrados a dos migrantes con engaños, prometiendo que los cruzaría a Estados Unidos sin documentos. | https://www.facebook.com/104805888231365/posts/305050192281/ |

PC_076272

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

CLP_PC_076273

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 12/3/2021 | rape, sexual assault, kidnapping, human trafficking, armed robbery, beatings | 679 | Asylum seekers from Cuba, El Salvador, Guatemala, Haiti, Honduras, Nicaragua, Venezuela and other countries who were expelled or blocked from seeking U.S. asylum due to Title 42 reported having been the victim of a violent attack or attempted attack in Mexico in the last month in an ongoing electronic survey conducted by Al Otro Lado. | Human Rights First review of survey data received by Al Otro Lado between September 14 and December 2, 2021. |
| 12/5/2021 | kidnapping | 5 | Cinco migrantes procedentes de Guatemala y del estado de Veracruz fueron secuestrados por un chofer de taxi en el aeropuerto internacional Abraham González de Ciudad Juárez, estuvieron retenidos en una vivienda de la colonia Villas de Alcalá durante cinco días, hasta que policías municipales concretaron su rescate, informó este lunes la Secretaría de Seguridad Pública Municipal (SSPM). | https://www.jornada.com.mx/notas/2021/12/13/estados/autoridades-de-juarez-liberan-a-5-migrantes-de-guatemala-secuestrados/ |
| 12/7/2021 | kidnapping | 2 | Dos nicaragüenses más fueron secuestrados en México por uno de los carteles considerados como los más peligrosos: Los Zetas. Se trata de Bismarck José Contreras y Erling Francisco Tinoco, originarios de Estelí. Ambos huían del asedio. | https://nicaraguainvestiga.com/nacion/68655-cartel-mexicano-secuestra-a-nicas-que-huian-de-persecucion-politica/ |
| 12/9/2021 | kidnapping | 2 | A Nicaraguan asylum seeker and his adult son were kidnapped in December 2021 and held for 7 days until their family paid ransom after CBP expelled them to San Luis Colorado, Mexico under Title 42, according to the man's nephew, who is also seeking asylum. | HRF interview with asylum seeker |
| 12/11/2021 | kidnapping | 3 | La Fiscalía de Distrito zona Norte obtuvo la auto de vinculación a proceso en contra de Brayan Jasiel R.C., al acreditar su posible participación en el delito de secuestro, cometido en agravio de tres personas migrantes en Ciudad Juárez. Durante la audiencia inicial, el agente del Ministerio Público expuso ante el órgano jurisdiccional que el imputado realizó actos de violencia física y moral en contra de tres masculinos de origen extranjero, quienes fueron retenidos y amenazados para que familiares depositaran importantes cantidades de dinero a cambio de su libertad | https://www.elheraldodejuarez.com.mx/policiaca/procesan-a-imputado-por-secuestro-de-tres-personas-migrantes-ciudad-juarez-7596616.html |
| 12/12/2021 | kidnapping | 50 | Los municipios encontraron a 50 centroamericanos: 34 adultos y 16 menores de edad, entre ellos un bebé de un año y seis meses. En total, 35 mujeres. | https://jornadabc.com.mx/region/liberan-a-50-en-n// |
| 12/18/2021 | kidnapping | 1 | La Fiscalía de Distrito Zona Norte en Chihuahua obtuvo un auto de vinculación a proceso en contra de los imputados José 'R' y Adanber 'C' por el delito de secuestro agravado de una persona migrante, a quien mantuvieron en cautiverio en un domicilio de la colonia Del Carmen en Ciudad Juárez. | https://www.milenio.com/estados/chihuahua-vinculan-proceso-responsables-secuestro-migrante |
| 12/20/2021 | kidnapping/pot ential murder | 13 | Trece migrantes que fueron secuestrados en Chihuahua pudieron haber sido asesinados durante una guerra territorial entre cárteles de drogas, un señal más de un conflicto cada vez más violento entre bandas rivales por las rutas de contrabando en este estado del norte de México que colinda con Texas, según fuentes mexicanas y estadounidenses. | https://www.dallasnews.com/espanol/al-dia/inmigracion/2021/12/20/temen-que-13-migrantes-hayan-sido-asesinados-por-carteles-en-la-frontera-entre-texas-y-chihuahua/ |
| 12/21/2021 | kidnapping, extortion | 2 | Two migrants were held captive against their will in Tijuana by a man demanding ransom for their release. | https://www.facebook.com/104805888231365/posts/305058074872811 |
| 12/21/2021 | kidnapping | 1 | De acuerdo a la información proporcionada por la víctima de origen peruano, los referidos detenidos lo mantuvieron en cautiverio en un domicilio de las calles Níquel y Joaquín Terrazas de la colonia Del Carmen, de donde logró escapar. | https://www.elheraldodejuarez.com.mx/policiaca/migrante-secuestrado-se-escapa-y-encuentra-a-policias-arrestan-2-polleros-7638283.html |
| 12/21/2021 | kidnapping | 5 | Dos hombres fueron vinculados a proceso por el secuestro de cinco migrantes en la colonia Villas de Alcalá, informó la Fiscalía Zona Norte. De acuerdo con el report, Juan de Dios H.S. y Jamie Daniel C.M. amenazaron a las víctimas con un arma y las mantuvieron en cautiverio, exigiendo a los familiares despositos dinero a cambio de su liberacion. | https://netnoticias.mx/juarez/los-vinculan-a-proceso-por-secuestrar-a-migrantes/ |
| 12/27/2021 | kidnapping | 27 | Noviembre no fue el mejor mes para intentar cruzar a Estados Unidos. Unos 27 nicaragüenses sufrieron secuestro, al menos cinco familias enteras entre ellos y sus familiares en el país en vez de recibir remesas tal y como lo esperaban al despedirlos, se vieron obligados a buscar dinero para salvar sus vidas. | https://nicaraguainvestiga.com/nacion/70633-nacion-al-menos-27-nicas-secuestrados-en-30-dias/ |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 1/1/2022 | murder | 1 | Un hombre haitiano, identificado como Casseus Franck, fue asesinado el fin de semana en Tijuana, Baja California, y su cuerpo identificado por el Servicio Médico Forense (Semefo), pero hasta ahora ningún familiar ha reclamado su cuerpo. Franck fue asesinado cerca de las 15:00 horas del sábado, cuando el o los agresores le dispararon en la cabeza al migrante. El ataque ocurrió en el puente peatonal "México", entre la calle Miguel Negrete y vía Rápida Poniente, en la zona centro de Tijuana. | https://www.reforma.com/aplicacioneslibre/preacceso/articulo/default.aspx?__rval=1&urlredirect=/identifican-a-haitiano-asesinado-nadie-lo-reclama/ar2325510?referer=--7d616165662f3a3a62626623b2267b60657a6770737467787743b76783a-- |
| 1/4/2022 | kidnapping | 4 | Familiares de cuatro nicaragüenses que fueron secuestrados a mediados de diciembre de 2021 por una banda criminal en México, pagaron 12 mil dólares para lograr la liberación de los jóvenes que salieron del país para cumplir el sueño americano. | https://jpnicaragua.com/pagaron-12-mil-dolares-para-liberar-a-migrantes-nicaraguenses-secuestrados-en-mexico/ |
| 1/4/2022 | kidnapping | 30 | Alberto Xicoténcatl, director de la Casa del Migrante informó en el año 2021 se registraron alrededor de 15 secuestros de migrantes, sobre todo en municipios fronterizos como Acuña y Piedras Negras. No obstante, en cada uno de estos casos, hubo más de una víctima de secuestro. | https://www.elsiglodetorreon.com.mx/noticia/2022/en-2021-hubo-alrededor-de-15-secuestros-de-migrantes-en-coahuila.html |
| 1/10/2022 | kidnapping | 1 | A Honduran asylum seeker was kidnapped near the Reynosa tent encampment by men who forced him into a van and held him captive until his employer negotiated for his release. DHS had expelled the man to Reynosa under Title 42 in October 2021 after he had requested U.S. asylum. | HRF communication with asylum seeker |
| 1/13/2022 | kidnapping | 1 | In January 2022, a 19-year-old Honduran woman was kidnapped from an informal tent encampment in Reynosa while blocked from seeking asylum due to the Title 42 policy, according to Charlene D'Cruz, an attorney with Lawyers for Good Government. | https://www.humanrightsfirst.org/resource/shameful-record-biden-administration-use-trump-policies-endangers-people-seeking-asylum |
| 1/13/2022 | kidnapping | 1 | DHS used Title 42 to expel to Mexico an 18-year-old Nicaraguan political dissident who had twice been kidnapped there, leaving him stranded in danger. In November 2021, in the Mexican border city of Nogales, the young man managed to escape the second kidnapping and flee across the border to request asylum. But DHS officers expelled him back to Nogales using Title 42, where he remains in hiding from his kidnappers, according to KBI | https://www.humanrightsfirst.org/resource/shameful-record-biden-administration-use-trump-policies-endangers-people-seeking-asylum |
| 1/13/2022 | kidnapping | 1 | A Honduran asylum seeker is stranded in danger in Tijuana where Mexican immigration agents turned him over to a cartel that held him hostage in horrendous conditions for days following his expulsion under Title 42 to Mexico. He told Human Rights First that the kidnappers beat other migrants in front of him, killing one, and that he was only released after his family paid ransom. The man had fled threats in Honduras by gang members who murdered his father | https://www.humanrightsfirst.org/resource/shameful-record-biden-administration-use-trump-policies-endangers-people-seeking-asylum |
| 1/13/2022 | kidnapping, assault | 2 | A transgender Honduran woman, who was expelled by DHS to Mexico under Title 42 even though she had been kidnapped there with another transgender woman who remains missing, is stranded in danger in Mexico. The woman managed to escape after being kidnapped in Ciudad Juárez in summer 2021 with her friend. When the woman, who had fled torture and threats in Honduras due to her gender identity, attempted to request asylum at the border, a DHS officer told her "the border is closed" and that the United States is "not giving asylum." After being expelled to Mexico, the woman was immediately beaten and robbed, and a Mexican police officer refused to take her complaint. She told Human Rights First that she does not know if her friend, who was unable to escape the kidnapping, is still alive | https://www.humanrightsfirst.org/resource/shameful-record-biden-administration-use-trump-policies-endangers-people-seeking-asylum |
| 1/13/2022 | kidnapping | 2 | A Central American asylum-seeking woman and her children, who were kidnapped and held for ransom for eight days in August 2021, remain in danger in Reynosa due to Title 42 restrictions on asylum at the border. The woman told Human Rights First that uniformed men she believed to be Mexican police officers had forced her family off a bus and turned them over to the cartel that held them captive. | https://www.humanrightsfirst.org/resource/shameful-record-biden-administration-use-trump-policies-endangers-people-seeking-asylum |
| 1/13/2022 | attempted kidnapping | 2 | In November 2021, a Honduran woman and her five-year-old son escaped a kidnapping attempt by armed men who chased them soon after DHS returned the family to Reynosa under Title 42. The woman told Human Rights First that she had entered the United States to seek asylum after fleeing death threats by gang members who killed her relatives in Honduras. | https://www.humanrightsfirst.org/resource/shameful-record-biden-administration-use-trump-policies-endangers-people-seeking-asylum |
| 1/13/2022 | kidnapping, rape, assult | (counted in Al Otro Lado survey data above) | A Haitian man reported in late November 2021 that he and his family were kidnapped, beaten, and robbed in Mexico, and his wife raped in front of their child. The man provided his account in a survey conducted by Al Otro Lado of migrants and asylum seekers stranded in Mexico due to current policies restricting access to asylum in the United States. | https://www.humanrightsfirst.org/resource/shameful-record-biden-administration-use-trump-policies-endangers-people-seeking-asylum |

