**AKIN GUMP STRAUSS HAUER & FELD LLP**
ASHLEY VINSON CRAWFORD (SBN 257246)
100 Pine Street, Suite 3200
San Francisco, California 94111
Telephone: 415-765-9500
Facsimile: 415-765-9501
E-mail:   avcrawford@akingump.com

*Counsel for Amici Former Immigration Judges &
Former Members of the Board of Immigration Appeals*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| East Bay Sanctuary Covenant, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>Joseph R. Biden, et al.,<br><br>*Defendants*. | Case No.: 18-cv-06810-JST<br><br>**BRIEF OF *AMICI CURIAE* FORMER IMMIGRATION JUDGES & FORMER MEMBERS OF THE BOARD OF IMMIGRATION APPEALS IN SUPPORT OF PLAINTIFFS**<br><br>Judge: Hon. Jon S. Tigar<br>Trial Date: None<br>Action Filed: November 9, 2018 |

**TABLE OF CONTENTS**

STATEMENT OF INTEREST OF AMICI CURIAE ............................................................................... 1

INTRODUCTION .............................................................................................................................. 2

ARGUMENT ..................................................................................................................................... 3

    I.     The Rule Creates a Near-Complete Bar to Asylum for Those Seeking Asylum Protections at the Border. ................................................................................................ 3

    II.    The Rule's Elimination of Nearly All Asylum Relief Arbitrarily Abrogates Congress' Longstanding Asylum Scheme, Undermining the Integrity of the Asylum Adjudication Process. .............................................................................. 5

    III.   The Rule Will Prolong Cases and Complicate the Role of Immigration Judges in Subsequent Proceedings. ................................................................................ 10

    IV.   The Rule Runs Afoul of International Law. ................................................................. 12

CONCLUSION ................................................................................................................................ 13

APPENDIX A Former Immigration Judges and Members of the Board of Immigration Appeals ..... 14

i

BRIEF OF *AMICUS CURIAE* FORMER IMMIGRATION JUDGES &
FORMER MEMBERS OF THE BOARD OF IMMIGRATION APPEALS                CASE NO. 18-CV-06810-JST

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Matter of A-M-E & J-G-U-*,
   24 I&N Dec. 69 (BIA 2007) ......................................................................................................... 9

*Matter of Acosta*,
   19 I&N Dec. 211 (BIA 1985) ................................................................................................... 8, 9

*Alquijay v. Garland*,
   40 F.4th 1099 (9th Cir. 2022) ..................................................................................................... 4

*Matter of C-A-*,
   23 I&N Dec. 951 (BIA 2006) ..................................................................................................... 9

*INS v. Cardoza-Fonseca*,
   480 U.S. 421 (1987) ............................................................................................................. 8, 12

*Kone v. Holder*,
   596 F.3d 141 (2d Cir. 2010) ....................................................................................................... 4

*Lauritzen v. Larsen*,
   345 U.S. 571 (1953) ................................................................................................................. 12

*Matter of M-E-V-G-*,
   26 I&N Dec. 227 (BIA 2014) ..................................................................................................... 9

*MacLeod v. United States*,
   229 U.S. 416 (1913) ................................................................................................................. 12

*Murray v. Schooner Charming Betsy*,
   6 U.S. (2 Cranch) 64 (1804) .................................................................................................... 12

**Statutes**

8 U.S.C. § 1158 ............................................................................................................................ 4, 6

8 U.S.C. § 1225 ................................................................................................................................ 6

8 U.S.C. § 1229(a) ........................................................................................................................... 6

8 U.S.C. §1362 ................................................................................................................................. 6

INA § 208(a)(2)(B) ...................................................................................................................... 4, 5

INA § 235 ..................................................................................................................................... 3, 6

ii

BRIEF OF *AMICUS CURIAE* FORMER IMMIGRATION JUDGES &
FORMER MEMBERS OF THE BOARD OF IMMIGRATION APPEALS        CASE NO. 18-CV-06810-JST

INA § 240 .......... 2, 6, 7, 11

Pub. L. No. 96-212, 94 Stat. 102 (1980) .......... 12

**Other Authorities**

8 C.F.R. § 235.3 .......... 3

8 C.F.R. §1003.42 .......... 8

8 C.F.R. §1208.13 .......... 4

8 C.F.R. § 1208.18(a)(1) .......... 11

8 C.F.R. § 1240.3 .......... 6

88 Fed. Reg. 31314 (May 11, 2023) .......... 1, 2, 3, 10

142 Cong. Rec. S11491-02 (daily ed. Sept. 27, 1996) (statement of Sen. Hatch) .......... 7

American Immigration Council & National Immigrant Justice Center, *The Difference Between Asylum and Withholding of Removal* (Oct. 2020) .......... 10

Black's Law Dictionary .......... 4

Convention Relating to the Status of Refugees, art. 1, July 28, 1951, 189 UNTS 137 .......... 13

