**DECLARATION OF LINDSAY TOCZYLOWSKI,
EXECUTIVE DIRECTOR, IMMIGRANT DEFENDERS LAW CENTER**

I, Lindsay Toczylowski, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2. I am the Co-Founder and Executive Director of Immigrant Defenders Law Center ("ImmDef") where I have been employed for 8 years. ImmDef is a non-profit organization incorporated in California and based in Los Angeles, with additional offices in San Diego, Santa Ana, and Riverside, California, that serves immigrants and asylum seekers throughout Southern California and in Tijuana, Mexico. ImmDef's mission is to defend immigrants against the injustices of our immigration system, and we achieve this mission by providing legal services through a universal representation model so immigrants are not forced to face removal proceedings alone.

3. In my role as Executive Director, I make executive decisions related to all of ImmDef's programs and budgets, oversee the management of ImmDef's representation and advocacy programs, and fundraise to support ImmDef's work. I am also a case-carrying attorney and represent a small number of individuals across ImmDef's representation programs.

4. As of May 2023, ImmDef has a total of 150 employees, including 57 attorneys, 8 post-bar law clerks, 2 law fellows, and 67 legal support staff members. Funding for our programs comes from a variety of sources that include the federal government, private foundations, and state and local governments. On occasion, ImmDef also raises money through crowdsourcing and individual donor campaigns, especially when faced with urgent humanitarian crises.

**ImmDef's Mission and Scope of Work**

5. ImmDef's vision is to create a public defender system for immigrants facing deportation, while working towards systemic change that makes our immigration system more just. ImmDef pursues this mission through several different programs and projects.

6. ImmDef represents approximately 2500 noncitizens in their removal proceedings and provides other legal services (discussed below) to approximately 21,000 additional noncitizens annually. Our clients include unaccompanied minor children, indigent detained and non-detained adults, individuals deemed mentally incompetent to represent themselves, families separated at the border, deported veterans, and individuals seeking asylum at the U.S.-Mexico border. We provide all representation on a *pro bono* basis.

7. ImmDef's Cross Border Initiative ("CBI") fights against cruelty toward migrants at the border, with a focus on assisting families and individuals in vindicating their right to asylum. ImmDef's CBI team, among other things: (1) provides legal screenings and consultations; (2) conducts "Know Your Rights" presentations; (3) equips families with the knowledge they will need if forced to represent themselves; (4) prepares asylum-seeking families to present themselves at the border; (5) identifies particularly vulnerable asylum-seeking families in Mexico who are at risk of family separation and provides them with specialized legal services to minimize risks of family separation and detention; (6) provides comprehensive credible fear interview preparation, document review, assistance obtaining documents from consulates, and matching of families with potential sponsors; (7) assists with and prepares requests for humanitarian parole and previously made requests for exemptions from exclusion under Title 42; (8) provides full-scale deportation defense to asylum-seeking families in San Diego, as well as deportation defense and bond requests for those individuals who are detained in Southern California ICE facilities and those who stay in

Southern California following their release from border facilities; (8) pursues appeals before the Board of Immigration Appeals; and (9) seeks to create systemic change in treatment of individuals, families, and unaccompanied children in CBP custody by monitoring conditions and treatment of clients, publicizing information, and engaging in policy advocacy.

8. Through contracts with local government entities in Southern California, ImmDef's Community Defense Program provides removal defense legal representation and services to immigrants facing deportation. ImmDef currently receives local-government funding to protect our communities from the cities of Long Beach, Santa Ana, San Diego, and Los Angeles, as well as from the county of Los Angeles. We also receive some private foundation funding to supplement our local government funding and grow our detained removal defense programs in Los Angeles, San Diego, and the Inland Empire.

9. ImmDef's Family Unity Project provides legal representation to separated families, pursues the release of parents from immigration detention, fights for the reunification of families, and provides reunified families with zealous defense in their immigration proceedings. ImmDef's Family Unity Project, which is now part of our Community Defense Program, is funded entirely through private donations and foundation grants.

10. ImmDef's National Qualified Representative Program provides representation to immigrants in detention who are entitled to court-appointed counsel because of serious mental disorders that render them unable to represent themselves. This model of court-appointed counsel in immigration court is possible due to *Franco-Gonzalez v. Holder*, a class action lawsuit and settlement. For these cases, handled through EOIR's National Qualified Representation Program ("NQRP"), ImmDef has a contract with the Acacia Center for Justice through which ImmDef handles a caseload of approximately 130 cases and agrees to a set number of new cases each year.

