BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*
WILLIAM C. PEACHEY
*Director*
EREZ REUVENI
*Assistant Director*
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 307-4293
Email: Erez.R.Reuveni@usdoj.gov
PATRICK GLEN
CHRISTINA P. GREER
*Senior Litigation Counsel*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| East Bay Sanctuary Covenant, *et al.*, | No. 4:18-cv-06810-JST |
| Plaintiffs, | **CROSS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| Joseph R. Biden, *et al.*, | |
| Defendants. | |

# TABLE OF CONTENTS

**INTRODUCTION** ....................................................................................................... 1

**LEGAL AND PROCEDURAL BACKGROUND** ..................................................... 1

Legal Background............................................................................................................ 4

Title 42............................................................................................................................. 6

Joint Rule......................................................................................................................... 6

This Lawsuit ....................................................................................................................

**STANDARD OF REVIEW** ......................................................................................... 9

**ARGUMENT** ................................................................................................................ 9

**I.      The Government is Entitled to Summary Judgment**...................................... 9

    A.     Plaintiffs Lack Standing................................................................... 9

    B.     The Rule Is Consistent With The INA. ......................................... 10

        1.    The rule is authorized by the INA ..................................... 10

        2.    The rule is consistent with Ninth Circuit precedent................. 13

        3.    Plaintiffs' remaining arguments are unavailing....................... 16

    C.     The Rule Is Not Arbitrary and Capricious.......................................... 19

        1.    The Rule does not rely on impermissible factors ................... 21

        2.    The Rule's reliance on lawful pathways is supported by the record.. ...... 22

        3.    The Rule does not rely on any assumptions concerning meritorious claims.. .................................................................... 26

        4.    The Rule does not fail to consider interrelated policies............ 27

    D.     The Rule Satisfies the APA's Procedural Requirements................................. 29

        1.    The 33-day comment period is consistent with the APA........................ 29

        2.    The Departments provided relevant data............................... 31

**II.     Any Relief Must Be Sharply Limited.** ...................................................... 32

**CONCLUSION** ...................................................................................................... 35

**CERTIFICATE OF SERVICE** ..........................................................................

# TABLE OF AUTHORITIES

## CASE LAW

*Abebe v. Mukasey*,
554 F.3d 1203 (9th Cir. 2009)...................................................................................... 11

*Air Transp. Ass'n of Am., Inc. v. U.S. Dep't of Agric.*,
317 F. Supp. 3d 385 (D.D.C. 2018)............................................................................. 35

*Alanniz v. Barr*,
924 F.3d 1061 (9th Cir. 2019)..................................................................................... 17

*All. for the Wild Rockies v. U.S. Forest Serv.*,
907 F.3d 1105 (9th Cir. 2018)..................................................................................... 34

*Allina Health Servs. v. Sebelius*,
746 F.3d 1102 (D.C. Cir. 2014)................................................................................... 32

*Barr v. Am. Ass'n of Political Consultants, Inc.*,
140 S. Ct. 2335 (2020)................................................................................................ 34

*Barr v. East Bay Sanctuary Covenant*,
140 S. Ct. 3 (2019).................................................................................................. 3, 15

*Block v. Cmty. Nutrition Inst.*,
467 U.S. 340 (1984).................................................................................................... 10

*Bob Jones Univ. v. United States*,
461 U.S. 574 (1983).................................................................................................... 12

*Bringas-Rodriguez v. Sessions*,
850 F.3d 1051 (9th Cir. 2017)..................................................................................... 17

*California Communities Against Toxics v. U.S. EPA*,
688 F.3d 989 (9th Cir. 2012)................................................................................. 34, 35

*City of Sausalito v. O'Neill*,
386 F.3d 1186 (9th Cir. 2004)..................................................................................... 30

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013).................................................................................................... 10

*Clarke v. Secs. Indus. Ass'n*,
479 U.S. 388 (1987).................................................................................................... 10

*Dep't of Commerce v. New York,*
  139 S. Ct. 2551 (2019).................................................................................. 27

*Dhakal v. Sessions,*
  895 F.3d 532 (7th Cir. 2018)........................................................................... 4

*East Bay Sanctuary Covenant v. Barr,*
  385 F. Supp. 3d 937 (N.D. Cal.).................................................................... 10

*East Bay Sanctuary Covenant v. Barr,*
  934 F.3d 1026 (9th Cir. 2019)........................................................................ 34

*East Bay Sanctuary Covenant v. Biden,*
  993 F.3d 664 (9th Cir. 2021)...................................................................... 9, 14

*East Bay Sanctuary Covenant v. Garland,*
  994 F.3d 962 (9th Cir. 2020)..................................................... 10, 11, 15, 16

*East Bay Sanctuary Covenant v. Trump,*
  909 F.3d 1219 (9th Cir. 2018)......................................................................... 9

*Env't Def. Fund, Inc. v. EPA,*
  82 F.3d 451 (D.C. Cir. 1996) ......................................................................... 11

*FCC v. Prometheus Radio Project,*
  141 S. Ct. 1150 (2021).................................................................................. 20

*Garland v. Aleman Gonzalez,*
  142 S. Ct. 2057 (2022)............................................................................ 32, 33

*Gill v. DOJ,*
  913 F.3d 1179 (9th Cir. 2019)........................................................................ 19

*Gill v. Whitford,*
  138 S. Ct. 1916 (2018).............................................................................. 9, 33

*Grace v. Barr,*
  965 F.3d 883 (D.C. Cir. 2020) ...................................................................... 32

*Hall v. EPA,*
  273 F.3d 1146 (9th Cir. 2001)........................................................................ 30

*Holder v. Humanitarian L. Project,*
  561 U.S. 33 (2010) ........................................................................................ 35

*INS v. Cardoza-Fonseca,*
    480 U.S. 421 (1987).................................................................................... 4, 10

*Komarenko v. INS,*
    35 F.3d 432 (9th Cir. 1994)...................................................................... 11, 14

*Las Americas Immigrant Advoc. Ctr. v. Wolf,*
    507 F. Supp. 3d 1 (D.D.C. 2020)............................................................. 27, 28

*Linda R.S. v. Richard D.,*
    410 U.S. 614 (1973).......................................................................................... 9

*Little Sisters of the Poor Saints Peter & Paul Home v. Penn.,*
    140 S. Ct. 2367 (2020)................................................................................... 30

*Lopez v. Davis,*
    531 U.S. 230 (2001)........................................................................................ 13

*Madsen v. Women's Health Ctr., Inc.,*
    512 U.S. 753 (1994)........................................................................................ 33

*Marczak v. Greene,*
    971 F.2d 510 (10th Cir. 1992)....................................................................... 17

*Massachusetts v. EPA,*
    549 U.S. 497 (2007)........................................................................................ 19

*Moncrieffe v. Holder,*
    568 U.S. 184 (2013).......................................................................................... 6

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.,*
    463 U.S. 29 (1983) ......................................................................................... 20

*Nat'l Lifeline Ass'n v. FCC,*
    921 F.3d 1102 (D.C. Cir. 2019) .................................................................... 30

*Occidental Eng'g Co. v. INS,*
    753 F.2d 766 (9th Cir. 1985)........................................................................... 9

*Omnipoint Corp. v. FCC,*
    78 F.3d 620 (D.C. Cir. 1996) ........................................................................ 30

*Pacific Power & Light Co. v. FPC,*
    111 F.2d 1014 (9th Cir. 1940)....................................................................... 11

*Phillips Petroleum Co. v. EPA,*
   803 F.2d 545 (10th Cir. 1986) ................................................................... 29

*Power Corp. v. NRDC,*
   435 U.S. 519 (1978) ....................................................................... 29, 32

*Radio-Television News Directors Ass'n v. F.C.C.,*
   184 F.3d 872 (D.C. Cir. 1999) ..................................................................... 34

*Reno v. Flores,*
   507 U.S. 292 (1993) ................................................................................... 34

*Riverbend Farms, Inc. v. Madigan,*
   958 F.2d 1479 (9th Cir. 1992) ..................................................................... 29

*R-S-C v. Sessions,*
   869 F.3d 1176 (10th Cir. 2017) ........................................................14, 15, 22

*Sacora v. Thomas,*
   628 F.3d 1059 (9th Cir. 2010) ................................................................ 19, 20

*San Luis & Delta-Mendota Water Auth. v. Locke,*
   776 F.3d 971 (9th Cir. 2014) ......................................................................... 9

*Sure-Tan, Inc. v. NLRB,*
   467 U.S. 883 (1984) ..................................................................................... 9

*Trump v. Hawaii,*
   138 S. Ct. 2392 (2018) ......................................................................... 15, 34

*United States v. Arvizu,*
   534 U.S. 266 (2002) ................................................................................... 22

*United States v. Cortez,*
   449 U.S. 411 (1981) ................................................................................... 35

*Wide Voice, LLC v. FCC,*
   61 F.4th 1018 (9th Cir. 2023) ..................................................................... 13

*Yang v. INS,*
   79 F.3d 932 (9th Cir. 1996) ................................................................. 11, 13

**STATUTES**

5 U.S.C. § 553(c) ........................................................................................... 9

5 U.S.C. § 706 ................................................................................................ 8, 9, 30

5 U.S.C. § 706(2) ................................................................................................ 34

6 U.S.C. § 552(d) .................................................................................................. 5

6 U.S.C. § 111(b)(1) ............................................................................................ 19

6 U.S.C. § 202 ...................................................................................................... 19

6 U.S.C. § 211(c) .................................................................................................. 19

6 U.S.C. § 211(g)(3) ............................................................................................ 19

8 U.S.C. § 1101 ...................................................................................................... 4

8 U.S.C. § 1101(a)(13) ........................................................................................ 17

8 U.S.C. § 1101(a)(42) .......................................................................................... 4

8 U.S.C. § 1101(a)(42)(A) .................................................................................. 11

8 U.S.C. § 1103(a)(1) ...................................................................................... 5, 19

8 U.S.C. § 1103(a)(3) ............................................................................................ 5

8 U.S.C. § 1103(g) ................................................................................................. 5

8 U.S.C. § 1103(3) ........................................................................................ 13, 19

8 U.S.C. § 1103(5) ................................................................................................ 19

8 U.S.C. § 1157 .................................................................................................... 17

8 U.S.C. § 1158 .............................................................................................. 4, 10

8 U.S.C. § 1158(a) ................................................................................................ 11

8 U.S.C. § 1158(a)(1) .......................................................................................... 22

8 U.S.C. § 1158(a)(2) ............................................................................................ 5

8 U.S.C. § 1158(a)(2)(A) .................................................................................... 14

8 U.S.C. § 1158(a)(2)(A)(vi) .............................................................................. 14

8 U.S.C. § 1158(a)(2)(B) .................................................................................. 12

8 U.S.C. § 1158(a)(2)(C) .................................................................................. 12

8 U.S.C. § 1158(b)(1)(A) .................................................................................... 1

8 U.S.C. § 1158(b)(1)(B) .................................................................................... 5

8 U.S.C. § 1158(b)(2) ............................................................................... 4, 5, 1

8 U.S.C. § 1158(b)(2)(C) ................................................................... 3, 10, 12, 13

8 U.S.C. § 1158(d)(5)(B) ............................................................................. 5, 10

8 U.S.C. § 1158(d)(7) ...................................................................................... 10

8 U.S.C. § 1158(3) ........................................................................................... 4,

8 U.S.C. § 1158-1159 ....................................................................................... 4,

8 U.S.C. § 1182(d)(5) ...................................................................................... 17

8 U.S.C. §§ 1221-31 ....................................................................................... 32

8 U.S.C. § 1225 .............................................................................................. 33

8 U.S.C. § 1225(b)(1) .................................................................................. 5, 32

8 U.S.C. § 1225(b)(1)(B)(iii)(III) ......................................................................... 5

8 U.S.C. § 1225(b)(1)(B)(v) ................................................................................ 5

8 U.S.C. § 1229a ................................................................................... 4, 32, 33

8 U.S.C. § 1229a(b)(4)(A)-(B) .......................................................................... 34

8 U.S.C. § 1229a(c)(1)(A) ................................................................................ 34

8 U.S.C. § 1229a(c)(4)(B) ................................................................................ 34

8 U.S.C. § 1231 .............................................................................................. 33

8 U.S.C. § 1231(b)(3) ........................................................................................ 5

8 U.S.C. § 1252(a)(2)(A) .................................................................................. 28

8 U.S.C. § 1252(a)(2)(A)(iv) .................................................................................... 32

8 U.S.C. § 1252(a)(5) .................................................................................... 10, 34

8 U.S.C. § 1252(b)(9) .................................................................................... 34

8 U.S.C. § 1252(e)(1) .................................................................................... 32

8 U.S.C. § 1252(e)(3) .................................................................................... 28

8 U.S.C. § 1252(f) .................................................................................... 28, 33

8 U.S.C. § 1252(f)(1) .................................................................................... 33

8 U.S.C. § 1252(3) .................................................................................... 32

42 U.S.C. § 265 .................................................................................... 6

## REGULATIONS

8 C.F.R. § 208.2(a) .................................................................................... 4

8 C.F.R. § 208.2(b) .................................................................................... 4

8 C.F.R. § 208.8(f) .................................................................................... 11

8 C.F.R. § 208.13(f) .................................................................................... 7

8 C.F.R. § 208.13(b)(1) .................................................................................... 11

8 C.F.R. §§ 208.16-.18 .................................................................................... 6

8 C.F.R. § 208.33(a) .................................................................................... 7

8 C.F.R. § 208.33(a)(1) .................................................................................... 7

8 C.F.R. § 208.33(a)(2) .................................................................................... 8

8 C.F.R. § 208.33(a)(2)(ii)(A) ....................................................................16, 18, 24

8 C.F.R. § 208.33(a)(2)(B) .................................................................................... 23

8 C.F.R. § 208.33(a)(3) .................................................................................... 23

8 C.F.R. § 208.33(a)(3)(i)(A)-(C) .................................................................................... 8

8 C.F.R. § 208.33(a)(3)(ii) ........................................................................................... 8

