## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

|  |  |
|---|---|
| East Bay Sanctuary Covenant, *et al.*,<br><br>                    Plaintiffs,<br><br>v.<br><br>Joseph R. Biden, *et al.*,<br><br>                    Defendants. | No. 4:18-cv-06810-JST |

## DECLARATION OF BLAS NUÑEZ-NETO

I, Blas Nuñez-Neto, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and documents and information made known or available to me from official records and reasonably relied upon in the course of my employment, hereby declare as follows:

1.      I am the Assistant Secretary for Border and Immigration Policy for the U.S. Department of Homeland Security (DHS) and have served in this role since March 26, 2023. I previously served as the Acting Assistant Secretary for Border and Immigration Policy since October 1, 2021.  Prior to this acting role, I served as the Chief Operating Officer for U.S. Customs and Border Protection (CBP), a DHS component, since March 5, 2021. In a prior administration, I served DHS as Senior Advisor to then-CBP Commissioner Richard Gil Kerlikowske, from January 12, 2015 to January 16, 2017.

**The challenged rule is critical to DHS' plan to effectively manage irregular migration.**

2.       On May 12, 2023, after a robust regulatory process that included responding to more than 50,000 comments from the public, DHS and the Department of Justice (DOJ) implemented the Circumvention of Lawful Pathways rule.  The rule is designed to incentivize noncitizens to use the new and existing lawful, safe, and orderly processes that DHS has established and expanded, and disincentivize dangerous and irregular border crossings by placing a condition on asylum eligibility for those noncitizens who fail to do so, and who do not otherwise qualify for an exception.  Critically, the rule fits into a broader strategy to address historic migratory challenges impacting the entire Western Hemisphere.  Through a variety of actions, the United States and its foreign partners are seeking to incentivize migrants to use lawful, safe, and orderly pathways, as well as to disincentivize irregular migration.  As such, this rule is a critical component of the United States' regional strategy and aims to discourage noncitizens from crossing the Southwest Border (SWB) unlawfully between ports of entry, or without authorization at a port of entry.[1]

3.       Imposing consequences for unlawfully, or irregularly, crossing the border is, by itself, not sufficient to deter irregular migration.  Migrants have, time and time again, shown that they are willing to endure unfathomable suffering for an opportunity to come to the United States, even if their chances of success are small.  To be effective, the consequences DHS applies must be paired with incentives for migrants to use lawful processes.  DHS and the U.S. Department of State have been working with our foreign partners in the Western Hemisphere to enhance enforcement efforts along national borders and expand lawful pathways in countries

---

[1] U.S. Dep't of Homeland Sec., *Fact Sheet: Department of State and Department of Homeland Security Announce Additional Sweeping Measures to Humanely Manage Border through Deterrence, Enforcement, and Diplomacy* (May 10, 2023*)*, https://www.dhs.gov/news/2023/05/10/fact-sheet-additional-sweeping-measures-humanely-manage-border

throughout the region—including protection programs—to address the current migration challenge.  DHS has, over the past two years, undertaken a series of measures designed to increase access to processes and pathways for noncitizens to come to the United States or in a safe, orderly, and lawful manner.  But similarly, incentives without consequences are insufficient to deter irregular migration—they must go hand-in-hand.  In concert with the increase in lawful means for migrants to come to the United States in a safe and orderly manner, this rule imposes strengthened consequences on noncitizens who do not avail themselves of the wide range of lawful pathways the U.S. Government has made available for entering the United States, do not seek protection from countries they travel through, and do not merit an exception or otherwise overcome the rule's presumption.  In this way, the rule follows the successful model of the Cuban, Haitian, Nicaraguan, and Venezuelan ("CHNV") processes, which significantly reduced encounters from those countries after their implementation: it creates a viable lawful, safe, and orderly option for noncitizens, and imposes consequences for failing to follow that process.

4.     The rule's condition on asylum eligibility is a temporary measure intended to respond to a time of heightened irregular migration throughout the Western Hemisphere. Importantly, and as detailed further below, the rule is working as intended and has already significantly reduced encounters at the border. In the absence of the rule, DHS planning models suggest that irregular migration could meet or exceed the levels that DHS recently experienced in the days leading up to the end of the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order.  These levels of irregular migration would severely stress DHS and DOJ's continued ability to safely, effectively, and humanely enforce and administer U.S. immigration law, including the asylum system.  They would also quickly overwhelm shelter capacity in border communities and interior cities.

**Hemispheric conditions are driving encounter levels that strain DHS resources.**

5.      Violence, food insecurity, severe poverty, corruption, climate change, the

continuing effects of the COVID-19 pandemic, and dire economic conditions have all

contributed to a significant increase in irregular migration around the globe, fueling the highest

levels of irregular migration since World War II.  This wave of global migration is challenging

many nations' immigration systems, including the United States.  In the Western Hemisphere,

failing authoritarian regimes in Venezuela, Cuba, and Nicaragua, along with an ongoing

humanitarian crisis in Haiti, have driven millions of people from those countries to leave their

homes.  Additionally, violence, corruption, and the lack of economic opportunity—challenges

that are endemic throughout the region—are driving noncitizens from countries such as Brazil,

Colombia, Ecuador, and Peru to make the dangerous journey to the U.S. border.  This is in

addition to the continuing economic headwinds and rule of law concerns in traditional sending

countries, such as Guatemala, Honduras, and El Salvador.

