Omar C. Jadwat*
Lee Gelernt*
Anand Balakrishnan**
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
*ojadwat@aclu.org*
*lgelernt@aclu.org*
*abalakrishnan@aclu.org*

Katrina Eiland (SBN 275701)
Morgan Russell (SBN 296137)
Spencer Amdur (SBN 320069)
Oscar Sarabia Roman (SBN 341385)
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-0770
F: (415) 395-0950
*keiland@aclu.org*
*mrussell@aclu.org*
*samdur@aclu.org*
*osarabia@aclu.org*

*Attorneys for Plaintiffs (additional counsel listed on following page)*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

East Bay Sanctuary Covenant, *et al.*,

       *Plaintiffs*,

       v.

Joseph R. Biden, President of the United States, *et al.*,

       *Defendants*.

Case No.: 18-cv-06810-JST

**PLAINTIFFS' REPLY TO THEIR MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' CROSS MOTION**

Melissa Crow*
CENTER FOR GENDER & REFUGEE
STUDIES
1121 14th Street, NW, Suite 200
Washington, DC 20005
T: (202) 355-4471
F: (415) 581-8824
crowmelissa@uchastings.edu

Anne Peterson (SBN 258673)
Blaine Bookey (SBN 267596)
Julie Bourdoiseau (SBN 340462)
Karen Musalo (SBN 106882)
CENTER FOR GENDER & REFUGEE
STUDIES
200 McAllister Street
San Francisco, CA  94102
T: (415) 610-5729
F: (415) 581-8824
petersonanne@uchastings.edu

Robert Pauw**
CGRS Cooperating Attorney
GIBBS HOUSTON PAUW
1000 Second Avenue, Suite 1600
Seattle, WA  98104
T: (206)682-1080
F: (206)689-2270
rpauw@ghp-law.net

Keren Zwick*
Richard Caldarone*
Colleen Cowgill (SBN 321542)
Mary Georgevich*
NATIONAL IMMIGRANT JUSTICE
CENTER
224 S. Michigan Ave., Suite 600
Chicago, IL 60604
T: (312) 660-1370
F: (312) 660-1505
kzwick@heartlandalliance.org
rcaldarone@heartlandalliance.org
ccowgill@heartlandalliance.org
mgeorgevich@heartlandalliance.org

Michelle (Minju) Y. Cho (SBN 321939)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
T: (415) 621-2493
F: (415) 255-1478
mcho@aclunc.org

*Attorneys for Plaintiffs*

*Admitted Pro hac vice*
** *Application for admission pro hac vice*
*forthcoming*

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

ARGUMENT ..................................................................................................................... 3

I.     The Rule Is Contrary to Law. .......................................................................... 3

    A.     The Government Cannot Force Asylum Seekers to Choose Between Three Invalid Requirements. .................................................................... 3

    B.     The Rule Amounts to a Harsher Entry Ban with Slight Cosmetic Changes. .......... 8

II.    The Rule Is Arbitrary and Capricious. .......................................................... 10

    A.     The Rule's Justification Relies on Factors That Congress Has Rejected. ............. 11

    B.     The Record Contradicts the Rule's Justification that Its Pathways Are Widely Available. ................................................................................... 12

    C.     The Record Does Not Support the Rule's Assumption that People Who Enter Between Ports or Pass Through Transit Countries Without Seeking Protection Have Weaker Asylum Claims. ................................. 17

    D.     The Agencies Failed to Consider Related Border Policies. ................................ 19

III.   The Rule Is Procedurally Defective. ............................................................. 20

IV.   Plaintiffs Have Standing. ............................................................................. 22

V.    8 U.S.C. § 1252(f)(1) Does Not Apply. ........................................................ 24

    A.     8 U.S.C. § 1252(f)(1) Does Not Apply to Vacatur. ............................................. 24

    B.     8 U.S.C. § 1252(f)(1) Does Not Apply to Policies Implementing the Asylum Statute. ............................................................................................ 25

VI.   The Court Should Vacate the Rule in Full. ................................................... 27

    A.     The Court Should Reject the Government's Novel Request for Partial Vacatur .. 27

    B.     Remand Without Vacatur Is Not Warranted. ................................................... 27

CONCLUSION ................................................................................................................ 30

i

1

**TABLE OF AUTHORITIES**

2

**Cases**

3

*Advocate Health Care Network v. Stapleton*,
   581 U.S. 468 (2017) .................................................................................................... 27

4

*Al Otro Lado v. Mayorkas*,
   619 F. Supp. 3d 1029 (S.D. Cal. 2022) ..................................................................... 25

5

*Al Otro Lado, Inc. v. Mayorkas*,
   2022 WL 3142610 (S.D. Cal. Aug. 5, 2022) ........................................................ 25, 26

6

7

*Alabama Ass'n of Realtors v. HHS*,
   141 S. Ct. 2485 (2021) ................................................................................................. 6

8

*Alaska Factory Trawler Ass'n v. Baldridge*,
   831 F.2d 1456 (9th Cir. 1987) ................................................................................... 21

9

10

*All. for the Wild Rockies v. United States Forest Serv.*,
   907 F.3d 1105 (9th Cir. 2018) ................................................................................... 28

11

*Allen v. Milligan*,
   599 U.S. ___, 2023 WL 3872517 (2023) ..................................................................... 4

12

13

*Allina Health Servs. v. Sebelius*,
   746 F.3d 1102 (D.C. Cir. 2014) ................................................................................. 22

14

*Am. Radio Relay League v. FCC*,
   524 F.3d 227 (D.C. Cir. 2008) ................................................................................... 22

15

16

*Bringas-Rodriguez v. Sessions*,
   850 F.3d 1051 (9th Cir. 2017) ..................................................................................... 7

17

*CAIR Coalition v. Trump*,
   471 F. Supp. 3d 25 (D.D.C. 2020) ............................................................................ 28

18

19

*Cal. ex rel. Becerra v. Dep't of Interior*,
   381 F. Supp. 3d 1153 (N.D. Cal. 2019) ..................................................................... 21

20

*California v. Trump*,
   963 F.3d 926 (9th Cir. 2020) ....................................................................................... 4

21

22

*Cent. Lincoln Peoples' Util. Dist. v. Johnson*,
   735 F.2d 1101 (9th Cir. 1984) ................................................................................... 20

23

*Chamber of Commerce v. DHS*,
   504 F. Supp. 3d 1077 (N.D. Cal. 2020) ..................................................................... 20

24

25

*Chamber of Commerce v. SEC*,
   443 F.3d 890 (D.C. Cir. 2006) ................................................................................... 22

26

*City & Cnty. of S.F. v. Azar*,
   411 F. Supp. 3d 1001 (N.D. Cal. 2019) ..................................................................... 27

27

28

*Cook County v. Wolf*,
  962 F.3d 208 (7th Cir. 2020) ........................................................................... 4

*Council of S. Mountains, Inc. v. Donovan*,
  653 F.2d 573 (D.C. Cir. 1981) ...................................................................... 20

*Ctr. for Biological Diversity v. NHTSA*,
  538 F.3d 1172 (9th Cir. 2008) ...................................................................... 18

*Ctr. for Biological Diversity v. Ross*,
  480 F. Supp. 3d 236 (D.D.C. 2020) ............................................................. 28

*Dep't of Commerce v. New York*,
  139 S. Ct. 2551 (2019) ........................................................................... 18, 19

*Doe v. Indian River Sch. Dist.*,
  653 F.3d 256 (3d Cir. 2011) ........................................................................... 4

*EBSC v. Biden*,
  993 F.3d 640 (9th Cir. 2021) ................................................................. passim

*EBSC v. Trump*,
  354 F. Supp. 3d 1094 (N.D. Cal. 2018) ................................................... 23, 27

*EBSC v. Barr*,
  385 F. Supp. 3d 922 (N.D. Cal. 2019) ............................................ 5, 6, 7, 23

*EBSC v. Garland*,
  994 F.3d 962 (9th Cir. 2020) ................................................................. passim

*Florida v. Mayorkas*,
  2023 WL 3398099 (N.D. Fla. May 11, 2023) ............................................... 26

*Florida v. United States*,
  __ F. Supp. 3d. ___, No. 21-1066, 2023 WL 2399883 (Mar. 8, 2023) ......... 25

*Garland v. Aleman Gonzalez*,
  142 S. Ct. 2057 (2022) ..................................................................... 24, 25, 26

*Gill v. Whitford*,
  138 S. Ct. 1916 (2018) ................................................................................. 27

*Gonzales v. DHS*,
  508 F.3d 1227 (9th Cir. 2007) ...................................................................... 26

*Gonzalez v. ICE*,
  975 F.3d 788 (9th Cir. 2020) ........................................................................ 26

*Habeas Corpus Res. Ctr. v. DOJ*,
  2009 WL 185423 (N.D. Cal. Jan. 20, 2009) ................................................. 21

*Hall v. EPA*,
  273 F.3d 1146 (9th Cir. 2001) ...................................................................... 20

iii

*HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Ass'n,*
  141 S. Ct. 2172 (2021) ................................................................................................. 7

*Humane Soc'y of the United States v. Jewell,*
  76 F. Supp. 3d 69 (D.D.C. 2014) ......................................................................... 28, 30

*Humane Soc'y of United States v. Zinke,*
  865 F.3d 585 (D.C. Cir. 2017) ................................................................................... 28

*Ill. Pub. Telecomms. Ass'n v. FCC,*
  123 F.3d 693 (D.C. Cir.1997) .................................................................................... 28

*Johnson v. Branch,*
  364 F.2d 177 (4th Cir. 1966) ....................................................................................... 4

*Los Angeles v. FAA,*
  63 F.4th 835 (9th Cir. 2023) ....................................................................... 9, 15, 19

*Madsen v. Women's Health Ctr., Inc.,*
  512 U.S. 753 (1994) ................................................................................................... 27

*Matter of Pula,*
  19 I&N Dec. 467 (BIA 1987) .................................................................................. 6, 7

*Merrill v. Milligan,*
  142 S. Ct. 879 (2022) (Mem.) ..................................................................................... 3

*Monsanto Co. v. Geertson Seed Farms,*
  561 U.S. 139 (2010) ................................................................................................... 24

*Moreno Galvez v. Jaddou,*
  52 F.4th 821 (9th Cir. 2022) ...................................................................................... 25

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ..................................................................................................... 12

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,*
  145 F.3d 1399 (D.C. Cir. 1998) ................................................................................. 27

*New York v. United States,*
  505 U.S. 144 (1992) ..................................................................................................... 4

*NFIB v. Dep't of Labor,*
  142 S. Ct. 661 (2022) ................................................................................................... 5

*Nken v. Holder,*
  556 U.S. 418 (2009) .............................................................................................. 3, 29

*NRDC v. EPA,*
  571 F.3d 1245 (D.C. Cir. 2009) ................................................................................. 28

*NRDC v. NHTSA,*
  894 F.3d 95 (2d Cir. 2018) ........................................................................................ 20

iv

*O.A. v. Trump*,
  404 F. Supp. 3d 109 (D.D.C. 2019) .................................................................... 27, 28

*Pangea Legal Servs. v. DHS*,
  501 F. Supp. 3d 792 (N.D. Cal. 2020) ...................................................................... 20

*Petroleum Commc'ns, Inc. v. FCC*,
  22 F.3d 1164 (D.C. Cir. 1994) .................................................................................. 19

*Reno v. Am-Arab Anti-Discrimination Comm.*,
  525 U.S. 471 (1999) .................................................................................................. 24

*San Francisco v. DHS*,
  408 F. Supp. 3d 1057 (N.D. Cal. 2019) ...................................................................... 5

*Spence v. Bailey*,
  465 F.2d 797 (6th Cir. 1972) ...................................................................................... 4

*Stewart v. Azar*,
  313 F. Supp. 3d 237 (D.D.C. 2018) .......................................................................... 28

*Texas v. United States*,
  40 F.4th 205 (5th Cir. 2022) ..................................................................................... 24

*Texas v. United States*,
  50 F.4th 498 (5th Cir. 2022) ..................................................................................... 24

