# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| East Bay Sanctuary Covenant, *et al.*,<br><br>    *Plaintiffs*,<br><br>    v.<br><br>Joseph R. Biden, President of the United States, *et al.*,<br><br>    *Defendants*. | Case No.: 18-cv-06810-JST |

## PLAINTIFFS' SUPPLEMENTAL APPENDIX

The following documents are supplemental excerpts of the administrative records cited in support of Plaintiffs' concurrently-filed reply in support of their motion for summary judgment and opposition to Defendants' cross motion for summary judgment.

### INDEX OF "CLP_AR" DOCUMENTS

|  | Title | Page Number |
|---|---|---|
| 1. | Comprehensive Regional Protection and Solutions Framework, *MIRPS National Action Plan: Belize, Costa Rica, El Salvador, Guatemala, Honduras, Mexico, Panama* | CLP_AR_0005009-32 |
| 2. | Creative Associates, *Saliendo Adelante: Why Migrants Risk It All* (Sept. 2019) | CLP_AR_0005077-88 |
| 3. | Inter-Agency Coordination Platform for Refugees & Migrants from Venezuela, *Regional Refugee and Migrant Response Plan Jan. 2023-Dec. 2024* [Colombia & Ecuador] (Nov. 30, 2022) | CLP_AR_0006307-53 |

### INDEX OF "CLP_PC" DOCUMENTS

|  | Title | Page Number |
|---|---|---|
| 1. | Diego Fernandez-Pages Public Comment (Mar. 7, 2023) | CLP_PC_003999-4002 |
| 2. | American Immigration Lawyers Association and American Immigration Council Public Comment (Mar. 26, 2023) | CLP_PC_020712-38 |
| 3. | Brooklyn Defender Services Public Comment (Mar. 27, 2023) | CLP_PC_021450-70 |
| 4. | U.S. Dep't of State, Nicaragua 2021 Human Rights Report (Apr. 2022) | CLP_PC_024058-104 |
| 5. | U.S. Dep't of State, Panama 2021 Human Rights Report (Apr. 2022) | CLP_PC_024113-43 |
| 6. | International Refugee Assistance Project Public Comment (Mar. 27, 2023) | CLP_PC_031200-32 |
| 7. | American Gateways Public Comment (Mar. 27, 2023) | CLP_PC_031496-518 |
| 8. | U.S. Dep't of State, Mexico Travel Advisory (Oct. 5, 2022) | CLP_PC_033467-79 |

# **MIRPS** NATIONAL ACTION PLAN

## BELIZE
## COSTA RICA
## EL SALVADOR
## GUATEMALA
## HONDURAS
## MEXICO
## PANAMA



**MIRPS**

**Comprehensive Regional Protection and Solutions Framework**

Addressing forced displacement in Central America and Mexico

CLP_AR_005009



# INDEX

National Plans **Objectives** ..................................................................3

National Plan in **Belize** ....................................................................4

National Plan in **Costa Rica** ......................................................... 6

National Plan in **El Salvador** ....................................................... 9

National Plan in **Guatemala** .......................................................12

National Plan in **Honduras** ...........................................................15

National Plan in **Mexico** ...............................................................18

National Plan in **Panama** ...............................................................21

# NATIONAL PLANS **OBJECTIVES**

- Improve **mechanisms for reception and admission**
- Respond to immediate and persistent **humanitarian and protection needs**
- Support **host countries and communities**
- Enhance **opportunities for durable solutions**

## FOCUS AREAS:



**PROTECTION**

**JOBS AND LIVELIHOODS**

**SOCIAL PROTECTION**

**EDUCATION**

**HEALTH**

## COMMITMENTS BY COUNTRY

**BELIZE · COSTA RICA · EL SALVADOR · GUATEMALA · HONDURAS · MEXICO · PANAMA**

CLP_AR_005011

3

# **MIRPS** NATIONAL ACTION PLAN IN
# BELIZE

## 10 TOTAL COMMITMENTS
FOCUS AREAS:



**PROTECTION**
**7 COMMITMENTS**



**JOBS AND
LIVELIHOODS**
**2 COMMITMENTS**



**EDUCATION**
**1 COMMITMENT**

Committed to a comprehensive refugee response, Belize has been improving standard operating procedures for identification, reception and referral of refugees, while simultaneously upgrading the quality of refugee status determination processes. Effects of the current pandemic however have created obstacles, delaying envisioned progress. Similar delays have occurred in advancing sustainable solutions in the livelihoods sector as negative socioeconomic fall-out from the pandemic has limited the absorption capacity of the formal and informal economies. Within its recovery plan, Belize has identified Technical Vocational Education and Training, when adopting new transformational vocations, as key instrument for creating new growth industries, while possessing sufficient potential to rebuild Belize's economy and to include young refugees, migrants and vulnerable nationals in delivering individual and common benefits.

 **Comprehensive Regional Protection and Solutions Framework** Addressing forced displacement in Central America and Mexico



##  PROTECTION

- Capacity building for all relevant Government authorities, delivering Standard Operating Procedures for POC referral
- Provision of information to POC in relation to admission to territory and asylum processes
- Provision of public information campaigns, to sensitize the general population about the reality of refugees in Belize
- Improved comprehensive data collection (applications; admissions; rejections) and analysis System
- Consideration of participation in the Quality Assurance Initiative (QAI) for strengthening of the asylum process
- Exchange of information with MIRPS States on best practices and mechanisms of responsibility sharing

##  EDUCATION

- Support to comprehensive knowledge-, skills-, and livelihood-based integration opportunities

##  JOBS AND LIVELIHOODS

- Collaboration with international community in relation to improved opportunities for refugee integration
- Optimize internal coordination, ensuring that asylum-seekers access all social services to which they are entitled
- Mapping and data collection exercises on POC and host communities to create evidence for inclusion in national plans

# **MIRPS** NATIONAL ACTION PLAN IN
# **COSTA RICA**

## **32 TOTAL COMMITMENTS**
## FOCUS AREAS:









**PROTECTION**
**11 COMMITMENTS**

**JOBS AND
LIVELIHOODS**
**4 COMMITMENTS**

**SOCIAL
PROTECTION**
**12 COMMITMENTS**

**EDUCATION**
**5 COMMITMENTS**

Costa Rica stands on a long tradition of providing asylum and protection to refugees and asylum seekers. However, its national asylum system is under pressure as a result of displacement situations in the region, particularly Nicaragua. The country hosts approximately 100,891 persons in need of international protection, this figure represents 2% of Costa Rica total population. Out of that number 90,891 are asylum seekers (mostly Nicaraguans) and 9,801 refugees.

Through the implementation of its national chapter Costa Rica increased the overall recognition rate of refugees from 21% (2019) to 49% in 2020.  Similarly, the Refugee Unit opened an office in the northern border to ensure access to the national asylum system. The access to state-run social services extended to include asylum seekers and refugees on an equal standing with nationals and provided medical insurance to 6,000 refugees and asylum seekers in high vulnerability.

Despite these efforts, the pandemic has aggravated the challenges to respond to this population, including extended claim processing times, loss of livelihoods, economic hardships, and xenophobia.  In response to this scenario, the  national technical team quantified and developed three concept notes on key sectors that include social assistance services, health services and the access to the national asylum system for refugees and asylum seekers

 **Comprehensive Regional Protection and Solutions Framework**
Addressing forced displacement in Central America and Mexico

# COSTA RICA

 ## PROTECTION

- Presence at the border: Strengthen the agreement that exists between the DGME and UNHCR to maintain the current presence of personnel at border migration posts in Peñas Blancas, Los Chiles and Tablillas in the north, Paseo Canoas in the south; as well as extend it with at least one person in the ports of Golfito, Limón, Caldera and in both international airports

- Regionalization of the Shelter Unit: Advance in the regionalization of the Shelter Unit in Upala, Liberia, Paso Canoas and Limón to decentralize the functions of this Unit

- Strengthening CATEM: Ensure the allocation of funds for the maintenance of the infrastructure, equipment and administration of CATEM as a good regional practice as an alternative to administrative detention

- Promote national or international public-public and/or public-private alliances for fundraising and response to the needs for legal assistance and sponsorship for applicants in procedures for determining refugee status

- Project for the prevention of delays: Project for the prevention of delays: Increase the number of specialized officers in refuge matters, in at least 6 people for each of the instances

- Strengthening the CVRR: Assign a full-time Specialized Legal Advisor to each Commissioner, by the respective Ministries in order to assist in the review of files received by the Unit of Shelter, and in the elaboration of draft resolutions of the CVRR

- Modernization of the TAM: Establish the Migratory Administrative Court (TAM) with two specialized administrative sections: one for refuge matters and another in immigration.

- Documentation for refuge applicants: Submit the provisional identification document with DIMEX numbering and temporary work permit at the time of filing the application for the condition of refugee.

- Maintain no-cost documentation for the applicants for refugee status and reduce the cost of documentation for refugees

- Guarantee the non-refoulement principle: Establish complementary protection or other mechanisms to guarantee the non-refoulement principle for people who do not meet the requirements to be recognized as refugees but should not be returned to their country of origin, because of reasonable risk of suffering harm

- Adaptation of the RSD Procedures for people with disabilities: CONAPDIS will advise the DGME to develop a mechanism to assist asylum-seekers with cognitive, physical or sensory disabilities during the refugee status determination procedures

## EDUCATION

- Flexible requirements for academic training: The INA will develop an alternative mechanism to check the academic requirements and / or the matching of technical skills of refugees who want to enter technical training courses. Likewise, it will carry out joint actions with the private sector for the promotion of learning internships and the certification of competencies through dual training opportunities

- Provision of alternative evidence for the recognition of academic degrees: CONARE will incorporate the Consular Section of the Ministry of Foreign Affairs to the agreement of understanding with UNHCR for the provision of alternative evidence for the formalization of the application for recognition of academic degrees and professional degrees in country of origin in favour of refugees

- Technological Literacy Project: The Ministry of Culture, IMAS and the Ministry of Science and Technology will promote the technological literacy of asylum-seekers and refugees through literacy activities of the National Library System (SINABI) and the National Strategy of Costa Rica Digital (access to equipment)

- Project for the recognition of the contributions of the population to the culture of the host communities: The Ministry of Culture and Youth will strengthen the information and training processes of the cultural advisors of the local governments that are carrying out activities with population of interest, to promote the recognition of refugees to the cultural dynamics of the host communities

- Refuge children in the SINEM project: The National Music Education System (SINEM) will give free access to refuge minors to music education processes, including free access to musical instrument



**Comprehensive Regional Protection and Solutions Framework**
Addressing forced displacement in Central America and Mexico

# COSTA RICA

## JOBS AND LIVELIHOODS

- Employment opportunities for LGTBI populations: The Ministry of Human Development and Social Inclusion, in coordination with the Costa Rican Chamber of Commerce and with the support of UNHCR, will develop a training and job placement program for refugees from LGBTI communities

- Digital Consultation initiative for Work Permits: The DGME, in coordination with the Ministry of Labour and Social Security and the support of UNHCR, will create a digital consultation mechanism that allows refugees to certify the validity of their work permit to potential employers

- Intermediation for the inclusion for refugees in the labour market: (a) The Ministry of Labour and Social Security will provide effective access to labour intermediation programs such as www.buscoempleo.go.cr, EMPLEATE Program, My First Job and PRONAE 4x4, in addition to the micro-enterprise support programs. (b) The National Labour Inspectorate will consider refugee persons in its procedures with the objective of ensuring that their labour rights and employer obligations are recognized on equal terms as nationals. (c) Informative actions will also be carried out on current legislation to improve the recognition of ID documents and reduce discrimination and xenophobia during recruitment and selection processes

- Project for the promotion of entrepreneurship: The Ministry of Economy, Industry and Commerce will include ventures led by refugees in the Entrepreneurs Registry and will encourage their participation in business meetings and other activities organized by the Ministry to strengthen micro and small businesses

## SOCIAL PROTECTION

- Inclusion of a category of "refugee or asylum-seeker" in the Social Information Sheet: The Ministry of Human Development and Social Inclusion will instruct all institutions of the social sector and the National Registration System of Beneficiaries (SINIRUBE) to include the categories in their information sheets

- Protocols for refugee assistance in the social sector: The Ministry of Human Development and Social Inclusion will provide technical support to all institutions in the social sector to establish protocols that allow the standardization of the assistance provided to refugees and asylum-seekers, and for the implementation of internal awareness processes that guarantee the application of these protocols at all levels within the institution

- National programmes for the reduction of poverty: The Ministry of Human Development and Social Inclusion will include refugees and asylum-seekers in the poverty reduction programmes implemented by the Institute of Social Assistance

- Protocol for the attention of refugee women: INAMU together with the DGME, PANI and UNHCR will develop a protocol for the assistance of women, adolescent mothers and victims of gender-based violence that allows the coordination and attention of refugees and asylum-seekers cases in Costa Rica; this will include women in Attention Centres

- Protocol for the protection and attention of refugee children: The PANI, with support from UNHCR and DGME, will update the Protocol for the protection and attention of refugee children following international standards. The protocol shall include actions for the protection of unaccompanied or separated children and at risk of Statelessness

- Fund for DNA testing: The PANI will develop a project for the creation of a fund for DNA testing for refugee families or asylum-seekers, to be used when in doubt of the filial link to prevent trafficking or other type of activities that affect children

- Protocol for the elderly refugee population: The Ministry of Human Development and Social Inclusion in coordination with CONAPAM will manage the development of a specialized protocol for the attention of elderly refugee populations, allowing access to public services and the right to health

- Protocol for the attention of refugees with problematic use of psychoactive substances: The IAFA will develop a protocol for the attention of refugee population in recovery centres for people with addition and under the supervision of the Institute

- Solidarity networks for refugees: The Ministry of Human Development and Social Inclusion, with the collaboration of UNHCR, will promote the participation of civil society in the attention of refugees through research and professional practice initiatives with public and private universities

- Methodology for the quantification of the state's contribution to refugees: The Ministry of National Planning and Economic Policy (MIDEPLAN), with technical support from the OECD, will develop a methodology for quantifying the state's contribution on refugees. Formulation, validation and implementation of a system of simultaneous generation of actual data on financial gaps to cover all the programmes available for refugees and asylum-seekers. Also, training for officers at institutional levels for the optimal use and analysis capacity that facilitates decision-making and the collection of resources in international cooperation

- MINARE permanent team: The MINARE Technical Team will be a permanent mechanism for monitoring, evaluation and fundraising that ensures the sustainability of the MINARE's implementation. The team will be coordinated by the Ministry of Governance and Police through monthly meetings. UNHCR will participate as a technical secretariat

- Temporary housing program: The Ministry of Housing and Human Settlements (MIVAH) will look for ways to incorporate asylum-seekers into their services in order to facilitate a housing solution, with an inclusive approach

CLP_AR_005016

8

# **MIRPS** NATIONAL ACTION PLAN IN
# EL SALVADOR

## 49 TOTAL COMMITMENTS
## FOCUS AREAS:






**PROTECTION**
27 COMMITMENTS

**JOBS AND LIVELIHOODS**
10 COMMITMENTS

**EDUCATION**
5 COMMITMENTS

**HEALTH**
7 COMMITMENTS

Since joining the MIRPS, El Salvador is highly committed to address forced displacement, defining a comprehensive National Action Plan that involves 7 line-ministries. Despite challenges posed by Covid-19, during 2020 the country managed to advance more than 15 commitments, particularly in the areas of protection and education, including the IDP Law approval, hiring and specialized training of staff, adequation of a shelter, enhancement of asylum capacity, definition of a roadmap for the protection of displaced children and adolescents in the education system, among others. During 2021, efforts will be focused in the areas of education, health, and livelihoods / jobs, as priorities to reduce greater vulnerability of POC, as well partnership-building with relevant cooperation actors to cover gaps and reach goals.

 Comprehensive Regional
Protection and Solutions Framework
Addressing forced displacement in Central America and Mexico

# EL SALVADOR

 **PROTECTION**

- Creation and installation of shelters and shelters to serve internally displaced persons and deported persons in need of protection (with a focus on the family unit); that have adequate protocols for their management.

- Training of personnel in specialized legal assistance (economic, social and cultural rights), and on the protection of property and assets for populations of interest

- Review and update of existing protocols and roadmaps in the GAMI to include specialized care for vulnerable populations (children and adolescents, women, families, LGBTI population, persons with disabilities, elderly).

- Implementation of the single migratory registry by all institutions in the GAMI; design and implementation of a module on protection, to strengthen the identification and management of cases of deportees with protection needs (children and adolescents, women, families, LGBTI population, people with disabilities, elderly).

- Establishment of a training plan for the GAMI personnel, which fills the identified needs with the involvement of competent institutions according to their expertise.

- Creation, printing and dissemination of informative material on the services available in the GAMI.

- Training processes on the identification of people with protection needs, for the consular networks in Mexico, the United States and Guatemala.

- Design of a protocol for the identification and assistance of people with protection needs outside the country, including roadmaps for the direct linkages with national services.

- Conduct training on international protection and Refugee Status Determination for DGME officers and child protection institutions at the borders and in other institutions involved.

- Strengthen the CODER Secretariat and Subcommittee, and increase their capacities for the analysis and resolution of applications.

- Design and disseminate educational materials on Refugee Status Determination in El Salvador.

- Establish a document that certifies that a person has started the Refugee Status Determination and is awaiting for a resolution.

- Review and update the protocol for the assistance for internally displaced persons, establishing roadmaps according to specific profiles and their needs, for monitoring cases and mapping existing services.

- Establish a specialized unit for displaced populations with technical teams trained to attend to those with different profiles within the DAV.

- Creation of the Single Registration of displaced populations and people at risk of forced displacement, carrying out annual statistical analyses.

- Update the study on internal displacement profiling.

- Develop studies and analyses on the types of dispossession of property and housing; analyse the legal, regulatory and institutional framework to propose possible protection actions

- Identify spaces for the installation of shelters for asylum-seekers

- Design and implement a strategy with a community approach, for monitoring protection services at local offices

- Design and implement contingency plans at the municipal level to generate early alerts and responses to forced displacement.

- Strengthen the community approach of local offices through interinstitutional and intersectoral coordination.

- Present the project for the creation of a Special Law for the Attention of Populations At-Risk of Forced Displacement and other regulatory frameworks that provide greater protection for internally displaced persons.

- Coordinate with COMURES for the elaboration of guidelines and principles related to the implementation of policies and roadmaps for the attention on forced displacement at the local level, to boost the participation of local governments in the response.

- Promote the development of a policy for the attention, protection and solutions for internally displaced persons at the national and local levels.

- Present the Law initiative for the granting of "International Protection and Statelessness". Integration of the refugee population in El Salvador.

- Encourage the creation of spaces for dialogue, participation and consultation between the central and local government and the forcibly displaced population to promote their participation in the design of local, municipal or departmental plans or policies for comprehensive care.

- Promote, together with the municipalities, the creation or adjustment of mechanisms, programs, plans or local, municipal or departmental policies for humanitarian assistance and reception for internally displaced persons in prioritized municipalities that have a greater number of displaced population or at risk of being displaced.

 **Comprehensive Regional Protection and Solutions Framework**
Addressing forced displacement in Central America and Mexico
MIRPS

# EL SALVADOR

 ## EDUCATION

- Develop and implement an internal roadmap for the protection of displaced children and adolescents, and for at-risk teachers.
- Inclusion of variable on school dropout due to displacement in the SIGES NID SYSTEM, to get reliable information on the magnitude of the impact on the educational community.
- Include courses on forced displacement caused by violence, and on primary psychological attention, in the training programmes for teachers.
- Implement psychosocial care programs to mitigate the impact of violence, with children and adolescents in contexts of social violence and at risk of dropping out of school.
- Design and implement an educational strategy in schools, to raise awareness on the inclusion of displaced children and adolescents.

## JOBS AND LIVELIHOOD

- Design campaigns to inform and raise awareness on the rights of displaced populations and existing services
- Disseminate information to raise awareness in governmental institutions and the private sector about the rights and issuance of identity documents for asylum-seekers and refugees.
- Prioritize displaced and at-risk women and youth in employment rosters
- Strengthen and coordinate the Roundtable for Labour Insertion, and coordinate with different LGBTI associations and INSAFORP for the technical training of populations of interest.
- Awareness campaign with the private sector to promote the recruitment of LGBTI population.
- Expand and strengthen the entrepreneurship programme to support and sponsor displaced persons, asylum-seekers and deportees with protection needs.
- Create a Specialized Centre that promotes technical and vocational programs, access to tertiary education, livelihoods, and labour insertion (in coordination with the private sector) for displaced populations.
- Promote a programme for skills training for displaced populations.
- Design of a local integration model for refugees and asylum-seekers that includes legal, economic and social actions.
- Dissemination of the new Migration and Foreigners Law for the population nationwide

## HEALTH

- Design and implement information and awareness campaigns on the right of access to health for displaced persons, deportees in need of protection, refugees and asylum seekers.
- Preparation of a specialized protocol for comprehensive health care (medical and psychosocial) for displaced persons, deportees in need of protection, refugees and asylum seekers.
- Provide specialized training to health system officials on psychological, psychiatric and psychosocial care for people affected by forced displacement (internally displaced people, deportees in need of protection, refugees and asylum seekers).
- Coordinate comprehensive mobile care (Medical and psychosocial) for health services in shelters and reception areas to care for displaced people, deported people in need of protection, refugees and asylum seekers.
- Design a model of psychological / psychosocial care for people affected by violence (internally displaced people, deportees in need of protection, refugees and asylum seekers).
- Design indicators of internal forced displacement for inclusion in the MINSAL Information System for the analysis of the impact on health of internally displaced persons, as an input for the design of programs and interventions.
- Include within its policies and protocols of comprehensive health care (direct medical care, psychosocial care, care for chronic diseases, special health conditions) to guarantee the continuity of care and access to specific medicines for displaced people, deported people in need of protection, refugees and asylum seekers, without discrimination.

CLP_AR_005019

# **MIRPS** NATIONAL ACTION PLAN IN
# GUATEMALA

## 30 TOTAL COMMITMENTS
FOCUS AREAS:



**PROTECTION**
19 COMMITMENTS



**JOBS AND
LIVELIHOODS**
8 COMMITMENTS



**EDUCATION**
2 COMMITMENTS



**HEALTH**
1 COMMITMENT

The purpose of the National Action Plan is to provide a comprehensive response to persons with protection needs, among the results obtained in its implementation, is the strengthening of the capacities of government institutions,   as well as the improvement in the procedure of registration and resolution of asylum seekers and alliances between the public and private sectors about the importance of formal employment when it comes to equality of opportunities for vulnerable groups. Guatemala has prioritized working in the protection, jobs and livelihood sectors, the expected results for this year are the labour inclusion of asylum-seekers  and refugees, improve the protection for children and adolescents especially in border areas and the creation of decent and specialized shelters for the care of persons in need of international protection. To achieve the expected results, it is necessary to expand resources to complement state efforts.



# GUATEMALA

 **PROTECTION**

- Strengthen the institutional capacity of the General Directorate of Migration / Guatemalan Institute of Migration, particularly those capacities related to attention and protection.
- Awareness raising and training of migration delegates, National Police, Army, Jurisdictional Bodies and border security personnel and airports in the field of international protection.
- Inclusion of refugee-related courses in the training programmes for authorities involved in the national protection systems, including information from the Migration Code, the Law for the Protection of Children and Adolescents, and other international protection measures and instruments.
- Prepare and update the regulations and protocols for attention and protection of refugees and asylum-seekers, in accordance with the Migration Code, including information on refugees and other measures taken by the Government, such as the humanitarian visa.
- Strengthen the awareness raising and training processes for border migration delegates on the identification of people with protection needs.
- Preparation and distribution of informative materials on access to refuge and other systems of international protection and care for migrants.
- Strengthening of the Reception Centres for the identification (in situ) of returned Guatemalan people with protection needs and victims of rights violations in the returning process.
- Training and awareness raising of officials who work with the migrant population, for a comprehensive approach, taking into account the age, gender and diversity of the people, with special attention to unaccompanied girls, boys and adolescents, women at risk, LGTBI population, victims trafficking, the elderly and people with different abilities.
- Strengthening the governing institutions for the protection of children and adolescents, especially in border areas.
- Develop the Regulation of the Migration Code for the continuity of the permit mechanism for people in transit, in order to ensure regular transit through the country.

- Design, create and implement a mechanism for registering cases and complaints about human rights violations against migrants in transit through Guatemalan territory.
- Create and/or improve adequate spaces with inter-view rooms that guarantee the confidentiality of the information of asylum-seekers, as well as specialized and friendly spaces for children and adolescents.
- Expand the staff of eligibility officers that process refugee applications at the General Directorate of Migration / Guatemalan Migration Institute.
- Start the creation of a multidisciplinary team for the international care and protection of refugees and refugee applicants.
- Preparation of a diagnosis for the creation of open shelters in decent conditions, specialized for the population with international protection needs, with specialized and trained teams.
- Restructure the Temporary Foster Care Program, for the care of returned girls, boys and adolescents in transit with international protection needs.
- Strengthen inter-institutional and intersectoral coordination to expand basic service options to refugees and refugees.
- Create the international protection mechanism in transit for people at high risk who need support for safe and regular access to countries of refuge (MINEX-UNHCR)
- Include in the Institutional Strategic Plans, Multiannual Plan and Annual Operational Plan the provision of basic services to people with international protection needs.

 **HEALTH**

- Strengthening of the Directorate for the Attention to Migrants of the Ministry of Public Health and Social Assistance.



 Comprehensive Regional Protection and Solutions Framework
Addressing forced displacement in Central America and Mexico

# GUATEMALA

 ## EDUCATION

- Negotiation and implementation of regional and international agreements for the recognition of study certificates with special attention to the specific needs and difficulties of refugees in presenting documentation from their countries of origin.
- Coordination of actions with local authorities and educational institutions throughout the country for the inclusion of children and young people into the national education system. These include awareness campaigns about the risks and consequences of the migration route; and the socialization of the guide for the attention of the student population on the move. Preparation and implementation of the roadmap for the attention of the Guatemalan migrant population in the process of accreditation and certification of labor competencies. Implementation and socialization of Ministerial Agreement 696-2017 which establishes "to validate the studies of deported Guatemalans who will continue their training in the National Educational System" (Agreement 696-2017 was repealed, by Ministerial Agreement 1753-2019 "Regulation of Equalization and Equivalences of studies at the levels of pre-primary, primary and secondary education, and in the subsystems of school and extracurricular education ")

## JOBS AND LIVELIHOOD

- Propose changes to the labour regulations to allow the access to work permits for refugees and asylum-seekers.
- Design awareness campaigns for the private sector and public officers on rights of refugees, especially on labour market and access to services (job fairs).
- Strengthening information campaigns for general public on labour rights and insertion of refugees and asylum-seekers.
- Prioritize the process and resolution of work permits requests for refugees and asylum-seekers.
- Facilitate access to Spanish language courses for refugee and refugee applicants.
- Create an intersectoral mechanism for the establishment of roadmaps and national strategies for the labour insertion of returned Guatemalans with or without needs of international protection.
- Give continuity to statistical studies and improve registration systems to understand the profiles of returnees, asylum seekers or refugees, including labour profiling, for their integration and, if necessary, internal relocation.
- Design awareness campaigns for the private sector on labor inclusion of returned Guatemalan migrants.

# **MIRPS** NATIONAL ACTION PLAN IN
# HONDURAS

## 44 TOTAL COMMITMENTS
## FOCUS AREAS:



**PROTECTION**
39 COMMITMENTS



**JOBS AND LIVELIHOODS**
**4 COMMITMENTS**



**EDUCATION**
1 COMMITMENT

Honduras made progress on (i) identifying the causes, impacts, and magnitude of displacement through a Characterization Study at the national level; (ii) the technical and participatory drafting of a Bill that defines the framework of protection and care for the internally displaced population; (iii) the consolidation of a system for registering of land and assets abandoned or dispossessed.

Progress was also made in strengthening care protocols for returnees with protection needs, including the training of 120 officials from the central, municipal and foreign service governments. Registration and processing capacities within the asylum system were increased, and registration and interview brigades continue to be implemented in border areas, with the aim of centralizing access to the asylum system.

As for 2021 it is expected; increase access in high-risk areas, as well as increase reception capacities and humanitarian assistance for returnees with protection needs and refugees and promote access to livelihoods for the persons of interest



# HONDURAS



## PROTECTION

- Strengthen the capacity to identify people with international protection needs.
- Undertake training processes for migration public officials in border areas to strengthen their capacity to identify protection needs.
- Provide information material in offices and border areas.
- Increase the capacity of municipal officials who assist returnees, migrants and their families.
- Follow-up on the protocol to assist returnees/deportees with protection needs.
- Develop a referrals protocol to follow-up on cases of returnees with protection needs through the Municipal Units for the Attention to Returnees.
- Strengthen and update existing capacities of consular officials for the identification and referral of cases with protection needs abroad.
- Train and update consular representations on international protection.
- Implement the assistance and protection roadmap to facilitate the reception, assistance and referral of cases, and strengthen the technical and financial capacities of the DPPDIV.
- Strengthen the technical and operational capacities of DPPDIV.
- Undertake awareness-raising activities for decision-makers on internal displacement and the assistance and protection roadmap.
- Continue strengthening humanitarian and legal assistance mechanisms
- Provide humanitarian and legal assistance at CAMIs at the national level.
- Develop an awareness-raising initiative for authorities and the private sector on the category of refugees and asylum seekers, and their rights.
- Strengthen the assistance provided to returnees with protection needs to cover their basic needs of shelter, food and health at the short and medium term.
- Enhance the coverage of humanitarian assistance during the reintegration process.
- Strengthen mechanisms of referral and legal orientation abroad.
- Establish partnerships with free legal representations abroad to provide effective assistance
- Train staff to provide better assistance and guidance at consulates.
- Implement a roadmap to coordinate the actions and services provided abroad.
- Continue strengthening the state presence in communities at risk, develop programmes for the prevention and protection based on causes and risk profiles that includes a prioritized access to documentation, and maintain updated information on displacement for an adequate response.
- Create a contingency plan in cases of massive displacements due to violence.
- Implement a humanitarian assistance mechanism articulated with the existing state response.
- Progress in the formulation and implementation of prevention and protection strategy at schools.
- Develop strategies to prevent and address specific risks for women and girls, commercial transporters, people at risk due to land dispossession, returnees with protection needs, and LGBTI persons.
- Establish an information mechanism on displacement that provides periodic data.
- Promote measures to facilitate the access to personal identification documents
- Develop a communication and awareness-raising strategy on the rights of internally displaced people together with local governments.
- Develop an information and awareness-raising strategy on the rights of internally displaced people.
- Design a methodology that enables a close relationship with communities and internally displaced people without increasing their risk.
- Implement a national protection system for internally displaced people, progress towards the establishment of a mechanism to register abandoned goods, facilitate access of internally displaced people to vocational training programmes and initiatives to generate income, promote dialogue and consultation spaces with displaced populations.
- Promote dialogue spaces among state institutions and groups of displaced people or at risk.
- Create a confidential system to register abandoned goods and housing.
- Strengthen the institutional response through coordination and referral of cases.
- Include the population within the prevention and protection mechanism in affected communities.
- Establish dialogue spaces to achieve the inclusion of the population in prevention and protection
- mechanisms.
- Include the interests of refugees within the institutional response and continue strengthening the capacities of groups and organizations through the Refugee Commission.
- Promote initiatives for the participation of the Refugee Committee to incorporate their needs through the Refugee Commission.

CLP_AR_005024



# HONDURAS

 ## EDUCATION

- Establish a dialogue with the Ministry of Labor and the Ministry of Education to resolve obstacles in the access to employment and education for refugees and applicants for refugee status

 ## JOBS AND LIVELIHOOD

- Promote priority access for returnees to existing labour reintegration programmes.
- Promote interinstitutional partnerships at the central and local levels to provide priority access to labour reintegration programmes.
- Strengthen leadership at the community level.
- Facilitate access to vocational training programmes and initiatives to generate income.

CLP_AR_005025

# **MIRPS** NATIONAL ACTION PLAN IN
# MEXICO

## 38 TOTAL COMMITMENTS
## FOCUS AREAS:



**PROTECTION**
19 COMMITMENTS




**JOBS AND
LIVELIHOODS**
5 COMMITMENTS



**SOCIAL
PROTECTION**
9 COMMITMENTS



**EDUCATION**
1 COMMITMENT



**HEALTH**
4 COMMITMENTS

Mexico promotes the integration of asylum seekers and refugees in national systems, with full access to employment, public health services, and education at all levels. The MIRPS framework has been key to achieve a more efficient registration of asylum seekers, and to achieve progress in the protection of the best interests of children in migratory contexts, including those in need of international protection. A policy to internal displacement is currently being developed by the Mexican government. Simplified asylum procedures, financial inclusion and the strenghtening of public services in host communities in the south, also remain priorities of the 2021 action plan.

CLP_AR_005026



**MEXICO**



## PROTECTION

- Increase COMAR's presence in INM Immigration Stations for a greater number of applicants for refugee status.

- COMAR will train INM personnel in airports, where there is greater flow of people requesting refugee status.

- Promote permanent information campaigns that inform about rights and the process for the recognition of refugee status, in a simple and understandable way.

- Provide training to public servants who assist or work directly with refugee applicants, refugees and beneficiaries of complementary protection, to ensure decent attention; institutions that make up the Interinstitutional Roundtable on Refugee and Complementary Protection will be prioritized.

- COMAR and UNHCR will promote the "Jaguar" information and awareness campaign on the rights of applicants and refugees in the areas of greatest transit and destination.

- SE-SIPINNA, the DIF and the PFPNNA will strengthen alternative care centres for temporary housing, preventing the use of Migration Stations for shelter.

- INM, COMAR, SE-SIPINNA and UNHCR will seek for alternatives for shelters to lower the use of the Migration Stations, particularly for family groups with children.

- Improve coordination mechanisms between the authorities that assist children (COMAR, INM, PFPNNA, SIPINNA) to facilitate the identification of international protection needs and access to Refugee Status Determination.

- The INM and the Procurator's Office for the Protection of the Rights of Children and Adolescents (federal, state and municipal) will apply the specialized protocol for the care of children developed by COMAR, UNICEF and UNHCR; also for interview techniques to identify needs of international protection and for the referral of cases to the COMAR or to the competent authority.

- Increase the operational capacity of the federal, state and municipal Child Protection Offices, principally in the states with the largest migrant and asylum-seeker population, (Chiapas, Tabasco and Veracruz).

- The PFPNNA, through SIPINNA, will generate coordination mechanisms with state and municipal protection offices to standardize criteria that regulate the determination, coordination, monitoring and restitution plans for child protection.

- The SIPINNA, from the Protection Commission for migrant children and asylum-seekers, will promote the harmonization of the General Law on the Rights of Children and Adolescents with the Law on Refugees, the Migration Law and the Complementary Protection and Political Asylum regulations.

- The SIPINNA, from the Protection Commission for migrant children and asylum-seekers, will promote the harmonization of the General Law on the Rights of Children and Adolescents with the Law on Refugees, the Migration Law and the Complementary Protection and Political Asylum regulations.

- CONAVIM will promote access to services for female asylum-seekers or refugees in the Justice Centres for Women (CJM), by coordinating with the 3 governmental levels. CONAVIM and COMAR will carry out actions aimed at preventing and eradicating gender-based violence against girls and women.

- COMAR, UNHCR and UNICEF will review and standardize the interview format for children seeking asylum for quality assurance during the interviews; a guide for the use of appropriate language with children will be developed and used in all interviews and questionnaires.

- COMAR, UNHCR and UNICEF will develop and share support materials with appropriate language for children, to be used during eligibility interviews and other questionnaires addressed to this population of interest.

- Disseminate a handbook of available shelters (public and private) by federation, for asylum-seekers, refugees and beneficiaries of complementary protection.

- Review and accelerate current procedures for the issuance of documents for asylum-seekers, refugees and beneficiaries of complementary protection.

- Guarantee the right to the identity to asylum-seekers, refugees and beneficiaries of complementary protection, through the issuance of the temporary and/or permanent CURP, and establish coordination mechanisms between RENAPO, INM and COMAR to strengthen management, implementation and training; also, review and make regulatory changes, for the assignation of CURPs in a more efficient and simple way.

- INM, COMAR and UNHCR will promote measures to accelerate the signing process at the COMAR and INM offices, in accordance with the obligations of people requesting refugee status.

## EDUCATION

- SEP, INEA and COMAR will promote actions that allow the formal inclusion of children seeking asylum, refugees and beneficiaries of complementary protection to mandatory school education (preschool, primary, secondary and preparatory), as well as access to educational programs nationwide through the INEA.

CLP_AR_005027

  **Comprehensive Regional Protection and Solutions Framework** Addressing forced displacement in Central America and Mexico

# MEXICO

##  JOBS AND LIVELIHOOD

- Within the scope of their competencies, the agencies will promote the incorporation of asylum-seekers, refugees and beneficiaries of complementary protection, to public and private institutions for job training and certification processes.
- UNHCR will carry out projects aimed at peaceful coexistence in the main host communities, and will foster spaces for cultural and learning exchange, which will favour the integration of the population of interest.
- Promote the recruitment of asylum-seekers, refugees and beneficiaries of complementary protection for job vacancies available in the National Employment Service; disseminate the calendar of job fairs organized nationwide.
- Promote actions to include asylum-seekers, refugees and beneficiaries of complementary protection to housing programs.
- CNBV will promote access to financial services for asylum-seekers, refugees and beneficiaries of complementary protection with the Association of Banks of Mexico.

## HEALTH

- The Ministry of Health and COMAR will carry out actions aimed at risk prevention and access to health services for asylum-seekers, refugees and beneficiaries of complementary protection; the CNPSS will promote strategies for Primary Health Care, Childbirth, puerperium and new born care, prevention of gender-based violence and addiction, by training public officers on the specific needs of this population.
- Perform actions aimed at ensuring access to mental health services for asylum-seekers, refugees and beneficiaries of complementary protection.
- Promote the inclusion of asylum-seekers, refugees and beneficiaries of complementary protection, in all reforms to the General Health Law, secondary laws and administrative provisions, in terms of access to health services and medicines, and consideration of the documentation issued by the COMAR and the INM, instead of social security, for the populations of interest.
- UNDP, UNHCR and PAHO will conduct studies of the capacities of public health services in the host communities in southern Mexico (mainly Chiapas and Tabasco), identifying opportunities to strengthen them and meet the needs of the host communities and populations of interest.

##  SOCIAL PROTECTION

- Together with COMAR and UNHCR, the participating institutions of the Interinstitutional Roundtable on Refugee and Complementary Protection will develop materials that describe and explain how to access the programs and services available to the populations of interest.
- COMAR, together with the participating agencies in the Interinstitutional Roundtable on Refugee and Complementary Protection, will promote access to public services and programs at the federal and state levels, through the revision of guidelines and the creation of integration modules
- Development and dissemination of awareness mass campaigns, through television, radio and social networks to counteract xenophobic manifestations against migrants and refugees, including information on the mechanisms to file complaints with CONAPRED for discriminatory acts committed by public or private servants.
- CONAPRED will provide courses and workshops to public officers and media to avoid prejudiced
- and stigmatizing news coverage and communication for asylum-seekers, refugees and beneficiaries of complementary protection.
- INDESOL will promote asylum-seekers, refugees and beneficiaries of complementary protection, in the activities organized by civil society organizations, and will review social joint venture programs for the inclusion of this population.
- Promote actions for the inclusion and issuance of credentials for elder asylum-seekers, refugees and beneficiaries of complementary protection, to assure their access to services offered by INAPAM at the national and state levels.
- COMAR, in coordination with UPM, will generate and publish statistical information including data disaggregated by sex, age, place of origin, and other variables, with the objective of analysing the characteristics of the populations of interest for its inclusion to programs and services.
- UPM, in coordination with COMAR, will promote collaboration and joint efforts between governmental institutions, academia and civil society organizations for the generation of studies and information linked to the design and evaluation of public policy related to populations of interest.
- The Welfare Secretariat will promote actions for the inclusion of asylum-seekers, refugees and beneficiaries of complementary protection in all social programs, especially in "Sembrando Vida" and "Emergencia Social".

# **MIRPS** NATIONAL ACTION PLAN IN
# **PANAMA**

## 26 TOTAL COMMITMENTS
FOCUS AREAS:



**PROTECTION**
12 COMMITMENTS



**JOBS AND
LIVELIHOODS**
7 COMMITMENTS



**SOCIAL
PROTECTION**
5 COMMITMENTS




**EDUCATION**
3 COMMITMENT



**HEALTH**
1 COMMITMENTS

Panama, as a transit and asylum country, has strengthened its capacities to ensure access to refugee protection for those fleeing violence. The implementation of the MIRPS National Plan has led to a significant improvement in the access to their basic rights, livelihoods, and local integration. This includes the approval of work permits for asylum seekers admitted to the procedure, strengthening of ONPAR's presence at the southern border and the implementation of innovative employability programs, among other achievements.

However, there are still some challenges that need to be addressed. The COVID-19's emergency worsened the already vulnerable condition of some refugees and asylum seekers, forcing to redefine priorities and actions to continue providing refugees and asylum seekers protection, inclusion and humanitarian assistance.

CLP_AR_005029

 **Comprehensive Regional Protection and Solutions Framework** Addressing forced displacement in Central America and Mexico

# PANAMA

 ## PROTECTION

- Strengthen training processes for public servants at the national and local levels on international protection, in order to enhance their capacity to identify and refer people with protection needs. Special focus will be provided to SENAFRONT, SNM, SEN-AN, ONPAR, INAMU, SENNIAF, Ombudspersons Office and local authorities in priority areas.

- Promote an agreement between the Ministry of Safety and Ministry of Government (ONPAR) to formalize and set in motion referral protocols and guidelines between SNM – ONPAR, and SENA-FRONT – ONPAR. In order to provide a timely response to the identification and referral of people with international protection needs in border areas and airports, and in line with what is established in Executive Decree N.5 of 2018

- Improve the registration system (TRE) to facilitate a cross-cutting revision of asylum claims among authorized public institutions, ensuring confidentiality.

- Reduce the backlog of claims submitted to ON-PAR under the jurisdiction of Decree N. 23 of 1998, which gave way to the development of Law N. 5 of 1977, that approves the 1951 Convention and the 1967 Protocol.

- Facilitate the management of larger human and financial resources of ONPAR in order to ensure the capacity to provide a response to an increasing number of asylum seekers, which includes, inter alia, personnel for project management, data management, lawyers, social workers, psychologists and other relevant professions.

- Undertake meetings with technical teams of CONARE to analyze cases to be presented during ordinary meetings of the National Commission for the Protection of Refugees, with the aim of ensuring a swifter response for cases admitted by ONPAR.

- Undertake brigades to issue documents in areas of difficult access, to renew refugee identity documents.

- Promote the elaboration of a legal instrument so that people recognized as stateless can opt for a permanent residence and Panamanian nationality.

- Promote an attention and referral roadmap and a protocol between the Ministry of Government (ON-PAR) and the National Institute for Women (INAMU) and other partners for refugee and asylum-seeking women, survivors of SGBV.

- Engage legal clinics of Law faculties in private and public universities in providing free orientation accompaniment and legal assistance to asylum seekers.

- Promote the university social service and or internships within ONPAR for University of Panama students undertaking careers in law, psychology, social work, archives, public administration, among others.

## EDUCATION

- Share information with asylum seekers on workshops, courses and trainings provided by the National Institute for Professional Training (INADEH), as follow-up to the agreements reached in the beginning of 2019.

- Match tuition costs for refugee students who are undertaking a bachelor's degree or technical careers at University of Panama with the cost for a national, recognizing the special protection condition of this population and their recognition by the Panamanian state.

- Promote the creation of an instruction manual 'Procedure and placement tests' for the operation of Decree 1225 of 2015

## HEALTH

- Promote and establish an attention roadmap and protocol between the Ministry of Government (ON-PAR) and Ministry of Health (Department of mental health and other services) for the attention and referral of refugees and asylum seeker for whom it is required as a result of their mental health.

 **Comprehensive Regional Protection and Solutions Framework**
MIRPS | Addressing forced displacement in Central America and Mexico

# PANAMA

##  JOBS AND LIVELIHOOD

- Manage the certification of extension of work permits in cases where people recognized as refugees present a request before the Ministry of Labour and Labour Development (department of migration), with 30 days or more prior to the expiration of their permit, and that the extension request is in progress.
- Promote the issuance of work permits for asylum seekers admitted to procedure by ONPAR
- Promote the issuance of drivers licenses for asylum seekers who have possession of their claim certification issued by ONPAR
- Search for income generation alternatives for refugees. Focus will be given to institutions, the private sector and the civil society to explore alternatives and put in motion concrete strategies for the economic inclusion of refugees.
- Raise awareness within the private sector on refugees seeking employment.
- Incorporate asylum seekers admitted to procedure and refugees within the database of the Ministry of Labour, for their participation in job fairs and job exchange.
- Manage the viability of opening bank accounts for refugees

##  SOCIAL PROTECTION

- Launch the incorporation of actions within existing social policies for highly vulnerable refugees.
- Promote existing programmes to cover basic needs with key actors (including food and temporary shelter) for extremely vulnerable people.
- Promote the participation and consultation of communities in the design of activities and public policies and enhance joint work with identified facilitators within communities.
- Promote anti-xenophobia campaigns for different entities for the integration of refugees and asylum seekers in Panama.
- Promote community-based integration initiatives for refugees and host communities.



*Saliendo Adelante*

Why migrants risk it all

Brief on Creative Associates International's
research study into the differentiating factors of
migration from the Northern Triangle

CLP_AR_005077

# At the root of migration

The pervasive challenges of the Northern Triangle, its fragile economies and epidemic levels of gang violence, lead thousands to cross borders in search of a better future. If the global development community is to respond to the ongoing but constantly shifting migration crisis, it requires nuanced and in-depth data that go beyond common knowledge of the region's economics and security situation.

Creative Associates International believes that development can significantly mitigate irregular migration through a *first mile approach* – one that addresses the specific factors that trigger someone to leave their home. With an intentional and targeted first mile approach, development programs can address the root causes that drive migration and ultimately reduce the number of people embarking on an often dangerous journey, whose absence reverberates through their communities.

It is important to note that this first mile approach must be tailored for each location, based on the specific factors that push people to emigrate from one high-migration area as opposed to another. In fact, the success of this approach in mitigating migration hinges on a localized strategy.

In February 2019, Creative commissioned an ambitious research study that first zeroed in on those municipalities that have the highest rates of outward migration from Honduras, El Salvador and Guatemala. Analyzing data from nearly 900 municipalities, Creative identified the 60 that combined account for more than half of all the region's emigration. In those 60 municipalities, Creative then conducted 2,400 individual in-person surveys to gather data on intentions to migrate, family, the economic situation of the household and exposure to crime, among other points. Based on these surveys and extensive data analysis, Creative was able to distinguish the different triggers of migration in each municipality, as well as paint a general portrait of potential migrants. These conclusions shed light on the region's textured migration landscape and can be used to inform highly focused programming that can mitigate irregular migration and improve the conditions of Central Americans.

The study took on the name "Saliendo Adelante," borrowing from a Spanish phrase that was heard frequently across the region as people described what drives them to migrate – their resilience and desire to move forward in life.

The factors at play in each of these 60 mostly urban municipalities, while varied, can be broken down into three principal categories: economics, victimization and transnational ties.

Percentage of survey respondents who intend to migrate



El Salvador
**24**%



Guatemala
**18**%



Honduras
**33**%

CLP_AR_005078

## Local data for targeted solutions

The factors that influence migration vary widely across the Northern Triangle's diverse communities. The three municipalities below seem similar at first glance: They all have populations under 300,000, and in each, 35% of residents plan to migrate. However, a closer look at the data shows significant differences among them.



■ **La Ceiba, Honduras**    ■ **Soyapango, El Salvador**    ■ **Totonicapán, Guatemala**

**52%**  **25%**  **43%**

**Households that have income under $400 a month and can't make ends meet**

**30%**  **13%**  **0%**

**Residents who have had a relative or close friend murdered**

**85%**  **67%**  **35%**

**Households that have a relative abroad**

## Where are people migrating from?

Creative's survey focuses on the 60 municipalities that combined account for more than half of all migration from the Northern Triangle to the United States. The percentages below indicate the municipality's share of all emigration from each country. For example, 16 percent of Guatemalan migrants come from Guatemala City.

**Guatemala**

**Honduras**

**El Salvador**

La Ceiba
**5%**

Mixco
**4%**

Guatemala City
**16%**

San Pedro Sula
**20%**

Villa Nueva
**2%**

La Libertad
**5%**

San Salvador
**18%**

San Miguel
**5%**

Central District
*(Tegucigalpa & Comayagüela)*
**27%**



# ECONOMICS

The principal factors that differentiate those who do intend to migrate from those who do not in the 60 high-migration municipalities surveyed fall under the category of economics. When asked what their primary reason for migrating would be, more than 60 percent of respondents cited economic-related concerns. Migration from the Northern Triangle occurs against the backdrop of a vulnerable regional economy, where many of those who are working do so in an informal capacity with few protections or opportunities for advancement.

Within the broader context of economics, three main factors were found to be differentiators:

*Figure 1:*

Percentage of those who intend to migrate who cite economic concerns as their primary reason for migration.

EL SALVADOR - 50%

GUATEMALA - 71%

HONDURAS - 67%

## Unemployment

On average across the region's high-migration municipalities, being unemployed makes someone nearly twice as likely to consider migrating. According to Creative's analysis, the issue of unemployment is particularly influential in Guatemala and El Salvador, and slightly less so in Honduras.

By looking closely at the local data, the study can also identify the municipalities in which unemployment is a stronger push factor for migration. In Guatemala City, for example, 16 percent of those who have considered migrating are unemployed, compared to just 5 percent who have not considered migrating but are unemployed. Holding a low-skill and unstable job is also a differentiator in Guatemala City, and 20 percent of those who have considered migrating are low-skill workers.

## Household Earnings

Those whose households earn less than $400 a month and who cannot make ends meet are 1.25 times more likely to consider migrating. More than one-third of survey respondents reported household earnings under the $400 line and said they could not make ends meet.

However, in breaking this information down further, Creative found that individuals in that group whose households earn under $200 monthly and who cannot make ends meet are actually less likely to migrate. One explanation could be that those with the most limited resources cannot afford the journey; depending on the country, hiring a coyote, or smuggler, to lead the trip to the U.S. border can cost up to $8,000 per person.

## Pessimistic Outlook

Believing that their household's economic situation is on the decline is an interestingly strong indicator of migration. This is particularly true in high-migration municipalities in Honduras, where believing that the household is worse off than it was the previous year makes individuals 1.5 times more likely to consider migrating.

Looking closely at the coastal municipality of La Ceiba, Honduras, pessimistic economic outlook is a clear differentiator: 71 percent of those who have considered migrating think their economic situation will be worse next year, compared to 39 percent who have not considered migrating but feel the same.

*Figure 2:*

**Migration and unemployment among youth ages 18 to 29**

| | EL SALVADOR | | GUATEMALA | | HONDURAS | |
|---|---|---|---|---|---|---|
| | Plans to migrate & unemployed | No plans to migrate & unemployed | Plans to migrate & unemployed | No plans to migrate & unemployed | Plans to migrate & unemployed | No plans to migrate & unemployed |
| Young men | 20% | 10.4% | 18.4% | 2.2% | 23.6% | 18.4% |
| Young women | 18.5% | 1.9% | 11.5% | 8.6% | 8.3% | 4.2% |

CLP_AR_005080

# Saliendo Adelante:
## Isabel



| Isabel | Age 20 |
|---|---|
| Location | Salcajá, Guatemala |
| Migration experience | Has not migrated but intends to |
| Primary reason for migrating | Unemployment; wants to provide more economic stability for her family |
| Hopes for her future | Dreams of becoming a doctor to help those with limited resources |

"Here, there aren't many jobs, and the jobs that exist don't pay well.
So I want to run the risk to be able to get to the U.S."

- Isabel

*Figure 3:*

**Pessimistic Economic Outlook in Tegucigalpa and La Ceiba, Honduras**

These two municipalities show how the same differentiating factor can uniquely affect people from different areas. While having a pessimistic economic outlook is a strong motivation in both, the factor's effect on the likelihood of migration in La Ceiba is far stronger. Both cities exhibit similar rates of irregular migration.

| Municipality | Intends to migrate and thinks economic situation will worsen | Does not intend to migrate but thinks economic situation will worsen |
|---|---|---|
| Tegucigalpa, Honduras | 48% | 34% |
| La Ceiba, Honduras | 71% | 39% |

CLP_AR_005081



# VICTIMIZATION

Across the Northern Triangle, and particularly in high-migration, urban municipalities, residents are coping with levels of violence that are among the highest in the world. Creative's study sought to look beyond the alarming homicide rates and focus instead on personal experiences of victimization and how they relate to migration. The study focused not just on homicides, but also on exposure to other crimes that breed feelings of insecurity, including extortion, robbery, bribery and violence against women.

Regionally, having been a victim of a crime or having a family member or someone close to you who has been makes an individual 1.5 times more likely to consider migrating. The analysis suggests that how people react to these crimes varies significantly by country and by municipality; Hondurans and Salvadorans appear to be more greatly impacted by victimization than Guatemalans.

## Homicides

Having personal exposure to homicide is a clear differentiating factor in the high-migration municipalities of both Honduras and El Salvador.

Nearly one-third of survey respondents who have considered migrating from Honduras have had a family member or close friend murdered, while 15 percent of those who do not intend to migrate have lost a relative or friend to homicide.

## Robbery

Even more so than homicides, robberies are a powerful influencer of migration decisions. Again, this is truer in Honduras and El Salvador than in Guatemala.

In Honduras, 61 percent of those who have considered migrating have been robbed on the street, compared to 39 percent who haven't considered migrating but have been robbed.

## Extortion

Extortions are particularly concentrated in the high-migration municipalities surveyed. Eighty-six percent of the total registered extortions in Honduras in 2017 occurred in these municipalities, which are home to less than 60 percent of the total population. In El Salvador, 70 percent of registered extortions occurred in high-migration municipalities, and in Guatemala, 43 percent. Extortions seem to have the biggest impact in El Salvador: Nearly a quarter of those who have considered migrating have been extorted, compared to 11 percent of people who have not considered migrating but have been extorted.

*Figure 4:*

**Percentage of those who intend to migrate who cite victimization factors as their primary reason for migration**

| EL SALVADOR | GUATEMALA | HONDURAS |
|---|---|---|
| 38% | 14% | 18% |

*Figure 5:*

**In Guatemala, victimization affects municipalities differently, as seen in Guatemala City and Totonicapán.**

| Municipality | Intends to migrate and has been exposed to at least two acts of crime or violence | Does not intend to migrate but has been exposed to at least two acts of crime or violence |
|---|---|---|
| Guatemala City, Guatemala | 57% | 39% |
| Totonicapán, Guatemala | 50% | 27% |

**52%** of those who say they have thought about migrating say they would do so alone; 26% say they would migrate with their children

CLP_AR_005082

# Saliendo Adelante
## Luisa & Alejandro



| Luisa & Alejandro | Ages 31 |
| --- | --- |
| Location | San Pedro Sula, Honduras |
| Migration experience | Joined a caravan heading north from San Pedro Sula with their 5-year-old son. Turned back in Mexico after facing violence and illness. |
| Primary reason for migrating | Violence and extortion; low-wage, informal work |
| Hopes for their future | Want their children to grow up in a safe community with better opportunities. |

"We want to see a change in combating crime.
We don't feel safe when we go to work."

- Luisa



# TRANSNATIONAL TIES

Transnational ties – defined here as existence of family in the U.S., receipt of remittances, and prior migration to the U.S. – is an important pull factor in the migration equation, although far less impactful than economics and victimization.

In the larger regional context, a culture of migration has been and continues to be solidified through the generations. Nearly two-thirds of all survey respondents have a relative living abroad, 75 percent of those relatives have lived in the U.S. for 10 years or more, and about 25 percent for over 20 yeas. However, an expectation that family reunification would be a significant driver of migration was disproven by the data collected, with only 3 percent of survey respondents citing reuniting with relatives as their primary reason for migration.

In addition, statistical analysis shows that simply having a family member in the U.S. is not a differentiating factor between those who intend to migrate and those who don't, despite the large number of people who reported family ties.

Remittances, however, are indicative of a strong family connection to the U.S. while also pointing to viable job opportunities, an existing support system in the U.S. and the potential for economic prosperity.

**Over 20%** of income for households across the region comes from remittances

## Remittances

Nearly a quarter of those who say they have thought of migrating receive remittances across the Northern Triangle's high-migration municipalities, in comparison to 15 percent of those who haven't thought of migrating but receive remittances. The statistical significance of remittances is greatest in Guatemala, where receiving remittances makes an individual nearly twice as likely to have thought about migrating.

But remittances also have a positive effect in reducing poverty and help families below the $400 monthly income threshold make ends meet.



**Only 3%** of those who intend to migrate cite family reunification as their primary reason for migration

CLP_AR_005084

# Saliendo Adelante
## Alberto



| Alberto | Age 22 |
|---------|--------|
| Location | Apopa, El Salvador |
| Migration experience | Migrated to the U.S. in 2016, was apprehended by immigration authorities and deported |
| Primary reason for migrating | Family living in the U.S.; crime and violence in his neighborhood; underemployment |
| Hopes for his future | A steady job and better future for his family |

"My greatest inspiration was my daughter and sister because
what I want most is for them both to have a better life."

- Alberto



# YOUTH MIGRATION

Respondents ages 18 to 29 years old are more than twice as likely to consider migrating than adults ages 30 and older. The data from Honduras is particularly stark: 46 percent of youth from the municipalities surveyed intend to migrate, compared to 28 percent of older adults.

Youth exposure to the factors that influence migration differs from that of adults, and these factors may influence youth differently. According to the survey, due to a combination of factors among which victimization is significant, Honduran young women intend to migrate more than young men. This is not the case in the other countries where young men were found to have higher intentions to migrate.

*Figure 6:*

**Youth who intend to migrate**

| Country | Percent of youth who plan to migrate | |
|---|---|---|
| | Young men | Young women |
| El Salvador | 44.6% | 30.0% |
| Guatemala | 31.7% | 22.6% |
| Honduras | 40.7% | 51.3% |

*Figure 7:*

**What drives youth to migrate**

| | EL SALVADOR | | GUATEMALA | | HONDURAS | |
|---|---|---|---|---|---|---|
| | Youth 18-29 who intend to migrate | Adults 30+ who intend to migrate | Youth 18-29 who intend to migrate | Adults 30+ who intend to migrate | Youth 18-29 who intend to migrate | Adults 30+ who intend to migrate |
| Unemployed | 19% | 7% | 16% | 5% | 16% | 12% |
| Has been robbed on the street | 58% | 45% | 47% | 48% | 63% | 59% |
| Receives remittances | 28% | 23% | 14% | 12% | 26% | 31% |

# CONCLUSIONS & RECOMMENDATIONS

The results of the Creative Associates International migration study underscore the need for a first-mile approach to reducing migration that addresses specific drivers, strengthens communities and creates opportunity locally. The following findings and recommendations are intended to help shape effective migration-focused programming in the Northern Triangle.

| Key conclusions | Recommendations for development |
| --- | --- |
| **Migration is highly localized** | **Focus on high-migration areas** |
| A small number of municipalities, largely urban, account for the bulk of all irregular out-migration from the Northern Triangle. While trends emerge at the national level, the factors that influence one's decision to migrate vary dramatically by municipality. | For the most effective and efficient results in mitigating migration, programs should focus on high-migration municipalities. Interventions should be designed to address the specific factors influencing migration in each. |
| **Economics are driving migration** | **Expand economic programs** |
| Economic factors are the most salient in influencing migration and are cited far more often as the primary motivator for migration than victimization factors. | Programming should seek to stabilize vulnerable local economies and then expand on traditional economic development interventions to address the specific economic realities of high-migration municipalities, including the informal economy. |
| **Youth are most likely to migrate** | **Meet youths' urgent needs** |
| People from the ages of 18 to 29 report distinct levels of exposure to economic and victimization factors and react to these factors differently than adults in their decisions to migrate. | Youth, and positive youth development, should be at the center of migration-specific programs. Implementers should also be cognizant of differences in young women's and young men's motivations for migration. |
| **Victimization is varied** | **Address the victimization spectrum** |
| Extortion, robbery and other crimes are, in most cases, an even stronger motivator for migration than exposure to homicide. | Programs should seek to reduce the high levels of victimization in target areas, taking into account not only homicides but all types of crime and violence that create highly victimized communities. |

CLP_AR_005087

## Study Methodology

### About Creative

Creative Associates International works with underserved communities by sharing expertise and experience in education, elections, economic growth, citizen security, governance and transitions from conflict to peace.

Based in Washington, D.C., Creative has active projects in nearly 30 countries. Since 1977, it has worked in nearly 90 countries and on almost every continent. Recognized for its ability to work rapidly, flexibly and effectively in conflict-affected environments, Creative is committed to generating long-term sustainable solutions to complex development problems.

Creative has grown to become a leader among U.S. private sector implementers of global development projects. Creative is minority owned and operated.

### Creative in Latin America and the Caribbean

Creative has been leading innovative, sustainable development programs in Latin America and the Caribbean for four decades.

Creative's programming in the hemisphere is built on evidence, proven tools and a deep understanding of local contexts. Projects are designed to be inclusive of marginalized groups, operate with local organizations and engage the private sector to ensure that the positive change put in motion lasts long after Creative's interventions.

Creative began its work in the Northern Triangle in 1983 with a training of Peace Corps volunteers in Guatemala. Since then, Creative has implemented dozens of programs in the region's most challenging communities and contexts, supporting gang violence prevention, peace and reconciliation, education and civic engagement, positive youth development, rule of law and governance strengthening and more. Creative currently implements four programs in Honduras, El Salvador and Guatemala, reaching many of the region's highest-migration municipalities. ∎

Creative's study began in early 2019 with an extensive review of available data at the regional, national and municipal levels that relate to migration.

To narrow down the study to those municipalities that have the highest rates of emigration, Creative relied on a methodology that uses remittance payment points in the recipient country to identify the place of origin of migrants who are in the United States. This methodology was designed by Manuel Orozco and has been adopted and used by the International Fund for Agricultural Development and the Inter-American Dialogue since 2009. In the Northern Triangle, there are more than 100,000 payment points where families collect remittances.

Drawing data from 893 municipalities in El Salvador, Guatemala and Honduras, Creative identified the 60 municipalities that 1) each account for more than 1 percent of irregular migration from their respective countries and 2) combined, make up a majority of outward irregular migration from the Northern Triangle.

Creative then commissioned a randomized survey of residents in those 60 municipalities, first testing the detailed survey instrument in two municipalities in Honduras. Trained enumerators were then dispatched to conduct 2,400 in-person surveys, which ultimately generated about 100,000 individual data points.

With municipal-level data on 48 distinct social, economic and crime variables that relate to migration, Creative analyzed migratory trends and their relationship to the survey indicators. Statistical regression models were used to identify any statistical significance of these indicators on the likelihood of migration.

**The 60 municipalities surveyed were (by country, in order of emigration from highest to lowest):**

### El Salvador

San Salvador (18% of Salvadoran emigration), San Miguel, La Libertad, Soyapango, Santa Ana, Sonsonate, La Unión, Apopa, Zacatecoluca, Usulután, Cojutepeque, Metapán, Ahuachapán, Ilopango, Santa Rosa de Lima, Juayúa, San Francisco Gotera, Antiguo Cuscatlán, Chalatenango, San Vicente

### Guatemala

Guatemala City (16% of Guatemalan emigration), Mixco, Villa Nueva, Totonicapán, Chiquimula, Huehuetenango, Jutiapa, Chimaltenango, Retalhuleu, Sololá, San Pedro Sacatepéquez, Cobán, Villa Canales, Escuintla, Flores, La Libertad, Coatepeque, Morales, San Marcos, Antigua Guatemala, Salamá, San Juan Sacatepéquez, Jalapa, Zacapa, Sayaxché, Esquipulas, Puerto Barrios

### Honduras

Central District (Tegucigalpa and Comayagüela, 27% of Honduran emigration), San Pedro Sula (20% of Honduran emigration), La Ceiba, Comayagua, El Progreso, Choluteca, Santa Rita, Puerto Cortés, Choloma, Siguatepeque, Danlí, Juticalpa

*Municipalities listed above without a number account for between 1 percent and 5 percent of their respective country's emigration.*

To see more study results and hear migrant stories, visit:

**Saliendo-Adelante.com**

**Creative Associates International**
5301 Wisconsin Avenue NW, Suite 700
Washington, DC 20015

CLP_AR_005088



COLOMBIA



• 132 • R4V

© Flóres Soláno

# COLOMBIA
# AT A GLANCE

|  | 2023 |
|---|---|
|  | 2024 |

| | POPULATION PROJECTION | PEOPLE IN NEED (PiN) | PIN PERCENTAGE | PEOPLE TARGETED |
|---|---|---|---|---|
| **VENEZUELANS IN-DESTINATION** | ■ 2.98 M | ■ 2.39 M | 80.3% | ■ 714.0 K |
| | 3.26 M | 2.62 M | 80.3% | 590.7 K |
| **IN-TRANSIT** | 402.3 K | 349.6 K | 86.9% | 104.3 K |
| | 446.2 K | 387.9 K | 86.9% | 87.5 K |
| **PENDULAR** | 1.90 M | 1.24 M | 65.2% | 369.8 K |
| | 1.93 M | 1.26 M | 65.2% | 284.3 K |
| **COLOMBIAN RETURNEES** | 980.0 K | 541.6 K | 55.3% | 161.5 K |
| | 980.0 K | 549.8 K | 56.1% | 122.2 K |
| **AFFECTED HOST COMMUNITIES** | – | 885.3 K | – | 264.1 K |
| | – | 941.2 K | – | 212.3 K |

**AGE AND GENDER DISAGGREGRATION**

| | | |
|---|---|---|
| 34.0% 37.7% | 34.4% 37.3% | 34.4% 37.3% |
| 14.1% 14.2% | 14.2% 14.1% | 14.2% 14.1% |



TOTAL REQUIREMENTS
**$664.87 M** **$575.86 M**



RMRP PARTNERS
**74**

CLP_AR_006308

## COLOMBIA: BENEFICIARIES TARGETED



PEOPLE TARGETED 2023

- 14 - 5,000
- 5,001 - 30,000
- 30,001 - 90,000
- 90,001 - 200,000
- 200,001 - 280,000

This map is for illustration purposes only. The boundaries and names shown and the designations used on this map do not imply official endorsement or acceptance by the UN.

CLP_AR_006309

## COLOMBIA: KEY FIGURES BY DEPARTMENTS

Population Projection     People in Need (PiN)     People Targeted     Total Requirements

| | 2023 | | | | 2024 | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Population Projection | People in Need (PiN) | People Targeted | Total Requirements | Population Projection | People in Need (PiN) | People Targeted | Total Requirements |
| AMAZONAS | 1.9K | 1.5K | 436 | $313.2 K | 2.0K | 1.5K | 339 | $309.8 K |
| ANTIOQUIA | 653.3K | 501.9K | 149.7K | $57.88 M | 702.5K | 541.4K | 122.1K | $46.52 M |
| ARAUCA | 655.7K | 437.2K | 130.4K | $42.07 M | 671.7K | 448.8K | 101.2K | $37.49 M |
| ATLÁNTICO | 375.0K | 266.0K | 79.3K | $53.26 M | 400.1K | 285.7K | 64.4K | $43.81 M |
| BOGOTÁ DC | 932.5K | 705.2K | 210.3K | $80.08 M | 1.00M | 760.1K | 171.5K | $66.73 M |
| BOLÍVAR | 221.4K | 150.3K | 44.8K | $26.14 M | 234.9K | 160.6K | 36.2K | $21.71 M |
| BOYACÁ | 72.5K | 56.7K | 16.9K | $10.84 M | 77.7K | 60.8K | 13.7K | $11.86 M |
| CALDAS | 35.9K | 28.2K | 8.4K | $1.44 M | 38.4K | 30.3K | 8.4K | $1.94 M |
| CAQUETÁ | 5.4K | 4.2K | 1.2K | $21.0 K | 5.6K | 4.3K | 981 | $18.0 K |
| CASANARE | 42.1K | 31.4K | 9.4K | $6.88 M | 45.3K | 33.9K | 7.6K | $6.50 M |
| CAUCA | 39.6K | 27.6K | 8.2K | $8.15 M | 42.7K | 29.9K | 6.7K | $7.20 M |
| CESAR | 147.4K | 106.9K | 31.9K | $20.45 M | 156.6K | 114.3K | 25.8K | $16.91 M |
| CHOCÓ | 7.2K | 5.3K | 1.6K | $7.19 M | 7.7K | 5.8K | 1.3K | $7.41 M |
| CÓRDOBA | 63.1K | 41.5K | 12.4K | $560.0 K | 65.7K | 43.5K | 9.8K | $577.4 K |
| CUNDINAMARCA | 296.0K | 222.3K | 66.3K | $23.71 M | 318.0K | 240.1K | 54.2K | $22.08 M |
| GUAINÍA | 12.1K | 9.3K | 2.8K | $3.41 M | 13.0K | 10.1K | 2.3K | $2.96 M |
| GUAVIARE | 3.5K | 2.7K | 799 | $193.0 K | 3.7K | 2.9K | 646 | $12.0 K |
| HUILA | 24.5K | 16.0K | 4.8K | $69.8 K | 26.3K | 17.3K | 3.9K | $58.3 K |
| LA GUAJIRA | 861.8K | 630.9K | 188.2K | $81.03 M | 890.4K | 654.0K | 147.5K | $68.67 M |
| MAGDALENA | 171.6K | 131.7K | 39.3K | $23.78 M | 183.2K | 141.0K | 31.8K | $19.31 M |
| META | 65.7K | 49.2K | 14.7K | $2.24 M | 70.7K | 53.1K | 12.0K | $2.97 M |
| NARIÑO | 35.0K | 27.9K | 8.3K | $34.07 M | 37.7K | 30.1K | 6.8K | $31.86 M |
| NORTE DE SANTANDER | 1.40M | 934.2K | 278.6K | $93.22 M | 1.45M | 971.6K | 219.2K | $76.21 M |
| PUTUMAYO | 24.6K | 15.9K | 4.7K | $1.95 M | 26.3K | 17.2K | 3.9K | $1.84 M |
| QUINDÍO | 40.0K | 29.1K | 8.7K | $768.5 K | 42.9K | 31.4K | 7.1K | $1.91 M |
| RISARALDA | 78.4K | 60.9K | 18.2K | $7.13 M | 84.3K | 65.6K | 14.8K | $7.81 M |
| SAN ANDRÉS Y PROVIDENCIA | 293 | 187 | 56 | $8.0 K | 307 | 198 | 45 | $8.0 K |
| SANTANDER | 226.7K | 163.2K | 48.7K | $30.07 M | 242.4K | 175.5K | 39.6K | $26.46 M |
| SUCRE | 68.6K | 42.0K | 12.5K | $50.0 K | 70.9K | 43.8K | 9.9K | 0 |
| TOLIMA | 63.4K | 53.6K | 16.0K | $2.50 M | 66.7K | 56.2K | 12.7K | $3.26 M |
| VALLE DEL CAUCA | 392.4K | 294.4K | 87.8K | $36.60 M | 420.1K | 316.2K | 71.3K | $32.81 M |
| VAUPÉS | 63 | 49 | 14 | 0 | 66 | 50 | 11 | 0 |
| VICHADA | 16.7K | 12.9K | 3.8K | $8.77 M | 18.1K | 14.0K | 3.2K | $8.65 M |

CLP_AR_006310

## NUMBER OF ORGANIZATIONS AND FINANCIAL REQUIREMENTS BY ORGANIZATION TYPE

|  | TOTAL | International NGOs | National NGOs / CSOs[i] | Others[ii] | UN Agencies |
|---|---|---|---|---|---|
| Financial requirements | $664.87 M | 22.8% | 3.4% | 3.0% | 70.9% |
| Organizations | 74 | 35 | 21 | 6 | 12 |

[i] Civil Society Organizations.
[ii] Others include the Red Cross Movement, academia and faith based organizations.

The list of organizations only includes appealing organizations under the RMRP, many of which collaborate with implementing partners to carry out RMRP activities.

## POPULATION IN NEED AND TARGET, FINANCIAL REQUIREMENTS AND NUMBER OF PARTNERS BY SECTOR*

| Sector | People in Need (PiN) | PiN percentage** | People targeted | Targeted In need | Financial requirements | Partners |
|---|---|---|---|---|---|---|
| Education | 4.09 M | 54.9% | 449.4 K | 11.0% | 56.21 M | 18 |
| Food Security | 3.96 M | 53.2% | 975.8 K | 24.7% | 125.36 M | 17 |
| Health | 5.32 M | 71.5% | 1.43 M | 26.8% | 97.29 M | 34 |
| Humanitarian Transportation | 1.85 M | 24.9% | 119.4 K | 6.5% | 4.66 M | 10 |
| Integration | 5.25 M | 70.6% | 239.1 K | 4.6% | 126.84 M | 46 |
| Nutrition | 1.20 M | 16.1% | 114.8 K | 9.6% | 4.36 M | 12 |
| Protection*** | 4.58 M | 61.6% | 542.0 K | 11.8% | 64.12 M | 38 |
| Child Protection | 1.70 M | 22.8% | 119.6 K | 7.0% | 28.02 M | 17 |
| Gender-Based Violence (GBV) | 2.97 M | 39.9% | 177.7 K | 6.0% | 20.23 M | 35 |
| Human Trafficking & Smuggling | 948.2 K | 12.7% | 29.0 K | 3.1% | 6.75 M | 8 |
| Shelter | 5.08 M | 68.2% | 232.5 K | 4.6% | 36.02 M | 18 |
| WASH | 3.80 M | 51.0% | 288.7 K | 7.6% | 22.63 M | 29 |
| Multipurpose Cash Assistance | – | – | 272.4 K | – | 59.42 M | 21 |
| Common Services**** | – | – | – | – | 12.97 M | 21 |

* While not being Sectors, data for Multipurpose Cash and for Common Services is included to inform on the overall targets and distribution of financial requirements in the RMRP 2023-2024.
** The PiN calculations for some sectors (namely, Nutrition, Education and all Protection subsectors) are based on specific age and gender groups, resulting in a low PiN percentage as a proportion of the total population.
*** This includes Support Spaces.
**** This includes AAP-CwC, Communication, Coordination, Information Management, PSEA, and Reporting.

CLP_AR_006311

## NUMBER OF ORGANIZATIONS AND FINANCIAL REQUIREMENTS BY ORGANIZATION TYPE

|  | TOTAL | International NGOs | National NGOs / CSOs[i] | Others[ii] | UN Agencies |
|---|---|---|---|---|---|
| **Financial requirements** | $575.86 M | 19.9% | 2.7% | 3.3% | 74.1% |
| Organizations | 59 | 25 | 17 | 6 | 11 |

i   Civil Society Organizations.
ii  Others include the Red Cross Movement, academia and faith based

The list of organizations only includes appealing organizations under the RMRP, many of which collaborate with implementing partners to carry out RMRP activities.

## POPULATION IN NEED AND TARGET, FINANCIAL REQUIREMENTS AND NUMBER OF PARTNERS BY SECTOR*

| Sector | People in Need (PiN) | PiN percentage** | People targeted | Targeted / In need | Financial requirements | Partners |
|---|---|---|---|---|---|---|
| Education | 4.36 M | 55.4% | 419.4 K | 9.6% | 46.27 M | 13 |
| Food Security | 4.20 M | 53.4% | 693.5 K | 16.5% | 99.98 M | 15 |
| Health | 5.66 M | 71.9% | 849.4 K | 15.0% | 78.42 M | 21 |
| Humanitarian Transportation | 2.03 M | 25.8% | 99.9 K | 4.9% | 4.54 M | 9 |
| Integration | 5.59 M | 71.0% | 237.6 K | 4.3% | 127.26 M | 40 |
| Nutrition | 1.25 M | 15.9% | 149.9 K | 12.0% | 3.85 M | 9 |
| Protection*** | 4.91 M | 62.4% | 247.8 K | 5.0% | 51.31 M | 28 |
| Child Protection | 1.82 M | 23.1% | 113.4 K | 6.2% | 25.02 M | 15 |
| Gender-Based Violence (GBV) | 3.17 M | 40.2% | 103.2 K | 3.3% | 18.49 M | 26 |
| Human Trafficking & Smuggling | 1.02 M | 12.9% | 27.9 K | 2.8% | 5.54 M | 6 |
| Shelter | 5.42 M | 68.8% | 186.7 K | 3.4% | 28.14 M | 14 |
| WASH | 4.04 M | 51.3% | 284.5 K | 7.0% | 20.85 M | 20 |
| Multipurpose Cash Assistance | – | – | 235.1 K | – | 52.97 M | 17 |
| Common Services**** | – | – | – | – | 13.20 M | 17 |

*    While not being Sectors, data for Multipurpose Cash and for Common Services is included to inform on the overall targets and distribution of financial requirements in the RMRP 2023-2024.
**   The PiN calculations for some sectors (namely, Nutrition, Education and all Protection subsectors) are based on specific age and gender groups, resulting in a low PiN percentage as a proportion of the total population.
***  This includes Support Spaces.
**** This includes AAP-CwC, Communication, Coordination, Information Management, PSEA, and Reporting.

CLP_AR_006312

# COUNTRY OVERVIEW

Colombia is the country hosting the largest number of refugees and migrants from Venezuela in the region, 2.48 million.[122] The reopening of official border crossings in the course of 2022 facilitated onward movements, as well as additional inflows of refugees and migrants from Venezuela and Ecuador and increased the proportion of regular entries in recent months.[123] Irregular arrivals are expected to continue, in parallel with onward movements towards Central and North America of refugees and migrants of various nationalities. Pendular movements between Colombia and Venezuela remain frequent.[124]

The results of the joint needs assessment for in-transit and pendular population,[125] by the National R4V Platform in Colombia (GIFMM) show a persistence of humanitarian needs. For example, 92 per cent of those in-transit have no resources for their journey; 51 per cent are severely food insecure, 69 per cent face difficulties accessing potable water; and important gaps for assistance to children aged 0 to 5 were identified.[126] Fifty-two per cent faced protection risks and 33 per cent knew someone within their environment who was a GBV survivor. Those engaging in pendular movements enter Colombia mainly to access food, healthcare (including mental health and SRH[127]), medicines and livelihoods.

For refugees and migrants in-destination, despite the efforts of the Colombian government to regularize and integrate refugees and migrants through the Temporary

Protection Status for Venezuelans (TPS), and the subsequent access to the General Social Security Health System (SGSSS) and other social protection programmes through the *Sisbén*,[128] multiple challenges persist. As such, the results of the JNA conducted for the population in-destination[129] reflect persistent humanitarian needs and integration challenges, particularly for those that do not have TPS and asylum-seekers (many of whom face barriers in accessing the asylum system). Eighty-two per cent of households live in inadequate indoor housing conditions, 51 per cent eat two meals a day or less, 92 per cent have insufficient or intermittent access to water and only 48 per cent of children attend school. Meanwhile, 52 per cent earn less than the minimum wage, 19 per cent are unemployed and 24 per cent of households resort to risky activities as a negative coping mechanism. Furthermore, a significant number of refugees and migrants face multiple challenges in a context of armed conflict and disasters caused by natural threats, where indigenous populations are particularly affected.[130] Services in some territories are saturated due to the increase of the population in need, posing challenges to access to health, education, shelter, water and sanitation, basic goods and services.

The current government has prioritized the integration of refugees and migrants through the TPS, in particular focusing on homologation of higher education degrees and employability. However, Colombia's socio-economic

---

[122] Migration Colombia. Distribution of Venezuelans in Colombia as of 28 February 2022. https://bit.ly/3SABjtv

[123] Official figures (available at Migration Colombia dashboard on Migration Flows of Foreigners in 2022, https://tabsoft.co/3sK09MD) register >171,400 official entries of Venezuelan nationals in the first nine months of 2022 through the Venezuelan border and >8,300 from Ecuador; similarly, the National R4V Platform (GIFMM) estimates, based on the extrapolation of Migration Colombia data and movements monitored through an R4V partner's Wi-Fi Analytics project, indicate >112,000 irregular entries between Venezuela and Colombia and >11,800 from Ecuador.

[124] 37% of the groups of refugees and migrants interviewed perform pendular movements "whenever required", 19% undertake them on a monthly basis and 8% undertake them daily. R4V, RMNA, October 202

[125] Ibid.

[126] 60% of children ages 0 to 5 have not accessed nutritional interventions, only 2% reported attending a kindergarten, institutional or community-based child development centre or school, and 25% are cared for by their parents while they are working (mostly in informal settings), which exposes them to risks

[127] 60% of pendular groups required mental health services while 41% mentioned needs in sexual and reproductive health.

[128] The Sisbén is the System for the Identification of Potential Beneficiaries of Social Programmes, which classifies the population according to their living conditions and income. This classification is used to target social investment and ensure that this access to social programmes (housing, health, education, among others) is allocated to those who need it most. The Sisbén is administered by the National Planning Department (DNP). According to an R4V partner's analysis based on DNP data, between January and July 2022, 459,169 refugees and migrants who had a Temporary Protection Permit were affiliated to Sisbén IV (38% of total Venezuelans with a TPP). See more at: https://bit.ly/3uyDiCV

[129] R4V, RMNA, October 2022 https://rmrp.r4v.info

[130] The humanitarian emergencies that occurred in 2022 as a result of the armed conflict in Arauca, Vichada and Magdalena stand out, as well as impacts in regions such as Nariño, Norte de Santander and Cauca; and those caused by disasters also in Vichada and Arauca, in Norte de Santander and in the Caribbean region (including the Mojana).

CLP_AR_006313

conditions, characterized by income inequality[131], high labour informality, growing inflation and unemployment are challenges that require a differentiated approach to effectively integrate refugees and migrants from Venezuela.[132] Coupled with above-mentioned challenges to integration, concerning levels of xenophobia and discrimination against refugees and migrants are expected to persist.[133]

## SCOPE OF THE RESPONSE AND PRIORITIES

This Plan contains a comprehensive and coordinated response in 31 of Colombia's 32 departments[134] implemented through 74 partners. Priority is given to departments on the country's borders with Venezuela, Ecuador and Panama, as well as cities and territories with a high proportion of refugees and migrants in rural and remote areas.

While addressing the needs identified through the RMNA, the RMRP will support the State's response with complementary programmes funded through bilateral cooperation, particularly in the area of medium to longer-term socio-economic inclusion of refugees and migrants from Venezuela in their host communities. To achieve this goal, the planning process included consultations with International Financial Institutions (IFI),[135] donors and the government of Colombia to ensure a coherent and complementary response by stakeholders within and outside the RMRP. Following a roundtable with bilateral, multilateral donors and IFIs in July, the GIFMM mapped key areas of bilateral donor support to the state.[136] The National Council on Economic and Social Policy (CONPES) document on migration,[137] adopted in July 2022, reflects the Government's key response priorities to the socio-economic inclusion of refugees and migrants from Venezuela for the next decade, a direction which has been reaffirmed by the current government to R4V partners in 2022.

In line with government priorities, R4V partners will support the socio-economic and cultural **integration** of refugees and migrants from Venezuela, including through their registration in the Sisbén, facilitating access to education and health/SGSSS affiliation, and will work on capacity development for the State's health, protection, education and justice services. Support for regularization will remain a priority, providing the basis for integration. The overall aim is to ensure refugees' and migrants' effective access to rights, goods and services, advancing the generation of sustainable livelihoods, jobs and entrepreneurship opportunities, and promoting harmonious relations with host communities. Corresponding RMRP activities will particularly target female heads of households, young people of productive age, entrepreneurs, and people in areas affected by conflict or disasters.

**Humanitarian assistance** will be provided through direct assistance/activities, such as Cash and Voucher Assistance (CVA), nutritional assistance, provision of food and sanitation items, humanitarian transportation and collective temporary shelters. These interventions will target the most vulnerable, such as those in-transit on foot ('*caminantes*'), refugees and migrants who recently arrived or who live in informal settlements, indigenous populations, persons with specific protection needs (e.g. UASC, women at-risk, people with disabilities and/or chronic diseases) and those who cannot access the TPS or asylum procedures and therefore cannot benefit from social protection schemes.

**Protection** is central in all activities under this Plan. As such, partners will support and strengthen mechanisms to identify, refer and assist vulnerable cases and profiles. Mass information strategies on access to rights and risks will target particular profiles and contexts (e.g. on transit routes and/or situations of conflict and disasters, among others).

[131] The Gini index, which measures income distribution and inequality on a scale from 0 (least unequal) to 1 (most unequal), Colombia was ranked 0.523 in 2021. According to World Bank Data, the country ranks as the most unequal among the 38 OECD countries (OECD average Gini index is 0.334) and the third most unequal in Latin America and the Caribbean (average Gini index from the 25 LAC countries with available data is 0.461). (*https://datos.bancomundial.org/indicador/SI.POV.GINI*)

[132] According to an assessment conducted by an R4V partner on the integration of refugees and migrants from Venezuela in Colombia, 30 out of every 100 refugees and migrants who report having been living in the country for more than two years still have humanitarian needs. Norwegian Refugee Council, Report on the integration of refugees and migrants in Colombia, 2022, *https://nrc.org.co/wp-content/uploads/2022/07/Annex-4-NRC-Reporte-Quedarse-no-rendirse-Colombia.pdf*

[133] Even though in the different rounds of the GIFMM JNA this proportion has gradually decreased, by 2022, 37% of interviewees in -destination had experienced discrimination, 96% due to their nationality. R4V, RMNA, October 2022.

[134] With the exception of Vaupés, given the low presence of both refugee and migrant populations and humanitarian actors.

[135] World Bank and Inter-American Development Bank.

[136] The CONPES priorities as well as the donor mapping can be found at: *https://www.dnp.gov.co/CONPES/documentos-conpes*

[137] National Planning Department (DNP), National Council on Economic and Social Policy (CONPES). CONPES document N° 4100: Strategy for the integration of the Venezuelan migrant population as a factor for the country's development. 11 July 2022. *https://bit.ly/3THOEjN*.

CLP_AR_006314

The RMRP incorporates cross-cutting principles relating to gender, environment, Centrality of Protection (CoP), Protection from Sexual Exploitation and Abuse (PSEA) and Accountability to Affected Populations (AAP). PiN and target populations are therefore disaggregated by age and gender; while partners self-evaluated through the Gender and Age Marker (GAM)[138] the differential considerations of their response. Under the joint guidance from the Environment focal point and the national coordination team, partners will expand the scope of the environmental approach,[139] including environmental considerations to improve the design of the response and also to identify and minimize sectoral gaps. Protection will be mainstreamed across interventions to ensure safety and dignity of all people reached, to promote their exercise of fundamental rights, safe access to services and their participation in decision-making without discrimination. Aligned with the principle of "Do No Harm" and to promote minimum standards in PSEA, R4V partners will establish actions to prevent and mitigate sexual exploitation and abuse (SEA). AAP will inform the design and implementation of context-specific, confidential, and safe community complaint and feedback mechanisms, for reporting possible SEA situations, as well as other sectoral community feedback requirements.

## CASH AND VOUCHER ASSISTANCE (CVA) 

According to the JNA,[140] food is the main need for the different population groups: in-destination (74 per cent), in-transit (82 per cent), pendulars (85 per cent) and host communities[141] (66 per cent). Other needs differ according to the population's profile: for those in-destination and affected host communities employment or income generation (69 per cent and 61 per cent respectively), shelter (52 per cent and 44 per cent) and education (22 per cent and 15 per cent) are the prevalent needs; for those in-transit, humanitarian transportation (62 per cent), medical care (39 per cent), and shelter (37 per cent) are the most important needs; and for the pendular population medical care (78 per cent), medication (58 per cent), and employment or income generation (55 per cent) are the key needs.

Insufficient financial resources, among others, prevent the populations from meeting their multiple needs, leading refugees and migrants to resort to negative coping mechanisms.[142]

Multi-Purpose Cash Assistance (MPC) will be employed to:

Support refugees and migrants in-need to meet all or part of their basic needs while respecting direct decision-making at the individual and household level.

Prevent the use of negative coping mechanisms. CVA programmes will be implemented in all territories where targeted population groups are present, both in border areas and in the interior of the country.

The CVA Group (CCWG) will take into account the estimate of the minimum expenditure basket (MEB) for 2022[143] and updated guidelines of the national government that promote the inclusion of host populations and the strengthening of the link with national social protection systems. The CCWG will also ensure that targeting criteria and procedures, intersectoral coordination and exit strategies are coordinated. It will also promote the implementation of accountability models, community engagement, CwC and cross-cutting issues such as PSEA, gender, environment, diversity, age and disability.

[138] According to the GAM marker self-assessments, 97% of R4V 2023-2024 partners in Colombia incorporated considerations of gender equity according to age and/or disability in their activities (this is 19% higher than RMRP 2022 results), while 1% expect to promote and/or contribute to gender equity without incorporating age and/or disability. However, only two thirds (67%) aim at actions to transform gender roles, which are root causes of discrimination and violence. In addition, 73% of the submissions evaluated include specific needs of LGBTQI+ persons in the project design.

[139] In Colombia, 81 R4V partners self-assessed their interventions using the cross-sectoral questionnaire of the Environmental Scoreboard, through 1,020 answers to questions regarding 13 humanitarian sectors. As a result, 38% of the responses indicate that the environmental considerations consulted have been previously or are currently carried out by the organizations, 42% are considering the evaluated aspects; while in 9% of the cases such indications are not being considered and only 1% were not aware of these criteria (for the remaining 10%, such considerations did not apply to the evaluated submission).

[140] R4V, RMNA, October 2022.

[141] Considering only five municipalities: Arauca, Cúcuta, Pasto, Riohacha and San Miguel, where Venezuelans and host communities were interviewed in the GIFMM's JNA for in-destination and returnee populations.

[142] Mechanisms such as: begging, spending savings, buying food on credit, selling goods, or doing some activity that they had never thought would do and prefer not to mention.

[143] GTM Colombia and REACH, Gap Analysis, 2022, *https://www.r4v.info/es/document/gifmm-colombia-canasta-basica-de-gastos-minimos-humanitaria-para-poblacion-migrante*

CLP_AR_006315



## EDUCATION

2023   2024

| PEOPLE IN NEED | ↑ 34.2% ↑ 37.1% | PEOPLE TARGETED | ↑ 34.3% ↑ 37.0% |
|---|---|---|---|
| 4.09 M   4.36 M | ↑ 14.5% ↑ 14.2% | 449.4 K   419.4 K | ↑ 14.5% ↑ 14.2% |

| PIN PERCENTAGE | TOTAL REQUIREMENTS | RMRP PARTNERS |
|---|---|---|
| 54.9%   55.4% | $56.21 M   $46.27 M | 18 |

**SECTOR LEADS:**   NRC, SAVE THE CHILDREN, UNICEF

The Education Sector will prioritize:[144]

1. **Promote access and retention in the education system** of children and adolescents, with an emphasis on education phases with the greatest enrolment and retention gaps, such as early childhood education and high school.[145]

2. **Improve capacities of educational institutions** and authorities, and welfare systems, teachers and providers of early childhood education to support the inclusion and permanence of children and adolescents in the educational system.[146]

3. **Promote the recovery of post-pandemic learning** through remedial learning, curricular adaptation, greater flexibility in assessments for children and adolescents, and capacity development for teachers to create more inclusive and protective learning environments.

**Response modalities:**

These priorities will be delivered through:

- **Technical assistance** to national and local educational institutions to support the effective inclusion and retention of refugee and migrant

children and adolescents in the education system and education services within the welfare system.

- **Capacity development** for educational authorities, teachers and providers of early childhood education; application of educational strategies tailored to specific characteristics and challenges of the target population, as well as strengthening social cohesion and integration with host community children.

- **In-kind distribution** of educational supplies, guides and school meals to assist families in enrolling their children and reducing school dropouts, including through CVA.

The Education Sector will ensure an integrated response in collaboration with several other Sectors. It will promote PSEA actions and will coordinate with the Ministry of Education in line with the Ministry's strategy on education of Venezuelans and Decree 1288 of 2018.[147] It will also coordinate with the Food Security and Nutrition Sectors to promote childhood nutrition and WASH to rehabilitate sanitary facilities and hygiene promotion (including menstrual hygiene campaigns) in educational institutions and early childhood education services. It will bolster child protection and GBV efforts by promoting regularization of refugee and migrant

[144] The response will focus on border areas, and municipalities with higher rates of refugee and migrant children and adolescents from Venezuela enrolled in the school system.

[145] This includes the provision of school supplies and support services, flexible and accelerated education models, and tailored educational strategies for children and adolescents in-transit.

[146] This includes the information-sharing with education actors to allow the completion of school trajectory and the link with socio-economic integration.

children, and develop joint strategies that aim to prevent violence, xenophobia and recruitment by illegal armed actors and organized criminal groups. The Sector will coordinate efforts with the Integration Sector to promote obtention and validation of academic degrees and assist with pathways in technological or entrepreneurial fields for the youth. The Sector will also coordinate alternative education solutions for children living in shelters and school transportation services with the Humanitarian Transportation and Shelter Sectors.



## FOOD SECURITY

| | 2023 | 2024 |
|---|---|---|

| | PEOPLE IN NEED | | PEOPLE TARGETED | |
|---|---|---|---|---|
| | 3.96 M | 4.20 M | 975.8 K | 693.5 K |

People in need: ↑ 34.7%  ↑ 37.3%  ↑ 14.0%  ↑ 14.0%
People targeted: ↑ 34.7%  ↑ 37.3%  ↑ 14.0%  ↑ 14.0%

| PIN PERCENTAGE | | TOTAL REQUIREMENTS | | RMRP PARTNERS |
|---|---|---|---|---|
| 53.2% | 53.4% | $125.36 M | $99.98 M | 17 |

**SECTOR LEAD:** WFP

The main response priorities identified by the Food Security Sector partners are:

1. **Food assistance** for refugees and migrants in highly vulnerable situations with an AGD and ethnicity-sensitive approach, and a focus on community integration.

2. **Recovery of productive capacities and sustainable agricultural livelihoods** through agro-food systems tailored to the local context,[148] taking into consideration environmental impact evaluations, anticipatory action, and socio-economic integration approaches.

3. **Food and nutrition education activities**, including on healthy lifestyle habits, in accordance with peoples' age, food practices and their income and livelihood prospects.

Populations in-transit and in pendular movements, peri-urban and rural populations in-destination, indigenous households, households with pregnant and lactating members, children, and those located in highly affected departments[149] will be prioritized. Actions will integrate, wherever possible, gender equity in food assistance and livelihoods, and will engage populations in accountability processes including awareness on PSEA.

The following response modalities will be used by Food Security Sector:

• Food assistance through **CVA** (both vouchers and MPC), as well as targeted[150] **in-kind** food assistance for households or groups in locations without adequate access to markets. Environmentally conscious management of organic waste will also be promoted.

• **In-kind provision of and technical assistance** on the use of agricultural supplies for the rehabilitation, maintenance and/or protection of livelihoods and rapid food production, while protecting natural resources.

[147] *https://www.suin-juriscol.gov.co/viewDocument.asp?ruta=Decretos/30035590*

[148] Includes ecosystems, productive uses, market access, culture, and local identity.

[149] Antioquia, Arauca, Atlántico, Bolívar, Cauca, La Guajira, Nariño, Norte de Santander, Santander, and Valle del Cauca are prioritized departments; however, sectoral response covers other departments.

CLP_AR_006317

- **Capacity building** through community workshops, practical activities on optimization of agricultural production, food purchases and cooking, dissemination of key messages on food and healthy life habits with an age, gender and ethnically sensitive approach.

**Integral response approaches:**

Collaborative approaches will be undertaken with multiple sectors to ensure food security actions are more effective. For example, working with the WASH Sector to ensure water is available for food production and for agricultural livelihoods, while promoting handwashing practices. Partners will also work with the Health Sector to integrate food assistance and agricultural livelihoods programmes to promote affiliation to the General Health Social Security System (SGSSS). With the Integration Sector, access to agricultural livelihoods through entrepreneurship will be promoted. Intersectoral actions will also be carried out with the Education, Protection and Shelter Sectors, the GBV Sub-sector and the CVA Working Group.



## HEALTH

| | 2023 | 2024 |
|---|---|---|

| PEOPLE IN NEED | ⬆ 34.3% ⬆ 37.3% | | PEOPLE TARGETED | ⬆ 34.3% ⬆ 37.3% |
|---|---|---|---|---|
| 5.32 M | 5.66 M | ⬆ 14.3% ⬆ 14.1% | 1.43 M | 849.4 K | ⬆ 14.3% ⬆ 14.1% |

| PIN PERCENTAGE | | TOTAL REQUIREMENTS | | RMRP PARTNERS |
|---|---|---|---|---|
| 71.5% | 71.9% | $97.29 M | $78.42 M | 34 |

**SECTOR LEADS:   MINISTRY OF HEALTH, WHO/PAHO**

The main response priorities identified by Health Sector partners are to:

1. **Contribute to the effective access of refugees and migrants to health services**, by increasing access to health insurance among the regularized population, and through the implementation of health access mechanisms targeting those in irregular situations and those with unmet health needs.

2. **Provide effective and complementary health services** based on quality standards according to individual needs and risks. Health services will include: a) primary healthcare; b) nutritional health; c) mental health; d) sexual and reproductive health (maternal care, voluntary termination of pregnancy (VTP), contraception, prevention, and care for GBV, STI/ HIV); e) assistance for chronic or 'high-cost' diseases; f) epidemiological surveillance and response to communicable diseases; g) health prevention and promotion for children; h) promotion of oral health; and i) environmental health.

3. **Strengthen institutional and community capacity support** to facilitate effective access to health services that ensure durable solutions. Additionally, health services and referral and counter-referral processes at different levels of care will be strengthened aimed at ensuring comprehensive and safe care for the population.

**Response modalities:**

- **In-kind assistance** will be provided applying a case-management approach. Direct provision of health supplies (including medicines, equipment, assistive devices, etc.) and telemedicine/teleassistance.

CLP_AR_006318

- **Support the enrolment in national health insurances and access to services** through communication campaigns and health fairs with the Ministry of Health and relating advocacy.

- **Institutional and community capacity development to improve healthcare standards,** especially for primary healthcare facilities, first responders, community health vigilance, dialogues on ancestral knowledge[151] and health education, as well as coordination between host communities and healthcare institutions, articulating intersectoral plans, and monitoring of accountability and advocacy measures.

**Integral response approaches:**

Interventions of Health Sector partners will incorporate human rights-based, gender-based, cross-cultural, and multi-sectoral approaches and PSEA actions. Partners will prioritize assistance to refugees and migrants in highly vulnerable situations, such as children and adolescents, pregnant and lactating women, people living with HIV/AIDS, people with specific needs and LGBTQI+ persons.

In addition to coordinating with the Ministry of Health, the Sector will coordinate with the Protection Sector and the GBV Sub-sector to provide assistance for GBV survivors, psychosocial support and establish referral pathways for critical mental health cases, and with Humanitarian Transportation to support access to healthcare. Coordination will take place with the WASH, Food Security, Nutrition, Education and Shelter Sectors related to social determinants of health.[152] This response will contribute to SDG 3 to ensure healthy lives, free from violence, and promote well-being at all ages.



## HUMANITARIAN TRANSPORTATION

| | 2023 | 2024 |
|---|---|---|

| | | ↑ 35.3% | ↑ 35.3% |
|---|---|---|---|
| **PEOPLE IN NEED** | | | |
| 1.85 M | 2.03 M | ↑ 15.2% | ↑ 14.3% |

| | | ↑ 35.3% | ↑ 35.3% |
|---|---|---|---|
| **PEOPLE TARGETED** | | | |
| 119.4 K | 99.9 K | ↑ 15.2% | ↑ 14.3% |

| **PIN PERCENTAGE** | | **TOTAL REQUIREMENTS** | | **RMRP PARTNERS** |
|---|---|---|---|---|
| 24.9% | 25.8% | $4.66 M | $4.54 M | 10 |

**SECTOR LEADS:    IOM, NATIONAL RED CROSS SOCIETY, UNHCR**

The Sector will prioritize the following responses:

1. **Transportation between cities and municipalities** in Colombia to facilitate family reunification, socio-economic integration and assistance within the framework of other sectoral activities (Health, Education and Protection). It also includes transportation within the country to official border crossings, in close coordination with migration authorities and subject to prior verification of the documentation required for regular transit to a third country and is underpinned by R4V partner case management of each individual case. The response generally does not include cross-border or border-to-border transportation.

---

[150] According to the specific needs of children and adolescents, pregnant/lactating women, elderly people, people with disabilities and ethnic groups.

[151] Dialogues on indigenous practices in the field of health treatment and medicines with indigenous groups.

[152] WHO defines the social determinants of health (SDH) as the conditions in which people are born, grow, work, live and age, and the wider set of forces and systems shaping the conditions of daily life that influence health outcomes. https://www.who.int/health-topics/social-determinants-of-health#tab=tab_1

CLP_AR_006319

2. **Local transportation assistance** (within cities/ municipalities) to facilitate access to basic goods and services (protection, education, food, documentation, regularization, health, socio-economic integration, among others). The Sector will seek to encourage engagement and advocacy with the national and local authorities, to promote safe and dignified transportation solutions for refugees and migrants in an irregular situation.

Priority will be given to women at-risk (unaccompanied women, women heads of households responsible for children, pregnant and lactating women, and GBV survivors), LGBTQI+ persons at-risk and/or GBV survivors, households with children and adolescents, UASC (within the framework of best interest determination processes with prior coordination between the R4V partner and the Colombian Family Welfare Institute), persons with specific needs or with critical/chronic diseases, elderly people, and families threatened or at-risk within the context of the internal armed conflict or in contexts of generalized violence.

**Response modalities:**

In-kind assistance through the procurement of land transportation services and distribution of individual land transportation tickets. CVA, both restricted and multipurpose (MPC), will allow refugees and migrants to make the direct purchase of land transportation tickets. All activities will be implemented within a case management framework.

**Integral response approaches:**

Coordination with the CVA Group is a priority. The Humanitarian Transportation Sector will also work with Education and Integration Sectors to promote access to services for those in rural areas, as well with Protection and Health Sectors to update protocols and guidelines for the incorporation of a comprehensive approach in the response, including case management and prioritization of profiles in vulnerable situations, facilitating the prevention, identification and management of victims of human trafficking, as well as cases associated with smuggling. Cross-cutting approaches to GBV, environment, PSEA, and AAP, in coordination with CwC, will be applied.



© IOM/Elizabeth Rivera

CLP_AR_000320



## INTEGRATION

| | 2023 | 2024 |
|---|---|---|

**PEOPLE IN NEED** — 34.1% 37.4% / 14.3% 14.1%
5.25 M | 5.59 M

**PEOPLE TARGETED** — 34.1% 37.4% / 14.3% 14.1%
239.1 K | 237.6 K

**PIN PERCENTAGE**
70.6% | 71.0%

**TOTAL REQUIREMENTS**
$126.84 M | $127.26 M

**RMRP PARTNERS**
46

**SECTOR LEADS:    IOM, PADF, UNDP**

The Sector will work towards the socio-economic integration of refugees and migrants from Venezuela, with an emphasis on activities targeting youth, women and LGBTQI+ persons,[153] by:

1. **Improving access to decent work**, through the validation of higher education degrees, certification of competencies, job trainings and human development, among others.

2. **Promoting support services for entrepreneurship,**[154] aiding refugee and migrant entrepreneurs to create, capitalize and develop their businesses, while boosting local economies.

3. **Strengthening financial autonomy** through facilitating access to financial education services and access to savings and credit products.

4. **Strengthening social cohesion** and peaceful coexistence in order to reduce incidents of discrimination and xenophobia when accessing economic and social rights.

5. **Strengthening the public offer of socio-economic and cultural integration services**, by assisting the implementation of the TPS, the Government's

Comprehensive Migration Policy[155] and the new "Income Generation Strategy for the Migrant Population and Host Communities".[156]

**Response modalities:**

Capacity building through guidance and trainings, as well as technical assistance, distribution of work tools and equipment will be provided on an in-kind basis to refugees and migrants from Venezuela and affected host communities. Cash grants will also be provided to support refugees and migrants with their rents, food, transportation and connectivity needs, among others, to complement employability pathways, entrepreneurship, financial inclusion, and social cohesion.

To improve capacities of government institutions, private sector and R4V partners, the Sector will provide technical assistance, assist with the recruitment of personnel, conduct research exercises, provide equipment and the strengthen of information systems.

**Integral response approaches:**

The Integration Sector will coordinate with the CVA Group to develop mechanisms that complement entrepreneurship and employability pathways and improve financial inclusion. With the Food Security

---

[153] Environmentally conscientious solutions will also be considered and promoted, including green jobs, green ventures, and green loans.

[154] Especially in territories where the implementation of the "Centros Intégrate" (Integration Centres for Development) strategy and INNPULSA Colombia's entrepreneurship programme coincide.

[155] The CONPES 4100 "Strategy for the Integration of the Venezuelan Migrant Population as a Development Factor", *https://colaboracion.dnp.gov.co/CDT/Conpes%C3%B3micos/4100.pdf*

[156] *https://www.undp.org/es/colombia/publications/estrategia-de-ingresos-para-migrantes-venezolanos*

CLP_AR_006321

and Nutrition Sectors, the Integration Sector will jointly promote access to agricultural livelihoods; while with the Education Sector, technical secondary education will be supported; and with the Protection Sector, the GBV and, Child Protection Sub-sectors, and with the PSEA focal point, strategies for the prevention of xenophobia, prevention and assistance to GBV, PSEA, protection of labour rights and the prevention of child labour will be developed and implemented.

The Integration Sector will work closely with government authorities to strengthen socio-economic integration strategies, according to Action Line #3 of the CONPES 4100, which includes employability entrepreneurship, diploma recognition and skills certification.[157]



The response priorities based on the needs and gaps identified by Nutrition Sector partners are:

1. **Providing direct nutritional assistance,** to prevent and manage malnutrition among refugee and migrant children, and pregnant and lactating women. Assistance will include measures to prevent and treat acute malnutrition, such as nutritional assessments, micronutrient supplementation and deworming treatments, taking into account an AGD approach.

2. **Strengthening the capacity of health and social protection services** to ensure access to nutrition interventions including nutritional assessments and referral, and interventions (e.g. deworming, micronutrient supplementation, identification and treatment of malnutrition due to deficiency and excesses in children under 5 and pregnant and lactating women).

3. **Awareness raising and information provision** on breastfeeding, infant and young child feeding practices for parents, caregivers, families, health workers and community agents. The active participation of refugees and migrants will be promoted in the design and monitoring of nutrition interventions, through an AGD approach.

**Response modalities:**

• **Ensure provision of services** to concerned refugees, migrants and affected host communities **provided by local health institutions.**

• **Community focused participatory and practical sessions** with refugee and migrant families on breastfeeding, young child feeding and key nutrition practices.

[157] Government authorities include: Ministry of Labour and the Public Employment Service; Ministry of Commerce, Industry and Tourism; The National Learning Service (SENA); Ministry of Finance, and the Ministry of Education.

- **Capacity building for health and social protection workers,** on regulations on nutritional care and good practices in reducing barriers to access to health services and social protection for refugee and migrant populations.

All the actions described will apply PSEA considerations.

**Integral response approaches:**

The Nutrition Sector will coordinate and liaise with the Education, Health, WASH and Protection Sectors to promote and incorporate nutrition considerations in their strategies through education, information provision and factoring in nutritional outcomes of refugees and migrants, while enhancing key actions (e.g. breastfeeding counselling, nutrition services engagement) including with CVA programmes.



## PROTECTION

2023    2024

| | | |
|---|---|---|
| **PEOPLE IN NEED** | ♂ 34.1% ♀ 36.4% | |
| 4.58 M | 4.91 M | ♂ 15.1% ♀ 14.4% |

| | | |
|---|---|---|
| **PEOPLE TARGETED** | ♂ 34.1% ♀ 36.4% | |
| 542.0 K | 247.8 K | ♂ 15.1% ♀ 14.4% |

| | |
|---|---|
| **PIN PERCENTAGE** | 61.6%  62.4% |
| **TOTAL REQUIREMENTS** | $64.12 M  $51.31 M |
| **RMRP PARTNERS** | 38 |

**SECTOR LEADS:    DRC, UNHCR**

The response activities of the Protection Sector aim to identify refugees and migrants with protection needs, including those exposed to double impact contexts (linked to armed conflict and/or organized crime). The departments of Antioquia, Arauca, Bolívar, Cauca, Nariño, Norte de Santander, and the Bogotá area,[158] as well as the sub-region of Urabá,[159] are the most affected and will be prioritized. Priority is also given to individuals and communities subject to double affectation.[160]

Capacity building and advocacy with the Government[161] regarding Refugee Status Determination (RSD) procedures is a response priority, as well as mass information, counselling and follow-up strategies on access to rights.[162]

---

[158] Ombudsperson's Office,"Dynamic Dashboard on Early Warnings," accessed 28 July 2022, _https://alertastempranas.defensoria.gov.co/Alerta/Tablero_

[159] A strategy has been prioritized in the Urabá area in response to the identified protection risks of mixed movements in the area.

[160] In accordance with the back-to-back coordination mechanism with the Protection Cluster, and focusing on profiles that include indigenous peoples in border contexts, people at risk of eviction, pregnant and lactating women, LGBTQI+ people, youth between 18-23 years old, people with serious medical situations, and those in-transit.

[161] By complementing the actions developed by the authorities through the ICBF, the Ministry of Health and Social Protection, Social Prosperity, among other entities, and also through guidance, advisory and legal representation, aiming to guarantee protection services.

[162] Such as access to medical services, financial and bank services, appropriate housing programmes, access to legal work opportunities, education in all levels, and work specialized trainings.

CLP_AR_006323

The Sector will work on reducing access gaps to nationality and the risk of statelessness for children of Venezuelan parents,[163] Colombian returnees born in Venezuela, and those affected by discretionary document cancellation measures.

The response will prioritize reducing gaps to specialized protection services for Venezuelans lacking documentation, those requiring access to the TPS[164] and asylum procedures, those who are homeless or at risk of eviction, or who do not have the possibility of accessing decent housing in Colombia.[165] Priority will be given to the response to indigenous peoples in border contexts, in coordination with national and local authorities, as well as indigenous organizations.

**Response modalities:**

The Sector will provide:

- **Protection assistance and specialized services**, including case management and referral, for refugees and migrants to address their protection needs.

- **Capacity-building** for relevant national and local authorities to enhance ongoing regularization programmes (particularly the TPS process), international protection capacities, especially to enhance RSD processing.

- **Direct services** such as mass information, counselling and follow-up strategies on access to rights, aiming at promoting informed decision-making of refugees and migrants.

**Integral response approaches:**

The Protection Sector will promote and ensure the mainstreaming of protection in all Sectors with a focus on the identification of individuals facing protection risks and needs, and the strengthening of Support Spaces and other key points for the provision of services and assistance for persons with protection needs; while ensuring close collaboration on AAP approaches and PSEA considerations with respective R4V Working Groups.



© GOAL/Silvia Calderón

[163] Pursuant to Resolution 8470/2019-Law 1997/2019, children born to Venezuelan parents in Colombia are entitled to Colombian citizenship; https://bit.ly/3bwLIWA

[164] This also includes the identification of barriers to accessing rights for those who carry the TPP and the design of strategies to overcome those barriers.

[165] According to the R4V Protection Sector's regional housing survey, 90% of people pay rent in host countries and 99.5% do not have access to housing programmes.

CLP_AR_006324



## CHILD PROTECTION

2023  2024

**PEOPLE IN NEED**  0.0%  0.0%
1.70 M  1.82 M  51.0%  49.0%

**PEOPLE TARGETED**  0.0%  0.0%
119.6 K  113.4 K  51.0%  49.0%

**PIN PERCENTAGE**
22.8%  23.1%

**TOTAL REQUIREMENTS**
$28.02 M  $25.02 M

**RMRP PARTNERS**
17

**SUB-SECTOR LEADS: IOM, CID**

The Child Protection Sub-sector has identified the following response priorities:[166]

1. Creation and strengthening of protective environments to carry out activities to prevent the recruitment, use, utilization,[167] and sexual violence by illegal armed groups and criminal groups, or any type of violence that violates the rights of refugee and migrant children, especially in border areas.[168]

2. Support the response to unaccompanied and separated refugee and migrant children to monitor risks, strengthen access to protection pathways at the national and local levels, and develop activities to prevent family separation, facilitate reunification with families and/or caregivers and strengthen their life plans and prospects.

3. Support national strategies for the regularization and social integration of refugee and migrant children, and the strengthening of their life plans and prospects and the socio-economic integration of their families,

to facilitate access to care services to enhance access to rights and prevent violations. This includes promoting strategies to reduce barriers on access to nationality and prevent the risk of statelessness.

**Response modalities:**

**Support national and partner protection services**, with a capacity building perspective through:

- The creation and strengthening of **child friendly spaces, protective spaces or safe community spaces** to prevent protection risks and assist refugee and migrant children and adolescent.

- Comprehensive strengthening of **protective environments** to prevent violence against refugee and migrant children and adolescents.

- **Integration** activities for children and adolescents to promote community-based affirmative action.[169]

- Activities with adolescent refugees and migrants to **enhance their plans and prospects** (as autonomously as possible).

---

[166] In complementarity with the State's public policy frameworks, such as the "Strategy for stabilization, integration and future of children, adolescents, young migrants and their families from Venezuela" implemented by the Colombian Institute for Family Welfare (ICBF), among others **https://www.icbf.gov.co/sites/default/files/30112021_estrategia_migracion_v3_final_esta_si.pdf**

[167] According to ICBF, "Reclutamiento", "Uso" and "Utilización" in Spanish are conceptualized as three specific affectations. See more at: ICBF, Technical Guideline for the Prevention of Recruitment Use and Utilization of Adolescents and Youth - Technical Appendix (page 6), **https://www.icbf.gov.co/sites/default/files/documentos-construccion/08_anexo_tecnico_para_la_prevencion_del_reclutamiento_uso_y_utilizacion_de_adolescentes_y_jovenes_.pdf**

[168] The Recruitment Probability Index designed by the Technical Secretariat of the Intersectoral Commission for the Prevention of Recruitment, Utilization, and Sexual Violence against Boys, Girls, and Adolescents indicates prioritizing prevention actions in the following border departments: Norte de Santander, Arauca, Vichada, La Guajira, Putumayo, and Antioquia.

[169] The Colombian Constitutional Court understands affirmative action as policies or measures aimed at favouring certain individuals or groups, either to eliminate or reduce social, cultural or economic inequalities that affect them or to ensure that members of an underrepresented group, which has usually suffered from historical discrimination, have greater representation. **https://www.corteconstitucional.gov.co/Transparencia/publicaciones/Igualaci%C3%B3n%20material%20v2%2071020.pdf**

CLP_AR_006325

- Carry out **case management, activation and territorialization of pathways** enhancing individual and community care.

- **Technical assistance** to partners and authorities to integrate child- and adolescent approaches in the context of mixed movements.

- Technical assistance at the national and local level for the protection and integration of UASC, with an emphasis on the search for durable solutions.

**Integral response approaches:**

The Sub-sector will work in coordination with the Protection Sector and the Sub-sectors on GBV, Human Trafficking and Smuggling, as well as the Health, Education, WASH, Food Security, Nutrition, and Integration Sectors to mainstream child protection initiatives.



## GENDER-BASED VIOLENCE (GBV)

| | 2023 | 2024 |
|---|---|---|
| **PEOPLE IN NEED** | | |
| ⬆ | 26.0% | 40.5% |
| | 2.97 M | 3.17 M |
| ⬆ | 14.2% | 19.4% |
| **PEOPLE TARGETED** | | |
| ⬆ | 26.0% | 40.5% |
| | 177.7 K | 103.2 K |
| ⬆ | 14.2% | 19.4% |
| **PIN PERCENTAGE** | 39.9% | 40.2% |
| **TOTAL REQUIREMENTS** | $20.23 M | $18.49 M |
| **RMRP PARTNERS** | 35 | |

**SUB-SECTOR LEADS: UNFPA, UNHCR, UN WOMEN**

The GBV Sub-sector has identified an increase in GBV incidences suffered by refugees and migrants, especially sexual violence against those in-transit and engaging in pendular movements, a concern for early unions, economic and institutional violence.[170] The following response priorities will be at the core the Sub-sector's engagement:

1. **Provision of GBV response services** through case management services, safe spaces for women and girls, as well as to survivor-centred assistance for LGBTQI+ persons, and increasing services at the institutional (capacity building), community, and organizational levels for GBV survivors.

2. **GBV prevention actions** through the challenging of stereotypes and relating gender roles, and actions for the protection of GBV survivors and those at-risk.

3. **Promotion of inclusion of women at-risk or survivors** of intimate partner/ex-partner violence in **economic empowerment** programmes.

The response priorities have the long-term objective of driving gender transformations to eradicate GBV. Prioritized population groups for the Sub-sector's response are adolescents, youth and women caught in human trafficking and sexual exploitation networks, women community leaders, women heads of

[170] Institutional violence is recognized as a form of GBV: The sentence T-462-18 by the Colombian Constitutional Court recognizes that "when women victims of violence turn to the public authorities for the protection of their rights, on repeated occasions there is a "re-victimization" by the legal operators, since the response expected from these authorities is not satisfactory and, in addition, often confirms patterns of inequality, discrimination and violence against this population." Additionally, in the case of refugees and migrant GBV survivors, according to analysis conducted by the Sub-sector, this pattern is reinforced by xenophobia. *https://www.corteconstitucional.gov.co/relatoria/2018/T-462-18.htm*

CLP_AR_006326

households, pregnant women, women with disabilities and LGBTQI+[171] persons.[172]

**Response modalities:**

The following response modalities are proposed:

Capacity-building of public institutions, social and community organizations to enhance GBV prevention, response and solutions for survivors.[173]

Guidance, and design of protocols and documentation to strengthen processes and procedures of public institutions and social and community organizations in providing services for survivor-centred care.

Direct actions with the community at the individual and group levels such as: strengthening of community-based protection, monitoring and reporting, case management,

psychosocial support, including in-kind assistance and CVA for GBV survivors and those at-risk.

**Integral response approaches:**

The GBV Sub-sector will ensure that intersectoral approaches are planned in the response for refugee and migrant GBV survivors and at-risk populations. With the Integration Sector, access to livelihoods opportunities will be prioritized.

With the Health Sector, clinical management of sexual violence, PEP kits, emergency and long-term contraception, and strengthening services with survivor-centred care (including mental health) will be featured. Joint work with the Shelter Sector will help identify and mitigate GBV risks. Throughout, PSEA and AAP approaches will be applied.



## HUMAN TRAFFICKING AND SMUGGLING

2023   2024

| | | 2023 | 2024 | |
|---|---|---|---|---|
| **PEOPLE IN NEED** | | 948.2 K | 1.02 M | ↑ 35.7% ↑ 36.1% / ↑ 14.1% ↑ 14.1% |
| **PEOPLE TARGETED** | | 29.0 K | 27.9 K | ↑ 35.7% ↑ 36.1% / ↑ 14.1% ↑ 14.1% |
| **PIN PERCENTAGE** | | 12.7% | 12.9% | |
| **TOTAL REQUIREMENTS** | | $6.75 M | $5.54 M | |
| **RMRP PARTNERS** | | 8 | | |

**SUB-SECTOR LEADS: IOM, UNODC**

The Human Trafficking and Smuggling Sub-sector identified the following response priorities:[174]

1. **Strengthen mechanisms, instruments, strategies, and actions aimed at identifying and preventing** of cases of human trafficking and smuggling of refugees and migrants. This will target state and non-state actors.

2. **Reinforce actions, strategies and pathways aimed at providing comprehensive assistance and protection** to victims of human trafficking and smuggling at national and local levels through the relevant inter-institutional coordination mechanisms.

3. **Promote spaces and processes for knowledge generation and management** to identify emerging

---

[171] Especially men and boys with diverse sexual orientations and gender identities.

[172] Furthermore, the geographic scope of the response includes border regions, also covering Caribbean and Pacific coasts, as well as in the main capital cities of Bogotá, Cali, Barranquilla, and Medellín.

[173] For instance, through trainings, GBV awareness, dissemination, and visibility activities, and empowerment of women leaders.

[174] Under a cross-cutting scope of enhancing a human rights-based, gender, intersectional, and victim-centered approach.

CLP_AR_006327

trends and new phenomena related to these crimes in order to enable relevant, timely, effective, evidenced-based response actions.

All priorities will be implemented working closely with the national and local authorities, including the Ministry of the Interior and the Ombudsperson's Office, as well as local human trafficking committees.

**Response modalities:**

The corresponding response modalities of the Sub-sector will be:

- **Technical capacity development** of state actors, civil society, R4V partners, academia and others involved in fighting against human trafficking and smuggling across the country. Prevention, protection, assistance and guidance to victims and their families will be prioritized.

- Enhance and consolidate **proactive identification processes** related to the referral of cases to competent authorities and entities, in accordance with the national assistance pathway for victims of human trafficking of the Ministry of the Interior[175] and the Protocol Against the Smuggling of Migrants by Land, Sea and Air.[176]

- **Comprehensive direct short and mid-term assistance to victims** of both crimes, based on the needs of each case, in coordination with the designated local and national authorities.[177]

**Integral response approaches:**

The Sub-sector will coordinate with the Protection, Health, GBV and Child Protection Sectors/Sub-sectors to ensure assistance provided to victims of trafficking and smuggling integrates the response priorities of these Sectors. Assistance will be provided with an AGD approach. Coordination with the Humanitarian Transportation Sector will ensure assistance is provided when required. The Sub-sector will also work with the Integration Sector to feature medium-term actions and the generation of livelihoods for persons at risk and/or victims of human trafficking or smuggling.



© GOAL/Adriana Ruiz

[175] Documented in Chapter II of Decree 1066/2015 of the Ministry of the Interior: *https://bit.ly/3xNkrqP*

[176] Ministry of the Interior, National Strategy to Combat Human Trafficking, 2020-2024, *https://bit.ly/3BClZnv*

[177] This will be implemented by: i) supporting interinstitutional coordination for immediate attention and response to victims (by state entities or through subsidiary routes), particularly in shelter, medical and psychological healthcare; and ii) capacity development through training of institutional actors responsible for providing assistance to victims to ensure the adequate restitution of rights from a victim-centered approach throughout the assistance process.

CLP_AR_006328



RMRP 2023 - 2024

COLOMBIA   R4V • 153 •

### SHELTER

| | 2023 | 2024 |
|---|---|---|

| | | 2023 | 2024 |
|---|---|---|---|
| PEOPLE IN NEED | ↑34.3% ↑37.0% ↑14.6% ↑14.2% | 5.08 M | 5.42 M |
| PEOPLE TARGETED | ↑34.3% ↑37.0% ↑14.6% ↑14.2% | 232.5 K | 186.7 K |
| PIN PERCENTAGE | | 68.2% | 68.8% |
| TOTAL REQUIREMENTS | | $36.02 M | $28.14 M |
| RMRP PARTNERS | | 18 | |

**SECTOR LEADS:   IOM, NATIONAL RED CROSS SOCIETY, UNHCR**

The Shelter Sector will aim to promote timely, contextualized,[178] comprehensive, decent and safe shelter solutions through the implementation of the following priorities:

1. **Medium to longer-term collective and individual shelter solutions,** based on financial support for rent and utility payments, and interventions to improve community infrastructure (including settlement management) and housing.[179]

2. **Short-term collective and individual shelter solutions** as an emergency response for transit locations of refugees and migrants,[180] as well as for the population in-destination to support integration processes in host cities. This will be implemented in close coordination with local authorities.[181]

3. **Distribution of household items**[182] complementing individual (short and long-term) and collective shelter response strategies for refugees and migrants in-destination and in-transit.

**Response modalities:**

The response priorities will be delivered through:

- **In-kind shelter solutions,** such as collective shelters and reception and transit centres, or hotel rooms, as well as provision of household items, assistance in reaching agreements between landlords and organizations, interventions in community and housing infrastructure and settlement management.

- **CVA** to access short-term and long-term shelter solutions (e.g., financial support for rent and utility payments), as well as to purchase household items.

- **Technical capacity development** to manage, handle and coordinate shelter solutions through roundtable working groups and training sessions with local and national authorities, Sector partners, community organizations and other relevant stakeholders.

**Integral response approaches:**

Within collective shelters and transit centers, it will be a priority to strengthen the mechanisms for case referral through complementary response activities provided by Sectors such as Protection, Food Security, Nutrition, WASH and Health as well as the provision of basic services associated with these Sectors. For WASH, Protection and Integration Sectors, joint and complementary actions will be implemented focusing on community

---

[178] Designed and implemented with AGD considerations, as well as targeted to each local context.

[179] Mainly in departments with the highest concentration of population in- destination, such as Bogotá, Antioquia, Norte de Santander, Valle del Cauca, and Atlántico.

[180] Norte de Santander, Arauca, Bogotá, Valle del Cauca, and Nariño departments.

[181] These solutions include activities related to Collective Centres, Reception and Transit Centres, and hotel rooms.

[182] E.g., those for sleeping, preparing and preserving food, eating and drinking, maintaining thermal comfort, lighting, personal clothing, construction materials and tools.

CLP_AR_006329

infrastructure and settlements. This will contribute to capacity building for its management, promoting access to basic services and knowledge transfer on land tenure security and legalization, favouring durable shelter solutions supporting integration of the target population.

The adoption of cross-cutting approaches to GBV, environment, PSEA, and AAP is a priority.

Close coordination with the CVA Working Group is key to contribute to the planning, implementation, and monitoring of activities for the provision of financial support.



## WASH

| | 2023 | 2024 |
|---|---|---|
| **PEOPLE IN NEED** | 3.80 M ⬆ 34.3% ⬆ 14.5% | 4.04 M ⬆ 37.1% ⬆ 14.2% |
| **PEOPLE TARGETED** | 288.7 K ⬆ 34.3% ⬆ 14.5% | 284.5 K ⬆ 37.1% ⬆ 14.2% |
| **PIN PERCENTAGE** | 51.0% | 51.3% |
| **TOTAL REQUIREMENTS** | $22.63 M | $20.85 M |
| **RMRP PARTNERS** | 29 | |

**SECTOR LEADS:** ACTION AGAINST HUNGER, UNICEF, UNIVERSIDAD TECNOLÓGICA DE PEREIRA

The response priorities of the WASH Sector will address the needs and gaps, in line with the comprehensive WASH response approach, through:

1. **Service construction, improvement, rehabilitation, installation and hygiene promotion** in non-formalized settlements where refugees and migrants in-destination and host communities reside.

2. **Implementation and maintenance of WASH services, hygiene promotion and distribution of critical supplies**[183] for those in-transit and those engaging in pendular movements at key assistance points and facilities providing other humanitarian services.[184]

3. **Technical assistance and advocacy with government authorities** on WASH policies and for

the response for vulnerable refugees and migrants and affected host communities (especially for binational indigenous peoples) from a multiple impact perspective and differential AGD approaches.

**Response modalities:**

**Response modalities will include capacity building** through technical assistance and training for community associations responsible for the management of WASH services; technical assistance to such organizations and indigenous groups, as well as to the administrations of municipalities and departments, especially those facing multiple impacts and challenges.[185]

**Support the provision of services (including infrastructure interventions)**, relating to construction, repair, improvement and rehabilitation of systems and alternatives for water supply and sanitation

[183] For personal and household hygiene, water storage and treatment for consumption.

[184] Specifically in border departments and those areas with constraints for accessing such services.

[185] E.g. derived from the coexistence of displacement and conflict and/or natural disaster-related situations.

CLP_AR_006330

in settlements and host communities, as well as implementation and maintenance of WASH services in community facilities.[186]

**Hygiene supplies/communication campaigns on hygiene practices** to drive behavioural change, according to the socio-cultural context and distribution of critical supplies;[187] foster spaces that promote access to menstrual rights (for refugee and migrant women, girls and transgender men) and disaster risk prevention and survival techniques.

**Integral response approaches:**

The WASH Sector response will be implemented in accordance with international humanitarian response standards, as well as national standards. Assistance and coordination will be carried out at the national level with the Ministry of Housing, City and Territory and the Ministry of Health and Social Prosperity, as well as with local authorities. An integrated response with other Sectors will be applied. WASH strategies and hygiene promotion will be articulated with Education, Health, Protection, Food Security and Nutrition interventions. CVA and Shelter strategies will articulate for hygiene promotion. Also, the Sector will coordinate with the Integration Sector on initiatives, promoting medium/longer-term WASH activities which are tied to the RMRP's HDPN priorities. The WASH Sector will coordinate with the GBV Sub-sector on the installation and/or refurbishment of safe and illuminated WASH spaces with protection-sensitive approaches to prevent violence (especially GBV). All projects and programmes will consider PSEA and AAP priorities.



UNHCR/Sebastian Gil

[186] Including in health centres, shelters, schools, community kitchens, and points of care for refugees and migrants.

[187] Including in-kind or CVA for personal hygiene, household, storage, waste management and water treatment for consum

CLP_AR_006331



ECUADOR

CLP_AR_000322



R4V • 157

© Flóres Soláno



# ECUADOR AT A GLANCE

2023
2024

| |  POPULATION PROJECTION |  PEOPLE IN NEED (PiN) |  PIN PERCENTAGE |  PEOPLE TARGETED |
|---|---|---|---|---|
| **VENEZUELANS IN-DESTINATION** | ■ 518.9 K | ■ 402.5 K | 77.6% | ■ 294.4 K |
| | 536.5 K | 416.3 K | 77.6% | 300.0 K |
| **IN-TRANSIT** | 367.9 K | 285.5 K | 77.6% | 145.1 K |
| | 357.1 K | 277.1 K | 77.6% | 140.0 K |
| **AFFECTED HOST COMMUNITIES** | - | 208.6 K | - | 84.0 K |
| | - | 211.8 K | - | 83.0 K |

**AGE AND GENDER DISAGGREGATION**


32.0%  31.5%
18.9%  17.6%


32.0%  31.4%
19.0%  17.6%


30.0%  32.6%
19.5%  17.9%

 TOTAL REQUIREMENTS
$300.92 M   $289.68 M

 RMRP PARTNERS
71

CLP_AR_006333

## ECUADOR: BENEFICIARIES TARGETED



PEOPLE TARGETED 2023

- 100 – 3,000
- 3,001 – 8,000
- 8,001 – 15,000
- 15,001 – 40,000
- 40,001 – 125,000

This map is for illustration purposes only. The boundaries and names shown and the designations used on this map do not imply official endorsement or acceptance by the UN.

CLP_AR_006334

## ECUADOR: KEY FIGURES BY REGION

Population Projection    People in Need (PiN)    People Targeted    Total Requirements

| | 2023 | | | | 2024 | | | |
|---|---|---|---|---|---|---|---|---|
| | Pop. | PiN | Targeted | $ | Pop. | PiN | Targeted | $ |
| AZUAY | 29.7K | 21.8K | 13.2K | $10.70 M | 30.5K | 22.4K | 13.3K | $10.60 M |
| BOLÍVAR | 1.5K | 1.1K | 389 | $520.6 K | 1.5K | 1.1K | 635 | $518.6 K |
| CAÑAR | 4.9K | 3.6K | 1.1K | $1.34 M | 5.0K | 3.7K | 1.2K | $1.64 M |
| CARCHI | 14.5K | 10.7K | 7.8K | $18.81 M | 14.9K | 10.9K | 7.8K | $17.13 M |
| CHIMBORAZO | 10.5K | 7.7K | 3.3K | $1.90 M | 10.8K | 7.9K | 3.9K | $1.96 M |
| COTOPAXI | 8.8K | 6.5K | 4.1K | $3.14 M | 9.0K | 6.6K | 3.9K | $2.75 M |
| EL ORO | 50.1K | 36.9K | 26.0K | $18.01 M | 51.4K | 37.8K | 25.4K | $17.03 M |
| ESMERALDAS | 11.4K | 8.4K | 6.2K | $6.54 M | 11.7K | 9.7K | 8.6K | $6.78 M |
| GALÁPAGOS | 125 | 95 | - | - | 131 | 97 | - | - |
| GUAYAS | 213.3K | 157.0K | 92.2K | $41.00 M | 219.0K | 160.7K | 93.1K | $38.27 M |
| IMBABURA | 25.1K | 18.5K | 14.1K | $14.31 M | 25.8K | 18.9K | 14.0K | $12.30 M |
| LOJA | 5.2K | 3.9K | 2.6K | $4.22 M | 5.4K | 3.9K | 2.1K | $4.20 M |
| LOS RÍOS | 18.5K | 13.6K | 7.3K | $2.21 M | 19.0K | 13.9K | 7.3K | $2.47 M |
| MANABÍ | 88.6K | 65.2K | 39.9K | $24.29 M | 91.0K | 66.8K | 40.5K | $25.31 M |
| MORONA SANTIAGO | 2.6K | 1.9K | 200 | $55.0 K | 2.7K | 2.0K | 200 | $82.8 K |
| NAPO | 1.9K | 1.4K | 362 | $302.1 K | 2.0K | 1.4K | 362 | $465.6 K |
| ORELLANA | 6.3K | 4.6K | 2.5K | $3.05 M | 6.5K | 4.7K | 2.4K | $3.09 M |
| PASTAZA | 2.3K | 1.7K | 585 | $250.5 K | 2.3K | 1.7K | 486 | $501.5 K |
| PICHINCHA | 261.6K | 192.5K | 124.1K | $120.71 M | 268.6K | 197.1K | 125.1K | $115.77 M |
| SANTA ELENA | 13.4K | 9.8K | 1.2K | $696.6 K | 13.7K | 10.1K | 1.4K | $1.00 M |
| SANTO DOMINGO DE LOS TSÁCHILAS | 23.9K | 17.6K | 12.6K | $8.13 M | 24.6K | 18.0K | 11.3K | $8.67 M |
| SUCUMBÍOS | 11.2K | 8.3K | 6.5K | $14.05 M | 11.5K | 9.6K | 9.3K | $12.90 M |
| TUNGURAHUA | 23.5K | 17.3K | 12.3K | $6.62 M | 24.1K | 17.7K | 10.8K | $6.13 M |
| ZAMORA CHINCHIPE | 1.5K | 1.1K | 100 | $72.0 K | 1.5K | 1.1K | 100 | $89.8 K |

CLP_AR_006335



## NUMBER OF ORGANIZATIONS AND FINANCIAL REQUIREMENTS BY ORGANIZATION TYPE

| | TOTAL | International NGOs | National NGOs / CSOs[i] | Others[ii] | UN Agencies |
|---|---|---|---|---|---|
| **Financial requirements** | $300.92 M | 16.3% | 5.3% | 2.1% | 76.3% |
| **Organizations** | 71 | 25 | 28 | 5 | 13 |

[i] Civil Society Organizations.
[ii] Others include the Red Cross Movement, academia and faith based organizations.

The list of organizations only includes appealing organizations under the RMRP, many of which collaborate with implementing partners to carry out RMRP activities.

## POPULATION IN NEED AND TARGET, FINANCIAL REQUIREMENTS AND NUMBER OF PARTNERS BY SECTOR*

| Sector | People in Need (PiN) | PiN percentage** | People targeted | Targeted / In need | Financial requirements | Partners |
|---|---|---|---|---|---|---|
| Education | 189.2 K | 15.8% | 133.5 K | 70.5% | 18.93 M | 28 |
| Food Security | 643.6 K | 53.7% | 290.2 K | 45.1% | 67.13 M | 12 |
| Health | 547.5 K | 45.7% | 210.9 K | 38.5% | 24.86 M | 24 |
| Humanitarian Transportation | 171.1 K | 14.3% | 14.1 K | 8.3% | 612.8 K | 2 |
| Integration | 557.3 K | 46.5% | 213.8 K | 38.4% | 53.97 M | 43 |
| Nutrition | 131.6 K | 11.0% | 8.6 K | 6.5% | 3.16 M | 6 |
| Protection*** | 838.5 K | 70.0% | 434.7 K | 51.8% | 44.05 M | 40 |
| Child Protection | 407.9 K | 34.0% | 52.6 K | 12.9% | 12.64 M | 17 |
| Gender-Based Violence (GBV) | 268.9 K | 22.4% | 133.0 K | 49.5% | 12.66 M | 27 |
| Human Trafficking & Smuggling | 58.3 K | 4.9% | 920 | 1.6% | 2.55 M | 5 |
| Shelter | 495.9 K | 41.4% | 241.1 K | 48.6% | 18.29 M | 14 |
| WASH | 468.6 K | 39.1% | 221.5 K | 47.3% | 6.27 M | 10 |
| Multipurpose Cash Assistance | – | – | 108.4 K | – | 24.17 M | 14 |
| Common Services**** | – | – | – | – | 11.62 M | 29 |

* While not being Sectors, data for Multipurpose Cash and for Common Services is included to inform on the overall targets and distribution of financial requirements in the RMRP 2023-2024.
** The PiN calculations for some sectors (namely, Nutrition, Education and all Protection subsectors) are based on specific age and gender groups, resulting in a low PiN percentage as a proportion of the total population.
*** This includes Support Spaces.
**** This includes AAP-CwC, Communication, Coordination, Information Management, PSEA, and Reporting.

CLP_AR_006336

## NUMBER OF ORGANIZATIONS AND FINANCIAL REQUIREMENTS BY ORGANIZATION TYPE

| | TOTAL | International NGOs | National NGOs / CSOs[i] | Others[ii] | UN Agencies |
|---|---|---|---|---|---|
| **Financial requirements** | **$289.68 M** | 15.8% | 5.5% | 1.7% | 77.0% |
| **Organizations** | **68** | 24 | 28 | 4 | 12 |

[i] Civil Society Organizations.
[ii] Others include the Red Cross Movement, academia and faith based organizations.

The list of organizations only includes appealing organizations under the RMRP, many of which collaborate with implementing partners to carry out RMRP activities.

## POPULATION IN NEED AND TARGET, FINANCIAL REQUIREMENTS AND NUMBER OF PARTNERS BY SECTOR*

| Sector | People in Need (PiN) | PiN percentage** | People targeted | Targeted / In need | Financial requirements | Partners |
|---|---|---|---|---|---|---|
| Education | 195.9 K | 16.2% | 138.3 K | 70.6% | 24.17 M | 25 |
| Food Security | 648.8 K | 53.6% | 271.7 K | 41.9% | 62.51 M | 11 |
| Health | 554.3 K | 45.8% | 235.6 K | 42.5% | 22.74 M | 21 |
| Humanitarian Transportation | 168.2 K | 13.9% | 13.2 K | 7.8% | 598.6 K | 2 |
| Integration | 572.3 K | 47.3% | 205.4 K | 35.9% | 53.26 M | 44 |
| Nutrition | 133.1 K | 11.0% | 8.6 K | 6.4% | 2.54 M | 6 |
| Protection*** | 846.1 K | 69.9% | 433.0 K | 51.2% | 40.46 M | 36 |
| Child Protection | 414.5 K | 34.3% | 51.4 K | 12.4% | 14.30 M | 15 |
| Gender-Based Violence (GBV) | 272.4 K | 22.5% | 130.5 K | 47.9% | 11.91 M | 24 |
| Human Trafficking & Smuggling | 57.0 K | 4.7% | 1.0 K | 1.8% | 2.53 M | 5 |
| Shelter | 499.0 K | 41.2% | 225.4 K | 45.2% | 18.62 M | 14 |
| WASH | 473.8 K | 39.2% | 219.8 K | 46.4% | 5.93 M | 9 |
| Multipurpose Cash Assistance | – | – | 104.3 K | – | 18.39 M | 11 |
| Common Services**** | – | – | – | – | 11.71 M | 25 |

\*    While not being Sectors, data for Multipurpose Cash and for Common Services is included to inform on the overall targets and distribution of financial requirements in the RMRP 2023-2024.
\*\*   The PiN calculations for some sectors (namely, Nutrition, Education and all Protection subsectors) are based on specific age and gender groups, resulting in a low PiN percentage as a proportion of the total population.
\*\*\*  This includes Support Spaces.
\*\*\*\* This includes AAP-CwC, Communication, Coordination, Information Management, PSEA, and Reporting.

CLP_AR_006337

# COUNTRY OVERVIEW

It is estimated that approximately half a million refugees and migrants from Venezuela live in Ecuador. A high proportion of this population is in an irregular situation in the country (73 per cent).[188] Their irregular status affects their access to services and to the formal labour market, exposing them to protection risks and limiting their socio-economic integration prospects. In this context, the broad regularization exercise announced by the Government of Ecuador,[189] which started in September 2022, will be key for enabling the needs of this population to be met and to advance solutions for refugees and migrants from Venezuela in Ecuador as part of a broader socio-economic integration and social inclusion strategy.

The country is also witnessing population movements from countries such as Haiti, who transit through the territory in complex routes and secondary movements both towards the north and the south of the continent. R4V partners monitor these movements through an inter-agency Border Monitoring and Population Profiling System, which also serves as an important entry point to identify and assist people in-need. The irregular nature of these movements, due to visa requirements for Venezuelans and other populations, leads to heightened protection risks and increased vulnerabilities for refugees and migrants, who are often exposed to sexual abuse, trafficking, and other human rights violations.

With the assumption that Venezuelans, as well as refugees and migrants of other nationalities, will continue arriving to and transiting through Ecuador, mainly through irregular channels, it is estimated that approximately 519,000 refugees and migrants from Venezuela will be living in Ecuador by December 2023, while some 368,000 will be transiting to third countries throughout the year (of which approximately 19,000 are of other nationalities, mainly Haitians).

The presence of irregular armed groups and criminal gangs in the country and the continued deterioration of the security situation results in an increasingly complex operational environment. The challenges are further deepened by a deteriorating economic situation, made worse by the impact of the conflict in Ukraine and continued post-COVID-19 global supply chain factors, which have caused rising inflation and production deficits and an increase in the cost of the minimum expenditure basket. The slow economic recovery and insecurity affect both host communities and refugees and migrants, particularly those already in vulnerable situations. It contributes to increased xenophobia (93 per cent[190] of those who report episodes of discrimination mention it is due to their nationality), and heightens protection risks, as almost 9 out 10 Venezuelans report resorting to negative coping strategies.[191]

Despite this situation, Ecuador´s legal framework does guarantee universal access to services such as health and education, including for refugees and migrants in an irregular situation, and the Government has continuously worked to promote their inclusion. However, being the country hosting the third largest refugee and migrant population from Venezuela, the pressure on public capacities often translates into practical barriers for accessing services.

## SCOPE OF THE RESPONSE AND PRIORITIES

Seventy-one R4V partners in Ecuador will work in a coordinated manner in order to address the protection, humanitarian and integration needs of refugees and migrants from Venezuela as well as their host communities in 23 provinces of the country. The response will include technical and material support to the Government, both at the national and local levels, contributing to strengthening national systems that assist both refugees and migrants, and their host communities. It will develop the capacity of civil society and provide direct support through in-kind assistance and CVA. Moreover, strategic partnerships with development actors, including development banks, and with the private sector, will be at the centre of the strategy

---

[188] GTRM, Joint Needs Assessment, May 2022, *https://www.r4v.info/es/document/gtrm-ecuador-evaluacion-conjunta-necesidades-mayo-2022*

[189] Executive Decree No. 436, 1 June 2022, *Decreto Ejecutivo 436 del 01 de junio de 2022 sobre proceso de regularización de ciudadanos venezolanos, primera etapa. | Ecuador - Guía Oficial de Trámites y Servicios (www.gob.ec).*

[190] Ibid, pag. 41.

[191] Ibid, pag. 41.

of the national R4V Platform in Ecuador (GTRM), with a view to promote coherence and synergies between humanitarian and development actions. This will also allow for strategic policy, alliances and investments to advance the Sustainable Development Goals, ensuring no one is left behind, as reflected in the recently adopted United Nations Sustainable Development Cooperation Framework (UNSDCF).

To respond to protection needs, R4V partners will support the Government in implementing the registration and regularization exercises, including through technical, material and financial support, by facilitating communication with refugees and migrants from Venezuela. R4V partners will also provide direct assistance to refugees and migrants to facilitate access to the regularization exercise, and by coordinating the implementation of the process across the country. While these processes go hand in hand with socio-economic integration efforts, it will also function as an entry point for partners to identify and respond to immediate urgent needs of refugees and migrants. Legal assistance and support to the Government will also be provided to uphold the right to access to asylum and the process of Refugee Status Determination (RSD). Furthermore, partners will work with different authorities to strengthen national protection systems, enhancing prevention mechanisms and specialized services for people with protection needs, including those in need of family reunification, GBV survivors, unaccompanied and separated children, among others.

Advocacy and technical support will also aim at advancing the mainstreaming of human mobility considerations into public policies, and to foster the inclusion of refugees and migrants in social protection systems and public services such as health, education and WASH. Partners will work to promote access to decent work, support self-employment, reduce xenophobia, improve access to financial services, as well as other strategies to advance refugees' and migrants' self-reliance and contribute to their integration in Ecuador, while contributing to boosting the country's economy.

The response will support the most vulnerable among affected host community members through a holistic response that aims to boost community capacities and foster harmonious coexistence. Food and non-food items (NFIs), temporary shelter, and other forms of more urgent assistance will be directed mainly to refugees and migrants in-transit through Ecuador, particularly in border provinces such as Carchi and El Oro, but also to new arrivals for whom Ecuador is a destination country

and those who need support in the aftermath of events that can destabilize communities or families.

CVA for food, health, shelter, education, protection and other sectoral responses will complement in-kind assistance and will be delivered both to people in-transit and those considered in-destination, and living in Ecuador in vulnerable situations, to safeguard their well-being while helping to support local markets. Moreover, where appropriate, multipurpose CVA will be used to stabilize families and increase the impact of other sectorial interventions, including those related to livelihoods.

The needs identified through the JNA, the Secondary Data Review, and other relevant information, will inform the geographical prioritization of the response. Targeting criteria will consider protection and socio-economic considerations and will be applied, where appropriate, using inter-agency tools. Inclusive protection and integration strategies will target refugees and migrants from Venezuela in-need living in Ecuador as well as vulnerable members of affected host communities, particularly in the provinces of Pichincha, Guayas, Manabí, El Oro, Azuay and Imbabura, as it is estimated these host the biggest numbers of Venezuelans in the country, mainly concentrated in these provinces' capital cities. As for those in-transit, the response will focus on Carchi, El Oro, Sucumbíos, Imbabura as well as Loja.

## RESPONSE PRINCIPLES, GOOD PROGRAMMING/ COLLECTIVE ACCOUNTABILITY CONSIDERATIONS

Communicating with refugees and migrants will be a cross-cutting action that is key to ensuring their protection and integration in Ecuador, particularly in light of changing movement dynamics. Hence, partners will aim to strengthen communication and accountability through two-way mechanisms that can contribute to understanding and responding to population needs. Using existing local networks will help partners to disseminate key information more effectively. Moreover, it will improve two-way-communication throughout the programme cycle, enabling feedback and direct input in programme decisions, based on refugees and migrants as well as affected host communities' needs, concerns and capacities. At the coordination level, continuous feedback will be collected through joint needs assessments and rapid inter-agency assessments, that among other initiatives, inform partners' programming. These cross-cutting actions will aim at promoting accountability to affected populations across the response.

With respect to integrated approaches to prevent, mitigate and respond to protection needs, the Protection Sector and its Sub-sectors will work in a coordinated manner with the Government's Secretariat for Human Rights to implement GBV protocols and will build upon efforts made in 2022 in order to advance the roll-out of the inter-agency SOPs on GBV. This will entail technical support and training to relevant public and humanitarian actors, including on the protection of LGBTQI+ people.

The Sector will work with a wide range of actors to promote a multisectoral response to protection cases. The Education and WASH Sectors will work closely to ensure education facilities serve as assistance points for access to menstrual hygiene items, that school sanitary installations are safe, and that spaces are accessible for persons with disabilities. In coordination with health and GBV actors, the Education Sector will also promote comprehensive education on adolescents' sexual and reproductive health. Moreover, the Shelter Sector will work to enable that temporary shelters, facilities along travel routes and communal spaces serve as safe spaces for identification and response to protection cases. The Food Security Sector will collect ongoing feedback through post-distribution monitoring and risk assessments with actors and institutions that deliver food. Finally, the Integration Sector will work closely with protection partners to support in breaking the cycle of violence for GBV survivors by supporting their access to livelihoods. Regarding PSEA, the GBV Sub-sector will lead capacity development initiatives and roll-out of tools on PSEA targeting a wide range of partners and other actors involved in the response, in order to prevent, mitigate the risks and respond to misconduct and to put the protection of victims at the forefront.

CLP_AR_006340



## EDUCATION

2023  2024

**PEOPLE IN NEED**  ↑ 14.1%  ↑ 19.5%
189.2 K  195.9 K  ↑ 34.5%  ↑ 31.9%

**PEOPLE TARGETED**  ↑ 14.1%  ↑ 19.6%
133.5 K  138.3 K  ↑ 34.6%  ↑ 31.7%

**PIN PERCENTAGE**
15.8%  16.2%

**TOTAL REQUIREMENTS**
$18.93 M  $24.17 M

**RMRP PARTNERS**
28

**SECTOR LEADS:**  RET, UNESCO, UNICEF

The Education Sector will coordinate the actions of 28 partners in 23 provinces, with particular attention to Pichincha, Guayas and Carchi, with a focus on:

1. improving access to the national education system in order to boost enrolment levels among refugee and migrant children;

2. promoting a safe and inclusive education system that positively impacts the socio-emotional well-being of students; and

3. improving school retention and the completion of school stages through a holistic and quality learning in a safe environment.

Awareness raising exercises on the importance of inclusive education accessible and catered to all children will target a wide range of actors in the educational community including parents and caregivers of children and adolescents from prioritized educational institutions. An active search process will be promoted to identify refugee and migrant children in vulnerable situations who are out of the educational system, as well as those who are at risk of dropping out.

Parents and caregivers will receive guidance on access to the education system, within the framework of the national 026A agreement.[192] Given the multiple vulnerabilities and barriers to education faced by many children, this process will be accompanied by

the provision of educational kits and CVA to the most vulnerable families, as a strategy to address access gaps and increase school retention rates.

Teachers and staff from the Student Counselling Departments (DECE) and from the Ministry of Education will be provided with support and mentoring, including on the process of inclusion and detection of cases of bullying and violence. Furthermore, they will be supported to develop their teaching practice and will receive training that aims at enhancing their capacities in incorporating, among other things, psychosocial care and socio-cultural education into their practice. Support to the national education system will also aim to improve school access for children from host communities and generate safe learning spaces that promote harmonious coexistence.

Levelling and academic reinforcement programmes will be carried out with an emphasis on adolescents, with flexible modalities adapted to their need to address learning gaps created by significant breaks in education. At the same time, in coordination with the WASH and Shelter Sectors, improvements of school infrastructure of the prioritized educational institutions will be conducted so they can be safe and accessible and function as access points for hygiene items and menstrual hygiene kits.

[192] Ministry of Education, Ecuador. Ministerial Agreement 2021-00026-A. *https://educacion.gob.ec/wp-content/uploads/downloads/2021/05/MINEDUC-MINEDUC-2021-00026-A.pdf*

CLP_AR_006341



## FOOD SECURITY

| | 2023 | 2024 | |
|---|---|---|---|

**PEOPLE IN NEED** ⬆ 32.3% 🚹 31.2%
643.6 K   648.8 K   ⬆ 19.0% 🚹 17.6%

**PEOPLE TARGETED** ⬇⬇ 29.0% 🚹 32.2%
290.2 K   271.7 K   ⬆ 20.3% 🚹 18.6%

**PIN PERCENTAGE**
53.7%   53.6%

**TOTAL REQUIREMENTS**
$67.13 M   $62.51 M

**RMRP PARTNERS**
12

**SECTOR LEADS:**   HIAS, WFP

The Food Security Sector, composed of 12 R4V partners, will coordinate actions in 20 provinces, with an emphasis on those with the highest numbers of refugees and migrants from Venezuela in vulnerable situations, namely the northern and southern borders and Pichincha and Imbabura provinces.

Sector partners will centre their response around three main objectives: 1) Improve the food security situation for the most vulnerable refugees and migrants, both those in-transit and in-destination, as well as host community members, through direct food assistance as well as support to food delivery services in temporary shelters and other communal spaces; 2) Enhance the harmonization of the different food assistance programmes to increase their efficiency, including by strengthening inter-sectoral cooperation; 3) strengthen food security strategies that engage the most vulnerable host community populations, with an aim to reducing xenophobia against refugees and migrants.

The Sector plans to introduce a cash and voucher assistance (CVA) modality aligned with national programmes directed at vulnerable households with pregnant and lactating women, and children under 2 years old. Direct in-kind food delivery will complement this strategy, especially at the borders and through food assistance provided in shelters and community kitchens.

Food assistance provision to vulnerable populations will prioritize households with pregnant and lactating women, children under 2 years old, elderly people, and people with specific needs and/or chronic illnesses. Moreover, programming will follow gender-sensitive approaches and emphasize cooperation with host communities. Direct assistance will be complemented by sensitization campaigns directed to personnel managing temporary shelters and communal spaces, and by messages that help the targeted population to improve their food and nutritional security, such as families managing home and communal gardens. CVA will be the main assistance modality, primarily through rechargeable and single-use cards that can be used to purchase nutritious food.

Providing an adequate food security response will require close inter-sectoral coordination, especially between the Nutrition, Shelter, WASH and Protection Sectors. Particularly for refugees and migrants from Venezuela in temporary accommodations, close coordination between shelter providers and food delivery services will be sought.

CLP_AR_006342



## HEALTH

2023 | 2024

**PEOPLE IN NEED**
↑ 30.7% ↑ 31.5%
547.5 K | 554.3 K
↑ 19.7% ↑ 18.0%

**PEOPLE TARGETED**
↓↓ 28.5% ↑ 32.6%
210.9 K | 235.6 K
↑ 20.2% ↑ 18.7%

**PIN PERCENTAGE**
45.7% | 45.8%

**TOTAL REQUIREMENTS**
$24.86 M | $22.74 M

**RMRP PARTNERS**
24

**SECTOR LEADS:   KIMIRINA, UNFPA, WHO/PAHO**

The Health Sector response will include 24 partners with actions in 21 provinces, prioritizing border provinces and those with the highest concentration of refugee and migrant populations. The response will focus on:

1. Strengthening the Ecuadorian public health system through support to the Ministry of Public Health, including through technical assistance to develop and/or update specific administrative regulations to enhance the mainstreaming of human mobility considerations, investment in health infrastructure, provision of equipment, medicines, medical devices and personal protective equipment.

2. Enhancing the capacities of health personnel, including training to communities' health promoters, on topics such as health and human mobility, and mental health.

3. Strengthening national vaccination campaigns against COVID-19 as well as the regular vaccination schedule, with special attention to children. By strengthening the capacities of the national health system, the Sector also aims at having a positive impact on the levels of access to medical services for the host community.

Additionally, direct assistance interventions are planned, aimed at promoting access to primary health care through medical brigades, including prenatal care, healthy child control, psychosocial care and first aid, crisis containment and the delivery of medicines. Moreover, partners will deliver vouchers to cover costs related to attending medical appointments, basic and specialized laboratory tests and purchase of medicines. Sexual and reproductive health is also a key priority: it will include the clinical management of sexual violence, specialized kits, and a comprehensive care for people living with HIV/AIDS.

Special attention will be given to populations with chronic and serious diseases and those with specialized health needs such as pregnant women, nursing mothers, new-born children and those under 5 years of age, elderly people and people with disabilities. The main assistance modality will be capacity development and technical assistance to the Ministry of Public Health, direct in-kind assistance that will be complemented with educational and communication campaigns that include, among others, public health system access; sexual and reproductive health awareness; prenatal care and healthy childhood, among others. The Sector has planned 29 per cent of the total sectorial budget to be delivered through CVA.

The Health Sector will work closely with the Nutrition Sector to assist children under 5 years of age and pregnant and lactating women in order combat chronic child malnutrition including child health assessments and nutritional follow-up for both healthy as well as malnourished children (provision of nutritional guidelines, food and vitamins). Similarly, it will coordinate with the WASH Sector in order to provide safe potable water, sanitation and hand wash facilities in transit facilities; as well as the Protection Sector to assist persons with specific protection needs that require attention, care and monitoring of their physical and mental health.

CLP_AR_006343



# HUMANITARIAN TRANSPORTATION

| 2023 | 2024 |

**PEOPLE IN NEED**  ↑ 40.1%  ↑ 27.9%
171.1 K  168.2 K  ↑ 16.8%  ↑ 15.2%

**PEOPLE TARGETED**  ↑ 34.9%  ↑ 29.7%
14.1 K  13.2 K  ↑ 18.6%  ↑ 16.8%

**PIN PERCENTAGE**  14.3%  13.9%

**TOTAL REQUIREMENTS**  $612.8 K  $598.6 K

**RMRP PARTNERS**  2

**SECTOR LEADS:**    IOM, NRC, UNHCR

The Humanitarian Transportation Sector will provide assistance to in-transit and in-destination refugees and migrants in 13 provinces, through:

1. Provision of safe transportation from borders to urban centres in Ecuador in order to enable family reunification, reach destinations and reduce protection risks;

2. Day-to-day transportation within cities or inter-province transportation to access essential goods and services, especially health, employment and consular services.

Priority will be given to people in vulnerable situations such as pregnant and lactating woman, women with children, elderly people, and people with disabilities or chronic illnesses.

These interventions will contribute to alleviating the pressure on services and host communities in border areas and those with intense population movements as well as support refugees and migrants from Venezuela in reaching areas with support networks and potentially more integration opportunities. Information on safe transportation routes will be provided in border areas, shelters and transportation terminals. In-kind assistance will complement direct payment to transportation providers and CVA. Sector partners will coordinate actions to develop transportation providers capacities to deliver principled, inclusive and safe services to refugees and migrants.

Close coordination with the Protection Sector and the GBV and Trafficking and Smuggling Sub-sectors will be critical in order to meet transportation needs, prevent and respond to GBV, and reduce the use of unsafe means and strategies of travel. Collaboration with the WASH Sector will be promoted to improve access to hydration and sanitation services on-route and in terminals.

CLP_AR_006344



## INTEGRATION

2023   2024

**PEOPLE IN NEED**   26.5%  33.7%   557.3 K   572.3 K   20.5%  19.3%

**PEOPLE TARGETED**   26.2%  33.7%   213.8 K   205.4 K   20.7%  19.4%

**PIN PERCENTAGE**   46.5%   47.3%

**TOTAL REQUIREMENTS**   $53.97 M   $53.26 M

**RMRP PARTNERS**   43

**SECTOR LEADS:**   IOM, FUDELA

The Integration Sector will coordinate the actions of 43 partners in 22 provinces, with a focus on those with higher concentration of refugees and migrants living in Ecuador, prioritizing the following:

**Access to income generating opportunities, including** different types of technical training, market-oriented entrepreneurship support and seed funding, targeting entrepreneurs in the ideation stage and those with small and medium-sized enterprises. Financial inclusion will be enhanced through saving initiatives and financial education. Support to access formal employment through sensitization and alliances with private sector stakeholders as well as job placement initiatives, and support for validation of competences and recognition of professional titles, will be made available to refugees and migrants from Venezuela.

**Advocacy and technical support** to public and private stakeholders in order to strengthen their capacities to advance the socio-economic integration of refugees and migrants, while supporting host communities. Actions will target relevant public institutions both at the national and local levels as well as private sector actors, including through initiatives such as the UN Global Compact. The Sector will develop joint strategies with state institutions that promote the integration of refugees and migrants, such as the Ministry of Labour, Ministry of Economic and Social Inclusion and Ministry of Production, aimed at improving services and capacities of state initiatives to respond to the integration needs of refugees and migrants. As for the private sector, raising awareness and creating alliances with key actors, such as industrial

chambers, will be essential to achieve the objectives of labour inclusion of the population.

**Promote social cohesion** through support to community networks with a view to foster resilience and empowerment and facilitate social inclusion of refugees and migrants with the communities that host them. For example, support for cultural initiatives led by refugees and migrants that reaffirm their cultural identity, inviting the host community to join in the exchange of cultural practices that strengthen ties with the community and advance the construction of the social fabric.

Partners will implement the Sector strategy through direct in-kind assistance and CVA, support to relevant Government institutions, and capacity development focusing on both public and private actors. Strategic partnerships with financial institutions and development actors will be at the centre of the Sector strategy, with a view to promote coherence and synergies between humanitarian and development actions in relation to strategic policy, alliances and investments to advance the Sustainable Development Goals.

The Sector will work closely with the Cash Working Group on guidance to harmonize seed funding targeting criteria, including levels of funding. Moreover, it will coordinate actions with the Protection Sector to foster the socio-economic integration of refugees and migrants, enhancing referral mechanisms both for those in an irregular situation facing various vulnerabilities, as well as people who benefited from the registration and regularization processes launched by the Government in 2022. For the latter, the response will focus on access

CLP_AR_006345

to formal employment and support to meet national requirements to establish formal businesses and access the national financial system. Coordination with the GBV and Human Trafficking and Smuggling Sub-sectors will also be key to promote the economic empowerment of GBV survivors and victims of human trafficking.



## NUTRITION

| | 2023 | 2024 |
|---|---|---|

**PEOPLE IN NEED** — 👨 0.0% 👩 38.8% | 131.6 K | 133.1 K | 👶 31.4% 🧒 29.8%

**PEOPLE TARGETED** — 👨 0.0% 👩 41.7% | 8.6 K | 8.6 K | 👶 29.8% 🧒 28.5%

**PIN PERCENTAGE** — 11.0% | 11.0%

**TOTAL REQUIREMENTS** — $3.16 M | $2.54 M

**RMRP PARTNERS** — 6

**SECTOR LEAD:** UNICEF

The Nutrition Sector will implement its response through six partner organizations across 19 prioritized provinces.

The actions will focus on the following activities:

1. Nutrition counselling aimed at strengthening Infant and Young Child Feeding (IYCF) practices for children under 5 years old, and nutrition practices for pregnant women and adolescents;

2. Nutritional and health screenings of children under 5 years old, pregnant women and adolescents, including children anthropometric testing and anaemia testing, ensuring children under 2 years old and pregnant women receive a prioritized package of health services to prevent stunting and other forms of malnutrition; and

3. Provision of nutritional supplements for pregnant women, adolescents and children under 5 years old, including micronutrient supplementation and nutritional supplements.

The activities delivered by the Nutrition Sector will target vulnerable groups of children under 5 years old, pregnant women and lactating women, and adolescent girls both in-transit and in-destination. By targeting these groups, the actions will prioritize the work with women by supporting them and responding to their needs. Moreover, the response will aim to support strengthening the Government's campaign to eradicate chronic child malnutrition, also reaching children and mothers in affected host communities.

The response modality for these actions will include direct service provision through mobile teams; in kind-support through the provision of micronutrients and nutritional supplements; capacity development of health care providers and local authorities in areas related to nutrition in emergencies. CVA will be delivered and represents 35 per cent of the total Sector budget and will include transfers for access to medical consultations, rehabilitation, medicines and access to nutritional supplements. The activities will also be complemented by social and behavioural change strategies and campaigns to sensitize people on the relationships between nutritional factors and health outcomes, improving cooking practices and promoting changes in unfavourable dietary habits, with the aim to improve the nutritional status of vulnerable populations.

Actions to addressing nutritional deficiencies and malnutrition require multisectoral efforts, including with the WASH, Education, Health, Food Security and Protection Sectors. Collaboration with these Sectors will aim at improving access to safe water for consumption, working to ensure that children under 2 years old receive the package of care required to prevent stunting, and working to implement actions to promote healthy habits among school-aged children and adolescents.

CLP_AR_006346



**RMRP 2023 - 2024**

ECUADOR  **R4V • 171 •**

## PROTECTION

2023  2024

**PEOPLE IN NEED**  32.0% 31.2%
838.5 K  846.1 K  19.1% 17.6%

**PEOPLE TARGETED**  30.3% 31.3%
434.7 K  433.0 K  20.1% 18.2%

**PIN PERCENTAGE**
70.0%  69.9%

**TOTAL REQUIREMENTS**
$44.05 M  $40.46 M

**RMRP PARTNERS**
40

**SECTOR LEADS:    NRC, UNHCR**

The Protection Sector will coordinate the actions of 40 partners in 21 provinces and will prioritize:

1. Supporting relevant Government institutions to facilitate access to the territory, asylum, and regular stay arrangements, and will support other national protection systems, to promote a holistic protection response and advance durable solutions for refugees and migrants.

2. Promote the peaceful coexistence between refugees and migrants from Venezuela and their hosts communities to enhance protection mechanisms.

In support of the registration and regularization exercise initiated by the Government of Ecuador on 1 September 2022,[193] partners will focus on disseminating and strengthening the scope and coverage of the registration and regularization processes. This will be achieved through the deployment of teams to different areas of the country to support the Government-led communication campaign,[194] of legal teams that will enhance referral mechanisms and provide legal services, specialized counselling services, and assistance focused on obtaining the certificate of permanence, subsequently applying for the Exception Temporary Residence Visa for Venezuelan citizens (VIRTE), and finally obtaining a national identity document. CVA will be provided for the payment of the consular fees, identity orders, mobilization expenses and other costs involved

in these processes. The Sector will support Government institutions through the provision of financial, technical and material support in order to enhance their capacities to effectively implement these processes.

Legal assistance to promote access to essential rights and services, particularly the right to access to asylum and the process of RSD, as well as the different types of migratory arrangements available in Ecuador, will also be prioritized.

Peaceful coexistence is a central aspect to enhancing protection mechanisms for refugees, migrants and their host communities. To promote this, the Sector will engage with communities to harness their knowledge and resources to strengthen their capacities to protect themselves, promote integration and rebuild their lives. Communities will have an active and leading role in the response.

With a population largely concentrated in urban and peri-urban areas (80 per cent) and often sharing similar risks, vulnerabilities and opportunities with local communities, Sector partners' work will focus on implementing field activities that promote access to rights, particularly for the most vulnerable. Over 340 community-based organizations have been mapped across the country, and the Sector will build upon existing efforts to strengthen community-based groups and engage them, among other things, in social media and other innovative initiatives to fight against xenophobia and discrimination.

[193] Executive Decree No. 436, 1 June 2022: Decreto Ejecutivo 436 del 01 de junio de 2022 sobre proceso de regularización de ciudadanos venezolanos, primera etapa, *https://www.gob.ec/regulaciones/decreto-ejecutivo-436-01-junio-2022-proceso-regularizacion-ciudadanos-venezolanos-primera-etapa*

[194] 'Estoy Aquí' Campaign: *https://estoyaqui.ec/*

CLP_AR_006347

As part of the Sector strategy, partners will prioritize, among others, women heads of households, pregnant and lactating women, sex workers, children, elderly people, people affected by evictions, people with disabilities and those with serious and chronic diseases. An overall vision, close collaboration and continuous feedback with the Child Protection, GBV and Human Trafficking and Smuggling Sub-sectors will strengthen referral mechanisms and protocols between partners and enable a holistic response. Coordination with other Sectors such as Shelter (for preventing evictions) and Health (for community-based health initiatives) will also be key. Finally, in view of the regularization exercise, joint strategies with the Integration Sector will be a cornerstone of the response, with a view to advancing the socio-economic integration of refugees and migrants from Venezuela and thus fostering peaceful coexistence and mitigating protection risks.



### CHILD PROTECTION

| | 2023 | 2024 |
|---|---|---|

| PEOPLE IN NEED | | | ♂ 17.1% ♂ 16.7% |
|---|---|---|---|
| | 407.9 K | 414.5 K | ♂ 34.3% ♂ 31.8% |

| PEOPLE TARGETED | | | ♂ 13.8% ♂ 16.7% |
|---|---|---|---|
| | 52.6 K | 51.4 K | ♂ 36.3% ♂ 33.3% |

| PIN PERCENTAGE | | | TOTAL REQUIREMENTS | | | RMRP PARTNERS |
|---|---|---|---|---|---|---|
| | 34.0% | 34.3% | | $12.64 M | $14.30 M | 17 |

**SUB-SECTOR LEADS: COOPI, UNICEF**

With 17 R4V partners, the Child Protection Sub-sector will focus its intervention on three main response priorities:

**1.** Provision of psychosocial support and recreational activities in child-friendly spaces, strengthening community mechanisms and safe spaces for the identification of child protection cases. It will include mental health services, psychosocial assistance, inclusion strategies through art, sports and recreational activities, as well as leadership programmes for adolescents and support groups for adolescent parents.

**2.** Enhance identification, referral and case management services of children and adolescents at risk, including unaccompanied and separated children. Among other services, this will entail the provision of legal assistance to refugee and migrant families with children and adolescents to mitigate the vulnerabilities and protection risks that may arise from their lack of documentation and irregular status in Ecuador. The Sub-sector will place a particular focus on unaccompanied and separated children and adolescents as a cross-cutting consideration throughout all response interventions, given their specific vulnerability to being exposed to sexual exploitation, human trafficking and other protection risks.

**3.** Advocacy and capacity development aimed to strengthening the national protection system for children and adolescents through the development of specific methodologies to prevent children's rights violations, training to public officials and civil society organizations in comprehensive care for refugee and migrant children at risk, and the development of campaigns for the integration of children that promote social cohesion, interculturality and non-discrimination.

Assistance for children and adolescents at-risk and those unaccompanied and separated will prioritize care in border provinces for the population in-transit, and in the main cities for the population in-destination,

CLP_AR_006348

ensuring coordination among partners in different areas. The main form of assistance will be direct, through case management, referrals and the provision of recreational activities and psychosocial assistance. CVA will also be utilized (11 per cent of the Sub-sectors financial requirements), particularly for supporting alternative care and supervised independent living arrangements for unaccompanied adolescents as well as to support access to the registration and regularization process for children and adolescents. Advocacy and strengthening of local and national child protection systems will also be a key component of the Sub-sector response, with a view to promoting access to protection services for refugee and migrant children in-need, as well as those for host communities.

In order to provide an effective child protection response, the Sub-sector will focus on intersectoral planning and coordination with Sectors such as Education, Health and Nutrition to respond in a comprehensive and complementary way to the needs related to accessing national educational system, completing vaccination schedules and combating chronic child malnutrition. Moreover, it will work in an articulated manner as part of the Protection Sector strategy and its Sub-sectors, such as GBV.



## GENDER-BASED VIOLENCE (GBV)

| | 2023 | 2024 |
|---|---|---|
| **PEOPLE IN NEED** | 268.9 K | 272.4 K | ♂ 6.5% ♀ 75.4% / ♂ 9.7% ♀ 8.3% |
| **PEOPLE TARGETED** | 133.0 K | 130.5 K | ♂ 5.6% ♀ 76.6% / ♂ 9.6% ♀ 8.2% |
| **PIN PERCENTAGE** | 22.4% | 22.5% | |
| **TOTAL REQUIREMENTS** | $12.66 M | $11.91 M | |
| **RMRP PARTNERS** | 27 | | |

**SUB-SECTOR LEADS: UNFPA, UN WOMEN**

The GBV Sub-sector will coordinate the actions of 27 partners in 21 provinces, with particular focus on border areas and cities with high concentration of refuges and migrants.

The response priorities will be oriented to:

1. Strengthening public policies and mechanisms for the prevention and protection against GBV, including technical assistance and national and local-level advocacy for the mitigation, prevention and response to GBV, as well as for the protection of the rights of the LGBTQI+ refugees and migrants. This will include capacity building for first line responders such as public servants, civil society organizations and humanitarian actors on GBV, positive masculinities, PSEA, minimum standards and IASC Guidelines on GBV, GBV Case Management Standard Operating Procedures, LGBTQI+ protection, clinical management of sexual violence and referral pathways and protocols.

2. Enhancing safe spaces and safe reporting mechanisms (such as partners' complaint and reporting mechanisms and helplines articulated with national and local GBV responses) and comprehensive response services for GBV survivors to access safe spaces, legal assistance and the justice system, sexual and reproductive health, and psychosocial support. This will also include the delivery of specialized GBV kits.

3. Developing edu-communicational campaigns to prevent GBV, xenophobia and discrimination, and to disseminate life-saving information about GBV risks and response services. This includes campaigns in public schools on preventing GBV and teenage

CLP_AR_006349

pregnancy; and campaigns targeting refugees, migrants and affected host communities on masculinities and gender diversities.

The delivery of GBV assistance to both in-transit and in-destination populations will prioritize women, children and LGBTQI+ refugees and migrants, as well as vulnerable cases detected in host communities. The main response modality will be support to relevant Government institutions at the national and local levels, with a view to strengthening public policies and the implementation of referral mechanisms and protocols both for refugees and migrants from Venezuela in-need as well as for their host communities. This will be complemented by direct in-kind assistance, such as kits, and through CVA for GBV survivors to access safe accommodation, health services, and livelihoods (12 per cent of the planned budget). Direct assistance will be accompanied by information campaigns and roll-out of behaviour change methodologies.

As part of the overall protection strategy, the GBV Sub-sector will coordinate with the Human Trafficking and Smuggling Sub-sector, including through a shared coordination working group, to advance advocacy and communication efforts. Close collaboration will also be sought with the Integration Sector to promote access to livelihoods for GBV survivors. Finally, Sectors such as Health, Shelter and WASH as well as partners providing multi-purpose CVA will be key for articulating comprehensive multisectoral GBV response.



## HUMAN TRAFFICKING AND SMUGGLING

| | 2023 | 2024 |
|---|---|---|

| PEOPLE IN NEED | | | ↑ 40.4% ↑ 28.0% |
|---|---|---|---|
| | 58.3 K | 57.0 K | ↑ 16.5% ↑ 15.1% |

| PEOPLE TARGETED | | | ↑ 31.8% ↑ 31.6% |
|---|---|---|---|
| | 920 | 1.0 K | ↑ 18.9% ↑ 17.6% |

| PIN PERCENTAGE | | |
|---|---|---|
| | 4.9% | 4.7% |

| TOTAL REQUIREMENTS | | |
|---|---|---|
| | $2.55 M | $2.53 M |

| RMRP PARTNERS |
|---|
| 5 |

**SUB-SECTOR LEAD: IOM**

The Human Trafficking and Smuggling Sub-sector will coordinate the actions of five partner organizations with the following priorities:

1. Provide direct assistance that supports the recovery of victims of trafficking and reduces protection risks of people at-risk and in situations of exploitation, including psychosocial and medical assistance, development of a life plan and prospects, and integration activities.

2. Strengthen the capacities of public officials, NGOs, civil society organizations and UN partners. This will include capacity development targeting judicial officials in the investigation and prosecution of human trafficking and smuggling crimes, and awareness raising and training sessions on specialized SOPs and other relevant topics to partners. Technical assistance will be provided to prevent human trafficking and smuggling through the development of tools for handling cases, improving detection and identification mechanisms, and developing and implementing referral pathways. These tools will facilitate specialized case management by law enforcement and migration authorities as well as other state actors, in addition to humanitarian personnel.

3. Support the strengthening of public policies and prevention and protection mechanisms by building

CLP_AR_006350

national and local networks and case committees, providing technical and financial assistance to promote the application of local ordinances, and supporting the development of care protocols and the improvement of mechanisms for identifying and referring cases.

The delivery of assistance will prioritize border provinces as Tulcán, Sucumbíos, and Orellana in the north, and El Oro in the south. It will also focus on provinces with high concentrations of refugees and migrants, such as Guayas, Pichincha and Ibarra. Assistance to refugees and migrants will target single women and men, adolescents' girls, and boys, and LGBTQI+ people at-risk.

Direct multisectoral assistance to victims and people at-risk will be provided through CVA (47 per cent) and in-kind assistance. It will be complemented by capacity development and technical and financial support to the civil society and Government authorities.

Human Trafficking and Smuggling Sub-sector partners will coordinate with GBV Sub-sector partners both to articulate activities and to complement direct assistances and advocacy efforts. In addition, it will implement a comprehensive response through close articulation with other Sectors such as Health, Education and Integration through improved coordination, information exchange and joint referral pathways.



**SHELTER**

| 2023 | 2024 |

**PEOPLE IN NEED**   ↑ 32.7%  ↑ 30.7%
495.9 K   499.0 K   ↑ 19.1%  ↑ 17.4%

**PEOPLE TARGETED**   ↑ 35.0%  ↑ 29.8%
241.1 K   225.4 K   ↑ 18.5%  ↑ 16.8%

**PIN PERCENTAGE**
41.4%   41.2%

**TOTAL REQUIREMENTS**
$18.29 M   $18.62 M

**RMRP PARTNERS**
14

**SECTOR LEADS:   IOM, NRC, UNHCR**

Through its 14 partners, the Shelter Sector will focus its response on 19 provinces, particularly Pichincha, El Oro and Guayas, prioritizing the following interventions:

1. Establishment of and support to temporary shelters and communal spaces, including through infrastructure upgrades of collective shelters and communal spaces to meet minimum standards, community infrastructure improvements in prioritized neighbourhoods, provision of equipment, and strengthening of management capacities, including through the effective mainstreaming of protection considerations. Within the Sector strategy, spaces such as community kitchens and educational facilities will be supported, and partnerships with private actors will be sought for temporary accommodation options.

2. Rental support both directly through CVA for up to three months (cash-for-rent) as well as through infrastructure upgrades that will also benefit host community homeowners, with a focus on WASH improvements.

3. Delivery of non-food items (NFIs), including kits, essential household items and equipment, for individual families and to support community spaces.

The response will focus on both in-transit and in-destination populations, targeting households with high levels of vulnerability, including those where children, elderly people and people with disabilities are present. Family groups at imminent risk of eviction will be considered as a priority within the rental support assistance.

CLP_AR_006351

The main response modalities will consist of direct collective shelters upgrades, including through operational and financial support; capacity development and technical support in communal spaces management and protection; infrastructure support to improve community spaces, aiming to serve both the host and refugee and migrant communities and foster peaceful coexistence; direct assistance through NFIs distributions, including the provision of household items such as mattresses, blankets, among others; and CVA

for rent coupled with information campaigns on rental rights and host community sensibilization.

For the development of the response, close coordination with the WASH, Health, Education and Integration Sectors will be key to broaden the shelter support spectrum within a safe-space perspective. Moreover, joint strategies with the Protection Sector will be a key priority in order to prevent and respond to eviction cases.



## WASH

2023    2024

| PEOPLE IN NEED | | | |
|---|---|---|---|
| ↑ 31.4% | ↑ 31.5% | | |
| 468.6 K | 473.8 K | ↑ 19.2% | ↑ 17.8% |

| PEOPLE TARGETED | | | |
|---|---|---|---|
| ↑ 31.7% | ↑ 31.5% | | |
| 221.5 K | 219.8 K | ↑ 19.1% | ↑ 17.7% |

| PIN PERCENTAGE | | TOTAL REQUIREMENTS | | RMRP PARTNERS |
|---|---|---|---|---|
| 39.1% | 39.2% | $6.27 M | $5.93 M | 10 |

**SECTOR LEAD:    UNICEF**

The WASH Sector, composed of 10 partners, will coordinate actions in 22 provinces. The Sector will seek to provide assistance both to refugees and migrants in-transit and new arrivals, to satisfy their essential needs, as well the communities hosting them, with priority to women and girls, with a gender approach and accessibility considerations to people with disabilities or serious illnesses.

The response will focus on assistance to access drinking water, personal hygiene items and sanitation services along highways, in temporary shelters and at border crossing points through:

**1.** Provision of hygiene services, distribution of water and establishment of hydration points and bathrooms/showers at information points in border areas and along the route.

**2.** Distribution of NFIs such as hygiene supplies for women and men as well as specific NFI kits for babies.

**3.** For those residing in Ecuador, to mitigate protections risks that can arise from sharing a bathroom with other households, shelters will be upgraded to promote access to adequate housing, including through improvements to WASH facilities in homes, in coordination with the Shelter Sector.

The main response modalities will include direct assistance through hygiene kits distribution, CVA for people in-need living in prioritized provinces, WASH infrastructure upgrades, and capacity-development to manage WASH infrastructure.

Public institutions, such as schools and health centres that provide services to a considerable number of refugees and migrants will be supported by increasing their installed capacity, improving, adapting or building WASH facilities so that they meet minimum standards, and thus provide better services to both refugees and migrants and their host communities. Moreover, partners will work on improvements, repairs, and construction of

CLP_AR_006352

WASH infrastructure and services in community and public spaces. This will require close coordination with the Shelter, Health and Education Sectors. Finally, the Sector will coordinate with Nutrition partners in order to address underlying causes of malnutrition related to inadequate access to water, sanitation and hygiene.

# CASH AND VOUCHER ASSISTANCE (CVA)



In Ecuador, 14 partners will provide multipurpose CVA through recurring as well as one-time assistance, while 31 partners will use CVA as part of their sectorial interventions, including Food Security, Protection, Health, Shelter and Education. CVA represents 38 per cent (USD 223M) of RMRP activities in Ecuador.

Most refugees and migrants from Venezuela, 74 per cent of households, live in poverty[195] and have considerably less income than is needed to afford minimum needs based on the minimum expenditure basket. The Cash Working Group will coordinate CVA approaches to ensure support is reflective of the cost-of-living and to the update the Minimum Expenditure Basket, which is set at USD 853 per month for an average family of four members according to a recent study[196] (compared to USD 713 in 2019), an amount considerably higher than the average income in Ecuador.[197]

The Cash Working Group will focus on monitoring market trends updating identification and targeting methodologies; fostering coordination between partners in different provinces; harmonizing transfer mechanisms; and advocating to improve access to financial services and ease Know Your Customer (KYC) requirements (identification and authentication standards for financial services) for refugees and migrants from Venezuela, in coordination with the Integration Sector. Finally, the Working Group will aim to strengthen the nexus between CVA and social protection schemes, including by closer collaboration with relevant public actors.

The Cash Working Group will promote exchanges among partners on best practices, monitor the results of multipurpose CVA and collect data to inform and improve programming. It will share experiences and solutions from other countries with the aim to apply those considered relevant in Ecuador through collaborative initiatives such as the UN Common Cash System (UNCCS), the Collaborative Cash Delivery Network (CCD) and the Cash Learning Partnership (CaLP). The coordination model will incorporate IASC guidance, while acknowledging the context and particularities of the Venezuela situation.

[195] For 74 per cent of households, the average per capita income is lower than USD 85.60 (which is the income poverty threshold established by the Ecuadorian Statistic and Census National Institute, INEC). R4V, RMNA 2022, page. 152.

[196] Minimum Expenditure Basket Taskforce, Cash Working Group. Market and basic goods evaluation and monitoring study. Ecuador, July 2022. Publication forthcoming

[197] The cost of living and thus the minimum expenditure basket are on the rise in Ecuador (1.22 per cent and 2.16 per cent monthly increases for the survival and the livelihood baskets, respectively, set at USD 529.07 and USD 751.04 as of June 2022). At the same time, as the JNA shows, the average monthly income of USD 235.54 for a Venezuelan family of four is notably lower than the minimum expenditure basket. R4V, RMNA 2022, page 152.

CLP_AR_006353

# PUBLIC SUBMISSION

**As of:** May 08, 2023
**Received:** March 07, 2023
**Status:** Posted
**Posted:** March 09, 2023
**Tracking No.** ley-vys0-3ywh
**Comments Due:** March 27, 2023
**Submission Type:** Web

**Docket:** USCIS-2022-0016
Circumvention of Lawful Pathways

**Comment On:** USCIS-2022-0016-0001
Circumvention of Lawful Pathways

**Document:** USCIS-2022-0016-3267
Comment Submitted by Diego Fernandez-Pages

---

## Submitter Information

**Name:** Diego Fernandez-Pages
**Address:**
    New Haven,  CT,  06511
**Email:** diegofernandezpages@gmail.com

---

## General Comment

See attached file(s)

---

## Attachments

Asylum Rule_Comment

CLP_PC_003999

This proposed rule is flawed in several respects, and, should it be promulgated in its current state, does not account for several fatal problems:

1. *Speculative Projections*

The proposed rule is based primarily on "planning assumptions [that] suggest that encounter numbers may increase to 11,000-13,000 per day following the termination of the Title 42 public health Order." The model used to project that is difficult to access and not apparently available to the general public. The model should by law be available for perusal from statistical experts to ensure its accuracy. *United States v. Nova Scotia Food Products Corp.,* 568 F.2d 240 (1977).

Apart from the model's unavailability, the Departments offer no justification for these conceded assumptions in the body of the proposed rule. Indeed, the Departments use vague and imprecise language to describe the potential increase in encounter numbers at the Southwest Border: "could," (p. 11705), and "may" (p. 11728), "assumes" or "assumption," (p. 11712) and "projections" (p. 11705) all suggest a high level of uncertainty—one not at all alleviated by any explanation of the assumptions in the text. Further, the Departments concede that "a number of factors make it particularly difficult to precisely project the numbers of migrants who would seek to cross the border, without authorization, after the lifting of the Title 42 public health Order." (p. 11705). These factors are also unexplained.

When a rule of such magnitude, affecting the entire breadth of the asylum system, relies on such unclear, uncertain, and unsubstantiated projections, it must be arbitrary.

2. *Reliance on CBP One*

The proposed rule relies on CBP One, the new application extensively discussed, to operationalize the "scheduling system" referenced in § 1280.33(a)(ii) of the proposed rule. CBP One is poorly tested. Three primary problems remain unaddressed: A. People that have attempted to use the app to schedule entry—CBP's preferred method—report long, arbitrary wait times reminiscent of "a lottery." B. The assumption that most asylum seekers have devices that will allow them to access the CBP One app is poorly substantiated. C. Exceptions to the use of the application are not sufficient to account for technical problems with the application that are not due to user error.

A. The Departments do not address the concern that the CBP One app functions as a lottery. The Departments have not looked into these claims, or conducted any surveys to that end. (Miriam Johnson, *Biden Administration Announces New Border Crackdown*, NY Times (Feb 21 2023).) If CBP One does function as a lottery, then it may contradict the Immigration and Nationality Act. 8 USC § 1158 makes clear that *"any"* migrant who arrives at or enters the United States can apply for asylum. If it functions as a lottery, then CBP One first prevents arriving migrants from applying

for asylum, and second, removes procedural protections afforded migrants who are seeking asylum.

B. While the Departments have addressed concerns that asylum seekers will not have the necessary devices to access the CBP One app, the study they rely on to substantiate their dismissal of the concerns only looks at 95 migrants at a single port of entry. (Part III.E.7) This represents .8% of the number of encounters at the Southwest Border CBP projects *at minimum*. To establish an additional barrier to asylum based on a single small-scale study at a single port of entry is irresponsible and does not substantially address the concerns the Departments themselves reference.

C. The Departments do not offer alternative processes for asylum seekers who encounter technical difficulties not due to their own error with the CBP One app. If, for example, the app crashes, is unavailable, or is compromised by cyberattack, asylum seekers may lose their place in line, may have to restart their application, or may have their valuable personal data stolen. The Departments' exception creates an unreasonable additional procedural barrier to asylum seekers by creating a threshold adjudication where the burden of proof is on the asylum seeker rather than on the Department to prove inability to access the application. (Part III.E.7)

3. *Inaccurate Comparison to U4U*

The Departments rely on the Uniting for Ukraine (U4U) and Venezuela parole processes to justify promulgating this rule. (Part V.A.) This reliance is inaccurate. Both processes introduce affirmative parole procedures in addition to regular asylum procedures for migrants from two specific countries undergoing emergencies. The U4U parole process *lowers* barriers to entry: The U4U program required Ukrainian migrants to show only that they: Resided in Ukraine before February 11, 2022; are a Ukrainian citizen or possessed a valid Ukrainian passport; have a vetted supporter file an I-134A form; and pass biometric and biographic security checks. (https://www.uscis.gov/ukraine).

These four requirements represent significantly less stringent procedural barriers to Ukrainian asylum or parole seekers. They also do not establish a rebuttable presumption of ineligibility; they affirmatively create a presumption of eligibility if Ukrainian migrants meet these four criteria. The new rule, meanwhile, establishes higher procedural barriers for asylum seekers by introducing a stringent presumption, rebuttable only on very specific, hard-to-meet grounds.

The proposed rule suffers on several other grounds. Exceptions to the rebuttable presumption, for instance, are impermissibly high and do not give migrants a reasonable opportunity to make a credible fear argument before an asylum officer. The risk of error that those subject to the presumption but *do* have a credible fear of persecution will be even higher than it already is. The Departments do not address this and other due process problems in any part of the rule. I

do not believe that the Departments should issue this rule at all for the reasons stated, but also because I believe this is a violation of asylum seekers' right to seek asylum per long-standing and ratified international law.

# PUBLIC SUBMISSION

**As of:** May 08, 2023
**Received:** March 26, 2023
**Status:** Posted
**Posted:** March 29, 2023
**Tracking No.** lfp-h6ww-7c60
**Comments Due:** March 27, 2023
**Submission Type:** API

**Docket:** USCIS-2022-0016
Circumvention of Lawful Pathways

**Comment On:** USCIS-2022-0016-0001
Circumvention of Lawful Pathways

**Document:** USCIS-2022-0016-12228
Comment Submitted by American Immigration Lawyers Association and American Immigration Council

## Submitter Information

**Email:** agrenier@aila.org
**Organization:** American Immigration Lawyers Association and American Immigration Council

## General Comment

Please see the attached comment and four attachments.

## Attachments

2023 AILA AIC Asylum Transit Ban Comment

Attachment 001_AICAILACommentMar23

Attachment 002_AICAILACommentMar23-compressed

Attachment 003_AICAILACommentMar23-compressed

Attachment 004_AICAILAComment Mar23

 

March 26, 2023

Daniel Delgado
Acting Director, Border and Immigration
Policy, Office of Strategy, Policy, and Plans
Department of Homeland Security
Washington, DC 20528

Lauren Alder Reid
Assistant Director
Office of Policy
Executive Office for Immigration Review
Department of Justice
5107 Leesburg Pike
Falls Church, VA 22041

*Submitted via* http://www.regulations.gov

**Re:   American Immigration Lawyers Association and American Immigration Council
Comment on Circumvention of Lawful Pathways
DHS Docket Number USCIS 2022-0016**

Dear Mr. Delgado and Ms. Alder Reid:

The American Immigration Lawyers Association (AILA) and the American Immigration Council
(Council) submit the following comments in response to the above-referenced Department of
Homeland Security (DHS) and Department of Justice (DOJ) (collectively, "the Departments")
Notice of proposed rulemaking (proposed rule), Circumvention of Lawful Pathways (DHS
Docket Number USCIS 2022-0016), 88 Fed. Reg. 11704 (February 23, 2023). The Departments
request comment on, among other things,  "[w]hether the proposed rule appropriately provides
migrants a meaningful and realistic opportunity to seek protection."[1]

The situation the Departments face is a uniquely difficult one. Regional migratory and
displacement patterns have shifted significantly in recent years. Increased numbers of asylum
seekers at the Southern Border are a symptom of these shifting patterns and long-term
Congressional inaction to address humanitarian needs holistically to fix issues within the wider
immigration system that would alleviate the pressure at the Southern border. Compounding this
is a historic asylum backlog across both Departments.

---

[1] Circumvention of Lawful Pathways, 88 FR 11704, 11708 (proposed Feb. 23, 2023) (to be codified at 8 CFR 208
and 8 CFR 1208),
https://www.federalregister.gov/documents/2023/02/23/2023-03718/circumvention-of-lawful-pathways. [hereinafter:
"NPRM"]

CLP_PC_020713

However, the proposed rule is a step in the wrong direction. The proposed rule will prevent meaningful access to asylum to individuals who arrive at the U.S.-Mexico border, which covers the majority of asylum seekers who are unable to afford a passport (or had their passport revoked by a persecuting government) and a flight. The proposed rule amounts to an asylum transit ban−relying on transit countries that can neither ensure asylum seekers' safety nor meaningful access to a system that protects the human rights guaranteed under U.S. law. It further conditions access to asylum based on how asylum seekers enter the country. Furthermore, the proposed "core protections" and safeguards will not sufficiently protect access to asylum and other forms of humanitarian relief, particularly in light of our significant concerns surrounding its implementation and access to counsel.

AILA and the Council urge the Biden administration to remain true to its commitment to asylum law and humanitarian protections.

## I.   About AILA and the Council

Established in 1946, AILA is a voluntary bar association of more than 16,000 attorneys and law professors practicing, researching, and teaching in the field of immigration and nationality law. AILA's mission includes the advancement of the law pertaining to immigration and naturalization and the facilitation of justice in the field. AILA members regularly advise and represent businesses, U.S. citizens, U.S. lawful permanent residents, and foreign nationals regarding the application and interpretation of U.S. immigration laws.

The Council is a non-profit organization established to increase public understanding of immigration law and policy, advocate for the just and fair administration of our immigration laws, protect the legal rights of noncitizens, and educate the public about the enduring contributions of America's immigrants. The Council litigates in the federal courts to protect the statutory, regulatory, and constitutional rights of noncitizens, advocates on behalf of noncitizens before Congress, and has a direct interest in ensuring that those seeking protection in the United States have a meaningful opportunity to do so.

## II.   The proposed rule violates international and domestic law, as it functionally denies individuals safety from persecution

### (A) The proposed rule undermines both U.S. domestic and international law obligations

The proposed rule violates the United States' obligations to protect individuals fleeing persecution under both international and domestic law. As a signatory to the 1967 Refugee Protocol, the United States has agreed to uphold the principles of the 1951 Convention Relating to the Status of Refugees, including the right to seek asylum and the prohibition on refoulement. Domestic law also requires the United States to protect asylum seekers. Under the Immigration and Nationality Act (INA), an individual may apply for asylum regardless of their manner of entry, subject to certain very limited exceptions.[2] The INA also sets limits on when an asylum seeker can be denied protection based on residing in a third country. The proposed rule denies

---

[2] 8 U.S.C. § 1158(a)(1) (1952).

CLP_PC_020714

access to asylum to individuals primarily on the basis of their manner of entry and is therefore contrary to international and domestic law.

The proposed rule is inconsistent with fundamental international law principles aimed at protecting refugees, which the United States has agreed to uphold. The Refugee Convention's principle of non-refoulement prohibits the United States from returning an individual seeking humanitarian protection to a country where they could face persecution.[3] Under the proposed rule, asylum seekers subject to the ban will be ineligible for asylum and face a heightened risk of being returned to countries where they fear persecution based on factors that have nothing to do with the merits of their underlying asylum claim. The proposed rule's requirement that asylum seekers enter through a port of entry with an appointment or via parole also violates the Refugee Convention's prohibition against imposing penalties on asylum seekers based on their irregular entry into the country.[4]

The United States incorporated these international law principles into domestic law when it passed the 1980 Refugee Act.[5] In 8 U.S.C. § 1158, Congress established a comprehensive asylum system, which includes limited exceptions to noncitizens' ability to apply for and be granted asylum. The rule relies on 8 U.S.C. § 1158(b)(2)(C), which allows the Attorney General to establish regulations with additional limitations, to justify its ability to implement a new bar to asylum. However, 8 U.S.C. § 1158(b)(2)(C) mandates that any additional limitations be "consistent with" the statute.[6] The limitations in the proposed rule are in direct conflict with the INA.[7] For example, the INA states that, subject to certain exceptions, anyone "who is physically present in the United States or who arrives in the United States (*whether or not at a designated port of arrival . . .*), irrespective of [their] status, may apply for asylum."[8] The proposed rule contravenes the statute by barring from asylum individuals who enter between ports of entry and those who arrive at a port of entry without utilizing DHS's appointment system, unless there is a specific reason why they could not.[9]

Additionally, Congress already explicitly addressed asylum restrictions for people who may find safety in other countries in two separate statutory provisions. First, under 8 U.S.C. § 1158(a)(2)(A), individuals generally cannot apply for asylum if they can be removed to a country that has a formal safe third country agreement with the United States. A "safe third country" is defined as a country where that person's life or freedom would not be threatened and

---

[3] United Nations High Commissioner for Refugees (UNHCR), *Note on Non-Refoulement (Submitted by the High Commissioner)*, Aug. 1977, https://www.unhcr.org/en-us/excom/scip/3ae68ccd10/note-non-refoulement-submitted-high-commissioner.html.

[4] *See* UNHCR, *Brief of the Office of the United Nations High Commissioner for Refugees, O.A., et al. v. Trump, et al.*, Aug. 13, 2020, No. 19-5272 ("[n]either the 1951 Convention nor the 1967 Protocol permits parties to condition access to asylum procedures on regular entry"), https://www.refworld.org/docid/5f3f90ea4.html, at 24.

[5] *Matter of D-L-S*, 28 I. & N. Dec. 568, 571 (BIA 2022) ("It is well established that Congress enacted the Refugee Act of 1980 to 'bring United States refugee law into conformance with the country's obligations under the Protocol.'" (citing and quoting *Matter of Q-T-M-T-*, 21 I. & N. Dec. 639, 645 (BIA 1996)).

[6] 8 U.S.C. § 1158(b)(2)(C) ("The Attorney General may by regulation establish additional limitations and conditions, consistent with this section, under which a [noncitizen] shall be ineligible for asylum under paragraph (1).").

[7] *See E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962 (9th Cir. 2020) (upholding preliminary injunction of Trump administration transit ban interim final rule) [hereinafter "East Bay I"].

[8] 8 U.S.C. § 1158(a). Emphasis added.

[9] *See E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 669 (9th Cir. 2021) (concluding that a 2018 asylum restriction based on manner of entry was "not in accordance with law") [hereinafter "East Bay III"].

CLP_PC_020715

where they would have "access to a full and fair procedure" for accessing humanitarian protection. Second, under 8 U.S.C. § 1158(b)(2)(A)(vi), an asylum seeker who was "firmly resettled," meaning that the person was eligible for or received permanent legal status, in another country is generally not eligible for asylum.

Finally, 8 U.S.C. § 1231 codified the Convention's prohibition against returning refugees to countries where they face persecution. The proposed rule, which conditions access to asylum on manner of entry and transit, would result in the return of refugees to danger and contravenes these provisions of U.S. law.

The proposed rule is also contrary to the credible fear screening standard Congress established in 1996, when it created the expedited removal process through the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"). Under this process, asylum seekers placed in expedited removal who establish a credible fear of persecution must be referred to full removal proceedings, where they can apply for asylum.[10] Congress intended the "significant possibility" standard used in credible fear interviews to be a low threshold.[11] If an asylum officer determines that an applicant is not eligible for asylum under the proposed rule, the officer must interview the person under the heightened standard generally applicable in reasonable fear proceedings to determine if they may qualify for withholding of removal or protection under the Convention Against Torture.[12] Given the higher standard required for withholding and CAT, the proposed rule will drain resources from USCIS by requiring asylum officers to apply a two-step process while making it more difficult for individuals to qualify for life-saving protection. Even those who meet the higher standard for withholding of removal or CAT will not receive the same benefits that asylum provides, which could lead noncitizens to experience instability, lack of permanency, and family separation.[13]

The proposed rule undermines our domestic law obligations. As a result, most individuals who cross the southern border without an appointment, except Mexican nationals or those who meet the proposed rule's limited exceptions, would be ineligible for asylum in the United States because they would have transited through a country that is a signatory to the Convention or the Protocol. Additionally, nearly every country in the world is a signatory to the Convention or the Protocol.[14] Thus, this proposed rule will adversely impact asylum seekers from all over the world who are seeking protection in the United States.

Such a ban undermines congressional mandates regarding our domestic asylum system and betrays our international law obligations. Indeed, federal courts repeatedly vacated and enjoined similar Trump administration asylum bans based on manner of entry and transit because they

---

[10] *See* 8 U.S.C. § 1225(b)(1)(B)(ii).

[11] *See* 142 CONG. REC. S11491–02 (daily ed. Sept. 27, 1996) (statement of Sen. Hatch) ("The conference report struck a compromise by rejecting the higher standard of credibility included in the House bill. The standard adopted . . . is intended to be a low screening standard for admission into the usual full asylum process"), https://www.govinfo.gov/content/pkg/CREC-1996-09-27/html/CREC-1996-09-27-pt1-PgS11491-2.htm.

[12] NPRM at 11750.

[13] *See* American Immigration Council, *Fact Sheet: The Difference Between Asylum and Withholding of Removal*, https://www.americanimmigrationcouncil.org/research/asylum-withholding-of-removal (Oct. 6, 2020).

[14] 148 countries signed one or both of the 1951 Convention and the 1967 Protocol. *See* UNHCR, *States Parties to the 1951 Convention relating to the Status of Refugees and the 1967 Protocol*, https://www.unhcr.org/protect/PROTECTION/3b73b0d63.pdf.

CLP_PC_020716

were contrary to U.S. law.[15] The proposed rule relies on these same premises that courts have already found unlawful.

> (B) <u>Mexico, Guatemala, and other common transit countries lack fair and functioning asylum systems</u>

The proposed rule exempts people who apply for protection in a third country and receive a denial. However, Mexico, Guatemala, and most countries through which asylum seekers regularly transit en route to the United States have deficient asylum systems that fail to meet the INA's requirements of a "full and fair" process. In particular, Mexico and Guatemala lack the capacity, infrastructure, and rule of law required to process high numbers of asylum claims while providing safety to the number of refugees in need.[16]

It is well documented that the Mexican asylum system is deeply flawed and underfunded.[17] Mexico already receives high numbers of asylum applications, but it struggles to adjudicate them in a timely manner. From January to August 2021, Mexico received nearly 78,000 asylum applications but resolved only about 23,000 cases.[18] In 2019, the Mexican Commission for Refugee Assistance ("COMAR") had only 48 staff members adjudicating asylum claims.[19] According to the Department of State, "COMAR's budget increased modestly in recent years but was not commensurate with the growth in refugee claims."[20] Asylum approval rates also differ widely based on country of origin, with most Haitian and Guatemalan asylum seekers being denied asylum in Mexico.[21] Given current backlogs and resource constraints, Mexico is not prepared to adjudicate the increased volume of applications that will be generated by the proposed rule.

---

[15] *See Cap. Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 60 (D.D.C. 2020) (vacating Trump administration transit ban interim final rule); *see also* East Bay I (concluding that a 2019 third country transit bar is not "consistent with this section"); *O.A. v. Trump*, 404 F. Supp. 3d 109, 154 (D.D.C. 2019) (vacating Trump administration interim final rule barring asylum for individuals who entered between ports of entry).

[16] *See* Human Rights First*, Is Guatemala Safe for Refugees and Asylum Seekers?*, https://humanrightsfirst.org/wp-content/uploads/2022/10/IsGuatemalaSafeforRefugeesandAsylumSeekers.pdf (June 2019); *see also* Human Rights First, *Is Mexico Safe for Refugees and Asylum Seekers?*, https://humanrightsfirst.org/wp-content/uploads/2022/10/MEXICO_FACT_SHEET_PDF.pdf (Nov. 2018).

[17]*See* Human Rights First, *Is Mexico Safe for Refugees and Asylum Seekers?* (Nov. 2018).

[18] *See* Human Rights Watch, *World Report 2022: Mexico*, https://www.hrw.org/world-report/2022/country-chapters/mexico#39f1f6 (n.d.).

[19] *See* Refugees International, *Harmful Returns: The Compounded Vulnerabilities of Returned Guatemalans in the Time of COVID-19*, https://www.refugeesinternational.org/reports/2020/6/16/harmful-returns-the-compounded-vulnerabilities-of-returned-guatemalans-in-the-time-of-covid-19 (June 23, 2020).

[20] U.S. Dep't of State, *2021 Country Reports on Human Rights Practices: Mexico*, https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/mexico/.

[21] *See* Refugees International, *Harmful Returns: The Compounded Vulnerabilities of Returned Guatemalans in the Time of COVID-19* (June 23, 2020); *see also* Alex J. Rouhandeh, "Haitians Stuck in Mexico's 'Open Air Prison' City Claim Racism as Asylum Cases are Denied," *NEWSWEEK*, https://www.newsweek.com/haitians-stuck-mexicos-open-air-prison-city-claim-racism-asylum-cases-are-denied-1662251 (Dec. 22, 2021).

5

Additionally, Mexico's asylum process presents asylum seekers with many hurdles, which severely limit access to asylum.[22] Mexican officials often expel individuals seeking protection or violently detain them.[23] Black migrants in particular report experiencing longer periods of detention and discriminatory treatment by officials while detained.[24] Asylum seekers in Mexico must also generally apply for asylum within 30 days of arriving in Mexico and they must remain in the state where they applied for asylum until their application is decided.[25] Given the instability faced by recently arrived asylum seekers, Mexico's onerous asylum requirements and lack of capacity severely limit the availability of protection.

Guatemala has a "nascent and cumbersome asylum system" that is unable to meet current demands, much less process a significant increase in asylum applications. In 2018, around 260 people applied for asylum in Guatemala (an increase of 75 percent from previous years), and only 20 cases were approved.[26] A Guatemalan Office of the Ombudsman official warned, "If we had, in two years, 472 cases and we were not able to resolve them, what is going to happen if we have thousands of cases or hundreds each day? We are not going to be able to resolve them. We don't resolve the cases because the [National] Migration Authority, the institution responsible for resolving the cases, is not interested in resolving them . . . Asylum is not a priority for our country."[27] Instead, the Guatemalan government shifts the burden to civil society groups to provide critical legal orientation and humanitarian aid to asylum seekers.[28]

Though the preamble to the proposed rule mentions developments in Guatemala's asylum system during the last two years, it is unfathomable that Guatemala's very new asylum system could be prepared to provide a full and fair asylum process for people in need of protection. Indeed, the preamble states that as of March 2022, the Guatemalan Migration Institute ("IGM") had "already received nearly 300 applications in 2022 and granted asylum to 590 individuals."[29] However, according to the document cited in the preamble, 590 actually refers to the total number of individuals *ever granted* asylum in Guatemala, not to the number of applications granted in 2022.[30] Other Central American countries are also ill-equipped to offer necessary protection to a

---

[22] *See* Kirk Semple, "A Flawed Asylum System in Mexico, Strained Further by U.S. Changes," *New York Times*, https://www.nytimes.com/2017/08/05/world/americas/mexico-central-america-migrants-refugees-asylum-comar.html (Aug. 5, 2017); *see also* Human Rights First, *Is Mexico Safe for Refugees and Asylum Seekers?* (Nov. 2018).

[23] *See* Human Rights Watch, *World Report 2022: Mexico*.

[24] *See* S. Priya Morley et al., *"There is a Target on Us" – The Impact of Mexico's Anti-Black Racism on African Migrants at Mexico's Southern Border*, https://baji.org/wp-content/uploads/2021/01/The-Impact-of-Anti-Black-Racism-on-African-Migrants-at-Mexico.pdf (2021).

[25] *See* Asylum Access, *Mexican Asylum System for U.S. Immigration Lawyers FAQ*, https://asylumaccess.org/wp-content/uploads/2019/11/Mexican-Asylum-FAQ-for-US-Immigration-Lawyers.pdf (Nov. 2019).

[26] *See* Human Rights First, *Is Guatemala Safe for Refugees and Asylum Seekers?* (June 2019).

[27] Georgetown Law Human Rights Institute, *Dead Ends: No Path To Protection for Asylum Seekers Under the Guatemala Asylum Cooperative Agreement*, https://www.refworld.org/docid/5f0eeeb04.html (June 10, 2020).

[28] *Id.*

[29] NPRM at 11722.

[30] *See* Instituto Guatemalteco de Migración, *Información Sobre Personas Solicitantes y Refugiadas en Guatemala: Enero 2002–Marzo 2022*, https://igm.gob.gt/wp-content/uploads/2022/04/Informe-con-Graficos-Marzo-2022.pdf (Mar. 2022).

CLP_PC_020718

large number of asylum seekers because their asylum systems are either not well-established or suffer from severe resource constraints.[31]

Given these known deficiencies in Guatemala's and Mexico's asylum systems—the two countries most migrants transit through—the proposed rule does not adequately explain why only those who seek asylum in such countries and are denied can rebut a presumption *against* asylum in the United States.

### (C) The proposed rule would place bona fide asylum seekers in danger

The proposed rule will return bona fide asylum seekers to danger and persecution abroad or force them to remain in dangerous transit countries. Individuals will be forced to attempt to find protection in transit countries, such as Mexico and Guatemala, that are not equipped to offer safe harbor.

Mexico and Guatemala are deeply affected by violence and instability. Non-Mexican asylum seekers have been subjected to extortion, kidnapping, rape, and other violent crime while in Mexico, especially following the implementation of the "Migrant Protection Protocols" (MPP).[32] The State Department has also documented numerous risks to migrants in Mexico and it has stated that "violence against migrants by government officers and organized criminal groups" is one of the "most significant human rights issues" in Mexico.[33] In his October 2021 memorandum terminating the Migrant Protection Protocols, DHS Secretary Mayorkas cited concern for migrant safety as one of the reasons for ending MPP, as "there were pervasive and widespread reports of MPP enrollees being exposed to extreme violence and insecurity at the hands of transnational criminal organizations that prey on vulnerable migrants."[34] Black migrants in Mexico "faced widespread racial discrimination from individuals and authorities" and are particularly vulnerable.[35] Mexico also has high rates of gender-based violence, with the government reporting nearly 1,000 femicides in 2020.[36]

Guatemala has high rates of systemic violence, instability, and corruption, making it unsafe for asylum seekers.[37] The Department of State has reported that Guatemala "remains among the most dangerous countries in the world," due to "endemic poverty, an abundance of weapons, a

---

[31] *See* Karen Musalo, "Biden's Embrace of Trump's Transit Ban Violates US Legal and Moral Refugee Obligations," *Just Security*, https://www.justsecurity.org/84977/bidens-embrace-of-trumps-transit-ban-violates-us-legal-and-moral-refugee-obligations (Feb. 8, 2023).

[32] *See* American Immigration Council, *Letter Urges Sec. Nielsen to End the Migrant Protection Protocols Policy*, https://immigrationjustice.us/advocacy/advocacy-issues/access-to-counsel/letter-migrant-protection-protocols/ (Feb. 6, 2019); *See also* Human Rights First, *Delivered to Danger: Illegal Remain in Mexico Policy Imperils Asylum Seekers' Lives and Denies Due Process*, https://humanrightsfirst.org/library/delivered-to-danger-illegal-remain-in-mexico-policy-imperils-asylum-seekers-lives-and-denies-due-process (Aug. 2019).

[33] U.S. Dep't of State, *Country Reports on Human Rights Practices for 2017: Mexico (2018)*, https://www.state.gov/reports/2017-country-reports-on-human-rights-practices/mexico/.

[34] U.S. Dep't of Homeland Security, *Explanation of the Decision to Terminate the Migrant Protection Protocols*, https://www.dhs.gov/sites/default/files/2022-01/21_1029_mpp-termination-justification-memo-508.pdf (Oct. 29, 2021).

[35] U.S. Dep't of State, *2021 Country Reports on Human Rights Practices: Mexico*.

[36] *See* Human Rights Watch, *World Report 2022: Mexico*.

[37] Human Rights First, *Is Guatemala Safe for Refugees and Asylum Seekers?* (June 2019).

CLP_PC_020719

legacy of societal conflict, and the presence of organized criminal gangs."[38] According to the Department of State, "[v]iolent crime such as extortion, murder, armed robbery, carjacking, narcotics trafficking and gang activity are common."[39] It also notes that "Guatemala's high murder rate is driven by narcotrafficking activity, gang-related violence, a heavily armed population, and a law enforcement and judicial system unable to hold criminals accountable."[40] Moreover, Guatemala, like other Central American countries, has recently attempted to crack down on migration, implementing new regulations in January 2023 that could criminalize religious workers and volunteers for assisting asylum seekers.[41] Leaders of the Catholic Church in Guatemala reported that the new regulations could force them to close all nine of their shelters.[42] This would leave asylum seekers in Guatemala without a crucial source of humanitarian aid.

Seeking asylum in neighboring countries is not a viable option for Central American asylum seekers in particular, because the border between Mexico and Guatemala is porous and law enforcement in both countries lack resources and are susceptible to corruption. Central American gangs and other armed groups can easily find and persecute their victims in Mexico.[43] Conditions throughout Central America's Northern Triangle are no better, as Guatemala, Honduras, and El Salvador have the highest rate of femicide in the world and all three countries have extremely high rates of violence against LGBTQ+ individuals.[44]

By forcing individuals transiting through countries such as Mexico and Guatemala to seek asylum there, the rule will in practice lead to asylum seekers being caught in countries where they are not safe.

## III.    The proposed rule is not materially different from previous entry and transit rules enjoined by the 9th Circuit

The proposed rule suggests that it is significantly different from two rules previously issued and then vacated due to subsequent litigation.[45] In those cases (collectively *East Bay I, II, and III*) the 9th Circuit's reasoning was crystal clear—a categorical bar to asylum based on either how a person enters the country and/or what processes they do or do not avail themselves of in a country through which they transit is in violation of Section 208 of the INA.[46] The proposed rule's suggestion that this iteration is distinct because it only applies a rebuttable presumption instead of a categorical bar is a distinction without a difference. The presumption can only be

---

[38] U.S. Dep't of State, *Overseas Security Advisory Council, Crime & Safety Report (2022)*, https://www.osac.gov/Content/Report/2013f384-296b-4394-bfcb-1c9c40b9c7df.

[39] U.S. Dep't of State, *Guatemala Travel Advisory*, https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/guatemala-travel-advisory.html (Mar. 1, 2023).

[40] U.S. Dep't of State, *Overseas Security Advisory Council, Crime & Safety Report (2022)*, https://www.osac.gov/Content/Report/2013f384-296b-4394-bfcb-1c9c40b9c7df.

[41] Jeff Abbott, "Migrant Shelters in Guatemala under Threat from Legal Reforms," *Al Jazeera*, https://www.aljazeera.com/news/2023/2/18/migrant-shelters-in-guatemala-under-threat-from-legal-reforms (Feb. 18, 2023).

[42] *Id.*

[43] U.S. Dep't of State, *Country Reports on Human Rights Practices for 2017: Mexico (2018)*.

[44] *See* Karen Musalo, "Biden's Embrace of Trump's Transit Ban Violates US Legal and Moral Refugee Obligations."

[45] East Bay III; East Bay I, and an injunction in *E. Bay Sanctuary Covenant v. Barr*, 519 F. Supp. 3d 663 (N.D. Cal. 2021) ("East Bay II").

[46] *Id.*

rebutted by a demonstration of extremely narrow circumstances that are wholly unrelated to a person's asylum claim.

While the proposed rule claims that this system is designed to vet out meritorious claims, the bases for rebuttal do nothing of the sort. Those bases—acute medical issues, imminent *and* extreme threats to life or safety, or severe forms of trafficking—do not relate to whether an individual is more or less likely to have a meritorious claim for asylum. While the rule allows for adjudicators to accept a rebuttal based on other "extremely compelling circumstances," the proposed rule is designed to exempt people from the presumption based only on circumstances related to their manner of entry.

Further, the means of implementing this system of presumption and rebuttal is so fraught that it will in practice become a *de facto* categorical bar. According to the rule as currently designed, an adjudicator would first assess whether a person is subject to the presumed ineligibility. If that adjudicator finds the presumption applies, the burden shifts to the asylum seeker to prove by a preponderance of the evidence that they can rebut it. Functionally, this burden is nearly impossible for an asylum seeker to meet. These determinations are made in a single interview with an asylum officer. The idea that a person who has just fled across the border seeking safety would have the means to provide evidence of an acute medical issue, an imminent and extreme threat, or trafficking is absurd. There is no indication that the asylum officer would be directed to affirmatively elicit from an applicant facts related to a possible basis for rebuttal.

This process is significantly different from how other presumed bars to asylum function. For example, when an asylum officer believes at a credible fear interview that a person is likely to be subject to the firm resettlement bar, this determination is not dispositive. While it is indicated on the credible fear worksheet, it is ultimately up to an immigration judge to determine whether the bar actually applies. The potential for immigration judge (IJ) review of the application of the presumption under this proposed rule is unclear. It is clear, however, that an individual who was deemed subject to the presumption would have to affirmatively request review by an IJ. This makes the application of the rule more akin to the categorical bans prohibited by previous federal courts than to other forms of presumptive bars.

## IV.    In practice, implementation of the rule will be fraught with problems

### (A) The rule will cause confusion and inconsistent application at the ports of entry

Implementation of this rule can be expected to go poorly at the ports of entry. While there are exceptions built into the rule for individuals who do not have an appointment to present at the border nor prior authorization such as parole, how the exceptions will be determined and at what stage in the process is unclear, and can easily lead to improper application of the rule. Will individuals without an appointment be uniformly admitted upon presentation at the port, to be assessed later by an asylum officer as to whether they meet the exemption, or will Customs and Border Protection (CBP) officers turn away people who do not have an appointment? Though the rule indicates the latter should not happen, experience with officers implementing previous similar rules is a cause for concern that, while CBP may not be formally empowered to make these determinations, in practice they often make their own determinations on the spot.

Further complicating this process is how family units are treated under the proposed rule. For families, the proposed rule states that the presumption of ineligibility does not apply if any member of the family unit traveling together meets one of the exceptions.[47] For example, the presumption of ineligibility would not apply if one person in the family unit traveling together was fleeing imminent and extreme danger. This presents a quandary for an individual—do they wait to travel with their family, or do they flee on their own, leaving their family to have to meet the higher standard for entry?

For those who do avail themselves of a processing appointment through the CBP One app, under the proposed rule, there are no assurances as to how long individuals will be required to wait in Mexico to make their appointments on the app. For migrants, then, this system will be unpredictable and technology-dependent. Rather than creating a more predictable process, the new rule only adds an additional requirement for individuals to be put on this new list: they must access a smartphone, connect to the internet, download the CBP One app, and navigate that app in order to even be put on a list.

Under Title 42, MPP, and the metering policy implemented under President Trump, similar restrictions on entering the United States resulted in large communities of migrants settling in temporary encampments by the ports of entry waiting for their opportunity to cross the US-Mexican border as discussed above in Section III. Widespread media reports have documented the challenges facing individuals living in these makeshift communities. Primary among them are that the individuals must often live in the most dangerous cities in Mexico, where they have been extremely vulnerable to kidnapping, extortion, rape, and other abuses.

In a March 2021 report, Human Rights Watch (HRW) documented widespread targeting of asylum seekers waiting at the southern border.[48] In interviews with 71 Venezuelan asylum seekers who transited through Mexico, HRW concluded that "migrants in Mexico are exposed to rape, kidnapping, extortion, assault, and psychological trauma."[49] They articulated a fear of reporting crimes and abuse to Mexican authorities.[50] In addition to threatening the health and safety of the asylum seekers, violence and other setbacks in Mexico also posed a major obstacle to attending the hearing dates set in the United States.[51] HRW writes:

> Nearly half of asylum seekers under the Remain in Mexico program lost their cases after missing court dates. Human Rights Watch has spoken to families who missed court dates because they were kidnapped in Mexico. Others were bused south by the Mexican government, leaving them thousands of miles from their hearing locations.[52]

The same difficulties that plagued these earlier border externalization programs will affect users of CBP One. Kidnappings, violence, and extortion from criminal actors, and limitations on movement by Mexican authorities will all prevent individuals from booking appointments through CBP One and showing up once those appointments are

---

[47] NPRM at 11750.
[48] Human Rights Watch, *Mexico: Abuses Against Asylum Seekers at US Border*, https://www.hrw.org/news/2021/03/05/mexico-abuses-against-asylum-seekers-us-border (Mar. 5, 2021).
[49] *Id.*
[50] *Id.*
[51] *Id.*
[52] *Id.*

CLP_PC_020722

scheduled. Already, international media have reported on the death of a 15-year-old Haitian boy waiting for his CBP One appointment in Reynosa, Mexico.[53]

In addition to the risks of waiting in Mexico, the CBP One app stands to inherit other pitfalls of earlier Trump administration initiatives caused by inconsistencies across different ports of entry. Due to the differences in processing capacity across ports of entry, some ports will inevitably have more appointments, faster processing, or gain a reputation for easier access. Migrants will be motivated to travel between ports of entry, based on either real or rumored advantages at one port over another, exposing them to greater risk of harm along the way, simply to get an appointment at the port with the most appointments or fastest processing. Such movement was common under the Trump-era "metering" practice: an October 27, 2020 memo prepared by the DHS Office of Inspector General found that CBP agents themselves would tell migrants to travel to other ports where processing could take place more quickly.[54]

This movement of migrants to find the best port will create artificial and unnecessary inefficiencies in the asylum process, expose migrants to greater risk of harm in Mexico, and undermine the goal of equitable and efficient implementation of the rule at the southern border. These likely scenarios are not taken into account by the proposed rule.

The new system, then, introduces a number of elements that will cause implementation to go poorly at the ports of entry. It will create new waitlists and feed into makeshift communities of migrants forming around the ports of entry as they wait on the CBP One list, or wait to join that list. For those who cannot access CBP One, the rule does not lay out a process by which CBP will process their cases at the border, which may result in incentivizing crossing without permission. This will present a drain on CBP resources as well as asylum officers responsible for credible fear screening, while adding complexity to the process at a time when both agencies are suffering from understaffing. In short, implementation at the border is expected to result in many predictable problems.

---

[53] Jaime Jiménez, "Haitian Youth Dies in Reynosa, Waiting to Enter the United States [Muere joven haitiano en Reynosa, esperaba ingresar a Estados Unidos]," *El Sol de Tampico*, https://www.elsoldetampico.com.mx/policiaca/muere-joven-haitiano-en-reynosa-esperaba-ingresar-a-estados-unidos-9552796.html (Jan. 31, 2023).
[54] DHS Office of Inspector General, OIG 21-02, *CBP Has Taken Steps to Limit Processing of Undocumented Aliens at Ports of Entry*, 7, 10-12, https://www.oig.dhs.gov/sites/default/files/assets/2020-10/OIG-21-02-Oct20.pdf (Oct. 27, 2020).

CLP_PC_020723

(B) <u>Implementation by asylum officers will be overly burdensome</u>

In addition, the new system will add to the burden of asylum officers, who are also already grossly understaffed. Already, the agency is processing record numbers of credible fear interviews, and denials of this initial screening are being reviewed and overturned in record numbers by the immigration judges.[55] The Citizenship and Immigration Services (CIS) Ombudsman warned in its most recent annual report to Congress that using asylum officers in the credible fear interview (CFI) process has in turn reduced capacity to process affirmative applications and contributed to a growing backlog of affirmative applications.[56] By adding the additional burden of screening for applicability and exceptions to the new rule, the fear interviews can be expected to take even longer per case, and further contribute to growing backlogs.

(C) <u>Implementation at the Immigration Court will go poorly</u>

Far from furthering the agencies' goal of streamlining asylum processing and easing the burden on already-overtaxed immigration judges, the proposed regulation will overtax the Executive Office for Immigration Review (EOIR) at both the negative credible fear review (NCFR) and asylum merits stages.

### 1. *Negative Credible Fear Adjudications*

The proposed rule presumes that the new process will cull potential asylum applicants from the pool, and will result in fewer asylum seekers presenting their claims to EOIR. To the extent that the new bar will result in more negative credible fear determinations it is true that the total number of people who are placed in removal proceedings will quite likely fall. But any increase in negative CFI determinations at the DHS level will result in a concurrent increase in NCFR proceedings. As such, EOIR will need to divert more immigration judges to adjudicate more credible fear review proceedings and those reviews will require significantly more administrative resources than do NCFR adjudications under the current regulatory scheme. EOIR will be overloaded on the front end, with more IJs expending more time on more negative credible fear review proceedings, particularly since the proposed rule adds significant additional fact-based determinations to the process.

The proposed rule lays out a complicated framework for assessing the applicability of the new bar to asylum eligibility in NCFR proceedings. It requires that the IJ first evaluate *de novo* whether the bar applies; that is, whether the applicant 1) had authorization to travel to the U.S. to seek parole pursuant to a DHS-authorized parole process; 2) presented at a port of entry at a pre-scheduled time and place unless it was not possible for them to access CPP One because of language, literacy, or technical barriers or an undefined "other ongoing and serious obstacle;" or 3) applied for and was denied asylum or an undefined "other protection" in a third country en route to the United States. That analysis will require significantly more factual development than

---

[55] TRAC Immigration, *Immigration Judge Decisions Overturning Asylum Officer Findings in Credible Fear Cases*, https://trac.syr.edu/reports/712/ (Mar. 14, 2023).
[56] U.S. Dep't Homeland Security, Citizenship and Immigration Services Ombudsman, *Annual Report 2022*, at 43, https://www.dhs.gov/sites/default/files/2022-07/2022%20CIS%20Ombudsman%20Report_verified_medium_0.pdf (June 30, 2022).

CLP_PC_020724

does the current NCFR scheme—a scheme in which none of the bars to asylum apply, and in which the relevant facts are limited to those relating to the applicant's fear of persecution or torture.

If the judge determines that the presumption applies, the rule further mandates that they engage in still more factual development to review *de novo* whether "exceptionally compelling circumstances exist" including (but not limited to) evidence that the applicant or their family 1) faced an acute medical emergency; 2) faced an imminent and extreme threat to life or safety such as rape, kidnapping, torture, or murder; or 3) was a victim of a severe form of trafficking in persons.

The proposed rule places the burden on the applicant to establish either the inapplicability of the presumption or an exception to that presumption by a preponderance of the evidence. But it does not define or provide guidance on many of the dispositive terms (such as "extreme threat to life or safety" or "acute medical emergency"), and does not articulate whether the "exceptionally compelling circumstance" is in any way tied to the applicant's failure to use CBP One—that is, it does not clarify whether the exceptionally compelling circumstance must be one which prevented the asylum seeker from scheduling an appointment or whether it may be an equitable factor which mitigates in favor of granting humanitarian protection.

And finally, the rule not only permits but demands that immigration judges look outside of the record of proceedings to rely on their own personal breadth of knowledge[57] to reach a conclusion. Not only requiring but actually mandating that IJs engage in speculation and guesswork is wholly contrary to the notion of an unbiased adjudicator, and will lead to disparate adjudications and confusion in the courts.

The rule would significantly expand the scope of NCFR proceedings, would place a tremendous burden on the IJs to develop the factual record, and would not only encourage but actually mandate that they engage in improper speculation and rely on facts outside of the record of proceedings in the course of their adjudications.

### 2. *Asylum Adjudications*

The proposed rule lays out a complicated framework for assessing the applicability of the new bar to asylum eligibility to NCFR proceedings, but says not a word about substantive asylum adjudications. As such, it will likely engender confusion among the nation's IJs about whether the rule even applies once an applicant has been placed in removal proceedings or whether it is applicable only at the credible fear stage. This is because the text of the rule indicates that once an individual passes the fear interview with the higher standard applied, it indicates the person could then apply for asylum, withholding, or other humanitarian relief. The inclusion of asylum as a possibility at this stage is unexplained and will cause confusion. And assuming the bar does apply at the merits stage, the same issues discussed above—the lack of clarity as to many of the dispositive terms and overly complicated adjudicatory framework—will continue to plague adjudicators in the removal context.

---

[57] NPRM at 11752, proposed 8 CFR § 1208.13(c)(1), instructing that IJs in credible fear determinations "shall take into account the credibility of the statements made by the [noncitizen] in support of the [noncitizen]'s claim ***and such other facts as are known to the immigration judge***." (emphasis added).

Far from easing EOIR's burden, the proposed rule would front-end already overtaxed EOIR resources to credible fear review proceedings, and would significantly expand the IJ's duty to develop a factual record in both NCFR and removal proceedings. And the lack of clarity in the proposed rule as to the meaning of dispositive terms, the applicability to removal proceedings, and the scope of the IJ's authority to consider extra-record evidence will overtax the agency and lead to disparate adjudications.

**V.   The proposed rule improperly makes asylum eligibility contingent on individuals' ability to use CBP One**

With the proposed rule, CBP effectively has made the use of a mobile phone app—CBP One—a threshold requirement for asylum. The scheme under the proposed new rule establishes a rebuttable presumption of ineligibility for asylum for those who "present[ ] at a port of entry without a pre-scheduled time and place," i.e. an appointment, for inspection.[58] Based on language in a related document, CBP One is the "mechanism" for noncitizens to schedule a time to arrive at ports of entry at the southwest border.[59] Because asylum seekers now must submit information prior to arrival at a port of entry and receive an appointment time for their inspection, CBP One is, in practice, the only way asylum seekers can be processed at the border. To be clear, the proposed rule would not codify the use of CBP One because it references a "DHS scheduling system." However, DHS has clarified in related documents that CBP One will serve as the "DHS scheduling system."[60]

The new heavy reliance on CBP One to prepare an asylum seeker to present at the border is concerning given CBP One's poor track record during its roll out as part of the Title 42 exemption process.

In short, the app has barred thousands of individuals from seeking exemptions to restrictions under Title 42. Previously, international organizations had been tasked with entering information on behalf of individuals seeking Title 42 exemptions and helping them secure an "appointment" at ports of entry. Though CBP touted CBP One as a method an individual could use to enter information to secure appointments on their own, users immediately encountered myriad issues with CBP One that prohibited them from entering their information into the app and securing a time and place for inspection. While the proposed rule acknowledges some of CBP One's failures by offering limited exceptions to the app's use, the rule lacks guidance as to how these exceptions will be applied. Because the proposed rule addresses asylum eligibility rather than CBP officers' conduct at ports of entry, this lack of guidance is particularly troublesome as it leaves many questions unanswered relating to how asylum seekers, especially those without appointments, will be able to access ports of entry.

First, the agency's expansion of CBP One relied on the assumption that asylum seekers near the U.S.-Mexico border would have obtained, or be able to obtain, a mobile phone that could support the app's functions. However, those who arrive at the border seeking safety in the United States

---

[58] NPRM at 11750 (to be codified at 8 C.F.R. § 208.33(a)(ii)).
[59] NPRM at 11707 fn. 25, citing CBP, *Fact Sheet: Using CBP One to Schedule an Appointment*, https://www.cbp.gov/document/fact-sheets/cbp-one-fact-sheet-english (last modified Jan. 12, 2023).
[60] NPRM at 11750.

CLP_PC_020726

often lack the latest phone models that can support the app's functions.[61] Those who cannot afford a phone are shut out from the process unless they can procure assistance from non-governmental organizations.

Though DHS states in the proposed rule that CBP One will help minimize the influence of smugglers, the requirement that individuals have access to advanced technology to use CBP One has played into the hands of unscrupulous actors at the border. The Office Chief for the United Nations International Organization for Migration in Ciudad Juarez reported that people pose as lawyers or other professionals and offer vulnerable migrants assistance using CBP One in exchange for a fee.[62] The government's purported goal to use CBP One to create a safer way for asylum seekers to access the asylum process is thwarted when the new system is based on an assumption that users will have access to certain technology. When potential users lack a mobile phone that supports CBP One, they are vulnerable to exploitation.

Another issue users have encountered with CBP One is challenges in meeting the requirement that an individual submit a live photograph taken with their mobile phones while the app is operating at various stages of the data entry process. Some users have not been able to submit photos through the app because conditions such as bad lighting, poor internet connection, and even darker skin tones often lead to CBP One rejecting the photo.[63] When CBP One rejects a user's submission of a photo, it allows the user to try again. But multiple rejections cost users valuable time and prevent them from obtaining appointments during the limited number of timeslots at ports of entry on a given day. Though CBP has not informed the public about the number of appointments available at the participating ports of entry, reports suggest that all appointments are taken only minutes after they are released early in the morning. Thus, any delays in accessing CBP One are costly.[64]

Issues with internet connectivity also limit asylum seekers' access to CBP One. Registering as a CBP One user, and then using the app's functions, requires individuals to be connected to the internet for a prolonged time. Users must first create an account through login.gov, then navigate the app's identity verification process, enter extensive biographic information for themselves and their accompanying family members, and finally access CBP One's scheduling feature.[65] Throughout this process, if users are disconnected from their internet connection, the app prohibits them from advancing to the next step, delaying their submissions.[66] This particularly burdens immigrants at shelters, which often lack reliable internet, forcing some individuals to seek Wi-Fi signal in dangerous places. Families must wander into city centers controlled by

---

[61] Bernd Debusmann Jr., "At US border, tech issues plague new migrant applications," *BBC News*, https://www.bbc.com/news/world-us-canada-64814095 (Mar. 8, 2023).

[62] Julian Resendiz, "IOM warns asylum-seekers of CBP One scams in Juarez," *Border Report*, https://www.borderreport.com/immigration/iom-warns-asylum-seekers-of-cbp-one-scams-in-juarez/ (Jan. 23, 2023).

[63] Eileen Sullivan and Steve Fisher, "At the End of a Hard Journey, Migrants Face Another: Navigating Bureaucracy," *The New York Times*, https://www.nytimes.com/2023/03/10/us/politics/migrants-asylum-biden-mexico.html (Mar. 10, 2023).

[64] *Id.*

[65] U.S. Dep't of Homeland Security, "Privacy Impact Assessment for the CBP OneTM Mobile Application," https://www.dhs.gov/sites/default/files/2023-01/privacy-pia-cbp068-cbpmobileapplication-jan2023.pdf, 1, 15-16 (Feb. 19, 2021; updated Jan. 19, 2023).

[66] *See* Arelis R. Hernández, "Desperate migrants seeking asylum face a new hurdle: Technology," *The Washington Post*, https://www.washingtonpost.com/nation/2023/03/11/asylum-seekers-mexico-border-app/ (Mar. 11, 2023).

CLP_PC_020727

cartels that "kidnap, rape and extort migrants" to find stable internet.[67] In one tragic case, a migrant was severely burned because he climbed onto the roof of a building and ran into low-hanging power lines looking for Wi-Fi signal to make an appointment.[68] Users also received error messages while they used the app that prevented them from completing the pre-registration process.[69] Many families state that CBP One simply does not work.[70]

These issues are aggravated by how difficult it is to navigate CBP One. Asylum seekers may not have the tech skills to be able to complete all the steps required to access CBP One. An unintelligible error message may cause some to simply abandon use of the app altogether. The limited number of appointments, coupled with CBP One's systemic issues, have led to families being separated at the border. The system requires asylum seekers to make appointments for each member of the family.[71] Individuals who can enter their information quicker are more likely to get one of the coveted inspection appointments. This issue has left families with the unenviable decision of either waiting an unknown amount of time for everyone to get an appointment, or allowing one family member to take an appointment while leaving their family behind with the hope those left in Mexico can later join them.[72]

Finally, CBP One is not accessible in the multiple languages spoken by asylum seekers. Until February 2023, CBP One was only available in English and Spanish. Media reports indicate that in February, CBP One became available in Haitian Creole.[73] Based on government data showing asylum seekers' nationalities,[74] many asylum seekers coming to the southern border speak many other languages other than English, Spanish, and Creole; for example, Russian and Turkish. Thus, thousands of asylum seekers could be deemed ineligible for asylum simply because they do not speak one of the languages in which CBP One is available.

The agency has implemented some positive changes to CBP One. For example, CBP One now allows individuals to submit their registration information separately from the time they schedule an inspection appointment, which can reduce the time that people need to be connected to the internet to get an appointment. Agency officials have also stated that the app was recently

---

[67] Eileen Sullivan and Steve Fisher, "At the End of a Hard Journey, Migrants Face Another: Navigating Bureaucracy," *The New York Times*, https://www.nytimes.com/2023/03/10/us/politics/migrants-asylum-biden-mexico.html (Mar. 10, 2023).
[68] Arelis R. Hernández, "Desperate migrants seeking asylum face a new hurdle: Technology," *The Washington Post*, https://www.washingtonpost.com/nation/2023/03/11/asylum-seekers-mexico-border-app/ (Mar. 11, 2023).
[69] Regina Yurrita, "Asylum seekers met with issues from new CBP One app," *CBS8*, https://www.cbs8.com/article/news/local/asylum-seekers-met-with-issues-from-cbp-one-app/509-5f69579c-05e1-4999-a7a9-720eab0cc680 (Feb. 1, 2023).
[70] Corrie Boudreaux, "Hundreds of frustrated Venezuelan migrants block bridge linking El Paso and Juárez," *El Paso Matters*, https://elpasomatters.org/2023/03/12/el-paso-juarez-bridge-blocked-by-venezuelan-migrants/ (Mar. 12, 2023).
[71] Arelis R. Hernández, "Desperate migrants seeking asylum face a new hurdle: Technology," *The Washington Post*, https://www.washingtonpost.com/nation/2023/03/11/asylum-seekers-mexico-border-app/ (Mar. 11, 2023).
[72] *Id.*
[73] Melissa del Bosque, "Facial recognition bias frustrates Black asylum applicants to US, advocates say," *The Guardia*N, https://www.theguardian.com/us-news/2023/feb/08/us-immigration-cbp-one-app-facial-recognition-bias (Feb. 8, 2023).
[74] Dep't Homeland Security, *Annual Flow Report, Refugees and Asylum: 2021*, 9-11, https://www.dhs.gov/sites/default/files/2022-10/2022_0920_plcy_refugees_and_asylees_fy2021.pdf ( Sept. 2022).

CLP_PC_020728

updated to make groups of appointments available at the same time so families could stay together.[75]

The agency must continue to improve CBP One's functionality so asylum seekers can access inspection appointments and their safety does not hinge upon a technological glitch. Otherwise, the same issues that have plagued app users applying for Title 42 exemptions will prohibit people from accessing asylum processing at ports of entry under the scheme outlined in the proposed rule.

(A) <u>CBP has failed to clearly explain how individuals may obtain exemptions to CBP One, and restrictive agency interpretations of eligibility for exemptions may lead to wrongful denials</u>

The proposed rule recognizes that in some situations people cannot access CBP One. The rule purportedly exempts a person from using CBP One if they can demonstrate by a "preponderance of the evidence" that they cannot access the app "due to language barriers, illiteracy, significant technical issues, or other ongoing and serious obstacle."[76] Without examples of what information an individual would need to provide or how the information will be assessed, this standard has little meaning for asylum seekers. In addition, the proposed rule provides no details about whether asylum seekers will be able to simply present at ports of entry and, if they can, what the process will look like for people trying to demonstrate that an exemption to the use of CBP One should apply to them. The rule states that people seeking processing at ports of entry will need to appear at pre-scheduled times and places for their inspections, but DHS has not provided any information as to how people without an appointment will be able to access ports of entry. This is concerning, especially considering that many asylum seekers were turned back from ports of entry during the implementation of Title 42 or due to metering.

The rule also fails to explain how the exemptions' evidentiary standard—"preponderance of the evidence"—might be met to demonstrate language barriers, illiteracy, significant technical issues, or other "ongoing and serious" obstacles. For example, officers could ask asylum seekers about their ability to read or write, but it is unclear whether individuals' testimony about their own abilities will be sufficient to apply an illiteracy exemption. It is also unclear whether an individual's failure to indicate that they believe an exception applies to a CBP officer would be counted against them when an asylum officer reviews their case for applicability of the rule, as is sometimes the case for asylum seekers in other contexts. The rule also fails to define what type of technical difficulties qualify for the exemption and how individuals who encounter technical difficulties with CBP One will be able to document them to meet the standard of proof envisioned in the proposed rule.

This lack of clarity is particularly problematic as it relates to the language barrier exemption because it will lead to disparate outcomes depending on individuals' spoken languages. Assuming no other exception applies, Spanish speakers, English speakers, and Creole speakers

---

[75] Eileen Sullivan and Steve Fisher, "At the End of a Hard Journey, Migrants Face Another: Navigating Bureaucracy," *The New York Times*, https://www.nytimes.com/2023/03/10/us/politics/migrants-asylum-biden-mexico.html (Mar. 10, 2023).
[76] NPRM at 11750.

are required to use CBP One because the app is available in those languages. For asylum seekers who are not fluent in one of the languages in which the app is available, the rule provides no standards as to how officials will determine asylum seekers' language proficiency to justify an exemption. This could lead to erroneous denials when applicants speak limited English but may have trouble understanding the app's English-only directions.

   (B) DHS's lack of publicly available guidance has contributed to asylum seekers' troubles using the app

The proposed rule does not outline a plan to educate intending asylum seekers about the app, even as media and advocacy groups question its workability. As DHS has expanded the uses for CBP One so individuals can submit their own information, the agency has failed to educate potential users about how to use the app and its potential risks. In contrast, the agency prepared detailed presentations for staff members of international organizations instructing them how CBP One worked as it recruited these staff members to help enter asylum seekers' information into the app to request exemptions to Title 42. A description of how CBP One's functions work can only be obtained by piecing together the limited information the agency has made available on the CBP One webpage, the information on agency fact sheets, and several Privacy Impact Assessments (PIA) published by DHS on different functions of the app. For example, while DHS published a PIA dedicated to CBP One, a more detailed explanation about how CBP uses some photographs submitted to the agency through the app is found in the Traveler Verification Service PIA. In short, the agency has not created a user-friendly instruction manual for CBP One or a one-stop repository where users can easily find information on the app.

This lack of information makes asylum seekers attempting to use CBP One vulnerable to fraud and scams. Migrants have complained that, in Ciudad Juárez for example, individuals have offered to help them navigate the app in exchange for money.[77] DHS officials have stated that the agency is continually improving CBP One.[78] However, the agency lacks a cohesive publicly available repository with all information related to CBP One, so it is unclear what changes the agency is making to the app and when those changes will be made. When this information is available, it is not effectively communicated to potential CBP One users.

   (C) A mobile app cannot be the only way vulnerable populations can access asylum

The proposed rule channels all asylum seekers into one track: seeking asylum at ports of entry via the CBP One app (or mounting the evidentiary burden to show why they cannot access the app). Implementation of technology tools to make border processing more efficient and safer is likely inevitable, but for the technology to serve this laudable goal, it must work. Technology is not infallible, and it is seldom accessible to all, which is why a mobile phone app cannot be the only way vulnerable populations access their passage to safety. There should be other methods for presenting the same information users provide through CBP One, and asylum seekers should not be penalized for using alternatives to CBP One. All those who seek asylum should be able to

---

[77] Julian Resendiz, "IOM warns asylum-seekers of CBP One scams in Juárez," *Border Report*, https://www.borderreport.com/immigration/iom-warns-asylum-seekers-of-cbp-one-scams-in-juarez/ (Jan. 23, 2023).
[78] Sandra Sanchez, "DHS tweaks CBP One app after reports of family separation, agency says," *NewsNation*, https://www.newsnationnow.com/us-news/immigration/border-coverage/dhs-tweaks-cbp-one-app-after-reports-of-family-separations-agency-says (Mar. 6, 2023).

CLP_PC_020730

access processing at ports of entry. These alternatives must be robust realistic alternatives to CBP One and be widely publicized to ensure that asylum seekers can make an informed decision as to their preferred method for making appointments. Forcing individuals to use CBP One, while providing unworkable exemptions to the app's use, will inevitably bar individuals from seeking asylum at our borders. It also may lead to greater numbers of individuals attempting to reach the United States outside the ports of entry, undermining DHS's intended purpose for implementing this rule.

## VI.    The proposed rule will exacerbate problems with access to counsel

The proposed rule does not adequately address concerns regarding meaningful access to counsel for asylum applicants. Notably missing from the Departments' preamble is *any* mention of access to counsel during the credible and reasonable fear interview process. The importance of legal representation cannot be overstated. A person who can retain an attorney is far more likely to succeed in immigration court.[79] A 2015 study showed that for immigrants who were never detained, those with lawyers were nearly five times more likely to obtain immigration relief than those without (63 percent of those with representation obtained relief versus 13 percent of those without representation).[80] The proposed rule allows asylum officers at the border to quickly determine whether a person can rebut the presumption of ineligibility or prove why they shouldn't be subject to the rule, with no explicit reference to access to counsel. Under the proposed procedure, the asylum officer first determines whether the asylum seeker has rebutted the presumption of asylum ineligibility.[81] If they have not rebutted the presumption, then they will have to show a higher bar of a "reasonable possibility" of persecution or torture.[82] Because of the fast-tracked nature of the proceedings that the proposed rule contemplates, it is unlikely that asylum seekers will have counsel throughout this period to help them support this higher threshold showing or to demonstrate that an exemption should apply. The May 2022 asylum processing rule is telling in this regard. Under proceedings subject to that new rule, only one percent of credible fear cases have had attorney representation.[83]

The proposed presumption of ineligibility is applied as a part of the credible fear screening interviews at the border, which is an element of the expedited removal process.[84] The expedited removal process has long been rife with concerns of a lack of due process and little access to

---

[79] Ingrid V. Eagly & Steven Shafer, A National Study of Access to Counsel in Immigration Court, 164 U. Pa. L. Rev. 1, 48–59, https://scholarship.law.upenn.edu/cgi/viewcontent.cgi?article=9502&context=penn_law_review (2015).
[80] American Immigration Council, *Access to Counsel in Immigration Court*, 2-3, https://www.americanimmigrationcouncil.org/sites/default/files/research/access_to_counsel_in_immigration_court.pdf (Sept. 2016).
[81] 8 C.F.R. 208.33(a)(2).
[82] 8 CFR 1208.33(c)(2)(ii).
[83] U.S. Dep't of Homeland Security, "Asylum Processing Rule Cohort Report – December  2022," https://www.dhs.gov/immigration-statistics/special-reports/asylum-processing-rule-report (Jan. 6, 2023). (Tab: Credible Fear Claims, "Final or Most Recent Credible Fear Outcome by Attorney Representation." The available data demonstrates that 42 cases have attorney representation out of 3,741 cases completed under this pilot program, with four of these cases with attorney representation still pending completion.)
[84] *See* 208.33(c).

counsel.[85] The majority of asylum seekers navigate expedited removal without an attorney. Now, under the proposed rule, they must mount a case, likely without an attorney, to make a case for one of the exceptions to the proposed rule. Without counsel, they will likely struggle to provide the evidentiary support needed to clear that burden, nor will they have the requisite knowledge of asylum procedures to make a claim for relief. The United Nations High Commissioner for Refugees (UNHCR) has specifically recommended that "exclusion" decisions, which would include decisions such as those made on the applicability of the transit ban, not be made in accelerated procedures such as expedited removal.[86]

The proposed rule will accelerate the already fast-tracked removal proceedings in a way that will exacerbate barriers to counsel. Data collected from immigration cases that are part of another recent initiative to fast-track immigration proceedings, known as the "Dedicated Docket," makes clear that accessing counsel takes time.[87] In May 2021, the U.S. Department of Justice (DOJ) and DHS announced the Dedicated Docket initiative, which places certain families who crossed between ports of entry on or after May 28, 2021 into fast-tracked removal proceedings where an IJ is generally expected to issue a decision within 300 days of the master calendar hearing.[88] In the first seven months of the Dedicated Docket initiative, only 15.5 percent of asylum seekers had counsel to represent them in their proceedings, compared to 91.1 percent of asylum seekers whose cases were decided over the same period, virtually all of whom were not in fast-tracked proceedings.[89] Of those who had been on the Dedicated Docket for seven months—more than three times as long as the IFR's timeline (60 days) for issuing an asylum decision—only 45 percent had an attorney to represent them in court.[90] A total of 1,557 asylum seekers on the Dedicated Docket have received deportation orders so far. Of these, only 75—just 4.7 percent—had representation. By contrast, since the start of the Dedicated Docket program just 13 people—all represented—have been granted asylum or another form of lawful relief from deportation.[91] These statistics are particularly troubling given the administration's assurances that families placed on the Dedicated Docket would have time, despite the expedited schedule, to access representation.[92]

---

[85] *See, e.g.*, Daniel Kanstroom, *Expedited Removal and Due Process: "A Testing Crucible of Basic Principle" in the Time of Trump*, 75 Wash. & Lee L. Rev. 1323, 1356 (2018); Stephen Manning and Kari Hong, *Getting It Righted: Access to Counsel in Rapid Removals*, 101 Marq. L. Rev. 673, 692 (2018).

[86] UNHCR, Guidelines on International Protection: Application of the Exclusion Clauses: Article 1F of the 1951 Convention relating to the Status of Refugees, III. Procedural Issues, 31 at p. 8-9, https://www.refworld.org/docid/3f5857684.html (2003).

[87] TRAC Immigration, Unrepresented Families Seeking Asylum on "Dedicated Docket" Ordered Deported by Immigration Courts, https://trac.syr.edu/immigration/reports/674/#f4 (Jan. 13, 2022) [hereinafter "TRAC Dedicated Docket Report"].

[88] U.S. Dep't of Justice, *DHS and DOJ Announce Dedicated Docket Process for More Efficient Immigration Hearings*, https://www.justice.gov/opa/pr/dhs-and-doj-announce-dedicated-docket-process-more-efficient-immigration-hearings (May 28, 2021).

[89] *See* TRAC Dedicated Docket Report.

[90] *Id.*

[91] *Id.*

[92] U.S. Dep't of Justice, *DHS and DOJ Announce Dedicated Docket Process for More Efficient Immigration Hearings*,

CLP_PC_020732

These concerns relating to the Dedicated Docket will only be amplified by the addition of a new evaluation of a rebuttable presumption against asylum eligibility. Those individuals subject to the rebuttable presumption who pass the heightened "significant possibility" screening standard applied by the proposed rule and are placed on the Dedicated Docket will find it even more difficult to obtain counsel, as they will have to argue a case for withholding of removal while simultaneously attempting to rebut the presumption a second time. In essence, the proposed rule will further compound the already significant problems with access to counsel caused by the Dedicated Docket.

Furthermore, it can only be presumed that most immigrants going through the new rebuttable-presumption credible fear process will be detained. Among detained immigrants, people with lawyers were twice as likely to obtain relief than those without lawyers (49 percent of those with representation are able to obtain relief whereas only 23 percent of those without representation are able to obtain relief).[93] Notably, non-detained immigrants are much more likely to have representation, with two-thirds of them having counsel compared to only 14 percent of detained immigrants.[94] Recently arrived asylum seekers—who often have added vulnerabilities, including trauma, language barriers, and a lack of familiarity with the U.S. legal system—are especially dependent on counsel to understand and navigate our evolving and highly complex U.S. asylum laws.

In sum, navigating the process outlined in the proposed rule, with its added burdens, imposes new complexity to an asylum system that is already impenetrable to pro se individuals. Navigating that system without the aid of counsel will have devastating consequences for those fleeing persecution who are making a protection-based claim. The proposed rule fails to address these challenges and the critical need for access to counsel.

## VII.    Flawed data is at the heart of the justification for this proposed rule

There is a concerning and deeply flawed assumption within the rationale of the proposed rule that an alleged disparity between credible fear grants and the number of IJ grants of relief justifies the issuance of this proposed rule. The proposed rule asserts that "a full 83 percent of the people who were subject to ER and claimed fear from 2014 to 2019 were referred to an IJ for section 240 proceedings, but only 15 percent of those cases that were completed were granted asylum or some other form of protection."[95]

However, this 15 percent figure is misleading. The choice of the denominator of "total case completions" in getting to this figure is problematic and artificially deflates this number. DHS Office of Immigration Statistics (OIS) numbers divide asylum grants by total case completions, which generally include cases that have been abandoned, not adjudicated, withdrawn, and

---

https://www.justice.gov/opa/pr/dhs-and-doj-announce-dedicated-docket-process-more-efficient-immigration-hearings (May 28, 2021).
[93] *Supra* note 79.
[94] *Supra* note 79.
[95] NPRM at 11716.

CLP_PC_020733

administratively closed.[96] Including these "other closures" in the math deflates the overall grant rate, as many of those asylum applications may well have been found to be meritorious if litigated to their conclusion. The proposed rule cites OIS analysis which is not publicly available. However, available EOIR data on asylum decisions originating with a credible fear claim shows that when dividing the number of grants by the total of grants and denials (i.e., only looking at those cases which are adjudicated on the merits), the asylum grant rate rises to 36 percent.[97] Theoretically, this number would be higher if it included withholding of removal and Convention Against Torture (CAT) cases, which the 15 percent number includes.

The administration acknowledges this methodological choice. Tucked in a footnote within the proposed rule is an acknowledgment that the 15 percent number includes case completions that were not decided on the merits, stating that "OIS estimates that 28 percent of cases decided *on their merits* are grants of relief" (emphasis added).[98] Choosing to uplift the lower 15 percent number, which includes cases not decided on their merits in its math, is not only misleading but misrepresents the ratio of asylum seekers who present at our southern border with a meritorious claim of persecution.

Whatever methodological choices are made in crunching numbers, the success rate in seeking relief from persecution should have no impact on meaningful access to asylum. The consequences of an asylum seeker being returned to persecution are simply too dire to be distilled to a number in an Excel chart.

## VIII.   Relying on "legal pathways" disparately harms Black, Brown, and Indigenous asylum seekers

The proposed rule applies only to people who seek protection at the southern border, and as a result, specifically impacts individuals who do not have access to a passport or a visa. An asylum seeker may not have access to a passport for any number of reasons, including affordability, bureaucratic instability, and that it would need to be issued by the government that may be persecuting them. Indeed, it is not uncommon for an individual facing persecution due to being critical of their government to have their passport revoked.[99] If a passport is in hand, an asylum

---

[96] NPRM at note 97; EOIR, "Executive Office for Immigration Review Adjudication Statistics: Asylum Decisions and Filing Rates in Cases Originating with a Credible Fear Claim," https://www.justice.gov/eoir/page/file/1062976/download (Jan. 16, 2023).
[97] EOIR, "Executive Office for Immigration Review Adjudication Statistics: Asylum Decisions and Filing Rates in Cases Originating with a Credible Fear Claim," https://www.justice.gov/eoir/page/file/1062976/download (Jan. 16, 2023). Period of time: 2014 to 2019.
[98] NPRM at note 97.
[99] *See e.g.*, Melissa Medina Márquez, *Adding to the Stress of Emigration from Venezuela: Passports hard to come by*, Venezuela Politics and Human Rights, https://www.venezuelablog.org/migration-venezuela-passport-inefficiencies/#:~:text=A%20major%20factor%20is%20the,follow%2Dup%20after%20the%20first (Apr. 19, 2018) (stating "in early 2017 several opposition politicians and public figures reported having their passports seized or their migration procedures canceled."); Charlie Campbell, "The Thai Junta Revokes a Famed Academic's Passport in Its Crackdown on Dissidents," *Time*, https://time.com/2971785/thailand-junta-pavin-chachavalpongpun-passport/ (July 10, 2014); *The World*, "This Egyptian musician's passport was revoked for his political songs. He still can't wait to go home again," https://theworld.org/stories/2019-01-10/egyptian-musicians-passport-was-revoked-his-political-songs-he-still-cant-wait-go (Jan. 10, 2019); *Radio Free Europe Radio Liberty*, "Iran Revokes Passports Of Celebrities Who Supported

seeker is not likely to have access to a visa in a timely manner. While visa wait times vary by post, a tourist visa requiring an interview in Guatemala City will have a 371-day wait as of writing.[100] Complicating this is the fact that someone is unlikely to get a tourist visa if they intend to abandon their foreign residence to seek asylum.[101] For individuals who cannot access a passport and visa and are not one of the specific and limited countries with a parole program, the southern border is their only avenue to asylum in the United States.

The availability of lawful pathways to a potential asylum seeker is more narrow for individuals from predominantly Black countries. The Department of State has limited public statistics available and does not state specific reasons for denying visas, but reports show disproportionate denials for African countries. Professionals in international education, for example, report that "[d]enial rates for US F1 visas reached 'a new high' in Nigeria in 2022, with around two in three students being rejected" and "denial rates for students in Ghana and other Sub-Saharan regions are trending in a similar fashion."[102] This problem is not a new one. A published author was denied a visa to attend a prestigious literary residency.[103] A University of Southern California attempted to hold an Africa Trade Meeting without any Africans after losing "about 100 attendees, including speakers and government officials [due to visa denials]. The countries affected included Sierra Leone, Guinea, Ghana, Nigeria, Ethiopia and South Africa."[104] While AILA has heard reports of perceived higher denial rates of visas from its members, a 30-day comment period is not a sufficient length of time to adequately survey more than 16,000 members.

The visa denials are significant because they leave only the Southern border open to asylum seekers from these countries. This is reflected in the change in migrant flows, as according to a Migrant Policy Institute (MPI) report, Africans are increasingly joining the migrant flows to the southern land border of the United States.[105]

Someone who experiences persecution should not have to settle for the first country they transit through if this will mean facing discrimination on account of their race. According to MPI, most Africans "enter the Americas through Brazil or Ecuador," and experiences with racism begin then, "making it difficult for those who may otherwise intend to remain, at least in the short term,

Nationwide Protests," https://www.rferl.org/a/iran-bans-celebrities-leaving-country-support-protests/32074157.html (Oct. 10, 2022).

[100] U.S. Dep't of State, "Global Visa Wait Times," https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/global-visa-wait-times.html (Mar. 9, 2023).

[101] 9 FAM 402.2-2(B), https://fam.state.gov/fam/09fam/09fam040202.html.

[102] Maureen Manning, "US visa denials in Sub-Saharan region concern stakeholders," *The Pie News*, https://thepienews.com/news/us-visa-denials-in-sub-saharan-region-concern-stakeholders/ (Jan. 18, 2023).

[103] Nkiacha Atemnkeng, "'Try again next time': my three visa rejections," *The Guardian*, https://www.theguardian.com/world/2020/oct/29/try-again-next-time-my-three-visa-rejections (Oct. 29, 2020).

[104] Michelle Quinn, "Africa Trade Meeting Has No Africans After US Visa Denials," *Voice of America*, https://www.voanews.com/a/african-trade-conference-canceled-after-visas-denied-african-delegates/3770907.html (Mar. 17, 2017).

[105] Caitlyn Yates and Jesica Bolter, *African Migration through the Americas: Drivers, Routes, and Policy Responses*, Migration Policy Institute, https://www.migrationpolicy.org/research/african-migration-through-americas (Oct. 2021).

CLP_PC_020735

to secure housing and good jobs, and leading to violence and harassment for some."[106] The Department of State Country Reports on Human Rights Practices for both of these countries acknowledge a high level of racism.[107] Both of these countries also signed the 1951 Convention relating to the Status of Refugees and the 1967 Protocol, and under the proposed rule, African arrivals would need to apply in these countries.[108] The unsuitability of the proposed alternative countries is discussed further below.

As discussed, requiring asylum seekers to use CBP One to seek asylum at the border disparately harms Black asylum seekers due to the challenges recognizing Black faces.[109] CBP One also has accessibility issues for individuals who are illiterate in a language other than English, Spanish, and Haitian Creole, which will include many native speakers of indigenous languages. Indigenous languages such as Mam, K'iche' and Q'anjob'al have become increasingly common among asylum seekers in recent years and should not be discounted.[110]

In short, this proposed rule is significantly out of line with the Biden administration's recent executive order stating a "commitment to advancing equity for all . . . and addressing systemic racism in our Nation's policies and programs."[111]

## IX.    30 days is insufficient time to prepare a comment on a rule of this magnitude

The Biden administration has provided only 30 days for the public to comment on the proposed rule, effectively denying the public the right to meaningfully comment under the notice and comment rulemaking procedures required by the Administrative Procedure Act. This timeframe is insufficient for a sweeping proposed rule that would deny many people access to asylum in violation of U.S. law. On March 1, 2023, 172 organizations wrote to the agencies urging them to provide at least 60 days to comment on the complex 153-page rule that would have enormous implications for asylum access at the border and in USCIS and immigration court asylum proceedings.[112]

---

[106] *Id.* at 2.

[107] U.S. Dep't of State, *2021 Country Reports on Human Rights Practices: Brazil*, https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/brazil/, at 32 ("Despite this high representation within the general population, darker-skinned citizens, particularly Afro-Brazilians, encountered discrimination."); U.S. Dep't of State, *2021 Country Reports on Human Rights Practices: Ecuador*, https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/ecuador/ at 27, ("Afro-Ecuadorian citizens . . . suffered pervasive discrimination, particularly regarding educational and economic opportunity.").

[108] UNHCR, *States Parties to the 1951 Convention relating to the Status of Refugees and the 1967 Protocol.*

[109] Melissa del Bosque, "Facial recognition bias frustrates Black asylum applicants to US, advocates say," *The Guardian* (Feb. 8, 2023).

[110] Jennifer Medina, "Anyone Speak K'iche' or Mam? Immigration Courts Overwhelmed by Indigenous Languages," *New York Times*, https://www.nytimes.com/2019/03/19/us/translators-border-wall-immigration.html (Mar. 19, 2019).

[111] Exec. Order No. 14091, 88 Fed. Reg. 10825, https://www.federalregister.gov/documents/2023/02/22/2023-03779/further-advancing-racial-equity-and-support-for-underserved-communities-through-the-federal (Feb. 16, 2023).

[112] Letter from 172 organizations to Attorney General Merrick Garland, Secretary Alejandro Mayorkas, et. al., https://immigrantjustice.org/sites/default/files/content-type/commentary-item/documents/2023-03/Biden%20Asylum%20Ban%20-%20Extension%20letter%20to%2030-days%20comment%20period%20FINAL.pdf (Mar. 1, 2023).

CLP_PC_020736

Executive Orders 12866 and 13563 state that agencies should generally provide at least 60 days for the public to comment on proposed regulations.[113] A minimum of 60 days is especially critical given the rule's attempt to ban asylum for many refugees in violation of U.S. law and international commitments and return many to death, torture, and violence. While the agencies cite the termination of the Title 42 policy in May 2023 as a justification to curtail the public's right to comment on the proposed rule, this reasoning is specious especially given that the administration itself sought to formally end Title 42 nearly a year ago and has had ample time to prepare for the end of the policy.

Providing a 30-day comment period for the proposed asylum ban is reminiscent of Trump administration practices, when agencies routinely provided 30-day comment periods on sweeping asylum rules, leaving the public little time to meaningfully assess and respond to proposed rules.

For example, while AILA has heard reports of perceived higher denial rates of visas from our members, a 30-day comment period is not a sufficient length of time to adequately survey our more than 16,000 members, evaluate their responses, and incorporate them into a comment. This is indicative of the many challenges presented by having a shortened comment period.

Furthermore, on March 23, we learned that the API technology on Regulations.gov had been malfunctioning, causing an unknown number of public comments to be discarded when posted via third-party software. In a conversation on March 23, a representative from Regulations.gov indicated that the issue began on Monday, March 20. According to the representative, as of Thursday afternoon, March 23, there was no timeline for a resolution and no plan for accepting the public comments that failed to post to Regulations.gov. This technical outage effectively shortened the 30-day period further and apparently discarded public comments without the knowledge of the commenters.

### X.    The standards set to bypass the sunset date set up the proposed rule to be continued indefinitely

The structure created within this proposed rule would apply from the date of the termination of the Title 42 public health order (May 11, 2023) until 24 months after the rule's effective date.[114] After the sunset date, the proposed rule would continue to apply to the asylum seekers who entered under this rule.[115] If the proposed rule is effective as scheduled, the sunset date will be a few months into either the current administration's second term or a few months into a new administration.

---

[113] Exec. Order 12866, 58 Fed. Reg. 190, https://www.archives.gov/files/federal-register/executive-orders/pdf/12866.pdf (Sep. 30, 1993) (stating ". . . each agency should afford the public a meaningful opportunity to comment on any proposed regulation, which in most cases should include a comment period of not less than 60 days."); Exec. Order 13563, 76 Fed. Reg. 3821, 3822, https://www.federalregister.gov/documents/2011/01/21/2011-1385/improving-regulation-and-regulatory-review (Jan. 18, 2011) (stating "[t]o the extent feasible and permitted by law, each agency shall afford the public a meaningful opportunity to comment through the Internet on any proposed regulation, with a comment period that should generally be at least 60 days.").
[114] NPRM at 11708-08.
[115] NPRM at 11726.

CLP_PC_020737

It is highly problematic that the standard the proposed rule states for supporting the determination that the sunset provision should be extended sets up a current or future administration to extend the proposed rule indefinitely. The proposed rule states "if migration remains or is expected to remain at a sustained or heightened level, despite the Departments' actions, that could support a determination that the sunset provision should be lifted or extended."[116] Notably, there is no definition of "sustained" or "heightened" levels.

Without a concrete definition of what is considered "sustained" or "heightened," the sunset clause grants DHS effectively unbounded discretion to continue using the heightened standard set forth in the proposed rule. Every modern administration has looked to the southern border and seen a problem thought to be sustained or heightened.[117] This is part of a larger problem in addressing border security more broadly: a lack of concrete standards and metrics. In 2011, researchers observed DHS "has never clearly defined what border security means in practice," an observation that has withstood the test of time.[118] Without clear definitions of what constitutes "sustained," "heightened," or a border "emergency," this administration or subsequent ones can claim sustained or heightened numbers indefinitely.

## XI. Conclusion

AILA and the Council urge the administration not to move forward with this proposed rule and to rescind the proposed rule. The consequences of this proposed rule are too grave to do otherwise.

For any questions, please reach out to Amy Grenier at agrenier@aila.org or Rebekah Wolf at rwolf@immcouncil.org.

Sincerely,

THE AMERICAN IMMIGRATION LAWYERS ASSOCIATION
THE AMERICAN IMMIGRATION COUNCIL

Attachments (4): Select Citations Sources

---

[116] NPRM at 11727.

[117] Notably, when issuing the Trump administration's asylum ban in 2018, President Trump observed, "[f]ailing to take immediate action to stem the mass migration the United States is currently experiencing and anticipating would only encourage additional mass unlawful migration and further overwhelming of the system." President Donald Trump, "Read Trump's Proclamation Targeting the Caravan and Asylum Seekers," *New York Times*, https://www.nytimes.com/2018/11/09/us/politics/trump-proclamation-caravan-asylum.html (Nov. 9, 2018); The Obama administration faced an "influx of children" requiring a "surge" in resources in 2014. The White House Office of the Press Secretary, *The Obama Administration's Government-Wide Response to Influx of Central American Migrants at the Southwest Border*, https://obamawhitehouse.archives.gov/the-press-office/2014/08/01/obama-administration-s-government-wide-response-influx-central-american- (Aug. 1, 2014); President George W. Bush noted in a 2006 speech "we do not yet have full control of the border." George W. Bush, "Transcript: Bush's Speech on Immigration," *New York Times*, https://www.nytimes.com/2006/05/15/washington/15text-bush.html (May 15, 2006).

[118] Danilo Zak, *What Makes a Border Secure? Building a Healthier Border Dialogue*, National Immigration Forum, https://immigrationforum.org/article/what-makes-a-border-secure-building-a-healthier-border-dialogue/ (Apr. 16, 2022), *citing* Edward Alden and Bryan Roberts, "Are U.S. Borders Secure? Why We Don't Know, and How to Find Out*," Foreign Affairs*, 90, 4 (2011): 19–26, http://www.jstor.org/stable/23039603 (2011).

CLP_PC_020738

# PUBLIC SUBMISSION

**As of:** May 08, 2023
**Received:** March 27, 2023
**Status:** Posted
**Posted:** March 29, 2023
**Tracking No.** lfr-75e9-b2oa
**Comments Due:** March 27, 2023
**Submission Type:** Web

**Docket:** USCIS-2022-0016
Circumvention of Lawful Pathways

**Comment On:** USCIS-2022-0016-0001
Circumvention of Lawful Pathways

**Document:** USCIS-2022-0016-12269
Comment Submitted by Brooklyn Defender Services

---

## Submitter Information

**Email:** ksiegel@bds.org
**Organization:** Brooklyn Defender Services

---

## General Comment

Brooklyn Defender Services ("BDS") submits the attached comment in response to Circumvention of Lawful Pathways, a Notice of Proposed Rule published on February 23, 2023 by the Department of Homeland Security and the Department of Justice, 88 Fed. Reg. 11,704, OMB Control Number 1651-0140, Doc. No. 2023-03718.

---

## Attachments

USCIS-2022-0016_BDS_Public_Comment_3_27_2023

CLP_PC_021450



Brooklyn Defender Services
177 Livingston St., 7ᵗʰ Fl.
Brooklyn, NY 11201

Tel (718) 254-0700
Fax (718) 254-0897
ksiegel@bds.org

March 27, 2023

Via Federal e-Rulemaking Portal
Daniel Delgado
Acting Director, Border and Immigration Policy
Office of Strategy, Policy, and Plans
U.S. Department of Homeland Security
2707 Martin Luther King Jr. SE
Washington, DC 20032

Lauren Adler Reid
Assistant Director, Office of Policy, EOIR
Department of Justice
5107 Leesburg Pike
Falls Church, VA 22041

> Re: Circumvention of Lawful Pathways
> 88 Fed. Reg. 11,704 (Feb. 23, 2023)
> OMB Control Number 1651-0140
> Doc. No. 2023-03718

Dear Daniel Delgado and Lauren Adler Reid,

Brooklyn Defender Services ("BDS") submits this comment in response to Circumvention of Lawful Pathways, a Notice of Proposed Rule ("NPRM") published on February 23, 2023 by the Department of Homeland Security ("DHS") and the Department of Justice ("DOJ") (collectively, "the Departments"). For the reasons set forth below, BDS firmly opposes the NPRM in its entirety. If implemented, the NPRM would eviscerate the right to asylum by imposing unlawful manner of entry and transit bans on refugees entering the United States via the southwest border. These measures revive unlawful and racist plans created by the Trump administration and betray the Biden administration's commitment to strengthening the US asylum system. BDS urges the Departments to rescind the unlawful NPRM in its entirety.

BDS is a public defense office in Brooklyn, New York, that provides multi-disciplinary and client-centered criminal, family, and immigration defense, and civil legal services, along with social work and advocacy support. BDS represents low-income people in nearly 22,000 criminal, family, civil, and immigration proceedings each year. Since 2009, BDS has counseled, advised, or represented more than 16,000 clients in immigration matters, including deportation defense, affirmative applications, advisals, and immigration consequence consultations in Brooklyn's criminal court system. About a quarter of BDS' criminal defense clients are foreign-born, roughly half of whom are not naturalized citizens and therefore are at risk of losing the opportunity to obtain lawful immigration status as a result of criminal or family defense cases. Our criminal-immigration specialists provide support and expertise on thousands of such cases. In addition, BDS is one of three New York Immigrant Family Unity Project ("NYIFUP") providers and has represented more than 1,700 people in detained deportation proceedings since the inception of the program in 2013. BDS represents noncitizens in non-detained removal proceedings in New York's

**DEFEND • ADVOCATE • CHANGE**

CLP_PC_021451

immigration courts, in petitions for review before the U.S. Circuit Court of Appeals for the Second and Third Circuits, and in writs of mandamus and habeas corpus in U.S. district courts.

## I.    <u>Overview of Proposed Rule</u>

The NPRM proposes to unlawfully ban refugees from asylum protection based on manner of entry into the United States and transit through other countries. It does so through a presumption of non-eligibility for sweeping categories of people seeking refuge in the United States. According to the NPRM, all people entering the United States via the southwest border who are not Mexican nationals will be presumptively ineligible for asylum unless:  (1) they are preapproved nationals of the five countries subject the administration's parole programs (Cuba, Haiti, Nicaragua, Venezuela, and Ukraine); (2) they have preregistered at a port of entry using the CBP One application; or (3) they have requested and failed to obtain asylum in a transit country.[1] The presumption would also be rebuttable through a showing of "exceptionally compelling circumstances by a preponderance of the evidence." As described below, these restrictions are unmistakable violations of U.S. asylum law and of the United States' commitments under international refugee law.[2]

The ban would apply to anyone physically present in the United States after crossing the southwest border, "without regard to whether the noncitizen has been inspected by an immigration officer, evaded inspection by an immigration officer, or was free from official restraint or surveillance."[3] Therefore, even people not in removal proceedings who apply affirmatively for asylum would still be subject to a presumption of ineligibility.

In addition, many refugees subject to the bans will not have the opportunity to a full removal proceeding as they will be subject to expedited removal proceedings following apprehension near the southwest border or presentation at a port of entry. Through these already flawed proceedings,[4] the government is able to deport noncitizens without a hearing unless they express a fear of return and show *either* a significant possibility of establishing eligibility for asylum in a "credible fear interview" *or*, if ineligible for asylum, the higher standard of a reasonable fear of persecution or torture in a "reasonable fear interview."[5]

---

[1] 88 Fed. Reg. 11,723.

[2] *See infra* Part II.G.

[3] 88 Fed. Reg. 11,723.

[4] *See infra* Part II.G.3.ii; *see also, e.g.*, American Civil Liberties Union 63, American Exile: Rapid Deportations That Bypass the Courtroom (2014) (describing erroneous expedited removal of Mexican citizen who had lived in the United States for 14 years); *id*. at 38 (recounting case of a Guatemalan citizen and mother of four U.S. citizen children who was removed under an expedited removal order even though she told the CBP officers that she was afraid to be deported to Guatemala, where her father had been murdered and her mother had been the target of extortion by gangs); *id*. at 39 (describing 22-year-old woman who fled domestic violence removed to El Salvador without being provided a credible fear interview).

[5] *See generally* 8 U.S.C. § 1125(b); 8 C.F.R. § 253.3.

CLP_PC_021452

Under the NPRM, asylum officers first would determine whether the presumption of ineligibility applies and, if so, whether the noncitizen has rebutted it.[6] Those who fail would automatically be subjected to the higher reasonable fear standard and would be eligible only for the lesser forms of relief known as withholding of removal and protection under the Convention Against Torture ("CAT").[7] Refugees barred from applying for asylum under the NPRM would generally have no opportunity to gather evidence and prepare arguments to rebut the presumption of ineligibility. While a negative determination could be reviewed *de novo* by an immigration judge, the NPRM requires noncitizens to affirmatively request such review, rather than being asked by an officer if they want administrative review by an immigration judge.[8]

According to the NPRM, the Departments expect that their asylum bans will push refugees to avail themselves of several "lawful pathways" the Departments put forward.[9] It is, however, doubtful that these pathways provide anything like the protection of the United States asylum system or respond to the urgent needs of people seeking persecution.[10]

\*       \*       \*

The NPRM's deficiencies are myriad. Among other issues discussed below, it is a revival of previously enjoined and inhumane policies made by the Trump administration to further its xenophobic and racist platform;[11] it exposes refugees to extreme physical danger and contravenes U.S. law and international obligations; and it is based on unsupported and erroneous assumptions about the efficacy of immigration deterrence, the safety of transit countries, and the usability of a Customs and Border Patrol's ("CBP") online application.

The Departments must rescind the NPRM in its entirety and recommit to strengthening the statutory right of refugees to apply for asylum in the United States regardless of manner and place of entry or their path to the United States.

## II.    Analysis and Recommendations

### A.    The 30-day comment period is insufficient for a rule of the NPRM's magnitude.

Despite the magnitude of their proposed changes to asylum law, the Departments have only provided 30 days for public comment on the NPRM. This abbreviated comment period effectively

---

[6] 88 Fed. Reg. 11,724-5.

[7] 88 Fed. Reg. 11,725.

[8] *Id*.

[9] *See, e.g.*, 88 Fed. Reg. 11,728.

[10] *See infra* Part II.C.

[11] *See, e.g.*, Michele Goodwin and Erwin Chemerinsky, *The Trump Administration: Immigration, Racism, and COVID-19*, 169 U. Penn. L.R. 313, 318 (2021) ("[W]e raise alarm about the unconstitutional legal policies that flow from racist ideology, manifesting harmful racial ideologies into law.")

3

CLP_PC_021453

denies the public its right to meaningfully comment on the NPRM,[12] including, for example, to discuss the NPRM with other stakeholders or with clients whose family members may be impacted. A minimum comment period of 60 days is necessary to allow the public to comment on the NPRM's attempt to create a wholesale reordering of asylum at the border in a way that violates U.S. and international law.

As with much in the NPRM, the Departments' decision to truncate the comment period is reminiscent of the practices of the previous administration. In *Centro de la Raza v. EOIR*, for example, the District Court for the Northern District of California found that the previous administration violated the Administrative Procedures Act ("APA") by providing only 30 days to comment on a rule that would have significantly changed immigration court procedures.[13] In addition to highlighting the magnitude of the rule, the court noted that, as here, the Departments "acknowledged that the Rule constituted a 'significant regulatory action,' and stated that they 'drafted the rule consistent with the principles of Executive Orders 12866 and 13563.'"[14] Those executive orders, in turn, state that "a comment period . . . should generally be at least 60 days."[15] The court found it "curious" that EOIR had not explained its departure from those executive orders despite stating that it had complied with them.

The situation is no different here. In discussing their compliance with the aforementioned executive orders, the Departments do not explain why this NPRM, with its massive changes to the treatment of refugees at the southwest border, should deviate from recommended procedures for significant regulatory actions. Moreover, the Departments invoke the impending end of the Title 42 public health order, which allows DHS to expel arriving noncitizens at the border, as a reason for rapid action.[16] But they neglect to mention that the administration has been seeking to end Title 42 for the past year. Similarly, they say that the resolution of litigation seeking to end Title 42 would create chaos at the border, but omit that the litigation has been pending for over one year. They also discuss the administration's decision to end the Covid-19 public health emergency as if it were an external factor that they could not have anticipated.[17]

Because the possibility of Title 42's end was clearly foreseeable, the Departments have had ample time to craft their policy and provide an appropriate amount of time for public comment.[18] The Departments should withdraw the NPRM in its entirety and instead pursue a

---

[12] 5 U.S.C. § 553(b), (c); *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1101 (D.C. Cir. 2009) (noting that the requirement under the APA is for a "meaningful opportunity" for comment).

[13] 524 F. Supp. 3d 919, 954-56 (N.D. Cal. 2021).

[14] *Id*. at 955 (quoting 85. Fed Reg. 81,463) (cleaned up).

[15] Exec. Order No. 13,563, 76 Fed. Reg. 3821, 2821-22 (Jan. 18, 2011); *see also* Exec. Order. 12866, 58 Fed. Reg. 51,735 § 6(a)(1) (Oct. 4 1993).

[16] *See* 88 Fed. Reg. 1170.

[17] *See id*.

[18] *Cf. Centro de la Raza*, 524 F. Supp. 3d at 955 ("DOJ did not identify any exigent circumstances requiring a compressed comment period.").

CLP_PC_021454

lawful and humane asylum policy. At a minimum, should the Departments continue their course to circumvent U.S. law and treaty obligations, they must provide at least 60 days to meet their obligations under the APA and provide the public sufficient time to provide comment on its catastrophic effects for refugees.

### B.     The NPRM revives the Trump administration's cruel and illegal asylum bans and abandons the idea of fair and humane asylum procedures.

The Departments' proposed restrictions on asylum based on manner of entry and transit are alarmingly similar to the bans that the Trump administration sought to implement. In 2018, the Trump administration issued an interim final rule that categorically barred asylum for any applicant who entered the United States via the southwest border outside of a port of entry.[19] (The Departments refer to this regulation as the "Proclamation Bar.") In 2019, the administration issued an interim final rule that would deny asylum to anyone crossing the southwest border who had not applied for humanitarian protection in a transit country, was not a victim of trafficking, or only transited through countries that were not parties to the relevant United Nations conventions.[20] (The Departments refer to this regulation as the "TCT ban" or "transit ban.") Both regulations were repeatedly enjoined for violating U.S. asylum law.)[21]

During the approximately one year in which the transit ban was in effect, it inflicted immense hardship on refugees deported to unsafe countries, on families separated at the border, and on people subject to prolonged detention. Among the documented deportations due to the transit ban were those of a Venezuelan opposition journalist and her one-year-old baby, a Cuban asylum seeker persecuted and subjected to forced labor for his political activity, a Nicaraguan student shot during an antigovernment protest, and a gay Honduran threatened and assaulted for his sexual orientation.[22]

The Departments try repeatedly to distinguish their proposal from the Trump-era bans by saying that they are merely creating a rebuttable presumption of ineligibility, rather than categorical bars.[23] The current proposal would nonetheless bar scores of refugees from asylum eligibility, and, as discussed *infra* Part II.G, rebuttal does not save the bans from violating the asylum statute or the United States' commitments under international law.

---

[19] *See* Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. 55,934 (Nov. 9, 2018); Addressing Mass Migration Through the Southern Border of the United States, 83 Fed. Reg. 57,661, 57,663 (Nov. 9, 2018).

[20] *See* Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33,829 (July 16, 2019).

[21] *See E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962 (9th Cir. 2020) (*"East Bay I"*); *E. Bay Sanctuary Covenant v. Barr*, 519 F. Supp. 3d 663 (N.D. Cal. 2021) (*"East Bay II"*); *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640 (9th Cir. 2021).

[22] *See* Asylum Denied, Families Divided 6-7, Human Rights First (2019), https://humanrightsfirst.org/wp-content/uploads/2022/10/AsylumDeniedFamiliesDivided.pdf.

[23] *See* 88 Fed. Reg. 11,735, 11,736, 11,739, 11,740.

CLP_PC_021455

Regardless, the Departments' attempt to place such extreme restrictions on the right to asylum is irredeemably misguided. The Departments support their authority to make these restrictions on the basis of the alleged breadth of their discretion and by interpreting the asylum statute as narrowly as possible. In doing so, they give the impression that they hope to provide persecuted people the meagerest protection they can. As BDS has learned in hundreds of asylum cases, people seeking refuge in the United States need *more* avenues for protection and *more* safeguards to ensure that their claims are fully and fairly adjudicated. Far from burdening the country, asylees enrich the United States and contribute to the vibrancy of countless communities across the country.

Early on, it appeared that the Biden administration understood the need to welcome and protect people fleeing persecution. As a candidate, President Biden campaigned on *not* "denying asylum to people fleeing persecution and violence"[24] and on reversing President Trump's asylum restriction.[25] In Executive Order 14,010, President Biden pledged to "restore and strengthen our own asylum system, which has been badly damaged by policies enacted over the last 4 years that contravened our values and caused needless suffering."[26] While President Biden did mention "enhanc[ing] lawful pathways" as part of a comprehensive policy platform, it is dismaying that his administration has now abandoned one half of this formula and chosen instead what the press has accurately called "a Trump-style plan"[27] and an "embrace of Trumpian border policies."[28] The administration's plan is also one that the United Nations High Commissioner for Refugees ("UNHCR") has warned is "not in line with refugee law standards" because it "establish[es] a link between [the expansion] of safe and legal pathways" and the right to asylum.[29]

The Departments are completely wrong to revive the inhumane and illegal practices of the Trump administration. They must rescind the NPRM in its entirety and renew their commitment to a lawful, just, and compassionate asylum system.

---

[24] Biden Harris, The Biden Plan for Securing Our Values as Nation of Immigrants, https://joebiden.com/immigration/#, last accessed March 21, 2023.

[25] Elena Moore, *Trump's and Biden's Plans On Immigration*, NPR (Oct. 16, 2020), https://www.npr.org/2020/10/16/919258401/trumps-and-biden-s-plans-on-immigration.

[26] Exec. Order No. 14,010, 86 Fed. Reg. 8267 (Feb. 2, 2021).

[27] *Biden unveils Trump-style plan to deter asylum seekers at Mexico border*, THE GUARDIAN (Feb. 21, 2023), https://www.theguardian.com/us-news/2023/feb/21/us-mexico-border-immigration-joe-biden-donald-trump.

[28] Nicole Narea, *How Biden came to embrace Trumpian border policies*, VOX (Feb. 22, 2023), https://www.vox.com/policy/2023/2/22/23610849/biden-border-asylum-app-transit.

[29] *New US border measures 'not in line with international standards', warns UNHCR*, UN NEWS (Jan. 6, 2023), https://news.un.org/en/story/2023/01/1132247.

CLP_PC_021456

### C. The Departments do not show that implementing a rebuttable presumption of ineligibility would discourage refugees from seeking protection in the United States.

The Departments' primary justification for the new asylum restrictions is the need to reduce "border encounters, [which] could rise, and potentially rise dramatically . . . subsequent to the lifting of the Title 42 public health Order."[30] Even if, *arguendo*, this were an acceptable reason to broadly deny access to asylum—which it is not—the Departments have not provided adequate evidence for their assertion that the proposed restrictions will "deter" refugees from arriving at the southwest border.

The Departments' estimation of the number of border encounters it expects when Title 42 is lifted is critical to its justification of the NPRM. The Departments cite a "DHS Office Immigration Statistics planning model [that] assumes that, without a meaningful policy change, border encounters could rise, and potentially rise dramatically—up to as high as 13,000 a day."[31] The Departments aver that DHS does not have the capacity to process "migratory flows of this magnitude" and must therefore take immediate action.[32] While the Departments' footnotes includes a reference to "DHS SWB Encounter Planning Model generated January 6, 2023,"[33] there is no link to that model and it does not appear on a search of DHS' website. Without more information on the model (such as methodology, data sources, and alternative figures), the public is unable to evaluate a piece of data that underpins the Departments' supposed need for the NPRM.

Moreover, the Departments' own data shows that Title 42—which allows the summary expulsion of refugees—has not deterred people from seeking refuge by crossing the southwest border.[34] Similarly, the implementation of expedited removal in 1997 was not correlated with a drop in apprehensions of people who crossed the southwest border without authorization.[35] It was, however, associated with a drop in asylum applications,[36] suggesting that a primary effect of expedited removal was to deny asylum to people apprehended along the southwest border whether or not they were eligible. There is also no correlation between the previous restrictions on asylum—the ban on applications filed after one year from entry to the United States, the safe third country bar, or firm resettlement, for example—and a rise or drop in apprehensions.

---

[30] 88 Fed. Reg. 11712.

[31] 88 Fed. Reg. 11,713.

[32] *Id.*

[33] *Id.* n.76.

[34] *See, e.g.*, Fed. Reg. 11,710.

[35] *See* U.S. Border Patrol, Southwest Border Sectors – Total Illegal Alien Apprehension By Fiscal Year (1960-2018), https://www.cbp.gov/sites/default/files/assets/documents/2019-Mar/bp-southwest-border-sector-apps-fy1960-fy2018.pdf, last accessed March 14, 2023.

[36] *See* 2003 Yearbook of Immigration Statistics 56, Office of Immigration Statistics (2004), https://www.dhs.gov/sites/default/files/publications/Yearbook_Immigration_Statistics_2003.pdf.

CLP_PC_021457

As discussed throughout this comment, there are many compelling moral, policy, and legal reasons to reject the Departments' proposal. The Departments' failure to provide substantial evidence that the NPRM will accomplish the goals they profess is an independent reason that it must be rejected.

### D. The Departments obfuscate or fail to address the grave humanitarian consequences of their asylum bans.

#### 1. *The Departments incorrectly vouch for the safety of transit countries that cannot adequately protect refugees.*

The Departments claim that there is no issue in requiring refugees to first apply for and be denied asylum in a transit country because the most common transit countries have become safe places for asylum seekers.[37] The Departments ignore significant evidence that these countries do not offer refugees safety and protection comparable to the United States.

For example, the Departments refer to Colombia as "one of the leaders in the Western Hemisphere—and the world—in its response to the unprecedented surge in irregular migration from Venezuela."[38] In fact, 40 percent of Venezuelan women in Colombia reported being victims of both psychological and physical violence between 2020 and 2022.[39] Moreover, Colombia continues to suffer from chronic internal displacement, which affected 61,396 people in 2022.[40]

In Mexico, too, another country whose humanitarian record the Departments tout, the reality is much grimmer. Human Rights First, for example, documented over 13,480 reports of violence against asylum seekers in Mexico between January 2021 and December 2022.[41] These include the rape of a Guatemalan trans woman by Mexican police after she was denied entry to the United States and a 13-year-old Venezuelan child abducted at gunpoint after being expelled under Title 42.[42] Funding per refugee status applicant in Mexico fell from approximately $1,800 in 2011 to just $17 in 2021.[43] Asylum seekers in Mexico also reported in 2021 and 2022 that

---

[37] *See* 88 Fed. Reg. 11,720.

[38] 88 Fed. Reg. 11,722.

[39] Everado Esquivel, For Venezuelan women, gender-based violence is a widespread risk at home and abroad, warns IRC, International Rescue Committee (Nov. 25, 2022), https://www.rescue.org/press-release/venezuelan-women-gender-based-violence-widespread-risk-home-and-abroad-warns-irc.

[40] Internal Displacement/Colombia, UNHCR (Dec. 2022), https://reporting.unhcr.org/document/4248.

[41] Human Rights Stain, Public Health Farce 4, Human Rights First (2022), https://humanrightsfirst.org/wp-content/uploads/2022/12/HumanRightsStainPublicHealthFarce-1.pdf.

[42] *See id*.

[43] *See* Mexico: Asylum Seekers Face Abuses at Southern Border, Human Rights First (2022), https://www.hrw.org/news/2022/06/06/mexico-asylum-seekers-face-abuses-southern-border.

8

immigration agents tried to dissuade them from applying for refugee status or turned them away at the southern border of Mexico.[44]

In other Western Hemisphere transit countries, the U.S. Department of State is itself a source for information on the inadequacy of asylum procedures. In the NPRM, the Departments claim, for example, that "the Government of Guatemala has taken key steps to continue to develop its asylum system."[45] Their colleagues at the Department of State, however, state in their latest country report that "identification and referral mechanisms for asylum seekers were inadequate" and that "there continued to be gaps and lack of clarity in the procedures for implementing the [asylum] framework."[46] In Honduras, a transit country the Departments do not even address, the Department of State says that the asylum system is "nascent" and that "asylum seekers with pending cases were vulnerable to abuse and sexual exploitation."[47]

The Departments simply ignore the reality that transit countries are dangerous for asylum seekers and do not offer adequate protection. Their revival of the Trump-era transit ban is therefore arbitrary and lacking support in substantial evidence.

> 2.   *The Departments do not address the likelihood that the NPRM will lead to mass deportations, leave families separated, and deprive refugees of a path to citizenship.*

The Departments do not adequately address the consequences of the NPRM in terms of the conditions under which refugees will be deported or the otherwise precarious status of people barred from asylum under the proposed bans.

To begin—as discussed *infra* Part II.G.3.ii—the constraints of the expedited removal process and of credible fear screenings make it almost certain that vast numbers of refugees will face summary removal from the United States if the NPRM is implemented. Language barriers, abusive and dangerous conditions of confinement, acute trauma, and lack of knowledge of the complexities of both existing asylum law and the new presumption would all contribute to making it challenging for asylum seekers to overcome the presumptions in initial screenings. Just as occurred when the Trump ban was in effect and during Title 42, these mass deportations at the border will unlawfully put refugees in harm's way and endanger their lives.

The Departments offer the possibility of withholding of removal or protection under the CAT as alternative forms of protection for people denied asylum under the NPRM. However,

---

[44] *See id*. ("Some said immigration agents tried to dissuade them from applying for refugee status and pressured them to agree to voluntary return, even when they said they would be at risk of violence and persecution in their home countries.").

[45] 88 Fed. Reg. 11,721.

[46] 2021 Country Reports on Human Rights Practices: Guatemala, Department of State (2022), https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/guatemala/.

[47] 2021 Country Reports on Human Rights Practices: Guatemala, Department of State (2022), https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/honduras/.

CLP_PC_021459

withholding of removal and CAT are not replacements for people with a valid asylum claim. First, both require applicants to meet a higher standard of proof in order to receive protection. Moreover, neither is a permanent status, nor do they provide definitive relief from deportation or a pathway to permanent residence or citizenship. BDS represents many people who seek withholding of removal or CAT because of statutory asylum restrictions. Those who are successful live with the stress and precarity of knowing how thin their protection from deportation is. Unable to request derivative status for their family members, they also face the possibility of permanent separation and worry for the safety of loved ones who could not escape persecution or torture.

It is unfair and arbitrary to subject refugees to a higher standard of proof and an inferior form of relief based on factors unrelated to the strength of their claim or even to their statutory eligibility for asylum.

The Departments do not adequately address the likelihood that the NPRM will result in large-scale deportations of people with valid asylum claims or that people with such claims will never have access the protection they deserve.

### E.      CBP One is a cumbersome and inaccessible platform that cannot be trusted to facilitate appointments at ports of entry.

Under the NPRM, the only way refugees can request asylum is by prescheduling an appointment at a port of entry through the CBP One app. Because of the app's deficiencies and the uncertainty of DHS' expansion plans for it, this restriction will further limit the number of refugees able to exercise their right to apply for asylum.

CBP One is and will remain inaccessible to many asylum seekers. The app requires the use of a working smartphone connected to a cellular network or Wi-Fi, which a significant number of asylum seekers do not have. The Departments acknowledge this "access concern," but provide only a vague assurance that an "ongoing and serious obstacle" will overcome the presumption of ineligibility created when a refugee does not use the app.[48] It is alarming that CBP agents would have discretion to turn away refugees without a smartphone, leaving them vulnerable to victimization as they try to access the app in Mexico. Additionally, the app does not clearly identify the option to schedule an appointment at a port of entry (confusingly, users must press an icon labeled "Traveler"), features many other unrelated services, and requires multiple login and authentication steps.

Furthermore, the app is available in only three languages: English, Spanish, and Haitian Creole.[49] It is completely inaccessible to refugees who cannot read. The Departments do not indicate any plan to add new language capabilities. Many refugees BDS has represented, including indigenous people from Central America, may have basic communication skills in English or Spanish, but cannot read or write proficiently in those languages, and are instead fluent in

---

[48] 88 Fed. Reg. 11,720.

[49] *See* Asylum Processing at the U.S.-Mexico Border: February 2023 1, Strauss Center for International Security and Law (2023), https://www.strausscenter.org/wp-content/uploads/Feb_2023_Asylum_Processing.pdf.

CLP_PC_021460

indigenous languages. CBP agents and asylum officers will likely wrongly conclude that people in this position do not have a "language barrier" that would exempt them the requirement to use the app.

The app also discriminates against Black refugees because its facial recognition system rejects images of people with darker skin tones, a well-documented problem in facial recognition technologies that the Departments have full knowledge of, but do not address.[50]

Even if refugees have access to the app, appointment slots are extremely limited and inadequate for the number of people *already* trying to book an appointment. In February 2023, there were a total of approximately 500 unique appointments per day (with one appointment for one person), and thousands of people with pending appointments were seeking shelter in Mexican border cities.[51] The Departments say that "CBP will, upon the lifting of the Title 42 public health Order, expand access to the CBP One app."[52] They provide no details on their expansion plans, including how many appointments will be available and what new information the app—which does not currently ask about intent to apply for asylum[53]—will solicit. Without any information beyond the existence of a goal to expand CBP One's use, the pubic cannot meaningfully comment on the Departments' expansion plan for CBP One, a central component of the processing scheme they propose.

Requiring asylum seekers to schedule an appointment through CBP One, often weeks or months ahead of time, has already resulted in horrific violence, including the murder of a 17 year-old Cuban child while he was waiting for weeks for his appointment.[54] A Venezuelan family unable to secure an appointment at a port of entry near them in Piedras Negras and forced to travel over 1,200 miles to another port of entry for an appointment was kidnapped, tortured, and extorted by a criminal group while traveling to their appointment. After 20 days, their abductors blindfolded them and brought them to the U.S.-Mexico border, threatening to murder them if they did not cross. After crossing, the family tried to explain to Border Patrol that they had been kidnapped and forced to cross, but agents told them they were criminals for crossing illegally and expelled them back to Mexico.[55] Women, LGBTQI+, and survivors of gender-based violence ("GBV") will be

---

[50] *See, e.g.*, Melissa del Bosque, *Facial recognition bias frustrates Black asylum applicants to US, advocates say*, THE GUARDIAN (Feb. 8, 2023), https://www.theguardian.com/us-news/2023/feb/08/us-immigration-cbp-one-app-facial-recognition-bias.

[51] Strauss Center, *supra* n.51, at 4-9.

[52] 88 Fed. Reg. 11,729.

[53] Jack Herrera, *Fleeing for Your Life? There's an App for That.*, TEXAS MONTHLY (Mar. 2, 2023), https://www.texasmonthly.com/news-politics/cbp-app-asylum-biden-administration/.

[54] *See id*.

[55] *See* @ReichlinMelnick, TWITTER (Mar. 2, 2023) https://twitter.com/ReichlinMelnick/status/1631400369266872322.

CLP_PC_021461

especially vulnerable to harm.[56] The Departments completely ignore these well-documented dangers, an extremely important aspect of the problem they seek to address.[57]

It is alarming the Departments would allow CBP One—an inaccessible and cumbersome platform with long wait times—to play such a central role in determining eligibility for asylum. The Departments' reliance on the platform demonstrates once more how deeply flawed, poorly considered, and dangerous their proposal is.

### F. The asylum bans would disparately harm Black, brown, and indigenous asylum seekers and discriminate based on national origin.

The policies within the NPRM will have a disparate on asylum on refugees of color and on refugees from Latin America, the Caribbean, and Africa.

The proposed restrictions apply only to people who seek asylum at the southwestern border, where the vast majority of asylum seekers are people of color and people from Latin American and the Caribbean countries.[58] It does not apply to people arriving by land at the northern border, by sea, or by plane (where most asylum seekers are traveling with a visa), whose demographics differ sharply from those of people entering the United States at the southwestern border. During the period that the Trump transit ban was in effect, immigration court asylum denial rates skyrocketed for many Black, brown, and indigenous asylum seekers at the southwestern border. For example, asylum grant rates declined by 45 percent for Cameroonian asylum seekers, 32.4 percent for Cubans, 29.9 percent for Venezuelans, 17 percent for Eritreans, 12.9 percent for Hondurans, 12 percent for Congolese (Democratic Republic of the Congo), and 7.7 percent for Guatemalans, compared to the same time period the year before.[59]

---

[56] *See, e.g.*, Surviving Deterrence: How US Asylum Deterrence Policies Normalize Gender-Based 21, Oxfam America and Tahirih Justice Center (2022), https://www.tahirih.org/wp-content/uploads/2022/10/Oxfam_Tahirh_Surviving-Deterrence_English_2022.pdf ("[O]ur data show how policies such as expulsions under Title 42, returns under [Remain in Mexico], and turnbacks contribute to conditions that foster various forms of GBV at the US-Mexico border such as rape, human trafficking, sexual assault, psychological trauma, and other abuses[.]").

[57] *Cf. Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43 (1983) (stating it is arbitrary and capricious under the APA for an agency to fail to consider an important aspect of the problem).

[58] *See, e.g.*, John Gramlich, *Monthly encounters with migrants at U.S.-Mexico border remain near record highs*, Pew Research Center (Jan. 13, 2023), https://www.pewresearch.org/fact-tank/2023/01/13/monthly-encounters-with-migrants-at-u-s-mexico-border-remain-near-record-highs/#:~:text=But%20that%20is%20no%20longer,%2C%20Nicaragua%2C%20Peru%20and%20Venezuela (noting that Mexico, Guatemala, El Salvador, and Honduras account for 37% percent of border encounters and that there have been steep increases in the number of encounters with nationals of Colombia, Cuba, Nicaragua, Peru, and Venezuela).

[59] *See* Biden Administration Plan to Resurrect Asylum Ban Advances Trump Agenda 4-5, Human Rights First (2023), https://www.pewresearch.org/fact-tank/2023/01/13/monthly-encounters-with-migrants-at-u-s-mexico-border-remain-near-record-

CLP_PC_021462

As stated *supra* Part II.F, the Departments' reliance on CBP One also has a disparate impact on Black asylum seekers due to its facial recognition technology and to indigenous asylum seekers less likely to be able to access and use the app.

The NPRM also introduces nationality-based discrimination into asylum by providing an exception for people who benefit from DHS' new parole processes, which allow certain people from Cuba, Haiti, Nicaragua, and Venezuela to enter or temporarily remain in the United States. While this exercise of DHS' parole authority provides a much-needed procedure for family reunification, it is inappropriate and unfair to use it to determine who can apply for asylum. In the context of the proposed bans, parole functions as a "legal pathway" expressly available only to people from Cuba, Haiti, Nicaragua, and Venezuela.[60] Asylum procedures may not deny refugees from other countries equal protection by treating them differently based on their nationality.[61] The Departments' plan harnesses parole—an otherwise positive development—to do just that.

This discrimination based on race, ethnicity, and national origin is yet another reason that the Departments' bans are untenable and wrong and that they must be rescinded in their entirety.

### G. The NPRM unequivocally violates United States law and international humanitarian law.

In addition to the defects and shortcomings discussed above, the NPRM must be rescinded in its entirety because it is fundamentally unlawful. The NPRM violates the plain meaning of United States refugee law and the United States' commitments under international refugee law.

The foundational texts of both U.S. and international refugee law are the 1951 United Nations Convention Relating to the Status of Refugees ("1951 Convention"), which defined the term refugee and delineated state parties' obligations towards refugees, and the 1967 United Nations Protocol Relating to the Status of Refugees ("1967 Protocol"), which gave the 1951 Convention universal application. In acceding to the 1967 Protocol, the United States committed itself "to comply with the substantive provisions of Articles 2 through 34 of the [1951 Convention] with respect to 'refugees' as defined in Article 1.2 of the [1967 Protocol]."[62]

---

.highs/#:~:text=But%20that%20is%20no%20longer,%2C%20Nicaragua%2C%20Peru%20and%20Venezuela.

[60] *See* USCIS, Processes for Cubans, Haitians, Nicaraguans, and Venezuelans (Feb. 22, 2023), https://www.uscis.gov/CHNV.

[61] *See, e.g.*, *United States v. Windsor*, 570 U.S. 744, 774 (2013) ("The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws."); *Huynh v. Carlucci*, 679 F. Supp. 61, 66 (D.D.C. 1988) ("Discrimination on the basis of national origin is subject to strict scrutiny and can be sustained only if there is a close relationship between the classification and promotion of a compelling interest, the classification is necessary to achieve that interest, and the means or procedures employed are precisely tailored to serve that interest.").

[62] *INS v. Stevic*, 467 U.S. 407, 416 (1984).

13

CLP_PC_021463

These provisions include the requirement for a nondiscriminatory framework to determine refugee status[63] and prohibitions on imposing penalties based on unauthorized entry,[64] on expelling a refugee without a proceeding in accordance with due process of law,[65] and on expelling a refugee to a territory "where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion."[66]

In 1980, Congress enacted the Refugee Act, which standardized refugee and asylum procedures in the United States and aligned them with the 1951 Convention and 1967 Protocol. As a contemporary commentator put it, the law was intended to "reconcile [American] rhetoric with our law, our national immigration policy and our international treaty obligations so that we could maintain a consistent posture towards the world as a nation with a strong humanitarian tradition and a unique historic role as a haven for persons fleeing oppression."[67] "Both House and Senate sponsors [of the Refugee Act] emphasized that the purpose was to create a nondiscriminatory definition of a refugee and to make United States law conform to the UN Convention."[68]

For the reasons below, the NPRM is an affront to both the language and the principles of U.S. and international humanitarian law.

1.   *By restricting asylum based on manner and place of entry, the NPRM violates the plain language of the foundational statute of U.S. asylum law— 8 U.S.C. § 1158(a).*

The Refugee Act provides at 8 U.SC. § 1158(a)(1) that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not a designated port of arrival . . .) irrespective of such alien's status, may apply for asylum in accordance with [this statute]."[69] Both Article III courts and the Board of Immigration Appeals ("BIA") have consistently interpreted this provision to mean that place and manner of entry may not be the basis for the denial of an asylum application.[70]

---

[63] *See* Convention Relating to the Status of Refugees, art 4. July 28, 1951, 19 U.S.T. 6259 (*"1951 Convention"*).

[64] *Id.*, art. 31.

[65] *Id.*, art. 32

[66] *Id.*, art. 33.

[67] Deborah Anker, *The Refugee Act of 1980: An Historical Perspective*, 5 IN DEFENSE OF THE ALIEN 89, 89 (1982), https://www.jstor.org/stable/23141008?read-now=1&refreqid=excelsior%3A1060953608aa0bdd30d5d506e1ff6318&seq=1#page_scan_tab_contents.

[68] Deborah E. Anker and Michael H. Posner, *The Forty Year Crisis: A Legislative History of the Refugee Act of 1980*, 19 SAN DIEGO L.R. 9, 60 (1980) (citing S. Rep. No. 590, 96th Cong., 2d Sess. 1 (1980)).

[69] Refugee Act of 1980, § 208, Pub. L. 96-212, 94 Stat 102 (codified at 8 U.S.C. § 1158(a)(1)).

[70] *See, e.g.*, *Matter of Pula*, 19 I&N Dec. 467, 473 (BIA 1987), *superseded in part by statute on other grounds as stated in Andriasian v. INS*, 180 F.3d 1033, 1043-44 (9th Cir. 1999) ("[Manner of entry]

14

The NPRM clearly violates this provision by denying the possibility to apply for asylum based on place and manner of entry, *i.e.*, by barring all applications not filed at a port of entry during an appointment scheduled on CBP One. The Departments' attempt to support the legality of the NPRM falls resoundingly flat.

The Departments' discretion to regulate the asylum system does not extend to rules like the NPRM, which violates the asylum statute. The Departments point to their history of "exercis[ing] discretion, now expressly authorized by Congress [since 1996], to create new rules governing the granting of asylum."[71] The direct statutory authority they invoke requires that any "limitations and conditions" be "consistent with [section 1158]."[72] The proposals are not consistent with section 1158 and therefore cannot be justified using the Departments' discretionary authority.

The Departments also cite examples of previous restrictions on asylum eligibility to support their contention that they have discretionary authority to impose the bans in the NPRM. These examples do not support that contention. To begin, the examples they cite do not directly violate the plain language of section 1158 and primarily reflect restrictions contemplated by the 1951 Convention and the 1967 Protocol.[73] Moreover, many of those restrictions were codified by Congress as exceptions or bars to section 1158(a) and therefore have little bearing on the Departments' discretionary authority. The Trump administration cited these same examples in defending its asylum bans, to which the Ninth Circuit Court of Appeals responded that "the statutory bars in the INA do not separately conflict with explicit text in section 1158(a)"[74] and that "[t]he asylum bars in the INA and in the 1951 Convention appear to serve either the safety of those already in the United States or . . . the safety of refugees."[75] The same is true here.

The Departments also list previous rulemaking that asserted broad discretion to limit the availability of asylum. However, three of the six rules they list are proposed or interim final rules issued by the Trump administration that were struck down as violations of section 1158.[76] Thus, these examples demonstrate the exact opposite of what the Departments attempt to show: the

---

should not be considered in such a way that the practical effect is to deny relief in virtually cases."); *East Bay III*, 993 F.3d at 669 ("Section 1158(a) provides that migrants arriving anywhere along the United States' borders may apply for asylum."); *Huang v. INS*, 463 F.3d 89, 99 (2d Cir. 2006) ("[I]f illegal manner of flight and entry were enough independently to support a denial of asylum, . . . virtually no persecuted refugee would obtain asylum.") (quoted in *East Bay III*, 993 F.3d at 671); *Hussam F. v Sessions*, 897 F3d 707, 718 (6th Cir. 2018) ("[A]lthough the BIA may consider an alien's failure to comply with established immigration procedures, it may not do so to the practical exclusion of all other factors.").

[71] 88 Fed. Reg. 11,734.

[72] 8 U.S.C. § 1158(a)(2)(C).

[73] *See id*.

[74] *East Bay III*, 993 F.3d at 670.

[75] *Id*. at 674.

[76] *See* 88 Fed. Reg. 11,735.

CLP_PC_021465

government does *not* have limitless discretion to regulate the asylum system in order to further *ultra vires* policies.

Simply put, the Departments have proposed a rule that is inconsistent with section 1158. They do not show—and could not show—that they have discretion to enact regulations that are inconsistent with the asylum statute.[77]

The Departments attempt to skirt the violation of section 1158, by emphasizing that a rebuttable presumption of ineligibility cannot violate section 1158 because it is "not a categorical bar."[78] The presumption is not comparable, they say, to the previous administration's enjoined manner of entry ban because "[t]he circumvention of orderly refugee processing would only be relevant where the applicant cannot demonstrate [a] compelling reason why they did not avail themselves of a growing number of legal pathways to the United States."[79] These distinctions do not make a difference. The possibility of a rebuttal presumption does not make the manner of entry ban consistent with the statute. The Departments' proposal impermissibly conditions access to asylum on manner of entry. All legal issues in an asylum matter—including categorical statutory bars—are contestable. That does not mean that the Departments can craft restrictions, however elaborate and circuitous, that violate the plain language of section 1158. Regardless of the possibility of rebuttal, conditioning asylum eligibility on manner of entry is unlawful.

Furthermore, the Departments also rely on an alleged distinction in the INA between limitations on *applying* for asylum and limitations on *eligibility* for a favorable grant of asylum.[80] Section 1158(a), according to the Departments, enshrines only the right to apply for asylum, and their proposal, they continue, is only a restriction on eligibility for a favorable grant, with which section 1158(a) is not concerned. However, this distinction is illogical. The previous administration unsuccessfully made the same argument in defending its manner of entry ban.[81] There, the Ninth Circuit rejected the idea that Congress would make such a distinction. As the court stated, "[e]xplicitly authorizing a refugee to file an application *because* he arrived between ports of entry and then summarily denying the application for the same reason borders on absurdity. The consequences of denial at the application or eligibility stage are, to a refugee, the same."[82] The notion that the statute makes the distinction the Departments put forward—and that

---

[77] *See* 5 U.S.C. § 706(2)(A), (C) (permitting courts to hold unlawful and set aside agency action that is "not in accordance with the law" or "in excess of statutory jurisdiction, authority, or limitations.").

[78] 88 Fed. Reg. 11,735.

[79] 88 Fed. Reg. 11,739.

[80] *See* 88 Fed. Reg. 11,735 ("Section 208 draws a distinction between those permitted to apply for asylum and those eligible to receive a grant of asylum.").

[81] *See East Bay III*, 993 F.3d at 670 ("Critical to the government's argument is that section 1158 splits asylum applications (§ 1158(a)) and eligibility (§ 1158(b)) into two different subsections; therefore, the government explains, Congress intended to allow DOJ to promulgate limitations on asylum eligibility without regard to the procedures and authorizations governing asylum applications.").

[82] *Id*. (emphasis in original).

16

CLP_PC_021466

such a distinction would support the legality of the rule—is no less absurd now than when the Ninth Circuit issued its decision.

For these reasons, the manner of entry ban is plainly inconsistent with section 1158(a). The Departments' justifications are unavailing. The effect of the ban would be to unlawfully condition asylum based on manner and place of entry, and thousands of refugees—including many similarly situated to people BDS assists in presenting meritorious asylum claims—would be denied access to protection.

> 2. *By requiring refugees to apply for asylum in transit, the NPRM is for similar reasons inconsistent with the asylum statute.*

The NPRM's transit ban is unlawful for similar reasons. The requirement that people seeking asylum in the United States (except Mexican nationals) first apply for asylum in any country through which they transit violates the asylum statute.

The Departments claim that their proposal does not conflict with existing restrictions in section 1158. This is incorrect. The safe third country bar applies in cases where a refugee can be removed "pursuant to a bilateral or multilateral agreement" to a country where the refugee's life or freedom would not be in danger on account of a protected characteristic *and* "where the [refugee] would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection."[83] The firm resettlement bar applies where a refugee "received[] an offer of permanent resident status, citizenship, or some other type of permanent resettlement."[84]

In all other cases, "the failure to apply for asylum in a country through which [a refugee] has transited has *no bearing* on the validity of [the refugee's] claim for asylum in the United States."[85]

The NPRM, however, makes asylum eligibility broadly dependent on whether or not a refugee has applied for asylum while transiting to the United States (in any country of transit). It is therefore unlawful. As with the manner of entry ban, the Departments rely heavily on the possibility of rebutting the presumption of ineligibility to argue that its transit ban is consistent with the statute. They reason that their proposal is not a ban because the presumption is rebutted on a showing of "imminent and extreme threat to life or safety at the time of entry into the United States."[86] But, just as with the manner of entry ban, the simple fact of conditioning eligibility based on whether a refugee applied for asylum in transit is itself inconsistent with the statute. The possibility of rebutting the presumption based on an imminent danger at the time of entry has nothing to do with a refugee's lawful choice to prefer to avail themselves of protection in the

---

[83] 8 U.S.C. § 1158(a)(2)(A).

[84] 8 C.F.R. § 208.15 (implementing 8 U.S.C. § 1158(b)(2)(vi)).

[85] *East Bay I*, 994 F.3d at 982 (citing cases) (emphasis added).

[86] 88 Fed. Reg. 11,736.

CLP_PC_021467

United States, a safe country with adequate asylum procedures that guarantees them the right to apply.

Even if the transit ban were consistent with the statute, the Departments misrepresent the safety of the countries through which refugees transit enroute to the United States, as well as the adequacy of their asylum procedures. As discussed above, refugees face significant physical danger in countries such as Mexico, Colombia, Guatemala, and Honduras, none of which can guarantee a full and fair asylum procedure. In enjoining the Trump-era transit ban, the Ninth Circuit stated that "the agencies' conclusion . . . ignores extensive evidence in the record documenting the dangerous conditions in Mexico and Guatemala that would lead [refugees] with valid asylum claims to pursue those claims in the United States rather than in those countries." The same is true here.

The proposed transit ban is unlawful because it is inconsistent with the asylum statute and ignores the compelling and lawful reasons that a refugee would prefer to seek asylum in the United States.

> 3.    *The NPRM violates the United States' commitments under international refugee law.*

In addition to its incompatibility with U.S. refugee law, the NPRM violates various provisions of the 1951 Convention and the 1967 Protocol, such as the ban on penalties based on unauthorized entry, the ban on expulsion of refugees without due process of law, and the guarantee of nondiscrimination in asylum proceedings. In determining that the Trump-era manner of entry ban was unreasonable, the Ninth Circuit factored in provisions of the 1951 Convention and 1967 Protocol,[87] and the same reasoning applies here.

First, the NPRM violates Article 31 of the 1951 Convention by imposing a penalty on asylum seekers based on unauthorized entry.[88] The Departments make clear that at least one goal of the NPRM is punitive: "[t]he proposed rule would also position the Departments to impose consequences on certain noncitizens who fail to avail themselves of lawful, safe, and orderly means for seeking protection in the United States or elsewhere."[89] That consequence is the denial of the right to asylum and summary expulsion based on manner of entry or transit. UNCHR addressed this type of penalty in a brief supporting an injunction against the Trump's administration's manner

---

[87] *See East Bay III* 993 F.3d at 672 ("The Attorney General's interpretation of section 1158(a) is also unreasonable, as the district court discussed, in light of the United States's treaty obligations.").

[88] 1951 Convention, art. 31(1) ("The Contracting States shall not impose penalties, on account of their illegal entry or presence, on refugees who, coming directly from a territory where their life or freedom was threatened in the sense of article 1, enter or are present in their territory without authorization, provided they present themselves without delay to the authorities and show good cause for their illegal entry or presence."). UNHCR has explained that the term "coming directly" "does not disenfranchise refugees who have passed through, or even have been previously admitted to, another country." Brief of *Amicus Curiae*, UNHCR, *O.A. v. Biden*, No. 19-5272, Dkt. No. 1856344 at 19 (D.C. Cir. Aug. 13, 2020) (quotations omitted).

[89] 88 Fed. Reg. 11,735.

CLP_PC_021468

of entry ban. As UNHCR explained, the drafters of the Protocol sought "to prohibit *any* penalties imposed on refugees due to their unlawful entry."[90] UNHCR continued, "[t]he nature of the penalty imposed [by the transit ban]—the categorical denial of asylum process . . . will likely result in the return of some refugees to countries where they will be persecuted."[91] The Departments' current proposal creates exactly the same type of penalty and therefore violates the Protocol in the same way.

Second, the NPRM violates Article 32 of the 1951 Convention by proposing to expel refugees without due process of law[92]—also a serious cause for concern under U.S. law. The Departments' scheme would add obstacles to the statutory procedure for expedited removal by (1) depriving asylum seekers of immigration court review unless affirmatively requested, and (2) removing their ability to request USCIS reconsideration of negative credible fear determinations. This would strip the expedited removal process—which already suffers from serious procedural deficiencies[93]—of two important safeguards built into the statute creating the extraordinary form of removal proceedings. It is especially concerning that the new credible fear interviews would take place in the crushing environment of CBP custody—without access to counsel or an opportunity to prepare. Given the hurdles placed before review of the determination, the NPRM would result in summary expulsions without due process of law.

Third, the NPRM violates Article 3 of the 1951 Convention by discriminating in refugee proceedings[94] for the reasons listed in the discussions of discrimination above. It will only bar asylum for people entering the United States via the southwest border and, as such, will have a discriminatory impact based on race, ethnicity, and national origin.[95] By incorporating the Biden administration's parole scheme for certain countries, it will have a discriminatory impact based on

---

[90] Brief of UNHCR, *supra* n.90, at 28.

[91] *Id*. at 29.

[92] 1951 Convention, art. 32(2) ("The expulsion of such a refugee shall be only in pursuance of a decision reached in accordance with due process of law.").

[93] *See, e.g.*, "You Don't Have Rights Here:" US Border Screening and Returns of Central Americans to Risk of Serious Harm, Human Rights First (2014), https://www.hrw.org/report/2014/10/16/you-dont-have-rights-here/us-border-screening-and-returns-central-americans-risk ("Research by Human Rights Watch and others show that the CBP's methods for interviewing migrants in expedited removal procedures are seriously flawed."); Sara Campos and Guillermo Cantor, Ph.D., Deportations in the Dark: Lack of Process and Information in the Removal of Mexican Migrants 12, American Immigration Council (2017), https://www.americanimmigrationcouncil.org/sites/default/files/research/deportations_in_the_dark.pdf ("[A]s noted in some of the testimonies, immigration authorities often ignore these significant requirements [to inform migrants of charges against them and the opportunity to review their sworn statement.]").

[94] 1951 Convention, art. 3 ("The Contracting States shall apply the provisions of this Convention to refugees without discrimination as to race, religion or country of origin.").

[95] *See supra* Part II.F.

CLP_PC_021469

national origin.[96] And the NPRM's reliance on CBP One will have a discriminatory impact on Black refugees, who may not be able to use the app due to faulty face recognition that does not accept dark-skinned faces.[97] These discriminatory effects violate the 1951 Conventions.

For these reasons, the NPRM violates specific provisions of the United States' commitments under international law, further demonstrating how incompatible the NPRM is with a humane, fair, and lawful asylum system.

*     *     *

Starting from its euphemistic title, "Circumventing Lawful Pathways," and all the way to its end, the NPRM is a betrayal of the United States' moral and legal obligations to respect the right to asylum. Without any demonstrated benefit, the NPRM would deny asylum to thousands of refugees regardless of the strength of their claims and on bases that are patently illegal.

The right to asylum is not and cannot be conditioned on manner and place of entry or on whether an applicant has requested asylum in a transit country. It does not matter that the Departments mask what amount to bans in the language of presumptions and rebuttals. The Departments must rescind the NPRM in its entirety.

Sincerely,

/s/ *Kevin Siegel*
Kevin Siegel
Staff Attorney, Civil Rights and Law Reform

/s/ *Lucas Marquez*
S. Lucas Marquez
Director, Civil Rights and Law Reform

---

[96] See *id*.

[97] See *supra* Part II.E.

20

CLP_PC_021470

# NICARAGUA 2021 HUMAN RIGHTS REPORT

## EXECUTIVE SUMMARY

Nicaragua has a highly centralized, authoritarian political system dominated by President Daniel Ortega Saavedra and his wife, Vice President Rosario Murillo Zambrana. Ortega's Sandinista National Liberation Front party exercises total control over the country's executive, legislative, judicial, and electoral functions. President Ortega awarded himself a fourth consecutive term in November elections after arbitrarily jailing nearly 40 opposition figures, barring all credible opposition political parties from participating, blocking legitimate international observation efforts, and committing widespread electoral fraud. Independent observer groups and international organizations characterized the electoral process as seriously flawed, lacking credibility, and defined by historically low voter turnout. The 2021 elections expanded the ruling party's supermajority in the National Assembly, which previously allowed for changes in the constitution that extended the reach of executive branch power and eliminated restrictions on re-election of executive branch officials and mayors. Observers noted serious flaws in municipal, regional, and national elections since 2008. Civil society groups, international electoral experts, business leaders, and religious leaders identified persistent flaws in the 2019 Caribbean regional and 2017 municipal elections and noted the need for comprehensive electoral reform.

The Nicaraguan National Police is responsible for internal security. The army is responsible for external security but also has some domestic security responsibilities. Both report directly to the president, pursuant to changes in the police and army code in 2014. Parapolice, which are nonuniformed, armed, and masked units with tactical training and organization, act in coordination with government security forces, under the direct control of the government, and report directly to the national police. Civilian authorities maintained effective control over police and parapolice security forces. There were credible reports that members of the security forces committed numerous abuses.

Significant human rights issues included credible reports of: unlawful or arbitrary killings, including extrajudicial killings; forced disappearances; torture and cruel,

CLP_PC_024058

inhuman, or degrading treatment or punishment by prison guards and parapolice; harsh and life-threatening prison conditions; arbitrary arrest and detentions; political prisoners; politically motivated reprisal against individuals located in another country; serious problems with the independence of the judiciary; arbitrary and unlawful interference with privacy; punishment of family members for offenses allegedly committed by an individual; serious restrictions on free expression and media, including threats of violence, unjustified arrests, censorship, criminal libel suits against journalists; substantial interference with the rights of peaceful assembly and freedom of association, including overly restrictive laws on the organization, funding, and operation of nongovernmental organizations and civil society organizations; severe restrictions on religious freedom; restrictions on freedom of movement within the country and the right to leave the country; inability of citizens to change their government peacefully through free and fair elections; serious and unreasonable restrictions on political participation; serious corruption; serious government restrictions on and harassment of domestic and international human rights organizations; lack of investigation of and accountability for gender-based violence; trafficking in persons; crimes involving violence or threats of violence targeting ethnic minorities and indigenous communities; crimes involving violence or threats of violence targeting lesbian, gay, bisexual, transgender, queer and intersex persons; and the worst forms of child labor.

The government did not take steps to identify, investigate, prosecute, or punish officials who committed human rights abuses, including those responsible for at least 355 killings and hundreds of disappearances during the prodemocracy uprising of April 2018.  The government did not address instances of widespread corruption.  President Ortega actively strengthened impunity for human rights abusers who were loyal to him.

Police, parapolice, and individuals linked to the Ortega regime carried out a campaign of harassment, intimidation, and violence toward perceived enemies of the regime, such as former political prisoners and their families, farmworker activists, prodemocracy opposition groups, human rights defenders, private-sector leaders, and Catholic clergy.

CLP_PC_024059

# Section 1. Respect for the Integrity of the Person

## a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were several reports that the government or its agents committed arbitrary or unlawful killings.  Human rights organizations and independent media alleged some killings were politically motivated, an allegation difficult to confirm because the government refused to conduct official inquiries.

Reports of killings were common in the north-central regions and the North Caribbean Autonomous Region (RACN).  Human rights groups said these killings illustrated a continuation of a campaign of terror in the north-central and RACN regions, perpetrated by parapolice groups to stamp out political opposition to the ruling Sandinista National Liberation Front (FSLN) party.  On March 29, unknown assailants shot Ernesto Jarquin five times in the chest in the north-central town of Mulukuku.  Imprisoned in 2018 for participating in prodemocracy protests in Mulukuku, Jarquin was released with other political prisoners under a 2019 amnesty law.  The Nicaraguan National Police (NNP) and official media reported Jarquin's killing by focusing on the government's previous allegations of Jarquin's involvement in homicide, illegal weapons possession, collusion to commit crimes, and kidnapping in association with his participation in 2018 prodemocracy protests.  As of October no arrests had been made in the case.

On August 23, land invaders linked to the ruling FSLN party killed at least 13 indigenous persons.  The attack happened near Musawas, in the Sauni As territory, in a protected area of the Bosawas biosphere reserve.  The attack included rape and dismemberment.  On September 8, police stated the attack stemmed from a quarrel over an artisanal gold mining site and that police had identified 14 assailants and captured three.  Witnesses and indigenous rights defenders disputed the findings and said police had arrested individuals other than those identified as perpetrators by the community and had failed to address the root causes that lead to such attacks.

There was no indication the government investigated crimes committed by police and parapolice groups related to the 2018 prodemocracy uprising.  In April 2018

CLP_PC_024060

President Ortega and Vice President Murillo ordered police and parapolice forces to suppress violence peaceful protests that began over discontent with a government decision to reduce social security benefits.  By late November 2018, the ensuing conflict had left at least 355 persons dead; more than 2,000 injured; thousands forced into hiding; hundreds illegally detained and tortured; and as of September, more than 130,000 in exile in neighboring countries.  Beginning in August 2018, the Ortega government instituted a policy of "exile, jail, or death" for anyone perceived as opposition, amended terrorism laws to include prodemocracy activities, and used the justice system to prosecute civil society actors as terrorists, assassins, and coup mongers.  Police and the Public Prosecutor's Office detained, brought to trial, and imprisoned many members of the prodemocracy opposition.  Human rights organizations documented that the investigations and prosecutions did not conform to the rule of law.  The government continued to make no effort to investigate several 2017 incidents of extrajudicial killings and torture in both the North and South Caribbean Autonomous Regions.  The army continued to deny its involvement in cases perceived by human rights organizations as politically motivated extrajudicial killings.

## b. Disappearance

Starting on May 28, police detained at least 40 members of the opposition and civil society leaders using a February change in the criminal procedural code that allows for a detention period of up to 90 days during the public prosecutor's initial investigation, before presenting charges.  While technically under custody of police or prison authorities, the 40 detained leaders did not have access to legal counsel or family visitations.  Authorities did not reveal the location of these detainees, and judicial authorities rejected habeas corpus writs in their favor.  National and international human rights organizations deemed the detention of these political prisoners effectively a form of forced disappearance.  After authorities held them incommunicado for months, at least 25 of these political prisoners were formally charged in August, at which time they were allowed limited access to legal counsel and three 30-minute family visits.

## c. Torture and Other Cruel, Inhuman, or Degrading Treatment or

CLP_PC_024061

## Punishment

Although the law prohibits such practices, government officials intentionally carried out acts that resulted in severe physical or mental suffering for the purposes of securing information, inflicting punishment, and psychologically deterring other citizens from reporting on the government's actions or participating in civic actions against the government.  Members of civil society and student leaders involved in the protests that began in April 2018 were more likely than members of other groups to be subjected to such treatment.

On July 6, authorities detained prodemocracy student leader Lesther Aleman Alfaro without a warrant.  The Public Prosecutor's Office later announced it had accused Aleman of treason under the Law for the Defense of the Rights of the People to Independent Sovereignty and Self-Determination for Peace, or Law 1055, passed in December 2020.  Prison authorities held Aleman incommunicado in solitary confinement at the El Chipote detention center, with no access to legal counsel or family visits, no access to sunlight, and with lights on 24 hours a day in his cell.  He endured multiple interrogations a day.  After 58 days in detention, he was briefly allowed to see a family member and a lawyer.  Following Aleman's arraignment, his lawyer said he appeared severely underweight and under deep psychological duress.  Human rights groups characterized Aleman's treatment by prison authorities as psychological torture.  Other political prisoners suffered similar conditions while in detention, including several who had protective measures in place from the Inter-American Commission of Human Rights.

Human rights organizations reported female prisoners were regularly subjected to strip searches, degrading treatment, and rape threats while in custody of parapolice forces, prison officials, and police.  Prison officials forced female prisoners to squat naked and beat them on their genitals to dislodge any supposedly hidden items.

Impunity persisted among police and parapolice forces in reported cases of torture, mistreatment, or other abuses.  The NNP's Office of Internal Affairs is charged with investigating police suspected of committing a crime.  The Office of the Military Prosecutor investigates crimes committed by the army, under the jurisdiction of the Office of the Military Auditor General.  With complete control

CLP_PC_024062

over the police, prison system, and judiciary branch, however, the FSLN governing apparatus made no effort to investigate allegations that regime opponents were tortured or otherwise abused.

## Prison and Detention Center Conditions

Prison conditions were harsh and potentially life threatening.  Overcrowding, poor sanitation, difficulties obtaining medical care, and violence among prisoners remained serious problems in prison facilities.

**Physical Conditions:**  Prison conditions continued to deteriorate due to antiquated infrastructure and increasing inmate populations.  Despite new temporary holding cells in the Directorate of Judicial Assistance, the rest of the prison system was in poor condition.  The government reported overcrowding in five of the seven prisons for men, holding 15,333 prisoners with capacity for 12,600, or 22 percent over capacity in 2020.  The government did not provide updated figures for the year.  More than 1,000 of these inmates were held in the prison known as La Modelo.  Human rights organizations continued to be concerned about prison overcrowding.  Due to overcrowding, pretrial detainees often shared cells with convicted prisoners, and juveniles shared cells with adults.

Many prisoners suffered mistreatment from prison officials and other inmates. Human rights organizations confirmed that at least 16 men detained in the context of the 2018 protests were subjected to solitary confinement in maximum-security cells of La Modelo Prison, in some cases for months at a time.  Political prisoners held since the government's crackdown that began in May were detained in Directorate of Judicial Assistance temporary holding cells, known as El Chipote. Relatives of the prisoners reported that at least four women were held in solitary confinement in El Chipote since June.

Inmates also suffered from parasites, inadequate medical attention, frequent food shortages and food contamination, contaminated water, and inadequate sanitation. The COVID-19 pandemic compounded these conditions.  The government failed to take adequate measures to protect inmates from illness.  Prison authorities prohibited the delivery of health and hygiene kits provided by family members for inmates to protect themselves from COVID-19, particularly in the case of political

CLP_PC_024063

prisoners.  Human rights groups reported that prison authorities randomly fumigated prisons with inmates still inside their cells.  Although sanitary conditions for female inmates were generally better than those for men, they were nevertheless unsafe and unhygienic.  According to the most recently available government report, the Human Rights Ombudsman's Office received five complaints related to prison conditions between January 2019 and September 2020, of which it resolved four and dismissed one as unsubstantiated.  The Human Rights Office did not make updated numbers publicly available for the year.

Conditions in jails and temporary holding cells were also harsh.  Most facilities were physically decrepit and infested with vermin; had inadequate ventilation, electricity, or sewage systems; and lacked potable water.

The government continued to release common criminals outside of lawfully prescribed procedures, telling them their release was "thanks to the president."  Between January and October, the government released up to 2,700 prisoners.  Independent media and human rights organizations reported that following their release, some of these individuals were responsible for at least two femicides and one killing.

**Administration:**  Although prisoners and detainees could submit complaints to judicial authorities without censorship and request investigation of credible allegations of inhuman conditions, authorities often ignored or did not process complaints.  The extent to which the government investigated allegations of poor prison conditions was unknown.  The government ombudsman could serve on behalf of prisoners and detainees to consider such matters as informal alternatives to incarceration for nonviolent offenders, although this generally did not occur.

The government restricted political prisoners' access to visitors, attorneys, and physicians.  Staff members of human rights organizations, family members, and other interested parties were not allowed access to the prison system or to prisoners in custody.

**Independent Monitoring:**  The government permitted the International Committee of the Red Cross (ICRC) access to some prisoners but denied prison visits by local human rights groups and media outlets.  The government reportedly

CLP_PC_024064

denied the ICRC access to 40 political prisoners detained since May 28, despite ICRC requests to see those detainees.  Nongovernmental organizations (NGOs) generally received complaints through family members of inmates and often were unable to follow up on cases until after the release of the prisoner due to lack of access.  The government denied all requests from local human rights organizations for access to prison facilities.

## d. Arbitrary Arrest or Detention

The law prohibits arbitrary arrest and detention and provides for the right of any person to challenge the lawfulness of his or her arrest or detention in court. Human rights NGOs, however, noted hundreds of cases of arbitrary arrests by police and parapolice forces, although parapolice have no authority to make arrests.  Human rights organizations reported police and parapolice agents routinely detained and released government opponents within a 48-hour window, beyond which the Public Prosecutor's Office would have to request to extend detention for up to 90 days to continue its investigation.  Detentions of political opponents mostly occurred without a warrant or formal accusation and for causes outside the legal framework.

### Arrest Procedures and Treatment of Detainees

The law requires police to obtain a warrant from a judicial authority prior to detaining a suspect and to notify family members of the detainee's whereabouts within 24 hours, but this rarely happened in the context of arrests related to civil unrest.

Police may hold a suspect legally for 48 hours before arraignment or release; however, a February amendment to the criminal procedural code allows for the Public Prosecutor's Office to request an extension for 15 to 90 days if a judge deems the case complex.  A judge then must order the suspect released or transferred to jail for pretrial detention.  The suspect is permitted family member visits after the initial 48 hours.  A detainee has the right to bail unless a judge deems there is a flight risk.  The criminal code lists a number of crimes that may be tried by a judge without a jury and that would not qualify for bail or house arrest during the duration of the trial.  Detainees have the right to an attorney

CLP_PC_024065

immediately following their arrest, and the state provides indigent detainees with a public defender. In several instances authorities denied having detainees under custody in a specific jail, even to their family members or legal counsel. Police routinely rejected complaints filed by prodemocracy opposition activists.

The government used money laundering laws, a foreign agents law, and a law for the defense of sovereignty against political opponents. Human rights organizations and civil society activists asserted that these laws constituted part of a larger scheme by the ruling FSLN party to exert its own concept of sovereign security, laid out in the 2015 Sovereign Security Law, which significantly broadened the definition of state sovereignty and security, as a pretext to arrest protesters and citizens it deemed in opposition to its goals.

**Arbitrary Arrest:** According to NGOs and other human rights groups, arbitrary arrests occurred regularly, particularly of those the government deemed active opposition members or participants in previous prodemocracy protests. The government detained several members of the opposition for extended periods using Law 1055 (Law for the Defense of the Rights of the People to Independence, Sovereignty, and Self-Determination for Peace). The statute does not specify sentencing guidelines, and the individuals were eventually charged under other statutes.

For example, the 40 political prisoners detained between May and November were not allowed to choose their own legal counsel and were arbitrarily assigned a public defender for their initial pretrial hearings. After holding the political prisoners incommunicado for months, the government permitted most to choose their own legal counsel and allowed family visits on three occasions. The law allows for family visits ranging from every eight days to every 21 days. Family visits were restricted to once a month only to highly dangerous prisoners. Prison authorities held the political prisoners incommunicado for 50 to 80 days before allowing them to see an attorney of their choice and receive limited family visits. Their hearings were not public, and most lawyers did not receive a copy of the court records prior to the trial. In an effort to impede access to legal counsel, hearings for political prisoners were held inside the jail instead of a court of law, outside of normal working hours. Judicial officials did not record the hearings or give the defendant's legal counsel a transcript of the hearings. Other prisoners also

CLP_PC_024066

reported a lack of immediate access to an attorney or legal counsel and were not afforded one during their detention.

In many cases police and parapolice detained persons who had participated in prodemocracy protests in 2018 and 2019 but who were not currently participating in any activity deemed illegal or in opposition to the ruling party. Police often arrested these individuals without a warrant and occasionally entered private homes or businesses without a court order. In several cases police raided and ransacked the houses of those detained, also without court warrants. Many arrests were allegedly made without informing family members or legal counsel. Reports were common of armed, hooded men in plain clothes acting alone or together with police to arrest and detain prodemocracy protesters. In several cases groups of hooded men looted the homes of political opponents immediately after police left the scene. Human rights organizations indicated that delays in the release of prisoners after finishing prison terms led to many cases of arbitrary continuation of a state of arrest. Police also committed irregular arrests and detentions under the guise of investigations into armed opposition groups or other violent crimes in the north-central regions of the country.

**Pretrial Detention:** Lengthy pretrial detention continued to be a problem. Many opposition leaders and prodemocracy protesters were detained and held with no charges and without following due process. Observers noted that in several instances lengthy pretrial detention was intentional against specific protest leaders. Observers attributed other delays to limited facilities, an overburdened judicial system, judicial inaction, and high crime rates. No information was available on the percentage of the prison population in pretrial detention or the national average length of pretrial detention.

**Detainee's Ability to Challenge Lawfulness of Detention before a Court:** While the law provides detainees the ability to challenge the legality of their detention before a court, the government generally did not allow those arrested during protests to challenge in court the lawfulness of their arrests or detentions. In cases of political opponents, judges regularly denied or ignored constitutional protections for detainees, including habeas corpus.

CLP_PC_024067

## e. Denial of Fair Public Trial

The law provides for an independent judiciary, but the government did not respect judicial independence and impartiality.  The law requires vetting of new judicial appointments by the Supreme Court of Justice, a process dominated by the government.  Once appointed, most judges submitted to political pressure and economic inducements for themselves or family members that compromised their independence.  The 40 political prisoners arrested between May 28 and November 10 were subjected to closed pretrial hearings without access to their own lawyers or notification of family members.  The court arbitrarily assigned public defenders for these detainees.  Although the Public Prosecutor's Office announced these hearings afterwards, details were scarce.  These detainees were held incommunicado for up to 80 days without access to independent private legal counsel or to family members.  The justice system did not confirm the location of these detainees.  The cases of these detainees did not appear in an online system for public access to legal cases.  Five FSLN-aligned judges – Henry Morales, Nalia Ubeda, Abelardo Alvir, Karen Chavarria, and Gloria Saavedra – oversaw the pretrial hearings against these detainees.  These judges routinely denied writs in favor of the defendants and in some cases denied defendants and their lawyers access to the accusations and other court documents before the hearings.  After holding them incommunicado for months, the government permitted most political prisoners to choose their own legal counsel starting in August.

NGOs complained of delayed justice caused by judicial inaction and widespread impunity, especially regarding family and domestic violence and sexual abuse.  In cases against political activists, judges at the bidding of the government handed down biased judgments, including adding charges for crimes not presented by the prosecutor's office.  Lawyers for political prisoners reported that judges routinely dismissed defendants' evidence and accepted prosecutors' anonymous sources as valid.  In many cases trial start times were changed with no information provided to one or both sides of the trial, according to human rights organizations.  Authorities occasionally failed to respect court orders.

### Trial Procedures

The law provides the right to a fair and public trial.  Changes to the law enacted in

CLP_PC_024068

2017, however, allow judges to deny jury trials in a wider range of cases, deny bail or house arrest based on unclear rules, and arbitrarily move a case from other judicial districts to Managua, to the disadvantage of defendants, their families, or their counsel.  Defendants have the right to be fully and promptly informed of the charges against them and the right to a fair trial, although this was not respected.  While the law establishes specific time periods for cases to come to trial, most cases encountered long delays.  Trials are public, except in some cases involving minors or at the victim's request.  The law requires defendants must be present at their trial, although this was not always respected.

The hearings for many political prisoners detained between May and September did not conform to legal procedures.  The defendants were detained without warrants and were not afforded legal counsel of their choice or access to their family members within 48 hours after their detention or during at least two initial hearings.  Their location was not publicly disclosed, judges dismissed or ignored habeas corpus writs in their favor, hearings and trials were closed to the public and held within the detention center, and, when they finally had access to their legal counsel of choice, judicial and prison officials denied lawyers access to their clients and refused to provide lawyers with the court documents before trial, including the charges against their clients.

According to the constitution, defendants are presumed innocent until proven guilty.  Observers claimed, however, that the extension of time from 48 hours to up to 90 days that a detainee can be held during a pretrial investigation posed an undue presumption of guilt on defendants.  In the case of the political prisoners detained between May and November, Chief of Police Francisco Diaz told official media that police had "enough proof to ensure that these terrorists, these vandals, these coup-mongers face the consequences."  Diaz gave the interview when the defendants were still awaiting trial and before any charges were confirmed.  The Public Prosecutor's Office presented police officers as witnesses in hearings on these charges.  In her daily press briefings, Vice President Murillo frequently referred to political prisoners as "terrorists" and "coup-mongers," although the prisoners were still awaiting trial.

Migration authorities confiscated the passports of at least 30 Nicaraguans at either the international airport or at land border crossings, although the individuals had no

CLP_PC_024069

formal charges pending against them.  Officials provided no explanation other than saying authorities higher up the chain of command had ordered migratory restrictions against the individuals.  Some human rights defenders saw this as a de facto presumption of guilt without a formal accusation.  The government also prevented a civil society leader from returning to the country, without reason or formal charge against the individual.  Under the law defendants have the right to legal counsel, and the state provides public defenders for indigent persons.  Defendants have the right to adequate time and facilities to prepare a defense, but judges commonly failed to grant counsel's access to the defendant.  In several instances related to prodemocracy protests, defendants were not allowed to name their legal counsel, and the court appointed a public defender, which family members and human rights organizations claimed was detrimental to the defendant's case.  In many cases involving the government's political opponents, private defense lawyers were barred from meeting with defendants and trial times were set outside of working hours in an effort to force the accused to accept a public defender appointed by a biased judiciary.  Additionally, several pretrial hearings took place in detention centers rather than a courtroom, without notifying defendants' legal counsel.  In at least one instance, lawyers who entered the detention center to participate in the trial were threatened by a guard, who wondered aloud whether the lawyers would be allowed to leave the prison after the hearing.  At least seven lawyers defending political prisoners were forced to flee the country due to harassment and death threats against them.  Although the constitution recognizes indigenous languages, indigenous defendants were not always granted court interpreters or translators.  Under the law defendants may confront and question witnesses and have the right to appeal a conviction.  Defendants may present their own witnesses and evidence in their defense; however, some judges refused to admit evidence on behalf of the defense.  Defendants may not be compelled to testify or confess guilt.  Nevertheless, many defendants continued to be interrogated by police and prison guards while their trials were in process.

Women's rights organizations believed the court system continued to operate under unofficial orders not to impose jail time or pretrial detention in domestic violence cases.  The policy reportedly applied only to domestic violence cases that authorities considered mild.

CLP_PC_024070

## Political Prisoners and Detainees

Human rights NGOs characterized as political prisoners those detained in the context of prodemocracy protests and those detained as part of the government's crackdown on the political opposition starting in May.  The government does not recognize political prisoners as an inmate category and considers all prisoners to be common criminals.  According to human rights organizations, the government continued to hold more than 150 political prisoners as of September, with at least 20 of them in solitary confinement.

Political prisoners did not receive appropriate health care, including while suffering COVID-19 symptoms.  Several political prisoners were severely undernourished, with no access to sunlight or appropriate health-care services.  Some political prisoners were denied access to medicine and medical treatment for chronic illnesses.

Political prisoners were kept together with common criminals.  Advocacy groups reported that prison authorities instigated quarrels between the general prison population and political prisoners by blaming political prisoners for any withheld privileges, often resulting in violence.  Human rights organizations received several reports of political prisoners being beaten, threatened, held in solitary confinement for weeks, and suffering from poor ventilation and poisoned or contaminated food and water.

The government did not permit access to political prisoners by local human rights groups.

## Politically Motivated Reprisal against Individuals Located Outside the Country

Groups of exiles in Costa Rica alleged political persecution by parapolice and FSLN sympathizers who crossed the border to target exiles.  Family members of opposition exiles were surveilled and harassed in an attempt to force exiles to return to the country and face arrest.  In at least one instance, migration authorities withheld documentation for a minor to exit the country in an effort to force the exiled father to return to Nicaragua and face arrest.  The Public Prosecutor's Office accused three exiled Nicaraguans of conspiring to undermine national integrity.

CLP_PC_024071

In October 2020 the National Assembly approved the politically motivated Cybercrimes Law, which establishes the government may use the international extradition system to pursue Nicaraguans abroad who commit so-called cybercrimes.

## Civil Judicial Procedures and Remedies

Individuals and organizations may file suit in civil courts to seek damages for alleged human rights violations, but authorities did not always respect court decisions.

The lack of an effective civil law system resulted in some civil matters being pursued as criminal cases, which were often resolved more quickly.  In several instances, individuals and groups appealed to the Inter-American Commission on Human Rights (IACHR), which passed their cases to the Inter-American Court of Human Rights.  The government regularly dismissed or ignored orders from the Inter-American Court of Human Rights, including orders to protect or release certain political prisoners.

## Property Seizure and Restitution

The government regularly failed to take effective action with respect to seizure, restitution, or compensation of private property.  These failures were exacerbated by the social upheaval in 2018, in which groups of persons, including members of the FSLN, illegally took over privately owned lands, with implicit and explicit support by municipal and national officials.  Some land seizures were politically targeted and directed against specific individuals, such as business owners traditionally considered independent or against the ruling party.  In August the government seized the house of independent journalist Patricia Orozco while she was in exile, and police evicted her parents from the house.  On September 7, the government revoked a 2008 donation of property to the National Public Accountant's College.  The revocation happened several days after the Public Prosecutor's Office summoned the coordinator of the college for questioning regarding the government's politically motivated money laundering case against a foundation run by a presidential precandidate.

The Office of the Attorney General routinely either rejected requests to evict

CLP_PC_024072

illegal occupants of real property or failed to respond to the requests altogether. National and local police also routinely refused to evict illegal occupants of real property.  Police often took no action against violence perpetrated by illegal occupants, while acting swiftly against any use of force by legitimate property owners.  The judicial system delayed final decisions on cases against illegal occupants.  Members of the judiciary, including those at senior levels, were widely believed to be corrupt or subject to political pressure.  When judges issued orders in favor of landowners, enforcement of court orders was frequently subject to nonjudicial considerations.  In the face of government inaction, some landowners were forced to pay squatters to leave their real property.  As of September nine NGOs still did not have a legal resolution or any type of compensation after the National Assembly annulled their legal status and the government seized their properties in 2018.

## f. Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence

The law prohibits arbitrary or unlawful interference with privacy, family, home, and correspondence.  The government, however, failed to respect these prohibitions.  In several trials against political opposition members, the Public Prosecutor's Office presented messages, emails, and documents exchanged through private phones and computers, obtained by police through raids without judicial warrants.  FSLN grassroots organizations such as the Citizen Power Councils colluded with parapolice or party loyalists to target the homes of prodemocracy protesters.  Without a warrant and under no legal authority, these groups illegally raided homes and detained occupants.  Police routinely stationed police vehicles and officers outside the homes of opposition members, harassing visitors and often prohibiting opposition members from leaving their houses. These actions were widespread in large cities, particularly Managua, Matagalpa, Esteli, Masaya, Rivas, Leon, and Jinotega.

The Ministry of Health continued to hold several buildings seized by the Interior Ministry in 2018 from independent television station 100% Noticias and news magazine *Confidencial* and nine NGOs when it annulled the legal status of the media groups and NGOs.  The ministry ordered the seized assets transferred to

CLP_PC_024073

government ownership to create a Comprehensive Attention and Reparation Fund for the Victims of Terrorism.  The government carried out this de facto confiscation without following due process or providing appropriate compensation to the lawful owners.  Police again raided the offices and television studio of *Confidencial* on May 20, acting without a judicial warrant and seizing television equipment, computers, and documents from the news outlet.

Domestic NGOs, Catholic Church representatives, journalists, and opposition members alleged the government monitored their email and telephone conversations.  Church representatives also stated their sermons were monitored.  As part of a continuing social media campaign against prodemocracy protests, ruling party members and supporters used social media to publish personal information of human rights defenders and civil society members.  Progovernment supporters marked the houses of civil society members with derogatory slurs or threats and then published photographs of the marked houses on social media.  On several occasions the markings were accompanied by or led to destruction of private property.  Although the law prohibits the use of drones, some members of the opposition claimed FSLN supporters used drones to spy on their houses.

Inhabitants in northern towns, particularly in the departments of Nueva Segovia, Jinotega, and Madriz, as well as the RACN and the South Caribbean Autonomous Region (RACS), alleged repeated government interrogations and searches without cause or warrant, related to supposed support for armed groups or prodemocracy protests, while government officials claimed they were confronting common criminals.  Several opposition members who were former Contras claimed they were regularly surveilled, stopped, and detained by police for questioning for several hours, usually in connection with alleged contact with rearmed groups or antigovernment protests.  The individuals also said progovernment sympathizers verbally threatened them outside their homes and surveilled and defaced their houses.

The ruling party reportedly required citizens to demonstrate party membership to obtain or retain employment in the public sector and have access to public social programs.

CLP_PC_024074

# Section 2. Respect for Civil Liberties

## a. Freedom of Expression, Including for Members of the Press and Other Media

The law provides for freedom of expression, including for members of the press and other media, but the government did not respect this right.  Restrictions on press freedom, the absence of an independent judiciary, and a nondemocratic political system combined to inhibit freedom of expression, including for members of media.  Although the law provides that the right to information may not be subjected to censorship, the government and actors under its control retaliated against the press and radio and television stations by blocking transmissions, impeding the import of ink and paper, and committing violence against journalists.  The government sought to control information on the COVID pandemic by restricting news coverage and blocking independent media access to public health briefings, as well as using government-aligned media to publish misinformation.

**Freedom of Expression:**  The government used reprisals and Law 1055 to restrict the ability of individuals to criticize the government.  Persons who criticized the government, the ruling party, or its policies were subjected to police and parapolice surveillance, harassment, imprisonment, and abuse.  Beginning in May, the government used the law as a pretext to arrest and imprison presidential candidates, independent journalists, civil society members, opposition leaders, NGO workers, student leaders, human rights defenders, farmworker advocates, and private-sector leaders who criticized the government.  Progovernment supporters considered the use of the national flag and the national colors of white and blue as acts of defiance and attacked opposition activists flying the flag or national colors.

**Freedom of Expression for Members of the Press and Other Media, Including Online Media:**  Independent media were active and expressed a wide variety of views, albeit mainly through online venues due to the government's restrictions and intimidation.  In June and July, the government arrested five independent journalists, including three presidential precandidates, and the general manager of the country's largest print daily newspaper on charges of "undermining national integrity."  As of October the general manager and three of the journalists were

CLP_PC_024075

awaiting trials while in prison, and two journalists remained under house arrest. The Public Prosecutor's Office summoned at least 32 journalists as part of an investigation into alleged money laundering against the Violeta Barrios de Chamorro Foundation, an NGO that supported independent media by offering journalism training programs.  In some cases the journalists had received seed funding to pursue new digital startups or other forms of independent journalism. At least 30 journalists fled into exile due to threats or summons from the Public Prosecutor's Office, which in the case of other independent journalists and political opponents resulted in imprisonment.

Independent media outlets experienced vandalism, seizure of broadcast equipment, cyberattacks, and criminal defamation charges.  On August 13, after a public complaint by the newspaper *La Prensa* that the Customs Office had withheld its paper and printing material for months, police raided the newspaper's headquarters and detained the general manager, preventing him from accessing legal counsel and detaining him for several weeks without bringing him before a judge.  Police held *La Prensa* journalists and staff for hours inside the newspaper's offices and allowed progovernment media to enter and film the police raid.  Police later announced the raid was part of an investigation into the newspaper for money laundering and tax evasion.  *La Prensa*, the last remaining daily print newspaper with national distribution, moved to online-only content and dismissed half its employees in September because of government persecution.

The government repeatedly denied broadcasting licenses and other permits for independent media.  Independent news outlets faced restrictions on speech, such as not being permitted to attend official government events, being denied interviews by government officials, and receiving limited or no direct access to government information.  Official media, however, were not similarly restricted.  The government published false COVID-19 data that minimized the spread of the illness in the country.  International reports and unpublished official documents showed the government intentionally misled the public about the severity of the pandemic to avoid an economic downturn.

Independent media faced official and unofficial restrictions, reprisals, and harassment, but they were nonetheless successful in expressing a variety of views. Journalists from many stations were threatened and harassed with the purpose of

CLP_PC_024076

limiting their editorial independence.  According to a September report by the Violeta Barrios de Chamorro foundation titled *Assault on Independent Press in Nicaragua between December 2020 and June 2021*, there were 1,176 assaults on journalists while they performed their duties.  Of those, 426 assaults were perpetrated against female journalists and included sexual violence and threats of rape.

Significant state influence, ownership, and control over the majority of media outlets continued.  National television was largely controlled either by business associates of the president or directly owned and administered by his family members.  Eight of the 10 basic channels available were under direct FSLN influence or owned and controlled by persons with close ties to the government.  Media stations owned by the presidential family generally limited news programming and served as outlets for progovernment or FSLN propaganda and campaign advertisements.  On June 30, the governing authority for telecommunications published a decree obliging all private cable stations to lock in their broadcasts to official television and radio for emergency or special interest messaging.  This decree compounded the already established obligation for open-air television and radio stations to do the same.  This obligation was enforced every time the president participated in a public event, even when it was a political party event.  Press and human rights organizations claimed the use of state funds for official media, as well as biased distribution of government advertising dollars, placed independent outlets at an extreme disadvantage.

**Violence and Harassment:**  Journalists were subject to government violence, harassment, and death threats.  Four journalists remained in prison:  three after they indicated they would run as presidential candidates and one for expressing his views on social media.  Two others remained under house arrest.  Since May more than 30 journalists fled into exile with pending accusations against them from the Public Prosecutor's Office.  At least 90 journalists had already fled following the government's crackdown on protesters in 2018.  The Ministry of Health took possession of offices belonging to television station 100% Noticias and news magazine *Confidencial*, which had been closed and under police custody since a 2018 raid of those facilities.

**Censorship or Content Restrictions:**  The government continued to arbitrarily

CLP_PC_024077

penalize those who published items counter to the ruling party's ideology.  The government restricted access to public events, obligated independent press to use official media to cover presidential activities, and actively used troll farms to amplify its own messaging or attack independent media websites.  In November, Meta (Facebook's parent company) announced the removal of troll farms operated by the government, implicating the telecommunications regulator TELCOR, the Supreme Court of Justice, and the Social Security Institute.

Restrictions in acquiring broadcast licenses and equipment prevented media from operating freely.  Beginning in 2008, media outlets were unable to apply for new broadcasting licenses while the General Law (Law 200) on Telecommunications was under review in the National Assembly.  The government extended the validity of existing licenses indefinitely.  Human rights groups and independent media also reported that the failure to approve or deny Law 200 resulted in uncertainty surrounding the purchase and import of goods related to broadcasting. As a result, independent radio owners continued to defer long-term investments.

Some independent-media owners also alleged the government exerted pressure on private firms to limit advertising in independent media, although other observers believed the lack of advertising was the result of self-censorship by private companies or a business decision based on circulation numbers.  Many journalists practiced self-censorship, fearing economic and physical repercussions for investigative reporting on crime or official corruption.  In addition media outlet owners exercised self-censorship by choosing not to publish news that affected public perceptions of the government or the FSLN.

**Libel/Slander Laws:**  In February FSLN-aligned judge Jose Ernesto Martinez found journalist David Quintana guilty on trumped-up slander charges after Quintana was accused by a staff member of an official television station in 2020. Another FSLN-aligned judge, Fatima Rosales, denied Quintana's request for appeal in April.  In June a judge denied an appeal on behalf of independent radio station director Kalua Salazar in a slander case brought against Salazar by FSLN municipal workers.  Slander and libel are both punishable by fines ranging from 120 to 300 times the minimum daily wage.

**National Security:**  Human rights NGOs and civil society organizations argued

CLP_PC_024078

the Sovereign Security Law exemplified the government's failure to respect civil liberties.  Although not cited in specific cases, the law applies to "any other factor that creates danger to the security of the people, life, family, and community, as well as the supreme interests of the Nicaraguan nation."  The government used and threatened further use of the Cybercrimes Law, which includes as online crimes social media posts deemed dangerous by the regime and grants law enforcement access to information systems and other data.  On September 7, the Public Prosecutor's Office accused indigenous rights activist Amaru Ruiz of cybercrimes after he reported extensively on social media about the killing of 13 indigenous persons by individuals suspected by human rights groups to have ties to the government.  Penalties for online crimes include prison time and hefty fines, disproportionate to the crimes as broadly defined by the law.

A police regulation restricts criticism of government policies and officials under the guise of protecting national security.

**Internet Freedom**

There were credible reports that the government monitored private online communications without appropriate legal authority and in some cases restricted or disrupted access to the internet or censored online content.  Independent media reported the government provided logistical support for "troll farms" that routinely carried out cyberattacks against opposition media websites and social media accounts.  Trolls and bots reportedly tracked opposition and progovernment social media accounts to retaliate against users deemed opponents to the ruling party and to amplify progovernment messaging.

Several NGOs claimed the government monitored their email and online activity without appropriate legal authority.  Paid government supporters used social media and website commentary spaces to harass prominent members of civil society, human rights defenders, and well known journalists.

As part of a continuing social media campaign against prodemocracy protests, ruling party members and supporters used social media to publish personal information of human rights defenders and civil society members.  Civil society members alleged government offices provided the information to penalize the free

CLP_PC_024079

expression of opinions.  Government supporters also used the personally identifiable information to mark the houses of civil society members with either derogatory slurs or threats, then published photographs of the marked houses on social media.

**Academic Freedom and Cultural Events**

There were government restrictions on academic freedom, and many students, academics, and researchers reported pressure to censor themselves.

Public universities continued to withhold the records of many university students who participated in prodemocracy protests.  In many cases students who went into exile could not continue their studies abroad without their records.  Entrances to public universities remained under surveillance by progovernment guards or police who regularly checked visitors and searched their belongings – a practice begun after the prodemocracy protests of 2018.

Human rights NGOs and civil society groups reported authorities required students in elementary and secondary public schools to participate in progovernment rallies while schools were in session.  Political propaganda for the ruling party was posted inside public schools.  Teacher organizations and NGOs alleged continuing FSLN interference in the school system through the use of school facilities as FSLN campaign headquarters, favoritism shown to members of FSLN youth groups or to children of FSLN members, politicized awarding of scholarships, and the use of pro-FSLN education materials.  On September 8, the Public Prosecutor's Office issued an accusation against writer and former vice president Sergio Ramirez for "committing acts that incite hatred and violence," conspiring to "undermine national integrity," and money laundering.  The Customs Office withheld Ramirez's latest novel, effectively banning it from entering the country in apparent retaliation and intimidation against Ramirez for his public commentary in international fora against the FSLN party, the president, and the vice president.

## b. Freedoms of Peaceful Assembly and Association

The government restricted freedoms of peaceful assembly and association.

CLP_PC_024080

**Freedom of Peaceful Assembly**

The government did not respect the legal right to public assembly, demonstration, and mobilization.  Prodemocracy marches and protests continued to be banned during the year.  Police and parapolice actively persecuted, harassed, and occasionally impeded private meetings of NGOs, civil society groups, and opposition political organizations.  Police failed to protect peaceful protesters from attacks; they also committed attacks and provided logistical support to other attackers.  Human rights organizations reported police stopped traffic for and otherwise protected progovernment demonstrations.

Police routinely surrounded, surveilled, and threatened meetings of political parties and civil society organizations.  Police entered private meeting spaces to disrupt gatherings of opposition parties and civil society organizations.

**Freedom of Association**

The law provides for freedom of association, including the right to organize or affiliate with political parties; nevertheless, the Supreme Electoral Council and National Assembly used their accreditation powers for political purposes.  National Assembly accreditation is mandatory for NGOs to receive funding, have bank accounts, or legally employ workers.  The Ministry of the Interior has oversight of regulatory compliance by NGOs and provides certificates.  Many NGOs that worked on topics of democracy, human rights, and women's issues complained the ministry purposefully withheld certification to hinder their work and access to funding.

Beginning in February, the government began enforcing the 2020 Foreign Agents Law with far-reaching implications for entities and employees of entities receiving funding from outside the country.  The law requires anyone receiving funding from foreign sources to register with the Ministry of the Interior and provide monthly, detailed accounts of how funds are intended to be used.  Additionally, NGOs need to present their legal accreditation, subject to annual renewal by the ministry.  Many NGOs complained that the ministry purposefully withheld or delayed this accreditation, which led to the loss of their legal status.  Individuals who register as foreign agents cannot participate in internal politics or run for elected positions for

CLP_PC_024081

up to one year after being removed from the registry.  Failure to register can lead to fines, judicial freezing of assets, and the loss of legal status for associations or NGOs.  The Violeta Barrios de Chamorro Foundation decided to close before the deadline to register to avoid being labeled a foreign agent.  The government, through the Public Prosecutor's Office, accused the NGO, its staff, and the beneficiaries of its grants of money laundering.  Up to 142 individuals, including vendors, consultants, staff, and 32 journalists, were summoned for the investigation.  Some NGO staff remained imprisoned during the government's 90-day investigation period.  In June the government placed Cristiana Chamorro, the foundation's former executive director and a leading opposition presidential precandidate, under house arrest on related accusations of money laundering.

## c. Freedom of Religion

See the Department of State's *International Religious Freedom Report* at https://www.state.gov/religiousfreedomreport/.

## d. Freedom of Movement and the Right to Leave the Country

The law provides for freedom of internal movement, foreign travel, emigration, and repatriation, but the government did not always respect these rights.  On July 16, the government denied Lesther Javier Aleman entry to the country despite being a Nicaraguan citizen and showing a valid Nicaraguan passport.  Aleman was ordered to fly out of the country the same day.  Aleman was the father of student leader Lesther Aleman Alfaro, who was arrested on July 6 in a crackdown on the opposition.  The government strictly controlled the entry of persons affiliated with some groups, specifically humanitarian and faith-based organizations.  The government may prevent the departure of travelers with pending legal cases; the government used this authority against individuals involved in the political opposition and media who had not been charged with any crimes.  The law requires exit visas for minors.

**In-country Movement:**  Police consistently restricted the travel of opposition members to cities other than their hometown.  In many cases police restricted the movement of political opponents outside their homes, although these individuals did not have pending charges against them or judicially imposed restrictions on

CLP_PC_024082

their movement.

**Foreign Travel:**  Migration authorities confiscated the passports of at least 15 Nicaraguans who were trying to leave the country.  Authorities told the individuals that migration restrictions had been levied on them, although the individuals had no formal accusations or charges against them.

**Citizenship:**  On August 6, the ruling FSLN party used its control over government agencies to revoke the Nicaraguan nationality of opposition leader Carmella Rogers Amburn (also known as Kitty Monterrey) without due process. The ruling party, however, issued citizenship to ideologically aligned foreigners fleeing corruption charges in their countries, such as former Salvadoran president Salvador Sanchez Ceren and several of his close family members, bypassing the law and procedures.

## e. Status and Treatment of Internally Displaced Persons

According to contacts and local media, hundreds of participants in the 2018 prodemocracy protests and others who ran afoul of the Ortega regime remained in hiding to evade government persecution, including arbitrary arrest, detention, and torture.  These individuals reported being unable to find work or study due to fear of government reprisals.  As the root cause of this forced displacement, the government did not promote the safe, voluntary, dignified return, resettlement, or local integration of internally displaced persons.  The government does not have policies and protections for internally displaced persons in line with the UN Guiding Principles on Internal Displacement.

## f. Protection of Refugees

The government does not cooperate with the Office of the UN High Commissioner for Refugees and other humanitarian organizations in providing protection and assistance to refugees, returning refugees, asylum seekers, stateless persons, and other persons of concern.  The government has not provided updated information on refugees or asylum seekers since 2015.

**Access to Asylum:**  The law provides for the granting of asylum or refugee status, and the government has established a system for providing protection to refugees.

CLP_PC_024083

Only the executive branch or the country's embassies abroad may grant asylum for political persecution.  The Nicaraguan National Commission for Refugees has not met since 2015.

**Durable Solutions:**  The government recognized 61 persons as refugees in 2015, the most recent year for which information was available.  By year's end partner agencies estimated there were more than 1,300 refugees or persons in refugee-like situations in the country.

## g. Stateless Persons

Registration of births in rural areas was difficult due to structural constraints, and the government took no measures to address this, resulting in a number of de facto stateless persons in the country (see section 6, Children).

# Section 3. Freedom to Participate in the Political Process

While the law provides citizens the ability to choose their government in free and fair periodic elections based on universal and equal suffrage and conducted by secret ballot, the government restricted freedom of expression, peaceful assembly, and association.  Institutional fraud, among other obstacles, precluded opportunities for meaningful choice.

## Elections and Political Participation

**Recent Elections:**  In November President Ortega awarded himself a fourth term in office following a deeply flawed electoral process characterized by historically low voter turnout.  Ortega and his FSLN party cancelled the legal registration of all credible opposition political parties, jailed opposition presidential candidates on spurious charges, and committed blatant electoral fraud.  Independent observer groups and international organizations characterized the electoral process as not credible.  The government did not allow credible, independent electoral observers into the country.  The 2021 elections expanded the ruling party's supermajority in the National Assembly, which previously allowed for changes in the constitution that extended the reach of executive branch power and the elimination of restrictions on re-election for executive branch officials and mayors.  On November 12, a total of 25 member states of the Organization of American States

CLP_PC_024084

(OAS) voted in favor of a resolution declaring the elections were "not free, fair or transparent, and lack democratic legitimacy."

The 2019 Caribbean regional and 2017 municipal elections were marred by widespread institutional fraud and heavy security force presence.

Civil society groups expressed concerns over the lack of a transparent and fair electoral process leading up to the 2021 national elections, the 2019 Caribbean regional elections, and the 2017 municipal elections.  Electoral experts, business leaders, representatives of the Catholic Church, and civil society organizations reported that a lack of accredited domestic or international observation, in addition to the ruling party's control over all aspects of the official electoral structure and all branches of government, combined to impede holding free and fair elections.

**Political Parties and Political Participation:**  The Supreme Electoral Council (CSE) announced on May 18 that it had cancelled the legal status of the opposition Democratic Restoration Party.  On May 19, the CSE announced it cancelled the legal status the Conservative Party.  On August 6, the CSE revoked the legal status of a third opposition party, Citizens for Liberty.  The remaining political parties were controlled by the Ortega regime, paving the way for Ortega to run unopposed in the November elections.  In 2020 the National Assembly passed a law that bars anyone from running for office whom the government designated as a "traitor," defining the term so broadly that it could be applied to anyone who expressed opposition to the ruling party.  In June the ruling party used this law to jail at least six individuals who had signaled they would run as opposition presidential candidates.

The government used state resources for political activities to enhance the FSLN's electoral advantage in recent elections.  Independent media, human rights groups, and opposition parties reported the government used public funds to provide subsidized food, housing, vaccinations, access to clinics, and other benefits directly through either FSLN-led "family cabinets" (community-based bodies that administer government social programs) or party-controlled Sandinista leadership committee (CLS) systems, which reportedly coerced citizens into FSLN membership while denying services to opposition members.  The regime also made party membership mandatory for an increasing number of public-sector employees.

CLP_PC_024085

Observers noted government employees continued to be pressured into affiliating with the FSLN and participating in party activities.  During the year the government pressured public servants to participate in mass public gatherings including sports events, political rallies, and marches despite the dangers of spreading COVID-19 via mass gatherings.

The FSLN also used its authority to decide who could obtain national identity cards.  Persons seeking to obtain or retain public-sector employment, national identity documents, or voter registration were obliged to obtain recommendation letters from CLS block captains.  Those without identity cards were unable to vote and had difficulty participating in the legal economy or conducting bank transactions.  Such persons also were subject to restrictions in employment, access to courts, and land ownership.  Civil society organizations continued to express concern about the politicized distribution of identity cards, alleging this was one way the FSLN manipulated past elections and that the CSE failed to provide identity cards to opposition members while widely distributing them to party loyalists.

**Participation of Women and Members of Minority Groups:**  No laws limit participation of women or members of minority groups, including persons with disabilities; lesbian, gay, bisexual, transgender, queer, and intersex (LGBTQI+) persons; and indigenous persons, in the political process, and they did participate, although observers noted most women in elected positions at the municipal and national levels held limited power or influence in their respective bodies.

# Section 4. Corruption and Lack of Transparency in Government

The law provides criminal penalties for corruption by officials, although the government did not implement the law effectively.  There were numerous reports of government corruption during the year, including in the police force, the CSE, the Supreme Court, customs and tax authorities, and other government organs.  The Supreme Court and lower-level courts remained particularly susceptible to bribes, manipulation, and political influence, especially by the FSLN.  Companies reported that bribery of public officials, unlawful seizures, and arbitrary

CLP_PC_024086

assessments by customs and tax authorities were common.  Municipal governments and regional governments of the Caribbean Coast were also plagued by corruption.  The Managua municipal government reportedly engaged in corrupt practices related to infrastructure projects.

A general state of permissiveness hindered the possibility of addressing the problem effectively.  A lack of strong institutions, a weak system of checks and balances, and the regime's absolute control of government institutions allowed for corruption to continue with impunity.

**Corruption:**  The Office of the Comptroller, responsible for combating corruption within government agencies and offices, did not carry out a complete verification of the government's full financial statements.  For example, the comptroller maintained that Albanisa, a private company controlled by regime insiders that imported and sold Venezuelan petroleum products, as well as associated revenue under the Venezuela oil cooperation agreement, was not subject to audit because the National Assembly did not approve the agreement.  The Financial Analysis Unit did not fully implement its mandate in prosecuting money laundering of government officials and focused on investigating President Ortega's political opposition.

Executive branch officials continued to be involved in businesses financed by economic and developmental assistance funds lent by the Venezuelan-led Bolivarian Alliance for the Peoples of Our America (ALBA), all of it outside the normal budgetary process controlled by the legislature.  This included the Nicaraguan Electric Transmission Enterprise, which funneled ALBA funding and other oil-based assistance into privately owned businesses.  Media reported that companies linked to previous ALBA-funded contracts and with links to the president's family were tightly controlled by members of Ortega's inner circle, with little public oversight.  Cases of mismanagement of these funds by public officials were reportedly handled personally by FSLN members and President Ortega's immediate family, rather than by the government entities in charge of public funds.

# Section 5. Governmental Posture Towards International and Nongovernmental Investigation of Alleged Abuses of Human

CLP_PC_024087

# Rights

The government imposed significant and increasing burdens on the limited number of human rights organizations it allowed to operate in the country.  The Nicaraguan Center for Human Rights remained deprived of its legal status, hindering its ability to investigate human rights abuses.  The Nicaraguan Pro-Human Rights Association continued to operate from exile in Costa Rica and focused more on the Nicaraguan exile community.  Other human rights organizations faced significant harassment and police surveillance.  Humanitarian organizations faced obstacles to operating or denial of entry, and government officials harassed and intimidated domestic and international NGOs critical of the government or the FSLN.  Some NGOs reported government intimidation created a climate of fear intended to suppress criticism.

The government continued to prevent non-FSLN-affiliated NGOs and civil society groups from participating in government social programs, such as Programa Amor, which provides social protections to children and adolescents, and Hambre Cero, a program that distributes livestock for smallholder production.  The government frequently used FSLN-controlled family cabinets and party-controlled CLSs to administer these programs.  Government programs purportedly created to provide support for victims of the violence since 2018 benefited only FSLN party members.  Increased government restrictions on domestic NGOs' ability to receive funding directly from international donors seriously hindered the NGOs' ability to operate.  In addition, increased control over the entry of foreign visitors or volunteer groups into the country hindered the work of humanitarian groups and human rights NGOs.  The Swedish NGO We Effect discontinued its activities in the country in December after 30 years of humanitarian aid work, citing difficulties in complying with the foreign agents law.  Some groups reported difficulties in moving donated goods through customs and said government officials were rarely cooperative or responsive to their complaints.

Several domestic NGOs reported that the Ministry of the Interior purposefully denied receipt of their compliance documentation and withheld or unduly delayed providing certifications in order to revoke the legal status of NGOs.  NGOs under government investigation reported problems accessing the justice system and

CLP_PC_024088

delays in filing petitions, as well as pressure from state authorities.  Many NGOs believed comptroller and tax authorities audited their accounts as a means of intimidation.  While legally permitted, spot audits were a common form of harassment and often used selectively, according to NGOs.  NGOs reported difficulties in scheduling meetings with authorities and in receiving official information due to a growing culture of secrecy.  Local NGOs reported having to channel requests for meetings with ministry officials and for public information through the Ministry of Foreign Affairs.  These requests were generally not processed.  NGOs also reported government hostility or aggression when questioning or speaking with officials on subjects such as corruption and the rule of law.  Groups opposing the construction of a proposed interoceanic canal also reported being harassed and placed under surveillance.  Three members of the Farmworker's Movement opposing the canal were arrested, including a presidential precandidate, and many more fled into exile.

The government enforced the law that requires any citizen working for "governments, companies, foundations, or foreign organizations" to register with the Interior Ministry, report monthly their income and spending, and provide prior notice of how the foreign funds are intended to be spent.  The law establishes sanctions for those who do not register.

**The United Nations or Other International Bodies:**  The government did not allow the Office of the UN High Commissioner for Human Rights (OHCHR) or IACHR to send working groups to monitor the human rights situation in the country.  The government did not cooperate with these groups, as noted in OHCHR and IACHR reports.

The government continued to block the entrance of the OAS high-level commission to help resolve the country's sociopolitical crisis.  The government did not send a representative to any of the 2021 IACHR sessions.  The attorney general participated in a May IACHR hearing on protective measures awarded to the human rights NGO CENIDH.  The attorney general rejected any claims of wrongdoing and stated the government was acting according to its laws.  In several instances progovernment supporters detained or harassed protesters protected by IACHR precautionary measures.

CLP_PC_024089

**Government Human Rights Bodies:**  The Office of the Ombudsman for Human Rights, led since 2019 by Darling Rios, a sociologist with no previous human rights experience, and Adolfo Jarquin, also with no previous human rights experience, was perceived as politicized and ineffective.  In 2019 the UN Human Rights Council demoted the Office of the Ombudsman for Human Rights from category A to B for its lack of independence.

# Section 6. Discrimination and Societal Abuses

## Women

**Rape and Domestic Violence:**  The law criminalizes all forms of rape of men or women, regardless of the relationship between the victim and the accused. Sentences for those convicted of rape range from eight to 12 years' imprisonment. The law criminalizes domestic violence and provides prison sentences ranging from one to 12 years.

The government failed to enforce rape and domestic violence laws, leading to widespread impunity and reports of increased violence from released offenders emboldened by their release.  The NGO Catholics for the Rights to Decide reported that there were 46 femicides as of July, most of them committed after the victims suffered sexual violence.  The government continued to use FSLN-led family cabinets and CLSs in mediation processes in cases of domestic violence. Both processes were politicized and did not operate according to the rule of law. The government employed limited public education, shelters, hotlines, psychosocial services, and police training in nominal and unsuccessful attempts to address the problem.

Observers reported a general increase in sexual crimes and violence against women during the year; however, data were unreliable.  NGOs working on women's issues reported that violence against women remained high and that police generally understated its severity.  The government did not coordinate with women's rights NGOs and actively blocked their operations and access to funding.

**Sexual Harassment:**  The law prohibits sexual harassment, and those convicted face one- to three-year sentences in prison, or three to five years if the victim is

CLP_PC_024090

younger than 18.  No information was available on government efforts to prevent or prosecute complaints of sexual harassment.

**Reproductive Rights:**  There were no reports of coerced abortion or involuntary sterilization on the part of government authorities.

While there were no cultural barriers that adversely affected women's access to health-care services, rural women's access to health care during pregnancy and childbirth was hindered by long distances to appropriate health-care facilities in scarcely populated areas with poor transportation infrastructure.  Women in some areas, such as the RACN and the RACS, lacked widespread access to medical care or programs, and maternal death affected poor rural women more than their urban counterparts.  This also affected indigenous and Afro-descendant women in the RACN and the RACS more than nonindigenous women in other regions.  In addition, adolescents often faced social stigma when seeking contraception methods.

The government provided limited access to sexual and reproductive health services for survivors of sexual violence.  The Ministry of Health had a standing protocol for the provision of health services to survivors of sexual violence, which included the provision of emergency contraception within five days of the assault as well as treatment of HIV or sexually transmitted diseases.  Women's rights organizations, however, claimed the Ministry of Health did not always provide this treatment due to fear of subverting the government's strict prolife policy, directed by the president and vice president.  While no legal barriers impede adolescent girls' access to education due to pregnancy or motherhood, economic hardships and a lack of social safety nets to protect young mothers often impeded continued education for pregnant girls or young mothers.

**Discrimination:**  The law provides for gender equality in access to education, labor rights, and civil rights.  Nevertheless, women often experienced discrimination in employment, obtaining credit, and receiving equal pay for similar work, as well as in owning and managing businesses.  While the government enforced the law effectively in the public sector, women in positions of power faced limitations, and their authority was limited compared with that of men.  For example, despite a law that requires equal participation of men and women in

CLP_PC_024091

elected positions, male political party leaders often made decisions on public policy without internal debate or input from female political leaders.  Enforcement was not effective in the private sector or the larger informal sector.

## Systemic Racial or Ethnic Violence and Discrimination

Exclusionary treatment based on race, skin color, and ethnicity was common, especially in higher-income urban areas.  Darker-skinned persons of African descent from the RACN and the RACS, along with others assumed to be from those areas, experienced discrimination, such as being subjected to extra security measures and illegal searches by police.  Indigenous and other ethnic groups from the RACN and the RACS alleged that discriminatory attitudes toward ethnic and racial minorities were responsible for the lack of government resources devoted to those regions.  The government focused attention and resources on maintaining political control over decision-making bodies in the regions where most indigenous groups lived.

## Indigenous Peoples

Indigenous persons constituted approximately 5 percent of the population and lived primarily in the RACN and the RACS.  Despite having autonomous governing bodies, decisions affecting their lands, cultures, traditions, or the exploitation of energy, minerals, timber, and other natural resources on their lands were largely made or approved by national government authorities or by FSLN representatives. Individuals from five major indigenous groups – the Miskito, Sumo/Mayangna, Garifuna (of Afro-Amerindian origin), Creole, and Rama – the alleged government discrimination through underrepresentation in the legislative branch.

NGOs and indigenous rights groups denounced the increasing number of killings of indigenous persons at the hands of nonindigenous populations encroaching on their lands in the RACN and the RACS, and they claimed the government failed to protect the civil and political rights of indigenous communities.  In August armed gold miners attacked an artisanal gold mining site and killed up to 13 indigenous persons in an effort to drive indigenous populations away from the site.  The attack occurred in the Sauni As territory in the Bosawas protected biosphere.  During the raid the attackers also raped two women and dismembered some of the bodies of

CLP_PC_024092

their victims.  Police announced the arrests of three of 14 individuals accused of the crime, but many observers doubted the government's narrative, particularly because those arrested were indigenous persons, including a sibling of one of the rape victims.  Some observers alleged government and FSLN involvement in the violence against Miskito populations in the RACN along the Coco River, either by failing to defend indigenous populations or as accomplices to nonindigenous groups invading indigenous lands.  Indigenous groups continued to complain of rights violations in connection with government plans to build an interoceanic canal through their territory.

Indigenous persons from rural areas often lacked birth certificates, identity cards, and land titles.  While the government did not deny these rights if requested, it favored FSLN party members over other constituents.  Additionally, indigenous groups alleged the government provided identity cards to outsiders who encroached on indigenous lands in the RACS and the RACN, leading to overrepresentation of FSLN-aligned, nonindigenous persons in regional governing bodies.  Most indigenous individuals in rural areas lacked access to public services, and deteriorating roads hindered access to health care for many.

Indigenous women faced multiple levels of discrimination based on their ethnicity, gender, and lower economic status.  For example, indigenous women do not receive medical attention, education, police protection, or representation in government at the same level as nonindigenous women.

Throughout the year indigenous leaders alleged that regional and national governments granted logging and mining concessions to private firms and to government-affiliated businesses, such as ALBA-Forestal, without adequate consultation of the indigenous community, and that logging and mining continued in violation of national autonomy laws in the RACS and the RACN.

## Children

**Birth Registration:**  Citizenship is derived by birth within the country's territory and from one's parents.  Local civil registries register births within 12 months, although many persons, especially in rural areas, lacked birth certificates.  Registration in rural areas was difficult due to structural constraints, and the

CLP_PC_024093

government took no measures to address this, resulting in a growing number of de facto stateless persons in the country.  Persons without citizenship documents were unable to obtain national identity cards and consequently could not vote and had difficulty participating in the legal economy and conducting bank transactions. Such persons also were subject to restrictions in employment, access to courts, and land ownership.

**Child Abuse:**  According to the criminal code, prison sentences for rape committed against minors range from 12 to 15 years and for child abuse from seven to 12 years.  Government efforts were insufficient to combat child abuse and sexual violence against minors.  High rates of sexual violence against teenage girls contributed to high rates of teenage pregnancy, according to UNICEF.

**Child, Early, and Forced Marriage:**  The minimum legal age for marriage is 18 for men and women, or 16 with parental authorization.  There were credible reports of forced early marriages in some rural indigenous communities.  UNICEF's *2019 State of the World's Children*, the most recent data available, reported 35 percent of women 20 to 24 years of age were married or in a union by age 18, and 10 percent were married by age 15.  No information was available on government efforts to address or prevent forced and early marriage.

**Sexual Exploitation of Children:**  The law prohibits sexual exploitation in general and designates enticing children or adolescents to engage in sexual activity as an aggravating condition.  The government generally did not enforce the law pertaining to child sex trafficking.  Penalties include 10 to 15 years in prison for a person who entices or forces any individual to engage in sexual activity and 19 to 20 years in prison for the same acts involving children or adolescents.  The law defines statutory rape as sexual relations with children ages 14 or younger.

The law also prohibits child pornography, and the government generally enforced it.  The penalty for inducing, facilitating, promoting, or using a minor for sexual or erotic purposes is 10 to 15 years in prison.

The country was a destination for child sex tourism.  The law imposes a penalty of five to seven years in prison for those convicted of child-sex tourism.

**International Child Abductions:**  The country is a party to the 1980 Hague

CLP_PC_024094

Convention on the Civil Aspects of International Child Abduction.  See the Department of State's *Annual Report on International Parental Child Abduction* at https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/for-providers/legal-reports-and-data/reported-cases.html.

## Anti-Semitism

The country has a very small Jewish population.  There were no known reports of anti-Semitic acts.

## Trafficking in Persons

See the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## Persons with Disabilities

The law requires persons with disabilities to have access to education, health services, public buildings, and transportation, although this did not occur in practice.  Persons with disabilities faced severe problems accessing schools, public health facilities, and other institutions.  Children with disabilities attended schools with nondisabled peers; specialized school materials were not readily available and on occasion were blocked by the Ministry of Education.  Anecdotal evidence suggested that children with disabilities completed secondary education at a significantly lower rate than other children.  Public schools were rarely well equipped, and teachers were poorly trained in providing appropriate attention to children with disabilities.  Police stations and public health-care facilities did not have staff trained in sign language, making persons with hearing disabilities dependent on caretakers.  Many voting facilities were not accessible.  Advocates for persons with disabilities complained of a lack of accessible public transportation.  Some persons with disabilities reported taxi drivers often refused them service due to the perceived extra burden on the driver to aid customers with disabilities.  Advocates for persons with disabilities claimed interpreters for the deaf were not accessible at schools and universities, making it difficult for these persons to obtain education.  Government clinics and hospitals provided care for veterans and other persons with disabilities, but the quality of care was generally

CLP_PC_024095

poor.

Discrimination against persons with physical, sensory, intellectual, and mental disabilities was widespread, despite being prohibited by law.  Laws related to persons with disabilities do not stipulate penalties for noncompliance, although penalties may be issued under the general labor inspection code.  The Ministry of the Family, Ministry of Labor, and Human Rights Office are among government agencies responsible for the protection and advancement of rights of persons with disabilities.  The government did not enforce the law effectively; did not mandate accessibility to buildings, information, and communications; and did not make information available on efforts to improve respect for the rights of persons with disabilities.  Advocacy organizations for persons with disabilities reported persons with disabilities accounted for less than 1 percent of public-sector employees, despite the legally mandated minimum representation of 2 percent.  Further reports indicated public institutions did not sufficiently coordinate with the Labor Ministry to accommodate persons with disabilities in the workplace.  While there were no official reports of violence, harassment or intimidation against persons with disabilities by government officials, there were several anecdotal reports of violence and harassment.  These incidents generally went unreported mainly because victims did not want to face the burdensome process of filing a complaint.

## HIV and AIDS Social Stigma

The law provides specific protections for persons with HIV or AIDS against discrimination in employment and health services, but such persons continued to suffer societal discrimination.  An administrative resolution issued by the Ministry of Health continued in effect, declaring that HIV/AIDS patients should not suffer discrimination and making available a complaints office.

## Acts of Violence, Criminalization, and Other Abuses Based on Sexual Orientation and Gender Identity

LGBTQI+ groups reported discrimination, a lack of access to justice, and a lack of response from police.  The government and FSLN supporters frequently targeted LGBTQI+ participants in civil protests in particular, using online smear campaigns and physical attacks in some cases.  LGBTQI+ opposition members were

CLP_PC_024096

particularly targeted with sexual violence by police, parapolice, and progovernment supporters.  The Observatory for Human Rights Violations Against LGBTQI+ Persons stated there were 43 attacks against LGBTQI+ in the first six months of the year, one-half against transgender women.  LGBTQI+ activists said LGBTQI+ political prisoners hid their orientation, fearing increased abuse from prison guards.  Reliable data on the breadth of such discrimination were not available.  No specific laws exist to punish hate crimes against LGBTQI+ persons.

Transgender women detained for participating in prodemocracy protests were particularly harassed while in custody.  They were held with male inmates, forced to strip in front of their peers, and specifically harangued by guards.  The law does not recognize the right to gender identity self-determination, and as such the penitentiary system is not required to separate inmates based on gender identity.  Celia Cruz, a political prisoner and transgender woman, was given amnesty and released in April, although her trial continued and an appeals court ratified her guilty sentence in June.

Although it does not mention sexual orientation and gender identity specifically, the law states all persons are equal before the law and provides for the right to equal protection.  No laws specifically criminalize consensual same-sex sexual conduct between adults.  LGBTQI+ persons, however, continued to face widespread societal discrimination and abuse, particularly in housing, education, and employment.  LGBTQI+ organizations continued to complain the law curtailed the rights of LGBTQI+ households by defining families as necessarily headed by a man and a woman; this definition particularly affected LGBTQI+ households' access to social security, survivor benefits, and adoption rights.

# Section 7. Worker Rights

## a. Freedom of Association and the Right to Collective Bargaining

The law provides for the right of all workers in the public and private sectors, except for those in the military and police, to form and join independent unions of their choice without prior authorization and to bargain collectively.  The government's control of all major unions effectively nullified those rights.  The ruling party used its control over major unions to harass and intimidate workers in

CLP_PC_024097

several sectors, including education, health care, the public sector, and free trade zones.  The constitution recognizes the right to strike, although it places some restrictions.  The law prohibits antiunion discrimination but does not provide for measures to protect against rights violation.  Burdensome and lengthy conciliation procedures and government control of all major unions impeded workers' ability to call strikes.  In smaller businesses where major unions were not present, the government created parallel labor unions to confuse and diffuse efforts to organize strikes or other labor actions.  In addition, if a strike continues for 30 days without resolution, the Ministry of Labor may suspend the strike and submit the matter to arbitration.

Collective bargaining agreements last up to two years and are automatically renewed if neither party requests its revision.  Collective bargaining agreements in the free trade zone regions, however, are for five-year periods.  Companies in disputes with their employees must negotiate with the employees' union if one exists.  By law several unions may coexist at any one enterprise, and the law permits management to sign separate collective bargaining agreements with each union.

The government sought to foster resolution of labor conflicts through informal negotiations rather than formal administrative or judicial processes.  The law does not establish specific fines for labor law violations, and penalties were commensurate with those for other laws involving denials of civil rights, such as discrimination.  Although the law establishes a labor court arbitration process, it was subject to long wait times and lengthy and complicated procedures, and many labor disputes were resolved out of court.

Freedom of association and the right to collective bargaining were not respected, and the government often intervened for political reasons.  The government did not effectively enforce the laws.  Most labor unions were historically allied with political parties, but in recent years the government reportedly dissolved unions and fired workers not associated with the ruling FSLN.  Independent labor experts reported the Ministry of Labor denied or unduly delayed providing legal recognition to unions that were not aligned with the FSLN.

Politically motivated firings continued to be a problem.  Most of the doctors and

CLP_PC_024098

university staff from the public sector fired for political reasons since 2018 had not received severance pay as of September.  Labor experts highlighted similar instances of public-sector employees being fired without receiving severance pay. FSLN party affiliation or letters of recommendation from party secretaries, family cabinet coordinators, or other party officials were allegedly required from applicants seeking public-sector jobs.

The government restricted the organizing of trade unions and teachers perceived to be in opposition to the government.

There were no known documented instances of strikes being declared illegal. Under the law, during a strike employers may not hire replacement workers, but unions alleged this practice was common.  Wildcat strikes – those without union authorization – were historically common.

Employers interfered in the functioning of workers' organizations and committed other violations related to freedom of association and collective bargaining.  Labor leaders noted employers routinely violated collective bargaining agreements and labor laws with impunity.

Official union federations were accused of protecting employer interests by identifying and isolating workers who attempted to organize as well as frustrating such attempts through arbitrary procedural barriers that delay approval processes. Federations also permitted illegal firings of workers who tried to organize themselves; the workers faced retaliation and permanent exclusion from jobs in the free trade zones.

Many employers in the formal sector continued to blacklist or fire union members and did not reinstate them.  Many of these cases did not reach the court system or a mediation process led by the Ministry of Labor.  Employers often delayed severance payments to fired workers or omitted the payments altogether. Employers also avoided legal penalties by organizing employer-led unions lacking independence and by frequently using contract workers to replace striking employees.  There were reports FSLN party dues were automatically deducted from paychecks.

CLP_PC_024099

## b. Prohibition of Forced or Compulsory Labor

The law prohibits all forms of forced or compulsory labor.  There was no information available regarding government enforcement of these laws.  Penalties were commensurate with those for other analogous serious crimes, such as kidnapping.  Despite reported political will to combat human trafficking, including labor trafficking, during the year the government did not take sufficient action to address the scope of the problem and provided only limited information about its law enforcement efforts.

Observers noted reports of forced labor, including of men, women, and children in agriculture, construction, mining, street begging, and domestic servitude.  Victim identification, prosecution, and conviction remained inadequate, and victims' family members were often complicit in their exploitation.  Traffickers lured residents of rural or border regions with the promise of high-paying jobs in urban and tourist areas but then subjected them to sexual exploitation and forced labor.

Also see the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## c. Prohibition of Child Labor and Minimum Age for Employment

The law prohibits the worst forms of child labor.  The law establishes the minimum age for employment at 14 and limits the workday for any individual between ages of 14 and 18 to six hours and the workweek to 30 hours.  Those between 14 and 16 must have parental approval to work or enter into a formal labor contract.  The law prohibits teenage domestic workers from sleeping in the houses of their employers. It is illegal for minors to work in places the Ministry of Labor considers harmful to their health or safety, such as mines, garbage dumps, and night entertainment venues, and to undertake certain agricultural work.  The government mostly enforced the law in the formal sector, but enforcement was insufficient in the much larger informal sector, where child labor was more prevalent.  Legal penalties for persons employing children in dangerous work were commensurate with those for other analogous serious crimes, such as kidnapping.

The government used limited resources to concentrate on child labor violations in

CLP_PC_024100

select sectors in narrow geographic areas, such as coffee-growing regions, and gave only limited attention to the large informal sector.  The government reported having separated nine children from work between January 2019 and the first semester of 2020.

The government signed thousands of cooperative agreements with employers to prevent the hiring of minors and continued Programa Amor, which aimed to eradicate child labor by reintegrating abandoned children into society.  Information on the program's activities, funding, and effectiveness was unavailable, but independent observers deemed it insufficient.

Laws to eliminate child labor were not fully implemented and lacked a consistent mechanism to coordinate efforts to address child labor.  The government also divested resources from child labor prevention.  Attendance in secondary schools remained much lower than in primary schools, increasing the risk of older children engaging in exploitative labor.  The country made minimal advancement in efforts to eliminate the worst forms of child labor.

Fifteen percent of children lacked birth certificates, which increased their risk for human trafficking, including for the purposes of commercial sexual exploitation.

Child labor remained widespread.  According to organizations that worked on children's rights, this likely increased to almost 320,000 children working in some form of child labor.  A common feature of child labor was the prevalence of unpaid family work, and the National Institute of Development Information stated 80 percent of children and adolescents were unpaid workers.

Children engaged in the worst forms of child labor, including in commercial sexual exploitation (see section 6).  Most child labor occurred in forestry, fishing, and the informal sector, including on coffee plantations and subsistence farms.  Child labor also occurred in the production of dairy products, oranges, bananas, tobacco, palm products, coffee, rice, and sugarcane; cattle raising; street sales; garbage-dump scavenging; stone crushing; gold mining and quarrying of pumice and limestone; construction; marijuana and other drug production and trafficking; street performing; domestic work; and transport.  Persons with disabilities and children were subjected to forced begging, particularly in Managua and near tourist centers.

CLP_PC_024101

Children working in agriculture suffered from sun exposure, extreme temperatures, and dangerous pesticides and other chemicals.  Children working in the fishing industry were at risk from polluted water and dangerous ocean conditions.

Also see the Department of Labor's *Findings on the Worst Forms of Child Labor* at https://www.dol.gov/agencies/ilab/resources/reports/child-labor/findings and the Department of Labor's *List of Goods Produced by Child Labor or Forced Labor* at https://www.dol.gov/agencies/ilab/reports/child-labor/list-of-goods.

## d. Discrimination with Respect to Employment and Occupation

The law and regulations prohibit discrimination regarding race, sex, gender, disability, language, sexual orientation or gender identity, HIV or other communicable disease status, or social status.  The government did not deter such discrimination because it did not effectively enforce the law and regulations.  Penalties for violations were commensurate with laws related to civil rights, such as election interference.

Discrimination in employment took many forms.  Although women generally had equal access to employment, few women had senior positions in business and worked in the informal sector in higher numbers than men; in the public sector or in elected positions, an autocratic ruling political party limited women's independence and influence.  In addition, women's wages were generally lower when compared with those of male counterparts, even for the same position and work performed.  Workplace challenges for persons with disabilities included inadequate infrastructure, lack of educational opportunities, and a generally low rate of public-services positions, despite a legal requirement that a certain percentage be available to them.  LGBTQI+ organizations reported that sexual orientation and gender identity continued to be a basis for discriminatory behavior.

Workers who disagreed with government recommendations were fired, and only those with a membership card of the ruling party were hired.

## e. Acceptable Conditions of Work

**Wage and Hour Laws:**  The law establishes a statutory minimum wage for 10 economic sectors.  According to the Ministry of Labor, the average legal minimum

CLP_PC_024102

wage covered only 35 percent of the cost of basic goods.  The ministry, together with workers' unions aligned with the ruling party, agreed to a 3 percent wage increase for the year.  Public-sector employees received a 5 percent salary increase in August.  Free trade zone regions had a wage increase of 8 percent, prenegotiated in a five-year agreement expected to expire in 2022.  The salary increase remained unchanged despite free trade zone representatives reporting unsteady industry performance.

The minimum wage was generally enforced only in the formal sector, estimated to be 20 percent of the economy.  The Ministry of Labor is the primary enforcement agency.

The standard legal workweek is a maximum of 48 hours, with one day of rest.  The law dictates an obligatory year-end bonus equivalent to one month's pay, proportional to the number of months worked.  The law mandates premium pay for overtime, prohibits compulsory overtime, and sets a maximum of three hours of overtime per day not to exceed nine hours per week.  Penalties for violations of minimum wage and overtime laws were not commensurate with those for similar crimes, such as fraud.

According to International Labor Organization guidelines, the number of labor inspectors was insufficient for the size of the workforce, which included approximately three million workers.  The law allows inspectors to conduct unannounced inspections and initiate sanctions for egregious violations.

**Occupational Safety and Health:**  The National Council of Labor Hygiene and Safety, including its departmental committees, is responsible for implementing worker safety legislation and collaborating with other government agencies and civil society organizations in developing assistance programs and promoting training and prevention activities.  According to labor contacts, the council was inactive throughout the year.  The government did not allocate adequate staff or other measures to enable the Office of Hygiene and Occupational Safety to enforce occupational safety and health (OSH) provisions.  Penalties for violations of OSH laws were commensurate with those for crimes such as negligence, but they were infrequently enforced and only in the formal sector.

CLP_PC_024103

OSH standards also were not widely enforced in an expanding large informal sector, which represented 77 percent of employment and 88 percent of businesses, according to 2016 reports from the Consultants for Business Development and the Nicaraguan Foundation for Economic and Social Development.  Although more recent statistics on informality were not available, experts viewed this indicator as necessarily rising because of sociopolitical unrest and the aftermath of the COVID-19 pandemic.  By law workers may remove themselves from situations that endanger their health or safety without jeopardy to their employment.  It was unclear whether authorities effectively protected employees in such cases.

**Informal Sector:**  The informal sector included the bulk of workers in street sales, agriculture and ranching, transportation, domestic labor, fishing, and minor construction.  Legal limitations on hours worked often were ignored by employers, who claimed workers readily volunteered for extra hours for additional pay.  Violations of wage and hour regulations in the informal sector were common and generally not investigated, particularly in street sales, domestic work, and agriculture, where children continued to work in tobacco, banana, and coffee plantations.  Compulsory overtime was reported in the private-security sector, where guards often were required to work excessive shifts without relief.

CLP_PC_024104

# PANAMA 2021 HUMAN RIGHTS REPORT

## EXECUTIVE SUMMARY

Panama is a multiparty constitutional democracy.  In 2019 voters chose Laurentino Cortizo Cohen as president in national elections that international and domestic observers considered generally free and fair.

The country has no military forces.  The Panama National Police is principally responsible for internal law enforcement and public order, and the National Border Service handles border security.  The country also has a National Aeronaval Service that is responsible for carrying out naval and air operations.  Civilian authorities maintained effective control over the security forces.  There were credible reports that members of security forces committed some abuses.

Significant human rights issues included credible reports of:  serious problems with the independence of the judiciary; serious restrictions on free expression and media, including censorship and the existence of criminal libel laws; and serious government corruption.

Impunity among security forces existed due to weak and decentralized internal control mechanisms for conduct and enforcement.  Corruption was a serious problem in the executive, judicial, and legislative branches as well as in the security forces.  The law provides criminal penalties for corruption by officials, but the government generally did not implement the law effectively.

## Section 1. Respect for the Integrity of the Person

### a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were no reports the government or its agents committed arbitrary or unlawful killings.

CLP_PC_024113

## b. Disappearance

There were no reports of disappearances by or on behalf of government authorities.

## c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The constitution prohibits such practices, and there were no reports that government officials employed them.

Impunity among security forces existed due to weak and decentralized internal control mechanisms for conduct and enforcement, in addition to a culture of corruption.  Poor availability of data made the extent of impunity difficult to gauge.  The National Criminal Statistics Directorate was unable to provide thorough data on the police's internal affairs, as the government rarely made cases of police abuse or corruption public.  The Panama National Police's internal affairs office is responsible for enforcing conduct violations but was inefficient and resisted efforts to modernize.  National police authorities provided training and information to officers to discourage involvement in narcotics trafficking and corruption.

### Prison and Detention Center Conditions

Prison conditions remained harsh due to overcrowding, insufficient internal security, a shortage of prison guards, lack of potable water, and inadequate medical services and sanitary conditions.

**Physical Conditions:**  According to the Ministry of Government's National Directorate of the Penitentiary System (DGSP), as of October the prison system held 19,169 prisoners in facilities with an intended capacity of 14,591.  Pretrial detainees shared cells with convicted prisoners due to space constraints.  Prison conditions for women were generally better than for men, but conditions for both populations were poor.  Several facilities were overcrowded, and several others lacked adequate inmate security and medical care, basic supplies for personal hygiene, and potable water.

Nongovernmental organizations (NGOs) with access to prisons reported that self-

CLP_PC_024114

described evangelical pastors and gang leaders continued to tightly control the pavilions inside the prisons.  The NGOs reported perceived favoritism towards evangelical inmates who appointed themselves "leaders of the prison pavilions." NGO representatives also reported that perceived corruption within the prison system enabled these "leader" inmates to receive privileges, most likely requiring the collaboration of police or civilian custodians.  Other inmates had to secure approval of these "leaders," which often involved payment of bribes, to obtain expedited transfers or access to their legal counselors.

Gang activity in prisons represented a daily threat to prisoner safety.  NGO representatives said prison security personnel and inmates' relatives were likely complicit in the smuggling of weapons.  In March and April, cats and pigeons were used to smuggle illicit substances into the Colon Nueva Esperanza prison.  In April and July, prison security agents caught drones entering the prisons' perimeters carrying either weapons, drugs, or cell phones.  Authorities found a dog serving as a message courier between gang members within the La Joya prison complex.

Despite various sanitary protocols implemented due to the pandemic, medical care overall was inadequate due to lack of personnel, transportation, and medical resources.  As of August, the Ombudsman's Office had received 377 complaints against prisons, 223 of them for human rights violations due to lack of medical care during the pandemic.  Authorities transferred patients with serious illnesses to public clinics, but there were constant difficulties in arranging inmate transportation.  During the year the DGSP adapted a truck to work as an ambulance to serve the La Joya complex.  Transfer of inmates depended on the availability of police vehicles or the limited national ambulance system.  Starting in February, DGSP began its nationwide vaccination program, which included vaccines against tuberculosis, hepatitis, measles, influenza, and COVID-19.

**Administration:**  Authorities conducted investigations of credible allegations of mistreatment.

**Independent Monitoring:**  The government permitted prison monitoring by independent nongovernmental observers.  The Ombudsman's Office prisons officer conducted several unannounced visits without restrictions.  Human rights NGOs seeking access to prisons were required to send a written request to the

CLP_PC_024115

DGSP 15 days in advance.

## d. Arbitrary Arrest or Detention

The law prohibits arbitrary arrest and detention and provides for the right of any person to challenge the lawfulness of his or her arrest or detention in court. The government generally observed these requirements.

### Arrest Procedures and Treatment of Detainees

The law requires arresting officers to inform detainees immediately of the reasons for arrest or detention and of the right to immediate legal counsel. During the pandemic there were several complaints of abuse of authority by police agents detaining persons during the quarantine and curfew. Most complaints focused on the verbal mistreatment of citizens at checkpoints.

Legal cases opened prior to the transition to the accusatory justice system (SPA) continued to be processed under the previous inquisitorial system. Courts' ruling under the inquisitorial system in the Panama and La Chorrera judicial districts were scheduled to close permanently in December. Both systems demonstrated vulnerabilities to corruption, inefficiencies, and bureaucratic obstacles. Informality in the judicial processes, such as sending documents through mobile messenger platforms instead of official emails, became the norm for some lower-level court judges, thus jeopardizing the transparency of the judicial process.

Under the SPA, bail exists but was rarely granted because of implementation of a less costly provisional release system. Under the inquisitorial system, a bail procedure exists for a limited number of crimes but was largely unused. Most bail proceedings were at the discretion of the Prosecutor's Office and could not be initiated by detainees or their legal counsel. Bail was granted in high-profile corruption cases, which prompted complaints by civil society that the Public Ministry was administering "selective" justice.

The law prohibits police from detaining adult suspects for more than 48 hours but allows authorities to detain minor suspects for 72 hours. Under the SPA, arrests and detention decisions were made on a probable cause basis.

CLP_PC_024116

**Arbitrary Arrest:**  During the COVID-19 pandemic, individuals violating curfews established nationwide were arrested but had access to legal representation.  They were released after paying the corresponding fine.

**Pretrial Detention:**  According to official statistics, as of October approximately 37 percent of inmates had not been convicted.  Full implementation of the SPA structure nationwide decreased the number of pretrial detainees consistently since 2016.

## e. Denial of Fair Public Trial

While the law provides for an independent judiciary, the lack of criminal convictions for corruption reinforced widespread public opinion that the judicial system was susceptible to corrupt internal and external influence.

Most allegations of manipulation of the justice system continued to be related to the influence of political actors.  Former president Ricardo Martinelli's 2018 extradition from the United States to face illegal wiretapping charges resulted in an August 2019 "not guilty" verdict, but an appeal by the prosecutors was admitted by the Superior Court in November 2020.  A new trial began in July; four of the six plaintiffs withdrew from the case at that time.  The trial ended on November 9 with Martinelli's acquittal, a decision decried by many prominent members of civil society.

Unlike in accusatory system cases, court proceedings for cases in process under the inquisitorial system were not publicly available.  As a result, nonparties to inquisitorial case proceedings did not have access to them until a verdict was reached.  Under the inquisitorial system, judges could decide to hold private hearings and did so in high-profile cases.  Consequently, the judiciary sometimes faced accusations, particularly in high-profile cases, of procedural irregularities.  Since most of these cases had not reached conclusion, the records remained under seal.  Interested parties generally did not face gag orders, and because of this lack of transparency, it was difficult to verify facts.

**Trial Procedures**

The law provides for the right to a fair and public trial, and the judiciary generally

CLP_PC_024117

enforced this right.  The law provides that all citizens charged with crimes enjoy the right to a presumption of innocence.  They have the right to be informed promptly and in detail of the charges (with free language interpretation available for non-Spanish-speaking inmates), to have a trial without undue delay, to have counsel of their choice and adequate time and facilities to prepare a defense, to refrain from incriminating themselves or close relatives, and to be tried only once for a given offense.  The accused may be present with counsel during the investigative phase of proceedings.

By law the judicial branch is the only entity that schedules hearings within the SPA, while the Penitentiary System is in charge of facilitating logistics for detainees' attendance at virtual in-person hearings.  Detention centers faced problems with virtual hearings due to lack of sufficient equipment and reliable wireless connections to support many scheduled hearings, which created delays.  Following a change in SPA leadership in January, there were reports that some courts unofficially transferred the authority to set dates for virtual hearings to the Penitentiary System.  This change led to reports of unfair administration of justices, further delays or missed hearings, and a lack of accurate statistics on the number of hearings conducted throughout the year.

The fully implemented SPA system stipulates that trials must be completed in less than 12 months.  Due to the pandemic, a Supreme Court decree in January extended the term to 30 months.  Judges may order detainees to be present during the pretrial phase to provide or expand upon statements or to confront witnesses.  Trials are conducted based on evidence presented by the public prosecutor.  Defendants have the right to be present at trial and to consult with an attorney in a timely manner, along with the right to enter into a plea deal.  During the pandemic many of these hearings were conducted virtually, but at times alleged technical issues caused further delays in the hearings.  Defendants have a right to appeal.  The Penitentiary System's lack of equipment significantly reduced its capability to conduct virtual hearings.  Most prisons were limited in their capacity to hold several hearings at once due a lack of available computers.  Failure to hold a hearing meant that the affected inmates had to wait months, on average, for a rescheduled hearing.  There were few if any hearings with multiple inmates.

The Public Defender's Office continued to fail to initiate the formal process for

CLP_PC_024118

early release of inmates in a timely fashion, despite written instructions from the judicial branch.  No disciplinary actions were taken.

**Political Prisoners and Detainees**

There were no reports of political prisoners or detainees.

**Civil Judicial Procedures and Remedies**

Citizens have access to the courts to bring lawsuits seeking damages for, or cessation of, human rights violations, although most did not pursue such lawsuits due to the length of the process.  There are administrative and judicial remedies for alleged wrongs, and authorities often granted them to citizens who followed through with the process.  A court may order civil remedies, including fair compensation to the individual injured.  Individuals or organizations that have exhausted domestic remedies may submit petitions alleging human rights violations to the Inter-American Commission on Human Rights.

# f. Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence

The law prohibits arbitrary interference with privacy, family, home, or correspondence, and the government generally respected these prohibitions.

# Section 2. Respect for Civil Liberties, Including

## a. Freedom of Expression, Including for Members of the Press and Other Media

The constitution provides for freedom of expression, including for members of the press and other media.  The government generally respected this right, but journalists and media outlets noted a continuation of criminal and civil libel and slander lawsuits, which they considered a threat to freedom of expression and freedom of the press.  In addition, media expressed concern with government and private-sector attempts to withdraw paid advertisements – a significant source of funding – when outlets published information that was unfavorable to them.

CLP_PC_024119

**Violence and Harassment:**  In April the Inter American Press Association issued a report highlighting instances of police aggression against journalists covering public protests.  In 2020 National Assembly deputy Zulay Rodriguez sued journalist Mauricio Valenzuela, of the online media outlet *Foco Panama*, in family court on charges of gender-based violence, infringing the rights of a minor, and attacking her personal liberty and integrity.  Valenzuela reported Rodriguez's alleged involvement in trafficking gold.  In September prosecutor Lorena Quiroz officially filed the case, and it was subsequently approved by a family court judge. The processing and admission of gender-violence charges (instead of libel and slander) resulted in public complaints by social media users and civil society organizations.  The National Council on Journalism and the National Forum of Journalists issued a press statement questioning the charges and raising concerns regarding freedom of the press.

In April lawyer Ronier Ortiz, a member of former president Martinelli's legal defense team, publicly threatened *Foco Panama* for its negative coverage of Martinelli.  In response the Journalists Forum, National Council of Journalists, and Panamanian Broadcasting Association issued a joint statement condemning direct threats of violence against media, calling Ortiz's statements "intolerable."  In June journalist Flor Mizrachi received death threats after her investigative reporting uncovered an unregistered COVID-19 vaccination clinic clandestinely administering vaccines in the upscale neighborhood of Coco del Mar.  Mizrachi filed a report with the Attorney General's Office, which opened an investigation into the matter.

In August, Annette Planells, cofounder of the NGO Independent Movement (MOVIN), received anonymous threats via third parties following the NGO's publication of alleged corruption schemes in the National Assembly.  MOVIN is the founder and funder of *Foco Panama*.

**Libel/Slander Laws:**  The law criminalizes defamation, and penalties include fines, imprisonment, or both.  The case related to the 2020 civil court-ordered seizure of Corprensa's assets remained in the courts awaiting a ruling.  Corprensa was overdue on posting financial bail of more than one million dollars for a 2012 libel and slander lawsuit brought by former president Perez-Balladares.  Corprensa had been appealing the case for eight years.

CLP_PC_024120

**Internet Freedom**

The government did not restrict or disrupt access to the internet or censor online content, and there were no credible reports that the government monitored private online communications without appropriate legal authority.

**Academic Freedom and Cultural Events**

There were no government restrictions on academic freedom or cultural events.

## b. Freedoms of Peaceful Assembly and Association

The law provides for the freedoms of peaceful assembly and association, and the government generally respected these rights.

## c. Freedom of Religion

See the Department of State's *International Religious Freedom Report* at https://www.state.gov/religiousfreedomreport/.

## d. Freedom of Movement and the Right to Leave the Country

The law provides for freedom of internal movement, foreign travel, emigration, and repatriation, but due to the COVID-19 pandemic, the government issued several resolutions limiting movements nationwide.  Limitations included strict quarantine rules and long curfews.  In July the Supreme Court of Justice ruled unconstitutional all Ministry of Health decrees forbidding movement based on gender, date, and national identification numbers.  The ruling was significant for the transgender, nonbinary, and gender nonconforming communities as well as for persons with disabilities, who were most directly affected by the strict movement restrictions imposed in 2020.

## e. Status and Treatment of Internally Displaced Persons

Not applicable.

CLP_PC_024121

## f. Protection of Refugees

The government cooperated with the Office of the UN High Commissioner for Refugees (UNHCR) and other humanitarian organizations in providing protection and assistance to refugees, asylum seekers, stateless persons, and other persons of concern.

International organization and NGO partners reported that there continued to be barriers to integration of asylum seekers and refugees, including, but not limited to, lack of work opportunities and barriers preventing children in these populations from attending school.

**Access to Asylum:**  The law provides for asylum or refugee status, and the government has established a system for providing protection to refugees.  Despite the lifting of movement restrictions, the Panamanian National Office for Attention to Refugees (ONPAR) received a significantly reduced number of asylum and refugee applications.  ONPAR reduced its backlog of asylum cases from nearly 20,000 to 11,000, but most cases were dismissed or asylum seekers had left the country.  Admission and approval rates for asylees remained extremely low during the year (less than 1 percent).  ONPAR processed initial asylum applications.  Once a case is approved for consideration, the application is referred to the National Commission for Refugees, an interagency committee that decides the final status of every case.  This committee meets only a few times a year and adjudicates fewer than 50 cases annually.  The entire process could take up to three years.  Those initially admitted into the process by ONPAR may obtain work authorization, but the waiting period also normally took a year and did not guarantee final approval.

The government approved and implemented a protocol for identification, referral, and attention for minors requiring international protection; however, the institutional protocol for protecting minors who migrate was pending implementation approval.

The government continued to manage camps in the Darien and Chiriqui Provinces that provide food, shelter, and medical assistance to migrants.  Conditions in the camps remained difficult.  At least one camp did not have regular access to potable

CLP_PC_024122

water and at times had unsanitary conditions due to the unprecedented increase of refugees, asylum seekers, and migrants.  Authorities reported continued migration from Brazil, Chile, Cuba, Haiti, Venezuela, as well as from South Asia and Africa. Nearly all the migrants entered by foot through the Darien Gap, a roadless expanse of jungle on the eastern border with Colombia.  International organizations reported an increase in acts of violence against migrants during their trek through the Darien Gap, including sexual assaults, robberies, and killings, prompting authorities to permanently assign three Public Ministry officials to document criminal complaints from migrants.

ONPAR did not have a permanent presence at migrant camps in the Darien region; persons who wished to request asylum had to approach the National Border Service, an international organization, or an NGO to request protection and then meet with an ONPAR representative, creating barriers to access and delays.

According to UNHCR and its NGO implementing partners, thousands of persons in the country needed international protection.  These included persons in the asylum and refugee process, persons denied refugee status, and persons who did not apply for refugee status due to lack of knowledge or fear of deportation.

**Employment:**  Refugees recognized by authorities have the right to work, but recognized refugees complained that they faced discriminatory hiring practices. To prevent such discrimination, ONPAR removed the word "refugee" from recognized refugees' identification cards.  By law ONPAR continued to assist applicants admitted to the refugee process with obtaining temporary work permits. Temporary work permits are valid for one year but may be renewed as many times as needed, until the National Commission for Refugees issues a final resolution on a case.

**Access to Basic Services:**  Education authorities sometimes denied refugees access to education and refused to issue diplomas to others if they could not present complete certified school records from their country of origin.  The Ministry of Education continued to enforce the government's 2015 decree requiring schools to accept students in the asylum process at the grade level commensurate with the applicants' prior studies.  A UNHCR survey conducted during the year found that school-age refugee children often did not have the

CLP_PC_024123

financial resources or tools to take advantage of opportunities for virtual education. As a result of the long wait times to be entered into the asylum system, many applicants encountered difficulties accessing basic services such as health care, financial services, and appropriate housing.

**Durable Solutions:**  The law allows persons legally recognized as refugees or with asylum status who have lived in the country for more than three years to seek permanent residency.

## g. Stateless Persons

The government continued to work with Colombia to recognize approximately 200 stateless persons on the border.

# Section 3. Freedom to Participate in the Political Process

The law provides citizens the ability to choose their government in free and fair periodic elections held by secret ballot based on universal and equal suffrage.  In October citizens protested against the National Assembly's proposed electoral reforms, which several members of civil society had criticized as politically motivated mechanisms that could increase corruption and clientelism.

## Elections and Political Participation

**Recent Elections:**  In May 2019 voters chose Laurentino Cortizo Cohen as president in national elections that independent observers considered generally free and fair.  Elected at the same time were national legislators, mayors, local representatives, and council members.  A group of international observers from the Organization of American States, the EU, electoral NGOs, regional electoral authorities, and the diplomatic corps considered the elections fair and transparent.

**Political Parties and Political Participation:**  The law requires new political parties to meet strict membership and organizational standards to gain official recognition and participate in national campaigns.  Political parties must obtain the equivalent of 2 percent of total votes cast to maintain legal standing.  When the year began, there were six registered political parties, but three new political movements also received the Electoral Tribunal's official recognition.  The three

CLP_PC_024124

new parties were Realizando Metas (Realizing Goals), led by former president Martinelli; Movimiento Otro Camino (Another Path Movement), led by the 2019 third runner-up, Ricardo Lombana; and Partido Alternativa Independiente Social (Alternative Social Independent Party, or PAIS), led by members of the evangelical community.

**Participation of Women and Members of Minority Groups:**  No laws limit participation of women or members of minority groups in the political process, and they did participate.

# Section 4. Corruption and Lack of Transparency in Government

The law provides criminal penalties for corruption by officials, but the government generally did not implement the law effectively.  Corruption remained a serious problem in the executive, judicial, and legislative branches as well as in the security forces.

**Corruption:**  In March the Public Ministry filed charges against 25 individuals accused of using $43 million in public funds to purchase the Editora Panama America newspaper group.  In April the Public Ministry filed charges against two former presidents, Ricardo Martinelli and Juan Carlos Varela, and three former ministers, Demetrio "Jimmy" Papadimitriu, Frank De Lima, and Jaime Ford, for corruption related to the Odebrecht case.  As of October the courts had not made a decision in either case.

In June a major scandal broke nationwide when journalists found a private clinic administering Pfizer vaccines for an alleged fee of $200.  COVID-19 vaccines (Pfizer and AstraZeneca) were solely managed – purchased, guarded, and administered – by the Ministry of Health.  In December the Public Ministry pressed criminal charges against two individuals involved in the case.  Separately, former president Ernesto Perez Balladares publicly admitted to being vaccinated prior to national availability along with 10 members of his family at his residence. Meanwhile, the rest of the country, including President Cortizo, awaited their turn as dictated by the ministry's strict guidelines on age, health conditions, and place of residence.  The Public Ministry did not open investigations into the matter or

CLP_PC_024125

file charges for abuse of authority or corruption.

Corruption and lack of accountability continued in the police force.  The public forces lacked an impartial investigative body for internal investigations.  The absence of clear standard operating procedures allowed for discretion by agents on a case-by-case basis.  The lack of periodic audits over operations to oversee efficiency, efficacy, accountability, and transparency contributed to the problem.  In September authorities arrested a corporal and two agents from the Institutional Protection Service in a counternarcotics sting that revealed a network of individuals trafficking drugs from Colombia.

As of October investigations continued in the 2020 case involving weapons and weapons-trafficking charges against more than 25 individuals, most of whom were high-level security officials during the previous government.  The charges involved the illegal distribution to the officials of legally imported weapons, some designated "weapons of war."  The Public Security Affairs Directorate, the office within the Security Ministry that regulates and licenses firearms, was associated with corruption in the past, and at least two former officer directors were facing charges, with one of them implicated in the case.  Some defendants filed legal proceedings before the Supreme Court alleging courts' restrictions to their right to defense by lower courts.  As of October the court had not ruled on the writ of mandamus.

There were no developments in the 2020 Public Ministry investigations of national government institutions allegedly overpaying for ventilators and purchasing used ventilators to treat COVID-19 patients.

## Section 5. Governmental Posture Toward International and Nongovernmental Investigation of Alleged Abuses of Human Rights

Several domestic and international human rights groups generally operated without government restriction, investigating and making public their findings on human rights cases.

**Government Human Rights Bodies:**  The ombudsman, elected by the National

CLP_PC_024126

Assembly, heads an office with legal but nonbinding authority.  The Ombudsman's Office refers cases to the proper investigating authorities and files cases before the Public Ministry.  In a national television interview in August, the ombudsman publicly complained that the government refused to dedicate sufficient resources for human rights purposes (investigations, information gathering, infrastructure, and more professional staff and training, among others.)  The Ministry of Economy and Finance reduced the 2022 Ombudsman's Office budget to $5.6 million, an amount like its 2012 budget.  The ombudsman's executive team said the reduction would diminish the entity's capacity to oversee human rights issues in the management of prisons and migrant camps; investigate reports of gender violence and discrimination against persons with disabilities, members of ethnic groups, as well as lesbian, gay, bisexual, transgender, queer, and intersex (LGBTQI+) persons; and sustain staffing of three of its 14 offices and maintain its vehicle fleet.

# Section 6. Discrimination and Societal Abuses

## Women

**Rape and Domestic Violence:**  The law criminalizes rape of men or women, including spousal rape, and stipulates prison terms of five to 10 years.  Rapes continued to constitute most sexual crimes investigated by the National Police Directorate of Judicial Investigation.  In April the Supreme Court found National Assembly member Arquesio Arias, a Guna Yala native, not guilty in both of his 2020 charges for sexual assault, alleging a "lack of evidence."  Arias was a physician in his indigenous *comarca* (a legally designated semiautonomous area) and was denounced by several Guna Yala women for sexual misconduct and abuse.  Arias returned to his legislative seat on July 1.  The law against gender violence stipulates stiff penalties for harassment, gender-based violence, and both physical and emotional abuse.  For example, the law states that sentencing for femicide is 25 to 30 years in prison, whereas penalties for other forms of homicide range from 10 to 20 years in prison.  The law was not effectively enforced.  Officials and civil society organizations agreed that domestic violence continued to be a serious problem.

As of October the Public Ministry reported 13,013 new cases of domestic violence nationwide, including 12 attempted femicides and 16 femicides.  The province of

CLP_PC_024127

Panama Oeste and the Ngabe Bugle comarca led the numbers with four femicides each, followed by the Panama Province with three cases.  In August, Panama City's deputy mayor Judy Meana pressed charges against her partner for domestic violence.  The alleged abuser was detained for several hours.  The judge released him while requiring that the accused release his passport to the court, appear before the court's office every Monday, Wednesday, and Friday, and adhere to a restraining order from Meana.  The prosecutor filed an appeal, but the judge upheld the decision.

From January through August, the National Institute for Women's Affairs continued to operate its hotline to give legal guidance to victims of domestic violence and extended its services to include mental health services for women facing stress as a result of the COVID-19 pandemic.  Hours of operation were reduced from 24/7 to 9 a.m. to 5 p.m.  due to a shortage of professional staff to support the hotline.  If a caller were at risk during the call, the operator would make a connection with the Specialized Unit for Domestic and Gender Violence within the police department.  After professional staff returned to in-person work in September, the hotline services were discontinued due to staffing limitations. The institute continued to work under a budget that did not allow for victim services and assistance.

**Sexual Harassment:**  The law prohibits sexual harassment in cases of employer-employee relations in the public and private sectors and in teacher-student relations but not between colleagues.  Violators face a maximum three-year prison sentence. The extent of the problem was difficult to determine because convictions for sexual harassment were rare, pre-employment sexual harassment was not actionable, and there was a lack of formal reports (only 16 cases had been reported as of September).

Investigations at the Public Ministry continued in the 2020 case of a National Aeronaval Service (SENAN) female pilot who filed a criminal complaint for sexual harassment against her immediate supervisor.  Both the man accused of the harassment and the victim were transferred to other departments and given new duties.  For months during the year, many restrooms for women at SENAN remained locked due to the pending case.  In these cases, women needed to obtain a key from a specific office to access their restrooms.  Restrooms for men

CLP_PC_024128

continued to be open and unlocked at all times.

**Reproductive Rights:**  There were no reports of coerced abortion or involuntary sterilization on the part of government authorities.

The law permits medical professionals to perform abortions only if the fetus, the mother, or both are in danger, or, in some very limited cases, if the pregnancy is the result of rape.

The government provided sexual and reproductive health services for survivors of sexual violence, including emergency contraception.

**Discrimination:**  The law prohibits discrimination based on gender, and women enjoyed the same legal status and rights as men, but the law was not enforced.  For example, SENAN permitted female pilots to fly only as copilots, while male newcomers with less seniority were allowed to fly as principal pilots without restrictions.  The law recognizes joint property in marriages.  The law does not mandate equal pay for men and women in equivalent jobs.  Some employers continued to request pregnancy tests, although it is an illegal hiring practice.  The law puts restrictions on women working in jobs deemed hazardous.

## Systemic Racial or Ethnic Violence and Discrimination

Minority groups were generally integrated into mainstream society.  Prejudice was directed, however, at recent legal immigrants, the Afro-Panamanian community, and indigenous Panamanians.

The Afro-Panamanian community continued to be underrepresented in governmental positions and in political and economic power.  Areas where many Afro-Panamanians lived lagged in terms of government services and social investment.  The government's National Secretariat for the Development of Afro-Panamanians focused on the socioeconomic advancement of this community.

As of August, the Ombudsman's Office had received six complaints of racism.  Five of the complaints involved the use of traditional African costumes at work sites.  The sixth report concerned a public school that barred a student's use of hair braids.  After the ombudsman contacted the school principal regarding the matter,

CLP_PC_024129

the student was allowed to attend his virtual classes in braids.

The law prohibits discrimination in access to public accommodations such as restaurants, stores, and other privately owned establishments.  Lighter-skinned individuals continued to be overrepresented in management positions and jobs that required dealing with the public, such as bank tellers and receptionists.

## Indigenous Peoples

The law affords indigenous persons the same political and legal rights as other citizens, protects their ethnic identity and native languages, and requires the government to provide bilingual literacy programs in indigenous communities. Despite the law's requirement, the government failed to assign funds necessary for completion of the bilingual literacy project.  Indigenous persons have the legal right to take part in decisions affecting their lands, cultures, traditions, and the allocation and exploitation of natural resources.  Nevertheless, they continued to be marginalized in mainstream society.  Traditional community leaders governed comarcas for five of the country's seven indigenous groups.

Several of the groups faced internal governance problems, since they either did not have legally elected authorities, or the government delayed the recognition of their duly elected authorities.  This complicated the receipt of government funds, including those allotted to combat the spread of COVID-19.  During the year the government issued an executive degree regulating elections in the Ngabe Bugle comarca, which had been on stand-by since 2017.

The government unofficially recognized eight other traditional indigenous government authorities, on the basis that these eight regions were traditionally organized indigenous settlements and territories that were excluded from the constitution when the original comarcas were designated in 1938.  The traditional government authorities are organized under a national coordinating body for indigenous affairs, the National Coordinator of Indigenous Peoples.  In August the coordinating body stated that high-level government authorities had ignored their meeting requests, which they considered discriminatory, since the government held meetings with other ethnic groups and associations.  The coordinating body also expressed concern that the government was stalling full implementation of the

CLP_PC_024130

*Indigenous Peoples Development Plan.*

Officials from various government entities continued to meet with traditional organized authorities from indigenous communities, many of whom requested recognition of their land via collective titles.  No collective land titles were granted during the year, however, and land conflicts continued to arise.  Several Embera communities in Darien Province claimed that illegal settlers continued to enter their lands during the COVID-19 pandemic, despite the nationwide movement restrictions, and that their complaints went unaddressed.  The Supreme Court of Justice ruled the Naso comarca constitutional, and the legal process for its creation was underway.  In June the Bri Bri people submitted a demand to the Supreme Court for protection of their human rights, requesting that the court overturn the denial of their application for collective title to their lands.

The Barro Blanco dam project, opposed by the Ngabe Bugle peoples, continued to operate unhindered.  There were no plans by the government to halt dam operations.

Although the law is the ultimate authority in indigenous comarcas, many indigenous peoples had not received sufficient information to understand their rights.  Additionally, due to the inadequate educational system available in the comarcas, many indigenous peoples were unaware of or failed to use available legal channels.

Societal and employment discrimination against indigenous persons was widespread.  Employers frequently denied indigenous workers basic rights provided by law, such as a minimum wage, social security benefits, termination pay, and job security.  Laborers on the country's agricultural plantations (most of whom were indigenous persons) continued to work in overcrowded and unsanitary conditions.  The Ministry of Labor conducted limited oversight of working conditions in remote areas.

Access to health care continued to be a significant problem for indigenous communities, primarily due to poor infrastructure and lack of personnel and supplies.  During the year the Embera health and sanitary infrastructure collapsed under the increased influx of migrants emerging from Colombia.  The Ngabe

CLP_PC_024131

Bugle people closed the Interamerican Highway on several occasions, demanding significant improvements to their comarca's road system.  Deficiencies in the educational system deepened at all levels during the COVID-19 pandemic.  Although the public school system remained operational through virtual education, the comarcas typically had very limited access to internet and radio signals.  These technological barriers prevented indigenous students from accessing educational opportunities.

## Children

**Birth Registration:**  The law provides citizenship for all persons born in the country, but parents of children born in remote areas sometimes had difficulty obtaining birth registration certificates.

**Child Abuse:**  Child abuse is illegal.  The law has several articles pertaining to child abuse and its penalties, which depend on the type of abuse and range from six months to 20 years' imprisonment if the abuse falls under a crime that carries a higher penalty.  Public Ministry statistics as of September reported that 3,660 children were victims of different types of abuse; the Public Ministry believed these crimes were underreported.  The Ministry of Social Development maintained a free hotline for children and adults to report child abuse and advertised it widely.  The ministry provided funding to children's shelters operated by NGOs.

In February the Women's, Children and Youth Commission of the National Assembly revealed the results of a study commissioned in 2019 of children's shelters nationwide.  The 700-page report, which was not made public but was widely discussed by legislators, allegedly revealed widespread abuse, including sexual abuse, negligence, lack of supply of medications, and administrative irregularities in the shelters investigated.  These shelters were managed by NGOs, supervised by the National Secretariat for Children, Adolescents, and Family Affairs (SENNIAF), and operated with government funding.

In late August, SENNIAF announced that between May and July, it filed eight criminal complaints for alleged abuse in shelters, in response to a legislator who alerted the media about receiving anonymous complaints detailing additional abuse cases in SENNIAF-supervised shelters.  As of September, the Public Ministry had

CLP_PC_024132

opened 27 cases, charged 13 individuals, and convicted three others.

**Child, Early, and Forced Marriage:**  The minimum legal age for marriage is 18.  The government prohibits early marriage even with parental permission.

**Sexual Exploitation of Children:**  The law prohibits the commercial sexual exploitation, sale, and offering for prostitution of children, in addition to child pornography.  Officials from the Ministry for Public Security prosecuted cases of sexual abuse of children, including within indigenous communities.  Ministry officials believed commercial sexual exploitation of children occurred, including in tourist areas in Panama City and in beach communities, although they did not keep separate statistics.  As of September, there were no cases reported nationwide of child sexual tourism.

**International Child Abductions:**  The country is a party to the 1980 Hague Convention on the Civil Aspects of International Child Abduction.  See the Department of State's *Annual Report on International Child Abduction* at https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/for-providers/legal-reports-and-data/reported-cases.html.

## Anti-Semitism

Jewish community leaders estimated there were 15,000 Jews in the country.  There were no known reports of anti-Semitic acts.

## Trafficking in Persons

See the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## Persons with Disabilities

Persons with disabilities faced difficulty accessing education, health services, public buildings, and transportation on an equal basis with others.  Government information and communication is not provided in accessible formats, and there is no law requiring such access.  The law mandates that persons with disabilities have access to education and health services, including rehabilitation and therapies,

CLP_PC_024133

public transportation, public and private buildings, sports and cultural events, and jobs without discrimination.  In practice, however, accessibility was limited.

Private schools started reopening in June, but public schools remained closed during the year due to the pandemic.  Public schools taught via the public SerTV radio and television stations.  Only occasionally did the Ministry of Education facilitate sign language interpretation for students with hearing disabilities during classes taught on television.  Schools did not address other disabilities during home and virtual schooling.

Most of Panama City's bus fleet remained wheelchair inaccessible.  Public buses in the rest of the country were small and not adapted for persons with disabilities.  The Panama City Metro elevators remained closed for most of the year, according to NGO representatives.  A lack of ramps further limited access to older stations, although Metro Line 2 had ramp access.

## HIV and AIDS Social Stigma

The law prohibits discrimination against persons with HIV and AIDS in employment and education.  Discrimination, however, continued to be common due to ignorance of the law and a lack of mechanisms for ensuring compliance.  LGBTQI+ individuals with HIV or AIDS reported mistreatment by public health-care workers.

Employees are not obligated to disclose their condition to the employer, but if they do so, the employer must keep the information confidential.  Employers may be fined for not keeping an employee's medical condition confidential.  The government was not active in preventing discrimination against persons with HIV and AIDS.

There were fewer public HIV/AIDS medical treatments and supplies available, since most medical resources were dedicated to fighting COVID-19.  The University of Guatemala funded stigma-free "friendly clinics" for LGBTQI+ COVID-19 patients, but activists reported that staff members in these clinics were not friendly to their visitors.

During the year there was only one appointment per month at the Ministry of

CLP_PC_024134

Health's facilities for the HIV viral load test.  Pregnant women who needed the test were prioritized for appointments over members of the LGBTQI+ community.

## Acts of Violence, Criminalization, and Other Abuses Based on Sexual Orientation and Gender Identity

During the COVID-19 pandemic, LGBTQI+ persons reported harassment by public-health officials, but there were no public reports of police harassment during the year.

In June, LGBTQI+ activists organized two Pride Month parades in Panama City. Early in the month, the private Museum of Liberty and Human Rights raised the Pride flag, but days later it was vandalized by a group of "profamily" and anti-same-sex marriage activists during a protest outside the museum.  Part of the museum's board decided not to raise the flag again.  As a result, five board members submitted their resignations to the board's president in protest.  The Canal Museum also raised the Pride flag but later took it down upon receiving a government request citing a law that stipulate only the Panamanian flag can be flown in government buildings.  The Canal Museum is a joint private-public venture and received public funding.

The law does not prohibit discrimination based on sexual orientation.  There was societal discrimination based on sexual orientation and gender identity, which often led to denial of employment opportunities.  Same-sex marriage continued to be prohibited by law.  As of October the Supreme Court had not ruled on the 2016 class-action lawsuit requesting the article of the family code that refers to marriage as "the union of a man and a woman," and thus forbids same-sex legal unions, be declared unconstitutional.  Panamanian same-sex couples who were married abroad were not allowed to legally register their marriage.  In September the Supreme Court did not admit a writ of mandamus filed by a local law firm against the Civil Registry's decision not to register the same-sex marriage of a Panamanian citizen and his Colombian spouse held in Colombia in 2017.

CLP_PC_024135

# Section 7. Worker Rights

## a. Freedom of Association and the Right to Collective Bargaining

The law provides for private-sector workers to form and join independent unions, bargain collectively, and conduct strikes.  Public-sector employees may organize to create a professional association to bargain collectively on behalf of its members, even though public institutions are not legally obliged to bargain with the association.  Members of the national police are the only workers prohibited from creating professional associations.  There were 14 public-worker associations registered.  The National Federation of Public Servants (FENASEP), an umbrella federation of 31 public-sector worker associations, traditionally fought to establish rights similar to those of private-sector unions.  The law prohibits antiunion discrimination and requires reinstatement of workers terminated for union activity but does not provide adequate means of protecting this right.

Unions and associations are required to register with the Ministry of Labor.  If the ministry does not respond to a private-sector union registration application within 15 calendar days, the union automatically gains legal recognition, provided the request is submitted directly with the supporting documentation required.  In the public sector, professional associations gain legal recognition automatically if the Ministry of Government does not respond to registration applications within 30 days.  According to FENASEP leaders, most associations were approved, although some cases were denied for political reasons.  According to official sources, the Ministry of Labor approved applications for the formation of two private-sector unions and one public-sector association during the year.

The law allows arbitration by mutual consent, at the request of employees or the ministry, in cases of collective disputes at privately held companies.  It allows either party to appeal if arbitration is mandated during a collective dispute at a public-service company.  The Ministry of Labor Board of Appeals and Conciliation has the authority to resolve certain labor disagreements within the private sector, such as internal union disputes, enforcement of the minimum wage, and some dismissal issues.  For example, the Ministry of Labor, as a mediator in biennial minimum wage negotiations between unions and businesses in 2019, announced a minimum wage increase of 3.3 percent when negotiations failed.

CLP_PC_024136

Government regulations on union membership place some restrictions on freedom of association.  The constitution mandates that only citizens may serve on a union's executive board.  In addition, the law requires a minimum of 40 persons to form a private-sector union (either by a company across trades or by trade across companies) and allows only one union per business establishment.  The International Labor Organization criticized the 40-person minimum as too large for workers wanting to form a union within a company.  Many domestic labor unions, as well as the public and private sectors, reiterated their support for keeping the figure at 40 individuals, since having a greater number of participants can strengthen a union's influence.

In the public sector, professional associations represent the majority of workers.  The law stipulates only one association may exist per public-sector institution and permits no more than one chapter per province.  At least 50 public servants are required to form a professional association.  No law protects the jobs of public-sector workers in the event of a strike.  FENASEP contended there was no political will to allow all public servants within ministries to form unions, because this could eliminate positions for political appointees.

The law prohibits federations and confederations from calling strikes.  Individual professional associations under FENASEP may negotiate on behalf of their members, but the Ministry of Labor can order compulsory arbitration.  According to the labor code, the majority of private-sector employees must support a strike, and strikes are permitted only if they are related to improvement of working conditions, a collective bargaining agreement, repeated violations of legal rights, or support for another workers strike on the same project (solidarity strike).  In event of a strike, at least 20 to 30 percent of the workforce must continue to provide minimum services, particularly public services defined by law as essential, such as transportation, sanitation, mail delivery, hospital care, telecommunications, and provision of necessary food.

Strikes in essential transportation services are limited to those involving public passenger services.  The law prohibits strikes by Panama Canal Authority employees but allows professional associations to organize and bargain collectively on issues such as schedules and safety and provides arbitration to resolve disputes.  The Canal Authority is an autonomous entity, independent of the

CLP_PC_024137

national government and as such is subject to its own labor regulation.

The Ministry of the Presidency Conciliation Board is responsible for resolving public-sector worker complaints.  The board refers complaints it cannot resolve to an arbitration panel, which consists of representatives from the employer, the professional association, and a third member chosen by the first two.  If the dispute cannot be resolved, it is referred to a tribunal under the board.  Observers, however, noted that the Ministry of the Presidency had not named the tribunal judges.  The alternative to the board is the civil court system, but those procedures can take more than three years and usually result in negative outcomes for the employee.  While Supreme Court decisions are final, labor organizations may appeal cases in international human rights courts.

The government did not consistently enforce the law in the formal sector and was less likely to enforce the law in most rural areas (see section 6, Indigenous Peoples).  Throughout the year the administration continued to dismiss public workers, mostly without citing a legal basis and all without paying negotiated employment benefits such as paid vacation leave or severance pay.  According to reports, these firings were due to the change in government and not the COVID-19 pandemic.  An estimated 80,000 public workers had been dismissed since the start of President Cortizo's administration in 2019.  In August FENASEP presented a lawsuit to the Supreme Court for noncompliance with Decree 466 of 2020, which prohibits employees from being fired during the state of emergency imposed due to the pandemic.  In the lawsuit FENASEP also claimed that workers were not paid for months after being called back to work during the pandemic.

The government and employers generally respected freedom of association. Penalties for violations were commensurate with those for similar offenses.

## b. Prohibition of Forced or Compulsory Labor

Although the law prohibits all forms of human trafficking, including forced labor of adults and children, the penal code stipulates that a trafficking offense must include movement, which is inconsistent with international protocols.  The law establishes criminal penalties commensurate with those for other similar serious crimes.

CLP_PC_024138

The government enforced the law in the formal sector.  The Ministry of Labor investigated human trafficking for the purpose of forced labor, granted residency and work permits for foreign trafficking victims, and provided additional food and hygiene support to trafficking victims during the pandemic.  Authorities prosecuted and convicted fewer perpetrators of labor exploitation and identified fewer potential forced labor victims, compared with previous years.  In July the Public Ministry sentenced a person to 23 years in prison for the crimes of trafficking in persons (sexual servitude), kidnapping, and extortion.  The convicted person was also disqualified from exercising public functions for five years after completing the prison term.

Forced labor occurred, mainly with sexual exploitation of adults and children.  Labor traffickers reported using debt bondage, false promises, exploitation of migratory status, lack of knowledge of the refugee process and irregular status, restrictions on movement, and other indicators of forced labor.  Migrant workers without work permits were vulnerable to forced labor.  There also were reports of forced child labor (see section 7.c.).

Also see the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## c. Prohibition of Child Labor and Minimum Age for Employment

The law prohibits all the worst forms of child labor.  Minors younger than 16 may work no more than six hours per day or 36 hours per week, while children ages 16 and 17 may work no more than seven hours per day or 42 hours per week.  Children younger than 18 may not work between 6 p.m. and 8 a.m.  The law prohibits employment of children younger than 14, and children who have not completed primary school may not begin work until 15.  The law allows children ages 12 to 15 to perform light work in agriculture if the work is outside regular school hours.  The law also allows a child older than 12 to perform light domestic work and stipulates that employers must ensure the child attends school through primary school.  The law neither defines the type of light work children may perform nor limits the total number of light domestic work hours children may perform.  The law prohibits children younger than 18 from engaging in hazardous work but allows children as young as 14 to perform hazardous tasks in a work-

CLP_PC_024139

training facility, in violation of international standards.

The government inconsistently enforced the law; criminal penalties were commensurate with those for similar crimes but were not enforced in all sectors. Children were exploited in forced labor, particularly domestic servitude, and subjected to sex trafficking and sexual exploitation.  After the government prosecuted and convicted its first child-labor case in September 2020, it started investigating a second case and provided social services to 1,500 child victims and children at risk of child labor.

Child labor occurred.  According to the observations of a well known NGO on child labor, before the pandemic, child labor was centered in the agricultural sector, but pandemic movement restrictions forced children and adolescents to also become street vendors in urban areas.  Children worked in agriculture, where they could be subjected to hazardous work.  Children from indigenous and Afro-descendent communities were most vulnerable to the worst forms of child labor.

Also see the Department of Labor's *Findings on the Worst Forms of Child Labor* at https://www.dol.gov/agencies/ilab/resources/reports/child-labor/findings and the Department of Labor's *List of Goods Produced by Child Labor or Forced Labor* at https://www.dol.gov/agencies/ilab/reports/child-labor/list-of-goods.

## d. Discrimination with Respect to Employment and Occupation

The law prohibits discrimination based on race, sex, religion, political opinion, citizenship, disability, social status, and HIV status.  The law does not prohibit discrimination based on sexual orientation or gender identity.  Although the country is a member of the International Equal Pay Coalition, which promotes pay parity between women and men, a gender wage gap continued to exist, and no law mandates equal pay for equal work.  The law puts restrictions on women working in jobs deemed hazardous.

The government did not effectively enforce the law, and penalties were not commensurate with those for similar crimes.  Despite legal protections, discrimination in employment and occupation occurred with respect to race, sex, disability, and HIV-positive status.  During the job interview process, applicants, both citizens and noncitizens, must complete medical examinations, including

CLP_PC_024140

HIV/AIDS testing.  The law requires all laboratories to inform applicants that an HIV test will be administered, but private-sector laboratories often did not comply. It was common practice for private-sector human resources offices to terminate applications of HIV-positive citizens without informing the applicant.  While private laboratories often informed law enforcement of HIV-positive migrants, the National Migration Service did not engage in deportation procedures based specifically on a migrant's HIV status.  NGOs noted that during job interviews, women were often asked if they were married, pregnant, or planned to have children.  It was common practice for human resources offices to terminate the applications of women who indicated a possibility of pregnancy in the near future (see section 6, Women).  Persons with disabilities continued to face discrimination in hiring and accessing the workspace.

## e. Acceptable Conditions of Work

**Wage and Hour Laws:**  The law provides for a national minimum wage only for private-sector workers.  The wage was above the poverty line.  Public servants received lower wages than their private-sector counterparts, but salaries were above the poverty line.  Most workers formally employed in urban areas earned the minimum wage or more.  According to some reports, the pandemic eliminated as much as 50 percent of formal jobs in the private sector.

The law establishes a standard workweek of 48 hours, provides for at least one 24-hour rest period weekly, limits the number of hours worked per week, provides for premium pay for overtime, and prohibits compulsory overtime.  There is no annual limit on the total number of overtime hours allowed.  If employees work more than three hours of overtime in one day or more than nine overtime hours in a week, excess overtime hours must be paid at an additional 75 percent above the normal wage.  Workers have the right to 30 days of paid vacation for every 11 months of continuous work, including those who do not work full time.

**Occupational Safety and Health:**  The Ministry of Labor is responsible for setting health and safety standards.  Standards were generally current and appropriate for the industries in the country.  The law requires employers to provide a safe workplace environment, including the provision of protective clothing and equipment for workers.  Equipment was often outdated, broken, or

CLP_PC_024141

lacking safety devices, due in large part to fear that replacement costs would be prohibitive.  After the beginning of the pandemic, all workplaces were required to establish a health committee to enforce the mandatory health standards established by the Ministry of Health.

The Ministry of Labor generally enforced the law in the formal sector.  The inspection office consists of two groups:  the Panama City-based headquarters group and the regional group.  The number of inspectors and safety officers was sufficient to enforce wage, hour, and safety regulations adequately in the formal sector.  As of September, the ministry conducted 8,551 safety inspections, an increase of 110 percent from the same period in 2020.  Penalties were not commensurate with those for similar violations.  Employers often hired employees under short-term contracts to avoid paying benefits that accrue to long-term employees.  Employers in the maritime sector also commonly hired workers continuously on short-term contracts but did not convert them to permanent employees as required by law.  The law states that employers have the right to dismiss any employee without cause during the two-year tenure term.  As a result, employers frequently hired workers for one year and 11 months and subsequently dismissed them to circumvent laws that make firing employees more difficult after two years of employment.  This practice is illegal if the same employee is rehired as a temporary worker after being dismissed, although employees rarely reported the practice.

In workplaces 83 accidents were registered.  Construction was the most dangerous sector for workplace accidents, accounting for 82 percent of all accidents registered.  In some cases, equipment was outdated, broken, or lacking safety devices, and in other cases the employee failed to wear appropriate personal protective equipment.  In February a construction worker died after falling from the 26th floor of a building under construction.  The Public Ministry is charged with investigating these incidents.  The most hazardous sectors were construction, agriculture, and mining.

**Informal Sector:**  According to official sources, in September 2020, 53 percent of the working population worked in the informal sector, and some earned well below the minimum wage.  The informal sector grew substantially over the past two years due to massive job dismissals in the formal sector because of the COVID-19

CLP_PC_024142

pandemic.

In August 2020 the government reformed the law to promote the creation and development of micro, small, and medium-sized enterprises.  These reforms assisted the National Authority for Micro, Small, and Medium Sized Businesses to institute policies to help formalize the economy, including the creation of soft loans and policies to help employers pay required social security fees to employees.

CLP_PC_024143

# PUBLIC SUBMISSION

**As of:** May 08, 2023
**Received:** March 27, 2023
**Status:** Posted
**Posted:** March 29, 2023
**Tracking No.** lfr-eg5p-zvje
**Comments Due:** March 27, 2023
**Submission Type:** Web

**Docket:** USCIS-2022-0016
Circumvention of Lawful Pathways

**Comment On:** USCIS-2022-0016-0001
Circumvention of Lawful Pathways

**Document:** USCIS-2022-0016-12324
Comment Submitted by International Refugee Assistance Project

---

## Submitter Information

**Email:** asiddiqi@refugeerights.org
**Organization:** International Refugee Assistance Project

---

## General Comment

Please see the attached. The International Refugee Assistance Project (IRAP) submits this comment in opposition to the Department of Homeland Security (DHS) and Department of Justice (DOJ)'s Notice of Proposed Rulemaking and Request for Comment on Circumvention of Lawful Pathways, CIS No. 2736-22, Docket No: USCIS 2022-0016, A.G. Order No. 5605-2023, 88 Fed. Reg. 11704, published in the Federal Register on February 23, 2023.

IRAP strongly opposes all aspects of the NPRM except for its proposed rescission of the prior rules establishing bars to asylum that are currently subject to court orders. IRAP urges the administration not to finalize this NPRM with the exception of the rescission of the Trump-era rules, and to stop punishing refugees who enter at the U.S. southern border. Instead, the administration must devote resources to humane asylum processing and just adjudications. IRAP welcomes the opportunity to discuss this Comment with you further. If you have any questions, please reach out to Sunil Varghese at policy@refugeerights.org.

---

## Attachments

IRAP Comment - Circumvention of Lawful Pathways Proposed Rule



**IRAP**

International Refugee
Assistance Project

March 27, 2023

*Submitted via: https://www.regulations.gov.*

Daniel Delgado
Acting Director
Border and Immigration Policy
Office of Strategy, Policy, and Plans
U.S. Dep't of Homeland Security
telephone (202) 447-3459

Lauren Alder Reid
Assistant Director,
Office of Policy, EOIR
U.S. Dep't of Justice
telephone (703) 305-0289

### Re: Notice of Proposed Rulemaking and Request for Comment on Circumvention of Lawful Pathways

Dear Acting Director Daniel Delgado and Assistant Director Lauren Alder Reid:

The International Refugee Assistance Project (IRAP) respectfully submits this comment in opposition to the Department of Homeland Security (DHS) and Department of Justice (DOJ)'s Notice of Proposed Rulemaking and Request for Comment on Circumvention of Lawful Pathways, **CIS No. 2736-22, Docket No: USCIS 2022-0016, A.G. Order No. 5605-2023, 88 Fed. Reg. 11704** ("the NPRM" or "the Proposed Rule"), published in the Federal Register on February 23, 2023.

IRAP strongly opposes all aspects of the NPRM except for its proposed rescission of the prior rules establishing bars to asylum that are currently subject to court orders.  *See* 88 Fed. Reg. 11727-28.

### The International Refugee Assistance Project and its Interest in the Issue

The International Refugee Assistance Project (IRAP) provides comprehensive legal services to refugees and displaced persons. Since our establishment, we have provided legal assistance to thousands of displaced persons seeking legal pathways from conflict zones to safe countries.

CLP_PC_031201



**IRAP**

International Refugee
Assistance Project

IRAP's goal is to ensure that available services and legal protections go to those who are most in need. Our clients include LGBTI individuals, religious minorities subject to targeted violence, survivors of sexual and gender-based violence, children with medical emergencies for which local treatment is not available, and interpreters being targeted by the Islamic State, militias, and the Taliban in retaliation for their work with the United States and NATO.

Of particular relevance to the NPRM, IRAP works with Derechos Humanos Integrados en Acción (DHIA), a Mexican non-governmental organization, to provide daily services to migrants in Ciudad Juárez seeking legal information and representation. Until January 2023 and the rollout of the CBP One application, IRAP represented individual clients in Ciudad Juárez seeking to enter the United States via Title 42 Exemptions. IRAP continues to provide legal information and assistance to migrants in Ciudad Juárez who are struggling to use CBP One, amid the application's many glitches and complications. IRAP also screens clients for eligibility for other pathways to enter the United States and provides legal representation as appropriate.  Finally, IRAP intends to provide clients with legal advice and legal information about how to lawfully enter the United States to seek asylum after Title 42's anticipated end in May 2023.

**The Agencies' Notice of Proposed Rulemaking**

The agencies propose to create substantial barriers to many, if not most, asylum seekers' ability to access the U.S. asylum system enshrined in statute by Congress. In general, all refugees seeking to enter the United States by land at the southern border with Mexico would be presumed ineligible to seek asylum unless they could demonstrate, to the government's satisfaction, that they had applied for and been denied asylum in one of the countries they transited through, or they were successful in making an appointment to present themselves at a port of entry using the CBPOne application.[1]  *See* 88 Fed. Reg. 11704.  Only a "narrow set" of refugees who seek to present themselves at a port of entry but are unable to make an appointment using CBPOne due to "serious obstacle[s]" such as "illiteracy", would

---

[1] While much of the agencies' discussion concerns the existence of the parole programs for certain migrants from Cuba, Haiti, Nicaragua, and Venezuela ("CHNV parole programs"), those programs require accepted individuals to fly into the United States, 88 Fed. Reg. 1249-1250 (2023), and so by definition, do not provide protection to refugees who seek to enter the United States by land.

CLP_PC_031202



**IRAP**
International Refugee
Assistance Project

be exempt from the presumption.[2]  *Id.* at 11723 & n.173.  Unaccompanied minors would also be exempt from the presumption.  *Id.* at 11707.

For refugees subject to the presumption, all are to be presumed ineligible for asylum in the United States unless they can "demonstrat[e] exceptionally compelling circumstances," such as an "[a]cute medical emergency," "an imminent and extreme threat to their life or safety," or that they were a victim of "a severe form of trafficking."  *Id.* at 11723.  They bear the burden to prove such circumstances by a preponderance of the evidence.  *Id.*  This showing must be made both at the beginning of the credible fear interview (CFI) before an asylum officer, and, for those cases that are permitted to proceed to affirmative or defensive asylum application merits proceedings, before the adjudicator considering the merits.  *Id.* at 11707.

In addition, for asylum seekers who are barred from asylum under the presumption, the rule would heighten the legal standard they must meet to demonstrate that they may be entitled to protection under the Convention Against Torture or withholding of removal.  Specifically, such individuals must demonstrate a "reasonable possibility" that they will suffer persecution or torture at the CFI screening, rather than a "significant possibility," to be placed in removal proceedings.  *Id.* at 11742.  In addition, under the NPRM, negative CFI determinations of individuals subjected to the ban will be reviewed by an immigration judge only at the express request of the individual, no longer as a matter of course.  *Id.* at 11744.

The agencies identify several purposes that they state motivate their proposed rule, specifically: (1) an anticipated "unmanageable flow of migrants" at the U.S. southern border when the Title 42 restrictions are lifted, and as a result, a concern that federal and local border infrastructure will be overwhelmed and immigration court backlogs will grow; (2) a concern about "putting migrants' lives at risk" by policies that incentivize the use of smugglers and human traffickers to cross the border; (3) a concern that increasing existing immigration backlogs harm individuals with "meritorious" claims by delaying positive resolution of their cases and reward

---

[2] The NPRM does not explain the circumstances under which such individuals would be permitted to enter at a port of entry, and so presumably it contemplates that such individuals would have no choice but to enter without inspection between ports of entry.

CLP_PC_031203



**IRAP**
International Refugee
Assistance Project

individuals with "non-meritorious" claims who are able to remain in the United States while their cases are pending; and (4) a desire to urge migrants "to seek protection in third countries in the region." *Id.* at 11705, 11707, 11737.

The agencies state that they are proposing a "temporary" 2-year rule, but are soliciting comments on whether the rule should be in place for more or less time; they intend to have their new regulatory regime in place when Title 42 ends; and they may rely on an interim final rulemaking while the notice and comment rulemaking process is underway. *Id.* at 11727.

IRAP opposes the NPRM on the following grounds:

**IRAP's Opposition to the NPRM**

### I.      The Agencies Have Failed to Adequately Explain Their Reasoning

The NPRM rests on several explicit or implicit premises, which are not sufficiently explained or supported by the evidence the agencies have identified.

### a.  The Agencies Have Not Adequately Explained Their Basis for Believing that a "Surge" in Border Crossings is Imminent

First, the NPRM rests on the premise that the end of Title 42 will lead to an "unmanageable flow of migrants'' at the southern border that will overwhelm the federal government's ability to "safely, humanely, and efficiently administer the immigration system, including the asylum system." *Id.* at 11707, 11729.  The agencies do not, however, provide data showing that the federal government is *currently* overwhelmed, notwithstanding the NPRM's repeated discussion of historically high rates of border encounters by the agencies.  Rather, they cite internal government data that the agencies say shows some CBP facilities were at or over capacity earlier this fiscal year. *Id*. at 11714. But the agencies concede that their data is from before the Cuba, Haiti, and Nicaragua parole programs went into effect, and they say these programs were highly "success[ful]" in reducing the number of individuals seeking to enter the U.S., *id.* at 11711.  As such, it is not at all clear whether any CBP facilities are currently at capacity.

CLP_PC_031204



**IRAP**
International Refugee
Assistance Project

To predict what may happen in the future, the agencies rely on a single internal projection by DHS, finding that "encounter numbers *may* increase to 11,000-13,000 per day" when Title 42 ends, absent policy changes.  *Id.* at 11728-29 & n.189 (emphasis added) (citing "DHS Post-Title 42 Planning Model generated on January 6, 2023"); *see also id.* 11705, 11731, 11746.  But this projection also relies on data from before the CHNV parole programs went into effect, such that it does not reflect the government's current capacity with far fewer people seeking to enter the United States.  Moreover, the agencies provide no information about the data or assumptions DHS relied upon in making its projection, as would be necessary to allow commenters to assess the validity of the projection.  Nor do the agencies identify all the outputs generated by the DHS Post-Title 42 Planning Model; they concede that the 11,000-13,000 number is in the "upper bounds" of the model's outputs, *id.* at 11705 n.11 & 11706, but they fail to provide the other predictions the model made that would allow the public to consider reasonable alternatives.

In short, the agencies do not sufficiently identify the problem the NPRM purports to solve.  The explanation of why the federal government will be unable to meet the demands placed on it in the immediate aftermath of Title 42 lifting absent this new policy proposal is noticeably lacking.  The agencies' failure is particularly striking given that they justify the NPRM as a "temporary" measure that is specifically designed to respond to a "unique" time-limited situation.  *Id.* at 11730.

### b.  The Agencies Have Not Adequately Explained their Basis for Believing that Viable Alternatives Exist for Asylum Seekers

#### i.  CHNV Parole Programs

The NPRM rests on the premise that refugees seeking protection from persecution have viable alternatives to entering the United States without inspection.  The agencies concede that a deterrence-only policy is not sufficient to meet their goals, and providing "lawful processes for individuals who intend to migrate" is a "critical component to reducing migratory flows."  *Id.* at 11713.  To that end, the agencies describe three different processes, incorrectly assuming each is a viable alternative for asylum seekers without sufficient explanation.

CLP_PC_031205



**IRAP**

International Refugee
Assistance Project

First, the agencies identify the CHNV parole programs as one "lawful pathway" refugees can use in lieu of approaching the southern border by land.  At the threshold, those pathways are limited to nationals of four countries.  Moreover, as the agencies recognize, those pathways are limited to individuals who have a passport, have a financial sponsor in the United States, and are able to pay for their airfare to the United States.  In short, the design of the parole pathways all but ensures that the most vulnerable refugees, forced to flee without time to prepare documents and resources, are categorically excluded.  Finally, even with respect to those who are able to qualify for the program, the agencies offer no information as to how many applicants have applied and how quickly the monthly cap of 30,000 individuals from all four countries has been filled.

Notably, the agencies state that Venezuelan, Nicaraguan, and Cuban nationals are expected to comprise a "significant part" of the increased number of individuals seeking to cross the border after Title 42 ends.  *See id.* at 11731; *see also id.* at 11712. In doing so, they essentially concede that the parole programs—specific to these nationals—are insufficient to meet their need for refuge in the United States.

### ii.  The Agencies Have Not Adequately Explained Their Basis for Believing that Asylum is Meaningfully Available in Transit Countries

The agencies also assume that seeking asylum in a transit country is a viable option for many refugees.  The agencies' data fails to support their assumption.  In particular, the agencies focus on the increasing number of asylum applications *received* in Mexico and Costa Rica, *see id.* at 11721-22, but not on whether those applications result in access to meaningful protection in those countries for individuals who need it.

For example, with respect to Mexico—the country through which all individuals will necessarily transit if they are approaching the southern border by land—the agencies rely on media accounts to suggest that most of the refugee cases filed in 2021 were approved, *see id.* at 11721 n.145.  But the Mexican government's publicly available data shows otherwise:  Mexico's overburdened asylum system has too few resources to meet the current demand for its services and its backlog is rapidly

CLP_PC_031206



**IRAP**

International Refugee
Assistance Project

growing.[3] The Mexican Commission for Refugee Assistance (COMAR) limited staffing and geographic presence mean that many refugees are simply unable to access it. And Mexico requires individuals to apply for asylum within 30 days of their entry to the country, so if individuals are unable to quickly access the system, they will be barred through no fault of their own.

### iii. The Agencies Have Not Adequately Explained Their Basis for Believing that CBP One Is a Functional System That Will Enable Asylum Seekers to Access the Border

Finally, the agencies assume that CBP One is or will be a meaningful mechanism by which asylum seekers can access the southern border. *See id.* at 11707. But CBP One was designed for a much narrower purpose and it has repeatedly failed in the face of the new demands placed on it.[4] Technological problems that refugees have encountered when trying to use CBP One have been well-documented and include issues such as the lack of proper functionality for people with darker skin tones.[5] But the NPRM myopically fails to address any of the issues currently plaguing CBP One, incorrectly assuming that most migrants have smartphones, third parties can assist migrants in accessing CBP One, and the "very narrow" exception for individuals who are unable to accept the app for specific reasons cures any remaining concerns. *See id.* at 11720, 11723 n.173.

Moreover, among the current problems with CBP is the extremely limited number of appointments available each day. While the agencies vaguely assert that the government will "expand implementation" of the application after Title 42 is lifted, they fail to provide any information related to the number of appointments that they will make available each day, as would be necessary to enable commenters to the NPRM to assess whether appointments will even begin to meet the need.

---

[3] A detailed discussion on this issue based, in part, on data obtained from the Mexican Commission for Refugee Assistance (COMAR) follows below in Section III.f.

[4] An in-depth discussion of the inadequacies of CBP One follows below in Section III.f.

[5] *See e.g.*, "CBP One Is Riddled With Flaws That Make the App Inaccessible to Many Asylum Seekers," Immigration Impact, American Immigration Council, February 28, 2023, available at: https://immigrationimpact.com/2023/02/28/cbp-one-app-flaws-asylum-seekers/.

CLP_PC_031207



**IRAP**
International Refugee
Assistance Project

Despite vague statements that narrow categories of people who are unable to access or use CBP One,[6] the NPRM provides no process or explanation on how these individuals would access a port of entry without an appointment. *See id.* at 11720. Based on IRAP's observations of the current implementation of CBP One, they cannot. This virtually guarantees that asylum seekers who cannot access CBP One will have no choice but to enter without inspection between ports of entry, likely with the assistance of smugglers, and putting themselves at grave risk.  This outcome runs expressly counter to the agencies' stated goals of increasing the safety of migrants, reducing their dependence on smugglers, and reducing the number of people entering between ports of entry given the associated strain on limited CBP resources.

### c.  The Agencies Have Not Adequately Explained Their About-Face on Legal Standards

The NPRM is premised on the idea that the vast majority of asylum claims are not meritorious, *and* that those cases can be effectively weeded out at the threshold of the process by imposing more stringent standards – for example, by requiring asylum seekers subjected to the ban to prove that they fear a "reasonable possibility" of persecution or torture.  But as the government recently recognized in the context of the Credible Fear and Asylum Processing Interim Final Rule, the higher standard is not effective at screening out "non-meritorious" claims.  *Id.* at 11746 (citing 87 FR 18078, 18092).  The government's abrupt about-face today is not based on new data, but rather the lack of evidence that the reasonable probability standard is *not* effective in the context in which it is currently used, *see id.* at 11746-47 (information available when the government made its prior determination).

Moreover, the agencies' premise runs counter to IRAP's extensive experience representing and assisting asylum seekers at the U.S. southern border.  Based on IRAP's experience, we believe that asylum seekers who would ultimately prevail on the merits will be screened out by the NPRM's asylum ban.  To take an illustrative client example: a Salvadoran woman who has been a victim of rape repeatedly in

---

[6] "due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle" will be exempted from the rebuttable presumption if they arrive at ports of entry without an appointment,

CLP_PC_031208



**IRAP**
International Refugee
Assistance Project

Mexico by gangs because of her family relationships, whom Mexican authorities have been unwilling to assist, and who had been in hiding for 6 months prior to entering the U.S. because she could not safely travel to the U.S.-Mexico border until mere days prior to her entry.[7] Under current law, this client would not be barred from asylum because of the dangers she faced in Mexico, whether she applied for and received asylum or any other status in the United States.[8]  However, under the NPRM, if she is unable to access an appointment through CBP One – as has been the case for most of IRAP's clients – this same woman is unlikely to meet the requirement of an "imminent and extreme" threat to life and safety if she were to attempt to access asylum at the U.S.-Mexico border because she had been in hiding for six months and therefore the threat may not be "imminent" under the NPRM. *See id.* at 11707 n.27 (the "imminent" requirement cannot be satisfied by "a prior threat that no longer poses an immediate threat").  And so, if the NPRM becomes law, this woman would be denied the chance to even present an asylum claim that today she would likely win.

## II.     The Agencies' Stated Purposes are Not Reasonably Related to the Results of the Proposed Rule

Among the goals the agencies identified in promulgating the NPRM were to promote the safety of migrants and lessen reliance on smugglers across the border and maximize government capacity, which they say is strained when CBP must search for individuals between ports of entry.  But the rule is all but certain to ensure that migrants who would otherwise seek to present themselves at a port of entry will have no choice but to cross between ports when they are unable to make an appointment using CBP One.  This will increase reliance on smugglers, and greatly increase the risks to migrants.  And CBP will, according to the agencies, need to divert resources away from processing at ports of entry to patrolling between ports of entry.

Another of the goals identified by the agencies is to increase the percentage of "meritorious" asylum claims.  While IRAP strongly disputes the agencies' premise for

---

[7] These facts are representative of fact patterns that IRAP has seen present in our clients' cases but have been edited in their details to avoid directly identifying any particular client.

[8]  *See* 8 C.F.R. § 208.15(b) for the standard for the firm resettlement bar to asylum.

CLP_PC_031209



**IRAP**
International Refugee
Assistance Project

the reasons described, *supra*, even if the goal were valid, the agencies' NPRM is designed to have the opposite effect. Specifically, the NPRM privileges asylum seekers who have applied for asylum *and been denied* in another country. Such individuals will not be subject to the asylum ban, while nearly all other asylum seekers at the border will be banned. As a result, and given the design and purpose of the NPRM, individuals who have been denied asylum elsewhere will be much more likely to have their asylum cases adjudicated on the merits. While many of these individuals likely will ultimately prevail in U.S. courts even if they were unsuccessful in other countries, the likely result of this rule privileging claims already denied in other countries over claims that have not been previously adjudicated will be an *increase* in the portion of claims the U.S. government finds "non-meritorious."

### III. The Agencies Have Failed to Consider the Full Impact of the NPRM

#### a. The NPRM is contrary to Congress's intent when it created the current asylum system

Congress intentionally designed the asylum system to create a minimal burden at the initial, rapid screening stage. In May 1939, the *St. Louis* sailed from Germany carrying over 900 predominantly Jewish refugees in search of safety. The United States did not allow the passengers to land. According to the Holocaust Memorial Museum, 254 passengers aboard the ship turned away from our shores were killed in the Holocaust.

In 1948, a collection of nations riddled with shock and guilt over all that had transpired and animated by the promise of "never again" drafted the Universal Declaration of Human Rights. Among them, Articles 13 and 14 state plainly and powerfully that "everyone has the right to freedom of movement and residence within the borders of each State," the "right to leave any country, including his own" and the corresponding right "to seek and to enjoy in other countries asylum from persecution."[9]

---

[9] Universal Declaration of Human Rights, Articles 13-14 (1948).

CLP_PC_031210



**IRAP**
International Refugee
Assistance Project

In 1951, the United Nations Conference of Plenipotentiaries on the Status of Refugees and Stateless Persons took place and convening parties drafted and signed the Convention relating to the Status of Refugees. With pen to paper guided by the horrors of the persecution of Jewish, LGBTQIA+, Roma, disabled, and countless other persons, the participating drafters produced the following definition of a refugee:

> Any person who as a result of events occurring before 1 January 1951 and owing to a well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country; or who, not having a nationality and being outside the country of his former habitual residence as a result of such events, is unable or, owing to such fear, is unwilling to return to it.

In 1967, the temporal and geographical limitations of the Convention's definition were removed in recognition of the unfortunate reality that the mass displacement and persecution of the Holocaust and World War II would not remain a singular aberration in human history. The United States ratified the 1967 protocol, binding us to this centerpiece of international refugee protection.

Finally, and most relevantly, in 1980, the United States enshrined the international law refugee definition into its domestic law by passing the Refugee Act of 1980. As a result, under U.S. law, a person seeking asylum would henceforth be expected to meet the refugee definition and, crucially, could do so by arriving at the border and asking to be screened at a port of entry *or* by entering without prior inspection and then declaring their fear of persecution.

All of this brings us to 2023. For all of the ways this NPRM emphasizes the importance of "lawful" pathways, it at best misses and at worst intentionally seeks to undo the fact that in both international and domestic U.S. law, asylum itself is a lawful pathway—and one that already has an extensive body of law composed of statutes, case law, and regulations. Moreover, the manner of entry is "only one of a number of factors which should be balanced in exercising discretion [to grant asylum], and the weight accorded to this factor may vary depending on the facts of

CLP_PC_031211



**IRAP**
International Refugee
Assistance Project

a particular case" as held by the Board of Immigration Appeals, explicitly withdrawing previous precedent "insofar as it suggests that the circumvention of *orderly* refugee procedures alone is sufficient to require the most unusual showing of countervailing equities."[10] The NPRM falls short of the Department of Justice's own precedent, short of U.S. domestic law, short of our international obligations, and well short of the promise to 'never again' be complicit in acts like turning away the passengers of the *St. Louis*. The U.S. Government cannot cite efficiency and order to justify the abrogation of the rights of individuals fleeing persecution to seek asylum.

> **b. The agencies failed to consider that the CHNV parole programs are inaccessible to many, if not most, refugees**

The Proposed Rule incorrectly assumes that CHNV parole processes are a viable pathway for individuals to lawfully enter the United States to pursue their asylum claims. These parole processes have requirements that are often incongruent with the lived reality of most refugees. For example, the requirement for a valid, unexpired passport alone already disqualifies a significant percentage of refugees. Although there are some carve-outs for expired Venezuelan passports, the need for exceptions only proves that the reality of migration and the experiences that lead people to need to seek asylum are incompatible with such documentation requirements. In January 2023, IRAP spoke with numerous Haitian nationals who were interested in pursuing the parole program but realized they were not eligible because they did not have passports and could not obtain passports due to the same fears and security risks that had driven them to flee and seek asylum in the first place.

The nationality-specific programs referenced above also require a sponsor residing in the United States. This requirement is unrealistic and unrelated to the fact that individuals seeking asylum are facing dangers and threats to their safety, and only serves to impose another bar that would disqualify countless people. The agencies suggest that these pathways increase the accessibility of humanitarian protection but by including a financial sponsorship component, the agencies are creating a

---

[10] *Matter of Pula*, 19 I&N Dec. 467, 473 (BIA 1987) (distinguishing and withdrawing from *Matter of Salim*) (emphasis added).

CLP_PC_031212



**International Refugee
Assistance Project**

class and resource stratification as to who receives refugee protection in the United States. Moreover, the tie back to sponsors already residing in the United States perpetuates the existing inequities in who is able to get to the United States, who is able to successfully navigate the legal system of seeking asylum, and who is able to reach the financial stability required by this sponsorship component. Whether in terms of language access, financial resources, access to counsel, or many other facets, there is no way in which such reliance upon the CHNV parole processes is going to "increase accessibility" to anything for anyone in an equitable way.

### c.  The agencies failed to adequately consider the substantial accessibility issues plaguing CBP One

The NPRM provides that the asylum ban will not apply to noncitizens who demonstrate that they were unable to access the CBP One application for specific reasons. *See* 88 FR 11704, 11720. The NPRM is silent, however, on how an individual would demonstrate such inaccessibility and how an adjudicator would determine whether it was "truly not possible" for the individual to access or use the application.

The NPRM also fails to explain how individuals seeking an exception from the asylum ban would actually be processed upon presenting at a Port Of Entry (POE). While the NPRM's text strongly suggests that such individuals will be turned away from ports of entry and left with no choice but to enter without inspection, the NPRM's text fails to make this explicit.  The NPRM contemplates that the exception analysis will be done at the CFI stage (as well as at the merits stage), but it fails to consider the practicality of this approach.  Are translators readily available for those with language barriers whom the NPRM specifically contemplates will be covered by the exception?  Will individuals be forced to linger in CBP detention while interpreters for indigenous languages are found?  Does an individual qualify for the exception if they do not have a phone/smart device? The Proposed Rule fails to address any of these important questions.

Simply put, CBP One lacks the technological capacity necessary for the widespread use envisioned by the NPRM, let alone play its role as asylum gatekeeper at the border, as envisioned in the NPRM.  CBP One was "not created for the purposes of data collection," but to bring overlapping CBP services together on different CBP

CLP_PC_031213



**IRAP**
International Refugee
Assistance Project

mobile apps.[11] For instance, documents obtained by the American Immigration Council ("AIC") show that, when announcing the CBP One's official launch, CBP noted the app's "limited capabilities" - those being its narrow abilities to be utilized for the Form I-94 and to make appointments scheduling inspections of perishable cargo. *Id.* AIC's documents also show that the original plans of the application (the "Capability Roadmap") did not include its use for processing individuals at ports of entry. *Id.* The limited purposes for which CBP One was intended and designed compared to the purposes proposed in the NPRM justifiably cause alarm.

Perhaps unsurprisingly given its origins, individuals attempting to use CBP One are already encountering significant issues that prevent them from accessing the border.[12] IRAP's clients and communities we serve at the border in Ciudad Juárez have reported many technical issues, including error messages (appearing in English regardless of the language selected for CBP One access), frequent need to change the password and update the application, the application crashing unexpectedly, inability to upload files, and issues with facial recognition, especially for people with darker skin tones.  These discriminatory and technological issues have made it extremely difficult, if not impossible, for at-risk asylum seekers to complete the registration process.

IRAP staff at the border have directly witnessed the technical failures of the application. For example, members of a Venezuelan family with darker skin were unable to complete their registration because CBP One's facial recognition did not pick up the image of all three family members (father, mother, and child).  The family experienced persecution in Venezuela and were forced to flee after the child was shot and severely injured.  While in Mexico, the mother was kidnapped and

---

[11]American Immigration Council. Government Documents Reveal Information about the Development of the CBP One App. February 28, 2023 (https://www.americanimmigrationcouncil.org/FOIA/government-documents-reveal-information-about-development-cbp-one-app).

[12] *See, e.g.,* Melissa del Bosque. "Facing Bias: CBP's Immigration App Doesn't Recognize Black Faces, Barring Thousands from Seeking Asylum," *The Border Chronicle*, February 7, 2023 (https://www.theborderchronicle.com/p/facing-bias-cbps-immigration-app); "U.S. Border Protection App Causes Tech Headaches for Asylum  Seekers," February 1, 2023 (https://www.marketplace.org/shows/marketplace-tech/u-s-border-protection-app-causes-tech-headaches-for-asylum-seekers/).

CLP_PC_031214



sexually assaulted, and the child has been unable to receive medical treatment for the gunshot injury.  The family has been unable to obtain an appointment since the app was rolled out and continues to wait in dangerous conditions in Mexico despite months of efforts to enter the United States lawfully. *Id.*

Notably, the CBP One system does not account for the amount of time that a person has been waiting to access the port of entry, or the number of times that they have tried and failed to obtain an appointment. Rather, CBP One is a roulette system where vulnerable migrants must rush to their mobile phones every day once the system opens at 11:00 a.m. EST and test their luck by trying to obtain an appointment.[13]  Due to the very limited number of appointments available, only a limited number of lucky individuals (or bots) receive an appointment and therefore the opportunity to enter the United States.

CBP One's appointment process also fails to take into account the vulnerability of the migrant and the urgency of their need to access the port of entry. In order to make an appointment, a person must certify that they or someone traveling with them meets the broad vulnerability criteria, which include: physical or mental illness, disability, no access to safe shelter in Mexico, or having been threatened or harmed while in Mexico.  The application does not ask for any details about vulnerabilities, and there is no opportunity for anyone to provide such detail via the app.  As a result, CBP One is incapable of prioritizing the scheduling of cases based on the gravity of a person's situation in Mexico and how urgently they need protection in the U.S.

For example, a single adult traveler who was a victim of a robbery in Mexico but is no longer in danger relies on the same mechanism for making an appointment as a single mother traveling with young children who are fleeing cartel members and who currently are unable to obtain urgent medical care for the children in Mexico.  But the notable difference between these two individuals is that the single traveler who is not in danger is much more likely to obtain an appointment than the family because the family must use the facial recognition technology for each member of the family unit, which takes

---

[13] Though the time has been subject to change in the last several months, furthering confusion and frustration at the border.

CLP_PC_031215



**IRAP**
International Refugee
Assistance Project

more time, and all but ensures that the limited appointments available will be taken by the time the family finishes the process.

Vulnerable families are also at a significant disadvantage because appointments for family units (as opposed to for individuals) are practically nonexistent. CBP has claimed that the app's recent update in late February makes it easier for families to secure appointments, but IRAP has observed that vulnerable families are forced to wait for appointments indefinitely.[14]  The example of "Claudia"[15], one of IRAP's clients, is illustrative of the broader issues IRAP has observed.  "Claudia" is a Salvadoran woman traveling with her two young children who fled her country after her husband and siblings were murdered by gang members in her home. They urgently need protection in the U.S. because while in Mexico, the gang members became aware of their location and began to make death threats. Additionally, both of her children suffer from medical conditions and mental health symptoms as a result of the trauma they endured in El Salvador, and they are unable to access proper medical care in Mexico. "Claudia" attempted to make an appointment together with her children for three months through the CBP One app. Every time that she selected a time slot available, the app notified her that there was no availability for three individuals. She decided to register by herself and was able to find an appointment. When she approached the border with her children, hoping that CBP officials would allow them to enter the U.S., she was told that only she would be allowed to enter because the children were not registered. After ruling out the option of leaving her children behind, "Claudia" returned to the shelter with the children.  Despite needing urgent protection in the U.S., they are still unable to get an appointment together.

The proliferation of bots and auto clickers - software that automates the CBP One application process in milliseconds - have made the process even more arbitrary

---

[14] Andrea Castillo, "Asylum Seekers Face Decision to Split Up Families or Wait Indefinitely Under New Border Policy," *Los Angeles Times*, February 24, 2023 (https://www.latimes.com/politics/story/2023-02-24/asylum-seeking-families-consider-separation-shortage-mobile-app-appointments).

[15] Name changed to protect confidentiality.

CLP_PC_031216



**IRAP**
International Refugee
Assistance Project

and stacked the odds against the most vulnerable refugees.[16]  It is now impossible for those without auto clickers to obtain an appointment through CBP One.  *Id.* Autoclickers have made it impossible for humans to compete with, often leading to the application crashing, and they add an additional element of unfairness for individuals attempting to use CBP One who are unaware of autoclickers' existence or simply do not have smartphones capable of downloading these types of line-skipping apps.  *Id.*

Prior to the launch of CBP One as the main channel to seek protection in the U.S., trusted legal aid organizations, like IRAP, were able to flag urgent cases to CBP by submitting Title 42 requests on behalf of migrants.  For example, in November 2022, IRAP staff identified 25 vulnerable families and submitted Title 42 exemptions on their behalf; every exemption was granted and the families were able to enter and receive protection in the U.S.  Since January 2023, IRAP staff have identified dozens of migrants, who need urgent protection but have not been able to get an appointment through the app. For instance, "Rose"[17], a Haitian woman and IRAP client was eight months pregnant with twins and suffering from diabetes.  She fled Haiti after gang members forced her out of her house and attempted to assault her sexually.  While in Mexico, "Rose" was unable to access specialized medical care for her high-risk pregnancy. Additionally, she lived in a house with water damage and a mold infestation, posing significant health risks given her pregnancy.  IRAP sent an email to CBP via the same channel used for Title 42 exemption requests before the launch of CBP One, explaining her urgent situation and requesting an exemption to Title 42.  IRAP received no response to its request.

In sum, CBP One does not allow, and was not created for, vulnerable asylum seekers to access the U.S. asylum system. It does not serve this purpose, nor was it designed to be used at anything close to the scale that the agencies contemplate. Even use at the current scale has led the application to crashing, fraud, discriminatory practices, and auto-clicking/bots/third-party markets targeting refugees.  The agencies have utterly failed to consider any of these issues.

---

[16] Stephania Corpi Arnaud, "Once a Ticket Scalpers' Tool, Auto Clickers Now Help Migrants Enter the U.S.," February 23, 2023 (https://restofworld.org/2023/auto-clicker-migrants-us-mexico/).

[17] Name changed to protect confidentiality.

CLP_PC_031217



International Refugee
Assistance Project

### d. The agencies failed to adequately consider that the NPRM will increase CBP detention times

Conditions for migrants in Customs and Border Protection's detention facilities have been broadly documented as insufficient and, too often, dangerous.  Even though the 2009 CBP Security Policy and Procedures Handbook describes CBP holding cells as small concrete rooms "not designed for sleeping,"[18] people are regularly held in these facilities sometimes for several nights— a period that we can expect only to increase under the NPRM due to the need for increased screening.  The agency has admitted to the limitations of its detention facilities and, in 2015, issued its National Standards on Transport, Escort, Detention and Search (TEDS), which determined that detention in CBP facilities should  "generally" last no longer than 72 hours, and that "every effort must be made to hold detainees for the least amount of time required for their processing."[19]  IRAP staff have observed that migrants being paroled into the United States remain in CBP custody generally for at least 24 hours, and often for longer.  An Office of Inspector General (OIG) investigation in 2022 focused on El Paso Border Patrol facilities found that 87% of people detained from October to November 2021 spent longer than 72 hours in Border Patrol custody.[20]

It is commonly understood and has been consistently reported that CBP facilities are unfit for long-term detention due to unsanitary conditions, extremely low temperatures, lack of proper food and other suboptimal conditions.[21]  Detainees

---

[18] CBP Security and Procedures Handbook, HB 1400-02B, August 13, 2009 (https://info.publicintelligence.net/CBP-SecurityHandbook.pdf).

[19] CBP National Standards on Transport, Escort, Detention and Search, October 2015 (https://www.cbp.gov/sites/default/files/assets/documents/2020-Feb/cbp-teds-policy-october2015.pdf).

[20] El Paso Sector Border Patrol Struggled With Prolonged Detention and Consistent Compliance with TEDS Standards, Department of Homeland Security, Office of the Inspector General, OIG-22-57, August 9, 2022 (https://www.oig.dhs.gov/sites/default/files/assets/2022-08/OIG-22-57-Aug22.pdf).

[21] *See, e.g.*, "In the Freezer: Abusive Conditions for Women and Children in US Immigration Holding Cells," Human Rights Watch, February 28, 2018 (https://www.hrw.org/report/2018/02/28/freezer/abusive-conditions-women-and-children-us-immigration-holding-cells); Hannah Critchfield, "Border Patrol Burritos are Making People Sick, Doctors Say," *Phoenix New Times*, January 14, 2020

CLP_PC_031218



**IRAP**
International Refugee
Assistance Project

are forced to sleep on the floor or concrete furniture without mats or sufficient covers.[22]  Furthermore, CBP facilities are often unsanitary, and it has been reported that detainees have limited to no access to showers and personal hygiene supplies while in custody.[23]

Treatment of people in CBP custody is widely reported as punitive and inhumane. In 2019, OIG learned as part of their investigations into conditions at CBP facilities in Texas that some detainees had been held in these facilities in "standing-room only conditions for days or weeks."  In July 202l, OIG issued a memorandum describing how CBP consistently failed to show that it conducted required medical screenings or consistent welfare checks to detainees.[24] The Freedom of Information Act (FOIA) documents obtained by Human Rights Watch in 2021 identified over 160 misconduct and abuse incidents against asylum applicants at the hands of officers, particularly CBP officers and agents.[25]

Lack of access to counsel in CBP custody and other detention facilities will pose a serious barrier to fair asylum processing under the rule.  IRAP attorneys have consistently heard from their clients being paroled into the United States through Title 42 exemptions that CBP officers do not provide them with thorough information about their legal rights, or that they are issued documents, such as

---

(https://www.phoenixnewtimes.com/news/burritos-border-patrol-ice-migrants-sick-asylum-arizona-casa-alitas-11425176).

[22] Brief for the American Immigration Council and the American Immigration Lawyers Association as Amici Curiae at 4-5, *Las Americas Immigrant Advocacy Center, et al v. Chad Wolf, et al*, 507 F.Supp.3d 1 (D.D.C. 2020).

[23] Guillermo Cantor, "Hieleras (Iceboxes) in the Rio Grande Valley Sector," American Immigration Council Special Report, December 2015 (https://www.americanimmigrationcouncil.org/sites/default/files/research/hieleras_iceboxes_in_the_rio_grande_valley_sector.pdf).

[24] "CBP Needs to Strengthen its Oversight and Policy to Better Care for Migrants Needing Medical Attention," Department of Homeland Security, Office of the Inspector General, OIG-21-48, July 20, 2021 (https://www.oig.dhs.gov/sites/default/files/assets/2021-07/OIG-21-48-Jul21.pdf).

[25] "'They Treat You Like You Are Worthless': Internal DHS Reports of Abuses by US Border Officials," Human Rights Watch, October 21, 2021 (https://www.hrw.org/report/2021/10/21/they-treat-you-you-are-worthless/internal-dhs-reports-abuses-us-border-officials).

CLP_PC_031219



Notices to Appear or Orders of Supervision, that are not explained to them at all or in a language that they do not understand while in CBP custody.

This is particularly problematic in the context of legal services providers who are not permitted to enter Border Patrol facilities or provided with a mechanism to contact their clients while detained there.  Asylum seekers detained in CBP facilities are not able to make phone calls, including to counsel they might have retained before their crossing. Without access to counsel or proper legal information, even those who still qualify for asylum under the NPRM will likely not be able to access such relief.  Because of the lack of access to counsel at CBP facilities, asylum seekers with imminent threats to their life or safety, who should be able to rebut the presumption under the rule, are likely to be deported back to Mexico due to erroneous information being provided by Border Patrol officers and lack of sufficient, compassionate, and accessible screening of their vulnerabilities.

We are concerned that, in order to meaningfully apply the NPRM, detention in CBP facilities would increase and exceed 72 hours. The conditions of CBP facilities lead to sleep deprivation, poor health, and further traumatization that directly affect the ability of asylum seekers to meaningfully assert their rights. Instead of addressing the underlying suboptimal conditions of these facilities, the NPRM increases reliance on these facilities for the processing of asylum seekers.  The U.S. government should not rely on the expansion of these facilities to further implement this rule, as there is extensive evidence that the basic human needs of detainees are not being met.  Therefore, these facilities should not be used to hold detainees for any form of vulnerability assessment, including assessments of "exceptionally compelling circumstances" that rebut their presumption of asylum ineligibility under this rule.

> ### e.   The agencies failed to adequately consider the additional burdens the NPRM would impose on asylum officers and immigration judges

The NPRM would further burden the immigration system by imposing different standards and factors to review in asylum cases, which would exacerbate current backlogs and delays and increase the chances for error. For example, the NPRM would require adjudicators to perform new legal assessments of other countries'

CLP_PC_031220



**International Refugee
Assistance Project**

asylum processes.  The NPRM does not explain how immigration adjudicators are to treat a denial of asylum in a third country, and specifically, whether a previous denial of asylum and all related records are to become part of the immigration case file and part of the merits determination.  If so, an adjudicator would need to examine evidence that was previously submitted in the country of transit and records of proceedings in order to make a determination on the credibility and materiality of the case before them in the United States.  Obtaining such files would take additional time and resources, as would making complex determinations on laws and regulations of other countries.  Additionally, credible fear interviews and judicial reviews of credible fear decisions provide insufficient time to make these complex inquiries.  Imposing this resource-intensive and highly-nuanced assessment would prolong asylum and credible fear proceedings, contributing to the very backlogs that the NPRM is purportedly designed to lessen.

### f.  The agencies failed to adequately consider the substantial limitations of Mexico's asylum system

The NPRM would require asylum seekers subject to the presumption to show an asylum denial from a third country they transited through before arriving at the U.S. border.  As most asylum seekers presenting at the southern border are non-Mexicans who travel through Mexico to reach the U.S., thousands of migrants will presumably file for, or be forced to file for, asylum in Mexico, a country whose asylum system is already overburdened due to limited resources, lack of funding, and an increasing caseload they are struggling to keep up with.  If the NPRM were to go into effect, it would put even more pressure on a system that is already straining to function making it an inefficient and nonviable alternative for migrants seeking to apply for asylum.

In Mexico, migrants can only apply for asylum before the Mexican Commission for Refugee Assistance. COMAR is the entity responsible for adjudicating asylum claims and determining refugee status in Mexico.  Thus, its decisions have significant implications for the lives and safety of asylum seekers and refugees in Mexico.  However, the agency has long been criticized for its growing backlog of cases, lack of resources, and overall inability to provide adequate services to asylum seekers.

CLP_PC_031221



**IRAP**
International Refugee
Assistance Project

COMAR is already overwhelmed with the enormous number of applications it has received over the past decade which has led to long delays in the processing and adjudication of applications.  Between 2014 and 2019, Mexico registered a 3,190% increase in the number of asylum applications it received - from 2,137 in 2014 to 70,310 in 2019.[26]  After a slight dip in 2020 due to COVID-19, the number ballooned again in 2021 to 129,780 applications.  *Id.*  Of these nearly 130,000 applications received, only 38,099 were processed.  *Id.*  Furthermore, in January 2023 alone, Mexico received 12,863 asylum applications - a 120% increase compared to January 2022 and a 97% increase compared to January 2021.  *Id.*  It is expected that the NPRM will cause asylum applications filed in Mexico to skyrocket even more, a scenario that the country simply does not have the capacity to handle.

As the backlog of unresolved claims continues to increase, the time asylum seekers are waiting to receive a decision continues to increase as well.  Under Mexican law, COMAR must evaluate an application and issue a decision within 45 business days from the date the process started.  However, reports show that some asylum seekers wait over two years for COMAR to resolve their claims.[27]  This backlog is particularly problematic given the barriers asylum seekers face in accessing work and government services during their waiting periods, such as lack of access to humanitarian visas.  Furthermore, Mexican law stipulates that asylum seekers must remain in the state where they filed their asylum application.  If they fail to present themselves for two consecutive weeks before COMAR, their asylum process automatically ends.[28]  This means migrants are forced to remain in states where they receive little to no support, living conditions at shelters are often abysmal, and jobs are difficult or impossible to get.  Given that the NPRM requires that migrants

---

[26] Data obtained from the Mexican Commission for Refugee Assistance (COMAR), "La Comar en Números," January 2023 (https://www.gob.mx/comar/articulos/la-comar-en-numeros-327441?idiom=es).

[27] Rachel Schmidke, "A New Way Forward: Strengthening the Protection Landscape in Mexico," Refugees International, November 12, 2020 (https://www.refugeesinternational.org/reports/2020/11/9/a-new-way-forward-strengthening-the-protection-landscape-in-mexico).

[28] "Mexican Asylum System for U.S. Immigration Lawyers F.A.Q.," AsylumAccess, November 2019 (https://asylumaccess.org/wp-content/uploads/2019/11/Mexican-Asylum-FAQ-for-US-Immigration-Lawyers.pdf).

CLP_PC_031222



**International Refugee
Assistance Project**

receive a denial before attempting to seek asylum in the U.S., many refugees will be forced to wait for an indefinite amount of time in dangerous situations until they receive a decision from COMAR.

COMAR is also severely underfunded as Mexico's government has limited financial resources to allocate towards the country's asylum system.  Over the years, its minuscule budget has not been able to keep pace with its mushrooming caseload.  In 2019, although the number of asylum applications more than doubled compared to the previous year, COMAR's budget was reduced from $1.3 million to $1 million.[29]  In 2020 and 2021, the budget was increased to roughly $2 million, but according to COMAR officials, this amount was insufficient even for basic operational expenses.  *Id.*  If the NPRM goes into effect and no additional resources are allocated to COMAR, the agency will find itself in a dire situation, one that will ultimately result in asylum seekers having to wait even longer to have their claims processed.

Another problem resulting from COMAR's lack of sufficient funding is that there are only 10 locations across the country, most of which are understaffed and overwhelmed, further restricting the agency's ability to handle its growing caseload.  Reports from Mexican attorneys with whom IRAP collaborates in Ciudad Juárez (CDJ) indicate that there is only one person in the CDJ COMAR office charged with adjudicating applications for refugee protection in Mexico, and the Mexican government has expressed no intention to increase staffing.  COMAR operations also have yet to recover from setbacks experienced during the COVID-19 pandemic when they had to reduce in-office staff capacity to process claims.  As a result, they temporarily suspended their 45-day timeline for processing meaning there is no longer a time limit to process claims.[30]  The reduction in staff and the suspension of the 45-day limit coupled with the likely effects of the proposed rule will only lead to high burnout rates, staff turnover, and further addition to the backlog and time it takes for cases to be resolved.

---

[29] "Mexico: Asylum Seekers Face Abuses at Southern Border," Human Rights Watch, June 6, 2022 (https://www.hrw.org/news/2022/06/06/mexico-asylum-seekers-face-abuses-southern-border).

[30] Ariel G. Ruiz Soto, "One Year After the U.S.-Mexico Agreement: Reshaping Mexico's Migration Priorities," Migration Policy Institute, June 2020 (https://www.migrationpolicy.org/research/one-year-us-mexico-agreement).

CLP_PC_031223



IRAP
International Refugee
Assistance Project

Additionally, none of COMAR's offices are located at any airport or border crossing, further creating barriers for refugees to easily access the system[31]– particularly given that Mexican law requires asylum seekers to apply within 30 days of their arrival in Mexico absent extenuating circumstances beyond their control.[32]  Instead, many COMAR offices are situated in some of the country's poorest and most dangerous states. For instance, the busiest COMAR office is located in Tapachula, Chiapas where approximately 70% of refugee status claims are made.  *Id.*  Reports indicate that staff at the Tapachula office have had trouble keeping up with the demand for appointments where crowds of people seeking asylum gather outside the office early in the morning to wait in line.  *Id.*  In August 2021, COMAR tried to establish an online appointment system, however, within a few weeks, appointments were booked through the end of the year. And, according to media reports, people began to take advantage of desperate asylum seekers by selling appointments for hundreds of dollars.[33]  This is just one of the countless examples that showcase the NPRM's misguided reliance on the Mexican asylum system to justify excluding asylum seekers from even seeking protection in the United States. The NPRM would only add to these deficiencies and further weaken an already dysfunctional system.

Mexico's asylum system is struggling to keep up with the increase in hemispheric migration over the past decade and lacks the necessary resources to effectively process and manage the increasing number of asylum applications.  There is simply not enough staff, funding, or infrastructure to handle the already growing caseload

---

[31] "Mexico: Asylum Seekers Face Abuses at Southern Border," Human Rights Watch, June 6, 2022 (https://www.hrw.org/news/2022/06/06/mexico-asylum-seekers-face-abuses-southern-border).

[32] Amparo en Revision 353/2019 of the Mexican Supreme Court, Oct. 16, 2019 (https://www.refworld.org/cases,MEX,60be49fb4.html); Amparo en Revision 6268/2019 of the Mexican Supreme Court, June 2, 2020 (https://www2.scjn.gob.mx/ConsultaTematica/PaginasPub/DetallePub.aspx?AsuntoID=261293); "Mexican Asylum System for U.S. Immigration Lawyers FAQ," Asylum Access, Nov. 2019 (https://asylumaccess.org/wp-content/uploads/2019/11/Mexican-Asylum-FAQ-for-US-Immigration-Lawyers.pdf).

[33] "Las Citas en la Comar Tienen un Costo y no Tenemos  el Dinero: Haitianos," *Diario del Sur*, March 24, 2023 (https://www.diariodelsur.com.mx/local/la-citas-en-la-comar-tienen-un-costo-y-no-tenemos-el-dinero-haitianos-7264038.html).

CLP_PC_031224



International Refugee
Assistance Project

and the proposed rule will only further strain the Mexican asylum system while punishing asylum seekers themselves for its shortcomings. The expected new surge of applications as a result of the proposed rule would likely overwhelm a system that is already struggling to operate under less-than-optimal conditions. Ultimately, Mexico's asylum system is not ready for the inevitable influx of asylum seekers it faces in the coming months and years if the NPRM were to go into effect. This fatal flaw in the NPRM will prevent it from meeting any of the agencies' stated purposes and force refugees into harm's way.

g. **The agencies failed to adequately consider the additional burdens the NPRM would impose on organizations providing direct services, like IRAP**

The agencies' failure to explain many of the key details of how the NPRM would work in practice harms IRAP's ability to engage in its mission-driven programming to assist individuals in need of humanitarian assistance. IRAP provides direct legal services to clients at the border as well as remote know-your-options presentations to migrants and asylum seekers in Ciudad Juárez, Mexico regarding Title 42, nationality-based parole programs, and the credible fear process in the United States. Without concrete information as to how the NPRM will be implemented, IRAP will be unable to adequately advise its clients, partner organizations, and the communities it serves.

For example, the NPRM proposes that individuals be required to use the CBP One application to request appointments to present at the border, but it fails to provide any insight into how the agencies plan to fix the many problems with CBP One that refugees are currently encountering. The NPRM provides insufficient details on questions such as, will more appointments per day be available than currently are available? Will the application require information about a person's claim for protection and/or the urgency of their protection needs in Mexico as a precursor to obtaining an appointment?

To provide another example, IRAP currently has a client who only speaks the indigenous language Mixteco. As a result, the client is unable to navigate CBP and has therefore been unable to make an appointment. The NPRM suggests that asylum seekers in this situation would be able to qualify for an exception, but it fails

CLP_PC_031225



**IRAP**

International Refugee
Assistance Project

to provide any additional information that would be of any use to asylum seekers
or their legal representatives.  Notably, the NPRM leaves unclear whether this client
would have an option to present themself at a port of entry without using the app,
or if the only way they could enter the United States would be without
inspection—putting their life in peril.  More generally, the limited information in the
NPRM is insufficient to determine whether a client's failed efforts to make an
appointment using CBP One are likely to be considered "sufficient" to justify
requesting an exception from the presumption or whether they would be expected
by the U.S. government to endure further hardship or danger in Mexico before
qualifying for the exception.

And to provide yet another example, under the NPRM it is unclear how the
government will evaluate claims of "imminent and extreme" threats. How
immediate must the threat be?  Is it enough to have been threatened with murder
the night before one presents at the border?  The week before?  The month before?
It is also unclear how severe the threat to life or safety must be - the examples
provided in the NPRM include "rape, kidnapping, torture or murder", but what
about severe beatings?

To take an illustrative example from IRAP's direct services work: a Haitian man and
his brother fled to the Dominican Republic after their family was directly targeted
by a local gang.  They remained in the Dominican Republic until members of the
same gang who had targeted their family in Haiti found them in the neighboring
country.  The brothers then fled to Chile but were attacked at gunpoint by a group
of men believed to be part of the same gang and had to flee once more to Mexico,
where one of the brothers was diagnosed with prostatitis, a painful and distressing
disorder of the prostate gland, but could not access treatment.[34]  Under the NPRM,
the violence and threats experienced in two transit countries would apparently not
meet the rebuttable presumption's requirements of an "imminent and extreme"
threat to life and safety.  As written, if the NPRM becomes law, the brothers would
likewise be denied even the opportunity to present an asylum claim despite facing
significant threats to their lives in more than one transit country. Furthermore, the
significant medical need of the brother after arriving in Mexico does not appear to

---

[34] These facts are representative of fact patterns that IRAP has seen present in our clients' cases but
they have been edited in their details to avoid directly identifying any particular client.

CLP_PC_031226



**IRAP**
International Refugee
Assistance Project

qualify as an "acute medical emergency" for the alternative basis for rebutting the presumption.

The answers to these and other questions about how the NPRM is to be implemented are necessary for IRAP to understand how the Proposed Rule would apply to its clients and the communities it serves.

### V.   The Agencies Have Deprived the Public of Adequate Notice of their Proposed Rule and Adequate Opportunity to Comment

#### a.   The Agencies Failed to Sufficiently Explain Their Proposal, as Needed to Enable the Public an Adequate Opportunity to Comment

For all of the reasons described the agencies' failure to explain the data underlying their premises and failure to explain how the NPRM would be implemented in practice deprives interested commenters like IRAP of notice of what the agencies intend to do and why.  Commenters like IRAP are thereby deprived of their right to an adequate opportunity to comment.

#### b.   The 30-day Comment Window is Insufficient to Enable a Meaningful Opportunity to Comment

The limited 30-day window the agencies provided the public to comment is insufficient.  Executive Order 12866 requires agencies to "...afford the public a meaningful opportunity to comment on any proposed regulation, which in most cases should include a comment period of not less than 60 days."  Executive Order 13563 likewise directs agencies to "...afford the public a meaningful opportunity to comment through the Internet on any proposed regulation, with a comment period that should generally be at least 60 days."

The agencies purport to justify the truncated 30-day comment period for this proposed regulation by relying on their desire to have the rule in place by the time Title 42 expulsions end on May 11th, 2023 but do not even attempt to explain why refusing to give the public and stakeholders adequate time to analyze the proposed rule furthers that goal.

CLP_PC_031227



**IRAP**
International Refugee
Assistance Project

The Centers for Disease Control (CDC) announced its intention to end Title 42 nearly a year ago, in April 2022.  The agencies essentially appeal to their own foot-dragging to justify depriving the American public and relevant stakeholders of a meaningful opportunity to respond to a complicated 153-page rule that will inflict immense human suffering.

The implications of this rule are vast.  The agencies devised this rule with the intent of drastically limiting access to the asylum system.  The agencies' notice takes little time to assess or even acknowledge the massive humanitarian, legal, and economic burdens of this rule and even goes so far as to solicit that analysis from commenters.

## VI.     The Agencies Failed to Consider Reasonable Alternatives

### a.  Agencies Failed to Consider An Extremely Limited Duration Proposal

For the reasons discussed, the NPRM's proposed system should never go into effect.  Even a single day of the Proposed Rule preventing asylum seekers from accessing safety in the United States will cause grave harm and violate U.S. law. Nonetheless, the length of the NPRM (a minimum of two years), is incongruent and disproportionate with its stated purposes. Such a lengthy draconian measure goes beyond addressing "this urgent and extreme situation" in which it is "particularly difficult to precisely predict" what will happen in the aftermath of Title 42.  *See id.* at 11705-06; *see also id.* at 11708 ("rule is justified" due to concerns about "the possibility of a surge in irregular migration" after Title 42 ends).

As laid out above, the agencies have not provided sufficient information to accurately identify the "problem" they are trying to address. However, if the agencies are trying to prepare contingency plans in advance of the rollback of Title 42, the NPRM's duration should more appropriately be extremely limited, as opposed to indefinite. A more temporary measure would cause much less harm than the NPRM.

CLP_PC_031228



To the extent the agencies contend that their proposal is necessary to respond to "unique" circumstances that are directly tied to the end of Title 42, *see* 85 Fed. Reg. 11725 n.176, 11744, 11746; *but see supra* (explaining that this premise is unfounded), they should have considered as a reasonable alternative an extraordinarily limited timeframe of perhaps up to 30 days.  Such a timeframe would enable the agencies to actually observe what impact the end of Title 42 has on the number of people seeking to access the United States via the southern border and to address any sharp changes requiring changes to government capacity in the region.  At the same time, a shorter timeframe will ensure that a system that is contrary to the letter and spirit of United States law, and that ignores the reality of the lack of genuine options confronting people in humanitarian need, does not become enshrined as the new status quo.  Should the agencies consider such a time-limited alternative, they could also consider ways to remedy the denials of rights anticipated in even that 30-day period in a way likely to cause significantly less human suffering than the NPRM's contemplated long-term implementation.

### b.  Agencies Failed to Consider Whether to Expand Pathways

The agencies rely on the changes to migration patterns after the CHNV parole programs took effect to argue that new pathways combined with punitive measures are highly successful.  *See, e.g.*, 85 Fed. Reg. 11706.  And the agencies concede that punitive measures alone are not sufficient.  *Id.* at 11713.  But the agencies conspicuously fail to consider whether new and/or expanded pathways uncoupled with punitive measures are sufficient to alleviate the number of people seeking to enter at the U.S. southern border, even though the effectiveness of pathways alone would explain the "success" of the CHNV and Ukraine parole programs.

Given that the agencies anticipate that the need for protection is likely to be significantly greater than that provided by the existing parole programs and other existing pathways, *see supra*, one reasonable alternative would be to create

CLP_PC_031229



additional legal pathways or expand the existing ones.  In particular, the agencies should consider expanding pathways targeted at assistance for the most vulnerable individuals with immediate protection needs who, as explained *supra*, are not served by the CHNV parole programs.

### c. Agencies Failed to Consider Allowing Migrants to Present Without An Appointment

The agencies have defined the NPRM to presumptively apply to individuals who present at a port of entry and are inspected by an immigration officer.  *See id*. at 11723 (defining "enters the United States at the southwest land border").  To avoid being subject to the presumption, such individuals must fit within the "narrow set of cases in which it was truly not possible for the noncitizen to access or use the DHS system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle." *Id.* at 11723 & n.173.  Moreover, separate and apart from the legal impediments to this group obtaining asylum, there is nothing in the NPRM that discusses how the agencies plan to process such individuals at ports of entry without a CBP One appointment, leaving them no choice but to enter without inspection.

The agencies' proposal actively undermines several of their stated goals–most notably, reducing the dangers to migrants, reducing migrants' reliance on smugglers, and reducing the burdens on federal government infrastructure which occur when CBP officers must be redistributed.  *See* 88 Fed. Reg. 11707, 11715.  An obvious and reasonable alternative is to ensure that migrants who seek to present themselves at ports of entry and who are unable to obtain appointments using CBP One are encouraged to do so, as has historically been the case.  At a minimum, such individuals should not be presumptively deemed ineligible for asylum where the only behavior that the agencies seek to deter is their inability to obtain an appointment through a glitchy smartphone app, perhaps because they are part of a family unit, or have a darker complexion, or do not have access to an auto-clicker.

CLP_PC_031230



International Refugee
Assistance Project

**VII.   IRAP Agrees With the Agencies' Proposal to Formally Rescind the Enjoined Trump-Era Rules**

IRAP welcomes the agencies' proposal to formally rescind the Trump-era rules severely limiting access to asylum that have been held unlawful and enjoined by various courts.  *See* 88 Fed. Reg. 11727.  These rules were unlawful and wrong when first promulgated and they remain so now.  Moreover, the government now recognizes that these approaches were ineffective at achieving their stated aims, because, for example, they added significant complexity to asylum processing and thus led to further delays and backlogs.  *See id.* at 11744.  Finally, IRAP agrees with the agencies' assessment that no reliance interests would be impacted by the rescission of the rules because they have been enjoined for years.  *See id.* at 11728.

**VIII.   Conclusion**

IRAP strongly opposes the Proposed Rule as it is illegal, inhumane, and discriminatory. The NPRM is riddled with insufficient explanations and fails to consider reasonable alternatives. It violates the existing statutory framework and mandate of the agencies to protect and provide a fair asylum process. It will deny access to protection to many of the most vulnerable and send refugees back to places of persecution and torture.

IRAP urges the administration not to finalize this NPRM with the exception of the rescission of the Trump-era rules, and to stop punishing refugees who enter at the U.S. southern border. Instead, the administration must devote resources to humane asylum processing and just adjudications. IRAP welcomes the opportunity to discuss this Comment with you further.

Sincerely,

CLP_PC_031231



International Refugee
Assistance Project

Laurie Ball Cooper
U.S. Legal Services Director, International Refugee Assistance Project (IRAP)
650 Massachusetts Avenue NW, Suite 600
Washington, DC 20001

Linda B. Evarts
Senior Supervising Attorney
U.S. Litigation Department, IRAP
One Battery Park Plaza, 33rd Floor
New York, NY 10026

Sunil Varghese
Policy Director, IRAP
650 Massachusetts Avenue NW, Suite 600
Washington, DC 20001

CLP_PC_031232

# PUBLIC SUBMISSION

**As of:** May 08, 2023
**Received:** March 27, 2023
**Status:** Posted
**Posted:** March 29, 2023
**Tracking No.** lfr-hkpg-167b
**Comments Due:** March 27, 2023
**Submission Type:** Web

**Docket:** USCIS-2022-0016
Circumvention of Lawful Pathways

**Comment On:** USCIS-2022-0016-0001
Circumvention of Lawful Pathways

**Document:** USCIS-2022-0016-12343
Comment Submitted by American Gateways

---

## Submitter Information

**Email:** ednay@americangateways.org
**Organization:** American Gateways

---

## General Comment

March 27, 2023

American Gateways respectfully submits the attached comments in response to the Notice of Proposed Rulemaking regarding Circumvention of Lawful Pathways, which was published by U.S. Citizenship and Immigration Services, the Department of Homeland Security; and the Executive Office for Immigration Review, Department of Justice on February 23, 2023 (RIN 1615-AC83 / 1125-AB26 / USCIS Docket No. 2022-0016 / A.G. Order No. 5605-2023).

Thank you for the opportunity to submit comments. Please do not hesitate to contact me via phone at 512-279-0879 or via email at Ednay@americangateways.org to provide further information.

Sincerely,

Edna Yang
Co-Executive Director
American Gateways

---

## Attachments

American Gateways Comments to Proposed Rule - Circumvention of Lawful Pathways

**Comments Submitted by American Gateways RE: Joint Notice of Proposed Rulemaking (NPRM) by U.S. Citizenship and Immigration Services, Department of Homeland Security; the Executive Office for Immigration Review, Department of Justice: Circumvention of Lawful Pathways; RIN 1615-AC83 / 1125-AB26 / USCIS Docket No. 2022-0016/ A.G. Order No. 5605-2023 (published in the Federal Register on February 23, 2023).**

American Gateways provides much needed legal representation for indigent immigrants in Central Texas. Our mission is to champion the dignity and human rights of immigrants, refugees, and survivors of persecution, torture, conflict, and human trafficking through exceptional legal services at low or no cost, education, and advocacy. Our agency began in 1987 as the Political Asylum Project of Austin and was founded to provide legal representation to Central American immigrants fleeing persecution and seeking asylum in the United States. Over the past thirty-three years, American Gateways has become an indispensable legal services provider for low-income asylum seekers and immigrants in Central Texas.

American Gateways opposes the notice of proposed rulemaking regarding Circumvention of Lawful Pathways (the "Proposed Rule"), published by the Department of Homeland Security (DHS) and Department of Justice (DOJ) (collectively, the "Departments") on February 23, 2023, and requests that the Departments promptly rescind the Proposed Rule. American Gateways describes below how some of the proposed changes will impact our organization and our clients, and the reasons for our opposition. Omission of any proposed change from these comments should not be interpreted as tacit approval. American Gateways opposes all aspects of the Proposed Rule that would erode the due process rights of asylum seekers or otherwise impede—in any way—the ability of individuals who have suffered persecution to access humanitarian protection in the United States. At the same time, American Gateways expresses heightened concern regarding the disproportionate harms that will befall certain asylum seekers—namely, detained and *pro se* asylum seekers—if the Proposed Rule is not withdrawn. The Departments propose to implement a presumption of ineligibility for asylum upon certain noncitizens arriving at the U.S. southern border who (1) did not seek asylum in a country of transit or (2) did not obtain an appointment to present at the border using a mobile phone application known as "CBP One." The proposed changes will prevent current and future asylum seekers from accessing protection they merit under domestic and international law, result in the return of many asylum seekers to harm, without allowing them their legal right to seek protection under the asylum law. The proposed rule also leaves others in the United States without stable protection. Rather than "align with the [Immigration and Nationality Act] and Congress's general intent to create an asylum and protection system that adjudicates claims both expeditiously and fairly," 88 Fed. Reg. 11704, 11746, the Proposed Rule would only result in lower rates of representation, poorly prepared filings, due process violations, higher denial rates, and the more rapid deportation of refugees back to the persecution from which they fled.

## I.    GENERAL COMMENTS

### A. The shortened comment period does not provide adequate time for meaningful participation in the rulemaking process.

CLP_PC_031497

Although the Administrative Procedures Act ("APA") does not prescribe a minimum time period for comments, agencies must afford interested persons a reasonable and meaningful opportunity to participate in the rulemaking process. *See* 5 U.S.C. § 553(c) ("After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments. . . ."). Furthermore, Executive Order 12866 provides that the public's opportunity to comment "in most cases should include a comment period of not less than 60 days." Exec. Order No. 12866, 58 Fed. Reg. 51735, 51740 (Oct. 4, 1993). Despite having had the Proposed Rule "reviewed . . . as a 'significant regulatory action' under . . . Executive Order [13563]," 88 Fed. Reg. 11704, 11748, the Departments have deviated from the customary 60-day comment period, instead allowing the public only 30 days to submit comments to the Proposed Rule.

American Gateways objects to the shortened 30-day comment period. As discussed herein, the Proposed Rule contains several substantial changes to regulations governing asylum and withholding of removal that would have a detrimental impact on immigrants seeking asylum and other forms of humanitarian protection.[1] For example, the Proposed Rule would introduce a new condition on asylum eligibility, in the form of a presumption of ineligibility for asylum for certain noncitizens who enter the United States at the southwest land border, thereby rendering it more difficult for asylum seekers to meet the conditions for asylum eligibility. The Proposed Rule would only allow noncitizens to rebut this presumption if they are able to demonstrate "exceptionally compelling circumstances by a preponderance of the evidence," a heightened evidentiary burden that is very difficult to meet and will likely impose unduly harsh consequences on *pro se* asylum seekers. The public should be afforded adequate time to meaningfully consider and respond to the complex revisions proposed by the Department.

The Departments have offered no fitting justification for shortening the comment period. The Departments' sole proffered defense is that they are issuing the Proposed Rule with this 30-day comment period "because they seek to be in a position to finalize the proposed rule, as appropriate, before the Title 42 Public Health Order is lifted."[2] 88 Fed. Reg. 11704, 11708. While the Departments cite the termination of the Title 42 policy in May 2023 as a justification to curtail the public's right to comment on the proposed rule, this reasoning is specious especially given that the administration itself sought to formally end Title 42 nearly a year ago and has had ample time to prepare for the end of the policy. The lack of sufficient explanation for shortening the comment period signals that the Departments have improperly prejudged the issues and intend to implement the Proposed Rule without having provided interested persons with a *meaningful* opportunity to participate. At the same time, the shortened comment period suggests that the Departments desire

---

[1] American Gateways uses the term "asylum seekers" throughout these comments to refer to individuals seeking asylum, as well as those seeking statutory withholding of removal or withholding under the Convention Against Torture.

[2] The Departments argue that the "lifting of the Order could occur as a result of several different litigation and policy developments, including the vacatur of the preliminary injunction entered in *Louisiana v. CDC*, No. 22–cv–885, 2022 WL 1604901 (W.D. La. May 20, 2022), *appeal pending*, No. 22–30303 (5th Cir.); the lifting of the stay entered by the Supreme Court in *Arizona v. Mayorkas*, No. 22A544, 2022 WL 17957850 (U.S. Dec. 27, 2022); or 'the expiration of the Secretary of HHS' declaration that COVID–19 constitutes a public health emergency,' 86 FR at 42829." 88 Fed. Reg. 11704, 11708. The Departments further argue that "[t]he termination of the Secretary of HHS' declaration that COVID–19 constitutes a public health emergency is expected to occur on May 11, 2023," based on a recent announcement of such intent by the Executive Office of the President's Office of Management and Budget. *Id.*

CLP_PC_031498

not to improve the efficiency or quality of procedures governing asylum and withholding of removal, but to push through their divisive political agenda in disregard of public comments.

American Gateways therefore respectfully requests that, if the Proposed Rule is not withdrawn, the comment period be extended for at least an additional 30 days consistent with Executive Order 12866.

**B.  The Proposed Rule fails to engage in a cost/benefit analysis, as required by law.**

Executive Orders 12866 and 13563 require agencies to assess all costs and benefits of regulatory changes, including both quantifiable and qualitative factors, and choose the regulatory alternative that maximizes net benefits.[3] The Departments acknowledge that the Office of Information and Regulatory Affairs of the Office of Management and Budget ("OMB") has "reviewed" the Proposed Rule as a "significant regulatory action" within the meaning of Executive Order 12866. 88 Fed. Reg. 11704, 11748. Yet, the Proposed Rule contains no meaningful assessment of costs, benefits, and regulatory alternatives. Instead, the Departments list a single purported cost to migrants of the Proposed Rule—briefly noting that ineligibility for asylum under the presumptive condition "would entail a loss of the benefits of asylum, although [such migrants] would continue to be eligible for statutory withholding of removal and withholding under the CAT," *id.* at 11748— and a cost to the Departments, noting that the Proposed Rule "would require additional time for asylum officers, during fear screenings, to inquire into the applicability of the presumption and whether the presumption has been rebutted," *id.*

The Departments cannot discharge their obligation to fully assess costs and benefits of the proposed regulatory changes by simply disregarding the real harms that would flow from the Proposed Rule, especially for detained and *pro se* asylum seekers. Moreover, the Department's evident implication that a new presumption of asylum ineligibility for noncitizens who did not seek asylum in a country of transit or did not obtain an appointment to present at the border will have virtually *no* further impact on asylum seekers beyond their loss of a path to citizenship and inability to petition for certain family members to join them in the United States is absurd. Most *pro se* asylum seekers struggle to understand and adequately prepare for asylum application procedures, and they would face significant challenges retaining counsel or even *pro se* legal assistance when faced with the significantly increased likelihood of expedited removal. Furthermore, given the speed at which expedited removal takes place, there is rarely an opportunity to collect evidence or even merely consult with an attorney, family member, or friend before the decision is made.

Agencies may "propose or adopt a regulation only upon a reasoned determination that the benefits of the intended regulation justify its costs." Exec. Order No. 12866 § 1(b)(6) (1993). Rather than engage in a cost-benefit analysis, as the law requires, the Departments simply assert that a

---

[3]     *See* Exec. Order No. 12866 § 1(b)(6) (1993), https://www.archives.gov/files/federal-register/executive-orders/pdf/12866.pdf ("Each agency shall assess both the costs and the benefits of the intended regulation and, recognizing that some costs and benefits are difficult to quantify, propose or adopt a regulation only upon a reasoned determination that the benefits of the intended regulation justify its costs."); Exec. Order No. 13563, https://obamawhitehouse.archives.gov/the-press-office/2011/01/18/executive-order-13563-improving-regulation-and-regulatory-review (supplementing and reaffirming the mandate in Executive Order 12866 that agencies "must take into account benefits and costs, both quantitative and qualitative" when implementing regulations).

CLP_PC_031499

presumption of asylum ineligibility for certain noncitizens will present benefits in the form of "improved relationships with, and enhanced opportunities to coordinate with and benefit from the migration policies of, regional neighbors; large-scale reductions in strains on limited national resources; preservation of the Departments' continued ability to safely, humanely, and effectively enforce and administer the immigration laws; and a reduction in the role of exploitative transnational criminal organizations and smugglers." 88 Fed. Reg. 11704, 11748. But this listing of purported benefits improperly discounts obvious costs to the Proposed Rule. Executive Orders cannot be so easily circumvented. Indeed, the Proposed Rule would effectively operate as an asylum ban for individuals based on factors that do not relate to their fear of return and would result in asylum denials for all who are unable to establish that they qualify for the extremely limited exceptions to the presumption of asylum ineligibility. Its use in expedited removal will require asylum seekers—many of whom have suffered persecution and violence and undergone a harrowing journey to reach safety—to prove that the rule does not apply to them in a credible fear interview shortly after arrival in the United States, while detained and with little to no access to counsel, likely without knowledge of how the rule works or what they need to prove.

American Gateways acknowledges that the Proposed Rule is only at the public comment stage of the rule-making process. However, the Departments' utter failure to consider a host of relevant factors and indifference toward the harmful impact their proposal would have on individuals seeking humanitarian protection are incurable deficiencies. If the Departments were to consider all aspects of the issue, as they are required to do under Executive Orders 12866 and 13563, they cannot possibly conclude that any purported benefits of the Proposed Rule outweigh its tremendous costs. Rather than push forward with a proposal that is doomed for judicial invalidation, the Departments should rescind the Proposed Rule.

### C.  The Proposed Rule, if made final, would violate the Administrative Procedure Act.

Under the Administrative Procedure Act (APA) (5 U.S.C. §§ 551-559), courts are authorized to "hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right . . . ." 5 U.S.C. § 706(2)(A)-(C). The Proposed Rule contravenes or is otherwise inconsistent with several provisions of the governing statute, infringes upon due process rights, is not the product of reasoned decision-making, and is otherwise arbitrary and capricious. If implemented in its current form, the Proposed Rule would be subject to judicial invalidation on multiple grounds.

For example, several provisions of the Proposed Rule are contrary to constitutional rights because they infringe upon the due process rights of asylum seekers. The presumption of asylum ineligibility, coupled with the high burden asylum seekers must meet to show they can overcome this presumption—*i.e.*, by showing they sought asylum in a country of transit, or obtained an appointment to present at the border using CBP One—would substantially interfere with asylum seekers' ability to obtain counsel and a full and fair hearing on their claims for relief. Throughout its comments, American Gateways highlights some of the constitutional violations that would flow from the Proposed Rule.

CLP_PC_031500

Additionally, the Proposed Rule, as well as the separate provisions thereof, is arbitrary and capricious. The arbitrary-and-capricious standard requires that an agency "examine the relevant data and articulate a satisfactory explanation for its action, including a 'rational connection between the facts and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). When reviewing an agency's proffered explanation, courts "must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Id.* at 43 (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)). Further, courts require that an agency provide the "essential facts upon which the administrative decision was based," *United States v. Dierckman*, 201 F.3d 915, 926 (7th Cir. 2000) (quoting *Bagdonas v. Dep't of Treasury*, 93 F.3d 422, 426 (7th Cir. 1996)), and explain the justification for its determinations with actual evidence beyond a "conclusory statement," *Allied-Signal, Inc. v. Nuclear Reg. Comm'n*, 988 F.2d 146, 152 (D.C. Cir. 1993). In general, an agency decision is arbitrary and capricious

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* In other words, agency actions are subject to invalidation where an agency fails to adequately explain its decision, fails to consider relevant factors, including the policy effects of its decisions, fails to adequately explain illogical actions, or reaches a conclusion that contradicts the underlying record. What counts as "relevant" is context specific, but the U.S. Supreme Court has previously instructed that agency decision-making on immigration matters "must use an approach that is tied to the purposes of the immigration laws or the appropriate operation of the immigration system." *Judulang v. Holder*, 565 U.S. 42, 132 S. Ct. 476, 478 (2011).

Here, the Departments propose a rule that is so plainly contrary to the "purposes of the immigration laws" and the "appropriate operation of the immigration system" that it is necessarily arbitrary and capricious. The Departments claim that the Proposed Rule is "designed to improve the overall functioning of the immigration system and to improve processing of asylum applications." 88 Fed. Reg. 11704, 11736. The Departments do not sufficiently explain how any of the proposed changes—which will largely vet out meritorious claims and harm asylum seekers, without resulting in greater efficiency—support these stated purposes (which are, at best, conclusory). Moreover, the Departments entirely fail to consider several important aspects of the problems they claim to address, and they do not balance concerns of adjudicatory efficiency and deterrence against the rights of individuals seeking humanitarian protection or the country's international obligations to afford such protection.

For example, the Departments propose a new presumption of asylum ineligibility for noncitizens who enter the country from the southern border and who (1) did not apply for and receive a formal denial of protection in a transit country; and (2) entered between ports of entry at the southern border or entered at a port of entry without a previously scheduled appointment through the CBP One mobile application, subject to extremely limited exceptions. Although the Departments

CLP_PC_031501

loosely suggest that this procedure would be both desirable and necessary in order to more effectively screen out unmeritorious (*i.e.*, frivolous) claims and alleviate burdens on immigration court dockets, they do not actually pinpoint any interests that would be furthered by denying asylum applicants the right to a hearing. Even if this presumption would enhance efficiency (which it will not), the Departments also completely fail to consider that allowing the summary denial of asylum applications will result in the deportation of thousands of refugees entitled to protection under domestic and international law. The Departments make no attempt to explain how the proposed process comports with fundamental notions of fairness or the constitutional and statutory right to a full and fair hearing. The Departments also fail to adequately evaluate the impacts of this provision on *pro se* applicants, detained applicants, and other particularly vulnerable groups. In essence, the Departments propose to penalize asylum seekers for their lack of familiarity with U.S. immigration law. There is no basis in U.S. tradition or law for imposing such harsh sanctions absent evidence of knowingly fraudulent conduct. The Departments offer no effective explanation for this change in policy, no explanation for how the policy will conserve resources, and no assessment of its devastating implications, particularly for asylum seekers who could be rendered permanently ineligible for any benefits under the INA simply because they cannot afford to retain an attorney to help them articulate their claim—or do not have enough time to do so, given the severe restrictions placed upon them by the application of this new presumption at the credible fear interview stage.

### D. If the Proposed Rule is not withdrawn, it should not have any retroactive applicability.

The Proposed Rule is wholly silent on the issue of retroactive applicability. To avoid any doubt concerning the retroactive applicability of the Proposed Rule, the Departments should at the very least make an affirmative pronouncement that the Proposed Rule will definitively not apply retroactively. Indeed, if the Proposed Rule becomes final and effective, it should not apply to anyone whose latest entry into the United States was prior to the effective date(s) of the rule. Alternatively, any final rule should specifically identify the individuals and claims to which the Proposed Rule, and any provisions thereof, would apply.

Section 551 of the Administrative Procedures Act (APA) sets forth clear standards for rulemaking. According to subsection 5, "'rule making' means agency process for formulating, amending, or repealing a rule," 5 U.S.C. § 551(5), which is what the Departments seek to do. Subsection 4, however, requires that any such rulemaking have a future effect. The APA defines a "rule" to mean "the whole or a part of an agency statement of general or particular applicability and *future effect* designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4) (emphasis added). "The only plausible reading of the italicized phrase is that rules have legal consequences only for the future." *Bowen v. Georgetown Univ. Hosp*., 488 U.S. 204, 216 (1988). This meaning is bolstered by the remainder of the definition, which goes on to say that a rule "includes the approval or prescription *for the future* of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing." 5 U.S.C. § 551(4) (emphasis added). Indeed, the government's own authority on interpretation of the APA—the *Attorney General's Manual on the*

CLP_PC_031502

*Administrative Procedure Act*[4] (a guide given great weight by courts and used by agencies in adjusting their procedures to the requirements of the APA)—notes that "'rule' includes agency statements not only of general applicability but also those of particular applicability applying either to a class or to a single person. In either case, they must be of *future effect*, implementing or prescribing future law."[5]

Simply put, "[r]etroactivity is not favored in the law." *Bowen*, 488 U.S. at 208. "Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." *Id.*; *see also Criger v. Becton*, 902 F.2d 1348, 1353 (8th Cir. 1990) ("[L]aws are to have prospective effect only, unless the law-making entity has indicated otherwise."). Retroactivity is disfavored because the due process clause "protects the interests in fair notice and repose that may be compromised by retroactive legislation." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 266 (1994); *Hem v. Maurer*, 458 F.3d 1185, 1190 (10th Cir. 2006). "It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings." *Reno v. Flores*, 507 U.S. 292 (1993) (citing *Yamataya v. Fisher*, 189 U.S. 86, 100-01 (1903) ("[T]his Court has never held, nor must we now be understood as holding, that administrative officers, when executing the provisions of a statute involving the liberty of persons, may disregard the fundamental principles that inhere in 'due process of law' as understood at the time of the adoption of the Constitution.")). "[A]liens who have once passed through our gates, *even illegally*, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law." *F.L.B. v. Lynch*, 180 F. Supp. 3d 811, 819 (W.D. Wash. 2016) (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953)).

Retroactivity will necessarily infringe upon due process rights if the Proposed Rule, or any provision thereof, is applied to claims of asylum seekers whose latest entry into the United States was before the effective date(s) of the proposed changes. The Supreme Court has repeatedly warned against retroactive legislation, because it "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf*, 511 U.S. at 280. If the result of legislation "attaches new legal consequences to events completed before its enactment[,]" courts should be guided by "familiar considerations of fair notice, reasonable reliance, and settled expectations." *Id*. at 269-70. This same principle must be followed here.

Consistent with addressing due process concerns, the Departments should specify that *the Proposed Rule does not have any retroactive effect*. As the Departments admit, in FY 2022, EOIR hired 104 Immigration Judges for a total of 634 and completed a record 312,486 cases. Yet the number of cases pending before the immigration courts has risen to nearly 1.8 million, as the courts were unable to keep pace with the incoming volume. 88 Fed. Reg. 11704, 11715. Applying the Proposed Rule to pending claims would jeopardize the safety and security of nearly two million people, whose cases would be thrown into a state of uncertainty. Such uncertainty would, without doubt, increase the burden on immigration courts and judges as asylum seekers and their representatives attempt to reconcile the effects of the new rules on their own cases. Moreover, applying the Proposed Rule to those who last entered the United States prior to the effective date(s)

---

4 Tom C. Clark, U.S. Dep't of Justice, *Attorney General's Manual on the Administrative Procedure Act* (photo. reprint 1973) (1947), https://archive.org/details/AttorneyGeneralsManualOnTheAdministrativeProcedureActOf1947.

5 *Id.* at 13.

CLP_PC_031503

would undermine reliance interests and add to the uncertainty while the inevitable litigation pends. At the very least, the Departments should specify to whom each of the new provisions would apply so that all individuals who might be impacted by the Proposed Rule are on notice of the Departments' intentions and can, as appropriate, challenge any attempt at retroactive application.

## II.  SPECIFIC COMMENTS

### A.  The Proposed Rule's introduction of a presumption of asylum ineligibility for certain noncitizens emphasizes efficiency at the expense of due process.

American Gateways acknowledges that Immigration Courts are faced with a tremendous backlog of cases and that the Departments endeavor to increase the speed and efficiency of proceedings. Yet, in several respects, the Proposed Rule prioritizes efficiency over fairness, thereby threatening the due process rights of asylum seekers.

"'It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings.'" *Demore v. Kim*, 538 U.S. 510, 523 (2003) (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)). Indeed, for over a century, the Supreme Court has repeatedly affirmed that the "Due Process Clause applies to all persons within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 679 (2001). As early as 1896, the Court held that due process rights applied to an individual detained for unauthorized entry into the United States. *See Wong Wing v. United States*, 163 U.S. 228, 238 (1896). Less than a decade later, the Court reaffirmed that immigrants in removal proceedings are guaranteed due process rights, including the right "to be heard upon the questions involving [the] right to be and remain in the United States." *Yamataya v. Fisher*, 189 U.S. 86, 101 (1903); *see also Mathews v. Diaz*, 426 U.S. 67, 77 (1976) (Fifth Amendment protects all persons "from deprivation of life, liberty, or property without due process of law") (citations omitted); *Plyler v. Doe*, 457 U.S. 202, 210 (1982) (same).

It is similarly well settled that due process requires: (1) notice and (2) an opportunity to be heard. *See, e.g.*, *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950) ("'The fundamental requisite of due process of law is the opportunity to be heard.' This right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest.") (internal citations omitted). In the immigration context, due process requires that "[a]n alien who faces deportation is entitled to a full and fair hearing of his claims." *Agyeman v. INS*, 296 F.3d 871, 877 (9th Cir. 2002) (internal quotation marks and citation omitted); *see also Colmenar v. INS,* 210 F.3d 967, 971 (9th Cir. 2000) ("[A]n alien who faces deportation is entitled to a full and fair hearing of [her] claims and a reasonable opportunity to present evidence on [her] behalf."); *Bah v. Keisler*, 249 F. App'x 876, 879 (2d Cir. 2007) ("Due process in the asylum context requires that an applicant receive a full and fair hearing that provides a meaningful opportunity to be heard.") (citing *Li Hua Lin v. U.S. Dep't of Justice*, 453 F.3d 99, 104-05 (2d Cir. 2006)); *Cano-Merida v. INS*, 311 F.3d 960, 964 (9th Cir. 2002) (failure to allow the petitioner to present oral testimony constitutes a denial of right to due process).

The civil rather than criminal nature of removal proceedings does not diminish this due process right:

CLP_PC_031504

> Though deportation is not technically a criminal proceeding, it visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom. That deportation is a penalty . . . cannot be doubted. Meticulous care must be exercised lest the procedure by which he is deprived of that liberty not meet the essential standards of fairness.

*Bridges v. Wixon*, 326 U.S. 135, 154 (1945). Procedural due process rights have also animated statutory rights that apply to immigration proceedings. Section 240 of the Immigration and Nationality Act (INA) delineates the contours of a fair hearing and enumerates the rights that apply to persons in removal proceedings. The INA provides that an "Immigration Judge shall administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses." 8 U.S.C. § 1229a(b)(1). Moreover, "the alien shall have a reasonable opportunity to examine the evidence against the alien, to present evidence on the alien's own behalf, and to cross-examine the witnesses presented by the Government." *Id*. § 1229a(b)(4)(B). The INA's implementing regulations also require a hearing. The BIA has acknowledged that "[a]t a minimum, . . . the regulations require that an applicant for asylum and withholding take the stand, be placed under oath, and be questioned as to whether the information in the written application is complete and correct." *Matter of Fefe*, 20 I. & N. Dec. 116, 118 (BIA 1989).

It is critical that asylum seekers be given an opportunity to understand the procedure they are facing, to obtain counsel, and to present all evidence in support of their claim in a full merits hearing. Under the Proposed Rule, asylum seekers could be deported without an asylum hearing if they do not pass their fear screenings. *See generally* 88 Fed. Reg. 11704, 11724-25. The Proposed Rule will be implemented during the expedited removal process, where asylum seekers are swiftly deported without a day in court if they do not pass their fear screenings. *Id.* ("Although the rebuttable presumption would apply to any noncitizen who is described in proposed 8 CFR 208.33(a)(1), it would most frequently be relevant for noncitizens who are subject to expedited removal under section 235(b)(1) of the INA, 8 U.S.C. 1225(b)(1).").

During the threshold fear interview, asylum seekers will be required to show that the ban does not apply to them or, if it does, that they can rebut the presumption of ineligibility by proving they fall within one of the Rule's exceptions. *Id.* This will be impossible for many given that these screenings typically occur over the phone while asylum seekers are detained, with little or no access to counsel. Language barriers, abusive and dangerous conditions of confinement, acute trauma, and lack of knowledge of the requirements of this complex rule would make it extremely challenging for asylum seekers to overcome this ban in preliminary screenings. Many would be unable to prove to an asylum officer that they should not be banned from the right to apply for asylum by the rule. Those who cannot rebut the presumption will then be forced to meet a "more likely than not" standard just to be able to present a claim to lesser protections in the form of withholding of removal or CAT protection. *Id.*

For those forced to undergo this credible fear screening while in detention, the obstacles to due process are so high as to render success unachievable for most, regardless of the merits of their asylum claim. Asylum seekers will be forced through their fear interviews while in government

CLP_PC_031505

custody in notoriously difficult and abusive conditions,[6] without prior knowledge as to the rule's details or workings, and only a few hours or days away from the dangers and horrors of their flight. Even if legal service providers are able to obtain the ability to provide brief orientation or consultation services prior to a credible fear interview, there will be no meaningful access to representation for asylum seekers navigating this complex process.

The severe consequences asylum seekers would face as a result of implementation of the Proposed Rule's presumption of asylum ineligibility, especially at the expedited removal stage, cannot be understated. American Gateways has witnessed the problems with credible fear interviews firsthand. Indeed, American Gateways has observed several credible fear interview denials where the asylum officer did not follow the law, cut off the applicant's answers to questions, mocked the applicant, or had an interpreter in a language the applicant did not fully understand. Given the reality that Immigration Judges routinely rubberstamp asylum officers' determinations, there is an unacceptable chance that justice will be miscarried. Further, while asylum applicants who reach the Immigration Judge review stage have a right to counsel, Immigration Judges often limit the participation of legal counsel at the review hearing. Often, Immigration Judges do not allow attorneys to ask additional clarifying questions or make legal arguments to support asylum seekers' claims. Most Immigration Judge reviews last less than five minutes, and in many instances the Immigration Judges do not ask for any clarification or additional testimony from applicants.

For example, Ms. C was a detained asylum seeker who was fleeing persecution based on the murder of her husband who was a police officer. He was targeted because he was a police officer who investigated gang activity. After he was killed, Ms. C began to receive threats and was attacked. She fled because she feared that she would be killed if she remained in her home country. She was given a negative credible fear interview finding. She requested an Immigration Judge review. The review before the Immigration Judge took minutes. He affirmed the decision of the asylum officer. American Gateways intervened and requested a reinterview for Ms. C based on the legal error in the asylum officer's decision and the cursory and insufficient review by the Immigration Judge. The Asylum Office granted Ms. C an additional interview where she was represented by American Gateways. She was interviewed for nearly two hours and her attorney was able to provide legal arguments on her behalf. Because of this additional advocacy and

---

6 *See, e.g.*, Catherine E. Shoichet, "The Death Toll in ICE Custody Is the Highest It's Been in 15 Years," CNN, September 30, 2020, https:// www.cnn.com/2020/09/30/us/ice-deaths-detention-2020/index.html; Joel Rose, "ACLU Calls on DHS to Close ICE Detention Centers, Citing High Cost of Empty Beds," NPR, April 28, 2021, https://www.npr.org/2021/04/28/991679868/aclu-calls-on-dhs-toclose-ice-detention-centers-citing-high-cost-of-empty-beds; Laura Wilson, "Violence Against Women and Girls in ICE Custody," Global Rights for Women, September 21, 2020, https://globalrightsforwomen.org/featured/violence-against-women-and-girlsice-custody; Caitlin Dickerson, Seth Freed Wessler, and Miriam Jordan, "Immigrants Say They Were Pressured into Unneeded Surgeries," New York Times, September 29, 2020, https://www.nytimes.com/2020/09/29/us/ice-hysterectomies-surgeries-georgia. html; Ian Urbina, "The Capricious Use of Solitary Confinement against Detained Immigrants," Atlantic, September 6, 2019, https:// www.theatlantic.com/politics/archive/2019/09/ice-uses-solitary-confinement-among-detained-immigrants/597433; and Noah Lanard, "Guards Pepper-Spray Protesting Asylum Seekers at an ICE Detention Center," Mother Jones, June 25, 2020, https://www. motherjones.com/politics/2020/06/guards-pepper-spray-protesting-asylum-seekers-at-an-ice-detention-center.

CLP_PC_031506

representation, the Asylum Office overturned its initial decision in Ms. C's credible fear interview and allowed her to move forward with her asylum claim.

In another instance, a detained American Gateways client was given a negative credible fear interview determination for lack of nexus between her feared harm and a protected ground. Due to American Gateways' representation during the request for review by an Immigration Judge, the client was able to prove up nexus on at least two protected grounds and was issued a notice to appear. She ultimately prevailed in her case. In several other instances, American Gateways' attorneys have helped clients overcome adverse credibility findings during their interview that were largely the result of poor interpretation, false assumptions, or missed questions. In other instances, American Gateways' staff have been able to overturn negative credible fear interview determinations where the asylum officer did not evaluate the applicant for eligibility for protection under the Convention Against Torture.

These due process violations would be magnified if the administration pursues its reported plan to conduct credible fear interviews within days of asylum seekers' arrival in Customs and Border Protection (CBP) custody, where dire conditions and lack of access to counsel would exacerbate the due process nightmare. The Trump administration similarly conducted credible fear interviews in CBP custody through the Prompt Asylum Claim Review (PACR) and Humanitarian Asylum Review Process (HARP) programs, which the Biden administration ended.[7] Resurrecting this policy and imposing the asylum ban in these fear screenings would be a due process fiasco.

Asylum seekers detained in CBP custody have frequently reported[8] being provided insufficient or inedible food and water; lack of access to showers and other basic hygiene; and inability to sleep because of overcrowding, lack of adequate bedding, cold conditions, and lights that are kept on all night. For asylum seekers subjected to PACR and HARP, positive credible fear determinations plummeted[9]: according to a January 2021 United States Government Accountability Office report,

---

7 "Executive Order on Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border." The White House. The United States Government, February 4, 2021. https://www.whitehouse.gov/briefing-room/presidential-actions/2021/02/02/executive-order-creating-a-comprehensive-regional-framework-to-address-the-causes-of-migration-to-manage-migration-throughout-north-and-central-america-and-to-provide-safe-and-orderly-processing/.

8 *See, e.g.,* Human Rights Watch. "'They Treat You Like You Are Worthless': Internal DHS Reports on Abuses by US Border Officials." Human Rights Watch, 21 Oct. 2021, https://www.hrw.org/report/2021/10/21/they-treat-you-you-are-worthless/internal-dhs-reports-abuses-us-border-officials; Human Rights First. "Family Detention at Berks County Residential Center." Human Rights First, 1 Dec. 2022, https://humanrightsfirst.org/wp-content/uploads/2022/12/Final-Berks-Factsheet-12.1.2022_FINAL-1.pdf; Human Rights Watch. "'The Freezer' Abusive Conditions for Women and Children in US Immigration Holding Cells." Human Rights Watch, 28 Feb. 2018, https://www.hrw.org/report/2018/02/28/freezer/abusive-conditions-women-and-children-us-immigration-holding-cells.

9 Human Rights First. "A Pretense of Protection: The Dangerous Impact of the U.S. 'Remain in Mexico' Policy." Human Rights First, Jan. 2023, https://humanrightsfirst.org/wp-content/uploads/2023/01/PretenseofProtection-21.pdf.

CLP_PC_031507

only 18 percent of individuals in PACR and 30 percent in HARP passed their screenings, as shown in the figure below.[10]



Outcomes of Screenings Under Expedited Fear Screening Pilot Programs, October 2019 through March 2020 (as of August 11, 2020)

Expedited Fear Screening Programs combined

| 69% | 23% | 9% |

Prompt Asylum Claim Review

| 73% | 18% | 9% |

Humanitarian Asylum Review Process

| 62% | 30% | 9% |

Negative     Positive     Administrative closure (e.g. withdrawals)

Source: GAO analysis of USCIS data.  |  GAO-21-144

Note: Percentages do not total 100 due to rounding.

United States Government Accountability Office [11]

This is compared to 40 percent nationwide (excluding HARP and PACR) during the same period.[12]

The following examples from the American Gateways experience highlight the impacts of detention on asylum seekers and the ways in which the Proposed Rule would lead to magnified due process violations for detained asylum seekers in particular:

- American Gateways has worked with a number of indigenous Kichwa speakers from Ecuador at the Hutto detention center. After months of difficulty in locating an interpreter that the detained women needed, American Gateways was able to locate **one** interpreter who speaks the correct dialect, which the women could understand. Coordinating a time when the interpreter is available that also corresponds to the rigid schedule at the detention center (so as not to conflict with numerous counts and other meetings at the facility) has often been difficult. Many of these women have family and community support in the U.S. and would be able to find representation and interpretation services much more easily if they were not detained and each of these women are asylum seekers who have suffered a great deal of trauma. Detention has exacerbated their trauma and also made them feel more isolated, due to the inability to communicate effectively with American Gateways, with ICE, with the Asylum Office, and with the Immigration Court.

- American Gateways represented an unaccompanied minor, Miss K, from Sierra Leone who had been incorrectly placed in adult detention at Hutto. She was 17 years old and spoke only Krio. Finding an appropriate interpreter was incredibly difficult and it also became clear that ICE and the contractors at the detention center were communicating (or attempting to communicate) with her in English despite the fact that she did not understand English. Several medical authorizations and other documents were explained to Miss K in English. Despite not understanding what she was signing, she did so out of fear. Once American Gateways was able to obtain a Krio interpreter (of which there are very limited

---

10 U.S. Government Accountability Office. "Central America: Regional Development Plan Includes Strategies to Address Migration, but Implementation Challenges Remain." GAO-21-144, U.S. Government Accountability Office, Feb. 2021, https://www.gao.gov/assets/gao-21-144.pdf.

11 *Id.*

12 *Id.*

CLP_PC_031508

numbers), American Gateways was able to review the documents she signed with her and discovered that she did not understand that she had consented to medical procedures, including a dental exam. Detention made communicating with Miss K more difficult because there were limited options for Krio interpreters. American Gateways had to prepare her asylum case via a phone interpreter when that interpreter was available. She should have been released, and correctly identified as an unaccompanied minor thus limiting her detention, but the language barrier was something that prevented this in the first place.

- American Gateways became very involved in the asylum cases of several women from East Africa because Immigration Judges were requiring proof of female genital mutilation (FGM) in order to grant these women asylum. However, the medical staff at Hutto would not perform the exams needed to prove FGM. American Gateways had to coordinate with an outside clinic and ICE to get the exams performed, but this proved to be burdensome. Detention only creates substantial barriers to these types of efforts, and *pro se* respondents would have little to no chance of prevailing on FGM-based claims when detention facilities refuse access to necessary medical exams.

Detention thus severely raises the hurdles asylum seekers already face in obtaining legal counsel, locating interpreters who speak the asylum seeker's language or dialect, or even collecting any other resources—such as documents or medical proof—that could assist the asylum seeker with overcoming the presumption of asylum ineligibility during credible fear screenings. It is undeniable that these barriers raise grave due process concerns under the Fifth Amendment.

Furthermore, American Gateways emphasizes that the Proposed Rule fails to recognize the significant due process concerns raised by the various parole processes that have already been implemented and from which the Departments claim to draw "lessons" in drafting the Proposed Rule—*i.e.*, the Uniting for Ukraine ("U4U") and Venezuela parole processes, as well as the processes for Cubans, Haitians, and Nicaraguans, under which DHS imposed new consequences for those who cross the border without authorization in the form of returns to Mexico. 88 Fed. Reg. 11704, 11706. These parole programs have been criticized as allowing only small numbers of migrants into the United States, and having a disproportionately negative impact on low-income individuals who may not be able to find sponsors as required under the programs. For example, up to 30,000 "qualifying nationals" per month from Cuba, Nicaragua, Haiti and Venezuela have been allowed "to reside legally in the United States for up to two years and to receive permission to work here during that period" pursuant to the parole process created for migrants of those nationalities.[13] But as the Departments themselves acknowledge, the number of *daily* encounters prior to announcement of these processes was 928 for Cuban, Haitian, and Nicaraguan nationals alone, and over 1,100 for Venezuelan nationals—on average more than *740,220 per year*, or *61,685 per month*. *See* 88 Fed. Reg. 11704, 11706. Moreover, the parole process for Haitians

---

13 Lavers, M. K. (2023, January 6). *Advocacy groups criticize new Biden immigration policies*. Washington Blade: LGBTQ News, Politics, LGBTQ Rights, Gay News. https://www.washingtonblade.com/2023/01/05/advocacy-groups-criticize-new-biden-immigration-policies/.

13

ignores the fact that Haiti lacks a functioning government, creating severe obstacles for Haitian migrants attempting to obtain passports in the first instance.[14]

### B. The Proposed Rule's exceptions to the "rebuttable presumption" will be impossible to navigate for *pro se* asylum seekers.

The Proposed Rule creates a complex system to bypass the rebuttable presumption, which includes demonstrating by the "preponderance of the evidence" that "exceptionally compelling circumstances exist." 88 Fed. Reg. 11704, 11723. The Proposed Rule specifically lists a number of "per se grounds for rebuttal" of the presumption: acute medical emergency, imminent and extreme threat to life or safety (such as rape, kidnapping, torture, or murder), and satisfying the legal definition of a "victim of a severe form of tracking in persons." *Id.*

Navigating this added layer to our already complex asylum system will be particularly problematic given the application of the rebuttable presumption to the credible fear interview stage. Under this Proposed Rule, the asylum officer determines whether the asylum seeker has rebutted this presumption. *Id.* at 11724 ("For each noncitizen referred to an asylum officer for a credible fear interview, the asylum officer would first determine if the noncitizen is covered by and fails to rebut the presumption of ineligibility"). If they have not, they receive a negative fear determination for their asylum claim. *Id.* The asylum officer will then determine whether the asylum seeker established a "reasonable possibility" of persecution or torture—a standard that is higher than the credible fear standard and more difficult to meet.[15] They will likely navigate this rebuttable presumption alone, as asylum seekers very rarely have attorney representation at this stage.

Asylum seekers face a difficult time obtaining representation for their initial asylum office "hearing." Legal representation rates among noncitizens in removal proceedings generally are low. As of 2016, only 37% of individuals appearing before immigration courts secured legal representation.[16] Immigrants in detention were the least likely to obtain representation—only 14% had legal counsel.[17] Access to counsel is often outcome-determinative. Represented detainees are ten-and a-half times more likely than their *pro se* counterparts to win their cases.[18] The disparities are similarly high for asylum seekers (both detained and non-detained). In Fiscal Year (FY) 2020,

---

14 "Passport rush blamed on US policy stalls adoptions in Haiti." Associated Press, February 10, 2023, https://apnews.com/article/biden-politics-united-states-government-caribbean-haiti-f98a84e03e56e2702fb6880ec1825f0f (noting that the "U.S. policy change has unleashed a rush for passports at Haiti's main immigration office," and that "the ensuing demand for Haitian passports has overwhelmed Haiti's passport office in the capital, Port-au-Prince, where people with appointments cannot squeeze through the aggressive crowd or secure new appointments.").

15 American Immigration Council. "Asylum in the United States." Accessed March 26, 2023. https://www.americanimmigrationcouncil.org/research/asylum-united-states.

16 Ingrid Eagly & Steven Shafer, *Access To Counsel In Immigration Court*, Am. Immigration Council (Sept. 28, 2016), https://www.americanimmigrationcouncil.org/research/access-counsel-immigration-court.

17 Eagly, https://www.americanimmigrationcouncil.org/research/access-counsel-immigration-court. Since 2000, representation rates for detained individuals have ranged between roughly 10% and 30%. According to some estimates, the rates leveled off between 2015 and 2017 at about 30%. *See* TRAC Immigration, *Who Is Represented in Immigration Court?* (Oct. 16, 2017), https://trac.syr.edu/immigration/reports/485/.

18 Eagly, https://www.americanimmigrationcouncil.org/research/access-counsel-immigration-court.

CLP_PC_031510

the overall asylum denial rate rose for the eighth straight year to 71.6%.[19] The denial rate for unrepresented asylum seekers was a staggering 82.3% (versus 68.9% for represented asylum seekers).[20] During the first quarter of FY 2020, less than 27% of asylum requests were granted in immigration court—a 36.6% decline from FY 2016.[21] The asylum grant rate for Central American migrants has declined even more steeply to 13.3%—a 50% decline from FY 2016.[22] For those caged in detention facilities, where myriad barriers frustrate efforts to access counsel and basic legal information, circumstances are even more dire. Because noncitizens appearing before immigration courts have no right to government-appointed counsel, *pro se* respondents must often confront the complex process of drafting filings, filling out forms, and presenting arguments to a judge with little to no legal, technical, or linguistic guidance. As a result, thousands of detained immigrations without legal representation rely on legal services organizations like American Gateways for *pro se* legal assistance.

Furthermore, even if they somehow proceed past the credible fear interview stage to a full asylum adjudication, *pro se* respondents face significant challenges in appearing before immigration courts without counsel. Most individuals in removal proceedings do not speak English and have little, if any, familiarity with U.S. immigration law, which courts have described as "a maze of hyper-technical statutes and regulations that engender waste, delay, and confusion," including among immigration lawyers.[23] Applications for relief must be submitted in English, or they will be deemed abandoned and the respondent ordered removed. Without the assistance of counsel, few individuals—many of whom are torture or trauma survivors who suffer from post-traumatic stress disorder or other mental health ailments—can successfully complete required legal forms, much less complete them within the required time constraints. Given this, it is imperative that asylum seekers be given an opportunity to obtain counsel and present all evidence in support of their claims in full merits hearings before Immigration Judges.

The Biden administration faces a very real challenge at the southern border. This region is where the most vulnerable asylum seekers arrive, including those who do not have access to a plane ticket to fly to the United States through the newly established parole programs. However, the Proposed Rule is not the answer to these challenges. This Proposed Rule adds unnecessary complexity to

---

19    TRAC Immigration, *Asylum Denial Rates Continue To Climb* (Oct. 28, 2020), https://trac.syr.edu/immigration/reports/630/ (asylum was granted in just 26.3% of cases; in an additional 2.1% of cases, some other form of relief (e.g., statutory withholding of removal or withholding of removal under CAT) was granted when asylum itself was denied); *see also* TRAC Immigration, *Record Number of Asylum Cases in FY 2019* (Jan. 8, 2020), https://trac.syr.edu/immigration/reports/588/ (reporting asylum denial rate of 69% in FY 2019).

20 TRAC Immigration, *Asylum Denial Rates Continue to Climb*, *supra* note 19. Between FY 2019 and FY 2020, the percentage of unrepresented asylum seekers increased from 15.6% to 20%. *Id.* This decrease in representation is one of several factors that have contributed to the increase in denial rates.

21 Human Rights First, *Grant Rates Plummet As Trump Administration Dismantles U.S. Asylum System, Blocks and Deports Refugees*, Fact Sheet, 2 (June 2020), https://www.humanrightsfirst.org/sites/default/files/AdministrationDismantlingUSAsylumSystem.pdf. USCIS has not released data for the first quarter of FY 2020. As of FY 2019, the asylum grant rate for affirmative asylum claims adjudicated before USCIS was 30.7%—a decline of 28.8% since FY 2016. *Id.*

22 *Id.* at 1; *see also* TRAC Immigration, *Asylum Denial Rates Continue to Climb*, *supra* note 19 (reporting that denial rates for asylum seekers from Honduras, Guatemala, and El Salvador in FY 2020 were 87.3%, 85.8%, and 85%, respectively).

23 *Drax v. Reno*, 338 F.3d 98, 99 (2d Cir. 2003).

CLP_PC_031511

the asylum process that will become insurmountable barriers to asylum, especially to those who do not have legal counsel.

### C. The Proposed Rule's presumption of asylum ineligibility would disparately harm black, brown, and indigenous asylum seekers.

The Proposed Rule discriminates against asylum seekers based on manner of entry and transit and will have a racially disparate impact on asylum seekers from Africa, the Caribbean, and Latin America. The proposed ban, which applies only to people who seek protection at the southern border, will disproportionately harm people of color who do not have the resources or ability to arrive in the United States by plane.

The United States and other countries employ visa regimes to prevent low income people of color from reaching their countries' territories to seek asylum while often allowing access to people from wealthier and predominantly white nations.[24] Imposing a ban on refugees seeking safety at the southwest border will, like the Trump third-country transit ban, disproportionately harm people of color who must undertake an often difficult and dangerous journey to arrive in the United States by way of the southern border. During the period that the Trump transit ban was implemented, immigration court asylum denial rates skyrocketed for many Black, Brown, and Indigenous asylum seekers requesting safety at the southern border.[25] For instance, asylum grant rates declined by 45 percent for Cameroonian asylum applicants, 32.4 percent for Cubans, 29.9 percent for Venezuelans, 17 percent for Eritreans, 12.9 percent for Hondurans, 12 percent for Congolese (DRC), and 7.7 percent for Guatemalans from December 2019 to March 2020, compared to the year before the third-country transit asylum ban began to affect refugee claims, according to data analyzed by Syracuse University's Transactional Records Access Clearinghouse.

Additionally, as discussed below, requiring asylum seekers to use CBP One to seek asylum at the border disparately harms Black asylum seekers due to racial bias in its facial recognition technology[26] and is inaccessible to many Indigenous, African, and other asylum seekers due to language barriers. This proposed asylum ban will significantly thwart the Biden administration's stated commitment to racial justice and equity.[27]

The ban also builds in nationality-based discrimination in access to asylum, as it largely bans asylum for people who do not enter the United States via limited parole initiatives or previously scheduled appointments at ports of entry while simultaneously only affording limited access to

---

24 Women's Refugee Commission. "Visa Regimes: A Threat to Migrants' Access to Safety and Asylum." June 2022. Accessed March 26, 2023. https://www.womensrefugeecommission.org/wp-content/uploads/2022/06/Visa-Regimes-A-Threat-to-Migrants-Access-to-Safety-and-Asylum.pdf.

25 Human Rights First. "The Asylum Ban: Ending the Ban and Protecting Asylum Seekers." January 2023. Accessed March 26, 2023. https://humanrightsfirst.org/wp-content/uploads/2023/01/AsylumBanFactsheet_final2.pdf.

26 Melissa del Bosque, "Facial recognition bias frustrates Black asylum applicants to US, advocates say," *The Guardian*, February 8, 2023.

27 "Executive Order on Further Advancing Racial Equity and Support for Underserved Communities Through The Federal Government," EO 13985, February 16, 2023, https://www.whitehouse.gov/briefing-room/presidential-actions/2023/02/16/executive-order-on-further-advancing-racial-equity-and-support-for-underserved-communities-through-the-federal-government/ (accessed March 26, 2023).

CLP_PC_031512

parole initiatives for certain nationalities.[28] For instance, while there are currently limited parole initiatives for some nationalities, there are no similar parole initiatives for people from Guatemala, Honduras, and El Salvador—and recent reporting has indicated the Biden administration plans to wield the asylum ban against these nationalities.[29]

### D.  The Proposed Rule's presumption of asylum ineligibility raises concerns regarding domestic and international refugee and asylum law obligations.

As a signatory to the 1967 Protocol of the 1951 Convention Relating to the Status of Refugees (the "1967 Protocol"),[30] the United States has obligations under international law to afford protections to individuals who have a well-founded fear of being persecuted in their home country. Furthermore, when Congress passed the Refugee Act in 1980, thereby incorporating those obligations into domestic law, it made its intentions abundantly clear: The purpose was to enforce the "historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands."[31]

The Proposed Rule, in its totality, contravenes this congressional intent and U.S. law governing asylum access, expedited removal procedures, and prohibitions on the return of refugees to persecution and torture. In purporting to protect the United States from asylum seekers, the Proposed Rule turns the presumption in favor of extending protections to asylum seekers on its head. The Departments' attempt to dismantle the asylum system is unlawful and indefensible.

As a historical matter, the United States played a lead role in drafting the Refugee Convention in the aftermath of World War II. By later acceding to the Refugee Protocol, the United States promised to abide by the Convention's legal requirements. These requirements include non-discriminatory access to asylum, the prohibition against returning refugees to persecution, and the prohibition against imposing improper penalties on people seeking refugee protection based on manner of entry. The U.N. Refugee Agency (UNHCR) previously warned, with respect to the Trump administration's entry and transit bans, that such asylum bans are not consistent with fundamental protections of refugee law, including the right to seek asylum, the principle of non-refoulement, and the prohibition against penalties for irregular entry. By denying asylum where an individual has not used certain limited migration pathways, the Proposed Rule attempts to unlawfully use the existence of lawful pathways as a justification to deny access to asylum at the

---

28 Human Rights Watch. "Biden's New Plan No Help for Desperate Venezuelan Refugees." Human Rights Watch, 28 Oct. 2022, https://www.hrw.org/news/2022/10/28/bidens-new-plan-no-help-desperate-venezuelan-refugees.

29 NBC News. "Biden to block migrants with Trump-era Stephen Miller tactic." NBC News, 8 Mar. 2022, https://www.nbcnews.com/politics/immigration/biden-block-migrants-trump-era-stephen-miller-tactic-rcna71282.

30 The 1967 Protocol incorporates Articles 2 through 34 of the 1951 Refugee Convention, making those provisions binding on countries that have acceded to the 1967 Protocol, including countries like the United States that have not acceded to the Convention itself. See Protocol Relating to the Status of Refugees, Jan. 31, 1967, 606 U.N.T.S. 267, https://www.refworld.org/docid/3ae6b3ae4.html (hereinafter the 1967 Protocol); Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 137, https://www.refworld.org/docid/3be01b964.html (hereinafter the 1951 Refugee Convention).

31 Refugee Act of 1980, § 101(a), Pub. L. No. 96–212, 94 Stat. 102 (1980) (hereinafter the 1980 Refugee Act).

CLP_PC_031513

border.[32] UNHCR, IOM, and UNICEF recently warned that the provision of safe pathways "cannot come at the expense of the fundamental human right to seek asylum."[33]

Furthermore, the Refugee Act of 1980, which incorporated these principles of the 1967 Protocol into domestic U.S. law, provides any person arriving at a U.S. border the right to seek asylum, regardless of the person's status or manner of entry. Specifically, 8 U.S.C. 1158 provides that people may apply for asylum regardless of manner of entry into the United States. It also delineates limited exceptions where an asylum seeker may be denied asylum based on travel through another country, but these restrictions only apply where an individual was "firmly resettled" in another country (defined to mean the person was eligible for or received permanent legal status in that country) or if the U.S. has a formal "safe third country" agreement with a country where refugees would be safe from persecution and have access to fair asylum procedures. The statute prohibits the administration from issuing restrictions on asylum that are inconsistent with these provisions. 8 U.S.C. 1231 codified the prohibition against returning refugees to countries where they face persecution.

But the central function of this Proposed Rule is to limit asylum eligibility at the southern border based on a person's manner of entry or transit, their ability to access technology, and/or the number of appointments that DHS decides to make available on a given day. The presumption of asylum ineligibility that arises from this function directly contravenes the principle of non-discriminatory asylum access codified by the 1980 Refugee Act. The Proposed Rule, which conditions access to asylum on manner of entry and transit, would result in the return of refugees to danger and unequivocally contravenes these provisions of U.S. law.

Indeed, this central premise of the Rule recalls similar bans issued by the Trump administration, which were repeatedly struck down by federal courts.[34] During the time it was in place, the Trump-era rule that banned asylum seekers based on their manner of transit resulted in migrants with strong claims to asylum being rapidly deported to their persecutors, and separated countless families when refugees barred from asylum under the rule obtained lesser protections that did not allow them to apply for family members abroad. These harms will inevitably recur under the Proposed Rule.

---

32 *See generally* Comment on the Proposed Rule by the Department of Homeland Security (DHS) and the Executive Office for Immigration Review (EOIR) on Circumvention of Lawful Pathways | Human Rights Watch. "Comment on the Proposed Rule by the Department of Homeland Security (DHS) and the Executive Office for Immigration Review (EOIR) on Circumvention of Lawful Pathways," March 24, 2023. https://www.hrw.org/news/2023/03/24/comment-proposed-rule-department-homeland-security-dhs-and-executive-office.

33 "UNHCR, IOM and UNICEF Welcome New Pathways for Regular Entry to the US, Reiterate Concern over Restrictions on Access to Asylum," Joint statement by UNHCR, IOM, and UNICEF, October 14, 2022, https://www.unhcr.org/en-us/news/press/2022/10/63497be44/unhcr-iom-and-unicef-welcome-new-pathways-for-regular-entry-to-the-us-reiterate.html (accessed March 26, 2023).

34 *O.A. et al. v. Donald J. Trump et al.* and *S.M.S.R. et al. v. Donald J. Trump et al.*, No. 1:18-cv-02718-RDM, Memorandum Opinion, (D.D.C. Aug. 2, 2019), https://www.caircoalition.org/sites/default/files/Memo%20Opinion%20Dkt.%2092.pdf (accessed March 26, 2023); *Capital Area Immigrants' Rights Coal. v. Trump*, Civil Action No. 19-2117 (TJK) and Civil Action No. 19-2530 (TJK), (D.D.C. June 30, 2020), https://casetext.com/case/capital-area-immigrants-rights-coal-v-trump (accessed March 26, 2023); *East Bay v. Barr*, No. 19-cv-04073-JST, (N.D. Cal. February 16, 2021), https://www.aclu.org/cases/east-bay-v-barr?document=pi-order (accessed March 26, 2023).

CLP_PC_031514

The Proposed Rule also violates specific congressional intent concerning asylum seekers. In 1996, Congress created the expedited removal process through the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA). Under this process, asylum seekers placed in expedited removal who establish a credible fear of persecution must be referred for full asylum adjudications. The Proposed Rule attempts to unlawfully circumvent the credible fear screening standard established by Congress, which was intended to be a low screening threshold. The government is required to refer asylum seekers in expedited removal for full asylum adjudications if they can show a "significant possibility" that they could establish asylum eligibility in a full hearing. The Proposed Rule attempts to eviscerate this standard by *first* requiring asylum seekers to prove to an asylum officer by a preponderance of evidence that they can rebut the presumption of asylum ineligibility, and *then* requiring those who cannot overcome the presumption to meet a higher fear standard before being permitted to seek protection. This provision is inconsistent with U.S. law.

In addition, the Proposed Rule violates the Refugee Convention's prohibition against imposing improper penalties on asylum seekers based on their irregular entry into the country of refuge. The Departments explicitly note that the asylum ban would inflict "consequences" on people seeking asylum—a blatant attempt to punish people based on their manner of entry into the United States. These consequences could include the denial of access to asylum, deportation to harm, family separation, and deprivation of a path to naturalization. With respect to the Trump administration's entry ban, UNHCR has stated that "[n]either the 1951 Convention nor the 1967 Protocol permits parties to condition access to asylum procedures on regular entry."[35]

The Proposed Rule's implementation of a presumption of asylum ineligibility for many noncitizens entering the U.S. from the southern border violates these key provisions of U.S. law and treaty commitments. Indeed, similar Trump administration asylum bans targeting refugees at the border based on manner of entry and transit were vacated and enjoined by federal courts for violating these provisions of U.S. law, as discussed throughout these comments. In 2021, when the Biden administration first considered adopting an asylum ban, legal counsel for the White House warned that it could be struck down as illegal for the same reason that federal courts struck down the Trump administration bans. Nonetheless, the Departments have decided to proceed with this patently illegal policy.[36]

Finally, the Proposed Rule will, in effect, shift to other countries the responsibility for adjudicating asylum claims, providing appropriate reception arrangements, and granting international

---

[35] *See generally* Comment on the Proposed Rule by the Department of Homeland Security (DHS) and the Executive Office for Immigration Review (EOIR) on Circumvention of Lawful Pathways | Human Rights Watch. "Comment on the Proposed Rule by the Department of Homeland Security (DHS) and the Executive Office for Immigration Review (EOIR) on Circumvention of Lawful Pathways," March 24, 2023. https://www.hrw.org/news/2023/03/24/comment-proposed-rule-department-homeland-security-dhs-and-executive-office.

[36] Camilo Montoya-Galvez, "U.S. Officials Clashed over Asylum Restriction, and Its Legality, Before Biden Proposed It," *CBS News*, March 1, 2023, https://www.cbsnews.com/news/immigration-biden-asylum-restrictions-legality/ (accessed March 26, 2023).

CLP_PC_031515

protection.[37] This is true regardless of whether the individual is pursuing protection in the United States. The Proposed Rule would have a potential significant negative impact on those individuals, particularly in cases where they lack a reasonable connection or link to those States but do have one to the United States.[38]

The Proposed Rule's conditionality based on transit vitiates the right to seek asylum and the core principle of non-refoulement.[39] First, such conditionality amounts to a unilateral, de facto transfer of responsibility for adjudication to another state without the necessary safeguards in place, and second, the conditionality goes beyond the exhaustive exclusion framework contemplated in the 1951 Convention and its 1967 Protocol.[40]

Asylum seekers should ordinarily be processed in the state in which they seek asylum.[41] As a limited exception to this general rule, states may enter into an agreement with another state to facilitate the transfer of asylum seekers.[42] While international law does not prevent states from entering into responsibility-sharing arrangements which allocate responsibility for adjudicating asylum claims between them, it does require protections to ensure that the individual's rights are upheld.[43] Any transfer of people who may be in need of international protection from one country to another must ensure that asylum seekers receive the protection guaranteed to them by the 1951 Convention, including but not limited to, the protection from refoulement articulated in Article 33.[44]

### E. The Proposed Rule's presumption of asylum ineligibility for asylum seekers who did not obtain an appointment to present at the border using CBP One raises equal access concerns.

The Proposed Rule introduces an entirely new concept into the U.S. asylum system—it renders asylum at the southern border contingent on migrants' ability to access and properly utilize a mobile phone app prior to their arrival. All asylum seekers attempting to enter the United States between ports of entry and those arriving at ports who are subject to the new transit grounds of ineligibility will be ineligible for asylum unless they made an advance appointment to present at the port of entry using the CBP One app.

Requiring access to technology to secure asylum access fails to account for gaps in technology, language access, and economic disparities between groups of migrants attempting to use the app while fleeing harm. The result will be an asylum system that leaves behind those with fewer resources, often those in the greatest need.

---

37 *See generally* United Nations High Commissioner for Refugees (UNHCR), "Comments of the United Nations High Commissioner for Refugees on the Proposed Rule: Circumvention of Lawful Pathways" (20 March 2023), accessed March 26, 2023, https://www.refworld.org/pdfid/6417e6674.pdf.

38 *Id.*

39 *Id.*

40 *Id.*

41 *Id.*

42 *Id.*

43 *Id.*

44 *Id.*

CLP_PC_031516

Furthermore, the CBP One app in its limited roll-out has already proven extremely flawed: users have reported frequent glitches and appointments that fill up before they can access them; and the facial recognition technology is racially disparate in application, often rejecting photos of migrants with darker skin.[45]

CBP One is an extremely flawed government tool for requesting an appointment at a port of entry and is inaccessible to many asylum seekers due to financial, language, technological, and other barriers. It clearly discriminates against Black and Indigenous asylum seekers, and has very limited appointment slots such that requiring asylum seekers to use the application essentially turns asylum access into a lottery. The Proposed Rule attempts to establish CBP One as the only mechanism to request asylum at the southern border and seeks to punish those who cannot wait indefinitely in danger while they attempt to schedule an appointment.

The rule requires asylum seekers at the southwest border to schedule appointments through the CBP One app and would generally deny asylum to refugees who arrive at a border port of entry without a previously scheduled appointment and were not denied protection in a transit country. CBP One is impossible for **many asylum seekers to access or use**,[46] including those who do not have the resources to obtain a smartphone, access to Wi-Fi, or the ability to navigate the app. The app is not available in most languages—including Indigenous languages—and all error messages are in English, effectively barring many asylum seekers from using the app. It also disparately harms **Black asylum seekers**[47] due to racial bias in its facial recognition technology, which has **prevented** many from obtaining an appointment. Asylum seekers who can access and navigate the app are still often unable to schedule appointments due to extremely limited slots and are forced to remain in dangerous conditions indefinitely. Requiring asylum seekers to use CBP One at the southwest border also raises concerns that the system will be used for **illegal metering** (based not on wait time but on luck, technology skills, or resources to secure an appointment—turning asylum access in effect into a lottery).

Requiring asylum seekers to schedule an appointment through CBP One has already resulted in horrific violence and death, including the murder of a 17-year-old Cuban child in Mexico who was required to wait weeks for an appointment.[48]

    **F. If the Proposed Rule is to apply at all, it should not apply at the credible fear interview stage; asylum seekers should be given the opportunity to have an asylum hearing before the Immigration Judge.**

---

45 Herrera, J., Solomon, D., Articles, V., Holley, P., Cantu, R., Hooks, C., Hardy, M., Oldershausen, S. V., Scudder, C., Sharpe, P., Ross, R., O'Neal, S., & McCarthy, W. (2023, March 2). *Fleeing for Your Life? There's An App for That.* Texas Monthly. https://www.texasmonthly.com/news-politics/cbp-app-asylum-biden-administration/.

46 Leutert, Stephanie, and Caitlyn Yates. "Asylum Processing at the U.S.-Mexico Border: February 2023." *Strauss Center for International Security and Law*. The University of Texas at Austin, February 2023. https://www.strausscenter.org/wp-content/uploads/Feb_2023_Asylum_Processing.pdf.

47 Bosque, Melissa del. "Facial Recognition Bias Frustrates Black Asylum Applicants to US, Advocates Say." the Guardian, February 8, 2023. https://www.theguardian.com/us-news/2023/feb/08/us-immigration-cbp-one-app-facial-recognition-bias.

48 Herrera, Jack, Dan Solomon, View Articles, Peter Holley, Ryan Cantu, Christopher Hooks, Michael Hardy, et al. "Fleeing for Your Life? There's An App for That." Texas Monthly, March 2, 2023. https://www.texasmonthly.com/news-politics/cbp-app-asylum-biden-administration/.

CLP_PC_031517

The asylum ban would apply in the fundamentally flawed expedited removal process as well as in full asylum adjudications before USCIS and the immigration court. As mentioned above, expedited removal is the process that allows the U.S. government to deport people arriving at the border without ever seeing an Immigration Judge if they do not express fear or do not pass a "credible fear" screening interview where they must show a significant possibility that they could establish asylum eligibility in a full hearing.

In expedited removal, asylum seekers covered by the Proposed Rule would be required to gather the evidence and arguments necessary to "rebut the presumption of ineligibility" (in other words, prove they fall within one of the few exceptions to the rule). Those who fail to do so would be automatically subject to a higher screening standard (in violation of 8 U.S. Code § 1225 governing credible fear interviews) and would face deportation to danger if they cannot pass the screening. Even those who do pass would be subject to the presumption of ineligibility in an immigration hearing and if barred from asylum would only be eligible for lesser forms of protection known as Withholding of Removal or Convention Against Torture (CAT) protection. These protections do not provide a pathway to citizenship, are subject to revocation at any time, and do not allow people to petition for their spouses and children.

The Proposed Rule will also apply to immigrants in full asylum hearings before USCIS and the immigration court. In these proceedings, asylum seekers would be denied asylum if they cannot rebut the presumption of ineligibility, resulting in the deportation of many refugees and leaving others with only lesser forms of protection available to them.

Asylum seekers who are banned by the rule during their credible fear interviews would have to meet a heightened screening standard in order to access immigration court hearings and would be subject to deportation if they cannot pass the screening. As discussed above, the Proposed Rule's attempt to illegally elevate the credible fear standard established by Congress violates the statute and congressional intent in setting a low screening threshold.

Even when an applicant who applies for asylum affirmatively is able to develop a full evidentiary record before an asylum officer, it is still extremely difficult to prevail on meritorious claims. For detained applicants, it is even harder to prevail on a meritorious claim before an asylum officer. Detained applicants are much more likely to be unrepresented and rarely have the ability to develop evidence before the asylum officer. In these cases, it is even more critical that applicants have the opportunity to present their claims at a full evidentiary hearing before an Immigration Judge.

Ultimately, to ensure that asylum seekers due process rights are protected, they must receive full hearings in front of Immigration Judges—not just a *de novo* record review. Eliminating the full hearing does not properly balance efficiency and fairness considerations especially, as noted above, for detained and other *pro se* litigants. If the Departments want to increase efficiency, then they should place all applicants in Section 240 removal proceedings instead of expedited removal proceedings, which are only compounding the existing backlog of cases. Placing applicants whose defensive asylum applications are denied by USCIS into full Section 240 proceedings will also remedy the disparate treatment of defensive cases and affirmative cases, the latter of which are referred to Immigration Court for a full hearing if denied by USCIS.

CLP_PC_031518



Travel.State.Gov > Travel Advisories > Mexico Travel Advisory

Print    Email    Facebook    Twitter    More

# Mexico Travel Advisory

| Travel Advisory | See State Summaries | Ⓒ Ⓚ |
| --- | --- | --- |
| October 5, 2022 | | |

**Last Updated: Reissued with updates to health information**

See state summaries and advisory levels below for information on your specific travel destination. Some areas of Mexico have increased risk of crime and kidnapping.

**Country Summary**: Violent crime – such as homicide, kidnapping, carjacking, and robbery – is widespread and common in Mexico. The U.S. government has limited ability to provide emergency services to U.S. citizens in many areas of Mexico, as travel by U.S. government employees to certain areas is prohibited or restricted. In many states, local emergency services are limited outside the state capital or major cities.

U.S. citizens are advised to adhere to restrictions on U.S. government employee travel. State-specific restrictions are included in the individual state advisories below. U.S. government employees may not travel between cities after dark, may not hail taxis on the street, and must rely on dispatched vehicles, including app-based services like Uber, and regulated taxi stands. U.S. government employees should avoid traveling alone, especially in remote areas. U.S. government employees may not drive from the U.S.-Mexico border to or from the interior parts of Mexico, except daytime travel within Baja California and between Nogales and Hermosillo on Mexican Federal Highway 15D, and between Nuevo Laredo and Monterrey on Highway 85D.

Read the country information page for additional information on travel to Mexico.

**Do Not Travel To:**

- **Colima state** due to **crime** and **kidnapping**.

## Travel Advisory Levels



### Information for Vaccinated Travelers

The CDC's latest guidance on international travel for vaccinated people can be found here .

### Assistance for U.S. Citizens

U.S. Embassy Mexico City
Paseo de la Reforma 305
Colonia Cuauhtemoc
06500 Ciudad de

CLP_PC_033467

- [Guerrero state](#) due to **crime**.
- [Michoacan state](#) due to **crime** and **kidnapping**.
- [Sinaloa state](#) due to **crime** and **kidnapping**
- [Tamaulipas state](#) due to **crime** and **kidnapping**.
- [Zacatecas](#) state due to **crime** and **kidnapping**.

**Reconsider Travel To:**

- [Baja California](#) state due to **crime** and **kidnapping**.
- [Chihuahua state](#) due to **crime** and **kidnapping**.
- [Durango state](#) due to **crime**.
- [Guanajuato state](#) due to **crime** and **kidnapping**.
- [Jalisco state](#) due to **crime** and **kidnapping**.
- [Morelos state](#) due to **crime**.
- [Sonora state](#) due to **crime** and **kidnapping**.

**Exercise Increased Caution When Traveling To:**

- [Aguascalientes](#) state due to **crime**.
- [Baja California Sur state](#) due to **crime**.
- [Chiapas state](#) due to **crime**.
- [Coahuila state](#) due to **crime**.
- [Hidalgo state](#) due to **crime**.
- [Mexico City](#) due to **crime**.
- [Mexico State](#) due to **crime**.
- [Nayarit state](#) due to **crime**.
- [Nuevo Leon](#) state due to **crime** and **kidnapping**.
- [Oaxaca state](#) due to **crime**.
- [Puebla state](#) due to **crime** and **kidnapping**.
- [Queretaro state](#) due to **crime**.
- [Quintana Roo state](#) due to **crime** and **kidnapping**.
- [San Luis Potosi state](#) due to **crime** and **kidnapping**.
- [Tabasco state](#) due to **crime**.
- [Tlaxcala state](#) due to **crime**.
- [Veracruz state](#) due to **crime**.

**Exercise Normal Precautions When Traveling To:**

- [Campeche state](#)
- [Yucatan state](#)

Visit our website for [Travel to High-Risk Areas](#).

If you decide to travel to Mexico:

- Review the [U.S. Embassy's webpage](#) on COVID-19.
- Visit the CDC's web page on [Travel and COVID-19](#).
- Keep traveling companions and family back home informed of your travel plans. If separating from

Mexico
Mexico

Telephone
Emergency
U.S. Citizen Services:
From Mexico 800-681-9374 or 55-8526-2561.
From the United States
1-844-528-6611

Fax

Email
[Contact Form](#)

Website
[U.S. Embassy Mexico City](#)

**Mexico Map**

View Larger Map

**Search for Travel Advisories**

Country or area 

your travel group, send a friend your GPS location. If taking a taxi alone, take a photo of the taxi number and/or license plate and text it to a friend.

- Use toll roads when possible and avoid driving alone or at night. In many states, police presence and emergency services are extremely limited outside the state capital or major cities.

- Exercise increased caution when visiting local bars, nightclubs, and casinos.

- Do not display signs of wealth, such as wearing expensive watches or jewelry.

- Be extra vigilant when visiting banks or ATMs.

- Enroll in the **Smart Traveler Enrollment Program (STEP)** to receive Alerts and make it easier to locate you in an emergency.

- Follow the Department of State on **Facebook** and **Twitter**.

- Follow the U.S. Embassy on Facebook and Twitter.

- Review the **Country Security Report** for Mexico.

- Mariners planning travel to Mexico should check for U.S. maritime **advisories** and **alerts**, which include instructions on reporting suspicious activities and attacks to Mexican naval authorities.

- Prepare a contingency plan for emergency situations. Review the **Traveler's Checklist**.

- Visit the CDC page for the latest Travel Health Information related to your travel.

## Aguascalientes state – Exercise Increased Caution

Exercise increased caution due to crime.

Criminal activity and violence may occur throughout the state.

There are no restrictions on travel for U.S. government employees in Aguascalientes state.

## Baja California state – Reconsider Travel

Reconsider travel due to crime and kidnapping.

Transnational criminal organizations compete in the border area to establish narco-trafficking and human smuggling routes. Violent crime and gang activity are common. Travelers should remain on main highways and avoid remote locations. Of particular concern is the high number of homicides in the non-tourist areas of Tijuana. Most homicides appeared to be targeted; however, criminal organization assassinations and territorial disputes can result in bystanders being injured or killed. U.S. citizens and LPRs have been victims of kidnapping.

U.S. government employees must adhere to the noted restrictions:

- **Mexicali Valley:** U.S. government employees should avoid the Mexicali Valley due to the heightened possibility of violence between rival

CLP_PC_033469

cartel factions. The boundaries of the restricted area are: to the east, the Baja California/Arizona and Baja California/Sonora borders; to the south, from La Ventana (on Highway 5) due east to the Colorado River; to the west, Highway 5; and to the north, Boulevard Lazaro Cardenas/Highway 92/Highway 1 to Carretera Aeropuerto, from the intersection of Highway 1 and Carretera Aeropuerto due north to the Baja California/California border, and from that point eastward along the Baja California/California border.

Travelers may use Highways 2 and 2D to transit between Mexicali, Los Algodones, and San Luis Rio Colorado during daylight hours. Travelers may also use Highways 1 and 8 to transit to and from the Mexicali Airport during daylight hours. Travel on Highway 5 is permissible during daylight hours.

There are no other travel restrictions for U.S. government employees in Baja California state. These include high-traffic tourism areas of border and coastal communities, such as **Tijuana**, **Ensenada**, and **Rosarito**.

### Baja California Sur state – Exercise Increased Caution

Exercise increased caution due to crime.

Criminal activity and violence may occur throughout the state.

There are no restrictions on travel for U.S. government employees in Baja California Sur state, which includes tourist areas in: **Cabo San Lucas, San Jose del Cabo,** and **La Paz**.

### Campeche state – Exercise Normal Precautions

Exercise normal precautions.

There are no restrictions on travel for U.S. government employees in Campeche state.

### Chiapas state – Exercise Increased Caution

Exercise increased caution due to crime.

Criminal activity and violence may occur throughout the state.

There are no restrictions on travel for U.S. government employees in Chiapas state, which includes tourist areas in: **Palenque, San Cristobal de las Casas,** and **Tuxtla Gutierrez**.

### Chihuahua state – Reconsider Travel

Reconsider travel due to crime and kidnapping.

Violent crime and gang activity are common. Most homicides are targeted assassinations against members of criminal organizations. Battles for territory between criminal groups have resulted in violent crime in areas frequented by U.S. citizens and U.S. government employees, including restaurants and malls during daylight hours. Bystanders have been injured or killed in shooting incidents. U.S. citizens and LPRs have been victims of kidnapping.

U.S. government employee travel is limited to the following areas with the noted restrictions:

- **Ciudad Juarez:** U.S. government employees may travel to the area of Ciudad Juarez bounded to the east by Bulevar Independencia; to the south by De los Montes Urales/Avenida Manuel J Clouthier/Carretera de Juarez; to the west by Via Juan Gabriel/Avenida de los Insurgentes/Calle Miguel Ahumada/Francisco Javier Mina/Melchor Ochampo; and to the north by the U.S.-Mexico border. Direct travel to the Ciudad Juarez airport (officially called Abraham Gonzalez International Airport) and the factories located along Bulevar Independencia and Las Torres is permitted. Travel to San Jeronimo is permitted only through the United States via the Santa Teresa U.S. Port of Entry; travel via Anapra is prohibited.

U.S. government employees may only travel from Ciudad Juarez to Chihuahua City during daylight hours via Federal Highway 45, with stops permitted only at the Federal Police station, the Umbral del Milenio overlook area, the border inspection station at KM 35, and the shops and restaurants on Federal Highway 45 in the town of Villa Ahumada.

- **Chihuahua City:** U.S. government employees may travel at any time to the area of Chihuahua City bounded to the north by Avenida Transformación; to the east by Avenida Tecnológico/Manuel Gómez Morin; to the west by the city boundary; and to the south by Route 16/Calle Tamborel.
- **Nuevo Casas Grandes Area (including Nuevo Casas Grandes, Casas Grandes, Mata Ortiz, Colonia Juarez, Colonia LeBaron, and Paquime):** U.S. government employees may only travel to the Nuevo Casas Grandes area during daylight hours through the United States, entering Mexico at the Palomas U.S. Port of Entry on New Mexico Route 11 before connecting to Mexico Federal Highway 2, and subsequently Federal Highway 10, to Nuevo Casas Grandes. Employees are permitted to stay overnight in the cities of Nuevo Casas Grandes and Casas Grandes only.
- **Ojinaga:** U.S. government employees must travel to Ojinaga via U.S. Highway 67 and enter through the U.S. Port of Entry in Presidio, Texas.
- **Palomas:** U.S. government employees must travel to Palomas via U.S. highways through the U.S. Port of Entry in Columbus, New Mexico.

U.S. government employees may not travel to other areas of Chihuahua, including **Copper Canyon**.

### Coahuila state – Exercise Increased Caution

Exercise increased caution due to crime.

Violent crime and gang activity occur in parts of Coahuila state.

U.S. government employees must adhere to the following travel restrictions:

- **Zaragoza, Morelos, Allende, Nava, Jimenez, Villa Union, Guerrero, and Hidalgo municipalities**: U.S. government employees may not travel to these municipalities.
- **Piedras Negras and Ciudad Acuña:** U.S. government employees must travel directly from the United States and observe a curfew from midnight to 6:00 a.m. in both cities.

There are no other restrictions on travel for U.S. government employees in Coahuila state.

### Colima state – Do Not Travel

Do not travel due to crime and kidnapping.

Violent crime and gang activity are widespread. Most homicides are targeted assassinations against members of criminal organizations. Shooting incidents between criminal groups have injured or killed bystanders. U.S. citizens and LPRs have been victims of kidnapping.

Travel for U.S. government employees is limited to the following areas with noted restrictions:

- **Manzanillo:** U.S. government employee travel is limited to the tourist and port areas of Manzanillo.
- Employees traveling to Manzanillo from Guadalajara must use Federal Toll Road 54D during daylight hours.

U.S. government employees may not travel to other areas of Colima state.

### Durango state – Reconsider Travel

Reconsider travel due to crime.

Violent crime and gang activity are common in parts of Durango state.

U.S. government employees must adhere to the following travel restrictions:

- **West and south of Federal Highway 45:** U.S. government employees may not travel to this region of Durango state.

There are no other restrictions on travel for U.S. government employees in Durango state.

### Guanajuato state – Reconsider Travel

Reconsider travel due to crime and kidnapping.

Gang violence, often associated with the theft of petroleum and natural gas from the state oil company and other suppliers, occurs in Guanajuato, primarily in the south and

CLP_PC_033472

central areas of the state. Of particular concern is the high number of murders in the southern region of the state associated with cartel-related violence. U.S. citizens and LPRs have been victims of kidnapping.

U.S. government employees must adhere to the following travel restrictions:

- **Areas south of Federal Highway 45D:** U.S. government employees may not travel to the area south of and including Federal Highway 45D, Celaya, Salamanca, and Irapuato.

There are no other restrictions on travel for U.S. government employees in Guanajuato state, which includes tourist areas in: **San Miguel de Allende**, **Guanajuato City**, and **surrounding areas.**

## Guerrero state – Do Not Travel

Do not travel due to crime.

Crime and violence are widespread. Armed groups operate independently of the government in many areas of Guerrero. Members of these groups frequently maintain roadblocks and may use violence towards travelers. U.S. citizens and LPRs have been victims of kidnapping in previous years.

Travel for U.S. government employees is limited to the following area with the noted restrictions:

- **Taxco:** U.S. government employees must use Federal Highway 95D, which passes through Cuernavaca, Morelos, and stay within downtown tourist areas of Taxco. Employees may visit Grutas de Cacahuamilpa National Park during the day with a licensed tour operator.

U.S. government employees may not travel to other areas of the state of Guerrero, including to tourist areas in **Acapulco**, **Zihuatanejo**, and **Ixtapa**.

## Hidalgo state – Exercise Increased Caution

Exercise increased caution due to crime.

Criminal activity and violence may occur throughout the state.

There are no restrictions on travel for U.S. government employees in Hidalgo state.

## Jalisco state – Reconsider Travel

Reconsider travel due to crime and kidnapping.

Violent crime and gang activity are common in parts of Jalisco state. In Guadalajara, territorial battles between criminal groups take place in tourist areas. Shooting incidents between criminal groups have injured or killed innocent bystanders. U.S. citizens and LPRs have been victims of kidnapping.

U.S. government employees must adhere to the following travel restrictions:

CLP_PC_033473

- **Jalisco-Michoacan border and Federal Highway 110:** U.S. government employees may not travel to the area between Federal Highway 110 and the Jalisco-Michoacan border, nor travel on Federal Highway 110 between Tuxpan, Jalisco, and the Michoacan border.

- **Federal Highway 80:** U.S. government employees may not travel on Federal Highway 80 south of Cocula.

- **State Highway 544:** U.S. government employees may not travel on State Highway 544 between Mascota and San Sebastian del Oeste.

There are no other restrictions on travel for U.S government employees in Jalisco state which includes tourist areas in: **Guadalajara Metropolitan Area**, **Puerto Vallarta (including neighboring Riviera Nayarit)**, **Chapala**, and **Ajijic**.

## Mexico City (Ciudad de Mexico) – Exercise Increased Caution

Exercise increased caution due to crime.

Both violent and non-violent crime occur throughout Mexico City. Use additional caution, particularly at night, outside of the frequented tourist areas where police and security patrol more routinely. Petty crime occurs frequently in both tourist and non-tourist areas.

There are no restrictions on travel for U.S. government employees in Mexico City.

## Mexico State (Estado de Mexico) – Exercise Increased Caution

Exercise increased caution due to crime.

Both violent and non-violent crime occur throughout Mexico State. Use additional caution in areas outside of the frequented tourist areas, although petty crime occurs frequently in tourist areas as well.

There are no restrictions on travel for U.S. government employees in Mexico State.

## Michoacan state – Do Not Travel

Do not travel due to crime and kidnapping.

Crime and violence are widespread in Michoacan state. U.S. citizens and LPRs have been victims of kidnapping.

Travel for U.S. government employees is limited to the following areas with the noted restrictions:

- **Federal Highway 15D:** U.S. government employees may travel on Federal Highway 15D to transit the state between Mexico City and Guadalajara.

- **Morelia:** U.S. government employees may travel by air and by land using Federal Highways 43 or 48D

CLP_PC_033474

from Federal Highway 15D.

- **Lazaro Cardenas:** U.S. government employees must travel by air only and limit activities to the city center or port areas.

U.S. government employees may not travel to other areas of the state of Michoacan, including the portions of the **Monarch Butterfly Reserve** located in Michoacan.

## Morelos state – Reconsider Travel

Reconsider travel due to crime.

Violent crime and gang activity are common in parts of Morelos state.

There are no restrictions on travel for U.S. government employees in Morelos state.

## Nayarit state – Exercise Increased Caution

Exercise increased caution due to crime.

Criminal activity and violence may occur throughout Nayarit state.

- There are no restrictions on travel for U.S government employees in Nayarit state, including tourist areas in: **Riviera Nayarit** (including **Nuevo Vallarta**, **Punta Mita**, **Sayulita**, and **Bahia de Banderas**), and **Santa Maria del Oro**.

## Nuevo Leon state – Exercise Increased Caution

Exercise increased caution due to crime and kidnapping.

Criminal activity and violence may occur throughout the state. U.S. citizens and LPRs have been victims of kidnapping.

There are no restrictions on travel for U.S. government employees in Nuevo Leon state.

## Oaxaca state – Exercise Increased Caution

Exercise increased caution due to crime.

Criminal activity and violence occur throughout the state.

U.S. travelers are reminded that U.S. government employees must adhere to the following travel restrictions:

- **Isthmus region:** U.S. government employees may not travel to the area of Oaxaca bounded by Federal Highway 185D to the west, Federal Highway 190 to the north, and the Oaxaca-Chiapas border to the east. This includes the cities of Juchitan de Zaragoza, Salina Cruz, and San Blas Atempa.
- **Federal Highway 200 northwest of Pinotepa:** U.S. government employees may not use Federal Highway 200 between Pinotepa and the Oaxaca-Guerrero border.

There are no restrictions on travel for U.S. government

employees to other parts of Oaxaca state, which include tourist areas in: **Oaxaca City**, **Monte Alban**, **Puerto Escondido**, and **Huatulco**.

### Puebla state – Exercise Increased Caution

Exercise increased caution due to crime and kidnapping.

Criminal activity and violence may occur throughout the state. U.S. citizens and LPRs have been victims of kidnapping.

There are no restrictions on travel for U.S. government employees in Puebla state.

### Queretaro state – Exercise Increased Caution

Exercise increased caution due to crime.

Criminal activity and violence may occur throughout the state.

There are no restrictions on travel for U.S. government employees in Queretaro state.

### Quintana Roo state – Exercise Increased Caution

Exercise increased caution due to crime and kidnapping.

Criminal activity and violence may occur in any location, at any time, including in popular tourist destinations. Travelers should maintain a high level of situational awareness, avoid areas where illicit activities occur, and promptly depart from potentially dangerous situations. U.S. citizens and LPRs have been victims of kidnapping.

While not directed at tourists, shootings between rival gangs have injured innocent bystanders. Additionally, U.S. citizens have been the victims of both non-violent and violent crimes in tourist and non-tourist areas.

There are no restrictions on travel for U.S. government employees in Quintana Roo state, which include tourist areas in: **Cancun**, **Cozumel, Isla Mujeres, Playa del Carmen**, **Tulum**, and **the Riviera Maya**. However, personnel are advised to exercise increased situational awareness after dark in downtown areas of Cancun, Tulum, and Playa del Carmen, and to remain in well-lit pedestrian streets and tourist zones.

### San Luis Potosi state – Exercise Increased Caution

Exercise increased caution due to crime and kidnapping.

Criminal activity and violence may occur throughout the state.  U.S. citizens and LPRs have been victims of kidnapping.

There are no restrictions on travel for U.S. government employees in San Luis Potosi state.

### Sinaloa state – Do Not Travel

Do not travel due to crime and kidnapping.

Violent crime is widespread. Criminal organizations are based in and operating in Sinaloa. U.S. citizens and LPRs have been

CLP_PC_033476

victims of kidnapping.

Travel for U.S. government employees is limited to the following areas with the noted restrictions:

- **Mazatlan:** U.S. government employees may travel to Mazatlan by air or sea only, are limited to the Zona Dorada and historic town center, and must travel via direct routes between these destinations and the airport and sea terminal.
- **Los Mochis and Topolobampo:** U.S. government employees may travel to Los Mochis and Topolobampo by air or sea only, are restricted to the city and the port, and must travel via direct routes between these destinations and the airport.

U.S. government employees may not travel to other areas of Sinaloa state.

### Sonora state – Reconsider Travel

Reconsider travel due to crime and kidnapping.

Sonora is a key location used by the international drug trade and human trafficking networks. Violent crime is widespread. U.S. citizens and LPRs have been victims of kidnapping.

U.S. government employees must adhere to the following travel restrictions:

- **Travel between Hermosillo and Nogales:** U.S. government employees may travel between the U.S. Ports of Entry in Nogales and Hermosillo during daylight hours via Federal Highway 15 only. Travelers should exercise caution and avoid unnecessary stops as security incidents, including sporadic, armed carjackings, have been reported along this highway during daylight hours.
- **Puerto Peñasco:** U.S. government employees may travel between Puerto Peñasco and the Lukeville-Sonoyta U.S. Port of Entry during daylight hours via Federal Highway 8 only.
- **San Luis Rio Colorado, Cananea, and Agua Prieta**: U.S. government employees may travel directly from the nearest U.S. Port of Entry to San Luis Rio Colorado, Cananea, and Agua Prieta but may not go beyond the city limits.
- **Triangular region near Mariposa U.S. Port of Entry:** U.S. government employees may not travel to the triangular region west of the Mariposa U.S. Port of Entry, east of Sonoyta, and north of Altar municipality.
- **Nogales:** U.S. government employees may not travel to the area north of Avenida Tecnologico, west of Bulevar Luis Donaldo Colosio (Periferico), and east of Federal Highway 15D (Corredor Fiscal) and the residential areas to the east of Plutarco Elias Calles. U.S. government employees may not use taxi services in Nogales.
- **Eastern and southern Sonora (including San Carlos Nuevo Guaymas and Alamos):** U.S.

government employees may not travel to areas of Sonora east of Federal Highway 17, the road between Moctezuma and Sahuaripa, and State Highway 20 between Sahuaripa and the intersection with Federal Highway 16. U.S. government employees may travel to San Carlos Nuevo Guaymas and Alamos; travel to Alamos is only permitted by air and within city limits. U.S. government employees may not travel to areas of Sonora south of Federal Highway 16 and east of Federal Highway 15 (south of Hermosillo), as well as all points south of Guaymas, including Empalme, Guaymas, Obregon, and Navojoa.

U.S. government employees may travel to other parts of Sonora state in compliance with the above restrictions, including tourist areas in: **Hermosillo**, **Bahia de Kino**, and **Puerto Penasco**.

**Tabasco state – Exercise Increased Caution**

Exercise increased caution due to crime.

Criminal activity and violence may occur throughout the state.

There are no restrictions on travel for U.S. government employees in Tabasco state.

**Tamaulipas state – Do Not Travel**

Do not travel due to crime and kidnapping.

Organized crime activity – including gun battles, murder, armed robbery, carjacking, kidnapping, forced disappearances, extortion, and sexual assault – is common along the northern border and in Ciudad Victoria. Criminal groups target public and private passenger buses, as well as private automobiles traveling through Tamaulipas, often taking passengers and demanding ransom payments.

Heavily armed members of criminal groups often patrol areas of the state and operate with impunity particularly along the border region from Reynosa to Nuevo Laredo. In these areas, local law enforcement has limited capacity to respond to incidents of crime. Law enforcement capacity is greater in the tri-city area of Tampico, Ciudad Madero, and Altamira, which has a lower rate of violent criminal activity compared to the rest of the state.

U.S. citizens and LPRs have been victims of kidnapping.

Travel for U.S. government employees is limited to the following areas with the noted restrictions:

- **Matamoros and Nuevo Laredo:** U.S. government employees may only travel within a limited radius around and between the U.S. Consulates in Nuevo Laredo and Matamoros, their homes, the respective U.S. Ports of Entry, and limited downtown sites, subject to an overnight curfew.

- **Overland travel in Tamaulipas:** U.S. government employees may not travel between cities in Tamaulipas using interior Mexican highways. Travel

between Nuevo Laredo and Monterrey is limited to
Federal Highway 85D during daylight hours with
prior authorization.

U.S. government employees may not travel to other parts of
Tamaulipas state.

### Tlaxcala state – Exercise Increased Caution

Exercise increased caution due to crime.

Criminal activity and violence may occur throughout the state.

There are no restrictions on travel for U.S. government
employees in Tlaxcala state.

### Veracruz state – Exercise Increased Caution

Exercise increased caution due to crime.

Violent crime and gang activity occur with increasing
frequency in Veracruz, particularly in the center and south
near Cordoba and Coatzacoalcos. While most gang-related
violence is targeted, violence perpetrated by criminal
organizations can affect bystanders. Impromptu roadblocks
requiring payment to pass are common.

There are no restrictions on travel for U.S. government
employees in Veracruz state.

### Yucatan state – Exercise Normal Precautions

Exercise normal precautions.

There are no restrictions on travel for U.S. government
employees in Yucatan state, which include tourist areas
in: **Chichen Itza**, **Merida**, **Uxmal**, and **Valladolid**.

### Zacatecas state – Do Not Travel

Do not travel due to crime and kidnapping.

Violent crime, extortion, and gang activity are widespread in
Zacatecas state. U.S. citizens and LPRs have been victims of
kidnapping.

Travel for U.S. government employees is limited to the
following areas with the noted restrictions:

- **Zacatecas City**: U.S. government employee travel is
  limited to Zacatecas City proper, and employees may
  not travel overland to Zacatecas City.
- U.S. government employees may not travel to other
  areas of Zacatecas state.

Travel.State.Gov

Popular Links

Stay Connected

Travel.State.Gov
U.S. Passports

Home
Travel Advisories

CLP_PC_033479