1   BRIAN M. BOYNTON
    *Principal Deputy Assistant Attorney General*
2   AUGUST FLENTJE
    *Special Counsel*
3   WILLIAM C. PEACHEY
    *Director*
4   EREZ REUVENI
    *Assistant Director*
5   CHRISTINA GREER
6   *Senior Litigation Counsel*
    Office of Immigration Litigation
7   U.S. Department of Justice, Civil Division
    P.O. Box 868, Ben Franklin Station
8   Washington, DC 20044
    Tel: (202) 598-8770
9   Email: Christina.P.Greer@usdoj.gov
10  PATRICK GLEN
    *Senior Litigation Counsel*
11

12

13 **UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
14 **OAKLAND DIVISION**

15

16 East Bay Sanctuary Covenant, *et al.*,

17            Plaintiffs,

18      v.

19 Joseph R. Biden, *et al.*,

20            Defendants.

21

22

No. 4:18-cv-06810-JST

**REPLY IN SUPPORT OF
DEFENDANTS' CROSS MOTION
FOR SUMMARY JUDGMENT**

23

24

25

26

27

28

## <u>TABLE OF CONTENTS</u>

**INTRODUCTION**........................................................................................................... 1

**ARGUMENT** ................................................................................................................... 1

**I.      Plaintiffs Lack Standing.** ................................................................................... 1

**II.     Plaintiffs' APA Claims Fail.** ............................................................................. 2

      A.      The Rule Is Consistent With The INA. (Count I) ................................... 2

            1.      The rule is consistent with the INA and Ninth Circuit precedent. .............. 2

            2.      The rule is distinct from prior "bars." ...................................... 8

      B.      The Rule Is Not Arbitrary and Capricious. (Count II) .......................... 10

            1.      The rule does not rely on impermissible factors. ...................................... 11

            2.      The rule's reliance on lawful pathways is supported by the record. ......... 13

            3.      The rule does not pre-judge the strength of asylum claims based on whether an individual complied with the rule's requirements. ................. 18

            4.      The rule properly considered relevant policies and practices. ................. 18

      C.      The Rule Satisfies the APA's Procedural Requirements. (Count III) ................. 20

**III.    Any Relief Must Be Sharply Limited** ........................................................................ 22

**CONCLUSION** ................................................................................................................. 25

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Addo v. Barr,*
    982 F.3d 1263 (10th Cir. 2020) .................................................................................. 5

*Allina Health Servs. v. Sebelius,*
    746 F.3d 1102 (D.C. Cir. 2014) ............................................................................... 22

*Arboleda v. U.S. Att'y Gen.,*
    434 F.3d 1220 (11th Cir. 2006) ................................................................................ 5

*Blanco v. Att'y Gen.,*
    967 F.3d 304 (3d Cir. 2020) ..................................................................................... 5

*Brucaj v. Ashcroft,*
    381 F.3d 602 (7th Cir. 2004) .................................................................................... 5

*California ex rel. Becerra v. Dep't of Interior,*
    381 F. Supp. 3d 1153 (N.D. Cal. 2019) ................................................................. 21

*Centro Legal de la Raza v. EOIR,*
    524 F. Supp. 3d 919 (N.D. Cal. 2021) ............................................................. 20, 21

*DHS v. New York,*
    140 S. Ct. 599 (2020) ............................................................................................. 23

*Direct Mktg. Ass'n v. Brohl,*
    575 U.S. 1 (2015) ................................................................................................... 23

*East Bay Sanctuary Covenant v. Biden,*
    993 F.3d 640 (9th Cir. 2021) ........................................................................... 2, 6, 8

*East Bay Sanctuary Covenant v. Garland,*
    994 F.3d 962 (9th Cir. 2021) ............................................................................. 6, 14

*eBay Inc. v. MercExchange, L.L.C.,*
    547 U.S. 388 (2006) ............................................................................................... 24

*Garland v. Aleman Gonzalez,*
    142 S. Ct. 2057 (2022) ........................................................................................... 23

*Gonzales v. DHS,*
    508 F.3d 1227 (9th Cir. 2007) ............................................................................... 23

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982) ................................................................................................. 2

*Hecht Co. v. Bowles,*
    321 U.S. 321 (1944) ............................................................................................... 24

*Highlands Hosp. Corp. v. NLRB,*
    508 F.3d 28 (D.C. Cir. 2007) ................................................................................. 14

*INS v. Aguirre-Aguirre*,
    526 U.S. 415 (1999) .................................................................................................... 11

*INS v. Cardoza-Fonseca*,
    480 U.S. 421 (1987) .................................................................................................... 11

*Ixtlilco-Morales v. Keisler*,
    507 F.3d 651 (8th Cir. 2007) ........................................................................................ 5

*Las Americas Immigrant Advoc. Ctr. v. Wolf*,
    507 F. Supp. 3d 1 (D.D.C. 2020) ................................................................................ 19

*Li Fang Lin v. Mukasey*,
    517 F.3d 685 (4th Cir. 2008) ........................................................................................ 5

*Linda R.S. v. Richard D.*,
    410 U.S. 614 (1973) ...................................................................................................... 2

*Little Sisters of the Poor Saints Peter & Paul Home v. Penn.*,
    140 S. Ct. 2367 (2020) ................................................................................................ 20

*Mbonga v. Garland*,
    18 F.4th 889 (6th Cir. 2021) ......................................................................................... 5

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
    463 U.S. 29 (1983) ...................................................................................................... 10

*New York v. United States*,
    505 U.S. 144 (1992) ...................................................................................................... 3

*Nken v. Holder*,
    556 U.S. 418 (2009) ...................................................................................................... 7

*Orion Reserves Ltd. P'ship v. Salazar*,
    553 F.3d 697 (D.C. Cir. 2009) ............................................................................... 14, 16

*Pangea Legal Servs. v. DHS*,
    501 F. Supp. 3d 792 (N.D. Cal. 2020) ........................................................................ 21

*R-S-C v. Sessions*,
    869 F.3d 1176 (10th Cir. 2017) .................................................................................. 13

*Sacora v. Thomas*,
    628 F.3d 1059 (9th Cir. 2010) .................................................................................... 10

*Singh v. Barr*,
    920 F.3d 255 (5th Cir. 2019) ........................................................................................ 5

*Singh v. Garland*,
    11 F.4th 106 (2d Cir. 2021) .......................................................................................... 5

*Sowe v. Mukasey*,
    538 F.3d 1281 (9th Cir. 2008) ...................................................................................... 5

*Sure-Tan, Inc. v. NLRB*,
   467 U.S. 883 (1984) ................................................................................................... 2

*United States v. Texas*,
   No. 22-58, 2023 WL 4139000 (U.S. June 23, 2023) ................................... 1, 2, 24

*Uruci v. Holder*,
   558 F.3d 14 (1st Cir. 2009) ...................................................................................... 5

*Va. Soc'y for Human Life, Inc. v. FEC*,
   263 F.3d 379 (4th Cir. 2001) ................................................................................. 24

*Vt. Yankee Nuclear Power Corp. v. NRDC*,
   435 U.S. 519 (1978) ........................................................................................ 21, 22

### Administrative Decisions

*Matter of D-A-C-*,
   27 I. & N. Dec. 575 (BIA 2019) ........................................................................... 12

*Matter of Pula*,
   19 I. & N. Dec. 467 (BIA 1987) .................................................................. 5, 8, 12

### Federal Statutes

6 U.S.C. § 557 ............................................................................................................. 5

8 U.S.C. § 1101(a)(42)(A) ......................................................................................... 5

8 U.S.C. § 1158 ................................................................................................. passim

8 U.S.C. § 1158(a) (1998) ......................................................................................... 4

8 U.S.C. § 1158(a)(1) .................................................................................... 5, 8, 12

8 U.S.C. § 1158(a)(2)(B) ..................................................................................... 6, 13

8 U.S.C. § 1158(a)(2)(C) ..................................................................................... 6, 14

8 U.S.C. § 1158(b)(2) ................................................................................................. 5

8 U.S.C. § 1158(b)(2)(C) ........................................................................... 3, 5, 6, 12

8 U.S.C. § 1158(d)(5)(B) ........................................................................................... 3

8 U.S.C. § 1225(b)(1) ....................................................................................... 22, 23

8 U.S.C. § 1229a ............................................................................................... 22, 23

8 U.S.C. § 1231 ................................................................................................. 22, 23

8 U.S.C. § 1252(e)(1) ............................................................................................... 22

8 U.S.C. § 1252(e)(3) ............................................................................................... 22

8 U.S.C. § 1252(f)(1) ....................................................................................... 22, 23

# Regulations

8 C.F.R. § 1208.13(b)(1) ................................................................................................. 4

8 C.F.R. § 1208.33(a)(1) ................................................................................................. 8

