UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EAST BAY SANCTUARY COVENANT, et al., | Case No. 18-cv-06810-JST |
| Plaintiffs, | |
| v. | **ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| JOSEPH R. BIDEN, et al., | |
| Defendants. | Re: ECF Nos. 169, 176 |

Before the Court are motions for summary judgment filed by Plaintiffs East Bay Sanctuary Covenant ("EBSC"), Central American Resource Center of Los Angeles, Tahirih Justice Center, National Center for Lesbian Rights, Immigrant Defenders Law Center, and American Gateways, ECF No. 169; and Defendants Joseph R. Biden, Merrick Garland, United States Department of Justice ("DOJ"), David Neal, Executive Office of Immigration Review, Alejandro Mayorkas, United States Department of Homeland Security ("DHS"), Ur Jaddou, United States Citizenship and Immigration Services, Troy A. Miller, United States Customs and Border Protection ("CBP"), Tae D. Johnson, and Immigration and Customs Enforcement ("ICE"), ECF No. 176.  The Court will grant Plaintiffs' motion for summary judgment and deny Defendants' motion for summary judgment.

## I.     BACKGROUND

On May 16, 2023, DHS and DOJ published a final rule, Circumvention of Lawful Pathways ("the Rule"), which applies a presumption of asylum ineligibility to noncitizens who traveled through a country other than their own before entering the United States through the southern border with Mexico.  88 Fed. Reg. 31314, 31449–52 (May 16, 2023).  Unless they meet one of several exceptions, such individuals will be presumed ineligible for asylum; they may rebut

1  this presumption only upon a showing of "exceptionally compelling circumstances" at the time of

2  entry.  *Id.*  The Rule provides exceptions for unaccompanied children, noncitizens authorized to

3  travel to the United States pursuant to a DHS-approved parole process, certain noncitizens who

4  present at a port of entry, and noncitizens who have been denied asylum or other forms of

5  protection by another country.  *Id.*

6          Plaintiffs are organizations that represent and assist asylum seekers.  They argue the Rule

7  is invalid under the Administrative Procedure Act ("APA") for three reasons: first, it is contrary to

8  law; second, it is arbitrary and capricious; and third, it was issued without adequate opportunity

9  for public comment.

10         **A.       Statutory Framework**

11         "In 1980, to limit the [Executive's] parole power, create a predictable and permanent

12  admissions system, and fulfill international obligations, Congress passed the Refugee Act," which

13  "provided a statutory basis for asylum, the granting of status to refugees who arrive or have been

14  physically present in the United States."  *Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1060 (9th

15  Cir. 2017) (en banc); *see also EBSC v. Biden* (*Entry V*), 993 F.3d 640, 658 (9th Cir. 2021) ("[T]he

16  Refugee Act of 1980 . . . established an asylum procedure available to any migrant, 'irrespective

17  of such alien's status,' and irrespective of whether the migrant arrived 'at a land border or port of

18  entry.'") (quoting Pub. L. No. 96-212, § 208(a), 94 Stat. 102, 105 (1980)).

19         This statutory basis is now found in the Immigration and Nationality Act ("INA"), which

20  provides that any noncitizen who arrives in the United States, "whether or not at a designated port

21  of arrival" and "irrespective of [their] status, may apply for asylum."  8 U.S.C. § 1158(a)(1).[1]  The

22  statute grants the Attorney General or Secretary of Homeland Security discretion to grant asylum

23  to applicants who qualify as refugees, *id.* § 1158(b)(1)(A), defined as those "unable or unwilling

24  to return to" their home countries "because of persecution or a well-founded fear of persecution on

25

26  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

27  [1] This provision does not apply to noncitizens whom the Attorney General determines can be
    removed to a safe third country, 8 U.S.C. § 1158(a)(2)(A); or to noncitizens who apply for asylum
    more than one year after arrival or have previously been denied asylum in the United States, *id.*

28  § 1158(a)(2)(B)–(C), unless they demonstrate changed or extraordinary circumstances, *id.*
    § 1158(a)(2)(D).

United States District Court
Northern District of California

account of race, religion, nationality, membership in a particular social group, or political

opinion," *id.* § 1101(a)(42).  Certain noncitizens are statutorily barred from eligibility for asylum:

those who have persecuted others on the basis of race, religion, nationality, membership in a

particular social group, or political opinion; those who have been convicted by final judgment of a

particularly serious crime; those who there are serious reasons to believe have committed a serious

nonpolitical crime outside the United States prior to arrival; those who there are reasonable

grounds to regard as terrorists or a danger to the security of the United States; and those who have

firmly resettled in another country prior to arriving in the United States.  *Id.* § 1158(b)(2)(A)(i)–

(vi).  The statute also provides that "[t]he Attorney General may by regulation establish additional

limitations and conditions" on asylum eligibility, so long as such limitations and conditions are

"consistent with this section."  *Id.* § 1158(b)(2)(C).

### B.    The Challenged Rule

The Rule establishes a "rebuttable presumption" of asylum ineligibility which applies to all

noncitizens who enter the United States at the southern border between May 11, 2023, and

May 11, 2025, "after . . . travel[ing] through a country other than [their] country of citizenship,

nationality, or, if stateless, last habitual residence."[2]  88 Fed. Reg. at 31450.  The presumption

does not apply to unaccompanied minor children.  *Id.*  Otherwise, noncitizens are exempt from

this presumption only if they (1) have "authorization to travel to the United States to seek parole,

pursuant to a DHS-approved parole process"; (2) "[p]resented at a port of entry, pursuant to a pre-

scheduled time and place, or presented at a port of entry without a pre-scheduled time and place,"

provided they demonstrate, by a preponderance of the evidence, that "it was not possible to access

or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure,

or other ongoing and serious obstacle"; or (3) "[s]ought asylum or other protection in a country

---

[2] This requirement applies only if the country or countries the noncitizen traveled through are
parties to the 1951 Convention Relating to the Status of Refugees, July 28, 1951, 19 U.S.T. 6259,
189 U.N.T.S. 150, or 1967 Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T.
6223, 606 U.N.T.S. 268.  88 Fed. Reg. at 31450.  As noted in the preamble to the Rule, all but one
of the countries in North, Central, and South America are parties to at least one of these
agreements.  88 Fed. Reg. at 31411.

United States District Court
Northern District of California

1   through which [they] traveled and received a final decision denying that application," provided the

2   denial was for a reason other than abandonment of the claim.[3]  *Id.*  To rebut this presumption,

3   noncitizens must demonstrate, by a preponderance of the evidence, the existence of "exceptionally

4   compelling circumstances" at the time of entry.  Such circumstances exist in cases of acute

5   medical emergencies, "imminent and extreme threat to life or safety, such as an imminent threat of

6   rape, kidnapping, torture, or murder," or "severe . . . trafficking in persons."  *Id.*[4]

7          In simpler terms, under the Rule, noncitizens other than Mexican nationals who cross the

8   southern border are presumed ineligible for asylum unless they (1) have received advance

9   permission to travel to the U.S. to apply for parole; (2) present at a port of entry for a pre-

10  scheduled appointment (or without an appointment, if they can demonstrate an "ongoing and

11  serious obstacle" that precluded pre-scheduling); or (3) have already sought and been denied

12  asylum or other protection in another country en route to the U.S.[5]  The presumption may be

13  rebutted only upon a showing of exceptionally compelling circumstances.

14         The Attorney General and DHS Secretary issued the challenged Rule "pursuant to their

15  shared and respective authorities concerning asylum, statutory withholding, and CAT

16  determinations" under the INA, including their discretionary authority to grant asylum to refugees,

17

18  [3] The exception for noncitizens who apply for and are denied asylum or other protection in transit
    countries does not differentiate among denials for reasons other than abandonment—for example,
19  claims that are not cognizable under the asylum laws of those transit countries or applications that
    are procedurally barred.  *See* 88 Fed. Reg. at 31450 ("A final decision includes any denial by a
20  foreign government of the applicant's claim for asylum or other protection through one or more of
    that government's pathways for that claim.  A final decision does not include a determination by a
21  foreign government that the alien abandoned the claim.").  To qualify for this exception,
    noncitizens must have applied for and been denied asylum in a country through which they
22  traveled, regardless of whether or not their applications had any possibility of being granted, and
    regardless of whether or not that country is a safe option for them.

23  [4] The Rule provides that exceptionally compelling circumstances will also be found, in removal
24  proceedings pursuant to 8 U.S.C. § 1229(a), where a principal asylum applicant is eligible for
    statutory withholding of removal or Convention Against Torture ("CAT") withholding and would
25  be granted asylum but for the presumption, and an accompanying family member does not
    independently qualify for protection from removal or the principal applicant has a spouse or child
26  who would be eligible to follow to join them if they were granted asylum.  88 Fed. Reg. at 31452.
    In such cases, the presumption will be deemed rebutted.

27  [5] As noted above, unaccompanied children are also not subject to the presumption.  Because this
    challenge largely does not concern the exception for unaccompanied children, the Court does not
28  discuss this exception in detail.

4

8 U.S.C. § 1158(b)(1)(A); their authority to establish requirements and procedures to govern asylum applications, *id.*; and their authority to establish additional limitations and conditions for asylum eligibility "consistent with this section," *id* § 1158(b)(2)(C).   88 Fed. Reg. at 31323.

The agencies issued a Notice of Proposed Rulemaking ("the Notice") on February 23, 2023, and received public comments until March 27, 2023.  Circumvention of Lawful Pathways, 88 Fed. Reg. 11704, 11704 (Feb. 23, 2023).  Including the last day, the comment period spanned 33 days.[6]  In promulgating the Rule, the agencies invoked the foreign affairs and good cause exceptions to the APA's required 30-day delayed effective date for substantive rules.  *Id.* at 31444–47.  The Rule took effect on May 11, 2023.  *Id.* at 31314.

