FILED

FEB 21 2024

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| EAST BAY SANCTUARY COVENANT; et al., <br><br> Plaintiffs-Appellees, <br><br> v. <br><br> JOSEPH R. BIDEN, President of the United States; et al., <br><br> Defendants-Appellants. | No. 23-16032 <br><br> D.C. No. 4:18-cv-06810-JST <br> Northern District of California, Oakland <br><br> ORDER |

Before: W. FLETCHER, PAEZ, and VANDYKE, Circuit Judges.

Order by Judges W. FLETCHER and PAEZ; Dissent by Judge VANDYKE.

The parties in this appeal have filed a Joint Motion to Place Appeal in Abeyance (Dkt. No. 83) pending settlement negotiations in this case, and a related case, *M.A. v. Mayorkas*, No. 1:23-cv-1843 (D.D.C.). The motion is GRANTED as follows:

This appeal is placed in abeyance pending the parties' settlement discussions. The parties shall file a joint status report 60 days after the entry of this order and every 60 days thereafter. If the parties settle this case or settlement discussions fail, the parties shall promptly notify the court. Submission of this case is vacated pending further court order.

FILED

FEB 21 2024

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

*East Bay Sanctuary Covenant v. Biden*, No. 23-16032
VANDYKE, Circuit Judge, dissenting:

The current administration promulgated the rule challenged in this case to help manage the "historic surge in migration" that followed the end of the Title 42 order and to relieve "significant strain on DHS's operational capacity at the border." *See* 88 Fed. Reg. 31314 (May 16, 2023) (codified at 8 C.F.R. §§ 208.33, 1208.33). After the plaintiffs brought this case to enjoin and vacate the rule, the federal government spent the better part of a year vigorously defending the rule's critical necessity before the district court and in this court—all because, in the government's words, "any interruption in the rule's implementation will result in another surge in migration that will significantly disrupt and tax DHS operations." Indeed, only a few months ago, the government insisted that "[i]f the Rule is unavailable, [it] expects 'a surge … that could match—or even exceed—the levels seen in the days leading up to the end of' the Title 42 order," and that "the negative consequences of such an increase in migration—for the government, for migrants, and for the public—would be even greater than [before]." The executive even went so far as to urge that if our court were to rule against it in this appeal, we should nevertheless stay our decision pending the filing of a petition for relief from the Supreme Court to avoid the disastrous consequences of the rule not being in force even for a short period of time. And while the outcome of this case *in the lower courts* (including this one) was anything but certain given the mess we previously made of our precedent during our

1

court's immigration wars with the prior presidential administration, the government has to know the Supreme Court would likely not only reach the correct result in this case, but in doing so rectify some of our court's erroneous precedent. Any adverse decisions from the Northern District of California and the Ninth Circuit would be mere temporary speed bumps on the way to eventual, likely inevitable, vindication of the rule from the Supreme Court.

Taking the government at its word about the pressing need for this crucial rule to remain in effect and be enforced, our court granted a stay of the district court's decision enjoining the government's rule. We heard oral argument and are now poised to render our decision. Then suddenly, out of the blue, the parties come to us hand-in-hand, jointly asking us to hold off making a decision while they "engage[] in discussions regarding the Rule's implementation and whether a settlement could eliminate the need for further litigation." For months, the rule was so important that "any interruption" in its implementation, even for a short period of time, would incapacitate the executive's border response. This panel made decisions based on those representations. Now, the government implies the rule isn't so important after all. Indeed, the government is now "engaged in discussions" that could result in the rule going away. What?

The administration's abrupt about-face makes no sense as a legal matter. Either it previously lied to this court by exaggerating the threat posed by vacating

2

the rule, or it is now hiding the real reason it wants to hold this case in abeyance. Given its success thus far in defending a rule it has consistently characterized as critical to its control of the border, and the fact that it has to realize its odds of success in this case can only improve as it works its way vertically through the federal court system, the government's sudden and severe change in position looks a lot like a purely politically motivated attempt to throw the game at the last minute. At the very least it looks like the administration and its frenemies on the other side of this case are colluding to avoid playing their politically fraught game during an election year.

    This court is a legal institution, not a political one. Thus it must insist that parties provide adequate *legal* justifications for the relief they seek, whatever their underlying political motivations may be. While I am of course agnostic as to the sufficiency of the government's political reasons for suddenly reversing course, it has provided no coherent legal reason why it has suddenly changed its position about the importance of the continued enforcement of the rule challenged in this case, so I would not grant the stay now requested.

    While we often hold cases in abeyance during settlement negotiations, the government has not given us any real reason to do so here. The vague reasons the parties have provided for a stay of litigation are sharply at odds with the reasons the government gave us just a few short months ago for granting a stay of the district

court's preliminary injunction. The purported reason for halting this case is that "there are currently two pending cases raising overlapping claims relating to the Rule and its implementation that have been brought by some similarly situated plaintiffs represented by overlapping counsel." This sounds more like a normal day in the life of a DOJ litigator than a compelling reason to stay a case. Having multiple cases about the same issue in multiple courts is the *norm* for our federal government, so it can't be a real reason to slam the brakes on a case. And it's not as if there is already a decision from a lower court in another circuit awaiting a helpful verdict on appeal. There are simply two similar proceedings, and since the present one has progressed farther along than the one in the District Court for the District of Columbia, it makes little sense to think that proceeding is a reason to stay this one. The federal government routinely litigates similar issues in multiple courts, even when different circuits reach different conclusions.

