Omar C. Jadwat*
Lee Gelernt*
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
ojadwat@aclu.org
lgelernt@aclu.org

Morgan Russell (SBN 296137)
Spencer Amdur (SBN 320069)
Oscar Sarabia Roman (SBN 341385)
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-0770
mrussell@aclu.org
samdur@aclu.org
osarabia@aclu.org

*Attorneys for Plaintiffs (additional counsel listed on following page)*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| East Bay Sanctuary Covenant, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> Donald J. Trump, *et al.*, <br><br> *Defendants*. | Case No.: 18-cv-06810-JST |

**PLAINTIFFS' BRIEF ON REMAND**

Melissa Crow*
CENTER FOR GENDER & REFUGEE STUDIES
1121 14th Street, NW, Suite 200
Washington, DC 20005
T: (202) 355-4471
F: (415) 581-8824
*crowmelissa@uchastings.edu*

Anne Peterson (SBN 258673)
Blaine Bookey (SBN 267596)
Karen Musalo (SBN 106882)
CENTER FOR GENDER & REFUGEE STUDIES
200 McAllister Street
San Francisco, CA 94102
T: (415) 610-5729
F: (415) 581-8824
*petersonanne@ucsflaw.edu*
*bookeybl@uclawsf.edu*
*musalok@uclawsf.edu*

Robert Pauw**
CGRS Cooperating Attorney
GIBBS HOUSTON PAUW
1000 Second Avenue, Suite 1600
Seattle, WA 98104
T: (206)682-1080
F: (206)689-2270
*rpauw@ghp-law.net*

Keren Zwick*
Colleen Cowgill (SBN 321542)
Mary Georgevich*
NATIONAL IMMIGRANT JUSTICE CENTER
111 W. Jackson Blvd., Suite 800
Chicago, IL 60604
T: (312) 660-1370
F: (312) 660-1364
*kzwick@immigrantjustice.org*
*ccowgill@immigrantjustice.org*
*mgeorgevich@immigrantjustice.org*

Michelle (Minju) Y. Cho (SBN 321939)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF NORTHERN CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
T: (415) 621-2493
F: (415) 255-1478
*mcho@aclunc.org*

*Attorneys for Plaintiffs*

**Admitted Pro hac vice*
*** Application for admission pro hac vice forthcoming*

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................... 1

BACKGROUND ...................................................................................................................... 1

ARGUMENT ........................................................................................................................... 4

    I. Plaintiffs Continue To Have Standing To Challenge The Rule ......................................... 4

    II. The Termination Of The "Lawful Pathways" Underscores The
        Rule's Illegality ................................................................................................................ 7

CONCLUSION ........................................................................................................................ 9

**INTRODUCTION**

Plaintiffs respectfully submit this brief pursuant to the Court's April 29, 2025, scheduling order. ECF No. 209. For the reasons explained below, the Court should modify its prior summary judgment order, ECF No. 187, to hold that Plaintiffs continue to have standing to challenge the "Circumvention of Lawful Pathways" rule ("Rule") following *FDA v. Alliance for Hippocratic Medicine* ("*Alliance*"), 602 U.S. 367 (2024). The Court should also modify its opinion to hold that Defendants' termination of the so-called "lawful pathways" on which the Rule is premised further confirms that the Rule is inconsistent with the asylum statute and arbitrary and capricious.

With respect to standing, Plaintiffs' supplemental declarations submitted herewith demonstrate that the Rule has already interfered with Plaintiffs' core organizational work of representing asylum seekers and caused them to divert resources to counteract this harm; these harms will continue if the Rule remains in place. That suffices to establish standing under *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), and *Alliance*. And even apart from *Havens* standing, the Rule has caused several Plaintiffs financial injury in the form of lost funding.

On the merits, Defendants' termination of the related "pathways" underscores the Rule's illegality. As this Court previously explained, the existence and purported availability of the "pathways" was an essential premise of the Rule. The termination of those pathways further confirms that that the Rule violates the asylum statute and is arbitrary and capricious.

