BRETT A. SHUMATE
Assistant Attorney General

BRIAN C. WARD
Acting Assistant Director

KATHERINE J. SHINNERS
Senior Litigation Counsel
DC Bar No. 978141

      U.S. Department of Justice
      Civil Division
      Office of Immigration Litigation
      P.O. Box 878, Ben Franklin Station
      Washington, D.C. 20044
      Telephone: (202) 598-8259
      katherine.j.shinners@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| East Bay Sanctuary Covenant, *et al.*, | CASE NO. 4:18-cv-06810-JST |
|     Plaintiffs, | |
|   v. | **DEFENDANTS' SUPPLEMENTAL OPPOSITION BRIEF ON REMAND** |
| Donald J. Trump, *et al.*, | |
|     Defendants. | |

1

**TABLE OF CONTENTS**

2    **INTRODUCTION**............................................................................................................1

3    **SUPPLEMENTAL BACKGROUND** ...........................................................................1

4    **ARGUMENT** .................................................................................................................6

5
     **I.**    ***FDA v. Alliance for Hippocratic Medicine* Demonstrates that Plaintiffs Cannot Establish**
6            **Article III Standing to Vacate the Rule.** ..........................................................6

7    **II.**    **The Rule is Lawful and Is Not Arbitrary and Capricious.** ....................................14

8    **CONCLUSION** .............................................................................................................17

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## CASE LAW

*Arizona All. for Retired Americans v. Mayes*,
    117 F.4th 1165 (9th Cir. 2024) ................................................................ 10

*Arizona All. for Retired Americans v. Mayes*,
    130 F.4th 1177 (9th Cir. 2025) ................................................................ 10

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) .................................................................................... 13

*California Cmtys. Against Toxics v. US EPA*,
    688 F.3d 989 (9th Cir. 2012) ...................................................................... 13

*California v. Texas*,
    593 U.S. 659 (2021) ..................................................................................... 12

*California Wilderness Coal. v. U.S. Dep't of Energy*,
    631 F.3d 1072 (9th Cir. 2011) .................................................................... 13

*Citizens to Preservce Overton Park v. Volpe*,
    401 U.S. 402 (1971) ...................................................................................... 16

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ..................................................................................... 11

*Coal. on Homelessness v. City & Cnty. of San Francisco*,
    758 F. Supp. 3d 1102 (N.D. Cal. 2024) ......................................................... 7

*E. Bay Sanctuary Covenant v. Biden*,
    993 F.3d 640 (9th Cir. 2021) ................................................................. 7, 9

*E. Bay Sanctuary Covenant v. Biden*,
    No. 23-16032, 2023 WL 11662094 (9th Cir. Aug. 3, 2023) ......................... 2

*E. Bay Sanctuary Covenant v. Garland*,
    994 F.3d 962 (9th Cir. 2021) ....................................................................... 3

*E. Bay Sanctuary Covenant v. Trump*,
    134 F.4th 545 (9th Cir. 2025) ....................................................................... 5

*FDA v. Alliance for Hippocratic Medicine (*"Alliance"*)*,
    602 U.S. 367 (2024)............................................................................. *passim*

*Gill v. Whitford*,
    585 U.S. 48 (2018) .......................................................................................... 6

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ........................................................................................ 6, 7, 11

*Hecht Co. v. Bowles*,
    321 U.S. 321 (1944) ............................................................................................... 12

*Immigrant Defenders Law Center v. Noem*,
    No. 25-2581, 2025 WL 2080742 (9th Cir. July 18, 2025) ................................. 9, 12

*INS v. Cardoza-Fonseca*,
    480 U.S. 421 (1987) ............................................................................................... 14

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004) ................................................................................................. 8

*Las Americas Immigr. Advoc. Ctr. v. DHS*,
    No. 24-cv-1702, --- F. Supp. 3d ---, 2025 WL 1403811 (D.D.C. May 9, 2025) ................ 3

*Linda R.S. v. Richard D.*,
    410 U.S. 614 (1973) ................................................................................................. 6

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ............................................................................................ 6, 11

*Nat'l Wildlife Fed'n v. Espy*,
    45 F.3d 1337 (9th Cir. 1995) ................................................................................. 13

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*,
    No. 25-cv-306 (RDM), 2025 WL 1825431 (D.D.C. July 2, 2025) ......................... 5

*Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*,
    100 F.3d 1443 (9th Cir. 1996) ............................................................................... 16

*Trump v. CASA, Inc.*,
    145 S. Ct. 2540 (June 27, 2025) ....................................................................... 12, 13

*United States v. Texas*,
    599 U.S. 670 (2023) ............................................................................................. 6, 7

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982) ............................................................................................... 12

**ADMINISTRATIVE DECISIONS**

*Matter of D-A-C-*,
    27 I. & N. Dec. 575 (B.I.A. 2019) ........................................................................ 15

*Matter of Pula*,
  19 I. & N. Dec. 467 (B.I.A. 1987) ........................................................................... 15

**STATUTES**

5 U.S.C. § 705 ....................................................................................................................... 12

5 U.S.C. § 706(2) ................................................................................................................... 12

8 U.S.C. § 1158 ............................................................................................................... 2, 4, 5

8 U.S.C. § 1158(a) ................................................................................................................... 2

8 U.S.C. § 1158(a)(2)(A) ........................................................................................................ 3

8 U.S.C. § 1158(a)(2)(B) ...................................................................................................... 14

8 U.S.C. § 1158(a)(2)(C) ...................................................................................................... 14

8 U.S.C. § 1158(b)(1)(A) ...................................................................................................... 14

8 U.S.C. § 1158(b)(2)(A)(vi) .................................................................................................. 3

8 U.S.C. § 1158(b)(2)(C) ................................................................................................. 2, 14

8 U.S.C. § 1182(a) ................................................................................................................... 4

8 U.S.C. § 1182(a)(1) .............................................................................................................. 4

8 U.S.C. § 1182(a)(1)-(3) ........................................................................................................ 4

8 U.S.C. § 1182(f) ................................................................................................................... 4

8 U.S.C. § 1185(a) ................................................................................................................... 4

**REGULATIONS**

8 C.F.R. § 208.33(a) ................................................................................................................ 1

