UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EAST BAY SANCTUARY COVENANT, et al., <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, et al., <br><br> Defendants. | Case No. 18-cv-06810-JST <br><br> **ORDER RECONSIDERING STANDING ON REMAND** <br><br> Re: ECF Nos. 187, 205, 217, 222 |

Plaintiffs are legal services organizations challenging a rule imposing a rebuttable presumption of asylum ineligibility for individuals who do not utilize certain "lawful pathways." Two events relevant to this case occurred while it was on appeal to the Ninth Circuit. First, the Supreme Court decided *Food and Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), which addressed organizational standing. Second, the Trump Administration took a series of executive actions foreclosing certain "lawful pathways" and otherwise restricting asylum. The Ninth Circuit remanded the case for this Court to reconsider its prior order granting summary judgment to Plaintiffs, in light of both intervening changes. Before the Court is the parties' supplemental briefing addressing these issues. The Court's prior summary judgment order is hereby modified to reflect (1) that *Alliance* does not undermine Plaintiffs' Article III standing and (2) that the termination of lawful pathways underscores the rule's unlawfulness, as set forth below. The Court therefore reaffirms its prior order.

## I.    Background

Promulgated by the Department of Homeland Security and the Department of Justice ("the Departments") in May 2023, the Circumvention of Lawful Pathways Rule ("the Rule") creates a rebuttable presumption of asylum ineligibility for noncitizens who crossed the southern border

into the United States between May 11, 2023 and May 11, 2025, after traveling through a country other than their home country. 88 Fed. Reg. 31,314 (May 16, 2023); 8 C.F.R. §§ 208.33(a), 1208.33(a). Noncitizens who sought to enter the United States but lacked authorization to do so could avoid the presumption of asylum ineligibility by seeking asylum or protection in a third country through which they transited, using alternative legal mechanisms such as refugee admissions or parole processes, or by presenting themselves at a Port of Entry (POE) with a pre-scheduled appointment for inspection and processing, made through the CBP One app. 8 C.F.R. §§ 208.33(a)(2), 1208.33(a)(2). The presumption of ineligibility therefore functions as an incentive to promote these "lawful pathways," the availability of which was a central premise of the Rule. *See* 88 Fed. Reg. at 31,314 ("The rule encourages migrants to avail themselves of lawful, safe, and orderly pathways into the United States . . . ."). A demonstration of exceptionally compelling circumstances could also rebut the presumption of ineligibility. 8 C.F.R. §§ 208.33(a)(3), 1208.33(a)(3).

Plaintiffs are six legal services organizations that provide representation to asylum seekers, operating primarily in California and Texas: East Bay Sanctuary Covenant ("EBSC"), Central American Resource Center ("CARECEN"), American Gateways, Tahirih Justice Center, National Center for Lesbian Rights, and Immigrant Defenders Law Center ("ImmDef"). Challenging the Rule as unlawful, they filed the complaint in this case on November 9, 2018, ECF No. 1, and an amended complaint on May 18, 2023, ECF No. 164.

On July 25, 2023, the Court granted summary judgment to Plaintiffs, vacating the Rule as contrary to the asylum statute, 8 U.S.C. § 1158, arbitrary and capricious, and procedurally defective. ECF No. 187. The Court observed that "conditioning asylum eligibility on presenting at a port of entry or having been denied protection in transit" conflicts with Section 1158 according to binding Ninth Circuit precedent. *Id*. at 16 (citing *EBSC v. Biden*, 993 F.3d 640, 669–70, 671 (9th Cir. 2021); *EBSC v. Garland*, 994 F.3d 962, 976, 678 (9th Cir. 2020)). The Court then rejected Defendants' argument that the existence of other exceptions or the possibility of rebutting the presumption of ineligibility saved the Rule, because there would be some individuals "for whom other exceptions are not available and who cannot rebut the presumption." *Id*. at 18–

2

19. As to Article III standing, the Court found that Plaintiffs had established a concrete injury because the Rule "will frustrate Plaintiffs' missions and require them to divert resources from existing programs" and "devote additional resources to each client seeking asylum," which would decrease the number of clients served and "substantially affect" the organizations' funding. ECF 187 at 8, 9–10. Defendants appealed on July 25, 2023. ECF No. 189. The Ninth Circuit stayed this Court's order vacating the Rule, ECF No. 196, and subsequently held appeal proceedings in abeyance pending settlement negotiations that were ultimately unsuccessful, ECF No. 205 at 7.