CLP_PC_076274

CLP_PC_076275

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 1/13/2022 | assault, robbery | (counted in Al Otro Lado survey data above) | 196 Haitians reported abuse by Mexican police within the past month. A Haitian migrant wrote, "The police have threatened me at gunpoint many times, abused me, and stolen money from me and because of this I am afraid to walk in the street in Mexico." Other Haitian migrants targeted by Mexican authorities include a man robbed at gunpoint by Mexican police, a migrant robbed by knife-wielding police officers, and a migrant who could not afford food for days after uniformed Mexican officers robbed him. | https://www.humanrightsfirst.org/resource/sh ameful-record-biden-administration-s-use-trump-policies-endangers-people-seeking-asylum |
| 1/13/2022 | kidnapping | 1 | A 19-year-old Honduran woman with a high-risk pregnancy who was initially denied humanitarian parole in December 2021 went missing by the time CBP reconsidered its faulty decision. The woman who was eight-months pregnant and experiencing severe bleeding, had been denied medical treatment in Ciudad Acuña and attempted three times to enter the United States to seek protection. Each time she was expelled by DHS to Ciudad Acuña under Title 42. By the time CBP reversed its initial parole denial following advocacy by Charlene D'Cruz, an attorney with Lawyers for Good Government, the woman had disappeared and remains missing as of January 2022. | https://www.humanrightsfirst.org/resource/sh ameful-record-biden-administration-s-use-trump-policies-endangers-people-seeking-asylum |
| 1/13/2022 | kidnapping | 1 | In December 2021, a Nicaraguan asylum seeker who was kidnapped and tortured by electrocution and beatings for three weeks in Reynosa in November 2021 did not pass a RMX non-refoulment interview and was returned to Ciudad Juárez by CBP under RMX. The man reported to Human Rights First that photos and audio recordings of the kidnappers beating him were sent to his aunt in the United States, demanding a $5,000 ransom and threatening to "cut him to pieces" if she did not pay. | https://www.humanrightsfirst.org/resource/sh ameful-record-biden-administration-s-use-trump-policies-endangers-people-seeking-asylum |
| 1/13/2022 | kidnapping | 1 | A Nicaraguan asylum seeker, who had been kidnapped and held for ransom in Mexico after being expelled there under Title 42, did not pass an RMX non-refoulment interview and was returned to Ciudad Juárez by CBP in December 2021. The man told the asylum officer conducting the fear interview that he had been kidnapped near the border after being expelled by DHS under Title 42, held captive for eight days, and denied food for more than 24 hours until his family paid a $3,000 ransom. "They said, 'if you don't pay, we'll kill you,'" he told Human Rights First. Mexican police had also twice extorted the man. On one occasion, the Mexican police officers, who extorted and threatened him and other migrants on a bus, abducted two migrant girls. | https://www.humanrightsfirst.org/resource/sh ameful-record-biden-administration-s-use-trump-policies-endangers-people-seeking-asylum |
| 1/13/2022 | kidnapping | 2 | A Honduran asylum seeker and her son, who were subjected to RMX 1.0, were kidnapped for a second time in Mexico in summer 2021 while waiting to be removed from the program and held in horrific conditions for months. The woman developed a painful neurological condition in captivity that caused half of her face to become paralyzed. The family had previously been kidnapped and held for ransom immediately after the Trump administration returned them to Mexico under RMX in 2019. | https://www.humanrightsfirst.org/resource/sh ameful-record-biden-administration-s-use-trump-policies-endangers-people-seeking-asylum |
| 1/17/2022 | rape, kidnapping, human trafficking, armed robbery, beatings | 271 | Asylum seekers from Colombia, El Salvador, Guatemala, Haiti, Honduras, Nicaragua, Venezuela and other countries who were expelled or blocked from seeking U.S. asylum due to Title 42 reported having been the victim of a violent attack in Mexico in the past month in an ongoing electronic survey conducted by Al Otro Lado. | Human Rights First review of survey data received by Al Otro Lado between December 3, 2021 and January 7, 2022. |
| 1/17/2022 | kidnapping | 120 | Law enforcement in Mexico discovered 120 migrants bound and blindfolded in a cartel stash house in Ciudad Victoria, Tamaulipas. On Sunday, authorities searched the house after receiving a tip from the Embassy of Guatemala. The migrants were determined by authorities to be mostly from Nicaragua, Guatemala, and El Salvador. | https://www.breitbart.com/border/2022/01/17 /120-kidnapped-migrants-rescued-by-mexican-authorities/ |
| 1/22/2022 | murder | 13 | Mexican police participated in a massacre last month that left 19 people dead, including at least 13 who appear to have been Guatemalan migrants on their way to the United States, a state prosecutor said late Tuesday. The victims were killed Jan. 22 in Camargo, close to the Texas border. | https://www.washingtonpost.com/world/the_a mericas/mexico-tamaulipas-police-migrant-killing/2021/02/03/32c22274-65c7-11eb-8468-21bc4807fe5_story.html |
| 2/3/2022 | kidnapping, attempted kidnapping | 2 | A Honduran man who came through KBI two weeks ago had passed through a city in the Mexican border state of Coahuila and was renting a room with other Honduran migrants when Mexican police entered their room and attempted to capture them. He managed to escape through a window, but one of his companions was taken. | Communication from Kino Border Initiative |

CLP_PC_076276

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 2/3/2022 | kidnapping | 1 | Manuel,* a Nicaraguan man fleeing political persecution, was kidnapped by Mexican police officers in two different cities while traversing the country. He was held in a police station for over 24 hours until the police received a $500 USD ransom payment from his family. With no regard for the fact that Manuel suffered two separate kidnappings by Mexican authorities, CBP expelled him back to Mexico without ever screening him for fear of return. | Communication from Kino Border Initiative |
| 2/7/2022 | assault, robbery | 2 | Un grupo de pandilleros despojaron de sus pertenencias a dos migrantes, a uno lo hirieron con un machete y a otro con un arma de fuego, por lo que tuvieron que ser trasladados de emergencia a un hospital en las primeras horas del lunes. | https://eldiariodecoahuila.com.mx/2022/02/07/asaltan-con-violencia-a-migrantes/ |
| 2/10/2022 | kidnapping | 2 | El Ejército Mexicano rescató en Nuevo Laredo, Tamaulipas, a quince personas que se encontraban privadas de su libertad en una casa de seguridad entre los cuales había mexicanos, estadounidenses y centroamericanos. En total fueron 15 los rescatados de los cuales 12 son mexicanos, 2 hondureños y un americano. | https://www.milenio.com/estados/tamaulipas-ejercito-rescata-15-migrantes-laredo |
| 2/10/2022 | sexual violence | 2 | La Comisión de Derechos Humanos del Estado de Tamaulipas (Codhet) pidió apoyo a las autoridades del DIF estatal para que se investigue los casos de presunta violencia sexual contra las niñas que están en el campamento de migrantes en Reynosa. | https://www.milenio.com/politica/comunidad/investigan-presunta-violencia-sexual-ninas-migrantes-reynosa |
| 2/12/2022 | kidnapping | 5 | La Fiscalía de Distrito Zona Norte, ejerció acción penal en contra de María Lucero C. H. y Manuel C. C., por su presunta responsabilidad penal en el delito de secuestro cometido en perjuicio de cinco personas de origen guatemalteco y hondureño cometido en Ciudad Juárez. | https://www.elheraldodejuarez.com.mx/policiaca/vinculan-a-pareja-por-secuestro-de-cinco-migrantes-en-juarez-7855937.html |
| 2/14/2022 | kidnapping | 18 | Juárez- Dos sujetos fueron detenidos durante el rescate de 18 migrantes a los que tenían privados de la libertad... además de portar armas y cartuchos... Siendo en ese momento que del interior del domicilio se escucharon gritos de auxilio por lo que al realizar una inspección localizaron a 18 migrantes, siendo 15 hombres y tres mujeres provenientes de El Salvador, Guatemala y del Estado de Chiapas, a quienes tenía retenidos en contra de su voluntad. | https://www.elheraldodejuarez.com.mx/policiaca/rescatan-a-18-migrantes-y-detienen-a-dos-sujetos-con-armas-y-cartuchos-7861674.html |
| 2/16/2022 | kidnapping | 3 | El ejercito en coordinación con migración rescataron a varias personas migrantes de diferentes nacionalidades que estaban privadas de su libertad por estás personas pedían la cantidad de 5 y 10 mil dólares por cada una,estos hechos fueron reportados por vecinos ya que mediante una llamada anónima hicieron saber que autoridades que habían personas secuestradas en una casa en Tamaulipas. | https://www.facebook.com/permalink.php?story_fbid=1256346533217968&id=107636665121595 |
| 2/17/2022 | extortion, threats | 1 | One person reported that her bus was stopped at a checkpoint outside of Altar, Sonora, ... and a Mexican police officer threatened to take her kids unless she paid him. | Communication from Kino Border Initiative |
| 2/17/2022 | attempted kidnapping | 2 | El domingo pasado un hombre que se identificó como esposo y padre de una familia intentó raptar a dos menores de edad de un albergue de Tijuana. | https://www.elimparcial.com/tijuana/tijuana/Temen-migrantes-denunciar-crimenes-20220216-0028.html |
| 2/28/2022 | kidnapping | 33 | Treinta y tres personas migrantes originarios de Guatemala, Nicaragua, Cuba y Panamá, fueron localizados y rescatados por agentes de la Fiscalía General del Estado, ya que se encontraban en condiciones inhumanas en una vivienda de la colonia Zaragoza, Chihuahua. | https://www.elsoldemexico.com.mx/republica/sociedad/rescatan-a-33-migrantes-que-estaban-encerrados-en-vivienda-7926650.html |
| 2/28/2022 | kidnapping | 2 | Esta banda criminal se caracterizó por ofrecerles a migrantes en Tijuana cruzarlos ilegalmente a EEUU, para luego secuestrarlos y exigirles a sus familiares que pagara los rescates en tiendas de California. Del 29 de marzo al 1 de junio de 2021, estos criminales utilizaron secciones específicas en Walmart y otras tiendas para reunirse con los familiares para cobrar los rescates. Los pagos oscilaron entre 12,000 y 30,000 dólares en efectivo. | https://www.univision.com/noticias/criminalidad/secuestro-migrantes-tijuana-frontera-rescates-mexico |
| 3/1/2022 | assault, robbery | 2 | A Mexican train worker was arrested in Piedras Negras for robbing migrants at gunpoint | https://www.facebook.com/permalink.php?story_fbid=1162879317802204&id=177665452990267 |
| 3/1/2022 | kidnapping | 150 | Más de 150 migrantes, víctimas de secuestro, abandonados por los "coyotes" o en espera de cruzar a Estados Unidos, han sido detectados en Ciudad Juárez durante 2022 por los elementos de la Secretaría de Seguridad Pública Municipal (SSPM) y la Fiscalía General del Estado (FGE). | https://diario.mx/juarez/liberaron-a-156-migrantes-en-dos-meses-20220228-1903248.html |