H.R. Rep. No. 104-469, Pt. 1 (1996) .......... 7

Human Rights First, *Pretense of Protection: Biden Administration and Congress Should Avoid Exacerbating Expedited Removal Deficiencies* (Aug. 2022) .......... 5

Fatma E. Marouf, *Becoming Unconventional: Correcting the 'Particular Social Group' Ground for Asylum*, N.C. J. Int'l Law, Summer 2019 .......... 9

Fatma E. Marouf, *The Emerging Importance of "Social Visibility" in Defining a "Particular Social Group and Its Potential Impact on Asylum Claims Related to Sexual Orientation and Gender*, 27 Yale L. & Pol'y Rev. 47 (2008) .......... 9

Merriam-Webster Dictionary .......... 4

Victoria Nielson et al, *Asylum Manual,* Immigration Equality .......... 11

S. Rep. No. 96-256 (1979), *reprinted in* 1980 U.S.C.C.A.N. 141 .......... 12

U.N. Refugee Agency, *Handbook on Procedures and Criteria for Determining Refugee Status and Guidelines on International Protection* (2019) .......... 12, 13

U.S. Citizenship and Immigration Services, *Questions & Answers: Credible Fear Screening* (Updated May 11, 2023) .......... 6, 7, 9

iii

BRIEF OF *AMICUS CURIAE* FORMER IMMIGRATION JUDGES & FORMER MEMBERS OF THE BOARD OF IMMIGRATION APPEALS

CASE NO. 18-CV-06810-JST

**STATEMENT OF INTEREST OF AMICI CURIAE**

*Amici curiae* are former immigration judges and former members of the Board of Immigration Appeals ("BIA" or the "Board"), listed in Appendix A, with substantial, combined years of service and intimate knowledge of the U.S. immigration system. *Amici* seek to illuminate for this Court the role of the immigration courts in reviewing claims for asylum and other forms of human rights protection at the border. Circumvention of Lawful Pathways Rule, 88 Fed. Reg. 31314 (May 11, 2023). The Rule challenged by Plaintiffs severely compromises these protections, which are required by U.S. and international law.

*Amici* filed comments to the Notice of Proposed Rulemaking that led to the publication of the Rule at issue in the Complaint. They are invested in the issues presented by Plaintiffs because they have dedicated their careers to improving the fairness and efficiency of the U.S. immigration system, even after departing from the bench. Given *amici*'s familiarity with the procedures and realities of the immigration adjudication system, *amici* respectfully submit that this Court should find the Rule is unlawful. This brief is filed with permission of all parties, as reflected in the Court's May 24, 2023 Order re: Joint Stipulation and Proposed Schedule.

1

BRIEF OF *AMICUS CURIAE* FORMER IMMIGRATION JUDGES &
FORMER MEMBERS OF THE BOARD OF IMMIGRATION APPEALS                    CASE NO. 18-CV-06810-JST

# INTRODUCTION

As former immigration judges and former members of the Board, we submit this *amicus* brief to ask the Northern District of California to strike down the Circumvention of Lawful Pathways Rule, 88 Fed. Reg. 31314 (May 11, 2023). The Rule, which came into effect in the immediate aftermath of Title 42's sunset and which applies to non-Mexican asylum-seekers at the U.S.-Mexico border, automatically forecloses a migrant's asylum claim unless the person (i) arrives at an official port of entry having secured an immigration appointment through a complex mobile application, (ii) receives advance permission to travel to the U.S., or (iii) comes to the U.S. after applying for and being denied asylum in a transit country. Absent proof one of these narrow exceptions or a medical or other emergency, asylum-seekers will be unable to seek asylum regardless of whether they have compelling claims to relief.

Immigration judges serve an important role in the Congressionally-mandated process for reviewing the claims of asylum-seekers at or near the U.S.-Mexico border. This decades-old process, known as Expedited Removal, has its own flaws, but it does provide a credible fear review system that provides important protections for those seeking asylum. Specifically, and as explained in more detail below, the Expedited Removal statute requires that asylum-seekers, regardless of how they entered the United States, be interviewed by asylum officers to determine whether they have a credible fear of persecution and therefore can proceed to a full asylum hearing under Section 240 of the INA. The statute further mandates that immigration judges provide *de novo* review of asylum officers' negative credible fear determinations, and thus make the final decision about whether an asylum-seeker at the U.S.-Mexico border has shown a credible fear of persecution and will have the opportunity to progress to a full asylum hearing.

The Rule unlawfully undermines this statutory scheme. First, the Rule creates clear bars to asylum for most migrants, disingenuously labeling these as "rebuttable presumptions." As a result, almost all claims for asylum are pretermitted without the full asylum credible fear interviews required by the statutory Expedited Removal process. Rather, the credible fear interview will be turned into a "reasonable fear" interview to determine whether the migrant can proceed to claim withholding of

2

removal or protection under the Convention Against Torture ("CAT"), lesser forms of relief compared to asylum. Asylum-seekers are thus denied the opportunity to obtain full review of their asylum credible fear claims, including the *de novo* review by an immigration judge as required by Section 235 of the INA, 8 C.F.R. § 235.3. Instead, asylum-seekers may only seek review from an immigration judge as to the application of the narrow exceptions under the Rule or the lesser claims for relief. Accordingly, the Rule significantly and unlawfully curtails the role of immigration judges in asylum adjudication as set forth in the INA.