When EOIR identifies a person who is not competent to represent themselves, they will refer the case to Acacia, which will then assign it to us.

11. Our Deported Veterans Project provides comprehensive intake and screening for deported veterans from around the world for potential immigration and post-conviction relief. We offer limited representation to investigate potential claims for relief, including naturalization. For individuals eligible for immigration relief, we provide full representation either before the immigration court or before United States Citizenship and Immigration Services ("USCIS"). We also provide full representation in pardon applications to the State of California and federal mandamus litigation before the federal courts to move forward stalled naturalization applications.

12. Finally, ImmDef's Children's Representation Project is one of the largest programs of its kind in the United States and provides legal representation and *pro bono* placement (referrals for free representation by non-ImmDef attorneys) for more than 1500 children each year. ImmDef has a contract with the Office of Refugee Resettlement ("ORR"), managed by the Acacia Center for Justice, through which we provide legal orientation classes to all unaccompanied children in ORR custody in the Los Angeles area, and "friend of court" services or full-scope representation to any detained unaccompanied minor who has to go to court in the greater Los Angeles area. Further, we provide full-scope removal defense to all unaccompanied children released from ORR shelters we service to sponsors within any of the following counties in Southern CA: Los Angeles, Kern, Orange, Riverside, San Bernardino, Santa Barbara, or Ventura. Full-scope representation includes representation in immigration court as well as any ancillary state court proceedings that are necessary to obtain relief from removal.

13. ImmDef also serves as co-facilitator of the legal subgroup of the California Welcoming Task Force ("CAWTF"), a bi-national coalition of organizations working together to

welcome asylum seekers with dignity. The organizational members of the CAWTF provide a variety of services to asylum seekers, including respite shelter, case management, financial and travel assistance, legal support, COVID testing, and general medical assistance. Through CAWTF, humanitarian groups on both sides of the border work closely with local government authorities to process people seeking asylum safely and efficiently and assist them in reaching their destinations.

14. ImmDef receives requests for assistance from our various projects in several ways. As mentioned above, ImmDef provides representation for children and adults who do not have the capacity to represent themselves through contracts with the Acacia Center for Justice; we receive these cases as direct placement from Acacia or through the Acacia legal service provider networks. ImmDef is also listed on EOIR's list of providers of pro bono legal services under various jurisdictions. In addition, ImmDef has an email address for referrals and receives many clients through referrals from partner legal services organizations who operate hotlines or Legal Orientation Programs. We also work with community-based organizational partners who refer cases to us for residents of Santa Ana, Long Beach, Los Angeles, San Diego, and the Inland Empire.

15. At present, ImmDef has approximately 2,150 open immigration cases, more than 1,100 of which involve clients who are asylum eligible. The vast majority of our clients who pursue asylum are in removal proceedings. We also represent clients or prepare individuals for *pro se* CFIs approximately 60 times a year. The most common nationalities of our active asylum-seeking clients are Guatemalan (30%), Salvadoran (20%), Mexican (19%), Honduran (17%), Afghan (2%), and Colombian (2%), most of whom enter through the U.S.-Mexico border.

**The Asylum Ban Rule**

16. The Department of Justice ("DOJ") and Department of Homeland Security's ("DHS") rule, proposed on February 23, 2023, and finalized on May 10, 2023, is illegal, inhumane, and discriminatory. The Rule generally creates a presumption of asylum ineligibility for non-Mexican individuals and families at the southern border unless they applied for and received a denial of protection in a transit country or obtained an appointment on a smartphone app called CBP One. As described in further detail below, the CBP One app has been riddled with technological glitches, making it extremely difficult for individuals and families to obtain the necessary appointment to pursue their asylum claims.

17. The proposed rule would trap asylum seekers in dangerous parts of Mexico for prolonged periods of time, bar many refugees from asylum protection in the United States, separate families, and force refugees to return to countries where they are likely to suffer persecution and torture.

18. In accordance with ImmDef's mission of expanding access to representation to any and all noncitizens within the immigration system so that they do not face immigration court without counsel, our organization assists and represents individuals seeking asylum at the U.S.-Mexico border. Under a universal representation model, ImmDef represents asylum seekers in their removal proceedings, without regard to how they entered the United States or what countries they transited through on their way to the border. However, the Asylum Ban Rule will seriously undermine these efforts by making cases more time-consuming and resource-intensive and by forcing us to divert vast organizational resources away from our existing programs and alter our service-delivery model to address the urgent needs of asylum seekers at the southern border and to represent individuals who are barred from asylum.