8 C.F.R. § 208.33(b) ..................................................................................................... 32

8 C.F.R. § 208.33(d) ..................................................................................................... 34

8 C.F.R. § 214.11(a) ...................................................................................................... 8

8 C.F.R. § 1208.2(b) ...................................................................................................... 4

8 C.F.R. § 1208.13(b)(1) ............................................................................................... 11

8 C.F.R. § 1208.13(f) ..................................................................................................... 7

8 C.F.R. §§ 1208.16-.18 ................................................................................................ 6

8 C.F.R. § 1208.33(a) .................................................................................................... 7

8 C.F.R. § 1208.33(a)(1) ............................................................................................... 7

8 C.F.R. § 1208.33(a)(2) ............................................................................................... 8

8 C.F.R. § 1208.33(a)(2)(ii)(A) ............................................................................... 18, 24

8 C.F.R. § 1208.33(a)(3)(1) ........................................................................................... 8

8 C.F.R. § 1208.33(a)(3)(i)(A)-(C) ............................................................................... 8

8 C.F.R. § 1208.33(b) .................................................................................................... 32

8 C.F.R. § 1208.33(c) ................................................................................................ 8, 34

8 C.F.R. § 1240.11(c) .................................................................................................... 4

**FEDERAL REGISTER**

45 Fed. Reg. 37,392 ...................................................................................................... 11

55 Fed. Reg. 30,674 .................................................................................................. 5, 11

55 Fed. Reg. 30,678 ...................................................................................................... 11

55 Fed. Reg. 30,683 .................................................................................................. 5, 11

65 Fed. Reg. 76,121 ....................................................................................................... 5

65 Fed. Reg. 76,126 ........................................................................................................... 5

83 Fed. Reg. 55,934 ......................................................................................................... 14

83 Fed. Reg. 55,952 ......................................................................................................... 14

84 Fed. Reg. 33,829 ......................................................................................................... 16

84 Fed. Reg. 33,843 ......................................................................................................... 16

86 Fed. Reg. 42,828 ........................................................................................................... 6

87 Fed. Reg. 16,022 ........................................................................................................... 5

87 Fed. Reg. 18 078 ......................................................................................................... 31

88 Fed. Reg. 11,704 ........................................................................................................... 1

88 Fed. Reg. 11,705 ..................................................................................................... 6, 31

88 Fed. Reg. 11,705-06 ................................................................................................... 28

88 Fed. Reg. 11,706 ......................................................................................................... 28

88 Fed. Reg. 11,720-23 ..................................................................................................... 6

88 Fed. Reg. 11,724 ......................................................................................................... 32,

88 Fed. Reg. 11,734 ........................................................................................................... 5

88 Fed. Reg. 11,736 ......................................................................................................... 13

88 Fed. Reg. 31,312 ......................................................................................................... 28

88 Fed. Reg. 31,314 ........................................................................................................... 1

88 Fed. Reg. 31,314-19 ............................................................................................... 20, 26

88 Fed. Reg. 31,315 ......................................................................................................... 28

88 Fed. Reg. 31,316 ......................................................................................................... 20

88 Fed. Reg. 31,316-17 ................................................................................................... 28

88 Fed. Reg. 31,316-19 ................................................................................................... 12

88 Fed. Reg. 31,317 .................................................................................................... 28

88 Fed. Reg. 31,317-318 ............................................................................................. 27

88 Fed. Reg. 31,318 .................................................................................................... 21

88 Fed. Reg. 31,322 .................................................................................................... 24

88 Fed. Reg. 31,324 .................................................................................................... 30

88 Fed. Reg. 31,325 .................................................................................................... 28

88 Fed. Reg. 31,328 ................................................................................................ 31, 32

88 Fed. Reg. 31,331 ...................................................................................................... 6

88 Fed. Reg. 31,337 .................................................................................................. 6, 28

88 Fed. Reg. 31,345 .................................................................................................... 26

88 Fed. Reg. 31,355-57 ............................................................................................... 31

88 Fed. Reg. 31,363 .................................................................................................... 27

88 Fed. Reg. 31,396 ...................................................................................................... 7

88 Fed. Reg. 31,398 ......................................................................................... 19, 22, 23

88 Fed. Reg. 31,406 .................................................................................................... 23

88 Fed. Reg. 31,410 .................................................................................................... 25

88 Fed. Reg. 31,413 .................................................................................................... 18

88 Fed. Reg. 31,415 .................................................................................................... 24

88 Fed. Reg. 31,430 .................................................................................................... 28

88 Fed. Reg. 31,431 .................................................................................................... 24

88 Fed. Reg. 31,433-35 ........................................................................................... 29, 31

88 Fed. Reg. 31,444-47 .................................................................................................. 6

**PUBLIC LAW**

Pub. L. 104-208 ..................................................................................................... 12

**LEGISLATIVE HISTORY**

H.R. Rep. No.  469 ................................................................................................. 17

**MISCELLANEOUS**

U.S Department of Homeland Security, *Asylum Processing Rule Cohort Reports*, (Last visited
   Jun. 16, 2018), https://www.dhs.gov/immigration-statistics/special-reports/asylum-processing-
   rule-report........................................................................................................ 31

# INTRODUCTION

Plaintiffs challenge a critical new rule promulgated by the Departments of Homeland Security (DHS) and Justice (DOJ) to address an anticipated influx of migrants at the southwest border by incentivizing the use of safe, orderly, and lawful pathways to enter the United States or seek protection in third countries. *See* Circumvention of Lawful Pathways, 88 Fed. Reg. 31,314 (May 16, 2023) (final rule); Circumvention of Lawful Pathways, 88 Fed. Reg. 11,704 (Feb. 23, 2023) (notice of proposed rulemaking (NPRM)). The final rule (FR)—adopted after public notice and opportunity to comment—implements a carefully calibrated condition on asylum eligibility that applies to certain noncitizens who cross the southwest border, subject to certain exceptions and means of rebuttal, including a catch-all for "exceptionally compelling circumstances." The rule took effect May 11, 2023, the same day the Centers for Disease Control and Prevention (CDC)'s Title 42 public health Order expired. Under the Order, covered noncitizens were generally not processed into the United States, but instead were expelled to Mexico or their home countries. Absent any policy change, the Order's expiration was expected to cause the number of migrants seeking to enter the United States without authorization or documents sufficient for admission to increase to record numbers. The expected heightened encounters threatened to embolden and enrich smuggling networks and impair the government's ability to safely, effectively, and humanely apprehend, process, detain, and remove, as appropriate, the migrants encountered.

Facing this urgent situation, and in coordination with actions by Mexico and other countries to jointly address irregular migration in the Western Hemisphere, the Departments deemed it necessary to encourage migrants to avail themselves of lawful, safe, and orderly pathways to enter the United States or seek protection in countries through which they travel. Conversely, they determined that it is necessary to discourage migrants from disregarding those options and entering irregularly, which diverts limited government resources from processing those who enter in a safe and orderly manner.

The Departments have thus adopted a balanced approach. On the one hand, the United States has significantly expanded the safe and orderly pathways available for migrants to enter the United States. For example, the United States has established processes to allow certain nationals

of Cuba, Haiti, Nicaragua, and Venezuela to obtain advance authorization to travel to the United States to seek temporary parole into the country. The United States has also expanded implementation of the CBP One™ app, which allows noncitizens to schedule a time to arrive at ports of entry along the southwest border for orderly processing. And new screening centers will allow migrants, if eligible, to be processed while in other countries in the Western Hemisphere.

On the other hand, the Departments have determined that certain noncitizens who do not use those lawful options or seek protection in third countries and instead enter the United States at the southwest land border or adjacent coastal borders without authorization are presumptively ineligible for asylum. Covered noncitizens may overcome the presumption by demonstrating exceptionally compelling circumstances. But even migrants ineligible for asylum under the rule will receive appropriate screening for statutory withholding of removal or protection under the Convention Against Torture (CAT), such that they will not be removed to a country where they face a likelihood of persecution on protected grounds or torture.

In the more than one month since the rule went into effect, it has worked as intended. Immediately before Title 42's expiration, more than 10,000 migrants crossed the southwest border each day, threatening to overwhelm the immigration system, enrich smuggling networks, and cause serious harms to migrants themselves. As soon as this rule was implemented, border crossings fell dramatically—in recent weeks, to an average of 3,360 per day. Decl. ¶ 13  Rather than crossing the border illegally, large numbers of noncitizens have instead availed themselves of safe and orderly pathways to enter the United States, including 1,250 who have made appointments on the CBP One app each day, and thousands who have entered through the parole programs each month. In other words, the Departments' balanced approach has proven critical in preventing chaos at the southwest border while preserving the ability of noncitizens to seek protection. And the country has witnessed first-hand what would occur if one half of that policy was eliminated.

Plaintiffs do not express concerns with the expansion of safe and orderly pathways. Instead, plaintiffs challenge the condition the Departments have deemed essential to encouraging migrants to use those pathways, claiming primarily that the condition is materially identical to two prior regulations—which categorically denied asylum to most noncitizens who entered between ports

of entry or traveled through a third country without seeking asylum there—that this Court and the Ninth Circuit held unlawful, and that this rule rescinded. However, unlike those rules, which were designed to deter nonmeritorious asylum claims with categorical bars and were note paired with expanded lawful pathways for presenting protection claims, this rule is aimed at safeguarding the ability of the immigration and asylum system to function effectively in the face of an anticipated dramatic increase in border encounters—and at ensuring that the government's limited resources are used in the most efficient and equitable way. The rule does not treat place of entry or the failure to follow orderly pathways as dispositive, but instead adopts only a condition on asylum eligibility that can be excepted or rebutted. The rule is indisputably less strict than the "Transit" bar the Supreme Court allowed to take effect. *Barr v. East Bay Sanctuary Covenant*, 140 S. Ct. 3 (2019).

For decades, the Departments have similarly adopted regulations limiting asylum for particular classes of noncitizens—and Congress expressly reaffirmed the Departments' broad discretion to do so in the Immigration and Nationality Act (INA), specifying that they "may by regulation establish additional limitations and conditions, consistent with [§ 1158], under which an alien shall be ineligible for asylum." 8 U.S.C. § 1158(b)(2)(C); *id.* § 1158 (d)(5)(B). Exercising that statutory authority, the Departments have determined that certain noncitizens who do not use the expanded lawful pathways or seek protection in third countries, and instead enter the United States at the southwest border without prior authorization, shall be presumptively ineligible for asylum. The rule contains important, significant safeguards: The rebuttable presumption does not apply to a migrant who (1) obtains appropriate authorization to travel to the United States to seek parole pursuant to an approved DHS parole process, (2) presents at a port of entry pursuant to a pre-scheduled appointment using the CBP One app or demonstrates that it was not possible to access or use the app, or (3) seeks asylum or other protection in a third country through which they traveled and receives a final decision denying that application. In addition to the three exceptions, noncitizens may overcome the presumption by demonstrating that "exceptionally compelling circumstances" warrant its rebuttal. Even where a noncitizen is subject to the presumption, does not establish an exception, and cannot rebut its application, the noncitizen will not be removed to a country where they likely will be persecuted or tortured because the rule does not alter eligibility

for statutory withholding of removal or Convention Against Torture (CAT) protections.