6.      In the early 2010s, after three decades of bipartisan investments in border security

and strategy, encounters along the SWB reached modern lows, averaging fewer than 400,000 per

year from 2011 to 2017.  This followed decades during which annual encounters routinely

numbered in the millions.  However, even during this period of relatively low encounter levels at

the border, DHS faced significant challenges in 2014 due to an unprecedented surge in migration

of unaccompanied children, and in 2016 due to a surge in family units at the border—

demographics that present unique challenges due to their vulnerability.  Between 2017 and 2019,

however, encounters along the SWB more than doubled, and—following a significant drop

during the beginning of the COVID-19 pandemic, which shut down travel across the world—

continued to increase in 2021 and 2022.  In fiscal year (FY) 2021, encounters at the SWB

reached levels not seen since the early 2000s, with U.S. Border Patrol (USBP) making 1.7

million encounters.  In FY 2022, DHS reached a new high-water mark for encounters at the land border, with total USBP encounters at the SWB exceeding 2.2 million.  As a result of the hemispheric conditions described above, much of this growth in encounters was driven by nationalities that DHS has historically not encountered in large numbers at the border—including countries that make it difficult for DHS to repatriate their nationals who do not establish a legal basis to remain in the United States.

7.     From March 20, 2020 to May 11, 2023, the DHS implemented the CDC's Title 42 public health Order, under which noncitizens encountered by DHS personnel could be quickly expelled to Mexico or to their home country—but only if Mexico or their home country accepted their return.[2]  Importantly, an expulsion under the Title 42 public health Order did not carry with it any lasting consequences for noncitizens, aside from their expulsion.  It was, however, a relatively quick process for frontline personnel.  By contrast, a removal under DHS' traditional Title 8 authorities carries with it significant and lasting consequences, including a minimum 5-year ban on admission and the potential to be criminally prosecuted for illegal re-entry.  Title 8 processes, however, are substantially longer than Title 42 processes.

8.     In preparation for the return to Title 8 processing of all noncitizens, DHS led a comprehensive, all of government planning effort that lasted more than 18 months.  This included record deployments of personnel, infrastructure, and resources to support DHS's frontline personnel at a substantial cost to other DHS operations.  This effort also included the

---

[2] The Title 42 public health Order applied to certain noncitizens arriving from Canada or Mexico who would otherwise be held in a "congregate setting" at a port of entry or U.S. Border Patrol station at or near the U.S. land and adjacent coastal borders.  Public Health Reassessment and Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists 86 Fed. Reg. 42,828 42,841 (Aug 5, 2021).  Under the Title 42 public health Order, "covered noncitizens apprehended at or near U.S. borders" were "expelled" to Mexico, Canada, or their country of origin.  *Id.* at 42,836.  As a result, they could be processed much faster—in "roughly 15 minutes," as compared to "approximately an hour and a half to two hours" for noncitizens who are processed and issued a notice to appear for removal proceedings under Title 8.  *Id.*

development and implementation of policy measures, including the rule and its associated lawful pathways and processes, that were critically important components of DHS preparations to manage the anticipated significant influx of migrants at the SWB associated with the end of Title 42's application at the border.

9.      In the days leading up to the end of the Title 42 public health Order on May 12, 2023, DHS saw a historic surge in migration.  This surge culminated with the highest recorded encounter levels in U.S. country's history over the days immediately preceding May 11, which placed significant strain on DHS's operational capacity at the border.  Encounters between ports of entry (thus excluding arrivals scheduled through the CBP One application, who appear at ports of entry) almost doubled from an average of approximately 4,900 per day the week ending April 11, 2023, to an average of approximately 9,500 per day the week ending May 11, 2023, including an average of approximately 10,000 encounters immediately preceding the termination of the public health Order (from May 8 to May 11).  The sharp increase in encounters during the 30 days preceding May 11 represents the largest month over month increase in almost two decades—since January 2004.

10.      As a result, in the days leading up to the end of the Title 42 public health Order, USBP saw a steady increase in the numbers of noncitizens in custody, leading to significant operational challenges as described below.  From May 8 to 11, 2023, USBP's daily in-custody average was approximately 27,000, with a single-day peak of approximately 28,500 on May 10—well above its holding capacity at that time of approximately 18,500.  During this same timeframe, eight out of nine SWB sectors were over their holding capacity—with four sectors (El Centro, El Paso, RGV, and Yuma) more than 50 percent over their holding capacity and one sector (Tucson) more than two-and-a-half times its holding capacity.

11.     As discussed more fully below, this record number of encounters severely strained DHS operations and resources, as well as the resources of other federal government agencies, local communities, and non-governmental organizations.  CBP had to redirect limited resources from other mission needs—particularly, legitimate travel and trade operations, the volume of which now surpasses pre-pandemic levels—to focus on processing apprehended noncitizens.  Overcrowding in CBP facilities increased the potential of health and safety risks to noncitizens, government personnel, and contract support staff—risks which were exacerbated by an increase in the average time in custody, which generally occurs when there are large numbers of noncitizens in custody that must be processed.  To manage these overcrowded conditions, USBP sectors had to pull personnel from the field to perform tasks including processing, transporting, escorting, and detaining noncitizens in custody, as well as other related functions. This, in turn, decreased USBP's ability to respond to noncitizens avoiding detection, other agency calls for assistance, and noncitizens in distress.