*Trump v. Hawaii*,
  138 S. Ct. 2392 (2018) .............................................................................................. 27

*United States v. Texas*,
  No. 22-58, __ U.S. ___, 2023 WL 4139000 (U.S. June 23, 2023) ....................... 4, 23

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) .................................................................................................... 6

*Zheng v. Gonzales*,
  422 F.3d 98 (3d Cir. 2005) .......................................................................................... 5

**Statutes**

5 U.S.C. § 706(2) ......................................................................................................... 24

8 U.S.C. § 1153 ............................................................................................................. 26

8 U.S.C. § 1158 .................................................................................................... 6, 8, 25

8 U.S.C. § 1158(a)(1) ........................................................................................... 1, 8, 10

8 U.S.C. § 1158(a)-(b) .................................................................................................. 25

8 U.S.C. § 1158(b)(2)(C) ..................................................................................... 3, 6, 25

8 U.S.C. § 1158(d)(5)(B) .............................................................................................. 25

8 U.S.C. § 1182 ............................................................................................................ 26

8 U.S.C. § 1182(d)(5) ................................................................................................... 26

8 U.S.C. § 1184 ............................................................................................................ 26

8 U.S.C. § 1187 ............................................................................................................ 26

8 U.S.C. § 1225 ............................................................................................................ 25

8 U.S.C. § 1225(b)(1)(B) ............................................................................................... 7

8 U.S.C. § 1226 ............................................................................................................ 25

8 U.S.C. § 1229a .......................................................................................................... 25

8 U.S.C. § 1231 ............................................................................................................ 25

8 U.S.C. § 1231(a)(1) ................................................................................................... 26

8 U.S.C. § 1231(a)(5) ................................................................................................... 26

8 U.S.C. § 1252(f) ........................................................................................................ 24

8 U.S.C. § 1252(f)(1) ............................................................................................. passim

8 U.S.C. § 1255 ............................................................................................................ 26

8 U.S.C. § 1481 ............................................................................................................ 26

8 U.S.C. §§ 1421-1427 ................................................................................................. 26

Pub. L. No. 104-208, Div. C, § 306(a)(2), 110 Stat. (1996) ....................................... 25

**Regulations and Executive Actions**

8 C.F.R. § 1208.33(b) ................................................................................................... 27

8 C.F.R. § 208.33(a)(1) ................................................................................................... 8

8 C.F.R. § 208.33(a)(2)(i) ............................................................................................... 9

8 C.F.R. § 208.33(a)(2)(ii)(B) ........................................................................................ 9

8 C.F.R. § 208.33(b) ..................................................................................................... 27

8 C.F.R. § 208.33(a)(2)(ii)(A) ........................................................................................ 9

8 C.F.R. § 212.21(b)(5)(iii) ............................................................................................ 5

Executive Order 14010 (Feb. 2, 2021), 86 Fed. Reg. 8,267 ....................................... 20

Final Rule, Circumvention of Lawful Pathways, 88 Fed. Reg. 31,314 (May 16, 2023) ......... passim

Notice of Proposed Rulemaking, Circumvention of Lawful Pathways, 88 Fed. Reg. 11,704 (Feb. 23, 2023)............................................................................................................. 12-13, 18, 22, 26

Public Health Determination and Order Regarding Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists, 87 Fed. Reg. 19,941 (Apr. 6, 2022) ........................................................................................................ 20

Public Health Reassessment and Order Suspending the Right to Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists, 86 Fed. Reg. 42,828 (Aug. 5, 2021).............................................................................................................................. 20

**Other Authorities**

H.R. 2182, 104th Cong. § 1(a) (1995) ............................................................................................ 7

## INTRODUCTION

The government provides no meaningful response to the key elements of Plaintiffs' claims. Instead, it repeatedly describes the Rule and its rationales without offering a valid defense of its legality.  And the government confirms the Rule's devastating impact—thousands of people with likely viable claims already ordered deported because of the bar—and acknowledges that many asylum seekers have *no* readily available "pathway" to present their meritorious claims.  The government essentially argues that, even if the Rule's components are contrary to the basic principles of the asylum system—and therefore unlawful—it should still be allowed to maintain the eligibility bar because some people can enter the country under parole programs and via CBP One appointments, and it fears strained processing capacity if the bar is lifted.

As to the Rule's statutory conflict, the government does not make a serious attempt to contest that, under binding precedent, it lacks the power to impose any of the Rule's three conditions—port of entry, transit denial, parole—as a standalone requirement.  Nor does the government explain why it can force asylum seekers to choose among these invalid requirements, none of which is "consistent with" the asylum statute.  Its main response is to identify a series of superficial ways in which the Rule differs from the prior bans.  All of them are irrelevant to the Rule's legality.

The government also fails to show that the Rule gives asylum seekers any real option other than to present at a port of entry, just like the first asylum ban.  As to parole, its arguments do not dispute that parole will help virtually no asylum seekers at the border—the only people to whom the Rule applies.  As to transit countries, the government's declaration *confirms* that almost no one can satisfy the transit-denial condition, just as under the prior transit ban.  Given that these two "pathways" are largely unavailable to people subject to the Rule, the only option the Rule gives them is to enter at a port, in direct conflict with 8 U.S.C. § 1158(a)(1).

The government notably refuses to defend some of the Rule's core justifications, instead claiming that they are not a part of the Rule.  But the preamble repeatedly relies on the premise that non-asylum options for entering the United States justify a significant reduction in asylum access at the border—a premise that Congress has rejected.  And it consistently invokes the rationale that asylum seekers who do not use one of the Rule's supposed "pathways" have weaker claims—a

premise the Ninth Circuit has rejected.  The preamble treats these as essential justifications for the Rule, even if the government will not defend them in its brief.

As for the record, the government takes the same circular approach as the preamble, sidestepping the problems of one "pathway" by pointing to others, which themselves are plagued with problems.  For instance, the government does not dispute, and its declaration confirms, that CBP One appointments remain so scarce that asylum seekers must wait weeks and months to secure them.  The government does not cite any evidence contradicting Plaintiffs' proof of the enormous dangers faced by migrants in Mexico and other transit countries, or the serious flaws with Mexico's asylum system that make it impossible for many people to receive asylum there *or* the final denials the Rule requires.

The government has no better defense of the Rule's procedural defects.  It argues that the agencies faced a tight deadline with the end of Title 42, but they knew all along that Title 42 was temporary and the CDC sought to terminate the policy a year before they issued the Rule.  The government confirms that the agencies spent at least *18 months* preparing for the policy to end.  The agencies cannot wait until the last minute and then invoke the exigency they created to justify taking shortcuts.  Nor can the government justify the agencies' refusal to provide the study and model that were used to generate the Rule's key prediction that ordinary Title 8 processing—which, unlike Title 42 expulsion, comes with formal deportation, years-long bars to admission, and potential criminal prosecution—would be insufficient to manage the border after Title 42. This prevented commenters from effectively addressing whether the Rule was needed to avoid a post-Title 42 spike.

Finally, the government's contentions on threshold issues are meritless.  The Ninth Circuit has already rejected all of its standing and zone-of-interest arguments.  Vacatur is universally agreed to be the appropriate remedy for unlawful agency action.  Section 1252(f)(1) does not apply to vacatur or to policies implementing the asylum statute.  And remand without vacatur is not warranted.  Remand may be available when a rule simply requires a bit more explanation to reach the same result, but here, the agencies cannot change the statute, the record, or the Rule's key rationales.  The disruption the government claims is also overblown.  It asserts that the Rule is the only thing preventing a renewed a spike in encounters.  But it does not show that ordinary Title 8

2

1   consequences will not achieve a similar effect.  And it ignores the disruption to 40 years of asylum

2   practice, and to Plaintiffs whose clients face grievous harms and an impossible choice: to wait

3   indefinitely in Mexico and face kidnapping or worse; or to enter between ports and face asylum

4   ineligibility.

5   <center>**ARGUMENT**</center>

6   **I.      The Rule Is Contrary to Law.**

7          Plaintiffs' opening brief explained why the Rule is invalid on its face, and why in practice it

8   re-imposes a harsher version of the prior entry ban.  The government does not contest the core

9   elements of these claims.  Most of its arguments sidestep the main issues, and many respond to

10  arguments that Plaintiffs have not made.

11      **A.   The Government Cannot Force Asylum Seekers to Choose Between Three Invalid**
12           **Requirements.**

13         The government does not meaningfully engage with Plaintiffs' main statutory claim.  As

14  Plaintiffs explained, the Rule requires asylum seekers to satisfy one of three requirements, each of

15  which would be illegal if imposed as a standalone requirement.  Mot. 9-11.  Given that none of the

16  requirements is "consistent with" the asylum statute, 8 U.S.C. § 1158(b)(2)(C), the government

17  cannot force asylum seekers to choose between them.  Imposing invalid requirements in the

18  alternative does not make them valid.

19         Defendants do not challenge these contentions.  They do not claim that they can require all

20  asylum seekers to enter at ports with an appointment.  *See E. Bay Sanctuary Covenant ("EBSC") v.*

21  *Biden*, 993 F.3d 640, 669-70 (9th Cir. 2021) (*EBSC Entry Ban*) (resolving this issue).  They do not

22  claim that, under Ninth Circuit precedent, they can force asylum seekers to apply for protection and

23  receive a denial in transit countries.  *See EBSC v. Garland*, 994 F.3d 962, 976-79 (9th Cir. 2020)

24  (*EBSC Transit Ban*) (same).[1]  They do not claim that they can require asylum seekers to obtain

---

25  [1] The government notes that the Supreme Court stayed the injunction of the prior transit ban without
26  opinion.  Opp. 3, 15.  But the Ninth Circuit subsequently held that the ban was unlawful, and that is
    what controls here.  *EBSC Transit Ban*, 994 F.3d 962.  In any event, a Supreme Court "stay order is
    not a ruling on the merits, but instead simply stays the District Court's injunction *pending a ruling*
27  *on the merits*."  *Merrill v. Milligan*, 142 S. Ct. 879 (2022) (Mem.) (Kavanaugh, J., concurring); *see*
    *Nken v. Holder*, 556 U.S. 418, 432 (2009) (stay pending appeal does not "decide[] the merits," but
28  rather "hold[s] the matter under review in abeyance because the appellate court lacks sufficient time

<center>3</center>

1    advance travel permission.  Opp. 16-17 (arguing primarily the red herring that the INA "allow[s] a

2    parolee to seek asylum").[2]  The government also cites no authority suggesting that, even if each of

3    these requirements would be invalid on its own, the agencies can nonetheless force asylum seekers

4    to comply with one of them.  And for good reason: the government cannot force a "choice between"

5    alternatives that would be invalid "standing alone."  *New York v. United States*, 505 U.S. 144, 176

6    (1992); *see Doe v. Indian River Sch. Dist.*, 653 F.3d 256, 279 (3d Cir. 2011) (explaining that "the

7    government cannot force one to choose between" requirements that could not be imposed

8    individually); *Johnson v. Branch*, 364 F.2d 177, 180 (4th Cir. 1966) (same); *Spence v. Bailey*, 465

9    F.2d 797, 800 (6th Cir. 1972) (similar).  These uncontested points are sufficient to resolve Plaintiffs'

10   first statutory claim.

11       The government's response largely just re-describes the Rule and argues that it differs from

12   prior bans, because it provides a choice between three requirements and contains additional narrow

13   exceptions.  *See* Opp. 14-15 (attempt to distinguish entry ban); *id.* at 16 (same for transit ban).  That

14   is true as a basic description of the Rule, but it is not responsive to Plaintiffs' argument that the

15   requirements are all inconsistent with the asylum statute.