8 C.F.R. § 1208.33(a)(1)(iii) ....................................................................................... 14

8 C.F.R. § 1208.33(a)(2) ................................................................................................. 6

8 C.F.R. § 1208.33(a)(2)(B) ........................................................................................... 9

8 C.F.R. § 1208.33(a)(2)(C) ........................................................................................... 9

8 C.F.R. § 1208.33(a)(2)(ii)(B) ........................................................................... 4, 15, 16

8 C.F.R. § 1208.33(a)(3) ........................................................................................ passim

8 C.F.R. § 1208.33(a)(3)(i) ...................................................................................... 7, 15

8 C.F.R. § 1208.33(e) ..................................................................................................... 22

8 C.F.R. § 208.13(b)(1) ................................................................................................... 4

8 C.F.R. § 208.33(a)(1) ................................................................................................... 8

8 C.F.R. § 208.33(a)(1)(iii) ......................................................................................... 14

8 C.F.R. § 208.33(a)(2) ................................................................................................... 6

8 C.F.R. § 208.33(a)(2)(B) ............................................................................................. 9

8 C.F.R. § 208.33(a)(2)(C) ............................................................................................. 9

8 C.F.R. § 208.33(a)(2)(ii)(B) ............................................................................. 4, 15, 16

8 C.F.R. § 208.33(a)(3) .......................................................................................... passim

8 C.F.R. § 208.33(a)(3)(i) ........................................................................................ 7, 15

8 C.F.R. § 208.33(d) ....................................................................................................... 22

*Aliens and Nationality; Asylum and Withholding of Deportation Procedures,*
  55 Fed. Reg. 30,674 (July 27, 1990) ........................................................................ 4

*Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures
  for Protection Claims,*
  83 Fed. Reg. 55,934 (Nov. 9, 2018) .......................................................................... 3

*Asylum Eligibility and Procedural Modifications,*
  84 Fed. Reg. 33,829 (July 16, 2019) ......................................................................... 3

*Circumvention of Lawful Pathways,*
  88 Fed. Reg. 11,704 (Feb. 23, 2023) .................................................................. 1, 19

*Circumvention of Lawful Pathways,*
  88 Fed. Reg. 31,314 (May 16, 2023) ................................................................ passim

**Miscellaneous**

Br. for Resp. at 15,
No. 22-58 (U.S. Oct. 18, 2022)..................................................................................................... 2

## INTRODUCTION

The joint Department of Homeland Security (DHS) and Department of Justice (DOJ) rule, *Circumvention of Lawful Pathways*, 88 Fed. Reg. 31,314 (May 16, 2023) (rule), is a critical border management tool that encourages migrants to use safe and orderly pathways to enter the United States or seek protection in third countries while addressing unprecedented irregular migration. It was promulgated after issuance of a notice of proposed rulemaking, *Circumvention of Lawful Pathways*, 88 Fed. Reg. 11,704 (Feb. 23, 2023) (NPRM), an opportunity for comment, and a careful assessment of those comments. Plaintiffs seek to end this critical, well-reasoned border-management policy that for the past month and a half has been key to ensuring the continued functioning of the U.S. immigration and asylum system during exigent circumstances while providing ways for vulnerable populations to seek protection.

Plaintiffs argue that the rule is contrary to the Immigration and Nationality Act (INA), is arbitrary and capricious, and violates the Administrative Procedure Act's (APA) procedural requirements. As explained in Defendants' cross-motion for summary judgment, Plaintiffs lack Article III standing, are outside the INA's zone of interests, Cross-Mot. 9-10; the rule is consistent with the Executive's authority under the INA to adopt additional limitations or conditions on asylum eligibility, *id.* at 10-16; the rule is reasonable and reasonably explained, *id.* at 19-28; and the rule was promulgated consistent with the APA's procedural requirements, *id.* at 28-32. And Plaintiffs' request for a universal vacatur is foreclosed by Article III, the INA, the APA, and principles of equity, *id.* at 32-35. At an absolute minimum, the Court should stay any order for fourteen days to allow the government to seek emergency relief in the court of appeals, a request to which Plaintiffs do not object.

## ARGUMENT

### I.   Plaintiffs Lack Standing.

Plaintiffs fail to satisfy the "bedrock constitutional requirement" of standing, which requires a "legally and judicially cognizable" injury. *United States v. Texas*, No. 22-58, 2023 WL 4139000, at *3-4 (U.S. June 23, 2023) (quotation marks omitted). Plaintiffs do not dispute the settled principle that a party has "no judicially cognizable interest in procuring enforcement of the

immigration laws." *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984) (citing *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)). Indeed, the Supreme Court recently reiterated that this principle "remains the law today" in holding that two States lacked standing to challenge DHS immigration enforcement policies. *See Texas*, 2023 WL 4139000, at *4 (citing *Sure-Tan* and *Linda R.S.*).

Plaintiffs dismiss the Supreme Court's *Texas* decision, Opp. 23 n.11, and rely on a footnote in one of the Ninth Circuit's prior *East Bay* decisions stating that the principle in *Sure-Tan* and *Linda R.S.* is entirely irrelevant to organizational standing because those cases involved third-party standing, *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 665 n.6 (9th Cir. 2021). But the Supreme Court rejected a similar attempt by the States in *Texas* to evade these precedents by disclaiming an "interest in procuring enforcement of the immigration laws against third parties" and instead asserting an "interest in avoiding the harms . . . to their fiscs and residents." *See* Br. for Resp. at 15, No. 22-58 (U.S. Oct. 18, 2022) (quotation marks omitted). Just as the States had no standing to challenge the Executive's "enforcement discretion over arrests and prosecutions" based on allegations of indirect effects on revenue and spending, *Texas*, 2023 WL 4139000, at *5-6 & n.3, Plaintiffs cannot justify judicial intrusion into the Executive's discretionary authority over grants of asylum based on allegations of volitional expenditure of their own resources to adapt to new policies. To hold otherwise would contravene the foundational notion that an organization, like any litigant, must satisfy the strictures of Article III, including a specific legally and judicially cognizable injury to itself as an entity. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).[1]

## II.    Plaintiffs' APA Claims Fail.

### A.    The Rule Is Consistent With The INA. (Count I)

Contrary to plaintiffs' primary contention, Compl. ¶¶ 222-29, the rule is authorized by the INA and consistent with circuit precedent. Cross-Mot. 10-20.

#### 1.    The rule is consistent with the INA and Ninth Circuit precedent.

The INA expressly authorizes the Secretary and Attorney General to establish "limitations and conditions" on asylum eligibility, beyond those already set out in the statute, if they are

---

[1] The government also preserves its argument that Plaintiffs fall outside the asylum statute's zone of interests. *See* Cross-Mot. 9 n.7.

"consistent with" § 1158. 8 U.S.C. § 1158(b)(2)(C); *see also id.* § 1158(d)(5)(B) (authorizing "other conditions or limitations"). As the statutory text, structure, and history demonstrate, a new limitation or condition is "consistent with" § 1158 if it does not affirmatively conflict with another provision of § 1158. *See* Cross-Mot. 10-12. And the rule does not. *See id.* at 12-14. As explained in our motion, the rule functions as a whole, accounts for alternative pathways for those seeking protection, and reflects consideration of exigencies that might prevent a person from using those pathways by allowing the presumption to be rebutted in exceptionally compelling circumstances. Cross-Mot. 10-19. And the Departments also contested Plaintiffs' claim that the Departments cannot adopt as a condition of eligibility to receive asylum that noncitizens enter at ports of entry with a pre-scheduled appointment, seek protection in third countries, or obtain advance travel authorization. Opp. 3-4 (citing *New York v. United States*, 505 U.S. 144, 176 (1992)). In their effort to show the rule is legally indistinguishable from two prior rules—the "entry bar" rule regarding individuals who enter between ports of entry, *Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations*, 83 Fed. Reg. 55,934 (Nov. 9, 2018), and the "transit bar" rule requiring noncitizens to first apply for asylum in a transit country, *Asylum Eligibility and Procedural Modifications*, 84 Fed. Reg. 33,829 (July 16, 2019)—Plaintiffs disregard key features of this rule, improperly divide the rule and by doing so ignore how it functions as a whole in conjunction with established lawful pathways, preserves important protections for vulnerable individuals who are unable to utilize those pathways, helps control the border, and shares responsibility with other countries in the region.