### C.    Procedural History

This case began in November 2018, when Plaintiffs filed suit to challenge an interim final rule, Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. 55934 (Nov. 9, 2018), and accompanying presidential proclamation which together barred asylum eligibility for noncitizens who entered the United States outside of designated ports of entry ("Entry Rule").  ECF No. 1.  This Court enjoined the Entry Rule.  *EBSC v. Trump* (*Entry I*), 349 F. Supp. 3d 838 (N.D. Cal. 2018) (granting temporary restraining order); *EBSC v. Trump* (*Entry II*), 354 F. Supp. 3d 1094 (N.D. Cal. 2018) (granting preliminary injunction).  The Ninth Circuit and Supreme Court declined to stay the temporary restraining order pending appeal.  *EBSC v. Trump* (*Entry III*), 932 F. 3d 742 (9th Cir. 2018); *Trump v. EBSC* (*Entry IV*), 139 S. Ct. 782 (2018) (mem.).  This Court stayed the case in March 2019, pending resolution of the appeal.  ECF No. 113.  The Ninth Circuit subsequently held that the Entry Rule was substantively invalid and affirmed this Court's orders granting preliminary injunctive relief.  *Entry V*, 993 F.3d at 640.

In 2019, DOJ and DHS issued an interim final rule that rendered noncitizens who crossed

---

[6] The parties dispute the exact length of the comment period:  Defendants include the final day of the comment period in their calculation, while Plaintiffs omit the final day.  For purposes of this motion, the Court assumes that the public could begin submitting comments on the day the Notice was issued and could continue to submit comments until the end of the day the comment period closed, such that the comment period was 33 days long.

the southern border after traveling through a country other than their own categorically ineligible for asylum ("Transit Rule").  Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33829 (July 16, 2019).  The Transit Rule contained three exceptions under which noncitizens could remain eligible for asylum: (1) if they had applied for and been denied asylum or other protection in at least one country en route to the United States; (2) if they qualified as victims of human trafficking; and (3) if the only countries they traveled through were not parties to one of three international treaties.  *Id.* at 33843.  This Court enjoined the Transit Rule.  *EBSC v. Barr* (*Transit I*), 385 F. Supp. 3d 922 (N.D. Cal. 2019).  The Ninth Circuit narrowed the scope of the injunction, staying it outside of the Ninth Circuit, and explained that this Court retained jurisdiction to further develop the record in support of a broader injunction.  *EBSC v. Barr* (*Transit II*), 934 F.3d 1026 (9th Cir. 2019).  Following remand, this Court restored the nationwide scope of the injunction.  *EBSC v. Barr* (*Transit III*), 391 F. Supp. 3d 974 (N.D. Cal. 2019).  The Supreme Court then stayed the injunction pending appeal.  *Barr v. EBSC* (*Transit IV*), 140 S. Ct. 3 (2019) (mem.).  On appeal, the Ninth Circuit affirmed this Court's order granting a nationwide injunction and held that the Transit Rule was substantively invalid.  *EBSC v. Garland* (*Transit V*), 994 F.3d 962 (9th Cir. 2020).

The Rule Plaintiffs presently challenge removed provisions implementing the Entry and Transit Rules.  *See* 88 Fed. Reg. at 31319.  On May 11, 2023—the day the Rule was scheduled to take effect, which was five days before its publication—Plaintiffs filed a motion seeking to lift the stay in this case and requesting leave to file an amended and supplemental complaint.  ECF No. 147.  Pursuant to the parties' subsequent stipulation, the Court granted the motion and adopted the parties' proposed case schedule, which contemplated proceeding directly to summary judgment.  ECF No. 163.  The parties now move for summary judgment.  ECF Nos. 169, 176.  The Court permitted and has considered amicus briefs by a group of former immigration judges and members of the Board of Immigration Appeals ("BIA"), ECF No. 172, and by National Citizenship and Immigration Services Council 119, ECF No. 174-1.

**II.      JURISDICTION**

The Court has jurisdiction under 28 U.S.C. § 1331.

III.    **LEGAL STANDARD**

Granting summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For cases involving review of agency action under the APA, "[t]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *City & County of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir. 1997) (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985)). In such cases, a court's review is generally limited to the administrative record. *Lands Council v. Powell*, 395 F.3d 1019, 1029–30 (9th Cir. 2005).

IV.    **DISCUSSION**

A.    **Preliminary Issues**

The Court begins by addressing preliminary issues that affect this Court's jurisdiction to reach the merits and grant the relief sought—namely, Article III standing, statutory standing, and provisions of the INA that limit judicial review.

1.    **Article III Standing**

"Article III confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). "For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case—in other words, standing." *Id.* (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997)). "[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant, and (iii) that the injury would likely be redressed by judicial relief." *Id.* "The party invoking federal jurisdiction bears the burden of establishing" each element of standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). At summary judgment, plaintiffs "must 'set forth' by affidavit or other evidence 'specific facts,' which for purposes of the summary judgment motion will be taken as true." *Id.* (internal citation omitted).

Plaintiffs assert organizational standing to challenge the Rule. "An organization may establish standing on its own behalf by showing that the defendant's conduct resulted in 'a

diversion of its resources and frustration of its mission,' or caused a substantial loss in organizational funding." *Transit V*, 994 F.3d at 974 (internal citation omitted) (quoting *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002)); *see Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (allegations that challenged practices "frustrated" organization's mission and required reallocation of resources are sufficient to confer direct standing because "[s]uch concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests"). "[U]nder *Havens Realty*, 'a diversion-of-resources injury is sufficient to establish organizational standing,' if the organization shows that, independent of the litigation, the challenged 'policy frustrates the organization's goals and requires the organization to expend resources in representing clients they otherwise would spend in other ways.'" *Entry III*, 932 F.3d at 765 (first quoting *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040 (9th Cir. 2015), then quoting *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943 (9th Cir. 2011) (en banc)).

Plaintiffs are immigration legal services organizations that represent noncitizens seeking asylum. ECF No. 169-2 ¶¶ 5, 7; ECF No. 169-3 ¶¶ 4, 12–13; ECF No. 169-5 ¶ 10; ECF No. 169-6 ¶¶ 6, 9, 11; ECF No. 169-7 ¶¶ 6, 12; ECF No. 175 ¶¶ 6–7. Plaintiffs assert that the Rule frustrates their organizational goals, requires them to reallocate resources in a manner which will limit the number of clients they serve, and will cause them to lose funding. ECF No. 169-2 ¶¶ 11, 13; ECF No. 169-3 ¶ 17; ECF No. 169-5 ¶ 11; ECF No. 169-6 ¶ 14; ECF No. 169-7 ¶¶ 19–20, 26; ECF No. 175 ¶ 18.

The Rule will frustrate Plaintiffs' missions and require them to divert resources from existing programs. ECF No. 169-2 ¶ 16; ECF No. 169-3 ¶¶ 25–26; ECF No. 169-5 ¶ 24; ECF No. 175 ¶¶ 18, 21. Under the Rule, many of Plaintiffs' clients will be presumed ineligible for asylum. ECF No. 169-2 ¶¶ 7, 11; ECF No. 169-3 ¶ 18; ECF No. 169-5 ¶¶ 15, 28–43; ECF No. 169-6 ¶¶ 10–11; ECF No. 169-7 ¶¶ 20, 32–43; ECF No. 175 ¶¶ 15, 37. To assist asylum seekers, Plaintiffs will need to overhaul their screening and intake processes to determine whether clients can qualify for an exception to the Rule or rebut the presumption, and assign staff to gather

8

relevant evidence and prepare such arguments.  ECF No. 169-2 ¶ 13; ECF No. 169-3 ¶ 24; ECF

No. 169-5 ¶¶ 20–23.  Because many of their clients will be presumed ineligible for asylum,

Plaintiffs will have to assist clients who cannot meet an exception or rebut the presumption in

seeking other forms of relief—statutory withholding of removal and CAT withholding—which are

far more time- and resource-intensive than asylum, largely because they impose a higher

evidentiary standard.  ECF No. 169-2 ¶ 11; ECF No. 169-3 ¶ 21; ECF No. 169-5 ¶ 17; ECF

No. 169-7 ¶ 24.  Because of the higher evidentiary standard, Plaintiffs will have to devote

resources to filing appeals to the BIA and petitions for review.  ECF No. 169-7 ¶ 24.  Statutory

withholding and CAT withholding do not permit principal applicants to petition for derivative

applicants—as asylum does—so Plaintiffs will have to devote additional resources to preparing

separate applications to ensure the safety of applicants' family members.  ECF No. 169-2 ¶ 12;

ECF No. 169-3 ¶¶ 22–23; ECF No. 169-5 ¶¶ 18–19.  Plaintiffs will also need to adjust outreach

programs to educate the community about the new Rule and develop new materials for such

outreach.  ECF No. 169-3 ¶ 27; ECF No. 169-4 ¶ 35; ECF No. 169-6 ¶ 22; ECF No. 175 ¶ 37.

Because Plaintiffs will need to devote additional resources to each client seeking asylum—

for additional screening and preparation to argue that exceptions apply or rebut the presumption;

for the complexities involved in preparing statutory withholding and CAT withholding

applications; and for the training required to prepare staff to take on these tasks—Plaintiffs will be

able to represent fewer clients.  ECF No. 169-2 ¶¶ 13–14; ECF No. 169-4 ¶ 36; ECF No. 169-5

¶ 23; ECF No. 169-6 ¶ 16; ECF No. 169-7 ¶ 22.  Several Plaintiffs additionally anticipate a loss of

funding due to these operational shifts.  ECF No. 169-2 ¶¶ 8, 13–14; ECF No. 169-6 ¶ 16; ECF

No. 175 ¶ 36.