Aside from the non-reason provided by the parties, it is difficult to think of any other legal reason why they would seek to hold this case in abeyance. The parties raise the prospect of settlement but have provided no reason why either party would actually want to settle at this point given what the parties have previously told this court. Any effect of the government's only loss at this point has been reversed by winning a stay from this court of the district court's vacatur. Based on the issuance of that stay, the only reasonable conclusion was that a majority of the panel

in this case thought the government was likely to prevail on the merits. *See Nken v. Holder*, 556 U.S. 418, 425–26 (2009) (stating that one of the relevant factors in deciding to grant a stay is "whether the stay applicant has made a strong showing *that he is likely to succeed on the merits*" (emphasis added)). Even assuming the government were to lose before this court on the merits, which would make our prior decision to stay the district court's vacatur all the more perplexing, it is clear enough that the government is destined to prevail before the Supreme Court—whether on an emergency or permanent basis. Indeed, the government has already strongly implied that it planned to do exactly that if it lost before this court.

Given all of this, it's hard to avoid any impression other than that the administration is snatching defeat from the jaws of victory—*purposely* avoiding an ultimate win that would eventually come later this year, whether from this court or from the Supreme Court.

It is also unclear what a settlement would even look like in this case. In its briefing, the government has repeatedly stressed the vital importance of this rule in fending off the border crisis. As the government explained, "[w]ithout the Rule, the expected increase in border encounters threatened to overwhelm the Departments' 'ability to effectively process, detain, and remove, as appropriate, the migrants encountered,' with attendant increases in the number of migrants unlawfully present in the country, strains on government operations and resources, health and safety

5

concerns for migrants at overcrowded processing facilities, and impacts on local communities along the southwest border." In the days before Title 42 ended, "'DHS saw a historic surge in migration' … that 'culminated with the highest recorded encounter levels' in history and 'placed significant strain on DHS's operational capacity at the border.'" "Encounters between ports of entry nearly doubled in the month before May 11, increasing 'from an average of approximately 4,900 per day' to 'approximately 9,500 per day,' including even higher numbers in the final few days." "Between May 8 and 11, the Border Patrol's 'daily in-custody average' was approximately 50% above 'its holding capacity.'" According to the government, "that overcrowding, combined with an increased average time in custody because of the many noncitizens who CBP needed to process, generated serious 'health and safety risks to noncitizens, government personnel, and contract support staff.'"

"If the Rule is unavailable, the government expects 'a surge in border crossings that could match—or even exceed—the levels seen in the days leading up to the end of' the Title 42 order. The government thus 'anticipates that any interruption in the rule's implementation will result in another surge in migration that will significantly disrupt and tax DHS operations.'" Given the criticality of this potential disruption in border operations, the government has repeatedly requested that "if the Court affirms in whole or in part, it leave the stay pending appeal in place pending the filing and disposition of any petition for further review." In other words:

if you're going to rule against us, please please please make sure we have the opportunity to get a stay from the Supreme Court since this rule is so important.

Unless the government has grossly misrepresented the importance of its rule and the ramifications of vacating it in its prior filings before this court, it seems that any prospect of settling this case by recission of the rule would be a nonstarter. Indeed, the government has been very careful not to suggest *that* in its intentionally vaguely worded joint motion to hold this case in abeyance.

And it would make little sense for the plaintiffs—who are public interest groups insisting they are harmed by the mere existence of the rule and that the rule is contrary to law—to accept anything less than rescission of the rule. It is therefore difficult to see what kind of acceptable middle ground the two parties could reach that would satisfy the plaintiffs while allowing the government to keep enforcing the rule.

The standardless timeline of the jointly requested abeyance is further evidence that this seems to be nothing more than a collusive effort to postpone resolution of this case until a more politically palatable time. The parties have given no indication how long they expect the abeyance period to last, saying only that they will provide status reports every 60 days. Should the court expect to sit on this case forever? Until after election day in November? Until ballot counting is finished long after that election? January 6, 2025? Given that the parties have provided no real reason

7

*why* they are asking to abruptly halt this appeal, we have no idea when they plan to start it up again. My guess is that sometime after November would fit their "settlement negotiations" needs nicely.

Even if the government's recent explanations cannot be taken at face value, we do know a few things for certain. This administration went to considerable lengths to both promulgate this rule and vigorously defend it. Yet now, a mere nine months before the general election, and in the face of an immigration crisis that has produced one of the most intense showdowns between state and federal government in recent memory, the administration is requesting something that is completely inconsistent with its previous actions and representations to the court. So why? As I see it, there are several interrelated possibilities, all of which are wholly political—not legal—and thus do not merit the relief requested.