**BACKGROUND**

The Rule first took effect on May 11, 2023. 88 Fed. Reg. 31314. As this Court noted, the Rule's "primary purpose" is to incentivize migrants to come to the United States using certain "lawful pathways" by imposing ineligibility for asylum as a consequence for those who do not. ECF No. 187 at 20 (quoting 88 Fed. Reg. at 31336). "The agencies justify imposing conditions on asylum eligibility by reference to the availability of these other pathways." *Id.* (citing 88 Fed. Reg. at 31318, 31347). The purported availability of these "pathways" is a central premise of the Rule, which is reflected in the Rule's title and repeated throughout the preamble. *E.g.*, 88 Fed. Reg. at 31314, 31316, 31317, 31324, 31330, 31331, 31344, 31365, 31409.

The Rule relies on two main pathways, which are both no longer available. The first was the

1

CBP One appointment system, which previously permitted select noncitizens to present at southern border ports of entry to seek asylum and related relief. The second encompassed several country-specific parole processes that permitted select noncitizens to fly into the United States from abroad—particularly the so-called "CHNV" parole processes for certain nationals of Cuba, Haiti, Nicaragua, and Venezuela. ECF No. 187 at 3-4, 24, 28-29; 8 C.F.R. § 208.33(a)(2)(ii)(A)-(B). As this Court explained, the Rule also relied on other purported avenues for coming to the United States, including "refugee admission." ECF No. 187 at 20 (citing 88 Fed. Reg. at 31336).

This Court vacated the Rule as contrary to law, arbitrary and capricious, and procedurally defective. ECF No. 187. Defendants appealed. ECF No. 189. Proceedings on appeal were held in abeyance pending settlement negotiations that proved unsuccessful. *See* ECF No. 205 at 7.

On January 20, 2025, President Trump issued an executive order terminating the CBP One appointment system, the CHNV parole processes, and other similar parole processes. *See* Executive Order No. 14165 § 7(a)-(b), 90 Fed. Reg. 8467, 8468 (Jan. 20, 2025). In another executive order issued the same day, the President indefinitely suspended virtually all refugee admissions. *See* Executive Order No. 14163 § 3, 90 Fed. Reg. 8459, 8459 (Jan. 20, 2025).

The Ninth Circuit then vacated this Court's prior judgment and remanded for further proceedings. ECF No. 205. The Court of Appeals directed that on remand this Court should address (1) any impact of the Supreme Court's decision in *Alliance* on Plaintiffs' standing; and (2) any impact of President Trump's executive order "that terminated the 'lawful pathways' on which the Rule relies in part." *Id.* at 7-8.

On April 29, 2025, this Court set a schedule for proceedings on remand to address these issues. ECF No. 209. The Court also ordered Defendants to file a "statement regarding whether the Rule has been extended." *Id.* at 2. That was important because although the Rule as issued applies only to noncitizens who cross the southern border between May 11, 2023, and May 11, 2025, the prior administration had proposed amending the Rule to apply indefinitely to new border crossers. 89 Fed. Reg. 81156, 81156, 81274-77 (Oct. 7, 2024). On May 20, 2025, Defendants notified the Court that they have not extended the Rule to apply to noncitizens who cross the border after May 11, 2025. ECF 210. As a result, the scenario that seemed most likely at the time of the Ninth Circuit's

2

remand order—that Defendants would seek to keep applying this Rule to new border crossers indefinitely even after termination of the "pathways"—has not yet come to pass. However, the Rule does still bar asylum to most non-Mexican nationals who crossed the border between May 11, 2023, and May 11, 2025 and who have pending asylum proceedings, either affirmatively before United States Citizenship & Immigration Services ("USCIS") or defensively before the immigration courts. 8 C.F.R. § 208.33(a)(1)(i); *See, e.g.*, Suppl. Decl. of Naomi Calonje ("Suppl. Calonje Decl.") ¶ 11 (explaining expectation that claims currently pending before USCIS will be referred to immigration court because of the Rule).[1]