8 C.F.R. § 208.33(a)(2) ........................................................................................................... 2

8 C.F.R. § 208.33(a)(2)(C) ............................................................................................... 16, 17

8 C.F.R. § 208.33(a)(2)(i) ........................................................................................................ 2

8 C.F.R. § 208.33(a)(3) ............................................................................................ 2, 16

8 C.F.R. § 1208.33(a) ..................................................................................................... 1

8 C.F.R. § 1208.33(a)(2) ................................................................................................ 2

8 C.F.R. § 1208.33(a)(3) ................................................................................................ 2

8 C.F.R. § 1208.33(a)(2)(i) ............................................................................................ 2

8 C.F.R. § 1208.33(a)(2)(C) ................................................................................... 16, 17

8 C.F.R. § 1208.33(a)(3) ........................................................................................ 2, 16

**FEDERAL REGISTER**

88 Fed. Reg. 31,314 .................................................................................. 1, 2, 14, 16

89 Fed. Reg. 48,487 ...................................................................................................... 3

89 Fed. Reg. 48,710 ...................................................................................................... 3

89 Fed. Reg. 80,351 ...................................................................................................... 3

89 Fed. Reg. 81,156 ...................................................................................................... 3

90 Fed. Reg. 8,333 ........................................................................................................ 4

90 Fed. Reg. 8,467 ..................................................................................................... 4, 5

90 Fed. Reg. 13,611 ................................................................................................. 4, 16

**EXECUTIVE ORDER**

E.O. 14165 ................................................................................................................ 4, 5

**PRESIDENTIAL PROCLAMATIONS**

Proclamation 10888 ................................................................................................. 4, 17

# MISCELLANEOUS

CBP, *CBP One™ Appointments Increased to 1,450 Per Day (June 30, 2023) (stating that more than 49,000 aliens had presented at Southwest border ports of entry through scheduled CBP One appointments for inspection as of June 30, 2023)* available at https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day (last visited Aug. 5, 2025)...................................................................................................... 31

CBP, *CBP Removes Scheduling Functionality in CBP One™ App* (Jan. 21, 2025), https://www.cbp.gov/newsroom/national-media-release/cbp-removes-scheduling-functionality-cbp-one-app (last visited Aug. 5, 2025)............................................................................................ 4

# INTRODUCTION

Plaintiffs, six legal-services organizations operating primarily in Texas and California, continue to seek to overturn a Rule that does not apply to them. That Rule creates a rebuttable presumption of asylum ineligibility for certain of their clients or potential clients: aliens who crossed the southern border into the United States from May 11, 2023, to May 11, 2025, after traveling through a country other than their home country. The Rule contains several exceptions to that presumption, including if an alien sought and was denied protection in a third country through which he traveled. Defendants respectfully submit this brief pursuant to the Court's April 29, 2025, scheduling order. ECF 209; *see also* ECF 221.

The basis for this Court's prior holding that the Plaintiff organizations have standing is no longer viable in light of the Supreme Court's holding in *FDA v. Alliance for Hippocratic Medicine ("Alliance")*, 602 U.S. 367 (2024), which rejected the notion that an organization can show standing to challenge an action merely by demonstrating frustration of mission and a consequent diversion of resources. Plaintiffs' supplemental and prior evidence fails to establish that they have a cognizable injury post-*Alliance*. Their services have not been impaired within the meaning of *Alliance*, and any re-allocation of resources they have undertaken does not establish standing. Further, they have not substantiated any specific, non-attenuated loss of funding, even assuming such downstream monetary injuries were cognizable.

Further, Defendants respectfully maintain that the Court, in previously finding that the Rule was contrary to law and arbitrary and capricious, did not sufficiently consider the purposes of the Rule and the variety of options and exceptions available under the Rule to avoid the presumption of asylum ineligibility. In any event, the elimination of the CBP One appointment system and certain parole processes cannot, and does not, undermine the legality of the Rule—particularly given the existence of additional exceptions and rebuttal grounds, and the fact that the Rule was superseded by Presidential Proclamation during the relevant time period.

# SUPPLEMENTAL BACKGROUND

The Circumvention of Lawful Pathways Rule (the Rule), promulgated in May 2023, generally imposed a rebuttable presumption of asylum ineligibility on certain aliens who crossed the southern border without authorization between May 11, 2023, and May 11, 2025, after traveling through a third country. 88 Fed. Reg. 31,314 (May 16, 2023); 8 C.F.R. §§ 208.33(a), 1208.33(a). The Departments of Justice and

Homeland Security (the Departments) promulgated the Rule under their statutory authority to "by regulation establish additional limitations and conditions, consistent with this section [8 U.S.C. § 1158], under which an alien shall be ineligible for asylum." 8 U.S.C. § 1158(b)(2)(C). Aliens who sought to enter the United States but lacked authorization to do so were able to avoid the presumption of asylum ineligibility by seeking asylum or protection in a third country through which they transited en route to the United States, using alternative pathways such as refugee admissions or parole processes like the former parole programs for nationals of Cuba, Haiti, Nicaragua, and Venezuela (CHNV), or by presenting themselves at a Port of Entry (POE) with a pre-scheduled appointment for inspection and processing. 8 C.F.R. §§ 208.33(a)(2), 1208.33(a)(2). Appointments to present at POEs were made through the CBP One app. Additionally, aliens are able to rebut the presumption by demonstrating exceptionally compelling circumstances. 8 C.F.R. §§ 208.33(a)(3), 1208.33(a)(3). Unaccompanied alien children are exempt from the presumption. 8 C.F.R. §§ 208.33(a)(2)(i), 1208.33(a)(2)(i).

Plaintiffs, six organizations that provide legal services to aliens primarily in parts of California and Texas, filed this lawsuit challenging the Rule under the Administrative Procedure Act (APA). On July 25, 2023, the Court granted summary judgment to Plaintiffs and vacated the Rule, *see* ECF 187,[1] although the Court's order was stayed by the Ninth Circuit, *see E. Bay Sanctuary Covenant v. Biden*, No. 23-16032, 2023 WL 11662094, at *1 (9th Cir. Aug. 3, 2023). As relevant here, the Court found that Plaintiffs had shown the requisite injury because the Rule "will frustrate Plaintiffs' missions and require them to divert resources from existing programs," ECF 187 at 8, and that the "devot[ion of] additional resources to each client seeking asylum" would "substantially affect [the organizations'] funding." ECF 187 at 9–10.