On January 20, 2025, President Trump took three executive actions affecting the implementation of the Rule. First, he issued an executive order directing the Secretary of Homeland Security to terminate the CBP One appointment system and certain parole processes including those allowing certain nationals of Cuba, Haiti, Nicaragua, and Venezuela ("CHNV") to enter the U.S. *See* Executive Order No. 14165 § 7(a)–(b), 90 Fed. Reg. 8,467, 8,468 (Jan. 29, 2025). While termination of the CBP One app was effective immediately, the CHNV parole programs were terminated on March 25, 2025. Termination of the Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 13,611, 13,611 (Mar. 25, 2025). In a second executive order issued the same day, the President indefinitely suspended all decisions on applications for refugee status, with exceptions only pursuant to the joint agreement of the Secretaries of State and Homeland Security. *See* Executive Order No. 14163 § 3, 90 Fed. Reg. 8,459, 8,459 (Jan. 30, 2025).

The third action that day, Presidential Proclamation 10888, entitled "Guaranteeing the States Protection Against Invasion," invoked the President's authorities under the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1182(f) and 1185(a), and the Constitution, to preclude the entry of noncitizens who engage in an invasion across the southern border, or who fail to submit "sufficient medical information and reliable criminal history and background information as to enable fulfillment of the requirements of" the inadmissibility provisions of 8 U.S.C. § 1182(a)(1)–(3). Presidential Proclamation 10888 §§ 1, 3, 90 Fed. Reg. 8,333, 8,335 (January 29, 2025). The proclamation barred the same noncitizens from invoking certain forms of protection, including asylum. *Id*. §§ 2, 3, 90 Fed. Reg. at 8,335. Although the U.S. District Court for the District of

United States District Court
Northern District of California

3

Columbia enjoined the application of the Proclamation to noncitizens in the United States, *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 793 F. Supp. 3d 19, 111 (D.D.C. July 2, 2025), the D.C. Circuit stayed that order insofar as it enjoins, vacates, and declares unlawful the Proclamation's restrictions on asylum, *see Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, No. 25-5243, Doc. No. 2128457, at p. 2 (D.C. Cir. Aug. 1, 2025).

On February 5, 2025, the parties notified the Ninth Circuit that their settlement discussions were not successful and were given the opportunity to provide their views on how the case should proceed. ECF No. 205 at 7. The Ninth Circuit then vacated this Court's prior summary judgment order and remanded for further proceedings, directing this Court to address the impact of two intervening changes: the Supreme Court's decision in *Food and Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), and the above-detailed termination of certain "lawful pathways." *Id*. at 7–8.

On April 29, 2025, this Court issued a scheduling order requesting supplemental briefing from the parties concerning the issues identified in the Ninth Circuit's order. ECF No. 209. The Court also ordered Defendants to file a "statement regarding whether the Rule has been extended." *Id*. at 2. Although the Rule originally applied only to noncitizens who crossed the southern border between May 11, 2023, and May 11, 2025, the Biden Administration had proposed amending the Rule to apply indefinitely to new border crossers. 89 Fed. Reg. 81,156, 81,274 (Oct. 7, 2024). On May 20, 2025, Defendants notified the Court that they had not extended the Rule to apply to noncitizens who cross the border after May 11, 2025. ECF 210.

The Rule therefore only applies to those who crossed the border between May 11, 2023 and May 11, 2025 and who have pending asylum proceedings. ECF No. 217 at 6; 8 C.F.R. § 208.33(a)(1)(i). This includes individuals who crossed the border after January 20, 2025, who could not have come to the United States via CBP One appointments, and those crossing after March 25, 2025, to whom the CHNV parole programs were no longer available. ECF No. 217 at 6. And although most noncitizens who crossed during that period are also ineligible for asylum because of Presidential Proclamation 10888, that proclamation is being challenged in court, as outlined above. *Id*.

4

**II.     Jurisdiction**

This Court has statutory jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331. Article III standing is discussed below.

**III.     Discussion**

**A.  Standing**

To establish Article III standing, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Cottonwood Env't Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1079 (9th Cir. 2015) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)).