CLP_PC_076277

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 3/5/2022 | kidnapping | 13 | Un grupo de 13 migrantes originarios de Guatemala, El Salvador, Nicaragua, Chiapas y Chihuahua fueron asegurados por elementos de la Secretaría de Seguridad Pública Municipal, luego de que fueron encontrados en condiciones insalubres en una vivienda en la colonia Infonavit Jurado. | https://www.elsoldeparral.com.mx/local/juarez/encuentran-a-13-migrantes-en-condiciones-insalubres-en-ciudad-juarez-7951919.html |
| 3/7/2022 | kidnapping | 2 | Un migrante hondureño fue rescatado de las garras de un grupo de secuestradores en Piedras Negras, Coahuila, México, durante un operativo policial. Al llegar al lugar lograron rescatar a varios migrantes | https://www.elheraldo.hn/hondurenoenelmundo/rescatan-hondureno-secuestrado-traficantes-personas-coyote-mexico-piedras-negras-AF6272727 |
| 3/7/2022 | kidnapping | 3 | Una mujer extranjera embarazada, quien llegó a la Central Camionera, en donde se le acercó una persona que le ofreció una vivienda y cruzaría a Estados Unidos. "La llevaron a una colonia en donde la tuvieron un mes secuestrada, le hablaron a su familia y les pidieron 10 mil dólares"... "Hace días dos menores centroamericanos, de aproximadamente 14 años de edad, llegaron a la Casa del Migrante, temblando, sin zapatos, sin camisa. Se les atendió y nos dicen: nosotros habíamos estado secuestrados, se les pagó desde equis lugar para traernos aquí, pero aquí nos tenían secuestrados desde hace un mes, nos pudimos escapar y nosotros queremos comida y poder comunicarnos con nuestra familia" | http://radioabstereo.com/nota/21030_familia-jinotegana-es-secuestrada-en-mexico-los-delincuentes-piden-30-mil-dolares-para-liberarlos |
| 3/9/2022 | kidnapping | 6 | A Nicaraguan family of 6 with 2 young daughters was kidnapped in Reynosa, Mexico en route to the United States, where they'd planned to turn themselves in to U.S. immigration authorities. | https://diario.mx/juarez/enganchan-a-migrantes-desde-redes-sociales-20220307-1905766.html |
| 3/9/2022 | robbery, assault | 4 | A Honduran mother, her sister, and her two children were robbed and beaten in Piedras Negras while awaiting the opportunity to request U.S. asylum. | HRF communication with asylum seeker |
| 3/10/2022 | assault | 1 | A 62-year-old Colombian woman was shot near the Río Colorado at the border between Baja California and Sonora. | https://www.elsoldecuernavaca.com.mx/republica/sociedad/guardia-nacional-presuntamente-disparan-contra-mujer-migrante-en-san-luis-rio-colorado-7973571.html |
| 3/13/2022 | kidnapping, assault | 2 | Kidnappers abducted and tortured a pregnant Nicaraguan woman, Claudia Castro Andino, and her husband the day they were set to attempt to enter the United States in late February 2022. The woman was so severely beaten that she lost her baby. The couple remain in captivity. Castro Andino's husband sent an audio recording begging the family to meet the kidnappers' demand for a $15,000 ransom: "If we don't pay, they're going to kill us." Castro Andino pled, "mommy, don't let me die." | https://www.despacho505.com/joven-de-diriamba-secuestrada-en-mexico/ |
| 3/14/2022 | rape, kidnapping, human trafficking, armed robbery, beatings | 534 | Asylum seekers from Colombia, Cuba, El Salvador, Ghana, Guatemala, Haiti, Honduras, Nicaragua, Venezuela, and other countries who were expelled or blocked from seeking U.S. asylum due to Title 42 reported having been the victim of a violent attack in Mexico in the past month in an ongoing electronic survey conducted by Al Otro Lado. | Human Rights First review of survey data received by Al Otro Lado between January 7 and March 13, 2022. |
| 3/16/2022 | kidnapping, rape | 2 | Junior Almendarez, un inmigrante hondureño de 23 años, fue engañado por malas amistades en Los Ángeles y sin saberlo terminó involucrado con una banda de secuestradores de Tijuana que tuvo en cautiverio a varias personas que esperaban cruzar sin autorización a California...Las víctimas de estos secuestros quedarán traumatizadas toda su vida... al menos dos mujeres víctimas fueron brutalmente violadas mientras estaban cautivas", describe un memorando de sentencia. "La conspiración de secuestro fue brutal y violenta, y se aprovechó de una población vulnerable". | https://www.univision.com/noticias/criminalidad/secuestro-migrantes-tijuana-frontera-rescates-mexico |
| 3/17/2022 | kidnapping, sexual assault | 1 | A humanitarian aid worker told Isacson that DHS had expelled to Nuevo Laredo a migrant woman even though she had previously been kidnapped and repeatedly sexually abused in captivity. | https://www.humanrightsfirst.org/sites/default/files/TwoYearsofSuffering.pdf |