Moreover, the idea that the Rule heightens efficiency in the asylum adjudication process is an illusion. When an asylum-seeker is denied the ability to provide a credible fear of persecution, Expedited Removal still requires a review of potentially more complicated claims for withholding of removal and protection under the CAT. Thus, immigration judges on the one hand find their hands tied, unable to review the claims of *bona fide* asylum-seekers, but on the other hand are required to delve into the standards of withholding and CAT. Thus, the Rule turns a straightforward (and efficient) asylum credible fear review into a three-part analysis: the Rule exceptions, withholding, and CAT.

Finally, by creating exclusions that deny asylum to refugees who appear at the U.S.-Mexico border, the Rule violates U.S. obligations under the 1951 Refugee Convention. Longstanding canons of statutory and regulatory construction require consideration of international law; in this case, the Rule violates both the INA and international law.

**ARGUMENT**

**I.    The Rule Creates a Near-Complete Bar to Asylum for Those Seeking Asylum Protections at the Border.**

The Rule creates an absolute bar to asylum for the vast majority of migrants notwithstanding its framing it as a "rebuttable presumption." Circumvention of Lawful Pathways Rule, 88 Fed. Reg. 31314 (May 11, 2023). Labeling the bar to asylum as a presumption is disingenuous, as these are in fact insurmountable obstacles for nearly all asylum-seekers.

First, it is important to distinguish a "rebuttable presumption" from a "bar," which are terms different in definition, but both commonly and distinctly used in asylum law and procedure. A

3

rebuttable presumption is defined as a legal assumption that parties can dispute through the introduction of evidence. *Rebuttable Presumption*, Black's Law Dictionary (Online Edition). A presumption is "an attitude or belief dictated by probability; a legal inference as to the existence or truth of a fact…drawn from the known or proved existence of some other fact." *Presumption*, Merriam-Webster Dictionary (Online Edition). For the Rule to stand as a rebuttable presumption, it must flow from established facts. Indeed, U.S. asylum law contains several presumptions in the context of common factual scenarios. For instance, an asylum applicant who has suffered persecution in the past is entitled to a presumption that she will face persecution in the future. 8 C.F.R. §1208.13(b)(1). That presumption can be rebutted by evidence that the applicant can now live safely in her home country because, for example, the government who persecuted her is no longer in power.[1] Similarly, a refugee who fears persecution by his government is entitled to a presumption that relocation within his country of origin would not be safe. 8 C.F.R. 1208.13(b)(3)(ii). The government may rebut this presumption by offering evidence that parts of the country are safe for relocation – for instance, that an opposition force securely controls that part of country. These presumptions logically follow from the facts underlying them.  For example, the fact of actual past persecution can lay a foundation of fear for future persecution, and when an applicant fears persecution from her government, she is likely to face persecution anywhere in that state's territory.

      What the Rule calls a presumption is, in fact, a bar to asylum. A bar is "that which defeats, annuls, cuts off, or puts an end to." *Bar*, Black's Law Dictionary (Online Edition). Asylum law contains many bars duly enacted through the INA. For example, INA Section 208(a)(2)(B) states that a migrant cannot apply for asylum more than one year after arrival in the United States. 8 U.S.C. § 1158(a)(2)(B). This one-year filing bar contains *exceptions* for changed or extraordinary circumstances, but the exceptions do not turn the bar into a presumption. 8 U.S.C. § 1158(a)(2)(D); *see Alquijay v. Garland*,

---

[1] To satisfy this threshold, the government must prove by a preponderance of the evidence that the changed conditions they proffer to rebut the presumption of persecution "obviate the risk to life or freedom related to the original claim[.]" *Kone v. Holder*, 596 F.3d 141, 149 (2d Cir. 2010) (internal quotation marks omitted).

4

BRIEF OF *AMICUS CURIAE* FORMER IMMIGRATION JUDGES &
FORMER MEMBERS OF THE BOARD OF IMMIGRATION APPEALS      CASE NO. 18-CV-06810-JST

40 F.4th 1099, 1102 (9th Cir. 2022) (describing the one-year filing deadline as a "bar" to which "exceptions" may apply).

There is no presumption to rebut in the Rule. It is a bar with very limited exceptions. Unlike the presumptions based on past persecution and government action, there is no intrinsic connection between the failure to book an immigration appointment through a complex digital application or the lack of advance "permission" to travel to the U.S. to seek asylum, on the one hand, and the lack of a cognizable claim under U.S. asylum law, on the other. Rather, the Rule's design resembles the one-year application bar codified in Section 208(a)(2)(B). As demonstrated in the context of the Section 208(a)(2)(B) carve-out, the existence of exceptions to a bar does not defeat the fundamental nature of the regulation as a bar.