19. ImmDef submitted comments on the proposed rule on March 27, 2023. As we noted in our comments, the 30-day comment period provided insufficient time for ImmDef, impacted individuals, and the general public to weigh in on the significant changes proposed by the rule and the drastic implications the rule would have for asylum seekers at the southern U.S. border to whom we provide legal services. In that short window, ImmDef was not able to fully analyze the complex 153-page proposed rule or its implications for our clients, and thus we could not adequately respond.

20. In addition to not having sufficient time to comment on the rule, there are a number of issues that ImmDef did not raise because we were not aware of them until after the comment period was closed. For example, we did not know until after the close of the comment period that the agencies planned to resume conducting credible fear interviews (CFIs) for those individuals in the custody of Customs and Border Protection (CBP). Had we been aware of this, we would have vehemently objected because of the challenges of assisting asylum seekers in CBP custody, the lack of access to counsel in CBP custody, and the resulting burden on legal counsel to prepare for now significantly-more-complicated credible fear interviews upon the implementation of the Asylum Ban Rule. Under the Rule, the rebuttable presumption of ineligibility for asylum described above applies in affirmative and defensive asylum application merits adjudications, as well as during credible fear screenings. Preparing an asylum seeker for a credible fear interview will require significantly more time to explain the Rule and to collect evidence that would help the asylum seeker prove that they meet one of the few "exceptionally compelling circumstances" that would rebut the presumption of asylum ineligibility.

21. Beyond the harm to ImmDef and to our clients caused by the Asylum Ban Rule, as described below, ImmDef is additionally harmed by the fact that the final rule was issued without

a 30-day notice period before its implementation. With more time before the rule's implementation, ImmDef would have been able to train our staff on the Rule and its impact on our clients, update our educational materials, and adjust our intake and consultation procedures to identify and advise those clients who will be subject to the Rule. We will now have to scramble to do all of those things under a much faster timeline, thereby diverting even more resources away from providing removal defense representation, representation at bond hearings, and appeals before the BIA and the Ninth Circuit Court of Appeals.

**Inability of ImmDef's Clients to Seek Protection in Transit Countries**

22.     ImmDef understands the dangers refugees encounter when traveling through Mexico. Since 2019, ImmDef attorneys have provided consultations to hundreds of asylum seekers in Tijuana and Mexicali, Mexico. Through the CBI Project, we have also represented migrants who have been robbed, raped, tortured, kidnapped by cartels, or extorted by Mexican authorities, among other atrocities.  One family we represented had been kidnapped by a cartel and was forced to watch them torture migrants who challenged their authority. We also represented a gay Salvadoran woman stranded in Mexico under the Migrant Protection Protocols (MPP) who was targeted and raped based on her sexual orientation.

23.     Gang violence is also a pervasive problem in Mexico, which the government is either unable or unwilling to prevent. In early 2021, ImmDef assisted a Honduran family enrolled in MPP. The mother was threatened by her ex-partner, an MS-13 gang member, who told her the gang was looking for her in Mexico and threatened to kill her and kidnap her 4-year-old son so that he could be raised to become a gang member. ImmDef also advised a pregnant Guatemalan woman stranded in Mexico who had fled persecution by gangs in Guatemala. The gang had found

her twice in Mexico, and she narrowly escaped each time. Meanwhile, the gang located her partner in Tijuana and beat him.

24. LGBTQ+ and Black refugees are subject to discrimination and harassment in Mexico, and they are often victims of physical violence. ImmDef represented a Black asylum seeker enrolled in MPP who was falsely imprisoned and extorted by Mexican authorities and harassed by local authorities in Tijuana due to his race. We also represented an Afro-Cuban LGBTQ+ asylum seeker who, as she waited for her MPP hearings, was persecuted by Mexican police due to her sexual orientation.

**Obstacles to Navigating CBP One**

25. When DHS announced that it would require asylum seekers to use the CBP One smartphone app to make an appointment to seek asylum at a port of entry, ImmDef's CBI Project began receiving many questions about the process from our partners across the border in Mexico. At migrant shelters across the border, asylum seekers were having serious difficulties using the CBP One app to schedule appointments, including technological glitches, lack of adequate Wi-Fi access or cell phone service, and lack of access to a smartphone, which is required to use the CBP One app.

26. On January 24, 2023, I traveled with three ImmDef staff members to two migrant shelters in Tijuana, Mexico—Pro Amore Dei and Borderline Crisis Center—to provide community education presentations. Out of about two hundred people at the Pro Amore Dei shelter, only two had been able to obtain a CBP One appointment on their own. At Borderline Crisis Center, several people told ImmDef staff that they had not been able to get appointments, despite multiple attempts. Many migrants expressed confusion, as they had attempted to obtain appointments for

many weeks but were unable to do so because the application had technical issues or there were no appointments available.