Plaintiffs now ask this Court to grant them summary judgment and vacate the rule. This Court should deny that request and instead grant Defendants' summary judgment. Plaintiffs lack Article III standing and are outside the asylum statute's zone of interests. The rule is consistent with the Executive's statutory authority, is reasonable and reasonably explained, and is consistent with the procedural requirements of the Administrative Procedure Act (APA). And Plaintiffs' request for a universal vacatur is foreclosed by Article III, the INA, the APA, and principles of equity. Even if the court rejects those arguments, it should limit relief to remand without vacatur to avoid vacatur's profoundly disruptive consequences for the government's management of the border.  At an absolute minimum, the court should stay any order for fourteen days to allow the government to seek emergency relief in the court of appeals.

## LEGAL AND PROCEDURAL BACKGROUND

Legal Background. Asylum is a form of discretionary relief under the INA, 8 U.S.C. § 1101 *et seq. See id.* § 1158; *INS v. Cardoza-Fonseca*, 480 U.S. 421, 444 (1987). Generally, a grant of asylum protects noncitizens from removal, creates a path to lawful permanent residence and U.S. citizenship, authorizes noncitizens to work, and enables a noncitizen's immediate family members to seek asylum derivatively. *See id.* §§ 1158-1159. To obtain asylum, noncitizens must show that they: (1) qualify as a "refugee"—that is, that they are unable or unwilling to return to their home country "because of persecution or a well-founded fear of persecution on account of" a protected ground, *id.* §§ 1101(a)(42), 1158(b)(1)(A); (2) are not subject to an exception or mandatory condition or bar that precludes applying for or receiving asylum, *id.* § 1158(a)(2), (b)(2); and (3) merit a favorable exercise of discretion, *id.* § 1158(b)(1)(A).

Generally, a request for asylum may arise in three circumstances: (1) a noncitizen present in the United States and not in removal proceedings may affirmatively apply to U.S. Citizenship and Immigration Services (USCIS), *see Dhakal v. Sessions*, 895 F.3d 532, 536 (7th Cir. 2018); 8 C.F.R. § 208.2(a).; (2) a noncitizen in removal proceedings under 8 U.S.C. § 1229a may apply before the immigration judge (IJ) as a defense to removal, 8 C.F.R. §§ 208.2(b), 1208.2(b), 1240.11(c); (3) a noncitizen in expedited removal proceedings under 8 U.S.C. § 1225(b)(1) may

request asylum.[1] In the last case, an asylum officer interviews the noncitizen to determine if there is a "significant possibility" that they "could establish eligibility for asylum." 8 U.S.C. § 1225(b)(1)(B)(v). If the noncitizen passes that screening, they are placed in removal proceedings before an IJ, where they may apply for asylum and other protection. If they fail the screening (and do not pass a screening for statutory withholding of removal or CAT), an IJ may review that determination. *Id.* § 1225(b)(1)(B)(iii)(III). If the IJ affirms the determination, or the noncitizen declines IJ review, they are ordered removed without further review. *See id.* § 1225(b)(1).

The INA forbids certain noncitizens from applying for asylum and deems others ineligible—for example, those who have participated in persecution or who were firmly resettled in another country before arriving in the United States. *See* 8 U.S.C. §§ 1158(a)(2), (b)(1)(B), (b)(2). And for decades, the Executive has promulgated mandatory bars that have rendered certain noncitizens ineligible for asylum. *See* 88 Fed. Reg. at 11,734. Attorneys General originally adopted such limits pursuant to their general authority "to establish a procedure" for asylum. *See id.* Then, in 1996, Congress codified several of those limits. *See id.* Simultaneously, Congress reaffirmed that the Departments retain the same broad authority to establish new conditions, specifying that they "may by regulation establish additional limitations and conditions, consistent with [§ 1158], under which an alien shall be ineligible for asylum." *Id.* § 1158(b)(2)(C); *see id.* § 1158 (d)(5)(B); 6 U.S.C. § 552(d); 8 U.S.C. § 1103(a)(1), (a)(3), (g). Secretaries and Attorneys General have invoked that authority for decades to establish conditions beyond those in the statute. *See, e.g.*, *Asylum Procedures*, 65 Fed. Reg. 76,121, 76,126 (Dec. 6, 2000) (safe relocation bar); *Aliens and Nationality; Asylum and Withholding of Deportation Procedures*, 55 Fed. Reg. 30,674, 30,683 (July 27, 1990) (absence of future persecution bar).

While asylum is discretionary, withholding of removal under 8 U.S.C. § 1231(b)(3) and protection under the regulations implementing U.S. obligations under the CAT, 8 C.F.R. §§ 208.16-.18, 1208.16-.18, are mandatory and prohibit removal to a country where the noncitizen

---

[1] Section 1225(b)(1)(A)(i) provides for the expedited removal of noncitizens encountered within 100 air miles of the border and not present continuously for 14 days who are arriving in the United States and are inadmissible because they lack documents sufficient for admission or used fraud to enter the United States. *See* 87 Fed. Reg. 16,022 (Mar. 21, 2022).

will likely be persecuted or tortured. *See Moncrieffe v. Holder*, 568 U.S. 184, 187 n.1 (2013).

Title 42. From March 20, 2020, through May 11, 2023, a series of CDC Title 42 public health Orders were in effect to combat the COVID-19 pandemic. These orders implemented the CDC's authority under 42 U.S.C. § 265 to prevent the introduction of individuals into the United States to avoid a serious danger to public health arising from a communicable disease. *See* AR565-78. Under the Title 42 Order, covered noncitizens were expelled to Mexico or their home countries without processing under Title 8, including processing for asylum. The expiration of the public health emergency at the end of May 11, 2023, caused the then-operative Order to terminate.

Joint Rule. Absent any policy change, the end of the Title 42 Order was expected to cause the number of migrants seeking to illegally enter the United States at the southwest border to surge[2] to all-time highs—an estimated 11,000 migrants daily. 88 Fed. Reg. at 31,331. Those migrants could no longer be promptly expelled under Title 42 and instead would have to be processed at the border through the substantially more resource-intensive procedures required by Title 8. *Id.* at 31,442; 88 Fed. Reg. at 11,705. Under those procedures, many migrants who assert a fear of persecution during expedited removal are statutorily entitled to remain in the United States pending resolution of their asylum claims. 88 Fed. Reg. at 31,337 (citing 83 percent positive screening rate). Because the number of noncitizens who satisfy this screening standard far exceeds the capacity of the immigration system to process them quickly, many noncitizens remain in the United States for years before their claims are adjudicated. *See id.* at 31,326. This process, along with the insufficient resources to execute removal orders, may incentivize nonmeritorious protection claims and irregular migration. *Id.* at 31,326, 31,337-38; *see also id.* at 11,716.

The Departments thus faced a looming urgent situation: absent policy change, the end of Title 42 would result in many more migrants crossing the border and asserting asylum claims which would in turn overwhelm the government's ability to process migrants in a safe, expeditious, and orderly way and lead to an increase of the number of noncitizens released into the country. To address this exigent circumstance, DHS and DOJ promulgated a final rule, following an NPRM, a

---

[2] While such a surge occurred before Title 42's end, the number of noncitizens encountered dropped by about half when this rule went into effect, and continued to drop, as the rule predicted. Decl. ¶ 13; AR2489 (projecting 5,480 encounters daily for May 2023 with the rule in place).

33-day comment period, and review of 51,952 comments. The rule generally imposes a condition on asylum eligibility on noncitizens who fail to pursue safe, orderly, and lawful processes for entry into the United States. 8 C.F.R. §§ 208.33(a), 1208.33(a). That condition on eligibility is, however, subject to various exceptions, and its application may be rebutted in certain compelling circumstances. The rule was made effective immediately, 88 Fed. Reg. at 31,444-47, and it applies to asylum determinations made in any context, including in removal proceedings, 8 C.F.R. §§ 208.13(f), 1208.13(f), and in credible fear screenings, *id.* §§ 208.3(b), 1208.33(b).

Specifically, the rule applies "[a] rebuttable presumption of ineligibility for asylum … to an alien who" "enters the United States from Mexico at the southwest land border or adjacent coastal borders without documents sufficient for lawful admission" (1) "between May 11, 2023 and May 11, 2025," (2) "[s]ubsequent to the end of" Title 42, and (3) "[a]fter the alien traveled through a country other than the alien's country of citizenship [or] nationality." 8 C.F.R. §§ 208.33(a)(1), 1208.33(a)(1). The presumption does not apply to unaccompanied children or migrants who (1) availed themselves of, or were traveling with a family member who availed themselves of, certain safe and orderly pathways—specifically, those who were "provided appropriate authorization to travel to the United States to seek parole, pursuant to a DHS-approved parole process"; (2) "[p]resented at a port of entry, pursuant to a pre-scheduled time and place"[3] or "presented at a port of entry without a pre-scheduled time and place" but who can "demonstrate[] by a preponderance of the evidence that it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle"; or (3) "[s]ought asylum or other protection in a country through which the alien traveled and received a final decision denying that application." *Id.* §§ 208.33(a)(2), 1208.33(a)(2). In addition, migrants subject to the presumption and who do not establish an exception may overcome that presumption by "demonstrating" by a preponderance of the evidence that "exceptionally compelling circumstances exist." [4] *Id.* §§ 208.33(a)(3)(i),

_____

[3] DHS is also increasing the number of daily CBP One appointments available, allowing noncitizens to schedule a time for orderly processing at ports of entry. 88 Fed. Reg. at 31,396.

[4] Plaintiffs incorrectly claim this general standard for rebuttal applies only to circumstances at the time of entry. Mot. 7. The clause related to timing applies only to the three per se rebuttal

1208.33(a)(3)(i). And such circumstances necessarily exist where, at the time of entry, the migrant, or a family member with whom the migrant is traveling, "[f]aced an acute medical emergency"; "[f]aced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder"; or was a "victim of a severe form of trafficking in persons" under 8 C.F.R. § 214.11(a). *Id.* §§ 208.33(a)(3)(i)(A)-(C), (ii), 1208.33(a)(3)(i)(A)-(C), (ii). Finally, a noncitizen presumed ineligible for asylum under the rule is still eligible to apply for statutory withholding of removal or CAT protection and thus may not be removed to a country where it is likely that they will be persecuted because of a protected ground or tortured.[5]

   <u>This Lawsuit.</u> Eight organizations that provide services to immigrants and refugees seek declaratory and injunctive relief as well as vacatur of the rule. Am. & Supp. Compl. (Compl.), Prayer for Relief. Plaintiffs allege that the rule unlawfully restricts noncitizens fleeing persecution from obtaining asylum in the United States. *Id.* ¶ 1. Plaintiffs' own alleged injuries are different, however, since none of them is a noncitizen: they allege that they must "divert organizational resources" to, "among other things, understand[ ] the new policy" and "educat[e] ... staff," *id.* ¶¶ 164, 206; *see id.* ¶¶ 179, 187, 203, 213, and that the rule "would jeopardize [] funding streams," *id.* ¶ 209; *see id.* ¶¶ 160, 163, 168, 180, 190, 216. Plaintiffs seek summary judgment, contending the rule is (1) contrary to law, Mot. 8-14; *see* 5 U.S.C. § 706, (2) arbitrary and capricious, Mot. 14-27; *see* 5 U.S.C. § 706, and (3) procedurally improper. Mot. 28-30; *see* 5 U.S.C. § 553(c), (d).

**STANDARD OF REVIEW**

   In an APA case, the court's function at summary judgment is not to resolve disputed facts or make factual determinations, but "to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769-70 (9th Cir. 1985). Review is generally limited to the administrative

---

circumstances, *see* 8 C.F.R. §§ 208.33(a)(3), 1208.33(a)(3). And the rule explicitly identifies one circumstance that is untethered to the timing of entry—where the principal applicant is found eligible for withholding of removal, but their spouse or child does not independently qualify for protection—as an "exceptionally compelling circumstance." *See id.* § 1208.33(c).

[5] The rule also provides additional protections for family unity, *see* 8 C.F.R. § 1208.33(c), and exempts noncitizens who were minors when they entered but who apply for asylum as principal applicants after the two-year period expires. *Id.* §§ 208.33(c)(2), 1208.33(d)(2).

record. *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 992 (9th Cir. 2014).