12.     The surge in encounters immediately preceding the end of Title 42 also led to significant challenges for local border communities.  For example, in the days leading up to May 12, local community resources in El Paso, Texas were soon overwhelmed as the number of noncitizens arriving in the United States quickly surpassed the city's capacity.  In anticipation of an influx of noncitizens arriving to the city—an influx that ultimately materialized—the city declared a state of emergency,[3]  as more than 1,000 noncitizens were sleeping on the sidewalks

---

[3] Sneha Dey, *As Title 42 comes to an end, El Paso declares state of emergency,* Tex. Tribune (Apr. 30, 2023), https://www.texastribune.org/2023/04/30/el-paso-state-of-emergency-title-42.

and left without shelter.[4]  Similarly, the cities of Brownsville and Laredo, Texas, declared states of emergency to allow them to seek additional resources to bolster their capacities.[5]

**Implementation of the rule has significantly reduced encounters at the U.S. border and migration throughout the Western Hemisphere.**

13.     In the weeks since May 12, 2023, DHS has executed on its more than 18-month post-Title 42 planning effort by leading a whole-of-government effort to ensure the safe, orderly, and humane management of the nation's borders and the continued enforcement of U.S. immigration laws.  The rule plays an integral role in this effort.  These efforts, and in particular the disincentives to irregular migration put in place through the new rule, have produced significant results.  From May 12 to June 13, 2023, encounters between ports of entry at the SWB have decreased by 69 percent compared to their peak just before the end of Title 42, with CBP averaging approximately 3,360 USBP encounters between ports of entry.  As a result of this swift and sustained decline in encounters, the number of noncitizens in USBP holding facilities has decreased from a high of more than 28,500 on May 10—or 153 percent of its rated holding capacity at that time—to approximately 8,600 on June 9, or 46 percent of its holding capacity.

14.     The strengthened consequences in place at the border under Title 8 authorities, including use of the rule, has reduced migration throughout the Western Hemisphere as intending migrants and the smuggling networks that move them assess the new policies.  For example, daily entries into the perilous Darién jungle between Colombia and Panama have declined by more than 50 percent since May 11, from nearly 1,900 encounters between May 1 and May 11 to

---

[4] Rose Flores, Dakin Andone & Nouran Salahieh, *Migrants Living on the Streets of El Paso are Urged to Turn Themselves in to Immigration Authorities as Expiration of Title 42 Looms,* CNN (May 9, 2023), https://www.cnn.com/2023/05/09/us/title-42-expires-border-immigration-tuesday/index.html.
[5] Edgar Sandoval, Eileen Sullivan & Miriam Jordan, *Some Texas Border Cities Are Already Under a State of Emergency,* New York Times (May 11, 2023), https://www.nytimes.com/2023/05/11/us/texas-el-paso-state-emergency-title-42.html.

approximately 800 a day between June 1 and June 14.  It is clear that actions taken by the U.S.

Government to provide both legal pathways and consequences to irregular migration—actions

that also spurred regional partners to undertake their own measures seeking to address irregular

movements of migrants—were critical factors in reducing migratory flows throughout the

Western Hemisphere.

15.     The rule has strengthened the consequences for noncitizens who cross unlawfully

between ports of entry, or without prior authorization at ports of entry.  Overall, in the four

weeks since the rule has been implemented, 46 percent of single adults processed under the rule[6]

making credible fear claims have been screened-in,[7] compared to an 83 percent screen-in rate in

the pre-pandemic period of 2014 to 2019.  As intended, the rule has significantly reduced screen-

in rates for noncitizens encountered along the SWB.  The decline in encounters at the U.S.

border, and entries into the Darién Gap, show that the application of consequences as a result of

the rule's implementation is disincentivizing noncitizens from pursuing irregular migration and

incentivizing them to use safe and orderly pathways.

16.     Between May 12 to June 13, 2023, U.S. Citizenship and Immigration Services

(USCIS) has interviewed approximately 8,195 noncitizens who have been subject to the rule.

Out of these noncitizens, 261 (3 percent) were able to establish an exception to the rule; 689 (8

percent) were able to rebut the presumption; and 7,243 (88 percent) were subject to the

presumption.  Of the noncitizens who were able to establish an exception to the rule, 189 (72

percent) were able to establish a credible fear of persecution or torture under the "significant

---

[6] This includes all categories of noncitizens processed under the rule, including those who establish an exception or rebut the presumption.

[7] The screen-in rate refers to the percentage of cases with a positive fear determination calculated by dividing the number of cases that receive a positive fear determination by cases adjudicated on merit (i.e. positive and negative fear determinations).

possibility" standard.  Of the noncitizens who were able to rebut the presumption, 528 (77 percent) were able to establish a credible fear of persecution or torture under the "significant possibility" standard.  Of the noncitizens who were subject to the rule's presumption, 3,036 (42 percent) were able to establish a credible fear of persecution or torture under the "reasonable possibility" standard.  Additionally, thousands more are currently in CBP or U.S. Immigration and Customs Enforcement (ICE) custody going through the expedited removal process.