16       The government's other attempts to distinguish the current Rule from its predecessors are

17   equally unresponsive to the analysis above and do not impact the Rule's validity.  First, the

18   government repeats the Rule's statement that it establishes a "presumption" against asylum

19   eligibility, instead of a "bar."  Opp. 14, 15-16.  That is pure semantics.  However it is described,

20   the Rule renders a huge category of people ineligible for asylum unless they meet conditions that

21   _____

22   to decide the merits").  Unsurprisingly, then, the Supreme Court and lower courts frequently rule on
     the merits for the party that lost at the stay stage.  *See, e.g.*, *Allen v. Milligan*, 599 U.S. __, 2023 WL
23   3872517 (2023), *compare* 142 S. Ct. 879 (Mem.); *United States v. Texas*, No. 22-58, __ U.S. ___,
     2023 WL 4139000 (U.S. June 23, 2023), *compare* 143 S. Ct. 51 (Mem.); *EBSC Transit Ban*, 994
24   F.3d 962; *California v. Trump*, 963 F.3d 926, 949 (9th Cir. 2020); *Cook County v. Wolf*, 962 F.3d
     208, 233-34 (7th Cir. 2020).  The transit ban stay therefore has no bearing on the issues presented
25   in this case.

26   [2] The government responds at length to a supposed "conten[tion] that the Refugee Act foreclosed
     entry via parole for asylum seekers."  Opp. 16.  But Plaintiffs made no such argument.  Of course
27   asylum seekers can receive parole, and parolees can seek asylum.  Plaintiffs acknowledge that, for
     those asylum seekers who qualify, the parole programs are a benefit.  Mot. 17.  Plaintiffs' argument
28   is instead that the government cannot *require* putative asylum seekers to first obtain parole or other
     advance travel permission, since that would conflict with the text and purpose of the asylum statute.
     *See infra* at 7; Mot. 10-11.  The government makes no argument to the contrary.

1   the agencies may not impose, just like the prior bans did.  The choice of terminology makes no

2   difference.  Nor, as Plaintiffs explained, Mot. 7, does the Rule function like an actual rebuttable

3   presumption—a point to which Defendants do not respond.

4       Second, the agencies point out that the Rule has more exceptions than the prior rules.  Opp.

5   3, 14, 15-16, 21 (discussing "rebuttal").  But courts consistently vacate illegal rules despite narrow

6   exceptions.  *See NFIB v. Dep't of Labor*, 142 S. Ct. 661, 663-65 (2022) (vaccine mandate violated

7   statute despite a number of exceptions); *Zheng v. Gonzales*, 422 F.3d 98, 119 (3d Cir. 2005) (rule

8   invalid despite "narrow exception"); *San Francisco v. DHS*, 408 F. Supp. 3d 1057, 1110 (N.D. Cal.

9   2019)  (invalid  immigration  rule  contained  several  "narrow  exception[s],"  *see*  8  C.F.R.

10  § 212.21(b)(5)(iii)) (quotation marks omitted), *aff'd*, 981 F.3d 742 (9th Cir. 2020).  Indeed, the

11  transit ban was invalidated despite its narrow exceptions, *EBSC Transit PI*, 385 F. Supp. 3d at 935,

12  and the government provides no reason why an additional exception reserved for "exceptionally

13  compelling circumstances" would make any difference. Opp. 14.  This is particularly true where the

14  Rule's preamble states that this exception is reserved for only the rarest and most extraordinary

15  scenarios, such as when a person faces "an imminent and extreme threat" of "rape" or "torture" "at

16  the time of entry" into the United States.  88 Fed. Reg. at 31,450.[3]

17      Third, the government suggests that, unlike the prior bans, "the rule provides alternative

18  pathways" to asylum.  Opp. 14, 20.  But the Rule itself says exactly the opposite: "this rule does not

19  create, expand, or otherwise constitute the basis for any lawful pathways."  88 Fed. Reg. at 31,370.

20      Fourth, the government claims that the Rule is different because, separate from the Rule, the

21  government has "significantly expanded" other options for people to seek protection in the United

22  States.  Opp. 1-2, 3.  But that is both wrong and beside the point.  It's wrong because the government

23  has largely *curtailed* access to the normal means of seeking protection from persecution.  Forcing

---

[3]  The  government  suggests  that  not  all  "exceptionally  compelling  circumstances"  necessarily
involve circumstances at the time of entry.  Opp. 7 n.4.  But as applied to danger, the government
does not dispute that any safety threat must be "extreme and imminent" "at the time of entry."  88
Fed. Reg. at 31,318 & n.36, 31,322, 31324-25.  The Rule consistently stresses that less urgent or
extreme threats will not suffice.  *Id.*  That comes nowhere close to the safeguards required by the
firm resettlement and the safe third country provisions to guarantee that an asylum seeker has a
"genuinely safe option in another country" where they can live freely and seek long-term legal
protection.  *EBSC Transit Ban*, 994 F.3d at 979.

people to use CBP One does not expand anything, but rather reduces access to asylum at ports of entry, Mot. 16; the government has effectively eliminated asylum for people who enter between ports, Mot. 11-13; and, in the last several years, the government has admitted the fewest refugees processed overseas since the Refugee Act was enacted, PC_039834.  Though the government has created *separate* programs like the parole processes mentioned in the Rule, those programs are not a replacement for asylum and are only available to people from a tiny handful of countries.  But the government's claim is also beside the point, because the legal question is whether the Rule's own limitations are "consistent with" § 1158, not whether the administration has, separate from the Rule, tightened or loosened migration in general.  Even if the government massively expanded tourist visas, parole, or anything else, that would not justify violating § 1158 by requiring asylum seekers to enter at ports or apply in transit countries.

Apart from trying to distinguish the prior bans, the government's other statutory arguments are unavailing.  It argues at length that the asylum statute gives it authority to create new eligibility bars.  Opp. 10-12.  But Plaintiffs never argued otherwise.  While the government can add new bars, they must "consistent with" the statute.  8 U.S.C. § 1158(b)(2)(C).  This requirement is unaffected by the government's prediction that "large numbers" of people may seek asylum.  Opp. 12.  The two prior bans were struck down despite similar concerns about an "influx of persons seeking asylum." *EBSC Transit PI*, 385 F. Supp. 3d at 959; *see EBSC Entry Ban*, 993 F.3d at 695 (Bumatay, J., dissenting).  And the Supreme Court has made clear that such claimed exigencies "do[] not permit agencies to act unlawfully." *Alabama Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2490 (2021) (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582 (1952)).

As it has before, the government argues that its ultimate discretion to grant or deny asylum to eligible applicants expands its authority to adopt bars to eligibility itself.  Opp. 13.  The Ninth Circuit has already rejected that theory. *EBSC Transit Ban*, 994 F.3d at 979-80.  Likewise foreclosed is the government's reliance on *Matter of Pula*, 19 I&N Dec. 467 (BIA 1987), for the proposition that manner of entry and transit are relevant at the discretionary stage, after eligibility has been determined.  Opp. 13, 15, 21.  Even there, entry between ports is "worth little if any weight." *EBSC Entry Ban*, 993 F.3d at 671 (quotation marks omitted).  As to transit, "*Matter of*

1    *Pula* was superseded by the mandatory firm resettlement bar." *EBSC Transit PI*, 385 F. Supp. 3d

2    at 946-47; *see EBSC Transit Ban*, 994 F.3d at 983 (*Pula* not even cited on appeal).  The government

3    highlights that *Pula* mentions "circumvention of orderly refugee procedures" as a relevant factor.

4    Opp. 13.  But *Pula* actually *rejects* the idea that this is a sufficient reason to deny asylum, or even

5    to require (as the Rule does) an "unusual showing of countervailing equities."  19 I&N Dec. at 473.

6         Finally, the government argues for general "deference" to its view that the Rule is valid.

7    Opp. 13-14.  It is unclear whether the government means to ask specifically for *Chevron* deference,

8    since its brief does "not mention *Chevron*," and in the transit ban case, the government "disclaimed

9    reliance on *Chevron* during oral argument."  *EBSC Transit Ban*, 994 F.3d at 976; *see HollyFrontier*

10   *Cheyenne Refining, LLC v. Renewable Fuels Ass'n*, 141 S. Ct. 2172, 2180 (2021) ("declin[ing] to

11   consider" *Chevron* deference where "the government does not" ask for it).  But even if *Chevron*

12   applied, the Ninth Circuit has already held that the Rule's entry and transit conditions are "contrary

13   to the unambiguous language of § 1158" and so they fail *Chevron* at step one.  *See EBSC Transit*

14   *Ban*, 994 F.3d at 976; *EBSC Entry Ban*, 993 F.3d at 671, 675.  The same is true of the parole

15   condition.  *Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1059-60 (9th Cir. 2017) (statute ended

16   the practice of requiring asylum seekers to obtain travel permission through parole); *see also* Mot.

17   11-12.

18        Even if the statute were ambiguous, "the Rule fails at the second step of *Chevron* because it

19   is an arbitrary and capricious interpretation of the statutory provision."  *EBSC Entry Ban*, 993 F.3d

20   at 671; *see* Mot. 14-16.  The port-of-entry requirement conflicts with "the United States's treaty

21   obligations" and conditions asylum on a factor that is "worth little if any weight."  *Id.* at 671-72.

22   The transit-denial requirement is one that almost no asylum seeker can satisfy—something Congress

23   could not have intended in creating a robust asylum system at the border.  Mot. 12 n.4; *see* 8 U.S.C.

24   § 1225(b)(1)(B) (ensuring access to asylum specifically for people who arrive at the border).  Indeed,

25   Congress squarely rejected a proposal that would have required asylum seekers to first apply in

26   transit countries.  *See* H.R. 2182, 104th Cong. § 1(a) (1995).  And as for parole, as Plaintiffs have

27   explained, the whole purpose of the asylum statute was to ensure that asylum seekers would not

28

1    have to rely on first obtaining ad hoc grants of parole.  Mot. 10-11.  Thus, even if § 1158 were

2    ambiguous, it is not reasonable to conclude that these requirements are "consistent with" the statute.

3              **B.  The Rule Amounts to a Harsher Entry Ban with Slight Cosmetic Changes.**

4              As Plaintiffs explained, the Rule collapses into a rehash of the prior entry ban, because it

5    forces most asylum seekers to enter at a port, and bars them from asylum if they do not.  Mot. 11-

6    14.  The Rule's other options are essentially illusory, as they apply to so few asylum seekers who

7    are subject to the Rule that, for almost everyone, entering at a port after securing a CBP One

8    appointment is the only potential option.  This violates § 1158(a)(1), which specifically authorizes

9    people to apply for asylum "whether or not" at a port.  *EBSC Entry Ban*, 993 F.3d at 669.

10             The government does not contest that the Rule would violate § 1158(a)(1) if it effectively

11   required people at the border to enter at ports to be eligible for asylum.  *See* Opp. 17-18.  But it

12   argues that the Rule does not force most people to ports, because the two other "pathways" identified

13   in the Rule are widely available to asylum seekers at the border.  Its arguments are incorrect.

14             As Plaintiffs explained, the Rule's parole provision does not present a real way for asylum

15   seekers at the border to avoid the Rule's port-of-entry requirement.  Mot. 12.  The government has

16   no coherent response.  To the contrary, it acknowledges that the programs identified in the Rule

17   require participants to fly to interior U.S. airports.  Opp. 17, 23, 24.  The government cannot deny

18   that such participants will never encounter the Rule, because it only applies at the "southwest land

19   border or adjacent coastal borders."  8 C.F.R. § 208.33(a)(1).  Nor does the government dispute that

20   almost no one can apply for parole through these programs after they reach the border, because

21   migrants' irregular entry into Mexico or Panama renders them ineligible.  Mot. 12.  It is thus clear

22   that *those who are subject to the Rule*—asylum seekers at the border—will virtually never overcome

23   the Rule using the parole exception. Whether or not "significant numbers of individuals" can fly to

24   U.S. airports through the parole programs, Opp. 18, the relevant point here is that people *at the*

25   *border* cannot use this avenue to overcome the bar and will therefore have to present at ports.