Plaintiffs concede that the Secretary and Attorney General have authority to impose additional conditions on asylum eligibility. *See* Opp. 6. Instead, they argue that the Departments "just re-described the Rule and argued that it differs from prior bans." Opp. 4. But in fact the Departments explained that the rule is consistent with the history of § 1158 and prior longstanding uses of the authority to impose additional limitations on asylum eligibility. Cross-Mot. 10-14. Plaintiffs do not address those arguments on their terms but rather ask the Court to consider only some of the rule's component parts. Plaintiffs rely on the incorrect assumption that the three pathways they challenge as unlawful pre-conditions for seeking asylum are the only ways of

avoiding the presumption. They are not. There are other important exceptions and means of rebutting the presumption that Plaintiffs fail to address and do not challenge as unlawful, most importantly, in particular, an exception to the presumption for individuals unable to access the scheduling system to present at a port of entry "due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle," 8 C.F.R. §§ 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B), and an ability to rebut the presumption for those facing an imminent and extreme threat to their life or safety, *id.* §§ 208.33(a)(3), 1208.33(a)(3). The rule also provides that individuals can rebut the presumption if, at the time of entry, they or a family member traveling with them faced an "acute medical emergency" or were "victim[s] of a 'severe form of trafficking in persons,'" or in other "exceptionally compelling circumstances." *Id.* §§ 208.33(a)(3), 1208.33(a)(3). Moreover, Plaintiffs' general approach is flawed. The rule's array of exceptions and rebuttal circumstance does not set up a "Hobson's choice" between three unlawful conditions—instead it sets up a comprehensive system that promotes the use of safer, more orderly pathways while providing for the opportunity to rebut the presumption in exceptionally compelling circumstances, including where those pathways are not available. This case is nothing like the cases Plaintiffs cite that involve a binary choice between two unconstitutional options without any other recourse. Opp. 4.

As explained in our motion, the INA confers, and the Attorney General has long exercised, the discretionary authority to adopt additional limitations on asylum eligibility so long as those limitations are "consistent with" 8 U.S.C. § 1158. Cross-Mot. 10-12. Plaintiffs fail to address this fundamental conferral of authority or the history of its use. For example, consistent with Congress's general grant of broad discretion to "establish a procedure" for noncitizens to apply for asylum and make discretionary asylum determinations, *see* 8 U.S.C. § 1158(a) (1988), in 1990, the Attorney General codified a near-categorical limitation regarding the fear of future persecution. *See Aliens and Nationality; Asylum and Withholding of Deportation Procedures*, 55 Fed. Reg. 30,674, 30,678, 30,683 (July 27, 1990). The 1990 rule codified a requirement that adjudicators deny on the basis of discretion nearly all asylum claims resting on past persecution alone, *see* 8 C.F.R. §§ 208.13(b)(1), 1208.13(b)(1), even though those who have experienced past persecution

but do not have a fear of future persecution are explicitly included in the definition of "refugee," *see* 8 U.S.C. § 1101(a)(42)(A). The fact that a noncitizen is a refugee eligible for an exercise of discretion did not bar the Attorney General from exercising that discretion by providing for the denial of asylum on a near categorical basis. Congress has not altered this limitation even as it has amended the statute multiple times.[2] Instead, Congress subsequently expressly codified the Secretary and Attorney General's discretionary authority to impose further "conditions or limitations."[3] Pub. L. 104-208, div. C, § 604 (1997) (codified at 8 U.S.C. § 1158(b)(2)). This demonstrates that Congress approved substantial regulatory limitations to asylum, and authorized the Secretary and Attorney General to issue further conditions or limitations to address circumstances arising in the future. This history underscores that § 1158(b)(2)(C)'s "consistent with" standard simply requires that the Departments avoid affirmative conflicts with § 1158.

Here, the rule avoids such conflicts. Although Congress authorized applications "whether or not at a port of entry," it is well established that this does not mean that the Departments must treat manner of entry as entirely irrelevant. *See Matter of Pula*, 19 I. & N. Dec. 467 (BIA 1987). And in any event, § 1158(a)(1) provides only that a noncitizen may *apply* for asylum irrespective of the manner of entry, it does not cut off its consideration in determining eligibility or discretion. Regardless, as the Departments have explained, under the rule, a specific manner of entry is not dispositive of whether someone will be eligible for asylum. Cross-Mot. 14. Instead, a noncitizen is excepted from the presumption if they received advance authorization to travel pursuant to a parole process wherever they enter, presented at a port of entry with an appointment, presented at

---

[2] Every circuit court follows this regulation. *See Uruci v. Holder*, 558 F.3d 14, 19 (1st Cir. 2009) (upholding asylum denial where past persecution established but DHS rebutted presumption of a well-founded fear); *Singh v. Garland*, 11 F.4th 106, 116 (2d Cir. 2021) (same); *Singh v. Barr*, 920 F.3d 255, 259 (5th Cir. 2019) (same); *Brucaj v. Ashcroft*, 381 F.3d 602, 607 (7th Cir. 2004) (same); *Ixtlilco-Morales v. Keisler*, 507 F.3d 651, 655 (8th Cir. 2007) (same); *Sowe v. Mukasey*, 538 F.3d 1281, 1286 (9th Cir. 2008) (same); *Mbonga v. Garland*, 18 F.4th 889, 894-96 (6th Cir. 2021) (same and discussing framework); *see also Blanco v. Att'y Gen.*, 967 F.3d 304, 315 (3d Cir. 2020) (discussing framework for denying asylum based on past persecution alone); *Li Fang Lin v. Mukasey*, 517 F.3d 685, 693-94 (4th Cir. 2008) (same); *Addo v. Barr*, 982 F.3d 1263, 1269 (10th Cir. 2020) (same); *Arboleda v. U.S. Att'y Gen.*, 434 F.3d 1220, 1223 (11th Cir. 2006) (same).

[3] Under the Homeland Security Act (HSA), references to the "Attorney General" in the INA also encompass the Secretary, either solely or additionally, with respect to statutory authorities vested in the Secretary in the HSA or subsequent legislation. 6 U.S.C. § 557.

a port of entry without an appointment because they were unable to access the scheduling system for specified reasons, or were denied protection in a third country regardless of whether they enter at or between ports of entry. Additionally, regardless of the place of entry, the presumption is rebutted if the noncitizen establishes exceptionally compelling circumstances, such as that at the time of entry the noncitizen or a family member traveling with them faced an acute medical emergency, faced an imminent and extreme threat to life or safety, or were a victim of a severe form of trafficking. *See* 8 C.F.R. §§ 208.33(a)(2)-(3), 1208.33(a)(2)-(3). There is thus no conflict between the rule's provisions and the general ability of an individual to apply for asylum under § 1158(a)(1) regardless how they entered. Furthermore, the presumption does not conflict with any other part of § 1158, and its aim at incentivizing individuals to use safe, orderly, and lawful pathways is consistent with other provisions with similar goals, *see* 8 U.S.C. § 1158(a)(2)(B) (one-year deadline); *id.* § 1158(a)(2)(C) (bar on successive asylum applications).

The rule is also consistent with Ninth Circuit precedent. Unlike the entry bar found to be "effectively a categorical ban on migrants who use a method of entry" in *East Bay*, 993 F.3d at 669-75, the rule does not treat manner of entry as dispositive in determining eligibility. *See* Cross-Mot. 14-15. And the rule is consistent with the Ninth Circuit's decision affirming a preliminary injunction of the transit bar, in *East Bay Sanctuary Covenant v. Garland*, 994 F.3d 962 (9th Cir. 2021), where it held that "additional limitations and conditions" imposed under § 1158(b)(2)(C) "must be consistent with" what it identified as the safe-third-country and firm-resettlement bars' "core principle"—namely, that noncitizens may be denied asylum only if the rule adequately aims to ensure "a 'safe option'" for pursuing protection. *Id.* at 968. As an initial matter, because the rule does not enact a flat bar but rather a rebuttable presumption, it need not further the core principle of the statutory bars. In other words, because the rule is not an analogous "bar," there is not the same risk of circumventing limits imposed by Congress under the statutory bars. But in any event, the rule is fully consistent with the Ninth Circuit's approach in the transit bar case since it includes just such "safe option[s]" for pursuing protection: It excepts noncitizens from the presumption if they use one of the other recognized pathways to enter the United Sates, includes exceptions tied to ensuring safety including the exception for those facing an imminent and extreme threat to their

safety or an acute medical emergency, and preserves statutory withholding and CAT protection. It is also relevant that the Supreme Court stayed the transit bar injunction, which necessarily means the Court found the government likely to prevail. *Nken v. Holder*, 556 U.S. 418, 434 (2009).