EBSC, for instance, focuses on affirmative asylum, which is "core to the organization's

mission, and accounts for almost half . . . [its] budget."  ECF No. 169-6 ¶ 8.  A substantial number

of EBSC's affirmative asylum clients are likely to be subject to the Rule's presumption of

ineligibility:  in 2022, nearly a third of EBSC's affirmative asylum clients crossed the southern

border between ports of entry after transiting through a third country, *id.* ¶ 10; EBSC's clients

include victims of gender-based violence and indigenous, LGBT, and HIV positive individuals,

1    who are particularly vulnerable to violence en route to the United States and are likely to have

2    "great difficulty accessing protection" in transit countries, *id.* ¶ 11; and many of EBSC's clients

3    are "illiterate or only marginally literate," such that they will struggle to use the CBP One mobile

4    scheduling application, *id.*  Because such individuals will be presumed ineligible for asylum,

5    EBSC will need to "significantly cut [its] affirmative asylum program," which is core to its

6    mission, *id.* ¶ 18, and "make [an] enormous and costly shift in how [it] provide[s] services," *id.*

7    ¶ 19, by pivoting to removal defense work, for which it would need to find new funding sources,

8    *id.* ¶ 21.  "If EBSC were no longer able to file [affirmative asylum] cases for most individuals who

9    entered without inspection after transiting through a third country, [it] would face a marked

10   decrease in [its] budget, which would jeopardize [its] entire asylum program."  *Id.* ¶ 16.

11       Because Plaintiffs offer uncontroverted evidence that the Rule will frustrate their

12   organizational goals, require diversion of resources, and substantially affect their funding, the

13   Court finds that Plaintiffs have standing to challenge the Rule.

14       Defendants argue that Plaintiffs nevertheless lack standing to challenge "what is, in

15   essence, a decision regarding enforcement of the immigration laws against third parties," such that

16   standing is barred by *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973), and *Sure-Tan, Inc. v.*

17   *NLRB*, 467 U.S. 883, 897 (1984).  ECF No. 176-1 at 22.  The Ninth Circuit previously rejected

18   this argument, explaining that those cases concern third-party, not organizational, standing.  *Entry*

19   *V*, 993 F.3d at 664 n.6.[7]

20       On reply, Defendants argue that *United States v. Texas*, 143 S. Ct. 1964 (2023),

21   additionally precludes Plaintiffs from challenging the Rule.  ECF No. 182 at 8–9.  In that case, the

22   Supreme Court held that two states lacked standing to challenge DHS's immigration-related arrest

23   and prosecution priorities, which the states argued conflicted with arrest mandates in the INA.  *Id.*

24   at 1969–70.  Relying on *Linda R.S.*, the Supreme Court explained that the states had no judicially

25   cognizable interest in the Executive's "exercise of enforcement discretion over whether to arrest or

26   prosecute."  *Id.* at 1970.  The Court also explicitly noted that "a challenge to an Executive Branch

27

28   ---
     [7] The Court notes that the Supreme Court's decision in *United States v. Texas*, 143 S. Ct. 1964
     (2023), suggests these cases are not limited to third-party standing.

1    policy that involves both the Executive Branch's arrest or prosecution priorities *and* the Executive

2    Branch's provision of legal benefits or legal status could lead to a different standing analysis . . .

3    because the challenged policy might implicate more than simply the Executive's traditional

4    enforcement discretion."  *Id.* at 1974 (emphasis in original).

5          The Rule Plaintiffs challenge does not seem to implicate the Executive's exercise of

6    enforcement discretion over whether to arrest or prosecute.  Regardless, the Rule certainly

7    implicates the Executive's provision of legal benefits or legal status because it categorically limits

8    eligibility for asylum, which offers "a number of benefits, including pathways to lawful permanent

9    resident status and citizenship," the opportunity to obtain derivative asylum for spouses and

10   unmarried children, employment authorization, the freedom to travel abroad without prior

11   government approval, and eligibility for certain federal financial benefits.  *Entry III*, 932 F.3d at

12   759–60.  Thus, *United States v. Texas*, 143 S. Ct. at 1964, does not bar Plaintiffs from challenging

13   the Rule.

14         The Court concludes that Plaintiffs have established Article III standing.

15               **2.      Statutory Standing**

16         Courts "presume that a statutory cause of action extends only to plaintiffs whose interests

17   'fall within the zone of interests protected by the law invoked.'"  *Lexmark Int'l, Inc v. Static*

18   *Control Components, Inc.*, 572 U.S. 118, 129 (2014) (quoting *Allen v. Wright*, 468 U.S. 737, 751

19   (1984)).  "[T]he test 'forecloses suit only when a plaintiff's interests are so marginally related to or

20   inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that'

21   Congress authorized that plaintiff to sue."  *Id.* at 130 (quoting *Match-E-Be-Nash-She-Wish Band*

22   *of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012)).  Because Plaintiffs bring an APA

23   challenge to rules promulgated pursuant to the INA, the Court considers whether Plaintiffs fall

24   within the zone of interests protected by the INA.  *Patchak*, 567 U.S. at 224.

25         The Ninth Circuit has already held that organizations that provide asylum services—some

26   of which are parties to this case—fall within the zone of interests protected by the INA, and

27   therefore satisfy the zone-of-interests standard to bring an APA challenge.  *See Entry III*, 932 F.3d

28   at 768–69 ("Although the Organizations are neither directly regulated nor benefitted by the INA,

United States District Court
Northern District of California

1    we nevertheless conclude that their interest in 'provid[ing] the [asylum] services [they were]

2    formed to provide' falls within the zone of interests protected by the INA.") (alterations in

3    original) (quoting *El Rescate Legal Servs. v. EOIR*, 959 F.2d 742, 748 (9th Cir. 1991)); *Entry V*,

4    993 F.3d at 668 ("The Organizations' claims fall within the zone of interests of the INA and of the

5    regulatory amendments implemented by the Rule.").  Because Plaintiffs' "purpose is to help

6    individuals apply for and obtain asylum, provide low-cost immigration services, and carry out

7    community education programs with respect to those services," their "interests are 'marginally

8    related to' and 'arguably within' the scope of the statute," such that the zone-of-interests analysis

9    does not foreclose suit.  *Entry V*, 993 F.3d at 668.

10         The Court concludes that Plaintiffs have statutory standing to challenge the validity of the

11   Rule.

12              **3.      Jurisdictional Bars**

13         Defendants argue that several provisions of the INA prohibit this Court from reviewing the

14   Rule or granting any remedy.

15              **a.      8 U.S.C. §§ 1252(a)(2)(A)(iv), (e)(1), and (e)(3)**

16         First, Defendants argue that the Rule implements expedited removal, such that 8 U.S.C.

17   §§ 1252(a)(2)(A)(iv), (e)(1), and (e)(3) divest this Court of jurisdiction to review or vacate the

18   Rule.  Section 1252(a)(2)(A)(iv) provides that "no court shall have jurisdiction to review . . .

19   except as provided in subsection (e), procedures and policies adopted by the Attorney General to

20   implement" expedited removal.  Section 1252(e)(1) provides that no court may grant equitable

21   relief "in any action pertaining to an order to exclude" based on expedited removal, while Section

22   1252(e)(3) limits judicial review of regulations implementing the expedited removal statute to

23   cases initiated in the United States District Court for the District of Columbia.  These provisions

24   therefore limit judicial review of rules implementing the expedited removal statute.

25         Defendants argue that the Rule implements the expedited removal statute because the

26   presumption of asylum ineligibility must be applied in expedited removal proceedings.  The

27   argument stretches too far.  As the Ninth Circuit previously explained, "[b]ars to asylum eligibility

28   may eventually be relevant to removal proceedings, but they are not 'regulation[s] . . . to

implement [removal orders]' or otherwise entirely linked with removal orders." *Entry V*, 993 F.3d at 666–67. "This is consistent with the purposes of these jurisdictional limitations: allowing collateral APA challenges to an asylum-eligibility rule does not undermine Congress's desire to 'limit all aliens to one bite of the apple with regard to challenging' their removal orders." *Id.* at 667 (quoting *Martinez v. Napolitano*, 704 F.3d 620, 622 (9th Cir. 2012)). The Rule implements the asylum statute by imposing new conditions on asylum eligibility; that the standard articulated in the Rule is also applied in the expedited removal process does not convert the Rule into one implementing the expedited removal statute.

The Court is not persuaded that Defendants' proposed reading of the limit on judicial review imposed by Sections 1252(a)(2)(A)(iv), (e)(1) and (e)(3) is appropriate. "As the Supreme Court has observed, where 'Congress wanted [a] jurisdictional bar to encompass [particular] decisions [under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA")] . . . it expressed precisely that meaning." *Entry II*, 354 F. Supp. 3d. at 1119 (alterations in original) (quoting *Kucana v. Holder*, 558 U.S. 233, 248 (2010)). Congress could have imposed similar limits on judicial review of challenges to regulations that implement the asylum statute, but it did not do so. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Nken v. Holder*, 556 U.S. 418, 430 (2009) (alteration in original) (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 432 (1987)). In the absence of binding authority holding that these provisions limit judicial review of regulations implementing the asylum statute, the Court concludes that it has jurisdiction over this case.

### b.   8 U.S.C. § 1252(f)(1)

Defendants also argue that 8 U.S.C. § 1252(f)(1) divests this Court of jurisdiction to grant the relief Plaintiffs seek. Section 1252(f), titled "[l]imit on injunctive relief," provides that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter . . . other than with respect to the application of such provisions to an individual alien against whom proceedings under such part

1    have been initiated." 8 U.S.C. § 1252(f)(1).  As the Supreme Court has explained, "[Section]

2    1252(f)(1) generally prohibits lower courts from entering injunctions that order federal officials to

3    take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified

4    statutory provisions."  *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2065 (2022).