The administration may want to avoid going before the Supreme Court to defend a rule that is obviously unpopular with its base during a presidential election year in which immigration figures to be an important issue. The rule puts the administration in a political pickle. It is both politically unpopular with some of its own constituency, *and*, as the government has vigorously argued, deeply necessary to prevent a worsening of the border crisis, which is perceived as one of this administration's political vulnerabilities. An abeyance splits the baby, temporarily ensuring that an important tool in its immigration-enforcement toolbox remains in

8

place, while postponing any potential Supreme Court fight about that tool until after the election. This temporary resolution to the political problems presented by this litigation affords the administration plausible deniability it can pitch to its base while it nevertheless continues to enforce the rule to stave off a worse crisis at the southern border.

The government might also simply be trying to avoid another immigration loss in court, the optics of which could be particularly devastating during the current immigration crisis. Americans of all political persuasions are increasingly focused on—and worried about—the situation on our southern border.[1] Placing these proceedings in abeyance avoids the possibility of a loss before the Ninth Circuit that could potentially exacerbate the issues at the border in the months leading up to the

---

[1] *See, e.g.*, *Statement from President Joe Biden On the Bipartisan Senate Border Security Negotiations*, The White House (Jan. 26, 2024), https://www.whitehouse.gov/briefing-room/statements-releases/2024/01/26/statement-from-president-joe-biden-on-the-bipartisan-senate-border-security-negotiations (President Joe Biden calling the border "broken"); Reese Gorman, *Fetterman continues his feud with progressive Democrats and says they 'left' him*, Washington Examiner (Jan. 20, 2024), https://www.washingtonexaminer.com/news/2808370/fetterman-continues-his-feud-with-progressive-democrats-and-says-they-left-him/ (Pennsylvania Senator John Fetterman saying "There is a crisis …. We have a crisis at our border, and it can't be controversial that we should have a secure border."); Greg Abbott (@GregAbbott_TX), Twitter (Sep. 20, 2023, 4:34 PM), https://twitter.com/GregAbbott_TX/status/1704640256429985863 (describing the border crisis as "an invasion"); *'Secure our border along the southwest,' Senator Cortez Masto speaks on protection issues*, News 3 Las Vegas (Jan. 24, 2024) (Nevada Senator Catherine Cortez Masto calling to "secure our border along the southwest").

9

election—a loss made even more damaging given that it would be meted out by a panel comprised primarily of Democratic appointees, no less. The CNN headline practically writes itself: "Biden Immigration Enforcement Policy Struck Down by Two Clinton Appointees."

Relatedly, the administration may be seeking to create policy that resonates with its base while blaming the practical results of that policy on the courts. Such a strategy would be remarkably simple for the government to enact. Step one: Stay proceedings before a final vindication of its position. Step two: Settle, agree not to enforce the rule, and blame the courts for tying its hands. If this is truly the government's plan, then it is for all practical purposes seeking to repeal the rule without the need for notice and comment, and its *pro forma* defense of the rule has been rendered nothing more than a half-measure—an illusion. It could take credit for creating an important rule and defending it with one hand, and then, by colluding with the plaintiffs, it can set the policy it actually wants with the other, all while publicly blaming the result—cloaked as it is in the language of a judicial "settlement"—on the courts. This would be even worse than "rulemaking-by-collective-acquiescence." *Arizona v. City & County of San Francisco*, 596 U.S. 763, 765–66 (2022) (Roberts, C.J., concurring). It's "rulemaking by political settlement" while dishonestly shifting the blame to the non-political branch of government.

Likewise, the executive may once again be trying to insulate bad Ninth Circuit caselaw from Supreme Court review. As I and others have previously written, our *Easy Bay* precedents are clearly wrong. *See E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 696 (9th Cir. 2021) (VanDyke, J., dissenting from the denial of rehearing en banc); *id.* at 687 (Bumatay, J., same). Yet they aided the Democratic cause by invalidating Trump-era immigration rules. If this case gets before the Supreme Court, the safe bet is that it would overrule those erroneous precedents. This settlement tactic is therefore a powerful tool for the administration: it lets it perpetuate bad—but politically favorable—law in the Ninth Circuit by settling before reaching the Supreme Court, and then throw up its hands and say it is bound by that law.

Ultimately, it is impossible to know the government's exact motives for its current course of action because it hasn't even attempted to tell us. But putting aside the *political* legitimacy of any of the potential motivations discussed above, one thing is clear: none of them are a *legally* sufficient reason to grant a judicial stay of this case, particularly since the request is directly at odds with the many dire predictions the government has previously made before this court. Up until now, we have been repeatedly assured that the rule is critical to the security of the border. But now, astoundingly, the government seeks to abandon its defense of the rule—or at least put that defense on ice until a more politically convenient time. Whatever the

parties' real motivations are for seeking to stay this case, they haven't provided us with a legally sufficient basis for their sudden change of course. Accordingly, I respectfully dissent from the panel's decision to grant the stay motion.