Notably, that includes people who crossed the southern border on or after January 20, 2025, the date that Defendants terminated the "pathways." The vast majority of noncitizens who crossed the border during that nearly four-month period are ineligible for asylum under the Rule, even though none of them could have come to the United States via CBP One appointments, the CHNV parole programs, or the other terminated pathways. This represents a significant number of noncitizens.[2] And although noncitizens who crossed the border during that period currently also face a second obstacle to asylum in the form of a proclamation issued by President Trump, *see* Proclamation No. 10888, 90 Fed. Reg. 8333 (Jan. 20, 2025), that proclamation is being challenged in separate litigation and its application could soon be enjoined. *See Refugee & Immigr. Ctr. For Educ. & Legal Servs. v. Noem*, No. 1:25-cv-306-RDM (D.D.C. filed Feb. 3, 2025) (summary judgment argument held April 29, 2025).[3]

---

[1] Attached to this brief are new or supplemental declarations filed on behalf of each of the six Plaintiff organizations challenging the Rule except for Plaintiff CARECEN, which rests on its prior declaration. *See* ECF No. 169-2.

[2] Customs and Border Protection ("CBP") processed more than 11,000 inadmissible noncitizens at or between southern border ports of entry each month in February, March, April, and May 2025. *See* CBP, Southwest Land Border Encounters (last updated June 17, 2025), https://perma.cc/TF8F-DZ7Z. Additionally, between January 21 and March 12, 2025, CBP recorded approximately 6,000 noncitizens who crossed the southern border without being apprehended. *See* Alex Nitzberg *et al.*, Fox News (Mar. 13, 2025), https://perma.cc/U7ZF-TUZW.

[3] A third restriction that could have likewise barred asylum to many of those same noncitizens—a 2024 regulation also premised on the CBP One appointment system—was vacated by another court last month. *Las Americas Immigr. Advoc. Ctr. v. DHS*, No. 24-cv-1702 (RC), --- F. Supp. 3d ---, 2025 WL 1403811, at *13-15, 21 (D.D.C. May 9, 2025).

3

**ARGUMENT**

**I.    Plaintiffs Continue To Have Standing To Challenge The Rule.**

Plaintiffs continue to have standing to challenge the Rule on both of the independently adequate grounds this Court previously recognized. ECF No. 187 at 8-10. First, all Plaintiffs have standing under *Havens* and *Alliance* because the Rule "directly affect[s] and interfere[s] with [their] core business activities" by "'perceptibly impair[ing] [their] ability to provide counseling'" and other representation to asylum seekers. *Alliance*, 602 U.S. at 395 (quoting *Havens*, 455 U.S. at 379). Second, at least Plaintiff East Bay Sanctuary Covenant ("EBSC") has already suffered economic injury in the form of lost funding, and that injury will continue to grow if the Rule is not vacated. Suppl. Decl. of Michael Smith ("Suppl. Smith Decl.") ¶¶ 10-11. This Court and the Ninth Circuit have previously held that EBSC had standing to challenge this Rule and its predecessors based on equivalent financial injury, and *Alliance* has no impact whatsoever on this independent basis for standing.

As is relevant here, the Supreme Court's decision in *Alliance* reaffirmed *Havens*.[4] *Alliance* rejected only the standing of certain "issue-advocacy" organizations "based on their incurring costs to oppose [agency] actions." *Alliance*, 602 U.S. at 395. The Court held that organizations "cannot manufacture" standing "simply by expending money to gather information and advocate against the defendant's action." *Id.* at 394. That is consistent with existing Ninth Circuit precedent. *E.g.*, *EBSC v. Biden*, 993 F.3d at 663 ("organizations cannot manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization" (internal quotation marks omitted)). And Plaintiffs have not "manufactured" their injuries here. Rather, Plaintiffs are similarly situated to the organization held to have standing in *Havens*. "Critically," the Supreme Court explained, the plaintiff in *Havens* "not only was an issue-advocacy organization, but also operated a housing counseling service." *Alliance*, 602 U.S. at 395 (citing *Havens*, 455 U.S. at 368). It had standing because the defendants' actions "directly affected

---

[4] The panel decision in *Arizona Alliance for Retired Americans v. Mayes*, 117 F. 4th 1165 (9th Cir. 2024), suggesting a wider interpretation of the decision in *Alliance* has been vacated and the Ninth Circuit will rehear that case *en banc* on June 25, 2025. *See* 9th Cir. Case No. 22-16490, Dkt. No. 131; *Az. All. for Retired Americans v. Mayes*, 130 F.4th 1177 (mem.) (Mar. 18, 2025).