On the merits, the Court determined that the Rule is contrary to law because it is inconsistent with the asylum statute, 8 U.S.C. § 1158. ECF 187 at 15–19. It reasoned that the Rule "restrict[s]" asylum eligibility based on manner of entry, and that the statute provides that aliens who are present in the United States may apply for asylum "regardless of whether or not [they] arrive at a designated port of arrival," 8 U.S.C. § 1158(a). ECF 187 at 17–18. It also reasoned that the Rule's imposition of a presumption of

---

[1] The Court's Order appeared to vacate all aspects of the Rule, including the Rule's removal of language from the Code of Federal Regulations concerning the Third-Country Transit Rule and Entry Rule. *See* 88 Fed. Reg. at 31,319 (explaining amendments removing the provisions of those rules, which had been previously vacated or enjoined).

asylum ineligibility on those who failed to seek asylum or protection in third countries through which they traveled is inconsistent with the principles of the safe-third-country and firm-resettlement bars, 8 U.S.C. §§ 1158(a)(2)(A) and (b)(2)(A)(vi), which allow asylum to be denied "only if there is a safe option in another country." ECF 187 at 18 (quoting *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 979 (9th Cir. 2021)). The Court dismissed the relevance of other means of excepting oneself from or rebutting the presumption. *See id.*

The Court also determined that the Rule was arbitrary and capricious because the Departments considered the availability of other lawful pathways to the United States, which, in the Court's view, are "irrelevant" to asylum eligibility under the Immigration and Nationality Act (INA), and because each exception to the asylum-ineligibility presumption may not be available to all aliens. ECF 187 at 20–30. The Court also found APA procedural violations despite the Rule's 33-day notice and comment period. *See* ECF 187 at 30–33. Defendants appealed. *See E. Bay Sanctuary Covenant v. Biden*, No. 23-16032 (9th Cir.).

Meanwhile, in 2024 the Departments promulgated a new rule—*Securing the Border*—that established a limitation on asylum eligibility for those who enter the United States during times when encounters between ports of entry are above thresholds specified by two Presidential Proclamations: "Securing the Border," 89 Fed. Reg. 48,487 (June 7, 2024), and "Amending Proclamation 10773," 89 Fed. Reg. 80,351 (Oct. 2, 2024). The *Securing the Border* interim final rule took effect on June 5, 2024, *see* 89 Fed. Reg. 48,710 (June 7, 2024), and was replaced by a final rule effective October 1, 2024, *see* 89 Fed. Reg. 81,156 (Oct. 7, 2024). The rule's limitation on asylum eligibility remained in effect for illegal border crossers from June 5, 2024, until May 9, 2025, when the rule was vacated by the U.S. District Court for the District of Columbia. *See Las Americas Immigr. Advoc. Ctr. v. DHS*, No. 24-cv-1702, --- F. Supp. 3d ---, 2025 WL 1403811 (D.D.C. May 9, 2025).

On January 20, 2025, to address the nation's broken immigration system and the ongoing crisis at the southern border that had not been resolved by the Rule or other actions of the prior administration, the President took two actions relevant to the questions to be addressed in this briefing. The first, the Executive Order titled "Securing Our Borders," called for the Department of Homeland Security (DHS) to "ceas[e] using the 'CBP One' application as a method of paroling or facilitating the entry of otherwise inadmissible

aliens into the United States" and to terminate "all categorical parole programs that are contrary to the policies of the United States established in" the President's Executive orders, including the CHNV programs. Executive Order 14165 § 7(a)-(b), 90 Fed. Reg. 8467, 8468 (Jan. 29, 2025). In accordance with that Order, DHS "announced removal of the scheduling functionality within the CBP One™ mobile application, effective Jan. 20, 2025, at noon EST." CBP, *CBP Removes Scheduling Functionality in CBP One™ App* (Jan. 21, 2025), https://www.cbp.gov/newsroom/national-media-release/cbp-removes-scheduling-functionality-cbp-one-app (last visited July 30, 2025). On March 25, 2025, the Secretary of Homeland Security terminated the CHNV parole programs. *Termination of the Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, 90 Fed. Reg. 13,611 (Mar. 25, 2025).

The second Presidential action, Presidential Proclamation 10888, titled "Guaranteeing the States Protection Against Invasion," invokes the President's authorities under the INA, 8 U.S.C. §§ 1182(f) and 1185(a), and the Constitution, to preclude the entry of aliens who engage in an invasion across the southern border, or who fail to submit "sufficient medical information and reliable criminal history and background information as to enable fulfillment of the requirements of" the inadmissibility provisions of 8 U.S.C. § 1182(a)(1)–(3). Proclamation §§ 1, 3, 90 Fed. Reg. 8333, 8335 (Jan. 29, 2025). This includes precluding aliens from invoking provisions of the INA, including the asylum statute, that would permit their continued presence in the United States. Proclamation §§ 1, 3, 90 Fed. Reg. at 8335.

Specifically, the President invoked his authority under 8 U.S.C. §§ 1182(f) and 1185(a) and found "that the entry into the United States … of aliens engaged in the invasion across the southern border is detrimental to the interests of the United States," and thus suspended the "entry into the United States of such aliens" until "a finding that the invasion at the southern border has ceased." Proclamation § 1. The Proclamation further restricts "aliens engaged in the invasion across the southern border" from "invoking the provisions of the INA that would permit their continued presence in the United States, including, but not limited to" 8 U.S.C. § 1158, until the President issues "a finding that the invasion at the southern border has ceased." Proclamation § 2. Additionally, the President determined "that the entry into the United States … of any alien who fails, before entering the United States, to provide Federal officials with sufficient medical information and reliable criminal history and background information as to enable fulfillment of the requirements of" 8 U.S.C. § 1182(a)(1)–(3), "is detrimental to the interests of the United

States"; he therefore suspended "entry into the United States of such aliens" and "restrict[ed] their access to provisions of the INA that would permit their continued presence in the United States, including, but not limited to" 8 U.S.C. § 1158. Proclamation § 3. Finally, the President invoked his "express and inherent powers in Article II of the Constitution of the United States," including "control over foreign affairs," to suspend "the physical entry of any alien engaged in the invasion across the southern border of the United States" until the President issues "a finding that the invasion at the southern border has ceased." Proclamation § 4.