"[O]rganizations may have standing 'to sue on their own behalf for injuries they have sustained.'" *Alliance*, 602 U.S. at 393 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, n.19 (1982)). "In doing so, however, organizations must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." *Id*. at 393–94.

In *Havens*, a nonprofit organizational plaintiff called HOME sued Havens Realty Corporation for "racial steering" practices in leasing its two apartment complexes. 455 U.S. at 366–67. HOME alleged that Havens' discrimination had "frustrated" the organization's "efforts to assist equal access to housing through counseling and other referral services" because the organization "has had to devote significant resources to identify and counteract the defendant's racially discriminatory steering practices." *Id*. at 379. The Court held that if Havens' steering practices "perceptibly impaired" the plaintiff's ability to provide services, then "there can be no question that the organization has suffered injury in fact." *Id*. "Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests." *Id*. (citing *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972)).

The Supreme Court followed up *Havens* in *Alliance*, which considered the contours of organizational standing in the context of medical associations' challenge to FDA actions

5

United States District Court
Northern District of California

facilitating access to mifepristone, an abortion-inducing medication. 602 U.S. at 372–74. The medical associations argued, in relevant part, that the FDA's actions had "impaired" their "ability to provide services and achieve their organizational missions." *Id*. at 394. As evidence of this impairment, they identified the costs of performing studies to "better inform their members and the public about mifepristone's risks." *Id*. They also identified the expenditure of "'considerable time, energy, and resources' drafting citizen petitions to FDA, as well as engaging in public advocacy and public education." *Id*. "And all of that has caused the organizations to spend 'considerable resources' to the detriment of other spending priorities." *Id*.

On that record, the Supreme Court concluded that the associations had not shown any actual impairment to their missions because these costs were only incurred as part of the plaintiff organizations' attempts to oppose the FDA's policies. The Court held that "an organization that has not suffered a concrete injury . . . cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id*. In other words, "[a]n organization cannot manufacture its own standing in that way." *Id*.

In deciding *Alliance*, the Supreme Court both distinguished and reaffirmed *Havens*, in which the organizational plaintiffs had standing because the defendants' actions "directly affected and interfered with" the plaintiff's "core business activities." *Alliance*, 602 U.S. at 395 (citing *Havens*, 455 U.S. at 368). "Critically, HOME not only was an issue-advocacy organization, but also operated a housing counseling service." *Id*. In providing false information to the plaintiff's Black employees about apartment availability, Havens Realty directly interfered with HOME's core activities of providing counseling to home-seekers in a manner "not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer." *Id*.

*Alliance* was consistent with existing Ninth Circuit precedent. *See, e.g.*, *EBSC v. Biden*, 993 F.3d at 663 (9th Cir. 2021) ("Of course, organizations cannot 'manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all,' but they can show they 'would have suffered some other injury' had they 'not diverted resources to counteracting the problem.'" (quoting *La Asociacion de Trabajadores de Lake Forest v. Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010)); *EBSC v. Garland*, 994 F.3d at 974–75 (9th Cir. 2021) ("Plaintiffs' injuries are not 'manufactured injuries"

United States District Court
Northern District of California

addressing "a problem that would not affect the organization at all.' The injuries affect plaintiffs' core mission and their organizational funding, and are sufficient to establish standing." (citation modified)).

In this Court's summary judgment order, it found that the plaintiff organizations had adequately established two classes of injury in fact. ECF No. 187 at 8–10. First, all Plaintiffs had established standing because the Rule "will frustrate Plaintiffs' missions and require them to divert resources from existing programs." *Id*. at 8. "Plaintiffs will need to overhaul their screening and intake processes to determine whether clients can qualify for an exception to the Rule or rebut the presumption, and assign staff to gather relevant evidence and prepare such arguments." *Id*. at 8–9. For clients ineligible for asylum under the Rule, Plaintiffs will have to assist them in seeking withholding of removal and CAT withholding, which require greater investment of time and resources because they impose a higher evidentiary standard and because they do not allow for derivative claims by family members. *Id*. at 9. Forced to devote more resources to each client, Plaintiffs will be able to serve fewer clients. *Id*. And because of that, several Plaintiffs anticipate losing funding awarded based on the number of clients served, constituting a financial injury. *Id*. at 9–10. The Court therefore concluded that Plaintiffs had established standing because "the Rule will frustrate their organizational goals, require diversion of resources, and substantially affect their funding." *Id*. at 10.