CLP_PC_076278

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 3/17/2022 | robbery, assault | (counted in Al Otro Lado survey data above) | An LGBTQ asylum seeker stranded due to Title 42 in Ciudad Acuña reported through the Al Otro Lado survey in late February 2022 that police had stopped her and a female friend who were holding hands on the street, robbed, and groped them, threatening to rape them saying it would "take the lesbian out of them." | https://www.humanrightsfirst.org/sites/default/files/TwoYearsofSuffering.pdf |
| 3/17/2022 | kidnapping, rape | (counted in Al Otro Lado survey data above) | A Honduran man blocked from seeking asylum because of Title 42 reported to the Al Otro Lado survey in January 2022 that Mexican migration officials in Reynosa sold him and his wife to a cartel for $500 each and that cartel members raped his wife. | https://www.humanrightsfirst.org/sites/default/files/TwoYearsofSuffering.pdf |
| 3/17/2022 | assault, robbery, threats | (counted in Al Otro Lado survey data above) | In late January 2022, a Haitian woman in Matamoros reported to Al Otro Lado that Mexican police threatened to kill her and her five-year-old daughter, beat her husband, and stole the family's money. The police left the wounded man on the street and dumped the woman and her daughter in another city at night. | https://www.humanrightsfirst.org/sites/default/files/TwoYearsofSuffering.pdf |
| 3/17/2022 | assault, robbery, rape | (counted in Al Otro Lado survey data above) | A Black transgender asylum seeker reported through the Al Otro Lado survey in late January 2022 that Mexican police officers beat, robbed, and raped him, and jailed him for three days without food. | https://www.humanrightsfirst.org/sites/default/files/TwoYearsofSuffering.pdf |
| 3/17/2022 | attempted kidnapping, abuse | (counted in Al Otro Lado survey data above) | Asylum seekers from the Afro-Honduran Garifuna ethnic group reported to the Al Otro Lado survey multiple incidents of kidnappings and racist attacks by Mexican police while stranded in Mexico due to Title 42 including, a Garifuna Honduran man who recounted that he was nearly kidnapped in Piedras Negras and that police had attacked and racially abused him. | https://www.humanrightsfirst.org/sites/default/files/TwoYearsofSuffering.pdf |
| 3/17/2022 | kidnapping | (counted in Al Otro Lado survey data above) | A Salvadoran asylum seeker reported to Al Otro Lado in January 2022 that when she attempted to cross the border near Piedras Negras with a group of other asylum seekers, men kidnapped the woman and her four-year-old daughter separating them from the woman's nine-year-old son who managed to reach safety in the United States. | https://www.humanrightsfirst.org/sites/default/files/TwoYearsofSuffering.pdf |
| 3/17/2022 | assault, extortion | 2 | A young Haitian man who arrived in Nogales with his girlfriend last week reported that on the bus ride northbound through Mexico, an organized crime group stopped them and ordered all Haitians to get off the bus. They then held them captive and ordered each one to pay $3,000 to be released and continue north. When he refused to pay, members of the organized crime group beat him. | Communication from Kino Border Initiative |
| 3/21/2022 | kidnapping | 1 | "Mexican immigration [in Nuevo Laredo] turned us over to some men who supposedly were going to help us but who instead kidnapped us. They took us to a hotel of theirs, supposedly of the cartel. They called my family for a deposit of $5,000... During this time I was held in a small house... It was horrible. In two rooms we were about 50 people with one bathroom. The rooms were about three or four meters squared. They required us to lay down like we were sleeping the whole time, not walking or stretching, because they were afraid we would run. They gave us to eat only sometimes, around one time a day a burrito. There were days when they didn't give us anything. There were three to four armed guards at all times." | Communication from Migrant Center for Human Rights; https://twitter.com/AriMSawyer/status/150599 3814112018434?t=qONZw3i1an1iDL6-PFLzw&s=09 |
| 3/21/2022 | kidnapping | 1 | Statement of an asylum seeker who was pregnant and sick when Border Patrol expelled her to Tamaulipas where the Mexican police turned her over to the cartel. The cartel kidnapped her for 20 days during which she and her unborn baby nearly died. | |
| 3/26/2022 | kidnapping | 2 | Recupero aquí la historia narrada por una mujer con su hijo menor de edad, venidos de Guatemala, quienes llegaron a México en una de las varias caravanas de migrantes centroamericanos durante el año 2021. La solicitud de asilo de la mujer fue rechazada por el gobierno de Estados Unidos, por lo que ella decide aventurarse a cruzar de manera no documentada; posteriormente ella y su hijo fueron devueltos a México a través de la frontera tamaulipeca donde: "En Nuevo Laredo, de ahí en el puente dos fuimos secuestrados tres meses yo y mi hijo...Mi hermana pagó y [los malos] nos encerraron en una bodega, no comíamos casi nada, días que sí comíamos, días que no nos gritaba de cosas, nos trataba muy mal y a mí hijo igual" | https://www.milenio.com/opinion/varios-autores/corredor-fronterizo/la-violencia-que-no-vemos-contra-los-migrantes |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 3/28/2022 | attempted kidnapping | 2 | Ramiros and her family were among the people taken on a bus to a shelter from the camp. But after the bus arrived, she was told that the shelter was already full, she said. Someone gave her enough money to get to a park near downtown Tijuana, where she lived for a week until someone tried to kidnap her 2-year-old daughter...Pancho, a 21-year-old from Honduras...has been expelled from the United States 11 times after trying to cross to seek asylum along the Texas border, he said. The last time he tried, he ended up kidnapped for weeks before he was let go and made his way to Tijuana. | https://www.sandiegouniontribune.com/news/immigration/story/2022-03-27/asylum-seekers-tijuana-tent-camp |
| 3/29/2022 | kidnapping | 7 | Solamente en 2021, al menos unos 30 jóvenes de Lucerna emprendieron viaje rumbo a Estados Unidos, según los lugareños, y siete de esos migrantes fueron secuestrados en el norte de México. | https://www.agenciaocote.com/blog/2022/03/29/el-temor-al-secuestro-no-detiene-el-exodo-de-un-pais-atormentado/ |
| 3/29/2022 | kidnapping | | Tres migrantes originarios de Nicaragua, presuntamente fueron secuestrados cuando intentaban cruzar de manera irregular hacia los Estados Unidos (EE. UU.), por la frontera norte de México en el estado de Coahuila, por el Río Bravo. | https://trincheradelanoticia.com/2022/03/29/reportan-secuestro-de-tres-migrantes-nicaraguenses-en-la-frontera-norte-mexico-ee-uu/ |
| 3/29/2022 | kidnapping | | Border Patrol expelled a young Guatemalan woman to Nogales, Mexico last week despite the fact that she had been repeatedly raped by the guides that brought her across the border into the US. Her attackers threatened her life if she went to the authorities. One Border Patrol agent insinuated that the woman was lying about the attack, and tried to convince her not to undergo a forensic examination that would verify the abuse. When she showed paperwork from the hospital examination to a Border Patrol agent as proof of the attack, asking that he not send her back to Mexico, the Border Patrol agent confiscated the paperwork and did not return it to her. | Communication from Kino Border Initiative |
| 3/31/2022 | rape | 1 | Alrededor de las 14:00 horas del martes una mujer hondureña ingresó a hospital asegurando haber sido víctima de 6 hombres, a quienes identificó como migrantes que esperaban para cruzar el Río Bravo y alcanzar el sueño americano. De acuerdo a lo mencionado por la mujer afectada, quien asegura tener siete meses de embarazo, se encontraba con un grupo de migrantes esperando por cruzar cuando seis de ellos decidieron atacarla; tras escapar se dirigió de inmediato al nosocomio para su valoración médica y de su bebé. | https://noticiasnrt.com/2022/04/03/seis-hombres-la-atacaron-obligan-a-migrante-hondurena-abuso-sexual-en-piedras-negras/ |
| 4/3/2022 | rape | 1 | Once Haitians arrive in Tijuana, they continue to experience violence, harassment, and racism. 16.3% (20 total) of interviewees shared experiences of violence in Mexico, including robbery at knife point, assault, and attempted kidnapping. At least two individuals witnessed someone attacked in front of them...Peerson was beaten in Brazil and in Mexico. In Brazil, his ear was bitten off after someone attacked him. In Tijuana, he called the police one day when he thought he was in danger, but when the police arrived, they beat him and knocked out his bottom teeth. | https://cgrs.uchastings.edu/sites/default/files/Tijuana%20Factsheet_2022.04.07%20FINAL%20v2_0.pdf |
| 4/7/2022 | assault, robbery, attempted kidnapping | 20 | | |
| 4/18/2022 | armed threats | 1 | Reynosa, México -- Los migrantes están ansiosos por que termine el Título 42... Un niño de 8 años le dijo a su madre que se quería morir, semanas después de que lo salvó de un pandillero armado. | https://www.dallasnews.com/espanol/al-dia/dallas-fort-worth/2022/04/18/aumentan-campamentos-de-migrantes-en-reynosa-a-semanas-de-fin-de-titulo-42/ |
| 4/19/2022 | rape, kidnapping, human trafficking, armed robbery, beatings | 265 | Asylum seekers from Colombia, El Salvador, Guatemala, Haiti, Honduras, Nicaragua, and Venezuela who were expelled or blocked from seeking U.S. asylum due to Title 42 reported having been the victim of a violent attack in the past month in an ongoing electronic survey conducted by Al Otro Lado. | Human Rights First review of survey data received by Al Otro Lado between March 14, 2022 and April 18, 2022. |
| 4/20/2022 | rape | 2 | "Yesterday I spoke to a trans man from Honduras who has been waiting in MX for Biden to restore asylum in the U.S. While POTUS kept the border closed to asylum seekers, he and his girlfriend were raped by men who targeted them for their queerness and gender expression. Before raping them, the men taunted the couple by asking "who is the man and who is the woman." They asked my new acquaintance, "What are you?" Then they said they were going to teach them how to be women." | https://twitter.com/AriMSawyer/status/1516784901860720642 |
| 4/20/2022 | attempted kidnapping, extortion | 2 | A Central American woman and her 5-year-old daughter escaped an attempted kidnapping by a taxi driver in Piedras Negras while awaiting the opportunity to seek U.S. asylum. Cauhuila police also beat and extorted her, threatening her with deportation. | Human Rights First communication with asylum seeker |