The distinction between a rebuttable presumption and a bar matters. To characterize the Rule's central element as a rebuttable presumption obscures its insidious power to deny relief to asylum-seekers with valid compelling claims. In reality, the Rule is a bar that eviscerates the statutory process for asylum claims at the U.S.-Mexico border.

## II. The Rule's Elimination of Nearly All Asylum Relief Arbitrarily Abrogates Congress' Longstanding Asylum Scheme, Undermining the Integrity of the Asylum Adjudication Process.

By creating near absolute bars to asylum in the guise of rebuttable presumptions, the Rule tries to hide its radical and unlawful revision of the INA's statutory process for evaluating asylum claims at the border. This Expedited Removal process, severely flawed as it might be,[2] reflects Congress' judgment on how to balance the nation's commitment to asylum with the desire to keep our immigration system efficient and fair. The Expedited Removal process provides a system for fair evaluation of each asylum-seeker's claim to protection, including the important backstop that immigration judges serve as the final reviewers in the asylum credible fear process. The Rule eviscerates the Expedited Removal process and will result in the denial of protection to many legitimate asylum-seekers, who could otherwise find refuge in the system Congress created for them.

---

[2] *See, e.g.,* Human Rights First, *Pretense of Protection: Biden Administration and Congress Should Avoid Exacerbating Expedited Removal Deficiencies* (Aug. 2022), https://humanrightsfirst.org/wp-content/uploads/2023/01/PretenseofProtection-21.pdf.

5

The Immigration & Nationality Act includes two types of proceedings to evaluate claims for asylum. Full adjudication of an asylum claim is conducted via removal proceedings under Section 240 of the INA. 8 U.S.C. § 1229(a). Section 240 proceedings, which are presided over by immigration judges, provide due process for the asylum-seeker, who has a full panoply of rights, including the right to have a lawyer to present her claims.[3] In 1996, Congress created an exception to Section 240 proceedings, allowing the Executive Branch (then via the Immigration & Naturalization Service, now via the Department of Homeland Security ("DHS")) to use truncated proceedings under Section 235 of the INA, commonly called Expedited Removal, applicable to migrants who are arriving at the border or who recently entered the United States (virtually the same population targeted by the Rule).[4]

When DHS elects to proceed under Section 235, it may remove migrants who arrive at a U.S. port of entry "without further hearing or review" if those individuals are undocumented or use misrepresentation or fraud to attempt to enter into the U.S. However, Congress included important protections in the Expedited Removal process in an effort to ensure that *bona fide* asylum-seekers are not removed without an opportunity to proceed through full Section 240 proceedings.[5] The protections of Expedited Removal, including interviews by asylum officers and *de novo* review by immigration judges, apply to a person requesting protection regardless of whether the migrant arrived in the U.S. at an official port or by other means. 8 U.S.C. §§ 1225, 1158(a)(1).

If the Executive Branch opts to apply Expedited Removal proceedings to an asylum-seeker under Section 235, it is required to interview that person to determine whether she has a credible fear of persecution or torture on the basis of race, religion, nationality, membership in a particular social group, or political opinion.[6] INA § 235(b)(1); 8 U.S.C. §§ 1225, 1158(a)(2)(A). If the migrant cannot show a credible fear of persecution (*i.e.,* the basis for asylum), the review process may then also include claims

---

[3] 8 U.S.C. §1362; 8 C.F.R. § 1240.3.

[4] U.S. Citizenship and Immigration Services, *Questions & Answers: Credible Fear Screening* (Updated May 11, 2023) ("USCIS Credible Fear Screening Q&A"), https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum/questions-and-answers-credible-fear-screening.

[5] If an asylum-seeker were to be afforded an asylum hearing in Section 240 proceedings, the Rule would still apply the same bars to asylum.

[6] *See also* USCIS Credible Fear Screening Q&A.

6

for withholding of removal and protection under CAT. These credible fear determinations involve a two-step administrative process, critical to vindicating the full force of the INA, in which immigration judges play a central role. First, the migrant interviews with an asylum officer, who makes an initial credible fear determination. If the asylum officer does not find that the asylum-seeker credibly fears persecution, the asylum-seeker can request that an immigration judge review the officer's decision. Only when the migrant does not ask for an immigration judge to review their case, or when the immigration judge agrees with the asylum officer that no credible fear exists, may ICE then remove the person from the U.S. However, if the asylum-seeker asks for an immigration judge's review and the judge finds a credible fear, the individual may seek asylum in full Section 240 proceedings. *See* USCIS Credible Fear Screening Q&A.