27.  On February 6, 2023, I returned to Tijuana and visited a shelter called Juventud 2000 in collaboration with a humanitarian aid organization. I provided pro se assistance to asylum seekers who were attempting to obtain appointments using CBP One. Out of approximately 150 families at the shelter, not one had successfully made an appointment via the CBP One app. I had to contend with CBP One's many glitches as I helped migrants use the app. For example, CBP One—which is currently only available in English, Spanish, and Haitian Creole—is inaccessible to many Indigenous, African, and other asylum seekers due to language barriers. Many refugees could not understand the error messages because they were in English, even for those trying to make appointments using the Spanish version of the app. I personally spent hours translating error messages for people desperately trying to make appointments, often with no luck.

28.  On March 1, 2023, 11 ImmDef staff members and I traveled from Los Angeles, Riverside, Santa Ana, and San Diego to Tijuana, Mexico, to conduct another legal clinic to assist asylum seekers at the border in seeking and obtaining CBP One appointments. The ImmDef team members provided community education presentations at Borderline Crisis Center shelter and a legal clinic at Espacio Migrante, a local community center. ImmDef served people who fled Haiti, Bangladesh, Honduras, Venezuela, Cuba, and Mexico, among other countries. Migrant shelters in Tijuana have also been helping families from various other countries, including Cameroon, Ivory Coast, and Russia. Over 150 people, including families with children, attended the legal clinic to seek guidance on how to obtain appointments through the CBP One app.

29.  As in February, the CBP One app continued to exhibit multiple glitches and errors, and many of those whom we attempted to help were unable to obtain appointments through the

app. For example, some family members were unable to obtain appointments together when the app would not let them make an appointment on the same day. Others relayed that they had been trying to get appointments for weeks or, in some cases, months. There were about six people who had managed to select an appointment time, but they never received a confirmation email. They had taken a screenshot of the appointment time they were given, but when they arrived for that appointment at the designated port of entry, CBP told them they could not assist them because they did not have a confirmation email. A few individuals indicated that the app had prevented them from getting an appointment because they were not near the port of entry, even though their actual location, as determined by the app, showed they were in fact located near the port of entry.

30. Staff members also assisted asylum seekers who were not able to register with CBP One because they are Black or Brown. CBP One disparately harms asylum seekers with dark skin due to racial bias in its facial recognition technology. On March 1, 2023, two ImmDef staff members tried for twenty minutes to capture the photo of an asylum seeker with a darker complexion to no avail because the app would not recognize the person's face.

31. The requirement to register through the CBP One app to seek asylum in the United States also adversely impacts poor and low-income asylum seekers. Flaws with the app force individuals to make many attempts to register. During ImmDef's March 2023 clinic in Tijuana, one of our attorneys met with a Haitian man who was not able to register through the CBP One app because he could not afford to buy more time on his phone's SIM card.

32. On April 27, 2023, I joined 8 colleagues from our Los Angeles, Santa Ana, and San Diego offices in Tijuana at the Borderline Crisis Center to conduct a community education presentation, provide legal consultations, and assist individuals and families in seeking and obtaining CBP One appointments. The community education presentation included information

about the Asylum Ban Rule, in order to explain to attendees their current options and how those options would change and become more limited once the Asylum Ban Rule and other policies at the border were implemented after May 11, 2023.

33. Of the more than 100 people who attended the legal clinic, only two families had already obtained an appointment through CBP One. The vast majority of attendees would therefore be entering the United States after the end of Title 42 and the implementation of the Asylum Ban Rule, making them subject to a presumption of ineligibility for asylum that is virtually impossible to rebut. Although they will remain eligible for withholding of removal and relief under the Convention Against Torture, they are likely to be detained by CBP and deported quickly unless they can satisfy the heightened "reasonable possibility" of harm standard at the credible fear interview stage.

34. One Venezuelan mother who was lucky enough to get a CBP One appointment was forced to travel by bus over 20 hours away from Tijuana to her appointment because of an error. Although she was scared to travel so far by bus, we advised her that her fate and that of her children would be uncertain if she waited in Tijuana in hopes of obtaining an appointment that was closer. As had been the case for months, the CBP One app continued to exhibit glitches and error screens in English that were difficult to maneuver around and to explain to those seeking appointments.