**ARGUMENT**

**I.      The Government is Entitled to Summary Judgment**

      **A.  Plaintiffs Lack Standing.**

      Plaintiffs fail to demonstrate they have standing because they have not shown that they have suffered an "invasion of a legally protected interest" that is "concrete and particularized." *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018). The rule does not regulate plaintiffs or otherwise implicate their legally protected interests in any way. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992). And although plaintiffs contend they may have clients that may be affected by the rule, it is well established that a party—organizational or otherwise—generally "lacks a judicially cognizable interest in the prosecution or nonprosecution of another," *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973), including "enforcement of the immigration laws," *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984). That principle alone precludes finding standing.

      Although plaintiffs assert the rule will "[d]ivert their resources and frustrate[] their shared mission[s]" and "cost Plaintiffs clients," Mot. 30; *see East Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1240-43 (9th Cir. 2018), reliance on such collateral effects to challenge what is, in essence, a decision regarding enforcement of the immigration laws against third parties circumvents *Linda R.S.*'s and *Sure-Tan*'s clear limitations on the nature of Article III standing in these circumstances[6]. In any event, plaintiffs do not in fact show any loss of future clients or funding or other non-self-inflicted injury as a result of the rule, and their "speculation" through declarations is insufficient to satisfy Article III. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). Although Plaintiffs previously argued these same harms would result from the "Transit" rule going into effect, *see East Bay*, 385 F. Supp. 3d at 937, Plaintiffs do not submit any evidence that those harms in fact materialized during the nine months the "Transit" rule was in effect, *see generally* Compl., further demonstrating the impermissibly speculative nature of their claims.[7]

---

[6] The government acknowledges *East Bay* viewed those cases as addressing third-party standing.
[7] Ordinarily, a party may bring an APA challenge only if it asserts an interest that is "arguably within the zone of interests to be protected or regulated by the statute" at issue. *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 396 (1987). Nothing in § 1158 evinces any concern with organizations

**B.  The Rule Is Consistent With The INA.**

Plaintiffs first argue the rule is contrary to the INA because it is foreclosed by circuit precedent and imposes a new version of the "Entry" bar. Mot. 8-13. However, the rule is expressly authorized by the INA and consistent with circuit precedent.

1.  <u>The rule is authorized by the INA.</u>

As the asylum statute makes clear, asylum is always a matter of executive "discretion" and never a matter of "entitlement." *Cardoza-Fonseca*, 480 U.S. at 428 n.6; *see* 8 U.S.C. § 1158(b)(1)(A). The statute also makes clear that the Executive may exercise its discretion by adopting categorical rules, not just through case-by-case adjudication. The INA expressly provides that the Executive may establish "limitations and conditions" on asylum eligibility, beyond those already set out in the statute, so long as they are "consistent with" § 1158. 8 U.S.C. § 1158(b)(2)(C); *see also id.* § 1158(d)(5)(B) (authorizing "other conditions or limitations").

The condition in the rule does not conflict with the asylum statute. As the statutory text, structure, and history demonstrate, a new limitation or condition is "consistent with" § 1158 as long as it does not affirmatively conflict with another provision of § 1158. This is confirmed first by the text of the statute. Congress's use of "consistent with" means a new limitation or condition is permissible when it is compatible with or not in conflict with other provisions of § 1158. *See, e.g.*, *Env't Def. Fund, Inc. v. EPA*, 82 F.3d 451, 457 (D.C. Cir. 1996) (consistent with means "compatible with"); *Pacific Power & Light Co. v. FPC*, 111 F.2d 1014, 1016 (9th Cir. 1940) (same); MERRIAM-WEBSTER, Consistent ("COMPATIBLE—usually used with *with*"), *at* https://www.merriam-webster.com/dictionary/consistent (last accessed June 7, 2023).

The structure and history of the statute further support this conclusion. Section 1158

---

like plaintiffs or with their asserted interests in representing asylum seekers. The opposite is true. *See* 8 U.S.C. § 1158(d) (7) ("Nothing in this subsection shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person."). Thus, the interests plaintiffs assert in this suit do not fall within § 1158's zone of interests. Moreover, the INA carefully prescribes a scheme of judicial review of these "particular issues" only for the noncitizens subject to it, *see* 8 U.S.C. § 1252(a)(5), (b)(9), (e), demonstrating that Congress did not intend for "judicial review of those issues at the behest of other persons." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984). Defendants acknowledge the Ninth Circuit rejected a similar argument in *East Bay*, 994 F.3d at 666-67.

implements the government's asylum authority, which as discussed is entirely discretionary. When Congress authorized the Departments to add new eligibility conditions, it did so within the context of this broad discretion. The Attorney General and the Secretary have long exercised discretion to create new rules governing the granting of asylum. When section 1158 was first enacted as part of the Refugee Act of 1980, it simply provided that the Attorney General "shall establish a procedure" for a noncitizen "to apply for asylum," and that a noncitizen "may be granted asylum in the discretion of the Attorney General if the Attorney General determined that the noncitizen was a refugee." 8 U.S.C. § 1158(a) (1982). In 1980, the Attorney General, in the exercise of that broad statutory discretion, established several mandatory bars to the granting of asylum. *See* 8 C.F.R. § 208.8(f) (1980); Aliens and Nationality; Refugee and Asylum Procedures, 45 Fed. Reg. 37,392, 37,392 (June 2, 1980). In 1990, the Attorney General substantially amended the asylum regulations, but exercised his discretion to retain the mandatory bars to asylum eligibility and codified a more-recent limitation regarding the fear of future persecution. *See* 55 Fed. Reg. at 30,674, 30,678, 30,683; *see also Yang v. INS*, 79 F.3d 932, 936-39 (9th Cir. 1996) (upholding firm resettlement bar); *Komarenko v. INS*, 35 F.3d 432, 436 (9th Cir. 1994) (upholding particularly serious crime bar), *abrogated on other grounds by Abebe v. Mukasey*, 554 F.3d 1203 (9th Cir. 2009) (en banc). The 1990 rule codified a near-categorical rule resulting in the denial of nearly all asylum claims resting on past persecution alone, 8 C.F.R. §§ 208.13(b)(1), 1208.13(b)(1), although the INA explicitly allows for such claims, 8 U.S.C. § 1101(a)(42)(A). Then, shortly after, Congress in 1996 codified six mandatory bars the Attorney General had previously adopted by regulation and at the same time enacted § 1158(b)(2)(C), codifying the authority to create further "conditions or limitations." *See* Pub. L. 104-208, div. C, § 604 (1997) (codified at 8 U.S.C. § 1158(b)(2)).

This history underscores that § 1158(b)(2)(C)'s "consistent with" standard simply requires that the Departments avoid affirmative conflicts with § 1158. Congress was well aware of the broad discretion the Attorney General exercised and, instead of limiting that authority, codified it in statute. That decision to leave undisturbed the Attorney General's construction of his authority, coupled with Congress's codification of many of the Attorney General's regulatory asylum limitations and its decision to explicitly preserve the Attorney General's authority to promulgate

additional limitations, is strong support for the government's longstanding construction of its discretionary authorities. *See Bob Jones Univ. v. United States*, 461 U.S. 574, 599 (1983) (Congress's clear awareness of, but failure to address, widely known agency action "when enacting other and related legislation make out an unusually strong case of legislative acquiescence").

Ninth Circuit precedent does not hold otherwise. While the Court in *East Bay* held a new condition under § 1158(b)(2)(C) must "further the purpose" of another provision in § 1158 to be consistent with § 1158, it did so in the context of a rule—the "Transit" bar—that was similar to two codified asylum conditions—the "safe-third country and firm-resettlement bars." 994 F.3d at 977. The Court did not hold that an asylum condition that is not similar to pre-existing asylum bars must further the purposes of a pre-existing asylum limitation.[8]

Regardless the rule is consistent with § 1158. DHS and DOJ determined, in the face of an anticipated influx of large numbers of noncitizens threatening to overwhelm the immigration system, to encourage the use of lawful, safe, and orderly avenues for entry to this and partner countries by generally disqualifying from obtaining asylum those migrants who disregard those pathways, absent exceptionally compelling circumstances. 88 Fed. Reg. at 31,316-19. That determination does not conflict with the text or structure of § 1158 and is consistent with (and an appropriate exercise of the Departments' authority under) that provision. And while nothing more is required for the rule to constitute a valid exercise of authority under § 1158(b)(2)(C) because it is not similar to any pre-existing bar, its propriety is reinforced by other bars to applying for asylum aimed at systemic efficiency, whose "purpose" it likewise furthers. For example, Congress has

---

[8] The government preserves its argument that *East Bay* was wrongly decided. The requirement that additional asylum limitations "further[] the purpose" of the existing exceptions by either targeting threats to the nation or promoting the purposes the Ninth Circuit identified in the safe-third-country or firm-resettlement bars, 994 F.3d at 977, is irreconcilable with the statute's meaning and conflicts with its history. Not only has Congress adopted asylum-eligibility bars that do not further the purpose the Ninth Circuit identified—e.g., the one-year filing deadline and the criminal bars—but it has recognized the broad discretion to add more such bars. That approach is also inconstant with *Trump v. Hawaii*, 138 S. Ct. 2392, 2411-12 (2018) (INA's express provisions governing entry "did not implicitly foreclose the Executive from imposing tighter restrictions," even if restrictions addressed a subject that is "similar" to one that Congress "already touch[ed] on"). The enumerated asylum bars also do not foreclose imposing further conditions, even if those conditions address subjects similar to those already in the asylum statute. Indeed, it is notable that the Supreme Court allowed the transit rule to go into effect. *See East Bay*, 140 S. Ct. at 3.

---

generally prohibited applications for asylum filed more than one year after entry. 8 U.S.C. § 1158(a)(2)(B). And Congress has generally prohibited noncitizens from pursuing successive asylum applications. *See id.* § 1158(a)(2)(C). Congress did not foreclose the Departments from likewise taking systemic considerations into account when exercising their discretion. Indeed, the "ultimate consideration" when determining whether someone warrants a grant of relief as a matter of discretion is whether granting relief "appears to be in the best interests of the United States." *Matter of D-A-C-*, 27 I. & N. Dec. 575, 578 (BIA 2019), a point Congress was aware of when it amended the INA in 1996. *See id.* (best interests standard preceded 1996 amendments by 20 years).

Consistent with that best-interest standard, the Board has long held a noncitizen's "circumvention of orderly refugee procedures" to be relevant to whether a favorable exercise of discretion is warranted. *Matter of Pula*, 19 I. & N. Dec. 467, 474 (BIA 1987). And the Board has specifically considered as relevant factors the noncitizen's "manner of entry or attempted entry," "whether [he] passed through any other countries or arrived in the United States directly from his country, whether orderly refugee procedures were in fact available to help him in any country he passed through, and whether he made any attempts to seek asylum before coming to the United States." *Id.* Although the rule places greater weight on these factors, 88 Fed. Reg. at 11,736, this decades-old precedent establishes that the Departments can permissibly take into account manner of entry. And exactly how much weight to place on those factors, and whether to do so in weighing asylum eligibility, falls well within the broad discretion conferred by § 1158(b)(2)(C). *Cf. Lopez v. Davis*, 531 U.S. 230, 244 (2001); *Yang*, 79 F.3d at 936-37.

Finally, if there remains any doubt regarding the rule's consistency with § 1158, that doubt must be resolved in favor of the Departments. Unless Congress "has directly spoken to the precise question at issue," an agency's construction of a statute generally must be upheld if it is "permissible." *Wide Voice, LLC v. FCC*, 61 F.4th 1018, 1025 (9th Cir. 2023). "[J]udicial deference to the Executive Branch is especially appropriate in the immigration context where officials 'exercise especially sensitive political functions that implicate foreign relations.'" *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999). That is particularly so given that Congress has authorized the Secretary and Attorney General to speak with the force of law when interpreting the INA. 8 U.S.C.

§ 1103(a)(1), (3), (g). Here, the Departments' determination that the rule properly establishes conditions that are consistent with § 1158 is based on a permissible understanding of the statute.

2.   The rule is consistent with Ninth Circuit precedent.

Plaintiffs principally contend that each of the pathways identified in the rule cannot lawfully be a precondition for asylum eligibility under Ninth Circuit precedent. Mot. 9-13. But unlike the categorical bars to asylum that this Court and the Ninth Circuit deemed unlawful, the rule provides alternative pathways and does not definitively preclude individuals from receiving asylum even if they did not pursue any alternative pathway. And Plaintiffs fail to grapple with the rule's multiple exceptions and rebuttal grounds and entirely ignore their interaction with available lawful pathways. Plaintiffs thus err in comparing this rule to those prior rules. *See* Mot. 8.