17.     The rebuttable presumption established by the rule has allowed DHS to significantly increase its use of expedited removal, including by applying it to more nationalities than it otherwise would have.  This is because, prior to the rule's implementation, the screen-in rates for noncitizens from some key countries—including Venezuela, Cuba, and Nicaragua—were sufficiently high as to make it ineffective to refer nationals of those countries into expedited removal, given the significant, multiagency resources required to process them.  Absent the rule's impact on screen-in rates, it is likely that DHS would not devote the resources to process noncitizens from those countries for expedited removal as it would result in issuing a notice to appear before an immigration judge anyway while unnecessarily increasing time in custody. This, in turn, may lead to increased encounter levels and all the challenges that they entail.

18.     In its preparations for the end of the Title 42 public health Order, DHS made improvements to the technology and processes at the border that are now allowing it to process credible fear cases more quickly than ever before—enhancing its ability to quickly deliver consequences to noncitizens who do not establish a legal basis to remain in the United States. DHS has reduced the median time for USCIS to complete fear claim cases for single adults encountered since May 12 by 57 percent, to 13 days from CBP apprehension compared to 30 days in the pre-pandemic period (2014–2019).  These process enhancements and the rule work

together to more quickly and effectively, impose consequences on those who do not establish a legal basis to remain in the United States.  The rule allows DHS to place more noncitizens into the expedited removal process, and the process enhancements help ensure that the increased use of expedited removal does not result in unhelpful backlogs or increased holding times.  Without the rule, these process enhancements would be substantially less effective given significantly higher screen in rates that would, as noted above, make it largely impractical for DHS to apply expedited removal to key nationalities encountered at the border.

19.     The rule's implementation has generated widespread understanding that DHS has strengthened consequences at the border for those who enter without authorization even as DHS has significantly increased lawful pathways and processes for noncitizens to come to the United States in a safe and orderly manner. The effect of these developments is that there has been an immediate reduction in encounters at the border.

20.     As part of these efforts, DHS has repatriated approximately 50,000 noncitizens, including single adults and family units to more than 100 countries since May 12.  This includes more than 1,650 noncitizens from Cuba, Haiti, Nicaragua, and Venezuela who were returned or removed to Mexico during this time-frame—the first time in the United States' bilateral history that the Government of Mexico has accepted third country nationals under Title 8 authorities at the border at scale.

21.     The ability to quickly apply consequences at the border is important because DHS must contend with callous human smuggling networks that weaponize misinformation and look for any opportunity to put intending migrants' lives at risk for profit.[8]  These criminal

---

[8] *See* U.S. Dep't of Justice, Press Release, *Defendants Indicted in Tractor Trailer Smuggling Incident That Resulted in 53 Deaths* (July 20, 2022), https://www.justice.gov/usao-wdtx/pr/defendants-indicted-tractor-trailer-smuggling-incident-resulted-53-deaths; U.S. Dep't of Justice, Press Release, *Cuban National Sentenced to Over 38 Years in*

organizations intentionally twist information about U.S. immigration policy for the express purposes of encouraging would-be migrants to use their services—services that regularly result in tragedy.  Because profit is the motivating factor, criminal organizations have no qualms when it comes to exploiting migrants through false promises—particularly when there are changes in the United States' immigration policy or border operations.  This familiar pattern was seen in the weeks leading up to the lifting of Title 42.

22.     In the days immediately following the rule's effective date, media reporting confirmed internal DHS analyses that the rule and accompanying messaging were ultimately effective in communicating that there would be stricter consequences for crossing the SWB unlawfully between ports of entry, or without authorization at ports of entry, after the end of Title 42.   For example, a *Washington Post* article states that in interviews with migrants waiting on the Mexican side of the SWB, U.S. messaging relating to stricter penalties under Title 8 authorities were a factor in many intending migrants' decisions to attempt to cross the border "before—not after—Title 42's expiration."[9]  Similarly, the article further describes migrants' understanding that there would be consequences associated with irregularly crossing the SWB without scheduling an appointment at a port of entry through the CBP One app.[10]

23.     As part of its preparations for the end of the Title 42 public health Order and the implementation of the rule, DHS significantly expanded access to land border ports of entry. The CBP One mobile app, which is available to download for free to a mobile device, allows

---

*Prison for Drug Trafficking and Other Crimes after Using His Border Ranch as a Criminal Corridor* (Mar. 9, 2022), https://www.justice.gov/usao-wdtx/pr/cuban-national-sentenced-over-38-years-prison-drug-trafficking-and-other-crimes-after.