26             The government's brief vaguely suggests that some parole program participants may, "if

27   necessary, attempt[] to cross the southwest border."  Opp. 24.  But the record and the Rule identify

28   no such cases, and certainly make no attempt to show that this happens with any regularity.  *See Los*

1    *Angeles v. FAA*, 63 F.4th 835, 842 (9th Cir. 2023) (agency action must be justified by "the agency's

2    own articulation" and not "post hoc explanations" by "counsel") (cleaned up).  And for good reason,

3    since a person would take an enormous risk of being denied parole by entering at a land border in

4    spite of the programs' clear "air travel" requirements.[4]  Mot. 12.  Even if that happened on a rare

5    occasion, it would not change the key point that the parole exception will exempt virtually no one

6    at the border from the requirement to enter at a port.[5]

7          The Rule's transit-denial exception is just as illusory.  The government does not dispute that

8    over 98% of asylum seekers were unable to meet that condition during the year the prior transit ban

9    was in effect.  *See* Mot. 12-13; Opp. 18-19 (no mention of this).  In the Rule's preamble, the agencies

10   did not even bother to address this striking fact—that one of the Rule's two main "pathways" for

11   maintaining asylum eligibility at the border was previously, in fact, available to almost no one.  The

12   government's declaration confirms that this remains true: Only 3% of people interviewed by USCIS

13   so far have qualified for an "exception" to the Rule.  *See* Nuñez-Neto Decl. ¶ 16.  That figure

14   includes, not just people who received a denial in a transit country, but also people who proved they

15   could not use CBP One.  *See* 8 C.F.R. § 208.33(a)(2)(i), (ii)(B) (describing these as "exceptions").

16   So while 3% is minuscule, the real number of people who can satisfy the transit-denial condition is

17   likely far lower.  The government notably does not provide this figure.

18         As Plaintiffs explained, the record makes clear why so few people can qualify for the transit-

19   denial exception to the Rule.  Mot. 13, 19-23; *infra* at 15-17.  Most asylum seekers are unsafe in

20   transit countries, where migrants are constantly targeted by gangs, cartels, and police; they cannot

21   find sanctuary in these countries or be expected to wait in danger while they pursue their claims.

---

[4] The government asserts that Plaintiffs arguments are misplaced because the parole condition does not require someone to have been *granted* parole, but merely to have been "provided appropriate authorization to travel to the United States *to seek* parole."  Opp. 16 (citing 8 C.F.R. §208.33(a)(2)(ii)(A)).  Plaintiffs, however, do not contend otherwise.  Instead, Plaintiffs argue that, for virtually everyone subject to the Rule, obtaining this advance travel authorization is not possible and it would be irrational for anyone with prior authorization to come to the border instead of flying in, as the program terms require.

[5] The government also gestures at the theoretical possibility of grants of parole outside the new programs the Rule cites.  Opp. 18.  But the Rule makes no attempt to suggest that these other mechanisms would exempt large numbers of people at the border from the port-of-entry requirement.  And the family-based programs the government cites, Opp. 18, are directed towards people who have means of immigrating unrelated to any protection needs.

Many more are deported by immigration authorities before they can apply, while their cases are pending, or soon after they are resolved; they never reach the U.S. border to apply for asylum. Others who try to apply for asylum in Mexico are thwarted by the enormous procedural hurdles imposed by Mexico's asylum system, receiving neither asylum *nor* the "final denial" that the Rule requires. The transit condition thus presents no real alternative to the requirement to enter at a port.

The government's main response, as in the Rule itself, is that Mexico recently began receiving a larger number of applications, and grants a high percentage of the cases it decides. Opp. 18-19. But that does little to show that the transit-denial "pathway" is a meaningful alternative to the Rule's port-of-entry requirement. The number of applications increased only as a result of Title 42 blocking access to asylum in the United States, and the number means little for people who face too much danger in Mexico to even apply. Many of those who do apply do not find sufficient safety in Mexico, but submit applications in a desperate attempt to avoid refoulement by Mexican immigration officials. Mot. 22. The number of decided cases is also a small percentage of the applications—far lower than Defendants claim—and it appears to be declining. *See infra* at 15. Of those, people who receive asylum obviously cannot satisfy the transit-denial condition and must remain in Mexico even if they are not safe. And many who do not receive asylum *still* cannot satisfy the transit-denial condition, because their application is rejected for reasons other than a "final denial." Mot. 13, 21-22. The government's brief offers no response to any of these problems. When you consider all of them together, it is not surprising that fewer than 2% of asylum seekers could satisfy the condition the Rule now re-imposes.

Thus, because the other two options are largely illusory, in the mine run of cases, the Rule will force asylum seekers at the border to enter at a port, in direct violation of § 1158(a)(1).

**II.      The Rule Is Arbitrary and Capricious.**

The Rule is arbitrary and capricious because at least three of its central justifications are impermissible or baseless. First, the Rule's assertion that its limited pathways provide "sufficient avenues" to protection defies Congress's contrary judgment. 88 Fed. Reg. at 31,329. Second, its premise that one or more of those pathways will be "available" to those fleeing persecution is contradicted by overwhelming and uncontested record evidence. Third, there is no evidence for the

1    Rule's assertion—which it makes repeatedly, despite the government's denials—that it bars people

2    who are less likely to have valid asylum claims.  And the Rule is also arbitrary and capricious

3    because it fails to account for the effects of related, contemporaneous policy changes with

4    overlapping rationales.

5         **A. The Rule's Justification Relies on Factors That Congress Has Rejected.**

6         Congress guaranteed asylum access anywhere along the U.S. border, despite the availability

7    of asylum in other countries, and despite Congress's authorization of other means of seeking entry,

8    including immigrant and non-immigrant visas, refugee admission, and humanitarian parole

9    processes.  The Rule is impermissibly based on the contrary conclusion. Mot. 14-16.

10        Defendants claim that Plaintiffs' argument "misrepresents" the Rule.  Opp. 21. But the Rule

11   repeatedly states the rationale that third countries, CBP One appointments, and other means of

12   seeking entry to the United States offer "sufficient avenues for migrants with valid claims to apply

13   for asylum."  88 Fed. Reg. at 31,329; *id.* at 31,330 (same); *see id.* at 31,352 (asylum seekers unable

14   to "apply[] for asylum in a third country" or present with CBP One appointments can instead seek

15   entry via "an employment-based visa or refugee admission"); *id.* at 31,353 ("if any noncitizens,

16   including members of indigenous communities and people of color, do not believe that they will be

17   able to meaningfully access protection in a third country," they may instead "seek parole pursuant

18   to a DHS-approved parole process" or apply for an "employment-based visa or refugee admission").

19        Defendants also assert that the Rule does not aim to "dramatically reduce" the availability

20   of asylum.  Opp. 21 (cleaned up).  But the preamble is clear.  The Rule explicitly seeks to reduce

21   what the agencies view as an unduly "high number" of asylum seekers who could otherwise "pursue

22   their claims" in full removal proceedings.  88 Fed. Reg. at 31,315; *id.* at 31,330 (Rule aims to

23   "reduce[] the number of individuals" able to pursue asylum claims); *id.* at 31,334 (same); *see also,*

24   *e.g.*, *id.* at 31,338 (Rule "will result in fewer" asylum seekers "being placed into removal

25   proceedings").  Defendants respond that a meaningful number of people can still enter the country

26   through CBP One and parole.  Opp. 22; *but see infra* at 13-15.  But that is not responsive to the

27   defect here, which is the Rule's *rationale*—that reducing asylum is justified by other options for

28

entry and protection outside the U.S. asylum system.  That is an impermissible justification whatever the size of the reduction.

Defendants' remaining contentions misunderstand this claim.  The defect is not that the agencies "rel[ied] on systemic efficiency concerns," Opp. 21, but rather that they relied on mechanisms other than asylum to conclude that access to asylum could be dramatically curtailed. Plaintiffs' argument also does more than "repackage" the agencies' statutory violations, Opp. 21, because the Rule's reliance on a rationale that Congress rejected renders it arbitrary and capricious independent of whether its operative terms conflict with the asylum statute.  *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).[6]  And the fact that Congress gave the agencies some leeway to create regulatory bars, Opp. 22, is irrelevant, because even if a rule falls within an agency's statutory authority, its justification still cannot rely on "factors which Congress has not intended [the agencies] to consider."  *State Farm*, 463 U.S. at 43.  Because the Rule deems sufficient the very means to seek protection that Congress judged inadequate to comply with U.S. treaty obligations, it fails that test.

### B. The Record Contradicts the Rule's Justification that Its Pathways Are Widely Available.

The government similarly fails to defend the Rule's premise that its "pathways" are readily accessible to asylum seekers.

The government first erects a straw man, claiming Plaintiffs argue that a "a core premise of the rule is that a viable alternative pathway will be *available to every noncitizen* affected by the rule."  Opp. 22 (emphasis added).  But Plaintiffs instead challenge the Rule's actual premise: that "[a]vailable pathways" provide adequate "mechanisms for migrants to enter the United States and make their protection claims," such that those who "fail to avail themselves" of these options should face "consequences."  88 Fed. Reg. at 31,318; *see id.* at 31,352 (stating the Rule bars asylum seekers who "choose to forgo such options"); *id.* at 31,366 (describing "purpose of this rule" as "preserving the opportunity for individuals fleeing persecution to pursue protection-based claims"); *see also* 88

---

[6] As Plaintiffs' noted, however, Defendants' reliance on factors that Congress rejected does further underscore the statutory violation.  *See* Mot. 15 n.5; *supra* at 7-8 (addressing *Chevron* step two).

12

1    Fed. Reg. 11,704, 11,737 (NPRM) (stating that Rule would bar "those who would circumvent

2    orderly procedures and forgo *readily available* options") (emphasis added).  This was a necessary

3    premise of the Rule, because the agencies never claimed or explained why they would adopt the

4    same Rule if these pathways were *not*, in fact, readily available to most asylum seekers.

5         This key premise is contrary to the record.  Overwhelming record evidence—which the

6    government largely fails to contest—shows that many asylum seekers have *no* pathway they can

7    access when they get to the border.  Accordingly, the Rule's premise that its pathways generally

8    preserve asylum seekers' access to protection is arbitrary and capricious.

9         *1.  CBP One Appointments.*  The government does not dispute the key record evidence

10   showing that the CBP One pathway is unavailable to most asylum seekers.  First, it does not contest

11   that there are not nearly enough CBP One appointments for asylum seekers at the border, who may

12   be unable to "wait weeks or longer" to secure appointments.   Mot. 16-17; *see* Opp. 23-24.

13   Defendants instead note that over the course of a year, the number of appointments will exceed the

14   number of people encountered at the border in some years—although far fewer than in 2019 and

15   other past years.  Opp. 23.  But the question is whether the Rule actually makes asylum "available"

16   to those *currently* fleeing persecution, *e.g.*, 88 Fed. Reg. at 31,329, and there is no dispute that the

17   Rule fails to do so.  Indeed, the government does not contest that there is an "insufficient number of

18   appointments."  Mot. 17 (quoting PC_24902); *see also* Nuñez-Neto Decl. ¶¶ 22, 26 (discussing

19   asylum seekers waiting for appointments in Mexico).  And by pointing to the total number of people

20   who might be able to get a CBP One appointment in a year, the government also ignores the fact

21   there are entire categories of asylum seekers who because of indigence, language capacity, illiteracy,

22   and other barriers will never have access to those appointments at all.

23        Second, the government does not dispute that asylum seekers waiting to secure CBP One

24   appointments in Mexico face grave danger that could force them to enter between ports.  Mot. 17.

25   Defendants note that CBP One can be accessed in central Mexico as well as in the north.  Opp. 23;

26   *see also* Mot. 17 (acknowledging same).  Naturally, however, most asylum seekers trying to secure

27   appointments to cross the U.S. border are "currently waiting in northern Mexico."  88 Fed. Reg. at

28   31,400; *accord* PC_24899-910, 33003-4.  And the dangers facing asylum seekers are not limited to

northern Mexico.  Mot. 19-20 (detailing record evidence of violence against asylum seekers throughout Mexico); PC_33467-75 (State Department warning of high levels of violence in numerous central Mexican states).