Plaintiffs' arguments to the contrary do not establish that the rule is unlawful. *First*, Plaintiffs argue that the exceptions are too narrow and therefore do not serve to distinguish this rule from the entry and transit bars. Opp. 5. But the rule also allows its presumption to be rebutted in ways that meaningfully protect those who are unable to pursue a lawful pathway, including because of exceptionally compelling circumstances. 8 C.F.R. §§ 208.33(a)(3)(i), 1208.33(a)(3)(i). In addition to this catch-all safe harbor, the rule sets out three "exceptionally compelling circumstances" that always qualify—that at the time of entry the noncitizen or a family member traveling with them faced an acute medical emergency, faced an imminent and extreme threat to life or safety, or was a victim of a severe form of trafficking. *See id.* §§ 208.33(a)(3), 1208.33(a)(3). Contrary to plaintiffs' suggestion that those three circumstances are exclusive, Opp. 5 (citing 88 Fed. Reg. at 31,450), the regulatory text and preamble make clear that the ability to rebut the presumption in "exceptionally compelling circumstances" is not limited to those examples. *See, e.g.*, 8 C.F.R. § 208.33(a)(3)(i) (noting that the requisite circumstances "includ[e]" the listed examples). As the rule explains explicitly, "[t]he presumption *also* may be rebutted in *other* exceptionally compelling circumstances." 88 Fed. Reg. at 31,318 (emphases added).[4]

*Second*, Plaintiffs argue that exigent circumstances do not allow the agency to violate the asylum statute. Opp. 6. The Departments do not dispute that general proposition. While the Departments acted in part to address an anticipated rise in border encounters, they justified the rule under the text of § 1158, the overall statutory context (including that the rule furthers the purpose of other provisions in § 1158 that promote system efficiency), and the historical practice of adopting conditions on asylum eligibility. Re-framing the argument as Plaintiffs attempt does not make these considerations any less valid or render the rule inconsistent with the INA or Ninth

---

[4] Plaintiffs are correct that the rule does not "'create, expand, or otherwise constitute the basis for any lawful pathways.'" Opp. 5 (quoting 88 Fed. Reg. at 31,370). The Departments do not claim otherwise. Stating that the rule "provides alternative pathways," *see* Cross-Mot. 15, does not mean that the rule established those pathways, especially where the rule consistently states it does not.

Circuit precedent. *See* Cross-Mot. 10-16.

*Third*, plaintiffs draw the wrong conclusion regarding the interplay between the government's "ultimate discretion to grant or deny asylum to eligible applicants" and "its authority to adopt bars to eligibility itself." Opp. 6. These self-reinforcing features of the asylum statute underscore the extent of the Executive's authority in this sphere. Cross-Mot. 13.

*Fourth*, contrary to Plaintiffs' contention, Opp. 6-7, the Departments properly relied on *Pula*. Plaintiffs focus on the factual details of *Pula* while ignoring its legal import and the reason the Departments relied upon it: to show "the rule is consistent with historical consideration of manner of entry as a relevant factor in considering an asylum application." 88 Fed. Reg. at 31,376; *East Bay*, 993 F.3d at 671 ("The [BIA] and this Court have long recognized that a refugee's method of entering the country is a discretionary factor in determining whether the migrant should be granted humanitarian relief."). The Departments explicitly acknowledge that the rule's operation is distinct from *Pula*, 88 Fed. Reg. at 31,376, and that it places different weight on these factors than *Pula*, Cross-Mot. 13. But it also involves a situation where additional lawful pathways have been made available that did not exist at the time of *Pula*. Regardless, the basic principle is the same: the government has long treated manner of entry as a relevant consideration and doing so is fully consistent with § 1158(a)(1).

### 2. The rule is distinct from prior "bars."

As discussed above, *supra* 6-7, the rule is lawful under Ninth Circuit precedent because it is distinct from the prior entry and transit bars. Cross-Mot. 14-18. Unlike the prior entry bar, the rule does not treat manner of entry as dispositive, but instead creates a rebuttable presumption that can be overcome where exceptionally compelling circumstances exist and that can be avoided by pursuing another pathway (either obtaining advance authorization to travel to the United States under a DHS-approved parole process or seeking asylum in a third country). *See* 8 C.F.R. §§ 208.33(a)(1), (3), 1208.33(a)(1), (3). Indeed, by limiting its applicability to those who transit a third country, the rule effectively excludes Mexican nationals from the presumption, unlike the entry bar IFR. And unlike the transit bar IFR, a person traveling through a third country is not required to seek asylum in any such country.

Plaintiffs' allegations otherwise are incorrect. Rather than challenging the rule as written, Plaintiffs narrow the focus and argue that the fact that noncitizens already at the border are not eligible for the parole processes renders the exception illusory and not a sufficient way to "avoid the Rule's port-of-entry requirement." Opp. 8. In so doing, Plaintiffs ignore both the exceptions and means of rebuttal under the rule that apply to people already in the vicinity of the border as well as a key goal of the rule—to encourage the use of lawful pathways that relieve strain at the border. *See, e.g.*, 88 Fed. Reg. at 31,316, 31,332.  For individuals in the vicinity of the border, the CBP One app is available to provide over 450,000 appointments a year, CLP_AR_002489 (citing 1,250 appointments per day starting June 1, which would equal approximately 456,250 per year).[5] Where the app cannot be accessed for specified reasons, thus triggering the exception under the rule, that too permits entry at a port of entry without the presumption being applied. 8 C.F.R. §§ 208.33(a)(2)(B), 1208.33(a)(2)(B). Those who sought and were denied protection from a third country may avoid the presumption when crossing at the border. *Id.* §§ 208.33(a)(2)(C), 1208.33(a)(2)(C). And the rebuttal circumstances to account for exigency apply at the border. *Id.* §§ 208.33(a)(3), 1208.33(a)(3). Moreover, the country-specific parole programs are currently available to up to 360,000 noncitizens per year from four countries with high encounter rates— Cuba, Haiti, Nicaragua, and Venezuela. CLP_AR_004553, CLP_AR_002374.[6] The goal of such lawful pathways is to encourage safe processing and reduce the number of people who are making the dangerous journey to the southwest border and entering the United States unlawfully.

Similarly, Plaintiffs contend that third countries are unsafe and their asylum systems are insufficient.[7] Opp. 9-10. But the Departments recognized that not everyone will find safe harbor

---

[5] Importantly, "the Departments anticipate that the use of the CBP One app . . . will allow CBP to streamline the processing of noncitizens at [ports of entry] on the [southwest border] and process significantly more individuals in a safe and orderly manner." 88 Fed. Reg. at 31,326.

[6] For example, in September 2022, the month before the Venezuela parole process was announced, 83,344 of the 227,547 encounters of noncitizens along the southwest border (or about 36.6 percent) were of nationals of those four countries. CLP_AR_002374.

[7] Plaintiffs object that the percentage of noncitizens excepted under the prior transit bar IFR and the current transit exception is too low. Opp. 9. But the figures Plaintiffs cite are uninformative. Because it takes time for noncitizens to apply for asylum in a third country, receive a denial, and approach the United States, numbers from the nine months the transit bar was in effect and the six

in a third country—although some will. *See* 88 Fed. Reg. at 31,371. For example, as Plaintiffs note, Mexico adjudicated 34,762 applications with a 61 percent grant rate in 2022. CLP_AR_005707. For those who do not obtain protection in a particular third country, there are other options that a noncitizen can pursue to obtain protection in other third countries or the United States. Cross-Mot. 18. As noted throughout the rule and briefing, the exception for those who are denied protection in a transit country is merely one way to avoid the presumption and should not be viewed in isolation from the rest of the rule, which works in conjunction with the parole pathway, the CBP One app, and the ability to rebut the presumption in exceptionally compelling circumstances. If a noncitizen is not safe in a third country, there are other pathways to entering the United States and remaining eligible for asylum. *See* 88 Fed. Reg. at 31,371. Even those granted asylum in Mexico who feel unsafe are not ineligible for asylum in the United States under the rule, *contra* Opp. 10, but rather may enter at a port of entry with an appointment, or without one if it was not possible to schedule one for specified reasons, or may rebut the presumption of ineligibility if they establish exceptionally compelling circumstances—for example if they face an extreme threat to their safety. Plaintiffs do not acknowledge this.

## B.      The Rule Is Not Arbitrary and Capricious. (Count II)

Contrary to Plaintiffs' claims, Compl. ¶¶ 230-32, the rule is not arbitrary and capricious, Defs.' Cross-Mot. 19-28. The rule readily meets the deferential standard applied to such APA claims because the agencies have articulated "a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983); *see id.* at 52 ("It is not infrequent that the available data does not settle a regulatory issue and the agency must then exercise its judgment in moving from the facts and probabilities on the record to a policy conclusion."); *Sacora v. Thomas*, 628 F.3d 1059, 1068-69 (9th Cir. 2010) (it is "reasonable for the [agency] to rely on its experience" in exercising its judgment). The rule was promulgated based on several urgent and compelling considerations. *See generally* 88 Fed. Reg. at 31,314-19. The rule is reasonably related to those objectives. Plaintiffs

---

weeks the challenged rule has been in effect are insufficient time periods on which to base an argument that "few people" will ever benefit from this exception.

do not seriously contest that the rule rationally furthers the goal the rule articulates—avoiding the risk that, otherwise, increased migration would "overwhelm[] the Departments' ability to effectively process, detain, and remove, as appropriate, the migrants encountered," by encouraging migrants to pursue orderly pathways. *Id.* at 31,316. By coupling an expansion of safe and orderly pathways to enter the United States with a presumption of asylum ineligibility for noncitizens who fail to pursue such avenues for entry or seek protection in other countries, the rule encourages individuals to raise their asylum or protection claims in other countries through which they travel or to avail themselves of lawful and orderly pathways for entry into the United States. *See*, *e.g.*, *id.* at 31,329. And by promoting the use of orderly pathways and thus reducing irregular migration, the rule will reduce migrant reliance on dangerous smuggling networks and the government will be able to devote more of its limited resources to more effectively and quickly process migrants.