5         First, the Court notes that Plaintiffs seek vacatur under the APA, not an injunction.

6    Though Defendants argue that the Section 1252(f)(1) bar also applies to vacatur, they cite no

7    binding authority on this point, and this Court is not aware of any.

8         Further, even if Section 1252(f)(1) did bar relief under the APA, the asylum statute is not

9    among the statutory provisions specified in Section 1252(f)(1).  Defendants argue that, because the

10   Rule provides that the presumption of asylum ineligibility shall apply in removal proceedings

11   initiated under 8 U.S.C. §§ 1225(b)(1) and 1229a, vacating or enjoining the Rule would

12   effectively "enjoin or restrain the operation" of those removal statutes in violation of Section

13   1252(f)(1) by preventing the agencies from applying the Rule's presumption in removal

14   proceedings.

15        The Court is not persuaded by this argument.  "At best, the law governing asylum is

16   collateral to the process of removal."  *Entry V*, 993 F.3d at 667.  The Rule imposes conditions on

17   eligibility for asylum; these conditions are applied across all contexts in which asylum claims may

18   arise.  That any injunction would have a collateral effect on the conditions for asylum eligibility as

19   applied during removal proceedings does not bring it within the bar imposed by Section 1252(f).

20   *See Gonzales v. DHS*, 508 F.3d 1227, 1233 (9th Cir. 2007) (holding that Section 1252(f)(1) did

21   not prohibit injunction directly implicating adjustment of status—which is not among the statutory

22   provisions specified in Section 1252(f)(1)—despite collateral effect on removal); *Aleman*

23   *Gonzalez*, 142 S. Ct. at 2067 n.4 (noting that *Gonzales*, 508 F.3d at 1227, "stands at most for the

24   unresponsive proposition that a court may enjoin the unlawful operation of a provision *that is not*

25   *specified in § 1252(f)(1)* even if that injunction has some collateral effect on the operation of a

26   covered provision") (emphasis in original).  Congress expressly limited the jurisdictional bar of

27   Section 1252(f)(1) to "the provisions of part IV of this subchapter," which do not include the

28   asylum statute.  *Gonzalez v. ICE*, 975 F.3d 788, 813 (9th Cir. 2020) ("[B]y specifying only 'the

14

1    provisions of Part IV' and reinforcing its focus on only '*such* provisions,' the statute's plain text

2    makes clear that its limitations on injunctive relief do *not* apply to *other* provisions of the INA.")

3    (emphasis in original) (internal citation omitted).  The fact that the removal statutes cross-

4    reference the asylum statute does not bring the asylum statute within the limited jurisdictional bar

5    of Section 1252(f)(1).

6        The Court concludes that it has jurisdiction to review the Rule and grant an appropriate

7    remedy under the APA.

8        **B.    APA Claims**

9        The APA provides, in relevant part, that courts "shall . . . hold unlawful and set aside

10   agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in

11   accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations . . . ; [or]

12   without observance of procedure required by law."  5 U.S.C. § 706(2).  "[I]n reviewing agency

13   action, a court is ordinarily limited to evaluating the agency's contemporaneous explanation in

14   light of the existing administrative record."  *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2573

15   (2019).

16       **1.    Substantive Validity**

17       Plaintiffs argue the Rule is substantively invalid because it is both not in accordance with

18   law and arbitrary and capricious.

19       **a.    "Not in Accordance with Law"**

20       The Rule imposes additional conditions on asylum eligibility; such conditions must be

21   "consistent with" Section 1158.  8 U.S.C. § 1158(b)(2)(C).  The government argues that the

22   conditions imposed by the Rule are consistent with Section 1158, and that the Court should defer

23   to the agencies' interpretation of the statute.

24       To determine whether judicial deference to an agency's interpretation of a statute is

25   appropriate, courts apply the framework articulated by the Supreme Court in *Chevron*, *U.S.A., Inc.*

26   *v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  Under *Chevron*, courts first

27   consider "whether Congress has directly spoken to the precise question at issue"; "[i]f the intent of

28   Congress is clear, that is the end of the matter."  *Campos-Hernandez v. Sessions*, 889 F.3d 564,

United States District Court
Northern District of California

15

568 (9th Cir. 2018) (quoting *Chevron*, 467 U.S. at 842). "The first and most important canon of statutory construction is the presumption 'that a legislature says in a statute what it means and means in a statute what it says there.'" *In re Pangang Grp. Co., LTD.*, 901 F.3d 1046, 1056 (9th Cir. 2018) (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992)). The Court "starts with the plain statutory text and, 'when deciding whether the language is plain, . . . must read the words in their context and with a view to their place in the overall statutory scheme.'" *Altera Corp. & Subsidiaries v. Comm'r of Internal Revenue*, 926 F.3d 1061, 1075 (9th Cir. 2019) (quoting *King v. Burwell*, 576 U.S. 473, 486 (2015)). "In addition, [courts] examine the legislative history, the statutory structure, and 'other traditional aids of statutory interpretation' in order to ascertain congressional intent." *Id.* (quoting *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 13 (1981)). "If 'the statute is silent or ambiguous with respect to [a] specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.'" *Wide Voice, LLC v. FCC*, 61 F.4th 1018, 1025 (9th Cir. 2023) (quoting *Chevron*, 467 U.S. at 843).

Congress granted the agencies authority to impose additional conditions on asylum eligibility, but only those consistent with Section 1158. The Rule effectively conditions asylum eligibility on whether a noncitizen qualifies for any of three exceptions—presenting at a port of entry, having been denied protection by another country in transit, and having parole-related travel authorization—or can show exceptionally compelling circumstances.[8] The agencies can only condition asylum eligibility based on these factors if doing so is consistent with Section 1158.

Two of the conditions imposed by the Rule have been previously found to be inconsistent with Section 1158. Under binding Ninth Circuit precedent, conditioning asylum eligibility on presenting at a port of entry or having been denied protection in transit conflicts with the unambiguous intent of Congress as expressed in Section 1158. *Entry V*, 993 F.3d at 671 ("[T]he [Entry] Rule is substantively invalid because it conflicts with the plain congressional intent

---

[8] As noted above, by its terms, the Rule only applies to individuals who transited through a country other than their own en route to the U.S. border. The Rule also contains an exception for unaccompanied minors.

United States District Court
Northern District of California

instilled in [Section] 1158(a), and is therefore 'not in accordance with law.'") (quoting 5 U.S.C. § 706(2)(A)); *Transit V*, 994 F.3d at 976 ("We hold, independently of *Chevron*, that the [Transit] Rule is not 'consistent with' [Section] 1158.  We note, however, that we would come to the same conclusion even if we were to apply *Chevron*, for the Rule is contrary to the unambiguous language of [Section] 1158.").  Section 1158(a) permits noncitizens to apply for asylum regardless of whether or not they arrive at a designated port of entry; a rule that conditions eligibility for asylum on presentment at a port of entry conflicts with Section 1158(a).  *Entry V*, 993 F.3d at 669–70.  The safe-third-country and firm-resettlement bars, 8 U.S.C. § 1158(a)(2)(A), (b)(2)(A), "specifically address[] the circumstances in which an alien who has traveled through, or stayed in, a third country can be deemed sufficiently safe in that country to warrant a denial of asylum in the United States"; conditioning asylum eligibility on having been denied protection in transit is not consistent with these bars.  *Transit V*, 994 F.3d at 978.

Defendants argue that this Court is not bound by the Ninth Circuit's holdings in *Entry V* and *Transit V* because, unlike the Entry and Transit Rules, this Rule does not impose a categorical bar, and a noncitizen may avoid the application of the presumption by qualifying for a different exception.  ECF No. 176-1 at 27–29; *see also* 88 Fed. Reg. at 31374 ("[U]nder this [R]ule . . . manner of entry, standing alone, is never dispositive. . . .  [T]he narrower application and numerous exceptions and methods of rebutting the presumption demonstrate the differences between the prior, categorical bars [and the Rule]."); *id.* at 31379 ("[T]he [R]ule imposes a condition on asylum . . . eligibility relating to whether the noncitizen availed themselves of a lawful pathway, but the [R]ule does not direct an inquiry as to whether the noncitizen can or should return to a third country.").

The Court is not persuaded that the existence of other exceptions or the opportunity to rebut the presumption materially distinguishes this Rule from the reasoning of *Entry V* and *Transit V*.  In *Entry V*, the Ninth Circuit explained that requiring noncitizens to present at ports of entry "effectively [constitutes] a categorical ban on migrants who use a method of entry explicitly authorized by Congress in [S]ection 1158(a)."  993 F.3d at 669–70.  The Entry Rule was contrary to law because it excluded noncitizens from eligibility for asylum based on their failure to present

1   at a port of entry, despite express statutory language providing that any noncitizen may apply for

2   asylum, regardless of "whether or not [they arrived] at a designated port of arrival."  8 U.S.C.