4

and interfered with" the plaintiff's "core business activities" of providing counseling services. *Id.* Like the *Havens* plaintiff, Plaintiffs here are by no means only "issue-advocacy organizations." *Id.* Just as the organization there "provide[d] counseling and referral services for . . . homeseekers," *Havens*, 455 U.S. at 379, Plaintiffs here provide legal representation and counseling to asylum seekers. Defendants have impaired those core activities.

For EBSC and other Plaintiffs for whom a core area of work involves representing asylum seekers on affirmative asylum applications, the Rule makes it much more difficult if not impossible to carry out that core work for many potential clients. For example, since 1992, EBSC has run an affirmative asylum program that is "central to [EBSC's] day-to-day operations." Suppl. Smith Decl. ¶ 5. Indeed, the "program accounts for almost half of EBSC's operational budget." *Id*. Representing affirmative asylum seekers therefore clearly constitutes part of EBSC's "core business activities" under *Havens* and *Alliance*. *See Alliance*, 602 U.S. at 395 (discussing *Havens*, 455 U.S. at 379). Because "[a]pproximately 30% of EBSC's affirmative asylum clients are typically people who crossed the southern U.S. border between ports of entry after transiting through Mexico," the Rule has rendered many of EBSC's potential clients who crossed the border since it took effect ineligible for asylum, such that EBSC cannot represent them on affirmative asylum applications. Suppl. Smith Decl. ¶¶ 7-9. Indeed, in each of the two years since the Rule took effect, the number of affirmative asylum applications EBSC filed fell significantly compared to the year before the Rule took effect. *Id.* ¶ 9. Clearly, therefore, the Rule has "'perceptibly impaired [EBSC]'s ability to provide'" affirmative asylum representation services, one of its "core business activities"; and that harm is sufficient to confer standing. *Alliance*, 602 U.S. at 395 (quoting *Havens*, 455 U.S. at 379).

The Rule has similarly impaired to the affirmative asylum programs of Plaintiffs Tahirih Justice Center ("Tahirih"), National Center for Lesbian Rights ("NCLR"), and American Gateways. *See* Decl. of Morgan Weibel ("Weibel Decl.") ¶¶ 10, 11-16, 19; Suppl. Calonje Decl. ¶¶ 11, 20-21; Suppl. Decl. of Edna Yang ("Suppl. Yang Decl.") ¶¶ 6-7. The Rule has cut off their ability to serve people who would have been previously able to file affirmative asylum applications after entering via the U.S.-Mexico border, and it will also convert many of their affirmative cases into defensive ones, which are much more labor intensive. *See* Suppl. Calonje Decl. ¶¶ 11, 20-21; Weibel Decl.

5

¶¶ 14-17; Suppl. Yang Decl. ¶¶ 6-7.

Meanwhile, for Plaintiffs that represent asylum seekers in removal proceedings in immigration court, as many do, the Rule impedes that core work by making it much more difficult and resource-intensive to effectively provide that representation. *See* Suppl. Yang Decl. ¶¶ 8-13; Weibel Decl. ¶¶ 20-24; Suppl. Decl. of Lindsay Toczylowski ("Suppl. Toczylowski Decl.") ¶¶ 8-15; Suppl. Calonje Decl. ¶¶ 13-18. What has come to pass for these plaintiffs aligns with this Court's prior standing analysis. *See also* ECF 187 at 9 ("Because many of their clients will be presumed ineligible for asylum, Plaintiffs will have to assist clients who cannot meet an exception or rebut the presumption in seeking other forms of relief—statutory withholding of removal and CAT withholding—which are far more time- and resource-intensive than asylum, largely because they impose a higher evidentiary standard."). Plaintiffs have had to divert staff time and other resources to counteract these harms to their work. *See, e.g.*, Suppl. Smith Decl. ¶ 13; Suppl. Calonje Decl. ¶¶ 11-17, 26; Weibel Decl. ¶¶ 18-24; Suppl. Yang Decl. ¶¶ 8-9, 15; Suppl. Toczylowski Decl. ¶¶ 12-17. These specific and concrete ongoing harms, flowing directly from the Rule, suffice for organizational standing. *EBSC v. Biden*, 993 F.3d 640, 663-64 (9th Cir. 2021); *EBSC v. Garland*, 994 F.3d 962, 974-75 (9th Cir. 2021).