Although the District Court of the District of Columbia has enjoined the application of the Proclamation to aliens in the United States, *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, No. 25-cv-306 (RDM), 2025 WL 1825431 (D.D.C. July 2, 2025), the government has appealed. *See Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, No. 25-5243 (D.C. Cir.). The district court's order has been stayed insofar as it enjoins, vacates, and declares unlawful the Proclamation's restrictions on asylum. *See id.*, Doc. No. 2128457, at p. 2 (D.C. Cir. Aug. 1, 2025).

On April 10, 2025, the  Ninth Circuit vacated this Court's order vacating the Rule and remanded for consideration of (1) the Supreme Court's "new guidance on how organizations may establish standing" set forth in *Food and Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), and (2) what impact Executive Order 14165 § 7(a)–(b), which terminated the "lawful pathways" on which the Rule relies in part, *see*  90 Fed. Reg. 8467, 8468 (Jan. 20, 2025), has on this case. *E. Bay Sanctuary Covenant v. Trump*, 134 F.4th 545, 547–48 (9th Cir. 2025). This Court issued a briefing schedule. *See* ECF 209, 221. Defendants subsequently reported that the Rule had not been extended, which meant that aliens who cross the southern land border or adjacent coastal borders into the United States after May 11, 2025, are not subject to the Rule. *See* ECF 210.

**ARGUMENT**

I.    ***FDA v. Alliance for Hippocratic Medicine*** **Demonstrates that Plaintiffs Cannot Establish Article III Standing to Vacate the Rule.**

Organizations "must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." *Alliance*, 602 U.S. at 393–94 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). As an initial matter, where a regulation—like the Rule at issue here—does not directly regulate the plaintiff, standing "is ordinarily substantially more difficult to establish." *Alliance*, 602 U.S. at 382 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992)). Here, Plaintiffs seek to vacate the Rule as to all covered aliens based on their assertions of downstream, indirect impacts of the Rule's presumption of asylum ineligibility on their allocation of resources and the legal work they do. The various Plaintiffs claim that the Rule has caused them to make changes to their approach to assisting with and handling the immigration cases of aliens who seek asylum or other forms of protection in the United States—including sometimes by spending more time and resources on certain cases—and to take time to learn about the Rule, educate their staff, and adapt their counseling materials. Certain Plaintiffs also conversely claim that their caseload in certain areas of their practices has been reduced since the Rule was in place, which could eventually cause them to lose some funding or to shift their work or funding sources. These downstream, incidental impacts are not the type of "invasion of a legally protected interest" sufficient to support Article III standing. *Gill v. Whitford*, 585 U.S. 48, 65 (2018). The Rule regulates asylum eligibility for certain aliens, and the Plaintiff organizations lack any "judicially cognizable interest" in how the Executive enforces the immigration laws against third parties. *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973).

The Supreme Court reiterated these principles in *United States v. Texas*, 599 U.S. 670 (2023), holding that they precluded plaintiff States from establishing standing to challenge the Executive's immigration enforcement priorities, even though the States contended that those priorities caused the States to spend additional money. Each of the reasons underlying the Supreme Court's decision in *Texas* are applicable here: in the Rule, the Departments "do[] not exercise coercive power" over "the plaintiff," *Texas*, 599 U.S. at 678; challenges to immigration enforcement policies like the Rule's exercise of statutory enforcement authority to limit asylum eligibility "run up against the Executive's Article II

authority to enforce federal law," *id.* (which, here, implicates "foreign-policy objectives" including cooperation with regional partners concerning migration, *see id.* at 679); and the courts lack "meaningful standards for assessing" the Rule's discretionary exercise of authority to set conditions on asylum, which reflects a complicated balancing of various factors like resource constraints, public safety, and the situation at the southwest border in 2023, *id.* at 679–80.  Nor does this case involve the "provision of legal benefits," *see* ECF 187 at 11, which the Supreme Court said "could lead to a different standing analysis," 599 U.S. at 683. Here, Plaintiffs urge that the Executive Branch is impermissibly exercising its discretionary authority to deny asylum, and thus to subject aliens to removal; their entire interest therefore hinges on the circumstances in which aliens are subject to immigration enforcement.

Like the States in *Texas*, Plaintiffs cannot leverage the incidental effects of enforcement policies directed at third parties to create Article III standing for themselves. Any changes plaintiffs may make in their own affairs in light of the Executive's exercise of enforcement discretion with respect to others are not judicially cognizable injuries.

The Supreme Court's decision in *Alliance* confirms that the Plaintiff organizations lack standing here. As the Ninth Circuit recognized in remanding this case for further consideration, this Court's finding of organizational standing based on "diversion of resources" and "frustration of mission" is irreconcilable with the Supreme Court's holding in *Alliance*. *See, e.g.*, *Coal. on Homelessness v. City & Cnty. of San Francisco*, 758 F. Supp. 3d 1102, 1128 (N.D. Cal. 2024) ("[T]he Supreme Court recently rejected the 'frustration-of-mission and diversion-of-resources theories' in *Hippocratic Medicine*."). In *Alliance*, the Supreme Court explained that its prior decision in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), did not stand for the broad proposition that an organization that diverts resources in response to a policy that touches on or frustrates its mission has standing to challenge that policy. *See* 602 U.S. at 395. It is not enough that "an organization diverts its resources in response to defendants' actions," even if it will "expend considerable time, energy, and resources" in response to a policy change. 602 U.S. at 394–95. Thus, contrary to prior Ninth Circuit precedent, a "frustration of mission" or "purpose" and a diversion of resources to address that frustration is not sufficient to establish standing. *See E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 663 (9th Cir. 2021). Instead, an unregulated organization must show that the challenged action "perceptibly impair[s]" or "interferes with" its activities by imposing an affirmative

1    "impediment" to performing those activities. *Id.* This requirement safeguards against an organization

2    being permitted to "spend its way into standing." *Id.* As the Supreme Court made clear in *Alliance*, *Havens*

3    *Realty* was an "unusual case" where the defendant, as part of its challenged practice, provided the

4    organizational plaintiff's employees with "false information about apartment availability," thereby

5    "perceptibly impair[ing] [the organization's] ability to provide counseling and referral services to" its

6    home-seeking clients. *Alliance*, 602 U.S. at 395–96. Thus, the organizational plaintiff's theory of standing

7    in *Havens Realty* was akin to that of "a retailer who sues a manufacturer for selling [it] defective

8    goods." *Id.* at 395.