Defendants argue (1) that legally, *Alliance* prevents Plaintiffs from establishing standing based on the frustration of organizational goals or the diversion of resources and (2) that factually, Plaintiffs "have not substantiated any specific, non-attenuated loss of funding." ECF No. 222 at 8. The Court disagrees on both grounds.

### 1.    Impairment to Core Activities

Because the Rule impairs their core activities, Plaintiffs have established organizational standing under *Havens* and *Alliance*.

Plaintiffs' core activities involve representing asylum seekers on affirmative asylum applications. Half of Plaintiff EBSC's operations budget is dedicated to representing asylum seekers on affirmative asylum applications, but approximately 30% of those clients cross the U.S.

border between ports of entry after transiting through Mexico and are therefore ineligible for asylum under the Rule. ECF No. 217 at 8. Accordingly, EBSC noted a steep drop in the affirmative asylum applications it filed in the two years after the Rule took effect. *Id.* Tahirih Justice Center, National Center for Lesbian Rights, and American Gateways also provide representation for affirmative asylum applications and have been harmed because fewer individuals are eligible under the Rule. *Id.* These plaintiffs are also harmed because the Rule converts many affirmative asylum cases into defensive ones, which involve a greater number of proceedings and are more labor intensive. *Id.*; ECF No. 217-12 ¶ 12. And the Rule makes representing individuals made ineligible for asylum more difficult by forcing them to seek withholding of removal or CAT protection with their attendant higher evidentiary standards. ECF No. 217 at 9. Forced to engage in more labor-intensive forms of representation, Plaintiffs are forced to divert time and resources, leaving them able to serve fewer clients. *Id.* at 9–10. These impacts will continue because many noncitizens who entered during the Rule's two-year window will have their cases adjudicated on the merits in the coming years. *Id.* at 9. As in *Havens*, and unlike in *Alliance*, these increased costs result from the *application* of the challenged executive action, not merely *opposition* to it.

Defendants assert that *Alliance* "rejected the notion that an organization can show standing to challenge an action merely by demonstrating frustration of mission and a consequent diversion of resources." ECF No. 222 at 8. It is true that Alliance rejected standing based on "a setback to the organization's abstract social interests" and held that "issue-advocacy organizations" did not have standing simply because they "incurr[ed] costs to oppose [agency] actions" through lobbying and public education. *Alliance*, 602 U.S. at 394–95. But *Alliance* did not overrule *Havens*. *Id.* at 395 (citing *Havens*, 455 U.S. at 368). Like the *Havens* plaintiff, HOME, Plaintiffs here provide counseling and legal services to clients. And much like the racial steering practices harmed HOME's activities in furtherance of fair housing by impairing its counseling services, the Rule impedes Plaintiffs' attempts to secure immigration protection for their clients by making that representation more burdensome. Just as HOME was forced to compensate for the harm by undertaking investigative efforts to root out the discrimination, Plaintiffs have been forced to

United States District Court
Northern District of California

compensate by shifting their focus to defensive proceedings, withholding of removal, and CAT protection. 455 U.S. at 379 ("HOME has had to devote significant resources to identify and counteract the defendant's racially discriminatory steering practices.").

To be sure, this case is not precisely the same as *Havens*, which was an "unusual" case that the Court has not extended "beyond its context." *Alliance*, 602 U.S. at 396. Namely, while the alleged misconduct in *Havens* interfered directly with the ease and accuracy of counseling in a manner akin to a "manufacturer . . . selling defective goods to the retailer," here, the alleged misconduct has the most direct effect on the availability of relief for clients. *Alliance*, 602 U.S. at 395. But under the particular circumstances of this case, it takes only one more step to connect the availability of relief for Plaintiffs' clients to interference with their ability to provide services. Because so many clients are made ineligible for asylum, Plaintiffs must undertake more costly and burdensome representation efforts to compensate for the harm to their core services, ultimately serving fewer clients overall. This is a far cry from the manufactured standing in *Alliance*.