CLP_PC_076279

CLP_PC_076280

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 4/25/2022 | assault, extortion | 1 | A gay asylum seeker fleeing Honduras told Human Rights Watch he was extorted by Mexican immigration officials several times. The Mexican police also once beat him while using anti-gay slurs. When he tried to seek asylum in March of 2021, he affirmatively told border agents that he is gay and was afraid to be returned to Mexico and his country of origin. They nonetheless expelled him in a matter of hours to Palomas, Chihuahua, a small town about two hours from Ciudad Juarez. | Human Rights First communication with Ari Sawyer, Human Rights Watch researcher |
| 4/25/2022 | kidnapping | 1 | A Honduran asylum seeker was kidnapped in mid-March 2022 in Piedras Negras by men in a vehicle that approached him on the street. He was held with other kidnapping victims and later released. | Human Rights First communication with Joy Olson of WOLA. |
| 4/25/2022 | kidnapping, rape | (counted in Al Otro Lado survey data above) | A lesbian asylum seeker from El Salvador, who is stranded in Tijuana due to Title 42, was kidnapped and repeatedly raped after DHS expelled her to Mexico. She reported the attack to Al Otro Lado in late March 2022. | https://www.humanrightsfirst.org/resource/ext ending-title-42-would-escalate-dangers-exacerbate-disorder-and-magnify-discrimination |
| 4/25/2022 | armed robbery | 1 | Because Title 42 is blocking access to asylum at ports of entry, a Haitian asylum seeker is stranded in danger with his wife and two-year-old child in Tijuana, where he was robbed at gunpoint in February 2022. He told Human Rights First that he is afraid to ask for asylum while Title 42 is still in place because afraid to be returned to Haiti, where he was shot at by an organized criminal group that been hired to kill him. | https://www.humanrightsfirst.org/resource/ext ending-title-42-would-escalate-dangers-exacerbate-disorder-and-magnify-discrimination |
| 4/25/2022 | kidnapping, threats | (counted in Al Otro Lado survey data above) | A Nicaraguan asylum seeker was raped in Reynosa by men who had kidnapped her and her four-year-old daughter and threatened to harm the girl. The woman reported to Al Otro Lado in April 2022 that she is not safe in Ciudad Juárez where police have repeatedly robbed and extorted her when she leaves the shelter where the family stays to purchase food. | https://www.humanrightsfirst.org/resource/ext ending-title-42-would-escalate-dangers-exacerbate-disorder-and-magnify-discrimination |
| 4/25/2022 | kidnapping, sexual abuse | (counted in Al Otro Lado survey data above) | An asylum-seeking woman from Guatemala and her six-year-old son were kidnapped by police in Ciudad Juárez who held them at gunpoint and sexually abused the woman. The family reported to Al Otro Lado in March 2022 that they remain stranded there unable to seek asylum due to Title 42, according to Al Otro Lado. | https://www.humanrightsfirst.org/resource/ext ending-title-42-would-escalate-dangers-exacerbate-disorder-and-magnify-discrimination |
| 4/25/2022 | kidnapping | 4 | A Honduran family expelled to Mexico under Title 42, where they had been kidnapped at knifepoint, remains in danger in Tijuana unable to request asylum. After DHS returned the family to Mexico under Title 42 in January 2022, the woman saw armed men watching her daughters. Fearing they planned to kidnap the girls, the family fled the area and now remains in hiding in a Tijuana shelter, terrified of going outside. | https://www.humanrightsfirst.org/resource/ext ending-title-42-would-escalate-dangers-exacerbate-disorder-and-magnify-discrimination |
| 4/25/2022 | kidnapping | (counted in Al Otro Lado survey data above) | A Salvadoran woman and three-year-old son, who are unable to seek asylum due to Title 42, were twice abducted in Mexico, denied food, and both were beaten by the kidnappers. The family reported through the Al Otro Lado survey that they remain stranded in Ciudad Juárez. | https://www.humanrightsfirst.org/resource/ext ending-title-42-would-escalate-dangers-exacerbate-disorder-and-magnify-discrimination |
| 4/25/2022 | assault | 1 | A Haitian man who had fled death threats in Haiti remains in danger in Tijuana, where he was attacked with a bat in February 2022 outside the Tijuana shelter where he is staying with his teenage daughter. The man told Human Rights First that people in the streets in Tijuana have made racist remarks to him and his daughter, including calling them "monkeys" and telling them to go back to their country. The family was previously expelled to Haiti under Title 42 in December 2021 and fears seeking U.S. asylum while Title 42 remains in place. | https://www.humanrightsfirst.org/resource/ext ending-title-42-would-escalate-dangers-exacerbate-disorder-and-magnify-discrimination |
| 4/25/2022 | robbery, extortion, threats | 2 | In March 2022 a Salvadoran mother and daughter, who had been expelled to Tijuana by DHS under Title 42 the prior month, were robbed, extorted, and threatened by Mexican officers in black uniforms. The woman told Human Rights First that the officers threatened to turn the family over to a cartel, if they refused to pay the extortion demand. | https://www.humanrightsfirst.org/resource/ext ending-title-42-would-escalate-dangers-exacerbate-disorder-and-magnify-discrimination |
| 5/10/2022 | kidnapping | 5 | An asylum-seeking family of five from Colombia was kidnapped and held for ransom in Reynosa by men who had promised to bring them to the United States. | https://www.debate.com.mx/migracion/El-Hueco-el-sitio-que-usan-los-migrantes-para-cruzar-de-Mexico-a-Estados-Unidos-20220510-0222.html |
| 5/11/2022 | kidnapping | 3 | 3 young Guatemalan women intending to enter the U.S. disappeared in Ciudad Juárez after leaving the shelter where they were staying. | https://lasillarota.com/estados/buscan-a-3-migrantes-adolescentes-salieron-de-un-albergue-en-cd-juarez-y-no-regresaron/648134 |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 5/20/2022 | shooting | 1 | In late May 2022, Ana, a 25-year-old Mexican asylum seeker, was hit in the neck by a stray bullet while shielding her children during a shootout near the shelter where she had been stranded due to Title 42. They reportedly had fled Michoacán to seek asylum in the United States after family members were kidnapped and killed. | https://www.elimparcial.com/tijuana/policiaca/Migrante-resulta-lesionada-por-bala-perdida-en-Tijuana-20220520-0013.html |
| 5/25/2022 | kidnapping | 2 | A Cuban man and his mother were kidnapped, tortured, and extorted by an organized criminal group in Ciudad Juárez. When they attempted to seek U.S. asylum, they were returned to Mexico under Title 42. | https://www.cnn.com/videos/spanish/2022/05/25/migrantes-secuestro-seguridad-violencia-perspectivas-mexico-titulo-42-caravana-crisis-migratoria-rey-rodriguez-pkg.cnn |
| 5/25/2022 | assault | 1 | A Honduran asylum seeker reported that the witnessed police in Piedras Negras punch another asylum seeker in the face until his nose was bleeding | Human Rights First interview with asylum seeker |
| 5/25/2022 | kidnapping | 1 | "A Salvadoran man fleeing a gang that threatened to kill him because he had reported them to the police in El Salvador is stranded in Piedras Negras due to Title 42 where he was nearly kidnapped one night by men in a black truck who tried to grab him as he approached a shelter." | https://twitter.com/KenniKizuka/status/1529115148853084419 |
| 5/25/2022 | assault | 1 | "Nearly every asylum seeker I spoke w/in Piedras Negras reported threats, beatings & extortion by local police. An older woman said she was thrown in a police car & hit in the back w/ a police stick." | https://twitter.com/KenniKizuka/status/1529151794302536644 |
| 5/26/2022 | armed robbery | 2 | A Colombian asylum-seeking woman and her two daughters were robbed of their money and luggage at gunpoint in Ciudad Acuña in May 2022. | Human Rights First interview with asylum seeker |
| 5/28/2022 | kidnapping, threats | 2 | A Cuban woman and her son were expelled to Mexico under Title 42 after an organized criminal group had kidnapped them in Ciudad Juárez in April 2022, held them captive, and tortured them for 26 days until their family members paid a $30,000 ransom. "They pointed a gun at my neck and they kneeled him in front of me, and if I didn't say what they told me to say, they would kill my son in front of me," the mother told CNN. | https://cnnespanol.cnn.com/video/migrantes-secuestro-seguridad-violencia-perspectivas-mexico-titulo-42-caravana-crisis-migratoria-rey-rodriguez-pkg/ |
| 5/30/2022 | kidnapping, rape | 17 | Irene, a Salvadoran asylum seeker, was kidnapped and raped with her 9-year-old daughter in Ciudad Juárez in spring 2022 along with 15 other Central American migrants. When Mexican municipal police arrived at the house where the family was being held captive for more than a month, Irene thought she was being rescued. Instead, police transported the family to another house, where the same organized criminal group continued to hold them captive. After a month in captivity, Irene and her daughter managed to escape the kidnappers and cross the border to seek U.S. asylum. DHS expelled them back to Ciudad Juárez under Title 42, where they were kidnapped for a second time. | https://piedepagina.mx/mama-por-que-nos-van-a-matar-el-infierno-del-secuestro-de-migrantes-en-mexico/ |
| 5/31/2022 | assault, kidnapping | 1 | One woman interviewed fled to the United States from Honduras, where she previously faced targeted violence for living openly as a lesbian woman, including one incident when someone cut her face, leaving a large scar. Near the US border, people she believed to be members of a Mexican cartel kidnapped her and forcibly took nude photos of her. He said that when she explained to US border officials that she was a lesbian seeking asylum from Honduras and that she had also experienced abuse in Mexico, agents laughed at her. She said one agent told her: "I don't care what's happening to you." She was expelled to Honduras, and immediately fled again to the US border, this time afraid to seek asylum for fear of being returned to Honduras again. | https://www.hrw.org/news/2022/05/31/us-lgbt-asylum-seekers-danger-border |
| 5/31/2022 | assault, kidnapping | 1 | Mariana L., a lesbian woman who fled Honduras in 2021, said she was kidnapped for ransom in January 2021 and held for over a week near the US-Mexico border by people she believed to be cartel members. They took her to a house in Reynosa, Tamaulipas, where she saw several other kidnapped migrants. She said they stole her passport and forcibly photographed her naked until her sister managed to pay a ransom of US$3,000. Her kidnappers would hit her to make her cry when they called her sister for the ransom money. | https://www.hrw.org/news/2022/05/31/us-lgbt-asylum-seekers-danger-border |
| 5/31/2022 | assault, kidnapping | 1 | Kayla K., the transgender woman who fled Guatemala, said that in July 2021 Mexican state police in Piedras Negras robbed her and beat her with batons so badly that she was ultimately hospitalized and vomited blood...after she reported the crime, Mexican immigration agents returned her to Guatemala, where she had experienced brutal violence. She immediately fled again. While she was making her way back to the US border in March 2022, criminals threatened her with a machete and robbed her. | https://www.hrw.org/news/2022/05/31/us-lgbt-asylum-seekers-danger-border |
| 6/3/2022 | murder | 1 | Jocelyn Anselme, a 34-year-old Haitian asylum seeker, was murdered during an attempted assault and robbery in Tijuana in May 2022 while blocked from seeking asylum due to Title 42. | https://www.latimes.com/world-nation/story/2022-06-12/haitian-migrants-tijuana |