To establish a credible fear of persecution, the asylum-seeker must demonstrate to the asylum officer a "significant possibility" that, in Section 240 proceedings, she could convince an immigration judge that she has been persecuted, or has a well-founded fear of persecution "on account of his or her race, religion, nationality, membership in a particular social group, or political opinion if returned" to their country of origin. *See* USCIS Credible Fear Screening Q&A.[7] Congress designed this standard as a "low screening standard for admission into the usual full asylum process." 142 Cong. Rec. S11491-02 (daily ed. Sept. 27, 1996) (statement of Sen. Hatch). In adopting the option of Expedited Removal, Congress emphasized that "there should be no danger that an alien with a genuine asylum claim will be returned to persecution." H.R. Rep. No. 104-469, Pt. 1, at 158 (1996).

Through this statutory scheme, Congress allowed the Executive to screen out fraudulent asylum claims, but instructed it to use a "low screening standard" for the Credible Fear Determination process to protect asylum-seekers. Congress gave no authority to eliminate paths to relief and deny asylum to those who seek it under a legitimate threat of persecution or torture. The Rule clashes with Congressional intent by imposing arbitrary requirements on broad categories of people, excluding them from relief regardless of whether their asylum claims are worthy of relief. An asylum-seeker who can

---

[7] Alternatively, to establish a credible fear of torture under CAT or for persecution under withholding of removal, a migrant must show under the same standard a "significant possibility" that they will endure torture if returned to their country of origin.

7

establish before an asylum officer or immigration judge that she faces the fear of murder in her country of origin on the basis of her race, for example, would be barred from relief if she simply did not find a way to present that claim via the new, narrow exceptions to the Rule's ban. If she doesn't have access to the right kind of mobile phone to download the CBP One application? Too bad. If she cannot understand and navigate that application and make the appointment? Too bad. If she didn't apply for asylum as she fled through a foreign country, even if that country offered no notice, assistance, or accessible process for asylum? Too bad.  If she simply didn't know these new rules as she fled for her life? Too bad. Nothing in the Expedited Removal scheme contemplated these arbitrary hurdles. The Rule runs afoul of the INA by creating these unprecedented bars.

Even as it stands, Expedited Removal is a complicated process for asylum-seekers. This procedural complexity makes the role of immigration judges as the last reviewer in Expedited Removal even more important. Immigration judges are the last chance for an asylum-seeker to have her claim considered during this process, if the asylum officer has not found a credible fear. 8 C.F.R. §1003.42(a).[8] Immigration judges are given the authority to consider any relevant statement – written or oral – and evaluate the applicable law as the Court hears the credible fear claim *de novo*. 8 C.F.R. §1003.42(c), (d). This role is not ministerial, by any means.  The immigration judge must weigh the facts and complex legal questions, such as whether a "particular social group" meets the "particularity" and "socially distinct" thresholds, or whether the migrant has proven that they face a "significant possibility" of persecution or torture. *Matter of Acosta*, 19 I&N Dec. 211, 233 (BIA 1985), *overruled in part on other grounds by INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987).

In the decades since the INA's enactment, changes in asylum law have made the evaluation of asylum claims at the border far more fact-intensive and legally complicated. Three decades ago, the

---

[8] Immigration judges serve as an important check on the initial determination conducted by the asylum officer. As of February 2023, in just over 25% of cases that have reached immigration judges since 1998, the immigration judge overturns the initial decision of the asylum officer who found no credible fear, paving a potential path toward relief for asylum-seekers. Since 100,000 migrants have had a credible fear hearing before an immigration judge since 1998, these reversals out of the expedited removal process have created the possibility of a potentially life-saving outcome for more than 25,000 migrants.

8

BRIEF OF *AMICUS CURIAE* FORMER IMMIGRATION JUDGES &
FORMER MEMBERS OF THE BOARD OF IMMIGRATION APPEALS                                    CASE NO. 18-CV-06810-JST

typical "asylum-seeker" was a political activist fleeing their country out of fear of persecution. Now, through the development of the law, especially interpretations of the term "particular social group," asylum may be available to people persecuted for many reasons, including gang violence and domestic violence.[9]

Because the law has begun to recognize a path toward asylum relief for more groups, courts had to develop additional requirements to account for new circumstances giving rise to asylum relief. By way of illustrative example, if an asylum-seeker claims that they have a credible fear of persecution based on their membership in a particular social group, she must prove not only a fear of persecution, but three different elements to show a qualifying particular social group. First, the migrant must show that the particular social group shares a common, immutable characteristic. *Matter of Acosta,* 19 I&N Dec. at 233. Second, the migrant must satisfy the "particularity" requirement: the identified group must have clearly-defined boundaries. Third, the group must be "socially distinct" in that society at large must recognize the group as such. *Matter of M-E-V-G-,* 26 I&N Dec. 227, 237 (BIA 2014).