35. By requiring people at the southern border to use CBP One, the Asylum Ban Rule forces many vulnerable asylum seekers to wait indefinitely in northern Mexico, placing them in grave danger. The permanent and mandatory use of CBP One will continue to frustrate ImmDef's mission to provide all immigrants with counsel in their immigration proceedings. Given the requirement to obtain a CBP One appointment, despite its errors and glitches, individuals and families who would otherwise have been able to present themselves at the border to seek asylum

will be unable to access the asylum system altogether. Moreover, ImmDef expects to continue to incur significant costs and to divert substantial resources for additional trips to Tijuana and Mexicali to provide information, legal consultations, and assistance to migrants as they attempt to obtain an appointment through CBP One, and to educate them about the Asylum Ban Rule.

**The Asylum Ban Rule Irreparably Harms ImmDef and Its Clients**

36. In April 2023, I instructed Melissa Shepard, Directing Attorney for our San Diego office and the lead attorney on our CBI Project, to shift some of her time and that of our San Diego staff to prepare for the impending implementation of the Asylum Ban Rule. In order to do so, members of our San Diego team have had to reduce the time that they dedicate to providing removal defense legal services to people detained at the Otay Mesa Detention Center and limited representation services to individuals at the Imperial Regional Detention Facility. As a result, our San Diego office will be able to handle far fewer removal cases than we would otherwise accept, which could impact funding for our San Diego-based team as they must maintain a specific number of cases to maintain our current funding under our contract with the State of California. Further, as panel attorneys through a program with the Public Defender Office in San Diego, if we are unable to take on new matters, we will not receive any of our budgeted funding from that source. Therefore, shifting the focus for our team creates new, additional gaps for which we must fundraise.

37. The inability of most ImmDef clients to seek protection in Mexico or another transit country, to obtain an appointment through CBP One, or to satisfy one of the narrow exceptions to the presumption of ineligibility under the Asylum Ban Rule will make most of them ineligible for asylum. Since very few people will be eligible for asylum, ImmDef will have to take on even more cases in a defensive posture. In addition, the added complexity of our defensive cases involving

clients subject to the Asylum Ban Rule will make ImmDef's representation more complicated and labor-intensive. In order to rebut the presumption of ineligibility for asylum or to establish an exception to the Asylum Ban Rule, ImmDef will need to spend more time conducting intakes, preparing arguments, and collecting evidence, thereby substantially reducing the total number of cases that ImmDef can take on. Because more clients will be eligible only for withholding of removal or protection under the Convention Against Torture—claims that require more evidence, are more time-intensive to pursue, and are tougher to win—the number of ImmDef cases requiring appeals to the Board of Immigration Appeals and petitions to the Ninth Circuit Court of Appeals will increase. Finally, ImmDef will need to increase the number of legal clinics, community education sessions, and Know Your Rights presentations it provides to individuals and families and create new materials to explain the Asylum Ban Rule and its limitations on the ability to obtain asylum.

38. ImmDef has already diverted funding from other projects to fund the work of our CBI Project on the Asylum Ban Rule. This decision was driven by our sense of the urgency of the need and partner organizations' relative lack of resources to assist asylum seekers in Tijuana and Mexicali who will be subject to this Rule. Our staff has reduced capacity to represent asylum seekers in removal proceedings because they spend more of their time providing consultations to asylum seekers stranded in Tijuana, participating in community education events in Tijuana to assist refugees in completing the CBP One application process to obtain an appointment, and responding to inquiries from human rights organizations and attorneys throughout the United States regarding the status of asylum at the southern U.S. border.

39. To provide legal advice and assistance to individuals subject to the Asylum Ban Rule, ImmDef must engage in international, cross-border travel to Mexico. This work entails

additional costs, including travel expenses to both Tijuana and Mexicali from Los Angeles, Santa Ana, and San Diego; phones with international plans for staff; international travel insurance for our team; and salaries for staff in San Diego and for staff who travel from other offices to the border. Since January 2023, ImmDef has spent approximately $16,500 on these costs associated with sustaining our CBI Project to support limited representation, Know Your Rights presentations, and CBP One clinics for asylum seekers. ImmDef has largely funded this work through the reallocation of previously raised funds that had been designated for removal defense and the provision of other legal services, including representation at bond hearings for individuals detained in Southern California and on appeals before the Board of Immigration Appeals.

40. For the foregoing reasons, the Asylum Ban Rule will severely compromise ImmDef's mission, force the organization to divert substantial resources away from its existing programs, and irreparably harm ImmDef and its clients.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Lindsay Toczylowski

Executed this 2nd day of June 2023