Plaintiffs are incorrect to liken the rule to the prior "Entry" rule addressed in *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 669-75 (9th Cir. 2021). Mot. 9-10. Unlike that rule (*see* 83 Fed. Reg. 55,934, 55,952 (Nov. 9, 2018)), the rule here does not treat manner of entry as dispositive in determining asylum eligibility, but instead creates a rebuttable presumption that can be overcome where exceptionally compelling circumstances exist. Moreover, that presumption can be avoided entirely if noncitizens receive authorization to travel to the United States under a DHS-approved parole process, present at a port of entry at a pre-scheduled time and place (including through use of CBP One), or apply for and are denied asylum or other protection in another country. Nor does the rule contravene § 1158(a)(1)'s provision that noncitizens may apply for asylum "whether or not" they arrived "at a designated port of arrival." Mot. 9-10. Under the rule, many noncitizens will remain eligible for asylum despite entering between ports of entry given the exceptions and rebuttal circumstances. There is thus no conflict between the rule and § 1158(a)(1). Indeed, lawful entry at a port of entry is neither necessary nor sufficient. In fact, some noncitizens who present at ports of entry will be subject to the presumption if they do not schedule an appointment to present themselves. In those respects, the rule is like other statutory and regulatory asylum bars that similarly operate to limit the availability of asylum for defined categories of noncitizens for reasons separate from the merits of their claims. It would be improper to read the INA to provide that there can be "no categories of aliens for whom asylum would be

completely unavailable," let alone presumptively unavailable. *Komarenko*, 35 F.3d at 436; *see R-S-C v. Sessions*, 869 F.3d 1176, 1187 & n.9 (10th Cir. 2017). The INA does not mandate that anyone who presents at a port of entry must be eligible for asylum. And nothing in § 1158(a)(1) precludes the Executive from considering how a noncitizen enters the country or what happens before they reach the border in adjudicating asylum claims. To the contrary, the asylum statute expressly recognizes the relevance of a noncitizen's interaction with third countries, *see* 8 U.S.C. § 1158(a)(2)(A) (safe-third-country provision); *id.* § 1158(b)(2)(A)(vi) (firm-resettlement bar), and both the Board and the Ninth Circuit have long recognized that the failure to avail oneself of orderly processing can be a relevant consideration in denying asylum, *see Pula*, 19 I&N Dec. at 473-74; *East Bay*, 993 F.3d at 671 ("The [BIA] and this Court have long recognized that a refugee's method of entering the country is a discretionary factor in determining whether the migrant should be granted humanitarian relief."). There is no basis to view Congress as intending § 1158(a)(1) to bar the agencies from taking into account, when assessing asylum eligibility, considerations such as those embodied in this rule. *See R-S-C-*, 869 F.3d at 1187.

Plaintiffs also err in contending the rule is unlawful because the third-country transit exception to the condition is foreclosed by circuit precedent. Mot. 10. The Ninth Circuit in *East Bay Sanctuary Covenant v. Garland*, 994 F.3d 962 (9th Cir. 2021), held unlawful a rule that generally deemed ineligible for asylum noncitizens who arrived at the southwest border unless they had first applied for, and been denied, asylum in a country through which they transited. *See id.* at 968. The Court held that "additional limitations and conditions" imposed under § 1158(b)(2)(C) "must be consistent with" what it identified as the safe-third-country and firm-resettlement bars' "core principle"—namely, that noncitizens may be denied asylum only if the rule adequately aims to ensure "a 'safe option'" for pursuing protection. *Id.*

That decision—which followed a stay order from the Supreme Court allowing the transit rule to take effect, a decision that necessarily found a likelihood of success on the government's argument that the rule was lawful, *see East Bay*, 140 S. Ct. at 3—provides no basis for concluding that the rule is unlawful, as this rule is fully consistent with the approach reflected in that decision and ensures a "safe option" for pursuing protection. Rather than enacting a categorical bar, the rule

imposes a tailored rebuttable presumption that aims to incentivize noncitizens to use safe options for entry or to seek protection in third countries and away from the overwhelmed southwest border; the rule provides exceptions and means for rebuttal in situations where circumstances warrant non-application of the presumption. In addition, under the rule, seeking protection in a third country is not the only way to avoid or rebut the presumption of asylum ineligibility. The rule other options to avoid or rebut the presumption, allowing migrants to pick a safe alternative "option." And the rule accommodates noncitizens who may be unable to pursue lawful options. As explained, a noncitizen who fails to avail themselves of the specified pathways may rebut the presumption by establishing that exceptionally compelling circumstances exist—and, specifically, may point to certain compelling circumstances, such as a medical emergency or an imminent and extreme threat to life or safety, that may have rendered it unsafe or infeasible to pursue alternative avenues. *See E. Bay*, 994 F.3d at 983 (faulting "Transit" rule for relying on "categorical assumption[s]" about merits of asylum claim based on failure to apply for asylum elsewhere); 84 Fed. Reg. 33,829, 33,843 (July 16, 2019) (adopting only a narrow trafficking exception). Similarly, plaintiffs are mistaken to suggest that the rule is inconsistent with the mandatory statutory restriction on asylum for those who can safely be removed to a third country or were firmly resettled. Those prohibitions are not exclusive, and the rule at issue here in any event addresses a different subject and operates through different means, preserving safe options for asylum.

### 3. Plaintiffs' remaining arguments are unavailing.

Plaintiffs' remaining arguments fail. *First,* Plaintiffs contend the rule's exception from the presumption for those who avail themselves of a parole pathway conflicts with §§ 1157 and 1158, which in their view provide a "separate refugee admission system for people" abroad (§ 1157) and permit asylum applications "irrespective of a status like parole" (§ 1158). Mot. 10-12. Both contentions are misplaced. The exception does not turn on whether a noncitizen has been *granted* parole; the noncitizen must merely have been "provided appropriate authorization to travel to the United States *to seek* parole." 8 C.F.R. § 208.33(a)(2)(ii)(A) (emphasis added). Moreover, even if the exception applied only to those granted parole, that would not conflict with the gloss plaintiffs place on § 1158; nothing in the INA prohibits allowing a parolee to seek asylum, and nothing in

the rule requires that all asylees have been paroled.[9] And the refugee statute has no relevance here, as the rule governs applications for *asylum* made once an individual is inside the United States; it does not apply "to individuals who seek to be admitted as refugees [under § 1157] from outside the United States." *Matter of L-T-P-*, 26 I. & N. Dec. 862, 864 (BIA 2016).

Regardless, Plaintiffs misapprehend the relationship between parole and asylum by contending that the Refugee Act foreclosed entry via parole for asylum seekers. Mot 10. To be sure, before 1980, parole was the primary mechanism the Executive used to process refugees into the country. *Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1060 (9th Cir. 2017) (en banc). Congress amended the INA through the Refugee Act of 1980 to provide for a formal asylum and refugee process and to limit in part the use of parole for refugee admissions. *See id.* The amendments did not, however, eliminate parole for individuals who might apply for asylum once in the United States. *See, e.g.*, *Marczak v. Greene*, 971 F.2d 510, 520 n.12 (10th Cir. 1992) ("parole authority stay[ed] exactly as it was vis-a-vis nonrefugee aliens"). Instead, Congress intended only to make clear that *refugees* should be admitted through the process established by 8 U.S.C. § 1157. *See id.*; *see also* H.R. Rep. No. 469, 104th Cong., 2d Sess. Pt. 1, at 140 (1996) (explaining Congress had intended to limit using parole to admit groups such as refugees indefinitely or permanently). But individuals excepted from the rule by virtue of the travel authorization exception are individuals who cross the southwest border after receiving travel authorization and who then seek *asylum* under section 1158. They are not individuals who are paroled indefinitely or permanently as refugees were prior to the Refugee Act, and so the 1980 amendments to the parole statute have no bearing on their asylum applications. In addition, the authorized travel pathway in the rule at issue here assists in easing the burden on border facilities by enabling beneficiaries to fly to an interior airport. *See* AR908 (Venezuela); AR983 (Haiti); AR996 (Nicaragua); AR1011 (Cuba).

*Second*, Plaintiffs contend that, notwithstanding the alternatives the rule references, the only actual pathway available to most migrants will be to appear at a port of entry, after securing a CBP One appointment, which they also contend is illusory. Mot. 11-13. Plaintiffs do not dispute

---

[9] Also, "parole of [an] alien shall not be regarded as an admission," 8 U.S.C. § 1182(d)(5), and so paroled noncitizens have not been admitted in any lawful status, *id.* § 1101(a)(13); *see Alanniz v. Barr*, 924 F.3d 1061, 1066 (9th Cir. 2019) (parolee has not been "admitted in any status").

that those granted advance travel authorization may indeed seek asylum after entry and that the parole processes are available to significant numbers of individuals seeking to enter the United States. Presently, nationals of five countries—30,000 nationals of Cuba, Haiti, Nicaragua, and Venezuela per month, AR4553, and, separately, Ukraine[10]—AR4553, and additional processes are being developed, AR2187. The rule makes clear such individuals may apply for asylum. In addition, the exception applies to noncitizens—not limited to these five countries—who receive prior "authorization to travel to the United Sates to seek parole, pursuant to a DHS-approved parole process," 8 C.F.R. §§ 208.33(a)(2)(ii)(A), 1208.33(a)(2)(ii)(A); *see https://www.uscis.gov/humanitarian/humanitarian_parole* (describing other processes). Plaintiffs are thus incorrect that the travel authorization exception is illusory.

Plaintiffs' contention about the rule's exemption for those who travel through a third country and apply for asylum is also misplaced. Mot. 12-13. While the rule acknowledges that not all countries a migrant might pass through will be safe for all noncitizens, the rule does not require anyone to apply for asylum in any particular country in order to qualify for the travel exception. 88 Fed. Reg. at 31,413. Plaintiffs disregard the Rule's extensive discussion of Mexico's asylum system and ability to handle a large volume of asylum claims. *Id.* at 31,414 (noting Mexico received 118,478 asylum applications in 2022; of those completed, 61 percent resulted in an asylum grant). Although the Departments acknowledge, that "like the United States, Mexico has a significant asylum backlog," "it remains a viable option for many seeking protection in Mexico." *Id.*; *see* 88 Fed. Reg. at 11,720-23 (discussing functionality of and improvements to asylum systems of Mexico, Guatemala, Belize, Costa Rica, Columbia, and Ecuador).[11] Indeed, individuals

---

[10] *See* AR857-60 (Ukraine); AR907-17, 1023-26 (Venezuela); AR982-94, 1062-64 (Haiti); AR995-1006 (Nicaragua); AR1009-1022, 1065-67 (Cuba).

[11] *See generally* AR1126-46, 1575-77, 4178-4355, 4419, 4565-84, 4942-5032, 5113-14, 5150-52, 5421-26, 5457-87, 5498-5687, 5707-61, 5766-5949, 5958, 6177-6480, 6868-79, 7212-25, 7233-40, 7543-45, 7562-63, 7658-66, 7693-94, 7710-97, 7899-7909; *see, e.g.*, AR4580-84 (Los Angeles Declaration), 5009-32 (national action plans for countries that participate in the Marco Integral Regional para la Proección y Soluciones (MIRPS): Belize, Costa Rica, El Salvador, Guatemala, Honduras, Mexico, and Panama), 4948-98 (2022 annual MIRPS report), 5707 (providing statistics for Mexican refugee applications from 2019 to 2022; showing that in 2022, 63,762 were adjudicated, 63 percent of which resulted in a grant of protection), 7212-25 (describing Mexico's innovative approach to asylum and adoption of a more relaxed standard for refugee status).

awaiting adjudication of their asylum applications can apply to work lawfully in Mexico while they wait. AR4866. Plaintiffs' concern that the threat of violence in some parts of Mexico renders the travel exception illusory, Mot. 13, is likewise belied by the large numbers of individuals who apply for and receive asylum in Mexico. And those who do face a serious threat of violence in Mexico may avoid the presumption by seeking entry through one of the alternative pathways, or by entering outside a port of entry and establishing that they faced "an imminent and extreme threat to life or safety" or some other exceptionally compelling circumstance.