[9] *See* Mary Beth Sheridan, Reyes Mata III, Maria Sacchetti & Nick Miroff, *End of Title 42 Pandemic Border Policy Brings Reset, But No Sudden Rush*, Wash. Post (May 12, 2023).
https://www.washingtonpost.com/nation/2023/05/12/title-42-pandemic-ends-border-migrants/

[10] *See also* Valerie Gonzalez, *Migrants Rush Across U.S. Border in Final Hours Before Title 42 Asylum Restrictions are Lifted*, Associated Press: PBS (May 11, 2023), https://www.pbs.org/newshour/politics/migrants-rush-across-u-s-border-in-final-hours-before-title-42-asylum-restrictions-are-lifted.

noncitizens of any nationality who are in Central or Northern Mexico to schedule an appointment to present at a port of entry along the SWB in a safe and orderly manner.  The advance biographic and biometric information captured by the app allows CBP to significantly improve the efficiency of its processes at the border—even as it ensures that every individual processed is thoroughly vetted against national security and public safety systems.  This, in turn, has allowed CBP to greatly increase its ability to process inadmissible noncitizens at land border ports of entry compared to its 2014-2019 pre-pandemic average.  On June 1, CBP expanded the number of available daily appointments from 1,000 to 1,250 per day—almost four times the average number of noncitizens processed per day at ports of entry than in the years preceding the pandemic.  This expansion has allowed a greater number of noncitizens to present themselves in a safe and orderly manner at ports of entry each day during their scheduled appointment time. DHS has also made a series of updates to the app that have significantly improved access to appointments and provided greater predictability to migrants about the process.  This app, available in English, Spanish, and Haitian Creole, effectively cuts out the smugglers, decreases migrant exploitation, and improves safety and security in addition to making the process more efficient.

24.     The rule's combination of strengthened consequences at the U.S. land border, regional partnership, and increased lawful pathways and processes for noncitizens has had an immediate impact on encounters at the U.S. border and migration throughout the region. **If DHS cannot rely on the rule, DHS expects an increase in encounters between ports of entry that will severely tax operational capacities to the detriment of other critical missions and expects the absence of the rule to negatively impact receiving communities in the United States and our relationships with foreign partners.**

25.     As detailed in the rule, DHS planning models suggest that, without the strengthened consequences, including those put in place by the rule, these elevated encounter

levels would have continued after May 11.[11]  Thus, if the rule is unavailable for any amount of time, DHS expects that the current decline in border encounters will quickly be erased by a surge in border crossings that could match—or even exceed—the levels seen in the days leading up to the end of the Title 42 public health Order.

26.     To put the current situation on the ground into perspective, CBP's Southern Border Intelligence Center estimates that as of June 14, 2023, approximately 104,000 migrants are in Northern Mexico, within eight hours of the U.S. border, with many more along the transit route between Colombia and the SWB.  It appears that many of these migrants are waiting to see whether the strengthened consequences associated with the rule's implementation are real.[12] DHS anticipates that any interruption in the rule's implementation will result in another surge in migration that will significantly disrupt and tax DHS operations.  This expectation is not speculative.  DHS needs only to look back to the pre-May 12 surge, which was only blunted by the application of strengthened consequences at the border and expanded access to lawful pathways and processes, in large part as a result of the rule's implementation on May 12, to identify the repercussions of losing the rule.  A similar surge now would put even greater strain on DHS operations, given that Title 8 processes take substantially longer and are more operationally complex than Title 42 processes at the border.

**Impact on CBP**

---

[11] *Circumvention of Lawful Pathways*, 88 Fed. Reg. 31,314, 31316 & n.14 (May 16, 2023).

[12] *See* José Ignacio Castañeda Perez, *Here's Why There Was No Immediate Migrant Influx at the Arizona Border When Title 42 Ended*, Ariz. Republic (June 1, 2023) https://www.azcentral.com/story/news/politics/border-issues/2023/06/01/title-42-lifted-but-no-immediate-migrant-influx-was-seen/70269773007/.  This news article explains that due to new immigration rules and consequences, migrants and transnational smuggling networks are taking a "wait and see" approach when it comes to the SWB.  This observation is noted by Adam Isacson, director for defense oversight at the Washington Office on Latin America, who states that "[b]oth migrants and their smugglers right now are trying to figure out what those new pathways are."

27.     CBP, a component of DHS, is charged with enforcing federal customs and immigration laws at or near the international border, including at and between U.S. ports of entry, while facilitating lawful international travel and trade.  CBP facilities, whether operated by the Office of Field Operations (OFO) or USBP, are designed for short-term custody and have limited holding capacity.  These facilities are only designed to hold noncitizens for a few days, generally for the purpose of immigration processing and subsequent transfer to the custody of another agency, or release pending removal proceedings, as appropriate.  CBP facilities typically do not provide services adequate for longer-term detention, such as beds, routine medical care, or recreational areas.  If the rule is enjoined, CBP will likely once again be required to hold more noncitizens than its short-term, small capacity holding facilities can handle.  This will exacerbate overcrowding of facilities, which can create unsafe conditions.

28.     As noted above, CBP experienced severe overcrowding in the period leading up to May 12, 2023.  During this time, USBP encounters outpaced processing and movement out of USBP custody—generally via transfer to ICE custody, repatriation, expulsion, or release—of noncitizens from CBP holding facilities by an average of 950 noncitizens daily for seven days in a row.  The inability to process noncitizens out of USBP custody quickly enough to match the rate at which agents were making apprehensions led to a sharp increase in the number of noncitizens in USBP custody, as detailed above.  This sharp increase in its in-custody numbers, in turn, required Border Patrol agents to be reassigned from frontline border security enforcement activities to support processing operations in its facilities.

29.     Previous migration trends tended to heavily impact only a couple of sectors over a given period of time, shifting locations across the SWB over time.  Under these circumstances, USBP had the ability to "laterally decompress" migrants to less-impacted sectors by leveraging

air and ground transportation contracts, helping to mitigate the effects of migrant surges in over-capacity sectors.  As noted above, between May 8 and 11, 2023, however, eight out of the nine SWB Sectors were over capacity, which limited USBP's ability to move noncitizens laterally to alleviate the pressure in over capacity sectors.