Third, the government does not contest the numerous problems with CBP One's functionality, including that its facial recognition discriminates against Black and Indigenous asylum seekers. Mot. 17-18; *see* Opp. 23.  The government instead argues—without citation to the record—that many noncitizens will be able to "satisfy the rule's exceptions" to the CBP One appointment condition, insisting that these "exceptions are meaningful." Opp. 23, 24.  The Rule's preamble and the government's own declaration indicate otherwise.  88 Fed. Reg. at 31,401 (suggesting that people who cannot afford smartphones should try to borrow them from "trusted partners," rather than indicating they will satisfy the exception); *id.* at 31,406 (CBP One exception applicable at ports only "captures a narrow set of circumstances in which it was truly not possible for the noncitizen to access or use the CBP One app"); *id.* (rejecting "'illiteracy' exception and instead suggesting that non-literate people "seek assistance, including translation assistance, in using the app").  The same is true for the "imminent and extreme threat" exception.  *Id.* at 31,380 (stressing that this exception is "narrow"); *see also id.* at 31,418 (stating that "broad exceptions . . . would be contrary to the purpose of the rule").[7]

The government also claims that the parole programs make it likely that, in the future, fewer noncitizens will have to wait at the border for appointments.  Opp. 24.  But that is unlikely, because the programs have been in place for months already, they only affect a tiny number of countries, and as the government acknowledges they could end.  88 Fed. Reg. at 31,410.  In any event, the government's claim ignores the asylum seekers who are *already* at the border, who cannot use the Rule's parole exception, Mot. 12, and cannot get appointments without a long and dangerous wait.

*2. Parole Programs.*  As to the parole pathway, the government merely repeats that the Rule

---

[7] The government's declaration confirms that just 3% of asylum seekers interviewed by USCIS in the Rule's first month satisfied an "exception," which under the Rule encompasses the exceptions for parole authorization, inability to use CBP One, and denial of protection in transit.  Nuñez-Neto Decl. ¶ 16.  Only 8% demonstrated the so-called rebuttal grounds based on medical emergencies, imminent and extreme threats, and severe trafficking, *id.*—even though only people in extremely dire situations would likely risk asylum ineligibility in hopes of establishing one of these narrow rebuttal grounds.

1   technically contains an exception for people already granted permission to travel to the United States

2   to seek parole.  Opp. 24.  But as explained, the exception is illusory.  *See supra* at 8-9.  The

3   government does not dispute that the current parole programs the Rule relies on apply to only five

4   countries.  Mot. 12, 18.  Nor does it dispute that many asylum seekers from those five countries

5   cannot satisfy the programs' requirements that participants obtain valid passports, U.S.-based

6   sponsors, and airline tickets to the United States.  *Id.* at 18.  And it does not dispute that if the

7   programs end or are enjoined, the Rule's bar will be unaffected.

8       ***3. Transit Countries.***  Defendants claim that "the rule adduces substantial evidence that

9   seeking asylum in transit countries is a viable option for many migrants."  Opp. 25.  They fail to

10  identify any such record evidence.

11      The government does not contest that asylum seekers are systematically targeted for violence

12  and exploitation in Mexico.  Mot. 19-20; *see* Opp. 25-26.  The government does claim, without

13  record support, that Mexico has made "security gains."  Opp. 26.  But in reality, the overwhelming

14  evidence shows that Mexico's "rates of violent crime have skyrocketed" in recent years, and are

15  now at "historic highs."  PC_23079; *see also* Mot. 19.  Defendants also do not contest the extensive

16  evidence of widespread violence against asylum seekers in other transit countries, including Belize,

17  Guatemala, Colombia, and Ecuador.  Mot. 20.

18      Defendants instead argue that what they call "potential harm to migrants" in Mexico is

19  acceptable in part because the agencies reasonably relied upon "the high number of claims [Mexico]

20  can adjudicate every year."  Opp. 25-26 (citing 88 Fed. Reg. at 31,414).  That is divorced from both

21  the record evidence and the Rule's stated rationale.  The government mistakenly states that Mexico

22  adjudicated more than 63,000 asylum applications in 2022.  Opp. 18 n.11.  The actual number was

23  less than 35,000, which was lower than the number adjudicated in 2021.  AR_5707.  The record

24  thus reflects—and the government does not contest—that Mexico's overwhelmed asylum agency is

25  unequipped to handle the cases it already has, much less the significant further increase in

26  applications the Rule contemplates.  Mot. 21.  In any event, the Rule relied on the number of

27  applications Mexico *received* in the last two years, not the number of applications Mexico

28  *adjudicates*.  88 Fed. Reg. at 31,414, 31,415; *see Los Angeles*, 63 F.4th at 842 (agency action must

1    be justified by "the agency's own articulation").  And the government does not contest that those

2    recent application numbers are hugely inflated both because the Title 42 policy barred asylum

3    seekers from the United States and left them with nowhere else to turn—"even if they do not feel

4    safe in Mexico," AR_4874—and because many people apply for asylum in Mexico to get temporary

5    travel documents in hopes of avoiding *refoulement* as they continue their journey north.  Mot. 22;

6    *cf.* 88 Fed. Reg. at 31,415 (assuming without evidence that the 2022 application figures reflect the

7    number of asylum seekers who "felt safe enough" in Mexico).  The government also does not contest

8    the many other barriers that prevent people fleeing persecution from accessing Mexico's asylum

9    system or receiving final denials even if they do apply.  Mot. 21-22.

10        Nor do the government's claims regarding other transit countries withstand scrutiny.

11   Defendants note that Colombia and Belize recently permitted certain asylum seekers already in those

12   countries to regularize their status.  Opp. 24.  But they do not contest that the cut-off dates for both

13   programs, like that in Costa Rica, have passed.  Mot. 23.  It is true that Colombia and "every Central

14   American country" are parties to the U.N. refugee treaties as well as "the non-binding Cartagena

15   Declaration."  Opp. 25.  But Belize, Guatemala, Honduras, and Colombia have granted asylum and

16   "complementary protection" under that Declaration to only around 2,500 people *total* in the last two

17   decades.   PC_23478-80, 23483-86.   Nicaragua's asylum agency "has not met since 2015."

18   PC_24084.  El Salvador's system has "major regulatory and operational gaps."  PC_34206.  And

19   Panama adjudicates "fewer than 50 cases annually" and grants "less than 1 percent."  PC_24122.

20        Unable to identify specific evidence supporting their position, the government directs the

21   Court to "see generally" more than 1,200 pages of the record.  Opp. 18 n.11.  The portions of those

22   documents that address transit countries' asylum systems actually support Plaintiffs' position.  *See,*

23   *e.g.*, AR_5007 (Mexico needs to "strengthen the capacity" of its asylum agency "to deliver

24   protection"); AR_5014 (Costa Rica's "asylum system is under pressure," and applicants face

25   "extended claim processing times, loss of livelihoods, economic hardship, and xenophobia");

26   AR_6313 (many Venezuelans in Colombia "face barriers in accessing the asylum system," and "a

27   significant number of refugees and migrants face multiple challenges" there due to ongoing "armed

28   conflict"); AR_6338 (noting "continued deterioration of the security situation" in Ecuador, where

1    Venezuelan "refugees and migrants . . . are often exposed to sexual abuse").

2            Because one of its essential premises is contradicted by a "mountain of evidence" that the

3    agencies failed to address, the Rule is arbitrary and capricious.  *EBSC Transit Ban*, 994 F.3d at 981.

4            ***4.  Particularly Vulnerable Asylum Seekers.***  The government argues that there are two

5    ways in which the Rule adequately considered the particular challenges and dangers facing women

6    and Black, Indigenous, and LGBTQ+ people fleeing persecution.  First, the government cites the

7    Rule's narrow "imminent and extreme threats" exception.  Opp. 26.  But a person who knows they

8    are very likely to face extreme violence due to their identity cannot afford to wait for a particular

9    threat to become concretely "imminent" before crossing the border—especially where they have

10   *already* suffered attacks in Mexico, which do not qualify them for this exception.  Mot. 7, 23-24;

11   *see also* Mot. 19-20 (detailing record evidence of Mexican criminals and officials preying on

12   vulnerable populations with impunity); *EBSC Entry Ban*, 993 F.3d at 671 ("The most vulnerable

13   refugees are perhaps those fleeing across the border through the point physically closest to them.").

14   And many of the harms faced by people in these groups, like deportation or exclusion from

15   employment and legal protection, presumably would not qualify as "imminent and extreme" enough

16   to satisfy the exception.  Mot. 23-24.

17           Second, the government claims that the Rule's asylum restrictions themselves account for

18   the dangers these groups face by aiming to reduce their "incentive to make a dangerous irregular

19   migration journey."  Opp. 26; *see also* 88 Fed. Reg. at 31,352-53 (recommending that they seek

20   advance parole, employment-based visas, or admission as refugees).  In other words, the Rule

21   essentially says that the solution to its obstacles is for these asylum seekers not to seek asylum at

22   all.  Like the transit ban's rationale for not exempting unaccompanied children, this "explanation in

23   no way addresses the special vulnerability" of these groups.  *EBSC Transit Ban*, 994 F.3d at 984.

24           **C.  The Record Does Not Support the Rule's Assumption that People Who Enter
25                Between Ports or Pass Through Transit Countries Without Seeking Protection
                 Have Weaker Asylum Claims.**

26           In defending the transit ban, the government offered "only a single record citation" which

27   they claimed justified an "assumption that [noncitizens] subject to [it] do not have a valid asylum

28   claim."  *EBSC Transit Ban*, 994 F.3d at 983.  The Ninth Circuit held the ban arbitrary and capricious

17

because that lone citation did not, in fact, support the agencies' assumption. *Id.* at 980, 983.  Here, Defendants do not offer even a single record citation in support of the Rule's analogous assumption. *See* Opp. 26-27.  Therefore, just like the transit ban, this Rule is arbitrary and capricious.

The government instead asserts that the *Final* Rule "is not based on [this] premise," and that only "the NPRM suggests such reasoning." Opp. 26 & n.12.  That is incorrect.  As Plaintiffs showed, Mot. 25, the Rule repeatedly claims that it preserves eligibility for applicants more likely to have valid asylum claims and bars those without valid claims.  For example, the Rule states that it enables the agencies to sort out and "remov[e] those with non-meritorious claims."  88 Fed. Reg. at 31,336.  The same paragraph states that "[t]he Departments believe that the [Rule's] condition on eligibility" is "reasonable and necessary *for the reasons discussed in the NPRM*."  *Id.* (emphasis added) (citing NPRM, 88 Fed. Reg. 11,744-47).  The cited pages of the NPRM, in turn, state the very same assumption: that the Rule would facilitate the "rejection of unmeritorious claims" and "removing those with non-meritorious claims."  88 Fed. Reg. at 11,744-45; *accord id.* at 11,746-47 (the Rule would filter out people with "non-meritorious claims," "make it more difficult for those with non-meritorious claims" to apply for asylum, and cause "those without meritorious claims to be removed"); *see also id.* at 11,737 ("those who would circumvent orderly procedures and forgo readily available options may be less likely to have a well-founded fear of persecution").  Elsewhere, the final Rule asserts that its "lawful pathways" are sufficient "for migrants with valid claims," *id.* at 31,329; that it enables the agencies to "identify[] non-meritorious claims" in order to "focus on those claims most likely to warrant protection," 88 Fed. Reg. at 31,381 (citing NPRM, 88 Fed. Reg. at 11,742); and that people who cross the border irregularly "unfairly delay the adjudication of meritorious claims for asylum," *id.* at 31,387.

The government also contends that they needed no evidentiary basis for this assumption because it only formed part of their "'weighing of risks and benefits.'"  Opp. 26 (quoting *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2571 (2019)).  But assumptions that inform such balancing must still be supported by evidence.  *Ctr. for Biological Diversity v. NHTSA*, 538 F.3d 1172, 1198, 1202-03 (9th Cir. 2008) (agency's cost-benefit analysis was arbitrary and capricious because "[n]o evidence support[ed]" one of the factual assertions involved); *compare Dep't of Commerce*, 139 S.