Plaintiffs assert that the rule relies on three impermissible or unsupported justifications: (1) the pathways available provide sufficient avenues to obtain protection; (2) one or more of the pathways are available to those fleeing persecution; and (3) the presumption applies to people who are less likely to have meritorious claims. Opp. 10-19. Plaintiffs further assert that the Departments failed to consider other relevant policies. *Id.* at 19-20. These contentions underlie a series of arbitrary and capricious arguments raised in Plaintiffs' brief, each of which should be rejected.

### 1.    The rule does not rely on impermissible factors.

Plaintiffs first argue that the Departments considered factors Congress did not deem relevant, such as manner of entry and the availability of other means of entering the United States. Opp. 10-11. This is really an argument that the rule violates the statute, which is addressed above. The argument also rests on the mistaken premise that Congress decided that "other options" for entry set forth by statute "were insufficient to satisfy our international obligations and protect people fleeing from persecution." Mot. 15. The statute includes no such indication. Indeed, it is well understood that statutory withholding (not asylum) satisfies the United States' international obligations against refoulement. *INS v. Aguirre-Aguirre*, 526 U.S. 415, 426-27 (1999); *see also* *INS v. Cardoza-Fonseca*, 480 U.S. 421, 440-41 (1987). In codifying a broader asylum system and allowing the Secretary and Attorney General to adopt additional limitations on eligibility as a

matter of discretion, Congress did not prohibit considering the ability to administer the system in the face of exigent circumstances, encouraging shared responsibility among countries, or taking into account an individual's actions prior to arriving in the United States in promulgating rules concerning eligibility—Congress merely stated that additional limitations must be "consistent with" § 1158. 8 U.S.C. § 1158(b)(2)(C). As previously explained, such considerations have long been deemed relevant even alongside the language in § 1158(a)(1), *supra* 8; *see Pula*, 19 I. & N. Dec. at 473-74, as has the "ultimate consideration" when determining whether someone warrants a grant of relief as a matter of discretion: whether granting relief "appears to be in the best interests of the United States," *Matter of D-A-C-*, 27 I. & N. Dec. 575, 578 (BIA 2019) (best interests standard preceded 1996 amendments by 20 years).

Plaintiffs next allege that the Departments' true aim was to reduce the availability of asylum. Opp. 11. This is not correct. Reasonably judging that they were at risk of losing the ability to safely, effectively, and humanely enforce and administer the U.S. immigration and asylum systems, the Departments determined that they needed to discourage migrants from circumventing lawful pathways. The rule they developed in this context, which applies only to noncitizens who enter during a two-year period, preserves asylum eligibility for those who comply with the applicable requirements, including those who qualify for an exception or rebut the presumption. Between parole programs (which include approximately 360,000 per year for the processes for Cuba, Haiti, Nicaragua, and Venezuela alone,[8] CLP_AR_004553) and CBP One appointments (approximately 450,000 per year, Cross-Mot. 19), at least 810,000 noncitizens who are seeking protection may avoid the presumption each year, which is more than the number of noncitizens encountered at the southwest border each year between 2010 and 2020 other than in 2019 (851,508, CLP_AR_002377). A fortiori the Departments have no intention of *reducing* the availability of asylum, they instead encourage use of safer, more orderly pathways for those who seek protection and in so doing permit nearly a million migrants each year to pursue asylum via lawful pathways.

In addition to these many opportunities, individuals will be excepted because it was not

---

[8] The exception for "DHS-approved parole processes" include other parole processes not subject to the 30,000 monthly cap, such as the processes for nationals of Ukraine, the Central American Minors Program, and family reunification parole programs, 88 Fed. Reg. at 31,332.

possible to obtain an appointment for certain identified reasons before appearing at a port of entry or they were denied asylum in a transit country, or they are able to rebut the presumption due to exceptionally compelling circumstances. To support their argument, Plaintiffs engage in selective quotation to suggest that the rule set out to reduce asylum adjudications in the abstract. *See* Opp. 11. But the Departments created an incentive to pursue lawful pathways in order to preserve their ability to safely and humanely administer the immigration and asylum system: "By encouraging noncitizens seeking to travel to the United States, including those seeking asylum, to pursue lawful pathways and processes, the rule promotes orderly processing and reduces the number of individuals who would be placed in lengthy section 240 removal proceedings and released into the United States pending such proceedings." 88 Fed. Reg. at 31,330; *see id.* at 31,334-35, 31,338 (similar). Indeed, reducing the number of individuals in section 240 proceedings (as the rule aims to do) does not reduce asylum applications—those who are granted parole may file affirmative asylum applications after arriving on U.S. soil in a safe and orderly manner and will not be subject to removal proceedings. Although the Departments recognize that some noncitizens who do not avail themselves of such lawful pathways will be deemed ineligible for asylum under this rule, that is a necessary and appropriate consequence of Congress's delegation of authority to the Secretary and the Attorney General to establish additional conditions on eligibility. *See*, *e.g.*, *R-S-C v. Sessions*, 869 F.3d 1176, 1187 (10th Cir. 2017) ("This delegation of authority means that Congress was prepared to accept administrative dilution of the asylum guarantee in § 1158(a)(1).").

### 2. The rule's reliance on lawful pathways is supported by the record.

Plaintiffs next argue that the rule assumes that the available lawful pathways will be sufficient to permit the assertion of all valid asylum claims, when they allegedly are not. Opp. 13. But the rule "acknowledge[s] that despite the protections preserved by [it] and the availability of lawful pathways, the rebuttable presumption . . . will result in the denial of some asylum claims that otherwise may have been granted." 88 Fed. Reg. at 31,332. The Departments explained that the risk of that result is outweighed by "the benefits to the overall functioning of the system, including deterrence of dangerous irregular migration and smuggling." *Id.* This is exactly how other provisions limiting asylum work. *See* 8 U.S.C. § 1158(a)(2)(B) (one-year filing deadline);

*id.* § 1158(a)(2)(C) (successive application bar). Congress provided a backstop via withholding of removal and instructions to implement the CAT, ensuring that no one would be removed to face persecution or torture, but Congress carefully refrained from limiting the Departments' broad authority to establish limitations on asylum. Finally, as noted above, the significant number of people that may be accommodated by the expanded lawful pathways and the grounds for rebuttal reduces the number of individuals prevented from asserting otherwise valid asylum claims.

Plaintiffs also critique the rationales offered by the Departments for each of the three pathways they identify—CBP One appointments, parole, and denial of an application by a third country—and then find fault with each piece in isolation. Yet the Departments did not rely on these pathways as isolated mechanisms of asylum eligibility but as parts of a larger scheme including rebuttal circumstances designed to balance system efficiency against countervailing concerns. Contrary to Plaintiffs' claims, the rule does indeed aim to "preserv[e] the opportunity for individuals fleeing persecution to pursue protection-based claims." 88 Fed. Reg. at 31,366.

Plaintiffs' challenges to pieces of the rule do not prove the contrary. Under applicable standards, courts may "reverse an agency's decision 'only when the record is so compelling that no reasonable factfinder could fail to find to the contrary.'" *Orion Reserves Ltd. P'ship v. Salazar*, 553 F.3d 697, 704 (D.C. Cir. 2009) (quoting *Highlands Hosp. Corp. v. NLRB*, 508 F.3d 28, 31 (D.C. Cir. 2007)); *see East Bay*, 994 F.3d at 990 (Miller, J., concurring and dissenting). The Departments considered each of the issues Plaintiffs raise and reasonably rejected them. Plaintiffs' disagreement with how the Departments weighed competing evidence is no basis for relief.