3   § 1158(a).  That a noncitizen may attempt to preserve their eligibility for asylum by meeting

4   another of the Rule's exceptions, or that their failure to present at a port of entry may be excused

5   upon a showing of exceptionally compelling circumstances, does not address the reason why

6   restricting asylum eligibility based on place of entry conflicts with the law.  Defendants are correct

7   that the Rule does not impose a categorical bar on all noncitizens subject to the Rule; however,

8   failure to present at a port of entry will exclude those for whom other exceptions are not available

9   and who cannot rebut the presumption.[9]

10          In *Transit V*, the Ninth Circuit explained that "regulations imposing additional limitations

11  and conditions under [Section] 1158(b)(2)(C) must be consistent with the core principle of

12  [Sections] 1158(a)(2)(A) and (b)(2)(A)(vi)—that an otherwise qualified alien can be denied

13  asylum only if there is a 'safe option' in another country."  994 F.3d at 979.  As written, the Rule

14  imposes a presumption of ineligibility on asylum seekers who did not apply for or were granted

15  asylum in a transit country regardless of whether that country is a safe option.  That noncitizens

16  may try to escape the presumption by satisfying a different exception, or that the presumption of

17  ineligibility may be rebutted in exceptionally compelling circumstances, does not address whether

18  a noncitizen has a safe option in another country.  While Defendants are correct that failure to seek

19  protection in a transit country alone may not be dispositive for many noncitizens subject to the

20  Rule, it would be so for the subset of noncitizens for whom the other exceptions are unavailable

---

[9] For example, a noncitizen ineligible for existing DHS parole programs who has been in Mexico for more than 30 business days—and is therefore ineligible for asylum in Mexico, AR 5715 (Ley Sobre Refugiados, Protección Complementaria y Asilo Político, Diario Oficial de la Federación [DOF] 27-01-2011, últimas reformas DOF 18-02-2022 (Mex.))—must present at a port of entry to avoid the presumption altogether.  If they cannot safely wait for a CBP One appointment to become available, and cannot show some exceptionally compelling circumstance, they are barred from asylum.

United States District Court
Northern District of California

1    and who cannot rebut the presumption.[10]  Regulations imposing additional conditions on asylum

2    must be consistent with the core principle of the safe-third-country and firm-resettlement bars.

3    This Rule is not.

4             The Court concludes that the Rule is contrary to law because it presumes ineligible for

5    asylum noncitizens who enter between ports of entry, using a manner of entry that Congress

6    expressly intended should not affect access to asylum.  The Rule is also contrary to law because it

7    presumes ineligible for asylum noncitizens who fail to apply for protection in a transit country,

8    despite Congress's clear intent that such a factor should only limit access to asylum where the

9    transit country actually presents a safe option.

10                             **b.      Arbitrary and Capricious**

11            "The APA's arbitrary-and-capricious standard requires that agency action be reasonable

12   and reasonably explained."  *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).

13   "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to

14   substitute its judgment for that of the agency."  *Wide Voice*, 61 F.4th at 1024 (quoting *Motor*

15   *Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

                    Nevertheless, [courts] require the agency to 'examine the relevant
16                  data and articulate a satisfactory explanation for its action,' and
                    [courts] will strike down agency action as 'arbitrary and capricious
17                  if the agency has relied on factors which Congress has not intended
                    it to consider, entirely failed to consider an important aspect of the
18                  problem, offered an explanation for its decision that runs counter to
                    the evidence before the agency,' or if the agency's decision 'is so
19                  implausible that it could not be ascribed to a difference in view or
                    the product of agency expertise.'
20

21   *Turtle Island Restoration Network v. U.S. Dep't of Com.*, 878 F.3d 725, 732–33 (9th Cir. 2017)

22

23   _____

     [10] For instance, a noncitizen originating from a third country presently in Mexico who is ineligible
24   for existing DHS parole programs and for whom Mexico is not safe, such that they cannot wait for
     a CBP One appointment to become available, would be subject to the presumption, regardless of
25   whether any country they traveled through presented a safe option for them.  To rebut the
     presumption, that noncitizen must wait until they experience an extreme and imminent threat to
26   life or safety to enter the United States to seek protection.  88 Fed. Reg. at 31396 ("[D]anger in
     Mexico generally would justify failing to pre-schedule a time and place to appear at a [port of
27   entry] . . . only when it amounts to an extreme and imminent threat to life or safety.").  If they
     cannot show that or some other exceptionally compelling circumstance, they are barred from
28   asylum.

United States District Court
Northern District of California

1 (quoting *State Farm*, 463 U.S. at 43).

2      The Rule is arbitrary and capricious for at least two reasons.  First, it relies on the

3 availability of other pathways for migration to the United States, which Congress did not intend

4 the agencies to consider in promulgating additional conditions for asylum eligibility.  Second, it

5 explains the scope of each exception by reference to the availability of the other exceptions,

6 although the record shows that each exception will be unavailable to many noncitizens subject to

7 the Rule.

8                 **i.**     **"Lawful Pathways"[11]**

9      As the preamble states, "[t]he [R]ule's primary purpose is to incentivize migrants,

10 including those intending to seek asylum, to use lawful, safe, and orderly pathways to enter the

11 United States, or seek asylum or other protection in another country through which they travel."

12 88 Fed. Reg. at 31336.  The final Rule offers several examples of these "lawful pathways," namely

13 temporary worker visa programs, parole programs, and refugee admission in the United States.  *Id.*

14 The agencies justify imposing conditions on asylum eligibility by reference to the availability of

15 these other pathways.  *See, e.g.*, *id.* at 31318 ("Available pathways provide lawful, safe[,] and

16 orderly mechanisms for migrants to enter the United States and make their protection claims. . . .

17 [T]his [R]ule also imposes consequences on certain noncitizens who fail to avail themselves of the

18 range of lawful, safe, and orderly means for entering the United States."); *id.* at 31347 ("[T]he

19 meaningful pathways detailed in the [R]ule, combined with the exceptions and rebuttals to the

20 presumption, provide sufficient opportunities for individuals to meet an exception to or rebut the

21 presumption."); *see also* ECF No. 176-1 at 33 ("The [R]ule was promulgated based on several

22 urgent and compelling considerations, including . . . the expansion of lawful, safe, and orderly

23 _____

24 [11] The preamble to the Rule defines "lawful pathways" and "lawful, safe, and orderly pathways"
as "the range of pathways and processes by which migrants are able to enter the United States or

25 other countries in a lawful, safe, and orderly manner and seek asylum and other forms of
protection as described in this [R]ule."  88 Fed. Reg. at 31316 n.18.  The Rule elsewhere appears

26 to use "pathways" to describe the means by which an individual may qualify for an exception to,
or rebut, the presumption.  *See, e.g.*, *id.* at 31410 ("The Departments believe that these alternative

27 pathways for a noncitizen to be excepted from or rebut the presumption against asylum eligibility
are sufficient.").  For the sake of clarity, the Court uses "pathways" and "lawful pathways" to refer

28 to the means by which noncitizens may enter the United States, and not to refer to any exceptions
to or opportunities to rebut the presumption imposed under the Rule.

1    pathways noncitizens can pursue to seek entry to the United States.").

2          The agencies' authority to promulgate regulations imposing additional limitations and

3    conditions on asylum eligibility requires only that such conditions be "consistent with" the asylum

4    statute, 8 U.S.C. § 1158(b)(2)(C); the statute does not otherwise mandate that particular factors be

5    considered in the rulemaking process.  However, "agency action must be based on non-arbitrary,

6    'relevant factors.'" *Judulang v. Holder*, 565 U.S. 42, 55 (2011) (quoting *State Farm*, 463 U.S. at

7    43).  The availability of refugee admissions, parole, or work visas is irrelevant to the availability

8    of asylum, which Congress considered to be independent of any particular means of entry.

9          Consider, for example, parole.  The Executive's longstanding discretion to parole

10   noncitizens into the country, codified in 1952, has changed only slightly in the decades since.

11   *Compare* 8 U.S.C. § 1182(d)(5) (1952) ("The Attorney General may in his discretion parole into

12   the United States temporarily under such conditions as he may prescribe for emergent reasons or

13   for reasons deemed strictly in the public interest any alien applying for admission to the United

14   States.") *with* 8 U.S.C. § 1182(d)(5) (2018) ("The Attorney General may . . . in his discretion

15   parole into the United States temporarily under such conditions as he may prescribe only on a

16   case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying

17   for admission to the United States.").[12]  "Prior to the [1980 Refugee Act], asylum for aliens who

18   were within the United States had been governed by regulations promulgated by the INS, pursuant

19   to the Attorney General's broad parole authority." *Cardoza-Fonseca*, 480 U.S. at 427 n.4.  The

20   1980 Refugee Act ordered the Attorney General to "establish a procedure for an alien physically

21   present in the United States or at a land border or port of entry, irrespective of such alien's status,

22   to apply for asylum."  Pub. L. No. 96-212, § 208(a), 94 Stat. 102, 105 (1980).  Asylum would

23   therefore be a benefit for which any qualifying noncitizen at a border or port of entry could apply,

24   independent of the Attorney General's parole power.  Imposing conditions on asylum eligibility

25   based on the availability of parole programs relies on a factor that Congress did not intend to be

26   _____

27   [12] While parole is discretionary and must be granted on a case-by-case basis, the Executive has
     created country-specific programs through which eligible noncitizens may seek individual grants
28   of parole. *See, e.g.*, 87 Fed. Reg. at 63507.

considered in the asylum context.[13]

Work visas and refugee admissions are similarly irrelevant to asylum. The H-2A and H-2B temporary worker visa programs predate Congress's enactment of the asylum statute. *See Mendoza v. Perez*, 754 F.3d 1002, 1007 (D.C. Cir. 2014) ("The H-2A visa program—created by the [INA] of 1952 [] and amended by the Immigration Reform and Control Act of 1986 ["IRCA"]—permits employers to hire foreign workers to perform temporary agricultural work in the United States."); *La. Forestry Ass'n Inc. v. Sec'y U.S. Dep't of Lab.*, 745 F.3d 653, 659 (3d Cir. 2014) ("In 1986, Congress enacted [IRCA], which amended the INA by, among other things, bifurcating the H-2 visa program into the H-2A and H-2B programs, which govern the admission of agricultural and nonagricultural workers, respectively."). The asylum statute expressly instructs that the ability to apply for asylum should not be limited based on status; whether temporary work visas are sufficiently available is irrelevant to whether asylum should remain so. The Refugee Act, which codified the availability of asylum protection, separately established a permanent refugee admission system. Pub. L. No. 96-212, §§ 207–08. That Congress provided for refugees and asylees separately—and has maintained that distinction in the intervening decades—indicates that the availability of refugee protection should not impact asylum eligibility.