The Rule's interference with Plaintiffs' core work representing asylum seekers will continue even though the Rule was not extended beyond May 11, 2025. Many people who entered during the Rule's two-year window will have their cases adjudicated on the merits in the years to come. *See, e.g.*, Suppl. Smith Decl. ¶ 12 ("People subject to the Rule … will still be contacting us for potential asylum representation for many months into the future. And if not for the Rule, we would be able to effectively represent many of those people on affirmative asylum applications."); Suppl. Toczylowski Decl. ¶ 19 (similar); Weibel Decl. ¶ 25 (similar); Suppl. Calonje Decl. ¶¶ 22-24 (similar and also describing additional hurdles for asylum applicants who crossed the southern border between January 20, 2025 and May 11, 2025, after Defendants terminated the CBP One appointment system and parole processes); Suppl. Yang Decl. ¶ 14 (similar).

Additionally, independent from standing under *Havens* and *Alliance*, Plaintiff EBSC has already suffered financial harm from the Rule and that harm will continue to increase if the Rule is

not vacated. An important aspect of EBSC's funding comes from $2,000 per-case state grants it receives for each affirmative asylum case it takes on. Suppl. Smith Decl. ¶ 10. Since the Rule took effect, EBSC has had to turn away numerous potential clients that it could have otherwise represented on affirmative asylum applications because they were ineligible for asylum under the Rule. *Id.* ¶ 9. From May 2023 to May 2025, the number of affirmative asylum cases EBSC has filed decreased by more than 50 cases per year on average compared to the last year before the Rule took effect, leading to an average loss of over $100,000 of this per-case funding each year. *Id.* ¶ 10. And this financial harm will continue to grow if the Rule is not vacated, because EBSC will continue to have to turn away potential affirmative asylum clients who crossed the border when the Rule was operative. *Id.* ¶ 12. Additionally, each potential asylum client that EBSC has been unable to represent because of the Rule "will also lead to a significant loss in future revenue," because EBSC's "[s]uccessful affirmative asylum clients generally remain [its] clients in future applications" for which EBSC charges or receives per-case funding, including green card and citizenship applications. *Id.* ¶ 11. Meanwhile, Plaintiff ImmDef faces a loss of funding through a government-funded panel attorney program because the Rule increases the complexity of defensive asylum cases and therefore reduces the number of such cases ImmDef can take. Suppl. Toczylowski Decl. ¶ 15. Therefore, at least one Plaintiff has standing to challenge the Rule based on financial injury, regardless of any possible impact of *Alliance* on organizational standing under *Havens*. *See, e.g.*, *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'"); *see also* ECF 187 at 9-10 (holding that EBSC previously established standing based on threatened loss of funding); *EBSC v. Biden*, 993 F.3d at 663-64 (same); *EBSC v. Garland*, 994 F.3d at 974-75 (same).

II.     **The Termination Of The "Lawful Pathways" Underscores The Rule's Illegality.**

As this Court previously held, the Rule has always been substantively unlawful. ECF No. 187 at 15-30. Defendants' termination of the so-called "lawful pathways" on which the Rule is premised further underscores that illegality on both statutory and arbitrary-and-capricious grounds.

First, termination of the pathways underscores that the Rule is inconsistent with the asylum statute. As the Court previously explained, the Rule is contrary to law because, "[u]nder binding

7

Ninth Circuit precedent, conditioning asylum eligibility on presenting at a port of entry or having been denied protection in transit conflicts with the unambiguous intent of Congress" in 8 U.S.C. § 1158. ECF No. 187 at 16 (citing *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 671 (9th Cir. 2021), and *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 976 (9th Cir. 2021)).