9          Plaintiffs' evidence does not demonstrate the type of interference with or impairment of their

10   existing legal services that could amount to a cognizable injury under *Havens Realty*. Nothing about the

11   Rule directly regulates the organizations' provision of legal services. The Rule's condition on asylum

12   eligibility also does not make it more difficult for the Organizations to provide legal services to aliens, at

13   least no more than any change in law requires lawyers to adapt their representation of clients. At most,

14   Plaintiffs' evidence demonstrates the common-sense principle that changes to the legal landscape of

15   asylum eligibility may mean that some aliens will not be eligible for that relief and that, in particular cases,

16   lawyers will have to meet additional evidentiary or procedural burdens to try to establish their clients'

17   eligibility for relief or other protection from removal. *See* ECF 217 at 5–6; *see also, e.g.*, ECF 169-2 at

18   ¶¶ 11–12, 15; ECF 169-5 at ¶¶ 16–18; ECF 169-6 at ¶¶ 19–20; ECF 169-7 at ¶¶ 23–24; ECF 217-2 at ¶¶

19   12–17; ECF 217-3 at ¶¶ 11, 13–14; ECF 217-4 at ¶¶ 8–10; ECF 217-5 at ¶¶ 16, 20–24. Accepting such

20   common-place impacts of legal developments on legal services providers as judicially cognizable injuries

21   would allow lawyers to sue whenever changes in the law require them to change their approach to handling

22   particular cases or to do more research or devote more resources to particular cases. Such a theory of

23   lawyer standing is startling, as it would provide lawyers with standing to sue over every new statute or

24   regulation that touches their core business areas and nullify the principle that lawyers generally lack an

25   independent interest in the rules applicable to their clients. *See Kowalski v. Tesmer*, 543 U.S. 125, 130-34

26   (2004) (addressing third-party standing). Plaintiffs' theory would, for example, allow "medical

27   malpractice attorney[s]" to claim cognizable injury from "tort reform statutes," *id.* at 134 n.5, on the

28   ground that the statutes require them to gather relevant evidence or otherwise limit their ability to take on

DEFENDANTS' BRIEF ON REMAND
4:18-CV-06810 JST                                    8

clients, thereby affecting their caseload and income. It would also allow "attorney[s] specializing in Social Security cases [to] challenge implementation of a new regulation," *id.*, on the ground that they will respond by expending resources developing arguments. Such injuries thus cannot constitute the type of impairment of services contemplated in *Alliance.*[2]

Similarly, Plaintiffs assert that the Rule has caused them to spend resources on learning and obtaining information about the Rule, training staff, updating internal procedures, conducting educational outreach to the public, and developing new strategies for counseling aliens who may be ineligible for asylum under the Rule. *See, e.g.*, ECF 217 at 6; ECF 217-1 at ¶ 13; ECF 217-2 at ¶ 18; ECF 169-2 at ¶ 16; ECF 169-7 at ¶ 25. But such education and outreach expenditures are the type of activities taken in *response* to a government policy that cannot satisfy standing. *See, e.g.*, *Alliance*, 602 U.S. at 394. They do not represent any independent impairment of the Organizations' pre-existing activities, but are instead a continuation of those activities. As the Supreme Court explained in *Alliance,* an organization "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Alliance*, 602 U.S. at 394. Although the Supreme Court references advocacy activities, the principle announced in *Alliance* is broader—it places the focus of the injury analysis on the *impairment* of the organization's *services*, rather than on the organization's expenditures or allocation of resources. This principle is thus not limited to "issue-advocacy" organizations, as Plaintiffs contend (ECF 217 at 4), but applies equally to direct services organizations who spend money or resources *in response* to the challenged policy without any corresponding impairment to their ability to provide services.[3] As

---

[2] The Supreme Court's decisions in *Texas* and *Alliance*, which scale back significantly on judicial recognition of injuries of third-party entities in the context of Article III standing, require revisiting this Court's and the Ninth Circuit's rejection of similar arguments, including in *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 664 (9th Cir. 2021). This argument does not conflate the merits of the claim with standing—it only concerns the type of injuries that are judicially cognizable, not whether the Rule is lawful under the APA. Further, these same principles demonstrate why Plaintiffs are not within the relevant zone of interests of the asylum statute or the INA generally, which do not evince any Congressional concern for the interests of lawyers and legal services providers. *See* ECF 176-1 at 9 n.7; ECF 182 at 2 n.1.

[3] In its recent decision on a stay motion in *Immigrant Defenders Law Center v. Noem*, --- F. 4th ---, No. 25-2581, 2025 WL 2080742 (9th Cir. July 18, 2025), the Ninth Circuit glossed over this requirement, finding a "concrete and demonstrable injury" to core activities without adequately explaining what precisely constituted the impairment to those activities that triggered the identified re-allocation or expenditure of resources—seemingly equating those uses of resources with the impairment itself. *Id.* at *9. That reasoning runs contrary to the holding of *Alliance*. But this decision is in any event not instructive

the Supreme Court's reasoning in *Alliance* made clear, courts should not allow an organization to demonstrate standing any time it shifts resources from one set of direct-service activities to another set of similar activities in support of its mission. Instead, the organization must show that the new policy directly harms its already-existing core activities. To hold otherwise would impermissibly allow organizations to manufacture standing to challenge any policy that touches on their mission by voluntarily spending money in response to the policy and in support of their mission. *See Alliance*, 602 U.S. at 394.