In support of their view that Plaintiffs have not established standing under *Alliance*, Defendants cite *Coalition on Homelessness v. City & County of San Francisco*, 758 F. Supp. 3d 1102, 1128 (N.D. Cal. 2024). *Coalition on Homelessness* relied on *Arizona All. for Retired Americans v. Mayes*, 117 F.4th 1165, 1177 (9th Cir. 2024), which has now been vacated and taken en banc, 130 F.4th 1177 (9th Cir. 2025). And even under *Arizona Alliance*'s now-vacated read of *Alliance*'s standing requirement, the case here would pass muster. Under *Arizona Alliance*, standing may not "hinge on the claim that the organization has diverted resources in response to government action that does not directly affect the organization's existing core activities." *Id.* at 1177. But here, the government action directly affects Plaintiffs' core activities by obstructing unlawful barriers to clients' receipt of asylum and forcing Plaintiffs to compensate by diverting resources to other forms of representation.

Defendants also aver that Plaintiffs' "services have not been impaired within the meaning of *Alliance*, and any re-allocation of resources they have undertaken does not establish standing." ECF No. 222 at 8. But in the absence of that reallocation of resources and to some extent despite it, Plaintiffs have been and will continue to be impeded in their efforts to perform the core

9

organizational function of representing noncitizens seeking immigration protection.  In no sense is Plaintiffs' standing reliant on spending money on advocacy opposing the Rule; rather, their standing is established because they have had to spend more to compensate for the harm the Rule caused to their core organizational missions.[1]

### 2. Funding-Loss Injury

*Alliance* did not address an organization's ability to establish standing based on the loss of funding.  As this Court and the Ninth Circuit previously held, Plaintiff EBSC has standing to challenge the Rule on that basis.  *See* ECF No. 187 at 9–10 (holding that EBSC established standing based on threatened loss of funding because it would be able to serve fewer clients under the Rule); *EBSC v. Biden*, 993 F.3d at 663–64 (holding that EBSC and other plaintiffs established funding-loss injury on a similar theory); *EBSC v. Garland*, 994 F.3d at 974 (same).

Plaintiff EBSC has established that the Rule caused it to lose funding from a $2,000 per-case grant that it receives for each affirmative asylum case.  ECF No. 217 at 10.  Since the Rule took effect, EBSC has had to turn away potential affirmative asylum application clients because

---

[1] Defendants also assert that the Supreme Court's decision in *United States v. Texas*, 599 U.S. 670 (2023), provides grounds for rejecting Plaintiffs' standing.  ECF No. 222 at 13–14.  As a preliminary matter, this Court notes that the same argument was raised in Defendants' summary judgment briefs, ECF No. 176-1 at 22; ECF No. 182 at 1–2, was considered by the Court in its prior order, ECF No. 187 at 10–11, and is outside of the scope of the supplemental briefing requested by the Court here.  *United States v. Texas* is, in any case, inapposite.  In that case, the Supreme Court held that state plaintiffs did not have standing to challenge immigration enforcement priorities resulting in too few arrests and prosecutions.  The dispute was not "judicially cognizable meaning "traditionally thought to be capable of resolution through the judicial process."  *Id*. at 676 (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997)).  This was so because the plaintiffs' suit would interfere with the Executive's "exclusive" and "absolute" discretion to allocate prosecutorial resources and the Court lacked "meaningful standards for assessing" the exercise of that discretion.  *Id*. at 679–80.  The state plaintiffs had identified no "precedent, history, or tradition of courts ordering the Executive Branch to change its arrest or prosecution policies so that the Executive Branch makes more arrests or initiates more prosecutions."  *Id*. at 677.  In other words, the reasoning and outcome of *United States v. Texas* was extensively tethered to the executive's discretion to decline to enforce the law or prosecute violations.  There are no nonenforcement decisions at issue here.  Moreover, the APA and the text of the INA provide clear standards for assessing the imposition of unlawful conditions on asylum.  *See* ECF No. 187 at 15–19.  Finally, the Court in *United States v. Texas* stated that the "provision of legal benefits . . . could lead to a different standing analysis."  599 U.S. at 683.  Asylum is a legal benefit.

10

United States District Court
Northern District of California

they were ineligible for asylum and EBSC has therefore lost the corresponding funding. *Id*. From May 2023 to May 2025, EBSC's new affirmative asylum cases decreased by an average of 50 cases a year from the last year before the Rule took effect, leading to an average loss of over $100,000 each year. *Id*. "Additionally, each potential asylum client that EBSC has been unable to represent because of the Rule 'will also lead to a significant loss in future revenue,' because EBSC's '[s]uccessful affirmative asylum clients generally remain [its] clients in future applications' for which EBSC charges or receives per-case funding, including green card and citizenship applications." *Id*.