CLP_PC_076281

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 6/8/2022 | assault | 1 | Mario Alvarez González, un periodista que huyó de Guatemala tras amenazas, personifica las crisis de migración y de libertad de prensa en México, donde ha afrontado un secuestro y agresiones mientras espera en Ciudad Juárez que Estados Unidos le dé asilo. | https://lasillarota.com/nacion/periodista-trabajo-para-reuters-cnn-ahora-vivio-abuso-en-mexico-como-migrante/657510 |
| 6/10/2022 | kidnapping | 14 | 14 migrantes indocumentados que estaban retenidos contra su voluntad por criminales fueron rescatados en un escondite, como resultado de una operación conjunta de diferentes corporaciones de seguridad en El Paso. | https://www.elheraldodejuarez.com.mx/local/el-paso/rescatan-a-14-migrantes-secuestrados-en-el-paso-8416230.html |
| 6/10/2022 | kidnapping | 3 | In early June 2022, a Nicaraguan couple and their nine-year-old son were kidnapped in Reynosa, according to family members in Nicaragua who are reportedly currently fundraising the $25,500 ransom demanded by the cartel that abducted them. | https://www.laprensani.com/2022/06/10/nacionales/3005629-cartel-mexicano-secuestra-a-familia-nicaraguense-y-parientes-salen-a-las-calles-con-alcancias-para-pagar-su-rescate |
| 6/12/2022 | kidnapping, rape | 2 | "I went to Reynosa, in Mexico across the border from McAllen, Texas. One mother and daughter I met from Honduras: The daughter is 15. She was leaving class one day when they were kidnapped and raped by a local gang. Once girls hit their teens, they're not really safe; they're seen as fair game for these attacks. This mother and daughter, once they got to Mexico, were kidnapped again, probably by cartel members, and sexually assaulted for days before they escaped. It's devastating." | https://www.nytimes.com/2022/06/12/briefing/us-mexico-border-immigration.html |
| 6/15/2022 | assault | 2 | Coahuila state police detained and beat two Honduran asylum seeking women, one of whom was pregnant, while they were washing clothes at a river in Ciudad Acuña. Police turned the women over to Mexican immigration authorities, who deported them to Honduras, according to another Honduran woman who had been with them at the river and managed to escape. | Human Rights First interview with asylum seeker |
| 6/16/2022 | kidnapping | 1 | In May 2022, a Honduran asylum seeker witnessed a friend kidnapped from a store in Piedras Negras where the pair had gone after DHS expelled them to Mexico at 2 a.m. Men with their faces covered with ski masks who searched the women's phones for contacts in the United States abducted the other woman. The Honduran asylum seeker told Human Rights First that more than two weeks later the Honduran asylum seeker had not heard from her friend. | https://www.humanrightsfirst.org/resource/nightmare-continues-title-42-court-order-prolongs-human-rights-abuses-extends-disorder-us |
| 6/16/2022 | kidnapping | 2 | In May 2022, DHS expelled a Guatemalan woman fleeing death threats by her abusive ex-husband and her five-year-old daughter to Nuevo Laredo, where a taxi driver immediately kidnapped them. She reported to Human Rights First that the driver delivered the family to the same organized criminal group that had previously kidnapped them and had held them captive for nearly a month until the woman's relatives sold their car to pay the $9,000 ransom demanded by the kidnappers. | https://www.humanrightsfirst.org/resource/nightmare-continues-title-42-court-order-prolongs-human-rights-abuses-extends-disorder-us |
| 6/16/2022 | sexual assault | 1 | In late May 2022, a Honduran woman was sexually assaulted in a Nuevo Laredo shelter after she and her children were turned away under Title 42 at the Laredo port of entry where they had attempted to seek asylum. She told Human Rights First she has been unable to sleep in the week since the attack, terrified the assailant would return. | https://www.humanrightsfirst.org/resource/nightmare-continues-title-42-court-order-prolongs-human-rights-abuses-extends-disorder-us |
| 6/16/2022 | sexual assault | 1 | In May 2022, a Coahuila state police officer sexually assaulted a 12-year-old Honduran girl in Ciudad Acuña near the public plaza where her family sleeps because they are blocked from seeking asylum due to Title 42. The girl's mother told Human Rights First that a police officer on a motorcycle stopped the girl and groped her as she was returning from a nearby store. | https://www.humanrightsfirst.org/resource/nightmare-continues-title-42-court-order-prolongs-human-rights-abuses-extends-disorder-us |
| 6/16/2022 | kidnapping | 1 | Coahuila state police kidnapped a Honduran asylum seeker in Piedras Negras in March 2022 and turned him over to an organized criminal group that held him captive for 15 days. His family were forced to pay the $15,000 ransom. The man told Human Rights First that police had also stolen his money and cell phone in a separate incident after the kidnapping. | https://www.humanrightsfirst.org/resource/nightmare-continues-title-42-court-order-prolongs-human-rights-abuses-extends-disorder-us |
| 6/16/2022 | kidnapping | 3 | Coahuila state police kidnapped a Honduran asylum-seeking woman, her husband, and their young daughter in Piedras Negras in May 2022 while they were blocked from seeking U.S. asylum due to Title 42. The woman reported to Human Rights First that police held her family captive for three days with 15 other migrants and demanded an $800 ransom. | https://www.humanrightsfirst.org/resource/nightmare-continues-title-42-court-order-prolongs-human-rights-abuses-extends-disorder-us |
| 6/14/022 | kidnapping | 80 | 2 buses carrying 80 migrants, including women and children, were kidnapped by a criminal group near the northern border of Coahuila, Mexico. | https://www.debate.com.mx/migracion/Queremos-que-nos-atienda-el-Gobernador-Reportan-secuestro-de-migrantes-en-Coahuila--20220614-0177.html |

CLP_PC_076282

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 6/20/2022 | kidnapping | 2 | El Instituto Nacional de Migración (INM) desmintió esta mañana que dos personas de nacionalidad salvadoreña hayan sido secuestradas de la estancia provisional de Ciudad Juárez, Chihuahua. | https://www.lacapital.com.mx/noticia/90980-Desmiente INM_secuestro_de_dos_migrantes https://www.elsiglodetorreon.com.mx/noticia/2022/migrante-senala-presunta-desaparicion-por-la-policia-de-6-de-sus-familiares-en-nava.html |
| 6/21/2022 | beating | 1 | Kenia Herrera Castillo, una mujer migrante originaria de nicaragüense y que fue internada en el Hospital General de Allende, resultó lesionada al arrojarse junto a otros familiares de una patrulla en movimiento cuando era trasladada con otros extranjeros hacia el sur del estado de Coahuila por presuntos elementos de seguridad del municipio de Nava. | |
| 7/7/2022 | assault | 1 | "Rodrigo* left his native Colombia over a year ago. After he participated in marches in opposition to President Márquez's policies, the Colombian police detained and tortured him. Although he escaped, several of his friends who had also participated in the marches disappeared. Since the border was closed to travel, Rodrigo walked for five days through the Damien, the most dangerous jungle in the world, on foot. When he arrived in Mexico, he was detained by immigration officials and attempted to seek humanitarian protection, but was denied. As he traveled north through Mexico, he faced extortion at the hands of Mexican police at numerous checkpoints and at one point was assaulted by a group of armed men who stole everything he had. He arrived in Nogales hoping to cross to safety and live with family members in the US." | Communication from Kino Border Initiative |
| 7/7/2022 | kidnapping | 2 | "Belén,* a young Guatemalan mother, arrived with her four-year-old son after the two of them had been kidnapped for days in Nogales. Belén had crossed into the US to seek protection after she fled threats from her son's father. When she and her son were deported to Nogales, Mexico, a man approached them offering help. Since she did not know the area or have any support, she went with him. He kidnapped the two of them and held them for four days until her partner paid extortion fees. She then fled with her son to a church where they recommended they come to Kino." | Communication from Kino Border Initiative |
| 7/11/2022 | rape | 1 | The situation of the migrant population on the northern edge of Mexico is distressing. As the immediate removals under Title 42 continue, hundreds of people continue to arrive from the south in search of entering the United States or to begin their asylum application processes from there. Testimony of Yaneth, a migrant from Honduras: "When they threw me to Reynosa, they raped me. They didn't care that I was pregnant, that affected me a lot, it affected my pregnancy. I looked for my husband in Monterrey, I felt very bad about my pregnancy, my delivery was early and my baby was born prematurely, with many health problems. | https://www.msf.org.ar/actualidad/mexico-mientras-continuan-expulsiones-desde-eeuu-se-agrava-situacion-personas-migrantes-frontera-norte |
| 7/21/2022 | kidnapping | 4 | "Under Title 42, Border Patrol also expels families directly into the hands of criminal groups. Mari*, her husband and her 2 sons, ages 7 and 9, fled Guatemala after her husband was beaten and threatened for his refusal to join the gang. Mari and her family tried to enter the US through Nuevo Laredo, Mexico, but were deported. Once in Mexico, the INM (National Migration Institute of Mexico) said they would take them to a shelter, but instead, turned them over directly to the cartel, los Zetas. Mari and her family were kidnapped and held hostage by los Zetas for 3 months, where they faced physical torture. They watched others who tried to escape be killed and were only able to leave after paying an extortion. " | Communication from Kino Border Initiative |
| 9/1/2022 | kidnapping | 3 | Juan* and his family fled from organized crime in Guerrero, Mexico. When they arrived in Nogales to attempt to seek asylum in the US, they were riding in a taxi when the mafia kidnapped the taxi driver, Juan and his entire family. The kidnappers shut Juan and his family in a room in a house, and they still don't know what happened to the taxi driver. The kidnappers said they had to pay 500,000 pesos per person to leave. They spent all day in the room until the person watching the door briefly left his post and they escaped, leaving all of their items behind. They arrived at Kino fearing for their lives. | Communication from Kino Border Initiative |
| 9/8/2022 | sexual assault | 1 | "Doña Murphey, a neurologist based in Houston, remembers a case of a disabled child with epilepsy living in an encampment with his mother after being ejected. When they were moved to a shelter, the boy was sexually assaulted there. ...He "stopped eating, was exhibiting depressive symptoms, was crying all the time and not engaging any more," Murphey said, which in addition made him more at risk of a fatal seizure." | https://www.theguardian.com/us-news/2022/sep/08/title-42-covid-policy-migrants-mexico-us |
| 9/9/2022 | assault | 1 | Its director said that some migrants have received threats due to the context of violence from which they are fleeing. He recalled that a couple of months ago a woman was injured by a bullet that came from outside, and a week ago they demonstrated in front of C2 because two armed men entered the shelter. | https://www.elsoldetijuana.com.mx/local/se-extiende-violencia-contra-albergues-de-migrantes-y-8787148.html |