The BIA added the second and third of these requirements in 2006 and 2007, respectively, a decade or longer after Congress created the credible fear process. *See Matter of C-A-,* 23 I&N Dec. 951, 957 (BIA 2006); *Matter of A-M-E & J-G-U-,* 24 I&N Dec. 69, 71 (BIA 2007). And in practice, these elements often require immigration judges to consider country conditions evidence that are often not yet available to the migrant at the credible fear stage. Indeed, these standards have spawned significant amounts of litigation seeking clarity on the meaning of these terms.[10]

When determining whether to grant asylum after making a finding of credible fear, an asylum officer or immigration judge must also consider potential bars to asylum relief, including whether the individual persecuted others on protected bases, whether the individual has been found guilty of a "particularly serious crime," and whether there are reasonable grounds to believe that the asylum-seeker poses a threat to American national security. *See* USCIS Credible Fear Screening Q&A.

---

[9] *See* Fatma E. Marouf, *The Emerging Importance of "Social Visibility" in Defining a "Particular Social Group and Its Potential Impact on Asylum Claims Related to Sexual Orientation and Gender*, 27 Yale L. & Pol'y Rev. 47 (2008).

[10] *See* Fatma E. Marouf, *Becoming Unconventional: Correcting the 'Particular Social Group' Ground for Asylum*, N.C. J. Int'l Law, Summer 2019.

9

BRIEF OF *AMICUS CURIAE* FORMER IMMIGRATION JUDGES &
FORMER MEMBERS OF THE BOARD OF IMMIGRATION APPEALS          CASE NO. 18-CV-06810-JST

Under the Rule, both asylum officers and immigration judges are now prohibited from evaluating these complex issues of fact and law, as Congress intended when it created Expedited Removal. Instead of considering a full claim for credible fear, they are simply to examine whether the asylum-seeker booked an appointment via the CBP One app or was denied asylum in Mexico, or otherwise fit into an exceedingly narrow exception to the Rule. The important statutory roles asylum officers and immigration judges are intended to serve in evaluating asylum claims in the Expedited Removal process are now severely diminished.

### III.  The Rule Will Prolong Cases and Complicate the Role of Immigration Judges in Subsequent Proceedings.

The government seeks to justify the Rule as a mechanism of efficiency, and while it is indeed brutally efficient in sweeping away the ability of *bona fide* refugees to seek asylum at the U.S.-Mexico border, it in fact makes Expedited Removal and later proceedings more complicated. While the Rule all but eliminates asylum at the U.S.-Mexico border, it does not touch the potential forms of relief of withholding of removal and protection under CAT, as explained *supra* at 7. Both withholding of removal and CAT protection require higher thresholds of proof as compared to asylum claims, and they confer insufficient relief on migrants who should be able to pursue asylum claims and obtain the benefits thereof.[11] Accordingly, the idea that the Rule will mean the "swift returns" of migrants who do not meet its qualifications, "ensure that the processing of migrants seeking protection in the United States is done in an effective, humane, and efficient manner," and reduce the "inefficient" effects of allowing migrants to remain in the U.S. while awaiting the outcomes of their proceedings, is illusory. Circumvention of Lawful Pathways Rule, 88 Fed. Reg. 31314 (May 11, 2023).

Under the Rule, an asylum officer or immigration judge may have an easy time pretermitting what would have been a strong asylum claim, but still must consider alternative forms of relief. The

---

[11] *See* American Immigration Council & National Immigrant Justice Center, *The Difference Between Asylum and Withholding of Removal*, at 2 (Oct. 2020) https://www.americanimmigrationcouncil.org/sites/default/files/research/the_difference_between_asylum_and_withholding_of_removal.pdf ("Withholding of removal provides a form of protection that is less certain than asylum, leaving its recipients in a sort of limbo. A person who is granted withholding of removal may never leave the United States without executing that removal order, cannot petition to bring family members to the United States, and does not gain a path to citizenship.").

10

BRIEF OF *AMICUS CURIAE* FORMER IMMIGRATION JUDGES &
FORMER MEMBERS OF THE BOARD OF IMMIGRATION APPEALS                          CASE NO. 18-CV-06810-JST

credible fear interview thus turns into a reasonable fear interview, and every *bona fide* asylum-seeker now becomes an applicant for relief for withholding of removal (essentially, an asylum claim with a higher standard of proof and significantly reduced benefits) *and* for protection under the CAT (a different set of considerations). In other words, instead of one claim for asylum, the decision-maker in Expedited Removal must consider the Rule's exceptions, withholding of removal, *and* CAT for nearly every applicant.

And if the applicant passes the reasonable fear review and shows a likelihood of proving eligibility for that relief, what awaits is a Section 240 proceeding with a higher burden of proof and more complicated procedures. When granting withholding of removal, an immigration judge approves a removal order against the migrant, but then orders the federal government not to remove that person to their country of origin. If a third-party country, however, consents to accepting the migrant, then the U.S. government may remove that person to the other country.[12] Additionally, for a migrant to achieve relief under the withholding of removal process, she must show that it is "more likely than not" – a significantly higher standard than the ten percent required in the context of asylum relief – that she will face persecution if deported to her home country. Victoria Nielson et al, *Asylum Manual,* Immigration Equality. This heightened evidentiary standard and enduring state of limbo puts stress on the individual and on the system.