Last, Plaintiffs criticize the port-of-entry exception because CBP One appointments are purportedly available to only "a small fraction of people." Mot 13-14. But Plaintiffs admit 1,250 appointments a day—37,500 a month or 456,250 a year—are presently available, Mot. 16, and do not dispute that this allows the processing of "several times more migrants each day at [southwest border ports-of-entry] than the 2010-2016 average." 88 Fed. Reg. 31,398. The government may take steps to promote the orderliness and efficiency of asylum processing, and Plaintiffs do not contend otherwise. Such a claim would be contrary to statutory directives that DHS manage the ports of entry in a safe and orderly manner that balances competing priorities including combatting terrorism, managing individual entry, and ensuring orderly and efficient flow of lawful traffic and commerce. *See* 6 U.S.C. §§ 111(b)(1), 202, 211(c), (g)(3); 8 U.S.C. § 1103(a)(1), (3), (5). Plaintiffs point to no provision of the INA that precludes adopting an asylum limitation in order to manage limited border resources, including using CBP One to promote orderly processing. *Massachusetts v. EPA*, 549 U.S. 497, 527 (2007) ("[A]n agency has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities.").

### C.  The Rule Is Not Arbitrary and Capricious.

Contrary to Plaintiffs' argument, Mot. 14–27, the rule is not arbitrary and capricious. Arbitrary-and-capricious review is limited and "highly deferential"; courts must "presume[] the agency action to be valid," *Sacora v. Thomas*, 628 F.3d 1059, 1068 (9th Cir. 2010), and may not substitute their "judgment for that of the agency," *Gill v. DOJ*, 913 F.3d 1179, 1187-88 (9th Cir. 2019); *see FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). The agency need only articulate "a rational connection between the facts found and the choice made," *Motor Vehicle*

*Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983), and it is "reasonable for the [agency] to rely on its experience" in exercising its judgment, *Sacora*, 628 F.3d at 1068-69; *see State Farm*, 463 U.S. at 29 ("It is not infrequent that the available data does not settle a regulatory issue and the agency must then exercise its judgment in moving from the facts and probabilities on the record to a policy conclusion.").

The rule easily meets that deferential standard. The rule was promulgated based on several urgent and compelling considerations, including: (1) an expected increase in migration following the end of the Title 42 Order at a time when encounters at the southwest border were already at historic levels; (2) the significant risk that, in the absence of other incentives, increased irregular migration would overwhelm the Departments' ability to safely, effectively, and humanely enforce and administer U.S. immigration and asylum law; (3) the likelihood that, in the absence of other incentives, migrants would undertake a dangerous journey or rely on dangerous human smuggling networks; and (4) the expansion of lawful, safe, and orderly pathways noncitizens can pursue to seek entry to the United States. *See generally* 88 Fed. Reg. at 31,314-19.

The rule is reasonably related to those objectives. Without this emergency measure, increased irregular migration "risks overwhelming the Departments' ability to effectively process, detain, and remove, as appropriate, the migrants encountered" and will

> put an enormous strain on already strained resources, risk overcrowding in already crowded [USBP] stations and border [ports of entry] in ways that pose significant health and safety concerns, and create a situation in which large numbers of migrants—only a small population of whom are likely to be granted asylum—are subject to exploitation and risks to their lives by the networks that support their movements north.

88 Fed. Reg. at 31,316. By coupling an expansion of safe and orderly pathways to enter the United States with a presumption of asylum ineligibility for noncitizens who fail to pursue such avenues for entry or seek protection in other countries, the rule encourages individuals to raise their asylum or protection claims in other countries through which they travel or to avail themselves of lawful and orderly pathways for entry into the United States. *See, e.g., id.* at 31,329. And by reducing irregular migration and channeling migrants to orderly pathways, the government will be able to devote more of its limited resources to more effectively and quickly process migrants.

At the same time, the rule's presumption can be overcome in exceptionally compelling circumstances, including circumstances that are linked to the migrant's need to take immediate action notwithstanding that they did not pursue any lawful pathways. The rule thus ensures that individuals who do not pursue a lawful pathway because they, for example, were experiencing an acute medical emergency, faced an imminent threat to life or safety, or were a "victim of a severe form of trafficking in persons" will not be ineligible for asylum based on the rule. 88 Fed. Reg. at 31,318. And the rule is reasonably modeled, in part, on past processes that have successfully reduced unauthorized border crossing by coupling orderly pathways with the imposition of new consequences for those who entered without authorization. *Id.* at 31,316-17.

### 1. The Rule does not rely on impermissible factors.

Plaintiffs first argue the rule is arbitrary and capricious because "one of its main justifications for restricting asylum at the border—that other 'pathways' are available—relies on factors that Congress did not intend the agencies to consider." Mot. 14. Plaintiffs note that parole, refugee admissions, employment visas, and the availability of relief in a third country have existed in various permutations throughout the years, but that "[i]n creating an asylum system separate from all of these other mechanisms, Congress's necessary premise was that these other options were insufficient to satisfy [the United States'] international obligations and protect people fleeing persecution." Mot. 15. Plaintiffs' argument repackages their statutory argument and misrepresents the rule, which takes a balanced approach to resolving the problem of heightened irregular migration at the southwest border. As discussed, Congress did not preclude the Departments from relying on systemic efficiency concerns or taking into account an individual's actions prior to arriving in the United States in promulgating rules concerning asylum eligibility, and indeed the Departments have long deemed such considerations relevant in evaluating asylum claims. *Supra* 10-13; *see Matter of Pula*, 19 I&N Dec. at 473-74.

Plaintiffs are also incorrect in asserting the rule seeks to *displace* asylum in favor of alternative pathways to the United States or "dramatically reduc[e]" its availability. *See* Mot. 15-16. The rule preserves eligibility for asylum for all those who comply with its terms, including those who qualify for an exception or rebut the presumption. There are already 1,250 noncitizens

per day arriving at a port of entry with a CBP One appointment, numbers, as discussed, which significantly exceed asylum processing at the ports of entry historically. *See* 88 Fed. Reg. at 31,398. The CHNV parole program permits up to 30,000 individuals a month—or 360,000 per year—to enter the country, AR4553, and this number does not count those individuals who enter via other existing—like Ukraine—and future parole programs or who otherwise fall within the third-country exception or rebut the presumption. Asylum protections thus retain their vitality under this rule. That some asylum seekers may nonetheless fail to establish eligibility while retaining eligibility for withholding or CAT protection because of the terms of the rule is, in any event, a necessary and appropriate consequence of Congress's delegation of authority to the Secretary and the Attorney General to establish additional conditions on asylum eligibility. *See*, *e.g.*, *R-S-C-*, 869 F.3d at 1187 ("This delegation of authority means that Congress was prepared to accept administrative dilution of the asylum guarantee in § 1158(a)(1).").

### 2. The Rule's reliance on lawful pathways is supported by the record.

Plaintiffs next argue "[t]he Rule's main factual premise is that its several 'lawful pathways' ... provide ample means for asylum seekers at the border to obtain protection," but that "this premise is contradicted" by evidence "the Rule fails to grapple with." Mot. 16. Specifically, Plaintiffs contend that: (1) the CBP One App offers too few appointments and is plagued by technical glitches (Mot. 16-18); (2) relevant parole programs exist for nationals of only six countries, and otherwise have limitations (Mot. 18); and (3) third countries are not capable of processing additional asylum applicants and remain unsafe (Mot. 19-23). Plaintiffs' argument that the Departments' "factual premise" is arbitrary and capricious, however, misapprehends the rule. To begin, Plaintiffs wrongly assert a core premise of the rule is that a viable alternative pathway will be available to every noncitizen affected by the rule. *See* Mot. 16. The rule does not articulate such a goal. Rather, the rule "acknowledge[s] that despite the protections preserved by the rule and the availability of lawful pathways, the rebuttable presumption adopted in the rule will result in the denial of some asylum claims that otherwise may have been granted." 88 Fed. Reg. at 31,332. The Departments explained, however, the risk that some meritorious claims may not be heard is outweighed by "the benefits to the overall functioning of the system, including deterrence of

dangerous irregular migration and smuggling." *Id.* Plaintiffs also critique the actual rationales offered by the Departments and then find fault with each piece in isolation. Yet the Departments did not offer these pathways as isolated mechanisms but as parts of a larger rule designed to balance system efficiency against countervailing concerns.

Even on their own terms, Plaintiffs' arguments fail. First, the current number of CBP One appointments—1,250 a day, which, if maintained, amounts to 37,500 a month or 456,250 a year—is significant, and provides more opportunities for asylum seekers to enter in an orderly fashion than the number of noncitizens encountered at the southwest border each year between 2010 and 2020 other than 2014 (479,370) and 2019 (851,508). AR2377; 88 Fed. Reg. at 31,398. *Contra* Mot. 16-17. Moreover, many noncitizens will be eligible for parole processes or obtain relief (or a denial of relief) in a transit country, thus obviating the need to make an appointment and present at a port of entry. And Plaintiffs disregard noncitizens who retain asylum eligibility because they satisfy the rule's exceptions, including showing they could not access the "scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle," 8 C.F.R. § 208.33(a)(2)(B), or because they rebut the presumption, 8 C.F.R. § 208.33(a)(3). Contrary to Plaintiffs' contention (Mot. 18), nothing in the rule precludes applying the exception when an individual lacks a phone, or cannot read or understand the app. *See* 88 Fed. Reg. at 31,406.

Plaintiffs also argue CBP One's scheduling requirements will require asylum seekers to wait in unsafe conditions in northern Mexico. *See, e.g.*, Mot. 16. But CBP One is not limited to noncitizens in Northern Mexico—it may be accessed by individuals in central Mexico as well. AR1652. Regardless, the rule does not require anybody to wait in Mexico prior to obtaining permission to present at a port of entry or, more importantly, during the course of immigration proceedings, and is expected to result in fewer noncitizens waiting in Northern Mexico. As the rule explains, one of its goals is to encourage migrants to use other lawful pathways—which the government has been expanding—to seek entry to the United States or protection in a transit country. These pathways include processes that would permit noncitizens from certain countries to fly directly into the interior rather than traveling to the border and new processing centers that allow the U.S. government to conduct screening in other countries in the Western Hemisphere.

Accordingly, it is likely *fewer* noncitizens will have to wait under potentially dangerous conditions for pre-scheduled appointments, since the provision of incentives and disincentives on net is expected to reduce the number of individuals coming to the border without first having attempted a lawful alternative. 88 Fed. Reg. at 31,431 ("As has been shown with the CHNV parole processes, pairing such policies together can lead to meaningful decreases in the flow of irregular migration to the SWB."). Additionally, for those who do arrive at a port of entry without an appointment, the rule contains an exception for those who establish that it was not possible to use CBP One. Although those exceptions may not cover every conceivable circumstance where use of the app is inconvenient or difficult, *contra* Mot. 18, the exceptions are meaningful and can address systemic technological problems. Also, the presumption can be rebutted where exceptionally compelling circumstances are present, including where the applicant or a family member with whom they are traveling faced an "imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder." *See*, *e.g.*, 88 Fed. Reg. at 31,322, 31,415. If a noncitizen faces such threats in Mexico, the noncitizen will be able to rebut the presumption for entering to avoid or mitigate harm related to those threats. *Id.* at 31,415.

Second, as previously noted, *supra* 22, Plaintiffs misunderstand the scope of the travel authorization exception. That exception does apply to a person who crosses the southwest border without authorization, if that noncitizen previously received "authorization to travel to the United States to seek parole, pursuant to a DHS-approved parole process." 8 C.F.R. §§ 208.33(a)(2)(ii)(A), 1208.33(a)(2)(ii)(A). Five countries currently have eligible parole programs, while the government is working on establishing several additional programs. *See supra* 22. As noted, these programs provide travel authorization to hundreds of thousands of individuals, all of whom would, both by flying to the interior or, if necessary, attempting to cross the southwest border, be exempt from the rebuttable presumption upon presentation at the border.

Third, Plaintiffs argue the countries through which asylum seekers travel to reach the southwest border are not safe and lack functioning asylum systems or the capacity to accept claimants. Mot. 19-23. But, again, the rule provides for a variety of lawful options, including *but not limited to* seeking and obtaining a decision in a third country; this exception thus works hand-

in-hand with the other two to encourage use of alternatives prior to reaching the southwest border. In any event, the rule adduces substantial evidence that seeking asylum in transit countries is a viable option for many migrants. The rule's assessment of that evidence is therefore conclusive.