30.     As part of its preparations for and response to this surge, CBP instituted a number of other extraordinary measures at great expense to the agency.  For example, USBP had to expand processing facility support by hiring additional armed facility guards, porters, data entry specialists, and Border Patrol Processing Coordinators.  To address personnel shortages caused by the increased encounter numbers, USBP executed memoranda of agreement with other federal agencies to provide surge support.[13]  Some of these agreements required USBP to reimburse the cost of these agencies' support, totaling more than $50,600,000 in FY 2023 (almost twice the cost in FY 2022).[14]  USBP also expanded transportation contracts to increase its number of leased buses, transportation routes, transportation hours, and flights and routes in response to the increased encounter numbers.  It also began increasing holding capacity through the expansion of the soft-sided facilities in El Paso and Yuma sectors.  These facilities have significantly increased USBP's temporary holding capacity, but at a cost.  Specifically, the El Paso expansion cost more than $46 million to mobilize, and costs nearly $26 million per month to maintain.  The Yuma expansion cost more than $14 million to mobilize and more than $6 million per month to maintain.

31.     Overcrowding at CBP facilities adversely impacts noncitizens in CBP custody as well as CBP personnel.  DHS's Office of Health Security (OHS) notes that overcrowding and

---

[13] Agencies included ICE Homeland Security Investigations, Federal Air Marshals, U.S. Marshals Service, Bureau of Prisons, U.S. Secret Service, National Oceanic and Atmospheric Administration, U.S. Coast Guard, U.S. Forest Service, DHS Volunteer Support, and ICE Enforcement and Removal Operations
[14] Total cost in FY 2022 was more than $26,500,000.

increased movement of noncitizens between facilities may result in adverse health outcomes, including the spread of communicable diseases (e.g., COVID-19, measles, varicella, etc.) among noncitizens held in these facilities.  Furthermore, noncitizens held in overcrowded facilities may be particularly vulnerable to communicable diseases due to situational factors relating to the arduous journey to the SWB, including, in many cases, days and weeks of poor health and nutrition, lack of access to health care, and/or inadequate water, sanitation, and hygiene services. For these reasons, surges, which inherently increase the risk of overcrowding in CBP holding facilities along the SWB, negatively impact CBP's ability to avoid preventable harm and mitigate health and welfare risks to noncitizens and the DHS workforce.

32.     OFO operations at ports of entry would also be adversely impacted if the rule is unavailable to DHS.  During surges of noncitizens encountered between ports of entry, OFO often needs to provide assistance to USBP to process noncitizens.   Because each port of entry has a finite number of resources and processing capacity to facilitate lawful trade and travel, and irregular migration, any diversion of resources toward processing increased numbers of noncitizens takes resources away from those missions.  This, in turn, challenges OFO's ability to execute its national security, counter-narcotics, and trade and travel missions by requiring the diversion of critical resources.

33.     In response to the pre-May 11 surge, 124 OFO personnel—who are dedicated to the processing of legitimate travel and trade operations of which volume now surpasses pre-pandemic levels—were detailed to assist USBP processing of apprehensions between ports of entry.   For example, in April 2023, OFO detailed staff from ports of entry in Laredo, Texas, to the Rio Grande Valley—a move that required Laredo to close some vehicle lanes, slowing down its operations.  In mid-April 2023, CBP also had to temporarily close ports of entry in the El

Paso, TX area in order to manage the surge in encounters in that area of operations.  This included the cessation, and subsequent resumption at reduced volume, of all port of entry operations at the Bridge of the Americas (BOTA) in El Paso, Texas—a port of entry that primarily focuses on processing cargo shipments—from April 13 through April 17, 2023.  The economic impact of this five-day processing slowdown was likely acute; in FY2022, more than $10.7 billion in imports passed through the BOTA port of entry, or roughly $205 million per week.  Additionally, from April 13 to 17, 2023, the Ysleta port of entry in El Paso also detailed personnel to assist USBP, necessitating a reduction on open travel lanes by approximately 37 percent for commercial cargo and 58 percent for passenger traffic.  At both locations, increased wait times for inspection reached as high as 180 minutes—with substantial economic costs as a result.

34.     OFO also had to take extraordinary measures to ensure that legitimate trade and travel continued to flow along the SWB.  In addition to the personnel detailed to support USBP operations between ports of entry, OFO temporarily deployed approximately 420 personnel to support SWB ports of entry, at a cost of approximately $4 million monthly, and deployed approximately 39 OFO Special Response Team operators to SWB locations to ensure continuation of safe and secure operations at ports of entry.  In the weeks leading up to the end of the Title 42 public health Order, as certain ports of entry began processing increased numbers of noncitizens seeking an exception to the public health Order and due to OFO providing assistance to USBP to process noncitizens encountered between ports of entry, OFO spent over $8 million in support of overtime needs.  OFO also repurposed the Brownsville Immigration Hearing Facility to process noncitizens at a cost of over $13.8 million in FY23 through June 30, and approximately $1.5 million monthly thereafter.