1  Ct. at 2569 (agency's analysis was not arbitrary and capricious because "[t]he evidence before the

2  [agency] supported [its] decision").  Because its reasoning is premised on the same baseless

3  assumption as before, the Rule is arbitrary and capricious.

4        **D.  The Agencies Failed to Consider Related Border Policies.**

5        The agencies cannot justify the Rule's failure to consider its interaction with roughly

6  contemporaneous and interrelated policy changes, including rapid credible fear interviews ("CFIs")

7  in CBP custody and the removal of third-country nationals to Mexico, both of which share

8  intersecting aims with the Rule.  Opp. 27-28.

9        The agencies contend that the policy of conducting CFIs in CBP custody is categorically

10  "beyond the scope of the rule."  Opp. 27 (citing 88 Fed. Reg. at 31,363).  That is wrong.  Agencies

11  must consider whether, "*given*" other related policies, a rule should not be adopted.  *Petroleum*

12  *Commc'ns, Inc. v. FCC*, 22 F.3d 1164, 1173 (D.C. Cir. 1994).  The commenters who foresaw the

13  CBP custody policy urged the agency not to adopt the Rule, arguing that the policies together would

14  be a "fiasco," PC_31507, and set "unachievable" standards, PC_32981.  The government argues

15  that the commenters were wrong on the merits about the policies' interaction.  Opp. 27 (arguing that

16  the commenters' concern was "not supported by the record").  But the agencies never said that in

17  the Rule—they flatly refused to engage with the issue.  88 Fed. Reg. at 31,363.  Counsel cannot now

18  supply the response that the agencies refused to give.  *See Los Angeles*, 63 F.4th at 842.

19        The government also argues it has the *legal authority* to conduct CFIs in CBP custody, Opp.

20  27-28, but that is entirely unresponsive to Plaintiffs' argument.  The question is whether the agencies

21  appropriately considered the *wisdom* of adopting the Rule along with that separate policy.

22        As to third-country national removals to Mexico, the agencies' response amounts to another

23  lengthy non-sequitur.  Plaintiffs argued that the agencies failed to consider that the third-country

24  removal policy would also "lead[] to shorter periods in custody," thereby undermining a key

25  justification for the Rule—the supposed need to reduce pressure on detention capacity.  Mot. 27.

26  More generally, in adopting the Rule, the agencies assumed a third-country removal policy would

27  not exist.  *See* 88 Fed. Reg. at 31,316 ("DHS encounter projections and planning models . . . suggest

28  that encounters could rise to 11,000 per day, absent policy changes and *absent a viable mechanism*

1  *for removing*" nationals from the four countries now subject to the removal policy) (emphasis

2  added).  The government's response confirms as much.  It uniformly points to portions of the Rule

3  explaining the need for a third-country removal policy, but that do not consider the impact of that

4  soon-to-be-adopted policy on *the Rule* and its justifications.  *See* Opp. 28.

5      The agencies therefore failed to consider important aspects of the problem and the Rule is

6  arbitrary and capricious as a result.  *See* Mot. 27 (citing cases).

7  **III.    The Rule Is Procedurally Defective.**

8      The agencies seek to evade their obligation to "provide the public with a meaningful

9  opportunity to comment," *Hall v. EPA*, 273 F.3d 1146, 1162 (9th Cir. 2001), by invoking "exigent

10 circumstances" surrounding the end of Title 42.  Opp. 28-30.  But any exigency was solely of the

11 agencies' own making.  The President and CDC instructed the agencies to prepare for the end of

12 Title 42 two years ago, 86 Fed. Reg. 8,267 (Feb. 2, 2021); 86 Fed. Reg. 42,828 (Aug. 5, 2021); 87

13 Fed. Reg. 19,941 (Apr. 6, 2022), and the government confirms that it spent 18 months planning for

14 it, Nuñez-Neto Decl. ¶ 8.  The agencies had ample time to develop and announce their plans while

15 also complying with the APA's procedural requirements; they simply failed to do so.  The agencies'

16 own delay cannot provide a basis for circumventing the APA.  *Chamber of Commerce v. DHS*, 504

17 F. Supp. 3d 1077, 1087 (N.D. Cal. 2020); *accord, e.g.*, *NRDC v. NHTSA*, 894 F.3d 95, 114 (2d Cir.

18 2018); *Cent. Lincoln Peoples' Util. Dist. v. Johnson*, 735 F.2d 1101, 1117 (9th Cir. 1984); *Council

19 of S. Mountains, Inc. v. Donovan*, 653 F.2d 573, 581 (D.C. Cir. 1981).

20     The government's further defense of the shortened comment period also falls flat.  It is

21 irrelevant that the APA does not specify a minimum comment period (Opp. 29), because the

22 necessary length of a comment period turns on the complexity of the rule.  *See, e.g.*, *Pangea Legal

23 Servs. v. DHS*, 501 F. Supp. 3d 792, 819 (N.D. Cal. 2020).  The agencies do not even attempt to

24 explain why 30 days[8] was sufficient for a regulation that indisputably wreaks "enormous, complex

25 changes that impact matters of life or death."  Mot. 28.  They also ignore the cases finding 30 days

26 to be too short in similar circumstances.  *Id.* (collecting cases).

27 _____

28 [8] The government claims that the comment period was 33 days.  Plaintiffs calculate 32 days from
the publication date (with the last two days before the deadline over a weekend).  In either case, the
comment period length fell far short of what was necessary for meaningful participation.

1    Instead, the agencies contend that the number of comments they received shows that the

2    comment period was long enough.  Opp. 29.  But the fact that commenters scrambled to provide

3    *some* information does not mean that they had adequate time to assemble *complete* information.  *See*

4    *Cal. ex rel. Becerra v. Dep't of Interior*, 381 F. Supp. 3d 1153, 1177 (N.D. Cal. 2019) (the "number

5    of commenters does not show that the [agency] provided an adequate amount of time").  There is

6    ample evidence that, given more time, commenters would have presented the agencies with more

7    data and information, including, for example, "a thorough refutation of . . . misapprehensions about

8    the safety and availability of asylum processing in transited countries," PC_32743,[9] reports on the

9    experiences and needs of "clients stranded at the border," PC_31523, and data collected, *e.g.*, about

10   Black migrants from the "more than 16,000 members" of the American Immigration Lawyers'

11   Association, PC_20737.  And the agencies' claim that this significant additional information could

12   not have changed the outcome would be true only if the agencies had "an unalterably closed mind

13   on matters critical to the disposition of the proceeding"—which would itself violate the APA.

14   *Alaska Factory Trawler Ass'n v. Baldridge*, 831 F.2d 1456, 1467 (9th Cir. 1987); *see Habeas*

15   *Corpus Res. Ctr. v. DOJ*, 2009 WL 185423, at *9 (N.D. Cal. Jan. 20, 2009).

16   The government likewise does not dispute that the timing of their announcements

17   undermined the public's ability to fully address the interaction of interrelated policies with the Rule.

18   *See* Opp. 30-31.  Instead, they again invoke "harmless" error because the comments would not "have

19   been different" with this information.  *Id*. 30-31.  But the agencies do not dispute that, for instance,

20   conducting rapid credible fear interviews in CBP custody makes it more difficult for people both to

21   find counsel and to satisfy the Rule's onerous burdens.  *See* Mot. 26.  Had the agencies announced

22   that policy earlier, they would have received much more on that topic from additional commenters.

23   Finally, the agencies do not dispute that they failed to disclose the critical OIS study and the

24   model it analyzed, which together underpinned the agencies' conclusion that the Rule was necessary

25   to manage migration after Title 42.  *See* Opp. 31-32.  Nor do they dispute that the study was critical

26

27   [9] The agencies contend that commenters should have anticipated the need to discuss asylum systems
     throughout the Western Hemisphere at length from the phrase "and partner nations" in a January
28   2023 statement. Opp. 30 (emphasis removed). But three words in a press release are no substitute
     for full notice and comment procedures under the APA.

1   to their conclusion that restoring ordinary Title 8 processing and consequences would not be

2   sufficient to prevent unmanageable numbers of border crossings and thus to their decision to adopt

3   the Rule.  *See id.*  The agencies suggest that disclosure was not required, but their own authority

4   confirms that "an agency's failure to disclose *critical* material, on which it relies, deprives

5   commenters" of the right "to participate in rulemaking." *Allina Health Servs. v. Sebelius*, 746 F.3d

6   1102, 1110 (D.C. Cir. 2014) (quotation omitted); *see also* Mot. 29-30.

7          The agencies claim that it was sufficient for the NPRM to cite some of the underlying

8   data. Opp. 31-32. But the Rule is premised on the model's undisclosed calculations and predictions,

9   not the disclosed subset of the raw data that was used in the model.  *See* NPRM, 88 Fed. Reg.

10  11,704-05, 11,708–14 (cited at 88 Fed. Reg. at 31,328); 88 Fed. Reg. at 31,314, 31,316, 31,331,

11  31,341, 31,363-64.  This data provides no substitute for the actual analysis that formed a basis of

12  the Rule.  *Am. Radio Relay League v. FCC*, 524 F.3d 227, 237 (D.C. Cir. 2008).

13         The government's claim that this violation was harmless, Opp. 31-32, again lacks merit.

14  Had the study and model been disclosed, commenters would have—among other things—been able

15  to "assess the validity of the projection[s]," to analyze the effect of the January 2023 parole programs

16  on the model's forecasts, and to use "the model's outputs" to present other "reasonable alternatives"

17  for consideration.  PC_31205; *see also, e.g.*, PC_4000, 21457.  Commenters would thus have had

18  "something useful to say," and no more is needed "to establish prejudice." *Chamber of Commerce*

19  *v. SEC*, 443 F.3d 890, 905 (D.C. Cir. 2006).[10]

20         Individually and collectively, these procedural failures deprived the public of a meaningful

21  opportunity to comment on the Rule.

22  **IV.    Plaintiffs Have Standing.**

23         Contrary to Defendants' arguments, the Ninth Circuit has held that organizations in the exact

24  position as Plaintiffs had Article III standing.  *EBSC Transit Ban*, 994 F.3d at 975; *see also EBSC*

25

26  ---
    [10] The agencies' contention that their predictive model was "entirely correct," Opp. 32, is
    misleading.  The model predicted events *after* Title 42 ended, 88 Fed. Reg. at 31,316, while the
27  agencies now point to evidence concerning events *before* Title 42 ended, Nuñez-Neto Decl. ¶¶ 9-
    12.  The agencies do not say whether their undisclosed model predicted the increase in border
28  crossings before the end of Title 42, or the decrease afterward.  In any case, post-decisional events
    have no bearing on whether pre-decisional procedural violations prejudiced commenters.

1   *Entry Ban PI*, 354 F. Supp. 3d 1094, 1109-10 (N.D. Cal. 2018) (same); *EBSC Transit Ban PI*, 385

2   F. Supp. 3d 992, 937 (N.D. Cal. 2019) (same).  That court has already rejected each of the arguments

3   Defendants make here.  Opp. 9.  It held that *Linda R.S.* and *Sure-Tan* are not relevant, that Plaintiffs

4   have standing even though they are not individual asylum seekers, and that the harms they face are

5   not speculative.  *See EBSC Entry Ban*, 993 F.3d at 663-64 & n.6.[11]  Nor did it require Plaintiffs to

6   analyze the effects of prior policies, *contra* Opp. 9, given that the harms Plaintiffs face are clear and

7   flow directly from the intended operation of the Rule.  Even "one less client that they may have had

8   but-for the Rule's issuance is enough" to establish standing.  *EBSC Entry Ban*, 993 F.3d at 664; *see*

9   *also EBSC Transit Ban*, 994 F.3d at 974.  And here, for instance, despite the Rule's assertion that

10  "CBP will not turn away individuals without appointments," 88 Fed. Reg. at 31,365, ImmDef

11  explains that it has already witnessed CBP officers turn away many asylum seekers, Toczylowski

12  Decl. (ImmDef) ¶¶ 40-48, thus preventing ImmDef from representing them in asylum proceedings.

13  Plaintiffs also explain how the Rule's intended decrease in CFI passage rates will injure their

14  respective organizations.  *See* Smith Decl. (EBSC) ¶¶ 14-22; Alvarez Decl. (CARECEN) ¶¶ 11-16;

15  Garza Decl. (Tahirih) ¶¶ 16-26 Calonje Decl. (NCLR) ¶¶ 15-25; Toczylowski Decl. (ImmDef)

16  ¶¶ 18, 26-39; Yang Decl. (American Gateways) ¶ 17-25.  And while not necessary for standing here,

17  Plaintiffs do show diversion of resources due to the prior transit ban, including time spent litigating

18  withholding and CAT claims for clients barred from asylum.  *See* Suppl. Yang Decl. ¶¶ 5-8.[12]

19

20

---

21  [11] The Supreme Court's decision in *United States v. Texas*, issued today, does not address this.  It

22  does not concern organizational standing or standing to challenge substantive eligibility rules.  It
    only addresses standing to challenge "the Executive Branch's exercise of enforcement discretion
    over whether or not to arrest or prosecute," which is not at issue in the present case.  2023 WL

23  4139000, *4; *see id.* at *5-6 (explaining the "problems raised by judicial review of the Executive
    Branch's arrest and prosecution policies"); *id.* at *7-8, 9 (emphasizing that "this case raises only [a]

24  narrow Article III standing question").