*First*, Plaintiffs argue that "the CBP One pathway is unavailable to most asylum seekers." Opp. 13. Although the number of daily appointments is finite, and most people may have to wait for one to become available, the pathway is available for more than 450,000 noncitizens per year, Cross-Mot. 23. Furthermore, someone from Mexico who is fleeing persecution is not subject to the rule at all, 8 C.F.R. §§ 208.33(a)(1)(iii), 1208.33(a)(1)(iii) (applying rule only to those who enter the United States after transiting through a third country), and certain noncitizens (including up to 360,000 nationals of Cuba, Haiti, Nicaragua, and Venezuela) have an additional pathway through a DHS-approved parole process. Those who cannot utilize any of these pathways may be

able to establish exceptionally compelling circumstances, *id.* §§ 208.33(a)(3), 1208.33(a)(3). And to the extent that "there are entire categories of asylum seekers who because of indigence, language capacity, illiteracy, and other barriers" are unable to access the CBP One app, *see* Opp. 13, their lack of access may likewise establish an exception if they approach a port of entry, *see* 8 C.F.R. §§ 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B), or meet the standard of exceptionally compelling circumstances if not, *see id.* §§ 208.33(a)(3), 1208.33(a)(3).

Plaintiffs also contend the CBP One app is not realistically available because the border area is dangerous. Mot. 16. The agency considered this in multiple ways. First, appointments can be made in Central as well as Northern Mexico. 88 Fed. Reg. at 31,399; Cross-Mot. 23. Second, some of the per se exceptionally compelling circumstances are keyed to the danger faced by the individual, so people who are at imminent risk of violence or face an acute medical emergency will be entitled to rebut the presumption. 8 C.F.R. §§ 208.33(a)(3)(i), 1208.33(a)(3)(i). Plaintiffs' disagreement with how the Departments struck that balance is no ground to displace the judgment of the agencies Congress expressly empowered to weigh new asylum conditions.

Plaintiffs minimize the exception for those who present at a port of entry without an appointment because they could not access the app due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle. Opp. 14. The circumstances the exception targets, though the Departments anticipate they will be "narrow, 88 Fed. Reg. at 31,406, play an important role in preserving eligibility for those who are truly unable to access the app. Nor was it arbitrary for the Departments to observe that some migrants, though lacking direct access to smart phones, may be able to rely on trusted partners. Plaintiffs' desire for a different policy balance, *see* Opp. 14, does not render the rule unlawful. The record, moreover, includes significant discussion of the steps taken to resolve technical issues with the app. *See* CLP_AR_001654-57.

Plaintiffs contend that the parole processes will not lower the number of noncitizens waiting for appointments at the southwest border "because the programs have been in place for months already" and "they only affect a tiny number of countries." Opp. 14. Substantial evidence, however, supported the Departments' contrary conclusion. As the Departments noted throughout the rule, after the start of the parole processes for Cuba, Haiti, Nicaragua, and Venezuela, the

number of southwest border encounters for nationals from those countries dropped dramatically. *See, e.g.*, 88 Fed. Reg. at 31,316. And although these processes apply to only nationals of four countries (as well as immediate family members), the increase in irregular migration the Departments have seen since FY 2021 has been "driven by a significant increase in unique encounters of" nationals from those four countries. 88 Fed. Reg. at 11,709. Finally, although those already at the border cannot avail themselves of such a process, if their wait is indeed "dangerous" or they are unable to access CBP One, they may be excepted from or able to rebut the presumption. *See* 8 C.F.R. §§ 208.33(a)(2)(ii)(B), (3), 1208.33(a)(2)(ii)(B), (3).

*Second*, substantial evidence supports the Departments' conclusion that the parole processes are robust and that their inclusion as an exception to the presumption promotes their use. *See* 88 Fed. Reg. at 31,339 (noting that the parole processes for Cuba, Haiti, Nicaragua, and Venezuela allow up to 30,000 noncitizens per month to seek authorization to travel to the United States); Opp. 14-15. Even if the universe of people who will be excepted from the presumption because they received authorization to travel but did not arrive at an interior port and instead arrived at the southwest border may not be large, the exception will likely cover some people, and it is not arbitrary and capricious to use the rule's exception to highlight the parole pathway and to make unambiguously clear that those who obtain advance permission to travel to an interior port of entry are not subject to the rule's rebuttable presumption.

*Third*, Plaintiffs have not shown that the record contradicts the Departments' reasonable conclusion that seeking asylum in transit countries may be a viable option for some migrants. *See* Opp. 15-17. Plaintiffs' bare disagreement with the Departments' determination does not compel a contrary conclusion. *See Orion Reserves*, 553 F.3d at 704. Seeking to show otherwise, Plaintiffs assert that "asylum seekers are systematically targeted for violence and exploitation in Mexico" and suggest that almost every other country in the Western Hemisphere is unsafe for anyone seeking protection. Opp. 15-17. They include discussions about countries the Departments never identified as potential reasonable alternatives, *see* Opp. 16 (discussing Nicaragua and El Salvador), and criticize other countries' asylum and protection systems for imperfections, some of which— like large backlogs and long delays—the United States shares, *see id.* at 15-16 (discussing

Mexico's asylum system). But the rule explicitly

> recognize[s] that not all third countries will be safe for all noncitizens seeking asylum and acknowledge[s] that some migrants may feel that the dangers noted by commenters, or the risk that a particular country's asylum system would be unduly delayed or leave them vulnerable to refoulement, make applying for protection in that country untenable.

88 Fed. Reg. at 31,413. Substantial evidence supported the Departments' judgment that, for many migrants, seeking protection in third countries is a safe, genuine option—including evidence that Mexico and every Central American country are parties to the 1951 Refugee Convention and its 1967 Protocol and have adopted the non-binding Cartagena Declaration on Refugees that contains a broader definition of "refugee" than in U.S. law, that countries in Central and South America have provided aid and protection to those fleeing violence, and that they continue to improve their protection systems. *See* 88 Fed. Reg. at 31,410-17; Cross-Mot. 25-26. The record is also replete with documentation of efforts to augment available protections, such as a detailed report on the successes of efforts to improve the systems in Belize, Costa Rica, Guatemala, Honduras, Mexico, and Panama, which tells stories of those who have found protection in those countries. *See* CLP_AR_004948-98. Plaintiffs do not address such evidence. Regardless, the Departments did not act in an arbitrary and capricious manner by including as one of several pathways obtaining a denial of protection in a third country. *See* 88 Fed. Reg. at 31,371 ("The rule therefore strikes a balance: It provides an exception from its presumption of ineligibility for individuals who seek and are denied protection in a third country, but it recognizes that for some individuals, particular third countries—or even all third countries—may not be a viable option.").

*Fourth*, Plaintiffs contend that the rule did not "adequately consider[] the particular challenges and dangers facing" certain vulnerable groups. Opp. 17. But the rule explicitly considered the circumstances facing such groups. *See, e.g.*, 88 Fed. Reg. at 31,345 (recognizing that "irregular migration journeys can be particularly fraught for vulnerable groups" and that the rule "is intended to benefit particularly vulnerable groups by removing the incentive to make a dangerous irregular migration journey and reducing the role of exploitative transnational criminal organizations and smugglers"); *id.* at 31,351 (providing that the rule's "presumption can be rebutted by noncitizens, including those with particular vulnerabilities, who do not use a lawful

pathway but who face imminent and extreme threats to life or safety"); *id.* at 31,350-51 (addressing comments relating to women, domestic violence survivors, and LGBT individuals); *id.* at 31,352-53 (addressing comments relating to indigenous people and people of color).

> ### 3. The rule does not pre-judge the strength of asylum claims based on whether an individual complied with the rule's requirements.

Plaintiffs argue that the rule "repeatedly claims that it preserves eligibility for applicants more likely to have valid claims and bars those without valid claims." Opp. 18. The rule makes no such statement. The 139-page final rule nowhere claims that those who are subject to the rebuttable presumption are less likely to have experienced past persecution or to have a well-founded fear of future persecution, and Plaintiffs are wrong to so suggest. Rather, throughout the rule, the Departments express the goal of being able to more efficiently and quickly evaluate the merits of asylum claims for those who are eligible. *See, e.g.*, 88 Fed. Reg. at 31,315 ("The practical result of this growing backlog is that those with meritorious claims may have to wait years for their claims to be granted, while individuals who are ultimately denied protection may spend years in the United States before being issued a final order of removal."); *id.* at 31,381 ("the application of the heightened standard is in line with the goal of identifying nonmeritorious claims at the screening stage"); *see also id.* at 31,337-38, 31,387.

> ### 4. The rule properly considered relevant policies and practices.

As the Departments have explained, the rule expressly discusses and addresses relevant policy changes. Cross-Mot. 27-28; *see, e.g.*, 88 Fed. Reg. at 31,317-18, 31,317 & n.21 (discussing efforts over the prior two years as well as new efforts announced on April 27, 2023).