Simply put, the asylum statute contemplates that, subject to certain exceptions, any noncitizen physically present in the United States—regardless of whether they entered on a work visa or with parole-related travel authorization—or at a land border or port of entry—regardless of the size and scope of refugee admissions efforts—may apply for asylum. To justify limiting eligibility for asylum based on the expansion of other means of entry or protection is to consider factors Congress did not intend to affect such eligibility. The Rule is therefore arbitrary and capricious.

### ii.    Scope of Exceptions

Plaintiffs additionally argue that the agencies rely on the exceptions to justify the Rule,

---

[13] That Congress later imposed additional limitations on asylum eligibility and granted the Attorney General the authority to impose further limitations consistent with the statute does not alter this analysis; none of the statutory limitations is related to the availability of other ways to enter or be admitted to the United States.

1   while the record demonstrates that many asylum seekers will be unable to qualify for these

2   exceptions.  In the preamble, the agencies acknowledge that the Rule's exceptions and opportunity

3   for rebuttal are insufficient to ensure that all noncitizens with otherwise meritorious asylum claims

4   will remain eligible for asylum:

> The Departments acknowledge that despite the protections preserved
> by the [R]ule and the availability of lawful pathways, the rebuttable
> presumption adopted in the [R]ule will result in the denial of some
> asylum claims that otherwise may have been granted, but . . . believe
> that the [R]ule will generally offer opportunities for those with valid
> claims to seek protection through asylum, statutory withholding of
> removal, or protection under the CAT . . . .

9   88 Fed. Reg. at 31332.  However, the Rule justifies the breadth of its presumption of ineligibility

10  by reference to its multiple exceptions and the opportunity to rebut it.  *See, e.g.*, 88 Fed. Reg. at

11  31325 ("These exceptions and opportunities for rebuttal are meant to ensure that migrants who are

12  particularly vulnerable, who are in imminent danger, or who could not access the lawful pathways

13  provided are not made ineligible for asylum by operation of the rebuttable presumption."); *id.* at

14  31334 (distinguishing the Transit Rule because "this [R]ule includes a number of broader

15  exceptions and means for rebutting the presumption" and "the means of rebutting or establishing

16  an exception to the presumption are not unduly burdensome"); *id.* at 31347 ("[T]he meaningful

17  pathways detailed in the [R]ule, combined with the exceptions and rebuttals to the presumption,

18  provide sufficient opportunities for individuals to meet an exception to or rebut the

19  presumption."); *id.* at 31418 ("The Departments believe that the [R]ule will generally offer

20  opportunities for those with valid claims to seek protection.").  The Rule further points to the other

21  exceptions and opportunity for rebuttal to justify the scope of each exception.  *See, e.g.*, *id.* at

22  31411 ("Applying for, and being denied, asylum or other protection in a third country is one

23  exception to the rebuttable presumption, but noncitizens who choose not to pursue this path may

24  instead seek authorization to travel to the United States to seek parole pursuant to a DHS-approved

25  parole process, or present at a [port of entry] at a pre-scheduled time and place."); *id.* at 31408

26  (noting that "the parole processes are not universally available, even to the covered populations,"

27  but that individuals who cannot qualify for parole processes "can present at a [port of entry] by

28  using a DHS scheduling mechanism to schedule a time to arrive at [ports of entry] at the [southern

border] and not be subject to the presumption of ineligibility").  The Rule therefore assumes that these exceptions will, at the very least, present meaningful options to noncitizens subject to the Rule.

Parole programs are not meaningfully available to many noncitizens subject to the Rule. Though other parole programs exist, *see* ECF No. 176-1 at 31, the Rule generally relies on the parole programs for Cuban, Haitian, Nicaraguan, Venezuelan, and Ukrainian nationals.  These programs are country-specific and "are not universally available, even to the covered populations." 88 Fed. Reg. at 31408.  The programs are further limited numerically, capped at 30,000 total individuals from Cuba, Haiti, Nicaragua, and Venezuela per month.  AR 4553.  Puzzlingly, these programs require that individuals fly to an interior port of entry—that is, an airport—rather than cross the southern border.  Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1266, 1273 (Jan. 9, 2023) ("Beneficiaries are required to fly at their own expense to an interior [port of entry], rather than arriving at the [southern border]."); Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1255, 1261 (Jan. 9, 2023) (same); Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243, 1249 (Jan. 9, 2023) (same); Implementation of Changes to the Parole Process for Venezuelans, 88 Fed. Reg. 1279, 1279–80 (Jan. 9, 2023) ("DHS provided the new parole process for Venezuelans who are backed by supporters in the United States to come to the United States by flying to interior [ports of entry]—thus obviating the need for them to make the dangerous journey to the [southern border]."); *see also* Implementation of the Uniting for Ukraine Parole Process, 88 Fed. Reg. 25040, 25041 (Apr. 27, 2022) ("If advance authorization is granted, the recipient will be permitted to board a flight to the United States for the purpose of requesting parole.").  Because the Rule's presumption only applies at the southern land border, it necessarily would not apply to beneficiaries of these programs arriving at interior ports of entry. Of course, some number of individuals who receive travel authorization pursuant to a parole program might conceivably cross the southern border anyway.[14]  Nevertheless, the record shows

---

[14] For instance, a prior version of the Venezuelan parole program "required [beneficiaries] to fly to the interior, rather than arriving at the [southern border], *absent extraordinary circumstances*," suggesting that there are circumstances in which applicants may have remained eligible for parole despite arriving at the southern border.  Implementation of a Parole Process for Venezuelans, 87

United States District Court
Northern District of California

1    that the presumption's exception for parole-related travel authorization will necessarily be

2    unavailable to many asylum seekers—due to the parole programs' limited scope and eligibility

3    requirements—and irrelevant to many noncitizens with travel authorization to apply for parole

4    programs that require applicants to fly to interior ports.

5         Seeking protection in a transit country is similarly infeasible for many asylum seekers

6    subject to the Rule.  The preamble to the Rule notes that, while the agencies "recognize that not

7    every country will be safe for every migrant," they "expect that many migrants seeking protection

8    will be able to access asylum or other protection in at least one transit country."  88 Fed. Reg. at

9    31411.  The record evidence available to Defendants, however, undermines this finding.  Though

10   Defendants argue that "the [R]ule adduces substantial evidence that seeking asylum in transit

11   countries is a viable option for many migrants," ECF No. 176-1 at 38, the final Rule only

12   specifically discusses Belize, Colombia, and Mexico as countries where noncitizens can

13   effectively seek protection, 88 Fed. Reg. at 31410–11.

14        The record suggests that seeking asylum or other protection in Belize or Colombia is not a

15   viable option for many migrants.  Belize has a limited asylum system:  the country has only ever

16   received 4,104 applications for asylum and has granted just 74 of those applications.  AR 5423;

17   *see also* AR 4188–89; AR 4967.  The Rule highlights Belize's 2022 amnesty program, which

18   provided a path to citizenship for asylum seekers registered with the Department of Refugees

19   before March 31, 2020, and limited categories of migrants residing in Belize.  AR 5425–26; PC

20   22825.[15]  As of September 30, 2022—two months after the end of the registration period—5,097

21

22   Fed. Reg. 63507, 64512 (Oct. 19, 2022) (emphasis added).

23   [15] At oral argument, Defendants challenged Plaintiffs' reliance on data provided in public
     comments.  ECF No. 186 at 50:10–13 ("I saw many citations to the comments, the PC record
24   citations, but no citations really, very few, to the actual AR, the record itself.").  Public comments
     form part of the administrative record in the context of informal rulemaking.  *Rodway v. U.S.*
25   *Dep't of Agric.*, 514 F.2d 809, 817 (D.C. Cir. 1975) ("The APA requires the reviewing court to
     'review the whole record' in measuring the validity of agency action.  The whole record in an
26   informal rule-making case is comprised of comments received, hearings held, if any, and the basis
     and purpose statement.") (internal citation omitted); *Nat'l Ass'n of Chain Drug Stores v. U.S.*
27   *Dep't of Health & Hum. Servs.*, 631 F. Supp. 2d 23, 26 (D.D.C. 2009) ("An informal rulemaking
     record consists of the following materials: (1) the notice of proposed rulemaking; (2) comments
28   submitted by interested persons; (3) hearing transcripts, if any; (4) other factual information
     considered by the agency; (5) reports of advisory committees, if any; and (6) the agency's

people had applied for amnesty.  AR 4968.  Because the registration period has ended and eligibility generally requires prior presence in Belize, the amnesty program is not available to newly arriving asylum seekers.  Colombia's asylum system has limited capacity and a significant backlog.  AR 4231 (2021 State Department report noting that, of approximately 37,000 applications submitted between January 2017 and June 2021, just 753 were granted); AR 1575 (2023 DHS memorandum noting 26,000-case backlog of asylum cases).  The Rule specifically references Colombia's two-year-old temporary protection program for Venezuelans, 88 Fed. Reg. at 31411, but eligibility is limited to those who arrived irregularly before January 31, 2021, PC 23296, and those who arrived regularly before January 31, 2023, PC 23398.  Nothing in the record suggests this program will be available to newly arriving migrants going forward.  And migrants who apply for asylum or other protection in Belize or Colombia are at risk of violence while they wait for their applications to be adjudicated.  *See, e.g.*, AR 5423 (Belizean government source noting "many migrants find themselves victims of human trafficking" in the country); AR 4204– 05 (2021 State Department report noting that migrants are at risk of forced labor in Belize); AR 4224, 4228–29, 4248 (2021 State Department report noting forced labor and human trafficking of migrants, forced recruitment of migrant children by armed groups, and other violence by armed groups in Colombia); PC 22186–93 (2022 non-governmental organization ["NGO"] report documenting gender-based violence against Venezuelan women in Colombia); PC 25592–607, 25615–19 (2022 news report documenting rising violence related to ongoing armed conflict in Colombia).