        The elimination of the lawful pathways exacerbates this statutory violation—at least for non-Mexican nationals who crossed the southern border between January 20 and May 11, 2025. Even with the CBP One appointment system in place, the Rule's elimination of the right to seek asylum between ports of entry clearly violated the text of 8 U.S.C. § 1158(a)(1), which guarantees the right to apply for asylum "whether or not" one entered at a port of entry. ECF No. 187 at 17-18. But with the CBP One system terminated, noncitizens could not even access what was supposed to be the principal mechanism for crossing into the United States at the southern border under the Rule. And as this Court explained, the Rule's "exceptionally compelling circumstances" provision does not save the Rule. ECF No. 187 at 18; *see also Gall v. United States*, 552 U.S. 38, 46-47 (2007) (holding that where the government cannot make an action "mandatory," it equally cannot require a showing of "extraordinary circumstances to justify" a departure from that action) (cleaned up). Moreover, that "exceptionally compelling circumstances" provision is itself linked to the CBP One appointment system, insofar as that provision requires an applicant to demonstrate that "it would be unreasonable to require use of the DHS appointment scheduling system or pursuit of another lawful pathway." 88 Fed. Reg. at 31338.

        Second, termination of the pathways underscores that the Rule is arbitrary and capricious. In particular, at least with respect to noncitizens who crossed the southern border between January 20 and May 11, 2025, the termination of the pathways further confirms this Court's conclusion that the Rule wrongly assumed that the pathways it discusses "will, at the very least, present meaningful options to noncitizens," while the record reflects that, in fact, they "will not be meaningfully available to many noncitizens subject to the Rule." ECF No. 187 at 24, 30. All the reasons this Court identified that the parole, transit country, and CBP One pathways were never reasonably available remain valid. *Id.* at 24-29. But the parole and CBP One pathways have now been eliminated. For people who crossed the border between January 20 and May 11, 2025, those options were not

available at all. There can therefore be no basis at all for applying the Rule to people who crossed the border on or after January 20, 2025.

## CONCLUSION

The Court should modify its prior summary judgment ruling, ECF No. 187, to hold that (1) Plaintiffs continue to have standing to challenge the Rule following *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), and (2) the termination of the "lawful pathways" on which the Rule is premised further confirm the Rule's illegality.

Dated: June 20, 2025

Respectfully submitted,

Keren Zwick*
Colleen Cowgill (SBN 321542)
Mary Georgevich*
NATIONAL IMMIGRANT JUSTICE CENTER
224 S. Michigan Ave., Suite 600
Chicago, Illinois 60604
T: (312) 660-1370
F: (312) 660-1505
kzwick@immigrantjustice.org
ccowgill@immigrantjustice.org
mgeorgevich@immigrantjustice.org

Melissa Crow*
CENTER FOR GENDER & REFUGEE STUDIES
1121 14th Street, NW, Suite 200
Washington, D.C. 20005
T: (202) 355-4471
F: (415) 581-8824
crowmelissa@uchastings.edu

Anne Peterson (SBN 258673)
Blaine Bookey (SBN 267596)
Julie Bourdoiseau (SBN 340462)
Karen Musalo (SBN 106882)
CENTER FOR GENDER & REFUGEE STUDIES
200 McAllister Street
San Francisco, CA 94102
T: (415) 610-5729
F: (415) 581-8824
petersonanne@ucsflaw.edu
bookeybl@uclawsf.edu
bourdoiseaujulie@uclawsf.edu
musalok@uclawsf.edu

Robert Pauw**

/s/ Lee Gelernt
Lee Gelernt*
Omar Jadwat*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
lgelernt@aclu.org
ojadwat@aclu.org

Morgan Russell (SBN 296137)
Spencer Amdur (SBN 320069)
Oscar Sarabia Roman (SBN 341385)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-1198
mrussell@aclu.org
samdur@aclu.org
osarabia@aclu.org

Michelle (Minju) Y. Cho (SBN 321939)
AMERICAN CIVIL LIBERTIES UNION OF NORTHERN CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
T: (415) 621-2493
F: (415) 255-1478
mcho@aclu.org

CGRS Cooperating Attorney
GIBBS HOUSTON PAUW
1000 Second Avenue, Suite 1600
Seattle, WA 98104
T: (206)682-1080
F: (206)689-2270
rpauw@ghp-law.net

*Attorneys for Plaintiffs*

\**Admitted Pro hac vice*

\*\* *Application for pro hac vice admission forthcoming*