Nor does a reduction in the number of affirmative asylum applications that Plaintiffs East Bay Sanctuary Covenant (EBSC) or American Gateways have assisted in filing—assuming such reductions are fairly traceable to the Rule—qualify as an impairment of services. *See* ECF 217 at 5; ECF 217-1 at ¶ 9; ECF 217-4 at ¶ 7.[4] A reduction in the number of aliens who entered before May 12, 2025, and who are potentially eligible for asylum does not impair the organization's ability to provide its services generally. This theory is essentially that the demand for certain of these Organizations' core services has been reduced. But American Gateways also represents clients in defensive applications for asylum. *See id.* at ¶ 6. Even so, assuming that there are fewer aliens that can avail themselves of these organizations' affirmative asylum services due to the Rule, this does not equate to an impairment of or interference with those existing services. Similarly, a reduction in the number of clients any particular organization may serve because they need to spend more time on certain asylum cases, *see* ECF 217-2 at ¶ 20, likewise does not impair the organization's ability to provide services to the clients they do serve. The Rule may frustrate the organization's mission by making it more difficult for certain aliens to obtain asylum, but this is not the type of impairment to services that *Alliance* requires for EBSC to show standing. "Like an individual, an organization may not establish standing simply based on the intensity of the litigant's interest, no matter

---

here, where Plaintiffs do not base their arguments on the type of expenditures alleged in *Immigrant Defenders*, and given that the Ninth Circuit is currently considering en banc an appeal that addressed the impact of *Alliance* on the Circuit's organizational-standing precedents, *see Arizona All. for Retired Americans v. Mayes*, 130 F.4th 1177 (9th Cir. 2025) (ordering rehearing en banc in, and vacating, *Arizona All. for Retired Americans v. Mayes*, 117 F.4th 1165, 1170 (9th Cir. 2024)).

[4] Tahirih Justice Center ("Tahirih") also conclusorily asserts that the Rule has "inhibited the ability of some prospective clients to reach Tahirih's services areas," ECF 217-5 at ¶ 19, but this does not amount to any type of injury to Tahirih itself. Moreover, this speculative impact—unsupported by any specific examples—appears to be attributable to the use of expedited removal and exercise of mandatory statutory detention authorities. *See id.*

how longstanding the interest and no matter how qualified the organization." *Alliance*, 602 U.S. at 394 (cleaned up); *see also Havens Realty*, 455 U.S. at 379 (a "setback to the organization's abstract social interests" is insufficient to support standing). Yet, at base, this is what these organizations have shown: a setback to their interests in helping some aliens obtain asylum. *See, e.g.*, ECF 169-7 at ¶ 20 (asserting that the Rule will "frustrate NCLR's mission" by making it more difficult for some aliens to seek asylum affirmatively). EBSC, for example, does not argue that the Rule impairs its ability to counsel aliens, nor that the Rule has prevented EBSC from continuing its work. Indeed, EBSC has continued to file numerous affirmative asylum applications, despite the existence of the Rule and the *Securing the Border* rule's limits on asylum eligibility, and it has not shifted to representing clients in defensive cases as it initially projected it would be forced to do. *See* ECF 217 at ¶ 9; ECF 169-6 at ¶¶ 18–19. Accordingly, a reduction in certain affirmative asylum clients covered by the Rule due to a decreased eligibility for asylum does not constitute the type of impairment recognized in *Alliance.*

Lastly, Plaintiffs argue that EBSC will suffer a financial injury in the form of a loss of funding or lost future revenue as a result of the decrease in affirmative asylum applications it can file. ECF 217 at 6–7. Assuming such a downstream financial injury is cognizable (it is not, *see supra* at 6–7), the declaration submitted demonstrates that this injury remains attenuated and speculative. *See Alliance*, 602 U.S. at 383 (standing's causation requirement "rules out attenuated links—that is, where the government action is so far removed from its distant (even if predictable) ripple effects"). Standing must be measured based on whether injury was imminent or "certainly impending" at the time of the Complaint. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013); *Lujan*, 504 U.S. at 571 n.4. At or around the time of the amended complaint, EBSC had not adequately substantiated a prospective funding-loss injury, instead speculating that it could experience a "marked decrease" in its budget. *See* ECF 169-6 at ¶ 16. Even now, its assertions concerning loss of funding remain vague and non-specific. EBSC has not specified how much funding it applied for or received for its affirmative asylum work since the Rule, and it fails to specify whether the approximated funding decrease has materialized. *See* ECF 217-1 at ¶ 10. EBSC also fails to demonstrate any concrete loss of funding from successful asylum applicants' applications for other benefits. Plaintiffs have likewise failed to substantiate any projected loss of funding for Immigrant Defenders (ImmDef). ImmDef speculates that, because it is "handling fewer removal cases than they would otherwise accept,"

this "promises to impact" its funding. ECF 217-3 at ¶ 15. But ImmDef does not quantify the number of cases it is currently handling versus those it handled previously, nor does it specifically attest that it will lose or has lost funding. *See id.* At most, ImmDef vaguely asserts that it must wait longer to receive payment for its work on an administrative appeal if the appeal takes time to resolve—but this bears no apparent relationship to the Rule. Accordingly, these two organizations' alleged funding or revenue losses do not satisfy Article III standing.

There is another recent Supreme Court development concerning scope of relief, which relates closely to the standing issues in this matter: *Trump v. CASA, Inc.*, 145 S. Ct. 2540 (June 27, 2025). Although this decision post-dates (and thus is not addressed by) the Ninth Circuit's remand order or this Court's scheduling order on remand, it is instructive as to the scope of the relief as compared to the scope of the harms asserted by the particular Plaintiffs. It emphasized the principle that equitable relief may be no "broader than necessary to provide complete relief to each plaintiff with standing to sue." 145 S. Ct. at 2562–63; *see also id.* at 2557. Although the Supreme Court in *CASA* declined to expressly extend its holding to the APA context, *see* 145 S. Ct. at 2554 n.10, its complete-relief principle for crafting injunctive relief at minimum provides important limits on the relief of "set[ting] aside" agency action under 5 U.S.C. § 706(2). *Cf. Immigrant Defenders*, 2025 WL 2080742, at *15 (applying the complete-relief principle to stays of agency action under 5 U.S.C. § 705).