Defendants assert that "[a]t . . . the time of the amended complaint, EBSC had not adequately substantiated a prospective funding-loss injury," but the Ninth Circuit has found arguments of the type made by Plaintiffs to suffice. *See EBSC v. Biden*, 993 F.3d at 663–64 (finding that EBSC had sufficiently established funding-loss injury because 80% of its clients would be ineligible for asylum under the challenged rule because they entered without stopping at a port of entry, causing EBSC to "suffer a concomitant loss of funding").

Meanwhile, Plaintiff ImmDef faces a loss of funding through a government-funded panel attorney program because the Rule increases the complexity of defensive asylum cases and therefore reduces the number of such cases ImmDef can take. ECF No. 217 at 10; ECF No. 217-3 ¶ 15 (explaining that "if we are unable to take on new matters, we will not receive any of our budgeted funding from [a program with the Public Defender Office in San Diego]"). Defendants object that "ImmDef does not quantify the number of cases it is currently handling versus those it handled previously," ECF No. 222 at 19, but again, the Ninth Circuit has found a funding-loss injury sufficiently established based on an identical theory without requiring such quantification. *See EBSC v. Biden*, 993 F.3d at 664 (finding that CARECEN had sufficiently established funding-loss injury because it receives flat funding from the state per client and would be able to serve fewer clients because of the challenged rule would result in clients being placed into more time- and resource-intensive withholding proceedings).

Plaintiffs have established direct "injuries to their own pocketbooks." *Washington v. Trump*, 145 F.4th 1013, 1024 (9th Cir. 2025). Even if Plaintiffs had not established impairment to

their core organizational functions, two Plaintiffs have established financial injury that is unaffected by the holding in *Alliance*.

### B. Termination of Lawful Pathways

The Ninth Circuit's remand order also directed this Court to address the impact of Executive Order 14165, which terminated the CBP One app appointment scheduling system and the CHNV parole processes. ECF No. 205 at 8. The Court concludes that the termination of those pathways underscores the Rule's inconsistency with the asylum statute. Even before the termination, the Rule violated 8 U.S.C. § 1158 because it "condition[ed] asylum eligibility on presenting at a port of entry or having been denied protection in transit," which "conflicts with the unambiguous intent of Congress" in 8 U.S.C. § 1158 according to binding Ninth Circuit precedent. ECF No. 187 at 16 (citing *EBSC v. Biden*, 993 F.3d at 671 and *EBSC v. Garland*, 994 F.3d at 976); *see also id*. at 17 ("Section 1158(a) permits noncitizens to apply for asylum regardless of whether or not they arrive at a designated port of entry; a rule that conditions eligibility for asylum on presentment at a port of entry conflicts with Section 1158(a)."). Without access to CBP One appointments, the Rule's violation of the asylum statute's expansive authorization for noncitizens to apply for asylum is made even more severe. And with respect to the availability of CHNV parole processes, the removal of an additional lawful pathway increases the number of individuals subject to the Rule's rebuttable presumption of ineligibility in violation of Section 1158(a).

Defendants argue that "the Rule's presumption of asylum ineligibility is lawful . . . regardless of whether the CBP One scheduling system and parole processes continue to exist" because asylum is granted as a matter of discretion and the Executive may impose conditions intended to protect "systemic efficiency." ECF No. 222 at 21–22; *see also id*. at 23–24. Defendants raised these arguments in their summary judgment briefing and the Court rejected them. *See* ECF No. 176-1 at 23–26. Time has not improved their appeal. In any event, because these arguments do not address the effect of the termination of lawful pathways, they are outside of the scope of the Ninth Circuit's remand and the Court does not address them further.

Defendants also argue that "the elimination of the CBP One appointment system and

certain parole processes cannot, and does not, undermine the legality of the Rule" for two reasons. ECF No. 222 at 8.  First, there exist "additional exceptions and rebuttal grounds." *Id*.  Second, "the Rule was superseded by Presidential Proclamation during the relevant time period." *Id*.