CLP_PC_076284

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 9/13/2022 | kidnapping | 4 | "La nicaragüense Kathy Smith Molina, de 26 años, su hermano Ricky Smith, y sus pequeños hijos Kyle y Danisha Smith, de 4 y un año respectivamente, fueron secuestrados por miembros de una banda criminal en México quienes están exigiendo 20 mil dólares a cambio de su liberación." | https://www.radiolavozdelnorte.com/2022/09/cartel-en-mexico-exige-20-mil-dolares.html |
| 9/13/2022 | kidnapping, extortion | 2 | "Dos migrantes fueron rescatados de la banda de secuestradores que privaron de la libertad a un dentista en Mexicali y que fue rescatado hace un par de semanas" | https://kvma.com/https-kvma-com-noticias-3/2022/09/13/operativo-antisecuestro-logro-rescate-de-dos-migrantes-en-mexicali-2/ |
| 9/14/2022 | kidnapping | 5 | "Elementos de la Fiscalía General del Estado en Ciudad Juárez, lograron liberar a cinco personas que se estaban privadas de la libertad en un domicilio...Los agentes lograron ubicar a cuatro personas de nacionalidad guatemalteca, dos mujeres y dos hombres de 39, 29, 27 y 19 años así como a un mexicano de 22 años" | https://www.elheraldodechihuahua.com.mx/local/juarez/liberan-a-cinco-migrantes-secuestrados-en-juarez-8890922.html |
| 9/16/2022 | kidnapping | 2 | When López discovered that they had been kidnapped, she felt helpless. The kidnappers harassed her several times a day on WhatsApp asking her for $10,000 in ransom. "I told them that she was a single mother, that she lived in a house that was not mine, that I have a disability, that I am in a wheelchair. Where was she going to get the money from?" she relates. | https://www.eldiario.es/desalambre/secuestro s-riesgo-enfrentan-migrantes-hondurenos-camino-eeuu_1_9266660.amp.html |
| 9/15/2022 | kidnapping, rape | 14 | Elementos de la Agencia de Investigación de Chihuahua rescataron a 14 migrantes que se encontraban secuestrados en una vivienda de Ciudad Juárez, entre ellos, al menos una persona oriunda de Ixmiquilpan, que recientemente se reportó como desaparecida junto a otros habitantes del municipio. | https://criteriohidalgo.com/regiones/rescatan-hidalguense-migrante-secuestrado-chihuahua |
| 9/26/2022 | kidnapping | 4 | "Una semana, 16 mil dólares y mucha incertidumbre tuvo que pasar una familia de migrantes venezolanos secuestrada en ... para ser liberada y estar a salvo. Claudia Rivero y Carlos Ospina viajaron a Estados Unidos junto a sus hijas, Victoria de 12 años y Carla de 10, con la intención de solicitar asilo en la frontera y luego reencontrarse con familiares en Georgia." | https://eltiempolatino.com/2022/09/26/inmigr acion/llegaron-a-migrantes-venezolanos-secuestrados-en-mexico-despues-de-pagar-miles-de-dolares/ |
| 9/28/2022 | kidnapping | 200 | "los llevaron a una bodega de Reynosa donde había casi 200 personas que también esperaban cruzar el río. Pero, de repente, unos hombres armados entraron y se los llevaron a todos violentamente. Para este padre y su niño, empezó un duro secuestro de 44 días." | https://www.telemundo.com/noticias/noticias-telemundo/inmigracion/asi-secuestraron-a-los-migrantes-capturas-mujeres-violadas-y-muerte-rcna2367 |
| 10/2/2022 | kidnapping | 399 | "In relation to migrants who suffer deprivation of their liberty by "polleros" and then request rescue, the Municipal Public Security Secretariat reported that from January to September 2022, 399 people have been rescued, detailing that: There are 171 from Guatemala, 30 from Ecuador, 105 from Venezuela, 68 from Mexico and 25 from Honduras." | https://www.elheraldodechihuahua.com.mx/po liciaca/han-abierto-11-carpetas-de-investigacion-por-secuestro-este-ano-en-juarez-8972383.html |
| 10/16/2022 | kidnapping | 13 | "Ciudad Juárez.- A través de un comunicado la Subsecretaría de Despliegue Policial Zona Norte de la Secretaría de Seguridad Pública del Estado (SSPE) informó la localización y aseguramiento de 13 personas migrantes que estaban retenidos contra su voluntad dentro de una vivienda en Ciudad Juárez." | https://netnoticias.mx/juarez/rescatan-a-13-migrantes-secuestrados-en-juarez/ |
| 10/20/2022 | kidnapping, armed robbery, attempted kidnapping | 62 | ""Flavio", un venezolano de 33 años de edad, quien fue liberado durante la madrugada de ayer después de que su familia pagó un rescate a sus secuestradores, narró que antes de llegar a la estación de camiones en donde serían dejados, ya dentro de la ciudad, el camión en el que viajaba fue detenido por un grupo de hombres armados.. Eran unas 50 personas las que detuvieron, era el camión completo", relató. Dijo que en el camión de turismo viajaban sólo migrantes, quienes al ser privados de la libertad fueron separados, y él fue trasladado a una casa, junto a un grupo de personas en donde antes de ser liberado vio llegar a grupo de cuatro migrantes secuestrados de Ecuador y Cuba. (54)..."Veníamos de Ciudad de México, en una guagua, en un camión, y cuando llegamos a Ciudad Juárez, después de que pasamos la revisión de Migración, en el segundo semáforo, estaba lloviendo esa noche, y se montaron dos jóvenes armados, pararon el camión en el que veníamos y pararon la guagua y había siete vehículos abajo esperando. Le quitaron el teléfono a todo el que venía, madres con sus hijos, su esposo, venían como tres o cuatro familias con niños pequeños y les quitaron los teléfonos, les quitaron el dinero que tenían.a todos.. Luego nos obligaron a bajar del bus y a montarse en los vehículos que tenían ellos abajo", narró otra mujer migrante."(8) | https://diario.mx/juarez/narran-sudamericanos-secuestros-en-carreteras-20221020-1984034.html |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 10/20/2022 | kidnapping | 1 | In October 2022, Mexican police turned over Jenny, a Venezuelan woman, and other migrants to a cartel that abducted and forced Jeny into labor . Police had stopped Jeny and other migrants near Ciudad Juárez and turned them over to the cartel, which demanded ransom payment for their freedom. Because Jeny was unable to pay due to several previous extortions, the cartel forced her to cook and clean—an experience she describes as "hell," explaining that she feared she would be killed. | https://www.elheraldodejuarez.com.mx/local/juarez/narra-migrante-venezolana-secuestro-vivido-en-su-camino-a-la-frontera-9060560.html |
| 10/21/2022 | shooting | 1 | "Pese a que el Hospital General 'Dr. Salvador Chavarría Sánchez' de Piedras Negras es una unidad médica de segundo nivel, durante la tarde del miércoles se llevó a cabo una cirugía de emergencia y de suma dificultad; que en teoría solo debería practicarse en hospitales de tercer nivel y con la cual, lograron salvarle la vida al migrante originario de Venezuela herido de bala por un policía municipal." | https://www.elsiglodetorreon.com.mx/noticia/2022/salvan-vida-de-migrante-venezolano-herido-de-bala-en-piedras-negras.html?v=20221021152420 |
| 10/27/2022 | kidnapping | 53 | 2 Venezuelan men were kidnapped when they arrived at the border and held captive for three days. One said he was released when the kidnappers discovered he had no money. Another Venezuelan man was kidnapped in Ciudad Juarez along with 50 other migrants. He was held captive for two weeks and released after his family paid an $8,000 ransom payment. The man said that those who were unable to pay are still being held captive. | https://cnnespanol.cnn.com/video/venezolanos-migrantes-ciudad-juarez-estados-unidos-rev-rodriguez-conclusiones-perspectivas-mexico/ |
| 10/30/2022 | assault | 1 | After being turned away from a migrant shelter in Piedras Negras, a Honduran migrant was assaulted and severely injured by three attackers, requiring the migrant to be hospitalized. | https://rancherita.com.mx/noticias/detalles/130162/golpean-y-dejan-grave-a-migrante-en-asalto-en-el-centro-de-piedras-negras-html |
| 10/31/2022 | kidnapping | 15 | En un rancho del ejido "El Centinela", al norte del municipio de Piedras Negras, policías investigadores y estatales rescataron a grupo de 15 migrantes, la mayoría centroamericanos de Venezuela y Cuba, y al parecer algunos mexicanos, quienes estaban secuestrados y los polleros exigían por teléfono a sus familiares 10 mil dólares por cada uno para liberarlos. | https://www.eluniversal.com.mx/estados/rescatan-15-migrantes-centroamericanos-secuestrados-en-piedras-coahuila |
| 11/1/2022 | kidnapping | 2 | "Piedras Negras, Coah.- La Policía de Investigación Criminal realizaba las indagaciones en torno a la privación ilegal de la libertad en su modalidad de secuestro agravado. Estos sujetos exigían cantidades hasta los 10 mil dólares por la liberación de los centroamericanos que estaban en la casa de seguridad" | https://superchannel12.com/607067/Investigan-secuestro-de-migrantes-ped%C3%ADan-10-mil-d%C3%B3lares-de-rescate-por-cada-uno |
| 11/2/2022 | kidnapping | 4 | A Venezuelan family with two young daughters was kidnapped by two hooded, armed men from a hotel in Ciudad Juarez as they awaited the opportunity to seek U.S. asylum. The kidnappers held the family captive for 12 days until their relatives managed to pay a $30,000 ransom. | https://cnnespanol.cnn.com/video/migrante-venezolana-secuestro-mexico-asilo-hijos-frontera-eeuu-dusa-roa/ |
| 11/3/2022 | rape, attempted sexual assault, kidnapping, attempted kidnapping, armed robbery, beatings | 2,123 | Asylum seekers from Brazil, Colombia, Cuba, El Salvador, Guatemala, Guinea, Haiti, Honduras, Iran, Nicaragua, Syria, and Venezuela who were expelled or blocked from seeking U.S. asylum due to Title 42 reported having been the victim of a violent attack in Mexico in the past month in an ongoing electronic survey conducted by Al Otro Lado. | Human Rights First review of survey data received by Al Otro Lado between June 14, 2022 and November 3, 2022. |
| 11/6/2022 | kidnapping | 1 | En Tamaulipas, un hombre de origen ruso fue rescatado por la policía estatal en el municipio de Reynosa, tras ser secuestrado por sujetos desconocidos. | https://www.jornada.com.mx/2022/11/06/politica/010n2pol |
| 11/7/2022 | kidnapping | 6 | Six migrants who had been kidnapped were rescued in Ciudad Juárez. | https://www.debate.com.mx/policiacas/Rescata-FGE-a-seis-migrantes-privados-de-la-libertad-en-Ciudad-Juarez-20221107-0002.html |
| 11/9/2022 | kidnapping | 23 | 23 migrants were rescued after they were kidnapped in Piedras Negras. 15 migrants were from Honduras, 4 from El Salvador, 3 from Guatemala, 1 from Colombia. | https://noticiasnrt.com/2022/11/09/rescatan-a-23-migrantes-en-piedras-negras-estaban-secuestrados/ |