And for the erstwhile asylum-seeker, withholding is not the only form of potential relief. Under the Convention Against Torture, a migrant must show it is more likely than not that she would face statutorily-defined torture *and* that such torture would be committed by or at the acquiescence of the government. 8 C.F.R. § 1208.18(a)(1). This high evidentiary standard and multi-prong requirement yields protections for migrants that are weak compared to those conferred by asylum. Under CAT, migrants have no lawful immigration status; they merely avoid facing deportation to a nation likely to torture them.

Not only does the Rule turn nearly every asylum-seeker at the U.S.-Mexico border into an applicant for withholding and CAT relief, complicating both Expedited Removal and 240 Proceedings,

---

[12] *See supra* n.11.

11

but in the name of "efficiency" it also imposes life-changing adverse consequences for migrants who are eligible for asylum under the INA but are precluded from applying for it under the Rule.

## IV. The Rule Runs Afoul of International Law.

By undermining Congress' statutory Expedited Removal scheme and eviscerating asylum protections, the Rule also directly violates the protections provided to asylum-seekers by international law. The relevant principles of international law, found in the 1951 Refugee Convention, do not allow a receiving country to deny refugee protection on the basis of how a migrant enters that country's territory. Congress confirmed that U.S. commitment to these international law principles through the Refugee Act of 1980, which enacted a broad definition of "refugee," heightening the United States' refugee protections to comply with international law under the United Nations Convention and Protocol Relating to the Status of Refugees. Pub. L. No. 96-212, 94 Stat. 102 (1980). Congress' goal was to give "statutory meaning to our national commitment to human rights and humanitarian concerns." S. Rep. No. 96-256, at 4 (1979), *reprinted in* 1980 U.S.C.C.A.N. 141, 144.

Moreover, as construing federal laws to avoid violating international law has been a "maxim of statutory construction" in American law for more than two centuries, the Rule was required to consider not only the INA, but the backdrop of international refugee laws. *Lauritzen v. Larsen,* 345 U.S. 571, 578-79 (1953); *MacLeod v. United States,* 229 U.S. 416, 434 (1913); *Murray v. Schooner Charming Betsy,* 6 U.S. (2 Cranch) 64, 118 (1804). Indeed, the Board of Immigration Appeals and the Courts have long looked to the Refugee Convention and the UNHCR Handbook for guidance on a statute or rule's compliance with the Refugee Convention. *See, e.g., INS v. Cardoza-Fonseca,* 480 U.S. 421, 438-39 (1987). As the Handbook explains, under the Refugee Convention, the receiving country has the burden of determining whether a person is a refugee; the person does not need to prove her status as a refugee to receive appropriate protections. U.N. Refugee Agency, *Handbook on Procedures and Criteria for Determining Refugee Status and Guidelines on International Protection*, ¶ 28 (2019). The Rule entirely sets this standard on its head—it denies a refugee that recognition merely by her mode of transit or compliance with an arbitrary appointment-scheduling app.

12

BRIEF OF *AMICUS CURIAE* FORMER IMMIGRATION JUDGES &
FORMER MEMBERS OF THE BOARD OF IMMIGRATION APPEALS                    CASE NO. 18-CV-06810-JST

The Rule also creates new bars to asylum where none are permitted by the Refugee Convention, which includes very limited Exclusion and Cessation Clauses that define when asylum-seekers may be denied protection. Specifically, Article I(C) contains a number of cessation provisions, which focus on circumstances where the refugee has gained protection or otherwise is no longer in need of protection. Convention Relating to the Status of Refugees, art. 1, July 28, 1951, 189 UNTS 137. Article 1(F) sets forth Exclusions from protection to those who have engaged in war crimes, crimes against humanity, or other particularly serious crimes. *Id*. None of these cessation or exclusion clauses apply to an asylum-seeker who has merely transited through another country or, in the Rule's new argot, has "circumvented pathways," lawful or not. Indeed, Article 31 of the Refugee Convention specifically precludes signatory countries from imposing "penalties, on account of illegal entry or presence." *Id*.

The Rule bars the U.S. from recognizing refugees at the border for reasons that are well beyond those permitted by international law and the INA. It should therefore be enjoined.

## CONCLUSION

For the reasons stated above, *amici* respectfully urge the U.S. District Court for the Northern District of California to rule that the Circumvention of Lawful Pathways Rule is unlawful.