As the rule recognizes, "[m]any of these countries [of transit] have taken substantial and meaningful steps in recent years that demonstrate their willingness to provide protection to those who need it." 88 Fed. Reg. at 31,410; AR4942-47, 4999-5008, 5421-24, 5757-61, 6126-73. Mexico and every Central American country are parties to the 1951 Refugee Convention and its 1967 Protocol, which require them to afford migrants nonrefoulement protections, and all have adopted the non-binding Cartagena Declaration on Refugees, which contains a more expansive definition of "refugee" than that contained in U.S. law, *i.e.*, some may qualify for protection under that definition who would not qualify for asylum in the United States. *Id.* at 31,410-11. Colombia is also a party to both instruments and, in 2021, "adopted legislation that allows Venezuelans to apply for temporary protected status, which grants Venezuelans 10-year residency and allows them to access public education, health care, and employment." *Id.* at 31,411. By February 2022, Colombia had received 2.2 million applications under this program, and by July of that same year it had already approved 1.4 million of these applications. *Id.* Belize likewise "offers an amnesty program for registered asylum seekers and certain irregular migrants that provides permanent residence and a path to citizenship." *Id.* Such programs demonstrate the governments' willingness to provide protection. Importantly, Mexico has continued to develop the capacities of its refugee system and has demonstrated the ability to handle and resolve a large volume of claims in an efficient manner. *See id.* ("Mexico has made exceptional strides to improve conditions for asylum seekers, migrants, and refugees within its borders."). Asylum processing times in Mexico average 8 to 12 months, and almost three quarters of applicants were granted some form of relief or protection in 2021. *Id.* at 31,414 (noting asylum was granted in 72 percent of cases, with an additional 2 percent of applicants granted some form of complementary protection). Moreover, Mexico has "substantially increased its Local Integration Program, which relocates and integrates individuals granted asylum in safe areas of Mexico's industrial corridor." *Id.* Although the Departments acknowledged concerns about potential harm to migrants in Mexico, they reasonably

concluded, given the high number of claims it can adjudicate every year, the significant grant rate for protection, ongoing efforts to assimilate asylum seekers, and other general efficiency and security gains, that Mexico "remains a viable option for many seeking protection," and that the rule preserves multiple alternative pathways for those for whom Mexico is not a viable option. *Id.*

Plaintiffs argue that the Departments ignored the plight of "[p]articularly vulnerable asylum seekers." Mot. 23. But the rule is explicitly premised on providing avenues that would alleviate the harsh conditions and suffering for the most vulnerable attempting to seek refuge in the United States, including LGBTQ, Black, and indigenous asylum seekers. The Departments recognized that "irregular migration journeys can be particularly fraught for vulnerable groups," and the rule "is intended to benefit particularly vulnerable groups by removing the incentive to make a dangerous irregular migration journey and reducing the role of exploitative transnational criminal organizations and smugglers." 88 Fed. Reg. at 31,345. Moreover, the rule "provides that its presumption can be rebutted by noncitizens, including those with particular vulnerabilities, who do not use a lawful pathway but who face imminent and extreme threats to life or safety." *Id.* at 31,351; *see also id.* at 31,352-53 (addressing comments relating to black and indigenous migrants).

### 3.   The Rule does not rely on any assumptions concerning meritorious claims.

Plaintiffs additionally argue that "[t]he Rule arbitrarily assumes that applicants subject to its bar are not likely to have a meritorious asylum claim." Mot. 24. This misunderstands the rule, which is not based on the premise that those subject to it are less likely than others to otherwise qualify for asylum.[12] Instead, the rule is based on the Departments' determination that it is imperative, given the exigent circumstances "to strike a balance" between systemic efficiencies and deterrence of irregular migration by "reduc[ing] the level of irregular migration to the United States," preserving "sufficient avenues for migrants with valid claims to apply for asylum or other protection, either in the United States or in third countries through which they travel," and sharing "the responsibility of providing asylum and other forms of protection with … regional partner[s]." *Id.* at 31,314-19, 31,329. Ultimately, Plaintiffs disagree with the reasoned judgment of the Departments. But this Court may not "second-guess[]" agencies' "weighing of risks and benefits"

---

[12] Although the NPRM suggests such reasoning, the final rule does not embrace that justification.

in adopting a policy choice. *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2571 (2019).

### 4. The Rule does not fail to consider interrelated policies.

Plaintiffs claim the Departments failed to consider how the rule and its justifications "interact[] with other contemporaneous and interrelated policy changes." Mot. 25. Specifically, Plaintiffs point to decisions to conduct some credible fear interviews while noncitizens are in CBP custody, schedule credible fear interviews no sooner than 24 rather than 48 hours, and remove certain non-Mexican citizens to Mexico through expedited removal, which they claim the Departments did not consider. Mot. 26. As explained below, however, the rule discusses and addresses relevant policy changes. *See, e.g.*, 88 Fed. Reg. at 31,317-18, 31,317 & n.21 (discussing efforts over the prior two years as well as new efforts announced on April 27, 2023).

*First*, as the rule explains, changes to the timing and location of credible fear interviews are beyond the scope of the rule. 88 Fed. Reg. at 31,363. The rule adopts a *substantive* change to asylum eligibility, which is implemented in credible fear proceedings. The *procedural* aspects of such proceedings are separate policies involving different considerations. *See id.* ("Any decision to conduct credible fear interviews while the noncitizen is in CBP custody will take into account a range of factors, including operational limitations associated with the facility, staffing, and throughput."); *see also Las Americas Immigrant Advoc. Ctr. v. Wolf*, 507 F. Supp. 3d 1, 19, 29-32 (D.D.C. 2020) (Jackson, J.) (under INA, credible fear interviews may be implemented differently depending on what border sector an individual is detained in). Indeed, the very procedural changes Plaintiffs invoke, which were previously implemented as the Prompt Asylum Case Review (PACR) and Humanitarian Asylum Review Process (HARP) programs while the "Transit" rule was in effect, *see id.* at 37-38, have been upheld against the same arguments Plaintiffs advance here, *see id.* 25-38, so their claim that the agency had to consider the issues anew is misplaced.

Citing data on credible fear passage rates during 2019-20, Plaintiffs contend "where a key justification for the Rule is the purported high [credible fear] passage rate, simultaneously-enacted policies that also predictably lower that rate are directly relevant." Mot. 26-27. But the general "prediction" is not supported by the record or data Plaintiffs cite. PACR and HARP, in effect from October 2019 to March 2020, applied to only 5,290 noncitizens—specifically, noncitizens subject

to the "Transit" rule from Brazil, El Salvador, Guatemala, and Honduras (PACR) or Mexico (HARP).[13] 88 Fed. Reg. at 31,430 n.304; AR1496-97, PC21524; PC21537; PC21550; PC21537. This is hardly a sufficient dataset from which to assert that a defunct policy that applied to just over 5,000 people is "directly relevant" to a rule governing *substantive* asylum eligibility for a far larger population such that the Departments should have considered it in greater detail. And it provides no basis to vacate the rule in all respects. Regardless, should Plaintiffs view these policies as problematic, they could have raised such a challenge in Washington, D.C. *See* 8 U.S.C. § 1252(a)(2)(A), (e)(3); *but see Las Americas.*, 507 F. Supp. 3d at 29-32 (upholding similar policies).

Plaintiffs also claim the rule does not "adequately address the Rule's interaction with DHS's separate decision to begin executing the expedited removal orders of" nationals of Cuba, Haiti, Nicaragua, and Venezuela "to Mexico instead of their countries of origin." Mot. 27. This is both incorrect and misplaced. First, the rule does in fact consider its interaction with that decision, *see, e.g.*, 88 Fed. Reg. at 11,705-06; AR2489 (including "CHNV Returns to Mexico continue" in modeling impact of the rule). Indeed, one of the key premises of the rule was data showing that imposing consequences on migrants from Cuba, Haiti, Nicaragua, and Venezuela—who generally cannot be removed to their home countries—was critical to lowering irregular encounters from nationals of those countries, which were at all-time highs and driving record border encounters. *See, e.g.*, 88 Fed. Reg. at 31,315. And the rule discusses at length the importance of being able to return or remove such nationals to Mexico, *see id.* at 31,317, 31,325, 31.337; 88 Fed. Reg. at 11,706, 11,712, and how, once the Title 42 Order ends, the government would be unable to expel nationals of those countries, and would instead rely, if Mexico agreed, on returning or removing such nationals to Mexico instead of their home countries. *See* 88 Fed. Reg. at 31,316-17 & n.21; 88 Fed. Reg. at 11,712. The Departments thus considered, and indeed relied upon, the ability to return or remove noncitizens from certain countries to Mexico when promulgating the rule.

### D.  The Rule Satisfies the APA's Procedural Requirements.

The Court should reject Plaintiffs' procedural challenges to the rule. Working under exigent circumstances replete with uncertainty about the status and fate of the Title 42 Order and

---

[13] Implementation of both programs officially ceased on February 2, 2021. AR556.

the enormous numbers of noncitizens potentially ready to cross the border as soon as the Order expired on May 11, the Departments provided for a notice-and-comment process and invoked only the exception to the delayed effective date requirement, specifically tailoring the APA process to both the exigency of the situation and the desire to obtain public comment. *See* 88 Fed. Reg. at 31,433-35. Plaintiffs fail to account for these exigent circumstances and the efforts the Departments took to ensure public engagement under these circumstances.

### 1. The 33-day comment period is consistent with the APA.

Plaintiffs' arguments that the comment period was insufficient fail. Mot. 28. First, Plaintiffs assert that the 33-day comment period was too short. But the APA "mandates no minimum comment period." *Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1484 (9th Cir. 1992). Section 553 of title 5 sets forth the procedures for informal rulemaking: the agency must provide notice of the proposed rulemaking and "give interested persons an opportunity to participate ... through submission of written data, views, or arguments." Some "opportunity to participate is all that the APA requires." *Phillips Petroleum Co. v. EPA*, 803 F.2d 545, 559 (10th Cir. 1986); *see Riverbend Farms*, 958 F.2d at 1484 (noting with approval the "usual[]" practice to allow "thirty days or more" for comment). Thus, the time for comment is left to an agency's reasonable discretion. *See, e.g.*, *Vt. Yankee Nucl. Power Corp. v. NRDC*, 435 U.S. 519, 543 (1978). Here, the agencies had good reason to select a 33-day comment period: the Title 42 Order was set to terminate May 11, 2023, and the Departments sought to receive and review comments and prepare a final rule by that date. A 60-day comment period would have run until April 24, 2023, and a final rule would have been impossible to prepare in the 17 days from April 24 to May 11, 2023. And it is clear that the 33-day period gave the public sufficient opportunity to comment, given that 51,952 comments were received, including from Plaintiffs.[14] 88 Fed. Reg. at 31,324; *see, e.g.*, *Little Sisters of the Poor Saints Peter & Paul Home v. Penn.*, 140 S. Ct. 2367, 2385 (2020) ("The object [of notice and comment], in short, is one of fair notice.").

Thirty days is generally "sufficient for interested persons to meaningfully review a

---

[14] *See* PC24158-209 (East Bay); PC33338-720 (Al Otro Lado); PC35106-24 (ILL); PC25373-84 (CARECEN); PC31496-518 (American Gateways); PC32378-744 (Tahirih); PC20365-68 (National Center for Lesbian Rights); PC32360-76 (Immigrant Defenders Law Center).

proposed rule and provide informed comment," even when "substantial rule changes" are proposed, as the over 50,000 comments received here demonstrate. *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1117 (D.C. Cir. 2019). And the exigent circumstances presented here—an imminent deadline by which Title 42 would end and Title 8 processing would begin and the anticipated increased irregular migration that would result—would have excused even a shorter period. *See Omnipoint Corp. v. FCC*, 78 F.3d 620, 629-30 (D.C. Cir. 1996) (collecting cases). Even absent the exigent circumstances, Plaintiffs and the public were provided "a meaningful opportunity to comment" and indeed availed themselves of that opportunity. *Hall v. EPA*, 273 F.3d 1146, 1162 (9th Cir. 2001). Plaintiffs were on notice well before the comment period began of the relevance of "the asylum systems and security situations in a dozen countries"—the only issue Plaintiffs claim it was "impossible" to timely analyze—because it was announced on January 5, 2023, 82 days before the end of the comment period, that a forthcoming proposed rule would "incentivize the use of new and existing lawful processes available in the United States *and partner nations*, and place certain conditions on asylum eligibility for failure to do so."[15] AR2582. In any event, a failure to afford adequate opportunity for comment is harmless "where the agency's mistake clearly had no bearing on the procedure used or the substance of decision reached." *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1220 (9th Cir. 2004); *see* 5 U.S.C. § 706 ("due account shall be taken of the rule of prejudicial error"). Plaintiffs identify nothing suggesting the 33-day comment period had such "bearing," so any violation is harmless.