**Impact on ICE**

35.     Within ICE, ERO oversees programs and conducts operations to identify and arrest removable noncitizens, to detain these noncitizens when necessary, and to remove noncitizens with final orders of removal from the United States to more than 170 countries around the world. ERO employs approximately 6,000 immigration officers nationwide, including executive leadership, the supervisory chain of command, and all field officers.  Over the past two years, ERO has routinely detailed personnel to the SWB to support USBP frontline operations— impacting its ability to execute its missions.  As of June 6, 2023, ERO had 134 personnel deployed to support USBP operations along the SWB.

36.     As of May 10, 2023, ICE had approximately 22,000 noncitizens in custody, or 64 percent of its funded bedspace, in part due to pandemic-related restrictions on congregant settings that impacted ERO's ability to fully utilize beds in its detention network.  These COVID-19 related restrictions were lifted with the end of the public health emergency on May 11, 2023. Since then, ICE bed usage increased quickly as part of DHS' comprehensive efforts to deliver consequences at the border.  On June 11, 2023, ICE had approximately 29,800 noncitizens in its custody.  This sharp increase in detention bed usage has come even as daily encounters have remained comparatively low compared to their pre-May 12 levels—a direct result of the record number of noncitizens being processed under expedited removal through the rule.  However, if another surge developed as a result of the rule not being in place, the anticipated increase of custodial transfer requests from CBP under Title 8 processes would quickly overwhelm ICE's detention capacity—which is limited by its appropriated funding— such that further CBP requests for bedspace would have to be declined.  This, in turn, would

require CBP to release more noncitizens from its custody who might otherwise be processed for expedited removal.

37.     In the event of a similar surge in the future, increased CBP encounters would have a significant impact on ICE transportation resources.  If CBP sectors become overwhelmed to the point where CBP's transportation assets and contracts are insufficient, ICE would have to divert its transportation resources from interior and removal operations to assist CBP.  This would include the use of ICE Air Charters typically needed for removal and interior movements to instead decompress the border, an increase in ICE Air Commercial removals, and increased ground transportation for removals to Mexico.  This, in turn, would impact ERO's ability to execute its core enforcement mission of apprehending and removing noncitizens from the interior of the United States.

**Impact on Communities**

38.     An increase in encounters between ports of entry will also strain the communities along the border and in the interior of the United States who receive noncitizens released from DHS custody pending the outcome of their immigration proceedings.  DHS generally seeks to release noncitizens in the vicinity of hospitality sites—locations which provide immediate resources and social service assistance—run by non-governmental organizations or municipalities along the SWB.  DHS has, over the past two years, worked closely with partners to build these kinds of capacity at the border. As a result of these efforts, these sites can currently provide overnight shelter and other kinds of support for thousands of noncitizens each day. Absent the rule, DHS anticipates encounter levels that would require noncitizens to be released from custody at levels that will greatly exceed the capacity of these sites to receive them.

39.     The Department supports border and interior communities receiving noncitizens through the humanitarian relief provided under the Emergency Food and Shelter Program (EFSP) as well as the newly established Shelter and Services Program (SSP).  However, even with the increase in Congressional funding from $150 million in FY2022 to $800 million in FY 2023 for these programs, DHS recognizes that the demand from communities and NGOs for this funding still far exceeds what has been made available.  For example, in April, the EFSP National Board received $1.26 billion in applications for only $350 million in available funds. DHS anticipates that SSP funding will also, unfortunately, not fully meet the needs of our community and NGO partners at the border and within the interior.

**Impact on Relationships with Foreign Partners**

40.     The United States' border management strategy is predicated on the belief that migration is a shared responsibility among all countries in the region—something that is reflected by the critical diplomatic efforts that DHS and the Department of State have been making to engage with partners throughout the Western Hemisphere.  DHS relies on and works closely with its foreign partners to manage migration throughout the region.[15]  Regional partner countries have encouraged and supported DHS's approach to address irregular migration through the application of disincentives for unlawful entry—through increased enforcement and consequences—coupled with incentives to provide intending migrants with expanded lawful pathways and processes, including humanitarian protection, innovative parole processes, and labor migration.

---

[15] *See, e.g., Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border*, Exec. Order 14,010, 86 FR 8,267, 8,270 (Feb. 2, 2021); The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/*

41.     Prior to the end of the Title 42 public health Order, regional partner countries expressed great concern that, without specific action from the United States to combat the misperception that the end of the Order would mean an open U.S. border, a surge of irregular migration would flow through their countries as migrants seek to enter the United States.  One foreign partner, for example, noted that they believed the formation of caravans in the spring of 2022 were spurred by rumors—and the subsequent official announcement—of the anticipated end of the Title 42 public health Order.  Moreover, regional partner countries have repeatedly expressed concerns about the ways in which recent migratory flows challenge their local communities and immigration infrastructure and have regularly highlighted how policy announcements have a direct and immediate impact on migratory flows through their countries.