25  [12] As Defendants acknowledge, the Ninth Circuit and this Court have repeatedly rejected
    Defendants' zone of interest argument.  *See EBSC Entry Ban*, 993 F.3d at 668; *see also EBSC Entry*

26  *Ban TRO*, 349 F. Supp. 3d 838, 854 (N.D. Cal. 2018) (same); *EBSC Entry Ban Stay*, 354 F. Supp.
    3d 1085, 1091 (N.D. Cal. 2018) (same); *EBSC Entry Ban PI*, 354 F. Supp. 3d 1094, 1110-11 (N.D.

27  Cal. 2018) (same).  Plaintiffs fall within the statute's zone of interest for the same reasons as last
    time.  *See* Smith Decl. (EBSC) ¶¶ 4-15, 18, 20; Alvarez Decl. (CARECEN) ¶¶ 4-7, 11-16; Garza

28  Decl. (Tahirih) ¶¶ 5-10, 12-23; Calonje Decl. (NCLR) ¶¶ 6-10, 13-18, 20-31; Toczylowski Decl.
    (ImmDef) ¶¶ 5-15, 18, 36-37; Yang Decl. (American Gateways) ¶¶ 3, 7-14, 17-25.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## V.    8 U.S.C. § 1252(f)(1) Does Not Apply.

Defendants invoke 8 U.S.C. § 1252(f)(1), which provides that, with some exceptions, courts may not "enjoin or restrain the operation of the provisions of part IV of this subchapter."  Opp. 32-33.  But § 1252(f)(1) does not apply here for two independent reasons.  As multiple courts have held, § 1252(f)(1) only prevents injunctions, not the vacatur that Plaintiffs seek.  And by its plain terms, § 1252(f)(1) only prevents courts from enjoining the operation of specific provisions of the INA, and those provisions do not include the asylum statute.

### A.    8 U.S.C. § 1252(f)(1) Does Not Apply to Vacatur.

Section 1252(f)(1) "prohibits lower courts from *entering injunctions* that order federal officials to take or to refrain from taking actions" pursuant to certain INA provisions.  *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2065 (2022) (emphasis added).  That § 1252(f) is limited to injunctions is confirmed both "by its title"—"Limit on injunctive relief"—and "its plain terms," which restrict courts' authority to "enjoin or restrain the operation" of specified INA provisions.  *Reno v. Am-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999); *see also Biden v. Texas*, 142 S. Ct. 2528, 2538-39 (2022) (section 1252(f)'s "title . . . makes clear the narrowness of its scope").  Accordingly, § 1252(f)(1) "is nothing more or less than a limit on *injunctive* relief."  *Reno*, 525 U.S. at 481 (1999) (emphasis added).

Vacatur is not injunctive relief.  *See* 5 U.S.C. § 706(2) (instructing courts to "set aside" unlawful agency action).  An injunction is "a drastic and extraordinary remedy."  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010).  It "tells someone what to do or not to do."  *Aleman Gonzalez*, 142 S. Ct. at 2064 (citation omitted).  Vacatur, by contrast, is a "less drastic remedy."  *Monsanto Co.*, 561 U.S. at 165-66.  Unlike an injunction, vacatur "neither compels nor restrains" agency action.  *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022).  The courts to consider the issue have therefore uniformly held that § 1252(f)(1) as interpreted by *Aleman Gonzalez* "does not apply to vacatur."  *Texas v. United States*, 50 F.4th 498, 528 (5th Cir. 2022); *accord, e.g.*, *Florida*

1  *v. United States*, __ F. Supp. 3d. ___, No. 21-1066, 2023 WL 2399883, at *34-35 (Mar. 8, 2023);

2  *Al Otro Lado v. Mayorkas*, 619 F. Supp. 3d 1029, 1045 (S.D. Cal. 2022).

3       **B.  8 U.S.C. § 1252(f)(1) Does Not Apply to Policies Implementing the Asylum Statute.**

4       Even if it applied to vacatur, § 1252(f)(1) still would not bar the relief in this case, because

5  it does not apply to asylum eligibility rules.  The text of § 1252(f)(1) bars only injunctions of policies

6  that implement "the provisions of chapter 4 of title II [of the Immigration and Nationality Act

7  (INA)]," which govern certain aspects of the detention and removal process.  *Moreno Galvez v.*

8  *Jaddou*, 52 F.4th 821, 830 (9th Cir. 2022); *see*  Pub. L. No. 104-208, Div. C, § 306(a)(2), 110 Stat.

9  at 3009-611 (1996); *Aleman Gonzalez*, 142 S. Ct. at 2066 n.3 (explaining that the statute bars

10  injunctions of policies that "enforce or implement" the covered statutes).[13]  By its terms, this does

11  not prevent courts from enjoining *all* immigration policies, only policies that implement a few

12  specified sections: those found in "chapter 4," which provide the procedures for the removal system,

13  including detention, adjudication, and physical removal.  *See, e.g.*, 8 U.S.C. § 1226 (detention),

14  § 1229a (regular removal proceedings), § 1225 (expedited removal proceedings), § 1231 (removal

15  operations).

16       The Rule's bar is not covered by § 1252(f)(1).  The bar implements 8 U.S.C. § 1158 which

17  contains both the eligibility rules for asylum, *id.* at § 1158(a)-(b), and the provision the government

18  claims as authority for the Rule, *id.* § 1158(b)(2)(C); *see also id.* § 1158(d)(5)(B).  The asylum

19  statute is located in chapter 1, not chapter 4.  Thus, by its plain terms, § 1252(f)(1) does not apply.

20       The Ninth Circuit and other courts have consistently held that § 1252(f)(1) is not triggered

21  by injunctions of policies that implement statutes outside of chapter 4.  *See, e.g.*, *Al Otro Lado, Inc.*

22  *v. Mayorkas*, 2022 WL 3142610, *23 (S.D. Cal. Aug. 5, 2022) (enjoining application of asylum ban

23  to certain class members despite § 1252(f)(1)); *Gonzalez v. ICE*, 975 F.3d 788, 813-15 (9th Cir.

24       _____

25  [13] The text of the statute as enacted by Congress conflicts with the text later codified in the U.S.
Code at § 1252(f)(1).  *See Moreno Galvez*, 52 F.4th at 830.  The version Congress enacted applies

26  the injunction bar to "chapter 4 of title II" of the INA, whereas the codified version refers to "part
IV of this subchapter," meaning U.S. Code Title 8, chapter 12, subchapter II, part IV.  These two

27  sets of statutes—"chapter 4" and "part IV"—are not coextensive, but the differences are not material
here, because neither set includes the asylum statute.  Because the enacted text trumps the "changed"

28  version in the U.S. Code, *Moreno Galvez*, 52 F.4th at 830, Plaintiffs refer to the relevant provisions
as those in "chapter 4."

1   2020) (detainer policy, *see* 8 U.S.C. § 1357(d)); *Gonzales v. DHS*, 508 F.3d 1227, 1233 (9th Cir.

2   2007) (adjustment-of-status policy, *see* 8 U.S.C. § 1255); *Florida v. Mayorkas*, 2023 WL 3398099,

3   at *6 (N.D. Fla. May 11, 2023) (parole policy, *see* 8 U.S.C. § 1182(d)(5)).  Defendants argue that

4   even though the asylum statute is outside chapter 4, § 1252(f)(1) still bars relief because asylum

5   rules are applied as part of the removal process, and so an injunction of an asylum policy will have

6   collateral effects on removal.  Opp. 32-33.  The Ninth Circuit has squarely rejected that position.  In

7   *Gonzales*, it explicitly held that such "collateral effect[s]" on the removal system do not trigger

8   § 1252(f)(1).  508 F.3d at 1233.  And in *Catholic Social Services, Inc. v. INS* the Ninth Circuit

9   upheld an injunction that expressly barred removals, even though the removal statutes are in chapter

10   4, *see* 8 U.S.C. § 1231(a)(5) (reinstatement); *id.* § 1231(a)(1) (execution of removal orders), because

11   the effect on removal was a downstream consequence of enjoining a *non*-chapter-4 policy regarding

12   adjustment of status.  *Catholic Social Servs.*, 232 F.3d 1139, 1145, 1149-50 (9th Cir. 2000) (en

13   banc); *see Gonzales*, 508 F.3d at 1233 (reaffirming this rule); *Al Otro Lado*, 2022 WL 3142610, at

14   *23 (applying this rule).  The Supreme Court left this rule undisturbed in *Aleman*, stating that it was

15   not addressing the "proposition that a court may enjoin the unlawful operation of a provision *that is*

16   *not specified in § 1252(f)(1)* even if that injunction has some collateral effect on the operation of a

17   covered provision."  *Aleman*, 142 S. Ct. at 2067 n.4 (emphasis in original) (citing *Gonzales*).

18          Apart from being foreclosed by precedent, the government's position—that any collateral

19   effect on removal proceedings triggers § 1252(f)(1)—would write the limiting language out of the

20   statute's text and enormously expand its reach.  Dozens if not hundreds of the INA's substantive

21   rules come from outside of chapter 4, and most of them could have a collateral effect on removal

22   proceedings, because they could affect a person's removability.  *See, e.g.*, 8 U.S.C. § 1153

23   (immigrant visas), § 1182 (inadmissibility grounds), § 1184 (admission of nonimmigrant), § 1187

24   (temporary admission), § 1255 (adjustment of status), §§ 1421-1427 (naturalization), § 1481

25   (denaturalization).  On the government's theory, these non-chapter-4 provisions would be covered

26   by § 1252(f)(1), even though its text is limited to "chapter 4."  If that were true, Congress could

27   have erased "chapter 4" and simply written that courts could not "enjoin or restrain the operation of

28

26

1   the provisions ~~of chapter~~ 4 of title II" of the INA.  *See Advocate Health Care Network v. Stapleton*,

2   581 U.S. 468, 477-78 (2017) (refusing to interpret statute "as if it were missing [] two words").

3         The government's only remaining contention is that even if the Court can vacate the Rule's

4   eligibility bar, it cannot vacate the Rule's separate expedited and regular removal procedures.  Opp.

5   32 (citing 88 Fed. Reg. at 11,724 and 8 C.F.R. §§ 208.33(b), 1208.33(b)).  Besides being wrong, it

6   is irrelevant, because if the Court vacates the eligibility bar, the Rule's tag-along procedures for

7   applying the bar have "no independent effect" whether or not they are separately vacated.  *EBSC*

8   *Entry PI*, 354 F. Supp. 3d at 1121 n.22.