*First*, Plaintiffs take issue with the practice of conducting some credible fear interviews while noncitizens are in CBP custody. Opp. 19-20. But a change in location for credible fear screenings is outside the scope of the rule. *See* 88 Fed. Reg. at 31,363. The rule adopts a *substantive* change to asylum eligibility, which is implemented in credible fear interviews. The *procedures* for conducting such interviews are addressed in separate policies that involve different considerations and that are not part of the rule. *See id.* ("Any decision to conduct credible fear interviews while the noncitizen is in CBP custody will take into account a range of factors, including operational

limitations associated with the facility, staffing, and throughput."); *see also Las Americas Immigrant Advoc. Ctr. v. Wolf*, 507 F. Supp. 3d 1, 19, 29-32 (D.D.C. 2020) (K.B. Jackson, J.) (under the INA, credible fear interviews may be implemented differently depending on which border sector an individual is detained in). Plaintiffs newly assert that the Departments failed to consider that the rule and change of location together would be a "fiasco" and "set unachievable standards." Opp. 19 (quotation marks omitted). Regardless, the response is the same: decisions relating to the process of conducting credible fear interviews are outside the scope of the rule and indeed may be changed if their interaction becomes problematic. Even were it otherwise, the Departments had no obligation to respond to every observation made in 52,000 comments. And given how the data on which Plaintiffs rely on its face fails to substantiate their position, *see* Cross-Mot. 27-28, Plaintiffs can have no complaints here.

*Second*, Plaintiffs also raise Mexico's agreement to accept the return or removal of some non-Mexican nationals, Opp. 19-20, but the Departments specifically considered the ability to remove non-Mexican nationals to Mexico throughout the rule. Cross-Mot. 22; *see, e.g.*, 88 Fed. Reg. at 11,705-06; CLP_AR_002489 (including "CHNV Returns to Mexico continue" in modeling impact of the rule); *see also* 88 Fed. Reg. at 31,317, 31,325, 31,337 (discussing the importance of being able to return or remove non-Mexican nationals to Mexico); *id.* at 31,316-17 & n.21 (noting that once the Title 42 Order ends, the government would rely, if Mexico agreed, on returning or removing some non-Mexican nationals to Mexico). Plaintiffs now contend that the Departments failed to consider that the ability to remove non-Mexican nationals to Mexico would lead to shorter periods of stays in custody. Opp. 19-20. This argument, however, fails to recognize the need to take a number of steps to address a significant problem at the border and focuses on only one of the justifications for the rule. Being able to return or remove noncitizens to Mexico may lead to shorter periods of stay in custody for some, but even if such an outcome could be relied upon in the absence of the rulemaking, it would not by itself accomplish the main goal of the rule, which is to create an incentive structure that encourages noncitizens to enter the United States through safe and orderly pathways to avoid overwhelming the immigration system. *See* 88 Fed. Reg. at 31,316. Plaintiffs do not explain how being able to return or remove some non-

1   Mexican nationals to Mexico has such a dramatic impact that there was no need to adopt the rule.

2       **C.      The Rule Satisfies the APA's Procedural Requirements. (Count III)**

3       The Court should reject Plaintiffs' procedural challenges. *See* Compl. ¶¶ 233-37. Under

4   exigent circumstances, the Departments provided for a notice-and-comment process that reflected

5   both the urgency of the situation and the desire to obtain public comment. *See* 88 Fed. Reg. at

6   31,433-35. During the 33-day period, commenters submitted 83,962 pages of comments, including

7   hundreds of substantive comments from non-governmental organizations. *See* CLP_PC. The

8   Departments satisfied the APA's procedural requirements to provide a meaningful opportunity to

9   comment. *See* Cross-Mot. 28-32. Plaintiffs' contrary claims are unavailing.

10      *First*, Plaintiffs' argument that the Departments had ample time to plan, Opp. 20, disregards

11  what happened during the 18 months leading up to the end of Title 42. As the rule explains in

12  detail, although the CDC's intent to end the Title 42 Order had been announced, due to litigation

13  and multiple injunctions, there was great uncertainty as to when the Order would actually

14  terminate. It was not until January 30, 2023, when the Administration announced that the public

15  health emergency underpinning the Order would be extended only until May 11, 2023, and then

16  expire, that the end of the Order became more concrete. 88 Fed. Reg. at 31,435. The NPRM was

17  published shortly after and provided for a 33-day comment period, [9] which allowed the

18  Departments just enough time to review the comments and publish the rule before the end of Title

19  42. *Id.* at 31,432-33. Additionally, the rule draws from the approach taken in the Venezuela parole

20  process issued in October 2022, the success of which was seen in January. *Id.* at 31,435.

21      *Second*, the Departments addressed the decisions Plaintiffs cited regarding sufficient time

22  for commenting. *See* 88 Fed. Reg. at 31,434. None of these cases found a 30-day comment period

23  necessarily deficient but rather looked to the specific circumstances of the rulemakings at issue.

24  Here, those circumstances demonstrate that the object of notice and comment—"fair notice"—was

25  served and that adopting a 33-day comment period was reasonable. *See Little Sisters of the Poor*

26  *Saints Peter & Paul Home v. Penn.*, 140 S. Ct. 2367, 2385 (2020). Unlike in *Centro Legal* and

27

28  [9] The NPRM was published on February 23, 2023, and the comment period ended at 11:59 pm on
    March 27, 2023. Including the start and end dates, that equals 33 days. *Contra* Opp. 20 n.8.

DEFENDANTS' REPLY
*East Bay Sanctuary v. Biden*,
Case No. 4:18-cv-06810-JST

*Pangea*, here there were exigent circumstances, no other rules addressing the same regulatory provisions in development, and no Federal holidays or other exceptional circumstances noted during the period. *Compare Centro Legal de la Raza v. EOIR*, 524 F. Supp. 3d 919, 955 (N.D. Cal. 2021) (DOJ's 30-day period likely insufficient for a rule implementing extensive changes and noting, inter alia, the arguments by commenters that they could not fully respond during the comment period, the effect of the COVID-19 pandemic, and allegations of "staggered rulemaking"); *Pangea Legal Servs. v. DHS*, 501 F. Supp. 3d 792, 818-22 (N.D. Cal. 2020) (plaintiffs had at a minimum shown "serious questions going to the merits" of whether the 30-day period was insufficient and noting, inter alia, the "magnitude" of the rule, that the comment period "spanned the year-end holidays," the number of comments received, and allegations of "staggered rulemaking"). Notably, *Centro Legal* and *Pangea* were decided at the preliminary injunction stage and thus are of limited relevance here. Plaintiffs now cite *California ex rel. Becerra v. Dep't of Interior*, 381 F. Supp. 3d 1153, 1177 (N.D. Cal. 2019), *see* Opp. 21, which is also distinguishable because there the 30-day period was found insufficient by comparison to the public participation for the prior rule that the challenged rule was repealing. *See id.*

*Third*, Plaintiffs argue there was insufficient notice of other interrelated policies and practices that the public should have had the opportunity to comment on. Opp. 21. To the extent Plaintiffs seek to comment on those other policies and practices, that was outside the scope of this rulemaking. Regardless, Plaintiffs still do not explain what would have been *different* about comments had these policies been announced sooner. Plaintiffs also still offer no plausible explanation why the Departments should have halted all other preparations for the end of Title 42 on February 23 when the NPRM was published to avoid any possible interaction with this rule, let alone how the failure to do so justifies vacating the rule.

*Fourth*, Plaintiffs assert that the Departments should have released the "calculations and predictions" the Departments used, not just the raw data that was provided. Opp. 22. But the APA does not require the "information to be conveyed to the public [be] a full technical exposition," *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 556 (1978), and agencies may rely on internal information in their files, *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir.

2014) (citing *Vt. Yankee*, 435 U.S. at 556). Given the tension between the "critical materials" doctrine and this aspect of *Vt. Yankee*, the D.C. Circuit, where the critical materials doctrine developed, "more carefully examine[s] whether a failure to disclose such material actually harmed" the plaintiffs. *Allina Health*, 746 F.3d at 1110. Here, there can be no doubt that it did not. Although Plaintiffs and commenters allege that they would have been able to assess the predictions' validity, analyze the effects of the parole programs, and use the outputs to provide other alternatives, Opp. 22, they have all the relevant information but they do not provide anything concrete, such as even an example of an additional option they would have suggested. And they do not assert that they did not have the underlying data, from which they could have prepared alternative modeling to challenge that of the Departments. Additionally, the models run before the end of Title 42 accurately predicted what would occur after the end of Title 42 with the rule in place. *Compare* CLP_AR_002489 *with* Decl., ¶¶ 9-12. *Contra* Opp. 22 n.10. Plaintiffs' non-specific assertion that they would have said something different do not establish prejudice here.