The record refutes the suggestion that seeking protection in Mexico is a viable option for many asylum seekers.  The Rule cites the large number of individuals applying for protection in Mexico as evidence that noncitizens subject to the presumption may seek safety there.  88 Fed. Reg. at 31414–15 ("The Departments . . . note that more than 100,000 individuals felt safe enough to apply for asylum in Mexico in 2022.").  However, while a total of 118,478 individuals applied for protection in 2022, Mexico processed just 34,762 applications that year.  AR 5707.  Mexico's

statement of basis and purpose.").  The Court must review the whole record in determining the validity of the agencies' action, and data submitted in public comments is part of that record.

United States District Court
Northern District of California

refugee agency is underfunded and unable to keep up with demand.  *See, e.g.*, PC 24183 (2021 State Department report noting that the increase in agency's budget "was not commensurate with the growth in refugee claims"); PC 22811 (2023 news report quoting refugee agency director explaining that, as a result of increased demand, the agency is "in a situation of near-breakdown"); PC 23082 (2023 NGO report noting that funding has not kept pace with the increase in applications and that the applications processed in 2022 included "many from previous years"); PC 32446–47 (2022 State Department report noting that civil society groups in Mexico reported that migration authorities did not provide information about how to request asylum, dissuaded migrants from doing so, and encouraged them to instead accept voluntary return to their countries of origin).  While they wait for an adjudication, applicants for asylum must remain in Mexico, where migrants are generally at heightened risk of violence by both state and non-state actors. *See, e.g.*, PC 32446–68 (2022 State Department report noting credible reports of gender-based violence against migrants; reports of migrants being tortured by migration authorities; "numerous instances" of armed groups targeting migrants for kidnapping, extortion, and homicide; and that asylum seekers and migrants were vulnerable to forced labor); PC 22839–42 (NGO report documenting violent crimes against 13,480 migrants in Mexico, by both state and non-state actors, between January 2021 and December 2022); PC 76248–87 (table of crimes summarized in preceding report); PC 21752–58 (2022 NGO report discussing gender-based violence in northern Mexico border cities, including against LGBTQI+ and Black migrants); PC 21610–11 (2022 NGO report concerning gender-based violence against Venezuelan women and LGBTIQ+ migrants in southern Mexico).[16]

---

[16] In addition to these examples, the record is replete with additional documentation of the extraordinary risk of violence many migrants face in Mexico.  *See, e.g.*, PC 22129–30 (2023 news report documenting instances of kidnapping of asylum seekers in northern Mexico); PC 23247–50 (2022 news report quoting Chihuahua state police chief stating that "organized criminal gangs are financing their operations through migrant trafficking"); PC 23082 (2023 NGO report discussing treatment of migrants and asylum seekers); PC 20937–43 (2021 NGO report documenting kidnapping and extortion of Venezuelan migrants in Mexico); PC 29740–29744 (2021 NGO report documenting instances of rape, kidnapping, and other violence experienced by migrant women in Mexico); PC 75946–48 (2022 NGO report documenting violence against migrants in Mexico); AR 4881 (2022 NGO report noting that asylum seekers from Central America have been pursued across the border and found in southern Mexico by their persecutors).

United States District Court
Northern District of California

1    The record thus undermines the Rule's finding that Belize, Colombia, and Mexico present

2  viable, safe options for many asylum seekers. Defendants argue that sufficient record evidence

3  supports the Rule's finding that transit countries present a viable option for many asylum seekers,

4  instructing the Court to "see generally" over 1,200 pages of the administrative record. ECF

5  No. 176-1 at 31 n.11. At oral argument, Defendants directed the Court to this footnote and

6  sources cited within it for data regarding improved safety and conditions in transit countries. ECF

7  No. 186 at 49:9–20. The sources cited in the footnote document asylum, temporary protection, or

8  other immigration programs of varying capacity presently or formerly available in transit

9  countries. *See, e.g.*, AR 1575–77 (2023 DHS memorandum noting that Costa Rica has established

10 a temporary protection program for certain Cuban, Nicaraguan, and Venezuelan asylum seekers

11 and that Ecuador has opened registration for temporary residence permits for Venezuelans); AR

12 5465–69 (Costa Rica government website explaining that the temporary protection program

13 applies to nationals of designated countries who applied for asylum prior to September 2022, and

14 is therefore not available to newly arrived migrants); AR 5757–61 (press release from Government

15 of Mexico noting the expansion of temporary labor programs). But none of the sources

16 Defendants cite suggests that safety and conditions in these transit countries have improved, and

17 several of the sources suggest migrants are susceptible to harm in these countries. *See, e.g.*, AR

18 4256–81 (2021 State Department report noting that migrants in Costa Rica are subject to forced

19 labor and that employers use threats of deportation to withhold wages from Nicaraguan migrants);

20 AR 4282–325 (2021 State Department report noting that migrants and refugees in Ecuador are

21 subject to gender-based violence, human trafficking, forced labor, and forcible recruitment into

22 criminal activity). The record evidence cited by Defendants does not support their argument.

23    That leaves the exception for noncitizens who present at a port of entry. To avoid the

24 presumption under this exception, noncitizens must secure an appointment using the CBP One

25 mobile application and present at the selected port of entry at the pre-scheduled date and time; if a

26 noncitizen presents at a port of entry but lacks an appointment, they must show "it was not

27 possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant

28 technical failure, or other ongoing and serious obstacle," or they will be subject to the

1  presumption.  88 Fed. Reg. at 31450.  "This exception [to the exception] captures a narrow set of

2  circumstances in which it was truly not possible for the noncitizen to access or use the CBP One

3  app," and exceptions for language barriers or illiteracy "will be assessed on a case-by-case basis."

4  *Id.* at 31406.  The sub-exception for technical failure is "intended to cover technical failures of the

5  app itself . . . rather than a situation in which a migrant is unable to schedule an appointment due

6  to high demand or one where there is a fleeting temporary technical error."  *Id.* at 31407.

7          The Rule acknowledges various limitations associated with CBP One, including the

8  existence of "connectivity gaps and unreliable Wi-Fi in central and northern Mexico," the only

9  parts of Mexico in which the app is available; that some individuals may lack smartphones; that

10  the appointment system creates unique challenges for larger families traveling together; that the

11  app is only available in English, Spanish, and Haitian Creole, and some error messages only

12  appear in English; that Login.gov, which applicants must use to access CBP One, is exclusively

13  available in English; and that users have identified various technical issues since the app was first

14  implemented, including the app timing out or becoming overloaded by requests.  *Id.* at 31401–05.

15  Additionally, when the Rule was issued, CBP One offered only 1,250 appointments per day across

16  eight southern border ports of entry.  AR 2489; 88 Fed. Reg. at 31358.  Demand for appointments

17  exceeds supply.  PC 21003; PC 21167; PC 25458; PC 25475.

18          The agencies also "acknowledge that individuals seeking to make an appointment . . . will

19  generally need to wait in Mexico" and "that, in some cases, the conditions in which such

20  individuals wait may be dangerous."  88 Fed. Reg. at 31400.  Because CBP One access is limited

21  to central and northern Mexico, asylum seekers must remain in these areas until they successfully

22  secure an appointment.  As discussed above, the record suggests that migrants waiting in Mexico

23  are at serious risk of violence.  Under the Rule, however, "danger in Mexico generally would

24  justify failing to pre-schedule a time and place to appear at a [port of entry] . . . only when it

25  amounts to an extreme and imminent threat to life or safety."  *Id.* at 31396.  Until the risk of

26  violence rises to this level, individuals seeking to maintain their eligibility for asylum in the

27  United States—and who cannot satisfy either of the other exceptions to the rule—must remain in

28  Mexico, where the record suggests many will not be safe.

United States District Court
Northern District of California

While the Rule explains each exception by reference to another, the record suggests these exceptions will not be meaningfully available to many noncitizens subject to the Rule. The Rule is therefore arbitrary and capricious.

### 2.      Procedural Validity

Prior to promulgating a rule, the APA generally requires agencies to publish notice of the proposed rulemaking in the Federal Register. 5 U.S.C. § 553(b). After providing notice, "the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(c). "The purpose of the notice and comment requirement is to provide for meaningful public participation in the rule-making process." *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1404 (9th Cir. 1995). "[Courts] determine 'the adequacy of the agency's notice and comment procedure, without deferring to an agency's own opinion of the . . . opportunities it provided.'" *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006) (quoting *Nat. Res. Def. Council v. EPA*, 279 F.3d 1180, 1186 (9th Cir. 2002)). "[T]he failure to provide notice and comment is harmless only where the agency's mistake 'clearly had no bearing on the procedure used or the substance of decision reached.'" *California v. Azar*, 911 F.3d 558, 580 (9th Cir. 2018) (quoting *Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1487 (9th Cir. 1992)).

Plaintiffs argue that the comment period was too short; that the agencies announced closely related policy changes after the public comment period closed; and that the agencies did not disclose the Office of Immigration Statistics ("OIS") analysis, model, or data underpinning the agencies' prediction of a sharp rise in migrants arriving at the southern border.