Congress enacted the APA against a background rule that statutory remedies should be construed in accordance with "traditions of equity practice." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). Courts "do not lightly assume that Congress has intended to depart from established principles" of equity, *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982), and ordinarily courts expect that Congress will make "an unequivocal statement of its purpose" if it intends to make "a drastic departure from the traditions of equity practice," *Hecht Co.*, 321 U.S. at 329. Thus, as Defendants previously argued, the APA does not authorize universal vacatur. *See* ECF 176-1 at 34. Indeed, remedies "ordinarily operate with respect to specific parties," rather than "on legal rules in the abstract"; reading the APA to authorize universal relief in the form of vacatur would do the opposite. *California v. Texas*, 593 U.S. 659, 671 (2021).

But at minimum, the "set aside" language of § 706(2) must be considered alongside the principle

that equitable relief must be no broader than necessary to afford relief to the specific Plaintiffs. Although the Ninth Circuit has recognized vacatur as an available remedy for a successful APA challenge to a regulation, *see, e.g.*, *California Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1095 (9th Cir. 2011), it has also treated universal vacatur of agency action as a discretionary equitable remedy—not a remedy that is automatic or compelled. *See, e.g.*, *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995) (stating that the court "is not required to set aside every unlawful agency action."); *see California Cmtys. Against Toxics v. US EPA*, 688 F.3d 989, 994 (9th Cir. 2012) (per curiam) (declining to enter vacatur in favor of remand). As an equitable remedy, vacatur should also be governed by the complete-relief principles set forth in *CASA*.

In *CASA*, the Supreme Court explained that for determining the scope of equitable relief, "the question is not whether an injunction offers complete relief to *everyone* potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief *to the plaintiffs before the court*." *CASA*, 145 S. Ct. at 2557 (citing *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.")). Applying this complete-relief principle here—and assuming Plaintiffs could establish standing and prevail on the merits—the Rule at most may only be set aside to the extent it would remedy the cognizable harms of those Plaintiffs who can demonstrate Article III standing. Thus, it is important to consider whether *each* Plaintiff has standing, and the extent of that Plaintiff's cognizable harms. That is especially true because the Organizations' reach is topically and geographically limited. Several of the Organizations operate only in certain regions of California. *See* ECF 169-2 at ¶ 5 (asserting that Central American Resource Center (CARECEN) serves clients in the Los Angeles, Van Nuys, and San Bernadino areas); ECF 175 at ¶¶ 2, 8 (asserting that ImmDef operates and serves clients in Southern California and Tijuana, Mexico); *see also* ECF 169-6 at ¶ 6 (asserting that EBSC serves San Francisco Asylum Office only, which includes applicants in California, Washington, Oregon, and part of Nevada). Some Plaintiffs often serve only particular categories of alien clients. *See* ECF 169-7 at ¶ 11 (asserting that National Center for Lesbian Rights serves only LGBTQ clients in the San Francisco area); ECF 169-5 at ¶¶ 3, 5 (asserting that Tahirih serves women, girls, and other survivors of gender-based violence and has offices in Falls Church, VA; Baltimore, Maryland; Atlanta, Georgia; Houston, Texas; and San Bruno, CA). American Gateways serves

1    clients in Central Texas. ECF 169-3 at ¶¶ 4–5. Although Defendants maintain that none of the Plaintiffs

2    can establish cognizable harms for the reasons stated above, at minimum, *CASA* counsels that any relief

3    must be tailored to the scope of the Plaintiffs' harms.

4    **II.     The Rule is Lawful and Is Not Arbitrary and Capricious.**

5          Defendants maintain, as previously argued before this Court and on appeal, that the Rule's

6    presumption of asylum ineligibility is lawful and the Rule is not arbitrary and capricious. This is true

7    regardless of whether the CBP One scheduling system and parole processes continue to exist.

8          *First*, Defendants respectfully maintain that the Rule's presumption of asylum ineligibility is

9    lawful, regardless of the availability of exceptions. *See* ECF 176-1 at 10–12. Asylum is always a matter

10   of "discretion"—never of "entitlement." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 428 n.6 (1987). Thus,

11   Congress has specified that the Executive "*may* grant asylum" to an alien who satisfies governing

12   requirements but is never obligated to do so. 8 U.S.C. § 1158(b)(1)(A) (emphasis added). And the INA

13   expressly provides that the Departments may by rule establish "limitations and conditions" on asylum

14   eligibility, beyond those already set out in the statute, that are "consistent with" the asylum statute. *Id.*

15   § 1158(b)(2)(C). The Rule temporarily established a presumption of asylum ineligibility that was aimed

16   at safeguarding the effective functioning of the immigration system. *See* 88 Fed. Reg. at 31,314–19. No

17   provision of § 1158 prohibits consideration of these factors or otherwise clashes with the Rule. Because

18   the Rule and the statute coexist with no conflict or contradiction, the Rule is "consistent with" § 1158.

19   *See* ECF 176-1 at 10.

20         Moreover, although not necessary to establish consistency with the statute, multiple provisions in

21   § 1158 affirmatively underscore the permissibility of the Rule's focus on protecting the systemic

22   efficiency of the asylum system. Congress conditioned the grant of asylum on an alien applying "in

23   accordance with the requirements and procedures established by" the Departments. 8 U.S.C.

24   § 1158(b)(1)(A). Congress itself has already established mandatory bars to asylum aimed at promoting

25   systemic efficiency. For example, Congress has generally prohibited applications for asylum more than

26   one year after an alien entered the United States. 8 U.S.C. § 1158(a)(2)(B). And Congress has generally

27   prohibited aliens from pursuing successive asylum applications when the previous application was denied.

28   *See id.* § 1158(a)(2)(C). These provisions make clear that the INA does not prioritize the identification of

otherwise-meritorious asylum claims above all else, and that administrative practicality and systemic efficiency are legitimate considerations. Nothing in the statute suggests that Congress intended to foreclose the Departments from similarly taking systemic considerations into account. Indeed, the Executive Branch has long considered factors similar to those underlying the Rule in determining whether any particular asylum applicant warrants a favorable exercise of discretion. *See* ECF 176-1 at 13 (citing *Matter of D-A-C-*, 27 I. & N. Dec. 575, 578 (B.I.A. 2019) (explaining "[t]he ultimate consideration" for whether an alien is deserving of discretionary relief, including asylum, is whether granting relief "appears to be in the best interest of the United States," as determined by the Executive Branch officials charged with making asylum determinations), and *Matter of Pula*, 19 I. & N. Dec. 467, 473–74 (B.I.A. 1987) (holding that an alien's "circumvention of orderly refugee procedures" is a relevant consideration in whether he warrants discretionary relief and considering the alien's "manner of entry or attempted entry," and availability of protection in countries which he passed through)).