Defendants' first argument is the Rule is lawful because even after CBP One appointments and CHNV parole were terminated, individuals could still receive asylum if they sought and were denied protection in a third country, showed exceptionally compelling circumstances, or rebutted the presumption of ineligibility.  ECF No. 222 at 23.  But this Court previously explained at length that providing means for circumventing an unlawful restriction do not render that restriction lawful if they are not meaningfully available to all asylum seekers.  ECF No. 187 at 22–30.  Because the Rule bars individuals who did *not* seek protection in a third country, *cannot* show exceptionally compelling circumstances,[2] and *cannot* rebut the presumption of ineligibility, it unlawfully conflicts with the asylum statute.  Moreover, the transit-country-denial requirement is contrary to the asylum statute under *EBSC v. Garland*, 994 F.3d at 975–980.

Second, Defendants argue that "the elimination of any pathways discussed in the Rule had little to no practical impact" because Proclamation 10888 was in effect from the time that the pathways were terminated to the time the Rule expired.  ECF No. 222 at 24.  As Plaintiffs note, litigation over Proclamation 10888 is ongoing and, should the Proclamation ultimately be enjoined, the Proclamation will serve as no barrier to status for individuals who entered during the relevant time period.  ECF No. 223 at 11.  Furthermore, the existence of an independent barrier in Proclamation 10888 does nothing to alter this Court's conclusion that the Rule was unlawful and that the termination of lawful pathways only underscores its unlawfulness.

Plaintiffs finally argue that termination of lawful pathways punctuates the agency's arbitrary and capricious decisionmaking, because the Rule relied on the existence of lawful

---

[2] Defendants baldly suggest that applicants would face no heavy burden establishing exceptionally compelling circumstances where "there is no available scheduling system or alternative lawful pathway to the United States."  ECF No. 222 at 23.  But under the Rule, "[s]uch circumstances exist in cases of acute medical emergencies, 'imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder,' or 'severe . . . trafficking in persons.'"  ECF No. 187 at 4.

pathways which now no longer exist. ECF No. 187 at 24, 30. However, Defendants are correct that the arbitrary-and-capricious determination is made based on the administrative record "before the [agency] at the time [it] made [its] decision." ECF No. 222 at 23 (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971)). Plaintiffs respond that the termination of lawful pathways is still persuasive because the Court's original holding relied in part on the fact that the lawful pathways were "completely discretionary," "not incorporated into the Rule," and "could be rescinded (or enjoined) at any time." ECF No. 223 at 10. The fact that the lawful pathways were subsequently rescinded does in fact validate that holding, but technically speaking, the fact that lawful pathways were in fact terminated is irrelevant to the arbitrary-and-capricious analysis. What is important is still that they *could have been* terminated at any time, the truth of which has not been affected by subsequent events.

The termination of lawful pathways underscores the unlawfulness of the Rule and makes the consequences of the Rule's unlawfulness more severe, but does not alter the Court's conclusion that the agency's decision to promulgate it was arbitrary and capricious.

## CONCLUSION

The Court reaffirms its prior summary judgment order, ECF No. 187, and finds, for the reasons set forth above, that (1) Plaintiffs continue to have standing to challenge the Rule following *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), and (2) the termination

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

United States District Court
Northern District of California

of the "lawful pathways" on which the Rule is premised further confirms the Rule's unlawfulness.[3]

**IT IS SO ORDERED.**

Dated:  May 7, 2026



JON S. TIGAR
United States District Judge

United States District Court
Northern District of California

---

[3] Defendants urge this Court to reconsider its decision to vacate the Rule in light of the Supreme Court's decision in *Trump v. CASA*, 606 U.S. 831 (2025).  ECF No. 222 at 20.  But as numerous courts have since held, *CASA* had no bearing on vacatur, a remedy expressly provided for in the APA.  *See, e.g.*, *Doe v. Trump*, 796 F. Supp. 3d 599, 603 (N.D. Cal. 2025) (rejecting "the *CASA* argument . . . because the Supreme Court did not resolve 'the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action.'" (quoting *CASA*, 606 U.S. at 847 n.10)); *New York v. United States Dep't of Energy*, No. 6:25-CV-01458-MTK, 2025 WL 3140578, at *16 (D. Or. Nov. 10, 2025) (same).