CLP_PC_076285

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 11/10/2022 | kidnapping, extortion, attempted kidnapping | 5 | Service providers assisting migrants at the border reported to the Center for Gender and Refugee studies between July and September 2022 that 1) a mother and daughter whom DHS had expelled under Title 42 were kidnapped in Juárez and held captive or two days and their family members extorted; 2) A mother and daughter whom DHS expelled under Title 42 had been kidnapped in Ciudad Juárez and held captive for 22 days; 3) a migrant woman reported that someone attempted to kidnap her son in Mexico before the family was expelled under Title 42. | Communication from UC Hastings Center for Gender and Refugee Studies |
| 11/20/2022 | kidnapping | 85 | 85 migrants, including at least 4 Venezuelans, were kidnapped and held for ransom while riding a bus near Ciudad Juárez. | https://100noticias.com.ni/migracion/119927-migrantes-nicas-bus-secuestro-mexico/ |
| 11/29/2022 | kidnapping | 2 | Asimismo, se registró un intento de secuestro en un albergue de migrantes ubicado en el bordo del Río Bravo, en el estado de Chihuahua. El hecho violento se presentó en las primeras horas de este martes. "Eran tres vehículos de reciente modelo, en cada uno venían tres hombres que dijeron que nos pondrían en carros diferentes, en uno a mujeres, en otro a niños y en otro a hombres", dijo a EFE un migrante que por cuestiones de seguridad pidió permanecer en el anonimato. Añadió que llenaron su cara con aceite, los empezaron a separar en fila. Sin embargo, los delincuentes se marcharon porque aparentemente se dieron cuenta de que llegarían las autoridades. | https://es-us.noticias.yahoo.com/crimen-organizado-ataca-albergues-campos-014332029.html |
| 12/7/2022 | attempted kidnapping | 1 | A Venezuelan man who fled political persecution and is stranded in Juárez due to Title 42 said he rode the "bestia" train through Mexico, where he could not sleep for days for fear of being targeted by criminals. He watched armed men rob another Ecuadorian man and throw him off the train, causing one of his legs to be run over and severed. 2 Venezuelan men and 1 woman he was with were raped on the train. When he arrived in Juarez, his phone was stolen at gunpoint. He has no money to buy a new one and without a phone, doesn't know how to contact legal services providers who might help him access the Title 42 exemption process. | Human Rights First interview with asylum seeker |
| 12/8/2022 | kidnapping | 23 | Policías de México rescataron a 23 migrantes, en su mayoría venezolanos, que habían sido secuestrados cuando se dirigían a la frontera con Estados Unidos, en una operación en la que fueron detenidos dos hombres, informaron este jueves las autoridades. | https://www.france24.com/es/minuto-a-minuto/20221208-rescatan-en-m%C3%A9xico-a-23-migrantes-secuestrados-en-su-mayor%C3%ADa-venezolanos |
| 12/8/2022 | attempted kidnapping | 1 | A Venezuelan asylum seeker stranded in Ciudad Juárez due to Title 42 said he began to get followed by cartel members who want to recruit him into their group because they learned about his training and familiarity with weapons. The Cartel tried to abduct him during daylight while he worked at a local car wash. He managed to escape but was forced to leave his employment and now fears to leave the shelter. | Human Rights First interview with asylum seeker |
| 12/14/2022 | kidnapping, extortion | 2 | Juarez, Mexico. The family of siblings Heysell Lineth Martínez and Julmer Martínez are desperately looking to raise $16,000 to pay the ransom demanded by a Mexican cartel that has been holding the young men hostage since last Saturday. "Please, dad, help us, get the money. If not, they are going to kill us. Get the money for both of us because if not, he says they are going to kill us or else they will cut off our fingers", pleads young Heysell Martinez, crying, in a video recorded by the kidnappers, where the brothers are seen seated and with a gun pointed at their heads. | http://www.borderlandbeat.com/2022/12/ciudad-juarez-chihuahua-siblings.html |
| 12/15/2022 | robbery, attempted kidnapping | 1 | In November 2022, a Venezuelan police investigator fleeing death threats for investigating cases of disappeared people was assaulted and robbed by armed men who bashed his head with the back of a gun, ordered him off the bus he was riding near Ciudad Juárez, and tried to kidnap him. He managed to escape, but when he arrived in Ciudad Juárez, police stopped him and stole his money. The man told Human Rights First he is terrified to stay in Juárez, where he remains stranded due to Title 42, because the cartel hunting him in Venezuela also operates there. | https://humanrightsfirst.org/library/human-rights-stain-public-health-farce/ |

CLP_PC_076286

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 12/15/2022 | sexual assault, robbery | 1 | In November 2022, a gay Venezuelan man was sexually assaulted and robbed in the public plaza where he had been sleeping in Ciudad Juárez. The man told Human Rights First that he had been staying in a makeshift tent encampment near the El Paso port of entry while blocked from seeking U.S. asylum due to Title 42 and moved to the plaza where he was attacked after Mexican authorities had forced him to leave the encampment. | https://humanrightsfirst.org/library/human-rights-stain-public-health-farce/ |
| 12/15/2022 | attempted kidnapping | 1 | A 13-year-old girl was nearly abducted at gunpoint in Juárez after her parents and sibling, who had fled political persecution in Venezuela, were denied the right to seek asylum and expelled to danger in Mexico in November by CBP under the Title 42 Venezuelan expansion. | https://humanrightsfirst.org/library/human-rights-stain-public-health-farce/ |
| 12/15/2022 | rape | (counted in Al Otro Lado survey data above) | In October 2022, a Guatemalan lesbian trans woman was violently raped by Mexican police officers in Piedras Negras soon after CBP officers turned her away from protection at the Eagle Pass port of entry. The woman reported to Al Otro Lado that she had sought protection due to her gender and sexual orientation. | https://humanrightsfirst.org/library/human-rights-stain-public-health-farce/ |
| 12/15/2022 | armed robbery | 1 | A Haitian asylum seeker, whom DHS had previously expelled to Haiti under Title 42, was robbed at gunpoint in Tijuana in summer 2022 while unable to seek U.S. asylum at a port of entry due to the continuation of Title 42. The armed assailants pulled the man's pants down and groped him looking for money, according to his cousin, another asylum seeker who spoke with Human Rights First. | https://humanrightsfirst.org/library/human-rights-stain-public-health-farce/ |
| 12/15/2022 | kidnapping | 2 | In October 2022, cartel members kidnapped a Honduran asylum seeker and her four-year-old daughter as they waited stranded in Tijuana due to Title 42. The kidnappers raped the woman in front of her daughter, beat the daughter, and held the family captive without sufficient food for 22 days. The woman, who remains stranded in Tijuana due to Title 42 as she awaits an opportunity to seek U.S. protection, reported the incident to Al Otro La | https://humanrightsfirst.org/library/human-rights-stain-public-health-farce/ |
| 12/15/2022 | kidnapping | 3 | In August 2022, a Salvadoran woman and her two children were held captive for hours by members of an armed group who forced them to strip and robbed them of all their belongings, including their clothing, shoes, and water. The family had been attempting to enter the United States near Calexico to seek asylum when the armed group approached them. "They were asking their boss what to do with us...I thought they were going to kill us," the woman told Human Rights First. | https://humanrightsfirst.org/library/human-rights-stain-public-health-farce/ |
| 12/15/2022 | sexual assault | (counted in Al Otro Lado survey data above) | Juárez police sexually assaulted a Honduran mother and her four-year-old daughter after the family was blocked from seeking protection in Ciudad Juárez in August 2022, then turned them over to cartel members who held the family captive for 22 days, raped the mother in front of the daughter, and physically attacked the daughter. The mother reported the incident to Al Otro Lado. | https://humanrightsfirst.org/library/human-rights-stain-public-health-farce/ |
| 12/15/2022 | attempted kidnapping | (counted in Al Otro Lado survey data above) | A Mexican family of five was nearly kidnapped after DHS turned them away from seeking asylum at the San Ysidro port of entry in November of 2022. The mother reported to Al Otro Lado that her husband and son had been kidnapped, beaten and held for ransom in their home state in southern Mexico. After the expulsion, the family continued to receive death threats. | https://humanrightsfirst.org/library/human-rights-stain-public-health-farce/ |
| 12/15/2022 | sexual abuse | (counted in Al Otro Lado survey data above) | An indigenous Triqui woman from Oaxaca who had been beaten by police, threatened, and her family members murdered for her activism defending the indigenous community was turned away from seeking asylum with her three children at the San Ysidro port of entry in September 2022 in Tijuana. She shared with Al Otro Lado that after the family was turned away, she sexually abused my Mexican police in Tijuana. | https://humanrightsfirst.org/library/human-rights-stain-public-health-farce/ |
| 12/15/2022 | assault, kidnapping, threats | 1 | In 2022 DHS expelled to Mexico a young Honduran man who had been living in the United States for nine years and had a pending immigration court hearing in Houston, Texas scheduled for December 2022, as his attorney reported to Human Rights First. After being expelled to Mexico, the man was beaten by Mexican police officers, kidnapped by a cartel, and threatened at gunpoint. He was only able to reenter the United States with assistance from his attorney. | https://humanrightsfirst.org/library/human-rights-stain-public-health-farce/ |
| Total victims of attacks: | | 13,480 | | |

CLP_PC_076287