Dated: June 7, 2023

Respectfully submitted,
/s/ *Ashley Vinson Crawford*

ASHLEY VINSON CRAWFORD
AKIN GUMP STRAUSS HAUER & FELD LLP

*Counsel to Amici Former Immigration Judges & Former Members of the Board of Immigration Appeals*

13

BRIEF OF *AMICUS CURIAE* FORMER IMMIGRATION JUDGES &
FORMER MEMBERS OF THE BOARD OF IMMIGRATION APPEALS             CASE NO. 18-CV-06810-JST

# APPENDIX A
## Former Immigration Judges and Members of the Board of Immigration Appeals

Hon. Steven Abrams, Immigration Judge, New York, Varick St., and Queens Wackenhut, 1997-2013

Hon. Terry A. Bain, Immigration Judge, New York, 1994-2019

Hon. Dayna M. Beamer, Immigration Judge, Honolulu, 1997-2021

Hon. Sarah M. Burr, Assistant Chief Immigration Judge and Immigration Judge, New York, 1994-2012

Hon. Jeffrey S. Chase, Immigration Judge, New York, 1995-2007

Hon. Joan V. Churchill, Immigration Judge, Washington, D.C. and Arlington, VA, 1980-2005

Hon. George T. Chew, Immigration Judge, New York, 1995 - 2017

Hon. Matthew D'Angelo, Immigration Judge, Boston, 2003-2018

Hon. Bruce J. Einhorn, Immigration Judge, Los Angeles, 1990-2007

Hon. Cecelia M. Espenoza, Appellate Immigration Judge, Board of Immigration Appeals, 2000-2003

Hon. Noel A. Ferris, Immigration Judge, New York, 1994-2013

Hon. James R. Fujimoto, Immigration Judge, Chicago, 1990-2019

Hon. Gilbert Gembacz, Immigration Judge, Los Angeles, 1996-2008

Hon. Jennie Giambastiani, Immigration Judge, Chicago, 2002-2019

Hon. Alberto E. Gonzalez, Immigration Judge, San Francisco, 1995 - 2005

Hon. John F. Gossart, Jr., Immigration Judge, Baltimore, 1982-2013

Hon. Paul Grussendorf, Immigration Judge, Philadelphia and San Francisco, 1997-2004

Hon. Miriam Hayward, Immigration Judge, San Francisco, 1997-2018

Hon. Charles M. Honeyman, Immigration Judge, New York and Philadelphia, 1995-2020

Hon. Rebecca Jamil, Immigration Judge, San Francisco, 2016-2018

Hon. William P. Joyce, Immigration Judge, Boston, 1996-2002

Hon. Samuel Kim, Immigration Judge, San Francisco, 2020-2022

Hon. Carol King, Immigration Judge, San Francisco, 1995-2017

Hon. Eliza C. Klein, Immigration Judge, Miami, Boston, Chicago, 1994-2015; Senior Immigration Judge, Chicago, 2019-2023

14

BRIEF OF AMICUS CURIAE FORMER IMMIGRATION JUDGES &
FORMER MEMBERS OF THE BOARD OF IMMIGRATION APPEALS                    CASE NO. 18-CV-06810-JST

1. Hon. Elizabeth A. Lamb, Immigration Judge, New York, 1995 - 2018
2. Hon. Dana Leigh Marks, Immigration Judge, San Francisco, 1987-2021
3. Hon. Margaret McManus, Immigration Judge, New York, 1991-2018
4. Hon. Steven Morley, Immigration Judge, Philadelphia, 2010-2022
5. Hon. Charles Pazar, Immigration Judge, Memphis, 1998-2017
6. Hon. Robin Paulino, Immigration Judge, San Francisco, 2016-2020
7. Hon. Laura Ramirez, Immigration Judge, San Francisco, 1997-2018
8. Hon. John W. Richardson, Immigration Judge, Phoenix, 1990-2018
9. Hon. Lory D. Rosenberg, Appellate Immigration Judge, Board of Immigration Appeals, 1995-2002
10. Hon. Susan G. Roy, Immigration Judge, Newark, 2008-2010
11. Hon. Paul W. Schmidt, Chairperson and Appellate Immigration Judge, Board of Immigration Appeals, 1995-2003; Immigration Judge, Arlington, VA, 2003-2016
13. Hon. Helen Sichel, Immigration Judge, New York, 1997-2020
14. Hon. Patricia M. B. Sheppard, Immigration Judge, Boston, 1993-2006
15. Hon. Ilyce S. Shugall, Immigration Judge, San Francisco, 2017-2019
16. Hon. Andrea Hawkins Sloan, Immigration Judge, Portland, 2010-2017
17. Hon. Gabriel C. Videla, Immigration Judge, New York and Miami, 1994-2022
18. Hon. Robert D. Vinikoor, Immigration Judge, Chicago, 1984-2017
19. Hon. Polly A. Webber, Immigration Judge, San Francisco, 1995-2016
20. Hon. Robert D. Weisel, Assistant Chief Immigration Judge, Immigration Judge, New York, 1989-2016

15

BRIEF OF *AMICUS CURIAE* FORMER IMMIGRATION JUDGES &
FORMER MEMBERS OF THE BOARD OF IMMIGRATION APPEALS                    CASE NO. 18-CV-06810-JST