Next, Plaintiffs contend the comment period was insufficient because they were not able to comment on the rule's interaction with later-enacted, different policy initiatives. Mot. 28. As discussed, the Departments provided adequate notice under exigent circumstances and provided the public as much time to comment as was feasible. *See* 88 Fed. Reg. 31,433-35. The changes to the timing and location of credible fear interviews were outside the scope of this substantive rule and previously were found legally sound. *Supra* 26-28. Moreover, Plaintiffs do not explain how comments, which included discussions of conditions in CBP custody and the difficulty of

---

[15] The record shows that in January 2023, multiple groups and two of Plaintiffs' attorneys wrote articles or issued press releases interpreting the rule's announcement as proposing to reenact the "Transit" bar or something like it. *See, e.g.*, AR4853; AR4854; AR5175; AR6914-15; AR7111.

preparing for credible fear interviews on short timeframes, *see* 88 Fed. Reg. at 31,355-57, would have been different had that specific policy change been announced sooner. As to their contention that they were not given an opportunity to comment on "an indefinite pause" on implementation of an earlier enacted rule, the Asylum Processing IFR, Mot. 28-29, they similarly do not explain how their comments would have been different had they known about the pause. Indeed, that rule itself made clear that it would be phased in, remained in the early stages of implementation as of March 2023,[16] and had only been used to process 1,732 noncitizens between June 2022 and March 202. *See* Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT protection Claims by Asylum Officers, 87 Fed. Reg. 18078, 18185 (Mar. 29, 2022) (discussing a "phased implementation").[17] Plaintiffs offer no plausible explanation why the Departments should have halted all preparations for the end of Title 42 based on a different rule applied to just 1,732 people, let alone how that justifies vacating the rule.

### 2.   The Departments provided relevant data.

Plaintiffs also argue the Departments did not provide "critical data underpinning the rule" concerning a "potential surge in migration at the southwest border" following Title 42's end. Mot 29-30. The Rule, and the NPRM, provided data from the Office of Immigration Statistics (OIS) concerning how the government calculated the numbers of encounters it anticipated. 88 Fed. Reg. at 31,328 (citing 88 Fed. Reg. at 11,705 n.11). Plaintiffs contend this was insufficient because the government "did not provide the public with that OIS analysis, the planning model underlying it, or the data the model used." Mot. 30. But the APA does not require the "information to be conveyed to the public [be] a full technical exposition." *Vt. Yankee*, 435 U.S. at 556. An agency thus may "rely on internal information in its files." *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014). Regardless, "[i]n addition to the Departments' description of the planning model in the NPRM ... the Departments presented a range of the underlying data clearly demonstrating the scope of the problem the Departments face." 88 Fed. Reg. at 31,328 (collecting

---

[16] At the time implementation was halted, only "single adults who are non-rare language speakers and whose intended destination is one of seven destination cities" were eligible for the process. *See* https://www.dhs.gov/immigration-statistics/special-reports/asylum-processing-rule-report.

[17]  *See*  https://www.dhs.gov/sites/default/files/2023-05/2023522_plcy_asylum_processing_rule_cohort_report_march_2023.xlsx

examples). Plaintiffs offer no explanation how being able to comment on the underlying planning and data models used would have changed the agency's disposition or the nature of their comments let alone why being able to do so was critical. *See Sebelius*, 746 F.3d at 1110. Regardless, those predictions turned out to be entirely correct. Decl., ¶¶ 9-12, so Plaintiffs cannot show prejudice.

## II.   Any Relief Must Be Sharply Limited

Even if any relief were warranted, it must be strictly limited. *First*, the rule "implements" the expedited removal system by "instruct[ing] asylum officers to apply the ... presumption during credible fear screenings," 88 Fed. Reg. at 11,724, and makes other changes to expedited removal and credible fear procedures for those subject to the rule, *see* 8 C.F.R. §§ 208.33(b), 1208.33(b). This Court lacks jurisdiction to review or vacate rules implementing the expedited removal system. *See* 8 U.S.C. § 1252(a)(2)(A)(iv); (e)(1), (3); *Grace v. Barr*, 965 F.3d 883, 891 (D.C. Cir. 2020) (section 1252(e) covers "agency [regulations or] policies governing credible-fear interviews").

*Second*, 8 U.S.C. § 1252(f)—which bars courts from "enjoin[ing] or restrain[ing] the operation of" 8 U.S.C. §§ 1221-31—precludes relief interfering with the government's chosen means of operating §§ 1225(b)(1), 1229a, and 1231, as implemented by the rule. *See Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2064-65 (2022). As explained, the rule establishes a rebuttable eligibility presumption applicable in three contexts: affirmative asylum applications under § 1158, credible fear interviews under § 1225(b)(1), and full removal proceedings under § 1229a. Vacating the rule's application in expedited and § 1229a removal proceedings would interfere with the government's chosen means of implementing those statutes by preventing the agencies from making a credible fear determination under § 1225(b)(1) as prescribed by the rule, by prohibiting IJs and the Board from using the means the agencies chose to determine whether a noncitizen has carried their burden to demonstrate eligibility for relief from removal under § 1229a(c)(4)(A), and by interfering with the agencies' chosen means of implementing the statutory withholding requirement under § 1231. That the rule was promulgated under § 1158 does not matter, given that it *operates* in expedited and § 1229a removal proceedings and is "the way that [§§ 1225, 1229a, and 1231 are] being carried out." *Aleman Gonzalez*, 142 S. Ct. at 2064. Indeed, §§ 1225 and 1229 incorporate that provision, and "the 'operation of' the relevant statutes is best understood to refer

to the Government's efforts to enforce or implement them." *Id.*; *see id* at 2067 (§ 1252(f)(1) may bar injunction of "operation of a provision that is not specified in § 1252(f)(1)" if the injunction "has some collateral effect on the operation of a covered provision"). Any injunction thus would impermissibly compel agency adjudicators "to take actions that (in the Government's view) are not required by" §§ 1225, 1229a, and 1231 or their implementing regulations, "and to refrain from actions that (again in the Government's view) are allowed by" those statutes. *Id.* at 2066.

Nor does it matter that Plaintiffs seek vacatur rather than an injunction. A vacatur is indistinguishable from an injunction for purposes of § 1252(f), if that vacatur compels the agency to rescind or cease implementing its chosen means of implementing covered provisions. Vacatur thus possesses the hallmark of the relief barred by § 1252(f)(1): It "order[s] federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out" the law, prohibiting government actions that the government maintains "are allowed" by the statute. *Aleman Gonzalez*, 142 S. Ct. at 2065-66. Regardless, § 1252(f)(1), on its face, prohibits lower-court orders that "enjoin or *restrain*" the Executive Branch's operation of the covered provisions. 8 U.S.C. § 1252(f)(1) (emphasis added). Those terms indicate that a court may not impose coercive relief that "interfere[s] with the Government's efforts to operate" the covered provisions in a particular way. *Aleman Gonzalez*, 142 S. Ct. at 2065. That understanding encompasses an order vacating the rule.

*Third*, Article III requires that "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury," *Gill*, 138 S. Ct. at 1934, and the rule in equity is that relief "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). Indeed, the rule includes a severability clause, 8 C.F.R. §§ 208.33(d), 1208.33(c), and "absent extraordinary circumstances, the Court should adhere to the text of the severability or nonseverability clause." *Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335, 2349 (2020) (plurality). Immigration law is not a special context that warrants a different rule. "[A]ll [relief]—even [orders] involving national policies—must be narrowly tailored to remedy the specific harm shown." *East Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019). And the APA does not affirmatively authorize universal vacatur or nationwide relief. *See Trump v. Hawaii*, 138 S. Ct. 2392, 2425

(2018) (Thomas, J. concurring). The APA provides only that a court, at most, may "hold unlawful and set aside agency action." 5 U.S.C. § 706(2). But section 706(2) does not authorize universal vacatur; indeed, it does not pertain to remedies at all. Remedies in APA cases are governed by § 703, which authorizes traditional equitable remedies. And as just discussed, those remedies are limited to redressing a particular plaintiff's specific injury. Even assuming Plaintiffs' asserted harms warrant any relief, Plaintiffs fail to show that "complete relief" could not be provided by a vacatur limited to any bona fide, identified clients subjected to unlawful portions of the rule.[18]

*Fourth*, even if vacatur were an available remedy, the circumstances of this case would warrant remand without vacatur. Remand without vacatur is appropriate where vacatur may cause "disruptive consequences," *California Communities Against Toxics v. U.S. EPA*, 688 F.3d 989, 992 (9th Cir. 2012), and where there is "at least a serious possibility that the [agency] will be able to substantiate its decision' given an opportunity to do so." *Radio-Television News Directors Ass'n v. F.C.C.*, 184 F.3d 872, 888 (D.C. Cir. 1999). "That the … final rule is invalid is not the end of the analysis. In considering whether vacatur is warranted, we must balance [any] errors against the consequences of such a remedy." *Cal. Communities*, 688 F.3d at 993; *see All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018) (equitable factors guide whether to remand without vacatur). Applying this balance here, if the Court were to find the rule invalid, it should remand without vacatur. Plaintiffs' claims, if found meritorious, may be remedied on remand through a new decision. *See, e.g.*, *Air Transp. Ass'n of Am., Inc. v. U.S. DOA*, 317 F. Supp. 3d 385, 391 (D.D.C. 2018) (remand without vacatur appropriate where "conceivable that on remand it can develop a reasoned explanation of its statutory authority"); *Cal. Communities*, 688 F.3d at 993 (remanding without vacatur on procedural and substantive APA claims).

On the other side of the balance, vacatur would have seriously disruptive consequences, frustrating the "public interest in effective measures to prevent the entry of" noncitizens at the Nation's borders. *United States v. Cortez*, 449 U.S. 411, 421 n.4 (1981). Here, the Executive

---

[18] That is especially so here, where the rule erects a presumption rather than a bar, which Plaintiffs have not shown cannot be applied lawfully in any set of circumstances, *Reno v. Flores*, 507 U.S. 292, 301 (1993), and whose application requires assessment of specific facts in a noncitizen's immigration proceedings, 8 U.S.C. § 1229a(b)(4)(A)-(B), (c)(1)(A), (c)(4)(B), and in later judicial review through the petition-for-review process, where available. *See* 8 U.S.C. § 1252(a)(5), (b)(9).

predicted an imminent increase in encounters at the southwest border—noncitizens seeking to enter our country without authorization or documentation, overwhelming the immigration system, incentivizing human trafficking, and risking lives—and the government took targeted measures to prevent that increase. Decl. ¶¶ 2-4, 9-12, 48-51. But for those measures, which depend on a balance of both consequences and incentives, encounters would have been significantly higher, overwhelming border enforcement resources at great risk to the public, migrants, and DHS officers. *Id.*, ¶¶ 3, 7-24. Indeed, in the run-up to Title 42's termination, encounters rose to record levels, averaging up to 10,000 per day, causing extreme, dangerous overcrowding, and overwhelming limited CBP and ICE resources. *Id.*, ¶¶ 9-12. While, as a result of the rule, those numbers dropped after May 11 to an average of 3,400 per day, DHS statistical models show that absent the rule, those numbers could rapidly rise again to 10,000 encounters a day or higher, causing potential chaos at the border. *Id.*, ¶¶ 4, 25-37; *see also id.*, ¶¶ 27-39 (describing serious harms to DHS's ability to effectively enforce the immigration laws if rule is set aside). Given this, the public interest is plainly served by encouraging noncitizens to avail themselves of lawful, safe, and orderly options for entering and seeking asylum in this country and elsewhere. It is also served by ensuring the Departments' continued ability to safely, effectively, and humanely enforce and administer U.S. immigration law, including provisions concerning asylum and removal, and in promoting the sharing with partner countries efforts to address the current migration surge. Vacatur would cause the very harms the rule successfully prevents, causing great damage to the government's interests and the public. And vacatur undermines "sensitive and weighty interests of … foreign affairs," *Humanitarian Law Project*, 561 U.S. at 33-34, by setting aside a rule that implements the result of ongoing diplomatic negotiations and is necessary to securing continued foreign government cooperation with the United States' foreign policy goals. Decl., ¶¶ 40-47

At a minimum, given the chaotic impact on the border any vacatur would have, the Court should stay any order it issues for fourteen days to allow for orderly review in the court of appeals.

## CONCLUSION

For these reasons, the Court should grant the government summary judgment.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

WILLIAM C. PEACHEY
Director

By: /s/ *Erez Reuveni*
EREZ REUVENI
Assistant Director
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 307-4293
Email: Erez.R.Reuveni@usdoj.gov

PATRICK GLEN
CHRISTINA P. GREER
Senior Litigation Counsel

Dated: June 16, 2023                    *Attorneys for Defendants*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

I hereby certify that on June 16, 2023, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of for the Northern District of California by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

By: */s/ Erez Reuveni*
EREZ REUVENI
Assistant Director
United States Department of Justice
Civil Division