42.     Regional partners have observed that, as a central part of a consequence framework that aims to slow migratory flows in the region, this rule is working and has reduced irregular migration in their countries as well as on our border.  As noted earlier, following the development of the enforcement process for Venezuelans announced in October 2022—an approach that was subsequently expanded to include processes for Cuban, Haitian, and Nicaraguan nationals in January 2023—regional partners urged the United States to continue building on this approach, which couples processes for noncitizens to find protection in the region or travel directly to the United States with consequences for those who do not avail themselves of these processes.[16]  But the lawful processes and regional protection mechanisms by themselves are not sufficient, as described above—DHS's ability to implement its border-

---

[16] Following the announcement of the Venezuela parole process in October 2022 and the subsequent announcement of the Cuba, Haiti, and Nicaragua parole processes in January 2023, migration flows through the region, and at the U.S.-Mexico border slowed.

management strategy is predicated on its ability to impose consequences on those who do not take advantage of lawful processes to access opportunity and protection in the United States.

43.     Continuing to implement and build on this approach is critical to the United States' ongoing engagements on migration management with regional partners.  For example, a number of foreign partners, including Mexico, Guatemala, Panama, and Colombia, announced significantly enhanced efforts to enforce their borders in the days leading up to the end of Title 42.  These governments recognized that the United States was taking new measures to strengthen enforcement of its border, in large part through the application of the rule, and committed to doing the same in order to impact irregular migratory flows in the region.

44.     For example, following the transition from DHS processing under Title 42 public health Order to processing under Title 8 authorities, Mexican authorities announced the continued acceptance of the return into Mexico of nationals from these CHNV countries under Title 8 processes.  This is the first time in the United States' bilateral history with Mexico that the Mexican government has stated it would accept the return or removal of non-Mexican nationals under Title 8.[17]  This decision was premised on the existence of lawful pathways and processes for nationals of these countries that were combined with a meaningful consequence framework to reduce irregular border crossings; this consequence framework includes the rule's rebuttable presumption of asylum ineligibility for noncitizens who chose to circumvent lawful pathways.  If DHS can no longer rely on the rule—thus creating a gap in the carefully balanced incentive structure that has been created—it could potentially put this arrangement in jeopardy.

---

[17] White House, Press Release, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.

45.     Like the United States, officials from a number of countries, including Mexico, have expressed grave concerns about the impacts that another significant increase in migrants will have on their communities and government agencies.  If DHS cannot apply the rule, DHS assesses there will be an increase in migration flows, and regional partner countries may take the view that the United States has reneged on the shared goal of stabilizing migratory populations and addressing migration collectively as a region.

46.     Ultimately, continued implementation of the rule is central to achieving a key foreign policy goal—fostering a hemisphere-wide approach of addressing migration on a regional basis.  Implementation of the rule responds to discussions with and feedback from regional partner countries, several of whom have previously criticized the United States for maintaining policies that create a pull factor throughout the region.  Eliminating the visible consequence for irregular migrants that is a core component of the rule would concern many foreign partners because it would incentivize migrants to make the journey north—particularly given how smugglers would weaponize the change in policy to drive migration.  This, in turn, would directly undermine the increased enforcement policies the United States' partners have undertaken, many of which were implemented at substantial cost for those governments—including, for example, the current unprecedented campaign by Colombia and Panama to attack smuggling networks operating in the Darién, and Mexico's deployments of law enforcement and military personnel to conduct enforcement along its southern border and transit routes.  Partner governments could be less inclined to support U.S. efforts to manage migratory flows through region—particularly through robust enforcement of their borders—if they perceive that United States is not committed to enforcing its own.

24

47.     In short, the rule is a substantive demonstration of the U.S. Government's partnership and commitment to the shared goal of stabilizing migratory populations and addressing migration collectively as a region, both of which are critical to maintaining strong bilateral and multilateral relationships.  If the rule is enjoined, it could serve to undermine the regional approach that has been carefully developed through thoughtful and intensive diplomatic effort.

**<u>Conclusion</u>**

48.     This rule is a foundational component of the comprehensive, all of government approach that DHS implemented to prepare for the end of Title 42 and respond to the unprecedented movement of people in our hemisphere.  This approach provides incentives for intending migrants to use safe and orderly pathways and processes that have been expanded to come to the United States, even as it seeks to disincentivize noncitizens from crossing unlawfully between ports of entry or without authorization at ports of entry.  The rule is a critical component of this measured and thoughtful approach to managing migratory flows, by imposing strengthened consequences at the border in order to change the calculus of intending migrants.

49.     This approach is working as intended, rapidly and significantly reducing encounters at the border while providing record numbers of noncitizens with access to lawful pathways and processes to seek protection in the region or come to the United States.  The more than 18-month long planning effort that DHS undertook, which included making key, ongoing enhancements to the expedited removal process, has allowed it to deliver the rule's strengthened consequences under Title 8 processes that are operating at a higher scale and more quickly than ever before.

50.     Should the rule no longer be in effect, DHS anticipates a return to elevated encounter levels that would place significant strain on DHS components, border communities, and interior cities, despite the careful planning and significant investments that have been made. CBP facilities will be overcrowded once again, placing the noncitizens in our custody and the frontline personnel who care for them at risk.  Border communities, and the NGOs that support them, will once again receive large scale releases of noncitizens that will overwhelm their ability to coordinate safe temporary shelter and quick onward transportation.  And interior destination cities will, once again, see their systems strained.

51.     DHS does not have to imagine what the impacts of a surge in migration of the anticipated scale would look like; we just experienced it.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.  Executed on this 16th day of June, 2023.

_____
Blas Nuñez-Neto
Assistant Secretary
Border and Immigration Policy
U.S. Department of Homeland Security