9   **VI.    The Court Should Vacate the Rule in Full.**

10         **A.  The Court Should Reject the Government's Novel Request for Partial Vacatur.**

11         Defendants' argument that the Court may vacate the Rule only as to Plaintiffs is foreclosed

12   by Ninth Circuit precedent.  *See EBSC Entry Ban*, 993 F.3d at 681 ("Because of the broad equitable

13   relief available in APA challenges, a successful APA claim by a single individual can affect an

14   'entire' regulatory program.").  Other courts have reached the same conclusion.  *E.g.*, *Nat'l Mining*

15   *Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) ("[W]hen a reviewing

16   court determines that agency regulations are unlawful, the ordinary result is that the rules are

17   vacated—not that their application to the individual petitioners is proscribed.") (quotation omitted);

18   *City & Cnty. of S.F. v. Azar*, 411 F. Supp. 3d 1001, 1025 (N.D. Cal. 2019) ("All of the courts that

19   have been presented with the possibility of such a remedy have rejected it."); *O.A. v. Trump*, 404 F.

20   Supp. 3d 109, 153 (D.D.C. 2019).  The government's cases all involved *injunctive* relief, which, as

21   explained above, is different from vacatur.  *See Gill v. Whitford*, 138 S. Ct. 1916 (2018); *Madsen v.*

22   *Women's Health Ctr., Inc.*, 512 U.S. 753 (1994); *Trump v. Hawaii*, 138 S. Ct. 2392 (2018).[14]

23         **B.  Remand Without Vacatur Is Not Warranted.**

24         "[V]acatur . . . normally accompanies a remand," unless "equity demands" that a regulation

25   be "left in place while the agency reconsiders."  *All. for the Wild Rockies v. United States Forest*

---

[14] The government invokes severability, but does not explain which provisions it would sever from the rest.  Opp. 33.  In any event, the possibility of severability has never prevented courts from vacating illegal rules.  And because each requirement in the Rule is illegal, unsafe, and inaccessible, vacatur of each provision is necessary to provide complete relief to Plaintiffs.

1    *Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018) (emphasis removed).   In considering a departure from

2    this default remedy, courts evaluate "the seriousness of the [rule]'s deficiencies (and thus the extent

3    of doubt whether the agency chose correctly) and the disruptive consequences" of vacating it.

4    *Humane Soc'y of United States v. Zinke*, 865 F.3d 585, 614 (D.C. Cir. 2017).   For a court to remand

5    without vacatur, the deficiencies must be of the sort that "can be redressed on remand," such as a

6    "mere failure in explanation."   *Ctr. for Biological Diversity v. Ross*, 480 F. Supp. 3d 236, 245

7    (D.D.C. 2020).   These factors heavily support vacatur.   *See O.A. v. Trump*, 404 F. Supp. 3d 109,

8    152-53 (D.D.C. 2019) (vacating entry ban on statutory grounds); *CAIR Coalition v. Trump*, 471 F.

9    Supp. 3d 25, 55 (D.D.C. 2020) (vacating transit ban on procedural violation alone).

10         Here, the Rule's numerous serious deficiencies cannot be remedied on remand.   The Rule's

11   statutory conflicts obviously cannot be cured.   *See NRDC v. EPA*, 571 F.3d 1245, 1276 (D.C. Cir.

12   2009) (denying remand for this reason); *Humane Soc'y of the United States v. Jewell*, 76 F. Supp.

13   3d 69, 137 (D.D.C. 2014) (same), *aff'd sub nom. Humane Soc'y of United States v. Zinke*, 865 F.3d

14   585 (D.C. Cir. 2017).   And the defects in the agencies' reasoning are "serious and pervading"—they

15   go to the very "heart" of the agencies' choice to adopt the Rule—because they involve the Rule's

16   core justifications and its consistency with the record.   *Id.* at 614-15; *see Ill. Pub. Telecomms. Ass'n

17   v. FCC*, 123 F.3d 693, 693 (D.C.Cir.1997) (practice is "ordinarily to vacate the rule" where it is

18   unlikely to be "readopted upon the basis of a more adequate explanation").   The agencies could not

19   reach the same result on remand, as doing so would require transforming the record facts and

20   abandoning the Rule's main rationales.   *See Humane Soc'y of United States*, 865 F.3d at 614-615;

21   *Stewart v. Azar*, 313 F. Supp. 3d 237, 272-73 (D.D.C. 2018) (vacating for failure to consider an

22   important aspect and collecting cases).

23         The disruption prong likewise supports vacatur.   It is *the Rule* that upends forty years of

24   asylum law.   Leaving it in place during remand would substantially harm the plaintiff organizations,

25   their clients, and thousands of other people seeking asylum who will be removed to danger or face

26   grave harms in Mexico as they wait for CBP One appointments.

27         These harms have only increased since the Rule's effective date.   *See* Opp. 34-35 (relying

28   on post-implementation facts).   Asylum seekers continue to wait "for weeks or months before

receiving an appointment." Paredes Decl., Ex. A at 3; *accord id.*, Ex. B at 3. Those waiting continue to endure "unstable living conditions and security risks in Mexican border cities" where "Black, LGBTQ+, Indigenous, and non-Spanish-speaking asylum seekers have faced targeted discrimination." *Id.*, Ex. A at 3; *see also id.*, Ex. D at 2-3.

Meanwhile, only a tiny percentage of people are allowed to present at ports of entry without CBP One appointments in hopes of meeting an exception. Mexican officials strictly limit the number of those without appointments they let reach the ports, permitting as few as 15 people per day in some locations. *Id.*, Ex. A at 3-11. U.S. border officials also regularly turn away those who do manage to reach the ports without appointments, telling them that CBP One is "the only way to request asylum." *Id.*, Ex. C at 7, 8; *accord id.*, Ex. D at 2. Even people seeking exceptions for urgent medical needs or threats of rape or murder have had to wait "for over two weeks" because so few people without CBP One appointments are processed. *Id.*, Ex. B at 3; *see also id.*, Ex. D at 3. Thus, despite Defendants' suggestions otherwise, *e.g.,* Opp. 24, many people without CBP One appointments are unable to seek exemptions. Paredes Decl., Ex. C at 7; *see also id.*, Ex. D at 3.

Thousands who request asylum without meeting one of the conditions are being barred from asylum and removed despite credible claims of persecution. *Cf. Nken*, 556 U.S. at 436 (noting in stay context the "public interest in preventing [noncitizens] from being wrongfully removed, particularly to countries where they are likely to face substantial harm"). In recent pre-pandemic years, 83% of asylum seekers at the border were "screened in" by USCIS. That number has plummeted to just 46% under the Rule—the vast majority of whom were barred from asylum and screened for withholding and CAT protection under a higher standard. Nuñez-Neto Decl. ¶ 15-16. Extrapolating from the government's data suggests that around 2,450 people with likely viable asylum claims—30% of those screened—were wrongfully ordered removed just in the Rule's first month.[15] And "thousands more" currently face the same fate. *Id.*

---

[15] 950 people met an exception, of whom 717 (75.5%) screened in under the credible fear standard. Nuñez-Neto Decl. ¶ 16. Had the 7,243 people barred by the Rule faced that same low standard and passed at the same rate, 5,468 of them would have screened in. That's 2,450 more than the 3,036 barred people who actually screened in under the Rule's higher standard. The roughly 2,450 people screened out due the Rule amounts to 30% of the 8,195 interviewed. *See id.*

1    By contrast, the government does not demonstrate that the disruption it alleges would be so

2    "substantial as to outweigh the serious substantive errors" in the Rule. *Humane Soc'y of the United*

3    *States*, 76 F. Supp. 3d at 137. The government predicts a spike in encounters if the Rule is vacated,

4    Nuñez-Neto Decl. ¶¶ 14, 25; *see also, e.g.*, 88 Fed. Reg. at 31,316, 31,335 (similar), but the evidence

5    does not support its inflated forecast. First, the government makes no effort to isolate *the Rule's*

6    effect on encounters from the effect of returning to normal Title 8 processing. Under Title 42, there

7    were no legal consequences from expulsion to Mexico—those expelled could simply cross again,

8    *id.* ¶ 7—and so Title 42 strongly incentivized people to repeatedly enter between ports. *See* Br. for

9    Federal Respondents at 4, *Huisha-Huisha v. Mayorkas*, No. 22-592 (S. Ct. Feb. 7, 2023). Under

10   Title 8, by contrast, people can request asylum at ports, reducing the incentive to enter between

11   ports. And those who do not establish credible fear are removed to their home countries and face a

12   5-year bar to reentry, as well as the risk of criminal prosecution for unlawful reentry. The

13   government does not show that these different consequences are insufficient to maintain lower post-

14   Title 42 encounter levels. In fact, its sources instead show that it was "penalties *under Title 8*" that

15   encouraged people to enter between ports before the end of Title 42 and not after. *See* Nuñez-Neto

16   Decl. ¶ 22 (emphasis added). Nor does the government disaggregate the impact of regional partners

17   simultaneously "undertak[ing] their own measures" to "reduc[e] migratory flows." *Id.* ¶ 14.

18   The government's prediction about vacatur relies heavily on its undisclosed model, but the

19   model's assumptions appear contradictory and unreliable. According to the government, the model

20   predicts that a return to Title 8 processing would cause encounters to return to the same heightened

21   levels that occurred in the days just before the end of Title 42. *Id.* ¶¶ 4, 25. But it makes no sense

22   to assume that encounters would be the same under Title 42 and Title 8, given their differing

23   incentives. And it is especially strange to assume that Title 8 numbers would match the anomalously

24   high numbers that occurred because people wanted to enter *before* Title 42 ended to avoid Title 8's

25   harsher consequences. The government's "planning models" and extrapolations thus provide little

26   support for its predictions about vacatur. *Id.*

**CONCLUSION**

28   The Court should grant summary judgment to Plaintiffs and vacate the Rule.

30

1

Dated: June 23, 2023

2

Lee Gelernt*
Omar Jadwat*
Anand Balakrishnan**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
*lgelernt@aclu.org*
*ojadwat@aclu.org*
*abalakrishnan@aclu.org*

3

4

5

6

7

8

Melissa Crow*
CENTER FOR GENDER & REFUGEE
STUDIES
1121 14th Street, NW, Suite 200
Washington, D.C. 20005
T: (202) 355-4471
F: (415) 581-8824
*crowmelissa@uchastings.edu*

9

10

11

12

13

Anne Peterson (SBN 258673)
Blaine Bookey (SBN 267596)
Julie Bourdoiseau (SBN 340462)
Karen Musalo (SBN 106882)
CENTER FOR GENDER & REFUGEE
STUDIES
200 McAllister Street
San Francisco, CA  94102
T: (415) 610-5729
F: (415) 581-8824
*petersonanne@uchastings.edu*

14

15

16

17

18

19

Robert Pauw**
CGRS Cooperating Attorney
GIBBS HOUSTON PAUW
1000 Second Avenue, Suite 1600
Seattle, WA  98104
T: (206)682-1080
F: (206)689-2270
*rpauw@ghp-law.net*

20

21

22

23

Respectfully submitted,

/s/ Katrina Eiland
Katrina Eiland (SBN 275701)
Morgan Russell (SBN 296137)
Spencer Amdur (SBN 320069)
Oscar Sarabia Roman (SBN 341385)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-1198
F: (415) 395-0950
*keiland@aclu.org*
*mrussell@aclu.org*
*samdur@aclu.org*
*osarabia@aclu.org*

Keren Zwick*
Richard Caldarone*
Colleen Cowgill (SBN 321542)
Mary Georgevich*
NATIONAL IMMIGRANT JUSTICE
CENTER
224 S. Michigan Ave., Suite 600
Chicago, Illinois 60604
T: (312) 660-1370
F: (312) 660-1505
*kzwick@heartlandalliance.org*
*rcaldarone@heartlandalliance.org*
*ccowgill@heartlandalliance.org*
*mgeorgevich@heartlandalliance.org*

Michelle (Minju) Y. Cho (SBN 321939)
AMERICAN CIVIL LIBERTIES UNION OF
NORTHERN CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
T: (415) 621-2493
F: (415) 255-1478
*mcho@aclu.org*

24

25

*Attorneys for Plaintiffs*

26

*\*Admitted Pro hac vice*

27

*\*\* Application for pro hac vice admission
forthcoming*

28

31