## III.   Any Relief Must Be Sharply Limited

Even if any relief were warranted, the nationwide vacatur Plaintiffs seek is overbroad and conflicts with multiple statutory provisions as well as bedrock principles of standing, equity, and judicial restraint. *See* Cross-Mot. 32-35. Under 8 U.S.C. § 1252(e)(1) and (3), this Court is not the proper forum to consider the rule's implementation of the expedited removal system under § 1225(b)(1). Cross-Mot. 32. Our motion noted how the rule addresses expedited removal procedures, *see id.*; Plaintiffs do not raise—and have thus waived—any argument to the contrary. Plaintiffs' assumption that the rule cannot be preserved in any application, Opp. 27, ignores the language of the severability clause, which requires upholding provisions to the extent they are not deemed invalid, "as applied to any person or circumstance," 8 C.F.R. §§ 208.33(d), 1208.33(e).

Another statutory provision, § 1252(f)(1), also precludes Plaintiffs' requested relief. Under § 1252(f)(1), this Court has no "jurisdiction or authority" to "enjoin or restrain" the "operation of," as relevant here, the statutes governing removal and withholding (§§ 1225(b)(1), 1229a, 1231). That bar applies here because Plaintiffs seek a court order that would "interfere with the Government's efforts to operate" those statutes by forcing "officials to take actions . . . and to

refrain from actions that," "in the Government's view," are not statutorily required or prohibited. *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2065 (2022). Plaintiffs' rationales for avoiding § 1252(f)(1) are unpersuasive. Its text makes clear that it is not limited to injunctive relief, and plaintiffs' contrary view would read the statutory prohibition on orders "restrain[ing]" operation of the law, separate and apart from the prohibition on orders "enjoin[ing]" operation of the law, out of the statute. In any event, Plaintiffs' reliance on Supreme Court references to § 1252(f)(1)'s limits on injunctive relief, Opp. 24, proves too much because judicial vacatur, like an injunction, is a form of coercive relief that "restrict[s] or stop[s] official action," *Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1, 13 (2015), by prohibiting officials from applying the agency rule under review.

That § 1252(f)(1) does not include the statutory subchapter and part in which the asylum statute (§ 1158) appears does not change the analysis. Section 1252(f)(1) prohibits relief directed to the "operation of," among other things, the provisions governing expedited removal and § 1229a removal proceedings—that is, the "functioning of or working of" those provisions. *Aleman Gonzalez*, 142 S. Ct. at 2063. Because the rule undisputedly applies in such removal proceedings, it forms part of "the Government's efforts to enforce or implement" the listed statutes. *Id.* None of the Ninth Circuit cases that Plaintiffs cite, Opp. 25-26, meaningfully grappled with the statute's "operation of" language. Regardless, this is not a case involving "collateral consequence[s]" or subsequent proceedings, *see, e.g.*, *Gonzales v. DHS*, 508 F.3d 1227, 1233 (9th Cir. 2007)—the rule is applied in and central to carrying out removal proceedings under § 1225(b)(1) and § 1229a, and implementing withholding of removal at § 1231, which are all covered by § 1252(f)(1) and cross-reference asylum claims under § 1158.

In all events, principles of Article III standing, equity, and judicial restraint dictate that any relief should be confined to remedying Plaintiffs' injury and, even then, the scope of the injuries alleged by Plaintiffs, which are de minimis, must be weighed against the substantial impacts on the border that would come with vacatur. When a court orders "the government to take (or not take) some action with respect to those who are strangers to the suit, it is hard to see how the court could still be acting in the judicial role of resolving cases and controversies." *DHS v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring). And "[n]othing in the language of the APA"

requires that an unlawful regulation be "set[] aside . . . for the entire country." *Va. Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 394 (4th Cir. 2001). Properly understood, the APA directs a court to disregard an unlawful agency action in resolving the case before it. Indeed, Congress enacted the APA against the backdrop of "equity practice," *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944), with no indication that the statute "overthrow[s] the bedrock practice of case-by-case judgments with respect to the parties in each case" or "vest[s] courts with a new and far-reaching remedial power," *Texas*, 2023 WL 4139000, at *13 (Gorsuch, J., concurring) (quotation marks omitted). Plaintiffs also fail to acknowledge the documented problems attendant to nationwide relief: it "can stymie the orderly review of important questions, lead to forum shopping, render meaningless rules about joinder and class actions," and create an impression that Article III judges are setting national policy "by decreeing the rights and duties of people nationwide." *Id.* at *17. Indeed, there are four other pending cases challenging the rule, including one brought by some of the same counsel, and nationwide vacatur would decide the question for all those courts.[10]

Even if vacatur were in theory an available remedy, remand without vacatur would be appropriate here. Plaintiffs do not contest that remand without vacatur may be warranted based on a balancing of the equities. *See* Opp. 27-28; *see also eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392-93 (2006) (equitable relief does not "automatically follow[]" a determination of success on the merits). As demonstrated in our motion, whereas the perceived deficiencies are remediable, vacatur of a rule that is critical to the orderly management of the border and will have been used to process noncitizens for over two months would trigger immediate and severe disruptive consequences. Cross-Mot. 34-35. DHS's Assistant Secretary for Border and Immigration Policy detailed the significant harms that would result to the public, migrants, and the agency from an imminent increase in border encounters, including strained resources, dangerous overcrowding, increased human trafficking, and international discord. *See id.* And the agency's statistical models showed that daily border encounters threatened to meet or exceed record levels without the rule encouraging noncitizens to avail themselves of lawful, safe, and orderly options. *See id.*

---

[10] *Texas v. Mayorkas*, 2:23-cv-00024 (W.D. Tex. filed May 23, 2023); *Indiana v. Mayorkas*, No. 1:23-cv-00106 (D.N.D. filed May 31, 2023); *Haitian Bridge Alliance v. Biden*, No. 1:21-cv-03317 (D.D.C. filed Dec. 20, 2021); *M.A. v. Mayorkas*, No. 1:23-cv-01843 (D.D.C. filed June 23, 2023).

Plaintiffs question these predictions by surmising that "Title 8's harsher consequences" may account for changes in the number of border encounters. Opp. 30. But that speculation disregards the agency's reasoned explanation based on enforcement experience that "[i]mposing consequences for unlawfully, or irregularly, crossing the border is, by itself, not sufficient to deter irregular migration" and that the rule is part of a carefully calibrated approach pairing consequences "with incentives for migrants to use lawful processes." Decl. ¶ 3. Moreover, and contrary to Plaintiffs' contention that there is no evidence about the rule's specific impact, *see* Opp. 30, news reports concluded that "the rule and [its] accompanying messaging" had a direct effect on migrants' decisions, Decl. ¶ 22, and that a large number of migrants are waiting in Northern Mexico to see how the rule plays out in practice, *id.* ¶ 26. The evidence before the agency was more than sufficient to expect that daily encounters could surge and overwhelm border resources in the absence of the rule. *See id.* ¶¶ 4, 25-37.[11]

Although the agency has expanded the number of daily appointments on the CBP One app to "almost four times the average number of noncitizens processed per day at ports of entry than in the years preceding the pandemic," Decl. ¶ 23, Plaintiffs cite sources indicating that some migrants have faced wait times in securing such appointments, *see* Opp. 28-29. But the rule was premised on allocating the government's limited resources in the most efficient and equitable way. Vacatur would have the perverse effect of shifting border resources to combat unlawful and irregular migration to the detriment of those determined to pursue orderly pathways.

Finally, given that Plaintiffs did not seek any form of emergency relief or object to the government's request for a fourteen-day administrative stay of any adverse court order, Cross-Mot. 35, such a stay would be warranted to facilitate orderly proceedings in the court of appeals.

## CONCLUSION

For these reasons, the Court should grant the government's motion for summary judgment and deny Plaintiffs' motion.

---

[11] Whatever the merit of plaintiffs' methodology "[e]xtrapolating from the government's data" to hypothesize about the number of people who would have been granted asylum absent the rule, *see* Opp. 29 & n.15, there is no dispute that the rule in operation "will result in the denial of some asylum claims that otherwise may have been granted," 88 Fed. Reg. at 31,332.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

AUGUST E. FLENTJE
Special Counsel

WILLIAM C. PEACHEY
Director

EREZ R. REUVENI
Assistant Director

By: /s/ *Christina P. Greer*
   CHRISTINA P. GREER
   Senior Litigation Counsel
   Office of Immigration Litigation
   U.S. Department of Justice, Civil Division
   P.O. Box 868, Ben Franklin Station
   Washington, DC 20044
   Tel: (202) 598-8770
   Email: Christina.P.Greer@usdoj.gov

PATRICK GLEN
Senior Litigation Counsel

Dated: June 30, 2023              *Attorneys for Defendants*

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 30, 2023, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of for the Northern District of California by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

By: */s/ Christina P. Greer*
    CHRISTINA P. GREER
    Senior Litigation Counsel
    United States Department of Justice
    Civil Division