The agencies provided 33 days for public comment, which Defendants argue is both sufficient under the APA and justified by the impending expiration of Title 42. "When substantial rule changes are proposed, a 30-day comment period is generally the shortest time period sufficient for interested persons to meaningfully review a proposed rule and provide informed comment." *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1117 (D.C. Cir. 2019); *see also Pangea Legal Servs. v. DHS*, 501 F. Supp. 3d 792, 820 (N.D. Cal. Nov. 19, 2020) (noting that, "[w]hile

not binding, the government's own internal orders state that 'a comment period . . . should generally be at least 60 days'") (quoting Exec. Order No. 13,563, 76 Fed. Reg. 3821, 3821–22 (Jan. 18, 2011)).  The COVID-19 public health emergency, pursuant to which the Title 42 public health order was in effect, was extended several times; at least as of December 13, 2022, DHS was actively preparing for the end of Title 42.  AR 2591.  On January 30, 2023, the Administration formally announced that the COVID-19 public health emergency would expire on May 11.  88 Fed. Reg. at 31435 n.312.  On February 23, the agencies published the Notice.  *Id.* at 11714.  The public comment period extended until March 27, and the final Rule was published on May 16.  *Id.* at 31433.

Shortly after the close of the Rule's comment period, the agencies implemented additional policy changes:  DHS announced it would resume conducting credible fear interviews in CBP custody and would only provide 24 hours' notice for such interviews; DHS would remove non-Mexican nationals, including nationals of Cuba, Haiti, Nicaragua, and Venezuela, to Mexico; and the agencies would indefinitely pause a prior regulation which permitted asylum officers to adjudicate certain asylum applications.[17]  The agencies did not disclose that they would undertake these policy changes, so the public was unable to comment on how they would interact with the Rule, and the Rule did not address these policies.  Plaintiffs argue that these policy changes undermined the rationale for the Rule, because conducting interviews in CBP custody on short notice was likely to dampen the passage rate, while being able to effectuate removals more quickly would lessen overcrowding in border and detention facilities.

The agencies also justified the broad presumption imposed by the Rule using OIS encounter projections which predicted that, once Title 42 was lifted, the agencies would encounter between 11,000 and 13,000 individuals attempting to cross the border without authorization each

---

[17] In the preamble to the Rule, the agencies state that the Rule does not present staggered rulemaking concerns, noting that "[t]he last asylum-related rulemaking, the Asylum Processing [Interim Final Rule ("IFR")], was published on March 27, 2022, and was effective on May 31, 2022[,] . . . [so] commenters did not have to contend with the interplay of intersecting rules and related policy changes when drafting their comments."  88 Fed. Reg. at 31434.  The Asylum Processing IFR was paused shortly after the close of the comment period for the challenged Rule.

United States District Court
Northern District of California

day, "absent policy changes and absent a viable mechanism for removing Cuban, Haitian, Nicaraguan, and Venezuelan [] nationals who do not have a valid protection claim."[18]  88 Fed. Reg. at 11705.  "[T]he notice required by the APA, or information subsequently supplied to the public, must disclose the thinking that has animated the form of a proposed rule and the data upon which that rule is based." *California ex rel. Becerra v. U.S.  Dep't of the Interior*, 381 F. Supp. 3d 1153, 1173 (N.D. Cal. 2019) (quoting *Home Box Off., Inc. v. FCC*, 567 F.2d 9, 35 (D.C. Cir. 1977)).  "Integral to an agency's notice requirement is its duty to 'identify and make available technical studies and data that it has employed in reaching the decisions to propose particular rules.'"  *Kern Cnty. Farm Bureau*, 450 F.3d at 1076 (quoting *Solite Corp. v. EPA*, 952 F.2d 473, 484 (D.C. Cir. 1991)).  In a footnote, the Notice explains that OIS "generates encounter projections every 2–4 weeks, using the best data and modeling available," and describes the statistical basis for the model and the mathematical processes it incorporates.  88 Fed. Reg. at 11705 n.11.  But the Notice does not provide the relevant data that goes into the projections, the factors that impact the model, or the complete OIS analysis on which the Rule depends.

Taken together, these circumstances persuade the Court that the Rule's notice procedures are insufficient under the APA.  The Rule is unquestionably complex—it establishes a presumption of asylum ineligibility for noncitizens who enter at the southern border that is subject to various exceptions ,one of which contains its own exception, and is rebuttable only in certain circumstances.  That presumption of ineligibility applies across all contexts in which such individuals might be screened for asylum or other protection.  The complexity of the Rule suggests that 30 days is unreasonable, particularly because the agencies were preparing for the end of Title 42 well before it was announced, such that they could have issued the Notice with sufficient time to grant a longer comment period and still have had the Rule in place when Title 42 expired.  The agencies also did not disclose other, relevant policy changes that would affect the agencies' reasoning for adopting the Rule, including one that controverted an assumption central

---

[18] The removal-to-Mexico policy announced after the comment period closed provides the "viable mechanism" referenced here.

United States District Court
Northern District of California

1    to the agencies' projection of post-Title 42 encounters at the southern border.  *See* 88 Fed. Reg. at

2    11705 ("[E]ncounters could rise to 11,000–13,000 . . . *absent a viable mechanism for removing*

3    Cuban, Haitian, Nicaraguan, and Venezuelan [] nationals who do not have a valid protection

4    claim.") (emphasis added); *Pangea*, 501 F. Supp. 3d at 821 (noting that staggered policy changes

5    "add[] to the overall context in which the notice provided . . . failed to give the public a

6    meaningful opportunity to comment").  The agencies further justified the breadth and urgency of

7    the Rule on the basis of data that they did not disclose; without any insight into the model or the

8    relevance of the factors it is designed to consider, the public had no means by which to challenge

9    that justification.  Together, these circumstances denied the public a meaningful opportunity to

10   comment on the Rule.

11         Defendants argue that the number of comments received, and the fact that Plaintiffs each

12   submitted a comment, indicates that the public was provided sufficient opportunity to provide

13   meaningful commentary.  Given more time, however, Plaintiffs would have provided more in-

14   depth analysis of the Rule and its potential impact on their clients.  ECF No. 169-5 ¶ 26; ECF No.

15   169-7 ¶ 30; ECF No. 175 ¶ 19.  Had they known about the contemplated policy changes, Plaintiffs

16   would have discussed how these policy changes would intersect with the Rule to affect their

17   clients.  ECF No. 169-3 ¶ 30; ECF No. 169-5 ¶ 26; ECF No. 175 ¶ 20.  The Court cannot assume

18   that the agencies would not have taken into consideration more comprehensive comments

19   addressing the related border policies or the OIS analysis that justified the Rule, such that the

20   "agenc[ies'] mistake 'clearly had no bearing . . . on the substance of decision reached,'" *Azar*, 911

21   F.3d at 580.  Accordingly, the Court concludes that the agencies' error was not harmless.

22         **C.      Scope of Relief**

23         When an agency decision is unlawful under the APA, the standard remedy is to vacate the

24   agency action and remand to the agency.  *See* 5 U.S.C. § 706(2)(A) (instructing reviewing court to

25   "set aside" agency action); *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th

26   Cir. 2018) ("Although not without exception, vacatur of an unlawful agency action normally

27   accompanies a remand."); *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1095

28   (9th Cir. 2011) ("When a court determines that an agency's action failed to follow Congress's

United States District Court
Northern District of California

33

1   clear mandate the appropriate remedy is to vacate that action.").

2       Defendants urge the Court to remand the Rule without vacating it.  "[Courts] leave an

3   invalid rule in place only 'when equity demands' that [they] do so."  *Pollinator Stewardship*

4   *Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (quoting *Babbitt*, 58 F.3d at 1405).  "Whether

5   agency action should be vacated depends on how serious the agency's errors are and the disruptive

6   consequences of an interim change that may itself be changed."  *350 Montana v. Haaland*, 50

7   F.4th 1254, 1273 (9th Cir. 2022) (quoting *Nat'l Family Farm Coal. v. EPA*, 966 F.3d 893, 929

8   (9th Cir. 2020)).  Courts also consider "whether the agency would likely be able to offer better

9   reasoning[;] [] whether by complying with procedural rules, it could adopt the same rule on

10  remand[;] or whether such fundamental flaws in the agency's decision make it unlikely that the

11  same rule would be adopted on remand."  *Pollinator*, 806 F.3d at 532.

12      The severity of the agencies' errors in this case counsels strongly in favor of vacatur.  The

13  Rule is both substantively and procedurally invalid.  The agencies cannot adopt the same rule on

14  remand; as described above, the Rule is contrary to law.  "[T]he threat of disruptive consequences

15  cannot save a rule when its fundamental flaws 'foreclose [the agency] from promulgating the same

16  standards on remand.'"  *North Carolina v. EPA*, 531 F.3d 896, 929 (D.C. Cir. 2008) (quoting *Nat.*

17  *Res. Def. Council v. EPA*, 489 F.3d 1250, 1261–62 (D.C. Cir. 2007)); *see also Nat'l Fam. Farm*

18  *Coal.*, 966 F.3d at 1145 (holding that vacatur was necessary, despite potential adverse impacts,

19  because "the 'fundamental flaws' in the [agency's] analysis are so substantial that it is exceedingly

20  'unlikely that the same rule would be adopted on remand'") (quoting *Pollinator*, 806 F.3d at 532).

21      The Court is not persuaded that deviating from the presumed remedy of vacatur and

22  remand is appropriate in this case.  The Court is mindful that this is "a time of heightened irregular

23  migration throughout the Western Hemisphere," ECF No. 176-2 ¶ 4; that such migration has

24  dropped since the Rule went into effect, *id.* ¶¶ 13–16; and that, in the absence of the Rule's

25  presumption of asylum ineligibility, "DHS anticipates a return to elevated encounter levels that

26  would place significant strain on DHS components, border communities, and interior cities," *id.*

27  ¶ 50.  But the Rule—which has been in effect for two months—cannot remain in place, and

28  vacating the challenged Rule would restore a regulatory regime that was in place for decades

34

before.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is granted. Defendants' motion for summary judgment is denied.  The Rule is hereby vacated and remanded to the agencies.

This order shall be stayed for 14 days.  The Clerk shall enter judgment and close the file.

**IT IS SO ORDERED.**

Dated:  July 25, 2023



_____
JON S. TIGAR
United States District Judge