Because the Rule is thus consistent with the asylum statute, the availability of exceptions—including parole processes and the CBP One appointment exception—and rebuttal grounds are immaterial to whether the Rule is authorized by law. Defendants did, however, point to such exceptions to distinguish this case from Ninth Circuit precedent addressing categorical bars to asylum. The Court erred in its prior decision by likening the Rule here to the rules at issue in *East Bay I* (entry rule) and *East Bay II* (transit rule), because those rules categorically denied asylum to most aliens who entered the United States between ports of entry or who transited a third country without first seeking asylum there, respectively. In this Rule, in contrast, the presumption of asylum ineligibility does not operate as a categorical bar based solely on manner of entry or based solely on failure to seek asylum in a third country. The Rule provided multiple means by which an alien may avoid or rebut the presumption of asylum eligibility, including, but not limited to, using parole processes or pre-scheduling an appointment to present themselves at a POE.

The termination of the CBP One appointment system or of certain parole processes does not undermine Defendants' arguments on this score. These two pathways were not the only means of avoiding the presumption of asylum ineligibility under the Rule. As noted, the Rule does not definitively preclude aliens from receiving asylum even if they did not pursue any alternative pathway to enter the United States. *See* ECF 176-1 at 14. Thus, the termination of these two pathways illustrates the soundness of Defendants'

arguments—without CBP One appointments or parole processes, aliens subject to the Rule still could have sought protection in a third country or, if they were not able to do so and/or nonetheless entered illegally between POEs, they may still rebut the presumption by showing exceptionally compelling circumstances. *See* 8 C.F.R. §§ 208.33(a)(2)(C), (3), 1208.33(a)(2)(C),(3). Moreover, contrary to Plaintiffs' arguments, the rebuttal ground for "exceptionally compelling circumstances" does not directly require an asylum applicant to demonstrate that "it would be unreasonable to require the use of the DHS appointment scheduling system or pursuit of another lawful pathway." *See* ECF 217 at 8 (citing 88 Fed. Reg. at 31,338); 8 C.F.R. §§ 208.33(a)(3), 1208.33(a)(3). However, even if it did, this would not be a heavy burden for an applicant to meet where there is no available scheduling system or alternative lawful pathway to the United States.

Regardless, as explained, even if the Rule's presumption of asylum ineligibility were solely based on manner of entry or included no exceptions at all, it would be lawful. Although the Rule sought to address record irregular migration by encouraging the use of orderly pathways to enter the United States and discouraging illegal entry between ports of entry, the fact that certain of those pathways no longer exist does not undermine the lawfulness of the Rule.

*Second*, whether the Rule is arbitrary or capricious is judged not by events that occur after the agency decision but based on the administrative record "before the [agency] *at the time [it] made [its] decision*." *Citizens to Preservce Overton Park v. Volpe*, 401 U.S. 402, 420 (1971) (emphasis added); *see also Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996) (agency action must be examined based on the "administrative record in existence at the time of the decision"). Thus, Plaintiffs are wrong that subsequent events can support a finding that the Rule is "arbitrary and capricious" or provide a basis not to apply the rule after the fact. *See* ECF 217 at 8. Further, Defendants respectfully disagree with the Court's conclusion that the administrative record showed that the Rule's exceptions were not reasonably available to many aliens. These options were reasonably available, viable options used by numerous aliens. *See* 90 Fed. Reg. at 13,618 (explaining that 532,000 aliens received parole under the CHNV parole programs); CBP, *CBP One™ Appointments Increased to 1,450 Per Day* (June 30, 2023) (stating that more than 49,000 aliens had presented at Southwest border ports of entry through scheduled CBP One appointments for inspection as of June 30, 2023) at

1  https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day.    As

2  explained above and in Defendants' prior briefing, the Rule contained a variety of different exceptions

3  and options for aliens to avoid asylum ineligibility—including the ability to demonstrate exceptionally

4  compelling circumstances when the alien did not use the appointment system. *See supra* at 15–16.

5         Moreover, the elimination of any pathways discussed in the Rule had little to no practical impact.

6  As Plaintiffs themselves acknowledge, the Rule was largely irrelevant from January 20, 2025 to May 11,

7  2025, because Proclamation 10888 was in effect during that entire time period and cut off access to the

8  asylum process altogether for aliens who crossed the border illegally, under the President's statutory and

9  constitutional authorities to suspend entry of aliens. Although plaintiffs in a separate challenge to

10  application of this Proclamation to aliens within the United States were recently successful in the district

11  court, that district-court order has been appealed and has been partially stayed as to the Proclamation's

12  restrictions on asylum. *See supra* at 5. Assuming the government ultimately prevails in that litigation, the

13  Proclamation will continue to be applicable to those who crossed the border without authorization during

14  the relevant time period. Accordingly, it is doubtful that the end of CBP One on January 20 and the pause

15  or elimination of certain parole processes like CHNV had a practical impact on the application of the

16  Rule's presumption of asylum ineligibility—including to Plaintiffs' clients or potential clients.

17                                      **CONCLUSION**

18         The Court should modify its prior summary judgment opinion to hold that Plaintiffs lack standing

19  to challenge the Rule following *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024). The

20  Court should also modify its holdings on Plaintiffs' APA claims because the termination of the CBP One

21  appointment system and certain parole programs only serves to underscore that the Rule is not contrary to

22  law or arbitrary and capricious.

23  //

24  //

25

26

27

28

Dated: August 5, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

BRIAN C. WARD
Acting Assistant Director

By: /s/ *Katherine J. Shinners*
KATHERINE J. SHINNERS
Senior Litigation Counsel
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 598-8259
Email: katherine.j.shinners@usdoj.gov

Attorneys for Defendants